# EXHIBIT G

## ARTUNDUAGA GRIEVANCE HEARING
## MAY 16, 2012

| SPEAKER: | |
|---|---|
| Krista Currell | Well good afternoon, everyone. My name is Krista Currell and I will be facilitating the hearing this afternoon as chair of this committee. Before we do get started with some introductory remarks for myself I thought we'd just go around and do some introductions so we all know each other. |
| Dr. Mike Hernandez | I'm Mike Hernandez. I'm an attending Anesthesiologist. |
| Dr. Maggie Mueller | Maggie Mueller, Gynecology Resident. |
| Dr. John McConVille | John McConVille, Pulmonary Critical Care in the Department of Medicine. |
| Antonio Copete | Antonio Copete I'm a post-doc at Harvard. I'm just serving as her adviser. |
| Dr. Maria Artunduaga | I'm Maria Artunduaga, [inaudible] Resident |
| Dr. David Song | David Song, Plastic Surgeon |
| Jane McAtee | Jane McAtee, here serving as counsel to the section. |
| Anne Duprey | Anne Duprey from Legal Affairs. I'm here serving as Adviser to the Committee |
| Dr. Eric Beck | Eric Beck, President of Emergency Medicine |
| Ms. Currell | So, before we get started with Testimony today I just wanted to review a few things related to the purpose and the chart of the Committee and also go through the agenda and just some rules of engagement during the hearing itself. So as you know, the two (2) issues under consideration this afternoon is the decision to not renew the contract and then also the decision to extend the probationary period. I just want to reinforce at this point and time to both parties that those are the only two (2) issues under the jurisdiction of this committee. You each only have fifteen (15) minutes in your statements and we would strongly encourage you to focus that time on those two (2) issues. If you do bring up extraneous things we just cannot consider them and again to remind you of that so you can really focus your discussion and the testimony that you will provide us. The standard of review for this committee is summarized in the grievance policy and we've also distributed a copy of that, but just to reinforce this |

| | committee can reverse, modify or change the decision of the program director only if we find that it was arbitrary and capricious or if there was no evidence supporting the decision. If this is not shown then the decision of the Program Director, okay? We will issue our decision in writing to you and Dr. Song within seven (7) days of this proceeding. What I would like to ask both parties at this point in time is our intent as a committee is to deliberate after the meeting today and reach a final decision. It will then take us a few days obviously to write the final report, but would you like to know today what the decision is? |
|---|---|
| Male voice | Yes. |
| Ms. Currell | I think seven (7) days is an awful lot to ask you to wait so I will email that to you, but it will just be the decision. There will be no supporting evidence, rationale and I will not entertain nor will any of the committee members entertain emails or questions, but if both agree than we'll go ahead and plan on that. Now if we can't as a committee reach a decision today and need more time to deliberate I will also let you know that [inaudible]. Um, so then after we make our decision there is no final appeal to this committee. Your appeal process after this hearing is laid out for you in the grievance procedure and you can go ahead and review that outside of this hearing. As far as the agenda and the rules of engagement, first and foremost, there is no recording that can be made of this proceeding. So there is no audio recording that can be done and we obviously don't have a court reporter here and we're not going to be taking that formal record or minutes of this proceeding. We'll just summarize the final decision and the rationale in a written format afterwards. You will each have fifteen (15) minutes for your testimony. Each of your witnesses will have fifteen (15) minutes for their testimony. We have decided as a committee to hold our questions until after you are done with your presentations. Now, we do reserve the right obviously to interrupt and ask, but that's our current plan right now. We will do the same for your witnesses. We're going to be pretty strict on timekeeping so we will start the stop clock and will end it at fifteen (15) minutes. Would you each like a five (5) minute warning? |
| Dr. Artunduaga | Yeah |
| Dr. Song | Five (5) minute warning. |
| Ms. Currell | Alright, so you can be your own timekeeper, so I'll go ahead and give you a five (5) minute warning when we reach the ten (10) minute mark. None of your witnesses will be able to listen to any of the testimony or listen to each other so we will try to give them a page fifteen (15) minutes before their scheduled time to let them know they are up next and they can arrive and get here. We do know that one of your witnesses will be calling in so as soon as we get close to that time we will go ahead and try to get in |

CHICAGO/#2539878.2

| | |
|---|---|
| | touch with him so he can plan accordingly. Only the committee members may ask questions of either you or your witnesses and that will also be strictly enforced and you cannot ask questions of each other. You can't ask questions of your own witnesses or each other's witnesses and the advisers cannot comment or ask questions. Now you can certainly talk to each other and confer, but just keep in mind your time clock will still be going and you can't speak to each other and that also will be strictly enforced. I think that is all I have as the way of opening comments. Are there any questions at this point about the agenda or how we will conduct the meeting? Jane? |
| Ms. McAtee | Our two (2) witnesses, Dr. Park is coming in from maternity leave and will be in my office at 1:30 so we'll either go get her depending on how Dr. Song [inaudible]. |
| Ms. Currell | Great, okay. Alright, so if there are no further questions at this point then we will go ahead and proceed with the agenda and we'll ask Dr. Song to get [inaudible] |
| Dr. Song | Great. Thanks everybody. I know this a serious hearing today and I want to thank you for participating. Dr. Maria has painted a picture in her written submission of a process entirely motivated by what she claimed as malice, bias, unfairness and prejudice on my part. She begins her argument by saying that "all the sections, actions were based on retaliatory and bias actions by Dr. Song." I don't know how to respond to those other than to say that they could not be further from the truth. She has made these statements as bald faced allegations without any substantiation hoping apparently that if she repeats them often enough someone will believe them. She has written quotes from me that are simply false. First, what would be my motivation to have bias or prejudice against one of my own residents? In fact, if there's any bias at all it was to afford Dr. Artunduaga a greater support, feedback, protection by bringing her on our service twice with another intern to share the load so that she may adjust more easily, have some mentorship with Dr. Park and senior residences. Second, as for the bald face allegations and quotes contributed to me, I have never met with Dr. Artundaga alone. It is my practice when meeting with anyone where critical feedback is given and where a serious corrective action plan is rendered is to have a second person always in the room with me. This is a practice that I abide by when meeting with students, residents and faculty. This serves many purposes: 1) it helps soften the mood and provide an anchor of presence to diffuse uncomfortable situations; 2) it helps to clarify for both me and for the other party that I'm meeting with so that a precise message is given and there are no misunderstandings and it prevents further accusations and false attributions and misquotes as it is happening today. Categorically, the quotes that Dr. Artundaga has attributed to me are false, taken out of context or just plain made up. If further clarification or |

corroboration are needed, I would ask the Committee to verify with our program coordinator if the Committee feels that this is necessary. She has been a constant chaperon in all of my meetings. So let's move on. As I clarified once, this is not about bias, misquotes and trumped up charges or about me going after one of my residents without a motive. It is purely about a resident who matched to our program unfortunately from early on was shown not to have the aptitude for plastic surgery. Despite a thorough, methodical and exhaustive attempt at mentoring and remediation via a probationary process insufficient improvement was seen. It all started in early August. Dr. Jaskowiak introduces us to her problems "when you tell her or ask her to do things she immediately dives into it even before you finish, she's constantly trying to pounce on something and the next best thing". She also states that it seems very difficult to teach her because you are not sure if she is really absorbing what you are trying to teach her. In late August I did a case with her where I was trying to teach her how to sew a simple incision and it was jump in before she understood what a deep dermal incision was, what a deep dermal stitch was, a verian knot. August 23rd and this is all in your notes here I just wanted to highlight some of those things. Dr. Artunduaga had an unfortunate incident with one of my patients who was actually a health care provider and she quotes the patient in an attacking tone Dr. Artunduaga stated that I should have been off the morphine. She not two days, or 24 hours, post op from a mastectomy. Dr. Artunduaga then tilted her head and made a face at me that if I was making up the story or even abusing the PCA. Those were serious charges. We were keen on the issues early on and our chief residents met with her, to mentor her, to guide her and to make sure that she didn't suffer from gossip or bad reputation. In fact, on August 31st I asked our chief residents to meet with her and an email she writes back "Maria's main problem stems from communication, jumbled and somewhat frenetic thought process in presenting patients, too much confidence when it comes to patient management without the knowledge. She comes across as abrupt, arrogant and lacking empathy. Occasionally argumentative as when discussing plans and what is perceived to be an error on her part. She finishes by saying Dave I hope things improve. So Dr. Artunduaga argues that I destroyed her reputation when, in fact, early on with these issues came to light I asked all the residents to reach out to the general surgery residents and sometimes general surgery residents can have biases against us. And her peers have then really sort of give her a fair shake to try to help both improve her image and her knowledge base amongst the general surgery senior residents and faculty. Then in July/August I get another evaluation, a 360, from one of the mid-level providers. She states Maria is lacks organization, prioritizing and communication skills. The two months she was on the B service she was overwhelmed with responsibility, could not prioritize important versus non-important tasks. There were also many tasks that were not done because it was just a lack

4

of communication. Let's move on to September, she's on the Bloch service so this is a two month block now. Dr. Umanski states "she has difficulty keeping up with the work load." "Frequently appears disorganized." Once again these are the similar things that are happening every month. Not able to establish a successful doctor/patient relationship with patients on the wards. She in the OR had difficulty following instructions and required frequent prompting as to her role and assignment in the case. Once again another recurring theme. Dr. Umanski has major concerns that she is significantly below that of a typical resident in general or plastic surgery. Final quote: "she may not be able to achieve the level of performance that we expect from our residents." In October Dr. Dickie gets another letter from Dr. Lawler, who is a rehab doctor stating Lawler says she voiced concerns to Maria before discharging a patient regarding an elevated white blood count. She felt that her concerns were quote/unquote blown off by Dr. Artunduaga. Let's move on to November. She's on the thoracic service. Dr. Ferguson who has been here for over 25 years and is an authority on resident education sends me an unprompted email. Quote her performance has been very poor. This is dated November 16. She is not functioning up to the level of a third year student at this time. Areas of weakness are numerous. Communication skills and information process abilities are the issue. We have had a few near misses as a result of her performance. I don't think Maria accepts responsibility for these shortcomings. When I mention specifics to her these were usually met with explanations that involve misunderstandings about her responsibilities, miscues from nurses or health care workers and inadequate introduction to the process and institution. He then finishes by saying I had a long discussion with Maria and informed her that in my opinion, this is now an expert in surgical education, he says she does not have the aptitude for a career in surgery much less in a specialty like plastic surgery. I want you remember that quote much less like a specialty like plastic surgery because that will come up in a little bit. I suggested that she begin to think immediately about changing her career path, that there was no point in continuing down a path that is almost certainly to be disappointing and ultimately unsuccessful. Taking into account everything that has happened from July, August, September, October and November, I put her on probation I shared with her these issues. I shared with her these evaluations and she goes on probation. In December she has vacation. In January she comes back on vascular and does a decent job. So let's move on to February. February she's on transplant. Despite positive evaluations of her peers and the transplant fellow, I actually think the two professors in surgery with the combined teaching experience of over 50 years will provide clarity and accuracy in her evaluation. Dr. Millis states "Maria is a struggling resident. The time management issues were also a chronic problem, as frequently the notes were not in the computer to co-sign until very late in the day." Maria needs a slower paced progression than is

5

typical of a surgical resident at the University of Chicago.
Dr. Thisselthwaite, I find Dr. Artunduag's fund of knowledge below
average. Overall from direct observation, I found that she did things I
asked her to do; however, in a sports world parlance, I would characterize
her as a "project" meaning she had some abilities but not yet clearly the
skills to be successful. In March, I specifically wanted to evaluate here
again so I brought her back onto our service for two weeks. At this point,
we had not made a decision at all. I actually got all the residents and
faculty and said, "Folks, let's give her a fair shake. Let's put everything
behind us and see if she could pass muster under our service." The time
on our service was the same; it was fraught with the exact same issues that
she's had this entire year: a lack of priority, a jumbled sense of
communication, difficulty presenting an H&P that's cogent and pertinent,
very defensive and blaming everyone else around her and an inability to
take responsibility and accountability for her mistakes. She was very
argumentative with senior residents who were trying to teach her how to
do a purse string closure in the operating room. This is March now. Then
she has a run-in with a faculty member in the emergency room where she
just basically hung up on her. And this is also in your folder; I won't go
into that. So the faculty meets at the end of March to put all this together
and this was a unanimous decision. We deliberated for over an hour and a
half, went through all these documents here. We asked her to supply
documents that would be supportive as well. This was a unanimous
decision. She suggested perhaps this grid that you have before you is
fabricated. This is simply ludicrous. In April—so we put her on
probation and a modified, heightened sense of supervision on the
endocrine service to help her even remediate further. This is the
"evaluation" from a chief resident: Overall, Maria's performance—this is
April 27th now—did not meet expectations. She did not function at the
level of an intern. She was disorganized, patient presentations of H&P
were often unclear and incomplete. This behavior was noted by both our
midlevel provider as well as our attending. Let me move on. I am aware
that during a probation, some residents and attendings rated her as
acceptable. Now one may ask what makes a plastic surgery intern in our
program different from the rest? You might well ask what are the
standards for this particular residency? Why is good enough for some not
good enough for us in plastic surgery? While I hesitate to say that we are
special and everyone must meet super high standards, it is simply true that
for our residency, all the kids aren't just average but they excel and are
typically seen as one of the best, if not the best, resident in their class.
Dr. Artunduag not only did not excel, but was no even average when
compared to plastic surgery residents and slightly below average amongst
the general surgery interns as her own graphs will show you. Some
background information about plastic surgery: it is the toughest match
that we have in all of ACGME matches. We take from the brightest of the
bright. Our service is fast moving and there is a lot of autonomy and

6

responsibility given to our residents from early on. Simply, all our residents are mature multi-taskers who do their job efficiently, with maturity and have the ability to manage concurrent, stressful situations successfully and manage change quickly. This is what our service does. Oftentimes, they are in the rooms by themselves and doing evaluations all by themselves. So a little bit more about how our section unanimously made a tough decision not to renew her contract. We found that during the probationary period she made little to no improvement in certain areas of professionalism, knowledge base. She scored two percentile across the country in her In Service exam. That was just an isolated thing; we can work with that, but on top of everything else that was going on, it was further corroborative fact-based evidence that she just did not have the ability or the aptitude for plastic surgery. She lacked the ability to prioritize and present a cogent H&P and, most importantly, this is key here, she lacked the ability and insight to take constructive criticism and improve upon it. She has continued to blame someone else for all of her problems.

