# EXHIBIT H

May 31, 2012

To: Kenneth S. Polonsky, MD, Dean of the Biological Sciences Division and Pritzker School of Medicine, University of Chicago
Sharon O'Keefe, RN, University of Chicago Medical Center President

From: Maria Artunduaga, MD, PGY-1 resident in Plastic and Reconstructive Surgery

Re: Request for review of decision by Housestaff Grievance Committee


Mr. Dean and Ms. President,

This letter constitutes my formal request for you or your representative to review the adverse decisions made by a Housestaff Grievance Committee against me, immediately following a Grievance Hearing on May 16, and communicated to me by the Chair of the Committee in writing on May 23. Your decision would be the final step in the Grievance Process I initiated on April 6 against the decisions made by Dr. David H. Song, in his capacity as Program Director of the Section of Plastic and Reconstructive Surgery. It is also my last resort for a just and fair treatment of my case at University of Chicago.

The decisions the Grievance Committee chose to review and decided on are:

1. Decision not to renew my contract for a second year of training in the Program: affirmed by the Grievance Committee.

2. Decision to keep me permanently under probation: affirmed by the Grievance Committee.

According to the Grievance Procedure (GME Policy 15 [1]), the review of the decision shall be limited to an examination of the same materials reviewed by the Grievance Committee. The Committee is charged with forwarding to you a copy of its decision, as well as the materials it reviewed during the Grievance Process, including at the Hearing. To my recollection, the materials that should be forwarded to you by Ms. Anne Duprey, legal counsel acting in representation of the Committee, are the following:

1. Written arguments and evidence submitted by the Section of Plastic and Reconstructive Surgery to the Committee on May 8.
2. Written arguments and evidence submitted by me on May 8.
3. Rebuttal statement to my written arguments, submitted by Ms. Jane McAtee on behalf of the Section on May 10.
4. Three (3) e-mails I submitted to the Chair of the Committee on May 10 and 11, in response to the Section's rebuttal statement, and which the Chair agreed to forward to the Committee.
5. Rebuttal statement to the Section's written arguments, submitted by me on May 14.
6. Documentation concerning the facts presented at the Grievance Hearing on May 16.

1

UCMC00001712

My motivation for requesting this review originates from well-founded concerns I have that the decision made by the Grievance Committee was arbitrary and capricious, and without proper consideration of the facts presented to them by both sides, particularly the ones presented by me. My serious reservations stem from particular actions and omissions by the Committee, both before and during the Grievance Hearing, which make me question the impartiality with which they reviewed the case. I am itemizing my concerns as follows, and providing my observations and evidence for each of them in the Appendix section of this document:

1. Favoritism as evidenced by the unequal treatment of my petitions compared to the Section's
2. Failure to scrutinize the Section's methods of evaluating my probation period
3. No serious consideration of my written arguments
4. Improper weight given to my arguments compared to the Section's
5. Confusion between verbal feedback and proper documentation of evaluations
6. Improper scrutiny of the Section's accusations against my character in contrast to the evidence provided
7. Failure to recognize my rights as a resident and to inquire the Section about their failure to uphold them
8. Failure to recognize the underlying causes of my particular situation

As part of your review, I hope your decision recognizes the significant degree to which my rights as a resident have been violated by the Section, with no adverse consequences for them so far, not even a recognition of that fact by the Grievance Committee. The evidence of misconduct is serious and varied: from the way critical information about my performance has been either mischaracterized or concealed from me altogether; to the way my probation period was conducted and evaluated without measurable goals and primarily based on anecdotal evidence; to a chronically inadequate exposure to surgical cases and experiences; to two (2) arbitrary dismissals from clinical duties, one based on completely illegitimate reasons, the other based on an evaluation from a senior resident that I was not even allowed to see and contest in a timely fashion. These allegations are based on solid evidence, but they were dismissed by Dr. Song at the hearing by saying they are *"no more truthful than a wish."* Only a decisive action from you would allow me to believe there is actually a functioning system of checks and balances at this institution, a system which holds the rights of residents as absolute, and which nobody regardless of rank can trample on; a system that corrects the types of abuses I have already been made a victim of, even if it failed to prevent them from happening in the first place. My educational and work experience at this University have not been what I had expected and hoped for, my professional future has been put in serious jeopardy as a result, and I hold you as the last resort in order to reverse this injustice and try to work out an acceptable solution.

