# EXHIBIT I

April 27, 2012

Resident Services
ACGME
515 North State Street, Suite 2000
Chicago, Illinois 60654

Dear ACGME Resident Services,

      My name is Maria Alexandra Artunduaga, and I am a PGY-1 integrated Plastic Surgery resident at the University of Chicago Medical Center (UCMC). This complaint concerns a critical situation I have been having to endure as of late, in which I have been the victim of numerous efforts of intimidation and retaliation originating from my Program Director, Dr. David H. Song, ever since I decided to initiate a Grievance Process against him. Furthermore, the institutional structure of the university has proven to be completely ineffective at enforcing its own GME policies as well as ACGME Institutional Requirements aimed at preventing this precise type of situations from happening to any resident at UCMC.

      From only the third month of my residency, I have been the subject of a relentless effort by Dr. Song to terminate me by all possible means available to him, trampling over my rights to academic due process and culminating in a decision of contract non-renewal and immediate dismissal from March 27 [1]. While these are the decisions I am currently contesting through the internal Grievance Process and hence they are not the subject of this complaint, my urgent appeal to you is due to the actions against me that have been taken after that date and still continue to this day, which I can only interpret as intimidatory and retaliatory, and which have significantly degraded the quality of my educational and work environment over the past month. This is a glaring violation of the ACGME Institutional Requirements, which state:

*Resident Educational and Work Environment*
*II.F.1. The Sponsoring Institution and its programs must provide an educational and work environment in which residents may raise and resolve issues without fear of intimidation or retaliation.*

      The use of both intimidation and retaliation on the part of my Program Director in response to a Grievance, and the institutional failure of the University of Chicago to appropriately address these allegations and to provide the necessary oversight to stop these actions from continuing, are the subject and the motivation of this formal complaint.

1

UCMC00006100

The following is the list of concrete actions and events that support my claim:

1) On March 27, I was relieved from all clinical duties effective immediately, in a decision communicated to me through a letter that stated the alleged reason to be that I "devote [my] time to consideration of [my] professional development and looking for a job or training program." This was a blatant infringement of University of Chicago GME policy [Appendix B1], which clearly states that a breach of contract is the only valid reason for dismissal. I could only interpret this as an overt action to arbitrarily remove me from clinical service, without giving me time to respond, and with the dubious motivation of providing me with a type of help that I did not request.

2) At my request [2], I was reinstated on April 4 and returned to clinical service on April 7, even though the reinstatement notice [3] clearly said that my contract had remained in full effect. This means that the overall result was that I was forced to miss 10 days of training without a valid justification.

3) The April 4 notice contained a clause saying: "Please note that if during this period, we believe that you have breached your contract in any way, that we may remove you from clinical service." This was an unnecessary warning that simply restated standing and widely known GME policy, but its invocation reflects a transparent intention to intimidate me with the threat of another immediate dismissal, such as the one I had just undergone.

4) On April 5 I was notified of my new rotation schedule [4], which was significantly different from the one I had prior to the dismissal, and which by any objective standard was of considerably less educational value. I was now scheduled to rotate for 8 weeks in a service (Endocrine Service) where I had already rotated for 9 weeks earlier in the year, and in addition, I would have to share duties with other interns. This would make me the only intern in a class of 18 who would have shared duties with another intern for 4.5 months of the academic year, far longer than anyone else, with the consequent negative impact on my case log numbers and progress in the development of the ACGME core competencies for my level of training.

5) After receiving the notification of my rotation schedule, I immediately contacted my Program Director to express my concern for what I considered to be an unacceptable arrangement, appealing to his ACGME/GME-mandated duty to ensure my educational needs were met [5]. He provided the following response through his lawyer, Ms. Jane McAtee [6]:

"Your demands concerning your schedule for the rest of your contracted period of training are not appropriate and do not adequately represent any 'rights' you claim to have. The Program Directors have the prerogative to assign you to the appropriate duties and assignments and Dr. [Kevin] Roggin [Program Director of General Surgery] will do so"

Even though I recognize the prerogative of Program Directors to decide on the rotation schedule, I can only see my new schedule as a deliberate and unjustified decision to lessen my

2

UCMC00006101

exposure to a variety of surgical specialties, as well as to a number of distinct clinical cases within each specialty.

