# EXHIBIT J

Date: June 22, 2012

To: Resident Services, Accreditation Council for Graduate Medical Education (ACGME)

From: Maria Artunduaga, MD, PGY-1 resident in Integrated Plastic Surgery at University of Chicago

Re: Formal Complaint against University of Chicago Medical Center and Section of Plastic and Reconstructive Surgery

Dear ACGME Resident Services,

This formal complaint follows an earlier one I filed on April 27 against the University of Chicago Medical Center (hereafter referred to as "the Institution") and its Section of Plastic and Reconstructive Surgery (hereafter referred to as "the Section") on the issue of their use of intimidation and retaliation in response to residents' concerns, originating from Dr. David H. Song as Chief and Program Director of the Section, and the institutional failure to appropriately address such concerns within its hierarchy. This current complaint addresses a larger and more chronic set of issues I have been privy to during my time at this Institution, and which I believe should be a subject for further careful review by the ACGME. I group the issues in four (4) main categories:

I. **Resident education:**
   - As a PGY-1 resident at the Institution, I was not provided with adequate educational opportunities, as ultimately evidenced by the number and types of cases I logged as junior surgeon during this year. My Program Director failed in his responsibility to make sure my educational needs were met.

II. **Resident evaluation:**
   - The Section is chronically non-compliant with ACGME regulations regarding proper and objective evaluation of residents who rotate through the service.

III. **Disciplinary action:**
   - The Institution lacks sufficiently clear and unambiguous guidelines for which types of academic and disciplinary actions are at the disposal of Program Directors for a given set of circumstances, and what specific rules govern each type of action chosen.
   - The Section's final evaluation of the probation period it imposed on me lacked objective and measurable criteria for successful completion, contrary to ACMGE and institutional regulations.

IV. **Due process:**
   - The Institution conducted a Grievance Process through a Housestaff Grievance Committee which failed to meet critical standards of impartiality, failed to ensure that potential witnesses would not be subject to intimidation or retaliation, and generally favored the interests of the Section throughout the process.
   - The Dean of the Medical School and President of the Medical Center conducted a final review which further failed to meet basic standards of fairness and impartiality.

I am hereby providing the specific ACGME and institutional GME regulations that are relevant for the purposes of this complaint, as well as the evidence of non-compliance by the Institution and the Section.

1

UCMC00006231

## I. Resident education:

The ACGME Program Requirements for Graduate Medical Education in Plastic Surgery [1] clearly state:

> II.A.4. The program director must administer and maintain an educational environment conducive to educating the residents in each of the ACGME competency areas. The program director must:
> II.A.4.a) oversee and ensure the quality of didactic and clinical education in all sites that participate in the program;
> II.A.4.u) demonstrate that residents have generally equivalent and adequate distribution of categories and cases.
>
> Int.C.2.c) Clinical experiences appropriate to plastic surgery education should be provided in alimentary tract surgery, abdominal surgery, breast surgery, emergency medicine, pediatric surgery, surgical critical care, surgical oncology, transplant, trauma management, and vascular surgery.

Since early on in my residency, I received a differential treatment at the University of Chicago, originating in large part from my background as the only intern in the Department of Surgery who was an international medical graduate (from Colombia), the only resident in the Section of Plastic Surgery who received her medical education in a foreign language (Spanish), and who in addition did four (4) years of post-doctoral research work prior to beginning her residency program. Since the Institution failed to appropriately address the concerns of discrimination on the basis of national origin that I made since the second month of my internship, I have now filed a complaint before the EEOC which they are currently investigating. On the educational side, there are four (4) specific facts that evidence the differential treatment I received:

1) First, the overall distribution of rotations I completed was particularly poor:
   July: Breast and Endocrine Surgery
   August: Breast and Endocrine Surgery
   September: Colorectal Surgery
   October: Plastic Surgery
   November: Thoracic Surgery
   January: Vascular Surgery
   February: Transplant Surgery
   March: Plastic Surgery (first half), Night Float (second half)
   April: Endocrine Surgery
   May: Independent Study Program (non-clinical)
   June: Independent Study Program (non-clinical)

