IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DR. MARIA ARTUNDUAGA,

        Plaintiff,

v.

THE UNIVERSITY OF CHICAGO
MEDICAL CENTER,

        Defendant.

No. 12 C 8733

Judge James B. Zagel
Magistrate Judge Sidney I. Schenkier

## DEFENDANT'S MEMORANDUM IN SUPPORT OF
## ITS MOTION FOR SUMMARY JUDGMENT

It was well known that Plaintiff Dr. Maria Artunduaga was from Colombia and spoke with an accent when she was admitted to the Defendant University of Chicago Medical Center's ("UCMC") Plastic and Reconstructive Surgery ("PRS") residency program for the 2011-2012 academic year. In less than a year in the program, her performance was criticized and evaluated negatively by more than 20 Attending Physician faculty members and senior residents. Ultimately, the seven PRS faculty members decided that she was not performing at expected levels and would not succeed in the program and voted unanimously not to give her a contract for a second year in the program. Her internal and external appeals all failed. She sues nonetheless, alleging discrimination because of her national origin and retaliation in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. Plaintiff's claims are entirely without basis, and UCMC should be granted summary judgment.

## I.      **FACTS**

Plaintiff, who speaks fluent English, was born in Colombia and attended medical school there.   After practicing medicine in Colombia for three years and doing several years of postdoctoral research at Harvard Medical School, she applied for a residency during the 2011-2012 academic year in the PRS residency program at UCMC.  The PRS residency program is six years long and each year admits two new first-year residents (often called interns).  Dr. David Song, a UCMC faculty member and Attending Physician, was the chief of the PRS section and Program Director of the PRS residency program.  Dr. Song selected Plaintiff as one of 29 applicants to be interviewed from a group of over 200 applicants for the PRS program, aware from review of her C.V. that she was from and attended medical school in Columbia.   After interviews where it was learned that she speaks with an accent, the PRS section ranked Plaintiff fifth out of the 29 applicants; and Plaintiff matched to the PRS program under the national student match program conducted by the Accreditation Counsel for Graduate Medical Education ("ACGME").   Plaintiff signed a one-year contract, which provided that "UCMC makes no commitment to renew this Agreement" and that "[r]eappointment is at the discretion of UCMC…."  She began her residency at the end of June 2011.  (DFOF ¶¶ 3, 6, 12, 17-20)[1]

First year PRS residents rotate on General Surgery services as well as the PRS service for one or two month periods.  Plaintiff's first rotation was on the Kaplan Service, which comprised breast surgery and endocrine surgery, in July and August 2011.  On August 4, Kaplan service Attending Physician Dr. Nora Jaskowiak emailed Dr. Song criticizing Plaintiff's performance.  Dr. Jaskowiak wrote that Plaintiff "just does not fully understand what is meant when certain things are asked of her or she is asked to do something.  Not language …."  She also wrote that

---

[1] References to "DFOF ¶__" are to paragraphs of UCMC's Local Rule 56 statement.  Additional record items and unreported decisions referred to in this brief are contained in UCMC's Appendix in support of its motion.

Plaintiff displayed "[a] sort of nervousness that makes her seem jumpy" and "seems difficult to teach because you are not sure she is really absorbing." (DFOF ¶¶ 14, 22-24)

Later in August, a patient emailed Dr. Song complaining that Plaintiff had been abusive to her, laughed at her and had used an inappropriate tone toward her. Dr. Song forwarded the email to Plaintiff, who emailed in response that "my accent sometimes can be misleading for English speakers (tone and intonation are different; however, I'm never rude to my patients." (DFOF ¶¶ 24-26)

Dr. Song informed the two PRS chief residents, Dr. Sarah Dickie and Dr. Justine Lee, about the issues that had been raised about Plaintiff's performance on the Kaplan service. They met with the Kaplan service Chief Resident for the month of August, Dr. John Seal, who also expressed concerns about Plaintiff's performance. Drs. Dickie and Lee later met with Plaintiff and offered her suggestions about how to improve. In late September and mid-October respectively, Dr. Jaskowiak and Dr. Peter Angelos, another Kaplan service Attending, submitted negative evaluations of Plaintiff's two months on the Kaplan service. (DFOF ¶¶ 27-30)

Plaintiff's rotation in September was to Colon and Rectal Surgery. On September 28, Colon and Rectal Attending Dr. Konstantin Umanskiy told Dr. Song that he did not want Plaintiff to continue on his service in the month of October, as she was scheduled to do. In an email he sent Dr. Song the next day and in his evaluation of Plaintiff for the full month, Dr. Umanskiy wrote that he had "major concerns that [her] performance is significantly below that of a typical resident" and that "she may not be able to achieve the level of performance expected from residents." (DFOF ¶¶ 32-35)

