# TAB 2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DR. MARIA ARTUNDUAGA,

       Plaintiff,

v.

THE UNIVERSITY OF CHICAGO
MEDICAL CENTER.

       Defendant.

No. 12 C 8733

Judge James B. Zagel
Magistrate Judge Sidney I. Schenkier

## DECLARATION OF KRISTA CURELL

I, Krista Curell, declare under penalty of perjury under the laws of the United States and

the State of Illinois as follows:

1.    I have personal knowledge of the facts set forth below.

2.    I am over the age of 18 and a resident of the State of Illinois.

3.    I was born in the United States.

4.    I am presently Vice President and Chief Compliance Officer of the University of

Chicago Medical Center ("UCMC").

5.    I served as a member of and Chair of the Grievance Committee that heard and

decided the grievance that Dr. Maria Artuduaga filed pursuant to the UCMC Graduate Medical

Education Grievance Policy.

6.    Dr. Artunduaga filed an internal grievance pursuant to the UCMC grievance

policy on March 29, 2012.

7.    Pursuant to the grievance policy, the Grievance Committee was appointed by

Dr. Michael Simon, UCMC's Associate Dean of Medical Education. In addition to me the other

members of the Grievance Committee were Department of Medicine Attending Physician Dr. John McConville; Department of Obstetrics and Gynecology Resident Margaret Mueller; Department of Emergency Medicine Resident Eric Beck; Department of Anesthesia and Critical Care Attending Physician Michael Hernandez.

8.      The Grievance Committee held a hearing on Dr. Artunduaga's grievance on May 16, 2012.

9.      Prior to the hearing, the Plastic Surgery section and Dr. Artunduaga each made written submissions. Dr. Artunduaga's submissions are Exhibit A. The plastic surgery section's submission is Exhibit B.

10.      At the hearing, the committee heard oral statements by Plaintiff, Dr. David Song, Dr. Julie Park and others. Dr. Artunduaga used a handout to accompany her oral statement. A copy of the handout Dr. Artunduaga used is Exhibit C.

11.      After the hearing, the Grievance Committee voted unanimously to deny Dr Artunduaga's grievance. A copy of the Committee's decision is Exhibit D.

12.      On May 31, 2012, Plaintiff appealed the Grievance Committee's decision to Dr. Kenneth Polonsky, Dean of the Medical School, and Sharon O'Keefe, President of UCMC. A copy of her appeal is Exhibit E.

13.      On June 19, 2012, Dr. Polonsky rejected Dr. Artunduaga's appeal. A copy of their decision is Exhibit F.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: February 16 , 2015            By: Krista Curell

                                              Krista Curell

CHICAGO/#2673486.1

# EXHIBIT A

Dr. Maria Alexandra Artunduaga

# Grievance Hearing

# University of Chicago

May 16, 2012

UCMC00000766

## Table of Contents

EXECUTIVE SUMMARY
MY ACADEMIC RECORD
LINES OF REASONING
    1) LINE 1: PROBATION PERIOD - THE FACTS
        Conditions of Probation:
        Objective Analysis of Weekly Evaluations:
        Progress on Core Competencies:
        The Big Picture:
    2) LINE 2: PROBATION PERIOD - DR. SONG'S METHODS OF EVALUATION
        Weekly meetings:
        Questionable evaluation methods:
        Confidentiality:
        End of Probation Period:
        Decision letter:
        Dr. Song's letter of March 27:
        Lack of facts and objective metrics:
    3) LINE 3: FAILURE OF DUE PROCESS
        1. Evaluation
        2. Professional/Performance Development
        3. Program Director
        4. Supervision
        5. Dismissal
    4) LINE 4: BIASED ACTIONS
APPENDICES
    APPENDIX A:  EVENTS LEADING TO PROBATION PERIOD
        1) "Several times misses were found, one in particular as it pertained to to maintenance fluid"
        2) "Several times misses were found, one in particular as it pertained to drain management"
        3) Supra-ventricular tachicardia, Cardiology/Gynecology consult, vaginal bleeding and tachycardia on RW's case.
        4) "Accidentally sent a patient home with a PICC line which was supposed to come out before discharge after multiple times of prompting"
    APPENDIX B: EVENTS DURING THE PROBATIONARY PERIOD
        1) "Late" progress notes entries
        2) Over-hours in February
        3) Dr. Tothy incident
    APPENDIX C: EVALUATIONS ON 'NEW INNOVATIONS' VS. PERSONAL FILE
REFERENCES

UCMC00000767

# EXECUTIVE SUMMARY

First of all, I recognize this is a very long document, but all the information here is important to fully support my statements (for this Grievance Hearing, and for future record).

Second, although the Grievance Hearing scheduled for May 16 of 2012 is focused only on two points:
- Evaluation of Probation period, continuing probation and
- Renewal of Contact for second year
this document also includes references to events prior and after the probation period, which help to draw a complete picture of the retaliatory/biased actions by Dr. Song against me, and which I consider are crucial to support and document our arguments.

I have split the document in four lines of reasoning plus appendices. Each line of reasoning can stand on its own, and be sufficient to draw the conclusion that I have not been treated fairly, and Dr. Song actions have been unjust and capricious, without following the Due Process set by the GME and ACGME.

In **Line 1,** the the original goals and mile posts of the probation are outlined, and an objective, fact driven analysis is presented, which shows that by all objective metrics I passed all the points and goals set for at the beginning of the probation.

In **Line 2**, the subjective and biased methods of evaluation interpretation used by Dr. Song are outlined, and proofs of the subjectivity and ill-oriented intent of his methods are outlined and denounced, which include manipulation of the information presented to Faculty.

In **Line 3**, the Failures of Due Process according to the GME and ACGME regulations regarding Dr. Song actions against me are presented. This line of reasoning on its own should grant its own review by ACGME inspectors.

In **Line 4**, a list of many biased and discriminatory measures against me since very early in my internship are outlined, which help to show a clearer picture on how the actions during the probation period are not isolated, but part of a larger trend.

In **[Appendix A]** I give an "in depth" recall of the events leading to probation. These are important because it shows how most of those events are actually not my fault, and they were capriciously twisted to paint a bad picture of me.

In **[Appendix B]** I preemptively treat some of the events I consider more important and that I believe will be the basis for Dr. Song attack over me at the Grievance Hearing.

Please note this is the first time I have the opportunity to respond to most of these attacks, and I want to leave clear with facts that most of the information used by Dr. Song has no solid sources (gossip), misinterpreted or just plain false.

UCMC00000768



MH#1 Informed of deficits, e-mails/informal comments not shown → Switched to Plastics, no remediation process outlined

MH#2 Blamed of co-intern's misses, no faculty evaluations, decision based on informal reports, no allowed to contest accusations, asked to leave the program, when refused was put on probation but *"you won't make it"*

MH#3 Probation starts, asked to contest accusations because Dr. Song found out I met with attendings asking for feedback for bad evaluations. Abuse/mistreatment/discrimination complaints ignored, *"you have a bad reputation, you're on your own"*, negative comments *"you won't make it"*, *"you're not wired to be a surgeon"*, *"you don't have the aptitude"*

MH#4 Granted 90-days of probation instead of initial 60-days

MH#5 Informed of probation failure, dismissed immediately citing reasons outside GME policy

4/7 Reinstated under heightened supervision, minimal clinical assignments, 1 OR case/wk as second assistant

4//29 Dismissed from clinical duties, no faculty evaluations completed, started *"independent study program"*

M. Artunduaga  Grievance Hearing Document  May 16, 2012

4

# MY ACADEMIC RECORD

Maria Alexandra Artunduaga, M.D.

| | |
|---|---|
| 7/11-Present | Physician Resident, Plastic and Reconstructive Surgery, U.Chicago |
| 3/11 | Matched into Plastic Surgery at U. Chicago |
| | -First time applicant, 16 ranked programs |
| 1/11 | Granted U.S. legal permanent residency under the National Interest Waiver |
| 7/07 - 6/11 | Human genetics postdoc in Harvard Medical School |
| | -Two book chapters |
| | -NEJM (first author), Nature Genetics, Journal of Pediatrics publications |
| | - Three research national prizes, International Fellowship $30,000 |
| | - 10 podium presentations, 5 poster presentations |
| 7/10-8/10 | Completed 2-months surgical Sub-I in University of Washington, Seattle |
| | - Only surgical Sub-I available for international physicians in the U.S. |
| | - Chosen from a pool of 200 applicants, 4-6 physicians each year |
| 2005-2008 | USMLE steps = 236/225/pass/pass |
| 2005-2006 | ER physician, Level II trauma center |
| 2004 | Social service year as general physician in rural area in Colombia |
| 6/03-1/04 | Harvard (ENT/PRS), Baylor (ED/Rads), Mount Sinai (SICU/GS) rotations |
| 12/03 | Cum Laude, GPA 3.81, Top 10 class |
| 1/97-12/03 | Attended top 3 Med School on national scholarship |
| 3/97 | Presidential Scholar |
| 12/96 | Top 20 SAT score in the nation, Valedictorian |

**Teaching/Advising/Mentoring:**

| | |
|---|---|
| 2011 | IMG advisor for ECFMG |
| 2007 | ECFMG advisor for Kaplan Test Prep Center Colombia, Bogota, Colombia |
| 2008 | Summer research tutor, Seidman lab, Harvard University, Boston |
| 2003 | Basic Science tutor, South-Colombian University, Neiva, Colombia |

**Leadership activities:**

| | |
|---|---|
| 2011 | "Transformation of Colombia's Health Sector", organizer, HMS, Boston |
| 2010 | "Symposium in Health and Biological Sciences", organizer, HMS, Boston |
| 2008-2011 | "Colombian Student Society – Harvard and MIT", HMS officer, Boston |
| 2009, 2010 | "Help Us Give Smiles Foundation", medical volunteer, Quito, Ecuador |
| 2007 | "Medical Missions for Children Foundation", medical volunteer, Quito, Ecuador |
| 2004 | "Health Prevention and Promotion Program", Director, Rivera, Colombia |
| 2003 | "Healing the Children Health", medical volunteer, Neiva Colombia |
| 2001 | "Colombian Society for Medical Students ACOME", Co-founder |
| 1997 | "Javeriana Student Medical Organization OME", Co-founder |
| 1996 | "Public Health Lectures in Middle School", lecturer, Neiva, Colombia |

UCMC00000770

# LINES OF REASONING

As stated previously, I will present four lines of reasoning that point to the arbitrary and capricious decision-making process used by Dr. Song in regards to my case, in his capacity as Program Director of the Section of Plastic and Reconstructive Surgery. These lines of reasoning are meant to be distinct and self-contained arguments for why I contend that the Grievance Committee should rule in my favor regarding the decisions I am grieving. I believe that if the Committee accepts any of these arguments as valid, my goals in this Process will have been fulfilled.

## 1) LINE 1: PROBATION PERIOD - THE FACTS

In this section:
- The goals, objectives and rules of evaluation for the probation are summarized.
- I show with objective metrics how all the specific goals and objectives of the probation period were fulfilled.
- From the data in my faculty evaluations, I show the significant progress I have made in all of the six ACGME core competencies, particularly in those where I was most deficient at the beginning of probation.
- I make an analytical comparison with the rest of my PGY-1 class, which shows a faster rate of progress that has already brought me well within the average in all core competencies.
- Some hints of bias and other external negative factors are revealed in the numerical analysis of my evaluations.

## Conditions of Probation:

On Nov 15, 2011, Dr. Song notified me that I had been placed under probation, and was handed the letter that set the conditions for this process [3]. The criteria for evaluation of the probation period and renewal of her contract were clearly itemized as follows:

> The following conditions must be met for you to continue in the program:
> - Establishing and maintaining your workload
> - Establishing successful doctor-patient relationships
> - Following technical instructions on the operating room
> - Improving organizational skills
> - Understanding what should be prioritized
> - Effectively communicating with faculty and staff
> - Appropriate clinical decision making
> - Accepting responsibility
> - Timely placing consult notes
> - Understanding the plan and your role in the plan

At the same time, on the first week of January an e-mail was sent to my evaluators, which informed them about my probation status and described the electronic evaluation method that had been set up for this specific purpose [8]:

> "I hope this email finds you well. I am Akilah Williams, Residency Coordinator in Plastic Surgery. As you may or may not know, Dr. Maria Artunduaga is currently on probation in our section. During her probation, we would like to ensure that she receives timely

M. Artunduaga Grievance Hearing Document   May 16, 2012                                                                 6

UCMC00000771

*feedback from her co-residents, chiefs and physician extenders on her performance. We have set up an evaluation in New Innovations that we would like you to complete by Friday of each week if you have interacted with Maria. We will then go over these evaluations with Maria the following Monday. You can visit New Innovations at www.newinnov.com.*

*The evaluation consists of 10 questions, and if you have any written feedback please feel free to make comments.*

*If you have not had interaction with Maria please let me know. Thank you for taking the time to complete the evaluation. If you have any additional questions feel free to email or call me at 5-1240."*

The following were the 10 specific areas of improvement in the electronic survey. These coincide with the itemized criteria in the probation letter, and evaluators had to provide a score from 1 (Deficient) to 6 (Exemplary) on each of them:

*Areas of Improvement:*
*1) Demonstrate ability to prioritize her work?*
*2) Efficient in completing her work?*
*3) See consults and efficiently place notes*
*4) Notify senior resident regarding change of patient status or continuing decline*
*5) Gather and relay pertinent patient history and exam*
*6) Follow directions in gathering appropriate diagnostic studies and ancillary services*
*7) Communicate effectively and demonstrate caring and respectful behavior when interacting with patients and their families*
*8) At any time, did you have concerns for patient safety?*
*9) Use of effective listening skills, eliciting and providing information using effective non-verbal, explanatory, questioning and writing skills.*
*10) Working effectively with others as a member or leader of a health care team*

## Objective Analysis of Weekly Evaluations:

As stipulated by ACGME and GME policy, an objective, competency-based evaluation must dictate the overall outcome of the probation period, and consequently the decision on renewal of contract, as stated in the conditions of the probation letter. Therefore, the numerical scores submitted by evaluators during the probation period, assessing my weekly performance on the 10 areas of improvement, should be the primary source of analysis in making this judgment.

The scores submitted by fellows and residents each week (usually 2-4 evaluators per week), who were also my direct supervisors and the people I had closest interaction with, are shown in table format in [31], and summarized in graphical form in Figure 2.

UCMC00000772

Figure 2: Weekly evaluations (10 areas of improvement) from Fellows and Residents during probation

M. Artunduaga  Grievance Hearing Document  May 16, 2012

8

UCMC00000773

Several clear facts can be derived from this figure:

- The beginning of the probation (2 weeks in Thoracic Surgery) was clearly a difficult period, and the data shows it. On the one hand, being placed on probation created a great amount of personal anxiety for me that prevented me from focusing solely on my clinical duties. On the other hand, the clinical house-staff on the service were alerted about my placement on probation since the beginning of the rotation, and they were consequently very apprehensive about letting me work on patients. This was one of the months with the least amount of clinical experience for me, and I expressed my dissatisfaction in a letter to Mr. Barry Kamin of the GME office [7]

- After my scheduled vacation (wedding) period in December, the months of January and February initially show an immediate and significant improvement from my previous rotation (from 3.6 to 5.3 in one week), followed by a smooth and steady further improvement over the following 8 weeks, in the opinion of all of my evaluators, culminating in an 5.8/6.0 average score by the end of week 10.

- Dr. Song's original deadline for the end of probation, as stated in the probation letter [3], was the second or third week of February, later extended in order to give me 90 working days of probation. However, by the end of the third week of February (week 9 of probation, highlighted in Figure 2), my average score was already 5.75/6.0, which placed me on the Exemplary level in almost all of the original 10 areas for improvement, according to both evaluators for that week. This shows I had actually fulfilled ahead of time the criteria laid out by Dr. Song, in fact by the time of his original deadline.

Upon switching to the Section of Plastic and Reconstructive Surgery, however, my scores significantly decline, from an average of 5.8 to 3.9 in only one week, breaking the upward trend I had maintained for the previous 8 weeks. I will further delve into the causes for this sudden decline in the next section, where I analyze Dr. Song's conduct of my probation period. Already, however, the data itself hints at a clear evidence of bias in at least 3 of my evaluators in the section, all of whom were senior Plastics residents who had been made keenly aware of my perilous situation within the Section.

Despite the poor grades by my senior residents on the first week of my Plastics rotation, they all agree on a significant improvement in my performance by the end of my second week; one of them even raised my overall grade by 1.5 points over this one-week period. This is evidence of the fact that many of the problems of the first week were due to having to share duties with another intern, which always requires some period of adjustment and makes it more difficult to assess individual performance. The Section would have gathered a more accurate impression of my individual performance if I had been left to rotate as a stand-alone intern, and this same issue had already occurred during my earlier rotation through the service in October.

- My individual performance in the Plastics rotation was most closely assessed by my co-intern (Joseph), who was able to see how I successfully carried out my in duties independently of his own performance, and even occasionally took over some of his duties. He was in fact the only resident in the service who gave me grades in the same range (Superior to Exemplary) that were consistent with those from my earlier rotations. In his own words even after the frustrating first week in the service:

    *"Having worked with her the past week and a half I have noticed no deficiencies in the way she organizes or completes her work, or in the way she interacts with patients and staff. She cares greatly about what she does and works hard to do her best."*

- Of note is the fact that no faculty evaluations whatsoever are on my file from my Plastics rotation (nor were there any from my earlier rotation in October), so these resident evaluations are the only assessments I have from that service over both rotations.

- Also noteworthy in table [31], in response to the question: *"At any time, did you have concerns for patient safety?,"* none of my evaluators from week 2 forward had any concerns about me in this respect. Therefore there is no objective basis for arguing that I could represent the type of

UCMC00000774

threat to patient safety that would warrant the reduced clinical workload I have been subject to since the end of my initial probation period.

In summary, this analysis of the numerical data shows how I steadily progressed towards the goals of my probation, and ultimately fulfilled them several weeks ahead of time in the opinion of my evaluators, despite significant evidence of bias and other negative external factors at both the beginning and the end of my probation period. Figure 2 contains the essence of the argument for why I should have been given a passing grade for my probation, and consequently also a renewal of my contract in accordance to the conditions in the probation letter [3].

## Progress on Core Competencies:

Monthly evaluations submitted by attendings did not directly evaluate the 10 areas of improvement outlined in my probation letter, and are therefore not a direct assessment of my progress on the conditions of probation. Furthermore, attending-intern interaction is much more limited than with direct supervisors, so evaluations are often drawn from a few direct interactions and/or second- or third-hand accounts, and thereby from an objective perspective are less reliable. However, for the sake of completeness, and in order to show my overall progress from the beginning of my internship year until the end of the probation period, using the average PGY-1 class performance as benchmark, I include the conclusions of an analysis of faculty evaluations here as well.

The overall progression in the six (6) ACGME Core Competencies, as derived from all attendings' evaluations, and for all months for which data are available, are illustrated in Figure 3. For each of the core competencies, my grade for each month (when available) is shown along with the average for the PGY-1 class on the same month, as well as the PGY-1 average plus and minus one (1) standard deviation, within which approximately ⅔ of the intern class should lie.

The following are the observations and conclusions that can be derived from the data:
- Overall, the PGY-1 class average is essentially flat over time, showing only a slight upward a few of the core competencies. At the same time, there are significant fluctuations from month to month, even in the negative direction, which serve as cautionary evidence of the overall unreliability of faculty evaluations, and also of the small size of the sample of 18 interns.
- I did in fact have a poor start to the internship year, particularly in the areas of Patient Care and Communication Skills, which eventually became also the core areas for improvement during my probation period.
- I was not evaluated by faculty in either of my rotations through the Section of Plastic and Reconstructive Surgery (October and March), so the data from those months is missing.
- In agreement with the fellow/resident evaluations, my worst performance was in the month of November, the month when I was placed on probation. As in the earlier analysis, the most likely explanation for this was my personal struggle with my placement on probation –a decision I had strongly disagreed with–, as well as the negative predisposition I found in most of the clinical staff in the Section of Thoracic Surgery, who had just learned I had been placed on probation and consequently were reluctant to let me work.
- By contrast, my best performance was in the month of January, directly following the Thoracic Surgery rotation, when I was proactive in informing my supervisors (fellows and residents) about my probationary status from the start, and asked them to judge me based only on our direct interactions, and not on what they had been told by other people. The results are well within the class average in all of the 6 core competencies, and show my true potential in a nurturing environment where the clinical staff are willing to approach me with an open mind.
- A slight drop can be observed in most areas in the month of February, which contrasts with my continued steady improvement in the judgment of my direct supervisors over the same period of time. This discrepancy is further testament to the unreliable nature of a good number of faculty evaluations, as I will further discuss in section 3 of this document.

M. Artunduaga Grievance Hearing Document May 16, 2012                                                      10

UCMC00000775



M. Artunduaga  Grievance Hearing Document  May 16, 2012

11

UCMC00000776

Figure 3: Progress on ACGME Core Competencies over internship year

12

UCMC00000777

## The Big Picture:

Figure 4 provides a summary of my overall progress in the 6 ACGME Core Competencies. The PGY-1 average on each competency, taken over all the months where data was available, is represented by a black ring, and the wide gray ring around it represents the region within one (1) standard deviation of the class average. For comparison, my overall grade on each competency is shown for two specific months: the July-August rotation (B service), the first rotation of my internship year, and the January rotation (Vascular service), the last rotation based on Dr. Song's original probation deadline of mid-February.

The graphic clearly shows my significant progress in all areas over this period: while my performance in my first rotation was within the class average only in one area (Professionalism), by my late probation period it was well within the class average in ALL areas, particularly those where I was most deficient at the beginning.

It is very clear here once again that indeed I was initially found to be significantly deficient in the areas of Patient Care and Communication Skills, also the key areas for improvement for my probation period. However, at the same time these areas were the ones where at the end I had made the most progress, nearly doubling my average grade compared to my first rotation and matching the class average. The overall trend shows that, should I be given the opportunity of further clinical training under fair conditions, my performance could only be expected to continue to improve, and eventually even place me at the leading edge of my class.

UCMC00000778



Figure 4: Overall progress on ACGME competencies from the beginning of internship year to the end of probation period

UCMC00000779

**2) LINE 2: PROBATION PERIOD - DR. SONG'S METHODS OF EVALUATION**

---

In This section:

- I draw a contrast between the objective rules and conditions that were set at the beginning of probation, and the questionably changing criteria for evaluation I was given throughout my weekly mentoring sessions.
- I challenge the validity of informal and non-documented evaluations routinely employed by Song to make major academic decisions regarding my past and continuing probation periods.
- I discuss Dr. Song's stated policy on the confidentiality of my probationary status, and show how it has been capriciously used to my detriment.
- The decision letter of March 27 is carefully examined, and the scarce evidence presented in it is challenged and shown to be without basis of fact.

The period following the decision of contract non-renewal is analyzed, and the pattern of ever more arbitrary decisions that continue into the present is highlighted.

---

As mentioned in the previous section, the probation letter from November 15 [3] stated the conditions of probation, and the e-mail sent to my supervisors [8] defined the procedures for electronic submission of weekly evaluations through the New Innovations system. The documented, competency-based, and quantifiable assessments in principle complied with both ACGME and GME regulations on resident evaluation. Also, during the course of the probation period, Dr. Julie Park would have the role of designated faculty mentor, who would be closely following my progress and would discuss it with me at weekly meetings. Finally, a faculty meeting of the Section of Plastic and Reconstructive Surgery would be held in order to evaluate my probation, and their decision communicated to me on March 23 [6].

Despite the seemingly clear and fair rules that were initially put into place, the conduct of the probation itself showed a number of irregularities which I will describe in this section, and which ultimately led to a decision that was contrary to the conclusions of the analysis I presented in section 1 of this document. In this section I will show the arbitrary and capricious nature of the process that led to that decision, and which I believe the Committee should invalidate according to current ACGME and GME standards.

## Weekly meetings:

As attested by the signatures on my file, I attended a total of eleven (11) weekly meetings with Dr. Park and Ms. Akilah Williams, residency coordinator of Plastic and Reconstructive Surgery, on 11/28/11, 01/03/12, 01/10/12, 01/18/12, 01/25/12, 02/06/12, 02/13/12, 02/28/12, 03/05/12, 03/12/12, and 03/21/12. The following were my observations and conclusions from these meetings:
- Of eleven (11) meetings with Dr. Park, only three (3) of them (on 11/28/11, 01/18/12, 03/21/12) were documented and put into my file, contrary to GME requirements on resident evaluation (GME Policy 11 [32]):
    *"Review of evaluations with the resident/fellow must be documented."*
- During the first weeks of probation in January, at the Vascular service, Dr. Park expressed her surprise at the significant positive change my evaluations showed after my December break.
- By late January, however, Dr. Park communicated to me that Dr. Song thought that my evaluations from fellows and residents were biased because I had openly shared with them the fact that I was on probation and regularly asked them for feedback, a strategy I felt had significantly helped me counter their initial bias and have them approach me with a more open mind, and also made me more aware of specific problems and things to improve. Dr. Park

UCMC00000780

implied I was getting favorable reviews not because of my actual performance but rather because they sympathized with me, and therefore told me the weekly evaluations from fellows/residents would no longer be taken into account to assess my performance. This was only one of several questionable decisions made during my probation that were not documented in my file.

- During the month of February, when my monthly faculty evaluations from January started coming in and also showed a significant improvement, I was communicated another set of questionable decisions:
    - o Dr. Song had reassigned me to finish my probationary period under his supervision, with the last two (2) weeks in the Plastic Surgery service [10]. Because of the last-minute change, I would have to share duties with another intern that had already been assigned to rotate in the service, an arrangement that had already caused significant misunderstandings in my earlier rotation through the service. Moreover, I would be supervised by senior residents under the direct control of Dr. Song, who would be much less likely to approach me with an open and unbiased attitude. The negative consequences of this arrangement would eventually show up in the numbers from my weekly evaluations that I discussed in section 1.
    - o Dr. Song also intended to ignore my faculty evaluations from Vascular Surgery (January), and possibly also Transplant Surgery (February), allegedly because I had been contacting attendings for feedback sessions at the end of the rotation, which according to Dr. Song were improperly biasing their final report.
    - o Accordingly, Dr. Park informed me that the final decision on my probation and contract renewal would be solely based on my performance during the last two (2) weeks on probation in the Section of Plastic and Reconstructive Surgery.
- The decisions above were again not documented in my file, and ultimately resulted in a method of evaluation completely different from the one that that had been initially set up. Importantly, since I was never presented with an official motion to change the rules for evaluation of my probation, I never signed on to any such change in the middle of the process.

In summary, despite the fact that the weekly meetings were conducted as stipulated in the probation letter, they also left me with the troubling sense that the "goal post" was being moved in response to my positive evaluations by attendings, fellows, and residents, in order to ultimately reach a preordained result.


## Questionable evaluation methods:


In several meetings with Dr. Song and Dr. Park, it was implied that Dr. Song was receiving direct communications about my performance in the form of personal e-mails and conversations, and intended to use those as basis for his decisions, many times even giving them more weight than to my official evaluations. I have knowledge that Dr. Song was contacting chief residents, attendings and nurse practitioners, requesting evidence that could be used against me since the beginning of my internship, and continued that practice throughout my probation. He even had designated people who would talk to my supervisors about me, and then report to him either verbally or by e-mail. These communications were never shared with me, even though they were directly related to me, and I only found traces of them when I requested a copy of my file in the week prior to submitting this document.

On my part, I spoke with some of the same people to ask them about the content of the reports they had been sharing with Dr. Song. In some cases, they refused to share the information with me outright [28]. In others, they actually expressed surprise at the way Dr. Song had used the information they had provided to him; in many occasions where they had intended to provide constructive feedback, pointing to a positive/fair overall impression, but with some minor incidents and areas to improve, the

UCMC00000781

information had instead been used by Dr. Song as part of an argument to punish me. Dr. Song's biased and malicious intent in spinning and manipulating the information he was provided about me is part of the subject of part 4 of this document.

Given the methods used to obtain unofficial evaluations about me, and the way they were used by Dr. Song, I request the Committee to invalidate this evidence because:

- The informal evaluations are not registered in any official evaluation system and do not conform to ACGME and GME standards. Therefore, they cannot be considered as valid evidence in making official and consequential academic decisions such as continued probation or non-renewal of contract.
- Though they could have been useful in supplementing official evaluations, they were never shared with me by any means, so I was never able to dispute false or misleading information that some of them do contain.
- I only got to review a few of them when, at my request, I received a copy of my file on May 4. They were therefore not shared with me in a timely manner that would have allowed me to correct misunderstandings that sprang from them.
- They are mostly composed of subjective comments and even second- or third-hand accounts, instead of the quantifiable, competency-based evaluations recommended by both the ACGME and the GME.

## Confidentiality:

One remaining point of contention about my still-ongoing probationary status concerns the confidentiality of my status. Dr. Song stated his view on this subject in an e-mail he sent me on March 14 [14]:

*"Please note that it has always been our intent to keep the fact that you are on probation confidential. I have learned that you have informed many people of your probationary status and have talked to many of the attendings and residents with whom you have worked since November about your probation. That is unfortunate since we hoped, for your sake, to keep this matter confidential. "*

About this policy I have the following observations:

- The confidentiality of the probation had already been officially broken ever since my supervisors received an e-mail from Ms. Akilah Williams informing them about my status and asking them to submit weekly evaluations concerning my areas of improvement. I therefore did not see a need to refrain from discussing my status openly at least with these people.
- Besides the official notification by e-mail, it was evident to me that my status was widely known by the clinical staff I worked with, as well as a large number of people at all levels in the Section of Plastic and Reconstructive Surgery. In my first rotation under probation in November (Thoracic Surgery), for instance, my superiors did not allow me to perform my intern floor duties or to perform junior level cases because they "knew about my issues." When I asked Dr. Song himself to intervene on my behalf to improve my working conditions, he refused to do it claiming I had a "bad reputation," and that I should work things out on my own. Hence, it became clear to me not only that the confidentiality of my status had not been kept by other people, but also that I was completely on my own, so whatever I did not do for myself to improve my work environment, nobody else would do it on my behalf.
- At the beginning of probation, I had identified my initial lack of openness and initiative to request feedback as a particular problem that generated a number of severe misunderstandings, which I

UCMC00000782

didn't learn about until I was already on the verge of being placed on probation. As I expressed it to Dr. Song in my response to the probation letter [4], it became my firm intention not to continue with that passive behavior, for my own sake.

- Dr. Park herself also encouraged me to be open, in response to my frustration at the mistreatment I had been receiving in my November rotation. As stated in the notes of the November 28 meeting [30 page 20]:

    *"Dr. Park suggested that when she starts her vascular rotation in January, she should let them know that she wants to prove herself and ask her seniors what she will be allowed to do to earn their trust."*

Though not stated there explicitly, I could not envision how to openly discuss my situation without mentioning my status, which they already knew about from Dr. Song and his surrogates anyway.

- There is no requirement from the GME or ACGME for the probation status to be a confidential matter, nor was it mentioned in the initial rules set by Dr. Song; it was explicitly mentioned by him only in the e-mail sent to me at the end of the probation period.

My own interpretation is that Dr. Song's real position was that he was free to discuss my probationary status with whomever he chose to, including direct supervisors and attendings even before they had gotten to interact with me and form their own impression, which I consider was at least a questionable practice that in many cases predisposed them against me. On the other hand, I was inexplicably expected not to discuss my status at least with the very same people Dr. Song had discussed it with, allegedly *"for my sake,"* but I did not see any benefit for me in staying silent. Therefore, I frankly saw this policy as an effort by Dr. Song to have my evaluators only take into account one version of events related to my case –his version–, while discouraging me from equally discussing my situation with them and giving them my own version, as any impartial evaluator should be allowed to do.

