# TAB 3

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DR. MARIA ARTUNDUAGA,

    Plaintiff,

v.

THE UNIVERSITY OF CHICAGO
MEDICAL CENTER,

    Defendant.

No. 12 C 8733

Judge James B. Zagel
Magistrate Judge Sidney I. Schenkier

## DECLARATION OF BARRY KAMIN

I, Barry Kamin, declare under penalty of perjury under the laws of the United States and the State of Illinois as follows:

1.     I have personal knowledge of the facts set forth below.

2.     I am over the age of 18 and a resident of the State of Illinois.

3.     I was born in the United States.

4.     I am presently Executive Director for Graduate Medical Education and Continuing Medical Education at the University of Chicago Medical Center ("UCMC").

5.     I have been employed by UCMC since 2008 and for the entire period of my employment my responsibilities have included the administrative operations of the UCMC Graduate Medical Education Office, in addition to other duties.

6.     UCMC Attending Physicians have clinical privileges and academic appointments such as Associate or Assistant Professor. Some Attending Physicians have endowed chairs or other special appointments. In addition to patient care, research and other responsibilities,

Attending Physicians generally are responsible for providing training to and evaluating the performance of residents.

7.  In the Plastic and Reconstructive Surgery and General Surgery Sections, one or more residents in their final year in the residency program may be Chief Residents for that year. In addition to patient care and other responsibilities, Chief Residents are responsible for assigning clinical and other duties to more junior residents, including making assignments of resident participation in clinics and operative cases. Chief Residents are responsible for providing training to and serving as mentors for more junior residents. Chief Residents are responsible for assessing and critiquing the performance of more junior residents and providing input about the performance of junior residents to the Program Directors and Attending Physicians.

8.  In the Plastic and Reconstructive Surgery and General Surgery Sections, Residents who have progressed beyond their first year but who are not yet in the final year in their program, in addition to patient care and other responsibilities, may provide training to more junior residents and provide input about the performance of junior residents to the Program Directors and Attending Physicians.

9.  In the Plastic and Reconstructive Surgery and General Surgery Sections, First year residents are frequently called interns. They are responsible for: carrying out the daily plan for each patient reviewed by the Attending and Chief Resident, such as ordering tests, medications and consultations; gathering data on the patients, such as vital signs, laboratory results and the recommendations of consultations; synthesizing and reporting that data to the Attending or Chief Resident; and preparing notes on patients at least once a day and updating those notes on patients as necessary, participating in rounds with Attending Physicians, Chief

-2-

Residents, other residents or physician assistants; studying on their own; seeing patients in clinics; and participating in surgeries.

10.    By virtue of my employment at UCMC, I am familiar with the New Innovations evaluation system software that was used during the 2011 – 2012 academic year for evaluations of Residents.

11.    Attached are true and correct copies of the following evaluations of Dr. Maria Artunduaga that were submitted using the New Innovations software:

        a.    Colon and Rectal Surgery Attending Physician Dr. Roger Hurst's evaluation of Dr. Artunduaga's performance on the Colon and Rectal Surgery rotation, submitted on October 17, 2011. (Exhibit A attached)

        b.    Fourth year General Surgery resident Dr. Carla Moreira's evaluation of Dr. Artunduaga's performance from November 21 to 25 on the Thoracic Surgery rotation, submitted on November 25, 2011.  (Exhibit B attached)

        c.    Dr. Moriera's evaluation of Plaintiff's performance from November 26 to December 2 on the Thoracic Surgery rotation, submitted on December 5, 2011 (Exhibit C attached)

        d.    Transplant Attending Physician and Transplant section chief Dr. Michael Millis evaluation of Dr. Artunduaga's performance on the Transplant rotation in February 2012, submitted on March 17, 2012.  (Exhibit D attached)

        e.    Fourth year PRS resident Dr. Jonathan Bank's evaluation of Dr. Artunduaga's performance on the Plastic and Reconstructive Surgery Rotation ("PRS") during the period March 1 to 9, 2012, submitted on March 12, 2012. (Exhibit E attached)

        f.    Fifth year PRS resident Dr. Matthew Greives's evaluation of Dr. Artunduaga's performance on the Plastic and Reconstructive Surgery Rotation ("PRS") during the period March 1 to 9, 2012, submitted on March 9, 2012. (Exhibit F attached)

        g.    Fourth year PRS resident Dr. Grant Kleiber's evaluation of Dr. Artunduaga's performance on the Plastic and Reconstructive Surgery Rotation ("PRS") during the period March 1 to 9. 2012, submitted on March 11, 2012. (Exhibit G attached)

-3-

12.     GME Office records show that:

    a.     During the 2011-12 academic year Dr. Baddr Shakhsheer was a second year resident in the UCMC General Surgery residency program. He was born in Kuwait and attended medical school in the United States.

    b.     During the 2011-12 academic year Dr. Melinda ("Mindy") Stack was a first year resident in the UCMC General Surgery residency program. She was born in and attended medical school in the United States.

    c.     During the 2011-12 academic year Dr. Jason Somogyi was a first year resident in the UCMC Orthopaedic Surgery residency program. He was born in and attended medical school in the United States.

13.     GME Office records show that Dr. Javed Khader-Eliyas, a Resident in the Neurology residency program, was born in Salem, Iran.

14.     GME Office records show that Dr. Reza Salabat, a Resident in the General Surgery residency program, was born in Tehran, Iran.

15.     GME Office records show that Dr.Ali Aria Razmaria, A Resident in the Urology residency program, was born in Tehran, Iran.

16.     The GME Office is responsible to maintain copies of residency contracts signed by residents. Attached as Exhibit H is a copy of the residency contract signed by Dr. Artunduaga for her first year of residency.         It is the standard form of residency contract used at UCMC for the 2011 – 2012 academic year.

17.     Attached as Exhibit I is a copy of a letter dated May 21, 2012 from Jonathan Rothstein, UCMC's Director, Employee/Labor Relations, on which I was copied.

18.     Attached as Exhibit J is an email from Dr. Artunduaga to Mr. Rothstein, on which I was copied.

19.     I met with Dr. Artunduaga once during her residency at UCMC. In my experience, she speaks fluent English. I have never experienced any difficulty in understanding her because of her accent or thought she did not understand the words that I was saying to her.

-4-

20.     On April 27, Dr. Artunduaga filed a complaint with the ACGME. She submitted an addendum to her complaint on May 1, 2012 and filed a second complaint with the ACGME on May 1, 2012. Her first complaint is Exhibit K and her addendum to that complaint is Exhibit L                                                                    Dr. Artunduaga's second complaint to ACGME is Exhibit M.

21.     ACGME found no merit to her complaints. A copy of ACGME's decision is Exhibit N.

22.     As a result of claims made in Plaintiff's appeal to the Dean and President, UCMC undertook an investigation and it was concluded that Plaintiff had not been discriminated against because of her national origin or retaliated against.                    A copy of the investigation report is Exhibit O.

23.     Dr. Artunduaga never complained to me that she was being harassed or discriminated against because she was from Colombia or because of her national origin or that she was being retaliated against because she had complained about discrimination or harassment because she was from Colombia or because of her national origin.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: _2/18_____, 2015            By:_____
                                           Barry Kamin

CHICAGO/#2665076.2

# EXHIBIT A

DOS - Faculty Evaluation of Resident

**Maria Alexandra Artunduaga**
SURG-GEN SURG Block H (2) Service (D) UCH
9/1/2011 to 9/30/2011

Evaluator

**Roger Hurst**

*Please evaluate the above noted surgery resident who rotated on your service. Specific overall comments regarding strengths and weaknesses are valuable to the professional development of this resident.*

### Knowledge Base

General knowledge (basic science, clinical)

| Exemplary | Superior | Very Good | Good | Could Improve | Deficient | N/A |
|-----------|----------|-----------|------|---------------|-----------|-----|
| ○ | ○ | ○ | ◉ | ○ | ○ | ○ |

Operative knowledge (anatomy, procedures)

| Exemplary | Superior | Very Good | Good | Could Improve | Deficient | N/A |
|-----------|----------|-----------|------|---------------|-----------|-----|
| ○ | ○ | ○ | ◉ | ○ | ○ | ○ |

### Clinical Skills

Pre-op care (formulates appropriate plan/assessment of details)

| Exemplary | Superior | Very Good | Good | Could Improve | Deficient | N/A |
|-----------|----------|-----------|------|---------------|-----------|-----|
| ○ | ○ | ○ | ○ | ◉ | ○ | ○ |

Post-op care (including recognition/Rx of complications)

| Exemplary | Superior | Very Good | Good | Could Improve | Deficient | N/A |
|-----------|----------|-----------|------|---------------|-----------|-----|
| ○ | ○ | ○ | ◉ | ○ | ○ | ○ |

Able to communicate/justify medical decisions

| Exemplary | Superior | Very Good | Good | Could Improve | Deficient | N/A |
|-----------|----------|-----------|------|---------------|-----------|-----|
| ○ | ○ | ○ | ○ | ◉ | ○ | ○ |

### Operative Skills

Preparedness (punctual, knows case)

| Exemplary | Superior | Very Good | Good | Could Improve | Deficient | N/A |
|-----------|----------|-----------|------|---------------|-----------|-----|
| ○ | ○ | ◉ | ○ | ○ | ○ | ○ |

Advanced OR skills (dissection, exposure, suturing)

| Exemplary | Superior | Very Good | Good | Could Improve | Deficient | N/A |
|-----------|----------|-----------|------|---------------|-----------|-----|
| ○ | ○ | ○ | ◉ | ○ | ○ | ○ |

### Personal Attributes/Professionalism

Ethical, honest, reliable

| Exemplary | Superior | Very Good | Good | Could Improve | Deficient | N/A |
|-----------|----------|-----------|------|---------------|-----------|-----|
| ○ | ○ | ◉ | ○ | ○ | ○ | ○ |

Shows sensitivity of age, gender, culture of patients/colleagues

| Exemplary | Superior | Very Good | Good | Could Improve | Deficient | N/A |
|-----------|----------|-----------|------|---------------|-----------|-----|
| ○ | ◉ | ○ | ○ | ○ | ○ | ○ |

### Relations with Others/Communication Skills

With patients and families

| Exemplary | Superior | Very Good | Good | Could Improve | Deficient | N/A |
|-----------|----------|-----------|------|---------------|-----------|-----|
| ○ | ○ | ○ | ◉ | ○ | ○ | ○ |

(1 of 4)

UCMC00004707

With other healthcare professionals

| Exemplary | Superior | Very Good | Good | Could Improve | Deficient | N/A |
|-----------|----------|-----------|------|---------------|-----------|-----|
| ○ | ○ | ○ | ◉ | ○ | ○ | ○ |

Documentation of practice activities

| Exemplary | Superior | Very Good | Good | Could Improve | Deficient | N/A |
|-----------|----------|-----------|------|---------------|-----------|-----|
| ○ | ○ | ◉ | ○ | ○ | ○ | ○ |

## Teaching Abilities

Teaches other residents/students effectively

| Exemplary | Superior | Very Good | Good | Could Improve | Deficient | N/A |
|-----------|----------|-----------|------|---------------|-----------|-----|
| ○ | ○ | ○ | ○ | ○ | ○ | ◉ |

## Administrative Abilities/Practice Based Learning

Ability to lead/manage a service

| Exemplary | Superior | Very Good | Good | Could Improve | Deficient | N/A |
|-----------|----------|-----------|------|---------------|-----------|-----|
| ○ | ○ | ○ | ○ | ◉ | ○ | ○ |

Tracking M&M's/presentation quality

| Exemplary | Superior | Very Good | Good | Could Improve | Deficient | N/A |
|-----------|----------|-----------|------|---------------|-----------|-----|
| ○ | ○ | ○ | ○ | ○ | ○ | ◉ |

Critiques personal practice outcomes

| Exemplary | Superior | Very Good | Good | Could Improve | Deficient | N/A |
|-----------|----------|-----------|------|---------------|-----------|-----|
| ○ | ○ | ○ | ◉ | ○ | ○ | ○ |

## System-Based Practice

Practices cost-effective patient care

| Exemplary | Superior | Very Good | Good | Could Improve | Deficient | N/A |
|-----------|----------|-----------|------|---------------|-----------|-----|
| ○ | ○ | ○ | ◉ | ○ | ○ | ○ |

Demonstrated knowledge of risk-benefit analysis

| Exemplary | Superior | Very Good | Good | Could Improve | Deficient | N/A |
|-----------|----------|-----------|------|---------------|-----------|-----|
| ○ | ○ | ○ | ◉ | ○ | ○ | ○ |

Demonstrates understanding of role of specialist in overall patient management

| Exemplary | Superior | Very Good | Good | Could Improve | Deficient | N/A |
|-----------|----------|-----------|------|---------------|-----------|-----|
| ○ | ○ | ○ | ◉ | ○ | ○ | ○ |

Overall Comments:
When Maria started the rotation it was clear that she was less prepared than her peers. Specifically she was less independent and was less aware of the routines of running the service. It is not clear whether this was due to a deficiency in competence or just a result of necessary adjustments to a different system. Given that she was trained where the routines and customs are not necessarily known to us, this is to a degree understandable, but it does make it more difficult to assess her overall capabilities so early on in her residency. She was always very hard-working and attentive. There were no deficiencies in this area. She followed directions and sought to improve her performance.

Evaluation Submitted on 10/17/2011 12:33:28 PM EST.

UCMC00004708

# EXHIBIT B

Weekly Evaluation of Maria Artunduaga, M.D.



**Maria Alexandra Artunduaga**
pgy1
PLSTC_SURG--Plastic Surgery
**SURG-GEN SURG Ferguson (C) UCH**
11/21/2011 to 11/25/2011

| Evaluator |
| --- |
| **Carla Moreira** |
| pgy4 |
| SUR-General Surgery |

### OVERALL RATING

*Please evaluate the trainee's performance of each component of clinical competence. Select the rating that best describes the trainee's skills and abilities. Identify the major strengths and weaknesses you have observed in the trainee's performance under the "comments" portion after each question.*

**1)** Did Dr. Artunduaga demonstrate the ability to correctly prioritize her work? Utilization of the comment box is strongly recommended.

| Yes | No | N/A |
| --- | --- | --- |
| ☑ | ○ | ○ |

*Maria has been working hard to improve this aspect of her training and she has shown progress during the rotation.*

**2)** Was Dr. Artunduaga efficient in completing her work? Utilization of the comment box is strongly recommended.

| Yes | No | Shows Improvement | Needs Help | N/A |
| --- | --- | --- | --- | --- |
| ○ | ○ | ☑ | ○ | ○ |

*Maria still having issues in seeing tasks to completion independently. She has made significant improvement but I expected her to have resolved this issue by the 4th week of the rotation.*

### PATIENT CARE

*FOR QUESTIONS 3-8, PLEASE RESPOND AS TO WHETHER DR. ARTUNDUAGA COMPLETED THESE DUTIES IN A TIMELY AND EFFICIENT MANNER.*

**3)** See consults and efficiently place notes. If not a duty of the junior resident on your service, please mark N/A. Utilization of the comment box is strongly recommended.

| Exemplary | Superior | Very Good | Good | Could Improve | Deficient | N/A |
| --- | --- | --- | --- | --- | --- | --- |
| ○ | ○ | ○ | ☑ | ○ | ○ | |

*Before the rotation began, I meet with Maria and she identified this issue as one of the things she wanted to work on during the rotation. I think this is one of the areas she has shown the most improvement in.*

**4)** Notify senior or attending regarding change of patient status or continuing decline. Utilization of the comment box is strongly recommended.

| Exemplary | Superior | Very Good | Good | Could Improve | Deficient | N/A |
| --- | --- | --- | --- | --- | --- | --- |
| ○ | ○ | ○ | ☑ | ○ | ○ | ○ |

*We have work to improve Maria's communication skills and she has shown improvement in this area. I think the main issue is that she doesn't always fully understands what is going on with the patients and this likely impedes her ability to ask the appropriate questions. She can improve this by reading a great deal more and learning about her patients.*

**5)** Gather and relay pertinent patient history and exam. Utilization of the comment box is strongly recommended.

UCMC00000928

New Innovations RMS Evaluations                                              Page 2 of 2

| Exemplary | Superior | Very Good | Good | Could Improve | Deficient | N/A |
|-----------|----------|-----------|------|---------------|-----------|-----|
| ○ | ○ | ○ | ● | ○ | ○ | ○ |

*Again, I feel that Maria has made improvement in her clinical skills. She unfortunately suffers from having limited clinical experience prior to starting residency but this is not an excuse. She needs to learn how to take feedback, both negative and positive, and use it to continue to improve.*

**6)** Follow directions in ordering appropriate diagnostic studies and ancillary services. Utilization of the comment box is strongly recommended.

| Exemplary | Superior | Very Good | Good | Could Improve | Deficient | N/A |
|-----------|----------|-----------|------|---------------|-----------|-----|
| ○ | ○ | ○ | ● | ○ | ○ | ○ |

*Please see comment 4.*

**7)** Communicate effectively and demonstrate caring and respectul behavior when interacting with patients and their families. Utilization of the comment box is strongly recommended.

| Exemplary | Superior | Very Good | Good | Could Improve | Deficient | N/A |
|-----------|----------|-----------|------|---------------|-----------|-----|
| ○ | ○ | ○ | ○ | ● | ○ | ○ |

*I think there are language and cultural barriers that have effected Maria's ability to effectively communicate with patients and medical staff, including nursing staff. She needs to to figure out how to be assertive while being respectful*

**8)** At any time, did you have any concerns for patient safety? If yes, please describe. Utilization of the comment box is strongly recommended.

| Yes | No | N/A |
|-----|-----|-----|
| ● | ○ | ○ |

*The reason I answered yes is because I think Maria needs more supervision than other interns. She started out behind, with larger gap in clinical knowledge, and although she has made significant improvement in this area, she still remains behind her peers at this time. She is a hard work and I believe she will eventually catch up but this make her transition to midlevel resident more difficult.*

**INTERPERSONAL AND COMMUNICATION SKILLS**

*FOR QUESTIONS 9 & 10, PLEASE RATE HOW YOU FEEL DR. ARTUNDUAGA COMPLETED THESE DUTIES.*

**9)** Use of effective listening skills, eliciting and providing information using effective non-verbal, explanatory, questioning and writing skills. Utilization of the comment box is strongly recommended.

| Exemplary | Superior | Very Good | Good | Could Improve | Deficient | N/A |
|-----------|----------|-----------|------|---------------|-----------|-----|
| ○ | ○ | ○ | ● | ○ | ○ | ○ |

*Again, Maria is working hard to improve her communication skills.*

**10)** Working effectively with others as a member or leader of a health care team or other professional group. Utilization of the comment box is strongly recommended.

| Exemplary | Superior | Very Good | Good | Could Improve | Deficient | N/A |
|-----------|----------|-----------|------|---------------|-----------|-----|
| ○ | ○ | ○ | ● | ○ | ○ | ○ |

*Please see above comments.*

*Please provide feedback regarding other areas of concern and where you feel Dr. Artunduaga needs improvement. Also include positive feedback.*

| Overall Comments: |
|---|
| Maria is smart, energetic and a hard worker. She unfortunately she started out behind her peers in terms of clinical knowledge and skills and remains behind at this time. |
| Evaluation Submitted on 11/25/2011 12:38:08 PM EST. |

UCMC00000929

# EXHIBIT C

Weekly Evaluation of Maria Artunduaga, M.D.



**Maria Alexandra Artunduaga**
pgy1
PLSTC_SURG--Plastic Surgery
11/26/2011 to 12/2/2011

Evaluator
**Carla Moreira**
pgy4
SUR-General Surgery

**OVERALL RATING**

*Please evaluate the trainee's performance of each component of clinical competence. Select the rating that best describes the trainee's skills and abilities. Identify the major strengths and weaknesses you have observed in the trainee's performance under the "comments" portion after each question.*

**1)** Did Dr. Artunduaga demonstrate the ability to correctly prioritize her work? Utilization of the comment box is strongly recommended.

| Yes | No | N/A |
|-----|-----|-----|
| ✅ | ◯ | ◯ |

*Maria had set this as one of the things she wanted during her rotation and she should effort and improvement during the course of the rotation.*

**2)** Was Dr. Artunduaga efficient in completing her work? Utilization of the comment box is strongly recommended.

| Yes | No | **Shows Improvement** | Needs Help | N/A |
|-----|-----|-----|-----|-----|
| ◯ | ◯ | ✅ | ◯ | ◯ |

*Maria showed significant improvement in this particular area. At the start of the rotation she needed reminders about updating the list and being on time and prepared in the morning. This was no longer an issue at the end of the rotation.*

**PATIENT CARE**

*FOR QUESTIONS 3-8, PLEASE RESPOND AS TO WHETHER DR. ARTUNDUAGA COMPLETED THESE DUTIES IN A TIMELY AND EFFICIENT MANNER.*

**3)** See consults and efficiently place notes. If not a duty of the junior resident on your service, please mark N/A. Utilization of the comment box is strongly recommended.

| Exemplary | Superior | Very Good | **Good** | Could Improve | Deficient | N/A |
|-----|-----|-----|-----|-----|-----|-----|
| ◯ | ◯ | ◯ | ✅ | ◯ | ◯ | ◯ |

**4)** Notify senior or attending regarding change of patient status or continuing decline. Utilization of the comment box is strongly recommended.

| Exemplary | Superior | Very Good | Good | **Could Improve** | Deficient | N/A |
|-----|-----|-----|-----|-----|-----|-----|
| ◯ | ◯ | ◯ | ◯ | ✅ | ◯ | ◯ |

*I think effective communications skills is Maria's biggest weakness and is an area where she will need to work on most in order to continue to improve. She's been instructed to read more and improve her clinical knowledge and skills and this will certainly help her become a better resident.*

**5)** Gather and relay pertinent patient history and exam. Utilization of the comment box is strongly recommended.

| Exemplary | Superior | Very Good | **Good** | Could Improve | Deficient | N/A |
|-----|-----|-----|-----|-----|-----|-----|
| ◯ | ◯ | ◯ | ✅ | ◯ | ◯ | ◯ |

UCMC00000936

Page 6 of 6

*Maria showed efforts of actively working to improve her clinical knowledge improves and her communication skills throughout the rotation.*

6) Follow directions in ordering appropriate diagnostic studies and ancillary services. Utilization of the comment box is strongly recommended.

| Exemplary | Superior | Very Good | **Good** | Could Improve | Deficient | N/A |
|-----------|----------|-----------|----------|---------------|-----------|-----|
| ○ | ○ | ○ | ◉ | ○ | ○ | ○ |

7) Communicate effectively and demonstrate caring and respectul behavior when interacting with patients and their families. Utilization of the comment box is strongly recommended.

| Exemplary | Superior | Very Good | Good | **Could Improve** | Deficient | N/A |
|-----------|----------|-----------|------|-------------------|-----------|-----|
| ○ | ○ | ○ | ○ | ◉ | ○ | ○ |

*Please see comment 4 and 5.*

8) At any time, did you have any concerns for patient safety? If yes, please describe. Utilization of the comment box is strongly recommended.

| Yes | No | N/A |
|-----|-----|-----|
| ○ | ◉ | ○ |

**INTERPERSONAL AND COMMUNICATION SKILLS**

*FOR QUESTIONS 9 & 10, PLEASE RATE HOW YOU FEEL DR. ARTUNDUAGA COMPLETED THESE DUTIES.*

9) Use of effective listening skills, eliciting and providing information using effective non-verbal, explanatory, questioning and writing skills. Utilization of the comment box is strongly recommended.

| Exemplary | Superior | Very Good | Good | **Could Improve** | Deficient | N/A |
|-----------|----------|-----------|------|-------------------|-----------|-----|
| ○ | ○ | ○ | ○ | ◉ | ○ | ○ |

*Again, I think that Maria's communication skills is an area she needs to improve greatly. She does not always appears to know or report the salient points about her patient's care. At times there were issues with sign out between Maria and other members of the staff. She did make improvements during the course of the rotation.*

10) Working effectively with others as a member or leader of a health care team or other professional group. Utilization of the comment box is strongly recommended.

| Exemplary | Superior | Very Good | **Good** | Could Improve | Deficient | N/A |
|-----------|----------|-----------|----------|---------------|-----------|-----|
| ○ | ○ | ○ | ◉ | ○ | ○ | ○ |

*Maria is very nice person and I did not know of any interpersonal issues during the rotation.*

*Please provide feedback regarding other areas of concern and where you feel Dr. Artunduaga needs improvement. Also include positive feedback.*

Overall Comments:
Overall, I believe Maria made effort and showed improvement in many areas during her rotation. She needs to comtinue to make strides to improve her clinical knowledge, communication skill, operative skills and time management. During the course of the rotation, she was able to recognize some of these defiencies and showed effort of trying to improve them. Her perfomance improved overall during the rotation.

Evaluation Submitted on 12/5/2011 11:01:54 PM EST.

UCMC00000937

# EXHIBIT D

New Innovations RMS Evaluations                                            Page 1 of 5

DOS - Faculty Evaluation of Resident




**Maria Alexandra Artunduaga**
**SURG-GEN SURG Transplant**
2/1/2012 to 2/29/2012

| | Evaluator |
|---|---|
| | **Michael Millis** |

*Please evaluate the above noted surgery resident who rotated on your service. Specific overall comments regarding strengths and weaknesses are valuable to the professional development of this resident.*

### Knowledge Base

General knowledge (basic science, clinical)

| Exemplary | Superior | Very Good | **Good** | Could Improve | Deficient | N/A |
|---|---|---|---|---|---|---|
| O | O | O | ✓ | O | O | O |

Operative knowledge (anatomy, procedures)

| Exemplary | Superior | Very Good | Good | Could Improve | Deficient | **N/A** |
|---|---|---|---|---|---|---|
| O | O | O | O | O | O | ✓ |

### Clinical Skills

Pre-op care (formulates appropriate plan/assessment of details)

| Exemplary | Superior | Very Good | **Good** | Could Improve | Deficient | N/A |
|---|---|---|---|---|---|---|
| O | O | O | ✓ | O | O | O |

Post-op care (including recognition/Rx of complications)

| Exemplary | Superior | Very Good | Good | **Could Improve** | Deficient | N/A |
|---|---|---|---|---|---|---|
| O | O | O | O | ✓ | O | O |

Able to communicate/justify medical decisions

| Exemplary | Superior | Very Good | **Good** | Could Improve | Deficient | N/A |
|---|---|---|---|---|---|---|
| O | O | O | ✓ | O | O | O |

### Operative Skills

Preparedness (punctual, knows case)

| Exemplary | Superior | Very Good | Good | Could Improve | Deficient | **N/A** |
|---|---|---|---|---|---|---|
| O | O | O | O | O | O | ✓ |

Advanced OR skills (dissection, exposure, suturing)

| Exemplary | Superior | Very Good | Good | Could Improve | Deficient | **N/A** |
|---|---|---|---|---|---|---|
| O | O | O | O | O | O | ✓ |

### Personal Attributes/Professionalism

Ethical, honest, reliable

| Exemplary | **Superior** | Very Good | Good | Could Improve | Deficient | N/A |
|---|---|---|---|---|---|---|
| O | ✓ | O | O | O | O | O |

Shows sensitivity of age, gender, culture of patients/colleagues

| Exemplary | **Superior** | Very Good | Good | Could Improve | Deficient | N/A |
|---|---|---|---|---|---|---|
| O | ✓ | O | O | O | O | O |



https://www.new-innov.com/EvaluationForms/EvaluationFormsHost.aspx?...   3/22/2012

UCMC00000972

New Innovations RMS Evaluations                                             Page 2 of 5

**Relations with Others/Communication Skills**

With patients and families
Exemplary  Superior  Very Good        **Good**  Could Improve  Deficient        N/A
   ○         ○          ○               ⊘         ○            ○                ○

With other healthcare professionals
Exemplary  Superior  Very Good        **Good**  Could Improve  Deficient        N/A
   ○         ○          ○               ⊘         ○            ○                ○

Documentation of practice activities
Exemplary  Superior  Very Good        Good  **Could Improve**  Deficient        N/A
   ○         ○          ○              ○         ⊘             ○                ○

**Teaching Abilities**

Teaches other residents/students effectively
Exemplary  Superior  Very Good        Good  Could Improve  Deficient        N/A
   ○         ○          ○              ○         ○            ○              ○

**Administrative Abilities/Practice Based Learning**

Ability to lead/manage a service
Exemplary  Superior  Very Good        Good  Could Improve  Deficient        **N/A**
   ○         ○          ○              ○         ○            ○              ⊘

Tracking M&M's/presentation quality
Exemplary  Superior  Very Good        Good  Could Improve  Deficient        **N/A**
   ○         ○          ○              ○         ○            ○              ⊘

Critiques personal practice outcomes
Exemplary  Superior  Very Good        Good  Could Improve  Deficient        **N/A**
   ○         ○          ○              ○         ○            ○              ⊘

**System-Based Practice**

Practices cost-effective patient care
Exemplary  Superior  Very Good        Good  Could Improve  Deficient        **N/A**
   ○         ○          ○              ○         ○            ○              ⊘

Demonstrated knowledge of risk-benefit analysis
Exemplary  Superior  Very Good        **Good**  Could Improve  Deficient        N/A
   ○         ○          ○               ⊘         ○            ○                ○

Demonstrates understanding of role of specialist in overall patient management
Exemplary  Superior  **Very Good**        Good  Could Improve  Deficient        N/A
   ○         ○          ⊘                 ○         ○            ○              ○

Overall Comments:
Maria is struggling as a resident. She is trying very hard. I understand that this might be a result of her being on probation ( she informed me of this status). At times it seemed like she was trying too hard to get in front of attendings to demonstrate her value/skills, etc. She had difficulty with time management on our service. We were notified of two incidences in which she broke resident work hour rules, neither of which were because the service was too busy or that she was the only one who was available to do the work. One incident involved an organ procurement that she wanted to go on. We facilitate a resident's desire to go on an organ procurement, but do not mandate it and it is understood by the resident that if they go on an organ procurement it is their responsibility to manage their work hours - she did not. The other incident was a patient who bled over the weekend. The fellow and attending was in the hospital the whole day helping manage and if she knew she was over her work hours she should have informed the team members present and they would have taken care of the issues. The time



UCMC00000973

hm

**-12-11 Ambulatory Rotations Kovits Evaluations**

management issues were also a chronic problem as frequently the notes were not in the computer to co sign until very late in the day. This improved as the rotation progressed, but was a consistent problem. Maria is a capable resident, but needs to have a slower paced progression than is typical of a surgical resident at the University of Chicago.

Evaluation Submitted on 3/17/2012 10:46:45 AM EST.



**UCMC00000974**

# EXHIBIT E



Page 1 of 10

Weekly Evaluation of Maria Artunduaga, M.D.



**Maria Alexandra Artunduaga**
pgy1
PLSTC_SURG--Plastic Surgery
3/1/2012 to 3/9/2012

| Evaluator |
| --- |
| **Jonathan Bank** |
| pgy1 |
| PLSTC_SURG--Plastic Surgery |

## OVERALL RATING

*Please evaluate the trainee's performance of each component of clinical competence. Select the rating that best describes the trainee's skills and abilities. Identify the major strengths and weaknesses you have observed in the trainee's performance under the "comments" portion after each question.*

1) Did Dr. Artunduaga demonstrate the ability to correctly prioritize her work? Utilization of the comment box is strongly recommended.

   Yes      No ✓      N/A

   *During the course of the the week of 3/5-3/9, three events, in my opinion, demonstrate this: 1. On one of these days, Maria was requested to round on two primary service patients at 8 am. By 2 pm these patients had not been seen. The reason offered was multiple other floor tasks inhibiting completion of this duty. 2. On the evening of 3/8 I had discussed the following day's cases with Maria and her co-intern on service and requested they participate in each of those cases if they were available. On 3/9 Maria had chosen to scrub in on a different case, stating she never new about the case she had been requested to join. In addition I had asked her assistance to prepare that patient for surgery -- this was not done (with the caveat that the request was conveyed via her co-intern - there may have been a disruption in communication between the interns at that interval). 3. On 3/10 Maria was sent to bring a patient to the OR. Per her report, she had gone to the designated OR, the room was empty, and she proceeded to other duties.*

2) Was Dr. Artunduaga efficient in completing her work? Utilization of the comment box is strongly recommended.

   Yes   No    Shows Improvement      Needs Help ✓    N/A

   *. Two instances of incomplete orders or notes: specifically - not completed Brief Post-Op notes, partially completed post-op orders.*

## PATIENT CARE

*FOR QUESTIONS 3-8, PLEASE RESPOND AS TO WHETHER DR. ARTUNDUAGA COMPLETED THESE DUTIES IN A TIMELY AND EFFICIENT MANNER.*

3) See consults and efficiently place notes. If not a duty of the junior resident on your service, please mark N/A. Utilization of the comment box is strongly recommended.

   Exemplary   Superior    Very Good   **Good** ✓   Could Improve    Deficient   N/A

   *Maria saw one consult while on service on 3/8. As I was preoccupied in the OR, she saw the consult on her own, presented the case coherently and fairly completely, interpreted X-rays, and proposed an adequate plan. Other than Comment 1)1. (above) there have been no issues with note completion.*

4) Notify senior or attending regarding change of patient status or continuing decline. Utilization of the comment box is strongly recommended.

