# TAB 8

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DR. MARIA ARTUNDUAGA,

      Plaintiff,

v.

THE UNIVERSITY OF CHICAGO
MEDICAL CENTER,

      Defendant.

No. 12 C 8733

Judge James B. Zagel
Magistrate Judge Sidney I. Schenkier

## DECLARATION OF DR. DAVID SONG, M.D.

I, Dr. David Song, M.D., declare under penalty of perjury under the laws of the United States and the State of Illinois as follows:

1.     I have personal knowledge of the facts set forth below.

2.     I am over the age of 18 and a resident of the State of Illinois. I speak fluent Korean.

3.     I was born in Korea. I came to the United States in 1973. I speak fluent Korean.

4.     When I selected Dr. Artunduaga to be interviewed out of the 200 candidates who had listed UCMC's Plastic and Reconstructive Surgery ("PRS") residency program as a preference, I knew from her C.V. that she was a native of Colombia and had attended medical school there.

5.     I interviewed Dr. Artunduaga when she came to UCMC to be interviewed for a residency position in the Plastic and Reconstructive Surgery ("PRS") program for the 2011 – 2012 academic year. At that time, I learned that she speaks English with a Spanish accent.

6.     Dr. Artunduaga speaks fluent English.

7.     During my interview of Dr. Artunduaga, I told her that I had very positive feelings toward Colombia because my uncle had been the South Korean ambassador to Colombia and had loved his time there. I told her that I had twice planned visits to Colombia during the time he was ambassador but that, unfortunately, I was not able to make the trips.

8.     I chaired the PRS meeting on January 19, 2011 at which all Attendings and residents who participated in the interviews and were available voted to compile a list ranking the candidates who were interviewed to be submitted for the national student match. Because it is my experience that the qualifications of candidates who interview in the first round of interviews can be overlooked, I reminded the group to be sure to consider Dr. Artunduaga, who was interviewed in the initial round and had been highly regarded.

9.     Dr. Artunduaga was ranked fifth on the list of 29 candidates submitted to the ACGME.

10.     As PRS Program Director, I could have made the decision to place Dr. Artunduaga on probation on my own. However, I consulted with all the other PRS Attendings before making the decision; and all of them agreed that she should be offered the option of resigning from the program or going on probation.

11.     In August 2011, I received an email, attached as Exhibit A, from a patient complaining about Dr. Artunduaga.

12.     On August 11, 2011, I received an email from Dr. Nora Jaskowiak concerning the same patient. That email is Exhibit B.

13.     Exhibit C is an email by PRS resident Dan Butz concerning Dr. Artunduaga.

14.     I met with Dr. Artunduaga on November 2, 2011 along with PRS Attending Physician Dr. Julie Park and PRS Program Administrator Akilah Williams. I provided Dr. Artunduaga an assessment of her performance and offered her the choice of leaving the program or going on probation. Dr. Artunduaga told us that she wanted probation. Dr. Park and I both told her that we felt strongly that she should look at other residencies in medicine and offered to

-2-

help her find a new position if she wanted to pursue a new career path, and I gave her 24 hours in which to reconsider her decision to be put on probation.

15.     On November 4, 2011, I sent Dr. Artunduaga a memo summarizing our November 2 meeting. That memo, which is Exhibit D, accurately summarizes the November 2 meeting.

16.     Exhibit E is a letter I wrote Dr. Artunduaga extending her probationary period until March 23, 2012.

17.     On November 15, 2011, I gave Dr. Artunduaga a memo in which I described her deficiencies and spelled out the actions she needed to take to remain in the program. Exhibit F is a copy of that memorandum.

18.     Applicants for PRS residency positions during the 2012 - 2013 academic year interviewed on campus on December 2011 and January 2012. Whether or not current PRS residents participate in such interviews depends on their schedule and availability. Because Dr. Artunduaga was on vacation the entire month of December 2011, she was not have been available to interview. I decided that she should not be scheduled for applicant interviews in January 2012 because she was on probation, and I thought that interviewing would distract her from what she need to do to accomplish the goals of her probation.

19.     On March 7, 2012, PRS Attending Dr. Ginard Henry told me of a complaint that Dr. Allison Tothy had made about Dr. Artunduaga. He also forwarded me a copy of Dr. Artunduaga's email purporting to apologize to Dr Tothy. I found Dr. Artunduaga's response completely unacceptable, arrogant and insincere. A copy of Dr. Artunduaga's email and emails between me and Dr. Henry about it is Exhibit G. I later spoke with Dr. Tothy to offer my apologies for Dr. Artunduaga's conduct. On March 13, Dr. Tothy sent me her own email summarizing what had occurred. A copy of that email is Exhibit H.

20.     As PRS Program Director, I could have made the decision that Dr. Artunduaga would not be offered a second year in the program on my own. However, it is my practice to put any significant decision about the section to a vote of all the Attendings. As a result, at a meeting of PRS Attendings on March 26, 2012, the Attendings voted whether to give Dr.

CHICAGO/#2609343.5

Artunduaga second year contract. All of the PRS Attendings were at the meeting – namely, Dr. Lawrence Gottlieb, Dr. Henry, Dr. Raphael Lee, Dr. Julie Park, Dr. Russell Reid and Dr. Lawrence Zachary. At the meeting, each of Attendings was provided a package of materials about Dr. Artunduaga's performance during her probationary period that had been assembled by Dr. Park as well as a memorandum that had been prepared by Dr. Artunduaga in support of a second year of residency. A copy of the package of materials prepared by Dr. Park is an exhibit to her declaration submitted in this case. A copy of Dr. Artunduaga's memorandum is Exhibit I.

21.     The discussion at the March 26 meeting of PRS Attendings about whether to offer Dr. Artunduaga a contract took almost two hours. All of the PRS Attendings voted unanimously not to give her a contact. I did not actually vote, but that was my decision too.

22.     On March 27, I gave Dr. Artunduaga a letter informing her of the decision not to offer a contract for a second year of residency. In that letter I also informed her of my decision that she was being removed from clinical duties effective immediately. A copy of my letter is Exhibit J. Before I handed her the letter, I told her that the decision had been unanimous not to offer her a second year in the program and offered her the opportunity to resign. She chose not to resign.

23.     In a letter dated March 29, 2012, Dr. Artunduaga requested reconsideration of the decision not to offer her a second year residency contract, initiated the grievance procedure under the UCMC grievance policy and requested that she be reinstated to clinical duties. That letter is Exhibit K.

24.     After receiving Dr. Artundauga's request to be restored to clinical duties, I asked Dr. Kevin Roggin, the General Surgery Residency Program Director whether there were General Surgery rotations to which she could be assigned. Dr. Roggin and I decided that it would be possible to assign her to the endocrine side of the Kaplan Service.

25.     By letter dated April 4, 2012, I informed Dr. Artunduaga that the decision not to give her a second year contract would stand. I also told her that the decision had been made to restore here to clinical duties on General Surgery rotations. My letter is Exhibit L.

-4-

26.     The next day, Dr. Artunduaga sent me an email in response. That email is Exhibit M.

27.     On April 26, 2012 Dr. Artunduaga sent an email to me and Dr. Roggin about her assignment to the Kaplan service stating that she had already been made to waste a full month of her time. That email is Exhibit N.

28.     In late April, Dr. Roggin told me that due to complaints about Dr. Artunduaga from the Chief Resident on the service, Dr. Eric Grossman, and from other residents, he had decided that he did not want Dr. Artunduaga to continue on the Kaplan Service. I concurred.

29.     By letter dated April 30, 2012, I informed Dr. Artunduaga that she was again being removed from clinical duties. I also informed her that I had decided that she was assigned to an independent study program for the rest of the year. The goal of my giving her the independent study assignment was to enable her to receive credit for her internship year. My letter is Exhibit O.

30.     Dr. Artunduaga successfully completed the independent study program, and she received full credit for her intern year.

