# TAB 10

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DR. MARIA ARTUNDUAGA,   )
                        )
     Plaintiff,   )
                        )
    -vs-         ) No. 12 CV 08733
                        )
THE UNIVERSITY OF     )
CHICAGO MEDICAL CENTER,   )
                        )
     Defendant.   )

     The videotaped deposition of MARIA ARTUNDUAGA, called for examination, pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Suzanne Burke, a Certified Shorthand Reporter in the State of Illinois, at 222 North LaSalle Street, 24th Floor, Chicago, Illinois, on April 2, 2014, 2014, A.D., commencing at the hour of 10:06 a.m.

## Page 2

1   APPEARANCES:
2   THE FRANKLIN LAW FIRM
     53 West Jackson Boulevard
3   Suite 803
     Chicago, Illinois 60604
4   BY: MS. JAMIE S. FRANKLIN
     Jsf@thefranklinlawfirm.com
5   312-662-1008,
6     appeared on behalf of the plaintiff;
7   VEDDER PRICE, PC
     222 North LaSalle Street
8   Chicago, Illinois 60601-1106
     BY: MR. MICHAEL G. CLEVELAND
9   BY: MR. ANDREW OPPENHEIMER
     Mcleveland@vedderprice.com
10  312-609-7860
11   -and-
12  THE UNIVERSITY OF CHICAGO MEDICAL CENTER
     OFFICE OF LEGAL AFFAIRS
13  5841 South Maryland Avenue
     Chicago, Illinois 60637-1470
14  BY: MS. ANNE E. DUPREY
     Anne.duprey@uchospitals.edu
15  773-702-1047,
16     appeared on behalf of the defendant.
17  ALSO PRESENT:
18  DR. DAVID SONG
19  MR. RICARDO GARCIA
20  MR. JAMES PORTER,
21     the videographer.
22
23     ----------
24

## Page 3

I N D E X - (1)

WITNESS:                   PAGE
MARIA ARTUNDUAGA
Examination By Mr. Cleveland       7
Examination By Mr. Cleveland (Continued) 109
Examination By Ms. Franklin       292
Further Examination By Mr. Cleveland   300

EXHIBITS

DEPOSITION EXHIBIT NOS.         PAGE

1 Laundry List           27
2 Points for Letter of March 23    31
3 Charging Party's Response to Request for Information          33
4 e-mail chain beginning with e-mail from M. Artunduaga to J. Williams - 9/6/11 41
5 e-mail chain beginning with e-mail from M. Artunduaga to R. Garcia - 4/22/12 43
6 e-mail chain beginning with e-mail from M. Artunduaga to R. Garcia - 4/22/12 47
7 e-mail chain beginning with e-mail from M. Artunduaga to R. Garcia - 4/25/12 47
8 e-mail chain beginning with e-mail from M. Artunduaga to A. Copete and R. Garcia - 6/19/12       49
9 e-mail chain beginning with e-mail from M. Artunduaga to A. Copete - 5/21/12 52
10 e-mail chain beginning with e-mail from M. Artunduaga to D. Shenaq - 7/2/11 76
11 e-mail from M. Artunduaga to D. Song - 7/7/11       81
12 letter from M. Artunduaga to D. Song - 11/18/11     87
13 e-mail chain beginning with e-mail from M. Artunduaga to D. Song - 8/23/11 103
14 e-mail chain beginning with e-mail from D. Song to A. Williams - 8/31/11   131
15 e-mail from D. Song to A. Williams - 11/24/11     134
16 e-mail chain beginning with e-mail from M. Artunduaga to A. Chhablani - 11/20/11     139

## Page 4

I N D E X - (2)
EXHIBITS
DEPOSITION EXHIBIT NOS.         PAGE
17 Areas for Improvement     145
18 Areas for Improvement - Reviewed 10/28/11     149
19 Summary of Evaluation with Dr. Maria Artunduaga - 11/2/11    157
20 Maria Artunduaga Note of Dr. Song   159
21 Letter to M. Artunduaga from D. Song - 11/15/11    165
22 text messages       167
23 e-mail chain beginning with e-mail from: D. Song to A. Williams - 11/16/11   173
24 meeting notes from 11/28/11   180
25A meeting notes from 1/3/12    187
25B meeting notes from 1/10/12   195
26 meeting notes from 1/18/12   196
27 meetings notes from 1/25/12  196
28 e-mail from M. Artunduaga to D. Song and J. Park - 11/26/12    198
29 e-mail chain beginning with e-mail from J. Park to A. Williams - 2/22/12   202
30 meeting notes from 2/6/12   205
31 meeting notes from 2/13/12   209
32 e-mail chain beginning with e-mail from J. Park to D. Song - 2/24/12   216
33 meeting notes from 2/28/12   218
34 e-mail chain beginning with e-mail from M. Artunduaga to K. Umanskiy - 3/4/12       224
35 meeting notes from 3/5/12   225
36 e-mail chain beginning with e-mail from D. Song to a. Williams - 3/10/12   232
37 e-mail chain beginning with e-mail from D. Song to A. Williams - 3/13/12   235
38 meeting notes from 3/12/12
39 letter to M. Artunduaga from D. Song - 4/4/12       237
40 e-mail from M. Artunduaga to E. Grossman - 4/9/12     246
41 e-mail chain beginning with e-mail from E. Grossman to M. Artunduaga - 4/30/12     248

Page 5

1       I N D E X - (3)
2           E X H I B I T S
3   DEPOSITION EXHIBIT NOS.          PAGE
4   42  letter to E. Grossman from M.
    Artunduaga - 5/30/12        256
5   43  meeting notes from 3/30/12      257
    44  letter to M. Artunduaga from D. Song -
6   4/30/12             258
    45  letter from M. Artunduaga to D. Song -
7   3/29/12             263
    46  2011 Graduate Medical Education
8   Handbook                268
    (no 47 - 50 marked)
9   51  Second Amended Complaint       269
10  EXHIBITS RETAINED BY COUNSEL
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 7

1                MARIA ARTUNDUAGA,
2   called as a witness herein, having been first
3   duly sworn, was examined and testified as follows:
4               EXAMINATION
5   BY MR. CLEVELAND:
6       Q.  Dr. Artunduaga, as you know, my name is
7   Michael Cleveland, and I represent the University
8   of Chicago Medical Center in this case, and I'm
9   going to be asking you some questions here today.
10          You attended the deposition of Sara
11  Dickie yesterday, so --
12      A.  Uh-huh.
13      Q.  -- I assume you're somewhat familiar
14  with the process, but let me remind you of a
15  couple of things that will be helpful.
16      A.  Uh-huh.
17      Q.  You understand you're under oath,
18  correct?
19      A.  Yes.
20      Q.  If you -- if I ask you a question that
21  you for any reason are unable to understand, will
22  you please tell me that.  And I will do my best
23  to phrase a question that you are able to
24  understand.  Okay?

Page 6

1           THE VIDEOGRAPHER:  My name is James
2   Porter representing Veritex Legal Solutions.  The
3   date today is April 2nd, 2014, and the time is
4   approximately 10:06 a.m.  This deposition is
5   being held in the office of Vedder Price located
6   at 222 North LaSalle in Chicago, Illinois.  The
7   caption of this case is Artunduaga versus
8   University of Chicago Medical Center.  The name
9   of the witness is Maria Artunduaga.
10          At this time the attorneys will
11  please identify themselves and the parties they
12  represent after which our court reporter, Suzanne
13  Burke of Veritex, will please swear in the
14  witness and we can proceed.
15          MR. CLEVELAND:  My name is Michael
16  Cleveland.  I represent the defendant University
17  of Chicago Medical Center.
18          Andrew.
19          MR. OPPENHEIMER:  I am Andrew
20  Oppenheimer.  I also represent the University of
21  Chicago Medical Center.
22          MS. FRANKLIN:  I'm Jamie Franklin.  I
23  represent the plaintiff.
24          (Witness sworn.)

Page 8

1       A.  Okay.
2       Q.  It's important since we have a court
3   reporter present who is taking down the
4   testimony --
5       A.  Uh-huh.
6       Q.  -- that we each wait for the other to
7   finish speaking before we begin speaking.  That
8   means that if I ask you a question, you may
9   anticipate where my question is going; but on the
10  other hand, you have to let me finish it before
11  you begin answering.  Likewise, I don't mean to
12  cut you off.  If you have not finished your
13  answer, please tell me that.  Okay?
14      A.  Okay.
15      Q.  We want to get your full and complete
16  testimony here today.
17      A.  Okay.
18      Q.  Also, it's important that you answer
19  with words.  Even though we do have a
20  videographer here, words are better especially
21  since we have a court reporter.  So yes and no
22  are much better than things like uh-uh, uh-huh.
23  And I assure you nearly every witness who has
24  ever given a deposition has messed up on that

Page 65

```
 1   you?
 2       A.  Well, I found out in September that she
 3   was talking to the faculty members and Brian
 4   Bello or people from the colorectal service
 5   trying to find out if I had made mistakes or
 6   anything, and she will report that to Dr. Song.
 7   And I consider that retaliatory, because I had
 8   made complaints about discrimination, and I
 9   didn't expect my own chief resident reporting me
10   to my program director.
11       Q.  To whom did you complain about
12   discrimination because of your Columbian national
13   origin at any time during your employment at the
14   Medical Center?
15       A.  I complained about accent discrimination
16   and hostile work environment both to Justine Lee
17   in July, late July, once, the second time mid
18   August, the third time to her, Justine Lee, and
19   Sara Dickie August 30th in a meeting that we had.
20   I said that it was -- I was positive it was due
21   to my accent, and I had the feeling it was
22   because of where I come from, my background,
23   cultural background, meaning, yeah, I'm
24   Columbian.
```

Page 66

```
 1           I spoke with Dr. Song about it.  He
 2   said there was no such a thing as accent
 3   discrimination, and that he was not going to do
 4   anything about that.  Our first meeting happened
 5   in September 29th.
 6       Q.  Now, many people at the Medical Center
 7   have accents, correct?
 8       A.  Not in the department of surgery.  I
 9   mean, not native English speakers.  I was the
10   only one, and a preliminary.
11       Q.  What about in plastic surgery, people in
12   plastic surgery have accents, don't they?
13       A.  It's different when you are coming from
14   a country where English is not your official
15   language than when you come from, let's say, the
16   UK or another country where English is
17   well-spoken.
18       Q.  That was not my question.  Please listen
19   to my question.
20       A.  Yes.
21       Q.  People in plastic surgery have accents,
22   don't they?
23       A.  They speak -- yes, have accents, but
24   they speak better English than I do.
```

Page 67

```
 1       Q.  You speak fluent English, don't you?
 2       A.  That's what I thought.
 3       Q.  And that's what you said many times,
 4   correct?
 5       A.  Yes, but the people that I work with
 6   didn't agree.
 7       Q.  Who thought you didn't speak fluent
 8   English?
 9       A.  John Seal.
10       Q.  Anybody else?
11       A.  Maybe Haejin In.
12       Q.  Anybody else?
13       A.  Who else?  Dr. Ferguson complained a lot
14   about my communication skills and my accent.
15       Q.  When did Dr. Ferguson complain about
16   your accent?
17       A.  Every time we were in the OR.  He kicked
18   me out three times for that.
19       Q.  We'll come back to Dr. Ferguson.
20           I do need to take a break.  So take
21   five, ten minutes.
22       A.  Sure.
23           THE VIDEOGRAPHER:  Off the record at
24   11:27 a.m.
```

Page 68

```
 1           (A short recess was taken.)
 2           THE VIDEOGRAPHER:  This begins disk
 3   No. 2.  Back on the record at 11:46 a.m.
 4   BY MR. CLEVELAND:
 5       Q.  Dr. Artunduaga, we just took a short
 6   break.
 7       A.  Uh-huh.
 8       Q.  And during that break you spoke with
 9   Mr. Garcia; is that correct?
10       A.  Yes, for a brief time.
11       Q.  And Ms. Franklin was also a party to
12   that conversation, correct?
13       A.  No.
14       Q.  What did you and Mr. Garcia say to each
15   other?
16       A.  He said that I was doing a good job.
17       Q.  What did you say?
18       A.  Thank you.
19       Q.  You came to be a resident at the
20   University of Chicago Medical Center through the
21   Match, of course, right?
22       A.  Yes.
23       Q.  And the plastic surgery program was one
24   of the residency programs to which you applied,
```

Page 69

1  correct?
2     A. Yes.
3     Q. Is it regarded as a prestigious plastic
4  surgery residency program?
5     A. There are no rankings out there. But
6  from what I've heard, it's middle tier. That's
7  all.
8     Q. So you were granted an interview at the
9  Medical Center; is that correct?
10    A. Yes, and eight more places, so...
11    Q. And when did you interview at the
12  Medical Center?
13    A. 2010, probably the 9th or 10th.
14    Q. Whom did you interview with?
15    A. Everybody, faculty members. It will be
16  Dr. Gottlieb, Dr. Lee, two people -- three people
17  from the University plastic surgery team,
18  Dr. Song obviously, Dr. Park, nurse practitioner
19  or physician assistant, the people from North
20  Shore. There was -- there was one Michael
21  Howard. Dr. Henry, Dr. Ginard Henry. I
22  interviewed with Matthew Greives, a resident,
23  Dr. Zachary, Trang Nguyen, Justine Lee, David
24  Teplica, and Aaron Pelletier. Eleven, twelve

Page 70

1  people.
2     Q. You referred to a Dr. Lee, is that
3  Dr. Raphael Lee?
4     A. Yes, Raphael Lee and Justine Lee, both
5  of them.
6     Q. Okay. We'll try to keep them separate
7  insofar as they come up.
8     A. Sorry.
9     Q. During the --
10    A. And there was somebody else, but he
11  left. Russ Reid, but he's still there, and
12  Kowalski, something with a K, two more people.
13  So 14 total.
14    Q. Did the people who interviewed you have
15  your CV?
16    A. Yes.
17    Q. And your CV disclosed that you were born
18  in Columbia, correct?
19    A. Uh-huh.
20    Q. Yes?
21    A. Yes, yes.
22    Q. And it also disclosed that you had been
23  to medical school in Columbia, correct?
24    A. Yes.

Page 71

1     Q. And when they interviewed you, of
2  course, they heard how you spoke and that you
3  have an accent, correct?
4     A. Yes.
5     Q. In your interview with Dr. Song --
6     A. Uh-huh.
7     Q. -- did he tell you that he had positive
8  feelings towards the nation of Columbia due to
9  his uncle?
10    A. Uncle? No.
11    Q. Did he tell you his uncle had been the
12  Korean ambassador to Columbia?
13    A. No, sorry. I don't remember. Uh-uh.
14  We talked things -- different things about
15  genetics and stuff.
16    Q. Did you come away with a positive
17  impression of Dr. Song from your interview?
18    A. Yes, I did.
19    Q. Was that impression that you garnered
20  from your interview with Dr. Song one of the
21  reasons that caused you to rank the University of
22  Chicago Medical Center where you did amongst the
23  schools that you interviewed at?
24    A. Him and the bunch of -- you know, the

Page 72

1  people, the people as a group. I mean --
2     Q. So --
3     A. -- I liked them, but it was the whole
4  experience with everybody else and especially the
5  residents. That was the thing that attracted me
6  more, the most.
7     Q. So that would be people like Dr. Greives
8  and Dr. Justine Lee?
9     A. Uh-huh.
10    Q. So overall you had a very positive
11  interview experience at the Medical Center; is
12  that correct?
13    A. With the plastic surgery section, yes, I
14  had a very positive experience.
15    Q. Did you have a not so positive
16  experience with other sections?
17    A. With the general surgery section, I had
18  a very negative experience during my internship.
19    Q. No, but during the interview?
20    A. I never interacted with them.
21    Q. I thought you said you saw Dr. In?
22    A. No.
23    Q. During your interviews. Maybe I
24  misheard you.

Page 89

1   taking here I took them out of fear of being
2   terminated, because I knew he was very upset with
3   me already.
4       Q.  So you were insincere in writing this
5   letter, right?
6       A.  Not everything is insincere.
7       Q.  But the apologies and admissions that
8   you made in this letter you're now telling me
9   were insincere?
10      A.  I would call them conciliatory.  I'm
11  sorry.
12      Q.  You didn't really mean them, did you,
13  the apologies and admissions?
14      A.  Yeah.  I mean, I honestly -- I just knew
15  that I was being unfairly treated, but that I
16  needed to do something, so that he wouldn't fire
17  me right away.
18      Q.  What's the first meeting you had with
19  Dr. Song about any matter relating to your
20  performance as a resident?
21      A.  When was it?
22      Q.  Yes.
23      A.  September 29th, I think.  Not August,
24  not July, no.  Just September.

Page 90

1       Q.  To your knowledge, did Dr. Song meet
2   with Dr. Shenaq regarding her performance as a
3   resident at any point between the start of the
4   residency and September 29?
5       A.  I have no idea.
6       Q.  What prompted that meeting of
7   September 29?
8       A.  Apparently rumors.  I found out during
9   the meeting that there was some sort of gossip
10  about me that I wasn't even aware of; that my
11  chief plastic surgery residents knew about it,
12  but never told me.  I was shocked.  I was -- I
13  didn't understand what was going on.  I didn't
14  understand why I was being reassigned to plastic
15  surgery.
16          I did not know anything about
17  Dr. Jaskowiak's e-mails about me.  She never
18  talked to me about any sort of concerns about my
19  performance or, you know, cultural adjustments,
20  how she calls it in the evaluations.  I didn't
21  know.
22      Q.  Who else -- who was present for the
23  meeting on September 29?
24      A.  No one.

Page 91

1       Q.  Other than you or Dr. Song?
2       A.  Uh-huh.
3       Q.  Where did it take place?
4       A.  At his office.
5       Q.  What did he say to you and what did you
6   say to him?
7       A.  Dr. Song says, Maria, I have given you
8   enough time to adjust, but it's taking you really
9   long.  I know about your complaints; and let me
10  tell you, there's not such a thing as accent
11  discrimination.  You speak English fine to me.
12  And I start talking to him, Look, I mean, this is
13  the way how I've been treated.  I gave him the
14  same examples that I gave to Justine Lee.
15          I told him about John Seal's yelling
16  at me, publicly humiliating me because he
17  apparently allegedly didn't understand how I
18  spoke; how he had distributed the assignments
19  during the month of August in a way that I was
20  getting always less than 50 percent of the cases
21  than my first year resident, co-intern who was
22  with me; how he said that he had -- I mean, that
23  he publicly and openly said that he couldn't
24  understand what I was saying.

Page 92

1           So to be honest, John Seal scared
2   me, and I was very, very afraid of him.  And I
3   actually start to believe that I couldn't
4   communicate in English.  And that I was having --
5   you know, that I shouldn't be there, that they
6   didn't want to work with me, that --
7       Q.  I want to go back to your conversation
8   with Dr. Song; and I want to know what you said
9   to him --
10      A.  I said that to him.
11      Q.  -- and what he said -- did you say to
12  him everything that you've just said to me?
13      A.  Yeah.  I told him about John Seal and
14  Haejin In and how they been treating me so badly.
15  He admitted that he knew about my complaints from
16  Justine Lee and from Sara Dickie.  He also
17  started showing me -- well, not showing me.  He
18  just said like this, I have these e-mails from
19  Dr. Jaskowiak and Dr. Umanskiy saying that you
20  can't convey patient's history, that you look
21  frazzled, and things like that.
22          And I told him, Well, it's been very
23  hard for me.  It's not about adjustment.  It's
24  like they are treating me very poorly and I

Page 93

1  believe it's because of who I am and where I come
2  from.
3          He then start saying that he has,
4  you know, people from all over the world,
5  foreigners doing residency there. But the fact
6  is I'm the very first nonnative speaker or, at
7  least, from South America. And the perceptions
8  that U.S. citizens have for someone who comes
9  from the UK or a developed country is not the
10  same as someone who comes from a country like
11  mine.
12         So to tell you one of the several
13  examples. There was one resident who every time
14  he saw me, he cited Wikipedia, FARC, and say out
15  loud in front of everybody (Witness speaking
16  Spanish) and showing pictures to everybody.
17         (Reporter interrupted.)
18  A.  How do you spell that?
19  Q.  FARC, F-A-R-C, is the acronym in
20  English, used in English?
21  A.  And he was doing that, like --
22  Q.  All right. Who is that person?
23  A.  Badir Shaksheer.
24  Q.  What was Mr. Shaksheer's position?

Page 94

1  A.  He was a second year.
2  Q.  In what field?
3  A.  General surgery.
4  Q.  What did you say when Mr. Shaksheer said
5  that to you?
6  A.  I turned the other way.
7  Q.  So you didn't say anything?
8  A.  No, I thought it was very immature and
9  ignorant.
10  Q.  Did you -- where is Mr. Shaksheer from?
11  A.  I don't know.
12  Q.  He's from Iran, isn't he?
13  A.  He speaks perfect English. I have no
14  idea.
15  Q.  And he didn't go to medical school in
16  the U.S., did he?
17  A.  Yeah, he did, to Virginia.
18  Q.  Did he go to med school?
19  A.  Yeah. He's said -- hey, he maybe moved
20  here when he was very little, but he's an
21  American, so...
22  Q.  Did you ever complain to anybody about
23  what Mr. Shaksheer said?
24  A.  No, I did not.

Page 95

1  Q.  Let's go back to the September 29
2  meeting with Dr. Song. What did Dr. Song say to
3  you?
4  A.  That he was putting me back in the
5  service of plastic surgery, because he wanted to
6  test me and he wanted to know if I could continue
7  in the program. And he said to me that if I did
8  not have a flawless performance he will just get
9  rid of me.
10  Q.  What were his words?
11  A.  Well, I will terminate you or I will
12  fire you or something. I mean, I told that to
13  Daniel Butz, and I told that to Justine Lee. And
14  they couldn't believe that Dr. Song was saying
15  that. I mean, he was threatening me with
16  termination after three months of internship.
17  Q.  Tell me anything else you remember about
18  the meeting with Dr. Song on September 29th?
19  A.  He said that my complaints that they
20  were not just -- I mean, the way how I been
21  complaining was not a good cultural fit, didn't
22  fit the culture of the department of surgery,
23  that that was the way it was, that's the way how
24  we learn surgery. In other words, that hostile

Page 96

1  work environment, discrimination is fostered and
2  tolerated in -- at UCMC, and that he wouldn't do
3  anything about it. He said, I'm not going to do
4  anything about it.
5  Q.  So he told you that all the residents in
6  the general surgery department were subjected to
7  a hostile work environment, right?
8          MS. FRANKLIN: Objection, misstates
9  testimony.
10  BY MR. CLEVELAND:
11  Q.  You can answer.
12  A.  He didn't say all of them. He just said
13  that what I was calling discrimination was
14  something that was fostered and tolerated. I
15  don't know if women were discriminated. I don't
16  know if internationals were discriminated. I
17  don't know if African-Americans were
18  discriminated. He just said that. So I do
19  believe that in the department of surgery there
20  is discrimination ongoing.
21  Q.  Based on what?
22  A.  Based on things that I saw, based on
23  things that I experienced myself.
24  Q.  Who else was discriminated against in

Page 97

1   the department of surgery?
2     A.  Who else was targeted, that I know of?
3  Other foreigners, no native speakers coming from
4  developing countries during the year that I was
5  there.
6     Q.  Please give me their names.
7     A.  You have them on your list of witnesses.
8     Q.  Just give me their names, please?
9     A.  Aria Razmaria.  He used to be a
10  neurology resident.  He was forced to resign.
11     Q.  What other names, please?
12     A.  There is a neurosurgery resident who is
13  still there.  Javed Khader.  He's, again, on the
14  list of witnesses.  He was about to be fired, put
15  on probation, I don't know.  But the thing is
16  that he's back; and what the department did is
17  that they have him rotating at North Shore
18  mostly, most of the time.
19     Q.  What other names?
20     A.  Reza Salabat.  I know, I mean, he was a
21  preliminary, and he was getting all these less
22  desirable rotations.
23     Q.  Are Dr. Razmaria, Dr. Khader, or
24  Dr. Salabat from Columbia?

