# TAB 16

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION
--------------------------------------------------------

Maria Artunduaga,

Plaintiff,

vs.       Case Number 1:2012cv08733

The University of Chicago Medical Center,

Defendant.
--------------------------------------------------------

Deposition of Nora T. Jaskowiak
Wednesday
April 23nd, 2014

-at-

The Franklin Law Firm
53 West Jackson Boulevard
8th Floor Conference Room
Chicago, Illinois

Page 2

1  APPEARANCES
2
3  For the Plaintiff:
4  Jamie Franklin
5  The Franklin Law Firm
6  53 West Jackson Boulevard
7  Suite 803
8  Chicago, Illinois 60604
9
10  For the Defendant:
11  Michael G. Cleveland
12  Vedder Price
13  222 North LaSalle Street
14  Chicago, Illinois 60601
15
16  Also present:
17  Maria Artunduaga
18  Ricardo Garcia
19
20  RECORDER: Good afternoon. We are now on the
21  record. The time is now 1:03 p.m. We are located at
22  the Franklin Law Firm, 53 West Jackson Boulevard, Suite
23  803, Chicago, Illinois 60604, for a deposition in the
24  matter of Maria Artunduaga v. The University of Chicago
25  Medical Center, case number 1:2012cv08733. The venue

Page 3

1  is the Northern District of Illinois, Eastern Division.
2  The witness today is Dr. Nora Jaskowiak. Dr.
3  Jaskowiak, my name is Natalie Olszewski, and I'm a
4  notary public, and I'm recording this deposition on
5  behalf of Exhibit 5, LLC. At this time, would you
6  please raise your right hand for the oath?
7       (Witness sworn)
8       RECORDER: Would the attorneys please state
9  their appearances for the record?
10      MS. FRANKLIN: Jamie Franklin for the
11  Plaintiff.
12      MR. CLEVELAND: Michael Cleveland for
13  Defendant University of Chicago Medical Center.
14      RECORDER: Would anyone else in the room
15  please state their appearance?
16      MS. ARTUNDUAGA: Maria Artunduaga, Plaintiff.
17      MR. GARCIA: Ricardo Garcia, husband of the
18  Plaintiff.
19      RECORDER: That completes the required
20  information. We can proceed.
21      MS. FRANKLIN: All right. Thank you.
22      EXAMINATION
23  BY MS. FRANKLIN:
24      Q. Dr. Jaskowiak, am I pronouncing your name
25  correctly?

Page 4

1      A. Yes.                        0:01:11
2      Q. Okay, great. Please state -- state your full
3  name for the record.
4      A. Nora Therese Jaskowiak.
5      Q. Thank you. I'm gonna hand you what we'll
6  mark as Exhibit 1. While she's working on that, I'm
7  gonna go over the ground rules for depositions. Have
8  you ever had your deposition taken before?
9      A. I have.
10     Q. All right. So you are probably familiar with
11  them. I'll be asking you questions. You'll be
12  responding. It's important that we don't speak over
13  each other. It's also important that we don't use
14  gestures or sounds like uh-huh to answer questions, so
15  that the record's clear. If you need a break at any
16  time, please let me know, and I'll be happy to --
17  take a break. If there's a question pending when you
18  ask for the break, I'll ask you to go ahead and answer
19  that question, and then we'll take the break. Finally,
20  if there's any question that's unclear to you, either
21  because you didn't hear me or because you weren't sure
22  what I was actually asking, please ask me to rephrase
23  it, and I'll be happy to do that so that we can be
24  certain that when you do answer, you felt that you
25  understood the question, okay?

1 (Pages 1 to 4)

Page 13

```
 1    rolling along.
 2         Q.  So how many would you advise at one given
 3    time?
 4         A.  Three to five.
 5         Q.  Okay.  So general surgery has a five year
 6    residency, correct?
 7         A.  Correct.  Five clinical years.
 8         Q.  And there could be research or other things
 9    after that, right?
10         A.  Within, usually.
11         Q.  Okay.  Is there a separate type of training
12    program for breast surgery?
13         A.  There is a fellowship that can be done after
14    a successfully completed general surgery residency.
15    Breast fellowships exist.
16         Q.  Is there a breast fellowship at U of C?
17         A.  There is not.                       0:12:47
18         Q.  Who are the other faculty members who are
19    part -- who are faculty in the breast center at U of C?
20         A.  Currently, there are three.  Myself, Dr. Asha
21    Chhablani, and Dr. Swati Kulkarni.
22         Q.  Okay.  And Dr. Chhablani, is that a man or a
23    woman?
24         A.  A woman.
25         Q.  And then Dr. Swati?  What was the --
```

Page 14

```
 1         A.  A woman.
 2         Q.  -- last?
 3         A.  Kulkarni.
 4         Q.  Kulkarni.  And that's also a female?
 5         A.  Correct.
 6         Q.  Okay.  When was the breast center created?
 7         A.  My understanding, it predates my time at U of
 8    C, but I believe in 1997.
 9         Q.  And when you became affiliated with U of C as
10    a faculty member, is that -- was that where you went,
11    directly to the breast center?  Or were you in some
12    other -- some other role before that?
13         A.  I'm a general surgeon on the general surgery
14    team.  The breast center is one of my jobs, it is not
15    my sole job, so I was affiliated, I worked within the
16    breast center, and I worked within the general surgery
17    clinic.
18         Q.  I see.  And Dr. Chhablani and Kulkarni are
19    also general surgery doctors?
20         A.  Dr. Chhablani is a general surgeon.  She only
21    does breast.  She is a clinical associate and only does
22    breast.  Dr. Kulkarni is general surgery trained, did a
23    breast surgery fellowship, and only does breast
24    surgery, but she is part of the section of general
25    surgery.
```

Page 15

```
 1         Q.  All right.  And is she a clinical or a
 2    faculty member?
 3         A.  Oh, full faculty.  An associate professor.
 4         Q.  Do you remember when Dr. Roggin became the
 5    program director for general surgery?
 6         A.  I don't recall the exact date.  Feels like
 7    three years, something along that line.
 8         Q.  Well we've seen some documents in this case
 9    that indicate it was in August -- I'm sorry, October
10    2011, does that sound right?
11         A.  Seems right.                         0:15:25
12         Q.  And when he -- when the directorship was
13    available, was that something that people applied for?
14         A.  No.
15         Q.  Did you know that the position was available?
16         A.  No.
17         Q.  So you didn't apply for it, right?
18         A.  There was no application.
19         Q.  No process by which you could have applied,
20    right?
21         A.  Correct.  To my understanding.
22         Q.  Do you know how Dr. Roggin became program
23    director?
24         A.  I don't.
25             MS. FRANKLIN:  All right.  Let's mark another
```

Page 16

```
 1    Exhibit.  And actually, we could do two at once, if
 2    that would work for you.
 3             RECORDER:  Yeah.
 4             MS. FRANKLIN:  2 and 3.
 5             (Off the record)
 6             RECORDER:  Back on the record, 1:21 p.m.
 7         Q.  All right.  Dr. Jaskowiak, if you could take
 8    a look at Exhibit 1 first.  Is this a document you're
 9    familiar with?
10         A.  Exhibit 1 we looked --
11         Q.  I'm sorry.
12         A.  -- at.
13         Q.  Exhibit -- I'm sorry, Exhibit 2?
14         A.  Yes.
15         Q.  The PGY1 academic schedule for 2011, 2012?
16         A.  Yes.
17         Q.  All right.  And this is the rotation schedule
18    for first year residents during that year, correct?
19         A.  Correct.
20         Q.  And that was the year that Dr. Artunduaga was
21    -- began at U of C, right?
22         A.  Correct.
23         Q.  And we see her name as the second one on --
24    on the -- right, do you see that?
25         A.  I do.
```

Page 17

1      Q. And it appears she was assigned to Kaplan
2   service for July and August, correct?
3      A. Correct.                              0:17:32
4      Q. And that's the service that you were working
5   on, right?
6      A. Correct.
7      Q. All right. Then if you could turn to the
8   Exhibit Number 3, just make sure that I have the cast
9   of characters right. You'll see the first page of that
10  Exhibit indicates it's the schedule of surgical
11  services for June to July, is that right?
12     A. June 24th through July 31st.
13     Q. Right. And the second entry on the list is
14  your -- is the Kaplan service, right?
15     A. Correct.
16     Q. This indicates that Dr. Kaplan, Chhablani,
17  yourself, and Dr. Angelos were the attendings, is that
18  right?
19     A. Correct.                              0:18:11
20     Q. And there was a surgical oncology fellow in
21  the service, is that right? Gnerlich?
22     A. That's what it looks like, yes.
23     Q. Okay.
24     A. But she wasn't on the service. They changed.
25     Q. Oh, it did, okay.

