# TAB 19

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

---

Maria Artunduaga,

    Plaintiff,

vs.    Case Number 1:2012cv08733

University of Chicago Medical Center
and David Song,

    Defendants.

---

Deposition of David Habin Song
Wednesday
December 4th, 2013

-at-

Caffarelli & Siegel, Ltd.
180 North Stetson Avenue
Suite 3150
Chicago, Illinois 60601

Page 2

APPEARANCES

For the Plaintiff:

  Alejandro Caffarelli
  Caffarelli & Siegel, Ltd.
  180 North Stetson Avenue
  Suite 3150
  Chicago, Illinois 60601

For the Defendants:

  Michael G. Cleveland
  Vedder Price, P.C.
  222 North LaSalle Street
  Suite 2400
  Chicago, Illinois 60601-1104

Also present:

  Andrew Craig
  Ricardo Garcia

Page 3

1   THE RECORDER: Good morning. We are now on
2 record on December 4th, 2013. The time is 10:13 a.m.
3 We are located at Caffarelli & Siegel, Ltd., 180 North
4 Stetson Avenue, Suite 3150, Chicago, Illinois 60601,
5 for a deposition in the matter of Maria Artunduaga
6 versus University of Chicago Medical Center and Dr.
7 David Song, Case Number 2012 CV 08733. Venue, Northern
8 District of Illinois, Eastern Division. The witness
9 today is Dr. David Habin Song.
10   Dr. Song, my name is Christina Kollintzas. I'm a
11 notary public and I'm recording this deposition for In
12 Demand Court Reporting. At this time would you please
13 raise your right hand for the oath.
14   (Witness sworn)
15   THE RECORDER: Would the attorneys please
16 state their appearances for the record.
17   MR. CAFFARELLI: Alex Caffarelli for the
18 Plaintiff, and with me is Ricardo Garcia.
19   MR. CLEVELAND: Michael Cleveland on behalf
20 of Defendant University of Chicago Medical Center. For
21 the record, though Dr. Song's name still appears in the
22 caption he has been dismissed from this lawsuit. Also
23 with me is Andrew Craig who is in-house counsel at the
24 Medical Center.     0:01:14
25   THE RECORDER: That completes the required

Page 4

1 information. We can proceed.
2   MR. CAFFARELLI: Thank you.
3   EXAMINATION
4 BY MR. CAFFARELLI:
5   Q. Good morning, Dr. Song. Thank you for coming
6 today. Before we get going I'll run through some of
7 the basic ground rules just so that we're all on the
8 same page. I will be asking you a series of questions
9 for your deposition. And as part of that process we're
10 going to be going for a couple of hours today and then
11 continuing this on Monday, so if at any time you feel
12 you need to take a break, just let me know, I'd be
13 happy to let you do that, run to the restroom, make a
14 call, I understand you're a busy physician so we don't
15 want to keep you from doing things that need to be
16 done.
17   Second, a transcript will likely be made of this
18 deposition so it's important that we not speak over
19 each other, that if you give me the opportunity to
20 finish my question I will give you the opportunity to
21 finish your answer. And to the extent you don't
22 understand my question I'm happy to repeat it or maybe
23 rephrase it for you if necessary. If later in this
24 deposition you realize that something you said was
25 incomplete or incorrect, please let me know, at any

Page 5

1 time I'd be happy to let you make any changes to your
2 answer or corrections as you feel are necessary.
3 Do you have any questions for me?
4 A. I do not. 0:02:43
5 Q. Okay. Have you ever had your deposition
6 taken before?
7 A. Yes, I have.
8 Q. On how many occasions?
9 A. Twice.
10 Q. Okay. Were you a party in either of those
11 occasions in which your deposition was taken?
12 A. No. I was an expert witness in both cases.
13 Q. In that vein actually, could you please tell
14 me your educational background.
15 A. Sure. I went to medical school at the
16 University of California, Los Angeles. I did my
17 general surgery, plastic surgery, microsurgical
18 training at the University of Chicago Medical Center.
19 Did my graduate school, a master's in business
20 administration, at the University of Chicago Booth
21 School of Business. 0:03:28
22 Q. Now, when you say training, could you
23 describe what training typically entails for a
24 physician after they've graduated from medical school.
25 A. It's predicated on the field of specialty

Page 6

1 that you match it to. 0:03:49
2 Q. What was your field of specialty?
3 A. General surgery.
4 Q. So what did your training entail?
5 A. How specific do you want? I mean I --
6 Q. To a -- to a layperson who is unfamiliar with
7 the medical field how would you describe the type of
8 training that a medical graduate goes through from the
9 time of graduation until they become a fully trained
10 physician?
11 A. Sure. So for general surgery and plastic
12 surgery it's intensive on-the-job training. That
13 requires many hours of in-hospital work, treating
14 patients, multitasking, ability to prioritize patient
15 needs, particularly in surgery where there are acute
16 and urgent issues, that is of the utmost importance, so
17 a sense and understanding and ability to do that would
18 be very crucial for patient safety. Being in the
19 operating room, rounding on patients, going to clinic,
20 and there's graduated responsibility over the course of
21 one's training predicated on successful completion of
22 milestones. 0:05:07
23 Q. Okay. And what is a residency?
24 A. It's a training process.
25 Q. Is that part of the training that you just

Page 7

1 described?
2 A. Correct.
3 Q. Is completing a residency a prerequisite to
4 becoming a licensed physician in Illinois? 0:05:34
5 A. In that specialty, yes.
6 Q. When did you become -- strike that.
7 When did you begin working for University of
8 Chicago Medical Center?
9 A. In 2001. I was a resident trainee in 1995
10 through 2000 and -- through 2000.
11 Q. Okay. And in 2001 you, I guess you could
12 say, were promoted?
13 A. No. Employed.
14 Q. Employed. Okay. And what was -- what was
15 your first position at University of Chicago Medical
16 Center? 0:06:12
17 A. As an employee I was an assistant professor
18 of surgery.
19 Q. Did you -- have you held any other positions
20 besides assistant professor of surgery?
21 A. Four years later I became associate professor
22 of surgery. Four years after that I became professor
23 of surgery. Two years after that I became the Cynthia
24 Chow Endowed professor of surgery. Most recently I'm
25 the associate dean of continuing medical education.

