# TAB 21



**E-Notice**

2014-L-008678

CALENDAR: Y

To:  Jamie Suzanne Franklin
     jsf@thefranklinlawfirm.com

# NOTICE OF ELECTRONIC FILING

### IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

**MARIA  ARTUNDUAGA vs. UCMC**
**2014-L-008678**

The transmission was received on 01/16/2015 at 2:48 PM and was ACCEPTED with
the Clerk of the Circuit Court of Cook County on 01/16/2015 at 3:16 PM.

**AMENDED COMPLAINT (Verified First Amended Complaint)**

Filer's Email:     jsf@thefranklinlawfirm.com
Filer's Fax:       (312) 662-1015
Notice Date:       1/16/2015 3:16:45 PM
Total Pages:       103

**DOROTHY BROWN**
**CLERK OF THE CIRCUIT COURT**
COOK COUNTY
RICHARD J. DALEY CENTER, ROOM 1001
CHICAGO, IL 60602

(312) 603-5031
courtclerk@cookcountycourt.com

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
CALENDAR: Y
PAGE 1 of 103
CIRCUIT COURT OF
COOK COUNTY, ILLINOIS
LAW DIVISION
CLERK DOROTHY BROWN

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| DR. MARIA ARTUNDUAGA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2014-L-008678 |
| | ) | |
| THE UNIVERSITY OF CHICAGO | ) | Jury Trial Demanded |
| MEDICAL CENTER and | ) | |
| DR. DAVID SONG, | ) | |
| | ) | |
| Defendants. | ) | |

## VERIFIED FIRST AMENDED COMPLAINT

The plaintiff, Dr. Maria Artunduaga, by and through her attorney, Jamie S. Franklin of the Franklin Law Firm LLC, brings the following Verified First Amended Complaint against defendants the University of Chicago Medical Center ("UCMC") and Dr. David Song and states as follows:

### Nature of Action

1.     This is an action for damages against UCMC and Dr. David Song for breach of contract and against Dr. David Song for tortious interference with prospective business relationships.

### Parties

2.     The plaintiff, Dr. Maria Artunduaga, was at the time she filed this lawsuit a resident of Cook County, IL. She is a medical doctor certified by the Educational Commission for Foreign Medical Graduates and the Federation of States Medical Boards.

3.      Defendant the University of Chicago Medical Center is an Illinois corporation engaged in the health care industry. Its principal place of business is in Cook County, IL at 5841 S. Maryland Ave., Chicago, IL 60637.

4.      Defendant Dr. David Song is a resident of Cook County, IL. He is a medical doctor who is licensed to practice medicine in Illinois. Dr. Song is a Professor of Surgery at UCMC and is an employee and agent of UCMC.

**Jurisdiction and Venue**

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 2 of 103

5.      The state of Illinois has jurisdiction over this matter pursuant to 735 ILCS 5/2-209(a)(2) because the acts that gave rise to this matter took place in Illinois.

6.      Venue in the Circuit Court of Cook County is proper pursuant to 735 ILCS 5/2-101(1) because all defendants reside in and/or do business in Cook County. Venue is also proper pursuant to 735 ILCS 5/2-101(2) because the acts that gave rise to this matter occurred in Cook County.

7.      An actual case or controversy has arisen between the parties.

8.      Dr. Artunduaga has been injured by the defendants' conduct and has suffered damages as a results.

**Facts Giving Rise to this Action**

9.      Dr. Artunduaga was born and raised in Neiva, Colombia.

10.     She graduated from one of the top medical schools in Colombia, Pontificia Universidad Javeriana, in 2003, placing in the top 10 of her class.

2

11.     Dr. Artunduaga completed her medical training in the United States, with clinical rotations at Harvard Medical School, Mt. Sinai School of Medicine, and Baylor College of Medicine in 2003 and 2004.

12.     Dr. Artunduaga practiced medicine in Colombia from 2004 to 2007.

13.     In July 2007, Dr. Artunduaga started a post-doctoral research fellowship in human genetics at Harvard Medical School, where she worked until 2011. She also completed a surgical sub-internship at the University of Washington in 2010.

14.     Dr. Artunduaga published her research in top peer-reviewed scientific journals and books, and she was invited to speak nationally and internationally about her research.

15.     Dr. Artunduaga decided that she wanted to obtain training in plastic and reconstructive surgery in the U.S. after she completed her Harvard post-doctoral fellowship.

16.     Residency programs at accredited United States medical schools are administered by the Accreditation Council for Graduate Medical Education ("ACGME").

17.     The National Resident Matching Program ("NRMP") and the ACGME administer a process that matches applicants for residencies to U.S. residency programs ("the match").

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 3 of 103

3

18.     Through the match, Dr. Artunduaga applied to U.S. residency programs in the fall of 2010. She was heavily recruited by 18 surgical training programs.

19.     Dr. Artunduaga received the results of her "match" from ACGME in March 2011. She was matched with one of her top choices: UCMC's Residency Program in General Surgery – Plastic Surgery Track.

20.     UCMC's Residency Program in General Surgery – Plastic Surgery Track was and is accredited by ACGME.

21.     UCMC admits just two General Surgery – Plastic Surgery Track residents each year.

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 4 of 103

22.     Dr. Mitchell Posner was UCMC's Program Director for the General Surgery Residency Training Program at the time Dr. Artunduaga matched with UCMC.

23.     Defendant Dr. David Song was and is the Chief of the Section of Plastic and Reconstructive Surgery and was the Director of its Residency Training Program at the time Dr. Artunduaga matched with UCMC.

24.     At the time Dr. Artunduaga matched, UCMC's General Surgery – Plastic Surgery Track residency program was a "combined" program, meaning that residents spent the first three years of their six-year residency in General Surgery rotations under the direction of the Program Director for General Surgery (then, Dr. Posner) and the last three years in Plastic and Reconstructive Surgery rotations

4

under the direction of the Program Director for Plastic and Reconstructive Surgery (then, Dr. Song).

25.     "Combined" programs are also referred to as "coordinated" programs by the ACGME. The terms are interchangeable.

26.     Other institutions offer "integrated" programs for plastic surgery, in which residents spend most of their six years in plastic surgery rotations under the supervision of the Plastic Surgery Program Director, rather than spending the first half under the auspices of General Surgery as in UCMC's program at the time that Dr. Artunduaga was admitted.

27.     As such, Dr. Artunduaga was matched with UCMC as a resident in a combined program that included three years in General Surgery rotations, followed by three years in Plastic Surgery rotations.

28.     On or about March 22, 2011, Dr. Artunduaga and UCMC entered into a written Residency Contract, attached as Exhibit A ("the Residency Contract").

29.     Dr. Artunduaga has in her possession a signed copy of the Residency Contract that was produced in other litigation and was designated as "confidential" by UCMC, so it cannot be appended to this Verified Complaint at this time, but it will be produced in discovery in this case.

30.     The signature page bears the signature of Dr. Mitchell Posner in the line designated "Program Director."

31.     Both parties were competent to enter the Residency Contract.

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 5 of 103

32.     The Residency Contract provided that Dr. Artunduaga would enter the General Surgery – Plastic Surgery Track as a first-year Resident in the Department of Surgery. Exhibit A, p. 2, Preamble.

33.     The term of the Residency Contract was for one year, running from June 20, 2011 to June 30, 2012. Exhibit A, p. 2, ¶ 1.

34.     The Residency Contract was renewable every year for the duration of the six-year residency training program. Exhibit A, p. 8, ¶ 13.

35.     The Residency Contract obliged UCMC to provide Dr. Artunduaga with certain benefits.

36.     The Residency Contract also obliged the parties to abide by the ACGME standards and policies for the accredited program at issue, the ACGME Program Requirements for Graduate Medical Education in Plastic Surgery ("ACGME Requirements"), attached as Exhibit B, and UCMC's Graduate Medical Education Policy Standards ("GME Policy"), attached as Exhibit C. Exhibit A, p. 4, ¶ 6.

37.     The ACGME Requirements and the GME Policy are akin to employee handbooks – they are promises by the employer, here UCMC, to abide by a set of rules that benefit the employee (here, Dr. Artunduaga).

38.     In addition, the GME Policy, which contains certain promises to Dr. Artunduaga, was disseminated to Dr. Artunduaga in the manner of an offer, which she accepted in commencing her residency and performing work for UCMC.

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 6 of 103

6

39.     The Residency Contract has incorporated by reference the ACGME Requirements and the GME Policy into its terms.

40.     For example, the Residency Contract incorporated the ACGME Requirements by obliging the resident to "abide by ... the guidelines established by applicable regulatory or accrediting agencies, including without limitation, the ACGME." Exhibit A, p. 4, ¶ 6(d).

41.     Similarly, the Residency Contract incorporated the GME Policy by binding the resident to "comply with all ACGME and UCMC GME policies and requirements applicable to the training program and working environment." Exhibit A, p. 4, ¶ 6.

42.     The ACGME Requirements, incorporated into the Residency Contract, mandate, *inter alia*, the following:

43.     "The program director must ... ensure compliance with grievance and due process procedures as set forth in the Institutional Requirements and implemented by the sponsoring institution ...." Exhibit B, pp. 4-5, II.A.4, II.A.4.h.

44.     "The program director must ... comply with the sponsoring institution's written policies and procedures ... for selection, evaluation and promotion of residents, disciplinary action, and supervision of residents." Exhibit B, pp. 4-5, II.A.4, II.A.4.l.

45.     "The program director must ... ensure that the program has a well-organized, comprehensive, and effective educational curriculum necessary to ensure

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 7 of 103

7

that all residents obtain experience in all the various area of the specialty ...."
Exhibit B, pp. 4, 7, II.A.4, II.A.4.r.

46. "The program director must ... demonstrate that residents have generally equivalent and adequate distribution of categories and cases ...." Exhibit B, pp. 4, 7, II.A.4, II.A.4.u.

47. The ACGME Requirements also mandate that "[t]he program must provide objective assessments of competence in patient care and procedural skills, medical knowledge, practice-based learning and improvement, interpersonal and communication skills, professionalism, and systems-based practice based on the specialty-specific Milestones" and "document progressive resident performance improvement appropriate to educational level ...." Exhibit B, p. 16, V.A.2.b(1), (3).

48. The GME Policy, also incorporated into the Residency Contract, sets forth UCMC's institutional commitment to its residents being trained at the University of Chicago Hospitals. Exhibit C, UCMC10456-10497

49. The GME Policy itself incorporates the ACGME Requirements, as it explicitly obliges UCMC to comply with "ACGME institutional and program requirements ...." Exhibit C, UCMC10456.

50. The GME Policy also obliges UCMC to undertake "establishment and implementation of formal written institutional policies for the selection, evaluation, promotion and dismissal of residents in compliance with both the institutional and relevant program requirements"; "[a]ssurance of an educational environment in which residents may raise and resolve issues without fear of intimidation or

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 8 of 103

8

retaliation"; and "[m]onitoring of the programs in establishing an appropriate work environment ...." Exhibit C, UCMC10458.

51.     The GME Policy provides that if performance concerns arise, a Program Director may place a resident on a "formal program of professional/performance development" that "must be documented in writing and must state clearly the areas where performance improvement is needed and the parameters by which successful completion of the Additional Professional/Performance Development plan will occur. A period of Additional Professional/Performance development is not disciplinary in nature and will not be reflected as discipline in the resident/fellow's program file. If performance successfully meets expectations the Additional Professional/Performance Development period will not be reported as a disciplinary matter in the resident/fellow record." Exhibit C, UCMC10485.

52.     UCMC breached the Residency Contract, the ACGME Requirements (incorporated in the Residency Contract and the GME Policy), and/or the GME Policy (incorporated in the Residency Contract), in a variety of ways, including, but not limited to, the following:

53.     Dr. Artunduaga began her intern year at UCMC on June 20, 2011.

54.     The appropriate UCMC program director to evaluate Dr. Artunduaga during her intern year was her Program Director, Dr. Mitchell Posner (later succeeded by Dr. Kevin Roggin), not Dr. David Song. Exhibit A, p. 1.

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 9 of 103

55.     Contrary to the Residency Contract's explicit provision that Dr. Posner was Dr. Artunduaga's Program Director, the evaluations, actions taken against her, and her termination were decided upon and implemented by Dr. Song in violation of the Residency Contract, the ACGME Requirements, and the GME Policy.

56.     Surgical interns "rotated," or worked, in different surgical departments at UCMC throughout the year in one-month increments. Dr. Artunduaga's first two surgical rotations, in July and August 2011, were both in what was called the Kaplan Service. She garnered positive reviews from attending physicians she worked with during these two rotations.

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 10 of 103

57.     Her primary attending physician, Dr. Edwin Kaplan, summarized in her evaluation that "[t]his was Maria's first rotation. She gained great experience with the U of C systems as time passed. She is a wonderful person and very good with her hands. She is good now but she will make a fine resident as she gains more experience and gains more confidence."

58.     Nevertheless, Dr. Song had decided by approximately August 2011 that he wanted to oust Dr. Artunduaga from the program. He began a course of conduct that culminated in her being prevented from completing her intern year in compliance with the ACGME Requirements and the nonrenewal of the Residency Contract, actions that were in breach of the Residency Contract, the ACGME Requirements, and the GME Policy.

59.     Dr. Song changed Dr. Artunduaga's rotation schedule so that she would rotate in Plastic Surgery in October 2011 (she had been scheduled for a different

rotation). He used this month to solicit Plastic Surgery residents' and attending

physicians' criticisms of her performance, including those who had never worked

with her or observed her perform the criticized activities.

60.     On November 2, 2011, after just four rotations, Dr. Song informed Dr.

Artunduaga that if she did not resign, she would be placed on probation.

61.     He did not offer to put Dr. Artunduaga on an Additional

Professional/Performance Development, as provided by the GME Policy to be used

in cases where performance is a concern.

62.     Dr. Artunduaga refused to resign, and she was placed on probation as

of November 15, 2011.

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 11 of 103

63.     Dr. Artunduaga remained on probation for the duration of her time at

UCMC.

64.     Dr. Song did not offer her a method in which to identify, set, quantify,

achieve, and document achievement of goals that would have allowed her to leave

probation, as required by the Residency Contract, the ACGME Requirements, and

the GME Policy.

65.     The "goals" that Dr. Artunduaga was to meet were vague,

unquantifiable, unreasonable, unrelated to her actual performance, and failed to

comply with the probation and other provisions of the Residency Contract, the

ACGME Requirements, and the GME Policy.

66.     While Dr. Artunduaga was on probation, she worked tirelessly to show that she had improved in the areas that Dr. Song claimed he found lacking and documented each such improvement in writing.

67.     In December 2012, Dr. Song contacted ACGME and tried to have UCMC's Plastic and Reconstructive Program re-designated as an "integrated" program. He told ACGME that "there are some internal politics involved which I can explain over the phone."

68.     On information and belief, Dr. Song's attempt to change the program from a coordinated program to an integrated program was made, at least in part, in order to legitimize his role in terminating Dr. Artunduaga (under the contract, the only person with that power was Dr. Mitchell Posner and later Dr. Kevin Roggin, the Program Directors for General Surgery).

69.     The ACGME refused to make this change and the program continued to operate as a combined program until the end of Dr. Artunduaga's tenure at UCMC.

70.     Dr. Artunduaga's reviews by her attending physicians and coworkers were positive during January and February 2012. Still, she was not removed from probation, nor was she counseled regarding what specific additional requirements she needed to fulfill to return to regular duty.

71.     When she tried to provide evidence to Dr. Song – reviews by other doctors and residents and statistics that showed her performance improvements – she was ignored.

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 12 of 103

72.     In March 2012, Dr. Song, rejecting the positive reviews from January and February 2012, forced Dr. Artunduaga to return for a second rotation in Plastic Surgery so that he could seed her file with criticisms from her Plastic Surgery co-residents and attending physicians to justify her ultimate termination from UCMC.

73.     Dr. Song actively solicited negative reviews from other attending physicians, residents, and nurses to place in Dr. Artunduaga's file.

74.     Dr. Artunduaga received no formal faculty evaluations during either of her Plastic Surgery Rotations (October 2011 and March 2012) or after March 2012, in violation of the ACGME Requirements.

75.     On March 27, 2012, Dr. Song informed Dr. Artunduaga that her Residency Contract would not be renewed for a second year. He refused to consider her positive formal faculty evaluations and weekly evaluations from her direct supervisors during January and February of 2012 that documented her continued improvement. He also continued to deny her a performance improvement plan.

76.     On March 30, 2012, Dr. Song suspended Dr. Artunduaga from her clinical duties, in direct violation of the ACGME Requirements and GME Policy that require residents to receive an appropriate education and an adequate number of surgical cases to meet their ACGME quotas and therefore complete their residency years.

77.     Even if Dr. Artunduaga was not coming back the following year, UCMC was still obligated under the Residency Contract, the ACGME Requirements, and/or

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 13 of 103

13

the GME Policy to allow her to finish her intern year so that she could apply as a second-year at other institutions.

78.     Dr. Song's suspension was without justification and without any evidence that Dr. Artunduaga was a danger to patients or was otherwise unable to perform her duties as a resident, and it was in contrary to the provisions of the Residency Contract, the ACGME Requirements, and the GME Policy.

79.     On April 4, 2013, Dr. Song reinstated Dr. Artunduaga to her clinical duties, but he took steps to prevent her from working on surgical cases, rendering the reinstatement meaningless for the purposes of her fulfilling her ACGME surgical case requirements necessary to complete her intern year.

80.     Dr. Song solicited more negative reviews of Dr. Artunduaga and instructed the chief resident on her April 2012 rotation to deny her surgical cases. Then, on April 29, 2014, he removed her from clinical duties a second and final time.

81.     Dr. Artunduaga was barred from clinical duties in May and June 2012, which, in combination with the dearth of surgical cases from earlier months, caused her to be unable to complete the ACGME surgical case requirements for her intern year.

82.     Dr. Artunduaga was assigned to read and summarize a textbook for the duration of her time at UCMC. Such an assignment is in direct contravention of the requirements of the Residency Contract, the ACGME Requirements, and the GME Policy that she be provided an adequate education and the ability to log an appropriate number of surgical cases.

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 14 of 103

14

83.    In May 2012, Dr. Artunduaga filed an internal grievance at UCMC seeking reversal of the decisions to suspend her from clinical duties and not renew her Residency Contract.

84.    On May 16, 2012, a grievance hearing was held, and two hours later, the Grievance Committee upheld each of Dr. Song's decisions.

85.    UCMC had appointed Krista Curell, an attorney employed by UCMC, to chair Dr. Artunduaga's grievance committee.

86.    Ms. Curell was not an impartial Chair, as required by the GME Policy.

87.    The defendants' actions severely damaged Dr. Artunduaga's clinical career path.

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 15 of 103

### Count I – Breach of Contract
**Brought Against UCMC and Dr. David Song**

88.    All the foregoing paragraphs are incorporated by reference into Count I as if fully restated herein.

89.    As alleged above, Dr. Artunduaga and UCMC entered into a written Residency Contract on or about March 22, 2011 (Exhibit A). The residency contract incorporated by reference the ACGME Requirements (Exhibit B) and the GME Policy (Exhibit C).

