# TAB 24



SEEMA NAYAK, M.D., Plaintiff, vs. ST. VINCENT HOSPITAL AND HEALTH CARE CENTER, INC., Defendant.

1:12-cv-00817-RLY-DML

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF INDIANA, INDIANAPOLIS DIVISION

2014 U.S. Dist. LEXIS 71379; 97 Empl. Prac. Dec. (CCH) P45,081

May 22, 2014, Decided
May 22, 2014, Filed

**SUBSEQUENT HISTORY:** Reconsideration denied by, Request denied by *Nayak v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 2014 U.S. Dist. LEXIS 111066 (S.D. Ind., Aug. 12, 2014)

**PRIOR HISTORY:** *Nayak v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 2013 U.S. Dist. LEXIS 3273 (S.D. Ind., Jan. 9, 2013)

**COUNSEL:** [*1] For SEEMA NAYAK, M.D., Plaintiff: Benjamin C. Ellis, Kevin W. Betz, BETZ & BLEVINS, Indianapolis, IN; Sandra L. Blevins, BETZ & ASSOCIATES, Indianapolis, IN.

For ST. VINCENT HOSPITAL AND HEALTH CARE CENTER, INC., Defendant: Craig M. Williams, John Patrick Ryan, Jr., HALL RENDER KILLIAN HEATH & LYMAN, Indianapolis, IN.

**JUDGES:** RICHARD L. YOUNG, Chief United States District Judge.

**OPINION BY:** RICHARD L. YOUNG

**OPINION**

**ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Seema Nayak, is a former employee of the defendant, St. Vincent Hospital and Health Care Center, Inc. Following St. Vincent's decision not to renew her residency contract, Plaintiff filed the present action against St. Vincent, alleging that St. Vincent harassed, discriminated, and retaliated against her on the basis of her national origin (Indian), and discriminated against her on the basis of her gender, under Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e et seq.* ("Title VII"). She also alleges St. Vincent discriminated and retaliated against her on the basis of her alleged disability, under the Americans with Disabilities Act of 1990, *42 U.S.C. § 12101, et seq.* ("ADA"), as amended by ADA Amendments Act of 2008. St. Vincent now [*2] moves for summary judgment. For the reasons set forth below, St. Vincent's motion is **GRANTED** in part, and **DENIED** in part.

**I. Material Facts**

**A. Background**

Plaintiff is of Indian national origin. (Deposition of Seema Nayak ("Plaintiff Dep.") at 7). In 1998, she completed her medical education training in India. (*Id.* at 7, 10). Although Plaintiff had the ability to practice medicine unsupervised, she chose to continue her training in a program similar to a residency program in the United States. (*Id.* at 13). In 2003, Plaintiff married her husband and moved to London, where she lived until 2006. (*Id.* at 11, 15). She did not practice medicine while there. (*Id.* at 15).

Plaintiff came to the United States in 2005 to take the U.S. Medical Board exams. (*Id.* at 7, 15). She first contacted St. Vincent around 2005/2006 to see if she could participate in an externship or rotation because she wanted to get exposed to the U.S. medical system prior to joining a residency program. (*Id.* at 15-16). St. Vincent accepted Plaintiff, and, in April/May 2006, she participated in a four-week visiting physician rotation. (*Id.*

Case: 1:12-cv-08733 Document #: 81-24 Filed: 05/22/15 Page 3 of 10 PageID #:2054

Page 2

2014 U.S. Dist. LEXIS 71379, *; 97 Empl. Prac. Dec. (CCH) P45,081

at 16-17; Deposition of Eric Strand, M.D. ("Strand Dep.") at 32, 132-33; Strand Dep. Ex. [*3] 2). During this rotation, Plaintiff spent two weeks in general OB/GYN, during which Dr. Eric Strand, the OB/GYN Residency Program Director, was able to observe her. (Plaintiff Dep. at 17; Strand Dep. at 13-14, 32). Dr. Strand believed Plaintiff to be very interested in St. Vincent and found that she had a "very good knowledge base at the student level." (Strand Dep. at 32). As a result, he provided Plaintiff with a letter of recommendation for purposes of gaining a spot in a residency program. (Plaintiff Dep. at 21; Strand Dep. at 32, 132-33; Strand Dep. Ex. 2).

Following her observer rotation, Plaintiff applied to St. Vincent's OB/GYN residency program. (Plaintiff Dep. at 19-20). During the match process, Plaintiff interviewed with several St. Vincent faculty, one of which was Dr. Strand. (Plaintiff Dep. at 20; Strand Dep. at 33). Ultimately, Plaintiff matched with St. Vincent, and she began her residency there in July 2007. (Plaintiff Dep. at 20; Strand Dep. at 34).

### B. Plaintiff's First Year (July 2007-June 2008)

#### 1. Work Environment

Plaintiff was the only non-white resident in her class and was the first foreign resident without Indiana ties to be placed in St. Vincent's OB/GYN residency [*4] program. (Deposition of Gregory Sutton, M.D. ("Sutton Dep.") at 11; Plaintiff's Ex. 7 at 974). Plaintiff experienced difficulties acclimating to the culture of St. Vincent, where residents, nurses, and staff work as a team. (Plaintiff's Ex. 8 at 625-26; Plaintiff Dep. at 27, 107-08). Nurses, residents and other faculty members complained to Dr. Strand that Plaintiff was not receptive to feedback, was short and rushed in her encounters with patients, and did not appear to have the same work ethic as the other residents. (Strand Dep. at 35-36).

