# TAB 25



KATHERINE LIU, Plaintiff, v. COUNTY OF COOK, et. al., Defendants.

Case No. 10 C 6544

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

2014 U.S. Dist. LEXIS 27163

March 3, 2014, Decided
March 3, 2014, Filed

**PRIOR HISTORY:** *Liu v. County of Cook, 2013 U.S. Dist. LEXIS 159501 (N.D. Ill., Nov. 6, 2013)*

**COUNSEL:** [*1] For Katherine Liu, M.D., Plaintiff: Robert D. Sweeney, LEAD ATTORNEY, Adam Seth Miller, RDS Law, Chicago, IL.

For County of Cook, Richard Keen, M.D., individually as as Chair of the Department of Surgery, Estate of Phillip Donahue, M.D., individually as as Chief of the Division of General Surgery, James Madura, M.D., individually as as Chair of the Surgical Oversight Committee, Defendants: Andrew Joseph Creighton, LEAD ATTORNEY, Anita Alvarez, State's Attorney of Cook County, Chicago, IL; James Charles Pullos, Cook County State's Attorneys Office (50 W), Chicago, IL; Karen J. Dimond, Cook County State's Attorney's Office, Chicago, IL.

**JUDGES:** George M. Marovich, United States District Judge.

**OPINION BY:** George M. Marovich

**OPINION**

## MEMORANDUM OPINION AND ORDER

Plaintiff Katherine Liu, M.D. ("Dr. Liu"), a surgeon, filed more than a dozen claims against defendants after she lost her position as a surgeon at Cook County's Stroger Hospital. Dr. Liu claims that Cook County violated Title VII of the Civil Rights Act of 1964 by discriminating against her on the basis of her race (Count I), national origin (Count III) and sex (Count V); by subjecting her to sexual harassment (Count VI), racial harassment (Count II) and national-origin [*2] harassment (Count IV); and by retaliating against her (Count VII). Dr. Liu alleges that Cook County violated the Equal Pay Act (Count X) wilfully (Count XI). She seeks to hold defendants Cook County, Richard Keen, M.D. ("Dr. Keen"), James Madura, M.D. ("Dr. Madura") and the Estate of Phillip Donahue ("Dr. Donahue") liable under § *1981* for race discrimination (Count VIII) and retaliation (Count IX). Plaintiff seeks relief under § *1983* (Count XII) against defendants Cook County, Dr. Keen, Dr. Madura and Dr. Donahue for allegedly denying her due process. Finally, in Count XIII, Dr. Liu alleges that Drs. Keen, Madura and Donahue tortiously interfered with her economic advantage by causing Cook County to discharge her.

Defendants have filed a motion for summary judgment with respect to all of plaintiff's claims. For the reasons set forth below, the Court grants defendants' motion for summary judgment. Dr. Donahue filed a separate motion for summary judgment, which the Court denies as moot.

## I. Background

*Local Rule 56.1* outlines the requirements for the introduction of facts parties would like considered in connection with a motion for summary judgment. The Court enforces *Local Rule 56.1* strictly. [*3] Facts that are argued but do not conform with the rule are not considered by the Court. For example, facts included in a party's brief but not in its statement of facts are not considered by the Court because to do so would rob the other party of the opportunity to show that such facts are disputed. Where one party supports a fact with admissible evidence and the other party fails to controvert the fact

*with citation to admissible evidence*, the Court deems the fact admitted. *See Ammons v. Aramark Uniform Services, Inc., 368 F.3d 809, 817-818 (7th Cir. 2004).* This does not, however, absolve the party putting forth the fact of its duty to support the fact with admissible evidence. *See Keeton v. Morningstar, Inc., 667 F.3d 877, 880 (7th Cir. 2012).* Asserted "facts" not supported by specific pages of deposition testimony, documents, affidavits or other evidence admissible for summary judgment purposes are not considered by the Court.

The following facts are undisputed unless otherwise noted.

Dr. Liu, an Asian woman of Chinese descent, began her surgical career at Stroger Hospital after she completed her residency in 1984. During her employment at Stroger Hospital, Dr. Liu served as an attending [*4] physician in the Department of Surgery. In 1985, Dr. Liu was given a performance appraisal of "good." From 1986 until 1999 (when Stroger stopped doing performance appraisals), Dr. Liu was rated "excellent" or "superior."

From 1996 to 1999, Dr. Liu served as Chair of the Department of Surgery's Surgical Oversight Committee ("SOC") and as a member of the Executive Medical Staff ("EMS"). The Surgical Oversight Committee is a group of surgeons who meet from time to time to review cases of undesirable patient outcomes in an apparent effort to improve patient care. The Executive Medical Staff is a group of approximately 40 people, including physicians from each of the various medical departments at Stroger. The Executive Medical Staff has a number of functions, including considering physician discipline.

In addition to her employment with Stroger Hospital, Dr. Liu has also taught at Rush University Medical Center ("Rush"). Dr. Liu served as an Assistant Professor in Rush's Department of General Surgery until 1998, when she was promoted to Full Professor. Dr. Liu also has staff privileges at Rush.

Like Dr. Liu, the three individual defendants are (or were) surgeons at Stroger. Dr. Keen is the [*5] Chair of the Department of Surgery, which is subdivided into several divisions, including the Division of General Surgery. Defendant Dr. Donahue was Chief of the Division of General Surgery until October 10, 2009, when he died. Defendant Dr. Madura was (for some period of time that is not made clear in the record) Chair of the Surgical Oversight Committee (the same committee Dr. Liu had once chaired).

Over the years, Dr. Donahue made several comments that Dr. Liu did not like. During the year 2000, Dr. Donahue called Dr. Liu a "good girl," when she agreed with him. She asked him to stop, and he did. Dr. Donahue once told her he fought in Vietnam against the Chinese. Once, when Dr. Liu asked for a raise, Dr. Donahue responded that her husband works and asked why she needed a raise. In addition, outside of Dr. Liu's presence, Dr. Donahue asked another female doctor why all female doctors have to be bitches. Neither Dr. Madura nor Dr. Keen ever made comments about Dr. Liu's race, sex or national origin.

The events that led to the filing of this lawsuit can be traced to a disagreement between Dr. Liu, on the one hand, and Stroger Hospital, on the other, about the appropriate care for patients [*6] with appendicitis. The general standard for treating most cases of appendicitis is to surgically remove the appendix. One study has shown that in some complicated cases (specifically, cases in which the patient presents with an abscess or phlegmon (an inflammatory mass)), patients respond more favorably if they receive antibiotics *before* surgery (not in lieu of).

Dr. Keen became particularly concerned about treating appendicitis patients without surgery in 2001, when a patient who had not had his appendix surgically removed died from a ruptured appendix. Dr. Keen wrote a detailed letter to the Hospital Oversight Committee and recommended that all patients presenting with abdominal pain be admitted to the surgical service so that a surgeon could determine early whether the patient suffered appendicitis.

In December 2004, the Surgical Oversight Committee (which, at the time, was chaired by Dr. Kathryn Bass) considered the case of an appendicitis patient who Dr. Liu had elected not to treat with surgery. The lack of surgery resulted in a negative outcome--a heart attack--for the nineteen-year-old patient. The Surgical Oversight Committee concluded that Dr. Donahue (who had the power to suggest [*7] to Dr. Liu that she abandon the non-surgical treatment of appendicitis) should counsel Dr. Liu about the situation.

In April 2005, the Surgical Oversight Committee discussed another case in which Dr. Liu had treated an appendicitis patient without surgery. The Committee noted that Dr. Donahue had counseled Dr. Liu that such treatment was non-conventional.

