**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DR. MARIA ARTUNDUAGA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | No. 12-cv-08733 |
| v. | ) | |
| | ) | Judge Zagel |
| THE UNIVERSITY OF CHICAGO | ) | Magistrate Judge Schenkier |
| MEDICAL CENTER, | ) | |
| | ) | |
| *Defendant.* | ) | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

"There is no such thing as accent discrimination." That was Dr. David Song's response to Dr. Maria Artunduaga when she went to him with complaints that her Chief Residents were discriminating against her because of her accent and her cultural background. PSAMF ¶ 19. Dr. Song was incorrect – there *is* such a thing, and it is unlawful. As shown below, Dr. Artunduaga has created triable issues of material fact that preclude summary judgment.[1]

I. **FACTS**

Dr. Maria Artunduaga is a highly-credentialed physician who was trained in Colombia, where she practiced medicine for three years before completing a post-doctoral fellowship in human genetics at Harvard Medical School. She then decided to train as a surgeon in the U.S., and she matched with UCMC's Residency Program in General Surgery – Plastic Surgery Track for the 2011-2012 academic year. When she entered the program at UCMC, Dr. Mitchell Posner was the Program Director for the General Surgery residency program, and Dr. David Song was the Residency Program Training Director for the Section on Plastic and Reconstructive Surgery ("PRS"). PSAMF

---

[1] References to Defendant's Statement of Material Facts are denoted by "SMF ¶ [#]," and references to Plaintiff's Statement of Additional Material Facts are denoted by "PSAMF ¶ [#]."

¶¶ 1-3. Dr. Artunduaga was the first Colombian resident ever matched with PRS at UCMC, and, during the years 2006-2012, she was the only resident in UCMC's Department of Surgery from Colombia and who trained at a medical school in Colombia. PSAMF ¶ 6.

Residency programs at accredited U.S. medical schools are administered by the Accreditation Council for Graduate Medical Education ("ACGME"). At the time Dr. Artunduaga began her residency, the UCMC PRS residency program was a "combined" program (also called an "independent program"). In such programs, residents complete three years of General Surgery residency, followed by three years of PRS residency. PSAMF ¶¶ 2-4. Dr. Artunduaga was assigned one- or two-month long rotations in General Surgery and other Sections, including PRS. Dr. Artunduaga's rotation schedule was to be as follows (PSAMF ¶ 5):

| | |
|---|---|
| July 2011 | Kaplan Service |
| August 2011 | Kaplan Service |
| September 2011 | Block 2 Service |
| October 2011 | Block 2 Service |
| November 2011 | Thoracic Service |
| December 2011 | Vacation |
| January 2012 | Vascular Service |
| February 2012 | Transplant Service |
| March 2012 | Kaplan Service/Night Float |
| April 2012 | Night Float |
| May 2012 | Plastic and Reconstructive Service |
| June 2012 | Anesthesiology Service |

During Dr. Artunduaga's first rotation in July 2011 in the Kaplan Service, the Chief Resident on the service, Dr. Haejin In, discriminated against her because of her accent and background. Dr. In treated Dr. Artunduaga as if she did not understand her because she spoke with an accent, ignored her, refused to answer her questions, asked disparagingly where she went to medical school, denied her surgical cases, and prohibited her from attending her own PRS residency orientation session. PSAMF ¶ 7. In late July 2011, just over a month into her residency, Dr. Artunduaga complained to PRS Chief Resident Dr. Justine Lee about the discrimination she had experienced from Dr. In. Dr. Lee responded that she would report these complaints to Dr. Song. PSAMF ¶ 8.

2

On July 26, 2011, Dr. Artunduaga met with Dr. Nora Jaskowiak, an Attending Physician on the Kaplan Service, who told Dr. Artunduaga that she felt that the problem had something to do with Dr. Artunduaga's "cultural background." PSAMF ¶ 9. A few days later, Dr. Jaskowiak wrote an email to Dr. Song regarding Dr. Artunduaga, telling him that there was "[s]omething cultural – like she just does not fully understand what is meant when certain things are asked of her or she is asked to do something. Not language, but something is just understanding how things are done in the US medical system." PSAMF ¶ 10.

By August 2011, Dr. Artunduaga felt that she was being treated as if she were "toxic or contagious." Her classmates ostracized her and made fun of her Colombian national origin, complained about her accent when she talked, imitated her accent, and made jokes about Latinos in front of her. PSAMF ¶ 11. That month, Dr. John Seal, another Chief Resident in the Kaplan service, publicly humiliated Dr. Artunduaga by claiming not to understand how she spoke and assigned Dr. Artunduaga fewer surgical assignments he assigned her co-intern. PSAMF ¶ 12. Dr. Artunduaga complained to Dr. Lee and another PRS Chief Resident, Dr. Sara Dickie, in August 2011 regarding Dr. In's and Dr. Seal's treatment of her. She told them that she was positive the discrimination she was experiencing was due to her accent and that she felt that it was also caused by her cultural background. They told Dr. Artunduaga that Dr. Song was aware of her complaints. PSAMF ¶ 13. Soon afterward, Dr. Dickie reported to Dr. Song criticisms by Dr. Seal that "Maria's main problems stem from communication which he detailed as such: -accent …." PSAMF ¶ 15.

In September, Dr. Konstantin Umanskiy, an Attending on the Colorectal Service, humiliated Dr. Artunduaga in front of other residents, stating "I don't know how you do things back in your country" and then stripping her of the contents of her pockets, her stethoscope, and her books. Another Attending on the Colorectal Service, Dr. Roger Hurst, wrote that "she was trained where the routines and customs are not necessarily known to us." PSAMF ¶¶ 17-18.

