**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

DR. MARIA ARTUNDUAGA,

      Plaintiff,

      v.

THE UNIVERSITY OF CHICAGO
MEDICAL CENTER,

      Defendant.

No. 12 C 8733
Judge James B. Zagel

## MEMORANDUM OPINION AND ORDER

Plaintiff Maria Artunduaga, M.D., filed a six-count complaint against Defendant University of Chicago Medical Center ("Defendant" or "UCMC") after working as a resident doctor for Defendant from June 2011 through June 2012. Plaintiff alleges that Defendant violated 42 U.S.C. § 1981 by discriminating against her because of her national origin (Count I), creating a hostile work environment on the same basis (Count II), and retaliating after she complained (Count III). Additionally, Plaintiff alleges that Defendant violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, for the same three reasons (Counts IV-VI).

This matter is presently before the Court on Defendant's motion for summary judgment on all counts. For the following reasons, Defendant's motion is granted in part and denied in part.

## FACTS AS ALLEGED

Plaintiff was born in Colombia and spent most of her life there. She graduated from a Colombian medical school, Pontificia Universidad Javeriana, in 2003, practiced medicine in her native country for three years, and then completed a post-doctoral research fellowship at Harvard Medical School from 2007 until 2011. By the time she applied for the General Surgery and

Plastic and Reconstructive Surgery ("PRS") programs (together, the "Program") at UCMC, Plaintiff had obtained strong letters of recommendation from her former supervising physicians. After interviewing with PRS faculty and residents, Plaintiff was ranked as the Program's fifth choice out of the 29 candidates interviewed. When this decision was made, Plaintiff's soon-to-be PRS supervisors and colleagues were aware that she was born in Colombia, attended medical school in Colombia, and spoke with a Colombian accent.

*Plaintiff Begins Residency at UCMC*

Plaintiff began her residency at UCMC in June 2011, pursuant to a one-year contract that was renewable at Defendant's discretion. At that time, Dr. David Song was the Program Director for the PRS Residency Program. It is unclear from the record, however, whether Plaintiff reported primarily to Dr. Song or to the Program Director for General Surgery. Throughout Plaintiff's 2011-2012 residency, sixth-year PRS residents Dr. Justine Lee and Dr. Sara Dickie were the chief residents of the PRS program. They were responsible for assigning job duties and clinical cases to junior residents, training them, and evaluating their performance. The Program was structured such that first-year residents were assigned one or two month rotations in General Surgery and other sections, including PRS.

*Plaintiff's First Rotation (July – August 2011)*

Plaintiff alleges that she was a victim of discrimination from the beginning of her residency. She claims that Dr. Haejin In, one of the chief residents on her rotation in Breast and Endocrine Surgery, treated her as if her accent was incomprehensible, asked her disparagingly where she attended medical school, and treated her like a personal assistant rather than a surgical intern. Plaintiff contends that she complained to Dr. Lee in late July, saying she felt that she was treated differently and given fewer surgical cases because of her Colombian accent and

Colombian training. She also claims to have told Dr. Lee that Dr. In had a problem with her accent and did not like her because she was from South America.

Defendant, on the other hand, claims that Plaintiff's performance was inadequate from the start. In August, Dr. Song received an email from Dr. Nora Jaskowiak, one of Plaintiff's attending physicians, expressing concern over Plaintiff's nervousness, technical abilities, and miscommunications, which Dr. Jaskowiak described as "[s]omething cultural . . . [n]ot language, but . . . just understanding how things are done in the U.S. medical system." Dr. Song also received an email from a patient complaining about an upsetting interaction she had with Plaintiff during a medical evaluation. When informed of the complaint, Plaintiff suggested that the patient had misinterpreted her accent.

In response to these concerns and seemingly at the suggestion of Dr. Song, Drs. Dickie and Lee met with Plaintiff in a series of August meetings. At one such meeting, Plaintiff said that she felt that she was not being treated fairly by Dr. John Seal, a chief resident on her current rotation. Plaintiff claims Dr. Seal acted as though he could not understand her accent and gave her less responsibility and time in the operating room than her fellow residents. Plaintiff recalls telling Drs. Dickie and Lee that she was positive that the discrimination she was experiencing was due to her accent and that she felt it was also caused by her being from Colombia. She testified that, by this time, she felt that she was being treated as if she were "toxic or contagious," as other residents ostracized her and mocked her national origin and accent. She alleges that one fellow resident shouted comments about the Revolutionary Armed Forces of Colombia People's Army ("FARC") and others compared her to the Hispanic cartoon character "Dora the Explorer."

At the end of her August rotation, Plaintiff received mixed evaluations. Dr. Dickie emailed Dr. Song with a summary of Dr. Seal's feedback. This email described Plaintiff as

"teachable" but affected by "communication" problems that stemmed from her accent, jumbled thought process, overconfidence in patient management, abrupt bedside manner, and occasional argumentativeness. Three attending physicians submitted evaluations. All of them mentioned Plaintiff's intelligence, describing her as "very bright," "very smart," and having "the intelligence and desire to improve." One evaluator emphasized Plaintiff's improvement but also characterized her as flustered and nervous. Another referenced issues with her performance that "may be cultural – as she has not worked in the American medical system before." The briefest evaluation predicted that "she will make a fine resident as she gains more experience and gains more confidence."

