**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **DR. MARIA ARTUNDUAGA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 12-cv-08733** |
| | ) | |
| **THE UNIVERSITY OF CHICAGO** | ) | **Judge Amy St. Eve** |
| **MEDICAL CENTER,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFF'S MOTION *IN LIMINE* NO. 4 – TO BAR EVIDENCE AND
TESTIMONY OF INVESTIGATION AND REPORT BY JONATHAN ROTHSTEIN**

Plaintiff Dr. Maria Artunduaga, by her attorneys, pursuant to Fed. R. Evid. 401, 402, 403,
801, and 802, files this Motion *in Limine* No. 4 – To Bar Evidence and Testimony Relating of
Investigation and Report of Jonathan Rothstein. In support thereof, Dr. Artunduaga states as
follows:

1.     Dr. Artunduaga has brought this case against Defendant University of Chicago
Medical Center ("UCMC"), claiming that UCMC discriminated against her on the basis of her
national origin and retaliated against her when it terminated her employment as a resident in
UCMC's Section of Plastic and Reconstructive Surgery ("PRS").

2.     Dr. David Song was the Program Director for the PRS residency program during
the time Dr. Artunduaga worked at UCMC, from late June 2011 until May 2012.  Dr. Song made
the decision to place Dr. Artunduaga on probation in November 2011.  Dr. Song, and possibly
other attending physicians in the PRS Section, made the decision to terminate Dr. Artunduaga
from the PRS residency program in March 2012. These are the two adverse employment actions
she challenges.

3.     In June 2012, months after the decisions challenged by Dr. Artunduaga in this lawsuit were made, Jonathan Rothstein, who was the Director of Employee and Labor Relations for the University of Chicago, commenced an investigation of her complaints. He produced a report sometime in July 2012 in which he purported to investigate Dr. Artunduaga's complaint of national origin discrimination, concluding that all of her complaints were "without merit." *See* Exh. A, Rothstein Report.

4.     Mr. Rothstein had previously ignored complaints made by Dr. Artunduaga and her husband, Ricardo Garcia, in November 2011 and in May 2012, telling her that her complaints were not within the purview of his office and that she should take them up with the Graduate Medical Education program. *See* Exh. B, November 2011 and May 2012 correspondence. As such, he played no role in any of the events that led to Dr. Artunduaga's probation and termination.

5.     Mr. Rothstein never spoke to Dr. Song or any of the other decision makers at the time the decision was made to place Dr. Artunduaga on probation in November 2011 or to terminate her in March 2012. His only contact with those individuals came long after these decisions had been made. *See* Exh. A, Rothstein Report.

6.     Dr. Artunduaga anticipates that UCMC will seek to elicit testimony from Mr. Rothstein regarding his June 2012 investigation and his conclusions, and to admit his July 2012 report into evidence, in order to buttress its defenses in this case. But that investigation is not relevant to either Dr. Artunduaga's claims or UCMC's defenses, which turn only on whether the decision makers were motivated by unlawful discrimination or retaliated against her for her complaints when they made their November 2011 and March 2012 decisions.

7. Any evidence or testimony regarding the investigation of Dr. Artunduaga's complaints that was not communicated to or shared with the persons who made the adverse employment decisions at issue here (at or before they made those decisions) is not relevant. Such evidence or testimony also impermissibly purports to advance a legal conclusion and may confuse the jury into believing that Dr. Artundaga's discrimination and retaliation claims have already been adjudicated. For these reasons, as explained more fully below, the Rothstein investigation and report should be barred.

**A. Investigations or Repots Not Communicated to Decision Makers Are Not Relevant to Title VII Discrimination and Retaliation Claims.**

8. The question for the jury in this case is whether UCMC would have terminated Dr. Artunduaga had she not been of Colombian national origin or if she had not complained of national origin discrimination. *See* Seventh Circuit Pattern Jury Instructions 3.01, 3.02. *See also Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, --- (7th Cir. 2016), No. 15-2574, 2016 U.S. App. LEXIS 15284, * 8 (7th Cir. Aug. 19, 2016) ("Sole question" that mattered in national origin discrimination case was "whether a reasonable juror could conclude that Ortiz would have kept his job if he had a different ethnicity and everything else had remained the same.").

9. In making this determination, the jury must focus on evidence regarding the decision that was made and the reasons the decision maker provides for that decision. *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993) (liability depends upon whether protected trait actually motivated the employer's decision).

10. Federal Rule of Evidence 401 provides that evidence is relevant if the fact is of consequence in determining the action, and under Rule 402, irrelevant evidence is not admissible. Mr. Rothstein's after-the-fact investigation and report are of no consequence in determining whether national origin discrimination or retaliation took place months earlier, as

they could not possibly have influenced the decision makers. As such, the evidence should be barred. *Dreger v. Mid-America Club*, No. 95 C 4490, 1998 U.S. Dist. LEXIS 2577 * 1 (N.D. Ill. Feb. 23, 1999) ("it is only the facts existing at the time of [the defendant's] decision and leading up to that decision which are relevant to the question of whether [the defendant] unlawfully discriminated against [the plaintiff] when it made its decision.").

**B.     Mr. Rothstein's Report Should be Excluded under Fed. R. Evid. 403.**

11.     Even if the Court found that the Rothstein investigation and report bore any relevance to the claims in this case, it should exclude the evidence under Federal Rule of Evidence 403, because the probative value of the Rothstein investigation and report is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, and wasting time.

12.     First, presenting the jury with a pseudo-"legal" document that concludes that Dr. Artunduaga's discrimination and retaliation claims were baseless would be confusing, misleading, and unduly prejudicial. In actuality, Mr. Rothstein's report carries no legal weight and has no precedential value, but the jury may nonetheless be swayed by its legalese and purported conclusions. The risk of such an outcome vastly outweighs any probative value that UCMC might argue the report possesses (and, as shown above, it has none).

13.     Second, if UCMC were permitted to introduce Rothstein's testimony about his investigation and his report, the trial would be needlessly lengthened. The plaintiff would then be entitled to cross-examine not only Mr. Rothstein, but every individual whose interviews he summarized in his report (which would be hearsay under Fed. R. Evid. 801 and would not fall under any exceptions under Rule 802, so a portion of the report would be barred for that reason as well).

