IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DR. MARIA ARTUNDUAGA, <br><br> Plaintiff, <br><br> v. <br><br> THE UNIVERSITY OF CHICAGO MEDICAL CENTER, <br><br> Defendant. | No. 12 C 8733 <br><br> Judge Amy J. St. Eve <br> Magistrate Judge Sidney I. Schenkier |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION TO BAR, OR IN THE ALTERNATIVE LIMIT, THE OPINIONS AND TESTIMONY OF PLAINTIFF'S DAMAGES EXPERT DR. MARK R. KILLINGSWORTH**

Defendant, The University of Chicago Medical Center ("UCMC"), hereby submits its Memorandum in Support of Its Motion to Bar, or, In The Alternative Limit, the Opinions and Testimony of Plaintiff's damages expert Dr. Mark R. Killingsworth ("Killingsworth") under Federal Rules of Evidence 702 and 403. In support, UCMC states as follows:

**I.  FACTUAL BACKGROUND**

**A.  Plaintiff's Education and Employment**

Plaintiff was born and graduated from medical school in Colombia. (Plaintiff's Response to Defendant's Local Rule 56.1 Statement of Material Facts (SOFR) ¶ 3 (Dkt. No. 87); 1/8/2016 Deposition of Maria Artunduaga ("Pl. Dep2.") 90 (Exhibit 1); Pl. Dep2. Exs. 1, 35 (Exhibit 2). Thereafter, she served as a general practitioner "in the mountains of Colombia" and as an emergency-physician in a "second-level regional hospital" in Colombia from 2004-2007. (Pl. Dep2. 90; Pl. Dep2. Ex. 1, 35). From 2007 to May 2011 she did post-doctoral research at Harvard Medical School. (SOFR ¶ 3).

1

Plaintiff began her residency at UCMC in June 2011 and signed a one year residency contract. (Pl. Dep2. 11-12, 14; Pl. Dep2. Ex. 2). The duration of the complete UCMC residency program was six years. (SOFR ¶¶ 6, 14). She was placed on probation and UCMC's Plastic and Reconstructive Surgery (PRS) section ultimately did not renew her contract for a second year in the residency program. (SOFR ¶¶ 49, 76-77).

In 2012, Plaintiff applied unsuccessfully to various non-UCMC residency programs in several specialties. (Pl. Dep2. 72-73; 4/2/14 Deposition of Maria Artunduaga (Pl. Dep.) 288-89 (Exhibit 3)). In 2014, Plaintiff enrolled in a public health masters ("MPH") degree program at The University of Washington, and she graduated in August 2016. (Pl. Dep. 290-91; MA 13914 (Exhibit 4)). After graduation from the MPH program, she entered a dual Master's in Translational Medicine ("MTM") Program at the University of California, Berkeley (with a focus in "bioengineering and entrepreneurship") and Master's in Translational Medicine, Clinical Needs program, at the University of California, San Francisco, which she still attends. (Plaintiff's LinkedIn CV (MA 13915-25 (at Exhibit 4); Pl. Sec. Supp. Ans. to Def. First Interrog. No. 4 (Exhibit 5)[1].

### B. Plaintiff's Stated Career Goals

In applying to various residency and health related graduate education programs, Plaintiff repeatedly has stated her career desire to provide treatment for craniofacial anomalies in Colombia. For example, in her 2010 application to UCMC's residency program, Plaintiff stated that her "ultimate career goal is to serve people who suffer from craniofacial anomalies by creating a treatment and research center in her home country." (11/30/15 Declaration of Dr. Maria Artunduaga ("MA Dec.") ¶ 1, Ex. A (Exhibit 6)). In applying to other residency programs

---

[1] A portion of Exhibit 5 is redacted, in part (provisionally filed under seal) pending court approval to file under seal.

2

in 2012, Plaintiff stated that she "wish[ed] to return to Colombia to set up a treatment and research center for congenital anomalies." (Pl. Dep2. 73-74, 90; Pl. Dep2. Ex. 27 (MA 1433-35), 35 (MA 3266)). And, in her 2013 MPH program applications, Plaintiff stated that "[t]en years from now, I see myself leading a successful surgical practice in a children's hospital in Colombia[.]" (Pl. Dep2. 111, Ex. 41 (MA 8400)).

