**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DR. MARIA ARTUNDUAGA, | ) | |
| | ) | |
| *Plaintiff,* | ) | Case No. 12-cv-08733 |
| | ) | |
| v. | ) | Judge Amy J. St. Eve |
| | ) | Magistrate Judge Sidney I. Schenkier |
| THE UNIVERSITY OF CHICAGO | ) | |
| MEDICAL CENTER, | ) | |
| | ) | |
| *Defendant.* | ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO**
**DEFENDANT'S MOTION *IN LIMINE* TO**
**EXCLUDE EVIDENCE, TESTIMONY, AND**
**ARGUMENT REGARDING IMPROPER "COMPARATORS"**

Plaintiff Dr. Maria Artunduaga, by her attorneys, files this Response in Opposition to Defendant's Motion *in Limine* to Bar Evidence, Testimony, and Argument Regarding Improper "Comparators." In support thereof, Plaintiff states as follows:

1. Defendant The University of Chicago Medical Center ("UCMC") seeks to bar Plaintiff from introducing testimony, evidence or argument regarding other UCMC residents that UCMC maintains are not proper comparators to Dr. Artunduaga *See* Dkt. 176 at 1.

2. A well-established method for a plaintiff to show that she has been the victim of discrimination or retaliation is to compare herself to other similarly-situated employees not in her protected class who were afforded more favorable treatment by her employer than she. *See Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012). "All things being equal, if an employer takes an action against one employee in a protected class but not another outside that class, one can infer discrimination." *Filar v. Bd. of Educ. of City of Chicago*, 526 F.3d 1054, 1061 (7th Cir. 2008).

3.     Whether a comparator is similarly situated is a question for the fact-finder – here the jury – to determine.  *Coleman*, 667 F.3d at 846.  This inquiry should be a "'common-sense,' factual" one:  "essentially, are there enough common features between the individuals to allow a meaningful comparison?"  *See Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007).  There is no "magic formula" for determining whether employees are comparable and the inquiry does not require a "one-to-one mapping between employees."  *Id.*

4.     Plaintiff intends to introduce exhibits and testimony regarding the performance of three residents in the UCMC General Surgery program, each of whom was placed on probation by the General Surgery Program Director at the applicable time – either Dr. Mitchell Posner or Dr. Kevin Roggin.[1]  Dr. Posner and/or Dr. Roggin worked with these residents while they were on probation and each of them eventually completed the residency program.  *See* Dkt. 176-2 (filed under seal).

5.     UCMC argues that these particular residents are not proper comparators to Dr. Artunduaga because:  (1) they were General Surgery residents and Dr. Artunduaga was a PRS resident; (2) they reported to either Dr. Posner or Dr. Roggin and Dr. Artunduaga reported to Dr. Song; (3) either Dr. Posner or Dr. Roggin made the decisions to put these residents on probation and Dr. Song made the decision to put Dr. Artunduaga on probation; (4) either Dr. Posner or Dr. Roggin made the decision that these residents successfully completed their probation and Dr. Song (and/or PRS attendings) made the decision that Dr. Artunduaga had not successfully completed her probation; and (5) these residents were in different program years than Dr. Artunduaga when they were placed on probation.  *See* Dkt. 176 at 3-5.

---

[1]     Dr. Posner served as the Program Director for UCMC's General Surgery Program from sometime in 2004 until October 2011; Dr. Roggin became Program Director on October 1, 2011.

6. But the evidence the jury will hear at trial will establish sufficient common features to allow a meaningful comparison. *See Humphries*, 474 F.3d at 405. First, in Dr. Artunduaga's first year of residency, the PRS residency program at UCMC was part of what was called a combined program. *See* Deposition of Sara Dickie, attached as Exhibit A, at 14:20-15:21, 19:6-11. That meant that PRS residents spent their first three years under UCMC's General Surgery Program. *See id.* at 18:2-11. Dr. Posner – as the General Surgery Program Director at the time Dr. Artunduaga began her residency at UCMC – signed Dr. Artunduaga's residency contract. *See* Deposition of Mitchell Posner, attached as Exhibit B at 7:3-24. As a resident in the PRS combined residency program, Dr. Artunduaga's primary responsibilities for the first year were to the General Surgery program and she would report to Dr. Posner, the General Surgery Program Director (and then to Dr. Roggin, who replaced him). *See* Exh. A at 19:12-20:21.

7. Dr. David Song was the Program Director for the PRS residency program. Exh. A at 22:12-18. He made the decision to put Dr. Artunduaga on probation and was involved in the decision to terminate her from the PRS residency program. Dkt. 176 at 1-2. He did not consult with either Dr. Posner or Dr. Roggin when making those decisions. *See* Exh. B at 27:13-20; Deposition of Kevin Roggin, attached as Exhibit C at 82:11-14, 102:4-6.

