## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| DR. MARIA ARTUNDUAGA, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 12-cv-08733** |
| | ) | |
| THE UNIVERSITY OF CHICAGO | ) | **Judge Amy J. St. Eve** |
| MEDICAL CENTER, | ) | **Magistrate Judge Sidney I. Schenkier** |
| | ) | |
| **Defendant.** | ) | |

### PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO BAR, OR IN THE ALTERNATIVE LIMIT, THE OPINIONS AND TESTIMONY OF PLAINTIFF'S DAMAGES EXPERT DR. MARK R. KILLINGSWORTH

Defendant, The University of Chicago Medical Center ("UCMC"), has moved to bar or limit the opinions and testimony of Plaintiff's damages expert, Dr. Mark R. Killingsworth.

UCMC does not challenge the qualifications of Dr. Killingsworth. Nor does it find fault with his methodology, which is "widely-accepted in the professional literature." Dkt. 174-7 at ¶ 2.[1]

Instead, UCMC raises three arguments, none of which has merit:

- UCMC contends that Dr. Killingsworth's testimony is "unnecessary" for calculation of any front pay and "will be of no assistance" in determining whether Dr. Artunduaga reasonably mitigated her damages. Dkt. 174 at 6, 7. But as explained below, Dr. Killingsworth is not offered as an expert calculating "front pay," but rather to analyze and calculate Dr. Artunduaga's loss of future earnings due to reputational injury. Further, Dr. Killingsworth has not been asked to opine on the "reasonableness" of mitigation efforts; he takes the career path Dr. Artunduaga is now on and analyzes what she is likely to earn from it. The legal question as to the "reasonableness" of her mitigation efforts, on which UCMC bears the burden of proof, has nothing to do with his testimony. *See* Argument Part B below.

---

[1]     Dr. Killingsworth's Expert Report was attached as Exhibit 7 to UCMC's motion. He also submitted a Rebuttal Report, which is attached as Exhibit A to this Memorandum.

- UCMC challenges the assumptions and data that Dr. Killingsworth used to calculate Dr. Artunduaga's economic losses as being "speculative" and "provided by Plaintiff's counsel." Dkt. 174 at 8. But as UCMC concedes, "it is for the jury to decide" the reasonableness of an expert's assumptions when they are drawn from "disputed facts," *id.* at 11, which is exactly what Dr. Killingsworth has done. Dr. Killingsworth's assumptions are, in fact, well supported by the evidence, and the fact that some were provided to him by counsel is irrelevant. *See* Argument Part C below.

- UCMC seeks Dr. Killingsworth's exclusion under Rule 403, rehashing the same arguments as above; they fail here for the same reasons. *See* Argument Part D below.

## I.     FACTUAL BACKGROUND.

### A.     Dr. Killingsworth's Qualifications and Methodology.

Dr. Killingsworth is an expert labor economist, with more than 40 years of experience, and a substantial record as an expert witness in federal and state litigation. Dkt. 174-10 at 9-19. Dr. Artunduaga has retained him to analyze her "economic losses arising from UCMC's decision to terminate her residency." Dkt. 174-7 at ¶ 2. Dr. Killingsworth's methodology is as follows.

First, he defined "lost earnings" as "the difference between (i) the hypothetical earning at each age that Dr. Artunduaga could have expected to receive had she been able to complete her residency at UCMC and become a plastic surgeon (sometimes called 'but-for' earnings); and (ii) her actual or expected earnings at each age, given that UCMC terminated her" and she has embarked on an alternate career ("mitigation damages"). *Id.* For losses in years prior to 2016 (when Dr. Killingsworth made his calculations), he added interest. He converted losses sustained in future years to their "present values," *i.e.*, their values in terms of today's money at an "appropriate rate of interest." *Id.* at ¶ 3.

Dr. Killingsworth determined Dr. Artunduaga's hypothetical "but-for" earnings had she completed her residency at UCMC and had a career as a plastic surgeon by:

(i)     for her years in residency, assuming a salary that approximates her actual salary as a resident in 2011-12;

(ii)    assuming an annual salary for one year as a fellow;

(iii)   deriving an estimate of earnings in her first two years as a plastic surgeon by using the midpoint between the median and mean starting salaries for the first year, and a figure below the median compensation for plastic surgeons with three and seven years' experience for the second year; and

(iv)   extracting data from the Current Population Survey ("CPS") to derive an "age-earnings profile for Hispanic females employed as physicians or surgeons" in 2013 and projecting annual earnings increases tied to a "general growth in occupational wages at the rate of 2.150 percent per year."

*Id.* at ¶¶ 5-8.

Next, he determined Dr. Artunduaga's actual and expected future earnings given that UCMC terminated her residency and she has now embarked on a career in public health, having obtained a Masters in Public Health ("MPH") degree, with a focus on work in nongovernmental organizations on global health matters. *Id.* at ¶ 10. He used the same methodology as described above:

(i)     using national survey data to determine salaries of recent MPH degree graduates and then extracting data from the CPS to determine "an age-earnings profile for Hispanic females with master's degrees employed in health services management"; and

(ii)    projecting earnings increases in future years as a result of "general growth in occupational wages at the rate of 3.287 percent per year."

*Id.* ¶¶ 11-12.

Finally, he determined the difference between "hypothetical earnings" and "actual or expected earnings" in each year until Dr. Artunduaga reaches age 72, and reduced each year's difference to present value dollars. "The cumulative present value of lost compensation" is then calculated as the total damages figure. *Id.* at ¶¶ 14-15. The result is presented in a chart that creates a running total. Were the jury to conclude that Dr. Artunduaga will retire before age 72,

it can still derive a damages figure for that age from Dr. Killingsworth's chart. *Id.* at 7. *See also* Dkt. 174-9 (Killingsworth Dep.) at 123:4-17.

### B. Dr. Killingsworth's "Assumptions" that UCMC Challenges.

UCMC seeks to bar Dr. Killingsworth's testimony based on what it claims to be his "speculative extrapolation and unsupported assumptions." Dkt. 174 at 10. UCMC identifies six "factual assumptions" it contends undermine the reliability of his expert opinion. *Id.* at 9. As explained below, each one is supported in the evidentiary record.

**1. Dr. Artunduaga would have successfully completed the UCMC program in six years. Dkt. 174 at 9.**

The evidence supporting this assumption is as follows:

- The UCMC residency program is a six-year program, and when Dr. Artunduaga entered it, her intent was to complete it. Dkt. 174-6 at ¶ 6.

- Dr. Song testified that Dr. Artunduaga is the only person who has ever been placed on probation in the UCMC residency program and not renewed. *See* Song Deposition, attached as Exhibit B, at 32:20-23. Thus, persons admitted into the program have a reasonable expectation of completing it.

**2. Dr. Artunduaga would have been admitted to and successfully completed a fellowship program in two years. Dkt. 174 at 9.**

The evidence supporting this assumption is as follows:

- Dr. Artunduaga also intended to seek post-residency fellowship opportunities in plastic surgery for two years after completing her residency. Dkt. 174-6 at ¶ 6.

**3. Dr. Artunduaga would have passed her licensing exams. Dkt. 174 at 9.**

The evidence supporting this assumption is as follows:

- Dr. Artunduaga's CV shows an extensive and distinguished academic history, including finishing in the top 10% of her class in medical school, securing positions at Harvard Medical School, UCMC, and the University of Washington, and receiving prestigious honors and awards recognizing the quality of her academic and research work. Dkt. 174-2.

4. **Dr. Artunduaga would have found a lucrative job as a plastic surgeon in the United States. Dkt. 174 at 9.**

UCMC does not challenge this assumption by arguing that persons who complete UCMC's residency program are ill-suited or unlikely to obtain "lucrative" plastic surgeon jobs in the United States, nor could it. Instead, it argues that Dr. Artunduaga has stated that she intended to eschew that career path and return to her native Colombia. Dkt. 174 at 2-3. The evidence in the record debunking this assertion is as follows:

- Dr. Artunduaga's career plan when she entered the UCMC program was to work as a plastic surgeon in the United States. Dkt. 174-6 at ¶ 6.

- Her statement about creating a training and research center in Colombia to increase the quality of care there did not reflect a desire to move to Colombia or to practice medicine there. *Id.* at ¶ 2.

- In any event, while in the UCMC residency program, Dr. Artunduaga married a senior software engineer who works for Google in Mountain View, California, a position that requires him to live and work in the United States. As a result, she also intends to live in the United States. *Id.* at ¶ 3.

- She applied for U.S. citizenship in July 2015. *Id.* at ¶ 4.

5. **Dr. Artunduaga would hold that position continuously until age 72. Dkt. 174 at 9.**

Dr. Killingsworth's opinion requires no such assumption. Instead, as he testified at his deposition, he has created a table that calculates lost earnings each year up to and including the age of 72, so that damages may be calculated up to whatever age the jury determines Dr. Artunduaga would likely retire. *See* 174-9 at 123:3-17. Dr. Killingsworth was asked by Dr. Artunduaga's counsel to calculate up to age 72 because she does intend to work that long. *Id.* at 122:18-123:2. But his opinion does not depend on that assumption.

