**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| DR. MARIA ARTUNDUAGA, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>THE UNIVERSITY OF CHICAGO )<br>MEDICAL CENTER, )<br>)<br>Defendant. ) | Case No. 12 C 8733 |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

On November 18, 2016, Defendant University of Chicago Medical Center ("UCMC") moved to bar, or in the alternative limit, the opinion and testimony of Plaintiff Dr. Maria Artunduaga's ("Dr. Artunduaga") damages expert Dr. Mark R. Killingsworth pursuant to the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). For the following reasons, the Court, in its discretion, denies Defendant's motion to bar because Plaintiff has met her burden in demonstrating that Dr. Killingsworth's expert opinion testimony satisfies the *Daubert* standard.

## BACKGROUND

**I. Factual Background**

Dr. Artunduaga was born and raised in Colombia, graduated from a Colombian medical school in 2003, practiced medicine in Colombia for three years, and completed a post-doctoral research fellowship at Harvard Medical School in 2011. In late June 2011, Dr. Artunduaga began working at UCMC as a resident in the Section of Plastic and Reconstructive Surgery ("PRS") – a residency that lasts six years. In 2011, Plaintiff signed a one-year residency contract

with UCMC that was subject to renewal in the spring of 2012. Dr. David Song served as the program director for UCMC's PRS residency program.

The two remaining claims in this matter include Plaintiff's national origin discrimination and retaliation claims brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. In this lawsuit, Dr. Artunduaga claims that beginning in July 2011 she was subjected to discrimination at UCMC based on her national origin. Further, Dr. Artunduaga asserts that she complained about this national origin discrimination to various persons at UCMC. In mid-November 2011, UCMC placed Dr. Artunduaga on probation, and in March 2012, PRS faculty decided not to renew Dr. Artunduaga's one-year residency contract. UCMC denies that it subjected Dr. Artunduaga to any discrimination. In addition, UCMC maintains that Dr. Artunduaga did not complain about the alleged national origin discrimination until after UCMC decided not to renew her contract.

In 2014, Dr. Artunduaga enrolled in a public health masters ("MPH") degree program at the University of Washington and graduated in August 2016. After graduation from the MPH program, she entered a dual masters program in Translational Medicine ("MTM") at the University of California at Berkeley and the University of California at San Francisco.

## II.     Dr. Killingsworth's Qualifications

Dr. Killingsworth is a labor economist with more than 40 years of experience and has a substantial record as an expert witness in federal and state litigation. *See, e.g., Jones v. YMCA,* 34 F.Supp.3d 896 (N.D. Ill. 2014); *Stagi v. Nat'l R.R. Passenger Corp.,* 391 Fed. Appx. 133, 135 (3d Cir. 2010); *Boyd v. Interstate Brands Corp.*, 256 F.R.D. 340, 353 (E.D.N.Y. 2009); *Pippen v. State,* 854 N.W.2d 1, 6 (Iowa 2014). Dr. Killingsworth is a professor of economics at Rutgers

University and was previously on the faculty of Barnard College and Fisk University. He is the author of *Labor Supply* and *The Economics of Comparable Worth* and has also authored numerous publications in the areas of comparable worth, pay equity, employment discrimination, and wage differentials. Also, Dr. Killingsworth has testified in front of United States Congressional Committees and the General Assembly of Pennsylvania. In addition, he has been a consultant to United States District Judge Robert L. Carter, the Canadian Department of Justice, and the United States Departments of Justice and Labor. Dr. Killingsworth graduated from the University of Michigan and received M.Phil. and D.Phil. degrees from the University of Oxford, where he was a Rhodes Scholar.

### III. Dr. Killingsworth's Expert Methodology and Opinions

Dr. Artunduaga retained Dr. Killingsworth to analyze her economic losses arising from UCMC's decision to terminate her residency. In his August 2015 report, Dr. Killingsworth explains the economic rationale and basic methodology that he used, namely, "'lost earnings' are the difference between (i) the hypothetical earnings at each age that Dr. Artunduaga could have expected to receive had she been able to complete her residency at UCMC and become a plastic surgeon (sometimes called 'but-for' earnings); and (ii) her actual or expected earnings at each age, given that UCMC terminated her residency and that she has enrolled in an MPH program with a view to entering a career in public health (sometimes called 'mitigation' earnings)." (R. 174-7, Expert Rep. ¶ 2.) He further articulates that "this methodology entails computing the difference between two different streams of earnings (often called earnings profiles) starting with the decision by UCMC to terminate her residency, and continuing into the future." (*Id.*) For the losses in the years prior to 2016 – when Dr. Killingsworth made his calculations – he added

