UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DR. MARIA ARTUNDUAGA, ) | |
| ) | |
| *Plaintiff,* ) | Case No. 12-cv-08733 |
| ) | |
| v. ) | Judge Amy J. St. Eve |
| ) | Magistrate Judge Sidney I. Schenkier |
| THE UNIVERSITY OF CHICAGO ) | |
| MEDICAL CENTER, ) | |
| ) | |
| *Defendant.* ) | |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF
HER ENTITLEMENT TO PUNITIVE DAMAGES**

Plaintiff Dr. Maria Artunduaga, by her attorneys, pursuant to this Court's request of February 6, 2017, submits this Memorandum in Support of Her Entitlement to Punitive Damages.

**I.   STANDARD FOR PUNITIVE DAMAGES**

Title VII authorizes an award of punitive damages when a plaintiff demonstrates that the defendant engaged in intentional discrimination "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. §1981(a)(b)(1). A plaintiff meets this burden when she shows that (1) the defendant acted in the face of a perceived risk that its actions would violate federal law, and (2) the agents who engaged in discrimination were acting within the scope of their employment. *Kolstad v. American Dental Association,* 527 U.S. 535-536, 543 (1999). The defendant must then prove that it engaged in good-faith efforts to implement an anti-discrimination policy to avoid liability for punitive damages. *Id*. at 544.

## II. THE EVIDENCE

### A. Dr. Artunduaga has presented evidence sufficient to show that UCMC acted in the face of a perceived risk that its actions would violate the law.

One of the ways that a plaintiff may satisfy this element is to "demonstrate[e] that the relevant individuals knew of or were familiar with the antidiscrimination laws and the employer's policies for implementing those laws." *Hertzberg v. SRAM Corp.*, 261 F.3d 651, 661-662 (7th Cir. 2001). Here, the primary decision maker – Dr. Song – freely admitted that he knew that UCMC had an anti-discrimination policy. Transcript, 688:12-15. ("Q: Now, you were aware in 2011 and 2012 that the medical center had a non-discrimination policy that applied to residents, correct? A: That is correct.")

Additionally, a plaintiff can establish this element by showing that the decision maker "lied, either to the plaintiff or to the jury, in order to cover up [his] discriminatory actions." *Bruso v. United Airlines, Inc.*, 239 F.3d 848, 857 (7th Cir. 2001). The evidence submitted at trial shows the reason Dr. Song gave Dr. Artunduaga for placing her on probation – that all of her reviewers unanimously stated that she could not improve enough to complete her residency, as set out in his November 2, 2011 memorandum (JX22) – was false. In fact, it was simply his opinion – not that of the other evaluators:

> Q. Joint Exhibit 22, if we could just pull that up. And we talked about that at length, and we talked about the first paragraph and that you said in there it was unanimous amongst the numerous evaluators, et cetera. And in response to a question that Mr. Jepson asked you, you said that that was your conclusion, correct?
>
> A. Correct.
>
> Q. But you didn't tell Dr. Artunduaga that that was your conclusion, did you?
>
> A. Didn't tell her what?

2

> Q. You didn't tell Dr. Artunduaga, this is my conclusion, that you can't -- that -- you did not tell Dr. Artunduaga in your meeting that it was your conclusion that the numerous evaluators had -- were unanimous -- that it would be extremely difficult for her to correct her issues? You didn't use those words, did you, "it is my conclusion"?
>
> A. I did not use the words "it is my conclusion."
> Q. Right. And this letter does not say "it is my conclusion," does it?
>
> A. No.

Transcript, 851:3-22. Contrary to Dr. Song's testimony, the evidence shows that it was decidedly not "unanimous amongst … evaluators" that Dr. Artunduaga could not improve enough to correct her deficiencies. Not a single reviewer used that language, and multiple evaluators between July and late October 2011 credited Dr. Artunduaga with improvement. *E.g.*, JX6 (Kaplan evaluation ("She gained great experience with the U of C system as time passed"); JX7 (Jaskowiak evaluation) ("Steps are being taken to address these issues"); JX8 (Angelos evaluation) ("she improved during the rotation"); JX14 (Umanskiy evaluation) ("Throughout the rotation she demonstrated improvement in patient care and communication skills").

