```
 1                    IN THE UNITED STATES DISTRICT COURT
                        NORTHERN DISTRICT OF ILLINOIS
 2                            EASTERN DIVISION

 3    DR. MARIA ARTUNDUAGA,           ) Docket No. 12 C 8733
                                      )
 4                    Plaintiff,      )
                                      )
 5               vs.                  )
                                      )
 6    THE UNIVERSITY OF CHICAGO       )
      MEDICAL CENTER,                 ) Chicago, Illinois
 7                                    ) January 31, 2017
                      Defendant.      ) 9:07 o'clock a.m.
 8
                              VOLUME TWO
 9                 TRANSCRIPT OF TRIAL PROCEEDINGS
          BEFORE THE HONORABLE AMY J. ST. EVE, AND A JURY
10
      APPEARANCES:
11
      For the Plaintiff:         THE FRANKLIN LAW FIRM, LLC
12                               BY:  MS. JAMIE S. FRANKLIN
                                 53 W. Jackson Blvd., Suite 803
13                               Chicago, Illinois  60604

14                               ROBINSON, CURLEY & CLAYTON, P.C.
                                 BY:  MS. CYNTHIA H. HYNDMAN
15                               300 South Wacker Drive, Suite 1700
                                 Chicago, Illinois  60606
16
      For the Defendant:         VEDDER PRICE, P.C.
17                               BY:  MR. EDWARD C. JEPSON, JR.
                                      MS. ELIZABETH N. HALL
18                               222 N. LaSalle St., Suite 2600
                                 Chicago, Illinois  60601
19
      Court Reporter:            MR. JOSEPH RICKHOFF
20                               Official Court Reporter
                                 219 S. Dearborn St., Suite 1232
21                               Chicago, Illinois  60604
                                 (312) 435-5562
22

23               *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

24                       PROCEEDINGS RECORDED BY
                         MECHANICAL STENOGRAPHY
25                  TRANSCRIPT PRODUCED BY COMPUTER
```

```
 1            THE CLERK:  12 C 8733, Artunduaga vs. The University

 2    of Chicago Medical Center.

 3            THE COURT:  Good morning.

 4            MR. JEPSON:  Good morning, your Honor.

 5            MS. HYNDMAN:  Good morning, your Honor.

 6            MS. FRANKLIN:  Good morning, your Honor.

 7            THE COURT:  You are here to continue trial.  We will

 8    pick up with Dr. Artunduaga's testimony.  Any issues for the

 9    Court before we begin?

10            MS. HYNDMAN:  No, your Honor.

11            MS. HALL:  No.

12            MR. JEPSON:  No.

13            THE COURT:  You are so easy --

14        (Laughter.)

15            THE COURT:  -- compared to my last trials.

16            MS. HALL:  It's only Day 2, your Honor.

17            THE COURT:  Thank you.  Thank you.

18        (Laughter.)

19            THE COURT:  All right.  We will see if the jury is

20    here and we will get started whenever the jury is here.

21            MS. FRANKLIN:  Thank you.

22        (Brief recess.)

23            THE COURT:  The jury is here.

24            Doctor, if you want to come back up, please.

25            Bring in the jury.
```

```
 1              Do you have a ballpark sense of how much longer on

 2   direct?  Just ballpark.

 3              MS. HYNDMAN:  Oh, probably till lunch at least.

 4              THE COURT:  That is fine.

 5              MS. HYNDMAN:  If maybe a little longer.

 6              THE COURT:  Just a ballpark.

 7              MS. HYNDMAN:  I'm terrible at predicting, too.

 8        (Jury in.)

 9              THE COURT:  Good morning, ladies and gentlemen.

10              When we broke at the end of yesterday, Dr. Artunduaga

11   was testifying.  We will pick up with her testimony.

12              Doctor, you are still under oath, ma'am.

13              THE WITNESS:  Yes.

14              THE COURT:  You may proceed.

15              MS. HYNDMAN:  Thank you, your Honor.

16   MARIA ALEXANDRA ARTUNDUAGA, PLAINTIFF HEREIN, PREVIOUSLY SWORN

17                    DIRECT EXAMINATION (Resumed)

18   BY MS. HYNDMAN:

19   Q.  Good morning, Maria.

20   A.  Hi.

21   Q.  Can you please look at Plaintiff's Exhibit No. 8?

22   A.  It doesn't show yet.

23        (Brief pause.)

24   BY MS. HYNDMAN:

25   Q.  Dr. Artunduaga, do you recognize this document?
```

Artunduaga - direct

1   A.  Yes, I do.

2   Q.  What is this?

3   A.  It's a weekly schedule for coverage in clinics and

4   cases -- operative cases -- for the week of August 16 to 19.

5   Q.  Who prepared this document?

6   A.  Dr. John Seal.

7   Q.  Did he provide you a copy of it at the beginning of that

8   week?

9   A.  Yes.

10          MS. HYNDMAN:  Your Honor, we'd move to admit

11  Plaintiff's Exhibit No. 8.

12          THE COURT:  Any objection?

13          MR. JEPSON:  No objection.

14          THE COURT:  It is admitted, and you may publish it.

15          MS. HYNDMAN:  Thank you, Judge.

16      (Plaintiff's Exhibit No. 8 received in evidence.)

17  BY MS. HYNDMAN:

18  Q.  Dr. Artunduaga, what were you scheduled to do on the

19  Kaplan Service the week of August 16th through 19th?

20  A.  Okay.  Sure.

21          On Monday, I didn't have any assignments.  On

22  Tuesday, I was assigned to two cases with Dr. Angelos.  On

23  Wednesday, I didn't have any assignments.  On Thursday, I was

24  scheduled to second assist Dr. Seal in two operation.  On

25  Friday, I was, again, scheduled to second assist Dr. Seal.

Artunduaga - direct

129

1   Q.  What does it mean to second assist?

2   A.  Second assist is performing -- you have the surgeon, and

3   then you have someone who is across the surgeon and who would

4   likely do most of the surgery under supervision.  The second

5   assistant is the one who, like, does suction or, like,

6   cleaning up.  Most of the medical students are assigned to do

7   that.

8   Q.  So, when you were second assisting, was it typically on a

9   surgery that was more complicated?

10  A.  Not necessarily.

11  Q.  But in some instances that was the case?

12  A.  From my personal experience with previous months with

13  Dr. Angelos, I was the first assistant in some of his cases

14  and a medical student will be the person second assisting us.

15          MS. HYNDMAN:  Let's take a look at Plaintiff's

16  Exhibit No. 9, please.

17  BY MS. HYNDMAN:

18  Q.  Do you recognize this document, Maria?

19  A.  It's a similar schedule for the next week prepared by

20  Dr. John Seal, the coverage or distribution of assignments for

21  cases in the OR and the clinics.

22  Q.  And what's the week?

23  A.  It's from August the 22nd to the 26th.

24          MS. HYNDMAN:  Your Honor, we'd move to admit

25  Plaintiff's Exhibit No. 9.

Artunduaga - direct

1          THE COURT:  Any objection?

2          MR. JEPSON:  No objection, your Honor.

3          THE COURT:  It is admitted, and you may publish it.

4          MS. HYNDMAN:  Thank you.

5      (Plaintiff's Exhibit No. 9 received in evidence.)

6  BY MS. HYNDMAN:

7  Q.  Dr. Artunduaga, what were you scheduled to do this week on

8  the Kaplan Service?

9  A.  On Monday, I would do clinic with Dr. Jaskowiak.  On

10 Tuesday, I was in clinic with Dr. Kaplan.  On Wednesday --

11 thank you -- I was scheduled to do a case with Dr.

12 Jaskowiak -- two cases.  And on Thursday, I was scheduled to

13 do three cases with Dr. Angelos.  On Friday, I was scheduled

14 to do one case with Dr. Jaskowiak and clinic with Dr. Kaplan.

15 Q.  Did you assist in the surgeries that are scheduled that

16 week?

17 A.  I think I might.  I don't remember.

18 Q.  Let's take a look at Plaintiff's Exhibit No. 10.

19          Have you seen this document before?

20 A.  Yes, I have.

21 Q.  What is this document?

22 A.  It -- about the same thing.  Coverage for cases and

23 clinics assignments throughout the week prepared by Dr. John

24 Seal.

25 Q.  For which week?

Artunduaga - direct

131

1   A.  From the 29th of August to September the 2nd.

2          MS. HYNDMAN:  Your Honor, we'd move to admit

3   Plaintiff's Exhibit No. 10.

4          THE COURT:  Any objection?

5          MR. JEPSON:  No objection, your Honor.

6          THE COURT:  It is admitted, and you may publish.

7      (Plaintiff's Exhibit No. 10 received in evidence.)

8   BY MS. HYNDMAN:

9   Q.  Dr. Artunduaga, what were you scheduled to do the week of

10  August 29th at the Kaplan Service?

11  A.  Sure.

12          On Monday, I was scheduled to work with Dr. Jaskowiak

13  in one surgery, and then I was covering the clinic for Dr.

14  Jaskowiak, too.  On Tuesday, I was doing three cases with

15  Dr. Chhablani.  On Wednesday, I was scheduled to do one case

16  with Dr. Kulkarni and clinic with her.  This case actually got

17  cancelled.  I had to remember that.

18          And, then, on September 1st, we switched rotations.

19  We started a new rotation.  Therefore, my name is not on the

20  schedule.

21  Q.  Thank you.

22          During the two months you worked on the Kaplan

23  Service, July and August, were there ever occasions that you

24  assisted on surgeries that did not show up on one of these

25  weekly schedules?

Artunduaga - direct

1   A.  I think there were a few, but I don't really -- can't

2   point you to specific ones.

3   Q.  But it's possible that you did assist on some that you

4   weren't scheduled to be on?

5   A.  Yeah.  I will have to go back to my -- my log of cases

6   that I'm -- and see.

7   Q.  So, during the month of August of 2011, did any of the

8   attending physicians on the Kaplan Service raise any issues

9   with you about your performance?

10  A.  No, none of them.

11  Q.  Did there ever come a time that you had an issue with a

12  patient of Dr. Jaskowiak?

13  A.  Oh, yes, that.  So, I will have to tell how the dynamics

14  of the team were working at the time.  Dr. John Seal was the

15  chief resident.

16          Should I say so?

17  Q.  Let me ask you a question.

18  A.  I'm sorry.

19  Q.  What was the issue that arose with Dr. Jaskowiak's

20  patient?

21  A.  Yes.  So, Dr. Jaskowiak patient had a mastectomy done.

22  Dr. Song decided to make -- to put two breast implants

23  immediately after the surgery.  And the patient was

24  complaining of a lot of -- a lot of pain.  Dr. Jaskowiak had a

25  protocol of not giving patients ibuprofen or NSAIDs.  Since

Artunduaga - direct

1    the patient didn't really improve, Dr. Song had decided to use

2    ibuprofen and much stronger medicines into that.

3         Unfortunately, I did not know that there was a change

4    of plans, even though I had already check the clinical history

5    on the electronic medical records in the computer.  There was

6    not note on that particular issue or the reason why it was

7    happening.

8         So, I had time to round on these patients, to go to

9    each of them and ask them how they were doing because I wanted

10   to report later in that day how, you know, they were doing and

11   give them information about them.

12        So, I came to the room unaware of these changes in

13   the plan, and the patient was in a lot of pain still and

14   expressed to me that she was very unsatisfied with the medical

15   care she was receiving by Dr. Jaskowiak and Dr. Song because

16   she had been on a lot of pain for so many hours and they had

17   left it -- I mean, not left it, but, like, had delayed their

18   treatment for so much time.

19        So, I started to ask questions obviously, naively,

20   about how she was doing with the pain.  And she got pretty

21   upset that I did not know that those changes were made and

22   that I was not kept in the loop between Dr. Jaskowiak's teams,

23   which is -- was supposed to be mine, and Dr. Song's team.  So,

24   she made a complaint and she wrote to Dr. Song about that.

25   Q.  Did you ever have a conversation with Dr. Jaskowiak about

Artunduaga - direct

134

1   this issue with this patient?

2   A.  No.  She directly -- I later learned that she complained

3   to Dr. Song about that.

4   Q.  Did you ever have a conversation with Dr. Song about the

5   issue with the patient?

6   A.  He sent me an e-mail, a forward of the patient's long

7   e-mail of complaints about the way I managed and, like, my

8   lack of knowledge about her case.  She actually thought that I

9   was the nurse practitioner.  The nurse --

10              MR. JEPSON:  Objection.  Foundation.

11              THE COURT:  Sustained.

12              I will strike it.  The jury should disregard it.

13              THE WITNESS:  She wrote it.

14              MR. JEPSON:  Objection.

15              THE COURT:  There is no question pending, Doctor.

16              THE WITNESS:  Okay.  I'm sorry.

17              MS. HYNDMAN:  You can't argue with the objections --

18              THE WITNESS:  Okay.

19              MS. HYNDMAN:  -- Dr. Artunduaga.

20              THE WITNESS:  I'm sorry.

21   BY MS. HYNDMAN:

22   Q.  So, you learned from -- Dr. Song sent you an e-mail,

23   forwarded you her e-mail?

24   A.  Yeah.

25   Q.  Did you respond to Dr. Song's e-mail?

Artunduaga - direct

135

1  A.  Yes, I did.  I explained what had happened, and I wanted

2  him to know my side of the story.

3  Q.  Did Dr. Song respond to your e-mail?

4  A.  No.

5  Q.  Did Dr. Song ever talk to you in person about this

6  incident?

7  A.  No.

8  Q.  Did he ever talk to you on the telephone about this

9  incident?

10  A.  Sorry?

11  Q.  Did he ever talk to you on the telephone about this

12  incident?

13  A.  No.

14  Q.  So, the only communication was with the e-mail?

15  A.  Uh-huh, yes.  Yes.

16  Q.  You have to say "Yes."  Okay.

17        Did you have any formal meetings with any of the

18  attending physicians from the Kaplan Service about your

19  performance in July and August?

20  A.  I had just one meeting with Dr. Jaskowiak at the end of

21  July, but nothing else up to August.

22  Q.  At any time, did you have any meetings with any of the

23  attendings on the Kaplan Service about your performance during

24  those two months?

25  A.  Later on in the months of, I think, October or November, I

```
 1   sent e-mails to Dr. Jaskowiak, Chhablani, Kaplan, even

 2   Dr. Roggin, the program director in general surgery, telling

 3   them about Dr. Song's decision on putting me through

 4   probation.

 5   Q.  Other than those e-mails, did you have any conversations

 6   with them about your performance?

 7   A.  No.

 8           MS. HYNDMAN:  Let's take a look at Plaintiff's

 9   Exhibit No. 20.

10   BY MS. HYNDMAN:

11   Q.  Dr. Artunduaga, can you look at Plaintiff's Exhibit No.

12   20, please.  The bottom -- very bottom e-mail --

13   A.  Uh-huh.

14   Q.  -- appears to be an e-mail that you sent on September

15   29th.

16           Do you recognize that document?

17   A.  Yes.

18   Q.  Who did you send that e-mail to?

19   A.  Dr. Peter Angelos.

20   Q.  And above that is a response.  Did you receive that

21   response from Dr. Angelos?

22   A.  Yes, I did.

23   Q.  And, then, there's a couple of more responses back and

24   forth.  Did you send and receive those e-mails on September

25   29th?
```

Artunduaga - direct

1    A.  Yes, I did.  Sorry.  I forget about the dates.

2            MS. HYNDMAN:  Your Honor, we would move to admit

3    Plaintiff's Exhibit No. 20.

4            THE COURT:  Any objection?

5            MR. JEPSON:  No objection, your Honor.

6            THE COURT:  It is admitted, and you may publish it.

7        (Plaintiff's Exhibit No. 20 received in evidence.)

8    BY MS. HYNDMAN:

9    Q.  According to this e-mail --

10           MS. HYNDMAN:  Can you zoom in on that a little bit,

11   Jamie, so I can see it.

12           Thank you.

13   BY MS. HYNDMAN:

14   Q.  Dr. Angelos says in the second from the bottom:  Maria, I

15   will certainly fill out your evaluation, but more importantly

16   we should talk.

17           Did you ever have a conversation with him?

18   A.  Yes, I did.

19   Q.  When did that conversation occur?

20   A.  I think it's up -- somewhere --

21   Q.  Oh, if you scroll up?  Yeah.

22   A.  Yes.

23           MS. HYNDMAN:  Can you scroll up, please, Jamie.

24   BY THE WITNESS:

25   A.  I cannot remember exactly.  I want to say after 9.  So,

1    that would likely have happened on October, right?

2    BY MS. HYNDMAN:

3    Q.  Some time in early October?

4    A.  Yes, like a week later.

5    Q.  Where was that meeting?

6    A.  At his office.

7    Q.  Was there anyone else present besides you and Dr. Angelos?

8    A.  No.

9    Q.  About how long did you meet with him?

10   A.  About half an hour.

11   Q.  What did Dr. Angelos say to you in that meeting?

12   A.  Well, I told him that I was very concerned about the

13   issues that Dr. Jaskowiak raised, and that I had not received

14   her feedback; and, that I've seen she has done feedback

15   sessions with other surgery residents or interns, so that I

16   wanted to get his feedback and, you know, try to understand

17   what I was doing wrong, things that I could improve on,

18   because I -- I was very eager to fix problems and do better,

19   become a better resident.

20        So, I told him also that I have had a very difficult

21   start.  I told him about the problems that I had faced since

22   the beginning of my internship with Dr. Haijin In, with

23   Dr. John Seal, the way how they have been treating me.  And he

24   was very -- very open to, you know -- I mean, we

25   understand you are in training residency program.  You are not

Artunduaga - direct

1   expected as an intern to be perfect, and that's the reason why

2   you are under supervision all the time; and, that there were

3   things that I should improve on.  And he mentioned the thing

4   about being in surgery with two pairs of gloves and that he

5   noticed that I had improved because I was practicing at home.

6   That I was very anxious, obviously, when I came into the

7   operating room because it had been such a long time since I

8   had been in an operating room, about ten years or so.

9          So that he understood where I was coming from and

10  that -- that I -- I should just work on those things and that

11  he -- I mean, that I was a very smart lady and that I could

12  definitely be a really good resident if people told me how and

13  which things I should be working on.

14  Q.  You mentioned that you talked with Dr. Angelos about some

15  of the issues that were raised by Dr. Jaskowiak.  What are you

16  referring to?

17  A.  I saw Dr. Jaskowiak's e- -- I'm sorry, evaluation about

18  referring to things such as cultural barriers or that I was

19  frazzled, that I had communication challenges.  And I -- since

20  I had worked with him more over the past of the last month in

21  August, I wanted to get his impression about my performance in

22  the operative room and in clinic.  He say that that was not a

23  problem from his perspective.

24  Q.  We spoke a little bit yesterday about your working

25  relationship with Dr. Chhablani.

Artunduaga - direct

1    A.   Uh-huh.

2    Q.   Did you ever have a chance to have a one-on-one meeting

3    with Dr. Chhablani to talk about your performance?

4    A.   Yes, I did.  I reached out to most of the faculty that I

5    have worked on to get feedback and understand what they

6    thought of me.  So, yes, I schedule a meeting with her and --

7    Q.   When was that meeting?

8    A.   When was it?

9    Q.   When was it, yeah.

10   A.   Some time in October, perhaps.

11   Q.   Around October?

12   A.   Yes.  Might be November.  It's in the exhibits.

13   Q.   Was there -- where did you have that meeting with

14   Dr. Chhablani?

15   A.   In her clinic, the breast clinic.

16   Q.   Was there anybody else present when you spoke with her?

17   A.   No.

18   Q.   How long did you meet with her?

19   A.   Half an hour.

20   Q.   What did she say to you in that meeting?

21   A.   Well, she gave me feedback in regards to my anxiety in the

22   operating room, that I should practice more with two pairs of

23   gloves and -- that was basically her feedback in regards to my

24   performance.

25   Q.   Did you talk about anything else with her?

Artunduaga - direct

1   A.  Yes.  I knew she was a foreign medical graduate from

2   India, and I wanted to get her advice as a role model kind of

3   thing, advice in regards to how to succeed in a male-dominated

4   field being, you know, a foreigner.

5           MR. JEPSON:  Objection.  Hearsay and foundation.

6           THE COURT:  What is your response?

7           MS. HYNDMAN:  I need to understand what the hearsay

8   part is.

9           THE COURT:  She is talking about her conversation.

10          MS. HYNDMAN:  She's talking about her conversation

11  with Dr. Chhablani.

12          MR. JEPSON:  But she's also saying why she wanted the

13  advice, and I'm not hearing that that's part of the

14  conversation.  Non-responsive to the question as to what was

15  said.

16  BY MS. HYNDMAN:

17  Q.  Why did you want to talk to Dr. Chhablani about the fact

18  that she was a foreign medical graduate?

19  A.  Because we were very few in the Department of Surgery.

20  She was the only woman coming from a developing country who

21  had done surgery and who had survived.

22          MR. JEPSON:  Objection.  Lack of foundation.

23          THE COURT:  Sustained on the last part.

24          MR. JEPSON:  Ask that it be stricken.

25          THE COURT:  I will strike the last part.  The jury

Artunduaga - direct

1    should disregard it.

2    BY MS. HYNDMAN:

3    Q.  What did you ask Dr. Chhablani in that meeting?

4    A.  I asked her about ways of making this work -- making the

5    surgical residency work -- as a minority.

6    Q.  Did she respond?

7    A.  Yes.

8    Q.  What did she say?

9           MR. JEPSON:  Objection.  Calls for hearsay.

10          MS. HYNDMAN:  Your Honor, she was one of the

11   evaluating physicians.  This is part of her job, to teach.

12   It's part of her job to help people get through a surgical

13   residency.  I think the evidence will show that the job of

14   attending physicians is to help the residents try to learn and

15   how to get through the residency.

16          THE COURT:  Mr. Jepson?

17          MR. JEPSON:  She's not a decision maker with respect

18   to any of the things that happened to Dr. Artunduaga.  All she

19   did was rotate with her and evaluate her.

20          MS. HYNDMAN:  The hearsay objection doesn't -- the

21   hearsay exception doesn't apply just to decision makers.  It

22   applies to anybody who's acting within the role -- scope of

23   their employment.

24          MR. JEPSON:  I don't think it falls within the

25   exception.  The evaluation says what it says.  All this other

Artunduaga - direct

143

1  stuff is hearsay.

2         THE COURT:  As to this particular conversation, the

3  objection is overruled, given the doctor's role at the

4  facility.

5  BY MS. HYNDMAN:

6  Q.  What did Dr. Chhablani say to you?

7  A.  Well, first of all, she said that she was very impressed

8  by the fact that a foreign medical graduate from Colombia had

9  made it into the university of plastic surgery; that from her

10 experience, she could not get into academic medical programs

11 many years ago; and, that she had gone through a community

12 general surgery program that it's more -- that is friendly to

13 foreign medical graduate.

14         She say that I will have a very difficult time to

15 succeed at the University of Chicago because they were not

16 used to have people like us; and, that I should definitely be

17 mentored and have some sort of role model, someone -- a

18 champion of some sort in the Plastic Surgery Department; and,

19 that she really thought that it will be really difficult.  I

20 mean, my experience at the University of Chicago would likely

21 be very, very painful.

22 Q.  Let's talk about your relationship with Dr. Seal.  How

23 would you describe your working relationship with Dr. Seal?

24 A.  Very difficult.

25 Q.  Why was it difficult?

Artunduaga - direct

1    A.   Well, since the beginning of my work with him, there were

2    several instances where he would rather have the other intern

3    do most -- almost all of the jobs that interns do, such as

4    rounding or preparing the list.  Many of the cases that were

5    first assistant cases -- I mean, you do the actual operation

6    with the attending -- were given to the other person.

7          He constantly called me out for my accent.

8    Apparently he told me that he couldn't understand me and that

9    I had communication issues and challenges.  Every time I ask a

10   question, he will ignore me completely.  If we were in a group

11   of people and I was here (indicating) and he was there

12   (indicating), he would just, you know, look at people right

13   here (indicating) and skip me over and talk to the rest.

14         He humiliated me publicly at least twice, criticizing

15   my command of the language -- the English language -- in front

16   of other people.  I was very embarrassed, humiliated, and I

17   try really hard not to cry.

18   Q.   You said there were two instances where that happened

19   where he humiliated you?

20   A.   Yes.

21   Q.   What was the first instance?

22   A.   The first instance happened in the hallway of one of the

23   hospital's hallway where some of the team were there, some

24   people -- probably just two -- and then anybody else, any

25   nurses, anyone walking by.  And he say that really loud.

Artunduaga - direct

1   Q.   What did he say?

2   A.   Maria, I mean, I don't understand why you're asking this

3   many questions.  Don't you understand English?  I don't

4   understand what you're saying.

5   Q.   Do you remember specifically who was there in the area at

6   the time when he made that comment?

7   A.   I think there was a medical student called Alison.  I

8   don't remember if it -- there was a resident, probably Suzanne

9   Lim, she was there.

10  Q.   You said there was a second incident where this -- where

11  Dr. Seal humiliated you.  What was the second incident?

12  A.   The second incident happened about mid-August, I think.

13  It was in a lounge where the residents work.  And apparently

14  there was some sort of miscommunication between him, myself

15  and the nurse practitioner, and he was very mad -- I mean,

16  upset clearly why.  And he started, you know, calling me out

17  about, don't you understand?  I mean, where do you learn

18  English?  I don't understand your accent.

19          He was very, very loud and -- not violent, but I was

20  afraid of -- you know, of him.

21  Q.   What was his tone when he was saying that to you?

22  A.   Tone, condescendent.  Very condescendent.

23  Q.   You said that was in the lounge.  Is that sometimes called

24  the cave?

25  A.   Yeah, the cave.  We call it a cave because it's not very

Artunduaga - direct

1  pretty.

2  Q.  Was there anybody else in the cave at the time that

3  Dr. Seal made those comments to you?

4  A.  There were some residents, interns, I believe; people from

5  the Orthopedic Surgery Department who were interns at the

6  time.  They were very close, about three chairs --

7  Q.  Did anyone say anything to you after Dr. Seal made that

8  comment?

9  A.  No.  I mean, like, they came to me and, like, you know,

10 trying to hug me or, like, Maria --

11          MR. JEPSON:  Objection.  Hearsay.

12          THE COURT:  Sustained.

13 BY MS. HYNDMAN:

14 Q.  Did you have any other incidents with Dr. Seal?

15 A.  Yes.  There were a few times when I asked him why he was

16 giving more breast cases to the other intern if as a plastic

17 surgery resident I was supposed to gain more knowledge and

18 experience in breast -- because, as you have heard,

19 reconstructive plastic surgeons do a lot of breast

20 reconstruction -- and that was my preference and if he could

21 do something about it, I would really appreciate it.

22          And regardless of that, he scheduled me to second

23 assist him in most the endocrine surgeries, which for a

24 plastic surgery resident are not that important because we

25 don't operate on the neck.

Artunduaga - direct

```
 1              Then I learned that Suzanne Lim, my other co-intern,

 2    she was allowed to stay in one of the breast cases, a

 3    mastectomy, for about three more hours.

 4              MR. JEPSON:  Objection.  Lack of foundation.

 5              THE COURT:  Sustained.

 6    BY MS. HYNDMAN:

 7    Q.  We'll stop there.

 8    A.  Okay.

 9    Q.  Do you know where Dr. John Seal was from?

10    A.  The U.S. here, Chicago.

11    Q.  Do you know where he had his medical training?

12    A.  The University of Chicago.

13    Q.  Did you talk to anyone about the comments that Dr. Seal

14    had made to you?

15    A.  Yes.  I talked to Justine Lee mid-August -- approximately

16    mid-August.

17    Q.  Where were you when you talked to Dr. Lee?

18    A.  I was heading to the outpatient building.  She was coming

19    from that building.  We crossed paths and she just, oh, Maria,

20    stop, let's talk about things.  Are things improving?  Are you

21    feeling better?  How your experience has been?

22              And the incident with the humiliation thing, calling

23    me out for my communication skills and accent, had just

24    happened the day before.  So, I told her, look, it's been

25    horrible and still I'm not getting the training.  I'm not
```

Artunduaga - direct

148

 1    getting the cases.  I've been completely dismissed from many

 2    things.  And this thing just happened the day before.

 3              I started crying because I was, you know, very

 4    touched by that.

 5    Q.  Did Dr. Lee say anything to you?

 6    A.  Yeah, she --

 7              MR. JEPSON:  Objection.  Hearsay.

 8              THE COURT:  What is your response?

 9              MS. HYNDMAN:  Dr. Lee was one of the chief residents.

10    She was responsible for assisting in the education and

11    training of Dr. Artunduaga.

12              MR. JEPSON:  She was a co-resident, your Honor.  The

13    exception doesn't apply.

14              THE COURT:  Sustained.  If you are offering it for

15    the truth, sustained because she does not fall within as a

16    co-resident under Upjohn.

17              MS. HYNDMAN:  She was one of the chief residents,

18    your Honor.  And I believe the testimony will be that the

19    chief residents -- Dr. Song charged the chief residents with

20    evaluating Dr. Artunduaga and making sure -- and charging them

21    with finding out how she was doing on the program and --

22              THE COURT:  Will you be able to -- that does not make

23    it fall under Upjohn.

24              Will you be able to link that conversation back as

25    somehow being conveyed to a decision maker?

```
 1              MS. HYNDMAN:  Yes.

 2              THE COURT:  Mr. Jepson?

 3              MR. JEPSON:  Ms. Hyndman is correct.

 4              THE COURT:  Okay.  Overruled then for that purpose.

 5   BY MS. HYNDMAN:

 6   Q.  What did Dr. Lee say to you?

 7   A.  Well, that things were really escalating and that they

 8   needed to do something about it, the plastic -- administrative

 9   chief -- I'm sorry, the chief resident -- and that she will

10   pass that information along to Dr. Song immediately.

11   Q.  Was that the only conversation you had with Dr. Lee about

12   Dr. Seal?

13   A.  Later in August the 31st, I believe, I met with her and

14   Dr. Sara Dickie, the other chief resident, plastic surgery.

15   Q.  Where was that meeting?

16   A.  In a place they call the plastic surgery lounge.

17   Q.  How long did you meet with Dr. Dickie and Dr. Lee?

18   A.  About an hour.

19   Q.  Was there anybody else present besides you, Dr. Dickie and

20   Dr. Lee?

21   A.  No.

22   Q.  Who spoke first in that meeting?

23   A.  Who spoke first at the meeting.  Justine.

24   Q.  What did she say?

25   A.  She --
```

Artunduaga - direct

1   Q.  Before I ask you that question --

2   A.  Yeah, wait.  I have to remember.

3   Q.  -- did you have an understanding of what the purpose of

4   the meeting was with Dr. Dickie and Dr. Lee?

5   A.  They wanted to help me out.  They say that they had not

6   predicted as much resistance to me -- my, you know, background

7   or accent or whatever -- from the General Surgery Department

8   and they really wanted to help me out, give me advice or tips

9   on, like, ways how to overcome those prejudices.

10  Q.  So, what did Dr. Lee say to you in that meeting?

11  A.  They -- she said that she had already spoken with Dr. Seal

12  and he had admitted that accent was a big problem.

13  Q.  Did she say anything else?

14  A.  She say that there were things that I needed to work out

15  clearly; that they made -- you know, they mentioned these

16  things that he had said about it, but that their main thing

17  was -- or take-out from that conversation was -- accent and

18  communication issues.

19  Q.  You said that she mentioned some things you needed to work

20  on.  Did she say specifically what she thought you should work

21  on?

22  A.  She did, but I don't remember right now.  It's in the

23  exhibits.

24          MR. JEPSON:  Objection.

25          MS. HYNDMAN:  You can't comment on what's in the

Artunduaga - direct

1    evidence --

2              THE WITNESS:  I'm sorry.

3              MS. HYNDMAN:  -- Maria.  Okay?

4              THE COURT:  Sustained.

5              THE WITNESS:  I don't know.  Okay.  I'm sorry.

6    BY MS. HYNDMAN:

7    Q.  Did Dr. Dickie say anything in that meeting?

8    A.  She said that Dr. Song was aware of everything, and that

9    they were in charge of doing his job as a program director

10   because she was -- he was very busy.  So that I didn't have to

11   worry; that I should look up to them like big sisters; that

12   they really wanted me to be successful regardless of the

13   resistance and reputation that I apparently had.

14   Q.  Did you say anything in this meeting?

15   A.  Yes, of course.

16   Q.  What did you say?

17   A.  I told them, look, since the beginning of the program,

18   people have been treating me so differently from the rest;

19   and, there have been a lot of comments about my accent.  And I

20   have never had any issue before coming to the U.S., like --

21   sorry, like working the U.S.

22              So, for example, I work at Harvard and -- for four

23   years as a post-doc, and I presented internationally,

24   nationally.  I wrote, you know, articles.  And people were

25   okay with who I was and, yeah, my accent.  And, then, you

Artunduaga - direct

1    know, I also rotated or had experience in the clinical or

2    hospitals.  Even though as an observer, I could ask questions

3    and I could contribute to the conversations that doctor has --

4    had.  And no one really cared about my accent or -- that never

5    came up.

6            Then at the University of Washington --

7    Q.  Wait.  Let --

8    A.  Sorry.

9    Q.  You told all of this to Dr. Dickie and Dr. Lee in this

10   conversation?

11   A.  Yes, I did.

12   Q.  Go on.

13   A.  And, then, at the University of Washington, where I did a

14   Sub-I or hands-on clinical rotation, they actually liked the

15   way how I presented.  They actually like the way how I

16   practice medicine.  I thought --

17           MR. JEPSON:  Objection.  Hearsay, your Honor.

18           MS. HYNDMAN:  Your Honor, she's relating what she

19   told Dr. Dickie and Dr. Lee.

20           THE COURT:  Is this last part -- I was not clear if

21   the last part was something she relayed to them.  If you could

22   confirm that.

23           MS. HYNDMAN:  Yes.

24   BY MS. HYNDMAN:

25   Q.  Dr. Artunduaga, did you relate to them that people at the

Artunduaga - direct

1    University of Washington liked how you presented patients?

2    A.   Yes.

3    Q.   Okay.

4    A.   I was trying --

5         MS. HYNDMAN:  Wait.  We need a ruling on the

6    objection.

7         THE COURT:  Overruled for purposes of the

8    conversation.

9         Ladies and gentlemen, this testimony about what was

10   said at the University of Washington is not being offered for

11   the truth.  It's being offered instead for state of mind as to

12   what was told to the individuals in the meeting.

13   BY MS. HYNDMAN:

14   Q.   What else did you tell Dr. Dickie and Dr. Lee in that

15   meeting?

