369

```
 1                    IN THE UNITED STATES DISTRICT COURT
                        NORTHERN DISTRICT OF ILLINOIS
 2                            EASTERN DIVISION

 3   DR. MARIA ARTUNDUAGA,            ) Docket No. 12 C 8733
                                      )
 4                    Plaintiff,      )
                                      )
 5            vs.                     )
                                      )
 6   THE UNIVERSITY OF CHICAGO        )
     MEDICAL CENTER,                  ) Chicago, Illinois
 7                                    ) February 1, 2017
                      Defendant.      ) 9:05 o'clock a.m.
 8
                              VOLUME THREE
 9                 TRANSCRIPT OF TRIAL PROCEEDINGS
          BEFORE THE HONORABLE AMY J. ST. EVE, AND A JURY
10
     APPEARANCES:
11
     For the Plaintiff:         THE FRANKLIN LAW FIRM, LLC
12                              BY:  MS. JAMIE S. FRANKLIN
                                53 W. Jackson Blvd., Suite 803
13                              Chicago, Illinois  60604

14                              ROBINSON, CURLEY & CLAYTON, P.C.
                                BY:  MS. CYNTHIA H. HYNDMAN
15                              300 South Wacker Drive, Suite 1700
                                Chicago, Illinois  60606
16
     For the Defendant:         VEDDER PRICE, P.C.
17                              BY:  MR. EDWARD C. JEPSON, JR.
                                     MS. ELIZABETH N. HALL
18                              222 N. LaSalle St., Suite 2600
                                Chicago, Illinois  60601
19
     Court Reporter:            MR. JOSEPH RICKHOFF
20                              Official Court Reporter
                                219 S. Dearborn St., Suite 1232
21                              Chicago, Illinois  60604
                                (312) 435-5562
22

23              * * * * * * * * * * * * * * * * * *

24                      PROCEEDINGS RECORDED BY
                        MECHANICAL STENOGRAPHY
25              TRANSCRIPT PRODUCED BY COMPUTER
```

```
 1              THE CLERK:  12 C 8733, Artunduaga vs. The University
 2   of Chicago Medical Center.
 3              THE COURT:  Good morning.  Thank you for being early.
 4              MR. JEPSON:  Good morning, Judge.
 5              MS. HYNDMAN:  Good morning, your Honor.
 6              We just had a text from our client.  She might be
 7   here about five after 9:00.
 8              THE COURT:  Okay.  Hopefully, she will be here before
 9   9:15.
10              MS. HYNDMAN:  Yeah.
11              THE COURT:  Two things for you.  One, I have looked
12   at -- I am not ready to rule on all of the deposition
13   designation responses yet, but on Fleming, I am overruling the
14   objection to the testimony at Page 78, Line 23, to Page 79,
15   Line 19, of the 2016 deposition.  The question was directly
16   responsive to prior questioning by the defendants in the
17   deposition.
18              Obviously, you cannot use this to make any kind of
19   comparator arguments.  It is not for that purpose.  But it is
20   directly responsive to the other.
21              I will get you rulings on the other.  I was
22   distracted with some other things this morning.
23              Can I see you, counsel, at sidebar just real briefly,
24   please.
25              MS. HYNDMAN:  Sure.
```

371

1          (Proceedings had at sidebar at Pages 371 to 373 under

2     seal.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Artunduaga - cross

```
 1        (The Court gave its attention to another matter, after
 2   which the following proceedings were had in open court:)
 3             THE COURT:  Are there any issues you need me to
 4   address, counsel?  Any issues you need me to address before?
 5   You are good?
 6             MS. HYNDMAN:  I don't think so.
 7             THE COURT:  Okay.
 8             We are still missing four jurors.  As soon as they
 9   are here, we will get started.
10        (Brief recess.)
11        (Jury in.)
12             THE COURT:  You may be seated.
13             Good morning, ladies and gentlemen.  We are
14   continuing today with the testimony of Dr. Artunduaga.  We are
15   continuing with cross-examination.
16             Doctor, you are under still under oath.
17             THE WITNESS:  Yes.
18             THE COURT:  You may proceed.
19   MARIA ALEXANDRA ARTUNDUAGA, PLAINTIFF HEREIN, PREVIOUSLY SWORN
20                   CROSS-EXAMINATION (Resumed)
21   BY MR. JEPSON:
22   Q.  Good morning, Dr. Artunduaga.
23   A.  Hello.
24   Q.  We will resume where we were yesterday, talking about the
25   Kaplan Service the first two months that you were --
```

1    A.   Yes.

2    Q.   -- at UCMC.  And I'd like to direct your attention to an

3    exhibit that has not yet been admitted, Defendant's Exhibit

4    20.

5         And this is a two-page -- actually, a three-page

6    document, which at the top appears to be an e-mail from you to

7    Dr. Song dated August 23, 2011.  And on the bottom of the

8    first page -- the e-mail on top is a response -- there's an

9    e-mail from Dr. Song to you dated August 23, 2011.

10        Did you receive and send these e-mails, Dr.

11   Artunduaga?

12   A.   Yes, I did.

13             MR. JEPSON:  I'll move their admission, your Honor.

14             THE COURT:  Any objection?

15             MS. HYNDMAN:  Your Honor, I don't have an objection

16   to the e-mail from Dr. Artunduaga.  I do have an objection to

17   the rest of the document because it contains hearsay.

18             MR. JEPSON:  It's her response to it.

19             MS. HYNDMAN:  No, I'm talking about the e-mail from

20   Dr. Song to Dr. Artunduaga.  I do have an objection to that

21   part of the exhibit.

22        So, if he just shows the first page, I don't have a

23   problem.

24             MR. JEPSON:  Well, your Honor --

25             THE COURT:  To the extent --

Artunduaga - cross

1            MR. JEPSON:  I'm not offering it for the truth --

2            THE COURT:  Right.

3            MR. JEPSON:  -- of the matter asserted.

4            THE COURT:  You are offering it to show the impact it

5   had on --

6            MR. JEPSON:  Yes.

7            THE COURT:  -- the listener?

8            MR. JEPSON:  It's an e-mail that Dr. Song received

9   and forwarded, and Dr. Artunduaga responded.  And I'm not

10  saying that what's in the underlying e-mail is necessarily

11  true.

12           THE COURT:  With that --

13           MS. HYNDMAN:  As long as that's clear to the jury.

14           THE COURT:  Okay.

15           Ladies and gentlemen, I am going to admit Defendant's

16  Exhibit 20.  The e-mail from Dr. Song back to the plaintiff is

17  not being offered for the truth of what is in that e-mail.

18  Instead, it is being offered to show the impact it had, if

19  any, on the listener -- or reader.

20           MR. JEPSON:  Thank you.

21      (Defendant's Exhibit No. 20 received in evidence.)

22  BY MR. JEPSON:

23  Q.  Direct your attention to that e-mail that prompted your

24  response, Dr. Artunduaga.  It starts off, "Maria," and on the

25  second page says:  I received this e-mail from one of our

Artunduaga - cross

1    patients recently.  And I know that there is always two sides

2    to the story, so let's sit down and discuss this.

3            And then goes on to a narrative:  On Thursday, August

4    11th, Dr. A knocked and entered my hospital room in the early

5    evening --

6            MS. HALL:  Judge, could you publish it, please?

7            THE COURT:  Sure.  Thank you.

8    BY MR. JEPSON:

9    Q.  (Reading):  My husband was also in the room.

10           It then goes down to the second paragraph.

11           MR. JEPSON:  If you would, Michael.  Second paragraph

12   on that page.  Yes.

13   BY MR. JEPSON:

14   Q.  (Reading):  She approached me, observed the PCA machine

15   and started asking questions about my pain management.  I was

16   taken aback momentarily but responded to the best of my

17   ability.

18           And then it goes on at the end to say:  She

19   interrupted me in a patronizing, condescending tone and told

20   me that most patients in my situation go home after one night

21   and again told me that I should not still be on the morphine

22   PCA.  Her comments and demeanor were insensitive and rude.  I

23   looked at -- blank -- to confirm he was actually hearing the

24   same thing and he was.

25           MR. JEPSON:  And, then, the next paragraph, Michael.

Artunduaga - cross

1  BY MR. JEPSON:

2  Q.  (Reading):  In an attacking tone --

3          MR. JEPSON:  The next paragraph.

4  BY MR. JEPSON:

5  Q.  (Reading):  In an attacking tone, Dr. A again stated that

6  I should have been off the morphine hours before and that most

7  patients are discharged by that point post surgery.

8          MR. JEPSON:  Next page, please.

9          The second paragraph.

10  BY MR. JEPSON:

11  Q.  (Reading):  At this point, I was getting emotional because

12  Dr. A was telling me the opposite of what Dr. Song and the

13  nurses had told me just a couple of hours earlier.  They had

14  told me to expect to stay two nights in the hospital, and that

15  I should use the morphine as needed to get back on top of the

16  pain.

17          When Dr. A saw I was upset, she laughed at me and

18  told me there was no need to get anxious.  She didn't

19  understand that it was her insensitivity that was upsetting

20  me.  My husband and I are not confrontational people, but we

21  finally had to explain to her that her tone was inappropriate.

22  She acted surprised, so we told her it felt like she was

23  attacking and humiliating me.  Dr. A got defensive of her tone

24  and questions and then must have realized that she was not

25  welcome in the room and left.

Artunduaga - cross

379

1            MR. JEPSON:  Then the final paragraph, Michael,

2    please.

3    BY MR. JEPSON:

4    Q.  (Reading):  As a healthcare professional myself, I found

5    the experience very upsetting.  I was in a very vulnerable

6    position as a patient who was suffering a great deal of pain

7    and on multiple medications.  The interaction was a setback

8    for my physical and mental health and did not help my opinion

9    of the care I received while at U of C Hospital, with the

10   exception of Dr. Song, Dr. Jaskowiak, Dr. Joly and Dr. Seal,

11   who were all outstanding.

12           Now, you responded to that e-mail on the first page;

13   correct, Dr. Artunduaga?

14   A.  Yes.

15   Q.  And in the first paragraph, you state:  After we finished

16   rounds, the plan for Mrs. Blank was to add NSAIDs and wean her

17   off PCA.  Unfortunately, the nurse practitioner did not inform

18   the residents about the changes done to her management until

19   4:00 p.m.

20           So, you believe that because the nurse practitioner

21   didn't tell you that, there was some confusion, correct?

22   A.  Yes.

23   Q.  Okay.

24           And, then, the next paragraph says:  Mrs. was very

25   confused by having multiple medical visits during the day and

Artunduaga - cross

380

1    manifested great disappointment with the nurse staff.  I

2    noticed that my questions were misinterpreted and apologize to

3    the couple.  When they said that my tone was condescending, I

4    apologize for a second time and explained that my duty was to

5    know all these details in order to improve her pain

6    management.

7             That was the response you sent to Dr. Song, correct?

8    A.   Yes.

9    Q.   And on that service, you received evaluations from four

10   attending physicians, correct?

11   A.   Yes.

12   Q.   Dr. Kaplan, Dr. Jaskowiak, Dr. Chhablani and Dr. Angelos?

13   A.   Angelos.

14   Q.   All right.

15            Let's look at Dr. Kaplan's first.  That was the first

16   one submitted, correct?  And that's Joint Exhibit 6.

17            Now, you recognize this as the evaluation you

18   received from Dr. Kaplan?

19   A.   Yes.

20   Q.   And on the first page, it contains a number of "goods,"

21   three "very good."  Then on the second page, none of the dots

22   are filled in at all except for three or four non-applicables,

23   correct?

24   A.   Yes.

25   Q.   And his comment:  This was Maria's first rotation.  She

Artunduaga - cross

381

1   gained great experience with the U of C systems as time

2   passed.  She is a wonderful person who is very bright and very

3   good with her hands.  She is good now, but she will make a

4   fine resident as she gains more experience and gains more

5   confidence.

6           So, that was the sum total of his evaluation,

7   correct?

8   A.  Yes.

9   Q.  All right.

10          And, then, you received one from Dr. Jaskowiak --

11          MR. JEPSON:  Well, strike that.

12  BY MR. JEPSON:

13  Q.  You don't know if Dr. Kaplan saw any of the other

14  evaluations submitted about you, do you?

15  A.  I don't know.

16  Q.  And you don't know if he spoke with any of the other

17  physicians who were on that service about you, do you?

18  A.  I don't know.

19  Q.  Okay.

20          So, let's go to Joint Exhibit 7.  This is -- you

21  recognize this as Dr. Jaskowiak's evaluation, correct?

22  A.  Yes.

23  Q.  And this one was submitted later in September, correct?

24  A.  Yes.

25  Q.  And you saw it, correct?

Artunduaga - cross

1   A.  Yes.

2   Q.  And on the first page with respect to pre-op care, which

3   then has the parentheses --

4           MR. JEPSON:  And that's the third one down, Michael.

5   BY MR. JEPSON:

6   Q.  -- formulates appropriate plan, assessment of details.

7   And she rated you "could improve" there, correct?

8   A.  Yes.

9   Q.  And, then, the next one down is post-op care, including

10  recognition and -- recognition of complications.

11          Do you see that?

12  A.  Yes.

13  Q.  She rated you there as "deficient," correct?

14  A.  Yes.

15  Q.  Then the next one is, able to communicate and justify

16  medical decisions.

17          Do you see that?

18  A.  Yes.

19  Q.  And she rated you there as a "could improve"?

20  A.  Yes.

21  Q.  And, then, the next down under operative skills, under

22  preparedness, punctual, knows case, she rated you as "could

23  improve," correct?

24  A.  Yes.

25  Q.  And, then, the next one, advanced OR skills, dissection,

Artunduaga - cross

1   exposure, suturing, she rated you as "deficient," correct?

2   A.  Yes.

3   Q.  Let's turn to the second page.  And there the marks

4   improve except at the top, the second one down.  Relations

5   with others, with other healthcare professionals, she rated a

6   "could improve."

7        Do you see that?

8   A.  Yes.

9   Q.  And, then, documentation of practice activities, which is

10  the next one down, she rated you there as a "could improve,"

11  correct?

12  A.  Yes.

13  Q.  And, finally, let's go to the overall comments at the

14  bottom:  Maria spent over two months on our service and it was

15  fairly challenging.  Many issues arose with communication,

16  with clinical care, with technical OR skills.  These have been

17  brought to the attention of Dr. Song.  Bottom line, she is

18  very smart and very sweet.  And she works hard.  There seems

19  to be some critical issues that may be cultural, as she has

20  not worked in the American medical system before.  She often

21  did not seem to understand completely what the plan was or her

22  role in the plan.  Also, she is so eager to do well and to

23  improve that she is constantly diving forward without even

24  fully listening to what is being recommended.  This occurred

25  technically in the OR -- which I assume means the operating

Artunduaga - cross

1    room -- and also on rounds.  Steps are being taken to address

2    these issues.

3              So, you would have read that at the time, correct?

4    A.  Yes.

5    Q.  And, indeed, that led you -- reviewing this evaluation,

6    led you -- to e-mail Dr. Angelos, correct?

7    A.  Yes.

8    Q.  And, again, you don't know if Dr. Jaskowiak talked with

9    Dr. Kaplan or Dr. Chhablani or Dr. Song or anybody else at

10   this time before she submitted the evaluation, do you?  About

11   what should be in her evaluation.

12   A.  She told me she had talked to Dr. Chhablani.

13   Q.  Dr. Chhablani?

14   A.  Uh-huh.

15   Q.  Okay.

16             And Dr. Chhablani was the other breast surgeon,

17   correct?

18   A.  Yes.

19   Q.  All right.

20             Let's go, if we would, to Plaintiff's Exhibit 20.

21             MR. JEPSON:  And this is already in evidence.

22   BY MR. JEPSON:

23   Q.  And this was the e-mail exchange we looked at yesterday,

24   correct?

25   A.  Yes.

Artunduaga - cross

1   Q.  And at the bottom, you e-mailed Dr. Angelos and stated:

2   Hope all is well.  I was wondering if you could have some time

3   to complete my evaluation.  Dr. Jaskowiak raised some concerns

4   regarding my performance.  I was hoping that I could get your

5   input, too.

6           Correct?

7   A.  Yes.

8   Q.  And Dr. Angelos was on the endocrine side, correct?

9   A.  Yes.

10  Q.  All right.

11          And, indeed, he wrote you back and offered to meet

12  with you, correct?

13  A.  Yes.

14  Q.  And he wrote you back and said:  I will certainly fill out

15  your evaluation, but more importantly we should talk.  I think

16  there are some positives and negatives that we should discuss.

17          And, then, I think you testified earlier that you met

18  the following week with him, correct?

19  A.  Yes.  I think.

20  Q.  You testified that you told him that you hadn't really

21  been in an operating room for ten years during that meeting;

22  do you recall that?

23  A.  Yes.

24  Q.  Okay.

25          That wasn't true, was it?  Because you had been in an

Artunduaga - cross

1   operating room at the University of Washington for two months

2   in July and August of 2010, correct?

3   A.  Not really.  What I meant to say for surgical procedures

4   were mainly -- I was in charge of patients in the floor and I

5   would accompany them to minor surgical procedures like in

6   interventional radiology or the gastrointestinal service.

7   Q.  So, you meant that you hadn't been in the same kind of

8   operations?  Is that what you meant?

9   A.  I would call -- I mean, when you are at the operating

10  room, you call that surgeries or operations.

11  Q.  Okay.

12          Let me show you -- let's go back to what we looked at

13  yesterday, Joint -- I'm sorry, Defendant's Exhibit 1, which is

14  already in evidence.

15          MR. JEPSON:  Page 2.

16  BY MR. JEPSON:

17  Q.  It states here at the top with respect to that, that you

18  function at the intern level under close supervision, correct?

19  A.  Uh-huh, yes.

20  Q.  And it says:  You attended all operative procedures on my

21  patients and participated in rounds, correct?

22  A.  Yes.

23  Q.  Let's take a look at Defendant's Exhibit 249, which also

24  was admitted yesterday, which was your application submitted

25  in 2012-13.

Artunduaga - cross

1          And it says here:  Functions at the intern level

2   under close supervision of chief general surgery residents

3   during two months.

4          And it says here:  First assisted operations with the

5   surgical oncology team.

6          Correct?

7   A.  Yes.  I did it for --

8   Q.  There's no question pending.

9   A.  Okay.  Sorry.

10  Q.  All right.  So, you eventually did get an evaluation from

11  Dr. Angelos, correct?

12  A.  Yes, sir.

13  Q.  And that is Joint Exhibit 8, correct?

14  A.  Yes.

15          MR. JEPSON:  Let's take a look at that, Michael.

16  BY MR. JEPSON:

17  Q.  And Dr. Angelos gave you "goods" and "very goods" on the

18  first page, except for two "could improves," correct?

19  A.  Yes.

20  Q.  And the first "could improve" was, able to communicate and

21  justify medical decisions.

22          Do you see that?

23  A.  Yes.

24  Q.  And they also rated you "could improve" on advanced OR

25  skills such as dissection, exposure, suturing, correct?

Artunduaga - cross

1    A.  Yes.

2    Q.  And on the following page, he rated you a "could improve"

3    with other communications and relations with other healthcare

4    professionals.

5            Do you see that?

6    A.  Yes.

7    Q.  And, finally, he rated you "deficient" on ability to lead

8    and manage a service.

9            Do you see that?

10   A.  Yes.

11   Q.  All right.

12           Now, the overall comments --

13           MR. JEPSON:  Michael, please.

14   BY MR. JEPSON:

15   Q.  He recognizes here, doesn't he, that this was your first

16   rotation at the University of Chicago, correct?

17   A.  Yes.

18   Q.  And it says here -- it goes on to say:  She seemed to be

19   very flustered at the beginning of the rotation, and this was

20   not helped by the fellow who she was working with who often

21   called Maria to drop what she was doing and take care of

22   something else.

23           That would have been Dr. In, correct?

24   A.  Yes.

25   Q.  And you told Dr. Angelos about what Dr. In was doing with

Artunduaga - cross

1   you on that first month, correct?

2   A.  Yes, I did.

3   Q.  All right.

4          And you don't know if he actually saw it or not,

5   correct?

6   A.  I don't know.

7   Q.  He probably wouldn't, frankly, right?

8   A.  I mean, we were sometimes rounding with Dr. Angelos.

9   Sometimes Haijin In will be in the clinic.

10  Q.  So, you don't know, correct?

11  A.  No.

12  Q.  Okay.

13         It says:  Maria's operative skills were hampered by

14  what appeared to be a significant case of nerves.  However,

15  despite these weaknesses, she improved during the rotation.

16         And it goes on to say he thinks you will improve,

17  correct?

18  A.  Yes.

19  Q.  And it says:  She will need some mentoring, but I believe

20  she has the intelligence and desire to improve and should be

21  given a chance.

22         Correct?

23  A.  Yes.

24  Q.  That was his conclusion.

25         So, these were the four -- I'm sorry, the three of

Artunduaga - cross

1    the four attending evaluations, correct?

2    A.  Yes, sir.

3    Q.  And, finally, we have another breast surgeon, and that's

4    Asha Chhablani -- Dr. Asha Chhablani?

5    A.  Yes.

6    Q.  And you indicated that as a plastic surgeon, you wanted to

7    work more with the breast surgeons because, as opposed to

8    endocrine, the plastic surgeons deal with the breast surgeons

9    much more, correct?

10   A.  Yes.

11   Q.  And I think we've already established that Dr. Chhablani

12   herself was a foreign medical school grad, correct?

13   A.  Yes.

14   Q.  She came from India, correct?

15   A.  Yes.

16   Q.  And she had an accent, too, correct?

17   A.  Yes.

18   Q.  And Dr. Chhablani was an attending physician at the

19   University of Chicago Medical Center, correct?

20   A.  Yes.

21   Q.  And she submitted an evaluation, which is Joint Exhibit 9;

22   am I right?

23   A.  Yes.  I see it here.

24   Q.  And this evaluation, the first page, she rated as to

25   clinical skills a "could improve," correct?

Artunduaga - cross

1    A.  Yes.

2    Q.  And that's the pre-op care, which is formulating the plan

3    and assessment, right?

4    A.  Yes.

5    Q.  And that's where you figure out what we should do with the

6    patient, make an assessment, correct?

7    A.  Yes.

8    Q.  And, then, we have post-op care, which is including the

9    recognition and dealing with complications as they arise,

10   correct?

11   A.  Yes.

12   Q.  She rated you a "could improve" there, as well, correct?

13   A.  Yes.

14   Q.  And, finally, there's an advanced OR skills where she also

15   rated you "could improve," correct?

16   A.  Yes.

17   Q.  And she gave you one "very good" on this page, which

18   relates to your personal attributes, correct?

19   A.  Yes.

20   Q.  And, then, on the second page, we have some more "could

21   improve," correct?

22   A.  Yes.

23   Q.  The documentation of practice activities, "could improve";

24   is that right?

25   A.  Yes.

Artunduaga - cross

1   Q.  And that's where you would place notes and record the

2   activities that you were engaged in, correct?

3   A.  Yes.

4   Q.  And, then, we have teaching abilities, teaching other

5   resident students, that's a "could improve," correct?

6   A.  Yes.

7   Q.  And, finally, a "could improve" under ability to lead and

8   manage a service.

9           Do you see that?

10  A.  Yes.

11  Q.  And the other marks, all "good," correct?

12  A.  Yes.

13  Q.  Finally, let's look at her overall comments:

14          Maria's a very nice person, tries very hard to do her

15  best, is extremely anxious to learn and to please, honest,

16  upright and willing to work hard, but appeared to be

17  constantly overwhelmed by her workload, was easily flustered

18  and anxious.  She is smart enough to seek help and advice.

19  However, her ability to process information and have a game

20  plan is lacking.  She cares enough to be a great physician,

21  but needs to be nurtured, mentored and monitored.

22          Correct?

23  A.  Yes.

24  Q.  All right.

25          And these are individuals who saw you for the two

Artunduaga - cross

393

1    months in the Kaplan Service, correct?

2    A.  Yes.

3    Q.  And --

4            MR. JEPSON:  Strike that.

5    BY MR. JEPSON:

6    Q.  You also ended up e-mailing the nurse practitioner to get

7    her views, correct?

8    A.  Yes.

9    Q.  And I believe we saw this yesterday, Joint Exhibit 17 --

10   I'm sorry, let's not look at 17.  It would be Joint Exhibit --

11   yeah, Joint Exhibit 17.

12           And this is an e-mail that you sent to Joly Jose, the

13   nurse practitioner, on October 15th, correct?

14   A.  Yes.

15   Q.  And that was after you had -- the evaluations by Dr.

16   Chhablani and Angelos and Kaplan and Jaskowiak had been

17   submitted, correct?

18   A.  Yes.

19   Q.  And you state here:  I was wondering if you could submit

20   my evaluation.  I know that there are many things to improve,

21   but considering that it was my first rotation in several

22   years, I was hoping that you would comment on other aspects

23   that Dr. J couldn't see.  You're the one who knows me best

24   after all.

25           Do you see that?

Artunduaga - cross

1    A.  Yes.

2    Q.  And you learned, however, didn't you, that Doctor -- I'm

3    sorry, that Ms. Joly Jose could not submit an evaluation on

4    you directly because you were in plastics and she was only in

5    New Innovations for general surgery, correct?

6    A.  No, I didn't know that.

7    Q.  You didn't realize that?

8    A.  No.

9    Q.  But she did submit an e-mail that you eventually saw,

10   correct?

11   A.  Yes.

12   Q.  And we looked at that yesterday.  And she sent it to --

13   first to Dr. Jaskowiak, who then sent it to Dr. Song, correct?

14   A.  Yes.

15   Q.  And let's look at that.

16           MR. JEPSON:  Joint Exhibit 19, please, at the bottom.

17   The bottom portion, Michael.

18   BY MR. JEPSON:

19   Q.  (Reading):  Maria's motivated and has willingness to

20   learn.  However, she lacks organization, prioritization and

21   communication skills.  The two months she was on B service,

22   she was overwhelmed with responsibilities and could not

23   prioritize important versus non-important tasks.  There were

24   also many tasks that were not done because there was a lack of

25   communication.  Overall, I think Maria did a fair job.

Artunduaga - cross

1    However, she has many areas that need improvement,

2    specifically in organization, prioritization and

3    communication.

4            And you eventually learned that she submitted that,

5    correct?

6    A.  Yes, from Dr. Song.

7    Q.  And he told you at the time of the probation, correct?

8    A.  I think so, yes.

9    Q.  And you indeed texted back and forth with Joly Jose about

10   the evaluation after you had the meeting with Dr. Song,

11   correct?

12   A.  Yes.

13   Q.  And she told you that she submitted an evaluation which

14   was consistent with what she had told you her assessment of

15   your performance was about --

16   A.  No.

17   Q.  -- correct?

18           She didn't tell you that in the text?

19   A.  She told -- I mean, I --

20   Q.  I mean, I can show you the text if we want to.

21   A.  Sure.  Please do.

22   Q.  Let's look at Defendant's Exhibit 38.

23           MR. JEPSON:  And this has not been admitted.

24   BY MR. JEPSON:

25   Q.  Defendant's Exhibit 38 contains a number of pages which

Artunduaga - cross

1   are text messages, correct?

2   A.  Yes.

3   Q.  And these are text messages from your phone or received by

4   your phone at the time, correct?

5   A.  I think so.

6   Q.  Okay.

7        And you produced these to us -- to your lawyers -- in

8   this case, correct?

9   A.  Sorry?  What was the question?

10  Q.  The question was:  You gave these to your lawyers who gave

11  this to us, correct?

12  A.  Yeah.  Yes, I think so.

13       MR. JEPSON:  I'll move admission of these texts.

14       THE COURT:  Any objection?

15       MS. HYNDMAN:  No objection, Judge.

16       THE COURT:  It is admitted.

17    (Defendant's Exhibit No. 38 received in evidence.)

18  BY MR. JEPSON:

19  Q.  Let's go to the one with Joly Jose's name on it, which are

20  at Page 828 starting at the bottom.

21  A.  Uh-huh, yes.

22  Q.  And there's a "Received," which means you got it:  Maria,

23  what eval?  The evaluations for the residents?  I did them

24  already, but for some reason your name didn't come up on the

25  form.

Artunduaga - cross

1        And, then, the next one, your response:  Yes, the

2   residents evaluation.  Dan Butz told me Allain evaluated him

3   last year.  I was hoping you'd submit one.  Can you ask her on

4   Monday?

5        And, then, it goes on to say:  I can't eval you

6   unless I get the form, and then -- you know, there's back and

7   forth.

8        On our forms -- she sent you a text at the bottom:

9   Maybe they changed the process and we can't evaluate the

10  plastics residents anymore.

11       Do you see that?

12  A.  Yes.

13  Q.  And you said:  Well, we'll look into it.

14       But eventually, you got the evaluation, correct, or

15  she submitted one?

16  A.  Yes.

17  Q.  And, then, we go down on November 4th, it says:  Dr. Song

18  is putting me on probation.  He said your evaluation added a

19  lot of weight to it.  It was that bad really?

20       And, then, it says -- goes -- her response to you,

21  Friday, November 4th at 10:47:  No.  It's everything I told.

22  That's why I spoke to you first.

23       Do you see that?

24  A.  Yes.

25  Q.  So, she told you what was going to be in her evaluation,

Artunduaga - cross

1    correct?

2    A.   Yes.

3    Q.   All right.  So, that was Kaplan and the Kaplan Service.

4          And you testified yesterday that your experience in

5    July was unacceptable.  I think you indicated that Haijin In

6    made you follow her around like a pet.

7          Do you remember saying that?

8    A.   She instructed me to follow Joly Jose.

9    Q.   Okay.

10         Can you understand why she might have done that?

11   Because Joly Jose was an experienced nurse practitioner at the

12   hospital and this was your first month there and you might

13   learn something from her?  Do you see how it might have been a

14   positive thing, at least in her mind?

15   A.   When I spoke to the plastic surgery residents --

16   Q.   I'm just asking you, could you see how that could be a

17   positive thing for you?

18   A.   No.

19   Q.   You didn't think it could be.  Okay.

20         And you indicated that in August, that experience was

21   a nightmare, correct?

22   A.   Yes.

23   Q.   That was with John Seal, correct?

24   A.   Yes.

25   Q.   All right.

                          Artunduaga - cross
                                                                    399

 1              Let's take a look at first Defendant's Exhibit 15,
 2    which has not been admitted.
 3              MS. HYNDMAN:  15?
 4              MR. JEPSON:  15.
 5              MS. HYNDMAN:  Thank you.
 6    BY MR. JEPSON:
 7    Q.  And this appears to be an e-mail -- the bottom one -- from
 8    you to Dr. Seal, correct?
 9    A.  Yes.
10    Q.  And it says:  John, I've only --
11              MS. HYNDMAN:  Your Honor --
12              MR. JEPSON:  I'm sorry.
13    BY MR. JEPSON:
14    Q.  And, then, the top one is his response to you, correct?
15    A.  Yes.
16    Q.  And this was an exchange on August 14th?
17    A.  Yes.
18              MR. JEPSON:  We'll move its admission.
19              MS. HYNDMAN:  Your Honor, I do object to this.  The
20    bottom e-mail I have no objection to.  But the top e-mail from
21    Dr. Seal violates your ruling in Motion in Limine No. 1
22    because it was never given to Dr. Song.
23              THE COURT:  Can I please see the top part?
24              MR. JEPSON:  I'm not offering it for his opinion as
25    to her skills.  Frankly, I'm offering it as to some further --

Artunduaga - cross

1    that he responded to her request favorably.  The request about

2    the cases in the first.

3              THE COURT:  What is your response to that?

4              MS. HYNDMAN:  As long as he doesn't argue that --

5              MR. JEPSON:  I'm not.

6              MS. HYNDMAN:  -- it was an opinion that was of Dr. --

7              THE COURT:  He will not.

8              MS. HYNDMAN:  Okay.

9              THE COURT:  He will not.

10             And you cannot.

11             So, I will admit it with that understanding.

12             MR. JEPSON:  Thank you.

13        (Defendant's Exhibit No. 15 received in evidence.)

14             MS. HYNDMAN:  Thank you.

15             MR. JEPSON:  Thank you.

16             All right.  With that, if it could be published, your

17    Honor?

18             THE COURT:  Yes.

19    BY MR. JEPSON:

20    Q.  So, on August 14th, you asked Dr. Seal if you could -- if

21    he could assign you the next two reconstructive breast cases

22    happening on Friday, the 19th, and August the 24th.

23             Do you see that?

24    A.  Yes.

25    Q.  Okay.

Artunduaga - cross

401

```
 1              I want to direct your attention now first to
 2    Plaintiff's Exhibit 8, which I believe is already in evidence.
 3              THE COURT:  It is.
 4              MR. JEPSON:  If we could show that.
 5              And go to the 19th, Michael, please.
 6    BY MR. JEPSON:
 7    Q.  And it appears there that you are assigned to a mastectomy
 8    case with Dr. Seal and Dr. Chhablani on that day, correct?
 9    A.  Yes.
10    Q.  And he did assign you to that case that you requested to
11    be on, correct?
12    A.  I think I should explain something.
13    Q.  I'm asking you, correct; "Yes" or "No"?
14    A.  He assigned me to the portion for -- with Dr. Chhablani.
15    Afterwards the plastic surgery team would come in.  That's
16    what I was asking for.
17    Q.  Okay.
18              But you were working on that mastectomy case,
19    correct?
20    A.  For half of the --
21    Q.  Okay.
22    A.  -- the case.
23    Q.  But you were assigned to it?
24    A.  Just half of the case.
25    Q.  Okay.
```

Artunduaga - cross

 1          But you weren't on it originally, right?

 2    A.  No, I was originally scheduled for that --

 3    Q.  Well, you hadn't seen the schedule at the time that he

 4    sent you the -- that you and he sent the e-mails because it

 5    hadn't come out yet?

 6    A.  What I was asking him is to stay for the plastic surgery

 7    part, that follow-up.

 8    Q.  Does your e-mail say that?

 9    A.  Sorry?

10    Q.  Does your e-mail say that?

11    A.  Breast reconstruction, I think.

12    Q.  Okay.

13          So, your testimony is this was an unsatisfactory

14    assignment?

15    A.  What I wanted from him was to give me the opportunity to

16    participate in the breast reconstruction --

17    Q.  Okay.

18    A.  -- part because he had already allowed the other interns

19    to do that.

20    Q.  Well, let's look at Plaintiff's Exhibit 9, then.

21          And with respect to that, it indicates that you're

22    assigned to, on the 24th -- which was the date you were

23    requested -- bilateral mastectomy and simple mastectomy.

24          So, is your testimony the same that this wasn't

25    satisfactory either?

Artunduaga - cross

1    A.   Sorry.  I'm confused.

2    Q.   Well, you just told me with respect to -- the e-mail that

3    you sent, you said, I want to be on these reconstructive

4    cases, correct?

5    A.   Do you -- sorry.  What exact dates were those?  19 and the

6    24th?

7    Q.   19th and 24th.

8    A.   Yes, if he could do -- allowed me to stay longer with the

9    plastic --

10   Q.   Okay.

11   A.   -- surgery team.  That's what I wanted --

12   Q.   So, your testimony is here that he didn't really do

13   anything to help you?  Is that what you're saying?

14   A.   I wanted to have the same opportunity as the --

15   Q.   I understand that.

16   A.   -- other interns.

17   Q.   I'm just asking, did he respond to your request in the way

18   you wanted him to or not?

19   A.   It's not what I wanted.

20   Q.   Okay.  That was my question.

21        So, did you ever communicate with Dr. Seal in e-mail

22   afterwards?

23   A.   I talked to him.

24   Q.   Okay.

25        And, indeed, there was an e-mail you sent to him

Artunduaga - cross

404

```
 1   later, correct?

 2   A.  Perhaps.  I don't remember.

 3   Q.  How about Defendant's Exhibit 17?

 4       MR. JEPSON:  And this has not been published.

 5   BY MR. JEPSON:

 6   Q.  And this appears to be an e-mail exchange between you and

 7   Dr. Seal, correct?

 8   A.  Yes.

 9   Q.  The first e-mail is from you to him on the 17th; he

10   responded on the 17th of August; and, then, you responded yet

11   again on the 17th of August, correct?

12   A.  Yes.

13       MR. JEPSON:  We move its admission, please.

14       THE COURT:  Any objection?

15       MS. HYNDMAN:  No objection, Judge.

16       THE COURT:  It is admitted.

17   (Defendant's Exhibit No. 17 received in evidence.)

18   BY MR. JEPSON:

19   Q.  And the first e-mail at the bottom says:  John, do you

20   think you'll have some time for feedback tomorrow, correct?

21   A.  Yes.

22   Q.  And he then says:  Tomorrow may be busy, but let's shoot

23   for Friday, correct?

24   A.  Yes.

25   Q.  And you thanked him, correct?
```

Artunduaga - cross

1   A.  Sorry?

2   Q.  You thanked him for that, correct?

3   A.  Of course, yes.

4   Q.  And you got some feedback, right?

5   A.  I don't remember.  Do you have --

6   Q.  Okay.

7   A.  -- an exhibit maybe?

8   Q.  There was another e-mail exchange you had with him at the

9   end of the rotation, correct?

10  A.  Okay.  Yes.

11  Q.  You're taking my word for it.  I will show you one.

12  A.  I don't remember.

13  Q.  Thank you.

14  A.  Sorry.

15  Q.  And that e-mail is Defendant's Exhibit 26.

16          MR. JEPSON:  That has not been admitted yet, your

17  Honor.

18  BY MR. JEPSON:

19  Q.  This starts out with an e-mail at the bottom from John

20  Seal to a number of different people regarding a -- something

21  unrelated to you, correct?  And there's another e-mail at the

22  top, correct?

23  A.  Yes.

24  Q.  And, then, at the top -- at the top two -- you sent

25  Dr. Seal an e-mail and he sent you a reply, correct?

Artunduaga - cross

406

1    A.   Uh-huh, yes.

2    Q.   Okay.

3         And you sent your e-mail to him on September 3rd,

4    2011, and he sent his reply on September 5th, 2011, correct?

5    A.   Yes.

6         MR. JEPSON:  I'll move the admission of this.

7         THE COURT:  Any objection?

8         MS. HYNDMAN:  No objection.

9         THE COURT:  It is admitted.

10        (Defendant's Exhibit No. 26 received in evidence.)

11   BY MR. JEPSON:

12   Q.   And your e-mail to him states:  Thanks, John.  I'm sorry I

13   couldn't say good-bye on Wednesday.  I had to help Ricardo

14   move into our new place.  It was nice working with you.  I

15   learned a lot.  And I really admire your dedication to patient

16   care and surgery education.  Thanks for all your feedback.

17   I'll work hard on all aspects you emphasized.

18        Correct?

19   A.   Yes.

20   Q.   And he responded:  Thanks, Maria.  Keep up the hard work.

21        Correct?

22   A.   Yes.

23   Q.   Now, there were some e-mails that you sent to people you

24   were acquainted with outside of UCMC regarding your experience

25   during the first couple months of your residency, correct?

Artunduaga - cross

407

1    A.  Yes.

2    Q.  And, in particular, I want to direct your attention to

3    Defendant's Exhibit 18.

4         MR. JEPSON:  This has not been admitted.

5    BY MR. JEPSON:

6    Q.  For the record, Defendant's Exhibit 18 appears to be an

7    e-mail from you to a John Mulliken on Sunday, August 21st,

8    2011.  And his reply on Monday, August 22nd, 2011.