Throughout the year, it has been other residents or interns. It was Dr. Park, now it seems to be me. I think she subscribes to the theory that wishing will make it so but what she has written in her materials is no more truthful than a wish. I don't know how to respond other than to once again categorically deny any bias, prejudice against her. As I said from the beginning, what motive would I have to do that? This is very painful for us, our whole section. It is no doubt for Dr. Artunduag as well. It is not task I relish to sit here in front of you and have to point to out her continued deficiencies that don't go away. I don't like to this at all but I want you to know how carefully and methodically we considered her situation based on facts and how much time and exhaustive effort we put into trying to bring her up to speed, but it just didn't happen. We tried very hard, she just did not meet our expectations. Dr. Artunduag may argue that she's from nontraditional background and we knew that from the beginning so we should have given her a wider birth. Well, we have many residents from a nontraditional background. In fact, a third of our residents are foreign and have spent two, three years in the lab. She claims that if we just gave her more time, she would be at the leading edge of our residence. We did and she was not. The key issue once again is her willingness, lack of ability to learn from mentoring and teaching, it's a fundamental key disconnect in this area and I think this is what this is all about for us; her inability to learn and to go and process that information and obviously the whole time blaming someone else. I know that Irma may be here today, she's one of her staunchest supporters. I just want to quote Irma's evaluation of her. She says In January, late January, that we're working on organizing her H&P, that we're working on having her become a better more efficient resident. This as a third year medical student is what someone should be working on, not an intern in January. So let me close by saying that one may act, this is all based on fact, we

7

|  | really carefully took every bit of information that we had and we try to mentor a couple times, we had a prolonged probationary period with remediation where she went and met with Dr. Park on a weekly basis and she did not succeed. So I'd like you to consider that and understand that this is not about bias or prejudice. It's based on fact, you know an unfortunate outcome with the fact that this is capricious or arbitrary, thank you. |
|---|---|
| Ms. Currell | Okay, at this point I'd like to ask the committee members if they have any questions for Dr. Song. |
|  | [inaudible] |
| Male voice | I have one. One question, for residents on the plastic surgery service, what's the typical evaluation process for something versus being on the transplant or other? |
| Dr. Song | Yeah, because I meet with all of my residents semiannually then we do a summative evaluation semiannually. We don't have a monthly evaluation for our residents because it's so intimate that we do this. This is beyond what I usually do for my interns. This is beyond what I usually do for my interns. We did this Maria because we wanted to remediate her, wanted to bring her up to speed and it just didn't happen. |
| Female voice | Whose evaluations were you considering in the meeting that you had with your faculty members were there was the unanimous decision or was it just plastic surgeons or all …? |
| Dr. Song | Everything. We took this whole entire folder and this folder and took and hour and a half to go through every single evaluation, every single letter, every single incident and talk and also understanding that she went through this remediation and probationary process to come up with this unanimous decision. |
| Female voice | And that included that vascular evaluations that were more favorable on the January period? |
| Dr. Song | Yes. Sure did, yep. |
| Dr. McConville | Dr. Song, I have two questions. At the beginning of the probationary period and when meeting with, I forget, Dr. Park, on a regular basis, did you set up what criteria she needed to achieve to be successful? |
| Dr. Song | Yes. |
| Dr. McConville | Was it, it wasn't, I guess just tell me exactly what that was. |

8

| | |
|---|---|
| Dr. Song | So it's in your packet here. With Dr. Park's letters. |
| | [Inaudible] |
| Dr. McConville | That was the ten points, areas to improve? |
| Dr. Song | Right, so this was shared with her and this is what we really graded her on, so she had this upfront. So if you look at Tab 3, I think it's sort of the second letter. "The following conditions must be", this was actually given to her "The following conditions must be met for you to continue in the program, establishing and maintaining your workload, establishing successful doctor patient relationships, following technical instructions in the operating room, improving organizations skills, understanding what should be prioritized, effectively communicating with faculty and staff, appropriate decision making, clinical decision making, accepting responsibility, timely placing consult notes and understanding the plan and your role in the plan in the arena of the team". So this was given to her, we went through this grid here and looked at every single criteria that she had upfront in the probation, while she me made some improvements in some she just did not flat out meet the expectations. |
| Dr. McConville | So it wasn't a number per se on the one to six grading skill, it was an overall gestalt of all of the forms of evaluation you had to determine a yes or no in each of those areas? |
| Dr. Song | It was all of the above. The numbers were there too, so we looked and she actually helped clarify those evaluations, the numbers were there. Once again, let me just back up and say that this was a rookie error, if this was about interns making mistakes, isolated mistakes, this happens all the time. This was a systematic inability to improve upon stated goals over and over and over again. If you look at the evaluations, it's the exact same thing every month. So that's really what was the issue here and it was tough for us. I mean no one wants to do this. |
| Dr. McConville | Second question, as a program director to remediate a resident and how to go about it is a challenging thing and so I wanted you to explain your thought process in terms of sending the email describing the need to get these evaluations. I just wanted to clarify, it seemed that it went out to house staff, that Maria was going to work with as well as fellows and faculty, so the rationale behind sending that out? |
| Dr. Song | So that was sent out by our program director. If you look through what happened is I wanted to keep a Chinese wall between me and the process, so we assigned her a mentor and that's Dr. Park. |
| Dr. McConville | Hmmm huh. |

9

| | |
|---|---|
| Dr. Song | I wanted to extract any bias that I was perceived to shed on this situation. This is why I actually assigned Dr. Park to this process. She came up with the criteria because she wanted numbers behind every one of these ten things. |
| Dr. McConville | She being Dr. Park? |
| Dr. Song | She being Dr. Park and so that was done specifically to address her probationary period. |
| Dr. McConville | But the decision to send an email out to, does everyone know that the email I'm referring to is from your assistant I think |
| Dr. Song | From Akilah? |
| Dr. McConville | Right. |
| Dr. Song | Yeah. |
| Dr. McConville | To notify people that Maria was on probation and that you were looking for evaluations from folks. |
| Dr. Song | That's different than our current … |
| Dr. McConville | Yeah, so I want to know the rationale behind notifying others. |
| Dr. Song | Yeah, I mean, number one, we deviated from the process because we wanted a heightened sense of feedback, we wanted this to be done in a timely fashion, we wanted to make sure we had accurate fact based information real time. |
| Dr. McConville | Okay. |
| Male voice | Just a quick question. Leaving the evaluation of her performance aside. The issues specifically with professionalism, do you feel that those were issues in and of themselves that were grounds for nonrenewal of her contract. |
| Dr. Song | You know once again, if it this was about one isolated incident where an intern hangs up on attending because she's frustrated, you know we can work with that. If this was about one incident of her having a miscue with a patient, we can work with that. This is a comprehensive systematic inability to get to a level where we expect in plastic surgery and that includes professionalism, that includes all the things I stated so far. Professionalism is extremely in plastic surgery where there's such intimate relationships with our patients and with our colleagues, our specialty as you know is based on consultations, we don't have an organ base that we deal with so we deal with services and our colleagues so |

10

| | |
|---|---|
| | taken and isolated it would not have been, if everything all things being equal to she was like the rest of our interns excelling, top of her class, top of all her residency classes and she had a couple of incidents of professionalism that happens right? I mean it's what residency and maturation is all about and that's what we could work with. This is a situation where that was just additive to all the other issues that she's had. |
| Female voice | Can I ask a question about one of the statements that was made prior to the probationary period or perhaps just as the probationary period was starting. It was essentially suggesting that Maria would not be successful during the probationary period and perhaps she should reconsider, at that point in time transition out of the program or ending at that stage, can you explain a little bit about the rationale for that statement and what was intended by the comment? |
| Dr. Song | So, so and I think this is another miscommunication and a lack of an ability to communicate properly. So the intention there was no one likes to be put on probation, that record stays with you for the rest of your life and I relayed that to her and I said let's look at these evaluations, you know, if we feel if all these people from July, August, September, October, November feel that you don't have an aptitude for plastic surgery and you're going to be unsuccessful in the future, you're better off switching to a different career where we can help you get to that state if it's a different career that you want and so the intention there was to preempt a probationary period, preempting quote on quote "black mark" on one's record so that she can transition into a field that's fulfilling and that she could be successful at, that was the intention and that's typically done here at University of Chicago where, you know, people match into specialties that they don't necessarily have the aptitude for or can thrive in and typically when this is suggested it's an easier transition because you have the program helping you to do that. With the probationary period, it's a black mark on someone's record. So that was the pure intention of that was to help her transition in a positive light with a backing of her faculty member in plastic surgery. |
| Female voice | And then just two questions about the evaluations. So the ones that were that you were receiving prior to Dr. Park's involvement and assignment as a mentor, so some of the earlier ones before the probationary period. How was that information communicated to Maria? Was it as you got the emails in and the opinions back from the faculty? Would someone share that with Maria? |
| Dr. Song | So everyone knows that they have access to their file. So this is their file, everyone has access to it. In fact, all my residents go through it routinely because I put emails, unsolicited emails in their file, the vast majority are extremely positive. "Dr. so and so did a wonderful job", "Dr. so and so can I put those in their file?" And they know, every resident knows that |

11

| | |
|---|---|
| | that file is open to them whenever he or she wishes to look at it. So it doesn't require prompting but that file is an open file. |
| Female voice | Was there any remediation or proactive constructive feedback given to Maria though in June, July, August when you started to receive some of the concerns from the faculty that she was struggling working with, so things for her to focus on during that time period before we got to the probationary stage? |
| Dr. Song | Yes and that's why I just excerpted to Dr. Dickey's email |
| Female voice | Yes. |
| Dr. Song | If you look back at it. So she sat down with Dr. Dickey and Dr. Justine Lee our two chief residents and one thing that happens is sometimes, you know, there's a reputation that happens in plastic surgery they get matched and sometimes there's some discrimination or historically it has been discrimination from general surgeries against plastic surgery residents, right or wrong. I wanted to make sure that this wasn't about gossip or reputation, so I had Justine and I asked Sarah to meet with her and say "look, here's what you need work on, here's what you remediate, here's how we need to improve" and that was back in August and you guys can read the content of that discussion in your folders. So there was multiple attempts of remediation. Yeah, so finally this time of being put on probation, I also met with her and said "look this is what's happening, let me read you what these evaluations are saying", so not only did she have access to them but I read these evaluations from Dr. Umanski from Dr. Ferguson and so forth and also trying to reiterate that this is, you know, you met our chief residents we're trying to help you and this is not meeting our standards and the trajectory is not anywhere close. |
| Female voice | And then when Dr. Park was assigned as Maria's mentor it appears from all the documentation that after those weekly meetings there was a very comprehensive summary that was written out and then that was signed by both parties shortly after the meeting, correct? |
| Dr. Song | Correct, and that's all on your folders. |
| Ms. Currell | Yes. Ok. Are there any other questions? |
| Male voice | Yeah, just a few quick questions. Had you ever been accused of or had discussed allegations of harassment, bias or discrimination prior to the grievance process? |
| Dr. Song | No and in fact, I don't know if people know this but I'm actually on the committee of diversity and inclusion at the Medical Center so had I been accused of that I'm sure the Dean wouldn't have asked to be, serve on this |

12

| | committee. So absolutely, and categorically, no. |
|---|---|
| Male voice | And just one other question, the University of Chicago GME manual discusses something called GME professional performance development and distinguishes that from probation, was there ever any consideration of using this mechanism of remediation as opposed to probation? |
| Dr. Song | So if you look back at that, that's at the purview of the program director to enact that. For us it's a fast moving, we have to train these folks within an eighty work week and six years to be competent plastic surgeons. The slope of where she started and the rate at which she's improving, it just wouldn't get there. We don't have the time to do that, so to me that is an option I chose not to do. And once again if you look back these were repeated problems throughout the course of the entire year for _____ [inaudible] remediation for a resident with these repeated problems with inability to learn and to continuously blame other people that option did not seem feasible to me. |
| Female voice | Before the probation probationary period started when there were some clear deficiencies that were outlined and I understand the chief residents and yourself discussed them, was there any kind of plan on how to work these through or was someone else helping? |
| Dr. Song | You know so it's all about being there for her and trying to help her along in the process so plastic surgery residents are very tight close knit as you may or may not know and we take care of our own. So it's all about making sure that we succeed, so that was done continuously, not in a formal fashion, but hey what could we do, this is what you need to do, this is what, how you present a patient and so forth, so it wasn't done necessarily in a formal fashion but clearly it was continuing and we also offered her Perspectives. We said listen you have an option to go to Perspectives and exercise that right to explore that option. |
| Female voice | And then for the remediation sessions, were there outlines for each session? Or did Dr. Park kind of create and agenda for that to first meeting through all the twelve meetings? |
| Dr. Song | Yeah, great question. So, actually that's a great question for Dr. Park. I specifically wanted a distance from that so as to avoid the perception of bias so I actually asked someone to mentor her and she could speak in detail about that process. |
| Female voice | Okay, thanks. |
| Male voice | Last question, at least from me, have you ever had to dismiss a plastics resident before either in your time as program director or since you've |