2

UCMC00001713

On the specific subject of the underlying causes of my particular situation, I want to stress the fact that the Section, particularly Dr. David Song and Dr. Julie Park, have always insisted in equating my situation and expected rate of progress to that of other foreign medical graduates whose native tongue is English and who received their medical education in that language. They have dismissed my concerns and those of several supervisors by claiming on the one hand that *"[my] deficiencies are not caused by a language barrier"* [2], despite significant evidence to the contrary, and that they were instead caused by some fundamental flaws in my ability to think and communicate, my medical knowledge, and my character, to the point of Dr. Park stating at the Grievance Hearing that *"Rush Limbaugh would give better apologies"* than I do. Drs. Jaskowiak, Kaplan, Angelos, Hurst, Moreira, Fleming, Paruch, Shao, as well as a number of other doctors including Plastic Surgery residents Drs. Dickie, Greives and Kleiber who evaluated me, repeatedly claimed that my alleged inability to communicate, and specifically my accent, were significant factors in some of my performance problems. Many comments in the same direction can be found in my official evaluations, such as: *"There seem to be some critical issues that may be cultural, as she has not worked in the American medical system before"* (Dr. Jaskowiak, August); *"Given that she was trained where the routines and customs are not necessarily known to us... it does make it more difficult to assess her overall capabilities so early on in her residency"* (Dr. Hurst, September); or *"I think there are language and cultural barriers that have affected Maria's ability to effectively communicate with patients and medical staff, including nursing staff."* (Dr. Moreira, November).

Despite this, there has been a generalized lack of sensitivity to my cultural and professional background at all levels in the UCMC Housestaff; Drs. Umanskiy, Ferguson and Seal, for instance, have made derogatory remarks to me regarding my communication skills and my medical training in South America during our feedback meetings, not to mention the constant snide comments I would receive from co-workers about my home country or my accent, and which contributed to a hostile work environment for me from the beginning. On Dr. Song's part, he did not hesitate to ask me to either resign or be put on probation as early as November [3], and explicitly withdrew his support of me at a meeting I had with him on November 21, when he said I was "on my own," since I had a "bad reputation" and was an "embarrassment" for him and the Section. The chronically unequal learning opportunities I was given were even noted by some of my direct supervisors in their official evaluations, such as Dr. Fleming when she stated: *"many of her seniors are not giving her the opportunity to learn and instead just bypass her... I just don't think she was given the opportunity to be an intern."* [4]

I have made many complaints of discrimination on the basis of national origin, deriving in particular from comments and criticisms regarding my command of the English language, since as early on in my residency as August, to my chief Plastic Surgery residents (Drs. Justine Lee and Sara Dickie), my Program Director (Dr. David Song), my probation mentor (Dr. Julie Park), the UCMC DIO in the GME office (Mr. Barry Kamin), and the director of Labor relations in Human Resources (Mr. Jonathan Rothstein). All of my complaints have been either completely ignored or dismissed as being an effort to "make up excuses." While I do have confidence in your ability to look at this case impartially, at the same time I am prepared to bring my complaints of discrimination and its supporting evidence to the EEOC, given the uniform response I have received up to this point from the entire institutional hierarchy, a response which in my opinion has been completely unsatisfactory.

3

UCMC00001714

Overall, beyond all the rules and regulations, I hope you recognize the fundamental fact conveyed by my careful analysis of the data in my case, and it is that I have already demonstrated that I am capable of performing at a similar level as other Plastic Surgery residents who still continue in the Program, even if I have not yet achieved a level of consistency that would be impossible to reach in a short probation period of three months. Similarly, I have shown I am perfectly capable of expressing myself well both verbally and in writing, by the admission of the Grievance Committee members themselves, in a language that I only started to learn at the same time I started to learn Medicine. If those fundamental facts were recognized, then the logical conclusion would be that I should be able to continue to do so, in an ever more frequent and consistently competent way. Such level of consistency can only be achieved through continued clinical exposure in a nurturing environment, an opportunity Dr. Song and the Section have been bent on denying me altogether, despite the significant progress I showed and which is unmistakable from the numerical indicators of my performance. This is the main underlying fact and the logical conclusion that the Section's as well as the Grievance Committee's arbitrary and capricious analyses have prevented them from acknowledging with respect to my case.