6) The e-mail from Dr. Song's lawyer, dated April 6, further contained yet another stern warning:

"I caution you against misrepresentations about your status to other residents and against acting in any way that is disruptive to the operations of the Medical Center and the care of patients."

Given that I have never been accused of the types of behavior Dr. Song's lawyer was warning me against, I must interpret this as another effort at intimidation. Dr. Song clearly feels uncomfortable about me talking with other hospital personnel about the situation he has been putting me through –another possible explanation for the dismissal decision and later for my limited number of rotations–, as he has expressed it to me in writing [6], and he would prefer for his own interests that I remain silent about it.

7) In the three weeks since my reinstatement, my chief resident in the Endocrine Service has assigned to me a remarkably low number of clinical cases: two (2) on the week of April 9, one (1) on the week of April 16, and zero (0) on the week of April 23. In contrast, the co-intern at the same rotation and level of training as I am, has been assigned seven (7), ten (10), and nine (9) cases, respectively, over the same time period.

When I asked the chief resident to explain this disparity, he only said he had received explicit orders from Drs. Roggin and Song to treat me differently from other interns [7], without specifying what those orders were. Furthermore, when I spoke on April 24 with Dr. Edwin Kaplan, head of the Endocrine Service, he expressed surprise than an intern in his service would be receiving such inadequate assignments for no apparent reason. I then e-mailed Drs. Song and Roggin [8a to ask them to justify the order that my chief resident had refrained from explaining to me, and which had already made me waste almost a full month of my training, but my message went unanswered despite my repeated attempts [8b].

The assignments I have been given have had a particularly negative impact on my progress in the development of the following ACGME core competencies:
I. *Patient care (compassionate, appropriate, effective)*
Patient presentations, bedside rounds, morning report presentations have diminished considerably; I have logged only 40 hours of duty per week over the last month [9].
II. *Medical knowledge (biomedical, clinical, cognate sciences, and their application)*
Senior residents were instructed to basically ignore me during morning rounds; I have been excluded from direct questioning during clinical care and teaching experiences, as well as journal club and conference discussions where my name does not even appear in the resident sign-up sheets anymore [10] [11].
III. *Practice-based learning and improvement (investigation and evaluation, appraisal and assimilation of evidence)*

3

UCMC00006102

My progressive and graded improvement in clinical care and surgical technique has been deteriorated with such unequal distribution of surgical cases compared to my co-intern in the service.

*IV. Interpersonal and communication skills (effective information exchange, teaming with patients and families)*
My interaction with other residents, faculty, non-physician non-clinical staff, and patients and their families is minimal; I attend 1-2 clinics per week, and I have had a maximum of 1 surgical case to perform and follow every week [12] [13] [14].

*V. Systems-based practice (awareness and responsiveness to larger context and system of health care, use of system resources)*
The use of the entire health care system in patient care, and teamwork over the last month has been minimal, as I have been excluded from standard surgical resident activities.

In addition, the inadequate distribution of rotations and of clinical cases within each rotation for the past month and the foreseeable future, and my exclusion from conference attendance lists, violate the following specific ACGME Program Requirements regarding the duties of Program Directors [15]:

*II.A.4. The program director must administer and maintain an educational environment conducive to educating the residents in each of the ACGME competency areas. The program director must:*
*II.A.4.t) ensure that faculty and resident attendance at conferences is documented; and,*
*II.A.4.u) demonstrate that residents have generally equivalent and adequate distribution of categories and cases.*

8) Given the inadequate response of my direct supervisors, I requested a meeting with Dr. Michael Simon, Chair of the GMEC, and Mr. Barry Kamin, University of Chicago DIO, and it took place on April 20 [16]. I explained to them the situation of intimidation and retaliation I was being subjected to since my Grievance Process began, and asked them to take action in accordance to their ACGME/GME-mandated role in the supervision of Program Directors and of residents' educational and work environment:

From ACGME Institutional Requirements:
*I.B.4. The DIO and GMEC must have authority and responsibility for the oversight and administration of the Sponsoring Institution's programs and responsibility for assuring compliance with ACGME Common, specialty/subspecialty-specific Program, and Institutional Requirements.*

From UCMC GME Policy Manual:
*Responsibilities of the GMEC include the following [17]:*
*Establishment and maintenance of appropriate oversight of, and liaison with, program directors and assurance that program directors establish and maintain proper oversight of, and liaison with, appropriate personnel of other institutions participating in programs sponsored by the University of Chicago Hospitals.*

4

UCMC00006103

*Assurance that all programs provide appropriate supervision for all residents that is consistent with proper patient care, the educational needs of residents, and the applicable Program Requirements.*
*Assurance of an educational environment in which residents may raise and resolve issues without fear of intimidation or retaliation.*

In addition, the UCMC GME Handbook specifies individual roles in the handling of residents' concerns [Appendix C1], and I made use of all the channels outlined there for their effective resolution, including the Chair of the GMEC.

Though the University of Chicago DIO and the Chair of the GMEC understood my struggle, they claimed that they did not have the power to intervene, in contrast with the explicit ACGME/GME policies quoted above, and they instead raised as a suggestion that I talk to Dr. Jeffrey Matthews, Chair of the Department of Surgery, as the only institutional official with the necessary oversight power to review the situation.

9) I e-mailed Dr. Matthews to clearly outline the situation [18] and met with him on April 24. Though I had never met him, he seemed to be have been informed about my case. However, he openly refused to look into the actions of my Program Director, instead claiming among others that being reinstated had been a "significant accommodation" to me, even though my contract had remained in full force, and that he considered my rotation schedule to be "a pretty good arrangement," despite the evidence to the contrary I had brought with me, and which he was unwilling to see. Furthermore, he seemed to be completely unaware that a contract non-renewal was a grievable decision, as GME regulations stipulate [Appendix B3]. Hence, instead of addressing the immediate problem at hand, and realizing the serious challenges I would have to face even if I were successful in my Grievance Process, but had already suffered from either a non-existent or a sub-standard quality training for a significant part of my internship year, he stubbornly focused on trying to give me career advice I did not request, and speaking about the end of my residency as a foregone conclusion.

This being the last of the institutional channels at my disposal, it became perfectly evident to me that the institutional hierarchy at the University of Chicago did not adequately protect residents from the types of abuses of power by Program Directors I had been experiencing, apart from those that can be challenged through a formal Grievance Process [19].

5

UCMC00006104

Though I recognize that the ACGME does not have the power to order specific actions in response to a resident's particular situation, I believe that my experience, along with the documented evidence I have accumulated, provide reasonable cause for concern regarding institutional non-compliance with an array of ACGME regulations that protect the fundamental right of residents to address issues and grievances without fear of intimidation or retaliation. My case highlights the reality of an institutional structure that does not provide for independent review of allegations of intimidation and retaliation by Program Directors, along with the necessary power to counter those measures if such allegations are found to be credible.

Given the unsatisfactory response I have received at all levels of the UCMC hierarchy, I hope first of all that the relevant institutional officials will be able to provide the ACGME with the explanation of their actions that they have so far refused to provide to me. Secondly, and most important, I hope that they will be able to state the specific GME policies they have devised in order to effectively and meaningfully address the type of concerns I have raised, and that they express their explicit commitment to implement and enforce such policies.

I thank you in advance for your time and effort in following up with this complaint, and you are free to use my name and any of the information herein in your communication with UCMC officials. You can use my personal information below to contact me regarding any further questions or concerns.

Respectfully yours,

*[signature: Maria Alexandra Artunduaga]*

Maria Alexandra Artunduaga, M.D.
Plastic & Reconstructive Surgery Resident
University of Chicago Medical Center
Cell Phone: (617) 999-3735
martunduaga@gmail.com

6