   In contrast, my Plastic Surgery co-intern's schedule was more diverse:
   July: Plastic surgery
   August: Thoracic surgery
   October: Colorectal surgery
   November: Hepatobiliary surgery
   December: Oncological surgery
   January: Anesthesia
   February: Breast and Endocrine Surgery
   March: Breast and Endocrine Surgery (first half), Night Float (second half)
   April: Night Float
   May: Transplant surgery
   June: Vascular surgery

2

UCMC00006232

As can be seen, I was assigned to the Endocrine Surgery Service for 3 out of 11 months of training, and to Plastic Surgery for 1.5 months. I did not rotate through Anesthesia, Oncological Surgery and Hepatobiliary Surgery as my Plastic Surgery co-intern did, while she did rotate through all the services I did. Furthermore, as I stated in my first complaint, my Program Director used a retaliatory action against me after I complained to him about the inadequate number of junior surgeon cases I had received during the entire month of April (zero). Only three (3) hours after I submitted in person my first complaint to the ACGME on April 27, I received an e-mail from him which stated [2]:

> "Maria, I'd like to discuss with you your new assignment for May and June. Please meet in my office, J641, at 8am [Monday, April 30]."

Through a letter dated April 30 [3], Dr. Song communicated to me that he was withdrawing me from all clinical service for the last two (2) months of my internship year, and that my new assignment would be to complete an "Independent Study Program" under his supervision. The assignment consisted in making summaries of every chapter of Grabb and Smith's Plastic Surgery textbook, and he alleged that if I completed this task, he would then be able to certify that I had completed a year's worth of surgical training.

At the end of the first month of the study program, I e-mailed him an internet link where he could retrieve the summaries I had completed thus far, and he did not even go as far as acknowledging receipt of my message. Hence, I have received absolutely no supervision from him ever since he gave me the independent study assignment at a meeting we had in his office on May 7.

2) In addition to the issue of my rotation schedule, I was assigned to share rotations with other interns far more often than anyone else at the Department of Surgery. Namely, I had to share duties during the months of August, October, March, and April, i.e. four (4) months out of the nine (9) months of clinical training I actually received, when the average at my Institution is one (1) month or less. In particular, my co-intern at the Section of Plastic Surgery never had to share duties during any of her rotations throughout the year.

It is well known that sharing duties with another intern in a rotation has a significantly negative impact on the value of the educational experience. First, there tends to be a lack of clarity in the distribution of duties between the two interns, especially at the beginning of the rotation. This results in a higher likelihood of errors and misunderstandings, and a performance problem in one of the interns may unfairly reflect negatively on the other, as was very often the case with me. Second, and most important, each intern will have the opportunity to log a lower number of surgical cases than if he/she had rotated alone. This arrangement, especially when employed as often as it was in my particular case, goes against the ACGME Program Requirements for Graduate Medical Education in Plastic Surgery [1], which state:

> III.D. The presence of other learners (including, but not limited to, residents from other specialties, subspecialty fellows, PhD students, and nurse practitioners) in the program must not interfere with the appointed residents' education. The program director must report the presence of other learners to the DIO and GMEC in accordance with sponsoring institution guidelines.

3) As a direct consequence of both of the issues outlined above, I had a chance to log a remarkably low number and variety of surgical cases throughout my internship year, with only fifty-one (51) total cases logged in the ACGME Resident Case log system. Figure 1 below shows the total number of cases I logged each month, while Figure 2 shows the number of cases by type of procedure.

3

UCMC00006233



Figure 1: Distribution of logged surgical cases by month



Figure 2: Distribution of logged surgical cases by type of procedure

4

UCMC00006234

On Figure 1 it can be seen that I generally logged much fewer surgical cases on each month than the nine (9) that would typically be expected if I were to achieve a total number for the year of approximately 100. In particular, on the months of September (Colorectal) and April (Endocrine), I logged zero (0) cases, in addition to the "independent study" months of May and June. Further, in the months of October (Plastics), January (Vascular), February (Transplant), and March (Plastics), I logged a very low number of five (5) or fewer cases for the entire month.