-3-

Drs. Lee and Dickie recommended that Plaintiff's rotation schedule be changed to bring her on the PRS service for the month of October so that PRS Attendings and residents could work with Plaintiff directly and assess her performance first hand. Dr. Song agreed, and the schedule was changed. While Plaintiff was on the PRS service, Drs. Lee and Dickie and senior PRS resident Dr. Trang Nyugen met with her to review issues with her performance and to help her improve. On October 24, Orthopedic Surgery Attending Dr. Mary Lawler complained to Dr. Dickie that Plaintiff had provided inadequate patient care and had responded inappropriately when the problem was pointed out to her. In an October 30 email, senior PRS resident Dr. Dan Butz criticized Plaintiff in multiple respects, including that she could not synthesize data to derive a diagnosis and could not accept and implement feedback, instead preferring to make excuses and to blame others. Dr. Dickie told Dr. Song that Plaintiff was performing at the level of a second year medical student and had too far to go to be able to be able to complete the PRS program in six years. (DFOF ¶¶ 37, 39-42)

Dr. Song consulted with the six other PRS Attending Physicians and all of them agreed that Plaintiff should be offered the choice of resigning from the PRS program, with the promise of assistance in transitioning to another specialty or program, or probation. In a meeting with Plaintiff on November 2, Dr. Song reviewed her performance, told her that her performance issues would be difficult to correct and offered her the option of resigning from the program or being placed on probation. Plaintiff elected probation; and on November 15 Dr. Song gave her a memo outlining the conditions of her probation. He designated PRS Attending Dr. Julie Park as Plaintiff's mentor for the probationary period, which extended until March 23, 2012. During that period, Dr. Park met with Plaintiff every week but one to review her performance and offer her guidance about how to improve. (DFOF ¶¶ 44-45, 49, 52)

Plaintiff's November rotation was to Thoracic Surgery. On November 16, Thoracic Surgery Attending Dr. Mark Ferguson emailed Dr. Song that Plaintiff's performance was "very poor" and "not up to the level of a 3rd year student. In his evaluation for the full month, he wrote: "My concern is that she does not have aptitude for the work she has chosen — very little improvement was evident during our month." (DFOF ¶ 53)

After being on vacation for the entire month of December, Plaintiff rotated to Vascular Surgery in January 2012. Plaintiff's February rotation was to Transplant. In his evaluation of her work on that rotation, Attending Physician Dr. Michael Millis criticized Plaintiff's performance and wrote that she "need[ed] to have a slower paced progression than is typical of a surgical resident at [UCMC]." Transplant Attending Dr. Yolanda Becker wrote in her evaluation that Plaintiff "has difficulty applying knowledge to a clinical situation and seemed easily overwhelmed." Transplant Attending Dr. Richard Thistlewaite wrote: "I found [her] fund of knowledge to be below average…. [i]n sports world parlance, I would characterize her as a 'project', meaning she has some abilities, but not yet clearly the skill to be successful." (DFOF ¶¶ 57, 59, 62-63)

Plaintiff was returned to the PRS service for the first two weeks of March. On March 7, Pediatric Emergency Attending Dr. Alison Tothy complained to PRS Attending Dr. Ginard Henry that Plaintiff had rendered poor patient care and behaved rudely toward her. Dr. Tothy later emailed the same complaint to Dr. Song. Drs. Henry and Song concluded that Plaintiff's purported apology to Dr. Tothy showed a lack of proper perspective and was arrogant. Plaintiff's performance during the two weeks on the PRS service was criticized by senior PRS residents and by Dr. Park in a detailed memo, which concluded that Plaintiff was not performing at even an average level, lacked basic skills, did not respond well to teaching or feedback, had

engaged in unprofessional behavior, would not accept responsibility and did not respond well under pressure. (DFOF ¶¶ 64-75)

On March 26, the seven PRS Attendings met and, after reviewing Plaintiff's record, unanimously concluded that Plaintiff should not be given a contract for a second year in the program. On March 27, she was advised of this decision and that she was being removed from all clinical duties immediately. Plaintiff protested, and it was decided to place Plaintiff back on the endocrine part of the Kaplan Service only. Dr. Jaskowiak, who headed the breast part of the Kaplan service, would not allow Plaintiff to work on that part of the service. (DFOF ¶¶ 76-78)

Plaintiff complained about her reassignment only to the endocrine side of the Kaplan service and demanded reassignment to a different service where she would not be on a rotation with another intern. She complained that she had not been given the same assignments as the other intern on the Kaplan service (who was doing all the breast cases since Plaintiff could not do them) and on April 26 wrote: "I have already been made to waste 1 full month of my time." (DFOF ¶¶ 79-82)

On April 27, Dr. Eric Grossman, the chief resident on the Kaplan service emailed Drs. Roggin and Song his evaluation of Plaintiff's performance on the Kaplan service. In addition to specific criticisms, he wrote that "overall [her] performance did not meet expectations and she did not function at the level of an intern." It was decided that Plaintiff should be removed from clinical duties, and she was given an independent study assignment for the rest of the year. That enabled her to receive full credit for one year of residency in the PRS program. (DFOF ¶¶ 83-84)