One clear example of the consequences of Dr. Song's approach occurred during the month of February. One of my attendings in the Transplant service, Dr. Yolanda Becker, sent a surprisingly poor monthly evaluation 10 days before the end of the rotation, and after having interacted with me on only 3 rounds of 20 minutes each. When I asked her about why she had graded me on areas that she had never supervised me on (e.g. OR skills, clinical skills, practice-based learning), Dr. Becker claimed that her reviews had been partly based on what she called "informal reports" from the Transplant fellow (Dr. Dolamu Olaitan) and the senior resident (Dr. Irma Fleming). Contrary to that, I later confirmed not only that my supervisors had never discussed my performance with Dr. Becker up to that point, but she also admitted that because she had previously learned about my struggles and my probationary status from "other sources," she had already assumed I was a bad resident and her grades were a reflection of that. Her grades were by far the lowest among 5 attendings in that rotation, a full 1.0/6.0 points lower on average than the next lowest faculty evaluation. This is relevant to the discussion on the unreliability of faculty evaluations that I presented in section 1.

Dr. Becker later offered to withdraw her evaluation from the system [12], [13], but Dr. Park in a later e-mail confirmed to me that her evaluation would be used despite of my expressed concerns in regards to the fairness of her assessment.

## End of Probation Period:

Dr. Song's e-mail from March 14 [14] stated that the faculty would not be able to meet that week as stated at the beginning of the probation period, so the final decision on my probation and contract renewal would instead be delivered to me by March 27, following a Plastic Surgery faculty meeting to be held on March 26. It also asked me to write up a letter to be shown to the faculty at the meeting.

UCMC00000783

On the letter I sent to Dr. Song on March 23 [15], and asked him to share with the rest of the faculty, I quoted some of the reviews given by attendings, fellows, and other residents, while recognizing some of my mistakes and areas where I felt I still had room for improvement. At the same time, I urged the faculty to give me the opportunity to be trained as the rest of the residents and have the same opportunities for learning, so I could continue building on the demonstrated improvement I had shown throughout my probation period.

## Decision letter:

This letter [16], signed by Dr. Song and given to me at the end of a short meeting on March 27, is of course very important. It announced the following:

1. In a "unanimous" decision, the faculty had decided not to renew my contract, and by implication that I had failed my probation period.
2. I was removed from all clinical duties effective immediately, with the stated reason of allowing me to *"devote [my] time to consideration of my professional development and looking for a job or training program."*

About decision 1, the only supporting reasons provided to me were:

- The review was made based on *"[my] complete file and with particular attention to [my] knowledge, skills and judgment since my probation started."*
- My faculty evaluations were *"well below the norm for residents at [my] level of training."*
- In particular, I am still *"below expectations on the manner in which [I] present patients, on anticipating and addressing clinical situations, listening carefully and behaving professionally to avoid conflicts."*
- My work on the Plastic Surgery service in March *"evidenced many problems."*

All other statements in the letter were generic conclusions about my abilities that had been allegedly derived from this evidence.

The way it was provided to me, I consider this evidence to be unsatisfactory for these reasons:

- It lacks the quantitative rigor of a truly objective evaluation. Prominent among the only quantifiable statements is the one that says my evaluations were *"well below the norm"* for residents at my level. The plot I presented in section 1, figure 4, directly challenges this statement. I not only present what the quantitative "norm" has been for residents at my level in each of the six (6) ACGME core competencies, but I also show that my faculty evaluations by the end of my probation placed me <u>well within</u> that norm for <u>all</u> of the competencies, not "well below" it, as Dr. Song argues. Despite repeated requests, no additional data was provided to me to support that claim, and only a capricious treatment of the numbers could yield the opposite conclusion from the one I showed from an analysis of all available data.
- The only mention of my performance in the specific areas for improvement for my probation is the tangential reference to 1)the manner in which I present patients, 2)anticipating and addressing clinical situations, 3)listening carefully, and 4)behaving professionally to avoid conflicts. The only quantitative conclusions I can glean from the available data are:

UCMC00000784

○ <u>The manner in which I present patients</u> is best addressed by Question 5 of the weekly evaluations: *"[Can Dr. Artunduaga] gather and relay pertinent history and exam?"* The numerical data from fellows and residents in a 6-point scale is shown in the figure.




First, it is clear first of all that there is wide disagreement among evaluators on this point. However, individual evaluators agree in observing progress over consecutive weeks. Also, the fact that several of them have already rated me in the Superior category means that I do have the capacity to be excel in this aspect, and it would only a matter of time to achieve greater consistency.

○ <u>Anticipating and addressing clinical situations</u> can be evaluated through multiple questions, including Question 5 above, as well as Question 4: *"Notify senior resident regarding change of patient status or continuing decline,"* and Question 8: *"At any time, did you have concerns for patient safety?"* As pointed out in section 1, after week 2 <u>all</u> of the fellows and residents answered NO to question 8, which means that my performance was <u>never</u> cause for concern regarding patient safety. In addition, Question 4 (plotted here) was actually one of the areas where I performed the best: from week 3 onwards, I was never graded below Very Good by any of my evaluators, and by Dr. Song's original deadline of mid-February, I was already consistently getting a perfect score in this area from all of my evaluators.

From the point of view of the faculty evaluations, this aspect fits squarely within the core competency of Patient Care. As shown in the analysis of section 1 and illustrated in figure 4, though this competency was indeed one of my weakest at the beginning of my internship year, by the end of my probation it was one of the ones where I had made the most progress, already matching the average performance (the "norm") of my class.

UCMC00000785

o   Listening carefully was directly addressed by Question 9 of the weekly evaluations: *"Use of effective listening skills, eliciting and providing information using effective non-verbal, explanatory, questioning and writing skills."* As shown in the embedded figure on the next page, this is another aspect where I showed steady and significant improvement, reaching a perfect score in the opinion of both of my evaluators by the



last week of February. Despite the significant but uncharacteristic dip on the first week of my Plastic Surgery rotation, my 3 senior residents all observed an almost equally significant improvement on the second week, all 3 of them raising my grade by 2 points in a 6-point scale.

In the faculty evaluations, this is one of the skills that makes up the Communication Skills competency. As in the case of Patient Care, figure 4 in section 1 also shows that although this was one of my weakest areas at the beginning of my internship, this was in fact the one competency out of 6 where I had made the most progress by the end of my probation, again already matching my class's average performance.

o   Behaving professionally to avoid conflicts was addressed by Question 10 of the weekly evaluations: *"Working effectively with others as a member or leader of a health care team."* Again, the data in the embedded graph shows I was consistently strong in this aspect, always scoring above the Very Good level from week 3 of probation onwards, including perfect scores by all of my evaluators in the last 3 weeks of February.

In the realm of faculty evaluations, this aspect lies squarely within the competency of Professionalism, which actually happens to be my very best core competency since the beginning of my internship, as shown by figures 3 and 4 of section 1. I have consistently stayed on par with my class in this area throughout this year, which means the people I interact with normally regard me as a pleasant person to interact with, and who is very much committed to her work, as evidenced by multiple comments in my evaluation forms. Though not stated explicitly by him, I believe Dr. Song singled out this area mostly based on an incident I had with Dr. Alison Tothy (Appendix B, example 3) towards the end of my probation period. I do recognize I behaved inappropriately towards her when I hung up the phone in the middle of a tense discussion I had with her and subsequently apologized for it, but at the same time I have to point out that I felt her treatment of me at the time was particularly demeaning and abusive, and also her written account of the incident to Dr. Song was not completely accurate [30 page 89,91].. Nevertheless, the numerical data shows this was only an isolated incident, from which I did learn useful lessons, but which is far from being part of a pattern of unprofessional behavior.

UCMC00000786

- Beyond the quantitative measures discussed above and shown to be largely contradicted by the data available, the decision letter also fails to mention specific events or communications that were deemed most relevant in reaching the decision. I doubt that in a short faculty meeting my entire file of 255 pages could have been carefully reviewed, and instead there must have been particular incidents and statements that were highlighted in the discussion. Despite my insistence, those events or statements were never shared with me, and I will probably learn about them at the same time the Grievance Committee will.
- As I also showed and discussed in section 1, my resident evaluations from March showed a significant break from my steadily rising performance of the previous several weeks, a break which cannot logically be only attributed to a sudden and uncharacteristic drop in my individual performance. Instead, several negative external factors I discussed earlier in this section weighted heavily on those weekly scores, and I do not believe my evaluation in this particular rotation was conducted under unbiased conditions.
- Lastly, as I have also stated before, no faculty evaluations whatsoever are available from my March rotation, a failure that can be directly attributed to Dr. Song as Program Director of the section, nor were there any in the copy of my file I was given on May 4 either. Therefore, any opinions or statements from Plastic Surgery faculty in their role as attendings during my rotation should not be taken into account by the Grievance Committee in its review.

Regarding the second decision communicated in the letter –immediate dismissal from clinical duties–, I only need to point out that GME policy 10 [32] clearly states that a breach of contract is the only valid grounds for dismissal. Though this decision was later reversed at my request, the dubious claim of helping me find a job exemplifies the arbitrary nature and –frankly– the bad faith displayed throughout the decision-making process that took place during my probation period and which culminated with the March 26 faculty meeting. If Dr. Song and the rest of the faculty had actually had the benign intention of giving me time to find a job, they would have given me the option of taking time off my clinical duties if I considered it necessary for that purpose, instead of preemptively giving me a type of help that I did not request.

Section 3 of this document will show the systematic violation of my rights to academic due process deliberately promoted by Dr. Song, which is not limited to the examples from the probation period I have highlighted in this section, but in fact extends much further beyond this period to cover virtually my entire experience at the University of Chicago so far.

In conclusion, in my opinion the decision letter is only the culmination of a process whose outcome had already been decided months before the letter itself was written. Given the scarce evidence quoted by the letter and the glaring contradictions with the quantifiable facts, this appears to be a case where the arguments were made to fit the conclusion, instead of the other way around. Though I am proud of the significant progress I made throughout the probation period, I cannot say I was surprised by the non-renewal decision itself, as the changing and increasingly unattainable goals relayed to me in my weekly meetings had long hinted at what the ultimate outcome was going to be.

## Meeting with Dr. Gottlieb:

A March 30 meeting with Dr. Lawrence Gottlieb of the Section of Plastic and Reconstructive Surgery provided me with the most detailed explanation I have received so far of the decisions that were communicated to me on March 27. Though the full minutes from the meeting are hereby provided as reference [30 Page 15],,, I want to highlight a couple of statements from the meeting:

- The first relates to the evidence used to reach the decisions:

UCMC00000787

> *"Dr. Gottlieb explained that all members of the core faculty met and decided on her status in the program. Not only were all evaluations reviewed and included in the decision, but also e-mails and comments from faculty and staff on other services"*

Though I already had access to all my official evaluations from faculty, fellows and residents throughout my probation, and had the opportunity to discuss my concerns about them, the same is not true of the "e-mails and comments" mentioned by Dr. Gottlieb. If they had as significant an impact on the decision as my official evaluations did, I could only have expected to know what those particular communications were, preferably at the time they were issued so I could have had the opportunity to address any inaccuracies and misunderstandings arising from them. If they were not shared with me at the time, then by all means I should have had the right to see them when I requested them after the decisions were made, because those communications are now partially responsible for an official and significant academic decision that so far has gravely jeopardized my professional future.

- The second statement concerns the reasons for my dismissal:

> *"Dr. Gottlieb acknowledged with Maria that she was given the option and declined to resign from the program, resulting in her removal."*

This is an admission that was nothing short of disturbing. It plainly means that a decision was made to immediately and forcibly remove me from the program, even though as Dr. Song later admitted [18], my contract had remained in full force, and the grounds for dismissal as stated in the GME policy manual had not been fulfilled. Therefore, this was an open breach of GME policy by the Section of Plastic and Reconstructive Surgery, unconvincingly justified by the benign reasons that were stated in the decision letter, and later restated in Dr. Song's response to my request for reconsideration. Since dismissal decisions lie within the domain of the Grievance Process, I ask the Committee to categorically condemn this way of proceeding by the Section, irrespective of the fact that it was later reversed.

## Request for reconsideration:

As the first step in this Grievance Process, on March 29 I submitted to Dr. Song a formal request for reconsideration [17]. The letter 1)restated the decisions I was asking to be reconsidered, 2)summarized the faculty evaluation data which the decision letter claimed placed me "well below the norm" of residents at my level, 3)requested a more thorough explanation of the rationale used to reach the decisions, and 4)made several observations about the short meeting I had with Dr. Song at the time he handed me the decision letter. He claimed that meeting was merely informative, and therefore I felt it had not allowed adequate room for discussion.

On April 4, Dr. Song issued the response to my request for reconsideration [18]. The main points of the letter were:

- The non-renewal decision was affirmed.
- My request for further explanation of the basis for that decision was met with this statement:
  > *"I have reviewed the issues raised in your letter and have consulted with the faculty. After a thorough review, we will not change our decision and your contract will not be renewed."*
- He reversed the decision of my removal from clinical service, still claiming that the original reason for my dismissal had been to give me *"time to consider [my] career options."*
- Upon reinstatement, I would stay under permanent probationary status and heightened supervision, though this period would not be evaluative in regards to my continuation in

UCMC00000788

the program, and would only be used in order to *"allow [me] to earn credit for this entire year."*

- He issued a stern warning to me on behalf of the Section: *"Please note that if during this period, we believe that you have breached your contract in any way, that we may remove you from clinical service."*
- He claimed that many of the statements in my letter were not correct, without specifying most of them, and that he would rebut them at the Grievance Hearing should I still continue to pursue that option.

My observations about this letter are the following:

- Later claims by Dr. Song to the contrary, I believe I was still not provided with sufficient justification for the decision that I had failed my probation period, with the consequent contract non-renewal.
- No mention was made in this letter of a modified rotation schedule or a modified amount of clinical workload, save for the fact that Dr. Kevin Roggin, Program Director of General Surgery, would later give me my new assignment. Given that I had demonstrated that I could handle a full clinical workload without endangering patient safety while I was on the initial probation period, my expectation was that I would continue with a similar amount of clinical duties despite my continuing probationary status.
- The warning about a second dismissal was merely a restatement of longstanding GME policy, a warning that was in my opinion unnecessary and made with a tacit purpose to intimidate me upon my return to the hospital, after 10 days of what I considered a forced and unjustified lapse in my clinical training.

Given the expected but unsatisfactory response by Dr. Song, I decided to continue with the Grievance Process regarding the contract non-renewal decision and my continuing probation. I formalized my request through a letter [20] submitted to Mr. Barry Kamin, Executive Director of Graduate Medical Education and DIO, on April 6, which became the "trigger date" for the process.

## Endocrine Service rotation:

My return to clinical duties was met with several unexpected and unpleasant surprises, as follows:

- In an e-mail from April 5 [19] Dr. Roggin communicated to me that the rotation schedule had been changed as a result of my (illegitimate) dismissal. In consequence, I was now assigned to rotate for 8 weeks on the Kaplan Service also known as B Service (Breast and Endocrine Surgery), despite the fact I had already rotated through this service for 9 weeks at the beginning of my internship, which I believe did not allow for an educational experience that would expose me to a large enough variety of surgical specialties throughout my internship year.
- Furthermore, at the B service I would be made to share duties with another intern, an uncommon arrangement that had already caused significant misunderstandings and misconceptions about my performance in the past. In addition, this implied that I would be logging a reduced number of clinical cases, a chronic problem I already had been a victim of in the past and that I will more fully address in section 4; as it was, I already was the intern with the smallest number of clinical cases logged in my entire class. Already at the 10th month of my internship, I had logged only 50 clinical cases thus far, far below the standard average of approximately 100 cases/year.
- On the same day, I decided to e-mail Dr. Song in order to express my dissatisfaction with this arrangement [21], in an appeal to his GME-mandated duty to ensure my educational needs were met, and which in my opinion this schedule evidently would not meet. Importantly, this request did not ask for any specific rotation schedule, contrary to later assertions by Dr. Song,

M. Artunduaga Grievance Hearing Document May 16, 2012                                      24

but it merely asked for a schedule of equivalent educational quality to my peers, in accordance with ACGME Program Requirements for Program Directors [33]:

> *II.A.4. The program director must administer and maintain an educational environment conducive to educating the residents in each of the ACGME competency areas. The program director must:*
> *II.A.4.u) demonstrate that residents have generally equivalent and adequate distribution of categories and cases.*

- The response to my April 5 e-mail to Dr. Song was provided by his lawyer, Ms. Jane McAtee, who made the following noteworthy statements among others:
  - Regarding my clinical schedule:
    > *"Your demands concerning your schedule for the rest of your contracted period of training are not appropriate and do not represent any 'rights' you claim to have. The Program Directors have the prerogative to assign you the appropriate duties and assignments and Dr. Roggin will do so."*

    Though I do not in any way dispute the prerogative of Program Directors to set my clinical schedule, I believe I do still retain the right to express my disagreement with a schedule which in my opinion does not serve my best educational interests, so I still consider my request as being appropriate. Further, I did not know until this point that I did not have a right to a clinical schedule of equivalent educational value to my peers, which seems to contradict ACGME Program Requirement II.A.4.u), quoted above.
  - Regarding my expected behavior:
    > *"I caution you against misrepresentations about your status to other residents and against acting in any way that is disruptive to the operations of the Medical Center and the care of patients."*

    As already mentioned several times, since the very beginning Professionalism has been the core competency that have most consistently gotten high marks for. I take issue with this statement by Ms. McAtee, not only because it warns me about a type of behavior that is demonstrably uncharacteristic of me, but because it represents a further veiled attempt to intimidate me. I have always been truthful and open about disclosing my probationary status to my co-workers, so a more plausible explanation of this statement is that, in line with the discussion about the confidentiality of my status, Dr. Song would rather prefer that I stay silent about the situation he has been putting me through.
- On April 9, my first day of work after my reinstatement, I was informed by my senior resident, Dr. Eric Grossman, that he had received orders to assign me to cases in the Endocrine Service only, a subset of B Service patients, which implied a further reduction of potential cases to the one I had expressed my concerns to Dr. Song about. Once again, no explanation was provided of this decision, and as I was obliged to, I accepted the assignment as given [22].
- Over the remaining 3 weeks of the month, I would see a grossly inadequate number of clinical cases and clinical duties assigned to me, much fewer than the already reduced number I expected to have, given my rotation assignment. On the weeks of April 9, 16, and 23, I was respectively assigned two (2), one (1), and zero (0) clinical cases for the entire week, for a total of 3 clinical cases for the entire month. By comparison, my co-intern in the service received seven (7), ten (10) and nine (9) cases over the same period, which shows this was not a case of too few cases to be assigned among interns. In my opinion, my clinical abilities would have to be severely underestimated by anyone who would think that such a minimal workload would be an appropriate one to assign to me on a consistent basis for a full month.
- After the third consecutive week of inadequate assignments, I felt compelled to e-mail Drs. Song and Roggin [24] to request that they state and explain the order they had given to my senior resident, which had still not been officially communicated to me, but had already had a profound impact on the amount of clinical training I was receiving. After 2 days without receiving a response, I sent out a second request, which again did not demand any changes to my schedule, but merely asked for an explanation of what was happening, which I thought was the

UCMC00000790

least I could legitimately expect from them. The second request was finally met the next day, April 27, with an e-mail by Dr. Song announcing another change to my schedule for May and June, which he wanted to explain at a meeting on Monday, April 30.

- Finally, I replied to Dr. Song saying that because of the pending grievance process, I did not consider it appropriate to discuss my future schedule over a meeting, and I would prefer to learn about his decision in writing. This final decision, which determined my current status at the time of preparation of this document, is discussed in the last part of this section.

## Current status:

Song's final letter from April 30 is provided here as reference [26]. The main points of the letter are summarized as follows, along with my observations:

- He expresses his displeasure at the communications to him that I initiated during the month of April, two (2) to be exact, plus a second request after not receiving a response to the first one, after my official request for reconsideration. He terms them *"unproductive,"* as well as *"demanding and harassing,"* and then demands that I stop sending any to him or to others.
- He expresses surprise at my disappointment over the schedule I have been given during the month of April. To the contrary, his opinion is that my assignments were *"appropriate,"* and that I had been given *"adequate clinical and educational opportunities"* throughout my rotation in the Endocrine Service.
- He specifically accuses me of not having *"fully participated in [the Endocrine] assignment, coming late to morning rounds and skipping many morning rounds completely,"* which he considers to be *"disruptive"* to the program.
- Based on the points above, he considers I have *"continued to exhibit disruptive and unprofessional behavior,"* that I have *"failed to meet the expectations of the program and the conditions of probation,"* and that therefore he is prepared to terminate me immediately.
- He further accuses me of having already committed acts of *"unprofessional behavior, insubordination, harassment, threats, and dereliction of [my] responsibilities,"* and warns me that any *"further"* acts of this type would result in my actual termination.
- He restates that he has, *"repeatedly,"* provided me with the reasons for my contract non-renewal and my probation.
- He argues that my rights under the ACGME and my contract are only a subject for the Grievance Process, not a matter that I should be bringing up to him.
- Finally, he states that my new assignment as of May 1 and for the remainder of my internship year is to complete a program of *"independent study"* under his supervision, and by implication that I had been permanently removed from all clinical activities. Completion of this program would allow him to *"certify that [I] completed [my] internship year."*

My observations about these statements are:

- With all due respect to Dr. Song, I believe it continues to be my right to express any concerns I may have about my educational or work environment, either to him or any other member of the UCMC housestaff I deem appropriate, and I will continue to reserve the exercise of that right. He should not interpret this exercise as constituting insubordination, nor should he respond using intimidatory and retaliatory actions, as he seems to have done in this case. My overriding concern has always been to look after my interests as a resident who wants a good quality education, and not to instigate conflict.
- In the preceding part of this section, I already stated the facts about my assignment during the Endocrine rotation, which I encourage the Grievance Committee to contrast against the metrics of my previous performance in the core competencies and areas for improvement, and Dr. Song's assertion that this was an "appropriate" workload.

UCMC00000791

- This letter was the first and only occasion I have had to see an evaluation of my performance in the Endocrine Service, as no official evaluation of any kind has been added to my file. Song's accusations are misrepresentations about my performance in the service, which as usual, I did not have the opportunity to respond to before another major decision about my status was made. This is only a continuation of the pattern of Dr. Song's basing major decisions on informal communications about my performance that I am never made party to.
- Upon receiving this letter by Dr. Song, I immediately contacted Dr. Eric Grossman, my chief resident in the Endocrine Service, and confronted him with the accounts Dr. Song had made about my performance in the service, which I felt were inaccurate and did not convey my full commitment to the assignment I had been given. His one-line response read [28]:
    *"I think these questions and concerns would be best answered by Dr. Song"*
    I can only interpret this a confirmation that there had in fact been unofficial communication between Dr. Grossman and Dr. Song, which by an inexplicable reason both of them refused to share with me.
- As in previous occasions, I do not believe this abrupt decision to change my status was done in accordance with ACGME and GME regulations on resident evaluation and academic due process. Nevertheless, I have already accepted the assignment and met with Dr. Song to discuss the conditions of the independent study program.
- I have already discussed my dissatisfaction with the justifications Dr. Song has provided for his decisions about my probation and contract non-renewal, along with the evidence that has led me to that conclusion.
- I found it quite telling to learn from Dr. Song about his view –twice implied in his letter– that he does not have a duty to uphold my rights as a resident as part of his obligations as Program Director in every decision he makes about me, and that that is instead a job for the Grievance Committee. As I expressed it to him in my response, I believe that view contradicts longstanding ACGME and GME regulations, which hold Program Directors as being primarily responsible for implementation and enforcement of all such regulations within the Program. In my interpretation, the job of the Grievance Committee should restricted only to address his failure to uphold the rights of residents as laid out by those policies.
- Finally, I still find it troubling to learn that I will be able to legitimately claim that I have completed a year's worth of clinical duties, when I have been forced into at least 3 months of non-existent or severely reduced clinical training. In fact, my electronic file still lists my original rotation schedule [29] as it was before March 27, so as I understand it, my official record at the end of my year will state that I have completed rotations that I in fact have not. This is one further irregularity I think has not yet been fully explained to me.

In conclusion, though I recognize that the Grievance Committee does not have the power to order specific changes to a resident's rotation schedule and assignments, I am providing this information in an effort to show the arbitrary way in which Dr. Song continues to direct my educational curriculum under probation, to the point of violating standing GME and ACGME regulations on educational standards for PGY-1 residents. The mounting evidence only leads me to conclude that the quality of my education has long ago stopped being a priority for my Program Director.

UCMC00000792

### 3) LINE 3: FAILURE OF DUE PROCESS

In This section:
- I present my understanding of the rules of due process as derived from the ACGME and GME policy documents.
- Rules pertaining to proper evaluation and examples from throughout my internship year.
- The failure to implement less severe corrective measures, such as an Academic Performance Improvement Program, prior to Probation is discussed
- Role of the Program Director and direct supervision
- Grounds for Dismissal

My overall goal in this section is to show evidence that points to a pattern of systematic disregard by Dr. Song for the rules of academic due process, as laid out in the ACGME Institutional [33] and Program Requirements [32], as well as the GME Policy Manual. By the term "academic due process," I understand the proper procedure that must/should be followed in order to address academic performance issues in residents, which begins with an evaluation and feedback process that conforms to certain objective standards, and ends with the proposal, execution and final evaluation of corrective measures that are appropriate in addressing the academic performance issue at hand. Due process is a right that all residents should expect to have at all times, no matter the magnitude of the alleged issues, and that Program Directors should be responsible for observing.

In this section, I will show how Dr. Song's failure to follow the rules of academic due process, which began much earlier than my probation period, has led in the first place for my performance to be mischaracterized and improperly evaluated, without paying proper attention to my particular background but demonstrated potential for excellence, with severely negative effects to my educational and work environment. Improper evaluations have led to improper corrective measures, which have been made significantly more severe than the real performance issues actually warranted. Finally, improper implementation of corrective measures has led to subjective and further improper evaluation, leading into arbitrary decisions from the assessment of such corrective measures. This vicious cycle has repeated itself several times over throughout my internship year, in a deliberate and systematic fashion in my opinion, and I believe it is important for the Grievance Committee to examine it in considering whether to invalidate the decisions that have sprung from it.

Many examples of failures of due process have already been presented in the preceding two sections, but this one aims to present them and expand on them in a more systematic way, and with explicit reference to related ACGME and GME policy.

## 1. Evaluation

```
GME Policy 11
Program Director
The responsibility for overseeing the evaluation of residents/fellows rests
with the Program Director.
Evaluation
Each program is required to create written criteria for evaluation based on
the specialty and subspecialty requirements set forth in ACGME
Specialty/subspecialty and Common program requirements. Each program is
required to create and utilize competencies-based evaluation forms. It is
```

UCMC00000793

recommended that programs utilize electronic formats for resident/fellow evaluations. The criteria and evaluation forms must be submitted to the GMEC as part of the Internal Review protocol. The GMEC will review criteria and adequacy of completion rates for compliance with ACGME requirements.

Each program is required to assure that faculty members and others who supervise residents/fellows submit completed evaluation forms in a timely manner and submit them to the program director. Each program will maintain a file from which completed evaluations for each resident/fellow may be accessed.

Each program is required to enact processes to ensure that residents/fellows receive timely feedback about performance. Review of evaluations with the resident/fellow must be documented.

**ACGME**

V. Evaluation
V.A. Resident Evaluation
V.A.1. Formative Evaluation
V.A.1.a) The faculty must evaluate resident performance in a timely manner during each rotation or similar educational assignment, and document this evaluation at completion of the assignment.
V.A.1.b) The program must:
V.A.1.b).(1) provide objective assessments of competence in patient care, medical knowledge, practice-based learning and improvement, interpersonal and
communication skills, professionalism, and systems based practice;
V.A.1.b).(2) use multiple evaluators (e.g., faculty, peers, patients, self, and other professional staff);
V.A.1.b).(3) document progressive resident performance improvement appropriate to educational level; and,
V.A.1.b).(4) provide each resident with documented semiannual evaluation of performance with feedback.
V.A.1.c) The evaluations of resident performance must be accessible for review by the resident, in accordance with institutional policy.
V.A.1.d) A policy for a resident's annual advancement must be developed and implemented.

**Failures of Due Process**
**1) Lack of faculty evaluations in Plastic Surgery**
- The Plastic Surgery program does not provide faculty evaluations to their interns, even though this is a mandatory requirement by ACGME.
- No objective metrics are available from faculty from these rotations.
- The rules clearly specify the use of multiple and objective evaluators.

**2) Missing evaluations from my personal file:**
- No faculty evaluations from July-August 2011. Just some comments [30 Page 101].
- Only 2 (partial) objective sets created on late November and late December. No other objective metrics on File. [30 Pages 99, 102].

UCMC00000794

- Only 3 out of 11 meetings with Dr. Park during the probation period have notes in the file. 11/28/11, 1/18/12, 3/21/12. [30 Pages 19,20,21,22].

### 3) Evaluation Material was not accessible or difficult to access:
- Only the "official" evaluations from New Innovations are accessible online
- Dr. Song never shared his evaluation methodology for November Probation letter or March End of Probation Letter, despite multiple communications asking him to do so. [17]
- The first time I had access to my personal file was on 5/04/12.

### 4) Lack or misuse of Objective Assessments
- The bulk of the assessments made by Dr. Song before the probation and during the probation period is subjective, without support from any Objective Metric.
- The Objective Mechanisms set forth the probation (10 areas of competence, 6 point scale) for attendings, fellows and residents were ignored for the probation evaluation, as shown in previously in the Line of Reasoning 2.
- On [16] Dr. Song states that:
    "Your overall faculty evaluations are well below the norm for residents at your level of training."
    Which is contested statistically in my Line of Reasoning 1.

### 5) Use of "out of channel" evaluations and comments
- A very specific incident (treated in detail in the Line of Reasoning 4), shows the manipulation of the information acquired by these informal evaluations:
    - Dr. Song version from the Nov 4th letter [2]:
    "It was also found that she accidentally sent a patient home with a PICC line which was 'supposed to come out before discharge after multiple times of prompting. This was not fully realized by Dr. Artunduaga."
    - Original Dr. Dickie email from Sept 8th [30 Page 50,51]:
    "She accidentally sent a patient home with a PICC line that was supposed to come out before d/c. Brian was upset because he told her the day before to remove it prior to d/c. She got the patient back to the hospital and found a room in DCAM to accommodate the patient and had the PICC out before 9 am. He was again impressed (after being annoyed) with her resourcefulness and motivation to fix the problem".

### 6) Completed evaluations on file
- As detailed in [Appendix C], many of the completed evaluations were missing form my personal file, which allegedly was the only source of information used for the Faculty meetings.
- As explained in Line 4 of reasoning, many evaluations, meeting notes, emails and important communications are missing from my personal file.

## 2. Professional/Performance Development

GME Policy 11
Additional Professional/Performance Development
As part of resident/fellow evaluation the Program Director may conclude that a resident/fellow requires a formal program of professional/performance development to address academic or performance deficiencies which are beyond the norm for the respective PGY level. Such a program of professional/performance development

UCMC00000795

must be documented in writing and must state clearly the areas where
performance improvement is needed and the parameters by which successful
completion of the Additional Professional/Performance Development plan will
occur. A period of Additional Professional/Performance Development is not
disciplinary in nature and will not be reflected as discipline in the
resident/fellow program file. If performance successfully meets expectations
the Additional Professional/Performance Development period will not be
reported as a disciplinary matter in the resident/fellow record.
Imposition of Additional Professional/Performance Development requirements
may not be reviewed under the GME Grievance Procedure.
If the resident/fellow does not successfully meet performance criteria noted
in the Additional Professional/Performance Development, the Program Director
may address the issues in a disciplinary manner, including suspension,
probation, failure to promote or termination, all of which is subject to
review under the GME Grievance Procedure.