UCMC00001007

| Exemplary | Superior | Very Good | Good | Could Improve | Deficient | N/A |
|---|---|---|---|---|---|---|
| ○ | ○ | ○ | | ○ | ○ | ◉ |

*This was not an issue.*

5) Gather and relay pertinent patient history and exam. Utilization of the comment box is strongly recommended.

| Exemplary | Superior | **Very Good** | Good | Could Improve | Deficient | N/A |
|---|---|---|---|---|---|---|
| ○ | ○ | ◉ | ○ | ○ | ○ | ○ |

*There was truly only one episode to base this evaluation upon. See question 3.*

6) Follow directions in ordering appropriate diagnostic studies and ancillary services. Utilization of the comment box is strongly recommended.

| Exemplary | **Superior** | Very Good | Good | Could Improve | Deficient | N/A |
|---|---|---|---|---|---|---|
| ○ | ◉ | ○ | ○ | ○ | ○ | ○ |

*Assisted in coordinating PT/OT.*

7) Communicate effectively and demonstrate caring and respectul behavior when interacting with patients and their families. Utilization of the comment box is strongly recommended.

| Exemplary | Superior | **Very Good** | Good | Could Improve | Deficient | N/A |
|---|---|---|---|---|---|---|
| ○ | ○ | ◉ | ○ | ○ | ○ | ○ |

*Communicates warmly and with genuine care towards patients.*

8) At any time, did you have any concerns for patient safety? If yes, please describe. Utilization of the comment box is strongly recommended.

| Yes | No | N/A |
|---|---|---|
| ○ | ◉ | ○ |

*The only comment with respect to this topic is somewhat indirect and pertains to familiarity with surgical and sterility technique ("range" of sterile field on operating gown, safe management of suture needles in the OR). Further operative exposure will undoubtedly strengthen and solidify safe habits that recognizably require time to learn.*

### INTERPERSONAL AND COMMUNICATION SKILLS

*FOR QUESTIONS 9 & 10, PLEASE RATE HOW YOU FEEL DR. ARTUNDUAGA COMPLETED THESE DUTIES.*

9) Use of effective listening skills, eliciting and providing information using effective non-verbal, explanatory, questioning and writing skills. Utilization of the comment box is strongly recommended.

| Exemplary | Superior | Very Good | Good | **Could Improve** | Deficient | N/A |
|---|---|---|---|---|---|---|
| ○ | ○ | ○ | ○ | ◉ | ○ | ○ |

*On several occasions prior to the week of 3/5-3/9, when trying to teach or explain topics to Maria, it seemed as if she would hasten me to finish as if to say she "already knows". I did note some improvement in this during the week of 3/5-3/9. However, I do believe she would benefit from "slowing down" and taking time to listen through and learn from advice offered. Unfortunately, non-verbal feedback from Maria dissuades me from attempting to engage in such interactions with her. One example of listening skills occurred on 3/9, when Maria had asked another resident, in my presence, whether to put a patient on the "small list", to which the answer was clearly stated "No". The following morning the patient was on the "small list". This may have been done by a different intern; even if this was the case, I believe this demonstrates an inadequacy of fulfilling a simple communications task which which Maria had been charged, and resulted in a minor though poignant disruption of patient care.*

10) Working effectively with others as a member or leader of a health care team or other professional group. Utilization of the comment box is strongly recommended.

| Exemplary | Superior | Very Good | **Good** | Could Improve | Deficient | N/A |
|---|---|---|---|---|---|---|
| ○ | ○ | ○ | ◉ | ○ | ○ | ○ |

https://www.new-innov.com/EvaluationForms/EvaluationFormsHost.aspx?...   3/12/2012

UCMC00001008



*Maria seems to have found a working relationship with her co-intern and senior resident. As no medical student was present on service during the period of my interaction with her, it is difficult to comment on a leadership role. I had not had the opportunity to observe her interaction closely with her co-intern, though I would expect her to assume more of a leadership role during this current period as she had already served on the service earlier in the year.*

*Please provide feedback regarding other areas of concern and where you feel Dr. Artunduaga needs improvement. Also include positive feedback.*

Overall Comments:

Maria cares about her patients and is eager to learn. She is clearly highly intelligent and has the potential to become a very capable physician. However, she seems to be encountering difficulty in translating her baseline excellence and realizing said potential within the multifaceted and, at times, rigorous dynamics of a surgical residency.

Evaluation Submitted on 3/12/2012 12:27:22 AM EST.

https://www.new-innov.com/EvaluationForms/EvaluationFormsHost.aspx?... 3/12/2012

UCMC00001009

# EXHIBIT F



Page 6 of 10

### Weekly Evaluation of Maria Artunduaga, M.D.



**Maria Alexandra Artunduaga**
pgy1
PLSTC_SURG--Plastic Surgery
3/1/2012 to 3/9/2012

| Evaluator |
| --- |
| **Matthew Robert Greives** |
| pgy2 |
| PLSTC_SURG--Plastic Surgery |

#### OVERALL RATING

*Please evaluate the trainee's performance of each component of clinical competence. Select the rating that best describes the trainee's skills and abilities. Identify the major strengths and weaknesses you have observed in the trainee's performance under the "comments" portion after each question.*

**1)** Did Dr. Artunduaga demonstrate the ability to correctly prioritize her work? Utilization of the comment box is strongly recommended.

Yes ✓        No ○        N/A ○

*While we have only been on the service a week together, Maria was able to see all patients in a timely fashion. Fortunately, there have not been any medical "emergencies" that required immediate care so I cannot evaluate her to that effect. One consult for necrotizing soft tissue infection that needed to be seen immediately was staffed with me as I was the only resident not operating and she realized the need for someone senior to evaluate the patient immediately.*

**2)** Was Dr. Artunduaga efficient in completing her work? Utilization of the comment box is strongly recommended.

Yes ○   No ○   **Shows Improvement** ✓        Needs Help ○   N/A ○

*It is difficult to assess as there are two residents on the service and it is unclear to me how the work is divided. For the most part, the assignments that I gave her for the care of my patients were completed by the end of the work day.*

#### PATIENT CARE

*FOR QUESTIONS 3-8, PLEASE RESPOND AS TO WHETHER DR. ARTUNDUAGA COMPLETED THESE DUTIES IN A TIMELY AND EFFICIENT MANNER.*

**3)** See consults and efficiently place notes. If not a duty of the junior resident on your service, please mark N/A. Utilization of the comment box is strongly recommended.

Exemplary ○   Superior ○        Very Good ○   **Good** ✓   Could Improve ○        Deficient ○   N/A ○

*Consults were seen relatively quickly and staffed in an appropriate timely fashion. Consult notes however, were sometimes delayed in their admission to the chart.*

**4)** Notify senior or attending regarding change of patient status or continuing decline. Utilization of the comment box is strongly recommended.

Exemplary ○   Superior ○        Very Good ○   **Good** ✓   Could Improve ○        Deficient ○   N/A ○

*Fortunately, I did not have an adverse patient outcome in the past week working with Maria that necessitated this. However, she was able to keep me abreast of ongoing patient management issues for the patients on my service and seemed knowledgable about their progress overall.*

https://www.new-innov.com/EvaluationForms/EvaluationFormsHost.aspx?...   3/12/2012

UCMC00001012

**5)** Gather and relay pertinent patient history and exam. Utilization of the comment box is strongly recommended.

| Exemplary | Superior | Very Good | Good | Could Improve | Deficient | N/A |
|-----------|----------|-----------|------|---------------|-----------|-----|
| O | O | O | O | ☑ | O | O |

*There is still deficiency in her ability to effectively and quickly convey the problem and solution. Presentations of consults are lengthy and sometimes it is difficult to determine her thought process in arriving at her plan for the care of the patient. Generally, she has almost all of the appropriate information gathered, but has a difficult synthesizing it into a clear and concise message for the senior residents. This has been my experience with her for the past year, both over the phone and in person.*

**6)** Follow directions in ordering appropriate diagnostic studies and ancillary services. Utilization of the comment box is strongly recommended.

| Exemplary | Superior | Very Good | Good | Could Improve | Deficient | N/A |
|-----------|----------|-----------|------|---------------|-----------|-----|
| O | O | O | ☑ | O | O | O |

*Generally no problems. I did have one incident where she ordered the wrong formulation of a topical medication, sulfamylon liquid instead of creme. I had not specifically specified the formulation that I wanted and had assumed that she would know that. Otherwise, she was able to call and arrange appropriate consults for me.*

**7)** Communicate effectively and demonstrate caring and respectul behavior when interacting with patients and their families. Utilization of the comment box is strongly recommended.

| Exemplary | Superior | Very Good | Good | Could Improve | Deficient | N/A |
|-----------|----------|-----------|------|---------------|-----------|-----|
| O | O | O | O | ☑ | O | O |

*Maria is a hard worker and cares for her patients. As I stated above, I think that she needs to improve her ability to form concrete action plans and convey them in a manner to both other physicians as well as patients. Some of this is a language issue as her accent at times is difficult to understand, but I believe most of this is an organizational issue.*

**8)** At any time, did you have any concerns for patient safety? If yes, please describe. Utilization of the comment box is strongly recommended.

| Yes | No | N/A |
|-----|-----|-----|
| O | ☑ | O |

*I have not experienced any issues with Maria that could have potentially jeopardized my patients.*

**INTERPERSONAL AND COMMUNICATION SKILLS**

**FOR QUESTIONS 9 & 10, PLEASE RATE HOW YOU FEEL DR. ARTUNDUAGA COMPLETED THESE DUTIES.**

**9)** Use of effective listening skills, eliciting and providing information using effective non-verbal, explanatory, questioning and writing skills. Utilization of the comment box is strongly recommended.

| Exemplary | Superior | Very Good | Good | Could Improve | Deficient | N/A |
|-----------|----------|-----------|------|---------------|-----------|-----|
| O | O | O | O | ☑ | O | O |

*As stated above, Maria needs to improve on her patient presentation skills. Her notes are generally correct in the plan for the patient.*

**10)** Working effectively with others as a member or leader of a health care team or other professional group. Utilization of the comment box is strongly recommended.

| Exemplary | Superior | Very Good | Good | Could Improve | Deficient | N/A |
|-----------|----------|-----------|------|---------------|-----------|-----|
| O | O | O | ☑ | O | O | O |

*Maria is energetic and a hard worker. She has always had a positive attitude with me and any of the patients that I have seen her interact with.*

UCMC00001013

*Please provide feedback regarding other areas of concern and where you feel Dr. Artunduaga needs improvement. Also include positive feedback.*

Overall Comments:

Evaluation Submitted on 3/9/2012 11:00:55 AM EST.

https://www.new-innov.com/EvaluationForms/EvaluationFormsHost.aspx?... 3/12/2012

UCMC00001014

# EXHIBIT G

Weekly Evaluation of Maria Artunduaga, M.D.



**Maria Alexandra Artunduaga**
pgy1
PLSTC_SURG--Plastic Surgery
3/1/2012 to 3/9/2012

| Evaluator |
|---|
| **Grant Kleiber** |
| pgy1 |
| PLSTC_SURG--Plastic Surgery |

## OVERALL RATING

Please evaluate the trainee's performance of each component of clinical competence. Select the rating that best describes the trainee's skills and abilities. Identify the major strengths and weaknesses you have observed in the trainee's performance under the "comments" portion after each question.

1) Did Dr. Artunduaga demonstrate the ability to correctly prioritize her work? Utilization of the comment box is strongly recommended.

   Yes            **No**            N/A
    ○             ◉            ○

*Maria has trouble triaging coinciding tasks. Surgical residents must be able to multitask and effectively prioritize their work, which she has trouble with. Sometimes she focuses on whatever task was given to her first, rather than more important or more time-sensitive tasks. An example would be failing to escort a patient back to the operating room because she was completing paperwork for another patient. I discussed this in person with her, and I believe she understands that she needs to improve on her prioritization skills*

2) Was Dr. Artunduaga efficient in completing her work? Utilization of the comment box is strongly recommended.

Yes   No       Shows Improvement           **Needs Help**    N/A
○    ○            ○                 ◉      ○

*Maria tries earnestly to get all of the work done, but she seems to work very inefficiently compared to the other interns who have been on the service. The plastic surgery service typically only has one intern, but this month she is on with another first year resident. She should work on improving her efficiency.*

## PATIENT CARE

FOR QUESTIONS 3-8, PLEASE RESPOND AS TO WHETHER DR. ARTUNDUAGA COMPLETED THESE DUTIES IN A TIMELY AND EFFICIENT MANNER.

3) See consults and efficiently place notes. If not a duty of the junior resident on your service, please mark N/A. Utilization of the comment box is strongly recommended.

Exemplary    Superior       Very Good   Good   **Could Improve**    Deficient   N/A
○         ○           ○      ○        ◉          ○    ○

*Computerized notes are not placed in a timely manner for floor patients. On several occasions patients have not had notes written until well into the afternoon.*

4) Notify senior or attending regarding change of patient status or continuing decline. Utilization of the comment box is strongly recommended.

Exemplary    Superior       **Very Good**   Good   Could Improve    Deficient   N/A
○         ○           ◉      ○        ○          ○    ○

*She communicates patient statuses with the senior residents.*

5) Gather and relay pertinent patient history and exam. Utilization of the comment box is strongly recommended.

UCMC00001015

| Exemplary | Superior | Very Good | Good | Could Improve | Deficient | N/A |
|-----------|----------|-----------|------|---------------|-----------|-----|
| O | O | O | O | ✓ | O | O |

*Presentation of new consults has been scattered, disorganized, and unfocused. She should be better at this considering she has been a resident here for over 8 months. We discussed patient presentation and she understands that she needs to do better.*

6) Follow directions in ordering appropriate diagnostic studies and ancillary services. Utilization of the comment box is strongly recommended.

| Exemplary | Superior | Very Good | Good | Could Improve | Deficient | N/A |
|-----------|----------|-----------|------|---------------|-----------|-----|
| O | O | O | ✓ | O | O | O |

*Everything I have asked her to order for floor patients has been carried out. Postoperative orders were not placed on one OR patient when she was directly asked to do so, but that was the only incident to my knowledge.*

7) Communicate effectively and demonstrate caring and respectful behavior when interacting with patients and their families. Utilization of the comment box is strongly recommended.

| Exemplary | Superior | Very Good | Good | Could Improve | Deficient | N/A |
|-----------|----------|-----------|------|---------------|-----------|-----|
| O | O | ✓ | O | O | O | O |

*She is respectful toward her patients and genuinely cares for them.*

8) At any time, did you have any concerns for patient safety? If yes, please describe. Utilization of the comment box is strongly recommended.

| Yes | No | N/A |
|-----|-----|-----|
| O | ✓ | O |

## INTERPERSONAL AND COMMUNICATION SKILLS

### FOR QUESTIONS 9 & 10, PLEASE RATE HOW YOU FEEL DR. ARTUNDUAGA COMPLETED THESE DUTIES.

9) Use of effective listening skills, eliciting and providing information using effective non-verbal, explanatory, questioning and writing skills. Utilization of the comment box is strongly recommended.

| Exemplary | Superior | Very Good | Good | Could Improve | Deficient | N/A |
|-----------|----------|-----------|------|---------------|-----------|-----|
| O | O | O | O | ✓ | O | O |

*She frequently interrupts when I am trying to speak to her rather than listening. This is excusable when discussing patient care. It is not appropriate in the operating room when I am taking her through a procedure, when I did not feel she was listening to my instructions. She needs to be better at taking direction.*

10) Working effectively with others as a member or leader of a health care team or other professional group. Utilization of the comment box is strongly recommended.

| Exemplary | Superior | Very Good | Good | Could Improve | Deficient | N/A |
|-----------|----------|-----------|------|---------------|-----------|-----|
| O | O | O | ✓ | O | O | O |

*Please provide feedback regarding other areas of concern and where you feel Dr. Artunduaga needs improvement. Also include positive feedback.*

Overall Comments:
I feel that Marla needs to improve in several areas: efficiency, prioritization, patient presentation, and listening skills. She and I discussed these areas for improvement extensively. I believe that she understands the need for improvement.

Evaluation Submitted on 3/11/2012 2:08:39 PM EST.

https://www.new-innov.com/EvaluationForms/EvaluationFormsHost.aspx?...    3/12/2012

UCMC00001016

# EXHIBIT H



### University of Chicago Medical Center
*Office of Graduate Medical Education*
*J-141 773-702-6760*



### Resident/Fellow Contract Request
### Cover Sheet
### 2011-2012

(Print or Type)
**Resident/Fellow Name:** Maria Artunduaga   PGY 1

*Department:* Surgery

*Program Specific Name:*    *General Surgery – Plastic Surgery Track*

*Program Director Name:* **Mitchell Posner, M.D.**

Is the Program ACGME accredited? **Yes**   No

Is this a non-accredited Research Year?    Yes    **No**

(J-1 visa holders are specifically excluded from participating in research beyond the accredited program requirements)

Program Contact: Carmen Barr   Phone: 2-6337

M/C 6040    Fax 2-2140

<u>**This form is to accompany the Contract when it is returned to the GME Office**</u>

Contract/CoverACGME.doc

1

UCMC00005120



**2011-2012**
**RESIDENT/FELLOW CONTRACT**

**Department: Surgery**

**Program**: General Surgery - Plastic Surgery Track

\_\_X\_\_ Resident \_\_\_\_\_ Fellow

This contract is entered into as of March 22, 2011 between THE UNIVERSITY OF CHICAGO MEDICAL CENTER, an Illinois not-for-profit corporation ("UCMC"), and Maria Artunduaga, M.D. ("Resident/Fellow").
(Name)

UCMC wishes to appoint the Resident/Fellow as a PGY 1 in the Department of Surgery and the Resident/Fellow wishes to accept such appointment. Therefore the parties hereto agree as follows:

1. <u>Term of Agreement.</u> Unless earlier terminated in accordance with this Agreement, the term of the Resident/Fellow appointment commences on June 20, 2011 ("Commencement Date") and terminates on June 30, 2012 (the "Appointment Period").

2. <u>Pre Commencement Health Screening</u>. It is a precondition to commencement of this contract that all Residents/Fellows who have not previously done so undergo a health screening examination provided by UCMC or designee on or prior to the Commencement Date specified in Section I of this contract. This examination is furnished without charge and the Resident/Fellow appointment will not commence until he or she successfully completes the physical examination including all required follow-up tests.

3. <u>Compensation of Resident/Fellow</u>. The total stipend of the Resident/Fellow for the term of this Agreement shall be $49,291, to be paid in arrears in monthly installments on the last regular working day of each month starting in July. The stipend may be reduced prorata for any periods during the Appointment Period where the Resident/Fellow is unable or unwilling to perform services pursuant to this Agreement or due to Resident/Fellow failure to comply with the terms of this Agreement, including a failure to complete the health screening requirements, maintain licensure, adhere to compliance policies, or complete medical records. The stipend may be reduced by any applicable withholding requirements, including FICA and any applicable federal or state withholding taxes.

4. <u>Additional Benefits</u>. In addition to the specified stipend, UCMC agrees to provide to the Resident/Fellow for the term of this Agreement, the following benefits:

2

UCMC00005121

a. The Resident/Fellow will be provided information about health insurance. If the Resident/Fellow elects in writing within thirty days of the commencement date shown in Section 1, health insurance, long-term disability coverage, and life insurance of the type and at the charges and under the terms and conditions customarily offered to UCMC staff, commencing on the Commencement Date.

b. Professional liability coverage through either the UCMC Self-Insurance Trust or through professional liability insurance of the affiliated hospitals, which shall be maintained at levels acceptable to UCMC for activities performed in connection with assigned duties as a Resident/Fellow at UCMC and at off-campus rotations approved by the Program Director and the Chairman of the Department to which this appointment is made (the "Department Chairman"), and the Office of Medical-Legal Affairs.

c. Paid vacation leave of four weeks, to be scheduled by mutual agreement between the Resident/Fellow and the Program Director, and five days of sick leave to be used only for personal illness.

d. Personal Leave of Absence as described in the GME Policy titled "Leave of Absence" available on the University of Chicago Medical Center website under GME Resources). In order to meet ACGME program requirements, a resident/fellow may be required to extend the training period for any dates of absence in excess of allowable vacation time. Extensions of training beyond the dates of this Contract require specific approval of the program director. In addition, an Amendment to this Contract, or a new Resident/Fellow Contract will be required.

e. Up to four weeks paid short-term medical leave (including pregnancy), as described in the Resident/Fellow Handbook. Short-term medical leave runs concurrent with eligible FMLA.

f. Eligible residents/fellows may receive approval up to a maximum 12 weeks leave under the Family Medical Leave Act as described in the Resident/Fellow Handbook. FMLA is inclusive of short-term disability and any other paid (vacation/sick) or unpaid leave.

g. Residents/Fellows with disabilities may request and receive accommodation for disabilities pursuant to UCMC policy "Equal Employment Opportunity for Individuals with Disabilities". UCMC will provide a reasonable accommodation to the known physical or mental limitations of an otherwise qualified applicant or employee with a disability, unless doing so would impose an undue hardship on UCMC.

h. Access to appropriate and confidential counseling, medical and psychological support services are available through the confidential Employee Assistance Program (EAP), the Physician's Assistance Committee (PAC), and other programs recommended by the EAP and the PAC. The PAC has the responsibility to receive, verify and evaluate reports related to the health, well-being and impairment of physicians, including all members of the Medical Staff, UCMC Residents, Clinical Fellows and medical students on occasion (referred to herein as "practitioners"), and to provide recommendations to Chairs and Program Directors about their practitioners. The PAC is described in further detail in the Resident/Fellow Handbook and PAC brochure. The protocol under which the PAC functions is available in the Office of

3

Graduate Medical Education. It is agreed that mandatory referral for evaluation as a condition of performance evaluation may be imposed by the Program Director.

i. The benefits provided under this Agreement are in lieu of benefits ordinarily provided to UCMC employees.

j. Privileges to use library services.

k. The Program Director will ensure review of goals and objectives at least annually.

l. Access to information related to eligibility for specialty Board examinations will be provided.

5. <u>Duty Hours</u>. UCMC agrees to implement the ACGME Common duty hour standards and any duty hour standards prescribed by the applicable Residence Review Committee. UCMC will monitor program compliance with duty hour standards to meet the goals of promoting patient safety, resident learning and well being. (Refer to GMEC Policy "Duty Hours and Working Environment" available on the University of Chicago Medical Center website under GME resources)

6. <u>Obligations and Responsibilities of Resident/Fellow</u>. The Resident/Fellow agrees to fulfill the following obligations and responsibilities:

a. To use his or her best efforts, judgment and diligence in a professional manner in performing all duties, tasks and responsibilities (including but not limited to, clinical services and educational and scholarly activities) assigned to the Resident/Fellow by the Program Director (or any other person designated or authorized by the Program Director) for the duration of the Appointment Period. Clinical services shall be provided under circumstances and at locations as assigned by the Program Director.

b. To fulfill the educational and clinical requirements of the graduate medical or dental education and clinical training programs.

c. To continuously comply with the published principles of ethics of the American Medical Association or the American Dental Association.

d. To abide by the rules, policies and procedures contained in the applicable policies, procedures, bylaws, orders, rules and regulations of UCMC and of each affiliated Hospital and the guidelines established by applicable regulatory or accrediting agencies, including without limitation, the ACGME.

e. To comply with all ACGME and UCMC GME policies and requirements applicable to the training program and working environment, including but not limited to duty hour standards and levels of supervision.

f. If the Resident/Fellow is not a United States citizen, to obtain and show proof of visa status consistent with undertaking and fulfilling the obligations of this Agreement. Further, the Resident/Fellow authorizes UCMC to solicit and/or obtain verification of such status from third parties. Failure to possess such proof by the Commencement Date of this Agreement will serve to automatically terminate this Agreement. The provisions of this paragraph shall survive the expiration, termination or nonrenewal of this agreement. The cost of obtaining and maintaining an HI-B visa is the

4

UCMC00005123

responsibility of the Program.

g. License to Practice Medicine or Dentistry. The Resident/Fellow is required and is responsible for obtaining and continuously maintaining, at his or her expense, a current and valid Illinois medical or dental temporary or permanent license. The Resident/Fellow will submit all required applications, forms and other documents as directed by the Office of Graduate Medical Education, and will follow in a timely fashion all requirements of the Graduate Medical Education Office pertaining to licensure. Any Resident/Fellow who does not possess a current and valid Illinois license will not be permitted to participate in any patient care activities, and will not receive any compensation for any period of time during which the Resident/Fellow is prohibited from working due to the absence of a license. Failure to obtain and maintain a license as required by this Agreement shall be cause for UCMC to terminate this Agreement immediately, and/or to take such other steps as UCMC shall deem necessary.

h. To notify the Program Director and the Office of Graduate Medical Education in writing immediately if the Resident/Fellow(s) medical license is revoked, suspended or otherwise restricted or if an application for a temporary or permanent license is denied. Any such revocation, suspension, restriction or denial shall serve automatically to terminate this Agreement.

i. To notify the Program Director, the Office of Graduate Medical Education and the Compliance Director in writing immediately if the Resident/Fellow is or becomes ineligible to participate in, or is suspended or excluded from, the Medicare, Medicaid or other governmental payment program. Any such ineligibility exclusion or suspension shall serve automatically to terminate this Agreement.

j. To complete medical records as set forth in applicable institutional policies of the institution where the resident is working. Failure to complete medical records in a timely fashion in accordance with those policies may result in disciplinary action. Disciplinary action taken for failure to complete medical records in a timely fashion is not subject to review under the Grievance Procedure provided for in Section 10 of this Agreement.

k. To complete all training required by either the Medical Center Compliance Office or institutional GME Committee. Failure to complete such training will result in suspension of the Resident/Fellow or other disciplinary action, and is not subject to review under the Grievance Procedure provided for in Section 10 of this Agreement.

l. During your appointment, your professional liability coverage may be provided by either the affiliated hospital at which the Program is based or by the UCMC Self-Insurance Trust. You agree to immediately notify the Office of Medical-Legal Affairs of any lawsuit or other claim resulting from patient services initiated against the Resident/Fellow and to cooperate with UCMC or the affiliated hospital in the defense of any professional malpractice or other action for which coverage is provided to the Resident/Fellow under this Agreement or involving a case about which the Resident/Fellow has knowledge. The provisions of this paragraph shall survive the termination or expiration of this Agreement. Failure to comply with the terms of this section may result in loss of liability coverage.

m. At all times during your appointment and after its termination you will promptly

5

UCMC00005124

report all adverse patient incidents about which the Resident/Fellow has personal knowledge to the Office of Medical-Legal Affairs and/or to the risk management office of the affiliated hospital. For purposes of this section an incident shall mean any occurrence or circumstance which could reasonably be expected to result in any assertion of a right to, or a suit or other proceeding seeking, compensation or damages. Incident includes, but is not limited to, any unanticipated death, paralysis, paraplegia, quadriplegia, spinal cord injury, nerve injury or neurological deficit, brain damage, total or partial loss of limb or loss of the use of a limb, loss or impairment of a sensory organ or reproductive organ, and substantial disability or disfigurement. Failure to report an incident may result in loss of liability coverage under the self-insurance trust. You will also cooperate and participate in risk management activities of UCMC and affiliated hospitals.

n. To refrain from accepting any fees from any patient or other responsible party for services rendered pursuant to the Program. For purposes of this Agreement, the term "Program" shall mean the educational and clinical activities assigned to the Resident/Fellow pursuant to this Agreement.

o. To continuously comply with all applicable laws, regulations and governmental guidelines, including but not limited to the OSHA standards for the prevention of transmission of blood borne pathogens.

Hospital and Participating Site Affiliations

You acknowledge that UCMC has contractual obligations to the affiliated hospitals. The Program is under the direct administration of UCMC and the educational standards for performance in the Program shall be established and administered by UCMC. Not withstanding the foregoing, at all times, all clinical care rendered by you will be under the direction and supervision of each patient's attending clinical faculty member, who is a member of the affiliated hospital medical staff.

7. Prohibition of Harassment. It is the policy of UCMC to maintain a work environment free from prohibited forms of harassment, including sexual harassment.

UCMC has established procedures for investigating and responding to claims of harassment. These procedures can be obtained from the Office of Graduate Medical Education and the Program Director. Any Resident/Fellow who believes that he or she has been subjected to harassment should report the alleged act immediately as set forth in the above publications.

If an investigation discloses that a Resident/Fellow has harassed any other employee or student of the hospitals or the University, or an affiliated hospital, the Resident/Fellow shall be subject to appropriate disciplinary action up to and including termination from the residency program.

8. Off Duty Activities (including Moonlighting). The Resident/Fellow with either a temporary Illinois medical license, or any type of visa, is not permitted to undertake patient care activities outside the Program. Other Residents/Fellows must obtain prior written approval from the Program Director for each moonlighting experience. Time spent in moonlighting experiences must be recorded for duty hour reporting and monitoring purposes.

In the event that approval is given for a Resident/Fellow to engage in any clinical practice

6

UCMC00005125

outside of the Program and in facilities not under corporate ownership by UCMC, no liability coverage under the Self-Insurance Trust will be provided unless otherwise expressly agreed to in writing. The Resident/Fellow is exclusively responsible for all liabilities arising out of such outside practice.

9. Termination of Agreement.

a. Failure to comply with any of the terms of this Agreement, including, without limitation, (i) failure to fulfill the applicable educational and clinical requirements of the graduate education and clinical training program to the satisfaction of the Program Director, (ii) failure to acquire at least the same professional knowledge, skill and judgment that residents in the relevant department normally acquire at the same level of post graduate medical education and training, or (iii) failure to carry out satisfactorily his or her professional responsibilities, may result in disciplinary action of the Resident/Fellow by UCMC. Such disciplinary action may take any appropriate form, including without limitation performance of remedial or educational activities, immediate suspension of the Resident/Fellow, with or without pay, or termination of this Agreement. The Termination and Progressive Corrective Action policies of UCMC or other UCMC human resource policies governing grievances or the discipline or termination of UCMC employees shall not be applicable to Residents/Fellows.

b. This Agreement may be terminated by the Resident/Fellow upon 30 days prior written notice to UCMC in the event of (1) failure of UCMC to provide any of the benefits under Section 4 of this Agreement, or (2) the Resident/Fellow(s) inability to fulfill the Agreement due to total incapacity or extreme hardship.

c. This Agreement shall terminate automatically in the event that:
   i. Resident/Fellow(s) license to practice medicine is terminated or suspended; or
   ii. Resident/Fellow is, or becomes, ineligible to participate in the Medicare, Medicaid or other governmental payment programs; or
   iii.. in the case of a Resident/Fellow who is not a U.S. Citizen, suspension or loss of a visa status consistent with the provision of services pursuant to this Agreement.

d. Upon termination of this Agreement, the obligations of UCMC under this Agreement shall cease. If the Resident/Fellow(s) appointment is terminated, the Program Director shall determine the extent of credit earned by the Resident/Fellow. The Program Director shall document a final performance evaluation to indicate credit earned during the course of training.

10. Resident/Fellow Grievance Procedure.

a. A list of those matters which are grievable by Residents and Fellows and the procedures for implementing and pursuing the grievance procedure are contained in the GMEC policy titled "Grievance Procedure" available on the UCMC website under GME resources.

b. Neither the conflict resolution nor corrective action procedures set forth in the Medical Staff By-Laws, nor any human resources policies of UCMC or affiliated hospitals pertaining to grievances, appeals, performance management, corrective action, or termination, shall apply to Residents/Fellows.

UCMC00005126

11. <u>Patents and Software</u>. Residents/Fellows shall be subject to the Statutes of The University of Chicago which governs patents and software and any policy issued there under by UCMC or the University of Chicago which applies to Residents/Fellows or, in the absence of a policy specifically applicable to Residents/Fellows, any policy which is applicable to UCMC or University of Chicago employees. In interpreting this Statute with respect to Residents/Fellows, the word "University" shall be deemed to include UCMC.

12. <u>Notice of Non-Renewal or Non-Promotion</u>. UCMC will provide the Resident/Fellow with a written notice of intent not to renew a yearly contract prior to completion of a multi-year residency program, or if the resident/fellow will not be promoted, by the end of February for contracts which run from July 1 to June 30 or for contracts for PGY1 residents. If the contract runs for a period other than July 1 to June 30, then UCMC will provide the Resident/Fellow with a written notice of intent not to renew the contract, or promote, no later than four months prior to the end of this contract. However, if the primary reason(s) for the non-renewal occur(s) after the second Monday in February or within the four months prior to the end of the contract, UCMC will provide the Resident/Fellow with as much written notice of the intent not to renew, or promote, as the circumstances will reasonably allow, prior to the end of the contract. If the Program cannot determine, by the end of February, if the contract will be renewed due to issues related to the resident/fellow(s) progress in the program, the Program Director will inform the resident/fellow in writing of the reasons why a decision cannot be made, the timetable for making the decision, and the issues which must be addressed by the resident/fellow before such decision can be made.

13. <u>Renewal of Agreement</u>. The Resident/Fellow understands and acknowledges that this Agreement expires no later than the date set forth in Section 1 and that UCMC makes no commitment to renew this Agreement. Reappointment is at the discretion of UCMC and is contingent upon several factors, including but not limited to, the following:
    a. Satisfactory completion of all training components;
    b. the availability of a position;
    c. satisfactory performance evaluations;
    d. full compliance with the terms of this Agreement;
    e. continuation by ACGME of institutional and program accreditation;
    f. UCMC financial ability.

Each Resident/Fellow whose Appointment Period as stated in Section 1 is for one year, whose Appointment Period is from July 1 to June 30, and whose contract is to be renewed for another one year period, will receive a renewal contract no later than the second Monday in February. Residents/Fellows whose one year Appointment Period does not run from July 1 to June 30 and whose contract is to be renewed for a one year term will receive a renewal contract no later than 120 days prior to the commencement of the new contract term. Execution of a renewal agreement is contingent upon satisfactory evaluation during the 120 day period preceding the new contract term. In all cases, each Resident/Fellow offered a renewal contract shall accept such offer in writing by signing and returning the contract within 3 weeks of the date on which the Agreement was sent to the Resident/Fellow.

14. <u>Hospital or Program Closure or Program Reduction</u>. In the event a UCMC sponsored Program in which the Resident/Fellow is enrolled is closed or discontinued, or there is a proposed reduction in the size of the residency program, UCMC shall provide the Resident/Fellow with notification of the projected closing date as soon as possible after

8

the decision to close is made. In the event of such a reduction or closure, residents already in the program will be allowed to complete their education, or UCMC shall provide the Resident/Fellow with assistance in obtaining appointment to another ACGME residency program.

15. Access to Records. In accordance with Section 952 of the Omnibus Reconciliation Act of 1980 (PL 96-499), the Resident/Fellow agrees to make available for a period of four (4) years following completion of the term of this Agreement, upon request of the Secretary of Health and Human Services of the United States or of the United States Comptroller General or any of their authorized agents, all books, documents and records necessary to certify the nature and extent of the cost of the services rendered pursuant to this Agreement as required by federal statute or duly promulgated regulations.

16. Acceptance. This Agreement shall not be effective and shall not bind either party until it is submitted to UCMC and accepted by UCMC by signature below. UCMC reserves the right to refuse to accept any Agreement which is not submitted to UCMC within three weeks of the date on which the Agreement was sent to the Resident/Fellow.

17. Survival of Terms. All outstanding obligations of the parties shall survive termination or expiration of this Agreement for any reason.

18. Waiver. Any waiver by UCMC of the strict compliance with any term or provision of this Agreement shall not constitute a waiver of any other term or provision of this Agreement, or of any subsequent breach or failure to comply with such term or provision.

19. Controlling Law. This Agreement shall be construed in accordance with Illinois law, and the forum for any disputes arising hereunder shall be the circuit courts of Cook County, Illinois.

RESIDENT/FELLOW: _____ Date: 03/22/11

PROGRAM DIRECTOR: _____ Date: 3/36/2011

EXECUTIVE
ADMINISTRATOR: _____ Date: 4/21/11

THE UNIVERSITY OF CHICAGO MEDICAL CENTER

_____ Date: 5/11/11
Barry Kamin
Director, Graduate Medical Education

Approved GMEC 2-10-0

9

UCMC00005128

# EXHIBIT I



THE UNIVERSITY OF
CHICAGO MEDICINE

AT THE FOREFRONT OF MEDICINE

May 21, 2012

**VIA E-MAIL & U.S. MAIL**
Dr. Maria Artunduaga
208 W Washington
Apt. 1210
Chicago, IL 60606

Re:     Complaint of Discrimination under GME Handbook

Dear Dr. Artunduaga:

This is a follow-up to our meeting of May 8, 2012 to discuss your complaint of discrimination as provided for in the Graduate Medical Education Handbook (GME Handbook).