31.     I was PRS program Director from November 2004 to November 2013, when I was succeeded by Dr. Julie Park. During my tenure as Program Director, all decisions relating to the selection, appointment, discipline, remediation, probation, and contract renewal of PRS residents were made and carried out by the PRS program. The Program Directors of other programs, including General Surgery and Otolaryngology, did not make or carry out such decisions for PRS residents. Likewise, the PRS section not make or carry out such decisions for residents in other residency programs.

32.     Drs. Mitchell Posner (General Surgery Program Director until September 30, 2011), Kevin Roggin (General Surgery Program Director as of October 1, 2011) and Robert Naclerio (Otolaryngology Program Director) did not have any involvement in assessing whether Dr. Artunduaga was making adequate progress in the program or in the decisions to place Dr. Artunduaga on probation and not to offer her a second year residency contract.

CHICAGO/#2609343.5

33.     I did not have any involvement in the any decisions relating to the selection, appointment, training, discipline, remediation, probation, contract renewal and termination of Dr. Jonathan Lusardi and Dr. Reza Salabat.

34.     At no time did Dr. Artunduaga complain to me that she was being harassed or discriminated against because she was from Colombia or because of her national origin or that she was being retaliated against because she had complained about discrimination or harassment.

35.     First year residents in the PRS program do not receive protected time to attend the plastic surgery core curriculum.  Protected time to attend the plastic surgery core curriculum is provided only toe more senior residents in the PRS program.

36.     In order successfully to complete the PRS residency program, a resident should have performed 1,400 to 1,600 surgeries over the six years of the program.  Over the years, the number of surgeries a PRS resident completes in his or her intern year has varied widely.  There is no minimum number of surgeries that a PRS intern is expected to complete in his or her first year in the program.

37.     In my nearly 20 years at UCMC, I have observed that the medical staff at UCMC is racially and ethnically diverse.  During the year that Dr. Artunduaga was in the PRS residency program, and before and since, it is common to hear an array of accents among the medical staff at UCMC.  For example, I regularly work with doctors or other staff who have Russian, Filipino, Spanish, Arabic, Indian, Scots, Israeli, British and other accents.

38.     Residents in the PRS program from academic year 2006-7 to academic year 2013-2014 were:

| Name | Dates of Residency | National Origin | Languages spoken fluently in addition to English |
|---|---|---|---|
| Alkureshi, Lee | 6/24/09 to present | United Kingdom | |
| Artunduaga, Maria | 6/24/11 to 6/23/12 | Colombia | Spanish |
| Bank, Jonathan | 6/24/08 to present | Israel | Hebrew |

CHICAGO/#2609343.5

| Name | Dates of Residency | National Origin | Languages spoken fluently in addition to English |
|------|--------------------|-----------------|--------------------------------------------------|
| Butz, Daniel | 6/24/10 to present | U.S.A. | |
| Dickie, Sara | 6/24/06 to 6/30/12 | U.S.A. | |
| Fuller, Sam | 6/24/09 to present | U.S.A. | |
| Greives, Matthew | 6/24/07 to present | U.S.A. | |
| Klieber, Grant | 6/28/08 to present | U.S.A. | |
| Kueberuwa, Essie | 6/24/10 to present | United Kingdom | |
| Kwan, Daniel | 6/24/04 to 6/30/10 | U.S.A | Mandarin |
| Lee, Justine | 6/24/06 to 6/30/12 | U.S.A. | Mandarin |
| Nyugen, Trang | 6/24/07 to present | Vietnam | Vietnamese |
| Pelletier, Aaron | 6/24/05 to 6/30/11 | U.S.A. | |
| Roughton, Michelle | 6/24/05 to 6/30/11 | U.S.A. | |
| Seitz, Iris | 6/24/04 to 6/30/10 | Germany | German |
| Shenaq, Deana | 6/24/11 to present | U.S.A. | Arabic |

39. Of the PRS residents listed above, in addition to Dr. Artunduaga, Dr. Alkureshi speaks English with a Scots accent; Dr. Seitz speaks English with a German accent; Dr. Essie Kuberuwa, speaks English with British accent; and Dr. Banks speaks English with an Israeli accent.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: February 19, 2015

By: _____
Dr. David Song, M.D.

-7-

# EXHIBIT A

| | |
|---|---|
| **From:** | Song, David [BSD] - SUR <dsong@surgery.bsd.uchicago.edu> |
| **Sent:** | Tuesday, August 23, 2011 7:39 PM |
| **To:** | Artunduaga, Maria [UCH] <maria.artunduaga@uchospitals.edu> |
| **Subject:** | |

Maria

I received this email from one of our patients recently and I know that there is always 2 sides to the story so let's sit down and discuss this:

-David

On Thursday Aug. 11, Dr. A knocked and entered my hospital room (TN422) in the early evening. My husband      was also in the room. She greeted us nicely but she did not explain what she was doing there, who she was or if she worked with Dr. Jaskowiak or Dr. Song.

She approached me, observed the PCA machine, and started asking me questions about my pain management. Dr. A quickly started making statements about how I should be recovering faster and no longer using the PCA machine. I was taken aback momentarily, but responded to the best of my ability given how I was feeling and the pain I was in. She interrupted me in a patronizing, condescending tone, and told me that most patients in my situation go home after one night, and again told me that I should not still be on the morphine PCA. Her comments and demeanor were insensitive and rude. I looked at Jeremy to confirm he was actually hearing the same thing, and he was.

In an attacking tone Dr. A again stated that I should have been off of the morphine hours before and that most patients are discharged by that point post surgery. Dr. A then asked me if I was still actively pushing the PCA button, and I answered yes, because I had been instructed to use it as needed, and I was still in a good deal of pain. Dr. A then tilted her head and made a face at me as if I was making up a story; or even abusing the PCA.

Dr. A then asked me about all of the medications that had been given to me. I explained that I had had a difficult day trying to manage pain, which began when I stopped using the Dilaudid (?) for several hours because it had made me very itchy. I explained that in the morning I was told I would be switched to Morphine due to the itchiness but that didn't happen until the afternoon when the pain became intolerable and Dr. Song intervened. I also explained that at this time I was told to use the morphine as needed in order to get ahead of the pain.

During this time, Dr. A interrupted me multiple times to ask questions including asking me to recount every medication I had been given and when. I explained that I was given Morphine, 2 Percocet, and Toradol all at the same time in the afternoon per Dr. Song's intervention. I couldn't remember the exact times. Dr. A continued to press me about what time I took the Percocet and why I was unable to explain what medications were working for me. I explained that I didn't know which medications were working because I had taken them close together. I then asked her to look at my chart to confirm the times. She admitted that she had not looked at my chart, and appeared to show no interest in looking at it now.

At this point I was getting emotional because Dr. A was telling me the opposite of what Dr. Song and the nurses had told me just a couple of hours earlier. They had told me to expect to stay 2 nights in the hospital and that I should use the morphine as needed to get back on top of the pain. When Dr. A saw I was upset she laughed at me and told me there was no need to get anxious. She didn't understand that it was her insensitivity that was upsetting me. My husband and I are not confrontational people, but we finally had to explain to her that her tone was inappropriate. She acted surprised, so we told her it felt like she was attacking and humiliating me. Dr. A got defensive of her tone and questions and then must have realized that she was not welcome in the room and left.

As a health care professional myself, I found the experience very upsetting. I was in a very vulnerable position as a patient who was suffering a great deal of pain and on multiple medications. This interaction was a setback for my physical and mental health, and did not help my opinion of the care I received while at U of C hospital, with the exception of Dr. Song, Dr. Jaskowiak, Dr. Jolie (?) and Dr. Seal (?) who all were outstanding.

Thank you,

UCMC00001640

David H. Song, MD, MBA, FACS
Professor of Surgery
Chief and Program Director
Section of Plastic Surgery
Vice-Chair, Department of Surgery
University of Chicago Medical Center
5841 S. Maryland Ave, MC 6035
Chicago, IL 60637
(773) 702-6302
(773) 702-1634 fax
songd@uchicago.edu
http://surgery.uchicago.edu/specialties/plastic

This email is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged and confidential. If the reader of this email message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is prohibited. If you have received this email in error, please notify the sender and destroy/delete all copies of the transmittal. Thank you.