Page 98

1     A.  No, they are not.
2     Q.  Did any of them go to the same medical
3  school you went to?
4     A.  No.
5     Q.  Do any of them have a Spanish accent?
6     A.  No.
7     Q.  Who was treated better in general
8  surgery than Dr. Razmaria, Dr. Khader, and
9  Dr. Salabat, and yourself?
10     A.  In my mind, well, what I saw, anyone who
11  speak without an accent, without a no native
12  accent, actually.  The only thing that I do know
13  is that none of them complained.  I have been the
14  only one who has stood up.
15     Q.  So one may have an accent and not be
16  from Columbia, correct?
17     A.  Yes.
18     Q.  So you're telling me that the department
19  of general surgery discriminated against anybody
20  who had an accent regardless of where they were
21  from; is that true?
22     A.  What I'm saying that there are biases
23  and prejudices, prejudice, against people who
24  come from countries like mine.

Page 99

1     Q.  Regardless of which -- what's a country
2  like yours?
3     A.  A developing country with problems, with
4  bad publicity.
5     Q.  So it doesn't matter which country it
6  is, if that fits that category, you're saying
7  there are biases against people with an accident,
8  from that country, right?
9     A.  In my experience with Columbia, yes.  I
10  don't know about the others.  You will have to
11  ask them.  That's an observation.  I don't know
12  for sure.
13     Q.  You said earlier you were afraid of
14  Dr. Seal?
15     A.  Yes.
16     Q.  Right?
17        You said you were afraid of
18  Dr. Song, right?
19     A.  Yes.
20     Q.  Who else were you afraid of?
21     A.  Ferguson.
22     Q.  Anybody else?
23     A.  Umanskiy, he made fun of me every day.
24  So far so good.  I don't remember anybody else.

Page 100

1     Q.  Now, Dr. Umanskiy has an accent, doesn't
2  he?
3     A.  Yeah.  So?
4     Q.  Do you know where he's from originally?
5     A.  Russia, I think, Ukraine.  I don't know.
6     Q.  And he's in the department of general
7  surgery; is he not?
8     A.  Yes, but he was trained in the U.S.  He
9  went to med school here.  He did his residency
10  here.  It's another story.
11     Q.  So are you telling me that you contend
12  you were discriminated against because you went
13  to medical school somewhere other than the U.S.
14  and you have an accent from a country that is a
15  third-world country that, as you said, has
16  problems and has had bad publicity?
17     A.  In part, yes.
18     Q.  Why else are you claiming you were
19  discriminated against in addition to those two
20  factors?
21     A.  Because I opened my mouth and complained
22  early on, and said, hey, they are targeting me
23  because of the way how I speak, I think, and I'm
24  not getting trained.  I'm not getting

Page 117

1    A. Caffarelli & Siegel, uh-huh, yes.
2    Q. So if Mr. Caffarelli and Ms. Engel
3  denied you made that statement to them, would
4  they be lying, too?
5    A. To my understanding, that's privileged
6  communication, right? So I don't think they will
7  say anything that we talked, right?
8    Q. If they denied making that statement,
9  would that be a lie? I'm not asking you if --
10   A. I'll say yes, they are lying; but we are
11 making an assumption.
12   Q. As a matter of fact, the first time you
13 ever put anything in writing asserting you were
14 discriminated against because of your national
15 origin was when you appealed the grievance
16 committee's denial of your grievance, correct?
17   A. No. I tried to make -- I made several
18 oral verbal complaints to my chief residents to
19 Dr. Song. I even tried to go to human resources.
20 Even my husband approached them. I was told that
21 they were forbidden to talk to me about my
22 complaints about discrimination.
23   Q. Dr. Artunduaga, I'm going to ask the
24 court reporter to read the question back.

Page 118

1    A. Okay.
2    Q. I want you to listen to the question and
3  give an honest answer to the question. Okay?
4       MS. FRANKLIN: I'm sorry. Object to
5  form. And, please, you're harassing the witness.
6  You -- she answered your question.
7       Let's read it back. Let's read the
8  answer back. And then I'll decide whether
9  there's going to be an objection to you asking
10 her again.
11      Would you do that for me.
12      (Whereupon, the question was read.)
13      MR. CLEVELAND: We don't need the
14 answer. I just want the question.
15      MS. FRANKLIN: Okay. I'd like to hear
16 the answer, so we can tell whether she answered
17 your question. That was the basis for my
18 objection.
19      MR. CLEVELAND: If you decide she's
20 answered the question, are you going to instruct
21 her not to answer?
22      MS. FRANKLIN: Could you just please
23 read the -- read me the answer to the question.
24      MR. CLEVELAND: You can read -- go

Page 119

1  ahead, read it.
2       (Whereupon, the answer was read.)
3       MS. FRANKLIN: Okay. I'm not trying to
4  be difficult. I think she was answering with
5  respect to oral complaints.
6       So, go ahead, you're right, you can
7  ask the question again.
8       MR. CLEVELAND: All right. So I'm just
9  going to -- so there's no confusion, I want the
10 court reporter to read the question again.
11      MS. FRANKLIN: Okay.
12 BY MR. CLEVELAND:
13   Q. Dr. Artunduaga, please listen to the
14 question and answer.
15   A. Okay.
16      (Whereupon, the record was read.)
17 BY THE WITNESS:
18   A. More likely, I did not do it before,
19 because I was afraid of retaliation; and most of
20 my -- many of my plastic surgery coresidents
21 discouraged me to do so. They say that they will
22 advocate for me in front of Dr. Song.
23 BY MR. CLEVELAND:
24   Q. The answer to my question which you've

Page 120

1  heard three times is no; is it not?
2    A. More likely. I mean, I think I did not,
3  but I haven't gone through everything.
4    Q. Let's stick with Exhibit 1 for a minute.
5    A. Okay.
6    Q. At page 8630.
7    A. Uh-huh, yes.
8    Q. You attribute a statement to
9  Dr. Jaskowiak, "You are so cute, so sweet, and
10 that's OK. You need to remember that female
11 surgeons can't be that nice. Otherwise patients
12 and colleagues would disrespect you."
13      When did Dr. Jaskowiak say that to
14 you?
15   A. That's a part of my conversation with
16 her July, I think, 24th, 26th.
17   Q. You attribute to Dr. Umanskiy the
18 following statement, "Dr. Artunduaga, why are you
19 always smiling?"
20   A. Yeah.
21   Q. "You're too nice with nurses and people
22 in general, that's not what expected from a
23 surgeon."
24      When did he say that?

Page 121

1    A. He made fun of me during the entire
2  month of September, because he said every time he
3  saw me, almost every time, if I was crazy or what
4  or what happened to me, because I was always
5  smiling and being nice to people. If there was
6  anything wrong with me. And always quoted the
7  thing about the surgeon's stereotype.
8    Q. Who heard Dr. Umanskiy ask you if you
9  were crazy or what and if there was anything
10  wrong with you?
11    A. I don't remember. But I have another
12  example I can definitely tell you with exact
13  detail.
14    Q. Please do.
15    A. Okay.
16    Q. Tell me when first?
17    A. Dr. -- it was September. Brian Bello
18  was there. There were other residents. I can't
19  recall the others. I was very ashamed actually.
20  Dr. Umanskiy told me, that Maria, this is no --
21  this is not how we do things here in the U.S. I
22  don't know how you do things back in Columbia,
23  but you, for example, can't carry your
24  stethoscope around your neck, and put it away.

Page 122

1  And then all of your books, those books that you
2  are carrying in your lab coat, take them out. He
3  put them in trash. And all of those colorful
4  pens and things, nothing. I mean, you need to
5  take them out. So he basically stripped me of
6  things in front of other people and he humiliated
7  me.
8    Q. Why do you think Dr. Umanskiy did that?
9    A. You should probably ask him.
10    Q. You don't know why he did that?
11    A. No, I did not ask him why. He was my
12  faculty, my attending. I always show respect to
13  everybody that I work with.
14    Q. Did you talk about that incident with
15  Dr. Bello or anybody else?
16    A. I can't recall. I was too ashamed.
17    Q. Sticking with Exhibit 1, page 8630.
18    A. Yes.
19    Q. You attribute to Dr. Ferguson a
20  statement actually, there's a snippet of
21  dialog between you and him.
22    A. Yes.
23    Q. Starting out, "Why don't you go outside
24  and have some coffee." Do you see that?

Page 123

1    A. Yes.
2    Q. What's the camera that's referred to?
3    A. The laparoscopic video camera that
4  usually the more junior resident will carry
5  during a case. It's heavy. It's big.
6    Q. And was there a problem with your use of
7  the camera during that procedure?
8    A. There were problems, because it's big.
9  I have small hands, and I am right-handed. So
10  Dr. Ferguson always wanted me to do it with the
11  left. And he also -- of course, he's just much
12  taller than I am. He wanted me to do things
13  correctly. Sometimes between the PA and I, we
14  had to switch in the case. So I'll have to take
15  what's called step-ons or stands to make myself
16  taller, so that I could reach angles and move,
17  you know, things around.
18        Sometimes regardless of the steps, I
19  couldn't reach the angles, because I'm really
20  short. And, yeah, and Dr. Ferguson, at least,
21  two or three times kicked me out of the room,
22  because he couldn't wait for me to get the steps.
23    Q. None of what you've just described had
24  anything to do with your national origin, did it?

Page 124

1    A. It has to do with my genetics, my
2  Hispanic background. I mean, I look Hispanic.
3  I'm five feet. It does absolutely have to do
4  with my national origin, my ethnicity, of course.
5    Q. Are you telling me there aren't
6  native-born Americans who are five feet tall?
7    A. Yes, and there are many who are really
8  tall who are -- I mean, it's just about -- I
9  mean, what was my experience, that was my
10  experience.
11    Q. There are plenty of Hispanic people who
12  are well over six feet tall, too, aren't there?
13    A. Yes, but this happened to me and I
14  happen to be only five.
15    Q. Dr. Ferguson is well-known to be
16  difficult to work with in the operating room,
17  isn't he?
18    A. Yes, he's difficult, but I think he made
19  it more difficult for me.
20    Q. Have you ever observed him to be
21  difficult with other people in the operating
22  room?
23    A. I was not present when he was being
24  difficult to other interns.

Page 129

1    Q. "Got paged by RN who wanted me to check
2  on a patient, came and saw Dr. Ferguson." And
3  then there's a dialog between you and
4  Dr. Ferguson. Is that a different incident?
5    A. Yes.
6    Q. And you recite a comment here from
7  Dr. Ferguson saying you have communication
8  issues.
9    A. Yeah.
10    Q. Asking you why you're asking him to
11  repeat something he just said, right?
12    A. Yes.
13    Q. Makes no reference whatsoever to your
14  language, does it?
15    A. It does to me. Communication issues,
16  problems.
17    Q. So any time anybody remarks about a
18  communication issue, it relates to the fact that
19  you're a native speaker of Spanish?
20    A. I might have written here communication
21  issues, but he mentioned my accent times -- a lot
22  of times. So maybe here it says communication
23  issues, but I can tell you for sure that he made
24  references to my accent in the operating room

Page 130

1  under witnesses.
2    Q. Who?
3    A. The nurses, you have the witness list.
4  Fran, Michael, Carla Moreira, someone who already
5  graduated. At least, those three people, yes.
6    Q. If we go through all the pages you've
7  written, we're not going to see one statement
8  wherein Dr. -- you say Dr. Ferguson referenced
9  your accent, are we?
10    MS. FRANKLIN: Object to form.
11  BY MR. CLEVELAND:
12    Q. You can answer.
13    A. I don't remember. I don't recall. But
14  I'm deposing, I'm telling you that he did.
15    Q. So let's go back to Exhibit 12 for a
16  minute.
17    A. Uh-huh.
18    Q. Exhibit 12 is your letter of November 18
19  to Dr. Song?
20    A. Uh-huh, yes.
21    Q. You wrote this letter to him, because
22  you wanted to convey to him all the reasons you
23  thought you should not have been placed on
24  probation; is that right?

Page 131

1    A. Yes.
2    Q. There's no reference in this letter
3  whatsoever to the fact you're from Columbia; is
4  there?
5    A. I don't think so. And, again, for the
6  record, I was really afraid of retaliation.
7  That's the reason why I didn't put anything in
8  writing until this time. Especially after -- one
9  day after I tried to speak to human resources and
10  they shut the door to me and my husband.
11    MR. CLEVELAND: 14, I think.
12    MS. FRANKLIN: Yes, that's what I have.
13    (Document marked as Artunduaga Deposition
14    Exhibit No. 14 for identification.)
15  BY MR. CLEVELAND:
16    Q. Now, before we get to 14, I've got one
17  other question for you about Dr. Ferguson.
18    A. Yes.
19    Q. Isn't it possible he just thought you
20  were a bad doctor?
21    A. You should ask him.
22    Q. If he testifies he thought you were a
23  bad doctor, would you accept that?
24    A. No.

Page 132

1    Q. Turning to Exhibit 14, the bottom e-mail
2  of this two e-mail chain is from Dr. Dickie to
3  Dr. Song, CC Justine Lee.
4    A. Uh-huh, yes.
5    Q. The second and third paragraphs recite
6  a -- summarize purportedly a meeting that you had
7  with Dr. Lee and Dr. Dickie. My question for you
8  is: Are those two paragraphs accurate?
9    A. No, they missed a lot of things.
10    Q. What's left out?
11    A. The hostile work environment issue; that
12  I thought I was being targeted because of my
13  accent; that John Seal had been treating me
14  really, really badly. I gave them several
15  examples that are not here. And in overall my
16  experience so far at the University of Chicago
17  Medical Center had been very, very bad and poor
18  and worrisome for my training as a plastic
19  surgery resident.
20    Q. Those are things that you say were left
21  out. Is what's written here accurate?
22    A. I mean, I have -- I didn't see this. I
23  didn't review it until -- I saw this for the very
24  first time in May 7 of 2012. I had no idea that

Page 133

1 they were reporting me to Dr. Song, that
2 everything was going to my file, nothing. I had
3 absolutely no idea.
4 Q. So you saw this document almost two
5 years ago now.
6 A. Yes.
7 Q. As you sit here today --
8 A. Uh-huh.
9 Q. -- I'm asking the best of your
10 recollection, are the two paragraphs, the second
11 and third paragraph that I directed your
12 attention to, accurate?
13 A. I don't agree with Dr. Seal saying that
14 I have too much confidence when it comes to
15 patient management; that I come across as abrupt,
16 arrogant, and lacking empathy. Maybe that's her
17 personal opinion, because he definitely was very
18 biased against me. In fact, all of my
19 evaluations say that professionalism-wise I'm
20 very good, I'm sweet and nice and friendly.
21 Q. Those are things that you disagree with?
22 A. Totally with him.
23 Q. Well, this e-mail is not from Dr. Song.
24 This e-mail is from Dr. Dickie.

Page 134

1 A. Yes, that's true.
2 Q. Okay. So let me try it one more time.
3 The second and third paragraphs of this e-mail,
4 does that accurately summarize, at least, part of
5 what was discussed in the meeting?
6 A. It summarizes part of what it was
7 discussed, yes.
8 Q. Accurately?
9 A. Some things were left out. So it's not
10 accurate.
11 Q. All right. Except for what's left out,
12 is what's here accurate?
13 A. Yes. What is here, it might be -- yeah,
14 it is accurate, at least, the last two
15 paragraphs.
16 MR. CLEVELAND: 15.
17 (Document marked as Artunduaga Deposition
18 Exhibit No. 15 for identification.)
19 BY MR. CLEVELAND:
20 Q. Exhibit 15 is, again, a two e-mail
21 chain. The bottom one is an e-mail from
22 Dr. Dickie to Dr. Song recounting a complaint by
23 Mary Lawler.
24 A. Uh-huh, yes.

Page 135

1 Q. And Mary Lawler is an attending at the
2 Medical Center, right?
3 A. Yes.
4 Q. And Mary Lawler did complain about you,
5 didn't she?
6 A. Apparently she complained about the
7 treatment of JT to Sara Dickie as a team, it's my
8 belief. Yes, she complained.
9 Q. You said as a team.
10 A. Yes. We worked as a team.
11 Q. Who is the we?
12 A. Sara Dickie and myself, yeah, the two of
13 us, because we were following Dr. Larry Zachary's
14 patients during the month of October.
15 Q. And the second paragraph seems to
16 summarize a conversation that you had with
17 Dr. Dickie. Do you see that?
18 A. Uh-huh, yes, I do.
19 Q. And does that accurately summarize the
20 conversation you had with Dr. Dickie?
21 A. Let's see.
22 I don't think it does --
23 Q. What's inaccurate?
24 A. -- in part.

Page 136

1 What's -- when I spoke with her -- I
2 mean, I wrote it here, the exact explanation of
3 what happened in your Exhibit No. 1. If you go
4 back there --
5 Q. Please refer me to the page.
6 A. Yes, two seconds. MA, it's, 8621. So
7 8620 MA, and then 8621 I believe. Yes, it is.
8 So this patient in particular had
9 different JP drains, abdominal drains. What
10 Dr. Lawler was worried about was that one of the
11 sites that was draining significantly was located
12 on the left thigh, and it didn't have a drain per
13 se. So what the nurses did was they applied some
14 Tegaderm in it and created a pouch, so that it
15 would collect the actual fluid.
16 When I saw this patient and even
17 Sara Dickie when she saw her before discharging
18 her home, the abdominal drains were secured and
19 they were fine. What I meant to say here with
20 the Tegaderm -- and that's definitely, I mean,
21 some sort of misunderstanding, my communication
22 was, I was referring to the Tegaderm thing on the
23 left thigh. How do you say that word?
24 Okay. And, yes, that's what

Page 145

1  say to you?
2      A.  I told her overall about my experience,
3  same things about complaints about John Seal,
4  complaints about Haejin In.  She recognized that,
5  at least, Haejin In she witnessed a lot of things
6  that were not very -- could be discriminatory.
7  She advised me that I should leave University of
8  Chicago Medical Center, because someone like me
9  will not -- given my background, and she made
10  that very clear, with my background coming from
11  Columbia, with my accent, will have a very
12  difficult time to succeed at the University of
13  Chicago; that the department of surgery had a
14  very difficult environment.  And, yeah, I think
15  that was all.  She advised me that I should take
16  the offer and leave if they gave me an offer.
17      Q.  What offer?
18      A.  If.  I don't know; this is the thing I
19  don't understand.  Apparently faculty had already
20  been talking about my future there.
21          (Document marked as Artunduaga Deposition
22          Exhibit No. 17 for identification.)
23  BY MR. CLEVELAND:
24      Q.  Dr. Artunduaga, you have what's been

Page 146

1  marked as Exhibit 17.
2      A.  Uh-huh, yes.
3      Q.  Is that your signature in the lower
4  right-hand corner?
5      A.  Yes, it is.
6      Q.  Are these notes that were presented to
7  you by Dr. Nguyen on October 24, 2011?
8      A.  These were observations that she made
9  while she was supervising me and Jonathan
10  Lusardi.  As the title says, these are just areas
11  of improvement.  It's not an evaluation or, at
12  least, she never told me that was an evaluation.
13  She said that Dr. Song requested them to make a
14  list of things that I should improve or things
15  that they had identified.
16          And some of these things are misses
17  that I, yeah, probably did; and some of them are
18  also misses that either -- that Jonathan Lusardi
19  did.
20      Q.  What are the misses that you did?
21      A.  Okay.  Let's see.  For example, the
22  first example here that --
23      Q.  Ms. W?
24      A.  Ms. W, yes.  Vaginal bleeding and

Page 147

1  tachycardia.  This patient belonged to
2  Dr. Lusardi.  He was the one responsible to
3  follow up this patient.
4          Same thing.  Cardiology consult this
5  is for the exact same patient, Mrs. W.  Jonathan
6  Lusardi was the one who consulted cardiology, not
7  me.  And he was the one who was supposed to do
8  the follow-up.  Same with the gynecology consult.
9  Endo consult, same thing.  All of these things
10  are related to Mrs. W.
11      Q.  Is it your testimony that any of those
12  things are your responsibility?
13      A.  No, I'm following through the list, so
14  those are -- well, this is his patients.
15          It's my mistake, yeah, I mean, I --
16      Q.  What is?
17      A.  The first, ordering the transfer of
18  patient out of a unit before the attending
19  confirmation by the senior.  I made a mistake by
20  ordering apparently another splint.  I did not do
21  any workshop on splinting or anything.  So
22  honestly, I just did not know what to do.
23  Because I wasn't trained to do -- to recognize
24  the materials or splinting.

Page 148

1      Q.  So it's your testimony that really
2  wasn't your fault either, because it was
3  something you hadn't been trained to do; is that
4  correct?
5      A.  For example, this one, yes, definitely.
6          Approve -- the Lantus ordered TID,
7  perhaps it was definitely my mistake.  ID
8  approval for antibiotics, it might be my mistake,
9  too.
10          That, I mean, I agree, I didn't know
11  they wanted me to actually write down the
12  description in a text when I saw some sort of
13  wound, a fracture.  But, I mean, if they had told
14  me, I would just do it, you know.  You don't
15  really need to make a list -- I mean, to bring it
16  up in a document and put it in your file.  If you
17  just consult a resident, you can, you know, I
18  want this to be done and I'll do it.
19      Q.  So you're complaining that this was put
20  in writing?
21      A.  I complained that, yes, that it was put
22  into my file without me knowing, without me --
23  yeah, I did not know that this was an evaluation
24  and that was going into my file.  I was never

Page 149

1    told that I -- that they were reporting me by
2    them.
3        Q. Did Dr. Nguyen do anything to
4    discriminate against you or harass you because of
5    your national origin?
6        A. She followed Dr. Song's orders about
7    reporting things.
8        Q. So the answer is, no, she didn't do
9    anything of her own accord to discriminate
10   against you because of --
11       A. I think she --
12       Q. -- your national origin or harass you on
13   that basis?
14           I'm sorry, my voice is fading.
15       A. I haven't seen all the evidence. I
16   can't be certain. I haven't reviewed all the
17   evidence. I just don't know.
18           MR. CLEVELAND: No. 18.
19           (Document marked as Artunduaga Deposition
20           Exhibit No. 18 for identification.)
21   BY THE WITNESS:
22       A. Okay.
23   BY MR. CLEVELAND:
24       Q. Number -- Exhibit No. 18 is -- bears

Page 150

1    your signature; is that right?
2        A. Uh-huh, yes, sir.
3        Q. And the other signature under yours is
4    Sara Dickie's; is that correct?
5        A. I think so.
6        Q. Do these notes accurately reflect a
7    meeting that you had with Dr. Dickie on
8    October 28, 2011?
9        A. This is a summary of things she observed
10   and what she thought were either my misses or
11   mistakes. Some of them are very inaccurate.
12           For example, the first paragraph she
13   wasn't even in the hospital. She was
14   interviewing at North Shore. She made
15   responsible Dr. Daniel Butz, the second year, and
16   he -- she verbalized to him that if something
17   happened with this patient we could transfer her
18   to the ICU. When the status of this patient
19   deteriorated, I was in the operating room, and
20   there is plenty of evidence to prove that.
21   Dr. Jonathan Lusardi was the person covering the
22   floor. I don't really know what happened. We'll
23   have to ask him. But there was some sort of
24   miscommunication between him and Justine Lee.