Page 18

1      A. She wasn't on the service.
2      Q. Okay. So she didn't actually -- she wasn't
3   on the service during this time period, correct?
4      A. Correct.
5      Q. And then the nurse practitioner was Jose? Do
6   you see that?
7      A. Joly Jose, yep.
8      Q. Joly Jose. It also shows the senior resident
9   was Fleming. Is that --
10     A. Correct.
11     Q. -- correct? And that Dr. Artunduaga was the
12  junior resident, right?
13     A. Correct.
14     Q. Okay. If you could flip to the second page
15  of that same document, I've got the August schedule of
16  surgical services. And this one indicates that Dr.
17  Kaplan, Chhablani, Roggin, Angelos, and yourself were
18  the attendings, is that right?
19     A. That's what it looks like, yes.
20     Q. Dr. John Seal was the chief resident,
21  correct?
22     A. Yes.
23     Q. Same nurse practitioner, right?
24     A. Correct.                              0:19:13
25     Q. We don't see anyone listed as a senior

Page 19

1   resident, correct?
2      A. Correct.
3      Q. And then Dr. Artunduaga, and then Drs. Lim
4   and Berian were on the service as junior residents,
5   correct?
6      A. Correct.
7      Q. And do you know what year Dr. Lim was during
8   this time?
9      A. Dr. Lim was an intern.
10     Q. So a first year also?
11     A. Yes.
12     Q. And what about Dr. Berian?
13     A. Dr. Berian was an intern also.
14     Q. Okay. All three of them were first years
15  then, correct?
16     A. Correct.
17     Q. And do you remember -- was Dr. Lim a general
18  surgery resident?
19     A. She was.
20     Q. And what about Dr. Berian?
21     A. General surgery also.
22     Q. Okay. What is Dr. Lim's first name?
23     A. Susan.
24     Q. And Dr. Berian?
25     A. Julia.

Page 20

1      Q. Thank you. Do you know who makes the
2   rotation schedule for the interns?
3      A. The program director.
4      Q. Do you know who'd made Dr. Artunduaga's 2011,
5   2012 rotation schedule?
6      A. I don't actually know how the interaction
7   exactly between plastics and the general surgery
8   program director. I imagine it's some combination of
9   the two.
10     Q. You -- did you have any role in Dr.
11  Artunduaga being assigned to two Kaplan services?
12     A. I did not.
13     Q. Had -- had you ever met Dr. Artunduaga before
14  she started working on your service in July?
15     A. I did.
16     Q. When did you first meet her?
17     A. I met her at the new intern welcome cocktail
18  party.
19     Q. Where was that?
20     A. At the Quadrangle Club.
21     Q. And was that sometime before --
22     A. I believe it was the night before. The
23  evening before.
24     Q. Before the -- residency began?
25     A. I don't know what day June 24th was in 2011,

Page 25

1    Q. Okay. And again, I'm just trying to make
2  sure I have the cast of characters correct. We looked
3  at the schedule -- the general -- the main schedule of
4  surgical services, which was Exhibit 3. On this
5  schedule, it would appear that the fellow -- there was
6  a fellow involved in that -- in that rotation named
7  Haejin In. Is that right?
8    A. That's correct.
9    Q. Is that the person who actually was on the
10  service for July?
11    A. Correct.
12    Q. And Dr. Gnerlich was not on the service,
13  correct?
14    A. Correct.                    0:27:50
15    Q. Okay. Do you know -- do you know what Dr.
16  In's fellowship was in?
17    A. She's a surgical oncology fellow.
18    Q. Is she still with the university?
19    A. She is.
20    Q. Is she now a faculty member?
21    A. No. She's still a fellow.
22    Q. Still a fellow. Okay. And so do you know
23  who puts together these weekly schedules for the Kaplan
24  service?
25    A. Typically, the fellow or the chief resident

Page 26

1  makes the weekly schedule.
2    Q. In this case, that -- would that have been
3  Dr. In?
4    A. Yes.
5    MS. FRANKLIN: And then I'll mark one more.
6    Q. All right. Please take a look at Exhibit 5.
7  This is the weekly schedule for the Kaplan service for
8  August, correct?
9    A. That appears to be the case.        0:29:10
10    Q. Okay. It actually goes through September the
11  2nd. Then there's a stray email that's the very last
12  page there that you can actually pull off and discard
13  'cause that wasn't intended to part of the Exhibit.
14  Thank you. All right. So and then in this case, it
15  would appear -- you said that normally the chief
16  resident and the fellow prepares the weekly schedule,
17  correct?
18    A. That's my understanding, yes.
19    Q. In -- in August, it looks like, if we go back
20  to Exhibit 3 -- I'm sorry, go back to Exhibit -- yes,
21  Exhibit 3, page 2, that would have been Dr. John Seal,
22  correct?
23    A. Correct.
24    Q. Okay. Any reason why the formats of Exhibits
25  5 -- 4 and 5 are different? Or is that just the

Page 27

1  preference of whoever created them?
2    A. Creator preference.
3    Q. Do you remember when you first had any
4  interaction with Dr. Artunduaga during a clinic or a
5  case?
6    A. I don't.
7    Q. Sometime early in July though probably,
8  correct?
9    A. Or -- or in late June. June 24th was the
10  date the interns started.
11    Q. Okay. Was there a schedule for the -- that
12  last week of June? Or was -- was it a general --
13    A. I'm sure there was a schedule.      0:30:39
14    Q. Okay. I don't have that. So if you would
15  look at Exhibit 4 again, please. Looking at Tuesday,
16  July 5th, do you see that?
17    A. Yes.
18    Q. There is an indication that Dr. Artunduaga
19  had -- assigned to clinic with Dr. Kaplan, right?
20    A. That appears to be the case.
21    Q. Okay. I'm looking down through the list,
22  looking to see -- I -- if you could look at Thursday,
23  the 7th, and go down to about halfway down, it would
24  appear that Dr. Artunduaga was working with you and Dr.
25  Agarwal, do you see that?

Page 28

1    A. Yes.
2    Q. On a lumpectomy? Is that right?
3    A. Yes.                        0:31:24
4    Q. Okay. Do you know if that's the first time
5  that you worked with Dr. Artunduaga in a --
6    A. I can't imagine that it is because I'm sure I
7  worked with her at the end of June.
8    Q. Okay. You did -- but you worked with her
9  throughout the months of July and August, correct?
10    A. Correct.
11    Q. Okay. Did you have a chance to see her in
12  the operating room?
13    A. We operated together, yes.
14    Q. And did you participate in clinics with her?
15    A. She attended in my clinics, yes. Just a
16  clarification, I think you said Dr. Agarwal, but Dr.
17  Agarwal is a student
18    Q. Oh, I'm sorry. So that would be a medical
19  student, correct?
20    A. Correct.                    0:32:17
21    Q. Okay. Thank you. Did Dr. Artunduaga come to
22  you some time in July and talk to you about some
23  problems she was having?
24    A. I don't remember -- it's possible. I don't
25  know if it was July, when it was.

Page 29

1    Q. Do you remember having a conversation with
2  her some time in those early weeks about some problems
3  she was having?
4    A. I don't remember specific conversations. I
5  remember problems so -- but I don't remember the
6  specific conversations.
7    Q. What problems did Dr. Artunduaga express to
8  you that she was having in those early weeks?
9    A. I -- I can't say what problems she expressed
10 to me. I don't recall the conversation.
11   MS. FRANKLIN: Okay. Let's mark another
12 Exhibit.
13   Q. Before we get to that Exhibit, just one more
14 clarification, was Dr. Irma Fleming also an intern in
15 2011, 2012? She's listed --
16   A. Irma Fleming?
17   Q. Yes.
18   A. No, she's a senior resident. I believe she
19 would have been a third year resident at that time.
20   Q. Okay. Thank you. So if you would quick --
21 if we could just quickly look at Exhibit 4 again, that
22 was the July weekly schedule. Dr. Fleming was a -- you
23 said you think she was about a third year that year?
24   A. She was a third year resident.
25   Q. She was a third year. Dr. Artunduaga, of

Page 30

1  course, was an intern. So she was the only intern on
2  the service for that month, correct?
3    A. Correct.                          0:33:59
4    Q. Okay. All right. I've handed you what was
5  marked as --
6    RECORDER: Exhibit 6.
7    Q. -- Exhibit 6. Please take a look. This is
8  an email that you wrote to Dr. Song in August 2011,
9  correct?
10   A. Correct.
11   Q. And it's a chain actually, so if you'll turn
12 to page 2, we'll look at the most -- we'll look at it
13 in chronological order. The first email is from you to
14 Dr. Song there on page 2, do you see that?
15   A. I do.
16   Q. Apparently, he's out of -- out of -- he's
17 out, but you say, "I know you're away, and this is
18 nothing major, but there are definitely issues with
19 Maria Artunduaga that need to be addressed." Do you
20 see that?
21   A. I do.
22   Q. What caused you to write this email to Dr.
23 Song on August 4th?
24   A. Concerns that I had about Dr. Artunduaga's
25 performance on the service.