Page 8

1 Q. When did you become the associate dean of
2 continuing medical education?
3 A. November 1st, 2013. 0:06:46
4 Q. What was your position at the time that Maria
5 Artunduaga was at the University of Chicago Medical
6 Center?
7 A. I was the Cynthia Chow professor of surgery.
8 I was the chief of plastic and reconstructive surgery,
9 the vice chairman of the Department of Surgery, and the 0:07:05
10 residency program training director.
11 Q. Did you supervise Ms. Artunduaga at that --
12 at the time that she was there?
13 A. Yes.
14 Q. And in what capacity did you supervise her?
15 In other words, under which of your job titles or
16 descriptions were you her supervisor? 0:07:30
17 A. Technically all of the above. But directly
18 as it relates to any trainee, residency program
19 director within the Section of Plastic Surgery.
20 Q. How long were you the residency program
21 director?
22 A. From 2004 November through November 1st of
23 2013.
24 Q. And is that for both general and plastic
25 surgery?

Page 13

1  initial document production?
2      A. Honestly I don't remember that I had it.
3  I mean, there was a lot of documentation to be
4  produced, so that's the reason.
5      Q. When you made the audio recording of
6  your meeting with Dr. Song on May 7, 2012 --
7      A. Uh-huh.
8      Q. -- did you know that it was a violation
9  of Illinois law to do so?
10     A. No, I didn't know.
11     Q. Did you subsequently learn it was a
12 violation of Illinois law to do so?
13     A. Yes. When I spoke with my lawyers,
14 previous representation, Caffarelli & Siegel.
15     Q. When, by that I mean what date, did you
16 learn that the audio recording was illegal?
17     A. Sometime around June perhaps, July.
18     Q. Of what year?
19     A. 2012.
20     Q. When did you retain the law firm of
21 Caffarelli & Siegel?
22     A. I believe it was beginning of May,
23 around May, May, June. I can't recall.
24     Q. Prior to that time, were you represented

Page 14

1  by a different lawyer Thomas Crooks?
2      A. No.
3         Oh, no. We just consulted with him
4  once, and we never had an agreement or anything,
5  nothing.
6      Q. So Mr. Crook was never your attorney?
7      A. No.
8      Q. Is that correct?
9      A. Never.
10     Q. What other audio recordings did you make
11 at any time during your tenure at the University
12 of Chicago Medical Center?
13     A. That was the only one.
14     Q. You also produced an audio recording of
15 a conversation with Dr. Michelle Josephson,
16 correct?
17     A. It was a voice mail that she left in my
18 phone. I didn't record it.
19     Q. You, nonetheless, saved it; is that
20 correct?
21     A. Yes, I saved it. I don't go deleting
22 everything.
23     Q. After Dr. Josephson left you that
24 voicemail recording, what did you do with it?

Page 15

1      A. Nothing. I just -- I had it in my
2  phone. That's all.
3      Q. There was also an audio recording
4  produced of a grievance hearing that was held on
5  a grievance you filed on May 16, 2012, correct?
6      A. Yes. A friend of mine did it.
7      Q. Who was the friend?
8      A. Antonio Copete.
9      Q. And Dr. -- he's Dr. Copete, right?
10     A. Yes.
11     Q. But he's not a medical doctor; he's a
12 PhD?
13     A. He's a PhD. He's a post doc in
14 astrophysics at Harvard, so...
15     Q. And whose idea was it to make that audio
16 recording?
17     A. I think it was his.
18     Q. Why do you think it was his?
19     A. We were having the conversation. He
20 suggested it. I knew that the grievance manual
21 rules state specifically that we couldn't make a
22 recording without consent, and I told Ricardo --
23 I'm sorry, Antonio that I did not consent. We
24 stopped, you know, discussing further about it.

Page 16

1      Q. Did you also discuss the subject of
2  making an audio recording with your husband
3  Ricardo Garcia?
4      A. Yes, he was present.
5      Q. When did you learn that there was an
6  audio recording that had been made?
7      A. After the grievance, I believe, Antonio
8  sent a link of some sort to Ricardo. I haven't
9  even listened to that recording. Never intend to
10 make it or use it, so...
11     Q. That recording, also, was a violation of
12 Illinois law, correct?
13        MS. FRANKLIN: Object, calls for a legal
14 conclusion.
15 BY MR. CLEVELAND:
16     Q. Is it your understanding that recording
17 was made in violation of Illinois law?
18     A. At that time I didn't know.
19     Q. But you subsequently learned that from
20 Caffarelli & Siegel, right?
21     A. Yes.
22     Q. That recording was not produced to
23 defendant in this case until December 4, 2013.
24 Does that sound correct?