90.    Dr. Artunduaga performed all of the conditions on her part under the terms of the Residency Contract.

91.    All conditions precedent to Dr. Artunduaga's right of recovery under the Residency Contract have occurred or have been excused.

15

92.     UCMC and Dr. Song failed to fulfill the Residency Contract on their part, as alleged above.

93.     Dr. Artunduaga has been damaged by reason of the breach by losing her career as a plastic surgeon in the U.S. and the monetary and professional rewards that such a career would have brought her throughout her life.

<u>Prayer for Relief as to Count I</u>

WHEREFORE, Dr. Artunduaga prays that the Court enter the following relief:

A.     Payment of Dr. Artunduaga's lost past and future wages and benefits (including any and all types of compensation and benefits, backpay, frontpay, and future damages for loss of livelihood);

B.     Compensatory damages, emotional and mental distress damages, reputational damages, punitive or exemplary damages, statutory damages, liquidated damages, and civil penalties;

C.     Payment of Dr. Artunduaga's attorneys' fees and all costs of litigation (including expert witness fees);

D.     Pre-and post-judgment interest; and

E.     All other and relief that the Court may deem appropriate.

<u>Count II – Tortious Interference with Prospective Business Relationships</u>
**Brought Against Dr. David Song**

94.     All of the foregoing paragraphs are incorporated by reference into Count II as if fully restated herein.

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 16 of 103

16

## Additional Facts Giving Rise to Count II

95.     As described above, Dr. Song informed Dr. Artunduaga that her contract would not be renewed on March 30, 2012.

96.     During that same time period, Dr. Artunduaga was informed by ACGME that she would have to repeat her internship year because UCMC did not allow her to finish her clinical rotations, log the necessary number of surgical cases, or provide ACGME-compliant faculty evaluations for 5 of the 11 months of her UCMC internship.

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 17 of 103

97.     In the spring of 2012, Dr. Artunduaga applied for positions both within and outside the National Resident Matching Program ("NRMP"), seeking to be enrolled in another residency program for the following year so that she could get her career path back on track.

98.     Dr. Artunduaga was offered four interviews.

99.     When the match results came out, Dr. Artunduaga was not matched with any program and was not offered a position outside the match. She followed up with programs that had not filled their slots and had no success.

100.    Dr. Artunduaga was highly qualified for admission as a resident to these programs, as evidenced by her academic and professional history and the stellar performance during the 2010 match, in which she had been offered 20 interviews.

17

101.   Dr. Artunduaga had a reasonable expectation of a business relationship with the residency programs to which she applied, resulting either from her own efforts or the NRMP match.

102.   Had she realized this expectation, Dr. Artunduaga would have received a salary and benefits and would have been in a position to continue in a residency program that would have provided her with the opportunity to continue her surgical career.

103.   Dr. Artunduaga has direct evidence that Dr. Song interfered with her receiving residency positions for the 2013 match.

104.   For example, on October 9, 2012, Dr. Juliana Hansen from Oregon Health and Science University's Department of Plastic and Reconstructive Surgery emailed Dr. Song and asked "Hi David, What is the deal with Maria Artunduaga? Her application looks superhuman."

105.   Dr. Song responded, "Need to talk. Don't make any decisions before we chat. 312 493 1103." One minute later, he wrote, "Officially: We had to terminate her. First resident ever."

106.   Dr. Hansen replied "I figured it was something bad – I was just deciding whether to offer an interview or not. Say no more."

107.   Dr. Song then replied, "one of these days we can talk – Our legal dept involved."

108.   Similarly, on November 12, 2012, Dr. Michael Zenn from Duke University Medical School emailed Dr. Song, stating "What can you tell me about

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 18 of 103

18

Maria Artunduaga who is applying for plastics at Duke. Sounds like this might be a good story."

109. Dr. Song's response was "Lets talk – Can't email – What's a good number?"

110. On information and belief, Dr. Song talked to Dr. Zenn and provided false and negative information about Dr. Artunduaga, scuttling her chances of an offer from Duke.

111. Dr. Song interfered with Dr. Artunduaga's prospective business relationships with at least Oregon and Duke, and possibly other residencies whose program directors contacted him.

112. For example, Dr. Artunduaga had positive interviews at Baylor College of Medicine (for Plastic Surgery), where she had previously been affiliated, and the University of Pittsburgh School of Medicine (in Anesthesiology). Both Program Directors indicated they wanted her for their programs.

113. On information and belief, Dr. Song was contacted by Baylor and Pittsburgh and, as a result, Dr. Artunduaga did not receive either position.

114. Similarly, on November 7, 2012, the Program Director for a surgical program at the University of North Carolina emailed Dr. Song, and the two of them engaged in an email conversation regarding Dr. Artunduaga in which Dr. Song asked the UNC doctor to "[d]o me a favor and monitor all her comments as I'd like to use them as evidence."

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 19 of 103

19

115. Dr. Song knew that Dr. Artunduaga had an expectation of entering into a business relationship with a new residency program.

116. Dr. Song interfered with Dr. Artunduaga's future economic gain by providing false and negative information about her to those who inquired – information that was untrue, baseless, and resulted in harm to Dr. Artunduaga.

117. Dr. Song's actions were purposeful, intentional, malicious, and motivated by ill will.

118. As a results of Dr. Song's actions, Dr. Artunduaga's potential business relationships with Oregon and Duke, with which she was in the preliminary stages of negotiation, and Baylor and Pittsburgh, whose Program Directors had indicated they wanted her for their programs, and, on information and belief, other programs, was destroyed.

119. Dr. Artunduaga suffered damages as a result.

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 20 of 103

**Prayer for Relief as to Count II**

WHEREFORE, Dr. Artunduaga prays that the Court enter the following relief:

A. Payment of Dr. Artunduaga's lost past and future wages and benefits (including any and all types of compensation and benefits, backpay, and frontpay, and future damages for loss of livelihood);

B. Compensatory damages, emotional and mental distress damages, reputational damages, punitive or exemplary damages, statutory damages, liquidated damages, and civil penalties;

20

G.    Payment of Dr. Artunduaga's attorneys' fees and all costs of litigation

(including statutory fees and expert witness fees);

H.    Pre-and post-judgment interest; and

I.    All other and relief that the Court may deem appropriate.

Dated: January 16, 2015                    Respectfully submitted,

                                           /s/ Jamie S. Franklin
                                           Jamie S. Franklin

Jamie S. Franklin
The Franklin Law Firm LLC
53 W. Jackson Blvd., Ste. 803
Chicago, IL 60604
(312) 662-1008
(312) 662-1015 (fax)
jsf@thefranklinlawfirm.com
Attorney No. 48135
ARDC No. 6242916

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 21 of 103

21

## CERTIFICATE OF SERVICE

I, the undersigned, certify that a true and correct copy of the foregoing document, Verified First Amended Complaint, was served on January 16, 2015 via email and U.S. Mail on the following:

Michael G. Cleveland
Andrew T. Oppenheimer
VEDDER PRICE P.C.
222 N. LaSalle St., Ste. 2600
Chicago, IL 60601

/s/ Jamie S. Franklin
Jamie S. Franklin

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 22 of 103

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

DR. MARIA ARTUNDUAGA,                    )
                                          )
    Plaintiff,                           )
                                          )
    v.                                   )        Case No. 2014-L-008678
                                          )
THE UNIVERSITY OF CHICAGO     )        Jury Trial Demanded
MEDICAL CENTER and                       )
DR. DAVID SONG,                          )
                                          )
    Defendants.                          )

## VERIFICATION

I, Dr. Maria Artunduaga, having been duly sworn, attest that I have reviewed the foregoing Verified First Amended Complaint, and, to the best of my knowledge at the time of this Verification, its contents and the matters set out therein are true in substance and in fact, except as to matters stated to be on information and belief.

_Maria Alexandra Artunduaga_
Dr. Maria Artunduaga

_1/15/15_
Date

NOTARIZED:

State of Washington
County of King

Signed before me on 1/15/15 by Maria Artunduaga.

_Samantha DV._
My appointment expires 12/06/2016

> Notary Public
> State of Washington
> SAMANTHA DEVRIES
> My Appointment Expires Dec 6, 2016

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 23 of 103

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

| | |
|---|---|
| DR. MARIA ARTUNDUAGA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 2014-L-008678 |
| | ) |
| THE UNIVERSITY OF CHICAGO | ) Jury Trial Demanded |
| MEDICAL CENTER and | ) |
| DR. DAVID SONG, | ) |
| | ) |
| Defendants. | ) |

## JURY DEMAND

The plaintiff, Dr. Maria Artunduaga, demands a trial by jury.

_Maria Alexandra Artunduaga_
Dr. Maria Artunduaga

1/15/15
Date

State of Washington
County of King

Signed before me on 1/15/15 by Maria Artunduaga.

_Samantha DeVries_
My appointment expires 12/06/16

Notary Public
State of Washington
SAMANTHA DEVRIES
My Appointment Expires Dec 6, 2016

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 24 of 103

# Exhibit A

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 25 of 103

### University of Chicago Medical Center
*Office of Graduate Medical Education*
*J-141 773-702-6760*



### Resident/Fellow Contract Request
### Cover Sheet
### 2011-2012

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 26 of 103

(Print or Type)
**Resident/Fellow Name:** Maria Artunduaga   **PGY 1**

*Department:* Surgery

*Program Specific Name:*   *General Surgery – Plastic Surgery Track*

*Program Director Name:* **Mitchell Posner, M.D.**

**Is the Program ACGME accredited?   Yes   No**

**Is this a non-accredited Research Year?        Yes        No**

**(J-1 visa holders are specifically excluded from participating in research beyond the accredited program requirements)**

**Program Contact: Carmen Barr   Phone: 2-6337**

**M/C 6040      Fax 2-2140**

<u>**This form is to accompany the Contract when it is returned to the GME Office**</u>

Contract/CoverACGME.doc

1



**2011-2012**
**RESIDENT/FELLOW CONTRACT**

**Department: Surgery**

**Program**: General Surgery - Plastic Surgery Track

\_\_X\_\_ **Resident**      _____ **Fellow**



ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 27 of 103

This contract is entered into as of March 22, 2011 between THE UNIVERSITY OF CHICAGO MEDICAL CENTER, an Illinois not-for-profit corporation ("UCMC"), and Maria Artunduaga, M.D. ("Resident/Fellow").
(Name)

UCMC wishes to appoint the Resident/Fellow as a PGY 1 in the Department of Surgery and the Resident/Fellow wishes to accept such appointment. Therefore the parties hereto agree as follows:

1. <u>Term of Agreement.</u> Unless earlier terminated in accordance with this Agreement, the term of the Resident/Fellow appointment commences on June 20, 2011 ("Commencement Date") and terminates on June 30, 2012 (the "Appointment Period").

2. <u>Pre Commencement Health Screening.</u> It is a precondition to commencement of this contract that all Residents/Fellows who have not previously done so undergo a health screening examination provided by UCMC or designee on or prior to the Commencement Date specified in Section 1 of this contract. This examination is furnished without charge and the Resident/Fellow appointment will not commence until he or she successfully completes the physical examination including all required follow-up tests.

3. <u>Compensation of Resident/Fellow.</u> The total stipend of the Resident/Fellow for the term of this Agreement shall be $49,291, to be paid in arrears in monthly installments on the last regular working day of each month starting in July. The stipend may be reduced prorata for any periods during the Appointment Period where the Resident/Fellow is unable or unwilling to perform services pursuant to this Agreement or due to Resident/Fellow failure to comply with the terms of this Agreement, including a failure to complete the health screening requirements, maintain licensure, adhere to compliance policies, or complete medical records. The stipend may be reduced by any applicable withholding requirements, including FICA and any applicable federal or state withholding taxes.

4. <u>Additional Benefits.</u> In addition to the specified stipend, UCMC agrees to provide to the Resident/Fellow for the term of this Agreement, the following benefits:

2

MA006636

a. The Resident/Fellow will be provided information about health insurance. If the Resident/Fellow elects in writing within thirty days of the commencement date shown in Section 1, health insurance, long-term disability coverage, and life insurance of the type and at the charges and under the terms and conditions customarily offered to UCMC staff, commencing on the Commencement Date.

b. Professional liability coverage through either the UCMC Self-Insurance Trust or through professional liability insurance of the affiliated hospitals, which shall be maintained at levels acceptable to UCMC for activities performed in connection with assigned duties as a Resident/Fellow at UCMC and at off-campus rotations approved by the Program Director and the Chairman of the Department to which this appointment is made (the "Department Chairman"), and the Office of Medical-Legal Affairs.

c. Paid vacation leave of four weeks, to be scheduled by mutual agreement between the Resident/Fellow and the Program Director, and five days of sick leave to be used only for personal illness.

d. Personal Leave of Absence as described in the GME Policy titled "Leave of Absence" available on the University of Chicago Medical Center website under GME Resources). In order to meet ACGME program requirements, a resident/fellow may be required to extend the training period for any dates of absence in excess of allowable vacation time. Extensions of training beyond the dates of this Contract require specific approval of the program director. In addition, an Amendment to this Contract, or a new Resident/Fellow Contract will be required.

e. Up to four weeks paid short-term medical leave (including pregnancy), as described in the Resident/Fellow Handbook. Short-term medical leave runs concurrent with eligible FMLA.

f. Eligible residents/fellows may receive approval up to a maximum 12 weeks leave under the Family Medical Leave Act as described in the Resident/Fellow Handbook. FMLA is inclusive of short-term disability and any other paid (vacation/sick) or unpaid leave.

g. Residents/Fellows with disabilities may request and receive accommodation for disabilities pursuant to UCMC policy "Equal Employment Opportunity for Individuals with Disabilities". UCMC will provide a reasonable accommodation to the known physical or mental limitations of an otherwise qualified applicant or employee with a disability, unless doing so would impose an undue hardship on UCMC.

h. Access to appropriate and confidential counseling, medical and psychological support services are available through the confidential Employee Assistance Program (EAP), the Physician's Assistance Committee (PAC), and other programs recommended by the EAP and the PAC. The PAC has the responsibility to receive, verify and evaluate reports related to the health, well-being and impairment of physicians, including all members of the Medical Staff, UCMC Residents, Clinical Fellows and medical students on occasion (referred to herein as "practitioners"), and to provide recommendations to Chairs and Program Directors about their practitioners. The PAC is described in further detail in the Resident/Fellow Handbook and PAC brochure. The protocol under which the PAC functions is available in the Office of

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 28 of 103

3

MA006637

Graduate Medical Education. It is agreed that mandatory referral for evaluation as a condition of performance evaluation may be imposed by the Program Director.

i. The benefits provided under this Agreement are in lieu of benefits ordinarily provided to UCMC employees.

j. Privileges to use library services.

k. The Program Director will ensure review of goals and objectives at least annually.

l. Access to information related to eligibility for specialty Board examinations will be provided.

5. Duty Hours. UCMC agrees to implement the ACGME Common duty hour standards and any duty hour standards prescribed by the applicable Residence Review Committee. UCMC will monitor program compliance with duty hour standards to meet the goals of promoting patient safety, resident learning and well being. (Refer to GMEC Policy "Duty Hours and Working Environment" available on the University of Chicago Medical Center website under GME resources)

6. Obligations and Responsibilities of Resident/Fellow. The Resident/Fellow agrees to fulfill the following obligations and responsibilities:

a. To use his or her best efforts, judgment and diligence in a professional manner in performing all duties, tasks and responsibilities (including but not limited to, clinical services and educational and scholarly activities) assigned to the Resident/Fellow by the Program Director (or any other person designated or authorized by the Program Director) for the duration of the Appointment Period. Clinical services shall be provided under circumstances and at locations as assigned by the Program Director.

b. To fulfill the educational and clinical requirements of the graduate medical or dental education and clinical training programs.

c. To continuously comply with the published principles of ethics of the American Medical Association or the American Dental Association.

d. To abide by the rules, policies and procedures contained in the applicable policies, procedures, bylaws, orders, rules and regulations of UCMC and of each affiliated Hospital and the guidelines established by applicable regulatory or accrediting agencies, including without limitation, the ACGME.

e. To comply with all ACGME and UCMC GME policies and requirements applicable to the training program and working environment, including but not limited to duty hour standards and levels of supervision.

f. If the Resident/Fellow is not a United States citizen, to obtain and show proof of visa status consistent with undertaking and fulfilling the obligations of this Agreement. Further, the Resident/Fellow authorizes UCMC to solicit and/or obtain verification of such status from third parties. Failure to possess such proof by the Commencement Date of this Agreement will serve to automatically terminate this Agreement. The provisions of this paragraph shall survive the expiration, termination or nonrenewal of this agreement. The cost of obtaining and maintaining an H1-B visa is the

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 29 of 103

4

responsibility of the Program.

g. License to Practice Medicine or Dentistry. The Resident/Fellow is required and is responsible for obtaining and continuously maintaining, at his or her expense, a current and valid Illinois medical or dental temporary or permanent license. The Resident/Fellow will submit all required applications, forms and other documents as directed by the Office of Graduate Medical Education, and will follow in a timely fashion all requirements of the Graduate Medical Education Office pertaining to licensure. Any Resident/Fellow who does not possess a current and valid Illinois license will not be permitted to participate in any patient care activities, and will not receive any compensation for any period of time during which the Resident/Fellow is prohibited from working due to the absence of a license. Failure to obtain and maintain a license as required by this Agreement shall be cause for UCMC to terminate this Agreement immediately, and/or to take such other steps as UCMC shall deem necessary.

h. To notify the Program Director and the Office of Graduate Medical Education in writing immediately if the Resident/Fellow(s) medical license is revoked, suspended or otherwise restricted or if an application for a temporary or permanent license is denied. Any such revocation, suspension, restriction or denial shall serve automatically to terminate this Agreement.

i. To notify the Program Director, the Office of Graduate Medical Education and the Compliance Director in writing immediately if the Resident/Fellow is or becomes ineligible to participate in, or is suspended or excluded from, the Medicare, Medicaid or other governmental payment program. Any such ineligibility exclusion or suspension shall serve automatically to terminate this Agreement.

j. To complete medical records as set forth in applicable institutional policies of the institution where the resident is working. Failure to complete medical records in a timely fashion in accordance with those policies may result in disciplinary action. Disciplinary action taken for failure to complete medical records in a timely fashion is not subject to review under the Grievance Procedure provided for in Section 10 of this Agreement.

k. To complete all training required by either the Medical Center Compliance Office or institutional GME Committee. Failure to complete such training will result in suspension of the Resident/Fellow or other disciplinary action, and is not subject to review under the Grievance Procedure provided for in Section 10 of this Agreement.

l. During your appointment, your professional liability coverage may be provided by either the affiliated hospital at which the Program is based or by the UCMC Self-Insurance Trust. You agree to immediately notify the Office of Medical-Legal Affairs of any lawsuit or other claim resulting from patient services initiated against the Resident/Fellow and to cooperate with UCMC or the affiliated hospital in the defense of any professional malpractice or other action for which coverage is provided to the Resident/Fellow under this Agreement or involving a case about which the Resident/Fellow has knowledge. The provisions of this paragraph shall survive the termination or expiration of this Agreement. Failure to comply with the terms of this section may result in loss of liability coverage.

m. At all times during your appointment and after its termination you will promptly

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 30 of 103

5

report all adverse patient incidents about which the Resident/Fellow has personal knowledge to the Office of Medical-Legal Affairs and/or to the risk management office of the affiliated hospital. For purposes of this section an incident shall mean any occurrence or circumstance which could reasonably be expected to result in any assertion of a right to, or a suit or other proceeding seeking, compensation or damages. Incident includes, but is not limited to, any unanticipated death, paralysis, paraplegia, quadriplegia, spinal cord injury, nerve injury or neurological deficit, brain damage, total or partial loss of limb or loss of the use of a limb, loss or impairment of a sensory organ or reproductive organ, and substantial disability or disfigurement. Failure to report an incident may result in loss of liability coverage under the self-insurance trust. You will also cooperate and participate in risk management activities of UCMC and affiliated hospitals.

n. To refrain from accepting any fees from any patient or other responsible party for services rendered pursuant to the Program. For purposes of this Agreement, the term "Program" shall mean the educational and clinical activities assigned to the Resident/Fellow pursuant to this Agreement.

o. To continuously comply with all applicable laws, regulations and governmental guidelines, including but not limited to the OSHA standards for the prevention of transmission of blood borne pathogens.