Academically, Plaintiff excelled in her first year, earning the highest score on the national subspecialty examination (known as the "CREOG" examination), and receiving the Best Case Report award. (Plaintiff's Ex. 10). On her evaluations, Plaintiff's clinical performance was satisfactory or above. (Strand Dep. at 60; Plaintiff's Ex. 11).

In March 2008, Dr. Strand placed Plaintiff on a performance improvement plan because of "persistent concerns regarding her communication and work ethic." (Strand Dep. at 46, 175-76; Strand Dep. Ex. 21 at 1042). Plaintiff does not recall receiving a copy of the actual performance improvement plan, but does recall [*5] discussing many of the issues mentioned in the plan. (Id. at 114-21).

In April 2008, Plaintiff was notified of her promotion to the second year of residency training. (Plaintiff's Ex. 13). During her annual review, Dr. Strand concluded that Plaintiff's performance was "sound" overall, but that "continued attention" needed to be "paid to her communication with fellow residents and staff." (Plaintiff's Ex. 8 at 630).

#### 2. Dr. Judi Kennedy

During her first year of residency training, Plaintiff had a strained relationship with her senior resident, Dr. Judi Kennedy. Kennedy would often act as though she did not understand Plaintiff and ask her to repeat herself. (Plaintiff Dep. at 24, 38-39). Plaintiff "took it lightly" and "laughed with her." (Id. at 39). Plaintiff felt that Kennedy spoke to her rudely, and, on one occasion, hung the phone up on her "without giving a reason." (Id. at 24).

In another instance, Plaintiff asked for Kennedy's assistance in formulating a management plan for a patient. Kennedy responded, to the best of Plaintiff's knowledge, by stating, "You had Dr. Greg Sutton drooling all over you. What is going on now? Why can't you figure out what's to be done?" (Id. at 25). Plaintiff [*6] reported this incident to Dr. Dawn Zimmer, a faculty member in the residency program and Plaintiff's class mentor, and told her she felt the comment was indicative of her "being treated differently from other residents." (Id. at 29-31). Dr. Zimmer indicated that she would talk to Kennedy, and recommended to Plaintiff that she not pursue the matter any further. (Id. at 32). Subsequent to that time, Kennedy made no further derogatory comments to Plaintiff; however, Plaintiff continued to feel as though Kennedy did not treat her well in the "tone of her voice" and the "words that she used on a day-to-day basis." (Id. at 33).

Plaintiff also asserts that Kennedy scheduled Plaintiff's call assignment unfairly by putting her on call every third day for the first 21 days of the month. (Id. at 35-36). Typically, a resident's call schedule is spread throughout the month, rather than front loaded into the first three weeks. (Id.). The record indicates this happened once, and that Plaintiff complained to one second-year resident (she doesn't remember who). (Id. at 35-37). The resident recommended that Plaintiff ask Kennedy to change the schedule. (Id. at 37). Plaintiff testified that she had "already [*7] done" that "and had gotten a negative response." (Id.).

Finally, Plaintiff claims that one day (the record is not clear) when she was feeling overwhelmed and emotional, she asked senior resident, Christina Francis, "Why am I being treated differently? Is it because I am Indian?" (Id. at 50). Plaintiff did not ask Dr. Francis to report

Case: 1:12-cv-08733 Document #: 81-24 Filed: 05/22/15 Page 4 of 10 PageID #:2055

Page 3

2014 U.S. Dist. LEXIS 71379, *; 97 Empl. Prac. Dec. (CCH) P45,081

her complaint to anyone in management, as she was just "venting." (*Id.*).

### C. Plaintiff's Second Year (July 2008-May 2009)

#### 1. Six Month Review

At the beginning of her second year of residency training, Dr. Strand met with Plaintiff for her six month review. He wrote that academically, she was considered "quite strong" as evidenced by her high CREOG scores. (Strand Dep. Ex. F at 623). However, "she found the transition to American medicine a challenge," particularly with regard to medical jargon. (*Id.*). He noted that they met "several times to discuss 'friction' that has periodically developed between her and resident colleagues, particularly their impression that [Plaintiff] can be demanding and inflexible regarding expectations and scheduling." (*Id.*). The goals for the upcoming year included: record keeping (timely completion of "statistics, medical records, [*8] and clinic billing") and better communication skills/attitude. (*Id.*).

With regard to her record keeping, Dr. Strand observed that it had gotten worse over the past several months as she struggled with a miscarriage, but was beginning to improve. (*Id.*). With regard to her communication/attitude, he observed that others perceived her as lacking initiative, and that she needed to be more direct in her communication "when she feels others may be holding back." (Strand Dep. Ex. F). Dr. Strand found that Plaintiff was interested in addressing her communication style, and that he would look to outside resources to help assist Plaintiff in that regard. (*Id.*).