At some point in 2006, Dr. Donahue asked Dr. Liu to cover a call for Dr. Madura. Dr. Liu said yes, so long as Dr. Madura would cover a call for her in the future. Dr. Donahue told Dr. Liu that he could order her to do it. Dr. Donahue issued her a reprimand for insubordination and for faking a migraine in order to avoid the extra call.

On October 24, 2006, Dr. Donahue issued a reprimand to Dr. Liu on account of Dr. Donahue's belief that Dr. Liu should have immediately operated on a patient. Dr. Liu responded by telling Dr. Donahue that the patient

had not suffered complications. Dr. Liu asked Dr. Donahue how cases were selected for review.

On December 7, 2006, the Surgical Oversight Committee again considered a case in which Dr. Liu had treated an appendicitis patient without surgery. The SOC concluded that Dr. Liu had provided the patient [*8] with deficient care and recommended that Dr. Keen put a letter in her file regarding the deficiency.

On May 23, 2007, Dr. Madura wrote to Dr. Donahue about an appendicitis patient on whom Dr. Liu had failed to operate and who was readmitted days after Dr. Liu released him. In his letter, Dr. Madura stated, in relevant part:

> Dear Dr. Donahue,
>
> May 17, 2007 at Mortality and Morbidity conference a patient was presented that needs to be brought to your attention. The short story is as follows:
>
> A 25 year old Hispanic male presented with 12 hours of right lower quadrant pain. He had an elevated white bloods [sic] cell count and a CT clearly showing acute appendicitis with a fecalith. He was managed with intravenous antibiotics; no surgery. A repeat scan 4 or 5 days later showed an early abscess and the patient was sent home. He returned 7-10 days later with an abscess and spent several more days in the hospital with percutaneous aspiration and repeat CT scans. He was discharged again.
>
> The unanimous opinion of the audience was in agreement that this patient should have had his appendix out at the first admission when the CT scan results were known.
>
> Most concerning was Dr. Liu's discussion that she [*9] is publishing her results on non-operative treatment of early acute appendicitis. I am concerned that she is treating patients not according to the standard of care for research purposes. This is unethical and needs to be addressed at all levels: departmental, hospital, and institutional review board (IRB).
>
> At best this is a pattern of patient care far below the standard of care; at worst it is unethical and unapproved human subjects research.
>
> I am referring this to the Surgical Oversight Committee.

(Madura Dep. Exh. 2). Days later, with respect to the same patient, a resident physician wrote to Dr. Keen that Dr. Liu had discharged the patient even though the patient had begged for an operation every day for the first three days he was there. The resident had told the patient that it was Dr. Liu's decision. The resident told Dr. Keen that the patient had been grossly mismanaged.

The Surgical Oversight Committee discussed this case on June 7, 2007. The SOC decided to invite Dr. Liu to their next meeting on July 19, 2007 so that Dr. Liu could present her side of the case. At the July 19, 2007 meeting, the SOC decided to write a letter to the Division Chief (Dr. Donahue) about Dr. Liu's ongoing [*10] mismanagement of appendicitis and to recommend to him that he institute corrective/disciplinary action.

On September 10, 2007, Dr. Madura (who was Chair of the Surgical Oversight Committee), wrote to Dr. Donahue a letter in which he stated, among other things:

> Dear Dr. Donahue:
>
> As you are aware, the S.O.C. met on September 6, 2007 and reviewed the above cases with Dr. Liu. The following unanimous opinion was reached by the committee: **multiple episodes of deficient care in her approach to the treatment of appendicitis.** Specifically, the committee addressed:
>
> 1. Multiple missed opportunities to diagnose cancer in the case of B.H. 1245619.
>
> 2. Failure to personally examine and evaluate the clinical course of patient R.L 4459519/44333298 prior to making clinical decisions.
>
> 3. Failure to appreciate clinical findings and the need for surgical intervention in the case of J.E. 1914291.
>
> 4. Continued non-operative management of acute appendicitis despite previous action recommending against the management strategy.

Case: 1:12-cv-08733 Document #: 81-25 Filed: 05/22/15 Page 5 of 16 PageID #:2066

Page 4
2014 U.S. Dist. LEXIS 27163, *

 5. Insistence that this management strategy is supported by the medical literature and is an acceptable practice.

As per the Department of Surgery Oversight Committee guidelines, this is referred [*11] to you as the Division Chair for corrective action. In light of the fact that Dr. Liu has apparently failed to modify her practices after previous action, the committee was unanimous in the recommendation to escalate this action to the highest level necessary. This letter will be presented at the Hospital Oversight Committee on September 17, 2007.

(Keen Dep. Exh. 8) (emphasis in original).

On October 16, 2007, Dr. Donahue wrote a memo to Dr. Liu. In the memo, Dr. Donahue wrote, in relevant part:

Dear Dr. Liu:

Following the presentation of all details regarding several of your cases at the Surgical Oversight Committee, there was a unanimous decision that your care had been deficient.

Previously I have asked that you operate on all cases of suspected acute appendicitis, since that is the way that surgeons treat adult patients. I asked that you develop a protocol for management of patients by non-operative means if you believed that this approach is warranted; until now, you have not done so.

Since that time, however, you have come to the attention of the committee, and have been judged to have had "multiple episodes of deficient care." I have been directed to develop a corrective action plan [*12] for you to avoid similar instances in the future.

I propose the following plan:

 1. When you are faced with a case of acute appendicitis, simply perform the operation which most of the staff recommend for this condition: appendectomy.
 2. If you encounter a patient with suspected acute appendicitis in whom you believe appendectomy is not appropriate, you will discuss the case with a colleague on staff. Dr. Richter has agreed to provide this service, and I will be available for same. Dr. Keen or the acting chair of surgery would be available in the case that no one else is available. The surgeon will then provide an assessment of the most appropriate care to be provided.
 3. If there is disagreement about the most appropriate action, the chairman of General Surgery will be consulted. If the General Surgery chair is unavailable, the acting chair or his designate will respond.

I hope you will modify your practice and avoid similar instances in the future.

(Liu Dep. Exh. 1).

On November 8, 2007, Dr. Liu wrote to Dr. Donahue. She stated, "I do not recall you previously requesting that I operate on all cases of suspected acute appendicitis. Had I previously understood this, I would have immediately [*13] proceeded to surgery. . . . I am willing to follow your request that all cases of suspected uncomplicated acute appendicitis in our institution receive surgery."

On January 14, 2008, Dr. Madura wrote the following to Drs. Keen and Donahue:

> RE: Katherine Liu, MD; continued mismanagement of appendicitis
>
> Dear Drs. Donahue and Keen,
>
> While auditing charts for documentation and medicine reconciliation for the upcoming JCAHO visit I came across another patient who is presently in the hospital for appendicitis being managed with antibiotics. I reviewed the record, CT and discussed with the residents.
>
> My interpretation is that this patient had acute appendicitis by history, exam and by CT scan and was inappropriately managed by not being offered surgery. Furthermore, he failed to improve and was still not operated upon.
>
> It is only a matter of time before a tragic outcome results from this problem.

(Liu Dep. Exh. 11).

The JCAHO mentioned in Dr. Madura's January 14, 2008 letter is the Joint Commission on Accreditation of Healthcare Organizations ("JCAHO"). The day after Dr. Madura's letter, Dr. Keen held a meeting with the members of the Department of Surgery to discuss the upcoming JCAHO visit. Dr. [*14] Keen asked the surgeons to instruct the residents to enter their patient notes under the name of the attending physician, rather than the resident's own name. Dr. Liu objected and stated that she thought this would constitute falsification of medical records and a violation of federal law. Dr. Liu believes she was retaliated against after this meeting.