On September 29, 2011, Dr. Artunduaga met with Dr. Song and complained to him directly about being discriminated against based on her accent and background. Dr. Song responded that there was "no such thing as accent discrimination" and that he was not going to do anything about it. Dr. Song told Dr. Artunduaga that he already knew about her complaints from Dr. Lee and Dr. Dickie, and he dismissed her concerns. He then told Dr. Artunduaga that she was being switched to PRS for her October rotation and that if she did not perform flawlessly, she would be terminated from the program. PSAMF ¶ 19.

In November 2011, Dr. Mark Ferguson, an Attending on the Thoracic service, became angry with Dr. Artunduaga several times because she was too small to properly position the camera and needed both hands and two stepping stools to do so. He dismissed her from the operating room several times, shouting on one occasion "mother fucker Jesus Christ." He also made disrespectful comments about her understanding of English, criticized her communications skills, ridiculed how she spoke through a mask, and shouted at her about not being able to understand her English and that she should speak better. PSAMF ¶ 23.

On November 2, 2011, Dr. Song called a meeting with Dr. Artunduaga. Dr. Julie Park, an Attending in PRS, was also present. Dr. Song told Dr. Artunduaga that he had made a decision to put her on probation, but that he really wanted her to leave the program quietly, because she would not succeed. Both doctors emphasized "cultural issues" and "cultural fit" were preventing her from continuing in the program. Dr. Artunduaga responded that she had been complaining about disparate treatment, that she had not been offered the same training opportunities as comparable residents, and that she disagreed. She asked Dr. Song to allow her to be placed on a performance improvement program, a non-disciplinary procedure provided for in UCMCs Graduate Medical Education ("GME") Policy Manuel. Dr. Song refused. PSAMF ¶ 24.

On November 4, 2011, Dr. Song gave Dr. Artunduaga a letter that stated "[i]t was unanimous amongst the numerous evaluators across the Department of Surgery … that the issues that Dr. Artunduaga has will be extremely difficult to correct within the time allotted during residency period." This was untrue: three of the Attendings from Dr. Artunduaga's rotations from June-September 2011 testified that they were never consulted about the decision. The letter contained additional a number of other factual allegations that were untrue. PSAMF ¶¶ 26-27.

On November 15, 2011, Dr. Song met with Dr. Artunduaga again and informed her she was being put on probation. He again encouraged her to leave the program rather than go through probation, stating that she could not succeed. Dr. Artunduaga disagreed, stating that she could improve and continue in the residency. Dr. Artunduaga complained to Dr. Song again on November 21, 2011, telling him that Dr. Mark Ferguson discriminated against her because of her accent. Dr. Song's response was that life is never fair to people like her coming from developing countries who did not go to Ivy League schools. He cited a *New York Times* article that he had read on immigrants from developing countries in the U.S. In mid- to late November 2011, Dr. Song told Dr. Artunduaga that he could not tolerate having his colleagues calling him regarding her "struggles" and again said she should leave the program or transfer. PSAMF ¶¶ 30-32.

Dr. Song assigned Dr. Julie Park to be Dr. Artunduaga's "mentor" during her probation. They had several meetings, which were also attended by Dr. Song's assistant, Akilah Williams, who took notes. In the meetings, Dr. Park grilled Dr. Artunduaga for information, urged her to confess mistakes and weaknesses, and discouraged her from her goal of continuing in the PRS program. Dr. Artunduaga did not see the notes taken and later transcribed by Ms. Williams until months later. No one told her they were to be considered official "minutes" of the meetings, and she was not allowed to review them for accuracy or add her own information regarding what took place in the meetings. Dr. Artunduaga disagreed with many of the characterizations in the notes, including the fact that

they do not discuss her ongoing complaints of disparate treatment and retaliation, which she discussed with Dr. Park on numerous occasions. PSAMF ¶ 34.

During her first month of probation in January 2012, Dr. Artunduaga received uniformly positive evaluations for her rotation in the Vascular service, and in February 2012, she received many positive evaluations for her rotation in the Transplant service. PSAMF ¶¶ 35-45. Nonetheless, in March 2012, for the second time, her rotation schedule was changed, and she was moved back to Plastic Surgery. Dr. Park told her that Dr. Song wanted to test her again and that he would decide whether she passed probation based on just two weeks in PRS. She told Dr. Artunduaga that everything she had achieved during the prior two months on the Vascular and Transplant services did not matter. PSAMF ¶ 46. Dr. Park prepared a letter for Dr. Song dated March 14, 2012 to provide a written foundation for his decision to not renew her contract for a second year. The positive reviews that Dr. Artunduaga had received were not credited in the letter, which contained primarily negative information, much of it misleading, subjective, or incorrect. PSAMF ¶ 47.

Dr. Song met with Dr. Artunduaga on March 27, 2012 and told her that her contract would not be renewed for a second year. Dr. Song stated that he did not take her positive evaluations from January and February 2012 into account, that he was doing what he wanted to do, and that he had the faculty vote to support him. He also stated that he knew from the beginning of her probationary period that she would not pass. At the end of the meeting, Dr. Song handed Dr. Artunduaga a sealed envelope containing a letter stating that he was removing her from all clinical duties immediately and that a unanimous decision had been made by the faculty on March 26, 2012. PSAMF ¶ 49. Documents produced by UCMC show that Dr. Song drafted Dr. Artunduaga's termination letter on March 8, 2012 – nearly three weeks before the alleged faculty meeting ever took place and before many of her faculty evaluations were in. PSAMF ¶¶ 50-51.