<em>Plaintiff's Second Rotation (September – October 2011)</em>

When Plaintiff began her next rotation in Colon and Rectal Surgery, she was reported to be "doing ok with a few exceptions." Not long into the rotation—and for unclear reasons—Dr. Dickie recommended that Plaintiff's rotation be divided so that she spend October in PRS. At the end of September, Plaintiff's attending physicians submitted evaluations of her performance to Dr. Song. One such physician, Dr. Konstantin Umanskiy, reported that Plaintiff had demonstrated improvement but nonetheless performed at a level "significantly below that of a typical resident." He expressed concern that she may not be able to achieve the level of performance expected from UCMC residents. Plaintiff claims that Dr. Umanskiy publicly humiliated her during the rotation. She alleges that he told her, "I don't know how you do things back in your country," before taking everything from her pockets, along with her stethoscope and books.

Plaintiff met with Dr. Song in late September (the "September Meeting"). He informed her that she would be rotating in PRS for the month of October. The reason for this change and

the substance of the September Meeting are disputed. Plaintiff claims that she complained to Dr. Song about being discriminated against based on her accent. He allegedly responded that there was "no such thing as accent discrimination" and that he was not going to do anything about it. Plaintiff further claims that Dr. Song dismissed her concerns, stating that people come from all over the world to join UCMC—she just was not a good cultural fit. Dr. Song denies that Plaintiff mentioned national origin discrimination at all during the September Meeting. He only recalls discussing her schedule and overall performance issues.

Plaintiff completed her rotation with PRS in October 2011. Defendant claims Plaintiff made numerous mistakes, leading to Dr. Dickie's conclusion that Plaintiff was at the level of a second year medical student and was too far behind to successfully complete the Program.

*Plaintiff's Probation and Third Rotation (November 2011)*

After completing the PRS rotation, Plaintiff met with Dr. Song and others to discuss what Dr. Song apparently viewed to be her unsatisfactory performance and the appropriate remediation. The substance of this meeting (the "November Meeting") is contested. Defendant asserts that Dr. Song presented Plaintiff with the options of either resigning from the PRS program, with an offer of assistance in transitioning to another specialty or program, or being placed on probation. Plaintiff contends that during the meeting, Dr. Song announced his executive decision to place her on probation and encouraged her to leave the Program quietly because she would not be successful. She claims Dr. Song emphasized "cultural issues" and "cultural fit" as preventing her from continuing in the Program. According to Plaintiff, she responded that she had been complaining about disparate treatment, had not been offered the same training opportunities as other residents, and disagreed with Dr. Song's determination.

After the November meeting, Plaintiff was given 24 hours to decide whether to resign

or accept probation. She elected the latter. Shortly thereafter, Dr. Song gave Plaintiff a letter that summarized the November Meeting and explained Defendant's supposed decision-making process and rationale for placing her on probation. It stated that the PRS faculty had unanimously agreed that Plaintiff was unlikely to succeed in the Program and should be offered the choice of resignation or probation. It also described Plaintiff's alleged shortcomings during her October rotation in PRS. Plaintiff disputes the accuracy of these statements.

Meanwhile, Plaintiff had started her November rotation in Thoracic Surgery. She recalls an attending physician, Dr. Mark Ferguson, dismissing her from the operating room two or three times due to her inability to position the camera given her short stature. She claims that Dr. Ferguson also made disrespectful comments about her understanding of English, criticized her communication skills, and ridiculed how she spoke through a mask. Dr. Ferguson submitted evaluations of Plaintiff's performance at both the mid-point and completion of her November rotation. He described her work as "very poor" and "not up to the level of a 3rd year student." He specifically mentioned her weaknesses in communication, information processing, and accepting responsibility for mistakes (among other concerns).

Plaintiff was formally placed on probation in mid-November. She claims to have again complained to Dr. Song about national origin discrimination based on her experience working with Dr. Ferguson. Dr. Song allegedly responded that life is never fair to people like her coming from developing countries. Plaintiff contends that later that month, Dr. Song told her he could not tolerate having his colleagues calling him regarding her "struggles" and again encouraged her to leave the Program. Plaintiff did not complete any rotations in December, as she took time off to get married in Colombia.

*Plaintiff's Probationary Rotations (January – March 2012)*

Plaintiff rotated in Vascular and Transplant Surgery in January and February, respectively. Plaintiff claims to have received uniformly positive evaluations for her January rotation. She cites evaluations from UCMC doctors saying "[s]he is on par with her fellow interns;" "[she] performs at her expected level," and "[s]he is easy to get along with, a good communicator, and very enthusiastic." Plaintiff's February evaluations were mixed. She was described as having a "slower paced progression than is typical of a surgical resident" and having "difficulty applying knowledge to a clinical situation." However, she was also reported to have "performed at an above average level as a first year resident," compared to other interns who had done "much more egregious acts to warrant this type of probation."