4

14.     Mr. Rothstein's report states that he interviewed fourteen people, whose opinions he summarized in the report. The plaintiff would need to cross-examine each of those fourteen people to assess if he accurately summarized those opinions, if the report were allowed. Such an outcome would be absurd, as it would add days to the trial that would be spent on issues that have nothing to do with liability.

15.     In sum, the fact that Mr. Rothstein did an investigation and prepared a report months after Dr. Artunduaga was put on probation and terminated has nothing whatsoever to do with UCMC's liability in this case. For all the reasons presented above, evidence and testimony of his investigation and report should be excluded.

WHEREFORE, the plaintiff Dr. Maria Artunduaga, respectfully requests that this Court grant her *motion in limine* to bar evidence and testimony related to the investigation of Jonathan Rothstein, and to grant such other and further relief as may be just and proper.

Dated: November 18, 2016                      Respectfully submitted,

                                              **DR. MARIA ARTUNDUAGA**

                                     By:     /s/ Cynthia H. Hyndman
                                              One of her Attorneys

Jamie S. Franklin, ARDC No. 6242916
The Franklin Law Firm LLC
53 W. Jackson Blvd., Ste. 803
Chicago, IL 60604
(312) 662-1008
(312) 662-1015 (fax)
jsf@thefranklinlawfirm.com

Cynthia H. Hyndman
ROBINSON CURLEY & CLAYTON, P.C.
300 South Wacker Dr., Ste. 1700
Chicago, IL 60606
(312) 663-3100
(312) 663-0303 (fax)
chyndman@robinsoncurley.com

5

<u>**CERTIFICATE OF SERVICE**</u>

I, the undersigned, certify the foregoing document, **Plaintiff's Motion in Limine No. 4– to Bar Evidence and Testimony of Investigation and Report by Jonathan Rothstein** as additional Counsel for Plaintiff, was served by electronic mail on November 18, 2016 on the following persons:


Edward C. Jepson Jr.
Elizabeth N. Hall
VEDDER PRICE P.C.
222 N. LaSalle Street
Suite 2600
Chicago, IL 60601
ejepson@vedder.com
ehall@vedder.com

Jamie S. Franklin
THE FRANKLIN LAW FIRM LLC
53 W. Jackson, Boulevard
Suite 803
Chicago, IL 60604
jsf@thefranklinlawfirm.com


/s/Cynthia H. Hyndman

# Exhibit A

**MEMORANDUM**

TO:        Mike Simon, M.D.
              Barry Kamin

FROM:     Jonathan Rothstein

RE:         M. Artunduaga, M.D., national origin discrimination complaint

------------------------------------------------------------------------------------------------------

**INTRODUCTION**

On April 6, 2012, Maria A. Artunduaga, M.D., filed a grievance with the Housestaff Grievance Committee. Following a May 16, 2012 hearing, that grievance was denied, the reasons for which were communicated to Dr. Artunduaga by letter from the Grievance Committee Chair dated May 23, 2012. By letter dated May 31, 2012 to Dr. Ken Polonsky (Dean of the Pritzker School of Medicine) and Sharon O'Keefe (UCMC's President), Dr. Artunduaga requested review of the Grievance Committee's decision denying the grievance. By letter to Dr. Artunduaga dated June 19, 2012, Dr. Polonsky and Ms. O'Keefe denied Artunduaga's request for review.

Nowhere in Dr. Artunduaga's grievance itself nor in her case before the Grievance Committee did she allege discrimination based on national origin. Indeed, seven of eight grounds for review enumerated in Artunduaga's May 31, 2012 request for review do not expressly or impliedly allege national origin discrimination.

However, in her eighth ground for review, Dr. Artunduaga alleges that the Grievance Committee "[failed] to recognize the underlying causes of my particular situation." *See* Exhibit A at 2. In context and in substance, this was a complaint of national origin discrimination. Much of the narrative following Dr. Artunduaga's enumerated grounds for review pertains to her national origin (Columbian) and/or incidents thereof, for example, that English is her second

**UCMC00004674**

language, that she received her medical education and training in Latin America, and that she speaks with an accent. *Id.* at 3. More specifically, Dr. Artunduaga's May 31 appeal alleges:

- Dr. David Song and Dr. Julie Park have always insisted in equating my situation and expected rate of progress to that of other foreign medical graduates whose native tongue is English and who received their medical education in that language.

- Drs. Jaskowiak, Kaplan, Angelos, Hurst, Moreira [and others] including Plastic Surgery residents … repeatedly claimed that my alleged inability to communicate, and specifically my accent, were significant factors in some of my performance problems.

- I have many complaints of discrimination on the basis of national origin, deriving in particular from comments and criticisms regarding my command of the English language, since as early on in my residency as August ….

Thus, at least by her May 31, 2012 request for review, Dr. Artunduaga had complained internally of national origin discrimination.[1] Whether that complaint was timely or otherwise proper under the GME Grievance Procedure is a question I need not answer, because shortly thereafter Dr. Artunduaga filed a charge of discrimination on or about June 12, 2012 with the U.S. Equal Employment Opportunity Commission (EEOC). In that charge, Artunduaga recounts her personal and educational history, noting that she was one of two incoming Plastic and Reconstructive Surgery residents matched to UCMC.[2] Artunduaga further notes that, out of 18 Residents in the Department of Surgery, she was the only one whose first language was not

---

[1] I found during the investigation that Artunduaga had not before this point complained to Drs. Park and Song (nor to the attending doctors I interviewed or to GME management) about national origin discrimination. Although I have reviewed extensive written communications by Dr. Artunduaga contesting numerous evaluations of and other comments regarding her performance, none of those alleges national origin discrimination. Even in connection with the May 2012 hearing on her grievance (during which Dr. Artunduaga complained regarding her probation, her contract non-renewal, her evaluations and assignments, even the grievance process itself), she failed to attribute her complaints and/or her treatment by others to her national origin. Finally, in my own meetings with Dr. Artunduaga, she did not complain of discrimination based on national origin. Rather, she attributed the claimed harassment she was experiencing from Dr. Song to be retaliation for his having filed a grievance against him under the provisions of the GME Handbook.