## II. PLAINTIFF'S DAMAGES CLAIMS

On October 31, 2012, Plaintiff sued UCMC over her termination from its residency program. (Dkt. No. 1, 35). Only two claims remain for trial – whether UCMC discriminated against Plaintiff based on her national origin or retaliated against her for allegedly making claims of national origin discrimination in violation of Title VII. (Dkt. No. 101). Plaintiff's prayer for relief under Title VII seeks damages for "loss of income" and damage to reputation. (Dkt. No. 35 (Count IV (¶ 119); Count VI)).

## III. AVAILABLE MONETARY REMEDIES

A successful plaintiff under Title VII may be entitled to back pay and front pay (in lieu of reinstatement) and to compensatory damages for future pecuniary losses, *i.e.* "lost future earnings." *See* 42 U.S.C. § 2000e-5(g)(1); *Williams v. Pharmacia*, 137 F.3d 944, 951-52 (7th Cir. 1998).

### A. Front Pay

Front pay is an equitable remedy awardable by the Court as it deems appropriate where reinstatement is unavailable or not advisable because of "workplace incompatibility." *Shick v. Ill. Dept. of Human Servs.*, 307 F.3d 605, 614 (7th Cir. 2002); *Williams*, 137 F.3d at 951-52. It is the "functional equivalent of reinstatement because it is a substitute remedy that affords the plaintiff the same benefit (or as close an approximation as possible) as the plaintiff would have received had she been reinstated." *Williams*, 137 F.3d at 952. Front pay is "only designed to

3

compensate a plaintiff for the lost earnings from his old job for as long as he may have been expected to hold it," and the front pay remedy "terminates" at the time the plaintiff's employment relationship with the defendant would otherwise have ended. *Shick*, 307 F.3d at 614. A "front pay award gives the [plaintiff] the present value of the earnings from her old job less the earnings from her new (or expected) job." *Williams,* 137 F.3d at 954; *see Biondo v. City of Chi., Ill.*, 382 F.3d 680, 691 (7th Cir. 2004).

### B. Lost Future Earnings

By contrast, lost future earnings is a common law tort remedy that "compensates the plaintiff for the diminution in expected earnings in all of her future jobs for as long as the reputational or other injury may be expected to affect her [future earnings] prospects." *Williams*, 137 F.3d at 954. Lost future earnings damages "compensate[s] [the plaintiff] for a lifetime of diminished earnings resulting from the reputational harms she suffered as a result of [the defendant's] discrimination." *Williams*, 137 F.3d at 953; *see also* 7th Cir. Pattern Civil Jury Instruction 3.10 (2015). Under general tort principles applicable to Title VII, "a plaintiff may only recover damages proximately caused by the defendant's conduct." *Shick*, 307 F.3d at 615. An award of damages for lost future earnings is subject to the $300,000 compensatory damages cap under Title VII and is for the jury to determine. *Williams*, 137 F.3d at 947-48; *Bennett v. Smith*, No. 96 C 2422, 2001 WL 717490, at * 3 (N.D. Ill. June 25, 2001).

### IV. PLAINTIFF'S EXPERT

Plaintiff intends to call Dr. Mark R. Killingsworth at trial to testify about Plaintiff's "lost earnings" damages. (8/31/15 Report of Dr. Mark R. Killingsworth ("First Rpt.") ¶ 1 (in full at Exhibit 7, 12/7/2015 Rebuttal Report of Dr. Mark R. Killingsworth ("Rebuttal Report") in full at

4

Exhibit 8); Deposition of Dr. Mark R. Killingsworth ("MK Dep.") 42 (in full at Exhibit 9[2]), MK Dep. Exhibits in full at Exhibit 10). Killingsworth purports to estimate Plaintiff's "lost future earnings" from the time of her termination from the UCMC residency program through her alleged working life. (First Rpt. ¶¶ 1-2, 15). To do so, Killingsworth compares an estimate of what he asserts Plaintiff would have earned first as a resident, then as a fellow, and finally as a plastic surgeon practicing in the United States with what she in fact earned through 2015 and, then, what he projects her as earning going forward as a professional with an MPH in public health administration. (First Rpt. ¶¶ 1-15, Table 1). Killingsworth draws no distinction between front pay and lost earnings in his calculations.