8. While UCMC contends that the fact that Dr. Song – and not Dr. Posner or Dr. Roggin – made the decisions at issue dooms her use of the comparators who were put on probation by Dr. Posner and Dr. Roggin, that is not the case. The evidence at trial will also be that Dr. Posner had spoken in the past to Dr. Song about how he generally handled situations where residents were struggling and had issues with their performance. *See* Exh. B at 23:23-24:18. Furthermore, after Dr. Roggin became the General Surgery Program Director, he often

sought Dr. Posner's counsel about how to handle situations such as the one involving Dr. Artunduaga. *Id.* at 28:13-29:11. Both Dr. Posner and Dr. Roggin had a general policy of helping residents who were struggling. *See id.* at 40:12-19; Exh. C at 25:12-18, 89:10-24.

9. Plaintiff will also introduce testimony that Dr. Song had no intention of helping Dr. Artunduaga with what he believed to be her performance problems and, in fact, told her from the start that she would not pass her probation. *See* Deposition of Maria Artunduaga, attached as Exhibit D at 154:1-155:12, 170:21-171:7. *See also* Dkt. 101 at 24 (citing Dr. Song's statements regarding the likelihood of Dr. Artunduaga passing her probation as evidence of pretext). Based on this evidence, Plaintiff will be entitled to argue, and the jury will be entitled to believe, that Dr. Song intentionally did not consult with Dr. Posner or Dr. Roggin – who after all were Dr. Artunduaga's actual supervisors her first year – about how to handle Dr. Artunduaga's perceived performance issues because he knew they had policies and reputations of helping residents who were struggling. The jury will be entitled to believe that had either Dr. Posner or Dr. Roggin been consulted, Dr. Artunduaga could very well have been afforded more favorable treatment, as were the three residents Dr. Artunduaga has offered as comparators, and she could very well have passed her probation and remained in the program.

10. With respect to whether the comparators engaged in similar conduct as Dr. Artunduaga, that again is for the fact-finder to determine. *Coleman*, 667 F.3d at 846. Resident A was dealing with communication and confidence issues, often appeared overwhelmed, and on one occasion had an incident with a patient that led to the patient requiring "substantial resuscitation." *See* Dkt. 176-2 (under seal) at UCMC 27251, 27257, 27265. Resident B had issues getting along with nurses, had poor communication skills, and lacked medical knowledge. *See* Dkt. 176-2 (under seal) at UCMC 23663-64. Resident C exhibited a below average

4

knowledge base that affected clinical judgment and ability to make decisions on both complex and routine clinical issues. *See* Dkt. 176-2 (under seal) at UCMC 25073, 25077. These are many of the same issues raised with Dr. Artunduaga at the time she was placed on probation. *See* UCMC 30392-3, attached as Exhibit E (citing need to effectively communicate with faculty and staff and make appropriate clinical decisions).[2] Based on this evidence, the jury could reasonably conclude that UCMC treated other residents with similar perceived performance problems more favorably than Dr. Artunduaga.

11.     There are more than "enough common features between the individuals to allow a meaningful comparison" between Dr. Artunduaga and the three comparator residents. *See* *Humphries*, 474 F.3d at 405. Therefore, UCMC's Motion seeking to bar this evidence should be denied.

Respectfully submitted,

**DR. MARIA ARTUNDUAGA**

By:     /s/ Cynthia H. Hyndman
        One of her Attorneys

Jamie S. Franklin (ARDC # 6242916)
THE FRANKLIN LAW FIRM LLC
53 W. Jackson Blvd., Ste. 803
Chicago, IL 60604
(312) 662-1008
(312) 662-1015 (fax)
jsf@thefranklinlawfirm.com

---

[2]     As to UCMC's contention that these residents are not proper comparators because they were not in their first program year as residents, see Dkt. 176 at 4-5, the jury would be entitled to believe that residents with more seniority would be expected to perform better than first year residents and that issues regarding lack of medical knowledge and difficulty making clinical judgment are more egregious as a resident gains experience.

5

Cynthia H. Hyndman
ROBINSON CURLEY & CLAYTON, P.C.
300 South Wacker Dr., Ste. 1700
Chicago, IL 60606
(312) 663-3100
(312) 663-0303 (fax)
chyndman@robinsoncurley.com

## CERTIFICATE OF SERVICE

I, the undersigned, as additional Counsel for Plaintiff, certify the foregoing document, **Plaintiff's Response in Opposition to Defendant's Motion *in Limine* To Bar Evidence, Testimony and Argument Regarding Improper "Comparators,"** was served by electronic mail on December 2, 2016 on the following persons:

> Edward C. Jepson
> Elizabeth N. Hall
> Emily C. Fess
> VEDDER PRICE, P.C.
> 222 N. LaSalle Street
> Suite 2600
> Chicago, IL 60601
>
> Jamie S. Franklin
> THE FRANKLIN LAW FIRM LLC
> 53 W. Jackson, Boulevard
> Suite 803
> Chicago, IL 60604

/s/Cynthia H. Hyndman

Exhibit A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

--------------------------------------------------------

Maria Artunduaga,


       Plaintiff,


   vs.                 Case Number 1:2012cv08733


The University of Chicago Medical Center and David

Song,


       Defendants.