6. **Dr. Artunduaga would only consider a public health position once her UCMC contract was not renewed.  Dkt. 174 at 9.**

UCMC's characterization of this as an assumption is not accurate; Dr. Killingsworth made no such assumption.  In any event, the evidence is as follows:

- Dr. Artunduaga did not "only consider" a public health position after being terminated at UCMC.  In fact, she attempted to continue her training as a doctor in the United States.  Dr. Artunduaga applied for physician residency programs by sending emails directly to several such programs, as well as by submitting an application to participate in the National Resident Matching Program.  She applied to more than 270 residency programs in six different specialties, three of which are in plastic surgery.  *See* Artunduaga Deposition, attached as Exhibit C, at 72:20-73:10; Dkt. 174-6 at ¶¶ 8-9.  Had her efforts been successful, she would have continued her training to be a physician. Dkt. 174-6 at ¶ 10.

- At least a couple of programs initially expressed interest in her application, until Dr. Song spoke to them. *See* Dkt. 196, Exh. A, B (filed under seal).

- In addition, as Dr. Song testified, "[w]hen someone gets put on probation, let alone has their contract not renewed, it severely scars their record for further employment elsewhere."  *See* Exh. B at 80:8-10.

- As a foreign medical graduate, Dr. Artunduaga cannot practice medicine in any state in the United States without completing either a certain number of years of residency training or an ACGME-accredited residency program.  Dkt. 174-6 at ¶ 10.

- As a result of being unable to continue to train to become a physician, she is now on the path to a career in public health, and has successfully completed the Masters in Public Health Program at the University of Washington.  *See* Dkt. 174-2.  The Masters in Translational Medicine she is pursuing at the University of California, Berkeley, is not inconsistent with a public health career, but in fact provides her with training in bioengineering and technology as applied to public health.  *See* Supplemental Answer to Interrogatory No. 9, attached as Exhibit D.

## II.    ARGUMENT.

### A.    Standard for Admissibility of Expert Testimony.

"Expert testimony is admissible at trial under Federal Rule of Evidence 702 if the testimony is relevant to a fact in issue, is based on sufficient facts or data, and is the product of reliable scientific or other expert methods that are properly applied."  *Stollings v. Ryobi Techs.,*

*Inc.*, 725 F.3d 753, 765 (7th Cir. 2013). The district court acts as a "gatekeeper to ensure that all admitted expert testimony satisfies the Rule's reliability and relevance requirements," but that role "does not render the district court the trier of all facts relating to expert testimony." *Id.* "[T]he key to the gate is not the ultimate correctness of the expert's conclusions. Instead, it is the soundness and care with which the expert arrived at her opinion." *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013). The "soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact." *Stollings*, 725 F.3d at 765; *see also Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012) ("the accuracy of the actual evidence is to be tested before the [factfinder] with the familiar tools of 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'") (citations omitted).

## B. UCMC's "Front Pay" and "Mitigation" Arguments Are Meritless.

UCMC contends that Dr. Killingsworth's testimony should be barred because it is unnecessary for the calculation of "front pay." Dkt. 174 at 6. Dr. Killingsworth is not being offered to opine on front pay, but rather to analyze and caculate Dr. Artunduaga's lost future earnings resulting from the reputational injury she suffered due to her termination from the UCMC Residency Program. To determine Dr. Artunduaga's lost future earnings total, Dr. Killingsworth first estimated what she would have earned during her six years in the residency program. [2] This is not front pay; it is an element of the lost future earnings calculation.

---

[2] Because it is a six-year program, she intended to remain in and complete the program, and no resident in the program's history other than Dr. Artunduaga had ever been terminated, *supra* at 4, Dr. Killlingsworth calculated her lost earnings for the five years after her termination as though she would have completed the residency program, assuming a salary that approximates her actual salary as a resident in 2011-12. Dkt. 174-6 at ¶ 5. Contrary to UCMC's assertion, Dr. Killingsworth does not assume that Dr. Artunduaga "would have received employment at UCMC" after completing the residency program. Dkt. 174 at 7.

Next, UCMC argues that Dr. Killingsworth's testimony "will be of no assistance in determining whether Plaintiff satisfied her duty to mitigate damages" during the years of 2012 to 2017, or in estimating what she could have earned in those years in some hypothetical career path other than the public health career she is pursuing. Dkt. 174 at 7. But Dr. Killingsworth was not asked to evaluate whether she "satisfied her duty to mitigate," a highly factual affirmative defense, on which UCMC bears the burden of proof. *Donnelly v. Yellow Freight Sys., Inc.*, 874 F.2d 402, 411 (7th Cir. 1989). The evidence in the record establishes that she sought to continue her training as a physician, applying to several hundred residency programs, but, as Dr. Song himself testified, her termination from UCMC was an impediment to doing so. *See supra* at 6. Indeed, Dr. Song torpedoed some of Dr. Artunduaga's prospects. *Id.* Given these circumstances, she is pursuing a public health career, the projected earnings from which Dr. Killingsworth has attempted to quantify, and to the extent she has earned some income in the interim, that has been included in his calculations. Dkt. 174-6 at 7. His damages calculations are not rendered inadmissible because he has not opined on the reasonableness of her mitigation efforts, and UCMC has cited no case requiring such an outcome. [3]

The practical effect of UCMC's challenge is worth noting. UCMC is asking the Court to hold, as a matter of law, that a damages expert in a case where a terminated employee has already embarked on a new career path must not only quantify the economic effects of that path, but also speculate as to other paths the terminated employee could have taken, quantify those, and opine on the reasonableness of the road ultimately taken. For obvious reasons, such a regime would be both speculative and untenable, and the law does not require it.

---

[3]      *McNeil v. Economics Lab., Inc.,* 800 F.2d 111 (7th Cir. 1986), did not concern expert testimony at all, and *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887 (7th Cir. 2011), did not concern a damages expert.

### C.     Dr. Killingsworth Used Sufficient Data to Support His Analysis.

"Rule 702's reliability elements require the district judge to determine only that the expert is providing testimony that is based on a correct application of a reliable methodology and that the expert considered sufficient data to employ the methodology." *Stollings*, 725 F.3d at 766. "Reliability … is primarily a question of the validity of the methodology employed by an expert, not the quality of the data used in applying the methodology or the conclusions produced." *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013). "The district court usurps the role of the jury, and therefore abuses [its] discretion, if it unduly scrutinizes the quality of the expert's data and conclusion rather than the reliability of the methodology the expert employed." *Id.*

USMC asks the Court to do exactly that.  UCMC does not dispute that Dr. Killingsworth's methodology – establishing Dr. Artunduaga's economic losses by determining the difference between what she would have earned had she not been terminated by USMC and what she is projected to earn in light of that termination – is proper and reliable.  Instead, UCMC challenges the "quality" of certain of the data Dr. Killingsworth used in his analysis, which UCMC characterizes as "assumptions" that are "based on speculative extrapolation" and are unsupported in the record.   Dkt. 174 at 10.  UCMC is wrong both legally and factually.

Experts routinely rely on factual assumptions.  *See e.g. Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000) (expert accountant's calculations permissible even though he based them on "financial information furnished by Tuf and assumptions given him by counsel of the effect of the termination on Tuf's sales"); *Wilbern v. Culver Franchising Sys.*, No. 13 C 3269, 2015 WL 5722825, 2015 U.S. Dist. LEXIS 130888 * 37-39 (N.D. Ill. Sept. 29, 2015) (expert permitted to rely on factual assumptions); *Richman v.*

*Sheahan*, 415 F. Supp. 2d 929, 942 (N.D. Ill. 2006) (same).  When, as here, a party opposing

expert testimony contends that the expert's data is flawed because it rests on allegedly

unsupported assumptions, "the Court must determine *only* whether Plaintiffs have 'some'

evidence in support of [the expert's] factual assumptions." *Wilbern*, 2015 WL 5722825, 2015

U.S. Dist. LEXIS 130888 * 39 (emphasis in original).  "The question is not whether the opinion

is based on assumptions, but whether there is some factual support for them.  It there is not, they

are by hypothesis unreliable and inadmissible … If there is, it is for the jury, properly instructed,

to determine the credibility of the witnesses and thus the weight to be given to the expert

opinion." *Richman*, 415 F. Supp. 2d at 942.  UCMC recognizes that this is the legal standard.

Dkt. 174 at 11.  UCMC simply ignores the evidence in the record that supports Dr.

Killingsworth's assumptions, which amounts to "some factual support."  The fact section above

lays out the evidentiary support for each of the six assumptions that UCMC identifies, evidence

on which Dr. Killingsworth can properly rely.  *See supra* at 4-6.  That is all Rule 702 requires.