3

interest. (*Id.* ¶ 3.) He converted the losses sustained in future years to their "present values," namely, their values in terms of today's money at an "appropriate rate of interest." (*Id.*)

Dr. Killingsworth determined Dr. Artunduaga's hypothetical "but-for" earnings stream had she completed her residency at UCMC and had a career as a plastic surgeon by:

- assuming a salary that approximates her actual salary as a resident in 2011-12 for her years in residency;

- assuming an annual salary for years as a fellow;

- deriving an estimate of earnings in her first two years as a plastic surgeon by using the midpoint between the median and mean starting salaries for the first year, and a figure below the median compensation for plastic surgeons with three and seven years' experience for the second year; and

- extracting data from the Current Population Survey ("CPS") to derive an "age earnings profile for Hispanic females employed as physicians or surgeons" in 2013 and projecting annual earnings increases tied to a "general growth in occupational wages at the rate of 2.150 percent per year."

(*Id.* ¶¶ 5-8; R. 174-9, Killingsworth Dep., at 65-68, 79-80, 91-92, 104-05.)

In regard to Plaintiff's actual and expected future earnings stream based on UCMC terminating Plaintiff from the residency program and Plaintiff obtaining a Masters of Public Health ("MPH") with the objective of having a career in public health, Dr. Killingsworth:

- considered survey data complied by the Association of Schools and Programs in Public Health ("AASPH") on recent graduates with MPH degrees and data from the CPS to determine an "age-earnings profile for Hispanic females with master's degrees employed in health services management;" and

- projected earnings increases in the future years as a result of "general growth in occupational wages at the rate of 3.287 percent per year."

(*Id.* ¶¶ 11, 12; Killingsworth Dep., at 93-94, 98-99, 104-05.)

4

Last, Dr. Killingsworth determined the difference between the two earnings streams – hypothetical earnings and actual/expected earnings – in each year until Plaintiff reaches the age of 72, the result of which is reflected in Table 1 attached to his expert report. (R. 174-7, Table 1.) According to Dr. Killingsworth, Table 1 shows the cumulative loss earnings at any desired retirement age. (Killingsworth Dep., at 123.)

## DAUBERT STANDARD

"Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), govern the admission of expert testimony in federal courts." *C.W. ex rel. Wood v. Textron, Inc.,* 807 F.3d 827, 834 (7th Cir. 2015). "The rubric for evaluating the admissibility of expert evidence considers whether the expert was qualified, whether his methodology was scientifically reliable, and whether the testimony would have assisted the trier of fact in understanding the evidence or in determining the fact in issue." *Hartman v. EBSCO Indus., Inc.,* 758 F.3d 810, 817 (7th Cir. 2014); *see also Higgins v. Koch Dev. Corp.,* 794 F.3d 697, 704 (7th Cir. 2015) ("Rule 702 and *Daubert* require the district court to determine whether proposed expert testimony is both relevant and reliable."). Although the Seventh Circuit reviews "the district court's application of *Daubert* [] de novo," if "the court adhered to the *Daubert* framework, then its decision on admissibility is reviewed for abuse of discretion." *Estate of Stuller v. United States,* 811 F.3d 890, 895 (7th Cir. 2016).

Once it is determined that "the proposed expert testimony meets the *Daubert* threshold of relevance and reliability, the accuracy of the actual evidence is to be tested before the jury with the familiar tools of 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012)

5

(quoting *Daubert*, 509 U.S. at 596). A district court's inquiry under *Daubert* is a flexible one and district courts have wide latitude in performing this gate-keeping function. *See Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); *Hartman,* 758 F.3d at 818. "'[T]he key to the gate is not the ultimate correctness of the expert's conclusions,'" rather, "'it is the soundness and care with which the expert arrived at her opinion[.]'" *Wood*, 807 F.3d at 834 (citation omitted). The "proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard." *Lewis v. Citgo Petroleum Corp.,* 561 F.3d 698, 705 (7th Cir. 2009).