      Similarly, regarding Dr. Song's decision to terminate Dr. Artunduaga from the residency program, she has submitted evidence – and expects to put on more during the next day of testimony – showing that the reasons Dr. Song gave her were false. He stated that she "failed to fulfill the applicable educational and clinical requirements of the graduate education and clinical training program" and "failed to carry out satisfactorily [her] professional responsibilities," and that the termination decision was made "with particular attention to [her] knowledge, skills and judgment since [her] probation" (JX100), yet based on the evidence, the jury could reasonably believe that:

- Dr. Artunduaga improved substantially during her probationary period, which lasted from November through March, and garnered many positive reviews. *E.g.*, JX35 (Moreira evaluation); JX42, JX51, JX54, JX58 (Shao evaluations); JX43, JX52, JX63, JX74, JX80 (Fleming evaluations); JX44 (Eton evaluation); JX45 (Hall evaluation); JX46 (Skelly evaluation); JX47 (Milner evaluation); JX48 (Blecha evaluation); JX49 (Steppacher evaluation); JX55, JX57, (Paruch evaluations); JX 60, JX71, JX75, JX 7(Olaitan evaluations); JX62, JX72 (Li evaluations); JX68 (Witkowski evaluation); JX86, JX91 (Cohen evaluations).

- Dr. Song had decided to terminate Dr. Artunduaga on or before March 8, 2012, when he sent a draft of her termination letter to UCMC's attorney, Jane McAtee. Transcript, 738:24-740:2.

- Dr. Song had no idea how Dr. Artunduaga was performing during the probationary period before he made the decision to terminate her on or before March 8, 2012:

    Q.   Now, during the time that she was in thoracic and vascular and transplant, the residents and the fellows and the physician extenders who were working with her had been asked to do weekly evaluations, correct?

    A.   Correct.

    Q.   Were you keeping -- were you monitoring those weekly evaluations as they came in?

    A.   No.

    Q.   Did you look at them at all?

    A.   No.

    Q.   What about monthly evaluations from the attendings, were you looking at those?

    A.   No. At that point, I asked Dr. Park to.

    Q.   Was Dr. Park reporting to you?

    A.   Not at that time. I wanted to keep an arm's distance from this process.

4

Transcript, 738:7-22. Given this evidence, the jury could conclude that Dr. Song's stated reason for terminating Dr. Artunduaga was false, since he knew nothing at all about her performance during probation at the time he made his decision.

As such, evidence of Dr. Song's knowledge that it was UCMC's policy not to discriminate, along with evidence that he lied to Dr. Artunduaga about both the reason for her probation and the reason he terminated her from the program, are sufficient to satisfy the first *Kolstad* prong.

### B. The evidence shows that Dr. Song acted within scope of his employment.

There is no dispute regarding *Kolstad's* second requirement that that plaintiff show that the discriminating decision maker is a managerial employee. Both parties have put on evidence confirming that Dr. Song, as the Program Director for the Section of Plastic and Reconstructive Surgery, was acting within the scope of his employment in deciding to place Dr. Artunduaga on probation and participating in and implementing the decision to terminate her from the residency program. *See, e.g.*, Transcript, 683:11-14, 770:13-18.

### C. Dr. Artunduaga has presented evidence sufficient to show that UCMC did not make a good faith effort to comply with the law.

Dr. Artunduaga has also submitted evidence sufficient to rebut the third *Kolstad* prong, which requires UCMC to prove it implemented an anti-discrimination policy in good faith. The evidence shows that the very individual who was tasked with administering UCMC's anti-discrimination and anti-retaliation policies – Jonathan Rothstein, UCMC's Director of Labor and Employee Relations – refused to even meet with Dr. Artunduaga for months and failed to investigate her complaints of both discrimination and retaliation, despite multiple pleas from both Dr. Artunduaga and her husband, Ricardo Garcia.

Mr. Rothstein was an experienced attorney (he had even been in private practice handling plaintiff-side employment discrimination matters) during the relevant time period. Transcript, 1114:6-1115:24. He testified that he was well aware of both the federal anti-discrimination laws and UCMC's own policies prohibiting discrimination and retaliation. *Id.*, 1116:17-20. Mr. Rothstein admitted that it was his responsibility to "receive complaints regarding claims of discrimination based on national origin and retaliation, among other categories, and to investigate those claims and to prepare -- reach conclusions and prepare a report regarding them." Transcript, 1117:1-7.

Yet when Dr. Artunduaga's husband, Ricardo Garcia, called and emailed him in November 2011, pleading for the chance to meet with him to discuss Dr. Artunduaga's concerns, Mr. Rothstein refused to even hear what he had to say. *Id.*, 1119:18-24, 1120:11-15; JX2. Despite the fact that Mr. Rothstein was the person at UCMC responsible for investigating EEO complaints, he never even asked Mr. Garcia whether Dr. Artunduaga had a complaint of discrimination during what he conceded was a "very brief" conversation. Instead, he shut Mr. Garcia down and refused to even listen to what the problem was. Transcript, 1039:16-1040:11; 1130:4-1131:4.