16   A.   Well, that the University of Washington, I didn't have any

17   trouble; that they like my style; that they didn't have an

18   issue with my accent.  And what I thought was the reason was

19   that they do have a lot of Latin American residents.  So, they

20   were --

21        MR. JEPSON:  Objection.

22   BY THE WITNESS:

23   A.   -- used to their ways, their accents.

24        THE COURT:  I am sorry, what is your objection?

25        MR. JEPSON:  My objection, again, is hearsay and

```
 1   foundation with respect to this -- her thoughts about why.
 2   BY MS. HYNDMAN:
 3   Q.  Dr. Artunduaga, did you tell that to Dr. Dickie and
 4   Dr. Lee in the conversation?
 5   A.  Yes, I did.
 6           MR. JEPSON:  As long as that's --
 7           THE COURT:  I am sorry?
 8           MR. JEPSON:  I think the same instruction, your
 9   Honor.
10           THE COURT:  The same instruction.
11           The testimony you are hearing now is not being
12   offered for the truth of what she is saying.  Instead, it is
13   being offered to show what she told the individuals during
14   this meeting.
15           MR. JEPSON:  Thank you, your Honor.
16   BY MS. HYNDMAN:
17   Q.  Did you say anything else to Dr. Dickie and Dr. Lee in
18   that meeting?
19   A.  That I was really looking forward to have Dr. Song
20   intervene in some sort of way and stand up for his own
21   resident and do something about it.
22   Q.  Have you now told us everything that you said and
23   Dr. Dickie and Dr. Lee said in that conversation, to the best
24   of your recollection?
25   A.  I don't remember anything --
```

Artunduaga - direct

1   Q.  Don't remember anything else?

2   A.  Yeah.  Sorry.

3   Q.  Dr. Artunduaga, how were you feeling about your residency

4   experience by the time you had completed your first two months

5   of training?

6   A.  Oh, well, extremely frustrated.  I had a completely

7   different idea of what I had been promised -- the family

8   thing, helping each other.  I never expected so much -- so

9   much -- resistance to -- towards my cultural background, you

10  know, the fact that I was from Colombia and had an accent.

11  Q.  What was your next rotation?

12  A.  We are in August?

13  Q.  September now.  I'm sorry.

14  A.  I'm sorry.  I rotated -- I was scheduled to rotate to the

15  colorectal service.

16  Q.  What kind of patients are seen in that service?

17  A.  Patients that have -- this is in regards to -- like, I

18  don't know if you've heard about Crohn's diseases -- or

19  Crohn's disease, ulcerative colitis.  They were the main

20  patients that we took care of.

21  Q.  What kind of surgeries were being performed?

22  A.  Dr. Umanskiy did a lot of robotic surgery.  And Dr. Hurst

23  was the person that I spent most of my time, and he did open

24  surgeries -- you know, traditional operations -- to treat

25  these patients.

Artunduaga - direct

1   Q.  Did you have any clinical experience with these type of

2   surgeries before you began the rotation?

3   A.  No, never.  That's too high tech or -- but in Colombia, we

4   don't have such a high number of cases with Crohn's or

5   ulcerative colitis.  That happens mostly in latitudes that are

6   up north.

7   Q.  What did you hope to learn from your rotation on this

8   service?

9   A.  Well, I wanted to learn about these new diseases,

10  obviously, because -- I'm sorry, I say obviously, again.

11          I wanted to learn more about those diseases, how to

12  treat them, how to do clinical examinations, to work them up

13  from their first day at the clinic; and, then, you know, which

14  sort of labs do you ask for and how you take them to the OR,

15  the whole process; how the operation is performed, the

16  clinical judgment or the algorithm, I'll say, like how -- how

17  you reach a decision to take them to the OR or just to give

18  them medication.  That was mainly --

19          MS. HYNDMAN:  Can we take a look at Plaintiff's

20  Exhibit 12, please.

21  BY MS. HYNDMAN:

22  Q.  Dr. Artunduaga, this is Plaintiff's Exhibit No. 12.

23          Do you recognize this document?

24  A.  Yes, I do.

25  Q.  What is it?

Artunduaga - direct

1   A.  It's a document that lists all of the services where the

2   residents rotate through.  Each one has a name.  And on the

3   right side, you'll find the senior residents, chief residents,

4   the faculty, their information about pagers.  The way how you

5   contact them is by pager.

6          Then in the middle, senior residents, their last

7   names with their pager numbers.  And junior resident on the

8   left, far left.  Then, again, the last names of every one of

9   them and their pager numbers.

10  Q.  What month was this document?

11  A.  September.

12  Q.  Do you know who prepared this document?

13  A.  John Seal and Eric Grossman.

14         MS. HYNDMAN:  Your Honor, we would move to admit

15  Plaintiff's Exhibit No. 12.

16         MR. JEPSON:  No objection, your Honor.

17         THE COURT:  It is admitted.

18     (Plaintiff's Exhibit No. 12 received in evidence.)

19  BY MS. HYNDMAN:

20  Q.  Dr. Artunduaga, if you could look under the service on the

21  left-hand side of the document.  If you look at the -- towards

22  the bottom of the first section there, Block H Service.

23  A.  Yes.

24  Q.  Do you know what the Block H Service is?

25  A.  It's -- there are two colorectal services.  They are

Artunduaga - direct

158

```
 1    called Block 1 or Block 2.  It's named after a very famous

 2    surgeon from the University of Chicago many years ago.

 3    Q.  But this is Block F and Block H.  Are those also the same?

 4    A.  Oh, well, I don't really know.  The only thing I knew is

 5    that I was on Block H.

 6    Q.  Okay.

 7         Sometimes Block H is referred to as Block 2; is that

 8    right?

 9    A.  Yes, exactly.

10    Q.  So, that's the same service?

11    A.  Exactly.

12    Q.  Okay.

13         And that's the colorectal service you've been talking

14    about?

15    A.  Uh-huh, yes.

16    Q.  You mentioned Dr. Hurst, Dr. Umanskiy.  Were there any

17    other attending physicians you worked with that month?

18    A.  No.

19    Q.  Under their names is the name of Dr. Bello.  Who is

20    Dr. Bello?

21    A.  Dr. Bello was a senior resident I -- he was a chief -- not

22    a chief resident, a last-year resident in the program of

23    general surgery.  And Villa or Villa was the nurse

24    practitioner.

25    Q.  Did you do anything to prepare for your rotation on this
```

Artunduaga - direct

159

 1    colorectal service?

 2    A.  Yes.  I always, before every rotation, read about the type

 3    of diseases that I would see, the most common surgeries they

 4    will perform.

 5           And with Brian, actually, for the first time I spoke

 6    with him about what had happened already and that I did not

 7    want him to listen to any sort of rumors or gossip, and that I

 8    wanted him to give me a fair chance to participate; that I

 9    will expect from him to treat me as everybody else, as an

10    intern; that I round the floor, that I will do the

11    consultations.

12           And he was very enthusiastic about it and very

13    willing to help me out.

14    Q.  When you say "Brian," who is Brian?

15    A.  I'm sorry.  Brian Bello.

16    Q.  Dr. Bello?

17    A.  Yes.

18           MS. HYNDMAN:  Can we take a look at Plaintiff's

19    Exhibit 13, please.

20    BY MS. HYNDMAN:

21    Q.  Dr. Artunduaga, do you recognize Plaintiff's Exhibit 13?

22    A.  Yes.

23    Q.  What is this?

24    A.  It's kind of same thing we have been seeing.  Every week

25    you are assigned to -- each day of the week you are assigned

Artunduaga - direct

160

```
 1   to different cases of clinics.  And this was prepared by Brian

 2   Bello -- Dr. Bello.

 3   Q.  What week does it cover?

 4   A.  The first week of September.

 5          MS. HYNDMAN:  Your Honor, we would move to admit

 6   Plaintiff's Exhibit No. -- is this 13?

 7          MR. JEPSON:  The only reason I would object to it,

 8   your Honor, is some clarification that it reflects both Block

 9   H, as well as Block F.

10          THE COURT:  Is that clarification acceptable?

11          MS. HYNDMAN:  Yes, your Honor.

12          THE COURT:  I will admit it.

13      (Plaintiff's Exhibit No. 13 received in evidence.)

14   BY MS. HYNDMAN:

15   Q.  Dr. Artunduaga, what were you scheduled to do on the Block

16   H Service for the week of September 5th through the 13th?

17   A.  Sure.

18          On Tuesday -- thank you -- nothing.  Wednesday, I was

19   scheduled for -- to cover Dr. Hurst clinic.  Sorry.

20   Thursday -- I'm sorry -- nothing.  Friday, clinic with

21   Dr. Umanskiy.

22   Q.  Now, when you say you're not scheduled -- you have nothing

23   scheduled, what -- were you in the hospital those days --

24   A.  Yes.

25   Q.  -- when there's nothing scheduled?
```

Artunduaga - direct

161

1   A.  I was in the hospital most of these days.  I will take

2   care of the floor.

3           MS. HYNDMAN:  Can we look at Plaintiff's Exhibit No.

4   15, please.

5   BY MS. HYNDMAN:

6   Q.  Dr. Artunduaga, do you recognize this document?

7   A.  Yes.  Weekly schedule for clinics and OR coverage from

8   September the 12th to the 20th prepared by Dr. Brian Bello.

9   Q.  Does this cover both the Block F and Block H Services?

10  A.  It seems like it does, yes.

11  Q.  Did you get a copy of this document at the beginning of

12  the week?

13  A.  Yes, I did.

14          MS. HYNDMAN:  Your Honor, we'd move to admit

15  Plaintiff's Exhibit No. 15.

16          THE COURT:  Any objection?

17          MR. JEPSON:  No objection, your Honor.

18          THE COURT:  It is admitted.

19      (Plaintiff's Exhibit No. 15 received in evidence.)

20  BY MS. HYNDMAN:

21  Q.  Dr. Artunduaga, what were you scheduled to do the week of

22  September 12th to the 20th on the Block H Service?

23  A.  On Monday, I did not have any coverage -- I didn't have

24  any assignments for either clinic or the OR.  Tuesday, I

25  covered the clinic of Dr. Hurst.  On Wednesday, I can see,

Artunduaga - direct

162

1    clinic with Dr. -- either Dr. Umanskiy or Hurst.  Thursday,

2    nothing.  Friday, clinic, again, with Dr. Umanskiy.

3            And, then -- I don't know why there is Tuesday here.

4    It's a little weird.  Yeah.  Okay.

5            Tuesday, the 20th, nothing.

6            MS. HYNDMAN:  Let's take a look at Plaintiff's

7    Exhibit No. 16.

8    BY MS. HYNDMAN:

9    Q.  Do you recognize this document?

10   A.  Yes, I do.

11   Q.  What is it?

12   A.  Weekly coverage of clinics and operative cases from

13   September the 19th to the 27th for both services.

14   Q.  Who prepared this document?

15   A.  Dr. Brian Bello.

16   Q.  Did you receive a copy of it at the beginning of the week?

17   A.  Yes, I did.

18           MS. HYNDMAN:  Your Honor, we'd move to admit Exhibit

19   No. 16.

20           THE COURT:  Any objection?

21           MR. JEPSON:  No objection, as long as it's clear that

22   it's for both services.

23           MS. HYNDMAN:  I believe she testified to that.

24           THE COURT:  Yes.

25           I will admit it.

Artunduaga - direct

163

 1      (Plaintiff's Exhibit No. 16 received in evidence.)

 2  BY MS. HYNDMAN:

 3  Q.  Dr. Artunduaga, what were you scheduled to do this week?

 4  A.  On Monday, nothing.  On Tuesday, nothing.  Wednesday,

 5  cover Hurst clinic.  Thursday, nothing.  Friday, clinic with

 6  Dr. Umanskiy.

 7          And I don't know why it's showing Monday, too.

 8  Nothing.  Tuesday, nothing.

 9  Q.  Did you assist in any surgeries that week, to your

10  recollection?

11  A.  No.

12  Q.  Let's take a look at Plaintiff's Exhibit 17, please.

13          Dr. Artunduaga, do you recognize this document?

14  A.  Yes.  That's for the week of September the 26th to October

15  4th; two services, Block 2 and 1; prepared by Dr. Brian Bello.

16  Q.  Did he provide you a copy of this document --

17  A.  Yes, he did.

18  Q.  -- at the beginning of the week?

19          MS. HYNDMAN:  Your Honor, we'd move to admit

20  Plaintiff's Exhibit 17.

21          THE COURT:  Any objection?

22          MR. JEPSON:  No objection, your Honor.

23          THE COURT:  It is admitted.

24      (Plaintiff's Exhibit No. 17 received in evidence.)

25  BY MS. HYNDMAN:

Artunduaga - direct

164

1    Q.  Dr. Artunduaga, according to this schedule, what were you

2    going to be doing the week of September 26th?

3    A.  Thank you.

4         I was helping with one case on Monday.  On Tuesday, I

5    was covering the clinic with Dr. Hurst.  On Wednesday, I was

6    covering two clinics with Dr. Hurst and Umanskiy.  On

7    Thursday, nothing.  On Friday, clinic, again with

8    Dr. Umanskiy.

9         And, then, Monday -- the next Monday -- I don't know

10   why -- oh, actually -- obviously, I know why.  They -- there

11   was a switch of month, so that's why --

12   Q.  So, you're switching over to a different rotation?

13   A.  Yes.

14   Q.  Okay.

15        Did you assist in the surgery with Dr. Umanskiy that

16   was scheduled?

17   A.  Yes.  Half of the case I assisted.

18   Q.  Did you ever assist on any surgeries with Dr. Hurst while

19   you were on that rotation?

20   A.  Yes, I did, a couple.

21   Q.  How many -- other than this one surgery that was scheduled

22   with Dr. Umanskiy, did you assist on any other surgeries with

23   Dr. Umanskiy?

24   A.  No.  Just half of one case.

25   Q.  When you say "half of one case," what do you mean by that?

Artunduaga - direct

1   A.  If the case would go long, like, for two hours, I had to

2   leave right in the middle, about two hours of -- from the

3   starting time I left.

4   Q.  How would you describe your working relationship with

5   Dr. Bello on the rotation that month?

6   A.  He was really -- he was very friendly.  He really wanted

7   me to tea- -- to teach me.  He was very supportive.  He knew

8   how hard it was to be through -- he told me that he had been

9   put on a professional improvement program at the beginning of

10  his general surgery residency and that he understood how

11  difficult that was, so that he will make every effort to help

12  me out to succeed.

13  Q.  Did Dr. Bello raise any concerns with you about your

14  performance?

15  A.  No, he did not.

16  Q.  How would you describe your working relationship with

17  Dr. Hurst?

18  A.  Well, it's very professional.  He's a very good surgeon.

19  He's -- he respects people.  I mean, he's quiet, though.  But

20  it was fine.

21  Q.  Did Dr. Hurst raise any concerns with you about your

22  performance on the service?

23  A.  No, he did not.  Maybe he made a few comments during

24  rounds and, like, told me, Maria, you should just shorten your

25  presentations.  But I obviously incorporated his feedback and

Artunduaga - direct

1   they were getting shorter.

2   Q.  Anything else you can recall that Dr. Hurst talked to you

3   about in terms of your performance?

4   A.  No.

5   Q.  What was your relationship -- working relationship -- like

6   with Dr. Umanskiy?

7   A.  Oh, well, a nightmare.

8   Q.  Why do you say that?

9   A.  Well, there were several instances where he made fun of my

10   cultural background.  He told me once in the middle of a

11   hallway why I was always so happy and friendly and warm.  I

12   told him, because I'm Colombian, Dr. Umanskiy.  And he say,

13   that's the reason why you're not -- never going to succeed as

14   a surgeon.  You don't inspire confidence or respect from

15   others.

16         MR. JEPSON:  Your Honor, I would just like the

17   caution, again, on this as to the hearsay nature of it and the

18   truth of -- whether it's offered for the truth.

19         MS. HYNDMAN:  Dr. Umanskiy is one of the people who

20   was charged with evaluating her.  His evaluation went directly

21   to Dr. Song.

22         THE COURT:  Overruled.  I do not think it is

23   appropriate.

24   BY THE WITNESS:

25   A.  You want more?

Artunduaga - direct

1    BY MS. HYNDMAN:

2    Q.  Did Dr. Umanskiy -- is there any other basis for your

3    feeling that Dr. Umanskiy -- your relationship with

4    Dr. Umanskiy was a nightmare?

5    A.  Well, there was one incident where I was in the lounge --

6    the cave -- where all of the interns and residents were.

7    Dr. Brian Bello was next to me.  And he comes to me and tells

8    me, Maria, I mean, why the heck you have on a stethoscope on

9    your neck?  You don't look like a surgeon, you know.  I don't

10   know how you do things in your country, but -- and he started

11   to strip -- strip me down or off -- I don't know how to say

12   that; I'm sorry -- from things.

13          So, he took my stethoscope and threw it to the trash.

14   Then he took my clipboard and took all of the pages and put it

15   -- put it on the trash.  And, then, he told me, all of these

16   colored pencils or pens you have, that's not a -- I mean, a

17   surgeon doesn't do that, doesn't have all these coloring

18   pencils.

19          And I told him, well, I'm a very visual person and

20   that's the way how I do things.

21          And he just took them out and throw them to the

22   trash.  And, then, he took my little books on my lab coat and

23   did exactly the same thing.  And, then, he looked at me and

24   say, now you look like a surgeon.

25          I was so embarrassed and I feel so humiliated because

1   there were people around.  I mean -- sorry.  It's a little bit

2   difficult.

3   Q.  Did Dr. Umanskiy raise any concerns with you about your

4   performance on the service?

5   A.  No, not during the time that I rotated with him.

6   Q.  Did you ever sit down and have a conversation with him

7   about your performance?

8   A.  Later, yes.  I -- you know, I wanted to improve.  I wanted

9   to get feedback from people, so I asked Dr. Hurst and

10  Dr. Umanskiy to meet with me before the evaluations because I

11  knew that general surgery residents did that on regular basis.

12  So, their faculty will ask them to meet before, do a feedback

13  session, and then they will place the evaluations.

14  Q.  Did you have a sit-down conversation with Dr. Umanskiy?

15  A.  Yes, I did.

16  Q.  What did he tell you in that conversation?

17  A.  Well, he told me, Maria, I mean, there has been some

18  improvement, but definitely you have communication challenges

19  that you need to work on.  And he told me -- like, gave me

20  examples of the reasons why I was not a good doctor or

21  resident.

22          And he say to me, you know, I mean, you cannot

23  establish a doctor-patient relationship because your patients

24  don't look you at the eye.

25          And I reply back and say, well, Dr. Umanskiy, I'm

1   really short and I'm always standing behind -- behind you and

2   Dr. Brian Bello, so -- you're really tall people.

3           He said, I don't care.  That's -- you know, this is

4   what I'm saying and you should work on that.

5           In terms of communication challenges, he say that

6   there had been problems for him to understand me in some ways

7   and that he did not like my style of practicing medicine.

8   Q.  Was he specific when he said he didn't like your style?

9   Did he give you examples?

10  A.  Yeah.  I mean, that I was lengthy when I was presenting

11  patients; that I should shorten things; that there were things

12  that were not very relevant to the presentation and I should

13  just, you know, skip them because surgeons were quick, sharp

14  and didn't have time to deal with hypertension of his patients

15  or any other thing.  They just wanted to do the operation and

16  take people home as soon as possible and nothing else.

17  Q.  Did Dr. Umanskiy say anything else to you in that

18  conversation?

19  A.  Well, he said that he had talked to Dr. Song and he had

20  already expressed his concerns.  So, whatever thing we had --

21  we were talking there, it didn't really matter because he had

22  already made up his mind.

23  Q.  Did you have any sit-down conversations with Dr. Hurst

24  about your performance?

25  A.  No.  He didn't have the time.  I tried hard.

1  Q.  Other than this conversation you just described with

2  Dr. Umanskiy, did you have any other discussions with him

3  about your performance on the Block H Service?

4  A.  Not that I recall.

5  Q.  Overall, how would you describe your experience on that

6  rotation in September?

7  A.  It's mixed feelings.  I had a very good senior resident --

8  chief resident -- who was willing to help and understandable

9  and he really wanted to teach me, and I had a bully as a

10  faculty.  Anything I would say.  Even sometimes he even

11  imitated my accent.  So, I mean, coming from a faculty member.

12          MR. JEPSON:  Objection to the commentary.

13          THE COURT:  Sustained.

14          I will strike it.  The jury should disregard it.

15          THE WITNESS:  Sorry.

16  BY MS. HYNDMAN:

17  Q.  Did you learn anything on that rotation in terms of

18  gaining medical knowledge, Dr. Artunduaga?

19  A.  Not quite medical knowledge, because I was not really

20  going into any surgeries.  And most of my -- of the surgeries

21  that I -- who have done were given to a medical student,

22  again, or the nurse practitioner.

23          I was handling mostly the floor.  And I definitely

24  improved in terms of, like, prioritization.  Dr. Brian Bello

25  was -- you know, he told me, you know, this is the way how you

Artunduaga - direct

1   should do it.  I improved over time very quick, and he say

2   that to my plastic surgery residents, who, by the way, were

3   contacting him every week.  So, he say that --

4           MR. JEPSON:  Objection.  Non-responsive narrative.

5           THE COURT:  Sustained.

6           I will strike the last part.  The jury should

7   disregard it.

8           MS. HYNDMAN:  That's fine.

9   BY MS. HYNDMAN:

10  Q.  What was your next rotation scheduled to be in October?

11  A.  Officially I will have to stay there with Dr. Umanskiy and

12  Dr. Hurst.

13  Q.  Did you stay on the Block H Service in October?

14  A.  No, I did not.  I received an e-mail from an administrator

15  from the General Surgery Department saying that I was in -- I

16  was -- I had been removed from that rotation, and that a

17  decision had been made to switch me over plastic surgery.  I

18  was clueless about -- I mean, like, I didn't know what was

19  happening.

20  Q.  Hold on.

21  A.  Sorry.

22  Q.  You really need to listen to the questions I'm asking you.

23  Just make sure you answer those.

24  A.  Sorry.

25  Q.  Okay?

Artunduaga - direct

1        You said you learned in an e-mail from an

2   administrator.  Who was that administrator?

3   A.  Carmen Barr.

4        MS. HYNDMAN:  Could we take a look at Plaintiff's

5   Exhibit 22, please.

6   BY MS. HYNDMAN:

7   Q.  Dr. Artunduaga, do you recognize Plaintiff's Exhibit No.

8   22?

9   A.  Yes, I do.

10  Q.  What is it?

11  A.  It's an e-mail that I sent to my chief plastic surgery

12  resident, Dr. Justine Lee and Dr. Sara Dickie, asking --

13  Q.  Wait.  Don't say what it says.

14  A.  Oh.

15  Q.  What day did you send it?

16  A.  The date, September 29.

17  Q.  What year?

18  A.  2011.

19       MS. HYNDMAN:  Your Honor, we would move to admit

20  Exhibit No. 22.

21       THE COURT:  Any objection?

22       MR. JEPSON:  No objection, your Honor.

23       THE COURT:  It is admitted.

24    (Plaintiff's Exhibit No. 22 received in evidence.)

25  BY MS. HYNDMAN:

Artunduaga - direct

173

1   Q.   Now, Dr. Artunduaga, what did you say in the e-mail to

2   Dr. Lee and Dr. Dickie?

3   A.   I'm really sorry.

4           Guys, is there any reason why the switch is

5   happening?  I was really looking forward to finish my two

6   months now and have plastics at the end of the year.  Also,

7   Deanna and I had split October rounds and calls.  We were very

8   excited to work together.  Let me know.

9   Q.   Did you receive a response from either Dr. Lee or

10  Dr. Dickie to your e-mail?

11  A.   No.  They called me.

12  Q.   Both of them called you?

13  A.   Just Sara.

14  Q.   What did she say?

15  A.   She said, well, Maria, we have made the decision to switch

16  you because we didn't anticipate these difficulties -- this

17  hostility towards you, and I think it's better to take you

18  under our wings and protect you and let things -- you know,

19  give it a month, maybe two, so that things calm down.

20  Because, you know, the general surgery residents are out for

21  blood.

22  Q.   How did you feel about being switched to the plastics

23  rotation for October?

24  A.   I was surprised, but I started to connect the dots and I

25  was afraid about my future in the program.

Artunduaga - direct

1  Q.  Did you ever talk to Dr. Song about the switch to plastics

2  for the month of October?

3  A.  I sent an e-mail to Doctor -- I'm sorry, Carmen Barr, the

4  administrative person who sent an e-mail to notify me.  And

5  she replied:  You need to speak to Dr. Song.  I cannot give

6  you any more information.

7  Q.  So, did you speak to Dr. Song?

8  A.  Yes.

9  Q.  When did you speak to him?

10        MS. HYNDMAN:  Can we take a look at that e-mail --

11 BY THE WITNESS:

12 A.  Sorry.

13        MS. HYNDMAN:  -- Exhibit 22, again, please?

14 BY THE WITNESS:

15 A.  I mean, September 30th, I guess.

16 BY MS. HYNDMAN:

17 Q.  Take a look at this.

18 A.  All right.

19 Q.  This e-mail is September 29th.  Does that refresh your

20 recollection of when you spoke to Dr. Song?

21 A.  Right after that.

22 Q.  The same day?

23 A.  Probably.

24 Q.  Before we talk about your conversation with Dr. Song, I

25 wanted to ask you this:  Up until September 29th, had you had

1    any meetings with Dr. Song at all to talk about your

2    performance?

3    A.   No, never.

4    Q.   Did you run into him on occasion in the hospital?

5    A.   I did, once.

6    Q.   Where was that?

7    A.   We actually took the elevator together.  And I had an idea

8    about putting profiles of the residents on the Web site of the

9    plastic surgery program.  And he said, yes, go ahead.  I mean,

10   lead this project and get as many, you know, information from

11   your co-residents.

12   Q.   Did you talk with Dr. Song about anything else in that

13   elevator ride?

14   A.   I didn't feel it appropriate to talk about my

15   complaints --

16   Q.   I'm just asking you --

17   A.   No.  Sorry.

18   Q.   -- Dr. Artunduaga, whether you talked about anything else

19   with him.

20   A.   Besides that, no.

21   Q.   Where did you meet with Dr. Song on September 29th?

22   A.   At his office in the plastic surgery section.

23   Q.   Was there anybody else present for that meeting?

24   A.   Yes.  Akilah Williams.

25   Q.   How long did you meet with Dr. Song that day?

Artunduaga - direct

1   A.  30, 45 minutes.

2   Q.  What did you tell Dr. Song in that meeting?

3   A.  Well, that I wanted to understand why he was switching me,

4   that -- which were the reasons.  Because I was completely

5   clueless of all of these things or complaints.  I had not

6   received any feedback on my performance up to that day.

7           So, he told me, Maria, I mean, like, I'm just so sick

8   of -- tired of your complaints.  You're always blaming other

9   people.  And this is not about accent discrimination or your

10  training overseas or anything like that.  So, please, just

11  stop complaining.

12  Q.  Had you complained to Dr. Song prior to that day?

13  A.  Just that day.

14  Q.  What did you complain to him about that day?

15  A.  Well, I -- you know, I mean, he mentioned a lot of the

16  things, such as Dr. Umanskiy saying that because I didn't

17  have -- I couldn't get eye contact from my patients so that

18  that was a bad thing and I was a bad resident because of that.

19  That Dr. Umanskiy had also raised the issue that once I had

20  took his team to the wrong wing of the hospital and that it

21  was really a lack of -- of -- that, I mean, like residents

22  should know how the hospital, you know, is distributed.  You

23  know, what is west, what is north, what is south.  That he had

24  received numerous unsolicited complaints about me.

25  Q.  Did you make any complaints to Dr. Song in that meeting?

Artunduaga - direct

1   A.  Yes, I did.

2   Q.  What complaint did you make?  That was the question I had

3   asked you.

4   A.  I'm sorry.

5          So, I told him my feeling is that I'm being treated

6   disparately because of my accent.  I think my accent is a big

7   deal or at least has been perceived as detrimental, as a

8   negative thing for them, and that I feel unwelcome.  I feel

9   the teams don't want to work with me because of that or either

10  the fact that I'm a foreign medical graduate from a developing

11  country in South America.  That, yes, I mean, I understand

12  they don't know, but they are not even giving me the chance.

13  From Day One everything that I was supposed to do was given to

14  other people, even people who have -- who are medical

15  students, people who haven't even finished medical school or,

16  well, the nurse practitioners have less training than we do as

17  doctors.  He --

18  Q.  So, Doctor -- I'm sorry, I cut you off.  Did you complain

19  about anything else to Dr. Song?

20  A.  On that day, oh, well, he told me that --

21  Q.  Wait, wait.  The question is:  Did you make any --

22  A.  Did I say anything?

23  Q.  -- other complaints to Dr. Song?  You just told us a few

24  things.  Was there anything else you complained to him about

25  that day?

Artunduaga - direct

1   A.  I don't remember.

2   Q.  Did Dr. Song respond to the complaints that you made to

3   him?

4   A.  Yes.  He say that, again -- sorry, I told that already --

5   that it was my fault because I had not gained the trust of the

6   people since the beginning; that there was not such a thing as

7   accent discrimination; that I should just stop complaining;

8   that it was best for me to stop complaining, otherwise he will

9   make strict, radical decisions; that I should perform

10  flawlessly in October, otherwise I'll be out.

11  Q.  Did Dr. Song say anything else to you in that meeting?

12  A.  That's the most thing -- I mean, what I remember.

13  Q.  That's what you can remember?

14  A.  The most impactful thing I remember.

15  Q.  After you had this conversation with Dr. Song, how did you

16  feel about having a plastics rotation in October?

17  A.  I tried to look everything on the positive light, right?

18  I mean, maybe, you know, they are a family and they really

19  want to help me.  The chief residents told me that -- even

20  Justine Lee say to me that she was shocked at how Dr. Song had

21  told me all of these things because --

22  Q.  Wait, wait.

23  A.  Sorry.

24  Q.  I haven't asked you that question.

25  A.  Sorry.

Artunduaga - direct

1  Q.  I'm asking you how you felt about going onto the rotation

2  for October.

3  A.  I was scared because I had been threatened already.

4  Working -- you know, performing flawlessly, it's very

5  difficult to achieve.

6  Q.  So, let's talk about that rotation in October.

7  A.  Uh-huh.

8  Q.  What kind of patients are seen in the clinics on the

9  plastic surgery rotation?

10 A.  So, the plastic surgery service is very atypical in a way

11 that they have three different teams.  There is a blue team

12 that takes care of hand and the face.  There is a golden team

13 or gold team that takes care of breast reconstruction patients

14 and body contouring.  I don't know if you know that, but it's

15 people who have lost a lot of weight and need to get, you

16 know, their tissues up.  So, they do a lot of liposuction and

17 a lot of reduction of things that are not in the right place.

18 For -- there is a red team that takes care of reconstructive

19 surgery.  That's about it.

20 Q.  Did you have any clinical experience with any of these

21 types of surgeries before you began the rotation?

22 A.  Let's see.  Hands -- like, clinical rotation, hands-on

23 taking care of patients like that, no for hand.  No for

24 craniofacial.  Maybe -- yes, reconstruction definitely,

25 because we do a lot of that in Colombia.  And nothing on

Artunduaga - direct

 1   breast reconstruction because in Colombia, there is not --

 2   it's very expensive.  There is not -- no -- there is not

 3   technology.  We don't have the gigantic --

 4           MR. JEPSON:  Objection to the narrative, your Honor.

 5           THE COURT:  Sustained.

 6           MS. HYNDMAN:  Let's take a look at Plaintiff's

 7   Exhibit No. 23.

 8   BY MS. HYNDMAN:

 9   Q.  Do you recognize this document, Maria?

10   A.  Yes, I do.

11   Q.  Can you first tell me what it is?

12   A.  It's an e-mail from Sara Dickie to everybody else in the

13   service with distribution of assignments per day.

14   Q.  Okay.

15           What's the date of the e-mail?

16   A.  The date, it's October the 2nd of 2011.

17   Q.  Did you receive a copy of this e-mail from Dr. Dickie

18   around that time?

19   A.  Yes, I did.

20           MS. HYNDMAN:  Your Honor, we would move to admit

21   Plaintiff's Exhibit No. 23.

22           THE COURT:  Any objection?

23           MR. JEPSON:  No objection.

24           THE COURT:  It is admitted.

25       (Plaintiff's Exhibit No. 23 received in evidence.)

Artunduaga - direct

181

1  BY MS. HYNDMAN:

2  Q.  Dr. Artunduaga, what was your understanding as to why

3  Dr. Dickie sent this e-mail?

4  A.  I guess, I mean, she wanted to --

5          MR. JEPSON:  Objection.  Foundation.

6          THE COURT:  Sustained.

7          MS. HYNDMAN:  Okay.

8  BY MS. HYNDMAN:

9  Q.  Dr. Artunduaga, if you could look at what is indicated on

10 Monday by Dr. Dickie.  Do you have an assignment for that day?

11 A.  For Monday?

12 Q.  Yep.

13 A.  For Monday, she suggested that either John, my co-intern,

14 and me could assist Dr. Gottlieb's surgery.  But I didn't go.

15 Q.  Who is John?

16 A.  Jonathan Lusardi, an ENT -- an intern in the ENT track.

17 Q.  On Tuesday, did you have an assignment from Dr. Dickie on

18 Tuesday?

19 A.  Yes.  With Dr. Zachary doing -- it's called

20 panniculectomy.

21 Q.  What is a panniculectomy?

22 A.  What we are doing is taking -- so, when you lose a lot of

23 weight, there are a lot of tissue that they're handling

24 somewhere.  So, what you do is an incision across your waist,

25 you take that out, and then you suture it.  It's like a mommy

Artunduaga - direct

1   tuck kind of thing but across entire waist.

2   Q.  Did you assist Dr. Zachary on that --

3   A.  Yes, I did.

4   Q.  -- surgery?

5           On Wednesday, do you have an assignment on Wednesday?

6   A.  No, I did not.

7   Q.  Did you have an assignment on Thursday?

8   A.  No, I did not.

9   Q.  What about Friday?

10  A.  No, nothing.

11  Q.  So, on those days when you didn't have an assignment, were

12  you in the hospital?

13  A.  Yes, I was in the hospital.

14  Q.  What were you doing?

15  A.  I was taking care of people in the floor and doing

16  consults.  With us interns or junior residents, we generally

17  didn't cover clinic.

18  Q.  Did you work with Dr. Song at all during this October

19  rotation?

20  A.  I think I did for a couple of days.

21  Q.  What kind of work did you do with Dr. Song?

22  A.  I assisted him with mammoplasties, reduction mammo- --

23  like -- yeah, reduction mammoplasties or mastopexies.