9         Is that correct?

10   A.  Yes.

11   Q.  And I think yesterday you indicated that Dr. Mulliken was

12   someone -- a physician you worked with at Harvard?

13   A.  He was my research mentor.

14   Q.  Okay.

15        Was he a physician?

16   A.  Yeah, plastic surgeon.

17   Q.  Okay.

18        And he actually wrote you some of your reference

19   letters, correct?

20   A.  Yes.

21   Q.  And I want to direct your attention first --

22        MR. JEPSON:  I ask that this be admitted.

23        THE COURT:  Any objection?

24        MS. HYNDMAN:  No objection.

25        THE COURT:  It is admitted.

Artunduaga - cross

408

1       (Defendant's Exhibit No. 18 received in evidence.)

2   BY MR. JEPSON:

3   Q.  And the e-mail you sent to him reads:  Hi, Dr. Mulliken,

4   moving was exhausting, but we're finally settled into Chicago.

5   Ricardo found an affordable two-bedroom, two-bath condo in the

6   loop downtown, and I'll be finishing my second month of

7   internship with 40 OR cases, 20 as a Surgeon, Jr.

8           Do you see that?

9   A.  Yes.

10  Q.  (Reading):  And I had a rocky start, but overall surgery

11  internship has been a great experience.

12          And you sent this to Dr. Mulliken on that date,

13  correct?

14  A.  Yes.

15  Q.  And, indeed, he responded to you with:  Maria, internship

16  is always hectic.  Remember the intern's rule -- do it now.

17  A.  Yes.

18  Q.  And you sent and received these e-mails, correct?

19  A.  Yes, I did.

20  Q.  And who is Lourdes Quintanilla -- Quintanilla?

21  A.  My former post-doc -- she was part of my microtia team

22  research -- research team.

23  Q.  At Harvard?

24  A.  Yes.

25  Q.  And she's a personal friend of yours?

Artunduaga - cross

1   A.  Yes, I would say so.

2   Q.  Okay.

3         And you sent her -- let's talk about Defendant's

4   Exhibit 19, which has not been admitted.  It is a two-page

5   document.  It starts with an e-mail dated August 21, 2011,

6   which appears to be an e-mail blast you sent out regarding

7   your change --

8         MR. JEPSON:  Strike that.

9   BY MR. JEPSON:

10  Q.  And, then, she responded to you at the top, correct?

11  A.  Yes.

12  Q.  And on the next page you then sent her a response on

13  August 22nd, 2011, correct?

14  A.  Yes.

15        MR. JEPSON:  We'll move the admission of this.

16        THE COURT:  Any objection?

17        MS. HYNDMAN:  No objection.

18        THE COURT:  It is admitted.

19     (Defendant's Exhibit No. 19 received in evidence.)

20        MR. JEPSON:  Okay.  Let's go to the second page

21  first, Michael.

22  BY MR. JEPSON:

23  Q.  And it appears that the e-mail on the bottom half was

24  similar to the one -- indeed, almost word for word to the one

25  -- you sent to Dr. Mulliken, correct?

Artunduaga - cross

1   A.   Yes.

2   Q.   And, then, Ms. Quintanilla sent a response to you at the

3   top, correct?

4   A.   Yes.

5   Q.   And she asks you:  Why did you get off to a rocky start?

6            Do you see that?

7   A.   Yes.

8   Q.   And she said -- was she in a residency program, as well?

9   A.   Yes.

10  Q.   And she was indeed advanced.  She was in her third year --

11  A.   Yes.

12  Q.   -- at the time?

13           And she stated:  It's hard to start and get used to

14  the quick pace of an internship.  I think it's a shock to

15  everyone, but, well, once you get used to it, everything will

16  be better.

17           Do you see that?

18  A.   Yes.

19  Q.   And you sent her a response at the top of the first page

20  on August 22nd, 2011, right?

21  A.   Yes.

22  Q.   And in that, you say it was -- she had asked you why it

23  was hard.  And you said:  It was hard because I was alone, I'd

24  come and go by bike, the interns are much younger than me, and

25  I'm the only international person.

Artunduaga - cross

411

1          You wrote that, correct?

2   A.  Yes, I did.

3   Q.  (Reading):  And I started breast and endocrine surgery.

4   My chief was a lazy and rude fellow who made me write her

5   reports on the computer and things like that.

6          Do you see that?

7   A.  Yes.

8   Q.  Then it says:  The second month, things got better.  I

9   like it more and at least I know where and how to do things.

10  All these years out of the system were not in vain.

11         So, you sent that to her, correct?

12  A.  Yes.

13  Q.  All right.

14         And that was on August 22nd, nine days before the end

15  of your two months in the Kaplan rotation, correct?

16  A.  Yes.

17  Q.  All right.

18         Also, one other thing that you mention here was that

19  you were in the process of getting all of your marriage

20  preparations ready, correct?

21  A.  Yes.

22  Q.  It says that you were buying things over the Internet and

23  fitting in a trip for three weeks.  So, you were planning your

24  wedding at this time, correct?

25  A.  Yes, during my free time.

Artunduaga - cross

1   Q.  Okay.

2        Now, there's no mention in any of these e-mails or

3   either of these e-mails of any Colombian national origin

4   discrimination, correct?

5        You don't say, I'm being discriminated against

6   because I'm from Colombia, do you, in either one of these

7   e-mails?

8   A.  No.

9   Q.  Okay.

10       And, indeed, you don't say in either one of these

11  e-mails that people are treating me badly, making fun of my

12  accent or saying they can't understand me, correct?

13  A.  Not in this e-mail.

14  Q.  Correct.

15       All right.  Now, you're on Twitter or at least were

16  on Twitter back in 2011, correct?

17  A.  Yes.

18  Q.  And you send out tweets from time to time about various

19  things, correct?

20  A.  Yes.

21  Q.  And I'm not a Twitter person, so bear with me, but is it

22  your hash tag -- is that what it's called, that identifier?

23  A.  No.

24  Q.  Okay.

25       What's it called?

                      Artunduaga - cross
                                                                413

1    A.   Username.

2    Q.   Okay.

3         Well, you have -- yours is @ --

4    A.   martunduaga.

5    Q.   martunduaga.

6         It has your photograph, correct?

7    A.   (Nodding.)

8    Q.   And back in the summer of 2011, you did send out tweets

9    about your experience at UCMC, correct?

10   A.   Yes.

11   Q.   Okay.

12        I want -- again, this has not been admitted, but I

13   want you to look at Defendant's 265-C.

14        This appears to be a tweet that you sent out on July

15   8, 2011, about two weeks after you started at the University

16   of Chicago Medical Center, correct?

17   A.   Yes.

18   Q.   All right.

19        MR. JEPSON:   I'd move its admission.

20        THE COURT:   Any objection?

21        MS. HYNDMAN:   No objection, Judge.

22        THE COURT:   It is admitted.

23        MS. HYNDMAN:   But I didn't have a copy of this prior.

24        MR. JEPSON:   We just pulled them off.

25        MS. HYNDMAN:   We've had no notice of this, Judge.   I

Artunduaga - cross

1   mean, I'm going to object because --

2          MR. JEPSON:  It's impeachment.

3          MS. HYNDMAN:  Yeah, but -- it's not impeachment.

4   It's --

5          MR. JEPSON:  Well --

6          MS. HYNDMAN:  These are documents that were not on

7   the original exhibit list.  So, I object to that.

8          THE COURT:  There is an indication any documents to

9   be used for impeachment and for impeachment purposes you do

10  not have to turn over.  But that does not mean it gets

11  admitted.

12         You can certainly use this to impeach and read it.

13  And to the --

14         MR. JEPSON:  Sure.

15         THE COURT:  -- extent it is impeaching, that is a

16  question for the jury.

17         MR. JEPSON:  Got it.

18  BY MR. JEPSON:

19  Q.  And you have this in front of you, correct?

20  A.  Sorry?

21  Q.  You have this in front of you, correct?

22  A.  Yes, I do.

23  Q.  And it says:  Logged a breast case as a junior surgeon.

24  Happy intern.

25         Do you see that?

Artunduaga - cross

1  A.  Yes.

2  Q.  And it's dated July 8, 2011?

3  A.  Yes.

4  Q.  All right.

5          MS. HYNDMAN:  Your Honor, I object.  This has been --

6  it has not been admitted, and it's now been published to the

7  jury.

8          THE COURT:  It is being published for impeachment

9  purposes only.  It is not admitted.  It will not go back.  But

10  it can be used for that purpose.

11          MR. JEPSON:  Thank you, your Honor.

12          Michael, if we could go now to Defendant's Exhibit

13  265-D.

14  BY MR. JEPSON:

15  Q.  Now, this appears to be another tweet that you sent out in

16  the summer of 2011, correct?

17  A.  Yes.

18  Q.  And this one is dated July 30, 2011, correct?

19  A.  Yes.

20  Q.  And this was at the end of the first month of your

21  internship with Dr. In and others, correct?

22  A.  Yes.

23  Q.  And it says:  Survived first month of internship.

24  Satisfied, with exclamation point.

25          Correct?

Artunduaga - cross

1   A.  Yes.

2   Q.  And you tweeted that, correct?

3   A.  Yes.

4   Q.  I'll direct your attention now to Defendant's Exhibit

5   265-E.  This appears to be yet another tweet that you sent

6   out.  This one on August 5th, 2011, correct?

7   A.  Yes.

8   Q.  And that would have been after you finished July with

9   Fellow In and moved to August with Chief Resident John Seal,

10  correct?

11  A.  Yes.

12  Q.  And 7:14 a.m., August 5th, you tweeted this, correct?

13  A.  Yes.

14  Q.  And it says:  Hit 15 junior surgeon cases mark on sixth

15  week.  Loving at University of Chicago Hospitals.

16          And you sent that out, correct?

17  A.  Yes.

18  Q.  All right.  After you finished the Kaplan Service, you

19  testified that you then moved on to colorectal or Block 2 or

20  Block H, correct?

21  A.  Yes.

22  Q.  And on that service were -- the attendings were

23  Dr. Konstantin Umanskiy, correct?

24  A.  Yes.

25  Q.  And Dr. Umanskiy is from the Ukraine, correct?

Artunduaga - cross

1   A.  I don't know.  I --

2   Q.  You know he's not from the United States, though, correct?

3   A.  Yes.  He has an accent.

4   Q.  He has an accent?

5       Did you know he's from a former Soviet Union country?

6   A.  Yes.

7   Q.  Okay.

8       And he came to the United States later in life,

9   correct?

10  A.  Yes.

11  Q.  And, also, the other attending that's on that service is

12  somebody named Roger Hurst?

13  A.  Yes.

14  Q.  Okay.

15      And you described that they were the two attendings

16  you work with, right?

17  A.  Yes.

18  Q.  And the chief resident was Brian Bello, correct?

19  A.  Yes.

20  Q.  And you're aware, aren't you, that Sara Dickie contacted

21  Brian Bello and asked him to work closely with you on that

22  service, correct?

23  A.  He told me that he had talked to Sara.

24  Q.  Good.

25      And it was on that service that early in the month

Artunduaga - cross

1   you sent a patient home accidentally with a PICC line in them,

2   correct?

3   A.  Yes.

4   Q.  And that was a PICC line that Dr. Bello had asked you the

5   day before twice to make sure you removed it, correct?

6   A.  Yes.

7   Q.  And you also received evaluations from the attendings on

8   that service, correct?

9   A.  Yes.

10  Q.  And let's go first to Joint Exhibit -- bear with me here.

11      (Brief pause.)

12  BY MR. JEPSON:

13  Q.  I want to direct you to Dr. Umanskiy's evaluation, which

14  is Joint Exhibit 14, I believe.  Yes, it is.

15          Now, this came in at the end of the month, right?

16  A.  Yes.

17  Q.  And prior to that, you had had occasion to sit down and

18  talk with Dr. Umanskiy about your performance, correct?

19  A.  Yes.

20  Q.  And you testified yesterday about some things that

21  Dr. Umanskiy did to you, such as pulling out pens and throwing

22  things you had into the trash, correct?

23  A.  Yes.

24  Q.  You never submitted anything in writing complaining about

25  that to anyone, did you?

Artunduaga - cross

1   A.  I talked to -- I told --

2   Q.  The question was:  Did you submit anything in writing to

3   anyone complaining about that?

4   A.  No.

5   Q.  And let's take a look at Dr. Umanskiy's evaluation, which

6   is Joint Exhibit 14.

7           And this one, he rates on the first page, there are

8   five "could improves," correct?  The first being general

9   knowledge, basic science and clinical.

10          Do you see that?

11  A.  Yes.

12  Q.  And, then, he also rated you as "could improve" with

13  respect to the third one down, pre-op care, which would be

14  formulating plans and assessment of details.

15          MR. JEPSON:  Let's go down one more, please.

16  BY MR. JEPSON:

17  Q.  He rated you as "could improve" in post-op care, as well,

18  correct?

19  A.  Yes.

20  Q.  And he rated you as "could improve" on the ability to

21  communicate and justify your medical decisions.

22          Do you see that?

23  A.  Yes.

24  Q.  And, finally, with respect to your operative skills, the

25  first entry as to preparedness, punctual, knows case, he rated

Artunduaga - cross

1   you "could improve," correct?

2   A.  Yes.

3   Q.  All right.

4          Let's go to the second page.  At the top there about

5   communications with patients and family, we have another

6   "could improve."

7          Do you see that?

8   A.  Yes.

9   Q.  And, then, further down we have the third one, the

10  documentation of practice activities, the notes and those

11  kinds of things.  He rated you "could improve," correct?

12  A.  Yes.

13  Q.  Now let's go down further.

14         He rated you "deficient" in the ability to manage --

15  lead and manage a service, correct?

16  A.  Yes.

17  Q.  Let's go down even further.

18         Critiques personal practice outcomes, "could

19  improve."

20         So, we've got those "could improves," and then we

21  have an overall narrative there, right?

22  A.  Yes.

23         MR. JEPSON:  Let's highlight that, Michael, please.

24  BY MR. JEPSON:

25  Q.  And he begins as do most of your evaluators:  Dr.

Artunduaga - cross

1    Artunduaga has a pleasant personality.  She's eager and

2    interested in learning surgery.  Throughout the rotation, she

3    demonstrated improvement in patient care and communication

4    skills.

5         And this was your third month at the hospital,

6    correct?

7    A.  Yes.

8    Q.  (Reading):  However, there are several areas of concern

9    that I would like to point out.  Dr. Artunduaga appears to

10   have difficulty keeping up with the workload.  She frequently

11   appears disorganized, unsure of her knowledge and excessively

12   talkative at times.

13        Number two, she was not able to establish successful

14   doctor-patient relationships with the patients on the wards.

15   At times, this led to miscommunication between her and the

16   patients.

17        Do you see that?

18   A.  Yes.

19   Q.  And, indeed, this was a different service than the one at

20   the complaint that you and Dr. Song e-mailed about that we

21   looked at earlier today, right?  That happened on the breast

22   service, correct?

23   A.  Yes.

24   Q.  And, number three:  In the operating room, she had

25   difficulty with following instructions and required frequent

Artunduaga - cross

422

1    prompting as to her role and assignment during the case.  In

2    summary, I have concerns that Dr. Artunduaga's performance is

3    below that of a typical resident in general or plastic and

4    reconstructive surgery at the University of Chicago.

5            So, that was the end of that evaluation on the

6    overall, correct?

7    A.  Yes.

8    Q.  All right.

9            And this indicates it was submitted on October 14,

10   2011, after you completed the rotation, correct?

11   A.  Yes.

12   Q.  And Dr. Hurst also submitted an evaluation for the

13   rotation, correct?

14   A.  Yes.

15   Q.  And Dr. Hurst's evaluation is Joint Exhibit 13?

16           MR. JEPSON:  Let's, if we could, on the first page,

17   the third one down.

18   BY MR. JEPSON:

19   Q.  Again, pre-op care, formulating the appropriate plan,

20   assessing the details, he rated you as a "could improve,"

21   correct?

22   A.  Yes.

23   Q.  Then further down, the fifth one, able to communicate and

24   justify your medical decisions, he again rated you a "could

25   improve," correct?

Artunduaga - cross

1   A.  Yes.

2           MR. JEPSON:  Let's go to the second page, please.

3   And, in particular, let's go to the bottom, the overall

4   comments -- I'm sorry, there's another "could improve."

5   BY MR. JEPSON:

6   Q.  Ability to lead and manage a service is also rated as

7   "could improve," correct?

8   A.  Yes.

9   Q.  Let's go to the bottom paragraph.

10          When Maria started the rotation, it was clear that

11  she was less prepared than her peers.  That's how he starts it

12  off, correct?

13  A.  Yes.

14  Q.  Specifically, she was less independent and was less aware

15  of the routines of running the service.  It's not clear

16  whether this was due to a deficiency in competence or just a

17  result of necessary adjustments to a different system.

18          Correct?

19  A.  Yes.

20  Q.  Now, Dr. Jaskowiak made a comment about there might be

21  something cultural that's involved here, correct?

22  A.  Yes.

23  Q.  And here Dr. Jaskowiak -- or Dr. Hurst mentions maybe it

24  might be something from another -- because of another system,

25  correct?

Artunduaga - cross

1   A.  Yes.

2   Q.  Okay.

3        And here -- this was your third month at the

4   University of Chicago Medical Center, correct?

5   A.  Yes.

6   Q.  And Dr. Kaplan had said you had made great progress in

7   learning the University of Chicago Medical Center systems,

8   correct?

9   A.  Yes.

10  Q.  And Dr. Hurst and Dr. Jaskowiak were not in the plastic

11  and reconstructive surgery section, correct?

12  A.  Yes, they were not.

13  Q.  And they wouldn't have reviewed your application, correct?

14  A.  No.

15  Q.  And they wouldn't have known about all of the rotations

16  that you -- or the opportunities you had in the U.S. prior to

17  coming to the University of Chicago Medical Center, correct?

18  A.  They were not rotations, but observerships, most of them.

19  Q.  They wouldn't have known you spent two months at the

20  University of Washington the previous summer observing

21  surgical oncology procedures, correct?

22  A.  I was observing --

23  Q.  The only question was:  They wouldn't have known that you

24  were at the University of Washington Hospital in the months of

25  July and August, 2010, observing procedures, correct?

Artunduaga - cross

1  A.  Yes.

2  Q.  Okay.

3       Now, after you completed your rotation in colorectal,

4  you were informed you were going to be moved to the plastic

5  and reconstruction surgery section, correct?

6  A.  Yes.

7  Q.  And we talked yesterday about how you found out about it

8  from an e-mail and then had a conversation with Dr. Song about

9  it later in the day, correct?

10 A.  Yes.

11      MR. JEPSON:  And let's take a look at Defendant's

12 Exhibit 33, which has not been admitted.  And it may be

13 identical, but in a different format, of another one.  Let's

14 take a look at that.

15      THE COURT:  Is there any objection to its admission?

16      MS. HYNDMAN:  No.

17      THE COURT:  I will admit it.

18      MR. JEPSON:  Thank you.

19   (Defendant's Exhibit No. 33 received in evidence.)

20 BY MR. JEPSON:

21 Q.  And this is an e-mail from you -- Justine Lee to you and

22 Jonathan Lusardi, correct?

23 A.  Yes.

24 Q.  And you testified yesterday that Jonathan Lusardi was

25 another intern who was on the service with you that month,

Artunduaga - cross

426

1    right?

2    A.  Yes.

3    Q.  And Justine Lee was the chief in the plastics section,

4    correct?

5    A.  Yes.

6    Q.  And -- (reading):  Dear guys, welcome to the service.

7    We're excited to have you both on for October.  I think you're

8    both on call this weekend.

9         It goes on, and it indicates there that she wanted to

10   give you a -- you guys a better idea of the service, correct?

11   A.  Yes.

12   Q.  She wanted to round with you and do that, right?  That's

13   what it says?

14   A.  Yes.  We rounded on Sunday, uh-huh.

15   Q.  Okay.

16        So, that was right at the beginning of the service?

17   A.  Yes.

18   Q.  Thank you.

19        And let's take a look at Defendant's Exhibit 35.

20   And this is an e-mail exchange --

21        MR. JEPSON:  And, actually, the bottom one has

22   already been admitted as a plaintiff's exhibit, counsel.  And

23   there's just some follow-up on the two e-mails above.  They're

24   e-mails back and forth between Justine Lee, Sara Dickie, Dr.

25   Artunduaga, and others.

 1              I'd move them to be admitted.

 2              THE COURT:  Any objection?

 3              MS. HYNDMAN:  No objection.

 4              THE COURT:  It is admitted.

 5        (Defendant's Exhibit No. 35 received in evidence.)

 6   BY MR. JEPSON:

 7   Q.  And, so, the bottom e-mail, Sunday, October 2nd -- which,

 8   again, would have been right at the start of things in the

 9   plastics rotation, correct?

10   A.  Yes.

11   Q.  -- came from Sara Dickie to you; do you see that?  And

12   others?

13   A.  Yes.

14   Q.  And she made a number of assignments, correct?

15   A.  Yes.

16   Q.  And at the middle e-mail is on October 4th from you to

17   what appears to be the same group.  It's hard to say here.  It

18   says:  Guys, I'd like to help Dan closing the abdomen during

19   the DIEP case next Friday.

20              And you were allowed to do that, weren't you?

21   A.  I think so.

22   Q.  Okay.

23              And, indeed, the e-mail from Justine at the top, the

24   last paragraph says:  You are more than welcome to come to the

25   DIP for belly closure, but indicates it might be later in the

Artunduaga - cross

428

1  day, right?

2  A.  Yes.

3  Q.  Okay.

4       So, let me direct your attention to Defendant's

5  Exhibit 39.

6       MR. JEPSON:  This has not been admitted.

7  BY MR. JEPSON:

8  Q.  This is a two-page document.  And it appears to be an

9  e-mail from you at the bottom to Dr. Lusardi and someone named

10 Lemelman and then at the top, an e-mail from a Maureen

11 Beederman to you; am I correct?

12 A.  Yes.

13 Q.  And did you send and receive these e-mails?

14 A.  The question was?

15 Q.  Did you send and receive these e-mails on the date?

16 A.  Yes.

17 Q.  Okay.

18       MR. JEPSON:  I'll move the admission of this

19 document.

20       MS. HYNDMAN:  No objection.

21       THE COURT:  Any objection?

22       MS. HYNDMAN:  No.

23       THE COURT:  It is admitted.

24    (Defendant's Exhibit No. 39 received in evidence.)

25 BY MR. JEPSON:

Artunduaga - cross

429

1   Q.  I want to direct your attention to the e-mail at the
2   bottom.  It's dated October 10, 2011.
3           Do you see that?
4   A.  Yes.
5   Q.  And this was an e-mail from you to your co-intern and, I
6   believe, Mr. Lemelman was a sub-intern, correct?
7   A.  Yes.
8   Q.  And here it states:  We've been overlapping.  We need to
9   split coverage equally and try to get exposure.
10          Do you see that?
11  A.  Yes.
12  Q.  And you took it on yourself to actually make some
13  assignments, correct?
14  A.  Yes.
15  Q.  And Maureen Beederman -- was she a physician assistant or
16  what was she?
17  A.  A medical student.
18  Q.  A medical student.
19          She asked to observe something else, correct, or to
20  make a switch?
21          The e-mail above, it says:  Hey, Maria, do you think
22  it would be possible for me to go to Dr. Henry's surgeries in
23  the morning and then join the Jasko/Song DIEP?
24          Do you see that?
25  A.  Sure, yes.

Artunduaga - cross

430

1   Q.  So, she apparently saw your e-mail and the assignments and

2   asked to make a change, and you said that was fine, correct?

3   A.  Yes.

4   Q.  And, so, on that service in October, you were taking some

5   charge and responsibility for the assignments among the

6   interns and lower-level people, correct?

7   A.  I was told to do so.

8   Q.  Okay.

9       And you did it, right?

10  A.  Yes.

11  Q.  All right.

12      Now, you're aware that during the month of October,

13  Sara Dickie received a call from a Dr. Mary Lawler about a

14  drain issue with a patient, correct?

15  A.  Yes.

16  Q.  And, indeed, the issue was the question about how a drain

17  should be secured, correct?

18  A.  Yes.

19  Q.  And Dr. Lawler expressed, to your knowledge -- at least

20  Sara told you -- some displeasure, correct?

21  A.  Yes.

22  Q.  And Dr. Dickie communicated with you about it, correct?

23  A.  Yes.

24  Q.  And, indeed, Dr. Dickie told you that Dr. Lawler felt that

25  either you didn't understand an issue or had blown her off,

Artunduaga - cross

431

1    correct?

2         MS. HYNDMAN:  Your Honor, I would just object on the

3    grounds of hearsay.  I think it should just be limited.

4         THE COURT:  Mr. Jepson?

5         MR. JEPSON:  That's fine.

6         THE COURT:  Offering it as to this witness' --

7         MR. JEPSON:  Yes.

8         THE COURT:  -- state of --

9         MR. JEPSON:  Dr. Dickie will testify.

10        THE COURT:  Ladies and gentlemen, the testimony you

11   are hearing about what others said is not being offered for

12   the truth of what they said.  Instead, it is being offered for

13   the impact or effect on the listener.

14   BY MR. JEPSON:

15   Q.  And really all I'm getting at, Dr. Artunduaga, is this:

16   You knew that an issue had arisen where an attending physician

17   made a complaint about interaction with you, correct?

18   A.  From Sara, yes.

19   Q.  Yes.

20        And Sara talked to you about it and gave you a chance

21   to explain what happened, right?

22   A.  Yes.  And I wrote --

23        THE COURT REPORTER:  I'm sorry?

24   BY THE WITNESS:

25   A.  Yes.  And I also wrote a document explaining.

Artunduaga - cross

1    BY MR. JEPSON:

2    Q.  Well, that's something else.  You didn't do it at the

3    time; you did it later, correct?

4    A.  Yes.

5    Q.  You're referring to your response to your probation,

6    right?

7    A.  Yes.

8    Q.  Okay.

9          So, at the time, you had conversations about it; and,

10   in addition, you testified yesterday that you met with the

11   senior residents on the plastic and reconstructive surgery

12   section towards the end of your rotation, correct?

13   A.  Yes.

14   Q.  And, in particular, you indicated that you met with a

15   Dr. Trang Nyugen?

16   A.  Yes.

17   Q.  And also with Dr. Sara Dickie, correct?

18   A.  Yes.

19   Q.  And there was reference to documents entitled "Areas of

20   improvement," which you said you signed at that time, correct?

21   A.  Yes.

22   Q.  I want to direct your attention to Defendant's Exhibit 45.

23          MR. JEPSON:  And this has not been admitted.

24   BY MR. JEPSON:

25   Q.  But it appears to be one of the documents that you

Artunduaga - cross

433

1   mentioned yesterday, correct?

2   A.  Yes.

3   Q.  Areas for improvement?

4   A.  Yes.

5   Q.  And at the bottom is your signature on October 24, 2011?

6   A.  Yes.

7   Q.  And, also, there's a signature from Trang Nyugen that

8   date, correct?

9   A.  Yes.

10          MR. JEPSON:  I would move the admission of this

11  document, your Honor.

12          THE COURT:  Any objection?

13          MS. HYNDMAN:  Yes, your Honor.  We object on the

14  grounds it's a hearsay document.

15          MR. JEPSON:  She signed it.  She reviewed it,

16  discussed it.

17          THE WITNESS:  I was --

18          THE COURT:  Wait.  There is no question for you,

19  Doctor.

20          At the bottom she has just indicated this is her

21  writing, so her statements.

22          MS. HYNDMAN:  Her signature --

23          THE COURT:  So, that would not be hearsay.

24          MS. HYNDMAN:  The statements on the top are all

25  hearsay, your Honor.

Artunduaga - cross

434

1           THE COURT:  Is this being offered for the truth or

2   to --

3           MR. JEPSON:  No.

4           THE COURT:  Okay.

5           MR. JEPSON:  It's being offered to discuss the

6   meeting that was discussed yesterday about where they went

7   over issues and items.

8           THE COURT:  To show that she was aware of these

9   issues?

10          MR. JEPSON:  Correct.

11          THE COURT:  Her state of mind --

12          MR. JEPSON:  Correct.

13          THE COURT:  -- not for the truth?

14          So, I will admit it with that.

15          Ladies and gentlemen, the content of this memo is not

16  being offered for the truth of what is stated in the memo.

17  Instead, it is being offered to show state of mind and what

18  the doctor knew at the time.

19          MR. JEPSON:  Thank you, your Honor.

20      (Defendant's Exhibit No. 45 received in evidence.)

21          MR. JEPSON:  Let's go up to the top, Michael.

22  BY MR. JEPSON:

23  Q.  And under the areas of improvement, it says, Areas of --

24  for improvement, and there's a colon.  It says:  Notification

25  of seniors in case of change in patient status and then

Artunduaga - cross

1    references vaginal bleeding and tachycardia despite a 500

2    milliliter bolus, no labs drawn, senior not notified.

3              Do you see that?

4    A.  Yes.

5    Q.  And Dr. Trang Nyugen mentioned that to you that day,

6    correct?

7    A.  Yes.  We discussed --

8    Q.  And then --

9    A.  -- this case.

10   Q.  -- going down, there's another area for improvement -- or

11   at least below that, it says:  Appropriate understanding and

12   follow-up of consults?

13   A.  Yes.

14   Q.  And, then, underneath it:  Cardiology consult, paging

15   service for patient's SVT, and when cardiology did not call

16   back, did not contact them again.

17             That's another thing she pointed out, correct?

18   A.  Yes.

19   Q.  And, then, there's a gyne consult referred to, correct?

20   A.  Yes.

21   Q.  (Reading):  Consult for vaginal bleeding, ordering labs,

22   ultrasound without getting from gyne service what the labs and

23   ultrasound were for or asking consult service to answer the

24   question with their differential diagnosis.

25             This is another item that Dr. Nyugen pointed out to

Artunduaga - cross

436

1    you, correct?

2    A.  Yes.

3    Q.  And, then, below that, endo consult, recs in note

4    different from meds that were ordered.

5            Another item she pointed out, correct?

6    A.  Yes.

7            MR. JEPSON:  Let's go down, Michael, please, further.

8    BY MR. JEPSON:

9    Q.  And this refers to following directions, ordering

10   appropriate diagnostic studies and ancillary services.

11           First point:  Ordering transfer of patient out of

12   unit before attending confirmation by senior, correct?

13   A.  Yes.

14   Q.  This is a thing she pointed out to you, correct?

15   A.  Yes.

16   Q.  And, then, below:  Plaster splint from blank --

17           MS. HALL:  Judge, can we publish it?  Sorry.

18           THE COURT:  Yes.

19           Go ahead.

20           MR. JEPSON:  Let's just go back to the top again so

21   everybody can see it.

22           Michael, let them -- blow it up.  There was testimony

23   about these items already being discussed.  Let the jury take

24   a moment, please.

25       (Brief pause.)

Artunduaga - cross

437

1           MR. JEPSON:  All right.  Michael, let's go down,

2    then, to the following directions.

3    BY MR. JEPSON:

4    Q.  We already talked about ordering the transfer of the

5    patient out of the unit before attending confirmation.

6           And, then, the next one is:  Plaster splint from

7    blank.  Despite multiple attempts to explain the type of

8    splint needed, patient received the wrong splint.  No

9    recognition that splint was wrong until seen by senior.

10          That's another item that was discussed, correct?

11   A.  Yes.

12   Q.  And, then, below:  A CT abdomen ordered instead of CT

13   abdomen pelvis, which was changed by senior after looking over

14   orders.

15          Another thing discussed with Dr. Nyugen, right?

16   A.  Yes.

17   Q.  And, then, next:  Antibiotics dropped off blank, Ancef on

18   replant fell off, which was not recognized by intern.  Vanc

19   not ordered for patient admitted from ER.

20          Another item talked about, right?

21   A.  Yes.

22   Q.  Next:  Heparin and SQ not ordered on patient on bed rest.

23          Do you see that?

24   A.  Yes.

25   Q.  Dr. Nyugen raised that with you, right?

Artunduaga - cross

438

1    A.  Yes.

2    Q.  And, then, Lovenox discontinued on morbidly obese

3    patient -- I'm not going to try to pronounce that -- reported

4    at 36 when was PTT.

5          So, she raised that issue, correct?

6    A.  Yes.

7    Q.  And, then:  ID approval for antibiotics not followed up

8    on.

9          She mentioned that to you, correct?

10   A.  Yes.

11   Q.  And, then:  Lantus ordered TID instead of novolog.

12         She mentioned that, as well, correct?

13   A.  Yes.

14   Q.  And, then, lower down:  Description of wounds and

15   fractures.  Heavy reliance on photos.  Need to be able to

16   describe wounds over the phone using proper anatomical terms.

17         That was something she mentioned to you, as well, as

18   an area to improve, correct?

19   A.  Yes.

20   Q.  And, finally, on consults:  Putting consult notes in

21   timely manner and communicating recs with the service.

22   Consults being put in one week after initial consult only

23   after requesting service called when they were unable to find

24   consult note.

25         Another thing that Dr. Nyugen pointed out to you,

                              Artunduaga - cross
                                                                    439

 1    correct?

 2    A.  Yes.

 3    Q.  And, finally, let's go to the bottom.  And you signed it

 4    down there, correct?

 5    A.  I was told that I needed to --

 6    Q.  You did sign that, correct?

 7    A.  Yes.

 8    Q.  And Dr. Nyugen signed it, correct?

 9    A.  Yes.

10    Q.  Okay.  Thank you.

11           You had a similar meeting with Dr. Dickie four days

12    later, correct?

13    A.  Yes.

14    Q.  And let's take a look at Defendant's Exhibit 47.

15           THE COURT REPORTER:  Mr. Jepson, is this in evidence?

16           MR. JEPSON:  It's not in evidence, and I think we're

17    going to have the same discussion we just did.  So --

18           THE COURT:  Are you offering it for the same purpose?

19           MR. JEPSON:  Yes.  Let's do it that way.

20           MS. HYNDMAN:  Yes, your Honor, that would be my

21    objection.  If it's just offered for state of mind and not for

22    anything else, I --

23           THE COURT:  Okay.

24           Ladies and gentlemen, I am going to admit Defendant's

25    Exhibit 47 that you are about to see.  Again, it is not being

Artunduaga - cross

1  offered for the truth of the matter, so not being offered that

2  what is on the document itself is true.  Instead, it is being

3  offered for the impact on the reader or state of mind of the

4  plaintiff.

5  BY MR. JEPSON:

6  Q.  All right.  Dr. Artunduaga, this is another document you

7  mentioned signing yesterday, as well, correct?

8  A.  Yes.

9  Q.  And this was a document that you met with Dr. Sara Dickie

10  and discussed, correct?

11  A.  Yes.

12  Q.  And it's dated October 28, 2011.  Does that sound about

13  right as to the date you would have met with Dr. Dickie and

14  talked about these things?

15  A.  Yes, sir.

16  Q.  Okay.

17       And let's take a look at this document.  Again,

18  entitled, "Areas for improvement."

19       Do you see that?

20  A.  Yes.

21  Q.  And, then, number one:  Notification of senior in change

22  in status or continuing decline.

23       And, then, there's a specific patient mentioned

24  below, correct?

25  A.  Yes.

Artunduaga - cross

441

1   Q.  And you discussed that with Dr. Dickie, correct?

2   A.  Yes.

3   Q.  And, then, below that:  Consults.  Seeing consults in

4   efficient manner.  Placing consult notes in appropriate time.

5   Improved communication with senior on call as to what consults

6   need to still be seen, which need disposition.

7          So, that's another thing you talked about in general

8   as to consults issue, correct?

9   A.  Yes.

10  Q.  And you understood that Dr. Dickie was pointing these

11  things out as to areas she thought you could improve, correct?

12  A.  Yes.

13  Q.  And, then, below:  Prioritization, seeing consults,

14  alerting senior to patient status.  Coordinating with other

15  residents the list update, notes, consults and sign-out in

16  order to not repeat work and provide efficiency.

17          This is something else she raised with you, correct?

18  A.  Yes.

19  Q.  And, then, below that:  History gathering.

20          She indicates your knowledge base is good, but

21  gathering history and physical exam is lacking.  Data gathered

22  by Epic and patient interview is generally slow and

23  incomplete.

24          I'm assuming Epic is a system you used electronically

25  to put things in?

Artunduaga - cross

442

1   A.  Yes.

2   Q.  Okay.

3        And, then:  Not compiled into an understandable

4   story.  Routine patient presentation seems to be a struggle.

5   Must work on presenting physical exam findings.  Must not rely

6   on pictures.

7        Another area you and Sara Dickie discussed, correct?

8   A.  Yes.

9   Q.  And, then:  General organization.  Keeping track of all

10  orders for patients on the list and ensuring they're all done.

11  Not getting caught up in the first part of the plan and

12  forgetting the second, third, et cetera.

13       Another item you and she discussed at the end of the

14  service, right?

15  A.  Yes.

16  Q.  And, then, finally:  OR.  Pre-oping patients.  Any floor

17  patient needs pre-op reconciliation when it is known they will

18  go to the OR.  Don't wait for patient to be called.

19       Again, giving advice on how to do these kinds of

20  things, correct?

21  A.  Yes.

22  Q.  And, finally:  If there are two interns, the other can

23  finish rounding.

24       In other words, prioritization for this task,

25  correct?

Artunduaga - cross

443

1   A.  Yes.

2   Q.  And that's your signature there, correct?

3   A.  Yes.

4   Q.  And, then, the signature below, I believe, fits into the

5   stereotype of doctors' signatures, but Sara Dickie signed

6   this, as well, correct?

7   A.  Yes.

8   Q.  All right.  Thank you.

9           Now, you indicated that you attended a meeting on

10  November 2nd, 2011, at which -- in Dr. Song's office, I

11  believe, was it?

12  A.  Yes.

13  Q.  With Dr. Park and also Akilah Williams, the program

14  coordinator, right?

15  A.  Yes.

16  Q.  And you indicated that at that time, you were given a

17  choice as to whether to accept a probation or transition into

18  another -- they would help you transition to another program,

19  correct?

20  A.  That was a third option.  I mean, resig- -- resignation.

21  Q.  And you indicated there was an exhibit -- I believe it was

22  Joint Exhibit 22 -- that you stated was there at that meeting,

23  correct?

24  A.  Sorry?

25  Q.  Take a look at Joint Exhibit 22.

Artunduaga - cross

444

```
 1   A.  I'm sorry.

 2   Q.  Now, yesterday you testified that this exhibit --

 3   A.  Uh-huh, yes.

 4   Q.  -- was presented to you at the meeting, correct?

 5   A.  Yes.

 6   Q.  It actually was given to you a couple of days later, after

 7   the meeting, correct?

 8   A.  November 4th.

 9   Q.  Correct.

10        So, they did not have this written up at the time.

11   They gave it to you after the fact as a summary of the

12   evaluation that was presented to you that day, correct?

13   A.  Yes, but they had the --

14   Q.  All I'm asking you is when you received this document,

15   Doctor.

16   A.  I don't remember.  It might be two days afterwards --

17   Q.  Okay.

18        Well, you testified at an earlier deposition that you

19   received it on November 4th, which you just seemed to

20   indicate.

21   A.  Oh, sorry.  I forgot.

22   Q.  Okay.

23        So, you had the meeting with those individuals, and

24   Akilah Williams was there, correct?

25   A.  Yes.
```

1    Q.  And she was taking notes as she usually did in these kinds

2    of meetings, correct?