13

| | been here? |
|---|---|
| Dr. Song | So I've been program director for eight years now, this is my 9th year and no, never had this before and just to underscore that question as a part two answer you know I sit on the surgical educational committee for all of surgery, all of general surgery and whenever our residents come up, they're lauded and they're you know one of the general surgery faculty accused me of being real Madrid picking only the best residents from the world to serve, so that's what I'm used. That's what we're used to, we're used to excellence and when we're used to residents performing way above their level and being at the top of their class. Yeah, I mean obviously that's not to say we couldn't work with someone to get there but the trajectory and the slope is just not there. |
| Ms. Currell | Any other questions for Dr. Song? Okay with that we will conclude Dr. Song's opening presentation, would you like to call Dr. Grieves or Dr. Park? |
| Ms. McAtee | Dr. Grieves. |
| | [other conversation, some inaudible and in Spanish] |
| Ms. Currell | Good afternoon, thank you for taking the time to come to hearing this afternoon. The committee has decided that we are going to allow you to give an entire presentation and then hold our questions until the end of your testimony so I'd love for you to start. Why don't you introduce yourself? We're not going to go through . . . |
| Dr. Grieves | I'm Matt Grieves, I'm one of the fifth year residents in plastic surgery. |
| Female voice | And no talking. |
| Dr. Grieves | So like I said I'm Matt Grieves, a fifth year resident in plastic surgery. I worked with Maria in March and you have a copy of my evaluation from that time. Up until that time I never worked with Maria previously so this is my first interaction with her. Some things she did very well, she was very energetic, she was a hard worker and always had a positive attitude, however given this was her second on time on the plastic surgery service, I was surprised that she still had difficulty on the service, especially since she was one of our own residents. From my experience, this was never, we've never had difficulty with any of our own residents on our service. As I've never directly worked with Maria prior to this rotation, I was intent on keeping an open mind in evaluating her objectively. I did know that she was on probation, this was her trial period to determine if she had improved. I was told by Dr. Song and Dr. Park that she was assigned to our service as part of this probation so that we can directly evaluate her to improve, evaluate her improvement or lack thereof. This way we could |

14

|  | directly observe her work and make a true assessment of her skills rather than relying on other surgical services and rumors to make this assessment. I was instructed by Dr. Song to give Maria a fair and honest evaluation. I was never asked to grade her poorly. While it was made clear to us that she was on probation it was never preordained that was to be terminated at the end of this time period. In fact, as I'd never worked with her previously, I hoped that what I'd heard from other residents regarding her work had distinctly improved. On our service, the interns have a higher level of independence and autonomy but not of other service purposes. We expect them to manage all four patients, see consults in a timely fashion, cover the ERs and help out with the caseload when we are short extra senior residents staff these. There's no PA or MPM on the floor to assist in the care of our patients. As such our interns are quiet busy. Maria had already completed an entirely month with us in the fall and we believe you have her evaluations from that month as well. As this was her second month with us, I'd hope that work would be exemplary, especially as this is a standard for all plastic surgery juniors who rotate with us. As you can see from my evaluations and those of my co-residents, Maria performed adequately, though far below what we have seen with prior plastic surgery junior rotators. While she was a very hard worker she remained disorganized and I've often had trouble understanding her presentations of consults. I know that the daily progress notes were sometimes forgotten on patients. There were also strange medications ordered for patients such a liquid formula pain medication which was given instead of the usual pill form, or a type of pain medication that we rarely if ever use. In one instance, I asked her if she put the admission, I watched as she put the admission orders in the computer and was shocked at how I had to insist that she go through the order set in a systematic fashion instead of jumping between portions of the order. This was concerning to me as it only highlighted her lack of organization and lead to medications being admitted on patients. These are errors that are made by interns earlier in the year. However, by March of the academic year this should no longer be happening. While discussing her with my co-residents in the program, I learned that these were not isolated events and all the senior residents had issues with her similar to mine. While I feel that my two weeks with her was a very short time to make a true in depth assessment of her personally, I do feel that my interactions echo the experiences my co-residents that I've been hearing about the entire year up until this point. I believe that my evaluation of Maria was fair and based on facts, on my interaction with her. While I like Maria as a person and I think she tries very hard, I do not think that she will succeed at our plastic surgery residency program. It's been a very difficult decision for all of us in the department to make and one that was definitely taken lightly. |
| Ms. Currell | Thank you. Questions from the committee members? |

15

| | |
|---|---|
| Male voice | During her time when she was on the plastic surgery service with you was there any effort to try to improve her performance through feedback, mentoring guidance, role modeling and one on one partnering? |
| Dr. Grieves | So I knew that she had been meeting with Dr. Park during the entire probation period, ideally once a week and had weekly evals from her and Dr. Song for the time she was with us, those two weeks specifically we both completed online evaluations and I actually had face to face feedback with Maria at the end of both weeks definitely at the end of the first week, the second week because she had rotated off the service at the end of that week for at least face to face and gave her my constructive criticism on things that she needed to improve. So . . . |
| Male voice | In reviewing the document in its completeness, as you alluded to there, there was a heightened sense of supervision as a result of her probation and one of the challenges when file was reviewed is was this heightened sense of monitoring really designed to be informative and to help improve performance or was it designed more to sort of evaluate and document deficiency? Can you just speak to your experience, when you were supervising and maybe just comment on the sort of culture during the probation at large within the section of plastic surgery? |
| Dr. Grieves | Well I can only speak to the time, I was actually offsite previously, so I can't speak to the first months of her probation. I know that, from our discussion after the fact at the faculty meeting, it sounds like Dr. Park's experience with her was much more hands on in teaching and evaluations were meant help her fix inadequacies that were pointed out to her. As far my experience with her directly on this [inaudible] my assessment was these are things you can improve on but the attempt of improving them the same way that I would make of any other junior who's on our service. It's not, it's not normal for us to do weekly evals on someone so I think that the amount evaluation and the constant evaluation is specific to this case but I think that was necessary if we were hoping to effect a change which I think all of us in the department were really hopeful to do. But if we were able to be a part of this, and her learning and improving that we would be able to help her become what we expect from all of our plastic surgeons and unfortunately that was not the case. |
| Female voice | When you were supervising her on the same service when she started did you layout your expectations for her as your junior resident? |
| Dr. Grieves | We did not get a chance to meet at the beginning of my rotation however as she'd previously been on the rotation, I know she had received that from her prior experience on the rotation so I know we had, it was a little off of a month, I believe the first of day of the month was the same day as our entrance exam and we'd planned on meeting that day but because of the test and everything it actually didn't end up happening but part of the |

| | |
|---|---|
| | reason I didn't think that was extremely necessary because she'd already done this before. |
| Male voice | In reading the documents, I think you were present for the faculty and senior resident sort of final review at the end of the probationary period, can you just speak to the sort of the reviewed in broad strokes would you feel that all the documents were reviewed, that there were fair balance of assessment of all factors within her application both evaluations that came from faculty outside the section plastic surgery and within section and comment on your perspective of fairness in that process? |
| Dr. Grieves | Well, all the faculty members were present and myself as the chief residents, we all got a copy of the packet, which I believe you have of all the evaluations up until that point including Dr. Park's weekly assessments including from all the other services and letters and we went through it systematically tab by . . . I don't know if it's the same, exactly the same packet as you have but it looks similar with tabulated formulations of graphs and these are all the letters from other people and we went through it nearly section by section and then at the end, it was literally everyone in the room having to voice their opinion [inaudible] on this issue so it was a unilateral decision it was unanimous by all the faculty members in the department. |
| Male voice | What information did you know going into that month of the month you had in plastics to kind of help with your evaluation were you told, you know were told about the probationary status and then the evaluations were going to be requested frequently, did you have any formal instruction as to what the issues would be or was it based on discussion with your co-residents or . . . . |
| Dr. Grieves | I mean I was aware of issues that other, my other senior residents in plastic surgery had had with Maria on the previous rotation. As I'd never really direct one on one interaction with her prior to that I didn't have any preconceived idea of things I would run into, how I'd handle it other than I knew that I had to be more, because I knew to give weekly evaluations I knew to make sure that I was paying more attention to detail and oversight just cause that would have to be the basis I would have to have those kind of discussions. |
| Female voice | Do you think that caused to be more harsh than you would have for a resident that wasn't under that much scrutiny? |
| Dr. Grieves | It's hard to tell because you know, I definitely feel like she was under a lot more scrutiny and I you know, like I said I think she was a very hard worker and always had a positive attitude but as far as comparing her to, even in the short time comparing her to other junior residents who have rotated through our service both from other service specialties as well as |

17

| | |
|---|---|
| | our own, I felt like she was not performing at the level that we see or what's expected from our juniors and particularly comparing her to residents who are from our own department she was far below that. I mean if you could read my emails too but not everything was negative, in fact some of the things on there are is she a hard worker, does she you know does she display a positive attitude, I mean she got high marks for all of those things. I think I was pretty fair in my assessment of her. |
| Female voice | I know you said you hadn't worked with her during the earlier months in her year but some of the other chiefs had, did they talk to you at all about when they did see issues with her performance, the follow-up that they had with her and the direction that they gave her? And if not, maybe you can talk about just in general what your process is with brand new interns and as you things right away in those first few months how you help remediate them so they don't get to the probationary point? |
| Dr. Grieves | Well actually, Sarah and Justine were our chief residents this year. As you know, beginning in July when we first started receiving reports that there were issues, they had an emergency meeting between the two of them and then actually met with Dr. Song with the idea of bringing Maria on to our service so (a) we could control any rumors that would be happening outside of our department, from general surgery, from anything else and really making an assessment of how she performed with us and also give her one on one guidance at a very close range to help you know if there were transition problems, if it was, you know, she didn't know things about the hospital, new intern things that we could help make her a better intern quickly before rumors started and things spread. So she came on to our service, to be honest I don't remember what month it was but I know it was earlier in the academic year and they met with her at the beginning of that month, they met with her a weekly basis afterwards with written evaluations that I believe are in your folders. So they were giving her feedback on a weekly basis for that month. |
| Female voice | Okay. |
| Male voice | So you said you, you're fifth year you've worked with at least four other classes of first year interns, two plastics folks per year is that right? |
| Dr. Grieves | Yes. |
| Male voice | And you stated, I just want to be clear, is Maria in your opinion substantially below any of the other eight interns that you've seen come after you? |
| Dr. Grieves | As compared to the other plastic surgery residents who are juniors to me, yes, Maria was below average from them. |

18

| Male voice | Below, okay and now the difficult question, if she were to stay in the program and be remediated could she run the services as a fifth year? In five years? Understanding that people sometimes start slowly, this is your opinion is not under the purview of this committee I understanding that but in your opinion? |
|---|---|
| Dr. Grieves | It's my opinion that she would have a lot of difficulty running a service and being able to balance the needs of large service or the critical care needs of patients either as an intermediate resident in the ICU or especially as a senior resident being able to balance the entire service and responsibilities that we require for the residents. |
| Male voice | During your two weeks did you have any concern regarding the professionalism, specifically? |
| Dr. Grieves | I did not personally have any interaction or have any problems with it. I did hear of an instance with the ER that occurred during that time period with again documentations in your folder, but I was not part of that discussion and don't really have any facts other than what I've was informed of at the faculty meeting which was after the fact. |
| Male voice | Did you ever assess her to be dangerous either directly or indirectly to patients? |
| Dr. Grieves | I did not have any issue with any of my patients having any complications because of her actions, again, it was a short period of time and I also noted in my evaluations at the time that thankfully we did not have any on my service at that time who was critically ill, that needed constant assessment so it was really, it was really hard for me to make that assessment. I know speaking with other senior residents when she was on earlier in the year that was a concern that they felt that there were critical issues that were being overlooked and I believe those are in your documentation as well. |
| Male voice | And based on your experience or sort of your interaction with her probationary period at large, do you feel that she was ever disruptive? |
| Dr. Grieve | No. |
| Dr. McConville | Another question, did she ask you for good evaluations? |
| Dr. Grieves | No, she asked me for evaluations. |
| Female voice | Did she ask you to take into consideration her probation? |
| Dr. Grieves | No. |
| Ms. Currell | Any other questions _____? Okay thank you very much for |

19

| | your time. |
| --- | --- |
| | [inaudible] |
| Female voice | Hello, good afternoon. |
| Ms. Currell | Thank you so much for taking the time to participate in the hearing today. My name's is Krista, I'll be chairing the hearing. If you could just introduce yourself for the committee. |
| Dr. Park | Good afternoon my name is Julie Park. I'm an assistant professor of surgery in the section of plastic surgery and I became associate program director of this Fall/Winter and I liked to just start off by stating for the record, we as a section have no agenda against Maria and I'd like to make that very, very clear. We really want all of our residents to succeed because we have nothing to gain from them not succeeding or failing and I'll have to say that repeatedly Dr. Song asked me as well as the section, in terms of the attendings and the residents to always give Maria a blank slate when she started probation, to give her a chance to see how she was going to do. On paper, Maria seems very, very intelligent and bright and that she would be very successful. She has a background that's similar to several other residents that we've had in our program, meaning foreign medical grad, time off from school, research time, publications and we really thought that she was sort of like crème de la crème of Columbia that came to America and we got her and we had all hopes and thoughts that she would just be as successful as our other foreign medical grads have been in the past. Dr. Song asked me to mentor Maria once the probation started for two reasons, in addition as being first year program director but also because I am a woman, I'm basically the woman in our core faculty here at the hospital and he wanted to make sure that they would be absolutely no barriers in terms of having Maria feel uncomfortable with her mentoring partner. When Dr. Song asked me to do this, he did not present me with any preordained outcome. In fact, if he had presented me with a preordained outcome, I would not have worked so hard and put so much effort into our mentoring process. Just to give a little bit of a background in general surgery and plastic surgery as part of general surgery, all the residents all evaluated on monthly basis by the attendings at the end of the month on the core competencies of resident training. This email goes out in a web based thing towards like the third week of the month and then we keep getting reminder emails [inaudible]. I created a weekly evaluation tool for Maria for her probation because I thought if we got evaluation and feedback at the end of the month once a rotation was over it wouldn't give us the opportunity to actually correct any of it on the rotation that she currently was. So basically this was an evaluation tool to give her timely feedback so we could address any problems more in real time and try to fix them with the team that she had. It was not given to the attendings, it was given to what |