Finally, regarding the rules for this part of the process, I need to make the following comments:

- The Grievance Procedure does not have an allowance for a statement by the other party in response to this Request for Review, and I expect that rule to be upheld. Furthermore, I see no need for the Section to provide such a statement, since the Grievance Committee decided to uphold the Section's arguments as given.

- The Grievance Procedure further states that, whereas I must submit this request within "five (5) business days" of the written decision by the Committee, your decision is due "within fourteen (14) days" of my request. I interpret this to mean 14 calendar days, or exactly 2 weeks, but I would appreciate that you provide clarification of that point.

I look forward to your communications regarding this Request for Review, and please do not hesitate to contact me regarding questions about the arguments and evidence I have presented.

Sincerely,

*[signature]*

Maria Alexandra Artunduaga, M.D.
Plastic and Reconstructive Surgery Resident
University of Chicago Medical Center

4

# Appendix

I am hearby providing my observations and evidence of what I have considered to be an arbitrary and capricious way to proceed on the part of the Grievance Committee:

1. <u>Favoritism as evidenced by the unequal treatment of my petitions compared to the Section's:</u>

    Several signs of favoritism on the part of the Committee, starting with the Chair herself, were evident throughout this process. To begin, on the day following the announcement of the formation of the Grievance Committee, I made a number of sensible petitions to the Chair, most of which were denied by her in an e-mail she sent out on May 1 [5]. In particular, she denied a petition I had made to allow for the submission of a rebuttal statement to the Section's arguments, saying the following in her e-mail:

    *"The Committee will not entertain any pre-hearing objections by either side regarding the materials submitted prior to the hearing. The Committee will review all documents prepared by both parties and you will have an opportunity to respond to documents submitted by the Section during the hearing."*

    After the May 8 submission deadline, however, the Section broke this ruling on May 10 by submitting a rebuttal statement to the Chair and asking for it to be forwarded to the rest of the Committee. I objected to this action on two (2) separate e-mails on that day, as it openly violated the earlier directive by the Chair herself. The Chair, however, tersely stated in response: *"I am granting the request to file the two-paged memorandum submitted by Jane McAtee to the Committee,"* without offering any compelling explanation for why she had decided to reverse her earlier ruling. While it is true that to compensate she did allow me to submit my own response, the reason for allowing this breach of the rules by the Section was never fully explained.

    The exact opposite of this situation happened at the end of the Grievance Hearing, when I tried to make a request to put out a word about an earlier question from the Committee I felt I had not fully answered. The Chair wrongly interpreted this as wanting to make a closing statement, and her reaction was to immediately move on to ask the Section if they wanted to make a closing statement as well. Since they declined to do so, she did not allow me to speak, to the point of abruptly cutting me off at mid-sentence when I was trying to explain that I actually did not intend to give a closing statement.

    One further pre-hearing incident occurred on May 11 when the Section requested for one of its witnesses to be allowed to speak after 3:00pm, very late into a hearing that would begin at 12:30pm. The Chair's reaction was to grant the request almost immediately, without taking into account that, per the Committee's own rules, I had the right to use my oral statement to respond to the testimony of any of the Section's witnesses. Only after I objected was the final schedule eventually revised to put the witness before my testimony at 2:30pm. The initial reaction of the

5

Chair, however, revealed an inclination towards using her discretion to allow requests by the Section, even if they were not necessarily in accordance with my rights under the process.

This capricious application of the rules is only a factual indication of a much larger problem regarding the impartiality of the Committee, as the following motivations explain.