On the side of the types of procedures I performed, Figure 2 shows that twenty-seven (27) of the cases I did as junior surgeon –more than half of my total of fifty-one (51)– correspond to only three (3) types of procedures, which is evidence of the remarkably poor variety of experiences I was assigned to as a whole. While I have not had access to national figures from the Accreditation Data System (ADS) on the typical number and variety of cases by other residents at my level of training, I am sure I must be far below the national average on both accounts, and most certainly below the number and variety of cases that my co-intern in the Section of Plastic Surgery at my Institution did. This must be interpreted as a failure by my Program Director to provide residents with a *"generally equivalent and adequate distribution of categories and cases,"* and even worse, I have learned that he himself actively ordered my chief residents to assign me a lower number of cases than to other interns. In the words of one of my senior residents in one of her evaluations during my probation period, after noticing the differential treatment I routinely received: *"many of her seniors are not giving her the opportunity to learn and instead just bypass her... I just don't think she was given the opportunity to be an intern."* [4]

Furthermore, on Figure 3 below, I provide my cumulative total number of cases as of each day of training of my internship year, compared to the total that would be expected if I were to achieve a total of 100 cases for the year. This shows how chronic the problem of lack of educational opportunities was, as I begin to fall below the expected average since only the third month of my training, and the trend only continues in an ever more pronounced fashion for the rest of the year.



Figure 3: Cumulative distribution of total cases logged

UCMC00006235

4) Finally, there was an issue with the type of preparation I received for the In-Service exam in Plastic Surgery that I took on March 1. At the beginning of my internship year, I was told by my senior residents at the Section that I would take the ABSITE test along with the General Surgery residents during the last week of January, as all previous Plastic Surgery interns had done before me. Accordingly, I was scheduled to attend the General Surgery conferences every Wednesday from 6:15am to 9:00am, which I did as the records at my Institution show. However, on December 1, as I was leaving the country for my 1-month vacation period, I suddenly learned from my Plastic Surgery co-intern (never directly from my Program Director) that we were inexplicably scheduled to take the In-Service exam in Plastic Surgery instead of the ABSITE [5]. No Plastic Surgery interns had ever had to take this exam before, and in recognition of that, my chief resident assured me by e-mail that *"[my] score will not be used in any way to penalize [me], so please do not be concerned that a lack of study time will be a detriment at this point."* [6] She further stated that *"this will be the first year the intern level has taken the test so a low score for anyone junior is more a reflection on us as far as educational needs as we integrate the program."*

This gave me less than two (2) months to prepare for the exam, a time in which I was not yet scheduled to attend the Plastic Surgery core curriculum conferences with the rest of the Plastic Surgery residents, so I was basically expected to study completely on my own. Therefore, not only did my program not give me timely and appropriate notice that I would have to take the much more specialized In-Service exam instead of the ABSITE, but it also did not put adequate educational resources at my disposal in order to help me prepare for it, not even any protected time beyond my clinical duties in order to allow me to study independently. In both January and February, I consistently logged close to the maximum of 80 hours/week at the hospital, which routinely left me with very little time for any type of activity besides my clinical work.

When the results of the In-Service exam came in on April 30, Dr. Song pointed out the low score I received in the exam (38/100) as part of his argument to dismiss me from all clinical duties that same day, contrary to the assurances I had received earlier from my chief resident. He used the score in order to justify my new assignment of an "independent study program" for the last two (2) months of my internship year, which consisted in making summaries of a textbook in Plastic Surgery.

6

UCMC00006236

## II. Resident evaluation:

The ACGME Program Requirements for Graduate Medical Education in Plastic Surgery clearly state:

> V.A.1.a) The faculty must evaluate resident performance in a timely manner during each rotation or similar educational assignment, and document this evaluation at completion of the assignment.
>
> V.A.1.b).(1) The program must provide objective assessments of competence in patient care, medical knowledge, practice-based learning and improvement, interpersonal and communication skills, professionalism, and systems-based practice.