Plaintiff filed an internal grievance under the UCMC grievance policy for residents, complaining about her probation and not being continued in the program. After written

submissions by her and the PRS program and a hearing on May 16 at which Plaintiff, Dr. Song and others made oral statements and answered questions, the five-member Grievance Committee unanimously upheld the program's actions and the decision not to continue her in the program. Plaintiff appealed to UCMC's President and to the Dean of the Medical School, who affirmed the Committee's decision. In her appeal, Plaintiff complained for the first time that she had been discriminated against because of her national origin. A subsequent investigation by UCMC found her complaint to be without merit. Plaintiff also filed two complaints with ACGME about her treatment at UCMC. ACGME rejected both complaints. (DFOF ¶¶ 86-89)

## II.  ARGUMENT

### A.  All of Plaintiff's § 1981 claims fail at the outset

Plaintiff's claims under § 1981 are that she was discriminated against because of her Colombian national origin (Count I), subjected to a hostile work environment because of her Colombian national origin (Count II) and retaliated against for asserting her right to be free from national origin discrimination (Count III). These three claims fail for a fundamental reason — § 1981 prohibits discrimination because of race, not national origin.

In *St. Francis College v. Al-kahzraji*, 481 U.S. 604, 606, 613 (1987), the Supreme Court held that an Iraqi-American alleging that he was discriminated against because he was a member of the Arabian race could sue under § 1981 if he could show that "he was subjected to intentional discrimination based on the fact that he was born an Arab, rather than solely on the place or nation of his nation of origin." The Court further held that the law protected those persons who are discriminated against "solely because of their ancestry or ethnic characteristics." *Id*. at 613. Examining 19th century sources, the Court found that Congress had regarded persons of Arab ancestry as a separate racial group, bringing the plaintiff within the protections of § 1981 even if Arabs would not be considered a separate racial group by contemporary standards.

This Court applied *St. Francis College* in *Padron v. Wal-Mart Stores*, 783 F. Supp. 2d 1042 (N.D. Ill. 2011), and held that persons of Cuban origin alleging discrimination because of race could sue under § 1981. In so ruling, this Court noted that "Spanish" was considered a separate racial group at the time Congress passed § 1981, and because Cuba was a Spanish colony until 1902, "Congress's understanding of 'Spanish' may have included Cubans." *Id.* at 1053. Further, the plaintiffs alleged "that they were members of a racial minority and have dark eyes hair and skin and thus possessed ethnic characteristics of the type Congress intended to protect by adopting § 1981." *Id.*

Here, in contrast, Plaintiff in her Complaint alleges national origin discrimination only — not race discrimination. And, unlike the *Padron* plaintiffs, she does not allege that she is a racial minority and possesses ethnic characteristics of the type Congress wanted to protect by enacting § 1981. Further, Colombia became an independent nation in 1819, nearly 50 years before the passage of § 1981 (en.wikipedia.org/wiki/Colombia (visited on February 20, 2015)), so there is no basis for concluding that Congress might have regarded Colombians as "Spanish." Indeed, Plaintiff's deposition testimony confirms that her claim is not racial in character. She testified that she and other residents were discriminated against if they were non-native speakers of English who came from "[a] developing country with problems, bad publicity." (Artunduaga Dep. 92-93, 96-97) Countries around the world may be classified as "developing with problems, bad publicity" and do not define any racial group by 19th century or contemporary standards. Demonstrating that, at her deposition she identified three other residents who were allegedly discriminated against for the same reasons; all are from Iran. (Artunduaga Dep. 96-97; Kamin Dec. ¶¶ 13-15).

Because § 1981 does not apply to national origin discrimination, Plaintiff's discrimination and hostile work environment claims fail. *Leon v. Fed. Reserve Bank of Chicago*, 823 F.2d 928, 931 (6th Cir. 1987) (Colombian plaintiff alleging national origin discrimination could not sue under § 1981). Her § 1981 retaliation claim fails too because Plaintiff cannot bring a § 1981 claim that would serve as the predicate for that claim. *Muhammad v. Caterpillar, Inc.*, 767 F.3d 694, 699 (7th Cir. 2014) (statutory retaliation claim cannot be based on a complaint of conduct that is not prohibited by the statute).

UCMC is thus entitled to judgment on all three of Plaintiff's § 1981 Counts. But even if not granted summary judgment on those Counts because she does not make the requisite claim of race discrimination, UCMC should be granted summary judgment because Plaintiff cannot prove her claims in those Counts and in her parallel Counts under Title VII for discrimination (Count IV), hostile work environment (Count V) and retaliation (Count VI).[2]

**B.** **Plaintiff's Count I and IV discrimination claims fail**

**1.** **Plaintiff cannot prove her claims using the direct method**

A plaintiff alleging discrimination may proceed by the direct or the *McDonnell Douglas* indirect method of proof. The direct method requires that a plaintiff "marshal sufficient evidence, either direct or circumstantial, that an adverse employment action was motivated by discriminatory animus." *Porter v. City of Chicago*, 700 F.2d 944, 955 (7th Cir. 2012) Direct evidence is an outright admission of discriminatory intent. *Dass v. Chicago Bd. of Educ.*, 675 F.3d 1060, 1071 (7th Cir. 2012). Plaintiff does not claim to have any such direct evidence. Circumstantial evidence must directly point to a discriminatory reason for the employer's action

---

[2] UCMC discusses Plaintiff's § 1981 and Title VII claims together because the same proof standards apply under both. *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2012). UCMC has denied that Plaintiff was an employee; it does not waive that position here but simply assumes for purposes of this motion that she was an employee covered by Title VII.

and also be directly related to the employment decision. *Id*. Plaintiff cannot present any such circumstantial evidence.