**Failures of Due Process**

**1) No Professional/Performance Development program executed**
- After identifying the issues that were more important to address, the Program Director directly jumped to a Probation Period, regardless the many times I asked him to do the due process instructed in the GME manual. [2]
- Before the Probation Period there was no documented development program, which requires:
  - To be documented in writing
  - Clearly state the areas where performance improvement is needed
  - The parameters by which successful completion of the Additional Professional/Performance Development plan will occur.
- Additionally, because this is an evaluative measure, its evaluations and progress must be objective, include multiple evaluators, have documented progression, and be readily accessible by the intern. None of this ever happened.

**2) "Continuing Probation Period": No rules, evaluation or written records.**
- On a letter from April 4th [18] Dr. Song stated:
  - *"You will remain on probation and under supervision during the rest of your work at UC."*
- But there have not been any written goals for this period, evaluation, documented progression or parameters to measure successful completion of the probation period.


# 3. Program Director

**ACGME (selected policies)**
II.A. Program Director
II.A.4. The program director must administer and maintain an educational
environment conducive to educating the residents in each of the
ACGME competency areas. The program director must:
II.A.4.h) ensure compliance with grievance and due process
procedures as set forth in the Institutional Requirements and
implemented by the sponsoring institution;
II.A.4.l) comply with the sponsoring institution's written policies and
procedures, including those specified in the Institutional
Requirements, for selection, evaluation and promotion of
residents, disciplinary action, and supervision of residents;

UCMC00000796

II.A.4.m) be familiar with and comply with ACGME and Review
Committee policies and procedures as
II.A.4.r) ensure that the program has a well-organized, comprehensive,
and effective educational curriculum necessary to ensure that all
residents obtain experience
II.A.4.s) document periodic review of the morbidity and mortality
experiences of the service;
II.A.4.t) ensure that faculty and resident attendance at conferences is
documented; and,
II.A.4.u) demonstrate that residents have generally equivalent and
adequate distribution of categories and cases.

**Failures of Due Process**

**1) Equivalent and adequate distribution of Categories and Cases**
- As expressed early in my rotation schedule [30 page 48,49], [7] I felt I was not receiving a "fair share" of cases when compared to other interns at my same level.
- After I started the Grievance, I made my concerns clear and it led to this communication exchange:

  Request on April 4th: [21]
  *"I must remind you that it is my right as a duly admitted PRS intern and your obligation as my Program Director to ensure that my educational needs are met for the length of my stay at UofC. Up to this point, I have already rotated with another intern three times so far (August in B service; October and March in PRS service), more than any other intern in my class; I have only logged 50 cases in 10 months, far fewer than the PGY-1 average in UofC of 100 cases/year; I have only done 1 week of night-float, out of the average of 4-6 weeks; and I have already missed 10 training days since the dismissal. I therefore demand that for the remainder of my time as a UofC intern, I be returned to the night float schedule as I was previously assigned, and that I be left to rotate as a stand-alone intern, so as to have the chance to log as many cases as my peers have."*

  Lawyer McAtee response (on behalf of Dr. Song)
  *"Your demands concerning your schedule for the rest of your contracted period of training are not appropriate and do not adequately represent any "rights' you claim to have. The Program Directors have the prerogative to assign you to the appropriate duties and assignments and Dr. Roggin will do so."*

  Response from Dr. Song: [26]
  *"There is nothing that gives an intern any rights to any specific rotations or experiences.*

  *It is my opinion that your assignment was an appropriate assignment and that you have been given adequate clinical and educational opportunities while assigned to the Endocrine Service.*
  …
  *Your rights will be addressed at the Grievance hearing and I ask you to stop sending demanding and harassing emails to me and others.*

  *Your assignment beginning May 1 is to complete an independent study under my supervision. If you do that, we will be able to certify that you completed your internship year."*

**2) Familiarity with ACGME policies**
- My understanding is that my rights exist regardless if I enact a Grievance process or not.

UCMC00000797

From the April 40th letter [26]:
*"Your rights under the ACGME and your contract are handled through that [grievance] process."*

## 3) Maintain an educational environment conducive to educating the residents in each of the ACGME competency areas
- There were early signs of an ill educational environment plagued by gossip:

On email from Dr. Dickie to Dr. Song on Sept. 8th: [30 Page 50,51]

*"Hey Dave, So I spoke with Brian Bello regarding Maria's performance on the service and regarding some of the gossip I had heard. And the gossip was just gossip, yay.*

*" Regarding the pain service issue. This was GOSSIP. Maria did nothing wrong, … …. Maria did a good job prioritizing the patient needs."*

# 4. Supervision
ACGME (selected policies)

```
VI.D. Supervision of Residents
VI.D.1. In the clinical learning environment, each patient must have an
identifiable, appropriately-credentialed and privileged attending
physician (or licensed independent practitioner as approved by each
Review Committee) who is ultimately responsible for that patient's
care.
VI.D.5. Programs must set guidelines for circumstances and events in
which residents must communicate with appropriate supervising
faculty members, such as the transfer of a patient to an intensive
care unit, or end-of-life decisions.
VI.D.5.a) Each resident must know the limits of his/her scope of
authority, and the circumstances under which he/she is
permitted to act with conditional independence.
VI.D.5.a).(1) In particular, PGY-1 residents should be supervised
either directly or indirectly with direct supervision
immediately available.
```

### Failures of Due Process

#### 1) Lack of direct supervision immediately available
- On a particular instance, there was no direct supervision immediately available for the interns at the Plastic Surgery service on October 29, 2011. [2]. This is extensively covered **[appendix 1, example 3]**

# 5. Dismissal
```
GME Policy 10
Dismissal
A. Grounds for Dismissal
Any Housestaff member who fails to comply with the terms of his/her
contract, including, without limitation:
```

M. Artunduaga  Grievance Hearing Document  May 16, 2012                                        33

UCMC00000798

-    failure to fulfill the educational and clinical requirements of the graduate medical education and clinical training program to the satisfaction of the Program Director;
-    failure to acquire at least the same professional knowledge, skill and judgment that
-    residents in the relevant department normally acquire at the same level of post
-    graduate medical education training, or;
-    failure to carry out satisfactorily his/her professional responsibilities,
-    failure to maintain a current professional license, or;
-    failure of Housestaff members who are not U.S. citizens to maintain a current visa, or;
-    Housestaff member is, or becomes, ineligible to participate in the Medicare Medicaid or other governmental payment program.

**Failures of Due Process**

**1) Failure to demonstrate valid grounds for dismissal**
- On Dr. Song Letter from March 27: [16]
  *"We suggest that you now devote your time to consideration of your professional development and looking for a job or training program. Therefore, we are removing you from all clinical duties effective March 27th, 2012. Your stipend and benefits will continue through the end of your contract."*
- After asking for reconsideration, on a letter from Dr. Song on April 4th [18]
  *"You raised an issue about our decision to remove you from clinical service. We have not terminated your contract but we believe that under these circumstances, it is best that you not continue with this year's clinical activities so that you have time to consider your career options. After consideration, however, we will reinstate you to the general surgery schedule so that you can complete this year of training."*

UCMC00000799

## 4) LINE 4: BIASED ACTIONS

> In This section:
> - Many "isolated" incidents are discussed, which when put together show a clear biased picture against me.
> - Lack of action from the Program Director and other people in power is shown.
> - Hard evidence of biased action against me is shown.

If we look at each action by Dr. Song independently it is difficult to find a clear bias against me, but when look together, the pattern emerges and I believe it is identifiable in an objective way. Dr. Song has been selectively choosing the information to paint a very bad picture of me in front of the General Surgery and Plastic Surgery faculty. He has also over-documented my file with incidents that are usually condoned to my peers but somehow heightened in my case. Some important examples follow:

## INADEQUATE CASE LOAD!!! (COPETE)

| Dr. Song Communication | Original Communications |
|---|---|
| "It was also found that she accidentally sent a patient home with a PICC line which was 'supposed to come out before discharge after multiple times of prompting. This was not fully realized by Dr. Artunduaga." [2] | "She accidentally sent a patient home with a PICC line that was supposed to come out before d/c. Brian was upset because he told her the day before to remove it prior to d/c. She got the patient back to the hospital and found a room in DCAM to accommodate the patient and had the PICC out before 9 am. He was again impressed (after being annoyed) with her resourcefulness and motivation to fix the problem". Dr. Dickie [30 Page 50] |
| "It was unanimous amongst the numerous evaluators across the Department of Surgery, particularly within our section, that the issues that Dr. Artunduaga has will be extremely difficult to correct within the time allotted during residency period.... We discussed the probability of probation, but we agreed that probation at this level would not lead to successful remediation" [2] | ".. regarding Maria's performance on the service and regarding some of the gossip I had heard. And the gossip was just gossip. yay...she's doing ok with a few exceptions. (Brian is very positive and supportive in general)." Dr. Dickie [30 Page 50]

"We started first with John Seal who told us the following: the problem is NOT knowledge and is NOT lack of motivation or wanting to work hard and that she IS teachable." Dr. Dickie [30 Page 48]

"I am convinced that her operative skills will improve since I saw improvement over the course of the month." Dr. Angelos [1] (missing from Dr. Artunduaga file)

"She is good now but she will make a fine resident as she gains more experience and gains more confidence." Dr. Kaplan [1] (missing from Dr. Artunduaga file)
"I am convinced that her operative skills will improve since I saw improvement over the course of the month...She will need some mentoring, but I believe that she has the intelligence and desire to improve that she should be given a chance to do so." Dr. Angelos [1] (missing from Dr. Artunduaga file)

"She cares enough to be a great physician, but needs to be nurtured, mentored and monitored." Dr. Chhablani [1] (missing from Dr. Artunduaga file)

"She is good now but she will make a fine resident as she gains more experience and gains more confidence." Dr. Kaplan [1] (missing from Dr. Artunduaga file)

"Given that she was trained where the routines and customs are not necessarily known to us. this is to a degree understandable, but it does make it more difficult to assess her overall capabilities so early on in her residency. She was always very hard-working and attentive. There were no deficiencies in this area. She followed directions and sought to improve her performance." Dr. Hurst [1] (missing from Dr. Artunduaga file) |

UCMC00000800

| | |
|---|---|
| | *"I have been with Maria since earlier in the year on Kaplan service , we then were together again on Vascular and now Transplant. Therefore, I have had the opportunity to see her grow over several months. She has exponentially improved since our initial encounter. She has efficiently done everything she has been asked to do, she has learned to reflexively double check any information she passes on, she's dramatically improved when presenting patients, and she continues to be enthusiastic and always has a smile on her face regardless of her current situation, which would make anyone else stressed. I have seen interns do much more egregious acts to warrant this type of probation and having spent the most time with her of any resident, she has not shown any evidence of being a threat to patients. She has effectively managed the Transplant service for a week and a half while the PA was on vacation without any issues. I say this because: 1. Transplant is a service that we don't manage often as General surgery residents, therefore we have very limited experience and 2. Many of the interns before Maria have had the PA as the main floor person. I have continue enjoyed working with her and I know she will continue to improve. She is a great person and a great doctor if given the chance. She takes feedback well and is willing to learn. It's just sad that no one wants to take the time to teach."* Dr. Fleming [5] (missing from Dr. Artunduaga file)* |
| | *"Dr. Artunduaga's strongest attributes are her work ethic, desire for continual self-improvement, and willingness to be receptive to advice or criticism. With these attributes, she will continue to mature as a clinician and should develop, as expected, into a fine physician."* Dr. Shao [5] |
| | *"With time, experience, and mentorship from senior residents or attendings, she should develop into a fine resident and surgeon."* Dr. Shao [5] |
| | *"... Her energy, ability to take feedback, and efforts to improve were laudable. I think with good mentorship she will continue to be an excellent clinician and surgeon."* Dr. Hall [1] |
| | *"Excellent enthusiasm and was a pleasure to have on vascular surgery. Positive attitude, worked hard, and reliable."* Dr. Blecha [1] |
| | *"She was thorough in clinic and in taking care of inpatients."* Dr. Milner [1] |
| | *"She is very even-keeled and did not get frustrated or complain on our very busy service. She was able to effectively expedite patient care even in our high acuity population."* Dr. Steppacher [1] |
| *"However, the overwhelming issue was thematically agreed upon once again by all of the reviewers, including a 360 degree evaluation by a nurse practitioner who worked with her extensively. "* [2] | *"Overall, I think Maria did a fair job, however she has many areas that need improvement, specifically in organization. prioritizing and communication."* Ms. Jose [30 Page 54] |
| *"These are thematically consistent with the evaluations Dr. Artunduaga received in the months of July, August and September where it was seen that "she frequently appeared disorganized, unsure of her knowledge and at times had an unsuccessful doctor/patient relationship." Another set of reviewers stated that "she is often frazzled when presenting patient issues, and it was very difficult to keep her organized and goal- oriented."* [2] | **All comments from ONLY 2 reviewers:** *"...she frequently appeared disorganized, unsure of her knowledge and at times had an unsuccessful doctor/patient relationship."* Dr. Umanskiy [30 Page 52]<br><br>*"...she is often frazzled when presenting patient issues, and it was very difficult to keep her organized and goal- oriented."* [30 Page 50]<br><br>**in the same email form Dr. Dickie it also says:** *"Brian says she's doing ok with a few exceptions. (Brian is very positive and supportive in general)."*<br><br>*" Regarding the pain service issue. This was GOSSIP Maria did nothing wrong, ... .... Maria did a good job prioritizing the patient needs."*<br><br>*"Earlier this week a sick patient needed an urgent IR drain. She got it ordered, completed and the proper cultures sent before noon and without issue. Brian was impressed."* |
| *"At your request, we extended the probationary period until March 23, 2012 to give you ample opportunity to work on the areas where* | *"it has been known from the beginning of my appointment with University of Chicago that I was getting married on December 10,* |

UCMC00000801

| | |
|---|---|
| improvement was needed." [16] | 2011... I am formally asking you to reconsider the dates and time-frame set for my probation period to encompass the **90 working days** that are customary [instead of 60]" Dr. Artunduaga [4] |
| "I have learned that you have informed many people of your probationary status and have talked to many of the attendings and residents with whom you have worked since November about your probation. That is unfortunate since we hoped, for your sake, to keep this matter confidential." [14] | "We have stated numerous times to the interns and residents that the goals and objectives are to be reviewed, the TEC appointments to be scheduled by the residents to provide verbal feedback for each rotation, and that all evaluation should be signed by the residents." Dr. Roggin [30 Page 17]

"Dr. Park suggested that when she starts her vascular rotation in January, she should let them know that she wants to prove herself and ask her seniors what she will be allowed to do to earn their trust." Akilah's notes [30 Page 20] |
| "...You have complained that this is an inadequate experience, is somehow discriminatory and is in violation of rights you claim to have..." [26] | "Maria's main problems stem from communication which he detailed as accent....She feels that on the current service being run with two interns that there is intern favoritism from the top down and that she is the last to know a lot oft hings....the second intern is being given the bulk of the duties and she is treated like a medical student. She was also concerned about lack of OR exposure." Dr. Dickie [30 Page 48]

"...I feel that I am not being given a fair chance to perform my intern duties since I was put on probation. The following examples justify my worries: 1) Logged only 3 junior-level cases in the last month; 2)I have not placed a single chest tube during my Thoracic Surgery rotation; 3) I have closed skin no more than twice; 4) I was not allowed to manage intern in conjunction with the PAs; 5) I was not given the chance to give my monthly presentation" Dr. Artunduaga [17] |
| "We suggest that you now devote your time to consideration of your professional development and looking for a job or training program. Therefore, we are removing you from all clinical duties effective March 27th, 2012." [16] | "At no point in your communications did you state that my permanence through the end of my internship year was at stake, nor do my recent evaluations convey that I represent the type of imminent danger to patient safety that would warrant this type of extraordinary measure." Dr. Artunduaga [17] |
| "...Also note that your in-service score, which will be available for your perusal today, was poor. You scored in the bottom 2% of all first year plastic surgery residents across the country. Given your ongoing probationary status coupled with your poor performance on the in-service exam, I encourage you to use the remainder of this academic year to focus on building a solid fund of knowledge." [27] | " I didn't know you guys were taking the inservice with us. I thought Absite....This will be the first year the intern level has taken the test so a low score for anyone junior is more a reflection on us as far as educational needs as we integrate the program....Again, your score will not be used in any way to penalize you, so please do not be concerned that a lack of study time will be a detriment at this point." Dr. Dickie [11] |
| "We are putting you back on clinical service at your request and to allow you to earn credit for this entire year." [18] | "When I asked you why I didn't get assigned an equivalent number of OR cases to my co-intern for this week (1 for me vs 7 for her), you told me that you received instructions from your program director....these conditions weren't notified to me prior to my return." Dr. Artunduaga [22]

"I'd like to cover 1-2 OR cases in the Endocrine service on T/W/Tr. I'm still a surgical resident and I have significant ownership over the students." Dr. Artunduaga [23] |
| "You lack many of the basic skills expected of a resident at your level of training." [16] | "Her strengths were her effort, her reliability in performing daily responsibilities of patient care and on following through with additionally requested tasks, her ability to work well with other residents, nurses, and patients, and her reliability in communicating about patient problems with more senior residents and with me. Her interactions with patients were excellent; her patient care skills, meaning to me at the first year level, her ability to recognize medical problems, was average to above average. Her ability to present patients on rounds in a focused fashion improved greatly during the month of her rotation....As with most first year residents, she needs more time in the operating room to assess the development of technical skills." Dr. Thistlethwaite, [30 Page 97]

"She is on par with her fellow interns. As with all our interns, she could improve with more reading. She was wonderful with her demeanor towards patients and families." Dr. Skelly [1]

"I've worked with her more than anyone else and I think she's is exceptional, way above average, very enthusiastic and has improved tremendously over the past 2 weeks. I have no concerns whatsoever about her clinical competence. She pays attention to details, has high integrity and extremely enthusiastic and hardworking. Arguably one of the best interns I've worked with on the transplant service." Dr. Olaitan |

M. Artunduaga  Grievance Hearing Document  May 16, 2012                                    37

| | |
|---|---|
| | [5] |
| | "..performs at her expected level. She is reliable and hard working. She interacts well with the attending staff and the other residents, nurses and patients. She is confident and able. She has been a real pleasure to have on the service." Dr. Eton [1] |
| | "If she has had problems in the past with efficiency, she has clearly made progress, because I would never make that complaint about her." Dr. Paruch [5] |
| | "... she is on par with her peers..." Dr. Hall [1] |
| | "....Her history and exam skills are comparable to her peers." Dr. Shao [5] |
| | "Dr. Artunduaga performs adequately and at the level of her peers as far as gathering and presenting pertinent patient information." Dr. Shao [5] |
| | "She does perform at a comparable level to her peers with regard to communication." Dr. Shao [5] <br> "..Certainly she could improve her fund of knowledge but she does remain within the bounds of acceptable intern performance..." Dr. Renz [1] |
| "It is my opinion that your assignment was an appropriate assignment and that you have been given adequate clinical and educational opportunities while assigned to the Endocrine Service." [26] | "...we discussed the remarkably poor assignments I have been given for now 3 weeks in a row: 2 cases 2 weeks ago, 1 case last week, and 0 cases this week. This contrasts with the assignments my co-intern has been getting: 7 cases 2 weeks ago, 10 last week, and 9 this week. Dr. Kaplan had no knowledge about this arrangement and expressed his surprise that a resident in his service is receiving this kind of assignments for no apparent reason." Dr. Artunduaga [24] |
| "...you have not fully participated in this assignment, coming late to morning rounds and skipping many morning rounds completely....You have failed to fully participate in the Endocrine assignment. Thus, you have failed to meet the expectations of the program and the conditions of probation and we are prepared to terminate you now." [26] | "I was assigned to cover the Endocrine Service only, therefore I did not attend morning rounds whenever there were no patients from the Endocrine Service. Instead, I spent that time updating the list for the team, entering post-op orders for the cases of the day and finishing progress notes/orders on all patients from the Endocrine service.... I completed all of my weekly assignments during the last three weeks – and even asked you [chief resident] for more–, I covered all clinics on Monday (Grogan/Angelos), Tuesday (Kaplan) and Friday (Kaplan) and participated in 1-2 cases every week. The rest of the day I spent it entering information in the Endocrine Research database in the Surgery Resident lounge room, pre-oping patients for the Endocrine cases and doing post-op checks at 4:00 pm." Dr. Artunduaga [28] <br> Dr. Kaplan can confirm this information during the hearing |

**Dr. Song's discouraging comments:**

-"I don't have time to train you, you're not advancing at the same rate than your peers, you're not a good fit "

-"We can help you transitioning to another program, but it would have to be a non-surgical specialty, otherwise I won't give you a letter of recommendation"

-"You're not wired to be a surgeon, you don't have the aptitude"

-"Things will get more demanding along in your training, we don't think you'll be able to handle it"

-"It's impossible that you'll succeed the probation if you haven't improved in four months of internship"

-"Plastics residents are the the best residents in the hospital, you're not at the same level and never will be"

- "Your situation is embarrassing for the section, we'd rather to keep this confidential"

UCMC00000803

# APPENDICES

## APPENDIX A: EVENTS LEADING TO PROBATION PERIOD

In this section I will revisit the "events" that lead to the probation period. I consider this to be very important, especially because Dr. Song, despite the promise to do so in the letter from Nov 25th *"As we move forward, I will review the factual issues raised on your letter"*, has addressed them. [6]

To put things in context:
On Nov 2nd Dr. Song notified me that he did not think I was a good fit to the Plastic Surgery program, citing that no one of his students had ever needed any help from him, and the fact that she needed help immediately disqualified me from receiving my training at University of Chicago. Also, it was "embarrassing for the section" to have a resident that was not on the top of the class, he advised me to leave the program at the end of my internship year and transfer elsewhere, preferably a non-surgical program otherwise he would not give me a letter of recommendation.
The meeting was as usual "mostly informative", in the sense that I was not allowed to contest Dr. Song's accusations. When I declined his proposal, he said that his plan was to put me on probation, he refused to start me on an Academic Improvement Program, because he needed to have a final decision by February when the contracts are renewed.
This meeting was transcribed in a letter handed to Dr. Artunduaga on November 4 [2], I refused to sign it because I was pictured as a person with major clinical deficiencies which I believe were the result of Dr. Song's manipulation of the information he was given.

In the coming weeks I started collecting the evidence to contest Dr. Song's false accusations, unfortunately, this letter was not ready on time before Dr. Song presented the probation letter on Nov 17. [3].

On Nov 18th, I sent the official request for reconsideration letter [4]. This (rather long) letter had several goals, including:
- Set the record straight about the accusations and "facts" stated on the November 4 letter.
- Officially ask for the reconsideration of the probation period, which as explained it covered my month of vacation, in which I had already planned my wedding.
- Discuss the subjective part of the comments and put in context the mistakes done in the previous months.

It is important to note that I did not request for a reconsideration or grievance on my probation in a very naive move, because I honestly believed on the "good intentions" of Dr. Song to help me improve, even though he was using a Probation method to do so.

Although I considered most of the situations fully explained in this letter, more evidence that support the original explanations has been recently found and it will be shown here. Also, some excerpts from a diary written by me to document important events during my residency year will be used.

## 1) "Several *times misses were found, one in particular as it pertained to to maintenance fluid"*
Early in the morning intern JL received the following text page:

UCMC00000804

*JT, Rm TS312-2 has a blood pressure of 80/43, heart rate is 115. The 1000cc bolus of LR was given. Do you wish to take additional measures? Thanks, Mattie #55510. 10/13/2011 06:03am*

Dr. Sara Dickie, chief resident in charge of the management of JT, was notified about the patient's vital signs during Burn walking rounds, she discussed the plan with Dr. Daniel Butz, then later said that she was going to be out for a job interview, and that both JL and myself should report to Dr. Butz (senior) during the day. In this page, Dr. Dickie gave Dr. Butz instructions to follow:

*___ i d/c'd the albumen b/c hadn't gotten yet. blood going now. changed PO to IV lasix after blood. labs being drawn now, but hgb won't reflect blood. needs leg dressings changed w/ new burn and ACE. check for hematoma -sara 4-3398. 10/13/2011 08:14am*

Dr. Butz left for the Microsurgery interview day that was happening in the Plastics office, I took care of JT's care during the morning. Blood products were released until 10:30 am because the patient developed antigens to blood available in the blood bank. Transfusion started, vital signs improved as I notified Dr. Daniel Butz via text page:

*·: BP 117/6838, HR 102, doing better. Maria 3394. 10/13/2011 11:15am*

At 1:15 pm, I was asked by PA Elizabeth Carlisle to take care of Dr. Julie Park's emergent case (salvage of thrombosed DIEP flap), her patient needed to be seen in the pre-op area, her paperwork needed to be completed and also escorted her back to the room at 2:00 pm.

| GOR 09 | | 38 mins late | | | | |
|--------|------|------|-----|-----|-----|-----|
| 0730 | 1414 | 21 | SDA | in, H.<br>Reggin, K. | GEN | ADMS |
| S A N D P I O | | ███████████ | | Staging Whipple Procedure | Glick, D.<br>Patel, N. | |
| Pat Discharge | | | | | | |
| 1449 | 2049 | | FINP | Artunduaga, M.<br>Park, J.<br>Pelletier, A | GEN | ADMS |
| S A N D P I O | | ███████████ | | (left)-Exploration Of Flap | Glick, D.<br>Patel, N. | |
| Pat Discharge | | | | | | |

Meanwhile, co-intern JL was left in the floor monitoring JT status closely, once I received this page at 2:02 pm I communicated with JL immediately, I asked him to contact Dr. Dan Butz to figure out if patient needed to get transfer to ICU for closer monitoring or if there was something else that needed to get done now.

*TS312 __ : FYI pts BP is still 70's/30's. 2nd unit not yet complete. Thanks Lisa 41262. 10/13/2011 02:02pm*

At 3:15 pm, JL communicated to Dr. Justine Lee, chief in house, his concerns about JT's poor response to the blood transfusion. I left the OR at 4:00 pm, and met with Dr. Lee and Dr. Borucki (Anesthesia) at the bedside. We agreed to transfuse 1 Lt of Albumin STAT, and in later conversations with Dr. Borucki, I agreed that her recommendation to transfer the patient to the ICU was indicated at this point. A final page from the RN, prompted me to make the decision:

*TS312-2 __ please come evaluate pt for ICU transfer and write for the fluid bolus you would like me to give. Pt still has not made urine and bp is still 70's/30's thanks Lisa 41262. 10/13/2011 04:51pm*

Dr. Lee agreed with my suggestion of transferring the patient to the ICU. Dr. Butz helped me with the transfer while I consulted cardiology for suspected cardiogenic shock. Dr. Lee called Dr. Dickie and Dr.

UCMC00000805

Zachary to notify them about their patient status. From 6:00 pm to 8:00 pm the patient received aggressive intravenous resuscitation and an echocardiogram was performed at the bedside. At 8:00 pm, I received a call from Dr. Dickie, who was very upset about me not having transferred the patient to the ICU earlier in the day, she said she explicitly told Dr. Butz about her *"low-threshold for ICU transferring"*. I told her that she did not verbalize her plan to me prior to that conversation, and that I reported to Dr. Butz about her patient's course early in the day. In hindsight, I think the confusion started when Dr. Butz and myself went to cover OR cases and the floor was left in the hands of Dr. JL, who unfortunately did not have much experience with the logistics of the service, it was not clear to him that he should have called Dr. Dickie instead of Dr. Lee.

### 2) "Several *times misses were found, one in particular as it pertained to drain management*"

Dr. Mary Lawler, from Rehabilitation Medicine was consulted for disposition recommendations 10/18/2011 on JT's case, the next day we had a telephone conversation regarding the patient's future drain care.

### Consult (Follow-Up) note dated 10/19/2011, 8:58 am:

I spoke with Plastics resident Marie Artunduaga p3394 about plan for JP drain. She will switch from wall suction to bulb suction. The bulbs are to remain in place < 30 cc/24 hrs - until f/u as an outpt per plastics.
Leukocytosis - UA and UC ordered, pt asymptomatic.

Dr. Lawler expressed concerns about a pouch (ostomy bag) that was used as a temporary draining measure over one of the liposuction incisions on her left leg. I advised Dr. Lawler to change the appliance regularly until drainage was <30cc/day, also TegaDerm should be used to enforce the adherent dressing around the stoma bag. The drawing documents the patient's wounds and drains, the pouch is #8:



1: Incision completely covered with steri-strips, minimal erythema/swelling
2: JP draining sanguinous fluid
3: JP draining sanguinous fluid
4: Bilateral tenderness/swelling/ecchymosis
5: Skin tears
6: L flank ecchymosis
7: Stage 2 ulcer
8: Pouch with active serosanguinous drainage

On 10/22/2011, JT returned to the ED with a surgical site infection on her back secondary to poor mobility in the Rehabilitation Center, the abdominal drains were out, the patient reported output of ~50 cc/day, no signs of fluid collection/seroma were noted at physical exam. The day after her admission, Dr. Lawler called Dr. Dickie regarding JT's complaints about the Schwab Rehabilitation Center. Dr. Dickie said that Dr. Lawler claimed that I had been notified about JT's "loose drains." However, if you refer to Dr. Lawler's consult note from 10/19/2011 at 8:58 am, you will see that no observations were made about any "loose drains," although she did mention that the pouch was loose during our conversation, it was evident that the device could not be sutured to the skin and should be reinforced with something else instead. I did not discuss my recommendations with Dr. Dickie before the patient

UCMC00000806

was discharged because it did not fall out from the usual recommendations that we give patients who undergo body-contouring surgery in our institution.