The GME Handbook provides for "a work environment free from all forms of prohibited harassment . . .," and specifically references "sexual harassment," a form of harassment prohibited by both state and federal law. "Prohibited" harassment is any form of harassment prohibited by law. In this instance, your sole and exclusive complaint is that your department chair, Dr. Song, has allegedly been harassing you for filing a grievance under a separate provision of the GME Handbook. This claim is not within the purview of Human Resources but rather should be addressed through the GME Office (which I understand from Barry Kamin has already taken place). Human Resources cannot take any further action with respect to your complaint, and the file on this matter will be closed.

Sincerely,

Jonathan A Rothstein
Director, Employee/Labor Relations
JAR/ct

cc:     Terry Solem
        Barry Kamin

UCMC00001908

# EXHIBIT J

| From: | Artunduaga, Maria [UCH] </O=UCH/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=MARTUNDUAGA> |
|---|---|
| Sent: | Monday, May 21, 2012 1:21 PM |
| To: | Rothstein, Jonathan [UCH] <Jonathan.Rothstein@uchospitals.edu> |
| Cc: | Solem, Terry [UCH] <Terry.Solem@uchospitals.edu>; Kamin, Barry [UCH] <barry.kamin@uchospitals.edu> |
| Bcc: | 'ragomusic@gmail.com'; 'antoniocopete@gmail.com' |
| Subject: | HR complaint 5/8/12 |

Dear Mr. Rothstein,

First of all, I need to clarify that in both my previous e-mails and our May 8 meeting I made clear that my claim was for retaliatory harassment, not discrimination, as your letter from today states. My husband and I discussed with you (in separate conversations) the issue of discrimination and harsh work environment back in November, but you sent us an e-mail on November 21 stating that you could take no action, but that is not the focus of this complaint.

Second, as the GME Handbook 2011, page 19, states:

*"Any resident/fellow who believes that he or she has been subject to harassment should report the alleged act immediately to his/her immediate, or next non-involved supervisor, to their Program Director or to the Vice President & Chief Human Resource Officer, or designee."*

I have already exhausted all other institutional channels within the GME office. Previous to my meeting with you, I already had a meeting with both Mr. Kamin and Dr. Simon of the GME office, who said they were unable to intervene and only recommended that I talk to Dr. Matthews, Chair of the Department of Surgery. I then met with Dr. Matthews, and he was clearly unwilling to intervene as well. I later e-mailed Mr. Kamin and Dr. Simon again to ask for their intervention following the latest retaliatory measure my Program Director took against me on April 30. They did not respond to my message.

I would like to make clear that I would very much prefer to solve this issue within the institutional structure of the University. However, I will not continue to be bounced around and stonewalled across the bureaucracy. If your office does not take this matter seriously and opens an investigation, I will not hesitate to take this matter to the appropriate state and federal agencies.

Sincerely,

**MARIA ALEXANDRA ARTUNDUAGA, M.D.**
Physician Resident, Plastic and Reconstructive Surgery
The University of Chicago Biological Sciences
5841 S. Maryland Ave. | Rm J-641, MC 6035 | Chicago, IL 60637, USA
Maria.Artunduaga@uchospitals.edu
Cell: (617) 999-3735
Pager: (773) 652-1363 (#3394)
Website: http://martunduaga.com

-
**AT THE FOREFRONT OF MEDICINE®**
http://www.uchospitals.edu
http://www.uchicagokidshospital.org
http://www.facebook.com/UChicagoMed
Twitter: @UChicagoMed

# EXHIBIT K

April 27, 2012

Resident Services
ACGME
515 North State Street, Suite 2000
Chicago, Illinois 60654

Dear ACGME Resident Services,

My name is Maria Alexandra Artunduaga, and I am a PGY-1 integrated Plastic Surgery resident at the University of Chicago Medical Center (UCMC). This complaint concerns a critical situation I have been having to endure as of late, in which I have been the victim of numerous efforts of intimidation and retaliation originating from my Program Director, Dr. David H. Song, ever since I decided to initiate a Grievance Process against him. Furthermore, the institutional structure of the university has proven to be completely ineffective at enforcing its own GME policies as well as ACGME Institutional Requirements aimed at preventing this precise type of situations from happening to any resident at UCMC.

From only the third month of my residency, I have been the subject of a relentless effort by Dr. Song to terminate me by all possible means available to him, trampling over my rights to academic due process and culminating in a decision of contract non-renewal and immediate dismissal from March 27 [1]. While these are the decisions I am currently contesting through the internal Grievance Process and hence they are not the subject of this complaint, my urgent appeal to you is due to the actions against me that have been taken after that date and still continue to this day, which I can only interpret as intimidatory and retaliatory, and which have significantly degraded the quality of my educational and work environment over the past month. This is a glaring violation of the ACGME Institutional Requirements, which state:

*Resident Educational and Work Environment*
*II.F.1. The Sponsoring Institution and its programs must provide an educational and work environment in which residents may raise and resolve issues without fear of intimidation or retaliation.*

The use of both intimidation and retaliation on the part of my Program Director in response to a Grievance, and the institutional failure of the University of Chicago to appropriately address these allegations and to provide the necessary oversight to stop these actions from continuing, are the subject and the motivation of this formal complaint.

1

UCMC00006100

The following is the list of concrete actions and events that support my claim:

1) On March 27, I was relieved from all clinical duties effective immediately, in a decision communicated to me through a letter that stated the alleged reason to be that I "devote [my] time to consideration of [my] professional development and looking for a job or training program." This was a blatant infringement of University of Chicago GME policy [Appendix B1], which clearly states that a breach of contract is the only valid reason for dismissal. I could only interpret this as an overt action to arbitrarily remove me from clinical service, without giving me time to respond, and with the dubious motivation of providing me with a type of help that I did not request.

2) At my request [2], I was reinstated on April 4 and returned to clinical service on April 7, even though the reinstatement notice [3] clearly said that my contract had remained in full effect. This means that the overall result was that I was forced to miss 10 days of training without a valid justification.

3) The April 4 notice contained a clause saying: "Please note that if during this period, we believe that you have breached your contract in any way, that we may remove you from clinical service." This was an unnecessary warning that simply restated standing and widely known GME policy, but its invocation reflects a transparent intention to intimidate me with the threat of another immediate dismissal, such as the one I had just undergone.

4) On April 5 I was notified of my new rotation schedule [4], which was significantly different from the one I had prior to the dismissal, and which by any objective standard was of considerably less educational value. I was now scheduled to rotate for 8 weeks in a service (Endocrine Service) where I had already rotated for 9 weeks earlier in the year, and in addition, I would have to share duties with other interns. This would make me the only intern in a class of 18 who would have shared duties with another intern for 4.5 months of the academic year, far longer than anyone else, with the consequent negative impact on my case log numbers and progress in the development of the ACGME core competencies for my level of training.

5) After receiving the notification of my rotation schedule, I immediately contacted my Program Director to express my concern for what I considered to be an unacceptable arrangement, appealing to his ACGME/GME-mandated duty to ensure my educational needs were met [5]. He provided the following response through his lawyer, Ms. Jane McAtee [6]:

"Your demands concerning your schedule for the rest of your contracted period of training are not appropriate and do not adequately represent any 'rights' you claim to have. The Program Directors have the prerogative to assign you to the appropriate duties and assignments and Dr. [Kevin] Roggin [Program Director of General Surgery] will do so"

Even though I recognize the prerogative of Program Directors to decide on the rotation schedule, I can only see my new schedule as a deliberate and unjustified decision to lessen my

2

UCMC00006101

exposure to a variety of surgical specialties, as well as to a number of distinct clinical cases within each specialty.

6) The e-mail from Dr. Song's lawyer, dated April 6, further contained yet another stern warning:

"I caution you against misrepresentations about your status to other residents and against acting in any way that is disruptive to the operations of the Medical Center and the care of patients."

Given that I have never been accused of the types of behavior Dr. Song's lawyer was warning me against, I must interpret this as another effort at intimidation. Dr. Song clearly feels uncomfortable about me talking with other hospital personnel about the situation he has been putting me through —another possible explanation for the dismissal decision and later for my limited number of rotations–, as he has expressed it to me in writing [6], and he would prefer for his own interests that I remain silent about it.

7) In the three weeks since my reinstatement, my chief resident in the Endocrine Service has assigned to me a remarkably low number of clinical cases: two (2) on the week of April 9, one (1) on the week of April 16, and zero (0) on the week of April 23. In contrast, the co-intern at the same rotation and level of training as I am, has been assigned seven (7), ten (10), and nine (9) cases, respectively, over the same time period.

When I asked the chief resident to explain this disparity, he only said he had received explicit orders from Drs. Roggin and Song to treat me differently from other interns [7], without specifying what those orders were. Furthermore, when I spoke on April 24 with Dr. Edwin Kaplan, head of the Endocrine Service, he expressed surprise than an intern in his service would be receiving such inadequate assignments for no apparent reason. I then e-mailed Drs. Song and Roggin [8a to ask them to justify the order that my chief resident had refrained from explaining to me, and which had already made me waste almost a full month of my training, but my message went unanswered despite my repeated attempts [8b].

The assignments I have been given have had a particularly negative impact on my progress in the development of the following ACGME core competencies:
I. Patient care (compassionate, appropriate, effective)
Patient presentations, bedside rounds, morning report presentations have diminished considerably; I have logged only 40 hours of duty per week over the last month [9].
II. Medical knowledge (biomedical, clinical, cognate sciences, and their application)
Senior residents were instructed to basically ignore me during morning rounds; I have been excluded from direct questioning during clinical care and teaching experiences, as well as journal club and conference discussions where my name does not even appear in the resident sign-up sheets anymore [10] [11].
III. Practice-based learning and improvement (investigation and evaluation, appraisal and assimilation of evidence)

3

UCMC00006102

My progressive and graded improvement in clinical care and surgical technique has been deteriorated with such unequal distribution of surgical cases compared to my co-intern in the service.

*IV. Interpersonal and communication skills (effective information exchange, teaming with patients and families)*
My interaction with other residents, faculty, non-physician non-clinical staff, and patients and their families is minimal; I attend 1-2 clinics per week, and I have had a maximum of 1 surgical case to perform and follow every week [12] [13] [14].

*V. Systems-based practice (awareness and responsiveness to larger context and system of health care, use of system resources)*
The use of the entire health care system in patient care, and teamwork over the last month has been minimal, as I have been excluded from standard surgical resident activities.

In addition, the inadequate distribution of rotations and of clinical cases within each rotation for the past month and the foreseeable future, and my exclusion from conference attendance lists, violate the following specific ACGME Program Requirements regarding the duties of Program Directors [15]:

*II.A.4. The program director must administer and maintain an educational environment conducive to educating the residents in each of the ACGME competency areas. The program director must:*
*II.A.4.t) ensure that faculty and resident attendance at conferences is documented; and,*
*II.A.4.u) demonstrate that residents have generally equivalent and adequate distribution of categories and cases.*

8) Given the inadequate response of my direct supervisors, I requested a meeting with Dr. Michael Simon, Chair of the GMEC, and Mr. Barry Kamin, University of Chicago DIO, and it took place on April 20 [16]. I explained to them the situation of intimidation and retaliation I was being subjected to since my Grievance Process began, and asked them to take action in accordance to their ACGME/GME-mandated role in the supervision of Program Directors and of residents' educational and work environment:

From ACGME Institutional Requirements:
*I.B.4. The DIO and GMEC must have authority and responsibility for the oversight and administration of the Sponsoring Institution's programs and responsibility for assuring compliance with ACGME Common, specialty/subspecialty-specific Program, and Institutional Requirements.*

From UCMC GME Policy Manual:
*Responsibilities of the GMEC include the following [17]:*
*Establishment and maintenance of appropriate oversight of, and liaison with, program directors and assurance that program directors establish and maintain proper oversight of, and liaison with, appropriate personnel of other institutions participating in programs sponsored by the University of Chicago Hospitals.*

4

UCMC00006103

*Assurance that all programs provide appropriate supervision for all residents that is consistent with proper patient care, the educational needs of residents, and the applicable Program Requirements.*
*Assurance of an educational environment in which residents may raise and resolve issues without fear of intimidation or retaliation.*

In addition, the UCMC GME Handbook specifies individual roles in the handling of residents' concerns [Appendix C1], and I made use of all the channels outlined there for their effective resolution, including the Chair of the GMEC.

Though the University of Chicago DIO and the Chair of the GMEC understood my struggle, they claimed that they did not have the power to intervene, in contrast with the explicit ACGME/GME policies quoted above, and they instead raised as a suggestion that I talk to Dr. Jeffrey Matthews, Chair of the Department of Surgery, as the only institutional official with the necessary oversight power to review the situation.

9) I e-mailed Dr. Matthews to clearly outline the situation [18] and met with him on April 24. Though I had never met him, he seemed to be have been informed about my case. However, he openly refused to look into the actions of my Program Director, instead claiming among others that being reinstated had been a "significant accommodation" to me, even though my contract had remained in full force, and that he considered my rotation schedule to be "a pretty good arrangement," despite the evidence to the contrary I had brought with me, and which he was unwilling to see. Furthermore, he seemed to be completely unaware that a contract non-renewal was a grievable decision, as GME regulations stipulate [Appendix B3]. Hence, instead of addressing the immediate problem at hand, and realizing the serious challenges I would have to face even if I were successful in my Grievance Process, but had already suffered from either a non-existent or a sub-standard quality training for a significant part of my internship year, he stubbornly focused on trying to give me career advice I did not request, and speaking about the end of my residency as a foregone conclusion.

This being the last of the institutional channels at my disposal, it became perfectly evident to me that the institutional hierarchy at the University of Chicago did not adequately protect residents from the types of abuses of power by Program Directors I had been experiencing, apart from those that can be challenged through a formal Grievance Process [19].

5

UCMC00006104

Though I recognize that the ACGME does not have the power to order specific actions in response to a resident's particular situation, I believe that my experience, along with the documented evidence I have accumulated, provide reasonable cause for concern regarding institutional non-compliance with an array of ACGME regulations that protect the fundamental right of residents to address issues and grievances without fear of intimidation or retaliation. My case highlights the reality of an institutional structure that does not provide for independent review of allegations of intimidation and retaliation by Program Directors, along with the necessary power to counter those measures if such allegations are found to be credible.

Given the unsatisfactory response I have received at all levels of the UCMC hierarchy, I hope first of all that the relevant institutional officials will be able to provide the ACGME with the explanation of their actions that they have so far refused to provide to me. Secondly, and most important, I hope that they will be able to state the specific GME policies they have devised in order to effectively and meaningfully address the type of concerns I have raised, and that they express their explicit commitment to implement and enforce such policies.

I thank you in advance for your time and effort in following up with this complaint, and you are free to use my name and any of the information herein in your communication with UCMC officials. You can use my personal information below to contact me regarding any further questions or concerns.

Respectfully yours,

Maria Alexandra Añunduaga, M.D.
Plastic & Reconstructive Surgery Resident
University of Chicago Medical Center
Cell Phone: (617) 999-3735
martunduaga@gmail.com

6

UCMC00006105

From: **Sara Dickie** <sdickie@gmail.com>
Date: Tue, Feb 21, 2012 at 12:20 PM
Subject: Work hours plan for week of February 19-25
To: martunduaga@gmail.com
Cc: Justine Lee <justinebruin@gmail.com>, irma.fleming@uchospitals.edu

Hi Maria,

I've spoken with Irma regarding your work hours issue. Although studying for the inservice is important, being over hours is a bigger issue. We need to get you to 80 hours on average for the month of February. Currently, by your report you are 10 hours over for the month right now. This means that over this week and weekend you need to be at 70 hours.

Maria, this is not a suggestion or a request, this is a commandment.

Irma will speak with the Tranplant fellows and attendings to ensure everyone is aware that you must leave the hospital daily to make sure you are not over 70 hours this week. If you are told to leave, you must leave, there are no exceptions. The work will get done. As always, make an effort to be efficient in your work style this week so that as much is completed in the mornings as possible.

This will allow you to also have some time to study for your inservice. Again, your score will not be used in any way to penalize you, so please do not be concerned that a lack of study time will be a detriment at this point.

The most important thing is that we are adherent to the ACGME work hours rules.

If there is any problem with this plan, please contact me or Justine.

Thanks everyone,
-Sara

--
Sara R. Dickie, MD
Department of Surgery
Section of Plastic and Reconstructive Surgery
University of Chicago Hospitals

----

From: **Maria Alexandra Artunduaga** <martunduaga@gmail.com>
Date: Tue, Feb 21, 2012 at 9:42 AM
Subject: Re: Over hours
To: Sara Dickie <sdickie@gmail.com>
Cc: Justine Lee <justinebruin@gmail.com>

Thanks, Sara. I'm assuming not much can be done this week, the NP is on vacation and I'm covering the floor for her.

Regarding the exam, Deana and I were under the impression that we were taking the Absite during internship year. We found out back in December that we were signed out for the Inservice instead. If that's the case, we need to figure out a way the interns can make it to Core next year. The Neurosurgery residents have protected time, we

UCMC00006106

might be able to do the same.

Sent from my iPhone

On Feb 21, 2012, at 9:21 AM, Sara Dickie <sdickie@gmail.com> wrote:

Hi Maria,

Thanks for letting us know. We will work on a solution. Stay tuned, we'll have an update for you and a plan by the end of the day.

Rest assured though, that most of us never feel like we study enough. This will be the first year the intern level has taken the test so a low score for anyone junior is more a reflection on us as far as educational needs as we integrate the program.

-Sara

On Mon, Feb 20, 2012 at 8:21 PM, Maria Alexandra Artunduaga, M.D. <martunduaga@gmail.com> wrote:
Guys,

I've been over hours for the past three weeks (82/84/84), I did mention it to my senior but things are so extremely busy in Transplant that we haven't come up with a good plan yet. My main concern is that I haven't been able to prepare for the Inservice as I'd like (Vascular was also very similar in terms of duty hours). Any advice?

-M

--
Maria Alexandra Artunduaga, M.D.
Plastic & Reconstructive Surgery Resident
University of Chicago Medical Center


--
Sara R. Dickie, MD
Department of Surgery
Section of Plastic and Reconstructive Surgery
University of Chicago Hospitals

UCMC00006107

## APPENDICES

### APPENDIX A: Program Requirements for Graduate Medical Education in Plastic Surgery [15]

**Appendix A1**

*II. INSTITUTIONAL RESPONSIBILITIES FOR RESIDENTS*
*II.D.4.e) Grievance procedures and due process: The Sponsoring Institution must provide residents with fair, reasonable, and readily available written institutional policies and procedures for grievance and due process. These policies and procedures must minimize conflict of interest by adjudicating parties in addressing:*
*II.D.4.e).(1)     Academic or other disciplinary actions taken against residents that could result in dismissal, non-renewal of a resident's agreement, non-promotion of a resident to the next level of training, or other actions that could significantly threaten a resident's intended career development; and,*
*II.D.4.e).(2)     Adjudication of resident complaints and grievances related to the work environment or issues related to the program or faculty.*

**Appendix A2**
*GMEC Responsibilities: The GMEC must establish and implement policies and procedures regarding the quality of education and the work environment for the residents in all programs.*
*III.B.4.   Resident supervision: Monitor programs' supervision of residents and ensure that supervision is consistent with:*
*III.B.4.b)  Educational needs of residents*
*III.B.4.c)  Progressive responsibility appropriate to residents' level of education, competence, and experience*

7

UCMC00006108

### APPENDIX B: UNIVERSITY OF CHICAGO GME POLICY [17]

**Appendix B1**
**GROUNDS FOR DISMISSAL**
Any Housestaff member who fails to comply with the terms of his/her contract, including, without
limitation:
1) Failure to fulfill the educational and clinical requirements of the graduate medical education
and clinical training program to the satisfaction of the Program Director.
2) Failure to acquire at least the same professional knowledge, skill and judgment that residents
in the relevant department normally acquire at the same level of postgraduate medical
education training.
3) Failure to carry out satisfactorily his/her professional responsibilities.
4) Failure to maintain a current professional license.
5) Failure of Housestaff members who are not U.S. citizens to maintain a current visa.
6) Housestaff member is, or becomes, ineligible to participate in the Medicare Medicaid or other
governmental payment program.

**Appendix B2**
Responsibilities of the GMEC include the following:
1) Establishment and implementation of policies and procedures that affect all training programs
regarding the quality of education and the work environment for the Residents/Fellows in each
program.

2) Establishment and maintenance of appropriate oversight of, and liaison with, program
directors and assurance that program directors establish and maintain proper oversight of, and
liaison with, appropriate personnel of other institutions participating in programs sponsored by
the University of Chicago Hospitals.

3) Establishment and implementation of formal written policies governing resident duty hours
that are consistent with ACGME Institutional and Program Requirements (REF: GMEC Policy
#08).

4) Assurance that each program provides a curriculum and an evaluation system to ensure that
residents demonstrate achievement of the six general competencies.

5) Regular review of all ACGME letters of accreditation and the monitoring of action plans for
the correction of concerns and areas of noncompliance.

6) Regular review of the University of Chicago Hospitals Letter of Report from the Institutional
Review Committee and developing and monitoring action plans for the correction of concerns
and areas of noncompliance.

**Appendix B3**
This Grievance Procedure applies to the following actions by a Program:
1. Termination or dismissal from the program
2. Disciplinary suspension or probation
3. Non-renewal of a contract during a residency program to which the resident has been
   admitted

8

### *APPENDIX C: UNIVERSITY OF CHICAGO GME HANDBOOK [20]*

*Appendix C1:*

*RESOURCES FOR ADDRESSING RESIDENT/FELLOW CONCERNS AND GRIEVANCES*
*Residents/Fellows may raise concerns regarding their education and/or professional*
*environment either in writing or verbally with their Program Director, Chief Resident, Section*
*Chief or Department Chair. If a resident/fellow does not feel comfortable raising such a concern*
*with any of the above, he/she may utilize the UCMC Ombudsmen. The Ombudsmen serve as*
*advocates and provide a mechanism for Residents/ Fellows to raise and resolve issues without*
*fear of intimidation or retaliation. They may also investigate and resolve complaints of*
*mistreatment or other issues and abuses. All interactions with the Ombudsmen are completely*
*confidential. Alternatively, a resident/fellow may contact Michael Simon, MD, Chair of the*
*Graduate Medical Education Committee (GMEC) at 4-3757.*

9

UCMC00006110

## REFERENCES

[1] 2012_03_27_LETTER        Letter from Dr. Song to Dr. Artunduaga
[2] 2012_03_29_MAA_LETTER    Letter from Dr. Artunduaga to Dr. Song
[3] 2012_04_04_LETTER        Letter from Dr. Song to Dr. Artunduaga
[4] 2012_04_05_EMAIL_TRAIL   Email exchange between Dr. Roggin and Dr. Artunduaga
[5] 2012_04_05_MAA_EMAIL     Email from Dr. Artunduaga to Dr. Song
[6] 2012_04_06_EMAIL         Ms. McAtee email to Dr. Artunduaga
[7] 2012_04_09_MAA_EMAIL     Email from Dr. Artunduaga to Dr. Grossman
[8a] 2012_04_24_MAA_EMAIL    Email from Dr. Artunduaga to Dr. Roggin and Dr. Song
[8b] 2012_04_26_MAA_EMAIL    Email from Dr. Artunduaga to Dr. Roggin and Dr. Song
[9] 2012_04_HOURS            Dr. Artunduaga duty hours for April
[10] 2012_04_25_MAA_PHOTO    Grand Rounds signing sheet April 25th
[11] 2012_04_25_EMAIL_TRAIL  Email exchange between Dr. Artunduaga and Ms. Barr
[12] 2012_04_09_SCHEDULE     Kaplan Service Case Coverage April 9-13
[13] 2012_04_16_SCHEDULE     Kaplan Service Case Coverage April 16
[14] 2012_04_23_SCHEDULE     Kaplan Service Case Coverage April 23
[15] ACGME_MANUAL        ACGME Manual360_plastic_surgery_07012009_f07012012
[16] 2012_04_13_MAA_EMAIL        Email from Dr. Artunduaga to Dr. Simon
[17] UCH_DOCUMENT_GME_POLICY_MANUAL   UCHICAGO GME Policy Manual
[18] 2012_04_20_MAA_EMAIL    Email from Dr. Artunduaga to Dr. Matthews
[19] 2012_04_24_MAA_EMAIL2   Email from Dr. Artunduaga to Dr. Matthews
[20] UCH_DOCUMENT_2011_GME_HANDBOOK   UChicago GME Handbook

10



THE UNIVERSITY OF
CHICAGO
MEDICAL CENTER

DEPARTMENT OF SURGERY          MC 6035
Section of Plastic and Reconstructive Surgery      5841 South Maryland Avenue
                                                   Chicago, Illinois 60637-1470
                                                   tel   773-702-6302
                                                   fax   773-702-1634

Dear Dr. Artunduaga,

This letter is to inform you that the Faculty of the Plastic and Reconstructive Surgery section has
reviewed your progress in the residency. We have concluded that we will not offer you a contract for
additional training in the Plastic Surgery program at the University of Chicago. You were placed on
probation on November 15, 2012. At your request, we extended the probationary period until March
23, 2012 to give you ample opportunity to work on the areas where improvement was needed. Also at
your request, we agreed to provide you with notice concerning renewal of your contract following
completion of your probation.

We are not renewing your contract because you have failed to fulfill the applicable educational and
clinical requirements of the graduate education and clinical training program to the satisfaction of the
Program Director, you have failed to acquire at least the same professional knowledge, skill and
judgment that residents in the Program normally acquire at the same level of post graduate medical
education and training, and you have failed to carry out satisfactorily your professional responsibilities.

This decision was made by the faculty at a meeting held on March 26, 2012 after review of your
complete file and with particular attention to your knowledge, skills and judgment since your probation
started. The decision was unanimous. We considered all of the issues raised in your November 18 and
March 23 letters to me. You have met with Dr. Park during this probationary period and she has
discussed with you specific steps you could take to improve your performance and has discussed your
status with you throughout your probation. While you have improved in some areas and have worked
hard to meet the goals we set for you, you have not satisfactorily demonstrated to us that you can meet
the requirements of the program. Your overall faculty evaluations are well below the norm for
residents at your level of training. In particular, despite remedial efforts, you are still below
expectations on the manner in which you present patients, on anticipating and addressing clinical
situations, listening carefully and behaving professionally to avoid conflicts. You lack many of the basic
skills expected of a resident at your level of training. In particular, your work on our service in March
evidenced many problems.

We believe that further remediation will not resolve these issues. Therefore, we are not offering you
continued training in the Program.

This decision is subject to review under the Graduate Medical Education Grievance policy, a copy of
which is attached.

We suggest that you now devote your time to consideration of your professional development and
looking for a job or training program. Therefore, we are removing you from all clinical duties effective
March 27th, 2012. Your stipend and benefits will continue through the end of your contract.

Sincerely,

David H. Song, MD, MBA, FACS
Cynthia Chow Professor of Surgery
Program Director and Chief, Section of Plastic and Reconstructive Surgery
Vice-Chairman, Department of Surgery                           AT THE FOREFRONT OF MEDICINE®
The University of Chicago Medicine and Biological Sciences

2012/April/27  08:08  [01_J2012_03_27_LETTER[dr_song_lo_dr_artunduaga.pdf]

March 29, 2012

Dr. David H. Song
Professor of Surgery
Vice Chairman, Department of Surgery
Chief, Section of Plastic and Reconstructive Surgery
Director, Residency Training Program
University of Chicago Medical Center
5841 S. Maryland Avenue, MC 6035
Chicago, IL 60637

     With this letter I want to initiate the Grievance Process concerning the three major decisions you communicated to me on your letter from March 27, 2012, and directly request your reconsideration on:

1. **The immediate dismissal from my clinical duties:** As your November 15 probation letter states, the decision to be reached at the end of this period would concern "whether [I] have met the conditions for this probation and whether [I] would be offered a contract for another year of training." At no point in your communications did you state that my permanence through the end of my internship year was at stake, nor do my recent evaluations convey that I represent the type of imminent danger to patient safety that would warrant this type of extraordinary measure.

2. **The decision that I had failed the probation period:** The conditions that had to be met for me to continue in the program were clearly laid out and itemized in the probation letter, and they were directly addressed through my weekly evaluations. Your letter makes no mention of your assessment of those specific criteria and how your overall decision followed from it.

3. **The non-renewal of my PGY-2 contract:** As stated in the probation letter, the decision to renew my contract was directly linked to the successful completion of the probation period. Since I must ask for reconsideration of the probation grade, I must ask for reconsideration of this decision as well.

     Because a principal argument for your decision states that "[my] faculty evaluations are well below the norm for residents at [my] level of training," I decided to do my own review and tally of a total of ten attendings' evaluations from the months of January and February, and excluded two from the month of November since I felt I was denied the opportunity to have a fair educational experience as stated in my letter of November 28 that was hand-delivered to the GME office (attached). I compared my grades against those of 1) a Plastic Surgery resident who has a similar background to mine (IMG) at the same period of time during his/her internship year; and 2) the grade average of my PGY-1 class of eighteen (18) interns. The results are shown in the table below:

1

UCMC00006113

| Evaluation Criteria | Me | PRS resident | Diff | PGY-1 average | Diff | STDev | Diff / STDev |
|---|---|---|---|---|---|---|---|
| General knowledge | 3.78 | 4.17 | -0.39 | 3.84 | -0.06 | 1.29 | -0.05 |
| Operative knowledge | 3.83 | 4.00 | -0.17 | 3.54 | +0.29 | 1.41 | +0.21 |
| Pre-Op Care | 3.89 | 4.17 | -0.28 | 3.95 | -0.06 | 1.16 | -0.05 |
| Post-Op Care | 3.89 | 4.50 | -0.61 | 4.00 | -0.11 | 1.38 | -0.08 |
| Able to communicate/justify medical decisions | 4.11 | 4.83 | -0.72 | 4.05 | +0.06 | 1.45 | +0.04 |
| Preparedness | 4.50 | 4.00 | +0.50 | 4.09 | +0.41 | 1.51 | +0.27 |
| Advanced OR skills | 4.40 | 4.00 | +0.40 | 4.00 | +0.40 | 1.52 | +0.26 |
| Ethical, honest, reliable | 5.11 | 5.17 | -0.06 | 5.11 | 0.00 | 0.94 | 0.00 |
| Shows sensitivity of age, gender, culture | 5.11 | 5.17 | -0.06 | 5.05 | +0.06 | 1.06 | +0.06 |
| Relations with patients and family | 4.67 | 5.17 | -0.50 | 4.79 | -0.12 | 1.22 | -0.10 |
| Relations with healthcare professionals | 4.67 | 5.00 | -0.33 | 4.74 | -0.07 | 1.27 | -0.06 |
| Documentation of practice activities | 3.71 | 4.60 | -0.89 | 4.17 | -0.46 | 1.04 | -0.44 |
| Teaching abilities | 3.67 | 4.00 | -0.33 | 4.00 | -0.33 | 1.41 | -0.23 |
| Ability to lead/manage a service | 3.75 | 4.00 | -0.25 | 3.8 | -0.05 | 1.26 | -0.04 |
| Presentation quality | 3.67 | 4.00 | -0.33 | 3.56 | +0.11 | 0.75 | +0.15 |
| Critiques personal practice outcomes | 4.40 | 4.20 | +0.20 | 4.07 | +0.33 | 1.41 | +0.23 |
| Practices cost-effective patient care | 4.00 | 4.00 | 0.00 | 4.13 | -0.13 | 0.92 | -0.14 |
| Demonstrated knowledge of risk-benefit analysis | 4.00 | 4.00 | 0.00 | 4.20 | -0.2 | 1.07 | -0.19 |
| Demonstrates understanding of role of specialist | 4.14 | 4.00 | +0.14 | 4.29 | -0.15 | 0.95 | -0.16 |

Two conclusions are immediately clear from this table: first, that I am not "well below average," as you have repeatedly stated in your communications, and second, that I am in fact performing at a very similar level compared to my peers, with a difference of less than 1.0 points in all aspects evaluated. When matched against the rest of my intern class –a legitimate comparison since I am currently undergoing three years of General Surgery training prior to my Plastic Surgery years–, my performance was within 0.3 standard deviations (STDev) from the average, with only one case being higher at 0.44 (documentation of practice activities), out of all 19 aspects evaluated.

2

UCMC00006114

Given the results above, I first need to ask you to share with me the objective metrics that were used to reach your conclusion about my faculty evaluations, as my own analysis seems to reach a very different result. Furthermore, given that a Probation Committee made the decision to put me on dismissal and not to renew my contract, I think I have the right to know the individuals present, as well as the time and place where this faculty meeting took place on March 26. In regards to the other conclusions in your letter of March 27, since I cannot make any comments on the generic statements you made, I would appreciate that you give me specific examples of events and reviews that you considered most relevant in reaching your decision.

About the short meeting we held on March 27, which you emphasized was merely informative and hence I was not given a chance to respond, I feel compelled to make the following comments for the record:

- You mentioned that you knew from the beginning of my probationary period that I would not pass, which makes me question whether you at all intended to give an objective and independent review of my performance during probation. I went into this period with the belief you had a real interest in helping me improve as any other program director would do with his/her own residents.
- You once again suggested that I should voluntarily quit my job, as you had also done at our November 2 meeting, instead of fighting for the spot I earned after one of the most competitive application processes in the country. On the day of my interview, when I mentioned the transition I would need to undergo after having received my medical training abroad, followed by a 4-year research postdoc at Harvard Medical School, you offered me mentoring and support during this period of adjustment if I considered ranking this program high on my list. Having made my choice partly on that basis, I have yet to see proof of the support you mentioned at that time.
- You mentioned that you decided to completely ignore the evaluations of fellows and residents, who were not only the people whom I worked most closely with, but were also the people who directly evaluated me on the 10 specific areas itemized in your probation letter. If the goal was to evaluate my improvement on those areas, I would have assumed that their input would have been most valuable in making this assessment.
- I must take issue with your accusation of asking for favorable reviews from attendings prior to my rotations during my probationary period, which not only is false but I would also consider to be a seriously unethical action. I only asked for feedback from the attendings by my third week of rotation with the sole purpose of helping sustain my continued improvement, and I have written proof of the requests I made.

I still have hope that we can resolve this situation in amicable terms, because I consider that most of the decisions in my case have been made with limited and selectively chosen information. Most immediately, I ask you to reinstate me to my clinical duties as a precautionary measure while the other decisions are under review, so that I can have the opportunity to finish my internship year and not ruin the last hope I have to become a Plastic and Reconstructive Surgeon.

Sincerely,

Maria Alexandra Artunduaga, M.D.