UCMC00001641

# EXHIBIT B

**From:** Jaskowiak, Nora [BSD] - SUR
**Sent:** Thursday, August 11, 2011 8:06 PM
**To:** Song, David IBSDI - SUR; Seal, John [BSD]
**Subject:** Issue with        and Maria A.

Just want to give you both a heads up on a bad interaction tonight between Maria Artunduaga and '        I only have Bethany and her husband's side of the story, but they were very upset about how Maria came in tonight and basically grilled them about pain management and as to why Bethany was still in the hospital at all. It was very upsetting to even hear about.

I will speak with Maria tomorrow, but I wanted to make you both aware. I really have serious concerns about Maria both in the operating room and in patient management.

NJ

Nora Jaskowiak, M.D., FACS
Associate Professor of Surgery
Surgical Director, Breast Center
Director, Third Year Student Clerkship
Associate Program Director, General Surgery Residency
University of Chicago Medical Center
Phone: (773) 702-2048
Fax: (773) 834-4022
email: njaskowi@surgery.bsd.uchicago.edu

1

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

UCMC00011957

# EXHIBIT C

**Williams, Akilah [BSD] - SUR**



| | |
|---|---|
| **From:** | Song, David [BSD] - SUR |
| **Sent:** | Sunday, November 06, 2011 8:22 PM |
| **To:** | Williams, Akilah [BSD] - SUR |
| **Subject:** | FW: Feedback |

please put this in Maria's file

David H. Song, MD, MBA, FACS
Professor and Chief
Section of Plastic Surgery
Vice-Chair of Surgery
University of Chicago Pritzker School of Medicine songd@uchicago.edu
http://twitter.com/dhsong


-----Original Message-----
From: Nguyen, Trang [UCH]
Sent: Sun 11/6/2011 4:25 PM
To: Song, David [BSD] - SUR
Subject: Fwd: Feedback


Sent from my iPhone

Begin forwarded message:

> From: Daniel Butz <daniel.r.butz@gmail.com>
> Date: October 30, 2011 9:33:36 PM CDT
> To: trang.nguyen@uchospitals.edu
> Subject: Feedback
>
> Trang
>
> Here's what I can put a finger on.
>
> 1. Returning Pages/Communication
>     In the beginning of the month there were frequent issues with returning pages. Not only
from the chiefs but also returning consult pages.
>     I received two pages regarding consults that had not been called back or no notes were
placed for.
>         This has improved. Pages are returned faster and I haven't had another consulting
service page me in the last two weeks.
>
> 2. Notes
>     Consult notes have not been placed in an efficient time frame. Frequently they are
placed at the end of the day. Earlier in the month one was not placed at all and we were
paged two weeks later requesting our recommendations.
>     Daily notes frequently take until noon to be placed. As far as I'm concerned it should
only take 20-30 minutes to enter the daily notes.
>     These concerned have been mentioned several times without a significant improvement.
>

1

UCMC00004533

> 3. Patient issues/Clinical decision making
>     This has been a pretty serious issue. She has been slow to recognize when patient are
unstable and to notify the chiefs. This was especially relevant with Turner who wasn't
properly resuscitated and ended up in the ICU.
>     I feel like she has a problem synthesizing data and putting it together in a diagnosis.
>
>  . Colleague work relationships/accepting responsibility
>     When confronted about a lot of the issues I found that she frequently made excuses and
occasionally blamed her co-intern.
>
> 5. Implementing feedback...
>
>
> Hope you had a good weekend
> Dan
>

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This e-mail is intended only for the use of the individual or entity to which it is addressed
and may contain information that is privileged and confidential.
If the reader of this e-mail message is not the intended recipient, you are hereby notified
that any dissemination, distribution or copying of this communication is prohibited. If you
have received this e-mail in error, please notify the sender and destroy all copies of the
transmittal.

Thank you
University of Chicago Medical Center
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

2

UCMC00004534

# EXHIBIT D



THE UNIVERSITY OF
**CHICAGO**
MEDICAL CENTER

DEPARTMENT OF SURGERY
*Section of Plastic and Reconstructive Surgery*

MC 6035
5841 South Maryland Avenue
Chicago, Illinois 60637-1470
*tel* 773-702-6302
*fax* 773-702-1634

| | |
|---|---|
| **Meeting Name:** | Summary of evaluation with Dr. Maria Artunduaga |
| **Date:** | Wednesday, November 2nd, 2011 |
| **Time:** | 1:00 p.m. |
| **Location:** | J641 |
| **Participants:** | Dr. Maria Artunduaga, Dr. David Song, Dr. Julie Park and Akilah Williams |

Acknowledging that this was a very difficult meeting, we convened an urgent meeting with Dr. Maria Artunduaga after her most recent rotation on our service through the month of October. It was unanimous amongst the numerous evaluators across the Department of Surgery, particularly within our section, that the issues that Dr. Artunduaga has will be extremely difficult to correct within the time allotted during residency period. We all recognize that she is a pleasant, hard-working individual who most certainly is intelligent. However, the overwhelming issue was thematically agreed upon once again by all of the reviewers, including a 360 degree evaluation by a nurse practitioner who worked with her extensively.

It became very clear that during the month of October, while Maria had another intern on service who admittedly was not the strongest intern and perhaps added to the problem, performed far below what would be acceptable for an intern, particularly an intern in Plastic and Reconstructive surgery. Throughout the entire course of the month, Dr. Artunduaga failed to communicate properly and failed to efficiently organize a system of rounding and patient follow-up. Several times near misses were found, one in particular as it pertained to maintenance fluid, another as it pertained to drain management, where Dr. Artunduaga failed to recognize her errors despite being told multiple times to follow-up. These are thematically consistent with the evaluations Dr. Artunduaga received in the months of July, August and September where it was seen that "she frequently appeared disorganized, unsure of her knowledge and at times had an unsuccessful doctor/patient relationship." Another set of reviewers stated that "she is often frazzled when presenting patient issues, and it was very difficult to keep her organized and goal-oriented."

It was also found that she accidently sent a patient home with a picc line which was supposed to come out before discharge after multiple times of prompting. This was not fully realized by Dr. Artunduaga. Once again, while on our service, she failed to realize an issue of severe vaginal bleeding and tachycardia and did not appropriately notify senior residents. Another issue is where a patient had a supra-ventricular tachycardia and cardiology was consulted. She failed to follow up with this patient. The list continues with multiple sets of tests and lab that were incorrectly or not ordered. This is not just focusing on specific incidents, and I relayed to Dr. Artunduaga that if these incidents were isolated or if they were thematically different, we would have had a much different conversation of remediation. With all of these issues being

AT THE FOREFRONT OF MEDICINE*

UCMC00004701



thematically universal when it came to her performance or lack thereof, it was quite clear to all of the reviewers that Surgery, and in particular Plastic and Reconstructive Surgery, just would not be the best fit for Dr. Artunduaga.

Regrettably, this is painful for all of us to discover and we have assured Dr. Artunduaga that we would like to move forward in every way possible to support her transition into another specialty or another program. We discussed the probability of probation, but we agreed that probation at this level would not lead to successful remediation and only lead to a permanent deleterious record in her portfolio, thus jeopardizing her future possibilities. I have relayed this to Dr. Artunduaga and have confirmed that she has understood them clearly. I also as a courtesy have given her 24 hours to decide whether she would like to proceed with probation or if she would like to consider a transition in her career where we would all be helpful. She has agreed to get back with me in 24 hours.

The meeting ended with Dr. Artunduaga stating that she recognized and understood these issues, yet being adamant that she has improved. This has further reiterated to us that she feels that she has improved, however, no one else in the entire section and across the department has recognized that fact. Once again, this was a confirmatory step for us, understanding the disconnect between her skill set, the understanding of the situation and the reality of the situation at hand. Regrettably, these things have come to fruition and I have relayed to her both my personal and our collective disappointment at the situation, and have once again relayed to her that we will do whatever is in our power to facilitate her transition. We have also allowed her to understand the grievance process as well and relayed contact information related to grievance if she so chose to move forward in that direction.