Page 151

1            And eventually the patient was
2    transferred. I went out -- I left the operating
3    room, and I helped them to transfer the patient
4    to the ICU. This is one of the misses that
5    Dr. Song is blaming me for in his November 2nd
6    letter.
7            Definitely, I mean, she's suggesting
8    me that I should prioritize some consults,
9    coordinate with my coresident everything, because
10   there were a lot of issues of communication
11   with -- between the three of us.
12           There was one single time that I
13   forgot to place a consult because I thought that
14   Daniel Butz was going to write it. Instead
15   Jonathan Lusardi forgot to write probably three
16   or four. Even Sara had to write the consult
17   notes for him. He was never punished or
18   reported.
19           What else? Data gathering by Epic,
20   yeah, sometimes I couldn't find things very, very
21   quickly.
22           What else? Preop-ing patients
23   and -- yes, I forgot sometimes to do the preop
24   reconciliation; but it didn't happen again after

Page 152

1    she told me that, you know, this is how things --
2    you are expected to do that every night before.
3    But, as I said, you know, you -- she could have
4    told me this instead of writing it in a document
5    and putting it in my file.
6        Q. Did Dr. Lusardi have the same amount of
7    complaints about him from attending physicians
8    that you had from attending physicians?
9        A. His evaluations are mediocre. And the
10   big difference is that his program director never
11   start asking people to report Lusardi or to write
12   things or ask the chief residents in
13   otolaryngology to report or write or speak to
14   people.
15       Q. His program director was not your
16   program director, was it?
17       A. No. But I complained about hostile work
18   environment and discrimination, and he did not.
19       Q. These notes, Exhibit 17 and 18, relate
20   to the month of October 2011 when you were doing
21   a rotation on plastic surgery, correct?
22       A. Yes, sir.
23       Q. And Dr. Lusardi was also an intern, a
24   first year?

Page 153

1    A.  Yes.
2    Q.  On that rotation?
3    A.  Uh-huh, yes, he was.
4    Q.  And both of you were responsible for all
5  the patients --
6    A.  No.
7    Q.  -- of all three services, correct?
8    A.  No.  We were assigned different teams.
9  I should have follow -- I was following the gold
10  service and the blue service, and he was supposed
11  to follow the red service.
12    Q.  Who made that assignment?
13    A.  Justine and Sara Dickie.
14    Q.  You were at Dr. Dickie's deposition
15  yesterday, right?
16    A.  Yes.
17    Q.  And you heard her say that you and
18  Lusardi were responsible to follow the patients
19  of all three services, didn't you?
20    A.  Yes, but that's not what happened.
21    Q.  Was she lying?
22    A.  That's not what happened.
23    Q.  Was she lying?
24    A.  I guess she is.

Page 154

1    Q.  You had a meeting with Dr. Song on
2  November 2nd, 2011; is that right?
3    A.  Yes.
4    Q.  Who else was there?
5    A.  Akilah Williams and Dr. Julie Park.
6    Q.  And what was said by whom at that
7  meeting?
8    A.  Sorry?
9    Q.  Who said what to whom at that meeting?
10    A.  Who said --
11    Q.  Who said -- what did you say, what did
12  Dr. Park say, what did Dr. Song say at the
13  meeting?
14    A.  I don't understand the question.  I'm
15  totally lost.
16    Q.  Okay, all right.  When -- the meeting
17  was in Dr. Song's office, was it?
18    A.  Oh, yes, yes.
19    Q.  Who began the meeting?
20    A.  I was coming from the retreat that was
21  held at the Gleacher Center.  I was paged either
22  by -- I think Akilah.  I ran into Julie Park,
23  Dr. Julie Park, in the lobby, and she said that
24  we needed to go see Dr. Song.  So, yes, that's

Page 155

1  how we met.
2    Q.  So what did Dr. Song say?
3    A.  Dr. Song said that he had made a
4  decision to put me on probation, and that he
5  really wanted me to think about better leave
6  quietly, because he thought that I was not going
7  to survive the environment at the University of
8  Chicago Medical Center and that I was not going
9  to be successful as a resident there, because
10  there was -- there were too many rumors and
11  gossip around; and that, yeah, that I should just
12  look for another job.
13    Q.  What did you say?
14    A.  The exact same thing I told him the
15  meeting I saw -- in September, that I didn't
16  agree; that I have been complaining about
17  disparate treatment; that I have not been offered
18  the same training opportunities as everybody
19  else; that it was his responsibility to enforce
20  my rights and my contract; and that I disagreed
21  with his decision.  And I asked him to, please, I
22  mean, let's do a professional development
23  program, because that's what's -- that's what the
24  GME policy manual says that we should be doing at

Page 156

1  this stage.
2    Q.  The GME policy manual, are you referring
3  to the University of Chicago GME policy manual?
4    A.  Yes, uh-huh.
5    Q.  And, of course, that document says
6  whatever it says, right?
7    A.  It says that you should do that before
8  doing an academic probation.
9    Q.  What did Dr. Song say?
10    A.  There is no way you are doing a
11  probation or you -- I mean, either that or you
12  leave now.  There is no other option.
13    Q.  You said what?
14    A.  He gave me 24 hours to answer him,
15  because I did not agree with his decision, and I
16  thought I been retaliated for opening my mouth
17  and complaining.  Yes, and he gave me that letter
18  the day after.
19    Q.  By that letter, you're referring to the
20  document that you obviously see I have in my hand
21  which I am marking as Exhibit 19; is that
22  correct?
23    A.  Uh-huh, exactly, yes.
24

Page 157

1  (Document marked as Artunduaga Deposition
2  Exhibit No. 19 for identification.)
3  BY MR. CLEVELAND:
4  Q. And he handed you this letter on
5  November 3rd; is that your testimony?
6  A. I think it was the 4th actually. It was
7  handed to me by Dr. -- Akilah Williams. She
8  wanted me to sign it and I refused.
9  Q. Did you speak specifically about the
10  letter which is Exhibit 19 with Dr. Song?
11  A. I -- he wrote up all of these misses or
12  mistakes that allegedly I did. I told him --
13  gave him my version of the events. Regardless,
14  he used them to backed up decision, an employment
15  decision. And, yes, here he says that he's
16  giving me 24 hours to decide or, I don't know,
17  I'm out.
18  Q. Do you think that as of November 2nd
19  Dr. Song had decided that you would not succeed
20  in the program?
21  A. Yes.
22  Q. Do you think he had made that decision
23  before November 2nd?
24  A. Sometime around late October or

Page 158

1  November, early November, he -- yeah, he had
2  decided already that I was not going to continue,
3  and he says that here actually.
4  Q. So as of late October, is it your
5  testimony that Dr. Song had decided that no
6  matter what happened in the rest of the academic
7  year you were not going to get a second year
8  contract?
9  A. I mean, it's hard for me to say, because
10  I'm not Dr. Song. That's my belief. Definitely
11  around the first days of November, late days of
12  October. As I said, we should ask him. That's
13  what I believe.
14  Q. What do you base that belief on?
15  A. On what he told me on November 2nd, that
16  I was just not going to be successful as a
17  resident there, because people were biased and
18  prejudiced and they were bypassing me all the
19  time. So there was no -- I wasn't going to be
20  successful at becoming a plastic surgeon.
21  Q. So is it your testimony that everything
22  happened -- that happened during the rest of the
23  academic year was simply going through the
24  motions from the Medical Center's standpoint?

Page 159

1  A. I don't understand. Like --
2  Q. Is it your testimony that everything
3  that happened during the rest of the academic
4  year was not going to change the determination
5  that was made in late October 2011, that you
6  would not succeed in the program?
7  A. I think so. Because even though I
8  showed improvement and I have the statistical
9  data to prove that and I present it to the
10  grievance hearing, Dr. Song made the decision
11  even before the probation was over. He wrote a
12  draft letter to terminate me; and per Sara
13  Dickie's testimony yesterday, she's saying that
14  they never reviewed my probation evaluations. So
15  I don't know why -- I don't really know why he
16  went ahead with the probation if he had already
17  decided that he wanted me out. So I believe he
18  did everything in his power to force me out.
19  Q. Did you meet with Dr. Song on or about
20  November 10, 2011?
21  A. 10th? I don't remember.
22  (Document marked as Artunduaga Deposition
23  Exhibit No. 20 for identification.)
24

Page 160

1  BY THE WITNESS:
2  A. Roggin. You mean Roggin, right? This
3  is --
4  BY MR. CLEVELAND:
5  Q. I'm sorry.
6  A. This is Dr. Roggin's.
7  Q. I'm sorry, I misspoke. Did you meet
8  with Dr. Roggin?
9  A. Yes, I did.
10  Q. Do you recognize this to be Dr. Roggin's
11  notes of his conversation with you?
12  A. I never saw it until recently, months or
13  probably a year after the litigation start. I
14  didn't know that he made a record of our
15  conversation.
16  Q. Why did you request to meet with
17  Dr. Roggin?
18  A. We had a retreat for residents, and his
19  talk was about resident education and how at the
20  University of Chicago Medical Center, especially
21  in the department of surgery, residents were
22  encouraged to have feedback sessions in the
23  middle of their rotation with somebody called --
24  it's called a TEC. Well, a faculty member who

Page 173

1  to complain about Dr. Ferguson's treatment of me.
2      Q.  What was Dr. Ferguson's complaint?
3      A.  It's in an e-mail.
4      Q.  From whom to whom?
5      A.  From Ferguson to Song.
6      Q.  Excuse me one second.
7      A.  It's dated November 16.
8          MR. CLEVELAND:  Unfortunately I didn't
9  get other copies of this document.
10         MS. FRANKLIN:  That's okay.  I have one.
11         (Discussion off the record.)
12         MS. FRANKLIN:  Okay.  Thank you.
13         MR. CLEVELAND:  I think this is 23.
14         (Document marked as Artunduaga Deposition.
15         Exhibit No. 23 for identification.)
16  BY MR. CLEVELAND:
17     Q.  I show you what I've marked as
18  Exhibit 23.  Is that the e-mail that --
19     A.  Uh-huh.
20     Q.  -- you just referred to?
21     A.  Uh-huh, yes, sir.
22     Q.  And did Dr. Song call you into his
23  office to meet with him about that e-mail?
24     A.  Yes.

Page 174

1      Q.  What did he say to you?
2      A.  That I should seriously think about
3  resigning.
4      Q.  Was there anybody else present besides
5  him?
6      A.  Akilah.
7      Q.  What did you say?
8      A.  What did I say?
9      Q.  Yes.
10     A.  First of all, I asked him if he had
11  meeting -- had talked to Dr. Ferguson, and he
12  denied it.  Dr. Ferguson did say that he was
13  contacted by someone from the plastic surgery
14  section.  All of the things he -- we discussed
15  during the meeting were extremely similar to what
16  Dr. Song had told me the day before.
17     Q.  By -- Dr. Song had told you the day
18  before?
19     A.  Yes, November 15.  Criticism.  I also,
20  of course, you know -- I was thankful for, you
21  know, the suggestions, but, again, I told
22  Dr. Ferguson that I thought it was unfair to do
23  an evaluation of a resident having interacted
24  with him for only six days, because she was -- he

Page 175

1  was out of town for an entire week.
2          He mentions here that I was supposed
3  to do some sort of training, laparoscopic
4  training; but the truth is that the only machine
5  that the hospital had in the residents' lounge
6  was not calibrated.  So it was not possible for
7  me to train.  Most of the residents go to North
8  Shore, and I was not offered that opportunity
9  either.
10         And what else?  During this
11  rotation, unfortunately, my senior Carla, she was
12  very, very close to Akilah Williams, and Essie,
13  another plastic surgery resident, she was aware
14  of everything, the probation, et cetera.  And she
15  told me that she was very afraid of letting me do
16  intern duties.
17         So to give you an example, she
18  didn't let me place a chest tube, something that
19  routinely first year residents do.
20     Q.  Dr. Kueberuwa?
21     A.  My senior was Carla Moreira.
22     Q.  Oh, and she did not let you place a
23  chest tube?
24     A.  No.  She said that she was too afraid of

Page 176

1  me because of the rumors and what she had heard
2  from Akilah and Essie.
3      Q.  Did Dr. Moreira discriminate against you
4  or harass you because of your Columbian national
5  origin?
6      A.  I don't think she harassed me, but
7  she -- she was acting based on rumors and gossip
8  and didn't -- yeah, I mean, didn't let me do many
9  things.
10     Q.  What did you tell -- you said -- in this
11  meeting you had with Dr. Song about
12  Dr. Ferguson's e-mail, you said, I thought, that
13  you had told Dr. Song some things about
14  Dr. Ferguson?
15     A.  Oh, yes.  The --
16     Q.  What did you tell Dr. Song about
17  Dr. Ferguson?
18     A.  The complaints about -- that I had
19  referred to an hour ago, about Dr. Ferguson being
20  in my opinion more disrespectful than to the
21  others.  And the thing with the steps, kicking me
22  out of the operating room, because I was not too
23  tall or I couldn't reach certain angles.  And
24  that he was not happy with my speaking skills or

Page 177

1 listening skills when we were operating together.
2 And that he cursed a lot and that I was
3 intimidated by him. I would tremble, and
4 sometimes I really thought he was going to take
5 tools or the camera rudely from my hand. So I
6 was afraid of him.
7 Q. Dr. Ferguson's e-mail says that he
8 informed you that in his opinion you didn't have
9 the aptitude for a career in surgery, much less
10 in a specialty like plastic surgery or a
11 subspecialty like congenital cranial facial
12 disorders.
13 A. Yes.
14 Q. Did he tell you that?
15 A. Yes, he told me that and Dr. Song told
16 me exactly the same before. So it's to me two
17 people telling me the same within 24 hours.
18 That's not a coincidence.
19 Q. It might mean that they just both
20 reached the same conclusion, right?
21 A. When you are rotating with a resident
22 for only six days and this resident is not
23 allowed to do anything, I don't know. I think
24 there is bias or he knows something and he's

Page 178

1 just -- you know, has this type of image that is
2 just wrong.
3 Q. That's what you suspect?
4 A. Yes, sir.
5 Q. We discussed that Dr. Park was your
6 mentor. You had regular meetings with Dr. Park;
7 is that right?
8 A. Uh-huh, yes.
9 Q. One other question. After the meeting
10 you had with Dr. Song about Dr. Ferguson's
11 e-mail --
12 A. Uh-huh.
13 Q. -- did you -- what was the next meeting
14 you had with Dr. Song after that?
15 A. May. No, March, March 27th when he
16 fired me.
17 Q. The letter informing you of your
18 probation stated that the probationary period
19 would expire on February 28th.
20 A. Yes.
21 Q. You requested that that be extended --
22 A. Of course.
23 Q. -- by 30 days?
24 A. Because I was --

Page 179

1 Q. Let me finish the question.
2 A. Sorry.
3 Q. You requested that it be extended by
4 30 days and your request was granted, correct?
5 A. Probation periods are supposed to be
6 90 days, business days. I was going to be out of
7 the country for an entire month, so the logical
8 thing to do was to do 90 business days. So, yes,
9 I wrote a letter requesting for an extension,
10 because I was not going to cancel my Catholic
11 wedding back in my home country.
12 Q. And Dr. Song said fine, didn't he?
13 A. No. At the beginning he said -- he
14 suggested that I should just cancel everything.
15 I told Ricardo. We're, like, I mean, like, what
16 should we do. And -- during the 24 period
17 window, and I requested him that, and he finally
18 said yes.
19 Q. So you got what you wanted. You got the
20 probation extended another 30 days, right?
21 A. I got 90 days of probation, which was
22 the necessary time for a probation period at the
23 UCMC.
24 Q. All right. So you got 90 days not

Page 180

1 including your wedding vacation?
2 A. Yes.
3 Q. The meetings that you had with Dr. Park,
4 Ms. William was in all of them, too?
5 A. Yes.
6 Q. And she took notes?
7 A. Yes.
8 Q. I'm going to show you what I think is
9 going to be Exhibit 24.
10 (Document marked as Artunduaga Deposition
11 Exhibit No. 24 for identification.)
12 BY THE WITNESS:
13 A. Just to let you know, I never reviewed
14 these minutes.
15 BY MR. CLEVELAND:
16 Q. There is no question, Dr. Artunduaga.
17 A. Okay.
18 Q. That's your signature on the first page,
19 right, of Exhibit 24?
20 A. Yes, it's my signature.
21 Q. And the second two pages are minutes; is
22 that correct?
23 A. Are minutes that I never had the chance
24 to review until the grievance.

Page 197

1    incorrect?
2        A.  The way how they portray me here being
3    combative or, you know, problematic, that's not
4    what really happened.  I was just looking for
5    advice from Dr. Park in regards to nurses who
6    were aggressive.
7        Q.  So you're referring to the sixth bullet
8    on the second page, right?
9        A.  Yes, yes, sir, uh-huh.
10       Q.  And you interpret that as being
11   combative?
12       A.  Sorry.  Ask --
13       Q.  You interpret that as portraying you as
14   being combative?
15       A.  Yes.
16       Q.  Other than that particular bullet, are
17   the rest of these notes a correct summary of what
18   happened in the January 25, 2012 meeting?
19       A.  In the last bullet point, when I say
20   that I felt that I was being left out, that was
21   something that I always brought up to her and
22   that I always felt treated differently.  I mean,
23   even though it was only socializing with peers,
24   you know, in social settings at this point, I

Page 198

1    brought up the fact that, you know, it was really
2    hard to be treated as an outsider and that it
3    really, really hurt my feelings.
4        Q.  Dr. Park suggested you talk to
5    Dr. Shenaq, right?
6        A.  Yes.
7        Q.  Did you?
8        A.  I don't remember.
9        Q.  Did you ask Dr. Shenaq to be a witness
10   on your behalf at the grievance hearing?
11       A.  No.  Why would she?  She never
12   supervised me, so... She's just a resident.
13          (Document marked as Artunduaga Deposition.
14          Exhibit No. 28 for identification.)
15   BY MR. CLEVELAND:
16       Q.  The next Exhibit No. 28, an e-mail from
17   you to Dr. Song and Dr. Park.
18       A.  Uh-huh, yes.
19       Q.  This is an e-mail that you sent to them,
20   right?
21       A.  Yes.
22       Q.  Why did you decide you should send this
23   e-mail to the two of them?
24       A.  Because from previous history, I knew

Page 199

1    Dr. Jaskowiak was going to complain or something
2    about me.  So I just wanted to get my side of the
3    story in the record.
4        Q.  And in your e-mail, you acknowledge that
5    you had made a mistake in prescribing antibiotics
6    to the patient in question, right?
7        A.  Let's see.
8           Well, first of all, first year
9    residents never take calls from patients.  It's
10   the duty -- these duties are assigned to third
11   year residents.  In this particular case, Andrea
12   Olivas asked me to do a refill, and I did based
13   on either her conversation with the patient or
14   her analysis of the case.  So, yes, I did went --
15   I did go ahead and refill the prescription,
16   because she was my senior and she told me to do
17   so, so I did.
18       Q.  And in this e-mail, you acknowledge it
19   was a mistake for you to have done that?
20       A.  Yes, because I spoke with Dr. Jaskowiak,
21   and she didn't like it.  That's not how she
22   wanted me to proceed, neither Andrea or me.
23       Q.  In this e-mail you say in the next to
24   last paragraph, I made mistakes during my first

Page 200

1    months of internship.  Is that true?
2        A.  I might have as any other intern, minor
3    mistakes.  Nothing really, really, you know,
4    major.
5        Q.  So this e-mail should have said I made a
6    few minor mistakes during my months of
7    internship?
8           MS. FRANKLIN:  Object to form.
9    BY MR. CLEVELAND:
10       Q.  Is that what you're telling me it really
11   should say?
12       A.  Yes.  I mean, it's not -- when I write,
13   it's not perfect, you know.  So I wish I had an
14   English major to write better e-mails.  Sometimes
15   I just don't convey.
16       Q.  Well, you had Mr. Garcia and Mr. Copete
17   helping you with your e-mails, too, right?
18       A.  Sometimes, yes, they did.
19       Q.  Did they help you with this one?
20       A.  I don't think so.  No, I don't think so.
21       Q.  Did you receive any feedback from
22   Dr. Song about this e-mail?
23       A.  I don't remember.
24       Q.  Did you receive any feedback from

Page 201

1    Dr. Park about this e-mail?
2        A. Yes.
3        Q. What was Dr. Park's feedback to you?
4        A. She said that she had spoken with
5    Dr. Jaskowiak and that Dr. Jaskowiak expected
6    from me confirmation of who was the person who
7    told me to make the refill, to make refill, yes.
8    And since I did not find anything in my e-mails,
9    I initially thought that was John Seal. But then
10   I realized that it was a Saturday when I was on
11   call. So it had to be -- it had been somebody
12   else and not the chief resident, but a third year
13   resident. So I was trying to figure that out. I
14   mean, I see -- I saw many patients.
15       Q. Did Dr. Park advise you to write a
16   response to Dr. Jaskowiak?
17       A. Because Dr. Jaskowiak told her that she
18   expected that. But Dr. Jaskowiak really did not
19   verbalize having me, you know, writing her an
20   e-mail with everything, just if I found an e-mail
21   from John Seal.
22       Q. But you did write a response to
23   Dr. Jaskowiak?
24       A. I did, yes. Dr. Park told me that

Page 202

1    Dr. Jaskowiak wanted an e-mail with the whole
2    description of what happened, so I did.
3        (Document marked as Artunduaga Deposition.
4        Exhibit No. 29 for identification.)
5    BY MR. CLEVELAND:
6        Q. Exhibit 29 is an e-mail chain. The
7    bottom e-mail in this chain is from you to
8    Dr. Jaskowiak, right?
9        A. Uh-huh.
10       Q. Yes?
11       A. Yes. Sorry.
12       Q. And that's in response to the e-mail
13   that you -- it's in response to this situation
14   that was addressed in the e-mail that you had
15   sent to Dr. Song and Dr. Park on January 26,
16   2012?
17       A. Uh-huh.
18       Q. Yes?
19       A. Yes. Sorry.
20       Q. Did Dr. Park help you write your e-mail
21   to Dr. Jaskowiak?
22       A. Yes. She wanted me to write you are
23   right, I made a huge mistake and I regret it.
24   She wanted me to be more conciliatory, less

Page 203

1    defensive, as she said, more probably
2    Americanized or American. Because she said that
3    that's how you deal with things in the clinical
4    setting.
5        Q. Did Dr. Park say it should be more
6    Americanized?
7        A. Did she say it? How things are done
8    here.
9        Q. Here being at the Medical Center,
10   University of Chicago Medical Center, right?
11       A. I don't know. I interpret it as
12   America, the U.S.
13       Q. But she didn't say U.S. She just said
14   here?
15       A. Well, she said here. But based on the
16   fact that I was trained in South America where
17   things are done differently, I interpreted it as
18   like in the U.S.
19       Q. The Medical Center --
20       A. Uh-huh, yes.
21       Q. -- has its own particular work
22   environment that's different from other medical
23   center or hospital work environments, right?
24       A. I think so.

Page 204

1        Q. It has a culture that's different from
2    other medical center or hospital cultures, right?
3        A. I think so.
4        Q. And sometimes people would refer to the
5    culture of the University of Chicago Medical
6    Center as being different from the culture at
7    other institutions like Northwestern or Rush or
8    elsewhere, right?
9        A. What do you mean, because of this e-mail
10   or --
11       Q. Just asking a question.
12       A. -- just in general?
13       Q. In general.
14       A. Yeah. I mean, there are good programs
15   or malignant programs or toxic programs and there
16   are friendly programs.
17       Q. So that would be a cultural difference
18   of one program to the other; friendly, toxic,
19   malignant, whatever else you said, right?
20       A. It's work environment, yes.
21       Q. All right. So you got a response from
22   Dr. Jaskowiak?
23       A. Uh-huh.
24       Q. Yes?