Page 31

1    Q. You said, "This is nothing major." What did
2  you mean by that?
3    A. I meant there wasn't a major incident, but
4  there were issues, as I state in the email, that need
5  to be addressed.
6    Q. Is it your practice to write emails like this
7  to program directors for interns in other programs?
8    A. Yes.                             0:35:23
9    Q. Have you ever done it before?
10   A. I can't specifically think of an incident
11 that I have.
12   Q. What were the issues that you were -- that
13 were on your mind when you wrote this first -- this
14 initial email that we just looked at?
15   A. The issues of her performance in the
16 operating room, the issues of her performance in
17 clinic, and the issues that had been relayed to me
18 about her performance on rounds.
19   Q. Okay. So by the time that you wrote this
20 email in August, had you talked to Dr. -- to Dr.
21 Artunduaga herself about some of the problems that she
22 was having?
23   A. I don't recall.
24   Q. Did you know that she was having issues that
25 she felt were related to her background and her

Page 32

1  language?
2    MR. CLEVELAND: Objection to the form of the
3  question. You may answer, if you think you can.
4    A. I -- I don't remember any specific
5  conversations, but certainly, part of my concerns were
6  that she seemed, right, more stressed and less
7  comfortable than many -- I've worked with many, many
8  interns over the years and many early in the rotation
9  interns over the years.
10   Q. Did you think Dr. Artunduaga seemed more
11 stressed than most interns early in their rotations?
12   A. It's so variable how -- how interns react,
13 but she -- she's not the most stressed, but on the more
14 stressed end.
15   Q. Okay. Did you ask her what was causing her
16 stress?
17   A. I don't recall.                    0:37:26
18   Q. Why did you bring this -- these concerns to
19 Dr. Song before bringing them to Dr. Artunduaga?
20   MR. CLEVELAND: Objection to the form of the
21 question.
22   A. Dr. Song is her program director and is
23 responsible for knowing how she is performing, and I
24 don't -- I don't know if I brought them to him before I
25 brought them to her. I don't remember any timing of

Page 41

1   the more senior plastic surgery residents.
2        Q.   This email was in August, so that would have
3   been -- I'm sorry, this was on August 4th, so you would
4   have still had several weeks to go with Dr. Artunduaga,
5   correct?
6        A.   Correct.                          0:47:27
7        Q.   I'm sorry, I actually should have given you
8   this earlier.
9             MS. FRANKLIN:  Can you mark this one please?
10  Number 7.
11       Q.   Please take a look at Number 7.  We were
12  talking about whether Dr. Song got back to you, and I
13  believe he did, according to this, correct?
14       A.   Looks like it.
15       Q.   And he said, "This is very helpful.  I'll
16  address ASAP when I get back."  Do you see that?
17       A.   I do.
18       Q.   Do you know whether he addressed it with you
19  when he got back?
20       A.   I don't recall the specifics.  I know we
21  spoke about it in August, but I can't give you any
22  specific details.
23       Q.   Do you remember the date?
24       A.   No.
25       Q.   Was it in person?

Page 42

1        A.   I don't know.
2        Q.   Did you -- did you -- do you know -- I'm
3   sorry, I said -- did -- I already asked you that.  Did
4   you go to Dr. Song and -- and bring up the subject of
5   Dr. Artunduaga, or did he come to you?
6        A.   I have no recollection.
7        Q.   Do you talk to him on a regular basis?
8        A.   I do.                             0:49:07
9        Q.   Every day?
10       A.   Not every day.
11       Q.   About how many times a week?
12       A.   Extremely variable depending on, principally,
13  patients, you know, that we have in common, unless
14  there's some other issues going on.
15       Q.   Okay.  And then the rest of the email, that
16  just refers to an issue with a patient, is that right?
17       A.   Yes.
18       Q.   Okay.  After you wrote the email that we've
19  been looking at where you have expressed your concerns
20  and proposed an idea of -- of some way to -- sort of
21  the idea of the boot camp, did you do anything to help
22  Dr. Artunduaga improve while she was on your service
23  the rest of August?
24       A.   I constantly am working with the interns in
25  clinic and in the operating room, so I don't -- I can't

Page 43

1   say specific examples, but I'm always working towards
2   improvement.
3        Q.   Did she -- she seemed to be a hard worker?
4        A.   She was a hard worker.
5        Q.   Did she seem to be committed to improving?
6        A.   She did.                          0:50:26
7        Q.   What was her relationship like with Dr. Seal?
8        A.   I -- I don't know.  In August, I always take
9   some time off, always.  So I -- for part of the month,
10  I was gone.  I don't know the exact dates.
11       Q.   Do you -- are -- you didn't observe her
12  interactions with Dr. Seal?
13       A.   Not very often.
14       Q.   For the ones that you did observe, what was
15  your impression of how they got along?
16       A.   It's -- I -- I think it was a strained
17  relationship, but I can't say anything more specific
18  than that.
19       Q.   Did Dr. Seal ever complain to you about Dr.
20  Artunduaga?
21       A.   I think he did, in -- in was as described in
22  that email from August 4th.  He obviously complained to
23  me about her from early in the month, since he only
24  started on the service on August 1st.
25       Q.   So when you wrote the note -- the email from

Page 44

1   August 4th, that was based on your observation from
2   June 24th through August 4th obviously, correct?
3        A.   Correct.
4        Q.   So a lot of that was during the July time
5   period when Dr. In was the fellow, right?
6        A.   Correct.
7        Q.   Did Dr. In complain to you about Dr.
8   Artunduaga?
9        A.   I have no specific recollection.    0:52:22
10       Q.   Do you know if Dr. In required Dr. Artunduaga
11  to do clerical work?
12       A.   I -- I don't know the way that it's stated,
13  the -- there's a lot of different work that interns do.
14       Q.   Do you know that -- whether Dr. In assigned
15  Dr. Artunduaga a lot of things that had to do with
16  fixing her computer or working -- working on computer
17  --
18       A.   I have no --
19       Q.   -- issues?
20       A.   -- idea.  No idea.
21       Q.   Didn't talk to her about that?
22       A.   Not to my recollection, no.
23       Q.   Did you know Dr. Artunduaga was -- was
24  exceeding her hours, from time to time, during July,
25  based on Dr. In's scheduling?

Page 45

1     MR. CLEVELAND: Objection to the form of the
2  question.
3     A. I -- I likely was made aware of it. I don't
4  have specific recollections, and it would not be
5  unusual. It's a very frequent thing in July for
6  interns, as they're learning the system, to exceed
7  their hours. It wouldn't have been specifically
8  troubling to me.
9     Q. Is that because they could make it up -- make
10  it up later? They could reduce their hours in the
11  weeks going forward, so that it would balance out?
12     A. It's a -- that's how the hours rules are
13  generally viewed.
14     Q. Are these the -- are the hours restrictions
15  based on ACGME requirements?
16     A. Yes.                        0:53:52
17     Q. Okay. And I -- as I understand it, there's
18  weekly rules, and then there's monthly rules, is that
19  right?
20     A. Correct.
21     Q. So even if you go over during a weekly time
22  period, as long as you don't go over for the month,
23  it's -- is that acceptable?
24     A. Yeah, there's a lot of rules, so the time can
25  be spread out over a number of weeks and averaged, and

Page 46

1  then gets days off, all has to do about the month and
2  weekends and --
3     Q. Okay. So there's some kind of a set of rules
4  that you can apply to see whether somebody goes over,
5  right?
6     A. Correct.
7     Q. And what happens if someone goes over after
8  you apply the set of rules?
9     A. It's noted, and it's viewed on more the --
10  the chief residents present the data periodically after
11  M&M conference, and then we look for patterns, you
12  know, is this on a certain service over or is it one
13  person consistently over, looking for patterns.
14     Q. Okay. Does -- does it have to be reported to
15  the ACGME?
16     A. Perhaps it does. I don't -- I don't deal
17  with that, so I don't know.
18     MS. FRANKLIN: Okay. I'd like to mark the
19  next Exhibit.
20     Q. All right. Please take a look at Exhibit
21  Number --
22     RECORDER: 8.
23     Q. -- 8, please. Thank you. Now this -- is
24  this your evaluation of Dr. Artunduaga?
25     A. It is.