Page 17

1  different sections. In my section I seek the counsel
2  of many before I make that decision. I typically like
3  a vote because I like to give everyone as many chances
4  as possible. So in my section I seek the counsel of
5  not only my colleagues within but without -- outside of
6  the section, as well as my own faculty. And that's how
7  I make my decision.
8      Q. With regard to the decision to place Maria
9  Artunduaga on probation, was there a vote taken among
10 the faculty?                                  0:21:28
11     A. No.
12     Q. Why not?
13     A. The vote was individual meetings with me and
14 each of the faculty members, but it wasn't an official
15 vote where we get together as a section and say yea or
16 nay.
17     Q. Are the residents in the Section of Plastic
18 Surgery on annual contracts?
19     A. I don't know if it's a contract, per se.
20 It's a letter of understanding, but it's an annual
21 letter of understanding, and I believe it is a
22 contract.
23     Q. Who is involved in the department -- or the
24 Section of the Plastic Surgery in making the decision
25 to renew the letter of understanding or the contract

Page 18

1  for residents?
2      A. It is the ultimate decision of the program
3  director, but in our section it is the standard
4  practice that all the faculty weigh in and a vote is
5  taken.
6      Q. Were you involved in the decision not to
7  renew Ms. Artunduaga -- or Dr. Artunduaga's contract?
8      A. Can you state the question one more time?
9      Q. Sure. Were you involved in the decision not
10 to renew Dr. Artunduaga's contract at UCMC?
11     A. Yes.                                   0:23:30
12     Q. Do you know whether a vote was taken to
13 decide whether or not to renew Dr. Artunduaga's
14 contract at UCMC?
15     A. Yes.
16     Q. Was a vote taken?
17     A. Yes.
18     Q. What were the results of that vote?
19     A. It was a unanimous vote to not renew her
20 contract.
21     Q. Approximately when did that take place?
22     A. Sometime in March of 2011.
23     Q. Can you name the individuals that voted not
24 to renew Dr. Artunduaga's contract in approximately
25 March of -- what was it, 2012?

Page 19

1      A. 2012, 2012. Dr. Larry Gottlieb, Dr. Raphael
2  Lee, Dr. Russell Reid, Dr. Julie Park, Dr. Larry
3  Zachary, and I believe Dr. Ginard Henry was there as
4  well. So all the faculty members.              0:24:35
5      Q. Have residents in plastic surgery or --    0:24:53
6  strike that.
7      Has any resident in plastic surgery ever been
8  required to repeat a year of residency?
9      A. Not in my tenure. Not since I've been at the
10 University of Chicago.
11     Q. Do you know whether there is a process
12 whereby residents are required to repeat a year of
13 residency?
14     A. I don't know.
15     Q. Okay. You'll have to pardon me but I'd like
16 to get some of the medical titles and lingo out of the
17 way so just that I make sure we're speaking the same
18 language to the greatest extent possible. What is an
19 attending? Can you describe what an attending does.
20     A. An attending is a supervisory -- let me
21 re-ask that question. As it pertains to resident
22 training or patient care?                       0:26:00
23     Q. As it pertains to resident training.
24     A. Resident training. So an attending is a fac
25 -- typically a faculty member that oversees resident

Page 20

1  training across the Departments of Surgery, Medicine,
2  peds, and so forth.
3      Q. What is a chief resident?
4      A. A chief resident is typically someone in
5  their final year of training.                   0:26:27
6      Q. Does a chief resident have any different
7  duties or authority than a regular resident?
8      A. They do. And they have the role of -- some
9  have the role of the administrative chief resident
10 where she or he will make the call schedule and help
11 the program director formulate a rotation schedule.
12     Q. What are fellows?
13     A. Fellows are post-graduate fully trained
14 plastic surgeons. I'm assuming you're asking that
15 about plastic surgery or other --
16     Q. Correct --
17     A. Okay.
18     Q. -- plastic surgery. So --
19     A. Well, we only have one fellow which is a
20 microsurgery fellow so it's someone that has completed
21 plastic surgery, a full plastic surgery training
22 program.
23     Q. Okay. So a fellow has completed his or her
24 residency?                                     0:27:19
25     A. In our section, yes.

### Page 33

```
 1    director in resolving interpersonal disputes between
 2    residents?
 3        A.  That's part of my job.              0:48:12
 4        Q.  As a medical professional are you familiar
 5    with the term confirmation bias?
 6        A.  Not within medicine.
 7        Q.  Are you familiar with the term?
 8        A.  Yes.
 9        Q.  Can you describe what that is?
10        A.  I believe it pertains to puristics described
11    by Daniel Kahneman codified in the book Thinking Fast
12    and Slow and his embodiment of work looking at
13    post-facto data and whether it's true or not, believing
14    that it is true.                            0:49:12
15        Q.  Believing that what is true?
16        A.  A certain fact or a certain set of
17    observations.
18        Q.  Okay.  I'd like to move to the recruitment of
19    Dr. Artunduaga.  When did you first hear about Dr.
20    Artunduaga?
21        A.  During the application process through her
22    application.
23        Q.  Approximately when was that?
24        A.  Fall of 2010 I believe.
25        Q.  So is it fair to say that residents are
```

### Page 34

```
 1    typically recruited about almost a year in advance of
 2    their residency?
 3        A.  Yes.
 4        Q.  Were you personally involved in recruiting
 5    Dr. Artunduaga?
 6        A.  Yes.                                0:50:13
 7        Q.  At the time that you recruited Dr.
 8    Artunduaga, were you aware that she had been working in
 9    a non-clinical environment for a number of years?
10        A.  Yes.
11        Q.  Did you have any concerns about transitioning
12    her into a clinical setting?
13        A.  No.
14        Q.  Why not?                            0:50:38
15        A.  Because of the glowing letters that she
16    received and because of the mentoring that she received
17    in the Harvard programs.
18        Q.  Do you recall discussing the transition into
19    a clinical setting with her at the time she was
20    applying for her residency?
21        A.  I do not recall.
22        Q.  Do you recall whether she had any concerns
23    during the application process about moving into a
24    clinical setting?
25        A.  I do not recall.
```