Hospital and Participating Site Affiliations

You acknowledge that UCMC has contractual obligations to the affiliated hospitals. The Program is under the direct administration of UCMC and the educational standards for performance in the Program shall be established and administered by UCMC. Not withstanding the foregoing, at all times, all clinical care rendered by you will be under the direction and supervision of each patient's attending clinical faculty member, who is a member of the affiliated hospital medical staff.

7. <u>Prohibition of Harassment.</u> It is the policy of UCMC to maintain a work environment free from prohibited forms of harassment, including sexual harassment.

UCMC has established procedures for investigating and responding to claims of harassment. These procedures can be obtained from the Office of Graduate Medical Education and the Program Director. Any Resident/Fellow who believes that he or she has been subjected to harassment should report the alleged act immediately as set forth in the above publications.

If an investigation discloses that a Resident/Fellow has harassed any other employee or student of the hospitals or the University, or an affiliated hospital, the Resident/Fellow shall be subject to appropriate disciplinary action up to and including termination from the residency program.

8. <u>Off Duty Activities (including Moonlighting).</u> The Resident/Fellow with either a temporary Illinois medical license, or any type of visa, is not permitted to undertake patient care activities outside the Program. Other Residents/Fellows must obtain prior written approval from the Program Director for each moonlighting experience. Time spent in moonlighting experiences must be recorded for duty hour reporting and monitoring purposes.

In the event that approval is given for a Resident/Fellow to engage in any clinical practice

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 31 of 103

6

outside of the Program and in facilities not under corporate ownership by UCMC, no liability coverage under the Self-Insurance Trust will be provided unless otherwise expressly agreed to in writing. The Resident/Fellow is exclusively responsible for all liabilities arising out of such outside practice.

9. Termination of Agreement.

    a. Failure to comply with any of the terms of this Agreement, including, without limitation, (i) failure to fulfill the applicable educational and clinical requirements of the graduate education and clinical training program to the satisfaction of the Program Director, (ii) failure to acquire at least the same professional knowledge, skill and judgment that residents in the relevant department normally acquire at the same level of post graduate medical education and training, or (iii) failure to carry out satisfactorily his or her professional responsibilities, may result in disciplinary action of the Resident/Fellow by UCMC. Such disciplinary action may take any appropriate form, including without limitation performance of remedial or educational activities, immediate suspension of the Resident/Fellow, with or without pay, or termination of this Agreement. The Termination and Progressive Corrective Action policies of UCMC or other UCMC human resource policies governing grievances or the discipline or termination of UCMC employees shall not be applicable to Residents/Fellows.

    b. This Agreement may be terminated by the Resident/Fellow upon 30 days prior written notice to UCMC in the event of (1) failure of UCMC to provide any of the benefits under Section 4 of this Agreement, or (2) the Resident/Fellow(s) inability to fulfill the Agreement due to total incapacity or extreme hardship.

    c. This Agreement shall terminate automatically in the event that:
        i. Resident/Fellow(s) license to practice medicine is terminated or suspended; or
        ii. Resident/Fellow is, or becomes, ineligible to participate in the Medicare, Medicaid or other governmental payment programs; or
        iii.. in the case of a Resident/Fellow who is not a U.S. Citizen, suspension or loss of a visa status consistent with the provision of services pursuant to this Agreement.

    d. Upon termination of this Agreement, the obligations of UCMC under this Agreement shall cease. If the Resident/Fellow(s) appointment is terminated, the Program Director shall determine the extent of credit earned by the Resident/Fellow. The Program Director shall document a final performance evaluation to indicate credit earned during the course of training.

10. Resident/Fellow Grievance Procedure.

    a. A list of those matters which are grievable by Residents and Fellows and the procedures for implementing and pursuing the grievance procedure are contained in the GMEC policy titled "Grievance Procedure" available on the UCMC website under GME resources.
    b. Neither the conflict resolution nor corrective action procedures set forth in the Medical Staff By-Laws, nor any human resources policies of UCMC or affiliated hospitals pertaining to grievances, appeals, performance management, corrective action, or termination, shall apply to Residents/Fellows.

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 32 of 103

7

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 33 of 103

11. Patents and Software. Residents/Fellows shall be subject to the Statutes of The University of Chicago which governs patents and software and any policy issued there under by UCMC or the University of Chicago which applies to Residents/Fellows or, in the absence of a policy specifically applicable to Residents/Fellows, any policy which is applicable to UCMC or University of Chicago employees. In interpreting this Statute with respect to Residents/Fellows, the word "University" shall be deemed to include UCMC.

12. Notice of Non-Renewal or Non-Promotion. UCMC will provide the Resident/Fellow with a written notice of intent not to renew a yearly contract prior to completion of a multi-year residency program, or if the resident/fellow will not be promoted, by the end of February for contracts which run from July 1 to June 30 or for contracts for PGY1 residents. If the contract runs for a period other than July 1 to June 30, then UCMC will provide the Resident/Fellow with a written notice of intent not to renew the contract, or promote, no later than four months prior to the end of this contract. However, if the primary reason(s) for the non-renewal occur(s) after the second Monday in February or within the four months prior to the end of the contract, UCMC will provide the Resident/Fellow with as much written notice of the intent not to renew, or promote, as the circumstances will reasonably allow, prior to the end of the contract. If the Program cannot determine, by the end of February, if the contract will be renewed due to issues related to the resident/fellow(s) progress in the program, the Program Director will inform the resident/fellow in writing of the reasons why a decision cannot be made, the timetable for making the decision, and the issues which must be addressed by the resident/fellow before such decision can be made.

13. Renewal of Agreement. The Resident/Fellow understands and acknowledges that this Agreement expires no later than the date set forth in Section 1 and that UCMC makes no commitment to renew this Agreement. Reappointment is at the discretion of UCMC and is contingent upon several factors, including but not limited to, the following:
    a. Satisfactory completion of all training components;
    b. the availability of a position;
    c. satisfactory performance evaluations;
    d. full compliance with the terms of this Agreement;
    e. continuation by ACGME of institutional and program accreditation;
    f. UCMC financial ability.

Each Resident/Fellow whose Appointment Period as stated in Section 1 is for one year, whose Appointment Period is from July 1 to June 30, and whose contract is to be renewed for another one year period, will receive a renewal contract no later than the second Monday in February. Residents/Fellows whose one year Appointment Period does not run from July 1 to June 30 and whose contract is to be renewed for a one year term will receive a renewal contract no later than 120 days prior to the commencement of the new contract term. Execution of a renewal agreement is contingent upon satisfactory evaluation during the 120 day period preceding the new contract term. In all cases, each Resident/Fellow offered a renewal contract shall accept such offer in writing by signing and returning the contract within 3 weeks of the date on which the Agreement was sent to the Resident/Fellow.

14. Hospital or Program Closure or Program Reduction. In the event a UCMC sponsored Program in which the Resident/Fellow is enrolled is closed or discontinued, or there is a proposed reduction in the size of the residency program, UCMC shall provide the Resident/Fellow with notification of the projected closing date as soon as possible after

8

the decision to close is made. In the event of such a reduction or closure, residents already in the program will be allowed to complete their education, or UCMC shall provide the Resident/Fellow with assistance in obtaining appointment to another ACGME residency program.

15. <u>Access to Records</u>. In accordance with Section 952 of the Omnibus Reconciliation Act of 1980 (PL 96-499), the Resident/Fellow agrees to make available for a period of four (4) years following completion of the term of this Agreement, upon request of the Secretary of Health and Human Services of the United States or of the United States Comptroller General or any of their authorized agents, all books, documents and records necessary to certify the nature and extent of the cost of the services rendered pursuant to this Agreement as required by federal statute or duly promulgated regulations.

16. <u>Acceptance</u>. This Agreement shall not be effective and shall not bind either party until it is submitted to UCMC and accepted by UCMC by signature below. UCMC reserves the right to refuse to accept any Agreement which is not submitted to UCMC within three weeks of the date on which the Agreement was sent to the Resident/Fellow.

17. <u>Survival of Terms</u>. All outstanding obligations of the parties shall survive termination or expiration of this Agreement for any reason.

18. <u>Waiver</u>. Any waiver by UCMC of the strict compliance with any term or provision of this Agreement shall not constitute a waiver of any other term or provision of this Agreement, or of any subsequent breach or failure to comply with such term or provision.

19. <u>Controlling Law</u>. This Agreement shall be construed in accordance with Illinois law, and the forum for any disputes arising hereunder shall be the circuit courts of Cook County, Illinois.

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 34 of 103

RESIDENT/FELLOW: _____ Date: _____

PROGRAM DIRECTOR: _____ Date: _____

EXECUTIVE
ADMINISTRATOR: _____ Date: _____

THE UNIVERSITY OF CHICAGO MEDICAL CENTER

_____      Date: _____
Barry Kamin
Director, Graduate Medical Education

Approved GMEC 2-10-0

MA006643

# Exhibit B

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 35 of 103

**ACGME Program Requirements for Graduate Medical Education
in Plastic Surgery**

**One-year Common Program Requirements are in BOLD**

Effective: July 1, 2009

**Introduction**

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 36 of 103

Int.A.     **Residency is an essential dimension of the transformation of the medical
student to the independent practitioner along the continuum of medical
education. It is physically, emotionally, and intellectually demanding, and
requires longitudinally-concentrated effort on the part of the resident.**

**The specialty education of physicians to practice independently is
experiential, and necessarily occurs within the context of the health care
delivery system. Developing the skills, knowledge, and attitudes leading to
proficiency in all the domains of clinical competency requires the resident
physician to assume personal responsibility for the care of individual
patients. For the resident, the essential learning activity is interaction with
patients under the guidance and supervision of faculty members who give
value, context, and meaning to those interactions. As residents gain
experience and demonstrate growth in their ability to care for patients, they
assume roles that permit them to exercise those skills with greater
independence. This concept—graded and progressive responsibility—is
one of the core tenets of American graduate medical education.
Supervision in the setting of graduate medical education has the goals of
assuring the provision of safe and effective care to the individual patient;
assuring each resident's development of the skills, knowledge, and
attitudes required to enter the unsupervised practice of medicine; and
establishing a foundation for continued professional growth.**

Int.B.     Plastic surgery residency programs educate physicians in the resection, repair,
replacement, and reconstruction of defects of form and function of the
integument and its underlying anatomic systems, including the craniofacial
structures, the oropharynx, the trunk, the extremities, the breast, and the
perineum. This includes aesthetic (cosmetic) surgery of structures with
undesirable form. Special knowledge and skill in the design and transfer of flaps,
in the transplantation of tissues, and in the replantation of structures are vital to
these ends, as is skill in excisional surgery, in management of complex wounds,
and in the use of alloplastic materials. Plastic surgery residency education trains
physicians broadly in the art and science of plastic and reconstructive surgery.
These residency programs develop a competent and responsible plastic surgeon
with high moral and ethical character, capable of functioning as an independent
surgeon. A variety of educational plans will produce the desired result.

Int.C.     The Review Committee for Plastic Surgery will accredit *independent* plastic
surgery programs of three years duration and *integrated* programs of six years
duration. All prerequisite residency education must be taken within programs
accredited by the Accreditation Council of Graduate Medical Education

(ACGME), the Royal College of Physicians and Surgeons of Canada (RCPSC), or the American Dental Association.

Int.C.1.    Independent format: residents complete three years of concentrated plastic surgery education, with 12 months of chief responsibility, after successful completion of one of the following prerequisite curricula:

Int.C.1.a)    an ACGME-accredited surgery, neurological surgery, orthopaedic surgery, otolaryngology, or urology residency; or,

Int.C.1.b)    an educational program in oral and maxillofacial surgery approved by the American Dental Association (ADA) is an alternate pathway for prerequisite education prior to a plastic surgery residency. This pathway is available only to those individuals holding the DMD/MD or DDS/MD degree. This education also must include a minimum of 24 months of progressive responsibility on surgical rotations under the direction of the general surgery program director after receipt of the MD degree. Rotations in general surgery during medical school, prior to receiving the MD degree, will not be considered as fulfilling any part of the 24-month minimum requirement.

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 37 of 103

Int.C.2.    Integrated format: residents complete six years of ACGME-accredited plastic surgery education following receipt of an MD or DO degree from an institution accredited by the Liaison Committee on Medical Education (LCME) or the American Osteopathic Association (AOA). Graduates of schools of medicine from countries other than the United States or Canada must present evidence of final certification by the Education Commission for Foreign Medical Graduates (ECFMG).

Int.C.2.a)    The integrated curriculum must contain six years of clinical surgical education under the authority and direction of the plastic surgery program director.

Int.C.2.b)    Of these years, 36 months must be concentrated plastic surgery education with no less than 12 months of chief responsibility on the clinical service of plastic surgery. Residents must complete the last 36 months of their education in the same plastic surgery program. See section IV.A.5.a) for specific plastic surgery requirements.

Int.C.2.c)    Clinical experiences appropriate to plastic surgery education should be provided in alimentary tract surgery, abdominal surgery, breast surgery, emergency medicine, pediatric surgery, surgical critical care, surgical oncology, transplant, trauma management, and vascular surgery. See section IV.A.5.a) for specific plastic surgery requirements.

Int.C.3.    Prior to entry into the program, each resident must be notified in writing of the required program length.

I.          Institutions

I.A.        Sponsoring Institution

            **One sponsoring institution must assume ultimate responsibility for the program, as described in the Institutional Requirements, and this responsibility extends to resident assignments at all participating sites.**

            **The sponsoring institution and the program must ensure that the program director has sufficient protected time and financial support for his or her educational and administrative responsibilities to the program.**

I.A.1.      The sponsoring institution must:

I.A.1.a)             demonstrate commitment to education in plastic surgery education in their support of the residency program;

I.A.1.b)             provide the program director with a minimum of 15% protected time, which may take the form of direct or indirect salary support, such as release from clinical activities provided by the institution for programs with one to six residents. Programs with more than six residents shall provide the program director with a minimum of 25% protected time;

I.A.1.c)             support and provide evidence of faculty development for the program director and the faculty in education and teaching.

I.B.        **Participating Sites**

I.B.1.      **There must be a program letter of agreement (PLA) between the program and each participating site providing a required assignment. The PLA must be renewed at least every five years.**

            **The PLA should:**

I.B.1.a)             **identify the faculty who will assume both educational and supervisory responsibilities for residents;**

I.B.1.b)             **specify their responsibilities for teaching, supervision, and formal evaluation of residents, as specified later in this document;**

I.B.1.c)             **specify the duration and content of the educational experience; and,**

I.B.1.d)             **state the policies and procedures that will govern resident education during the assignment.**

I.B.2.      **The program director must submit any additions or deletions of participating sites routinely providing an educational experience, required for all residents, of one month full time equivalent (FTE) or**

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 38 of 103

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 39 of 103

more through the Accreditation Council for Graduate Medical Education (ACGME) Accreditation Data System (ADS).

I.B.3.    The addition or deletion of participating sites providing three or more months of a resident's required clinical education must be prior-approved by the Review Committee

## II.    Program Personnel and Resources

II.A.    **Program Director**

II.A.1.    **There must be a single program director with authority and accountability for the operation of the program. The sponsoring institution's GMEC must approve a change in program director. After approval, the program director must submit this change to the ACGME via the ADS.**

II.A.2.    **The program director should continue in his or her position for a length of time adequate to maintain continuity of leadership and program stability.**

II.A.3.    **Qualifications of the program director must include:**

II.A.3.a)    **requisite specialty expertise and documented educational and administrative experience acceptable to the Review Committee;**

II.A.3.b)    **current certification in the specialty by the American Board of Plastic Surgery, or specialty qualifications that are acceptable to the Review Committee; and,**

II.A.3.c)    **current medical licensure and appropriate medical staff appointment.**

II.A.4.    **The program director must administer and maintain an educational environment conducive to educating the residents in each of the ACGME competency areas. The program director must:**

II.A.4.a)    **oversee and ensure the quality of didactic and clinical education in all sites that participate in the program;**

II.A.4.b)    **approve a local director at each participating site who is accountable for resident education;**

II.A.4.c)    **approve the selection of program faculty as appropriate;**

II.A.4.d)    **evaluate program faculty and approve the continued participation of program faculty based on evaluation;**

II.A.4.e)    **monitor resident supervision at all participating sites;**

| II.A.4.f) | prepare and submit all information required and requested by the ACGME, including but not limited to the program information forms and annual program resident updates to the ADS, and ensure that the information submitted is accurate and complete; |
| II.A.4.g) | provide each resident with documented semiannual evaluation of performance with feedback; |
| II.A.4.h) | ensure compliance with grievance and due process procedures as set forth in the Institutional Requirements and implemented by the sponsoring institution; |
| II.A.4.i) | provide verification of residency education for all residents, including those who leave the program prior to completion; |
| II.A.4.j) | implement policies and procedures consistent with the institutional and program requirements for resident duty hours and the working environment, including moonlighting, and, to that end, must: |
| II.A.4.j).(1) | distribute these policies and procedures to the residents and faculty; |
| II.A.4.j).(2) | monitor resident duty hours, according to sponsoring institutional policies, with a frequency sufficient to ensure compliance with ACGME requirements; |
| II.A.4.j).(3) | adjust schedules as necessary to mitigate excessive service demands and/or fatigue; and, |
| II.A.4.j).(4) | if applicable, monitor the demands of at-home call and adjust schedules as necessary to mitigate excessive service demands and/or fatigue. |
| II.A.4.k) | monitor the need for and ensure the provision of back up support systems when patient care responsibilities are unusually difficult or prolonged; |
| II.A.4.l) | comply with the sponsoring institution's written policies and procedures, including those specified in the Institutional Requirements, for selection, evaluation and promotion of residents, disciplinary action, and supervision of residents; |
| II.A.4.m) | be familiar with and comply with ACGME and Review Committee policies and procedures as outlined in the ACGME Manual of Policies and Procedures; |
| II.A.4.n) | obtain review and approval of the sponsoring institution's GMEC/DIO before submitting to the ACGME information or requests for the following: |