#### 2. Communication Coach

At some point early in her second year, Plaintiff met with a communication "coach" to "assess the flaws in [her] style of communication and help [her] improve." (Plaintiff Dep. at 64). The coach did not speak to Plaintiff regarding her accent or otherwise try to change the way that she spoke; indeed, he did not "express any major concerns." (*Id.* at 64-66). Instead, he gave her a "personality test." (*Id.* at 64-66, 110-11, 182-83). Dr. Strand volunteered to take the test so that he would have "a better sense of what [*9] [the coach] would be discussing with her." (Strand Dep. at 80). Dr. Strand recalls Plaintiff scoring high on the "competitive side of the scale." (*Id.*).

In her review dated November 21, 2008, Dr. Strand noted that "[w]hile [Plaintiff] has made some significant strides, it [communication] is an area for continued improvement." (Plaintiff's Ex. 8 at 629).

#### 3. Dr. Jody Freyre

While Plaintiff was on the maternal fetal medicine rotation, she was under the supervision of upper-level resident, Dr. Jody Freyre. Plaintiff testified that Freyre left her a threatening voicemail, but could not remember what it said. (Plaintiff Dep. at 39). Freyre also criticized Plaintiff's "management" "in front of all the nurses," accused Plaintiff of not seeing a C-section patient even though Plaintiff states that she did, and used a bad tone of voice towards her. (*Id.* at 42-45). Plaintiff complained to Dr. Strand that Freyre was "treating her differently and she didn't know why" and "didn't know how to handle it." (*Id.* at 49).

On October 30, 2008, Plaintiff met with Dr. Strand to discuss her concerns regarding Freyre. (Plaintiff Dep. Ex. B). Because Freyre had also complained to Dr. Strand about Plaintiff's behavior, [*10] he arranged a meeting with them both on November 5, 2008, and asked Dr. Buzzetti, the Assistant Residency Program Director, to sit in on the meeting as well. (*Id.*; Plaintiff Dep. at 54). According to Dr. Strand, Freyre was frustrated over Plaintiff's inability to "get the job done" and "was very resistant to feedback." (Plaintiff Dep. Ex. B). Plaintiff was frustrated with Freyre's methods of communication, and felt she communicated to her in a hostile way. (*Id.*). Plaintiff testified that during the meeting, Dr. Buzzetti told Freyre that her behavior was "malignant." (Plaintiff Dep. at 55). Dr. Strand told Plaintiff and Freyre that "even though [they] differed in certain things, it would be nice to forget and forgive and work together as a team." (Plaintiff Dep. at 54, 56, 60-61; Plaintiff Dep. Ex. B). Plaintiff informed Dr. Strand that she was willing to work with Freyre in the future "provided she doesn't treat me like the way she is treating me." (Plaintiff Dep. at 56-57).

#### 4. Official Warning

On April 9, 2009, Dr. Strand met with Plaintiff to discuss specific concerns, including: not following through on seeing a post-op patient of Dr. Payne; signing out the "follow up" of a patient [*11] of Dr. Garrett despite the fact that Dr. Garrett "had specifically asked [Plaintiff] to follow"; appearing more disorganized; poor change over; requesting help from the clinic when Labor and Delivery was not busy; difficulty seeing a patient and making a plan without guidance; nurses finding her impatient and "barely visible;" and, continued challenge with communication skills, including a perception that "she is not willing to solve problems." (*Id.* at 142-47; Plaintiff Dep. Ex. J). During the meeting, Plaintiff informed Dr. Strand that she was nine-weeks pregnant with twins, and that her performance had slipped, to a certain degree, due to fatigue and nausea. (Plaintiff Dep. at 144-45, 156). She expressed concern that her next two rotations, both of which were in oncology (known to be

Case: 1:12-cv-08733 Document #: 81-24 Filed: 05/22/15 Page 5 of 10 PageID #:2056

Page 4

2014 U.S. Dist. LEXIS 71379, *; 97 Empl. Prac. Dec. (CCH) P45,081

busy and clinically demanding rotations), might suffer due to her physical state, and asked that the schedule be changed. (Plaintiff Dep. Ex. J). Dr. Strand stated that since she had asked that her oncology rotation be moved when she was pregnant the first time (which resulted in the present back-to-back oncology rotations), he would not change the upcoming schedule unless her physician indicated it [*12] was necessary. (*Id.*).

On April 24, 2009, Dr. Strand met with Plaintiff regarding her performance, following a meeting he had with the Residency Education Committee. Dr. Strand informed Plaintiff she would be placed on an official warning of one month during her rotation with Dr. Sutton, and that if she did not complete the requirements of that rotation, she would be placed on probation. (Plaintiff Dep. at 164; Strand Dep. at 61).

On May 11, 2009, Plaintiff received a form letter indicating that she would be promoted to a third year resident "[a]fter successful completion of [her] May and June rotations." (Plaintiff Dep. at 184; Strand Dep. at 199-200). Plaintiff's supervising faculty member at the time, Dr. Sutton, reported that, in the first two weeks of May 2009, Plaintiff's performance was excellent. (Sutton Dep. at 51-53).

### D. Plaintiff's Medical Leave and Return

Plaintiff began an extended medical leave on May 15, 2009, during which she was on bed rest. (Plaintiff Dep. at 183). In August 2009, one of Plaintiff's unborn twins passed away. (Deposition of Angela D. Stevens, M.D. ("Stevens Dep.") at 31; Plaintiff Dep. at 185). Approximately eight weeks later, when Plaintiff was 32 weeks [*13] into her pregnancy, Plaintiff became hospitalized until the time of her delivery. (Plaintiff Dep. at 183-85; Plaintiff's Ex. 8 at 290).