On February 21, 2008, Dr. Madura wrote to Drs. Donahue and Keen again. He wrote, among other things:

> Dear Drs. Donahue and Keen,
>
> This morning at mortality and morbidity conference, yet another patient who presented to Dr. Liu's service with acute appendicitis was presented after he was managed without operation and later re-admitted with an intra-abdominal abscess.
>
> Several issues continue to be a concern:
>
> 1. Misdiagnosis; the patient clearly had early acute appendicitis by clinical and CT criteria yet did not receive an operation. Dr. Liu's explanation (excuse) was that the patient had a WBC of 22, insists that patients with appendicitis can be managed without operation.
>
> 2. The patient failed to improve and still was not operated on; instead underwent a second CT scan demonstrating acute appendicitis. Subsequently required additional CT and [*15] percutaneous intervention. . . .

(Liu Dep. Exh. 11). Dr. Liu disputes that this was a different patient from the one Dr. Madura wrote about on January 14, 2008.

Dr. Donahue wrote to Dr. Liu on February 22, 2008. He wrote:

> Following an earlier note in which I asked that you desist from your practice of experimental treatment of acute appendicitis[,] I was disappointed when your case of a similar nature was presented at morbidity conference . . .
>
> In my note of October 16th, I directed you to consult with another surgeon if you felt compelled to consider antibiotic treatment in cases of acute appendicitis. You did not do so in this case, and possibly others. It is inappropriate to not follow directions from a Division Chief, and such deficiencies will have to be considered when reappointments are pending.
>
> Please comply with Division policies in the future

(Liu Dep. Exh. 6).

The SOC continued to discuss these cases, and Dr. Donahue continued to write to Dr. Liu about them. On April 10, 2008, Dr. Donahue wrote to Dr. Liu, "I have asked you to desist from your unorthodox treatment of acute appendicitis. . . . Further infractions will lead to additional disciplinary action including suspension or [*16] Peer Review." On May 2, 2008, Dr. Donahue

wrote to Dr. Liu and asked her to operate on all cases of suspected acute appendicitis, "because that is the way American surgeons treat adult patients with acute appendicitis." Dr. Donahue continued, "All surgeons, especially those of us who work in public hospitals are expected to conform to the standards of treatment." Although Dr. Liu did not see Dr. Donahue's May 2, 2008 note until July 18, 2008, Dr. Liu wrote to Dr. Donahue on May 2, 2008, saying that she would "perform appendectomy for all cases of uncomplicated appendicitis." On May 5, 2008, Dr. Madura informed Dr. Liu that her treatment of appendicitis patients was to be presented to the Hospital Oversight Committee ("HOC").

The HOC was run by the Hospital Quality Assurance Department, who reviewed admissions to the intensive care unit ("ICU") on a daily basis. Members of the Hospital Quality Assurance Department contacted Dr. Keen on July 19, 2008 about one of Dr. Liu's patients, Sandoval (aged 19), who was in the surgical ICU. Dr. Keen saw Sandoval. Sandoval had suffered an acute ruptured appendix, and stool was spilling into his abdomen. Sandoval needed immediate surgery, but Dr. [*17] Liu had delayed the surgery for more than 24 hours. Sandoval went into septic shock, and the residents had kept him alive overnight by pumping him full of fluids.

Two committees met in special session to review Dr. Liu's treatment of Sandoval. The HOC committee met on July 21, 2008. The Surgical Oversight Committee met on July 24, 2008 and agreed unanimously that Dr. Liu's treatment of Sandoval was below the standard of care and should be addressed immediately, because it was putting patient lives at risk.

On July 22, 2008, Dr. Liu wrote what she describes as a "detailed memo" to Dr. Donahue and sent copies to Dr. Maurice Lemon ("Dr. Lemon") and Dr. Keen. Dr. Liu did not put forth evidence of the contents of the July 22, 2008 memo. On July 25, 2008, Dr. Liu met with Dr. Lemon, who was the Interim Medical Director at the Hospital. Dr. Liu told Dr. Lemon that she wanted to be judged as a surgeon instead of as a Chinese woman. Dr. Liu told Dr. Lemon that she had hired an attorney to address issues of race and gender discrimination, pay inequality and retaliation. (Defendant disputes that Dr. Liu complained of race discrimination.) Dr. Lemon asked Dr. Liu if she thought she had been subjected [*18] to sexual harassment, and she said no. Dr. Lemon told Dr. Liu he would arrange a meeting with Dr. Keen and Dr. Liu to discuss her allegations of discrimination. According to Dr. Liu, during the two-year period between July 2006 and July 2008, she told Drs. Donahue, Madura, Keen, Benson, Dray and Langer, on no fewer than fifteen occasions, that she was being treated differently from her white, male colleagues. Apart from the July 25, 2008 conversation with Dr. Lemon, Dr. Liu has put forth no evidence as to when those conversations occurred or who was present for each conversation.

Sometime on or before August 1 or 2, 2008, Dr. Lemon had a conversation with Dr. Keen about Dr. Liu. Dr. Lemon did not tell Dr. Keen about Dr. Liu's allegations of discrimination. Instead, they discussed whether to suspend Dr. Liu or to send her to peer review. Ultimately, it was Dr. Keen's decision.

On August 4, 2008, Dr. Keen sent a letter to Dr. Liu to inform her that he was suspending her general surgical privileges and limiting her to surgical cases of "low complexity." Such suspensions are automatically reviewed by the peer review committee. Dr. Lemon gave Dr. Liu the option of resigning instead of going [*19] through peer review. Dr. Liu declined. Dr. Lemon also attempted to negotiate with Dr. Liu for a lesser punishment that would allow her to avoid peer review and the suspension and would ensure that Dr. Liu was reappointed in 2008. They did not, however, reach an agreement. Peer review proceeded.

By the time the peer review committee met, Dr. Keen had learned of an additional appendicitis patient that Dr. Liu (and another attending physician) had treated. The patient, Diane Bucki ("Bucki"), had presented with appendicitis in October 2007, and Dr. Liu had treated her with only antibiotics and without surgery. Six days after Bucki had been released from Stroger Hospital, she was admitted to a different hospital. When Bucki arrived at the other hospital, she was near death, with an exploded appendix and no blood pressure. At some point in 2008, Bucki filed a malpractice lawsuit against Dr. Liu and Cook County. After Cook County settled the case for $190,000.00, the Hospital Quality Assurance Department told Dr. Keen about the Bucki case. Dr. Keen, in turn, provided the peer review committee with information about the Bucki case.

The peer review committee was made up of seven physicians (four [*20] of whom were women and two of whom were born in countries other than the United States) and chaired by Dr. Jay Mayefsky. Neither Dr. Keen, nor Drs. Madura or Donahue controlled the peer review committee. The peer review committee met several times, interviewed Drs. Keen and Liu and reviewed medical records. In September 2008, the peer review committee issued a unanimous report, in which they recommended that the summary suspension remain in effect. The peer review committee concluded that Dr. Liu had not managed appendicitis according to Stroger Hospital's standard of care, that some of her patients had experienced complications, that she had failed to follow directions from her department and that she had exhibited poor judgment. Still, the peer review committee con-

cluded that Dr. Liu was a "bright and competent surgeon." The committee stated that the "process of oversight in the Department of Surgery is not without the potential for bias, and this may lead a department member to feel that she/he is a subject of unfair scrutiny." The peer review committee recommended that Dr. Liu's privileges be restored after she received counseling.