On March 29, 2012, Dr. Artunduaga informed Dr. Song that she was filing a grievance concerning her immediate dismissal from clinical duties, the decision that she had failed her probation, and the decision not to renew her contract for a second year. Her letter included a chart of her evaluations during her probationary period and compared them to another PRS resident who was not placed on probation and the entire intern class. The chart showed that Dr. Artunduaga was not "well below average," as Dr. Song's termination letter had stated, but that there was less than a one point difference between Dr. Artunduaga's reviews and her cohorts. PSAMF ¶ 52.

On April 4, 2012, Dr. Song informed Dr. Artunduaga that he was reinstating her to her clinical duties in the Endocrine side of the Kaplan service, but declined to reconsider the two other bases for her grievance. PSAMF ¶ 53. Dr. Song imposed significant restrictions on Dr. Artunduaga that were not imposed on other residents. PSAMF ¶ 54. Dr. Eric Grossman, who was the Chief Resident of the Kaplan Service, told Dr. Artunduaga that Dr. Song and Dr. Roggin had given him instructions to keep her out of the operating room. She was thus prevented from logging operative cases, as the ACGME requires. She made a written request to Dr. Song to be provided with the basic educational requirements mandated by the ACGME. In response, Dr. Song again removed Dr. Artunduaga from clinical duties for being "disruptive." Dr. Artunduaga spent the rest of her intern year – two months – summarizing chapters of a book. PSAMF ¶ 55.

Dr. Artunduaga's grievance hearing took place on May 16, 2012. The Grievance Committee found in favor of the PRS section within one hour of the end of the grievance hearing. Dr. Artunduaga appealed the decision on May 31, 2012. In her request for review, she wrote that "I have made many complaints of discrimination on the basis of national origin, deriving in particular from comments and criticisms regarding my command of the English language, since as early on in my residency as August, to my chief Plastic Surgery residents (Drs. Justine Lee and Sara Dickie), my Program Director (Dr. David Song), my probation mentor (Dr. Julie Park), the UCMC DIO in the

GME office (Mr. Barry Kamin), and the director of Labor relations in Human Resources (Mr. Jonathan Rothstein). All of my complaints have been either completely ignored or dismissed as being an effort to 'make up excuses.'" The appeal was denied. PSAMF ¶¶ 57-58.

UCMC's Jonathan Rothstein, Director of Labor Relations, conducted an investigation in July 2012, after Dr. Artunduaga had left the program, and concluded that she had not been discriminated against. Dr. Artunduaga's husband, Ricardo Garcia, who is a Software Engineer at Google, had called Mr. Rothstein in November 2011 to institute a discrimination complaint on her behalf. At that time, Mr. Rothstein told Mr. Garcia that his office did not deal with the problems of medical residents. During the July 2012 investigation, Mr. Rothstein did not interview Dr. Artunduaga. By that time, she had already retained counsel and filed an EEOC charge of national origin discrimination. PSAMF ¶¶ 59-60.

## II.   ARGUMENT

This case revolves around two dynamics: first, in the early days of Dr. Artunduaga's year at UCMC, she was discriminated against by her Chief Residents, Dr. In and Dr. Seal, and by her Attending Physicians, Dr. Jaskowiak, Dr. Umanskiy and Dr. Ferguson, on the basis of her accent, background, and the country in which she grew up and received her medical training. Upon recognizing the discrimination, Dr. Artunduaga immediately lodged complaints – to Chief Residents Dr. Dickie and Dr. Lee, and, most importantly, to the Program Director for PRS, Dr. Song. It was those complaints that set off the second element of this case – retaliation by Dr. Song, and the others whose actions he directed, that led to Dr. Artunduaga's probation, removal from clinical duties, and termination. The discrimination continued throughout the rest of Dr. Artunduaga's tenure, but it was the retaliation for her complaints that devastated her career.

### A. Plaintiff's discrimination claims

Dr. Artunduaga proceeds under the direct evidence method of proof. Direct evidence is, of course, rare in today's workplace. *Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582, 587 (7th Cir. 2011). Circumstantial evidence is more common, *id.*, and includes "(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action." *Dickerson v. Bd. of Trs. of Comm. Coll. Dist. No. 522,* 657 F.3d 595, 601 (7th Cir. 2011). Circumstantial evidence can be used by a plaintiff to present "a convincing mosaic ... that would allow a jury to infer intentional discrimination by the decisionmaker." *Silverman v. Bd. of Educ. of the City of Chicago*, 637 F.3d 729, 734 (7th Cir. 2011). Building a convincing mosaic does not require the plaintiff to present a specific type of evidence or adhere to a formula; unlike the burden-shifting method, which involves rigid steps, the direct method allows flexibility. *Hobgood v. Illinois Gaming Board*, 731 F.3d 635 (7th Cir. 2013). *See also Coleman v. Donahoe,* 667 F.3d 835, 861 at fn 8 (7th Cir. 2012) ("[t]he mosaic approach provides parties and courts with a little more flexibility and room for common sense than the indirect method sometimes allows.") Here, then, are the "bits and pieces" that, considered as a whole, require denial of summary judgment.

### 1. "Accent"

In July and August 2011, during her first two rotations, Dr. Artunduaga was discriminated against by Chief Residents Dr. In and Dr. Seal because of her accent.[2] Dr. In acted as if she could not understand Dr. Artunduaga's accent; ignored her when she spoke; refused to answer her questions; made fun of where she went to medical school; denied her surgical cases; prevented her

---

[2]As UCMC has admitted, Chief Residents, were responsible for assigning job duties, assigning clinics and operative cases, providing training, and assessing and critiquing the performance of Dr. Artunduaga while she was on their service. SMF ¶ 10.

from attending her orientation; assigned her non-medical tasks; and made her work over hours. PSAMF ¶ 7. Dr. Seal also complained about Dr. Artunduaga's accent; publicly humiliated her by claiming he couldn't understand her when she spoke; and assigned her fewer surgical cases he assigned the other intern. PSAMF ¶ 12. Dr. Sara Dickie conveyed Dr. Seal's complaint in writing to Dr. Song that one of Dr. Artunduaga's main problems was her accent. PSAMF ¶ 15. In November 2011, Attending Physician Dr. Ferguson ridiculed how Dr. Artunduaga talked through her face mask and shouted at her that he could not understand her English. PSAMF ¶ 23. And Dr. Artunduaga's fellow residents ridiculed her accent and made fun of her background. PSAMF ¶ 11.