In March, Plaintiff was again re-assigned to the PSR rotation for disputed reasons. According to Defendant, Plaintiff's performance was described in a number of evaluations that show she failed to improve since her first rotation in PSR. Dr. Julie Park, who was assigned as Plaintiff's mentor during her probation, concluded that "[Plaintiff] has not actually reached the level of even an average surgical intern." At the end of the month, Plaintiff met with Dr. Song to discuss her future with UCMC. At this meeting (the "March Meeting"), Dr. Song told her that she would not be offered a second year contract and that she was effectively removed from all clinical duties. Plaintiff alleges that Dr. Song admitted that he did not take her positive evaluations from January and February into account, that he was doing what he wanted to do, and that he had the faculty vote to support him.

At the close of the March Meeting, Dr. Song handed Plaintiff a letter (the "March Letter"), which said that the PRS faculty had met the day before and unanimously agreed (except for Dr. Song, who did not vote) to remove her from clinical duties and to let her contract expire

without renewal. The letter also explained the rationale for these decisions: Plaintiff allegedly had not demonstrated "many of the basic skills expected of a resident at [her] level of training. In particular, [her] work on [the PRS] service in March evidenced many problems." Plaintiff contests the accuracy of these statements. She points to UCMC documents that purportedly show that Dr. Song drafted the March Letter nearly three weeks before the alleged faculty meeting took place. Plaintiff notes that this draft would have been written before he received any of her March evaluations.

*Plaintiff Completes Residency (April – May 2012)*

After being temporarily reinstated and then again withdrawn from clinical duties, Plaintiff was finally assigned to an independent study program for the remainder of her residency. The parties dispute Defendant's reason for assigning Plaintiff to this independent program as well as the appropriateness of its content. By the end of her residency year, Plaintiff claims to have received only 51 surgical assignments in comparison to an average of 93 among similar first-year residents. She argues that this disparity is due to national origin discrimination, which she allegedly complained about from the start. Defendant maintains that Plaintiff did not complain about national origin discrimination until May 2012, when she appealed an internal grievance decision in favor of Defendant.

## LEGAL STANDARD

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of triable fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of*

*Attica, Ind.*, 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

Once the moving party has set forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). The nonmoving party must offer more than "[c]onclusory allegations, unsupported by specific facts" in order to establish a genuine issue of material fact. *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)). A party will be successful in opposing summary judgment only if it presents "definite, competent evidence to rebut the motion." *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000).

I consider the record in the light most favorable to the non-moving party, and I draw all reasonable inferences in the non-movant's favor. *Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 471 (7th Cir.2002). I will accept the non-moving party's version of any disputed fact, however, only if it is supported by relevant, admissible evidence. *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996).

## DISCUSSION

Plaintiff alleges that Defendant violated § 1981 by discriminating against her because of her national origin (Count I), creating a hostile work environment on the same basis (Count II), and retaliating after she complained (Count III). Plaintiff also alleges that Defendant violated Title VII for the same three reasons (Counts IV-VI).

## I.        Plaintiff's Section 1981 Claims (Counts I-III)

In Counts I, II, and III of the Complaint, Plaintiff alleges employment discrimination,

hostile work environment, and retaliation based on national origin in violation of 42 U.S.C. § 1981. All three of these counts fail as a matter of law because § 1981 prohibits discrimination on the basis of race, not on the basis of national origin. *See Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 756 (7th Cir. 2006).

The line between race and national origin is not always clear. *Saint Francis Coll. v. Al–Khazraji*, 481 U.S. 604, 614 (1987). According to the Supreme Court, a plaintiff need not explicitly allege racial discrimination in order to invoke § 1981 protections; so long as she alleges discrimination on the basis of "ancestry or ethnic characteristics," her claim may proceed. *Id.* at 605. The Seventh Circuit has specified certain actionable claims, holding that a complaint articulating national origin discrimination may constitute a complaint on the basis of race when "it is clear that the plaintiff is alleging that he belongs to a group that is distinct from white citizens as a matter of race or color." *Hussein v. Oshkosh Motor Truck Co.*, 816 F.2d 348, 352 (7th Cir. 1987). *See also Sanghvi v. St. Catherine's Hosp., Inc.*, 258 F.3d 570, 574 (7th Cir. 2001) (acknowledging evidence of rational discrimination when employer expressed concern about Asian-Indian employee's ability to form doctor-patient relationships with white patients). Thus, a plaintiff alleging discrimination on the basis of skin color, or other physical traits associated with ethnicity, can proceed with a § 1981 claim. *See, e.g.*, *Padron v. Wal-Mart Stores, Inc.*, 783 F. Supp. 2d 1042, 1054 (N.D. Ill. 2011) ("Plaintiffs allege that they have dark-colored skin, eyes and hair . . . which could give rise to an inference of racial animus.").

Although the Seventh Circuit applies the "loose sense of the word 'race'" propounded by the Supreme Court, *Abdullahi v. Prada USA Corp.*, 520 F.3d 710, 712 (7th Cir. 2008), it does not support judicial reimagining of a complaint. In every Seventh Circuit case cited by Plaintiff in support of her § 1981 claims, the plaintiffs either alleged racial discrimination or, as *pro se*

litigants, otherwise indicated that their claims related to ethnic characteristics. *See Pourghoraishi*, 449 F.3d at 755 (expressly alleging § 1981 violation on the basis of race); *Abdullahi*, 520 F.3d at 712 (allowing *pro se* plaintiff to proceed with § 1981 claim after unchecking race box in amended complaint, ostensibly due to insufficient understanding of distinction between race, color, and national origin); *Padron*, 783 F. Supp. 2d at 1054 (preserving *pro se* plaintiffs' § 1981 claims given their asserted membership in racial minority group and corresponding physical traits).