[2] Although not noted in her charge, Dr. Artunduaga was in fact heavily recruited by Dr. Song. *See* below at p. 9.

2

UCMC00004675

English and who had trained in a non-U.S. medical school, as well as the only resident of 12 in the Section of Plastic and Reconstructive Surgery who had received medical training in a language other than English.

Dr. Artunduaga goes on to allege in her charge that:

- I was "throughout my employment" treated less favorably than other Residents not from Columbia. From the beginning of my residency, I received considerably fewer surgical cases and fewer assignments than other, non-Columbian residents.

- In August 2011, Dr. John Seal, Chief Resident, criticized my "communication skills," and specifically referred to my accent (quotation marks by Dr. Artunduaga).

- Throughout my employment, my co-residents mocked my accent and made derogatory remarks and jokes about my Columbian heritage.

- [S]everal supervising doctors … claimed that my foreign medical education, "cultural issues" and/or my accent were detrimental to my performance. For example, … Dr. Nora Jaskowiak stated in an evaluation of my work that "there seem to be some critical issues that may be cultural." Similarly, in September 2011 Dr. Roger Hurst stated in an evaluation … that because the "routines and customs" where I trained "are not necessarily known to us … make[s] it more difficult to assess her overall capabilities so early in her residency" (quotation marks by Dr. Artunduaga).

- While many of my supervisors made an honest assessment that my language and cultural background may have been an important factor in my perceived performance issues, there was a generalized lack of sensitivity to my background which was wrongly interpreted as a lack of basic medical competence.

- On March 27, 2012 Respondent informed me that it would not renew my contract for a second year of employment. … [In April 2012], I complained to Dr. Simon, Dr. Kamin and Dr. Matthews regarding Dr. Song's direct orders to my chief resident, Dr. Eric Grossman, to discriminate against me during my Endocrine Surgery rotation in April.

After reviewing extensive background materials including most of the exhibits attached hereto, I further investigated Dr. Artunduaga's discrimination complaint by interviewing over a dozen

3

witnesses over the course of a month, beginning on July 11, 2012.[3] My investigation took the time it did not only because of the volume of documentation, but also due to the various doctors' schedules and availability during the summer.

I specifically interviewed Dr. David Song, Vice Chair of the Department of Surgery, Director of the Residency Program, and Chief of the Section of Plastic and Reconstructive Surgery; Dr. Sara Dickie, who had recently completed her residency in Plastic and Reconstructive Surgery (during the last year of which she was Co-Chief Resident); attending Dr. Nora Jaskowiak, Associate Professor of General Surgery and Director of the Breast Surgery Oncology Program; attending Dr. Mark Ferguson, Head of the Thoracic Surgery Service, Director of the Residency Program in Cardiothoracic Surgery, and a full Professor in the Department of Surgery and University of Chicago Cancer Research Center; Dr. Irma Fleming, a resident with whom Artunduaga worked several times, principally on the vascular and thoracic sections in early 2012. Barry Kamin, Executive Director for Graduate Medical Education; Dr. Carla Moreira, a fifth year General Surgery resident; attending Dr. Julie Park, Assistant Professor of Surgery and a specialist in reconstructive microsurgery and breast reconstruction; attending Dr. Konstantin Umanskiy, Assistant Professor of Surgery whose specialty is colorectal surgery; attending Dr. Roger Hurst, full Professor of Surgery who also specializes in colorectal surgery; Dr. Justine Lee, former senior resident in Plastic and Reconstructive Surgery who graduated in 2012; Dr. Michael Simon, the Chair of Graduate Medical Education; Dr. Eric Grossman, now on staff at Lurie's Children's Hospital of Chicago, having completed his residency in June 2012; and Dr. Jeffrey Matthews, Chair of the Department of Surgery, Professor of Surgery, and Dean of Clinical Affairs for the Biological Sciences Division.

---

[3] I contacted Dr. Artunduaga and asked her to meet with me to be interviewed regarding her charge; she declined.

4

UCMC00004677

## GENERAL FINDINGS AND CONCLUSIONS

I have investigated all allegations directly or indirectly related to actual or potential national origin claims, as set forth in Dr. Artunduaga's above-mentioned request for review and in her EEOC charge. For the reasons detailed below, I find these allegations to be without merit in that they do not evidence adverse action or a hostile work environment based on Dr. Artunduaga's national origin. The record reviewed suggests that, in the early part of her residency, some patients complained about (among other things) Dr. Artunduaga's accent. Some of these complaints may have been related to Dr. Artunduaga by the attending/supervising doctors. Others were related to Dr. Artunduaga by the then-chief resident or other supervising senior residents, and/or by her fellow residents. In no instance, however, did an attending doctor link Dr. Artunduaga's accent to that doctor's evaluation of her performance.[4] Indeed, no attending doctor received complaints about Artunduaga's accent, nor did they themselves have difficulty with or objections to her accent. (As detailed below, however, each of five attending doctors who evaluated Artunduaga found her communication skills to be deficient in that they were abrupt, disorganized, confrontational, argumentative, and/or unresponsive to questions posed by those doctors and by others.)

Whether Dr. Artunduaga has intentionally conflated feedback about communication deficiencies with second-hand comments about her accent, or whether she genuinely believes that others were alluding to her (self-acknowledged) accent when they were in fact addressing other communication issues, I cannot and need not decide. It is true that two attending doctors commented on Dr. Artunduaga's cultural and/or educational background in evaluating her

---

[4] Throughout her residency, Dr. Artunduaga denied any difficulties understanding or communicating in English. Moreover, as detailed below at p. 15, it was Dr. Artunduaga herself who raised the subject of her accent, and immediately thereafter indicated that it was a non-issue after the first few months of her residency.

5

UCMC00004678

performance. *See* below at pp. 9-12. In context, however, it is clear that those comments reflected efforts to better understand Dr. Artunduaga's performance shortcomings -- attempts to get at the root of those shortcomings and thereby help her succeed in the residency program. Moreover, these comments were made in August and September 2011, long before the decision was made in late March to non-renew her contract. Between September and March, Artunduaga was evaluated by at least four (4) other attending doctors, all of whom rated her performance as sub-standard, particularly for residents on the demanding Section of Plastic and Reconstructive Surgery.