As shown below, Killingsworth's testimony should be excluded with respect to both possible front pay and lost future income damages under Fed. R. Evid. 702.

V. Argument

    A. Standard for a Motion to Exclude Expert Testimony

Under Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), expert testimony is admissible only if the proffered expert witness: (a) is qualified to offer expert testimony on that subject; (b) has utilized a reliable methodology; (c) offers opinions that follow from application of his expertise; and (d) offers testimony that is relevant to the case and helpful to the trier of fact. *U.S. v. Lupton*, 620 F.3d 790, 798 (7th Cir. 2010); *Lewis v. Citgo Petroleum Corp.*, 561 F.3d 698, 704-05(7th Cir. 2009). In addition, the 2000 Advisory Committee's Notes on Rule 702 recommend that, in considering the relevance and reliability of proffered expert testimony, the Court considers "whether the expert has unjustifiably extrapolated from an accepted promise to an unfounded conclusion" and "whether the expert was

---

[2] A portion of testimony at page 55 is redacted, in part (provisionally filed under seal) pending court approval to file under seal.

CHICAGO/#2916372.8

adequately accounted for obvious alternative explanation." *Fuesting v. Zimmer*, 421 F.3d 528, 534-35 (7th Cir. 2005).

Expert testimony must be based upon sufficient facts or data. *Sys. Dev. Integration, LLC v. Computer Scis. Corp.*, 886 F.Supp.2d 873, 882 (N.D. Ill. 2012) (citing *Bielskis v. Louisville Ladder, Inc.*, 633 F.3d 887, 895 (7th Cir. 2011)) and an expert must perform an adequate investigation of relevant facts, including verifying information provided by a party or its counsel. *EEOC v. Rockwell Int'l Corp.*, 60 F. Supp. 2d 791, 797 (N.D. Ill. 1999). When expert opinions "are based upon assumptions that are unrealistic or unsupported by the record or leave the jury to speculate, they are not helpful to the jury and should be excluded." *Larson v. Wis. Cent., Ltd.*, Case No. 10-C-446, 2012 WL 359665, at * 2 (E.D. Wis. Feb. 2, 2012) (citation omitted) *Krocka v. City of Chicago*, No. 98 C 4644, 2011 WL 290399, at *2 (N.D. Ill. Mar. 22, 2001).

The trial court acts as a "gatekeeper" to ensure that expert testimony satisfies Rule 702, and the proponent of the expert testimony bears the burden of showing that Rule 702's requirements are met. *Lewis*, 561 F.3d at 705.

**B.     Dr. Killingsworth's Testimony Regarding Front Pay is Unhelpful and Not Based on Any Expertise**

Dr. Killingsworth's analysis and purported testimony is completely unnecessary for the calculation of any front pay award and, therefore, should be excluded. Front pay terminates when the plaintiff could no longer reasonably expect to work for the defendant because front pay compensates the plaintiff for the lost earnings she would have received had she been reinstated. *See Williams*, 137 F.3d at 954; *see also Garcia v. Sigmatron, Int'l, Inc.*, 130 F.Supp. 3d 1249, 1263 (N.D. Ill. 2015); *see also McKnight v. Gen. Motors Corp.*, 973 F.2d 1366, 1372 (7th Cir. 1992).

6

Here, Plaintiff's participation in UCMC's residency program was not guaranteed from one year to the next (Pl. Dep2. 11-12, 14; Pl. Dep2. Ex. 2 ¶¶ 1, 13), and the duration of the program was, at most, six years, ending in June 2017. (SOFR ¶¶ 6, 14). There is no factual basis to assume that Plaintiff would have received employment at UCMC, in any capacity, thereafter. (SOFR ¶¶ 6, 14) Plaintiff therefore would not be entitled to any front pay damages after June 2017. *See, e.g., Bennett*, 2001 WL 717490, at *2. Moreover, there will be no dispute as to the amount of compensation Plaintiff would have received between 2012 and the end of June 2017, as a resident's pay each academic year is set by contract prior to the beginning of the residency year. (Pl. Dep2. 11-12; Pl. Dep2. Ex. 2 ¶ 3). Therefore, there is no need for expert testimony as to the gross amount of earnings Plaintiff would have received from UCMC absent the nonrenewal of her contract.