--------------------------------------------------------

Deposition of Sara R. Dickie

Tuesday

April 1st, 2014



-at-



Axia Law, LLC

1 North LaSalle Street

Suite 1450

Chicago, Illinois

```
 1        A.    Yes.

 2        Q.    And he was the chief when you left, correct?

 3        A.    Yes.

 4        Q.    Okay.  Do you know when he became chief?

 5        A.    I think it was the year before I came, but

 6   I'm not 100 percent sure.  It was either the year

 7   before that or the year before.

 8        Q.    Okay.  So the year before you came, which was

 9   '05, or the year before that --

10        A.    Right.

11        Q.    -- which was '04?

12        A.    '04.  It was either '04 or '05.

13        Q.    Do you know how many years after Dr. Song

14   completed his residency that it was before he became

15   chief?

16        A.    No.                                    0:11:22

17        Q.    Do you know if he's still chief of the

18   section?

19        A.    Yes.  He is.

20        Q.    Now are you familiar with the terms combined

21   and integrated residencies?

22        A.    Yes.

23        Q.    Can you explain the difference between those

24   two?

25        A.    The combined residency was when -- where the
```

```
 1   residents spent a portion of the time with another

 2   specialty or subspecialty, in our case, general

 3   surgery, and a part of the time, usually their -- their

 4   senior years, with plastic surgery.  Integrated

 5   residencies are residencies in which the entire course

 6   of the academic career is under the guise of one

 7   specialty, so in this case, plastic surgery.

 8        Q.   And what was the University of Chicago's

 9   plastic surgery residency?  Which -- which of those two

10   types was it while you were there?

11        A.   So it began as a combined program.  I was a

12   -- considered a combined resident.  While I was a

13   chief, we were in the process of transitioning into an

14   integrated program.  We were attempting to -- to, at

15   least from a chief -- administrative chief resident

16   standpoint, create some teaching and didactics aimed

17   toward the junior residents, but at that point, I

18   believe they were still considered combined residents

19   until the year following that.  And they -- we were

20   officially integrated, and that was the year after I

21   graduated.

22        Q.   Okay.  When you were a sixth year resident,

23   were you a chief resident?

24        A.   Yes.                               0:13:05

25        Q.   And your -- as I understand it, there are two
```