And it does not matter that Dr. Killingsworth relied on assumptions provided by counsel,

so long as there is record support for them.  *Tuf Racing*, 223 F.3d at 591 (7th Cir. 2000)

("financial information furnished by Tuf and assumptions given him by counsel of the effect of

the termination on Tuf's sales"); *Wilbern*, 2015 WL 5722825, 2015 U.S. Dist. LEXIS 130888

* 36 ("Experts routinely opine based on factual assumptions given to them.").  *Accord*

*Manpower*, 732 F.3d at 808 ("That the expert accountant in *Tuf* could opine on future earnings

on the basis of information supplied *by counsel* should make clear that the reliability of the data

itself is not the object of the *Daubert* inquiry") (emphasis in original).

Nor does it matter that UCMC can point to evidence that might support different

assumptions.  *See* Dkt. 174 at 9 (identifying the disputed factual issue of whether Dr. Artunduaga

intended to return to Colombia to practice medicine). "Experts routinely base their opinions on assumptions that are necessarily at odds with their adversary's view of the evidence." *Richman*, 415 F. Supp. 2d at 942.

"[T]he selection of data inputs to employ in a model is a question separate from the reliability of the methodology reflected in the model itself." *Manpower*, 732 F.3d at 806. "[T]he Supreme Court and this Circuit have confirmed on a number of occasions" that "arguments about how the selection of data inputs affect the merits of the conclusions produced by an accepted methodology should normally be left to the jury." *Id. See also, id.* at 809 ("That the reasoning behind that choice [of data] could be challenged as incomplete or faulty does not make it any less grounded in real data."); *Stollings*, 725 F.3d at 766-67 (even though the data input in question "was undoubtedly a rough estimate … [t]he judge should have let the jury determine how the uncertainty about [the data input's accuracy] affected the weight of [the expert's] testimony."). "Our system relies on cross-examination to alert the jury to the difference between good data and speculation." *Manpower*, 732 F.3d at 808 (quoting *Schultz*, 721 F.3d at 432).

Recent cases exemplify the baselessness of UCMC's argument. In *Wilbern*, plaintiff sued Culver's Restaurants for racial discrimination in its franchising. Culver's moved to strike the proposed testimony of plaintiff's expert, a restaurant industry analyst and management consultant, who opined on both liability and damages. He testified as to five different restaurant sites at which the plaintiff would have successfully developed a franchise absent discrimination, and for each site opined on the amount of plaintiff's lost profits. Among other objections, Culver's challenged the expert's assumption that the plaintiff would have received TIF financing for a project, arguing that the expert had no expertise in TIF funding, so it was improper for him to make that assumption simply because plaintiff's counsel told him to. The court rejected the

challenge, because (1) the expert's "lack of expertise" in the area of TIF Funding was not relevant, so long as an expert in his position could properly rely on the assumption such funds would be available, and (2) there were "some" facts in the record supporting that assumption, upon which the expert could rely. *Wilbern*, 2015 WL 5722825, 2015 U.S. Dist. LEXIS 130888 at * 37-39. Consequently, any dispute over the validity of the assumption was a question going to the weight, not admissibility, of the expert's testimony. *Id.* at * 36.

Similarly, in *Manpower*, the question was whether the damages expert, whose calculation formula was not at issue, used "reliable methods when selecting the numbers used in his calculations – specifically, projected total revenues and projected total expenses." 732 F.3d at 801. He chose a growth rate that was based on an unusually high 5-month period. He "accepted the word of" his client's managers that this growth rate was the result of conditions that would continue. The district court found that his choice of growth rate was based on "assumptions, rather than reliable principles and methods," and barred the testimony. *Id.* at 802. Moreover, the district court faulted the expert for not further analyzing these growth rate assumptions, including the choice not to analyze other factors that might influence the growth rate. *Id.* The Seventh Circuit reversed the district court, however, holding that it "exercised its gatekeeping role under *Daubert* with too much vigor," *id.* at 805, when it "assess[ed] the quality of the data inputs" that the expert selected. *Id.* at 807. [4] *Accord Sys. Dev. Integ., LLC v. Computer Sciences Corp.*, 866 F.Supp. 2d 873, 882 (N.D. Ill. 2012) ("CSC's argument that the court should exclude [expert's] opinion because it impermissibly assumes that 'the Exelon Contract would be extended past the initial five (5) year term' and that SDI 'would have performed [desktop side] services (at a consistent level) for the initial five (5) year term, as well as any extensions' also fails"; "[t]he

---

[4]     UCMC, paradoxically, cites *Manpower* to argue that "speculative extrapolation" is improper.

strength or weakness of the factual underpinnings of [expert's] testimony is 'not a matter for exclusion,' but 'for vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'") (internal quotation omitted).

None of UCMC's cases holds otherwise or in any way supports the result UCMC seeks. *See Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010) (expert's testimony was not based on "speculation" where it rested on his experience; such criticisms go to weight, not admissibility); *Fuesting v. Zimmer, Inc.*, 421 F.3d 528, 535-36 (7th Cir. 2005) (scientific expert's methodology flawed in that he relied solely on "basic polymer science" to "extrapolate" his conclusion, rather than analyzing defendant's product through any "scientific method"); *Luxco, Inc. v. Jim Beam Brands Co.*, No. 14 C 0349, 2016 WL 4611385 (N.D. Ill. Sept. 6, 2016) (liability and damages expert – Luxco's President and COO – permitted to testify as to damages; disputed factual issues over "factual underpinnings" of his calculations should be "determined by the trier of fact"); *Consolmagno v. Hosp. of St. Raphael*, 72 F. Supp. 3d 367, 384-85 (D. Conn. 2014) (case did not involve experts or *Daubert* challenge; fact that plaintiff had failed Certified Registered Nurse Anesthetist ("CRNA") exam on "sixteen previous occasions" made it speculative that she would pass the exam and become a CRNA, which her lost earning damages figure depended on); *Castrillon v. St. Vincent Hosp.,* No. 11-cv-430, 2015 WL 3448947 (S.D. Ind. May 29, 2015) (plaintiff's expert assumed she would practice as a critical care physician, when her training was in internal medicine, and chose a lower-paying job for mitigation purposes than the one plaintiff held); *Schultz*, 721 F.3d at 436 (while causation expert, which Dr. Killingsworth is not, "should consider alternative causes" of plaintiff's disease, he is not required "to rule out every alternative cause"); *Roy v. Austin Co.*, 94 C 740, 1998 WL

544411 (N.D. Ill. Aug. 25, 1998)(expert opining on whether plaintiff was likely to be promoted did not "account for employee-specific factors," unlike Dr. Killingsworth).

In sum, as *Wilbern* explained, "[w]henever an issue in a case revolves around a hypothetical situation such as 'what would have happened,' the inquiry 'necessarily involves an element of approximation and uncertainty … [t]hat is not a reason, however, to say that [the expert's] version of 'what would have happened' is speculation." 2015 WL 5722825, 2015 U.S. Dist. LEXIS 130888 at * 53. "The generally accepted legal principle to be applied in this situation is that '[w]here the defendant's wrong has caused the difficulty of proof of damages, he cannot complain of the resulting uncertainty.'" *Id.* (quoting *Mid-Am. Tablewares, Inc. v. Mogi Trad. Co.*, 100 F.3d 1353, 1365 (7th Cir. 1996)). UCMC effectively asks the court to require Dr. Killingsworth to accept its version of "what would have happened" as though it were certain, and to reject any different scenario as "speculation." This is an argument UCMC "must make to the jury" and is insufficient to support the exclusion of Dr. Killingsworth's testimony. *Wilbern*, 2015 WL 5722825, 2015 U.S. Dist. LEXIS 130888 at * 54.

### D. Rule 403 Provides No Basis for Exclusion.

Alternatively, UCMC invokes Federal Rule of Evidence 403 to exclude Dr. Killingsworth's opinions, arguing that his "conclusions are too speculative" and "not a product of an application of his expertise to record fact." Dkt. 174 at 12. As explained above, these criticisms are factually baseless – the record supports Dr. Killingsworth's assumptions – and, at best, provide grist for cross-examination rather than exclusion.

It is certainly true that passing muster under *Daubert* does not preclude exclusion under Rule 403. *United States v. Redwood*, No. 16 CR 80, 2016 WL 6124451 (N.D. Ill. Oct. 20, 2016). But Rule 403 "does not mandate (or even allow) the exclusion of evidence merely because it is

14

prejudicial; it is only a showing of '*unfair* prejudice *substantially* outweighing probative value, which permits exclusion of relevant matter under Rule 403.'" *Jones v. Sheahan*, Nos. 99 C 3669 and 01 C 1844, 2003 WL 21654279, at *5 (N.D. Ill. July 14, 2003) (quoting *Young v. Rabideau*, 821 F.2d 373, 377 (7th Cir. 1987) (emphasis in original)). The "type of evidence that Rule 403 excludes" is evidence that appeals "to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or triggers other mainsprings of human action [that] may cause a jury to base its decision on something other than the established propositions in the case." *Cook v. Hoppin*, 783 F.2d 684, 689 (7th Cir. 1986). UCMC does not explain how a damages calculation, made by a qualified expert using an accepted and unquestioned methodology, can meet this standard.