## TITLE VII DAMAGES

Pursuant to 42 U.S.C. § 2000e-5(g)(1), courts may award successful Title VII plaintiffs equitable remedies, such as back pay and front pay. *See Kramer v. Banc of Am. Sec., LLC*, 355 F.3d 961, 965 (7th Cir. 2004); *see also Gracia v. Sigmatron Int'l, Inc.,* 130 F. Supp. 3d 1249, 1255 (N.D. Ill. 2015) (back pay "represents the wages the plaintiff would have earned had she not been fired between the time of the firing and the date of judgment"); *Shick v. Ill. Dep't of Human Servs.,* 307 F.3d 605, 614 (7th Cir. 2002) ("Front pay is an appropriate remedy in Title VII cases when reinstatement is not available or not advisable because of workplace incompatibility."). As the Seventh Circuit teaches, "as a substitute for reinstatement, front pay is designed to compensate discrimination victims for the reasonable time it would take to find comparable employment elsewhere, [b]ut front pay is only designed to compensate a plaintiff from the lost earnings from his old job for as long as he 'may have been expected to hold it.'" *Shick*, 307 F.3d at 614 (citation omitted). Because back pay and front pay are equitable remedies, they are matters for the Court to decide. *See David v. Caterpillar, Inc.,* 324 F.3d 851,

6

866 (7th Cir. 2003); *Pals v. Schepel Buick & GMC Truck, Inc.*, 220 F.3d 495, 499-501 (7th Cir. 2000).

In addition, "the 1991 Civil Rights Act, 42 U.S.C § 1981a(a)(2), expands the remedies available under § 2000e-5(g)(1) in certain circumstances, to provide for compensatory and punitive damages." *Kramer,* 355 F.3d at 964. Compensatory and punitive damages are questions for the jury. *See, e.g., May v. Chrysler Grp., LLC,* 716 F.3d 963, 965 (7th Cir. 2013). Compensatory damages may include lost future earnings based on the "reputational or other injury that causes the diminution in expected earnings [that] can stay with the employee indefinitely." *Williams v. Pharmacia, Inc.*, 137 F.3d 944, 954 (7th Cir. 1998). As the Seventh Circuit explains:

> [T]he calculation of front pay differs significantly from the calculation of lost future earnings. Whereas front pay compensates the plaintiff for the lost earnings from her old job for as long as she may have been expected to hold it, a lost future earnings award compensates the plaintiff for the diminution in expected earnings in all of her future jobs for as long as the reputational or other injury may be expected to affect her prospects.

*Id.* The statutory cap for compensatory and punitive damages in this matter is $300,000. *See* 42 U.S.C. § 1981a(b)(3)(D); *E.E.O.C. v. AutoZone, Inc.,* 707 F.3d 824, 840 (7th Cir. 2013).

**ANALYSIS**

In the present *Daubert* motion, Defendant does not contest Dr. Killingsworth's qualifications as a labor economist or his ability to calculate future income streams of given occupations. Instead, Defendant argues that Dr. Killingsworth did not apply any expertise in reaching his conclusions nor did he verify the reasonableness of the assumptions that form the basis of his calculations. Accordingly, Defendant maintains that Dr. Killingsworth's opinions are inadmissible because they are speculative and would not assist the trier of fact. These

7

arguments speak to *Daubert's* reliability and relevancy (helpfulness) requirements. *See Metavante Corp. v. Emigrant Sav. Bank,* 619 F.3d 748, 762 (7th Cir. 2010) (expert testimony cannot "be based on subjective belief or speculation."); *United States v. Gallardo,* 497 F.3d 727, 733 (7th Cir. 2007) ("*Daubert* instructs that expert testimony must be relevant and factually linked to the case in order to meet Rule 702's 'helpfulness' requirement.").

## I.     Front Pay and Mitigation

### A.     Front Pay

First, Defendant argues that Dr. Killingsworth's analysis and testimony is unnecessary for the calculation of any front pay award, and thus the Court should exclude this aspect of Dr. Killingsworth's opinion testimony. Defendant explains that because the PRS residency program was six years, Plaintiff is not entitled to any front pay damages after June 2017. Furthermore, Defendant asserts that there is no dispute as to the amount of compensation UCMC would have paid Plaintiff from 2012 until June 2017 because a resident's pay is set by contract prior to the beginning of each residency year. Under these circumstances, Defendant argues that expert testimony would not assist the Court in making this equitable front pay determination. *See Matter of the Complaint of Ingram Barge Co.*, No. 13 C 3453, 2016 WL 3763450, at *10 (N.D. Ill. July 14, 2016) ("Expert testimony does not assist the trier of fact when [it] is able to evaluate the same evidence and is capable of drawing its own conclusions without the introduction of a proffered expert's testimony.").