Similarly, when Dr. Artunduaga asked Mr. Rothstein to investigate her complaints of retaliation with respect to her grievance in early May 2012, he again refused to do so, despite the fact that he admitted that he did not even know the subject of her grievance, including, of course, whether there were any issues related to discrimination or unlawful retaliation that were involved. Transcript, 1131:8-16, 1125:6-14.

And UCMC's Associate General Counsel, Jane McAtee, actively dissuaded Mr. Garcia from attempting to explain Dr. Artunduaga's complaints to Mr. Rothstein by calling him on his

6

personal cell phone and threatening to have him removed by hospital security if he did not leave the premises immediately, telling him that "you should not be looking for [the] human resources department." Transcript, 660:3-12, 1031:13-21. That two attorneys employed by UCMC would attempt to bully and intimidate Dr. Artunduaga's husband for merely seeking a meeting to discuss her issues is extremely probative evidence of lack of good faith and could allow a jury to conclude that UCMC was recklessly indifferent to Dr. Artunduaga's federally protected rights. *Bruso*, 239 F.3d at 861 (evidence that defendant refused to implement its own policy sufficient to rebut defendant's argument of good faith effort).

Further, UCMC's anti-discrimination policy itself is vague and poorly-explained. The two documents that purport to set out the policy are the GME Handbook (JX1) and the GME Policy Manual (JX3). The Handbook does not even mention discrimination and only alludes to retaliation in passing (JX3, p. 19). The Policy Manual states that UCH and the individual programs "shall not discriminate against any person in the selection or promotion process because of race, color, religion, sex, national origin, age, marital status, disability or veteran status" (JX3 at UCMC 10463), but it does not explain the steps a resident should take to lodge a complaint. Indeed, the policies, together, were so unclear that Dr. Artunduaga had to ask Mr. Rothstein "are you the right person to file this complaint with?" DX156.

It is well-settled that the mere existence of a policy, without more, is insufficient to insulate an employer from a punitive damages award. *Hertzberg*, 261 F.3d at 663. The policy must, at a minimum, explain its contents and how employees may utilize it. As the Seventh Circuit held in *EEOC v. AutoZone, Inc.*, 707 F.3d 824, 837-838 (7th Cir. 2013), a policy that is unclear is additional evidence of lack of good faith. *Accord*, *EEOC v. Mgmt. Hospitality of Racine, Inc.*, 666 F.3d 422, 438 (7th Cir. 2012) (punitive damages proper where policy was

7

"ineffective in advancing the education and protection of the employees' rights under Title VII"). The nature of the policies themselves serves to rebut any argument UCMC may make that it implemented them in good faith.

### III. CONCLUSION

This evidence, together with the reasonable inferences that the jury is entitled to draw, is sufficient to justify a punitive damages instruction. The plaintiff respectfully requests that the Court instruct the jury that it may consider an award of punitive damages in this matter.

Respectfully submitted,

**DR. MARIA ARTUNDUAGA**

By: /s/ Jamie S. Franklin
One of her Attorneys

Jamie S. Franklin (ARDC # 6242916)
THE FRANKLIN LAW FIRM LLC
53 W. Jackson Blvd., Ste. 803
Chicago, IL 60604
(312) 662-1008
(312) 662-1015 (fax)
jsf@thefranklinlawfirm.com

Cynthia H. Hyndman
ROBINSON CURLEY & CLAYTON, P.C.
300 South Wacker Dr., Ste. 1700
Chicago, IL 60606
(312) 663-3100
(312) 663-0303 (fax)
chyndman@robinsoncurley.com

**CERTIFICATE OF SERVICE**

I, the undersigned, as additional Counsel for Plaintiff, certify the foregoing document, **Plaintiff's Memorandum in Support of her Entitlement to Punitive Damages** was served by electronic mail on February 7, 2017 on the following persons:

Edward C. Jepson
Elizabeth N. Hall
Emily C. Fess
VEDDER PRICE, P.C.
222 N. LaSalle St., Ste. 2600
Chicago, IL 60601

Cynthia H. Hyndman
ROBINSON CURLEY & CLAYTON, P.C.
300 South Wacker Dr., Ste. 1700
Chicago, IL 60606

/s/ Jamie S. Franklin