24          THE COURT REPORTER:  I'm sorry?

25          THE WITNESS:  It's called mastopexia.

Artunduaga - direct

1   BY MS. HYNDMAN:

2   Q.   Was that a surgery?

3   A.   Yes.

4   Q.   That was one surgery you assisted on or more than one?

5   A.   I think I -- from what I recall, I was with him two days

6   in the month.  It was approximately, I would say, five cases.

7   Q.   Did Dr. Song conduct a clinic on a regular basis?

8   A.   Sorry?

9   Q.   Did Dr. Song conduct a clinic on a regular basis?

10  A.   I guess so, but I never --

11  Q.   Did you assist him in his clinic at all?

12  A.   No.

13  Q.   During the month of October, was there any particular

14  attending physician you worked with more than the others on

15  the service?

16  A.   Yes.  Dr. Zachary.

17  Q.   What about the chief residents?  Did you work with them

18  that month?

19  A.   A few cases I did with Sara.  Mostly Sara.  But very few.

20  Q.   Dr. Dickie?

21  A.   Yes.  Sorry.  Sara Dickie.

22  Q.   Did you work with the chief residents outside of operative

23  cases?

24  A.   Yes.  So, the interns were in charge of everything that

25  happened in the floor.  So, we come early, around 5:00 a.m.,

Artunduaga - direct

184

1    prepare a list and only the interns will round on the

2    patients.  And we will gather the information and present it

3    to the chief residents or senior residents who would come

4    later, and they will tell us what was the plan for the day.

5            And other than that, the chief residents or, like,

6    the senior residents were in the operative room and we will

7    make sure as interns that everything got covered, everything

8    got completed.  And we had a pager so whenever a consultation

9    came in, we'll go and take the consult, go to the OR, present

10   it to either Sara or Justine or Trang.

11   Q.  About how many days out of the month of October did you

12   have any interaction with Dr. Dickie?

13   A.  It was significant.  She -- I was supposed to cover the

14   gold service and the red service.  Sara was the one -- like

15   the chief resident for the golden one and Trang on the red

16   one.

17   Q.  Who is Trang?

18   A.  She was a fifth-year resident.

19   Q.  Okay.

20           And her name is Trang Nyugen; is that correct?

21   A.  Yes.

22   Q.  How often did you interact with Dr. Nyugen during that

23   month of October?

24   A.  Whenever we have a consultation and we would come to them

25   and tell them the whole story, whole picture -- what we wanted

Artunduaga - direct

1   to do, our plan -- they would teach us, you know, this is what

2   you're supposed to do and then would go back to the patient

3   and do whatever we needed to do.

4   Q.  Did you have any interaction with Dr. Lee -- Dr. Justine

5   Lee -- during that month?

6   A.  It was -- it was very minimal.  There were a few, you

7   know, like, emergencies or complications with her patients.

8   So, she would cover for the others and help us out to the

9   interns.

10  Q.  Dr. Artunduaga, what was your working relationship like

11  with Dr. Nyugen?

12  A.  It was good.  It was -- it was -- it was really nice.  She

13  was very meticulous and detail oriented.  She would check

14  my -- my orders, everything, and she will let me know, you

15  forgot this and that.  So, she was a teacher.  She really

16  wanted me to improve.

17  Q.  What was your working relationship like with Dr. Dickie?

18  A.  It was okay.  She wouldn't let -- she wouldn't tell me

19  much about, you know, these are the ways how you should

20  improve, but she was friendly.

21  Q.  Did Dr. Dickie raise any issues regarding your performance

22  during the month of October on plastics?

23  A.  No, until the end of month when they called me for a

24  meeting.

25  Q.  Who called you for a meeting?

Artunduaga - direct

1   A.  I think it was Sara.  Sara did.  Dickie.  Dr. Dickie.

2   Q.  Who was in that meeting?

3   A.  Sorry.  Sara called me and she wanted to go through areas

4   of improvement.  So, we did one meeting with her, and I did a

5   second meeting separately with Dr. Nyugen.

6   Q.  Okay.

7        Which one came first, if you recall?

8   A.  I think Sara.

9   Q.  Where was that meeting?

10  A.  Plastic surgery lounge.

11  Q.  Was there anybody else present?

12  A.  No.

13  Q.  How long did the meeting last?

14  A.  20 minutes.

15  Q.  What did Dr. Dickie say in that meeting?

16  A.  Well, she first made a interesting disclaimer.  She say,

17  Dr. Song made us put together a list of things or misses or

18  areas of improvement that -- on things that you should work.

19  Some of them -- some of these things here on the list, we

20  don't really know it was -- if it was your fault or

21  Jonathan's, but I just include them so that you can relate

22  them to Jonathan later.

23        And, yeah, so we encourage us to go through

24  everything.  And sometimes she had an idea about -- you know,

25  I mean, like, this is wrong, this is a miss.  And, then, I

Artunduaga - direct

1    told her, well, this is what really happened.

2           And we didn't make any notes on it.  She just said,

3    you know, I mean, this is just for you to learn, to make

4    improvements.  And we really want to help you to get better.

5    And, you know, we'll make sure that we are there for you

6    because we are like your big sisters.  So, we will defend you,

7    even though you're going to go into thoracic surgery next and

8    it's going to be hell.

9    Q.  Did Dr. Dickie have a document that she was -- that you

10   were --

11   A.  Yeah.

12   Q.  -- looking at?

13   A.  She had a piece of paper called "Areas of Improvement,"

14   and she made me sign it because she say that Dr. Song wanted

15   to know if that really happened, so it needed to have my

16   signature.

17   Q.  Okay.

18          You said you then had a meeting with Dr. Nyugen?

19   A.  Yes.

20          THE COURT:  Ms. Hyndman, why don't we break before

21   you get into the next meeting.

22          MS. HYNDMAN:  Perfect.

23          THE COURT:  Let's take our morning break.

24      (Jury out.)

25          THE COURT:  We will pick back up in about ten

Artunduaga - direct

 1    minutes.

 2            MS. HYNDMAN:  Thank you.

 3        (Brief recess.)

 4        (In open court outside the presence of the jury:)

 5            THE COURT:  I received a note from our librarian.

 6            "To Judge St. Eve:  What is the meaning of

 7    'foundation' as used by the defense attorney in his various

 8    objections this morning?"

 9            So I can respond to them orally.  I thought maybe at

10    the end of the morning before we break for lunch I can tell

11    them that the lawyers' objections, it's their legal duty to do

12    so.  They should not be concerned with them or speculate about

13    my rulings.

14            Are you okay with that?

15            MS. HYNDMAN:  Yes, I'm fine with that.

16            MR. JEPSON:  Sure.

17            THE COURT:  Okay.

18            Bring in the jury, please.

19        (Jury enters.)

20            THE COURT:  You may be seated.

21            You may continue.

22    BY MS. HYNDMAN:

23    Q.  Dr. Artunduaga, we were talking about the meeting you had

24    with Dr. Nyugen at the end of the October plastics rotation.

25    Where did that meeting take place?

Artunduaga - direct

1   A.   It took place in the plastic surgery residency lounge.

2   Q.   Was there anyone there besides you and Dr. Nyugen?

3   A.   No.

4   Q.   How long did you meet with her?

5   A.   30 minutes.

6   Q.   What did she say to you in that conversation?

7   A.   She said that Dr. Song had asked them to make a list of

8   misses or areas of improvement that we should talk about as a

9   feedback session kind of thing and that she was, I mean, a bit

10  surprised that --

11           MR. JEPSON:   Objection.

12           THE COURT:   Sustained.

13  BY MS. HYNDMAN:

14  Q.   What did she tell you at the meeting?  Did she tell you

15  that she was surprised?

16  A.   Yes.

17  Q.   Okay.

18  A.   That she was surprised that they made them do so because

19  generally the junior residents were not evaluated.

20  Q.   Okay.  Did Dr. Nyugen have a document with her at that

21  meeting?

22  A.   Yes.  She had a piece of paper, areas of improvement --

23  that was the title -- and bullet points.

24  Q.   Did you discuss the information on that document?

25  A.   Yes, we did.

Artunduaga - direct

190

1   Q.  Okay.  Did you discuss anything else with Dr. Nyugen at

2   that meeting?

3   A.  I just pointed out that it was a list of feedback, that I

4   felt that Jonathan Lusardi should be here with me because some

5   of the things were done by either him or me in combination.

6   Q.  Did you say anything else to her?

7   A.  No.

8   Q.  During the month of October while you were on the plastics

9   rotation --

10  A.  Mm-hmm.

11  Q.  -- did any of the attending physicians in the plastics

12  section sit down with you to discuss your performance?

13  A.  No.

14  Q.  Okay.  Did you ever have any discussions with Dr. Butz

15  about your performance on the rotation in October?

16  A.  No.

17          MS. HYNDMAN:  Let's take a look at Joint Exhibit

18  No. 17, please.

19          THE COURT:  You said joint, right?

20          MS. HYNDMAN:  I did, Your Honor, yes.

21          THE COURT:  So it's in evidence.

22          MS. HYNDMAN:  Thank you.

23  BY MS. HYNDMAN:

24  Q.  Dr. Artunduaga, do you recognize this document?

25  A.  Yes, I do.

Artunduaga - direct

1   Q.  What is it?

2   A.  It's an e-mail that I sent to Joly Jose, the nurse

3   practitioner in the Kaplan service.

4   Q.  What are you asking Ms. Jose in this e-mail?

5   A.  I was asking her if she could submit an evaluation of my

6   performance.

7   Q.  Did -- why did you ask her to submit that evaluation?

8   A.  Well, I felt that she was the person that I had worked for

9   most of the time in the floor.  We spent several hours

10  together, and that, I mean, Dr. Jaskowiak's evaluation was

11  very critical of me, and I just wanted to have an -- I mean,

12  an evaluation, some sort of feedback from somebody who I

13  thought knew me better.

14          MS. HYNDMAN:  Could we look at Joint Exhibit 1919,

15  please.

16          THE COURT:  That is in evidence?

17          MS. HYNDMAN:  Yes.

18  BY MS. HYNDMAN:

19  Q.  Dr. Artunduaga, have you seen this document before?

20  A.  No, I did -- I mean, I have.

21  Q.  Did you see it sometime in October of 2011?

22  A.  No.

23  Q.  When is the first time you saw the document?

24  A.  In May during my grievance hearing when I asked for my

25  personnel file.

Artunduaga - direct

1  Q.  Did you ever have a conversation with Dr. Song about Joly

2  Jose's evaluation of you?

3  A.  Yes.  He did mention that even -- actually, no.  I'm

4  sorry.  I go back.

5       He did write about this evaluation in my probation

6  letter, one of my letters of November.

7  Q.  Did he speak to you about this evaluation at any time?

8  A.  No.  No, he did not.

9  Q.  Overall how would you describe your experience on the

10 plastics and reconstructive surgery rotation in October?

11 A.  It was a challenging rotation because we were two interns,

12 first year.  We didn't have much training as surgical

13 residents.  And we were left alone without supervision a lot,

14 so it was kind of frightening.

15 Q.  Did you feel that you had met Dr. Song's expectations of a

16 flawless performance for the month?

17 A.  No.

18 Q.  Did Dr. Song check in with you during the course of the

19 month at all to discuss your performance?

20 A.  During October?

21 Q.  During October.

22 A.  No.

23 Q.  Did you ever have a discussion with Dr. Song about your

24 performance on the plastics service for the month of October?

25 A.  Yes.  He called me or paged me to meet with him about

Artunduaga - direct

193

1    November 2nd.

2    Q.  Where was that meeting?

3    A.  In his office.

4    Q.  Was there anyone else present?

5    A.  Dr. Park and Akilah Williams.

6    Q.  Who is Dr. Park?

7    A.  Dr. Park is the only female faculty in the section, and

8    she does --

9              MR. JEPSON:  Objection.

10             THE COURT:  What's your objection?

11             MR. JEPSON:  The characterization, who is Dr. Park.

12             MS. HYNDMAN:  I think it's an accurate observation.

13             THE COURT:  Overruled.  Overruled.

14             THE WITNESS:  Oh, okay.  Sorry.

15   BY MS. HYNDMAN:

16   Q.  Go ahead.  Who is Dr. Park?

17   A.  A microsurgeon.  She does breast reconstructive surgery.

18   And she works with Dr. Song, like his working partner.

19   Q.  You've mentioned Akilah Williams a couple of times.  Who

20   is Akilah Williams?

21   A.  Akilah Williams was Dr. Song's exec assistant.

22   Q.  Do you know what title she had?  If you don't know, it's

23   fine.  You don't know?

24   A.  She took care of the programs.

25   Q.  I'm asking you if you knew what title she had.

Artunduaga - direct

194

1   A.  No, I don't remember that.

2   Q.  Okay.  You had this meeting with Dr. Song, Dr. Park,

3   Akilah Williams?

4   A.  Yes.

5   Q.  How long did that meeting last?

6   A.  Like an hour.

7   Q.  An hour?  Okay.  What did Dr. Song say to you in that

8   meeting?

9   A.  So he say to me that it was a difficult time to meet with

10  me, but he had already made a decision about my future in the

11  program, that there were way too many things that -- or misses

12  how he called it -- and he had a letter, showed the letter to

13  me, with a description of those misses.  He said that his

14  recommendation was to resign from the program immediately

15  because the second option he would offer me was to get -- to

16  go through a probation, probationary period, and that it was

17  very unlikely that I would succeed.

18  Q.  Did he say anything else?

19  A.  Well, he say that he hadn't anticipated so much resistance

20  towards me and that my -- that there will be no time for me to

21  level up with the other residents in six years and that he

22  didn't have time to help me achieve that level.  He was a busy

23  person.

24  Q.  What was Dr. Song's overall tone in that meeting?

25  A.  Very commanding; a bit condescending too.

Artunduaga - direct

1   Q.   I'm sorry.  I didn't hear that.

2   A.   Condescending too.

3   Q.   Did you respond to what Dr. Park told you?

4   A.   Dr. Park?

5   Q.   I'm sorry.  Dr. Song, did you respond to what Dr. Song

6   told you?

7   A.   Well, I told him when he showed me the letter, I told him,

8   well, these were the areas of improvement that I just

9   discussed with Sara and Trang.  And a lot of these things that

10  you are mentioning here were either my mistake or the other

11  intern's mistake or a combination of both of us.

12       I had discussed -- I had given them -- I mean Trang

13  and Sara -- my side of the story, and they realized that some

14  of these misses or mistakes were not real --

15  Q.   Maria, you can only talk about what you said to them.

16  A.   Sorry.

17  Q.   You can't talk about what they realized.

18       What did you say to Dr. Song about the information in

19  the letter?

20  A.   That it was misleading, that it was not completely true,

21  that I found it very unfair for him to base his decision on --

22  without investigating more about those misses, how they were

23  called.

24  Q.   Did Dr. Park say anything else in the meeting?

25  A.   Yes.  She said -- she tried to be a little bit more

Artunduaga - direct

1  amicable, in a way that she referred to her --

2          MR. JEPSON:  Objection to the characterization.

3          THE COURT:  Sustained.

4          I'll strike it.  The jury should disregard it.

5  BY MS. HYNDMAN:

6  Q.  Tell me what she said, please.

7  A.  I'm sorry.  She say that, Maria, it's very difficult to

8  succeed in surgery.  In my case, for example, I had to go

9  through a preliminary residency and prove to people that I was

10  good at Johns Hopkins, where she graduated from, and that

11  sometimes things are not -- are not made for some people.

12  Q.  Did she say anything else?

13  A.  That I should consider -- think a lot about going to

14  probation because I told them this is my dream.  I'm not

15  quitting it, that it will be a red flag that will taint my CV

16  forever and it will be unlikely that I will find a job ever

17  again in the clinical field.

18          MS. HYNDMAN:  If you could show us Joint Exhibit 22,

19  please, Jamie.

20  BY MS. HYNDMAN:

21  Q.  Dr. Artunduaga, do you recognize this document?

22  A.  Yes, of course.

23  Q.  What is it?

24  A.  It's a letter that Dr. Song wrote on November the 2nd.

25  It's a compilation of --

Artunduaga - direct

1    Q.  Hold on.

2    A.  Sorry.

3    Q.  You mentioned that he gave you a document at the meeting.

4    Was this the document he gave you?

5    A.  Yes, this was the document.

6    Q.  Can you take a look at the second page, please.

7            At the time that Dr. Song gave you this document, was

8    it signed by Dr. Song, Dr. Park and Akilah Williams?

9    A.  Yes.

10   Q.  Did you ever sign this document?

11   A.  No.

12   Q.  Why not?

13   A.  Because I did not agree with what was written here.

14   Q.  Okay.  Does this document accurately reflect what Dr. Song

15   told you in the meeting?

16   A.  No.

17   Q.  Okay.  Did Dr. Song -- strike that.

18           You said that Dr. Song was giving you the option of

19   taking probation.

20   A.  Yes, he did.

21   Q.  Did he ask you -- did he give you a time frame in which to

22   tell him your decision?

23   A.  A time frame in regards to when I should make a decision

24   or --

25   Q.  When you should advise him of your decision.

Artunduaga - direct

1   A.   24 hours.

2   Q.   Okay.  Did you say anything about the probation at that

3   meeting, how you felt?

4   A.   Yes, that this was to me a mischaracterization of the

5   issue.

6   Q.   No, I'm asking you did you say anything about whether you

7   wanted to take probation in the meeting?

8   A.   Yes.  I said before leaving the meeting, I'm going to do

9   the probation.  And he said wait -- I mean, think about it.

10  Q.   Okay.  How were you feeling in this meeting when

11  Dr. Park -- or Dr. Song was telling you that he either wanted

12  you to leave or you would go on probation?

13  A.   I was really upset, and, you know, crossing roads, it was

14  a difficult situation.  But the last thing I expected was my

15  program director telling me this.

16          MR. JEPSON:  Would you speak up?  I'm sorry.

17  BY MS. HYNDMAN:

18  Q.   Yeah.  Could you just speak up a little bit, please.

19  A.   I'm sorry.  I was very upset, frustrated, confused because

20  I never expected my program director to make such a radical

21  decision.

22  Q.   What did you do after the meeting with Dr. Song and

23  Dr. Park?

24  A.   I talked to my husband about it, and I did some research

25  about the advantages and disadvantages of probation.

Artunduaga - direct

1              The disadvantages were that --

2    Q.  Hold on.

3    A.  Sorry.

4    Q.  You can't testify about that.

5              You did some research?

6    A.  Yes.

7    Q.  Did you make a decision, a final decision, within the 24

8    hours that Dr. Song asked you to?

9    A.  Yes.

10   Q.  What was your decision?

11   A.  Going through probation.

12   Q.  Did you let Dr. Song know that was your decision?

13   A.  I sent an e-mail to Akilah Williams.

14   Q.  After you had made this decision, did you talk to anyone

15   else about the probation?

16   A.  Yes.

17   Q.  Who did you talk to?

18   A.  I reached out to Dr. Roggin, the general surgery program

19   director; Dr. Jaskowiak; Dr. Kaplan.

20   Q.  Anyone else?

21   A.  Maybe Dr. Chhablani.  I can't remember.

22   Q.  Did you talk to anybody in the section?

23   A.  Yes.  Sorry.  I forgot about that.

24              I wanted to set up a meeting with Trang, the plastic

25   surgery residents, the senior plastic surgery residents:

Artunduaga - direct

1   Trang, Sara and Justine.

2   Q.  Okay.  Let's talk about that meeting first.

3   A.  Yes.

4   Q.  Why did you ask to speak to these senior residents?

5   A.  The feedback that I got from their -- from them during the

6   sessions that we had about the areas of improvement, their

7   last words were, you know, we are looking forward to work with

8   you for the next few years.  You know, we are family; we help

9   each other.  And I wanted to understand how that was so

10   disconnected, the disconnection between that and the actual

11   decision.

12   Q.  Did you actually meet with Dr. Lee, Dr. Dickie and

13   Dr. Nyugen?

14   A.  Yes, the three of them.

15   Q.  Where was that meeting?

16   A.  The plastic surgery residency -- resident lounge.

17   Q.  Do you remember how long after you had your meeting with

18   Dr. Song that you met with the chief residents?

19   A.  About a week.

20   Q.  Was there anybody else at the meeting other than the

21   chiefs -- or the senior residents and you?

22   A.  No.

23   Q.  Okay.  How long did you meet with them?

24   A.  About an hour.

25   Q.  Okay.  What did any of them say to you?

Artunduaga - direct

1   A.  Well, they say that --

2          MR. JEPSON:  Objection to the -- I would like to know

3   who.

4          THE COURT:  Sustained.

5          Start by who, rather than just they said.

6          MS. HYNDMAN:  Sorry.

7   BY MS. HYNDMAN:

8   Q.  What did Dr. Dickie say in the meeting?

9   A.  She didn't say much.

10  Q.  What did Dr. Lee say?

11  A.  She was the one who talked mostly, for longer.  And she

12  said to me that, Maria, it's a very difficult situation, but

13  we have met with Dr. Song, and he has a lot of concerns about

14  you.  So we know that he had -- he has offered you the way --

15  I mean, a way of leave elegantly from the program, to even

16  transfer you or something, or the probation, which I would

17  highly recommend you don't take.

18  Q.  Did Dr. Nguyen say anything in the meeting?

19  A.  She spoke less too, but she -- she reflected the same --

20  the same opinion like Justine Lee, like this is a decision

21  that he has made, and we just gave him these documents.  He

22  told us to do that, but we actually never thought he would use

23  that against you.

24  Q.  How did you feel coming out of that meeting with the

25  senior residents?

Artunduaga - direct

202

1  A.  Oh, well, too many feelings.  I was so sad.  I felt
2  betrayed, completely alone, lonely.
3  Q.  You said that you spoke to Dr. Roggin.
4  A.  Yes, I did.
5  Q.  When did you speak with Dr. Roggin?
6  A.  Sometime in November, beginning of November, right after
7  the meeting I had with Dr. Song.
8  Q.  Okay.  Had you ever met Dr. Roggin before?
9  A.  No.
10  Q.  Where did you meet with him?
11  A.  At his office.
12  Q.  How long did you meet with him?
13  A.  30 minutes, 45 minutes.
14  Q.  Okay.  What did Dr. Roggin say in that meeting?
15  A.  Well, he say that he was very surprised that Dr. Song made
16  such a strong decision about one of his residents, that we
17  were here to learn, that some residents made more mistakes
18  than others but that's the reason why you are in a training
19  program, and that feedback was very, very important, that the
20  way how he handled his residents was that they were going
21  to --
22       MR. JEPSON:  I will object to this as subject to the
23  motion *in limine*.
24       THE COURT:  You want to ask another question?
25       MS. HYNDMAN:  Yeah.

1          THE WITNESS:  Okay.  Sorry.

2    BY MS. HYNDMAN:

3    Q.  Did -- what did you say to Dr. Roggin in that meeting?

4    A.  Well, I told him about Dr. Song's decision of putting me

5    through probation and that I disagreed completely with the

6    characterizations he had made on that letter because there

7    were two people in the service, two interns, and I was

8    being -- I was being attributed to all of these mistakes and

9    that it wasn't fair.

10   Q.  Did Dr. Roggin respond to that comment of yours?

11   A.  Yes.  So his recommendation was, Well, Maria, this is a

12   big deal.  It's probation.  This could damage your career

13   forever because you will have to disclose probations when you

14   apply for medical licensing.  And the only thing that I --

15   well, the thing you should do is get as much information, the

16   identifying information from the patients, make a case for

17   every single thing he said you did, put that letter together

18   and send it to him as soon as possible.

19   Q.  Did you do that?

20   A.  Yes, I did.

21   Q.  Okay.  Before we get to that letter, let's talk about your

22   conversation with Dr. Kaplan.

23        MS. HYNDMAN:  Could we take a look at Joint Exhibit

24   24, please.

25   BY MS. HYNDMAN:

1  Q.  Dr. Artunduaga, do you recognize this document?

2  A.  Yes, I do.

3  Q.  Did you send this e-mail to Dr. Kaplan --

4        MS. HYNDMAN:  What's -- can you scroll down on the

5  date?  Thank you.

6  BY MS. HYNDMAN:

7  Q.  -- on November 10th of 2011?

8  A.  Yes, I did.

9  Q.  In the e-mail you say, "My monthly evaluations have been

10 far below what plastic surgery residents usually get.

11 Dr. Song has decided to put me into probation, which is

12 totally understandable."

13        Why did you tell Dr. Kaplan that it was totally

14 understandable that Dr. Song decided to put you on probation?

15 A.  Well, I didn't come across as adversarial or

16 unprofessional.  After all, Dr. Song was my boss.  And the

17 only thing I wanted to do was get as much advice and feedback.

18 So I was reaching out to people.

19 Q.  Okay.  Did you meet with Dr. Kaplan?

20 A.  Yes, I did.

21 Q.  When did you meet with him?

22 A.  Like a week after that.

23 Q.  Where was that meeting?

24 A.  In his office.

25 Q.  How long was the meeting?

Artunduaga - direct

205

1    A.   An hour.

2    Q.   Anybody else there?

3    A.   No, unfortunately.

4    Q.   What did Dr. Kaplan say in that meeting?

5    A.   He was really surprised, rather shocked.  He thought that

6    I was a good resident, that there were some things that I

7    needed to improve, especially with communication stuff, but

8    that shouldn't be the reason to put me through probation.

9    Q.   Did he say anything else?

10   A.   He offered to help me out, to become my champion, to try

11   to ameliorate the rumors and things.  He offered to talk to my

12   future faculty evaluators so that to tell them, look, she's

13   good, or maybe not, but just give them a fair chance and

14   please evaluate them -- evaluate her objectively based on what

15   you observe whenever she does something and don't listen to

16   the rumors.

17   Q.   What did you say to Dr. Kaplan in that meeting?

18   A.   That I was, well, sad, lonely, that I was -- I just didn't

19   know what to do, to be -- you know, that I was -- I needed

20   someone to help me.

21   Q.   Did you take Dr. Kaplan up on his offer for help?

22   A.   Yes, I did.

23        MS. HYNDMAN:  Can we take a look at Joint Exhibit

24   No. 25, please.

25   BY MS. HYNDMAN:

Artunduaga - direct

1   Q.  Dr. Artunduaga, this is an e-mail --

2         MS. HYNDMAN:  Can we go to the second -- is there a

3   second page on that?

4   BY MS. HYNDMAN:

5   Q.  Let's look at that first e-mail at the bottom to

6   Dr. Jaskowiak.

7   A.  Mm-hmm.

8   Q.  Again, you said the same thing to her --

9   A.  Yes.

10   Q.  -- that you thought it was understandable that Dr. Song

11   put you on probation?

12   A.  Yes.

13   Q.  Why did you tell Dr. Jaskowiak that?

14   A.  Well, again, I knew that I had things to improve, and I

15   wanted to meet with people to try to have a game plan.  I

16   needed to understand what was -- you know, what they were

17   thinking of me to get a face-to-face meeting so that I could

18   gather all this information and really work on what they

19   thought were my main challenges.

20   Q.  Did you meet with Dr. Jaskowiak?

21   A.  Yes.

22   Q.  When did you meet with her?

23   A.  I think it says there.

24   Q.  Oh, yeah.

25         MS. HYNDMAN:  Can we look on the first page, Jamie,

Artunduaga - direct

1    please.

2              THE WITNESS:  Okay.  So --

3    BY MS. HYNDMAN:

4    Q.  Okay.

5    A.  It doesn't say.

6    Q.  Let's look at the very top e-mail there.

7              MS. HYNDMAN:  If we can zoom in on that, please.

8    BY MS. HYNDMAN:

9    Q.  Does that refresh your recollection about when you met

10   with Dr. Jaskowiak?

11   A.  So yes.  The next Monday then, November the 13th.

12   Q.  14th probably?

13   A.  Yes, sorry.

14   Q.  Okay.  Did you have that meeting with Dr. Jaskowiak?

15   A.  Yes, I did.

16   Q.  Where was the meeting?

17   A.  At the breast clinic.

18   Q.  Was there anybody else at that meeting?

19   A.  No.

20   Q.  How long did you meet with her?

21   A.  That was long.  Like 45 minutes to an hour.

22   Q.  What did Dr. Jaskowiak say in that meeting?

23   A.  Well, I told her that I have been put on probation, that I

24   have decided to go through the probation.  And she seemed very

25   upset.

Artunduaga - direct

208

1   Q.  What did she say to you?

2   A.  Sorry.  She told me that she was confused, that she didn't

3   understand why I was putting through probation.

4   Q.  Did she say anything else?

5   A.  She said that she had been communicating with Dr. Song,

6   but her idea of helping me out was not probation, neither

7   resignation.

8   Q.  What did you say to Dr. Jaskowiak in that meeting?

9   A.  I told her that I'm a bit confused because Dr. Song

10   asked -- said repeatedly that because of your complaints,

11   he -- his complaints and Dr. Umansky's complaints, he thinks

12   that the best course of action is to put me through probation.

13   Q.  Did Dr. Jaskowiak respond to that?

14   A.  Yes.  She said, I send him some -- I mean, some e-mails

15   regarding your --

16         MR. JEPSON:  Objection.  Foundation.

17         THE WITNESS:  Oh.

18         THE COURT:  I think she's testifying to what --

19         MS. HYNDMAN:  She's testifying about what she said to

20   the doctor.

21         THE COURT:  -- she said.  Overruled.

22         MR. JEPSON:  I'm sorry.  I misheard.

23         THE COURT:  You may continue.

24         THE WITNESS:  I'm sorry.  What was the question?

25   BY MS. HYNDMAN:

Artunduaga - direct

1   Q.  The question was did -- actually it was what Dr. Jaskowiak

2   was saying.  Did Dr. Jaskowiak respond to what you said about

3   Dr. Song's statements about Dr. Jaskowiak?

4   A.  She said that the main reason why she had been contacting

5   him was because she wanted him, Dr. Song, to act as my program

6   director and do something about it and somehow help me out

7   with transitioning, that her -- that she never meant to cause

8   me any harm or -- or to, you know, get me out of the program.

9   Q.  Okay.

10         MS. HYNDMAN:  Let's take a look at Joint Exhibit

11  No. 26, please.

12  BY MS. HYNDMAN:

13  Q.  Do you recognize this document, Maria?

14  A.  Yes, I do.

15  Q.  What is this?

16  A.  It's a letter, the formal letter informing me -- informing

17  me about the probation, that I was being placed on probation

18  from November the 15th, I think, yeah, and that the decision

19  was reached by something they called the faculty members of

20  the Residency Education Committee.

21  Q.  Did you -- how did you get this letter?

22  A.  He handed it to me.  We met on November the 15th.

23  Q.  Okay.  Was there anybody else at that meeting besides you

24  and Dr. Song?

25  A.  Akilah Williams.

Artunduaga - direct

1   Q.  Was Dr. Park at this meeting?

2   A.  I don't think so.

3   Q.  Okay.  Let's look at the second page of this document,

4   please.

5         Was the letter signed by Dr. Song when he handed it

6   to you?

7   A.  Yes.

8   Q.  Is that your signature at the bottom?

9   A.  Yes.

10  Q.  Did you sign it while you were at the meeting with

11  Dr. Song?

12  A.  Yes, I was asked to sign it.

13  Q.  Okay.  How long was this meeting with Dr. Song when you

14  talked about this letter?

15  A.  15 minutes, less maybe.

16  Q.  What did Dr. Song say to you in that meeting?

17  A.  That he had talked to the Graduate Medical Education and

18  that they had advised him to do the probation this way and

19  that I will have only 90 days to improve, to meet all their

20  requirements.

21  Q.  Did you say anything to Dr. Song in this meeting?

22  A.  Well, I told him, What do you mean the 90 days?  I'm

23  getting married in December.  I mean, my vacation has been

24  scheduled for December.  I'm getting married.  I have to go

25  for honeymoon, and, you know, I'm going back home.  And he

Artunduaga - direct

211

1  said, Well, these are the rules.  I don't make them.  It's a

2  Graduate Medical Education, and you will have just to cancel

3  your wedding.

4       MS. HYNDMAN:  Can we take a look at Joint Exhibit

5  No. 27, please.

6  BY MS. HYNDMAN:

7  Q.  Dr. Artunduaga, do you recognize this document?

8  A.  Yes, I do.

9  Q.  What is this?  What is this document?

10  A.  The letter that I put together in -- by following the

11  suggestion from Dr. Roggin, like a rebuttal letter for

12  defense.

13       MS. HYNDMAN:  If we could look at the last page.  I

14  don't remember if this is a two-page maybe?

15       MR. JEPSON:  No, it's seven.

16       MS. HYNDMAN:  Okay.

17  BY MS. HYNDMAN:

18  Q.  Is that your signature on the last page?

19  A.  Yes, it is.

20  Q.  Did you give this letter to Dr. Song?

21  A.  I -- actually it was my husband.  I was -- on that day, I

22  had a lot of -- I was covering the thoracic surgery service.

23  There was something ongoing that required my assistance on

24  something.  So Ricardo went to the plastic surgery section and

25  gave this letter to Akilah Williams.

Artunduaga - direct

1   Q.  Okay.  Did you ever have a conversation with Dr. Song

2   about the information that you included in this letter?

3   A.  No.

4   Q.  Did you ever have a conversation with Dr. Song at all

5   about this letter?

6   A.  He sent an e-mail saying that he will review my letter,

7   but that was about it.

8        MS. HYNDMAN:  Can we take a look at Joint Exhibit

9   No. 28, please.

10  BY MS. HYNDMAN:

11  Q.  Dr. Artunduaga, do you recognize this document?

12  A.  Yes.

13  Q.  What is it?

14  A.  Undated letter from Dr. David Song to me, letting me know

15  that he had accommodated to my request for the wedding, so

16  that the probation period would be November, January,

17  February.

18  Q.  How did Dr. Song give you this letter?

19  A.  He called me.  We met.

20  Q.  What day did you meet?

21  A.  The 21st?  Around --

22  Q.  Is that your signature at the bottom of the letter?

23  A.  Oh, yes.

24  Q.  And is -- what date does that say?

25  A.  Yeah, 21st.

Artunduaga - direct

1   Q.   Okay.

2   A.   Yes.  Thank you.

3   Q.   When did you sign the letter?

4   A.   On that day, when we met.  So, yes, the 21st.

5   Q.   You met with Dr. Song.  Where was the meeting?

6   A.   At his office.

7   Q.   Was anyone else there?

8   A.   Akilah Williams.

9   Q.   How long did you meet with Dr. Song that day?

10  A.   30 minutes.

11  Q.   Okay.  What did Dr. Song say to you in that meeting?

12  A.   Well, that he wished me good luck.

13  Q.   Did he say anything else?

14  A.   Oh, yes.  I forgot about that.

15          So, again, he revisited the issue of not advising me

16  to do the probation.  And he started talking about a *New York*

17  *Times* article about immigrants with accents are coming from

18  developing countries.  And he started to talk about this and,

19  like, you know, Maria, you know, life is never fair to many

20  people.  People like you generally are held to higher

21  standards, and I know it's unfair, but that's how the world

22  works.  So I'm really sorry.