3    A.  I think so.

4    Q.  Okay.

5           And a couple of days later, you got this document,

6    correct?

7    A.  Yes.

8    Q.  And during this meeting, Dr. Song went over with you a

9    number of issues regarding your performance not only on

10   plastic surgery, but on other rotations, correct?

11   A.  Yes.

12   Q.  Let's take a look at this document, then.

13          MR. JEPSON:  And look at the top just for a second,

14   Michael, please.

15   BY MR. JEPSON:

16   Q.  And you see the title of this is "Summary of evaluation

17   with Dr. Maria Artunduaga."

18          Do you see that?

19   A.  Yes, sir.

20   Q.  And indicates the meeting occurred on November 2nd at 1:00

21   p.m., correct?

22   A.  Yes.

23   Q.  And it goes on --

24          MR. JEPSON:  Let's go down to the first paragraph,

25   Michael, if you can.

Artunduaga - cross

1  BY MR. JEPSON:

2  Q.  And it started with Dr. Song acknowledging that this was a

3  difficult meeting to have, correct?  That's what happened?

4  A.  Yes.

5  Q.  And it was -- he indicates that there were issues that

6  were seen by various evaluators during the course so far of

7  your rotations, correct?

8  A.  Yes.

9         MR. JEPSON:  Let's go down to the next paragraph.

10  BY MR. JEPSON:

11  Q.  And it indicates -- it recognizes that Dr. Lusardi was not

12  necessarily the strongest co-intern to have, correct?

13  A.  Yes.

14  Q.  But it also goes on to say at the second sentence,

15  throughout the entire course of the month, Dr. Artunduaga

16  failed to communicate properly and failed to efficiently

17  organize a system of rounding and patient follow-up.

18         It then states:  Several near misses were found, one

19  in particular as it pertained to maintenance fluid, another as

20  it pertained to drain management, where Dr. Artunduaga failed

21  to recognize her errors despite being told multiple times to

22  follow up?

23         So, that was related to you by Dr. Song, correct?

24  A.  Yes.

25  Q.  And it says:  These are thematically consistent with the

Artunduaga - cross

1    evaluations Dr. Artunduaga received in the months of July,

2    August and September where it was seen that she frequently

3    appeared disorganized, unsure of her knowledge and at times

4    had an unsuccessful doctor-patient relationship.

5            That also was raised with you in the meeting, too,

6    correct?

7    A.   Yes.

8    Q.   And another set of reviewers, it goes on to say, state

9    that she is often frazzled when presenting patient issues, and

10   it was very difficult to keep her organized and goal-oriented.

11           And that's a quote from one of the evaluations,

12   correct?

13   A.   Yes.

14   Q.   And that also was discussed, correct?

15   A.   Yes.

16   Q.   And, then, going to the next paragraph, Dr. Song mentions

17   in the first sentence about the PICC line, correct?

18   A.   Yes.

19   Q.   And then says:  This was not fully realized by Dr.

20   Artunduaga.  But, once again, while on our service, she failed

21   to realize an issue of severe vaginal bleeding and tachycardia

22   and did not appropriately notify senior residents.

23           He raised this with you, too, correct?

24   A.   Yes.

25   Q.   And he also raised yet another issue where a patient had

Artunduaga - cross

448

1    supra-ventricular tachycardia and cardiology was consulted and

2    she failed to follow up.

3            Do you see that?

4    A.  Yes.

5    Q.  And that also was raised by Dr. Song with you, correct?

6    A.  Yes.

7    Q.  And, then, it goes on:  The list continues with multiple

8    sets of tests and labs that were incorrectly or not ordered.

9    This is not just focusing on specific incidents.  And I

10   relayed to Dr. Artunduaga that if these incidents were

11   isolated or if they were thematically different, we would have

12   had a much different conversation of remediation.

13           Do you see that?

14   A.  Yes.

15   Q.  And he said that to you, correct?

16   A.  Yes.

17   Q.  (Reading):  With all of these issues being --

18           MR. JEPSON:  And let's go to the next page, Michael.

19   BY MR. JEPSON:

20   Q.  -- thematically universal when it came to her performance

21   or lack thereof, it was quite clear to all of the reviewers

22   that surgery, and in particular plastic surgery, just would

23   not be the best fit for Dr. Artunduaga.

24           Correct?

25   A.  Yes.

Artunduaga - cross

1   Q.  He told you that, too, correct?

2   A.  Yes.

3   Q.  And, then, it goes on to say:  Regrettably, this is

4   painful for all of us to discover, and we have assured Dr.

5   Artunduaga that we would like to move forward in every way

6   possible to support her transition into another specialty or

7   another program.

8           Dr. Song said that to you, correct?

9   A.  Yes.

10  Q.  And they -- you talked about probation.  He indicated that

11  he didn't think you'd successfully complete it, correct?

12  A.  Yes.

13  Q.  And that it would lead to a negative mark on your record,

14  correct?

15  A.  Yes.

16  Q.  And he gave you 24 hours to decide, correct?

17  A.  Yes.

18  Q.  You didn't ask for any additional time, did you?

19  A.  No.

20  Q.  And, indeed, I think you said yesterday that you told Dr.

21  Song as you were leaving the office that you were going to

22  take the probation?

23  A.  Exactly.

24  Q.  Okay.

25          And, then:  The meeting ended with Dr. Artunduaga

Artunduaga - cross

1    stating that she recognized and understood these issues, yet

2    being adamant that she has improved.

3         It then says:  This is further reiterated to us that

4    she feels that she has improved.  However, no one else in the

5    entire section across the department has recognized that fact.

6    Once again, this was confirmatory.

7         So, in essence, the meeting ended on that note,

8    correct?

9    A.  Yes.

10   Q.  And you did not sign this, but others did, correct?

11   A.  Yes.

12   Q.  All right.

13        Now, there's no reference --

14        MR. JEPSON:  Strike that.

15   BY MR. JEPSON:

16   Q.  Now, after you had this meeting with Dr. Song, you

17   communicated with others, I think you testified yesterday,

18   correct?

19   A.  Yes.

20   Q.  And, indeed, you mentioned that you had a meeting with

21   Trang Nyugen, Justine Lee and Sara Dickie in which they all

22   advised you to move on.  I think the word you used was

23   "elegantly," correct?

24   A.  Leave ele- -- leave elegantly.

25   Q.  Leave elegantly.  Okay.

Artunduaga - cross

1          And, then -- but you decided to take probation,

2     right?

3     A.  Yes.

4     Q.  And there were various tweets about the events, correct?

5     Not tweets, but texts?

6     A.  Yes, texts, I think.

7     Q.  Let's take a look, if we would, again, at Defendant's

8     Exhibit 38, which I believe has already been admitted.

9          THE COURT:  It has.

10    BY MR. JEPSON:

11    Q.  And on November 2nd, you tweeted -- or texted to

12    Dr. Nyugen that you had a stressful meeting with Dr. Song; he

13    said there's nothing good to highlight about my performance;

14    and, you asked her -- you told her that you felt there was --

15    might be something -- some improvement and that if she had

16    anything positive, you asked her to communicate with Dr. Song,

17    correct?

18    A.  Yes.

19    Q.  And you also texted something similar to Sara Dickie

20    below, correct?  It would be on November 2nd.  Looks like the

21    exact same text?

22    A.  Can't see it, but --

23    Q.  It's on the second page, November 2nd.  I'm sorry.  I'm

24    asking you to look at something that's not in front of you.

25    A.  Uh-huh.

Artunduaga - cross

452

1  Q.  Don't have --

2  A.  Yes.

3  Q.  Got it.  All right.

4          And, then, Essie Kueberuwa, you texted her, as well,

5  correct?  At the top, November 2nd:  Song is putting me on

6  probation or I should start looking for another place,

7  correct?

8  A.  Yes.

9  Q.  And Dr. Kueberuwa was a second-year in your program,

10  correct?

11  A.  Yes.

12  Q.  And you then also texted Brian Bello on the next page:

13  Song is putting me on probation.  Don't know what to do.

14          Do you see that?

15  A.  Yes.

16  Q.  And you also let -- it says Yonni Banks.  You let him know

17  the same thing, correct, at the bottom?

18  A.  Yes.

19  Q.  And he was fourth year at that time in your section or

20  your residency program?

21  A.  Yes.

22  Q.  And you also let Deanna Shenaq know and Dan Butz and

23  others, correct?

24  A.  Yes.

25  Q.  All right.

Artunduaga - cross

1          Now, let's look at the text to Deanna.  You sent her

2    a text Wednesday, November 2nd, which says:  Sara, Justine and

3    Trang said I'm not at the level of a plastics resident.  If I

4    knew that there was going to be such a low threshold, I'd

5    never rank them that high.

6          You're aware, though, that your chiefs and seniors

7    felt that, correct, at that time?

8    A.  If the -- yes.

9    Q.  Okay.

10         Now, you also texted Jose Joly about the probation,

11   right?

12   A.  I guess so.

13   Q.  Okay.  You did.

14   A.  Okay.

15   Q.  Same text around November 4th.

16         In addition to texting these individuals and letting

17   them know about your situation, you also -- and I think we

18   looked at these yesterday -- sent e-mails to some attendings

19   letting them know and asking for advice, correct?

20   A.  Yes.

21   Q.  In particular, Joint Exhibit -- let's take a look at Joint

22   Exhibit 24.  And this is the e-mail you were shown yesterday

23   by counsel, and it indicates in the second paragraph:  You

24   stated my monthly evaluations have been far below what plastic

25   surgery residents usually get.  Dr. Song has decided to put me

Artunduaga - cross

1    into probation, which is totally understandable.  I've had

2    difficulties transitioning from my previous position.

3    Although uncomfortable and painful, I understand this is meant

4    to benefit me.

5           So, you sent this to Dr. Kaplan, correct?

6    A.   Yes.

7    Q.   You sent a very similar e-mail to Dr. Jaskowiak, correct?

8    A.   Yes.

9    Q.   And you indicated yesterday that you were trying to be

10   professional with the language you used, correct?

11   A.   Yes.

12   Q.   You didn't have to tell them, did you, that your

13   evaluations were far below what plastic surgery residents

14   normally get.  You didn't have to say that, did you.  You

15   could have just said, I'm on probation, I need to talk?

16   A.   I think I -- it added some context to the e-mail.

17   Q.   I'm asking you the question.  You didn't have to put that

18   into your e-mail, did you?

19   A.   I think I had to put it.

20   Q.   You felt you did?

21   A.   Yes.

22   Q.   Okay.

23          And you believed it to be true, correct?

24   A.   Yes.

25   Q.   Okay.

Artunduaga - cross

1       Now, you indicated that you met with Dr. Kaplan and

2  you met with Dr. Jaskowiak, correct?

3  A.  Yes.

4  Q.  And you told us about that.

5       You also sent an e-mail to Dr. Roggin, didn't you?

6  A.  Yes.

7  Q.  Let's take a look at Defendant's Exhibit 58.

8       MR. JEPSON:  This is not admitted.

9       THE COURT:  Is there any objection to its admission?

10      MS. HYNDMAN:  Can we see it again?

11      No.  No objection.

12      THE COURT:  I will admit 58.

13   (Defendant's Exhibit No. 58 received in evidence.)

14  BY MR. JEPSON:

15  Q.  And you sent this to Dr. Roggin, who at the time had just

16  taken over as the chief of the general surgery residency

17  program, correct?

18  A.  Yes.

19  Q.  And, indeed, you had attended a retreat the previous

20  day -- or the previous week in which there was discussion

21  about evaluations and other things, correct?

22  A.  Yes.

23  Q.  And you sent him this e-mail and you included the same

24  language in the second paragraph that you included in the

25  e-mails to Dr. Kaplan and Dr. Jaskowiak, correct?

Artunduaga - cross

1   A.  Yes.

2   Q.  And you met with him, correct?

3   A.  Yes.

4   Q.  And he ended up -- he did a summary of the meeting he had

5   with you at some point that you saw, correct?

6   A.  Yes.  Well, in May.

7   Q.  E-mail.  That's what I meant.  In writing -- he put

8   something in writing about the meeting he had, correct, with

9   you?

10  A.  The question is if I ever --

11  Q.  No, let me rephrase it.  If you're having trouble, it's my

12  job to get you a clear question.

13  A.  Thank you.

14  Q.  You met with Dr. Roggin, correct?

15  A.  Yes, uh-huh.

16  Q.  And at some point in time, you saw a summary of that

17  meeting that he had prepared, correct?

18  A.  In May, during my grievance, yes.

19  Q.  Yes.  I'm not asking you when, but you saw that, correct?

20  A.  Yes.

21  Q.  All right.

22          And you felt that that was generally a pretty

23  accurate representation, correct?

24  A.  Do you have it?

25  Q.  I do have it.  And I'll show it to you in a second.  Let

Artunduaga - cross

457

```
 1   me dig it out.  It is dated March 29th.  It is, I believe, No.

 2   130- -- no, it's not.  1- --

 3             MS. HALL:  1-3-3.

 4             MR. JEPSON:  Which one?

 5             MS. HALL:  33.

 6             MR. JEPSON:  133.  Sorry.

 7   BY MR. JEPSON:

 8   Q.  There's a cover e-mail here, which you wouldn't have seen;

 9   but, the attachment is what I would like you to look at.  It

10   says, Maria Artunduaga Note.

11             Do you see that?

12   A.  Yes.

13   Q.  And you had seen this in connection with the grievance,

14   correct?

15   A.  Yes.

16   Q.  And you felt that this was generally an accurate summary

17   of the meeting?

18      (Brief pause.)

19   BY THE WITNESS:

20   A.  Yes, I, uh-huh, agree.

21   BY MR. JEPSON:

22   Q.  Okay.

23             And you told Dr. Roggin that you had had some

24   difficulties in the rotations, correct?

25   A.  Yes.
```

Artunduaga - cross

1    Q.  And you also told him that you felt that at least some of

2    the things that had happened in plastic surgery were not your

3    fault, correct?

4    A.  I didn't make those mistakes.  That's what I thought.

5    Q.  Well, you told him that, correct?

6    A.  Yes.

7    Q.  Okay.

8            And he suggested to you that you write something to

9    Dr. Song?

10   A.  Yes.

11   Q.  Okay.

12           And you did that, correct?

13   A.  Yes, I did.

14   Q.  But you did it after the probation letter came out,

15   correct?

16   A.  Yes.  It took time to prepare.

17   Q.  And let's take a look, if we would, at --

18           MR. JEPSON:  Strike that.

19   BY MR. JEPSON:

20   Q.  One other thing I want to ask you about -- I apologize --

21   in Exhibit 133, second page.

22           So, you told Dr. Roggin that you believed --

23           MS. HYNDMAN:  Your Honor, to the extent he's using

24   this -- it's not been admitted, and I actually object to the

25   admission of this document.

Artunduaga - cross

1              MR. JEPSON:  Well, I'm not going to ask to have it

2      admitted.  I'm just going to ask him if --

3              THE COURT:  Okay.  Do not read from it.  I think that

4      is the objection.

5      BY MR. JEPSON:

6      Q.  You told --

7              MS. HYNDMAN:  That's the objection.

8      BY MR. JEPSON:

9      Q.  You told Dr. Roggin that you felt you were an excellent

10     resident at the University of Chicago Medical Center, correct?

11     A.  That I had the potential to become an excellent resident.

12     Q.  Well, you told him you felt you were already, correct?

13     A.  Well, that's what he wrote, but what I meant -- what I

14     said was --

15     Q.  Okay.  So --

16     A.  -- that I had potential.

17     Q.  -- something different.

18             You did finally get a probation letter on November

19     15, 2011, correct?

20     A.  Yes.

21     Q.  And we saw that yesterday, correct?

22     A.  Yes.

23     Q.  And you indicated that there was a meeting that was held

24     with Akilah Williams, Dr. Song and yourself in which the

25     probation letter was discussed, right?

Artunduaga - cross

460

1    A.  On the 15, yes.

2    Q.  And that letter spelled out --

3            MR. JEPSON:  If we could pull that letter up, please.

4            THE COURT:  Let me know when --

5            MR. JEPSON:  Joint Exhibit 26.

6            THE COURT:  Let me know when you are at a good point

7    to break, too.

8            MR. JEPSON:  Let's do it now.

9            THE COURT:  Okay.  Let's do it now.

10           We will have our morning break.

11           MR. JEPSON:  I have a sore throat.

12           THE WITNESS:  Ten minutes?

13       (Jury out.)

14           THE COURT:  We will pick up at ten after.

15       (Brief recess.)

16       (Jury enters.)

17           THE COURT:  You may be seated.

18           You may continue, Mr. Jepson.

19           MR. JEPSON:  Thank you, Judge.

20           Let's go to Joint Exhibit 26, Michael, please.

21   BY MR. JEPSON:

22   Q.  And there was discussion about this yesterday,

23   Dr. Artunduaga.  This was the probation letter you received on

24   November 15th, correct?

25   A.  Yes.

Artunduaga - cross

1    Q.  And at the top part of it, it indicated the various areas

2    in which the section believed you needed to work and improve,

3    correct?

4    A.  Yes.

5    Q.  And you understood that the following conditions at the

6    bottom that are listed, that they must be met for you to

7    continue in the program, correct?

8    A.  Yes.

9    Q.  And those -- those conditions included establishing and

10   maintaining your workload, right?

11   A.  Yes.

12   Q.  Establishing successful doctor-patient relationships?

13   A.  Yes.

14   Q.  Following technical instructions in the operating room?

15   A.  Yes.

16   Q.  Improving organizational skills?

17   A.  Yes.

18   Q.  Understanding what should be prioritized?

19   A.  Yes.

20   Q.  Effectively communicating?

21   A.  Yes.

22   Q.  Appropriate clinical decision making, correct?

23   A.  Yes.

24   Q.  Accepting responsibility?

25   A.  Yes.

Artunduaga - cross

1    Q.   Timely placing consult notes?

2    A.   Yes.

3    Q.   And understanding the plan and your role in it, correct?

4    A.   Yes.

5    Q.   And you were told at this meeting that you had to either

6    meet or exceed the expectations on each one of these items in

7    order to remain in the program, correct?

8    A.   Meet the expectations?

9    Q.   To meet them all, correct?

10   A.   Yes.

11   Q.   And we also discussed yesterday that as a result of this

12   letter you were notified that Dr. Park would engage in

13   mentoring with you, correct?

14   A.   Yes.

15   Q.   And originally this probation was set for a 90-day period,

16   which would have been through February 28th, but you requested

17   and Dr. Song extended it so you could have your wedding in

18   December, correct?

19   A.   Yes.

20   Q.   And you signed this letter on or about November 15, 2011,

21   correct?

22   A.   I guess.  Yes.

23   Q.   Well, okay.  And you were also notified both in this

24   meeting and the earlier meeting that you had on November 2nd

25   about the grievance procedure that was available if you so

Artunduaga - cross

1    choose -- chose to challenge your probation, the probation

2    decision, correct?

3    A.  In this meeting, yes.

4    Q.  Yes.  Well, and you were also told about it on November

5    2nd too, correct?

6    A.  That I was told about it?

7    Q.  Yes.

8    A.  Perhaps.

9    Q.  Okay.  And you decided not to file a grievance with

10   respect to the probation decision, correct?  Well, you didn't

11   file one, correct?

12   A.  No.

13   Q.  Okay.  You did, however, submit a response or a letter,

14   correct?

15          MR. JEPSON:  And, indeed, let's go to Joint Exhibit

16   27.

17   BY MR. JEPSON:

18   Q.  I think you testified yesterday that this was the letter

19   that you sent to Dr. Song in response to what was happening,

20   correct?

21   A.  Yes, sir.

22   Q.  And the letter is seven pages long, and you deal with some

23   of the specific issues that were cited in the probation

24   meeting and the probation evaluation summary, correct?

25   A.  Yes.

Artunduaga - cross

1   Q.  And in particular, let's take a look at No. 1 on the

2   second page.  It says here -- and this is the several near

3   misses and refers to a patient that was hypotensive overnight

4   and there was an issue about transfusion, correct?

5   A.  Yes.

6   Q.  And it says here on the -- beginning on the fifth line

7   down that Dr. Sara Dickie was notified about my patient's

8   vital -- about my patient's vital signs during walking rounds,

9   and she discussed the plan with Dr. Daniel Butz and later said

10  she was going to be out for a job interview and that I should

11  therefore report to Dr. Butz throughout the day, correct?

12  A.  Yes.

13  Q.  And that's -- and you referred to it as your patient,

14  correct, my patient?

15  A.  All of them were my patients.

16  Q.  I understand.  But you understood you had a responsibility

17  for that patient, correct?

18  A.  Of course.

19  Q.  And further down, about where it says at 1:15 p.m., I was

20  asked by PA Elizabeth Carlisle to cover Dr. Julie Park's

21  emergent case, and Dr. JL, my co-intern on the service during

22  the month, agreed to follow up on my patient's progress,

23  correct?

24  A.  Yes.

25  Q.  So you and he discussed it, and you, in essence, delegated

Artunduaga - cross

1    it to him or asked him to do it, correct?

2    A.  Yes.

3    Q.  And later in this paragraph, it says, In hindsight, I

4    think the confusion started when Dr. Butz and myself went to

5    cover OR cases and the floor was left in the hands of Dr. JL

6    who unfortunately did not have much experience.

7            You see that?

8    A.  With the logistics of the service.

9    Q.  Yeah.  I mean, it goes on.  But, in essence, you believe

10   the problem stemmed from Dr. JL's inexperience, correct?

11   A.  With the logistics of the service.

12   Q.  Okay.  And going on --

13   A.  And it's -- sorry.

14   Q.  No. 2, several times near misses were found in particular.

15   And we're referring here to the Dr. Lawler issue, correct?

16   A.  Yes.

17   Q.  And here you, in essence, state that I do not know the

18   details of the conversation, and I don't know why this was

19   mentioned, correct?  Once again do not understand why this was

20   quoted in your letter as the drainage would have needed suture

21   were not the same ones Dr. Lawler quoted in her consult note,

22   correct?

23   A.  Two seconds.

24   Q.  At the bottom of that paragraph Michael highlighted.

25   A.  Yes, okay.

Artunduaga - cross

1    Q.  Okay.  So, again, in your view, this wasn't your fault,

2    correct?

3    A.  That there was some sort of miscommunication.

4    Q.  Okay.  And the next one, this is the No. 3,

5    supraventricular tachycardia, cardiology, gynecology consult,

6    vaginal bleeding and tachycardia on blank's case.

7         That is a mouthful, but that is the title on No. 3,

8    correct?

9    A.  Yes.

10   Q.  And let's go midway down where it says, I assessed the

11   patient who was slightly lightheaded and gave her a bolus of

12   500c NS, and I advised Dr. JL to monitor her closely while I

13   was seeing two consults and making a thumb spica, correct?

14   A.  Yes.

15   Q.  So you went to do something else and then you found out

16   later that he didn't follow up, rather decided to spend an

17   hour seeing a consult for a toe blister, correct?

18   A.  Yes.

19   Q.  So, again, in your view, part of the problem here was

20   Dr. Lusardi not following up on your patient, correct, or the

21   patient on the service, correct?

22   A.  I was trying to explain the events.

23   Q.  Okay.  And then you go on, and you do say towards the

24   bottom, I also failed to notify Dr. Nyugen about her

25   tachycardia despite my attempts for reanimating her.

Artunduaga - cross

1          So you do admit that you should have notified

2     Dr. Nyugen, correct?

3     A.  Yes.

4     Q.  All right.  Then we move on to the next page.  No. 4,

5     accidentally sent a patient home with a PIC line which was

6     supposed to come out before discharge after multiple times of

7     prompting.  And your response was, on September 5, 2011, I was

8     told exactly twice by my senior resident, Dr. Bello, that

9     blank's PICC line needed to be removed prior to discharge.

10    During the morning rounds on September 6, 2011, my patient

11    said her daughter would come to pick her up at 7:00 p.m.

12    before I planned -- therefore, I planned to remove the PICC

13    line at 6:00 p.m.  And she got sent home earlier, correct?

14    A.  Yes.

15    Q.  Now, Dr. Mulliken advised you what was the rule for an

16    intern?  Do it now.  Why didn't you do it earlier in the day?

17    A.  Because the patient had difficulties getting an IV line.

18    So most of her medications were given through her PICC line.

19    Q.  Did you check on her at 3:00 or 4:00 or some other time to

20    see if she might go home early?

21    A.  I was checking her progress on the computer.

22    Q.  Okay.  So how did she end up getting discharged without

23    the PICC line being removed?

24    A.  ICU patients were managed by a different team on a

25    different general surgery resident.

Artunduaga - cross

468

1  Q.  Oh, I understand that, but you were supposed to have the

2  PICC line removed before she went home, and you just indicated

3  you were monitoring it.  So, I mean, you knew it was

4  irresponsibility, correct?

5  A.  Yes.

6  Q.  Okay.  And it didn't happen, correct?  It didn't get

7  removed?

8  A.  Yes.

9  Q.  And let's go on to page 5, please, and in particular the

10 paragraph regarding doctor/patient relationships.  And I'm

11 just curious.  Fourth line down says, My time in Chicago has

12 been very challenging.  Many of the patients in the hospital

13 have a strong accent that I was not used to.  Some others have

14 expressed their surprise that a Hispanic physician is taking

15 care of them.

16        What accent did you have trouble getting used to?

17 A.  Strong accents.  African-American accents especially.

18 Q.  Okay.  Now, you also indicate in this letter on page 7

19 towards the end that rotation again on the B service.  That's

20 the Kaplan service, right, the second bullet point?  Rotation

21 on the B service which will serve as a solid comparison point

22 for assessing my improvement.

23        Do you see that?

24 A.  Yes.

25 Q.  So you mention that at the conclusion of this letter,

Artunduaga - cross

469

1   correct?

2   A.  Yes.

3   Q.  And you asked Dr. Song to extend the period of time which

4   we've already said was granted so you could take December off,

5   correct?

6   A.  Yes.

7   Q.  All right.  And Dr. Song then sent you a note, which is

8   Joint Exhibit 28, notifying you of the extension and that the

9   probation would be accepted until -- extended until March 23,

10  right?

11  A.  Yes, sir.

12  Q.  All right.  Now, you did go to Colombia in December for a

13  church wedding, correct?

14  A.  Yes.

15  Q.  And but you had actually gotten married in June of 2011,

16  correct?

17  A.  Yes.

18  Q.  And that was in the U.S.?

19  A.  Yes.

20  Q.  And you took a six-month -- or six-week honeymoon at that

21  time, correct?

22  A.  Yes.

23  Q.  Went to Spain and Italy and Greece and somewhere else I

24  can't remember, correct?

25  A.  Where did you find that?

Artunduaga - cross

470

1    Q.  In your deposition.

2    A.  Okay.

3    Q.  Is that correct?

4    A.  Yes.

5    Q.  Okay.  So before you came to your residency program, that

6    happened, right?  Yes?

7    A.  Yes.

8    Q.  And then you had the church wedding with your family and

9    friends in Colombia, correct?

10   A.  Yes.

11   Q.  All right.  And, indeed, you wrote something in February

12   while you were still on probation asking whether some

13   publication would print your photographs or talk about your

14   wedding.  Do you remember that?

15   A.  No.

16   Q.  All right.  Let me just quickly show you this.  I say

17   quickly.  Take a look at December -- I'm sorry -- Defendant's

18   Exhibit 106.

19           MR. JEPSON:  And it has not been admitted.

20   BY MR. JEPSON:

21   Q.  All right.  This appears to be an e-mail that you prepared

22   in February 2012.  Am I right?

23   A.  I sent it on the 13th.

24   Q.  Okay.  February 13, 2012, and you prepared this describing

25   your wedding and the events?

Artunduaga - cross

1    A.  Yes.

2    Q.  It sounds like it was wonderful.

3    A.  Sorry?

4    Q.  It sounds like it was wonderful.

5    A.  Yes, of course.  It's a wedding.

6    Q.  And you planned it out and everything.  You basically did

7    most of the work, right, in planning it?

8    A.  No, I had a wedding planner in Colombia and my mom.

9    Q.  Got it.

10        Okay.  Let's go back to the month of November.  That

11   month you were on the thoracic section or rotation, correct?

12   A.  Yes, sir.

13   Q.  And you testified yesterday that the attending physicians

14   on that rotation were Dr. Ferguson and Vigneswaran?

15   A.  Yes.

16   Q.  And you testified I believe that you sat down with

17   Dr. Ferguson midway through the rotation to talk about your

18   performance, correct?

19   A.  Yes.

20   Q.  And he told you or suggested to you that it might be

21   better if you transition from a surgical residency to another

22   kind of residency, correct?

23   A.  Yes.

24   Q.  And he submitted an evaluation of you.  Am I right?

25   A.  Yes.

Artunduaga - cross

472

1   Q.  And I believe that's Joint Exhibit 20.  And this is the

2   evaluation that you received, correct?

3   A.  Yes.

4   Q.  And this is one that was discussed with your mentor,

5   Dr. Park, as well, correct?

6   A.  Yes.

7   Q.  And with respect to knowledge base, Dr. Ferguson states

8   could improve, correct, and that's your basic science and

9   clinical?

10  A.  Yes.

11  Q.  And then the next item, operative knowledge, anatomy,

12  procedures, you were rated deficient, correct?

13  A.  Yes.

14  Q.  And then he rated you could improve in pre-op care,

15  correct?

16  A.  Yes.

17  Q.  And could improve in post-op care?

18  A.  Yes.

19  Q.  And deficient in the next item, which is ability to

20  communicate and justify your medical decisions, correct?

21  A.  Yes.

22  Q.  And below he rated you could improve in preparedness as

23  well?

24  A.  Yes.

25  Q.  And then on the next page, he rated you as could improve

Artunduaga - cross

473

1   as to your communications with other healthcare professionals?

2   A.  Yes.

3   Q.  And rated you as could improve with the practice outcomes,

4   correct?

5   A.  Yes.

6   Q.  And could improve on practice costs as well.  But more

7   importantly, let's look at the overall comments.

8           Maria came to our service clearly unprepared for the

9   duties required of an intern.  She is enthusiastic and works

10  hard but is insufficiently experienced to be able to

11  participate at a meaningful level.  My concern is that she

12  does not have aptitude for the work she has chosen.  Very

13  little improvement was evident during our month.  Her

14  knowledge and skill levels are below -- well below those of

15  her peers.

16          So you received and reviewed this application -- this

17  evaluation, correct?

18  A.  Yes.

19  Q.  Take a look, if you would, at Joint Exhibit 21.  Now,

20  there were only surgeons on this thoracic portion of the

21  cardiothoracic section correct?

22  A.  Yes.

23  Q.  And Dr. Vigneswaran was the other one in addition to

24  Ferguson, correct?

25  A.  Yes.

Artunduaga - cross

474

1   Q.  And I think you indicated that Dr. Ferguson went on a

2   vacation for a period of time in November, correct?

3   A.  Yes.

4   Q.  And so Dr. Vigneswaran would have been the only one there

5   at that time, correct?

6   A.  Yes.

7   Q.  And he rated you deficient as to knowledge base, correct?

8   A.  Yes.

9   Q.  And he rated you deficient as to operative knowledge,

10  anatomy and procedures, correct?

11  A.  Yes.

12  Q.  And he rated you could improve in pre-op care, post-op

13  care, ability to communicate and justify medical decisions,

14  right?

15  A.  Yes.

16  Q.  And he also rated you a could improve in preparedness,

17  right?

18  A.  Yes.

19  Q.  And also advanced OR skills, he gave you a deficient,

20  correct?

21  A.  Yes.

22  Q.  And then on the next page, he rated you could improve as

23  to your communications with patients and families, right?

24  A.  Yes.

25  Q.  And he then rated you as deficient in your teaching other

Artunduaga - cross

475

1   residents or students, correct?

2   A.  Yes.

3   Q.  And let's go down.  He rated you deficient in the ability

4   to lead or manage a service, correct?

5   A.  Yes.

6   Q.  And finally, he gave you could improves at the end,

7   correct?

8   A.  Yes.

9   Q.  And you would have seen this evaluation, and also it would

10  have been the subject of discussions with Dr. Park in

11  mentoring sessions?

12  A.  Yes.

13  Q.  Now, you've already testified about the mentoring that

14  Dr. Park did.  There were 11 sessions.  She met with you, and

15  I recall you testifying yesterday that you were appreciative

16  of her efforts, correct?

17  A.  Yes.

18  Q.  And in addition to actually meeting with you and

19  discussing your evaluations and progress, Dr. Park put

20  together a feedback evaluation to be used during the course of

21  your probation, correct?

22  A.  Yes.

23  Q.  And it was your understanding, wasn't it, that that

24  feedback evaluation was to go to residents, fellows and

25  physician extenders, nurse practitioners and the like, so that

Artunduaga - cross

476

1   you and Dr. Park could be made aware of issues as they came up

2   during the rotation, correct?

3   A.  Yes.

4   Q.  So that they could be dealt with as they came up rather

5   than wait until the end of the rotation when nothing could be

6   done, correct?

7   A.  Yes.

8   Q.  And I think you indicated that -- strike that.

9           With respect to thoracic rotation, you indicated

10  yesterday that your other -- or the senior resident on that

11  service was Carla Moreira?

12  A.  Yes.

13  Q.  And you indicated I believe that you felt that Carla

14  Moreira had some preconceptions about your performance and

15  thus limited the experience you had on thoracic, correct?

16  A.  Yes.

17  Q.  And indeed -- but before -- before the service began,

18  Carla Moreira sought you out to discuss the service and how

19  you would handle it, correct?

20  A.  Yes.

21  Q.  And, indeed, you and she met.  She came down from

22  Hyde Park where she lived to your home to meet on the Sunday

23  before the service started, correct?

24  A.  She came from North Shore, but yes.

25  Q.  I saw Hyde Park.  That's all.

Artunduaga - cross

1    A.   Okay.

2    Q.   North Shore?

3    A.   Yes.

4    Q.   I guess it's kind of an in-between, isn't it?

5    A.   Sure.

6    Q.   Okay.  So she came to your house, and you met and

7    discussed the service and how you would approach it, correct?

8    A.   Yes.

9    Q.   Because that service has a reputation of being difficult,

10   correct?

11   A.   Yes.

12   Q.   And let's take a quick look at Defendant's Exhibit 46.

13            MS. HYNDMAN:  Which number is this, Ed?

14            MR. JEPSON:  46.

15            THE COURT:  Is there any objection to its admission?

16   It doesn't look like on the --

17            MS. HYNDMAN:  Excuse me.  Then, yeah, no objection.

18            THE COURT:  I will admit Defendant's Exhibit 46.

19            MR. JEPSON:  Thank you, Your Honor.

20       (Defendant's Exhibit No. 46 was received in evidence.)

21   BY MR. JEPSON:

22   Q.   This appears to be an e-mail string between Dr. Moreira

23   and yourself.  Am I right?

24   A.   Yes.

25   Q.   And the bottom e-mail is Dr. Moreira reaching out to you

Artunduaga - cross

1   to discuss the service, correct?

2   A.  Yes.

3   Q.  And, indeed, she indicates that she wants to meet with you

4   to go over a few things before it begins, correct?

5   A.  Yes.

6   Q.  And that happened at your -- at your home, correct?

7   A.  Yes.

8   Q.  And did you and Dr. Artunduaga -- I'm sorry -- did you and

9   Dr. Moreira work well together on thoracic did you feel?

10  A.  She was very helpful.

11  Q.  Okay.  And, indeed, you appreciated things she was doing

12  with you, correct?

13  A.  Yes.

14          MR. JEPSON:  Let's take a look at Defendant's

15  Exhibit 38 which has been admitted.  And look at the second

16  page, Michael, please, or go to that second page.

17  BY MR. JEPSON:

18  Q.  There is an entry there for Carla Moreira.  These would

19  have been texts between you and Dr. Moreira, correct,

20  Dr. Artunduaga?

21  A.  Yes.

22  Q.  Okay.  And, indeed, you sent her a text on November 8th

23  stating, Okay.  Will think about it.  Thanks for caring about

24  my progress.  I really, really appreciate it.

25          Do you see that?

Artunduaga - cross

479

1   A.  Yes.

2   Q.  And, indeed, she sent an e-mail back -- or a text back

3   saying, This is your opportunity to prove to yourself that

4   this is what you really want to do.  Only you can do it?

5   A.  Yes.

6   Q.  And you said, You're right.  This is my challenge.

7   Tomorrow will be different, I promise, correct?

8   A.  Yes.

9   Q.  All right.

10          MR. JEPSON:  And I want to go to another exhibit that

11  hasn't been admitted, Defendant's Exhibit 34.

12  BY MR. JEPSON:

13  Q.  These are texts I believe from a different phone of yours,

14  Dr. Artunduaga?  I'm not sure.  It overlaps.  But these are

15  texts between you and a number of individuals, mostly at UCMC,

16  correct?

17  A.  Yes.

18          MR. JEPSON:  And I want to move this into admission.

19          THE COURT:  Any objection?

20          MS. HYNDMAN:  No objection.

21          THE COURT:  It's admitted.

22      (Defendant's Exhibit No. 34 was received in evidence.)

23  BY MR. JEPSON:

24  Q.  And in particular -- and the reason I'm showing you this

25  and directing you to it is that it has a little broader range

Artunduaga - cross

 1  of time.

 2  A.  Uh-huh.

 3  Q.  And, indeed, you and Dr. Moreira texted back and forth

 4  about meeting before the service began, correct?

 5  A.  Yes.

 6  Q.  And then going a little bit lower or down, Dr. Moreira

 7  invited you to her home for dinner, correct?  Do you remember

 8  that?

 9          MR. JEPSON:  Page 1318, Michael.

10          THE WITNESS:  Where exact time are you --

11  BY MR. JEPSON:

12  Q.  It's at the top.

13  A.  I'm sorry.

14  Q.  And it says received November 24th, Hi, Maria.  My address

15  is 935 East Hyde Park Boulevard, Apartment 1.  Looking forward

16  to having you guys over.

17  A.  Yes, that was for Thanksgiving dinner.

18  Q.  Okay.  And did you have Thanksgiving at her house?

19  A.  Yes.

20  Q.  And Hyde Park Boulevard is in Hyde Park, isn't it?

21  A.  Yes.

22  Q.  All right.  So not the North Shore?

23  A.  No.

24  Q.  Okay.  Now, there were in November the beginning of the

25  receipt of some of these feedback evaluations from the

Artunduaga - cross

481

1    physician extenders, correct?

2    A.  Yes, sir.

3    Q.  And I want to direct your attention to --

4            MR. JEPSON:  Let's go to Exhibit 31.

5            THE COURT:  Defendant's 31?

6            MR. JEPSON:  I'm sorry.  Joint Exhibit 31.

7            THE COURT:  Okay.

8            MR. JEPSON:  Sorry, Judge.

9    BY MR. JEPSON:

10   Q.  This appears to be a feedback evaluation from Kristy Todd,

11   correct?

12   A.  Yes.

13   Q.  And Kristy Todd was a nurse practitioner on thoracic.  Am

14   I right?

15   A.  Yes.

16   Q.  And this is the format which is different than the

17   attending evaluation format, correct?