we call the team, which on depending on the month of the service usually is a fellow or senior resident and maybe another intern or some sort of position extender like nurse practitioner or a medical assistant. These are the people work closely with interns and they would be able to be the ones to have first hand knowledge of any conflicts that come up on a day or weekly basis. No other resident is reviewed like this to my knowledge because I created this on our New Innovations website, specifically for Maria. It was tailored towards her and the problems that had been identified earlier on in the fall. And therefore it really cannot be used as a metric to compare her to other residents because no other residents are asked to be compared with these standards and so the metric that would be used to compare her to any other resident would be the monthly evaluations done by the attendants. And I'd like to take a minute to adjust one of the things that Maria alleges that we were always moving her goal post during the course of the probation, as I explained the monthly evaluations are the really the only way to compare residents like to like apples to apples. In the beginning, I explained all this to Maria why I was creating this because I wanted her to know that you know her team members would be getting this weekly evaluation and I explained to her it was so that we could get feedback and I said but the monthly evaluations still stand by the attendings at the end, however as our meetings progressed it became really clear to me that Maria fixated on her weekly reviews to the point of anxiety and stress sometimes. When, if a rotation was set up with say a nurse practitioner on the service or something, she felt like she couldn't enough floor work, she could not then have her reviewers review on the specific weekly questions and I repeatedly told her that it was more important just on doing her job, whatever that month and rotation requested of every intern that comes through, focus on doing your job well, don't worry about the weekly reviews, it was just my tool for feedback and then if she did her job well the monthly evaluations would reflect that. I never also told her that her entire probation would be determined her time on plastic surgery. What I did tell her was that she had two weeks with us at the end, towards the end of her probation and this was her opportunity to excel and show the whole section what she was capable of doing cause I wanted her to take advantage of it because it was really a two week rotation and so she had to had to start right off in the beginning in high gear and again each rotation that we did together, I always told her before it started contact the team, make sure you understand exactly what you need to do, contact either the intern and/or the senior resident and prep yourself. From the beginning again I'd like to reiterate that Maria was told that for her probation she would have to meet the expectation of plastic surgery residents not the general surgery residents but given that I'd like to take a little bit of time to review some of the data that she put in her package where she talks about her stint on her abilities and performance according to the general surgery residents. You note, she creates large bar of the standard deviation above and below

21

average, and this is average for general surgery residents. Despite the fact that she was told that we were comparing her to plastic surgery residents she chose to compare herself to the general surgery residents and there's actually also a graph that I found a little misleading because it highlighted in red the sample of just one month, which I did not think was representative of her overall evaluations in terms of her progress. If you look, and it's in the packet I think you all received, I did take Maria's monthly evaluations on average from the beginning to that point and compared her to her current co-intern but also just to look back on the past three years of our plastic surgery residents in their intern year. To just get a sense of how, what the comparison was but I thought it wasn't fair just to compare her to one intern and with that you see that she falls below the average [inaudible] plastic surgery residents [inaudible]. I think that she does the best and by that I mean she hits the average level for general surgery residents on things like professionalism and her willingness to learn, her personality, however, while I think Maria true and the earnest desire to learn, her interpretation, I felt by the end that there were just inherent problems that obstructed my ability to teach her. Basically, I did not find her teachable on certain of the things and there were several repeated incidences both in the beginning all the way through the end that lacked professionalism that remained disturbing. So towards the end of her probation, I wrote a letter to Dr. Song which I also think is in your file, where I summarize my feelings and overall evaluations based upon my meetings with Maria that were weekly with the exception with one week where scheduling conflicts occurred, her evaluations from both her team members and attendings, conversations I had with a certain, some of attendings during her evaluations and also some conversations of her I've had with other residents and that the problems that I identified was that there is no lack of professionalism, that I think there is a pattern where multiple incidences show this, she has a difficulty understanding what the root of the problem is so she sort of focuses on the trees and the forest and because of that she doesn't really see her own part of responsibility in a problem and so she doesn't take ownership of that responsibility. I think that really gets in the way of learning from mistakes and I think she has shown a pattern of not learning from her past mistakes. Again, as I said before I just found that it was very difficult to teach her and this this is despite intensive mentoring that borderline [inaudible] on my part I thought on several occasions. She had the same problems at the end of the rotating that she started off with at the beginning and just for my own personal interactions with her as an attending intern relationship when she was on our service or which was cross-covering my service, I felt like I could not trust her work, I couldn't tell what she understood for me, in terms of when I asked her to do something or what she would remember to do and therefore, I felt like I've always had to check up on her or ask someone else to check up on her and ultimately …

22

| | |
|---|---|
| Ms. Currell | You have five (5) minutes. |
| Dr. Park | Sure, and ultimately at the end, I felt like she, doesn't not perform well under stress or pressure, which as a surgeon is very, very important to be able to do. I can go into specific facts and details that support as to why I came to these conclusions [inaudible] session, but the majority of this is that document, that letter I wrote to Dr. Song. So at the end the facility all meet, the core facility here at the University and had the opportunity to review the data ask, any questions that we had the discussion was had and then very carefully, deliberately and based on the fact that they were presented and the discussion we had at the end this unanimous decision was not to recommend her for next year. |
| Ms. Currell | Questions for Dr. Park? |
| Male voice | The letter that you prepared discusses similarly to other documentation, but there seemed to be some concern about the veracity of the evaluation you were coming after the faculty, senior faculty discussion and heightened increased awareness and consequences of the evaluation. Do you feel that based on your interactions and your weekly meetings, that you were able to achieve a fair and balanced perspective, sort of her aside from those evaluations that are being doubted by both parties in this? |
| Dr. Park | Now, that's a difficult statement, because basically everyone's saying, "well what do we do with evaluations"? The best I could answer to your question would be that, when I thought about should we base it on that, it wasn't just based on the evaluations at what people tell you. I really sat down and asked my questions. What is the purpose of renewing Maria, is to keep her in the residency. What's the purpose of having someone in the residency, is to train someone in short period, six years, to go out and be a plastic surgeon and in this case ready for a pediatric craniofacial scholarship, which is a very specialized portion of plastic surgery, where basically you're responsible of reconstructing and remolding the skulls of babies under a year old. It takes, I think a very tough person to be able to do that and so then the question that I really sat down and ask myself, is based on everything I saw, that I think the time that we had, which was a, six year period, a year period or five year period after this could we train her in our department to be ready to go out as an independent plastic surgeon, that's basically what I came down to, given everything, the experience and the conversations and what I read. |
| Male voice | You mentioned in your remarks that, you felt through your interactions that you had a sense that you weren't sure she really understood the important the salient features of your message during the eval, with all the weekly evaluations that were co-signed by her, what was, you know there's not anything in the documentation that gives a sense of how productive those exchanges were, do you think that the eval was |

23

| | understood, do you think that it was understood but perhaps not embraced, can you just help us understand what the . . . |
|---|---|
| Dr. Park | Sure, to clarify this, let me cover a couple of different incidences cause, that's what made me think about this. You may be aware there's a incident early in the probation with a comfort for Dr. Jaskowiak regarding some administration, ordering of antibiotics and the accounting of, is everyone aware of that or should I go into details of it? So, I had gotten an email from her about this and then I got a phone call from Dr. Jaskowiak and I then meet with Maria during out next meeting and talked about it and we went over all the salient parts and what I basically said was that, if you break it down, this is basically comp work, right. I mean you have two parties, party A wants to say X and party Y wants to say Z and I gave her basically guidelines which I thought would help her resolve that conflict and could be applied to conflict, you know I actually said, you can take this and apply it to like your landlord or the plumber or whatever. You just realize that someone calls you upset at something you have to ask yourself, what is that they want from me, and what they want is to have their part heard. They want to say their part and make sure that you hear it, so you, then I offered her phrases, you know you say, I'm so sorry, I didn't meant to upset you. Because these would not be statements that you're lying about, Maria doesn't mean to upset people, she doesn't mean to do these things and so you just say, I'm very sorry, I didn't mean to upset you, listen nod your head, say thank you, I've learned from this experience. I know you really, really want to say your part, but this is not the time or the place that they're going to receive your information fairly, they're just going to hear it and it's going to create more conflict, so you stop the conflict with listening to what they say, wait a bit, whoever attended the important situation that day, that night, call them, email, meet them, do something, you address it again and you say something, like I want to say, thank you very much, I learned a lot from that experience, I won't do it again, I just wanted you to know what had occurred so you would understand why that happened, and now you have your opportunity to click in what you want to say, and they'll be receptive, because they see you now as someone that has heard what they've had to say and has said okay [inaudible] and then it's a win win situation, because everyone got what they needed to get done across and you've actually taken the opportunity of a conflict and molded it into being a chance to make that person think highly of you because they can come away from it say, wow, that person really heard what I had to say, learned from it, very mature. I literally almost want to role play this with her and I encouraged Maria to write a letter back to Dr. Jaskowiak because she had indicated in her initial phone call that she was going to contact her again and Dr. Jaskowiak, told me, I still haven't gotten any letter and I'm still waiting, so even though I can't recall the details it might have been ten (10) days or two (2) weeks up. I again coached her through with what to |

CHICAGO/#2539878.2

put in the letter about highlight, grateful, learning, example, you know, learning opportunity and then get your point across and I thought that letter to Dr. Jaskowiak was appropriate so I thought, wow she head it. Then you fast forward several months and there's an incident with Dr. Tothy, where I understand that there could be disagreements of the details of whether or how obnoxious one person was to the other, but ultimately what it comes down to is that we don't hang up on people, be it the attending, a resident, a medical student or a janitor, that is not behavior that is considered professional and it is not anything that we want to have as a face of our section and it's also something that gets in the way of teaching patient care and as a service that's mostly consults, you just can't do that. I was very concerned that this occurred during her last two weeks, you know, her two weeks with us where she's supposed to really show us what she's got, she couldn't, I don't know, just take on the frustration and hold on to it, go back to what we had learned with Dr. Jaskowiak about just saying okay, yes, yes, yes and then come back to her later. The email that she did write to Dr. Tothy later and this all occurred before I had an opportunity to discuss this in our meeting with here was very arrogant, was very rude, it wasn't really an apology. I think at the time when it came out, I said, you know Rush Limbaugh gave a better apology then this, because, there was this essence of let me keep telling you why I did this and I am right and you are wrong and it was just, it was very inappropriate and I just thought, what happened to everything that we talked about earlier in our probation, it's just that's an example of I think the same problem about the carrying its way out. There were other times where I think she's heard something that I've said, this goes into the incident with duty hours in transplant. She told me her first week was over duty hours, I said well how much, two hours and I said okay that's okay, because its average of the whole month, you have three more weeks to average two hours you can do that, that's a small enough amount you can take care of that. The next week we meet she told me she was five weeks over, five hours over because of some incident that occurred when she was on call on the weekend. It turned out with a patient that had to be transferred to the ICU and I said, okay, you still have time to make up for that, and the next I heard from it, was an email that went to Dr. Song and our Chief Resident saying, over hours I don't know what to do, I told Dr. Park about it and she said it okay. Which I never said, and so when I met with her next, I asked her, I'm concerned you didn't get the point of our conversation, which was, not that it's okay that you're over hours, but that it was a small enough amount to up because you had to average it over the month. Then Maria said to me, no, no, no, I understood that and then I read to her the email she wrote Dr. Song and I said then why did you write it this way, because you just made me seem like as Associate Program Director I had condoned breaking ACGME rules, which one is it? Do you not understand what I said or you being misleading in your email? I don't

CHICAGO/#2539878.2

| | |
|---|---|
| | know which the situation is and the response I got was, what she wrote was a mistake but didn't clarify what action occurred. So there's several indications where something like that would occur and that's what I mean by, I don't, I can't figure out what she takes away from what we have said in our conversations. |
| Female voice | Could you just elaborate on your weekly meetings? Did you A have an agenda before the meeting that was giving to you or provided to you and B how did you make a list for the meeting you had with Maria? |
| Dr. Park | I basically read her reviews and I make any, I would, my ideal was, I would address any problems that would come up in the reviews or that came up through, you know, I phone call or email or page or something like that. So the main thing was address any problems, my other thing was, if she was doing well, I just would ask her, what is that do you think that enabled you to do well this week or this month, for instance in vascular I asked her when she was doing very well and I said why do you suppose you're well this month when you didn't do well on thoracic identify what the root of the matter is so that you can then carry it over and apply it to the next month and then I would ask her do you have anything that you want to tell me, that didn't come across in any of your evaluations when it come up and then I would ask her, you know, do you have any other issues or questions that you want to refer to and then if we had something coming up like the in-service or something like that I would bring that up in terms of scheduling and exams. If I felt there was something carrying over from the week before, I would ask how that went so I said there was problem in transplant with the nurse practitioner and the certain chain of command as it flowed, she identified early on, I so I would ask her during the meeting how's it going with that? |
| Female voice | In the beginning of your meetings, did you go over, I note that she did sign the information which explained how she can stay in the program to meet the goals for the probationary period. Did you go over those with her yourself? |
| Dr. Park | Let me try to get back to that one. I remember our first meeting, what I went through was the initial letter, not the official these are your guides for your probation, but the letter before that that was very long, about these were the problems, and then she wrote a response saying, this is an explanation for all of that, we, I think our first meeting went an hour and a half, because we went through the seven page letter, we went through that piece by piece. |
| Female voice | Okay. Did you feel like she had understanding of what she needed to accomplish? |