2. <u>Failure to scrutinize the Section's methods of evaluating my probation period:</u>

As the second line of reasoning in my written arguments explains at length, there were many problems with the way Dr. Song conducted and evaluated my probation period. Some of the most prominent ones the Committee partly or totally failed to scrutinize include the following:

- In his oral statement, Dr. Song claimed that "insufficient improvement [from me] was seen," yet the Section's analysis does not include even a single plot that shows my progress <u>over time</u>. Strikingly, only one "graph of faculty evaluations" was in the binder given to the Committee and earlier to the Plastic Surgery faculty, which only takes a yearly average of faculty evaluations, thus giving equal weight to earlier and later months. In my presentation I pointed out the clear inadequacy of this graph as a measurement of improvement, yet the Committee members made no remarks at all about this fundamental disagreement in the use of performance data.

- In her testimony, Dr. Park remarked about the weekly evaluation form she tailored specifically for me, one which would directly measure my progress in the 10 specific areas for improvement itemized in the probation letter. I fully agree that this was a very useful evaluation tool, one which served the purpose of providing the type of objective, competency-based evaluation espoused by both the ACGME and the GME, and which should have become the primary metric for measuring my progress on the specific conditions of probation. I in fact welcomed Dr. Park's effort by making full use of this data in my analysis for both the written and oral parts of the Grievance Hearing, to the point of calling it "the essence of the argument for why I should have been given a passing grade for my probation, and consequently also a renewal of my contract."
The Section as well as Dr. Park herself, however, decided to practically discard the numerical data in these evaluations, as they did not even go as far as displaying the data in a plot to be discussed at the Plastic Surgery faculty meeting. They argued that they had done this because of some alleged undue pressure put on all of my evaluators, a claim never proven by the facts and categorically denied by Drs. Kaplan, Steppacher and Grieves at the hearing, after the Committee separately asked them about that specific issue. The Committee should have found that, having failed to find any conclusive proof to the contrary, the dismissal by Dr. Song and Dr. Park of the numerical weekly evaluation data during the probation period amounted to an arbitrary decision without basis of fact.

- Another arbitrary decision by Dr. Song that was not fully scrutinized by the Committee concerns his sudden decision in the middle of February to put me to rotate through the Section of Plastic Surgery for the first two (2) weeks of March, which were also the last ones of my probation. The decision would not have seemed so suspicious if it had been

6

determined from the very beginning of probation that those last 2 weeks would serve as that last proving ground to show how much I had improved during my probation. The sudden change, however, clearly approved by Dr. Song himself, first of all contradicts his claim at the hearing that he put a "Chinese Wall" between him and my probation process. Second, the decision clearly comes in response to an ongoing situation, namely that my evaluations up to mid-February had improved to a level that he and Dr. Park had not been expecting, and so they decided to do something about it; in the words of Dr. Park at the hearing: *"I just didn't understand how some of her evaluations were actually that high."* Third, as both Dr. Song and Dr. Grieves said at the hearing, there was a meeting of Plastic Surgery residents and faculty prior to the beginning of my rotation, with the explicit purpose of discussing my upcoming rotation through the service, meaning Dr. Song did cross the Chinese Wall to talk to my supervisors, all subordinate to him, before my rotation, and this was clearly not the first time he did so. Drs. Song and Grieves do have benign accounts of the discussions at that meeting; however, nobody outside those present can independently corroborate those accounts. The Committee members should have been troubled both by the arbitrary change in my schedule and its questionable motivations, as well as by the active role played by Dr. Song behind my back at least over those last several weeks prior to the end of my probation. They were not.

- The Committee members were clearly swayed by the claim from Dr. Song and both of his witnesses that my "entire file" was reviewed at the 1.5-hours long faculty meeting of March 26. That means that the members bought the claim that a 300-page document was reviewed, going through every single one of my evaluations before and during probation, plus another significant amount of e-mail correspondence and informal reports, followed by discussion where every single faculty member expressed their opinion, followed by the final decisions, all in 1.5 hours. Quoting from Dr. Song's oral statement in his characterization of my allegations, it seems the strategy employed by Section's witnesses regarding this claim was that if they *"repeat it often enough, someone will believe them."* In this case it seems the members of the Committee actually did just take them at their word, without any degree of skepticism on their part.