As a PGY-1 resident, I rotated through the Section of Plastic and Reconstructive Surgery twice, first during the whole month of October, and then during the first two weeks of March. Unlike at my other rotations, I did not receive official evaluations of any kind from the Plastic Surgery faculty, and neither did any other intern who rotated through the service. In fact, the Section never provides faculty evaluations of interns at the completion of the rotation, in direct violation of ACGME as well as institutional policy.

At my Grievance Hearing of May 16, Dr. Song directly addressed this issue in front of a Grievance Committee, confirming that in fact his service does not provide monthly faculty evaluation of residents. He justified that practice by saying that the Section instead did an "intimate" semi-annual evaluation of residents, meaning that he understands that evaluation as being somehow interchangeable with the monthly faculty evaluations. However, the semi-annual evaluation is only an additional ACGME Program Requirement he must comply with:

> The program must:
> V.A.1.b).(4) provide each resident with documented semiannual evaluation of performance with feedback.

This makes it clear that Dr. Song in his role as Program Director lacks a fundamental understanding of the way the ACGME has meant for resident performance to be evaluated. From the Program Requirements it is clear that the two forms of resident evaluation in question have not been designed to be mutually exclusive, but rather to be complementary and in fact mandatory.

At the same time, the Grievance Committee heard and was evidently persuaded by Dr. Song's argument about the was his Section conducted resident evaluations, as they did not address the issue in their decision, nor did the Dean and the President of the Medical Center when they later reviewed the case. This makes the Institution complicit in the non-compliant evaluation methods employed by the Section.

7

UCMC00006237

## III. Disciplinary action:

The ACGME has clear regulations in regards to the establishment of institutional policies governing all aspects of resident status, and in particular the implementation of disciplinary action:

> *III.B. GMEC Responsibilities: The GMEC must establish and implement policies and procedures regarding the quality of education and the work environment for the residents in all programs. These policies and procedures must include:*
> *III.B.7. Resident status: Selection, evaluation, promotion, transfer, discipline, and/or dismissal of residents in compliance with the Institutional and Common Program Requirements.*

For this purpose, the Institution established GME Policy 11, *"Resident/Fellow Evaluation"* [7], which does explain in detail one type of non-disciplinary remedial action for residents, namely the *"Additional Professional/Performance Development"* program. The institutional policy, however, lacks clarity in some critical aspects of the remedial/disciplinary actions at the disposal of Program Directors. In particular:

- It ambiguously states that *"if the resident/fellow does not successfully meet performance criteria noted in the Additional Professional/Performance Development, the Program Director may address the issues in a disciplinary manner, including suspension, probation, failure to promote or termination, all of which is subject to review under the GME Grievance Procedure."*

   My Program Director interpreted the word "may" in this policy to mean that he was under no obligation to implement the non-disciplinary option first, and that he could place me directly under probation. In a November 2 letter to me [8] he uses the threat of placing me under probation and leaving a permanent negative mark on my professional record in order to try to force me to resign from the program. Given the serious implications of these actions, the institutional policy should have been much clearer in stating whether non-disciplinary remedial actions must be implemented first before disciplinary action can be considered.

- Specific rules for the conduct of probation are not laid anywhere within the policy, basically leaving it up to Program Directors to arbitrarily decide what the conditions of probation should be. If true, this would constitute a violation of ACGME Institutional Requirement III.B.7., quoted above.