While Plaintiff repeatedly asserts that she was treated unfairly, she offers nothing to show that those events (even if true) occurred due to her national origin. Nothing she relies upon points directly to discriminatory motive or is directly related to the employment decisions she challenges. Indeed, much of what she complains of — changes in schedule and duties, placing her on probation, and negative performance reviews — are not adverse employment actions at all and so are not actionable. *Langenbach v. Wal-Mart Stores, Inc*., 761 F.3d 792, 799-800 (7th Cir. 2014). Nor do such events support her circumstantial case. "[A]n amorphous litany of complaints about a myriad of work place decisions" is not enough to meet a plaintiff's burden of proof. *Gorence v. Eagle Food Cntrs., Inc*., 242 F.3d 759, 762 (7th Cir. 2001).

First, and alone enough to rebut Plaintiff's claims, she repeatedly alleges in her Second Amended Complaint that Dr. Song took the actions that she says were discriminatory – alleging, for example, that he recommended she be placed on probation, denied her the chance to gain meaningful experience, removed her from clinical duties in April 2012, informed her she would not be continued in the Program and made false statements about her in the grievance hearing. (See Am. Complt. ¶¶ 68, 71, 75, 77, 79, 84-94). At her deposition, Plaintiff likewise blamed Dr. Song for everything she says happened to her. (Artunduaga Dep. 249-53) But at her deposition Plaintiff also admitted that Dr. Song (who, after all, knew she was from Colombia from the time he selected her to interview) did not discriminate against her because of her national origin. (Artunduaga Dep. 254) With that admission, she has doomed her national origin case.

CHICAGO/#2596976.5

Regardless, as shown below, none of Plaintiff's other allegations support her claim of national origin discrimination. Plaintiff complains that her co-residents mocked her by imitating her Spanish accent, made derogatory comments about Hispanics in front of her, recited Spanish phrases from the Hispanic children's cartoon character "Dora the Explorer" and made derogatory references about Colombia, specifically about the Colombian revolutionary group FARC. Plaintiff also claims that one of her fellow residents suggested Plaintiff dress as "Dora" for Halloween. (Sec. Am. Cmplt. ¶¶ 31-32). These comments allegedly made by co-residents who are not decision makers for any of the challenged actions are irrelevant. *Harris v. Warwick Cnty. Sheriff's Dep't*, 666 F.3d 444, 448 (7th Cir. 2014).

Plaintiff alleges that in the months of July, August and September 2011 and April 2012 she "received" fewer operative cases than her non-Colombian co-residents. (Sec. Am. Cmplt. ¶¶ 36, 42, 74) There is no expectation that interns like her will perform a certain number of surgical cases in their first year, making her claim irrelevant. Further, in each of those months, the Chief Resident on the service assigned operative cases among the residents; and it was a different doctor every month — Dr. Haejin In in July, Dr. Seal in August, Dr. Brian Bello in September and Dr. Grossman in April. (Artunduaga Dep. 278-80; Kaplin Dep. 15-16; Grossman Dep. 51). The assignments they made do not point to any discriminatory motive on the part of UCMC decision makers in putting Plaintiff on probation and not continuing her in the program. Furthermore, the non-Colombian residents referred to are not comparable to Plaintiff. The July and August resident is Dr. Irma Fleming, but she was third year General Surgery resident at the time. In September, Plaintiff refers to Drs. Susan Lim and Julia Berian, both first year General Surgery residents; but Plaintiff specifically denied that Dr. Bello — who did the assigning that month — discriminated against her (Artunduaga Dep. 280-81). And in

April 2012, Plaintiff was not comparable to Dr. Stack because by then Plaintiff had been terminated from the PRS program and clinical duties and brought back only to work on the endocrine side of the service while Dr. Stack worked on the breast side.

In a similar vein, Plaintiff complains that she was not allowed to participate in surgical skill session with her fellow PRS first-year resident Dr. Shenaq. (Sec. Am. Complt. ¶ 34(a)). But the sessions complained of were sessions taught by Dr. Umanskiy for General Surgery residents to which Dr. Shenaq, in essence, invited herself. (Artunduaga Dep. 222-25; Umanskiy Dep. 31-36). Plaintiff also complains that she did not receive "protected time" to attend the plastic surgery core curriculum (Sec. Am. Complt ¶ 34(b)); but no PRS intern received protected time to do so. (Song Dec. ¶35) And plaintiff complains that she was the only resident excluded from the 2012-13 plastic surgery recruitment season (Sec. Am. Complt. ¶ 34(c)), which took place in December 2011 and January 2012; but Plaintiff was on vacation in December and was not included in the January interviewing so she could focus on the goals of her probation (Song Dec. ¶18).