### 3) *Supra-ventricular tachicardia, Cardiology/Gynecology consult, vaginal bleeding and tachycardia on RW's case.*

During the month of October, there were two interns in the Plastic Surgery service, an atypical arrangement that resulted from Dr. Song's intent to assess my performance under his supervision. There were three senior residents, two chiefs (Drs. Sara Dickie and Justine Lee) and a PGY-5, Dr. Trang Nguyen. I was assigned to cover patients from the Blue (Dr. Nguyen) and Gold (Dr. Dickie) team, while JL was assigned to follow patients from the Red team (Dr. Lee). On the night of 10/13/2011, RW (Dr. Gottlieb's patient from the Red team) developed atrial fibrillation, Dr. Justine Lee ran the code and I helped her transfer her to the Cardiothoracic unit. We all agreed that for logistical purposes, it was going to be easier for Dr. JL to follow up on RW, as he was following Dr. Lee's patients every day. He was responsible for placing orders, writing notes and asking for consults from 10/13/2011 to 10/20/201 monitored by Dr. Butz, PGY-2 in the service during the month of October. Progress notes and pages delivered to both of them confirmed my statement:

| Note Date | Enc Type | Category | Status | Author |
|---|---|---|---|---|
| 10/20/2011 03.31 PM | Admis... | Progress Notes | | LUSARDI, JONATHAN JEROME, M.D. |
| 10/19/2011 09:48 AM | Admis... | Progress Notes | | LUSARDI, JONATHAN JEROME, M.D. |
| 10/18/2011 07:04 PM | Admis... | Progress Notes | | MCCONVILLE, JOHN F., M.D. |
| 10/18/2011 09:53 AM | Admis... | Progress Notes | | LUSARDI, JONATHAN JEROME, M.D. |
| 10/18/2011 08:15 AM | Admis... | Progress Notes | Rev... | ALKUREISHI, LEE, M.D. |
| 10/17/2011 02:34 PM | Admis... | Progress Notes | | HALL, RUSSELL B., M.D. |
| 10/17/2011 07:45 AM | Admis... | Progress Notes | | LUSARDI, JONATHAN JEROME, M.D. |
| 10/17/2011 07:10 AM | Admis... | Progress Notes | Rev... | ALKUREISHI, LEE, M.D. |
| 10/16/2011 01:42 PM | Admis... | Progress Notes | | NOTH, IMRE, M.D. |
| 10/16/2011 10:57 AM | Admis... | Progress Notes | Rev... | ALKUREISHI, LEE, M.D. |
| 10/16/2011 08:22 AM | Admis... | Progress Notes | | BUTZ, DANIEL ROBERT, M.D. |
| 10/15/2011 10:45 AM | Admis... | Progress Notes | | BUTZ, DANIEL ROBERT, M.D. |
| 10/14/2011 03:49 PM | Admis... | Progress Notes | | HALL, RUSSELL B., M.D. |
| 10/14/2011 11:01 AM | Admis... | Progress Notes | Rev... | LUSARDI, JONATHAN JEROME, M.D. |
| 10/13/2011 07:27 PM | Admis... | Progress Notes | | KATARIA, TRIPTI C., M.D. |
| 10/13/2011 01:59 PM | Admis... | Progress Notes | | RUBIN, DAVID T., M.D. |
| 10/12/2011 02:03 PM | Admis... | Progress Notes | | LABAS JENNIFER L., A.P.N. |
| 10/12/2011 10:49 AM | Admis... | Progress Notes | | LUSARDI, JONATHAN JEROME, M.D. |

**BUTZ - 2591**
Message # 4564     10/18/2011 04:05p
Message-A:            converted back to sinus spontaneously, will still send her to the floor.
Charoocka 23614

Message # 4565     10/18/2011 04:30p
Message-A: 22911, Hi, Endo recs for                    , 2826185, pls decrease Novolog with meals to
10u, give Novolog 3 units with snacks. -thanks, Sharon, p3518

Message # 4567     10/18/2011 06:09p
Message-A: Dr. pleas call Erin(ASAP)  at ext.21742 RE;pt            in TS521 concerning her blood-
sugar and insulin coverage....THX

Message # 4568     10/18/2011 07:02p
Message-A: Hello, re:                    (2826185): For insulin aspart orders, did you still want sliding
scale active?  Thanks, Andrius PharmD 57903 #4498

UCMC00000807

10/18/2011 07:02p
Message-A:        in ts521 is very worried about the non stop bleeding. Wanting to speak with someone from her team about it. thanks, Lauren 21742

10/19/2011 01:44p
Message-A: ·     n ts521 does not feel comfortable taking her coumadin because of the bleeding. thanks, Lauren 21742

Message # 4582     10/19/2011 08:41p
Message-A: .        .n TS 521 is c/o chest discomfort that is going to her stomach. Nurse Loretta @21742

10/19/2011 08:41p
Message-A: please call lauren at 21742 about      in ts521 and her labs. thanks!

Consecutive misses mentioned in your letter, such as "*consultant recommendation's follow-up, persistent tachycardia regardless of intravenous fluid boluses during heavy menstrual bleeding, etc.,*" were ultimately JL's responsibility as he never asked me to assist him to complete his tasks (*"VI.F.3. Residents must assume personal responsibility to complete all tasks to which they are assigned (or which they voluntarily assume) in a timely fashion. These tasks must be completed in the hours assigned, or, if that is not possible, residents must learn and utilize the established methods for handing off remaining tasks to another member of the resident team so that patient care is not compromised." ACGME Plastic Surgery programs requirements*)

During the afternoon of 10/20/2011, I noticed his patients was persistently tachycardic on the computer (110's), she was slightly lightheaded but not orthostatic, I ordered a bolus of 500c NS and I advised Dr. JL to monitor his patient closely, while I was seeing two consults in DCAM and making a thumb-spica in the cast room in another building. I feel compelled to point out that no senior resident was available in the hospital during that afternoon, they left to the "QMP Aesthetic Surgery Symposium" in downtown Chicago. Although they were reachable by phone, I think it was inappropriate of them to leave us in charge of the service without direct supervision immediately available according to the ACGME Plastic Surgery programs requirements:
*VI.D.5.a).(1) PGY-1 residents should be supervised either directly or indirectly with direct supervision immediately available.*
*VI.E. The clinical responsibilities for each resident must be based on PGY-level, patient safety, resident education, severity and complexity of patient illness/condition and available support services.*

Dr. Nguyen called me on my cell phone inquiring for RW's clinical status at 4:30 pm, I had very little information about her current clinical status given that Dr. JL was the resident following her. He recognized that he did not follow up consultant recommendations nor notified his senior resident about RW's tachycardia refractory to intravenous boluses. Although frustrating, I never felt that it was my place to give JL feedback regarding his clinical judgment. I expressed my concerns about my co-intern's misses to Dr. Daniel Butz, only to found out that JL's misses were later reported as mine to Dr. Song because I was expected to finish all the work regardless of the presence of two (2) interns in the service. Dr. Song said that I should have "run the service", to which I replied that I tried to finish critical issues such as consults, discharges, orders and disposition arrangements by noon every day, but that for reasons that are unclear to me, JL always took very long to accomplish his duties; and his consult notes were usually entered after working hours. It was clear that the dynamics between the two of us were very challenging, and I felt for him because I could identify with some of his struggles.

UCMC00000808

**4) "Accidentally *sent a patient home with a PICC line which was supposed to come out before discharge after multiple times of prompting"***

On 9/5/2011, I was told two times by my senior resident, Dr. Brian Bello, that WH's PICC line needed to be removed prior to discharge. During morning rounds on 9/6/2011, my patient said her daughter would come to pick her up after 7:00 pm, therefore I planned to remove the PICC line at 6:00 pm because she was a hard stick and had limited IV access. The ICU team sent the patient home at 5:00 pm without notifying me, they assumed the PICC line would stay since most of Colorectal Surgery patients get discharged with PICC lines for TPN needs. I realized what had happened on the same day and immediately communicated with the patient's daughter to set up an appointment the next morning in the clinic so that I can remove the PICC line. I acknowledge that delaying the removal was suboptimal; nevertheless, I emended my error as soon as I detected it, and here is the evidence to prove it:



Moreover, there is more evidence that my chief resident was very impressed by the way how I handled things to correct my mistake:

> *"...she got the patient back to the hospital and found a room in DCAM to accommodate the patient and had the PICC out before 9am. He was again impressed (after being annoyed) with her resourcefulness and motivation to fix it."*
> [30 Page 50]

UCMC00000809

# APPENDIX B: EVENTS DURING THE PROBATIONARY PERIOD

## 1) "Late" progress notes entries

I have been constantly reported for entering progress notes "late", I admit that during my first week in the transplant service in February I had some difficulties dealing with the special format used by the service, which I eventually learned to manage. These are representative examples of progress notes entered by me vs. other resident's log times including a Plastic Surgery resident (LA):

Patient GC:

| | | | | |
|---|---|---|---|---|
| 02/22/2012 10:36 AM | Admission ... | Progress Notes | Revised | ARTUNDUAGA, MARIA ALEXANDRA, M.D. |
| 02/22/2012 10:26 AM | Admission ... | Progress Notes | Revised | ARTUNDUAGA, MARIA ALEXANDRA, M.D. |
| 02/22/2012 10:24 AM | Admission ... | Progress Notes | Revised | ARTUNDUAGA, MARIA ALEXANDRA, M.D. |
| 02/20/2012 06:55 PM | Admission ... | Progress Notes | Revised | ARTUNDUAGA, MARIA ALEXANDRA, M.D. |
| 02/19/2012 09:51 AM | Admission ... | Progress Notes | Revised | ARTUNDUAGA, MARIA ALEXANDRA, M.D. |
| 02/19/2012 01:32 AM | Admission ... | Progress Notes | Revised | ARTUNDUAGA, MARIA ALEXANDRA, M.D. |
| 02/19/2012 01:31 AM | Admission ... | Progress Notes | Revised | ARTUNDUAGA, MARIA ALEXANDRA, M.D. |
| 02/17/2012 11:26 AM | Admission ... | Progress Notes | Revised | ARTUNDUAGA, MARIA ALEXANDRA, M.D. |
| 02/16/2012 08:10 AM | Admission ... | Progress Notes | Revised | ARTUNDUAGA, MARIA ALEXANDRA, M.D. |
| 02/15/2012 04:22 PM | Admission ... | Progress Notes | Revised | ARTUNDUAGA, MARIA ALEXANDRA, M.D. |
| 02/14/2012 01:40 PM | Admission ... | Progress Notes | Revised | ARTUNDUAGA, MARIA ALEXANDRA, M.D. |
| 02/13/2012 09:07 AM | Admission ... | Progress Notes | Revised | ARTUNDUAGA, MARIA ALEXANDRA, M.D. |
| 03/18/2012 10:03 AM | Admission ... | Progress Notes | Revised | STACK, MELINDA ELLEN, M.D. |
| 03/16/2012 03:05 PM | Admission ... | Progress Notes | Revised | STACK, MELINDA ELLEN, M.D. |
| 03/15/2012 07:54 AM | Admission ... | Progress Notes | Revised | STACK, MELINDA ELLEN, M.D. |
| 03/14/2012 04:19 PM | Admission ... | Progress Notes | Revised | STACK, MELINDA ELLEN, M.D. |

Patient IE:

| | | | | |
|---|---|---|---|---|
| 03/03/2012 05:52 PM | Admission ... | Progress Notes | | ALKUREISHI, LEE, M.D. |
| 02/22/2012 10:37 AM | Admission ... | Progress Notes | Revised | ARTUNDUAGA, MARIA ALEXANDRA, M.D. |
| 02/22/2012 10:19 AM | Admission ... | Progress Notes | Revised | ARTUNDUAGA, MARIA ALEXANDRA, M.D. |
| 02/22/2012 10:17 AM | Admission ... | Progress Notes | Revised | ARTUNDUAGA, MARIA ALEXANDRA, M.D. |
| 02/22/2012 10:14 AM | Admission ... | MD/APN AVS Discharge | | ARTUNDUAGA, MARIA ALEXANDRA, M.D. |
| 02/19/2012 10:03 AM | Admission ... | Progress Notes | Revised | ARTUNDUAGA, MARIA ALEXANDRA, M.D. |

Patient XS:

| | | | | |
|---|---|---|---|---|
| 02/23/2012 04:56 PM | Admiss... | Progress Notes | Revised | ARTUNDUAGA, MARIA ALEXANDRA, M.D. |
| 02/25/2012 09:37 AM | Post-op check Progress Notes | | Revised | ARTUNDUAGA, MARIA ALEXANDRA, M.D. |
| 02/29/2012 02:25 PM | Admiss... | Progress Notes | Revised | ARTUNDUAGA, MARIA ALEXANDRA, M.D. |
| 03/26/2012 09:30 PM | Admiss... | Progress Notes | | ARTUNDUAGA, MARIA ALEXANDRA, M.D. |
| 03/03/2012 06:24 PM | Admiss... | Progress Notes | | ALKUREISHI, LEE, M.D. |
| 03/07/2012 06:01 PM | Admiss... | Progress Notes | Revised | ALKUREISHI, LEE, M.D. |
| 03/10/2012 09:49 PM | Post-op check Progress Notes | | Revised | ALKUREISHI, LEE, M.D. |
| 03/17/2012 01:10 PM | Admiss... | Progress Notes | Revised | ALKUREISHI, LEE, M.D. |
| 03/26/2012 04:53 PM | Admiss... | Surgery Brief Op Note | | ALKUREISHI, LEE, M.D. |

Patient KC:

| | | | | |
|---|---|---|---|---|
| 03/09/2012 10:39 AM | ED to Hosp... | 22345619 | Progress Notes | Addendum | ARTUNDUAGA, MARIA ALEXANDRA, M.D. |
| 03/08/2012 02:01 PM | ED to Hosp... | 22314976 | Progress Notes | Signed | COHEN, JOSEPH BOWMAN, M.D. |
| 03/07/2012 02:47 PM | ED to Hosp... | 22278582 | Progress Notes | Signed | ARTUNDUAGA, MARIA ALEXANDRA, M.D. |
| 03/05/2012 08:27 AM | ED to Hosp... | 22218101 | Progress Notes | Signed | ARTUNDUAGA, MARIA ALEXANDRA, M.D. |
| 03/05/2012 08:33 AM | ED to Hosp... | 22170914 | Progress Notes | Signed | COHEN, JOSEPH BOWMAN, M.D. |

As you can see, my times remain within standard ranges when compared to other residents, except for those notes entered during night shifts where I performed post-op checks in these patients. With the

UCMC00000810

exemption of Sunday, February 5 (as seen in the Figure below) while I was on-call covering three more services, I have not stayed after working hours entering notes as mentioned in some communications sent to Dr. Song [30 Page 76]

## 2) Over-hours in February

By my third week of rotation in the Transplant Service, I asked my Plastics chief residents for advice on how to deal with my duty hours (>80 hrs/wk in 2 weeks in a row). There were two (2) particular events that made me go over-hours: [11]



**I) Organ procurement in Indiana 2/7/2012:** NP called me at 4:15 pm asking me if I was available to assist a donor procurement. The patient weighted >250 pounds, Dr. Renz requested 3-4 people assisting him. The transplant fellows signed up, I took the NP's spot because she had to go home to feed her dog and she asked me to cover her, which she never reported to Dr. Irma Fleming.

**II) Saturday rounds 2/11/2012:** Dr. Witkowski, Nick Alexiades (MS-III) and I rounded from 9:15 am to 4:30 pm. It took longer because CR was presenting an intra-thoracic bleeding and required ICU transfer where I started her management under Dr. Witkowski supervision. When she was more stable, Nick and I took her downstairs to get her CT AP done. Dolamu, the Transplant fellow, had some family plans during the morning, he was able to come until 4:00 pm, but I was constantly updating him over the phone. I did not sign this out to the person on-call because I felt I had to take care of her management closely, once the most critical parts of our plan were accomplished, I left home (information can be verified by Dr. Dolamu Olaitan during the hearing).

Dr. Song called me reprimanding me for letting this happened, to which I replied that I had notified Dr. Irma Fleming, my senior resident, but that I did not know how to manage the situation given that this was my very first time logging more than 80 hours/week in consecutive weeks. Instead of being supportive and offering me advice, he said I was endangering the hospital and the program with my

M. Artunduaga Grievance Hearing Document May 16, 2012                46

UCMC00000811

actions. As expected, he added this episode to my file and spoke to the Transplant Surgery attendings, who were very upset at me and brought up these incidents on my evaluations.

## 3) Dr. Tothy incident

On March 7, 2011, I received a hand fracture consult page from someone identified simply as "Tothy" in the pediatric ER. I answered her first page immediately.



Covering For: OriginalPgId [4739] OriginalPicfile [ P4739] OriginalName [PLASTIC SURGERY] Message-A: pt in peds er with nondisplaced metacarpal fracture. ▇▇▇▇ Thanks - Tothy 5-7696 IP:165.68.39.73 Paged at number : PAGE: 7736521363 at : Mar-07-2012 09:52

Dr. Tothy did not identify herself as an attending but started to behave disrespectfully by demanding me to see her patient without first putting me into context for her consult. I thought it was atypical consult request, therefore I asked her to give me more information about her patient's history of present illness and physical findings during the initial assessment. Once she finished, I added that I would see her patient as soon as I finished the transfer paperwork for one of my ICU patients who had transportation arranged for 10:00 am. Around 10:15 am, I headed to the Comer's ER to see patient EO, I entered my initial note before 10:30 am.

| Maria Alexandra Artunduaga, | PLASTIC SURGERY | RESIDENT | | Addendum | 05/04/2012 1615 | 03/07/2012 1015 | Consult (initial) |
|---|---|---|---|---|---|---|---|
| Alison Siegel Tothy, M.D. | EMERGENCY MEDICINE | ATTENDING | | | 03/07/2012 0955 | 03/07/2012 0955 | ED Notes |
| Alison Siegel Tothy, M.D. | EMERGENCY MEDICINE | ATTENDING | | | 03/07/2012 0913 | 03/07/2012 0910 | ED Notes |
| Kathleen Honkisz, R.N. | | REGISTERED NU | | | 03/07/2012 0853 | 03/07/2012 0853 | ED Nurses Notes |

I did not communicate my plan immediately to Dr. Tothy because she was seeing another patient in the ED, I decided to go back to Surgery floor to perform a bedside debridement in one of our consult patients:

Maria Alexandra Artunduaga, M.D.    RESIDENT    Service: PLASTIC SURGERY    Consult Follow-Up    04/07/2012 1043

PLASTIC SURGERY CONSULT FOLLOW-UP

S/ No purulent drainage

O/ _ 6x4cm dorsal wound proximal to MCP of 2-4 digits with fat necrosis FROM toes and ankle

A/P L foot wound w/ fat necrosis treated, moderate bedside debridement performed. Continue Silvadene dressing changes BID

Maria Alexandra Artunduaga, M.D.
PGY-1 Surgery resident
s#3394

While I was performing the procedure (10:30-11:00 am), I got two pages from Dr. Tothy:

Covering For: OriginalPgId:[4739] OriginalProfile [ P4739] OriginalName:[PLASTIC SURGERY] Message-A: please let me know when you will be down to see the patient in the PER. I would like to update the family on time frame. Thanks - Tothy 5-7696 IP:165.68.39.73 Paged at number : PAGE: 7736521363 at : Mar-07-2012 10:38

Covering For: OriginalPgId. [4739] OriginalProfile [ P4739] OriginalName:[PLASTIC SURGERY] Message-A: call the pediatric ER: - Tothy 5-7696 IP:165.66.39.73 Paged at number : PAGE: 7736521363 at : Mar-07-2012 11:03

I answered back after her second page and apologized for the delay, I explained I was doing a sterile procedure in a transplant patient when she sent me her second and third pages. I told her that I had seen her patient around10:15 am and that I had discussed with the mother my potential plan that will certainly include conservative management with an ulnar gutter splint because they fracture was non-displaced, nevertheless, Dr. Tothy started lecturing me in a condescending tone on how important was for residents to answer pages immediately so she could have a comprehensive plan for their patients and communicate that to their families. She added that she had a record of the times she had paged me and how she was documenting everything in the system. At that point, I was very frustrated, I had

UCMC00000812

apologized for my delay but it seemed Dr. Tothy expected me to prioritize her consult above other tasks that I had. She requested me for an exact time when I could go down to splint the patient, again I replied that I had to staff the consult with me senior resident and my attending, who were both operating at different places. She was disappointed at me for not having a plan after one (1) hour of her consult request, and said that the ED could have done the splinting sooner, she said she would report with my supervisors,, to which I responded that she could proceed as she felt appropriate with that information because I was prioritizing my work based on its medical urgency. After that I excused myself and hung up the phone.

Contrary to what Dr. Tothy told Dr. Song and Dr. Henry (hand surgery attending on-call) I did see the patient in a timely manner (30 minutes after the consult was placed) not 1.5 hours after how she claims I did [30 Page 91], I admit that I responded to her demands bluntly, but I believe she has no right to treat any house officer in the way she did, and she should be more insightful about using "reports" as a tool to expedite her consult needs. I strongly believe that my clinical judgment was used properly and that her non-emergent consult could be delayed for 30 minutes while I attended the needs of a immuno-compromised patient with an ongoing soft tissue infection. I later learned from other residents including my plastics co-intern, Deana Shenaq, that she had a similar episode with Dr. Tothy in July, 2011, which was never escalated in the way it has been by Dr. Song.

I have recreated a time-line of the communications related to this incident:



UCMC00000813

## APPENDIX C: EVALUATIONS ON 'NEW INNOVATIONS' VS. PERSONAL FILE

| ATTENDINGS | DATE | Present in personal file? | RESIDENTS FELLOWS | DATE | Present in personal file? |
|---|---|---|---|---|---|
| Kaplan | 9/6/11 | No (partial) | Grossman | 11/22/11 | Yes |
| Jaskowiak | 9/25/11 | No (partial) | Moreira_1 | 11/25/11 | Yes |
| Angelos | 10/13/11 | ▓ | Moreira_2 | 12/5/11 | Yes |
| Chhablani | 10/14/11 | ▓ | Shao_1 | 1/8/12 | Yes |
| Umanskiy | 10/14/11 | Yes | Fleming_1 | 1/9/12 | Yes |
| Hurst | 10/17/11 | ▓ | Shao_2 | 1/15/12 | Yes |
| Ferguson | 11/27/11 | Yes (partial) | Fleming_2 | 1/18/12 | ▓ |
| Vigneswaran | 12/11/11 | Yes | Shao_3 | 1/23/12 | Yes |
| Eton | 1/25/12 | Yes | Paruch_1 | 1/23/12 | Yes |
| Hall | 2/20/12 | Yes | Paruch_2 | 1/31/12 | Yes |
| Becker | 2/21/12 | Yes | Shao_4 | 2/1/12 | Yes |
| Skelly | 2/21/12 | Yes | Olaitan_1 | 2/10/12 | Yes |
| Renz | 2/23/12 | Yes | Qi_1 | 2/10/12 | Yes |
| Milner | 2/24/12 | Yes | Fleming_3 | 2/13/12 | Yes |
| Blecha | 2/28/12 | Yes | Olaitan_2 | 2/20/12 | Yes |
| Steppacher | 3/5/12 | Yes | Qi_2 | 2/21/12 | Yes |
| Millis | 3/17/12 | ▓ | Fleming_4 | 2/27/12 | ▓ |
| Witkowski | 3/19/12 | ▓ | Olaitan_3 | 2/27/12 | Yes |
| Thistlethwaite | 3/20/12 | Yes | Olaitan_4 | 3/3/12 | Yes |
| | | | Fleming_5 | 3/5/12 | Yes |
| | | | Greives_1 | 3/9/12 | Yes |
| | | | Kleiber_1 | 3/11/12 | Yes |
| | | | Cohen_1 | 3/11/12 | Yes |

M. Artunduaga  Grievance Hearing Document  May 16, 2012                    49

UCMC00000814

|  |  |  | Bank_1 | 3/12/12 | Yes |
|--|--|--|--------|---------|-----|
|  |  |  | Bank_2 | 3/16/12 | Yes |
|  |  |  | Cohen_2 | 3/18/12 | Yes |
|  |  |  | Greives_2 | 3/19/12 | Yes |
|  |  |  | Kleiber_2 | 3/19/12 | Yes |

UCMC00000815

# REFERENCES

1. [2011_06_24_EVAL]                    Attendings Evaluations 2011 - 2012
2. [2011_11_04_LETTER]                  Letter from Dr. Song to Dr. Artunduaga Nov. 4, 2011
3. [2011_11_15_LETTER]                  Letter from Dr. Song to Dr. Artunduaga Nov 15, 2011
4. [2011_11_18_MAA_LETTER]              Letter from Dr. Artunduaga to Dr. Song Nov. 18, 2011
5. [2011_11_21_EVAL]                    Fellows and Residents Evaluations vol 1.  2011-2012
6. [2011_11_25_LETTER]                  Letter from Dr. Song to Dr. Artunduaga November 25, 2011
7. [2011_11_28_MAA_LETTER]              Letter from Dr. Artunduaga to Dr. Kamin Nov. 28, 2011
8. [2012_01_04_EMAIL]                   Email from Akilah to multiple (protected) recipients
9. [2012_01_30_MAA_EMAIL_TRAIL]         Email trail Dr. Artunduga to attendings
10. [2012_02_10_EMAIL]                  Email from Carmen Barr with schedule changes
11. [2012_02_21_EMAIL_TRAIL]            Email Trail: Dr. Dickie and Dr. Artunduaga, Feb. 21, 2012
12. [2012_02_23_EMAIL_TRAIL]            Email Trail: Dr. Becker and Dr. Artunduaga, Feb. 23, 2012
13. [2012_02_24_MAA_EMAIL]              Email from Dr. Artunduaga to Dr. Park, Feb 24, 2012
14. [2012_03_14_EMAIL]                  Email from Dr. Song to Dr. Artunduaga March 14, 2012
15. [2012_03_23_MAA_LETTER]             Letter from Dr. Artunduaga to Faculty March 23, 2012
16. [2012_03_27_LETTER]                 Letter from Dr. Song to Dr. Artunduaga March 27, 2012
17. [2012_03_29_MAA_LETTER]             Letter from Dr. Artunduaga to Dr. Song March 29, 2012
18. [2012_04_04_LETTER]                 Letter from Dr. Song to Dr. Artunduaga April 4, 2012
19. [2012_04_05_EMAIL_TRAIL]            Email Trail: Dr. Roggin and Dr. Artunduaga, April 5, 2012
20. [2012_04_06_MAA_LETTER]             Letter from Dr. Artunduaga to Mr. Kamin, April 6,  2012
21. [2012_04_06_EMAIL_TRAIL]            Email Trail: Ms. McAtee and Dr. Artunduaga, April. 06, 2012
22. [2012_04_09_MAA_EMAIL]              Email from Dr. Artunduaga to Dr. Grossman, April 9, 2012
23. [2012_04_21_EMAIL_TRAIL]            Email trail: Dr Grossman and Dr. Artunduaga, April 21, 2012
24. [2012_04_24_MAA_EMAIL]              Email to Dr. Roggin and Dr. Song, April 24, 2012
25. [2012_04_26_MAA_EMAIL]              Email to Dr. Roggin and Dr. Song, April 26, 2012
26. [2012_04_30_LETTER]                 Letter from Dr. Song to Dr. Artunduaga April 30, 2012
27. [2012_04_30_EMAIL_TRAIL]            Email Trail: Dr. Song and Dr. Artunduaga, April 30, 2012
28. [2012_04_30_EMAIL_TRAIL2]           Email Trail: Dr. Grossman and Dr. Artunduaga, April 30, 2012
29. [2012_05_01_SCHEDULE]                       Dr. Artunduaga Schedule Printout, as of May 1, 2012
30. [2012_05_04_FILE]                   Dr. Artunduaga UChicago File 2012/05/04
31. [2012_05_05_TABLE]                  Excel file: Fellows/Residents evaluations
32. [UCH_DOCUMENT_GME_POLICY_MANUAL]    UChicago GME Policy Manual uch_015566
33. [ACGME_REQS]                        360_plastic_surgery_07012009_f07012012.pdf

UCMC00000816

May 14, 2012

Dear Grievance Committee,

This document is my rebuttal statement to the written materials submitted by Ms. Jane McAtee on behalf of the Section of Plastic and Reconstructive Surgery on May 8. Though my petition to submit a rebuttal statement had been initially denied, I have now been given this opportunity in light of the fact that Ms. McAtee violated that earlier ruling, and I am hereby exercising that option.

As I contend in my written arguments, there is a serious and systematic mishandling of information about my performance stemming directly from Dr. Song, which I claim is not only a serious violation of academic due process, but also the root cause of the arbitrary decisions against me that eventually followed from that reprehensible conduct. Very clear and important evidence of that can be found by comparing the version of my entire personal file, which –at my request– I was given by the Section on May 4 and I included as part of my supporting evidence, in contrast to the materials submitted by the Section to the Committee on May 8.

I am hereby providing an itemized list of all the missing documents from my version of the file, which suggests the existence of some clear discrepancies I hope the Committee would take the opportunity to ask Dr. Song to explain at the hearing. The confirmation of these missing documents from my copy of the file would reveal that Dr. Song keeps an additional "secret" version of my file, not viewable by me, in violation of GME regulations that the Program maintain *"a [i.e. one (1)] file"* that provides access to all resident evaluations. The list of missing documents, which anyone can independently verify, is as follows:

---

**Minutes from Faculty Meeting (3/26/12)**

With this being such a crucially important evaluative meeting, which would decide my future in the Program, at least the minutes from the meeting should have been made available to me. I requested on numerous occasions to see supporting materials for the Section's decision, namely on 3/29, 4/24, and 4/27. I was denied on each of those occasions. Rules of due process on evaluation should clearly apply to this meeting and the documentation deriving from it, and it would be particularly important to comply with them in this case.

---

**Binder given to faculty (3/26/12)**

Mentioned in both the meeting minutes and Dr. Song's Memorandum to the Grievance Committee, a copy of this binder *"detailing [my] entire intern year up until the meeting"* should have been made available to me as well, as supporting evidence of the exact information that the decisions made against me were based on. All indications are that this binder coincides with the "Packet #2" submitted by the Section on May 8, since its table of contents exactly matches the contents of the binder listed in the meeting minutes. However, this fact should have been made explicit by the Section. If that assumption is true, then many documents in that binder for the faculty were not made available to me when I was given a copy of my file on May 4, and those documents are listed in this table. This implies that the decision of the faculty was partly based on information never accessible for review by me, in violation of ACGME Program Requirement V.A.1.c), quoted at the end of this document.

---

**Table/Grid of specific Conditions of Probation (3/26/12)**

I have some reservations about the authenticity of this table. In his statement, Dr. Song claims that at the meeting the faculty *"created a grid of specific areas where improvement was needed and reviewed each element, grading whether Dr. Artunduaga had met the goal."* The reasons for my skepticism about this account are:
- If this exercise was truly done as described, and such categorical conclusions were reached on each of the 10 areas of improvement, why was a simple list of the 10 areas and their grades not provided in the March 27 decision letter? That would have at least appeared to be a simple but powerful argument to justify the decision. However, the letter does not even mention that this method of evaluation was used at all, and the meeting minutes do not refer to this grid either.
- The list of 10 criteria and their final grade was never provided to me at any other point after March 27, despite repeated requests.
- As an obviously evaluative statement, the table should have been provided to me upon request, or at the very latest with the copy of my file handed to me on May 4. I only learned about its existence on May 8.

I note that in order to address potential concerns about the authenticity of accounts from the all-important March 26 faculty meeting, I suggested that the Committee require at least two (2) PRS faculty members to independently sign on to the documentation, as proof that it contained a complete and accurate description of the discussion held at that meeting. My request was denied.

---

**Dr. Park evaluation (3/14/12)**

This is yet another evaluative statement that violates due process regulations regarding evaluation. Never made available for me to review and discuss, in fact I was never made aware of its existence at all; as all documents in this table, it is missing from my copy of my file but on the other hand it was an integral part of the binder given to the faculty on March 26.

If I had been given timely opportunity for review and discussion, I would have pointed out that only a few accounts of incidents were true (three (3) to be exact, namely: abscess incision and drainage, Dr. Jaskowiak refill, forgot post-op orders), others were inaccurate (In-Service, duty hours, Dr. Reid's cases assignment, and coordinated dressing change), and some others were undocumented and unfounded "rumors" (Neurosurgery PA's or "interference with evaluation process"). Also, please, refer to the discussion below on conflicts of interest and acceptability of Dr. Park's evaluation as attending during my Plastic Surgery rotation.

---

**Minutes from meetings with Dr. Park (1/3/12, 1/10/12, 1/25/12, 2/6/12, 2/13/12, 2/28/12, 3/5/12, 3/12/12)**

These eight (8) missing meeting minutes, added to the three (3) that were included in my copy of the file, improperly refer among others to an ongoing psychiatric treatment I was receiving. I consider this to be a breach of confidentiality in mentor-mentee relationship. In general, Dr. Park's roles as mentor who listens to my personal concerns and provides constructive advice, and evaluator of my progress under probation who would eventually recommend a specific action for the Section to take, were not clearly defined and separated. This is evidenced by the references in the minutes to matters outside the evaluative part of the meetings, which should not have been included due to their confidential nature. If I had known some personal concerns I shared with her would be mixed into her evaluative work, I would have never confided in her to discuss them.