C.C. Dr. Jeffrey B. Matthews, Chair, Department of Surgery
     Barry Kamin, M.S., Executive Director of Graduate Medical Education and DIO

3

2012/Apr/27 06:09  (02_[2012_03_29_MAA_LETTER]dr_artunduaga_to_dr_song.pdf)

UCMC00006115



THE UNIVERSITY OF
CHICAGO
MEDICAL CENTER

DEPARTMENT OF SURGERY          MC 6035
Section of Plastic and Reconstructive Surgery    5841 South Maryland Avenue
                                                 Chicago, Illinois 60637-1470
                                                 tel.  773.702.6302
                                                 fax.  773.702.1634

April 4, 2012

Maria Artunduaga
208 W. Washington St
Apt 1210
Chicago, IL 60606

Dear Maria:

This letter is in response to your letter to me dated March 28, 2012. In that letter you requested reconsideration of the decision of the Plastic and Reconstructive Surgery faculty to not renew your contract for a second year in the Program.

I have reviewed the issues raised in your letter and have consulted with faculty.
After a thorough review, we will not change our decision and your contract will not be renewed.

You raised an issue about our decision to remove you from clinical service. We have not terminated your contract but we believe that under these circumstances, it is best that you not continue with this year's clinical activities so that you have time to consider your career options. After consideration, however, we will reinstate you to the general surgery schedule so that you can complete this year of training. Please contact Dr. Kevin Roggin by noon on Friday, April 6, 2012 and he will make your assignment. You will remain on probation and under supervision during the rest of your work at UC. Please note that this is NOT a period where you should undertake to change our minds about the non renewal decision. We are putting you back on clinical service at your request and to allow you to earn credit for this entire year. Please note that if during this period, we believe that you have breached your contract in any way, that we may remove you from clinical service.

Many of the statements in your letter are not correct. I will not rebut those statements in this response as they will be addressed at the grievance hearing should you decide to proceed.

As to what you describe as the "short meeting" on March 27 and the comments which you attribute to me, I note that your statements are mischaracterization of our discussions. I need to point out to you that you abruptly left that meeting without further discussion. As to my suggestion that you consider resignation, it has been the experience of the medical center that some residents, faced with a non-renewal, request that we work on a smooth transition to their next job. They would prefer not to have a non-renewal on their record. That is the spirit in which I offered the opportunity for resignation and transition. If you are interested in discussing that option, please contact Jane McAtee, Associate General Counsel at 773 702 1057.

Sincerely,

DAVID H. SONG, MD, MBA, FACS
Cynthia Chow Professor of Surgery
Chief, Section of Plastic and Reconstructive Surgery
Vice-Chairman, Department of Surgery
The University of Chicago Medicine & Biological Sciences.

AT THE FOREFRONT OF MEDICINE®

2012/Apr/27  08:11  (09_[2012_04_04_LETTER]dr_song_to_dr_artunduaga.pdf)

UCMC00006116

**From:** Roggin Kevin <kroggin@surgery.bsd.uchicago.edu>
**Date:** April 5, 2012 12:59:53 PM CDT
**To:** "Artunduaga, Maria [UCH]" <Maria.Artunduaga@uchospitals.edu>
**Subject:** Re: Reinstatement of clinical duties

Maria,
I appreciate your request, but have already made the changes to the schedule.
Let me know if you would like to rotate on the Kaplan service for those six weeks.
Thx,
KR

**KEVIN ROGGIN, MD FACS**
Associate Professor, Surgery and Cancer Research
Program Director, General Surgery Residency Program
Associate Program Director, Surgical Oncology Fellowship
The University of Chicago Medicine
5841 S. Maryland Ave.|Room G-216, MC 5094|Chicago, IL 60637
Direct: 773-834-5410
Office: 773-795-4595
Mobile: 773-829-7942
Fax: 773-702-6120
Pager: 7198

**AT THE FOREFRONT OF MEDICINE®**
http://www.uchospitals.edu
http://www.uchicagokidshosptial.org
http://www.facebook.com/UChicagoMed
Twitter: @UChicagoMed

On Apr 5, 2012, at 12:58 PM, Artunduaga, Maria [UCH] wrote:

Dr. Roggin,


I feel I deserve the opportunity to:

1) To be on nightfloat for about 4 weeks as all the other interns normally do (I already did one week).

2) Get the opportunity to increase my case numbers (Kaplan), however I see that the B service has already a large group of residents this month (Eric, Essie, Mindy), I highly doubt I'm going to get a fair educational experience out of it. In May, there will be only 2 residents.


I appreciate your help,


-M

2012/Apr/27 08:12  (04_[2012_04_05_EMAIL_TRAIL]dr_roggin_and_dr_artunduaga.pdf)

UCMC00006117

**From:** Roggin, Kevin [BSD] - SUR [mailto:kroggin@surgery.bsd.uchicago.edu]
**Sent:** Thursday, April 05, 2012 12:11 PM
**To:** Artunduaga, Maria [UCH]
**Cc:** Barr, Carmen [BSD]
**Subject:** RE: Reinstatement of clinical duties

Maria,

I already had to make changes to the schedule to coverage our services.

It is possible that you could rotate on the Kaplan service for the rest of April and May.

You are scheduled to be on the Anesthesia service in June.

Please contact Carmen for additional details.

Thx,
KR

**KEVIN ROGGIN, MD FACS**

Associate Professor, Surgery and Cancer Research

Program Director, General Surgery Residency Program

Associate Program Director, Surgical Oncology Fellowship

The University of Chicago Medicine

5841 S. Maryland Ave.|Room G-216, MC 5094|Chicago, IL 60637

Direct: 773-834-5410

Office: 773-795-4595

Mobile: 773-829-7942

Fax: 773-702-6120

Pager: 7198

**AT THE FOREFRONT OF MEDICINE®**

2012/Apr/27 08:12 (04_[2012_04_05_EMAIL_TRAIL]dr_roggin_and_dr_artunduaga.pdf)

UCMC00006118

http://www.uchospitals.edu

http://www.uchicagokidshosptial.org

http://www.facebook.com/UChicagoMed

Twitter: @UChicagoMed

**From:** Artunduaga, Maria [UCH] [mailto:Maria.Artunduaga@uchospitals.edu]
**Sent:** Thursday, April 05, 2012 12:05 PM
**To:** Roggin, Kevin [BSD] - SUR
**Subject:** Reinstatement of clinical duties

Hi Dr. Roggin,

Dr. Song said I should contact you in regards to my re-assignment to the Surgery rotation schedule that was abruptly suspended 10 days ago. I'll be very happy to continue covering the PPVT pager during my night-float rotation starting next Sunday April 7, 2012.

Also, I noticed I was given about half of the cases that are usually given to the PGY-1 during my Kaplan rotation last year, making my case log substantially lower than my peers. I'd like to take this opportunity to suggest rotating through the B Service again next month (May).

I'd really appreciate your understanding,

-M

**MARIA ALEXANDRA ARTUNDUAGA, M.D.**

Physician Resident, Plastic and Reconstructive Surgery

The University of Chicago Biological Sciences

5841 S. Maryland Ave. | Rm J-641, MC 6035 | Chicago, IL 60637, USA

Maria.Artunduaga@uchospitals.edu

Cell: (617) 999-3735

2012/Apr/27 08:12  (04_[2012_04_05_EMAIL_TRAIL]dr_roggin_and_dr_artunduaga.pdf)

UCMC00006119

Pager: (773) 652-1363 (#3394)

Website: http://martunduaga.com

**AT THE FOREFRONT OF MEDICINE®**

http://www.uchospitals.edu

http://www.uchicagokidshospital.org

http://www.facebook.com/UChicagoMed

Twitter: @UChicagoMed

2012/Apr/27 06:12 f04_[2012_04_05_EMAIL_TRAIL]dr_roggin_and_dr_artunduaga.pdf)

UCMC00006120

**From:** "Artunduaga, Maria [UCH]" <Maria.Artunduaga@uchospitals.edu>
**Date:** April 5, 2012 10:39:31 PM CDT
**To:** "Song, David [BSD] - SUR" <dsong@surgery.bsd.uchicago.edu>
**Subject: Reinstatement of clinical duties**

Dear Dr. Song,

      This message is first to all to acknowledge receipt of your letter from yesterday, April 4, where you affirmed your decisions regarding the outcome of my probation period and the non-renewal of my contract for next year. At the same time, you informed me about the reversal of your decision of immediate dismissal and asked me to contact Dr. Roggin to put me back on the General Surgery rotation schedule for the remainder of my internship year.

      While I have decided to continue the grievance process regarding your other decisions, and you will shortly be receiving a copy of my letter to the GME office asking for the formation of a housestaff grievance committee, I must also let you know that I have learned from Dr. Roggin that the surgery rotation schedule had already been rearranged as a consequence of your dismissal decision. In consequence, I had been withdrawn from the night-float schedule and I can now only be put back on the B service for 8 weeks, where I will have to share duties with another intern, an arrangement that I find unacceptable.

      I must remind you that it is my right as a duly admitted PRS intern and your obligation as my Program Director to ensure that my educational needs are met for the length of my stay at UofC. Up to this point, I have already rotated with another intern three times so far (August in B service; October and March in PRS service), more than any other intern in my class; I have only logged 50 cases in 10 months, far fewer than the PGY-1 average in UofC of 100 cases/year; I have only done 1 week of night-float, out of the average of 4-6 weeks; and I have already missed 10 training days since the dismissal. I therefore demand that for the remainder of my time as a UofC intern, I be returned to the night float schedule as I was previously assigned, and that I be left to rotate as a stand-alone intern, so as to have the chance to log as many cases as my peers have.

      Given the urgent nature of this issue, I urge you to act as quickly as possible and to ensure, both as program director and the person who unilaterally made the decision that has put me in this situation, that I get a fair educational experience for the remainder of my internship year. If you had actually had the intention to help me in a transition period, you would have instead given me the option to take time off my duties if I considered it necessary, an option I would have

UCMC00006121

respectfully declined. If I do not see a swift and decisive action on your part in this regard, I will see myself in the undesirable position to have to bring up this matter to the GME office as well.

I await your quick and hopefully positive answer, not just "per my request," as you frequently point out, but because it is the fair and rightful opportunity that I have earned through my own effort and dedication, and which has so far been put in jeopardy in no small amount as a consequence of your actions.

Sincerely,

Maria Alexandra Artunduaga, M.D.

*********************************************************************
*************
This e-mail is intended only for the use of the individual or entity to which
it is addressed and may contain information that is privileged and confidential.
If the reader of this e-mail message is not the intended recipient, you are
hereby notified that any dissemination, distribution or copying of this
communication is prohibited. If you have received this e-mail in error, please
notify the sender and destroy all copies of the transmittal.

Thank you
University of Chicago Medical Center
*********************************************************************
*************

UCMC00006122

**From:** Artunduaga, Maria [UCH]
**Sent:** Monday, April 09, 2012 5:59 PM
**To:** Grossman, Eric [UCH]
**Cc:** Roggin, Kevin [BSD] - SUR
**Subject:** B service coverage

Hi Eric,

I'd like to summarize our conversation of this morning (Monday April 9th). When I asked you why I didn't get assigned an equivalent number of OR cases to my co-intern for this week (1 for me vs. 7 for Mindy), you told me that you received instructions from your program director that I should only cover cases/clinics in the Endocrine Service, even though B service encompasses both Endocrine and Breast Surgery.

I feel compelled to document our conversation via e-mail, since these conditions weren't notified to me prior to my return. I'm still certain that my most recent evaluations convey that I do not represent the type of imminent danger to patient safety that would warrant this type of treatment, however, I will accept Dr. Roggin's assignment and do my job in the ethical and professional way I have always aspired to do.

Thanks,


-M


**MARIA ALEXANDRA ARTUNDUAGA, M.D.**

Physician Resident, Plastic and Reconstructive Surgery

The University of Chicago Biological Sciences

5841 S. Maryland Ave. | Rm J-641, MC 6035 | Chicago, IL 60637, USA

Maria.Artunduaga@uchospitals.edu

Cell: (617) 999-3735

Pager: (773) 652-1363 (#3394)

Website: http://martunduaga.com


2012/Apr/27  08:14  (07_[2012_04_09_MAA_EMAIL]dr_artunduaga_to_dr_grossman.pdf)

UCMC00006123

**Subject:** Kaplan rotation
**From:** <Maria.Artunduaga@uchospitals.edu>
**Date:** 4/24/12 12:35 PM
**To:** <dsong@surgery.bsd.uchicago.edu>, <kroggin@surgery.bsd.uchicago.edu>

Drs. Song and Roggin,

This morning I had a conversation with Dr. Kaplan, the head of the Endocrine Service where I am rotating now, where we discussed the remarkably poor assignments I have been given for now 3 weeks in a row: 2 cases 2 weeks ago, 1 case last week, and 0 cases this week. This contrasts with the assignments my co-intern has been getting: 7 cases 2 weeks ago, 10 last week, and 9 this week. Dr. Kaplan had no knowledge about this arrangement and expressed his surprise that a resident in his service is receiving this kind of assignments for no apparent reason.

My chief resident has explained to me that this arrangement comes from orders he has received from you. I need to know from you exactly what order he was given, as well as the reasons behind such an order. If I will continue to get what seems to me a very low-quality training for the remainder of my internship year, I believe I at least have the right to know why, as no reason has been given to me so far. Also I need you to clearly state what kind of credit I will be getting for a rotation where I am not performing the standard surgical resident duties.

I look forward to your prompt response, and also whether I should expect this situation to be temporary or permanent.

Sincerely,
**MARIA ALEXANDRA ARTUNDUAGA, M.D.**
Physician Resident, Plastic and Reconstructive Surgery
The University of Chicago Biological Sciences
5841 S. Maryland Ave. | Rm J-641, MC 6035 | Chicago, IL 60637, USA
Maria.Artunduaga@uchospitals.edu
Cell: (617) 999-3735
Pager: (773) 652-1363 (#3394)
Website: http://martunduaga.com

**AT THE FOREFRONT OF MEDICINE®**
http://www.uchospitals.edu
http://www.uchicagokidshospital.org
http://www.facebook.com/UChicagoMed
Twitter: @UChicagoMed

*******************************************************************************
This e-mail is intended only for the use of the individual or entity to which
it is addressed and may contain information that is privileged and confidential.
If the reader of this e-mail message is not the intended recipient, you are
hereby notified that any dissemination, distribution or copying of this

2012/Apr/27 06:16 (08a_[2012_04_24_MAA_EMAIL]dr_artunduaga_to_dr_roggin_and_song.pdf)

4/25/12 4:47 PM

UCMC00006124

communication is prohibited. If you have received this e-mail in error, please notify the sender and destroy all copies of the transmittal.

Thank you
University of Chicago Medical Center
*******************************************************************************

2012/Apr/27 08:15 -[08a_[2012_04_24_MAA_EMAIL]dr_krtunduaga_to_dr_roggin_and_song.pdf]

4/25/12 4:47 PM

UCMC00006125

Second attempt

**Subject:** Second attempt
**From:** <Maria.Artunduaga@uchospitals.edu>
**Date:** 4/26/12 2:15 PM
**To:** <dsong@surgery.bsd.uchicago.edu>, <kroggin@surgery.bsd.uchicago.edu>

Drs. Song and Roggin,

This is the second attempt I'm making to get an answer to a straightforward question you seem to have ignored. An order has been given that has directly and significantly affected the quality of the training I have been receiving over the last several weeks, and I have been given no notice of what that order was and why it was given.

In case I haven't made my expectations clear, I am not here to add a line to a resume; I am here to receive an education, and I have already been made to waste 1 full month of my time. For one last time, if I do not receive a satisfactory response from either of you by tomorrow (Friday), I will have no option but to file a formal complaint with the ACGME, as this is far below the educational standards for a PGY-1 surgery resident. As Dr. Song himself said, my contract remains in full effect, with all the rights and obligations that entails, or so I thought. If you are not going to be as serious in recognizing my rights as you were in threatening me with another dismissal if I failed to fulfill my obligations, then at least I should be able to know why.

I expect your answer by 9:00am tomorrow.

Sincerely,

**MARIA ALEXANDRA ARTUNDUAGA, M.D.**
Physician Resident, Plastic and Reconstructive Surgery
The University of Chicago Biological Sciences
5841 S. Maryland Ave. | Rm J-641, MC 6035 | Chicago, IL 60637, USA
Maria.Artunduaga@uchospitals.edu
Cell: (617) 999-3735
Pager: (773) 652-1363 (#3394)
Website: http://martunduaga.com

**AT THE FOREFRONT OF MEDICINE®**
http://www.uchospitals.edu
http://www.uchicagokidshospital.org
http://www.facebook.com/UChicagoMed
Twitter: @UChicagoMed

************************************************************************
This e-mail is intended only for the use of the individual or entity to which
it is addressed and may contain information that is privileged and confidential.
If the reader of this e-mail message is not the intended recipient, you are
hereby notified that any dissemination, distribution or copying of this

2012/Apr/27 06:15 [080_[2012_04_26_MAA_EMAIL]dr_artunduaga_to_dr_roggin_and_song.pdf]

4/27/12 4:45 AM

UCMC00006126

Second attempt

communication is prohibited. If you have received this e-mail in error, please
notify the sender and destroy all copies of the transmittal.

Thank you
University of Chicago Medical Center
*******************************************************************************

UCMC00006127



UCMC00006128

| Resident Conference Sign In Sheet 2011-2012 | | | |
|---|---|---|---|
| Conference: OR | | | |

**Subject:** RE: Attendance list
**From:** <Maria.Artunduaga@uchospitals.edu>
**Date:** 4/25/12 10:11 AM
**To:** <cbarr@surgery.bsd.uchicago.edu>

Carmen,

If I'm asking is because I don't know the answer. I was reinstated 17
days ago, and Dr. Song has not been clear in regards to any "special"
status that I have. As far as I was told, my contract remained in full
effect at all times. I'd appreciate if you could answer my question.

-M

-----Original Message-----
From: Barr, Carmen [BSD] - SUR [mailto:cbarr@surgery.bsd.uchicago.edu]
Sent: Wednesday, April 25, 2012 7:39 AM
To: Artunduaga, Maria [UCH]
Subject: RE: Attendance list

We don't need to address why your name was taken off the list, I believe
you know the answer. Residents don't need CME credits. I'll add your
name back to the list. Carmen

-----Original Message-----
From: Artunduaga, Maria [UCH] [mailto:Maria.Artunduaga@uchospitals.edu]
Sent: Wednesday, April 25, 2012 6:27 AM
To: Barr, Carmen [BSD] - SUR
Subject: Attendance list

Carmen,

Why my name was taken out from the Wednesday/Thursday attendance
conference list? I still need to get CME credits, and my contract hasn't
expired yet.

-M

MARIA ALEXANDRA ARTUNDUAGA, M.D.
Physician Resident, Plastic and Reconstructive Surgery The University of
Chicago Biological Sciences
5841 S. Maryland Ave. | Rm J-641, MC 6035 | Chicago, IL 60637, USA
Maria.Artunduaga@uchospitals.edu
Cell: (617) 999-3735
Pager: (773) 652-1363 (#3394)
Website: http://martunduaga.com

*****************************************************************
********
This e-mail is intended only for the use of the individual or entity to
which it is addressed and may contain information that is privileged and
confidential.
If the reader of this e-mail message is not the intended recipient, you
are hereby notified that any dissemination, distribution or copying of
this communication is prohibited. If you have received this e-mail in
error, please notify the sender and destroy all copies of the
transmittal.

2012/Apr/27 09:22  (11_[2012_04_25_EMAIL_TRAIL]dr_artunduaga_ma_barr.pdf)

4/26/12 3:50 PM

UCMC00006130

Thank you
University of Chicago Medical Center
*************************************************************************
********

This email is intended only for the use of the individual or entity to
which it is addressed and may contain information that is privileged and
confidential. If the reader of this email message is not the intended
recipient, you are hereby notified that any dissemination, distribution,
or copying of this communication is prohibited. If you have received
this email in error, please notify the sender and destroy/delete all
copies of the transmittal. Thank you.

*************************************************************************
This e-mail is intended only for the use of the individual or entity to which
it is addressed and may contain information that is privileged and confidential.
If the reader of this e-mail message is not the intended recipient, you are
hereby notified that any dissemination, distribution or copying of this
communication is prohibited. If you have received this e-mail in error, please
notify the sender and destroy all copies of the transmittal.

Thank you
University of Chicago Medical Center
*************************************************************************

2012/Apr/27  08:22  [11_[2012_04_25_EMAIL_TRAIL]dr_artunduaga_ms_barr.pdf)

4/26/12 3:50 PM

UCMC00006131

## KAPLAN SERVICE - Case and Clinic Coverage
### Week of April 9th

| Surgeon | Location | time | MR/Name | Procedure | Coverage |
|---|---|---|---|---|---|
| **MONDAY April 9** | | | | | |
| **CASES** | | | | | |
| Jaskowiak | DCAM 7 | 12:30 | 2868873 / G___ K | Bl simple mastectomy | Mindy /Stud |
| | | | | | |
| | | | | | |
| **CLINIC** | | | | | |
| Angelos | DCAM 6a | 8:00 | 14 pts | | Eric / Joly |
| Grogan | DCAM 6a | 12:00 | 9 pts | | Essie / Maria |
| Jaskowiak | DCAM Br | 7:45 | 15 pts | | Mindy / Stud |
| **FLOOR: Maria** | | | | | |
| | | | | | |
| **TUESDAY April 10** | | | | | |
| **CASES** | | | | | |
| Angelos | DCAM 7 | 7:20 | 3231345 /S___ C | | Eric / Maria |
| Jaskowiak | GOR 12 | 7:30? | 1840899 / T___ V | Bl simple mastectomy w/ recon | Essie / Stud |
| | | | | | |
| **CLINIC** | | | | | |
| Jaskowiak | DCAM Br | 12:30 | 30 pts | | Essie / Stud |
| Kaplan | DCAM 6a | 8:30 | 6 pts | | Maria / Joly |
| | | | | | |
| **FLOOR:** | | | | | |
| | | | | | |
| **WEDNESDAY April 11** | | | | | |
| **CASES** | | | | | |
| Kaplan | GOR 3 | 11:00 | 3252558 / B___ J | Para | Eric / Maria |
| Jaskowiak | DCAM 1 | 12:20 | 2868873 / P___ R | Needle Loc Bx | Essie / Stud |
| Jaskowiak | DCAM 1 | 2:25 | 3256372 / W___ P | Needle Loc, SLN | Essie / Stud |
| Kulkarni | DCAM 7 | 3:15 | 3260060 / B___ M | Needle Loc Bx, SLN | Mindy |
| **CLINIC** | | | | | |
| | | | | | |
| **FLOOR: Joly** | | | | | |
| | | | | | |
| **THURSDAY April 12** | | | | | |
| **CASES** | | | | | |
| Angelos | Comer 3 | 7:50 | 3244891/E___ M | Thyroid | Eric |
| Angelos | DCAM 5 | 9:30 | 3236793 / rt___ P | Para | Eric |
| Angelos | DCAM 5 | 12:30 | 1160349 / M___ L | Para | Eric |
| Kaplan | DCAM 4 | 7:30 | 3222855 / S___ B | Para | Essie? / Stud |
| Kulkarni | DCAM add-on | ?? | 3257998 / C___ S Y | Lumpectomy | Mindy |
| Kulkarni | DCAM 4 | 11:05 | 3246747 / H___ M | Simple mastectomy, SLN | Mindy / Stud |
| | | | | | |
| **CLINIC** | | | | | |
| Chhablani | DCAM Br | 9:32 | 19 pts | | Joly / Maria |
| | | | | | |
| **FLOOR:** | | | | | |
| | | | | | |
| **FRIDAY April 13** | | | | | |
| **CASES** | | | | | |
| Chhablani | DCAM 6 | 7:30 | 3232460 / C___ S H | MRM | Essie? / Joly? |
| Chhablani | DCAM 6 | 11:15 | 1808121 / G___ P | Needle Loc | Essie |
| Jaskowiak | DCAM 7 | 7:30 | 3257882/ F___ Ma | MRM | Mindy / Stud |
| Jaskowiak | DCAM 7 | 11:36 | 2907925/ O___ S | Simple mastectomy, SLN | Mindy / Stud |
| **CLINIC** | | | | | |

2012/Apr/27 09:23 (12_[2012_04_09_SCHEDULE] Kaplan Service Case Coverage April 9-13.pdf)

UCMC00006132

| Angelos | DCAM 6a | 8:30 | 5 pts | | Maria |
| Kaplan | DCAM 6a | 8:00 | 7 pts | | Eric |
| Kulkarni | DCAM Br | 8:00 | 10 pts, 1 new | | ?Joly |

UCMC00006133

**KAPLAN SERVICE - Case and Clinic Coverage**
**Week of April 16th**

| MONDAY April 16 — Joly off, Essie EPIC @ 1pm, Maria EPIC @ 8am | | | | | | | |
|---|---|---|---|---|---|---|---|
| **CASES** | | | | | | | |
| Surgeon | Location | time | | MR/Name | | Procedure | Coverage |
| Jaskowiak | DCAM2 | 12:25 | K | L | /1672937 | Needle loc Breast Bx | Mindy, Stud |
| Jaskowiak | DCAM2 | 2:29 | A | A | /3237632 | Needle loc Breast Bx, SLN | Mindy, Stud |
| | | | | | | | |
| **CLINIC** | | | | | | | |
| Jaskowiak | DCAM Br | 800 | | 24 pts | | | Eric, Essie, Student |
| | | | | | | | |
| **FLOOR: Maria** | | | | | | | |
| | | | | | | | |

| TUESDAY April 17 | | | | | | | |
|---|---|---|---|---|---|---|---|
| **CASES** | | | | | | | |
| Grogan | DCAM 7 | 7:30 | D | B | '2920034 | Lap Chole | Eric, Mindy |
| | | | | | | | |
| **CLINIC** | | | | | | | |
| Jaskowiak | DCAM Br | 8 | | 42 pts | | | Joly, Essie |
| Kaplan | DCAM 6A | 830 | | 4 pts | | | Maria, Student |
| | | | | | | | |
| **FLOOR:** | | | | | | | |
| | | | | | | | |

| WEDNESDAY April 18 — Mindy EPIC @ 8am, Eric EPIC @ 1pm, Maria EPIC @ 10am | | | | | | | |
|---|---|---|---|---|---|---|---|
| **CASES** | | | | | | | |
| Jaskowiak | GOR 5 | 830 | V | J | /3133149 | Axillary dissection | Eric, Student |
| Jaskowiak | DCAM 5 | 115 | P | M | /3257658 | Needle Loc | Essie, Student |
| Jaskowiak | DCAM 5 | 320 | D | G | M | /3259485 | SLN | Mindy, Student |
| | | | | | | | |
| **CLINIC** | | | | | | | |
| | | | | | | | |
| **FLOOR:** | | | | | | | |
| | | | | | | | |

| THURSDAY April 19 | | | | | | | |
|---|---|---|---|---|---|---|---|
| **CASES** | | | | | | | |
| Angelos | GOR 10 | 730 | P | D | P | D /3250725? | Thyroid | Eric, Student 1 |
| Angelos | GOR 10 | Follow | B | M | /3263346 | Thyroid | Eric, Student1 |
| Angelos | GOR 10 | Follow | M | L | /3251179 | Para | Eric, Student 1 |
| Kaplan | DCAM 4 | 730 | H | M | /1996740 | Para | Essie, Maria |
| Kulkarni | GOR 6 | 730 | R | G | | Simple mastectomy, SLN, PRS recon | Mindy, Student 2 |
| Kulkarni | DCAM 4 | 1200 | C | S | Y 3257998 | Lumpectomy | Mindy |
| Kulkarni | DCAM 3 | 200 | A | F | /3250391 | MRM | Mindy, student |
| Jaskowiak | DCAM 6 | 1215 | P | M | /3244105 | Breast Bx, tissue expander removal | Essie |
| | | | | | | | |
| **CLINIC** | | | | | | | |
| Chhablani | DCAM Br | 930 | | 41 pts | | | Joly, Essie (after OR, before J's case) Student 2 after OR |
| Kulkarni | DCAM Br | 800 | | 1 pt | | No new | |
| | | | | | | | |
| **FLOOR:** | | | | | | | |
| | | | | | | | |

| FRIDAY April 20 | | | | | | | |
|---|---|---|---|---|---|---|---|
| **CASES** | | | | | | | |
| Angelos | GOR 2 | 730 | Q | T | /3250725 | Para | Eric, Student 2 |
| Grogan | GOR 2 | 1022 | D | M | ~/3259702 | Thyroidectomy | Eric, Student 2 |

2012/April27 00:26  (13_[2012_04_16_SCHEDULE] Kaplan Service Case Coverage April 16.docx.pdf)

UCMC00006134

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Chhablani | DCAM 2 | 740 | A | H | / 3257993 | Simple Mastectomy | Essie |
| | Chhablani | DCAM 2 | 1145 | D | D | / 3233679 | Needle Loc | Essie |
| | Jaskowiak | DCAM 7 | 730 | K | , R | / 3244528 | Bl simple mastectomy, SLN | Mindy, Stud 1 |
| | Jaskowiak | DCAM 4 | 130 | L | K | 3256398 | Needle Loc Bx, SLN | Mindy, Stud 1 |
| | Jaskowiak | DCAM 4 | 350 | N | , K | | SLN bx | Mindy, Stud 1 |
| | | **CLINIC** | | | | | | |
| | Kaplan | DCAM 6a | 830 | | 7 pts | | | Maria, Joly |
| | Kulkarni | DCAM Br | 800 | | 8 pts | | 1 new? | Joly for the possible 1 new pt |
| | | | **FLOOR:** | | | | | |
| | | | | | | | | |

UCMC00006135

## KAPLAN SERVICE - Case and Clinic Coverage
### Week of April 23 rd

**MONDAY April 23**

**CASES**

| Surgeon | Location | time | | MR/Name | | Procedure | Coverage |
|---------|----------|------|---|---------|--|-----------|----------|
| Kaplan | GOR 7 | 1250 | W. | A | 3265079 | Para | Eric, Essie |
| Jaskowiak | DCAM 3 | 400 | H | T | / 2109755 | Breast Bx | Mindy, Stud1 |
| Jaskowiak | DCAM 3 | 200 | W | C | / 1896506 | SLN Bx | Mindy, Stud1 |

**CLINIC**

| | | | | | | | |
|---------|----------|------|--------|--|--|--|----------|
| Jaskowiak | DCAM Br | 800 | 25 pts | | | | Eric, Stud1, Joly |
| Angelos | DCAM 6a | 830 | 21 pts | | | | Maria, Essie |
| Grogan | DCAM 6a | 1215 | 6 pts | | | | Mindy, Stud 2 |

**FLOOR: Maria**

**TUESDAY April 24**

**CASES**

| Surgeon | Location | time | | MR/Name | | Procedure | Coverage |
|---------|----------|------|---|---------|--|-----------|----------|
| Angelos | DCAM 7 | 830 | A | C | / 515857 | Para | Eric, Mindy |
| Angelos | DCAM 7 | 1130 | G | C | / 3234755 | Thyroid | Eric. Mindy |
| Angelos | DCAM 7 | 230 | B | A, | / 3259797 | Thyroid | Eric, Mindy |
| Jaskowiak | GOR 12 | 730? | S | D | / 3258161 | Mastectomy with PRS | Essie, Stud 1 |

**CLINIC**

| | | | | | | | |
|---------|----------|------|--------|--|--|--|----------|
| Jaskowiak | DCAM Br | 1000 | 39 | | | | Essie, Stud2 |
| Angelos | DCAM 6a | 930 | 1 pt | | | | Joly |
| Kaplan | DCAM 6a | 900 | 2 pts | | | | Maria |

**FLOOR:**

**WEDNESDAY April 25**

**CASES**

| Surgeon | Location | time | | MR/Name | | Procedure | Coverage |
|---------|----------|------|---|---------|--|-----------|----------|
| Kaplan | GOR 3 | 830 | L | J | / 3231456 | Para | Eric, Mindy |
| Kaplan | GOR 3 | 1134 | K | N | / 3259450 | Thyroid | Eric, Mindy |
| Kaplan | GOR 3 | 230 | H | N | / 3254066 | Thyroid | Eric, Mindy |
| Jaskowiak | DCAM 1 | 1100 | E | C | / 3217545 | Breast Bx | Essie, Stud1, |
| Jaskowiak | DCAM 1 | 100 | S | C | / 2124190 | SLN | Essie, Stud1 |

**CLINIC**

| | | | | | | | |
|---------|----------|------|------|--|--|--|----------|
| Kulkarni | DGAM Br | 900 | 1 pt | | | | Joly, Stud2 |

**FLOOR:**

**THURSDAY April 26**

**CASES**

| Surgeon | Location | time | | MR/Name | | Procedure | Coverage |
|---------|----------|------|---|---------|--|-----------|----------|
| Kaplan | DCAM 4 | 730 | J | N | 2893419 | Thyroid | Eric, Stud 1 |
| Kaplan | DCAM 4 | 1100 | T | E | / 2790000 | Para | Eric, Stud1 |
| Kaplan | DCAM 4 | 230 | M | L | 3207514 | Thyroid | Eric, Stud 1 |

**CLINIC**

| | | | | | | | |
|---------|----------|------|--------|--|--|--|----------|
| Chhabiani | DCAM Br | 830 | 41 pts | | | | Essie, Stud 2 |
| Jaskowiak | DCAM 6a | 115 | 5 pts | | | | Mindy, Stud 2 |

**FLOOR:**

**FRIDAY April 27, Joly off**

**CASES**

| Surgeon | Location | time | | MR/Name | | Procedure | Coverage |
|---------|----------|------|---|---------|--|-----------|----------|
| Jaskowiak | GOR 11 | 730 | D | G. M | / 3259485 | BL mastectomy w PRS | Eric, Stud1 |
| Jaskowiak | DCAM 4 | 1245 | Y | V- | 1956141 | Needle Loc, SLN | Mindy, Stud 1 |
| Chhablani | DCAM 7 | 730 | G | P / 1808121 | | Lumpectomy | Essie, Stud 2 |
| Chhablani | DCAM 7 | 915 | A | S / 2985231 | | MRM | Essie, Stud 2 |

2012/Apr/27 09:26 (14_[2012_04_23_SCHEDULE] Kaplan Service Case Coverage April 23.pdf)

UCMC00006136

| | | CLINIC | | | |
|---|---|---|---|---|---|
| Kaplan | DCAM 6 | 900 | 3 pts | | Joly, Maria |
| | | FLOOR: | | | |
| | | | | | |

UCMC00006137

**Subject: Important concerns**
**From:** <Maria.Artunduaga@uchospitals.edu>
**Date:** 4/13/12 2:12 PM
**To:** <msimon@surgery.bsd.uchicago.edu>

Dear Dr. Simon,

I am writing a personal e-mail to you because for the moment I would like the content of this message to remain confidential. Also, I would like you to regard this issue as being separate and apart from your decisions about the formation of the Grievance Committee and the rules for its proceedings.

Over the last week, Dr. Song has already resorted to both intimidatory measures (stern warnings) and retaliatory measures (inferior rotation assignments) in response to my decision to go forward with a Grievance process against him. In addition, this week after my reinstatement I have felt particularly discriminated and ostracized by the medical team I work with. Because part of your functions as Chair of the GMEC is to address concerns about residents' ongoing educational experience, I am wondering if I could seek your assistance in ensuring a fair training environment for me at least up to the time of my hearing, so the Grievance Committee can independently take charge of setting the conditions following the hearing.