_____
Dr. Maria Artunduaga

_____
Dr. Julie Park

Dr. David Song

Akilah Williams

# EXHIBIT E



THE UNIVERSITY OF
**CHICAGO**
MEDICAL CENTER

DEPARTMENT OF SURGERY          MC 6035
Section of Plastic and Reconstructive Surgery     5841 South Maryland Avenue
                                                  Chicago, Illinois 60637-1470
                                                  fax    773-702-6302
                                                  fax    773-702-1634

Dear Dr. Artunduaga,

I have reviewed your November 18, 2011 letter and your request that we re-consider the dates and time frame set for your probation. We will grant that request.

The initial probation to mid February was designed so that we could meet the requirements of the ACGME. Your contract with the Medical Center, the policies of our GME office, and the standards of the ACGME state:

Conditions for reappointment
II.D.4.d).(1) Non-renewal of appointment or non-promotion: In instances where a resident's agreement will not be renewed, or when a resident will not be promoted to the next level of training, the Sponsoring Institution must ensure that its programs provide the resident(s) with a written notice of intent *no later than four months* prior to the end of the resident's current agreement. If the primary reason(s) for the non-renewal or non-promotion occurs within the four months prior to the end of the agreement, the Sponsoring Institution *must ensure that its programs provide the resident(s) with as much written notice of the intent not to renew or not to promote as circumstances will reasonably allow, prior to the end of the agreement.*

We agree to adjust your probationary period and the time frame in which we will notify you of our decision about whether we will renew your contract to March 23, 2012. We need to assure that you understand and agree that we are adjusting these time frames at your request and in order to provide you with sufficient time to meet the goals we have set for you.

As we move forward, I will review the factual issues raised in your letter.

Sincerely,

David Song, MD, MBA

I have received a copy of this document and I understand the time frames set forth regarding a decision whether to renew my contract.

_____  11/21/2011
Maria Artunduaga, M.D.                     Date

AT THE FOREFRONT OF MEDICINE®

UCMC00004725

# EXHIBIT F



THE UNIVERSITY OF
**CHICAGO**
MEDICAL CENTER

DEPARTMENT OF SURGERY    MC 6035
*Section of Plastic and Reconstructive Surgery*    5841 South Maryland Avenue
Chicago, Illinois 60637-1470
*fax*    773-702-6302
*fax*    773-702-1634

Dear Dr. Artunduaga:

It is my duty to inform you that, effective November 15, 2011, you are being placed on Probation. . You will remain on probation until the time when we decide whether you will be offered a contract for another year of training in the program. This decision was reached by the faculty members of the Residency Education Committee as a whole after a thorough review of your progress in the residency program. As you are aware from several prior meetings and discussions with me about your progress in the program, you have failed to satisfactorily carry out your responsibilities. We have outlined for you specific areas where your progress had to improve, and have provided you with opportunities for assistance and remediation. Despite those efforts, you continue to exhibit significant performance deficits related to the competency domains of Patient Care and Interpersonal Communication skills.

The specific competency domains in which significantly deficient performance rating are noted include Patient Care and Interpersonal and Communication Skills:

Patient Care

- Communicate effectively and demonstrate caring and respectful behaviors when interacting with patients and their families

- Gather essential and accurate information about their patients

- Make informed decisions about diagnostic and therapeutic interventions based on patient information, preferences, up-to-date scientific evidence, and clinical judgment

- Develop and carry out patient management plans

Interpersonal and Communication Skills

- Use effective listening skills and elicit and provide information using effective nonverbal, explanatory, questioning, and writing skills

- Work effectively with others as a member or leader of a health care team or other professional group

The following conditions must be met for you to continue in the Program:
1.
- Establishing and maintaining your workload
- Establishing successful doctor-patient relationships
- Following technical instructions in the operating room
- Improving organizational skills
- Understanding what should be prioritized
- Effectively communicating with faculty and staff
- Appropriate clinical decision making

AT THE FOREFRONT OF MEDICINE®

UCMC00004714

- Accepting responsibility
- Timely placing consult notes
- Understanding the plan and your role in the plan.

2. You are required to schedule and meet with Dr. Julie Park, acting in the role of Mentor, at least every other week. Dr. Park may elect to change the frequency and will provide updates to me on the progress being made to address performance issues.

Your performance during this probationary period will be formally reviewed throughout the period of your probation and by faculty during the second or third week of February. At that time a decision will be reached about whether you have met the conditions of this probation and whether you will be offered a contract for another year of training. You will be provided official notification not later than February 28, 2012.

Moonlighting is not allowed while on Probation. It will constitute a violation of probation, and may be grounds for dismissal from residency if you continue to fail to fulfill the applicable educational and clinical requirements of the graduate education and clinical training program in a professional manner, to our satisfaction.

The Grievance Policy is available on the GME intranet site.

It is our sincere hope that the actions required of you will result in a positive outcome and continuation in the program.

Sincerely,

David H. Song, MD, MBA
Program Director
Plastic and Reconstructive Surgery

I have received a copy of this document. I understand the actions required of me.

Maria Artunduaga, M.D          11/15/2011

UCMC00004715

# EXHIBIT G

**Williams, Akilah [BSD] - SUR**

From:        Song, David [BSD] - SUR
Sent:        Wednesday, March 07, 2012 11:31 PM
To:          Henry, Ginard [BSD] - SUR
˙˙:          Williams, Akilah [BSD] - SUR
ɔject:       RE: Hand consult

this is unacceptable to me

none of our residents communicate with this arrogant tone carrying with it an air of a false
apology

i will reach out to Tothy tomorrow

thanks Ginard.  i'm copying Akilah so that she may put this in her file

David H. Song, MD, MBA, FACS
Cynthia Chow Professor of Surgery
Chief, Section of Plastic Surgery
Vice-Chair, Department of Surgery
University of Chicago Pritzker School of Medicine songd@uchicago.edu
http://twitter.com/dhsong


-----Original Message-----
From: Henry, Ginard [BSD] - SUR
Sent: Wed 3/7/2012 10:10 PM
˙˙˙ Song, David [BSD] - SUR
    ject: FW: Hand consult

Well, at least she apologized.

But the tone of her email shows lack of proper perspective.




Ginard I. Henry, MD

Assistant Professor of Surgery

University of Chicago Pritzker School of Medicine

Section of Plastic Surgery

5841 S. Maryland Ave MC 6035

Chicago, IL 60637

/˙˙3) 702-6302 (O)

1

UCMC00005857

(773) 702-1634 (F)

From: Artunduaga, Maria [BSD] - SUR
Sent: Wednesday, March 07, 2012 9:32 PM
   Tothy, Alison
__: Henry, Ginard [BSD] - SUR
Subject: Hand consult


Dear Dr. Tothy,


I tried to reach you tonight but you did not return my page.


Regarding the incident this morning, I apologize if my response time was not up to your
expected standards. Since your consult did not seem emergent, I took care of several issues
in, the floor that needed to be addressed by 10 am. When you paged me around 10:30 am, I told
you that the patient was already seen, that the mother was aware of the plan (medical
treatment, no surgery) and that I needed to staff the consult prior to go ahead and splint
the patient.


It is understandable your interest on following-up consults; in my experience, the plan is
informed to the ED once it has been discussed with the consulting senior resident/attending.
   , you should realize that surgical services might take longer to execute the plans since
   st of the time we are in the OR. In the future, let us know if your consults are of extreme
urgency so that we can tell our senior residents that you are requesting it.


I have CC Dr. Henry in this e-mail who is aware of the situation.


Thank you for understanding,


-M


MARIA ALEXANDRA ARTUNDUAGA, M.D.