Page 221

```
 1       Q.  Did she tell you that you needed to
 2   attain a level of excellence in the program?
 3       A.  She said she wanted me -- I mean, she
 4   said that if I wanted to stay, I had to be on the
 5   side where it says, yes, exemplary on the grades,
 6   in the grading system.  Meaning the highest
 7   grades, the perfect student.
 8       Q.  Now, in March 2012, you rotated back to
 9   plastic surgery, correct?
10       A.  Yeah, I was -- yes, I was suddenly
11   changed to plastic surgery.
12       Q.  When were you suddenly changed?
13       A.  I don't remember.  A few days, a week
14   before.
15       Q.  Did you take exception to the fact that
16   you were moved to plastic surgery?
17       A.  Did I take exception?
18       Q.  Did you disagree with being moved to
19   plastic surgery?
20       A.  I knew the real reasons.  Dr. Park said
21   that Dr. Song wanted to test me once again, and
22   that he will base my -- his decision on only two
23   weeks of rotation.  I was obviously very stressed
24   out.
```

Page 222

```
 1       Q.  So is it your testimony that Dr. Park
 2   told you that Dr. Song's decision would be based
 3   on just the two weeks that you spent on plastic
 4   surgery?
 5       A.  Yes.
 6       Q.  So from that you understood that
 7   everything else that had happened from the start
 8   of your probationary period until you moved to
 9   plastic surgery in March 2012 didn't matter?
10       A.  Exactly, and it really broke my heart.
11       Q.  In March 2012, did you ask to
12   participate in a program that Dr. Umanskiy
13   offered?
14       A.  I asked him electronically, yes.  But I
15   wanted to participate since this started, because
16   I knew that Deana Shenaq was invited and even the
17   preliminary residents were attending.  And,
18   again, I was left out, as usual.
19       Q.  When did the program start?
20       A.  September, October.
21       Q.  And how long did it last, the one that
22   started in September, October?
23       A.  How long did it last?
24       Q.  Yes.  Like, one session, multiple
```

Page 223

```
 1   sessions?
 2       A.  I just don't know.  Once a week, every
 3   two weeks.  I mean, they never really shared with
 4   me -- it was like the special people.
 5       Q.  The program was intended for general
 6   surgery residents?
 7       A.  Yes, I knew.
 8       Q.  Not for plastic surgery residents,
 9   right?
10       A.  Yes, but Dr. Umanskiy invited Dr. Deana
11   Shenaq and Mindy Stack and Oliver, too, from the
12   orthopedic surgery and Shane Pearce, people from
13   other subspecialties.  They were attending.
14       Q.  Did Dr. Shenaq complete the program
15   offered by Dr. Umanskiy?
16       A.  I don't know.  You should ask her.
17       Q.  How about -- you referred to Mindy.
18   That's Mindy Stack, right?
19       A.  Yes, Melinda, Mindy.
20       Q.  Did she complete the program?
21       A.  I don't know.  I mean, I didn't spoke
22   with them.  I didn't speak with them since May,
23   two years ago.
24       Q.  Well, during the time you were at the
```

Page 224

```
 1   Medical Center, did Dr. Stack complete the
 2   program?
 3       A.  I just don't know.  We weren't close.
 4          (Document marked as Artunduaga Deposition
 5          Exhibit No. 34 for identification.)
 6   BY MR. CLEVELAND:
 7       Q.  Exhibit 34 is an e-mail chain between
 8   you and Dr. Umanskiy?
 9       A.  Uh-huh, yes.
10       Q.  About the program we've just been
11   talking about, correct?
12       A.  Yes.
13       Q.  How do you know that Dr. Shenaq was
14   invited to participate in the program?
15       A.  She told me.
16       Q.  And how do you know that Dr. Stack was
17   invited to participate in the program?
18       A.  Because I overheard them talking about
19   the program since October, September, October,
20   yes, since it started.  Melinda was the one,
21   like, the moderator or something, and Deana had
22   some sort of thing, special position.  I don't
23   know.  I don't really know the details.
24       Q.  Dr. -- what program is Dr. Stack in?
```

Page 225

1    A. He was a preliminary surgery resident,
2  general surgery resident, yeah.
3    Q. Was she a friend of yours?
4    A. I mean, acquaintances, yes. We didn't
5  go out. We -- outside the hospital, we didn't
6  see each other, right.
7    Q. During the month of March, did you work
8  with Dr. Park in caring for patients?
9    A. With Dr. Park caring patients?
10   Q. Caring for patients.
11   A. Yes, yes. Two weeks, yes, two weeks.
12   Q. Exhibit 35.
13     (Document marked as Artunduaga Deposition
14     Exhibit No. 35 for identification.)
15     (Discussion off the record.)
16  BY MR. CLEVELAND:
17   Q. Exhibit 35 reflects a meeting that you
18  had with Dr. Park on March 5, 2012, right?
19   A. Yes, sir.
20   Q. Referring to the second page, is there
21  anything about these notes which is incorrect?
22   A. Okay. Let's see.
23     For example, here the second bullet
24  point, I tried to talk to them, but none of them

Page 226

1  went -- displayed -- replied my message -- text
2  messages or e-mails, either Matthew, Jonathan, or
3  Grant. So it's not like I did not approach them.
4  I did. But they didn't seem interested to help
5  me or just to speak with me or guide me. It felt
6  just like things -- I went through probation,
7  everybody in the plastic surgery section just
8  knew that, put me aside. And it completely
9  changed the way how I was treated. And as I
10  said, it's like if I was contagious or toxic.
11   Q. Were you satisfied with the way you were
12  treated by everybody in the plastic surgery
13  section up until the time you were placed on
14  probation?
15   A. I didn't like when I found out that
16  Justine and Sara were reporting me. I obviously
17  wasn't pleased, but I'm not the type of person
18  who has very hard feelings. You know, I'm very
19  -- I'm a very happy person. I try to be and keep
20  very positive. But I knew that they were doing
21  that. So I just knew that I had to be careful.
22     And, yes, this thing about Dr. Park
23  saying that -- it's the thing I was trying to
24  comment on about bias and not trying to talk to

Page 227

1  attendings, to gather feedback, because she
2  thought that I was influencing them. But I
3  thought that I was really improving much more,
4  more efficiently, if I knew what the attending or
5  the resident wanted and especially because other
6  interns did the same thing. So it's just, you
7  know, I tried to do the things that other interns
8  were doing.
9    Q. You did send e-mails to people who were
10  going to evaluate you asking them to point out
11  things in your evaluations that you had done
12  well, didn't you?
13   A. I said to them that to give me a fair
14  evaluation, meaning, like, either good or bad;
15  and more importantly based on objective data,
16  object -- like, direct observation. I was very,
17  very concerned, because most of the evaluations
18  that I got at the beginning to me were the result
19  of that gossip, of the rumors that were initiated
20  by people from the general surgery section. So I
21  didn't mean by any means to try to persuade
22  anyone to betray their own code of honor and,
23  like, you know, give you a good grade. Because
24  in medicine, we don't do that.

Page 228

1    Q. That would be improper for you to try to
2  persuade somebody to give you a grade you didn't
3  deserve, right?
4    A. Yeah, exactly, exactly. So I was
5  just -- I just wanted -- my intention was
6  objective data based on either seniors who
7  supervised me or fellows or people who were over
8  me always seeing how I worked.
9    Q. Did you ask Dr. Kaplan to speak to
10  anybody on your behalf?
11   A. I -- since Dr. Song decided not to do
12  anything on my behalf after my complaint and also
13  because he expressed that he was not going to put
14  in jeopardy his relationships with other
15  colleagues, members of other sections, and
16  especially because plastic surgery depends on
17  referrals from other sections, so that I was on
18  my own he said literally.
19     So I tried to look for someone who
20  really was a good person, who cared about me, and
21  someone with whom I had developed a relationship.
22  And Dr. Kaplan, I spend with him many weeks
23  during my months of July and August, because no
24  one wanted to go to his clinic. So I was always

Page 229

1    assigned to his clinic, because no one wanted to
2    go. So he really appreciated that fact that I
3    was always the one who was going.
4         And I asked him for help in regards
5    to, look, this is what's going on, these are the
6    rumors ongoing. I don't know what to do. I just
7    didn't know that this thing was happening. And
8    if I knew from the beginning that I was doing
9    anything wrong, I would have, you know, corrected
10   things just as rapid as any other intern would
11   have. Because that's the thing, you know, that's
12   part of the learning process.
13        And I told him everything about
14   Haejin In, John Seal, how Dr. Song had been
15   treated -- had been managing this whole
16   situation. And he obviously felt very sorry
17   from -- for me. And he, you know, volunteered
18   and he said that he was going to talk to people
19   to try to ask them to really give me the
20   opportunity to train to be an intern without
21   paying attention to those rumors and especially
22   to what Dr. Song having spreading around or
23   whatever he was trying to communicate with
24   others. Because I knew that was going on. And,

Page 230

1    yes, I mean, I don't know what he did. I just
2    know that he talked to two people.
3         Q. Who?
4         A. I think he talked to John Renz from
5    transplant and Christopher Kelly from vascular
6    surgery. And transplant surgery. That's John
7    Renz with a Z at the end.
8         Q. When did you have those communications
9    with Dr. Kaplan?
10        A. I met with him in November, I believe.
11        Q. Let's go back to Exhibit 35 for a
12   moment. Is there anything else on the second
13   page of these notes which is inaccurate?
14        A. I think Akilah never did the thing about
15   the sessions.
16        Q. You're referring to the next to last
17   bullet?
18        A. Yes. Sorry, yes.
19        Q. Anything else?
20        A. I can't remember. I guess this is
21   right.
22        Q. During the month of March 2012, was
23   there an issue regarding or involving Dr. Tothy?
24        A. Yes.

Page 231

1         Q. Dr. Tothy complained about you, correct?
2         A. She was asked by Dr. Song to write a
3    report about me, yes.
4         Q. How do you know that she was asked to
5    write a report about you?
6         A. Because I -- it's in the e-mail, right?
7    She said something like, well, following up our
8    conversation, Dr. Song, yadda, yadda, I forgot,
9    last week we talked or something.
10        Q. Did you behave inappropriately in your
11   communications with Dr. Tothy?
12        A. Unfortunately, I did not have enough
13   patience with her; and when she started
14   threatening me with reporting me and, like,
15   filling up a formal complaint or something, to be
16   honest, I just lose it. And I should have not
17   done it. And I apologized to her later over the
18   phone. I was under a lot of stress, and I was
19   just, just, you know, so paranoid about
20   everything I did either good or bad, everything
21   was going to be reported, reported, or, like,
22   would just -- you know. Dr. Song would find out
23   and, like, I -- yes.
24        Q. Dr. Ginard Henry became involved in the

Page 232

1    Dr. Tothy issue, too, correct?
2         A. I think so, yes.
3         Q. And as a matter of fact, he -- she
4    complained to him initially, didn't she?
5         A. Yes, I think so.
6         (Document marked as Artunduaga Deposition
7         Exhibit No. 36 for identification.)
8    BY MR. CLEVELAND:
9         Q. I show you what's marked as Exhibit 36.
10        A. Uh-huh.
11        Q. The second e-mail on this chain reflects
12   what Dr. Henry said you said to him?
13        A. Uh-huh, yes.
14        Q. Is what he has written here accurate
15   insofar as it reports what you said to him?
16        A. I mean, the thing about what I really
17   told him was most of -- I mean, most of these
18   things, yes, I mean, I had that conversation with
19   him. I didn't behave properly. He gave me
20   advice about that and told me that he understood
21   what I was going through, the probation and
22   everything else, that he could understand why I
23   did it.
24        What I said to him was unfortunately

Page 241

1    from clinical duties, and I don't think it's
2    fair. I really need to finish my internship.
3    That's the least he could do.
4           He didn't want to take me, and
5    Akilah said, Well, I'm sorry, I mean, he's not
6    just going to -- he's busy. I'll page you or
7    something if he says something. And I went home.
8    I went home.
9        Q. You said removal from your clinical
10   duties was not part of the agreement. What
11   agreement?
12       A. I mean, in the letter, in the letter he
13   gave me in November 15, the letter for probation,
14   he just does not mention anything if you don't --
15   I mean, he just mentions if you don't pass we
16   won't renew your contract. That's all, you know.
17   So I expected that, at least, I will be allowed
18   to finish.
19       Q. What other residents at the University
20   of Chicago Medical Center were placed on
21   probation?
22       A. I don't know that. You should probably
23   ask Dr. Roggin. He has the list of people, I
24   guess. Dr. Dickie mentioned someone who was

Page 242

1    remediated or something in the plastic surgery
2    department. I don't know. I don't have
3    information. You should probably look into that.
4        Q. Did you request in writing of Dr. Song
5    that you be reinstated to your clinical duties?
6        A. Yes, I did.
7        Q. And were you reinstated to your clinical
8    duties?
9        A. Well, that's the part that was a little
10   tricky, because I thought I was being reinstated
11   to finish an internship with the same clinical
12   activities and duties, et cetera. What I learned
13   after was that he reinstated me only because
14   Dr. Kaplan asked him to let me finish my
15   internship in his service.
16       Q. How did you learn that?
17       A. Dr. Kaplan told me that.
18       Q. When?
19       A. In April. I just did not understand why
20   Eric Grossman was not treating me the same, was
21   not assigning me cases as he did to other
22   surgical residents, why I was out of the on-call
23   schedule, why Eric or any of the other residents
24   wouldn't tell me where their rounds would take

Page 243

1    place, where they were meeting. I was left out
2    of team communications. I was -- it's like I did
3    not exist.
4           And, yes, I was discriminated
5    heavily by Dr. Grossman, who apparently was
6    following orders from Dr. Song.
7        Q. Why do you say Dr. Grossman was
8    following orders from Dr. Song?
9        A. Because he told me that.
10       Q. When did Dr. Grossman tell you that?
11       A. The day after or two days after I came
12   back. I wanted to understand why I couldn't see
13   Dr. Jaskowiak's patients. He said, You're --
14   have a very complicated situation, and you're --
15   and I asked him why I'm not doing cases as Mindy,
16   why is she having more cases. I just -- I don't
17   understand why.
18       Q. Let me show you --
19       A. What's happening.
20       Q. -- what I'm marking as Exhibit 31.
21           (Document marked as Artunduaga Deposition
22           Exhibit No. 39 for identification.)
23   BY MR. CLEVELAND:
24       Q. This is the letter to you from Dr. Song

Page 244

1    informing you that you were going to be
2    reinstated to clinical duties, right?
3        A. Uh-huh.
4        Q. And he asked that you advise Dr. Roggin
5    by April 6th if you would accept the
6    reassignment; yes?
7        A. Yes.
8        Q. And you told Dr. Roggin that you would?
9        A. Yes.
10       Q. When did you actually return to -- well,
11   let me phrase a different question. What
12   rotation were you reinstated to?
13       A. It's Kaplan's service, which is composed
14   of two services; breast surgery and endocrine
15   surgery. So I assumed that I was going to spend
16   my last months rotating in the service with
17   Dr. Edward Kaplan, Peter Angelos, Nora Jaskowiak,
18   Edwin Kaplan, Asha Chhablani.
19           Oh, I'll give you that.
20           A new -- the new faculty they have
21   hired, Dr. Grogan and Dr. Kulkarni. Because
22   that's the name of the actual service, Kaplan's
23   service. Yes.
24       Q. So when -- what date did you actually

Page 245

1  begin working on the Kaplan service?
2      A.  I think the Monday after that.
3      Q.  All right.  So that would be --
4      A.  9th.
5      Q.  -- April 9th, right?
6      A.  Yes, yes, sir.
7      Q.  And did you discuss with anybody upon
8  your return what your role would be?
9      A.  Yes.  I asked Eric -- well, I mean, I'm
10  really happy that -- first of all, no one wanted
11  to talk to me.  Everyone was, like, she's back,
12  she's a ghost.  I mean, like, she's coming back
13  from the dark.  I don't -- I didn't know what was
14  said about me and why I was back.
15      I spoke with Dr. Grossman, and he
16  told me that the order was that I had -- I was
17  only allowed to go to follow Dr. Kaplan
18  basically, to go to his clinics and to do only --
19  assist cases in endocrine surgery, because
20  Dr. Jaskowiak didn't want me in her service or
21  touching her patients or something like that.
22      I was really shocked, because in
23  this letter, that's not what it was told to me.
24      Q.  By this letter, you're referring to

Page 246

1  Exhibit 32?
2      A.  Sorry, yeah.  Exhibit 31.
3      Q.  31, I'm sorry.
4      A.  It just says, you know, that I'm going
5  to be reinstated; and I expected to be reinstated
6  to be able to finish and to be able to earn
7  credits in a rotation that any other surgery
8  intern was doing.  It's not -- it was a
9  conditional reinstatement which it doesn't show
10  here.  And, yeah, I mean, that's not what I
11  was -- I wanted.
12      Q.  I'm going to show you Exhibit 32.
13          (Document marked as Artunduaga Deposition
14          Exhibit No. 40 for identification.)
15  BY MR. CLEVELAND:
16      Q.  That's an e-mail that you sent to
17  Dr. Grossman.
18      A.  Yes.
19          (Discussion off the record.)
20      MR. CLEVELAND:  Let's go back on the
21  record.
22      I misspoke with regard to exhibit
23  numbers.  The number of the letter from Dr. Song
24  to Dr. Artunduaga should be Exhibit 39, and the

Page 247

1  number of the e-mail from Dr. Artunduaga to
2  Dr. Grossman which I had just shown her should be
3  No. 40.
4      So I thank --
5      THE WITNESS:  Yes.
6      MR. CLEVELAND:  -- the court reporter
7  for pointing that out.
8      THE WITNESS:  Uh-huh.
9  BY MR. CLEVELAND:
10      Q.  And Exhibit 40, Dr. Artundaga, is the
11  e-mail you sent to Dr. Grossman, right?
12      A.  Yes, sir.
13      Q.  Did you receive any sort of response
14  from Dr. Grossman?
15      A.  Never, nothing.
16      Q.  Did you ever have any further
17  communications with Dr. Grossman regarding the
18  matter of your assignments on that service?
19      A.  I always sent him e-mails asking him to
20  explain to me why he was giving me a considerable
21  significant lower amount of surgical cases.  And
22  I wanted to understand what was going on and
23  which type of -- which specific orders he had
24  received from Dr. Song or Dr. Roggin, but he

Page 248

1  never really wanted to get into that.  He just
2  said, you know, I'm following orders from above.
3  Dr. Roggin and Dr. Song had told me that I should
4  treat you this way.
5      Q.  Were there any other interns or
6  residents on the Kaplan service who had been
7  placed on probation besides yourself?
8      A.  With me?  No, there was a preliminary
9  resident, Melinda, Mindy Stack, and --
10      Q.  Had she been placed on probation?
11      A.  No.
12      Q.  Were there any other categorical
13  residents on the Kaplan service besides yourself?
14      A.  There was Essie Kueberuwa, a plastic
15  surgery resident.
16      Q.  Had that resident been told that he or
17  she would not receive a contract for the next
18  year of residency?
19      A.  No, I don't think so.
20      Q.  Show you what's marked as Exhibit 41.
21          (Document marked as Artunduaga Deposition
22          Exhibit No. 41 for identification.)
23  BY THE WITNESS:
24      A.  I should add a couple of things.  When

Page 249

1  you asked me these questions about all the
2  residents being on probation, the point of the
3  probation is to allow you to improve. And during
4  my probation, during the months of January and
5  February, I received a fair amount of cases and
6  assignments. So, in other words, the probation
7  should not influenciate the assignments you get.
8  You just get more supervision or you just get
9  weekly evaluations, because it's a program that's
10 designed to help the resident to improve. So I
11 was expecting, as I was treated during January
12 and February, to be expected the same way.
13 That's why I was -- I was in disagreement with
14 this type of what I consider retaliatory and
15 discriminatory treatment of Dr. Grossman and
16 retaliatory from Dr. Song, because I had been
17 complaining for a long, long time. So, yes, I
18 don't think that -- yes, that's all. I won't say
19 any more.
20 BY MR. CLEVELAND:
21     Q. You did understand, though, that the
22 conclusion that had been reached with regard to
23 your probation was that you had not performed
24 adequately and that you would not be continued

Page 250

1  in -- as a resident at the Medical Center, right?
2      A. Well, this is the thing. The problem
3  with that decision, Sara Dickie said yesterday
4  that the decision was reached between Dr. Song
5  and six more residents. None of them reviewed my
6  evaluations from my probation period. So that's
7  not what Dr. Song has told either the faculty,
8  the grievance hearing, in deposition, nothing.
9      So in my mind, I still believe that
10 I passed the probation; and that when Dr. Song
11 realized that I was improving and I was getting
12 good grades, he immediately switched me over to
13 plastic surgery, because he could control the
14 evaluations from residents and people who were
15 under him and, more importantly, which contracts
16 will depend on what he wanted.
17     And we have e-mails to prove that
18 Akilah Williams told everybody in the section of
19 plastic surgery to document absolutely everything
20 they have heard, seen, anything, anything,
21 anything, because it was pretty evident that he
22 was building up a file, so...
23     Q. So is it your testimony that Dr. Song
24 manipulated everything to get you out of the

Page 251

1  program and have you terminated from the program?
2      A. He has lied. He has manipulated
3  information. He has twisted information all over
4  since the very beginning. I -- my senior
5  residents in plastic surgery they weren't aware
6  of his actual intentions. They told me that.
7      Q. So Dr. Song manipulated everybody like
8  they were his little puppets to get
9  Dr. Artunduaga --
10     A. He --
11     Q. -- out of the residency program, right?
12 Is that your testimony?
13     A. He's --
14         MS. FRANKLIN: Object to form.
15         Go ahead.
16 BY THE WITNESS:
17     A. It's not puppets. He's a powerful
18 person. He's been there for 17 years. He has --
19 he's not only the program director, he's the
20 chief of plastic surgery, he's the vice chairman
21 of business and operations in the department of
22 surgery. Now he's an associate dean of continued
23 medical education. He's someone who out of the
24 record is called the Pope of the hospital,

Page 252

1  superpowerful, and, you know, people believe
2  whatever he said.
3      If he wrote in a letter that it was
4  a unanimous decision that I was -- I couldn't
5  improve in six years, that I was so lacking of
6  everything, that I graduated from med school and
7  he doesn't know how, people will believe him,
8  because he has a reputation and he's been there
9  for a long time.
10     And he count every single negative
11 evaluation that I got. The attendings when I
12 spoke with them privately behind doors they all
13 confirmed to me that they were contacted by him.
14 BY MR. CLEVELAND:
15     Q. Who refers to Dr. Song as the Pope of
16 the Medical Center?
17     A. Robert Stoppocher.
18     Q. Anybody else?
19     A. No. But everybody says that he's the
20 most powerful person in the hospital.
21     Q. So Dr. Song used his power to get you
22 out of the residency program, right?
23     A. I believe he went extra length to try to
24 force me out and create a retaliatory hostile

63 (Pages 249 to 252)

Page 253

1  work environment and to use -- coerce people to
2  really document everything I did. Even the other
3  people who were making the same mistakes are
4  still there.
5     Q.  Why do you contend that Dr. Song decided
6  to do that?
7     A.  Why?  Because he didn't like my
8  complaints, very early complaints.  He just did
9  not want to deal with, you know, discrimination
10  complaint, investigation.
11        I don't know.  We should ask him.
12     Q.  And I think you told us earlier that you
13  felt he had decided that he wanted you out of the
14  program in late October 2011?
15     A.  Yeah.  He wrote it on the November 2nd
16  letter that he thought that I was wasting my time
17  by going through the probation, so, yes.
18     Q.  And is it your testimony that everything
19  that happened after November 2011 was a sham?
20     A.  Yes.
21     Q.  Is it your testimony that anything
22  Dr. Song did with respect to you was motivated by
23  the fact that you're Columbian?
24     A.  By the fact that I complained and that

Page 254

1  he is moved by -- his motive is retaliatory.
2     Q.  It's not the fact that you're Columbian;
3  it's the fact that you complained; is that your
4  claim?
5     A.  At least, for him, yes.  I think it's
6  retaliation.
7     Q.  And everybody was motivated -- was
8  manipulated by Dr. Song, that's your claim?
9     A.  Not everybody.  I have cited a lot of
10  examples about national origin discrimination
11  from John Seal, Dr. Haejin In, Dr. Ferguson,
12  Dr. Umanskiy.  Those -- even Badir Shaksheer.
13        There were residents who will, you
14  know, start imitating my accent a lot.  They
15  thought that was funny, but it was very
16  uncomfortable.  Those are the ones that I
17  remember on top of my head.
18     Q.  None of those people were popes of the
19  Medical Center, were they?
20     A.  Ferguson has been there for a long time,
21  even longer than Dr. Song.
22     Q.  But Dr. Ferguson was not in the plastic
23  surgery section.  He was in a different section,
24  right?