Page 47

1     Q. And this is the only one that you had,
2  correct?
3     A. Correct.                        0:55:55
4     Q. And when I say the only one, I mean the only
5  one of this form, right? The -- the new -- the New
6  Innovations type evaluation?
7     A. This is the only New Innovations evaluation
8  that I completed.
9     Q. Okay. Please turn to page 2 of the
10  evaluation, and you'll see down at the bottom it says,
11  "Submitted on 9/25/11," right?
12     A. Yes.
13     Q. So that was about a month -- a few weeks
14  after Dr. Artunduaga left your service, correct?
15     A. Correct.
16     Q. Do you -- do you prepare these types of
17  evaluations for all residents who rotate on your
18  service?
19     A. I do.
20     Q. You're required to, right?
21     A. Yes.
22     Q. Do you know who -- who creates those
23  requirements?
24     A. Probably the ACGME.                0:56:36
25     Q. Okay. Is there any reason why it took a few

Page 48

1  weeks for you to get to the evaluation?
2     A. I'm very busy.
3     Q. That's not unusual, right?
4     A. Not unusual.
5     Q. Okay. Let's look at the first page then.
6  You noted that for general knowledge, basic science,
7  and clinical, you said, "Very good," do you see that?
8     A. I do.                        0:57:00
9     Q. What was that based -- what was your
10  evaluation of Dr. Artunduaga's general knowledge based
11  on?
12     A. My interactions with her in clinic, the OR,
13  and conference.
14     Q. Can you define what you mean by conference?
15     A. We have a surgical oncology conference
16  weekly. There are other teaching conferences, M&M,
17  morbidity and mortality rounds, so principally, it --
18  this was like -- the conference I'd be referring to
19  would be surgical oncology conference.
20     Q. Did you say that was weekly, I'm sorry?
21     A. Weekly.
22     Q. All right. And then continuing on, looking
23  at some of these other categories, I -- I note that you
24  found Dr. Artunduaga deficient on two issues here. One
25  is post-op care, one is advanced OR skills, do you see

Page 49

1  that?
2      A.  I do.
3      Q.  What was your basis for that assessment of
4  post-op care?
5      A.  Specifically based on a very bad interaction
6  that Dr. Artunduaga had with one of my patients.
7      Q.  Was that an interaction with somebody over a
8  pain management issue?
9      A.  Correct.                          0:58:14
10     Q.  Were you present for that interaction?
11     A.  I was not at the interaction, no.
12     Q.  Who was there?
13     A.  I don't know since I wasn't there, but I
14  imagine the patient, her husband, and Maria.
15     Q.  And how did you find out about what the
16  patients -- how did you find out that this was a bad
17  issue in your view?
18     A.  From talking with an extremely upset patient.
19     Q.  And what did the patient say?
20     A.  I don't know the details, but the gist was
21  that she felt attacked by needing -- having the amount
22  of pain that she was having and that she should be
23  discharged, and the patient felt that she was being
24  pushed out and forced to be discharged on post-op day
25  one, and the patient was just -- her husband, both

Page 50

1  extremely upset.
2      Q.  So she was in a great deal of pain, right?
3      A.  Correct.                          0:59:17
4      Q.  Was this patient somebody who was affiliated
5  with U -- U of C?
6      A.  She was our patient.
7      Q.  I mean was she a doctor, or nurse, or
8  somebody else who worked at the university?
9      A.  Not that I know of, no.
10     Q.  Did you talk to the patient yourself?
11     A.  I did.
12     Q.  And was that after -- I assume that was after
13  she saw Dr. Artunduaga, correct?
14     A.  Correct.
15     Q.  And she -- you said she had been in a great
16  deal of pain, and she felt like she was being told she
17  had to be discharged that day, is that -- is that
18  right?
19     A.  That -- yes --
20     Q.  Okay
21     A.  -- exactly.
22     Q.  And that was not correct?  She wasn't
23  discharged that day?
24     A.  I believe she was not discharged.
25     Q.  Did you talk to Dr. Artunduaga about that

Page 51

1  situation?
2      A.  I don't recall.
3      Q.  Wouldn't this be something that you'd want to
4  talk to the resident about if there was a problem?
5      A.  I would think so.  I cannot recall the
6  details.
7      Q.  Did you get her side of the story?
8      A.  I don't know.                      1:00:20
9      Q.  Do you think it's possible that a patient
10  who's in a lot pain might be responding to something
11  besides Dr. Artunduaga?
12         MR. CLEVELAND:  Object to the form of the
13  question.
14     Q.  I guess the question could have been stated a
15  little better.  Do you think a patient who's in a lot
16  of pain could misperceive the efforts of their medical
17  provider?
18         MR. CLEVELAND:  Object to the form of the
19  question.
20     Q.  You can answer though.
21     A.  I was with the patient very shortly after
22  this interaction, and I can say that there was nothing
23  about the amount of pain that she was in that made her
24  not accurately perceive the meaning of the interaction.
25     Q.  You weren't at the interaction though, right?

Page 52

1      A.  No, but I was there very shortly after.  This
2  was a Thursday after surgical oncology conference,
3  which happens every Thursday afternoon.  I made rounds
4  and came upon the upset patient and her husband.
5      Q.  So how do you know she was describing the
6  interaction accurately?
7      A.  I had the patient and her husband describe
8  the interaction to me.
9      Q.  So you -- but how do you know it was
10  accurate?  You said you thought it was accurate.  How
11  do you know it was accurate?
12     A.  I -- I listened to what they told me and
13  believed what they told me.
14     Q.  So you believed what they told you, right?
15     A.  That's what I just said.
16         MS. FRANKLIN:  Okay.  Let's mark Number 9,
17  please.
18     Q.  Okay.  Please take a look at Exhibit 9.  And
19  you'll see at the bottom, two thirds of the way down,
20  there's an email from Dr. Song to Dr. Artunduaga, and
21  this is referring to the patient we just discussed,
22  right?
23     A.  I assume so.
24     Q.  Okay.  Dr. Artunduaga wrote a response to Dr.
25  Song, and that's the email on top, correct?

Page 53

1    A. It looks to be the case.          1:02:47
2    Q. She said, "After we finished rounds, the plan
3  for Mrs. ___ was to add NSAID -- NSAIDs and to wean
4  her off from the PCA. Unfortunately, the NP did not
5  inform the residents about the changes done to her
6  management until 4:00 p.m. When I went to see her
7  around 3:30 p.m., I took a glance at the chart -- took
8  a quick a quick glance to her chart and couldn't find a
9  recent note regarding her pain control," and it goes on
10 with a little bit more detail there. Dr. Artundaga
11 then says that, "Mrs. ___ was very confused by having
12 multiple medical visits that day," do you see that?
13   A. I do.
14   Q. "And manifested great disappointment with the
15 nurse staff," do you see that?
16   A. Mm-hmm.
17   Q. Okay. Is it unusual for a patient in pain to
18 be frustrated with the -- her medical providers?
19     MR. CLEVELAND: Objection to the form of the
20 question.
21   A. It would not be unusual.          1:03:39
22   Q. Dr. Artunduaga continues, "I noticed that my
23 questions were misinterpreted and apologized to the
24 couple. When they said that my tone was condescending,
25 I apologized for a second time." And then she goes on

Page 54

1  in the next paragraph to say, "I believe my lack of
2  information facilitated an outlet mechanism for her to
3  blame me for her frustration. I also recognize that my
4  accent sometimes can be misleading for English
5  speakers. Tone and intonation are different in
6  Spanish." Do you see that?
7    A. I do.
8    Q. Is it your -- has Dr. Artunduaga ever been
9  rude to any other patient in your experience?
10   A. Not in my presence, I've not seen that.
11   Q. And in what -- how would you describe her
12 personality?
13   A. She has a kind personality.
14   Q. So wouldn't it be out of character for her to
15 be rude to a patient?
16   A. People react many different ways. I -- I
17 can't say it some -- anyone ever behaves the same way
18 at all times.
19   Q. You acknowledge that tone and intonation are
20 different in Spanish than in English?
21     MR. CLEVELAND: Objection to the form of the
22 question.                              1:04:48
23   A. I -- I don't speak Spanish. I -- I can't
24 elaborate on that.
25   Q. Dr. Artunduaga's tone and intonation