### Page 35

```
 1        Q.  Do you agree that the plastic surgery
 2    residency at the University of Chicago is highly
 3    competitive?
 4        A.  Yes.                                0:51:23
 5        Q.  Why did you rank Dr. Artunduaga as highly as
 6    you did relative to the other applicants?
 7        A.  I think her curriculum vitae showed promise.
 8    Her achievements showed promise.  The fact that she
 9    would add to our diversity pool was also beneficial.
10        Q.  And she started her residency on or about
11    June 20th, 2011?
12        A.  Yes.                                0:52:01
13        Q.  As the program director and as somebody who
14    worked in the department and recruited her, did you
15    have the opportunity to observe her language skills?
16        A.  Yes.
17        Q.  How would you describe her language skills in
18    English?
19        A.  Perfect.  Slight accent, but no more than
20    anyone else within our section.
21        Q.  So you agree that she didn't have any
22    problems speaking English?
23        A.  Correct.
24        Q.  Did you have the opportunity to observe Dr.
25    Artunduaga's work in the month that she started, June
```

### Page 36

```
 1    2011?
 2        A.  Could you clarify as to what you mean by
 3    observe?
 4        Q.  Sure.  Did you have the opportunity to
 5    physically observe, personally observe her in a
 6    clinical setting, let's say, within the first 30 days
 7    that she became a resident?              0:53:07
 8        A.  I believe so.  I think she was on a service
 9    that interacted with us, so yes.
10        Q.  What were your initial impressions of Dr.
11    Artunduaga on the occasions that you had an opportunity
12    to observe her?
13        A.  I don't recall.
14            MR. CAFFARELLI:  Let's take -- we've been at
15    it for about an hour.  Let's just take five minutes and
16    grab a drink of water or the restroom.
17            THE RECORDER:  Going off the record, 11:07
18    a.m.
19            (Off the record)
20            THE RECORDER:  Going back on the record,
21    11:26 a.m.
22            MR. CAFFARELLI:  Okay.  Let's mark the next
23    exhibit Exhibit 2.  Exhibit 2 consists of three pages
24    stamped UCMC 15518 through 15520.
25        Q.  Dr. Song, I've just handed you what's been
```

Page 37

1  marked as Exhibit 2 which purports to be an email trail
2  between you and Dr. Jaskowiak starting on page 15520     0:55:00
3  and in reverse chronological order ending at 15518. Do
4  you recognize this document?
5      A. I do.
6      Q. Now, moving from the first email, which is
7  the -- it will be the last one in this exhibit on page
8  15519, at the bottom of the page you'll see an August
9  4, 2011, email from Dr. Jaskowiak to you at 10:40 a.m.
10 stating that "There are definitely issues with Maria
11 Artunduaga that need to be addressed and likely the
12 sooner the better."
13     Do you see that?
14     A. I do.                                         0:55:36
15     Q. Dr. Song, is that the first time that you
16 became aware of any issues or concerns with Dr.
17 Artunduaga?
18     A. I believe so.
19     Q. Now, moving up the trail to the first page of
20 Exhibit 2, the page stamped UCMC 15518, Dr. Jaskowiak
21 identifies some issues numera -- she numbered them 1,
22 2, and 3. Do you see that?
23     A. I do.
24     Q. And then up at the top you indicate on
25 Thursday, August 4th, in your response to Dr. Jaskowiak

Page 38

1  that what she said was helpful and that you would
2  address it when you get back. Do you see that?
3      A. I do.
4      Q. Do you recall addressing her issues with Dr.
5  Artunduaga when you got back from Seoul?
6      A. Yeah. I don't know it was right aft --
7  thereafter, but I do recall discussing this with Dr.
8  Artunduaga, discussing with Dr. Jaskowiak, and
9  discussing it with one of my chief residents.
10     Q. When do you first recall discussing the
11 issues raised by Dr. Jaskowiak with Dr. Artunduaga?
12     A. Sometime -- I believe sometime in August. I
13 don't recall the exact date.                          0:57:11
14     Q. Was it a one-on-one meeting or in some other
15 context, or through email?
16     A. We never had one-on-one meetings. It was
17 always one on -- with me and a program coordinator. So
18 I believe it was during one of those sessions.
19     Q. Okay. So the first meeting that you recall
20 with Dr. Artunduaga to address concerns about her was
21 with you and the program coordinator and Dr.
22 Artunduaga?
23     A. I believe so.
24     Q. And that took place sometime in August of
25 2011?

Page 39

1      A. Thereabout.
2      Q. Okay. What do you recall being said at that
3  meeting?
4      A. You know, if I recall, it's more of getting
5  her side of the story, how's it going, what's going on.
6  Really sort of -- you know, a lot of interns have
7  transition issues, and I just wanted to make sure that
8  there's nothing I could do to improve that process.
9      Q. Okay. What do you recall being the outcome
10 of that initial meeting?
11     A. That she'll try harder. And it was -- I
12 believe it was a very brief meeting, just sort of going
13 over some of these issues.
14     Q. Did you specifically in that initial meeting
15 with Dr. Artunduaga raise the concerns identified by
16 Dr. Jaskowiak in Exhibit 2?
17     A. I believe so.                                 0:58:38
18     Q. Do you recall what, if any, her response was
19 to the cultural concerns that were raised?
20     A. I don't think this was -- I mean this may be
21 taken out of context. Cultural doesn't necessarily
22 mean cultural of, you know, where you're from, but
23 there's a surgical culture. And I believe that was
24 what we were talking about, a culture of surgery.
25     Q. Okay. Describe the surgical culture.

Page 40

1      A. There's a hierarchical system. There's a
2  reporting structure. There's a need to prioritize and
3  communicate effectively, concisely. There's a culture
4  of owning your responsibilities, being contrite for
5  your mistakes and moving forward and learning from
6  them. This is what we describe as surgical culture.
7      Q. Okay. Now, in Exhibit 2 up at the top you
8  state that you're, of course, beside yourself and
9  helpless here in Seoul. Why were you beside yourself?
10     A. So this is related to a patient issue, if you
11 look at the postscript.
12     Q. Yes.
13     A. I'm beside myself about a patient here. And
14 this probably shouldn't be in here. This is PHI.
15     MR. CLEVELAND: Yes. And for the record, the
16 patient's name should have been redacted as part of the
17 production process. This was obviously missed so.
18     MR. CAFFARELLI: Okay.
19     MR. CLEVELAND: We're going to need to amend
20 this document --
21     MR. CAFFARELLI: Sure. We'll go ahead --
22     MR. CLEVELAND: -- to delete the patient
23 name.
24     MR. CAFFARELLI: -- and redact the patient
25 name.