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 40 of 103

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 41 of 103

| | |
|---|---|
| II.A.4.n).(1) | all applications for ACGME accreditation of new programs; |
| II.A.4.n).(2) | changes in resident complement; |
| II.A.4.n).(3) | major changes in program structure or length of training; |
| II.A.4.n).(4) | progress reports requested by the Review Committee; |
| II.A.4.n).(5) | responses to all proposed adverse actions; |
| II.A.4.n).(6) | requests for increases or any change to resident duty hours; |
| II.A.4.n).(7) | voluntary withdrawals of ACGME-accredited programs; |
| II.A.4.n).(8) | requests for appeal of an adverse action; |
| II.A.4.n).(9) | appeal presentations to a Board of Appeal or the ACGME; and, |
| II.A.4.n).(10) | proposals to ACGME for approval of innovative educational approaches. |
| II.A.4.o) | obtain DIO review and co-signature on all program information forms, as well as any correspondence or document submitted to the ACGME that addresses: |
| II.A.4.o).(1) | program citations, and/or |
| II.A.4.o).(2) | request for changes in the program that would have significant impact, including financial, on the program or institution. |
| II.A.4.p) | compile annually a comprehensive record of the number and type of operative procedures performed by each resident completing the program. This record must include all of the procedures in which the plastic surgery resident was either surgeon or assistant during the plastic surgery program. The operative log must be provided as requested in the format and form specified by the Review Committee and it must be signed by both the resident and the program director as a statement of its accuracy. These records must be maintained by the program director using the ACGME Case Log System; |
| II.A.4.q) | advise resident applicants of the prerequisite requirements of the American Board of Plastic Surgery; |

| II.A.4.r) | ensure that the program has a well-organized, comprehensive, and effective educational curriculum necessary to ensure that all residents obtain experience in all the various areas of the specialty; |
|---|---|
| II.A.4.s) | document periodic review of the morbidity and mortality experiences of the service; |
| II.A.4.t) | ensure that faculty and resident attendance at conferences is documented; and, |
| II.A.4.u) | demonstrate that residents have generally equivalent and adequate distribution of categories and cases. |

**II.B.**      **Faculty**

**II.B.1.**      **At each participating site, there must be a sufficient number of faculty with documented qualifications to instruct and supervise all residents at that location.**

     **The faculty must:**

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 42 of 103

**II.B.1.a)**      **devote sufficient time to the educational program to fulfill their supervisory and teaching responsibilities; and to demonstrate a strong interest in the education of residents, and**

**II.B.1.b)**      **administer and maintain an educational environment conducive to educating residents in each of the ACGME competency areas.**

**II.B.2.**      **The physician faculty must have current certification in the specialty by the American Board of Plastic Surgery, or possess qualifications acceptable to the Review Committee.**

**II.B.3.**      **The physician faculty must possess current medical licensure and appropriate medical staff appointment.**

**II.B.4.**      **The nonphysician faculty must have appropriate qualifications in their field and hold appropriate institutional appointments.**

**II.B.5.**      **The faculty must establish and maintain an environment of inquiry and scholarship with an active research component.**

**II.B.5.a)**      **The faculty must regularly participate in organized clinical discussions, rounds, journal clubs, and conferences.**

**II.B.5.b)**      **Some members of the faculty should also demonstrate scholarship by one or more of the following:**

**II.B.5.b).(1)**      **peer-reviewed funding;**

II.B.5.b).(2)           **publication of original research or review articles in peer-reviewed journals, or chapters in textbooks;**

II.B.5.b).(3)           **publication or presentation of case reports or clinical series at local, regional, or national professional and scientific society meetings; or,**

II.B.5.b).(4)           **participation in national committees or educational organizations.**

II.B.5.c)           **Faculty should encourage and support residents in scholarly activities.**

II.B.5.d)           The faculty should organize conferences to allow discussion of topics that will broaden knowledge in the wide field of plastic surgery and to evaluate current information.

**II.C.**           **Other Program Personnel**

           **The institution and the program must jointly ensure the availability of all necessary professional, technical, and clerical personnel for the effective administration of the program.**

II.C.1.           There must be institutional support for a program coordinator, as follows:

II.C.1.a)           0.5 full-time equivalent for programs with up to six residents; and,

II.C.1.b)           1.0 full-time equivalent for programs with more than six residents.

**II.D.**           **Resources**

           **The institution and the program must jointly ensure the availability of adequate resources for resident education, as defined in the specialty program requirements.**

II.D.1.           The sponsoring institutions and participating sites of the program must have an adequate number and variety of adult and pediatric surgical patients for resident education. Experience in all 12 categories of surgical experience is important and must not be limited by excessive clinical responsibility in any one or several categories or by excessive nonclinical activities.

**II.E.**           **Medical Information Access**

           **Residents must have ready access to specialty-specific and other appropriate reference material in print or electronic format. Electronic medical literature databases with search capabilities should be available.**

**III.**           **Resident Appointments**

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 43 of 103

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 44 of 103

### III.A.       Eligibility Criteria

**The program director must comply with the criteria for resident eligibility as specified in the Institutional Requirements.**

III.A.1.          The program director must have documentation on file of the satisfactory completion of prerequisite education before the candidate begins plastic surgery residency education.

### III.B.       Number of Residents

**The program director may not appoint more residents than approved by the Review Committee, unless otherwise stated in the specialty-specific requirements. The program's educational resources must be adequate to support the number of residents appointed to the program.**

III.B.1.          Programs may not enroll more residents at any level or in total than the number of residents approved by the Review Committee.

III.B.2.          Any increase in resident complement, including a temporary increase, must be approved in advance by the Review Committee. This also includes a temporary increase in resident complement when a resident's education must be extended for remedial reasons.

III.B.3.          Vacant positions in either program format must be filled at the same level as the vacancy. If the program director wishes to fill a vacancy with a resident at another level, this request for a temporary increase in resident complement also requires advance approval from the Review Committee.

### III.C.       Resident Transfers

III.C.1.          **Before accepting a resident who is transferring from another program, the program director must obtain written or electronic verification of previous educational experiences and a summative competency-based performance evaluation of the transferring resident.**

III.C.2.          **A program director must provide timely verification of residency education and summative performance evaluations for residents who leave the program prior to completion.**

III.C.3.          Although residents may transfer from one program to another, they may not change from one format education to another, e.g., integrated to independent format or vice versa, without advance approval of the Review Committee.

### III.D.       Appointment of Fellows and Other Learners

**The presence of other learners (including, but not limited to, residents from other specialties, subspecialty fellows, PhD students, and nurse practitioners) in the program must not interfere with the appointed**

residents' education. The program director must report the presence of other learners to the DIO and GMEC in accordance with sponsoring institution guidelines.

III.D.1.    The addition of fellows or other students requires a clear statement of the areas of education, clinical responsibilities, duration of the education, and the impact of these fellows/other students on the education of the plastic surgery residents.

IV.    Educational Program

IV.A.    The curriculum must contain the following educational components:

IV.A.1.    Overall educational goals for the program, which the program must distribute to residents and faculty annually;

IV.A.2.    Competency-based goals and objectives for each assignment at each educational level, which the program must distribute to residents and faculty annually, in either written or electronic form. These should be reviewed by the resident at the start of each rotation;

IV.A.3.    Regularly scheduled didactic sessions;

IV.A.4.    Delineation of resident responsibilities for patient care, progressive responsibility for patient management, and supervision of residents over the continuum of the program; and,

IV.A.5.    ACGME Competencies

The program must integrate the following ACGME competencies into the curriculum:

IV.A.5.a)    Patient Care

Residents must be able to provide patient care that is compassionate, appropriate, and effective for the treatment of health problems and the promotion of health. Residents:

IV.A.5.a).(1)    should have specific clinical experience in the following areas:

IV.A.5.a).(1).(a)    congenital defects of the head and neck, including clefts of the lip and palate, and craniofacial surgery;

IV.A.5.a).(1).(b)    neoplasms of the head and neck surgery, including neoplasms of the head and neck, and the oropharynx;

IV.A.5.a).(1).(c)    craniomaxillofacial trauma, including fractures;

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 45 of 103

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 46 of 103

| | |
|---|---|
| IV.A.5.a).(1).(d) | aesthetic (cosmetic) surgery of the head and neck, trunk, and extremities; |
| IV.A.5.a).(1).(e) | plastic surgery of the breast; |
| IV.A.5.a).(1).(f) | surgery of the hand/upper extremities; |
| IV.A.5.a).(1).(g) | plastic surgery of the lower extremities; |
| IV.A.5.a).(1).(h) | plastic surgery of the trunk and genitalia; |
| IV.A.5.a).(1).(i) | burn reconstruction; |
| IV.A.5.a).(1).(j) | microsurgical techniques applicable to plastic surgery; |
| IV.A.5.a).(1).(k) | reconstruction by tissue transfer, including flaps and grafts; and, |
| IV.A.5.a).(1).(l) | surgery of benign and malignant lesions of the skin and soft tissues. |
| IV.A.5.a).(2) | are strongly suggested to have specific clinical experience in the following areas: |
| IV.A.5.a).(2).(a) | acute burn management; |
| IV.A.5.a).(2).(b) | anesthesia; |
| IV.A.5.a).(2).(c) | oral & maxillofacial surgery; |
| IV.A.5.a).(2).(d) | dermatology; |
| IV.A.5.a).(2).(e) | oculoplastic surgery or ophthalmology; |
| IV.A.5.a).(2).(f) | orthopedic surgery; |
| IV.A.5.a).(2).(f).(i) | These additional strongly suggested clinical experiences may occur during training prior to plastic surgery, if verified and documented by the program director. |
| IV.A.5.a).(3) | must have a well-organized and -supervised outpatient clinic experience operating in relation to an inpatient service used in the program. This experience must include: |
| IV.A.5.a).(3).(a) | the opportunity to see patients, establish provisional diagnoses, and initiate preliminary plans prior to the patients' treatment; |

IV.A.5.a).(3).(b)      an opportunity for follow-up care so that the results of surgical care may be evaluated by the responsible residents; and,

IV.A.5.a).(3).(c)      appropriate faculty supervision.

IV.A.5.a).(4)      who participate in patient care in a private office setting must function with an appropriate degree of responsibility and adequate supervision, with program director oversight.

**IV.A.5.b)**      **Medical Knowledge**

**Residents must demonstrate knowledge of established and evolving biomedical, clinical, epidemiological and social-behavioral sciences, as well as the application of this knowledge to patient care. Residents:**

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 47 of 103

IV.A.5.b).(1)      must have conferences that include the pertinent basic science subjects, such as anatomy, physiology, pathology, embryology, radiation biology, genetics, microbiology, pharmacology, as well as practice management, ethics, and medico-legal topics;

IV.A.5.b).(2)      must participate and present educational material at conferences. Adequate time for preparation should be permitted, both to maximize the educational experience for the residents and to emphasize the importance of the experience; and,

IV.A.5.b).(3)      must be exposed to surgical design, surgical diagnosis, embryology, surgical and artistic anatomy, surgical physiology and pharmacology, wound healing, surgical pathology and microbiology, adjunctive oncological therapy, biomechanics, rehabilitation, and surgical instrumentation are fundamental to the specialty. Residents must have sound judgment and technical capabilities to achieve satisfactory surgical results.

**IV.A.5.c)**      **Practice-based Learning and Improvement**

**Residents must demonstrate the ability to investigate and evaluate their care of patients, to appraise and assimilate scientific evidence, and to continuously improve patient care based on constant self-evaluation and life-long learning. Residents are expected to develop skills and habits to be able to meet the following goals:**

**IV.A.5.c).(1)**      **identify strengths, deficiencies, and limits in one's knowledge and expertise;**

**IV.A.5.c).(2)**      **set learning and improvement goals;**

| IV.A.5.c).(3) | identify and perform appropriate learning activities; |
| IV.A.5.c).(4) | systematically analyze practice using quality improvement methods, and implement changes with the goal of practice improvement; |
| IV.A.5.c).(5) | incorporate formative evaluation feedback into daily practice; |
| IV.A.5.c).(6) | locate, appraise, and assimilate evidence from scientific studies related to their patients' health problems; |
| IV.A.5.c).(7) | use information technology to optimize learning; and, |
| IV.A.5.c).(8) | participate in the education of patients, families, students, residents and other health professionals. |
| IV.A.5.d) | **Interpersonal and Communication Skills** |
| | **Residents must demonstrate interpersonal and communication skills that result in the effective exchange of information and collaboration with patients, their families, and health professionals. Residents are expected to:** |
| IV.A.5.d).(1) | communicate effectively with patients, families, and the public, as appropriate, across a broad range of socioeconomic and cultural backgrounds; |
| IV.A.5.d).(2) | communicate effectively with physicians, other health professionals, and health related agencies; |
| IV.A.5.d).(3) | work effectively as a member or leader of a health care team or other professional group; |
| IV.A.5.d).(4) | act in a consultative role to other physicians and health professionals; and, |
| IV.A.5.d).(5) | maintain comprehensive, timely, and legible medical records, if applicable. |
| IV.A.5.e) | **Professionalism** |
| | **Residents must demonstrate a commitment to carrying out professional responsibilities and an adherence to ethical principles. Residents are expected to demonstrate:** |
| IV.A.5.e).(1) | compassion, integrity, and respect for others; |
| IV.A.5.e).(2) | responsiveness to patient needs that supersedes self- |

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 48 of 103

|  |  |
|---|---|
|  | interest; |
| IV.A.5.e).(3) | respect for patient privacy and autonomy; |
| IV.A.5.e).(4) | accountability to patients, society and the profession; and, |
| IV.A.5.e).(5) | sensitivity and responsiveness to a diverse patient population, including but not limited to diversity in gender, age, culture, race, religion, disabilities, and sexual orientation. |
| IV.A.5.f) | **Systems-based Practice** |
|  | Residents must demonstrate an awareness of and responsiveness to the larger context and system of health care, as well as the ability to call effectively on other resources in the system to provide optimal health care. Residents are expected to: |
| IV.A.5.f).(1) | work effectively in various health care delivery settings and systems relevant to their clinical specialty; |
| IV.A.5.f).(2) | coordinate patient care within the health care system relevant to their clinical specialty; |
| IV.A.5.f).(3) | incorporate considerations of cost awareness and risk-benefit analysis in patient and/or population-based care as appropriate; |
| IV.A.5.f).(4) | advocate for quality patient care and optimal patient care systems; |
| IV.A.5.f).(5) | work in interprofessional teams to enhance patient safety and improve patient care quality; and, |
| IV.A.5.f).(6) | participate in identifying system errors and implementing potential systems solutions. |
| **IV.B.** | **Residents' Scholarly Activities** |
| IV.B.1. | The curriculum must advance residents' knowledge of the basic principles of research, including how research is conducted, evaluated, explained to patients, and applied to patient care. |
| IV.B.2. | Residents should participate in scholarly activity. |
| IV.B.3. | The sponsoring institution and program should allocate adequate educational resources to facilitate resident involvement in scholarly activities. |

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 49 of 103

V.    Evaluation

V.A.    Resident Evaluation

V.A.1.    Formative Evaluation

V.A.1.a)    The faculty must evaluate resident performance in a timely manner during each rotation or similar educational assignment, and document this evaluation at completion of the assignment.

V.A.1.b)    The program must:

V.A.1.b).(1)    provide objective assessments of competence in patient care, medical knowledge, practice-based learning and improvement, interpersonal and communication skills, professionalism, and systems-based practice;

V.A.1.b).(2)    use multiple evaluators (e.g., faculty, peers, patients, self, and other professional staff);

V.A.1.b).(3)    document progressive resident performance improvement appropriate to educational level; and,

V.A.1.b).(4)    provide each resident with documented semiannual evaluation of performance with feedback.

V.A.1.c)    The evaluations of resident performance must be accessible for review by the resident, in accordance with institutional policy.

V.A.1.d)    A policy for a resident's annual advancement must be developed and implemented.

V.A.2.    Summative Evaluation

The program director must provide a summative evaluation for each resident upon completion of the program. This evaluation must become part of the resident's permanent record maintained by the institution, and must be accessible for review by the resident in accordance with institutional policy. This evaluation must:

V.A.2.a)    document the resident's performance during the final period of education, and

V.A.2.b)    verify that the resident has demonstrated sufficient competence to enter practice without direct supervision.

V.B.    Faculty Evaluation

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 50 of 103

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 51 of 103

| V.B.1. | At least annually, the program must evaluate faculty performance as it relates to the educational program. |
|---|---|
| V.B.2. | These evaluations should include a review of the faculty's clinical teaching abilities, commitment to the educational program, clinical knowledge, professionalism, and scholarly activities. |
| V.B.3. | This evaluation must include at least annual written confidential evaluations by the residents. |
| V.C. | Program Evaluation and Improvement |
| V.C.1. | The program must document formal, systematic evaluation of the curriculum at least annually. The program must monitor and track each of the following areas: |
| V.C.1.a) | resident performance; |
| V.C.1.b) | faculty development; |
| V.C.1.c) | graduate performance, including performance of program graduates on the certification examination; and, |
| V.C.1.d) | program quality. Specifically: |
| V.C.1.d).(1) | Residents and faculty must have the opportunity to evaluate the program confidentially and in writing at least annually, and |
| V.C.1.d).(2) | The program must use the results of residents' assessments of the program together with other program evaluation results to improve the program. |
| V.C.2. | If deficiencies are found, the program should prepare a written plan of action to document initiatives to improve performance in the areas listed in section V.C.1. The action plan should be reviewed and approved by the teaching faculty and documented in meeting minutes. |
| VI. | Resident Duty Hours in the Learning and Working Environment |
| VI.A. | Professionalism, Personal Responsibility, and Patient Safety |
| VI.A.1. | Programs and sponsoring institutions must educate residents and faculty members concerning the professional responsibilities of physicians to appear for duty appropriately rested and fit to provide the services required by their patients. |
| VI.A.2. | The program must be committed to and responsible for promoting patient safety and resident well-being in a supportive educational |

environment.

| VI.A.3. | The program director must ensure that residents are integrated and actively participate in interdisciplinary clinical quality improvement and patient safety programs. |
|---|---|
| VI.A.4. | The learning objectives of the program must: |
| VI.A.4.a) | be accomplished through an appropriate blend of supervised patient care responsibilities, clinical teaching, and didactic educational events; and, |
| VI.A.4.b) | not be compromised by excessive reliance on residents to fulfill non-physician service obligations. |
| VI.A.5. | The program director and institution must ensure a culture of professionalism that supports patient safety and personal responsibility. Residents and faculty members must demonstrate an understanding and acceptance of their personal role in the following: |
| VI.A.5.a) | assurance of the safety and welfare of patients entrusted to their care; |
| VI.A.5.b) | provision of patient- and family-centered care; |
| VI.A.5.c) | assurance of their fitness for duty; |
| VI.A.5.d) | management of their time before, during, and after clinical assignments; |
| VI.A.5.e) | recognition of impairment, including illness and fatigue, in themselves and in their peers; |
| VI.A.5.f) | attention to lifelong learning; |
| VI.A.5.g) | the monitoring of their patient care performance improvement indicators; and, |
| VI.A.5.h) | honest and accurate reporting of duty hours, patient outcomes, and clinical experience data. |
| VI.A.6. | All residents and faculty members must demonstrate responsiveness to patient needs that supersedes self-interest. Physicians must recognize that under certain circumstances, the best interests of the patient may be served by transitioning that patient's care to another qualified and rested provider. |
| VI.B. | **Transitions of Care** |
| VI.B.1. | Programs must design clinical assignments to minimize the number |

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 52 of 103

of transitions in patient care.

| VI.B.2. | Sponsoring institutions and programs must ensure and monitor effective, structured hand-over processes to facilitate both continuity of care and patient safety. |

VI.B.2.  Sponsoring institutions and programs must ensure and monitor effective, structured hand-over processes to facilitate both continuity of care and patient safety.