While Plaintiff was in the hospital, Dr. Strand visited her on two occasions. (Plaintiff Dep. at 186). During the first visit, prior to Plaintiff's delivery, Dr. Strand asked Plaintiff how many weeks she planned on taking off following the delivery. (*Id.* at 193-94). Plaintiff responded that she planned to take off as much as allowed, but that she was keen to come back and finish her residency. (*Id.* at 194). St. Vincent's maternity leave policy provided that the period of leave "generally consists of . . . six weeks or more for a complicated delivery or delivery by cesarean section." (*Id.* at 195-96).

Dr. Strand visited Plaintiff a second time on November 2, 2009, three days following the delivery of her baby by cesarean section. (*Id.* at 198-201). Dr. Strand indicated that it was his expectation that she return to work in six weeks, unless her physician indicated she needed more time. (*Id.* at 199-200). Dr. Strand told her she would lose her position in the residency program if she did not return to work within that time frame. (*Id.* at 200; Strand Dep. [*14] at 185).

Following delivery, Plaintiff experienced post-partum depression and symphysis pubis dysfunction (severe pain in the pelvic region), which required her to use a brace and undergo physical therapy. (Plaintiff Dep. at 84-85; Stevens Dep. at 37-38). On December 7, 2009, one week before she was scheduled to return from maternity leave, Plaintiff's physician, Dr. Angela Stevens, indicated that Plaintiff needed an additional two weeks of leave, which was accommodated by Dr. Strand and the program. (Plaintiff Dep. at 202; Strand Dep. at 164).

On December 10, 2009, Dr. Strand sent Plaintiff a letter outlining the expectations of her return. (Plaintiff Dep. at 203; Strand Dep. at 162). The letter reminded Plaintiff that "at the time [she] left the program [she] was under an official warning period" and outlined six specific performance expectations upon her return, including "[c]ompletion of rounds in a timely fashion" and "[a]ppropriate follow-up of all clinical requirements." (Plaintiff Dep. Ex. R). The letter informed her that "[f]eedback will be solicited from attending physicians, fellow residents, nurses, and ancillary staff (as it is solicited for any resident in the program). [*15] Any evaluation with less than satisfactory remarks will result in you entering an official probationary period." (*Id.*). The letter also informed Plaintiff that she had exhausted all of her leave under the Family Medical Leave Act; thus, if she were unable to return on December 28, she would lose her position in the residency program. (*Id.*).

### E. Plaintiff's Return to Work

Plaintiff returned from her medical leave on December 28, 2009, eight weeks following her cesarean section. (Plaintiff Dep. at 86). At that time, Plaintiff was returned to work by her physician, Dr. Stevens, without restrictions. (*Id.* at 86-87; Strand Dep. at 138; Strand Dep. Ex. 7). Plaintiff testified she was still having issues with depression and that walking was a "struggle," but she was afraid to ask for any accommodation for fear she would be fired. (Plaintiff Dep. at 220-21).

Plaintiff was placed on the holiday schedule gynecology/oncology night float rotation, a combined rotation. (*Id.* at 213-14). Plaintiff testified the holiday schedule is more difficult because "only half the force works," and a resident ends up doing "much more than oncology" such as "calls for OB/GYN." (*Id.* at 79, 81). It is also "emotionally [*16] draining" due to the "acuity of the patients" and the long hours. (Deposition of Robin Nance ("Nance Dep.") at 46). Based on Plaintiff's experience, she testified the holiday oncology rotation is typically reserved for third-year residents because of the added responsibility and work load. (Plaintiff Dep. at 79-82).

Case: 1:12-cv-08733 Document #: 81-24 Filed: 05/22/15 Page 6 of 10 PageID #:2057

Page 5

2014 U.S. Dist. LEXIS 71379, *; 97 Empl. Prac. Dec. (CCH) P45,081

Freyre was the chief resident of that rotation, and thus had supervision over Plaintiff. (*Id.* at 226-27). Plaintiff was "not pleased," but Dr. Strand "just blew [Plaintiff] off." (*Id.* at 78). Plaintiff felt that Freyre "was short [and] rude at every conversation. She always wanted to prove that [Plaintiff] was wrong." (*Id.* at 219). Plaintiff also felt that the other resident on that rotation, Dr. April Lemmon, "was not very friendly at all." (*Id.*). Plaintiff did not feel like she could make a complaint regarding their behavior because Dr. Strand had informed her, upon her return to work, that she must "bend over backwards and do every extra work that is in the program for the time that [she] lost during the disability to prove . . . [she] was returning something back for the favor the residents have done for [her] during [her] absence." (*Id.* at 73-74).

On January 8, 2010, [*17] Dr. Strand met with Plaintiff regarding six "concerns" raised by others in the program, documented in a letter of that date, including a concern raised by fellow residents, nurses, and staff, that she "appeared distracted, sad, and tearful." (Plaintiff Dep. Ex. S). Plaintiff testified that, after looking at the nature of the complaints, almost all of them had to have been raised by Freyre and Lemmon. (*Id.* at 215-17) (noting complaints raised by "upper level resident" and "fellow resident"). She testified that Freyre never gave her a chance to explain herself, and that if she had, these concerns most likely would not have been presented to Dr. Strand. (*Id.* at 216).