The report of the peer review committee was then [*21] reviewed by the Executive Medical Staff. The Executive Medical Staff met several times, and Dr. Keen attended each meeting. On October 22, 2008, the members voted to retain the summary suspension and to reduce Dr. Liu's privileges to elective hernia repairs, cholecystecotomies and minor soft tissue resections. The vote was 27 in favor and none against, with one abstention. Neither Dr. Keen, nor Drs. Madura or Donahue controlled the Executive Medical Staff.

Soon thereafter, Dr. Liu was up for reappointment at the hospital. Like every physician at Stroger Hospital, Dr. Liu had to reapply for reappointment every two years. Applications for reappointment are reviewed by the Credentials Committee, the Executive Medical Staff and the County Board.

The Credentials Committee met twice to consider Dr. Liu's application for reappointment. Drs. Madura, Keen and Donahue told the Credentials Committee of their concerns about Dr. Liu's treatment of appendicitis. Dr. Liu also spoke of her appendicitis treatment. Dr. Liu stated that she was entitled to treat patients the way she saw fit. The Credentials Committee voted to recommend that Dr. Liu not be reappointed because she had failed to adhere to [*22] the standards of patient care generally accepted by medical professionals. Drs. Madura and Donahue sit on the Credentials Committee, but they were recused from the vote with respect to Dr. Liu's reappointment.

The Executive Medical Staff also voted against reappointing Dr. Liu. Eighteen members of the Executive Medical Staff voted against reappointment; one voted to support reappointment; two abstained. Their vote was held December 9, 2008.

Shortly thereafter, on January 28, 2009, Dr. Liu filed her first Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). She filed additional Charges on July 13, 2009 and August 29, 2009.

Pursuant to the hospital's by-laws, Dr. Liu appealed both the summary suspension of her privileges and the decision not to reappoint her. The appeal consisted of an evidentiary hearing, at which she had the burden to show by clear and convincing evidence that the decisions of the Executive Medical Committee were arbitrary, capricious or unreasonable. The hearing was before three physicians chosen by Dr. Janice Benson ("Dr. Benson"), the president of the medical staff. Dr. Benson chose three physicians she thought would provide a fair hearing: [*23] a surgeon, a palliative care doctor and an emergency room doctor. One of the three doctors on the hearing committee was, separately, involved in his own peer review process for having allegedly touched someone inappropriately. That doctor later resigned, but not until after Dr. Liu's hearing process was complete.

The three physicians on Dr. Liu's hearing committee conducted the hearings on nine dates, the last of which was November 6, 2009. They heard testimony from fifteen witnesses and considered 75 exhibits. Dr. Madura testified that Dr. Liu treated 41% of her appendicitis cases without surgery, while other surgeons treated only 2-3% of their appendicitis cases without surgery. Dr. Madura presented nineteen cases in which Dr. Liu treated appendicitis without surgery. Dr. Fred Luchette (a professor of surgery at Loyola University Chicago School of Medicine) testified that most surgeons would wait 48-72 hours for a clinical response to antibiotics before operating on a patient with appendicitis. On November 30, 2009, the hearing committee issued two unanimous reports, one of which recommended that the summary suspension be upheld and one of which recommended that the denial of reappointment [*24] be upheld. In each report, the hearing committee concluded that Dr. Liu had violated the standard of care by treating appendicitis without surgery. Neither Dr. Donahue (who had died by this point) nor Drs. Keen or Madura controlled the hearing committee.

Three more steps remained under the by-laws. First, on January 12, 2012, the Executive Medical Staff, after hearing presentations by Drs. Keen and Liu and reviewing the hearing committee reports, voted to adopt the hearing committee's recommendation to uphold the suspension and denial of reappointment. Then, on March 23, 2010, the Joint Conference Committee voted to uphold the summary suspension and denial of reappointment. Finally, on April 30, 2010, the Health System Board of Directors met in closed session and voted to confirm the summary suspension and denial of reappointment.

In the meantime, however, separate proceedings were underway for a separate infraction of hospital rules. While Dr. Liu was undergoing the peer review process, she accessed, without authority, patient records for patients treated by Drs. Keen, Madura and Donahue in an attempt to compare her work with theirs. Doing so violated hospital policies. The parties [*25] dispute whether it also violated the Health Insurance Portability and Accountability Act ("HIPAA") (though that is a legal rather than a factual dispute). Dr. Keen brought disciplinary charges against Dr. Liu, who was given a

...

pre-disciplinary hearing (at which she had counsel) before an independent hearing officer. On October 20, 2009, the hearing officer rendered a decision that Dr. Liu be discharged due to violations of HIPAA, hospital privacy policies and gross insubordination. The effective date of her discharge was January 4, 2010.

Dr. Liu is not the only physician at Stroger Hospital who has been suspended or denied reappointment. Between 2003 and 2010, ten Cook County physicians were reported to the National Practitioner Data Bank for suspension or denial of medical privileges or misconduct. All ten either resigned, surrendered their privileges or were discharged. Of the ten, two (including Dr. Liu) were female. Of the eight men, four were white, one was Hispanic and one was Middle Eastern. During the relevant time, fourteen female surgeons worked in the Department of Surgery. None (except Dr. Liu) was subject to peer review or the disciplinary process.

At some point, Dr. Madura [*26] was paid more than Dr. Liu was paid. The parties do not say when or for how long that continued, but the undisputed evidence is that during the period when Madura earned more than Dr. Liu, Dr. Madura was the Associate Chair of the Department of Surgery, which meant he had the additional duty of chairing the Surgical Oversight Committee. He was also responsible for running a new quality improvement program to curtail preventable deaths.

Dr. Liu brought her claims to this Court, and defendants moved for summary judgment.

**II. Summary Judgment Standard**

Summary judgment shall be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. When making such a determination, the Court must construe the evidence and make all reasonable inferences in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. Summary judgment is appropriate, however, when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. [*27] "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Brummett v. Sinclair Broadcast Group, Inc., 414 F.3d 686, 692 (7th Cir. 2005)*.

**III. Discussion**

**A. Dr. Liu's disparate treatment claims under Title VII and § 1981**

In Counts I, III, and V, respectively, Dr. Liu claims that she was subjected to disparate treatment on the basis of her race, national origin and sex. Pursuant to Title VII of the Civil Rights Act of 1964, it "shall be an unlawful employment practice for an employer-(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *42 U.S.C. § 2000e-2(a)*. To be actionable as discrimination under Title VII, a difference in treatment must be material. *Minor v. Centocor, Inc., 457 F.3d 632, 634 (7th Cir. 2006)*.

Dr. Liu claims that she was subjected to disparate treatment on the basis of her race, sex and national origin when her full surgery privileges were suspended and [*28] when her application for reappointment was rejected.[1]

> 1  Nowhere in her opposition to defendants' motion for summary judgment does Dr. Liu argue that her discharge from employment was due to her race, sex or national origin. Even if she had, the Court would have granted summary judgment on this claim, too, because Dr. Liu has put forth no evidence that defendant's reason for her discharge (that she had accessed patient files in violation of hospital policy) was pretext for race, sex or national-origin discrimination. It is undisputed that Dr. Liu accessed patient records without permission and that doing so violated hospital policies.