These instances of hostility directed toward Dr. Artunduaga **because of her accent** are direct evidence of discrimination, despite Dr. Song's statement to the contrary. The case law is clear that "'accent' comment[s] support[] an inference of discriminatory intent." *Hasham v. California State Board of Equalization*, 200 F.3d 1035, 1050 (7th Cir. 2000). "Accent is generally recognized as a manifestation of national origin." *Akinbode v. Motorola, Inc.*, No. 05-cv-4600, 2007 U.S. Dist. LEXIS 58909, * 22 (N.D. Ill. Aug. 13, 2007) (PX13), citing *Hasham*, 200 F.3d at 1050. This is because "accent and national origin are obviously inextricably intertwined in many cases." *Fragante v. City & County of Honolulu*, 888 F.2d 591, 596 (9th Cir. 1989).

UCMC asserts that Dr. Artunduaga "speaks fluent English" (Def. Brf., p. 2). In so doing, it forecloses any defense that it might have offered that her accent was a legitimate job consideration. "A foreign accent that does not interfere with a Title VII claimant's ability to perform duties of the position he has been denied is not a legitimate justification for adverse employment decisions." *Carino v. University of Oklahoma Bd. of Regents*, 750 F.2d 815, 819 (10th Cir. 1984). Yet later in its brief, UCMC attempts to have it both ways (Def. Brf., pp. 12-13), arguing that "[s]ince accent can be a legitimate concern," the fact that Dr. Artunduaga's accent was criticized is not evidence of discrimination. This must be disregarded, given that UCMC has submitted, as it third Statement of

Undisputed Material Facts, that Dr. Artunduaga "speaks English fluently and has an accent." UCMC also submitted declarations from multiple individuals stating that Dr. Artunduaga's English was fluent and that no one had any trouble understanding her. *E.g.*, DX1, Becker Decl. ¶ 16; DX3, Kamin Decl. ¶ 19; DX5, Park Decl. ¶ 28; DX8, Song Decl. ¶ 6.

The Seventh Circuit has explicitly held that comments about a plaintiff's accent must go to a jury because they can create an inference that discrimination has occurred. The facts of *Hasham*, 200 F.3d at 1050, closely track those in this case. There, the plaintiff, who is Pakistani, won his jury trial for national origin discrimination. In post-trial briefing, the defendant challenged evidence that a supervisory employee had used a demeaning tone to complain that he could not understand the plaintiff's accent. There, as here, the defendant had disavowed any possibility that the plaintiff's accent interfered with his ability to do his job; as such, the Seventh Circuit held that "[w]e are of the opinion that a reasonable jury could have concluded that, in conjunction with Zigelman's contradictory testimony, his comments about Hasham's accent … demonstrated a discriminatory animus that governed his promotional decision." *Id.* at 1044. *See also Carino v. University of Oklahoma*, No. CIV-78-1372-W, 1981 U.S. Dist. LEXIS 13280, *14-16 (W.D. Okla. May 7, 1981) (PX13), where the trial court (upheld by the 10th Circuit in the case discussed above) reasoned that "an employer should not make adverse employment decisions simply because a person possesses an accent resulting from birth and life in a foreign country."

The same is true here – UCMC, having staked its position on Dr. Artunduaga's fluency in English, cannot at the same time explain away the hostile comments about her accent by calling them "legitimate concerns," and the question of whether the multiple comments about her accent show discriminatory intent is a crucial, contested issue of material fact that must go to a jury. *Hasham*, 200 F.3d at 1050.

2.    "Communication"

Dr. Artunduaga was also criticized for her "communication" skills or abilities – another code phrase for national origin discrimination. Dr. Jaskowiak reported to Dr. Song that there was "[s]omething cultural- like she just does not fully understand what is meant when certain things are asked of her or she is asked to do something. Not language, but something is just understanding how things are done in the US medical system." PSAMF ¶ 10. Dr. Seal complained of "miscommunications" with Dr. Artunduaga, PSAMF ¶ 12. There were multiple references to "communication" issues in Dr. Artunduaga's written evaluations. PSAMF ¶¶ 15, 20, 23, 27. The Ninth Circuit directly addressed this type of criticism in *Fragante*:

> Accent and national origin are obviously inextricably intertwined in many cases. It would therefore be an easy refuge in this context for an employer unlawfully discriminating against someone based on national origin to state falsely that it was not the person's national origin that caused the employment or promotion problem, but the candidate's inability to measure up to the communications skills demanded by the job. **We encourage a very searching look by district courts at such a claim.**

*Id.*, 888 F.2d at 596 (bold added). In a national origin discrimination case like this, then, evidence that adverse decisions were made because of a lack of "communication" skills is a jury question, because it can be evidence of discrimination. Because all facts and inferences must be drawn in Dr. Artunduaga's favor, the Court cannot resolve this case on summary judgment.