Here, Plaintiff complains of disparate treatment because of her accent, cultural background, and country of origin (Colombia) where she received her medical training. She occasionally describes herself as "Hispanic," but the vast majority of the Complaint focuses on Plaintiff's national origin: she alleges that a UCMC doctor "did not like her because she was from South America," other residents made derogatory references to the Revolutionary Armed Forces of Columbia, an attending physician humiliated her by saying "I don't know how you do things back in your country," and her program director told her that life is never fair for immigrants from developing countries.

To support her § 1981 claims, Plaintiff argues that discrimination on the basis of accent constitutes racial discrimination. The Seventh Circuit has not ruled specifically on this issue, but other district courts in my circuit have addressed this issue. Absent additional motivating factors related to racial or ethnic characteristics, claims of differential treatment on the basis of accent are not actionable under § 1981. *See, e.g.*, *Ghosh v. S. Ill. Univ.*, 331 F. Supp. 2d 708, 719 (C.D. Ill. 2004) (acknowledging § 1981 claim when plaintiff alleged national origin discrimination on the basis of her Indian accent *and skin color*) (emphasis added); *Korpai v. A.W. Zengeler's Grande Cleaners, Inc.*, No. 85 C 9130, 1987 WL 20428, at *2 (N.D. Ill. Nov. 24, 1987) (holding

that discrimination based on foreign immigration and speech with an accent is not discrimination based on ancestry or ethnic characteristics, for purposes of § 1981). There are no such additional motivating factors in this case.

The only potential candidate to consider is Plaintiff's height. Although Plaintiff alleges that Dr. Ferguson dismissed her from an operating room due to her short stature and consequent inability to position a camera, this allegation is immaterial to Plaintiff's discrimination and retaliation claims because it is not sufficiently linked to any of the adverse employment actions in the Complaint. Plaintiff never suggests that her height was related to her diminished clinical assignments, probation, subsequent removal from clinical duties, or ultimate discontinuation in the Program.

Without any additional motivating factors related to Plaintiff's racial or ethnic characteristics, all of her § 1981 claims fail as a matter of law. Accordingly, I am granting Defendant's motion with respect to Counts I-III, and dismissing these claims with prejudice.

## II.     Plaintiff's Title VII Claims (Counts IV-VI)

## A.     National Origin Discrimination

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e–2(a)(1). A plaintiff bringing a Title VII discrimination claim can defeat a motion for summary judgment by way of the direct or indirect method of proof. *Dass v. Chicago Bd. of Educ.*, 675 F.3d 1060, 1068 (7th Cir. 2012).

Plaintiff proceeds under the direct method of proof, by which she must marshal sufficient direct or circumstantial evidence of a discriminatory motive behind her employer's

action. *See Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012). Direct evidence is akin to an explicit admission that an employment decision was motivated by discrimination. *See Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582, 587 (7th Cir. 2011). Direct evidence of discriminatory intent is rare, *id.*, and Plaintiff does not claim to have any here. Instead, Plaintiff offers circumstantial evidence related to Defendant's treatment of her accent, communication skills, and cultural background. To survive summary judgment, this evidence must create "a convincing mosaic . . . that would allow a jury to infer intentional discrimination by the decisionmaker." *Silverman v. Bd. of Educ. of the City of Chicago*, 637 F.3d 729, 734 (7th Cir. 2011).

Circumstantial evidence of discrimination may include: (1) ambiguous statements or behavior towards other employees in the protected group; (2) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (3) evidence that the employer offered a pretextual reason for an adverse employment action. *Darchak v. City of Chicago Bd. of Ed.*, 580 F.3d 622, 630 (7th Cir. 2009); *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 720-21 (7th Cir. 2005). To be convincing, Plaintiff's collection of circumstantial evidence must "directly point to a discriminatory reason for the employer's action and also be directly related to the employment decision." *Whitfield v. Int'l Truck and Engine Corp.*, 755 F.3d 438, 443 (7th Cir. 2014).

Plaintiff alleges that UCMC gave her fewer surgical cases than her peers, placed her on probation, removed her from all clinical duties, and eventually discontinued her from the Program. As a preliminary matter, we must examine whether Defendant's conduct constitutes "adverse employment actions" that can support a Title VII discrimination claim. To determine this, we consider both the quantitative and qualitative changes in the terms and conditions of Plaintiff's employment. *Patt v. Family Health Sys., Inc.*, 280 F.3d 749, 753 (7th Cir. 2002). All

of these events are actionable.

It is undisputed that the non-renewal of Plaintiff's residency contract constitutes an adverse employment action. Furthermore, the Seventh Circuit has held that placing an employee on probation may, in some cases, amount to an adverse employment action under Title VII. *See Harper v. C.R. England, Inc.*, 687 F.3d 297, 306 n.31 (7th Cir. 2012) (citing *Smart v. Ball State Univ.,* 89 F.3d 437, 442 (7th Cir. 1996)); *Cullom v. Brown*, 209 F.3d 1035, 1041-42 (7th Cir. 2000) (citing *Smart*, 89 F.3d at 442).