Each of those attending doctors further observed and recorded other deficiencies in Dr. Artunduaga's performance as a surgeon. During and since her UCMC residency, Artunduaga has contested these assessments, blaming her co-residents, her circumstances, the evaluators themselves, or some combination of the above. However, Dr. Artunduaga's many arguments do not change the myriad specific mishaps and mistakes that at least five (5) attending doctors attributed to Artunduaga. Nor do they establish that those attributions were motivated by Artunduaga's national origin. To the contrary, as Dr. Julie Park observed in her findings at the end of Artunduaga's probationary period, Artunduaga's numerous quarrels with others' evaluation of her performance served mainly to confirm the conclusion reached by Dr. Park and others: that Artunduaga spent more time and effort arguing than she did listening and learning.

As detailed below, I conclude that Dr. Song's decision to place Dr. Artunduaga on probation (and then to extend that probation at Artunduaga's request) was based not on any animus against her as a Columbian or South American, nor on her non-native education and medical training, but rather on his view (together with that of all 5 evaluating attending doctors) that: (1) Artunduaga's performance was sub-standard for a first-year surgical resident, especially

6

UCMC00004679

one in Plastic and Reconstructive Surgery; (ii) her performance failed to improve materially during her probationary period in the eyes of most attending surgeons; and (iii) she was unlikely to succeed in subsequent years as a Plastic Surgery resident. Accordingly, the decision in late March not to renew her contract was likewise legitimate.

Particularly relevant in these latter regards (probation and contract non-renewal) are the written evaluations and other correspondence of Dr. Park, together with the information Dr. Park provided when I interviewed her. *See* below at pp. 14-15 and 18-21. For the reasons detailed below, I found Dr. Park to be credible and fair-minded. As Dr. Artunduaga's assigned mentor, she had the incentive, desire, and ability to help Dr. Artunduaga succeed. Their weekly meetings during Dr. Artunduaga's probationary period were plainly intended to assist Artunduaga in:

- better understanding the negative feedback she had received (and continued to receive);

- taking affirmative steps to gain needed surgical experience; and,

- receiving more favorable evaluations and other feedback based on improved performance.

Instead of taking these meetings and Dr. Park's feedback in the constructive manner in which they were intended, Dr. Artunduaga rejected Dr. Park's recommendations – both during their meetings and in service thereafter. She argued with Dr. Park again and again, verbally and in writing. She also failed to heed Dr. Park's advice regarding needed experience working with particular surgeons and procedures. And, instead of working on the suggested ways to improve her surgical skills and abilities and professional demeanor (especially with patients but also with co-workers) – and to thereby receive improved evaluations - Artunduaga lobbied attending physicians and others to evaluate her favorably so she could retain her place in the program. By so doing, she undermined the favorable evaluations she did receive, at least in Dr. Park's

7

UCMC00004680

unbiased eyes.[5] All of which led Dr. Park to conclude on March 14, 2012 that Dr. Artunduaga did not meet "the level of excellence that we as a section expect from our residents." Exh. 1 at 2.

It was this unbiased conclusion, more than any evaluation or comments therein (or comments from other physicians or non-physicians) or anything else, that led Dr. Song – together with the rest of the faculty – to decide not to renew Dr. Artunduaga's contract. That decision, therefore, was consistent with the law (specifically Title VII) and UCMC policy.

The matter of allegedly discriminatory assignments thereafter is mostly academic (unless those allegations are substantiated by facts establishing some form of post-discharge hostile environment or retaliation). As detailed below, however, I find those allegations to be both unsubstantiated and immaterial.

## ADDITIONAL FINDINGS AND CONCLUSIONS[6]

### Factual Findings

1. Dr. Artunduaga's residency at UCMC was preceded by an impressive, indeed extraordinary, record of accomplishments, even for those admitted to UCMC's surgical residency program. Having been born in Columbia, Artunduaga's first language is Spanish. She attended medical school in Columbia but spent her final year on clinical rotations at Harvard

---

[5] Although I reviewed all those evaluations, I have not detailed them herein because none came from attending physicians under whom Dr. Artunduaga worked for an extended period. (Most came from fellow residents, LPNs, and physicians assistants, as did many mostly negative evaluations likewise not detailed herein.) I have, however, addressed below evaluations completed by Dr. Fleming, a fellow resident whose evaluations Artunduaga referenced at various junctures as demonstrative of her performance.

[6] I have endeavored to list additional Findings and Conclusions below in chronological order. So as to organize my remarks and discuss fully the comments of individuals I interviewed, however, I have also organized the findings and conclusions below largely by the witnesses I interviewed – more specifically, in the point in time at which each witness had his/her greatest level of interaction with Dr. Artunduaga. Those who interacted with her at multiple junctures (e.g., Drs. Song and Fleming) presented organizational challenges. I have endeavored to surmount those with cross-references and other means. Some redundancy as to events was unavoidable, however. To the extent these narrative Findings and Conclusions contain any material omissions, those are addressed in the evaluations and other written communications attached hereto as exhibits, including but not limited to Dr. Park's 3/14/12 report to Dr. Song (Exh. 1).

UCMC00004681

Medical School, Mount Sinai Medical Center, Baylor College of Medicine in Houston, and the University of Washington in Seattle. She next completed post-doctoral work in human genetics at Harvard Medical School.

2.      In March 2011, Dr. Artunduaga was the sole non-U.S. medical graduate to be chosen through the National Residency Match Program for an integrated program in Plastic and Reconstructive Surgery (from a pool of more than 300 candidates). She was one of only two residents matched to (chosen for) UCMC's residency program that year. In May 2011, Artunduaga obtained permanent U.S. residency through a National Interest Waiver from the federal government, which recognized her "extraordinary ability" in the scientific field based on her post-doctoral work in genetics at Harvard.

3.      Dr. David Song was instrumental in Dr. Artunduaga's being chosen for the program. As noted above, Song heads UCMC's Residency Program and is the chief of the Section of Plastic and Reconstructive Surgery – Dr. Artunduaga's chosen specialty. As he explained when I interviewed him on July 11, 2012, Song recruited Artunduaga, interviewed her himself and saw to it that the entire section did so as well.