Further, Killingsworth's testimony will be of no assistance in determining whether Plaintiff satisfied her duty to mitigate damages or in estimating the award of earnings she reasonably could have achieved as mitigation. *See McNeil v. Economics Lab, Inc.*, 800 F.2d 111, 118 (7th Cir. 1986); *Bielskisi*, 663 F.3d at 893-94. Killingsworth admitted that he has done nothing to determine what Plaintiff reasonably could have earned in alternative earnings from July 2012 through June 2017. (MK Dep. 8-9, 42-44, 56-59; MK Dep. Ex. 2). Indeed, Killingworth testified that he knew nothing of Plaintiff's mitigation efforts or work after her termination from UCMC other than as reflected in her 2013 and 2014 W2 forms. (MK Dep. 8-9, 43-44, 56-58; MK Dep. Ex. 2).

Accordingly, any testimony from Dr. Killingsworth regarding front pay through June 2017 is redundant of the record evidence, needlessly cumulative and will not assist the Court in determining what amount of front pay may be awardable. Killingsworth simply applies no

7

expertise in his calculation of front pay, and his testimony is therefore inadmissible under Rule 702. *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010); *United States v. Hall*, 93 F.3d 1337, 1343 (7th Cir. 1996); *Luxco, Inc. v. Jim Beam Brands Co.*, Case No. 14 C 0349, 2016 WL 4611385, at * 5 (N.D. Ill. Sept. 6, 2016); *Computer Scis. Corp*, 886 F.Supp.2d at 880; *see Schiller v. Schmidt, Inc. v. Nordisio*, 969 F.2d 410, 415 (7th Cir. 1992) (expert cannot simply function as a human calculator).

### C. Dr. Killingsworth's Testimony Regarding Lost Future Earnings is Speculative, Note Based on Record Fact or His Expertise

Killingsworth's testimony regarding lost future earnings also should be barred under Rule 702. As above discussed, to determine Plaintiff's "lost earnings," Dr. Killingsworth first calculated Plaintiff's purported lost earnings as a practicing plastic surgeon in the U.S. for each year starting in 2017 through 2052. (First Rpt. ¶¶ 5-7, 15). In doing so, Dr. Killingsworth relied on various assumptions provided by Plaintiff's counsel, including that Plaintiff intended to complete another five years of residency at UCMC and then complete a two year fellowship, and thereafter to work as a plastic surgeon in the United States through age 72. (MK Dep. 53-54, 58, 60-61; First Rpt. ¶¶ 1, 15, Table 1).

In determining how much Plaintiff could have earned, given her termination from the UCMC residency program, Dr. Killingsworth assumed, also based on Plaintiff's counsel's representation, that, because Plaintiff entered an MPH program, she intended thereafter to work in the field of public health in either an academic or a nonprofit setting. (First Rpt. ¶ 1;MK Dep. 106-07, 109).

Comparing the two estimated income streams as a plastic surgeon and as a public health professional, Killingsworth concluded that Plaintiff's "total cumulative loss" was approximately $9.5 million. (First Rpt. ¶¶ 1-15).

8

To reach his conclusion, Killingsworth had to make many factual assumptions, including that Plaintiff would have (1) successfully completed the UCMC program in six years; (2) been admitted to and successfully completed a fellowship program in two years; (3) passed her licensing exams; (4) found a lucrative job as a plastic surgeon in the United States; (5) held that job continuously until her retirement at age 72; and (6) would have only considered working as a public health official after her UCMC residency contract was not renewed. (First Rpt. ¶¶ 1, 2). Killingsworth did nothing to test these assumptions given him by Plaintiff's counsel or to determine if there was any record support for them.[3] Nor did he express any independent opinion on them such as whether Plaintiff would be successful in pursuing her medical career or at what age she would stop practicing. For example, he admitted that he had no idea about Plaintiff's likelihood of completing a residency, much less the complete UCMC residency program, or being admitted to a fellowship. (MK Dep. 58-59). He also expressed no opinion as to when Plaintiff would likely retire (MK Dep. 122-24). Dr. Killingsworth also did not consider many facts in the record that might bear upon his estimation of lost earnings, including Plaintiff's repeated stated intention to return to Colombia to practice as craniofacial plastic a surgeon there, although he admits that he would have wanted related pay data for such a position if Plaintiff planned on that career path.[4] (*See* MK Dep. 54-55, 88-89; MK Dep. Ex. 5) Moreover, Killingsworth's assumption that Plaintiff would pursue a public health administration career