Exhibit 5, LLC

```
 1   our -- our teaching sessions.

 2       Q.   When it was -- when the program was a

 3   combined program, as I understand -- do I understand it

 4   correctly that the first three years of the residency

 5   would be under general surgery?

 6       A.   Yes, and so you, as a resident or an intern,

 7   would attend all of their didactic teaching sessions,

 8   their morbidity and mortality report, their

 9   conferences, and only the chief residents or the four,

10   five, and six year would attend the plastic surgery

11   teaching sessions, M&M, that sort of thing.

12       Q.   Could one, two, and three years go to the

13   plastic surgery teaching sessions?

14       A.   If they were available from a work

15   standpoint, they were always invited.

16       Q.   Okay.  Do you know whose decision it was to

17   switch to the combined program -- I mean, sorry, to the

18   integrated program?

19       A.   I don't know whose decision it was.        0:16:19

20       Q.   Were you one of the people who made the

21   decision to do that?

22       A.   No.

23       Q.   You're acquainted with Dr. Artunduaga, aren't

24   you?

25       A.   Yes.
```

```
 1        Q.    Okay.  And she was a first year resident in

 2   2011, right?

 3        A.    Yes.

 4        Q.    And is that -- she was called an intern?

 5        A.    Yes.

 6        Q.    Okay.  So when Dr. Artunduaga began the

 7   residency program, she was considered a combined

 8   resident, correct?

 9        A.    Yes.

10        Q.    Or do you know?

11        A.    I think she was.

12        Q.    Okay.  So did she report to the chief of

13   surgery or the chief of plastic surgery?  General

14   surgery or plastic surgery?

15        A.    So I -- if she was -- she was combined, which

16   I believe she was, she would report to Mitchell Posner,

17   who is the chief of general surgery.

18        Q.    So you think she reported to Dr. Posner and

19   not Dr. Song during her year at U of C?

20        A.    Well, I think -- I mean she reported to -- to

21   both, I know she did.  But, in terms of primary

22   responsibilities, in terms of being a resident or an

23   intern and being on a certain medical team, she -- her

24   primary responsibilities were to the general surgery

25   team that she was with.  So if she was on a general
```

```
 1   surgery rotation, she was -- would report to Mitchell

 2   Posner.

 3       Q.   Okay.  Dr. Posner was chief until, I believe

 4   August 2011 -- I mean, sorry, October 2011.  Does that

 5   sound right?

 6       A.   You know, I thought he was chief the whole

 7   year.  I --

 8       Q.   Oh, you did.  I'm sorry.

 9       A.   -- don't remember

10       Q.   I didn't mean to put words in your mouth.

11       A.   That's okay.

12       Q.   Do you know whether Dr. Roggin took over as

13   chief sometime during your last year there?

14       A.    I believe he did, but I don't -- I wasn't

15   involved in their --

16       Q.   Okay.

17       A.   -- politics.

18       Q.   So at some point -- so Dr. Artunduaga --

19   Artunduaga, during her entire first year at U of C, her

20   only year at U of C, reported to Dr. Posner and

21   possibly later Dr. Roggin, correct?

22       A.   Yes.                                  0:18:25

23       Q.   Did Dr. Posner, and then later Dr. Roggin,

24   have a responsibility to -- well let me rephrase that.

25   So Dr. Artunduaga was going to teaching sessions and
```

```
 1  confused by the terminology.  S, forgive me, but what
 2  is an attending?
 3       A.   An attending is the -- a chief physician with
 4  admitting privileges at the university hospital.
 5       Q.   Would that be someone who would be considered
 6  a professor of whatever the discipline was?
 7       A.   It depends on what their academic appointment
 8  is.  Some -- most of them are professors, some are
 9  assistant professor.
10       Q.   Are you an attending?
11       A.   I am.                                   0:20:26
12       Q.   During the time that Dr. Artunduaga was in
13  the residency program, we're talking about -- June 2011
14  to June 2012, who was -- Dr. Song was the chief of the
15  residency program for plastics, correct?
16       A.   Mm-hmm.
17       Q.   Okay.
18       A.   Yes.
19       Q.   Was there an assistant chief or an assistant
20  program director?
21       A.   Julie Park was the assistant program
22  director, and I think she might have shared that with
23  Ginard Henry.
24       Q.   Julie Park was an attending?
25       A.   Yes.
```

Exhibit B

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

COUNTY DEPARTMENT, LAW DIVISION

--------------------------------------------------------

Maria Artunduaga,


            Plaintiff,


      vs.                        Case Number 2014-L-008678


David Song and The University of Chicago Medical

Center,


            Defendants.

--------------------------------------------------------

Deposition of Mitchell Posner

Friday

September 25th, 2015



-at-



The Franklin Law Firm

53 West Jackson Boulevard

Suite 803

Chicago, Illinois

```
 1      A.   It looks like the standard contract that we

 2 provide to our trainees.

 3      Q.   All right.  And on the first page, which is

 4 UCMC 5120, down there at the bottom, you'll see this is

 5 -- would you agree this is the resident fellow contract

 6 for Dr. -- Dr. Artunduaga?

 7      A.   Yes.

 8      Q.   Okay.  And it indicates that the -- the

 9 program's name that she was -- that she was under

10 contract for was general surgery, plastic surgery

11 track, correct?

12      A.   That's what it says here, yes.

13      Q.   And that you were the program director, Dr.

14 Mitchell Posner, correct?

15      A.   Yes.                              0:05:30

16      Q.   Okay.  If you could just flip to the very

17 last page of the contract, where we have the

18 signatures.  You see -- do you see there that Dr.

19 Artunduaga signed in the first line, as resident

20 fellow?

21      A.   Yes.

22      Q.   And is that your signature in the line for

23 program director?

24      A.   I recognize it, yes.

25      Q.   Okay.  Thank you.  And then under that, we
```

```
 1   about Dr. Artunduaga's concerns?

 2       A.   Not that I recall.                        0:25:12

 3       Q.   Do you have a close working relationship with

 4   Dr. Song?

 5       A.   Yes.  We care for -- in many instances, we --

 6   we have -- we care for patients together, since what I

 7   do, in many instances, I need his assistance for some

 8   of the operations I do, and yeah, I know him as a

 9   friend and as a colleague, so.

10       Q.   Okay.  Now with respect to Dr. Roggin, when

11   you were transitioning from -- when he was taking over

12   your role as program director, do you recall whether he

13   ever talked to you about -- particularly about Dr.

14   Artunduaga?

15       A.   I'm -- as I mentioned, I -- I'm -- I'm sure

16   he did, but the specifics of that, I don't recall at

17   all.

18       Q.   Okay.  Do you remember whether he ever

19   mentioned meeting with Dr. Artunduaga?

20       A.   I would expect that he mentioned that,

21   because of the issues going on, that he would meet with

22   her.

23       Q.   Do you remember if you gave him any advice

24   about what he might want to do with respect to Dr. --

25   Dr. Artunduaga?
```

```
 1      A.   I don't recall specifically about what he

 2   said, at that time.  I know that, in the past, I

 3   probably told him how I might handle similar

 4   situations, where -- from whoever's perspective, if

 5   someone wasn't performing at a certain level, how we --

 6   at least how I thought about it.

 7      Q.   So you -- you don't remember specifically

 8   telling him that, but that's the general type of

 9   information you think you would have told him?

10           MR. JEPSON:  I object to the form --

11      Q.   Is that -- is that how you're -- is that your

12   testimony?

13           MR. JEPSON:  I'm going to object to the form

14   of that question.  Lack of foundation.

15      A.   I -- as I mentioned, I -- you know, when we

16   had issues with resident performance, I probably

17   mentioned to him how I thought about handling those

18   things.

19      Q.   Okay.  Let me -- let me mark another Exhibit

20   for us to look at.  It's two pages, they're not

21   stapled.  Let me actually clip them.

22           WITNESS:  Oh.  Thank you.              0:28:05

23      Q.   All right.  So please take a look at Exhibit

24   5.  These are two sheets of paper, UCMC 22833 and UCMC

25   22832.  And if you wouldn't mind starting with the
```