Ultimately, UCMC disputes that it is to blame for the "economic losses" that Dr. Killingsworth has calculated. UCMC claims that his testimony creates a "great danger" that the jury will "erroneously … conclude that his analysis satisfies the causal effect requirement to entitle Plaintiff to lost earnings damages." Dkt. 174 at 12. But Dr. Killingsworth is not testifying as to causation, and that can easily be explained to the jury. In any event, "it is entirely appropriate for a damages expert to assume liability for the purposes of his or her opinion." *Sys. Dev. Integration*, 886 F. Supp. 2d at 882. Indeed, "to hold otherwise would be illogical." *Id.*

## III. CONCLUSION.

For all of the foregoing reasons, UCMC's motion should be denied in its entirety.

Respectfully submitted,

**DR. MARIA ARTUNDUAGA**

By:     /s/ Cynthia H. Hyndman
            One of her Attorneys

15

Jamie S. Franklin (ARDC # 6242916)
THE FRANKLIN LAW FIRM LLC
53 W. Jackson Blvd., Ste. 803
Chicago, IL 60604
(312) 662-1008
(312) 662-1015 (fax)
jsf@thefranklinlawfirm.com

Cynthia H. Hyndman
ROBINSON CURLEY & CLAYTON, P.C.
300 South Wacker Dr., Ste. 1700
Chicago, IL 60606
(312) 663-3100
(312) 663-0303 (fax)
chyndman@robinsoncurley.com

## CERTIFICATE OF SERVICE

I, the undersigned, certify the foregoing document, **Plaintiff's Memorandum in Opposition to Defendant's Motion to Bar, or in the Alternative Limit, the Opinions and Testimony of Plaintiff's Damages Expert Dr. Mark R. Killingsworth**, was served by electronic mail on December 2, 2016 on the following persons:

Edward C. Jepson
Elizabeth N. Hall
Emily C. Fess
VEDDER PRICE, P.C.
222 N. LaSalle Street
Suite 2600
Chicago, IL 60601

Jamie S. Franklin
THE FRANKLIN LAW FIRM LLC
53 W. Jackson, Boulevard
Suite 803
Chicago, IL 60604

/s/Cynthia H. Hyndman

Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DR. MARIA ARTUNDUAGA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | No. 12-cv-08733 |
| v. | ) | |
| | ) | Judge Zagel |
| THE UNIVERSITY OF CHICAGO | ) | Magistrate Judge Schenkier |
| MEDICAL CENTER, | ) | |
| | ) | |
| *Defendant.* | ) | |

**CORRECTED REBUTTAL REPORT OF DR. MARK R. KILLINGSWORTH**

1.      I am a professor of economics at Rutgers University, New Brunswick, NJ, and have been retained as a consultant and expert labor economist by counsel for Dr. Maria Artunduaga, the plaintiff in this litigation.  In August 2015, I presented a report ("Killingsworth Report") on the Plaintiff's economic losses arising from the decision of the University of Chicago Medical Center ("UCMC") to terminate her residency there.  In November 2015, Dr. Malcolm Cohen, who has been retained as an expert witness by UCMC, presented a report ("Cohen Report") that critiqued my August 2015 report.  Plaintiff's counsel has asked me to review and evaluate the Cohen Report.[1]

### Are Dr. Cohen's data on plastic surgeons' earnings "more reliable"?

2.      Dr. Cohen argues that "salary data [on plastic surgeons' compensation] compiled by the Economic Research Institute (ERI) are "more reliable" than the data that I have used (Cohen Report, pp. 5-6).  He is particularly critical about the fact that the MGMA survey data that I have used include about 75 plastic-surgery practitioners.  Remarkably, however, Dr. Cohen never describes precisely how ERI obtained its data.  Moreover, plaintiff's counsel has advised me that, at his deposition, Dr. Cohen was unable to say how many plastic-surgery practitioners are included in ERI's survey data, either in total or at each level of experience (one year, two years, etc.).[2]

3.      Still more important, having very carefully reviewed ERI's own description[3] of the so-called "salary assessor individual position profile" that Dr. Cohen displays in his Table 3, I conclude that ERI gives no indication anywhere concerning the total number of plastic-surgery practitioners that it has surveyed – either in the aggregate or at specific levels of experience.  I further conclude that ERI gives no indication anywhere concerning the date, or dates, on which it surveyed the practitioners it used to construct its data, or which survey(s) it used for this purpose.

4.      I also conclude that ERI smoothed its survey data – in unspecified ways – before reporting any results by level of experience.  To see this, consider Figure 1, which displays the ERI data in Dr. Cohen's Table 3.  It is clear that any sampling variation in the basic data has been completely smoothed away – with no indication of how the smoothing was performed, and with no trace of the basic data that underlie what is in the table.

5.      The most serious problem with the ERI data is that – in contrast with most other kinds of survey data – ERI is largely silent about its methods and procedures, which means that it is impossible to replicate the data in its survey or in its "Salary Assessor."  This stands in sharp contrast with government survey data such as the Census Bureau's Current Population Survey (CPS), which provides extensive documentation of the procedures used in generating CPS data.

6.      Simply put, the ERI data are a black box.  In the absence of the kinds of specifics that are completely missing here – e.g., sample sizes and date(s) on which individual practitioners were

---

[1] This report differs from my report of December 7, 2015, in only one respect:  it corrects a typographical error in ¶33.  (See ¶33 and n. 12.)

[2] Dr. Cohen's deposition took place on December 1, 2015.  I have not yet received the transcript.  Depending on what I see in the transcript after I receive it, I would reserve the right to revise these comments, particularly if they mischaracterize his testimony in any way.

[3] See UCMC/Cohen 000012-000042.

surveyed – the claim that the ERI data are "more reliable" than the MGMA survey data that I used is simply untenable.

### Did Dr. Artunduaga intend to practice in Latin America?

7.      Dr. Cohen quotes an essay that Dr. Artunduaga wrote in June 2010, when she applied to become a resident at UCMC. In this essay, she expressed a desire to improve medical care in Colombia after her residency. Dr. Cohen concludes that this was tantamount to a statement that she intended to return to Colombia to practice medicine and that, if she had done so, "this would have had an impact on her earnings" – presumably a negative one, relative to what she could have earned in the United States (Cohen Report, p. 6; see also p. 7). When she wrote this, Dr. Cohen must not have been aware of the fact that in June 2011 (prior to the events that gave rise to this litigation), Dr. Artunduaga married, and decided to remain in the United States because her husband's work requires him to work in the United States. (See Declaration of Dr. Maria Artunduaga, ¶3.)

8.      Thus, as of June 2011, Dr. Artunduaga no longer planned on returning to Colombia. As of 2012 – the starting date of my calculations – Dr. Artunduaga clearly intended to practice medicine in the United States.

### Could Dr. Artunduaga have "reduced or eliminated" her loss by entering another residency program?

9.      After she was informed that UCMC would not renew her residency contract, Dr. Artunduaga applied to participate in the National Resident Matching Program for the 2013-14 academic year in order to continue her training as a doctor in the U.S. She applied to over 270 residencies in six different fields, but was not matched with any program, and was therefore unable to continue her training as a doctor in this country. (See Declaration of Dr. Maria Artunduaga, ¶¶8-10.) Thus, Dr. Artunduaga tried to enter another residency program, but was not able to do so. There is therefore no merit to Dr. Cohen's suggestion that she could have reduced or eliminated her loss by entering another residency program.

### What is the value of the combined MD/MPH degree?

10.      Dr. Cohen suggests that a combined MD/MPH degree, "which Dr. Artunduaga will have once she completes her current [MPH] program… may result in a higher wage than an MPH alone." However, in order to earn a higher wage by virtue of having an MD degree as well as an MPH degree, Dr. Artunduaga would first have to be a licensed physician – and since she did not complete the first year of her U.S. residency program, she is not eligible to become a licensed physician.[4]

### Does Killingsworth assume that Dr. Artunduaga have worked until age 72?

11.      Dr. Cohen writes (Cohen Report, page 8): "By assuming Dr. Artunduaga would work to age 72, over eight years longer than her worklife expectancy, Dr. Killingsworth overstates her loss."

---

[4] See http://www.fsmb.org/policy/public-resources/state_specific. For example, California requires that for initial medical licensure, an "IMG" (international medical graduate) such as Dr. Artunduaga must have at least two years of post-graduate training (i.e., residency).