On the other hand, Plaintiff contends that she is not offering Dr. Killingsworth's expert testimony to opine about front pay, but rather to analyze and calculate her lost future earnings resulting from the reputation injury she suffered as a result of UCMC terminating her from the

PRS residency program. Plaintiff explains that to determine her lost future earnings total, Dr. Killingsworth first estimated what she would have earned during her six years in the residency program as an element of the lost future earnings calculation. Indeed – keeping in mind that front pay is awarded in lieu of reinstatement – loss future earning capacity is a factor within a front pay damages award. *See Williams,* 137 F.3d at 953 ("the jury could find that [plaintiff] suffered injury to her future earning capacity even during her period of reinstatement," and thus "there is no overlap between the lost future earnings award and the front pay award."). In addition, because front pay is an equitable remedy, the Court will "be vigilant to ensure that the[] damage inquiries are appropriately cabined to protect against confusion and potential overcompensation of plaintiffs." *Id.* at 954. Therefore, Dr. Killingsworth's calculations in regard to the two different streams of earnings for years 2012-17 are not a basis to exclude this expert opinion testimony.

**B.    Mitigation**

Next, Defendant argues that Dr. Killingsworth's testimony will not assist the jury in determining whether Dr. Artunduaga satisfied her duty to mitigate damages. Specifically, Defendant points to Dr. Killingsworth's deposition testimony that he was not aware of any mitigation efforts Plaintiff made between 2012 and when she entered her MPH program in 2014. (Killingsworth Dep., at 56-57.) In response, Plaintiff explains that she did not ask Dr. Killingsworth to evaluate whether she mitigated her damages because this is a highly factual affirmative defense on which Defendant has the burden of proof at trial. Under these circumstances, Dr. Killingsworth's failure to consider mitigation efforts is not a proper basis to exclude his expert opinion testimony in regard to Plaintiff's lost future earnings. Defendant is

9

free to rigorously cross-examine Dr. Killingsworth on this issue. *See Lapsley*, 689 F.3d at 805. The Court, in its discretion, denies Defendant's *Daubert* motion in this respect.

**II.     Lost Future Earnings**

    **A.     Speculative, Unsupported Opinions**

Defendant also seeks to bar Dr. Killingsworth's testimony that the difference between his two calculated income streams constitutes a reasonable estimate of "lost future earnings" because he did not apply any expertise in reaching his conclusions nor did he verify the reasonableness of the assumptions that form the basis of his calculations. *See Brown v. Burlington No. Santa Fe Ry. Co.*, 765 F.3d 765, 772 (7th Cir. 2014) ("Rule 703 requires the expert to rely on 'facts or data,' as opposed to subjective impressions"). Specifically, Defendant highlights the following factual assumptions as unreasonable and/or speculative – that Plaintiff would have (1) successfully completed the UCMC program in six years, (2) been admitted to and successfully complete a fellowship program in two years, (3) passed her licensing exams, (4) found a lucrative job as a plastic surgeon in the United States, (5) held that job continuously until her retirement at age 72, and (6) would have only considered working as a public health official after UCMC terminated her from the residency program.

In response, Plaintiff asserts that Defendant is attacking the factual underpinnings of Dr. Killingsworth's expert opinions, which are matters for the trier of fact. *See Manpower, Inc. v. Ins. Co. of Penn.,* 732 F.3d 796, 806 (7th Cir. 2013) ("The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact[.]"). In other words, once "the proposed expert testimony meets the *Daubert* threshold of relevance and reliability, the

accuracy of the actual evidence is to be tested before the jury with the familiar tools of 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Lapsley,* 689 F.3d at 805 (quoting *Daubert*, 509 U.S. at 596); *see also Manpower*, 732 F.3d at 806 (a "district court usurps the role of the jury, and therefore abuses its discretion, if it unduly scrutinizes the quality of the expert's data and conclusions rather than the reliability of the methodology the expert employed.").