23  Q.   Did Dr. Song say anything else in that meeting?

24  A.   Well, I -- I said something, but --

25  Q.   Did Dr. Song say anything else in that meeting?

Artunduaga - direct

1  A.  I don't remember anything else.

2  Q.  Did you say anything in that meeting?

3  A.  Yes.

4  Q.  What did you say?

5  A.  I told him that I was concerned about the probation being

6  somehow not completely -- I mean, like, how would I say that?

7  I told him about my meeting with Dr. Ferguson during -- in the

8  thoracic surgery service that was held on November 16.  And I

9  had barely interacted with him because he was on vacation for

10  one month -- for one week.  And Dr. Ferguson had started to

11  tell me that I -- you know, I had all these things that I

12  needed to improve.  And the things he said were exactly the

13  same things that Dr. Song had told me the day before on

14  November the 15th.  I told -- I asked Dr. Ferguson, Have you

15  talked to anybody in the section of plastic surgery?  And he

16  said, Yes, Dr. Song called me.

17          So when I came to this meeting of November the 21st,

18  I told Dr. Song that I -- that, you know, I mean, like, this

19  wasn't fair.  He was interfering with my probation, and that

20  it seemed like he wanted me to fail because he was biassing

21  people already.  And he denied everything.  He denied talking

22  to Ferguson.  He said, I haven't done anything.

23          MS. HYNDMAN:  Now, if we could look back at the

24  formal letter of probation, Joint Exhibit 26.

25  BY MS. HYNDMAN:

Artunduaga - direct

 1   Q.  If you look at --

 2          MS. HYNDMAN:  Yeah, at the second page is exactly

 3   where I wanted to be.  Thanks, Jamie.  Second page.

 4   BY MS. HYNDMAN:

 5   Q.  At paragraph No. 2 there, it says, "You are required to

 6   schedule and meet with Dr. Julie Park acting in the role of

 7   mentor at least" --

 8   A.  Sorry.  Hold on.

 9   Q.  "At least every other week."

10   A.  Yes.

11   Q.  Did you begin to have meetings with Dr. Park as required

12   on this probation letter?

13   A.  Yes, I did.

14   Q.  When was the first time you met with Dr. Park?

15   A.  Sometime around November.

16          MS. HYNDMAN:  Can we look at Joint Exhibit 39,

17   please.

18   BY MS. HYNDMAN:

19   Q.  Dr. Artunduaga, do you recognize this document?

20   A.  Yes.

21   Q.  What is this?

22   A.  An attendance document.

23   Q.  Is that your signature on it?

24   A.  Yes.

25   Q.  This says, "I have had the opportunity to meet with

Artunduaga - direct

216

1    Dr. Julie Park today to review and discuss my weekly

2    evaluations," et cetera.

3            Did you, in fact, meet with Dr. Park on November 28,

4    2011?

5    A.  Yes, I did.

6    Q.  Okay.  Did Dr. Park and Dr. -- and Ms. Williams sign this

7    document when you were at the meeting?

8    A.  No, later, perhaps.

9    Q.  You didn't see them sign it?

10   A.  No.

11   Q.  Okay.  But you signed it at the meeting?

12   A.  Yes.

13   Q.  Okay.  Where did that meeting take place?

14   A.  At Dr. Julie's -- Julie Park's office.

15   Q.  Dr. -- or Ms. Williams was there as well?

16   A.  Yes.

17   Q.  Okay.  How long was the meeting?

18   A.  30 to 45 minutes.

19   Q.  Do you -- what was discussed in that very first meeting

20   you had with Dr. Park?

21   A.   Dr. Park had asked Dr. -- I'm sorry -- Akilah Williams to

22   send an e-mail to the people in thoracic surgery, either

23   nurses, faculty or residents, with an evaluation.  And each

24   one, like, there were ten areas of improvement to rate me and

25   make comments.  So we reviewed the previous week.

Artunduaga - direct

1  Q.  Did you talk about anything else with Dr. Park at that

2  meeting?

3  A.  I told her that I was very grateful to help -- I mean to

4  offer to help to mentor me, to try to understand better, you

5  know, American culture system.  I was grateful.

6  Q.  Did you then continue to have meetings with Dr. Park over

7  the course of the probation?

8  A.  Yes, I did.

9  Q.  Did you ever see any typed-up notes or minutes of any of

10 those meetings?

11 A.  No.  Actually they never told me that there were going to

12 be minutes of a meeting.

13 Q.  You were never shown any notes from any meeting?

14 A.  No.

15 Q.  Did you take notes at any of those meetings?

16 A.  No.  I should have.

17 Q.  Did -- what did Ms. Williams do in these meetings that you

18 had with Dr. Park?

19 A.  She was taking notes.

20 Q.  Did Ms. Williams ever -- let's talk about this first

21 meeting.  Did Ms. Williams have anything to say in that

22 meeting?

23 A.  No.

24        MS. HYNDMAN:  Let's take a look at Joint Exhibit 40,

25 please.

1   BY MS. HYNDMAN:

2   Q.  Dr. Artunduaga, do you recognize this document?

3   A.  Yes, I do.

4   Q.  What is this?

5   A.  It's a letter that I wrote to Barry Kamin, the director of

6   the Graduate Medical Education, the person who is in charge of

7   monitoring and supervising all of the residency and fellowship

8   programs at the University of Chicago Medical Center.

9   Q.  Did -- had you ever met Mr. Kamin before?

10  A.  No.  No.  Sorry.

11  Q.  Why did you send this letter to Mr. Kamin?

12  A.  I was trying to reach out for help from people who were

13  over Dr. Song's power to try to convey to them what was

14  happening in my case and trying to get some, you know, advice

15  or guidance from people who could make decisions.

16  Q.  Did you send this letter to Mr. Kamin?

17  A.  I had -- I had it with me.  I called his executive

18  assistant, the front desk, the Graduate Medical Education

19  office.  She tells me that he's there.  He writes my name

20  down, and he asks my name and last name.  And when I got

21  there, she tells me that he has no time for me and that I

22  should just leave the letter there and that he will get back

23  to me later.

24  Q.  Did Mr. Kamin ever get back to you in response to your

25  letter?

Artunduaga - direct

1   A.  No.  And I even sent him a reminder e-mail about, like,

2   hey, what's -- I mean, like, are you -- what are we going to

3   do?  Are we setting up a meeting?  He didn't do it.

4   Q.  How did you feel when you got to Mr. Kamin's office and he

5   wouldn't meet with you?

6   A.  Like a door has been closed right in front of my face,

7   lonely.  I have lost hope.

8   Q.  Now, let's go back --

9   A.  Destroyed.

10   Q.  -- to talk about the training that you were getting in

11   November.  What rotation were you on for the month of

12   November?

13   A.  Thoracic surgery.

14   Q.  Did you do anything to prepare for that rotation?

15   A.  Yes, of course.  I read about lung cancer, esophageal

16   cancer, the most common operations that they did.

17         I also read about one of the procedures that interns

18   do mostly, like a lot.  That's the placement of a chest tube.

19         I expected to get many of those opportunities.

20         MS. HYNDMAN:  Let's take a look at Plaintiff's

21   Exhibit No. 26, please.

22   BY MS. HYNDMAN:

23   Q.  Dr. Artunduaga, do you recognize this document?

24   A.  Yes, I do.

25   Q.  What is it?

Artunduaga - direct

1    A.   It's a list of services with people assigned to each

2    service on the right side -- no, left side -- and the senior

3    resident, last name and pager next to it; junior resident on

4    the right and its pager number.  This was sent by Dr. Eric

5    Grossman and Dr. John Seal.

6    Q.   Which month does this relate to?

7    A.   November of the --

8    Q.   What year?

9    A.   Sorry.  2011.

10   Q.   Did you receive a copy of this schedule sometime at the

11   beginning of November?

12   A.   Yes, I did.

13        MS. HYNDMAN:  Your Honor, we would move to admit

14   Plaintiff's Exhibit No. 26.

15        THE COURT:  Any objection?

16        MR. JEPSON:  No objection.

17        THE COURT:  It's admitted.

18      (Plaintiff's Exhibit No. 26 was received in evidence.)

19        MS. HYNDMAN:  Could we take a look at the second page

20   of that document, please.

21   BY MS. HYNDMAN:

22   Q.   Under "cardiothoracic" and then under "thoracic," there

23   are two names there.

24   A.   Yes.

25   Q.   Who -- what are -- did you have an understanding as to who

Artunduaga - direct

 1   those people were?

 2   A.  Dr. Ferguson and Dr. Vigneswaran, they were the two

 3   surgeons doing the thoracic surgery operations.

 4   Q.  And then under "senior resident," there's a name there.

 5   A.  Yes, Moreira.

 6   Q.  Had you worked with Dr. Moreira --

 7   A.  No.

 8   Q.  -- before?

 9   A.  No.

10   Q.  Had you ever met her before?

11   A.  Yes.  I mean, like before November 1st?

12   Q.  Yes.

13   A.  She contacted me via text, I think.  And she told me that

14   she wanted to meet with me at my home.  I found it a little

15   awkward.  Okay.  So, yeah, she said that she wanted to meet

16   with me.  I replied of course.  I mean, come on Sunday, right,

17   the day before.  And she came.

18   Q.  Okay.  What did she say to you in that meeting?

19   A.  Well, she said that she had heard about the rumors, that

20   Akilah Williams, who was her roommate, and Essie Kueberuwa,

21   one of the plastic surgery residents who was a very good and

22   close friend to her, they have caught her up about me.

23          So she say that at least for the month of November --

24          MR. JEPSON:  I'm going to object to the hearsay here

25   of this resident.

Artunduaga - direct

1          THE COURT:  What's your response?

2          MS. HYNDMAN:  Your Honor, this goes to

3     Dr. Artunduaga's state of mind as she was beginning the

4     thoracic rotation.

5          MR. JEPSON:  It's hearsay.  This is not a chief

6     resident, not somebody who is a decision-maker or anything

7     with respect to her.

8          THE COURT:  I think I need you to link up a little

9     bit more the relevance of her state of mind from what

10    Ms. Williams is -- or what this individual is saying.  It

11    looks a little bit removed.

12          MS. HYNDMAN:  I'm talking about Dr. -- it goes to

13    Dr. Artunduaga's state of mind as she begins the thoracic

14    rotation.

15          THE COURT:  I'm sorry.  I understand that.  But there

16    still has to have some link or relevance to her state of mind,

17    the person who is saying it.  And I'm not sure you've linked

18    that up.

19          MS. HYNDMAN:  Dr. Moreira is going to be the senior

20    resident on the service.

21          THE COURT:  Just ask her a few more questions to

22    factually --

23          MS. HYNDMAN:  Okay.

24          THE COURT:  -- link it up.

25          MS. HYNDMAN:  Sure.

Artunduaga - direct

1    BY MS. HYNDMAN:

2    Q.  What was Dr. Moreira's role going to be, as you understood

3    it, on the service for November?

4    A.  She was going to be my senior resident.

5    Q.  What was the job of the senior residents on the thoracic

6    service?

7    A.  They would mostly do their operations with the faculty.

8    They supervise the intern.  And because of the probation --

9    Q.  Talk about what she did, please.

10   A.  I'm sorry.

11   Q.  What did Dr. Moreira do?  What was her job as the senior

12   resident on the service?

13   A.  To supervise me.

14   Q.  Okay.  Did she have any other jobs besides assisting on

15   cases and supervising you?

16   A.  To go to the clinics too.

17   Q.  Did you have an understanding as to whether Dr. Moreira

18   would be evaluating you?

19   A.  Not after that date.

20   Q.  At some point in time, did Dr. Moreira evaluate your

21   performance in the thoracic service?

22   A.  Yes.

23   Q.  When did that start to begin?

24   A.  Second week of November.

25           THE COURT:  That provides the link.

Artunduaga - direct

1     Ladies and gentlemen, the statement that you're

2  hearing testimony about from what Dr. Moreira said to this

3  witness are not being offered for the truth of what

4  Dr. Moreira said.  Instead they are being offered as to this

5  witness' state of mind.

6  BY MS. HYNDMAN:

7  Q.  So let's go back to the conversation you had with

8  Dr. Moreira at your home before you started the evaluation.

9  What did she say to you in that conversation?

10 A.  Yes.  So because she had talked to these people and she

11 knew about the rumors, she had decided to give me -- to

12 supervise me more and to give me fewer assignments than she

13 would regularly give to the interns.

14 Q.  Did she say anything else?

15 A.  Well, she said that she was very scared of Dr. Ferguson

16 and that she wanted everything to work flawlessly.

17 Q.  Anything else?

18 A.  That she apologized in advance, that it was the best for

19 her.

20 Q.  What kind of patients are seen on the thoracic service?

21 A.  It depends.  Dr. Ferguson did a lot of patients with

22 esophageal cancer.  That's the tube that communicates the

23 stomach to your oral cavity.  He did a lot of lung cancer.

24 Most of his operations were done laparoscopically.  Sorry.  He

25 was very famous.  Many people came to him.

Artunduaga - direct

225

1        Dr. Vigneswaran was an expert in mesothelioma which

2 is a cancer of the pleura.  That's the back -- or that

3 contains the lungs.

4 Q.  Had you had any clinical experience with these types of

5 surgeries before you began this rotation?

6 A.  No, this was too specialized.

7        MS. HYNDMAN:  Can we take a look at Plaintiff's

8 Exhibit 26?  We looked at 26 already, right?

9        MS. FRANKLIN:  Mm-hmm.

10        THE COURT:  Yes, 26 is in evidence.

11        MS. HYNDMAN:  Okay.  Thank you.  Sorry.

12 BY MS. HYNDMAN:

13 Q.  How often did you work with Dr. Ferguson during the month

14 of November?

15 A.  The first week I assisted Carla as I held the camera about

16 three times, three surgeries.  Then he left for vacation for

17 like ten days.  Then we met for our review or feedback

18 session.

19 Q.  And then after you had your feedback session with him, did

20 you work with Dr. Ferguson after that?

21 A.  Yes, I did.  I can't remember exactly, but at least twice

22 a week, I would go to the operating room with him.

23 Q.  Did -- in any of the surgeries that you assisted on with

24 Dr. Ferguson, were you the first assistant?

25 A.  No.

Artunduaga - direct

1   Q.   Okay.  You were -- so you were the second assistant?

2   A.   Yes, I did what medical students do most of the time.

3   Q.   What was your role in those surgeries?

4   A.   Holding the camera.

5   Q.   What camera are you talking about?

6   A.   So you have tools that go through orifices that are

7   really, really small, like 3 to 5 millimeters.  So he --

8   Dr. Ferguson would hold the main ones that would do most of

9   the cutting, and -- I mean, hmm, how do you say that? --

10  coagulate the blood, like to maintain blood loss.  And then

11  Carla Moreira will hold instruments to help him go through the

12  organs and to show him the right places, where to operate.

13  Since this is done without a -- like a big incision, you

14  cannot see anything, like, with your own eyes.  You're putting

15  instruments in it.  So there is a bigger orifice that it's

16  placed down here, and that orifice or hole for the camera,

17  that will help the surgeons to see everything they are doing

18  inside of the body.

19  Q.  Had you ever had any experience doing anything like that,

20  holding this kind of camera?

21  A.  I did in Mount Sinai, but there were not surgeries in the

22  thorax in this part.

23  Q.  So how did you do in those surgeries with holding this

24  camera for Dr. Ferguson?

25  A.  Well, I -- I did the best I could, but he always wanted me

Artunduaga - direct

1   to hold the camera with my nondominant hand, my left hand.

2   And whenever I wanted to hold it with my right hand, because

3   it was heavy and I have small hands, he would really get very

4   upset at me.

5   Q.  Did he say anything to you?

6   A.  Yeah, that I was incompetent and that -- and took my hand

7   and, like, took it away and, like, you know, he was a bit

8   violent.

9   Q.  How many -- did that just happen one time?

10  A.  Oh, no.  Many times.  That day, probably twice.

11  Q.  Did Dr. Ferguson raise with you any issues about your

12  performance?

13  A.  He said that I had communication issues whenever we were

14  in the OR.  He made comments about my accent, that he couldn't

15  understand what I was saying, loud, in front of five people or

16  more, and that I had problems understanding or comprehending

17  what he was saying.

18  Q.  Did he say anything else?

19  A.  Well, he cursed at me a lot whenever I could not hold a

20  camera with one hand because I got real tired so then he will

21  curse.  Like, can I say those words?

22  Q.  We don't need to.  We understand.

23  A.  Okay.  Yes.

24  Q.  Was there anybody else at --

25  A.  I remember.

Artunduaga - direct

1   Q.  Was there anybody else that witnessed this treatment of

2   you by Dr. Ferguson?

3   A.  Yes, Carla Moreira, she did, and some of the PAs and

4   nurses.

5   Q.  What's a PA?

6   A.  I'm sorry.  A physician assistant.

7   Q.  Okay.

8   A.  Someone similar to a nurse practitioner.

9   Q.  Now, you mentioned that you had a meeting with

10  Dr. Ferguson --

11  A.  Mm-hmm.  Yes.

12  Q.  -- to talk about your performance.

13          When was that meeting?

14  A.  November the 16th.

15  Q.  Where did that meeting take place?

16  A.  In his office.

17  Q.  How long did you meet with him?

18  A.  30 minutes.

19  Q.  What did he say to you in that meeting?

20  A.  He repeated the exact same comments that were on my letter

21  from the day before about things that I needed to improve and

22  the other comments that Dr. Song had made to me the day

23  before.

24  Q.  Did you respond to Dr. Ferguson?

25  A.  Well, I told him that I understood there was concerns, but

Artunduaga - direct

1   if he really wanted me to -- if he really wanted me to

2   improve, I should deserve a fair chance to either be taught or

3   to have the same opportunity to perform as any intern, and

4   that I told him about Carla telling me these things about not

5   letting me do intern's assignments and to rely on the PAs.

6   They have three PAs to do most of my job so that I was very

7   frustrated about it.

8   Q.  Did Dr. Ferguson say anything about that?

9   A.  Well, he said that, you know, there were rumors and that

10  they had the right to -- she had the right to decide what I

11  should do or not.

12  Q.  Anything else that Dr. Ferguson said in that meeting?

13  A.  I think I mentioned when I asked him about if he had

14  talked to Dr. Song, and he said yes.

15  Q.  What was your working relationship like with

16  Dr. Vigneswaran?

17  A.  We hardly interacted.  I did not go to any of his clinics.

18  I assisted him probably twice in two surgeries in the entire

19  month.

20  Q.  Did Dr. Vigneswaran raise any issues with you about your

21  performance during that month?

22  A.  Not at all.

23  Q.  Did you ever have a chance to sit down with

24  Dr. Vigneswaran to talk about your performance?

25  A.  No, I did not have a chance.

1    MS. HYNDMAN:  Can we take a look at Joint Exhibit

2  No. 38, please.

3  BY MS. HYNDMAN:

4  Q.  Dr. Artunduaga, if you look at the bottom of Joint Exhibit

5  38, do you recognize that e-mail?

6  A.  Yes.

7  Q.  Did you send that e-mail to Dr. Grossman on November 22nd

8  of 2011?

9  A.  Yes, I did.

10  Q.  Why did you send this e-mail to Dr. Grossman?

11  A.  Because I knew that he was going to be sent an evaluation

12  about my performance during the night, one night that I had to

13  cover.  And, you know, I mean, I was always looking into

14  getting feedback before, you know, things escalated, and I

15  want honest feedback.  I wanted to discuss, you know, better

16  ways of improvements instead of just reading something.

17  Q.  Did you work with Dr. Grossman?

18  A.  Yes, on that night.

19  Q.  Was it just one night in November?

20  A.  Yes, only one night.

21  Q.  And then if we'll scroll up to the top, please, did you

22  receive this e-mail from Dr. Grossman on November 26th of

23  2011?

24  A.  Yes.

25    MS. HYNDMAN:  Let's take a look at Joint Exhibit

Artunduaga - direct

1   No. 41, please.

2   BY MS. HYNDMAN:

3   Q.  Dr. Artunduaga, what is -- do you recognize this document?

4   A.  Yes, I do.

5   Q.  What is it?

6   A.  It's an e-mail that I sent to the plastic surgery

7   residents in regards to a recent decision about having my

8   coresident in plastic surgery, Deana Shenaq, and myself to

9   take the plastic surgery exam instead of the general surgery

10  exam we had been preparing for over six months.

11  Q.  What is the inservice exam?

12  A.  It's called inservice exam.  I don't know why.  I mean,

13  like for plastic surgery, it's called inservice.

14  Q.  What type of an exam is it?

15  A.  Oh, sorry.  It's an annual exam that the American Society

16  of Plastic Surgery I believe put together for -- to test the

17  knowledge of plastic surgery residents in the years number --

18  I mean, like, senior residents such as chief residents,

19  fifth-year residents and fourth-year residents.

20  Q.  Okay.  What is the ABSITE exam?

21  A.  The ABSITE, it's the name attributed to the general

22  surgery residents that take a similar exam every year to test

23  their knowledge in general surgery.

24  Q.  Okay.  How did you learn that you would be taking the

25  inservice exam instead of the ABSITE exam?

Artunduaga - direct

1   A.   Deana Shenaq sent me, forwarded me an e-mail from

2   Dr. Song, that Dr. Song had sent only to her.

3   Q.   Okay.  Did it matter to you which one of these exams you

4   took?

5   A.   Of course.

6   Q.   Why is that?

7   A.   Because I had been preparing for the ABSITE.  Every

8   Wednesday, we have two hours, all the interns, to study about

9   it and have presentations and study the questions from

10  January -- I'm sorry -- from June up to, whew, like this day,

11  11 of November.  And I had been studying on the side too

12  because I wanted to do well.  And, yeah.

13  Q.   Did you have an understanding of when you would be taking

14  the inservice exam?

15  A.   March the 1st.

16  Q.   So in the month of December, what happened?

17  A.   Well, I got married, and I went on my honeymoon on --

18  because I received this -- well, I found -- I'm sorry.

19  Q.   What was your -- did you have a rotation that month?

20  A.   No.  No.  It was my vacation time.

21  Q.   Okay.  When did you leave to go to Colombia?

22  A.   The 31st of November.

23  Q.   There's only 30 days in November.

24  A.   Oh, sorry.  The 30th.  The last day of November.

25  Q.   Okay.  How long were you gone?

Artunduaga - direct

1   A.   Oh, for the entire month.

2   Q.   When did you come back to Chicago then?

3   A.   January the 2nd, I think -- oh, no, no. December 31st.

4   We celebrated New Year's on the plane.

5   Q.   Oh, okay. Did you have any contact with anyone from UCMC

6   while you were on vacation in Colombia?

7   A.   I sent them some pictures from my wedding.

8   Q.   Did you have contact with anyone else that month?

9   A.   From the plastic surgery department?

10   Q.   No, I mean anyone from the medical center.

11   A.   I don't think so.

12   Q.   Okay. So when you came back to UCMC in January, how were

13   you feeling about getting back into the residency program?

14   A.   I had been recharged with a lot of, you know, energy from

15   Colombia, my friends, my family. They were very supportive.

16   So I was excited.

17   Q.   Did you have a plan for the probation period?

18   A.   Kind of, yes. I had asked Dr. Kaplan to tell at least the

19   chief of the section where I was going to rotate about giving

20   me a fair chance, an objective evaluation of the things that

21   they had seen, supervise me and to not be biased about rumors,

22   gossip, you know, anything prejudiced.

23   Q.   Do you know whether Dr. Kaplan had that conversation?

24   A.   With them?

25   Q.   Yes.

Artunduaga - direct

1    A.   Before I started --

2    Q.   Do you know if he actually had the conversation?  You said

3    you asked him to do it.  Do you know if he did?

4    A.   Yes.  Either he sent me an e-mail or he paged me.

5    Q.   What rotation was it you were scheduled for in January?

6    A.   Vascular surgery.

7    Q.   Had you had any prior experience doing vascular surgery?

8    A.   No.

9    Q.   Okay.

10         MS. HYNDMAN:  Let's take a look at Plaintiff's

11   Exhibit No. 32, please.

12   BY MS. HYNDMAN:

13   Q.   Dr. Artunduaga, have you seen this document before?

14   A.   Yes, I have.

15   Q.   What is it?

16   A.   It disappeared.  Okay.  Good.

17         It's the schedule.  It's called schedule of surgical

18   services for the month of January of 2012.  So it has a list

19   of the services on the left side with the faculty members and

20   the senior residents, nurse practitioners.  Then in the

21   middle, it has the senior residents, their last names and

22   pager numbers; and then junior resident on the right, last

23   names and pager numbers.

24   Q.   Who prepared this document?

25   A.   Dr. Eric Grossman and Dr. John Seal.

Artunduaga - direct

235

1  Q.  Did you receive a copy of it at the beginning of January?

2  A.  Yes, I did.

3         MS. HYNDMAN:  Your Honor, we would move to admit

4  Exhibit No. 32, please.

5         THE COURT:  Any objection?

6         MR. JEPSON:  No objection, Your Honor.

7         THE COURT:  It's admitted.

8      (Plaintiff's Exhibit No. 32 was received in evidence.)

9  BY MS. HYNDMAN:

10 Q.  Dr. Artunduaga, who were the attending physicians on the

11 vascular rotation?

12 A.  Dr. Skelly, Dr. Eton, Dr. Blecha, Dr. Hall,

13 Dr. Steppacher.

14 Q.  And then just below their names is a name Dr. Shao?

15 A.  Yes, Dr. Shao.

16 Q.  Who is Dr. Shao?

17 A.  He was a recent graduate from the general surgery program

18 who had decided to get more training in vascular surgery.  We

19 call them fellows.

20 Q.  If you'll look over at the last of the senior residents

21 for that service that month.

22 A.  Mink, but I did not --

23 Q.  No, no, I'm talking about the senior residents.

24 A.  Oh, I'm sorry.

25 Q.  It says Fleming and Paruch.

Artunduaga - direct

 1   A.  Yes.  So Irma Fleming and Jennifer Paruch.

 2   Q.  So was that the same Dr. Fleming that you had worked with

 3   back in July?

 4   A.  Yes.  She did the first 15 days and then Jennifer the last

 5   two.

 6   Q.  Had you ever worked with Dr. Paruch before this month?

 7   A.  No.

 8   Q.  Did you do anything to prepare for this rotation in

 9   vascular surgery?

10   A.  Yes.  I had brought my outside books to the -- to my

11   vacation, and I read about vascular surgery.

12   Q.  Did you tell anyone on the service that you were on

13   probation?

14   A.  Yes, I did.

15   Q.  Who did you tell?

16   A.  I told Irma Fleming, Jennifer Paruch when she came in,

17   Dr. Shao, Dr. Steppacher.  I didn't tell anybody else.

18   Q.  Why did you tell Dr. Steppacher you were on probation?

19   A.  Because he was a faculty member that I interacted more

20   with.  He had a large number of patients, and, yes, that's why

21   I did it.  I didn't -- I don't remember talking to the others.

22   Q.  If you'll look at Joint Exhibit No. 42, please.

23          THE COURT:  Why don't we break for lunch here.

24          MS. HYNDMAN:  That's fine.

25          THE COURT:  It's 25 till.  We'll pick up with that

1    after lunch.

2           We'll pick up, ladies and gentlemen, at 1:45.

3           THE CLERK:  All rise.

4     (Jury exits.)

5           THE COURT:  See you at 1:45.

6           MS. HYNDMAN:  Your Honor.

7           THE COURT:  Yes.

8           MS. HYNDMAN:  One housekeeping matter, if we might.

9           THE COURT:  Sure.

10          MS. HYNDMAN:  We had subpoenaed Barry Kamin to come

11   today, and we had an agreement with Mr. Jepson that we could

12   break and take his testimony.  He's planning to be here around

13   1:00.  So if we could put him on, he'll be brief, get him

14   done, and then continue with Dr. Artunduaga.

15          THE COURT:  That's fine.

16          Are you okay with that?

17          MS. HYNDMAN:  Is that okay with you guys?

18          MR. JEPSON:  We're okay that, Judge.

19          THE COURT:  Okay.  When you say "brief," what's your

20   idea?

21          MS. HYNDMAN:  I think I have maybe 20 minutes for

22   him.

23          THE COURT:  Okay.

24          MS. HYNDMAN:  And I don't know what they've got for

25   him.

```
 1              MS. HALL:  Same.

 2              MR. JEPSON:  Less.

 3              MS. HALL:  Less.

 4              THE COURT:  You could call him, and I'll explain to

 5    the jury just because of schedules we're accommodating and

 6    going to take him out of order.

 7              MS. HYNDMAN:  Great.  Thank you.

 8              THE COURT:  Okay.

 9        (Lunch recess had from 12:37 p.m. to 1:45 p.m.)

10                    *      *    *    *    *

11

12    We certify that the foregoing is a correct transcript from the
      record of proceedings in the above-entitled matter.
13

14
      /s/ Joseph Rickhoff                    January 31, 2017
15    Official Court Reporter

16
      /s/ Kelly Fitzgerald                   January 31, 2017
17    Official Court Reporter

18

19

20

21

22

23

24

25
```

239

<pre>
 1                   IN THE UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF ILLINOIS
 2                           EASTERN DIVISION

 3    DR. MARIA ARTUNDUAGA,            ) Docket No. 12 C 8733
                                       )
 4                    Plaintiff,       )
                                       )
 5              vs.                    )
                                       )
 6    THE UNIVERSITY OF CHICAGO        )
      MEDICAL CENTER,                  ) Chicago, Illinois
 7                                     ) January 31, 2017
                      Defendant.       ) 1:45 o'clock p.m.
 8

 9                    TRANSCRIPT OF TRIAL PROCEEDINGS
            BEFORE THE HONORABLE AMY J. ST. EVE, AND A JURY
10
      APPEARANCES:
11
      For the Plaintiff:         THE FRANKLIN LAW FIRM, LLC
12                               BY:  MS. JAMIE S. FRANKLIN
                                 53 W. Jackson Blvd., Suite 803
13                               Chicago, Illinois  60604

14                               ROBINSON, CURLEY & CLAYTON, P.C.
                                 BY:  MS. CYNTHIA H. HYNDMAN
15                               300 South Wacker Drive, Suite 1700
                                 Chicago, Illinois  60606
16
      For the Defendant:         VEDDER PRICE, P.C.
17                               BY:  MR. EDWARD C. JEPSON, JR.
                                      MS. ELIZABETH N. HALL
18                               222 N. LaSalle St., Suite 2600
                                 Chicago, Illinois  60601
19
      Court Reporter:            MR. JOSEPH RICKHOFF
20                               Official Court Reporter
                                 219 S. Dearborn St., Suite 1232
21                               Chicago, Illinois  60604
                                 (312) 435-5562
22

23              *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

24                      PROCEEDINGS RECORDED BY
                        MECHANICAL STENOGRAPHY
25               TRANSCRIPT PRODUCED BY COMPUTER
</pre>

240

 1                THE COURT:  Are you ready?

 2                MS. HYNDMAN:  Yes, we are.

 3                THE COURT:  Is the next witness here?

 4                MS. HYNDMAN:  Yes, he is.

 5                THE COURT:  Bring in the jury, please.

 6           And remind me of your next witness' name, please.

 7    Dr. --

 8                MS. HYNDMAN:  Barry Kamin.

 9                THE COURT:  Kamin.  Is it Dr.?

10                MS. HYNDMAN:  No.

11                THE COURT:  Mr. Kamin, you can come up here, please,

12    sir.

13           Good afternoon, sir.

14           If you would, please stay standing until the jury

15    comes in.  Once they sit, stay standing, and I will swear you

16    in in front of them.

17                THE WITNESS:  Okay.

18                THE COURT:  Thank you.

19      (Jury in at 1:45 p.m.)

20                THE COURT:  You may be seated.

21           Ladies and gentlemen, we try to accommodate

22    witnesses' schedules.  We are going to take a break in

23    Dr. Artunduaga's testimony.  Barry Kamin is going to testify,

24    and then we will pick back up with the doctor's testimony.

25                Just one thing to remind you, too.  As I told you at

Kamin - direct

1    the very beginning, the lawyers' objections and comments are

2    not evidence.  It's just what's coming from the witness that

3    is the evidence.  And if a lawyer makes an objection, if there

4    are certain legal words that are coming up, you don't have to

5    worry about those.

6         When I rule on an objection, you shouldn't guess why

7    I ruled one way or another.  And if I sustain an objection and

8    the witness can't answer the question, you shouldn't speculate

9    about what the witness might have said.

10        Sir, would you raise your right hand, please.

11            BARRY KAMIN, PLAINTIFF'S WITNESS, SWORN

12                      DIRECT EXAMINATION

13   BY MS. HYNDMAN:

14   Q.  Could you state your name for the record, please?

15   A.  Barry Kamin.

16   Q.  Mr. Kamin, you are appearing here today because you

17   received a subpoena?

18   A.  Correct.

19   Q.  And we have not met before.  We have had a couple of short

20   conversations on the telephone.

21        You previously served as the executive director for

22   Graduate Medical Education at the University of Chicago

23   Medical Center, correct?

24   A.  Yes.

25   Q.  What years did you hold that position?

Kamin - direct

1    A.  With that title, I think it was about 2010 through July of

2    2016.

3            THE COURT:  Sir, could you keep your voice up,

4    please, or maybe move that microphone just a tiny bit closer.

5            THE WITNESS:  I will move closer.

6            THE COURT:  Okay.

7    BY MS. HYNDMAN:

8    Q.  Did you do some of the functions of that position prior to

9    the time you had that title?

10   A.  Yes.

11   Q.  When did you first start performing functions of that

12   position?

13   A.  As the executive director, when I arrived in September of

14   2008.

15   Q.  You are retired now; is that correct?

16   A.  From the University of Chicago.

17   Q.  When did you retire from the University of Chicago?

18   A.  In July of 2016.

19   Q.  Now, in your capacity as executive director for Graduate

20   Medical Education, you had occasion in November of 2011 to

21   have some communication with Dr. David Song about one of his

22   residents; is that right?