18   A.  Yes.

19   Q.  And you understood that these were for feedback and the

20   attendings were what counted, so to speak, with respect to

21   your progress, correct?

22   A.  Yes.

23   Q.  And Ms. Todd rated you as could improves, correct, all the

24   way on the first page?

25   A.  Yes.

Artunduaga - cross

1   Q.  And in her overall comments, Ms. Todd says, Maria has good

2   intentions.  However, I believe she lacks a solid foundation

3   of medical knowledge, thereby inhibiting her progress during

4   her surgery rotations.  She definitely needs to improve her

5   communication and organizational skills.  From what I've

6   observed in the operating room, it's been difficult for her to

7   understand, grasp and perform basic concepts/skills as

8   explained by the attending surgeons.

9          So you would have received this sometime in November

10  and discussed it with Dr. Park, correct?

11  A.  Yes.

12          MR. JEPSON:  And let's move on to Joint Exhibit 32,

13  please.

14  BY MR. JEPSON:

15  Q.  And this is one that Dr. Moreira filled out for you,

16  correct?

17  A.  Yes.

18  Q.  And if we go to the second page, her overall comments are,

19  Maria is smart, energetic and a hard worker.  She

20  unfortunately started out behind her peers in terms of

21  clinical knowledge and skills and remains behind at this time.

22          Is that right?

23  A.  Yes.

24  Q.  And you would have received this also sometime in November

25  and discussed it with your mentor, correct?

Artunduaga - cross

483

1   A.  Yes.

2   Q.  And then we go on to Amy Durkin, which is Joint Exhibit

3   33.  She's another nurse practitioner, correct?

4   A.  Yes.

5   Q.  And her overall comments, Maria needs to work on her

6   organizational skills as well as ability to prioritize and

7   communicate effectively with the team.  I do think she is

8   working very hard to improve her skills.

9          Now, you don't know whether any of these people

10  talked with each other about what their evaluations would be,

11  do you?

12  A.  No, I do not.

13  Q.  You have no reason to believe they did or didn't, correct?

14  A.  I just don't know if they did.

15  Q.  Okay.  And then we have Joint Exhibit 34, which is another

16  feedback evaluation from a nurse practitioner named Nirja

17  Mehta.

18         Do you see that?

19  A.  Yes.

20  Q.  She indicates that -- with respect to No. 1 that you

21  didn't demonstrate the ability to correctly prioritize,

22  correct?

23  A.  Yes.

24  Q.  And she had a comment there that says she appeared to be

25  somewhat scattered and not really organized which reflected on

Artunduaga - cross

484

1  her performance, correct?

2  A.  Yes.

3  Q.  And then No. 3, there was a good -- it was a could

4  improve.  And her comment was, She was unable to multitask and

5  the notes would not be completed until later in the day.

6  Usually the residents are supposed to complete the brief

7  rounding notes before OR.

8          She wrote that, correct?

9  A.  Yes.

10          MR. JEPSON:  And then let's go to the second page,

11  Michael, please.

12  BY MR. JEPSON:

13  Q.  No. 10, there was a could improve, and her comment was,

14  Needed direction and checking as to whether the task was

15  complete or not.

16          Do you see that?

17  A.  Yes.

18  Q.  And Eric Grossman also submitted an evaluation, a feedback

19  one for you, during that month, correct?

20  A.  Yes.

21  Q.  And I think you testified that you and he worked together

22  for one night?

23  A.  Yes.

24          MR. JEPSON:  And that is Joint Exhibit 30, Michael.

25  BY MR. JEPSON:

Artunduaga - cross

1   Q.  And from that one night, it says, I have thought a lot

2   about this evaluation -- this is the overall comment -- during

3   my limited time with Maria.  It was extremely evident that she

4   was working very hard and wanted very much to perform well.

5   We had a sick patient who needed to go to the OR, and Maria

6   was very helpful in facilitating her transport and getting the

7   logistics taken care of.  However, when I got out of the OR,

8   there were multiple items that had not been checked on.  For

9   example, labs were not followed up on and Maria was unsure of

10  when certain labs were ordered.

11          So that's what -- your evaluation from Dr. Grossman,

12  correct?

13  A.  Yes.

14  Q.  Now, when you came back from your vacation and wedding and

15  honeymoon in Colombia, you were on the vascular service in

16  January, right?

17  A.  Yes, sir.

18  Q.  And we talked yesterday that there were five -- I think

19  five physicians on that service?

20  A.  About, yes.

21  Q.  Steppacher, Hall -- help me here -- Blecha, Eton, and one

22  more.  Trust me.

23  A.  Skelly?

24  Q.  What was that?

25  A.  Skelly?

Artunduaga - cross

486

1   Q.  Yeah, Skelly.  I forgot the chief.  Thank you.

2          And there were also -- there was also a fellow named

3   Michael Shao on that service, correct?

4   A.  Yes.  Yes.

5   Q.  I'm sorry.  I didn't hear you.

6          And you had one intern for two weeks and then another

7   intern for two weeks, correct -- or not intern but resident?

8   A.  Mm-hmm.  Yes.

9   Q.  Irma Fleming was on for a couple of weeks?

10  A.  And Jennifer Paruch.

11  Q.  Jennifer Paruch.  And they were both third-year general

12  surgery?

13  A.  Yes, they were.

14  Q.  And you testified that you told them about your probation,

15  correct?

16  A.  Yes.

17  Q.  And let's take a look at Joint Exhibit 55.  In particular,

18  take a look at No. 5.  Jennifer Paruch rated you as very good

19  on gathering and relaying pertinent patient history and exam.

20  Do you see that?

21  A.  Yes.

22  Q.  But then she comments, I need to spend more time observing

23  Maria in her examination and presentation of patient to

24  effectively comment on this, correct?

25  A.  Yes.

Artunduaga - cross

```
 1    Q.  But she rated you very good, correct?
 2    A.  Yes.
 3    Q.  And let's take a look at No. 7.  Communicate effectively
 4    and demonstrate caring and respectful behavior when
 5    interacting with patients and their families.
 6            And then again she comments.  She wrote very good or
 7    filled that in.  I anticipate that Maria is very compassionate
 8    with patients and families, but again, I haven't directly
 9    observed her in many of these interactions?
10            So you would have received that from Jennifer Paruch,
11    correct?
12    A.  Yes.
13    Q.  Okay.  And further on, you and Dr. Paruch spoke about your
14    presentations and your need to improve them, correct?
15    A.  Yes, she mentored me.
16    Q.  Okay.  She was helping you?
17    A.  Yes.
18    Q.  All right.  Now, during the month of January or prior to
19    the month beginning, there had actually been some e-mails back
20    and forth between Dr. Kaplan and Dr. Skelly, correct?
21    A.  I think so.  I don't -- haven't seen them.
22    Q.  Okay.  Well, let me show it to you.
23    A.  Okay.
24    Q.  Bear with me.  It was dated December 22nd, and it's not in
25    evidence.  And it is Defendant's Exhibit 78.
```

Artunduaga - cross

1       This -- there appear to be two e-mails here, an

2  e-mail from you to Dr. Kaplan dated December 22nd, and an

3  e-mail back to you from Dr. Kaplan that same day.  Am I

4  correct?

5  A.  Yes.

6       MR. JEPSON:  I'll move this into evidence, please.

7       THE COURT:  Any objection?

8       MS. HYNDMAN:  No objection to the exhibit.

9       THE COURT:  It's admitted.

10     (Defendant's Exhibit No. 78 was received in evidence.)

11  BY MR. JEPSON:

12  Q.  And your e-mail to Dr. Kaplan says, Dear Dr. Kaplan, I

13  hope you enjoyed the link to the wedding pictures that I sent

14  you last week.  I wanted to remind you to give Dr. Skelly a

15  call to speak to him on my behalf.  I have been doing some

16  reading to prepare ahead of time.  Also I am planning on

17  talking to Irma Fleming, my senior resident, as well as the

18  current vascular fellows to explain to them my situation since

19  the probation encompasses weekly evaluations and opportunities

20  to improve.

21       It goes on to say, I'd really like to succeed and

22  stay in the plastics program at U Chicago.  I have worked hard

23  to get where I am now, and I'm not planning to give it up so

24  easily.  Thank you for your constant mentoring and support.

25       And then he replied to you, correct?

Artunduaga - cross

489

1   A.  Yes.

2   Q.  And he said, Dear Maria, you are the most beautiful bride.

3   Thank you for sending me the wedding pictures.

4          But then he goes on to say, I spoke with Dr. Skelly

5   today.  No one had spoken to him about you, which means in

6   advance of the rotation, correct?  So that meant Dr. Song,

7   Park or anybody else, correct?

8   A.  Yes.

9   Q.  And he is a very fair man who will treat you very fairly.

10  I explained the whole situation to him.  He told me that he

11  will speak with you and tell you all of his expectations.

12         Now, Dr. Skelly was the chief of the vascular section

13  at the time, correct?

14  A.  Yes.

15  Q.  And Dr. Kaplan we've already established was a very, very

16  senior physician at the hospital, correct?

17  A.  Yes.

18  Q.  All right.  And let's go to -- strike that.

19         As part of the month of January on the vascular

20  service, you communicated with attending physicians prior to

21  them submitting their evaluations, correct?

22  A.  Yes.

23  Q.  You sent them e-mails, correct?

24  A.  Yes.

25         MR. JEPSON:  And let's take a look at Defendant's

Artunduaga - cross

1  Exhibit 99 which has not been admitted.

2  BY MR. JEPSON:

3  Q.  And let's -- starting on the second page, this appears to

4  be an e-mail from you to Dr. Steppacher dated February 2nd?

5  A.  Okay.  I'm assuming.

6  Q.  Your name is on the bottom of the first page.

7  A.  Yes.

8  Q.  Okay.  And the middle one is a response from

9  Dr. Steppacher to you, and the top is your response, correct?

10  A.  Yes.

11  Q.  And they're all dated February 2nd.

12         MR. JEPSON:  I would move this into admission.

13         THE COURT:  Any objection?

14         MS. HYNDMAN:  No objection.

15         THE COURT:  It's admitted.

16    (Defendant's Exhibit No. 99 was received in evidence.)

17  BY MR. JEPSON:

18  Q.  And let's go to your e-mail first, the first e-mail, which

19  begins at the top of the second page.

20         It says, Hi, Dr. Steppacher, I wanted to thank you

21  for a wonderful month.  I really enjoyed my time in vascular

22  surgery.  So far it has been the best experience I've had

23  during my internship year.  When the time comes to fill out my

24  evaluation, please do not forget to grade my operative skills.

25  Although I had a few OR opportunities, two toe amps with you

Artunduaga - cross

1    and three more cases with Dr. Eton, it is very important for

2    my PD -- I assume that's program director?

3    A.  Mm-hmm.

4    Q.  To know that I can follow technical instructions and

5    perform at the same level of my peers.  As I mentioned before,

6    I am doing my best to show improvement.  I really want to stay

7    in the program.  Thank you again.

8           So did you send this to Dr. Steppacher?

9    A.  Yes.

10   Q.  And you sent it to him before he filled out his

11   application, correct?

12   A.  We had met before, and he told me that -- to give him a

13   list of things that I had participated in.

14   Q.  Now that -- but you sent this to him before he filled it

15   out, correct?

16   A.  Yes.

17   Q.  And let's -- the next e-mail on the first page appears to

18   be his request.

19          Maria, thanks so much for your help.  I hope you had

20   an opportunity to learn something about vascular surgery, and

21   I wish you the best for the future.  Thanks also for reminding

22   me about my OR cases.

23          And then you also gave him some additional cases at

24   the top, correct?

25   A.  Mm-hmm.

Artunduaga - cross

1    Q.   Okay.  And you sent similar e-mails to the other

2    attendings on this service, correct?

3    A.   Yes.

4    Q.   I want to direct your attention to Joint Exhibit 44.  And

5    this is the evaluation of Dr. Darwin Eton who is also on that

6    service, correct?

7    A.   Yes.

8    Q.   And he rates you goods, a couple of nonapplicable and a

9    couple of exemplaries on the first page, correct?

10   A.   Yes.

11   Q.   And then a couple of exemplaries with respect to

12   communication and then a number of nonapplicables and a couple

13   of goods on the second page, right?

14   A.   Yes.

15   Q.   And his overall comments were, Dr. Artunduaga performs at

16   her expected levels.  She's reliable and hardworking.  She

17   interacts well.

18          Prior to him -- or strike that.

19          You sent him an e-mail actually after you got the

20   that evaluation, correct?

21   A.   Actually, sorry.  Can you repeat it?  I sent him an

22   e-mail?

23   Q.   After that evaluation was done, correct?  Let me show you,

24   and we will refresh your memory.

25   A.   Yes.  Thank you.

Artunduaga - cross

1          MR. JEPSON:  Let's go to Defendant's Exhibit 95,

2    which is not admitted.

3          THE COURT:  Is there any objection to its admission?

4          MS. HYNDMAN:  No objection, Your Honor.

5          THE COURT:  I will admit 95.

6          MR. JEPSON:  Thank you, Your Honor.

7       (Defendant's Exhibit No. 95 was received in evidence.)

8    BY MR. JEPSON:

9    Q.  And let's take a look at the evaluation -- or the e-mail

10   on the first page.  It's from you to Dr. Eton on January 30th,

11   correct?

12   A.  Yes.

13   Q.  It says, Hi, Dr. Eton.  I saw your January 25 evaluation

14   on new innovations.  Thank you for the nice comments.  I was

15   wondering if you could grade my operative, two amps, one IVCF

16   removal and managerial skills.  Mike and Jenn can give you a

17   better insight.  They were filled in as NA.

18          Now, Mike is Mike Shao, and Jenn was Jennifer Paruch,

19   correct?

20   A.  Yes.

21   Q.  It turns out that my PD put me on probation last year

22   because I wasn't performing at the level of a plastic surgery

23   resident.  I am doing my best to stay in the program, and I

24   would really appreciate your help in this regard.

25          You sent this to Dr. Eton, correct?

Artunduaga - cross

494

1   A.  Yes.

2   Q.  And you also worked with a Dr. Heather Hall on that

3   service, correct?

4   A.  Yes.

5   Q.  And Dr. Hall --

6          MR. JEPSON:  Let's take a look at Defendant's Exhibit

7   94.

8   BY MR. JEPSON:

9   Q.  This is dated January 30, 2012, and appears to be an

10  e-mail from you to Dr. Hall on that date; is that right?

11  A.  Yes.

12         MR. JEPSON:  I'll move this into admission.

13         THE COURT:  Any objection?

14         MS. HYNDMAN:  No objection.

15         THE COURT:  It's admitted.

16         MR. JEPSON:  Thank you.

17      (Defendant's Exhibit No. 94 was received in evidence.)

18  BY MR. JEPSON:

19  Q.  It says, Hi, Dr. Hall.  I wanted to thank you for having

20  me in your clinic.  Although we did not interact too often, I

21  really enjoyed those four hours following you.  I would rather

22  talk to you in person, but I recently found out that you would

23  not be in U of Chicago until Thursday.  I was placed on

24  probation last year by my PD, Dr. David Song, because I was

25  not performing at the level of a plastic surgery resident.  I

Artunduaga - cross

495

1    am working very hard to stay in the program, and I would

2    really appreciate any feedback if you'd wish to tell me.  When

3    the time comes to fill out my evaluation, I would appreciate

4    it if you get Mike and Jenn's input about my performance.

5    They have been very supportive, and I think I have done a

6    decent job.

7              You sent that to Dr. Hall, correct?

8    A.  Yes.

9    Q.  And Dr. Hall did complete an evaluation of you, correct?

10   A.  Yes.

11   Q.  That would be Joint Exhibit 45.  And your e-mail to

12   Dr. Hall indicated that you had spent four hours in clinic,

13   correct?

14   A.  Yes.

15   Q.  And her e-mail -- or her overall evaluation was, Maria

16   performed very well -- or well on a busy vascular service.

17   She is a hard worker and did well to manage the demands of the

18   floor work, consults and clinic.  She also made a very good

19   effort to communicate with the team and attendings, including

20   coming to the OR to discuss issues.  She was efficient in her

21   work and I think improved over her time on the service.  She

22   came to my clinic and did a fine job interviewing patients,

23   forming differential diagnosis and coming up with a treatment

24   plan.  She needs to have confidence in herself, as from my

25   perspective she is on par with her peers.

Artunduaga - cross

1      So she wrote all of that even though you had only

2  spent time in the clinic with her, correct?

3  A.  She told me she had talked to Mike.

4  Q.  I know.  But with respect to her direct observation of

5  you, you worked together for four hours in the clinic,

6  correct?

7  A.  Yes.

8  Q.  Now, let's take a look at Defendant's Exhibit 98.

9      THE COURT:  Is there any objection to its admission,

10  Ms. Hyndman?  You don't have it on the sheet.

11      MS. HYNDMAN:  No, Your Honor.

12      THE COURT:  Okay.  I will admit it.

13      MR. JEPSON:  Thank you.

14    (Defendant's Exhibit No. 98 was received in evidence.)

15  BY MR. JEPSON:

16  Q.  This appears to be an e-mail from you to Dr. Skelly who

17  was the chief of vascular, correct?

18  A.  Yes.

19  Q.  And his response to you, correct?

20  A.  Yes.

21  Q.  And it was the same kind of thing.  You asked him to give

22  input, told him you wanted to stay in the program and the

23  like, correct?

24  A.  Yes.

25  Q.  And he said he would do so, correct?

Artunduaga - cross

1   A.  Yes.

2   Q.  And your evaluations for the month of January were decent,

3   correct?

4   A.  Yes, were better.

5   Q.  And you sent the same e-mails to Dr. Milner and

6   Dr. Blecha, correct?

7   A.  Yes.

8   Q.  All right.  And Dr. Park told you though during the

9   mentoring session she had with you that although there was

10  improvement, you still needed to show more improvement,

11  correct?

12  A.  Yes.

13  Q.  And in February, you -- strike that.

14          There was testimony yesterday about an e-mail

15  exchange between you and Dr. Jaskowiak and actually an e-mail

16  that you sent to Dr. Song and Dr. Park about this antibiotic

17  issue, correct?

18  A.  Yes.

19  Q.  And you testified that you wanted to get ahead of it and

20  let Dr. Song and Dr. Park know about it, which is why you

21  alerted them, correct?

22  A.  Yes.

23  Q.  And Dr. Park told you in one of the mentoring sessions,

24  didn't she, that she had spoken with Dr. Jaskowiak, and

25  Dr. Jaskowiak felt that you were very defensive in the

Artunduaga - cross

498

1    telephone call you had, correct?

2    A.  Yes.

3    Q.  Okay.  And Dr. Song helped you write a response to

4    Dr. Jaskowiak, didn't she?

5    A.  Who?  Dr. Song?

6    Q.  Dr. Park assisted you in writing your -- an e-mail to

7    Dr. Jaskowiak, correct?

8    A.  She gave me some guidance.

9    Q.  Guidance.  And you followed that guidance, correct?

10   A.  Yes.

11   Q.  And you indicated yesterday that you were pleased with

12   Dr. Jaskowiak's response to you, correct?

13   A.  Yes.

14          MR. JEPSON:  And that response I believe was Joint

15   Exhibit 77.

16   BY MR. JEPSON:

17   Q.  This is Dr. Jaskowiak's response to you, correct?

18   A.  Yes, sir.

19   Q.  And she indicated to you in that response that you need to

20   communicate.  You should have communicated with her about

21   this, correct?

22   A.  Yes.

23   Q.  She also indicated that you needed to follow up to make

24   sure things get done, correct?

25   A.  Yes.

Artunduaga - cross

1   Q.  And she also indicated that you need to document this kind

2   of thing, correct?

3   A.  Yes.

4   Q.  And finally, you know, she indicated to trust yourself.

5   You have some doubts about something, ask.

6   A.  Yes.

7   Q.  Okay.  So in February you move to transplant, and there

8   are five attendings in transplant; is that right?

9   A.  Yes.

10  Q.  Thistlewaite, Becker, Millis?

11  A.  Grems (phonetic).

12  Q.  Grems?

13  A.  And Witkow- --

14  Q.  Witkowski.

15  A.  Sorry.

16  Q.  By the way, that's Piotr Witkowski?

17  A.  It's spelled P-i-o-t-r.

18  Q.  P-i-o-t-r, but I believe it's pronounced Peter.  He's from

19  Poland, correct?

20  A.  Yes, from --

21  Q.  You know he's a foreign medical graduate, correct?

22  A.  Yes, he's from eastern Europe.

23  Q.  And he's an attending in the transplant service at the

24  University of Chicago Medical Center?

25  A.  Yes, he's a surgeon scientist.

Artunduaga - cross

1   Q.  And he gave you a decent evaluation, correct?

2   A.  I think so, yes.

3   Q.  And you sent out the same kinds of e-mail to the

4   physicians in the transplant service that you sent out to

5   those in the vascular service, correct?

6   A.  Yes.

7           MR. JEPSON:  And also let's look at Defendant's

8   Exhibit 89.

9           THE COURT:  Any objection to its admission,

10  Ms. Hyndman?

11          MS. HYNDMAN:  No.

12          THE COURT:  Okay.  I will admit 89.

13          MR. JEPSON:  Yes.

14     (Defendant's Exhibit No. 89 was received in evidence.)

15  BY MR. JEPSON:

16  Q.  And this appears to be, again, a set of e-mails between

17  you and Dr. Kaplan.

18          Let's just look at the first page.  On January 23,

19  2012, it appears that you sent an e-mail to Dr. Kaplan

20  indicating, My vascular rotation is going very well.  I have

21  been getting very good and superior grades on my weekly

22  evaluations.  This time around I was allowed to run the

23  service and demonstrated the skills to be efficient, reliable

24  and trustworthy.  I'm committed to succeed the probation

25  period.  I was hoping that you could give Dr. Renz,

Artunduaga - cross

1    transplant, my next rotation, a short call to explain my

2    situation.

3           And then Dr. Kaplan says, I will be happy to speak

4    with him.  Please remind me at the proper time.  And you say

5    tomorrow should be appropriate, correct?

6    A.  Yes.

7    Q.  And Dr. Kaplan did speak to Dr. Renz, correct?

8    A.  Yes.

9           MR. JEPSON:  And let's take a look at Defendant's

10   Exhibit 100.

11          THE COURT:  That is not --

12          MR. JEPSON:  This is not admitted.

13   BY MR. JEPSON:

14   Q.  And it appears to be an e-mail from Akilah Williams to you

15   and then your response to Ms. Williams, correct?

16   A.  Yes.

17   Q.  And Ms. Williams was the program director who would send

18   out these feedback evaluations, correct?

19   A.  The coordinator, yes.

20   Q.  Coordinator, sorry.

21   A.  Uh-huh.

22   Q.  But she would send them out, correct?

23   A.  Yes.

24   Q.  And she asked you who you were going to work with in

25   transplant, right?

Artunduaga - cross

1    A.  Yes.

2    Q.  And your response, you listed four people who we've

3    already talked about.  And you said, I'll be in transplant for

4    four exact weeks, from Wednesday to Wednesday.  Create the

5    evaluations but don't make them available until Tuesday.

6            THE COURT:  Mr. Jepson, let's move it in before

7    you --

8            MR. JEPSON:  I'm sorry.  I move.

9            THE COURT:  Any objection?

10           MS. HYNDMAN:  No objection.

11           MR. JEPSON:  Thank you, Your Honor.  Sorry.

12           THE COURT:  It's admitted.

13       (Defendant's Exhibit No. 100 was received in evidence.)

14   BY MR. JEPSON:

15   Q.  I haven't talked to them yet.  I'm afraid some will fill

16   out the evaluations without putting too much attention to

17   details, and it won't help me out.

18           MS. HALL:  Judge, can we publish, please?

19   BY MR. JEPSON:

20   Q.  It happened with one of the vascular attendings.  He

21   submitted his evaluation, but failed to complete operative

22   managerial skills because he didn't know about the probation.

23   He completed his form six days before I finished.

24           You've sent those -- that e-mail, correct?

25   A.  Yes.

Artunduaga - cross

1   Q.  And the person you're referring to who completed the op

2   evaluation earlier was Dr. Eton, correct?

3   A.  Yes.

4   Q.  Now, during the month of February, there came an issue

5   with you being over hours, right?

6   A.  Yes.

7   Q.  And to get a little bit of background about this, there's

8   rules that you described yesterday about residents, that they

9   can only work 80 hours a week, correct?

10  A.  Yes.

11  Q.  And 80 hours averaged over a four-week period, correct?

12  A.  Yes.

13  Q.  And you, indeed, had sent an e-mail -- or strike that.

14          Take a look at Defendant's Exhibit No. 6, which is

15  not admitted.

16          THE COURT:  Any objection to its admission,

17  Ms. Hyndman?

18          MS. HYNDMAN:  No objection.

19  BY MR. JEPSON:

20  Q.  All right.  And this is as early as July 2011, an e-mail

21  from you to Dr. Seal and Grossman.  You see that?

22          THE COURT:  And I will admit it, just for the record.

23          MR. JEPSON:  Sorry.

24      (Defendant's Exhibit No. 6 was received in evidence.)

25          THE COURT:  Go ahead.

Artunduaga - cross

1          MR. JEPSON:  I'm glad you're pushing us along, Judge.

2    BY MR. JEPSON:

3    Q.  And then there's an e-mail from John Seal to you saying

4    there's absolutely no reason you should be over hours on the

5    Kaplan service.  I will send out an e-mail to the fellows, et

6    cetera, et cetera.

7          You knew as early as then that there was an over

8    hours requirement then, correct?

9    A.  Yes.

10   Q.  And, indeed, you received an e-mail in November from

11   Carmen Barr indicating that ACGME is really strict on the

12   rule, correct?

13   A.  Yes.

14   Q.  And so in February, there was an issue with you being over

15   hours several weeks in a row on transplant, correct?

16   A.  Yes.

17   Q.  Let's take a look at Joint Exhibit 76.  And this is an

18   exchange of e-mails with you and Dr. Dickie, correct?

19   A.  Yes.

20   Q.  You had alerted your chief about this, so she looked into

21   it and took some steps to help out, correct?

22   A.  Yes.

23   Q.  And there are also -- you also sent an e-mail to Dr. Song,

24   correct?

25   A.  I --

Artunduaga - cross

1  Q.  Let's take a look at Defendant's Exhibit 112 which is not

2  in evidence.  It appears to be an e-mail string beginning on

3  the second page, a February 24th e-mail from you to Dr. Song,

4  a response from Dr. Song to you, and then -- and to Dr. Park

5  as well as a final e-mail from Dr. Park regarding the

6  situation, correct?

7  A.  Yes.

8           MR. JEPSON:  All right.  I'll move this into

9  evidence.

10          THE COURT:  Any objection?

11          MS. HYNDMAN:  No objection.

12          THE COURT:  It's admitted.

13      (Defendant's Exhibit No. 112 was received in evidence.)

14  BY MR. JEPSON:

15  Q.  I want to first look at your e-mail on the second page.

16  A.  Yes.

17  Q.  And it says, Dr. Song, regarding your call yesterday, I

18  just wanted you to know that I did notify my senior resident.

19          So Dr. Song called you about this situation, correct?

20  A.  Yes.

21  Q.  And I failed to tell the fellow about my hours because I

22  was afraid that it would have a detrimental impact.  And you

23  also say, I also mentioned it to Dr. Park during our February

24  weekly meetings, and she said it was okay as long as it was

25  only a few hours.  And then you note that, I've noticed in

Artunduaga - cross

1  general surgery the chiefs monitor the juniors' hours weekly

2  and make adjustments so everybody complies.

3          Do you see that?

4  A.  Yes.

5  Q.  And so you then sent this to Dr. Song, correct?

6  A.  Yes.

7  Q.  And he responded to you on the first page that it is

8  imperative of each and every resident to plan ahead and

9  monitor his or her own hours, correct?

10 A.  Can you -- I'm sorry.  Can you --

11 Q.  Sure.  First sentence, While the general surgery chiefs

12 and plastic surgery chiefs monitor duty hours, it is also

13 important -- imperative of each and every resident to plan

14 ahead and monitor his or her own hours and communicate this

15 appropriately to those in the supervisory role.

16         Do you see that?

17 A.  Yes.

18 Q.  And he also says, As far as Dr. Park goes saying it was

19 okay as long as it was only a few hours, I can't imagine that

20 this is actually what she meant as these rules are absolute

21 hard stops and there are nonnegotiable.

22         And Dr. Park then weighed in with respect to that,

23 correct, at the top?

24 A.  Yes.

25 Q.  And at some point in time you apologized to Dr. Park for

Artunduaga - cross

 1    the back and forth on this, correct?

 2    A.  Yes.

 3    Q.  Okay.  Now, in February, you received an evaluation from

 4    Dr. Becker which is Joint Exhibit 65.  And in the transplant

 5    section -- and I know you have one rotation so maybe not that

 6    much experience.  But it was your understanding, wasn't it,

 7    was that typically it was one attending with the intern per

 8    week and that they kind of rotated it amongst themselves?  Did

 9    you know that?

10    A.  I think it was the call, on call thing.

11    Q.  Okay.  So in other words, you would work more with an

12    attending in one week than -- and then the next week another

13    attending, correct?

14    A.  Not necessarily.  It's the one attending will take care

15    of, like, on calls and rounding one week.

16    Q.  Okay.

17    A.  And the other on the other.

18    Q.  Got it.

19    A.  But each one has its own patients and surgeries.

20    Q.  Okay.  But anyway, so Dr. Becker gave you this evaluation,

21    correct?

22    A.  Yes.

23    Q.  And she submitted it on the second page on February 21,

24    2012?

25    A.  Yes.

Artunduaga - cross

1   Q.  And on the first page, she had six could improves,

2   correct?

3   A.  Yes.

4   Q.  And these are the knowledge base items, the pre-op,

5   post-op, the communication and justification of medical

6   decisions and your operative skills, correct?

7   A.  Yes.

8   Q.  And on the second page, she gave you a could improve with

9   respect to documentation of practice activities, correct?

10  A.  Yes.

11  Q.  And could improves as to the leading and managing a

12  service, tracking M&Ms and presentation quality and two other

13  items, correct?

14  A.  Yes.

15  Q.  Let's look at her overall evaluation.

16          My interaction with Maria was limited to one week on

17  service.  She should work toward more timely documentation.

18  Maria should also work to build her clinical fund of

19  knowledge.  She has difficulty applying knowledge to a

20  clinical situation and seemed easily overwhelmed.  Strong

21  mentorship and tutoring will likely help as Maria is certainly

22  making a good effort.

23          And, indeed, at this point in time, we're at the end

24  of February, and you had had about two and a half months of

25  mentoring from Dr. Park, correct?

Artunduaga - cross

509

1   A.  Yes.

2   Q.  And you were -- you e-mailed Dr. Park about this

3   evaluation, correct?

4   A.  Yes.

5   Q.  And you asked -- you told Dr. Park, don't know why in

6   essence Dr. Becker filled this out this way, correct?

7   A.  Yes.

8   Q.  Okay.  And you asked Dr. Park to speak with her, and

9   Dr. Park did, correct?

10  A.  Yes.

11  Q.  And Dr. Park reported back to you that Dr. Becker had told

12  Dr. Park that she felt in essence comfortable with her

13  evaluation of you, correct?  She stood by her evaluation?

14  A.  She said that she wanted to modify it, Dr. Becker.

15  Q.  But didn't Dr. Park tell you that she had spoken with

16  Dr. Becker and that Dr. -- and was satisfied that Dr. Becker

17  had evaluated you as she does other interns?

18  A.  That -- that is true.

19  Q.  Okay.

20          MR. JEPSON:  Now, let's take a look at Joint Exhibit

21  82.

22  BY MR. JEPSON:

23  Q.  Now, this e-mail and the first page -- I'm sorry -- on the

24  second page was from you to Dr. Becker, correct?

25  A.  Yes.

Artunduaga - cross

1   Q.  Dear Dr. Becker, although my month isn't over, I want to

2   thank you for a wonderful rotation.

3           Do you see that?

4   A.  Yes.

5   Q.  I learned a great deal.  Also I was wondering if you could

6   get some input from Domalu and Irma before completing my

7   evaluation, and you, again, explain the probation.  And

8   Dr. Becker responded that she had already spoken with the

9   relevant people.

10          Do you see that?

11  A.  Yes.

12  Q.  And frankly then she had already submitted your

13  evaluation, correct?

14  A.  Yes.

15  Q.  Okay.  Now, you also indicated that Dr. Park told you that

16  Dr. Becker felt that the interaction you had with her was

17  unprofessional I think was the word, correct?

18  A.  Yes.

19  Q.  Okay.  Now, you also received an evaluation from

20  Dr. Millis, correct?

21  A.  Yes.

22  Q.  And that is -- and you sent him a similar e-mail asking

23  for him to get input and to help you out, correct?  Give you a

24  fair assessment?  You wanted to stay in the program?

25  A.  Fair assessment, objective feedback.

Artunduaga - cross

1  Q.  And his evaluation is Joint Exhibit 67, correct?

2  A.  I don't know Joint 67.

3  Q.  Well, why don't we look at it, and you can then tell me.

4  I have the benefit of an outline here.

5  A.  Okay.  67, yes.

6  Q.  Is this the evaluation that you received from Dr. Millis?

7  A.  Yes, sir.

8  Q.  And Dr. Millis rated you a could improve on post-op care

9  and could improve on the second page as to documentation of

10  activities, right?

11  A.  Yes.

12  Q.  And he gave you a couple of superiors about your personal

13  attributes and a very good with respect to overall patient

14  management, but his comments on the second page --

15          MR. JEPSON:  Would you highlight those, Michael,

16  please.

17  BY MR. JEPSON:

18  Q.  -- it begins with, Maria is struggling as a resident.

19          And this is as of the end of February 2012, three

20  weeks before your probation is over, correct?

21  A.  Yes.

22  Q.  She is trying hard, and then he goes through and explains

23  that you were over hours and not managing your time, correct?

24  A.  Yes.

25  Q.  He describes that.

Artunduaga - cross

1      MR. JEPSON:  And then let's go to the bottom,

2  Michael, where it says the time and go to the next page, at

3  that time.  Yeah, there you go.

4  BY MR. JEPSON:

5  Q.  The time management skills were also a chronic problem as

6  frequently the notes were not in the computer to cosign until

7  very late in the day.

8      And, again, these are the progress notes, the plan

9  notes, correct?

10  A.  Yes.

11  Q.  And this improved as the rotation progressed but was a

12  consistent problem.  And he then goes on to say that you're

13  capable but you need slower paced progression.

14      Do you see that?

15  A.  Yes.

16  Q.  And this was, again, at the end of February, correct?

17  A.  Yes.

18  Q.  And in addition, Dr. Thistlewaite submitted an evaluation

19  of you in the form of an e-mail, correct?

20  A.  Yes.

21  Q.  Because he didn't have -- he explained he didn't have

22  access to the system.  And that is -- let's go to Defendant's

23  Exhibit 134 which is not admitted.  This appears to be an

24  e-mail from Dr. Thistlewaite to Dr. Park, and then at the top

25  an e-mail from Dr. Thistlewaite to you, Dr. Artunduaga,

Artunduaga - cross

1    transmitting the other e-mail, correct?

2    A.  Yes.

3            MR. JEPSON:  I'll move this into admission.

4            THE COURT:  Any objection?

5            MS. HYNDMAN:  No objection.

6            THE COURT:  It's admitted.

7        (Defendant's Exhibit No. 134 was received in evidence.)

8    BY MR. JEPSON:

9    Q.  And then so Dr. Thistlewaite sent this to you, but he sent

10   it to Dr. Park on March 20th apparently having misfired on the

11   first attempt, right?

12   A.  Yes.

13   Q.  And on the second page, he states, you know, that I would

14   characterize her as a project, meaning she has some abilities

15   but not yet clearly as skilled to be successful in medical

16   parlance.  This means to me that outside of her day-to-day

17   work as a resident, she needs to show that she is willing to

18   take the time to refresh her fund of medical knowledge and

19   that within her work as a resident, she needs to be challenged

20   to think through medical problems and propose how to address

21   them.

22           So you received this from Dr. Thistlewaite, correct?

23   A.  He forwarded it to me, I think.

24   Q.  Yes.  And he sent it also to Dr. Song and Dr. Park, at

25   least according to his e-mail, correct?

Artunduaga - cross

1  A.  Yes.

2  Q.  All right.  So Dr. Renz's evaluation, you sent him an

3  e-mail on --

4          MR. JEPSON:  Let's go to Defendant's Exhibit 118.

5  This is an e-mail between Dr. Artunduaga and Dr. Renz which is

6  not in evidence which I would move into evidence.

7          THE COURT:  Any objection?

8          MS. HYNDMAN:  No objection.

9          THE COURT:  It's admitted.

10      (Defendant's Exhibit No. 118 was received in evidence.)

11  BY MR. JEPSON:

12  Q.  This is dated February 28, 2012, and it says, Hi,

13  Dr. Renz.  I saw your evaluation submitted last week.  Thank

14  you very much for the nice comments.  I was wondering if you

15  could reevaluate me in some areas that you left blank but I

16  think you had the opportunity to interact with me.

17          So you sent him this e-mail, correct?

18  A.  Yes.

19  Q.  And the evaluation -- his evaluation of you --

20          MR. JEPSON:  Let's go to Joint Exhibit 66.

21  BY MR. JEPSON:

22  Q.  And he rated you goods on the first page and a couple of

23  very goods and left a number of things not applicable.  And

24  his overall comments were, Maria is very nice and genuine.

25  Certainly she could improve her fund of knowledge, but she

Artunduaga - cross

1   does remain within the bounds of acceptable intern

2   performance.  She has asked several times for feedback which

3   is great.  I believe she tries hard, and her heart is in her

4   work.

5           That was his evaluation, correct?

6   A.  Yes.

7   Q.  Do you know if he submitted another evaluation of you?

8   A.  I don't know.

9   Q.  Okay.  In any event, so for the transplant service, you've

10  got e-mails -- or strike that -- evaluations from Thistlewaite

11  and Becker and Millis as well as Renz and Witkowski, correct?

12  A.  Yes.

13  Q.  And then you moved on to the plastic rotation, correct?

14  A.  Yes.

15  Q.  And you spent two full weeks on that rotation?

16  A.  Yes.

17  Q.  And you were told I think you said that this was the last

18  chance for them to look at you and they were going to, you

19  know, take this seriously as they came to the decision whether

20  to renew you or not, correct?

21  A.  Yes.

22  Q.  Okay.  And you did receive evaluations from the seniors,

23  correct?

24  A.  Yes.

25  Q.  And I think you indicated also that you reached out to

Artunduaga - cross

1   them before you started the service but that it could not --

2   that they didn't respond to you; is that right?

3   A.  They couldn't meet with me.

4   Q.  Okay.  Let me show you what's been marked as Defendant's

5   Exhibit 117.

6           THE COURT:  Is there any objection to its admission?

7           MS. HYNDMAN:  No.

8           THE COURT:  I will admit it.

9      (Defendant's Exhibit No. 117 was received in evidence.)

10  BY MR. JEPSON:

11  Q.  It appears to be the bottom is an e-mail from you to

12  Matt Grieves.

13          I'll be joining the service for two weeks starting

14  next Thursday, March 1st.  When is a good time to talk about

15  the goals?