26

| | |
|---|---|
| Dr. Park | Yes and I also thought, I mean I could be wrong, I thought she had opportunity to explain some of her feelings that she thought she couldn't explain earlier and I had the opportunity to then give feedback on some of that. One of the situations [inaudible] on a patient was hypotensive, she giving [inaudible] and fluid and I not sure if bumping it up to a height of a senior person. I talked to her about and what are the other options available to you, you can do things like, call the Chief Resident, even if it's not that service if the patient is doing well, you know that sort of what [inaudible] talking about then. |
| Female voice | Okay, thank you. |
| Male voice | Did you report to Dr. Song after each of these weekly meetings? |
| Dr. Park | No. I asked him actually do you want me to talk to you about it and he goes no. Because he felt like he needed to stay out of it and keep it separate, he specifically told me you do the mentoring. |
| Male voice | Dr. Park, you mentioned that you assumed the PD role in the fall/winter. Was that in response to this incident in particular or were other larger programmatic needs? |
| Dr. Park | We had our ACGME site review and there was a very long, Dr. McConville, PIF, program information form. I don't know if you guys are familiar with that, the program information form, that needed to be given and sort of a dual thing actually. It was really the ACGME site review and the PIF that got me involved in the role before and also before Maria's renewal of her contract. |
| Male voice | The professionalism issues in and of themselves your opinion is enough to have Maria or other resident with those issues excused from the plastic's program? |
| Dr. Park | I'm going to have to say, depends. Because it really has to do with whether or not you learned from your experience I feel, cause everybody has a bad day and everybody can blow up, people have lives outside of our residency program, we all recognize that, God knows, you know, surgeons can also, there's a stereotype of the surgeon throwing a temper tantrum in a room or something like that. So I mean, no everyone can blow up every once in a while I mean we recognize that, it was sort of the pattern though and what it in my mind showed, it wasn't just the lack of professionalism, there was a lot of reason why someone could not be professional, right. They can be maliciously unprofessional, they can be, there could be so many different causes of it, but I felt that with Maria it was kind of again the result of some of the other problems that we've had already. |

27

| | |
|---|---|
| Male voice | So in this particular case, do you feel professionalism issues in and of themselves was enough for non-renewal? |
| Dr. Park | The multiple ones. |
| Male voice | In totality. |
| Dr. Park | Yes. Because it wasn't just isolated incidents it occurred [inaudible] judging how nurses where treated, how consults were treated, it concerns me when somebody treats somebody in a certain position differently because of their role in life and it also made me feel that it was a show of not doing well under pressure, under stress, she lost it and a good example would be if you're a surgeon and I brought this up to her because I was very concerned, you want to be a pediatric plastic surgeon you're doing a cranioplasty on an infant and there is air embolus and her heart rate stop going and she starts to code, what do you do? You can and you're allowed to through temper tantrum under your stress and start yelling at everybody, but that's just turn the whole O into chaos and make it harder to treat the situation. So, yes, I think that's a very important thing, but again, I'd like to stress, it's not the total picture, it's sort of the whole package. It's not just one goal, then we had identified multiple problems with her, we didn't feel that they had [inaudible] during her probation in the beginning and near the end and the professionalism was just really an example of taking like three problems [inaudible] and see as multiple incidences and [inaudible]. |
| Female voice | Can we talk a little about the probation issues, extending the probation throughout the year and one of the ways that I think about this is from a patient safety perspective and in all of the documentation that I read, I would characterize the patient incidences for the most part as near miss types of situations or events that occurred with the patients that didn't result in significant patient harm. From your perspective as an attending that it appears knew her better than any of the other attendings on the Plastic Surgery Service, do you think that more significant patient safety events were prevented because of the mentorship and the assignment of a double intern and scrutiny or are there, in your opinion significant safety concerns if you were to allow Maria to work more independently at the level that someone in her program would be? |
| Dr. Park | Let me try to put my thoughts together with this one. Because there is a lot of parts to that question. So let me parse it out. Let me discuss whether or not I felt that near misses were near misses of her because of mentorship or in double interns or things like that. |
| Female voice | No. If they just stayed at the level of near misses or did they rise to a higher degree of severity or even frequency because she was in such a structured environment. Had she been out on her own, do you think you |

| | would have seen even more patient safety events. |
|---|---|
| Dr. Park | That's interesting. A lot of these things are errors that occurred but that the patient won't die because of it. Medications that were [inaudible] or different versions of the medication were prescribed things like that kind of came a lot in the clinic follow-up too. I think that being in probation made Maria probably really tried to monitor herself and that probably caused several things. I don't know that that's something that is sustainable, that level of scrutiny is sustainable. And then—I'm sorry, what was the other part? |
| Female voice | Just, I guess when I think about quality . . . |
| Dr. Park | Patients' safety? |
| Female voice | Yeah, and the two, decisions are the two issues are your review for us to look at the probationary . . . |
| Dr. Park | Sure. You know, I guess my concern is that I don't know when she is going to do a good job, when she is going to do a bad job. I just don't know. I mean is it simple things like put in discharge orders which, not only did I hear my resident tell her to do multiple times, but I specifically said "Make sure you do what Grant says to do first" because I was trying to organize for her, you know. Before you scrub in, gotta do those orders and then get her to space. And then something as simple as that is forgotten. It's not huge patient safety issue because my resident just did it on his own so no one was harmed. But the potential for that being applied to another problem, let's say you're telling her, you know, "Make sure this person goes on a Heparin drip." I don't know if she is going to remember and that also ties into some of the problems we've had in our mentorship where I feel like she's either taking away a different message that the one she's saying? So, that's our concern, is that I'm always feeling—towards the end just felt like I needed to follow up on her. |
| Male voice | Did Maria's desire to get into a really competitive pediatric craniofacial fellowship at the end of this have any impact on your decision, in your opinion to renew her? |
| Dr. Park | I mean it highlighted it but; she just wanted to be a bread and butter plastic surgeon who did liposuction and breast augmentations. But still, her responsibility as a human being while they're asleep while you go and alter their body so I think it's just being a surgeon. |
| Male voice | So said another way that her desire for a super-competitive subspecialty did not impact, did not factor in, at least in your minds, a decision to renew her or not? |

| Dr. Park | What I'm saying is that it highlighted the problem but had she not wanted it, had just wanted to be a bread and butter plastic surgeon, I still would have had the same conclusion. |
| --- | --- |
| Female voice | At the faculty meeting, was it your feeling that there was thoughtful consideration given regarding the good and the bad to support the decision? |
| Dr. Park | Yes. |
| Male voice | At one point during the process of the mentoring you concluded eventually that you didn't think there were portions of performance that were teachable or corrective. At one point do you think you started to feel that was the case? |
| Dr. Park | About midway through orientation with us that like what I really wanted to do was see it for myself; see how we work, yeah, how she was on a service again. And I actually, I frankly didn't understand how some of her evaluations were actually that high because it wasn't the experience that I was giving reporting to her. |
| Male voice | And when you were presented, when she wasn't on plastic and on another service and there were issues that were either presented or evaluations that maybe didn't make sense. Did you contact people in those specialties that did have . . |
| Dr. Park | Do you mean for the very high or very low? |
| Male voice | Yeah, or did you have contact with people or did you use basically the evaluations as they stood? |
| Dr. Park | So, you know, if someone gave her a high evaluation, I did not call them and say, "Hey, how come you scored her so high lately?" It didn't trigger a red flag for me to be concerned. I just figured, you know, that was their opinion. There was some conversation we did have though, that it wasn't just the evaluation; it was usually something else. So with Dr. Yolanda Becker, there is a concern that she cut her evaluation too soon and that it was on [inaudible] interaction and Maria was concerned about the validity of it. So for two reasons I called it because I felt that there was a little bit on the professionalism, a breach that occurred in the interactions that I wanted to smooth over. And I also wanted it to appear specifically for myself when it happened. So, again, at my core is that the evaluations have to be held to somewhat of a standard and so this if is how Dr. Becker evaluates every single one of her residents, then I have to keep her evaluation valid. She wasn't evaluating Maria any differently that she would the resident that followed her or the resident that preceded her. And if I was going to toss out Dr. Becker's evaluation then basically I was |

| | saying this person who has been a surgical educator for over a decade, none of her evaluations are valid. And so, that's why I had the conversation with her and I said, you know, "Did you do anything differently when you evaluated Maria? Did you go on any different material? Did you treat her differently?" And then she said "No." |
|---|---|
| Female voice | Just for clarification of the surgeons outside of plastic surgery, you're not aware of any probationary status when they reporting evaluations? |
| Dr. Park | The only people who knew from my point of view were the people on her team, so the fellow and the resident who having to evaluate things, I did not call anyone up and say, "Maria's coming on your service, [inaudible] probation." No, that was certainly what I did officially. But, yeah, what individual people heard through conversations outside of the official role, I could not control. |
| Male voice | But to be clear, there was that e-mail that went at the beginning of the probationary period to anyone that she was on service with, residents and fellows, correct? |
| Dr. Park | Her team. Correct. |
| Male voice | So each month her team were getting kind of pushed for evaluations because she was on probation? |
| Dr. Park | There were not pushed but asked to do weekly evaluations so we could get feedback. |
| Male voice | Okay. |
| Dr. Park | Normally, the team members do not evaluate each other. This is something that we ask them to do. You know, otherwise residents don't tend to write evaluations on other residents on a monthly basis that way attendings do. And again, I mean, there's sort of a rock and a hard place. You know, do you not hear directly from the team and Julie back here saying a member that comes up to address the situations or do you try to implement something where you can try to catch it closer to the occurrence and then you actually have an opportunity to do something about it. So that was why I created that evaluation. |
| Male voice | The last question for you? What was the breach of professionalism in your opinion with the Dr. Becker evaluation? |
| Dr. Park | So, she repeatedly talked to her and said that basically, "I don't think it's valid." She was telling her how she needed to change certain things and her feelings of, you know, this question, I don't think you had enough of me, you saw enough of me with, so you should go to, you know, this |

CHICAGO/#2539878.2

| | |
|---|---|
| | should have been this, not that. Sort of that was my concern, it was the emotion behind that. I've never asked her, I've never had a resident tell me how I should evaluate them. I've never been told by somebody, this is not valid, you should not do this. You know, I thought maybe if it's true, a more professional way of doing would be to call me separately and say I, you know, [inaudible] this evaluation, I've reviewed this, these are my concerns. But to go back to the person and say, you know, you need to change this. I just felt that was not appropriate. That was an interaction between an intern and an attending. |
| Male voice | You know, the 360 feedback model is well validated for, you know, responding to performance improvement situations. In this particular case, I think one of the things that I struggle with in trying to understand the file is, was that hypervigilance that was invoked for the reasons that have already been stated, did that lead to additional sort of negative momentum within her perception, within her evaluations and I know that it's very difficult to sort that out cause there is a lot of complicated feelings. |
| Dr. Park | You know I think the best people to ask would be those who [inaudible]. I'm not sure, it wasn't my intent. I think [inaudible] an opportunity to come back any murmur so you start over in orientation and you have a team that you don't know [inaudible]. |
| Female voice | Was there a problem when you say no? You said [inaudible]. I actually think it [inaudible]. |
| Male voice | In just the point you mentioned before, in terms of her ability to perform, self-aware and self-reflection, there is those skills that really [inaudible] for her in granting [inaudible]. What is your opinion [inaudible] at the end of her probation? |
| Dr. Park | I think it's [inaudible]. |
| Ms. Currell | Thank you very much. |
| | RECESS |
| | |
| **SPEAKER:** | |
| Dr. Artunduaga | Okay, I have some handouts to help me out with the PowerPoint...... |
| Ms. Currell | We're still waiting for Anne. She'll be here shortly. |
| Dr. Artunduaga | Oh, really? |

| Ms. Currell | Yup, we're waiting for Anne. She will be here shortly. |
| Ms. Currell | Well, so what are you… |
| Dr. Artunduaga | No, I'm just gonna show some graphs. |
| Ms. Currell | We did say that in the rules of the PowerPoint presentation that you could bring graphs or handouts to speak from. That was in our earlier email that was sent out. |
| | [inaudible] |
| Ms. Currell | Are they things that we've seen before or is this new information? |
| Dr. Artunduaga | So, basically it's a combination of the data the section submitted with mine. So I'm just going to perform some of the analysis compared to the rest of the ….. |
| Ms. Currell | I'm going to allow this because I did say a few weeks ago that you could use handouts versus PowerPoint. |
| Dr. Artunduaga | Just to make things easier for you. |
| Ms. Currell | Okay, we'll just wait. |
| | [inaudible -- some in Spanish] [extraneous conversation] |
| Ms. Currell | Okay. |
| Dr. Artunduaga | Ready? |
| Ms. Currell | Alright. Everybody yes. |
| Dr. Artunduaga | So, I prepared this handout. It's gonna help me out a little bit with the oral statement that I have prepared. So the first pages are basically explanatory material and then if you could go straight to page 5. |
| Ms. Currell | And we're gonna give these back to you after the proceeding we won't be considering you after your testimony. Again, they are just notes for you to use in your presentation. |
| Dr. Artunduaga | Okay, so if we go straight to page number 5 it's gonna tell you a little about my unusual background. I was born and raised in a small town in a Latin American Country in Columbia. I only started learning English when I was eighteen (18) years old. My medical education was completely in Spanish different from most of the foreign medical |

33

| | graduates that are doing the residency in plastic surgery here in this section. I had a very long gap by doing research in Boston. Four years prior to starting my residency training here I have found that it's been quite unusual to have a doctor with a Hispanic background in this hospital. Definitely, my accent, I have felt that since the beginning that it's been pretty challenging for people sometimes to understand. So, when I came here what did I expect at the beginning? Well, I expected that I would have a difficult transition, but because there was so many new things to me I didn't know exactly what the particular difficulties will be and I expected also supportive attitude from Dr. Song and the faculty who were the persons who interviewed me and they knew what my background was and had promised to support me through during that transition. I also expected a sensitive attitude, sensitivity coming from the professionalism that everybody speaks about doctors. Show sensitivity to race, color, gender, culture. Sensitivity should be not only addressed to patients, but to co-workers and I don't mean that sensitivity is giving me better grades just because I'm you know, I have an accent, but if you don't like something that I have said just tell me first. No, go directly to Dr. Song who unfortunately usually has blown things out of proportion. Oh, please just give me the benefit of the doubt. Don't assume that I'm rude, that I'm aggressive, that I'm unprofessional without talking to me first and |
|---|---|
| Ms. Currell | I'm sorry, can I interrupt you for one second? |
| Dr. Artunduaga | Sure. |
| Ms. Currell | If I could just ask the committee members, please do not review the packet. This is just for Maria to use during her presentation. We are not going to consider anything in here other than what Maria is referencing as she gives her presentation. So right now you've referenced page 5 as you move through your presentation. Move us through your handout. That's all we will consider. So please don't look through the rest of the document. Sorry to interrupt. |
| Dr. Artunduaga | Even if I have graphed something. |
| Ms. Currell | You, you. As you move through your presentation you tell us where you would like us to look and we will reference that page. |
| Dr. Artunduaga | Oh yea, yea. |
| Ms. Currell | But I see a lot of us flipping through and I don't. We're not gonna consider any additional materials other than what you're presenting now. |
| Dr. Artunduaga | Yeah. |