  Assuming for a moment that the Section's claims were true, and all evaluations were indeed carefully reviewed at the faculty meeting, it is clear which subset of them they deemed to be most relevant in judging my progress on the conditions of probation, namely the ones they quoted in the evaluation grid they produced at the meeting. For my oral testimony, I made an elaborate diagram that analyzed those evaluations quoted in the table, and showed that there was a clear dominance of reports from the months where my overall performance was worst (November and March). Also, the diagram showed a significant contribution of as much as one third (⅓) of all reports quoted coming from informal reports; in most cases, these reports were never shared with me in a timely fashion, or they seem to have been prompted by requests that are not spelled out anywhere. The Committee did not ask any questions to me about this diagram, except to point out that the numbers next to each evaluator's name corresponded to the average of the 6 core competencies derived from their evaluation.

7

UCMC00001718

3. <u>No serious consideration of my written arguments</u>:

In one of the most evident signs of disregard for the arguments I provided, the Committee members did not ask me or Dr. Song a single question or remark related to the essence of the four (4) lines of reasoning I presented in my written arguments. In one of the few comments I received about them at the hearing, one member dismissively referred to them as just having the purpose of making *"a series of allegations and accusations."*

Much to the contrary, the chief purpose of my written arguments was to make a comprehensive <u>analysis</u>, using <u>all</u> the objective data available in my case, and particularly focusing on tracking my progress over time, both from my monthly faculty evaluations and my weekly resident/fellow evaluations, to an extent the Section never did. That is the essence of my first line of reasoning, entitled *"Probation Period - The Facts,"* which makes a careful quantitative analysis of the data beyond the individual comments and innuendo surrounding my case.

While I understand the remark by one of the Committee members, who said that a significant amount of resident performance information comes in the form of informal reviews, I have to agree with Dr. Park when she said that the monthly faculty evaluations are the only apples-to-apples way of measuring performance across residents and across rotations. That was precisely the principle that drove the first line of reasoning in my written arguments, but a principle to which the Grievance Committee evidently did not give the same degree of importance.

In one of the few references to my numerical analysis of the data in the entire hearing, Dr. Park criticized me for not having used data specifically from Plastic and Reconstructive Surgery interns instead of General Surgery interns. She did this in an effort to point out that I did not understand the standard against which I was being measured, perhaps unaware that I had not done so only because that Plastic Surgery data had never been made available to me by the Section, and certainly not by her in any of our mentoring sessions. The data was finally provided to me as part of Dr. Park's March 14 evaluation of my probation, a document I did not even know existed until the Section submitted it to the Committee on May 8.

Unbeknownst to Dr. Park, once I had the Plastic Surgery intern data, my first reaction was in fact to do a thorough revision of my graphical data to include it in my analysis, and in fact one of the main goals of the oral statement I would give after her testimony would be to add that entire dimension to my numerical analysis. My new plots in fact showed revealing information about how I compared to all of the other 5 individual Plastics Surgery interns from the last 3 years, at one point reaching a level well within the norm of PRS interns in 19 individual competencies. Again, this analysis I presented at the hearing elicited no questions from the Committee.

In one further disturbing lapse in the Committee's analysis of my documentation, they seem to have made no serious consideration of the issue of missing documentation from my file, the core theme of my rebuttal statement submitted May 14, 2 days in advance of the hearing. The most obvious question that would have been drawn from any careful reading of my statement would have been why those documents were missing from my copy of the file in the first place.

8

UCMC00001719

None of the Committee members asked that question to Dr. Song, and in general seemed unconcerned about the fact that I had not had timely access to a significant volume of the evaluative information that was later used to reach critical decisions about my academic future.