   In order to verify this, I e-mailed Mr. Barry Kamin, the Institution's DIO, to ask him that specific question. My question and his answer in a May 3 e-mail to me were [9]:

   > Dr. Artunduaga: *"What are the specific rules for Probation that Program Directors and Residents/Fellows must follow?"*
   >
   > Mr. Kamin: *"Answer: No specific rules"*

   The absence of rules for probation meant for instance that my Program Director was able to impose an arbitrarily short time for me to accomplish the goals of my probationary period. Initially, he set a period that went from November 15 until the *"second or third week of February"* [10] (with my 4-week vacation period in the middle), which meant the probation would only last 8-9 weeks, or approximately 2 months. Only after I requested for it to be extended did he agree to end it on the third week of March, making the extension appear as if it had only been done as a courtesy to me. In the end, my probation period of 86

8

UCMC00006238

working days was roughly what would be considered an acceptable minimum at other institutions that do have clear policies regarding the conduct of probation.

Another critical and even more serious problem with the absence of rules for probation concerns the criteria to be used for evaluation of its goals. At a minimum, I would have expected the criteria to conform to those of the less severe Additional Professional/Performance Development program:

> *"[The program] must state clearly the areas where performance improvement is needed <u>and the parameters by which successful completion of the Additional Professional/Performance Development plan will occur.</u>"*

Though my probation letter [10] did itemize ten (10) areas where performance improvement was needed, the "parameters by which successful completion of the plan will occur" were not stated. I consider this to be a serious omission by the Section, because it meant the faculty would later be able to use an arbitrary and subjective set of criteria at the end of probation in order to evaluate my performance in the specific areas for improvement, as they in fact did.

As part of the Grievance Process I initiated against Dr. Song and the Section, they submitted an evaluation grid to the Grievance Committee [11], which they claimed was the primary method of evaluation by which they decided I had failed at my conditions of probation. There are many problems with this table, which the Committee and later the Dean and President of the Institution failed to recognize, as follows:

- First, the Section had refused to share the table with me despite repeated requests. The table was even missing from a copy of my entire resident file that I requested and obtained from the Section's administrator on May 4. This was an overt violation of ACGME policy on resident evaluation, especially concerning a decision so crucial to my continuation in the Program:

  > *V.A.1.c) The evaluations of resident performance must be accessible for review by the resident, in accordance with institutional policy.*

  The table was actually not the only evaluative document that the Section had concealed from me when I requested a copy of my resident file. On May 8 they submitted a number of other documents to the Grievance Committee I had never been allowed to see before, to the point that I drafted a complete rebuttal statement to the Section's written documentation which included a table of all the documents that had previously been missing from my file [12]. This was only one notable instance of the Section's –and Dr. Song in particular– larger pattern of not allowing me timely access (or any access at all) to formal or informal performance evaluations that they had received about me. This common practice was also a violation of UCMC institutional policy (GME Policy 11 [7]):

  > *Each program will maintain a file from which completed evaluations for each resident/fellow may be accessed.*

- Second, as can be seen in the table, the evaluation of each of the 10 areas for improvement lacked any objective "parameters for successful completion." Rather, the analysis is completely anecdotal, relying on particular incidents and quotes from individual evaluations which may not reflect the true pattern that developed over the course of my probationary period. I must assume that given the general ACGME policy that *"the program must provide objective assessments of competence in patient care, medical knowledge, practice-based learning and improvement, interpersonal and communication skills,*

9

UCMC00006239

*professionalism, and systems-based practice,"* the evaluation of the conditions of probation must also follow from a series of quantitative "objective assessments" in the specific areas for improvement.

The Section's evaluation table is clear proof that their analysis did not follow that basic principle of resident evaluation. In fact, it followed instead a capricious pattern of quoting evaluations from the months were my overall performance was worst (November and March), and also of quoting a large number of informal reports (as many as ⅓ of all evaluations quoted in the table), many of which I was not allowed to see at the time and dispute their accuracy if I considered it necessary.

- Third, it is very important to note that a system of quantitative parameters was actually developed by the Section in order to specifically measure my performance on the 10 areas for improvement through weekly evaluations by my direct supervisors (senior residents and fellows). However, the Section arbitrarily decided to discard those numbers in their final evaluation, after accusing me of asking for "favorable reviews" and my evaluators of being "sympathetic" to my situation instead of providing their honest professional opinion in their weekly assessments. In the words of Dr. Park, my probation mentor, at the Grievance Hearing: *"I just didn't understand how some of her evaluations were actually that high."*

Contrary to Dr. Song's and Dr. Park's assertions, the other three (3) witnesses at my Grievance Hearing, Drs. Kaplan, Steppacher and Grieves –the latter a witness for the Section–, categorically denied that I asked them for favorable reviews. The Grievance Process showed that the dismissal by the Section of the numerical weekly evaluation data during my probation period amounted to an arbitrary decision without basis of fact.