Plaintiff also seeks to support her circumstantial case by alleging that Drs. Seal and Ferguson referred to her accent (Sec. Am. Cmplt. ¶¶ 46, 51), that Dr. Jaskowiak referred to Plaintiff as having "some critical issues that may be cultural" (*Id.* ¶ 48), that Dr. Song told her that she was not a "good cultural fit" at UCMC (*Id.* ¶ 49) and that Drs. Seal and Ferguson criticized her "communication skills". None of this helps her.

An employee's accent can be a legitimate job consideration. As stated long ago in *Fragante v. City and County of Honolulu*, 888 F.2d 591, 596 (9th Cir. 1989) (emphasis in original): "There is nothing improper about an employer making an *honest* assessment of the oral communication skills of a candidate for a job." See also, *Tseng v. Florida A &M Univ.*, 2010

U.S. App. LEXIS 10909, *3 (11th Cir. 1:09-cv -15297) (May 27, 2010), 109 FEP Cases 696, 697 ("[A]n employee's heavy accent or difficulty with spoken English can be a legitimate basis for adverse employment action where effective communication skills are reasonably related to job performance…."). Cf., *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1172 (10th Cir. 2007) (necessity of "clear and precise communication" in providing medical care justified an employer's English-only rule). Since accent can be legitimate concern, that Plaintiff's accent may have been raised on a few occasions as the possible source of at least some of her problems does not show that she was being discriminated against. Considering that possibility, rather than being discriminatory, could be an effort to identify and help resolve her performance issues. *Tseng, supra*, 109 FEP Cases at 696-97 (comments that plaintiff "needed to work on his English skills" and that language was "a challenge" for him "could simply have been meant to help [him] improve his effectiveness as a teacher."); *Bina v. Providence College*, 39 F.3d 21, 26 (1st Cir. 1994) ("[R]eferences to audience difficulty in understanding [Iranian plaintiff professor] may reasonably be interpreted as expressing a concern about his ability to communicate to students rather than discriminatory animus based on ethnicity or accent.") Further, it is impossible to see how references to her accent would evidence national origin discrimination when Plaintiff herself claimed it was a problem for her in providing patient care and communicating with other UCMC medical professionals. (DFOF ¶¶ 26, 47, 50)

Likewise, there is no reason to conclude that references to "cultural" differences show national origin bias. *Nayak v. St. Vincent Hosp. and Health Care Cntr.*, 2014 U.S. Dist. LEXIS 71379, *32 (S.D. Ind. 1:12-cv-00817) (May 22, 2014) ("At most, [plaintiff] has presented evidence of a possible cultural divide between Indian and American styles of communication and hospital norms, like working as a 'team' and her alleged inability to accept feedback from fellow

residents.  That is not, however evidence of intentional discrimination."); *Liu v. County of Cook*, 2014 U.S. Dist. LEXIS 27163, *16 (N.D. Ill. 1:10-cv-6544) (March 3, 2014) (statement directing plaintiff, who is from China, to operate in all suspect cases of acute appendicitis "because that is the way American surgeons treat adult patients with acute appendicitis" not related to national origin).  Indeed, it is clear that the cultural issues Dr. Jaskowiak was referring to stem from the differences between the U.S. and other medical systems.  Once again, Plaintiff herself has asserted that such differences exist, so it cannot be national origin bias for Drs. Jaskowiak and Song to have referred them.  (DFOF ¶¶ 47, 50).

Furthermore, it is apparent that Dr. Jaskowiak was seeking to explain Plaintiff's serious performance problems and to try to develop ways to address them, rather than discriminating against her.  *Rapold v. Baxter Int'l. Inc*., 718 F.3d 602, 608 (7th Cir. 2013) (comments about plaintiff's "European cultural differences", his "Germanic" attitude and "autocratic" tendencies not proof of discrimination; they "evince little more than an attempt to give [him] the benefit of the doubt" and "[f]ar from painting him in an unfavorable light … establishes [the supervisor's] attempt to help [him] succeed … even as she received increasing feedback of unacceptable behavior by him.")  Finally, at her deposition, Plaintiff admitted that Dr. Song's comment was that she was not a good cultural fit with the department of surgery and with how surgery was learned.  (Artunduaga Dep. 95).  In any event, any claim that Dr. Song's alleged comment that she was not "a good cultural fit" evidences national origin discrimination is completely undercut by Plaintiff's admission, discussed earlier, that Dr. Song did not discriminate against her because of her national origin.