UCMC00002006

Specific various other concerns over these meetings include: feelings of exclusion from social events and academic activities (monthly skill sessions) were ignored; my explicit concerns about conflicts and misunderstandings with faculty and staff arising from my accent and cultural background were dismissed by Dr. Park and are not mentioned in the minutes; my progress over time was never considered by Dr. Park as being significant enough and she would only keep raising the bar as my performance improved, at one point suggesting that only a string of perfect (6.0/6.0) evaluations on all aspects would prevent me from being failed.

### Faculty Evaluations (July-August, September, February)

Some of the standard competency-based evaluation forms are missing from my copy of the file, namely those of Dr. James Millis (3/17/12), and Dr. Piotr Witkowski (3/19/12). In addition, several more are missing from both copies of the file (mine and the one submitted to the Committee), including those by Dr. Edwin Kaplan (9/6/11), Dr. Asha Chhablani (10/14/11), Dr. Peter Angelos (10/13/11), and Dr. Roger Hurst (10/17/11), meaning this last group of evaluations was missing from the binder given to the Plastic Surgery faculty on March 26. Most of these faculty evaluations happened to rate me favorably, contrary to the notion by Dr. Song of a "unanimous" agreement on my lack of competence, stated in his 11/02/11 letter to me.

### Evaluation by Dr. Deana Shenaq, Plastic Surgery intern (5/3/12)

This is a negative report in response to a request that I assume came from Dr. Park, since the report is addressed to her, though the exact request is not specified. The report concerns my 1-week night float rotation on the week of March 19. The report (and probably also the request) was submitted 1.5 months after the rotation ended, outside what would have been considered "timely." This is the only document in "Packet #2" dated after March 26, meaning it was not part of the evidence considered by the faculty in making its decision on contract non-renewal, and likewise should not be considered by the Committee either.

Furthermore, Dr. Shenaq, author of the report, is my Plastic Surgery co-intern, who that week just happened to be assigned to night float as well, but she was covering other services and did not supervise my work. The examples she quotes lack crucial details, and more importantly, contrary to what she claims, she was not present during my conversations with consulting services or senior supervisors, because first of all we worked in different rooms. Also, please refer to my discussion below on conflicts of interest.

### E-mail by Dr. Sara Dickie (2/21/12)

This important e-mail, titled *"Work hours plan for week of February 19-25,"* and in which Dr. Song was also copied, was missing from my personal file as well as from the copy submitted to the Committee. In it, Dr. Dickie makes a clear statement in regards to the Section's expectations for the In-Service exam of March 1: *"your score will not be used in any way to penalize you, so please do not be concerned that a lack of study time will be a detriment at this point."* This was in addition to another e-mail by her from earlier that day, where she states that *"this will be the first year the intern level has taken the test so a low score for anyone junior is more a reflection on [the Section] as far as educational needs as we integrate the program."*

Contrary to these assurances, my eventual low score (38/100, percentile 2%, sample size of 58) was used by Dr. Song as part of his argument to reassign me to an "independent study program" for the last two (2) months of my internship year, which consisted in making a summary of a book in Plastic Surgery. This would allegedly allow him to officially certify that I have completed a year of training as a surgical resident.

There is also evidence of malicious intent when the text of the original requests that prompted some of the evaluative statements in this list, as well as many others found in my copy of the file, were omitted. For instance, several negative reports about me are found in the documentation, but it is unclear which specific question they were replying to; questions such as "give your overall impression of Dr. Artunduaga during assignment X," "what were the deficiencies of Dr. Artunduaga at assignment X?," or "what are Dr. Artunduaga's areas to improve?," would each prompt a different type of response.

As an example of the above, it appears that Dr. Song requested for some of his senior residents to provide him with periodic lists of my "areas for improvement," even while I was rotating in other services where they were not my supervisors. These lists, whose existence I was only made aware of during my first Plastic Surgery rotation in October, obviously highlighted areas where I was being found to be deficient, while omitting positive aspects and an overall impression with both good and bad aspects considered, due to the nature of the question they were answering. Dr. Song in turn used these lists as part of an argument to claim that there was a "unanimous" negative impression about my "performance or lack thereof," a questionable conclusion on top of the irregular handling of the information it was allegedly based on.

\* \* \*

Apart from the issues with the list above, I would also like to dispute the serious accusations that both Dr. Song and Dr. Park have made in their respective statements against all faculty, fellows and residents who have evaluated me favorably during my probation. Their suggestion of evaluations made with the purpose of expressing *"sympathy"* for me (Dr. Park) or *"interceding on my behalf"* (Dr. Song), instead of giving their honest professional opinion from their direct observation of my abilities, amounts to a grave charge of unethical behavior against them. If I were in their position, my sense of professionalism would absolutely prevent me from giving a favorable evaluation if it were contrary to my actual professional opinion, irrespective of what I may have been told by the person in question or any of their "allies" (in Ms. McAtee's words). Since I would appear as the author of the opinion, I must be aware that I would be held fully responsible for whatever is stated in it. Drs. Song and Park would have to submit considerably stronger evidence than they did in their written statements to the Committee, instead of giving mere suppositions and snippets of sentences, if their serious charges against their colleagues are to be believed.

On the other hand, I do have serious reservations about the impartiality and independence of the opinions of Dr. Park as evaluator of my probation period. It is evident that her job as evaluative mentor, who in theory should have no reservations about submitting opinions contrary to Dr. Song's own, comes in direct conflict with her position as Assistant Professor of Surgery, whose promotion and immediate professional goals directly depend on the favorable opinion of Dr. Song as Program Director and Chief of the Section.

As stated in the ACGME Program Requirements for Graduate Medical Education in Plastic Surgery, the Program Director must:

*II.A.4.d) evaluate program faculty and approve the continued participation of program faculty based on evaluation;*

The Committee should find Dr. Park's situation to be a manifest conflict of interest, as well as a crass error in judgment by Dr. Song in his choice of a mentor with evaluative power.

This same situation also applies to all other junior members of the Section of Plastic and Reconstructive Surgery, a situation that happens to cover all of the other witnesses testifying on Dr. Song's behalf. The senior residents who will be present at the hearing also owe their eventual certification as Plastic Surgeons to Dr. Song's favorable opinion of them, and have a vested interest in not appearing to contradict him regarding my situation. My experiences following the start of this Grievance Process serve as evidence of what may happen to them in that case. This conflict of interest must be taken into account by the Committee when debating whether their stated opinions can be truly considered as independent from Dr. Song's, and also whether the "unanimous" decision of the Section can be considered to be as coming from a wide variety of truly independent opinions. The same cannot be said about any of my evaluators and witnesses, who on the other hand hold no subordinate relationship to me, and who would obtain no potential personal benefit whatsoever by providing an evaluation that is in line with my own wishes or opinions.

Finally, I would like to submit to the Committee that at the hearing I will reserve the right not to answer any question related to evaluations that did not comply with ACGME and GME regulations on 1) documentation, 2) timely submission, and 3) availability for me to view at any time, explicitly quoted at the end of this statement. Ms. McAtee argues that *"[I] did not request a copy of [my] file until [the week of April 30]."* My reply to Ms. McAtee is that I cannot be expected to timely view any evaluative statement added to my file, when I have not even been made aware –in a timely fashion– that it exists in the first place.

An evaluative statement that fits squarely in this category is Dr. Park's March 14 letter to Dr. Song about my performance under probation, an evaluation I never even knew existed until the May 8 Grievance submission deadline. In her case as well as that of every other PRS faculty member, no consideration should be made of their evaluative opinions as attendings in the service, since the Section is chronically and entirely non-compliant with standing ACGME and GME mandates for documented faculty evaluation of residents.

I say the above because I consider that answering questions about an evaluation that is non-compliant with resident evaluation standards would amount to legitimizing it, which is something I am not willing to do. Likewise, the Committee should seriously consider completely removing all such non-compliant evaluations from its consideration of the facts of this case, in deference to the rules of academic due process regarding evaluation.

For the sake of completeness, specific rules on resident evaluation I am referring to include but are not limited to the following, on the side of the ACGME Program Requirements:

*V.A.1.a) The faculty must evaluate resident performance in a timely manner during each rotation or similar educational assignment, and document this evaluation at completion of the assignment.*
*V.A.1.c) The evaluations of resident performance must be accessible for review by the resident, in accordance with institutional policy.*

On the GME's side (Policy 11):

*Each program is required to create and utilize competencies-based evaluation forms.*
*Each program will maintain a file from which completed evaluations for each resident/fellow may be accessed.*
*Each program is required to enact processes to ensure that residents/fellows receive timely feedback about performance.*

I once again thank the members of the Committee for their time and attention, and I hope they understand my need to provide a comprehensive response to the Section's numerous lapses in due process, as poignantly evidenced by the documentation they submitted to you on May 8.

Sincerely,

María Alexandra Arizmendi Arizmendi, M.D.
Plastic and Reconstructive Surgery Resident
University of Chicago Medical Center

# EXHIBIT B

May 7, 2012

**Memorandum of the Department of Surgery/Section of Plastic and Reconstructive Surgery In Support of Decisions Concerning Dr. Maria Artunduaga**

**-Not to Renew Contract for a Second Year**
**-Continuing Probation for the Remainder of First Year Contract**

## I.   Introduction

This memorandum is submitted in support of the decisions of the Department of Surgery/Section of Plastic and Reconstructive Surgery (the "Section") not to renew the residency-training contract of Maria Artunduaga, M.D. ("Dr. Artunduaga") and to continue her probation for the duration of her contract for the current academic year.[1]

On behalf of our Section, and my Faculty, I urge the Grievance Committee to support this decision because Dr. Artunduaga has not satisfactorily completed all training components and has not received consistent satisfactory performance evaluations during her first year of clinical training. Despite informal feedback and mentoring from senior residents from the outset of her residency and despite 12 weeks of formal probation and mentoring from a faculty member, she has persistent deficiencies in Patient Care and Interpersonal and Communication Skills. These deficiencies have resulted in her inability to meet the expectations of this Program. When she was placed on probation in November, 2011, she was provided specific areas where her performance needed to improve. During her probation, she was mentored by a faculty member from the Section who met with her almost every week and provided her with education, counseling and feedback. At the end of that period, the Faculty of the Section met and reviewed each component of her probation and all the facts related to her performance in the Program and unanimously determined that she had failed to meet the conditions set for her probation. Since she had not progressed to the level expected of a first year resident in the Section, and since the Faculty decided that further remediation would not likely be successful, the Faculty decided not to offer her a contract for another year. In addition, due to the deficiencies in her medical

---

[1] Dr. Artunduaga was placed on probation on November 15, 2011. She did not grieve that decision but asked for reconsideration of the time period for her probation. She asked for and was granted a longer period of time. This was in part due to a scheduled vacation in December but she also requested more opportunity to demonstrate that she could satisfactorily meet the conditions of the probation.

1

UCMC00002317

knowledge and clinical care, the Faculty decided that she should remain on probation for the rest of the current year, so that her work could be closely supervised.[2]

The decisions of the Section were fair and appropriate, were in compliance with all ACGME and UCM GME policies and are supported by the facts. The Section's decisions should be affirmed.

## Standard of Review

In order to overturn the Section's decision, Dr. Artunduaga must establish, by a preponderance of the evidence, that the Section's decisions are either arbitrary or capricious. Dr. Artunduaga bears the burden of proof in this hearing.

To establish that the decisions were arbitrary and capricious, this committee must look only to see if there has been a clear error of judgment. The decision would be arbitrary and capricious only if it relied on erroneous facts, or entirely failed to consider an important aspect of her performance, or offered an explanation for its decision that runs counter to the evidence presented to it. This standard gives great deference to the Section's decision in this case. Dr. Artunduaga must show that the Section acted unreasonably by a preponderance of evidence. She must show evidence of great weight that the decision was wrong. We believe that there is no such evidence.

While this Committee's job is to carefully and conscientiously review this matter, your job is not to make this decision anew, not to substitute your judgment for the Section's but rather, to determine if, based on the evidence of this case, the Section acted reasonably. The Section submits that there is no evidence that should result in overturning our decision. The documentation clearly supports that Dr. Artunduaga has failed, in multiple competencies, to meet the standards expected of other residents in the Section, that she has been counseled and

---

[2] After the decision to not renew her contract, Dr. Artunduaga was assigned to a rotation where she could work with a supportive Faculty member, where her work would be supervised and she would have opportunity to complete her internship year. She did not like this rotation and has challenged it within the Section and Department complaining that it was a "waste of her time." After she failed to meet the requirements of that rotation, and scored in the bottom 2% on her In Service Exam, I re-assigned her to an independent study to complete this year. She is not happy with that assignment. However, these assignments are not a subject of this grievance proceeding - the Program Director can make appropriate assignments based on the particular situation of an individual resident.

2

UCMC00002318

provided assistance to remediate her deficiencies and that she has failed to meet the terms of her probation and the expectations of the Section.

## II.    Background Information on Residency in Plastic and Reconstructive Surgery

The Section of Plastic Surgery conducts an accredited six year training program based at The University of Chicago Medical Center. The Program accepts two residents each year, who are accepted from the NRMP match. New residents matriculate as PGY 1 residents into the training. Our residents come from varied backgrounds, including non-American medical schools, and include residents who, like Dr. Artunduaga, pursued other degrees or experiences following medical school and prior to starting the residency.

Attached are the Goals and Objectives of our Program. The Department clearly communicates the competencies and goals of the Program to residents at each stage of their clinical training. Residents are evaluated using the New Innovations. In addition, we receive information about a resident's progress through oral, written and electronic communications from nurses, physician assistants, other residents and attending physicians.

Rotations in the first three years focus on general surgical principles. Each Plastic Surgery Resident is assigned to services across the disciplines and subspecialties to provide a well-rounded experience and knowledge of the full spectrum of surgery. The first year is spent at UCM and our residents rotate along with general surgery and other "categorical" residents (residents who will move into specialty training following general surgery training). Time is spent on service with our Section.

Although our residents rotate through general surgery experiences, our Section oversees their progress and reviews residents for promotion in our Program. Our Faculty reviews all of the evaluations of the resident while rotating on general surgery rotations and considers those evaluations in conjunction with the expectations unique to our Program.

### Dr. Artunduaga's Experience in the Program

Dr. Artunduaga graduated from medical school in Colombia in 2003. She worked as a physician in Colombia for several years and she did a post doctoral research fellowship in human genetics

3

UCMC00002319

at Harvard Medical School beginning in 2007. Planning for additional training and a residency in the United States, with a stated goal of becoming a craniofacial surgeon in Colombia, she did many sub-intern clerkships at academic medical centers in the United States in 2010. She had previously done visiting clerkships at US academic medical schools as part of her medical school training. She applied for the NRMP and matched to our Program for 2011-2012. Although her medical school training was remote, her record evidenced sufficient clinical experience and medical knowledge to be a strong candidate in the Match. It was our expectation that she would be a successful and competent resident in our Program. We have had other residents with a non-traditional path to residency and, like them; we believed that Dr. Artunduaga had the knowledge and skills necessary to succeed.

Dr. Artunduaga's rotations were:

| | |
|---|---|
| July | General Surgery/Kaplan |
| August | General Surgery/Kaplan |
| September | ColoRectal |
| October | Plastics |
| November | Thoracic |
| December | On vacation |
| January | Vascular |
| February | Transplant |
| March | Plastics/Float |
| April | Kaplan April 7 – 30 |

From the outset, although Dr. Artunduaga did some things well, she demonstrated problems. As early as August, the feedback I received showed that Dr. Artunduaga's clinical performance and medical knowledge did not meet our expectations. We realized then that she needed a lot of remedial efforts in order to bring her performance up to the level of a first year intern.

In addition, there were issues concerning her professionalism. We received complaints that she was often perceived as rude, arrogant and disrespectful to co-workers. She was overconfident in her abilities, not aware of her limitations and moved quickly in situations without careful thought. Most troubling about these interactions is that when we counseled her about them, she

4

UCMC00002320

routinely made excuses and blamed another person. This evidenced to us a lack of insight into her deficiencies and an inability or unwillingness to learn from her problems. Of course, we continued to work with her to remediate her problems.

Sample comments from evaluations early in her training include:

August       Jumbled and frenetic thought process, over confident in patient management, argumentative when discussing errors, abrupt, arrogant and lacking in empathy. (Dickie email to Song 8/31/2011)

September       She was described as often frazzled, not knowing important details about patients. She had difficulty keeping up with the workload, disorganized, unsure of knowledge, unable to establish successful doctor patient relationships, difficulty following instructions in the OR and "significantly below that of a typical resident in general or plastic reconstructive surgery." (Umanskiy email 9/28/2010)

October       Had not placed consult notes, late daily notes and despite counseling "without significant improvement." Slow to recognize when patients are unstable and to notify the chiefs. This resulted in concerns for patient safety. (Butz email 10/30/11.)

We were concerned about her performance and our goal was to assist her. We met with her to review concerns and expectations. In August and thereafter, our Senior residents assisted her in identifying and trying to remediate her problems. We were hopeful that her rotation on Plastics in October would cool things down after her difficult beginning and allow us to get a first hand assessment of the issues. We provided her with assistance and advice about concrete ways to improve her performance. We were cognizant of the fact that she had been away from medical school longer than some residents, and appreciated that she might need time to adjust to the training in an academic medical center in the United States. However, we have had other residents who had foreign medical education and/or who did not come right to residency following graduation from medical school and we are accustomed to this transition. Those residents have routinely come up to speed quickly and were able to meet the Program expectations, as we expected of Dr. Artunduaga. However, Dr. Artunduaga's problems persisted

5

UCMC00002321

and we realized that she had significant deficiencies across multiple competencies irrespective of the fact that she was away from clinical medicine for a period. We began to realize that her problems were not related to a steeper learning curve than other residents, but were related to underlying problems.

Unfortunately, throughout this process, Dr. Artunduaga's response to feedback and constructive criticism was often to blame others, make excuses and fail to accept responsibility or take concrete steps to improve. For instance, one attending stated "When I mentioned specific (shortcomings) these were usually met with explanations that involved misunderstandings about her responsibilities, miscommunications from nurses or other heath care workers." This attending outlined specific opportunities to improve her surgical skills in minimally invasive surgery but she failed to take advantage of time in the MIS lab that he recommended for improvement on days when she had time. (Ferguson email 11/11/2011.)

Although Dr. Artunduaga's native language is not English and there is an occasional reference to her accent when evaluators were looking for a possible reason for her problems, she has worked, studied, given oral presentations and poster presentations and published articles in English in the United States and her English skills were very good. She attested to that fact on her applications and it is our experience that her deficiencies are not caused by a language barrier.

**Probation**

Because of our concern for her progress and the lack of improvement with informal interventions, the Faculty decided that Dr. Artunduaga needed a period of formal Probation. She was placed on probation on November 15, 2011 after a meeting with her where we reviewed her experience in the Program and specific goals she needed to meet to continue in the Program.

When Dr. Artunduaga's probation started, she was given a list of specific competency domains where her performance was deficient. She was also given a list of specific "conditions" for continuing in the Program.[3] Dr. Julie Park was asked to be her mentor and to work with her on

---

[3] This Probation was intended to be confidential. The Section did not intend to discuss it with anyone other than those with a need to know. However, Dr. Artunduaga herself told almost everyone with whom she worked about the probation and apparently asked them to intercede on her behalf. She assured that everyone with whom she worked was aware of what was riding on their evaluation of her performance. After an apparently tearful meeting,

6

UCMC00002322

specific ways to improve her performance. Dr. Park undertook this responsibility seriously and met with Dr. Artunduaga almost weekly. Dr. Park's goals were to monitor her progress and to provide timely constructive suggestions on how she could improve to meet the standards expected of the Section's interns. Dr. Park asked for "team" evaluations weekly in order to provide real time feedback. A "team" could consist of fellows, senior residents, PA's, nurse practitioners, and other interns depending of the service. This was something Dr. Park created based on the specific goals of her probation. This is not a typical evaluation for other residents, but Dr. Park did it in order to be able to provide feedback before the rotation was completed so that Dr. Artunduaga would have the opportunity to identify and rectify any problems.

The residency coordinator, Ms. Williams, documented each meeting with Dr. Park and Dr. Artunduaga. It is clear that Dr. Park reviewed precise issues and methods of improvement at every meeting. She gave Dr. Artunduaga detailed feedback and concrete ways to improve. For example, in reviewing an unprofessional interaction Dr. Artunduaga had with Dr. Jaskowiak, she reviewed and role played methods to handle conflict. Dr. Artunduaga did not "get it" since during her probation she had a similar incident with Dr. Tothy, where, after disagreeing with her about the timeliness of a consult, Dr. Artunduaga hung up on her.[4]

Dr. Park noted that Dr. Artunduaga was scheduled on the Plastics Service for the final month of her probation in March and told her that this would be a chance for her to show her improvement and that she could succeed in this residency. Dr. Park and the senior residents specifically recommended that Dr. Artunduaga work with the craniofacial team since that is the area where Dr. Artunduaga wanted to make her career. Dr. Artunduaga did not take this opportunity; instead she chose to do floor work or scrub in with other attendings. And she did not do well on

---

she engaged a senior Faculty member to call other Faculty with whom she would work, to inform them of her problems and apparently to encourage them to provide her a positive review. I spoke with some of these Faculty; in particular Faculty members in Transplant and in Vascular Surgery. They informed me that they felt that the Senior Faculty member was making a request that they should accede to due to his seniority in the department. While I don't know that Dr. Artunduaga directly asked for this intervention or for a positive review, this interference with the evaluation process casts doubt on some of these evaluations.

[4] One of the competencies at issue is Professionalism. Her file has many instances of deficiencies in that area, both with colleagues and patients. Although not under review in this Hearing, Dr. Artunduaga's response to our non-renewal and probation decisions is telling. Since she was informed of the non-renewal and her assignment was changed to one where she would get good experience in a supervised setting, she has complained, harassed and demanded things of other residents, supervisors, attendings, me and the Chair of the Department. Her tone has been argumentative, demanding and bordering on bellicose, again showing no insight into her issues. While she certainly is entitled to bring this Grievance, make complaints and advocate for herself, the manner in which she has handled her ongoing experiences is further evidence of her failure to learn from mentoring and a lack of professionalism.

7

UCMC00002323

this rotation, making multiple errors in situations that she should have perfected. Her senior residents concluded that she demonstrated an inability to "effectively and quickly convey the problem, and trouble triaging coinciding tasks." essential attributes for a resident at this stage of the Program.

Towards the end of the March rotation on Plastic and towards the end of the probation, Dr. Park wrote a memorandum to Dr. Song summarizing the probationary period. Her assessment was based on her own meetings with Dr. Artunduaga, information from other attendings, fellows, senior residents, nurses and PA's about Dr. Artunduaga's performance. It was also based on direct observations when Dr. Artunduaga was on the Plastics Service. Her conclusion:

"I have several serious reservations regarding her continuation as a resident. She continues to show problems with clinical judgment, floor management, handling criticism in a constructive fashion and work with peers." Dr. Park stated that these problems far exceed any problems she has encountered with any other resident. She concluded that after ten weeks of probationary meetings, "I am still working on the same issues with Maria - learning how to present patients, learning how to anticipate and address clinical and interpersonal problems, listening carefully, behaving professionally and avoiding conflicts and focusing more on doing her job well rather than the evaluations themselves."

Dr. Park's conclusion was that Dr. Artunduaga had not reached the level of even an average surgical intern.

**Decision Not to Renew:**

The Faculty of the Section met to consider whether they would offer Dr. Artunduaga another year in the Program. Dr. Artunduaga was invited to submit documents and information prior to the meeting. Each Faculty member received a binder with all documentation. They reviewed her entire file and the record of whether she had met the specific goals set for the probation. They reviewed all of the written materials that Dr. Artunduaga submitted. We created a grid of the specific areas where improvement was needed and reviewed each element, grading whether Dr. Artunduaga had met the goal.

8

We were aware that some residents with whom she worked during her probation thought her performance had improved. We were aware that some Faculty rated her well. Others, however, identified continuing deficiencies and problems. The senior residents in our Section who worked with her in March noted serious and continuing deficiencies. Overall, our Faculty unanimously concluded that Dr. Artunduaga had not met the expectations of the Program and had not met the conditions of her Probation. After careful consideration of all of the facts, we concluded that we would not renew her contract and would keep her on probation for the rest of this year. She simply had too many deficiencies across multiple competencies to work and succeed in our demanding residency Program. That decision was based on facts which are clearly evident in her file. That decision was not based, as Dr. Artunduaga has claimed, on discrimination, on any different standards applied to her, or any other improper factors. It was not based on her "reputation" from negative experiences early in her residency. Our Faculty wanted her to succeed and took extraordinary efforts to help her identify concrete ways to improve and to help her recover from a weak start in the Program. Unfortunately, she was either unable or unwilling to make the needed improvements.

Dr. Artunduaga was informed of this decision on March 27. In asking for reconsideration of the decision, she submitted "data" that she claimed showed that she was performing at a similar level compared to her peers. Her comparison is incomplete and incorrect. It was a sample biopsy of her two best months and was a comparison of her with general surgery residents. When comparing her to all other Plastic Surgery residents at various levels of training, her performance is well below average. Dr. Artunduaga asked to meet with Dr. Lawrence Gottlieb to discuss the decisions. Her comments at that meeting are illustrative of the manner in which she has responded to challenges: she stated that her evaluations were unfair, that she was not given a fair chance, and that she was not given enough experience on some rotations. Most surprising, she told Dr. Gottlieb that she had not been given the option for mentorship and felt she deserved more mentorship. She apparently does not appreciate the significant effort taken by Dr. Julie Park to meet with and mentor her for 12 weeks.

Finally, although this information was not known when our Faculty made our decisions, we have since learned that Dr. Artunduaga has scored in the bottom 2% of all first year plastic surgery residents across the country on the In-Service examination. She had been counseled by Dr. Park to study for and prepare for this examination during her probation. She told Dr. Park that she

9

UCMC00002325

thought she had done well, that she would score above 40%. While the test score alone, if it had been known prior to our decisions, would not have resulted in a non-renewal, it clearly corroborates our decision that Dr. Artunduaga can not meet the expectations of this Program. Our residents routinely score much better than this with many in the 70% or above. This is further evidence that she can not meet the expectations and standards of our residency.

## Conclusion:

Although Dr. Artunduaga came to our Program with great promise, she has consistently failed to meet the expectations of a resident in our Program. We identified her problems early in her internship year and worked with her to improve. When that failed, we put her on probation and had a vigorous 12 week mentoring and remediation Program. Even with that level of support, she has failed to meet the requirements for continuation in the Program.

Non-renewing an intern is a hard and difficult decision for our Faculty and our Program. Dr. Artunduaga is a talented and hard working person as evidenced in her research career. However, she was unable to meet the expectations of our Program. Our decision was fair and appropriate and was made after careful consideration of evidence and facts and should be affirmed.

Respectfully submitted

David H. Song, MD, MBA, FACS
Cynthia Chow Professor of Surgery
Chief and Program Director, Section of Plastic and Reconstructive Surgery
Vice-Chair, Department of Surgery

10

UCMC00002326

# EXHIBIT C

# Grievance Hearing
# University of Chicago

## Handout for Oral Statement

Dr. Maria Alexandra Artunduaga

May 16, 2012

1

UCMC00001954

# TABLE OF CONTENTS

EXECUTIVE SUMMARY OF PRESENTATION
MY BACKGROUND
NOVEMBER 2nd LETTER
PERFORMANCE ANALYSIS FIGURES
    FIG. 1: DR. PARK'S NUMERICAL ANALYSIS
    FIG. 2: PERFORMANCE EXPECTATIONS BASED ON
        DR. PARK'S ANALYSIS
    FIG. 3: NUMERICAL ANALYSIS OF WEEKLY EVALUATIONS
    FIG. 4: PLASTIC SURGERY FACULTY EVALUATION OF PROBATION
    FIG. 5: CORE COMPETENCIES COMPARISON WITH PGY-1
        AVERAGE AND PRS INTERNS (2009-12)
    FIG. 6: COMPARATIVE ANALYSIS OF PROGRESS ON 19
        INDIVIDUAL COMPETENCIES
MISHANDLING OF INFORMATION BY THE PROGRAM
PETITIONS
CLOSING STATEMENT
APPENDICES
    APPENDIX A: PERSONAL STATEMENT
    APPENDIX B: RESIDENCY APPLICATION
    APPENDIX C: LETTERS OF RECOMMENDATION

UCMC00001955

# EXECUTIVE SUMMARY OF PRESENTATION

This handout was prepared in support of my oral statement before the Grievance Committee on Wednesday, May 16, 2012, at the University of Chicago Medical Center, in the process against the decisions made by Dr. David H. Song, in his capacity as Program Director of Plastic and Reconstructive Surgery. This document, as well as the oral statement itself, is structured to provide the following information:

- Introduction to my personal background, with particular attention to the characteristics that make me a highly unusual resident among all others in the Section of Plastic and Reconstructive Surgery, as well as all other members of my incoming PGY-1 class at the Department of Surgery. With this in mind, I outline my initial expectations for my internship year and the challenging transition period I would be about to undergo.

- November 2 letter from Dr. Song after my fourth month of training, which marks the moment when he demonstrated to me that –quite prematurely, in my opinion– he had lost all faith in my capacity to succeed in the Program, and also defined the defeatist mindset with which he would approach my probation period.

- Numerical analysis of my performance by Dr. Park is presented, the only numerical analysis in the entire documentation presented by the Section. Her particular treatment of the data and the metrics she used, along with its conclusions as later quoted by Dr. Song, suggest in a concise way how they never intended to give me a real chance to succeed.

- I present the results of my numerical analysis of weekly evaluations during probation, and contrast it against the methods and evidence used by the Plastic Surgery faculty to reach their decision.

- Data from the other 5 interns in Plastic Surgery from the last 3 years is added to the analysis in my original documentation, showing that: 1) their performance in the 6 core competencies for the most part is indistinguishable from the average of my entire PGY-1 Department of Surgery class, so my earlier analysis still holds mostly true when adding this new sample; and 2) by the end of my probation, my significant progress in all of the 19 individual competencies, as evaluated by the faculty, had already brought me within range of their own performance as first-year residents.

- Since a thorough description of all the failures of academic due process on the part of the Section has already been provided in my written documentation, I choose to focus on only two specific aspects in this hearing, namely Dr. Song's capricious handling of information and his mischaracterizations about my performance. A type of conduct which alone should invalidate his entire case against me, it has ranged in many instances from misleading to outright defamatory, counter to the spirit of constructive evaluation, and significantly non-compliant with ACGME and GME regulations.

UCMC00001956

Further supporting material I will not get to address in my oral presentation includes:

- Detailed list of petitions for the Grievance Committee to take into account in consideration of its final decision

- Closing statement

- Appendix section with samples of my original application to the Program:

  - Personal statement
  - ERAS application
  - Letters of recommendation

An electronic version of this handout can be found at:

http://dl.dropbox.com/u/3252918/grievance/dr_artunduaga_grievance_handout.zip

4

UCMC00001957

# MY BACKGROUND

Though a more comprehensive summary of my academic record was provided with my written documentation, and expanded in Appendices A, B and C of this document, I hereby provide a few relevant facts about my background for context.