The following recent statements from Dr. Song and his lawyer have been cause for concern:
*"Please note that if during this period [after my reinstatement], we believe that you have breached your contract in any way, that we may remove you from clinical service"*
(letter April 4) *"I caution you against misrepresentations about your status to other residents and against acting in any way that is disruptive to the operations of the Medical Center and the care of patients"* (e-mail April 6) As I will show at the Grievance hearing, my conduct has never been consistent with the types of behavior they are warning me against, so I must interpret these statements as being attempts to intimidate me. All I am intending to do is to get through this terrible situation as quickly as possible, trusting in the fairness of the Grievance process, and in the meantime to do my job in the best way I can. This is not a conflict I have sought, but rather a conflict that I have been led into as the result of some very arbitrary decisions made against me, and which I feel obligated to contest.

I have two specific suggestions at this point: the first one is for you, either personally or through a UCMC Ombudsperson, to work directly with Dr. Roggin (who is handling my schedule, but has been unwilling to give me a more favorable assignment, I believe at Dr. Song's instigation) in order to ensure a much higher number of cases for me to work with in the B service than I am handling now. Or, alternatively, to put me back on the night float schedule (which I would much prefer), as I was assigned to do this month before the dismissal decision.

Since last November, I have had contact with Dr. Michelle Josephson, a UCMC Ombudsperson, who is reasonably acquainted with my case, and I believe I can trust her judgment. It would be very useful if you could officially appoint her to supervise my current working conditions, and to make sure at the very least that they come in compliance with GME and ACGME standards, since Dr. Song is clearly unwilling to do so. It would be best if she could have the power to take any and all necessary measures to that end, at least on a temporary basis. You can share this message with her if you wish.

UCMC00006138

Important concerns

The second suggestion, to counter possible future retaliatory measures, is to order Dr. Song to hold off on the enforcement of any possible future decision of immediate dismissal, so as to give time both to me and/or to the GME office to review the decision first. Most of my current problems are due to the fact that Dr. Song dismissed me, on illegitimate grounds, without giving me time to respond adequately, and I was dropped from the rotation schedule and lost over 10 days of training as a result. I believe that such a strong negative precedant, coupled with his explicit threat of another immediate dismissal, would justify such a precautionary measure at least while my Grievance is resolved.

These are only my suggestions, but I defer to your authority and experience in handling these cases in order to counter the treatment I am currently receiving. I am sure any action you can take or suggest for me to take would be extremely helpful, as I am feeling I am completely alone in this at the moment, given Dr. Song's power and influence over me and those who supervise me.

Sincerely yours,

**MARIA ALEXANDRA ARTUNDUAGA, M.D.**
Physician Resident, Plastic and Reconstructive Surgery
The University of Chicago Biological Sciences
5841 S. Maryland Ave. | Rm J-641, MC 6035 | Chicago, IL 60637, USA
Maria.Artunduaga@uchospitals.edu
Cell: (617) 999-3735
Pager: (773) 652-1363 (#3394)
Website: http://martunduaga.com


**AT THE FOREFRONT OF MEDICINE®**
http://www.uchospitals.edu
http://www.uchicagokidshospital.org
http://www.facebook.com/UChicagoMed
Twitter: @UChicagoMed

*********************************************************************
This e-mail is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged and confidential. If the reader of this e-mail message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is prohibited. If you have received this e-mail in error, please notify the sender and destroy all copies of the transmittal.

Thank you
University of Chicago Medical Center
*********************************************************************

UCMC00006139

**Subject:** Concerns about my ongoing training
**From:** <Maria.Artunduaga@uchospitals.edu>
**Date:** 4/20/12 2:25 PM
**To:** <jmatthews@surgery.bsd.uchicago.edu>

Dear Dr. Matthews,

My name is Maria Alexandra Artunduaga, and I am a PGY-1 resident in the Section of Plastic and Reconstructive Surgery. I was referred to you by Dr. Michael Simon and Mr. Barry Kamin of the GME office, whom I met with this morning to discuss a serious situation I have been having to endure for the last several weeks, ever since I decided to initiate a Grievance Process against Dr. David Song, my Program Director, for a set of adverse decisions he communicated to me in a letter dated March 27.

Since that date, he has resorted to a number of intimidatory and retaliatory measures against me, which have resulted so far in an illegitimate dismissal, followed by two (2) weeks of missed training, followed by another two (2) weeks of a rotation schedule of a remarkably poor educational quality compared to my peers. Since my reinstatement, I have been threatened by him with another immediate dismissal, along with stern warnings against talking about my situation with other people at the hospital. For my part, all I want right now is to complete my internship year in an adequate educational and working environment, at the very least up to ACGME standards, and at the same time deal with all other matters appropriately through the Grievance Process. However, Dr. Song's actions continue to hurt my training, and have relegated me to a seemingly endless inferior resident status.

If you agree, I would like to have a meeting with you as soon as possible to discuss how you as Chairman of the Department of Surgery can prevent these abuses from going any further, having already tried all other institutional channels. I have documented evidence to support these allegations, and I can also provide you with further written details in advance of the meeting. As you may understand, I would appreciate if you can handle this as an urgent and confidential matter.

Thanks in advance and I look forward to hearing from you,

**MARIA ALEXANDRA ARTUNDUAGA, M.D.**
Physician Resident, Plastic and Reconstructive Surgery
The University of Chicago Biological Sciences
5841 S. Maryland Ave. | Rm J-641, MC 6035 | Chicago, IL 60637, USA
Maria.Artunduaga@uchospitals.edu
Cell: (617) 999-3735
Pager: (773) 652-1363 (#3394)
Website: http://martunduaga.com

**AT THE FOREFRONT OF MEDICINE®**
http://www.uchospitals.edu
http://www.uchicagokidshospital.org
http://www.facebook.com/UChicagoMed
Twitter: @UChicagoMed

2012/Apr/27 06:27 (18_[2012_04_20_MAA_EMAIL]dr_artunduaga_to_dr_matthews.pdf)

4/25/12 4:28 PM

**UCMC00006140**

Concerns about my ongoing training

*********************************************************************

This e-mail is intended only for the use of the individual or entity to which
it is addressed and may contain information that is privileged and confidential.
If the reader of this e-mail message is not the intended recipient, you are
hereby notified that any dissemination, distribution or copying of this
communication is prohibited. If you have received this e-mail in error, please
notify the sender and destroy all copies of the transmittal.

Thank you
University of Chicago Medical Center
*********************************************************************

2012/Apr/27 06:27 (18_j2012_04_90_MAX_EMAIL)(d_arkinoulaga_lo_dr_matthews.pdf)

4/25/12 4:28 PM

UCMC00006141

RE: Concerns about my ongoing training

**Subject:** RE: Concerns about my ongoing training
**From:** <Maria.Artunduaga@uchospitals.edu>
**Date:** 4/24/12 7:57 PM
**To:** <jmatthews@surgery.bsd.uchicago.edu>

Dear Dr. Matthews,

I just wanted to follow up on the meeting we had this afternoon, so we are clear about its conclusions for the record. First of all, while I appreciate your concern about my possible future career choices, my main purpose for the meeting was to discuss the current conditions of my contract, which as Dr. Song himself said to me, still remains in full effect. That means that both my rights and my obligations under the contract do still apply, and one of those rights is to receive an education of comparable quality to my fellow interns, in accordance to ACGME standards. When I refer to quality, my main concern is not which specific rotations I am assigned to or how many credits I will receive for them, but that I receive a meaningful training on each rotation. And, when I get assigned zero (0) clinical cases as in this week, compared to my co-intern's nine (9) cases over the same period, I cannot possibly call that a "pretty good arrangement," as you said at the meeting. I want to make perfectly clear that the only additional condition that I have been given by Dr. Song is that I would remain under probation and supervision, all of which I am willing to accept, pending the outcome of my Grievance, provided that the quality of my training is not affected.

Regarding my current plans, and contrary to what you said in our meeting, under GME policy a contract non-renewal is a grievable decision, so until the Grievance Process plays out, both I and the Department of Surgery must assume that I may still be allowed to continue in the Program. Under that scenario, the quality of the training I am receiving right now still does matter to me very much, and I am not willing to consider other options until and unless the decision of the Grievance Committee is not favorable to me. If that is the case, then it is I who will request to take time off my duties if I see it necessary to pursue my options, and it is not the job of my Program Director to preemptively make that decision for me.

In conclusion, unless I get a reasonable explanation for why I have been given such remarkably poor assignments over the last month, I must continue to assume I am being treated in a retaliatory and discriminatory way. Given your unwillingness to look into Dr. Song's decisions, apart from those included in the Grievance Process, I must conclude that the Department does not seriously address claims of discriminatory treatment, and that there is no oversight of the decisions made by Program Directors. Unless you have any further suggestions to make on how my current working and educational conditions can be improved, I consider I have now exhausted all institutional channels at my disposal.

Thanks once again for your time, and I would appreciate that you continue to regard this matter as confidential.

**MARIA ALEXANDRA ARTUNDUAGA, M.D.**
Physician Resident, Plastic and Reconstructive Surgery
The University of Chicago Biological Sciences
5841 S. Maryland Ave. | Rm J-641, MC 6035 | Chicago, IL 60637, USA
Maria.Artunduaga@uchospitals.edu
Cell: (617) 999-3735
Pager: (773) 652-1363 (#3394)
Website: http://martunduaga.com

2012/Apr/27 08:28 (19_[2012_04_24_MAA_EMAIL2]dr_artunduaga_to_dr_mathews.pdf)

4/25/12 4:49 PM

UCMC00006142

AT THE FOREFRONT OF MEDICINE®
http://www.uchospitals.edu
http://www.uchicagokidshospital.org
http://www.facebook.com/UChicagoMed
Twitter: @UChicagoMed

---

**From:** Matthews, Jeffrey [BSD] - SUR [mailto:jmatthews@surgery.bsd.uchicago.edu]
**Sent:** Friday, April 20, 2012 3:44 PM
**To:** Artunduaga, Maria [UCH]
**Subject:** Re: Concerns about my ongoing training

Maria- I believe Jan is setting up some time.
JBM

Jeffrey B. Matthews, M.D.
Dallas B. Phemister Professor
Chairman, Department of Surgery
The University of Chicago

On Apr 20, 2012, at 2:25 PM, "Artunduaga, Maria [UCH]" <Maria.Artunduaga@uchospitals.edu> wrote:

Dear Dr. Matthews,

My name is Maria Alexandra Artunduaga, and I am a PGY-1 resident in the Section of Plastic and Reconstructive Surgery. I was referred to you by Dr. Michael Simon and Mr. Barry Kamin of the GME office, whom I met with this morning to discuss a serious situation I have been having to endure for the last several weeks, ever since I decided to initiate a Grievance Process against Dr. David Song, my Program Director, for a set of adverse decisions he communicated to me in a letter dated March 27.

Since that date, he has resorted to a number of intimidatory and retaliatory measures against me, which have resulted so far in an illegitimate dismissal, followed by two (2) weeks of missed training, followed by another two (2) weeks of a rotation schedule of a remarkably poor educational quality compared to my peers. Since my reinstatement, I have been threatened by him with another immediate dismissal, along with stern warnings against talking about my situation with other people at the hospital. For my part, all I want right now is to complete my internship year in an adequate educational and working environment, at the very least up to ACGME standards, and at the same time deal with all other matters appropriately through the Grievance Process. However, Dr. Song's actions continue to hurt my training, and have relegated me to a seemingly endless inferior resident status.

If you agree, I would like to have a meeting with you as soon as possible to discuss how you as Chairman of the Department of Surgery can prevent these abuses from going any further, having already tried all other institutional channels. I have documented evidence to support these allegations, and I can also provide you with further written details in advance of the meeting. As you may understand, I would appreciate if you can handle this as an urgent and confidential matter.

UCMC00006143

RE: Concerns about my ongoing training

Thanks in advance and I look forward to hearing from you,

**MARIA ALEXANDRA ARTUNDUAGA, M.D.**
Physician Resident, Plastic and Reconstructive Surgery
The University of Chicago Biological Sciences
5841 S. Maryland Ave. | Rm J-641, MC 6035 | Chicago, IL 60637, USA
Maria.Artunduaga@uchospitals.edu
Cell: (617) 999-3735
Pager: (773) 652-1363 (#3394)
Website: http://martunduaga.com

**AT THE FOREFRONT OF MEDICINE®**
http://www.uchospitals.edu
http://www.uchicagokidshospital.org
http://www.facebook.com/UChicagoMed
Twitter: @UChicagoMed

*******************************************************************

This e-mail is intended only for the use of the individual or entity to which
it is addressed and may contain information that is privileged and confidential.
If the reader of this e-mail message is not the intended recipient, you are
hereby notified that any dissemination, distribution or copying of this
communication is prohibited. If you have received this e-mail in error, please
notify the sender and destroy all copies of the transmittal.

Thank you
University of Chicago Medical Center
*******************************************************************

*******************************************************************

This e-mail is intended only for the use of the individual or entity to which
it is addressed and may contain information that is privileged and confidential.
If the reader of this e-mail message is not the intended recipient, you are
hereby notified that any dissemination, distribution or copying of this
communication is prohibited. If you have received this e-mail in error, please
notify the sender and destroy all copies of the transmittal.

Thank you
University of Chicago Medical Center
*******************************************************************

2012/Apr/27 08:28 (19_[2012_04_24_MAA_EMAIL2]dr_artunduaga_to_dr_matthews.pdf)

4/25/12 4:49 PM

UCMC00006144

May 14, 2012

Dear Grievance Committee,

This document is my rebuttal statement to the written materials submitted by Ms. Jane McAtee on behalf of the Section of Plastic and Reconstructive Surgery on May 8. Though my petition to submit a rebuttal statement had been initially denied, I have now been given this opportunity in light of the fact that Ms. McAtee violated that earlier ruling, and I am hereby exercising that option.

As I contend in my written arguments, there is a serious and systematic mishandling of information about my performance stemming directly from Dr. Song, which I claim is not only a serious violation of academic due process, but also the root cause of the arbitrary decisions against me that eventually followed from that reprehensible conduct. Very clear and important evidence of that can be found by comparing the version of my entire personal file, which –at my request– I was given by the Section on May 4 and I included as part of my supporting evidence, in contrast to the materials submitted by the Section to the Committee on May 8.

I am hereby providing an itemized list of all the missing documents from my version of the file, which suggests the existence of some clear discrepancies I hope the Committee would take the opportunity to ask Dr. Song to explain at the hearing. The confirmation of these missing documents from my copy of the file would reveal that Dr. Song keeps an additional "secret" version of my file, not viewable by me, in violation of GME regulations that the Program maintain "a [i.e. one (1)] file" that provides access to all resident evaluations. The list of missing documents, which anyone can independently verify, is as follows:

### Minutes from Faculty Meeting (3/26/12)

With this being such a crucially important evaluative meeting, which would decide my future in the Program, at least the minutes from the meeting should have been made available to me. I requested on numerous occasions to see supporting materials for the Section's decision, namely on 3/29, 4/24, and 4/27. I was denied on each of those occasions. Rules of due process on evaluation should clearly apply to this meeting and the documentation deriving from it, and it would be particularly important to comply with them in this case.

### Binder given to faculty (3/26/12)

Mentioned in both the meeting minutes and Dr. Song's Memorandum to the Grievance Committee, a copy of this binder *"detailing [my] entire intern year up until the meeting"* should have been made available to me as well, as supporting evidence of the exact information that the decisions made against me were based on. All indications are that this binder coincides with the "Packet #2" submitted by the Section on May 8, since its table of contents exactly matches the contents of the binder listed in the meeting minutes. However, this fact should have been made explicit by the Section. If that assumption is true, then many documents in that binder for the faculty were not made available to me when I was given a copy of my file on May 4, and those documents are listed in this table. This implies that the decision of the faculty was partly based on information never accessible for review by me, in violation of ACGME Program Requirement V.A.1.c), quoted at the end of this document.

### Table/Grid of specific Conditions of Probation (3/26/12)

I have some reservations about the authenticity of this table. In his statement, Dr. Song claims that at the meeting the faculty *"created a grid of specific areas where improvement was needed and reviewed each element, grading whether Dr. Artunduaga met the goal."* The reasons for my skepticism about this account are:
- If this exercise was truly done as described, and such categorical conclusions were reached on each of the 10 areas of improvement, why was a simple list of the 10 areas and their grades not provided in the March 27 decision letter? That would have at least appeared to be a simple but powerful argument to justify the decision. However, the letter does not even mention that this method of evaluation was used at all, and the meeting minutes do not refer to this grid either.
- The list of 10 criteria and their final grade was never provided to me at any other point after March 27, despite repeated requests.
- As an obviously evaluative statement, the table should have been provided to me upon request, or at the very latest with the copy of my file handed to me on May 4. I only learned about its existence on May 8.

I note that in order to address potential concerns about the authenticity of accounts from the all-important March 26 faculty meeting, I suggested that the Committee require at least two (2) PRS faculty members to independently sign on to the documentation, as proof that it contained a complete and accurate description of the discussion held at that meeting. My request was denied.

### Dr. Park evaluation (3/14/12)

This is yet another evaluative statement that violates due process regulations regarding evaluation. Never made available for me to review and discuss, in fact I was never made aware of its existence at all; as all documents in this binder, it is missing from my copy of my file but on the other hand it was an integral part of the binder given to the faculty on March 26.
If I had been given timely opportunity for review and discussion, I would have pointed out that only a few accounts of incidents were true (three (3) to be exact, namely: abscess incision and drainage, Dr. Jaskowiak refill, forgot post-op orders), others were inaccurate (In-Service, duty hours, Dr. Reid's cases assignment, and coordinated dressing change), and some others were undocumented and unfounded "rumors" (Neurosurgery PA's or "interference with evaluation process"). Also, please, refer to the discussion below on conflicts of interest and acceptability of Dr. Park's evaluation as attending during my Plastic Surgery rotation.

### Minutes from meetings with Dr. Park (1/3/12, 1/10/12, 1/25/12, 2/6/12, 2/13/12, 2/28/12, 3/5/12, 3/12/12)

These eight (8) missing meeting minutes, added to the three (3) that were included in my copy of the file, improperly refer among others to an ongoing psychiatric treatment I was receiving. I consider this to be a breach of confidentiality in mentor-mentee relationship. In general, Dr. Park's roles as mentor who listens to my personal concerns and provides constructive advice, and evaluator of my progress under probation who would eventually recommend a specific action for the Section to take, were not clearly defined and separated. This is evidenced by the references in the minutes to matters outside the evaluative part of the meetings, which should not have been included due to their confidential nature. If I had known some personal concerns I shared with her would be mixed into her evaluative work, I would have never confided in her to discuss them.

2012/Jun/22 06:50 ([2012_05_14_MAA_LETTER]Artunduaga - May 14 rebuttal.pdf)

Specific various other concerns over these meetings include: feelings of exclusion from social events and academic activities (monthly skill sessions) were ignored; my explicit concerns about conflicts and misunderstandings with faculty and staff arising from my accent and cultural background were dismissed by Dr. Park and are not mentioned in the minutes; my progress over time was never considered by Dr. Park as being significant enough and she would only keep raising the bar as my performance improved, at one point suggesting that only a string of perfect (6.0/6.0) evaluations on all aspects would prevent me from being failed.

### Faculty Evaluations (July-August, September, February)

Some of the standard competency-based evaluation forms are missing from my copy of the file, namely those of Dr. James Mills (3/17/12), and Dr. Piotr Witkowski (3/19/12). In addition, several more are missing from <u>both</u> copies of the file (mine and the one submitted to the Committee), including those by Dr. Edwin Kaplan (9/6/11), Dr. Asha Chhabiani (10/14/11), Dr. Peter Angelos (10/13/11), and Dr. Roger Hurst (10/17/11), meaning this last group of evaluations was missing from the binder given to the Plastic Surgery faculty on March 26. Most of these faculty evaluations happened to rate me favorably, contrary to the notion by Dr. Song of a "unanimous" agreement on my lack of competence, stated in his 11/02/11 letter to me.

### Evaluation by Dr. Deana Shenaq, Plastic Surgery Intern (5/3/12)

This is a negative report in response to a request that I assume came from Dr. Park, since the report is addressed to her, though the exact request is not specified. The report concerns my 1-week night float rotation on the week of March 19. The report (and probably also the request) was submitted 1.5 months after the rotation ended, outside what would have been considered "timely." This is the only document in "Packet #2" dated after March 26, meaning it was not part of the evidence considered by the faculty in making its decision on contract non-renewal, and likewise should not be considered by the Committee either.

Furthermore, Dr. Shenaq, author of the report, is my Plastic Surgery co-intern, who that week just happened to be assigned to night float as well, but she was covering other services and did not supervise my work. The examples she quotes lack crucial details, and more importantly, contrary to what she claims, she was not present during my conversations with consulting services or senior supervisors, because first of all we worked in different rooms. Also, please refer to my discussion below on conflicts of interest.

### E-mail by Dr. Sara Dickle (2/21/12)

This important e-mail, titled "Work hours plan for week of February 19-25," and in which Dr. Song was also copied, was missing from my personal file as well as from the copy submitted to the Committee. In it, Dr. Dickle makes a clear statement in regards to the Section's expectations for the in-Service exam of March 1: "your score will not be used in any way to penalize you, so please do not be concerned that a lack of study time will be a detriment at this point." This was in addition to another e-mail by her from earlier that day, where she states that "this will be the first year the intern level has taken the test so a low score for anyone junior is more a reflection on [the Section] as far as educational needs we integrate the program."

Contrary to these assurances, my eventual low score (38/100, percentile 2%, sample size of 58) was used by Dr. Song as part of his argument to reassign me to an "independent study program" for the last two (2) months of my internship year, which consisted in making a summary of a book in Plastic Surgery. This would allegedly allow him to officially certify that I have completed a year of training as a surgical resident.

There is also evidence of malicious intent when the text of the original requests that prompted some of the evaluative statements in this list, as well as many others found in my copy of the file, were omitted. For instance, several negative reports about me are found in the documentation, but it is unclear which specific question they were replying to; questions such as "give your <u>overall impression</u> of Dr. Artunduaga during assignment X," "what were the <u>deficiencies</u> of Dr. Artunduaga at assignment X?," or "what are Dr. Artunduaga's <u>areas to improve?</u>," would each prompt a different type of response.

As an example of the above, it appears that Dr. Song requested for some of his senior residents to provide him with periodic lists of my "areas for improvement," even while I was rotating in other services where they were not my supervisors. These lists, whose existence I was only made aware of during my first Plastic Surgery rotation in October, obviously highlighted areas where I was being found to be deficient, while omitting positive aspects and an overall impression with both good and bad aspects considered, due to the nature of the question they were answering. Dr. Song in turn used these lists as part of an argument to claim that there was a "unanimous" negative impression about my "performance or lack thereof," a questionable conclusion on top of the irregular handling of the information it was allegedly based on.

* * *

Apart from the issues with the list above, I would also like to dispute the serious accusations that both Dr. Song and Dr. Park have made in their respective statements against all faculty, fellows and residents who have evaluated me favorably during my probation. Their suggestion of evaluations made with the purpose of expressing "sympathy" for me (Dr. Park) or "interceding on my behalf" (Dr. Song), instead of giving their honest professional opinion from their direct observation of my abilities, amounts to a grave charge of unethical behavior against them. If I were in their position, my sense of professionalism would absolutely prevent me from giving a favorable evaluation if it were contrary to my actual professional opinion, irrespective of what I may have been told by the person in question or any of their "allies" (in Ms. McAtee's words). Since I would appear as the author of the opinion, I must be aware that I would be held fully responsible for whatever is stated in it. Drs. Song and Park would have to submit considerably stronger evidence than they did in their written statements to the Committee, instead of giving mere suppositions and snippets of sentences, if their serious charges against their colleagues are to be believed.

On the other hand, I do have serious reservations about the impartiality and independence of the opinions of Dr. Park as evaluator of my probation period. It is evident that her job as evaluative mentor, who in theory should have no reservations about submitting opinions contrary to Dr. Song's own, comes in direct conflict with her position as Assistant Professor of Surgery, whose promotion and immediate professional goals directly depend on the favorable opinion of Dr. Song as Program Director and Chief of the Section.

2012/Jun/22 05:50 (I2012_05_14_MAA_LETTER\Artunduaga - May 14 rebuttal.pdf)

UCMC00006146

As stated in the ACGME Program Requirements for Graduate Medical Education in Plastic Surgery, the Program Director must:

*II.A.4.d) evaluate program faculty and approve the continued participation of program faculty based on evaluation;*

The Committee should find Dr. Park's situation to be a manifest conflict of interest, as well as a crass error in judgment by Dr. Song in his choice of a mentor with evaluative power.

This same situation also applies to all other junior members of the Section of Plastic and Reconstructive Surgery, a situation that happens to cover all of the other witnesses testifying on Dr. Song's behalf. The senior residents who will be present at the hearing also owe their eventual certification as Plastic Surgeons to Dr. Song's favorable opinion of them, and have a vested interest in not appearing to contradict him regarding my situation. My experiences following the start of this Grievance Process serve as evidence of what may happen to them in that case. This conflict of interest must be taken into account by the Committee when debating whether their stated opinions can be truly considered as independent from Dr. Song's, and also whether the "unanimous" decision of the Section can be considered to be as coming from a wide variety of truly independent opinions. The same cannot be said about any of my evaluators and witnesses, who on the other hand hold no subordinate relationship to me, and who would obtain no potential personal benefit whatsoever by providing an evaluation that is in line with my own wishes or opinions.

Finally, I would like to submit to the Committee that at the hearing I will reserve the right not to answer any question related to evaluations that did not comply with ACGME and GME regulations on 1) documentation, 2) timely submission, and 3) availability for me to view at any time, explicitly quoted at the end of this statement. Ms. McAtee argues that *"[I] did not request a copy of [my] file until [the week of April 30]."* My reply to Ms. McAtee is that I cannot be expected to timely view any evaluative statement added to my file, when I have not even been made aware –in a timely fashion– that it exists in the first place.

An evaluative statement that fits squarely in this category is Dr. Park's March 14 letter to Dr. Song about my performance under probation, an evaluation I never even knew existed until the May 8 Grievance submission deadline. In her case as well as that of every other PRS faculty member, no consideration should be made of their evaluative opinions as attendings in the service, since the Section is chronically and entirely non-compliant with standing ACGME and GME mandates for documented faculty evaluation of residents.

I say the above because I consider that answering questions about an evaluation that is non-compliant with resident evaluation standards would amount to legitimizing it, which is something I am not willing to do. Likewise, the Committee should seriously consider completely removing all such non-compliant evaluations from its consideration of the facts of this case, in deference to the rules of academic due process regarding evaluation.

For the sake of completeness, specific rules on resident evaluation I am referring to include but are not limited to the following, on the side of the ACGME Program Requirements:

*V.A.1.a) The faculty must evaluate resident performance in a timely manner during each rotation or similar educational assignment, and document this evaluation at completion of the assignment.*
*V.A.1.c) The evaluations of resident performance must be accessible for review by the resident, in accordance with institutional policy.*

On the GME's side (Policy 11):

*Each program is required to create and utilize competencies-based evaluation forms.*
*Each program will maintain a file from which completed evaluations for each resident/fellow may be accessed.*
*Each program is required to enact processes to ensure that residents/fellows receive timely feedback about performance.*

I once again thank the members of the Committee for their time and attention, and I hope they understand my need to provide a comprehensive response to the Section's numerous lapses in due process, as poignantly evidenced by the documentation they submitted to you on May 8.

Sincerely,

María Alexandra Arduñaga, M.D.
Plastic and Reconstructive Surgery Resident
University of Chicago Medical Center

2012/Jun/22 08:50 ([2012_05_14_MAA_LETTER]Ariunduaga - May 14 rebuttal.pdf)

# EXHIBIT L

May 1, 2012

Resident Services
ACGME
515 North State Street, Suite 2000
Chicago, Illinois 60654

Dear ACGME Resident Services,

This letter is an addendum to the complaint submitted by me on April 27, 2012. In the few days since then, a couple of important events have happened that provide further support to my initial claim.

1) On Monday, April 30, I received an e-mail [A1] and letter [A2] from my Program Director, Dr. David H. Song, notifying me that I had failed my April rotation. He did so based on informal reports he seems to have requested from my chief resident, Dr. Eric Grossman, reports I was not allowed to see at any time and that Dr. Grossman refused to share with me when I asked for them [A3]. This violates clear ACGME provisions on resident evaluation:

*The program must:*
*V.A.1.b).(1) Provide objective assessments of competence in patient care, medical knowledge, practice-based learning and improvement, interpersonal and communication skills, professionalism, and systems- based practice;*
*V.A.1.c) The evaluations of resident performance must be accessible for review by the resident, in accordance with institutional policy*

In fact, there has not been a single faculty evaluation submitted since March to address my performance in the six (6) ACGME core competencies during my latest rotations. In addition to my rotation from April (Endocrine Service), the Section of Plastic and Reconstructive Surgery, where I rotated in March and Dr. Song is Program Director, does not provide documented faculty evaluations of interns. The same happened in my earlier rotation through that service in October, and I have no documented evaluation at all from that month either.

2) The decision in the letter came in response to an e-mail [A4] I sent to Dr. Song the week before, where I asked him for an explanation of the disproportionately low number of clinical cases and clinical duties I had been given for now three (3) weeks in a row, since I never received a justification for them, and which I described in the main section of this complaint. In the e-mail I said that if I did not receive a satisfactory response, I would have no option but to file a complaint with the ACGME, as the training I was receiving fell far below the educational standards for a resident at my level of training.

The response I received to my legitimate concern was a removal from all clinical duties, citing an allegedly "disruptive and unprofessional" behavior from me, and the subsequent implementation of an "independent study program" under the supervision of Dr. Song himself, a measure I can only view as openly retaliatory. He also demanded that I stop sending

1

UCMC00006097

"demanding and harassing" e-mails, as he called my requests, in a further effort to intimidate me and to make me stay silent about the situation he is putting me through.

One of the specific reasons he alleged for this study program was my low score in the INSERVICE exam that is delivered to all Plastic Surgery residents across the nation, regardless of their level of training. However, back in February I had received assurances from my chief resident that *"[my] score will not be used in any way to penalize [me]"*, because *"this will be the first year the intern level has taken the test so a low score for anyone junior is more a reflection on [the Plastic Surgery program] as far as educational needs as we integrate the program"* [A5]. In addition, Dr. Song knew that I was informed only 2.5 months before that I was scheduled to take the exam, that I had not attended the Plastic Surgery Core Curriculum conferences during the academic year, as it is common practice for interns to regularly attend the ABSITE conferences instead.

3) Dr. Song claims that the "independent study program" is my last opportunity to earn credit for my internship year, even though I will not complete a full year's worth of clinical activities. I have been forced out of the standard clinical duties since March 27, but my rotation schedule has not been changed officially [A6], which means the record will show that I have completed clinical rotations that I in fact have not. Furthermore, I do not understand how two (2) whole months of "independent study" can count towards clinical credits; and, surprisingly, the Chair of the Department of Surgery has endorsed this decision, which means no instances within the University of Chicago are left to review it [A7].

As I have expressed to my Program Director, I am not here to receive a certification of completion; I am here to receive an education, and I do not feel I have received a fair treatment and that my educational needs are important to the University of Chicago. Even if I succeed in my pending Grievance Process, my experience will be far below the educational standards for a PGY-1 surgery resident, with 3 out of 11 months of my academic year with either no or drastically reduced clinical training, and a total of 5 months (October, March, April, May and June) without faculty evaluations at all. The latest decisions only confirm the overt intimidatory and retaliatory intent of the actions of my Program Director, and the willful negligence by the GME officers in addressing and correcting the situation.

Sincerely,

Maria Alexandra Artunduaga, M.D.
Plastic & Reconstructive Surgery Resident
University of Chicago Medical Center
Cell Phone: (617) 999-3735
martunduaga@gmail.com

2

UCMC00006098

**REFERENCES**

[A1] 2012_04_30_EMAIL          Email Dr. Song to Dr. Artunduaga
[A2] 2012_04_30_LETTER         Letter Dr. Song to Dr. Artunduaga
[A3] 2012_04_30_EMAIL_TRAIL    Email Trail Dr. Grossman, Dr. Artunduaga, Dr. Song
[A4] 2012_04_26_MAA_EMAIL      Email Trail Dr. Artunduaga, Dr. Roggin, Dr. Song
[A5] 2012_02_20_EMAIL_TRAIL    Email Trail Dr. Artunduaga, Dr. Dickie
[A6] 2012_05_01_SCHEDULE       Schedule Printout from New Innovations
[A7] 2012_05_01_EMAIL          Email Dr. Matthews to Dr. Artunduaga

3

UCMC00006099

# **EXHIBIT M**

Date: June 22, 2012

To: Resident Services, Accreditation Council for Graduate Medical Education (ACGME)

From: Maria Artunduaga, MD, PGY-1 resident in Integrated Plastic Surgery at University of Chicago

Re: Formal Complaint against University of Chicago Medical Center and Section of Plastic and Reconstructive Surgery

Dear ACGME Resident Services,

This formal complaint follows an earlier one I filed on April 27 against the University of Chicago Medical Center (hereafter referred to as "the Institution") and its Section of Plastic and Reconstructive Surgery (hereafter referred to as "the Section") on the issue of their use of intimidation and retaliation in response to residents' concerns, originating from Dr. David H. Song as Chief and Program Director of the Section, and the institutional failure to appropriately address such concerns within its hierarchy. This current complaint addresses a larger and more chronic set of issues I have been privy to during my time at this Institution, and which I believe should be a subject for further careful review by the ACGME. I group the issues in four (4) main categories:

I. **Resident education:**

- As a PGY-1 resident at the Institution, I was not provided with adequate educational opportunities, as ultimately evidenced by the number and types of cases I logged as junior surgeon during this year. My Program Director failed in his responsibility to make sure my educational needs were met.

II. **Resident evaluation:**

- The Section is chronically non-compliant with ACGME regulations regarding proper and objective evaluation of residents who rotate through the service.

III. **Disciplinary action:**

- The Institution lacks sufficiently clear and unambiguous guidelines for which types of academic and disciplinary actions are at the disposal of Program Directors for a given set of circumstances, and what specific rules govern each type of action chosen.
- The Section's final evaluation of the probation period it imposed on me lacked objective and measurable criteria for successful completion, contrary to ACMGE and institutional regulations.

IV. **Due process:**

- The Institution conducted a Grievance Process through a Housestaff Grievance Committee which failed to meet critical standards of impartiality, failed to ensure that potential witnesses would not be subject to intimidation or retaliation, and generally favored the interests of the Section throughout the process.
- The Dean of the Medical School and President of the Medical Center conducted a final review which further failed to meet basic standards of fairness and impartiality.

I am hereby providing the specific ACGME and institutional GME regulations that are relevant for the purposes of this complaint, as well as the evidence of non-compliance by the Institution and the Section.