Physician Resident, Plastic and Reconstructive Surgery

The University of Chicago Biological Sciences

5041 S. Maryland Ave. | Rm J-641, MC 6035 | Chicago, IL 60637, USA

2

UCMC00005858

**Williams, Akilah [BSD] - SUR**

| | |
|---|---|
| **From:** | Song, David [BSD] - SUR |
| **Sent:** | Saturday, March 10, 2012 9:01 AM |
| **To:** | Williams, Akilah [BSD] - SUR |
| **Subject:** | FW: Tothy Complaint |

Please put in her file

**DAVID H. SONG, MD, MBA, FACS**
Cynthia Chow Professor of Surgery
Chief, Section of Plastic and Reconstructive Surgery
Vice-Chairman, Department of Surgery
The University of Chicago Medicine & Biological Sciences
5841 S. Maryland Ave. | Rm J641, MC 6035 | Chicago, IL 60637
Office: 773-702-6302
Pager: 1670

**AT THE FOREFRONT OF MEDICINE®**
http://www.uchospitals.edu
http://surgery.uchicago.edu/specialties/plastic
http://www.facebook.com/uchicagoplasticsurgery
Twitter: @dhsong

**From:** Henry, Ginard [BSD] - SUR
**Sent:** Friday, March 09, 2012 4:38 PM
**To:** Song, David [BSD] - SUR
**Cc:** Park, Julie [BSD] - SUR
**Subject:** Tothy Complaint

Song,
Here is a summary of my recollection of the events surrounding the complaint by Dr. Alison Tothy of the pediatric emergency medicine regarding Dr. Maria Artunduaga on March 14, 2012.

Dr. Tothy stated complaints:
- Maria was not responsive to > 4 pages sent to her for almost 90 min regarding a 8yo male consult with a hand fracture in the pediatric E.D.
- After one hour and 15 minutes from the original consultation call, Maria did see the patient in the peds E.R. but no communication was given to the ED team during or after her visit.
- After further repeated pages Maria did call back. Dr. Tothy stated that Maria was rude and unprofessional in their communication. Dr. Tothy said that Maria presented brusque explanations for the lack of communications and stated that 'she should know that surgeons are busy' and presented an attitude as if the consult and Dr. Tothy's requests were a bother to Maria. It seemed to Dr. Tothy that Maria became upset and hung up on Dr. Tothy immediately after stating that she had other pressing issues to attend to. Dr. Tothy was still trying to ascertain certain critical aspects of the consultation care when Maria disconnected the call abruptly.

I called Maria to discuss the complaints and she presented the following explanations:
- She admitted that she became anger and frustrated with the communication with Dr. Tothy.
- Maria stated that she did not realize that Dr. Tothy was an attending. When this was made know to Maria, she remarked that this fact now made sense to her now why Dr. Tothy was threatening to report her to her superiors during the heated part of their communication.
- Maria admitted to hanging up on Dr. Tothy.
- Maria stated that the peds ED problem was that they continually and repeatedly paged her and did not realize how busy she was a surgical intern.
- Maria indicated that she did not immediately communicate with the peds ED team because she had to first discuss the consultation with her senior resident and the process takes time.

1

UCMC00005859

Ginard

**Ginard I. Henry, MD**
~sistant Professor of Surgery
.versity of Chicago Pritzker School of Medicine
Section of Plastic Surgery
5841 S. Maryland Ave MC 6035
Chicago, IL 60637
(773) 702-6302 (O)
(773) 702-1634 (F)

2

**UCMC00005860**

# EXHIBIT H

## Williams, Akilah [BSD] - SUR

From:        Song, David [BSD] - SUR
Sent:        Tuesday, March 13, 2012 11:23 AM
To:          Park, Julie [BSD] - SUR; Williams, Akilah [BSD] - SUR; McAtee, Jane [UCH]
Subject:     Fwd:

Please put this in Maria's file

David H. Song, MD, MBA, FACS
Cynthia Chow Professor
Chief of Plastic Surgery
Vice-Chairman, Dept. Of Surgery

Begin forwarded message:

> **From:** "Tothy, Alison" <atothy@peds.bsd.uchicago.edu>
> **Date:** March 13, 2012 10:45:58 AM CDT
> **To:** "Song, David [BSD] - SUR" <dsong@surgery.bsd.uchicago.edu>
>
> Hi –
>
> Thanks for the page and phone call last week. Sorry for the delay in getting back to you via email.
>
> This is email will serve as a paper trail of the discussion we had regarding one of the plastic surgery residents, Maria Atrunduaga. She was the resident on call when I was taking care of a patient with a metacarpal fracture. I paged her several times that morning. She responded and said she would be down to see the patient. After an hour had passed I re-paged Maria several times. After the third page, she responded and said she was busy and would be down soon. She abruptly hung up on me after I began to discuss setting expectations for families regarding wait times, etc. When I tried to page her back she did not return my call. Unfortunately, when she hung up on me, I still had patient care questions, including whether or not I could let the child eat. (We try to keep the kids NPO until we determine if they will need sedation for a reduction of the fracture.) I then paged and spoke with the Attending Physician on call. When she did come to see the patient, there was no communication to the nursing or physician staff in the Pediatric ER. She only told the family she would speak with her senior and return for to care for the patient.
>
> I would be happy to discuss any questions or concerns that you might have. As we discussed on the phone, I strongly believe in a team approach (including subspecialists) to taking care of our patients in the Pediatric ER. We enjoy working with your residents, as we often learn as much from them as they can learn from us. Fortunately, the situation above rarely occurs and to my knowledge most interactions with the plastics team and the Pediatric ER run smoothly.
>
> Let me know if I can be of further assistance.
>
> Alison
>
> Alison S. Tothy, M.D.
>
> Medical Director; Pediatric Emergency Medicine
>
> Assistant Professor; Department of Pediatrics



> The University of Chicago Children's Hospital

1

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                     UCMC00016348

# EXHIBIT I

March 23, 2012

Dr. David H. Song
Professor of Surgery
Vice Chairman, Department of Surgery
Chief, Section of Plastic and Reconstructive Surgery
Director, Residency Training Program
University of Chicago Medical Center
5841 S. Maryland Avenue, MC 6035
Chicago, IL 60637

I would like to use this letter as an opportunity to summarize from my perspective the overall progress and conclusions about the probation period that is about to end, how I believe the goals set have been accomplished, as well as to address a few issues that have arisen during this period. It is my hope that you and the faculty members in charge of reviewing my probation will take this into consideration when deciding whether to lift my probationary status.

Even though I made clear that I disagreed with the appropriateness of such a severe sanction as probation at this point in my training, for all the reasons I presented at length in my November 18th letter, I decided to embrace this as a challenge that looking back at this period I now realize has helped me grow and mature both as a person and as a professional. Regarding the probation goals itemized on your November 15th letter, I believe I have met or exceeded all of them as has been widely acknowledged in numerous weekly performance evaluations, some of which I am quoting below:

*"She does perform at a comparable level to her peers. Overall, we were pleased with Dr. Artunduaga's performance on our busy service as far as her work ethic, positive attitude, and willingness to learn and to pursue continual self-improvement. These traits should serve her well in her professional development and maturation. Her struggles early in internship can likely be attributed to needing some time to adjust to an unfamiliar clinical environment. She continues to make progress in all facets of her job and has the insight to understand the areas she should focus on improving. She has the raw tools to mature into an excellent clinician. With time, experience, and mentorship from senior residents or attendings, she should develop into a fine resident and surgeon."* Michael Shao, Vascular Surgery Fellow

*"I think Maria did a great job in Vascular Surgery, I would be happy to have her on my team again in the future. She is easy to get along with, a good communicator, and very enthusiastic. If she has had problems in the past with efficiency, she has clearly made progress, because I would never make that complaint about her."* Jennifer Paruch, General Surgery Resident

*"I have been with Maria since earlier in the year on Kaplan service, we then were together again on Vascular and now Transplant. Therefore, I have had the opportunity to see her grow over several months. She has exponentially improved since our initial encounter. She*

1

UCMC00001445

*has efficiently done everything she has been asked to do, she has learned to reflexively double check any information she passes on, she's dramatically improved when presenting patients, and she continues to be enthusiastic and always has a smile on her face regardless of her current situation, which would make anyone else stressed. I have seen interns do much more egregious acts to warrant this type of probation and having spent the most time with her of any resident, she has not shown any evidence of being a threat to patients. She has effectively managed the Transplant service for a week and a half while the PA was on vacation without any issues. I say this because: 1. Transplant is a service that we don't manage often as General surgery residents, therefore we have very limited experience and 2. Many of the interns before Maria have had the PA as the main floor person. I have otherwise enjoyed working with her and I know she will continue to improve. She is a great person and a great doctor if given the chance. She takes feedback well and is willing to learn. It's just sad that no one wants to take the time to teach."* Irma Fleming, General Surgery Resident