Page 255

1     A.  He's a mentor of Dr. Song.  He's a close
2  friend of Dr. Song.
3     Q.  Dr. Ferguson didn't have the power to
4  have you terminated from the plastic surgery
5  residency program, did he?
6     A.  He just can't, because the only person
7  who can terminate my contract it's my program
8  director.  That's my understanding.
9     Q.  And that would be true for Dr. Umanskiy,
10  he didn't have the power to terminate you from
11  the residency program from plastic surgery
12  either, right?
13     A.  I don't think so.
14     Q.  And the other people you mentioned,
15  Dr. In and Dr. Seal, those were residents,
16  correct?
17     A.  Yes, but everybody had, you know,
18  criticism and inputs that were reported and -- in
19  my file and used, you know, to support the
20  employment decision.
21     Q.  Do you have in front of you Exhibit 41?
22     A.  Yes.
23     Q.  This is an e-mail you sent to
24  Dr. Grossman, right?

Page 256

1     A.  Uh-huh, yes, sir.
2     Q.  And he responded to address the -- your
3  questions and concerns to Dr. Song, correct?
4     A.  Yes.
5     Q.  Did you ever address these questions and
6  concerns to Dr. Song?
7     A.  Yes, I sent him several e-mails.  He
8  never replied, did not.
9        (Document marked as Artunduaga Deposition
10        Exhibit No. 42 for identification.)
11  BY MR. CLEVELAND:
12     Q.  This is -- Exhibit 42 is the this I'm
13  referring to -- appears to be an e-mail from you
14  to Dr. Grossman.
15     A.  Uh-huh.
16     Q.  Is this an e-mail that you sent to
17  Dr. Grossman?
18     A.  I don't remember.  Well, I don't
19  remember.  It looks like a draft.  I can't
20  remember.
21     Q.  So you have no recollection if you ever
22  actually sent this to him, correct?
23     A.  I mean, do you have another e-mail?
24  Probably I did.  I -- it looks like a draft I

Page 265

1    data. It's there. You can subtract it --
2    extract it. I don't -- it's anonymous. I mean,
3    I used to know who is who, just an average for
4    the class.
5        Q.  Looking at the column two to the right
6    of PGY-1 average, it's ST --
7        A.  Standard --
8        Q.  -- Dev, standard deviation, I assume?
9        A.  Yes.
10       Q.  Standard deviation of what to what?
11         (Reporter interrupted.)
12       A.  I think it's from the mean, but I can't
13    recall. I'm not 100 percent sure.
14       Q.  Who prepared this chart for you?
15       A.  I did. I mean, all the numbers I just
16    downloaded them from the actual -- the actual New
17    Innovations website, and I just plugged in my
18    average through the probation obviously, because
19    that's what you need to compare versus the same
20    numbers for these people within the same time.
21    That's, let's say, November to February. Yeah,
22    90 days.
23       Q.  What statistical test did you use to
24    make this comparison?

Page 266

1       A.  Sorry?
2       Q.  What statistical test did you use to
3    make this comparison?
4       A.  I don't think I did. I -- it's -- the
5    actual website gives it to you. I didn't make a
6    calculations. I mean, when I saw the numbers, I
7    thought they were fine. It's through New
8    Innovations. You should go and ask Carmen Barr
9    to get you a sample.
10       Q.  And the column different/standard
11    deviations, what's the comparison there?
12       A.  I think it's comparing me. So the
13    difference in grading. So it will be the
14    differential or the points either up or down with
15    the actual comparator here. I mean, if it's a
16    plus, it's because I'm missing .5, right. The
17    same -- it's just a subtraction, the
18    differential, is how I see it.
19        And all of these numbers were
20    from -- as I said, extracted from the New
21    Innovations. You can say I want the numbers from
22    this month to this month. I play around with it,
23    so I -- that's what I got. But it's a -- I mean,
24    I don't know who -- I mean, average of PGY-1, I

Page 267

1    guess, is everybody except me. And I don't know
2    plastic surgery resident. It's unanimous, so...
3       Q.  In connection with your grievance, you
4    submitted some charts and tables --
5       A.  Uh-huh.
6       Q.  -- that had what purported to be a
7    statistical analysis?
8       A.  Yes.
9       Q.  Where did the information from those
10    charts and tables come from?
11       A.  The New Innovations.
12       Q.  Did anybody assist you in preparing
13    those charts and tables for --
14       A.  Antonio, he helped me.
15       Q.  So he might understand those charts and
16    tables?
17       A.  Oh, yeah, he definitely will go through
18    everything with you.
19       Q.  And, by the way, you appeared at the
20    grievance committee hearing, of course, correct?
21       A.  If I went to the --
22       Q.  Yes.
23       A.  Yes, yes.
24       Q.  And even though you weren't sworn to

Page 268

1    tell the truth at that proceeding, did -- was
2    everything you said there truthful?
3       A.  I think so.
4        (Document marked as Artunduaga Deposition
5        Exhibit No. 46 for identification.)
6    BY MR. CLEVELAND:
7       Q.  Show you what's been marked as
8    Exhibit 46.
9       A.  Uh-huh.
10       Q.  Exhibit 46 is the 2011 Graduate Medical
11    Education Handbook.
12       A.  Yes.
13       Q.  Did you receive a copy of this during
14    the course of your residency at the Medical
15    Center?
16       A.  Yes, sir.
17       Q.  When did you receive it?
18       A.  At the beginning.
19       Q.  In July?
20       A.  June, July, yes.
21       Q.  Did you read it?
22       A.  Not all of it, but I know where the
23    important things are.
24       Q.  What are the important things?

Page 269

1    A.  For me, my case, harassment, workplace
2    civility.
3    Q.  When did you read those sections?
4    A.  Really early on October.
5        (Document marked as Artunduaga Deposition
6        Exhibit No. 51 for identification.)
7    BY MR. CLEVELAND:
8    Q.  Dr. Artunduaga --
9    A.  Yes.
10   Q.  -- I'm going to move on to another
11   exhibit now which is Exhibit 51.
12   A.  Uh-huh.
13   Q.  Which I have placed in front of you.
14   A.  The complaint, okay.
15   Q.  Which is the Second Amended Complaint
16   filed on your behalf in this case.
17   A.  Yes.
18   Q.  I have some questions for you about it.
19   A.  Sure.
20   Q.  Turning to exhibit -- paragraph 32 of
21   Exhibit 51, which is on page 5.
22   A.  Uh-huh, yes.
23   Q.  There's a reference that you -- to a
24   conversation you had with Dr. Stack.

Page 270

1    A.  Uh-huh.
2    Q.  In October 2011.
3    A.  Yes.
4    Q.  Did that conversation take place in the
5    Cave?
6    A.  Yes.
7    Q.  And the Cave is what?
8    A.  A working office for residents.
9    Q.  And Dr. Stack was seated next to you?
10   A.  I -- two seats, yes, next to me.
11   Q.  And you were discussing what sort of
12   costumes each of you was going to wear for
13   Halloween, right?
14   A.  Halloween was approaching, and Mindy has
15   very particular way of saying things.  She start
16   mocking me with -- she start imitating Dora the
17   Explorer.  You know, like, hey, hello, I'm Dora
18   and things like that.  And, like, Maria, you
19   should dress up as Dora.  And there were other
20   residents in the room.  They start doing the
21   same, trying to be playful, also, with her.  And
22   imitating Hispanics and, like, burrito, taco.  I
23   mean, they -- I mean, there was somebody else
24   there.  I can't recall her name.  She's -- used

Page 271

1    to be, I don't know if she's still at the
2    hospital, urology physician assistant.  And they
3    told -- she told them to stop, because, she said,
4    oh, guys, you should stop because this is
5    considered harassment, did you know, and it's not
6    fun for Maria.
7    Q.  Can you identify by name anybody else
8    who was present for me?
9    A.  His name, his name.  Orthopedic surgery
10   resident.  It's an orthopedic surgery resident.
11   I forgot his name.  There are four of them.
12   Cory, Aneet, Oliver, this is the other one.
13   Sorry.  I can't recall.  He was there.  Jason
14   Somogyl -- I don't know how to pronounce his last
15   name.  I'm sorry.  Jason was there.  I don't
16   remember if Joseph Cohen was there, too.
17       Mindy was the type of person that
18   every time she'll see me she'll start imitating
19   my accent.  She thought it was funny.
20   Q.  Did you ever tell her you thought it
21   wasn't funny?
22   A.  No, I did not.
23   Q.  All the people who were present for the
24   Dora the Explorer conversation were residents,

Page 272

1    right?
2    A.  Yes.  Except the PA.  Sorry.
3    Q.  Did you ever report that conversation to
4    any attending?
5    A.  No.  Because I -- my understanding of
6    discrimination complaints are that they are
7    confidential, and I had already been feeling very
8    isolated.  So that plus many of the other things
9    that were happening to me were one of the reasons
10   why I wanted to file a complaint in human
11   resources.
12       And as you can see here in the
13   Graduate Medical Education Handbook, it says that
14   you should go -- if your program director doesn't
15   do anything, if your chair or chief of section
16   doesn't do anything, go to the vice president or
17   chief of human resources, which my husband
18   contacted so many times, and I called.  And he
19   told me that he was forbidden to speak with me
20   and he hung up.
21   Q.  Who was the person who spoke with you?
22   A.  Jonathan Rothstein.
23   Q.  When he hung up, did he say good-by or
24   did he just hang up?

Page 273

1    A.  I'm very sorry.  He seemed, like, very
2  -- he was very scared, like, oh, I'm sorry, I
3  really -- I can't talk to you.  I've been
4  advised, I mean, I can't talk to you.  Go to your
5  program director, to your chief.  I can't take
6  your complaint.  I know why you're calling me,
7  chuunn.
8    Q.  How many times did you talk to
9  Mr. Rothstein?
10    A.  On the phone?
11    Q.  Yes.
12    A.  Once.  I tried to reach him through
13  e-mail, and my husband, too, several times.  He
14  tried to reach him several times on the phone.
15    Q.  You're indicating your husband?
16    A.  Sorry.  Ricardo, yes.
17    Q.  Have you told us everything about the
18  one conversation you had with Mr. Rothstein?
19    A.  I contacted him again in May, I believe,
20  when I was dismissed for a second time.  Yes,
21  exactly.  When I was sent home to write summaries
22  from a book, I was just, you know, very
23  frustrated with the hospital allowing this type
24  of thing, letting Dr. Song do whatever with the

Page 274

1  policies.
2    Q.  Did you talk to Mr. Rothstein in May
3  2012?
4    A.  If I spoke with him?
5    Q.  Yes.
6    A.  Yes.  He finally agreed to interview
7  with me after five months.
8    Q.  Did you ever actually interview with
9  Mr. Rothstein?
10    A.  Yes, I did, in May.  He wanted to know
11  my complaints.  I told him, Look, I'm just going
12  to concentrate in the retaliation part.  You
13  didn't want to take my discrimination complaint,
14  and I'm going to just go to the EEOC.  It took
15  him several weeks to get back to me.  I had to
16  e-mail him twice to find out, you know, what was
17  going on, if -- and he just said to me that he
18  was not going to do anything.  I think he sent us
19  a letter to my home address saying that he had no
20  dealings with residents.
21    Q.  Did Dr. -- I'm sorry, did Mr. Rothstein
22  ever conduct a complaint regarding any of your
23  allegations?  Conduct -- I'm sorry.  Did he
24  ever -- did Mr. Rothstein ever conduct an

Page 275

1  investigation regarding any of your allegations?
2    A.  I don't know.  I think so.  I was
3  already out of the hospital when he was -- when I
4  filed an EEOC complaint, so I guess he had to do
5  it.
6    Q.  Did you go to a Halloween party in
7  October 2011?
8    A.  Yes.
9    Q.  Was that a Halloween party attended by
10  other Medical Center residents?
11    A.  Yes.  Plus third year residents.  And I
12  went --
13    Q.  Who hosted it?
14    A.  Lee Alkureishi.
15    Q.  And what was your costume?
16    A.  I dance flamingo, so it was easy.
17    Q.  So you went as a flamingo dancer?
18    A.  Yes, because that's something that I do
19  and I love and I know how to do, so...
20    Q.  Did you ever have any other
21  conversations with Dr. Stack about Dora the
22  Explorer?
23    A.  I can't recall.
24    Q.  So it was just that one that you recall

Page 276

1  in the Cave that you've told us about?
2    A.  I mean, when someone was a bully or was
3  targeting me for being who I am, I just avoided
4  them, because it was uncomfortable enough.
5    Q.  Is it your testimony that Dr. Stack was
6  a bully?
7    A.  I think he discriminated me.  Yeah, I
8  mean, she targeted me.  She thought that I was, I
9  don't know, more vulnerable.  I have no idea.
10  You should ask her.
11    Q.  Paragraph 32(c) refers to residents
12  making derogatory references about Columbia,
13  specifically about FARC.
14    A.  Yes.
15    Q.  You identified to us a resident who made
16  some comments about FARC?
17    A.  Made not some, many, every time he saw
18  me.  He would --
19    Q.  That resident's name was?
20    A.  Badir Shaksheer.
21    Q.  Did anybody else besides Dr. Shaksheer
22  make any comments to you about FARC?
23    A.  A few people, but his comments were the
24  worse, so that's why I recall vividly.

Page 277

1    Q. Specifically what did Dr. Shaksheer say
2  about FARC?
3    A. He would say -- he would start yelling
4  out -- I'm sorry, yelling every time he saw me in
5  Spanish, like (witness spoke in Spanish) Oh,
6  Maria, Maria, I'm going to check on Wikipedia,
7  and he started reading these things on Wikipedia
8  about the history of FARC, pictures and stuff.
9    Q. Did Dr. Shaksheer speak Spanish?
10   A. I don't know.
11   Q. But he would speak Spanish phrases?
12   A. Many people do. I don't know. I'm not
13  his friend. We never went out.
14   Q. In paragraph 32(c), you attribute to
15  someone the statement, "In Columbia, people treat
16  this group as if they were heros"?
17   A. Yes, he said that.
18   Q. Did anybody else say that?
19   A. No. He said that.
20   Q. You also refer to the statement, "The
21  only remarkable thing about Columbia is the FARC
22  terrorist group"?
23   A. I -- to my recollection, that's one of
24  the many things he said. And he thought that

Page 278

1  they were heros and that we thought, too, that.
2  I mean, it was very disturbing.
3    Q. Did you ever complain about anything
4  Dr. Shaksheer said to you?
5    A. I wanted to make a confidential
6  complaint. Up to that point, I was just worried
7  about my education. I just did not want to be
8  the troublemaker.
9    Q. Turning to paragraph 36 of Exhibit 51,
10  which is on page 6.
11   A. Uh-huh.
12   Q. Paragraph -- subparagraph (a) of
13  paragraph 36 refers to a non-Columbian coresident
14  receiving nine cases?
15   A. Yes.
16   Q. Who?
17   A. Irma Fleming, I think.
18   Q. And what program was Dr. Fleming in?
19   A. General surgery.
20   Q. What year was she?
21   A. She's a third year.
22   Q. So at the time in July 2011, she was a
23  third year?
24   A. Yeah, yes, yes, sir.

Page 279

1    Q. Okay. Is Dr. Fleming the same
2  coresident referred to in subparagraphs (b) and
3  (c)?
4    A. Yes.
5       Wait. In July, just July.
6    Q. Okay. Both of those July subparagraphs
7  are -- the reference is to Dr. Fleming, right?
8    A. Yes, but the thing is that when you
9  rotate through Kaplan service, junior residents,
10  meaning interns, are expected to complete between
11  five to seven cases every week per statistics.
12  And plastic surgery coresidents told me that I
13  was supposed to get most of my internship cases
14  from this rotation.
15   Q. Who assigned surgery cases in July 2011?
16   A. Haejin.
17   Q. Subparagraphs (d) and (c) -- (d) and (e)
18  rather of paragraph 36 refer to a coresident in
19  September 2011. Who is that coresident?
20   A. September, that's going to be Shane
21  Pearce. We both were in the colorectal service.
22  He was following two attendings. I was following
23  two attendings.
24   Q. What program is Dr. Pearce in?

Page 280

1    A. Urology.
2    Q. What year was he?
3    A. First.
4    Q. Who assigned cases in September 2011,
5  surgical cases?
6    A. Between Brian Bello and -- what's her
7  name -- another chief. She was pregnant. I
8  can't recall her name.
9    Q. Did Dr. Bello discriminate against you
10  or harass you because of your Columbian national
11  origin?
12   A. I don't think so.
13   Q. Paragraph 42 of Exhibit 51.
14   A. Uh-huh.
15   Q. Refers to certain case assignments in
16  August 2011. Who is the coresident referred to?
17   A. During my first two weeks was Sue,
18  Suzanne Lim. Sue Lim, she goes by Sue; or is it
19  the other way around? Yes. Sue Lim and then
20  Julia Berian. So two weeks, two weeks.
21   Q. And both Dr. Lim and Dr. Berian were
22  general surgery residents; is that right?
23   A. Yes.
24   Q. What year were they?

Page 277

```
1        Q.  Specifically what did Dr. Shaksheer say
2    about FARC?
3        A.  He would say -- he would start yelling
4    out -- I'm sorry, yelling every time he saw me in
5    Spanish, like (witness spoke in Spanish) Oh,
6    Maria, Maria, I'm going to check on Wikipedia,
7    and he started reading these things on Wikipedia
8    about the history of FARC, pictures and stuff.
9        Q.  Did Dr. Shaksheer speak Spanish?
10       A.  I don't know.
11       Q.  But he would speak Spanish phrases?
12       A.  Many people do.  I don't know.  I'm not
13   his friend.  We never went out.
14       Q.  In paragraph 32(c), you attribute to
15   someone the statement, "In Columbia, people treat
16   this group as if they were heros"?
17       A.  Yes, he said that.
18       Q.  Did anybody else say that?
19       A.  No.  He said that.
20       Q.  You also refer to the statement, "The
21   only remarkable thing about Columbia is the FARC
22   terrorist group"?
23       A.  I -- to my recollection, that's one of
24   the many things he said.  And he thought that
```

Page 278

```
1    they were heros and that we thought, too, that.
2    I mean, it was very disturbing.
3        Q.  Did you ever complain about anything
4    Dr. Shaksheer said to you?
5        A.  I wanted to make a confidential
6    complaint.  Up to that point, I was just worried
7    about my education.  I just did not want to be
8    the troublemaker.
9        Q.  Turning to paragraph 36 of Exhibit 51,
10   which is page 6.
11       A.  Uh-huh.
12       Q.  Paragraph -- subparagraph (a) of
13   paragraph 36 refers to a non-Columbian coresident
14   receiving nine cases?
15       A.  Yes.
16       Q.  Who?
17       A.  Irma Fleming, I think.
18       Q.  And what program was Dr. Fleming in?
19       A.  General surgery.
20       Q.  What year was she?
21       A.  She's a third year.
22       Q.  So at the time in July 2011, she was a
23   third year?
24       A.  Yeah, yes, yes, sir.
```

Page 279

```
1        Q.  Okay.  Is Dr. Fleming the same
2    coresident referred to in subparagraphs (b) and
3    (c)?
4        A.  Yes.
5            Wait.  In July, just July.
6        Q.  Okay.  Both of those July subparagraphs
7    are -- the reference is to Dr. Fleming, right?
8        A.  Yes, but the thing is that when you
9    rotate through Kaplan service, junior residents,
10   meaning interns, are expected to complete between
11   five to seven cases every week per statistics.
12   And plastic surgery coresidents told me that I
13   was supposed to get most of my internship cases
14   from this rotation.
15       Q.  Who assigned surgery cases in July 2011?
16       A.  Haejin.
17       Q.  Subparagraphs (d) and (c) -- (d) and (e)
18   rather of paragraph 36 refer to a coresident in
19   September 2011.  Who is that coresident?
20       A.  September, that's going to be Shane
21   Pearce.  We both were in the colorectal service.
22   He was following two attendings.  I was following
23   two attendings.
24       Q.  What program is Dr. Pearce in?
```

Page 280

```
1        A.  Urology.
2        Q.  What year was he?
3        A.  First.
4        Q.  Who assigned cases in September 2011,
5    surgical cases?
6        A.  Between Brian Bello and -- what's her
7    name -- another chief.  She was pregnant.  I
8    can't recall her name.
9        Q.  Did Dr. Bello discriminate against you
10   or harass you because of your Columbian national
11   origin?
12       A.  I don't think so.
13       Q.  Paragraph 42 of Exhibit 51.
14       A.  Uh-huh.
15       Q.  Refers to certain case assignments in
16   August 2011.  Who is the coresident referred to?
17       A.  During my first two weeks was Sue,
18   Suzanne Lim.  Sue Lim, she goes by Sue; or is it
19   the other way around?  Yes.  Sue Lim and then
20   Julia Berian.  So two weeks, two weeks.
21       Q.  And both Dr. Lim and Dr. Berian were
22   general surgery residents; is that right?
23       A.  Yes.
24       Q.  What year were they?
```

Page 281

1      A.  First year.  They were my coresidents,
2   my same class.
3      Q.  You mentioned earlier Dr. Somogyl?
4      A.  Yes.
5      Q.  Other than what you testified to
6   regarding the conversation about Dora the
7   Explorer, did he ever say anything to you about
8   your Columbian national origin?
9      A.  I mean, she -- he tried to imitate my
10  accent and, like -- and say a few things, you
11  know.  I mean, it was pretty often.
12     Q.  What specifically did Dr. Somogyl say?
13     A.  Imitating the way how I speak, the
14  accent, my accent.  It's just not speaking
15  Spanish.  It's -- you know, I have certain way of
16  speaking, so they were making fun of me.
17     Q.  What is Dr. Somogyl's national origin,
18  if you know?
19     A.  He's America -- I mean, he's American.
20  He speaks perfect English and he graduated from
21  Loyola.
22     Q.  Did other residents imitate other
23  people's accents?
24     A.  No one -- I mean, Reza and I were the

Page 282

1   only ones who had a non-native accent.
2      Q.  What about Dr. Alkureishi Scotts?
3      A.  I don't know.  I mean, I did not spend
4   time -- much time with Lee or assigned to his
5   team.  I did not really interacted with him much.
6      Q.  So you wouldn't know if people --
7      A.  I don't know.
8      Q.  -- from time to time imitated his
9   accident, right?
10     A.  I don't know.
11     Q.  He does have a thick accent, doesn't he?
12     A.  Yes, but it's English.
13     Q.  Dr. Kueberuwa also has an accent,
14  correct?
15     A.  Yes, but it's English.
16     Q.  Did you ever hear anybody imitate her
17  accent?
18     A.  No.  People think it's posh and elegant
19  to have a British accent.
20     Q.  Well, that's your opinion, correct?
21     A.  No.  People say that.
22     Q.  Where is Dr. Kueberuwa from?
23     A.  She's British.
24     Q.  She's from the Cape Verde Islands, isn't

Page 283

1   she?
2      A.  Sorry?
3      Q.  Isn't she from the Cape Verde Islands?
4   Isn't that where she was born?
5      A.  I don't know.  She says that she's from
6   London, so I have no idea.
7      Q.  What residents, if any, had comparable
8   performance to yours?
9      A.  That I believe Reza, Jonathan Lusardi.
10  I mean, I -- people that I work with or that I
11  knew that were criticized.
12     Q.  Were -- well, take them one at a time.
13  Was Dr. -- was resident Dr. Salabat?
14     A.  (Nodding).
15     Q.  Was Dr. Salabat criticized for the same
16  things you were criticized for?
17     A.  Yes, cultural adjustment and
18  prioritizing, of being, you know, more efficient,
19  same things.
20     Q.  Was he ever placed on probation?
21     A.  I don't know.  You should probably ask
22  Dr. Roggin or him.
23     Q.  What was Dr. Lusardi criticized for?
24     A.  That he was slow at writing notes; that

Page 284

1   he needed to improve communication skills; that
2   he needed to make shorter presentations.  What
3   else?  Dr. Ferguson said he was not at the level
4   of an otolaryngological resident and that was May
5   rotation.  During the time that I spent with him
6   in October, Park even though never filled up
7   report or a negative report about him, she
8   thought he was bad.  Sara said yesterday that he
9   was mediocre.  And he made mistakes and probably
10  many more mistakes than I did.  But he's white
11  and he's American.
12     Q.  So other than Dr. Salabat and
13  Dr. Lusardi --
14     A.  Uh-huh.
15     Q.  -- you cannot identify for me any other
16  residents at the University of Chicago Medical
17  Center who had performance comparable to yours?
18     A.  I just don't know how they did.  I don't
19  have access to their evaluations, and I haven't
20  requested them to let them see, to give them to
21  me, so I don't know.
22     MR. CLEVELAND:  Okay.  Let's go off the
23  record for one second.
24     THE VIDEOGRAPHER:  Off the record at

November 18, 2011

**Dr. David H. Song**
Professor of Surgery
Vice Chairman, Department of Surgery
Chief, Section of Plastic and Reconstructive Surgery
Director, Residency Training Program
University of Chicago Medical Center
5841 S. Maryland Avenue, MC 6035
Chicago, IL 60637

Dear Dr. Song:

This letter was originally prepared as a response to the "Evaluation Summary" letter handed to me on Friday, November 4th of 2011, which referenced the meeting held on November 2nd at your office. This letter has since then been modified to include and address some points in the "letter of probation" handed to me on November 15, 2011.