Page 55

1  sometimes are different than if she were speaking -- if
2  somebody were speaking English though, right?
3      MR. CLEVELAND: Objection to the form of the
4  question.
5    A. I -- I don't understand the question.
6    Q. When Dr. Artunduaga speaks, her tone and
7  intonation are different from somebody who's speaking
8  English without an accent, right?
9      MR. CLEVELAND: Objection to the form of the
10 question.
11   A. I hear the accent. I -- I don't judge tone
12 and intonation. I'm -- I'm not linguist.
13   Q. Okay.
14   A. I'm sorry.
15   Q. And then she continues, she concludes, "I'm
16 never rude to my patients. In fact, senior residents
17 have told me I should be tougher if I wish to succeed
18 in surgery," do you see that?
19   A. I do.                           1:05:43
20   Q. And actually, you told Dr. Artunduaga that
21 she needed to be tougher, didn't you?
22   A. I don't know.
23   Q. That she was too sweet and cute to be a
24 surgeon? Didn't you tell her that one time?
25   A. No.                            1:05:55

Page 56

1    Q. Did you ever tell her that she was too nice?
2    A. That's not generally something I would say to
3  somebody, that they were too nice, no.
4    Q. Did you ever give her any advice about how --
5  how to seem more -- how to seem tougher?
6    A. We subsequently met much after this in
7  November of 2011, when she came to me for advice, and
8  we talked about ways to manage a surgical resident's
9  life, particularly as a woman. I have very little to
10 none specific recollection of the -- exactly what we
11 discussed.
12   Q. Do you think women who are surgeons have
13 specific issues that they have to deal with that men
14 don't have?
15   A. Of course.                      1:06:45
16   Q. Can you give me some examples?
17   A. I think this would take a very long time to
18 talk about. It's a very complex issue. I don't think
19 it's just women and men, but individual personalities,
20 so no.
21   Q. Okay. What kind of personality traits are --
22 are liabilities for a surgeon?
23   A. I don't view anything as a liability. It's a
24 package deal.
25   Q. You said that there -- you talked to Dr.

Page 101

1    Q. And what's the purpose of a PICC line?
2    A. PICC line enters the body on one of the
3    extremities, and then the tip of it is in the -- one of
4    the central veins or quite close to the heart, so that
5    certain -- it has several uses. One is for peripheral
6    nutrition that's very concentrated that can't be given
7    through a peripheral vein, it has to be given to a
8    larger vein with bigger blood flow. Or sometimes for
9    long term administration of a drug, or medication, or
10   something.
11   Q. So it -- does it prevent the patient from
12   having to be injected every time?
13   A. Well it takes the place of an IV.
14   Q. Okay.
15   A. Right. And it -- and it can stay in for much
16   longer.
17   Q. How long can it stay in?
18   A. It can stay in for a very long time, but
19   really the only limitation is it has to be kept
20   sterile, you know, and clean, and if it gets infected
21   or if the patient were to develop a clot associated
22   with it, then that would necessitate its removal.
23   Q. So it could stay in for weeks?
24   A. Weeks.
25   Q. Months?

Page 102

1    A. Mm-hmm. Sometimes yes.
2    Q. Patients can take it home with them?
3    A. Patients go home with PICC lines.        2:03:26
4    Q. If you look -- turn to the second page of the
5    document. Actually gonna -- I'm going to start at the
6    bottom of the first page and then turn to the second
7    page. Very bottom of the first page, it says, "With
8    all the -- of these issues being," and then turning to
9    the second page, "thematically universal when it came
10   to her performance or lack thereof, it was quite clear
11   to all of the reviewers that surgery, and in
12   particular, plastic and reconstructive surgery, would
13   not be the best fit for Dr. Artunduaga." Do you see
14   that?
15   A. I do.
16   Q. Were you part of the decision that led to
17   that conclusion?
18   A. I was not part of this -- the decision that
19   lead to this sentence being written. My contributions,
20   as we discussed earlier, were my evaluation and my
21   conveying of all the information that you see conveyed
22   to Dr. Song.
23   MS. FRANKLIN: Okay. 14.
24   Q. Okay. So if you could take a look at Number
25   14, we have some emails been you and Dr. Artunduaga,

Page 103

1    correct?
2    A. Yes.
3    Q. Is Erica Thomas your assistant?
4    A. She is.
5    Q. Okay. And it appears you were getting --
6    setting up a meeting with Dr. Artunduaga, correct?
7    A. Yes.                                     2:05:17
8    Q. And we -- I think you referenced a little
9    earlier there was a meeting in November, is this the
10   one?
11   A. Yes.
12   Q. And the first page of the document -- I'm
13   sorry, the second page of the document indicates down
14   -- halfway down, that Maria Artunduaga, has asked you
15   -- she says, "I feel -- felt compelled to write you
16   looking for advice." Do you see that?
17   A. I do.                                    2:05:39
18   Q. "My monthly evaluations have been far below
19   what plastic surgery residents usually get. Dr. Song
20   has decided to put me on probation," she says, "which
21   is totally understandable, I have had difficulties
22   transitioning from my previous position as a human
23   genetics researcher into clinical life. Although
24   uncomfortable and painful, I understand this is meant
25   to better me." And then she asks if you could meet to

Page 104

1    discuss, and you did so, correct?
2    A. Correct.
3    Q. And what did you discuss?
4    A. Again, I -- I can't remember the specifics of
5    the meeting, but we talked. I tried to be very
6    supportive of Maria and to -- we talked about how she
7    could improve and how to try to, you know, make things
8    work as a surgery resident.
9    Q. Did you feel she -- that she sincerely wanted
10   to improve?
11   A. I do.
12   Q. And did you feel she sincerely wanted to find
13   a way to make residency work?
14   A. I do.
15   Q. Did you have any specific kinds of advice for
16   her?
17   A. I -- I don't really remember the details. I
18   don't remember the details of our conversation. I know
19   that I was supportive, that we talked about what my
20   sense of her deficiencies had been when she was on our
21   service, and -- and I tried to give her advice, but I
22   don't have specific recollections of what we discussed.
23   Q. Do you remember talking about the probation?
24   A. I -- I don't remember it, only that she
25   references it and that -- you know, I've seen many

Page 129

1    Q. I understand. Thank you.
2        MS. FRANKLIN: Okay. Let's mark this one.
3    19. All right.
4        Q. Take a look at Exhibit 19, and here we have
5    an email from Dr. Song to -- you know what, I'm sorry,
6    I meant to give you the continuation that's -- of the
7    email on the bottom as well, so let me mark two
8    together.
9        MS. FRANKLIN: Let's make this -- give you 20
10   also.
11       Q. All right. Let's start with 20, and do you
12   see an email from Dr. Roggin?
13       A. Yes.
14       Q. And you see it's cc'd to you, right?
15       A. Yes.                          2:38:28
16       Q. Do you remember getting this email?
17       A. Yes.
18       Q. And can you explain how this happened?
19       MR. CLEVELAND: Objection to the form of the
20   question.
21       A. I received this email, and it has the
22   contents that you see, that Maria would be returning to
23   the Kaplan service, but only to the endocrine portion
24   of the service and then defining her roles and
25   responsibilities on the service.

Page 130

1        Q. Did someone ask you whether she could
2    participate in the breast portion of the service?
3        A. There was a discussion about her coming back
4    to the Kaplan service, and yes, there was a discussion
5    that she would not take care of breast patients.
6        Q. When was the discussion?
7        A. I don't know when the discussion was. Some
8    time prior to April 6th.
9        Q. And who was part of the discussion?
10       A. Dr. Roggin and myself.
11       Q. Anyone else?
12       A. Not -- not that I recall. I don't recall the
13   specifics of the conversation.
14       Q. Did he ask you whether you would allow her to
15   come back onto the service?
16       A. I don't know how it was phrased. We had a
17   conversation about the fact that this opportunity was
18   being extended to Maria, and -- and then we laid the
19   boundaries of what would happen.
20       Q. Did you talk to Dr. Kaplan about her coming
21   back on the service?
22       A. I didn't talk to Dr. Kaplan, but it was told
23   that Dr. Kaplan was very supportive of Maria and had --
24   or agreed to, you know, be her mentor sort of during
25   this period.