## Page 56

1  Jaskowiak perceived this or --
2  Q. Yes.
3  A. No.
4  Q. Were Drs. Angelos, Chhablani, and Kaplan
5  supervising Dr. Artunduaga during the July/August 2011
6  time period?
7  A. They were on the rotation, yes.
8  Q. Did you have an opportunity to speak with
9  those three doctors about Dr. Jaskowiak's concerns?
10 A. No.                                    0:04:01
11 Q. Why not?
12 A. Because it's her concern. It's private.
13 Q. Do you recall receiving a report from Dr.
14 Park evaluating Dr. Artunduaga's probation performance?
15 A. Yes.
16 Q. Were you involved at all in the creation of
17 this report?
18 A. No.
19    MR. CAFFARELLI: Let's mark the next exhibit
20 Exhibit Number 7.
21 Q. I'm handing you what's been marked as Exhibit
22 Number 7. Please take a look at that exhibit which is
23 stamped UCMC 19629 and let me know when you've had a    0:04:35
24 chance to do so.
25 A. Okay.

## Page 57

1  Q. Who made the decision to include counsel in
2  this meeting with -- in the meeting described in this
3  exhibit?
4  A. I think it's a joint decision. Any time we
5  discuss matters of this type counsel is often sought.
6  Q. And what do you mean by this type?
7  A. Issues regarding resident performance.
8  Q. Do you recall meeting with counsel to discuss
9  the performance of any other resident besides Dr.
10 Artunduaga?
11 A. Yes.                                    0:06:12
12    MR. CAFFARELLI: Let's mark the next exhibit
13 Exhibit 8 which is stamped UCMC 21417.
14 Q. I'm going to hand you what's been marked as
15 Exhibit 8. Please take a look at this document and let
16 me know when you've had a chance to do so.
17 A. Can I just make one comment?
18 Q. Of course.
19 A. This was done in the last session, but when
20 our court reporter announced that this was a case of
21 Maria Artunduaga versus the University of Chicago and
22 David Song, it's just the University of Chicago.
23 Q. Correct.
24 A. I don't know if that's already assumed but --
25 Q. It's in the caption.

## Page 58

1  A. Okay.
2  Q. Okay. Now, you were included in this email
3  trail which is part of Exhibit 8. However, there's a
4  reference to gossip. Do you see that?
5  A. I do.                                    0:07:57
6  Q. Were you aware of any specific gossip
7  regarding Dr. Artunduaga at UCMC at or around September
8  of 2011?
9  A. Only that her performance was terrible.
10 Q. Anything else?
11 A. No.
12 Q. Do you know where this gossip originated?
13 A. No.
14    THE RECORDER: Will you repeat your answer?
15    THE WITNESS: No.
16    THE RECORDER: Thank you.
17 Q. When did you first hear about this gossip
18 taking place?                                  0:08:51
19 A. Around this time of the email, early
20 September.
21 Q. Who do you recall first telling you that
22 there was gossip regarding Dr. Artunduaga's
23 performance?
24 A. I don't recall specifically, but this was
25 word I've heard from several attendings, several

## Page 59

1  supervisors, several residents including our own.
2  Q. Do you recall meeting with Dr. Artunduaga on
3  or about September 29 of 2011?                  0:09:42
4  A. I don't recall specifically that date, but
5  there were several meetings and I'm sure that they're
6  in the records.
7  Q. Do you recall a meeting on or about September
8  of 2011 where you indicated to her that you had
9  received numerous unsolicited complaints from faculty
10 members and faculty staff?
11 A. I do.
12 Q. What else do you recall about that meeting?
13 A. Just it was a meeting with -- I believe that
14 meeting was with myself and Akilah, our program
15 coordinator, sharing these concerns with Maria, hoping
16 to coach her and remedy some of these issues.
17 Q. Do you recall discussing her accent in that
18 meeting?
19 A. No.                                    0:10:36
20 Q. Do you recall any of these complaints being
21 in writing?
22 A. I think you have them in your exhibits, yeah.
23 Q. Did you share any written complaints with Dr.
24 Artunduaga when you met with her in September of 2011?
25 A. I don't recall specifically, but typically I

Page 60

1  do share a portfolio of information.
2      Q.  Do you recall sharing any complaints with Dr.
3  Artunduaga regarding the fact that she had conducted
4  her training outside of the U.S.?
5      A.  No.                              0:11:17
6      Q.  What's the first time you recall meeting with
7  Dr. Artunduaga from the time she started her residency?
8      A.  I believe it was sometime in August,
9  September-ish.
10     Q.  What do you recall being discussed at that
11 first meeting?
12     A.  Discussing her performance on Dr. Jaskowiak's
13 service.
14     Q.  What was discussed regarding her performance?
15     A.  Issues related to her presentation skills,
16 being frazzled, not being able to prioritize, and not
17 being a very good listener, and not taking criticism
18 well.
19     Q.  Do you recall anything else?
20     A.  No.                              0:12:08
21     Q.  Was there anybody present in the first
22 meeting that you had with Dr. Artunduaga?
23     A.  Yes.
24     Q.  Who else was present?
25     A.  Akilah.