VI.B.3.  Programs must ensure that residents are competent in communicating with team members in the hand-over process.

VI.B.4.  The sponsoring institution must ensure the availability of schedules that inform all members of the health care team of attending physicians and residents currently responsible for each patient's care.

VI.C.  Alertness Management/Fatigue Mitigation

VI.C.1.  The program must:

VI.C.1.a)  educate all faculty members and residents to recognize the signs of fatigue and sleep deprivation;

VI.C.1.b)  educate all faculty members and residents in alertness management and fatigue mitigation processes; and,

VI.C.1.c)  adopt fatigue mitigation processes to manage the potential negative effects of fatigue on patient care and learning, such as naps or back-up call schedules.

VI.C.2.  Each program must have a process to ensure continuity of patient care in the event that a resident may be unable to perform his/her patient care duties.

VI.C.3.  The sponsoring institution must provide adequate sleep facilities and/or safe transportation options for residents who may be too fatigued to safely return home.

VI.D.  Supervision of Residents

VI.D.1.  In the clinical learning environment, each patient must have an identifiable, appropriately-credentialed and privileged attending physician (or licensed independent practitioner as approved by each Review Committee) who is ultimately responsible for that patient's care.

VI.D.1.a)  This information should be available to residents, faculty members, and patients.

VI.D.1.b)  Residents and faculty members should inform patients of their respective roles in each patient's care.

VI.D.2.  The program must demonstrate that the appropriate level of

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 53 of 103

supervision is in place for all residents who care for patients.

Supervision may be exercised through a variety of methods. Some activities require the physical presence of the supervising faculty member. For many aspects of patient care, the supervising physician may be a more advanced resident or fellow. Other portions of care provided by the resident can be adequately supervised by the immediate availability of the supervising faculty member or resident physician, either in the institution, or by means of telephonic and/or electronic modalities. In some circumstances, supervision may include post-hoc review of resident-delivered care with feedback as to the appropriateness of that care.

VI.D.3.  Levels of Supervision

To ensure oversight of resident supervision and graded authority and responsibility, the program must use the following classification of supervision:

VI.D.3.a)  Direct Supervision – the supervising physician is physically present with the resident and patient.

VI.D.3.b)  Indirect Supervision:

VI.D.3.b).(1)  with direct supervision immediately available – the supervising physician is physically within the hospital or other site of patient care, and is immediately available to provide Direct Supervision.

VI.D.3.b).(2)  with direct supervision available – the supervising physician is not physically present within the hospital or other site of patient care, but is immediately available by means of telephonic and/or electronic modalities, and is available to provide Direct Supervision.

VI.D.3.c)  Oversight – the supervising physician is available to provide review of procedures/encounters with feedback provided after care is delivered.

VI.D.4.  The privilege of progressive authority and responsibility, conditional independence, and a supervisory role in patient care delegated to each resident must be assigned by the program director and faculty members.

VI.D.4.a)  The program director must evaluate each resident's abilities based on specific criteria. When available, evaluation should be guided by specific national standards-based criteria.

VI.D.4.b)  Faculty members functioning as supervising physicians should delegate portions of care to residents, based on the

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 54 of 103

needs of the patient and the skills of the residents.

VI.D.4.c)   Senior residents or fellows should serve in a supervisory role of junior residents in recognition of their progress toward independence, based on the needs of each patient and the skills of the individual resident or fellow.

VI.D.5.   Programs must set guidelines for circumstances and events in which residents must communicate with appropriate supervising faculty members, such as the transfer of a patient to an intensive care unit, or end-of-life decisions.

VI.D.5.a)   Each resident must know the limits of his/her scope of authority, and the circumstances under which he/she is permitted to act with conditional independence.

VI.D.5.a).(1)   In particular, PGY-1 residents should be supervised either directly or indirectly with direct supervision immediately available.

VI.D.6.   Faculty supervision assignments should be of sufficient duration to assess the knowledge and skills of each resident and delegate to him/her the appropriate level of patient care authority and responsibility.

VI.E.   Clinical Responsibilities

The clinical responsibilities for each resident must be based on PGY-level, patient safety, resident education, severity and complexity of patient illness/condition and available support services.

VI.F.   Teamwork

Residents must care for patients in an environment that maximizes effective communication. This must include the opportunity to work as a member of effective interprofessional teams that are appropriate to the delivery of care in the specialty.

VI.F.1.   Effective surgical practices entail the involvement of interdisciplinary team members with a mix of complementary skills.

VI.F.2.   Residents must collaborate with fellow surgical residents, and especially with faculty members, other physicians outside of the specialty, and non-physician health care providers, to best formulate treatment plans for an increasingly diverse patient population.

VI.F.3.   Residents must assume personal responsibility to complete all tasks to which they are assigned (or which they voluntarily assume) in a timely fashion. These tasks must be completed in the hours assigned, or, if that is not possible, residents must learn and utilize the established methods for handing off remaining tasks to another member of the resident team

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 55 of 103

so that patient care is not compromised.

VI.F.4.     Lines of authority should be defined by programs, and all residents must have a working knowledge of these expected reporting relationships to maximize quality care and patient safety.

VI.G.     **Resident Duty Hours**

VI.G.1.     **Maximum Hours of Work per Week**

**Duty hours must be limited to 80 hours per week, averaged over a four-week period, inclusive of all in-house call activities and all moonlighting.**

VI.G.1.a)     **Duty Hour Exceptions**

**A Review Committee may grant exceptions for up to 10% or a maximum of 88 hours to individual programs based on a sound educational rationale.**

The Review Committee for Plastic Surgery will not consider requests for exceptions to the 80-hour limit to the residents' work week.

VI.G.1.a).(1)     **In preparing a request for an exception the program director must follow the duty hour exception policy from the ACGME Manual on Policies and Procedures.**

VI.G.1.a).(2)     **Prior to submitting the request to the Review Committee, the program director must obtain approval of the institution's GMEC and DIO.**

VI.G.2.     **Moonlighting**

VI.G.2.a)     **Moonlighting must not interfere with the ability of the resident to achieve the goals and objectives of the educational program.**

VI.G.2.b)     **Time spent by residents in Internal and External Moonlighting (as defined in the ACGME Glossary of Terms) must be counted towards the 80-hour Maximum Weekly Hour Limit.**

VI.G.2.c)     **PGY-1 residents are not permitted to moonlight.**

VI.G.3.     **Mandatory Time Free of Duty**

**Residents must be scheduled for a minimum of one day free of duty every week (when averaged over four weeks). At-home call cannot be assigned on these free days.**

VI.G.4.     **Maximum Duty Period Length**

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 56 of 103

| VI.G.4.a) | Duty periods of PGY-1 residents must not exceed 16 hours in duration. |
|---|---|
| VI.G.4.b) | Duty periods of PGY-2 residents and above may be scheduled to a maximum of 24 hours of continuous duty in the hospital. Programs must encourage residents to use alertness management strategies in the context of patient care responsibilities. Strategic napping, especially after 16 hours of continuous duty and between the hours of 10:00 p.m. and 8:00 a.m., is strongly suggested. |
| VI.G.4.b).(1) | It is essential for patient safety and resident education that effective transitions in care occur. Residents may be allowed to remain on-site in order to accomplish these tasks; however, this period of time must be no longer than an additional four hours. |
| VI.G.4.b).(2) | Residents must not be assigned additional clinical responsibilities after 24 hours of continuous in-house duty. |
| VI.G.4.b).(3) | In unusual circumstances, residents, on their own initiative, may remain beyond their scheduled period of duty to continue to provide care to a single patient. Justifications for such extensions of duty are limited to reasons of required continuity for a severely ill or unstable patient, academic importance of the events transpiring, or humanistic attention to the needs of a patient or family. |
| VI.G.4.b).(3).(a) | Under those circumstances, the resident must: |
| VI.G.4.b).(3).(a).(i) | appropriately hand over the care of all other patients to the team responsible for their continuing care; and, |
| VI.G.4.b).(3).(a).(ii) | document the reasons for remaining to care for the patient in question and submit that documentation in every circumstance to the program director. |
| VI.G.4.b).(3).(b) | The program director must review each submission of additional service, and track both individual resident and program-wide episodes of additional duty. |
| VI.G.5. | Minimum Time Off between Scheduled Duty Periods |
| VI.G.5.a) | PGY-1 residents should have 10 hours, and must have eight hours, free of duty between scheduled duty periods. |

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 57 of 103

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 58 of 103

VI.G.5.b)    **Intermediate-level residents should have 10 hours free of duty, and must have eight hours between scheduled duty periods. They must have at least 14 hours free of duty after 24 hours of in-house duty.**

For independent programs, Y-1, -2, and -3 residents are considered to be in the final years of education.

For integrated programs, Y-2 and -3 residents are considered to be at the intermediate level.

VI.G.5.c)    **Residents in the final years of education must be prepared to enter the unsupervised practice of medicine and care for patients over irregular or extended periods.**

For independent programs, Y-1, -2, and -3 residents are considered to be in the final years of education.

For integrated programs, Y-4, -5 and -6 residents are considered to be in the final years of education.

VI.G.5.c).(1)    **This preparation must occur within the context of the 80-hour, maximum duty period length, and one-day-off-in-seven standards. While it is desirable that residents in their final years of education have eight hours free of duty between scheduled duty periods, there may be circumstances when these residents must stay on duty to care for their patients or return to the hospital with fewer than eight hours free of duty.**

VI.G.5.c).(1).(a)    **Circumstances of return-to-hospital activities with fewer than eight hours away from the hospital by residents in their final years of education must be monitored by the program director**

VI.G.5.c).(1).(b)    The Review Committee defines such circumstances as: required continuity of care for a severely ill or unstable patient, or a complex patient with whom the resident has been involved; events of exceptional educational value; or, humanistic attention to the needs of a patient or family.

VI.G.6.    **Maximum Frequency of In-House Night Float**

**Residents must not be scheduled for more than six consecutive nights of night float.**

VI.G.6.a)    Residents must not have more than four consecutive weeks of night float assignment, and night float cannot exceed one month

per year.

VI.G.7.        **Maximum In-House On-Call Frequency**

               **PGY-2 residents and above must be scheduled for in-house call no more frequently than every-third-night (when averaged over a four-week period).**

VI.G.8.        **At-Home Call**

VI.G.8.a)          **Time spent in the hospital by residents on at-home call must count towards the 80-hour maximum weekly hour limit. The frequency of at-home call is not subject to the every-third-night limitation, but must satisfy the requirement for one-day-in-seven free of duty, when averaged over four weeks.**

VI.G.8.a).(1)          **At-home call must not be so frequent or taxing as to preclude rest or reasonable personal time for each resident.**

VI.G.8.b)          **Residents are permitted to return to the hospital while on at-home call to care for new or established patients. Each episode of this type of care, while it must be included in the 80-hour weekly maximum, will not initiate a new "off-duty period".**

VII.     **Innovative Projects**

Requests for innovative projects that may deviate from the institutional, common and/or specialty specific program requirements must be approved in advance by the Review Committee. In preparing requests, the program director must follow Procedures for Approving Proposals for Innovative Projects located in the ACGME Manual on Policies and Procedures. Once a Review Committee approves a project, the sponsoring institution and program are jointly responsible for the quality of education offered to residents for the duration of such a project.

***

ACGME-approved: June 10, 2008; Effective: July 1, 2009
Revised Common Program Requirements Effective: July 1, 2011
ACGME-approved Focused Revision: October 1, 2011; Effective: July 1, 2012

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 59 of 103

# Exhibit C

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 60 of 103

The University of Chicago Medical Center
Graduate Medical Education Policy Manual

# Table of Contents

Policy Number

| | |
|---|---|
| Institutional Commitment for Graduate Medical Education | 01 |
| Internal Program Review | 02 |
| Resident Eligibility, Selection, and Promotion | 03 |
| Visas, Licenses, Matriculation, and Orientation | 04 |
| Salary, Vacation and Sick Days | 05 |
| Leave of Absence | 06 |
| Extra Service Pay Activity..... Including Moonlighting | 07 |
| Duty Hours and Working Environment | 08 |
| Resident Supervision | 09 |
| Resident Dismissal | 10 |
| Resident/Fellow Evaluation | 11 |
| Non-Renewal of Agreement | 12 |
| Residency Closure/Reduction | 13 |
| Blank | 14 |
| Grievance Procedure | 15 |
| Disaster Policy | 16 |
| Restrictive Covenants | 17 |

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 61 of 103

Revised June 2010

MA003588

The University of Chicago Hospitals
Graduate Medical Education Policy Manual

# Institutional Commitment for Graduate Medical Education

Issued: October 2000
Revised: February 2005
Reviewed:

Page 1 of 3
Institutional Commitment for Graduate Medical Education
Graduate Medical Education Policy 01

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 62 of 103

## Purpose

The purpose of this policy is to ensure that there is a clear statement of institutional commitment for training programs at the University of Chicago Hospitals.

This commitment must meet the Accreditation Council for Graduate Medical Education (ACGME) criteria as well as state and federal laws, orders, and regulations concerning discrimination and equal opportunity.

## Institutional Organization and Commitment

The University of Chicago Hospitals provides residency programs with guidance and supervision of all trainees.

The Hospitals is committed to quality education and patient care by providing an ethical and professional milieu, and the necessary educational, financial and human resources to support graduate medical education, in compliance with ACGME institutional and program requirements, and an assessment of the quality and compliance with ACGME requirements of the residency programs.

The Graduate Medical Education Committee provides the leadership for this continuing assessment and is supported by the administration and teaching staff.

## Educational Administration

The Dean of the Biological Sciences Division has the authority and responsibility for the oversight and administration of all training programs.

The Graduate Medical Education Committee (GMEC) monitors and advises on all aspects of Resident/Fellow education. The voting membership of the GMEC is comprised of the program directors of all ACGME approved core programs or their designees, residents/fellows nominated by their peers, appropriate faculty members, the Dean of the Biological Sciences Division or his/her designee, the GMEC chair, the Designated Institutional Official, and other individuals as determined by the Committee.

Responsibilities of the GMEC include the following:

MA003589

Establishment and implementation of policies and procedures that affect all training programs regarding the quality of education and the work environment for the Residents/Fellows in each program.

Establishment and maintenance of appropriate oversight of, and liaison with, program directors and assurance that program directors establish and maintain proper oversight of, and liaison with, appropriate personnel of other institutions participating in programs sponsored by the University of Chicago Hospitals.

Establishment and implementation of formal written policies governing resident duty hours that are consistent with ACGME Institutional and Program Requirements (REF: GMEC Policy #08).

Assurance that each program provides a curriculum and an evaluation system to ensure that residents demonstrate achievement of the six general competencies.

Regular review of all ACGME letters of accreditation and the monitoring of action plans for the correction of concerns and areas of noncompliance.

Regular review of the University of Chicago Hospitals Letter of Report from the Institutional Review Committee and developing and monitoring action plans for the correction of concerns and areas of noncompliance.

Review and approval prior to submission to the ACGME:
- All applications for ACGME accreditation of new programs and subspecialties
- Changes in resident complement
- Major changes in program structure or length of training
- Additions and deletions of participating institutions used in a program
- Appointment of new program directors
- Progress reports requested by any Review Committee
- Responses to all proposed adverse actions
- Requests for increases or any change in resident duty hours
- Requests for "inactive status" or to reactivate a program
- Voluntary withdrawals of ACGME-accredited programs
- Requests for an appeal of an adverse action
- Appeal presentations to a Board of Appeal or the ACGME

Conducting internal reviews of all ACGME-accredited programs including subspecialty programs to assess their compliance with the Institutional Requirements and the Program Requirements of the ACGME Residency Review Committees.

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 63 of 103

MA003590

Assurance that all programs provide appropriate supervision for all residents that is consistent with proper patient care, the educational needs of residents, and the applicable Program Reqirements.

Establishment and implementation of formal written institutional policies for the selection, evaluation, promotion, and dismissal of residents in compliance with both the institutional and relevant program requirements (REF: GMEC Policy #03).

Assurance of an educational environment in which residents may raise and resolve issues without fear of intimidation or retaliation.

Annual Review of, and making recommendations on, stipends and benefits and the funding for resident positions, and support services to assure that these are reasonable and fair.

Monitoring of the programs in establishing an appropriate work environment and duty hours of residents.

The GMEC is required to meet four times a year at a minimum.

### Interpretation, Implementation and Revision

The Graduate Medical Education Committee is responsible for the interpretation, implementation, and revision of this policy.

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 64 of 103

James L. Madara, MD
Dean
Vice President for
  Medical Affairs
Biological Sciences Division
University of Chicago

Michael C. Riordan
President and
  Chief Executive Officer
University of Chicago
Hospitals and Health System

Michael A. Simon, MD
Assoc. Dean for Graduate
  Medical Education
Chair, Graduate Medical
  Education Committee

Issued:    October 2000
Revised:   February 2005
Reviewed:

Page 3 of 3
Institnl Commitment for Graduate Medical Education
Graduate Medical Education Policy 01

MA003591

The University of Chicago Medical Center
Graduate Medical Education Policy

# Internal Program Review

| | | |
|---|---|---|
| Issued: | October 2000 | Page 1 of 3 |
| Revised: | September 2009 | Internal Program Review |
| Reviewed: | | Graduate Medical Education Policy 02 |

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 65 of 103

## Policy

The Graduate Medical Education Committee (GMEC) will review all ACGME-accredited programs according to the protocol described below and in compliance with ACGME Institutional Requirements Section IV (Internal Review). Specifically, internal reviews will assess for each program:

- Compliance with the Common, specialty/subspecialty-specific Program and Institutional Requirements;
- Educational objectives and effectiveness in meeting those objectives;
- Educational and financial resources;
- Effectiveness in addressing areas of non-compliance and concerns in previous ACGME accreditation letters of notification and previous internal reviews;
- Effectiveness of educational outcomes in the ACGME general competencies;
- Effectiveness in using evaluation tools and outcome measures to assess a resident's level of competence in each of the ACGME general competencies; and
- Annual program improvement efforts in:
  - Resident performance using aggregated resident data;
  - Faculty development;
  - Graduate performance including performance of program graduates on the certification examination; and
  - Program quality including the following parameters:
    - Confidential and written evaluation of the program at least annually by residents and faculty; and
    - Program improvement initiatives (including a documented written plan of action) resulting from input provided by residents and faculty.

## Internal Review Committee (IR) Membership

Internal reviews will be conducted by teams including:

- At least one program director or faculty member from a residency/fellowship program other than the one under review who will serve as IR co-chair with the GME Director;
- A resident/fellow from a program other than the one being reviewed;
- The GME Director who will serve as IR co-chair; and
- Additional internal or external reviewers or administrators from outside the program under review who may also be included at the discretion of the Chair of the GMEC or IR co-chairs.