### F. Plaintiff's Probationary Period and Non-Renewal

On January 13, 2010, Dr. Strand placed Plaintiff on probation for a period of three months, to be reviewed by the Residency Education Committee in April 2010. (Strand Dep. at 110-11; Plaintiff Dep. at 222-24; Plaintiff Ex. 7 at 1027). In an outline of Plaintiff's probation terms, Dr. Strand wrote that while St. Vincent was "willing to support [her] transition back from [her] prolonged leave," the "[f]ailure to comply with the [enumerated] requirements . . . would not be tolerated [*18] and will result in a loss of training position," and "[a]ny remarks below satisfactory may result in final termination." (*Id.* at 940).

Plaintiff appealed the decision to be placed on probation to the Education Committee. (*Id.* at 235-36; Strand Dep. at 111-12). At the appeal, Plaintiff was able to present her side of the argument and submit documentation. (Plaintiff Dep. at 238-39; Plaintiff Dep. Ex. Y). After hearing the evidence, the Education Committee voted unanimously to uphold the probation. (Plaintiff Dep. at 237, 239-40; Plaintiff Dep. Ex. X; Strand Dep. at 111-12).

Dr. Strand met with Plaintiff once or twice during her probationary period. (Plaintiff Dep. at 243). One such occasion was on March 11, 2010, and is documented in a letter of the same date. In the letter, he described five positive and five negative comments from doctors, nurses, residents, and students. (Plaintiff Dep. Ex. W). Dr. Strand wrote that while he believed Plaintiff was "making significant efforts to improve [her] performance . . . there is room for improvement." (*Id.*). The letter also stated, "We have reached a point in your training, however, where we need to see if you can rise to the challenges of upper [*19] level resident responsibilities. Therefore, I am recommending that you proceed with your scheduled rotations as outlined in the current schedule, beginning with night float on 3/14/10 and concluding with oncology ending June 10th." (*Id.*).

On May 14, 2010, the OB/GYN Residency Education Committee met and voted not to renew Plaintiff's contract. (Plaintiff Dep. at 248, 250-51; Plaintiff's Ex. Z). The news of her non-renewal took Plaintiff by surprise, as just days before the meeting Dr. Strand informed her that "he had received positive feedback from a number of faculty and staff nurses about [her] performance." (Plaintiff Dep. at 250). Even Dr. Buzzetti informed her that "things were going [her] way." (*Id.* at 250-51).

On May 28, 2010, Plaintiff appealed the decision not to renew her contract to the OB/GYN Residency Education Committee. (*Id.* at 251). After hearing the evidence, the Committee again voted to uphold the decision not to renew Plaintiff's contract. (*Id.* at 263; Plaintiff Dep. Ex. BB).

Plaintiff then appealed the decision not to renew her contract to the Graduate Medical Education Committee ("GME"). (*Id.* at 264-65). On June 4, 2010, the GME voted by ballot to uphold the Committee's [*20] decision. (Plaintiff's Ex. 24; Plaintiff's Ex. 7 at 925-27).

In a letter dated June 30, 2010, Dr. Strand notified the American Board of Obstetrics and Gynecology of St. Vincent's decision not to renew her contract. (Plaintiff's Ex. 1). Notably, the letter stated, "Due to a medically complicated pregnancy and significant concerns regarding her academic progress, our program decided not to extend her contract beyond this academic year." (*Id.*).

### II. Summary Judgment Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *FED. R. CIV. P. 56(a)*. A genuine issue of material fact exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. Thus, a

Case: 1:12-cv-08733 Document #: 81-24 Filed: 05/22/15 Page 7 of 10 PageID #:2058

Page 6

2014 U.S. Dist. LEXIS 71379, *; 97 Empl. Prac. Dec. (CCH) P45,081

factual dispute that does not rise to a genuine issue of material fact will not defeat a summary judgment motion. *Id. at 247-48*.

In deciding whether a genuine issue of material fact exists, the court views the evidence and draws all inferences in favor of the nonmoving party. *Miranda v. Wis. Power & Light Co., 91 F.3d 1011, 1014 (7th Cir. 1996)*. [*21] However, when a summary judgment motion is made and supported by evidence as provided in *Rule 56(c)*, the nonmoving party may not rest on mere allegations or denials in its pleadings but "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. *56(e)*.

### III. Discussion

#### A. National Origin Harassment (Count I)

Plaintiff first alleges that Kennedy and Freyre harassed her on the basis of her national origin. To establish employer liability for co-worker harassment, a plaintiff must establish that:

> (1) [s]he was subject to unwelcome harassment, (2) the harassment was based on h[er] national origin; (3) the harassment was severe and pervasive enough to alter the conditions of h[er] environment and create a hostile and abusive working environment; and (4) there is a basis for employer liability.

*Beamon v. Marshall & Ilsley Trust Co., 411 F.3d 854, 863 (7th Cir. 2005)*. "While it is true that harassment need not be explicitly racial in order to be probative of a hostile work environment", it must be "sufficiently connected to race before it may be reasonably construed as being motivated by the defendant's hostility to the plaintiff's race." *Id. at 863-64*. Further, [*22] an employer may only be liable for co-worker harassment "if it was negligent in discovering or remedying the harassment." *Bombaci v. Journal Cmty. Pub. Group, Inc., 482 F.3d 979, 983 (7th Cir. 2007)*. This requires a plaintiff to "offer evidence either that she notified the employer about the harassment or that the harassment was so pervasive that a jury may infer that the employer knew about it." *Id. at 983-84*.