**1. Dr. Liu's Title VII race claim**

Dr. Liu has not put forth any direct evidence of race discrimination. Accordingly, the Court will consider her race claims under the indirect method. To make out a *prima facie* case of discrimination, a plaintiff must put forth evidence that: (1) she is a member of a protected class; (2) she was meeting the employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) a similarly-situated employee not in her protected class was treated more favorably. *Alexander v. Casino Queen, Inc., 739 F.3d 972, 979 (7th Cir. 2014)*. [*29] The "burden of establishing a prima facie case of disparate treatment is not onerous." *Texas Dep't of Comm. Affairs v. Burdine, 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)*. It requires a plaintiff to show that she was "rejected under circumstances which give rise to an inference of unlawful discrimination," and the "standard is not inflexible" because facts vary in different cases. *Burdine, 450 U.S. at 253* and n.6. If plaintiff

makes out a *prima facie* case of race discrimination, defendant has the light burden of *articulating* a legitimate, non-discriminatory reason for the adverse action. *Alexander*, 739 F.3d at 979. If defendant does so, plaintiff has the burden to show that the proffered reason was just a pretext for race discrimination. *Id.* A pretext is a dishonest explanation, rather than an error. *See Bodenstab v. County of Cook*, 569 F.3d 651, 657 (7th Cir. 2009). To show pretext, Dr. Liu "must establish that the explanation is a lie, which permits a jury to infer that the tale has been concocted to conceal an unlawful truth. It is not enough to demonstrate that the employer was mistaken, inconsiderate, short-fused, or otherwise benighted; none of those possibilities violates federal law. Poor personnel [*30] management receives its comeuppance in the market rather than the courts." *Yindee v. CCH Inc.*, 458 F.3d 599, 602 (7th Cir. 2006) (internal citations omitted).

The Court assumes, without deciding, that Dr. Liu could make out a *prima facie* case of race discrimination with respect to her suspension of privileges and the decision to deny her application for reappointment. The defendant has offered the same legitimate, nondiscriminatory reason for both actions: Dr. Liu's continued failure to treat appendicitis with surgery.

Dr. Liu argues that defendant's reason was a pretext for race discrimination, because antibiotics are, she argues, an appropriate treatment for appendicitis. Dr. Liu put forth undisputed evidence that a study found that in some complicated cases (specifically, cases in which the patient presents with an abscess or phlegmon (an inflammatory mass)), patients respond more favorably if they receive antibiotics *before* surgery. (Note that the study did not conclude that patients should get antibiotics *instead* of surgery, which is how Dr. Liu was treating some patients.) Ultimately, it does not matter to the outcome of this case whether Stroger Hospital's doctors are correct [*31] that appendicitis should always be treated surgically or whether Dr. Liu is correct that it can sometimes be treated with antibiotics alone. Evidence that the employer was mistaken is not evidence of pretext. All this Court needs to consider is whether Dr. Liu has put forth enough evidence from which a reasonable jury could conclude that defendant's explanation (that Dr. Liu was failing to treat appendicitis with antibiotics) was dishonest, a mere pretext for race discrimination. Here, the undisputed evidence was that it was honest. It is undisputed that Dr. Liu treated appendicitis patients without surgery even after she was told to stop doing so. It is undisputed that such treatment caused several patients severe complications and cost the County $190,000.00 to settle a malpractice suit. It is undisputed that Dr. Liu told the Credentials Committee that she was entitled to practice as she saw fit. No reasonable jury could conclude that defendant's reason was a lie to cover for race discrimination.

Nor does it matter, as Dr. Liu argues, that she could have been given a lesser punishment. She argues that her punishment was too severe. The relative severity of the punishment is not the [*32] test for pretext. *See Zayas v. Rockford Memorial Hosp.*, 740 F.3d 1154, 1158-59 (7th Cir. 2014) ("The pretext inquiry focuses on whether the stated reason for the adverse employment action is *in fact* the reason for it--not on whether the stated reason is accurate or fair. . . . Thus, it is irrelevant if [plaintiff's] emails were not egregious enough to justify her termination, as long as [defendant] believed they were."). The Seventh Circuit has "repeatedly said we do not sit as a super-personnel department to determine which infractions deserve greater punishment." *Harris v. Warrick Cty. Sheriff's Dep't.*, 666 F.3d 444, 449 (7th Cir. 2012). Honesty is the test for pretext, and the undisputed evidence is that defendant's reason was honest. No reasonable jury could conclude that defendant's explanation was a mere pretext for race discrimination.

Defendant is entitled to judgment as a matter of law on Count I. The Court grants defendant summary judgment on Count I.

### 2. Dr. Liu's § 1981 race discrimination claim

In Count VIII, Dr. Liu alleges that defendants Cook County, Dr. Keen, Dr. Donahue and Dr. Madura discriminated against her on the basis of her race in violation of *§ 1981*. The parties [*33] agree that the same standards apply to this claim as apply to Dr. Liu's race discrimination claim under Title VII. *Smith v. Bray*, 681 F.3d 888, 896 (7th Cir. 2012) (claims of race discrimination and retaliation under *§ 1981* are analyzed using the same substantive standards as apply to Title VII). Both parties rely on the arguments they made with respect to Dr. Liu's race discrimination claim under Title VII.

Thus, for the same reasons as in Count I, the Court grants defendants summary judgment on Count VIII.

### 3. Dr. Liu's Title VII sex discrimination claim

In Count V, Dr. Liu alleges disparate treatment on the basis of her sex.

Dr. Liu argues that she has put forth direct evidence of sex discrimination. Specifically, she has put forth evidence that during the year 2000, Dr. Donahue used to refer to her as "good girl" until she asked him to stop. In addition, Dr. Donahue once asked another female doctor (outside of Dr. Liu's presence) why all female doctors had to be bitches. Plaintiff has not put forth any evidence as to the date on which Dr. Donahue made this comment.

A statement can be "direct evidence of discriminatory intent where the statement was made around the time of and in reference [*34] to the adverse employment action." *Olson v. Northern FS, Inc.,* 387 F.3d 632, 635 (7th Cir. 2004) (concluding that a stray remark made five months before and not in reference to an employee's discharge was not direct evidence of discrimination because it could not be considered "'an admission by the decision-maker that his actions were based upon the prohibited animus.'") (internal citations omitted). Neither of the statements Dr. Liu points to are direct evidence of discrimination. Dr. Donahue's calling her "good girl" occurred eight years before and was unrelated to Dr. Keen's decision to suspend Dr. Liu's complex surgery privileges and the Executive Medical Staff's decision against reappointing Dr. Liu. Dr. Liu has put forth no evidence that Dr. Donahue's statement about female doctors being bitches was related to either decision or was made at the same time.

Given the lack of direct evidence, the Court will consider Dr. Liu's sex discrimination claim under the indirect method. Once again, the Court will assume, without deciding, that Dr. Liu can make out a *prima facie* case of discrimination.

The question, then, is whether Dr. Liu has shown that the defendant's explanation (Dr. Liu's [*35] continued treatment of appendicitis patients without surgery) for the adverse actions is a pretext for sex discrimination. The only evidence that is different from the evidence of pretext in the race discrimination analysis above is Dr. Donahue's stray remarks that Dr. Liu was a "good girl" and that he once asked why all female doctors were bitches.