Judge Castillo addressed a similar situation in *Surti v. G. D. Searle*, 935 F.Supp. 980 (N.D.Ill. 1996). In that case, the plaintiff, who spoke with a Filipino accent, was urged several times in performance reviews to improve her communications skills – just as Dr. Artunduaga was in this case. Judge Castillo denied the defendant's motion for summary judgment, ruling that the communication issue could be a pretext for discrimination:

> [T]he Court is extremely mindful of the fact that an evaluation of a person's communication skills is an **inherently subjective determination**. (Indeed, the conflicting evaluations of Surti's oral communication skills by different Searle managers demonstrate this.) …. Thus, if the evidence adduced at trial suggests that the argument that Surti did not have adequate communication skills is merely a code

> for references to Surti's Filipino accent, Searle's asserted "legitimate,
> nondiscriminatory reason" for not promoting Surti may not qualify as
> nondiscriminatory in actuality.

*Id.* at 986-987 (bold added). Judge Castillo concluded that "the resolution of this case may involve a

determination of whether accent as opposed to other communication difficulties led to Surti's non-

promotion, an issue that is clearly **beyond the scope of a court's decision-making powers in the**

**context of a motion for summary judgment**. *Id.* at 987 (bold added). The same is true here.

### 3. "Culture"

Dr. Artunduaga was also criticized by a variety of doctors for issues related to her "culture"

or how things were done in her home country – another code for national origin. 29 CFR 1606.1

(EEOC definition of national origin discrimination, providing that "[t]he Commission defines

national origin discrimination broadly as including, but not limited to, the denial of equal

employment opportunity because of an individual's, or his or her ancestor's, place of origin; or

because an individual has the physical, cultural or linguistic characteristics of a national origin

group.") Dr. Jaskowiak identified Dr. Artunduaga's problem as "something cultural." PSAMF ¶ 10.

Dr. Umanskiy humiliated Dr. Artunduaga in front of other residents by stating "I don't know how

you do things in your country," PSAMF ¶ 17. Dr. Hurst wrote in his evaluation that Dr. Artunduaga

was "trained where the routines and customs are not necessarily known to us." PSAMF ¶ 18. Dr. In

asked disparagingly where Dr. Artunduaga was trained. PSAMF ¶ 7. These negative references to

Dr. Artunduaga's culture or home country are the kinds of ambiguous statements from which a jury

could infer discrimination. *Greengrass v. Int'l Monetary Sys., Ltd.*, 776 F.3d 481, 486 (7th Cir. 2015).

### 4. Similarly situated residents

Dr. Artunduaga has submitted evidence that her non-Colombian peers – the other first-year

residents who rotated in General Surgery – were assigned more surgical cases than she was. (Surgical

cases are critical for a surgical resident, because the ACGME requires that a certain number of

specific cases be logged – PSAMF ¶ 56). Dr. Artunduaga received 51 surgical cases, while the average number of cases for other interns was 93.[3] PSAMF ¶ 56. UCMC argues (Brf., p. 11) that because surgical cases are assigned by Chief Residents, Dr. Artunduaga cannot link their decisions to the ultimate adverse employment actions (probation, removal from clinical duties and termination). But receiving fewer surgical cases than her peers can be evidence of discrimination shown to be motivated by discriminatory animus, and it can be evidence of retaliation if linked to a complaint. The "convincing mosaic" that Dr. Artunduaga must piece together can include instances of discrimination and retaliation other than the ultimate adverse employment actions. That is the nature of building a "mosaic" – one small piece at a time. *Mataya v. Kingston*, 371 F.3d 353, 358 (7th Cir. 2004) ("a number of weak proofs can add up to a strong proof.")

Here, the Chief Residents who made surgical assignments included Dr. In and Dr. Seal, both of whom Dr. Artunduaga has identified as discriminating against her, and Dr. Grossman, who, as discussed above, was, according to evidence produced by Dr. Artunduaga, carrying out a retaliatory act assigned to him by Dr. Song. UCMC argues about which residents should be deemed "comparable" to Dr. Artunduaga for the purposes of comparing surgical cases (Brf., p. 11-12), but it is unnecessary to examine individual residents, because the ACGME requirements for surgical cases apply to each resident in the same manner. Every resident at UCMC must log a certain number of cases in order to complete his or her residency. PSAMF ¶ 56.

Dr. Artunduaga has also submitted evidence that besides herself, three other residents between 2007 and 2013 were placed on probation. All three, who were non-Colombian and who had not complained of discrimination, were eventually allowed to return to their regular duties and that all three ultimately finished their residencies at UCMC – including one whose shortcomings were legion and included dishonesty. Another went on to a fellowship at UCMC despite his earlier

---

[3]This disparity is also the result of retaliation.

probation. PSAMF ¶ 25.[4] The fact that UCMC treated Dr. Artunduaga differently by refusing to release her from probation and allow her to finish her residency, as it did all the others, raises a strong inference of discriminatory or retaliatory intent. *Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 645 (7th Cir. 2013), ("[s]ignificant, unexplained or systematic deviations from established policies or practices can no doubt be relative and probative circumstantial evidence of [unlawful] intent.") (*quoting Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012).

### B.     Plaintiff's retaliation claims

For her retaliation claims, Dr. Artunduaga again invokes the direct method of proof, which requires her to show that (1) she engaged in protected activity, (2) she was subjected to an adverse employment action, and (3) there was a causal link between the protected activity and the employment action. *Brown v. Advocate South Suburban Hosp.*, 700 F.3d 1101, 1106 (7th Cir. 2012). The Seventh Circuit has acknowledged that a smoking gun – like a bare admission – rarely, if ever, exists in the workplace. *Hobgood*, 731 F.3d at 643. Instead, as with discrimination claims, the causal link can be established by building a "convincing mosaic" of circumstantial evidence that, "when taken as a whole and viewed in a light favorable to [her] case, could convince a reasonable jury that [s]he was the victim of unlawful retaliation." *Id.*

### 1.     Protected activity

Dr. Artunduaga began complaining about national origin-based discrimination as soon as she recognized that it was occurring, and those complaints were going directly to Dr. Song. In late July 2011, she complained to Dr. Lee that Dr. In was treating her differently because of her accent and her South American medical training background. Dr. Lee said she would report the complaints to Dr. Song. PSAMF ¶ 8. Also in late July, Dr. Artunduaga complained to Dr. Jaskowiak, and just a few days later, Dr. Jaskowiak informed Dr. Song of Dr. Artunduaga's concerns. PSAMF ¶¶ 9-10. In

---

[4]Again, this differential treatment is also the result of retaliation.