Whether the reduction and eventual elimination of Plaintiff's clinical responsibilities constitute actionable employment actions turns on whether they materially altered the terms or conditions of her employment. *See Porter v. City of Chicago*, 700 F.3d 944, 955 (7th Cir. 2012); *Oest v. Ill. Dep't of Corr.,* 240 F.3d 605, 612-13 (7th Cir. 2001). A materially adverse change may be indicated by significantly diminished material responsibilities. *Oest*, 240 F.3d at 612-13. Plaintiff claims to have received a total of 51 surgical assignments compared to an average of 93 among similar first-year residents. Because a factfinder could reasonably interpret Plaintiff's decreased caseload as a material alteration to the terms of her employment, UCMC's reduction and elimination of her clinical duties is actionable for the purpose of summary judgment. Indeed, the Seventh Circuit has stated that whether a change in an employee's job is materially adverse is a question of fact, resolvable on summary judgment only if not fairly contestable. *See Williams v. Bristol-Myers Squibb Co.*, 85 F.3d 270, 273-74 (7th Cir. 1996).

With these adverse employment actions in mind, we must next consider whether Plaintiff has presented a sufficiently "convincing mosaic" of circumstantial evidence, from which a jury could reasonably conclude that she was subjected to national origin discrimination. Plaintiff complains of discrimination by chief residents, Dr. In and Dr. Seal, and by attending

physicians, Dr. Jaskowiak, Dr. Umanskiy, and Dr. Ferguson. Her complaints can be grouped into three categories—those related to her accent, communication style, and cultural background.

According to the Seventh Circuit, "accent is generally recognized as a manifestation of national origin." *Hasham v. CA State Board of Equalization*, 200 F.3d 1035, 1050 (7th Cir. 2000). Although accent and national origin are "inextricably intertwined," a person's accent can be a legitimate job consideration if it materially interferes with job performance. *Fragante v. City & Cnty. of Honolulu*, 888 F.2d 591, 596-97 (9th Cir. 1989) (holding that adverse employment decision due to deleterious effect of plaintiff's Filipino accent on his ability to communicate not indicative of discrimination). *See also Berke v. Ohio Dept. of Public Welfare,* 628 F.2d 980, 981 (6th Cir. 1980) (per curiam) (holding that a plaintiff with Polish accent and excellent command of English was improperly denied employment because of her accent); *Carino v. Univ. of Okla. Board of Regents,* 750 F.2d 815, 819 (10th Cir. 1984) (holding that plaintiff with Filipino accent unlawfully denied job where accent did not interfere with job performance).

There is no doubt that clear communication is an essential part of a surgical resident's job, but whether Plaintiff's accent undermined her job performance is a question of fact for a jury. Plaintiff's accent did not stop her from completing a graduate fellowship at Harvard Medical School, obtaining strong letters of recommendation from her pre-UCMC supervising physicians, or attaining a number-five ranking out of the 29 candidates who interviewed for the Program. On the other hand, it is possible that her accent compromised her professional performance, as suggested by Drs. In, Seal, and Ferguson. Given the factual dispute regarding Plaintiff's verbal clarity, a jury must determine whether UCMC doctors' complaints about her accent evidenced discriminatory intents or honest assessments of her professional ability.

References to Plaintiff's "communication issues" could also be reasonably construed as

"code" for national origin. Many doctors, including Drs. Seal and Ferguson, complained of "miscommunications" with Plaintiff. Of course, saying someone has communication issues does not necessarily imply anything about her national origin. But I am mindful of another district court's admonition that an evaluation of a person's communication skills is "an inherently subjective determination." *Surti v. G. D. Searle*, 935 F. Supp. 980, 986 (N.D. Ill. 1996). That court concluded that "a determination of whether accent as opposed to other communication difficulties led to [the adverse employment action is] an issue that is clearly beyond the scope of a court's decision-making powers in the context of a motion for summary judgment." *Id.* at 987. Given the conflicting reviews of Plaintiff's communication skills by different UCMC evaluators, I leave it to a jury to evaluate the meaning of Defendant's complaints about Plaintiff's "communication issues."

Lastly, Plaintiff alleges discriminatory intent on the part of UCMC doctors who attributed supposed performance problems to her "cultural background." Plaintiff claims Dr. In disparagingly asked where she attended medical school; Dr. Jaskowiak described her professional problems as "[s]omething cultural;" and Dr. Umanskiy publicly humiliated her by exclaiming "I don't know how you do things in your country." Conduct that alludes to differences between American and foreign medical systems is not necessarily evidence of discrimination. *See, e.g., Nayak v. St. Vincent Hosp. & Health Care Ctr.*, 2014 U.S. Dist. LEXIS 71379, *32 (S.D. Ind. 1:12-cv-00817) (May 22, 2014) (evidence of possible cultural divide between Indian and American communication styles and hospital norms not evidence of intentional discrimination). A reasonable factfinder, however, could easily conclude that disparaging references to Plaintiff's "culture" and "country" were indications of discriminatory intent. These allegedly negative references are precisely the kinds of ambiguous statements from

which a jury could infer discrimination. *See Greengrass v. Int'l Monetary Sys., Ltd.*, 776 F.3d 481, 486 (7th Cir. 2015); *see also Silverman*, 637 F.3d at 735 (stating that inference of discriminatory intent is stronger when ambiguous comment is made with demeaning tone).