4.      Dr. Song is originally from Korea.

5.      Under Dr. Song's leadership, UCMC's Residency Program is notably diverse: approximately half of the residents are women; perhaps more saliently, approximately one-third were born outside the U.S.[7]

6.      Dr. Artunduaga's residency at UCMC began in June 2011. Several months into her residency, Dr. Song concluded that Artunduaga was not succeeding. She had communication

---

[7] In 2011–2012, UCMC residents hailed from Iran, Israel, Germany, Scotland, and Columbia, among other places outside the U.S.

9

UCMC00004682

difficulties with patients and her fellow residents, and had received critical evaluations from several attending doctors.[8]

7.   Dr. Artunduaga spent the early part of her residency working under Dr. Nora Jaskowiak.  *See* Exh. 3 (Jaskowiak evaluation for the period 6/24/11 to 8/31/11).  Dr. Jaskowiak evaluated Artunduaga as needing improvement in five regards:   (1) pre-op, (ii) ability to communicate/justify medical decisions, (iii) preparedness, (iv) relations with other healthcare professionals, and (v) documentation of practice activities.  *Id.* at 1-2.  In the overall written comments section of her evaluation, Jaskowiak stated:

> Maria spent over two months on our service and it was fairly challenging.  Many issues arose – with communication, with clinical care, with technical OR skills.  These have been brought to the attention of Dr. Song.  Bottomline – she is very smart and very sweet.  And she works hard.  There seem to be some critical issues that may be cultural – as she has not worked in the American medical system before.  She often did not seem to understand completely what the plan was or her role in the plan.  Also, she is so eager to do well and to improve that she is constantly "diving forward" without even fully listening to what is being recommended.  This occurred technically in the OR and also on rounds.  Steps are being taken to address these issues.

*Id.* at 2.

8.   When I interviewed her, Dr. Jaskowiak credibly explained that her reference to Artunduaga's performance shortcomings as potentially "cultural" was more hope than conclusion.  She explained that Artunduaga's difficulties did not derive from English being her second language; Jaskowiak understood Artunduaga and (Jaskowiak believed) vice versa.  According to Jaskowiak, however, Artunduaga did not know when or how to communicate – neither with patients nor her co-workers.  During our interview, Dr. Jaskowiak provided concrete

---

[8] Dr. Song spoke with Dr. Artunduaga on numerous occasions, including in October 2011 when she was in Plastic and Reconstructive Surgery service.  *See* Exh. 2, Summary of Evaluation dated 11/2/11.  For Dr. Song, the difficulty in communicating with Dr. Artunduaga was not her accent; rather she came across as argumentative and disorganized.  *Id.*

10

UCMC00004683

examples of how Artunduaga's communication style and manner impacted patient care. For example, she recounted an incident after Dr. Song had performed bilateral mastectomies. The patient later became distraught, whereupon Artunduaga told her to "get her act together," that she was "being a wimp about the pain" and was "going to be discharged that day" (which was not the case). Jaskowiak had to spend considerable time calming the patient and her husband, and it was agreed that Artunduaga would not treat the patient further. Artunduaga said at the time she thought she had done the right thing: that patients were to be discharged promptly. According to Jaskowiak, however, by communicating with the patient as she did, Artunduaga showed no insight regarding sensitivity or the need to be kind at the appropriate time. Separately, Jaskowiak explained that Artunduaga's confrontational approach manifested in the OR: she would "dive" into surgery without listening to Jaskowiak – literally "lunging" into tissue. In Jaskowiak's view Artunduaga wanted to come across as aggressive, not realizing she was being cruel to patients. At the conclusion of our interview, Dr. Jaskowiak said it had been an "incredible gift" (to Artunduaga) to let her finish her first year of residency.

9.      Throughout September, Dr. Artunduaga worked under Dr. Roger Hurst who evaluated Dr. Artunduaga as needing improvement in three categories:

- Pre-op care (formulates appropriate plan/assessment of details),
- Able to communicate/justify medical decisions), and
- Ability to lead/manage a service.

According to Hurst, this was one of the worst evaluations he has given in 20 years of teaching general surgery. He communicated his assessment to Dr. Song last fall, telling him that Artunduaga was not up to the standards of Plastic Surgery residents generally.

Exh. 4 at 2.

10.      Dr. Hurst's written comments in his evaluation of Artunduaga state:

11

When Maria started the rotation it was clear that she was less prepared than her peers. Specifically she was less independent and was less aware of the routines of running the service. It is not clear whether this was due to a deficiency in competence or just a result of necessary adjustments to a different system. Given that she was trained where the routines and customs are not necessarily known to us, this is to a degree understandable, but it does make it more difficult to assess her overall capabilities so early on in her residency. She was always very hard-working and attentive. There were no deficiencies in this area. She followed directions and sought to improve her performance.

Exh. 4 at 2.

During our interview, Dr. Hurst credibly explained that his comments were based in part on his own background: he had taught in Hong Kong for a year, and was thus sensitive to the position of students whose first language is not English. Dr. Hurst's other explanation for his comment about "routines and customs not necessarily known to us" (which explanation I also credit) was that standard surgical procedures are, in fact, different outside the U.S. He explained, for example, that following abdominal surgery, if there is drainage from the wound, the standard U.S. procedure is to probe the wound to determine whether surgical repair is needed. In Hong Kong, by contrast, the standard instead is to leave the wound untouched and keep the staples in longer, accepting the possibility of hernia but believing the less invasive procedure to be the better one.

11.     In light of the above Findings 9 and 10, I further find that the comments in Dr. Hurst's written evaluation reflect no animus against Dr. Artunduaga based on her national origin, her accent, or her medical training outside the U.S. On the contrary, I find that Hurst – by his comments and by evaluating Artunduaga as he did (with 3 areas needing improvement instead of more) -- was in fact trying especially hard to be fair. Although apparently not recognized as such by Artunduaga, Hurst's comments reflect precisely the sort of positive cultural awareness Artunduaga wanted at UCMC but now claims she was denied throughout her residency. *See* above Finding 10.