---

[3] Indeed, he only reviewed a few pages of the record in total – two of her W2s and the summary judgment memoranda and opinion. (MK Dep. 42-44, 49-51, 57; MK Dep. Ex. 2).

[4] In his Rebuttal Report, Killingsworth did cite a declaration signed by Plaintiff on November 30, 2015, in which Plaintiff stated that as of June 2011, she "no longer planned on returning to Colombia," leading him to conclude that as of 2012 Plaintiff "clearly intended to practice medicine in the United States." (Rebuttal Report ¶¶ 7-8; MA Dec. ¶ 3, Ex. A). Nothing in the Rebuttal Report suggests that Killingsworth evaluated any documentation other than Plaintiff's self-serving declaration.

9

CHICAGO/#2916372.8

(provided by Plaintiff's counsel (First Rpt. ¶ 1)) is already refuted by her enrollment in the MTM program rather than embark on a public health career.

In addition, Dr. Killingsworth did not apply his expertise as a labor economist in deciding to rely on these assumptions. For instance, he admitted that he did not consider Plaintiff's earning potential in any other career. (MK Dep.54-55, 84-89, 108-09). Nor did he take into account Plaintiff's medical degree and past experience in estimating her future earnings capacity outside of plastic surgery. (MK Dep. 50-51, 58-59, 106-08; First Rpt. ¶¶ 1-15). To the contrary, he disclaimed the expertise to do so, testifying that he is "not a vocational counselor [] or a career counselor [and does not] have expertise in saying this person could get this or that job or is qualified for this or that job." (MK Dep. 110-11.

Where, as here, an expert's testimony is based on speculative extrapolation and unsupported assumptions, such testimony is unhelpful to a jury and should be excluded. *See Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010); *Manpower, Inc. v. Insurance Co. of Penn.*, 732 F.3d 796, 806 (7th Cir. 2013); *Fuesting v. Zimmer*, 421 F.3d at 536; *Luxco, Inc. v. Jim Beam Brands*, 2016 WL 4611385, at * 5; *Castrillon v. St. Vincent Hosp. & Health Care Ctr. Inc.*, 11–cv–430, 2015 WL 3448947 at *2-*3 (S.D. Ind. May 29, 2015); *Consolmagno v. Hosp. of St. Raphael Sch. of Nurse Anesthesia*, 72 F. Supp. 3d. 367, 384–85 (D. Conn. Dec. 18, 2014); *Christou v. Arlington Park-Washington Park Race Tracks Corps.*, 432 N.E.2d 920, 922-23 (Ill. App. Ct. 1982). In addition, his failure to consider alternative assumptions about possible careers and earnings for Plaintiff undermines the reliability and probative value of his testimony. *See Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 434 (7th Cir. 2013); *Roy v. Austin Co.*, 94 C 740, 1998 WL 544411, at *2-3 (N.D. Ill. Aug. 25, 1998).

This is not an instance where the expert's conclusions are based on an assumption drawn from disputed facts, in which case it would be for the jury to decide the questions of fact, including the reasonableness of the expert's assumptions in light of the facts. Nor is it a case of the expert considering and rejecting an assumption using his expertise to do so. Rather, this is a situation in which Killingsworth's extrapolations are not based on established facts, are entirely speculative and not based on any application of his expertise. All that connects the undisputed fact of Plaintiff's termination from UCMC's residency program and Killingsworth's conclusion as to her estimated lost earnings is his own *ipse dixit*. This is insufficient to satisfy Rule 702. *Id*.