Exhibit 5, LLC

```
 1  were also at this meeting, correct?

 2       A.   Yes.

 3       Q.   Do you recall specifically being at this

 4  meeting?

 5       A.   No.

 6       Q.   And again, there's a discussion, under

 7  miscellaneous, of some topics that were discussed,

 8  right?

 9       A.   Yes.

10       Q.   And do you remember if Dr. Artunduaga was

11  discussed at this meeting?

12       A.   I don't have -- no recollection.

13       Q.   Okay.  Do you remember Dr. Song ever

14  consulting with you about whether to place Dr.

15  Artunduaga on probation?

16       A.   Not that I recall.

17       Q.   Okay.  Do you remember if Dr. Song ever

18  consulted with you about deciding not to renew Dr.

19  Artunduaga's contract for the second year?

20       A.   Not that I specifically recall.

21       Q.   Okay.  And do you recall ever speaking with

22  Dr. Song about the decision to remove her from clinical

23  duties?

24       A.   I -- I don't recall if Dr. Song talked to me

25  about that or not.
```

```
 1      Q.   Okay.  Do you remember ever talking with Dr.

 2  Song about the decision to reinstate her to clinical

 3  duties?

 4      A.   I don't recall that conversation.

 5      Q.   Let me mark another document, while I still

 6  -- while we're getting those documents marked, just one

 7  more question.  Returning to my questions about the

 8  transition period, when Dr. Roggin took over as program

 9  director.

10      A.   Yes.

11           WITNESS:  Thank you.                    0:32:06

12           MR. JEPSON:  Thanks.

13      Q.   I asked you whether you recalled discussing

14  Dr. Artunduaga's issues.  Remember that question?

15      A.   I remember you asked a question --

16      Q.   Right.

17      A.   -- about these.

18      Q.   Just to make sure that I got -- I got the

19  right answer -- or got the answer, sorry, do you

20  remember specifically talking with Dr. Roggin about Dr.

21  Artunduaga's issues?

22      A.   As I stated, I don't recall a specific

23  conversation.  I -- I am certain he probably did, but I

24  can't recall.

25      Q.   Okay.  Why do you feel certain he probably
```

Exhibit 5, LLC

1  did talk to you about her?

2      A.   I know that Dr. Roggin, as I mentioned, I

3  think sought my counsel, because I had done this for so

4  many years, and I think someone who was beginning his

5  or her tenure would naturally speak to me about issues

6  like this, trying to query how I would have potentially

7  -- wanted to get my thoughts on it and how I might

8  potentially handle the situation.  And as I stated, I

9  think that -- I'm sure that he talked to me about it,

10  but I can't recall those discussions or what I

11  specifically said to him.

12      Q.   Okay.  Do you know what role Dr. Roggin had

13  with respect to Dr. Artunduaga's -- we'll just call it

14  her issues, whatever issues were going on with her?

15      A.   I don't know what -- I mean, I know that as

16  program director of general surgery --

17          MR. JEPSON:  I'm going to object to any

18  answers that are non-responsive.  Just answer the

19  question, please.