Here, Dr. Cohen errs on two counts. First, I do not assume that Dr. Artunduaga would work until age 72; and, second, Dr. Cohen's claim that Dr. Artunduaga's worklife expectancy is only 64 (= 72 – 8) is based on calculations that have little to do with Dr. Artunduaga.

12.     It is certainly true – as is obvious from Table 1 in my August 2015 report – that I carry the calculations of Dr. Artunduaga's lost earnings out to age 72. However, contrary to Dr. Cohen, that is obviously not the same as *assuming* that she will work to age 72. Rather, the calculations simply show what Dr. Artunduaga's lost earnings would be if she were to work up to each age shown in the table. For example, if Dr. Cohen wishes to assume that Dr. Artunduaga would only work up to age 64, all he needs to do is to find the entry in Table 1 for age 64 in my August 2015 report.

13.     Is Dr. Cohen correct in claiming (Cohen Report, p. 8) that Dr. Artunduaga would work only up to age 64, however? As Dr. Cohen notes, a research study by Skoog et al.[5] has calculated that, at age 32, the worklife expectancy for "initially active women with professional or Ph.D. degree" is 31.91 years (i.e., up to age 32 + 31.91 = 63.91). However, in the Skoog et al. calculations, "initially active" women at age 32 are defined as women who happen to have been in the labor force (either employed or unemployed, but not in school or otherwise out of the labor force) at age 32, without regard to their labor force status at any earlier age; and the category of "professional" degrees consists of M.B.A., law, dental, medical and other professional degrees – including (ironically enough) the degree of M.P.H.

14.     Thus, the calculation by Skoog et al. on which Dr. Cohen bases his claims about Dr. Artunduaga's expected worklife at age 32 does not distinguish between women at this age who were in full-time schooling and women of the same age who were otherwise out of the work force (e.g., taking time off to care for children). The calculation also does not distinguish between women who were continuously in the work force or in education up to age 32 and women who were in the labor force or in education only intermittently until age 32. Finally, the calculation refers not just to medical doctors, but to women with dental, legal or other professional degrees or the Ph.D. degree. Obviously, none of this has much to do with Dr. Artunduaga.

## Should the discount rate be based on current interest rates?

15.     In discounting future sums to their present value, it is both natural and appropriate to use interest rates prevailing at the present time. This is a very simple concept: as I explained in my August 2015 report, if one is to receive $105 in a year's time, and if the prevailing rate of interest is five percent, then the present value of this future sum is $100 – because, at the interest rate prevailing today, one would need to purchase an asset worth $100 today in order to have $105 in a year's time.

16.     Dr. Cohen does not agree with this, however. He seems to believe (Cohen Report, p. 8) that, in calculating what a future sum is worth today, one should not use today's interest rates. Instead, he says that current interest rates "may not be predictive of future rates." That is quite true, but it is also entirely irrelevant: the present value of a future sum of course refers to the value as of the present

---

[5] See Gary R. Skoog, James E. Ciecka and Kurt V. Krueger, "The Markov Process Model of Labor Force Activity: Extended Tables of Central Tendency, Shape, Percentile Points, and Bootstrap Standard Errors," *Journal of Forensic Economics* 22(2), 2011, pp. 165-229, and in particular Table 27 (p. 206).

of an amount to be received in the future; it does not refer to the value at some point in the future of an amount that will be received at some other point in the future.

17.  It is particularly telling, then, that although Dr. Cohen at first appears to argue for using "future rates" to compute the present value of future amounts, he then – quite paradoxically – goes on to advocate using an average of *previous* interest rates, as much as twenty years into the past, to calculate the present value of future amounts of money.[6] In particular, he apparently recommends (Cohen Report, p. 8) using "a twenty-year average of three-year treasuries, which is 3.38% [per year]," to discount future sums to their present values.

18.  To see the fallacy in Dr. Cohen's logic in simple terms, suppose we determine that a plaintiff has sustained an earnings loss of $10,000 three years from now. Using Dr. Cohen's preferred rate of discount of 3.38 percent, the present value of this future sum is $9,050.87.[7] Suppose, then, that we award the plaintiff this amount. In order to accumulate $10,000 three years from now, the best riskless rate of interest she will be able to obtain will be *today's* interest rate on three-year Treasury securities, which is 1.19 percent.[8] Unfortunately, investing her award of $9,050.87 at only 1.19 percent interest for three years will yield our plaintiff only $9,377.84, not $10,000[9]: there are currently no three-year Treasuries on the market that offer an interest rate of 3.38 percent.

### Are the data on early-career salaries of plastic surgeons overstated?

19.  Dr. Cohen suggests that it "appears" that I "misinterpreted" the data that I cited for the starting salary of plastic surgeons, resulting in an overstatement of plastic surgeons' starting salary. The data source I used reads as follows:

> The Medical Group Management Association (MGMA) reviewed 85 individual reports on academic surgeons... The median starting compensation was US$205,750. Taken as a whole, the mean base salary was US$239,641 and the median total was US$310,000... This, in turn, was compared to a similar group of private practitioners... with a mean total compensation of US$366,141 and a median total of US$324,837...

20.  I took this to mean that total starting compensation for private practitioners had a mean of $366,141 and a median of $324,837. Dr. Cohen evidently believes that these two figures are the *overall* mean and median (respectively) level of total compensation of all of the private practitioners at *all* levels of experience, not mean and median total *starting* compensation (i.e., the mean and median total compensation of private practitioners in their first year).[10]

---

[6] He thus ignores the standard caveat that even the novice investor understands: Past results are no guarantee of future performance.

[7] The calculation is simple: $10,000/(1.0338)^3 = \$9,050.87$.

[8] See Federal Reserve Board, "Selected Interest Rates (Daily) – H.15," December 2, 2015, for interest rates as of December 1, 2015.

[9] Again, the calculation is simple: $9,050.87 \times (1.0119)^3 = \$9,377.84$.

[10] He also contends that it is "unorthodox to take a midpoint of a mean and a median" (Cohen Report, p. 3), as I did, in deriving a figure for starting compensation. It might well be more "orthodox" to use the figure for mean starting compensation ($366,141), notwithstanding the fact that a relatively small number of very high starting salaries pulled the mean well above the figure for median starting compensation ($324,837). Under the circumstances, therefore, using the

21.     I am grateful to Dr. Cohen for raising this point, which is a useful one; but I think that the most sensible conclusion that one can draw from his discussion is that the text is ambiguous: it shifts back and forth between "compensation," "base salary" and "total compensation," and between academic surgeons and private practitioners, without clearly defining what group of surgeons (those just starting out, the entire population, or something in between) and what kind of pay (base pay, total compensation or something else) is being discussed.

22.     Dr. Cohen also contends that I overstated the salary of plastic surgeons with two years' experience.  (Cohen Report, pp. 4-5.)  He offers two reasons for this.  First, he notes that I arrived at this figure by considering MGMA data for plastic surgeons with three to seven years' experience and by reducing this figure by $10,000, which he appears to feel was too little, and implies excessively large growth in compensation.  Second, he argues that the MGMA data for plastic surgeons with between three and seven years' experience is based on 17 persons, which he thinks is "too small." However, his first argument overlooks the fact that earnings growth early in the career can be substantial, and his second argument is a complete non sequitur, since he does not (and cannot) suggest that the number of observations in the data has anything to do with the magnitude of estimates of the rate of growth of earnings over time.

23.     For the sake of argument, I have recalculated Dr. Artunduaga's lost earnings using the data on plastic surgeons that Dr. Cohen believes is "more reliable" than the data I used -- the ERI data.

24.     Accordingly, in Table 1, I have set out revised calculations of Dr. Artunduaga's economic loss.  These calculations are identical in all respects to the ones in Table 1 of my August 2015 report, except for one very important difference:  for the years beginning in 2020, when Dr. Artunduaga would have completed her residency and would have been a plastic surgeon, I have used Dr. Cohen's preferred ERI data for plastic surgeons' earnings, including not just data for the first and second years of experience as a plastic surgeon, but for all levels of experience.[11]  In all other respects, the calculations in both tables use the same data and assumptions (e.g., the same discounting to present value, the same figures for earnings as an MPH, etc.).

25.     Dr. Cohen contends that Dr. Artunduaga's worklife would end at age 64 (Cohen Report, p. 8).  As of this age, the new calculations imply that Dr. Artunduaga's economic loss would be $6,269,302, whereas my original calculations implied an economic loss of $8,487,456 at this age. Likewise, at age 72, the new calculations imply an economic loss of $8,476,419, whereas my original calculations implied an economic loss of $9,551,158.

26.     It is certainly true that, relative to the old calculations, the new calculations imply a smaller economic loss after 2020 (when Dr. Artunduaga would have started her career as a plastic surgeon).  This is hardly surprising, given that the earnings figures in the ERI data are smaller than the earnings figures that I used in my August 2015 report (e.g., for the first and second years of experience

---

midpoint of the mean and the median instead of the mean – as I did – is clearly conservative, however unorthodox Dr. Cohen thinks it might be.