Furthermore, despite Defendant's argument to the contrary, it is proper for counsel to furnish factual assumptions to experts as long as the factual assumptions are supported by the record. *See Tuf Racing Prod., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000) (expert's calculations – based on assumptions provided by counsel – permissible under *Daubert*); *Richman v. Sheahan,* 415 F.Supp.2d 929, 942 (N.D. Ill. 2006) ("The question is not whether the opinion is based on assumptions, but whether there is some factual support for them."); *see also Williams v. Illinois,* ___ U.S. ___, 132 S. Ct. 2221, 2234, 183 L.Ed.2d 89 (2012) ("Modern rules of evidence continue to permit experts to express opinions based on facts about which they lack personal knowledge"); *Manpower, Inc.,* 732 F.3d at 808 ("That the expert accountant in *Tuf* could opine on future earnings on the basis of information supplied *by counsel* should make clear that the reliability of the data itself is not the object of the *Daubert* inquiry.") (emphasis in original). It is also important to note that "[e]xperts routinely base their opinions on assumptions that are necessarily at odds with their adversary's view of the evidence." *Richman,* 415 F.Supp.2d at 942. With these standards in mind, the Court turns to Defendant's specific arguments about the factual assumptions upon which Dr. Killingsworth based his expert opinions.

Defendant first takes issue with the factual assumption that Plaintiff would have successfully completed her UCMC residency program in six years and then would have been admitted to and successfully completed a fellowship program in two years. Plaintiff points to evidence in the record supporting this factual assumption, including her declaration in which she avers that her "career plans when I arrived at UCMC were to complete my plastic surgery residency and to seek post-residency fellowship opportunities in plastic surgery for two years, then to work as a plastic surgeon in the U.S. either in an academic setting or private practice." (R. 174-6, Artunduaga Decl. ¶ 6.) Also, Plaintiff highlights Dr. Song's deposition testimony that Dr. Artunduaga was the only person that UCMC placed on probation whose residency contract UCMC did not renew. (R. 205, Ex. B, Song Dep., at 32.) Plaintiff explains that Dr. Song's deposition testimony supports the assertion that persons admitted into UCMC residency programs have a reasonable expectation to complete the program.

Despite this factual foundation, Defendant generally argues that Dr. Killingsworth's reliance on Plaintiff's "self-serving" declaration is somehow in error. It is well-established, however, that "[d]eposition testimony, affidavits, responses to interrogatories, and other written statements by their nature are self-serving." *Hill v. Tangherlini,* 724 F.3d 965, 967 (7th Cir. 2013). In short, federal courts do not discount self-serving declarations that are based on an affiant's first-hand knowledge and observations. *See Durukan Am., LLC v. Rain Trading, Inc.,* 787 F.3d 1161, 1164 (7th Cir. 2015). As such, Plaintiff has shown that there is a basis in the record supporting the factual assumption that she would finish her PRS residency program and complete a two year fellowship. Defendant may cross-examine Plaintiff concerning her other career goals and why her goals changed. *See EEOC v. DHL Express,* No. 10 C 6139, 2016 WL

5796890, at *9 (N.D. Ill. Sept. 30, 2016) ("the proper way for the EEOC to challenge these assumptions is to cross-examine her with contrary facts in the record or to present evidence that undermines [expert's] factual assumptions").

Similarly, Defendant challenges the factual assumption that Plaintiff would pass her licensing exams as unsupported by the evidence. Evidence in the record, however, reveals that Plaintiff has an extensive, successful academic history, that she secured research positions at Harvard Medical School and the University of Washington, that she has published multiple peer-reviewed publications, and has received numerous honors and awards. Based on her academic success and work experience, there is a factual record supporting the assumption that Plaintiff would have passed her licensing examinations.

Further, Defendant challenges the assumption that Plaintiff would have found a lucrative job as a plastic surgeon in the United States. More specifically, Defendant attempts to contradict this statement by highlighting Plaintiff's 2010 application to the UCMC residency program in which she stated that her "ultimate career goal is to serve people who suffer from craniofacial anomalies by creating a treatment and research center in her home country." (Artunduaga Decl. ¶¶ 1, 2.) Likewise, Defendant points to Plaintiff's statements in her applications to other residency and MPH programs about her desire to return to Colombia. Again, Defendant may cross-examine Plaintiff regarding the factual assumptions about her career goals, which goes to the weight – not the admissibility – of Dr. Killingsworth's expert opinion testimony. *See Metavante Corp.,* 619 F.3d at 761; *Richman,* 415 F.Supp.2d at 942.