23   A.  I don't remember the date or, frankly, the communication.

24   Q.  Did you have -- do you recall having a communication with

25   Dr. Song about Dr. Maria Artunduaga in November of 2011?

```
 1   A.  No.

 2        MS. HYNDMAN:  Let's take a look at Plaintiff's

 3   Exhibit 28, please, on the second page, please, Jamie.

 4   BY THE WITNESS:

 5   A.  Okay.

 6   BY MS. HYNDMAN:

 7   Q.  Mr. Kamin, do you see this email dated November 1st, 2011?

 8   A.  I do.

 9   Q.  Did you send that email to Dr. Song on or about November

10   1st, 2011?

11   A.  I am assuming I did.

12   Q.  Do you have any reason to doubt that you did?

13   A.  No.

14   Q.  Looking up above that, there is a response from Akilah

15   Williams.

16        Do you see that?

17   A.  I do.

18   Q.  Did you receive that email from Ms. Williams on November

19   1st?

20   A.  I assume so.

21   Q.  And then if you look on the first page of the exhibit,

22   there are, I think, four -- five emails back and forth between

23   you and Akilah Williams and Dr. Song.

24        Did you send and receive those emails on or about

25   November 1st, 2011?
```

Kamin - direct

244

 1    A.  I would also assume, yes.

 2           MS. HYNDMAN:  Your Honor, we would move to admit

 3    Plaintiff's Exhibit No. 28.

 4           THE COURT:  Any objection?

 5           MS. HALL:  No objection.

 6           THE COURT:  It's admitted.

 7     (Plaintiff's Exhibit No. 28 was received in evidence.)

 8    BY MS. HYNDMAN:

 9    Q.  Now, if you look back on the second page of that first

10    email, please.  You say to Dr. Song in that email, "I have

11    read the documents that Akilah brought down earlier."

12           First of all, before I ask you that question, prior

13    to the time you sent this email, did you know Dr. Song?

14    A.  Yeah.  He was a program director.

15    Q.  So you had met him and worked with him some?

16    A.  Yes.

17    Q.  Did you know Ms. Williams?

18    A.  She was a coordinator, so I would have had some

19    interaction.

20    Q.  So you say in this email, "I have read the documents that

21    Akilah brought down earlier."

22           What documents did Akilah Williams bring down to you

23    on that day?

24    A.  Well, I assume that it would have been some kind of

25    evaluation or evaluations.

Kamin - direct

1    Q.  Do you have any present recollection of what Ms. Williams

2    brought to you?

3    A.  No.

4    Q.  Were those documents relating to Dr. Artunduaga?

5    A.  Likely, but I can't say that with 100 percent certainty.

6    I just don't remember this.  It was five years ago, six years

7    ago.

8    Q.  Do these email exchanges refresh your recollection that

9    you had some communication with Dr. Song about Dr. Artunduaga

10   in 2011?

11   A.  I would assume that to be the case.

12   Q.  In that same email you say to Dr. Song in No. 2, "We could

13   discuss a preprobation letter with a somewhat specific

14   remediation plan and short (two month) formal reevaluation."

15         My first question is:  What is a preprobation letter?

16   A.  May I express and say that this is a very common approach

17   with any of the 79 program directors I would have been working

18   with?

19   Q.  I'm just asking you what a preprobation letter is.

20   A.  We sometimes put residents or fellows on a remediation

21   plan.  That's generally at the request of the program.  We

22   simply make them aware of it as one possible action.

23   Q.  What is a remediation plan?

24   A.  There is typically some behaviors or aspects of the

25   training that the individual may be deemed to be deficient in,

Kamin - direct

1   and that could be a first step or not.

2   Q.  Did the -- as the executor director of Graduate Medical

3   Education, did you have a role in overseeing remediation plans

4   for residents?

5   A.  No.

6   Q.  You then say in this email that "The specific remediation

7   plan could be accompanied by a short formal re-evaluation."

8          What did you mean by that?

9   A.  That both preprobation -- remediation and probation have

10  no set period of time.

11  Q.  What did you mean by a formal revaluation?

12  A.  That the program would obtain evaluations of performance

13  and take another look.

14  Q.  Mr. Kamin, is a specific or was a specific remediation

15  plan considered a disciplinary process at that time, in 2011?

16  A.  No.

17  Q.  Why did you suggest this kind of plan to Dr. Song?

18  A.  I didn't suggest it.

19  Q.  Why did you say you could discuss this kind of plan with

20  Dr. Song?

21  A.  Because that's part of my routine response to program

22  directors in a situation in which they have concerns about an

23  individual resident's performance.

24  Q.  Had you had a conversation prior to the time you sent this

25  email with Dr. Song about his concerns about Dr. Artunduaga?

Kamin - direct

247

1   A.  I'm sorry.  Say that again.

2   Q.  Had you had any conversations with Dr. Song about concerns

3   he may have had with Dr. Artunduaga?

4   A.  I honestly don't remember.

5   Q.  Had you had any conversations with Akilah Williams about

6   any concerns Dr. Song may have had?

7   A.  Doubtful.

8   Q.  When Akilah Williams brought documents to you, did you

9   have an understanding as to why she was bringing you those

10  documents?

11  A.  I think that it was to review whatever the program had

12  obtained.

13  Q.  In the responding email just above, Ms. Williams responds

14  and says, "We are considering formal probation."

15        Did you ever have a conversation with either

16  Ms. Williams or Dr. Song about formal probation for

17  Dr. Artunduaga?

18  A.  Oh, I don't know.  I may have.  I just don't remember.  I

19  don't remember these things.

20  Q.  If you will look at -- going back to -- I'm sorry.  Going

21  back to that first email, at the bottom, the last thing you

22  say is, "I'm happy to include Jane or Anne Duprey in the

23  discussions.  Just seeking to understand and clarify first."

24        By "Jane" are you referring to Jane McAtee?

25  A.  Yes.

Kamin - direct

248

1   Q.   Jane McAtee was in-house counsel for UCMC at the time?

2   A.   One of them.

3   Q.   And Anne Duprey was in-house counsel?

4   A.   One of them, yes.

5   Q.   Mr. Kamin, listen very carefully to the question I am

6   going to ask you.

7          Without revealing anything -- any conversations you

8   may have had with either Jane McAtee or Anne Duprey, my

9   question is merely this:  Why did you suggest to Dr. Song that

10  you would include Jane McAtee or Anne Duprey in the

11  discussion?

12  A.   That, again, was my routine.  I would always do that for

13  any conversation of this sort or situation like this.

14  Q.   If you look on the first page, the very -- in this series

15  of emails it looks like you are trying to set up a meeting

16  with either Dr. Song or Mrs. Williams.

17         Do you see that?  It's in sort of the middle emails

18  there.

19  A.   For a time to talk, yes.

20  Q.   Did you sit down and have a meeting with either

21  Ms. Williams or Dr. Song to talk about Dr. Artunduaga in

22  November of 2011?

23  A.   I'm not sure.  I don't remember.

24  Q.   Is there anything that would refresh your recollection as

25  to whether you had that meeting?

Kamin - direct

249

1   A.  No.

2   Q.  In the very last email at the top -- in your email to

3   Ms. Williams and Dr. Song you say, "If you have time, please

4   take a look at the attached template."

5         MS. HYNDMAN:  And if we could look at the attachment,

6   please, Jamie.  If you will just scroll through so Mr. Kamin

7   can see all three of the pages.

8   BY MS. HYNDMAN:

9   Q.  Were those three pages attached to this email when you

10  sent it to Ms. Williams and Dr. Song?

11  A.  Does it show up as an attachment?

12  Q.  That's my understanding.  I'm asking you.

13  A.  Well, if it is, it is.

14        MS. HYNDMAN:  Let's go back to the first page of that

15  attachment, please, Jamie.

16  BY MS. HYNDMAN:

17  Q.  This document has a name "Strategies For Dealing With

18  Problematic Performance."

19        Where did that document come from?

20  A.  From me.  I had been using it for years.

21  Q.  Was it something that you had drafted?

22  A.  Yes.

23  Q.  And if you look at the next page, the title is "Template

24  Example:  Probation Letter."

25        Where did that document come from?

Kamin - direct

250

1   A.   From me.

2   Q.   Was that something that you had drafted as well?

3   A.   Uh-huh.

4   Q.   You have to answer "yes" for the court reporter.

5   A.   Yes.  Years prior to this, yes.

6   Q.   Had you drafted it while you were working for UCMC?

7   A.   No.

8   Q.   When did you first draft this document?

9   A.   At the University of Colorado.

10  Q.   Had you at any other time provided this template example

11  to any other program director at UCMC?

12  A.   Yes.

13  Q.   Mr. Kamin, can we look at Joint Exhibit No. 40, please.

14         This is a letter dated November 28th, 2011, from

15  Maria Artunduaga addressed to you.

16         Did you receive this letter from Dr. Artunduaga

17  sometime around November 28?

18  A.   I assume so.

19  Q.   Do you have a recollection of receiving it?

20  A.   No.

21  Q.   Dr. Artunduaga requested a meeting with you in November to

22  discuss this letter?

23  A.   Okay.

24  Q.   Didn't she?

25  A.   Well, we had one meeting, so I assume so.

Kamin - direct

251

```
 1   Q.  Do you recall when that meeting was?

 2   A.  No, I really don't.  I'm sorry.  It was not such a big

 3   deal.  I had several of these, and it's five years ago.

 4            MS. HYNDMAN:  Move to strike the comments from the

 5   witness.

 6            THE COURT:  I will strike it.

 7   BY MS. HYNDMAN:

 8   Q.  What is the ACGME, Mr. Kamin?

 9   A.  The Accreditation Council for Graduate Medical Education.

10   Q.  The ACGME has certain rules and guidelines that graduate

11   medical education programs have to follow to maintain their

12   accreditation, right?

13   A.  They have what's known as institutional common and

14   specialty requirements.

15   Q.  So the answer is "yes" to my question?

16   A.  I wouldn't use your same words, "rules," but they were

17   requirements.

18   Q.  They have requirements?

19   A.  Yes.

20   Q.  That programs must follow to maintain their accreditation?

21   A.  Yes, to be in substantial compliance.

22   Q.  Now, Mr. Kamin, can we take a look at Joint Exhibit No. 3,

23   please.  This is the Graduate Medical Education policy manual.

24            As executive director of Graduate Medical Education,

25   were you familiar with this policy manual?
```

Kamin - direct

252

1    A.  Yes.

2    Q.  Were you a member of the Graduate Medical Education

3    committee?

4    A.  No.

5    Q.  Who was on that committee?

6    A.  It was comprised of program directors, peer-nominated

7    residents, and the associate dean for GME.

8    Q.  Who created this policy manual?

9    A.  I think a number of people did over the years preceding me

10   and my time and since I have gone.

11   Q.  Did you have a role in drafting any of the policies in

12   this manual?

13   A.  I would have to look at the dates.

14   Q.  Let's take a look at Policy No. 11.  It's on Page 30.

15        This is the policy for resident/fellow evaluation,

16   correct?

17   A.  Yes, it is.

18   Q.  It was first issued in February of 2007.  So that was

19   before your time?

20   A.  Correct.

21   Q.  But it was revised and approved in April of 2010?

22   A.  Correct.

23   Q.  So you would have been responsible for revising this?

24   A.  Well, I would have been at the University of Chicago

25   Medical Center.

Kamin - direct

1   Q.  Did you have a role in revising this policy, Mr. Kamin?

2   A.  I would have to read it and see if it jogs my memory.

3   Q.  Take your time and read it through, please.

4   A.  Can we scroll down?

5   Q.  Yes.

6    (Brief pause.)

7   BY THE WITNESS:

8   A.  Keep going.

9    (Brief pause.)

10  BY THE WITNESS:

11  A.  Keep going, please.

12   (Brief pause.)

13  BY THE WITNESS:

14  A.  Okay.  Thank you.

15  BY MS. HYNDMAN:

16  Q.  My question was:  Did you have a role in revising this

17  policy?

18  A.  I may have, yes.

19          MS. HYNDMAN:  Now, if we look at the first page,

20  please, Jamie.

21  BY MS. HYNDMAN:

22  Q.  And under the -- where it says "program director" --

23  A.  Yes.

24  Q.  -- this policy says that "Responsibility for overseeing

25  the evaluation of residents/fellows rests with the program

Kamin - direct

254

1    director."  Correct?

2    A.  It does.

3    Q.  And that was true, wasn't it?

4    A.  That was me?

5    Q.  Pardon me?

6    A.  I'm sorry.  Say that again.

7    Q.  That was true, wasn't it, that the responsibility for

8    overseeing --

9    A.  For overseeing, yes.

10   Q.  And then under "Evaluation" --

11          MS. HYNDMAN:  If you could, pull out the first

12   paragraph, please, Jamie.

13   BY MS. HYNDMAN:

14   Q.  -- this policy says, "Each program is required to create

15   and utilize competency-based evaluation forms."

16          Do you see that?

17   A.  I do.

18   Q.  And that was a requirement, wasn't it?

19   A.  It is or it was.

20   Q.  It was in 2011, correct?

21   A.  Right.

22   Q.  And this says that each program was required to create and

23   utilize those forms, correct?

24   A.  Correct.

25   Q.  It doesn't say just large residency programs have to do

1   that, does it?

2   A.  No.

3   Q.  It doesn't say this is at the program director's

4   discretion, does it?

5   A.  No.

6   Q.  The policy doesn't say it's okay not to follow this policy

7   if you are a small residency program?

8   A.  No, it doesn't.

9   Q.  It says "each program," right?

10   A.  Correct.

11   Q.  The policy goes on to say --

12        MS. HYNDMAN:  In the next paragraph, please, Jamie.

13   BY MS. HYNDMAN:

14   Q.  -- "Each program is required to assure that faculty

15   members and others who supervise residents/fellows submit

16   completed evaluation forms in a timely manner and submit them

17   to the program director."  Correct?

18   A.  Correct.

19   Q.  And that was also a requirement for each program, correct?

20   A.  That was a local requirement.

21   Q.  That was a requirement of UCMC for its programs, correct?

22   A.  It was not an ACGME requirement as written, no.

23   Q.  My question is:  It's a UCMC requirement?

24   A.  Yes.

25   Q.  Yes.  Okay.

Kamin - direct

1        Now, this policy doesn't say anywhere that if a

2   program director decides he really doesn't like this policy,

3   he can choose to ignore it, does it?

4   A.  I don't believe it does.

5   Q.  And that wouldn't be the case, would it?

6   A.  What?

7   Q.  If the program director --

8   A.  The program director wouldn't ignore it.

9   Q.  If the program director decides he doesn't like it, he

10  could ignore it.  That's not how this worked, did it?

11  A.  That's not what the -- yeah, it has written on the paper.

12  That's correct.

13  Q.  Now, you would agree with me, Mr. Kamin, that this is an

14  important policy in the handbook, wouldn't you?

15  A.  It's -- yeah, it's one of many policies.

16  Q.  But it's an important policy.  Would you agree with that?

17  A.  Well, there are a lot of -- they are all important.

18  Q.  I'm not talking about any other ones.  This one is

19  important, isn't it?

20  A.  What does "important" mean?

21        It has no greater or lesser importance in my mind

22  than any other policy.

23  Q.  All the policies in this handbook were important, weren't

24  they?

25  A.  They were all guidelines for programs to follow.

Kamin - direct

257

1   Q.   Now, did you have an understanding as to why there was a

2   resident/fellow evaluation policy in this handbook?

3   A.   Yes.

4   Q.   What's your understanding as to why this policy was there?

5   A.   Because ACGME requirements would stipulate that residents

6   and fellows should be evaluated --

7   Q.   If you look at --

8   A.   -- at least semiannually at that time.

9   Q.   If you look at the last paragraph on the first page, it

10  says, "Each program shall identify those persons or committees

11  with responsibility to review resident/fellow evaluations,

12  make decisions and recommendations regarding promotion or

13  changes in academic status."  Correct?

14  A.   Correct.

15  Q.   To your knowledge, did the plastic and reconstructive

16  surgery section identify those persons or committees with that

17  responsibility?

18  A.   Did they have evaluations from multiple faculty members?

19  Q.   I'm asking you, did they identify persons or committees

20  with responsibility to review evaluations?

21  A.   I don't know that.

22  Q.   If you look on the second page, the policy provides for a

23  process of additional professional/performance development for

24  a resident.

25          Is that what you would call a remediation plan?

Kamin - cross

1    A.  Yes.

2              MS. HYNDMAN:  I have no more questions at this time.

3              THE COURT:  Cross-examination.

4                          CROSS-EXAMINATION

5    BY MS. HALL:

6    Q.  Hi, Mr. Kamin.

7    A.  Hi.

8              MS. HALL:  Michael, could you please pull up

9    Plaintiff's Exhibit No. 28 and go to the second page.

10             THE COURT:  Are you using yours?

11             MS. HALL:  I'm sorry.  Yes, we will use ours.

12             THE COURT:  I think that will do it.

13             MS. HALL:  Michael, could you please pull out that

14   email, the one toward the bottom of the page from Mr. Kamin to

15   David Song and Akilah Williams.  Pull out the content, please.

16   BY MS. HALL:

17   Q.  Mr. Kamin, you were asked some questions about Point 2 in

18   this email in the preprobation letter.

19             Do you see that?

20   A.  Yes.

21   Q.  Can you please read the last sentence of that email?

22   A.  Of that email?

23   Q.  I'm sorry.  Of that paragraph.

24   A.  "Or are you thinking more in terms of formal probation?"

25   Q.  And is formal probation another option that Dr. Song could

Kamin - cross

1  consider in relation to a resident issue?

2  A.  Yes.

3  Q.  As well as the preprobation letter and a specific

4  remediation plan?

5  A.  Yes.

6          MS. HALL:  And if we can please go to Joint Exhibit

7  No. 3, Michael, Page 31.  If you can, pull out where it says,

8  "Additional Professional/Performance Development," that whole

9  section.

10  BY MS. HALL:

11  Q.  Mr. Kamin, this is the resident/fellow evaluation policy

12  you were looking at in the Additional Professional/Performance

13  Development section.

14          Could you please read to the jury the first sentence

15  in that paragraph?

16  A.  "As part of resident/fellow evaluation, the program

17  director may conclude that a resident/fellow requires a formal

18  program of professional/performance development to address

19  academic or performance deficiencies which are beyond the norm

20  for the respective PGY level."

21  Q.  According to this policy, Mr. Kamin, was the program

22  director required to utilize a formal program of professional

23  performance development?

24  A.  No.

25          MS. HALL:  That's all.

Artunduaga - direct

260

1          THE COURT:  Redirect?

2          MS. HYNDMAN:  None, your Honor.

3          THE COURT:  Thank you, Mr. Kamin.  You may step down,

4     sir.

5       (Witness excused.)

6          THE COURT:  Dr. Artunduaga, please come back up.

7          MS. HYNDMAN:  Jamie, if you could pull up Joint

8     Exhibit No. 42, please.

9                    MARIA ALEXANDRA ARTUNDUAGA,

10                PLAINTIFF HEREIN, PREVIOUSLY SWORN,

11                   DIRECT EXAMINATION (Resumed)

12    BY MS. HYNDMAN:

13    Q.  Dr. Artunduaga, do you recognize this document?

14    A.  Yes, I do.

15    Q.  What is it?

16    A.  It's a weekly evaluation from Dr. Michael Shao during a

17    vascular rotation.

18    Q.  And it's for the -- for what week?

19    A.  From January the 1st through January 6th.

20    Q.  You talked earlier about the fact that residents and

21    fellows and nurses would be doing weekly evaluations.  Is this

22    the form that they were doing, to your knowledge?

23    A.  Yes, it is.  It was.

24    Q.  Did you have access electronically to see these

25    evaluations after they were submitted?

Artunduaga - direct

1   A.  Yes, I think I did.

2   Q.  Did you discuss these weekly evaluations with Dr. Park at

3   your mentoring meetings?

4   A.  Yes.  I always did.

5   Q.  Did you meet with Dr. Park during the month of January?

6   A.  Yes, I did.

7   Q.  Okay.

8           MS. HYNDMAN:  Let's just look quickly at the joint

9   exhibits so that we can establish the dates for those.

10          Joint Exhibit 50, please.

11  BY MS. HYNDMAN:

12  Q.  Do you recognize this document?

13  A.  Yes.  It's an attendance sheet.

14  Q.  Is that your signature?

15  A.  Yes, it is.

16  Q.  And it says you met with Dr. Park that day, January 3rd.

17  Did you meet with her that day?

18  A.  Yes.  And Akilah Williams.

19          MS. HYNDMAN:  Joint Exhibit 53.

20  BY MS. HYNDMAN:

21  Q.  Do you recognize this document?

22  A.  Yes.  It's an attendance sheet for January 10th.

23  Q.  Did you have a meeting with Dr. Park on that day?

24  A.  Yeah.  I assume so, yes.

25  Q.  Is that your signature on that page?

Artunduaga - direct

1   A.  Yes.

2   Q.  Okay.

3   A.  Yes, I signed it.

4          MS. HYNDMAN:  If we could look at Joint Exhibit

5   No. 56, please.

6   BY MS. HYNDMAN:

7   Q.  Do you recognize this document?

8   A.  Yes, I do.

9   Q.  What is this?

10  A.  It's an attendance sheet for our meeting on January the

11  18th with Dr. Park and Akilah Williams.

12  Q.  That's your signature on the page?

13  A.  It's my signature.

14  Q.  Did you meet with Dr. Park that day?

15  A.  Yes, I did.

16  Q.  Okay.

17         MS. HYNDMAN:  And then Joint Exhibit No. 59, please,

18  Jamie.

19  BY MS. HYNDMAN:

20  Q.  Do you recognize this document?

21  A.  Yes, I do.

22  Q.  What is it?

23  A.  January 25th, an attendance sheet.  My meeting with

24  Dr. Park.  She signed, Akilah Williams signed, and I did too.

25  Q.  Okay.  What was your overall experience like on the

1    vascular rotation in January?

2    A.   I was very good rotation.  I proactively looked for

3    feedback every week from my fellows and my coresidents, senior

4    residents.  I tried to schedule meetings at least by the end

5    of the month with the faculty to get feedback.  And I was

6    looking to get as much feedback from anybody.  If I had done

7    something that they don't like, I wanted to correct it right

8    away.  So it was very nice.

9    Q.   How were you feeling by the end of January about your

10   progress on the probation?

11   A.   I thought that I was progressing really, really fast and

12   that I thought that I would make -- that I would -- actually

13   met the goals of the probation.

14   Q.   Did Dr. Park offer you any opinions about how she thought

15   you were doing when you had your weekly meetings?

16   A.   Yes.  She recognized that I was doing shocking

17   improvement, faster than what she had expected, and that she

18   was very happy that I was working really hard, looking out for

19   feedback.

20        MS. HYNDMAN:  Let's look at Joint Exhibit No. 60,

21   please, Jamie, and let's look at the email at the bottom.

22   BY MS. HYNDMAN:

23   Q.   Dr. Artunduaga, do you recognize this document?

24   A.   Yes, I do.

25   Q.   Did you send this email to Dr. Song and Dr. Park on

Artunduaga - direct

264

1   January 26th of 2012?

2   A.  Yes, I did.

3   Q.  Okay.  Just read the first sentence of -- actually read

4   the whole first paragraph of that email.

5   A.  Okay.

6        "Dr. Song and Park, today I received a call from

7   Dr. Jaskowiak regarding antibiotic prescription I refilled

8   over the phone for one of her patients in August of 2011.  She

9   said it was" -- "she said it was a very bad clinical judgment

10  on my part to have done it without examining the patient

11  first, and I" -- sorry -- "I also expressed a lot of

12  frustration because I did not inform her about the episode.  I

13  told her what happened.  Unfortunately she replied that she

14  could not believe me since there is no record of what

15  happened.  I decided to write you before things escalate, and

16  this is what happened."

17  Q.  Okay.  Why did you send this email to Dr. Park and

18  Dr. Song?

19  A.  Well, from previous experiences with Dr. Jaskowiak, she

20  had communicated with Dr. Song and Park about me, complaints.

21  And I just wanted to get them my side of the story so that,

22  you know, they heard what I had to say.

23  Q.  Did Dr. Song ever talk to you about this incident?

24  A.  No.

25  Q.  Did Dr. Park speak to you about it?

1  A.  Yes.

2  Q.  What did Dr. Park say?

3  A.  She said that I should have written this email long

4  before -- I think it took me at least a week to get this

5  information -- and that I should write it right away.

6  Q.  This email that you sent to Dr. Song and Dr. Park?

7  A.  Yes.  Oh, let me see.  Yes, because I -- yes.  Sorry.

8  Yeah, she wanted me to send the email explaining everything to

9  Dr. Jaskowiak.  And I haven't done it yet up to this day.

10  Q.  Do you remember what day you talked to Dr. Park about this

11  email?

12  A.  Around the time one of the meetings that we had.

13  Q.  So it was during the weekly evaluation meeting you had?

14  A.  Yes, exactly.

15  Q.  Okay.  You said that Dr. Park said you wanted -- she

16  wanted you to send an email to Dr. Jaskowiak?

17  A.  Yes.

18  Q.  All right.  Did you ever do that?

19  A.  Yes, I did.

20        MS. HYNDMAN:  Let's look at Joint Exhibit No. 77,

21  please.

22  BY MS. HYNDMAN:

23  Q.  And if you look at the email at the bottom, do you

24  recognize that email, Dr. Artunduaga?

25  A.  Yes.

Artunduaga - direct

1   Q.  What is that email?

2   A.  So it was the email that I sent to Dr. Jaskowiak about a

3   week after that.  Dr. Jaskowiak wanted me to search through my

4   email and look up for who had given me the order, if it was

5   Dr. John Seal or somebody else, or if it had been my own

6   decision.  So I gave her an accounting of what had happened.

7   I described it.  And obviously I apologized because it had

8   taken me more than a week.

9          MS. HYNDMAN:  And if you look just above that email,

10  please, Jamie.  The email in the middle.  Yes.

11  BY MS. HYNDMAN:

12  Q.  Did you receive that email from Dr. Jaskowiak?

13  A.  Yes, I did.

14  Q.  What was your reaction to Dr. Jaskowiak's response in this

15  email?

16  A.  It was nice to have an email or some sort of communication

17  telling you about the things that you can do in cases such as

18  the one that I had to -- that had happened back in August.  So

19  she summarized important lessons and her recommendations.  She

20  knew that as an intern --

21  Q.  You can't talk about what Dr. Jaskowiak said.

22  A.  Sorry.

23  Q.  So you were pleased with the response you got from

24  Dr. Jaskowiak?

25  A.  Yes, very pleased.

Artunduaga - direct

267

1   Q.   Okay.  What rotation were you scheduled for in February?

2   A.   Transplant, transplant surgery.

3   Q.   Had you had any prior experience with transplant surgery?

4   A.   No.

5        MS. HYNDMAN:  Let's look at Plaintiff's Exhibit 35,

6   please.

7        This has not been admitted yet, so take it off the

8   jury.

9   BY MS. HYNDMAN:

10  Q.   Dr. Artunduaga, do you recognize this document?

11  A.   Yes.

12  Q.   What is it?

13  A.   It's a schedule of surgical service that are -- they sent

14  out every month, at the beginning of the month, a list of

15  surgical services on the left, the names of the faculty

16  members, the fellows or senior res- -- no, sorry -- the

17  fellows or the nurse practitioners, senior residents in the

18  middle and interns or junior residents, meaning

19  second-level-year residents, on the left -- right.

20  Q.   Who prepared the schedule?

21  A.   Dr. John Seal and Eric Grossman.

22  Q.   Did you receive a copy of it at the beginning of February?

23  A.   Yes, I did.

24       MS. HYNDMAN:  Your Honor, we would move to admit

25  Plaintiff's Exhibit 35.

Artunduaga - direct

1          THE COURT:  Any objection?

2          MR. JEPSON:  No objection, your Honor.

3          THE COURT:  It's admitted.

4      (Plaintiff's Exhibit 35 was received in evidence.)

5          MS. HYNDMAN:  If we can look at the transplantation

6   section there, Jamie, please.

7   BY MS. HYNDMAN:

8   Q.  Who were the attending physicians in the transplant

9   rotation?

10  A.  Dr. Millis, Dr. Thistlethwaite, Dr. Becker, Dr. Renz, and

11  Dr. Witkowski.

12  Q.  There are then two fellows listed there?

13  A.  Yes.

14  Q.  Who?

15  A.  Dr. Li, Dr. Olaitan.

16  Q.  So this Dr. Lee is not Dr. Justine Lee, is it?

17  A.  No.  Justine Lee, her last name is spelled L-e-e.

18  Q.  Had you ever worked with Dr. Li or Dr. Olaitan before?

19  A.  No.

20  Q.  Who are the senior residents that went on the service?

21          MS. HYNDMAN:  If we could look at that, please.

22  BY MS. HYNDMAN:

23  Q.  So who's the senior resident listed there?

24  A.  Dr. Fleming.

25  Q.  So this is the same Dr. Fleming you worked with in January

Artunduaga - direct

1   and then back in July, correct?

2   A.  Yes.  We worked together for three months or longer.

3   Q.  Did you do anything to prepare for your rotation on the

4   transplant service?

5   A.  Sure, I did.  I read about liver transplantation, kidney

6   transplantation, immunology.

7   Q.  Did you meet with Dr. Park during the month of February?

8   A.  Yes, I did.

9   Q.  How many times did you meet with Dr. Park that month?

10  A.  I cannot recall.

11         MS. HYNDMAN:  Let's take a look at Joint Exhibit 69,

12  please.

13  BY MS. HYNDMAN:

14  Q.  Do you recognize this document?

15  A.  Yes.

16  Q.  What is it?

17  A.  Attendance sheet for our meeting of February the 6th with

18  Dr. Park, signed by me and Dr. Park and Akilah Williams.

19  Q.  Did you meet with Dr. Park that day?

20  A.  Yes, I did.

21  Q.  Okay.

22         MS. HYNDMAN:  Let's look at Joint Exhibit No. 73,

23  please.

24  BY MS. HYNDMAN:

25  Q.  Do you recognize this document?

Artunduaga - direct

1    A.  Yes.

2    Q.  What is it?

3    A.  Attendance sheet with Dr. Park, Akilah Williams, myself

4    signed for our weekly mentoring meeting.

5    Q.  On what date?

6    A.  Sorry.  February 13th of 2012.

7    Q.  Did you meet with Dr. Park that day?

8    A.  Yes.

9         MS. HYNDMAN:  Let's look at Joint Exhibit 84, please.

10   BY MS. HYNDMAN:

11   Q.  Do you recognize this document?

12   A.  Yes, I do.

13   Q.  What is it?

14   A.  It's dated February 28th of 2012.  A meeting was held on

15   that day.  This is the attendance sheet signed by Dr. Park,

16   Akilah Williams, and myself.

17   Q.  You met with Dr. Park on that day?

18   A.  Yes.

19   Q.  At the meetings you had with Dr. Park in February, did you

20   discuss the weekly evaluations you were receiving?

21   A.  Yes, I did.

22   Q.  When you were on the transplant service in February, did

23   you tell anyone on the service that you were on probation?

24   A.  Yes, I did.

25   Q.  Who did you tell?

Artunduaga - direct

1    A.  My fellow, Domalu Olaitan; Irma already knew; Dr. Millis,

2    I believe; probably Dr. Thistlethwaite.  No one else, I think.

3    Maybe more.

4    Q.  That's all you can recall right now?

5    A.  Yes, that's what I recall.

6            MS. HYNDMAN:  Let's take a look at Joint Exhibit No.

7    76, please.

8            Is there a second page to that?

9    BY MS. HYNDMAN:

10   Q.  So sort of in the middle there?

11   A.  Yes.

12   Q.  Do you recognize that email on February 20th, 2012?

13   A.  Yes, I do.

14   Q.  Okay.  Did you send that email to Dr. Dickie?

15   A.  Yes, I did.

16   Q.  And you say in that, "I have been over hours for the past

17   three weeks."

18           Do you see that?

19   A.  Yes.

20   Q.  What does it mean to be over hours?

21   A.  The ACGME requirements for a maximum number of hours in a

22   week, it is 80 for each resident.  So for the past three

23   weeks, I had gone up those hours.  So I wanted them to be

24   aware and to tell me what I should be doing -- what I should

25   do about that.

Artunduaga - direct

1   Q.  You say in your email, "I did mention it to my senior."

2        Who did you mean by that?

3   A.  Irma Fleming.

4   Q.  Okay.  When did you first mention this issue to

5   Dr. Fleming?

6   A.  Second week.

7   Q.  Why did you send this email to Dr. Dickie?

8   A.  We were short-staffed, and Irma hadn't had the chance to

9   talk about this issue that I raised with Domalu Olaitan, and

10  the fellow or anyone in the faculty.  So since there were four

11  weeks in February, I wanted to move -- I mean, to know what to

12  do.

13  Q.  Did the issue of being over hours get resolved in the

14  month of February?

15  A.  Yes, it did.

16  Q.  What did your hours end up averaging for that month?

17  A.  Less than 80 hours.

18       MS. HYNDMAN:  Let's look at Joint Exhibit No. 81,

19  please.  And if you will, zoom in on the middle email.

20  BY MS. HYNDMAN:

21  Q.  Dr. Artunduaga do you recognize this document?

22  A.  Yes, I do.

23  Q.  Did you send this email to Dr. Park on February 24th?

24  A.  Yes, I did.

25  Q.  Why did you send this email to Dr. Park?

Artunduaga - direct

273

A.  Well, I was very worried that I had received an evaluation
from one of the faculty members one week before finalizing the
actual rotation; and, more importantly, that I have had very
limited interaction with him because she was on vacation
several days, and that she was grading me on areas that she
had -- did not supervise me or anything.

Q.  How much had you worked with Dr. Becker during that
month -- or prior to February 24th?

A.  We rounded three times.  Each round lasted an hour.

Q.  Did you have any cases with Dr. Becker?

A.  No.

Q.  Did you talk to Dr. Becker directly about this evaluation
that she had submitted?

A.  Yes, I did.

Q.  When did you speak to her?

A.  The Saturday after February 24th -- February 20 --

Q.  So after you sent this email?

A.  Yes.

Q.  Okay.  What did you say to Dr. Becker?

A.  We were in one of the rounds that I mentioned, and we were
in the ICU.  I told her, I mean, "I can start the round, if
you don't mind."

        And she said, "No, no no.  I don't trust you.  I
would rather to have the fellow here, so let's wait."

        So while we were waiting, I told her, "Dr. Becker,

Artunduaga - direct

1  I'm very curious to know why you have evaluated me so poorly

2  if we have barely interacted."  I told her, "We haven't had

3  any clinic together.  We haven't had any operation together.

4  And I just want to understand where you are getting your

5  information from."