16          So he sent it out on the 28th.  And Matt Grieves

17  responded, Maria, let's sit down after the inservice on

18  Thursday and go over this stuff.

19          Did that meeting ever happen?

20  A.  No.

21  Q.  Indeed you ended up getting tied up with something else,

22  correct?

23  A.  It didn't happen.  I don't recall.

24  Q.  You don't know why?

25  A.  Yes.  Sorry.

Artunduaga - cross

1    Q.  Okay.  But in any event, you were then on plastics,

2    correct?

3    A.  Yes.

4           MR. JEPSON:  And let's take a look at Defendant's --

5    I'm sorry -- Joint Exhibit 65 -- not 65.  I'm sorry.  85.

6    BY MR. JEPSON:

7    Q.  So this is an evaluation that you would have received from

8    Matt Grieves, correct?

9    A.  Yes.

10   Q.  And you also, Joint Exhibit 87, received an evaluation

11   from Grant Kleiber.

12          You see that?

13   A.  Yes.

14   Q.  And what -- the question about prioritization, he wrote

15   no, that you didn't show that ability, correct?  No. 1, did

16   Dr. Artunduaga demonstrate the ability to correctly prioritize

17   her work?

18   A.  No, mm-hmm.  Yes, he said no.

19   Q.  That's what he said.  He wrote then, Maria has trouble

20   triaging, coinciding tasks.  Surgical residents must be able

21   to multitask and effectively prioritize their work which she

22   has trouble with.  Sometimes she focuses on whatever task was

23   given to her first rather than more important or more

24   time-sensitive tasks.  An example would be failing to escort a

25   patient back to the operating room because she was completing

Artunduaga - cross

1    paperwork for another patient.  I discussed this in person

2    with her, and I believe she understands.

3            And then No. 2, she needs help and efficiency.  Maria

4    tries earnestly to get all of her work done, but she seems to

5    work very inefficiently compared to the other interns who have

6    been on the service.

7            And then he gave you a could improve as to No. 3

8    which has to do with consults and notes.  And it says,

9    Computerized notes are not placed in a timely manner for floor

10   patients.  On several occasions patients have not had notes

11   written until well into the afternoon.

12           And on the next page at the top, the comment under a

13   could improve, Presentation of new consults has been

14   scattered, disorganized and unfocused.  She should be better

15   at this considering she has been a resident here for over

16   eight months.  We discussed patient presentation, and she

17   understands that she needs to do better.

18           Then finally, let's go to No. 9.  That's a could

19   improve, and the comment is, She frequently interrupts when I

20   am trying to speak to her rather than listening.  This is

21   excusable when discussing patient care.  It is not appropriate

22   in the operating room when I am taking her through a procedure

23   when I did not feel she was listening to my instructions.  She

24   needs to be better at taking direction.

25           And then finally, in the overall comments, I feel

Artunduaga - cross

1   that Maria needs to improve in several areas:  Efficiency,

2   prioritization, patient presentation and listening skills.

3   She and I discussed these areas for improvement extensively.

4   I believe that she understands the need for improvement.

5        You received -- saw this, correct?

6   A.  Yes.

7   Q.  And then Yonni Bank, the next one, Joint Exhibit 88, he

8   also rated you as not demonstrating the ability to correctly

9   prioritize your work, correct?

10  A.  Yes.

11  Q.  And indicated a number of reasons why, three different

12  things, one of them being that you were requested by him to

13  round on two primary service patients at 8:00 a.m., but by

14  2:00 p.m., you hadn't gotten to that, correct?

15  A.  Yes.

16  Q.  And then there's another case that he asked you to scrub

17  in on, and you went to another case, correct?  That's what it

18  says, correct?

19  A.  Yes.

20  Q.  And the third one is on March 10th, Maria was to bring a

21  patient to the OR.  But according to Dr. Bank, per her report,

22  she went to the designated OR and the room was empty, and she

23  proceeded to do other duties.

24       So you got this and read this, correct?

25  A.  Yes.

Artunduaga - cross

1    Q.  And then let's go to the second page.  He also, on No. 9,

2    rated you as a could improve with respect to listening skills

3    and eliciting and providing information, correct?

4    A.  Yes.

5    Q.  And he gave a number of reasons there, correct?

6    A.  Yes.

7    Q.  All right.  So you finished your time on plastics on

8    March 15th, correct?

9    A.  Yes.

10   Q.  And you had three meetings with Dr. Park during the month

11   of March as mentoring sessions, correct?

12   A.  Yes.

13   Q.  And Dr. Park raised issues with respect to -- at least

14   discussed these evaluations with you, correct?

15   A.  Yes.

16   Q.  And also discussed some of the observations she personally

17   had with you during that service, correct?

18   A.  Yes.

19   Q.  And you were informed that the faculty would meet,

20   correct?

21   A.  Yes.

22   Q.  And the attendings, to your knowledge, met on March 26th,

23   correct?

24   A.  That's what I was told.

25   Q.  And you were told that they unanimously voted to not renew

Artunduaga - cross

1   your contract?

2   A.  Yes.

3   Q.  And, indeed, you had a meeting with Dr. Song on March 27th

4   at which point in time you were given a letter to that effect.

5   Am I right?

6   A.  Yes.

7   Q.  And that -- let's take a look at that letter, which is

8   Joint Exhibit 100.  And in this letter, he indicates basically

9   the reasons why and what happened, correct?

10  A.  Yes.

11  Q.  And indicated that also, in the third bottom sentence,

12  that we believe that further remediation will not resolve

13  these issues.  Therefore, we are not offering you continued

14  training in the program.

15          Do you see that?

16  A.  Yes.

17  Q.  He also notified you about your right to the grievance

18  policy and your right to file one, correct?

19  A.  Yes.

20  Q.  And also stated at the bottom that they were removing you

21  from your clinical duties effective that day, correct?

22  A.  It was written on the letter, but I wasn't informed by

23  Dr. Song.

24  Q.  You weren't what?

25  A.  I wasn't told -- sorry -- by Dr. Song.

Artunduaga - cross

1   Q.  Okay.  So you were given the letter, and it said it in the

2   letter.

3   A.  Yes.

4   Q.  And then you read the letter, correct?

5   A.  Yes.

6           MR. JEPSON:  Let's take a look at Joint Exhibit 99.

7   BY MR. JEPSON:

8   Q.  Prior to the attendings making a decision as to whether

9   you should continue in the program, you were given an

10  opportunity to send a letter to support your view that you had

11  passed the probation, correct?

12  A.  Yes.

13  Q.  And this is that letter; is that right?

14  A.  Yes, sir.

15  Q.  And you quote from comments that you received from

16  individuals on the rotations in vascular and transplant,

17  correct?

18  A.  Yes.

19  Q.  And you quote from Michael Shao, a vascular surgery

20  fellow, on the first page?

21  A.  Yes.

22  Q.  And you quote from general Paruch -- Jennifer Paruch, a

23  general surgery resident?

24  A.  Yes.

25  Q.  And then you quote from Irma Fleming on the bottom of the

Artunduaga - cross

523

1    first going over to the second?

2    A.  Yes.

3    Q.  And you also quote from Domalu Olaitan, who was a

4    transplant surgery fellow, on the second page, correct?

5    A.  Yes.

6    Q.  You didn't quote from any of your attending physicians,

7    correct?

8    A.  No.  I think so.

9    Q.  And you nowhere in this letter state that you believed you

10   were being discriminated against because of your Colombian

11   national origin, correct?

12   A.  I didn't write it on the letter.

13   Q.  Okay.  So after you got Dr. Song's letter notifying you of

14   the nonrenewal and also that you would be removed from

15   clinical, you wrote a responsive letter, correct?

16   A.  Yes.

17   Q.  And you asked him to reconsider the decision not to renew

18   your contract, right?

19   A.  Yes.

20   Q.  You also asked that you be reinstated to clinical,

21   correct?

22   A.  Yes.

23         MR. JEPSON:  And that letter is Joint Exhibit 103, I

24   believe.

25   BY MR. JEPSON:

Artunduaga - cross

1  Q.  And in this letter, you begin by stating you're initiating

2  the grievance process, correct?

3  A.  Yes.

4  Q.  And nowhere in this letter do you state that you were

5  being discriminated against because of your Colombian national

6  origin, do you?

7  A.  From the GME policies, I was supposed to --

8  Q.  I'm asking you, do you state somewhere in here that you

9  were being discriminated against because of your Colombian

10 national origin?

11 A.  Not in this letter.

12 Q.  Okay.  And then you received a response from Dr. Song,

13 which is Joint Exhibit 104, correct?

14 A.  Yes.

15 Q.  And Dr. Song said that he -- that they weren't going to

16 reconsider the decisions to not renew your contract and the

17 like but that he had spoken with Dr. Roggin and you should

18 contact him about coming back onto clinical, correct?

19 A.  Yes.

20 Q.  And you then spoke with Dr. Roggin, correct?

21 A.  Yes.

22 Q.  And Dr. Roggin informed you that you were going to be back

23 on the Kaplan B service, correct?

24 A.  Yes.

25 Q.  And you were not happy with that.  Am I correct?

Artunduaga - cross

1   A.  I think I wasn't.

2   Q.  Yeah.  You wanted to be on the service that you were

3   originally assigned, the night float, correct?

4   A.  Yes.

5   Q.  And that night float was the service that stays on

6   overnight, correct?

7   A.  Yes.

8   Q.  And the night float -- during the time night float

9   physicians are on, there are many fewer physicians in the

10  hospital, correct?

11  A.  Yes.

12  Q.  And, indeed, much less supervision, correct?

13  A.  Yes.

14  Q.  And at that point in time when you were asking to be put

15  back on night float, your contract had already been not

16  renewed, correct?

17  A.  Yes.

18  Q.  Okay.

19      MR. JEPSON:  And let's take a look at Joint Exhibit

20  105.

21  BY MR. JEPSON:

22  Q.  This is an e-mail you sent to Dr. Song regarding the

23  assignment, the clinical assignment for April, correct?

24  A.  Yes.

25  Q.  And, indeed, you indicate here that you felt that you had

Artunduaga - cross

1    not logged enough cases, correct?

2    A.  Yes.

3    Q.  And as a matter of fact, there is no requirement.  There

4    was no minimum requirement in 2011, 2012 as to the number of

5    cases that you would log or not log, correct?  No ACGME

6    requirement of any sort, correct?

7    A.  Yes.

8    Q.  And you went on to say to Dr. Song in the third paragraph,

9    please, towards the bottom, I therefore demand that for the

10   remainder of my time as a U of C intern, I be returned to the

11   night float schedule as I was previously assigned and that I

12   be left to rotate as a standalone intern so as to have the

13   chance to log as many cases as my peers.

14          Do you see that?

15   A.  Yes.

16   Q.  And you placed that in the e-mail --

17   A.  Yes.

18   Q.  -- to Dr. Song, correct?

19          Was that a yes?  I didn't hear.

20   A.  Oh, yes.  I said yes.

21   Q.  Sorry.

22          So you sent this to him.  By the way, around this

23   time, you were asking some of your peers how many surgical

24   cases they had logged, right?

25   A.  Yes.

Artunduaga - cross

527

1   Q.  And, indeed, there are some texts about that, correct?

2   A.  Yes.

3   Q.  And you texted Dr. Shenaq, Dr. Stack, Melinda Stack, and

4   also someone named Dr. Puneet Singh?

5   A.  Mm-hmm.  Yes.

6          MR. JEPSON:  And let's, if we can, take a look at

7   Defendant's Exhibit 83, which has not been admitted.

8   BY MR. JEPSON:

9   Q.  And this appears to be it says at the top conversation

10  between MAA iPhone 617.

11         That's your phone, correct?

12  A.  Yes.

13  Q.  And then Deana Shenaq and her number, correct?

14  A.  Yes.

15  Q.  And you would have sent these texts, and she would have

16  responded, correct?

17  A.  Yes.

18         MR. JEPSON:  I'll move the admission of this.

19         THE COURT:  Any objection?

20         MS. HYNDMAN:  No objection.

21         THE COURT:  It's admitted.

22      (Defendant's Exhibit No. 83 was received in evidence.)

23  BY MR. JEPSON:

24  Q.  I want to direct your attention, please, to MA 0 -- I'm

25  sorry -- 1839.

Artunduaga - cross

```
 1            MR. JEPSON:  Which is the third page, Michael.
 2   BY MR. JEPSON:
 3   Q.  And it says here, Deana, can you tell me how many cases
 4   you've done as a surgeon junior and how many as a first
 5   assistant?
 6            And then you say, I have only logged 51 as a surgeon
 7   junior.
 8            And then her response is, I think that's an
 9   appropriate number to have logged.  I don't record mine
10   accurately so not 100 percent sure, but that sounds about
11   right.
12            You sent that -- those texts, and she responded that
13   way, correct?
14   A.  Yes.
15            MR. JEPSON:  Let's take a look, please, at
16   Defendant's Exhibit 137.  This is not admitted.
17   BY MR. JEPSON:
18   Q.  And it's a conversation between MAA iPhone, yours, and
19   Puneet Singh's, correct?
20   A.  Yes.
21   Q.  And Puneet Singh's, correct?
22   A.  Yes.
23   Q.  And on the first page, April 3, 2012, you sent Singh this
24   text:  Puneet, how many cases have you logged as a surgeon
25   junior and how many as a first assistant?
```

Artunduaga - cross

529

```
 1        And then he responds, I don't log first assistants
 2   personally.  I'll look and see how many as surgeon junior.
 3   I'm a little behind on logging.  Probably somewhere between 30
 4   and 40.
 5        Correct?
 6   A.  Yes.
 7   Q.  You sent those texts and received them, correct?
 8   A.  Yes.
 9        MR. JEPSON:  Now, let's take a look at Defendant's
10   Exhibit 119.
11        THE COURT:  Mr. Jepson, do you have a sense of how
12   much longer on cross?
13        MR. JEPSON:  You know, I'm a very bad estimator.
14        THE COURT:  Yes, I realize that.
15        MR. JEPSON:  But I believe 45 minutes or so.
16        THE COURT:  Okay.  Let's break for lunch then.
17        We'll pick back up at 1:45.
18        THE CLERK:  All rise.
19     (Jury exits.)
20        THE COURT:  1:45.
21     (Lunch recess had from 12:37 p.m. to 1:45 p.m.)
22                    *    *    *    *    *
23
24
25
```

530

1    We certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.
2

3
     /s/ Joseph Rickhoff                    February 2, 2017
4    Official Court Reporter

5    /s/ Kelly Fitzgerald                   February 2, 2017
     Official Court Reporter
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    IN THE UNITED STATES DISTRICT COURT
                        NORTHERN DISTRICT OF ILLINOIS
 2                            EASTERN DIVISION

 3   DR. MARIA ARTUNDUAGA,              ) Docket No. 12 C 8733
                                        )
 4                    Plaintiff,        )
                                        )
 5              vs.                     )
                                        )
 6   THE UNIVERSITY OF CHICAGO          )
     MEDICAL CENTER,                    ) Chicago, Illinois
 7                                      ) February 1, 2017
                      Defendant.        ) 1:45 o'clock p.m.
 8

 9              TRANSCRIPT OF TRIAL PROCEEDINGS
          BEFORE THE HONORABLE AMY J. ST. EVE, AND A JURY
10
     APPEARANCES:
11
     For the Plaintiff:        THE FRANKLIN LAW FIRM, LLC
12                             BY:  MS. JAMIE S. FRANKLIN
                               53 W. Jackson Blvd., Suite 803
13                             Chicago, Illinois  60604

14                             ROBINSON, CURLEY & CLAYTON, P.C.
                               BY:  MS. CYNTHIA H. HYNDMAN
15                             300 South Wacker Drive, Suite 1700
                               Chicago, Illinois  60606
16
     For the Defendant:        VEDDER PRICE, P.C.
17                             BY:  MR. EDWARD C. JEPSON, JR.
                                    MS. ELIZABETH N. HALL
18                             222 N. LaSalle St., Suite 2600
                               Chicago, Illinois  60601
19
     Court Reporter:           MR. JOSEPH RICKHOFF
20                             Official Court Reporter
                               219 S. Dearborn St., Suite 1232
21                             Chicago, Illinois  60604
                               (312) 435-5562
22

23              *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

24                    PROCEEDINGS RECORDED BY
                      MECHANICAL STENOGRAPHY
25              TRANSCRIPT PRODUCED BY COMPUTER
```

Artunduaga - cross by Jepson

1      (Jury out.)

2            THE COURT:  Ready?

3            MR. JEPSON:  We are, Your Honor.

4            THE COURT:  Doctor, if you would come back up,

5      please.

6      (Pause.  Jury in.)

7            THE COURT:  You may be seated.

8            Mr. Jepson, you may continue.

9            MR. JEPSON:  Thank you, Your Honor.

10           MARIA ALEXANDRA ARTUNDUAGA, PLAINTIFF HEREIN,

11                      PREVIOUSLY SWORN

12                 CROSS-EXAMINATION (Resumed)

13     BY MR. JEPSON:

14     Q.  When we broke, Dr. Artunduaga, we were talking about an

15     e-mail that you sent to Dr. Song on April 5th regarding the

16     new assignment that you got in your reinstatement to clinical.

17           Do you recall that?

18     A.  Yes.

19     Q.  And yesterday, you were shown an e-mail that is in

20     evidence, Plaintiff's Exhibit 43, which was a response to that

21     e-mail from Dr. -- or from Jane McAtee, correct?

22     A.  Yes.

23     Q.  And I just wanted to point out that in the first paragraph

24     of that e-mail, Ms. McAtee says: "Dr. Artunduaga, I'm

25     advising the Department concerning your situation and will

Artunduaga - cross by Jepson

533

1   represent the interests of them throughout your Grievance.

2   Dr. Song has forwarded your recent e-mail to me, and I told

3   him that I would respond."

4           That was in the first paragraph of that e-mail,

5   correct?

6   A.  Yes.

7   Q.  And you know that Ms. McAtee then did represent the

8   section of the Plastic and Reconstructive Surgery group in the

9   grievance, correct?

10  A.  Yes.

11  Q.  Now, so then you did -- you filed, actually, a formal

12  grievance on April 6th, and I want to go to Defendant's

13  Exhibit 142, which is not admitted.

14          Now, this appears to be a letter directed to Barry

15  Kamin, "Dear Mr. Kamin."  It's dated April 6, 2012 and signed

16  by you, is that correct?

17  A.  I don't think -- I think I sent it.  It's my signature.

18  Q.  Well, look at the --

19  A.  Second one.

20  Q.  -- second page.  Your signature appears, I believe.

21  A.  Yes.  Okay.

22  Q.  Okay.  And this was the letter you sent to Mr. Kamin as

23  your formal grievance, correct?

24  A.  Yes.

25  Q.  And you're grieving the -- that you failed your probation

                    Artunduaga - cross by Jepson
                                                              534

 1   and the nonrenewal of your contract, correct?

 2   A.  Yes.

 3   Q.  And also in the --

 4           MR. JEPSON:  And I'll move its admission, Your Honor.

 5           THE COURT:  Any objection?

 6           MS. HYNDMAN:  No objection.

 7           THE COURT:  It's admitted.

 8     (Defendant's Exhibit 142 received in evidence.)

 9   BY MR. JEPSON:

10   Q.  On the bottom of the first page, it's the continuation of

11   your probationary status, and there's a reference here, "After

12   my request for reconsideration" --

13           MS. HALL:  Judge, could we please publish the

14   exhibit?

15           THE COURT:  Oh.  Yes.

16   BY MR. JEPSON:

17   Q.  "After my request for reconsideration, he reversed his

18   initial decision and instead placed me on permanent,

19   nonevaluative probationary status."

20           You wrote that, correct?

21   A.  Yes.

22   Q.  It was your understanding that you would not be receiving

23   any more attending evaluations for any clinical rotations you

24   did after that, correct?

25           "The reason I'm saying it is he placed me on

Artunduaga - cross by Jepson

535

1   permanent, non evaluative probationary status."

2   A.  Oh, okay.  Yes.

3   Q.  Okay.

4   A.  Sorry.

5   Q.  Now -- and there's nothing in that grievance e-mail at all

6   regarding discrimination based on your Colombian national

7   origin, correct?

8   A.  Yes.

9   Q.  And you sent Dr. Roggin a number of e-mails regarding the

10  assignment that you were about to take in Endocrine, correct?

11  A.  Yes.

12  Q.  And, indeed, an e-mail exchange with Dr. Roggin occurred

13  on April 5th in which there were several back-and-forth about

14  the schedule.  Am I correct?

15  A.  Yes.

16  Q.  Let's take a look at Joint Exhibit 107, please.

17         Do you recognize this as that e-mail strain?

18  A.  Yes.

19         MR. JEPSON:  Let's go for a moment to the final

20  page -- or the second-to-final page and make that -- sorry,

21  Mike -- 03.

22  BY MR. JEPSON:

23  Q.  Beginning at the bottom of the page, you wrote to Dr.

24  Roggin:  "Hi, Dr. Roggin.  Dr. Song said I should contact

25  you," and you did.

Artunduaga - cross by Jepson

1      That was your initial reach-out to Dr. Roggin,

2  correct?

3  A.  Yes.

4  Q.  And then he responded:  "Maria, I'd already had to make

5  changes to the schedule to coverage our services.  It is

6  possible that you could rotate on Kaplan for the rest of April

7  and May.  You are scheduled to be on Anesthesia in June."

8      Do you see that?

9  A.  Yes.

10  Q.  And you responded:  "Dr. Roggin, I feel I deserve the

11  opportunity to be on night float for about four weeks as all

12  the other interns normally do -- I already did one week -- and

13  get the opportunity to increase my case numbers in Kaplan.

14  However, I see that the B service already has a large group of

15  residents.  In May, there will only be two.  I appreciate your

16  help."

17      And then it says:  "Maria, I appreciate your

18  request," at the top, "but have already made the changes to

19  the schedule.  Let me know if you would like to rotate on the

20  Kaplan service for those six weeks."

21      And your response later that day was:  "Dr. Roggin,

22  sorry to bother you again with this work.  April - Anesthesia,

23  3 weeks.  May - Kaplan, 5 weeks.  June - night float, 3

24  weeks."

25      And he then responds that evening at 7:51 p.m.:

Artunduaga - cross by Jepson

537

1  "Maria, I think it's best you finish the year on the services

2  that were assigned to you."

3          Do you see that?

4  A.  Yes.

5  Q.  Okay.  And you had that exchange of e-mails with Dr.

6  Roggin, correct?

7  A.  Yes.

8  Q.  And so then you went back to the Kaplan service.  And I

9  want to show you Defendant's Exhibit 143, which is not

10  admitted.

11          THE COURT:  Is there any objection to its admission?

12          MS. HYNDMAN:  No, Your Honor.

13          THE COURT:  It's admitted.

14    (Defendant's Exhibit 143 received in evidence.)

15  BY MR. JEPSON:

16  Q.  And this is an e-mail you wrote to Eric Grossman and

17  copied Dr. Roggin on, correct?

18  A.  Yes.

19  Q.  And it says:  "Hi, Eric.  I'd like to summarize our

20  conversation this morning, April 9th, when I asked you why I

21  didn't get assigned on an equivalent number of OR cases to my

22  co-intern for this week."

23          And, by the way, that was your first week back,

24  correct?

25  A.  Yes.

Artunduaga - cross by Jepson

538

1    Q.  "And you told me that you received instructions from your

2    program director that I should only cover cases/clinics in the

3    Endocrine service, even though B service encompasses both

4    Endocrine and Breast."

5           Do you see that?

6    A.  Yes.

7    Q.  And you state in the next paragraph:  "I feel compelled to

8    document our conversation via e-mail, since these conditions

9    weren't notified to me prior to my return.  I'm still certain

10   that my most recent evaluations convey that I do not represent

11   the type of imminent danger to patient safety that would

12   warrant this type of treatment; however, I will accept Dr.

13   Roggin's assignment and do my job in the ethical and

14   professional way I have always aspired to do."

15          You did send that to Dr. Grossman, correct?

16   A.  Yes.

17   Q.  And that was on April 9th.  And then on April 2 -- let's

18   go to Defendant's Exhibit 144.

19          And this is an e-mail string between you and

20   Dr. Grossman, correct?

21   A.  Yes.

22   Q.  And this is starting on or about April 20, 2012, correct?

23   A.  Yes.

24          MR. JEPSON:  I move this into admission, Your Honor.

25          THE COURT:  Any objection?

Artunduaga - cross by Jepson

539

1          MS. HYNDMAN:  No objection.

2          THE COURT:  It's admitted.

3      (Defendant's Exhibit 144 received in evidence.)

4          MR. JEPSON:  And if we could be published?

5   BY MR. JEPSON:

6   Q.  Here, you're asking Dr. Grossman to assign you to certain

7   cases on April 20th, correct?

8   A.  Yes.

9   Q.  And his response was:  "I appreciate your e-mail and the

10  difficult situation you're in.  As you know, there are many

11  people on our team, including two interns, a second year, a

12  chief, and two medical students.

13          "Please be patient as I try to organize the schedule

14  to optimize everyone's experience."

15          That was his response to you, correct?

16  A.  Yes.

17  Q.  And let's -- I'd like to show you Joint Exhibit 108.

18          This is an e-mail that you sent to both Dr. Song and

19  Dr. Roggin on April 24, 2012, correct?

20  A.  Yes.

21  Q.  And in this e-mail, you are reporting that you're unhappy

22  with the case -- number of cases you're getting, correct?

23  A.  Yes.

24  Q.  And you explain:  "My chief resident has explained to me

25  that this arrangement comes from orders he has received from

Artunduaga - cross by Jepson

540

```
 1   you."
 2            And you write:  "I need to know from you exactly what
 3   order he was given, as well as the reasons behind such an
 4   order.  If I will continue to get to" -- "what seems to be a
 5   very low-quality training for the remainder of my internship
 6   year, I believe at least I have a right to know why, as no
 7   reason has been given to me so far.  Also, I need to clearly
 8   state or find out what kind of credit I'm going to get."
 9            So you sent that to them on April 24th, correct?
10   A.  Yes.
11   Q.  And you sent another e-mail to them, this one a couple of
12   days later.
13            MR. JEPSON:  And let's go to Defendant's Exhibit 146,
14   which has not been admitted.
15   BY MR. JEPSON:
16   Q.  Now, Dr. Artunduaga, the e-mail in the center of the page
17   appears to be one from you to Dr. Song and Dr. Roggin dated
18   April 26, 2012, am I correct?
19   A.  Yes.
20   Q.  And that's an e-mail you sent to them?
21   A.  Yes.
22   Q.  And the e-mail above is a follow-up you sent, correct?
23   A.  Yes.
24            MR. JEPSON:  And I'd move this admission -- into
25   evidence.
```

Artunduaga - cross by Jepson

541

1          THE COURT:  Any objection?

2          MS. HYNDMAN:  Yeah, Your Honor.  This violates your

3    order in motion *in limine* No. 6.

4          MR. JEPSON:  I am not offering it for the ACGME

5    meeting part of it, Your Honor.  I am offering it to show the

6    nature of the -- the phrasing of the letter to them.

7          MS. HYNDMAN:  I think it should have been redacted if

8    they intended to use it for that purpose.  I mean, your order

9    was clear, and --

10         THE COURT:  I can admit it --

11         MS. HYNDMAN:  -- I don't think it's appropriate.

12         THE COURT:  -- with that taken out, so why don't you

13   redact it before displaying it to the jury.

14         MR. JEPSON:  Okay.

15         THE COURT:  That particular reference.  I will admit

16   it with that redaction.

17         MR. JEPSON:  Thank you.

18     (Defendant's Exhibit 146 received in evidence.)

19         MR. JEPSON:  All right.  While that's being done, let

20   us move on to Defendant's Exhibit 194.

21         MS. HALL:  Just one second, please.

22         MR. JEPSON:  Are you going to get it done?

23         MS. HALL:  Yeah.

24     (Pause.  Counsel conferring.)

25         MS. HYNDMAN:  Thank you.

Artunduaga - cross by Jepson

542

 1          MR. JEPSON:  All right.

 2          THE COURT:  Is it redacted to publish?

 3          MS. HYNDMAN:  Yes.

 4          MS. HALL:  Yes.

 5          MR. JEPSON:  It's amazing how technology works, to

 6   get it done --

 7          THE COURT:  I know.

 8          MR. JEPSON:  -- so fast nowadays.

 9   BY MR. JEPSON:

10   Q.  Dr. Artunduaga, this is an e-mail you sent to Drs. Song

11   and Roggin, correct?

12   A.  Yes.

13   Q.  And you haven't yet -- you haven't received a response

14   from them to your April 24th e-mail, am I correct?

15   A.  Yes.

16   Q.  And as -- this reads:  "This is the second attempt I'm

17   making to get an answer to a straightforward question you seem

18   to have ignored.  An order has been given that has directly

19   and significantly affected the quality of the training I have

20   been receiving over the last several weeks, and I have been

21   given no notice of what the order was and why it was given.

22          "In case I haven't made my expectations clear, I am

23   not here to add a line to a resume; I am here to receive an

24   education, and I have already been made to waste 1 full month

25   of my time.

Artunduaga - cross by Jepson

1    "For one last time, if I do not receive a

2  satisfactory response and" -- then you go on:  "As Dr. Song

3  himself said, my contract remains in full effect, with all the

4  rights and obligations."

5    So you sent this to them, correct?

6  A.  Yes.

7  Q.  And you were demanding to hear back from them at 9:00 a.m.

8  the following morning, correct?

9  A.  Yes.

10  Q.  And Dr. Roggin was the section -- the residency program

11  director, full attending for the General Surgery residency

12  program, correct?

13  A.  Yes.

14  Q.  And Dr. Song was chief of Plastic Surgery at UCMC?

15  A.  Yes.

16  Q.  Now, you were then removed from clinical, correct?

17  A.  Yes.

18  Q.  And --

19  A.  Right after this e-mail.

20  Q.  Pardon me?

21  A.  Right after this e-mail.

22  Q.  And you were removed.  And, indeed, you were given an

23  April 30, 2012 letter to that effect, correct?

24  A.  Yes.

25  Q.  Let me direct your attention to -- sorry -- Joint Exhibit,

Artunduaga - cross by Jepson

1    I'm sorry, 109.

2           And there's a cover e-mail and then a letter attached

3    to it, correct?

4    A.  Yes.

5    Q.  And the letter dated April 30th indicates that -- again,

6    reiterates you haven't been offered another year of training,

7    correct?

8    A.  Yes.

9    Q.  And it also indicates -- with respect to the clinical

10   experience, in the third paragraph, it says:  "We provided you

11   with clinical experience that would allow you to complete your

12   internship year.  This experience was done under heightened

13   supervision due to the deficiencies that resulted in the

14   nonrenewal decision and the continuing probation.  You have

15   complained that this is an inadequate and is" -- "and a waste

16   of time."  Now --

17   A.  I'd say this "is somehow" --

18   Q.  Yeah.  What you say --

19   A.  -- "discriminatory" --

20   Q.  I'll read it to you.

21   A.  -- "and" --

22   Q.  "You have complained" --

23   A.  -- "in violation" --

24          THE COURT:  Wait, wait, wait, wait.  You both can't

25   talk at the same time.

Artunduaga - cross by Jepson

545

1    BY MR. JEPSON:

2    Q.  "This is an inadequate experience, is somehow

3    discriminatory, and is in violation of the rights you claimed

4    to have."

5           Do you see that?

6    A.  Yes.

7    Q.  "And you have, surprisingly, stated that it is a 'waste of

8    your time.'"  Do you see that?

9    A.  Yes.

10   Q.  And at this point in time, the nonrenewal decision had

11   already been made, correct?

12   A.  Yes.

13   Q.  And you had already filed a grievance, correct?

14   A.  Yes.

15   Q.  And it goes on to say that:  "There is nothing that gives

16   an intern any rights to any specific rotations or

17   experiences."

18          Do you see that?

19   A.  Yes.

20   Q.  And going to the very end, it says:  "This letter is to

21   inform you that we will give you one more chance to complete

22   your internship.  Any further incidents of professional" --

23   "unprofessional behavior, insubordination, harassment, threats

24   or dereliction of your responsibilities will result in your

25   immediate termination.

Artunduaga - cross by Jepson

546

1          "Your assignment beginning May 1 is to complete an

2     independent study under my supervision.  If you do that, we

3     will be able to certify that you completed your internship

4     year."  Correct?

5     A.  Yes.

6     Q.  Now, you did complete the independent study, correct?

7     A.  Yes.

8     Q.  And you did receive a certification that you had completed

9     your internship year from Dr. Song, correct?

10    A.  I received a letter undated with --

11    Q.  Well, you did --

12    A.  -- no letterhead.

13    Q.  Let's go to Joint Exhibit 110.  This is what you're

14    referring to, correct?

15    A.  Yes.

16    Q.  And it says:  "This is submitted as the Summative

17    Evaluation for Maria Artunduaga."

18          Do you see that?

19    A.  Yes.

20    Q.  And it describes what rotations you went through, correct?

21    A.  Yes.

22    Q.  And it indicates you were placed on probation, correct?

23    A.  Yes.

24    Q.  And it indicates you were non-renewed, correct?

25    A.  Yes.

Artunduaga - cross by Jepson

1  Q.  And it indicates in No. 6 that you completed the academic

2  year effective June 30, 2012, correct?

3  A.  Yes.

4  Q.  And you never followed up with Dr. Song to get this in any

5  other different format, did you?

6  A.  I wrote --

7  Q.  Did you --

8  A.  -- him --

9  Q.  You never followed up with him in any way, shape, or form

10  to get another format?

11  A.  I sent him -- so when I ask him for this, I also asked him

12  for other, like, letter of recommendation for a different

13  specialty.

14  Q.  I'm not asking you if you asked him for a letter of

15  recommendation.

16         You started to say that you didn't like the way this

17  was formatted.  You never asked him for this to be formatted

18  in any different way, did you?

19  A.  No.

20  Q.  Now, you did proceed with your grievance, correct?

21  A.  Yes.

22  Q.  And, indeed, prior to -- there was a grievance hearing

23  held on May 16, 2012, right?

24  A.  Yes.

25  Q.  And I believe it's already been put into evidence that for

Artunduaga - cross by Jepson

 1   your side of the case, you presented, correct?

 2   A.  Yes.  I read --

 3   Q.  And before --

 4   A.  -- a document.

 5   Q.  -- you made your --

 6           THE COURT REPORTER:  I'm sorry?  "I read" --

 7           THE WITNESS:  I read a letter.

 8   BY MR. JEPSON:

 9   Q.  Well, and before you --

10   A.  Is that what you mean?

11   Q.  -- testified, you presented more -- a 50-page document for

12   the committee to consider, correct?

13   A.  I wanted to present it, but --

14   Q.  No.  Before -- you filed something on May 8th, 2012 at the

15   same time the section did, correct?

16   A.  I don't understand the question.

17   Q.  Before the hearing --

18   A.  Yes.

19   Q.  -- you submitted a paper supporting your position,

20   correct?

21   A.  Can you show me the exhibit?

22   Q.  I'll have to, then.

23   A.  Sorry.

24   Q.  You're aware that the committee -- you exchanged documents

25   with the committee, correct?  The committee submitted an inch

Artunduaga - cross by Jepson

549

1   and a half of paper?

2   A.  I think so.

3   Q.  And you submitted something at the very same time,

4   correct?

5   A.  I think so.

6   Q.  And, indeed, you asked to have the time for your

7   submission extended from May 7th to May 8th or 9th, correct?

8   Remember that?

9   A.  I don't remember.  Sorry.

10  Q.  Okay.

11  A.  If you have exhibits --

12  Q.  In any event, the hearing was held, correct?

13  A.  Yes.

14  Q.  And in addition to you, Dr. Kaplan testified?

15  A.  Yes.

16  Q.  And Dr. Steppacher --

17  A.  Yes.

18  Q.  -- correct?  And Dr. Song, Dr. Park, and Dr. Greives --

19  A.  Yes.

20  Q.  -- correct?  And during that hearing, you never raised an

21  issue of discrimination, did you?

22  A.  I was not allowed to.

23  Q.  You never did raise an issue of discrimination, correct?

24  You never said anything about it --

25  A.  They --

Artunduaga - cross by Jepson

1   Q.  -- is that correct?  Is that correct or not?

2          THE WITNESS:  Should I say "yes" or "no"?

3          THE COURT:  Answer the question the best you can.

4   BY MR. JEPSON:

5   Q.  You didn't raise it, correct?

6   A.  Krista Curell didn't allow --

7   Q.  I'm --

8   A.  -- me to.

9   Q.  Well, she'll testify.

10  A.  Okay.

11  Q.  But you didn't raise any issue of discrimination at the

12  hearing, correct?

13  A.  I talked about accent.

14  Q.  You talked about your accent?  Okay.  But you didn't --

15  A.  Being an issue.

16  Q.  -- say, "I'm being discriminated against because of my

17  Colombian national origin," or words to that effect, did you?

18  A.  I -- not exactly those words.

19  Q.  Okay.  And the committee was made up of non-surgeons,

20  correct?

21  A.  Yes.

22  Q.  Dr. John McConville of Critical Care, program director for

23  the residency, correct?

24  A.  Yes.

25  Q.  And Dr. Michael Hernandez, residency program director for

Artunduaga - cross by Jepson

551

1  Anesthesia?

2  A.  Yes.

3  Q.  And then two chief residents, correct?

4  A.  Yes.

5  Q.  And then Krista Curell was the chairperson, correct?

6  A.  Yes.

7  Q.  And that committee came out with a decision, correct?

8  A.  Yes.

9  Q.  And that decision, you indicated -- there was an e-mail

10  that was sent out shortly after the hearing ended, but a

11  formal decision followed, correct?

12  A.  Yes.

13  Q.  And that decision came out on May -- on or about May 23,

14  correct?

15  A.  Yes.

16      MR. JEPSON:  Let me pull out here -- I apologize.  I

17  wrote the wrong exhibit number, but it is Defendant's

18  Exhibit --

19      MS. HALL:  177.

20      MR. JEPSON:  -- 177.  This has not been admitted.

21  BY MR. JEPSON:

22  Q.  For the record, Dr. Artunduaga, do you recognize this as

23  the decision you received?

24  A.  I cannot see it.  Oh.  If you would go down -- yes.  I can

25  see it, yes.

Artunduaga - cross by Jepson

552

1   Q.  Okay.  And this would have been sent to you on or about

2   the 23rd of May, 2012, correct?

3   A.  Yes.

4   Q.  And it indicates here, doesn't it, in the middle

5   paragraph --

6           MS. HYNDMAN:  Your Honor --

7           MR. JEPSON:  I'm sorry.  Move for admission.

8           THE COURT:  Any objection?

9           MS. HYNDMAN:  I would just like a limiting

10  instruction, to the extent it's hearsay, that it's not being

11  offered for the truth.

12          MR. JEPSON:  Well, it's certainly what the committee

13  decided to do.

14          MS. HYNDMAN:  But it's hearsay.

15          THE COURT:  But it's not being offered for the truth

16  of the contents, and --

17          MR. JEPSON:  Correct.

18          THE COURT:  -- she's not disputing what the committee

19  decided to do.

20          MR. JEPSON:  Correct.

21          MS. HYNDMAN:  Correct.

22          THE COURT:  I will admit it with that limitation.

23     (Defendant's Exhibit 177 received in evidence.)

24          THE COURT:  Ladies and gentlemen, the document that

25  is being admitted is not being offered for the truth of its

Artunduaga - cross by Jepson

553

1    contents.  It is, instead, being offered to show what action

2    was taken, but not for the truth of what's written in it.

3         Go ahead.

4    BY MR. JEPSON:

5    Q.  The second paragraph states -- second sentence, actually:

6    "The committee was requested to review two actions taken by

7    the Plastic Surgery residency program director and section:

8    Nonrenewal of Dr. Artunduaga's contract, and extension of Dr.

9    Artunduaga's probation through the end of the year.

10        "After consideration of the evidence submitted by

11   both parties and testimony presented at the hearing, the

12   committee affirmed the decisions of the program director to

13   not renew Dr. Artunduaga's contract and extend her probation

14   through the end of the academic year.  The decision of the

15   committee was unanimous."

16        And it goes on to state in the next paragraph:

17   "Based on the evidence presented by the parties, the committee

18   determined the decisions were supported by the section and

19   were not arbitrary or capricious."

20        MS. HYNDMAN:  Your Honor, I object to that.  I think

21   that goes to the truth of.

22        MR. JEPSON:  It's what the committee ruled.

23        THE COURT:  Again, this is not going to the truth of

24   the matter of what is reported in there; just the fact of

25   that's the decision they made.

Artunduaga - cross by Jepson

554

```
 1              MR. JEPSON:  Thank you, Your Honor.