34

| | |
|---|---|
| Ms. Currell | Okay. |
| Dr. Artunduaga | Okay. |
| Ms. Currell | Okay, thank you. |
| Dr. Artunduaga | Perfect, don't worry. Um so as I was saying so recently I had a change, and email exchange with you. On something that I wrote you told that was inappropriate of the tone of the email. It wasn't appropriate and I'm thankful because you told me that and I didn't meant to be disrespectful. In fact that sometimes I don't, I just don't use the correct words to express myself. I think it might be a bit of the language barrier for me so, I'm still working on it, but I have never meant to be like really rude or not as Dr. Song's telling everybody that I have lack of professionalism. So basically, I was just asking people to be patient and understand so if you'd just go next to page number 6. This letter marks the moment when Dr. Song had completely given up on me on November. After only my fourth month of residency. He uses the term unanimous agreement among evaluators that I lack the competence. I will show later through a couple of quotes that this was not true. The real intention of this letter was to convince me that I should resign immediately or I should leave the program. He told me that I was an embarrassment for this section and at that moment I understood that honestly my education I felt at that point, stopped being his priority. For example, the second page of this letter he says the highlighting. "We agree that the probation of this level will not lead to success for remediation" so this already shows that the probation was only a second option, but and that they all, or that Dr. Song felt that I would fail. That I would not make it. Um, in the following months I felt that he would keep trying to convince himself he was right. I obviously didn't sign the letter because I thought that the incidents described were used to put me on probation were not accurate and or my fault. I have provided enough documentation and evidence on my Appendixes um in my document and a lot of the evaluations or quotes that he cited were either unofficial or not ACGME compliant and some of them I have never seen so I just didn't know what was going on up to that point. So, Dr. Song's approach was to create some sort of I don't know, I call it intelligence operation by getting feedback information behind my back. He used of course, chief residents and older people. I know that he was requesting for reports, which I believe is a very serious violation of my rights as a resident because this isn't the way that the ACGME has meant to evaluate a resident. I think it's very concerning. After this, I saw also, I noticed a very noticeable change in attitude in the residents in my section and I didn't feel that the help would come would continue as he was saying that I received all there help that I needed. In fact, sometimes they were just reporting things that they found out from gossips or rumors from other services. So it was very frustrating for me. Um, so now, finally I'm just gonna show you some numerical analysis that I have done |

CHICAGO/#2539878.2

| | |
|---|---|
| | with the sections numbers and my combined. We fast forward to the end of period and I'm gonna show you those drafts on page number 4 so this is Dr. Park's draft. I'm sorry number eight. Um, I'm going to show you first the numerical analysis that this section did. This graph I'm showing you here is Dr. Park's. She made it and is the only graph that the entire, well documentation from this section has submitted. This is the graph that I believe Dr. Song made his decision or based his decision based by saying that my oral faculty evaluations are well below the normal residents at my level of training. So facts are that this graph compares my average performance over an entire year versus the performance of my co-resident, Dr. Deana Shenaq was another intern in this section of plastic surgery, but this seems already a little off here because Dr. Shenaq, she's very good and smart, but she has a different background and a lot of advantages of me. She was born and raised in the U.S. She was always. Her language. Her first language is English. She was fresh out of med school when she started. She went to med school here at the University of Chicago and she also spent three (3) months in plastic surgery rotations, two of which were here so she was totally familiar to of course, the system on how the section and the surgeons and plastic surgery runs. So, it was always that she would have a faster transition and she will have a much better internship than me [inaudible] I think. My worse problem with this analysis is that it's asking the wrong question because the question for the probation was not whether I would have a great average over the whole year. I knew I had a bad start and I'm responsible for that. I knew that and I got it and yeah, I wish I could have done better. Um, the thing is that I knew that matching Deana's grades would never be possible. The right question to ask is if I can improve fast enough and significantly enough that I can show at one point that I can eventually do as well as my co-intern. So the right analysis cannot be given the same way to the first months and to the last months. It must look at the progress over time. The trend and this plot clearly does not show my progress over time. The next plot, the next page is gonna show you what I would have had to do in order to match those grades so this plot has the exact same plot that Dr. Park made. This is they are … okay. So this graph is showing you that on the green bars those are the grays that I will have to get during my probation period in order to match Deana's scores. Meaning that I will have to get numbers as high as 10, 9, 8 or 7 in a 1 to 6 scale, which is totally unrealistic. So, I mean this is humanly not possible. So, which this means is that I have failed already my probation if this was the question that we needed to answer or that Dr. Park is trying to answer. So, in other words, yeah. I think that Dr. Song by using this graph and using this data, they never had intention to pass me, and I believe this is capricious because from the faculty evaluations, you cannot, this does not answer the right questions about the probation. |
| Ms. Currell | Five minute warning and I gave you an extra 30 to 45 seconds because I |

36

| | interrupted. |
|---|---|
| Dr. Artunduaga | Ok. Ah, so I am just going to show you the numerical analysis that I did over the weekly evaluations that were used by the fellows and residences that's the next page. This is basically showing my progress over time during the probation period. As you can see, I have a slowly and steady progress. Most of the evaluators agree, unfortunately that there are two outliers in the thoracic service month in November because at the very beginning I was very stressed out. People were very apprehensive about me and letting me do my job. I did, I wasn't allowed to do almost anything and then ah, suddenly I got, suddenly I got switched again to plastic surgery on mid-February where I would be evaluated under my own section where I already knew that there was some apprehension and obviously some people knew that Dr. Song's intention was to suggest to me that I should resign. So I think that they were [inaudible] and that to me, that evaluation in my opinion was biased. Even, you can see here that other people who were with me in the same service, non plastic surgery residence rated me even better than my own plastic surgery co-resident. So, the take home from here is that Dr. Song's initial deadline for my probation was the third week of February and I have already excelled the ten areas of improvement by getting really high grades and I have never, ever asked anybody for favorable reviews and even though my witnesses decided not to come because they are afraid of retaliation, you can call them or email them and they will assure you that I have not asked for that ever. So, if we go to the next page, I want you to compare what I just presented to the way how the plastic surgery section analyzed my case. So, what they did was that they have over 40 something faculty evaluations, ACGME compliant from faculty, from residence, from nurses also from fellows those are on the top, and then below that you have the informal communications, emails or, yeah that communications that don't sometimes contain the question in the email or at least the things that I saw or some of these I have also never seen. For example, Dr. Park's evaluation is not in my file as many other documents that I have submitted in my review statement. It's a long list of things that are missing from my file. So here you will see clearly that this is clearly an incident based analysis. They pick things that are negative for me, meaning evaluations from nurses from November and people from Plastic Surgery. They completely ignore the January evaluations, the February evaluations, they don't take into account them; and more importantly, they don't do an objective analysis. They don't use numbers. They just go to comments and things that, like rumors, the gossip, whoever whatever they say. And, I have provided you with like a real data, numbers; completely objective analysis and even evidence in my large document. So I think that this is a very capricious way of choosing evidence or incidents to make me look very bad and obviously fail me. So, next, I am going to try to go really fast. |

37

| | |
|---|---|
| Ms. Currell | You've got about 40 seconds. |
| Dr. Artunduaga | 40 Seconds, okay. So, ah this graph is showing me. Ok. So I just wanted to see, to show you the last graph, number 13, page 13. I took the numbers from Dr. Park because they are saying that I am comparing myself to general surgery residences. In fact, if you go to the graph before that you will see that the average of the plastic surgery residences remain under the standard plus or minus deviation of the general surgery residence. So here what I am showing is a comparison of myself at the beginning in a blue line and the red line by the end of my probation on how that breaks, at least it is very close to the average of the plastic surgery interns. So, in my mind, I think I have shown already that I can… |
| Ms. Currell | Time. Stop. |
| Dr. Artunduaga | Ok. |
| Ms. Currell | Okay. Questions from the committee? |
| Dr. McConville | I have a question. What do you mean you've referred several times to ACGME compliant evaluations. |
| Dr. Artunduaga | Yeah. Six core competence evaluations that I can see under the, I don't know, the computer based website that I can review that I can see them in a timely fashion that all the things that evaluations are for. I mean that is what I meant. |
| Dr. McConville | Right, but as a program director, oftentimes we receive feedback that is not through that mechanism and is in my opinion, and my understanding of ACGME guidelines very valid. It helps program directors paint a picture of someone's ability, so, I am not familiar with that concept. I mean, you seem to be implying that with those sources of feedback to Dr. Song should be ignored and I want to understand the rationale for that. |
| Dr. Artunduaga | No, what I meant and through my whole documentation is that like, since the beginning of my problems, my struggles, Dr. Song was getting these emails, these warnings about me, but I was never told about that. He never called me for a meeting until September 29 when he made the decision and he told me that I was not a good fit for the program. So I evaluations for the ACGME requirements need to be in a timely manner reviewed whenever your program director receives this type of concerning emails you should know as the resident. |
| Dr. McConville | And what was the purpose of the meetings that you had with Dr. Dickey and Dr. Lee in August, I believe. |

38

| | |
|---|---|
| Dr. Artunduaga | So, they were concerned about me during the August rotation because I had a shared rotation with another intern and there was some favoritism and I felt that the senior resident was ignoring me all the time. He complained about my accent, that I was talking too fast and that I also complained; well told them to, Justine and Sarah that I was very frustrated because I was getting half the number of cases that the other general surgeon was getting. So I was getting the less desirable things. I mean, I don't mind going to clinic, but I it's… |
| Dr. McConville | Do you view that meeting as an opportunity to get feedback? Well, were you getting feedback at that point in time? |
| Dr. Artunduaga | Well, they told me you should just keep a low profile and don't worry, you will level things out in terms of OR exposure when you are in your plastic surgery years. They couldn't give me real feedback because I have never worked with them. I mean, they knew from the rumors and the gossip and things, but yeah, I mean…. |
| Dr. McConville | So you had not worked with either of those two at that point in time? |
| Dr. Artunduaga | No. Never. |
| Dr. McConville | And so, what do you think was the purpose of that meeting? |
| Dr. Artunduaga | To help me go through those difficult times and that I was feeling treated differently. |
| Dr. McConville | Do you view that meeting as getting feedback from the program? |
| Dr. Artunduaga | I saw that meeting as to be two big sisters giving me advice about how to become, about how to go through the internship. So, but not, I mean. The only feedback that I remember was that, not to worry about it. Just to go with the flow and like try to keep a low profile and they decided to, from that moment to talk to the next chief resident, Brian Bello in Colorectal. He was amazing. He helped me a lot. He treated me fairly and equally; and it went great. So, but, I didn't know this was Dr. Song's order. I just thought that they were worried because I met with one of them across the hall, Justine and she saw me that I was about to cry. |
| Dr. McConville | Right. I guess, and my point is in this; and I suppose I want to make this point as a program director that giving feedback is challenging and you always want to make sure that you have enough data points before you do it. It's hard early in the year to make sure that you have a pattern before giving feedback and so, that oftentimes is challenging to figure out if early in the year if this is an outlier; someone getting off to a rough start or if there is a pattern; so, I don't know what the right timing is to give feedback because you struggled in the beginning of the year and I wanted |

CHICAGO/#2539878.2

| | |
|---|---|
| | to get your sense if you viewed that meeting with the two chiefs as feedback from the program. |
| Female voice | It appears that there were other informal meetings with your seniors. One with, I think the last name is Trang? Mispronouncing that. In the communication that we have, the documentation, it appears that the areas of deficiencies were identified and then constructive criticism was given. |
| Dr. Artunduaga | Yeah, yeah. |
| Female voice | Is that how you interpreted your meeting? |
| Dr. Artunduaga | Yeah. I mean it was completely feedback and I knew that during the doctoral month they were supposed, I mean formally giving me feedback. The issue with those…. So, this is the thing. Those feedbacks were meant to identify my weaknesses, my deficiencies so that I could know what they were and try to figure out a way to improve so that as that page would say are things to improve or areas of weaknesses. So a lot of the examples that they also wrote there. So I was also working with another resident, and I don't mean to give excuses or anything, but, I think it's very important that I was accused of things that I did not do. So, at the time, I told them; well, like the issue with this patient or the other, or the other, this is what really happened. Because they are operating. They are not on the floor and I had this other co-intern and some of those things happened during our time together. And as I have submitted in my appendices, enough data from pages and stuff to just present evidence that I wasn't the person who; I mean that I felt that I was blamed for things that were not my responsibility directly. I knew that we should help each other; but some of those things, for example, I was in the OR, I could have never helped my co-intern to solve those issues and those particular examples that were waiting on those feedbacks opportunity that they didn't get crossed or anything, because I naively believed that I was just getting feedback from my big sister or some … I would just keep on, you know, working on my deficiencies and then the next day I find out that this examples are used to justify my probation. So the probation later has some examples of things that I was accused of to show a lack of medical judgment. I presented documentation and evidence to Dr. Song. He never investigated that. I, as I say, it's in my documentation. Yeah, I think there was an issue with communication here. And Dr. Song had made his mind already about putting me on probation right away, despite of whatever I say. |
| Female voice | Cause this was before the probationary period then? |
| Dr. Artunduaga | Yeah. |