Finally, one further aspect in the Section's case that I clearly pointed out in my rebuttal statement, and was not even acknowledged by the Committee, was the fact that both of Dr. Song's witnesses, Dr. Park and Dr. Greives, were affected by a clear conflict of interest, due to the fact that as junior faculty member and senior resident, they owed their immediate professional goals to a considerable extent to a favorable opinion of them by Dr. Song. By this I do not mean to imply that they were untruthful or insincere about their testimony or their opinion of me, but given that they were perfectly aware since before November that Dr. Song did not believe I was capable of succeeding in the Program, it is quite conceivable that an unconscious bias may have arisen from their manifest conflict of interest. That bias may have prompted them to seek their own reasons to convince themselves about their support for Dr. Song's view. Irrespective of their sense of professionalism and their stated commitment to giving me a "blank slate," they cannot be considered to be independent evaluators who would have absolutely no reservations about submitting an opinion that may well be contrary to Dr. Song's view. Despite their own denials, the Committee must have assumed that the unavoidable conflict of interest due to their subordination to Dr. Song might reasonably prevent them from being truly impartial.

4. <u>Improper weight given to my arguments compared to the Section's:</u>

In another sign of the capricious analysis of the Grievance Committee, one of the members drew a false parallel between my arguments and the Section's. She claimed in one of her questions to me that both of us had *"excerpted certain things"* from my evaluations, while *"leaving some things out"* at the same time, suggesting that we had both built equally valid arguments by selecting specific incidents or reviews at our convenience.

That was precisely what I did not want to do in my quantitative analysis, which <u>explicitly</u> took into account <u>all</u> of my evaluations, the good and the bad, both before and during my probation period. Mine is an analysis that anyone with the same set of data could have used to reach the same conclusions I did. My use of examples only followed later as a way of complementing my numerical analysis, either to illustrate the general trend observed, or to explain outliers observed in the data.

This stood in clear contrast to the Section's analysis, which only claimed in word to have taken all evaluations into consideration, but in the end ended up summarizing it in a table that cherry-picked quotes and evaluations which in the opinion of the faculty were deemed to be most relevant. The testimony from their three (3) witnesses went in the same direction, a testimony clearly led by examples of incidents and anecdotes, which were then used to draw a larger set of conclusions.

9

UCMC00001720

As I mentioned in section 1 of this Appendix, I summarized the analysis by the Section of what they considered to be the relevant evaluations in an elaborate diagram I discussed at the hearing. The diagram clearly showed the preference that had given to the months where my overall performance was worst, as well as the considerable weight they gave to informal evaluations that for the most part were not shared with me in a timely fashion. Regardless, the Committee insisted in equating the fundamental approach I took compared to the Section's, a fundamental error in data analysis, which in my opinion impaired their ability to properly weigh my arguments compared to theirs.

5. Confusion between verbal feedback and proper documentation of evaluations:

The Committee also went to great lengths in their line of questioning to ask me whether I considered I had received proper verbal feedback from the Section, a question that came in various forms from several of the Committee members. I understood this as being a deliberate effort to blunt my complaints about having been improperly evaluated, after I pointed out in my documentation a number of ACGME and GME regulations regarding resident evaluation that had not been followed by the Section and Dr. Song in particular during my entire internship year, including my probation period, and still continuing into the present.

In this regard I must say that while feedback is important and much appreciated, and I myself proactively went out of my way to request such feedback sessions with attendings and supervisors I worked with, I do not believe a feedback process can be effective when reports about my performance have not been properly documented and shared with me first. Knowing exactly what was said about me in informal reports, and very importantly, what the question was that prompted the report (when applicable), is the only way of having a feedback session that effectively builds on those facts, and then focuses on the general development of my medical competencies for the future.

The failure to distinguish between properly documented and shared evaluations of my performance, and the verbal feedback that is a necessary complement but not a substitute of those evaluations, was in my opinion another fundamental misunderstanding on the part of the Committee in their analysis of the case presented to them.

6. Improper scrutiny of the Section's accusations against my character in contrast to the evidence provided:

The accusations by the Section's witnesses against fundamental traits of my character were diverse and very direct. The testimonies by Dr. Song and Dr. Park were particularly blunt in this respect. Dr. Song began his testimony by accusing me of making *"allegations without any substantiation,"* and of attributing to him in my written arguments *"quotes that are simply false,"* basically calling me a liar. I do not take such accusations lightly, and I would have expected the Committee to have asked for evidence from him, as he would have the burden of proof in that case.