Unlike the Section, who never went as far as plotting the data from my weekly evaluations, I did do so as part of my written arguments, and I am providing the summary of the data in Figure 4 below:



Figure 4: Weekly evaluations of probation criteria

10

UCMC00006240

I am providing this plot only to show that, while by my ninth week of probation (Dr. Song's original deadline) my average grades over the 10 areas for improvement were as high as 5.8/6.0 in the opinion of all of my evaluators, the Section's final evaluation table shows a completely opposite result: according to the table, I successfully met only one (1) goal, partially met five (5) goals, and failed at four (4) goals.

The wide discrepancy between the results of Section's anecdotal and subjective analysis, and what the numerical data in my case shows, should be cause for concern about the standards or lack thereof that the Section uses, with the approval of the Institution, in evaluating a disciplinary measure as consequential to a resident's professional future as is probation.

UCMC00006241

## IV. Due Process:

The ACGME policy on grievances and due process states that:

> II.D.4.e) Grievance procedures and due process: The Sponsoring Institution must provide residents with fair, reasonable, and readily available written institutional policies and procedures for grievance and due process. These policies and procedures must minimize conflict of interest by adjudicating parties in addressing:
>
> II.D.4.e).(1) Academic or other disciplinary actions taken against residents that could result in dismissal, non-renewal of a resident's agreement, non-promotion of a resident to the next level of training, or other actions that could significantly threaten a resident's intended career development

The Institution's GMEC does have a version of such a policy as required by the ACGME (GME Policy 15 [7]). The Institution's Grievance Procedure has three (3) main stages:

1) Request for Reconsideration;
2) Review by Housestaff Grievance Committee; and
3) Review by Representatives of the Dean and Medical Center President

In my case, this entire process took place between March 29, when I submitted my Request for Reconsideration, and June 19, when the Dean and the President issued a letter affirming the adverse decisions by the Housestaff Grievance Committee. While on the surface the Grievance Procedure may seem to have been followed as written, several troubling incidents occurred during the process that make me question the Institution's fairness and impartiality in conducting it:

- Following the appointment of the Housestaff Grievance Committee, chaired by Ms. Krista Curell, the Institution's chief compliance officer, the Chair showed a marked favoritism towards the Section in adjudicating the pre-hearing petitions we both made before her. In one telling example, she denied a petition I had made to allow for the submission of a rebuttal statement to the Section's written arguments, saying the following in an e-mail dated May 1:

    > "The Committee will not entertain any pre-hearing objections by either side regarding the materials submitted prior to the hearing. The Committee will review all documents prepared by both parties and you will have an opportunity to respond to documents submitted by the Section during the hearing."

    After the May 8 submission deadline, however, the Section broke this ruling on May 10 by submitting a rebuttal statement to the Chair and asking for it to be forwarded to the rest of the Committee. I objected to this action on two (2) separate e-mails on that same day, as it openly violated the earlier directive by the Chair herself. The Chair, however, tersely stated in response: "I am granting the request to file the two-paged memorandum submitted by Jane McAtee [the Section's legal counsel] to the Committee," without offering any compelling explanation for why she had decided to reverse her earlier ruling. While it is true that to compensate she did allow me to submit my own response, this incident showed her clear inclination towards ruling in opposite ways to the very same petition, depending on whether it was submitted by me or by the Section, in each occasion favoring the Section's own wishes and interests.

12

UCMC00006242

- As part of my list of witnesses for the Grievance Hearing, I had initially intended to include three (3) residents and two (2) fellows from other specialties, whom I had worked closely with in my rotations during my probation period. They all had a positive impression of my clinical abilities and had earlier expressed their willingness to speak in support of me in a Grievance Process should it become necessary.