Much the same analysis applies to Plaintiff's attempt to use criticism of her communication skills by Drs. Seal and Ferguson to show discrimination.  Of course, saying that

someone has communication issues does not necessarily imply anything about their national origin. In fact, Dr. Ferguson testified that the problem he had with Plaintiff's communication was with how she synthesized and presented information — a problem noted by numerous evaluators throughout her entire residency — not her accent. (Ferguson Dep. 22-23) Further, Plaintiff has no independent evidence that Drs. Seal or Ferguson were motivated against her because of her national origin; indeed, while he criticized Plaintiff on multiple grounds, Dr. Seal expressly stated that she did not lack the required knowledge or motivation and was "teachable." (DFOF ¶ 27) Once again, comments about Plaintiff's communication difficulties show an attempt to address her performance issues, not national origin bias.

As to Dr. Ferguson, Plaintiff complains that he dismissed her from the operating room because she was too short to assist in surgeries and he would not wait for her to get steps to stand on. (Sec. Am. Complt. ¶ 5; Artunduaga Dep. 121-24). Despite Plaintiff's admission that Dr. Ferguson is notoriously difficult in the operating room toward all residents, Plaintiff nonetheless claims this is an instance of national origin discrimination because she is five feet tall and shortness has to do with her genetics and Hispanic background. Plaintiff's resort to such specious contentions show how pointless her case is.

Plaintiff takes issue with UCMC's assessment of her performance, alleging that it had improved by the time she was put on probation in November 2011 (Sec. Am. Complt. ¶¶ 57-61, 63-65) and by the time she was told she would not get a second year contract in March 2012 (Sec. Am. Complt. ¶¶ 87-91). She also claims that she was not appropriately removed from the Kaplan service in April 2012 (Sec. Am. Complt. ¶¶ 94-96). As shown above and at greater length in UCMC's Local Rule 56 statement, there was ample negative feedback on Plaintiff's performance at all three junctures, and it came from Attendings and senior residents whom

-15-

Plaintiff cannot show were biased against her because of her national origin. As she did in her unsuccessful appeals, Plaintiff may argue that the positive evaluations she received (most from junior residents and fellows) while she was on probation demonstrated her improvement and should have been given greater weight. However, UCMC was free to give greater weight to the many experienced Attending Physician medical educators who evaluated her performance negatively and complained about her during the same period. It was for UCMC to decide whether any improvements Plaintiff made were ultimately sufficient to meet its expectations. *Langenbach*, *supra*, 761 F.3d at 799. Plaintiff cannot attempt to prove discrimination by arguing that her performance should have been assessed differently and that the decisions about her probation, discontinuation from the program and removal from clinical practice were wrong. *Dickerson v. Bd. of Trustees of Cmty. Coll. Dist.*, 657 F.3d 595, 603 (7th Cir. 2011) (a plaintiff's disagreement with his performance evaluations "does not mean that the evaluations were the result of unlawful discrimination."). Here, Plaintiff asks the court to do what the Seventh Circuit has said repeatedly courts do not do — sit as super personnel agencies to second guess employer decision making. *Ballance v. City of Springfield*, 424 F.3d 614, 621 (7th Cir. 2005).

Finally, Plaintiff's circumstantial case fails because she has not identified any resident who had comparable performance and was treated differently. At her deposition, she identified two alleged comparator residents, General Surgery resident Dr. Reza Salabat and Otolaryngology resident Dr. Jonathan Lusardi (Artunduaga Dep. 283-84), but neither are valid comparators. All decisions regarding their residencies were made and carried out by their respective residency programs, not by the PRS program or Dr. Song. (Posner Dec. ¶ 7; Roggin Dec. ¶ 7; Naclerio Dec. ¶ 7; Song Dec. ¶ 31) *Little v. Ill. Dep't of Rev.*, 369 F.3d 1007, 1012 (7th Cir. 2004) ("A similarly-situated employee must have been disciplined, or not, by the same

decsionmaker who imposed an adverse employment action on the plaintiff.")  And Plaintiff has no evidence that any performance issues they may have had were of the same nature and severity as hers.  *Harris, supra*, 666 F.3d at 449 (plaintiff and comparator employees with shortcomings in common not similarly situated where plaintiff employee was terminated for additional, distinct performance problems and there were material distinctions between plaintiff's performance and her comparators').[3]

## 2.    Plaintiff's McDonnell Douglas case fails

As an alternative to either iteration of the direct method, a plaintiff may proceed using the *McDonnell Douglas* method.  Under that method, a plaintiff must first establish a prima facie case that: (1) she is a member of the protected class; (2) she met her employer's legitimate job expectations;  (3) she suffered an adverse employment action;  and  (4) similarly situated employees outside of the protected class were treated more favorably.  If she does so, the defendant must then articulate a legitimate, non-discriminatory reason for its actions.  Once the defendant does that, the plaintiff bears the burden of showing that the articulated reason is pretextual.  *Collins v. Am. Red Cross,* 715 F.3d 994, 1000 (7th Cir. 2013).