## My background is highly unusual for a Surgery resident at UCMC:

- Born and raised in a small town in a Latin American country (Colombia, South America)
- Only started learning English at 18
- Medical education in Spanish
- Four (4) years of research work following medical school, with limited clinical exposure before starting residency training
- Hispanic background is unusual for a doctor working at UChicago.
- Spanish accent uncommon in UChicago making communication challenging

## However:

- I got **236/225/pass/pass** scores at the USMLE
- I am an accomplished scholar http://martunduaga.com
- I became a US Permanent Resident as an alien of unusual talent under the National Interest Waiver program.
- Three peer reviewed publications including a first authorship in NEJM
- Fourteen (14) podium presentations, six (6) poster presentations, two (2) book chapters
- Awards: ASPO Travel grant 2010; AAUW International Fellowship 2009-2010; 1st place, ASPO basic science award 2009; Valedictorian 1996; Andrés Bello scholarship 1996; Scholars for Colombia 1996; Highest SAT score in the state and ranked top 20 in Colombia 1996;
- I have demonstrated leadership qualities: ECFMG advisor; Harvard Medical School officer at Colombian Student Society at Harvard and MIT; organizer of the "1st Symposium in Health and Biological Sciences" and "Transformation of Colombia's Health Sector" conferences; medical volunteer for four (4) international medical missions (MMFC, HUGS,HTC); ACOME/OME co-founder; Leadership school (1995-1996)

5

UCMC00001958

# NOVEMBER 2nd LETTER



THE UNIVERSITY OF
**CHICAGO**
MEDICAL CENTER

DEPARTMENT OF SURGERY
*Section of Plastic and Reconstructive Surgery*

MC 6035
5841 South Maryland Avenue
Chicago, Illinois 60637-1470
*tel* 773-702-6302
*fax* 773-702-1634

| | |
|---|---|
| **Meeting Name:** | Summary of evaluation with Dr. Maria Artunduaga |
| **Date:** | Wednesday, November 2nd, 2011 |
| **Time:** | 1:00 p.m. |
| **Location:** | J641 |
| **Participants:** | Dr. Maria Artunduaga, Dr. David Song, Dr. Julie Park and Akilah Williams |

Acknowledging that this was a very difficult meeting, we convened an urgent meeting with Dr. Maria Artunduaga after her most recent rotation on our service through the month of October. It was unanimous amongst the numerous evaluators across the Department of Surgery, particularly within our section, that the issues that Dr. Artunduaga has will be extremely difficult to correct within the time allotted during residency period. We all recognize that she is a pleasant, hard-working individual who most certainly is intelligent. However, the overwhelming issue was thematically agreed upon once again by all of the reviewers, including a 360 degree evaluation by a nurse practitioner who worked with her extensively.

It became very clear that during the month of October, while Maria had another intern on service who admittedly was not the strongest intern and perhaps added to the problem, performed far below what would be acceptable for an intern, particularly an intern in Plastic and Reconstructive surgery. Throughout the entire course of the month, Dr. Artunduaga failed to communicate properly and failed to efficiently organize a system of rounding and patient follow-up. Several times near misses were found, one in particular as it pertained to maintenance fluid, another as it pertained to drain management, where Dr. Artunduaga failed to recognize her errors despite being told multiple times to follow-up. These are thematically consistent with the evaluations Dr. Artunduaga received in the months of July, August and September where it was seen that "she frequently appeared disorganized, unsure of her knowledge and at times had an unsuccessful doctor/patient relationship." Another set of reviewers stated that "she is often frazzled when presenting patient issues, and it was very difficult to keep her organized and goal-oriented."

It was also found that she accidently sent a patient home with a picc line which was supposed to come out before discharge after multiple times of prompting. This was not fully realized by Dr. Artunduaga. Once again, while on our service, she failed to realize an issue of severe vaginal bleeding and tachycardia and did not appropriately notify senior residents. Another issue is where a patient had a supra-ventricular tachycardia and cardiology was consulted. She failed to follow up with this patient. The list continues with multiple sets of tests and lab that were incorrectly or not ordered. This is not just focusing on specific incidents, and I relayed to Dr. Artunduaga that if these incidents were isolated or if they were thematically different, we would have had a much different conversation of remediation. With all of these issues being

AT THE FOREFRONT OF MEDICINE

UCMC00001959

thematically universal when it came to her performance or lack thereof, it was quite clear to all of the reviewers that Surgery, and in particular Plastic and Reconstructive Surgery, just would not be the best fit for Dr. Artunduaga.

Regrettably, this is painful for all of us to discover and we have assured Dr. Artunduaga that we would like to move forward in every way possible to support her transition into another specialty or another program. We discussed the probability of probation, but we agreed that probation at this level would not lead to successful remediation and only lead to a permanent deleterious record in her portfolio, thus jeopardizing her future possibilities. I have relayed this to Dr. Artunduaga and have confirmed that she has understood them clearly. I also as a courtesy have given her 24 hours to decide whether she would like to proceed with probation or if she would like to consider a transition in her career where we would all be helpful. She has agreed to get back with me in 24 hours.

The meeting ended with Dr. Artunduaga stating that she recognized and understood these issues, yet being adamant that she has improved. This has further reiterated to us that she feels that she has improved, however, no one else in the entire section and across the department has recognized that fact. Once again, this was a confirmatory step for us, understanding the disconnect between her skill set, the understanding of the situation and the reality of the situation at hand. Regrettably, these things have come to fruition and I have relayed to her both my personal and our collective disappointment at the situation, and have once again relayed to her that we will do whatever is in our power to facilitate her transition. We have also allowed her to understand the grievance process as well and relayed contact information related to grievance if she so chose to move forward in that direction.

Did not sign the letter

_____
Dr. Maria Artunduaga

_____
Dr. David Song

_____
Akilah Williams

_____
Dr. Julie Park

7

UCMC00001960



**Figure 1:** Dr. Park's graphical analysis of Dr. Artunduaga's performance. This is where the claim **"Your overall faculty evaluations are well below the norm for residents at your level of training"** (March 27 letter) is derived from. No other graphical analyses were presented by the Section

M. Artunduaga  Grievance Hearing Handout  May 16, 2012

8



**Figure 1:** Necessary goals for Dr. Artunduaga to achieve on average over 2012, based on Dr. Park's graphical analysis.

M. Artunduaga Grievance Hearing Handout May 16, 2012

9



**Figure 2:** Summary of weekly evaluations during probation, based on Fellows/Residents' assessment of 10 areas for improvement

10

UCMC00001963

# Conditions of Probation – Plastic and Reconstructive Surgery Faculty Evaluation (March 26)



Figure 3: Plastic Surgery faculty analysis of 9 conditions of probation. Evidence selected and grade given for each.

M. Artunduaga  Grievance Hearing Handout  May 16, 2012

11



**Figure 4:** Progress on 6 Core Competencies for Dr. Artunduaga vs. PGY-1 class average. Data from 5 PRS interns (2009-12) also included.

* Months with faculty evaluations for Artunduaga not available

UCMC00001965



**Figure 5:** Performance of PRS interns on 19 individual competencies (2009-12). Dr. Artunduaga's evaluations of July-August and January are provided for performance comparison between the start of the internship year and the end of probation.

## MISHANDLING OF INFORMATION BY THE PROGRAM

### I. Due Process - Major stages[1]

#### 1) Evaluation:
- Affects everything else in the process
- Extremely important to comply with ACGME and GME regulations

#### 2) Corrective Measures:
- Warranted by the facts?
- Implemented correctly?
- Evaluated fairly?

#### 3) Grievance Process:
- The current stage, so not a subject of discussion
- NOT a substitute or excuse for incorrect implementation of earlier stages
- Primary responsibility for recognition of residents' rights rests with Program Director, NOT Grievance Committee

### II. Evaluation - List of missing documents from personal file[2]

- Minutes from Plastic Surgery faculty meeting (3/26/12)
- Binder given to faculty at meeting (3/26/12)
- Table/Grid of specific Conditions of Probation (3/26/12)
- Dr. Park's evaluation of Probation (3/14/12)
- 8 out of 11 minutes from meetings with Dr. Park
  (1/3/12, 1/10/12, 1/25/12, 2/6/12, 2/13/12, 2/28/12, 3/5/12, 3/12/12)
- 7 out of 19 faculty evaluations
  (July-August, September, February)
- Evaluation by Dr. Deana Shenaq, Plastic Surgery intern (5/3/12)
- E-mail by Dr. Sara Dickie, Plastic Surgery chief resident (2/21/12)

---

[1] Written arguments, line of reasoning 3
[2] Please refer also to rebuttal statement from 05/14/12

14

UCMC00001967

## III. Probation - Mischaracterizations of submitted evaluations

- **PICC line:**
  - ○ A compliment turned into a negative report

- **In-Service score:**
  - ○ Percentile is NOT the same as test score
  - ○ Severely punished as a result of test score despite previous explicit assurances to the contrary by chief resident.

- **April's Endocrine Service Evaluations:**
  - ○ No evaluations of any kind, but permanently removed from all clinical duties nonetheless due to supposed bad performance in the service.

- **"... *unanimous amongst the numerous evaluators... that the issues that Dr. Artunduaga has will be extremely difficult to correct..." (11/02/11)*
  - ○ Used as argument to first encourage resignation, then impose Probation
  - ○ Dr. Hurst (10/17/11): *"Given that she was trained where the routines and customs are not necessarily known to us... it does make it more difficult to assess her overall capabilities so early on in her residency."*
  - ○ Favorable reviews before Probation: Dr. Angelos, Dr. Hurst, Dr. Chhablani, Dr. Kaplan, Dr. Bello.
  - ○ Favorable reviews during Probation: Dr. Skelly, Dr. Milner, Dr. Steppacher, Dr. Blecha, Dr. Hall, Dr. Eton, Dr. Renz, Dr. Witkowski, Dr. Thistlethwaite, Dr. Shao, Dr. Fleming, Dr. Paruch, Dr. Olaitan, Dr. Li

- **"... *she feels that she has improved, however, no one else... has recognized that fact" (11/02/11)*
  - ○ Also used as an argument to place me on Probation
  - ○ Dr. Angelos (10/13/11) : *"I am convinced that her operative skills will improve since I saw improvement over the course of the month... I believe that she has the intelligence and desire to improve and that she should be given a chance to do so."*

15

UCMC00001968

# PETITIONS

The following is a detailed list of petitions for the Grievance Committee to take into consideration when deliberating on its final decision.

I hereby respectfully request from the Committee that it:

- In recognition of:

    - My significant overall progress on the 6 ACGME Core Competencies, particularly in the areas of Patient Care and Communication Skills, as shown by the data from official faculty evaluations.
    - My demonstrated capacity to excel in the 10 areas for improvement itemized in the conditions for probation and measured through weekly evaluations.
    - My demonstrated capacity to perform at a similar level as the other Plastic and Reconstructive Surgery interns from the past 3 years.
    - The improper and malicious way in which information about my performance was handled, in violation of ACGME and GME standards.
    - Significant failures in due process directly stemming from Dr. David H. Song's arbitrary and capricious management of my case as Program Director.
    - The explicit link in the probation letter between successful completion of probation and contract renewal.

    Issue the following decisions:

    - Either invalidate the entire probation process, due to numerous and significant lapses in due process in the lead-up to its declaration, as well as its subsequent conduct and evaluation; or, declare the successful completion of the probation period that ended in March, due to my fulfillment of its established goals
    - Reverse the decision of contract non-renewal and extend my residency training for another year.
    - Order the removal of all documentation of probation from my official record.

- Issue a reprimand to the Section of Plastic and Reconstructive Surgery for my dismissal on March 27 without just cause.

16

UCMC00001969

- Recognizing the arbitrary and capricious way in which Dr. Song has continued to direct my training following the non-renewal decision, and recognizing the significant improvement in my clinical abilities as demonstrated by my official evaluations:

    ○ Invalidate the decision of continuing probation and return me to regular resident status.
    ○ Issue a recommendation on the proper amount of clinical training I should be receiving from this point forward, compliant with ACGME standards, given both my demonstrated abilities and the sub-standard quality training that I have already been made a victim of, for a large part of my internship year, and without proper justification. The Program Director would still be free to use his discretionary power in considering how or whether to implement this recommendation.
    ○ Affirm my right as a resident to raise issues about my educational and work environment, to any member of the UCMC hierarchy I may deem appropriate, without fear of intimidation or retaliation.

- Given the chronic and systematic problems with my Program Director's handling of resident performance information, recommend the GME office to issue explicit guidelines on this matter in order to bring the Program in compliance with ACGME and GME standards. Suggestions include:

    ○ The Section of Plastic and Reconstructive Surgery should begin to issue official, documented faculty evaluations for all residents that rotate through the service.
    ○ Every e-mail sent to Ms. Akilah Williams, the Section's resident coordinator, for the purposes of adding information to my personal file, should be copied to me as well. This would both allow me to keep track of the information in my file, and also ensure compliance with the ACGME/GME requirements of timely feedback on performance.
    ○ Every evaluative conversation related to my academic performance, held either with me or with other UCMC housestaff members, should be documented, and likewise added to my file and copied to me by e-mail.
    ○ No written information about my performance should be prevented from being included in my file, so I can have access to any such information whenever I may request to view my file.

- Recommend the Program Director to play a constructive role in ensuring an appropriate educational and work environment for me from this point forward, and refrain from displaying a defensive, intimidatory or retaliatory attitude in response to respectful and legitimate concerns.

M. Artunduaga  Grievance Hearing Handout  May 16, 2012                    17

UCMC00001970

# CLOSING STATEMENT

In closing, I want first of all to affirm my belief in the fairness of the Grievance Process, and in its mission to resolve the issues I have brought up through the appropriate institutional channels. I also want to restate, as I already have several times before, that my overriding concern has always been the quality of the education I receive at the University of Chicago, which I deem to be critical to the success of my future professional career. As so many of my fellow UCMC Housestaff members can attest, I am a pleasant and hard-working professional, eager to learn and loath to engage in conflict. I have always wanted my personal relationships at UCMC to be nothing but constructive and collegial, first among them the relationship with my Program Director. At the same time, I cannot in good conscience assume a passive attitude and let an opportunity I have sought for so many years just go by, when my most basic rights as a resident have been systematically trampled on, and I have been made to stand a kind of treatment which too often has made me feel demeaned and humiliated, both as a professional and as a person. This is not a conflict I have sought, but one I have been forcibly led into as a consequence of a long string of arbitrary actions that have been taken against me since very shortly after my arrival at UCMC.

At this point, I would like nothing more than to see an acceptable closure of this unpleasant chapter. If the Committee happens to rule in my favor, I would like to see the ruling as a new beginning in a relationship that admittedly did not have a good start, but which does not have to end the same way either. Given my sense of professionalism, I am prepared to do my part to turn the page, and get back to becoming fully engaged in my clinical work as my first and only priority. At the same time, I hope Dr. Song agrees to play a constructive role in that process.

Finally, I would like to thank all members of the Committee for their time and careful consideration of the issues raised along this Grievance Process, along with the extensive amount of information provided by both parties participating in it. I pledge my full cooperation in the implementation of its decisions following this Process, and I wish to have a resolution to this matter in amicable terms.

Sincerely,

Maria Alexandra Artunduaga, M.D.
Plastic and Reconstructive Surgery Resident, PGY-1
University of Chicago Medical Center

18

UCMC00001971

# APPENDICES

## *APPENDIX A: PERSONAL STATEMENT*

I will never forget the day my youngest sister, Angelica, was diagnosed with cerebral palsy. Doctors said that she would never walk. My parents are both physicians and they arranged consultations, only to find out that health insurance would not cover the costs of her treatment. Nevertheless, they decided to go forward and pay whatever they could. Angelica is walking now, and she is graduating with the highest honors from law school.

While attending medical school, I witnessed similar situations as a volunteer for medical missions. I saw hundreds of children with cleft/lip palate but there are few plastic surgeons dedicated to craniofacial surgery in Colombia because there is not training in the field and insurance coverage is minimal. My decision to become a pediatric plastic surgeon came with the realization that my personal fulfillment would be met by having the ability to provide form and function to children suffering from congenital malformations. When I accomplish this, I will be giving many children the opportunity that my sister barely had.

The impact of congenital malformations in my society motivated me to learn more abroad. During my last year of medical school, I was chosen to finish my clinical rotations in the US. This opportunity exposed me to world-class medicine, leading experts and accessible advanced technology. In particular, the mentoring approach that I experienced while shadowing Dr. John B. Mulliken at Children's Hospital Boston revealed the possibility of realizing my potential as a skilled plastic surgeon, a dedicated researcher and an incredible teacher. Since that moment he became an endless inspiration to pursue my sense of wonder.

Upon completing a year of rural service in an isolated area of Colombia and two years of work as an emergency physician, I returned to the US to serve as a research fellow in genetics at Harvard Medical School. For the past three years I have studied the genetic causes of microtia, a common congenital malformation in Latin America and a leading cause of deafness in the Hispanic population. Using DNA microarrays and next-generation sequencing we have identified a novel sub-chromosomal duplication in chromosome 1q32.1 that encompasses a gene that is mutated in some patients. Throughout this research, I have enjoyed learning entirely new skills, from going on recruitment trips with medical missions to applying the most complex genetic technologies.

I have also co-authored original articles in Nature Genetics and the Journal of Pediatrics, and first-authored a letter that was published recently in the New England Journal of Medicine. As a result, I have been invited to present at 10 conferences and won 2 national prizes in basic science research, an international fellowship for $30,000 and a candidacy for permanent residency in the United States as an alien of extraordinary ability in genetics research. During this time, I have served as a main officer for the Colombian Student Society, a group dedicated to the promotion of activities in science and technology at Harvard and MIT.

My ultimate career goal is to serve people who suffer from craniofacial anomalies by creating a treatment and research center in my home country. Although I have had extensive clinical exposure during my 6-year medical school program and 3 years of practice in general medicine, I know that pursuing residency is the next logical step in my career. This year, I was chosen from a pool of 200 international physicians to complete a surgical sub-internship at University of Washington, one of the busiest teaching hospitals in the nation. There, I realized that training with outstanding surgeons will continue to spark my enthusiasm about science, bringing me one step closer to the academic plastic surgeon that I wish to become.

I am confident that training in the US will help me to accomplish my goals. I believe that my research experience, strong academic background and personal abilities will make me a valuable asset to your program. I am looking for a residency program where I can expand my knowledge and skills so that in future years I can employ all I have learned to contribute not only to patient care in the US, but also with the hope of one day increasing the quality of care in Latin America.

UCMC00001972

MyERAS 2011 - Application                                    https://services.aamc.org/eras/myeras2011/app/cv.cfm

| Account | Application | Documents | Programs | Help |

Electronic Residency
Application Service
**ERAS** AAMC
Maria Alexandra Artunduaga AAMC ID: 12357098
logout

Home

# APPENDIX B: RESIDENCY APPLICATION

### Artunduaga, Maria Alexandra
### AAMC ID: 12357098

**Present Mailing Address**          **Permanent Mailing Address**
77 Avenue Louis Pasteur               22 Laurel Street
NRB room 256                          Apt No. 23
Boston, MA 02115                      Somerville, MA 02143
Preferred Phone: 6179993735
Alternate Phone: 6174327837
Mobile Phone: 6179993735
martunduaga@gmail.com

**Medical Education**
Pontificia Universidad Javeriana, Colombia
01/1997 - 12/2003
M.D., 12/2003

**Education**

**Graduate** - Harvard University Extension School, Boston, MA
Biostatistics
01/2010 - 05/2010

**Graduate** - Harvard University Extension School, Boston, MA
Biological Sciences
09/2009 - 12/2009

**Other** – Pontificia Universidad Javeriana, Bogota, Colombia
Biomedical Research
05/2005 -08/2005

**Other** – Pontificia Universidad Javeriana, Bogota, Colombia
Emergency medicine
02/2005 -05/2005

**Membership and Honorary/Professional Societies**
No AOA Chapter At My School
American Physician Scientists Association, The American Society of Human Genetics, National Postdoctoral Association, Kaplan Medical Honor
Society

**Medical School Honors / Awards**
Highest class GPA during 6th year of medical school (12/2003) and International Medical Training Award (06/2003-11/2003)

**Certifi cation/Licensure**
ACLS, Exp. Date 05 / 2010
PALS, Exp. Date 07 / 2010

**Examinations**
USMLE Step 3   10/2007
USMLE Step 2 CS (Clinical Skills)   06/2006
USMLE Step 2 CK (Clinical Knowledge)   10/2006

UCMC00001973

USMLE Step 1   12/2005

## Work Experience
**07/2010 - 08/2010   Average Hours/Week:** 80
University of Washington Medical School, Washington
Sub-Intern
Functioned at the intern level under close supervision of the surgery residents during 2 months. Attended all operative procedures on my patients and participated in all rounds and teaching conferences. Presented 2 cases at tumor liver clinic conference and 1 case at M & M conference with very positive feedback.

**01/2010   Average Hours/Week:** 2
Kaplan Test Prep Center, Colombia
ECFMG advisor
Provide guidance on several topics concerning the ECFMG certification process: study strategies, visiting medical rotations, immigration issues and research opportunities in the US.

**06/2007   Average Hours/Week:** 5
Seidman Laboratory, Harvard Medical School, Massachusetts
Tutor
Train summer college students, medical students and new research fellows in basic laboratory techniques.

**02/2005 - 01/2007   Average Hours/Week:** 60
Clinica La Carolina, Colombia
Emergency Medicine physician
Offered immediate diagnosis and treatment for acute illnesses and life-threatening conditions in a secondary level clinic. Supervised a team of 5 healthcare professionals in the Emergency Department responsible for the care of 20 patients.

**07/2004 - 12/2004   Average Hours/Week:** 100
Hospital Divino Niño, Colombia
Rural Physician
Six months mandatory practice after completion of medical school in rural areas where there is a shortage of physicians. Provided patient care in the hospital wards, clinics and the emergency department in a primary level hospital. Took house on-calls twice/week and one full-weekend per month. Pioneered health brigades in isolated communities.

**12/2003 - 03/2004   Average Hours/Week:** 60
Harvard Medical School, Massachusetts
Visiting International Physician
Invited to shadow prestigious surgical attendings at HMS affiliated hospitals: Dr. Joseph Nadol (MEEI), Dr. John Mulliken (Children's), Dr. Elof Eriksson (BWH) and Dr. Jesse Jupiter (MGH). Observed in the operating room, assisted in the outpatient clinic, participated in daily academic conferences, served as a translator in several clinic settings.

**10/2003 - 11/2003   Average Hours/Week:** 80
Baylor College of Medicine, Texas
Visiting Medical Student
Joined the Radiology and Surgical Emergency departments during 8 weeks. Radiology: Exposed to broad range of radiologic techniques and interpretations, from basic plain films to high-resolution CT/MRI imaging. Presented at the monthly radiology conference with very positive feedback. Surgical Emergency Room: Evaluated patients and proposed treatment plans with full use of the scientific literature. Performed 20 minor procedures and assisted senior residents in 30 trauma cases. First respondent in ~50% of trauma cases due to my communication skills.

**08/2003 - 09/2003   Average Hours/Week:** 60
Mount Sinai School of Medicine, New York
Visiting Medical Student
Joined the Surgical Intensive Care Unit (SICU) and General Surgery departments during 8 weeks. SICU: Participated in daily rounds and delivered patient care with the medical team. Performed 20 bedside surgical procedures and assisted medical care meetings with my communicative skills. Delivered a case-presentation at the departmental conference that was regarded as superb and educational talk. General Surgery: Exposed to 50 OR cases including standard laparoscopic procedures and complex oncological operations. Performed focused patient evaluations, basic suturing in the OR and general wound management in the floor. Volunteered to take on call with a supervising resident once a week.

**06/2003 - 07/2003   Average Hours/Week:** 60
Harvard Medical School, Massachusetts
Visiting Medical Student
Awarded with an international medical exchange program in the US. Exposed to general otolaryngology, otology, pediatric otolaryngology, and head/neck surgery during 8 weeks. Observed in the operating room, helped in the outpatient clinic and participated in academic conferences. Volunteered to take on call with a supervising resident once a week.

**01/2003 - 04/2003   Average Hours/Week:** 5

UCMC00001974

Case: 1:12-cv-08733 Document #: 81-2 Filed: 05/22/15 Page 92 of 124 PageID #:1157

Surcolombiana University, Colombia
Tutor
Lectured on basic sciences for the Annual Colombian Medical examination (ASCOFAME) preparation course.

## Volunteer Experience

03/ 2010 - 03/2010   **Average Hours/Week**: 6
1st Symposium in Health and Biological Sciences, Massachusetts
Organizer
Organized the first medical symposium on clinical and basic science research carried out by Colombian physicians and scientists at Harvard
University and MIT.

09/ 2009   **Average Hours/Week:** 4
Colombian Student Society at Harvard and MIT, Massachusetts
Officer for Harvard Medical School
Direct the first Colombian student organization in Harvard/MIT that sponsors monthly political, cultural and scientific talks on issues related to
our home country.

08/ 2009 - 08/2009   **Average Hours/Week**: 80
Help Us Give Smiles Foundation, Ecuador
Volunteer Physician and Researcher
Served as a translator and helped evaluating patients with microtia. Collected discarded surgical specimens for genetic testing.

08/ 2007 - 08/2007   **Average Hours/Week**: 80
Medical Missions for Children Foundation, Ecuador
Volunteer Physician and Researcher
Served as a translator and helped evaluating patients with microtia. Assisted reconstructive operations and collected blood samples and
epidemiological data for my research project.

07/ 2004 - 12/2004   **Average Hours/Week**: 6
Prevention and Promotion Program, Colombia
Director
Designed medical missions that targeted isolated communities in the region. Supervised a team of 5 healthcare professionals that provided
patient care and education on prevalent diseases.

04/ 2003 - 04/2003   **Average Hours/Week**: 80
Healing the Children Health brigade, Colombia
Volunteer Medical Student
Served as a translator, evaluator and surgical assistant for the medical mission in my home town.

10/ 2002 - 06/2007   **Average Hours/Week**: 10
Colombian Society for Medical Students, Colombia
Co-founder
Founded the first national organization for medical students in Colombia. Represented the concerns of medical students across the country,
promoted highest standards in Colombian medical education through the promotion of training, activities and projects related to health in
Colombia.

07/ 1997 - 06/2000   **Average Hours/Week**: 6
Javeriana Student Medical Organization, Colombia
Co-founder
Founded the first medical student council in my medical school. Discussed the interests and opinions of the medical students and proposed
new alternatives that will guarantee the rights and interest of our peers. Conducted the bi-annual orientation week, the annual cultural week
and the Javeriana olympiads.

02/ 1994 - 11/1996   **Average Hours/Week**: 6
Social service on public health topics, Colombia
Instructor
Conducted lectures, conferences and debates on public health topics for high school students in underprivileged neighborhoods in my home
town.

## Research Experience

06/2007   **Average Hours/Week**: 40
Harvard Medical School, Massachusetts
Post-doctoral Research Fellow, Jonathan G. Seidman, Ph.D.
Study the genetic causes of microtia through the execution of multiple molecular assays ranging from basic DNA isolation and standard
sequencing up to genomic libraries construction and its hybridization to gene-filters, microarrays and high-throughput sequencing. Part of my
work involves statistical/computational analysis of high-volume of data using advanced software. Currently, we are preparing two manuscripts

UCMC00001975

for submission to Nature Genetics based on our most recent findings (please refer to my personal statement).

02/2007 - 04/2007 **Average Hours/Week:** 40
Harvard Cell Biology Department, Massachusetts
Visiting Research Fellow, Bjom R. Olsen, Ph.D.
Trained in basic principles of molecular biology (DNA isolation from blood, primer designing and DNA sequencing) and tissue engineering techniques (cell culture room-harvesting, passaging and cell manipulation).

## Publications

### Peer Reviewed Journal Articles/Abstracts

Artunduaga MA, Quintanilla-Dieck MdL, Greenway SC, Herman DS, DePalma SR, McDonough B, Watabe-Rudolph M, Nicolau Y, Rodriguez S, Hamdan US, Jarrin P, Osomo G, Brent B, Eavey RD, Seidman C, Seidman JG. Rare de novo copy number variant identifies new locus in non-syndromic microtia/anotia. Plastic and Reconstructive Surgery. 2010 Jun; 125(65): 24.

Artunduaga MA, Quintanilla-Dieck MdeL, Betensky RA, Nicolau Y, Hamdan U, Osomo G, Brent B, Eavey RD, Seidman CE, Seidman JG. A classic twin study of external ear malformations, including microtia. New England Journal of Medicine. 2009 Sep; 361(12): 1216-1218.

Greenway SC, Pereira AC, Lin JC, DePalma SR, Israel SJ, Mesquita SM, Ergul E, Kom JM, McCarroll SA, Gorham JM, Gabriel S, Altshuler DA, Quintanilla-Dieck MdeL, Artunduaga MA, Eavey RD, Plenge RM, Shadick NA, Seidman JG, Seidman CE. Novo copy number variants identify new genes and loci in sporadic, isolated tetralogy of Fallot. Nature Genetics. 2009 Aug; 41(8): 931-5.

Quintanilla-Dieck MdeL, Artunduaga MA, Eavey RD. Intentional exposure to loud music: the 2nd MTV.com survey reveals an opportunity to educate. Journal of Pediatrics. 2009 Oct; 155(4): 550-5.

### Peer Reviewed Book Chapter

Artunduaga MA, Quintanilla-Dieck McL, Eavey RD. (2010). Could microtia possibly be genetic?. In Sih T, Chinski A, Eavey R, Godinho R (Ed.), *IX IAPO Manual of Pediatric Otorhinolaryngology* (pp. 120-122). Sao Paulo, Brazil. Editora e Grafica Vida & Consciencia.

Quintanilla-Dieck MD*, Artunduaga MA*, Eavey RD. (2009). Evaluation of noise-induced hearing loss in young people using a web-based survey technique. In Sih T, Chinski A, Eavey R, Godinho R (Ed.), *VIII IAPO Manual of Pediatric Otorhinolaryngology* (pp. 251-253). Sao Paulo, Brazil. Editora e Grafica Vida & Consciencia.

### Poster Presentation

Artunduaga MA, Quintanilla-Dieck MdL, Greenway S, DePalma SR, McDonough B, Nicola Y, Rodriguez-Santamaria S, Hamdan US, Osomo G, Brent B, Pereira A, Mesquita S, Breitbart R, Plenge R, Shadick N, Weinblatt M, De Jager P, Eavey R, Seidman C, Seidman J. (2009, May). *Genome-wide association study identifies rare de novo copy number variant (CNV) in non-syndromic microtia.* Poster presented at: Harvard Medical School Genetics Retreat; Boston, MA.

Artunduaga MA, Quintanilla-Dieck MdL, Greenway S, DePalma SR, McDonough B. Nicola Y, Rodriguez-Santamaria S, Hamdan US, Osomo G, Brent B, Pereira A, Mesquita S, Breitbart R, Plenge R, Shadick N, Weinblatt M, De Jager P, Eavey R, Seidman C, Seidman J. (2009, May). *Genome-wide association study identifies rare de novo copy number variant (CNV) in non-syndromic microtia.* Poster presented at: Brigham and Women's Hospital research excellence awards; Boston, MA.

Artunduaga MA, Quintanilla-Dieck MdL, Nicolau Y, Hamdan U, Hadlock TA, Cheney ML, Rodriguez s, Osomo G, Brent B, DePalma SR, McDonough B, Eavey RD, Seidman CE, Seidman JG. (2008, May). *Genetics of congenital external ear malformations (microtia).* Poster presented at: Harvard Medical School Genetics Retreat; Newport, RI.

Artunduaga MA, Quintanilla-Dieck MdeL, Microtia Research Group, Eavey RD, Seidman CE, Seidman JG. (2010, March). *Discovery of novel JARID1b variants in non-syndromic microtia using high-throughput sequencing.* Poster presented at: Harvard Medical School Genetics Retreat; Boston, MA.