1

UCMC00006231

## I. Resident education:

The ACGME Program Requirements for Graduate Medical Education in Plastic Surgery [1] clearly state:

> II.A.4. The program director must administer and maintain an educational environment conducive to educating the residents in each of the ACGME competency areas. The program director must:
>
> II.A.4.a) oversee and ensure the quality of didactic and clinical education in all sites that participate in the program;
>
> II.A.4.u) demonstrate that residents have generally equivalent and adequate distribution of categories and cases.

> Int.C.2.c) Clinical experiences appropriate to plastic surgery education should be provided in alimentary tract surgery, abdominal surgery, breast surgery, emergency medicine, pediatric surgery, surgical critical care, surgical oncology, transplant, trauma management, and vascular surgery.

Since early on in my residency, I received a differential treatment at the University of Chicago, originating in large part from my background as the only intern in the Department of Surgery who was an international medical graduate (from Colombia), the only resident in the Section of Plastic Surgery who received her medical education in a foreign language (Spanish), and who in addition did four (4) years of post-doctoral research work prior to beginning her residency program. Since the Institution failed to appropriately address the concerns of discrimination on the basis of national origin that I made since the second month of my internship, I have now filed a complaint before the EEOC which they are currently investigating. On the educational side, there are four (4) specific facts that evidence the differential treatment I received:

1) First, the overall distribution of rotations I completed was particularly poor:

July: Breast and Endocrine Surgery
August: Breast and Endocrine Surgery
September: Colorectal Surgery
October: Plastic Surgery
November: Thoracic Surgery
January: Vascular Surgery
February: Transplant Surgery
March: Plastic Surgery (first half), Night Float (second half)
April: Endocrine Surgery
May: Independent Study Program (non-clinical)
June: Independent Study Program (non-clinical)

In contrast, my Plastic Surgery co-intern's schedule was more diverse:

July: Plastic surgery
August: Thoracic surgery
October: Colorectal surgery
November: Hepatobiliary surgery
December: Oncological surgery
January: Anesthesia
February: Breast and Endocrine Surgery
March: Breast and Endocrine Surgery (first half), Night Float (second half)
April: Night Float
May: Transplant surgery
June: Vascular surgery

2

UCMC00006232

As can be seen, I was assigned to the Endocrine Surgery Service for 3 out of 11 months of training, and to Plastic Surgery for 1.5 months. I did not rotate through Anesthesia, Oncological Surgery and Hepatobiliary Surgery as my Plastic Surgery co-intern did, while she did rotate through all the services I did. Furthermore, as I stated in my first complaint, my Program Director used a retaliatory action against me after I complained to him about the inadequate number of junior surgeon cases I had received during the entire month of April (zero). Only three (3) hours after I submitted in person my first complaint to the ACGME on April 27, I received an e-mail from him which stated [2]:

> "Maria, I'd like to discuss with you your new assignment for May and June. Please meet in my office, J641, at 8am [Monday, April 30]."

Through a letter dated April 30 [3], Dr. Song communicated to me that he was withdrawing me from all clinical service for the last two (2) months of my internship year, and that my new assignment would be to complete an "Independent Study Program" under his supervision. The assignment consisted in making summaries of every chapter of Grabb and Smith's Plastic Surgery textbook, and he alleged that if I completed this task, he would then be able to certify that I had completed a year's worth of surgical training.

At the end of the first month of the study program, I e-mailed him an internet link where he could retrieve the summaries I had completed thus far, and he did not even go as far as acknowledging receipt of my message. Hence, I have received absolutely no supervision from him ever since he gave me the independent study assignment at a meeting we had in his office on May 7.

2) In addition to the issue of my rotation schedule, I was assigned to share rotations with other interns far more often than anyone else at the Department of Surgery. Namely, I had to share duties during the months of August, October, March, and April, i.e. four (4) months out of the nine (9) months of clinical training I actually received, when the average at my Institution is one (1) month or less. In particular, my co-intern at the Section of Plastic Surgery never had to share duties during any of her rotations throughout the year.

It is well known that sharing duties with another intern in a rotation has a significantly negative impact on the value of the educational experience. First, there tends to be a lack of clarity in the distribution of duties between the two interns, especially at the beginning of the rotation. This results in a higher likelihood of errors and misunderstandings, and a performance problem in one of the interns may unfairly reflect negatively on the other, as was very often the case with me. Second, and most important, each intern will have the opportunity to log a lower number of surgical cases than if he/she had rotated alone. This arrangement, especially when employed as often as it was in my particular case, goes against the ACGME Program Requirements for Graduate Medical Education in Plastic Surgery [1], which state:

> III.D. The presence of other learners (including, but not limited to, residents from other specialties, subspecialty fellows, PhD students, and nurse practitioners) in the program must not interfere with the appointed residents' education. The program director must report the presence of other learners to the DIO and GMEC in accordance with sponsoring institution guidelines.

3) As a direct consequence of both of the issues outlined above, I had a chance to log a remarkably low number and variety of surgical cases throughout my internship year, with only fifty-one (51) total cases logged in the ACGME Resident Case log system. Figure 1 below shows the total number of cases I logged each month, while Figure 2 shows the number of cases by type of procedure.

3

UCMC00006233



Figure 1: Distribution of logged surgical cases by month



Figure 2: Distribution of logged surgical cases by type of procedure

4

UCMC00006234

On Figure 1 it can be seen that I generally logged much fewer surgical cases on each month than the nine (9) that would typically be expected if I were to achieve a total number for the year of approximately 100. In particular, on the months of September (Colorectal) and April (Endocrine), I logged zero (0) cases, in addition to the "independent study" months of May and June. Further, in the months of October (Plastics), January (Vascular), February (Transplant), and March (Plastics), I logged a very low number of five (5) or fewer cases for the entire month.

On the side of the types of procedures I performed, Figure 2 shows that twenty-seven (27) of the cases I did as junior surgeon –more than half of my total of fifty-one (51)– correspond to only three (3) types of procedures, which is evidence of the remarkably poor variety of experiences I was assigned to as a whole. While I have not had access to national figures from the Accreditation Data System (ADS) on the typical number and variety of cases by other residents at my level of training, I am sure I must be far below the national average on both accounts, and most certainly below the number and variety of cases that my co-intern in the Section of Plastic Surgery at my Institution did. This must be interpreted as a failure by my Program Director to provide residents with a *"generally equivalent and adequate distribution of categories and cases,"* and even worse, I have learned that he himself actively ordered my chief residents to assign me a lower number of cases than to other interns. In the words of one of my senior residents in one of her evaluations during my probation period, after noticing the differential treatment I routinely received: *"many of her seniors are not giving her the opportunity to learn and instead just bypass her... I just don't think she was given the opportunity to be an intern."* [4]

Furthermore, on Figure 3 below, I provide my cumulative total number of cases as of each day of training of my internship year, compared to the total that would be expected if I were to achieve a total of 100 cases for the year. This shows how chronic the problem of lack of educational opportunities was, as I begin to fall below the expected average since only the third month of my training, and the trend only continues in an ever more pronounced fashion for the rest of the year.

**Cumulative Distribution of Surgical Junior Cases (2011-2012)**



Figure 3: Cumulative distribution of total cases logged

5

4) Finally, there was an issue with the type of preparation I received for the In-Service exam in Plastic Surgery that I took on March 1. At the beginning of my internship year, I was told by my senior residents at the Section that I would take the ABSITE test along with the General Surgery residents during the last week of January, as all previous Plastic Surgery interns had done before me. Accordingly, I was scheduled to attend the General Surgery conferences every Wednesday from 6:15am to 9:00am, which I did as the records at my Institution show. However, on December 1, as I was leaving the country for my 1-month vacation period, I suddenly learned from my Plastic Surgery co-intern (never directly from my Program Director) that we were inexplicably scheduled to take the In-Service exam in Plastic Surgery instead of the ABSITE [5]. No Plastic Surgery interns had ever had to take this exam before, and in recognition of that, my chief resident assured me by e-mail that *"[my] score will not be used in any way to penalize [me], so please do not be concerned that a lack of study time will be a detriment at this point."* [6] She further stated that *"this will be the first year the intern level has taken the test so a low score for anyone junior is more a reflection on us as far as educational needs as we integrate the program."*

This gave me less than two (2) months to prepare for the exam, a time in which I was not yet scheduled to attend the Plastic Surgery core curriculum conferences with the rest of the Plastic Surgery residents, so I was basically expected to study completely on my own. Therefore, not only did my program not give me timely and appropriate notice that I would have to take the much more specialized In-Service exam instead of the ABSITE, but it also did not put adequate educational resources at my disposal in order to help me prepare for it, not even any protected time beyond my clinical duties in order to allow me to study independently. In both January and February, I consistently logged close to the maximum of 80 hours/week at the hospital, which routinely left me with very little time for any type of activity besides my clinical work.

When the results of the In-Service exam came in on April 30, Dr. Song pointed out the low score I received in the exam (38/100) as part of his argument to dismiss me from all clinical duties that same day, contrary to the assurances I had received earlier from my chief resident. He used the score in order to justify my new assignment of an "independent study program" for the last two (2) months of my internship year, which consisted in making summaries of a textbook in Plastic Surgery.

6

UCMC00006236

## II. Resident evaluation:

The ACGME Program Requirements for Graduate Medical Education in Plastic Surgery clearly state:

> *V.A.1.a) The faculty must evaluate resident performance in a timely manner during each rotation or similar educational assignment, and document this evaluation at completion of the assignment.*
>
> *V.A.1.b).(1) The program must provide objective assessments of competence in patient care, medical knowledge, practice-based learning and improvement, interpersonal and communication skills, professionalism, and systems- based practice.*

As a PGY-1 resident, I rotated through the Section of Plastic and Reconstructive Surgery twice, first during the whole month of October, and then during the first two weeks of March. Unlike at my other rotations, I did not receive official evaluations of any kind from the Plastic Surgery faculty, and neither did any other intern who rotated through the service. In fact, the Section never provides faculty evaluations of interns at the completion of the rotation, in direct violation of ACGME as well as institutional policy.

At my Grievance Hearing of May 16, Dr. Song directly addressed this issue in front of a Grievance Committee, confirming that in fact his service does not provide monthly faculty evaluation of residents. He justified that practice by saying that the Section instead did an "intimate" semi-annual evaluation of residents, meaning that he understands that evaluation as being somehow interchangeable with the monthly faculty evaluations. However, the semi-annual evaluation is only an additional ACGME Program Requirement he must comply with:

> *The program must:*
> *V.A.1.b).(4) provide each resident with documented semiannual evaluation of performance with feedback.*

This makes it clear that Dr. Song in his role as Program Director lacks a fundamental understanding of the way the ACGME has meant for resident performance to be evaluated. From the Program Requirements it is clear that the two forms of resident evaluation in question have not been designed to be mutually exclusive, but rather to be complementary and in fact mandatory.

At the same time, the Grievance Committee heard and was evidently persuaded by Dr. Song's argument about the was his Section conducted resident evaluations, as they did not address the issue in their decision, nor did the Dean and the President of the Medical Center when they later reviewed the case. This makes the Institution complicit in the non-compliant evaluation methods employed by the Section.

7

## III. Disciplinary action:

The ACGME has clear regulations in regards to the establishment of institutional policies governing all aspects of resident status, and in particular the implementation of disciplinary action:

> *III.B. GMEC Responsibilities: The GMEC must establish and implement policies and*
> *procedures regarding the quality of education and the work environment for*
> *the residents in all programs. These policies and procedures must include:*
> *III.B.7. Resident status: Selection, evaluation, promotion, transfer, discipline, and/or*
> *dismissal of residents in compliance with the Institutional and Common*
> *Program Requirements.*

For this purpose, the Institution established GME Policy 11, *"Resident/Fellow Evaluation"* [7], which does explain in detail one type of non-disciplinary remedial action for residents, namely the *"Additional Professional/Performance Development"* program. The institutional policy, however, lacks clarity in some critical aspects of the remedial/disciplinary actions at the disposal of Program Directors. In particular:

- It ambiguously states that *"if the resident/fellow does not successfully meet performance criteria noted in the Additional Professional/Performance Development, the Program Director may address the issues in a disciplinary manner, including suspension, probation, failure to promote or termination, all of which is subject to review under the GME Grievance Procedure."*

  My Program Director interpreted the word "may" in this policy to mean that he was under no obligation to implement the non-disciplinary option first, and that he could place me directly under probation. In a November 2 letter to me [8] he uses the threat of placing me under probation and leaving a permanent negative mark on my professional record in order to try to force me to resign from the program. Given the serious implications of these actions, the institutional policy should have been much clearer in stating whether non-disciplinary remedial actions must be implemented first before disciplinary action can be considered.

- Specific rules for the conduct of probation are not laid anywhere within the policy, basically leaving it up to Program Directors to arbitrarily decide what the conditions of probation should be. If true, this would constitute a violation of ACGME Institutional Requirement III.B.7., quoted above.

  In order to verify this, I e-mailed Mr. Barry Kamin, the Institution's DIO, to ask him that specific question. My question and his answer in a May 3 e-mail to me were [9]:

  > Dr. Artunduaga: *"What are the specific rules for Probation that Program Directors and Residents/Fellows must follow?"*

  > Mr. Kamin: *"Answer: No specific rules"*

  The absence of rules for probation meant for instance that my Program Director was able to impose an arbitrarily short time for me to accomplish the goals of my probationary period. Initially, he set a period that went from November 15 until the *"second or third week of February"* [10] (with my 4-week vacation period in the middle), which meant the probation would only last 8-9 weeks, or approximately 2 months. Only after I requested for it to be extended did he agree to end it on the third week of March, making the extension appear as if it had only been done as a courtesy to me. In the end, my probation period of 86

8

UCMC00006238

working days was roughly what would be considered an acceptable minimum at other institutions that do have clear policies regarding the conduct of probation.

Another critical and even more serious problem with the absence of rules for probation concerns the criteria to be used for evaluation of its goals. At a minimum, I would have expected the criteria to conform to those of the less severe Additional Professional/Performance Development program:

> *"[The program] must state clearly the areas where performance improvement is needed <u>and the parameters by which successful completion of the Additional Professional/Performance Development plan will occur.</u>"*

Though my probation letter [10] did itemize ten (10) areas where performance improvement was needed, the "parameters by which successful completion of the plan will occur" were not stated. I consider this to be a serious omission by the Section, because it meant the faculty would later be able to use an arbitrary and subjective set of criteria at the end of probation in order to evaluate my performance in the specific areas for improvement, as they in fact did.

As part of the Grievance Process I initiated against Dr. Song and the Section, they submitted an evaluation grid to the Grievance Committee [11], which they claimed was the primary method of evaluation by which they decided I had failed at my conditions of probation. There are many problems with this table, which the Committee and later the Dean and President of the Institution failed to recognize, as follows:

- First, the Section had refused to share the table with me despite repeated requests. The table was even missing from a copy of my entire resident file that I requested and obtained from the Section's administrator on May 4. This was an overt violation of ACGME policy on resident evaluation, especially concerning a decision so crucial to my continuation in the Program:

  > *V.A.1.c) The evaluations of resident performance must be accessible for review by the resident, in accordance with institutional policy.*

  The table was actually not the only evaluative document that the Section had concealed from me when I requested a copy of my resident file. On May 8 they submitted a number of other documents to the Grievance Committee I had never been allowed to see before, to the point that I drafted a complete rebuttal statement to the Section's written documentation which included a table of all the documents that had previously been missing from my file [12]. This was only one notable instance of the Section's –and Dr. Song in particular– larger pattern of not allowing me timely access (or any access at all) to formal or informal performance evaluations that they had received about me. This common practice was also a violation of UCMC institutional policy (GME Policy 11 [7]):

  > *Each program will maintain a file from which completed evaluations for each resident/fellow may be accessed.*

- Second, as can be seen in the table, the evaluation of each of the 10 areas for improvement lacked any objective "parameters for successful completion." Rather, the analysis is completely anecdotal, relying on particular incidents and quotes from individual evaluations which may not reflect the true pattern that developed over the course of my probationary period. I must assume that given the general ACGME policy that *"the program must provide objective assessments of competence in patient care, medical knowledge, practice-based learning and improvement, interpersonal and communication skills,*

9

UCMC00006239

*professionalism, and systems-based practice,"* the evaluation of the conditions of probation must also follow from a series of quantitative "objective assessments" in the specific areas for improvement.

The Section's evaluation table is clear proof that their analysis did not follow that basic principle of resident evaluation. In fact, it followed instead a capricious pattern of quoting evaluations from the months were my overall performance was worst (November and March), and also of quoting a large number of informal reports (as many as ⅓ of all evaluations quoted in the table), many of which I was not allowed to see at the time and dispute their accuracy if I considered it necessary.

- Third, it is very important to note that a system of quantitative parameters was actually developed by the Section in order to specifically measure my performance on the 10 areas for improvement through weekly evaluations by my direct supervisors (senior residents and fellows). However, the Section arbitrarily decided to discard those numbers in their final evaluation, after accusing me of asking for "favorable reviews" and my evaluators of being "sympathetic" to my situation instead of providing their honest professional opinion in their weekly assessments. In the words of Dr. Park, my probation mentor, at the Grievance Hearing: *"I just didn't understand how some of her evaluations were actually that high."*

Contrary to Dr. Song's and Dr. Park's assertions, the other three (3) witnesses at my Grievance Hearing, Drs. Kaplan, Steppacher and Grieves –the latter a witness for the Section–, categorically denied that I asked them for favorable reviews. The Grievance Process showed that the dismissal by the Section of the numerical weekly evaluation data during my probation period amounted to an arbitrary decision without basis of fact.

Unlike the Section, who never went as far as plotting the data from my weekly evaluations, I did do so as part of my written arguments, and I am providing the summary of the data in Figure 4 below:



Figure 4: Weekly evaluations of probation criteria

10

UCMC00006240

I am providing this plot only to show that, while by my ninth week of probation (Dr. Song's original deadline) my average grades over the 10 areas for improvement were as high as 5.8/6.0 in the opinion of all of my evaluators, the Section's final evaluation table shows a completely opposite result: according.to the table, I successfully met only one (1) goal, partially met five (5) goals, and failed at four (4) goals.

The wide discrepancy between the results of Section's anecdotal and subjective analysis, and what the numerical data in my case shows, should be cause for concern about the standards or lack thereof that the Section uses, with the approval of the Institution, in evaluating a disciplinary measure as consequential to a resident's professional future as is probation.

11

UCMC00006241

## IV. Due Process:

The ACGME policy on grievances and due process states that:

> II.D.4.e) *Grievance procedures and due process: The Sponsoring Institution must provide residents with fair, reasonable, and readily available written institutional policies and procedures for grievance and due process. These policies and procedures must minimize conflict of interest by adjudicating parties in addressing:*
>
> II.D.4.e).(1) *Academic or other disciplinary actions taken against residents that could result in dismissal, non-renewal of a resident's agreement, non-promotion of a resident to the next level of training, or other actions that could significantly threaten a resident's intended career development*

The Institution's GMEC does have a version of such a policy as required by the ACGME (GME Policy 15 [7]). The Institution's Grievance Procedure has three (3) main stages:

1) Request for Reconsideration;
2) Review by Housestaff Grievance Committee; and
3) Review by Representatives of the Dean and Medical Center President

In my case, this entire process took place between March 29, when I submitted my Request for Reconsideration, and June 19, when the Dean and the President issued a letter affirming the adverse decisions by the Housestaff Grievance Committee. While on the surface the Grievance Procedure may seem to have been followed as written, several troubling incidents occurred during the process that make me question the Institution's fairness and impartiality in conducting it:

- Following the appointment of the Housestaff Grievance Committee, chaired by Ms. Krista Curell, the Institution's chief compliance officer, the Chair showed a marked favoritism towards the Section in adjudicating the pre-hearing petitions we both made before her. In one telling example, she denied a petition I had made to allow for the submission of a rebuttal statement to the Section's written arguments, saying the following in an e-mail dated May 1:

> *"The Committee will not entertain any pre-hearing objections by either side regarding the materials submitted prior to the hearing. The Committee will review all documents prepared by both parties and you will have an opportunity to respond to documents submitted by the Section during the hearing."*

After the May 8 submission deadline, however, the Section broke this ruling on May 10 by submitting a rebuttal statement to the Chair and asking for it to be forwarded to the rest of the Committee. I objected to this action on two (2) separate e-mails on that same day, as it openly violated the earlier directive by the Chair herself. The Chair, however, tersely stated in response: *"I am granting the request to file the two-paged memorandum submitted by Jane McAtee [the Section's legal counsel] to the Committee,"* without offering any compelling explanation for why she had decided to reverse her earlier ruling. While it is true that to compensate she did allow me to submit my own response, this incident showed her clear inclination towards ruling in opposite ways to the very same petition, depending on whether it was submitted by me or by the Section, in each occasion favoring the Section's own wishes and interests.

12

UCMC00006242

- As part of my list of witnesses for the Grievance Hearing, I had initially intended to include three (3) residents and two (2) fellows from other specialties, whom I had worked closely with in my rotations during my probation period. They all had a positive impression of my clinical abilities and had earlier expressed their willingness to speak in support of me in a Grievance Process should it become necessary.

  However, when the time came to contact my potential witnesses, one of the three residents quickly excused himself, while the other two strangely did not respond to my initial request. Only after my continued insistence they finally got back to me, expressing a surprising reluctance towards appearing at the Hearing, in contrast to the supportive attitude they had earlier shown to me. One of them finally admitted that she had been discouraged from appearing at the Hearing by the chief residents from the Department of General Surgery, who said that she should not intervene in a matter that was allegedly only a problem of the Section of Plastic Surgery. These intimidatory tactics ultimately served their intended purpose, since I did not succeed in convincing any residents at all to testify in support of me at the Hearing.

  On the part of the two (2) fellows I intended to call to testify, both of them did originally agree to appear at the Hearing. However, less than 24 hours before the Hearing, I received an unexpected phone call from one of them who said he would be withdrawing. While he was reluctant to explain to me the full motives of his surprising decision, he made clear that he was fearful of retaliation as a consequence of him appearing at the Hearing, especially as he was a foreign doctor working under a visa, as well as the sole breadwinner of his household. Also, he said he believed his testimony would most likely serve no useful purpose, as he claimed it was widely rumored at the hospital that the decision in my Grievance Process had already been made, and that the Hearing would be held only to comply with the letter of the GME policy.

- As for the Grievance Hearing itself, I will not provide a detailed account of the arguments as I am aware that the purpose of this complaint is not to ask for a ruling in my specific case. However, I must note that the Committee members made little or no reference to the written arguments of over 50 pages I had carefully prepared and provided to them, to the point I doubt they ever made any proper reading of them or took them into serious consideration. They also tended to accept most of the assertions of the Section's witnesses as true without ever asking them for specific evidence, while at the same time appearing deeply skeptical of the evidence I presented to them, even though unlike the Section, I had made a rigorous quantitative analysis of the data in my case. Finally, I found it quite suspicious that it took no more than exactly 38 minutes between the time the hearing ended at 4:00pm and the time I received an e-mail from the Chair informing me of the Committee's ruling to affirm the Section's earlier decisions not to renew my resident contract and to keep me under permanent probationary status [13].

- The last phase of the Grievance Process began on May 31 when I submitted my formal Request for Review to the Dean of the Medical School and the President of the Medical Center. As per the Institution's GME policy, this final review would be conducted by representatives of the Dean and the President who had played no role in the earlier work by the Grievance Committee, and who would recommend to them a final decision to make in the case.

13

UCMC00006243

This final review, which ultimately affirmed on June 19 the decisions by the Grievance Committee, lacked many of the basic characteristics of an independent, fair and impartial process. Among the most prominent failures were:

o  I received no acknowledgement whatsoever that my Request had been received and the Review was in fact underway. In my Request I made certain questions about the conduct of this part of the process that were not answered at the time.

o  When one (1) week later I was basically forced to send an e-mail again to ask about the status of the Review, I only received answers from the Section's lawyer (Ms. McAtee) and the Chair of the Grievance Committee (Ms. Curell), who only wanted to demand that I stop all communication with the Dean and the President, even though they would be personally responsible for the decision, and they had not yet appointed a representative to speak with me on their behalf. Since Ms. McAtee represented the interests of the Section as their legal counsel, and Ms. Curell had already ruled against me in this process, they could not legitimately represent the opinion of the President, the Dean, or their representative, who would allegedly be the only impartial arbiters I should have had to answer to in this part of the process.

o  I was never notified of the appointment of any independent representative who would be in charge of reviewing the documentation, and Ms. Curell further made the dubious claim that *"Dr. Polonsky [Dean of the Medical School] and President [of the Medical Center] O'Keefe will be conducting the grievance review."* [14] I find it highly doubtful that the President and the Dean themselves would have had the time to review the nearly 400 pages of documentation that both I and the Section had provided in this process, when they were not even able to find the time to acknowledge receipt of my original request to them in the first place.

o  Even though the Institution's Grievance Policy states that the Dean and the President would need to find whether the Committee's decision was *"supported by the facts presented at the Grievance Hearing,"* the chair of the Committee actually refused to collect the handouts and transcripts of the testimonies that both the Section and I presented at the Hearing. I explicitly objected to this way of conducting the Review, yet the Ms. Curell paid no attention to my concerns. Therefore, the final Review cannot possibly have taken into account the testimony presented at the Hearing, still another critical error in the conduct of this final stage of the process. Yet, the Dean and the President inexplicably asserted in their decision letter that the Committee's decision *"was supported by the facts presented at the Grievance Hearing."*

14

UCMC00006244

In conclusion, the overall educational experience I have had at the University of Chicago Medical Center and its Section of Plastic Surgery has fallen far below the high expectations I came in with at the beginning. I entered the program as an accomplished and highly regarded medical professional, both at the clinical and the research settings, recipient of numerous awards and with strong recommendations from surgeons and scientists at several prestigious U.S. institutions, to the point that the U.S. government granted me legal permanent residence under a National Interest Waiver as an alien of "extraordinary ability." I now leave the program after the most degrading and humiliating experience of my personal and professional life, an experience where I felt constantly underestimated and underappreciated, most shockingly at the instigation of my own Program Director, who had little regard for my educational needs and even less so for my rights as a resident. While I reevaluate and reorient my professional goals for the future, I hope the ACGME's action can be effective in guaranteeing a fair, positive and meaningful educational experience for all future residents who enroll at the Section of Plastic and Reconstructive Surgery at the University of Chicago Medical Center, in accordance with its own mission and established policies.

While I recognize that I am presenting numerous allegations of failure to comply with various ACGME regulations on the part of both the Institution and the Section, I believe each of them is serious enough to warrant separate and careful consideration. While I have tried to provide only the most essential evidence in order to support my claims, I have considerable additional evidence I can forward to you upon request. Please do not hesitate to reach me with any further questions, and I would greatly appreciate to receive notification on the progress of this complaint.

Sincerely yours,

Maria Alexandra Artunduaga, M.D.
Plastic & Reconstructive Surgery Resident
University of Chicago Medical Center
Cell Phone: (617) 999-3735
martunduaga@gmail.com

15

## REFERENCES

1. [ACGME_REQS]              360_plastic_surgery_07012009_f07012012.PDF
2. [2012_04_27_EMAIL]        Email from Dr. Song to Dr. Artunduaga, April 27, 2012
3. [2012_04_30_LETTER]       Letter from Dr. Song to Dr. Artunduaga, April 30, 2012
4. [2011_11_21_EVAL]         Fellows and Residents Evaluations vol 1. 2011-2012
5. [2011_11_28_EMAIL_TRAIL]  Email Trail Shenaq, Dr. Song, November 2011
6. [2012_02_21_EMAIL_TRAIL]  Email Trail: Dr. Dickie and Dr. Artunduaga, Feb. 21, 2012
7. [UCH_DOCUMENT_GME_POLICY_MANUAL] UChicago GME Policy Manual
8. [2011_11_04_LETTER]       Letter from Dr. Song to Dr. Artunduaga, Nov 4, 2011
9. [2012_05_03_EMAIL_TRAIL]  Email Trail: Dr. Artunduaga and Dr. Kamin, May 3, 2012
10. [2011_11_15_LETTER]      Letter from Dr. Song to Dr. Artunduaga, Nov 15, 2011
11. [2012_05_09_TABLE]       Section material for Grievance Hearing, May 9, 2012
12. [2012_05_14_MAA_LETTER]  Letter from Dr. Artunduaga to Committee, May 14, 2012
13. [2012_05_16_EMAIL]       Email Ms. Curell to Dr. Artunduaga, May 16, 2012
14. [2012_06_07_EMAIL_TRAIL] Email Trail: Ms. Curell and Dr. Artunduaga, June 7, 2012

16



THE UNIVERSITY OF
CHICAGO
MEDICAL CENTER

DEPARTMENT OF SURGERY
*Section of Plastic and Reconstructive Surgery*

MC 6035
5841 South Maryland Avenue
Chicago, Illinois 60637-1470
*tel*   773-702-6302
*fax*   773-702-1634

| | |
|---|---|
| **Meeting Name:** | Summary of evaluation with Dr. Maria Artunduaga |
| **Date:** | Wednesday, November 2nd, 2011 |
| **Time:** | 1:00 p.m. |
| **Location:** | J641 |
| **Participants:** | Dr. Maria Artunduaga, Dr. David Song, Dr. Julie Park and Akilah Williams |

Acknowledging that this was a very difficult meeting, we convened an urgent meeting with Dr. Maria Artunduaga after her most recent rotation on our service through the month of October. It was unanimous amongst the numerous evaluators across the Department of Surgery, particularly within our section, that the issues that Dr. Artunduaga has will be extremely difficult to correct within the time allotted during residency period. We all recognize that she is a pleasant, hard-working individual who most certainly is intelligent. However, the overwhelming issue was thematically agreed upon once again by all of the reviewers, including a 360 degree evaluation by a nurse practitioner who worked with her extensively.

It became very clear that during the month of October, while Maria had another intern on service who admittedly was not the strongest intern and perhaps added to the problem, performed far below what would be acceptable for an intern, particularly an intern in Plastic and Reconstructive surgery. Throughout the entire course of the month, Dr. Artunduaga failed to communicate properly and failed to efficiently organize a system of rounding and patient follow-up. Several times near misses were found, one in particular as it pertained to maintenance fluid, another as it pertained to drain management, where Dr. Artunduaga failed to recognize her errors despite being told multiple times to follow-up. These are thematically consistent with the evaluations Dr. Artunduaga received in the months of July, August and September where it was seen that "she frequently appeared disorganized, unsure of her knowledge and at times had an unsuccessful doctor/patient relationship." Another set of reviewers stated that "she is often frazzled when presenting patient issues, and it was very difficult to keep her organized and goal-oriented."

It was also found that she accidently sent a patient home with a picc line which was supposed to come out before discharge after multiple times of prompting. This was not fully realized by Dr. Artunduaga. Once again, while on our service, she failed to realize an issue of severe vaginal bleeding and tachycardia and did not appropriately notify senior residents. Another issue is where a patient had a supra-ventricular tachycardia and cardiology was consulted. She failed to follow up with this patient. The list continues with multiple sets of tests and lab that were incorrectly or not ordered. This is not just focusing on specific incidents, and I relayed to Dr. Artunduaga that if these incidents were isolated or if they were thematically different, we would have had a much different conversation of remediation. With all of these issues being

"AT THE FOREFRONT OF MEDICINE"

UCMC00006247

thematically universal when it came to her performance or lack thereof, it was quite clear to all of the reviewers that Surgery, and in particular Plastic and Reconstructive Surgery, just would not be the best fit for Dr. Artunduaga.

Regrettably, this is painful for all of us to discover and we have assured Dr. Artunduaga that we would like to move forward in every way possible to support her transition into another specialty or another program. We discussed the probability of probation, but we agreed that probation at this level would not lead to successful remediation and only lead to a permanent deleterious record in her portfolio, thus jeopardizing her future possibilities. I have relayed this to Dr. Artunduaga and have confirmed that she has understood them clearly. I also as a courtesy have given her 24 hours to decide whether she would like to proceed with probation or if she would like to consider a transition in her career where we would all be helpful. She has agreed to get back with me in 24 hours.

The meeting ended with Dr. Artunduaga stating that she recognized and understood these issues, yet being adamant that she has improved. This has further reiterated to us that she feels that she has improved, however, no one else in the entire section and across the department has recognized that fact. Once again, this was a confirmatory step for us, understanding the disconnect between her skill set, the understanding of the situation and the reality of the situation at hand. Regrettably, these things have come to fruition and I have relayed to her both my personal and our collective disappointment at the situation, and have once again relayed to her that we will do whatever is in our power to facilitate her transition. We have also allowed her to understand the grievance process as well and relayed contact information related to grievance if she so chose to move forward in that direction.

---

Dr. Maria Artunduaga

Dr. David Song

Akilah Williams

Dr. Julie Park

2012/Jun/22 08:26 - [[2011_11_04_LETTER]]x_song_to_dr_artunduaga.pdf]

UCMC00006248



THE UNIVERSITY OF
**CHICAGO**
MEDICAL CENTER

DEPARTMENT OF SURGERY          MC 6035
*Section of Plastic and Reconstructive Surgery*   5841 South Maryland Avenue
                                                  Chicago, Illinois 60637-1470
                                                  *fax*   773-702-6302
                                                  *fax*   773-702-1634

Dear Dr. Artunduaga:

It is my duty to inform you that, effective November 15, 2011, you are being placed on Probation. . You will remain on probation until the time when we decide whether you will be offered a contract for another year of training in the program. This decision was reached by the faculty members of the Residency Education Committee as a whole after a thorough review of your progress in the residency program. As you are aware from several prior meetings and discussions with me about your progress in the program, you have failed to satisfactorily carry out your responsibilities. We have outlined for you specific areas where your progress had to improve, and have provided you with opportunities for assistance and remediation. Despite those efforts, you continue to exhibit significant performance deficits related to the competency domains of Patient Care and Interpersonal Communication skills.

The specific competency domains in which significantly deficient performance rating are noted include Patient Care and Interpersonal and Communication Skills:

Patient Care

- Communicate effectively and demonstrate caring and respectful behaviors when interacting with patients and their families

- Gather essential and accurate information about their patients

- Make informed decisions about diagnostic and therapeutic interventions based on patient information, preferences, up-to-date scientific evidence, and clinical judgment

- Develop and carry out patient management plans

Interpersonal and Communication Skills

- Use effective listening skills and elicit and provide information using effective nonverbal, explanatory, questioning, and writing skills

- Work effectively with others as a member or leader of a health care team or other professional group

The following conditions must be met for you to continue in the Program:
1.

- Establishing and maintaining your workload
- Establishing successful doctor-patient relationships
- Following technical instructions in the operating room
- Improving organizational skills
- Understanding what should be prioritized
- Effectively communicating with faculty and staff
- Appropriate clinical decision making

AT THE FOREFRONT OF MEDICINE®

2012/Jun/22 08:39 ([2011_11_15_LETTER]dr_song_to_dr_artunduaga.pdf)

UCMC00006249

- Accepting responsibility
- Timely placing consult notes
- Understanding the plan and your role in the plan.