*"She is excellent at prioritizing her work. She pays attention to details and follows things up very well. I think she is an extremely good clinician for her level. In the transplant service, I've worked with her more than anyone else and I think she's is exceptional, way above average, very enthusiastic and has improved tremendously over the past weeks. I have no concerns whatsoever about her clinical competence. Arguably one of the best interns I've worked with on the transplant service."* Dolamu Olaitan, Transplant Surgery Fellow

In regards to the confidentiality of the probation that you said in writing you were concerned for my sake that I had been infringing upon, I would like to remind you that a fair number of residents and attendings in the Department of Surgery knew about my struggles because you took the step of discussing your concerns with them prior to making your decision. During my Thoracic Surgery rotation in November, my superiors did not allow me to perform my intern floor duties or to perform junior level cases because they "knew about my issues." When I asked you for your help, you said you could not intervene on my behalf because I had a "bad reputation" and that I should work things out on my own. Therefore, as it became clear to me that information about my perceived performance had not been kept confidential by other people, I felt compelled to talk openly about it in future rotations, and that of course included discussing my probationary status. In my conversations, my overriding intention was only to ask to be given the same opportunities as others and to be fairly evaluated, as I stated in my letter from November 18th. I did not, nor would I ever ask for special favors on my behalf since it is my belief that in Medicine no one would ever risk their professional credibility by saying good things about a bad performer.

The proactive attitude I have taken has indeed helped blunt the preconceptions the attendings and residents would otherwise have about me, as proven by the attitude of some of those with whom I did not have the opportunity to discuss my situation beforehand. As an example of this, one of the attendings during my probation period believed she had seen enough of me based on the limited interactions I had with her during only three service rounds, and submitted her evaluation 10 days before she was supposed to do so. In her review, she graded me poorly on several aspects, even on areas that she had never supervised me on.

2

UCMC00001446

When I expressed my bewilderment to her, she said to me that she had assumed that I was not good because I was under probation, and that she was grading me based on other people's comments, some of whom in fact later told me they had never spoken with her about me. Her prejudgment also clearly had other negative effects on my interactions with her, for instance when during one of my night-float shifts, she decided not to communicate with me in regards to a case, preferring instead to call a senior resident on-call, despite knowing that it was me who was covering her service and that I should be the one taking care of her patient.

At the same time, I have also made mistakes I do recognize, but which I would ask you to contrast against the seriousness of the accusations against me that led to the meeting and letter from November 2nd. A few weeks ago, I behaved inappropriately towards Dr. Alison Tothy when I abruptly ended a conversation where I felt she was speaking very rudely to me, despite the fact I had already examined her patient and so far had followed proper procedure with him. I also had another incident with Dr. Nora Jaskowiak who admonished me due to an antibiotic prescription that I was asked to refill outside of my regular duties, but which I filled out incorrectly when there did not exist any documentation in the electronic chart and I instead decided to do based on the information the patient gave to me. I also had difficulty with time management during my Transplant Surgery rotation because I was concentrating so much on going the extra mile on my work that I sometimes failed to make appropriate arrangements to leave the hospital on time before being over-hours. While I acknowledge these and other mistakes, I also have to say that being on probation has put an additional amount of stress to my daily routine that I have had to learn to cope with only gradually over time.

In conclusion, as I believe my weekly evaluations attest, despite the occasional difficulties the record shows that my performance is entirely comparable to that of my intern class, even well above average in some instances. I understand that Plastic Surgery residents are expected to do better than General Surgery residents, but given the point where I started and which I made fully transparent when I first applied to this Program, I believe my strong rate of progress is unmistakable as I hope you and the faculty committee will recognize. I am certain that with my abilities and hard work ethic, aided by your mentorship and guidance, I can become the resident you want and expect me to be. I just want to have the same opportunities to develop my skills as other residents are having. I hope you find my performance satisfactory in order to remain in this Program, and furthermore I would urge you to consider removing any trace of this disciplinary action from my permanent record, as you have the power to do.

Sincerely,

Maria Alexandra Artunduaga, M.D.

C.C. Probation committee members

3

# EXHIBIT J



THE UNIVERSITY OF
CHICAGO
MEDICAL CENTER

DEPARTMENT OF SURGERY          MC 6035
Section of Plastic and Reconstructive Surgery     5841 South Maryland Avenue
                                Chicago, Illinois 60637-1470
                                tel   773-702-6302
                                fax   773-702-1634

Dear Dr. Artunduaga,

This letter is to inform you that the Faculty of the Plastic and Reconstructive Surgery section has
reviewed your progress in the residency. We have concluded that we will not offer you a contract for
additional training in the Plastic Surgery program at the University of Chicago. You were placed on
probation on November 15, 2012. At your request, we extended the probationary period until March
23, 2012 to give you ample opportunity to work on the areas where improvement was needed. Also at
your request, we agreed to provide you with notice concerning renewal of your contract following
completion of your probation.

We are not renewing your contract because you have failed to fulfill the applicable educational and
clinical requirements of the graduate education and clinical training program to the satisfaction of the
Program Director, you have failed to acquire at least the same professional knowledge, skill and
judgment that residents in the Program normally acquire at the same level of post graduate medical
education and training, and you have failed to carry out satisfactorily your professional responsibilities.

This decision was made by the faculty at a meeting held on March 26, 2012 after review of your
complete file and with particular attention to your knowledge, skills and judgment since your probation
started. The decision was unanimous. We considered all of the issues raised in your November 18 and
March 23 letters to me. You have met with Dr. Park during this probationary period and she has
discussed with you specific steps you could take to improve your performance and has discussed your
status with you throughout your probation. While you have improved in some areas and have worked
hard to meet the goals we set for you, you have not satisfactorily demonstrated to us that you can meet
the requirements of the program. Your overall faculty evaluations are well below the norm for
residents at your level of training. In particular, despite remedial efforts, you are still below
expectations on the manner in which you present patients, on anticipating and addressing clinical
situations, listening carefully and behaving professionally to avoid conflicts. You lack many of the basic
skills expected of a resident at your level of training. In particular, your work on our service in March
evidenced many problems.

We believe that further remediation will not resolve these issues. Therefore, we are not offering you
continued training in the Program.

This decision is subject to review under the Graduate Medical Education Grievance policy, a copy of
which is attached.

We suggest that you now devote your time to consideration of your professional development and
looking for a job or training program. Therefore, we are removing you from all clinical duties effective
March 27th, 2012. Your stipend and benefits will continue through the end of your contract.

Sincerely,

David H. Song, MD, MBA, FACS
Cynthia Chow Professor of Surgery
Program Director and Chief, Section of Plastic and Reconstructive Surgery
Vice-Chairman, Department of Surgery          AT THE FOREFRONT OF MEDICINE®
The University of Chicago Medicine and Biological Sciences

2012/Apr/27 08:05   (01_[2012_03_27_LETTER]dr_song_to_dr_artunduaga.pdf)

# EXHIBIT K

March 29, 2012

Dr. David H. Song
Professor of Surgery
Vice Chairman, Department of Surgery
Chief, Section of Plastic and Reconstructive Surgery
Director, Residency Training Program
University of Chicago Medical Center
5841 S. Maryland Avenue, MC 6035
Chicago, IL 60637

With this letter I want to initiate the Grievance Process concerning the three major decisions you communicated to me on your letter from March 27, 2012, and directly request your reconsideration on:

1. **The immediate dismissal from my clinical duties:** As your November 15 probation letter states, the decision to be reached at the end of this period would concern "whether [I] have met the conditions for this probation and whether [I] would be offered a contract for another year of training." At no point in your communications did you state that my permanence through the end of my internship year was at stake, nor do my recent evaluations convey that I represent the type of imminent danger to patient safety that would warrant this type of extraordinary measure.