I did not want so sign the letter of Nov 4th because I believe it does not accurately convey the facts about my overall performance, and the specific examples it quotes grossly misrepresent my role on the incidents that were cited.

Only as late as Nov 15 I had a minor opportunity to respond to some of the points made against me previously, but I still feel I have not been given an adequate opportunity to respond to those accusations; which in turn have helped create an erroneous impression of my abilities, overall fit for the residency program and ultimately a harsh work environment.

My primary goals with this letter are:
- Set the record straight about the basis of your accusations, which I never had a real opportunity to contest and show factual evidence.
- Formally ask you to reconsider the dates and timeframe set for my probation period, as it is outlined in the Grievance Procedure of the GME Policy handbook.

As secondary goals I have:
- Discuss some of the more subjective perceptions and feedback given.
- Recognize my mistakes and wrongdoings, and clarify the context where they happened and how the were addressed.

There were four particular factual situations highlighted in your letter as *"key examples to demonstrate my poor medical performance"*, and I would like to address them individually below:

1

ARTUNDUAGA
DEP. EX.
*12*
(4/2/14)

UCMC00004717

1) *"Several times misses were found, one in particular as it pertained to to maintenance fluid"*

My progress note dated 10/13/2011 at 8:26 am, stated my concern as to JT's hemodynamic status: *"Patient hypotensive over night, got 1.5 Lt of LR, temporarily improved, will transfuse 2 units of pRBC STAT."* Dr. Sara Dickie was notified about my patient's vital signs during walking rounds, she discussed the plan with Dr. Daniel Butz, then later said that she was going to be out for a job interview, and that I should therefore report to Dr. Butz throughout the day. Blood products were released around noon, transfusion started at 12:00 pm, vital signs improved from 1:00 – 2:00 pm (please refer to notes entered by Lisa Reny, RN at 11:00 am, 12:10pm and 2:00 pm), I notified Dr. Daniel Butz about JT's stable clinical status via text page, he then called me back and told me to continue monitoring her closely. At 1:15 pm, I was asked by PA Elizabeth Carlisle to cover Dr. Julie Park's emergent case (savage of thrombosed DIEP flap), and Dr. JL, my co-intern in the service during the month of October, agreed to follow up on my patient's progress. At 3:15 pm, he communicated to Dr. Justine Lee, chief in house, his concerns about JT's poor response to the blood transfusion. I left the OR at 3:30 pm, and went to check on my patient. I met with Dr. Lee and Dr. Borucki (Anesthesia) at the bedside. We all agreed to transfuse 1 Lt of Albumin STAT (please refer to note entered by Dr. Borucki at 4:48pm), and to re-evaluate JT's vital signs by 5:00 pm. I never left my patient's bedside, and as her vital signs did not improve, I paged Dr. Lee suggesting ICU transfer. Arrangements were made, Dr. Lee, Dr. Butz and myself transferred the patient to the unit. Dr. Dickie and Dr. Zachary were notified at 6:00 pm. From 6:00 pm to 8:00 pm the patient received aggressive intravenous resuscitation and an echocardiogram was performed at the bedside. At 8:00 pm, I received a call from Dr. Dickie, who was very upset about me not having transferred the patient to the ICU earlier in the day, she said she explicitly told Dr. Butz about her *"low-threshold for ICU transferring"*. I told her that she did not verbalize her plan to me prior to that conversation, and that I reported to Dr. Butz everything about her patient's day course. In hindsight, I think the confusion started when Dr. Butz and myself went to cover OR cases and the floor was left in the hands of Dr. JL, who unfortunately did not have much experience with the logistics of the service, it was not clear to him that he should have called Dr. Dickie instead of Dr. Lee. There is plenty of evidence on JT's medical records about my diligent performance, and I do not understand why this episode was brought up on your letter if I explained to Dr. Dickie during our feedback session on Friday 11/28/2011 that JT was stable during the time that I was following her, and that her status deteriorated when I was not available.

2) *"Several times misses were found, one in particular as it pertained to drain management"*

Dr. Mary Lawler, from Rehabilitation Medicine was consulted for disposition recommendations 10/18/2011 on JT's case, the next day we had a telephone conversation regarding my patient's future drain care. We agreed that drains needed to be switched from wall to bulb suction, so that the patient could get transferred to an outside facility, and that bulbs would remain in place until the output was <30cc/day in 2 consecutive

2

days. Dr. Lawler expressed concerns about an ostomy bag that was used as a temporary draining measure over one of the liposuction incisions, on her left leg. I advised Dr. Lawler to change the appliance regularly until drainage was <30cc/day. On 10/22/2011, JT returned to the ED with a surgical site infection on her back secondary to poor mobility in the Rehabilitation Center, abdominal drains were out, patient reported output of ~50 cc/day, no signs of fluid collection/seroma were noted at physical exam. The day after her admission, Dr. Lawler called Dr. Dickie regarding JT's complaints about the Schwab Rehabilitation Center. I do not know the exact details of their conversation, but Dr. Dickie then called me saying that Dr. Lawler claimed that I had been notified about JT's "loose drains." However, if you refer to Dr. Lawler's consult note from 10/19/2011 at 8:58 am, you will see that no observations were made about the abdominal drains, as the "loose drain" quoted there corresponds to the ostomy bag that we were using over her liposuction incision. Dr. Dickie said that I should have told her about that observation, so that in the future we could secure the drains with new suture, but I replied that Dr. Lawler was referring to the ostomy bag, which I believe could not have been sutured to the skin. I once again do not understand why this was quoted in your letter, as the drains that would have needed suture were not the same ones that Dr. Lawler quoted in her consult note.

3) *Supra-ventricular tachicardia, Cardiology/Gynecology consult, vaginal bleeding and tachycardia on RW's case.*

Many "misses" related to RW's case are mentioned in your summary letter. I agree that a big mistake during my Plastic Surgery rotation on October was not to monitor my co-intern Dr. JL more closely. I trusted his medical judgement and perhaps naively thought that he was going to do a competent job. On the night of 10/13/2011, RW developed atrial fibrillation, Dr. Justine Lee ran the code and I helped her transfer the patient to the Cardiothoracic unit. We all agreed that for logistical purposes, it was going to be easier for Dr. JL to follow up on RW, as he was following Dr. Lee's patients every day. He was responsible for placing orders, writing notes and asking for consults from 10/13/2011 to 10/20/2011. Consecutive misses mentioned in your letter, such as "*consultant recommendation's follow-up, persistent tachycardia regardless of intravenous fluid boluses during heavy menstrual bleeding, etc.,*" were ultimately his responsibility. During the afternoon of 10/20/2011, RW presented tachycardia, I assess the patient who was slightly lightheaded and gave her a bolus of 500c NS, I advised Dr. JL to monitor her closely, while I was seeing two consults and making a thumb spica in the cast room in DCAM. I found out later, that he did not follow her up, rather decided to spend 1 hour seeing a consult for a "toe blister". Dr. Nguyen called me on my cell phone inquiring for RW's clinical status, unfortunately at that time, I had very little information to give her since Dr. JL recognized that he did not follow up consultant recommendations neither watched her closely. It is true that I failed to cover his patients when critical issues raised, I also failed to notify Dr. Nguyen about her tachycardia despite of my attempts for reanimating her. It was frustrating, but I never felt that it was my place to give my co-intern feedback or advice regarding his performance. I did express my concerns to my seniors, and their response was that I should coordinate things better with him. At that point, I did not know what else I could have done; I tried to cover everything that seemed

3

to be critical such as consults, discharges, orders and disposition arrangements; I was done by 10:30 am every day. For reasons that are unclear to me yet, he always took very long to accomplish his duties; for instance, his consult notes were always entered late and sometimes the senior residents ended up writing them instead. I can not emphasize more that the dynamics of the team were very challenging, I feel for him because I could identify with some of his struggles. In hindsight most of the misses would have been avoided if I had taken over the monitoring of RW, but I did not feel comfortable with dismissing him from his clinical duties if my seniors did not take actions to remediate the known situation on their own.

4) *"Accidently sent a patient home with a PICC line which was supposed to come out before discharge after multiple times of prompting"*
On 9/5/2011, I was told exactly twice by my senior resident, Dr. Brian Bello, that WH's PICC line needed to be removed prior to discharge. During morning rounds on 9/6/2011, my patient said her daughter would come to 'pick her up after 7:00 pm, therefore I planned to remove the PICC line at 6:00 pm. The ICU team sent the patient home at 5:00 pm without notifying me, they assumed the PICC line would stay since most of Colorectal Surgery patients get discharged with PICC lines for TPN needs. I realized what had happened on the same day and immediately communicated with the patient's daughter, then removed the PICC line the following morning at the clinic. I acknowledge that delaying the removal was suboptimal; nevertheless, I emended my error as soon as I detected it.

About the subjective aspects cited by reviewers', several points have been called to my attention, which I would also like to address: *"Difficulty establishing a strong patient-doctor relationship"*, *"anxiety issues"*, *"failure to communicate with the medical staff effectively"*, and *"mediocre sense of prioritization"*. While I have acknowledged failings on those points, there have been several misunderstandings along the way, as well as evident signs of improvement, which I feel compelled to point out.

-*Task prioritization:* During my time in B Service, I worked under the supervision of a newly recruited fellow who constantly expected me to drop what I was doing in order to place operative notes, orders and consults for the cases she assisted while I was covering clinic and/or OR cases. While leaving the clinic or the OR in order to tend to her matters always seemed inappropriate to me, I did what my senior wanted me to do, which caused in me confusion and a deep sense of frustration. This was perceived as a lack of organization by my evaluators.

-**Floor workload:** My first time managing the floor happened during my third month of internship: *"...it was clear that she was less prepared than her peers. Specifically she was less independent and was less aware of the routines of running the service, a result of necessary adjustments to a different system. Given that she was trained where the routines and customs are not necessarily known to us"*, hence the obvious difficulties that an intern would face during his/her first month of internship and their superiors would be

4

UCMC00004720

more understanding, I was facing in my third month of training. I was lucky to work under Dr. Brian Bello's supervision, he was very helpful regarding task prioritization. List was run several times during the day, my tasks were always accomplished by noon, and I rounded on my own prior to afternoon rounds. I was also very diligent to come to the OR to update my senior twice per day. There were some misses, like the PICC line example that you mentioned on your letter, but he was kind enough to mentor me on those occasions.

**-OR skills:** Assisting cases created at the beginning a great deal of anxiety for me since I did not assisted enough operations during my research years: "*Maria's operative skills were hampered by what appeared to be a significant case of nerves. However, despite these weaknesses, she improved during the rotation. I am convinced that her operative skills will improve since I saw improvement over the course of the month*". By my second month of internship, I started showing more improvement: "*She is very bright and very good with her hands.*" By the end of October I felt a lot more comfortable in the cases I was assisting. I will keep working on improving my performance in the OR.

**-Doctor/Patient relationship:** I am a foreigner and I have an accent. This was never an issue during my time in Boston, I coordinated an international genetics project and was able to communicate with multidisciplinary team of scientists, physicians, nurses, patients and even the press. My time in Chicago has been very challenging. Many of the patients in the hospital have a strong accent that I was not used to, some others have expressed their surprise that a Hispanic physician is taking care of them. This has represented one of my major challenges; I have tried hard to find the right way to establish a strong relationship with my patients. Now they know who I am, where I come from and they have expressed a lot of satisfaction with my work. It has happen several times they ask the operator to page me directly, or have asked me to be present in their procedures or follow-up appointments. They said they feel reassured when I am the one delivering patient care; in particular because I take the time to answer their questions and explain the procedures in a simple yet comprehensive way.

**-Personality:** Some evaluators have expressed concerns about my personality: "*Maria is too sweet, she needs to toughen up*" by Dr. Umanskiy, "*Maria is too nice, she needs to inspire more respect*" by Dr. Jaskowiak; I totally agree that a surgeon must inspire confidence and respect, and I will be working hard on presenting a better image on this regard. Being sweet is not part of the common stereotype of a surgeon, but I strongly believe that this aspect of my personality does not diminish my medical abilities.

Dr. Song, I understand that your expectations from a Plastic Surgery resident are very high, but at the same time you knew that transitioning from my previous research position to the clinical setting was going to be challenging. Adding to that, my condition as a non-native speaker who has not trained in the U.S., would pose some additional difficulties, and they most certainly have. These facts were not hidden from anyone who evaluated my application for Plastic Surgery, and yet my professional qualifications were deemed to outshine all of these perceived weaknesses. From the start, I knew better than

5

UCMC00004721

anyone else that I would face a steeper learning curve than any of my US-raised and trained colleagues, but this was not a challenge unknown to me since I already went through a similar experience in Boston, with a similarly difficult start but with my talent and drive winning out in due course. Though I recognize that only I am responsible for my rate of progress, I would have expected from some of the faculty, staff and senior colleagues a minimum level of understanding and support in recognition of those facts that are common in anyone with a similar background as mine, as that would have greatly aided in my learning process.

I recognize that my biggest mistake was to not actively look for guidance and mentoring since the very beginning of my internship, rather doing just what other interns would tell me to do, and acting in good faith above everything else. Out of perhaps a naive sense of teamwork, I did not speak up when I felt I was placed in unfair situations, and I was individually blamed for incidents where the responsibility was either collective or it lied squarely on someone else, and I now regret it. At this point, I cannot accept that misses blamed on me were due to an "*uncorrectable lack of medical judgment*," as you strongly proposed. If I felt that was truly the case, I would be the first one to offer to step aside, as my unshakeable sense of medical ethic would not allow me to put other people's lives at risk while under my watch. If I am about to lose my job, I cannot stop feeling that you have made your decision based on inaccurate observations. Partly because I had no prior knowledge of the U.S. residency system, I mistakenly did not meet with my evaluators prior to evaluation submission, which I now realize would have helped clear up situations that may have been cause for concern. In addition to that, in later conversations, I have had with several of my evaluators and they have expressed surprise at the way the negative aspects of their own reviews have been singled out and highlighted, while positive aspects have hardly been acknowledged.

I have worked very hard in my life, and I have shown I am not afraid of new and difficult challenges. I have the ambition and ability to keep working to improve myself, and to improve the perception of me that unfortunately has been created on the service. I know I can become an invaluable member of the Plastic Surgery program at University of Chicago, but I am asking in return to have a fair evaluation of my abilities. I know I have the intelligence, desire and strength to improve if I am given the chance to do so.

My background makes my assessment more difficult early on during residency; but, as some evaluators have expressed, I will need guidance, mentoring and nurturing. Moving forward, I do promise to seek your guidance more actively in the future.

It has been known from the beginning of my appointment with University of Chicago that I was getting married on December 10, 2011. The school of Medicine scheduled my four weeks of vacation for the whole month of December. In a different set of circumstances I will cancel any plans I had on the month of December and ask to be included in the rotation schedule of the hospital. Given the circumstances, this is not a viable curse of action for me.

6

UCMC00004722

As I described at the beginning of this letter, I am formally asking you to reconsider the dates and timeframe set for my probation period to encompass the 90 working days that are customary, without been penalized for the working schedule that is already in place.

I want to have a fair chance to receive the guidance and mentorship you encourage on the Nov. 15th letter, and give enough time for my superiors and evaluators to get a real view and unbiased judgment of my performance.

These extended dates will give you two more objective comparison points:

- Absite test results will be available in early March. This is a great opportunity to have a quantitative assessment of my fund of knowledge compared to my intern class and other plastic surgery residents at the same level of post-graduate medical education training from previous years.
- Rotation again on the B service, which will serve as a solid comparison point for assessing my improvement.

I hope Dr. Song you find a way to help me, as you stated in your previous letters, to get a positive outcome of this situation, allowing me to stay in the program and be trained as a plastic surgeon. I will shine, if given the opportunity, as you expect.

Sincerely,

Maria Alexandra Artunduaga, M.D.          11/18/2011

C.C. Dr. Julie Park
C.C. Akilah Williams

7

UCMC00004723

**Williams, Akilah [BSD] - SUR**

| | |
|---|---|
| **From:** | Song, David [BSD] - SUR |
| **Sent:** | Monday, October 24, 2011 1:00 PM |
| **To:** | Williams, Akilah [BSD] - SUR |
| **Subject:** | FW: MA |

Please put this in Maria's file

David H. Song, MD, MBA, FACS
Professor of Surgery
Chief and Program Director
Section of Plastic Surgery
Vice-Chair, Department of Surgery
University of Chicago Medical Center
5841 S. Maryland Ave, MC 6035
Chicago, IL 60637
(773) 702-6302
(773) 702-1634 fax
songd@uchicago.edu
http://surgery.uchicago.edu/specialties/plastic



**From:** Dickie, Sara [UCH]
**Sent:** Monday, October 24, 2011 11:43 AM
**To:** Song, David [BSD] - SUR
**Subject:** MA

3,

Got a call from Mary Lawler today regarding a patient of Dr. Zachary, Ms. J    T    . She was recently discharged to Schwab after belt lipectomy and massive liposuction of bilateral thighs. Mary was concerned that the patient was recently readmitted to U of C because of cellulitis and wound complications. Mary says she voiced concerns to Maria before the discharge regarding an elevated WBC and temp. And she felt like her concerns were "blown off". As well, she was concerned that the drains were not secured in a way to ensure they would not be pulled out during physical therapy which tends to be more aggressive than at the hospital (obviously). In her experience the way the drains were secured was not good enough, it was loose and she voiced this concern to Maria. Prior to the day of discharge I spoke with Maria about the drains. She said Mary wanted to know the plan for the drains and whether they would be on bulb or wall suction. We went over that they could be on bulb for therapy and that they would stay in until less than 30ml was coming out. At this point they were putting out over 200cc a day. Maria stated that Mary wanted them to come out early, which I thought odd, but told her, "No, they must stay in".
The day after transfer to Schwab both drains pulled out during patient turning. Mary was upset as she felt her concerns were not addressed prior to discharge.

I called and spoke to Maria about her interpretation of what Mary wanted. Again she stated that Mary wanted, "a plan for the drains". which to her meant a plan for when they would be removed. I said that actually Mary was concerned they would be pulled out because they weren't secured well to the skin. Then Maria told me that, yes, Mary did say that to her. Maria checked the drains and they seemed secured well to the skin, but that they were better secured with Tegaderm over them, so she instructed the nurses to secure the drains better using Tegaderm.
I told Maria that this was not a good enough way to secure drains for this type of patient. We needed to listen to Mary's concerns and in fact we could have placed better sutures into the drains to secure them in a more permanent fashion. I also told her that although we believed the low grade temp was related to atelectasis, that we need to state that directly to Mary and let her know we have the same concerns and that we are addressing them. She agreed and apologized for not alerting me to this before the patient left. She stated she would let me know next time this happened.

1



ARTUNDUAGA
DEP. EX.

(4/2/14)

UCMC00005802

-Sara
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This e-mail is intended only for the use of the individual or entity to which
it is addressed and may contain information that is privileged and confidential.
If the reader of this e-mail message is not the intended recipient, you are
hereby notified that any dissemination, distribution or copying of this
communication is prohibited. If you have received this e-mail in error, please
notify the sender and destroy all copies of the transmittal.

Thank you
University of Chicago Medical Center
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

2

UCMC00005803

Areas for improvement:

Notification of seniors in case of change in patient status
-Ms. W████'s vaginal bleeding and tachycardia→despite a 500mL bolus, no labs drawn, senior not notified

Appropriate understanding and follow-up of consults
-Cardiology consult→paging service for patient's SVT, and when cardiology did not call back, did not contact them again
-Gyne consult→consult for vaginal bleeding, ordering labs/ultrasound without getting from gyne service what labs/ultrasound were for, or asking consult service to answer the question with their differential diagnosis
Endo consult→recs in note different from meds that were ordered

Following directions, ordering appropriate diagnostic studies and ancillary services
-Ordering transfer of patient out of unit before attending confirmation by senior
-plaster splint from OT→despite multiple attempts to explain the typle of splint needed, patient received the wrong splint, no recognition that splint was wrong until seen by senior
-CT abdomen ordered instead of CT Abdomen/pelvis→which was changed by senior after looking over orders
-Antibiotics dropped off MAR→Ancef on replant fell off MAR which was not recognized by intern; Vanc not ordered for patient admitted from ER
-Heparin SQ not ordered on patients on bedrest
-Lovenox discontinued on morbidly obese patient for thrombocytopenia (plts reported at 36, when that was the PTT)
-ID approval for antibiotics not followed up on
-Lantus ordered TID instead of novolog

Description of wounds/fractures
-heavy reliance on photos→need to be able to describe wounds over the phone using proper anatomical terms

Consults
-putting consult notes in a timely manner and communicating recs with the service→consults being put in 1 week after initial consult only after requesting service called when they were unable to find consult note

I discussed all these issues c̄
Maria and she understands
The issues ( context ( and
areas in which she can improve
10/24/11    [signature]                    [signature] 10/24/11

ARTUNDUAGA
DEP. EX.
1 †
(4/2/14)

UCMC00004531

*Reviewed 10/28/11*

Areas for Improvement:

Notification of Senior in change in patient status or continuing decline

     T██ (Zachary), first admission, hypotension and anemia while on stepdown. Patient condition did not improve with blood products. Senior asked you to keep a close eye on a patient and monitor for lack of response. Nursing notes indicate paging the intern (3394) at noon that patient still hypotensive despite blood and no new orders were given and no new plan. Needed to follow patient and update senior as to status. Eventually patient transferred to ICU when another senior was alerted at 4:30pm. Ordering Dilaudid 0.5mg from PACU orderset when patient had mental status changes and hypotension was an error.