Page 131

1        Q. And why didn't you want her working on the
2    breast patients?
3        A. By this time of 2012, there was so -- so much
4    that was swirling around, you know, Maria and her
5    performance issues, and of course, the experience that
6    we had had earlier in the year, the fact that she was
7    not going to be continuing in the program, and she -- I
8    didn't understand why she was being -- being put back
9    on the Kaplan service, so.
10       Q. What did doctor -- how did -- did Dr. Roggin
11   explain to you why she was -- why he was asking whether
12   she could come back on the Kaplan service?
13       A. My recollection is that there -- she needed
14   to be on some service to be able to complete the
15   internship year, that Dr. Kaplan was supportive of her,
16   and so then she would be coming back to the service,
17   and since it was a combined service at the time, then
18   we needed to define what she would be doing on the
19   service.
20       Q. So did you work with Maria at all when she
21   was on the service in April 2012?
22       A. I did not.                     2:41:28
23       Q. No cases and no clinics?
24       A. That -- that's my recollection, that I did
25   not work with her.

Page 132

1        Q. You didn't want her working -- you didn't
2    want her doing anything with respect to your patients,
3    is that correct?
4        A. Well I believe that the -- the way it was
5    defined was the breast part of the service versus the
6    -- versus the endocrine part of the service.
7        Q. So you didn't want her working on anything to
8    do with the breast part of the service --
9        A. Correct.
10       Q. -- correct? And what would that entail?
11       A. Coming to breast clinic, doing breast cases,
12   seeing the breast patients when they were inpatients.
13       Q. Anything else?
14       A. Attending breast conference, perhaps.
15       Q. That includes -- you didn't want her rounding
16   on your patients, right?
17       A. Correct. That's what I mean, on the wards
18   when they were inpatients.
19       Q. It also says that she will not be on the call
20   schedule. What does that mean?
21       A. I think that means that -- everything changes
22   so frequently, but probably -- the interns took some
23   call, you know, the weekends, possibly some nights or
24   something. I'm trying to remember when the 16 hour for
25   interns rule came in. That might have just been -- the

Page 133

1  July of 2012, so. But there -- sometimes the interns
2  would be on call, take call for the surgery services.
3      Q. One of the reasons you said you didn't want
4  Dr. Artunduaga on your -- the breast service was that
5  she wasn't coming back for another year, is that right?
6      A. Correct.                    2:43:12
7      Q. When did you find out she wasn't coming back?
8      A. I don't know. Some -- some time in the time
9  preceding this email.
10     Q. Why would her not being offered a second year
11 be your reason that you wouldn't want her on your
12 service?
13     A. It's -- it's a question, for me, of what's
14 the give and take, right. So that we are working with
15 residents, and you know, letting them take care of our
16 patients, and participate in their operations as part
17 of their growth and -- and what we are going to be
18 putting out as a final product of the residency, and
19 since that was not going to be happening, to me, the
20 investment of time and energy that would be -- go along
21 with having her on the service, I didn't see the payoff
22 of it.
23     Q. Do you not allow preliminary residents on
24 your service?
25     A. I allow plenty of preliminary residents on my

Page 134

1  service.
2      Q. Wouldn't that rationale apply to them?
3      A. They -- so it's -- it's a different
4  situation. They're -- they're not there under some
5  duress. At this point, Maria was under duress. It's a
6  different situation.
7      Q. So it was because she was under duress that
8  you didn't want her on the service then. What -- what
9  do you mean by under duress?
10     A. She -- as you see in this email, "If she
11 continues to complain or to be difficult." So that was
12 the sense that I had, that it would be a difficulty to
13 have her on the service.
14     Q. Did she ever complain or be difficult to you?
15     A. No.                        2:45:08
16     Q. But you saw the email from Dr. Roggin, and
17 you thought that might be something that could happen,
18 right?
19     A. And -- and I had general sense from what was
20 going on or just -- you know, it's a small group
21 setting, that this was not -- there wasn't a positivity
22 around it.
23     Q. Did I -- I gave you Number 19, didn't I?
24     A. Yes.
25     Q. Okay. Number 19, there's a little bit of

Page 135

1  what we looked at on 18 -- 18 at the bottom, and then
2  it continues on. It's an email from Dr. Song to a
3  variety of people at the top. Do you see that?
4      A. Yes.                        2:46:04
5      Q. And it says -- I don't see your name on that
6  list, do you know if you received this email?
7      A. No. I -- I didn't receive it.
8      Q. Okay. I don't have a question about that
9  one. Did you ever speak with Dr. Eric Grossman about
10 Dr. Artunduaga's performance on the service that April?
11     A. I don't know that it would've been about
12 performance, but certainly, around her presence on the
13 service, yes.
14     Q. And what did you talk with him about?
15     A. There -- there was some concerns about where
16 -- you know, how people were kind of stacking up, that
17 there was another intern on the service and -- where --
18 particularly around cases in the operating room and who
19 would be assigned to what cases, that was causing some
20 stress to Eric. That -- and so there was -- then this
21 false division of the service, right, between the
22 endocrine part and the breast part, which hadn't
23 traditionally existed. So, I was working with Eric,
24 but then we had this sort of split service, so. Right,
25 we discussed it.

Page 136

1      Q. Scheduling issues?              2:47:54
2      A. Scheduling issues and complaints being made
3  about fairness and who was being assigned to what and
4  this kind of thing.
5      Q. Do you know who made the complaints?
6      A. My -- my recollection is there -- there were
7  several complaining parties, that -- that Dr.
8  Artunduaga had complained some of her concerns about
9  fairness of clinic, or floor duties, or opportunities
10 to be in the operating room, and that the other intern
11 who was on the service may also have felt that her
12 experience was somehow being compromised. That's my
13 recollection.
14     Q. Do you remember who the other intern was?
15     A. The other intern was Dr. Stack.      2:48:37
16     Q. Did -- did you have any role in trying to
17 sort out any of those concerns?
18     A. There -- I -- I know that -- I remember there
19 were some emails which -- trying to sort of sort it
20 out. And so as the TEC on the service, I'm -- I'm
21 trying to -- one of my roles is working with the chief
22 to make sure that people, you know, have a good
23 learning experience, and this definitely causes stress
24 to the team.
25     Q. What does TEC mean?

EXHIBIT
Jaskowiak
4-23-14

## PGY 1 – 2011/12 Academic Schedule

| Resident | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Blake Anderson #3396 Urology | NShpb | Ferg | Ferg | NShpb | Trnsp | Thor | Drag | PL | Block 1 | VAC | Float | Block 1 |
| Maria Artunduaga #3394 Plastics | Kap | Kap | Block 2 | Block 2 | Thor | VAC | Vasc | Trnsp | Kap/Float | Float | PL | Anesth |
| Julia Berian #1103 | Float | Float/Kap | Drag | Kap | Ferg | Block1 | NShpb | Thor | VAC | Vasc | Peds | Trnsp |
| Joseph Cohen #3381 Ortho | Drag | Vasc | ED | MSKI | Float | ICU | ANES | VAC | PL | Peds | ORT | ORT |
| Ananh Eleswarapu #3388 Ortho | Block 2 | Peds | Vasc | ICU | Float | ORT | ORT | ANES | VAC | PL | ED | MSKI |
| Monika Krezalek #3334 | Float | Float/Ferg | Trnsp | Drag | Kap | VAC | Block1 | NShpb | Thor | Ferg | Vasc | Peds |
| Joon Hyung Lee #3337 | Peds | Ferg/Float | Float | Trnsp | Drag | Kap | Ferg | Block1 | NShpb | Thor | VAC | Vasc |
| Susan Lim #3345 | Vasc | Kap/Float | Float | VAC | Peds | Trnsp | Kap | Drag | Ferg | Block1 | NShpb | Thor |
| Johnathan Lusardi #3390 OHNS | ED | Neuro | A/I | PL | OHNS | Float | OHNS | Block 2 | VAC | A/I | Thor | PICU |
| Glenda Montague #3392 OHNS | OHNS | PL | OHNS | A/I | VAC | Float | Thor | PICU | Block 2 | Neuro | A/I | ED |
| Joseph Pariser #1098 Urology | Trnsp | Block 2 | Ferg | Peds | Block 1 | NShpb | PL | Ferg | VAC | Ferg | Float | NShpb |
| Shane Pearce #3399 Urology | Thor | Trnsp | Block 1 | Ferg | Block 2 | PL | Ferg | VAC | Drag | NShpb | Ferg | Float |
| Oliver Schipper #3384 Ortho | ED | MSKI | Peds | PL | VAC | ANES | Float | Vasc | ORT | ORT | Block 2 | ICU |
| Deana Shenaq #1553 Plastics | PL | Thor | VAC | Block 1 | NShpb | Drag | Anesth | Kap | Kap/Float | Float | Trnsp | Vasc |
| Puneet Singh #1177 | Block1 | NShpb | Thor | Vasc | VAC | Peds | Trnsp | Float | Float/Kap | Drag | Kap | PL |
| Jason Somogyi #3386 Ortho | MSKI | ED | ORT | ORT | ANES | PL | Float | Peds | Vasc | VAC | ICU | Drag |
| Melinda Stack | | | | | | | | | | | | |