Page 61

1      Q.  Do you recall Akilah saying anything at that
2  meeting?
3      A.  No.                              0:12:33
4      Q.  Do you recall telling Dr. Artunduaga, going
5  back to the meeting that took place in September of
6  2011, that if she didn't have flawless performance in
7  October she would have no future in the program?
8      A.  I never said that.
9      Q.  Did you share any type of benchmarks or goals
10 that Dr. Artunduaga was expected to meet in your
11 September 2011 meeting with her?
12     A.  I wanted her to remedy the situations that
13 were brought up regarding prioritization, patient care,
14 understanding urgencies and urgent patient care issues,
15 being able to present patient issues in a cogent,
16 succinct fashion, and generally becoming a better
17 intern related to all the issues.
18     Q.  Other than what you've described were there
19 any specific benchmarks that she was required to meet?
20     A.  I think those are benchmarks.
21     Q.  How would the benchmarks that you just
22 described be evaluated?
23     A.  Through formal and informal evaluations from
24 attendings and senior residents. And direct
25 observation from our service as well.    0:14:12

Page 62

1          MR. CAFFARELLI: Why don't we note for the
2  record that we have another individual in the room.
3  Just go ahead and state your appearance.
4          MS. DUPREY: I'm Anne Duprey, associate
5  general counsel for the Medical Center.
6          MR. CAFFARELLI: Thank you.
7          Okay. Let's mark the next exhibit. It will
8  be Exhibit Number 9 consisting of one page stamped UCMC
9  16355.
10     Q.  Dr. Song, I'm handing you what's been marked
11 as Exhibit 9. Please take a chance to review it and
12 let me know whether you recognize this document once
13 you've had a chance to do so.           0:15:08
14     A.  I do recognize this.
15     Q.  What is this?
16     A.  It's another evaluation speaking to a lack of
17 aptitude and performance of Dr. Artunduaga.
18     Q.  And that's by Dr. Umanskiy?
19     A.  Correct.
20     Q.  Did you have an opportunity to speak with Dr.
21 Umanskiy regarding Dr. Artunduaga prior to September
22 28, 2011?
23     A.  Yes.
24     Q.  What do you recall discussing with --
25     A.  I met him in --

Page 63

1      Q.  -- Dr. Uman --
2      A.  I met him in the hallway and he -- it's
3  typical that we have niceties and exchanges and small
4  talk. But what was atypical on that day was he pulled
5  me aside and said that we have some serious concerns
6  about the performance of your resident Dr. Artunduaga,
7  and I couldn't -- I had to go back to clinic and I
8  didn't have a chance to really sit and talk with him.
9  I said, please, if you wouldn't mind either emailing me
10 or setting up a meeting to make me aware of these
11 issues, and he agreed, and thus the email.
12     Q.  Okay. And how long before you received this
13 email on September 28th do you recall having that
14 discussion with Dr. Umanskiy?              0:16:32
15     A.  I think it was just the day before.
16         MR. CAFFARELLI: And let's mark the next
17 exhibit Exhibit 10, which consists of pages stamped
18 UCMC 21833 through UCMC 21836.
19     Q.  Dr. Song, I'm handing you what's been marked
20 as Exhibit 10. Ask you to take a look at that exhibit
21 and let me know if you recognize the document.
22     A.  I do recall this, yes.
23     Q.  Okay. All right. Now, the first page about
24 halfway down, do you see where you say that -- in an
25 email dated September 26th, 2011, that, quote, we look

Page 68

1  A. I do.  0:27:04
2  Q. What did you base that statement on?
3  A. On the numerous evaluators across the
4  department and within our section, both formal and
5  informal, and on direct observation that I had with
6  Maria during the month of October.  0:27:20
7  Q. Had you reviewed all of the evaluations prior
8  to drafting this memo?
9  A. I did.
10  Q. Did you also make your own assessment based
11  on your personal observations?
12  A. I did.
13  Q. Now, on the second paragraph of Exhibit
14  Number 11, the second line, you refer to another intern
15  who, quote, was not -- quote, admittedly was not the
16  strongest intern, end quote. Do you see that?
17  A. I do.  0:28:06
18  Q. Who were you referring to there?
19  A. I don't recall his name, but there was a
20  co-intern that month.
21  Q. If I mention the name Jonathan Lusardi, does
22  that refresh your recollection?
23  A. I believe so.
24  Q. Was it Dr. Lusardi that you're referring to
25  in Exhibit 11?

Page 69

1  A. I believe so.
2  Q. Were there any steps taken to determine how
3  much Dr. Lusardi contributed to the problems that Maria
4  was alleged to have been having?
5  A. Yes.  0:28:40
6  Q. What did that -- what did those steps consist
7  of?
8  A. Specific assignments and delineation of
9  responsibilities.
10  Q. Who reviewed those?
11  A. The chief residents.
12  Q. How did the chief residents communicate the
13  results of their review with you?
14  A. Verbally.
15  Q. Was there any action taken with regard to Dr.
16  Lusardi's performance?
17  A. Yes.  0:29:27
18  Q. What was that?
19  A. The chief residents discussed with him that
20  he would have to improve on certain specific rounding
21  issues. This was also -- I believe this was also
22  discussed with his program director. He's not a
23  plastic surgery resident.
24  Q. Okay.
25  MR. CAFFARELLI: Let's mark Exhibit 13.