MA003592

### Internal Review Scheduling

Internal reviews will be conducted prior to the current accreditation mid-cycle as indicated in the Institutional Review Document (IRD) Section 3 (Internal Review Schedule). The following guidelines will apply:

1.  Five or four-year cycle – 1 to 2 months prior to the ACGME designated mid-cycle date with a progress report addressing recommendations in 6 months following review by the GMEC.

2.  Three-year cycle – 2 to 3 months prior to the ACGME designated mid-cycle date with a progress report addressing recommendations in 3 months following review by the GMEC.

3.  Two-year cycle – program leadership will meet with the DIO/GMEC Chair and GME Director within one month following receipt of the Letter of Notification. An internal review will be scheduled to occur in 6 to 8 months. A progress report addressing recommendations will be due 3 months following review by the GMEC.

4.  One-year cycle – program leadership will meet with the DIO/GMEC Chair and GME Director within one month after the receipt of the Letter of Notification. An internal review will be conducted within 8 months. Progress reports will normally be required every 2 months thereafter until the next site visit.

If a program has no residents/fellows enrolled at the time of the scheduled review, the GMEC will conduct a modified review to ensure that the program has identified and maintained adequate faculty, staff resources, clinical volume and other necessary curricular elements required to be in substantial compliance with ACGME Institutional, Common and specialty/subspecialty-specific Program Requirements prior to the program enrolling a resident/fellow. After enrollment of a resident/fellow an internal review will be conducted within the second six-month period following commencement of training.

### Protocol

1.  The following material and data will be utilized for the internal review process:
    a.  ACGME Common, specialty/subspecialty-specific Program and Institutional Requirements in effect at the time of the review. Additionally, specialty/subspecialty-specific Program Requirements approved by ACGME but not yet effective may be utilized;
    b.  Most recent accreditation letter of notification and progress reports sent to the respective RRC;
    c.  Reports from previous internal reviews of the program;
    d.  Program documentation checklist;
    e.  Internal Review Self-Study Report;
    f.  Internal Review Checklist – Institutional Requirements for Internal Reviews;
    g.  Program policies on eligibility/selection, evaluation, promotion, disciplinary action, supervision, duty hours and moonlighting;
    h.  Resident and faculty evaluation of the overall program;
    i.  Program Goals and Objectives;
    j.  Results from internal or external resident surveys, e.g., ACGME online surveys;
    k.  Minutes from the most recent annual program review meeting.

2.  The internal review process will normally adhere to the following sequence:

    Dates for program internal review meetings will be set in accordance with the timeline described above. Following the setting of a date for the internal review meetings the GME Office will:
    1.  Provide to the program under review an electronic copy of the Internal Review Self-Study and list of additional documentation to be submitted. Completed documents are due to the GME Office at least one week prior to the scheduled meeting date;
    2.  Review team members will be provided copies of submitted documentation prior to the review meetings;

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 66 of 103

MA003593

3. Review team members will meet with the following:
   - Program director
   - Key faculty representing major participating sites
   - Residents/fellows representing all PG years (peer-selected)
   - Program coordinator
4. The GME Director or designee will review program documentation to ensure compliance with Common Program Requirements and UCMC GME policy. Results from the documentation review will be included in the internal review report.
5. The co-chairs will utilize the internal review report template and distribute a draft to all review team members, program director and GMEC Chair. Feedback will be incorporated into the final internal review report.
6. The GMEC will review findings and recommendations, suggest possible additional steps, approve the report and date for submission of a progress report addressing recommendations.

## Progress Report

Upon recommendation of the review team and approval by the GMEC progress reports may be required and will be submitted to the GMEC Chair. Receipt of internal review progress reports will be documented in GMEC minutes.

## Interpretation, Implementation and Revision

The Office of Graduate Medical Education is responsible for the revision of this policy.

The Graduate Medical Education Committee is responsible for the interpretation and implementation of this policy.

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 67 of 103

_____
Everett E. Vokes, M.D.
Interim Dean, Biological Sciences Division
   and the Pritzker School of Medicine
Interim Chief Executive Officer
University of Chicago Medical Center

_____
Michael A. Simon, M.D.
Assoc. Dean for Graduate Medical Education
Chair, Graduate Medical Education Committee
ACGME Designated Institutional Official

Issued:       October 2000
Revised:      September 2009
Reviewed:

Page 3 of 3
Internal Program Review
Graduate Medical Education Policy 02

The University of Chicago Hospitals
Graduate Medical Education Manual

## Resident Eligibility, Selection, and Promotion

| Issued: | September 1995 | Page 1 of 3 |
| Revised: | January 2005 | Resident Eligibility, Selection, and Promotion |
| Reviewed: | | Graduate Medical Education Policy 03 |

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 68 of 103

**Purpose**

The purpose of this policy is to set forth the requirements for applicants to the training programs at the University of Chicago Hospitals (UCH), to set forth the standards for the Hospitals and the individual training programs for the selection and promotion of residents in the training programs and to establish the institutional review of these matters, consistent with the program requirements of the ACGME and any applicable state and federal laws or regulations.

Graduate Medical Education Committee ("GMEC") The GMEC has the responsibility to monitor and advise on all aspects of residency education, including eligibility, selection and promotion. Each program is required to create written criteria for eligibility, selection and promotion and submit these criteria to the GMEC as part of the Internal Residency Program Review. Each program is also required to submit a written description of the processes by which these criteria will be implemented. The GMEC will review these criteria and their implementation for compliance with ACGME and institutional requirements.

**Eligibility**

To apply for a clinical training program position at the UCH, applicants must have one of the following qualifications:

- be graduates of United States or Canadian medical schools accredited by the Liaison Committee on Medical Education (LCME)
- be graduates of United States osteopathic medicine colleges accredited by the American Osteopathic Association
- be graduates of medical schools located outside the United States or Canada and have one of the following:
  - o a current valid certificate from the Educational Commission for Foreign Medical Graduates prior to appointment.
  - o a full and unrestricted license to practice medicine in the State of Illinois
- be graduates of medical schools outside the United States who have completed a Fifth Pathway program provided by an LCME accredited medical school (see "Institutional Requirements" III.A.1.d. in the current Graduate Medical Education Directory).

MA003595

**Enrollment of Noneligibles**

A training program's ACGME accreditation may be withdrawn if an applicant is enrolled who does not meet the above criteria.

**Nondiscrimination**

UCH and the individual programs shall not discriminate against any person in the selection or promotion process because of race, color, religion, sex, national origin, age, martial status, disability or veteran status.

**Selection**

Applicants are chosen according to criteria established by the individual programs.

These criteria include, but are not limited to:

- Preparedness
- Ability
- Aptitude
- Academic Credentials
- Communication Skills
- Personal Qualities such as motivation and integrity

**Method of Selection**

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 69 of 103

- Selected applicants are interviewed by the training program director and/or chairman of the department as designated by each department.
- Applicants are interviewed by faculty members and other program representative as designated by the training program written criteria.
- Evaluation of applicant interviews and credentials are reviewed by the program's selection committee.
- Selection of each applicant is based on the criteria listed in this policy.

Program directors may send applications for training programs to candidates at their discretion, as long as ACGME requirements, federal, and state nondiscrimination and equal opportunity laws, orders, and regulations are met.

**Promotion**

The decision whether to promote a resident is the responsibility of the residency director with the advice of the faculty of the program. Each program will develop written criteria for promotion based on the specialty and subspecialty requirements of the ACGME. The method of evaluation shall consist of direct observation of the resident as well as by indirect observation through rotation, evaluations, correspondence between programs and written examination (National Board, Inservice Exams). It is expected that residents will participate in all aspects of the curriculum, as well as in the periodic evaluation of educational experiences with teachers. It is further expected that residents will complete all administrative responsibilities of a resident. All contract renewals are subject to

review by the Hospitals to insure that the resident is in full compliance with all applicable Hospitals' policies, rules and regulations.

**Residency Training Program Director**

Nothing in this policy limits the training program directors' choices in selecting candidates when ACGME requirements, federal, and state nondiscrimination and equal opportunity laws, orders, and regulations are met.

Nothing is this policy limits the training directors' policies for promotion when ACGME requirements, federal, and state nondiscrimination and equal opportunity laws, orders, and regulations are met.

**Interpretation, Implementation and Revision**

The Office of Housestaff Affairs and Medical Legal Affairs are responsible for the revision of this policy.

The Graduate Medical Education Committee is responsible for the interpretation and implementation of this policy.

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 70 of 103

| | | |
|---|---|---|
| James L. Madara, M.D. | Michael C. Riordan | Michael A. Simon, M.D. |
| Dean | President and | Assoc. Dean for Graduate |
| Vice President for | Chief Executive Officer | Medical Education |
| Medical Affairs | University of Chicago | Chair, Graduate Medical |
| Biological Sciences Division | Hospitals and Health System | Education Committee |
| University of Chicago | | |

Issued: September 1995
Revised: January 2005
Reviewed: 03

Page 3 of 3
Resident Eligibility, Selection, and Promotion
Graduate Medical Education Policy

Case: 1:12-cv-08733 Document #: 81-21 Filed: 05/22/15 Page 73 of 105 PageID #:1998

The University of Chicago Medical Center
Graduate Medical Education Manual

# Visas, Licenses, Matriculation, and Orientation

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 71 of 103

**Purpose**

The purpose of this policy is to ensure that matriculation and orientation activities of all training programs at the University of Chicago Medical Center meet the Accreditation Council for Graduate Medical Education (ACGME) criteria as well as state and federal laws, orders, and regulations concerning discrimination and equal opportunity. Residents are required to obtain visas and licenses before they are matriculated.

**Matriculation**

Matriculation for each trainee is based on the starting date of the trainee's contract. A health screening examination is scheduled prior to the starting date of the contract. The trainee's appointment will not start until successful completion of the health screening including all required follow-up tests.

When the starting date of a trainee is delayed because of licensure, visa, or any other problem, the starting and ending dates in the trainee's contract and personnel files are changed to reflect the later starting date.

The training program director, in accordance with ACGME criteria, state and federal laws, orders, and regulations, may make a determination as to whether or not the lost time may be made up within the contract period.

**Licensure**

Trainees are required to hold temporary (training) or permanent State of Illinois licenses. No resident may participate in patient care activities, attend rounds, or be identified as a University of Chicago Medical Center resident or fellow until a valid Illinois medical license is obtained. Failure to obtain Illinois licensure by the contract starting date will delay the start date and may terminate the contract. The cost of obtaining licensure, either temporary or permanent, is the responsibility of the trainee.

**Visas**

When trainees are not United States Citizens, they must obtain and show proof of their visa status. The Medical Center will solicit verification of such status from third parties. Failure to show proof of visa status by the contract starting date will delay the start date and may terminate the contract.

MA003598

The J-1 visa is the preferred visa at the University of Chicago Medical Center. GMEC sponsored programs wishing to sponsor individuals on H1-B visas assume all financial costs related to the application process and continuation expenses associated with this class of visa. Programs are required to utilize the law firm with whom UCMC contracts for visa-related services. Additionally, approval from the GME Executive Committee is required prior to engaging the law firm representing UCMC.

The GME Office will provide facilitation assistance with the H1-B visa process.

**Orientation**

The Office of Graduate Medical Education has the responsibility to present a general orientation for all matriculated residents prior to commencing their clinical program.

Orientation content may include, but is not be limited to, presentations of benefits, payroll, health screening, identification photographs, training sessions required by law; and other information sessions specific to the policies and procedures of the University of Chicago Medical Center as determined necessary.

Departments are responsible for scheduling departmental orientation of clinical policies and procedures for new residents.

**Interpretation, Implementation and Revision**

The Office of Graduate Medical Education and Medical Legal Affairs are responsible for the revision of this policy.

The Graduate Medical Education Committee is responsible for the interpretation and implementation of this policy.

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 72 of 103

James L. Madara, M.D.
Dean, Biological Sciences Division
  and the Pritzker School of Medicine
Chief Executive Officer
  University of Chicago Medical Center

Michael A. Simon, M.D.
Assoc. Dean
  for Graduate Medical Education
Chair, Graduate Medical Education
  Committee

Issued:    October 2000
Revised:  January 2009
Reviewed:

Page 2 of 2
Visas, Licensure, Matriculation, and Orientation
Graduate Medical Education Policy 04

MA003599

The University of Chicago Medical Center
Graduate Medical Education Manual

**Salary, Vacation, and Sick Days**

Issued:                                                     Page 1 of 2
Revised: March 2001                             Salary, Vacation, and Sick Days
Reviewed:                        Graduate Medical Education Policy 05

## Purpose

The purpose of this policy is to ensure that salary and benefits for trainees in training programs at the University of Chicago Medical Center meet the Accreditation Council for Graduate Medical Education (ACGME) criteria as well as state and federal laws, orders, and regulations concerning discrimination and equal opportunity.

## Definitions

**Resident** is the term the *Graduate Medical Education Directory* and the ACGME use to designate all trainees at any training level in ACGME accredited programs. Trainees in accredited subspecialty training programs are specifically included.

**Fellow** is a term used by some training programs to indicate trainees in subspecialties.

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 73 of 103

## Salary

Salaries for residents are equitable and are set by PGY status rather than specialty. National and local reports issued by the Association of American Medical Colleges of salaries for previous years are taken into consideration. There is more latitude for compensating fellows with a range established for each PGY year. No contact is made with other hospitals to ascertain what they are planning to pay. Trainee salaries are set by the UCH SMG annually.

### Vacations

Residents and fellows paid by the Hospitals receive 20 days of paid vacation each year. Vacation days cannot be carried over to the next year and do not accrue during leave of absence. Program directors and trainees arrange vacation time by mutual agreement.

### Sick Days

Residents and fellows paid by the Hospitals receive five paid sick days a year. Sick leave days may not be used for vacation time. Sick days cannot be carried over to the following year and do not accrue during leave of absence.

MA003600

**Additional Benefits and Amenities**
A description of additional benefits may be found in the current edition of "Housestaff Benefits."

**Interpretation, Implementation and Revision**
The Office of Housestaff Affairs and Medical Legal Affairs are responsible for the revision of this policy.

The Graduate Medical Education Committee is responsible for the interpretation and implementation of this policy.

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 74 of 103

Bryce Weir, MD, PhD
Intermin Dean
Vice President for Medical Affairs
Biological Sciences Division
University of Chicago

Ralph W. Muller
President
University of Chicago
Hospitals and Health System

Michael J. Koetting
Chair
Graduate Medical Education Committee

Issued:
Revised: March 2001
Reviewed:
05

Page 2 of 2
Salary, Vacation, and Sick Days
Graduate Medical Education Policy

MA003601

The University of Chicago Medical Center
Graduate Medical Education Manual

**Leave of Absence**

Issued:
Revised:    February 2004
Reviewed:

Page 1 of 2
Leave of Absence
Graduate Medical Education Policy 06

**Purpose**

The purpose of this policy is to ensure that benefits for trainees in training programs at the University of Chicago Medical Center meet the Accreditation Council for Graduate Medical Education (ACGME) criteria as well as state and federal laws, orders, and regulations concerning discrimination and equal opportunity. The current edition of the "Housestaff Benefits" Handbook should be referenced for other leaves available to housestaff.

**Leave of Absence**

Trainees may request a personal leave of absence from their program directors in cooperation with the Office of Housestaff Affairs. The request should be predicated on an unusual or substantial personal situation not covered by FMLA, such as illness or death of a family member or civil or military obligation.

A written leave agreement must be formalized with the program director prior to the start date of the leave.

In most cases, a leave of absence should not exceed 8 weeks. During a given leave, a trainee must first use any available vacation allowance. Under no circumstances should additional paid leave be granted to compensate the trainee for vacation time used during a leave of absence.

Benefits coverage is continued during leave under the conditions specified by the UCH Personnel Policy 502.

If a personal leave compromises a trainee's ability to satisfy the criteria for completion of a residency program or specialty board requirements, the written leave agreement should specify how these requirements will be made up. A trainee may be required to extend the training period for any dates of absence in excess of allowable vacation time. During the extension, the housestaff member will receive the regular salary and benefits except for vacation allowance.

**Interpretation, Implementation and Revision**

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 75 of 103

The Office of Housestaff Affairs and Medical Legal Affairs are responsible for the revision of this policy.

The Graduate Medical Education Committee is responsible for the interpretation and implementation of this policy.

James L. Madara, M.D.
Dean
Vice President for Medical
Affairs
Biological Sciences Division
University of Chicago

Michael C. Riordan
President and
  Chief Executive Officer
University of Chicago
Hospitals and Health System

Michael A. Simon, M.D.
Chair
Graduate Medical Education
Committee

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 76 of 103

Issued:
Revised:        February 2004
Reviewed:
06

Page 2 of 2
Leave of Absence
Graduate Medical Education Policy

MA003603

University of Chicago Medical Center
Graduate Medical Education Policy

## Extra Service Pay Activity for Residents and Fellows
## Including Moonlighting

| Issued: | February 2001 | Page 1 of 4 |
|---------|---------------|-------------|
| Revised: | October 2008 | Extra Service Pay/Moonlighting |
| Reviewed: | October 2008 | Graduate Medical Education Policy 07 |

**Purpose**

The purpose of this policy is to ensure the graduate medical education programs at the University of Chicago Medical Center (UCMC) meet the Accreditation Council for Graduate Medical Education (ACGME) requirements as well as state and federal laws, orders, and regulations concerning off-duty activities.

**Definitions and Requirements -**

**Extra Service Pay** refers to professional activity not considered a required experience in the curriculum. The following elements are applicable to extra service pay:
1. Prior permission by the program director is required.
2. Professional activity is performed under the direct supervision of an attending physician.
3. Professional activity is performed in facilities and settings under corporate ownership of UCMC.
4. Compliance with ACGME duty hour standards must occur.
5. Residents/fellows may not be compelled or required to participate in activities required for extra service pay.

**Internal Moonlighting** refers to professional activity not considered an integral part or required experience in the curriculum. The following elements are applicable to internal moonlighting:
1. Prior permission by the program director is required.
2. Professional activity is performed without direct supervision within facilities under corporate ownership of UCMC.
3. An appointment to the UCMC medical staff is required.
4. An unrestricted Illinois medical license is required.
5. Compliance with ACGME duty hour standards must occur.
6. Residents/fellows may not be compelled or required to engage in internal moonlighting.

**External Moonlighting** activity includes professional activity not considered an integral part or required experience in the curriculum. The following elements are applicable to external moonlighting:
1. Prior permission by the program director is required.
2. Professional activity is performed without direct supervision within facilities not under corporate ownership of UCMC unless expressly stipulated pursuant to a

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 77 of 103

University of Chicago Medical Center
Graduate Medical Education Policy

contractual relationship between UCMC and the facility in which external
moonlighting will occur.

3. An unrestricted Illinois medical license is required.
4. Professional liability insurance is not provided by UCMC. Additionally, UCMC
   assumes no responsibility for professional activities performed by individuals
   engaged in external moonlighting.
5. Residents/fellows may not be compelled or required to engage in external
   moonlighting.

**Restrictions:**

A Resident or Fellow with either a temporary Illinois license or a J-1 visa is not permitted to
moonlight.