The record reflects that during one of Plaintiff's first year rotations (she could not remember which), Kennedy "pretended like she did not know what [Plaintiff] was saying and made [her] repeat things." (Plaintiff Dep. 24). Viewing the evidence in the light most favorable to Plaintiff, a jury could construe Kennedy's feigned inability to understand Plaintiff as being tied to Plaintiff's Indian accent and thus, as a form of harassment. However, Plaintiff did not report these incidents; instead, she laughed it off. (*Id.* at 38-39).

Plaintiff's complaints regarding the way Kennedy spoke to her, hung up the phone on her, and completed the call schedule, are not sufficiently tied to Plaintiff's national origin. Neither is the statement, "You had Dr. Greg Sutton drooling all over you. [*23] What is going on now? Why can't you figure out what's to be done?" (*Id.* at 24-29). In fairness to the Plaintiff, she did in fact report Kennedy's statement to Dr. Zimmer, and voiced her belief that she was "being treated differently from the other residents." (*Id.* at 31). Critically, however, she did not indicate that she thought the comments were based on her national origin, or use words to that effect. (*Id.* at 31).

Similarly, Plaintiff's complaints against Freyre are not sufficiently tied to her national origin. Plaintiff complains that Freyre left a "threatening voicemail," the contents of which she cannot remember, and criticized her quality and content of her work, which she perceived as being unfair. (*Id.* at 39, 42-45). Although Plaintiff complained to Dr. Strand that Freyre was "treating [her] differently and [she] didn't know why" and/or that [she] was "treating her differently and [she] didn't know how to handle it," (*id.* at 49), she never informed him that she thought Freyre's treatment was due to her Indian origin.

In sum, a fair reading of Plaintiff's testimony leads to the conclusion that Plaintiff believes the alleged harassment was due to her national origin for the sole [*24] reason that she is Indian and others are not. (*Id.* at 28-29, 47-48, 77-78, 91, 95-96). Such a tenuous connection is insufficient to raise a genuine issue of material fact. *See Lewis v. Ivy Tech State College, 2006 U.S. Dist. LEXIS 34805, 2006 WL 1408398, at *3 (N.D. Ind. 2006)* ("The Plaintiff offers nothing more than his subjective belief and speculation that his race was a motivating factor for any action taken against him; this is not sufficient to create an issue of fact."). Accordingly, the court **GRANTS** St. Vincent's motion for summary judgment on Plaintiff's national origin harassment claim.

#### B. Retaliation under Title VII (Count III)

Plaintiff alleges St. Vincent terminated her contract in retaliation for her complaining of a hostile work environment. Under the direct method of proof, a Title VII plaintiff must establish that: (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse employment action; and (3) a causal link exists between the two. *Silverman v. Bd. of Educ. of City of Chicago, 637 F.3d 729, 740 (7th Cir. 2011)*.

A plaintiff engages in statutorily protected activity when she puts her employer on notice that she is the vic-

Case: 1:12-cv-08733 Document #: 81-24 Filed: 05/22/15 Page 8 of 10 PageID #:2059

Page 7

2014 U.S. Dist. LEXIS 71379, *; 97 Empl. Prac. Dec. (CCH) P45,081

tim of discrimination. *Miller v. Am. Family Mut. Ins. Co., 203 F.3d 997, 1007-08 (7th Cir. 2000)* [*25] (noting "an employer cannot retaliate when it is unaware of any complaints"). In simple terms, this means Plaintiff must put the person or persons who were involved in her termination on notice of her complaints of discrimination. *Schandelmeier-Bartels v. Chicago Park Dist., 634 F.3d 372, 378 (7th Cir. 2011)* ("A decisionmaker is the person responsible for the decision.") (internal quotations and citations omitted)). An employee "need not use the words [national origin] discrimination to bring her speech within Title VII's retaliation protections." *Id. at 1007*. However, "she has to at least say something to indicate her [national origin] is an issue." *Id.*

Plaintiff testified to a conversation she had with Dr. Francis, in which she asked her if the fact that she was Indian had anything to do with the way she was being treated at St. Vincent. At the time she had that brief conversation, Dr. Francis was a third-year resident; not a decisionmaker. There is no evidence in the record that Francis ever told anyone, much less Dr. Strand, of Plaintiff's concerns.

Plaintiff did testify that she complained to Dr. Strand (here, the decisionmaker) about the conduct of Freyre and Kennedy, but she never [*26] complained that she was being treated differently because of her national origin.. (Plaintiff Dep. at 49, 56, 141). For example, Plaintiff testified that she "did not tell [Dr. Strand], 'Dr. Jody Freyre is treating me differently because I'm Indian. But I just told him, 'I'm being treated differently, and I don't know why.'" (Plaintiff Dep. at 49, 56). Complaints of this nature are insufficient to place her employer on notice that she believed her national origin was an issue. *Miller, 203 F.3d at 1007-08*. See also *Tomanovich v. City of Indianapolis, 457 F.3d 656, 663 (7th Cir. 2006)* ("Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient."); *Sitar v. Ind. Dep't of Transp., 344 F.3d 720, 727 (7th Cir. 2003)* (plaintiff complained only that she felt "picked on, not that she was discriminated against 'because of' sex or gender, which is what Title VII requires"). Accordingly, the court finds Plaintiff did not engage in statutorily protected activity. St. Vincent's motion for summary judgment on Plaintiff's retaliation claim must therefore be **GRANTED**. [*27] *See Sitar, 344 F.3d at 727-28* (plaintiff's failure to engage in protected activity "is enough to doom her claim of [retaliation].").