This is not sufficient evidence from which a reasonable jury could conclude that defendant's explanation was a pretext for sex discrimination. Although Dr. Donahue, as Chief of the Division of General Surgery within the Department of Surgery, was the doctor who wrote to Dr. Liu on multiple occasions to request that she treat acute appendicitis with surgery, he did so at the request of the Surgical Oversight Committee and its Chair, Dr. Madura. It was another doctor, Dr. Keen (who was Chair of the Department of Surgery), who decided to suspend Dr. Liu's complex surgery privileges. The incident that prompted Dr. Keen's decision was Dr. Liu's treatment of Sandoval, who went into septic shock after Dr. Liu failed to treat his appendicitis with surgery. The Sandoval case was brought to Dr. Keen's attention not by Dr. Donahue but by the Hospital [*36] Quality Assurance Department (whose job was to monitor ICU admissions on a daily basis), which was concerned about Sandoval's presence in the surgical ICU. Two separate committees met in special session to consider Dr. Liu's treatment of Sandoval, and the Surgical Oversight Committee agreed unanimously on July 24, 2008 that Dr. Liu's treatment of Sandoval was below the standard of care. Only then did Dr. Keen suspend Dr. Liu's complex surgery privileges, a decision which was reviewed by dozens of other doctors on several other committees. Furthermore, Dr. Liu does not dispute that she actually treated appendicitis patients without surgery or that defendant had told her not to. To the Credentials Committee (which made the decision not to reappoint her, although the decision was reviewed by dozens of doctors on multiple committees), Dr. Liu stated that she was entitled to treat patients in the manner in which she saw fit. Under these circumstances, no reasonable jury could conclude that defendant's explanation was dishonest, a pretext for sex discrimination.

Defendant is entitled to judgment as a matter of law on Count V. Therefore, defendant is granted summary judgment on Count V.

### 4. [*37] Dr. Liu's national origin discrimination claim

In Count III, Dr. Liu alleges that she was discriminated against of the basis of her national origin. She is from China.

Dr. Liu argues that she has put forth direct evidence of national-origin discrimination. Specifically, Dr. Liu points out that, on May 2, 2008, Dr. Donahue wrote her a letter, in which he asked her to operate on all cases of suspected acute appendicitis, "because that is the way American surgeons treat adult patients with acute appendicitis." This comment was made months before the decisions to suspend Dr. Liu's complex surgery privileges and the decision not to reappoint her, and the comment was not in reference to those decisions. In addition, the comment was not made by the decision maker. Dr. Keen decided to suspend Dr. Liu's surgery privileges, and the Credentials Committee decided (without a vote from Dr. Donahue) not to reappoint Dr. Liu. Thus, the comment does not constitute direct evidence of national-origin discrimination, and the Court will consider the claim under the indirect method.

Once again, the Court will assume, without deciding, that Dr. Liu can make out a *prima facie* case of national-origin discrimination [*38] and will consider whether Dr. Liu has put forth sufficient evidence from which a reasonable jury could conclude that defendant's reason for the adverse actions was pretext for national-origin discrimination.

The Court has already concluded that defendant's legitimate, non-discriminatory reason was not a pretext for race or sex discrimination. The only piece of evidence that is different from the analyses above is Dr. Donahue's statement that American surgeons use surgery to treat adult patients with acute appendicitis. For all of the rea-

sons explained above with respect to Dr. Liu's claims of sex and race discrimination, no reasonable jury could find that defendant's reason was a pretext for national-origin discrimination. Dr. Donahue's statement does not expose the reason for the decisions as dishonest, because Dr. Donahue was not the person who decided to suspend Dr. Liu's complex surgery privileges or to reject her application for reappointment. Those decisions were approved by dozens of doctors on several committees. In any case, it is undisputed that Dr. Liu treated many acute appendicitis patients without surgery (and that several patients suffered extremely serious complications [*39] as a result) despite being told repeatedly to treat such patients with surgery. In is also undisputed that she thought she was entitled to treat them without surgery.

Defendant is entitled to judgment as a matter of law on Count III. The Court grants summary judgment to defendant on Count III.

### B. Dr. Liu's harassment claims

In Counts II, IV and VI, respectively, Dr. Liu claims that she was subjected to racial harassment, sexual harassment and national-origin harassment, all in violation of Title VII of the Civil Rights Act of 1964.

Defendant is liable for creating a hostile work environment if Dr. Liu can show: "that her work environment was both objectively and subjectively offensive; (2) that the harassment was based on her [protected class]; (3) that the conduct was either severe or pervasive; and (4) that there is a basis for employer liability." *Vance v. Ball State Univ.*, 646 F.3d 461, 469 (7th Cir. 2011). In considering whether the environment is hostile, a court is to consider the "totality of the circumstances[,]" including "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether [*40] it unreasonably interferes with an employee's work performance.'" *Ellis v. CCA of Tenn. LLC*, 650 F.3d 640, 647 (7th Cir. 2011) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998)). In addition, to "qualify as a hostile work environment, the conduct at issue must be severe or pervasive enough to cause psychological injury." *Ellis*, 650 F.3d at 647.

Dr. Liu argues that she was subjected to a hostile environment in that she faced a "barrage of reprimands" leading to discipline. Discipline for workplace infractions is not inherently offensive, and the sort to which Dr. Liu was subjected in this case was not objectively offensive. The record reflects that Dr. Liu was counseled or reprimanded a number of times for treating appendicitis without surgery. In early 2005, Dr. Donahue counseled Dr. Liu that such treatment was non-conventional.

On October 24, 2006, Dr. Donahue issued a written reprimand. On July 19, 2007 (after allowing Dr. Liu to explain a particular case), the Surgical Oversight Committee decided to recommend to Dr. Donahue that he discipline Dr. Liu. On October 16, 2007, Dr. Donahue wrote Dr. Liu a letter in which he asked her to operate on patients with acute [*41] appendicitis and told her that if she did not think surgery was the appropriate approach, she should discuss the case with a colleague. On January 18, 2008, Dr. Donahue wrote Dr. Liu a letter in which he described his disappointment that she was still treating acute appendicitis without surgery and was not consulting her colleagues about such cases. On April 10, 2008, Dr. Donahue wrote to Dr. Liu, "I have asked you to desist from your unorthodox treatment of acute appendicitis. . . . Further infractions will lead to additional disciplinary action including suspension or Peer Review." These letters and reprimands were neither physically threatening nor severe. They were only as pervasive as Dr. Liu's treatment of appendicitis patients without surgery.

Furthermore, none of the letters or reprimands described above were in any way related to Dr. Liu's sex, race or national origin, as they must be in order to be actionable under Title VII. Likewise, the Court has already concluded that the decisions to suspend Dr. Liu's complex surgery privileges and to deny reappointment were not based on her sex, national origin or race. The only reprimand that has any connection to any protected class [*42] is the April 10, 2008 letter Dr. Donahue wrote to Dr. Liu. In that letter, Dr. Donahue asked her to operate on all suspected cases of acute appendicitis, "because that is the way American surgeons treat adult patients with acute appendicitis." Dr. Donahue continued, "All surgeons, especially those of us who work in public hospitals are expected to conform to the standards of treatment." This statement is not objectively offensive; nor is it severe. Dr. Donahue's point was merely that the accepted standard is surgery, regardless of what is accepted elsewhere.

In short, no reasonable jury could conclude that Dr. Liu was subjected to an objectively hostile environment on the basis of her sex, her race or her national origin. Defendant is entitled to judgment as a matter of law on Counts II, IV and VI. The Court grants defendant summary judgment on those claims.

### C. Dr. Liu's retaliation claims under Title VII and §1981

In Counts VII and IX, respectively, Dr. Liu alleges that she was retaliated against in violation of Title VII and *§ 1981*. Specifically, Dr. Liu claims that defendant suspended her privileges in retaliation for her having complained about discrimination.[2] Both parties agree

[*43] that the same standards apply to § 1981 retaliation claims as to Title VII retaliation claims (see *Smith v. Bray*, 681 F.3d 888, 896 (7th Cir. 2012)), and both refer to their Title VII arguments in arguing the § 1981 claim. Accordingly, the Court considers the claims together.