August 2011, Dr. Artunduaga complained to both Dr. Lee and Dr. Dickie that she was being treated differently by Dr. In and Dr. Seal, telling them she was positive that Dr. In and Dr. Seal were treating her differently because of her accent and Colombian background. Dr. Dickie said Dr. Song was aware of the complaints. PSAMF ¶ 13. In late August, Dr. Dickie wrote Dr. Song that one of Dr. Artunduaga's main problems was her accent. PSAMF ¶ 15. Then, on September 29, 2011, Dr. Artunduaga complained directly to Dr. Song that she was being discriminated against because of her accent and her background, to which Dr. Song replied that there was "no such thing as accent discrimination" and stated he would not do anything about it. PSAMF ¶ 19. After this conversation, Dr. Song began to retaliate against Dr. Artunduaga for her complaints.[5] He moved her back to PRS for the October 2011 rotation; he told her that if she did not perform flawlessly she would be terminated; he placed her on probation; he ignored her improvement; he removed her from clinical duties; and he ultimately terminated her contract. PSAMF ¶¶ 19, 24, 26, 27, 30, 46-55.[6]

Dr. Artunduaga has submitted a factual record showing that she engaged in protected conduct by complaining on many occasions to Dr. Lee, Dr. Dickie, Dr. Jaskowiak, Dr. Song, Dr. Kaplan, Dr. Chhablani, and others. PSAMF ¶¶ 8, 9, 13, 19, 21, 24. Yet in its brief, UCMC claims she has "no evidence" of complaints (Brf. p. 21). Dr. Artunduaga's sworn deposition testimony is that

---

[5]UCMC claims (Brf. p. 10) that Dr. Artunduaga's discrimination claims are "doomed" by her deposition testimony that Dr. Song did not discriminate against her. Indeed, she testified that Dr. Song was motivated by retaliation, not discrimination. The testimony is completely consistent with the facts of the case: several doctors discriminated against Dr. Artunduaga; she complained; her complaints reached Dr. Song; Dr. Song was angered; and Dr. Song retaliated. Nothing about the testimony undermines either her discrimination or her retaliation claims.

[6]UCMC appeals to the "same-actor inference" in stating that Dr. Song knew Dr. Artunduaga was from Colombia when he hired her. But the Seventh Circuit has held that the "same-actor inference is unlikely to be dispositive in very many cases. In fact, we have found no case in this or any other Circuit in which a plaintiff relying on circumstantial evidence to prove an improper motive was able to produce sufficient evidence to otherwise sustain his burden on summary judgment and yet was foreclosed from the possibility of relief by the same-actor inference." *Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 745 (7th Cir. 1999).

she made many complaints that she was being treated differently because of her accent and background. Dr. Song has denied that she specifically mentioned national origin-related issues.[7] This competing testimony creates issues of material fact that can only be resolved by a jury.

### 2. Adverse employment action

There is no dispute that Dr. Artunduaga experienced an adverse employment action – probation, being removed from clinical practice, and termination all "significantly alter[] the terms and conditions of the employee's job." *Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004).

### 3. Causal link

Dr. Artunduaga has provided direct evidence of a causal link between her complaints and Dr. Song's actions. When she met with him in September 2011, he told her that there was "no such thing" as the discrimination she was alleging and flatly refused to do anything about it, then immediately switched her rotation schedule to PRS. In November, he told her she should leave the program quietly because she would never succeed and that he told her that he could not tolerate having his colleagues calling him regarding her "struggles." PSAMF ¶ 32. Later, after Dr. Artunduaga refused to leave and had worked through her probationary period, Dr. Song refused to credit the positive reviews she had achieved during probation and made the decision to terminate her based only on her performance in two weeks of her March 2012 PRS rotation, PSAMF ¶ 46, and he chastised her for talking about his decision to put her on probation with other doctors at

---

[7]UCMC states (Brf, p. 21) that Dr. Artunduaga wrote UCMC's Director of Labor Relations, Jonathan Rothstein, on May 8, 2012 that she was "not claiming discrimination." This is false. Her email stated that "in both my previous emails and our May 8 meeting I made clear that my claim was for retaliatory harassment, not discrimination, as our letter from today states. My husband and I discussed with you (in separate conversations) the issue of discrimination and harsh work environment back in November, but you sent us an email on November 21 stating that you could take no action …." DX3, Kamin Decl. Ex. J, UCMC 1906. Dr. Artunduaga had already been told by Mr. Rothstein that he would not address her discrimination claim, and by this time she had retained counsel and was in the process of filing an EEOC charge of discrimination based on national origin (filed June 12, 2012). PSAMF ¶¶ 59-60. That is why she told him she was advancing just the retaliation claim within the GME process – not because she had dropped her discrimination claim.

UCMC. PSAMF ¶ 48. These facts create an inference that Dr. Song's actions were retaliatory. UCMC can dispute the details, but such disputes must be sorted out by a jury.

### C. Plaintiff's hostile work environment claims

To reach a jury on her harassment claims, Dr. Artunduaga must produce evidence to establish that "her work environment was both subjectively and objectively offensive; 'one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so'"; that the harassment was based on her national origin; that it was severe and pervasive; and that there is a basis for the defendants' liability. *Cerros v. Steel Technologies, Inc.*, 398 F.3d 944, 947 (7th Cir. 2005). As detailed above, Dr. Artunduaga has submitted such evidence, and her hostile work environment claims must go to a jury.