Plaintiff also compares herself to other UCMC employees who were not subject to the same adverse employment actions, ostensibly to show that "similarly situated," non-Colombian employees received differential treatment. One group of suggested comparators was comprised of non-Colombian UCMC residents who worked alongside Plaintiff during her residency. Unlike Plaintiff, these residents received more surgical cases; were not placed on probation; were not removed from clinical assignments; and were not discontinued from the Program after their first year. Another group of proposed comparators was made up of previous UCMC residents (also non-Colombian) who were placed on probation but later passed and were allowed to complete their entire residency with UCMC. This too is persuasive evidence that adds to Plaintiff's "convincing mosaic."

Defendant argues that Plaintiff "doomed" her case by admitting that Dr. Song did not discriminate against her due to her national origin. However, this admission merely squashes those discrimination claims that are grounded on employment actions dictated *exclusively* by Dr. Song. And the record is unclear as to which, if any, adverse actions were so singlehandedly decided. Some actions of which Plaintiff complains (such as her classmates' references to "Dora the Explorer" and FARC) were clearly not carried out by UCMC decisionmakers or decision influencers. But even if the people accused of discrimination were not the ultimate decisionmakers, their allegedly unlawful motives can be imputed to the decisionmakers in certain cases. *See Martino v. MCI Commc'ns Servs., Inc.*, 574 F.3d 447, 452-53 (7th Cir. 2009) (explaining the "cat's paw" theory, according to which the discriminatory motives of non-

decisionmakers can give rise to a valid Title VII claim if their discriminatory animus had "singular influence" over the decisionmaker). Because material issues of fact remain as to whether—and to what extent—UCMC decisions were influenced by people harboring discriminatory intent, I cannot dispose of Plaintiff's claim on this basis. Summary judgment is therefore denied, and Plaintiff may proceed with her Title VII discrimination claim under the direct method of proof.

**B.      Hostile Work Environment**

Plaintiff also claims that she was subjected to a hostile work environment on the basis of her national origin. Under Title VII, an employer is liable for a hostile work environment if an employee can prove (1) the work environment was both objectively and subjectively offensive; (2) the harassment was based on membership in a protected class; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability. *Nichols v. Michigan City Planning Dep't.*, 755 F.3d 594, 600 (7th Cir. 2014). An objectively and subjectively offensive environment is one that a reasonable person would find hostile or abusive and one that the victim perceived to be so. *Ellis v. CCA of Tenn. LLC*, 650 F.3d 640, 647 (7th Cir. 2011) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998)).

The Supreme Court has instructed courts to evaluate hostility based on a "totality of the circumstances," which includes (1) the frequency of the conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or merely offensive; and (4) whether it unreasonably interferes with the employee's work performance. *Ellis*, 650 F.3d at 647 (quoting *Faragher*, 524 U.S. at 787-88). Plaintiff bases her hostile work environment claim on much of the same conduct grounding her claim of discrimination.

However frequent, the type of negative remarks about Plaintiff's accent and

"communication issues" fail to reach the requisite level of severity. To qualify as sufficiently hostile, the conduct must be "severe or pervasive enough to cause psychological injury." *Ellis*, 650 F.3d at 647. Even if Defendant's comments about Plaintiff's accent and miscommunications were proxies for her national origin, they were not severe enough to psychologically injure a reasonable person. *See, e.g.*, *Prasad v. Acxiom Corp.*, No 10 C 5943, 2013 WL 2636050, at *1, *1 (N.D. Ill. June 12, 2013) (mocking and imitating Indian accents not enough); *Usherenko v. Bertucci's Corp.*, 2006 U.S. Dist. LEXIS 92726, *11-12 (D. Conn. 3:05-cv-756) (Dec. 20, 2006), 99 FEP Cases 1021 (D. Conn. 2006) (mocking plaintiffs' accents and belittling their country of origin not enough).

Plaintiff's allegations of being "humiliated" by more direct and disparaging references to her home country also fail to surpass the threshold for an actionable claim. While ridiculing an employee about "how you do things in your country" may be rude and inappropriate, this and other similar comments can only be interpreted as "relatively isolated instances" that do not rise beyond mere offensiveness. *See Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 646 (7th Cir. 2005). Title VII is not a general civility statute and does not reach the ordinary tribulations of the workplace such as abusive language, offhand comments, jokes, and occasional teasing. *Faragher*, 524 U.S. at 788. Moreover, Plaintiff has failed to show that Defendant's alleged misconduct interfered with her performance beyond causing her to question her command of English. *See Nicholas v. Mich. City Plant Planning Dep't.*, 755 F.3d 594, 601 (7th Cir. 2014) (stating that alleged harassment was not shown to have interfered with plaintiff's work performance where he claimed he "performed his job well with no complaints").

As stated by the Seventh Circuit, "[t]he workplace that is actionable is one that is 'hellish.'" *Whittaker*, 424 F.3d at 645. Because no reasonable jury could conclude that the

environment Plaintiff faced at UCMC was "hellish," Defendant's alleged conduct still falls short of the type of behavior that supports a hostile work environment claim. Defendant is therefore entitled to summary judgment on this count.