12

UCMC00004685

12.     Dr. Artunduaga also worked with and was evaluated by Dr. Konstantin Umanskiy, an Assistant Professor in the Department of Surgery.  Artunduaga worked under Umanskiy in the colon and rectal surgical service, Umanskiy's specialty.  Towards the end of September, Umanskiy met with Artunduaga and provided her formal feedback. (Exh. 5).  The next day, September 28, Umanskiy emailed Dr. Song his assessment of Artunduaga's performance.  Umanskiy noted that Artunduaga was "eager and interested in learning surgery." (*Id.*).  He further noted she had improved in patient care and communication skills over the month.  He went on, however, to note "several areas of concern":

> 1.     Dr. Artunduaga appears to have difficulty keeping up with the workload.  She frequently appears disorganized, unsure or [sic] her knowledge, and excessively talkative at times.

> 2.     She was not able to establish successful doctor-patient relationships with the patients on the wards.  At times this led to miscommunication between her and the patients.

> 3.     In the operating room she had difficulty with following instructions and required frequent prompting as to her role and assignment during the case.

> In summary, I have major concerns that Dr. Artunduaga's performance is significantly below that of a typical resident in general or plastic and reconstructive surgery at the University of Chicago.  While I believe that she's capable of addressing the criticisms presented above, she may not be able to achieve a level of performance that we expect from our residents.

*Id.*

13.     Dr. Umanskiy was born and raised in the former Soviet Union; his first language is Russian.  Like Dr. Artunduaga, he began his medical training outside the U.S. (in his case in Moscow), finishing at Case Western Reserve in Cleveland.  Given their largely parallel backgrounds, Umanskiy wanted to like Artunduaga and hoped she would succeed in the program.  He vehemently denied having made derogatory comments about Artunduaga's

13

UCMC00004686

medical training in South America – comments attributed to him in Artunduaga's request for review. Nor did he hear others make such comments.[9]

14.     When I interviewed him, Dr. Umanskiy elaborated on his September 2011 remarks regarding Dr. Artunduaga being disorganized and "excessively talkative." He explained that she had great difficulty communicating binary information: answering "yes" or "no" in response to a direct question, *e.g.*, "Did the patient have the ABC test?" She would instead launch into a disorganized, mostly unresponsive narrative non-answer. Umanskiy recalled difficulty on his rounds, when the attending physician is routinely briefed by a resident before seeing the patient – regarding tests given, the discharge plan, and other relevant, factual information. According to Umanskiy, Artunduaga often did not have such information; when she did, she failed to communicate it directly and succinctly. Umanskiy specifically recalled Artunduaga slowing his rounds by comparison with other interns during his four years of teaching at UCMC.

15.     On November 2, 2011, Drs. Song and Park met with Dr. Artunduaga. Also present was Alikah Williams, UCMC's residency coordinator. *See* Exh. 2. Dr. Song informed Dr. Artunduaga that her performance to date was unacceptable, and that she would either be placed on probation or should change career paths, *i.e.*, withdraw from the surgical residency program. *Id.* at 2. Artunduaga stated adamantly that her performance had improved over the prior months, but that none of the doctors in Plastic and Reconstructive Surgery – indeed, across the entire Surgery Department – had recognized this improvement. *Id.* For Dr. Song, this

---

[9] Not a single person I interviewed corroborated Artunduaga's claim that she was frequently subjected to unwelcome comments about her accent or national origin by co-workers. Indeed, these interviewees could not think of a single instance where this was the case, and denied having heard such comments.

UCMC00004687

statement only confirmed the "disconnect between [Artunduaga's] skill set ... and the reality of the situation." *Id.*

16.     Dr. Artunduaga elected to remain in the program. Accordingly, Dr. Song notified her by letter on November 15, 2011, that she was being placed on probation (sometimes referred to below as "remediation") until the end of February 2012. Exh. 6 at 1-2. That letter detailed performance deficiencies regarding both patient care and interpersonal/communication skills, and specified goals to be met for Artunduaga to successfully complete remediation.[10]

17.     As reflected in the November 15 letter, Dr. Song assigned Dr. Park to serve as Artunduaga's mentor during remediation. Exh. 6 at 2. Song also informed Artunduaga that she would be notified by the end of February regarding contract renewal for a second year of residency. *Id* at 2. In the meantime, she would be evaluated formally and regularly by faculty under whom she worked.

18.     Instead of responding to the notice of remediation by altering her work habits and rededicating herself to her residency, Dr. Artunduaga wrote a 7-page rebuttal. *See* Exh. 7 (Artunduaga letter dated November 18, 2011). She therein disputed each of Dr. Song's written remarks regarding patient care, attributing several surgical errors to her co-intern and a patient discharge error to UCMC's Intensive Care Unit. As to her interpersonal and communication skills, Dr. Artunduaga herself raised the subject of her national origin, stating: "I am a foreigner and I have an accent. ... Many of the patients in the hospital have a strong accent I was not used to, some others have expressed their surprise that a Hispanic physician is taking care of them. This has represented one of my major challenges" (*id.* at 5). In that same November 18 rebuttal

---

[10] Nothing in the November 15, 2011 letter references or alludes to Dr. Artunduaga's accent. Indeed, her communication deficiencies referenced had to do mainly with her need to *listen* to others, and to respond in a professionally appropriate manner. Exh. 7 at 2.

15

UCMC00004688

letter, however, Artunduaga indicated she had overcome these "challenges" well before November 2011 (*id.*). Later in her rebuttal letter, Dr. Artunduaga stated:

> Dr. Song, I understand that your expectations from a Plastic Surgery resident are very high, but at the same time you knew that transitioning from my previous research position to the clinical setting was going to be challenging. Adding to that, my condition as a non-native speaker who has not trained in the U.S., would pose some additional difficulties, and they most certainly have. These facts were not hidden from anyone who evaluated my application for Plastic Surgery, and yet my professional qualifications were deemed to outshine all of these perceived weaknesses. From the start, I knew better than anyone else that I would face a steeper learning curve than any of my US-raised and trained colleagues, but this was not a challenge unknown to me since I already went through a similar experience in Boston, with a similarly difficult start but with my talent and drive winning out in due course. Though I recognize that only I am responsible for my rate of progress, I would have expected from some of the faculty, staff and senior colleagues a minimum level of understanding and support in recognition of those facts that are common in anyone with a similar background as mine, as that would have greatly aided in my learning process.