      **D.**    **In the alternative, Dr. Killingsworth's testimony should be excluded Under Rule 403**

Even if this Court declines to bar Killingsworth's testimony under Rule 702, the Court should do so under Fed. R. Evid. 403 because its probative value is substantially outweighed by a danger of "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." *United States v. Redwood*, No. 16 CR 80, 2016 WL 6124451, at *3 (N.D. Ill. Oct. 20, 2016) (St. Eve, J). "[A] trial judge has a responsibility to screen expert evidence for reliability and to determine the total effects of proposed evidence, weighing its probative value against its potential to (among other things) confuse the jury." *United States v. Schiro*, 679 F.3d 521, 529 (7th Cir. 2012). If evidence would induce jurors to "decide the case on an improper basis, [commonly an emotional one], rather than on the evidence presented," then the evidence is unfairly prejudicial. *Thompson v. City of Chi.*, 472 F.3d 444, 456-57 (7th Cir. 2006) (citing *United States v. Connelly*, 874 F.2d 412, 418 (7th Cir. 1989)).

11

The Plaintiff has the burden of proving her damages to a reasonable degree of certainty. *Pearson v. Welbaum*, 471 F.3d 732, 744 (7th Cir. 2006). To be entitled to a "lost earnings" remedy, the plaintiff has to establish that defendant's discriminatory action was the proximate cause of her lost earnings damages. *Shick*, 307 F.3d at 614-15. Here, Dr. Killingsworth's conclusions are too speculative to support any expert conclusion that Plaintiff suffered any specific amount of lost earnings on account of the nonrenewal of her residency contract. Moreover, as shown above, Killingsworth's estimate of "lost earnings," in fact, is not a product of an application of his expertise to record fact. Under these circumstances, there is simply too great a danger that Killingsworth's proffered testimony would confuse the jury and lead it erroneously to conclude that Killingsworth's analysis satisfies the causal effect requirement to entitle Plaintiff to lost earnings damages. Furthermore, even though compensatory damages are capped at $300,000.00, the extraordinary size of Killingsworth's calculation is likely to improperly influence the jury. Thus, Killingsworth's testimony should be excluded under Federal Rule of Evidence 403.

Even if this Court does not bar Killingsworth's testimony regarding his estimates of what Plaintiff could have earned as a plastic surgeon, or, in the alternative, a public health administrator, this Court should bar Killingsworth from testifying or labeling his estimates as being estimates of "lost earnings" and not allow any testimony as to his estimate of "lost earnings" or that Plaintiff's termination from the residency program caused any lost earnings.

## VI. CONCLUSION

For the foregoing reasons, UCMC moves the Court to bar the admission at trial of the testimony and report of Plaintiff's damages expert, Dr. Mark Killingsworth, under Rule 702, or, in the alternative, under Rule 403 as above discussed.

Dated: November 18, 2016　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　　THE UNIVERSITY OF CHICAGO
　　　　　　　　　　　　　　　　　　　　　MEDICAL CENTER


　　　　　　　　　　　　　　　　　　　　　By:　　s/ Elizabeth N. Hall
　　　　　　　　　　　　　　　　　　　　　　　　　One of Its Attorneys

Edward C. Jepson, Jr.
Elizabeth N. Hall
Vedder Price P.C.
222 North LaSalle Street
Chicago, Illinois 60601
T:  +1 (312) 609 7500

13

CHICAGO/#2916372.8

**CERTIFICATE OF SERVICE**

I, the undersigned, certify that a true and correct copy of the foregoing document, DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION TO BAR, OR IN THE ALTERNATIVE LIMIT, THE OPINIONS AND TESTIMONY OF PLAINTIFF'S DAMAGES EXPERT DR. MARK R. KILLINGSWORTH, was served on November 18, 2016 via the Court's CM/ECF system on the following:

Jamie S. Franklin
The Franklin Law Firm LLC
53 W. Jackson Boulevard, Suite 803
Chicago, IL 60604
jsf@thefranklinlawfirm.com

Cynthia H. Hyndman
Robinson, Curley & Clayton, P.C.
300 South Wacker Drive, Suite 1700
Chicago, IL 60606
chyndman@robinsoncurley.com

    s/ Elizabeth N. Hall
    Elizabeth N. Hall

CHICAGO/#2916372.8