20          WITNESS:  Okay.                          0:33:50

21          MS. FRANKLIN:  I would ask you to not

22  interrupt the witness when he's answering one of my

23  questions, and I would ask --

24          MR. JEPSON:  I will, and I'll move to strike.

25          MS. FRANKLIN:  -- and I would ask the witness

```
 1   asked to resign?

 2        A.   I have no recollection of that.

 3        Q.   Okay.  Do you have any recollection of any

 4   problems that he was having with performance?

 5        A.   I think he well may have had trouble with --

 6   with his performance at certain periods of time.  I

 7   think that Dr. Roggin spent time with him and worked

 8   with him, but I don't -- if you ask me specifics of

 9   what those problems were, I don't recall.

10        Q.   Okay.  Did you ever have a resident who was

11   struggling performance-wise who -- you mentioned Dr.

12   Roggin may have worked with Dr. Salabat.  Was there

13   ever a resident that you, yourself, worked with to help

14   rehabilitate or -- or -- or assist with performance

15   problems?

16        A.   I think I worked with quite a few, yes.

17        Q.   Did you ever put any of your residents on a

18   performance improvement program?

19        A.   Yes.                                0:48:50

20        Q.   And what was such a program -- what -- what

21   kind of performance improvement programs did you -- did

22   you put residents on?

23        A.   It would depend on the situation.  In some

24   instances, it may have been, if their knowledge base

25   was poor, putting them on a remedial program to try to
```

Exhibit C

```
             IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

                 COUNTY DEPARTMENT, LAW DIVISION

    --------------------------------------------------------

    Maria Artunduaga,


              Plaintiff,


         vs.                        Case Number 2014-L-008678


    David Song and The University of Chicago Medical

    Center,


              Defendants.

    --------------------------------------------------------

                     Deposition of Kevin Roggin

                            Monday

                     September 28th, 2015



                             -at-



                         Vedder Price

                   222 North LaSalle Street

                      Chicago, Illinois
```

```
 1        A.    Correct.

 2        Q.    Okay.  Did you have a preference for keeping

 3   them on and allowing them to try to improve their

 4   performance, as opposed to just letting them leave

 5   institution?

 6              MR. JEPSON:  I'll object to the form of the

 7   question.  You may answer.

 8        A.    We had open positions, and we had familiarity

 9   with both candidates.  And I thought that it was an

10   opportunity for them to try another year in the same

11   level, to see if they could improve.

12        Q.    Is it your policy to allow people the

13   opportunity to improve?

14              MR. JEPSON:  I'll object to the form of the

15   question.  You may answer.

16        A.    So, I try to, for my general surgery

17   residents, give them direction on how they can improve

18   as residents all the time.

19        Q.    All right.  How many general surgery

20   residents are there in the program for each PGY year?

21              MR. JEPSON:  May we have a time?

22        Q.    Well, let's start with 2011 to 2012.  I just

23   want to get a -- just a sense of the number.

24        A.    I don't remember offhand.  I would be happy

25   to -- if you had the sheet, but I would say that, in
```

```
 1        A.   I was.  Correct.  Yes.

 2        Q.   Okay.  And this letter, if you look at the

 3   second page of it, it's signed by Dr. David Song.

 4   Correct?

 5        A.   Yes.                              1:28:25

 6        Q.   Okay.  Do you remember ever discussing Dr.

 7   Song's -- well, first, with respect specifically to

 8   this letter, do you recall discussing with Dr. Song the

 9   drafting of this letter?

10        A.   No.

11        Q.   Do you recall discussing with Dr. Song his

12   decisions regarding placing Dr. Artunduaga on probation

13   around this time period?

14        A.   No.

15        Q.   What -- earlier, we talked about whether you

16   evaluated residents, and you said you evaluated them if

17   they were on your service.  Correct?  What is your

18   service?

19        A.   Dragstedt surgical oncology service.

20        Q.   I'm sorry.  Can you say that again?

21        A.   The Dragstedt surgical oncology service.

22        Q.   Okay.                            1:29:06

23        A.   And on residents that -- you know, in a

24   general sense, that are residents in my program.

25        Q.   And do first year residents rotate on that
```

```
 1   that she had been given.
 2        Q.   Okay.  If she had been your resident, what
 3   would you have done in response to these concerns?
 4             MR. JEPSON:  Objection to the form.  Lack of
 5   foundation.  You may answer.
 6        A.   Well, I mean, every situation is different.
 7   So I don't -- I don't really know what I would have
 8   done in this hypothetical if she -- if she were my
 9   resident.
10        Q.   But in the past, when you have residents with
11   performance problems, you helped them out.  Right?
12             MR. JEPSON:  Objection to the form.  Lack of
13   foundation.
14        A.   So -- so every situation's different, and the
15   context is different, and the actual program that the
16   resident's in have been different in the cases that
17   we've mentioned.
18        Q.   I understand.  I'm not trying to, you know,
19   push you to -- to answer a certain way.  But -- but
20   normally, you would try to help a resident out.  Right?
21             MR. JEPSON:  Objection.  Form.  You may
22   answer.                                    1:36:13
23        A.   I -- it's my general policy to help
24   residents.
25        Q.   Okay.  Now, let's -- let's just briefly look
```