[11] The ERI data do not go beyond 24 years of experience.  To take the calculations up to age 72 (when Dr. Artunduaga would have 33 years of experience), I projected the ERI data out to 33 years of experience, using the coefficients estimated in a regression analysis of the ERI data up to 24 years of experience.

in plastic surgery). However, in the new calculations as well as the old calculations, the economic loss is very large indeed – greater than $6 million in both sets of calculations at age 64 (Dr. Cohen's preferred worklife expectancy), and greater than $8 million at age 72.

27.     In other words, like my original calculations, new calculations using both Dr. Cohen's preferred worklife expectancy and his preferred source of data for plastic surgeons' earnings imply very sizeable economic losses for Dr. Artunduaga.

28.     As an alternative way to respond to Dr. Cohen's concerns about how I used the MGMA data on early-career earnings of plastic surgeons, I proceeded as follows.

29.     First, I calculated starting compensation of plastic surgeons. Dr. Cohen interprets the passage in the book chapter summarizing an MGMA survey, quoted in my first report (Davison and Clemens, "The Job Search"), as saying that median starting compensation of academic plastic surgeons was $205,570 and that "taken as a whole" (i.e., the median for all academic plastic surgeons, at all levels of experience) was $310,000. Thus, for academic plastic surgeons, median starting compensation was 66 percent of median compensation for academic plastic surgeons at all levels of experience (that is, 205,570/310,000 = 0.66). The book chapter does not give median starting compensation of private-practice plastic surgeons, but it does give median compensation of these surgeons at all levels of experience, which was $324,837. To estimate median starting compensation of these surgeons, I took 66 percent of the "overall" figure ($324,837), or $215,409. I then estimated the overall median starting compensation of all plastic surgeons (academic and private-practice) by taking the midpoint of $205,570 and $215,409, which is $210,490. Also, since these MGMA compensation figures come from a survey conducted no later than 2011, I increased the estimated starting compensation figure ($210,490) by 2.15 percent per year, to reflect the annual rate of growth in surgeons' earnings. For 2020, which would be Dr. Artunduaga's first full year as a plastic surgeon, the estimated starting compensation is $254,904.

30.     Second, a survey by MGMA of plastic surgeons' compensation as of 2014 indicates that, for surgeons with between 3 and 7 years of experience, median compensation is $425,549. I took this as an estimate of median compensation for surgeons at the midpoint of the 3 to 7 year range of experience, i.e., 5 years' experience. Also, since this compensation figure comes from a survey conducted in 2014, I increased the compensation figure ($425,549) by 2.15 percent per year, to reflect the annual rate of growth in surgeons' earnings. For 2024, which would be Dr. Artunduaga's fifth full year as a plastic surgeon, the estimated starting compensation is $526,421.

31.     Finally, I assumed that between 2020 and 2024, Dr. Artunduaga's compensation would increase from $254,904 (the 2020 figure) to $526,421 (the 2024 figure) in equal increments, and that in years after 2024, her compensation would follow the age-earnings profile of physicians, with 2024 earnings as the base.

32.     The results of the calculations based on these compensation data (as described immediately above) appear in Table 2. Except for using the MGMA data on plastic surgeons in the manner described in the previous three paragraphs, the calculations in Table 2 use the same data and assumptions that are used both in Table 1 of this report and in Table 1 of my August 2015 report (e.g., the same discounting to present value, the same figures for earnings as an MPH, etc.).

33.     As previously noted, Dr. Cohen contends that Dr. Artunduaga's worklife would end at age 64 (Cohen Report, p. 8). As of this age, the calculations in Table 2 imply that Dr. Artunduaga's economic loss would be $8,711,073, whereas my original calculations implied an economic loss of $8,487,456 at this age. Likewise, at age 72, the new calculations imply an economic loss of $9,873,998,[12] whereas my original calculations implied an economic loss of $9,551,158.

34.     In sum, the calculations in Table 2, like the calculations both in Table 1 of the present report and in Table 1 of my August 2015 report, imply that Dr. Artunduaga's economic losses are substantial.

Mark R. Killingsworth

December 15, 2015

---

[12] This corrects the typographical error in the version of this report dated December 7, 2015, in which this amount was given as "$8,873,998."

Table 1:  Lost earnings calculations for Maria Artunduaga
(calculations use ERI data for plastic surgeons' earnings)

| | | (1) | (2) | (3) | (4) | (5) |
|---|---|---|---|---|---|---|
| | | annual earnings | | lost earnings | | |
| | | retained | terminated | annual | present | cumulative |
| year | age | ("but-for") | ("mitigation") | amount | value | amount |
| 2012* | 32 | 25000 | 0 | 25000 | 25412 | 25412 |
| 2013 | 33 | 50000 | 5395 | 44605 | 44896 | 70308 |
| 2014 | 34 | 50000 | 7553 | 42447 | 42557 | 112865 |
| 2015 | 35 | 50000 | 500 | 49500 | 49479 | 162344 |
| 2016 | 36 | 50000 | 32500 | 17500 | 17409 | 179753 |
| 2017 | 37 | 62500 | 65000 | -2500 | -2463 | 177290 |
| 2018 | 38 | 75000 | 68592 | 6408 | 6211 | 183502 |
| 2019 | 39 | 148182 | 72284 | 75898 | 72842 | 256343 |
| 2020 | 40 | 246205 | 76069 | 170136 | 157725 | 414069 |
| 2021 | 41 | 263593 | 79944 | 183649 | 167736 | 581805 |
| 2022 | 42 | 281598 | 83900 | 197697 | 173783 | 755588 |
| 2023 | 43 | 300185 | 87932 | 212253 | 183207 | 938796 |
| 2024 | 44 | 319319 | 92031 | 227287 | 192639 | 1131435 |
| 2025 | 45 | 338958 | 96190 | 242768 | 197149 | 1328584 |
| 2026 | 46 | 359060 | 100398 | 258661 | 205756 | 1534340 |
| 2027 | 47 | 379582 | 104647 | 274934 | 214223 | 1748562 |
| 2028 | 48 | 400480 | 108927 | 291553 | 222521 | 1971084 |
| 2029 | 49 | 421708 | 113226 | 308482 | 230622 | 2201705 |
| 2030 | 50 | 443220 | 117534 | 325686 | 238499 | 2440204 |
| 2031 | 51 | 464972 | 121838 | 343134 | 246132 | 2686336 |
| 2032 | 52 | 487104 | 126127 | 360977 | 253630 | 2939966 |
| 2033 | 53 | 509497 | 130388 | 379109 | 260917 | 3200882 |
| 2034 | 54 | 532202 | 134609 | 397593 | 268036 | 3468919 |
| 2035 | 55 | 555270 | 138775 | 416495 | 256334 | 3725252 |
| 2036 | 56 | 578752 | 142875 | 435877 | 261848 | 3987100 |
| 2037 | 57 | 602702 | 146894 | 455808 | 267272 | 4254372 |
| 2038 | 58 | 627171 | 150819 | 476351 | 272639 | 4527011 |
| 2039 | 59 | 652216 | 154637 | 497579 | 277978 | 4804989 |
| 2040 | 60 | 677898 | 158335 | 519563 | 283318 | 5088307 |
| 2041 | 61 | 704274 | 161899 | 542375 | 288665 | 5376992 |
| 2042 | 62 | 731413 | 165316 | 566097 | 294106 | 5671098 |
| 2043 | 63 | 759382 | 168574 | 590808 | 299603 | 5970701 |
| 2044 | 64 | 774917 | 171661 | 603256 | 298601 | 6269302 |
| 2045 | 65 | 797870 | 174564 | 623306 | 275051 | 6544353 |
| 2046 | 66 | 820307 | 177274 | 643033 | 276135 | 6820489 |
| 2047 | 67 | 842145 | 179779 | 662366 | 276798 | 7097286 |
| 2048 | 68 | 863306 | 182070 | 681236 | 277037 | 7374323 |
| 2049 | 69 | 883708 | 184137 | 699571 | 276852 | 7651176 |
| 2050 | 70 | 903276 | 185973 | 717303 | 276245 | 7927421 |
| 2051 | 71 | 921933 | 187570 | 734363 | 275219 | 8202640 |
| 2052 | 72 | 939604 | 188921 | 750683 | 273779 | 8476419 |

* Refers to July-December 2012.

───────────────────────────

(1)  Earnings if retained by UCMC.  For 2012, entry equals estimated earnings as
     a resident during June-December 2012.  For 2013 through June 2017, entries
     represent estimated earnings as a resident. For June 2017 through June 2019,
     entries represent estimated earnings as an intern.  For July-December 2019

and 2020, entries equal estimated initial earnings as plastic surgeon according to ERI data ($221,363), with allowance for 2.15 percent annual growth in occupational earnings.  For 2021 and later years, each entry is based on the ERI data by year of experience, with allowance for 2.15 percent annual growth in occupational earnings.  Figures do not include fringe benefits.