Next, Defendant challenges Dr. Killingsworth's assumption that Plaintiff would continuously work until the age of 72. At his deposition, Dr. Killingsworth explained that the

13

table he provided that reflects Plaintiff's lost future earnings shows the cumulative loss earnings at any desired retirement age up until the age of 72.  (Killingsworth Dep., at 123.)  He clarified that counsel asked him to calculate up to the age of 72, that the table reflects cumulative loss up to any desired age, and that he did not calculate that Plaintiff's worklife expectancy is 72.  (*Id*. at 122-23.)  In short, Dr. Killingsworth's opinion does not depend on the assumption that Plaintiff will work until 72, but rather, after the jury decides what year Plaintiff will retire, the jury can derive a damages figure for that age by referring to the Dr. Killingsworth's table.  Therefore, Defendant's argument that Dr. Killingsworth made an improper assumption as to Plaintiff's worklife expectancy is without merit.  Also without merit is Defendant's argument that Dr. Killingsworth does not have the requisite expertise to opine as to Plaintiff's worklife expectancy because Dr. Killingsworth made no such calculation.  *See Gayton v. McCoy,* 593 F.3d 610, 618 (7th Cir. 2010) ("Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony.") (internal quote and citation omitted).

Defendant also questions Dr. Killingsworth's failure to consider alternative assumptions about possible careers other than public health positions.  More specifically, Defendant argues that the factual assumption that Plaintiff would pursue a public health administration career is refuted by her enrollment in the University of California's Translational Medicine program.  Not only has Plaintiff set forth evidence that her new program is not inconsistent with a public health career, but this is a factual dispute for the jury to decide.  Moreover, Defendant's argument that Dr. Killingsworth's opinion testimony is somehow inadmissible because he did not consider alternative assumptions about careers is not supported by the case law it relies upon.  Defendant,

14

for example, cites *Schultz v. Akzo Nobel Paints*, LLC, 721 F.3d 426, 434 (7th Cir. 2013), in which the Seventh Circuit discussed an expert's consideration of alternative causes of a plaintiff's injury when relying on the method of differential diagnosis and differential etiology – which is not similar to Dr. Killingsworth's methodology in calculating future income. *See Daubert*, 509 U.S. at 595 (the court's focus is "solely on principles and methodology, not on the conclusions that they generate.").

Accordingly, Plaintiff has sufficiently presented evidence in the record supporting Dr. Killingsworth's factual assumptions, and despite Defendant's suggestion to the contrary, "an expert witness is not required to verify all the facts on which he relies." *Tilstra v. BouMatic LLC,* 791 F.3d 749, 753 (7th Cir. 2015). Therefore, the Court, in its discretion, denies Defendant's *Daubert* motion.

### B.     Federal Rule of Evidence 403

Last, Defendant argues that the Court should bar Dr. Killingsworth's expert opinion testimony because its probative value is substantially outweighed by the danger of juror confusion. *See United States v. Schiro,* 679 F.3d 521, 529 (7th Cir. 2012) ("a trial judge has a responsibility to screen expert evidence for reliability and to determine the total effects of proposed evidence, weighing its probative value against its potential to (among other things) confuse the jury"); *United States v. Alayeto,* 628 F.3d 917, 922 (7th Cir. 2010) (evidence is confusing if it distracts jurors from central issue of case).

In particular, Defendant argues that Dr. Killingsworth's conclusions are too speculative to support his expert conclusion that Plaintiff suffered a specific amount of lost earnings caused by UCMC terminating her from the residency program. Not only is Dr. Killingsworth's

testimony highly probative in relation to Plaintiff's compensatory and punitive damages, Defendant's argument that Dr. Killingsworth's conclusions are speculative is without merit, as discussed above. Furthermore, Defendant's argument that Dr. Killingsworth's testimony speaks to causation is not supported by the record and easily cured by a jury instruction. Finally, Defendant's contention that Dr. Killingsworth's damages calculation of over $9 million will improperly influence the jury is mitigated by the damages cap of $300,000. *See* 42 U.S.C. § 1981a(b)(3)(D).

## CONCLUSION

For these reasons, the Court, in its discretion, denies Defendant's motion to bar, or in the alternative limit, the opinion and testimony of Plaintiff's damages expert Dr. Mark R. Killingsworth pursuant to the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

**Dated:** December 21, 2016

**ENTERED**

_____
**AMY J. ST. EVE**
**United States District Court Judge**