6  Q.  Did she respond?

7  A.  Yes.  She told me that she had based her grades because

8  she had already spoken to the relevant people.

9  Q.  Did she say who the relevant people were?

10  A.  I asked her, and she said Dr. Irma Fleming and Domalu

11  Olaitan.

12        MS. HYNDMAN:  If we look at the top of this email,

13  please, Jamie.

14  BY MS. HYNDMAN:

15  Q.  Dr. Park says, "I will speak with Dr. Becker and make sure

16  she is evaluating you in the same manner that she does all the

17  residents that rotate on the transplant service."

18        Did Dr. Park ever report to you that she had had a

19  conversation with Dr. Becker?

20  A.  Yes, she did.

21  Q.  What did Dr. Park say about her conversation with

22  Dr. Becker?

23  A.  That Dr. Becker had been -- was not biased against me,

24  that he had evaluated me based on her clinical judgment, and

25  that she was very upset at having me asking her to reconsider

Artunduaga - direct

1    the evaluation, that residents are not supposed to complain or

2    to come to tell faculty things even though they might seem

3    unfair.

4    Q.  Did Dr. Park say anything else about that conversation

5    with Dr. Becker?

6    A.  Well, she told me that -- I mean, she reinforced the fact

7    that I should have not talked to Dr. Becker and asked her

8    about the evaluation because that was unprofessional.

9    Q.  What was your overall experience on the transplant

10   rotation in February?

11   A.  It was really, really good.  I had very good mentors.  My

12   fellow was phenomenal.  Irma was really, really good.

13           Half of the month we were meeting half of the nurse

14   practitioners, so I was able to do a lot of things.  So I

15   learned a lot.

16           I worked with Dr. Millis, Dr. Renz, even

17   Dr. Witkowski, and I got to get into the operating room and

18   help a little bit with transplants.  So that was cool.

19   Q.  How were you feeling by the end of February about your

20   progress on the probation?

21   A.  I felt that I had improved significantly.  Obviously there

22   were things that I needed to improve.  I wasn't perfect, but I

23   was very positive about it.

24   Q.  So during this whole time that you were on the probation,

25   how were you feeling generally about that experience?

Artunduaga - direct

1   A.   That it had enriched me, and that I was -- I was learning

2   a lot.  I was levelling up, and that I -- I thought that if I

3   had a little longer time, I could probably just do everything

4   well.

5   Q.   So during this period of time of November -- beginning,

6   like, November 2nd, when you first talked to Dr. Song up until

7   the end of February, what was your emotional state like?

8   A.   I was breaking down in little pieces.  Too many bad news.

9   Too many comments from Dr. Song telling me that I was unfit,

10  that I was not -- well, a cultural fit to their department,

11  that I couldn't make it as a surgeon, that I should probably

12  just do a more foreign-friendly residency and -- I mean, I had

13  symptoms.

14  Q.   What kind of symptoms did you start to have?

15  A.   Well, I was -- I started to believe that I actually

16  couldn't speak English or understand a word of English.  So I

17  grew very anxious every time that I had to talk.  I had

18  insomnia; I had pain in many parts of my body; I was very sad

19  regardless of the happy face that I was putting on every day.

20  Q.   What did you do, if anything, to cope with these symptoms

21  that you were feeling?

22  A.   Well, at the beginning, I thought that I could just be

23  strong and, you know, get better over time.  I didn't have

24  time to go to a psychiatrist or therapist.

25          But when, in February, things got -- like with this

Artunduaga - direct

1   letter and this incident with Dr. Becker, I started to have,

2   like, you know, crazy ideas about, you know, killing myself.

3   So I looked for help, medical help, psychiatrist.

4   Q.  Did you find a psychiatrist?

5   A.  Yes, I did.

6   Q.  Who did you find?

7   A.  My husband, Ricardo, he, from other connections or people

8   that he met here in Chicago, they recommended highly

9   Dr. Belazel Dantz.  He didn't have any relationship with

10  University of Chicago, which I loved, and apparently he had

11  already a lot of experience with doctors who had gone through

12  discrimination.

13  Q.  When did you begin seeing Dr. Dantz?

14  A.  February.

15  Q.  Did Dr. Dantz do anything to help you cope with the

16  symptoms that you were feeling?

17  A.  Yes.  He medicated me right away.

18  Q.  What medications did he prescribe?

19  A.  An anxiety medicine and an antidepressant.

20  Q.  Which anxiety medicine were you taking?

21  A.  I think it was Xanax and Effexor.

22  Q.  Did you begin taking the medications?

23  A.  Right away.

24  Q.  Did they help?

25  A.  The anxiety medications helped me to go -- I mean, to make

Artunduaga - direct

278

1    myself less anxious when I was presenting.  The

2    antidepressant, it took around two, three weeks to kick in.

3    So I was seeing him very often just to make sure that I didn't

4    do anything crazy.

5    Q.  In addition to prescribing the medication, did Dr. Dantz

6    help you in any other way?

7    A.  We had 30 minutes to an hour, and he did some

8    psychotherapy, too.

9    Q.  So at the end of February, you had meetings with Dr. Park.

10         Did Dr. Park offer you any opinions about how she

11   felt you were doing on the probation at the end of February?

12   A.  She told me she was very impressed with the progress, that

13   she didn't expect that I had -- I could improve in such a

14   short period of time that good.

15         However, her main issue was that -- she said that in

16   order to stay in the program, I could just be graded as

17   exemplary or outstanding; that anything below that was not at

18   the level of a plastic surgery resident.

19         She also added it was not up to her, but Dr. Song.

20   He was the one who was making the final decision.  She wished

21   me luck.

22   Q.  Did you have that conversation at the end of February with

23   her?

24   A.  I think so, or March, at the beginning.  The last one we

25   had.

Artunduaga - direct

1   Q.  So at the last meeting you with with her she told you

2   that.

3           You have to say "yes."

4   A.  I'm sorry.  Yes.

5   Q.  What was your rotation for March, Maria?

6   A.  They switched me back to plastic surgery.

7   Q.  How did you learn that your rotation had been changed

8   again?

9   A.  Through an email, I think, maybe.

10  Q.  Did you have a conversation with Dr. Park about that

11  change?

12  A.  She did mention it, but I already knew that I had been

13  switched to plastic surgery.

14  Q.  How did you feel about being put back on the plastics

15  rotation for March?

16  A.  Very afraid because of what had happened in October.

17  Q.  Did you do anything to prepare for your rotation in

18  plastics in March?

19  A.  Yes.  I read from plastic surgery books that I have.

20          MS. HYNDMAN:  Let's take a look at Joint Exhibit No.

21  83, please, Jamie.

22  BY MS. HYNDMAN:

23  Q.  Dr. Artunduaga, do you recognize this document?

24  A.  Yes, I do.

25  Q.  Did you send this email at the end of February?

Artunduaga - direct

280

1   A.  Yes, I did.

2   Q.  Why did you send this email?

3   A.  I had realized that the process or the approach that I had

4   been using over the past few months was actually working,

5   trying to meet with the team ahead of time, setting up

6   expectations and goals.  I wanted advice.  They were Grant,

7   Matthew, and Jonathan, the three plastic surgery residents who

8   will be supervising me and another resident -- another intern.

9   Q.  Did you ever sit down to talk with Dr. Grieves,

10  Dr. Kleiber, and Dr. Bank?

11  A.  No.  They didn't have time.

12  Q.  Did you have access -- strike that.

13         Were the plastic surgery residents filling out weekly

14  evaluations for you in the month of March?

15  A.  Yes, they were.

16  Q.  Did you have access to those weekly evaluations?

17  A.  Yes.

18  Q.  Did you look at them?

19  A.  Yes, I did.

20  Q.  Did you work with Dr. Song at all in March?

21  A.  No.

22  Q.  Did you work with Dr. Park at all during March?

23  A.  Yes.  Two cases.

24  Q.  Do you know a physician at UCMC by the name of Dr. Tothy?

25  A.  Yes, I do.

Artunduaga - direct

1   Q.  Who is Dr. Tothy?

2   A.  I mean, I have spoken with her.

3   Q.  Did you ever actually meet her face-to-face?

4   A.  No.

5   Q.  Who is Dr. Tothy?

6   A.  She was -- she is a pediatrician working in the emergency

7   room.

8   Q.  Did you have occasion ever to work with Dr. Tothy?

9   A.  I did a consult for her.

10  Q.  When was that?

11  A.  March, early March.  I cannot remember exactly.

12  Q.  But early March?

13  A.  Yeah.

14  Q.  What happened with that consult you had with Dr. Tothy?

15  A.  She paged me, and I called back.  She had a 90-year-old

16  patient who had a fracture on her hand, and she wanted me to

17  see her immediately.

18          I told her -- well, I first asked if she was stable,

19  if her pain was controlled.

20          She said "Yes."

21          So I told her, "Well, I have to deal with a patient

22  in the intensive care unit.  He is my priority number one this

23  morning because, if I don't fill out some paperwork, he will

24  not be able to be transferred to a nursing home and would

25  likely lose his bed if we don't do it now."  So I told her

Artunduaga - direct

 1  I'll be there in, like, 30 minutes.

 2  Q.  Did you have any other discussions with Dr. Tothy?

 3  A.  So I went to the emergency room.  I saw the patient.  I

 4  evaluated her.

 5         And then she paged me again, and she -- well, we talk

 6  on the phone, and she said that she was very unsatisfied

 7  because I should have told her what was the plan, and that she

 8  was going to write me up or complain to my supervisors about

 9  that.  So . . .

10  Q.  What did you do when Dr. Tothy said that to you?

11  A.  Well, I told her still, "I need to consult with my senior

12  resident and my faculty member, and they are in two different

13  hospitals now -- now consulting my senior resident."

14         And she just started, you know, saying things about,

15  "I'm going to report you.  This is, you know, unacceptable."

16         Honestly, I really lost it, and I hung up the phone.

17  Q.  Did you discuss this incident with Dr. Tothy with anyone

18  else?

19  A.  With Dr. --

20  Q.  Did you discuss the incident with Dr. Tothy with anyone

21  else?

22  A.  So by the time I had to go to my faculty member, Dr. Henry

23  Ginard, he already knew absolutely everything because she had

24  called him already and reported me.

25  Q.  So you discussed it with Dr. Ginard?

Artunduaga - direct

283

1   A.  Yeah, and he gave me some advice in regard to, like, you

2   know, when a faculty calls you, you just have to go and do

3   whatever they ask you to do regardless of which patient matter

4   most.

5   Q.  Did you ever discuss this incident that you had with

6   Dr. Tothy with Dr. Song?

7   A.  We were in the ICU on a Thursday morning, and Dr. Song

8   approached me and told me that I needed to apologize, that

9   this was unprofessional, that plastic surgery residents could

10  not behave this way.

11  Q.  Did you discuss the incident with Dr. Park ever?

12  A.  I don't remember.

13  Q.  Did you ever have another conversation with Dr. Tothy

14  after the second one where you hung up the phone with her?

15  A.  Sure, absolutely.  So I sent her -- I tried to reach out

16  to her.  I sent her a page.  I wanted to apologize and tell

17  her what had happened.

18          On that night, she didn't reply or contacted me.

19  Then I sent her an email describing what had happened.  And

20  then I finally got her to talk to me.  I apologized, and I

21  told her that I was under a lot of stress because I was under

22  probation and that anything -- any reports or write-ups, you

23  know, that just -- I was so tired of being written up for

24  everything I did.

25  Q.  Did she say anything in response?

Artunduaga - direct

1   A.  Yes.  She said that she appreciated the call and that now

2   she understood why I had hung up the phone and that she was

3   very understanding.

4        MS. HYNDMAN:  Let's take a look at Joint Exhibit No.

5   89, Jamie.

6   BY MS. HYNDMAN:

7   Q.  Dr. Artunduaga, do you recognize this document?

8   A.  Yes.

9   Q.  What is it?

10  A.  It's dated on March 5th, 2012.  It's an attendance sheet

11  with Dr. Julie Park, Akilah Williams, and myself.

12  Q.  Did you have a meeting with Dr. Park on March 5th?

13  A.  Yes.

14       MS. HYNDMAN:  Joint Exhibit 94, please.

15  BY MS. HYNDMAN:

16  Q.  Do you recognize this document?

17  A.  Yes.

18  Q.  What is this?

19  A.  Another one.  An attendance sheet of our meeting with

20  Dr. Park -- Akilah was there; I was there -- March 12th, 2012.

21  Q.  So you met with Dr. Park that day?

22  A.  Yes.

23  Q.  Okay.

24       MS. HYNDMAN:  And then Joint Exhibit 98, please.

25

Artunduaga - direct

1  BY MS. HYNDMAN:

2  Q.  Do you recognize this document?

3  A.  Yes.

4  Q.  What is this?

5  A.  An attendance sheet with Dr. Park, Akilah Williams, and

6  myself.

7  Q.  Did you meet with Dr. Park on March 21st?

8  A.  Yes, I did.

9  Q.  Did you have any meetings with -- any weekly mentoring

10  meetings with Dr. Park after March 21st?

11  A.  No.

12       MS. HYNDMAN:  If we could look at Joint Exhibit 95,

13  please.

14  BY MS. HYNDMAN:

15  Q.  Do you recognize this document, Dr. Artunduaga?

16  A.  Yes.

17  Q.  What is this?

18  A.  It's an email from Dr. Song letting me know that the

19  faculty members will meet on March 26th to decide my future in

20  the program.

21  Q.  In that email, Dr. Song says, "If you have other written

22  materials that you would like the faculty to review, please

23  get them to Akilah Williams by March 23rd, 2012"?

24  A.  Yes.

25  Q.  Did you submit any information to the faculty?

Artunduaga - direct

1   A.  Yes, a letter.

2           MS. HYNDMAN:  If we can look at Joint Exhibit 99,

3   please.

4   BY MS. HYNDMAN:

5   Q.  Do you recognize Joint Exhibit 99, Maria?

6   A.  Yes, I do.

7   Q.  What is that?

8   A.  A letter in response to what he suggested I could do.  I

9   was trying to convey my case, summarize my programs --

10  sorry -- progress, comments from the day that the probation

11  started up to the end.

12  Q.  Did you give this letter to anyone?

13  A.  Akilah Williams.

14  Q.  So you talked a little bit about the last meeting you had

15  with Dr. Park earlier.

16          After that meeting with Dr. Park on March 21st, prior

17  to this faculty meeting on March 26th, how were you feeling

18  about your prospects for passing the probation period?

19  A.  I felt that I had done a very good job.  I had -- well,

20  from my perspective, and most of my evaluators said I had

21  improved.

22  Q.  Were you able to get any kind of impression from Dr. Park

23  as to whether or not she believed that you had passed your

24  probation?

25  A.  Well, she said that it was up to Dr. Song, so that she

Artunduaga - direct

1    couldn't really tell me.

2    Q.  Now, by this time, the end of March, you had had, I think,

3    if we counted them all up, something like 11 meetings with

4    Dr. Park.

5          Did you feel like Dr. Park was a good mentor for you?

6    A.  Yes, I truly thought that she was a good mentor.

7    Q.  Now, we saw in that email that you knew that the plastics

8    faculty would be meeting on March 26th.

9          Did you know what time they were meeting?

10   A.  No.

11   Q.  Did you know where they were meeting?

12   A.  I assumed, but, I mean, I'm not certain where they met.

13   Q.  When did you talk to Dr. -- or did you talk to Dr. Song

14   about the meeting on March 26th?

15   A.  No.

16   Q.  Did you ever talk to him about what happened at that

17   meeting?

18   A.  Well, he made -- he revealed the news the day after.

19   Q.  So you met with him on March 27th?

20   A.  Yes.

21   Q.  What time of day was that?

22   A.  4:30 p.m.

23   Q.  So what was it like from March 26th to March 27th at 4:30

24   waiting to hear the news of what happened at that meeting?

25   How were you feeling?

Artunduaga - direct

1   A.  I was feeling positive, like, you know, excited that I had

2   a lot of work to do obviously, but I was positive about it.  I

3   wasn't preoccupied.

4   Q.  You met -- you said you met with Dr. Song on March 27th.

5   Where was that meeting?

6   A.  In his office.

7   Q.  Was there anyone else there besides you and Dr. Song?

8   A.  Akilah Williams.

9   Q.  What did Dr. Song say to you in that meeting?

10  A.  "Maria, we have reached a unanimous decision, and you are

11  not going to continue in our program.  You have not met" --

12  sorry.  I just blanked.  "I don't think you make a good

13  resident.  I had told you since November that this was not

14  going to work out anyway.

15          "I have to also let you know that you are entitled to

16  file a grievance."

17          And he handed me an envelope -- closed envelope --

18  with a letter.

19  Q.  Before we get to the letter, did you say anything to

20  Dr. Song in that meeting?

21  A.  I told him that I would file a grievance right away.

22  Q.  Did you say anything else?

23  A.  He said, "Well, that's your decision."

24  Q.  Did Dr. Song say anything else in the meeting other than

25  what you just related to us?

Artunduaga - direct

 1    A.  I don't remember.

 2    Q.  Did Akilah Williams say anything in the meeting?

 3    A.  Yes.  Akilah said, "Maria, we had already told you that

 4    the probation was difficult and that you are tainting your CV,

 5    and this is going to bring you -- it's going to impact your

 6    future significantly.  So we told you."

 7    Q.  How long was that meeting with Dr. Song and Ms. Williams?

 8    A.  Fifteen minutes.

 9    Q.  How long?

10    A.  Fifteen minutes.

11    Q.  What did you do after you left the meeting?

12    A.  I stood up.  I went up -- sorry -- went out.  And once I

13    had just crossed the principal door, I opened the letter,

14    called my husband.  And while I was reading the letter, I

15    reached the bottom paragraph where it says that I was released

16    of any clinical duties and that I should just go home and look

17    for a job.

18            MS. HYNDMAN:  Let's take a look at Joint Exhibit No.

19    100, please.

20    BY MS. HYNDMAN:

21    Q.  Dr. Artunduaga, do you recognize this document?

22    A.  Yes.

23    Q.  Is this the letter that Dr. Song gave you in that meeting?

24    A.  Yes, my termination letter.

25    Q.  You said you opened the letter and you read it after you

Artunduaga - direct

1    left the meeting.

2            What was your reaction to the letter?

3    A.  I was really upset because I -- I mean, he didn't tell me

4    anything about, "Go home, and don't finish your internship."

5    Q.  What did you do after you read that in the letter?

6    A.  Oh, well, it took me just five steps to get into the

7    plastic surgery section office, and I told Akilah, who was at

8    the front desk, "You guys didn't tell me anything about this.

9    What do you mean I cannot finish my internship with clinical

10   rotations?"

11           And she said to me, "He doesn't want to see you

12   because he's very busy," so his door was closed.

13           MR. JEPSON:  Objection to the hearsay.

14           THE COURT:  Overruled.

15   BY MS. HYNDMAN:

16   Q.  So did you ever speak to Dr. Song about this letter?

17   A.  No.

18   Q.  What did you do after you had that meeting with Dr. Song?

19   A.  I went to the parking garage.  I spent about two hours

20   there trying to figure out what to do with my life.

21           I called my husband.  I told him that I would be home

22   later, that I needed to think about it.

23           And I texted my night flow team, Deana Shenaq, Carla

24   Moreira, and Jennifer Paruch, "They kick me out of the

25   program, and I'm not coming tonight.  I'm sorry."

Artunduaga - direct

1  Q.  Did you talk to anybody else?

2  A.  On that day?

3  Q.  When you were sitting in your car?

4  A.  I didn't have the guts to tell anyone in my family.  I was

5  just crying.

6         MS. HYNDMAN:  Can we look at Joint Exhibit 103,

7  please.

8  BY MS. HYNDMAN:

9  Q.  Do you recognize this document, Maria?

10  A.  Yes.

11  Q.  What is it?

12  A.  It's a letter dated March 29th, two days after my

13  termination.  As I promised, I wanted to initiate a grievance

14  process.

15         I also asked him to reconsider my dismissal from

16  clinical duties because of -- well, three different reasons.

17  Q.  When did you prepare this letter?

18  A.  On the 28th.

19  Q.  How did you get the letter to Dr. Song?

20  A.  Email.

21  Q.  Did you, in fact, file a grievance about the termination

22  decision?

23  A.  Yes, I did.

24  Q.  Why did you file a grievance?

25  A.  Where?

Artunduaga - direct

1    Q.  Why?

2    A.  Why?  Because I did not agree with his decision, and I

3    wanted an unfair -- a fair -- sorry -- committee to review my

4    case and to provide them with the statistics numbers.

5           MS. HYNDMAN:  Let's look at the second page, please,

6    Jamie.

7    BY MS. HYNDMAN:

8    Q.  Dr. Artunduaga, where did you get the information that's

9    included in this chart on the second page?

10   A.  The new Innovation Portal that was used by the department

11   of surgery had a feature to compare yourself with -- I mean,

12   like to know the grades of yourself versus other people.

13   Q.  So was this information that you had to -- that was just

14   available on the site?

15   A.  Uh-huh.

16          MS. HYNDMAN:  Can we take a look at --

17   BY THE WITNESS:

18   A.  Yes.

19          MS. HYNDMAN:  Never mind.

20          Let's look at Joint Exhibit No. 104.

21   BY MS. HYNDMAN:

22   Q.  Dr. Artunduaga, do you recognize this document?

23   A.  Yes, I do.

24   Q.  Did you receive this letter from Dr. Song sometime around

25   April 4th of 2012?

Artunduaga - direct

293

1   A.  Yes.

2   Q.  How was that letter delivered to you?

3   A.  It might be FedEx or email.  I'm unsure.  I'm sorry.

4   Q.  If you look at, I think, the third paragraph --

5        MS. HYNDMAN:  If you could, zoom in on that, please,

6   Jamie.

7   BY MS. HYNDMAN:

8   Q.  In the middle of that paragraph Dr. Song says, "After

9   consideration, however, we will reinstate you to the general

10  surgery schedule so that you can complete this year of

11  training.  Please contact Dr. Kevin Roggin by noon on Friday,

12  April 6th, 2012, and he will make your assignment."

13       Did you contact Dr. Roggin?

14  A.  Yes, I did.

15  Q.  What did Dr. Roggin tell you about your assignment?

16  A.  He told me that he had already made arrangements to cover

17  my clinical rotations so that he will put me in the Kaplan

18  service in anesthesia and something else -- emergency room.

19  Q.  Did you begin a rotation in the Kaplan service then in

20  April?

21  A.  Yes.  It was restricted rotation.  They told me that I

22  should just take care of patients, endocrine patients, not

23  breast.

24  Q.  Who told you that it was restricted rotation?

25  A.  Dr. Roggin later.

Artunduaga - direct

294

 1          MS. HYNDMAN:  Can we look at Plaintiff's Exhibit 43,

 2   please.

 3   BY MS. HYNDMAN:

 4   Q.  Do you recognize -- oh, hold on.

 5          Do you recognize this document, Dr. Artunduaga, the

 6   one at the top, the email at the top?

 7   A.  Yes.

 8   Q.  What is it?

 9   A.  It's an email from the counsel or attorney of the hospital

10   to me.

11   Q.  Okay.  And the name of the attorney?

12   A.  Jane McAtee.

13   Q.  Did you receive this email on or about April 6th, 2012,

14   from Ms. McAtee?

15   A.  Yes.

16          MS. HYNDMAN:  Your Honor, plaintiffs would move to

17   admit Exhibit -- Plaintiff's Exhibit 43.

18          THE COURT:  Any objection?

19          MR. JEPSON:  No objection, your Honor.

20          THE COURT:  It's admitted.

21    (Plaintiff's Exhibit 43 was received in evidence.)

22   BY MS. HYNDMAN:

23   Q.  Maria, if you could, just read aloud the last paragraph in

24   that email.

25   A.  Jane McAtee says, "If you are represented by counsel,

Artunduaga - direct

1   please have your legal advisor contact me directly.  I caution

2   you against misrepresentations about your status to other

3   residents and against acting in any way that is disruptive to

4   the operations of the medical center and the care of patients.

5   All of your disputes should and will be handled in the

6   grievance hearing and not in the workplace."

7   Q.  You said you participated in the Kaplan endocrine rotation

8   in April.

9        Who else was working on the rotation that month?

10  A.  Eric Grossman was the chief resident, Essie Kueberuwa, and

11  Melinda Stack.

12  Q.  Did Dr. Grossman raise any concerns about your performance

13  with you while you were working on the rotation?

14  A.  No.

15  Q.  Did he have any conversations with you about your behavior

16  while you were on the service?

17  A.  No.

18  Q.  What was your working relationship like with Dr. Grossman

19  that month?

20  A.  It was professional.

21       MS. HYNDMAN:  Can we look at Plaintiff's Exhibit 47,

22  please.

23  BY MS. HYNDMAN:

24  Q.  Dr. Artunduaga, do you recognize this document?

25  A.  Yes, I do.

Artunduaga - direct

1   Q.  What is it?

2   A.  It's a case and clinic coverage weekly schedule for --

3   from April 9th to April 13th.

4   Q.  Who prepared this document?

5   A.  Dr. Eric Grossman.

6   Q.  Were you provided a copy of it prior to the week?

7   A.  Yes.

8          MS. HYNDMAN:  Your Honor, we would move to admit

9   Plaintiff's Exhibit 43.

10         THE COURT:  Any objection?

11         MR. JEPSON:  No objection, your Honor.

12         THE COURT:  It wasn't 43.

13         MS. HYNDMAN:  I'm sorry.

14         MR. JEPSON:  47.

15         MS. HYNDMAN:  47.  Thank you.

16         THE COURT:  I will admit 47.

17     (Plaintiff's Exhibit 47 was received in evidence.)

18   BY MS. HYNDMAN:

19   Q.  According to this document, Dr. Artunduaga, what were you

20   assigned to do that week?

21   A.  Let's see.  Clinic on Monday at noon; on Tuesday,

22   Dr. Kaplan's clinic; on Wednesday, nothing -- oh, yeah; sorry;

23   excuse me -- with Dr. Grossman -- sorry; I lost it; okay --

24   with Dr. Grossman for Dr. Kaplan.  On Thursday I was scheduled

25   clinic with Dr. Chhablani; and for Friday, nothing.

Artunduaga - direct

1      Can I add something?

2   Q.  No.

3   A.  Okay.

4      MR. JEPSON:  I will just object.  There is a second

5   page on the schedule.

6      MS. HYNDMAN:  Well, let's look at the second page,

7   then.

8   BY MS. HYNDMAN:

9   Q.  Okay.  According to that second page, were you scheduled

10  to do something?

11  A.  Clinic with Dr. Angelos.

12     MS. HYNDMAN:  Can we take a look at Joint Exhibit

13  109, please.

14  BY MS. HYNDMAN:

15  Q.  Do you recognize this document, Dr. Artunduaga?

16  A.  Yes.

17  Q.  Did you receive this email from Dr. Song around April 30th

18  of 2012?

19  A.  Yes.

20  Q.  Can you read the first two sentences in that first

21  paragraph, please?

22  A.  The first two sentences.

23     "Maria, attached is a letter describing your rotation

24  schedule for the remainder of the this academic year (May and

25  June.)  This is a change from your current schedule for

Artunduaga - direct

1    reasons that are clearly delineated in the letter."

2            MS. HYNDMAN:  Is the letter attached on this, Jamie?

3    BY MS. HYNDMAN:

4    Q.  Is that the letter that was attached to Dr. Song's email?

5    A.  I assume so, yes.

6    Q.  Does it look familiar to you?

7    A.  Yes.

8    Q.  What did Dr. Song assign you to for the last two months of

9    your residency?

10   A.  To write summaries of a book, a 500-page book.

11   Q.  Did you complete the independent study that Dr. Song

12   assigned to you in this letter?

13   A.  Yes, of course.

14   Q.  Did you have a conversation with Dr. Song after you

15   received this letter from him?

16   A.  Never.

17   Q.  When you were doing the independent study, did you go to

18   the medical center?

19   A.  Let's see.  Yes, for the grievance in May.

20   Q.  But when you were doing your independent study work, were

21   you doing it at the medical center or somewhere else?

22   A.  No.  I was instructed to do it from home.

23   Q.  You filed your request for a grievance hearing.

24           What was the process after you filed the request?

25   A.  It's my understanding that they select an impartial

Artunduaga - direct

1    committee, faculty members and two residents from the

2    university -- the medical center, and they choose a chair of

3    the committee.

4    Q.  Was there a grievance hearing that was held?

5    A.  Yes.

6    Q.  Did you have the opportunity to provide information to the

7    grievance committee?

8    A.  They told me that I could not talk about discrimination.

9    Q.  No.  My question, Maria, did you provide information to

10   the grievance committee?

11   A.  Yes, I think so.

12   Q.  What information did you provide to the grievance

13   committee?

14   A.  I read a letter that I had prepared.  I had ten minutes,

15   and I read it.

16   Q.  When was the grievance hearing?

17   A.  I believe it was May 17th.

18   Q.  Did you have any witnesses speak on your behalf at the

19   hearing?

20   A.  Yes.

21   Q.  Who spoke on your behalf?

22   A.  Dr. Kaplan, Dr. Steppacher, and I had asked other people,

23   but they didn't make it.

24   Q.  Who did you ask to speak -- who else did you ask to speak

25   on your behalf?

Artunduaga - direct

```
 1   A.  I asked Dr. Irma Fleming.  I asked Joseph Cohen.  I asked

 2   Dr. Michael Shao.  He actually was not allowed to --

 3              MR. JEPSON:  Objection.

 4   BY MS. HYNDMAN:

 5   Q.  Let me ask the questions.

 6              THE COURT:  Just answer the questions, please,

 7   Doctor.

 8              THE WITNESS:  I'm sorry.

 9   BY MS. HYNDMAN:

10   Q.  Did Dr. Fleming testify?

11   A.  No.

12   Q.  Did Dr. Cohen testify?

13   A.  No.

14   Q.  Did Dr. Shao testify?

15   A.  No.

16   Q.  Where was the grievance hearing held?

17   A.  In the hospital, a large room.

18   Q.  How long did it last?

19   A.  About two hours.

20   Q.  Who presented -- did anyone present information on behalf

21   of the plastics section?

22   A.  Yes, Dr. David Song, Dr. Park, and a resident, Matthew

23   Greives.

24   Q.  What happened at the end of the grievance hearing?

25   A.  We left and were told that they will rule within the next
```

Artunduaga - direct

1    hours, but they ruled in about 45 minutes.

2    Q.  What was their decision?

3    A.  Not to renew my contract.

4    Q.  Did you understand if you had any appeal rights for that

5    grievance decision?

6    A.  Yes.

7    Q.  Did you exercise those appeal rights?

8    A.  Yes, I did.

9    Q.  Who did that appeal go to?

10   A.  The president of the medical center and the dean of the

11   medical school.

12   Q.  When did you file that appeal?

13   A.  Some days after that.

14   Q.  What was the result of the appeal?

15   A.  Same thing, nonrenewal.

16           MS. HYNDMAN:  Can we look at Plaintiff's Exhibit No.

17   52, please.

18   BY MS. HYNDMAN:

19   Q.  Dr. Artunduaga, do you recognize this email at the top?

20   A.  No.

21   Q.  Did you receive this email from Dr. Song on May 30th?

22   A.  I'm sorry.  It says "Maria Artunduaga."

23           Two seconds.

24     (Brief pause.)

25

Artunduaga - direct

```
 1  BY THE WITNESS:

 2  A.  Sorry.

 3  BY MS. HYNDMAN:

 4  Q.  Look at the -- the one at the top is the one I'm

 5  interested in.

 6  A.  I guess I did receive it because it's --

 7  Q.  Do you recall receiving this email on May 30th?

 8  A.  Yes.

 9          MS. HYNDMAN:  Your Honor, we would move to admit

10  Plaintiff's Exhibit 52.

11          THE COURT:  Any objection?

12          MR. JEPSON:  No objection, your Honor.

13          THE COURT:  It's admitted.

14    (Plaintiff's Exhibit 52 was received in evidence.)

15  BY MS. HYNDMAN:

16  Q.  Attached to the email at the top is an email dated April

17  27th, 2012, from Dr. Grossman to Dr. Roggin and Dr. Song?

18  A.  Uh-huh.  Yes.

19  Q.  Did you see that email in April of 2012?

20  A.  No.

21  Q.  When was the first time you saw that email from

22  Dr. Grossman?

23  A.  On May -- May 30th.

24  Q.  When you received it from Dr. Song?

25  A.  Exactly.
```

Artunduaga - direct

1      MS. HYNDMAN:  Can we look at Plaintiff's Exhibit 53,

2  please.

3  BY MS. HYNDMAN:

4  Q.  Dr. Artunduaga, if you will, look at the email, the second

5  long email on the exhibit.  Do you recognize that email?

6  A.  Yes, I do.

7  Q.  Did you send that email to Dr. Grossman on May 30th of

8  2012?

9  A.  Yes, I did.

10      MS. HYNDMAN:  If you will look at the top email,

11  please, Jamie.

12  BY MS. HYNDMAN:

13  Q.  There is an email from Jane McAtee addressed to you on May

14  30th.

15      Did you receive that email from Ms. McAtee?

16  A.  Yes, it seems like.

17      MS. HYNDMAN:  Your Honor, we would move to admit

18  Exhibit 53.

19      THE COURT:  Any objection?

20      MR. JEPSON:  No objection, your Honor.

21      THE COURT:  It's admitted.

22    (Plaintiff's Exhibit 53 was received in evidence.)

23  BY MS. HYNDMAN:

24  Q.  Why did you send this email to Dr. Grossman on May 30th?

25  A.  I felt that I needed to address some of the, what I would

Artunduaga - direct

1  call mischaracterizations of my performance or work during the

2  April rotation.

3  Q.  Did Dr. Grossman ever respond to your email?

4  A.  I don't remember.  Maybe.

5  Q.  If you'll look at the email from Jane McAtee at the top,

6  please, can you just read what that email says?

7  A.  "April rotation review."  That's what you mean?

8  Q.  Yes, just read that first line.

9  A.  "This communication is totally inappropriate and misstates

10 significant facts."

11 Q.  Did you respond to -- strike that.

12        Did you ever have a discussion with Ms. McAtee about

13 that email?

14 A.  I might.

15 Q.  Did you have a conversation with her?

16 A.  No, an email.  Everything was email.

17 Q.  You didn't have a conversation with her about it?

18 A.  No.

19        MS. HYNDMAN:  Plaintiff's Exhibit 54, please.

20 BY MS. HYNDMAN:

21 Q.  If you will, look at the second email there on the page.

22        MS. HYNDMAN:  Can you zoom in on that, please, Jamie.

23 No.  Up at the top.  At the top of the document.  You got it.

24 BY MS. HYNDMAN:

25 Q.  Dr. Artunduaga, do you recognize that middle email, the

Artunduaga - direct

1 second email?