 2              THE COURT:  Is that acceptable, Ms. Hyndman?

 3              MS. HYNDMAN:  Yes, that's fine.  Thank you, Judge.

 4   BY MR. JEPSON:

 5   Q.  And you appealed this decision, correct?

 6   A.  Yes.

 7   Q.  And the -- and you appealed it to the president and the

 8   dean of the University of Chicago Medical Center?

 9   A.  Yes.

10   Q.  And they upheld, correct?

11   A.  Yes.

12   Q.  Okay.  Now, I just have a couple more points, believe it

13   or not.

14              We talked a little earlier about an incident

15   involving a Dr. Tothy in which you admitted you hung up on

16   her, correct?

17   A.  Yes.

18   Q.  And you indicated that -- or at least -- I believe you

19   testified that you sent her an apology on the day that

20   happened, correct?

21   A.  Yes.

22   Q.  And I want to direct your attention to --

23   A.  What --

24   Q.  -- Defendant's Exhibit 122, which has not been admitted.

25   I don't believe it has.
```

Artunduaga - cross by Jepson

555

1          THE COURT:  Is there any objection to its admission?

2          MS. HYNDMAN:  No objection, Judge.

3          THE COURT:  Okay.  I will admit 122.

4      (Defendant's Exhibit 122 received in evidence.)

5    BY MR. JEPSON:

6    Q.  And I want to direct your attention to the second page.

7          Is this the apology that you sent to Dr. Tothy on the

8    night of the incident?

9    A.  Yes.

10   Q.  Would you read the -- read it into the record for me,

11   please.

12         THE COURT:  Doctor, he's asking you, yes.

13         THE WITNESS:  I'm sorry.

14   BY THE WITNESS:

15   A.  What do you want me to --

16   BY MR. JEPSON:

17   Q.  After all the times when I've been reading, I'm actually

18   asking you to read this, if you would.

19         THE COURT:  Do you want to highlight --

20   BY THE WITNESS:

21   A.  Yeah, I was expecting you to read --

22         THE COURT:  Do you want to highlight --

23   BY THE WITNESS:

24   A.  -- this paragraph.

25         THE COURT:  -- for her what exactly you want her to

Artunduaga - cross by Jepson

556

1    read?  The whole thing or --

2              MR. JEPSON:  Yes.

3              THE COURT:  Okay.

4              MR. JEPSON:  It's not that long.

5    BY THE WITNESS:

6    A.  Everything?

7    BY MR. JEPSON:

8    Q.  Yes.

9    A.  Okay.  "So regarding the incident this morning" --

10   Q.  No, no.  Everything.

11   A.  Oh, sorry.

12             "Dear Dr. Tothy:  I tried to reach you tonight, but

13   you did not return my page.

14             "Regarding the incident this morning, I apologize if

15   my response time was not up to your expected standards.  Since

16   your consult did not seem emergent, I took care of several

17   issues in the floor that needed to be addressed by 10:00 am.

18   When you paged me around 10:30 am, I told you that the patient

19   was already seen, that the mother was aware of the plan and

20   medical treatment, no surgery, and that I needed to staff the

21   consult prior to go ahead and splint the patient.

22             "It is understandable your interest on following-up

23   consults; in my experience, the plan is informed to the ED

24   once it has been discussed with the consulting senior resident

25   or attending.  Also, you should realize that surgical services

Artunduaga - cross by Jepson

1  might take longer to execute the plans since most of the time

2  we are in the OR.  In the future, let us know if your consults

3  are of extreme urgency so that we can tell our senior

4  residents that you are requesting it.

5         "I have copied Dr. Henry in this e-mail who is aware

6  of the situation.

7         "Thank you for understanding."

8  Q.  Thank you, Dr. Artunduaga.

9         And at the time you sent this, you obviously were an

10  intern, correct?

11  A.  Yes.

12  Q.  And Dr. Tothy was the medical director for Pediatric

13  Emergency Care, correct?

14  A.  Yes.  I didn't know at the time.

15  Q.  Okay.  Now, it's true, isn't it, that you don't believe

16  that Dr. Song was motivated by your Colombian national origin

17  in connection with the actions he took towards you, correct?

18  A.  Can you -- that Dr. --

19  Q.  You don't believe that Dr. Song was motivated by your

20  Colombian national origin when he put you on probation or

21  non-renewed your contract?

22         MS. HYNDMAN:  Objection.  That goes to the ultimate

23  issue for the jury to determine.

24         MR. JEPSON:  It was asked and answered at a

25  deposition.

Artunduaga - cross by Jepson

1          MS. HYNDMAN:  Whether it was or not, that's not a

2     question that needs to be objected to at a deposition.

3          THE COURT:  But it's her belief he's asking about.

4          MR. JEPSON:  Yes.

5          MS. HYNDMAN:  And her belief, I don't think, is

6     relevant, and it goes to the ultimate issue that the jury is

7     to determine.

8          MR. JEPSON:  It's why we're here, Your Honor.

9          THE COURT:  The objection overruled.  Again, it's --

10    he's asking her belief.

11    BY MR. JEPSON:

12    Q.  That's correct, isn't it?

13         THE COURT:  And are you --

14         MR. JEPSON:  I'll ask it --

15         THE COURT:  I think you need to -- yes, rephrase.

16         MR. JEPSON:  Let me do it again.

17    BY THE WITNESS:

18    A.  Do you want me to --

19         THE COURT:  Wait.  There's no question pending.

20    BY MR. JEPSON:

21    Q.  No, I'm not --

22         THE COURT:  He's going to rephrase.

23    BY MR. JEPSON:

24    Q.  -- asking you to explain.

25         You don't believe that anything Dr. Song did with

Artunduaga - redirect by Hyndman

559

 1  respect to you was motivated by the fact that you're

 2  Colombian, do you?

 3  A.  I believe he retaliated against me because I complain

 4  about national origin discrimination.

 5  Q.  But the answer to my question is what?

 6  A.  No.

 7  Q.  Okay.

 8           MR. JEPSON:  I'm -- thankfully --

 9           THE WITNESS:  More?

10           MR. JEPSON:  -- no further questions.

11           THE COURT:  Redirect.

12                      REDIRECT EXAMINATION

13  BY MS. HYNDMAN:

14  Q.  I just have a few questions, Maria.

15  A.  Okay.

16  Q.  Yesterday, when Mr. Jepson was asking you questions, he

17  asked you about the lawsuit -- this lawsuit that you filed on

18  October 31st of 2012.

19           Do you remember that testimony?

20  A.  Yes.

21  Q.  And he asked you about interviews you had shortly after

22  the time you filed the lawsuit.

23           When you went to the interviews at Iowa and Weiss and

24  Baylor, did you talk to the attending physicians there about

25  the lawsuit that you'd filed?

Case: 1:12-cv-08733 Document #: 294 Filed: 06/20/17 Page 190 of 285 PageID #:8038
Artunduaga - redirect by Hyndman
560

1  A.  I did -- I did not talk about the lawsuit, but they wanted

2  to know what has happened with me at the University of

3  Chicago, especially because I was in a six-year training

4  program, and usually people in long -- like, it's called

5  category --

6          MR. JEPSON:  Objection, nonresponsive.

7          THE COURT:  I think we're getting a little narrative.

8  Why don't you --

9          MS. HYNDMAN:  Yes.  That's fine.

10          THE COURT:  -- ask another question.

11          THE WITNESS:  Sorry.

12  BY MS. HYNDMAN:

13  Q.  You said you didn't talk about the lawsuit?

14  A.  No.  Sorry.

15  Q.  Did you talk anything about your experience at the

16  University of Chicago?

17  A.  They asked me, and I explained.

18  Q.  What did you say when you explained?

19  A.  That I had faced a hostile work environment based on my

20  national origin and my accent.

21  Q.  Why did you tell them that?

22  A.  Because it is my belief that that's what happened at the

23  University of Chicago and I wanted to be truthful.

24  Q.  Mr. Jepson asked you about your Facebook, something you

25  had posted on Facebook.

Artunduaga - redirect by Hyndman

561

1   A.   Yes.

2   Q.   In 2012, who had access to your Facebook feed?

3   A.   My friends, mostly people from Colombia.

4   Q.   Did -- was it open to the public or did you --

5   A.   No.

6   Q.   -- have it restricted to your friends?

7   A.   No, no, no.  Just friends.

8   Q.   He asked you some questions about Dr. Umanskiy and the

9   fact that Dr. Umanskiy spoke with an accent and came from a

10  different country.

11          Do you know where Dr. Umanskiy did his medical

12  training?

13  A.   Yes.  Case Western University, his medical school, and he

14  trained there as a general surgeon, too.

15  Q.   Do you --

16  A.   In colorectal, I think.

17  Q.   Do you know where Case Western University is?

18  A.   Ohio.

19  Q.   Let's -- can we take a look at Defendant's Exhibit 45,

20  please.

21          THE COURT:  Did you say Defendant's?

22          MS. HYNDMAN:  Yes.

23          THE COURT:  Okay.  And that's in evidence.

24          MS. HYNDMAN:  That is in evidence.

25          Do we have it up?

Artunduaga - redirect by Hyndman

562

1          MS. FRANKLIN:  They're making the switch.

2          MS. HYNDMAN:  Oh.  There we go.  All right.  And can

3    we zoom in, Jamie -- yeah.

4    BY MS. HYNDMAN:

5    Q.  Mr. Jepson went through this with you in some detail, and

6    there's a lot of references here to different -- these are

7    different patients that are referred to --

8    A.  Yes.

9    Q.  -- on this document, right?  Were all the patients that --

10   A.  He asked me about this.

11   Q.  Were all the patients that are referred to on this

12   document that Dr. Nyugen gave you, were those all patients

13   that you had treated yourself?

14   A.  No.

15   Q.  Okay.  Which of the patients on here were patients that

16   you had treated?

17   A.  Okay.  So vaginal bleedings, that was one of Dr. Lusardi's

18   patients.  The cardiology consult, that was one of -- it was

19   actually same patient that Dr. Lusardi was taking care of.

20          Same thing with the gynecologic consult because it

21   was related to vaginal bleeding that ended up to be just her

22   period.  Same thing with the endocrine consult.  It was the

23   same patient under Jonathan Lusardi's supervision.

24          The next, following directions, ordering appropriate

25   diagnostics -- yeah, that part -- I order a transfer of a

Artunduaga - redirect by Hyndman

563

1   patient out of the unit before attending confirmation by

2   senior.

3   Q.  That was your patient?

4   A.  That was my patient.

5   Q.  Okay.

6   A.  She was in shock, and I transfer her to the ICU --

7   Q.  Okay.

8   A.  -- before --

9   Q.  And then just --

10  A.  -- an approval.

11  Q.  -- going through it, which ones were yours and which ones

12  were Dr. Lusardi's?

13  A.  Sorry.  Yes.  So the plaster splint, that was a mistake of

14  mine because I had never done a hand rotation before, so I

15  confused the name of the splint.

16          MR. JEPSON:  Objection, narrative.

17  BY MS. HYNDMAN:

18  Q.  The only question, Maria, is which one --

19  A.  Sorry.

20  Q.  -- of these were your patients and which were

21  Dr. Lusardi's.

22  A.  Sorry.

23  Q.  Okay?

24  A.  Okay.  So order a transfer -- oh, I touch it.  Plaster

25  splint, CT abdomen.  Only my patients, right?  (Witness

```
 1   reading) Not mine.  Heavy reliance on photos.

 2   Q.  Which one?  I'm sorry.  I didn't --

 3   A.  Heavy reliance on photo -- photographs.

 4   Q.  I think the rest of are --

 5   A.  Consults.

 6   Q.  -- don't relate to patients.  That's just general.

 7           I just wanted to know if these ones at the top

 8   here --

 9   A.  No.

10   Q.  -- which were your patients and which were --

11   A.  So --

12   Q.  So the ones that are not yours --

13           MR. JEPSON:  I object to the characterization.  I

14   think they all relate to people.

15           THE COURT:  Sustained on form.  Rephrase.

16   BY MS. HYNDMAN:

17   Q.  I was talking about the specific orders for different

18   patients at the top.  That's what I -- I wasn't talking about

19   anything under Description of Wounds and Fractures and

20   Consults at the bottom.  I was only talking about the top,

21   which of those were your patients and which weren't.

22           MR. JEPSON:  Sorry, Cindy.

23           MS. HYNDMAN:  Yeah.

24   BY THE WITNESS:

25   A.  The first paragraph.
```

Case: 1:12-cv-08733 Document #: 294 Filed: 06/20/17 Page 195 of 285 PageID #:8043
Artunduaga - redirect by Hyndman
565

1   BY MS. HYNDMAN:

2   Q.  Yeah.  What -- I think we've covered it.

3   A.  Sorry.  Oh, okay.

4   Q.  I think we've covered it.

5   A.  None of them --

6   Q.  That's what I'm --

7   A.  -- were mine.

8   Q.  That's what I'm trying to say.

9   A.  None of them were mine.

10  Q.  When you met with Dr. Nyugen, did you tell her which of

11  these patients were yours and which were Dr. Lusardi's?

12  A.  Yes, I did.

13  Q.  Did you ask her to make any notations on this document?

14  A.  No, I did not.  We were -- it was done informal,

15  conversation.

16  Q.  I think there were a couple of references in some e-mails

17  that you had sent to Dr. Kaplan and Dr. Jaskowiak and

18  Dr. Roggin where you said your monthly evaluations were lower

19  than what other Plastic Surgery residents usually get.

20          How did you have that information?

21  A.  Because Dr. Song told me.

22  Q.  So that's what Dr. Song told you?

23  A.  Yes.

24  Q.  Okay.  You didn't have any independent knowledge of

25  whether that was true or not?

Artunduaga - redirect by Hyndman

566

1   A.  No.

2   Q.  Okay.  And then you started to answer Mr. Jepson, and he

3   cut you off, about what did you tell Dr. Roggin in that

4   meeting about being an excellent resident?

5   A.  I told him that I had the potential to be an excellent

6   resident if I had received feedback on time on mentoring

7   which, up to that date, I felt that I had not.

8   Q.  And then there were a number of questions about where

9   Carla Moreira was coming from when she came to visit you at

10  your office.

11          Do you remember that?

12  A.  Yes.

13  Q.  And your testimony was that she came from North Shore?

14  A.  Yes.

15  Q.  And did you meet -- what did you mean by North Shore?

16  A.  North Shore Hospital.

17          MS. HYNDMAN:  Okay.  Can we take a look at

18  Plaintiff's Exhibit No. 77?  And if we look --

19          THE COURT:  Have you moved it in yet?

20          MS. HYNDMAN:  Yeah.  That's in evidence.

21          THE COURT:  Okay.

22          MS. HYNDMAN:  Jamie, I think it's the page 21374.

23  It's about the -- it's the second-to-last page, I think.

24          MS. FRANKLIN:  Okay.

25  BY MS. HYNDMAN:

Artunduaga - redirect by Hyndman

1   Q.  Do you see what rotation Dr. Moreira was on for the month

2   of October in 2011?

3   A.  It is not the right page.

4   Q.  Oh.

5   A.  Sorry.  Go two pages --

6   Q.  It's the page --

7   A.  Before.

8   Q.  -- before.

9   A.  Two before.

10  Q.  There we go.

11  A.  Carla.  "North Shore" means it's minimum evasive surgery.

12  Q.  Now, Mr. Jepson asked you a lot of questions about the

13  e-mails you sent to the various attendings when you were on

14  probation --

15  A.  Yes.

16  Q.  -- about your evaluations.  Was it your intent to ask

17  these attending physicians to be untruthful in their

18  evaluation of you?

19  A.  No.

20  Q.  Did you ever ask an attending physician to change a score

21  from a lower score to a higher score?

22  A.  No, never.

23  Q.  What was your goal in sending those e-mails to the

24  attending physicians?

25  A.  So I had already recognized that my main problems came

Artunduaga - redirect by Hyndman

1   from feedback, so I just wanted to get feedback on mentoring

2   as soon as possible.  I wanted to get better, truly get better

3   through -- use the probation to improve.

4           MS. HYNDMAN:  Let's take a look at Defendant's

5   Exhibit 112, please.

6           THE COURT:  And that's in evidence.

7           MR. JEPSON:  Yes.

8           MS. HYNDMAN:  Is that Defendant's Exhibit 112?  Did I

9   have the wrong one?  Yeah, there we go.  Thank you.

10  BY MS. HYNDMAN:

11  Q.  If you look at the --

12          MS. HYNDMAN:  Maria's e-mail.  You had it on the

13  second page there.

14  BY MS. HYNDMAN:

15  Q.  Do you see where you say -- you say in this e-mail to Dr.

16  Song:  "I also mentioned it to Dr. Park during our February

17  weekly meeting.  She said it was okay as long as it was only a

18  few hours."

19          What did you mean by that in that e-mail?

20  A.  That it will be okay as long as for the next week, I have

21  fewer hours.

22  Q.  You didn't mean to suggest to Dr. Song that Dr. Park said

23  it was okay for you to be over hours?

24  A.  No, he -- no.  Perhaps I should have explained better.

25  Q.  Mr. Jepson showed you a couple of evaluations you received

Artunduaga - redirect by Hyndman

1   from the Plastic Surgery residents in the month of March, your

2   weekly evaluations.

3           Do you remember he showed you those?

4   A.  Uh-huh, yes.

5           MS. HYNDMAN:  Can we take a look at Joint Exhibit No.

6   93?

7   BY MS. HYNDMAN:

8   Q.  Have you seen this document before, Dr. Artunduaga?

9   A.  Yes.

10  Q.  What is it?

11  A.  The second evaluation coming from Grant Kleiber.

12  Q.  And if you look at No. 2 there, under the question:  "Was

13  Dr. Artunduaga efficient in completing her work," what does

14  Dr. Kleiber indicate there?

15  A.  "Shows improvement."

16  Q.  And what does he say immediately in the Comments under

17  that?

18  A.  "She has improved her efficiency since I spoke to her last

19  week."

20  Q.  Okay.  And if you look at the Overall Comments --

21          MS. HYNDMAN:  And if we could zoom in on those.

22  BY MS. HYNDMAN:

23  Q.  -- can you just read those into the record, please, Maria.

24  A.  The Overall Comments?

25  Q.  Yeah, the Overall Comments.

Artunduaga - redirect by Hyndman

1   A.  "I did not work with Maria as much this past week as her

2   first week on the service.  I" -- "my limited interactions

3   with her over the past week, I believe she has shown

4   improvement in the specific areas I discussed with her at the

5   end of last week.  She still has a long way to go, but I

6   believe she is earnestly working on improving as a resident."

7           MS. HYNDMAN:  If we could look at Joint Exhibit No.

8   90 as well, please.

9   BY MS. HYNDMAN:

10  Q.  Dr. Artunduaga, do you recognize this document?

11  A.  Yes.

12  Q.  What is this?

13  A.  Dr. Jonathan Bank's weekly evaluation.

14  Q.  For which week?

15  A.  Oh, sorry.  From March the 10th to the 15.

16  Q.  And if you can look at No. 2 --

17  A.  Yes.

18  Q.  -- what does Ms. -- what does Dr. Bank say there?

19  A.  "Shows improvement."

20          MS. HYNDMAN:  Okay.  And if we could look at the

21  Overall Comments again, please.

22  BY MS. HYNDMAN:

23  Q.  Can you read what he put in the Overall Comments there?

24  A.  Yes.  "Although I had less opportunity to interact with

25  Maria this week - I did note an improvement in overall

Artunduaga - redirect by Hyndman

1      function."

2             MS. HYNDMAN:  If I could just have a moment, Your

3      Honor?

4             THE COURT:  You may.

5        (Counsel conferring.)

6             MS. HYNDMAN:  That's all I have for right now.

7             THE COURT:  Recross?

8             MR. JEPSON:  No further questions, Your Honor.

9             THE COURT:  Thank you, Doctor.  You may step down.

10       (Witness excused.)

11            THE COURT:  Please call your next witness.

12            MS. HYNDMAN:  Plaintiffs call Dr. Edwin Kaplan.  We

13     just need a moment to get set up.

14            THE COURT:  Okay.

15            MS. FRANKLIN:  And I also need to get the arrow on

16     the screen cleared, if we could.

17            MS. HYNDMAN:  How do we do that?

18       (Counsel conferring.)

19            MS. HYNDMAN:  We have an arrow because somebody

20     was -- because Maria touched the screen.

21            THE COURT:  Press the bottom right -- it's either the

22     bottom right or bottom left of the screen --

23            MR. JEPSON:  Your Honor --

24            THE COURT:  -- on the Elmo there.

25            MS. FRANKLIN:  Oh.

```
 1              MR. JEPSON:  -- I neglected to move in Defendant's
 2    Exhibit 137, which is the Puneet Singh text.
 3              THE COURT:  Is there any objection?
 4              MS. HYNDMAN:  No objection.
 5              THE COURT:  Okay.  I will admit that.
 6        (Defendant's Exhibit 137 received in evidence.)
 7        (Witness enters.)
 8              THE COURT:  Please come forward, Doctor.
 9              THE WITNESS:  Yes.
10              THE COURT:  Please raise your right hand, sir.
11              THE WITNESS:  Yes.
12        (Witness duly sworn.)
13              THE COURT:  You may be seated, sir.
14              MS. FRANKLIN:  Sorry, Your Honor.  The equipment's
15    not on yet.  Is there a way to --
16              THE COURT:  Okay.  We have to switch it over.
17              MS. FRANKLIN:  Yeah, that'd be great.
18        (Pause.)
19              THE COURT:  Are you plugged in?
20              MS. FRANKLIN:  Yes, I'm plugged in.
21              THE COURT:  Joe is coming.  He's our technical guru.
22    It's off on a link in your plug.
23        (Pause.)
24              THE COURT:  Do you want to start your questioning?
25              MS. FRANKLIN:  Yes, Your Honor.
```

Kaplan - direct by Franklin

573

1          THE COURT:  Joe is playing with this.

2          MS. FRANKLIN:  Absolutely.

3          EDWIN LOUIS KAPLAN, PLAINTIFF'S WITNESS, SWORN

4                    DIRECT EXAMINATION

5  BY MS. FRANKLIN:

6  Q.  Good afternoon, Dr. Kaplan.  Could you please state your

7  full name for the record.

8  A.  I'm having a little trouble hearing you from where you're

9  talking, so --

10  Q.  Is that any better, Dr. Kaplan?

11  A.  It is.  Thank you.

12  Q.  Great.  Could you please --

13  A.  My name is Edwin Louis Kaplan.

14  Q.  And are you employed by University of Chicago Medical

15  Center?

16  A.  I am.

17  Q.  And what's your position there?

18  A.  Professor of surgery.

19  Q.  What year did you begin practicing medicine?

20  A.  It depends what you mean by that.  I had finished medical

21  school in 1961 and finished my residency at the University of

22  Pennsylvania in surgery in 1967.  I then took a year of

23  fellowship at the Mayo Clinic and returned to Chicago in 1968

24  at Michael Reese Hospital.

25  Q.  And, Dr. Kaplan, what year did you join UCMC?

Kaplan - direct by Franklin

1   A.  The University of Chicago was -- Michael Reese was part of

2   the University of Chicago, so I actually in 1968 was assistant

3   professor there.  In 1971, I went over to what was then called

4   Billings Hospital and -- yes.  And I've been there since.

5   Q.  All right.  And what's the name of the surgical service

6   that you're currently on, Dr. Kaplan?

7   A.  Well, I'm honored that they call the surgical service the

8   Kaplan service.

9   Q.  And that's in honor of you?

10  A.  Pardon?

11  Q.  That's named in honor of you?

12  A.  It is.

13  Q.  Dr. Kaplan, did you work with Dr. Maria Artunduaga when

14  she was an intern at UCMC?

15  A.  I did.  I did.

16  Q.  And how long was Dr. Artunduaga on your service for the

17  first time?

18  A.  The first time, two months.

19  Q.  Do you remember what months those were?

20  A.  Yes.  July and August of, I think, 2011.

21  Q.  Were those the first two months of her internship?

22  A.  Yes.

23  Q.  And were you one of her supervisors while she was on your

24  service?  Did you supervise her work?

25  A.  Yes.

Kaplan - direct by Franklin

575

1  Q.  Okay.  And did you observe Dr. Artunduaga's work in the

2  clinic?

3  A.  Yes.

4  Q.  And did you observe her in the OR?

5  A.  Yes.

6  Q.  What are your expectations for interns on your service?

7  A.  When they first start, not very high.

8  Q.  And why is that?

9  A.  Well, they're just out of medical school, and some have

10  had experience, some have not had much experience at all

11  taking care of patients.

12  Q.  While Dr. Artunduaga was on your service for those first

13  two months of -- those months of July and August of 2011, do

14  you recall filling out a written evaluation for her?

15  A.  I do.

16        MS. FRANKLIN:  And I'd like to show a copy of that,

17  but I don't think our --

18        THE COURT:  Joe went to get our --

19        MS. FRANKLIN:  -- first option is working, so let me

20  try the second option.

21        MR. JEPSON:  Joint Exhibit 6.

22        MS. FRANKLIN:  Uh-huh.  Should we wait until -- let's

23  try it just with paper.

24        THE COURT:  Is this in evidence, what you're showing

25  him?

Kaplan - direct by Franklin

576

1              MS. FRANKLIN:  This is Joint Exhibit 6, yes.

2              MR. JEPSON:  Yes, it is, Your Honor.

3              MS. FRANKLIN:  Unfortunately, we seem to be having

4    technological problems here.

5              MR. JEPSON:  I like this better than Joint Exhibit 6.

6              THE COURT:  It might be because of your computer.

7    Did you try your computer out in advance of trial with the

8    equipment?

9              MS. FRANKLIN:  I'm actually now, Your Honor, trying.

10             THE COURT:  But your computer is still plugged in.

11   I'm not sure your computer is compatible with the equipment.

12             Joe just went to get our technical guru, so you may

13   need to unplug your computer.

14     (Counsel conferring.)

15             MR. JEPSON:  There you go.

16             THE COURT:  Thank you, Ms. Hall.

17             MS. FRANKLIN:  All right.  You can see I haven't used

18   one of these before, so I apologize for that.  We'll see if we

19   can do it with this.

20   BY MS. FRANKLIN:

21   Q.  Dr. Kaplan, can you see what's been put up on the screen

22   here?

23   A.  Yes.

24   Q.  All right.  Do you recognize this document?

25   A.  I do.

Kaplan - direct by Franklin

1   Q.  And what is it?  Is this your evaluation of Dr.

2   Artunduaga?

3   A.  It's an evaluation form that was used to evaluate the

4   residents at that time.

5   Q.  Okay.  And is this your evaluation of Dr. Artunduaga?

6   A.  Yes.

7   Q.  Great.  And on the first page of the evaluation, do you

8   see there that you've marked "very good" or "good" for all of

9   the categories that you rated her in?

10  A.  Yes.

11  Q.  I'm going to put up the second page of the evaluation now

12  and try to focus on the comments here.

13          Dr. Kaplan, can you read the Overall Comments in the

14  box there?

15  A.  Yes.  "This was Maria's first rotation.  She gained great

16  experience with the University of Chicago systems as time

17  passed.  She is a wonderful person who is very bright and very

18  good with her hands.  She is good now, but she will make a

19  fine resident as she gains more experience and gains more

20  confidence."

21  Q.  And was that what you believed at the time that you

22  prepared this evaluation?

23  A.  I did, yes.

24  Q.  What's the purpose of these evaluations that are done on

25  the performance of interns?

Kaplan - direct by Franklin

578

 1          MS. HALL:  Objection, foundation, Your Honor.

 2          THE COURT:  Sustained.  Lay some foundation with him.

 3  BY MS. FRANKLIN:

 4  Q.  Dr. Kaplan, do you regularly evaluate the performance of

 5  interns?

 6  A.  Do I regularly evaluate the different interns?  Yes.

 7  Q.  And do you use forms like this on a regular basis?

 8  A.  This -- I have -- now, I don't know how often that form

 9  is -- has been used.  It was used at that time.

10  Q.  Okay.

11  A.  But there are different forms at different times.

12  Q.  Do you ever use the evaluations like this to help teach

13  your interns?

14  A.  I guess it could be used that way.  I -- I don't know if I

15  ever used it to teach anybody.

16  Q.  Okay.  Thank you.

17          So, Dr. Kaplan, you noted in your Overall Comments

18  that you read aloud to the jury that Dr. Artunduaga gained

19  great experience during her rotations with you.

20          Did you believe that was true at the time you wrote

21  it?

22  A.  That -- yes.

23  Q.  And also, you noted in that same Overall Comments box that

24  you thought she'd make a fine resident as she gained more

25  confidence, and was that what you also believed at the time?

Kaplan - direct by Franklin

1          MS. HALL:  Objection.  Misstates the document.

2    BY THE WITNESS:

3    A.  I'm sorry.  I didn't hear what you --

4          THE COURT:  There's an objection, Doctor, so she's

5    going to ask you another question.

6          MS. FRANKLIN:  Sure.

7    BY MS. FRANKLIN:

8    Q.  Dr. Kaplan, in your Overall Comments, you said:  "She is

9    good now, but she will make a fine resident as she gains more

10   experience and gains more confidence."

11         Did you believe that when you wrote it at the time?

12   A.  Yes.

13   Q.  Now, Dr. Kaplan, did Dr. Song ever talk to you about Dr.

14   Artunduaga's performance?

15   A.  I think perhaps once he did, yes.

16   Q.  Do you remember what date that was?

17   A.  No.

18   Q.  Did Dr. Song ever ask you about Dr. Artunduaga's

19   performance during her July and August rotations with you?

20   A.  I don't remember that specifically.

21   Q.  Do you remember if he ever asked you for your opinion

22   about whether he should place her on probation?

23   A.  I think we had a conversation where -- there were a number

24   of things that happened on different people's services.  And

25   she -- and I believe that -- I don't remember the sequence,

Kaplan - direct by Franklin

580

 1  whether -- exactly who spoke to me first, but at one point,

 2  he asked me if there was any special reason why -- that he

 3  explained to me, as I knew, that there were different things

 4  going on, and that he -- that he wanted to have her on

 5  probation, to the best of my recollection.

 6  Q.  Did Dr. Song ask you whether you thought that was a good

 7  idea?

 8  A.  I don't remember that.

 9  Q.  Did you ever express the opinion to Dr. Song that you

10  thought Dr. Artunduaga would not be able to correct her

11  deficiencies during the six years of her residency?

12  A.  I don't remember saying that exactly.

13  Q.  Now, Dr. Kaplan, did Dr. Artunduaga ever ask you to meet

14  with her about her probation?

15  A.  Yes.

16  Q.  And do you remember if you met with her?

17  A.  I do.

18  Q.  Do you remember -- was the meeting in person?

19  A.  Yes.

20  Q.  And was it at the medical center?

21  A.  It was in my office in the medical center.

22  Q.  And do you remember what she said?

23  A.  Yes.  She was very upset and came to see me.  And she was

24  crying that she was going to get married soon, in a week or

25  two, and that it was very upsetting to her in that she was

Kaplan - direct by Franklin

1   placed on probation, and she was very, very upset about that.

2   And that -- do you want me to continue or is that the answer

3   to the question?

4   Q.  Yes.  Is there anything else that she said during the

5   meeting?

6   A.  Yes.  She told me that she had -- I believe that she

7   had -- I don't know if it was at that meeting or another

8   meeting that she had met with Dr. Song, and Dr. Song had said

9   that he would help her to -- that she -- that there were a

10   number of people who were upset about her in the -- in our

11   section of General Surgery; that he did not feel that she

12   could be part of his residency in Plastic Surgery; that he

13   would help her to find another position, and that's what he

14   advised her.  Or that if she wished, she could be placed on

15   probation and to be evaluated after the probation.  That's the

16   gist of what I remember.

17   Q.  Is there anything else you remember that Dr. Artunduaga

18   said during the meeting?

19   A.  Well, I remember more what I said, that I thought that she

20   should relax, and that getting married was a big step in her

21   life and that she should enjoy the moment and get married; and

22   that -- and she also asked me if I would help her, that -- I

23   don't know if it was at that meeting or another meeting.  I

24   think we met several times.  And that she knew that she was

25   going first on Vascular service and then the Transplant

Kaplan - direct by Franklin

1    service, and she asked me if I would help her and call the

2    people on the service.

3    Q.  And were you willing to do that?

4    A.  It was not my greatest joy, but I was willing to do that,

5    yes.

6    Q.  So what did you do after Dr. Artunduaga had the meeting

7    with you?  Did you speak to any of the other attendings about

8    her?

9    A.  I spoke to, first, Dr. Skelly, who was the head of

10   Vascular Surgery, and I explained to him that she was on

11   probation and that she thought she could do well on probation,

12   and that she was trying to ask for a -- to be judged -- I

13   don't know exactly the words I used, but that she wanted,

14   like, a fairer evaluation on the service.  And he said that --

15   if I remember correctly, that he said, "Have her come to see

16   me, and I'll explain what is expected of her on the service."

17            And then at another time, she asked me to call

18   Dr. Renz, who was then the head of the Transplant service, and

19   I did the same thing and called Dr. Renz and, again, explained

20   that she was on probation and that she wanted a -- she would

21   like to -- I mean, that she was hoping for a fair shake, and

22   he said, again, very similarly, "Come and" -- "have her come

23   and see me, and I'll explain to her what's expected on the

24   service."

25   Q.  So with respect to Dr. Skelly, the first individual you

Kaplan - direct by Franklin

583

 1   mentioned, is that Dr. Christopher Skelly?

 2   A.  It is.

 3   Q.  And did you believe that Dr. Skelly would give Maria

 4   special treatment as the result of your conversation?

 5   A.  I'm sorry.  I didn't --

 6   Q.  Did you -- you didn't think that -- did you think that

 7   Dr. Skelly would give Maria any special treatment as the

 8   result of your conversation?

 9   A.  I hoped he would not give her any special treatment but

10   just to explain the situation to him.

11   Q.  And did you believe he would be honest in his evaluation

12   of Maria?

13   A.  I have every reason to believe that he's an honest person.

14   Q.  Was Dr. Skelly one of your students?

15   A.  He -- he was one of my residents in the past.

16   Q.  And did you find him to be an honest person?

17   A.  A very fine person.

18   Q.  And what's Dr. Renz's first name?

19   A.  John.

20   Q.  John Renz.  Did you believe Dr. Renz would be honest in

21   his evaluations?

22   A.  Yes.

23   Q.  Did you have any reason to think Dr. Renz would give Maria

24   special treatment?

25   A.  No.

Kaplan - direct by Franklin

584

1   Q.  Was there anything else besides what you've already told

2   us that you told Dr. Skelly during the call that you had with

3   him?

4   A.  I can't remember the exact words, but I think that's the

5   essence of the conversation.

6   Q.  And have you told us everything you can recall having said

7   to Dr. Renz?

8   A.  I believe I said that -- yes.

9   Q.  Okay.  Dr. Kaplan, do you know the results of Dr.

10  Artunduaga's probation?  Do you know what happened?

11  A.  Yes.

12  Q.  Do you know whether she was terminated?

13  A.  I don't know that she was terminated, but the -- that she

14  was -- I don't know if she was kept on probation.  I don't

15  know the exact terminology that was used.

16  Q.  Her contract wasn't renewed, correct?

17          MS. HALL:  Objection, foundation.

18          THE COURT:  Sustained.

19  BY MS. FRANKLIN:

20  Q.  Do you know if her contract was renewed?

21  A.  I don't know anything about her contract.

22  Q.  Did -- do you know whether Dr. Artunduaga left the

23  University of Chicago Medical Center after that first year?

24  A.  Yes.

25  Q.  Okay.  And she did, correct?

Kaplan - direct by Franklin

585

1  A.  She left, yes.

2  Q.  Did Dr. Song ever talk to you about whether Dr. Artunduaga

3  should stay at the medical center?

4  A.  I think we did have one conversation and -- where he told

5  me that she was not good enough to be part of his residency

6  group.

7  Q.  Was this the same conversation that you mentioned earlier?

8  A.  I think that's true.

9  Q.  And did you say anything to Dr. Song during that

10  conversation that you can recall?

11  A.  I must have said she did okay on my service or something.

12  I cannot recall the exact words, no.

13  Q.  Do you have any recollection of when that was?

14  A.  No.

15  Q.  Okay.  Did you talk to any other attending besides Dr.

16  Song about what would happen to Dr. Artunduaga, what would

17  happen to her residency?

18  A.  I'm sorry.  Would you repeat that, please?

19  Q.  Sure.  Did you talk to any other attendings?  We've talked

20  about Drs. Skelly and Renz and Dr. Song.  Were there any other

21  conversations you had with other attendings about Dr.

22  Artunduaga's performance?

23  A.  No.

24  Q.  And did Dr. Artunduaga work on your service again that

25  year?

Kaplan - direct by Franklin

586

1    A.   Yes.

2    Q.   Do you remember what time period that was?

3    A.   I believe it was in April of the following year.

4    Q.   And how did you feel about having her back on your service

5    then?

6    A.   I was happy to have her back.  The situation was that she

7    was not -- I think she was unable to be on any other service.

8    And I thought it was important for her to finish the year and

9    get credit for the year, and I thought I was helping her a

10   great deal by doing that.  And I spoke with Dr. Angelos, who

11   was on my service, and the two of us agreed that we would be

12   happy to have her on our service.

13   Q.   How did she perform during that time period?

14   A.   I think she was better than she was before and more -- she

15   had improved from where she was previously; that -- I mean,

16   there were a lot of things that went on during that period.  I

17   don't know if you're asking me for that or --

18   Q.   No.  No, Dr. Kaplan.  Just your perception of how she

19   performed.

20   A.   I thought she -- that she did -- she had -- she showed

21   that she had learned during the period since I saw her.

22   Q.   Did you ever see Dr. Artunduaga do anything that you

23   thought would endanger patient safety during that April

24   rotation?

25   A.   No.

Kaplan - direct by Franklin

1   Q.  Was Dr. Artunduaga ever disruptive on your service during

2   that April rotation?

3   A.  I'm sorry.  I didn't -- was Dr. Artunduaga --

4   Q.  Ever disruptive?  Did she ever act disruptively on your

5   service?

6   A.  I didn't recognize it, but many others felt that she was

7   acting in a very disruptive manner.

8   Q.  Well, I'm asking about your observations.  Did you

9   perceive --

10  A.  I did not -- no, I did not observe that.

11  Q.  Okay.  And did you observe her acting unprofessionally on

12  your service?

13  A.  No.

14  Q.  Now, did you participate in Dr. Artunduaga's grievance

15  hearing in May 2012?

16  A.  I did.

17  Q.  What did you do?

18  A.  Well, I understand that she -- I don't know if -- I think

19  there was one other person who would speak on her behalf, and

20  I -- and she asked me, and I spoke on her behalf at the

21  grievance committee.

22  Q.  And do you recall what you said on her behalf?

23  A.  I must have said a lot because there was -- I think I was

24  given about 15 minutes to speak.

25  Q.  Okay.  Can you recall any of the things you had to say?

Kaplan - direct by Franklin

1  A.  I think I went over the entire episodes and that I thought

2  she was very bright.

3          When she came, she was very immature as far as

4  clinical medicine.  She did not have as much of a grasp with

5  clinic, but she had done several years of excellent research

6  elsewhere, and I thought that was extremely favorable and

7  that -- but from a clinical point of view, she was not very

8  experienced and very -- was very immature.

9          She was also -- if I remember correctly, she seemed

10  to lack a lot of confidence in herself and spoke about having

11  more confidence and whatnot, and that's one reason I wrote

12  that on the evaluation, and that she -- I spoke of

13  understanding the difficulties that she had with several other

14  people on the service.  That I respected these people very

15  much; on the other hand, I was giving my opinion of her that I

16  had seen myself.

17          I spoke that -- I thought that Dr. Angelos and I were

18  doing her -- advising her correctly and doing her a good favor

19  to just finish out the year and have credit for the year so

20  that she could go on; and that not everybody has to be a

21  plastic surgeon, not everybody is -- has to be a surgeon, in

22  fact.  And people can be very happy doing other things in

23  medicine and -- or going elsewhere, and that -- I'm sure I

24  spoke of that.

25          That -- I spoke that I was disturbed that she had

Kaplan - direct by Franklin

1    written very disruptive e-mails that I understood that she

2    had, and I thought that was unprofessional and that I wished

3    that she had not done so.  And I think I used the term

4    "stirred the pot," that she stirred the pot and got everything

5    all -- and I spoke that -- that there was a problem with --

6    when she came on our service -- you see, the service was

7    divided into a Breast service and an Endocrine service, and

8    there were two interns on the service.  Mindy Stack was the

9    other intern.  And Mindy Stack -- when she came -- when Maria

10   came in April, Mindy Stack was -- you see, Maria could only be

11   on half the service because she was only on the Endocrine

12   part.  She was not on the Breast part.

13          Mindy felt that she was being placed on the Breast

14   part and was missing out on the -- having the experience on

15   the Endocrine part, and that she felt she was not being

16   treated fairly.  And our senior resident at that time was Eric

17   Grossman, and Eric -- I think at one point, I asked Maria to

18   go see -- if she thought that things were not correct, that

19   she should go and see Dr. Matthews, who's our chief of

20   surgery.  And she told me she went to see Dr. Matthews, and

21   Dr. Matthews, if I remember correctly, wrote an e-mail saying

22   that Maria should be treated like everybody else.

23          And I know that Mindy and -- there was this tension

24   between Mindy Stack and Maria as to who was getting which

25   cases; and that Mindy wanted to be more on the Endocrine part

Kaplan - direct by Franklin

590

1   and was being sequestered in the Breast part because Maria

2   couldn't be on the Breast part.

3          And Eric, I believe, had some difficulties with

4   Maria, that she -- that he expressed that she was not coming

5   to rounds in the morning.  And, as I recall --

6   Q.  I'm sorry, Dr. Kaplan.  I don't -- I'm not going to

7   interrupt your testimony, but I just want to make sure these

8   are all the things you said at the grievance hearing?

9   A.  I don't know that because I don't know -- I don't have a

10  transcript of what --

11  Q.  Okay.  Right.

12  A.  -- I said.

13  Q.  Okay.  Yeah, I just -- my question was -- I just wanted to

14  find out all the things you recall saying at the grievance

15  hearing.

16  A.  I'm sure I said some of this.  I don't remember exactly

17  what I said there, but these are all things that happened.

18  Q.  Okay.  You mentioned Mindy Stack, who was another intern

19  on the service in April, right?

20  A.  Correct.

21  Q.  And she was unhappy because she felt she wasn't getting

22  enough cases as well?

23  A.  As I said, she was put on the -- there are two parts, and

24  the interns normally rotated equally on the Breast and the

25  Endocrine part.

Kaplan - direct by Franklin

591