40

| Female voice | Maria, from your perspective what are some of the areas that you self-identify for improvement? So when you look back at the last seven or eight months, what are some things that you think you should focus more on, or that were valid issues from your perspective that were identified for improvement? |
|---|---|
| Dr. Artunduaga | Definitely communication issues. I mean when you learn medicine in another language than Spanish it tends to be more verbose. So we speak with more words. So it was difficult for me to concise the information in a way that comes across as efficient and practical with the surgeons. I thought that my major point. Also, what else, I mean, I don't think professionalism has been an issue for me. In fact, all my faculty evaluations, the co-competency that where I score the highest, is professionalism. So I know those weren't isolated incidents and I made these mistakes, and I apologize for that. I was very, very stressed out during my probation. And, I mean, it was a very difficult time to be under the microscope and look back at the plastic surgery section I was very, very stressed. So another things, that I, at the beginning I wasn't very fast at like, you know, writing progress notes because I just wanted them to be very good. And I realize that that was not really very important for the surgery resident. I mean you need to be practical. So, yes, I mean also, being more efficient, multitasking … yeah I mean, I think honestly, to me, I thought that I improve a lot through the probation and my weekly evaluations show that. I know that Dr. Parks is saying that they shouldn't be taken into account. But those evaluations are the ones who address directly the deficiencies that I needed to work on. And all the other residents that I worked with saw that improvement. And I feel that all of them, I have satisfied and fulfilled them, probably I need to work more on the communication stuff. But, I mean, as I say it, I just, I mean, I'm not giving you excuses, but it for me it takes more time cause this is not my first language. So I mean there are several residents from overseas. And we all make it. But sometimes I have spoken with many friends and they all have a very rock star. I was just, I mean I know plastic surgery is very competitive and is very, you need to be the best of the best, but I mean, I have gone all the way, I have done so many sacrifice. I have accomplished so many things. I, this is the very first time, where I'm failing something. This was totally unknown to me. And, yeah, I mean I didn't do as I wanted. |
| Female voice | Can we talk a little bit about the communication please. Because you, to me, you are incredibly articulate and your writing certainly indicates an incredible grasp of the English language. So, I'm having a little bit of a challenge as that being presented as a reason for some of your struggles. I certainly understand that it is challenging when English is your second language. But, did you receive that direct feedback from other residents and fellows and attendings that you worked with, that it was a language |

41

| | |
|---|---|
| | barrier issue that they felt was the problem? |
| Dr. Artunduaga | Sometimes the accent and that I speak too fast. That I get flustered a lot when I try to find the words because I'm like too hyper sometimes. So, yeah, I struggle some time when I do the presentation and they want you to be, you know, straight to the point, and I try to find the words. So it seems like I don't know well the patient, but it's just because I'm trying to find the words. Or sometimes also when I was like double checking for orders, because I was aware that at the beginning I made some mistakes because I didn't double check and I understood something different. Either because it was an abbreviation or something that I'm not used to. So when I double checked peoples also, sometimes got upset. Or, I don't know, they took it the wrong way. I didn't mean to be disrespectful or something. But, and some other people thought that I didn't know medicine, and that I was stupid because I was asking something so obvious. So, it's been difficult, I mean, the hospital. I've rotated to other hospitals, but, yeah, I mean here is harsh. The people are not, you know, they're harsh on each other sometimes. And, so what impresses me the most that at the beginning I was way too sweet, way too nice. Probably not a good fit for surgery and when I started to tough up, now I'm called unprofessional. Because, I mean, sometimes, if people abused me, I just, you know, I had to stood up for myself. Because when I felt mistreated or abused and I reported that to Dr. Song, for example, when I had my rotation with Dr. Ferguson, he say that I had a bad reputation and that I was on my own. So, that was really hard. Really hard for me. I felt alone. |
| Male voice | You make a number of allegations and accusations in your case for the Committee. You know, just to be clear, the standard for our review is that the decision is arbitrary and capricious have made without, unreasonable grounds without proper consideration. There has been a significant amount of documentation and testimony here, that supports the case of the section of plastics and reconstructive surgery. |
| Dr. Artunduaga | Um Hmmmm |
| Male voice | Um, the ACGME requirements are very clear regarding due process and this hearing is that due process. |
| Dr. Artunduaga | Um Hmmmm |
| Male voice | Um, so I wonder what exactly do you feel has been lacking in thoughtfulness or lacking in consideration of your case? |
| Dr. Artunduaga | Ummm, what I feel that has lacked is definitely, well, out of all of the things that I mention in Section 3, um, due process … |

42

| | |
|---|---|
| Male voice | Just to be clear, I know that you have issues with evaluations and some of the objective data. But again, as a total process in terms of thoughtfulness, your probation, your weekly meetings, the documentation that you did co-sign. What about that to you, makes you think that it wasn't thoughtful in considering the [inaudible]? |
| Dr. Artunduaga | So, which documentation did I co-sign? I never saw the minutes of … |
| Male voice | You co-signed weekly meeting minutes. |
| Dr. Artunduaga | Like the attendance? Yes I did. But I didn't see the minutes until like a week ago. |
| Male voice | Well it's a summary sheet of what was discussed and at the bottom you … |
| Dr. Artunduaga | No, I … |
| Male voice | The meetings with Dr. Park, I think, you're … |
| Male voice | Yeah, the meetings with Dr. Park |
| Dr. Artunduaga | Yeah, so there was the minute, minutes, so meeting with Dr. Park. Which I have never seen until like, I don't know, last week when they submitted the section documentation. My personal file I have only three of those minutes. They submitted eight more, I think. |
| Female voice | So you just signed the blank documentation … without? |
| Dr. Artunduaga | That's the only thing that I signed. That's different. So, yeah, I didn't see those minutes at all. And, I mean, there is a bunch of things missing from my file. |
| Male voice | Wait, I want to understand that statement. |
| Female voice | You signed a blank form? |
| Dr. Artunduaga | Yeah, I never saw that. |
| Male voice | I see. I've had the opportunity to meet with …. |
| Female voice | Yeah |
| Male voice | OK |
| Female voice | Do you feel that you had adequate opportunity to kind of prove yourself after this, or during this probation period? |

43

| | |
|---|---|
| Dr. Artunduaga | Yeah, I mean, to me I feel that I passed and unfortunately the things, the plastic surgery rotation is that I was pretty stressed, and I was with another intern. So when Matt says consult notes or progress notes were not placed in time, well, we divided our duties and I did my owns at 6:30 a.m. because I knew that they were going to see my notes, and then the other intern, you know, does them at 2:00, well, so I'm also getting blamed for that, I mean, like, this is, I mean … I don't like blaming things on others, but for some reason every time on plastics I, with another intern because I was initially assigned for the month of May, initially my schedule. Then I got reassigned to October, because they wanted to evaluate me. But there was another intern. So, with the intern and myself, it would just, things happened. And like he, I mean I knew my deficiencies. I had to work on them already. And on the other hand, he have never ever manage a floor before. So he made mistakes and I was blamed for those mistakes because a plastic surgery resident should be better than anybody else and I should have supervised him, which I think is not, I mean, it's wrong. That's the seniors work, not mine. So I got accused or blamed of those mistakes and I got on probation. And then in March again, simple things, like the progress notes. I mean … I have tried to do my job, but I can be responsible for somebody else's? I mean … it's just frustrating. |
| Male voice | It needs to be clear, I realize you said you didn't have these minutes … |
| Dr. Artunduaga | No. |
| Male voice | And you're indicating you didn't receive them? |
| Dr. Artunduaga | No. |
| Male voice | Do you challenge the content of them? |
| Dr. Artunduaga | If I have? |
| Male voice | No. Do you? |
| Female voice | So now that you've had an opportunity to review them. Do you challenge anything that Dr. Parks summarized? Is it truthful? |
| Dr. Artunduaga | Eh, yes no most of them are. I, they are missing a couple of things that I did mention about feelings of exclusion and like unique, like I always I have always say that I feel that … that I … the communication part is challenging for me. When, you know, especially when I'm presenting like consult notes, sorry consults, and so, I don't know, I mean, they are in written there I think, um, strange things that I remember of … |

44

| Male voice | If you … if you agree that they are largely truthful? |
|---|---|
| Dr. Artunduaga | Yes they are. |
| Male voice | Is there something about them that you feel hasn't considered your situation?  Is there something that you feel isn't thoughtful about considering your probation? |
| Dr. Artunduaga | No, it is.  I mean, it's just the description of events or things that I mention, some of them are incomplete, but I mean, is Akilah, she's the one who inviting them on …  I didn't know that, yeah, that there were actual official minutes and that was very naïve of me.  I didn't know. |
| Male voice | So is it thoughtful and it considers your situation for the most part?  What is it do you feel is arbitrary and capricious? |
| Dr. Artunduaga | Eh, I don't … the mentorship, uh, I have not said anything about that.  I mean, I don't.  I'm not arguing that it was capricious.  Uh, what I'm saying that's capricious is the way how my probation was evaluated by just cherry-picking some evaluations where I don't know, I look bad, and saying that excluding good evaluations because I am coercing people to grade me well.  I don't think, I mean I don't think they have evidence for that? |
| Female voice | I want the question we've heard from 3 different individuals. |
| Female voice | That we all have.  That every single evaluation was a factor in the final decision that was made.  That they went through every single document that was turned in the good and the bad.  And we heard that from Dr. Song, from Dr. Parks and from Dr. Grieves. |
| Dr. Artunduaga | Mm Hmmm |
| Female voice | So are you suggesting that that's still not true? |
| Dr. Artunduaga | Well, …. |
|  | [inaudible - in Spanish] |
| Dr. Artunduaga | So I think they, if you go to their documentation there is a green table that they choose to exemplify the reasons, or I think it's somewhere in their documentation where it a table that's showing evaluations that they chose or to fail me on certain things.  I believe that basing a decision on certain comments or certain evaluations without taking the whole thing to account it's not … it's capricious. |
| Male voice | The testimony before our Committee is that your file is reviewed in its totality.  Which includes the documents that you say are largely truthful |

45

| | |
|---|---|
| | summarizing your weekly progress meetings during probation with Dr. Parks. So if the file was reviewed in totality what you feel was arbitrary and capricious about the review. It's the standard before our Committee. |
| Dr. Artunduaga | Yeah, I mean, it's very simple. I mean the numbers say something different. If you go and do the averages and like of you go through my documentation and my table, um, I mean to me this is a graph that I, the diagram that I made based on the documentation they submitted. The table where they, I don't know if you have it, and some of you, where they go through every single area of improvement and they give you examples of things that they chose. So I find very hard to believe that they have used everything. Because I have many, I mean like, way more positive reviews and good grades than what they are saying. That, I mean, what they are using. So, if you go through my graphs where I go through the weekly evaluations and do averages and some [inaudible] and etcetera about the, you know, the weekly evaluations that were addressing my probation to me, I mean, I have passed. It was never determined that I need to get a six over six. I mean no other plastic surgery resident has ever been on probation, so … |
| Female voice | I think what we're struggling with is that, you know, both of you have presented summary documents. Where you have excerpted certain things from evaluations quotes that people have made. |
| Dr. Artunduaga | Um Hmmm |
| Female voice | You have tried to summarize scores on evaluations, leaving some things out. Both sides have done that. And so I think what we're saying, and I think that everyone is in agreement, it's best to look at everything. |
| Dr. Artunduaga | Um Hmmmm |
| Female voice | And that's what we heard from three physicians in this section today. Is that they did look at everything. And this graph that you keep referring to, I believe it's our understanding that it was, it was just a summary with some examples, it wasn't meant to suggest that those excerpts were the only thing that was relied upon to reach a decision and that's what we've heard from the section's testimony. |
| | [inaudible - in Spanish] |
| Dr. Artunduaga | So, um, yeah, I understand that but I have, so the graph that I have made here, is taking into account absolutely everything. Everything. The residents, the fellows, the nurses, the faculty, and poor my communications absolutely everything. |

46

| Male voice | Is this the graph you're looking at? OK |
| --- | --- |
| Dr. Artunduaga | Sorry. So, um, I'm just taking the data that they, yeah it's page number eleven, that they submitted, and from the memorandum that Dr. Song wrote, so they are just citing 27 percent of evaluations and just use 36 percent of individual authors and they, I mean, to me it's very unrealistic to think that you can fail someone by just using comments and not numbers. Especially because all of these things are great. |
| Male voice | What are the numbers next to each person who evaluated you? |
| Dr. Artunduaga | Those are the averages. |
| Male voice | Of all the six competencies together? |
| Dr. Artunduaga | Yes, yes. |
| Male voice | From the perspective of a trainee and a chief resident, the vast majority of feedback that you get in graduate medical education is not quantified by numbers, it's provided in real time, it's provided in informal counseling sessions by senior residents. |
| Dr. Artunduaga | Mm Hmmm |
| Male voice | It's provided by faculty feedback. Much of which isn't ever documented. And when a formative evaluation is being developed, as was during your probation, from what I gather, you know sometimes that information is asked for so that it can be included in a larger program. Do you feel that the feedback in your case was not that? |
| | [inaudible - in Spanish] |
| Dr. Artunduaga | OK, the question about feedback. I threw out. Well, it all depends. On who was getting me the feedback. From the people who I rotated with through their probation side were general surgery residents most of them, and I always asked them by the end of my week every time for feedback. For things to improve to work on. Unfortunately they didn't want to come to the hearing. But they are, I mean, under, you know, weekly evaluations. They have written that I'm very receptive to criticism, that I want to improve, and I felt that from those residents and those fellows I received, yeah, appropriate feedback and I improved, I feel that I have improved up to the point of like, yeah, better or so. |
| | [inaudible - in Spanish] |
| Female voice | Do you have questions from back then? |