10

UCMC00001721

Yet, interestingly, the rest of Dr. Song's 15-minute testimony was long on denials and short on facts. He failed to point out a single instance of occasions when I may have misquoted him, or point out to evidence contrary to certain accusations I may have made against him. In his April 4 response to my request for reconsideration, for instance, he wrote:

*"Many of the statements in your letter are not correct. I will not rebut those statements in this response as they will be addressed at the grievance hearing should you decide to proceed."*

Neither the statements I made in my request for reconsideration nor at any other time were addressed or rebutted by Dr. Song in his oral statement at the hearing. The Committee simply listened to his sharp accusations against me, and they were evidently not troubled by them, since they did not ask him for proof of any kind when the time for their questions came up.

With respect to Dr. Park, one of the key aspects of her problematic testimony was her firm emphasis on my alleged lack of professionalism. In one particular example, she used that term to characterize my objections to a faculty evaluation that had been submitted 10 days ahead of time, and that I believed had wrongly graded me on aspects where the attending in question had not even observed me. Even worse, the attending had said to me that my probationary status had led her to assume I was a bad performer, with a direct negative influence on the grades she gave me. The numerical data seemed to add credibility to my objections: out of five (5) attendings in the service, she gave me by far the lowest grades of any of them, a full 1.0/6.0 points lower on average than the next lowest faculty evaluation. One of the Committee members did rightly ask Dr. Park to explain why she thought that incident showed lack of professionalism on my part, and she responded that she finds it inappropriate for any resident to question the way in which an attending chooses to grade them.

I have a well-founded concern that Dr. Park as well as Dr. Song have a confused notion between professionalism and unquestioning submissiveness. In an open and democratic society such as the United States, and even more so in a leading academic institution such as the University of Chicago, it is my belief that respectful and legitimate dissent should not only be allowed but also valued. While I have never refused to accept an assignment I have been given by my superiors, and therefore cannot be accused of insubordination, I have occasionally exercised my right to express concerns about certain decisions, from the above-mentioned faculty evaluation in February that I deemed utterly unfair, to a rotation assignment in April that I deemed of considerably less educational value that those of my peers. Dr. Song and Dr. Park in particular have responded to my raising these legitimate concerns with attacks on my character, calling me disruptive and unprofessional on the one hand, and also with harsh retaliatory measures on the other. Dr. Song went to the lengths of removing me from clinical service altogether after I asked him to explain why I had been getting a systematically low number of surgical cases in the Endocrine Surgery Service for 3 weeks in a row, with as few as zero (0) surgical cases compared to nine (9) for my co-intern in the same service in the same week. Dr. Song justified his arbitrary decision by claiming that I had performed unsatisfactorily on the service, based on an unofficial report by a senior resident in the service that I was not allowed to

11

UCMC00001722

see at the time. At the hearing, however, Dr. Kaplan, head of the service, directly contradicted Dr. Song and explicitly said that he believed I was doing satisfactorily on the service. Moreover, Dr. Kaplan made it clear that he had been shown the e-mails with my concerns that I had addressed only to Dr. Song and to Dr. Roggin, who were responsible for my assignments, and that therefore they should have been considered to be confidential.

7. <u>Failure to recognize my rights as a resident and to inquire the Section about their failure to uphold them</u>

For one of the aspects I most constantly refer to throughout my documentation, the Grievance Committee remarked or asked surprisingly little about the question of my rights as a resident. Even Dr. Song himself had previously said to me in a letter: *"Your rights will be addressed at the Grievance Hearing"* [6]. In my opinion, to any meaningful extent, they were not. Despite very concrete evidence I showed in my documentation, in particular in my third line of reasoning, where I cite specific ACGME and GME regulations Dr. Song and the Section broke in their handling of my case, the Grievance Committee could not even bring itself to an acknowledgement of whether those regulations had indeed been broken or not.

In one further example of this, Dr. Song said in his testimony that his service does not provide monthly faculty evaluations of residents, because they have an "intimate" semi-annual evaluation of residents instead. This may have sounded persuasive to the Committee, but it has a problem: it's not ACGME compliant.