    However, when the time came to contact my potential witnesses, one of the three residents quickly excused himself, while the other two strangely did not respond to my initial request. Only after my continued insistence they finally got back to me, expressing a surprising reluctance towards appearing at the Hearing, in contrast to the supportive attitude they had earlier shown to me. One of them finally admitted that she had been discouraged from appearing at the Hearing by the chief residents from the Department of General Surgery, who said that she should not intervene in a matter that was allegedly only a problem of the Section of Plastic Surgery. These intimidatory tactics ultimately served their intended purpose, since I did not succeed in convincing any residents at all to testify in support of me at the Hearing.

    On the part of the two (2) fellows I intended to call to testify, both of them did originally agree to appear at the Hearing. However, less than 24 hours before the Hearing, I received an unexpected phone call from one of them who said he would be withdrawing. While he was reluctant to explain to me the full motives of his surprising decision, he made clear that he was fearful of retaliation as a consequence of him appearing at the Hearing, especially as he was a foreign doctor working under a visa, as well as the sole breadwinner of his household. Also, he said he believed his testimony would most likely serve no useful purpose, as he claimed it was widely rumored at the hospital that the decision in my Grievance Process had already been made, and that the Hearing would be held only to comply with the letter of the GME policy.

- As for the Grievance Hearing itself, I will not provide a detailed account of the arguments as I am aware that the purpose of this complaint is not to ask for a ruling in my specific case. However, I must note that the Committee members made little or no reference to the written arguments of over 50 pages I had carefully prepared and provided to them, to the point I doubt they ever made any proper reading of them or took them into serious consideration. They also tended to accept most of the assertions of the Section's witnesses as true without ever asking them for specific evidence, while at the same time appearing deeply skeptical of the evidence I presented to them, even though unlike the Section, I had made a rigorous quantitative analysis of the data in my case. Finally, I found it quite suspicious that it took no more than exactly 38 minutes between the time the hearing ended at 4:00pm and the time I received an e-mail from the Chair informing me of the Committee's ruling to affirm the Section's earlier decisions not to renew my resident contract and to keep me under permanent probationary status [13].

- The last phase of the Grievance Process began on May 31 when I submitted my formal Request for Review to the Dean of the Medical School and the President of the Medical Center. As per the Institution's GME policy, this final review would be conducted by representatives of the Dean and the President who had played no role in the earlier work by the Grievance Committee, and who would recommend to them a final decision to make in the case.

UCMC00006243

This final review, which ultimately affirmed on June 19 the decisions by the Grievance Committee, lacked many of the basic characteristics of an independent, fair and impartial process. Among the most prominent failures were:

- I received no acknowledgement whatsoever that my Request had been received and the Review was in fact underway. In my Request I made certain questions about the conduct of this part of the process that were not answered at the time.

- When one (1) week later I was basically forced to send an e-mail again to ask about the status of the Review, I only received answers from the Section's lawyer (Ms. McAtee) and the Chair of the Grievance Committee (Ms. Curell), who only wanted to demand that I stop all communication with the Dean and the President, even though they would be personally responsible for the decision, and they had not yet appointed a representative to speak with me on their behalf. Since Ms. McAtee represented the interests of the Section as their legal counsel, and Ms. Curell had already ruled against me in this process, they could not legitimately represent the opinion of the President, the Dean, or their representative, who would allegedly be the only impartial arbiters I should have had to answer to in this part of the process.

- I was never notified of the appointment of any independent representative who would be in charge of reviewing the documentation, and Ms. Curell further made the dubious claim that *"Dr. Polonsky [Dean of the Medical School] and President [of the Medical Center] O'Keefe will be conducting the grievance review."* [14] I find it highly doubtful that the President and the Dean themselves would have had the time to review the nearly 400 pages of documentation that both I and the Section had provided in this process, when they were not even able to find the time to acknowledge receipt of my original request to them in the first place.