Plaintiff cannot meet either the second or the fourth *prima facie* case elements.  The extensive evidence submitted demonstrates that Plaintiff was not meeting the performance expectations of the PRS program.  And, as shown above, she has not identified anyone outside her protected class who was treated more favorably.  Nor can Plaintiff show the articulated reason — her inadequate performance — to be pretextual.  Plaintiff's admission that Dr. Song, whom she blames for virtually everything that happened to her, was not motivated by her national origin precludes a determination that the articulated reasons for UCMC's actions are

---

[3] Inconsistently, Plaintiff named Dr. Salabat as one of three residents allegedly discriminated against because they were non-native speakers of English from developing countries. (Artunduaga Dep. 96-97.)  Dr. Salabat continues in his program today.  (Roggin Dec. ¶ 12)

pretextual. From the very start of her residency and continuing throughout, multiple Attendings and others gave her negative evaluations, criticized her performance and complained about her. All seven PRS faculty numbers decided that she could not succeed in the program. That Plaintiff disagrees with that assessment is immaterial. *Coleman v. Donahoe*, 667 F.3d 835, 852 (7th Cir. 2012) ("It is not the court's concern that an employer may be wrong about its employee's performance, or may be too hard on its employee. Rather, the only question is whether the employer's proffered reason was pretextual, meaning that it was a lie.").

Plaintiff has no *McDonnell Douglas* indirect case.

### C. **Plaintiff's Count II and V hostile work environment claims fail**

To prove her hostile work environment claim Plaintiff must show that: (1) her work environment was both subjectively and objectively offensive; (2) the harassment was based on membership in a protected class; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability. *Nichols v. Michigan City Planning Dep't.*, 755 F.3d 594, 600 (2014). Even if Plaintiff could prove the first two elements, she cannot prove the third or the fourth.

As to the third, the conduct Plaintiff alleges here was neither severe nor pervasive. Factors considered in making that assessment are: (1) the frequency of the conduct; (2) how offensive a reasonable person would deem it to be; (3) whether it is physically threatening; (4) whether it unreasonably interferes with an employee's work performance; (5) whether it was directed at the victim. *Id.* at 601. Title VII and § 1981 are not general civility statutes and do not reach the ordinary tribulations of the workplace such as abusive language, offhand comments jokes and occasional teasing. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

The co-worker conduct Plaintiff alleges — that three residents mocked her by imitating her Spanish accent, made derogatory comments about Hispanics in front of her, made comments about the Hispanic children's cartoon character "Dora the Explorer" and the Colombian

-18-

revolutionary group FARC (Artunduaga Dep. 93-94, 224-25, 270-71) — is not sufficient to support her hostile work environment claim.  *Manatt v. Bank of Am., NA*, 339 F.3d 792, 798 (9th Cir. 2003) (racial jokes, ridicule of plaintiff's accent and act of pulling eyes back to imitate or mock the appearance of Asians insufficient to create an actionable hostile work environment); *Prasad v. Acxiom Corp.*, 2013 U.S. Dist. LEXIS 82237, *13-14 (N.D. Ill. 1:10-cv-5954) (June 12, 2013), 118 FEP Cases 1259, 11263 (N.D. Ill. 2013) (mocking and imitating Indian accents and comment that no one with an Indian last name could be a leader not enough); *Usherenko v. Bertucci's Corp.*, 2006 U.S. Dist. LEXIS 92726, *11-12 (D. Conn. 3:05-cv-756) (Dec. 20, 2006), 99 FEP Cases 1021 (D. Conn. 2006) (comments making fun of plaintiffs' accents and belittling their country of origin not enough).  Moreover, Plaintiff does not show that the complained of conduct interfered with her performance since she maintains she performed adequately as a resident.  (Artunduaga Dep. 164 ("I improved.  I did a good job.  To me, I passed my probation."))  *Nicholas v. Mich. City Plant Planning Dep't.*, 755 F.3d 594, 601 (7th Cir. 2014) (alleged harassment not shown to have interfered with Plaintiff's work performance where he claimed he "performed his job well with no complaints").

As to the fourth element, Plaintiff cannot show a basis for employer liability.  Here, UCMC designated multiple individuals to whom residents might direct complaints of harassment — her immediate or next non-involved supervisor, the Program Director or the Vice President & Chief Human Resource Officer.  Plaintiff failed to use those mechanisms to report the alleged harassing co-worker comments she claims.  (Artunduaga Dep. 270-72, 276-78)  For this further reason, her hostile work environment claims fail.  *Durkin v. City of Chicago*, 341 F.3d 606, 612-13 (7th Cir. 2003) ("An employer is not liable for co-employee sexual harassment when a mechanism to report the harassment exists but the victim fails to utilize it.").