Artunduaga MA, Quintanilla-Dieck MdeL, Microtia Research Group, Eavey RD, Seidman CE, Seidman JG. (2010, February). *Genetics of microtia: lessons from twin and family-based Studies.* Poster presented at: New England Science Symposium; Boston, MA.

Artunduaga MA, Quintanilla-Dieck, MdL, Nicolau Y, McDonough B, DePalma SR, Hamdan U, Rodriguez-Santamaria S, Osorno G, Eavey RD, Seidman CE, Seidman JG. (2009, April). *Congenital external ear malformation and isolated microtia: insights from a genome-wide association study.* Poster presented at: New England Science Symposium; Boston, MA.

### Oral Presentation

Artunduaga MA. (2008, March). *Microtia: the molecular approach to a clinical scenario.* Oral Presentation presented at: Otitis Media and Hypoacusia Symposium; Mexico city, Mexico.

UCMC00001976

Artunduaga MA. (2004, January). *Von-Hippel Lindau disease in the pediatric patient.* Oral Presentation presented at: CHB craniofacial conference; Boston, MA.

Artunduaga MA. (2003, October). *Arnold-Chiari malformations: a practical review for medical students.* Oral Presentation presented at: BCM Radiology Monthly Conference; Houston, TX.

Artunduaga MA. (2003, August). *Thrombotic thrombocytopenic purpura: an underlooked entity in the ICU.* Oral Presentation presented at: MSMM SICU Monthly Conference; New York, NY.

Artunduaga MA. (2010, August). *Small bowel carcinoma: an emergent disease in the US?.* Oral Presentation presented at: UWMC Surgery M & M conference; Seattle, WA.

Artunduaga MA. (2010, May). *Breaking through barriers: a story of a physician from the South who became a scientist in the North.* Oral Presentation presented at: AAUW Storrs Willimantic branch monthly meeting; Willimantic, CT.

Artunduaga MA. (2010, March). *Understanding the genetic causes of microtia using DNA microarrays and next-generation sequencing.* Oral Presentation presented at: Symposium on Biological and Health Sciences; Boston, MA.

Artunduaga MA, Quintanilla-Dieck MdL. (2008, January). *Adventures in microtia: linking patients to genes.* Oral Presentation presented at: MEEI Focus Research Conference; Boston, MA.

Artunduaga MA, Quintanilla-Dieck MdeL, Betensky RA, Nicolau Y, Hamdan U, Osorno G, Brent B, Eavey RD, Seidman CE, Seidman JG.. (2009, May). *Genetics of congenital external ear malformations in monozygotic and dizygotic twins.* Oral Presentation presented at: American Society of Pediatric Otolaryngology meeting; Seattle, WA.

Artunduaga MA, Quintanilla-Dieck MdeL, Eavey RD. (2008, April). *Music-induced hearing loss: MTV.com survey results reveals an opportunity to educate.* Oral Presentation presented at: New England Science Symposium; Boston, MA.

Artunduaga MA, Quintanilla-Dieck MdeL, Microtia Research Group, Eavey RD, Seidman CE, Seidman JG. (2010, May). *Rare de novo copy number variant identifies new locus in non-syndromic microtia/anotia.* Oral Presentation presented at: Plastic Surgery Research Council meeting; San Francisco, CA.

Artunduaga MA, Quintanilla-Dieck MdeL, Microtia Research Group, Eavey RD, Seidman CE, Seidman JG. (2010, June). *Rare de novo copy number variant identifies new locus in non-syndromic microtia.* Oral Presentation presented at: New England Society of Plastic and Reconstructive Surgery meeting; Hancock, MA.

Artunduaga MA, Quintanilla-Dieck MdeL, Microtia Research Group, Eavey RD, Seidman CE, Seidman JG. (2010, October). *Genomic analyses identify new locus and gene in non-syndromic microtia.* Oral Presentation presented at: North Eastern Plastic Surgery meeting; Washington, DC.

Artunduaga MA, Quintanilla-Dieck MdeL, Microtia Research Group, Eavey RD, Seidman CE, Seidman JG. (2010, April). *Genome-wide association study identifies rare de novo copy number variant in non-syndromic microtia.* Oral Presentation presented at: American Society of Pediatric Otolaryngology meeting; Las Vegas, NV.

**Hobbies & Interests**
Latin dances, digital photography and figure drawing. Advanced scuba diver and tennis player

**Language Fluency (Other than English)**
Spanish (first), French (conversational) and Portuguese (basic)

**Other Awards/Accomplishments**
ASPO Travel grant (04/2010); AAUW International Fellowship (07/2009-06/2010); 1st place, ASPO basic science award (05/2009); Best high-School student in the State (12/1996); Valedictorian (12/1996); Andrés Bello scholarship (10/1996); Scholars for Colombia (10/1996); Highest SAT score in the state and ranked top 20 in Colombia (10/1996); Leadership school (1995-1996); 2nd place, state spelling contest (1996); 1st place, regional level, maths olympiads (1996); 1st place, oratory competition (1994)

UCMC00001977

University of... Case: 1:12-cv-08733 Document #: 81-2 Filed: 05/22/15 Page 95 of 124 PageID #:1160
Plastic
age 1)
inced)

# APPENDIX C: LETTERS OF RECOMMENDATION

Burt Brent, M.D.
a Medical Corporation

Reconstructive Plastic Surgery

July 11, 2010

Re: María Alexandra Artunduaga, M.D.
AAMC ID # 12357098

Dear Program Director:

It is with great pleasure that I write this letter on behalf of Dr. María Alexandra Artunduaga's application for Plastic and Reconstructive Surgery residency. I should note that this applicant has waived her right to see this letter now and in the future.

I met María two and a half years ago when she came to my practice to research the clinical histories of my patients with microtia, in order to identify potential candidates for a classic twin study. After a week of manually sorting through 2,500 clinical histories, she identified 53 families that qualified for the study. In only one year, Maria managed to get DNA samples, performed bench experiments and applied difficult computational analyses to determine the effects of the genotype and the environment in the causation of microtia. Last year, Maria first-authored a groundbreaking study in the *New England Journal of Medicine*, using for the first time a large number of twins to show indications that microtia can indeed be inherited.

María's innovative ideas have leaded us to massively collect 500 DNA samples from all over the world. Her fluency in both English and Spanish facilitated the recruitment efforts in Latin America, where microtia is highly prevalent. Since 2007 she has been involved in medical missions overseas. During these trips, she has proven to be a committed scientist and a caring physician. She has personally collected blood and tissue samples and performed clinical evaluations in her patients. From my perspective, one rarely see researchers leaving the laboratory to get first hand information and immerse themselves with patients, families and communities in a foreign country. I was told that she did an amazing job explaining her research in simple terms to the patients as well as sharing her knowledge by imparting detailed teachings of the latest genetic research methodologies to doctors and hospital staff. Her performance has been memorable and her charisma has played a key-role for these large recruitments.

Her *Curriculum vitae* strongly reflects that she has been an extremely bright individual and an innate leader since her childhood. She was a recipient of several honors for her SAT-like examination score such as the *"Andrés Bello"* scholarship from the Colombian Ministry of Education, a prestigious award given to the top senior high-school students in her home country. During medical school, she distinguished herself as a co-founder of the first Colombian Association for Medical Students. For her academic and leadership accomplishments, Maria was one of three students chosen to finish her last year of medical school with rotations at Harvard Medical School, Mount Sinai School of Medicine and Baylor College of Medicine. Her evaluation in all aspects was outstanding, ranking her at the very top of her class during her last year of medical school. Her experience in the U.S. motivated her to increase her understanding of craniofacial anomalies and shortly afterward she joined the Seidman laboratory in Harvard Medical School. Maria's incredible capacity to successfully take on the most difficult challenges became even more evident when in less than two years she began receiving awards for her research work in the genetics of microtia. Last year, she received First Prize in the William P. Potsic Basic Science Award at the American Society of Pediatric Otolaryngology meeting and a

2995 Woodside Road, Suite 300, Woodside, CA 94062-2401 (650) 851-5300 FAX (650) 851-5302
Website: http://www.earsurgery.com

UCMC00001978

2

grant for $30,000 by the American Association for University Women (AAUW). This fellowship is awarded to the most promising young female scientists in the world. Recently, she was awarded with a travel grant from the American Society of Pediatric Otolaryngology. It is indeed remarkable that she has received three such prestigious awards consecutively.

Maria's love for science is boundless and the originality of her thinking has been crucial for the microtia project. Her ability to orchestrate an international collaboration has resulted in the identification of a promising microtia-associated region in the DNA. By reporting seminal studies in excellent peer-reviewed publications such as *Nature Genetics*, the *New England Journal of Medicine* and the *Journal of Pediatrics*, she has surpassed my highest expectation. Maria's accomplishments have been exceptional, and with her high international profile, she has been invited to national and international conferences. Her story is truly inspirational.

I was pleased to learn that Maria wants to become a craniofacial surgeon. There is a scarcity of plastic surgeons interested on this field in her country. Becoming a craniofacial surgeon requires a tremendous amount of dedication and sacrifice but I am confident that she will become a fine surgeon—with her discipline and perseverance she has proven that she has the ability to undertake and successfully complete the most challenging projects. I will not be surprised if she matches in a residency program because her USMLE scores are excellent and she is performing a state-of-the-art research project in Harvard Medical School. I am sure she will complete this research, and I have every expectation that we will see many more worthwhile contributions in the scientific literature from her efforts for many years to come.

In summary, Dr. Maria Alexandra Artunduaga is among the brightest and most talented physician-scientists I have encountered. Not only is clear that she is considered to be at the top of the microtia genetics field but has the work ethic, personal standards, enthusiasm for academics, and the true interest in surgery. I am pleased that she chose to pursue a career in plastic surgery and wants to become a surgeon-scientist when she returns to Colombia. I look forward to her continued successes in her microtia research and her future surgery training in the U.S. I think that her contributions to the medical field make her a top candidate for your residency program, and it is my pleasure to recommend her unreservedly.

Please fell free to contact me for any additional information.

Sincerely yours,

Burt Brent, MD

# Harvard Medical School

**DEPARTMENT OF GENETICS**



77 Avenue Louis Pasteur
Boston, MA 02115
Phone:   (617) 432-7871
Fax:      (617) 432-7832

Jonathan G. Seidman, Ph. D.
Henrietta B. and Frederick H. Bugher
Professor of Cardiovascular Genetics

Christine E. Seidman, M.D.
Thomas W. Smith
Professor of Medicine and Genetics

July 20, 2010

Re: Maria Alexandra Artunduaga, M.D.
    AAMC ID # 12357098

Dear Program Director:

   We are writing this letter to strongly support the selection of Dr. Maria Alexandra
Artunduaga as a surgical resident in your program. She has waived the right to see this letter now
and/or in the future.

   We have known Maria for 3 years and have worked closely with her during her research
fellowship in our laboratory in the Department of Genetics at Harvard Medical School. The
laboratory's focus is on the use of genetics to define the etiology of human diseases. In
collaboration with Dr. Roland Eavey (formerly at Massachusetts Eye and Ear Infirmary, and
currently at Vanderbilt Medical School), Maria has studied the genetic basis of microtia, in
particular those malformation of the pina that arise in the absence of a recognized clinical
syndrome such as Treacher Collins. When Maria joined our group in 2007 she had minimal
experience in bench research and limited computational skills, but during her tenure her she has
ably acquired these and today she is an accomplished experimentalist.

   Maria and on another research fellow have been the driving force behind the microtia
project. With Dr. Eavey she recognized that higher incidence of microtia in Equator and
Colombia than in other South and North American countries. She hypothesized that this high
incidence was due to shared genetic variants within indigenous populations of these countries.
To test this hypothesis Maria traveled to Quito and Columbia to recruit microtia subjects and their
families for genetic studies. She was remarkably successful in this, and collected consented
specimens and clinical data on 150 families and 75 twins with microtia. Using this cohort of
patients, she has undertaken two important studies to define the role of genetics in microtia. First
she has defined the inheritance of microtia among monozygotic (identical) and dizygotic
(fraternal) twins, a study that indicates a substantial role for genetics in microtia (New England
Journal of Medicine 2009; 361:1216-1218). Second she initiated genome-wide analyses to define
loci that segregated with microtia in familial cases. She is currently using next-generation
sequencing to interrogate genes within these loci.

   Maria's tenure in the laboratory made extensive use of both clinical and laboratory skills.
She has become quite skillful in recognizing the manifestations of subtle ear malformations and
associated facial findings in patients. This excellent clinical acumen is supported by strong
organizational skills, which have fostered statistical analyses of clinical features from large
cohorts of patients and controls as well as detailed genetic data. Maria's oral and written
presentations are also strong. While English is not her native language, she is totally fluent and
communicates with thoughtful insights. In addition to the NEJM paper, she contributed to a
manuscript on tetralogy of Fallot (TOF) that was published in Nature Genetics (2009; 41(8):931-
5

   Maria's interpersonal interactions are particularly strong. She deals with research
patients with appropriate compassion and candor and is a valued colleague to the other trainees in
the laboratory. She is a willing teacher who has been generous in helping others to learn new

Campus Address: New Research Bldg., Room 2561

UCMC00001980

University of Chicago Plastic and Reconstructive Surgery

Artunduaga, Maria Alexandra (12367098); LoR - 002 (Jonathan Seidman, Ph.D. and
Christine Seidman, M.D, Professors, HMS Dept. of Genetics) (Inactive) - (Page 2)
3+3 Combined/Coordinated (Advanced)

techniques easily. She adapts easily to new procedures and methodologies and has always been an excellent team player.

Maria's contributions to understanding the genetic basis of microtia were rewarded by a travel grant and the first prize in basic science research from the American Society of Pediatric Otolaryngology. She has also lectured on the genetics of microtia at the Children's Hospital in Mexico City. Last year, she was awarded an international fellowship from the American Association of University Women to continue her important research.

We trust that this brief synopsis will help you to appreciate the multiple accomplishments of this talented young clinical investigator. Maria recognizes that for her efforts to continue to be productive, she will need additional clinical training. And to that end she has elected to seek surgical training. We know that she will work hard and expect that she will be successful in this next important endeavor. We respectfully request that you favorable consider her application for surgery residency in your program.

If we can provide any additional information, please feel free to contact us.

Sincerely,

Jonathan G. Seidman, Ph.D.

Christine E. Seidman, M.D

UCMC00001981

University of Chicago Plastic and Reconstructive Surgery    Artunduaga, Maria Alexandra (12357098), L3H - 003 (John B. Mulliken, M.D., Pediatric Plastic Surgeon, CHB Plastic Surgery) - (Page 1)
3+3 Combined/Coordinated (Advanced)



**Harvard Medical School**
Professor of Surgery

### John B. Mulliken, MD
Children's Hospital Boston
300 Longwood Avenue
Boston, Massachusetts 02115
Tel: (617) 355-7686
Fax: (617) 738-1657
john.mulliken@childrens.harvard.edu



Children's Hospital Boston
Department of Plastic Surgery
Director, Craniofacial Centre

July 19, 2010

**Dear Program Director:
The applicant has
waived his/her
right to see this letter.
ERAS Support Services**

Re: Maria Alexandra Artunduaga, M.D.
AAMC ID # 12357098

Dear Program Director:

It is pleasure to write this letter of support for this candidate's application for your residency. I have known Maria for 6 years. She began to "tag along" with me while attending medical school in Columbia.

She was accepted in the prestigious Pontificia Universidad Javeriana after ranking 20 among 450,000 senior high-school students in the country. Her performance in medical school was notable for academic achievements, leadership skills and social work. She applied to leading institutions in the U.S. and was accepted to finish her studies abroad.

After graduation, she practiced medicine for one year in the "zona roja" (red zone) in Columbia. She was in charge of a small hospital, provided primary care, performed small surgical procedures, and delivered babies. Thereafter she worked in Bogota for another two years in order to raise funds to be able to return to the U.S., having passed USMLE boards with high marks.

In 2007, she joined the Seidman Laboratory at Harvard Medical School. Her mentors, Christine and Jonathan Seidman are internationally recognized researchers in human genetics. Maria's research is focused on the genetic basis of microtia. Having collected DNA from 500 individuals, she learned to master complex technologies, such as genome-wide scans and high-throughput sequencing. Her scientific productivity includes publications in *Nature Genetics*, *Journal of Pediatrics*, and first-authorship of a letter in the *The New England Journal of Medicine* based on her results in a twin study of microtia.

She has been invited to present her research at national and international conferences. In 2009, she was awarded first prize in basic science research by the American Pediatric of Otolaryngology, and given a scholarship by American Association of University Women, chosen from a pool of 1,100 applicants.

Maria's dream is to become a physician-scientist and return to her country to build a craniofacial center for treatment and research. Training in the U.S. would help her to fulfill this dream.

I am very proud of Maria, and have no doubts that she will perform as an outstanding resident. She has the native intelligence, love of life-long learning, and sense of wonder to become an accomplished surgeon

Sincerely yours,

John B. Mulliken, M.D.

UCMC00001982

University of Chicago Plastic and Reconstructive Surgery
Case: 1:12-cv-08733 Document #: 81-2 Filed: 05/22/15 Page 100 of 124 PageID #:1165
Artunduaga, Maria Alexandra (12357098); LoR - 004 (Karen D. Horvath, M.D.,
Professor Program Director, UW Dept. of Surgery) - (Page 1)
3+3 Combined/Coordinated (Advanced)

# UW Medicine
## SCHOOL OF MEDICINE

August 30, 2010

**Karen D. Horvath, MD, FACS**

*Professor of Surgery*
*Residency Program Director*

RF: Maria Alexandra Artunduaga, M.D.
AAMC # 12357098

University of Washington Medical Center
1959 NE Pacific Street, Box 356410
Seattle, WA 98195-6410
Surgical Education Office 206-543-3687
Academic Office 206-543-2241
Fax: 206-543-8136
Paging Operator 206-598-6190
Patient Care Coord. (Inna) 206-598-9459
*khorvath@uw.edu*

**Dr. Artunduaga has waived her right to view this letter**

Dear Program Director,

Dr. Maria Artunduaga has just completed our eight week sub-I Program for International Medical graduates. This program was designed to choose highly selected international medical graduates and allow them to work in our program and be evaluated as a clinical clerk with 4th year medical student responsibilities. Our ultimate goal for this program is to select physicians that will excel in U.S. training programs. We ask these sub-I's to focus mostly on ward care, ICU patient care, and clinic care. This allows them to learn our system of practice in a U.S. University hospital. Maria successfully completed this sub-I during July and August 2010.

Dr. Artunduaga was educated at the Pontificia Universidad Javeriana Medical School in Bogota, Colombia. During medical school, she excelled in her academic achievements and co-founded the first Colombian Association for Medical Students. During her last year of medical school, she was chosen to finish her studies in the U.S. In 2007, she joined the Seidman laboratory at Harvard Medical School as a postdoctoral research fellow and has won a number of awards including two first prizes in basic science research from the American Society of Pediatric Otolaryngology, a fellowship from the American Association of University Women and a candidacy for permanent residency in the United States as a researcher of extraordinary ability. Her work has resulted in publications in *The New England Journal of Medicine, Nature Genetics* and *The Journal of Pediatrics*. Maria's ultimate goal is to become an academic craniofacial plastic surgeon to be able to return to Colombia to lead a center for research and treatment of craniofacial anomalies.

Dr. Artunduaga expressive and receptive English is excellent. She is extremely bright with a good fund of knowledge. She is completely self-motivated, takes initiative and is responsive to feedback. Her patient work-ups and clinic presentations were organized and thorough and her data synthesis abilities were good and improved over time. She was responsible and dependable and she participated in the team. Maria is very pleasant and did not have any attitude or interpersonal problems. She is appropriately assertive in her patient care and takes ownership of the patient. Her clinical performance is at the level of a good 4th year medical student level. I think the best word to describe Maria is 'fortitude'. She is driven to accomplish her goals and succeed.

## UNIVERSITY OF WASHINGTON

UCMC00001983

University of Chicago Plastic and Reconstructive Surgery

Arunduaga, Maria Alexandra (1235709b); LoR - 004 (Karen D. Horvath, M.D.,
Professor Program Director, UW Dept. of Surgery) - (Page 2)
3+3 Combined/Coordinated (Advanced)

Case: 1:12-cv-08733 Document #: 81-2 Filed: 05/22/15 Page 101 of 124 PageID #:1166

Dr. Maria Artunduaga left our eight week program as a VERY GOOD candidate for a preliminary or categorical position in general surgery. With a little time and more experience I anticipate that she would quickly advance to the level of an EXCELLENT resident.

Sincerely,

Karen D. Horvath, MD, FACS
Professor of Surgery
Residency Program Director

UNIVERSITY OF WASHINGTON

UCMC00001984

University of Chicago Plastic and Reconstructive Surgery

Artunduaga, Maria Alexandra (12357098); LoR - 005 (Ernest Benjamin, M.D., Chief, Division of Surgical Critical Care, MSMC) - (Page 1)

3+3 Combined/Coordinated (Advanced)



**MOUNT SINAI SCHOOL OF MEDICINE**

**Ernest Benjamin, M.D. Division Chief**
Director, Surgical ICU

**John M. Oropello, M.D.**
Co-Director, Surgical Intensive Care Unit
Co-Director, Neurosurgical Intensive Care Unit
Director, Critical Care Medicine Fellowship

**Andrew B. Leibowitz, M.D.**
Co-Director, Surgical Intensive Care Unit
Director, Surgical Nutrition Support Service

**Anthony Manasia, M.D.**
Assistant Director, Surgical Intensive Care Unit
Director, Critical Care Research

**Roopa Kohli-Seth, M.D.**
Director, Medical Education
Director, Central Venous Access Service

**Adel Bassily-Marcus, M.D.**
Director, Critical Care Consultation Service

Division of Critical Care Medicine
Department of Surgery
One Gustave L. Levy Place
Box 1264
New York, NY 10029-6574

Tel: (212) 241-8867
Fax: (212) 860-3669

October 18, 2010

Re: Maria Alexandra Artunduaga, MD
AAMC ID # 12357098

It is with great pleasure that I write this letter on behalf of Dr. Maria Alexandra Artunduaga Buitrago. I have known Dr Artunduaga for over seven years - I met her first during her rotation in the Surgical ICU at the Mount Sinai Medical Center, New York when she was a final year medical student from Pontificia Universidad Javeriana Medical School in Colombia. My direct observation in a very busy and demanding ICU setting convinced me that Maria Alexandra was one of the very best medical students that have rotated in our ICU.

Dr Artunduaga is extremely bright, inquisitive and always eager to further her medical experience at every opportunity. She was an active participant in medical rounds and she was always very knowledgeable regarding the conditions of her patients and the relevant literature. During her rotation, Maria Alexandra always took the initiative when it came to academic events and asked if she could give a presentation on a critical care topic. She was assigned "Thrombotic Thrombocytopenic Purpura" to review and she gave an outstanding talk to our entire group of faculty, housestaff and medical students. The material was well-researched and concisely presented.

Dr. Artunduaga is a very pleasant, congenial and well-rounded person who relates very well with everyone. Her appealing personality made her universally liked by patients and their families and her fluency in English and Spanish made her a very important member of the medical team. I remember how she managed to help the faculty, residents and nurses with translating and maintain correct patient care during the Northeast blackout of 2003. Once she realized that there was no power to keep the ventilators on for many hours, she was one of the first to assist in organizing the medical teams needed to maintain patient safety.

While she was at Mount Sinai she also did a one month rotation in the General Surgery department. Although I did not observe her clinical performance, there I do know that she served as a sub-intern on a very vigorous surgical service. Her evaluations in all points were excellent.

Maria spent three years working as an emergency physician in her home country before returning to the United States to join one of the most prominent genetics laboratories in the nation. Her research focus was on discovering the genetic basis of microtia, or ear malformations. Although I did not observe her directly during her year, I have been told that her

UCMC00001985

University of Chicago Plastic and Reconstructive Surgery
Case: 1:12-cv-08733 Document #: 81-2 Filed: 05/22/15 Page 103 of 124 PageID #:1168
Artunduaga, Maria Alexandra (12357096); LoR - 005 (Ernest Benjamin, M.D., Chief,
Division of Surgical Critical Care, MSMC) - (Page 2)
3+3 Combined/Coordinated (Advanced)

PIs were impressed by her fund of knowledge and quick learning of new techniques and methodology. She has made significant inroads into the etiology of this disease and has co-authored publications in The New England Journal of Medicine, Nature Genetics, the Journal of Pediatrics and two book chapters.

Recently, I have been in contact with Maria as she made her decision to seek additional postgraduate training in the US. I am confident she will be an excellent surgeon, and I believe that she is a most outstanding applicant for your residency program. She has the necessary work ethic, the clinical knowledge and a real commitment to her academia work.

In summary, Dr. Maria Alexandra Artunduaga is an outstanding applicant for your program. She has the work ethic, personal standards, research background, enthusiasm for academics, and the true interest in science. I am so pleased that she chose a surgical specialty for her future training. I think she will be a superb asset to your program, and it is my pleasure to recommend her unreservedly

Please do not hesitate to contact me if you should need any further information.

Sincerely,

Ernest Benjamin M.D.
Professor of Anesthesiology and Surgery
Chief, Division of Surgical Critical Care

UCMC00001986

# EXHIBIT D

Memorandum

Date:       May 23, 2012

To:         David Song, MD
            Department of Surgery, Plastic Surgery Section Chief

            Maria Artunduaga, MD
            Department of Surgery, Plastic Surgery

            General Medical Education (GME) Office

From:       Resident Grievance Committee

Re:         Hearing Recommendation

On Wednesday, May 16, 2012, a Resident Grievance Hearing was convened at the request of Maria Artunduaga, MD, Intern in the section of Plastic Surgery. Committee members included: Krista Curell, Vice President, Chief Compliance Officer, Eric Beck, MD, Resident, Emergency Medicine, Department of Medicine, Margaret Mueller, MD, Resident, Obstetrics & Gynecology, Mike Hernandez, MD, Attending, Department of Anesthesia & Critical Care, and John McConville, MD, Attending, Department of Medicine.

The Committee was requested to review two actions taken by the Plastic Surgery Residency Program Director and Section: 1) Non-renewal of Dr. Artunduaga's contract and 2) Extension of Dr. Artunduaga's probation through the end of her first year. After consideration of the evidence submitted by both parties and testimony presented at the Hearing, the Committee affirmed the decisions of the Program Director to not renew Dr. Artunduaga's contract and extend her probation through the end of this academic year. The decision of the Committee was unanimous. This decision was communicated via email to Dr. Artunduaga and Dr. Song at the conclusion of the Committee's deliberations on May 16, 2012.

The Committee was charged with considering whether the decisions of the Program Director were supported by evidence and whether these decisions were arbitrary and capricious. Based on the evidence presented by the parties, the Committee determined the decisions were supported by evidence and were not arbitrary or capricious. The Committee determined the Section's decisions were made after review of all the evidence related to Dr. Artunduaga's performance and were not decisions made by one or two individuals or with mal intent. Further, the evidence demonstrated sufficient effort by the Section to improve Dr. Artunduaga's performance both before and during her probationary period.

The grievance process was thoughtful and thorough and both parties spent a tremendous amount of time and effort presenting their written materials and oral arguments.

UCMC00001903

Prior to the hearing and during the proceedings, Dr. Artunduaga made several references alleging Residents asked to testify on her behalf were reluctant to come forward due to fear of retaliation by their sections/program directors. The Chair of the Committee attempted to discuss these concerns with the identified residents, but none responded to the Committee's offers to review their concerns. The Committee Chair reinforced our non-retaliation policy and requested the residents report any form of intimidation or retaliation. The residents were also asked to reach out to the GME Office as well. The Committee received no evidence to corroborate the specific allegations in this case.

The Committee requests the broader issues of retaliatory actions and transparency be discussed at an upcoming Program Director's meeting to maintain an open and supportive environment for the residents, free of fear or intimidation.

Cc:
Jane McAtee
Anne Duprey
Mike Simon
Barry Kamin
Eric Beck, MD
Margaret Mueller, MD
John McConville, MD
Mike Hernandez, MD

UCMC00001904

<u>Hearing Agenda:</u>
**Introduction – 12:30pm**
Krista Curell, Committee Chair

**Section Statement – 12:45pm – 1:15pm (15 minute presentation, 15 minute Q&A Session)**
David Song, MD, Attending
*Department of Surgery, Plastic Surgery Section Chief*

**Section Witness Presentation – 1:15 – 2:15pm**
<u>Section Witness #1</u>
Matthew Grieves, MD, Resident
*Department of Surgery, Plastic Surgery*
<u>Section Witness #2</u>
Julie Park, MD. Attending
*Department of Surgery, Plastic Surgery*

*Break – 15 Minutes*

**Resident Statement – 2:30pm (15 minutes presentation, 15 minute Q&A Session)**
Maria Artunduaga, MD, Resident
*Department of Surgery, Plastic Surgery*

**Resident Witness Presentation – 3:00 – 5:00pm**
<u>Resident Witness #1</u>
Edwin Kaplan, MD, Attending
*Department of Surgery, General Surgery*
<u>Resident Witness #2</u>
Robert Steppacher, MD, Attending
*Department of Surgery, Vascular Surgery*
<u>Resident Witness #3</u>
Dolamu Olaitan, MD, Fellow
*Department of Surgery, Transplant Surgery*
Declined to testify
<u>Resident Witness #4</u>
Michael Shao, MD, Fellow (Testimony via Teleconference)
*Department of Surgery, Vascular Surgery*
Unavailable – unable to testify

**Testimony will be presented in full with a Q&A session following each presentation. Testimony will not exceed 15 minutes. Most Q&A sessions will not last 15 minutes.**

**UCMC00001905**

# EXHIBIT E

May 31, 2012

To:     Kenneth S. Polonsky, MD, Dean of the Biological Sciences Division and Pritzker School
        of Medicine, University of Chicago
        Sharon O'Keefe, RN, University of Chicago Medical Center President

From:  Maria Artunduaga, MD, PGY-1 resident in Plastic and Reconstructive Surgery

Re:     Request for review of decision by Housestaff Grievance Committee


Mr. Dean and Ms. President,

This letter constitutes my formal request for you or your representative to review the adverse
decisions made by a Housestaff Grievance Committee against me, immediately following a
Grievance Hearing on May 16, and communicated to me by the Chair of the Committee in
writing on May 23. Your decision would be the final step in the Grievance Process I initiated on
April 6 against the decisions made by Dr. David H. Song, in his capacity as Program Director of
the Section of Plastic and Reconstructive Surgery. It is also my last resort for a just and fair
treatment of my case at University of Chicago.

The decisions the Grievance Committee chose to review and decided on are:

  1. Decision not to renew my contract for a second year of training in the Program: affirmed by
     the Grievance Committee.

  2. Decision to keep me permanently under probation: affirmed by the Grievance Committee.

According to the Grievance Procedure (GME Policy 15 [1]), the review of the decision shall be
limited to an examination of the same materials reviewed by the Grievance Committee. The
Committee is charged with forwarding to you a copy of its decision, as well as the materials it
reviewed during the Grievance Process, including at the Hearing. To my recollection, the
materials that should be forwarded to you by Ms. Anne Duprey, legal counsel acting in
representation of the Committee, are the following:

  1. Written arguments and evidence submitted by the Section of Plastic and Reconstructive
     Surgery to the Committee on May 8.
  2. Written arguments and evidence submitted by me on May 8.
  3. Rebuttal statement to my written arguments, submitted by Ms. Jane McAtee on behalf of the
     Section on May 10.
  4. Three (3) e-mails I submitted to the Chair of the Committee on May 10 and 11, in response
     to the Section's rebuttal statement, and which the Chair agreed to forward to the
     Committee.
  5. Rebuttal statement to the Section's written arguments, submitted by me on May 14.
  6. Documentation concerning the facts presented at the Grievance Hearing on May 16.