2. You are required to schedule and meet with Dr. Julie Park, acting in the role of Mentor, at least every other week. Dr. Park may elect to change the frequency and will provide updates to me on the progress being made to address performance issues.

Your performance during this probationary period will be formally reviewed throughout the period of your probation and by faculty during the second or third week of February. At that time a decision will be reached about whether you have met the conditions of this probation and whether you will be offered a contract for another year of training. You will be provided official notification not later than February 28, 2012.

Moonlighting is not allowed while on Probation. It will constitute a violation of probation, and may be grounds for dismissal from residency if you continue to fail to fulfill the applicable educational and clinical requirements of the graduate education and clinical training program in a professional manner, to our satisfaction.

The Grievance Policy is available on the GME intranet site.

It is our sincere hope that the actions required of you will result in a positive outcome and continuation in the program.

Sincerely,

David H. Song, MD, MBA
Program Director
Plastic and Reconstructive Surgery

I have received a copy of this document. I understand the actions required of me.

Maria Artunduaga, M.D                    11/15/2011

2012/Jun/22 08:39 ([2011_11_15_LETTER]dr_song_to_dr_artunduaga.pdf)

UCMC00006250

Weekly Evaluation of Maria Artunduaga, M.D.



Maria Alexandra Artunduaga
pgy1
Plastic & Resconstruction Surgery
SURG-GEN SURG Vascular
1/7/2012 to 1/13/2012

Evaluator
Irma Fleming
pgy3
Surgery

**OVERALL RATING**

*Please evaluate the trainee's performance of each component of clinical competence. Select the rating that best describes the trainee's skills and abilities. Identify the major strengths and weaknesses you have observed in the trainee's performance under the "comments" portion after each question.*

1   Did Dr. Artunduaga demonstrate the ability to correctly prioritize her work? Utilization of the comment box is strongly recommended.

| Yes | No | N/A |
|-----|-----|-----|
| ⦿ | ○ | ○ |

2   Was Dr. Artunduaga efficient in completing her work? Utilization of the comment box is strongly recommended.

| Yes | No | Shows improvement | Needs Help | N/A |
|-----|-----|-----|-----|-----|
| ⦿ | ○ | ○ | ○ | ○ |

**PATIENT CARE**

*FOR QUESTIONS 3-8, PLEASE RESPOND AS TO WHETHER DR. ARTUNDUAGA COMPLETED THESE DUTIES IN A TIMELY AND EFFICIENT MANNER.*

3   See consults and efficiently place notes. If not a duty of the junior resident on your service, please mark N/A.  Utilization of the comment box is strongly recommended.

| Exemplary | Superior | Very Good | Good | Could Improve | Deficient | N/A |
|-----|-----|-----|-----|-----|-----|-----|
| ○ | ○ | ⦿ | ○ | ○ | ○ | ○ |

4   Notify senior or attending regarding change of patient status or continuing decline. Utilization of the comment box is strongly recommended.

| Exemplary | Superior | Very Good | Good | Could Improve | Deficient | N/A |
|-----|-----|-----|-----|-----|-----|-----|
| ○ | ⦿ | ○ | ○ | ○ | ○ | ○ |

5   Gather and relay pertinent patient history and exam.  Utilization of the comment box is strongly recommended.

| Exemplary | Superior | Very Good | Good | Could Improve | Deficient | N/A |
|-----|-----|-----|-----|-----|-----|-----|
| ○ | ○ | ○ | ⦿ | ○ | ○ | ○ |

*We are working on her not getting flustered when delivering information or when given a task. I explained to her the importance of still having a sense of urgency, but also staying calm so she can organize her thoughts.*

6   Follow directions in ordering appropriate diagnostic studies and ancillary services.  Utilization of the comment box is strongly recommended.

| Exemplary | Superior | Very Good | Good | Could Improve | Deficient | N/A |
|-----|-----|-----|-----|-----|-----|-----|
| ○ | ⦿ | ○ | ○ | ○ | ○ | ○ |

7   Communicate effectively and demonstrate caring and respectul behavior when interacting with patients and their families.  Utilization of the comment box is strongly recommended.

| Exemplary | Superior | Very Good | Good | Could Improve | Deficient | N/A |
|-----|-----|-----|-----|-----|-----|-----|
| ○ | ⦿ | ○ | ○ | ○ | ○ | ○ |

8   At any time, did you have any concerns for patient safety? If yes, please describe.  Utilization of the comment box is strongly recommended.

| Yes | No | N/A |
|-----|-----|-----|
| ○ | ⦿ | ○ |

**INTERPERSONAL AND COMMUNICATION SKILLS**

(11 of 46)

UCMC00006251

*FOR QUESTIONS 9 & 10, PLEASE RATE HOW YOU FEEL DR. ARTUNDUAGA COMPLETED THESE DUTIES.*

9   Use of effective listening skills, eliciting and providing information using effective non-verbal, explanatory, questioning and writing skills. Utilization of the comment box is strongly recommended.

| Exemplary | Superior | Very Good | Good | Could Improve | Deficient | N/A |
|-----------|----------|-----------|------|---------------|-----------|-----|
| ○ | ⊙ | ○ | ○ | ○ | ○ | ○ |

10  Working effectively with others as a member or leader of a health care team or other professional group. Utilization of the comment box is strongly recommended.

| Exemplary | Superior | Very Good | Good | Could Improve | Deficient | N/A |
|-----------|----------|-----------|------|---------------|-----------|-----|
| ○ | ⊙ | ○ | ○ | ○ | ○ | ○ |

*Please provide feedback regarding other areas of concern and where you feel Dr. Artunduaga needs improvement. Also include positive feedback.*

Overall Comments:
Overall she is a typical intern, I just don't think she was given the opportunity to learn the nuances of internyear like we all have. She is able to be taught. I'm just concerned that given the bad publicity, many of her seniors are not giving her the opportunity to learn and instead just bypass her. She is a great and caring person, willing to learn and I have not seen her do anything that would threaten patient safety. I just don't think she was given the opportunity to be an intern.

Evaluation Submitted on 1/18/2012 7:14:20 AM EST.

(12 of 46)

2012/Jun/22 06:40 - ([2011_11_21_EVAL]probation_evaluations_1.pdf)

UCMC00006252

---------- Forwarded message ----------
From: Song, David [BSD] - SUR <dsong@surgery.bsd.uchicago.edu>
Date: Mon, Nov 28, 2011 at 9:05 AM
Subject: RE: Absite Exam
To: Deana Shenaq <dshenaq@uchicago.edu>
Cc: "Williams, Akilah [BSD] - SUR" <awilliam@surgery.bsd.uchicago.edu>

correct, but you will have to take our inservice exams in march (i believe)

hope you had a good thanksgiving

```
David H. Song, MD, MBA, FACS
Professor and Chief
Section of Plastic Surgery
Vice-Chair of Surgery
University of Chicago Pritzker School of Medicine
songd@uchicago.edu
http://twitter.com/dhsong
```

**From:** dshenaq@gmail.com on behalf of Deana Shenaq
**Sent:** Mon 11/28/2011 8:59 AM
**To:** Song, David [BSD] - SUR
**Cc:** Williams, Akilah [BSD] - SUR
**Subject:** Absite Exam

Hi Dr. Song,

I hope you are doing well. I wanted to ask whether Maria and I are required to take the ABSITE exam? Carmen Barr sent out an email to the general surgery residents stating that we (as plastics residents) do not take the exam as interns. Is this correct?

Thanks!
Deana

This email is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged and confidential. If the reader of this email message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is prohibited. If you have received this email in error, please notify the sender and destroy/delete all copies of the transmittal. Thank you.

UCMC00006253

From: **Sara Dickie** <sdickie@gmail.com>
Date: Tue, Feb 21, 2012 at 12:20 PM
Subject: Work hours plan for week of February 19-25
To: martunduaga@gmail.com
Cc: Justine Lee <justinebruin@gmail.com>, irma.fleming@uchospitals.edu

Hi Maria,

I've spoken with Irma regarding your work hours issue. Although studying for the inservice is important, being over hours is a bigger issue. We need to get you to 80 hours on average for the month of February. Currently, by your report you are 10 hours over for the month right now. This means that over this week and weekend you need to be at 70 hours.

Maria, this is not a suggestion or a request, this is a commandment.

Irma will speak with the Tranplant fellows and attendings to ensure everyone is aware that you must leave the hospital daily to make sure you are not over 70 hours this week. If you are told to leave, you must leave, there are no exceptions. The work will get done. As always, make an effort to be efficient in your work style this week so that as much is completed in the mornings as possible.

This will allow you to also have some time to study for your inservice. Again, your score will not be used in any way to penalize you, so please do not be concerned that a lack of study time will be a detriment at this point.

The most important thing is that we are adherent to the ACGME work hours rules.

If there is any problem with this plan, please contact me or Justine.

Thanks everyone,
-Sara

--
Sara R. Dickie, MD
Department of Surgery
Section of Plastic and Reconstructive Surgery
University of Chicago Hospitals

--

From: **Maria Alexandra Artunduaga** <martunduaga@gmail.com>
Date: Tue, Feb 21, 2012 at 9:42 AM
Subject: Re: Over hours
To: Sara Dickie <sdickie@gmail.com>
Cc: Justine Lee <justinebruin@gmail.com>

Thanks, Sara. I'm assuming not much can be done this week, the NP is on vacation and I'm covering the floor for her.

Regarding the exam, Deana and I were under the impression that we were taking the Absite during internship year. We found out back in December that we were signed out for the Inservice instead. If that's the case, we need to figure out a way the interns can make it to Core next year. The Neurosurgery residents have protected time, we

UCMC00006254

might be able to do the same.

Sent from my iPhone

On Feb 21, 2012, at 9:21 AM, Sara Dickie <sdickie@gmail.com> wrote:

Hi Maria,

Thanks for letting us know. We will work on a solution. Stay tuned, we'll have an update for you and a plan by the end of the day.

Rest assured though, that most of us never feel like we study enough. This will be the first year the intern level has taken the test so a low score for anyone junior is more a reflection on us as far as educational needs as we integrate the program.

-Sara

On Mon, Feb 20, 2012 at 8:21 PM, Maria Alexandra Artunduaga, M.D. <martunduaga@gmail.com> wrote: Guys,

I've been over hours for the past three weeks (82/84/84), I did mention it to my senior but things are so extremely busy in Transplant that we haven't come up with a good plan yet. My main concern is that I haven't been able to prepare for the Inservice as I'd like (Vascular was also very similar in terms of duty hours). Any advice?

-M

--
Maria Alexandra Artunduaga, M.D.
Plastic & Reconstructive Surgery Resident
University of Chicago Medical Center

--
Sara R. Dickie, MD
Department of Surgery
Section of Plastic and Reconstructive Surgery
University of Chicago Hospitals

20120Jiv22 06:44. (2012_02_21_EMAIL_dr_dickie_dr_artunduaga.pdf)

UCMC00006255

From: "Song, David [BSD] - SUR" <dsong@surgery.bsd.uchicago.edu>
Date: April 27, 2012 12:31:47 PM CDT
To: "Artunduaga, Maria [BSD] - SUR" <maria.artunduaga@uchospitals.edu>
Subject: Rotation change for May and June

Maria,

I'd like to discuss with you your new assignment for May and June.

Please meet in my office, J641, at 8am

DAVID H. SONG, MD, MBA, FACS
Cynthia Chow Professor of Surgery
Chief, Section of Plastic and Reconstructive Surgery
Vice-Chairman, Department of Surgery
The University of Chicago Medicine & Biological Sciences
5841 S. Maryland Ave. | Rm J641, MC 6035 | Chicago, IL 60637
Office: 773-702-6302
Pager: 1670

AT THE FOREFRONT OF MEDICINE®
http://www.uchospitals.edu
http://surgery.uchicago.edu/specialties/plastic
http://www.facebook.com/uchicagoplasticsurgery
Twitter: @dhsong

This email is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged and confidential. If the reader of this email message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is prohibited. If you have received this email in error, please notify the sender and destroy/delete all copies of the transmittal. Thank you.

2012/Jun/22 09:46  ([2012_04_27_EMAIL]dr_song_to_dr_artunduaga.pdf)

UCMC00006256



THE UNIVERSITY OF **CHICAGO** MEDICAL CENTER

DEPARTMENT OF SURGERY
*Section of Plastic and Reconstructive Surgery*

MC 6035
5841 South Maryland Avenue
Chicago, Illinois 60637-1470
*phone* 773.702.6302
*fax* 773.702.1634

April 30, 2012

Dr. Artunduaga;

This letter is to inform you that you I am making a new assignment for you for the completion of your internship year.

To summarize your status: We have decided not to offer you another year of training in our program. You have invoked a Grievance concerning non-renewal of your contract and that process is underway. Your rights under the ACGME and your contract are handled through that process. We have decided that due to your substantial deficiencies, you will remain on probation for the remainder of this year and, as a result, any clinical work would be supervised. You have invoked a Grievance for that decision.

We provided you with a clinical experience that would allow you to complete your internship year. This experience was done under heightened supervision due to the deficiencies that resulted in the non-renewal decision and the continuing probation. You have complained that this is an inadequate experience, is somehow discriminatory and is in violation of rights you claim to have. You have, surprisingly, stated that it is a "waste of your time." Yet, you have not fully participated in this assignment, coming late to morning rounds and skipping many morning rounds completely. This is disruptive to the program.

There is nothing that gives an intern any rights to any specific rotations or experiences.

It is my opinion that your assignment was an appropriate assignment and that you have been given adequate clinical and educational opportunities while assigned to the Endocrine Service. Your continued challenges to this assignment and accusations about the people involved are unproductive. We have provided you, repeatedly, with information about the reasons for your non-renewal and your probation.

You have continued to exhibit disruptive and unprofessional behavior. You have failed to fully participate in the Endocrine assignment. Thus, you have failed to meet the expectations of the program and the conditions of probation and we are prepared to terminate you now.

This letter is to inform you that we will give you one more chance to complete your internship year. Any further incidents of unprofessional behavior, insubordination, harassment, threats or dereliction of your responsibilities will result in your immediate

AT THE FOREFRONT OF MEDICINE

2012/Jun/22 09:45 (2012_04_30_LETTER[dr_song_to_dr_artunduaga.pdf)

UCMC00006257

termination from the program. Your rights will be addressed at the Grievance hearing and I ask you to stop sending demanding and harassing emails to me and others.

Your assignment beginning May 1 is to complete an independent study under my supervision. If you do that, we will be able to certify that you completed your internship year.

I hope that you take this opportunity to complete this year without further incident.

Sincerely,

David H. Song, MD, MBA, FACS
Cynthia Chow Professor of Surgery
Chief, Section of Plastic and Reconstructive Surgery
Vice-Chairman, Department of Surgery

2013Jun22 06:45 ([2012_04_30_LETTER]dr_song_to_dr_artunduaga.pdf)

UCMC00006258

Mr. Kamin,

Thanks for your answer. However, I still need to have clarity about the GME's policies on due process and disciplinary action, in accordance with ACGME Institutional Requirements:

II.D.4.e) Grievance procedures and due process: The Sponsoring Institution must provide residents with fair, reasonable, and readily available written institutional policies and procedures for grievance and due process. These policies and procedures must minimize conflict of interest by adjudicating parties in addressing:
II.D.4.e).(1) Academic or other disciplinary actions taken against residents that could result in dismissal, non-renewal of a resident's agreement, non-promotion of a resident to the next level of training, or other actions that could significantly threaten a resident's intended career

The grievance procedures have already been made clear to me, but the rules of due process have not. If the steps I outlined in my earlier e-mail to address academic issues do not have to be followed, then that would mean that there are really no rules of due process.

At the same time, if the institution does not set a minimum time for academic/disciplinary actions such as the Additional Professional/Performance Development Program or Probation, then that would mean an arbitrarily short time could be set, where the goals of the program could not possibly be met, and that would not be considered "fair" or "reasonable."

Finally, Probation is of course a type of disciplinary action that falls under Institutional Requirement II.D.4.e).(1). So, there must be a "readily available written institutional policy" governing it.

The answers to these questions are very important, both for me and for UCMC to be in compliance with ACGME requirements, so please double-check and let me know if you have more specific answers to the questions on GME policies I have.

Thanks,

MARIA ALEXANDRA ARTUNDUAGA, M.D.
Physician Resident, Plastic and Reconstructive Surgery
The University of Chicago Biological Sciences
5841 S. Maryland Ave. | Rm J-641, MC 6035 | Chicago, IL 60637, USA
Maria.Artunduaga@uchospitals.edu
Cell: (617) 999-3735
Pager: (773) 652-1363 (#3394)
Website: http://martunduaga.com

AT THE FOREFRONT OF MEDICINE®
http://www.uchospitals.edu
http://www.uchicagokidshospital.org
http://www.facebook.com/UChicagoMed
Twitter: @UChicagoMed

**From:** Kamin, Barry [UCH]
**Sent:** Thursday, May 03, 2012 9:49 AM

2012/Jun/22 05:45 -{[2012_05_03_EMAIL_TRAIL]dr_artunduaga_dr_kamin.pdf}

6/21/12 9:01 PM

UCMC00006259

**To:** Artunduaga, Maria [UCH]
**Subject:** RE: Questions regarding GME policy manual

**From:** Artunduaga, Maria [UCH]
**Sent:** Thursday, May 03, 2012 9:08 AM
**To:** Kamin, Barry [UCH]
**Subject:** RE: Questions regarding GME policy manual

Thank you Mr. Kamin,

The following are the conclusions I've gathered from GME Policy 11 concerning the steps for Resident/Fellow Evaluation:

1) Competency-based evaluation forms must be developed by the program and timely completed and submitted by faculty members and other supervisors.
2) Residents/fellows must receive timely feedback about their performance, and any review of evaluations with the resident/fellow must be documented.
3) For residents/fellows with academic or performance deficiencies beyond the norm for the respective PGY level, the Program Director may require a formal "Additional Professional/Performance Development Program," which is not disciplinary in nature and is not subject to the GME Grievance Procedure.
4) If the Additional Professional/Performance Development Program is not successful, the Program Director may then go on to take disciplinary action, which includes (in order of severity?) suspension, probation, failure to promote or termination. All of these are subject to the Grievance Procedure.

Please confirm whether these are the right steps, in order, and if I may have incorrect or missing relevant information. Assuming these are correct, here are my remaining questions:

-If the procedure above is not followed (i.e. individual steps are either skipped or not implemented correctly), would that then be considered a violation of academic due process?

Answer: No

-What is the minimum length of time required for an Additional Professional/Performance Development Program?

Answer: No minimum

-The only disciplinary actions described in the manual are Dismissal (Policy 10) and Non-renewal of Agreement (Policy 12). Probation is not described anywhere. What are the specific rules for Probation that Program Directors and Residents/Fellows must follow?

Answer: No specific rules

Thanks again for your time in answering my questions.

Sincerely yours,

2012Jun22_08:45 ([2012_05_03_EMAIL_TRAIL]dr_artunduaga_dr_kamin.pdf)

UCMC00006260

**MARIA ALEXANDRA ARTUNDUAGA, M.D.**
Physician Resident, Plastic and Reconstructive Surgery
The University of Chicago Biological Sciences
5841 S. Maryland Ave. | Rm J-641, MC 6035 | Chicago, IL 60637, USA
Maria.Artunduaga@uchospitals.edu
Cell: (617) 999-3735
Pager: (773) 652-1363 (#3394)
Website: http://martunduaga.com

**AT THE FOREFRONT OF MEDICINE®**
http://www.uchospitals.edu
http://www.uchicagokidshospital.org
http://www.facebook.com/UChicagoMed
Twitter: @UChicagoMed

**From:** Kamin, Barry [UCH]
**Sent:** Thursday, May 03, 2012 9:01 AM
**To:** Artunduaga, Maria [UCH]
**Subject:** RE: Questions regarding GME policy manual

Dr. Artunduaga,

If you have specific questions please forward those to me.

Thank you

**From:** Artunduaga, Maria [UCH]
**Sent:** Wednesday, May 02, 2012 6:55 PM
**To:** Simon, Michael [BSD] - SUR; Kamin, Barry [UCH]
**Subject:** Questions regarding GME policy manual

Dear Dr. Simon and Mr. Kamin,

I apologize I have to e-mail you again, but only you can give me an answer to this question. After reviewing the GME policy manual, I still have a few specific questions regarding general GME policies that I need to clarify, but not related to the rules of the Grievance Process. The manual says that the interpretation of all GME policies is a responsibility of the GMEC, yet Ms. Anne Duprey says that as counsel to the Grievance Committee, she can only answer questions directly related the Grievance Process itself. Could you please refer me to someone who can answer general questions about GME policies on behalf of the GMEC? These questions are not specific to my case, but I do need an official interpretation of some rules that do not seem very clear to me.

Thanks,

**MARIA ALEXANDRA ARTUNDUAGA, M.D.**
Physician Resident, Plastic and Reconstructive Surgery
The University of Chicago Biological Sciences
5841 S. Maryland Ave. | Rm J-641, MC 6035 | Chicago, IL 60637, USA
Maria.Artunduaga@uchospitals.edu
Cell: (617) 999-3735

2012/Jun/22 06:46 (2012_05_02_EMAIL_TRAIL)dr_artunduaga_dr_kamin.pdf)

6/21/12 9:01 PM

UCMC00006261

Pager: (773) 652-1363 (#3394)
Website: http://martunduaga.com

**AT THE FOREFRONT OF MEDICINE®**
http://www.uchospitals.edu
http://www.uchicagokidshospital.org
http://www.facebook.com/UChicagoMed
Twitter: @UChicagoMed

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This e-mail is intended only for the use of the individual or entity to which
it is addressed and may contain information that is privileged and confidential.
If the reader of this e-mail message is not the intended recipient, you are
hereby notified that any dissemination, distribution or copying of this
communication is prohibited. If you have received this e-mail in error, please
notify the sender and destroy all copies of the transmittal.

Thank you
University of Chicago Medical Center
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

UCMC00006262

CONDITIONS OF PROBATION

| Performance Goals | Goals successfully met | Documentation |
|---|---|---|
| 1. Establishing and Maintaining Workload | Partially | • See email from Dr. Dickie regarding transplant work hours in section 4<br>• See weekly evaluation question #2 regarding efficiently completing work assignments<br><br>Cardiovascular Surgery<br>Week 11/21/2011 – Eric Grossman<br>Nirja Mehta<br><br>Plastic Surgery<br>Week 3/1/2012 – Jonathan Bank<br>Grant Kleiber<br><br>• See weekly evaluation question #3 regarding efficiently placing progress notes<br><br>Cardiovascular surgery<br>Week 11/21/2011 – Kristy Todd<br>Nirja Mehta<br>Week 11/26/2011 – Nirja Mehta<br><br>Plastic Surgery<br>Week 03/01/2012 – Grant Kleiber<br>Week 3/10/2012 – Matthew Greives |
| 2. Establishing Successful Doctor-Patient Relationships | Yes | N/A |
| 3. Following Technical Instructions in the Operating Room | No | • See minutes from 03/12/2012 meeting with Maria regarding argument in the OR with Grant Kleiber in section 12<br>• See Julie Park's letter in section 2<br>• See evaluation comments |
| 4. Improving Organizational Skills and Understanding What Should Be Prioritized | Partially | • See weekly evaluation question #1<br><br>Cardiovascular Surgery<br>Week 11/21/2011 – Kristy Todd |

- 1 -

8010/Jul/22 08:27 [[2012_05_09_TABLE]Non-Renewal.pdf]

UCMC00006263

| | | |
|---|---|---|
| | | Week 11/26/2011 – Nirja Mehta<br>Nirja Mehta<br>Amy Durkin<br><br>Transplant Surgery<br>Week 02/01/2012 – Christine Trotter<br><br>Plastic Surgery<br>Week 03/01/2012 – Jonathan Bank<br>Grant Kleiber<br><br>▪ See email from Dr. Dickie regarding transplant work hours in section 4<br>▪ See evaluation comments<br><br>Transplant Surgery<br>Month of February – Michael Millis<br>Week 2/1/2012 – Christine Trotter<br><br>Plastic Surgery<br>Week 3/1/2012 - Jonathan Bank<br>Grant Kleiber |
| 5. Effectively Communicating with Faculty and Staff | No | ▪ See incidents with Drs. Jaskowiak, Tcrhy and Becker in section 4.<br>▪ See weekly evaluation question #9 regarding interpersonal and communication skills<br><br>Cardiothoracic Surgery<br>Week 11/21/2011 – Kristy Todd<br>Amy Durkin<br>Week 11/26/2011 – Carla Moreira<br>Nirja Mehta<br>Amy Celauro<br><br>Plastic Surgery<br>Week 03/01/2012 – Matthew Greives<br>Grant Kleiber<br>Jonathan Bank |

2012/Jun/22 06:47 ([2012_05_09_TABLE]Non-Renewal.pdf)

-2-

UCMC00006264

| | | |
|---|---|---|
| 6. Appropriate Clinical Decision Making | Partially | • See minutes from 01/25/2012 regarding Maria's exchange with a nurse in section 12 <br> • See Dr. Park's letter regarding Dr. Reid's discussion with neurosurgery nurses in from section 2 (4th page) <br> • See weekly evaluation <br><br> Plastic Surgery <br> Week 3/01/12 – Matthew Greives <br> Week 3/01 /12 – Grant Kleiber |
| 7. Accepting Responsibility | No | • See incidents from Drs. Jaskowiak, Tothy and Becker in section 4 <br> • See email from Dr. Dickie regarding transplant work hours in section 4 <br> • See evaluation comments regarding work hours <br><br> Transplant Surgery <br> Month of February – Dr. Millis |
| 8. Timely Placing Consult Notes | Partially | • See weekly evaluation question #3 regarding efficiently placing progress notes <br><br> Cardiothoracic Surgery <br> Week 11/21/2011 – Kristy Todd <br> Nirja Mehta <br> Week 11/26/2011 – Nirja Mehta <br><br> Plastic Surgery <br> Week 03/01/2012 – Grant Kleiber <br> Week 3/10/2012 – Matthew Greives <br><br> • See email from Dr. Dickie regarding transplant work hours in section 4 |
| 9. Understanding the Plan and Your Role in the Plan | No | • See minutes from 01/10/2012 meeting with Maria regarding Dr. Park patient with orthostatic values in section 12 |

- 3 -

2012/Jun/22 05:47 : (|2012_05_09_TABLE)Non-Renewal.pdf)

UCMC00006265

May 14, 2012

Dear Grievance Committee,

This document is my rebuttal statement to the written materials submitted by Ms. Jane McAtee on behalf of the Section of Plastic and Reconstructive Surgery on May 8. Though my petition to submit a rebuttal statement had been initially denied, I have now been given this opportunity in light of the fact that Ms. McAtee violated that earlier ruling, and I am hereby exercising that option.

As I contend in my written arguments, there is a serious and systematic mishandling of information about my performance stemming directly from Dr. Song, which I claim is not only a serious violation of academic due process, but also the root cause of the arbitrary decisions against me that eventually followed from that reprehensible conduct. Very clear and important evidence of that can be found by comparing the version of my entire personal file, which –at my request– I was given by the Section on May 4 and I included as part of my supporting evidence, in contrast to the materials submitted by the Section to the Committee on May 8.

I am hereby providing an itemized list of all the missing documents from my version of the file, which suggests the existence of some clear discrepancies I hope the Committee would take the opportunity to ask Dr. Song to explain at the hearing. The confirmation of these missing documents from my copy of the file would reveal that Dr. Song keeps an additional "secret" version of my file, not viewable by me, in violation of GME regulations that the Program maintain *a [i.e. one (1)] file*" that provides access to all resident evaluations. The list of missing documents, which anyone can independently verify, is as follows:

### Minutes from Faculty Meeting (3/26/12)

With this being such a crucially important evaluative meeting, which would decide my future in the Program, at least the minutes from the meeting should have been made available to me. I requested on numerous occasions to see supporting materials for the Section's decision, namely on 3/29, 4/24, and 4/27. I was denied on each of those occasions. Rules of due process on evaluation should clearly apply to this meeting and the documentation deriving from it, and it would be particularly important to comply with them in this case.

### Binder given to faculty (3/26/12)

Mentioned in both the meeting minutes and Dr. Song's Memorandum to the Grievance Committee, a copy of this binder *"detailing [my] entire intern year up until the meeting"* should have been made available to me as well, as supporting evidence of the exact information that the decisions made against me were based on. All indications are that this binder coincides with the "Packet #2" submitted by the Section on May 8, since its table of contents exactly matches the contents of the binder listed in the meeting minutes. However, this fact should have been made explicit by the Section. If that assumption is true, then many documents in that binder for the faculty were not made available to me when I was given a copy of my file on May 4, and those documents are listed in this table. This implies that the decision of the faculty was partly based on information never accessible for review by me, in violation of ACGME Program Requirement V.A.1.c), quoted at the end of this document.

### Table/Grid of specific Conditions of Probation (3/26/12)

I have some reservations about the authenticity of this table. In his statement, Dr. Song claims that at the meeting the faculty *"created a grid of specific areas where improvement was needed and reviewed each element, grading whether Dr. Artunduaga had met the goal."* The reasons for my skepticism about this account are:
* If this exercise was truly done as described, and such categorical conclusions were reached on each of the 10 areas of improvement, why was a simple list of the 10 areas and their grades not provided in the March 27 decision letter? That would have at least appeared to be a simple but powerful argument to justify the decision. However, the letter does not even mention that this method of evaluation was used at all, and the meeting minutes do not refer to this grid either.
* The list of 10 criteria and their final grade was never provided to me at any other point after March 27, despite repeated requests.
* As an additional evaluative statement, the table should have been provided to me upon request, or at the very latest with the copy of my file handed to me on May 4. I only learned about its existence on May 8.
I note that in order to address potential concerns about the authenticity of accounts from the all-important March 26 faculty meeting, I suggested that the Committee require at least two (2) PRS faculty members to independently sign on to the documentation, as proof that it contained a complete and accurate description of the discussion held at that meeting. My request was denied.

### Dr. Park evaluation (3/14/12)

This is yet another evaluative statement that violates due process regulations regarding evaluation. Never made available for me to review and discuss, in fact I was never made aware of the statement at all; as all documents in this table, it is missing from my copy of my file but on the other hand it was an integral part of the binder given to the faculty on March 26.
If I had been given timely opportunity for review and discussion, I would have pointed out that only a few accounts of incidents were true (three (3) to be exact, namely: abscess incision and drainage, Dr. Jaskowiak refill, forgot post-op orders), others were inaccurate (In-Service, duty hours, Dr. Reid's cases assignment, and coordinated dressing change); and some others were undocumented and unfounded "rumors" (Neurosurgery PA's or "interference with evaluation process"). Also, please, refer to the discussion below on conflicts of interest and acceptability of Dr. Park's evaluation as attending during my Plastic Surgery rotation.

### Minutes from meetings with Dr. Park (1/3/12, 1/10/12, 1/25/12, 2/6/12, 2/13/12, 2/28/12, 3/5/12, 3/12/12)

These eight (8) missing meeting minutes, added to the three (3) that were included in my copy of the file, improperly refer among others to an ongoing psychiatric treatment I was receiving. I consider this to be a breach of confidentiality in mentor-mentee relationship. In general, Dr. Park's roles as mentor who listens to my personal concerns and provides constructive advice, and evaluator of my progress under probation who would eventually recommend a specific action for the Section to take, were not clearly defined and separated. This is evidenced by the references in the minutes to matters outside the evaluative part of the meetings, which should not have been included due to their confidential nature. If I had known some personal concerns I shared with her would be mixed into her evaluative work, I would have never confided in her to discuss them.

UCMC00006266

# EXHIBIT N



ACGME

**Accreditation Council for**
**Graduate Medical Education**

August 2, 2012

615 N. State Street
Suite 2000
Chicago, IL 60654

Phone 312.755.5000
Fax 312.755.7498
www.acgme.org

David H. Song, MD, MBA
Chief and Director Plastic Surgery Residency Program
University of Chicago Medical Center
5841 South Maryland Avenue, MC 6035
Chicago, IL 60637

Barry L. Kamin, MD
Executive Director for Graduate Medical Education
University of Chicago Medical Center
5841 South Maryland Avenue, MC 1052
Chicago, IL 60637

Re: Program #3621600146 and #8001600119

Dear Dr. Song and Mr. Kamin:

The Review Committee for Plastic Surgery and the Institutional Review
Committee have reviewed Maria Artunduaga' s complaints alleging the
University of Chicago and its Plastic Surgery Program are noncompliant with
ACGME requirements. The review committees also reviewed your responses
of June 22, 2012, and July 25, 2012, respectively, with supporting
documentation. Both review committees judged there was no validity to the
complaints and will not pursue any further action related to the complaint.

The ACGME will close its file on the complaint, and the complainant will be
notified of the review committees' decision.

Sincerely,

Marsha A. Miller

Marsha A. Miller, MA
Associate Vice President
Office of Resident Services
312-755-5041
mmiller@acgme.org

cc:     Peggy Simpson, EdD, Executive Director, RC for Plastic Surgery
        Patricia Surdyk, PhD, Executive Director, Institutional Review
        Committee

**UCMC00006279**

# EXHIBIT O

**MEMORANDUM**

TO:      Mike Simon, M.D.
              Barry Kamin

FROM:   Jonathan Rothstein

RE:       M. Artunduaga, M.D., national origin discrimination complaint

-------------------------------------------------------------------------------------------------------

**INTRODUCTION**

On April 6, 2012, Maria A. Artunduaga, M.D., filed a grievance with the Housestaff Grievance Committee. Following a May 16, 2012 hearing, that grievance was denied, the reasons for which were communicated to Dr. Artunduaga by letter from the Grievance Committee Chair dated May 23, 2012. By letter dated May 31, 2012 to Dr. Ken Polonsky (Dean of the Pritzker School of Medicine) and Sharon O'Keefe (UCMC's President), Dr. Artunduaga requested review of the Grievance Committee's decision denying the grievance. By letter to Dr. Artunduaga dated June 19, 2012, Dr. Polonsky and Ms. O'Keefe denied Artunduaga's request for review.

Nowhere in Dr. Artunduaga's grievance itself nor in her case before the Grievance Committee did she allege discrimination based on national origin. Indeed, seven of eight grounds for review enumerated in Artunduaga's May 31, 2012 request for review do not expressly or impliedly allege national origin discrimination.

However, in her eighth ground for review, Dr. Artunduaga alleges that the Grievance Committee "[failed] to recognize the underlying causes of my particular situation." *See* Exhibit A at 2. In context and in substance, this was a complaint of national origin discrimination. Much of the narrative following Dr. Artunduaga's enumerated grounds for review pertains to her national origin (Columbian) and/or incidents thereof, for example, that English is her second

UCMC00004674

language, that she received her medical education and training in Latin America, and that she speaks with an accent. *Id.* at 3. More specifically, Dr. Artunduaga's May 31 appeal alleges:

- Dr. David Song and Dr. Julie Park have always insisted in equating my situation and expected rate of progress to that of other foreign medical graduates whose native tongue is English and who received their medical education in that language.