2. **The decision that I had failed the probation period:** The conditions that had to be met for me to continue in the program were clearly laid out and itemized in the probation letter, and they were directly addressed through my weekly evaluations. Your letter makes no mention of your assessment of those specific criteria and how your overall decision followed from it.

3. **The non-renewal of my PGY-2 contract:** As stated in the probation letter, the decision to renew my contract was directly linked to the successful completion of the probation period. Since I must ask for reconsideration of the probation grade, I must ask for reconsideration of this decision as well.

Because a principal argument for your decision states that "[my] faculty evaluations are well below the norm for residents at [my] level of training," I decided to do my own review and tally of a total of ten attendings' evaluations from the months of January and February, and excluded two from the month of November since I felt I was denied the opportunity to have a fair educational experience as stated in my letter of November 28 that was hand-delivered to the GME office (attached). I compared my grades against those of 1) a Plastic Surgery resident who has a similar background to mine (IMG) at the same period of time during his/her internship year; and 2) the grade average of my PGY-1 class of eighteen (18) interns. The results are shown in the table below:

1

UCMC00006113

| Evaluation Criteria | Me | PRS resident | Diff | PGY-1 average | Diff | STDev | Diff / STDev |
|---|---|---|---|---|---|---|---|
| General knowledge | 3.78 | 4.17 | -0.39 | 3.84 | -0.06 | 1.29 | -0.05 |
| Operative knowledge | 3.83 | 4.00 | -0.17 | 3.54 | +0.29 | 1.41 | +0.21 |
| Pre-Op Care | 3.89 | 4.17 | -0.28 | 3.95 | -0.06 | 1.16 | -0.05 |
| Post-Op Care | 3.89 | 4.50 | -0.61 | 4.00 | -0.11 | 1.36 | -0.08 |
| Able to communicate/justify medical decisions | 4.11 | 4.83 | -0.72 | 4.05 | +0.06 | 1.45 | +0.04 |
| Preparedness | 4.50 | 4.00 | +0.50 | 4.09 | +0.41 | 1.51 | +0.27 |
| Advanced OR skills | 4.40 | 4.00 | +0.40 | 4.00 | +0.40 | 1.52 | +0.26 |
| Ethical, honest, reliable | 5.11 | 5.17 | -0.06 | 5.11 | 0.00 | 0.94 | 0.00 |
| Shows sensitivity of age, gender, culture | 5.11 | 5.17 | -0.06 | 5.05 | +0.06 | 1.06 | +0.06 |
| Relations with patients and family | 4.67 | 5.17 | -0.50 | 4.79 | -0.12 | 1.22 | -0.10 |
| Relations with healthcare professionals | 4.67 | 5.00 | -0.33 | 4.74 | -0.07 | 1.27 | -0.05 |
| Documentation of practice activities | 3.71 | 4.60 | -0.89 | 4.17 | -0.46 | 1.04 | -0.44 |
| Teaching abilities | 3.67 | 4.00 | -0.33 | 4.00 | -0.33 | 1.41 | -0.23 |
| Ability to lead/manage a service | 3.75 | 4.00 | -0.25 | 3.8 | -0.05 | 1.26 | -0.04 |
| Presentation quality | 3.67 | 4.00 | -0.33 | 3.56 | +0.11 | 0.75 | +0.15 |
| Critiques personal practice outcomes | 4.40 | 4.20 | +0.20 | 4.07 | +0.33 | 1.41 | +0.23 |
| Practices cost-effective patient care | 4.00 | 4.00 | 0.00 | 4.13 | -0.13 | 0.92 | -0.14 |
| Demonstrated knowledge of risk-benefit analysis | 4.00 | 4.00 | 0.00 | 4.20 | -0.2 | 1.07 | -0.19 |
| Demonstrates understanding of role of specialist | 4.14 | 4.00 | +0.14 | 4.29 | -0.15 | 0.95 | -0.16 |

Two conclusions are immediately clear from this table: first, that I am not "well below average," as you have repeatedly stated in your communications, and second, that I am in fact performing at a very similar level compared to my peers, with a difference of less than 1.0 points in all aspects evaluated. When matched against the rest of my intern class –a legitimate comparison since I am currently undergoing three years of General Surgery training prior to my Plastic Surgery years–, my performance was within 0.3 standard deviations (STDev) from the average, with only one case being higher at 0.44 (documentation of practice activities), out of all 19 aspects evaluated.

2012/Apr/27 05:09  (02_[2012_03_29_NAA_LETTER]dr_arriundiaga_to_dr_song.pdf)

UCMC00006114

Given the results above, I first need to ask you to share with me the objective metrics that were used to reach your conclusion about my faculty evaluations, as my own analysis seems to reach a very different result. Furthermore, given that a Probation Committee made the decision to put me on dismissal and not to renew my contract, I think I have the right to know the individuals present, as well as the time and place where this faculty meeting took place on March 26. In regards to the other conclusions in your letter of March 27, since I cannot make any comments on the generic statements you made, I would appreciate that you give me specific examples of events and reviews that you considered most relevant in reaching your decision.

About the short meeting we held on March 27, which you emphasized was merely informative and hence I was not given a chance to respond, I feel compelled to make the following comments for the record:
- You mentioned that you knew from the beginning of my probationary period that I would not pass, which makes me question whether you at all intended to give an objective and independent review of my performance during probation. I went into this period with the belief you had a real interest in helping me improve as any other program director would do with his/her own residents.
- You once again suggested that I should voluntarily quit my job, as you had also done at our November 2 meeting, instead of fighting for the spot I earned after one of the most competitive application processes in the country. On the day of my interview, when I mentioned the transition I would need to undergo after having received my medical training abroad, followed by a 4-year research postdoc at Harvard Medical School, you offered me mentoring and support during this period of adjustment if I considered ranking this program high on my list. Having made my choice partly on that basis, I have yet to see proof of the support you mentioned at that time.
- You mentioned that you decided to completely ignore the evaluations of fellows and residents, who were not only the people whom I worked most closely with, but were also the people who directly evaluated me on the 10 specific areas itemized in your probation letter. If the goal was to evaluate my improvement on those areas, I would have assumed that their input would have been most valuable in making this assessment.
- I must take issue with your accusation of asking for favorable reviews from attendings prior to my rotations during my probationary period, which not only is false but I would also consider to be a seriously unethical action. I only asked for feedback from the attendings by my third week of rotation with the sole purpose of helping sustain my continued improvement, and I have written proof of the requests I made.

I still have hope that we can resolve this situation in amicable terms, because I consider that most of the decisions in my case have been made with limited and selectively chosen information. Most immediately, I ask you to reinstate me to my clinical duties as a precautionary measure while the other decisions are under review, so that I can have the opportunity to finish my internship year and not ruin the last hope I have to become a Plastic and Reconstructive Surgeon.

Sincerely,


Maria Alexandra Artunduaga, M.D.

C.C. Dr. Jeffrey B. Matthews, Chair, Department of Surgery
    Barry Kamin, M.S., Executive Director of Graduate Medical Education and DIO

3

UCMC00006115

# EXHIBIT L



THE UNIVERSITY OF
# CHICAGO
MEDICAL CENTER

DEPARTMENT OF SURGERY      MC 6035
Section of Plastic and Reconstructive Surgery   5841 South Maryland Avenue
Chicago, Illinois 60637-1470
tel    773-702-6302
fax    773-702-1634

April 4, 2012

Maria Artunduaga
208 W. Washington St
Apt 1210
Chicago, IL 60606

Dear Maria:

This letter is in response to your letter to me dated March 28, 2012. In that letter you requested reconsideration of the decision of the Plastic and Reconstructive Surgery faculty to not renew your contract for a second year in the Program.

I have reviewed the issues raised in your letter and have consulted with faculty.
After a thorough review, we will not change our decision and your contract will not be renewed.