Consults
     Seeing consults in efficient manner. Placing consult notes in appropriate time. Improved communication with senior on call as to what consults need to still be seen, which need disposition.

Prioritization
     Seeing consults. Alerting senior to patient status.
     Coordinating with other residents the list update, notes, consults and signout in order to not repeat work and provide efficiency.

History gathering
     Knowledge base is good, but gathering of history and physical exam is lacking. Data gathering by Epic and patient interview is generally slow and incomplete, and then not compiled into an understandable story. Routine patient presentation seems to be a struggle. Must work on presenting physical exam findings. Must not rely on pictures.

General organization
     Keeping track of all orders for patients on the list and ensuring they are all done. Not getting caught up in the first part of plan and forgetting the second and third, etc.

OR
     Pre-oping patients. Any floor patient needs pre-op reconciliation when it is known they will go to OR. Don't wait for patient to be called. If going to OR as first case, leave rounds in timely manner to get patient prepped and ready. If there are two interns, the other can finish rounding.

*Marie Artunduaga*

ARTUNDUAGA
DEP. EX.

(4/2/14)

UCMC00004532



THE UNIVERSITY OF
**CHICAGO**
MEDICAL CENTER

DEPARTMENT OF SURGERY
*Section of Plastic and Reconstructive Surgery*

MC 6035
5841 South Maryland Avenue
Chicago, Illinois 60637-1470
fax    773-702-6302
fax    773-702-1634

| | |
|---|---|
| **Meeting Name:** | Summary of evaluation with Dr. Maria Artunduaga |
| **Date:** | Wednesday, November 2nd, 2011 |
| **Time:** | 1:00 p.m. |
| **Location:** | J641 |
| **Participants:** | Dr. Maria Artunduaga, Dr. David Song, Dr. Julie Park and Akilah Williams |

Acknowledging that this was a very difficult meeting, we convened an urgent meeting with Dr. Maria Artundnaga after her most recent rotation on our service through the month of October. It was unanimous amongst the numerous evaluators across the Department of Surgery, particularly within our section, that the issues that Dr. Artunduaga has will be extremely difficult to correct within the time allotted during residency period. We all recognize that she is a pleasant, hard-working individual who most certainly is intelligent. However, the overwhelming issue was thematically agreed upon once again by all of the reviewers, including a 360 degree evaluation by a nurse practitioner who worked with her extensively.

It became very clear that during the month of October, while Maria had another intern on service who admittedly was not the strongest intern and perhaps added to the problem, performed far below what would be acceptable for an intern, particularly an intern in Plastic and Reconstructive surgery. Throughout the entire course of the month, Dr. Artunduaga failed to communicate properly and failed to efficiently organize a system of rounding and patient follow-up. Several times near misses were found, one in particular as it pertained to maintenance fluid, another as it pertained to drain management, where Dr. Artunduaga failed to recognize her errors despite being told multiple times to follow-up. These are thematically consistent with the evaluations Dr. Artunduaga received in the months of July, August and September where it was seen that "she frequently appeared disorganized, unsure of her knowledge and at times had an unsuccessful doctor/patient relationship." Another set of reviewers stated that "she is often frazzled when presenting patient issues, and it was very difficult to keep her organized and goal-oriented."

It was also found that she accidently sent a patient home with a picc line which was supposed to come out before discharge after multiple times of prompting. This was not fully realized by Dr. Artunduaga. Once again, while on our service, she failed to realize an issue of severe vaginal bleeding and tachycardia and did not appropriately notify senior residents. Another issue is where a patient had a supra-ventricular tachycardia and cardiology was consulted. She failed to follow up with this patient. The list continues with multiple sets of tests and lab that were incorrectly or not ordered. This is not just focusing on specific incidents, and I relayed to Dr. Artunduaga that if these incidents were isolated or if they were thematically different, we would have had a much different conversation of remediation. With all of these issues being

AT THE FOREFRONT OF MEDICINE®



ARTUNDUAGA
DEP. EX.
19
(4/2/14)

**UCMC00004701**

thematically universal when it came to her performance or lack thereof, it was quite clear to all of the reviewers that Surgery, and in particular Plastic and Reconstructive Surgery, just would not be the best fit for Dr. Artunduaga.

Regrettably, this is painful for all of us to discover and we have assured Dr. Artunduaga that we would like to move forward in every way possible to support her transition into another specialty or another program. We discussed the probability of probation, but we agreed that probation at this level would not lead to successful remediation and only lead to a permanent deleterious record in her portfolio, thus jeopardizing her future possibilities. I have relayed this to Dr. Artunduaga and have confirmed that she has understood them clearly. I also as a courtesy have given her 24 hours to decide whether she would like to proceed with probation or if she would like to consider a transition in her career where we would all be helpful. She has agreed to get back with me in 24 hours.

The meeting ended with Dr. Artunduaga stating that she recognized and understood these issues, yet being adamant that she has improved. This has further reiterated to us that she feels that she has improved, however, no one else in the entire section and across the department has recognized that fact. Once again, this was a confirmatory step for us, understanding the disconnect between her skill set, the understanding of the situation and the reality of the situation at hand. Regrettably, these things have come to fruition and I have relayed to her both my personal and our collective disappointment at the situation, and have once again relayed to her that we will do whatever is in our power to facilitate her transition. We have also allowed her to understand the grievance process as well and relayed contact information related to grievance if she so chose to move forward in that direction.

Dr. Maria Artunduaga _____       Dr. David Song _____

Dr. Julie Park _____       Akilah Williams _____

UCMC00004702

**From:** Song, David [BSD] - SUR
**Sent:** Thursday, March 29, 2012 12:04 PM
**To:** Williams, Akilah [BSD] - SUR
**Subject:** FW: Confidential note on MA
**Attachments:** Maria Artunduaga.docx


DAVID H. SONG, MD, MBA, FACS
Cynthia Chow Professor of Surgery
Chief, Section of Plastic and Reconstructive Surgery Vice-Chairman, Department of Surgery The
University of Chicago Medicine & Biological Sciences
5841 S. Maryland Ave. | Rm J641, MC 6035 | Chicago, IL 60637
Office: 773-702-6302
Pager: 1670

AT THE FOREFRONT OF MEDICINE®
http://www.uchospitals.edu
http://surgery.uchicago.edu/specialties/plastic
http://www.facebook.com/uchicagoplasticsurgery
Twitter: @dhsong


-----Original Message-----
From: Roggin, Kevin [BSD] - SUR
Sent: Wednesday, March 28, 2012 4:03 PM
To: Song, David [BSD] - SUR
Subject: Confidential note on MA

David,
This is a confidential note that I wrote after meeting with Maria in November.
Please feel free to add this to your documentation.
KR

1

ARTUNDUAGA
DEP. EX.
20
(4/2/14)

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

UCMC00010390

Maria Artunduaga Note

I met with Maria Artunduaga, at her request on 11/10/2011. She contacted me by e-mail to ask for advice. She was trying to understand the,"... importance of feedback sessions"for her general surgery rotations. She acknowledged that she received a letter from Dr. Song on 11/4/2011 that suggested she consider transferring into another program, resigning her position, or being placed on academic/clinical probation.

Briefly, she expressed her concern over her performance to date. She recalled several examples of the types of problems she had been having on her prior rotations. She felt that her lack of experience in the US residency system, four year hiatus from medical care, and "high expectations"have contributed to her subpar performance to date. Maria felt that expectations and responsibilitieshave varied between services, communication has been difficult, and she has been held responsible for things that were "not her fault". She told me that she had never known that she could check the evaluations that had been written about her until she did so today.

I explained to Maria that there are clear expectations for our residents that are outlined in the "Goals and Objectives" for each rotation; this information is published on the Department of Surgery intranet. I also explained that there is a team education coordinator for each service who is responsible for providing constructive feedback to the residents on their services. We have stated numerous times to the interns and residents that the goals and objectives are to be reviewed, the TEC appointments to be scheduled by the residents to provide verbal feedback for each rotation, and that all evaluation should be signed by the residents. Maria said that she was unaware that these processes existed. I reminded her that this was explained to all of our interns during the "Intern Orientation" and that we have reminded the interns and residents of this multiple times during the year.

Maria believes that she is an "excellent resident" and has no problem understanding the duties of being an intern at the University of Chicago. I reinforced to her that she should formally respond to Dr. Song as soon as possible.

David Song, M.D.
Section of Plastic Surgery
MC 6035

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| | |
|---|---|
| **From:** | Artunduaga, Maria [UCH] </O=UCH/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=MARTUNDUAGA> |
| **Sent:** | Thursday, January 26, 2012 9:33 PM |
| **To:** | Song, David [BSD] - SUR; Park, Julie [BSD] - SUR |
| **Subject:** | August refill issue (Dr. Jaskowiak) |

Drs. Song and Park,

Today I received a call from Dr. Jaskowiak, regarding an antibiotic prescription I refilled over the phone for one of her patients in August, 2011. She said it was very bad clinical judgment on my part to have done it without examining the patient first; and also expressed a lot of frustration because I did not inform her about the episode. I told her what happened, unfortunately, she replied that she could not believe me since there is not record of what happened. I decided to write you before things escalate, this is what happened:

On August 20, Andrea Olivas, General Surgery PGY-3 received a page from patient CJ stating that a refill was needed at her closest 24-hours pharmacy. Dr. Olivas could not get a hold of the pharmacy, she asked me to help her out by calling later during my night-shift. Once I communicated with the pharmacy, they said this was CJ's second refill. This information was confirmed by the patient, who told me that she was advised to reach the Surgery resident on-call to refill her prescription whenever she had RUQ, and to make an appointment at the clinic to get her cholecystectomy scheduled.

During that week, Dr. Jaskowiak was on vacation, I decided to refill the prescription for only 7 days, because she refused to come to ED. I urged her to give us a call on Monday, so an appointment could be set up. Unfortunately, the patient never called the clinic, and I did not follow up to make sure she was contacted by the scheduler.

I understand Dr. Jaskowiak's point, and totally agree that junior residents should not prescribe antibiotics over the phone; however, my lack of experience at that time (it was my third call) and guidance (I was told to refill a prescription) made me more prone to errors. I naively believed the information I was given, CJ's medical records had no consult/progress notes, and the only available information was a discharge summary from March, 2011.

I made mistakes during my first months of internship and I am dealing with the consequences now. Currently, in a more nurturing environment, I have shown great improvement (as stated by my recent reviews). It is disappointing that Dr. Jaskowiak puts in doubt my word about what happened. I have already told Andrea what is going on, and although she does not remember the specifics, she gave her OK to be contacted if necessary.

I hope this e-mail clarifies this situation, let me know if you want to sit down and talk about it.

-M

Maria Alexandra Artunduaga, M.D.
Physician Resident, Section of Plastic & Reconstructive Surgery
University of Chicago Medical Center
5841 S. Maryland, MC 6035
Chicago, IL 60637, USA
Maria.Artunduaga@uchospitals.edu
Cell: (617) 999-3735
Pager: (773) 652-1363 (#3394)
Website: http://martunduaga.com

ARTUNDUAGA
DEP. EX.
28
(4/2/14)

MA008932

March 5, 2012

I have had the opportunity to meet with Dr. Julie Park today to review and discuss my weekly evaluations, areas for improvement and suggestions. I understand what has been discussed and accept responsibility for my actions.

Maria Artunduaga, M.D.

Julie Park, M.D.

Akilah Williams

ARTUNDUAGA
DEP. EX.

(4/2/14)

UCMC00000837

03/5/2012
Minutes from meeting with Dr. Maria Artunduaga, Dr. Julie Park, Akilah Williams

- Maria's first day and a half has been fine so far.
- Maria has not spoken with any seniors about the goals of her rotation. She wanted to do this after inservice on 3/1 but she stayed later than she had planned to complete the exam
  - Dr. Park stated that if she wants suggestions regarding her goals she should ask as soon as possible
- Regarding her hours last week last Thursday (3/1) Maria left around 5pm; last Friday (3/2) she left around 6pm
  - Dr. Park suggested Maria leave early if there is nothing going on in the hospital
- Inservice
  - Maria believes she got around 40% correct. She feels she performed well on the basics
  - She will study more next year to learn the differences in surgeries and techniques
- Evaluations
  - Maria worked with Dr. Blecha a couple of times, operated with him once
  - Maria will continue to work on the delivery of her H&P's and have more confidence when she talks
  - Dr. Park wants Maria's attendings to evaluate her just like any other resident. Maria should not go to her attendings prior to them completing her evaluations because that would show a bias. Her attendings should evaluate her on her actions
  - If Maria wants feedback she should not wait until the end of the month to ask. She should ask during clinic or along the way of her rotation
  - Maria should focus more on the job she does, not on how people will evaluate her
  - Dr. Park has never had an intern or resident sit down with her and say 'this is what I have done this month.' All interns should be evaluated the same way
  - Maria focuses on her evaluations because she feels the rumors have left her with a negative reputation, and she feels that people have the wrong impression of her. She would like her attendings to know that her career is important to her, and that a negative evaluation will have an impact on her career
- Goals for her next few days include being a team member, having the service run smoothly, focus on presentation skills, making decision and showing leadership
  - Dr. Park added that Maria should show that she is competent and that everything is under control
- Maria mentioned Dr. Umanskiy inviting other interns to a monthly skills session, including Deana. She was told there was not room for her in the session
  - Dr. Park reiterated that Maria will need to have the time to actually complete any homework that Dr. Umanskiy may give, and Maria stated she will have the time
  - Maria stated she has watched you tube videos and wants to know which exercises can help her progress into becoming a better surgeon
  - Akilah will look into who is going and what the criteria is for the sessions
- Next meeting will be Monday, March 12th at 4:00pm, 2012

UCMC00000838

**Williams, Akilah [BSD] - SUR**

| | |
|---|---|
| **From:** | Song, David [BSD] - SUR |
| **Sent:** | Saturday, March 10, 2012 9:01 AM |
| **To:** | Williams, Akilah [BSD] - SUR |
| **Subject:** | FW: Tothy Complaint |

Please put in her file

**DAVID H. SONG, MD, MBA, FACS**
Cynthia Chow Professor of Surgery
Chief, Section of Plastic and Reconstructive Surgery
Vice-Chairman, Department of Surgery
The University of Chicago Medicine & Biological Sciences
5841 S. Maryland Ave. | Rm J641, MC 6035 | Chicago, IL 60637
Office: 773-702-6302
Pager: 1670

**AT THE FOREFRONT OF MEDICINE®**
http://www.uchospitals.edu
http://surgery.uchicago.edu/specialties/plastic
http://www.facebook.com/uchicagoplasticsurgery
Twitter: @dhsong

---

**From:** Henry, Ginard [BSD] - SUR
**Sent:** Friday, March 09, 2012 4:38 PM
**To:** Song, David [BSD] - SUR
**Cc:** Park, Julie [BSD] - SUR
**Subject:** Tothy Complaint

Song,

Here is a summary of my recollection of the events surrounding the complaint by Dr. Alison Tothy of the pediatric emergency medicine regarding Dr. Maria Artunduaga on March 14, 2012.

Dr. Tothy stated complaints:

- Maria was not responsive to > 4 pages sent to her for almost 90 min regarding a 8yo male consult with a hand fracture in the pediatric E.D.
- After one hour and 15 minutes from the original consultation call, Maria did see the patient in the peds E.R. but no communication was given to the ED team during or after her visit.
- After further repeated pages Maria did call back. Dr. Tothy stated that Maria was rude and unprofessional in their communication. Dr. Tothy said that Maria presented brusque explanations for the lack of communications and stated that 'she should know that surgeons are busy' and presented an attitude as if the consult and Dr. Tothy's requests were a bother to Maria. It seemed to Dr. Tothy that Maria became upset and hung up on Dr. Tothy immediately after stating that she had other pressing issues to attend to. Dr. Tothy was still trying to ascertain certain critical aspects of the consultation care when Maria disconnected the call abruptly.

I called Maria to discuss the complaints and she presented the following explanations:

- She admitted that she became anger and frustrated with the communication with Dr. Tothy.
- Maria stated that she did not realize that Dr. Tothy was an attending. When this was made know to Maria, she remarked that this fact now made sense to her now why Dr. Tothy was threatening to report her to her superiors during the heated part of their communication.
- Maria admitted to hanging up on Dr. Tothy.
- Maria stated that the peds ED problem was that they continually and repeatedly paged her and did not realize how busy she was a surgical intern.
- Maria indicated that she did not immediately communicate with the peds ED team because she had to first discuss the consultation with her senior resident and the process takes time.

1

ARTUNDUAGA
DEP. EX.
36
(4/2/14)

**UCMC00005859**

Ginard

**Ginard I. Henry, MD**
ssistant Professor of Surgery
.versity of Chicago Pritzker School of Medicine
Section of Plastic Surgery
5841 S. Maryland Ave MC 6035
Chicago, IL 60637
(773) 702-6302 (O)
(773) 702-1634 (F)

2

**UCMC00005860**



AT THE FOREFRONT OF MEDICINE

2011
GRADUATE
MEDICAL
EDUCATION
HANDBOOK

THE
UNIVERSITY
OF CHICAGO
MEDICAL CENTER

ARTUNDUAGA
DEP. EX.
(4/2/14)

UCMC00004860

Welcome ..........



Michael Simon, MD, Associate Dean for Graduate
Medical Education and Chair of the Graduate Medical
Education Committee.

Welcome to University of Chicago Graduate Medical
Education. We are honored that you have chosen
our medical center to continue your education and
look forward to working with you and helping you
achieve your professional goals. We hope you find
your experience here challenging, satisfying and
intellectually stimulating.

UCMC00004861

THE UNIVERSITY OF CHICAGO MEDICAL CENTER

# 2011
# GRADUATE MEDICAL
# EDUCATION HANDBOOK

## TABLE OF CONTENTS     PAGE

***RESIDENT SUPPORT SERVICES***
Graduate Medical Education Office    2
Benefits    2
Employee Assistance Program (EAP)    12
Physician Assistance Committee    12
Occupational Medicine Dept.    12
Injuries on the Job    13
Security Services    13
Library Services    13
Mail Services    14
Publications    14
Recreational Facilities    14
Grievance Procedure    15

***PROFESSIONAL REQUIREMENTS***
Licensure    16
Drug Enforcement Administration (DEA)    16
Visas    16
NPI Number    17

***HEALTH CARE INTEGRITY PROGRAM***
Healthcare Integrity Program (HCIP)
     Standards of Conduct    18
Health Insurance Portability and
     Accountability Act (HIPAA)    18

***WORK ENVIRONMENT***
Resident Forum    19
Resident/Fellow HELP Line    19
Harassment    19
Workplace Civility    20
Post Call Transportation Service    20
Patient Safety Hotline    20
Resources for Addressing Resident/Fellow
     Concerns and Grievances    21
Duty Hour Resource Hotline    21



UCMC00004862

**RESIDENT SUPPORT SERVICES**

# RESIDENT
# SUPPORT SERVICES

**UCMC OFFICE OF GRADUATE MEDICAL EDUCATION**

| | |
|---|---|
| Location: | J-141 |
| Days: | Monday-Friday |
| Hours: | 8:00 a.m. - 4:00 p.m. |
| Phone: | 773-702-6760 |
| Fax: | 773-702-0861 |

**Assisting Residents and Fellows with:**
- Loan Deferments
- Certificates Of Completion
- Temporary And Permanent License Applications
- ECFMG Applications
- USMLE Step 3 Applications
- UCH Information Systems Training
- ACLS And PALS Training
- Verification Of Training
- Information And Referrals

**RESIDENT / FELLOW BENEFITS**

The UCMC Benefits office is located in Room B-112. For additional information or questions, please call a Benefits Administrator at 702-0301 or 702-7561, 7:30 a.m. to 5:00 p.m., Monday through Friday.

The University of Chicago Medical Center has developed an extensive benefits program for Residents/ Fellows and their dependents. In addition to the customary benefits, there are a number of plans that are optional and require separate enrollment. They include dental coverage, flexible spending accounts, life insurance, long-term disability, personal accident insurance, supplemental retirement annuities and tuition remission for spouses and children.



UCMC00004863

## RESIDENT SUPPORT SERVICES



### Health Insurance

(Some premiums may be required) Residents/
Fellows may choose from one of three health plans;
the current cost for these plans varies from $0 to
$115.83 per month for single coverage and from
$137.38 to $211.39 per month for family coverage.
Enrollment in one of the three plans is permitted
only during the open enrollment period, or upon
entry to a GME sponsored program. **Coverage is
effective the first day of employment provided
that enrollment takes place within the first 31
days of employment.** Residents/Fellows that do
not enroll in a medical plan will NOT be defaulted
into any plan, and will NOT have insurance cover-
age. Newly-eligible dependents may be added with-
in 30 days of marriage, birth or adoption.
Otherwise, such additions may only be made during
the open enrollment period. Rates are subject to
change.



UCMC00004864

## RESIDENT SUPPORT SERVICES

**Aetna Dental Plan**
This dental plan provides comprehensive dental benefits to residents/fellows through a network of private practice dentists. The plan allows resident/fellows the option of enrolling in a dental DMO or DPO plan. Under the dental DMO plan, you must receive services from a provider in the Network. There are no deductibles, annual maximums, or claim forms. Preventative services are covered at 100% and fixed co-pays apply to other services. Under the DPO plan, you may visit any of the DPO providers and preventative services are covered at 100%, basic services at 80% and major services at 50% with a $1,500 maximum per year for in-network provider services. Out-of-network service max is $1,200. Monthly coverage cost varies from $0 for single residents/fellows choosing the DMO plan and from $12.92 to $57.54 for participation in the DPO plan. To participate, please enroll online.

**Vision Service Plan (optional)**
The vision plan provides a full range of coverage for all of your vision needs and is available through participating and non-participating providers. No claim forms required. Receive greater benefits when services are provided by a Superior provider. Benefits include: Examination and lenses every 12 months. Frames every 24 months.

**Flexible Spending Accounts**
(Optional participation) These accounts offer residents/fellows the opportunity to pay for certain anticipated non-covered health and/or dependent care costs on a pre-tax basis. The money the resident/fellow elects to have deposited into the flexible spending account is automatically deducted from gross pay before federal and state taxes and social security are withheld, thereby reducing his or her taxable income. However, once deducted, IRS requires that any balance left after the last reimbursement period must be forfeited. There are two flexible spending accounts available - The Medical Care Flexible Spending Account and the Dependent Care Flexible Spending Account. To participate, enroll online.



UCMC00004865

## RESIDENT SUPPORT SERVICES

### Life Insurance

(Primarily optional participation) Residents/fellows may choose from a variety of coverage options. There is a basic $20,000 coverage available at no cost to the resident/fellow. For other extended options, the cost to residents/fellows is based on age and amount of coverage selected. Enrollment must be completed within the first 30 days of employment and coverage is effective upon completion of the enrollment application. Increases in the amount of coverage require insurance company approval, decreases can be made at any time.

### Long-Term Disability Coverage

(Required participation) The plan will provide a benefit of up to 60 percent of monthly earnings if, because of disability, a resident/fellow is unable to perform the duties of his or her occupation. After benefits have been paid for 12 months, payments will continue provided the resident/fellow is unable to perform the duties of any job for which he or she is qualified. Benefits begin on the first day of the month after the resident/fellow has been unable to work for 90 days and will continue until he or she is age 65 or is no longer disabled. There is no monthly premium for the resident/fellow. Coverage begins on the first day of the month after three months of employment. Pre-existing conditions have coverage limitations.