{ DATE \@ "MM/dd/yy" }

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

UCMC00012057

| #1134 Preliminary | Ferg | Drag | PL | Float | Ortho | Block 2 | Block 2 | VAC | Trnsp | Kap | Block 1 | Float |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

{ DATE \@ "MM/dd/yy" }

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

UCMC00012058

EXHIBIT

6 Jaskowiak
4·23·14        NJS

From:       Jaskowiak, Nora [BSD] - SUR
Sent:       Thursday, August 04, 2011 11:09 AM
To:         Song, David [BSD] - SUR
Subject:    RE: Resident Issue

Several issues-

1) Something cultural - like she just does not fully understand what is meant when certain things are asked of her or she is asked to do something. Not language, but something is just understanding how things are done in the US medical system.

2) A sor tof nervousness that makes her seem very jumpy - when you tell her or ask her to do thigs, she immediately dives into it, even before you finish. This is true in the OR and clinic and floor. John Seal says she does not stand still on rounds - that she is constantly trying to pounce on the next hing.

3) OR technical - same issue - she starts to listen but then dives in in a nuervous, pouncing sort of fashion. No grace or beauty in her OR technique and seems difficult to teach because you are not sure she is really absorbing.

She is very smart and very sweet. She takes her job very seriously -  example -she is the only resident to reply to my request for input on the students the same day I sent the email.

Then she goes and sees a patient in clinic with a problem and doesn't leave a note or talk to me about it...

So, inconsistent.

Hoep this helps. John Seal is our chief right now, so could have some helpful insights also. He and I were almost wondering if, in a calm way, she could be given a littel "American Surgery Boot Camp" to help her adapt. But I don't want to make her more nervous.

NJ

From: Song, David [BSD] - SUR
Sent: Thursday, August 04, 2011 11:00 AM
To: Jaskowiak, Nora [BSD] - SUR
Subject: Re: Resident Issue

can u givr me a brief synopsis

David H. Song, MD, MBA, FACS
Professor and Chief
Section of Plastic Surgery
Vice-Chair, Department of Surgery
University of Chicago Medical Center
5841 S. Maryland Ave, M/C 6035
Chicago, IL 60637
songd@uchicago.edu
773 702-6302
773 702-1634 fax
twitter.com/dhsong

1

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER          UCMC00012055

On Aug 4, 2011, at 10:40 AM, Jaskowiak, Nora [BSD] - SUR wrote:


David-

I know you are away and this is nothing major, but there are definitely issues with Maria Artunduaga that need to be addressed and likely the sooner, the better.

I wonder if, when you return, we can discuss these issues and figure out a plan to help direct her better, as we are all dedicatd to her success here.

Thanks and hope Korea is fun and safe.

NJ



Nora Jaskowiak, M.D., FACS
Associate Professor of Surgery
Surgical Director, Breast Center
Director, Third Year Student Clerkship
Associate Program Director, General Surgery Residency
University of Chicago Medical Center
Phone: (773) 702-2048
Fax: (773) 834-4022
email: njaskowi@surgery.bsd.uchicago.edu

2

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



From:        Song, David [BSD] - SUR
Sent:        Thursday, August 04, 2011 11:16 AM
To:          Jaskowiak, Nora [BSD] - SUR
Subject:     Re: Resident Issue

this is very helpful                                          REDACTED

i'll address asap when i get back

p.s.  did Julie tell you about            ? i had her on the schedule for an exchange next tuesday and i get on
the plane.  as soon as i get off and turn on my phone, there's a vm from greg saying her expander was exposed.
this is very strange as i just saw her on monday the very day before i leave.  so a breast that wasn't perfect, but
clearly no impending exposure goes to full thickness necrosis (almost like a pressure sore) in 24 -36 hours

i'm of course besides myself and helpless here in Seoul

let me know your thoughts

David H. Song, MD, MBA, FACS
Professor and Chief
Section of Plastic Surgery
Vice-Chair, Department of Surgery
University of Chicago Medical Center
5841 S. Maryland Ave, M/C 6035
Chicago, IL 60637
songd@uchicago.edu
773 702-6302
773 702-1634 fax
twitter.com/dhsong

On Aug 4, 2011, at 11:08 AM, Jaskowiak, Nora [BSD] - SUR wrote:


Several issues-

1) Something cultural - like she just does not fully understand what is meant when certain things are asked of her or she is
asked to do something. Not language, but something is just understanding how things are done in the US medical
system.

2) A sor tof nervousness that makes her seem very jumpy - when you tell her or ask her to do thigs, she immediately
dives into it, even before you finish. This is true in the OR and clinic and floor. John Seal says she does not stand still on
rounds - that she is constantly trying to pounce on the next hing.

3) OR technical - same issue - she starts to listen but then dives in in a nuervous, pouncing sort of fashion. No grace or
beauty in her OR technique and seems difficult to teach because you are not sure she is really absorbing.

She is very smart and very sweet.  She takes her job very seriously -  example -she is the only resident to reply to my
request for input on the students the same day I sent the email.

1

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER                         UCMC00015518

New Innovations RMS Evaluations



EXHIBIT
E Jaskowiak
4-23-14    NO

Page 1 of 6

## DOS - Faculty Evaluation of Resident



**Maria Alexandra Artunduaga**
**SURG-GEN SURG Kaplan (B) UCH**
6/24/2011 to 8/31/2011

| | Evaluator |
|---|---|
| | **Nora Jaskowiak** |

*Please evaluate the above noted surgery resident who rotated on your service. Specific overall comments regarding strengths and weaknesses are valuable to the professional development of this resident.*

### Knowledge Base

General knowledge (basic science, clinical)

| Exemplary | Superior | **Very Good** | Good | Could Improve | Deficient | N/A |
|---|---|---|---|---|---|---|
| O | O | ● | O | O | O | O |

Operative knowledge (anatomy, procedures)

| Exemplary | Superior | Very Good | **Good** | Could Improve | Deficient | N/A |
|---|---|---|---|---|---|---|
| O | O | O | ● | O | O | O |

### Clinical Skills

Pre-op care (formulates appropriate plan/assessment of details)

| Exemplary | Superior | Very Good | Good | **Could Improve** | Deficient | N/A |
|---|---|---|---|---|---|---|
| O | O | O | O | ● | O | O |

Post-op care (including recognition/Rx of complications)

| Exemplary | Superior | Very Good | Good | Could Improve | **Deficient** | N/A |
|---|---|---|---|---|---|---|
| O | O | O | O | O | ● | O |

Able to communicate/justify medical decisions

| Exemplary | Superior | Very Good | Good | **Could Improve** | Deficient | N/A |
|---|---|---|---|---|---|---|
| O | O | O | O | ● | O | O |

### Operative Skills

Preparedness (punctual, knows case)

| Exemplary | Superior | Very Good | Good | **Could Improve** | Deficient | N/A |
|---|---|---|---|---|---|---|
| O | O | O | O | ● | O | O |

Advanced OR skills (dissection, exposure, suturing)

| Exemplary | Superior | Very Good | Good | Could Improve | **Deficient** | N/A |
|---|---|---|---|---|---|---|
| O | O | O | O | O | ● | O |

### Personal Attributes/Professionalism

Ethical, honest, reliable

| **Exemplary** | Superior | Very Good | Good | Could Improve | Deficient | N/A |
|---|---|---|---|---|---|---|
| ● | O | O | O | O | O | O |

Shows sensitivity of age, gender, culture of patients/colleagues

| **Exemplary** | Superior | Very Good | Good | Could Improve | Deficient | N/A |
|---|---|---|---|---|---|---|
| ● | O | O | O | O | O | O |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

UCMC00017655

New Innovations RMS Evaluations

**Relations with Others/Communication Skills**

With patients and families

| Exemplary | Superior | Very Good | Good | Could Improve | Deficient | N/A |
|-----------|----------|-----------|------|---------------|-----------|-----|
| ○ | ○ | ○ | ● | ○ | ○ | ○ |