Page 70

1  Dr. Song, I'm handing you what's been marked as
2  Exhibit 13. It consists of two pages stamped UCMC
3  16322 and UCMC 16323. If you could please take a look
4  at Exhibit 13 and once you've had a chance to do so let
5  me know whether you recognize this document.  0:30:31
6  A. I do.
7  Q. And what is it?
8  A. It's a letter informing Dr. Artunduaga that
9  effective November 15th, 2011, she's being placed on
10  probation.
11  Q. When was the decision made to place Dr.
12  Artunduaga on probation?
13  A. Sometime before that. A week or so before
14  that. I don't recall exactly the date.
15  Q. Referencing Exhibit 11, the summary of your
16  meeting with Dr. Artunduaga, had the decision to place
17  Dr. Artunduaga on probation been made by that date,
18  Wednesday, November 2nd --
19  A. I think it --
20  Q. -- 2011?
21  A. I believe it was right after that.
22  Q. Who made the decision to place Dr. Artunduaga
23  on probation?
24  A. I did, along with feedback from all the
25  faculty members, and evaluations, the evaluators across

Page 71

1  the department and our section.
2  Q. What happened after November 2nd, 2011, and
3  November 15th, 2011, to cause you to place Dr.
4  Artunduaga on probation?
5  A. I don't think there was one specific
6  incident. I think that the overwhelming body of
7  evidence and evaluations gave me pause to consider Dr.
8  Artunduaga's performance, and after considering it,
9  along with feedback from multiple evaluators, that was
10  the decision that I make -- that I made.  0:33:09
11  Q. Did you have all of the evaluations and
12  information that you just described prior to November
13  2nd, 2011?
14  A. I don't know about all, but clearly most.
15  Q. Can you recall anything specific that you
16  received after November 2nd, 2011, that caused you to
17  place Dr. Artunduaga on probation?
18  A. No, I can't. I don't recall.
19  MR. CAFFARELLI: Let's mark the next Exhibit
20  14.
21  Q. Dr. Song, I'm handing you what's been marked
22  as Exhibit Number 14. Consists of one page stamped
23  UCMC 4459. Let me know once you've had a chance to
24  review this document whether you recognize it.  0:34:27
25  A. I do recognize it.

Page 76

1  A. Well, we reviewed all the facts, we reviewed
2  all the feedback, both form, informal. We discussed
3  all the issues related to her ineptitude and her
4  several patient safety issues that came up. We
5  reviewed an exhaustive diary of Dr. Park meeting with
6  and mentoring with Dr. Artunduaga. We reviewed
7  virtually everything we had at that time.
8  Q. Do you recall anybody objecting to removing
9  Dr. Artunduaga from her clinical duties at that
10 meeting?
11 A. No.                                    0:42:31
12 Q. How was the decision made to remove Dr.
13 Artunduaga from her clinical duties?
14 A. I asked for feedback. I wanted to take a
15 vote. It was unanimous. And I made the decision to
16 remove her from clinical duty.
17    MR. CAFFARELLI: Let's mark Exhibit Number
18 17.
19    Dr. Song, I'm handing you a one-page exhibit
20 marked -- actually Exhibit 17 is a one-page document
21 marked UCMC 19633. It's this one page, mostly a    0:42:33
22 redacted exhibit with the exception of the header at
23 the top. Do you recognize that header?
24 A. Not particularly.
25 Q. Do you recall sending Ms. McAtee a draft of a

Page 77

1  termination letter on or about Thursday, March 8, 2012?
2  A. Yes.                                   0:44:02
3  Q. Had the decision already been made to
4  terminate Dr. Artunduaga's contract or not renew Dr.
5  Artunduaga's contract as of that date?
6  A. No.
7  Q. Why did you send a draft termination letter
8  to Ms. McAtee on or about March 8, 2012?
9  A. I don't recall. But I'm typically one to be
10 very well prepared in all scenarios.        0:44:39
11 Q. So are you saying that as of March 8, 2012,
12 you had not yet made the decision to terminate Dr.
13 Artunduaga?
14 A. Correct. I was considering it highly, but I
15 had not made the decision because I had not received
16 the feedback from the faculty and the other evaluators
17 that were outstanding.
18 Q. Okay.
19    MR. CAFFARELLI: Actually, I gave you my
20 sticker. 17. Let's mark the next Exhibit 18 which is
21 a one-page document stamped UCMC 887.
22 Q. Dr. Song, I'm handing you a copy of what has
23 been marked as Exhibit 18. Once you've had a chance to
24 review this document let me know if you recognize it.
25 A. I do recognize this.

Page 78

1  Q. What is it?                            0:46:07
2  A. It's a letter by the medical director of
3  Pediatrics recounting the unprofessional and rude
4  interaction she had with Dr. Artunduaga.
5  Q. Now, in Exhibit 18, Dr. -- is it Tothy or
6  Tothy?
7  A. Tothy.
8  Q. Tothy. Dr. Tothy uses the term "paper
9  trail." Had you requested that Dr. Tothy create a
10 paper trail of Dr. Artunduaga's performance issues?
11 A. I request this of every feedback that we get,
12 both positive and negative. So you'll see this very
13 frequently, please put this in so-and-so's file.
14 Q. Did you solicit evaluations of Dr. Artunduaga
15 after removing her from her clinical duties?
16 A. Could you clarify that? What do you mean by
17 solicit? Because everyone's required to submit
18 evaluations.
19 Q. Other than the required evaluations, did you
20 solicit any additional evaluations of Dr. Artunduaga
21 after removing her from her clinical duties?
22 A. No.                                    0:47:35
23 Q. Does anyone have the ability to modify
24 evaluations once they are submitted?
25 A. No.

Page 79

1     MR. CAFFARELLI: Let's mark Exhibit 19.
2  Q. I'm handing you what's been marked as Exhibit
3  19 which is one page stamped UCMC 11609. In this
4  exhibit Akilah Williams references the ability to add
5  to Dr. Grant's last evaluation of Dr. Artunduaga. Do
6  you see that?
7  A. I do.
8  Q. How is it that Akilah Williams can add to Dr.
9  Grant's evaluation?
10 A. This is in addition to. It's not modifying
11 something that's was already written. Any information
12 that comes through, whether it's Maria or anybody else,
13 if it's additive to their performance this is added to
14 their file.
15    MR. CAFFARELLI: Let's mark the next exhibit.
16 Q. Dr. Song, I'm handing you what's been marked
17 as Exhibit 20 which consists of a one page stamped UCMC
18 12001. I'd like to ask you to review that document and
19 let me know if you recognize it.           0:49:23
20 A. I do recognize it.
21 Q. What is Exhibit 20?
22 A. It's a letter responding to Dr. Artunduaga's
23 letter dated March 28th, where she requests a
24 reconsideration of our decision and my decision not to
25 renew her contract.