**Interpretation, Implementation and Revision:**

The Office of Graduate Medical Education and the Office of Legal Affairs are responsible
for the revision of this policy.

The Chief Compliance Officer and the Office of Legal Affairs are responsible for resolving
billing issues concerning residents and fellows.

The Graduate Medical Education Committee is responsible for the interpretation and
implementation of this policy.

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 78 of 103

_____
James L. Madara, M.D.
Dean, Biological Sciences Division
  and the Pritzker School of Medicine
Chief Executive Officer
University of Chicago Medical Center

_____
Michael A. Simon, M.D.
Assoc Dean for Graduate Medical Education
Chair, Graduate Medical Education Committee
ACGME Designated Institutional Official

MA003605

University of Chicago Medical Center
Graduate Medical Education Policy

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 79 of 103

| | Extra Service Pay (UCMC Hospitals/Clinics) Within Scope of Program Activities and Rotations | Internal Moonlighting (UCMC Hospitals/Clinics) Not Within Scope of Program Activities and Rotations | External Moonlighting (non-UCMC Hospitals/Clinics) Not Within Scope of Program Activities and Rotations |
|---|---|---|---|
| Direct Supervision Required? | YES | NO | NO |
| Prior approval by PD Required and Documented? | YES | YES | YES |
| Academic appointment? | NO | YES | COULD BE REQUIRED BY EXTERNAL SITE |
| Credentialing packet? | NO | YES | COULD BE REQUIRED BY EXTERNAL SITE |
| Moonlighting contract? | NO | YES | COULD BE REQUIRED BY EXTERNAL SITE |
| UCH Medical Staff? | NO | YES | NO |
| Unrestricted License Required? | NO | YES | YES |
| Must comply with Duty Hour Standards? | YES | YES | NO |
| Covered by UCMC Malpractice? | YES | YES | NO |
| Visa Issues J-1 or H-1b | Not permitted if J-1 H1-b under some circumstances | H-1b if qualified | H-1b must get on their own |

MA003606

University of Chicago Medical Center
Graduate Medical Education Policy

**RESIDENT/FELLOW REQUEST FOR APPROVAL OF MOONLIGHTING ACTIVITY**

Resident/Fellow Name: _____

Program:_____  PGY: _____

Moonlighting Activities:

1. The UCMC does not require any Resident/Fellow to engage in moonlighting.

2. A Resident / Fellow with either a temporary Illinois license, or any type of visa, is not permitted to engage in Moonlighting (Internal or External).

3. Residents/Fellows may engage in patient care activity beyond the scope of the GME sponsored program only with prior written approval by the Program Director.

4. In the event that approval is given for a Resident/Fellow to engage in any clinical practice outside of the Program, UCMC accepts no responsibility for such practice and provides no liability coverage under the self-insurance trust unless otherwise expressly agreed to in writing between UCMC and the facility in which moonlighting will occur.

5. Moonlighting that occurs within the residency program and/or the sponsoring institution, i.e., internal moonlighting, must be counted toward the 80-weekly limit on duty hours. The resident/fellow agrees to remain in compliance with ACGME duty hour standards.

6. The Resident/Fellow understands and agrees that, except as specifically agreed in writing, s/he does not represent the University of Chicago Medical Center when performing any clinical activities outside of the residency program or outside of the University of Chicago Medical Center.

7. Except in the performance of clinical activities pursuant to the Program, no suggestion by word, uniform or use of documents that the individual functions as a representative of the University of Chicago Medical Center will be made.

8. While engaging in Moonlighting the Resident/Fellow stipulates that no use of any equipment or documents (including prescription pads) supplied by UCMC will occur.

**Description of Proposed Moonlighting Activity (including dates):**

_____
_____
_____
_____

Resident/Fellow Signature: _____  Date: _____
Approved by Program Director:_____  Date: _____

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 80 of 103

MA003607

University of Chicago Hospitals
Graduate Medical Education Policy Manual

## Duty Hours and Working Environment

| | | |
|---|---|---|
| Issued: | September 1995 | Page 1 of 5 |
| Revised: | February 2005 | Working Environment |
| Reviewed: | | Graduate Medical Education Policy 08 |

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 81 of 103

### Purpose
The purpose of this policy is to ensure training programs at the University of Chicago Hospitals meet the ACGME requirements established for resident training hours. Duty hour assignments recognize that faculty and residents collectively have responsibility for the safety and welfare of patients.

### Definitions
**Duty Hours** are defined as all clinical and academic activities related to the residency program, i.e., patient care (both inpatient and outpatient), administrative duties related to patient care, the provision for transfer of patient care, time spent in-house during call activities, and scheduled academic activities such as conferences. Duty hours do not include reading and preparation time spent away from the duty site.

**In-house Call** is defined as those duty hours beyond the normal work day when residents are required to be immediately available in the assigned institution.

**At-home (pager) Call** is defined as call taken from outside the assigned institution.

### Duty Hour Requirements
- Duty hours must be limited to 80 hours per week, averaged over a four-week period, inclusive of all in-house call activities.
- Residents must be provided with 1 day in 7 free from all educational and clinical responsibilities, averaged over a 4-week period, inclusive of call. One day is defined as one continuous 24-hour period free from all clinical, educational, and administrative activities.
- Adequate time for rest and personal activities must be provided. This should consist of a 10-hour time period provided between all daily duty periods and after in-house call.
- Continuous on-site duty, including in-house call, must not exceed 24 consecutive hours. Residents may remain on duty for up to six additional hours to participate in didactic activities, transfer care of patients, conduct outpatient clinics, and maintain continuity of medical and surgical care as defined in Specialty and Subspecialty Program Requirements.
- No new patients, as defined in Specialty and Subspecialty Program Requirements, may be accepted after 24 hours of continuous duty.

**Call Activity**
- In-house call must occur no more frequently than every third night, averaged over a four-week period.
- The frequency of at-home call is not subject to the every third night limitation. However, at home call must not be so frequent as to preclude rest and reasonable personal time for each resident.
- Residents taking at-home call must be provided with 1 day in 7 completely free from all educational and clinical responsibilities, averaged over a 4-week period.
- When residents are called into the hospital from home, the hours residents spend in-house are counted toward the 80-hour limit.
- The program director and the faculty must monitor the demands of at-home call in their programs and make scheduling adjustments as necessary to mitigate excessive service demands and/or fatigue.

**Moonlighting**

Moonlighting that occurs within the residency program and/or the sponsoring institution or the non-hospital sponsor's primary clinical site(s), i.e., internal moonlighting, must be counted toward the 80-hour weekly limit on duty hours. (See also GMEC Policy #7 "Off Duty Activities)

**Oversight**

The GMEC is responsible for establishing and implementing formal written policies and procedures governing resident duty hours in compliance with the Institutional and Program Requirements. Requirements for residents on-call or duty hours should reflect an educational rationale and patient need (including continuity care).

- Each program must establish written policies and procedures with regard to resident duty hours and working environment consistent with the Institutional and Program Requirements. These formal policies must apply to all participating institutions used by the residents. The policies must be approved by the GMEC and distributed to the residents and the faculty.

- Resident duty hours and on-call time periods must be in compliance with the Institutional and Program Requirements. The structuring of duty hours and on-call schedules must focus on the needs of the patient, continuity of care, and the educational needs of the resident.

- Programs must ensure that residents are provided appropriate backup support when patient care responsibilities are especially difficult or prolonged.

- Programs are to monitor the duty-hours and call schedules and adjustments made as necessary to address excessive service demands and/or resident fatigue.

- Work extraneous to the resident educational program should be minimized.

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 82 of 103

MA003609

**Monitoring**

Monitoring of duty hours is required with frequency sufficient to ensure an appropriate balance between education and service. Program directors are responsible for obtaining data on compliance with the Resident Duty Hours Policy for their programs. Each resident will be responsible for providing accurate and timely data on compliance with the Resident Duty Hours policy to her/his program director and the ACGME when this information is requested.

- The Office of Housestaff Administration will be responsible for providing an institutional system for measuring compliance with duty hours. The system will be available to all programs, and they are encouraged to use this system. It is the responsibility of each program to actually apply the system to its residents.

- If a program chooses not to use the institutional system, the program director must develop an alternative approach for measuring compliance with duty hours. The alternative system must be capable of providing the GMEC with a report that provides quantitative data on the major elements of duty hour compliance – total number of hours by week, number of hours of consecutive on-call, and days off. The reporting format must be approved in advance by the GMEC.

**Compliance**

- Program compliance will be reviewed by the GMEC on a regular basis. All programs will be required to report to the GMEC semi-annually. Each program should be cognizant of what data it may need for its RRC, regardless of the schedule of GMEC review.

- If a program is found to be out of compliance, more frequent monitoring of the program will result. The GMEC will ask the program director to explain to the GMEC the source of the problems and the steps that are being taken to bring the program into compliance.

- If a program is out of compliance for two consecutive reporting cycles, the GMEC will meet with the program director and the Department Chair to determine if there is any reason why the GMEC is not required to notify the RRC/ACGME.

**Duty Hours Exception**

Where permitted by the respective RRC, programs may apply for an exception to the 80-hour duty requirement. Prior review and endorsement of the GMEC is required. Following is the GMEC's procedure and criteria for endorsing requests for an exception to the duty hour limits.

**Criteria for Requesting an Exception**

- Key educational objectives cannot be accomplished within the present ACGME standards

- Negative effect on patient safety

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 83 of 103

MA003610

**Procedure for Requesting an Exception**

- The Program should submit its request for endorsement to the Chair of the GMEC. The request should include, at a minimum, the following:
  - The educational rationale (described in relation to the program's stated goals and objectives for the particular assignments, rotations, and levels of training) for which the increase is requested.
  - The impact on patient safety that would result if an increase were not approved.
  - Evidence of faculty educational activities regarding the effects of resident fatigue and sleep deprivation.
- The Chair of the GMEC will place the request on the Agenda for the next GMEC meeting. The program director should be present at the meeting to present the request.
- Following the meeting, the GMEC will either provide a written statement to the RRC of the institutional endorsement of the request, or, if the GMEC does not endorse the request, the program director will be so notified along with the reasons.

*Please refer to "RRC Procedures for Granting Duty Hours Exceptions" (attached) for information regarding the process, criteria and documentation programs will need to follow when making a request for exemption to their specific RRC*

**Ancillary Support**

- Residents on duty are to be provided with adequate and appropriate sleeping quarters and food services 24 hours a day.

- Patient support services, such as intravenous services, phlebotomy services and laboratory services, as well as messenger and transporter services are to be provided in a manner appropriate to and consistent with educational objectives and patient care.

- Appropriate security and personal safety measures are to be provided to residents at all locations including but not limited to parking facilities, on-call quarters, hospital and institutional grounds, and related clinical facilities (eg, medical office building).

- Appropriate laboratory, pathology and radiology information systems are to be available to support timely and quality patient care.

- A medical records system documenting the course of each patient's illness and care is to be available at all times and must be adequate to support quality patient care, the education of residents, quality assurance activities, and provide a resource for scholarly activity.

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 84 of 103

MA003611

**Interpretation, Implementation, Revision**

> The Graduate Medical Education Committee (GMEC) is responsible for the interpretation of this policy, and the GMEC and Program Directors are responsible for the implementation of this policy.

> The Office of Housestaff Administration and Legal Affairs are responsible for the revision of this policy.

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 85 of 103

| | | |
|---|---|---|
| James L. Madara, MD | Michael C. Riordan | Michael A. Simon, MD. |
| Dean | President and | Assoc. Dean for Graduate |
| Vice President for | Chief Executive Officer | Medical Education |
| Medical Affairs | University of Chicago | Chair, Graduate Medical |
| Biological Sciences Division | Hospitals and Health System | Education Committee |
| University of Chicago | | |

MA003612

The University of Chicago Medical Center
Graduate Medical Education Policy

## Resident/Fellow Supervision

| | | |
|---|---|---|
| Issued: | September 1995 | Page 1 of 2 |
| Revised: | October 2009 | Resident/Fellow Supervision |
| Reviewed: | | Graduate Medical Education Policy 09 |

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 86 of 103

### Purpose

To establish minimum requirements for supervision of residents/fellows enrolled in GME programs sponsored by the University of Chicago Medical Center ("UCMC") GME Committee ("GMEC") and in accordance with Accreditation Council for Graduate Medical Education ("ACGME") Institutional Requirements section III.B.4. Applicable state and federal laws, orders, and regulations concerning supervision and oversight of graduate medical education activities are also within the scope of this policy.

### Policy

It is GMEC policy that all residents/fellows enrolled in programs sponsored by the UCMC's GMEC be supervised by a physician with appropriate credentials and privileges as determined by the Program Director. Supervision will be provided in a manner to enable residents/fellows to assume progressively increasing responsibility according to each resident's/fellow's level of education, ability, and expertise. Each Program Director must support safe and appropriate patient care, in part, through proper supervision.

At all times patient care will remain the ultimate responsibility of qualified physicians holding appropriate clinical privileges. Requirements for on-site supervision will be established by the Program Director for each GMEC sponsored program in accordance with ACGME requirements and will be monitored through periodic program reviews. Institutional oversight will occur through the GMEC internal review process. The type of supervision (direct or indirect) required by residents/fellows at various levels of training must be consistent with the common program requirement for progressively increasing responsibility and the applicable specialty/subspecialty requirements established by the individual RCs, as well as standards for patient care and supervision published by other regulatory bodies, including the Joint Commission.

As the basic principles of supervision are patient safety, education, and communication, resident and fellow supervision is to be documented appropriately and accurately in the patient's medical record.

Responsibilities of the Program and Program Director:

- Develop written descriptions of the roles, responsibilities and patient care activities of residents/fellows and review such descriptions annually. Such descriptions shall also include identification of the mechanism by which the

MA003613

residents/fellows' supervisors and Program Director make decisions about each resident's or fellow's progressive involvement and independence in specific patient care activities.

- Develop a list of procedures that residents or fellows may be allowed to perform independent of the physical presence of an attending. Once competency has been documented in any of these specific procedures by the Program, the resident or fellow may perform these procedures without direct supervision.
- Ensure that faculty at non-UCMC training sites supervising residents and fellows hold appropriate appointments and credentials.
- Develop and maintain a system for documenting supervision in the resident/fellow rotation schedules and the attending on-call schedules. Ensure availability of backup at all times through more senior residents/fellows and appropriately credentialed attending physicians.
- Monitor supervision of residents or fellows and ensure that supervision is consistent with: a) Provision of safe and effective patient care; b) Educational needs of the residents or fellows; c) Opportunities for progressive responsibility appropriate to resident/fellow level of education, competence, and experience; and d) Other applicable Program requirements.

### Interpretation, Implementation and Revision

The Office of Graduate Medical Education and Medical Legal Affairs are responsible for the revision of this policy.

The Graduate Medical Education Committee is responsible for the interpretation and implementation of this policy.

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 87 of 103

---

Everett E. Vokes, M.D.
Interim Dean, Biological Sciences Division
  and the Pritzker School of Medicine
Interim Chief Executive Officer
University of Chicago Medical Center

Michael A. Simon, M.D.
Assoc. Dean for Graduate Medical Education
Chair, Graduate Medical Education Committee
ACGME Designated Institutional Official

Issued:    September 1995
Revised:   October 2009
Reviewed:

Page 2 of 2
Resident/Fellow Supervision
Graduate Medical Education Policy 09

MA003614

The University of Chicago Hospitals
Graduate Medical Education Manual

# Dismissal

| | | |
|---|---|---|
| Issued: | January 1995 | Page 1 of 2 |
| Revised: | January 2005 | Dismissal |
| Reviewed: | | Graduate Medical Education Policy 10 |

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 88 of 103

**Purpose**

The purpose of this policy is to ensure that dismissal of trainees in training programs at the University of Chicago Hospitals is in accordance with the Accreditation Council for Graduate Medical Education (ACGME) requirements.

**Dismissal**

A. Grounds for Dismissal

Any Housestaff member who fails to comply with the terms of his/her contract, including, without limitation:

- failure to fulfill the educational and clinical requirements of the graduate medical education and clinical training program to the satisfaction of the Program Director;
- failure to acquire at least the same professional knowledge, skill and judgment that residents in the relevant department normally acquire at the same level of post graduate medical education training, or;
- failure to carry out satisfactorily his/her professional responsibilities,
- failure to maintain a current professional license, or;
- failure of Housestaff members who are not U.S. citizens to maintain a current visa, or;
- Housestaff member is, or becomes, ineligible to participate in the Medicare Medicaid or other governmental payment program.

B. Recourse

Any Housestaff member who is dismissed during the course of a one-year appointment may have the matter reviewed via the established grievance procedure. (See Housestaff Handbook for Grievance Policy)

MA003615

**Interpretation, Implementation and Revision**

The Office of Housestaff Affairs and Medical Legal Affairs are responsible for the revision of this policy.

The Graduate Medical Education Committee is responsible for the interpretation and implementation of this policy.

| | | |
|---|---|---|
| James L. Madara, M.D. | Michael C. Riordan | Michael A. Simon, M.D. |
| Dean | President and | Assoc. Dean for Graduate |
| Vice President for | Chief Executive Officer | Medical Education |
| Medical Affairs | University of Chicago | Chair, Graduate Medical |
| Biological Sciences Division | Hospitals and Health System | Education Committee |
| University of Chicago | | |

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 89 of 103

Issued:    September 1995
Revised:   January 2005
Reviewed:
10

Page 2 of 2
Dismissal
Graduate Medical Education Policy

The University of Chicago Medical Center
Graduate Medical Education Committee

# Resident/Fellow Evaluation

Issued: February 2007
Revised/Approved: April 2010

Page 1 of 2
Resident/Fellow Evaluation
Graduate Medical Education Policy 11

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 90 of 103

## Purpose

The purpose of this policy is to set forth the standards and processes for the evaluation of residents/fellows in GMEC sponsored programs and to establish the institutional review process for these matters, consistent with institutional and program requirements set forth by ACGME and any applicable state and federal laws or regulations.

## Graduate Medical Education Committee

The Graduate Medical Education Committee (GMEC) has the responsibility to monitor and advise on all aspects of residency education, including evaluation of residents.

## Program Director

The responsibility for overseeing the evaluation of residents/fellows rests with the Program Director.

## Evaluation

Each program is required to create written criteria for evaluation based on the specialty and subspecialty requirements set forth in ACGME Specialty/subspecialty and Common program requirements. Each program is required to create and utilize competencies-based evaluation forms. It is recommended that programs utilize electronic formats for resident/fellow evaluations. The criteria and evaluation forms must be submitted to the GMEC as part of the Internal Review protocol. The GMEC will review criteria and adequacy of completion rates for compliance with ACGME requirements.

Each program is required to assure that faculty members and others who supervise residents/fellows submit completed evaluation forms in a timely manner and submit them to the program director. Each program will maintain a file from which completed evaluations for each resident/fellow may be accessed.

Each program is required to enact processes to ensure that residents/fellows receive timely feedback about performance. Review of evaluations with the resident/fellow must be documented.

Each program shall identify those persons or committees with responsibility to review resident/fellow evaluations, make decisions and recommendations regarding promotion or changes in academic status.