### C. Gender Discrimination (Count II)

Plaintiff also alleges she was the victim of gender discrimination; more specifically, that St. Vincent treated her differently due to her medically complicated pregnancy.

Title VII prohibits employment discrimination on the basis of sex. *42 U.S.C. § 2000e-2(a)*. In 1978, Congress amended Title VII by enacting the PDA to explicitly extend protection to pregnant women:

> The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work . . . ."

*42 U.S.C. § 2000e(k)*. "The PDA created no new rights or remedies, but clarified the scope of Title VII by recognizing certain inherently gender-specific characteristics that may not form the basis for disparate treatment of employees." *Hall v. Nalco Co., 534 F.3d 644, 647 (7th Cir. 2008)* [*28] (citing *Newport News Shipbuilding & Dry Dock Co. v. EEOC, 462 U.S. 669, 678-79, 103 S. Ct. 2622, 77 L. Ed. 2d 89 (1983)*). The PDA provides that "'discrimination based on a woman's pregnancy is, on its face, discrimination because of her sex.'" *Id.* (quoting *Newport News, 462 U.S. at 684*).

A Title VII plaintiff can show that she was a victim of intentional discrimination either by proceeding under the direct method or the indirect, burden-shifting method. *Rhodes v. Illinois Dep't of Transp., 359 F.3d 498, 504 (7th Cir. 2004)*. Under the direct method, the plaintiff may show, either through direct or circumstantial evidence, that the "employer's decision to take the adverse job action against h[er] was motivated by an impermissible purpose, such as sex." *Id.* (citation omitted). "Direct evidence is evidence that, if believed by the trier of fact, would prove discriminatory conduct on the part of the employer without reliance on inference or presumption." *Id.* (citation omitted). This type of evidence generally involves an admission or a statement by the decision maker that his actions were motivated by discriminatory intent. *Lewis v. Sch. Dist. # 70, 523 F.3d 730, 742 (7th Cir. 2008)* (citation omitted). A plaintiff may also [*29] establish her direct case by presenting a convincing mosaic of circumstantial evidence from which a reasonable juror could infer intentional discrimination by the decision maker. *Troupe v. May Dep't Stores Co., 20 F.3d 734, 737 (7th Cir. 1994))*. A plaintiff's circumstantial evidence "must point directly to a discriminatory reason

Case: 1:12-cv-08733 Document #: 81-24 Filed: 05/22/15 Page 9 of 10 PageID #:2060

Page 8

2014 U.S. Dist. LEXIS 71379, *; 97 Empl. Prac. Dec. (CCH) P45,081

for the employer's action." *Adams v. Wal-Mart Stores, Inc., 324 F.3d 935, 939 (7th Cir. 2003).*

St. Vincent argues it decided not to renew Plaintiff's contract due to continued concerns regarding her performance, including issues of patient care, work ethic, communication, and professionalism. Yet, in Dr. Strand's letter to the American Board of Obstetrics and Gynecology, he specifically stated that St. Vincent did not renew Plaintiff's contract "*[d]ue to a medically complicated pregnancy* and significant concerns regarding her academic progress." (Plaintiff's Ex. 1) (emphasis added). This is direct evidence of discrimination based upon a prohibited animus -- gender.

In addition, the circumstantial evidence in this case could lead a reasonable jury to reject St. Vincent's proffered reason for her termination. First, Dr. Strand scheduled Plaintiff on one of the [*30] toughest rotations in its program -- the holiday schedule gynecology oncology night float rotation. In fact, St. Vincent does not offer that rotation as a combined rotation anymore. (Nance Dep. at 46). Second, Plaintiff's chief resident on that rotation was Freyre with whom she had had documented difficulty in the past. Third, Dr. Strand placed Plaintiff on probation just two weeks after her return from an extended maternity leave, largely based on complaints made by Freyre, and met with her during that three-to-four month period only one or two times. Four, Plaintiff was still suffering from post-partum depression, as evidenced by the fact that she appeared distracted and tearful at times; thus, an oncology rotation would have been particularly difficult for Plaintiff. (Plaintiff Dep. at 220) (also testifying that walking was a struggle due to symphysis pubis dysfunction). Lastly, she had been away from the program for almost eight months; consequently, it is reasonable to infer that her skills had suffered.

The court is cognizant of the fact that it is prohibited from second-guessing the legitimate business decisions of St. Vincent; yet, in this instance, given the circumstances of [*31] her return to the residency program, the conflicting evidence regarding the reason for her termination and the inferences to be drawn therefrom, the court finds a reasonable jury could conclude that the reason Plaintiff was terminated was due to her medically complicated pregnancy and the complications that arose therefrom. St. Vincent's motion for summary judgment on Plaintiff's gender discrimination claim is therefore **DENIED**.