> 2   Dr. Liu does not argue in response to defendant's motion for summary judgment that any other actions (i.e., the discharge or the decision not to reappoint her) were retaliatory. Accordingly, those claims are waived. Even if she had made the argument, she would not have prevailed, because, as the Court has explained in other sections, Dr. Liu has not put forth evidence that defendant's reasons for those actions were pretextual.

Dr. Liu first attempts to defeat summary judgment using the direct method of establishing retaliation. To establish retaliation under the direct method, Dr. Liu must show: (1) she engaged in protected conduct; (2) she suffered a material, adverse action; and (3) a causal connection between the two. *Coleman v. Donahoe*, 667 F.3d 835, 859 (7th Cir. 2012). "Causality is typically one of the highest hurdles retaliation plaintiffs must clear." *Benuzzi v. Board of Ed. of Chi.*, 647 F.3d 652, 665 (7th Cir. 2011). [*44] A Title VII retaliation claim requires "proof that the desire to retaliate was the but-for cause of the challenged employment action." *University of Texas Southwestern Medical Center*, 133 S.Ct. 2517, 2528, 186 L. Ed. 2d 503 (2013).

Dr. Liu argues that she engaged in protected conduct a number of times when she complained about unlawful discrimination. First, she put forth evidence that between July 2006 and July 2008, she told Drs. Donahue, Madura, Keen, Benson, Dray and Langer on no fewer than fifteen occasions that she was being treated differently from her white, male colleagues. That constitutes protected conduct. Second, Dr. Liu put forth evidence that on July 22, 2008, she wrote a detailed memo and gave it to Drs. Donahue, Keen and Lemon. Because she has not put forth any evidence of the *content* of that memo, no reasonable jury could conclude that the memo was protected conduct. Finally, Dr. Liu has put forth evidence that she had a conversation with Dr. Lemon on July 25, 2008 in which conversation she complained about unlawful discrimination. That constitutes protected conduct.

Dr. Liu also argues that she has put forth sufficient evidence of causation. Here, she focuses on the temporal proximity [*45] between her July 25, 2008 complaint to Dr. Lemon and her August 4, 2008 suspension. Of course, "[e]vidence of temporal proximity . . . standing on its own, is insufficient to establish a causal connection for a claim of retaliation." *Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 549 (7th Cir. 2008). Dr. Liu argues that she has more than just temporal proximity. She claims it is suspicious that defendants referred to her non-surgical treatment of appendicitis as unorthodox, when other surgeons could disagree. The fact that defendants disagreed with Dr. Liu's preferred treatment of appendicitis does not make it more likely that her suspension was retaliation. To the contrary, it makes it *less* likely. The only evidence of causation Dr. Liu has put forth is timing, and, in this case, the timing is not suspicious. It is undisputed that Dr. Donahue had asked Dr. Liu repeatedly (most recently on May 2, 2008, in a note that Dr. Liu saw on July 18) to treat acute appendicitis with surgery. Yet, on July 19, 2008, Dr. Keen was contacted by the Hospital Quality Assurance Department about Sandoval, an appendicitis patient who was in the surgical ICU in septic shock and on whom Dr. Liu had failed to [*46] operate. The Surgical Oversight Committee met in special session on July 24, 2008 and agreed unanimously that Dr. Liu's treatment of Sandoval was below the standard of care and should be addressed immediately. The next day, Dr. Liu complained to Dr. Lemon about discrimination. The fact that Dr. Keen suspended her privileges ten days later is not suspicious, and is not enough to survive a motion for summary judgment. See *Morgan v. SVT, LLC.*, 724 F.3d 990, 998 (7th Cir. 2013) ("Where, as here, there are reasonable, non-suspicious explanations for the timing of [plaintiff's termination] . . . we will not deny summary judgment solely on the strength of this one point.").

Next, the Court considers whether plaintiff can establish retaliation using the indirect method. With respect to the indirect method, plaintiff argues only, "Plaintiff adopts her arguments made infra relative to the indirect method here." As the Court explained in the other sections, Dr. Liu has not put forth sufficient evidence from which a reasonable jury could conclude that defendant's reasons for its adverse actions were a pretext for discrimination. For the same reasons, the Court also concludes that no reasonable [*47] jury could conclude that defendant's reasons for its adverse actions were a pretext for retaliation.

Defendants are entitled to judgment as a matter of law on plaintiff's retaliation claims. The Court grants defendants summary judgment on Counts VII and IX.

### D. Dr. Liu's Equal Pay Act claims

In Count X, Dr. Liu alleges that defendant Cook County violated the Equal Pay Act by paying her less than another surgeon. In Count XI, Dr. Liu alleges that the Equal Pay Act violation was wilful.

The Equal Pay Act of 1963 prohibits employers from discriminating on the basis of sex:

by paying wages to employees . . . at a rate less than the rate [paid] to employees of the opposite sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (1) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any factor other than sex.

29 U.S.C. § 206(d). "An employee's only burden under the Equal Pay Act is to show a difference in pay for 'equal work on jobs the performance [*48] of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." *King v. Acosta Sales and Marketing, Inc., 678 F.3d 470, 474 (7th Cir. 2012)* (describing what is often called a *prima facie* case). "An employer asserting that the difference is the result of a 'factor other than sex' must present this contention as an affirmative defense--and the proponent of an affirmative defense has the burdens of both production and persuasion." *King, 678 F.3d at 474.*

Defendant argues that Dr. Liu has failed to make out a *prima facie* case of discrimination under the Equal Pay Act. The Court agrees. As the Seventh Circuit has explained, "[t]he EPA specifies three separate elements that are to be considered in comparing job duties: skill, effort and responsibility. Each of these elements must be met individually in order to establish a prima facie case." *Cullen v. Indiana Univ. Bd. of Trustees, 338 F.3d 693, 697 (7th Cir. 2003)* (internal citations omitted). Here, oddly, Dr. Liu has not put forth *any* evidence of her salary or job duties or the salary or job duties of any other employee. Defendant has put forth evidence that Dr. Madura was paid more than [*49] Dr. Liu (when or by how much is left unclear) and that Dr. Madura had responsibilities Dr. Liu did not have. For example, during the time period when Dr. Madura was paid more than Dr. Liu, Dr. Madura was Associate Chair of the Department of Surgery, which meant he had the additional responsibilities of chairing the Surgical Oversight Committee and of running a new quality improvement program to curtail preventable deaths. Dr. Liu has failed to put forth evidence from which a reasonable jury could conclude that she performed a job whose duties required the same skill, effort and responsibility as Dr. Madura.

Accordingly, defendant is entitled to judgment as a matter of law on Counts X and XI. The Court grants defendant summary judgment on Counts X and XI.

### E. Dr. Liu's due process claim

In Count XII, Dr. Liu seeks relief pursuant to *§ 1983* for an alleged violation of her constitutional rights. Specifically, Dr. Liu claims that defendants Cook County, Dr. Keen, Dr. Madura and Dr. Donahue deprived her of property without due process of law in violation of the *Fourteenth Amendment to the United States Constitution.*

To prevail, Dr. Liu must show: 1) she had a property interest in her continued [*50] employment; and 2) she was deprived of this interest without due process of law. *Krieg v. Seybold, 481 F.3d 512, 519 (7th Cir. 2007).* A property interest in employment is created in one of two ways: "1) by an independent source such as a state law securing certain benefits; or 2) by a clearly implied promise of continued employment." *Palka v. Shelton, 623 F.3d 447, 452 (7th Cir. 2010).* There, the Seventh Circuit explained:

> Due-process claims in the context of public employment require an entitlement to continued employment; more specifically, the plaintiff must have 'a legitimate claim of entitlement not to lose a valuable governmental benefit except for cause.'