### D. Plaintiff's performance

UCMC argues throughout its brief that Dr. Artunduaga cannot show that she satisfied UCMC's legitimate job expectations, so the issue of her performance is a factor in all of her claims. Dr. Artunduaga has submitted evaluations from many of the doctors she worked with, from senior Attendings to residents, stating that she was performing at or above expectations. PSAMF 16, 35-45. Weighing this evidence is the role of the jury, not the Court on summary judgment. *Hutchens v. Chi. Bd. of Educ.,* No. 13-3648, 2015 U.S. App. LEXIS 4769, *23, 781 F.3d 366, --- (7th Cir. Mar. 24, 2015) (PX13) ("an employee can create a litigable issue by submitting evidence that disputes the employer's charge of 'unsatisfactory conduct'").

In *Jamaleddin v. Oakland Physicians Med. Ctr. LLC*, No. 13-cv-12735, 2015 U.S. Dist. LEXIS 2874 (E.D.Mich. Jan. 12, 2015) (PX13), the plaintiff, a first-year medical resident of Arabic descent, was heavily criticized by his program director, despite the fact that he received favorable reviews from other doctors he worked with. *Id.*, *3-5. The hospital argued, as UCMC does here, that Dr. Jamaleddin could not prevail because his performance had been criticized. The court disagreed and

denied summary judgment, noting that he "presented evidence of positive reviews from doctors he worked with"; as such, "[t]he evidence concerning Jamaleddin's qualifications, when viewed in the light most favorable to him, is sufficient to establish the qualification element of Jamaleddin's prima facie case." *Id.*, * 13-14. The same is true here – Dr. Artunduaga presented evidence of extremely positive reviews from doctors who ranged from senior Attendings to fellow residents (PSAMF ¶ 16, 35-45), and that she was denied the same remediation opportunities given to others who were non-Colombian and who did not complain of discrimination (PSAMF ¶ 25). The Court cannot, and is not permitted to, adjudicate the competing evaluations presented by each side – it is up to a jury to decide which to believe.[8]

E.    **Section 1981 claims**

UCMC also argues that Counts I, II and III of Dr. Artunduaga's Second Amended Complaint cannot proceed under 42 U.S.C. § 1981 (Def. Brf., pp. 7-9). It advances two reasons: one, that she has not alleged "race discrimination," and two, that individuals from Colombia cannot invoke Section 1981. Both positions are incorrect.

First, UCMC states that because Dr. Artunduaga's complaint alleges national origin discrimination, not race discrimination, Section 1981 is not an available claim. This is both misplaced and substantively incorrect. This case is before the Court on UCMC's motion for summary judgment – not a motion to dismiss (in fact, UCMC did not move to dismiss Dr. Artunduaga's Section 1981 claims on such grounds). As such, the Court must evaluate the entire record in the

---

[8] *See also Bulwer v. Mount Auburn Hospital*, 86 Mass. App. Ct. 316 (2014). There, a resident from Belize, who was trained outside the United States and was an experienced physician when he entered a U.S. residency program, received inconsistent evaluations in his rotations – strong praise in some, sharp criticism in others, and mixed reviews in yet others. *Id.* at 321-323. Dr. Bulwer's program director terminated him based on the negative reviews, while failing to take into account the positive ones. *Id.* at 326. In reversing the trial court's grant of summary judgment, the appellate court held that the competing performance-related evidence was a jury question. *Id.* It also held that evidence that Dr. Bulwer was not given remediation opportunities that were offered other residents pointed toward pretext. *Id.* at 321. The same is true here.

light most favorable to the moving party – not just the allegations in the complaint. *Greengrass*, 776 F.3d at 485 (court must "constru[e] all facts and reasonable inferences from the record in a light most favorable to the nonmoving party"). Dr. Artunduaga testified in her deposition that she was discriminated against her on the basis of her ethnic characteristics: "[i]t has to do with my genetics, my Hispanic background. I mean, I look Hispanic. I'm five feet. It does absolutely have to do with my national origin, my ethnicity, of course." PSAMF ¶ 23. As such, Dr. Artunduaga has presented evidence that she was discriminated against on the basis of race, and her claim falls squarely under the protections of Section 1981.

In its brief, UCMC scoffed at the idea that height is a characteristic related to race (Brf., p. 15), but the EEOC disagrees: the EEOC Guidelines on Discrimination Because of National Origin, 29 C.F.R. § 1606.6(a)(2), note that "height or weight requirements tend to exclude individuals on the basis of national origin," and several courts have held that workplace height requirements that disadvantage Hispanics can be discriminatory. S*ee, e.g., League of United Latin American Citizens v. Santa Ana*, 410 F. Supp. 873, 898 (D. Cal. 1976); *Officers For Justice v. Civil Service Commission*, 395 F. Supp. 378, 380 (N.D. Cal. 1975). And it is not a barrier to a Section 1981 claim that the plaintiff pled a national origin claim rather than race in her complaint. This precise argument was rejected by this Court in *Padron v. Wal-Mart Stores, Inc.*, 783 F. Supp. 2d 1042, 1054 (N.D. Ill. 2011) (holding that plaintiffs who pled only national origin discrimination in their complaint could nonetheless proceed under Section 1981 because they had alleged discrimination based on ethnic characteristics).