## C.    Retaliation

Title VII makes it unlawful for an employer to take an adverse employment action against an employee as a result of her opposing any unlawful employment practice. 42 U.S.C. § 2000e–3(a). Similar to claims of discrimination, retaliation claims may be proven by either the direct or indirect method of proof. For her retaliation claim, Plaintiff again invokes the direct method, which requires her to offer sufficient "direct or circumstantial evidence" that (1) she engaged in protected conduct; (2) she was subjected to an adverse employment action; and (3) there was a causal connection between the two. *Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 673 (7th Cir. 2011). Plaintiff has met this burden.

Plaintiff describes a number of complaints that could reasonably be construed as protected conduct. General complaints of discrimination that do not "indicat[e] a connection to a protected class or provid[e] facts sufficient to create that inference" fail to establish the first element of a *prima facie* retaliation claim. *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006). *See also Durkin v. City of Chicago*, 341 F.3d 606, 615 (7th Cir. 2003) (vague complaints concerning subject matters other than harassment do not constitute protected conduct). Unlike the complaints in *Tomanovich* and *Durkin*, many of Plaintiff's complaints adequately indicated the alleged discrimination was based upon her country of origin.

Specifically, Plaintiff engaged in at least three acts of protected conduct. First, Plaintiff complained to Dr. Lee because she thought Dr. In "did not like her because she was from South America" and had a "problem with her accent." References to Plaintiff's native continent

sufficiently invoke her national origin. *See Salas v. Wis. Dep't of Corr.*, 493 F.3d 913, 922-23 (7th Cir. 2007) (even though Hispanics hail from various countries, plaintiff alleging he is "Hispanic" sufficiently identifies his national origin to support Title VII claim).

Second, Plaintiff met with Drs. Lee and Dickie to communicate her certainty that "the discrimination she was experiencing was due to her accent and . . . was also caused by being from Colombia." In addition to this direct reference to Colombia, Plaintiff's alleged complaints about the treatment of her accent could also underpin a national origin discrimination claim. *See, e.g.*, *Hasham*, 200 F.3d at 1050; *Salas*, 493 F.3d at 923. Not only has the Seventh Circuit stated that "accent is generally recognized as a manifestation of national origin," *Hasham* at 1050, it has also acknowledged the EEOC's broad definition of national origin discrimination. *See Salas* at 923 (noting that the EEOC defines national origin discrimination to include the denial of equal employment opportunities because an individual has the "physical, cultural *or linguistic characteristics* of a national origin group." 29 C.F.R. § 1606.1) (emphasis added).

Third, Plaintiff complained directly to Dr. Song during the September Meeting. At that time, Plaintiff explained that the discrimination she felt she had been subjected to and attributed it to her accent. She claims Dr. Song responded that there was "no such thing as accent discrimination" and that he was not going to do anything about it. Similar to the complaints made to Drs. Lee and Dickie, Dr. Song could have understood Plaintiff's concerns about her accent as concerns about her national origin. This inference is bolstered by the allegation that Dr. Song dismissed her complaint because "people came from all over the world to UCMC."

After engaging in protected conduct, the most favorable reading of the evidence suggests that Plaintiff was subjected to an adverse employment action that was causally connected to the protected conduct. In the context of a retaliation claim, an adverse employment

action is one that would dissuade a reasonable employee from engaging in the protected activity. *Silverman,* 637 F.3d at 740. There is no dispute that Plaintiff's probation, removal from clinical duties, and discontinuation in the Program constituted adverse employment actions under Title VII. Therefore, the dispositive question is whether material issues of fact exist as to the link between those actions and Plaintiff's alleged protected complaints. If Plaintiff has presented a "convincing mosaic" of circumstantial evidence, from which an inference of retaliatory intent could reasonably be drawn, her claim must survive.

Retaliation claims under Title VII require traditional but-for causation. *Cung Hnin v. TOA (USA), LLC*, 751 F.3d 499, 508 (7th Cir. 2014) (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2534, 186 L.Ed.2d 503 (2013)). Similar to discrimination claims, a plaintiff can establish the requisite causal connection by building a "convincing mosaic" of circumstantial evidence that, "when taken as a whole . . . could convince a reasonable jury that [s]he was the victim of unlawful retaliation." *Brown v. Advocate S. Suburban Hosp*., 700 F.3d 1101, 1106 (7th Cir. 2012). Circumstantial evidence can include suspicious timing, ambiguous statements, evidence that similarly situated employees were treated more favorably, and evidence of pretext. *See Cung Hnin*, 751 F.3d at 508; *Coleman v. Donahoe*, 667 F.3d 835, 860 (7th Cir. 2012).