*Id.* at 5-6. Artunduaga ended her written remarks by requesting that her probation period be extended to late March, assuring Dr. Song that she would "shine, if given the opportunity, as you expect." *Id.* at 6.[11]

19. Throughout November 2011, Dr. Artunduaga worked under Dr. Mark Ferguson on the Thoracic section. Ferguson's evaluation of Artunduaga's performance, both at the middle and at the end of the month, was unequivocally negative. In a November 16 email to Dr. Song, he characterized Artunduaga's performance on the service as "very poor." Exh. 9 at 1. He described her areas of weakness as "numerous," including "lack of technical skills, basic medical information, organizational/prioritizational skills, communication skills, and information processing abilities." *Id.* Ferguson never attributed these weaknesses to Artunduaga's non-U.S. medical training, nor to any language or cultural issues. Rather, he believed she lacked "aptitude

---

[11] In response to Dr. Artunduaga's November 11 letter, Dr. Song agreed with Artunduaga's request to extend her probation until on or about March 23, 2012 (Exh. 8).

UCMC00004689

... a skill that can[not] be taught." *Id.* at 2. All of this he communicated to Artunduaga, virtually all of which she blamed on others. In his summative evaluation at the end of the month, Ferguson indicated Artunduaga needed to improve in seven categories.[12] In his overall comments, Ferguson concluded that Artunduaga "does not have the aptitude for the work she has chosen – very little improvement was evident during the month. Her knowledge and skill levels are well below those of her peers." *Id.* at 2.

20.     Except for one week in February 2012, Drs. Park and Artunduaga met weekly throughout Artunduaga's probationary period (mid-November 2011 to mid-March 2012). *See* Exh. 11 at 1. As noted above, Alikah Williams also attended these meetings, which were intended to monitor Dr. Artunduaga's progress and provide her timely, constructive feedback. *Id.*

21.     Among all the evaluations Dr. Artunduaga received from attending physicians, I find Dr. Park's evaluation to be the one most relevant to and reflective of Dr. Artunduaga's performance during 2012. During the last month of Artunduaga's probationary period, she worked under Dr. Park on the Plastic and Reconstructive section – Artunduaga's chosen specialty. *See* Exh. 11. In her March 14, 2012 report to Dr. Song, Dr. Park assessed Artunduaga's performance in four categories: (1) clinical performance, (2) interpersonal relations, (3) responsiveness to advising, (4) other conduct during the evaluation period. All four assessments were negative. *Id.* at 1-7.

22.     With regard to clinical performance, Dr. Park recounted two instances of substandard work in the OR, an example of Dr. Artunduaga's failure to provide Dr. Park clear and necessary patient information, unresponsiveness to Dr. Park's pages (for which Artunduaga

---

[12] Ferguson's evaluation was not entirely negative: he rated Artunduaga "good" or better in six categories. Exh. 9.

17

UCMC00004690

wrongly blamed the senior resident), and failure to avail herself of important opportunities to work with a key surgeon on the Plastic and Reconstructive section – in contravention of Dr. Park's repeated advice that she do so. *See* Exh. 11. I credit Dr. Park's assessment in each of these instances, inasmuch as each was based on her direct observations, her direct instructions, and/or her immediate involvement in the situation recounted.

23.     With regard to interpersonal relations, Dr. Park recounted three negative incidents involving attending physicians (Drs. Jaskowiak, Tothy and Reid), two of which were reported by the attending doctors (Jaskowiak and Reid).     Both of these, together with the clinical performance issues noted above, refute Dr. Artunduaga's argument that fellow residents – in particular the senior residents – were in effect "out to get her," ostensibly (now) on account of her national origin.     In all three instances, Dr. Artunduaga was rude to other medical professionals – in two instances the attending physicians (Drs. Jaskowiak and Tothy), and in the third a group of nurses (as reported by attending Dr. Reid).

24.     With regard to Dr. Artunduaga's responsiveness to her advice, Dr. Park reported: "We have gone to extraordinary efforts to mentor Maria.  There are many instances in which she does not heed our advice.  This has hurt her training and preparedness.  This assessment is [sic] comes from my own personal experiences with Maria and what she relays in our meetings." Exh. 11 at 5.  Park provided multiple examples several of them involving Artunduaga's failure to follow Park's advice and operate with Dr. Reid in the Plastic Surgery service during March 2012.     Another involved Artunduaga's failure in and after January 2012 to study for and complete the 2010 In-Service exam.  *Id.*  According to Dr. Park: "we do not have such problems with our other residents studying for the In-Service exam."  *Id.*

18

25.     Lastly, Dr. Park described in detail her concern that Dr. Artunduaga had interfered with the evaluation process during her probationary period by telling her reviewers that she would lose her resident status unless they evaluated her favorably. Exh. 11 at 6.  This was reported to Dr. Park by Dr. Yolanda Becker, a Professor of Surgery and Director of the Kidney and Pancreas Program who worked with Artunduaga in the transplant service, and Christine Trotter, a Transplant Nurse Practitioner, both of whom had been lobbied by Artunduaga for favorable evaluations. *Id.*

26.     Dr. Park's March 15, 2012 report concluded:

> After ten weeks of probationary meetings, I still find I am still working on the same issues with Maria – learning how to present patients, learning how to anticipate and address clinical and interpersonal problems, listening carefully, behaving professionally and avoiding conflicts, and focusing more on doing her job well rather than the evaluations themselves.
>
> Her performance on our service these past two weeks reveals that she has not actually reached the level of even an average surgical intern.  Her performance on our service is not compatible with the evaluations I have seen over the past two months.  Clinically she still lacks many of the basic skills we require.  She has not responded well to teaching and feedback that could help her improve.  This is in contrast to the evaluations we have received from other services, but it is consistent with the problems that have arisen on other services that we have been expressed to us recently by a range of clinical staff.
>
> Finally, I am very concerned by persistent evidence regarding unprofessional behavior and an inability to accept responsibility for problems that arise surrounding her work.  She does not perform well under stress or pressure.  I do not think she meets the level of excellence that we as a section expect from our residents.

Exh. 11 at 6-7.