Exhibit 5, LLC

```
 1  decision to not -- not -- not renew the contract?

 2      A.   Can you please just clarify what you mean by

 3  "discussed"?

 4      Q.   Did he come to you for advice regarding

 5  whether to not renew Dr. Artunduaga's contract?

 6      A.   He did not come to me for advice.

 7      Q.   Did he inform you that he was going to not

 8  renew -- renew her contract?

 9      A.   I -- I'm pretty sure that he just let me

10  know, as a courtesy, since she was doing rotations in

11  general surgery.

12      Q.   Okay.  Did you have an opinion about whether

13  that was the right thing to do?

14          MR. JEPSON:  Objection.

15      A.   I did not.

16          MR. JEPSON:  Lack of foundation.

17      A.   I did not have an opinion.              1:49:51

18      Q.   Let's see.  I'll give you that one.  Were you

19  involved in any meetings were it was discussed whether

20  or not to terminate Dr. Artunduaga?

21          MR. JEPSON:  Objection to the form.  Lack of

22  foundation.  You may answer.

23      A.   I was involved with meetings that this topic

24  was discussed, but I don't remember if it would already

25  have been decided or -- this was dealing with issues
```

# Exhibit D

```
            IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
                    EASTERN DIVISION


 DR. MARIA ARTUNDUAGA,          )
                                )
              Plaintiff,        )
                                )
         -vs-                   ) No. 12 CV 08733
                                )
 THE UNIVERSITY OF              )
 CHICAGO MEDICAL CENTER,        )
                                )
              Defendant.        )
```

The videotaped deposition of MARIA
ARTUNDUAGA, called for examination, pursuant to
the Federal Rules of Civil Procedure for the
United States District Courts pertaining to the
taking of depositions, taken before Suzanne
Burke, a Certified Shorthand Reporter in the
State of Illinois, at 222 North LaSalle Street,
24th Floor, Chicago, Illinois, on April 2, 2014,
2014, A.D., commencing at the hour of 10:06 a.m.

Page 154

1      Q.    You had a meeting with Dr. Song on
2   November 2nd, 2011; is that right?
3      A.    Yes.
4      Q.    Who else was there?
5      A.    Akilah Williams and Dr. Julie Park.
6      Q.    And what was said by whom at that
7   meeting?
8      A.    Sorry?
9      Q.    Who said what to whom at that meeting?
10      A.    Who said --
11      Q.    Who said -- what did you say, what did
12   Dr. Park say, what did Dr. Song say at the
13   meeting?
14      A.    I don't understand the question.  I'm
15   totally lost.
16      Q.    Okay, all right.  When -- the meeting
17   was in Dr. Song's office, was it?
18      A.    Oh, yes, yes.
19      Q.    Who began the meeting?
20      A.    I was coming from the retreat that was
21   held at the Gleacher Center.  I was paged either
22   by -- I think Akilah.  I ran into Julie Park,
23   Dr. Julie Park, in the lobby, and she said that
24   we needed to go see Dr. Song.  So, yes, that's

1    how we met.

2         Q.    So what did Dr. Song say?

3         A.    Dr. Song said that he had made a

4    decision to put me on probation, and that he

5    really wanted me to think about better leave

6    quietly, because he thought that I was not going

7    to survive the environment at the University of

8    Chicago Medical Center and that I was not going

9    to be successful as a resident there, because

10   there was -- there were too many rumors and

11   gossip around; and that, yeah, that I should just

12   look for another job.

13        Q.    What did you say?

14        A.    The exact same thing I told him the

15   meeting I saw -- in September, that I didn't

16   agree; that I have been complaining about

17   disparate treatment; that I have not been offered

18   the same training opportunities as everybody

19   else; that it was his responsibility to enforce

20   my rights and my contract; and that I disagreed

21   with his decision.  And I asked him to, please, I

22   mean, let's do a professional development

23   program, because that's what's -- that's what the

24   GME policy manual says that we should be doing at

Page 170

1    expecting Deana to behave differently.  I mean,

2    this is just, you know, a few texts for -- I

3    texted many people, I mean.

4        Q.    So did Dr. Shenaq participate in the

5    ostracizing that you described?

6        A.    Yeah.  They went out a lot and really

7    did not invite us to go out; and I shared those

8    sad feelings with my husband.  But, I mean,

9    that's what she chose to do.