(2)     Earnings given termination by UCMC.  For 2012-2015, entries represent estimated actual earnings.  For 2016, entry represents estimated actual earnings, i.e., six months' initial earnings with MPH degree ($65,000).  For 2017, entry represents estimated annual earnings with an MPH degree.  For 2018 and later years, each entry is calculated based on the age-earnings profile of persons with master's degree employed as public health administrators, derived using U.S. Current Population Survey data, with 2017 as the base, and with allowance for 3.287 percent annual growth in occupational earnings.  Figures do not include fringe benefits.

(3)     (1) - (2).

(4)     Present value (as of September 1, 2015) of (3).  Discounted using a spectrum of interest rates as of August 20, 2015, on Treasury securities (the rate on a one-year Treasury security for an amount one year in the future, the rate on a two-Treasury security for an amount two years in the future, etc.).

(5)     Total of entries in (4) up to and including the present year.

Table 2: Lost earnings calculations for Maria Artunduaga
(calculations use MGMA data for plastic surgeons' earnings)

| year | age | (1) annual earnings retained ("but-for") | (2) annual earnings terminated ("mitigation") | (3) lost earnings annual amount | (4) lost earnings present value | (5) cumulative amount |
|------|-----|------|------|------|------|------|
| 2012* | 32 | 25000 | 0 | 25000 | 25412 | 25412 |
| 2013 | 33 | 50000 | 5395 | 44605 | 44896 | 70308 |
| 2014 | 34 | 50000 | 7553 | 42447 | 42557 | 112865 |
| 2015 | 35 | 50000 | 500 | 49500 | 49479 | 162344 |
| 2016 | 36 | 50000 | 32500 | 17500 | 17409 | 179753 |
| 2017 | 37 | 62500 | 65000 | -2500 | -2463 | 177290 |
| 2018 | 38 | 75000 | 68581 | 6419 | 6222 | 183512 |
| 2019 | 39 | 162270 | 72262 | 90008 | 86383 | 269896 |
| 2020 | 40 | 254904 | 76036 | 178868 | 165821 | 435716 |
| 2021 | 41 | 322783 | 79898 | 242885 | 221840 | 657557 |
| 2022 | 42 | 390663 | 83842 | 306820 | 269706 | 927263 |
| 2023 | 43 | 458542 | 87862 | 370680 | 319954 | 1247217 |
| 2024 | 44 | 526421 | 91948 | 434473 | 368241 | 1615458 |
| 2025 | 45 | 554759 | 96094 | 458665 | 372477 | 1987935 |
| 2026 | 46 | 582079 | 100290 | 481789 | 383245 | 2371180 |
| 2027 | 47 | 608087 | 104527 | 503560 | 392363 | 2763543 |
| 2028 | 48 | 632494 | 108794 | 523699 | 399701 | 3163245 |
| 2029 | 49 | 655018 | 113082 | 541935 | 405152 | 3568397 |
| 2030 | 50 | 675393 | 117379 | 558014 | 408632 | 3977029 |
| 2031 | 51 | 693372 | 121673 | 571699 | 410083 | 4387112 |
| 2032 | 52 | 708733 | 125953 | 582780 | 409473 | 4796585 |
| 2033 | 53 | 721282 | 130205 | 591077 | 406801 | 5203386 |
| 2034 | 54 | 730861 | 134418 | 596442 | 402090 | 5605476 |
| 2035 | 55 | 737344 | 138579 | 598765 | 368513 | 5973989 |
| 2036 | 56 | 740649 | 142674 | 597975 | 359226 | 6333215 |
| 2037 | 57 | 740732 | 146690 | 594042 | 348329 | 6681544 |
| 2038 | 58 | 737592 | 150614 | 586978 | 335956 | 7017500 |
| 2039 | 59 | 731271 | 154432 | 576838 | 322257 | 7339757 |
| 2040 | 60 | 721849 | 158132 | 563717 | 307395 | 7647152 |
| 2041 | 61 | 709448 | 161700 | 547748 | 291545 | 7938697 |
| 2042 | 62 | 694228 | 165123 | 529104 | 274887 | 8213584 |
| 2043 | 63 | 676378 | 168390 | 507988 | 257605 | 8471189 |
| 2044 | 64 | 656120 | 171487 | 484633 | 239884 | 8711073 |
| 2045 | 65 | 633700 | 174404 | 459296 | 202678 | 8913751 |
| 2046 | 66 | 609384 | 177129 | 432255 | 185622 | 9099372 |
| 2047 | 67 | 583451 | 179652 | 403799 | 168745 | 9268117 |
| 2048 | 68 | 556192 | 181962 | 374229 | 152187 | 9420304 |
| 2049 | 69 | 527899 | 184052 | 343847 | 136076 | 9556380 |
| 2050 | 70 | 498866 | 185912 | 312954 | 120524 | 9676904 |
| 2051 | 71 | 469378 | 187535 | 281843 | 105627 | 9782531 |
| 2052 | 72 | 439713 | 188916 | 250797 | 91467 | 9873998 |

* Refers to July-December 2012.

---

(1)  Earnings if retained by UCMC. For 2012, entry equals estimated earnings as
a resident during June-December 2012. For 2013 through June 2017, entries
represent estimated earnings as a resident. For June 2017 through June 2019,
entries represent estimated earnings as an intern. For July-December 2019

and 2020, entries equal estimated initial earnings as plastic surgeon (estimated at $210,490 in 2011, with 2.15% annual growth between 2011 and 2020). For 2024, entry equals estimated earnings as plastic surgeon (equal to $425,549 as of 2014, with 2.15% annual growth between 2015 and 2024). (For 2021-23, entries assume equal increases in compensation between the figures for 2020 and 2024.) For 2025 and later years, each entry is calculated based on the age-earnings profile of physicians and surgeons (occupation category 306) using U.S. Current Population Survey data, with 2024 as the base, and with allowance for 2.15 percent annual growth in occupational earnings. Figures do not include fringe benefits.

(2)     Earnings given termination by UCMC. For 2012-2015, entries represent estimated actual earnings. For 2016, entry represents estimated actual earnings, i.e., six months' initial earnings with MPH degree ($40,000). For 2017, entry represents estimated annual earnings with an MPH degree. For 2018 and later years, each entry is calculated based on the age-earnings profile of persons with master's degree employed as public health administrators, derived using U.S. Current Population Survey data, with 2017 as the base, and with allowance for 3.287 percent annual growth in occupational earnings. Figures do not include fringe benefits.

(3)     (1) - (2).

(4)     Present value (as of September 1, 2015) of (3). Discounted using a spectrum of interest rates as of August 20, 2015, on Treasury securities (the rate on a one-year Treasury security for an amount one year in the future, the rate on a two-Treasury security for an amount two years in the future, etc.).

(5)     Total of entries in (4) up to and including the present year.



# Exhibit B

In Demand Electronic Court Reporting, Inc.  www.InDemandReporting.com                    (773) 239-6008

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

---------------------------------------------------------

Maria Artunduaga,


        Plaintiff,


    vs.                        Case Number 1:2012cv08733


University of Chicago Medical Center

and David Song,


        Defendants.

---------------------------------------------------------

Deposition of David Habin Song

Wednesday

December 4th, 2013


-at-


Caffarelli & Siegel, Ltd.

180 North Stetson Avenue

Suite 3150

Chicago, Illinois 60601

In Demand Electronic Court Reporting, Inc   www.InDemandReporting.com                    (773) 239-6008

Page 32

1     Q.    Okay.

2     A.    Jonathan Bank who is Israeli received part of

3     his medical education in Hebrew.

4     Q.    Anyone else?                                                    0:45:43

5     A.    I think that covers it.

6     Q.    Are there any written policies you're aware

7     of that describe the disciplinary process for

8     residents?

9     A.    Could you explain that?

10    Q.    Sure.  Is there a written disciplinary

11    procedure that is used by the Section of Plastic

12    Surgery or is the disciplinary procedure that you

13    described earlier just more a matter of practice?

14    A.    You know, we've only had it happen once and

15    so we don't have a -- we've never had a process other

16    than coaching and -- and mentoring.                                  0:47:13

17    Q.    And when you say you only had it happen once,

18    what are you referring to?

19    A.    The case of Dr. Artunduaga.

20    Q.    Are you saying that she's the only person

21    who's ever been disciplined or she's the only person

22    who's ever been put on probation and not renewed?

23    A.    The latter.

24    Q.    Okay.  What do you consider your role to be

25    or what did you consider your role to be as program

In Demand Electronic Court Reporting, Inc.  www.InDemandReporting.com                    (773) 239-6008

Page 52

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

-----------------------------------------------------------

Maria Artunduaga,

       Plaintiff,

   vs.                          Case Number 1:2012cv08733

University of Chicago Medical Center

and David Song,

       Defendants.