2 A.  Yes.

3 Q.  Did you send that email to Ms. McAtee on May 30th, 2012?

4 A.  Yes, I did.

5 Q.  And there is an email at the top from Ms. McAtee dated May

6 31st, 2012.

7         Did you receive that email from her?

8 A.  Yes.

9         MS. HYNDMAN:  Your Honor, we would move to admit

10 Plaintiff's Exhibit 54.

11         THE COURT:  Any objection?

12         MR. JEPSON:  It's already published.  So . . .

13         MS. HYNDMAN:  Oh, I'm sorry.  I didn't even notice.

14         THE COURT:  It's admitted.

15         MS. HYNDMAN:  Okay.  I'm sorry.  I didn't notice.

16         MR. JEPSON:  I'm sure I will do it.

17   (Plaintiff's Exhibit 54 was received in evidence.)

18 BY MS. HYNDMAN:

19 Q.  Did you respond to Ms. McAtee's email of May 31st?

20 A.  May 31st?  I don't think so.  I might.  I just let it be.

21 Q.  When was your last day at the medical center?

22 A.  From the contract, June 30th.

23 Q.  What did you do after you were terminated from the medical

24 center?

25 A.  I started to look for jobs.

Artunduaga - direct

1    Q.  What was your emotional state like at that time?

2    A.  Really bad.  I had a lot of suicidal ideas still,

3    insomnia, didn't shower for many days, didn't get out of the

4    apartment for two months.  My husband was very worried.  I

5    would cry all the time.

6    Q.  Did you do anything to try to help those symptoms?

7    A.  Yes.  I went to see Dr. Dantz, and he increased the dose,

8    and I was seeing him more often.

9    Q.  You said you made an attempt to find a new job.

10            What did you do in that regard?

11   A.  I did two things.  I reapplied through the match to 270 or

12   50 programs.

13   Q.  What else did you do?

14   A.  I also looked for out-of-the-match positions, generally,

15   like general surgery positions that open up in the middle of

16   the academic year.

17            MS. HYNDMAN:  Can we look at Plaintiff's Exhibit 80.

18            THE COURT:  Before we do that, let's take our

19   afternoon break.

20            MS. HYNDMAN:  Sure.

21     (Jury out at 3:30 p.m.)

22     (A brief recess was taken at 3:31 p.m.)

23            THE COURT:  Are you ready?

24            MS. HYNDMAN:  Yes.

25            THE COURT:  Doctor, if you could please step back up.

Artunduaga - direct

307

1     (Jury enters courtroom.)

2              THE COURT:  You may be seated.

3              You may continue.

4              MS. HYNDMAN:  Thank you, Judge.

5     BY MS. HYNDMAN:

6     Q.  Could we look at Plaintiff's Exhibit 80, please.

7              Dr. Artunduaga, do you recognize this document?

8     A.  Yes, I do.

9     Q.  What is it?

10    A.  It's a list of the programs where I applied.

11    Q.  Who prepared this document?

12    A.  I think I did.

13    Q.  When did you prepare it?

14    A.  Can you scroll down?  Or not?

15             Okay.  So what it says here -- so I started preparing

16    it from May up to the date where the match started.  That was

17    about September.

18    Q.  Did you prepare this document all at one time?

19    A.  I started putting things together, organizing things

20    together.  I did the same on the previous match, so --

21             MS. HYNDMAN:  Your Honor, we would move to admit

22    Plaintiff's Exhibit No. 08.

23             THE COURT:  Any objection?

24             MR. JEPSON:  No objection, your Honor.

25             THE COURT:  It's admitted.

Artunduaga - direct

1    (Plaintiff's Exhibit No. 80 was received in evidence.)

2  BY MS. HYNDMAN:

3  Q.  Dr. Artunduaga, you see that over on the right, there's

4  some application dates.  Do you see those?

5  A.  Yes.

6  Q.  And there's many of them that are dated May 24th, 2012.

7  Am I reading that right?

8  A.  Yes.

9  Q.  When -- what kind of application was that that you

10 submitted on May 24th?

11 A.  So there were places where there were openings, either for

12 intern years or second-year positions, so I sent my CV and a

13 letter of intention.

14 Q.  How do you learn about -- how did you learn about these

15 open positions?

16 A.  There is a website on the Internet.  I don't remember

17 exactly the name, but they -- that's where the programs post

18 their openings.

19 Q.  Did you get any responses to any of these applications

20 that you submitted?

21 A.  None of them.

22 Q.  I think you mentioned earlier before the break that you

23 went through the match process again.

24 A.  Yes.

25 Q.  When did you start doing that?

Artunduaga - direct

1   A.   The matching?  I started to put together the application

2   sometime in June or July, and I applied in September.

3   Q.   Okay.  How many programs did you apply for?

4   A.   Oh, my God.  I know that -- oh, my God, over 200.  250.

5   Q.   Were those all -- what kind of programs were those you

6   were applying to?

7   A.   I applied to plastic surgery again.  I applied to ENT.  I

8   applied to anesthesiology.  Some other programs, in emergency

9   medicine perhaps.

10  Q.   Did you have a preference as between plastic surgery and

11  these other programs?

12  A.   Yes, of course.  I wanted to match in plastic surgery.

13  Q.   Did you get any interviews as a result of that matching

14  process?

15  A.   I got one interview from Baylor College of Medicine in

16  plastic surgery, and I got two programs in anesthesiology in

17  the University of Pittsburgh and University of Iowa.

18           I also -- I forgot to mention that I got an interview

19  for the emergency medicine program at Baylor to -- out of the

20  match that was sometime in June.

21  Q.   Did you attend all these interviews?

22  A.   Yes.

23  Q.   What was the result of these interviews?

24  A.   I did not get an offer.

25  Q.   You mentioned, it seems a very long time ago, I think it

Artunduaga - direct

1  was yesterday in your testimony that when you first wanted to

2  become a plastic surgeon, it was your dream to go and work in

3  Colombia.

4        By the time that you began your plastic surgery

5  residency at the University of Chicago, was that still your

6  goal, your career goal?

7  A.  No, it had changed because I married Ricardo, and he works

8  here.

9  Q.  Did you have a new career goal once you were working at

10  the University of Chicago?

11  A.  Likely practice here in the U.S., but do a lot of

12  collaborations globally.

13  Q.  After you didn't match in 2013, did you do anything else

14  to find a new residency program?

15  A.  I kept -- I kept applying to anything that opened up,

16  sending my CV, letter of intent, and, no, I did not get any

17  offer.

18  Q.  So what did you do?

19  A.  Well, it was pretty obvious to me that I had to switch

20  careers, and I decided to do masters of public health, or MPH.

21  I interview -- sorry.  I applied to 15 programs, and I got

22  offers from seven programs.

23  Q.  Did you accept any of those offers?

24  A.  Yes.  I accepted -- I visited two programs that I was very

25  interested in, and University of North Carolina, top two,

Artunduaga - direct

 1  University of Washington, specifically in the department of

 2  global health.

 3  Q.  So you visited two.  Did you attend one of them?

 4  A.  Yes, the University of Washington.

 5  Q.  Okay.  When did you begin that masters program?

 6  A.  I think mid-October.  They have -- mid-October.

 7  Q.  Of what year?

 8  A.  '14.

 9  Q.  What was your experience there like?

10  A.  It was very positive.  The faculty is pretty diverse.

11  They are very open minded.  All of them have travel abroad a

12  lot.  Everybody speaks one or two -- sorry, two or three

13  languages, and I studied -- one third of my classmates were

14  foreigners with accents.

15  Q.  Did you graduate from that program?

16  A.  Yes, I did.

17  Q.  When?

18  A.  June of 2016.

19  Q.  What are you doing now?

20  A.  I'm doing a second masters degree in translational

21  medicine at Berkeley.

22  Q.  What is translational medicine?

23  A.  Translational medicine means that you take biomedical

24  discoveries from the lab, bioengineering, mechanical

25  engineering, electrical engineering technology, and then you

Artunduaga - direct

1  learn how to take that technology and make it into a product

2  and to get -- I mean to make it accessible to patients.

3          So I'm learning about regulatory affairs.  I'm

4  learning about business entrepreneurship.  I'm learning -- I'm

5  learning a lot of things.

6  Q.  How long is that program at Berkeley?

7  A.  11 months.

8  Q.  What's your experience been so far there?

9  A.  It's been great.  It's been really good.

10 Q.  Were there some costs connected to your masters of public

11 health program at the University of Washington?

12 A.  Yes.  $110,000, around.

13 Q.  Are there costs connected with your program at Berkeley?

14 A.  I received partial tuition, half the tuition because they

15 wanted me to lead the global health initiative with technology

16 for low-income countries, so I'm paying just half, which is

17 about 25,000.

18 Q.  How has your mental health been since you left the

19 University of Chicago Medical Center?

20 A.  Destroyed.  I need to depend on medications to be

21 functional, at high doses.

22 Q.  Do you continue to see Dr. Dantz?

23 A.  Yes, I do.

24 Q.  Have you -- did Dr. Dantz charge you for his services?

25 A.  Yes.

Artunduaga - direct

1    Q.  Do you know how much you've paid Dr. Dantz for his

2    services since you first began seeing him in 2012?

3    A.  No.  My husband writes the checks.

4    Q.  Okay.  Have you seen any other mental health professionals

5    other than Dr. Dantz?

6    A.  Yes.  In Seattle, I saw one psychiatrist once,

7    Dr. Velander, and then she recommended that I saw a therapist,

8    a psychologist with a Ph.D., to tackle other things and --

9    Q.  So let's talk first about Dr. Velander.

10   A.  Yes.

11   Q.  Do you know how much?

12   A.  $25 because it was covered by insurance.

13   Q.  Who -- did you see this therapist that she recommended to

14   you?

15   A.  Yes.

16   Q.  Who was that?

17   A.  Dr. Keough.

18   Q.  How often did you see Dr. Keough?

19   A.  Every week, almost every week.

20   Q.  For how long?

21   A.  A year and a half.

22   Q.  Did you pay Dr. Keough?

23   A.  Yes.

24   Q.  Do you know how much?

25   A.  My copayment, 25 bucks.

Artunduaga - cross

1   Q.  Have you seen any mental health professionals since you

2   moved to Berkeley, back to California?

3   A.  No, I haven't.

4   Q.  Are you still taking medication for your mental health

5   issues?

6   A.  Yes.

7   Q.  What are you taking now?

8   A.  Effexor, 300 -- about 300 milligrams.  Klonopin, about

9   2 milligrams per day, Trazodone for insomnia, 100 milligrams,

10  and for muscular spasms, Flexeril, I think.

11  Q.  Have you tried to go off those medications?

12  A.  Yes, I have tried unsuccessfully.

13  Q.  How do you feel about having to continue to take all this

14  medication?

15  A.  Well, I feel like a crazy woman.  I'm 36 and I'm taking

16  all these meds, and there is a lot of a stigma around mental

17  health.  And, well, on the other side, I had to put off

18  starting a family, so --

19  Q.  Because of the medication?

20  A.  Yes.

21          MS. HYNDMAN:  I don't have any other questions, your

22  Honor, at this time.

23          THE COURT:  Cross-examination, Mr. Jepson.

24          MR. JEPSON:  Thank you.

25                          CROSS-EXAMINATION

Artunduaga - cross

1   BY MR. JEPSON:

2   Q.  Hello, Dr. Artunduaga.  We've met before obviously.

3          Let's talk a little bit just about background here.

4   Obviously, we all know now that you are from Colombia and went

5   to medical school there.

6          Your parents are both physicians in Colombia,

7   correct?

8   A.  Yes, they are.

9   Q.  And what does your father -- what's your father's

10  specialty?

11  A.  Anesthesiology.

12  Q.  And your mother?

13  A.  ENT surgeon.

14  Q.  And your sister Maddy is also a physician?

15  A.  Yes.

16  Q.  Has she completed her residency yet?

17  A.  Yes.

18  Q.  Okay.  What is her specialty now?

19  A.  Radiology -- well, she did a radiology residency, and

20  finished fellowship of Harvard for pediatric radiology.

21  Q.  So, and -- but your parents practice in Colombia, correct?

22  A.  Yes, sir.

23  Q.  And they are both board certified in Colombia in these

24  specialties?

25  A.  Yes.

Artunduaga - cross

1   Q.  And your sister, did she come to medical school in the

2   U.S.?

3   A.  No.

4   Q.  She went to medical school in Colombia?

5   A.  My same medical school.

6   Q.  Same school?  And she did her residency at Baylor?

7   A.  Yes.

8   Q.  All right.  And then you have another sister who's a

9   lawyer in Colombia, correct?

10  A.  Yes.

11  Q.  You have an achieving family.  You should be proud.

12  A.  We had to be.  My mom.

13  Q.  I want to ask you just a bit, I want to start at the end

14  here.

15  A.  Sure.

16  Q.  You're now in a program at Berkeley for a masters in

17  translational medicine, and --

18  A.  Yes.

19  Q.  -- you described it briefly to your counsel.

20          It's my understanding that many of the people who go

21  through that program move on to either start up companies to

22  bring products to market or go to established companies to do

23  so or become research analysts.

24          What are you planning to do with your degree, or have

25  you decided?

Artunduaga - cross

1  A.  I haven't decided yet.

2  Q.  Okay.  I noticed -- you're on LinkedIn, correct?

3  A.  Yes.

4  Q.  And I've noticed your LinkedIn feed, and it indicates that

5  there's several -- I hate to use the word products, but either

6  devices or inventions or something that you've got in the

7  works, correct?

8  A.  Yes.

9  Q.  And one is a KNOS is it 2?

10  A.  KNO2.

11  Q.  KNO2, okay.  And what is that?

12  A.  A KNO2 is a wrist wearable that will measure blood oxygen

13  in your blood.

14  Q.  Okay.

15  A.  I'm working -- my team is working with one of the Berkeley

16  labs that developed that technology.

17  Q.  Okay.

18  A.  And we are trying to find a market for them through a

19  special course.  And, I mean, it all depends if we find a

20  market or not.  So we are doing, like, student work for them.

21  Q.  Got it.

22        Do you like this bringing things to market or the

23  idea of doing something that could be helpful to patients here

24  in the U.S.?

25  A.  Yes, of course.

Artunduaga - cross

1   Q.  And elsewhere?

2   A.  Of course.

3   Q.  And also it's possible that you could make some money from

4   that, too, correct, if it was successful?

5   A.  I think it's too early to -- to say.

6   Q.  Oh, I'm not saying that specific one, but any device or

7   invention might --

8   A.  Well, the thing is that I don't own the technology.

9   Q.  Uh-huh.

10  A.  So I'm not indispensable for them.

11  Q.  Okay.

12  A.  So are just the student projects.

13  Q.  So you're training to learn more about this --

14  A.  Exactly.

15  Q.  -- and possibly go into it in the future, correct?

16  A.  I don't know.  It might.  It might not.

17  Q.  Well, I'm just saying it's something -- it's a skill

18  you're learning.

19  A.  Yes, it is a skill.

20  Q.  All right.  Let's then go back to the beginning.

21  A.  Uh-huh, yes.

22  Q.  We've already established that you were in medical school

23  for six years.

24  A.  Uh-huh, yes.

25  Q.  And I'd like to bring up on the screen -- this has not

Artunduaga - cross

1      been admitted -- Defendant's Exhibit 1.

2              THE COURT:  We have to switch.

3              That should work.

4              MR. JEPSON:  I'm the last one to be asking.

5              MS. FRANKLIN:  It's not admitted yet, your Honor.

6              MR. JEPSON:  Not admitted.

7      BY MR. JEPSON:

8      Q.  Now, this is a several-page document.  At the top -- I'm

9      sorry, I am too old.  I'm going to go get the paper.

10             The top of the document appears, it says it's an ERAS

11     application; is that correct?

12     A.  Yes.

13     Q.  And is this the ERAS application that you would have

14     submitted for the academic year 2011 and 2012?

15     A.  Yes.

16     Q.  And so this is the one that would have gone to the

17     University of Chicago and the other places that you mentioned,

18     correct, that you eventually interviewed at?

19     A.  I think so, yes.

20     Q.  Okay.  Well, there's a uniform application.  It's not

21     different.

22     A.  Uh-huh.

23     Q.  Is that right?

24     A.  Yes.

25     Q.  Okay.  And I want to just -- we've already talked about

Artunduaga - cross

1    the 10 months of either hands-on or observation rotations that

2    you did in the U.S. in 2003 and 2004, but I just want you to

3    focus on the one that you did at the University of Washington

4    in July 2010 through August 2010 on the second page.

5            MR. JEPSON:  But before we do that, I'd like to have

6    this admitted.

7            THE COURT:  Any objection?

8            MS. HYNDMAN:  No objection, your Honor.

9            THE COURT:  It's admitted.

10     (Defendant's Exhibit No. 1 was received in evidence.)

11           MR. JEPSON:  Thank you.

12   BY MR. JEPSON:

13   Q.  At the top there's a description there that's written

14   about that program, correct?

15   A.  Yes.

16   Q.  And you wrote that when you were putting this application

17   together?

18   A.  Uh-huh.

19   Q.  And it says, "Functioned at the intern level under close

20   supervision of the surgery residents during 2 months."

21   A.  Uh-huh.

22   Q.  "Attended all operative procedures on my patients and

23   participated in all rounds and teaching conferences," correct?

24   A.  Uh-huh, yes.

25   Q.  And you filled out another one of these applications for

Artunduaga - cross

321

1    the 2013 academic year when you were reapplying again,

2    correct?

3    A.  Yes.

4           MR. JEPSON:  And would you pull up, Michael, 249,

5    please?

6           THE COURT:  Is this Defendant's 249?

7           MR. JEPSON:  Defendant's 249.

8    BY MR. JEPSON:

9    Q.  And, again, this has not been admitted.  So this is a

10   multi-page document, but, Dr. Artunduaga, do you recognize

11   this as the updated application that you completed for when

12   you were following up after the University of Chicago Medical

13   Center?

14   A.  Yes.

15   Q.  Okay.  And, again, that particular clinical experience for

16   you in Washington starts at the bottom.  It says 80 hours a

17   week.

18          MS. HYNDMAN:  Your Honor, I object to him talking

19   about the document before it's been admitted.

20          MR. JEPSON:  I'm sorry.

21          THE COURT:  Sustained.  Do you want to move it in?

22          MR. JEPSON:  Yes, please.

23          THE COURT:  Any objection?

24          MS. HYNDMAN:  No objection.

25          THE COURT:  It's admitted.

                          Artunduaga - cross
                                                                        322

 1      (Defendant's Exhibit No. 249 received in evidence.)

 2    BY MR. JEPSON:

 3    Q.  It says, "Function at the intern level under close

 4    supervision of chief general surgery residents during

 5    2 months.  First assisted operations with the surgical

 6    oncology team," and I think that's first assisted as you were

 7    assisting whoever was doing the operation, correct?

 8    A.  Uh-huh.

 9    Q.  You have to say "yes."

10    A.  Yes, sorry.

11    Q.  "Assisted outpatient clinic on a daily basis and

12    participated in educational meetings," and that says you were

13    offered a PGY-1 surgery position.

14    A.  Yes.

15    Q.  That's true, correct?

16          And this happened one year before you started at the

17    University of Chicago Medical Center, correct?

18    A.  Yes.

19    Q.  Okay.  Now, as part of your application of 2011-2012,

20    there was a mention in Defendant's Exhibit 1, so let's pop

21    back to that, please, and I want to go to your statement,

22    which is at Page 3395.

23    A.  Uh-huh.

24    Q.  Do you see that?

25    A.  Yes.

Artunduaga - cross

1    Q.  And it says here, "My ultimate career goal is to serve

2    people who suffer from craniofacial anomalies by creating a

3    treatment and research center in my home country."  Do you see

4    that?

5    A.  Yes.

6    Q.  And this is what you referred to as having been your goal

7    at the time you started at University of Chicago Medical

8    Center, correct?

9    A.  Yes.

10   Q.  And you indicated that over time that this goal had

11   changed because you got married, correct?

12   A.  Yes.

13   Q.  All right.  You did have to submit an application to go to

14   the MPH program; isn't that right?

15   A.  Yes.

16   Q.  And that application, although it's not the ERAS, it's

17   called some other acronym like SOPHAS, correct?

18   A.  Yes.

19   Q.  I want to direct your attention to Defendant's

20   Exhibit 221.  And it's a little fuzzy, and I apologize for

21   that, but do you recognize this as your SOPHAS application?

22   A.  Yes.

23   Q.  And this is something that would have been completed

24   sometime in 2013, correct?

25   A.  Yes.

Artunduaga - cross

1        MR. JEPSON:  And I'd move this into evidence.

2        THE COURT:  Any objection?

3        MS. HYNDMAN:  No objection, your Honor.

4        THE COURT:  I will admit it.

5     (Defendant's Exhibit No. 221 was received in evidence.)

6        MR. JEPSON:  All right.  And I'd like to if we can,

7  Michael, if we can go to the statement on page 8403, bullet

8  point 6.  And in particular -- bullet point No. 8, I'm sorry,

9  and if you could blow that up.

10        Again, my eyes are bad, so I apologize.

11  BY MR. JEPSON:

12  Q.  So this was completed in 2013, correct?

13  A.  Yes.

14  Q.  And if we go to that paragraph, it says -- this is

15  something you wrote, right?

16  A.  Yes.

17  Q.  It says, "Ten years from now I see myself leading a

18  successful surgical practice in a children's hospital in

19  Colombia, educating residents, participating actively in the

20  making of public health policies concerning the distribution

21  of surgical care in rural areas, and leveraging technology to

22  bridge career -- the gap between rich and poor," and you wrote

23  that in 2013, correct?

24  A.  Yes.

25  Q.  Okay.  Thank you.  Now, you also --

Artunduaga - cross

1    MS. HYNDMAN:  Your Honor, I'm sorry to interrupt, but

2  I should have objected earlier.  This has not been admitted

3  into evidence before he read that into --

4    MR. JEPSON:  It had been.

5    THE COURT:  Yes, it had been.

6    MS. HYNDMAN:  Oh, this one had been?

7    THE COURT:  Yes, it has.  That was 221.

8    MS. HYNDMAN:  My apologies.

9    THE COURT:  That was 221.

10    MR. JEPSON:  I think it's your pattern to tell me

11  that I haven't, but I did.

12    THE COURT:  That was 221, it's in.

13    MS. HYNDMAN:  Sorry about that, Ed.

14    MR. JEPSON:  All right.  No problem.

15  BY MR. JEPSON:

16  Q.  And I want you to take a look also at Defendant's

17  Exhibit 217.

18    These appear to me to be statements that you would

19  have submitted at the time that you were applying for programs

20  after you left the University of Chicago, am I correct?

21  A.  Yes.

22  Q.  And indeed at that time, you applied for programs in

23  anesthesia, plastic surgery, and I'm not going to say the

24  proper word, let's just say ENT; is that right?

25  A.  Yes.

Artunduaga - cross

1  Q.  Okay.  And in particular, I'd like you, if we can, to look

2  at the first one, Paragraph 2.

3          MR. JEPSON:  And blow that up if you would, Michael.

4  BY MR. JEPSON:

5  Q.  It says here, "I started my internship at the University

6  of Chicago Medical Center" --

7          MS. HYNDMAN:  Your Honor, this time --

8          MR. JEPSON:  Now I'll move it to be admitted.

9          THE COURT:  Any objection?

10         MS. HYNDMAN:  No objection.

11         THE COURT:  Okay.  Now it's in.

12   (Defendant's Exhibit No. 217 was received in evidence.)

13         MR. JEPSON:  Sorry.  It's been a long day.

14         THE COURT:  Now you may read from it.

15  BY MR. JEPSON:

16  Q.  Okay.  Now, I just want to go to the last sentence, "Where

17  my rights to equal training opportunities were not going to be

18  fulfilled, I left UCMC in April with the conviction of finding

19  a nurturing environment for my training elsewhere."

20         You actually didn't leave UCMC in April of 2012,

21  correct?

22  A.  I left from clinical duties.

23  Q.  You did what?

24  A.  I left from the hospital.

25  Q.  Well, but you continued to do work and indeed you were

Artunduaga - cross

1    paid through June 30, 2012, correct?

2    A.  Yes.

3    Q.  Okay.  And the second page of this document is your

4    application for ENT, correct?

5    A.  Yes.

6    Q.  And I want to direct your attention there to Paragraph 2.

7        This is something, again, that you wrote, correct?

8    A.  Yes, sir.

9    Q.  And, again, it's the same, in essence, statement that you

10   made earlier, where you're indicating that "Upon my arrival, I

11   faced a generalized hostility to my background, my scientific

12   inclinations were discouraged, and my friendly personality was

13   not well received, a situation that prompted me to realize

14   that it was not worthwhile staying in a place where my rights

15   to equal training were not going to be fulfilled."

16       Now, this statement, as well as the one in the other

17   statement that we just read, you knew they were going to be

18   used by programs in determining whether or not to hire you,

19   correct, or to match you?

20   A.  Yes.

21   Q.  Or interview at least.

22       And I want to direct your attention, too, that in

23   Paragraph 3, the last sentence here.  And this is something

24   that's dated at the bottom if you see it, January 18, 2013.

25   Do you see that?

Artunduaga - cross

1   A.  Yes.

2   Q.  And it says here that, "In the long run, I would like to

3   gain deep experience in reconstructive head surgery, and then

4   fulfill my dream of becoming the first board certified

5   microtia"?

6   A.  Yes.

7   Q.  And what is that, again?

8   A.  A malformation of the outer ear.

9   Q.  Okay.  And you did a lot of research in that when you were

10  at Harvard, correct?

11  A.  That's true.

12  Q.  And so primarily you wanted to do pediatric surgery on the

13  head of children who had that problem or issue, or at least

14  one of the things?

15  A.  Yes.

16  Q.  Okay.  So you wanted to do that, become first board

17  certified surgeon in Colombia, correct?

18  A.  Yes.

19  Q.  That's what you said.

20  A.  Yes.

21  Q.  All right.  Now, when you were applying for residency

22  programs after you left the University of Chicago, you did at

23  first send out e-mails, correct?

24  A.  Yes, I did.

25  Q.  And indeed the Plaintiff's Exhibit 80, which was shown

Artunduaga - cross

329

1  here, was part of or at least records an e-mail blast that you

2  sent out on or about May 24th, 2012, correct?

3  A.  Yes.

4  Q.  And indeed that e-mail blast -- let's take a look at

5  Defendant's Exhibit 178, which has not been admitted.

6         Now, do you recognize this as an e-mail that -- a

7  cover e-mail you sent out to the programs that are listed

8  here?

9  A.  Yes.

10  Q.  And indeed in addition to the cover e-mail, you also had a

11  letter that was included, correct?

12  A.  Yes.

13  Q.  And this indeed is the cover letter that is reflected in

14  Plaintiff's Exhibit 80 which was sent to all of those

15  programs, correct?

16  A.  Yes.

17         MR. JEPSON:  I'd move the admission of Defendant's

18  Exhibit 178.

19         THE COURT:  Any objection?

20         MS. HYNDMAN:  No objection, Judge.

21         THE COURT:  It's admitted.

22    (Defendant's Exhibit No. 178 was received in evidence.)

23  BY MR. JEPSON:

24  Q.  And it starts here, "Hi, I'm currently an integrated

25  Plastic and Reconstructive Surgery resident at University of

Artunduaga - cross

1    Chicago Medical Center, and I was the only international

2    medical graduate to match into an integrated spot last year.

3    Unfortunately, I found this program not to be the nurturing

4    place that I thought it would be.  The environment has been

5    pretty harsh on me, and I have faced a generalized

6    insensitivity to my international and scientific background.

7    Therefore, I'm looking for a residency position, either PGY-1

8    or PGY-2."

9           So this was the cover that you sent out to all those

10   programs, correct?

11   A.  Yes.

12   Q.  And you indicated there since you had not discussed

13   your -- your intentions with your program director that they

14   should contact either Dr. Kaplan or Dr. John Mulliken,

15   correct?

16   A.  Yes.

17   Q.  And who was Dr. Mulliken?

18   A.  He was my plastic surgery mentor at Harvard.

19   Q.  Okay.  And indeed he is somebody who wrote you a very

20   strong reference for the program at UCMC, correct?

21   A.  Yes.

22   Q.  And somebody that you stayed in touch with over time,

23   correct?

24   A.  Sometimes.

25   Q.  Depending.  All right.

Artunduaga - cross

1        You also sent out other letters after this, correct?

2   In other words, after the e-mail blast, depending on what

3   programs you saw might become available or not, correct?

4   A.  Yes.

5   Q.  Okay.

6   A.  I think so.

7   Q.  And indeed the letters that you sent out to these other

8   programs during the course of the summer indicated the same

9   kind of or had the same kind of cover letter about the harsh

10  environment that you experienced, correct?

11  A.  Yes.

12  Q.  And I want to draft your or direct your attention to

13  Defendant's Exhibit 180.

14        And this is a situation where you actually -- this

15  refers to the Baylor ER.

16        MS. HYNDMAN:  Objection, your Honor, until it's

17  admitted.

18        THE COURT:  Any objection to its admission?

19        MS. HYNDMAN:  I have no objection.

20        THE COURT:  Okay.  I will admit it, and you may

21  proceed.

22    (Defendant's Exhibit No. 180 was received in evidence.)

23  BY MR. JEPSON:

24  Q.  And it's e-mails between you and the program director,

25  correct?

Artunduaga - cross

1  A.  Yes.

2  Q.  And it indicates you're thinking about switching to --

3  A.  It's the coordinator though.

4  Q.  The coordinator, I'm sorry.  But anyway you were arranging

5  an interview, correct?

6  A.  Yes.

7  Q.  And you then refer to University of Chicago as things were

8  not what you expected, correct?

9  A.  Yes.

10  Q.  And said you were looking to switch specialties, correct?

11  A.  Yes.

12  Q.  And it's true, isn't it, that at some point in time, your

13  lawyers previous to your lawyers who you have now recommended

14  that you not put anything negative in your letters or

15  applications.

16         MS. HYNDMAN:  Your Honor, I object to his inquiry

17  into --

18         MR. JEPSON:  I'm not --

19         MS. HYNDMAN:  -- conversations with his attorneys,

20  what the attorney recommended.

21         MR. JEPSON:  I will show you the e-mail then that is

22  part, on our defendant's exhibit list.

23         THE COURT:  Okay.  I will sustain the last objection.

24         MR. JEPSON:  Okay.

25         THE COURT:  You can't seek attorney-client privilege,

Artunduaga - cross

 1   but show Ms. Hyndman what you're talking about, and maybe

 2   there's a way to get around it.

 3     (Counsel conferring.)

 4          MR. JEPSON:  I'm referring to Defendant's

 5   Exhibit 189, and there was no objection on the --

 6          MS. HYNDMAN:  Is there another page?

 7          MR. JEPSON:  Draft.  There was no objection made

 8   during the pretrial.

 9          THE COURT:  There's no objection on the exhibit list

10   I have.  I don't know -- if you want to raise something else?

11          MS. HYNDMAN:  No, that's fine.

12          THE COURT:  Okay.

13   BY MR. JEPSON:

14   Q.  Take a look if you would at Defendant's Exhibit 189,

15   please, Dr. Artunduaga.

16          THE COURT:  Is there any objection to the admission

17   of 189?

18          MS. HYNDMAN:  No, your Honor.

19          THE COURT:  Okay.  I will admit 189.

20     (Defendant's Exhibit No. 189 was received in evidence.)

21   BY MR. JEPSON:

22   Q.  Okay.  And this Alejandro and Madelyn were giving you

23   advice about your job search.  Is that fair to say here?

24   A.  Yes.

25   Q.  And it says that "I know that recommendation is not to

Artunduaga - cross

1    mention any negative experience at UCMC.  However, I'm afraid

2    that program directors will start asking."

3            So they at least at this point had told you don't say

4    anything negative, correct?

5    A.  Two seconds.

6    Q.  And indeed --

7    A.  Can I say something?

8    Q.  Do you want me to repeat the question?

9    A.  Yes.

10   Q.  All I was getting at here was the lawyers had recommended

11   with respect to your job search trying to find a new position

12   in a residency program that you not mention anything negative

13   about UCMC, correct?

14   A.  Yes.

15   Q.  Okay.  Thank you.

16           And indeed you had asked Dr. Angelos and Dr. Kaplan

17   for letters of recommendation, correct?

18   A.  Yes.

19   Q.  And they agreed to provide them to you, correct?

20   A.  No.  I cannot see their letters.

21   Q.  You did not get letters of recommendation from them?

22   A.  Oh, no, sorry, yes, I got them, but I couldn't see them.

23   Q.  Okay.  I understand that you didn't -- that they didn't

24   waive the right for you to look at them, correct?

25   A.  Got it, yes.

Artunduaga - cross

1  Q.  But you understood that they submitted them on your

2  behalf, correct?

3  A.  Uh-huh, yes.

4  Q.  And you knew that they might be contacted possibly by one

5  of the programs you were applying to, correct?

6  A.  Yes.

7  Q.  And indeed you e-mailed them about those possible

8  contacts, correct?

9  A.  Yes.

10 Q.  I want to direct your attention to Defendant's

11 Exhibit 201.

12          And for the record, is this an e-mail that you sent

13 on October 19th, 2012 to Peter Angelos?

14 A.  Yes.

15 Q.  And the subject is interviews, correct?

16 A.  Yes.

17 Q.  And you told him the good news here that you had gotten

18 some interviews in some programs, correct?

19          MS. HYNDMAN:  Your Honor --

20          MR. JEPSON:  I move its admission.

21          MS. HYNDMAN:  No objection.

22          THE COURT:  I will admit 201.

23   (Defendant's Exhibit No. 201 was received in evidence.)

24 BY MR. JEPSON:

25 Q.  Correct?  And you also told him --

Artunduaga - cross

1          THE COURT:  I don't think she answered.  You have to

2    answer out loud.

3          THE WITNESS:  Can you repeat it?

4    BY MR. JEPSON:

5    Q.  Sure.  You told Dr. Angelos in this e-mail that you were

6    successful in getting some residency program interviews,

7    correct?

8    A.  Yes.

9    Q.  And indeed you mention University of Pittsburgh for

10   anesthesia, correct?

11   A.  Yes.

12   Q.  University of Iowa for anesthesia?

13   A.  Correct.

14   Q.  Transitional year at Weiss?

15   A.  Yes.

16   Q.  And you also I think testified earlier that you got an

17   interview at Baylor for plastic surgery, correct?