```
 1              Maria could not go on the Breast part, so that Mindy
 2    was put on the Breast part and with -- had more time there,
 3    and she felt that she -- that the experience that she was
 4    supposed to get on the Endocrine part she was not getting
 5    because of that --
 6    Q.  Did, did --
 7    A.  -- and apparently spoke to Eric Grossman.  And I -- I
 8    mean, my understanding -- I just told Eric treat everybody
 9    equitably.
10    Q.  Okay.  All right.  And after you testified at the
11    grievance hearing, did you stay and hear the rest of the
12    testimony or did you leave?
13    A.  I'm sorry.  Did -- after I spoke, I was asked to leave, so
14    I don't know -- that's the only -- well, the only thing I
15    remember, that I learned from the grievance committee at that
16    time was what I spoke.  I didn't hear anybody else's testimony
17    at all.
18    Q.  Okay.  Thank you.
19              Dr. Kaplan, did you write a letter of recommendation
20    for Dr. Artunduaga?
21    A.  Yes.
22    Q.  And do you remember what the letter -- what you were
23    recommending her for, what types of jobs?
24    A.  It was for a job in Anesthesiology, I believe.
25    Q.  Was it a residency, if you recall?
```

Kaplan - direct by Franklin

592

1  A.  I think it was, yes.

2  Q.  Okay.

3  A.  In fact, I know it was, yes.

4  Q.  I'd like to show you what's been marked as Plaintiff's

5  Exhibit 57, and it's not yet admitted.  Try to get it as clear

6  as we can.

7       Dr. Kaplan, can you see that well enough to make out

8  what it is?

9  A.  Yes.

10  Q.  The document?  All right.  Dr. Kaplan, do you know what

11  this document is?

12  A.  Yes.

13  Q.  Is this a letter written by you dated June -- July 11th,

14  2012?

15  A.  Yes.

16  Q.  And did you submit this letter to Dr. Artunduaga -- I'm

17  sorry, to Dr. Artunduaga's residency programs?

18  A.  I sent it to whomever she asked me to send it to.

19  Q.  Great.

20       MS. FRANKLIN:  We'd like to move this into evidence,

21  Your Honor.

22       THE COURT:  Any objection?

23       MS. HALL:  No objection.

24       THE COURT:  Okay.  It's admitted.

25    (Plaintiff's Exhibit 57 received in evidence.)

Kaplan - direct by Franklin

593

1      MS. FRANKLIN:  And we'd like to publish.

2      THE COURT:  You may.

3    BY MS. FRANKLIN:

4    Q.  All right.  Dr. Kaplan, I'm sorry I'm not able to make

5    this any larger at the moment, but can you see there at the

6    top, was this letter dated July 18th, 2012?

7    A.  Yes.

8    Q.  Was this after Dr. Artunduaga had left your service?

9    A.  I'm sorry.  Would you say that again?

10   Q.  This was after Dr. Artunduaga left your service?

11   A.  Yes.

12   Q.  Okay.  Would you mind reading the next-to-the-last

13   paragraph to the jury, which starts with "During her time."

14        Do you see that, Dr. Kaplan?

15   A.  I do.

16   Q.  Okay.

17   A.  Do you want me to read -- "During her time at the

18   University of Chicago and Plastic Surgery residency, she spent

19   several months with me on the Endocrine surgical service.  As

20   time progressed, she became much better clinically.  I found

21   her to be proficient in examining patients in the clinic and

22   assisting in the operating room.  She is very desirous of a

23   career in Anesthesia, and I have no doubt that she has the

24   intelligence and perseverance to do very well in your

25   program."

Case: 1:12-cv-08733 Document #: 294 Filed: 06/20/17 Page 224 of 285 PageID #:8072
Kaplan - cross by Hall
594

1    Q.  And you -- did you believe that at the time you wrote it?

2    A.  I did.

3           MS. FRANKLIN:  Okay.  Thank you, Dr. Kaplan.  That's

4    all I have for now.

5           THE COURT:  Cross-examination, Ms. Hall.

6                        CROSS-EXAMINATION

7    BY MS. HALL:

8    Q.  Hi, Dr. Kaplan.  You testified about disruptive e-mails

9    that you felt were professional (sic) that Dr. Artunduaga

10   sent.

11          Do you remember that?

12   A.  Could you repeat that again?

13   Q.  Yeah.  I'm sorry.  I have a little cold.

14          You testified about disruptive e-mails that Dr.

15   Artunduaga sent that you thought were unprofessional.

16          Do you remember that?

17   A.  Yes.

18   Q.  I'd like to show you what's been marked as Defendant's

19   Exhibit 149.  Do you see that on your screen?

20          MS. HALL:  And, Michael, can you try and blow up both

21   e-mails together?  Try and pull up both at the same time to

22   make them more clear.

23          THE COURT REPORTER:  Judge, is this admitted?

24          THE COURT:  It's not admitted, no.

25          MS. HALL:  Can we see the date, Mike?  Okay.

Kaplan - cross by Hall

595

1    BY MS. HALL:

2    Q.  So, Dr. Kaplan, on the bottom, this is an e-mail --

3            MS. HALL:  Can you lower it, Michael?

4    BY MS. HALL:

5    Q.  -- that Dr. Artunduaga sent to Dr. Song and Dr. Roggin on

6    April 26, 2012, correct?

7    A.  Yes.

8    Q.  And then Dr. Roggin forwarded that e-mail to you on April

9    27th, 2012, correct?

10   A.  Yes.

11   Q.  And you received it on that date?

12   A.  April 27th.

13           MS. HALL:  I'd like to move this into evidence, Your

14   Honor.

15           THE COURT:  Any objection?

16           MS. FRANKLIN:  No, Your Honor.

17           THE COURT:  It's admitted.

18     (Defendant's Exhibit 149 received in evidence.)

19   BY MS. HALL:

20   Q.  Dr. Kaplan, the bottom e-mail here from Dr. Artunduaga,

21   can you -- I'm going to read the first paragraph of this to

22   you:

23           "Dr. Song and Roggin, this is the second attempt I'm

24   making to get an answer to a straightforward question you seem

25   to have ignored.  An order has been given that has directly

Kaplan - cross by Hall

1   and significantly affected the quality of the training I have

2   been receiving over the last several weeks, and I have been

3   given no notice of what that order was and why it was given.

4            "In case I haven't made my expectations clear, I am

5   not here to add a line to a resume; I am here to receive an

6   education, and I have already been made to waste 1 full month

7   of my time."

8            And then she said she wants some type of answer.  And

9   at the bottom, she says:  "I expect your answer by 9:00

10  o'clock am tomorrow."

11           Dr. Kaplan, is this one of the disruptive and

12  unprofessional e-mails you mentioned at the grievance hearing?

13  A.  I'm sure it is, yes.

14  Q.  And why do you believe that this was inappropriate?

15  A.  I think several reasons.  I think that, one, we were

16  trying -- Dr. Angelos and I were trying to help her, and I

17  think her impression is that it was a waste of time on our

18  service.

19  Q.  And she'd been working on your service --

20  A.  Pardon me?

21  Q.  -- in April -- she had been working on your service in

22  April of 2012, correct?

23  A.  Correct.  So that was one thing.  I believe there were a

24  number of different e-mails that were sent.  This is one of

25  them.  And I can't -- I don't know if you want me to continue,

Kaplan - cross by Hall

597

1  but --

2  Q.  That's okay, Dr. Kaplan.

3         But this is one of the e-mails that you said at the

4  grievance hearing stirred the pot, correct?

5  A.  Correct.

6  Q.  I'd like to show you what's been marked as Defendant's

7  Exhibit 167, and this is not yet admitted.

8         MS. HALL:  And, Michael, could you blow up the e-mail

9  with the date?

10  BY MS. HALL:

11  Q.  Dr. Kaplan, this is an e-mail you received from Dr.

12  Artunduaga on May 16th, 2012, correct?

13  A.  Yes.

14         MS. HALL:  And I'd like to admit this into evidence.

15         THE COURT:  Any objection?

16         MS. FRANKLIN:  No, Your Honor.

17         THE COURT:  It's admitted.

18    (Defendant's Exhibit 167 received in evidence.)

19  BY MS. HALL:

20  Q.  And, Dr. Kaplan, this is what Dr. Artunduaga wrote you:

21  "I wanted to thank you for testifying today, you don't know

22  how much it meant to me."

23         And then the second paragraph:  "I especially wanted

24  to thank you for the honesty of your testimony.  You said that

25  you didn't agree with the e-mails I sent to Dr. Song over the

Kaplan - redirect by Franklin

598

1   past month and I acknowledge that they might have seemed to

2   'stir the pot,' as you said."

3           And, again, that reflects some of the testimony that

4   you gave at the grievance hearing, correct?

5   A.  Yes.

6           MS. HALL:  No further questions.

7           THE COURT:  Redirect, Ms. Franklin.

8                       REDIRECT EXAMINATION

9   BY MS. FRANKLIN:

10  Q.  Dr. Kaplan, you never -- Dr. Artunduaga didn't tell you

11  that she thought her rotation on your service was a waste of

12  time, did she?

13  A.  No, she never told me that, but the e-mail -- isn't that

14  what the e-mail says?

15  Q.  Doctor --

16  A.  And it was addressed to me.

17  Q.  Dr. Song and Dr. Roggin were the recipients of that

18  e-mail, correct?

19  A.  Say that again.

20  Q.  The e-mail was to Dr. Song and Dr. Roggin, correct?

21  A.  Why don't you show the e-mail again, because I believe it

22  was copied to me, was it not?

23  Q.  You were.  It was forwarded to you, Dr. Kaplan, but not by

24  Dr. Artunduaga, correct?

25  A.  I don't know who forwarded it.

Angelos - direct by Franklin

599

1  Q.  Okay.  You still wrote a letter of recommendation for her

2  in July 2012, though, correct?

3  A.  Correct.

4          MS. FRANKLIN:  Okay.  I think that's all I have.

5          THE COURT:  Any recross?

6          MS. HALL:  No.

7          THE COURT:  Thank you, Dr. Kaplan.  You may step

8  down, sir.  You are excused.

9          THE WITNESS:  Thank you.

10    (Witness excused.)

11          THE COURT:  Please call your next witness.

12          MS. FRANKLIN:  We call Dr. Piotr Angelos.

13    (Witness enters.)

14          THE COURT:  Please come forward, Doctor.

15          Please raise your right hand, sir.

16    (Witness duly sworn.)

17          THE COURT:  You may be seated.

18          THE WITNESS:  Thank you.

19        PIOTR ANGELOS, PLAINTIFF'S WITNESS, SWORN

20                    DIRECT EXAMINATION

21  BY MS. FRANKLIN:

22  Q.  Good afternoon, Dr. Angelos.  Could you please just state

23  your full name for the record.

24  A.  Sure.  Piotr Angelos.

25  Q.  And, Dr. Angelos, are you employed by UCMC?

Angelos - direct by Franklin

600

1   A.  I am.

2   Q.  And what is your position there?

3   A.  I am professor of Surgery and chief of Endocrine Surgery

4   and associate director of the MacLean Center for Clinical

5   Medical Ethics.

6   Q.  And when did you -- when did you join UCMC?

7   A.  In 2006.

8   Q.  And what is the name of the service on which you're an

9   attending?

10  A.  Well, now it's called the Kaplan Endocrine service.

11  Q.  Has the name changed since 2011?

12  A.  I don't think so.  I think it was the same, yeah.

13  Q.  And Dr. Kaplan is another of the attendings on your

14  service, correct?

15  A.  That is correct.

16  Q.  Okay.  Did you work with Dr. Maria Artunduaga when she was

17  an intern at UCMC?

18  A.  I did.

19  Q.  And do you remember when Dr. Artunduaga was on your

20  service for the first time?

21  A.  I do.

22  Q.  When was that?

23  A.  I believe it was the end of June of 2011.

24  Q.  Was -- so was this her first rotation for her intern year,

25  do you know?

                    Angelos - direct by Franklin
                                                                601

 1   A.  I think it was.

 2   Q.  Okay.  And do you know -- do you remember if she was on

 3   your service for two months, July and August 2011?

 4   A.  I believe so.

 5   Q.  Were you -- did you supervise her performance while she

 6   was on your service?

 7   A.  Yes.

 8   Q.  And did you observe her work?

 9   A.  Yes.

10   Q.  Did you observe her in clinic?

11   A.  Yes.

12   Q.  Do you recall observing her in the OR?

13   A.  I recall her being in the OR.  I don't recall specific

14   cases.

15   Q.  Okay.  When Dr. Artunduaga was on your service, did you

16   fill out a written evaluation for her?

17   A.  I did.

18          MS. FRANKLIN:  Okay.  I am going to put up Joint

19   Exhibit 8.

20          THE COURT:  It's in evidence already.

21          MS. FRANKLIN:  Yes.  Once again, my technology

22   problems.  Let's see if I can get this -- this was -- has the

23   switch been moved?

24          THE COURT:  You need to zoom out.

25          MS. FRANKLIN:  There we go.  Excellent.

Angelos - direct by Franklin

602

1    BY MS. FRANKLIN:

2    Q.  Sorry for that, Dr. Angelos.

3         Do you recognize this -- this document, Joint Exhibit

4    8?

5    A.  Yes.

6    Q.  Is this your evaluation of Dr. Artunduaga?

7    A.  Yes.

8    Q.  All right.  I'm going to put up page 2 of this evaluation

9    and see if we can see that Comment box.

10        Do you see that at the bottom of the page?

11        MS. HYNDMAN:  Your Honor, can we publish the

12   document, please?

13   BY THE WITNESS:

14   A.  I do.

15   BY MS. FRANKLIN:

16   Q.  Dr. Angelos, could you read that into the record?

17   A.  Can you make it a little bigger?

18   Q.  Yeah, I'm going to try to do that.  I'm not very

19   proficient with this.  All right.  That looks good.

20        Could you please read your Overall Comments into the

21   record.

22   A.  "This was Maria's very first rotation at the University of

23   Chicago.  She seemed to be very flustered at the beginning of

24   the rotation.  This was not helped by the fellow who she was

25   working with who often called Maria to drop what she was doing

Angelos - direct by Franklin

1    and take care of something else.  Maria's operative skills

2    were hampered by what appeared to be a significant case of

3    nerves.  However, despite these weaknesses, she improved

4    during the rotation.  I am convinced that her operative skills

5    will improve since I saw improvement over the course of the

6    month.  She needs to work on prioritizing the tasks at hand.

7    Her ability to work up patients in clinic strengthened

8    throughout the rotation.  She will need some mentoring, but I

9    believe that she has the intelligence and desire to improve

10   that she should be given a chance to do so."

11   Q.  Thank you.  And, Dr. Angelos, is that what you believed at

12   the time that you wrote it?

13   A.  Yes.

14   Q.  Did you believe that you saw improvement in Dr. Artunduaga

15   for the time period that you worked together in July and

16   August 2011?

17   A.  Yes.  That's why I wrote it.

18   Q.  Dr. Angelos, what are you -- in your view, what's the

19   purpose of these kinds of evaluations?

20   A.  Well, I think it is to allow the program directors to know

21   what my assessment is and to give the resident feedback for

22   the possibility of improvement.

23   Q.  Did Dr. Song -- did Dr. David Song ever ask you about your

24   opinion of Dr. Artunduaga's performance on that July and

25   August 2011 service?

Angelos - direct by Franklin

1    A.  No.

2    Q.  Did you ever talk to Dr. Song about your assessment of Dr.

3    Artunduaga's performance?

4    A.  No.

5    Q.  Did you ever communicate to Dr. Song in any way that you

6    thought Dr. Artunduaga couldn't successfully complete her

7    residency?

8    A.  No.

9    Q.  Now, did Dr. Artunduaga work with you again later in the

10   year?

11   A.  Yes.

12   Q.  Was that in April 2012?

13   A.  Yes.

14   Q.  Okay.  Did you have any concerns about having Dr.

15   Artunduaga back on your service in April 2012?

16   A.  Well, I was just surprised because it wasn't on the

17   schedule.

18   Q.  Were -- did you have any concerns about patient safety

19   with her on your service?

20   A.  No.

21   Q.  How did you find her performance during the April

22   rotation?

23   A.  Well, it was fairly limited because I didn't get that much

24   of an opportunity to work with her.

25   Q.  Did you observe any problems?

Case: 1:12-cv-08733 Document #: 294 Filed: 06/20/17 Page 235 of 285 PageID #:8083
Angelos - direct by Franklin
605

1   A.  No.

2   Q.  Did you ever observe Dr. Artunduaga being disruptive on

3   your service in April 2012?

4   A.  I did not observe that.

5   Q.  Did you feel she conducted herself professionally?

6   A.  Yes.

7   Q.  Do you recall writing Dr. Artunduaga a letter of

8   recommendation?

9   A.  Yes.

10          MS. FRANKLIN:  I'm going to put up Plaintiff's

11  Exhibit 60.  It's not yet been published.

12  BY MS. FRANKLIN:

13  Q.  All right.  Dr. Angelos, can you make out what this

14  document is?

15  A.  Yes, I can.

16  Q.  Is this a letter written by you dated July 26, 2012?

17  A.  Yes.

18  Q.  And is it a letter of recommendation for Dr. Artunduaga?

19  A.  Yes.

20          MS. FRANKLIN:  We move to have the Plaintiff's

21  Exhibit 60 entered into evidence.

22          THE COURT:  Any objection?

23          MS. HALL:  No objection.

24          THE COURT:  It's admitted.

25    (Plaintiff's Exhibit 60 received in evidence.)

Angelos - direct by Franklin

606

1          MS. FRANKLIN:  And we'd like to publish.

2          THE COURT:  Yes.

3     BY MS. FRANKLIN:

4     Q.  Dr. Angelos, I'd just like you to read a portion of this

5     letter, which is the next-to-the-last paragraph starting "In

6     my experience," if you could.

7     A.  "In my experience working with Dr. Artunduaga, I found her

8     to be an enthusiastic and pleasant individual.  I felt that

9     she had a strong work ethic and a real desire to take good

10    care of patients.  I did note, however, some difficulties with

11    prioritizing the work flow within the hospital.  I reviewed

12    these concerns with her at the end of her first rotation on

13    Endocrine Surgery, and when she returned to the Endocrine

14    Surgery service in the spring, I felt that she had improved in

15    her organizational abilities.  I found her to be adept and

16    efficient at obtaining history and physicals from preoperative

17    Endocrine Surgery patients.  She seemed to understand the

18    important issues in preoperative and postoperative

19    management."

20    Q.  Thank you.  And did you believe that at the time that you

21    wrote this letter?

22    A.  I did.

23         MS. FRANKLIN:  That's all I have at this time.

24         THE COURT:  Cross-examination.

25                        CROSS-EXAMINATION

Angelos - cross by Hall

1   BY MS. HALL:

2   Q.  Dr. Angelos, I want to direct you back to Joint Exhibit

3   No. 8, which is your evaluation of Dr. Artunduaga.

4           When you filled out this evaluation, it was honest,

5   correct?

6   A.  Yes.

7   Q.  And accurate?

8   A.  Yes.

9   Q.  And you were attempting to relay here your opinion of Dr.

10  Artunduaga's performance based on your observations, right?

11  A.  Yes.

12          MS. HALL:  In the -- could you please, Michael, pull

13  up the Able to Communicate and Justify Medical Decisions

14  category, on the first page in the middle under Clinical

15  Skills.  Yep.

16  BY MS. HALL:

17  Q.  And what did you rate her as in that category, Dr.

18  Angelos?

19  A.  "Could improve."

20  Q.  And what skills are you evaluating when you're looking at

21  that category?

22  A.  Well, it's essentially the ability to explain to me what a

23  patient has and what needs to be done for them.  So it's --

24  preoperatively, it's sort of assessing, you know, what they --

25  what operation they might need.  Postoperatively, it's sort of

Angelos - cross by Hall

608

1    assessing do they need changes in their medications or that

2    sort of thing.

3    Q.  And you marked her "could improve" based on your own

4    observations?

5    A.  Yes.

6           MS. HALL:  And, Michael, if you could please pull up

7    the Advanced OR Skills (Dissection, Exposure, Suturing)

8    category.

9    BY MS. HALL:

10   Q.  And you marked her as "could improve" here as well, Dr.

11   Angelos?

12   A.  Yes, I did.

13   Q.  And for an intern, what is it that you're evaluating here?

14   A.  Well, with respect to Advanced OR Skills, it's essentially

15   how well someone handles the tissue in the operating room, how

16   well they do at putting in stitches, tying knots, that sort of

17   thing.

18   Q.  And you marked her "could improve" based on your own

19   observations?

20   A.  Yes.

21          MS. HALL:  And, Michael, if you could go to the

22   second page and please pull up the -- under Relations with

23   Others and Communication Skills Be With Other Healthcare

24   Professionals category.

25   BY MS. HALL:

Angelos - cross by Hall

609

1   Q.  You marked her "could improve" here as well, Dr. Angelos?

2   A.  Yes.

3   Q.  And what are you evaluating here?

4   A.  It's essentially the interprofessional communication

5   amongst physicians, residents, et cetera.

6   Q.  And you evaluated her as "could improve" based on your own

7   observations, is that correct?

8   A.  That's correct.

9         MS. HALL:  And if we could, Michael, please pull up

10  under Administrative Abilities and Practice-Based Learning

11  (Ability to Lead/Manage a Service) category.

12  BY MS. HALL:

13  Q.  And, Dr. Angelos, you marked Dr. Artunduaga as "deficient"

14  here, correct?

15  A.  Yes.

16  Q.  And for an intern, what are you looking for in the Ability

17  to Lead and Manage a Service category?

18  A.  Mostly for an intern, I'm looking at the ability to

19  prioritize what needs to be done.  So it's not so much leading

20  but more managing.

21  Q.  And you marked her "deficient" based on your own

22  observations, is that correct?

23  A.  Yes.

24        MS. HALL:  And, Michael, if you could please pull up

25  the Overall Comments section of the evaluation.

Angelos - cross by Hall

610

1   BY MS. HALL:

2   Q.  Dr. Angelos, in this section, you stated:  "She seemed to

3   be very flustered at the beginning of the rotation.  This was

4   not helped by the fellow who she was working with who often

5   called Maria to drop what she was doing and take care of

6   something else."

7           Dr. Angelos, who's the fellow you're referring to

8   here?

9   A.  That was one of the surgical Oncology fellows, Haijin In.

10  Q.  Do you remember Haijin In?

11  A.  I do.

12  Q.  Did Dr. In have an accent?

13  A.  I don't think so.  Perhaps a little bit of one, but not

14  very strong.

15  Q.  Okay.  And this statement here you wrote about "the fellow

16  who often called Maria to drop what she was doing and take

17  care of something else," was that something you observed on

18  your own?

19  A.  No.  That's something that Maria told me.

20  Q.  And when did Maria tell you that?

21  A.  It was, gosh, sometime in October, I'm guessing.

22  Q.  In a meeting between the two of you?

23  A.  Yes.

24  Q.  Okay.  And was anyone else present during that meeting?

25  A.  No.

Angelos - redirect by Franklin

611

1    Q.  Okay.

2              MS. HALL:  Thank you.

3              THE COURT:  Redirect?

4                        REDIRECT EXAMINATION

5    BY MS. FRANKLIN:

6    Q.  Dr. Angelos, Ms. Hall asked you about some categories in

7    your evaluation where you evaluated Dr. Artunduanga either

8    "could improve" or "deficient."

9              Do you remember that?

10   A.  I do.

11   Q.  Did she improve by the second time you saw her on your

12   service in April 2012?

13   A.  There were some things that I felt had improved.

14             MS. FRANKLIN:  Okay.  That's all I have.

15             THE COURT:  Any recross?

16             MS. HALL:  No.

17             THE COURT:  Okay.  We'll take our afternoon break.

18      (Jury out.)

19             THE COURT:  You are excused, Doctor.  Thank you.

20             THE WITNESS:  Thank you.

21      (Witness excused.)

22             THE COURT:  Who's your next witness?

23             MS. HYNDMAN:  Dr. Roggin.

24             THE COURT:  And do you anticipate Dr. Roggin's

25   testimony will be brief?

```
 1              MS. HYNDMAN:  It will be brief --

 2              THE COURT:  And who's --

 3              MS. HYNDMAN:  -- from our standpoint.

 4              THE COURT:  Who's up after Roggin?

 5              MS. HYNDMAN:  I think we were going to show a couple

 6   of videos.

 7              THE COURT:  Video deps?  Okay.

 8              MS. HYNDMAN:  Rather than start Dr. Song, which will

 9   -- I mean, I don't see a point in having a lot of --

10              THE COURT:  That's fine.  However you want to present

11   it, that's fine.

12              MS. HYNDMAN:  Yeah.

13              THE COURT:  Okay.  We will pick up in about ten

14   minutes.

15              MS. HYNDMAN:  Thanks.

16      (Recess.)

17              THE CLERK:  All rise.

18      (Jury enters courtroom.)

19              THE COURT:  You may be seated.

20              Doctor, please raise your right hand, sir.

21              (Witness sworn.)

22              THE COURT:  You may be seated, sir.

23        KEVIN KING ROGGIN, PLAINTIFF'S WITNESS, DULY SWORN,

24                        DIRECT EXAMINATION

25   BY MS. HYNDMAN:
```

Roggin - direct

1   Q.  Please state your name for the record.

2   A.  Dr. Kevin King Roggin.

3   Q.  Dr. Roggin, we haven't met.  My name is Cindy Hyndman.

4   I'm one of Dr. Artunduaga's attorneys in this case.

5           Dr. Roggin, you're employed by the University of

6   Chicago Medical Center?

7   A.  Yes.

8   Q.  And you're the program director for general surgery

9   program -- residency program; is that right?

10  A.  That's correct.

11  Q.  And you took over on October 1st, 2011?

12  A.  I took over the residency program on October 1st, 2011.

13  Q.  Dr. Roggin, what is the Surgical Education Committee?

14  A.  It's a former committee that used to evaluate residents in

15  general surgery or preliminary residents in neurology and

16  contribute to plastic surgery evaluations.

17  Q.  How often did that committee meet?

18  A.  About two to three times a year.

19  Q.  Have you ever heard of a committee called the Residency

20  Education Committee?

21  A.  I may have.  I don't remember exactly what you're

22  referring to, so --

23  Q.  Do you know whether that's just something that people

24  called the Surgical Education Committee?  Is that another name

25  for that?

Roggin - direct

614

1    A.  I'm not sure.

2    Q.  Okay.  If we could look at Plaintiff's Exhibit 78, please.

3    And this is not in evidence yet.

4          Dr. Roggin, Plaintiff's Exhibit 78.  If you look at

5    the middle e-mail there, there's an e-mail from Carmen Barr to

6    Dr. Song with a copy to you dated October 13, 2011.  Did you

7    receive this e-mail on or about that date?

8    A.  Yes.  It seems I did.

9    Q.  Okay.  And if -- who is Carmen Barr?

10   A.  She is the residency program director for the general

11   surgery residency.

12   Q.  And --

13   A.  I'm sorry, she's the coordinator for the general surgery

14   residency.  I'm sorry.

15   Q.  What is a resident evaluation recap?

16   A.  I believe it's referring to a summary of electronic

17   evaluations.

18   Q.  Can we look at Page 4 of that exhibit, please.  Do you

19   recognize this document, Dr. Roggin?

20   A.  I -- I believe I've seen it before.

21   Q.  Okay.  Is this a residency evaluation recap?

22   A.  I think this would be one of the forms that they would be

23   in, correct.

24          MS. HYNDMAN:  Your Honor, we would move to admit

25   Plaintiff's Exhibit 78.

Roggin - direct

615

1                    THE COURT:  Any objection?

2                    MR. JEPSON:  You know, I'll object to it just on the

3      basis of relevance but expect that to be overruled, so --

4                    THE COURT:  Well, with that, overruled.

5        (Laughter.)

6                    THE COURT:  It's admitted.

7        (Plaintiff's Exhibit No. 78 was received in evidence.)

8                    MS. HYNDMAN:  Dr. Roggin -- if we could look at the

9      third page of exhibit, please, Jamie.

10     BY MS. HYNDMAN:

11     Q.  On this e-mail it's an indication that there will be a

12     Surgical Education Committee meeting scheduled for Tuesday,

13     October 18th.  Do you see that?

14     A.  I do.

15     Q.  Did that meeting proceed as scheduled?

16     A.  I believe so.

17                    MS. HYNDMAN:  Could we please look at Plaintiff's

18     Exhibit 24.

19     BY MS. HYNDMAN:

20     Q.  Do you recognize this document, Dr. Roggin?

21     A.  Yes.

22     Q.  Who prepared this document?

23     A.  I'm not sure, but probably Carmen Barr.

24     Q.  Did you see this document sometime before October 18th,

25     2011, or on or about that date?

Roggin - direct

616