47

| | [inaudible - in Spanish] |
|---|---|
| Female voice | OK, we'll call your first witness out Dr. Kaplan |
| Dr. Artunduaga | Yeah. |
| Female voice | And we can collect the handouts. |
| | [inaudible - in Spanish] |
| Dr. Edward Kaplan | How are you Maria? Dave? |
| Ms. Currell | Thanks for joining us. Please sit down. |
| Dr. Kaplan | OK. |
| Female voice | Dr. Kaplan I'm chairing the hearing this afternoon so we'd just like to thank you for your time and participation. Um if you could introduce yourself for the committee and then we'll ask that you |
| Dr. Kaplan | Do you want me to raise my hand and swear that I'm telling the truth? |
| Ms. Currell | We will assume that is the case. |
| Dr. Kaplan | It looks a little too serious here. |
| Female voice | So you'll have fifteen minutes to give any type of presentation that you would like to and then the Committee members will then take some time to ask you some specific questions. |
| Dr. Kaplan | OK. I met Maria as a resident. I don't recall if she was only service in July or August and I really don't expect huge things from the residents, new residents. Maria had, I think there was a bit of a language difficulty. I think there was, in my opinion … |
| Dr. Artunduaga | Mmm Hmmm |
| Dr. Kaplan | And I think that she had been in research, and I know that she had, was picked probably for the plastic surgery program because she was very successful in research and I, if I remember correctly, she had discovered a gene that was a new gene in a pediatric population. And I suspect that's one of the reasons that she was picked for plastic surgery residency. And I don't remember her as being outstanding and I don't remember her as being the worst at patient. I mean I, when people come in the beginning, many of them have a lot of difficulty and I didn't have any particular difficulties with Maria. And I thought that with time that she would get better and I think that with time that she did get better and I … She was |

CHICAGO/#2539878.2

on my service again more recently. I'm familiar with all the things that happened. I'm familiar with what has been said. I didn't experience the … I'd like to give you my experience. My experience, I did not experience anything that was deadly to patients or anything in anything like that. And I know that colleagues of mine said that. I think that once a person gets a bad reputation, in this hospital, that it follows them, and I think that both among the residents and among faculty members that she sort of got a reputation that was not terribly good. I don't think, I mean that, I don't know every experience so I can't judge whether that was. But my own experience was, I didn't experience that. The next time I think that I, that Maria, I don't recall if Maria was on my service for one month or two months. And she's certainly very bright, and I think that she did not have a lot of practice or whatever in clinical medicine when she arrived and things of that sort. The next interaction that I had Maria called me, I think it was in November, and if I remember, I didn't get it, I didn't write down notes or whatever. But that she was doing very poorly. That she was told that she, well she felt very badly that she was told that she was not good enough to be in the plastic surgery residency. And that she was, she was, I don't remember, she was put on probation and I think she was told that she had two options. It's what expressed to me. That she either could stop at this point and keep with I don't remember if it was said that people would help her to get another position, but she felt that there would be no positive things said about her. Or whether, and the other possibility was that she could be on probation. And I don't remember what I advised her, but she was going to get married in about 10 days or something like that, and I told her that she ought to ease up a little bit and enjoy life a little bit and enjoy her marriage and this and that. And she sent me, this is not pertinent, but she sent me pictures and I assume her marriage went well and everything is going well there. So then she asked me, you see everybody had a very bad, she had among the residents and among various attendings, she had a very bad reputation and she asked me that she thought that she had improved somewhat and she asked me could I put, could I call the people and or the person in Jan, I don't remember if it was January or December that she was on probation, and I don't remember who, one of them was, one was vascular and one was transplant, and first I think it was Dr. Piper Scully that I called and I just said, you know, she has a very bad reputation bad reputation and I hope that you would give her a fair shake that she's on probation and I said that to him. And I think he said something like have her come see me and I'll tell her what's expected on this service. And then when that month passed I asked how she was doing, and she said that she thought she was doing better and that she had done OK. And she asked me could I call Dr. Renz for her who was the head of transplant and on the service and I called him and said the same thing that she was on probation and she, you know, was being evaluated to see if she had improved and he said have her, and I think if I remember correctly, he said the same thing,

49

| | |
|---|---|
| | have her come and see me and I will tell her what's expected of them on this service. And I know that she then did not pass the probation in the sense that as I understood it she was told that she would not be continued as a resident in plastic surgery, that the probation had not been satisfactory. |
| | |
| Dr. Artunduaga | Mmm Hmmm |
| Dr. Kaplan | And that she was, as I understood it, she was dismissed from the residency. And I spoke, I think I spoke to Dr. Song, I spoke to Kevin Roggin, I said, you know, why don't we give her a chance and let her finish the year and have her finish the year and get credit for the year? And so apparently there were difficulties putting her on other services. I was very happy to have her on my service and she came back on my service. And I thought, you know, it's an outpatient setting, she performed quite well, she, and I believe we were in the operating room together, it was not a terribly busy time, but she did everything expected of her. And I was disappointed, I'm just telling the truth as I feel it. I thought that she was doing quite well and that she would finish the year and get credit for the year and all of that. And I mean don't think it was correct to write the e-mails that stirred up the pot and then suddenly you were without asking me, she was taken off my service and said she was doing unsatisfactory on my service. I thought she was doing satisfactory. So that's the way it happened. |
| Ms. Currell | Questions from the Committee? |
| Male voice | Was your assessment of her performance, and you mentioned improvement over subsequent rotations went on, was that based on personal interactions with her, personal observation, or was that also factoring in what you were hearing from senior residents on your service or how did, how did you kind of make those assessments? |
| Dr. Kaplan | Yeah, I think while our chief resident was Eric Grossman, I don't recall, I don't know what he thought. I think that he, I never really discussed it in any a great detail. I think there were some times when she did not come on rounds some and that I don't know that I ever discussed it with her in detail. |
| Male voice | Did you get a chance to, I mean, as you mentioned the OR, but you got a chance to kind of work together on, you know, direct basis. |
| Dr. Kaplan | She is very good with her hands. I've seen her close a wound. I have nothing wrong with her. You know the young people or not, first assisting, they either at the table and she certainly was no worse than any |

50

| | |
|---|---|
| | other people. I know that, I'm sure that some of her actions were, that she felt that she was being treated unfairly. I think that she came on a little bit strong in some of the e-mails and things that I had privy to see. And I was just, you know, I don't know that anybody has to be, I mean truthfully no one has to be a plastic surgeon, no one has to be a surgeon, no one, you know, I don't have that's a right, but the … I thought that she had done quite well, I was hoping that she would finish the year and get credit for the year. And I certainly would have tried to help her to get another spot or whatnot. |
| Ms. Currell | Any questions from the Committee? OK. Thank you for your time. |
| Dr. Kaplan | OK |
| Ms. Currell | Dr. Steppacher? |
| Female voice | Yeah – he said he was going to come back in 15 minutes. |
| Female voice | OK. I'll see if he's out. |
| | [Inaudible -- whispering in Spanish] |
| | Recess |
| Ms. Currell | Dr. Steppacher, thank you for joining us. The way that we have been running the hearing this afternoon is that we are going to give you an opportunity to speak. You have about 15 minutes to give your presentation and then we will, as committee members, ask you questions either related directly to your presentation or the materials that were submitted. Why don't you go ahead and introduce yourself and then please feel free to begin. |
| Dr. Steppacher | I am Robert Steppacher. I'm a relatively junior attending with the section of vascular surgery. I've been here since September and this is my first actual academic job. I was in private practice working by myself for two years after completing fellowship. I've had a variety of residents and interns on the service over the course of a year and, so far, I have to say I've been overall with pleased with everyone's performance in terms of care of the patients, operative skills, and knowledge base. Maria was on our service for about a month. I don't recall the exact dates she was on there but the general, overall impression I got comparing her to the other interns that I've had from the department of surgery, the residents, interns I've worked at when I was in fellow and, you know, people I was residents and interns with back when I was a resident three years ago was that, you know, she did an adequate job. I didn't personally observe her do anything dangerous. She wasn't, you know, like the world's best resident I've ever had in my life but on the other hand, she wasn't the |

| | |
|---|---|
| | worse either. I felt comfortable that I could give her a task and, you know, that it would be completed, which, at the end of the day for someone at her level of training, that's all I'm really looking for. You know, get the patient discharged, follow-up on the labs, run down to the ER, do an H&P, go hold the pressure on this point, things like that. You know, all those things happened. We didn't have any major mishaps or disagreements that I'm aware of when she was on our service, you know, most of the, as you can imagine in a hierarchical system such as ours, most of the feedback I get from the junior residents comes through the fellows and [inaudible] again in terms of the med students. Usually if it's somebody that's really doing an inadequate job, I hear about it. You know, the converses are not necessarily always true, somebody's doing a really excellent job, I don't necessarily hear that, "Oh yeah, so and so is doing a great job." But I guarantee you, bad news travels fast, so if somebody is not doing their fair share, I usually hear about it from the fellows pretty quickly. And, you know, if the other attendings are having a problem with someone, I also usually hear about it pretty quickly. The actual responsibility for resident evaluation and training, the formal assigned person for that is one of my partners, another member or section. So you've got, indirectly, the one writing evaluations or things like that but, you know, I think all the evaluations that we issue are all a collective of myself and the other section members, you know, kind of discussing the residents in four months or so. [inaudible] medical students and then kind of come up with some of the, you know, how do you feel about that individual. |
| Female voice | Okay, questions from [inaudible]? |
| Female voice | Did you receive any feedback or were you contacted by anyone prior to Maria joining your service? |
| Dr. Steppacher | Yeah, actually, you know, I did. There's—unfortunately, as the saying goes, the rumor is halfway around the world before the truth gets its shoes tied. And, you know, I heard rumors about various things, both positive and negative, prior to her joining the service. |
| Female voice | Did anyone contact you directly, any other attendings? |
| Dr. Steppacher | Uh, not attendings, no. |
| Female voice | Did those rumors or the fact that Maria was on probation, did that influence evaluations or perceptions? |
| Dr. Steppacher | Not to my knowledge or at least not my evaluation. I mean, only in the sense that, you know, Maria did inform me that she was on probation and as part of her I guess probationary agreement, or however you want to state it, that it that she needed to have, you know, evaluations done on a |

CHICAGO/#2539878.2

| | more frequent interval than would be the expected standard. I think that, you know, usually we just, evaluate the residents at the end of their time with us, frequently after they've left the service and I guess my understanding was that with Maria we had to actually perform evaluations during the time, I think, you know, suggested that we give her feedback on a weekly basis on how it was going. |
|---|---|
| Female voice | Any other questions from committee members? |
| Male voice | Do we have his evaluation in here? |
| Female voice | Yeah. [inaudible] It's under tab 9 of the book and about halfway back. |
| Female voice | So this is not your standard at-the-end-of-the-rotation evaluation? This is an extra, solicited evaluation? |
| Dr. Steppacher | The one that you have is probably our standard at-the-end-of-the-rotation evaluation, you know, intern evaluation [inaudible]. And, you know, I mean, for what it's worth, unless—you know, in terms of these numerically graded evaluations, my standard practice is if somebody does an exemplary job, I usually give the mostly fives. If someone is doing a job where I feel their performing at their level, what I expect their level of training, I usually give them mostly fours. If somebody is, you know, not performing below my expectations, I'll give them mostly threes. If someone is seriously going for the tough categories, then I'll give them a two or a one. That's usually how I grade residents and medical students. I don't know if that's consistent with the guidelines for my partner [inaudible] but this seems to be what makes sense to me. You know, I mean, the one thing I'd like to point out is that, you know, again, being an intern, basically, you're a glorified go-for. Your job is to, you know, take care of the patients, to make sure that everything that's happening, you know, what is it? I had an attending once tell me when I was an intern, know the plan, see the plan, be the plan. So, you know, what he was telling me by that was that I wasn't really expected to come up with a brilliant diagnosis or anything. My job was honestly to make sure I—you know, I trained in a hospital that was very much like this one where things didn't necessarily always go according to plans because the unit patients, sometimes the involved ancillary services, weren't quite meeting our expectations and needs a lot of the work of the intern was just making sure that, you know, if we ordered something, it got done, if we ordered a lab, it got drawn and when the results came back, that someone put that in, that, you know, if it was bad, I knew about it. And it's a little easier here because now we're in the age of electronic medical records. I don't have to sit at my desk and kind of monitor the whole thing but, you know, in the days before that, someone actually had to go the floor, look in the chart and find the labs and come back. So my expectation are things like. My second expectation is really that I want people that aren't going to— |

CHICAGO/#2539878.2

| | |
|---|---|
| | that have a pleasant personality, that aren't really going to, you know, get in trouble with annoying the patients, that aren't going to get in trouble with, you know, annoying the nurses and the ancillary staff because there are ways to get things done in a situation that is otherwise very adverse, when people don't want to do their job.   And there are ways to kind of negotiate these situations effectively instead of adding—you're getting the patient's needs met, you're getting the, you know, physician's needs met but you doing it in such a way where you're not really making enemies with the nurses.  And I think that's a very, very important skill for interns to have and, you know, I did not receive any negative feedback during the time when he was on our service that, you know, that was having problems like that.  And those were kind of the things I looked for, so, that's kind of my two cents. |
| Ms. Currell | Okay, if there are no other questions.  All right, thank you for your time.  Okay, Maria, do you want to see if Dr. Shao is available? |
| Dr. Artunduaga | He is not available yet but is in like two minutes. |
| Ms. Currell | In how many minutes? |
| Dr. Artunduaga | Thirty. |
| Ms. Currell | I don't think we are going to wait that long, so . . . |
| Dr. Artunduaga | Can I just add two things? |
| Ms. Currell | No.  So, I will ask the parties.  If I allow you to add a closing statement then Dr. Song gets a closing statement and you can object to that, so, but I will let Dr. Song make that decision. |
| Male voice | I have nothing further to say. |
| Ms. Currell | Okay.  I don't think I'm going to allow that because we did not tell either party that you would be allowed to prepare a closing statement. |
| Dr. Artunduaga | No, it's just that . . . |
| Ms. Currell | Maria, I . . . okay.  So we are going to deliberate now and like I said at the beginning of the committee, I will let you know if we can make a decision today, what that decision will be.  Thank you. |
| | |

CHICAGO/#2539878.2