First, the semi-annual evaluations are not an option; they are a requirement. From the ACGME Program Requirements for Graduate Medical Education in Plastic Surgery:

> *The program must:*
> *V.A.1.b).(4) provide each resident with documented semiannual evaluation of performance with feedback.*

In addition, there is another requirement:

> *V.A.1.a) The faculty must evaluate resident performance in a timely manner during each rotation or similar educational assignment, and document this evaluation at completion of the assignment.*

These two forms of evaluation are therefore <u>not</u> mutually exclusive, but the ACGME has clearly designed them to be complementary. Dr. Song has failed to implement the latter requirement as Program Director of the Section of Plastic and Reconstructive Surgery, as neither I nor any other intern who rotates through the Section has received an official performance evaluation from the Program's faculty. This is only an addition to the many other complaints I have made about non-compliance regarding performance evaluation, as well as the consideration, conduct and evaluation of the form of disciplinary action that was imposed on me (probation). The Committee in my opinion did not take those complaints into proper consideration.

12

UCMC00001723

8. <u>Failure to recognize the underlying causes of my particular situation</u>:

Finally, in one of the most serious failings of the Committee from my point of view, they seem to have made a woefully inadequate effort at considering the cultural and language barrier issue I have repeatedly raised, an issue that is particularly unique about my case. One of the members actually expressed finding it "a challenge" to believe my allegations that being in a foreign medical setting was a significant difficulty for me, because the member saw I was capable of expressing myself in writing with a firm grasp of the English language.

While I agree with the assessment that I am certainly capable of expressing myself well in both speaking and writing, what the member as well as Dr. Song on behalf of the Section (*"It is our experience that her deficiencies are not caused by a language barrier"* [2]), and seemingly other members of the Committee fail to recognize is that they cannot possibly have known how much effort it took from me to achieve such high-quality output. When they –and here I include Dr. Song, Dr. Park, as well as the Committee members– pretend they can alone assess my language difficulties just by looking at what they have in front of them, and without knowing the amount of effort I had to put into achieving it, they are failing to make use of a critical dimension of sensitivity to differences in language and culture. The selection of a Committee where none of its members seemed to have had to overcome that experience in a professional setting, the single aspect that makes me most different from all my other fellow PGY-1s as well as Plastic Surgery interns for the last several years, only added to that problem and also seems to have made it much more difficult to take that aspect into proper consideration.

In another poignant example, as most English speakers know, issuing an apology with the appropriate tone for the situation is probably one of the most difficult skills to master even for native speakers of the language, as countless politicians all the way up to the presidential level can attest. Commenting on a controversial incident I had with a Pediatric ER attending and the message of apology I later sent to her, Dr. Park said at the hearing: *"Rush Limbaugh would have given a better apology,"* while chuckling in front of the members of the Committee. Apart from the unwelcome comparison, this is a clear example which indicates that in her mind she would directly measure up my words against those of a native speaker who is also a well-known media personality in the United States. Dr. Song had expressed a similar sentiment by e-mail about the same incident as well, and then turned it into a prominent example of my alleged lack of professionalism, to the point all three of the Section's witnesses mentioned the incident at the hearing. The clear implication by all of them was that the awkward apology was unquestionably due to some fundamental flaw in my character, since their biased view prevented them from entertaining the possibility that it might have been due to just an inadequate mastery of that part of the language on my part.

UCMC00001724

# References

(found in Dr. Artunduaga's Grievance Materials or attached to the email*)

[1] "uch_015566.pdf"   U. Chicago GME policy manual
[2] "Memo in Support of Decisions.pdf"   Dr. Song letter shared with the Grievance Committee and Dr. Artunduaga on May 8th.
[3] 2011_11_04_LETTER   Dr. Song letter to Dr. Artunduaga, Nov 2, 2011
[4] 2011_11_21_EVAL  page 12   Dr. Fleming evaluation on 1/18/2011 (New Innovations)
*[5] 2012_05_01_EMAIL_TRAIL   Dr. Artunduaga and Ms. Curell email exchange May 1, 2012
[6] 2012_04_30_LETTER        Dr. Song to Dr. Artunduaga Letter  April 30, 2012

14

UCMC00001725