- Even though the Institution's Grievance Policy states that the Dean and the President would need to find whether the Committee's decision was *"supported by the facts presented at the Grievance Hearing,"* the chair of the Committee actually refused to collect the handouts and transcripts of the testimonies that both the Section and I presented at the Hearing. I explicitly objected to this way of conducting the Review, yet the Ms. Curell paid no attention to my concerns. Therefore, the final Review cannot possibly have taken into account the testimony presented at the Hearing, still another critical error in the conduct of this final stage of the process. Yet, the Dean and the President inexplicably asserted in their decision letter that the Committee's decision *"was supported by the facts presented at the Grievance Hearing."*

14

UCMC00006244

In conclusion, the overall educational experience I have had at the University of Chicago Medical Center and its Section of Plastic Surgery has fallen far below the high expectations I came in with at the beginning. I entered the program as an accomplished and highly regarded medical professional, both at the clinical and the research settings, recipient of numerous awards and with strong recommendations from surgeons and scientists at several prestigious U.S. institutions, to the point that the U.S. government granted me legal permanent residence under a National Interest Waiver as an alien of "extraordinary ability." I now leave the program after the most degrading and humiliating experience of my personal and professional life, an experience where I felt constantly underestimated and underappreciated, most shockingly at the instigation of my own Program Director, who had little regard for my educational needs and even less so for my rights as a resident. While I reevaluate and reorient my professional goals for the future, I hope the ACGME's action can be effective in guaranteeing a fair, positive and meaningful educational experience for all future residents who enroll at the Section of Plastic and Reconstructive Surgery at the University of Chicago Medical Center, in accordance with its own mission and established policies.

While I recognize that I am presenting numerous allegations of failure to comply with various ACGME regulations on the part of both the Institution and the Section, I believe each of them is serious enough to warrant separate and careful consideration. While I have tried to provide only the most essential evidence in order to support my claims, I have considerable additional evidence I can forward to you upon request. Please do not hesitate to reach me with any further questions, and I would greatly appreciate to receive notification on the progress of this complaint.

Sincerely yours,

*[signature]*

Maria Alexandra Artunduaga, M.D.
Plastic & Reconstructive Surgery Resident
University of Chicago Medical Center
Cell Phone: (617) 999-3735
martunduaga@gmail.com

15

UCMC00006245

**REFERENCES**

1. [ACGME_REQS] 360_plastic_surgery_07012009_f07012012.PDF
2. [2012_04_27_EMAIL] Email from Dr. Song to Dr. Artunduaga, April 27, 2012
3. [2012_04_30_LETTER] Letter from Dr. Song to Dr. Artunduaga, April 30, 2012
4. [2011_11_21_EVAL] Fellows and Residents Evaluations vol 1. 2011-2012
5. [2011_11_28_EMAIL_TRAIL] Email Trail Shenaq, Dr. Song, November 2011
6. [2012_02_21_EMAIL_TRAIL] Email Trail: Dr. Dickie and Dr. Artunduaga, Feb. 21, 2012
7. [UCH_DOCUMENT_GME_POLICY_MANUAL] UChicago GME Policy Manual
8. [2011_11_04_LETTER] Letter from Dr. Song to Dr. Artunduaga, Nov 4, 2011
9. [2012_05_03_EMAIL_TRAIL] Email Trail: Dr. Artunduaga and Dr. Kamin, May 3, 2012
10. [2011_11_15_LETTER] Letter from Dr. Song to Dr. Artunduaga, Nov 15, 2011
11. [2012_05_09_TABLE] Section material for Grievance Hearing, May 9, 2012
12. [2012_05_14_MAA_LETTER] Letter from Dr. Artunduaga to Committee, May 14, 2012
13. [2012_05_16_EMAIL] Email Ms. Curell to Dr. Artunduaga, May 16, 2012
14. [2012_06_07_EMAIL_TRAIL] Email Trail: Ms. Curell and Dr. Artunduaga, June 7, 2012

UCMC00006246