**D.** **Plaintiff's Count III and VI retaliation claims fail**

**1.** **Plaintiff cannot prove her claims using the direct method**

Like claims of discrimination, retaliation claims may be proven by either the direct or indirect method.  To succeed using the direct method Plaintiff must have "sufficient direct or circumstantial evidence to establish: (1) that she engaged in protected conduct; (2) that she suffered an adverse employment action; and (3) that there was a causal connection between the two."  *Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 673 (7th Cir. 2011). Complaints concerning matters other than alleged national origin discrimination cannot support a retaliation claim.  *Durkin*, *supra*, 341 F.3d at 615.  Further, "[m]erely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient.")  *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006).   Plaintiff must show that protected activity was the but-for cause for the claimed retaliatory action.  *Univ. of Texas Southwestern Med. Cntr. v. Nassar*, 133 S.Ct. 2517, 2534 (2013).

Plaintiff does not claim to have direct evidence of any unlawful retaliatory motive and her circumstantial case fails because she has alleged in a verified complaint filed in the Circuit Court of Cook County roughly two years after this lawsuit was filed that "Dr. Song had decided by approximately August 2011 that he wanted to oust [her] from the program."  D. App. Tab 21, ¶ 58.  Plaintiff however has not claimed to have engaged in any protected conduct before or during August 2011.  Thus, even if what she says is true – that Dr. Song decided by August 2011 that he wanted her out of the program – she does not have the requisite evidence of protected conduct.

At her deposition, Plaintiff, advanced a different story, that Dr. Song had decided by late October 2011 that he wanted her out of the program and that everything that happened later was

a "sham" (Artunduaga Dep. 253)  Plaintiff further testified that he retaliated against her because she told him at their meeting on September 29 that the criticisms of her performance and complaints about her were due to her accent or cultural background.  (Artunduaga Dep. 66-67). But, as already shown, references to accent or culture are not equivalent to a claim of national origin discrimination.  If Dr. Song decided to retaliate against her by August 2011 or in October 2011, any complaint she might later have made of national origin discrimination is irrelevant since the decision had allegedly already been made.  But in fact, she has no evidence that she made one.  In November, her husband, Ricardo Garcia emailed and spoke with UCMC's Director of Labor Relations but did not claim to have alleged discrimination.  After Plaintiff met with Mr. Rothstein on May 8, she wrote him to "clarify" that she was not claiming discrimination.  And, Plaintiff — who submitted hundreds of pages in support of her complaints — admitted that she did not complain in writing of national origin discrimination until her appeal to the President and the Dean of the grievance committee's decision.  (Artunduaga Dep. 117-20)

Even had Plaintiff evidence of protected conduct, she cannot establish a causal connection.  Numerous Attendings and senior residents concluded that Plaintiff was not measuring up.  Dr. Song made the decision to offer Plaintiff the choice of leaving the program or going on probation after receiving criticism of her from multiple Attendings and senior residents and only after consulting the full PRS faculty, all of whom agreed with the action.  The decision that Plaintiff would not receive a second year contract was made not by Dr. Song alone but by a unanimous vote of all seven PRS Attendings.  Plaintiff has no evidence that the PRS faculty, the other Attendings and the senior residents took any action against her because of any complaints she may have made.

Plaintiff's direct retaliation case fails.

2. **Plaintiff cannot prove her claims using the indirect method**

To establish a prima facie case of retaliation using the *McDonnell Douglas* indirect method, Plaintiff must prove that UCMC "subjected [her], and not any similarly situated employee who did not oppose impermissible discrimination, to an adverse employment action even though [s]he was performing [her] job satisfactorily." *Little*, *supra*, 369 F.3d at 1011. If she does so, UCMC would have to articulate reasons for its action and in response Plaintiff would have to prove that UCMC reasons were pretextual. *Id.* at 1011-12.

Plaintiff cannot prove her prima facie case. As shown above with regard to her direct case, she did not oppose discrimination. Further, as shown in connection with her discrimination claims, her alleged comparators were not similarly situated and she was not performing her job satisfactorily. And even if she had a prima facie case, she cannot show that UCMC's reasons for its actions were pretexts for retaliation.

Plaintiff has no retaliation case under *McDonnell Douglas* analysis.

## III.    CONCLUSION

For all of these reasons, summary judgment should be entered in favor of Defendant University of Chicago Medical Center and against Plaintiff Dr. Maria Artunduaga.

Dated: February 20, 2015                      Respectfully submitted,

                                              THE UNIVERSITY OF CHICAGO
                                              MEDICAL CENTER


                                              By:   s/ Michael G. Cleveland
                                                     One of Its Attorneys

Michael G. Cleveland
Andrew Oppenheimer
Vedder Price P.C.
222 North LaSalle Street, Suite 2600
Chicago, Illinois 60601-1003
+1 (312) 609-7500

-22-

## CERTIFICATE OF SERVICE

The undersigned certifies that he caused copies of the foregoing DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT to be served upon:

Jamie S. Franklin
The Franklin Law Firm LLC
53 W. Jackson Boulevard, Suite 803
Chicago, IL 60604
jsf@thefranklinlawfirm.com

by email and U.S. Mail  on February 20, 2015.


_s/ Michael G. Cleveland_____
Michael G. Cleveland