1

UCMC00001712

My motivation for requesting this review originates from well-founded concerns I have that the decision made by the Grievance Committee was arbitrary and capricious, and without proper consideration of the facts presented to them by both sides, particularly the ones presented by me. My serious reservations stem from particular actions and omissions by the Committee, both before and during the Grievance Hearing, which make me question the impartiality with which they reviewed the case. I am itemizing my concerns as follows, and providing my observations and evidence for each of them in the Appendix section of this document:

1. Favoritism as evidenced by the unequal treatment of my petitions compared to the Section's
2. Failure to scrutinize the Section's methods of evaluating my probation period
3. No serious consideration of my written arguments
4. Improper weight given to my arguments compared to the Section's
5. Confusion between verbal feedback and proper documentation of evaluations
6. Improper scrutiny of the Section's accusations against my character in contrast to the evidence provided
7. Failure to recognize my rights as a resident and to inquire the Section about their failure to uphold them
8. Failure to recognize the underlying causes of my particular situation


As part of your review, I hope your decision recognizes the significant degree to which my rights as a resident have been violated by the Section, with no adverse consequences for them so far, not even a recognition of that fact by the Grievance Committee. The evidence of misconduct is serious and varied: from the way critical information about my performance has been either mischaracterized or concealed from me altogether; to the way my probation period was conducted and evaluated without measurable goals and primarily based on anecdotal evidence; to a chronically inadequate exposure to surgical cases and experiences; to two (2) arbitrary dismissals from clinical duties, one based on completely illegitimate reasons, the other based on an evaluation from a senior resident that I was not even allowed to see and contest in a timely fashion. These allegations are based on solid evidence, but they were dismissed by Dr. Song at the hearing by saying they are *"no more truthful than a wish."* Only a decisive action from you would allow me to believe there is actually a functioning system of checks and balances at this institution, a system which holds the rights of residents as absolute, and which nobody regardless of rank can trample on; a system that corrects the types of abuses I have already been made a victim of, even if it failed to prevent them from happening in the first place. My educational and work experience at this University have not been what I had expected and hoped for, my professional future has been put in serious jeopardy as a result, and I hold you as the last resort in order to reverse this injustice and try to work out an acceptable solution.

2

UCMC00001713

On the specific subject of the underlying causes of my particular situation, I want to stress the fact that the Section, particularly Dr. David Song and Dr. Julie Park, have always insisted in equating my situation and expected rate of progress to that of other foreign medical graduates whose native tongue is English and who received their medical education in that language. They have dismissed my concerns and those of several supervisors by claiming on the one hand that *"[my] deficiencies are not caused by a language barrier"* [2], despite significant evidence to the contrary, and that they were instead caused by some fundamental flaws in my ability to think and communicate, my medical knowledge, and my character, to the point of Dr. Park stating at the Grievance Hearing that *"Rush Limbaugh would give better apologies"* than I do. Drs. Jaskowiak, Kaplan, Angelos, Hurst, Moreira, Fleming, Paruch, Shao, as well as a number of other doctors including Plastic Surgery residents Drs. Dickie, Greives and Kleiber who evaluated me, repeatedly claimed that my alleged inability to communicate, and specifically my accent, were significant factors in some of my performance problems. Many comments in the same direction can be found in my official evaluations, such as: *"There seem to be some critical issues that may be cultural, as she has not worked in the American medical system before"* (Dr. Jaskowiak, August); *"Given that she was trained where the routines and customs are not necessarily known to us... it does make it more difficult to assess her overall capabilities so early on in her residency"* (Dr. Hurst, September); or *"I think there are language and cultural barriers that have affected Maria's ability to effectively communicate with patients and medical staff, including nursing staff."* (Dr. Moreira, November).

Despite this, there has been a generalized lack of sensitivity to my cultural and professional background at all levels in the UCMC Housestaff; Drs. Umanskiy, Ferguson and Seal, for instance, have made derogatory remarks to me regarding my communication skills and my medical training in South America during our feedback meetings, not to mention the constant snide comments I would receive from co-workers about my home country or my accent, and which contributed to a hostile work environment for me from the beginning. On Dr. Song's part, he did not hesitate to ask me to either resign or be put on probation as early as November [3], and explicitly withdrew his support of me at a meeting I had with him on November 21, when he said I was "on my own," since I had a "bad reputation" and was an "embarrassment" for him and the Section. The chronically unequal learning opportunities I was given were even noted by some of my direct supervisors in their official evaluations, such as Dr. Fleming when she stated: *"many of her seniors are not giving her the opportunity to learn and instead just bypass her... I just don't think she was given the opportunity to be an intern."* [4]

I have made many complaints of discrimination on the basis of national origin, deriving in particular from comments and criticisms regarding my command of the English language, since as early on in my residency as August, to my chief Plastic Surgery residents (Drs. Justine Lee and Sara Dickie), my Program Director (Dr. David Song), my probation mentor (Dr. Julie Park), the UCMC DIO in the GME office (Mr. Barry Kamin), and the director of Labor relations in Human Resources (Mr. Jonathan Rothstein). All of my complaints have been either completely ignored or dismissed as being an effort to "make up excuses." While I do have confidence in your ability to look at this case impartially, at the same time I am prepared to bring my complaints of discrimination and its supporting evidence to the EEOC, given the uniform response I have received up to this point from the entire institutional hierarchy, a response which in my opinion has been completely unsatisfactory.

3

UCMC00001714

Overall, beyond all the rules and regulations, I hope you recognize the fundamental fact conveyed by my careful analysis of the data in my case, and it is that I have already demonstrated that I am capable of performing at a similar level as other Plastic Surgery residents who still continue in the Program, even if I have not yet achieved a level of consistency that would be impossible to reach in a short probation period of three months. Similarly, I have shown I am perfectly capable of expressing myself well both verbally and in writing, by the admission of the Grievance Committee members themselves, in a language that I only started to learn at the same time I started to learn Medicine. If those fundamental facts were recognized, then the logical conclusion would be that I should be able to continue to do so, in an ever more frequent and consistently competent way. Such level of consistency can only be achieved through continued clinical exposure in a nurturing environment, an opportunity Dr. Song and the Section have been bent on denying me altogether, despite the significant progress I showed and which is unmistakable from the numerical indicators of my performance. This is the main underlying fact and the logical conclusion that the Section's as well as the Grievance Committee's arbitrary and capricious analyses have prevented them from acknowledging with respect to my case.

Finally, regarding the rules for this part of the process, I need to make the following comments:

- The Grievance Procedure does not have an allowance for a statement by the other party in response to this Request for Review, and I expect that rule to be upheld. Furthermore, I see no need for the Section to provide such a statement, since the Grievance Committee decided to uphold the Section's arguments as given.

- The Grievance Procedure further states that, whereas I must submit this request within "five (5) business days" of the written decision by the Committee, your decision is due "within fourteen (14) days" of my request. I interpret this to mean 14 calendar days, or exactly 2 weeks, but I would appreciate that you provide clarification of that point.

I look forward to your communications regarding this Request for Review, and please do not hesitate to contact me regarding questions about the arguments and evidence I have presented.

Sincerely,

Maria Alexandra Artunduaga, M.D.
Plastic and Reconstructive Surgery Resident
University of Chicago Medical Center

4

UCMC00001715

# Appendix

I am hearby providing my observations and evidence of what I have considered to be an arbitrary and capricious way to proceed on the part of the Grievance Committee:

1. <u>Favoritism as evidenced by the unequal treatment of my petitions compared to the Section's:</u>

Several signs of favoritism on the part of the Committee, starting with the Chair herself, were evident throughout this process. To begin, on the day following the announcement of the formation of the Grievance Committee, I made a number of sensible petitions to the Chair, most of which were denied by her in an e-mail she sent out on May 1 [5]. In particular, she denied a petition I had made to allow for the submission of a rebuttal statement to the Section's arguments, saying the following in her e-mail:

*"The Committee will not entertain any pre-hearing objections by either side regarding the materials submitted prior to the hearing. The Committee will review all documents prepared by both parties and you will have an opportunity to respond to documents submitted by the Section during the hearing."*

After the May 8 submission deadline, however, the Section broke this ruling on May 10 by submitting a rebuttal statement to the Chair and asking for it to be forwarded to the rest of the Committee. I objected to this action on two (2) separate e-mails on that day, as it openly violated the earlier directive by the Chair herself. The Chair, however, tersely stated in response: *"I am granting the request to file the two-paged memorandum submitted by Jane McAtee to the Committee,"* without offering any compelling explanation for why she had decided to reverse her earlier ruling. While it is true that to compensate she did allow me to submit my own response, the reason for allowing this breach of the rules by the Section was never fully explained.

The exact opposite of this situation happened at the end of the Grievance Hearing, when I tried to make a request to put out a word about an earlier question from the Committee I felt I had not fully answered. The Chair wrongly interpreted this as wanting to make a closing statement, and her reaction was to immediately move on to ask the Section if they wanted to make a closing statement as well. Since they declined to do so, she did not allow me to speak, to the point of abruptly cutting me off at mid-sentence when I was trying to explain that I actually did not intend to give a closing statement.

One further pre-hearing incident occurred on May 11 when the Section requested for one of its witnesses to be allowed to speak after 3:00pm, very late into a hearing that would begin at 12:30pm. The Chair's reaction was to grant the request almost immediately, without taking into account that, per the Committee's own rules, I had the right to use my oral statement to respond to the testimony of any of the Section's witnesses. Only after I objected was the final schedule eventually revised to put the witness before my testimony at 2:30pm. The initial reaction of the

5

Chair, however, revealed an inclination towards using her discretion to allow requests by the Section, even if they were not necessarily in accordance with my rights under the process.

This capricious application of the rules is only a factual indication of a much larger problem regarding the impartiality of the Committee, as the following motivations explain.

2.  Failure to scrutinize the Section's methods of evaluating my probation period:

    As the second line of reasoning in my written arguments explains at length, there were many problems with the way Dr. Song conducted and evaluated my probation period. Some of the most prominent ones the Committee partly or totally failed to scrutinize include the following:

    - In his oral statement, Dr. Song claimed that "insufficient improvement [from me] was seen," yet the Section's analysis does not include even a single plot that shows my progress over time. Strikingly, only one "graph of faculty evaluations" was in the binder given to the Committee and earlier to the Plastic Surgery faculty, which only takes a yearly average of faculty evaluations, thus giving equal weight to earlier and later months. In my presentation I pointed out the clear inadequacy of this graph as a measurement of improvement, yet the Committee members made no remarks at all about this fundamental disagreement in the use of performance data.

    - In her testimony, Dr. Park remarked about the weekly evaluation form she tailored specifically for me, one which would directly measure my progress in the 10 specific areas for improvement itemized in the probation letter. I fully agree that this was a very useful evaluation tool, one which served the purpose of providing the type of objective, competency-based evaluation espoused by both the ACGME and the GME, and which should have become the primary metric for measuring my progress on the specific conditions of probation. I in fact welcomed Dr. Park's effort by making full use of this data in my analysis for both the written and oral parts of the Grievance Hearing, to the point of calling it "the essence of the argument for why I should have been given a passing grade for my probation, and consequently also a renewal of my contract."
    The Section as well as Dr. Park herself, however, decided to practically discard the numerical data in these evaluations, as they did not even go as far as displaying the data in a plot to be discussed at the Plastic Surgery faculty meeting. They argued that they had done this because of some alleged undue pressure put on all of my evaluators, a claim never proven by the facts and categorically denied by Drs. Kaplan, Steppacher and Grieves at the hearing, after the Committee separately asked them about that specific issue. The Committee should have found that, having failed to find any conclusive proof to the contrary, the dismissal by Dr. Song and Dr. Park of the numerical weekly evaluation data during the probation period amounted to an arbitrary decision without basis of fact.

    - Another arbitrary decision by Dr. Song that was not fully scrutinized by the Committee concerns his sudden decision in the middle of February to put me to rotate through the Section of Plastic Surgery for the first two (2) weeks of March, which were also the last ones of my probation. The decision would not have seemed so suspicious if it had been

6

UCMC00001717

determined from the very beginning of probation that those last 2 weeks would serve as that last proving ground to show how much I had improved during my probation. The sudden change, however, clearly approved by Dr. Song himself, first of all contradicts his claim at the hearing that he put a "Chinese Wall" between him and my probation process. Second, the decision clearly comes in response to an ongoing situation, namely that my evaluations up to mid-February had improved to a level that he and Dr. Park had not been expecting, and so they decided to do something about it; in the words of Dr. Park at the hearing: *"I just didn't understand how some of her evaluations were actually that high."* Third, as both Dr. Song and Dr. Grieves said at the hearing, there was a meeting of Plastic Surgery residents and faculty prior to the beginning of my rotation, with the explicit purpose of discussing my upcoming rotation through the service, meaning Dr. Song did cross the Chinese Wall to talk to my supervisors, all subordinate to him, before my rotation, and this was clearly not the first time he did so. Drs. Song and Grieves do have benign accounts of the discussions at that meeting; however, nobody outside those present can independently corroborate those accounts. The Committee members should have been troubled both by the arbitrary change in my schedule and its questionable motivations, as well as by the active role played by Dr. Song behind my back at least over those last several weeks prior to the end of my probation. They were not.

- The Committee members were clearly swayed by the claim from Dr. Song and both of his witnesses that my "entire file" was reviewed at the 1.5-hours long faculty meeting of March 26. That means that the members bought the claim that a 300-page document was reviewed, going through every single one of my evaluations before and during probation, plus another significant amount of e-mail correspondence and informal reports, followed by discussion where every single faculty member expressed their opinion, followed by the final decisions, all in 1.5 hours. Quoting from Dr. Song's oral statement in his characterization of my allegations, it seems the strategy employed by Section's witnesses regarding this claim was that if they *"repeat it often enough, someone will believe them."* In this case it seems the members of the Committee actually did just take them at their word, without any degree of skepticism on their part.

Assuming for a moment that the Section's claims were true, and all evaluations were indeed carefully reviewed at the faculty meeting, it is clear which subset of them they deemed to be most relevant in judging my progress on the conditions of probation, namely the ones they quoted in the evaluation grid they produced at the meeting. For my oral testimony, I made an elaborate diagram that analyzed those evaluations quoted in the table, and showed that there was a clear dominance of reports from the months where my overall performance was worst (November and March). Also, the diagram showed a significant contribution of as much as one third ($\frac{1}{3}$) of all reports quoted coming from informal reports; in most cases, these reports were never shared with me in a timely fashion, or they seem to have been prompted by requests that are not spelled out anywhere. The Committee did not ask any questions to me about this diagram, except to point out that the numbers next to each evaluator's name corresponded to the average of the 6 core competencies derived from their evaluation.

7

3. No serious consideration of my written arguments:

In one of the most evident signs of disregard for the arguments I provided, the Committee members did not ask me or Dr. Song a single question or remark related to the essence of the four (4) lines of reasoning I presented in my written arguments. In one of the few comments I received about them at the hearing, one member dismissively referred to them as just having the purpose of making *"a series of allegations and accusations."*

Much to the contrary, the chief purpose of my written arguments was to make a comprehensive analysis, using all the objective data available in my case, and particularly focusing on tracking my progress over time, both from my monthly faculty evaluations and my weekly resident/fellow evaluations, to an extent the Section never did. That is the essence of my first line of reasoning, entitled *"Probation Period - The Facts,"* which makes a careful quantitative analysis of the data beyond the individual comments and innuendo surrounding my case.

While I understand the remark by one of the Committee members, who said that a significant amount of resident performance information comes in the form of informal reviews, I have to agree with Dr. Park when she said that the monthly faculty evaluations are the only apples-to-apples way of measuring performance across residents and across rotations. That was precisely the principle that drove the first line of reasoning in my written arguments, but a principle to which the Grievance Committee evidently did not give the same degree of importance.

In one of the few references to my numerical analysis of the data in the entire hearing, Dr. Park criticized me for not having used data specifically from Plastic and Reconstructive Surgery interns instead of General Surgery interns. She did this in an effort to point out that I did not understand the standard against which I was being measured, perhaps unaware that I had not done so only because that Plastic Surgery data had never been made available to me by the Section, and certainly not by her in any of our mentoring sessions. The data was finally provided to me as part of Dr. Park's March 14 evaluation of my probation, a document I did not even know existed until the Section submitted it to the Committee on May 8.

Unbeknownst to Dr. Park, once I had the Plastic Surgery intern data, my first reaction was in fact to do a thorough revision of my graphical data to include it in my analysis, and in fact one of the main goals of the oral statement I would give after her testimony would be to add that entire dimension to my numerical analysis. My new plots in fact showed revealing information about how I compared to all of the other 5 individual Plastics Surgery interns from the last 3 years, at one point reaching a level well within the norm of PRS interns in 19 individual competencies. Again, this analysis I presented at the hearing elicited no questions from the Committee.

In one further disturbing lapse in the Committee's analysis of my documentation, they seem to have made no serious consideration of the issue of missing documentation from my file, the core theme of my rebuttal statement submitted May 14, 2 days in advance of the hearing. The most obvious question that would have been drawn from any careful reading of my statement would have been why those documents were missing from my copy of the file in the first place.

8

None of the Committee members asked that question to Dr. Song, and in general seemed unconcerned about the fact that I had not had timely access to a significant volume of the evaluative information that was later used to reach critical decisions about my academic future.

Finally, one further aspect in the Section's case that I clearly pointed out in my rebuttal statement, and was not even acknowledged by the Committee, was the fact that both of Dr. Song's witnesses, Dr. Park and Dr. Greives, were affected by a clear conflict of interest, due to the fact that as junior faculty member and senior resident, they owed their immediate professional goals to a considerable extent to a favorable opinion of them by Dr. Song. By this I do not mean to imply that they were untruthful or insincere about their testimony or their opinion of me, but given that they were perfectly aware since before November that Dr. Song did not believe I was capable of succeeding in the Program, it is quite conceivable that an unconscious bias may have arisen from their manifest conflict of interest. That bias may have prompted them to seek their own reasons to convince themselves about their support for Dr. Song's view. Irrespective of their sense of professionalism and their stated commitment to giving me a "blank slate," they cannot be considered to be independent evaluators who would have absolutely no reservations about submitting an opinion that may well be contrary to Dr. Song's view. Despite their own denials, the Committee must have assumed that the unavoidable conflict of interest due to their subordination to Dr. Song might reasonably prevent them from being truly impartial.

4. Improper weight given to my arguments compared to the Section's:

In another sign of the capricious analysis of the Grievance Committee, one of the members drew a false parallel between my arguments and the Section's. She claimed in one of her questions to me that both of us had *"excerpted certain things"* from my evaluations, while *"leaving some things out"* at the same time, suggesting that we had both built equally valid arguments by selecting specific incidents or reviews at our convenience.

That was precisely what I did not want to do in my quantitative analysis, which explicitly took into account all of my evaluations, the good and the bad, both before and during my probation period. Mine is an analysis that anyone with the same set of data could have used to reach the same conclusions I did. My use of examples only followed later as a way of complementing my numerical analysis, either to illustrate the general trend observed, or to explain outliers observed in the data.

This stood in clear contrast to the Section's analysis, which only claimed in word to have taken all evaluations into consideration, but in the end ended up summarizing it in a table that cherry-picked quotes and evaluations which in the opinion of the faculty were deemed to be most relevant. The testimony from their three (3) witnesses went in the same direction, a testimony clearly led by examples of incidents and anecdotes, which were then used to draw a larger set of conclusions.

9

UCMC00001720

As I mentioned in section 1 of this Appendix, I summarized the analysis by the Section of what they considered to be the relevant evaluations in an elaborate diagram I discussed at the hearing. The diagram clearly showed the preference that had given to the months where my overall performance was worst, as well as the considerable weight they gave to informal evaluations that for the most part were not shared with me in a timely fashion. Regardless, the Committee insisted in equating the fundamental approach I took compared to the Section's, a fundamental error in data analysis, which in my opinion impaired their ability to properly weigh my arguments compared to theirs.

5. Confusion between verbal feedback and proper documentation of evaluations:

The Committee also went to great lengths in their line of questioning to ask me whether I considered I had received proper verbal feedback from the Section, a question that came in various forms from several of the Committee members. I understood this as being a deliberate effort to blunt my complaints about having been improperly evaluated, after I pointed out in my documentation a number of ACGME and GME regulations regarding resident evaluation that had not been followed by the Section and Dr. Song in particular during my entire internship year, including my probation period, and still continuing into the present.

In this regard I must say that while feedback is important and much appreciated, and I myself proactively went out of my way to request such feedback sessions with attendings and supervisors I worked with, I do not believe a feedback process can be effective when reports about my performance have not been properly documented and shared with me first. Knowing exactly what was said about me in informal reports, and very importantly, what the question was that prompted the report (when applicable), is the only way of having a feedback session that effectively builds on those facts, and then focuses on the general development of my medical competencies for the future.

The failure to distinguish between properly documented and shared evaluations of my performance, and the verbal feedback that is a necessary complement but not a substitute of those evaluations, was in my opinion another fundamental misunderstanding on the part of the Committee in their analysis of the case presented to them.

6. Improper scrutiny of the Section's accusations against my character in contrast to the evidence provided:

The accusations by the Section's witnesses against fundamental traits of my character were diverse and very direct. The testimonies by Dr. Song and Dr. Park were particularly blunt in this respect. Dr. Song began his testimony by accusing me of making *"allegations without any substantiation,"* and of attributing to him in my written arguments *"quotes that are simply false,"* basically calling me a liar. I do not take such accusations lightly, and I would have expected the Committee to have asked for evidence from him, as he would have the burden of proof in that case.

10

UCMC00001721

Yet, interestingly, the rest of Dr. Song's 15-minute testimony was long on denials and short on facts. He failed to point out a single instance of occasions when I may have misquoted him, or point out to evidence contrary to certain accusations I may have made against him. In his April 4 response to my request for reconsideration, for instance, he wrote:

*"Many of the statements in your letter are not correct. I will not rebut those statements in this response as they will be addressed at the grievance hearing should you decide to proceed."*

Neither the statements I made in my request for reconsideration nor at any other time were addressed or rebutted by Dr. Song in his oral statement at the hearing. The Committee simply listened to his sharp accusations against me, and they were evidently not troubled by them, since they did not ask him for proof of any kind when the time for their questions came up.

With respect to Dr. Park, one of the key aspects of her problematic testimony was her firm emphasis on my alleged lack of professionalism. In one particular example, she used that term to characterize my objections to a faculty evaluation that had been submitted 10 days ahead of time, and that I believed had wrongly graded me on aspects where the attending in question had not even observed me. Even worse, the attending had said to me that my probationary status had led her to assume I was a bad performer, with a direct negative influence on the grades she gave me. The numerical data seemed to add credibility to my objections: out of five (5) attendings in the service, she gave me by far the lowest grades of any of them, a full 1.0/6.0 points lower on average than the next lowest faculty evaluation. One of the Committee members did rightly ask Dr. Park to explain why she thought that incident showed lack of professionalism on my part, and she responded that she finds it inappropriate for any resident to question the way in which an attending chooses to grade them.

I have a well-founded concern that Dr. Park as well as Dr. Song have a confused notion between professionalism and unquestioning submissiveness. In an open and democratic society such as the United States, and even more so in a leading academic institution such as the University of Chicago, it is my belief that respectful and legitimate dissent should not only be allowed but also valued. While I have never refused to accept an assignment I have been given by my superiors, and therefore cannot be accused of insubordination, I have occasionally exercised my right to express concerns about certain decisions, from the above-mentioned faculty evaluation in February that I deemed utterly unfair, to a rotation assignment in April that I deemed of considerably less educational value that those of my peers. Dr. Song and Dr. Park in particular have responded to my raising these legitimate concerns with attacks on my character, calling me disruptive and unprofessional on the one hand, and also with harsh retaliatory measures on the other. Dr. Song went to the lengths of removing me from clinical service altogether after I asked him to explain why I had been getting a systematically low number of surgical cases in the Endocrine Surgery Service for 3 weeks in a row, with as few as zero (0) surgical cases compared to nine (9) for my co-intern in the same service in the same week. Dr. Song justified his arbitrary decision by claiming that I had performed unsatisfactorily on the service, based on an unofficial report by a senior resident in the service that I was not allowed to

11

see at the time. At the hearing, however, Dr. Kaplan, head of the service, directly contradicted Dr. Song and explicitly said that he believed I was doing satisfactorily on the service. Moreover, Dr. Kaplan made it clear that he had been shown the e-mails with my concerns that I had addressed only to Dr. Song and to Dr. Roggin, who were responsible for my assignments, and that therefore they should have been considered to be confidential.

7. <u>Failure to recognize my rights as a resident and to inquire the Section about their failure to uphold them</u>

For one of the aspects I most constantly refer to throughout my documentation, the Grievance Committee remarked or asked surprisingly little about the question of my rights as a resident. Even Dr. Song himself had previously said to me in a letter: *"Your rights will be addressed at the Grievance Hearing"* [6]. In my opinion, to any meaningful extent, they were not. Despite very concrete evidence I showed in my documentation, in particular in my third line of reasoning, where I cite specific ACGME and GME regulations Dr. Song and the Section broke in their handling of my case, the Grievance Committee could not even bring itself to an acknowledgement of whether those regulations had indeed been broken or not.

In one further example of this, Dr. Song said in his testimony that his service does not provide monthly faculty evaluations of residents, because they have an "intimate" semi-annual evaluation of residents instead. This may have sounded persuasive to the Committee, but it has a problem: it's not ACGME compliant.

First, the semi-annual evaluations are not an option; they are a requirement. From the ACGME Program Requirements for Graduate Medical Education in Plastic Surgery:

> *The program must:*
> *V.A.1.b).(4) provide each resident with documented semiannual evaluation of*
> *performance with feedback.*

In addition, there is another requirement:

> *V.A.1.a) The faculty must evaluate resident performance in a timely manner*
> *during each rotation or similar educational assignment, and document*
> *this evaluation at completion of the assignment.*

These two forms of evaluation are therefore <u>not</u> mutually exclusive, but the ACGME has clearly designed them to be complementary. Dr. Song has failed to implement the latter requirement as Program Director of the Section of Plastic and Reconstructive Surgery, as neither I nor any other intern who rotates through the Section has received an official performance evaluation from the Program's faculty. This is only an addition to the many other complaints I have made about non-compliance regarding performance evaluation, as well as the consideration, conduct and evaluation of the form of disciplinary action that was imposed on me (probation). The Committee in my opinion did not take those complaints into proper consideration.

12

UCMC00001723

8. <u>Failure to recognize the underlying causes of my particular situation</u>:

Finally, in one of the most serious failings of the Committee from my point of view, they seem to have made a woefully inadequate effort at considering the cultural and language barrier issue I have repeatedly raised, an issue that is particularly unique about my case. One of the members actually expressed finding it "a challenge" to believe my allegations that being in a foreign medical setting was a significant difficulty for me, because the member saw I was capable of expressing myself in writing with a firm grasp of the English language.

While I agree with the assessment that I am certainly capable of expressing myself well in both speaking and writing, what the member as well as Dr. Song on behalf of the Section (*"It is our experience that her deficiencies are not caused by a language barrier"* [2]), and seemingly other members of the Committee fail to recognize is that they cannot possibly have known how much effort it took from me to achieve such high-quality output. When they –and here I include Dr. Song, Dr. Park, as well as the Committee members– pretend they can alone assess my language difficulties just by looking at what they have in front of them, and without knowing the amount of effort I had to put into achieving it, they are failing to make use of a critical dimension of sensitivity to differences in language and culture. The selection of a Committee where none of its members seemed to have had to overcome that experience in a professional setting, the single aspect that makes me most different from all my other fellow PGY-1s as well as Plastic Surgery interns for the last several years, only added to that problem and also seems to have made it much more difficult to take that aspect into proper consideration.

In another poignant example, as most English speakers know, issuing an apology with the appropriate tone for the situation is probably one of the most difficult skills to master even for native speakers of the language, as countless politicians all the way up to the presidential level can attest. Commenting on a controversial incident I had with a Pediatric ER attending and the message of apology I later sent to her, Dr. Park said at the hearing: *"Rush Limbaugh would have given a better apology,"* while chuckling in front of the members of the Committee. Apart from the unwelcome comparison, this is a clear example which indicates that in her mind she would directly measure up my words against those of a native speaker who is also a well-known media personality in the United States. Dr. Song had expressed a similar sentiment by e-mail about the same incident as well, and then turned it into a prominent example of my alleged lack of professionalism, to the point all three of the Section's witnesses mentioned the incident at the hearing. The clear implication by all of them was that the awkward apology was unquestionably due to some fundamental flaw in my character, since their biased view prevented them from entertaining the possibility that it might have been due to just an inadequate mastery of that part of the language on my part.

13

UCMC00001724

# References

(found in Dr. Artunduaga's Grievance Materials or attached to the email*)

[1] "uch_015566.pdf"      U. Chicago GME policy manual

[2] "Memo in Support of Decisions.pdf"    Dr. Song letter shared with the Grievance Committee and Dr. Artunduaga on May 8th.

[3] 2011_11_04_LETTER    Dr. Song letter to Dr. Artunduaga, Nov 2, 2011

[4] 2011_11_21_EVAL   page 12     Dr. Fleming evaluation on 1/18/2011 (New Innovations)

*[5]  2012_05_01_EMAIL_TRAIL   Dr. Artunduaga and Ms. Curell email exchange May 1, 2012

[6] 2012_04_30_LETTER           Dr. Song to Dr. Artunduaga Letter  April 30, 2012

14

# EXHIBIT F



Kenneth S. Polonsky, M.D.
Richard T. Crane Distinguished Service Professor
Dean of the Division of the Biological Sciences
and the Pritzker School of Medicine
Executive Vice President for Medical Affairs

June 19, 2012

We have reviewed Dr. Artunduaga's request for further review and her arguments in support of same. Having also reviewed the written decision of the Grievance Committee and the written materials reviewed by the Committee in hearing the Grievance, we hereby affirm the decision of the Grievance Committee. That decision was not arbitrary or capricious, and it was supported by the facts presented at the Grievance Hearing. Pursuant to the Grievance Procedure policy (GME #15), this decision is final.

We also note that Dr. Artunduaga has claimed in her request for further review that she previously made complaints of discrimination on the basis of national origin. Based on our review of the written record, it appears that Dr. Artunduaga did not raise any such claim in her Grievance or in her subsequent written submissions to the Grievance Committee in support of her request for review. Inasmuch as these complaints are first presented in Dr. Artunduaga's request for further review, they are not properly before us, and we cannot assess whether they have merit. That said, national origin discrimination in violation of UCMC policy, were that to have occurred, would of course be of concern to us. We do note some tensions between Dr. Artunduaga's description of her qualifications and her recent national origin-related statements. She states, for example, that there was a "generalized lack of sensitivity to [her] cultural and professional background," chiefly through alleged comments regarding her home country or her accent/her "command of the English language." At the same time, she claims to "have shown that I am perfectly capable of expressing myself well both verbally and in writing." Moreover, she has not contended that her performance or that her evaluators' assessment of her performance was impacted by any national origin-based animus. We will nonetheless refer her letter to the Director of Employee/Labor Relations, Jonathan Rothstein, to ensure that any complaints of national origin-based discrimination either have been or will be appropriately and fully investigated consistent with the Medical Center's policies.

Kenneth S. Polonsky, MD

Sharon O'Keefe
President
University of Chicago Medical Center

5841 South Maryland Avenue · MC 1000 · Chicago, Illinois 60637
Telephone: 773-702-0885 · Fax: 773-702-1897 · E-mail: polonsky@bsd.uchicago.edu

UCMC00001661