- Drs. Jaskowiak, Kaplan, Angelos, Hurst, Moreira [and others] including Plastic Surgery residents ... repeatedly claimed that my alleged inability to communicate, and specifically my accent, were significant factors in some of my performance problems.

- I have many complaints of discrimination on the basis of national origin, deriving in particular from comments and criticisms regarding my command of the English language, since as early on in my residency as August ....

Thus, at least by her May 31, 2012 request for review, Dr. Artunduaga had complained internally of national origin discrimination.[1] Whether that complaint was timely or otherwise proper under the GME Grievance Procedure is a question I need not answer, because shortly thereafter Dr. Artunduaga filed a charge of discrimination on or about June 12, 2012 with the U.S. Equal Employment Opportunity Commission (EEOC). In that charge, Artunduaga recounts her personal and educational history, noting that she was one of two incoming Plastic and Reconstructive Surgery residents matched to UCMC.[2] Artunduaga further notes that, out of 18 Residents in the Department of Surgery, she was the only one whose first language was not

---

[1] I found during the investigation that Artunduaga had not before this point complained to Drs. Park and Song (nor to the attending doctors I interviewed or to GME management) about national origin discrimination. Although I have reviewed extensive written communications by Dr. Artunduaga contesting numerous evaluations of and other comments regarding her performance, none of those alleges national origin discrimination. Even in connection with the May 2012 hearing on her grievance (during which Dr. Artunduaga complained regarding her probation, her contract non-renewal, her evaluations and assignments, even the grievance process itself), she failed to attribute her complaints and/or her treatment by others to her national origin. Finally, in my own meetings with Dr. Artunduaga, she did not complain of discrimination based on national origin. Rather, she attributed the claimed harassment she was experiencing from Dr. Song to be retaliation for his having filed a grievance against him under the provisions of the GME Handbook.

[2] Although not noted in her charge, Dr. Artunduaga was in fact heavily recruited by Dr. Song. *See* below at p. 9.

2

UCMC00004675

English and who had trained in a non-U.S. medical school, as well as the only resident of 12 in the Section of Plastic and Reconstructive Surgery who had received medical training in a language other than English.

Dr. Artunduaga goes on to allege in her charge that:

- I was "throughout my employment" treated less favorably than other Residents not from Columbia. From the beginning of my residency, I received considerably fewer surgical cases and fewer assignments than other, non-Columbian residents.

- In August 2011, Dr. John Seal, Chief Resident, criticized my "communication skills," and specifically referred to my accent (quotation marks by Dr. Artunduaga).

- Throughout my employment, my co-residents mocked my accent and made derogatory remarks and jokes about my Columbian heritage.

- [S]everal supervising doctors ... claimed that my foreign medical education, "cultural issues" and/or my accent were detrimental to my performance. For example, ... Dr. Nora Jaskowiak stated in an evaluation of my work that "there seem to be some critical issues that may be cultural." Similarly, in September 2011 Dr. Roger Hurst stated in an evaluation ... that because the "routines and customs" where I trained "are not necessarily known to us ... make[s] it more difficult to assess her overall capabilities so early in her residency" (quotation marks by Dr. Artunduaga).

- While many of my supervisors made an honest assessment that my language and cultural background may have been an important factor in my perceived performance issues, there was a generalized lack of sensitivity to my background which was wrongly interpreted as a lack of basic medical competence.

- On March 27, 2012 Respondent informed me that it would not renew my contract for a second year of employment. ... [In April 2012], I complained to Dr. Simon, Dr. Kamin and Dr. Matthews regarding Dr. Song's direct orders to my chief resident, Dr. Eric Grossman, to discriminate against me during my Endocrine Surgery rotation in April.

After reviewing extensive background materials including most of the exhibits attached hereto, I further investigated Dr. Artunduaga's discrimination complaint by interviewing over a dozen

3

UCMC00004676

witnesses over the course of a month, beginning on July 11, 2012.[3] My investigation took the time it did not only because of the volume of documentation, but also due to the various doctors' schedules and availability during the summer.

I specifically interviewed Dr. David Song, Vice Chair of the Department of Surgery, Director of the Residency Program, and Chief of the Section of Plastic and Reconstructive Surgery; Dr. Sara Dickie, who had recently completed her residency in Plastic and Reconstructive Surgery (during the last year of which she was Co-Chief Resident); attending Dr. Nora Jaskowiak, Associate Professor of General Surgery and Director of the Breast Surgery Oncology Program; attending Dr. Mark Ferguson, Head of the Thoracic Surgery Service, Director of the Residency Program in Cardiothoracic Surgery, and a full Professor in the Department of Surgery and University of Chicago Cancer Research Center; Dr. Irma Fleming, a resident with whom Artunduaga worked several times, principally on the vascular and thoracic sections in early 2012. Barry Kamin, Executive Director for Graduate Medical Education; Dr. Carla Moreira, a fifth year General Surgery resident; attending Dr. Julie Park, Assistant Professor of Surgery and a specialist in reconstructive microsurgery and breast reconstruction; attending Dr. Konstantin Umanskiy, Assistant Professor of Surgery whose specialty is colorectal surgery; attending Dr. Roger Hurst, full Professor of Surgery who also specializes in colorectal surgery; Dr. Justine Lee, former senior resident in Plastic and Reconstructive Surgery who graduated in 2012; Dr. Michael Simon, the Chair of Graduate Medical Education; Dr. Eric Grossman, now on staff at Lurie's Children's Hospital of Chicago, having completed his residency in June 2012; and Dr. Jeffrey Matthews, Chair of the Department of Surgery, Professor of Surgery, and Dean of Clinical Affairs for the Biological Sciences Division.

---

[3] I contacted Dr. Artunduaga and asked her to meet with me to be interviewed regarding her charge; she declined.

4

UCMC00004677

## GENERAL FINDINGS AND CONCLUSIONS

I have investigated all allegations directly or indirectly related to actual or potential national origin claims, as set forth in Dr. Artunduaga's above-mentioned request for review and in her EEOC charge. For the reasons detailed below, I find these allegations to be without merit in that they do not evidence adverse action or a hostile work environment based on Dr. Artunduaga's national origin. The record reviewed suggests that, in the early part of her residency, some patients complained about (among other things) Dr. Artunduaga's accent. Some of these complaints may have been related to Dr. Artunduaga by the attending/supervising doctors. Others were related to Dr. Artunduaga by the then-chief resident or other supervising senior residents, and/or by her fellow residents. In no instance, however, did an attending doctor link Dr. Artunduaga's accent to that doctor's evaluation of her performance.[4] Indeed, no attending doctor received complaints about Artunduaga's accent, nor did they themselves have difficulty with or objections to her accent. (As detailed below, however, each of five attending doctors who evaluated Artunduaga found her communication skills to be deficient in that they were abrupt, disorganized, confrontational, argumentative, and/or unresponsive to questions posed by those doctors and by others.)

Whether Dr. Artunduaga has intentionally conflated feedback about communication deficiencies with second-hand comments about her accent, or whether she genuinely believes that others were alluding to her (self-acknowledged) accent when they were in fact addressing other communication issues, I cannot and need not decide. It is true that two attending doctors commented on Dr. Artunduaga's cultural and/or educational background in evaluating her

---

[4] Throughout her residency, Dr. Artunduaga denied any difficulties understanding or communicating in English. Moreover, as detailed below at p. 15, it was Dr. Artunduaga herself who raised the subject of her accent, and immediately thereafter indicated that it was a non-issue after the first few months of her residency.

5

UCMC00004678

performance. *See* below at pp. 9-12. In context, however, it is clear that those comments reflected efforts to better understand Dr. Artunduaga's performance shortcomings -- attempts to get at the root of those shortcomings and thereby help her succeed in the residency program. Moreover, these comments were made in August and September 2011, long before the decision was made in late March to non-renew her contract. Between September and March, Artunduaga was evaluated by at least four (4) other attending doctors, all of whom rated her performance as sub-standard, particularly for residents on the demanding Section of Plastic and Reconstructive Surgery.

Each of those attending doctors further observed and recorded other deficiencies in Dr. Artunduaga's performance as a surgeon. During and since her UCMC residency, Artunduaga has contested these assessments, blaming her co-residents, her circumstances, the evaluators themselves, or some combination of the above. However, Dr. Artunduaga's many arguments do not change the myriad specific mishaps and mistakes that at least five (5) attending doctors attributed to Artunduaga. Nor do they establish that those attributions were motivated by Artunduaga's national origin. To the contrary, as Dr. Julie Park observed in her findings at the end of Artunduaga's probationary period, Artunduaga's numerous quarrels with others' evaluation of her performance served mainly to confirm the conclusion reached by Dr. Park and others: that Artunduaga spent more time and effort arguing than she did listening and learning.

As detailed below, I conclude that Dr. Song's decision to place Dr. Artunduaga on probation (and then to extend that probation at Artunduaga's request) was based not on any animus against her as a Columbian or South American, nor on her non-native education and medical training, but rather on his view (together with that of all 5 evaluating attending doctors) that: (1) Artunduaga's performance was sub-standard for a first-year surgical resident, especially

6

UCMC00004679

one in Plastic and Reconstructive Surgery; (ii) her performance failed to improve materially during her probationary period in the eyes of most attending surgeons; and (iii) she was unlikely to succeed in subsequent years as a Plastic Surgery resident. Accordingly, the decision in late March not to renew her contract was likewise legitimate.

Particularly relevant in these latter regards (probation and contract non-renewal) are the written evaluations and other correspondence of Dr. Park, together with the information Dr. Park provided when I interviewed her. *See* below at pp. 14-15 and 18-21. For the reasons detailed below, I found Dr. Park to be credible and fair-minded. As Dr. Artunduaga's assigned mentor, she had the incentive, desire, and ability to help Dr. Artunduaga succeed. Their weekly meetings during Dr. Artunduaga's probationary period were plainly intended to assist Artunduaga in:

- better understanding the negative feedback she had received (and continued to receive);
- taking affirmative steps to gain needed surgical experience; and,
- receiving more favorable evaluations and other feedback based on improved performance.

Instead of taking these meetings and Dr. Park's feedback in the constructive manner in which they were intended, Dr. Artunduaga rejected Dr. Park's recommendations – both during their meetings and in service thereafter. She argued with Dr. Park again and again, verbally and in writing. She also failed to heed Dr. Park's advice regarding needed experience working with particular surgeons and procedures. And, instead of working on the suggested ways to improve her surgical skills and abilities and professional demeanor (especially with patients but also with co-workers) – and to thereby receive improved evaluations - Artunduaga lobbied attending physicians and others to evaluate her favorably so she could retain her place in the program. By so doing, she undermined the favorable evaluations she did receive, at least in Dr. Park's

7

UCMC00004680

unbiased eyes.[5] All of which led Dr. Park to conclude on March 14, 2012 that Dr. Artunduaga did not meet "the level of excellence that we as a section expect from our residents." Exh. 1 at 2.

It was this unbiased conclusion, more than any evaluation or comments therein (or comments from other physicians or non-physicians) or anything else, that led Dr. Song – together with the rest of the faculty – to decide not to renew Dr. Artunduaga's contract. That decision, therefore, was consistent with the law (specifically Title VII) and UCMC policy.

The matter of allegedly discriminatory assignments thereafter is mostly academic (unless those allegations are substantiated by facts establishing some form of post-discharge hostile environment or retaliation). As detailed below, however, I find those allegations to be both unsubstantiated and immaterial.

## ADDITIONAL FINDINGS AND CONCLUSIONS[6]

### Factual Findings

1.     Dr. Artunduaga's residency at UCMC was preceded by an impressive, indeed extraordinary, record of accomplishments, even for those admitted to UCMC's surgical residency program. Having been born in Columbia, Artunduaga's first language is Spanish. She attended medical school in Columbia but spent her final year on clinical rotations at Harvard

---

[5] Although I reviewed all those evaluations, I have not detailed them herein because none came from attending physicians under whom Dr. Artunduaga worked for an extended period. (Most came from fellow residents, LPNs, and physicians assistants, as did many mostly negative evaluations likewise not detailed herein.) I have, however, addressed below evaluations completed by Dr. Fleming, a fellow resident whose evaluations Artunduaga referenced at various junctures as demonstrative of her performance.

[6] I have endeavored to list additional Findings and Conclusions below in chronological order. So as to organize my remarks and discuss fully the comments of individuals I interviewed, however, I have also organized the findings and conclusions below largely by the witnesses I interviewed – more specifically, in the point in time at which each witness had his/her greatest level of interaction with Dr. Artunduaga. Those who interacted with her at multiple junctures (e.g., Drs. Song and Fleming) presented organizational challenges. I have endeavored to surmount those with cross-references and other means. Some redundancy as to events was unavoidable, however. To the extent these narrative Findings and Conclusions contain any material omissions, those are addressed in the evaluations and other written communications attached hereto as exhibits, including but not limited to Dr. Park's 3/14/12 report to Dr. Song (Exh. 1).

8

UCMC00004681

Medical School, Mount Sinai Medical Center, Baylor College of Medicine in Houston, and the University of Washington in Seattle. She next completed post-doctoral work in human genetics at Harvard Medical School.

2.    In March 2011, Dr. Artunduaga was the sole non-U.S. medical graduate to be chosen through the National Residency Match Program for an integrated program in Plastic and Reconstructive Surgery (from a pool of more than 300 candidates). She was one of only two residents matched to (chosen for) UCMC's residency program that year. In May 2011, Artunduaga obtained permanent U.S. residency through a National Interest Waiver from the federal government, which recognized her "extraordinary ability" in the scientific field based on her post-doctoral work in genetics at Harvard.

3.    Dr. David Song was instrumental in Dr. Artunduaga's being chosen for the program. As noted above, Song heads UCMC's Residency Program and is the chief of the Section of Plastic and Reconstructive Surgery – Dr. Artunduaga's chosen specialty. As he explained when I interviewed him on July 11, 2012, Song recruited Artunduaga, interviewed her himself and saw to it that the entire section did so as well.

4.    Dr. Song is originally from Korea.

5.    Under Dr. Song's leadership, UCMC's Residency Program is notably diverse: approximately half of the residents are women; perhaps more saliently, approximately one-third were born outside the U.S.[7]

6.    Dr. Artunduaga's residency at UCMC began in June 2011. Several months into her residency, Dr. Song concluded that Artunduaga was not succeeding. She had communication

---

[7] In 2011–2012, UCMC residents hailed from Iran, Israel, Germany, Scotland, and Columbia, among other places outside the U.S.

9

UCMC00004682

difficulties with patients and her fellow residents, and had received critical evaluations from several attending doctors.[8]

7.     Dr. Artunduaga spent the early part of her residency working under Dr. Nora Jaskowiak.  *See* Exh. 3 (Jaskowiak evaluation for the period 6/24/11 to 8/31/11).  Dr. Jaskowiak evaluated Artunduaga as needing improvement in five regards:  (1) pre-op, (ii) ability to communicate/justify medical decisions, (iii) preparedness, (iv) relations with other healthcare professionals, and (v) documentation of practice activities.  *Id.* at 1-2.  In the overall written comments section of her evaluation, Jaskowiak stated:

> Maria spent over two months on our service and it was fairly challenging.  Many issues arose – with communication, with clinical care, with technical OR skills.  These have been brought to the attention of Dr. Song.  Bottomline – she is very smart and very sweet.  And she works hard.  There seem to be some critical issues that may be cultural – as she has not worked in the American medical system before.  She often did not seem to understand completely what the plan was or her role in the plan.  Also, she is so eager to do well and to improve that she is constantly "diving forward" without even fully listening to what is being recommended.  This occurred technically in the OR and also on rounds.  Steps are being taken to address these issues.

*Id.* at 2.

8.     When I interviewed her, Dr. Jaskowiak credibly explained that her reference to Artunduaga's performance shortcomings as potentially "cultural" was more hope than conclusion.  She explained that Artunduaga's difficulties did not derive from English being her second language; Jaskowiak understood Artunduaga and (Jaskowiak believed) vice versa.  According to Jaskowiak, however, Artunduaga did not know when or how to communicate – neither with patients nor her co-workers.  During our interview, Dr. Jaskowiak provided concrete

---

[8] Dr. Song spoke with Dr. Artunduaga on numerous occasions, including in October 2011 when she was in Plastic and Reconstructive Surgery service.  *See* Exh. 2, Summary of Evaluation dated 11/2/11.  For Dr. Song, the difficulty in communicating with Dr. Artunduaga was not her accent; rather she came across as argumentative and disorganized.  *Id.*

10

UCMC00004683

examples of how Artunduaga's communication style and manner impacted patient care. For example, she recounted an incident after Dr. Song had performed bilateral mastectomies. The patient later became distraught, whereupon Artunduaga told her to "get her act together," that she was "being a wimp about the pain" and was "going to be discharged that day" (which was not the case). Jaskowiak had to spend considerable time calming the patient and her husband, and it was agreed that Artunduaga would not treat the patient further. Artunduaga said at the time she thought she had done the right thing: that patients were to be discharged promptly. According to Jaskowiak, however, by communicating with the patient as she did, Artunduaga showed no insight regarding sensitivity or the need to be kind at the appropriate time. Separately, Jaskowiak explained that Artunduaga's confrontational approach manifested in the OR: she would "dive" into surgery without listening to Jaskowiak – literally "lunging" into tissue. In Jaskowiak's view Artunduaga wanted to come across as aggressive, not realizing she was being cruel to patients. At the conclusion of our interview, Dr. Jaskowiak said it had been an "incredible gift" (to Artunduaga) to let her finish her first year of residency.

9.  Throughout September, Dr. Artunduaga worked under Dr. Roger Hurst who evaluated Dr. Artunduaga as needing improvement in three categories:

- Pre-op care (formulates appropriate plan/assessment of details),
- Able to communicate/justify medical decisions), and
- Ability to lead/manage a service.

According to Hurst, this was one of the worst evaluations he has given in 20 years of teaching general surgery. He communicated his assessment to Dr. Song last fall, telling him that Artunduaga was not up to the standards of Plastic Surgery residents generally.

Exh. 4 at 2.

10.  Dr. Hurst's written comments in his evaluation of Artunduaga state:

11

UCMC00004684

> When Maria started the rotation it was clear that she was less prepared than her peers. Specifically she was less independent and was less aware of the routines of running the service. It is not clear whether this was due to a deficiency in competence or just a result of necessary adjustments to a different system. Given that she was trained where the routines and customs are not necessarily known to us, this is to a degree understandable, but it does make it more difficult to assess her overall capabilities so early on in her residency. She was always very hard-working and attentive. There were no deficiencies in this area. She followed directions and sought to improve her performance.

Exh. 4 at 2.

During our interview, Dr. Hurst credibly explained that his comments were based in part on his own background: he had taught in Hong Kong for a year, and was thus sensitive to the position of students whose first language is not English. Dr. Hurst's other explanation for his comment about "routines and customs not necessarily known to us" (which explanation I also credit) was that standard surgical procedures are, in fact, different outside the U.S. He explained, for example, that following abdominal surgery, if there is drainage from the wound, the standard U.S. procedure is to probe the wound to determine whether surgical repair is needed. In Hong Kong, by contrast, the standard instead is to leave the wound untouched and keep the staples in longer, accepting the possibility of hernia but believing the less invasive procedure to be the better one.

11. In light of the above Findings 9 and 10, I further find that the comments in Dr. Hurst's written evaluation reflect no animus against Dr. Artunduaga based on her national origin, her accent, or her medical training outside the U.S. On the contrary, I find that Hurst – by his comments and by evaluating Artunduaga as he did (with 3 areas needing improvement instead of more) – was in fact trying especially hard to be fair. Although apparently not recognized as such by Artunduaga, Hurst's comments reflect precisely the sort of positive cultural awareness Artunduaga wanted at UCMC but now claims she was denied throughout her residency. *See* above Finding 10.

12. Dr. Artunduaga also worked with and was evaluated by Dr. Konstantin Umanskiy, an Assistant Professor in the Department of Surgery. Artunduaga worked under Umanskiy in the colon and rectal surgical service, Umanskiy's specialty. Towards the end of September, Umanskiy met with Artunduaga and provided her formal feedback. (Exh. 5). The next day, September 28, Umanskiy emailed Dr. Song his assessment of Artunduaga's performance. Umanskiy noted that Artunduaga was "eager and interested in learning surgery." (*Id*). He further noted she had improved in patient care and communication skills over the month. He went on, however, to note "several areas of concern":

1. Dr. Artunduaga appears to have difficulty keeping up with the workload. She frequently appears disorganized, unsure or [sic] her knowledge, and excessively talkative at times.

2. She was not able to establish successful doctor-patient relationships with the patients on the wards. At times this led to miscommunication between her and the patients.

3. In the operating room she had difficulty with following instructions and required frequent prompting as to her role and assignment during the case.

In summary, I have major concerns that Dr. Artunduaga's performance is significantly below that of a typical resident in general or plastic and reconstructive surgery at the University of Chicago. While I believe that she's capable of addressing the criticisms presented above, she may not be able to achieve a level of performance that we expect from our residents.

*Id.*

13. Dr. Umanskiy was born and raised in the former Soviet Union; his first language is Russian. Like Dr. Artunduaga, he began his medical training outside the U.S. (in his case in Moscow), finishing at Case Western Reserve in Cleveland. Given their largely parallel backgrounds, Umanskiy wanted to like Artunduaga and hoped she would succeed in the program. He vehemently denied having made derogatory comments about Artunduaga's

13

UCMC00004686

medical training in South America – comments attributed to him in Artunduaga's request for review. Nor did he hear others make such comments.[9]

14.     When I interviewed him, Dr. Umanskiy elaborated on his September 2011 remarks regarding Dr. Artunduaga being disorganized and "excessively talkative." He explained that she had great difficulty communicating binary information: answering "yes" or "no" in response to a direct question, *e.g.*, "Did the patient have the ABC test?" She would instead launch into a disorganized, mostly unresponsive narrative non-answer.   Umanskiy recalled difficulty on his rounds, when the attending physician is routinely briefed by a resident before seeing the patient – regarding tests given, the discharge plan, and other relevant, factual information.  According to Umanskiy, Artunduaga often did not have such information; when she did, she failed to communicate it directly and succinctly.  Umanskiy specifically recalled Artunduaga slowing his rounds by comparison with other interns during his four years of teaching at UCMC.

15.     On November 2, 2011, Drs. Song and Park met with Dr. Artunduaga.  Also present was Alikah Williams, UCMC's residency coordinator. *See* Exh. 2.  Dr. Song informed Dr. Artunduaga that her performance to date was unacceptable, and that she would either be placed on probation or should change career paths, *i.e.*, withdraw from the surgical residency program.  *Id.* at 2.  Artunduaga stated adamantly that her performance had improved over the prior months, but that none of the doctors in Plastic and Reconstructive Surgery – indeed, across the entire Surgery Department – had recognized this improvement.  *Id.*  For Dr. Song, this

---

[9] Not a single person I interviewed corroborated Artunduaga's claim that she was frequently subjected to unwelcome comments about her accent or national origin by co-workers. Indeed, these interviewees could not think of a single instance where this was the case, and denied having heard such comments.

14

UCMC00004687

statement only confirmed the "disconnect between [Artunduaga's] skill set ... and the reality of the situation." *Id.*

16.     Dr. Artunduaga elected to remain in the program. Accordingly, Dr. Song notified her by letter on November 15, 2011, that she was being placed on probation (sometimes referred to below as "remediation") until the end of February 2012. Exh. 6 at 1-2. That letter detailed performance deficiencies regarding both patient care and interpersonal/communication skills, and specified goals to be met for Artunduaga to successfully complete remediation.[10]

17.     As reflected in the November 15 letter, Dr. Song assigned Dr. Park to serve as Artunduaga's mentor during remediation. Exh. 6 at 2. Song also informed Artunduaga that she would be notified by the end of February regarding contract renewal for a second year of residency. *Id* at 2. In the meantime, she would be evaluated formally and regularly by faculty under whom she worked.

18.     Instead of responding to the notice of remediation by altering her work habits and rededicating herself to her residency, Dr. Artunduaga wrote a 7-page rebuttal. *See* Exh. 7 (Artunduaga letter dated November 18, 2011). She therein disputed each of Dr. Song's written remarks regarding patient care, attributing several surgical errors to her co-intern and a patient discharge error to UCMC's Intensive Care Unit. As to her interpersonal and communication skills, Dr. Artunduaga herself raised the subject of her national origin, stating: "I am a foreigner and I have an accent. ... Many of the patients in the hospital have a strong accent I was not used to, some others have expressed their surprise that a Hispanic physician is taking care of them. This has represented one of my major challenges" (*id.* at 5). In that same November 18 rebuttal

---

[10] Nothing in the November 15, 2011 letter references or alludes to Dr. Artunduaga's accent. Indeed, her communication deficiencies referenced had to do mainly with her need to *listen* to others, and to respond in a professionally appropriate manner. Exh. 7 at 2.

15

UCMC00004688

letter, however, Artunduaga indicated she had overcome these "challenges" well before

November 2011 (*id.*). Later in her rebuttal letter, Dr. Artunduaga stated:

> Dr. Song, I understand that your expectations from a Plastic Surgery resident are
> very high, but at the same time you knew that transitioning from my previous
> research position to the clinical setting was going to be challenging. Adding to
> that, my condition as a non-native speaker who has not trained in the U.S., would
> pose some additional difficulties, and they most certainly have. These facts were
> not hidden from anyone who evaluated my application for Plastic Surgery, and
> yet my professional qualifications were deemed to outshine all of these perceived
> weaknesses. From the start, I knew better than anyone else that I would face a
> steeper learning curve than any of my US-raised and trained colleagues, but this
> was not a challenge unknown to me since I already went through a similar
> experience in Boston, with a similarly difficult start but with my talent and drive
> winning out in due course. Though I recognize that only I am responsible for my
> rate of progress, I would have expected from some of the faculty, staff and senior
> colleagues a minimum level of understanding and support in recognition of those
> facts that are common in anyone with a similar background as mine, as that would
> have greatly aided in my learning process.

*Id.* at 5-6. Artunduaga ended her written remarks by requesting that her probation period be

extended to late March, assuring Dr. Song that she would "shine, if given the opportunity, as you

expect." *Id.* at 6.[11]

19.    Throughout November 2011, Dr. Artunduaga worked under Dr. Mark Ferguson

on the Thoracic section. Ferguson's evaluation of Artunduaga's performance, both at the middle

and at the end of the month, was unequivocally negative. In a November 16 email to Dr. Song,

he characterized Artunduaga's performance on the service as "very poor." Exh. 9 at 1. He

described her areas of weakness as "numerous," including "lack of technical skills, basic medical

information, organizational/prioritizational skills, communication skills, and information

processing abilities." *Id.* Ferguson never attributed these weaknesses to Artunduaga's non-U.S.

medical training, nor to any language or cultural issues. Rather, he believed she lacked "aptitude

---

[11] In response to Dr. Artunduaga's November 11 letter, Dr. Song agreed with Artunduaga's request to extend her probation until on or about March 23, 2012 (Exh. 8).

16

UCMC00004689

... a skill that can[not] be taught." *Id.* at 2. All of this he communicated to Artunduaga, virtually all of which she blamed on others. In his summative evaluation at the end of the month, Ferguson indicated Artunduaga needed to improve in seven categories.[12] In his overall comments, Ferguson concluded that Artunduaga "does not have the aptitude for the work she has chosen – very little improvement was evident during the month. Her knowledge and skill levels are well below those of her peers." *Id.* at 2.

20.     Except for one week in February 2012, Drs. Park and Artunduaga met weekly throughout Artunduaga's probationary period (mid-November 2011 to mid-March 2012). *See* Exh. 11 at 1. As noted above, Alikah Williams also attended these meetings, which were intended to monitor Dr. Artunduaga's progress and provide her timely, constructive feedback. *Id.*

21.     Among all the evaluations Dr. Artunduaga received from attending physicians, I find Dr. Park's evaluation to be the one most relevant to and reflective of Dr. Artunduaga's performance during 2012. During the last month of Artunduaga's probationary period, she worked under Dr. Park on the Plastic and Reconstructive section – Artunduaga's chosen specialty. *See* Exh. 11. In her March 14, 2012 report to Dr. Song, Dr. Park assessed Artunduaga's performance in four categories: (1) clinical performance, (2) interpersonal relations, (3) responsiveness to advising, (4) other conduct during the evaluation period. All four assessments were negative. *Id.* at 1-7.

22.     With regard to clinical performance, Dr. Park recounted two instances of substandard work in the OR, an example of Dr. Artunduaga's failure to provide Dr. Park clear and necessary patient information, unresponsiveness to Dr. Park's pages (for which Artunduaga

---

[12] Ferguson's evaluation was not entirely negative: he rated Artunduaga "good" or better in six categories. Exh. 9.

17

UCMC00004690

wrongly blamed the senior resident), and failure to avail herself of important opportunities to work with a key surgeon on the Plastic and Reconstructive section – in contravention of Dr. Park's repeated advice that she do so. *See* Exh. 11. I credit Dr. Park's assessment in each of these instances, inasmuch as each was based on her direct observations, her direct instructions, and/or her immediate involvement in the situation recounted.

23.     With regard to interpersonal relations, Dr. Park recounted three negative incidents involving attending physicians (Drs. Jaskowiak, Tothy and Reid), two of which were reported by the attending doctors (Jaskowiak and Reid). Both of these, together with the clinical performance issues noted above, refute Dr. Artunduaga's argument that fellow residents – in particular the senior residents – were in effect "out to get her," ostensibly (now) on account of her national origin. In all three instances, Dr. Artunduaga was rude to other medical professionals – in two instances the attending physicians (Drs. Jaskowiak and Tothy), and in the third a group of nurses (as reported by attending Dr. Reid).

24.     With regard to Dr. Artunduaga's responsiveness to her advice, Dr. Park reported: "We have gone to extraordinary efforts to mentor Maria. There are many instances in which she does not heed our advice. This has hurt her training and preparedness. This assessment is [sic] comes from my own personal experiences with Maria and what she relays in our meetings." Exh. 11 at 5. Park provided multiple examples several of them involving Artunduaga's failure to follow Park's advice and operate with Dr. Reid in the Plastic Surgery service during March 2012. Another involved Artunduaga's failure in and after January 2012 to study for and complete the 2010 In-Service exam. *Id.* According to Dr. Park: "we do not have such problems with our other residents studying for the In-Service exam." *Id.*

18

UCMC00004691

25.    Lastly, Dr. Park described in detail her concern that Dr. Artunduaga had interfered with the evaluation process during her probationary period by telling her reviewers that she would lose her resident status unless they evaluated her favorably. Exh. 11 at 6. This was reported to Dr. Park by Dr. Yolanda Becker, a Professor of Surgery and Director of the Kidney and Pancreas Program who worked with Artunduaga in the transplant service, and Christine Trotter, a Transplant Nurse Practitioner, both of whom had been lobbied by Artunduaga for favorable evaluations. *Id.*

26.    Dr. Park's March 15, 2012 report concluded:

After ten weeks of probationary meetings, I still find I am still working on the same issues with Maria – learning how to present patients, learning how to anticipate and address clinical and interpersonal problems, listening carefully, behaving professionally and avoiding conflicts, and focusing more on doing her job well rather than the evaluations themselves.

Her performance on our service these past two weeks reveals that she has not actually reached the level of even an average surgical intern. Her performance on our service is not compatible with the evaluations I have seen over the past two months. Clinically she still lacks many of the basic skills we require. She has not responded well to teaching and feedback that could help her improve. This is in contrast to the evaluations we have received from other services, but it is consistent with the problems that have arisen on other services that we have been expressed to us recently by a range of clinical staff.

Finally, I am very concerned by persistent evidence regarding unprofessional behavior and an inability to accept responsibility for problems that arise surrounding her work. She does not perform well under stress or pressure. I do not think she meets the level of excellence that we as a section expect from our residents.

Exh. 11 at 6-7.

27.    Dr. Artunduaga has been replaced in the residency program by Amanda Silva, a U.S.-born Latina.

19

UCMC00004692

## Conclusions

1.      The decision to place Dr. Artunduaga on probation in November 2011 was not motivated by her national origin (Columbian), nor any incidents thereof. Rather, that decision was based on Dr. Artunduaga's failure to meet the legitimate expectations of Drs. Song and Park, as well as the attending doctors under whom she had worked and by whom she had been evaluated before November.

2.      The late March 2012 decision not to renew Dr. Artunduaga's contract was in no way based on her national origin. That decision was made by Dr. Song, together with the rest of the faculty, and was based primarily on Dr. Park's recommendation against renewal.

3.      Neither the fact of nor comments regarding Dr. Artunduaga's accent had a material bearing on the unfavorable evaluations she received from all of the attending doctors who evaluated her. Those doctors based their evaluations on their own observations of Artunduaga's clinical performance. Based on those observations, the attending doctors believed her performance was below that expected of UCMC first-year surgical residents, particularly residents on the Plastic and Reconstructive Surgery section. It was those evaluations that led to Artunduaga placed on probation, not her accent or anything else related in any way to her national origin.

4.      Dr. Artunduaga did receive some favorable evaluations from other residents, some senior and some not very senior. In particular, she received a number of favorable evaluations from Dr. Irma Fleming, especially during Artunduaga's early 2012 service on the vascular and transplant sections. *See* Exh. 11. When I interviewed her, however, Dr. Fleming characterized Dr. Artunduaga's performance *at the end of her time working under Dr. Fleming* as "remedial." This is inconsistent with Dr. Fleming's written evaluations, however, and I conclude that the written record shows that Dr. Fleming's overall view of Dr. Artunduaga's

20

UCMC00004693

performance was favorable/acceptable. However, that was not the view of the attending doctors who supervised Artunduaga.

5.      Dr. Artunduaga's claims of a hostile work environment are likewise without merit. The written record I reviewed, together with the witnesses interviewed, made clear that all or virtually all comments about Dr. Artunduaga's accent came from patients – or from Dr. Artunduaga herself, who repeatedly raised the subject of her accent but said it had no bearing on her performance. Some of those patient comments appear to have been reported to and/or repeated by fellow residents and other doctors. However, in no instance did those comments affect an attending physician's evaluation of Dr. Artunduaga's performance. Moreover, Artunduaga's other purported evidence of harassment – comments by two attending physicians about her having trained outside the U.S. and thus perhaps being at a cultural disadvantage – were not severe or pervasive. Nor were they derogatory or reflective of animus based on her national origin or anything else. Rather they were bona fide attempts to understand why someone who appeared so strong on paper was failing to perform satisfactorily.

6.      Dr. Artunduaga's claims of retaliation are also without merit. Dr. Eric Grossman supervised Dr. Artunduaga on the endocrine service in April 2012. Artunduaga claims Dr. Song told Grossman not to assign Artunduaga cases, and that she in fact had far fewer cases than other residents after March 2012. Both Song and Grossman denied this. During our interview, Grossman specifically recalled supervising Artunduaga and said she was treated the same as other residents as to caseload and otherwise. Regardless, I conclude that no adverse action was taken against Artunduaga after her contract non-renewal.

21

UCMC00004694