You raised an issue about our decision to remove you from clinical service. We have not terminated your contract but we believe that under these circumstances, it is best that you not continue with this year's clinical activities so that you have time to consider your career options. After consideration, however, we will reinstate you to the general surgery schedule so that you can complete this year of training. Please contact Dr. Kevin Roggin by noon on Friday, April 6, 2012 and he will make your assignment. You will remain on probation and under supervision during the rest of your work at UC. Please note that this is NOT a period where you should undertake to change our minds about the non renewal decision. We are putting you back on clinical service at your request and to allow you to earn credit for this entire year. Please note that if during this period, we believe that you have breached your contract in any way, that we may remove you from clinical service.

Many of the statements in your letter are not correct. I will not rebut those statements in this response as they will be addressed at the grievance hearing should you decide to proceed.

As to what you describe as the "short meeting" on March 27 and the comments which you attribute to me, I note that your statements are mischaracterization of our discussions. I need to point out to you that you abruptly left that meeting without further discussion. As to my suggestion that you consider resignation, it has been the experience of the medical center that some residents, faced with a non-renewal, request that we work on a smooth transition to their next job. They would prefer not to have a non-renewal on their record. That is the spirit in which I offered the opportunity for resignation and transition. If you are interested in discussing that option, please contact Jane McAtee, Associate General Counsel at 773 702 1057.

Sincerely,

DAVID H. SONG, MD, MBA, FACS
Cynthia Chow Professor of Surgery
Chief, Section of Plastic and Reconstructive Surgery
Vice-Chairman, Department of Surgery
The University of Chicago Medicine & Biological Sciences

AT THE FOREFRONT OF MEDICINE®

2012/Apr/27 06:11 (08_[2012_04_04_LETTER]d_song_to_dr_artunduaga.pdf)

UCMC00006116

# EXHIBIT M

| From: | Artunduaga, Maria [UCH] </O=UCH/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=MARTUNDUAGA> |
|---|---|
| Sent: | Thursday, April 5, 2012 10:40 PM |
| To: | Song, David [BSD] - SUR <dsong@surgery.bsd.uchicago.edu> |
| Bcc: | 'antoniocopete@gmail.com' |
| Subject: | Reinstatement of clinical duties |

Dear Dr. Song,

This message is first to all to acknowledge receipt of your letter from yesterday, April 4, where you affirmed your decisions regarding the outcome of my probation period and the non-renewal of my contract for next year. At the same time, you informed me about the reversal of your decision of immediate dismissal and asked me to contact Dr. Roggin to put me back on the General Surgery rotation schedule for the remainder of my internship year.

While I have decided to continue the grievance process regarding your other decisions, and you will shortly be receiving a copy of my letter to the GME office asking for the formation of a housestaff grievance committee, I must also let you know that I have learned from Dr. Roggin that the surgery rotation schedule had already been rearranged as a consequence of your dismissal decision. In consequence, I had been withdrawn from the night-float schedule and I can now only be put back on the B service for 8 weeks, where I will have to share duties with another intern, an arrangement that I find unacceptable.

I must remind you that it is my right as a duly admitted PRS intern and your obligation as my Program Director to ensure that my educational needs are met for the length of my stay at UofC. Up to this point, I have already rotated with another intern three times so far (August in B service; October and March in PRS service), more than any other intern in my class; I have only logged 50 cases in 10 months, far fewer than the PGY-1 average in UofC of 100 cases/year; I have only done 1 week of night-float, out of the average of 4-6 weeks; and I have already missed 10 training days since the dismissal. I therefore demand that for the remainder of my time as a UofC intern, I be returned to the night float schedule as I was previously assigned, and that I be left to rotate as a stand-alone intern, so as to have the chance to log as many cases as my peers have.

Given the urgent nature of this issue, I urge you to act as quickly as possible and to ensure, both as program director and the person who unilaterally made the decision that has put me in this situation, that I get a fair educational experience for the remainder of my internship year. If you had actually had the intention to help me in a transition period, you would have instead given me the option to take time off my duties if I considered it necessary, an option I would have respectfully declined. If I do not see a swift and decisive action on your part in this regard, I will see myself in the undesirable position to have to bring up this matter to the GME office as well.

I await your quick and hopefully positive answer, not just "per my request," as you frequently point out, but because it is the fair and rightful opportunity that I have earned through my own effort and dedication, and which has so far been put in jeopardy in no small amount as a consequence of your actions.

Sincerely,

Maria Alexandra Artunduaga, M.D.

# **EXHIBIT N**

| From: | Ricardo Garcia <ragomusic@gmail.com> |
|-------|----------------------------------------|
| Sent: | Thursday, April 26, 2012 2:14 PM |
| To: | Artunduaga, Maria [UCH] <Maria.Artunduaga@uchospitals.edu> |
| Subject: | Second attempt |

Drs. Song and Roggin,

This is the second attempt I'm making to get an answer to a straightforward question you seem to have ignored. An order has been given that has directly and significantly affected the quality of the training I have been receiving over the last several weeks, and I have been given no notice of what that order was and why it was given.

In case I haven't made my expectations clear, I am not here to add a line to a resume; I am here to receive an education, and I have already been made to waste 1 full month of my time. For one last time, if I do not receive a satisfactory response from either of you by tomorrow (Friday), I will have no option but to file a formal complaint with the ACGME, as this is far below the educational standards for a PGY-1 surgery resident. As Dr. Song himself said, my contract remains in full effect, with all the rights and obligations that entails, or so I thought. If you are not going to be as serious in recognizing my rights as you were in threatening me with another dismissal if I failed to fulfill my obligations, then at least I should be able to know why.

I expect your answer by 9:00am tomorrow.

Sincerely,

-MAA

UCMC00001303

# EXHIBIT O



THE UNIVERSITY OF
CHICAGO
MEDICAL CENTER

DEPARTMENT OF SURGERY
Section of Plastic and Reconstructive Surgery

MC 6035
5841 South Maryland Avenue
Chicago, Illinois 60637-1470
phone 773.702.6302
fax    773.702.1634

April 30, 2012

Dr. Artunduaga;

This letter is to inform you that you I am making a new assignment for you for the completion of your internship year.

To summarize your status: We have decided not to offer you another year of training in our program. You have invoked a Grievance concerning non-renewal of your contract and that process is underway. Your rights under the ACGME and your contract are handled through that process. We have decided that due to your substantial deficiencies, you will remain on probation for the remainder of this year and, as a result, any clinical work would be supervised. You have invoked a Grievance for that decision.

We provided you with a clinical experience that would allow you to complete your internship year. This experience was done under heightened supervision due to the deficiencies that resulted in the non-renewal decision and the continuing probation. You have complained that this is an inadequate experience, is somehow discriminatory and is in violation of rights you claim to have. You have, surprisingly, stated that it is a "waste of your time." Yet, you have not fully participated in this assignment, coming late to morning rounds and skipping many morning rounds completely. This is disruptive to the program.

There is nothing that gives an intern any rights to any specific rotations or experiences.

It is my opinion that your assignment was an appropriate assignment and that you have been given adequate clinical and educational opportunities while assigned to the Endocrine Service. Your continued challenges to this assignment and accusations about the people involved are unproductive. We have provided you, repeatedly, with information about the reasons for your non-renewal and your probation.

You have continued to exhibit disruptive and unprofessional behavior. You have failed to fully participate in the Endocrine assignment. Thus, you have failed to meet the expectations of the program and the conditions of probation and we are prepared to terminate you now.

This letter is to inform you that we will give you one more chance to complete your internship year. Any further incidents of unprofessional behavior, insubordination, harassment, threats or dereliction of your responsibilities will result in your immediate

UCMC00001261

termination from the program. Your rights will be addressed at the Grievance hearing and I ask you to stop sending demanding and harassing emails to me and others.

Your assignment beginning May 1 is to complete an independent study under my supervision. If you do that, we will be able to certify that you completed your internship year.

I hope that you take this opportunity to complete this year without further incident.

Sincerely,

David H. Song, MD, MBA, FACS
Cynthia Chow Professor of Surgery
Chief, Section of Plastic and Reconstructive Surgery
Vice-Chairman, Department of Surgery

UCMC00001262