### Personal Accident Insurance

(Optional participation) This insurance provides coverage for an accidental injury that results in the death or dismemberment of a resident/fellow or family member. Single or family coverage options are available and the coverage amounts range from $20,000 to $500,000. The cost for single coverage is 20 cents per $10,000 of coverage per month; the cost for family coverage is 30 cents per $10,000 of coverage per month. Coverage is effective the first day of the month after completing enrollment. Coverage amounts may be changed at any time.



UCMC00004866

## RESIDENT SUPPORT SERVICES

**Supplemental Retirement Annuities**
(Optional participation) Residents/fellows may invest pre-tax dollars in a 403(b) program. These unmatched dollars may be invested in funds available through TIAA/CREF or Vanguard. Applications for this benefit may be obtained from the benefits office.

**Transportation Benefit**
The Transportation benefit provides the resident/fellow with the opportunity to save money on transportation expenses related to getting to work. The benefit provides two options:
◆ The Transportation Spending Account which allows residents/fellows to pay for public transportation expenses and commuter parking expenses on a pre-tax basis. To participate, enroll online.
◆ Pre-tax parking deductions for residents/fellows who park in Hospital/University lots. Participation is automatic upon completion of the parking enrollment form.

**Tuition Remission**
Resident/fellow spouses/same sex domestic partners and unmarried dependent children qualify for tuition remission at any University of Chicago school. Tuition remission will be 50% of actual tuition cost to the employee minus any grants, scholarships and gifts. Admissions to classes are subject to approval by the office of admissions and to meeting prerequisites for specific courses. The applicant must apply and be admitted as a student before he or she becomes eligible for tuition remission. Resident/fellow spouses/same sex domestic partners will be granted remission of one-half of the full tuition less applicable taxes. Tuition remission applies to all courses, including those offered by the extension division and the evening programs of the business graduate school. Tuition remission to residents/fellows for their children at the University of Chicago Laboratory School, from nursery school through the undergraduate level, will be granted at one-half the full tuition each quarter, less applicable taxes. Application for tuition



UCMC00004867

## RESIDENT SUPPORT SERVICES

remission may be made by completing a "Request for Tuition Remission" form from the Benefits Office. This form must be completed to obtain a tuition remission voucher. All applications submitted for children must either include a birth certificate or proof of custody.

### Workers' Compensation

Residents/fellows are covered by workers' compensation for any injury or illness incurred on the job while performing regular duties. If a resident/fellow is injured at work, he or she will be treated free of charge in the Occupational Medicine Department during regular hours. When the Occupational Medicine Department is closed, injured residents/fellows may seek care in the Emergency Room and/or follow up with occupational medicine next business day. If the injury is due to a blood borne pathogen exposure or potentially infectious material: call the Needle-Stick Hotline 24/7 at 188-9990. All injuries must be reported promptly by telephone to Security Dispatch (direct telephone line hookup at both the Occupational Medical Department and Emergency Room, or by calling 702-6262). Although the resident/fellow is not obligated to receive continued treatment at this institution, benefits may be delayed or denied if his/her physician does not furnish information on a timely basis to the Worker's Compensation office.



UCMC00004868

## RESIDENT SUPPORT SERVICES



## GME LEAVE BENEFITS

**Sick Leave**

Sick leave is granted to residents/fellows who are absent from work and unable to perform their assigned duties due to personal illness. Each resident/fellow is allowed five days of paid sick leave per year. Absences due to sickness or injury should be reported to the program director and chief resident.

Sick leave may not be used for vacation time. Sick time not used during a given year cannot be carried over to the following year. Sick leave does not accrue during a leave of absence.

**Medical Leave**

Residents/fellows are provided a four-week (20 days) paid leave for medical, including pregnancy, purposes. Thereafter, if the resident/fellow has any remaining paid time off, they have the option to use those allowances for their medical leave. In most cases, maternity leave for residents/fellows should not exceed eight weeks. Benefits are continued during this leave. A leave agreement must be formalized in writing between the resident/fellow and the program director prior to the beginning of the leave. Copies of the leave agreement should be forwarded to the GME Office J-141.

A resident/ fellow may be required to extend training for any dates of absence in excess of allowable vacation time. During the extension, the resident/fellow will receive the regular salary and benefits except for vacation.

**Leave of Absence**

Residents/fellows may request a personal leave of absence from the program director in cooperation with the Office of Graduate Medical Education. Such a request should be predicated on some unusual and substantial personal situation including, but not limited to, the illness or death of a family member, or civil or military obligation. A leave agreement



UCMC00004869

## RESIDENT SUPPORT SERVICES

must be formalized in writing between the resident/fellow and the program director prior to the beginning of the leave.

In most cases, a leave of absence should not exceed eight weeks. During a given leave, a resident/fellow must first use any available vacation allowance. Once the vacation allowance is exhausted, subsequent leave will be unpaid.

A resident/fellow may be required to extend the training period for any dates of absence in excess of allowable vacation time. During the extension the resident/fellow will receive the regular salary and benefits except for vacation allowance.

### Family Medical Leave Act

Following one year of employment, and 1,250 hours worked, it is the policy of the University of Chicago Medical Center to grant family leave in accordance with the Family and Medical Leave Act of 1993. The intent is to provide up to twelve weeks of job-protected unpaid leave during any twelve-month period. The twelve week FMLA begins on the first day the resident/fellow is absent due to an approved FMLA qualifying reason. A resident/fellow is eligible to request leave for the birth of a child and to care for the child, and for adoption or foster care of a child. Additionally, a resident/ fellow can request leave to care for a spouse, child or parent who has a serious health condition, or for his or her own serious health condition. FMLA must be formalized in writing between the resident/fellow and the program director prior to the beginning of the leave. Applications for FMLA may be obtained online or from the Occupational Medicine Department (L-156). The completed form should be submitted to Occupational Medicine Department. Certification and approval will be coordinated through Occupational Medicine Department. If the Family Medical Leave compromises a resident/fellow's ability to satisfy specialty board training requirements, the written leave agreement must specify how these requirements will be made up.



UCMC00004870

## RESIDENT SUPPORT SERVICES

### OTHER BENEFITS

**Bereavement**
Bereavement leave is granted at the discretion of
the program director. The amount of time off is
based on the resident/fellow's relationship to the
deceased.

**Civil Leave**
When a resident/fellow is selected for jury duty, he
or she should notify the program director immedi-
ately. Jury duty does not affect continuous stipends
or benefits, and resident/fellows retain any check
issued by the court for expenses.

**Vacation**
Residents/fellows are eligible for four weeks paid
vacation each year. Vacation time not used during
a given year cannot be carried over to the following
year. Requests should be scheduled between the
resident/fellow and the program director. Vacation
requests should be made within the time frame
established by the respective program. Vacation
time does not accrue during a leave of absence.
For other restrictions, please consult your program
director.

**Educational Meetings**
Residents/fellows may attend education
meetings at the discretion of the program director.
Excused absence for attending such meetings
should not extend beyond dates of the educational
meeting and necessary travel time. Additional
days will be considered vacation time and also must
be scheduled with the permission of the
program director.

**Lab Coats**
Incoming residents/fellows receive three lab coats
initially and may receive two per year thereafter. All
residents/fellows must wear white laboratory coats
while on duty. Lab coat laundering is coordinated
through each department.



UCMC00004871

## RESIDENT SUPPORT SERVICES

### Scrubs – 2-9421 (pager 188-2900)

Scrub Machines (autovalets) are located on the 4th and 5th floors for the GOR, 2nd Floor CLI/OR (TC251), 2nd floor of DCAM/OR (2644 and 2645), DCAM 6H (6734) and COMER K339. The machines are filled twice daily at 3 a.m. and 3 p.m. *Don't forget to return your used scrubs.* The valets work on an exchange system. You will not be able to obtain clean scrubs unless you return used ones. Misty green scrubs are for use only in restricted areas. When leaving a restricted area scrubs must be covered with a lab coat and buttoned with three buttons. Scrubs are never to be worn off campus. These are requirements of the Illinois Department of Public Health. (Please refer to the scrubwear policy).

### Parking

Reduced cost parking is available for residents/fellows. Automatic pretax payroll deductions can be arranged. Parking services include jump start and fire assistance for vehicles in the structure. The parking office is located on the first floor of the parking garage. A secure bike cage is available in the parking garage. Contact Ron Rekosh in Security 2-6262 or GME office 2-6760 for access.

### Meal Allowance

Residents/fellows required to be on-call overnight receive a meal allowance for use in the cafeteria and food courts. Meal allowances are coordinated through each department.

### Pagers

Pagers are issued to residents/fellows through their departments. Each resident/fellow is responsible for his/her pager and if lost is liable for the cost of a replacement.

### Professional Liability Insurance Coverage

Medical malpractice liability coverage is provided without charge to Residents/Fellows.

### Cash Advances

Requests for emergency advances must be received by the GME Office not less than five (5) working days prior to the date the check is required. The advance check will be forwarded to the cashier's office in the Hospitals for pick-up by the Resident/Fellow or other authorized personnel.

### E-Mail & Internet Access

The University of Chicago Medical Center provides all residents/fellows with an e-mail address that is Internet accessible. The Hospitals Outlook E-Mail System is the preferred means of communicating with residents/fellows.

UCMC00004872

**RESIDENT SUPPORT SERVICES**

# EMPLOYEE ASSISTANCE PROGRAM

Perspectives offers assistance to individuals experiencing personal problems that may require professional help such as marital, family, financial, legal problems and/or addiction. The program is free, confidential, and open to residents/fellows. Perspectives offers assessment, referral, and follow-up support. For a confidential appointment call 1-800-456-6327. 24 Hr. Answering Service.

**THE PHYSICIAN'S ASSISTANCE COMMITTEE**

The Physician's Assistance Committee is available to assist physicians whose ability to practice medicine may be impaired due to alcohol or substance abuse, emotional or physical conditions. Members of the committee include concerned physicians, Legal Counsel, and the Employee Assistance Program Counselor. The committee will assist the impaired physician to enter into treatment voluntarily without legal recourse and help the physician to return to active patient care. All information is kept strictly confidential (including the referring source). Contact Dr. Lawrence Gottlieb, the Chair of the Physician's Assistance Committee at 1-773-702-6302 or *Perspectives* at 1-800-456-6327 for assistance.

**OCCUPATIONAL MEDICINE DEPARTMENT**

Location: L-156
Hours:   7:15 a.m. - 4:30 p.m. (Monday-Friday)
         Closed on Saturday & Sunday
Phone:   2-6757

◆ Walk-In Care
◆ Treatment For On The Job Injuries
◆ Health Screenings For New Employees
◆ Annual Health Screenings
◆ Screening for Exposures



UCMC00004873

## RESIDENT SUPPORT SERVICES

### ON THE JOB INJURIES

**Daytime Hours**
Location: Occupational Medicine Dept. L-156
Hours: 7:15 a.m. - 4:30 p.m. (Monday-Friday)
Closed Saturday & Sunday
Report immediately to Occupational Medicine
Department and specify it is treatment for an on the
job injury.

**Evening Hours**
Location: Mitchell Emergency Room
Hours: After 4:30 p.m. - Monday-Friday
All day Saturday & Sunday
Report immediately to the Mitchell Emergency
Room and specify it is treatment for an on the job
injury.
**Needlestick Hotline** – Page 9990

### SECURITY SERVICES

Hospitals Security
Escort Services
◆ To request escort services
to the parking structures                      2-6262
◆ To request escort service
to other locations                    2-8181 or 123

Escorts to the following locations:
◆ UCMC campus locations (24 hours daily)
◆ Parking Structure (24 hours daily)
◆ Off-site parking facilities (5:00 a.m. - 9:00 p.m.)
◆ Hyde Park or Kenwood locations (24 hours daily)

### LIBRARY SERVICES

**John Crerar Library - Medical Research Library**
Location: 5730 S. Ellis Avenue
Phone: 2-7715
Building Hours:
Sunday-Thursday   - 8:00 a.m. - 1:00 a.m.
Friday - Saturday   - 8:00 a.m. - 10:00 p.m.
*Hours may vary during summer*



UCMC00004874

## RESIDENT SUPPORT SERVICES

### MAIL SERVICES

(Residents/fellows are assigned mailboxes located in their departments.)

Mail Room
Location: Room AMB WSB 057
Phone:  2-1889
Days:   Monday-Friday
Hours:  8:30 a.m. to 5:00 p.m.
U.S. Post Office (sub-station)
Location: 956 E. 58th Street
Phone:  800-275-8777 / 773-324-1807
Days:   Monday through Friday
Hours:  9:00 a.m. to 6:30 p.m.

### PUBLICATIONS

News from the GME Office: A newsletter with information of interest to residents/fellows and program directors is issued periodically.

### RECREATION FACILITIES

**Gerald Ratner Athletics Center and
Henry Crown Field House**

Residents/fellows can join the Gerald Ratner Athletics Center and the Henry Crown Field House at a discounted rate. The Ratner Center features a gigantic swimming pool that measures 50 meters by 25 feet, a fitness center with weight training equipment and cardiovascular equipment, such as elliptical trainers, treadmills, rowers, upright and recumbent bicycles; a gym with two recreational basketball courts; an auxiliary gym with a multi-purpose court; dance/martial arts studio; and sauna. In the Field House you will find a 200m indoor track, squash and racquetball courts, a fitness center, 4 basketball courts, and more cardio-equipment.

4

UCMC00004875

## RESIDENT SUPPORT SERVICES

To become a member of the athletic facilities you must register at the Ratner Center located at 5530 South Ellis. A UCMC ID is required. Membership services can be reached by phone at 2-3846. Ratner building hours are 6:00 a.m. to midnight, M-F and 9 a.m. to 9 p.m. Saturday and Sunday. Henry Crown opens one hour later most days. Additional information regarding building hours, pool hours, wellness classes, and more can be found on-line at: http://athletics.uchicago.edu/facilities/facilities.html

For questions, please contact Reid Frye, Facilities Manager – Membership Services, Dept. of Physical Education and Athletics 2-3846.

## GRIEVANCE PROCEDURE

A list of those matters which are grievable by Residents and Fellows and the procedures for implementing and pursuing the grievance procedure are contained in the GMEC policy titled "Grievance Procedure" available on the UCMC website under GME Resources.

15

UCMC00004876

PROFESSIONAL REQUIREMENTS

# PROFESSIONAL REQUIREMENTS

## LICENSURE

**A physician may not participate in patient care, attend rounds, or be identified as a physician until he/she holds a valid Illinois medical license**

Residents/Fellows are required to hold temporary (training) or permanent licenses. Applications are processed at the UCMC GME Office, J-141, 2-6760

## DRUG ENFORCEMENT AGENCY (DEA) REGISTRATION

Temporary license:   DEA number issued by UCH Pharmacy, 2-6242

Permanent license:   Apply for federal DEA numbers on-line www.deadiversion.usdoj.gov

## VISAS

**INTERNATIONAL MEDICAL GRADUATES**
(Graduates of medical schools outside the United States and Canada)

**Visa Requirements:**

J1 Visa (Preferred)   sponsored by the Educational Commission for Foreign Medical Graduates

H1-B-Visa   sponsored by the University of Chicago Medical Center

Programs assume all financial costs related to application process and continuation expenses. (Refer to GME Policy #04).



UCMC00004877

## PROFESSIONAL REQUIREMENTS

### NPI NUMBER

The National Provider Identifier (NPI) is a 10-digit identifier that resulted from a HIPAA mandate that a standard, unique identifier be adopted for health care providers. Once assigned, a provider's NPI will not change and remain with them regardless of location or employer changes. All health care providers who bill for services will need to use their NPI in the filing and processing of health care claims covered under HIPAA. Residents/Fellows may apply individually for a number at any time and are encouraged to do so immediately upon entering their residencies if they have not previously done so. NPI numbers are required for residents in programs using NorthShore as a participating site.

The website link is http://nppes.cms.hhs.gov/ NPPES/StaticForward.do?forward=static.npistart.

There is no charge and the process takes about 20 minutes. You will need your State License number for the application (your program coordinator has your license number information.) NPPES will send you an e-mail notice in about a week with the assigned NPI. Please be sure to share your NPI number with your program coordinator.

UCMC00004878

## HEALTHCARE INTEGRITY PROGRAM

The University of Chicago Medical Center, through the Office of Medical Center Compliance, maintains a Health Care Integrity Program that is designed to ensure accurate billing, coding, and documentation for claims submitted to all payers, including federal health care programs such as Medicare and Medicaid; compliance with privacy and security laws; and adherence to policy and laws governing interaction with industry.

The complete Healthcare Integrity Program, including compliance program policies, and information about False Claims Laws and Whistleblower Protection is available to all employees via the Medical Center's intranet website: http://home.uchospitals.edu, or, the Office of Medical Center Compliance website at: http://compliance.bsd.uchicago.edu. Contact your supervisor or the Chief Compliance Officer at (773) 834-3150 if you need assistance. You may also call the toll-free, confidential Compliance Resource Line with any questions or concerns that you have (1-877-440-5480).

## HEALTH INSURANCE PORTABILITY AND ACCOUNTABILITY ACT (HIPAA)

### HIPAA

The University of Chicago Medical Center is subject to state and federal privacy and security laws. All Residents/Fellows must receive training about HIPAA and our privacy and security practices. University of Chicago Medical Center HIPAA policies are located on the administrative tab at the Medical Center's intranet website: http://home.uchospitals.edu or the Medical Center's HIPAA website: http://hipaa.bsd.uchicago.edu.

### HIPAA Security

HIPAA not only requires that we protect our patients' privacy and the confidentiality of their health information, but also requires that we ensure the security of their PHI when it is created, maintained, and transmitted within and outside our organization. This includes, for example, patient health information maintained on laptop and desktop computers, personal digital assistants (PDAs), and pagers. Never share your password or store it on your laptop, pda, or any other unsecure location.

### HIPAA Program Office

The University of Chicago Medical Center has its HIPAA Program office at L-147. The telephone number is 834-9716. Please note that we are a part of the University of Chicago Organized Health Care Arrangement, which includes the Medical Center and the regional doctors' offices.

UCMC00004879

## WORK ENVIRONMENT

### Resident Forum

The Resident Forum is a forum for the hospital administration and residents/fellows to come together to discuss and resolve issues of patient care and the physical environment relating to the ease with which residents/fellows are able to carry out their patient care responsibilities. Resident/Fellow mem- bership on this committee consists of the Chief Residents and other residents/fellows identified by the Chief Residents or Program Directors as having interest in participating in such a forum. The meetings are open to all residents/fellows and are held the 3rd Thursday of every month at 1:00 in TN-208.

### Resident/Fellow Help Line -- 4-DOCS (4-3627)

This is an answering service set up through the Call Center to assist residents/fellows in reaching needed services (e.g., linen, food service, transportation, etc.) The Operator will page the needed service with a 5-minute reminder and repeat x2. If no response, the operator will reach the administrator-on-call to inform that a particular service is not responding.

### Harassment

The University of Chicago and the University of Chicago Medical Center and all teaching affiliates strive to maintain a work environment free from prohibited forms of harassment, including sexual harassment.

The Medical Center has established policies and procedures for investigating and responding to claims of harassment without fear of retaliation. A copy of the policies can be found in the policy and procedure manuals of the institution, from the Program Directors or from the GME Office. Any resident/fellow who believes that he or she has been subject to harassment should report the alleged act immediately to his/her immediate, or next non-involved supervisor, to their Program Director or to the Vice President & Chief Human Resource Officer, or designee. The response to such concerns or complaints will be handled in a confidential and protected manner in accordance with the institutional policies and as permitted by law.

19

UCMC00004880

## WORK ENVIRONMENT

**Workplace Civility**
It is the goal of the Medical Center to promote and support a medical center community where all people will work together in an environment free of abusive or demeaning treatment.

The Medical Center is committed to achieving quality patient care delivery in an environment of professionalism, respect, tolerance, understanding and goodwill among all members of our diverse community. Conduct, whether verbal or physical, that interferes with the ability of others to effectively carry out their duties or that undermines patient care or the patient's confidence in the Medical Center or another member of the health care team may constitute disruptive behavior.

Any Resident/Fellow who believes that he or she has witnessed or been subject to disruptive behavior should report the alleged incident as described above in the section on Harassment.

Any Resident/Fellow who has engaged in disruptive behavior may be subject to disciplinary action under the terms of their Contract and the policies and procedures of the Graduate Medical Education Office.

**Post Call Transportation Service**
The Medical Center provides residents/fellows with a safe alternative to driving home following overnight in-house call assignments. Any resident/fellow who feels it would be unsafe for him/her to drive, may be reimbursed for post-call transportation home. Reimbursement is coordinated through each program.

**Patient Safety Hotline – 2-5544**
The Patient Safety Department's mission is based on a philosophy of proactive risk assessment to identify threats to patient safety prior to the occurrence of an adverse event. The Patient Safety Hotline offers anonymous occurrence reporting 24/7. You are encouraged to report all occurrences– regardless of whether or not the occurrence resulted in harm to a patient. Alternate methods of reporting an occurrence include calling a risk manager at 4-0473, paging a risk manager at 188-1241, or filing a Patient Safety Report.





## WORK ENVIRONMENT

### RESOURCES FOR ADDRESSING RESIDENT/FELLOW CONCERNS AND GRIEVANCES

Residents/Fellows may raise concerns regarding their education and/or professional environment either in writing or verbally with their Program Director, Chief Resident, Section Chief or Department Chair.

If a resident/fellow does not feel comfortable raising such a concern with any of the above, he/she may utilize the UCMC Ombudsmen. The Ombudsmen serve as advocates and provide a mechanism for Residents/Fellows to raise and resolve issues without fear of intimidation or retaliation. They may also investigate and resolve complaints of mistreatment or other issues and abuses. All interactions with the Ombudsmen are completely confidential. Alternatively, a resident/fellow may contact Michael Simon, MD, Chair of the Graduate Medical Education Committee (GMEC) at 4-3757.

If a Resident/Fellow chooses to pursue a grievance, the procedure to be followed is outlined in GMEC policy titled "Grievance Procedure" which is available on the GME intranet website or can be obtained from the Graduate Medical Education Office J-141.

Other important resources available to Residents/Fellows include the following:

**Resident/Fellow Duty Hours Resource Hotline – 1-877-440-5480**
The Resource Line provides a toll-free and anonymous way for you to ask a question or report a concern about the ACGME resident duty hours requirement. The Resource Line is available 24/7 and is managed by the Office of Medical Center Compliance. The line is not equipped with caller ID and calls cannot be traced. Messages may be left in a private voicemail box if the Chief Compliance Officer is not available to answer the phone.

By submitting your questions and concerns to the Resource Line you will help the Office of Graduate Medical Education and the Graduate Medical Education Committee monitor compliance with the Duty Hours requirement.



UCMC00004882



**Employee Assistance Program (Perspectives)**
(for family, financial, legal or other personal problems)
1-800-456-6327  24/7 answering service (see page
12 for more information)

**Physician's Assistance Committee**
For help in dealing with impairment due to alcohol/
substance abuse, emotional or physical conditions
Dr. Lawrence Gottlieb, Chair 1-773-702-6302
(see page 12 for more information)



UCMC00004883

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DR. MARIA ARTUNDUAGA,

      Plaintiff,

v.

THE UNIVERSITY OF CHICAGO
MEDICAL CENTER,

      Defendant.

No. 12 C 8733

Judge James B. Zagel
Magistrate Judge Sidney I. Schenkier

## **APPENDIX IN SUPPORT OF**
## **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# **VOLUME III**