With other healthcare professionals

| Exemplary | Superior | Very Good | Good | Could Improve | Deficient | N/A |
|-----------|----------|-----------|------|---------------|-----------|-----|
| ○ | ○ | ○ | ○ | ● | ○ | ○ |

Documentation of practice activities

| Exemplary | Superior | Very Good | Good | Could Improve | Deficient | N/A |
|-----------|----------|-----------|------|---------------|-----------|-----|
| ○ | ○ | ○ | ○ | ● | ○ | ○ |

**Teaching Abilities**

Teaches other residents/students effectively

| Exemplary | Superior | Very Good | Good | Could Improve | Deficient | N/A |
|-----------|----------|-----------|------|---------------|-----------|-----|
| ○ | ○ | ○ | ● | ○ | ○ | ○ |

**Administrative Abilities/Practice Based Learning**

Ability to lead/manage a service

| Exemplary | Superior | Very Good | Good | Could Improve | Deficient | N/A |
|-----------|----------|-----------|------|---------------|-----------|-----|
| ○ | ○ | ○ | ○ | ○ | ○ | ● |

Tracking M&M's/presentation quality

| Exemplary | Superior | Very Good | Good | Could Improve | Deficient | N/A |
|-----------|----------|-----------|------|---------------|-----------|-----|
| ○ | ○ | ○ | ○ | ○ | ○ | ● |

Critiques personal practice outcomes

| Exemplary | Superior | Very Good | Good | Could Improve | Deficient | N/A |
|-----------|----------|-----------|------|---------------|-----------|-----|
| ○ | ○ | ○ | ● | ○ | ○ | ○ |

**System-Based Practice**

Practices cost-effective patient care

| Exemplary | Superior | Very Good | Good | Could Improve | Deficient | N/A |
|-----------|----------|-----------|------|---------------|-----------|-----|
| ○ | ○ | ○ | ● | ○ | ○ | ○ |

Demonstrated knowledge of risk-benefit analysis

| Exemplary | Superior | Very Good | Good | Could Improve | Deficient | N/A |
|-----------|----------|-----------|------|---------------|-----------|-----|
| ○ | ○ | ○ | ● | ○ | ○ | ○ |

Demonstrates understanding of role of specialist in overall patient management

| Exemplary | Superior | Very Good | Good | Could Improve | Deficient | N/A |
|-----------|----------|-----------|------|---------------|-----------|-----|
| ○ | ○ | ○ | ● | ○ | ○ | ○ |

Overall Comments:
Maria spent over two months on our service and it was fairly challenging. Many issues arose - with communication, with clinical care, with technical OR skills. These have been brought to the attention of Dr. Song. Bottomline- she is very smart and very sweet. And she works hard. There seem to be some critical issues that may be cultural - as she has not worked in the American medical system before. She often did not seem to understand completely what the plan was or her role in the plan. Also, she is so eager to do well and to improve that she is constantly "diving forward" without even fully listening to what is being recommended. This occurred technically in the OR and also on rounds. Steps are being taken to address these issues.

Evaluation Submitted on 9/25/2011 10:34:41 AM EST.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

UCMC00017656



| | |
|---|---|
| **From:** | Jaskowiak, Nora [BSD] - SUR <njaskowi@surgery.bsd.uchicago.edu> |
| **Sent:** | Friday, November 11, 2011 7:40 AM |
| **To:** | Artunduaga, Maria [UCH] <maria.artunduaga@uchospitals.edu> |
| **Cc:** | Thomas, Erica [BSD] - SUR <ethomas1@surgery.bsd.uchicago.edu> |
| **Subject:** | RE: Advice |

So let's plan on meeting at the end of the day Monday. I will be in the Breast Center. Please oage me when you are done with your clinical duties, and I'll let you know where things stand with me to refine the timing.

Dr. J

Erica- can you note this on my calendar? thanks.

----------------------------------------------

**From:** Artunduaga, Maria [BSD] - SUR
**Sent:** Fri 11/11/2011 7:06 AM
**To:** Jaskowiak, Nora [BSD] - SUR
**Subject:** Re: Advice


Monday after 3:30 pm
Tuesday after 4 pm

Sent from my Verizon Wireless Phone


----- Reply message -----
From: "Jaskowiak, Nora [BSD] - SUR" <njaskowi@surgery.bsd.uchicago.edu>
Date: Thu, Nov 10, 2011 21:16
Subject: Advice
To: "Artunduaga, Maria [BSD] - SUR" <maria.artunduaga@uchospitals.edu>

No, unfortunately not tomorrow.

How is early next week?

Dr. J

-----Original Message-----
From: Artunduaga, Maria [BSD] - SUR
Sent: Thu 11/10/2011 8:09 PM
To: Jaskowiak, Nora [BSD] - SUR
Subject: Re: Advice


Thanks for your reply, Dr. J.

I'm on Thoracic Surgery, attendings are out of town, can you meet tomorrow?

-M

Sent from my Verizon Wireless Phone


----- Reply message -----
From: "Jaskowiak, Nora [BSD] - SUR" <njaskowi@surgery.bsd.uchicago.edu>

**UCMC00001609**

Date: Thu, Nov 10, 2011 19:28
Subject: Advice
To: "Artunduaga, Maria [BSD] - SUR" <maria.artunduaga@uchospitals.edu>

Maria-

I will be happy to meet with you.

Please remind me what service you are on now and when you might be available.

We will come up with a time.

Dr. J

_____

From: Artunduaga, Maria [BSD] - SUR
Sent: Thursday, November 10, 2011 2:31 PM
To: Jaskowiak, Nora [BSD] - SUR
Subject: Advice


Hi Dr. Jaskowiak,


I felt compelled to write you looking for advice. My monthly evaluations have been far below what Plastic Surgery residents usually get. Dr. Song has decided to put me into probation, which is totally understandable. I have had difficulties transitioning from my previous position as a human genetics researcher into the clinical life. Although, uncomfortable and painful, I understand that is meant to better me.


I know I have potential to be an excellent resident, I was wondering if you could have sometime to meet with me.


Thank you in advance,


Maria




*************************************************************************
********
This e-mail is intended only for the use of the individual or entity to which
it is addressed and may contain information that is privileged and confidential.
If the reader of this e-mail message is not the intended recipient, you are
hereby notified that any dissemination, distribution or copying of this

**UCMC00001610**



**From:** Artunduaga, Maria [BSD] - SUR
**Sent:** Tuesday, August 23, 2011 10:57 PM
**To:** Song, David [BSD] - SUR
**Subject:** RE: Mrs. Beard

Hi Dr. Song,

Let's meet anytime next week, a quick version of my side of the story:

After we finished rounds, the plan for Mrs ⎯⎯ was to add NSAIDs and wean her off from the PCA. Unfortunately the NP did not inform the residents about the changes done to her management until 4 pm. When I went to see her around 3:30 pm, I took a quick glance to her chart and couldn't find a recent note regarding her pain control. When I entered her room, I was surprised to find out that she was still on a PCA, evidently many of my questions were directed towards the medications she was taking and what had worked.

Mrs. ⎯⎯ was very confused by having multiple medical visits during the day, and manifested great disappointment with the nurse staff. I noticed that my questions were misinterpreted, and apologize to the couple. When they said that my tone was condescending, I apologize for a second time and explained that my duty was to know all these details in order to improve her pain management.

I understand her situation carries a great deal of anxiety; I believe my lack of information facilitated an "outlet" mechanism for her to blame me for her frustration. I also recognize that my accent sometimes can be misleading for English speakers (tone and intonation are different in Spanish); however, I'm never rude to my patients, in fact, senior residents have told me that I should be "tougher" if I wish to succeed in Surgery.

Thanks for sharing,

-M

**From:** Song, David [BSD] - SUR [mailto:dsong@surgery.bsd.uchicago.edu]
**Sent:** Tuesday, August 23, 2011 7:39 PM
**To:** Artunduaga, Maria [UCH]
**Subject:**

Maria

I received this email from one of our patients recently and I know that there is always 2 sides to the story so let's sit down and discuss this:

-David

On Thursday Aug. 11, Dr. A knocked and entered my hospital room (TN422) in the early evening. My husband Jeremy was also in the room. She greeted us nicely but she did not explain what she was doing there, who she was or if she worked with Dr. Jaskowiak or Dr. Song.

1

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER                    UCMC00008036