| | |
|---|---|
| From: | Song, David [BSD] - SUR |
| Sent: | Thursday, August 04, 2011 11:16 AM |
| To: | Jaskowiak, Nora [BSD] - SUR |
| Subject: | Re: Resident Issue |

this is very helpful

i'll address asap when i get back

p.s. did Julie tell you about Ginny Zagaja? i had her on the schedule for an exchange next tuesday and i get on the plane. as soon as i get off and turn on my phone, there's a vm from greg saying her expander was exposed. this is very strange as i just saw her on monday the very day before i leave. so a breast that wasn't perfect, but clearly no impending exposure goes to full thickness necrosis (almost like a pressure sore) in 24 -36 hours

i'm of course besides myself and helpless here in Seoul

let me know your thoughts

**David H. Song, MD, MBA, FACS**
**Professor and Chief**
**Section of Plastic Surgery**
**Vice-Chair, Department of Surgery**
**University of Chicago Medical Center**
5841 S. Maryland Ave, M/C 6035
Chicago, IL 60637
songd@uchicago.edu
773 702-6302
773 702-1634 fax
twitter.com/dhsong

On Aug 4, 2011, at 11:08 AM, Jaskowiak, Nora [BSD] - SUR wrote:

Several issues-

1) Something cultural - like she just does not fully understand what is meant when certain things are asked of her or she is asked to do something. Not language, but something is just understanding how things are done in the US medical system.

2) A sor tof nervousness that makes her seem very jumpy - when you tell her or ask her to do thigs, she immediately dives into it, even before you finish. This is true in the OR and clinic and floor. John Seal says she does not stand still on rounds - that she is constantly trying to pounce on the next hing.

3) OR technical - same issue - she starts to listen but then dives in in a nuervous, pouncing sort of fashion. No grace or beauty in her OR technique and seems difficult to teach because you are not sure she is really absorbing.

She is very smart and very sweet. She takes her job very seriously - example -she is the only resident to reply to my request for input on the students the same day I sent the email.

1



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER    UCMC00015518

Then she goes and sees a patient in clinic with a problem and doesn't leave a note or talk to me about it...

So, inconsistent.

Hoep this helps. John Seal is our chief right now, so could have some helpful insights also. He and I were almost wondering if, in a calm way, she could be given a littel "American Surgery Boot Camp" to help her adapt. But I don't want to make her more nervous.

NJ

---

**From:** Song, David [BSD] - SUR
**Sent:** Thursday, August 04, 2011 11:00 AM
**To:** Jaskowiak, Nora [BSD] - SUR
**Subject:** Re: Resident Issue

can u givr me a brief synopsis

David H. Song, MD, MBA, FACS
Professor and Chief
Section of Plastic Surgery
Vice-Chair, Department of Surgery
University of Chicago Medical Center
5841 S. Maryland Ave, M/C 6035
Chicago, IL 60637
songd@uchicago.edu
773 702-6302
773 702-1634 fax
twitter.com/dhsong

On Aug 4, 2011, at 10:40 AM, Jaskowiak, Nora [BSD] - SUR wrote:


David-

I know you are away and this is nothing major, but there are definitely issues with Maria Artunduaga that need to be addressed and likely the sooner, the better.

I wonder if, when you return, we can discuss these issues and figure out a plan to help direct her better, as we are all dedicatd to her success here.

Thanks and hope Korea is fun and safe.

NJ


Nora Jaskowiak, M.D., FACS
Associate Professor of Surgery
Surgical Director, Breast Center
Director, Third Year Student Clerkship
Associate Program Director, General Surgery Residency

2

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER         UCMC00015519

University of Chicago Medical Center
Phone: (773) 702-2048
Fax: (773) 834-4022
email: njaskowi@surgery.bsd.uchicago.edu

3

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER         UCMC00015520

**From:** Dickie, Sara [UCH]
**Sent:** Friday, September 09, 2011 11:53 AM
**To:** Lee, Justine [UCH]
**Subject:** RE: Intern Issue

yeah,
i think we need to be wary of the gossip we hear. everything is inflated now.
i think it will help greatly to get her on our service.

-sd


-----Original Message-----
From: Lee, Justine [UCH]
Sent: Fri 9/9/2011 10:50 AM
To: Dickie, Sara [UCH]
Subject: RE: Intern Issue

thanks for checking in with the BB. this certainly doesn't sound as bad as i had heard from trang yesterday. i'm sure they would be happy to give her up next month.


-----Original Message-----
From: Dickie, Sara [UCH]
Sent: Thu 9/8/2011 8:39 PM
To: Song, David [BSD] - SUR
Cc: Lee, Justine [UCH]
Subject: Intern Issue

Hey Dave,
So I spoke with Brian Bello regarding Maria's performance on the service and regarding some of the gossip I had heard. And the gossip was just gossip. yay.

Brian says she's doing ok with a few exceptions. (Brian is very positive and supportive in general). here are some specifics

1.. She has been coming to the OR frequently to run the list to enhance communication.

2. She is often frazzled when she presents patient issues and Brian has to work with her to keep the presentations organized. She presented a consult the other day of a patient in the ED with a stoma. Hurst asked why she had a stoma and Maria didn't know. Brian was able to find the information in the last discharge summery. He was disappointed that she didn't recognize the importance of the question and do the proper history taking before presenting the patient.

3. Regarding the pain service issue. This was GOSSIP. Maria did nothing wrong, in fact she was hesitant to follow their orders because the patient was not tolerating a diet and they wanted to stop the PCA and start orals. She was right to wait. The pain service was being difficult and Hurst was angry with them. Maria did a good job prioritizing the patient needs.

1

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER    UCMC00021417