MA003617

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 91 of 103

**Additional Professional/Performance Development**

As part of resident/fellow evaluation the Program Director may conclude that a resident/fellow requires a formal program of professional/performance development to address academic or performance deficiencies which are beyond the norm for the respective PGY level. Such a program of professional/performance development must be documented in writing and must state clearly the areas where performance improvement is needed and the parameters by which successful completion of the Additional Professional/Performance Development plan will occur. A period of Additional Professional/Performance Development is not disciplinary in nature and will not be reflected as discipline in the resident/fellow program file. If performance successfully meets expectations the Additional Professional/Performance Development period will not be reported as a disciplinary matter in the resident/fellow record.

Imposition of Additional Professional/Performance Development requirements may not be reviewed under the GME Grievance Procedure.

If the resident/fellow does not successfully meet performance criteria noted in the Additional Professional/Performance Development, the Program Director may address the issues in a disciplinary manner, including suspension, probation, failure to promote or termination, all of which is subject to review under the GME Grievance Procedure.

**Interpretation, Implementation and Revision**

The Graduate Medical Education Committee is responsible for the revision, interpretation and implementation of this policy.

_____
Everett E. Vokes, M.D.
Interim Dean, Biological Sciences Division
and the Pritzker School of Medicine
Interim Chief Executive Officer
University of Chicago Medical Center

_____
Michael A. Simon, M.D.
Assoc. Dean for Graduate MedicalEducation
Chair, Graduate Medical Education Committee
ACGME Designated Institutional Official

MA003618

The University of Chicago Hospitals
Graduate Medical Education Policy Manual

## Non-renewal of Agreement

Issued:     February 2005                             Page 1 of 2
Revised:                                      Non-renewal of Agreement
Reviewed:                        Graduate Medical Education Policy 12

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 92 of 103

### Purpose

The purpose of this policy is to ensure that non-renewal of trainee agreements at the University of Chicago Hospitals is in accordance with the Accreditation Council for Graduate Medical Education (ACGME) criteria.

### Non-renewal of Agreement

The University of Chicago Hospitals (Hospitals) will provide the Housestaff member with written notice of the Hospitals' intent not to renew a yearly contract prior to completion of a multi-year residency program, by the second Monday in February for contracts which run from July 1 to June 30. If the contract runs for a period other than July 1 to June 30, then the Hospitals will provide the Housestaff member with a written notice of the Hospitals' intent not to renew the contract no later than four months prior to the end of this contract. However, if the primary reason(s) for the non-renewal occur(s) after the second Monday in February or within the four months prior to the end of the contract, the Hospitals will provide the Housestaff member with as much written notice of the intent not to renew as the circumstances will reasonably allow, prior to the end of the contract.

### Recourse

Housestaff members who have received a written notice of intent not to renew their agreements have the ability to implement the institution's grievance procedures as outlined in the Housestaff Handbook.

### Interpretation, Implementation and Revision

The Office of Housestaff Administration and Legal Affairs are responsible for the revision of this policy.

The Graduate Medical Education Committee is responsible for the interpretation and implementation of this policy.

MA003619

James L. Madara, MD
Dean
Vice President for
  Medical Affairs
Biological Sciences Division
University of Chicago

Michael C. Riordan
President and
  Chief Executive Officer
University of Chicago
Hospitals and Health System

Michael A. Simon, MD
Assoc. Dean for Graduate
  Medical Education
Chair, Graduate Medical
  Education Committee

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 93 of 103

Issued:       February 2005
Revised:
Reviewed:

Page 2 of 2
Non-renewal of Agreement
Graduate Medical Education Policy 12

MA003620

The University of Chicago Medical Center
Graduate Medical Education Policy

## Institution/Program Closure or Program Reduction

| | | |
|---|---|---|
| Issued: | February 2005 | Page 1 of 1 |
| Revised: | October 2009 (Editorial) | Institution/Program Closure or Reduction |
| Reviewed: | | Graduate Medical Education Policy 13 |

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 94 of 103

### Purpose

The purpose of this policy is to ensure institution or program closure or program reduction in size at the University of Chicago Medical Center are in accordance with the Accreditation Council for Graduate Medical Education (ACGME) criteria, as well as applicable state and federal laws, orders, and regulations.

### Closure and/or Reduction in Size

In the event The University of Chicago Medical Center and/or a Program in which Residents are enrolled is closed or discontinued, or there is a proposed reduction in the size of a residency program, the Medical Center shall provide the DIO, GMEC and Residents with notification as soon as possible after the decision is made.

In the event of such a reduction or closure, residents already in the program will be allowed to complete their education, or the institution shall provide the Resident with assistance in obtaining appointment to another ACGME residency program.

In the event the institution elects to no longer be a sponsor of ACGME-accredited programs, the institution shall provide residents with assistance in obtaining appointment to another ACGME-accredited program as soon as possible after the decision is made.

### Interpretation, Implementation and Revision

The Office of Graduate Medical Education and the Office of Legal Affairs are responsible for the revision of this policy.

The Graduate Medical Education Committee is responsible for the interpretation and implementation of this policy.

| | |
|---|---|
| Everett E. Vokes, M.D. | Michael A. Simon, M.D. |
| Interim Dean, Biological Sciences Division | Assoc. Dean for Graduate Medical Education |
| and the Pritzker School of Medicine | Chair, Graduate Medical Education Committee |
| Interim Chief Executive Officer | ACGME Designated Institutional Official |
| University of Chicago Medical Center | |

| | |
|---|---|
| Issued: February 2005 | Page 1 of 1 |
| Revised: October 2009 | Institution/Program Closure/Reduction |
| Reviewed: | Graduate Medical Education Policy 13 |

The University of Chicago Medical Center
Graduate Medical Education Policy Manual

# Grievance Procedure

Issued: April 2007
Revised:
Reviewed:

Page 1 of 4
Grievance Procedure
Graduate Medical Education Policy 15

### Purpose

The purpose of this policy is to

- provide the Grievance Procedure to all participants in graduate medical education

- to ensure that the grievance procedure at the University of Chicago Medical Center is in accordance with the Accreditation Council for Graduate Medical Education (ACGME) requirements and Association of American Medical Colleges guidelines.

### Issues Subject to Review

This Grievance Procedure applies to the following actions by a Program:

- termination or dismissal from the program
- disciplinary suspension or probation
- non-renewal of a contract during a residency program to which the resident has been admitted

Additional Professional/Performance Development is not subject to this Policy (see GMEC Policy #11 Resident Evaluation)

### Notification

The program director will notify the resident in writing when a decision has been made which is subject to this procedure. The notification will be either hand delivered or mailed to the address which is on file with the Program and the Office of Housestaff Administration. It is the responsibiliy of each resident to notify both the Program and the Office of Housetaff Administration of any change of address.

### Request for Reconsideration

Within 5 business days of receipt of written notice of an action by the Program Director which is subject to review under the Grievance Procedure, the Housestaff member may submit to the Program Director a written request for reconsideration, specifying the action to be reconsidered. The written request shall be hand delivered, faxed or mailed to the Program Director and must bear a delivery date or postage date five (5) business days from the date of receipt of the written notice of an action. This time frame may be extended for additional time, not to exceed 30 days, if the Housetaff Member has been out of town and did not receive the written notice of action.

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 95 of 103

Within ten (10) business days after receiving such a request, the Program Director shall reconsider the matter. The Program Director may, but is not required to consult with his or her Section Chief, Department Chair, evaluation committee or other faculty as part of the process of reconsideration. The Program Director will notify the resident, in writing, about the decision after reconsideration. The notification will be either hand-delivered or mailed to the address which is on file with the Program and the Office of Housestaff Administration.

### Review by Housestaff Grievance Committee

If the decision issued upon reconsideration continues to be subject to review under the Grievance Procedure, the Housestaff member may request a review by a Housestaff Grievance committee. Within five (5) business days after receipt of the written notice of the decision after reconsideration by the Program Director, the housestaff member shall submit a written request for review by a Housestaff Grievance Committee. This must be done as follows:

The written request shall be hand delivered, faxed or mailed to the Chair of the Graduate Medical Education Committee and must hear a delivery date or postage date five (5) business days from the date of receipt of the written notice of reconsideration. A copy shall be sent to the Program Director in the same manner. The date of receipt by the Chair of the GMEC shall be the date by which other dates in this process are calculated ("the Trigger Date.")

The written request for a Housestaff Grievance Committee review must state in detail the issues requested to be reviewed.

The Chair of the Graduate Medical Education Committee shall, within ten (10) business days of the Trigger Date, appoint a Housestaff Grievance Commitee ("The Committee") consisting of two members of the medical staff, two chief residents, and a senior Hospitals' Vice President.

The Grievance Committee shall, within fourteen (14) business days of the Trigger Date, meet and chose a Chair, select a date for the Grievance Hearing and decide procedures by which the hearing will be conducted. The procedures shall be outlined in writing and given to all parties to the Grievance (the resident and Program Director). Any questions by the parties about the conduct of the Grievance Hearing shall be submitted, in writing, to the Chair of the Grievance Committee. The decision of the Committee about how the Hearing will be conducted is final.

The Grievance Hearing shall be held within thirty (30) days following the Trigger Date, unless an alternative date is agreed to by the Chair of the Grievance Committee, the Program Director and the Housestaff member due to the unavailability of necessary participants to the hearing.

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 96 of 103

**University of Chicago Medical Center, Graduate Medical Education Policy 15**　　　　　　　　　**2**

The Program Director and the Housestaff Member shall submit a list of proposed witnesses and written materials pertinent to the issues being raised by the Housestaff member to the Grievance Committee Chair seven (7) days prior to the Hearing Date. The Program Director will, at the same time, submit a copy of those materials to the resident and the resident will submit a copy of his/her materials to the Program Director.

The Grievance Hearing is intended to be an informal process for hearing all of the information pertinent to the decision of the Program Director and is not intended to be a legal proceeding. Rules for court proceedings do not apply. No transcript or recording is made of the Hearing.

The Housestaff member and the Program Director shall each have the right to be present at the Hearing and each may be accompanied by an advisor or attorney. The advisor or attorney shall be present to assist their client, but may not make any statements and may not question witnesses. The Housetafff member and the Program Director may make a statement outlining their position at the beginning of the Hearing and, if requested by the Committee, at the conclusion of the Hearing. All questioning of witnesses shall be done by the members of the Grievance Committee. Any questions that arise during the Hearing regarding how the hearing is to be conducted, shall be resolved by the Grievance Committee in closed session.

**Standard of Review**

The Grievance Committee will consider whether the decision of the Program Director was supported by the facts. The Grievance Committee can reverse, modify or change the decision of the Program Director only if it was arbitrary and capricious, or if there was no evidence supporting the decision. A decision is arbitrary and capricious if made on unreasonable grounds or without proper consideration of circumstances. If the Committee concludes that the decision was not arbitrary and capricious and that there was evidence supporting the decision, the decision of the Program Director will be affirmed.

Following the Hearing, the Committee will meet privately to consider its decision.

The Committee shall issue its decision in writing to the Housestaff member and the Program Director within seven (7) days following the date of the review. <u>In no case shall the Committee modify the decision of the Program Director in a manner as to make it more adverse to the resident than the decision issued by the Program Director following reconsideration.</u> The Chair of the Committee will send the decision to the Housestaff Member, the Program Director and the Chair of the GMEC. For the resident, the decision will be either hand-delivered or mailed to the address which is on file with the Program and the Office of Housestaff Administration. The decision will be hand delivered to the Program Director's Office.

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 97 of 103

MA003624

University of Chicago Medical Center, Graduate Medical Education Policy 15          3

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 98 of 103

MA003625

**Review by Representatives of the Dean and Medical Center President**

If either the Program Director or the Housestaff member is dissatisfied with the decision of the Committee, he or she may request further review by the Medical Center President and the Dean of the Biological Sciences Division. Such a request must be made in writing to the offices of the President and the Dean within five (5) days following the date the Committee issued its written decision. The request for review must bear a delivery date or postage date five (5) business days from the date of receipt of the written notice of reconsideration. A copy shall be sent to the Chair of the Grievance Committee and the other party to the Grievance. The Grievance committee shall deliver to the Medical Center President and the Dean a copy of its decision and the written materials which it reviewed in hearing the Grievance.

The Medical Center President and the Dean may appoint designee(s) (none of whom shall have been decisionmakers in the proceedings above) to review the materials and advise the President and Dean about this Grievance.

The Medical Center President and the Dean, or their designees, shall be limited to a review of the written materials from the Grievance Committee

The Medical Center President and Dean shall only reverse, change or modify the decision of the Grievance Committee if they conclude that the decision was arbitrary and capricious and not supported by the facts presented at the Grievance Hearing.

Within fourteen (14) days of receipt of the request for review, the President of the Medical Center and the Dean , shall in writing affirm, reverse, or modify the decision of the Grievance Committee (but shall not modify such decision in a manner as to make it more adverse to the resident than the decision issued by the Program Director following reconsideraion.) Their decision shall be delivered or mailed to the Housestaff Member, the Program Director, the Chair of the Grievance Committee, and the Chair of the GMEC.

The decision of the Medical Center President and the Dean shall be final.

**Interpretation, Implementation and Revision**

The Graduate Medical Education Committee and Medical Legal Affairs are responsible for the revision of this policy.

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 99 of 103

James L. Madara. M.D.
Dean, Biological Sciences Division
  and the Pritzker School of Medicine
Chief Executive Officer
  University of Chicago Medical Center

Michael A. Simon, M.D.
Assoc. Dean for Graduate
  Medical Education Committee
Chair, Graduate Medical Education
  Committee

Issued: April 2007
Revised:
Reviewed:

University of Chicago Medical Center
Graduate Medical Education Policy

## Disaster Policy

Issued:     February 2009
Revised:
Reviewed:

Page 1 of 4
Disaster Policy
Graduate Medical Education Policy 16

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 100 of 103

### Purpose

The purpose of this policy is to ensure the graduate medical education programs at the University of Chicago Medical Center (UCMC) meet the Accreditation Council for Graduate Medical Education (ACGME) requirements .

### Definitions

**Disaster** is an event or set of events (e.g., natural disaster, internal disaster, etc.) causing significant alteration to the residency experience at one or more residency programs.

### Disaster Declaration

Within UCMC a formal disaster declaration will be made only by the CEO of the institution. Upon declaration and following notification to the GMEC Committee, the DIO will notify the ACGME Institutional Review Committee Executive Director and provide an initial report on anticipated challenges in meet Institutional and Program Requirements..

### Procedure

The University of Chicago Medical Center (UCMC) seeks to provide a stable educational and employment environment for Residents. If an event or set of events causes significant alteration to the residency experience in more or more residency programs the following steps will occur:

1. As soon as possible, the GME Office, in conjunction with the GMEC will:
    a. Gather data/information from programs regarding the extent of damage and the impact of the disaster on the short-term (days/weeks) and long-term (weeks/months) function of individual programs and/or sites of training.
    b. The DIO will collaborate with program directors to assess the short-term and long-term impact on clinical operations at sites affected by the disaster.
    c. The DIO will contact ACGME within two business days of the initial assessment to provide an update on the disaster and initial steps taken by the institution and the GMEC.

2. The DIO will continue to communicate with the ACGME regularly as needed to provide updates on any additional program or institutional issues. Within 30 days of the disaster, the DIO will contact the ACGME with regard to final plans to reconfigure any programs.

MA003627

University of Chicago Medical Center
Graduate Medical Education Policy

3. The GMEC will meet regularly and as necessary to monitor operational effects on the quality of education provided to affected programs and to make decisions regarding needed additional actions. The GME Office will continue to provide administrative support to all affected programs during this period.

**Issues to be reviewed, assessed or acted upon by the GMEC**
   a. Patient safety
   b. Safety of residents, faculty and staff
   c. Supply and availability of faculty and residents for clinical and educational activities
   d. Extent/impact of damage to the physical plant/facilities
   e. Extent/impact of damage to clinical technology and clinical information systems
   f. Extent/impact of damage to communication technology (e.g., phones, pagers, intra/internet)
   g. Changes in the volume of patient activity in the short-term and long-term

If the GMEC determines that a program or the institution cannot provide an adequate educational experience for a resident because of the disaster, both individual programs and the institution will work to:
   a. Temporarily relocate a resident to a site of training within the current local affiliate training sites. For residents temporarily relocated to an affiliated training site, UCMC will continue to pay resident stipends and benefits for a period not to exceed 90 days.
                          Or
   b. Arrange a temporary transfer for a resident to another ACGME program until the institution can provide an adequate educational experience for the resident. To the extent possible, the program will inform the resident being transferred the minimum duration of the transfer and the anticipated total duration of the transfer. UCMC will continue to pay resident stipends and benefits (according to the then-current UCMC stipend schedule) as long as funds are deemed available by UCMC. Further, UCMC will work with the institution to which the resident is temporarily assigned to negotiate financial support from that site for residents temporarily assigned there.
                          Or
   c. Assist the resident in a permanent transfer to another program/institution. For residents permanently transferring to another institution, UCMC will not cover stipends and benefits.

## Continuation of Financial and Administrative Support in the Event of Disaster

Continuation of financial support in the event of a disaster will be dependent on the short-term and long-term impact on each program and the institution overall. In addition, continuation of financial support will be dependent on current policies related to reimbursement.

Disaster Policy

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 101 of 103

University of Chicago Medical Center
Graduate Medical Education Policy

### Notification to Residents

Not less than 30 days prior to the end of the academic year, the program will inform residents of the status of the program for the next academic year.

### Interpretation, Implementation and Revision:

The Office of Graduate Medical Education and the Office of Legal Affairs are responsible for the revision of this policy.

The Chief Compliance Officer and the Office of Legal Affairs are responsible for resolving billing issues concerning residents and fellows.

The Graduate Medical Education Committee is responsible for the interpretation and implementation of this policy.

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 102 of 103

_____
James L. Madara, M.D.
Dean, Biological Sciences Division
    and the Pritzker School of Medicine
Chief Executive Officer
University of Chicago Medical Center

_____
Michael A. Simon, M.D.
Assoc Dean for Graduate Medical Education
Chair, Graduate Medical Education Committee
ACGME Designated Institutional Official

Issued:   February 2009
Revised:

MA003629

The University of Chicago Medical Center
Graduate Medical Education Policy

# Restrictive Covenants

Issued: February 2010
Revised:
Reviewed:

Page 1 of 1
Restrictive Covenants
Graduate Medical Education Policy 17

**Purpose**

The purpose of this policy is to ensure the graduate medical education programs at the University of Chicago Medical Center (UCMC) meet the Accreditation Council for Graduate Medical Education (ACGME) requirements .

**Policy**

Programs sponsored by the GME Committee, in addition to UCMC as the Institutional Sponsor, cannot require residents to sign a non-competition guarantee.

ELECTRONICALLY FILED
1/16/2015 2:48 PM
2014-L-008678
PAGE 103 of 103

Everett E. Vokes, M.D.
Interim Dean, Biological Sciences Division
and the Pritzker School of Medicine
Interim Chief Executive Officer
University of Chicago Medical Center

Michael A. Simon, M.D.
Assoc. Dean for Graduate Medical Education
Chair, Graduate Medical Education Committee
ACGME Designated Institutional Official

Issued:    February 2010
Revised:
Reviewed:

Page 1 of 1
Restrictive Covenants
Graduate Medical Education Policy 17

MA003630