### D. National Origin Discrimination (Count I)

Plaintiff alleges St. Vincent discriminated against her on the basis of her national origin, Indian. Whether under either the direct or indirect method of proof, a Title VII plaintiff must ultimately prove that she was discriminated against *because of* her national origin. *42 U.S.C. § 2000e-2(a)(1)* (noting it is unlawful for an employer "to discriminate against any individual with respect to h[er] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, sex, or national origin"). *See also Logan v. Kautex Textron N. Am., 259 F.3d 635, 638 (7th Cir. 2001)* (noting that "the pertinent question" in a Title VII case "is not whether a plaintiff has direct (including circumstantial) [*32] or indirect proof of discrimination, but whether [she] has presented sufficient evidence that [her employer's] decision . . . was motivated by an impermissible purpose").

In her Response, Plaintiff argues her gender discrimination claim and her national origin discrimination claim together. With respect to her national origin discrimination claim, she argues that her national origin "factored into many of the measures taken against her," but does not support that statement with any evidence. At most, she has presented evidence of a possible cultural divide between American and Indian styles of communication and hospital norms, like working as a "team," and her alleged inability to accept feedback from fellow residents. That is not, however, evidence of intentional discrimination. St. Vincent's motion for summary judgment on Plaintiff's national origin discrimination claim is therefore **GRANTED**.

### E. ADA Discrimination (Count IV)

Next, Plaintiff alleges she was discriminated against because of her alleged disability. To successfully bring an ADA discrimination claim, an ADA plaintiff must first establish that she is protected by the ADA; in other words, that she is a qualified individual [*33] with a disability. *Timmons v. General Motors Corp., 469 F.3d 1122, 1127 (7th Cir. 2006).* Once that is established, she must show that her employer took an adverse action against her *because of* her disability. *Id.* St. Vincent does not contest the fact that she is protected under the ADA; instead, it argues that she cannot show St. Vincent did not renew her contract because of her disability. In other words, she cannot show that her disability was the "but-for" cause of her termination. *Serwatka v. Rockwell Automation, Inc., 591 F.3d 957, 963 (7th Cir. 2012).*

The issue in *Serwatka* was whether a jury's finding that the plaintiff was fired for lawful (performance issues) and unlawful reasons (due to perceived disability) was sufficient for judgment in her favor. The Seventh Circuit held that "in the absence of a cross-reference to Title VII's mixed-motive liability language or comparable stand-alone language in the ADA itself, a plaintiff complaining of discriminatory discharge under the ADA must show that his or her employer would not have fired h[er] but for his actual or perceived disability; proof of mixed-motive will not suffice." *Id. at 962.* The Court in

Case: 1:12-cv-08733 Document #: 81-24 Filed: 05/22/15 Page 10 of 10 PageID #:2061

Page 9

2014 U.S. Dist. LEXIS 71379, *; 97 Empl. Prac. Dec. (CCH) P45,081

*Fleishman v. Continental Cas.* [*34] *Co.*, extended "*Serwatka's* ADA causation requirement at trial to the summary judgment stage, meaning [a plaintiff] must produce evidence permitting a jury to infer [her disability] was a but-for cause of [her non-renewal]." *698 F.3d 598, 604 (7th Cir. 2012)*.

For the reasons set forth in Section III.C., the court finds a reasonable jury could conclude that her pregnancy-related impairments and related medical leave were the but-for cause of her termination. Simply because Dr. Strand's letter to the American Board of Obstetrics and Gynecology list two reasons -- her medically complicated pregnancy and her academic progress -- does not mean a jury could not find that her academic progress was not the real reason for her termination. Accordingly, St. Vincent's motion for summary judgment on Plaintiff's ADA discrimination claim is **DENIED**.

The court recognizes its ruling today conflicts with its ruling granting St. Vincent's motion to dismiss her perceived disability claim. In revisiting this issue, the court finds the motion should have been denied, as the issue is one for the jury.

### F. ADA Retaliation (Count V)

Lastly, Plaintiff alleges she was terminated in retaliation for taking a medical leave [*35] of absence. Under the direct method of proof, an ADA plaintiff must establish that: (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse employment action; and (3) a causal link exists between the two. *Povey v. City of Jeffersonville, Ind., 697 F.3d 619, 624 (7th Cir. 2012)*. St. Vincent does not dispute the first two elements listed above; however, St. Vincent contends there is not a causal link between Plaintiff's medical leave and St. Vincent's termination of her contract. The court does not agree. *See* Section III.C of this Entry. Accordingly, St. Vincent's motion for summary judgment on Plaintiff's ADA retaliation claim is **DENIED**.

### IV. Conclusion

The court finds there exists material issues of fact surrounding the reason for Plaintiff's termination from St. Vincent's OB/GYN residency program. Accordingly, the court **DENIES** St. Vincent's motion for summary judgment (Filing No. 65) on Plaintiff's gender, ADA, and ADA retaliation claims. The court finds that there does not exist material issues of fact on her national origin harassment, discrimination, and retaliation claims. Accordingly, the court **GRANTS** St. Vincent's motion for summary judgment on [*36] Plaintiff's national origin harassment, discrimination, and retaliation claims.

**SO ORDERED** this 22nd day of May 2014.

/s/ Richard L. Young

RICHARD L. YOUNG, CHIEF JUDGE

United States District Court

Southern District of Indiana