*Palka, 623 F.3d at 452* (internal citations omitted); *see also Krieg v. Seybold, 481 F.3d 512, 520 (7th Cir. 2007)* ("Because there is no clause [in the collective bargaining agreement] stating that employees may be discharged only for just cause, [plaintiff] was an at-will employee who did not have a property right in his job.").

As defendants argue, Dr. Liu does not point out any statute, contract or other documents that creates a legitimate expectation of continued employment. Her "mere status as a [h]ospital employee does not [*51] create a property interest for purposes of the *Fourteenth Amendment.*" *Draghi v. County of Cook, 184 F.3d 689, 692 (7th Cir. 1999).* Furthermore, it is undisputed that doctors at Stroger must be reappointed every two years. Dr. Liu does not put forth any evidence about the criteria for reappointment, let alone evidence that would suggest an entitlement to reappointment. *Cf. Lim v. Central DuPage Hosp., 871 F.2d 644, 647 (7th Cir. 1989)* ("The failure to reappoint [the plaintiff doctor] could deprive him of property only if he had an entitlement to reappointment. Whether he did depends on the criteria for reappointment set forth in the hospital's by-laws. Those criteria are general and vague . . . No one reading this laundry list could suppose that a member of the hospital's medical staff had an entitlement to reappointment.").

Instead, Dr. Liu seems to be arguing that she had an oral agreement with Dr. Lemon to revoke her suspension and ensure her reappointment in 2008. Specifically, she has put forth evidence that after Dr. Keen notified Dr. Liu that he was suspending her surgical privileges, Dr. Lemon and Dr. Liu spoke. Dr. Lemon attempted to negotiate with Dr. Liu for a lesser punishment, [*52] such that she would avoid peer review, have her privileges restored and be reappointed in 2008. It is undisputed, however, that they were unable to reach an agreement.

In short, Dr. Liu has not put forth sufficient evidence from which a reasonable jury could find that she had a property interest either in her privileges, in reappointment or in continued employment. Even if Dr. Liu could establish a property right in her privileges, reappointment or continued employment, she still cannot get past summary judgment without evidence from which a reasonable jury could conclude she was denied due process. "[T]he federal entitlement is to process, not to a favorable outcome." *Simmons v. Gillespie, 712 F.3d 1041, 1044 (7th Cir. 2013)*. For discharge, a pre-termination hearing is required. *See Bodenstab v. County of Cook, 569 F.3d 651, 663 (7th Cir. 2009)* (citing *Cleveland Bd. of Ed. v. Loudermill, 470 U.S. 532, 542, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985)*). For a suspension, a post-suspension hearing suffices. *Gilbert v. Homar, 520 U.S. 924, 932, 117 S. Ct. 1807, 138 L. Ed. 2d 120 (1997)*.

Here, no reasonable jury could conclude Dr. Liu was deprived of due process. With respect to her discharge, Dr. Liu was represented by counsel at her pre-termination hearing before [*53] an independent hearing officer. With respect to her suspension of privileges, the suspension was reviewed first by the peer review committee (made up of seven physicians) which approved it unanimously and then by the Executive Medical Staff (made up of 40 physicians and administrators) which voted to retain the suspension. With respect to the reappointment, first the Credentials Committee (which met with Dr. Liu) voted not to recommend reappointment and then the Executive Medical Staff voted against reappointment. After that, Dr. Liu had a hearing, in order to challenge the suspension and the reappointment decision. The hearing committee met nine times, considered 75 exhibits and heard the testimony of fifteen witnesses before concluding, unanimously, that the suspension should be upheld and the reappointment denied. That is not all. The hearing committee's decision was then reviewed by the Executive Medical Staff, the Joint Conference Committee and the Health System Board of Directors, each of whom sustained the suspension and the denial of reappointment. No reasonable jury could conclude that this process was less than what was due.

Defendants are entitled to judgment as a matter [*54] of law on Count XII. The Court grants defendants summary judgment on Count XII.

### F. Dr. Liu's claim for tortious interference

In Count XIII, Dr. Liu alleges that Drs. Keen, Donahue and Madura tortiously interfered with her prospective business advantage. In her brief, Dr. Liu argues that "Keen, Madura and Donahue utilized their supervisory powers to cause Dr. Liu's discharge."

To establish tortious interference with prospective business advantage, a plaintiff must show: "(1) the plaintiff's reasonable expectation of a future business relationship; (2) the defendant's knowledge of that expectation; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectations from ripening; and (4) damages." *Ali v. Shaw, 481 F.3d 942, 944 (7th Cir. 2007)* (citing *Fellhauer v. City of Geneva, 142 Ill.2d 495, 568 N.E.2d 870, 877-78, 154 Ill. Dec. 649 (Ill. S.Ct. 1991)*). As defendants point out, however, it is only third parties who can be liable for regular tortious interference with employment. *Ali, 481 F.3d at 946* ("only when the actions of a third party cause an employer to decide to fire an at-will employee, the third party might be liable in tort"). For a supervisor or corporate officer [*55] to be liable for tortious interference with respect to an employee's termination, the supervisor or corporate officer must have acted with malice, which is to say without justification. *Stafford v. Puro, 63 F.3d 1436, 1442 (7th Cir. 1995)* ("Malice, 'in the context of interference with contractual relations cases, simply means that the interference must have been intentional and unjustified.'") (quoting *HPI Health Care Serv., Inc. v. Mt. Vernon Hosp., 131 Ill.2d 145, 545 N.E.2d 672, 137 Ill. Dec. 19 (1989)*); *Harrison v. Addington, 2011 IL App (3d) 100810, 955 N.E.2d 700, 709, 353 Ill. Dec. 233 (Ill.App.Ct. Third Dist. 2011)* ("To be tortious, a corporate officer's action must be done without justification or maliciously.") (quoting *Mittelman v. Witous, 135 Ill.2d 220, 249, 552 N.E.2d 973, 142 Ill. Dec. 232 (Ill. S.Ct. 1989)*).

Dr. Liu does not say how Drs. Keen, Madura or Donahue acted maliciously in connection with her discharge, and the Court finds no evidence of malice in the record. To begin with, it was only Dr. Keen, not Drs. Madura or Donahue, who was involved with Dr. Liu's discharge. Dr. Keen was the person who brought the disciplinary charges against Dr. Liu that led to her discharge (after a hearing) for violation of hospital rules and gross insubordination. It is undisputed that Dr. Liu [*56] accessed hospital records without permission and that doing so violated hospital rules. Thus, Dr. Keen's actions were justified.

Because plaintiff has put forth no evidence from which a reasonable jury could conclude that defendants acted with malice in connection with Dr. Liu's discharge, defendants are entitled to judgment as a matter of law on Count XIII. The Court grants defendants summary judgment on Count XIII.

### G. Dr. Donahue's motion for summary judgment

Separately, the estate of Dr. Donahue has moved for summary judgment on plaintiff's claims on the grounds that they are barred by the Illinois Probate Act. Because the Court has already granted Dr. Donahue summary judgment on the merits of the claims, the Court denies as moot his separate motion for summary judgment.

### IV. Conclusion

For the reasons set forth above, the Court grants defendants' motion [180] for summary judgment. The Court denies as moot Dr. Donahue's separate motion [217] for summary judgment. Case closed.

/s/ George M. Marovich

George M. Marovich

United States District Judge

DATED: March 3, 2014