Second, UCMC argues that because Colombia was already an independent nation when Section 1981 was passed, individuals from Colombia would not have been considered a protected group by the drafters of Section 1981 and thus cannot invoke its protection. This is incorrect. The U.S. Supreme Court held in *St. Francis Coll. V. Al-Khazraji*, 481 U.S. 604, 613 (1987) that Section 1981 broadly protects "identifiable classes of persons who are subjected to intentional discrimination

solely because of their ancestry or ethnic characteristics." The court then explored the 19th-century legislative history of Section 1981, noting that the drafters considered individuals from a variety of countries or geographical areas to be members of a protected "race," including Scandinavians, Chinese, "Latins," Spanish, Anglo-Saxons, Jews, Mexicans, Blacks, Mongolians, and "Gypsies," *Id.* at 610-11. The Seventh Circuit has followed the lead of *St. Francis Coll.*, holding that it "consider[s] the matter of race broadly," *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 757 (7th Cir. 2006). As Judge Posner noted in *Abdullahi v. Prada USA Corp.*, 520 F.3d 710, 712 (7th Cir. 2008), "the loose sense [of race] is the right one to impute to a race statute passed in 1866" (allowing Section 1981 claim for plaintiff from Iran). *See also Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 695 n.4 (7th Cir. 2006) (allowing Section 1981 claim for a Polish immigrant).[9]

 As a Hispanic, then, Dr. Artunduaga may proceed under Section 1981 regardless of what country she hails from. *Hernandez v. City of Chicago*, 2008 U.S. Dist. LEXIS 32508, *7, (N.D. Ill. Mar. 31, 2008) (PX13) (noting that "[n]umerous courts have held, and this Court agrees, that discrimination against Hispanics is covered by section 1981"). Furthermore, as noted above, "Latin" was one of the categories explicitly contemplated by the 19th-century drafters of the Civil Rights Acts, which is synonymous with "Hispanic," or similar enough under the "loose sense" that the Seventh Circuit applies to the race inquiry. *Abdullahi*, 520 F.3d at 712. And *Padron* does not stand for the proposition that plaintiffs hailing from any country that existed before Section 1981 was drafted are excluded from protection. Under its reasoning, Congress might have been just as likely to view someone from Colombia as "Latin." And courts in our jurisdiction have rejected UCMC's position

---

[9]Similarly, the EEOC Guidelines, deemed "an appropriate source of guidance" in such matters (*Karraker v. Rent-A-Center, Inc.*, 411 F.3d 831, 835 n.2 (7th Cir. 2005)), state that [i]n order to have a claim of national origin discrimination under Title VII, … it is enough to show that the complainant was treated differently because of his or her foreign accent, appearance or physical characteristics. Guidelines on Discrimination Because of National Origin, 45 Fed. Reg. 85,632, 85,633 (Dec. 29, 1980).

with respect to plaintiffs from other Latin American countries that were independent states prior to Section 1981's passage. *See, e.g., Lopez v. Indiana-Kentucky Elec. Corp.*, 2006 U.S. Dist. LEXIS 84337, *32 (S.D. Ind. Aug. 17, 2006) (PX13) (Mexican plaintiff allowed to proceed under Section 1981; Mexico became a state in 1821 – *see* http://en.wikipedia.org/wiki/Mexico, visited 4/29/15). Finally, *Leon v. Fed. Reserve Bank of Chicago*, 823 F.2d 928, 931 (6th Cir. 1987) does not stand for the proposition that a "Colombian plaintiff alleging national origin discrimination cannot sue under Section 1981," as UCMC states (Def. Brf., p. 9). In *Leon*, which was being decided on a motion to dismiss, the court found that the plaintiff did not "raise any allegations of discrimination on the basis of race." *Id.* at 931. The analysis had nothing to do with the fact that the plaintiff was from Colombia. Here, as shown, Dr. Artunduaga has submitted evidence that she was discriminated against based on her Hispanic ethnicity. As such, her Section 1981 claims are actionable.

## III.   CONCLUSION

Throughout its brief, UCMC attempts to explain to the Court how something that *looks* discriminatory or retaliatory is actually benign.[10] These factual disputes, however, are hallmarks of a case that cannot be decided on summary judgment. The very fact that UCMC found it necessary to argue that the facts ought to be construed in its favor dooms its motion. The facts *cannot* be construed in UCMC's favor at this stage – they must all be construed in favor of Dr. Artunduaga. *Kasten v. Saint-Gobain Performance Plastics Corp.*, 703 F.3d 966, 974 (7th Cir. 2012).

---

[10]It argues that comments about Dr. Artunduaga's accent "may" have been intended to help address problems (p. 13); it posits that references to "cultural differences" could be innocent references to differences between the U.S. and other medical systems (pp. 13-14); it argues that Dr. Jaskowiak's email to Dr. Song listing Dr. Artunduaga's deficiencies, including "something cultural," was just an attempt to help her (p. 14); it opines that "communication issues" do not "necessarily imply anything about their national origin" (p. 15); and it suggests that Dr. Song's refusal to credit her improvements when making his decision regarding her future was just a matter of his choice of which evaluations to give "greater weight" to (p. 16).

Dated: May 1, 2015                                  Respectfully submitted,

                                                    /s/ Jamie S. Franklin
                                                    Jamie S. Franklin


Jamie S. Franklin (ARDC # 6242916)
THE FRANKLIN LAW FIRM LLC
53 W. Jackson Blvd., Ste. 803
Chicago, IL 60604
(312) 662-1008
(312) 662-1015 (fax)
jsf@thefranklinlawfirm.com

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned, certify the foregoing document, Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment, was served via email on the parties listed below on May 1, 2015.

/s/ Jamie S. Franklin
Jamie S. Franklin

<u>Service List</u>:

Michael G. Cleveland
Andrew Oppenheimer
VEDDER PRICE P.C.
222 N. LaSalle Street, Suite 2600
Chicago, IL 60601