Taken together, Plaintiff's circumstantial evidence creates a sufficient inference of retaliatory motive by UCMC decisionmakers. According to her testimony, Plaintiff was given the choice between voluntary resignation and probation just over a month after she personally complained of discrimination to Dr. Song. She was formally placed on probation almost two weeks later. Although "suspicious timing alone is rarely sufficient to create a triable issue," *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 665 (7th Cir. 2006), Plaintiff has

supplemented this questionable timeline with additional evidence of ambiguous statements. Plaintiff claims that during the November Meeting, Dr. Song emphasized "cultural issues" and "cultural fit" as preventing her from continuing in the Program. Plaintiff also claims that, within weeks of the start of her probation, Dr. Song told her "life is never fair to people from developing countries" and that he could not tolerate his colleagues calling him about "her struggles." These are exactly the kind of ambiguous statements from which a jury could infer retaliatory intent. *See Egonmwan v. Cook Cnty. Sheriff's Dept.,* 602 F.3d 845, 850 (7th Cir. 2010) (stating that plaintiff must demonstrate that decisionmaker made remark around time of retaliatory decision and in reference to adverse employment action).

The record is unclear as to who made the employment decisions on behalf of UCMC and to what extent they were influenced by non-decisionmakers. Defendant claims that Dr. Song offered Plaintiff the choice between resignation and probation only after consulting PRS faculty who "unanimously" agreed that Plaintiff should leave the Program, whereas Plaintiff claims Dr. Song made that decision singlehandedly. Neither party alleges that Dr. Lee or Dr. Dickie made this decision, but it is undisputed that they provided evaluations of Plaintiff's performance to more senior physicians. Therefore, a factfinder could reasonably infer a causal connection between Plaintiff's alleged complaints to Drs. Lee and Dickie and Defendant's adverse employment action. Given these material questions of fact regarding Defendant's decisionmaking process, I cannot dispose of Plaintiff's claim based on any determination of who made or influenced this particular decision.

Similarly, Plaintiff has also presented evidence linking her removal from clinical duties and ultimate termination to her alleged complaints. In the March Letter, Dr. Song explained that UCMC had decided not to renew Plaintiff's contract and to pull her from all clinical cases as a

result of her failure to satisfy its professional expectations for residents. As noted by Defendant, this Court cannot second-guess Dr. Song's and UCMC's assessments of Plaintiff's performance. *See Widmar v. Sun Chemical Corp.*, 772 F.3d 457, 463-64 (7th Cir. 2014) ("[I]t is not the court's concern that an employer may be wrong about its employee's performance, or be too hard on its employee . . . . A court cannot interfere because an employer is unwise or unfair.") (citations and quotations omitted). This Court can and should, however, consider evidence of pretext—that is, evidence of a phony reason for an otherwise retaliatory action. *See Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 645-46 (7th Cir. 2013) ("[A]n employer who advances a fishy reason takes the risk that disbelief of the reason will support an inference that it is a pretext for discrimination."). Plaintiff's testimony raises a number of material issues of fact that call into question the reasoning behind Defendant's decisions set forth in the March Letter.

Plaintiff claims UCMC decisionmakers decided the outcome of her probation without taking into account her performance from January through March 2012. The March Letter states that the PRS faculty met on March 26, 2012 and decided unanimously (except for Dr. Song, who did not vote) that Plaintiff's contract would not be renewed. In the letter, Dr. Song explained that UCMC's decision was made "after review of [Plaintiff's] complete file with particular attention to [her] knowledge, skills and judgment since [her] probation started." In sharp contrast to this explanation, Plaintiff testified that Dr. Song told her that he knew she would not pass her probation from the start, that he did not take her positive evaluations during probation into account, and that he was going to "do what he wanted " because he "had the faculty vote to support him." Plaintiff also points to UCMC documents which suggest Dr. Song drafted the March Letter on March 8, 2012—nearly three weeks before the alleged faculty meeting. When properly construed in Plaintiff's favor, this evidence supports a jury finding that the reasoning

conveyed in Dr. Song's March Letter was mere pretext for an unlawful, retaliatory decision that was under his control.

Defendant attempts to undermine Plaintiff's claim by appealing to the "same-actor inference." Under this theory, "where the same person does the hiring and firing of an individual, an inference arises that the firing did not result from an improper discriminatory motive." *Johnson v. Zema Systems Corp.*, 170 F.3d 734, 744-45 (7th Cir. 1999). It is undisputed that Dr. Song and other PRS doctors knew of Plaintiff's accent and national origin before she was offered residency at UCMC. But these facts do not undermine her claim. The Seventh Circuit has stated that "same-actor inference is unlikely to be dispositive in very many cases," *id.* at 745, because an employer may develop discriminatory animus over time or may hold discriminatory expectations that are subsequently not met by the employee. Construing all facts in Plaintiff's favor, I am not persuaded that the "same-actor inference" precludes the retaliatory motives she alleges.

Plaintiff's circumstantial evidence—in the form of ambiguous statements, suspicious timing, and indications of pretext—creates a sufficiently "convincing mosaic" from which a rational jury could infer that she was the victim of unlawful retaliation. Summary judgment is therefore denied on these counts, and Plaintiff may proceed with her retaliation claim under the direct method of proof.

## CONCLUSION

For the aforementioned reasons, Defendant's motion is granted in part and denied in part. All of Plaintiff's § 1981 claims fail, as does Plaintiff's hostile work environment claim under Title VII. Plaintiff, however, may proceed under the direct method of proof with her Title VII employment discrimination and retaliation claims.

ENTER:

*James B. Zagel*

James B. Zagel
United States District Judge

DATE: June 19, 2015