27.     Dr. Artunduaga has been replaced in the residency program by Amanda Silva, a U.S.-born Latina.

19

UCMC00004692

**Conclusions**

1.　　The decision to place Dr. Artunduaga on probation in November 2011 was not motivated by her national origin (Columbian), nor any incidents thereof. Rather, that decision was based on Dr. Artunduaga's failure to meet the legitimate expectations of Drs. Song and Park, as well as the attending doctors under whom she had worked and by whom she had been evaluated before November.

2.　　The late March 2012 decision not to renew Dr. Artunduaga's contract was in no way based on her national origin. That decision was made by Dr. Song, together with the rest of the faculty, and was based primarily on Dr. Park's recommendation against renewal.

3.　　Neither the fact of nor comments regarding Dr. Artunduaga's accent had a material bearing on the unfavorable evaluations she received from all of the attending doctors who evaluated her. Those doctors based their evaluations on their own observations of Artunduaga's clinical performance. Based on those observations, the attending doctors believed her performance was below that expected of UCMC first-year surgical residents, particularly residents on the Plastic and Reconstructive Surgery section. It was those evaluations that led to Artunduaga placed on probation, not her accent or anything else related in any way to her national origin.

4.　　Dr. Artunduaga did receive some favorable evaluations from other residents, some senior and some not very senior. In particular, she received a number of favorable evaluations from Dr. Irma Fleming, especially during Artunduaga's early 2012 service on the vascular and transplant sections. *See* Exh. 11. When I interviewed her, however, Dr. Fleming characterized Dr. Artunduaga's performance *at the end of her time working under Dr. Fleming* as "remedial." This is inconsistent with Dr. Fleming's written evaluations, however, and I conclude that the written record shows that Dr. Fleming's overall view of Dr. Artunduaga's

20

UCMC00004693

performance was favorable/acceptable. However, that was not the view of the attending doctors who supervised Artunduaga.

5. Dr. Artunduaga's claims of a hostile work environment are likewise without merit. The written record I reviewed, together with the witnesses interviewed, made clear that all or virtually all comments about Dr. Artunduaga's accent came from patients – or from Dr. Artunduaga herself, who repeatedly raised the subject of her accent but said it had no bearing on her performance. Some of those patient comments appear to have been reported to and/or repeated by fellow residents and other doctors. However, in no instance did those comments affect an attending physician's evaluation of Dr. Artunduaga's performance. Moreover, Artunduaga's other purported evidence of harassment – comments by two attending physicians about her having trained outside the U.S. and thus perhaps being at a cultural disadvantage – were not severe or pervasive. Nor were they derogatory or reflective of animus based on her national origin or anything else. Rather they were bona fide attempts to understand why someone who appeared so strong on paper was failing to perform satisfactorily.

6. Dr. Artunduaga's claims of retaliation are also without merit. Dr. Eric Grossman supervised Dr. Artunduaga on the endocrine service in April 2012. Artunduaga claims Dr. Song told Grossman not to assign Artunduaga cases, and that she in fact had far fewer cases than other residents after March 2012. Both Song and Grossman denied this. During our interview, Grossman specifically recalled supervising Artunduaga and said she was treated the same as other residents as to caseload and otherwise. Regardless, I conclude that no adverse action was taken against Artunduaga after her contract non-renewal.

21

UCMC00004694

# Exhibit B

**Subject:** RE: Inquiry; Meeting?
**From:** <Jonathan.Rothstein@uchospitals.edu>
**Date:** 11/21/11 11:21 AM
**To:** <rago@media.mit.edu>

Mr. Garcia — This is a response to your email and a follow-up to our
telephone conversation regarding your spouse's situation. As I explained
to you when we talked, I am not the appropriate person to deal with
issues your spouse may have, as this office does not deal with any
issues related to the graduate medical education program or participants
in that program.

Jonathan A. Rothstein
Director, Labor Relations
Office of Employee & Labor Relations
University of Chicago Medical Center
MC 1086, Room B—124
Chicago, Illinois 60637
773 702—3082 (office)
872 201—9626 (cell)


-----Original Message-----
From: Ricardo Garcia [mailto:rago@media.mit.edu]
Sent: Monday, November 21, 2011 10:39 AM
To: Rothstein, Jonathan [UCH]
Subject: Inquiry; Meeting?

Hello Mr. Rothstein.

I am Ricardo Garcia,  spouse of one of the employees at the University
of Chicago Hospital.
As you are probably aware now, my spouse is having some difficulties at
her program right now.
We are trying to solve them with the program director (we believe
everything is a big misunderstanding), but we would like to have a short

meeting with you to ask some questions and make sure we are taking the
right steps to solve this impasse.

is this possible?
we can also talk on the phone if that suits you best.
My cell phone number is (617) 653 3973, but I can also go and meet in
person if you want.

Thanks for your time,

—Ricardo Garcia

********************************************************************************
This e-mail is intended only for the use of the individual or entity to which
it is addressed and may contain information that is privileged and confidential.
If the reader of this e-mail message is not the intended recipient, you are
hereby notified that any dissemination, distribution or copying of this
communication is prohibited. If you have received this e-mail in error, please
notify the sender and destroy all copies of the transmittal.



THE UNIVERSITY OF
CHICAGO MEDICINE

AT THE FOREFRONT OF MEDICINE

May 21, 2012

**VIA E-MAIL & U.S. MAIL**
Dr. Maria Artunduaga
208 W Washington
Apt. 1210
Chicago, IL 60606

Re:     Complaint of Discrimination under GME Handbook

Dear Dr. Artunduaga:

This is a follow-up to our meeting of May 8, 2012 to discuss your complaint of discrimination as provided for in the Graduate Medical Education Handbook (GME Handbook).

The GME Handbook provides for "a work environment free from all forms of prohibited harassment . . .," and specifically references "sexual harassment," a form of harassment prohibited by both state and federal law. "Prohibited" harassment is any form of harassment prohibited by law. In this instance, your sole and exclusive complaint is that your department chair, Dr. Song, has allegedly been harassing you for filing a grievance under a separate provision of the GME Handbook. This claim is not within the purview of Human Resources but rather should be addressed through the GME Office (which I understand from Barry Kamin has already taken place). Human Resources cannot take any further action with respect to your complaint, and the file on this matter will be closed.

Sincerely,

Jonathan A Rothstein
Director, Employee/Labor Relations
JAR/ct

cc:     Terry Solem
        Barry Kamin