10       Q.    Okay.  Let's go back to Exhibit 21 for a

11   moment.  That's the letter you received from

12   Dr. Song informing you were being -- informing

13   you you were being put on probation, right?

14       A.    Uh-huh.

15       Q.    Yes?

16       A.    Yes, sir.

17       Q.    Did he hand this letter to you?

18       A.    Let's see.  November 15.  I think so.

19       Q.    Was there anybody else present?

20       A.    Akilah, Akilah.

21       Q.    What did Dr. Song say and what did you

22   say and what did she say?

23       A.    A few seconds.  I'm confusing.  There

24   were too many meetings in November.

1          Dr. Song wanted me to -- he really

2    wanted me to not take the probation, because he

3    thought that if I went through I was not going to

4    be successful and that I would not be allowed to

5    pursue a residency program anywhere else.  Akilah

6    didn't -- I don't remember what -- if she said

7    anything.  Sorry.

8        Q.   What did you say?

9        A.   What did I say?  That I was going

10   through the probation to show him that I could be

11   as good as any other plastic surgery resident and

12   that I could improve, and that I really wanted to

13   continue in the residency.  And that -- well,

14   that was my only option.  It was either that or

15   be out immediately, so I took it.

16       Q.   Do you recall anything else Dr. Song

17   said in the meeting?

18       A.   November 15.

19       Q.   That's correct.

20       A.   Oh, yes.  Sorry.  I just forgot.  This

21   is the meeting where he says that I'm at a level

22   of a third year medical student; that I have no

23   managerial skills; that -- he said four things.

24   I can't recall the other two things.

# Exhibit E



THE UNIVERSITY OF
**CHICAGO**
MEDICAL CENTER

**DEPARTMENT OF SURGERY**     MC 6035
*Section of Plastic and Reconstructive Surgery*     5841 South Maryland Avenue
Chicago, Illinois 60637-1470
*fax*     773-702-6302
*fax*     773-702-1634

Dear Dr. Artunduaga:

It is my duty to inform you that, effective November 15, 2011, you are being placed on Probation. . You will remain on probation until the time when we decide whether you will be offered a contract for another year of training in the program. This decision was reached by the faculty members of the Residency Education Committee as a whole after a thorough review of your progress in the residency program. As you are aware from several prior meetings and discussions with me about your progress in the program, you have failed to satisfactorily carry out your responsibilities. We have outlined for you specific areas where your progress had to improve, and have provided you with opportunities for assistance and remediation. Despite those efforts, you continue to exhibit significant performance deficits related to the competency domains of Patient Care and Interpersonal Communication skills.

The specific competency domains in which significantly deficient performance rating are noted include Patient Care and Interpersonal and Communication Skills:

Patient Care

- Communicate effectively and demonstrate caring and respectful behaviors when interacting with patients and their families
- Gather essential and accurate information about their patients
- Make informed decisions about diagnostic and therapeutic interventions based on patient information, preferences, up-to-date scientific evidence, and clinical judgment
- Develop and carry out patient management plans

Interpersonal and Communication Skills

- Use effective listening skills and elicit and provide information using effective nonverbal, explanatory, questioning, and writing skills
- Work effectively with others as a member or leader of a health care team or other professional group

The following conditions must be met for you to continue in the Program:
1.

- Establishing and maintaining your workload
- Establishing successful doctor-patient relationships
- Following technical instructions in the operating room
- Improving organizational skills
- Understanding what should be prioritized
- Effectively communicating with faculty and staff
- Appropriate clinical decision making

AT THE FOREFRONT OF MEDICINE®

UCMC00030392

- Accepting responsibility
- Timely placing consult notes
- Understanding the plan and your role in the plan.

2. You are required to schedule and meet with Dr. Julie Park, acting in the role of Mentor, at least every other week. Dr. Park may elect to change the frequency and will provide updates to me on the progress being made to address performance issues.

Your performance during this probationary period will be formally reviewed throughout the period of your probation and by faculty during the second or third week of February. At that time a decision will be reached about whether you have met the conditions of this probation and whether you will be offered a contract for another year of training. You will be provided official notification not later than February 28, 2012.

Moonlighting is not allowed while on Probation. It will constitute a violation of probation, and may be grounds for dismissal from residency if you continue to fail to fulfill the applicable educational and clinical requirements of the graduate education and clinical training program in a professional manner, to our satisfaction.

The Grievance Policy is available on the GME intranet site.

It is our sincere hope that the actions required of you will result in a positive outcome and continuation in the program.

Sincerely,

David H. Song, MD, MBA
Program Director
Plastic and Reconstructive Surgery

I have received a copy of this document. I understand the actions required of me.

Maria Artunduaga, M.D                    11/15/2011

UCMC00030393