-----------------------------------------------------------

Continued Deposition of David Habin Song

Monday

December 9th, 2013

-at-

Caffarelli & Siegel, Ltd.

180 North Stetson Avenue

Suite 3150

Chicago, Illinois 60601

Page 80

```
 1        Q.    Do you recall restoring Dr. Artunduaga to

 2   clinical duties on or about this date, April 4th, 2012?

 3        A.    I do.

 4        Q.    Why did you restore Dr. Artunduaga to

 5   clinical duties?

 6        A.    I was trying to be a nice guy.  I mean, I

 7   think once you finish a year of training that would --

 8   so let me back up.  When someone gets put on probation,

 9   let alone has their contract not renewed, it severely

10   scars their record for further employment elsewhere.

11   All these things that you showed me were an attempt to

12   prevent that from marring her record.  So when we

13   reinstate her after pulling her off, it's a modified

14   reinstatement so that at least she can move on and say

15   I finished a year of surgery.  I didn't have to do

16   this.                                               0:50:59

17        Q.    Did someone ever express concern to you about

18   patient safety issues with regard to Dr. Artunduaga?

19        A.    Several.

20        Q.    Who do you recall expressing patient safety

21   issues with you?

22        A.    There's at least six or seven faculty

23   members, residents said, you know, she sent a patient

24   with a PICC line home -- and just for you to understand

25   a PICC line is a line that exits the skin and goes
```

Exhibit C

Page 1

1        IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
                COUNTY DEPARTMENT, LAW DIVISION

2

DR. MARIA ARTUNDUAGA,            )

3                                )

                Plaintiff,       )

4                                )

        vs.                      ) No. 2014-L-008678

5                                )

THE UNIVERSITY OF CHICAGO        )

6    MEDICAL CENTER and DR. DAVID )

     SONG,                       )

7                                )

                Defendants.      )

8

9                _____

10              Videotaped Deposition of

11          MARIA ALEXANDRA BUITRAGO ARTUNDUAGA

12                  January 8, 2016

13                   10:18 a.m.

14

15                   Taken at:

16             222 North LaSalle Street

17                  26th Floor

18              Chicago, Illinois

19

20

21

22      Eric Campbell, Certified Legal Videographer

23      Diana G. Polk, Certified Shorthand Reporter

24

Page 72

1      A      Again, I know from other people who were

2  involved in the ranking decisions made by other program

3  directors.

4      Q      Who?  What?  Where?

5      A      I just gave you an example.

6      Q      I'm not asking for examples.  I want to

7  know which ones you had a rumor --

8      MS. FRANKLIN:  Objection to form.  She's trying

9  to answer the question with facts.  Let her answer the

10  question.

11      MR. JEPSON:  This is the question.

12      MS. FRANKLIN:  Please.

13  BY MR. JEPSON:

14      Q      This is the question.  Do you know for a

15  fact that Dr. Song had any contact about you with

16  anybody involved in making a decision as to your

17  admittance to a resident program other than what we

18  have in these emails that I've already shown you?

19      A      He might.  I don't know.

20      Q      Okay.  Thank you.  Now, after you left the

21  UCMC you in essence applied for residency programs in a

22  couple ways.  You sent out email blasts and emails with

23  respect to different jobs, correct?

24      A      Yes.

Page 73

1      Q     And you also participated in something

2   called ERAS or ERAS, E-R-A-S, correct?

3      A     Yes.

4      Q     And that's an electronic system where you

5   submit an application and information and then they,

6   for a fee, send that in and handle it, correct?

7      A     Yes, sir.

8      Q     And about the total number of that was

9   about 270, correct?  About?

10     A     Yes, too many.

11     MR. JEPSON:  And I just want to show you a couple

12  documents and we can then take a break.

13                    (Artunduaga Deposition Exhibit 27

14                     marked for identification.)

15     MR. JEPSON:  Let me show you what we'll have

16  marked as Exhibit 27.

17  BY MR. JEPSON:

18     Q     For the record, what's been marked as

19  Exhibit 27 is a printout it appears from something

20  called My ERAS 2013 Documents, and it's a three-page

21  document Bates numbered MA 1433 through MA 1435, which

22  means it was produced by you, and it appears to be your

23  personal statements with respect to anesthesia, plastic

24  surgery, and ENT, is that correct?

Exhibit D

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

| | | |
|---|---|---|
| DR. MARIA ARTUNDUAGA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 2014-L-008678 |
| | ) | |
| THE UNIVERSITY OF CHICAGO | ) | JURY TRIAL DEMANDED |
| MEDICAL CENTER and | ) | |
| DR. DAVID SONG, | ) | |
| | ) | |
| *Defendants.* | ) | |

**PLAINTIFF'S SUPPLEMENTAL ANSWERS TO DR. DAVID SONG'S**
**FIRST SET OF INTERROGATORIES**

The plaintiff, Dr. Maria Artunduaga, hereby submits her Supplemental Answers to

Dr. David Song's First Set of Interrogatories.

**GENERAL OBJECTIONS**

1.      The plaintiff objects to the interrogatories to the extent they purport to impose

requirements exceeding or differing from those provided by the Illinois Supreme Court Rules or

the Illinois Code of Civil Procedure.

2.      The plaintiff objects to the interrogatories to the extent they call for information

protected by the attorney-client privilege, the attorney work product doctrine, or any other

applicable privileges. Production of any information subject to any such privilege, protection or

doctrine is inadvertent and will not constitute or be deemed to constitute a waiver of any

privilege or other immunity from production.

3.      The plaintiff objects to the interrogatories to the extent they are vague,

ambiguous, overly broad, unduly burdensome, irrelevant or not reasonably calculated to lead to

the discovery of admissible evidence.

and Plaintiff's Second Supplemental Answers to UCMC's First Set of Interrogatories in the federal case, served on March 16, 2016.

**SUPPLEMENTAL ANSWER:**

The plaintiff completed a Master of Public Health with a concentration in Leadership, Policy and Management from the University of Washington in June 2016. She will produce documents memorializing the completion of this program when they become available.

**INTERROGATORY NO. 9:**

For any educational program in which you have been enrolled since January 1, 2012, describe the employment opportunities (including internships, volunteer opportunities, etc.) you have sought or intended to seek following your graduation (or similar) from such program and identify all related documents. To the extent you have previously provided any such information, identify where and when and identify (by bates label) the documents that relate to or concern such information.

**ANSWER:**

The plaintiff objects to this interrogatory as duplicative to the extent that it seeks information already provided by her in prior interrogatory answers, document production, and/or deposition testimony. Without waiving the foregoing, see Plaintiff's Answers to UCMC's First Set of Interrogatories in the federal case, served on February 8, 2013; Plaintiff's Supplemental Answers to UCMC's First Set of Interrogatories in the federal case, served on October 14, 2015; and Plaintiff's Second Supplemental Answers to UCMC's First Set of Interrogatories in the federal case, served on March 16, 2016.

**SUPPLEMENTAL ANSWER:**

The plaintiff will be pursuing a Master in Translational Medicine at the University of California, Berkeley, in the fall of 2016. The plaintiff chose this program because she seeks training in bioengineering and technology as applied to public health. Many positions in public health have clinical components and require a U.S. medical license or completion of a U.S.

5

residency for those with non-U.S. licenses. Due to the events that gave rise to this litigation, the

plaintiff has been unable to complete a U.S. residency. As such, she is limited to non-clinical

positions. She seeks training in bioengineering and technology in order to become more

competitive for the relatively fewer non-clinical positions that will be available to her in public

health. The plaintiff expects to pursue employment opportunities with nonprofits, non-

governmental organizations, technology companies, and start-ups working on global health

solutions after receiving this degree. She expects starting salaries to be in the range of $50,000 to

$100,000 per year.

Dated:  July 27, 2016                                          Respectfully submitted,

                                                              /s/ Jamie S. Franklin
                                                              Jamie S. Franklin

Jamie S. Franklin (ARDC # 6242916)
THE FRANKLIN LAW FIRM LLC
53 W. Jackson Blvd., Ste. 803
Chicago, IL 60604
(312) 662-1008
(312) 662-1015 (fax)
jsf@thefranklinlawfirm.com
Attorney No. 48135

Cynthia H. Hyndman
ROBINSON CURLEY & CLAYTON, P.C.
300 South Wacker Dr., Ste. 1700
Chicago, IL 60606
(312) 663-3100
(312) 663-0303 (fax)
chyndman@robinsoncurley.com

6

## VERIFICATION

I, the undersigned, verify that the foregoing Supplemental Answers to Dr. David Song's First Set of Interrogatories are complete and accurate to the best of my knowledge at this time.

Dr. Maria Artunduaga

7/26/16

Date