18   A.  Yes.

19   Q.  And it says here in the second paragraph, "If you're

20   contacted, I would appreciate if you refrain from commenting

21   about the events that led to my termination," and you referred

22   to an EEOC investigation, correct?

23   A.  Yes.

24   Q.  And you sent a similar e-mail to Dr. Kaplan, which has not

25   been admitted and it's 202, if you take a look at that.

Artunduaga - cross

1    And did you send this e-mail to Dr. Kaplan on or

2    about October 19, 2012?

3    A.  Yes.

4    Q.  Same message, correct?

5    A.  Yes, sir.

6        MR. JEPSON:  And I'll move this -- admission of this.

7        MS. HYNDMAN:  No objection.

8        THE COURT:  It's admitted.

9     (Defendant's Exhibit No. 202 was received in evidence.)

10        MR. JEPSON:  Thank you.

11   BY MR. JEPSON:

12   Q.  Now, your interviews, you interviewed at the University of

13   Iowa on November 14, 2012, correct?

14   A.  Yes.

15   Q.  And let's look at Defendant's Exhibit 209, please.  And

16   that's not been admitted.

17        This appears to be an e-mail to you and some other

18   recruits who were coming to interview at the University of

19   Iowa; is that right?

20   A.  Yes.

21   Q.  And it indicates basically the schedule and the

22   attachments, correct?

23   A.  Yes.

24        MR. JEPSON:  I'll move its admission.

25        THE COURT:  Any objection?

Artunduaga - cross

1          MS. HYNDMAN:  No objection, Judge.

2          THE COURT:  It's admitted.

3     (Defendant's Exhibit No. 209 was received in evidence.)

4   BY MR. JEPSON:

5   Q.  And let's take a look at Defendant's Exhibit 200, and this

6   has not been admitted.  It's an e-mail from you to a K. Verga

7   at Weiss Hospital, and it indicates -- appears to have been

8   sent on October 10, 2012, correct?

9   A.  Yes.

10          MR. JEPSON:  I move this into admission.

11          THE COURT:  Any objection?

12          MS. HYNDMAN:  No objection, Judge.

13          THE COURT:  It's admitted.

14     (Defendant's Exhibit No. 200 was received in evidence.)

15  BY MR. JEPSON:

16  Q.  And it indicates here that you'd like to interview on

17  Monday, November 12th; is that right?

18  A.  Yes.

19  Q.  And did you interview on or about that date?

20  A.  Yes.

21  Q.  And then let's take a look at Defendant's Exhibit 207.

22  Again, this has not been admitted but appears to be e-mail

23  from someone at Baylor named Cathryn Holmesly Linn to you

24  about the schedule for interviews at Baylor on December 5th

25  and 6th -- or 6th and 7th; is that right?

Artunduaga - cross

1   A.  Yes.

2           MR. JEPSON:  I'll move this admission.

3           THE COURT:  Any objection?

4           MS. HYNDMAN:  No objection.

5           THE COURT:  It's admitted.

6     (Defendant's Exhibit No. 207 was received in evidence.)

7   BY MR. JEPSON:

8   Q.  And so you would have interviewed around those dates there

9   at Baylor, correct?

10  A.  December.

11  Q.  And you also interviewed at Pittsburgh for an anesthesia

12  program, right?

13  A.  Yes.

14  Q.  And that interview occurred also in December sometime, if

15  you remember?

16  A.  I don't remember.

17  Q.  Okay.  Now, your interview at Baylor was coming up.  You

18  sent e-mails to some of the Baylor residents, didn't you?

19  A.  I might.

20  Q.  Okay.  Let's show you what has not been admitted but

21  Defendant's Exhibit 213.

22          This appears to be an e-mail from you dated

23  November 16, 2012 to Bryan Correa.  Do you see that?

24  A.  Yes.

25  Q.  And do you remember Bryan as being a resident at the

Artunduaga - cross

1   Baylor plastic surgery program, residency program?

2   A.  Yes.

3   Q.  And you sent him this e-mail prior to your interview,

4   correct?

5   A.  Yes.

6           MR. JEPSON:  And I'll move this into evidence.

7           THE COURT:  Any objection?

8           MS. HYNDMAN:  No objection.

9           THE COURT:  It's admitted.

10    (Defendant's Exhibit No. 213 was received in evidence.)

11  BY MR. JEPSON:

12  Q.  It says, "Hi, Bryan, I hope this message finds you well.

13  I'm reapplying this year to integrated plastics because I left

14  UChicago due to discrimination and retaliatory harassment

15  following my complaints.  It surprised me that I got an

16  interview from Baylor.  I was just wondering if you could give

17  me some advice."

18           And you sent similar e-mails to other residents

19  there, correct?

20  A.  Yes.

21  Q.  Now, you also filed the lawsuit that we're actually here

22  on trial on October 31, 2012, correct?

23  A.  Yes.

24  Q.  And at the time that you filed that lawsuit, you posted --

25  shortly thereafter, you posted a link on Facebook to it,

Artunduaga - cross

1    correct?

2    A.  Yes.

3    Q.  Let's take a look at Defendant's Exhibit 208.

4            THE COURT:  Is there any objection to its admission?

5            MS. HYNDMAN:  No, your Honor.

6            THE COURT:  Okay.  It's admitted.

7            MR. JEPSON:  Thank you.

8            Thanks for helping me out, Judge.

9      (Defendant's Exhibit No. 208 was received in evidence.)

10   BY MR. JEPSON:

11   Q.  And, "Dear friends," it reads, "As many of you might

12   assume from my profile, sadly I'm not further pursuing my

13   Plastic and Reconstructive Surgery training at the University

14   of Chicago Medicine.  Now that this is public, I can finally

15   share with you the reasons behind it.  Last April, I left the

16   University of Chicago Medicine due to discrimination,

17   retaliation, harassment and hostile work environment.

18   Although my complaints are undergoing a third-party

19   investigation, we filed a lawsuit in federal court on

20   October 31."

21           You then have a link there, it appears.

22           And in going down here, it indicates, doesn't it,

23   that you ask your Facebook friends to pass this on to others,

24   correct?

25   A.  Yes.

Artunduaga - cross

1   Q.  And this post is November 7, 2012, correct?

2   A.  Yes.

3   Q.  And we've already established that your interviews, you

4   had interviews on the 14th and 12th of November and on the 7th

5   of December at Iowa, Weiss and Baylor, correct?

6   A.  Yes.

7   Q.  And indeed your posting led to quite a flurry of activity

8   on something called the Student Doctor Network?

9   A.  I did not post anything.

10  Q.  I'm not asking if you posted it.  Your posting on Facebook

11  led to a lot of commentary on the Student Doctor Network;

12  isn't that correct?

13  A.  Yes.

14  Q.  Okay.

15          THE COURT:  Doctor, could you scoot up a little

16  closer to the microphone, please.  Thank you.

17          THE WITNESS:  Sorry, yes.

18  BY MR. JEPSON:

19  Q.  So there was a lot of commentary, lots of people

20  commenting on the lawsuit, correct?

21  A.  Yes.

22  Q.  All right.  And around this time, you also contacted the

23  mainstream press about the lawsuit, correct?

24  A.  Yes.

25  Q.  I want to direct your attention to Defendant's

Artunduaga - cross

1   Exhibit 211, which has not been admitted.  This appears to be

2   an e-mail string between you and someone named -- well,

3   actually several pages, and it starts out between you and

4   Andrew Wang with a copy to Claire Bushey and it goes back and

5   forth, correct?

6   A.  Yes.

7   Q.  And this e-mail string started on November 2nd, 2012,

8   correct?

9   A.  Yes.

10  Q.  And Andrew Wang and Claire Bushey both work for Crain's

11  Chicago Business, correct?

12  A.  Yes.

13  Q.  And indeed you sent them the link to your lawsuit,

14  correct?

15          MS. HYNDMAN:  Your Honor, I object.  It's not in

16  evidence yet.

17          MR. JEPSON:  Oh, I'm sorry.

18          THE COURT:  Sustained.  You want to move it in?

19          MR. JEPSON:  I need a personal assistant here, Judge,

20  apparently.

21  BY MR. JEPSON:

22  Q.  In any event, you sent them a link to your lawsuit,

23  correct?

24  A.  Yes.

25          THE COURT:  Do you want to move it in first before

Artunduaga - cross

1    you start asking?

2          MR. JEPSON:  Oh, I thought I -- I just moved it.

3          THE COURT:  No.

4          MR. JEPSON:  Move.

5          THE COURT:  Any objection?

6          MS. HYNDMAN:  No objection.

7          THE COURT:  I'll admit 211.

8          MR. JEPSON:  All right.

9     (Defendant's Exhibit No. 211 was received in evidence.)

10   BY MR. JEPSON:

11   Q.  And with respect -- so you alerted them to the lawsuit and

12   asked if they would be interested in writing about it,

13   correct?

14   A.  Yes.

15   Q.  And indeed as it turns out, they were already writing an

16   article on a similar topic, correct?

17   A.  Yes.

18   Q.  And they published an article in which your lawsuit was

19   featured sometime in November 2012, correct?

20          MS. HYNDMAN:  Objection, your Honor.  Calls for

21   hearsay.

22          THE COURT:  Just yes or no whether or not they

23   published the article.  That won't elicit hearsay.  So you can

24   answer yes or no, Doctor, if they published an article if you

25   know.

Artunduaga - cross

1   BY THE WITNESS:

2   A.  Yes.

3   BY MR. JEPSON:

4   Q.  Okay.  And indeed you sent that article to others in the

5   press, correct --

6   A.  I don't --

7   Q.  -- if you know?  Did you contact somebody at the Chicago

8   *Tribune*?

9   A.  I think I did.

10  Q.  Okay.  Are you familiar with a reporter by the name of

11  Bruce Japsen?

12  A.  Yes.

13  Q.  And indeed you sent him an e-mail about your lawsuit,

14  correct?

15  A.  Yes.

16  Q.  And are you familiar with somebody named Kim Janssen at

17  the Chicago *Sun-Times*?

18  A.  I don't remember the name.

19  Q.  Okay.  Well, well, let's start with Defendant's

20  Exhibit 216.

21          MS. HYNDMAN:  2 --

22          MR. JEPSON:  16.

23          MS. HYNDMAN:  16?

24          THE COURT:  6-0, right?

25          MR. JEPSON:  No, 1-6.

Artunduaga - cross

346

```
 1              THE COURT:  1-6?

 2              MS. HYNDMAN:  Okay.

 3    BY MR. JEPSON:

 4    Q.  This is not admitted.  It appears to be e-mails between

 5    you and Bruce Japsen, correct?

 6    A.  Yes.

 7    Q.  Dated November 6, 2012, November 13, 2012 and December 3,

 8    2012, correct?

 9    A.  Yes.

10              MR. JEPSON:  I'll move these into evidence.

11              THE COURT:  Any objection?

12              MS. HYNDMAN:  No objection.

13              THE COURT:  They're admitted.

14      (Defendant's Exhibit No. 216 was received in evidence.)

15    BY MR. JEPSON:

16    Q.  And so you communicated with Bruce Japsen to see if he'd

17    be interested in writing an article in the *Tribune* about the

18    case, correct?

19    A.  He didn't work in the *Tribune*, I think.

20    Q.  You don't think he did?

21    A.  No.

22    Q.  Just because there's -- it says here that you've read his

23    articles.  Do you know where he wrote articles?

24    A.  It's another online journal.

25    Q.  An online journal?  Okay.
```

Artunduaga - cross

 1          Well, let's take a look if we can at Defendant's

 2   Exhibit 205.

 3          This appears to be an e-mail between you and K.

 4   Janssen at the *Sun-Times* dated November 6, 2012.  Am I

 5   correct?

 6   A.  Yes.

 7   Q.  And it indicates here that you were sending her

 8   information about the lawsuit, correct?

 9   A.  Yes.

10   Q.  And the last -- I'm interested in the very last line here.

11   You're sending it to somebody at the *Sun-Times*, correct?

12   A.  Yes.

13          MS. HYNDMAN:  Your Honor --

14   BY MR. JEPSON:

15   Q.  And it says here --

16          MS. HYNDMAN:  I'm sorry.

17          THE COURT:  Do you want to move it in?

18          MR. JEPSON:  Oh, move it in.

19          THE COURT:  Any objection?

20          MS. HYNDMAN:  No objection.

21          THE COURT:  I will admit it.

22    (Defendant's Exhibit No. 205 was received in evidence.)

23   BY MR. JEPSON:

24   Q.  "I'd appreciate it if you keep this communication

25   confidential."

Artunduaga - cross

1      Why would you send it to a reporter and ask her to

2  keep it confidential?

3  A.  Good question.

4  Q.  Okay.  In any event, you would have been contacting these

5  reporters in November at the same time you would have been

6  interviewing for residencies, correct?

7  A.  Yes.

8  Q.  All right.  Now, you never did match, correct?

9  A.  No, I did not.

10 Q.  And as a result of not matching, you decided to explore

11 the masters of public health; is that correct?

12 A.  Yes.

13 Q.  And you graduated from that program in June 2016, correct?

14 A.  Yes.

15 Q.  And instead of looking for employment at that time, you

16 decided to go into another masters program; is that right?

17 A.  Yes.

18 Q.  And that was your choice, correct?

19 A.  Should I say yes or no?

20 Q.  Well, what I'm getting at here, Dr. Artunduaga, is you

21 decided to go into another masters program instead of looking

22 for a job at that time, correct?

23 A.  No.  I couldn't find a job in global health.

24 Q.  Did you look for a job?

25 A.  Yes.  I didn't find any openings in the Bay Area.

Artunduaga - cross

1  Q.  Okay.  And you limited yourself to the Bay Area because

2  your husband was there?

3  A.  Of course.

4  Q.  Of course.

5       Now, let's go back to earlier days.  With respect to

6  the University of Chicago Medical Center, I think we've

7  established that as far as you know, Dr. Song decided to

8  invite you for an interview, correct?

9  A.  They told me everybody -- oh, I just don't know.

10 Q.  Well, do you think they interviewed everybody who applied?

11 A.  No.

12 Q.  Okay.  So it was a much smaller group that was brought in

13 for interviews, correct?

14 A.  Yes.

15 Q.  And you were told that it was Dr. Song who selected your

16 resumé for interview, correct?

17 A.  No.

18 Q.  No one told you that?

19 A.  No.

20 Q.  Do you know who selected your resumé for interview?

21 A.  Who selected my resumé?

22 Q.  I'm just asking you.  I mean it to be simple.  You were

23 very well aware that Dr. Song was the program director for the

24 residency program at the University of Chicago Medical Center,

25 correct?

Artunduaga - cross

1    A.  Yes.

2    Q.  Okay.  And you knew that he was the one who selected your

3    application and you for interview, correct?

4           MS. HYNDMAN:  Objection.  Need a little foundation on

5    this.

6    BY THE WITNESS:

7    A.  No.

8           THE COURT:  If you know.

9    BY MR. JEPSON:

10   Q.  If you know.

11          THE COURT:  If you know.

12   BY THE WITNESS:

13   A.  No, I don't know.

14   BY MR. JEPSON:

15   Q.  If you don't, that's fine.  All right.  But you

16   interviewed, correct?

17   A.  Yes.

18   Q.  And you interviewed with Dr. Song and every attending,

19   correct?

20   A.  Yes.

21   Q.  And those attendings were Dr. Henry Gottlieb, Zachary,

22   Park, Reid -- I think I've gotten them all -- as well as a

23   number of the residents, correct?

24   A.  Yes.

25   Q.  And also a number of other nurse practitioners who work

Artunduaga - cross

1   with the group and others from other locations, correct?

2   A.  Yes, one physician assistant.

3   Q.  Okay.  And you were aware that after you matched, that

4   Dr. Song was actually very proud to have you in the program,

5   correct?

6   A.  How could I know that?

7   Q.  I don't know.  You testified to it before.  You were aware

8   that he was proud to have you in the program, correct?

9           MS. HYNDMAN:  Object to the extent it

10  mischaracterizes the testimony that she gave previously.

11          MR. JEPSON:  Well --

12          THE COURT:  Sustained on form.

13  BY MR. JEPSON:

14  Q.  All right.  Were you aware that Dr. Song was proud to have

15  you in the program?  I'm just asking.

16  A.  I don't know.

17  Q.  Do you remember giving a deposition in this case in 2014?

18  A.  Yes.

19  Q.  And do you remember it wasn't me asking the questions, it

20  was Michael Cleveland?

21  A.  Yes.

22          MR. JEPSON:  Do you guys have a transcript?

23          MS. HYNDMAN:  Yeah, can you give me a page?

24          MR. JEPSON:  I want to direct your attention to --

25  I'll give this to you.

Artunduaga - cross

1          Your Honor, may I approach here?

2      (Tendered.)

3          THE COURT:  Can you please identify this with some

4   type of exhibit number for the record.

5          MR. JEPSON:  We will call it Exhibit 266.

6          And for the record, the top first page, there's the

7   caption, and it basically says April 2nd, 2014, and I want to

8   direct your attention to Page 75, please.

9   BY MR. JEPSON:

10  Q.  And let's start at the bottom of Page 74.

11         On April 2nd, 2014, were you not asked these

12  questions and did you not give these answers?

13         MS. HYNDMAN:  What line are you starting with?

14         MR. JEPSON:  22 on Page 74.

15         MS. HYNDMAN:  Thank you.

16         THE WITNESS:  Page -- 22, okay.

17  BY MR. JEPSON:

18  Q.  Are you with me?

19  A.  Yes, I think.

20  Q.  All right.  "Did Dr. Song ever comment positively upon

21    your qualifications?

22         "I guess so.  I mean, I wasn't present when he did

23    it.  I guess so.  I guess he was proud to have Deana

24  Shenaq and me in the program.

25         "Why do you feel he was proud to have you and

Artunduaga - cross

1    Dr. Shenaq in the program?

2         "Because I believe that I have very good credentials

3    and I have been a very good research background and I'm

4    just, you know, I have honors, awards, the things that are

5    needed to become a plastic surgery resident.

6         "And so he was proud to have you in the program,

7    knowing that you were from Colombia, have an accent and

8    are a foreign medical grad, correct?"

9    A.  Yes.

10   Q.  And you answered, "Yes."

11   A.  Okay.

12   Q.  Do you see that?

13   A.  Yes.

14   Q.  And you gave those questions or those answers to those

15   questions under oath, correct?

16   A.  Yes.

17   Q.  Thank you.

18        Now, as you began the residency program at UCMC, you

19   did have an orientation, correct, to the hospital?

20   A.  The hospital orientation, yes.

21   Q.  Yes.  And that, I believe you said, took two days?

22   A.  One day.

23   Q.  Only one day?  And you went through the hospital systems

24   and various policies, correct?

25   A.  I had to complete online courses --

Artunduaga - cross

1   Q.   Okay.

2   A.   -- for that, before I arrived.

3   Q.   Okay.  So even before the orientation, you completed some

4   courses about hospital policies and the like, correct?

5   A.   Yes.

6   Q.   And you completed one in HIPAA?

7   A.   Yes.

8   Q.   All right.  Now, you were also given a contract when you

9   started, correct?

10  A.   Yes.

11  Q.   Or just before you started.

12  A.   Uh-huh, yes.

13          MR. JEPSON:  And that is Joint Exhibit 4.  If we can

14  see that, Michael, please.

15          Let's just go to the last page right away.

16  BY MR. JEPSON:

17  Q.   And that's your signature there?

18  A.   Yes, sir.

19  Q.   And you executed it and you sent it back and you were

20  working under that contract, correct?

21  A.   Yes, sir.

22  Q.   And you read it at the time you signed it, correct?

23  A.   Yes.

24  Q.   And in addition to a contract, you were also provided with

25  or had access to a number of other things, including a

Artunduaga - cross

1    handbook for the GME residence, correct?

2    A.   During the first week, they handed me that, yes.

3    Q.   Yes.  Let's, if we can, go to Joint Exhibit 1.

4         Do you recognize this -- I'm sorry, do you recognize

5    this as the handbook?

6    A.   Yes, sir.

7    Q.   And you got that when you started, and did you look at it

8    at the time you started?

9    A.   Yes, I did.

10   Q.   And that handbook contained a number of provisions,

11   correct?

12   A.   Yes.

13   Q.   Including provisions regarding workplace civility,

14   correct?

15   A.   Yes.

16        MR. JEPSON:  And that happens to be on Page 20, if we

17   can go to that, Michael.  I'm having trouble reading it.  Can

18   you give me yours?

19   BY MR. JEPSON:

20   Q.   Do you see that -- you were aware there was that policy in

21   there, correct?

22   A.   I see Page 18?

23   Q.   Yes.

24   A.   Okay.

25   Q.   Now, it was Page 20 that I said.

Artunduaga - cross

1   A.  Oh, okay.

2   Q.  If I said 18, I apologize.

3   A.  No, you say 20.

4   Q.  Thank you.  I got one thing right today.

5        And it says here, "It's the goal of the Medical

6   Center to promote and support a Medical Center community where

7   all people will work together in an environment free of

8   abusive or demeaning treatment.  The Medical Center is

9   committed to achieving quality patient care in an environment

10  of professionalism, respect, tolerance, understanding, and

11  good will among all members of our diverse community."  Do you

12  see that?

13  A.  Yes.

14  Q.  And it goes on to say that "Conduct, whether verbal or

15  physical, that interferes with the ability of others to

16  effectively carry out their duties or that undermines patient

17  care or the patient's confidence in the Medical Center or

18  another member of the health care team may constitute

19  disruptive behavior."  Do you see that?

20  A.  Yes.

21  Q.  And then it goes on to say that "Any resident/fellow who

22  believes that he or she has witnessed or has been subject to

23  disruptive behavior should report the alleged incident as

24  described above in the section on harassment," which is on the

25  previous page, correct?

1  A.  Yes.

2  Q.  And that provides that you can report to a number of

3  different individuals, right?

4  A.  Yes.

5  Q.  All right.  And in addition to this particular policy,

6  Joint Exhibit 3 you were also aware of.  That is the Graduate

7  Medical Education policy manual, correct?

8  A.  What was the question?  I'm sorry.

9  Q.  You were aware around the time you started there also was

10  a Graduate Medical Education policy manual, correct?  That's

11  the one that has the policies for GME, grievance procedure and

12  other things.

13  A.  I was not given one of these.  I looked it up on the

14  Internet.

15  Q.  Okay.  And you looked it up sometime in the first few

16  months you were there, correct?

17  A.  When I was -- about sometime in October.

18  Q.  Okay.  And you looked at the various policies that were

19  there?

20  A.  Yes.

21  Q.  And you looked through the policies, correct?

22  A.  Yes.

23       MR. JEPSON:  And I want to direct your attention to

24  the policy 3, Page 10463.  Actually, let's go 10462 first,

25  Michael.

1    BY MR. JEPSON:

2    Q.  This is entitled Resident Eligibility, Selection, and

3    Promotion, and I'm going to direct your attention to the

4    second page, at the top where it says non-discrimination.  And

5    this policy provides, I'll read it into the record,

6    "Non-discrimination, UCH and the individual programs shall not

7    discriminate against any person in the selection or promotion

8    process because of race, color, religion, sex, national

9    origin, age, marital status, disability or veteran status."

10   Do you see that?

11   A.  Yes.

12   Q.  And you would have come across this around the time that

13   you were looking at it in October, correct?

14   A.  Yes.

15   Q.  Yes.

16          Now, there was a Plastic and Reconstructive Surgery

17   section orientation, correct?

18   A.  Yes.

19   Q.  And you missed that orientation, right?

20   A.  Yes.

21   Q.  And that -- you had gotten notice of that orientation

22   sometime before it happened; in other words, weeks before it

23   happened, right?

24   A.  Yes.

25   Q.  And that orientation occurred on July 7, 2011; is that

Artunduaga - cross

359

 1   right?

 2   A.  Yes.

 3   Q.  And you knew as of July 5th, 2011, that you might have

 4   trouble making that orientation, correct?

 5   A.  No.

 6   Q.  Let me show you, if we can, Defendant's Exhibit 4.

 7           For the record, this appears to be a series of

 8   e-mails between you and Akilah Williams dated July 5, 2011.

 9   There are three of them, I believe, am I correct?

10   A.  Yes.

11           MR. JEPSON:  And I'll move this into evidence.

12           THE COURT:  Any objection?

13           MS. HYNDMAN:  No objection.

14   BY MR. JEPSON:

15   Q.  The first e-mail --

16           THE COURT:  Admitted.

17      (Defendant's Exhibit No. 4 was received in evidence.)

18   BY MR. JEPSON:

19   Q.  -- at the bottom says, "Akilah, I have a case at 12:15 on

20   Thursday.  We have 3 ORs running simultaneously.  Do you think

21   I can be out from orientation on time?"

22           She says, "Probably not.  I made binders so you can

23   just take that with you."

24           And then at the top you say, "Okay.  I'll have the MS

25   text me before the case starts."

Artunduaga - cross

1   A.  Yes.

2   Q.  Now, two days before, you knew there might be a problem,

3   correct?

4   A.  Yes, but I made arrangements to --

5   Q.  And I was about to say you didn't talk to Dr. Song, did

6   you, to get -- to be able to attend, did you?

7   A.  No, because I made arrangements to attend the meeting

8   after all.

9   Q.  And so then did you attend?

10  A.  No.  I could not.

11  Q.  Okay.  You got the binder instead, correct?

12  A.  Yes.

13  Q.  And did you contact Dr. Song when you could not make the

14  orientation to find out what was covered?

15  A.  Yes.

16  Q.  And did you have a conversation with him?

17  A.  No.

18  Q.  How did you contact him?

19  A.  Via e-mail.

20  Q.  Okay.  Do you have that e-mail?

21  A.  Should be in your exhibits.

22  Q.  Well, I'm asking if you have one?

23  A.  If I have it?

24  Q.  Yes, do you still have it?

25  A.  I should have it, I guess.

Artunduaga - cross

1    Q.  Okay.  And Dr. Song talked about the orientation with you

2    after it occurred, correct?

3    A.  No.

4    Q.  So you had no discussion with him?

5    A.  No.

6    Q.  Did you follow up?

7    A.  No.

8    Q.  Did you read the binder?

9    A.  Yes.

10   Q.  And in that binder, there was information about your

11   evaluations, correct?

12   A.  Evaluations given to the senior residents, not the junior

13   residents.

14   Q.  Okay.  So you knew that the junior residents didn't get

15   written evaluations at the time, correct?

16   A.  I assumed --

17   Q.  Okay.

18   A.  -- from the binder.

19   Q.  And that binder also had an explanation as to the New

20   Innovations system, correct?

21            MS. HYNDMAN:  Your Honor, I'm going to object to

22   questions about this binder on the grounds of hearsay.

23            THE COURT:  What's your response?

24            MR. JEPSON:  My response is I'm just asking her what

25   was in it and if she remembers or doesn't.  You know, it's

Artunduaga - cross

 1   not -- if it was covered, it was covered.  If it wasn't, she

 2   can say it wasn't.

 3            THE COURT:  It would go to her knowledge or her

 4   information.

 5            MR. JEPSON:  Correct.

 6            THE COURT:  Based on the last question, I'm going to

 7   overrule that objection.  If something comes up, you can renew

 8   the objection.

 9            MR. JEPSON:  And I'm not going to spend much time on

10   this.

11   BY MR. JEPSON:

12   Q.  But there was information about that that you reviewed,

13   correct?

14   A.  Yes.

15   Q.  All right.  And indeed Akilah Williams sent you your

16   password so that you could get into New Innovations sometime

17   in June, 2011, correct?

18   A.  Yes.

19   Q.  And you could -- and that New Innovations system allowed

20   you to assess not only your evaluations, but also calendars

21   and other information that might be there from the section.

22   A.  Up to that date sometime -- well, August actually, I just

23   thought -- I was under the impression that the New Innovations

24   system was to log your hours.  I did not know that I could see

25   my evaluations there.

Artunduaga - cross

1   Q.  Okay.  But then in August, you realized you could?

2   A.  When I met with Dr. Song for the first time, September.

3   Q.  Okay.  You didn't know until September that you could look

4   into New Innovations to see your evaluations?

5   A.  Sometime September, yes.  Sometime in late September.

6   Q.  Okay.  Let's -- do you still have your deposition there?

7   A.  Yes.

8           MR. JEPSON:  And do you have it, Jamie?

9           MS. HYNDMAN:  Do you mean me?

10          MR. JEPSON:  The question is whether I have it.

11  Cindy.

12  BY MR. JEPSON:

13  Q.  All right.  I want to direct your attention again to the

14  April evaluation -- or deposition that was taken by

15  Mr. Cleveland, and in particular -- you know what, I'm going

16  to move on because I don't have the cite right with me.

17          You said the first time you learned to look for your

18  evaluations was in September of 2011; is that correct?

19  A.  To the best of my recollection.

20  Q.  Okay.  And you -- when did you first see Dr. Jaskowiak's

21  evaluation?

22  A.  I think she filled it out September 25th.

23  Q.  Okay.  I guess that's really the point of my question.  As

24  of September 29th when you met with Dr. Song, the only

25  evaluations that had been submitted was one from Dr. Kaplan

Artunduaga - cross

1   early in September, correct?

2   A.  Uh-huh, yes.

3   Q.  And then the one from Dr. Jaskowiak a few days before you

4   learned about it, correct?

5   A.  Yes.

6   Q.  And from then on, you learned that you could see your

7   evaluations on New Innovations, correct?

8   A.  Yes.

9   Q.  And you would check them from time to time, correct?

10  A.  Yes.

11  Q.  All right.  Now, with respect to your July and August

12  rotation in the Kaplan service, just so we're clear, there are

13  two basic sides of that service, right?

14  A.  Yes.

15  Q.  Endocrine surgery and the breast surgery, correct?

16  A.  Yes.

17  Q.  And Dr. Chhablani and Dr. Jaskowiak were on the breast

18  side of that section, correct, or service?

19  A.  Yes, uh-huh.

20  Q.  And at the time Dr. Angelos and Dr. Kaplan were on the

21  endocrine side, correct?

22  A.  Yes.

23  Q.  And really the only differences between -- you were there

24  for two months, right?

25  A.  Yes.

Artunduaga - cross

1  Q.  And the only differences from one month to the other was

2  that Dr. In was a fellow from July, and Dr. Seal was the chief

3  resident for the month of August, correct?

4  A.  And the junior resident changed, too.

5  Q.  You had Irma Fleming on one month?

6  A.  Yes.

7  Q.  And the other junior was who, do you remember?

8  A.  Susan Lim and Julia Berian.

9  Q.  Okay.  Well, they were two weeks and two weeks, correct?

10         THE COURT:  We didn't hear the answer.  Can you

11  repeat your answer?

12  BY THE WITNESS:

13  A.  Sorry.  Irma Fleming in July.  Susan Lim, half of the

14  month of August, and Julia Berian.

15  BY MR. JEPSON:

16  Q.  And you were on for two months, correct?

17  A.  Yes.

18  Q.  And being on the rotation for two months actually let you

19  really learn about the rotation and the services that were on

20  that, correct?  You had an extra 30 days.

21  A.  Not really.

22  Q.  Not really?  What do you mean by that?

23  A.  Well, I had testified about my experience.

24  Q.  Well, I understand, but I'm asking you what do you mean by

25  that it really didn't help having another 30 days?

Artunduaga - cross

1   A.  Because instead of -- so instead of getting the average

2   cases that residents usually would get, I was actually getting

3   much fewer.

4   Q.  Okay.  I remember you testified to that, and you also

5   testified that you felt Dr. In mistreated you, correct?

6   A.  Yes.

7   Q.  And Dr. In did not ever submit an evaluation on you, did

8   she?

9   A.  No.

10  Q.  And you also testified that you felt that John Seal

11  treated you badly, correct?

12  A.  Yes.

13  Q.  And John Seal never submitted an evaluation on you, did

14  he?

15  A.  Dr. Jaskowiak told me that she had based her evaluation

16  on -- on what Dr. John Seal had to say about me.

17  Q.  And we'll hear from Dr. Jaskowiak, but my question to you

18  is this:  Dr. Seal never submitted a written evaluation of

19  you, correct?

20  A.  I don't know if the talk that he had with Justine and Sara

21  count as that.

22  Q.  I'm asking if he -- have you ever seen anything in writing

23  that he submitted about your performance?  You haven't, have

24  you?

25  A.  Like himself, no.

Artunduaga - cross

1   Q.  That's what I meant.  Thank you.

2   A.  Okay.

3           THE COURT:  Mr. Jepson, I think this is a good point

4   to end for the evening.  It's almost 5:00.

5           So we will pick back up tomorrow morning, ladies and

6   gentlemen, at 9:15.  Remember, please don't discuss the case.

7   Don't read any news coverage or communicate on social media

8   about it.  Have a great evening.  We'll see you tomorrow

9   morning at 9:15.

10          THE CLERK:  All rise.

11     (Jury exits courtroom.)

12          THE COURT:  So if you would be here by 9:00 tomorrow,

13  please, in case you have any issues for me.

14          MS. HYNDMAN:  Sure.

15          THE COURT:  Is there anything else tonight?  I'm

16  sorry, Ms. Franklin?

17          MS. FRANKLIN:  I said okay.

18          THE COURT:  Okay.

19          MR. JEPSON:  I think we can talk about scheduling.

20          THE COURT:  Okay.  Do you have a ballpark sense of

21  how much more?

22          MR. JEPSON:  Probably an hour and a half.

23          THE COURT:  Okay.  So let's try to wrap up redirect.

24          MS. HYNDMAN:  Yeah, I don't --

25          THE COURT:  Answering the questions posed is helpful.

Artunduaga - cross

368

1          Who's your next witness.  Dr. Kaplan?

2          MS. HYNDMAN:  Dr. Kaplan.

3          THE COURT:  Okay.  Hopefully we'll get to him in the

4     morning.  We'll see where we are.  So 9:15 tomorrow.  Anything

5     for me?

6          MS. HYNDMAN:  I don't believe so.

7          THE COURT:  Okay.  I'll see you tomorrow morning at

8     9:00, please.

9          MR. JEPSON:  Thank you, your Honor.

10         MS. HYNDMAN:  Thank you.

11         MS. FRANKLIN:  Thank you.

12         (Adjournment taken at 5:00 o'clock p.m., until 9:00

13         o'clock a.m., the following day, February 1, 2017.)

14                    C E R T I F I C A T E

15         We certify that the foregoing is a correct
      transcript from the record of proceedings in the
16    above-entitled matter.

17

         /s/ Frances Ward
18    _____

19       /s/ Kathleen M. Fennell          February 1, 2017
      _____  _____
20         Official Court Reporters      Date
         United States District Court
21       Northern District of Illinois
              Eastern Division
22

23

24

25