```
 1   A.  I don't remember when I saw this document for the first
 2   time.
 3   Q.  Okay.  Typically, are there agendas provided at Surgical
 4   Education Committee meetings at the beginning of the meeting?
 5   A.  I believe so.
 6        MS. HYNDMAN:  Okay.  Your Honor, we would move to
 7   admit Plaintiff's Exhibit No. 24.
 8        THE COURT:  Any objection?
 9        MR. JEPSON:  No objection.
10        THE COURT:  It's admitted.
11    (Plaintiff's Exhibit No. 24 was received in evidence.)
12   BY MS. HYNDMAN:
13   Q.  On this agenda, Dr. Roggin, it says that there would be
14   resident portfolio reviews.  What is a resident portfolio
15   review?
16   A.  I believe it's referring to reviewing evaluations or
17   summaries of evaluation of residents in our program.
18   Q.  You attended this meeting on October 18th?
19   A.  I believe I did.  There's no reason that I wouldn't have.
20   I just don't remember the exact meeting.
21        MS. HYNDMAN:  Can we look at Plaintiff's Exhibit 25,
22   please.
23   BY MS. HYNDMAN:
24   Q.  Dr. Roggin, do you recognize this document?
25   A.  I do.
```

Roggin - direct

617

1    Q.  What is it?

2    A.  I believe this is a recap of the meeting events or a

3    summary of the events.

4    Q.  Who prepared this document?

5    A.  I would imagine it was Carmen Barr, but I'm not sure.

6          MS. HYNDMAN:  We would move to admit Plaintiff's

7    Exhibit No. 25.

8          THE COURT:  Any objection?

9          MR. JEPSON:  No objection.

10         THE COURT:  It's admitted.

11    (Plaintiff's Exhibit No. 25 was received in evidence.)

12   BY MS. HYNDMAN:

13   Q.  Dr. Roggin, this reflects that you were present at the

14   Surgical Education Committee meeting on October 18th?

15   A.  Yes.

16   Q.  Does this refresh your recollection that you were there?

17   A.  I believe I was.  I just don't have a specific memory of

18   that meeting.

19   Q.  This would have been the first meeting after you became

20   the program director, correct?

21   A.  Correct.

22   Q.  Had you met Dr. Maria Artunduaga prior to October 18th of

23   2011?

24   A.  I don't remember if I actually met her, spent time with

25   her, but I remember her face.

Roggin - direct

618

1  Q.  Was there any discussion at this meeting on October 18th

2  of 2011 about Dr. Artunduaga?

3  A.  I -- I believe that she was discussed, but I can't

4  remember any details of what was discussed, I'm sorry.

5  Q.  There was no discussion at that meeting about putting

6  Dr. Artunduaga on probation, was there?

7  A.  I don't believe there was.

8  Q.  In fact, you never discussed putting Dr. Artunduaga on

9  probation with Dr. Song, did you?

10  A.  To the best of my recollection I did not and we did not.

11  Q.  And you weren't involved in determining any -- how long

12  any probationary period Dr. Artunduaga would have, were you?

13  You weren't involved in that decision?

14  A.  I was not involved in that discussion.

15  Q.  You met with Dr. Artunduaga in November of 2011?

16  A.  I believe I did, on November 10th.

17  Q.  In that meeting, you recommended to Dr. Artunduaga that

18  she should formally respond -- strike that.

19       In that meeting, Dr. Artunduaga told you that

20  Dr. Song had decided to put her on probation, correct?

21  A.  He did -- she did, I'm sorry.

22  Q.  And you recommended to her that she should formally

23  respond to Dr. Song about the probation, didn't you?

24  A.  I -- I told her I think at the end of the meeting that she

25  should talk to her program director, Dr. Song, about her

Roggin - direct

619

1    concerns.

2    Q.  You also recommended to her that she should look to her

3    peers for help in this situation, didn't you?

4    A.  It was one of many suggestions that I tried to give her to

5    help her.

6    Q.  But that is one that you gave her, correct?

7    A.  Correct.

8    Q.  You learned at some point that Dr. Artunduaga's contract

9    had not been renewed, correct?

10   A.  Correct.

11   Q.  Dr. Song didn't come to you for advice about whether or

12   not to renew Dr. Artunduaga's contract, did he?

13   A.  He did not.

14   Q.  But he told you that Dr. Artunduaga had been terminated --

15   her contract had not been renewed.

16   A.  At some point I remember we had a discussion.  He let me

17   know.

18   Q.  Okay.  And he told you he decided to remove her from

19   clinical duties, too, didn't he?

20   A.  I don't know if he told me that or I read that, but I

21   think he -- I think we discussed it because of the relevance

22   to our schedules.

23   Q.  He told you as a courtesy because she was scheduled for

24   general surgery rotations, right?

25   A.  Correct.

Roggin - direct

1    Q.  But at some point in time, Dr. Song discussed with you

2    putting Dr. Artunduaga back on clinical duties, didn't he?

3    A.  Correct.

4    Q.  And the decision at that time was put -- was made to put

5    Dr. Artunduaga on the Kaplan service, right?

6    A.  So we elected to put her on the endocrine side of the

7    Kaplan surgery service.

8           MS. HYNDMAN:  Let's look at Plaintiff's Exhibit 44,

9    please.

10   BY MS. HYNDMAN:

11   Q.  Dr. Roggin, do you recognize this document?

12   A.  I don't see it, but -- yes, I do.

13   Q.  Okay.

14   A.  Thank you.

15   Q.  Did you send this e-mail to Dr. Grossman and Dr. Seal on

16   or about April 6, 2012?

17   A.  I sent it to them on that date along with the other people

18   on the e-mail.

19          MS. HYNDMAN:  Your Honor, we would move to admit

20   Plaintiff's Exhibit No. 44.

21          THE COURT:  Any objection?

22          MR. JEPSON:  No objection.

23          THE COURT:  It's admitted.

24    (Plaintiff's Exhibit No. 44 was received in evidence.)

25   BY MS. HYNDMAN:

Roggin - direct

621

1   Q.  Now, Dr. Roggin, you thought the endocrine service would

2   be a good spot for Dr. Artunduaga because you believed both

3   Dr. Kaplan and Dr. Angelos were good teachers, right?

4   A.  That was among the reasons that I thought it would be a

5   good rotation.

6   Q.  You thought Dr. Artunduaga could benefit from the time

7   with them on that rotation?

8   A.  I thought it would be a good rotation for her to be on,

9   given what I had been told about her performance to date.

10  Q.  You had no direct knowledge about anything about

11  Dr. Artunduaga's performance to date, did you?

12  A.  Can you clarify what you mean by direct knowledge?

13  Q.  You never observed Dr. Artunduaga in a clinical setting,

14  did you?

15  A.  I don't believe -- I never worked with her on my service,

16  and I don't recall ever observing her performance.

17  Q.  The information you had came from Dr. Song; is that right?

18  A.  I think there were multiple -- at that point, there were

19  multiple sources of information, but mainly from what Dr. Song

20  had told me about his assessment of her performance to date.

21  Q.  Now, in this e-mail you see where you say, "If she

22  continues to complain or be difficult, please notify me

23  immediately."  Do you see that?

24  A.  I do.

25  Q.  You don't remember any specific circumstance that led you

Roggin - direct

622

1  to say that at the time, do you, Dr. Roggin?

2  A.  I remember that this was raised in an e-mail that I was

3  cc'd on.

4  Q.  But you didn't know of any specific circumstance at the

5  time.

6  A.  I don't know that I was aware of directly hearing about

7  some issue related to this.  It was more of a precautionary

8  measure.

9  Q.  Very simple question:  You don't remember when you --

10  right now, you don't remember what -- any circumstance in

11  particular that led you to write that.  You're saying that it

12  came from an e-mail.

13  A.  It came from an e-mail, correct.

14  Q.  Okay.  Do you see also where it says, "She's been warned

15  by Jane McAtee about misrepresenting her status to other

16  residents or acting in any way that is disruptive to the

17  operations of the Medical Center and the care of the

18  patients."  Do you see that?

19  A.  I do.

20  Q.  Now, at the time you wrote this e-mail, you didn't know of

21  any basis for concern regarding whether Dr. Artunduaga was

22  misrepresenting her status, do you?

23  A.  No.

24  Q.  And at the time you wrote this, you didn't have an opinion

25  about whether or not she was disruptive to the care of

Roggin - direct

623

1   patients, did you?

2   A.  It's hard for me to remember -- I don't know.  I remember

3   there was concern from multiple people to me, and I'd been

4   cc'd on e-mails, so I was concerned about the safety of

5   patients and the care of our patients more than anything.

6           MS. HYNDMAN:  Let me get your deposition transcript

7   here.

8           May I approach, your Honor?

9           THE COURT:  You may.

10    (Document tendered.)

11          MS. HYNDMAN:  Do you have one there?

12          MR. JEPSON:  I'm trying to get one.  Bear with me.

13          MS. HYNDMAN:  Sure.

14          MR. JEPSON:  Lots of boxes, Cindy.

15          MS. HYNDMAN:  I see that.

16          MR. JEPSON:  Got it.

17  BY MS. HYNDMAN:

18  Q.  Okay.  Dr. Roggin, do you remember giving your deposition

19  in this case?

20  A.  I do.

21          MR. JEPSON:  I'll object to that.  It wasn't in this

22  case.

23  BY MS. HYNDMAN:

24  Q.  Do you remember giving your deposition in a related case?

25  A.  I remember giving the deposition.

Roggin - direct

624

1   Q.  And if you'll look at Page 112, starting at the bottom of

2   the page, the question on line 24, do you see the line numbers

3   on the left there?

4   A.  Yes.

5   Q.  Were you asked this question, and did you give this

6   answer:

7          "What about the care of patients?  Did you feel --

8     and when I said did you feel, obviously, it's at the time

9     of this letter -- that she was disruptive to the care of

10    patients?

11         "Answer:  I don't have an opinion on that."

12  A.  I see that.

13  Q.  Okay.

14         MR. JEPSON:  What letter are you referring to?

15         MS. HYNDMAN:  Referring to this letter that was --

16  the e-mail.

17         MR. JEPSON:  This exhibit?

18         MS. HYNDMAN:  Yes, it's this exhibit.

19         MR. JEPSON:  Because it's not a letter.

20  BY MS. HYNDMAN:

21  Q.  You weren't aware of any patient complaints about

22  Dr. Artunduaga in the month of April, were you, Dr. Roggin?

23  A.  I'm not.  I don't remember.  I didn't see a document from

24  the month of April 2012 about a patient complaint, no.

25  Q.  At some point in time, Dr. Song made the decision to

Roggin - direct

625

1   remove Dr. Artunduaga from clinical duties altogether; isn't

2   that right?

3   A.  Correct.

4   Q.  And that was his decision?

5   A.  Yes.

6   Q.  He decided she would not rotate again after her month in

7   the endocrine service?

8   A.  I'm sorry --

9           MR. JEPSON:  Object to form.

10          THE COURT:  Sustained on form.  Rephrase your

11  question.

12          THE WITNESS:  Could you please be specific about

13  which time he removed her?  Because I think there were two --

14  BY MS. HYNDMAN:

15  Q.  I'm talking about at the end of April after she had spent

16  her time in the endocrine service.

17  A.  Okay.  Could you please re-ask the question, please?

18  Q.  Dr. Song told you that Dr. Artunduaga would not rotate

19  again after the end of the month in the endocrine service.

20  A.  I think I had -- I contributed to that decision.

21  Q.  But Dr. Song told you that he ultimately made the decision

22  that she would not rotate again.

23  A.  Yeah, I'm not sure if it was only him, but I think

24  ultimately he made the decision, but I felt that it was a good

25  idea.

Roggin - direct

1   Q.  I didn't ask that question, Dr. Roggin.  I asked you if he

2   made the decision.  Did he make the decision ultimately?

3   A.  I don't know who made the ultimate decision, but I was in

4   agreement with the decision.

5   Q.  I didn't ask you whether you were in agreement.  I asked

6   you if he made the decision.

7   A.  I don't know.

8   Q.  If you look at Page 128 in your deposition that's in front

9   of you, Line 19:

10          "Who decided that she" -- were you asked this

11  question, and did you give this answer?  I'm sorry.

12          THE COURT:  Are you attempting to refresh his

13  recollection since he said he didn't know?

14          MS. HYNDMAN:  I'm attempting to impeach.

15          THE COURT:  But he said he didn't know.

16          MR. JEPSON:  It's not impeachment.

17          MS. HYNDMAN:  Okay.

18          THE COURT:  I think you should -- because he said he

19  didn't know, just one second, he said he didn't know.  I think

20  you need to use this to refresh his recollection first --

21          MS. HYNDMAN:  That's fine.

22          THE COURT:  -- because that wouldn't be impeaching.

23  BY MS. HYNDMAN:

24  Q.  Okay.  Can you take a look and read lines 19 through 21.

25          THE COURT:  To yourself, Doctor.

Roggin - direct

627

1    BY MS. HYNDMAN:

2    Q.  To yourself.

3    A.  Yes.

4    Q.  Does that refresh your recollection about who ultimately

5    made the decision not to have Dr. Artunduaga rotate again

6    after the end of the endocrine service in April?

7    A.  Yes.

8    Q.  Okay.  And who made that decision?

9    A.  Dr. Song.

10           MS. HYNDMAN:  Can we look at Plaintiff's Exhibit 49,

11   please.

12   BY MS. HYNDMAN:

13   Q.  Do you recognize this document, just at the top,

14   Dr. Roggin?

15   A.  Yes.

16   Q.  Did you receive that e-mail from Dr. Song on or about

17   April 25th, 2012?

18   A.  Yes.

19           MS. HYNDMAN:  Okay.  We would move to admit Exhibit

20   No. 49, your Honor.

21           THE COURT:  Any objection?

22           MR. JEPSON:  No objection.

23           THE COURT:  It's admitted.

24     (Plaintiff's Exhibit No. 49 was received in evidence.)

25   BY MS. HYNDMAN:

1    Q.  Dr. Song sent this e-mail to you on or about April 25th,

2    2012?

3    A.  Yes.

4    Q.  What was your understanding of what Dr. Song was

5    communicating to you in this e-mail?

6    A.  It seems like he's referring to what rotations Maria

7    would -- or Dr. Artunduaga would rotate on for the months of

8    May and June, 2012.

9    Q.  Now, Dr. Roggin, you were aware that Dr. Artunduaga filed

10   a grievance relating to Dr. Song's termination decision,

11   correct?

12   A.  Do you mean the grievance with the ACGME or the GMEC?

13   Q.  The grievance, the internal in-house grievance.

14   A.  I was aware of that, correct.

15   Q.  Around the time that Dr. Artunduaga had her grievance

16   hearing, you had an occasion to have a conversation with

17   Dr. Kaplan about Dr. Artunduaga, correct?

18   A.  I've had many conversations with Dr. Kaplan in that time

19   period, but --

20   Q.  There was one particular conversation that Dr. Kaplan

21   talked to you and he was very complimentary about

22   Dr. Artunduaga, correct?

23   A.  There was a time where Dr. Kaplan came up to me in the

24   hall, stopped me to tell me his feelings on Dr. Artunduaga.

25   Q.  And in that conversation, he was very complimentary of

Roggin - cross

 1  her, correct?

 2  A.  Correct.

 3  Q.  Okay.  You didn't think that Dr. Kaplan was trying to

 4  coerce you into supporting Dr. Artunduaga in that -- by him

 5  having that conversation with you, did you?

 6  A.  I -- I don't know his intent.  I just know that he wanted

 7  to tell me his thoughts.

 8  Q.  But I'm asking you what your feeling was.  You didn't feel

 9  like he was trying to coerce you, did you?

10  A.  I -- I just didn't -- I felt uncomfortable because I

11  didn't want to be involved in that discussion, given what I

12  knew about the grievance process.

13  Q.  You think that Dr. Kaplan's an honest man though, don't

14  you?

15  A.  Absolutely.

16         MS. HYNDMAN:  No further questions.

17         THE COURT:  Cross-examination.

18                     CROSS-EXAMINATION

19  BY MR. JEPSON:

20  Q.  Let me try to straighten this out.  You have your

21  deposition up there.  I've asked for recollection, that you go

22  to the next page, the top of Page 129 and read it to yourself

23  about the recommendation.

24         And my question to you is this, Dr. Roggin:  At the

25  end of April, 2012, did you want Dr. Artunduaga to continue to

Roggin - cross

1    rotate on your general surgery rotations?

2    A.   No.

3    Q.   And did you tell Dr. Song that?

4    A.   I did.

5    Q.   And let's take a look at Plaintiff's 49 which you were

6    just shown.

7             THE COURT:  They'll put it on the screen, Doctor.

8             MR. JEPSON:  Yeah, it's high tech now.

9             MS. HALL:  Can we switch it, Judge?

10   BY MR. JEPSON:

11   Q.   Okay.  You were just shown this exhibit, correct?

12   A.   Yes.

13   Q.   And this is an e-mail from Dr. Song to you, correct?

14   A.   Yes.

15   Q.   Dated April 25th, correct?

16   A.   Yes.

17   Q.   And to brain storm, and it says here, "I'm thinking ER for

18   May and anesthesia for June."  Do you see that?

19   A.   I do.

20   Q.   And ER is not a general surgery rotation, is it?

21   A.   Correct.

22   Q.   And anesthesia is not a general surgery rotation, is it?

23   A.   Correct.

24   Q.   And at this point in time, had you already spoken with

25   Dr. Song about whether or not you wanted Dr. Artunduaga to

Roggin - cross

1  continue to work on general surgery rotations?

2  A.  Yes.

3  Q.  And you had told him your feeling about that, correct?

4  A.  I did.

5  Q.  And let's go back again to -- we'll come back to April,

6  but for right now, I want to talk a bit about the Surgical

7  Education Committee.  Does that still exist?

8  A.  No.

9  Q.  And at the time that it did exist, did it have any

10  responsibility whatsoever for the discipline, advancement of

11  plastic surgery residents?

12  A.  No.

13  Q.  And did it have any responsibility then for discipline,

14  advancement, probation, remediation, or any decisions having

15  to do with plastic surgery track residents who are in their

16  first, second or third years?

17  A.  It did not.

18  Q.  And the same is true with respect to those other

19  subspecialties that might rotate through general surgery prior

20  to going into their focused residency, correct?

21  A.  Correct.

22  Q.  Like ENT --

23  A.  Neurology, ENT.

24  Q.  -- et cetera?

25  A.  Yes.

Roggin - cross

1   Q.  And to the extent that evaluations were looked at at that

2   committee, did that committee have any say into how to

3   interpret or decide what those evaluations meant for standing

4   with any of those programs?

5   A.  Not really, no.

6   Q.  Okay.  And your general -- you were general surgery and

7   still are residency program chief.

8           Did you have any responsibility for recruiting or

9   hiring the plastic surgery track residents?

10  A.  I had no -- no involvement.

11  Q.  And you would have had no involvement, too, with respect

12  to their overall evaluation of remediation, discipline,

13  advancement or nonrenewal of contracts, right?

14  A.  Correct.

15  Q.  And in that sense, the responsibility you had for those

16  folks would have been administrative in the sense that they

17  serviced some general surgery rotations, correct?

18  A.  I think it was an administrative function in making

19  rotations and making sure they were compliant with, you know,

20  the rules and regulations and duty hours while on general

21  surgery services.

22  Q.  Okay.  And let's go back, if we would, to April, and I

23  want to direct your attention to Defendant's Exhibit 138,

24  which has not been admitted into evidence.

25          Do you recognize this as an e-mail from Dr. Song to

Roggin - cross

1    you at the top?

2    A.  Can you make it -- thank you.

3    Q.  Yeah, it's hard to see, unfortunately.  Dated April 3,

4    2012?

5    A.  Yes.  I see it.

6    Q.  Okay.  And attached to this e-mail, do you see a draft

7    letter dated April 4, 2012 to Maria Artunduaga?

8    A.  I can't see the attachment.

9    Q.  Yeah, they have to advance it.

10            Do you see that?

11   A.  Yes.

12   Q.  Okay.  Let's go back to the first page.

13            THE COURT:  Do you want to move to admit it?

14            MR. JEPSON:  First I will move it to be admitted.

15   Thank you, your Honor.

16            THE COURT:  Any objection?

17            MS. HYNDMAN:  No objection.

18            THE COURT:  It's admitted.

19     (Defendant's Exhibit No. 138 was received in evidence.)

20   BY MR. JEPSON:

21   Q.  And this is an e-mail from Dr. Song to you regarding the

22   attached letter, correct?

23   A.  Yes.

24   Q.  And it says, "Kevin, I'm sending this letter to Maria

25   FedEx so that she may respond to you by April 6th.  The hope

Roggin - cross

1   is that she successfully finishes her intern year and move

2   on."  Do you see that?

3   A.  I do.

4   Q.  And this was a communication that was sent to

5   Dr. Artunduaga to contact you about finishing her clinical in

6   Kaplan for April and May, correct?

7   A.  I believe so.

8   Q.  Okay.  And you had come and talked with Dr. Song about

9   that arrangement, correct?

10  A.  I remember discussing how we were going to assign her to

11  services that were different from her original schedule.

12  Q.  Okay.  And you were asked about one of the reasons why you

13  felt that the reinstatement to the endocrine side of the

14  Kaplan service was appropriate.  Do you remember just talking

15  about that?

16  A.  Yes.

17  Q.  Now, what were your other thoughts about why that was

18  appropriate?

19  A.  I felt that there were a number of different educational

20  opportunities on the service with supportive attendings.  The

21  care of the patients on that service in general are less

22  acutely ill than other services in the main, and I felt that

23  there were -- there's a lot of supervision and support around,

24  and I thought it would be a good rotation.  She was

25  comfortable with the attendings already, and I thought it was

Roggin - cross

635

1   a recipe for success for her.

2   Q.  Okay.  And with respect to that rotation, she wasn't going

3   to be on the breast side; is that correct?

4   A.  That is correct.

5   Q.  And why is that?

6   A.  I was -- I initially thought that she could go to both

7   sides, but I received communication from Dr. Nora Jaskowiak, a

8   breast surgeon, and she did not want Dr. Artunduaga taking

9   care of her patients.

10  Q.  And so --

11        MS. HYNDMAN:  Your Honor, I would move to strike that

12  on the grounds of hearsay unless we get a limiting

13  instruction.

14        MR. JEPSON:  Well, and Dr. Jaskowiak is going to

15  testify, but I'm fine with that for now.

16        THE COURT:  Okay.  I will.  The statement that was

17  just made about what the doctor said is not being offered for

18  the truth of what she said, but rather to show actions that

19  this doctor took in response.

20        MR. JEPSON:  Thank you, your Honor.

21  BY MR. JEPSON:

22  Q.  So that then resulted in her on the endocrine side as

23  opposed to rotating fully, correct?

24  A.  Correct.

25  Q.  At least your decision.

Roggin - cross

636

1   A.  Correct.

2   Q.  And that limitation was communicated to Dr. Artunduaga by

3   Dr. Grossman, the chief on that service, correct?

4   A.  Correct.

5   Q.  And I want to direct your attention to e-mails that are

6   dated 4-5-12, in a particular Joint Exhibit 107, which is

7   already in evidence.

8            MR. JEPSON:  Let's go back to the last page, please,

9   Michael.  Of course, that's -- okay.  Lots of disclaimers on

10  these documents.

11  BY MR. JEPSON:

12  Q.  The e-mail at the bottom there dated -- it's from Maria to

13  you, and that's her reaching out to contact you after she had

14  gotten the letter indicating she'd be reinstated, correct?

15  A.  Yes.

16  Q.  And did you respond to that?

17  A.  I believe I did.

18  Q.  And let's go to the e-mail that's on top of that.  And it

19  says there, "Maria, I already had to make changes to the

20  schedule to coverage our services.  It's possible you could

21  rotate on the Kaplan service for the rest of April and May.

22  You're scheduled to be on the anesthesia service in June."  Do

23  you see that?

24  A.  I do.

25  Q.  And you sent that to Dr. Artunduaga, correct?

Roggin - cross

1   A.  I believe I did.

2          MR. JEPSON:  And then let's go to the next page,

3   Michael, forward, at the bottom.

4   BY MR. JEPSON:

5   Q.  And this was the response you got from Dr. Artunduaga,

6   correct?

7   A.  Yes.

8   Q.  And she indicates she feels that she deserves the

9   opportunity to be on night float for about four weeks.  Do you

10  see that?

11  A.  I do.

12  Q.  Did you have an opinion at the time as to whether it would

13  be a good idea for Dr. Artunduaga to be on night float for

14  four weeks?

15  A.  I do have --

16          MS. HYNDMAN:  Objection, your Honor, to the relevance

17  of his opinion.

18          THE COURT:  What's the relevance?

19          MR. JEPSON:  Well, he's the one that's being asked to

20  make the decision.

21          THE COURT:  What's your response?

22          THE WITNESS:  I do have an opinion.

23          THE COURT:  Okay.  Not you, Doctor.

24          THE WITNESS:  Sorry.

25          MS. HYNDMAN:  The only decision that's relevant is

1   why did he put -- is he put her on -- the only thing that's

2   relevant is he put her on endocrine.  I don't think it's

3   relevant what he -- why he decided not to put her on --

4           MR. JEPSON:  There's a request that's being made from

5   the plaintiff here.

6           THE COURT:  Objection overruled.

7           You may answer if you can.

8   BY THE WITNESS:

9   A.  I decided not to put her on night float because I felt

10  that the supervision was not as direct as it is on the

11  endocrine service and because of the acuity of the patients,

12  how sick they can be, and I felt that it's a high-stress

13  rotation.

14  BY MR. JEPSON:

15  Q.  Okay.  And then the second point here, she asks to get the

16  opportunity to increase her case numbers on Kaplan, and she's

17  concerned about being overstaffed, correct, in essence?

18  A.  I believe that's one of the concerns.

19  Q.  Okay.  And back in 2011, 2012, as the program director for

20  the general surgery residency program, you were aware that

21  there were no minimal requirements for cases for that year,

22  correct?

23  A.  I don't believe there were any minimum requirements.

24          MR. JEPSON:  Okay.  And let's go on and take a look

25  at the next page -- or the one -- the next page, correct, at

Roggin - cross

1   the bottom.  Strike that.  You just did it.

2   BY MR. JEPSON:

3   Q.  Is this your response at the top?

4   A.  I believe so.

5   Q.  Okay.  And then you got, "Yet I appreciate your request,

6   but we've already made changes.  Let me know if you'd like to

7   rotate on Kaplan for those six weeks," and then going to the

8   next page, she e-mailed you again, correct?  That is,

9   Dr. Artunduaga.

10   A.  Yes.

11   Q.  And this e-mail was, "Sorry to bother you again.  Would

12   this work?  April anesthesia, 3 weeks; May Kaplan, 5 weeks;

13   June night float, three weeks?"

14        And you responded to that e-mail, correct?

15   A.  Yes.

16   Q.  Let's take the top.

17        And that's the e-mail -- the last e-mail in that

18   string, correct?

19   A.  Yes.

20   Q.  And you referred earlier in your testimony to e-mails that

21   you had seen about further e-mails about this, correct?

22   A.  Yes.

23   Q.  Let's direct your attention if we can to April 6th e-mail,

24   Joint -- I mean, it's our e-mail from Dr. Artunduaga to David

25   Song.

Roggin - cross

1        Were you copied on that one?  Or you were copied on

2   the one that Jane McAtee wrote back.

3        THE COURT:  What's the exhibit you're working on?  I

4   don't think he has something to look at it.

5        MR. JEPSON:  Unfortunately, I don't have it on my --

6   the number here.  If I could get --

7        MS. HALL:  That's a joint.

8        MR. JEPSON:  That will work.  All right.  It is --

9   none of my books have it.  Hold on.

10       It is here.

11    (Counsel conferring.)

12  BY MR. JEPSON:

13  Q.  I apologize.  Hold on.  Let's look at Plaintiff's

14  Exhibit 43.  At the top, there's an e-mail from Jane McAtee to

15  Maria Artunduaga.  You're copied on that, correct?

16  A.  Yes.

17  Q.  And you at that time would have seen the e-mail that's

18  attached from Dr. Artunduaga to Dr. Song protesting the

19  assignment, correct?

20  A.  I believe so.

21  Q.  And this is the e-mail you were referring to earlier when

22  you talked about e-mails you had seen go back and forth,

23  correct?

24  A.  Yes, it was.

25  Q.  All right.  And was that the last you heard from

Roggin - cross

1   Dr. Artunduaga about her assignment, or were there more

2   e-mails, if you recall?

3   A.  There were more e-mails.

4   Q.  All right.  Let's direct your attention to Defendant's

5   Exhibit 145.  Not 145, sorry.  Joint Exhibit 108.

6          This was an e-mail that was directed to you by

7   Dr. Artunduaga, correct?

8   A.  Yes.

9   Q.  In this e-mail, there was another complaint about the

10  quality of the amount of work she got on that rotation,

11  correct?

12  A.  Yes.

13  Q.  And did you respond to this?

14  A.  I believe I did.

15  Q.  Did you respond to it to her directly, or did you respond

16  to Dr. Song?

17  A.  I don't remember.  I have not seen the e-mail.  Sorry.

18  Q.  Okay.  Now, let's go back to Defendant's Exhibit 143.

19          MS. HYNDMAN:  What number, Ed?

20          MR. JEPSON:  143, Cindy.

21          MS. HYNDMAN:  Okay.

22  BY MR. JEPSON:

23  Q.  And you were copied on this one as well, too.  Do you see

24  this?

25  A.  I do.

Roggin - cross

1   Q.  And that was an e-mail from Dr. Artunduaga to Eric

2   Grossman, who was the chief, and you were copied.

3           And the second paragraph says, "I will accept

4   Dr. Roggin's assignment and do my job in the ethical and

5   professional way I have always aspired to do," correct?

6           MS. HYNDMAN:  Your Honor, this hasn't been admitted,

7   I don't think.

8           MR. JEPSON:  Yes, it has.

9           MS. HYNDMAN:  It was?

10          THE COURT:  Yes, it has.  It's in evidence.

11          MS. HYNDMAN:  I'm sorry.

12  BY THE WITNESS:

13  A.  Yes.

14  BY MR. JEPSON:

15  Q.  Okay.  And you thought at that point things had calmed

16  down, correct?

17  A.  I did.

18  Q.  And then you got that April 24th e-mail?

19  A.  I got a number of e-mails after that date.

20  Q.  Okay.  The one I just showed you though.

21  A.  Correct.

22  Q.  Okay.  And you got another one on April 26th, correct?

23  A.  I believe so.

24  Q.  And you had also had some communications with Dr. Grossman

25  about his experience with Dr. Artunduaga on the rotation,

Roggin - cross

1    correct?

2    A.  Correct.

3         MR. JEPSON:  I want to direct your attention to

4    Defendant's Exhibit 145.  This has not been admitted as far as

5    I recall.

6         THE COURT:  It has not.

7    BY MR. JEPSON:

8    Q.  This is an April 24, 2012 e-mail to you from Eric

9    Grossman, correct?

10   A.  Yes.

11   Q.  And you received it on or about April 24, 2012, correct?

12   A.  Correct.

13        MR. JEPSON:  I'd move its admission.

14        MS. HYNDMAN:  Your Honor, I object to this under your

15   ruling in motion *in limine* No. 1.  This was after the decision

16   was made by Dr. Song.  It was not sent to Dr. Song.  It's a

17   hearsay document.

18        MR. JEPSON:  If it's after the decision that was made

19   by Dr. Song, it's not relevant to that decision, I agree; but

20   there's been testimony about what happened in the month of

21   April 2012, and this is clearly relevant to that and also

22   relates to Dr. Kaplan's testimony.

23        MS. HYNDMAN:  It's a hearsay document.

24        THE COURT:  How do you get around the hearsay?

25        MR. JEPSON:  Dr. Roggin is going to testify via

Roggin - cross

644

1   deposition about this, and in addition, if -- we're not

2   offering it for the truth of the matter asserted but for its

3   effect on Dr. Roggin.  That is something we would be willing

4   to accept.

5           MS. HYNDMAN:  It's fine if it is for the limited

6   purpose of the effect on Dr. Roggin and that's all.

7           THE COURT:  Okay.  I will admit it for that purpose

8   because otherwise you have not given me a basis or an

9   exception to the hearsay rule.

10          So, ladies and gentlemen, this document is not being

11  offered for the truth of what is in the document.  Instead,

12  it's being offered to show what impact it had on Dr. Roggin.

13          Go ahead.

14          MR. JEPSON:  So may we publish it to the jury?

15          THE COURT:  Yes.

16  BY MR. JEPSON:

17  Q.  So this is the e-mail you received on April 24th from Eric

18  Grossman, correct?

19  A.  Yes.

20  Q.  And you had directed -- had you directed Eric Grossman to,

21  as the chief, to monitor the situation?

22  A.  Yes.

23  Q.  And it indicates here that -- a number of things, but I

24  want to direct your attention to the fifth paragraph.

25          MR. JEPSON:  If you highlight that, please, Michael.

Roggin - cross

1    BY MR. JEPSON:

2    Q.  Again, I'm not suggesting that this is true, but this is

3    in the e-mail that Dr. Grossman sent you, correct?

4    A.  Correct.

5    Q.  And you received this e-mail on the same day that you

6    received the first e-mail from -- at least one e-mail from

7    Maria Artunduaga protesting her treatment on the Kaplan

8    service, correct?

9    A.  I believe so.

10   Q.  And at this point in time, having received these e-mails,

11   had you also spoken with Grossman, too, as well, as to what's

12   going on?

13   A.  I recall that there were conversations on the phone about

14   how the service was going.

15   Q.  Okay.  And did those conversations and this e-mail and the

16   other e-mail I showed you prompt you to make the decision that

17   you did not want her to continue to rotate on your general

18   surgery rotations?

19   A.  Yes.

20   Q.  And you informed Dr. Song, correct?

21   A.  I believe I did.

22   Q.  Now, you indicated that you met with Dr. Artunduaga in

23   November of 2011, correct?

24   A.  Correct.

25   Q.  And you gave her some advice, correct?

Roggin - cross

1    A.  I did.

2    Q.  And you actually ended up putting together an e-mail and

3    sending it to Dr. Song regarding that conversation, correct?

4    A.  I did.

5    Q.  And that document is Defendant's Exhibit 133, which has

6    not been admitted yet, I believe.

7            And I want to direct your attention in particular to

8    the e-mail midway down from Kevin Roggin to David Song dated

9    March 28, 2012.  Do you see that?

10   A.  I do.

11   Q.  And did you send this to Dr. Song on or about that date?

12   A.  Yes.

13   Q.  Take a look at the second page, if you would.

14           And if you can read that, do you recognize this?

15   A.  I believe so, yes.

16   Q.  And is this the summary you made of that meeting you had

17   with Dr. Artunduaga in November of 2010 -- '11, I mean?

18   A.  Yes.

19           MR. JEPSON:  Okay.  I'll move this into evidence.

20           THE COURT:  Any objection?

21           MS. HYNDMAN:  Yes, your Honor.  It's a hearsay

22   document.  There's no exception for it.

23           MR. JEPSON:  Well, it was sent to Dr. Song at the

24   time that the decision was being made.

25           MS. HYNDMAN:  It was sent to him after the decision

Roggin - cross

647

```
 1    was made.
 2              MR. JEPSON:  March 28, 2012.
 3              MS. HYNDMAN:  The decision was made on March 26,
 4    2012.
 5              MR. JEPSON:  And she asked for reconsideration on the
 6    29th.
 7              THE COURT:  What about that, relevant to the
 8    reconsideration?
 9              MS. HYNDMAN:  If he can -- if Dr. Song at some point
10    testifies to that; but there's no evidence in the record that
11    he considered this in a reconsideration decision.
12              MR. JEPSON:  Well, it's something he would have had
13    at the time, and he would have gotten it the day before.
14              THE COURT:  I'm going to sustain the objection with
15    the caveat that if you can link it up with Dr. Song, I will
16    admit it then.
17              MR. JEPSON:  Thank you, your Honor.
18    BY MR. JEPSON:
19    Q.  All right.  In any event, you put that together, correct?
20    A.  Correct.
21    Q.  And with respect to Dr. Artunduaga in general, did you
22    know that she was from Colombia?
23    A.  I don't believe I did.
24    Q.  Okay.  Did you know that -- she had an accent, correct?
25    A.  I believe she did.
```

Roggin - redirect

648

1   Q.  Did you understand her when she spoke with you?

2   A.  I did.

3   Q.  Did you have any knowledge -- did you ever hear that she

4   was being mistreated or claimed that she was being mistreated

5   or discriminated against because of her Colombian national

6   origin prior to this lawsuit?

7   A.  No.

8   Q.  And did you witness any acts or hear about any acts with

9   respect to any of the rotations that were general surgery that

10  led you to believe that she might have been discriminated

11  against because of her Colombian national origin?

12  A.  I did not.

13  Q.  Or retaliated against for complaining?

14  A.  I did not.

15  Q.  And indeed you hadn't heard that she'd complained of

16  discrimination based on her Colombian national origin until

17  you heard about this lawsuit, correct?

18  A.  Correct.

19          MR. JEPSON:  I don't have anything further.

20          THE COURT:  Redirect, Ms. Hyndman.

21          MS. HYNDMAN:  Yes, your Honor.

22          If we could look at Joint Exhibit 107, Jamie, please.

23                      REDIRECT EXAMINATION

24  BY MS. HYNDMAN:

25  Q.  Dr. Roggin, you testified about this series of e-mails

Roggin - redirect

649

1   with Dr. Artunduaga where she was making suggestions about

2   rotations, and you had some testimony about the reasons why

3   you would not put her on the night float.

4           Did you know she was on night float at the end of

5   March at the time that Dr. Song had ended her contract?

6   A.  Did I know that -- I don't -- did I know that she was on

7   night float?  If it was on the schedule, I would have known

8   about it.

9   Q.  And you never told Dr. Artunduaga in this e-mail exchange

10  why you wouldn't put her on night float, did you?

11  A.  I don't believe I did.

12  Q.  Then there was a couple of questions about an e-mail you

13  had received from Dr. Artunduaga, Joint Exhibit No. 108.  And

14  you received this on April 24th at about 12:35 p.m., right?

15  A.  Correct.

16  Q.  And then Dr. -- Dr. -- Mr. Jepson --

17          MR. JEPSON:  I'd like to be a doctor.

18  BY MS. HYNDMAN:

19  Q.  -- asked you about an evaluation you received from

20  Dr. Grossman on the same day.  Let's take a look at that.

21  That was Defendant's Exhibit 145.

22          And you got that about 9:28 p.m., correct?

23  A.  Yes.

24  Q.  Now, it's not a coincidence that Dr. Grossman's evaluation

25  came to you on the same day you received your e-mail from

Roggin - redirect

1   Dr. Artunduaga, is it?

2   A.  I believe they're not coincidental.

3   Q.  It wasn't coincidental at all, was it?

4   A.  Right.

5   Q.  Didn't you ask Dr. Grossman to prepare this evaluation in

6   light of the letter you got from Dr. Artunduaga?

7   A.  I asked him to submit an evaluation.  I don't remember the

8   exact date or time, but I asked him to submit the evaluation.

9   Q.  But you gave him a copy of Dr. Artunduaga's e-mail, the

10  one we looked at, Joint Exhibit 108, before he sent this to

11  you, didn't you?

12  A.  I don't remember.  Could you show me the document?

13  Q.  Yep, I'd be happy to.

14     (Document tendered.)

15          THE WITNESS:  Thank you.

16  BY THE WITNESS:

17  A.  Yes, I sent it to him.

18  BY MS. HYNDMAN:

19  Q.  At 6:25 in the evening, correct?

20  A.  Correct.

21  Q.  And his evaluation came about three hours later?

22  A.  I -- I believe so.  I don't know when he wrote it, but I

23  know that I got it around or about that time.

24          MS. HYNDMAN:  Okay.  That's all.

25          THE COURT:  Recross?

Fleming - deposition

1          MR. JEPSON:  Nothing, your Honor.

2          THE COURT:  Thank you, Doctor.  You may step down.

3          Please call your next witness.

4          MS. HYNDMAN:  Your Honor, we were going to play the

5     deposition transcript of Irma Fleming.  It's about 50 minutes

6     long.

7          THE COURT:  You can start, and we'll finish it in the

8     morning unless you want to play somebody else's first.  Up to

9     you.

10          MS. HYNDMAN:  The other one we have is really short,

11     so we've got one that's about 8 minutes long that's not going

12     to fill up the day.

13          THE COURT:  Okay.  So go ahead and start.  We can

14     finish it in the morning.

15          MS. HYNDMAN:  Yeah, that's fine.

16          THE COURT:  We'll get a chunk of it in.

17          Ladies and gentlemen, you're about to see videotaped

18     testimony.  You should consider this testimony the same as you

19     would as if the witness were in here testifying before you.

20          This is the 2014 deposition?

21          MS. HYNDMAN:  Yes, your Honor.

22     (Said videotaped deposition played in open court.)

23          MS. HYNDMAN:  Can we turn up the volume a little?

24          THE COURT:  Going to try.

25          MS. HYNDMAN:  Start it over?

Fleming - deposition

 1          THE COURT:  Sure.  Try it.

 2     (Said videotaped deposition played in open court.)

 3          THE COURT:  Ms. Franklin, why don't we stop it there.

 4          Ladies and gentlemen, we are done for the day.  We

 5  will pick up tomorrow morning.  We'll finish this video and

 6  then call some additional witnesses.  Please don't discuss the

 7  case.  Have a great evening.  9:15 tomorrow morning.

 8          THE CLERK:  All rise.

 9     (Jury exits courtroom.)

10          THE COURT:  Any issues for the Court or any follow-up

11  to what we discussed earlier today?

12          MS. HYNDMAN:  Yes on both.

13          THE COURT:  Okay.

14          MS. HYNDMAN:  First, I just wanted to make a comment

15  when I asked Dr. Roggin whether he had given his deposition in

16  this case, and Mr. Jepson said not in this case.  They made

17  the motion *in limine* not to mention the other case, so --

18          MR. JEPSON:  Won't do it again.  Sorry.

19          MS. HYNDMAN:  -- it might come up again where we're

20  using a deposition from another case.

21          THE COURT:  You are correct.  Do you want me to say

22  anything curative?  My suggestion would be just let it go so

23  you don't bring attention to it, but --

24          MS. HYNDMAN:  That's what I thought --

25          MR. JEPSON:  Whatever you want.

653

```
 1          MS. HYNDMAN:  -- we'll just let it go, which is why I
 2  didn't say anything at the time, but I just didn't want it to
 3  happen again.
 4          THE COURT:  You are absolutely right.
 5          MR. JEPSON:  Yes, you are, sorry.
 6          MS. HYNDMAN:  And if we may have a sidebar.
 7          THE COURT:  Of course.
 8    (Proceedings heard at sidebar:)
 9          MS. HYNDMAN:  We spoke to Dr. Artunduaga this
10  afternoon, and she would be happy to talk to you.
11          THE COURT:  Okay.  I'll do it back in chambers.
12          MS. HYNDMAN:  Yeah.
13          THE COURT:  You should probably be there.
14          MS. HYNDMAN:  Okay.
15          THE COURT:  How do you feel, one from each side, just
16  you?  Do you want it on the record?
17          MS. FRANKLIN:  I would like to be there.
18          THE COURT:  I'm sorry?
19          MS. FRANKLIN:  I think you -- both of us should be
20  there.
21          MS. HYNDMAN:  If you just want one of us, Jamie can
22  do it.
23          THE COURT:  I was -- I meant somebody from --
24          MS. HYNDMAN: Yes.
25          THE COURT: -- one of her counsel should probably be
```

654

1  there.

2         MS. HYNDMAN: You should do it. She's been on the

3  case longer.

4         THE COURT: I don't know your relationships with her,

5  so I'll let you decide that.

6         Is she okay doing it now, does she have time?

7         MS. HYNDMAN: I think so.

8         THE COURT: Okay. Let me -- give me about

9  three minutes. I'm not sure what the status of my table looks

10  like honestly, so give me about three minutes and then come

11  back, either you or Joe, whoever.

12         Did you have any other issues for me?

13         MS. HYNDMAN: That was all.

14         THE COURT: Okay. I will talk to them and you may

15  want to wait just in case.

16         MR. JEPSON: We'll leave a cell, at least for me.

17         MS. HALL: We're going to chat for a couple minutes.

18         THE COURT: So one of you may want to wait in case.

19         MR. JEPSON: Yeah, and we'll be able to get ahold

20  of --

21         THE COURT: Go to see Judge Schenkier, I don't know

22  what the answer is going to be, and I don't know what his

23  schedule is like. So we'll have to work around that.

24         MS. HYNDMAN: Okay.

25   (Court adjourned at 5:00 p.m.)

1                        C E R T I F I C A T E

2              We certify that the foregoing is a correct

3    transcript from the record of proceedings in the

4    above-entitled matter.

5

6         /s/ Colleen M. Conway

7    _____

8

9         /s/ Kathleen M. Fennell          February 2, 2017

10   _____  _____

11        Official Court Reporters       Date
          United States District Court
12        Northern District of Illinois
                Eastern Division

13

14

15

16

17

18

19

20

21

22

23

24

25