655

```
 1                IN THE UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
 2                         EASTERN DIVISION

 3   DR. MARIA ARTUNDUAGA,          ) Docket No. 12 C 8733
                                    )
 4                  Plaintiff,      )
                                    )
 5            vs.                   )
                                    )
 6   THE UNIVERSITY OF CHICAGO      )
     MEDICAL CENTER,                ) Chicago, Illinois
 7                                  ) February 2, 2017
                    Defendant.      ) 8:56 o'clock a.m.
 8
                              VOLUME FOUR
 9                 TRANSCRIPT OF TRIAL PROCEEDINGS
          BEFORE THE HONORABLE AMY J. ST. EVE, AND A JURY
10
     APPEARANCES:
11
     For the Plaintiff:          THE FRANKLIN LAW FIRM, LLC
12                               BY:  MS. JAMIE S. FRANKLIN
                                 53 W. Jackson Blvd., Suite 803
13                               Chicago, Illinois  60604

14                               ROBINSON, CURLEY & CLAYTON, P.C.
                                 BY:  MS. CYNTHIA H. HYNDMAN
15                               300 South Wacker Drive, Suite 1700
                                 Chicago, Illinois  60606
16
     For the Defendant:          VEDDER PRICE, P.C.
17                               BY:  MR. EDWARD C. JEPSON, JR.
                                      MS. ELIZABETH N. HALL
18                               222 N. LaSalle St., Suite 2600
                                 Chicago, Illinois  60601
19
     Court Reporter:             MR. JOSEPH RICKHOFF
20                               Official Court Reporter
                                 219 S. Dearborn St., Suite 1232
21                               Chicago, Illinois  60604
                                 (312) 435-5562
22

23               *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

24                         PROCEEDINGS RECORDED BY
                           MECHANICAL STENOGRAPHY
25                   TRANSCRIPT PRODUCED BY COMPUTER
```

1          THE CLERK:  12 C 8733, Artunduaga vs. University of

2    Chicago Medical Center.

3          MS. FRANKLIN:  Good morning, your Honor.

4          MS. HYNDMAN:  Good morning, your Honor.

5          MS. HALL:  Good morning.

6          THE COURT:  We are a little early.  I am sure our

7    jury is not here yet.  But I wanted to check and see if there

8    are any issues for the Court this morning.

9          MS. HALL:  Not from us.

10         MS. HYNDMAN:  We have a response to the issues we

11   were talking about yesterday.

12         THE COURT:  Yes.

13         Do we need to go to sidebar?

14         MS. HYNDMAN:  I think so, yes.

15         THE COURT:  Okay.

16      (Sidebar Proceedings had at Page 657 to Page 658 under

17   seal.)

18

19

20

21

22

23

24

25

McAtee - direct

1      (Brief recess.)

2      (Proceedings had in open court:)

3           THE COURT:  Our jury is all here.

4      (Brief pause.)

5      (Jury in.)

6           THE COURT:  You may be seated.

7           Good morning, ladies and gentlemen.

8           When we broke yesterday, we were watching the

9    videotaped deposition of Dr. Fleming.  We will finish with

10   Dr. Fleming's video testimony and then call the next live

11   witness.

12          Ms. Franklin, if you want to continue with the

13   testimony.

14          MS. FRANKLIN:  Yes.  We're ready for the feed.

15          My apologies.

16     (Videotaped deposition of Irma Fleming continued to be

17   played in open court.)

18          THE COURT:  Is that the end of the video?

19          MS. FRANKLIN:  Yes, your Honor.

20          THE COURT:  Please call your next witness.

21          MS. HYNDMAN:  Your Honor, plaintiffs call Jane

22   McAtee.

23          JANE McATEE, PLAINTIFF'S WITNESS, SWORN

24                   DIRECT EXAMINATION

25   BY MS. HYNDMAN:

McAtee - direct

1   Q.  Good morning.

2   A.  Good morning.

3   Q.  Can you state your name for the record, please.

4   A.  Jane McAtee.

5   Q.  Ms. McAtee, you used to work for the University of Chicago

6   Medical Center?

7   A.  Yes, I did.

8   Q.  What was your title there?

9   A.  I was the Associate General Counsel and Executive Director

10  of the Professional Liability Program from 1983 until 2016.

11  Q.  Why did you leave UCMC in 2016?

12  A.  I retired.

13          Pardon me, I have a cold.

14  Q.  Ms. McAtee, you know Dr. Maria Artunduaga, don't you?

15  A.  I met her once at a hearing.  I wouldn't say I know her.

16  Q.  But you've met her before?

17  A.  Once, yes.

18  Q.  You know Jonathan Rothstein?

19  A.  I do.

20  Q.  Now, Mr. Rothstein, in the academic year 2011 and 2012,

21  was the director of employee and labor relations for the

22  medical center; is that right?

23  A.  That is my recollection, yes.

24  Q.  In that position, did he work in the medical center's

25  Human Resource Department?

McAtee - direct

1   A.  He did.

2   Q.  One of his responsibilities as the director of employee

3   and labor relations was to help ensure compliance with

4   anti-discrimination, harassment and retaliation policies of

5   the medical center?

6   A.  Yes.

7   Q.  It was also one of his responsibilities to help ensure

8   compliance with those kind of laws; is that right?

9   A.  Yes.

10  Q.  He was also tasked with investigating any complaints that

11  were made of discrimination or harassment or retaliation; is

12  that right?

13  A.  He was tasked with responding to complaints of illegal

14  discrimination and harassment.  I don't want to get technical,

15  but -- but any complaints that involved EEOC-type race,

16  national origin, gender discrimination.

17  Q.  But they didn't have to be formal -- they didn't have to

18  be filed with the EEOC.  They could be internal complaints,

19  correct?

20  A.  Correct.  But only those kinds of -- there's other kinds

21  of harassment complaints that he would not deal with.

22  Q.  He would have been charged -- if there had been a

23  complaint of national origin discrimination, for example, he

24  would have been charged with investigating that complaint,

25  correct?

McAtee - direct

1   A.  He was one of the people at the university and medical

2   center who had that responsibility.

3   Q.  And is it fair to say that it was Mr. Rothstein's

4   responsibility to begin an investigation as soon as the Human

5   Resource Department was advised of a complaint of some sort of

6   illegal discrimination?

7   A.  I don't know the exact timing requirements; but,

8   generally, yes.

9   Q.  Generally, he would do it fairly promptly, be fair to say,

10  wouldn't you think?

11  A.  Once he had any facts that supported such a complaint,

12  yes, he would begin an investigation, or his staff.

13  Q.  If one of the residents in the Graduate Medical Education

14  Department, if you will, of the medical center lodged a

15  complaint of illegal discrimination, would it be Mr.

16  Rothstein's obligation to investigate that complaint?

17  A.  If it was a complaint of illegal discrimination, he would

18  be one of the people tasked with responding.

19  Q.  Now, have you ever met Dr. Artunduaga's husband Ricardo

20  Garcia?

21  A.  I believe he was at the grievance hearing and I met him

22  then.

23  Q.  Okay.

24      You had a telephone conversation with him some time

25  before the grievance, though; isn't that right?

                            McAtee - direct
                                                                663

 1  A.  I have a recollection of that.

 2  Q.  In fact, you placed the call to Mr. Garcia; is that right?

 3  A.  I believe that's correct, yes.

 4  Q.  Sometime -- it was sometime in November of 2011?  Is

 5  that --

 6  A.  Yes.

 7  Q.  -- consistent with your recollection?

 8  A.  Yes.

 9  Q.  And it was in the morning sometime?

10  A.  I don't recall.

11  Q.  Okay.

12          You called Mr. Garcia's cell phone?  Do you recall

13  that?

14  A.  I recall calling a phone number that Mr. Rothstein gave

15  me.  I don't know what it was.

16  Q.  Did Mr. Rothstein ask you to make that call?

17  A.  I don't know if he asked me or if I volunteered to do it.

18  Because when Mr. Rothstein told me what he -- what his

19  questions were, we decided it would be best -- it was my usual

20  practice -- to respond and answer his questions.

21  Q.  At the time you spoke with Mr. Garcia, you were aware that

22  Dr. Song had put Dr. Artunduaga on probation; is that right?

23  A.  Yes, I was very aware -- I was aware she was on probation.

24  Q.  Now, in the conversation with Mr. Garcia, he told you that

25  Dr. Artunduaga was not going to file a grievance for that

McAtee - direct

 1   decision, right?

 2   A.  I don't recall that.  She did not file a grievance --

 3   Q.  But you don't recall him --

 4   A.  -- regarding probation.

 5   Q.  He didn't --

 6   A.  No.

 7   Q.  You don't recall him telling you that?

 8   A.  No.

 9   Q.  Okay.

10         And you told Mr. Garcia that you knew he had tried to

11   contact Mr. Rothstein relating to Dr. Artunduaga's issues,

12   didn't you, in that conversation?

13   A.  I don't recall that specific comment.

14   Q.  You told Mr. Garcia that human resources didn't have

15   anything to do with Dr. Artunduaga's issues, though, didn't

16   you?

17   A.  I don't think I ever said those words.

18   Q.  Did you say something to that effect?

19   A.  He -- if I may, I recall he had questions about the

20   process.  And we discussed that she was -- he -- if I recall,

21   he told me she didn't like proba- -- the probation and wanted

22   to know what the process was.

23         And, so, my recollection is that I informed him

24   about -- which I believe she already had the policies and

25   procedures of the Graduate Medical Education Office -- what

McAtee - direct

665

1  her rights were to file a grievance under the contract.  And

2  that's my general recollection.

3          And, therefore, because it was strictly a GME

4  contract issue and not one of illegal discrimination, it would

5  be handled under the house staff grievance policies and would

6  not be handled by human resources.  That's my recollection.

7  Q.  And that was based on your understanding of what

8  Mr. Garcia told you?

9  A.  And my overall understanding of the situation, yes.

10          I -- I had a thought --

11  Q.  There's no question pending.

12  A.  Sorry.

13  Q.  Now, you said you were aware that Dr. Song had put Dr.

14  Artunduaga on probation.  And were you aware that he had

15  extended the probationary period so that she could have her

16  wedding in Colombia --

17  A.  Yes.

18  Q.  -- in December?

19          So, you were aware that that probation period was

20  going to end sometime around the end of March of 2012?

21  A.  That's -- yes.

22          MS. HYNDMAN:  If we could have Plaintiff's Exhibit

23  38, please, Jamie.

24          This has not been admitted.

25  BY MS. HYNDMAN:

McAtee - direct

1   Q.  Ms. McAtee, can you just take a look, please, at what's

2   been marked as Plaintiff's Exhibit No. 38.

3           Do you recognize this document?

4   A.  Yes.

5           Thank you.

6   Q.  Did you -- did Dr. Song send this e-mail to you on or

7   about March 8th, 2012?

8   A.  Yes.

9           MS. HYNDMAN:  Your Honor, we would move to admit

10  Plaintiff's Exhibit 38.

11          THE COURT:  Any objection?

12          MR. JEPSON:  No objection in light of the rulings,

13  your Honor.

14          THE COURT:  It is admitted.

15      (Plaintiff's Exhibit No. 38 received in evidence.)

16  BY MS. HYNDMAN:

17  Q.  Ms. McAtee, the subject of this e-mail --

18          MS. HYNDMAN:  Can we publish it publish, please?

19          THE COURT:  One second.

20  BY MS. HYNDMAN:

21  Q.  The subject of this e-mail is:  Draft of termination

22  letter and, then, in what look like quotation marks,

23  "confidential," correct?

24  A.  Correct.

25  Q.  You received this e-mail sometime around March 8th?

McAtee - direct

667

1  A.  Yes.

2  Q.  And the draft of the termination letter that's referred to

3  here related to Dr. Artunduaga, correct?

4  A.  Yes.

5  Q.  It was your understanding at the time you received this --

6  without revealing any attorney-client conversations, but it

7  was your understanding at the time you received this e-mail

8  that Dr. Artunduaga had not yet been terminated; is that

9  right?

10 A.  Correct.

11       MS. HYNDMAN:  Can we look at Plaintiff's Exhibit 39,

12 please.

13       THE WITNESS:  Can you make it bigger?

14       MS. HYNDMAN:  Yeah.

15       THE COURT:  And it is not published.

16       MS. HYNDMAN:  Yeah, not published, right.  Sorry.

17       THE WITNESS:  Thank you.  That's good.

18 BY MS. HYNDMAN:

19 Q.  Ms. McAtee, do you know who Christine Smith is?

20 A.  Yes.  She was my legal assistant.

21 Q.  Did you have a meeting with Dr. Song and Dr. Park on March

22 14th of 2012?

23 A.  I believe so.  I don't have a clear recollection if they

24 were both there, but -- but I believe so.

25 Q.  And that meeting --

```
 1              MS. HYNDMAN:  You can take that down, Jamie.
 2   BY MS. HYNDMAN:
 3   Q.  That meeting related to Dr. Artunduaga, correct?
 4   A.  Yes.
 5   Q.  And at the time of that meeting on March 14th, 2012, Dr.
 6   Artunduaga hadn't been terminated yet, correct?
 7   A.  No.  That was before any decision had been made by the
 8   faculty.
 9   Q.  So, you were aware that UCMC didn't renew Dr. Artunduaga's
10   residency contract and that decision was made at the end of
11   March of 2012, correct?
12   A.  Correct.
13   Q.  You weren't responsible in any way for that termination
14   decision, were you?
15   A.  No.
16   Q.  And you didn't make any personnel decisions in your
17   position as Associate General Counsel, did you?
18   A.  No.
19   Q.  You didn't have any responsibility for managing any of the
20   residents in the residency program?
21   A.  No.  My role was to advise the people who made those
22   decisions.
23   Q.  And you didn't assign rotations to residents?
24   A.  No.
25   Q.  There weren't any residents reporting directly to you at
```

McAtee - direct

1  all, were there?

2  A.  No.

3  Q.  Dr. Artunduaga certainly didn't report to you, correct?

4  A.  No.

5  Q.  Okay.

6  A.  No.

7  Q.  So, after the medical center decided not to renew Dr.

8  Artunduaga's contract, she remained in the residency program

9  until the end of June of 2012?

10  A.  Correct.  She had a contract through the end of the year.

11  Q.  So, in the period of time from the beginning of April

12  until the end of June, you had some contact with Dr.

13  Artunduaga through some e-mail communications, correct?

14  A.  Yes, I did.

15      MS. HYNDMAN:  Can we look at Plaintiff's Exhibit 34.

16      And I believe that is already in evidence.

17      THE COURT:  It is.

18  BY MS. HYNDMAN:

19  Q.  Ms. McAtee, did you send this e-mail to Dr. Artunduaga on

20  April 6, 2012?

21  A.  Yes.

22  Q.  Okay.

23      And if you look just below the e-mail that you

24  sent --

25      MS. HYNDMAN:  Can we scroll down?

McAtee - direct

670

```
 1   BY MS. HYNDMAN:
 2   Q.  This is an e-mail from Dr. Artunduaga to Dr. Song.
 3           Do you see that?
 4   A.  Yes, I see that.
 5   Q.  Dr. Artunduaga did not copy you or send that e-mail to
 6   you, did she?
 7   A.  Not directly.
 8   Q.  Okay.
 9           But you responded to Dr. Artunduaga's e-mail to Dr.
10   Song, right?
11   A.  Yes.
12   Q.  And your response was on April 6th there?
13   A.  Yes.
14   Q.  And that was about, I don't know, ten or eleven days after
15   she had been terminated?
16   A.  This is just a point of clarification for me.  Her
17   contract was not renewed.  She was not immediately terminated
18   mid-contract.  So, for me, that's important.
19   Q.  I understand how lawyers think.
20   A.  Okay.
21   Q.  It was ten or eleven days after she had been advised that
22   her contract had been -- not been renewed?
23   A.  Would not be renewed, yes, correct.
24   Q.  In the e-mail, you say:  Your demands concerning your
25   schedule for the rest of your contracted period of training
```

McAtee - direct

1    are not appropriate and do not adequately represent any rights

2    you claim to have.

3            Correct?

4    A.  That's what it says, yes.

5    Q.  Now, Dr. Song could have communicated this to Dr.

6    Artunduaga himself, couldn't he?

7    A.  He could have, but we decided that in a difficult

8    situation, it would be better if I had such communications.

9    Q.  Now, were you aware that at the time you sent this e-mail

10   on April 6th, 2012, that Dr. Artunduaga had not begun a

11   rotation for the month of April?

12   A.  I did not know her schedule.

13   Q.  Okay.

14   A.  No.

15   Q.  At the time you sent this -- in this e-mail, you say:  I

16   caution you against misrepresentations about your status to

17   other residents.

18           Do you see that --

19   A.  Yes.

20   Q.  -- in the last paragraph?

21           You weren't aware of any misrepresentations of her

22   status she had made to other residents as of April 6th, 2012,

23   were you?

24   A.  That's not correct.  I was aware.

25   Q.  Okay.

McAtee - direct

```
 1              And what was your understanding of how she had
 2   misrepresented her status to other residents?
 3   A.  My recollection is that she had informed other residents
 4   that she had been fired summarily and was out of the
 5   residency, which was not correct.
 6   Q.  She didn't --
 7   A.  She was going to continue to work through the end of the
 8   year, consistent with her contract.
 9   Q.  So, she never told you that directly?
10   A.  She did not.
11   Q.  Okay.
12              And you didn't get that information directly from any
13   residents, did you?
14   A.  I don't recall.  I got that information about such
15   discussions from several residents.  I don't know who told me.
16   Q.  Did you have direct conversations with residents --
17   A.  I don't recall.
18   Q.  -- prior to April 6th?
19   A.  I don't recall.
20   Q.  Let me direct you to Plaintiff's Exhibit No. 53.
21              THE COURT:  Which is in evidence.
22              MS. HYNDMAN:  It is in evidence.
23   BY MS. HYNDMAN:
24   Q.  You sent this e-mail to Dr. Artunduaga on May 30th, 2012;
25   is that right?
```

McAtee - direct

673

1   A.  Yes, I did.

2   Q.  And that is in response to an e-mail that Dr. Artunduaga

3   had sent to Dr. Eric Grossman that same date?

4   A.  Correct, and with a copy to me.

5   Q.  Okay.

6        But the statements in the e-mail were not directed to

7   you, were they?  The statements in Dr. Artunduaga's e-mail?

8   A.  I don't know how to answer that.  I mean, she didn't

9   accuse me of anything, but she was making statements in this

10  e-mail to another resident about rights and obligations.  And,

11  so, as the hospital attorney, they fell within my purview, if

12  you will.

13  Q.  Now, we spoke a little bit earlier about Mr. Rothstein's

14  responsibilities as the director of employee and labor

15  relations?

16  A.  Correct.

17  Q.  And you agree that one of his responsibilities was to

18  investigate complaints of illegal discrimination?

19  A.  Correct.

20  Q.  Would that -- would it also be his responsibility to

21  investigate complaints of illegal retaliation?

22  A.  Yes, if it fell within the -- what I call the EEOC kind of

23  retaliation.

24  Q.  So, for example, if somebody complained -- if somebody

25  complained that they had been retaliated against because they

McAtee - direct

1   made a complaint of national origin discrimination, that would

2   fall within Mr. Rothstein's purview?

3   A.  Yes, if it was related to national origin discrimination.

4   If somebody complained that they were being retaliated against

5   because -- I can't think of a good example.

6   Q.  But it had to fall within --

7   A.  Yes, it had to fall within the federal and state human

8   rights.  We'll call it those guide- -- rules.

9   Q.  Now, you were aware that Dr. Artunduaga had notified

10  Mr. Rothstein in early May that she had a complaint for

11  retaliatory harassment against Dr. Song; is that right?

12  A.  I don't recall that.

13  Q.  Okay.

14          MS. HYNDMAN:  Can we look at Defendant's Exhibit 156.

15          And only to refresh recollection, your Honor.

16          THE COURT:  Okay.

17          MS. HYNDMAN:  And I don't remember if that's in

18  evidence or not.

19          THE COURT:  It is not in evidence.

20          MS. HYNDMAN:  Okay.  So, just to refresh

21  recollection.

22          Not quite the right one.

23          Bear with me a second here.

24      (Brief pause.)

25  BY MS. HYNDMAN:

1  Q.  Well, let me ask you this --

2         MS. HYNDMAN:  One second, please.

3      (Brief pause.)

4  BY MS. HYNDMAN:

5  Q.  Does that refresh your recollection that Dr. Artunduaga

6  had made a complaint to Mr. Rothstein about retaliatory

7  harassment?

8  A.  Could you help me?  Is this before the grievance hearing?

9  Q.  Yes.

10 A.  It is.

11        Well, I can read the e-mail.

12 Q.  Don't read it out loud.  Just --

13 A.  Oh.

14 Q.  -- look at it.  I'm asking you, does it refresh your

15 recollection?

16 A.  Not specifically.

17 Q.  That's fine.

18        Sometime before the grievance hearing began, you

19 believed, didn't you, Ms. McAtee, that Dr. Artunduaga was

20 going to mount some kind of a legal challenge against the

21 hospital?

22 A.  Based on some of her communications and the fact that she

23 had initiated a grievance, I thought it was likely, possible.

24 Q.  And by May 10th of 2012, it was your belief that Dr.

25 Artunduaga had made claims of bias and discrimination; isn't

1   that right?

2   A.   No.   In fact, she denied it at the grievance hearing.

3        (Brief pause.)

4            MS. HYNDMAN:   I have one copy of this document I'd

5   like to use for impeachment.   I guess I can show it on the

6   Elmo or can I just hand it to the witness?

7            THE COURT:   You may want to hand it.   Whatever you

8   want.   If you want to read from it if you are using it for

9   impeachment.

10           MR. JEPSON:   No objection to showing it to the

11  witness.

12           MS. HYNDMAN:   I'll just read it.

13           THE COURT:   However you want to present it.

14           MS. HYNDMAN:   I'll read it first.

15           THE COURT:   Okay.

16  BY MS. HYNDMAN:

17  Q.   Ms. McAtee?

18  A.   Yes, ma'am.

19  Q.   Do you recall sending an e-mail to Krista Curell on May

20  10th, 2012, relating to Dr. Artunduaga's grievance?

21  A.   I don't have --

22           MR. JEPSON:   Could you also say --

23  BY THE WITNESS:

24  A.   -- a specific recollection.

25           MR. JEPSON:   -- who else that went to?

McAtee - direct

677

```
 1    BY THE WITNESS:
 2    A.  If you'd show me a document --
 3              THE COURT:  Wait.
 4              Mr. Jepson, is that an objection or --
 5              MR. JEPSON:  I just -- who else did it go to?
 6              MS. HYNDMAN:  It went to Anne Duprey, Dr. Artunduaga
 7    and Dr. Song, as well, with copies to them.
 8    BY THE WITNESS:
 9    A.  I don't recall.
10    BY MS. HYNDMAN:
11    Q.  Did you at any time say to -- who is Krista Curell?  Let's
12    start with that first.
13    A.  Krista Curell is a vice president of the hospital.  She is
14    both a nurse and attorney.  Her title -- I don't know what her
15    official title is.  She directed patient safety, regulatory
16    compliance.
17              In this setting, she was chosen, by whoever in the
18    GME Office did, to be on the grievance hearing committee.
19    Q.  And at any time did you make a statement to Ms. Curell to
20    the effect, Dr. Artunduaga has made it very clear that her
21    materials are not just for the grievance hearing, but are
22    also, in quotes, for the future record.  She has made
23    inflammatory and unsubstantiated claims of bias and
24    discrimination in her written materials?
25    A.  Yes, that sounds like something I might say.  So --
```

McAtee - cross

678

1      MS. HYNDMAN:  I don't have any further questions.

2      THE COURT:  Cross-examination.

3      MR. JEPSON:  I just have a few.

4      CROSS-EXAMINATION

5  BY MR. JEPSON:

6  Q.  Good morning, Ms. McAtee.

7  A.  Good morning.

8  Q.  You were at the UCMC for a long time, correct?

9  A.  I was.

10  Q.  And I just -- within your duties, was it a normal or

11  routine part of your responsibility to advise program

12  directors of the various residency programs regarding issues

13  with their residents?

14  A.  Yes.  I did that every day, every week.  I served on

15  Graduate Medical Education Committee.  I taught in the

16  Graduate Medical Education program on residency issues.

17  Q.  And in addition to the residency program for plastic and

18  reconstructive surgery, there are more than 70 other residency

19  or fellowship programs that you would have been involved in

20  advising; is that correct?

21  A.  That's correct.

22  Q.  Now, let's take a look back at what you were shown, I

23  believe, as Plaintiff's Exhibit 43.

24      MR. JEPSON:  Correct me if I'm wrong.  That's the

25  April 6th --

McAtee - cross

1        MS. HYNDMAN:  I did show that one.

2        MR. JEPSON:  All right.

3   BY MR. JEPSON:

4   Q.  And you were directed here to a couple of paragraphs and

5   asked questions about it.  But I want to direct your attention

6   to the very first paragraph, which I'll read to you:

7        I'm advising the department concerning your situation

8   and will represent the interests of them throughout your

9   grievance.

10       Do you see that?

11  A.  Yes, sir.

12  Q.  And at that point in time, to your knowledge, did Dr.

13  Artunduaga filed a grievance?

14  A.  I believe so, but I don't have the dates in my head.

15  Q.  No, I'm not asking you that.

16  A.  Yeah.

17  Q.  But you wrote it?

18  A.  Yeah.

19  Q.  So, you would have been --

20  A.  I assume, yes, yes.

21  Q.  Okay.

22  A.  I'm sorry.

23  Q.  And, so, you were writing this in your role as the

24  attorney for the section in connection with the grievance

25  procedure; am I right?

McAtee - cross

1   A.  That's correct.

2   Q.  Okay.

3        And that was in no way unusual in how you performed

4   your duties, correct?

5   A.  No.  I served in this role dozens of times.

6   Q.  All right.

7        And you were shown a document a few minutes ago for

8   impeachment purposes that was dated May 10, 2012, where you

9   made some statements to Dr. Artunduaga, correct?  You just

10  looked at it.

11  A.  Yes.

12  Q.  About the record, making a record, et cetera?

13  A.  Yes.  Yes.

14  Q.  Okay.

15       And the grievance hearing took place on May 16, 2012,

16  correct?

17  A.  Correct.

18  Q.  And at that hearing, did -- you were there, correct?

19  A.  Yes.

20  Q.  Did Dr. Artunduaga make any statements about whether she

21  had discrimination claims or retaliation claims within -- that

22  were illegal retaliation claims?

23  A.  During what we'll call her case, her presentation of her

24  case, no.  Her case was all arguing that the facts on which

25  her probation and termination of her contract non-renewal were

McAtee - cross

1    incorrect.  In fact, one of the members of the committee,

2    Dr. McConville -- who is one of our senior physicians; he's a

3    program director in another department -- my recollection is

4    he asked her specifically in about five different ways if she

5    believed her language, her background, her training at a

6    foreign medical school, the fact that she was from another

7    country, if she believed that any of that had anything to do

8    with her complaints.  And she said "No."  And he asked her

9    that several times in my recollection.

10   Q.  Thank you.

11          MS. HYNDMAN:  Your Honor, move to strike on the

12   grounds of hearsay.

13          MR. JEPSON:  Thank you, Ms. McAtee.

14          THE COURT:  There is a hearsay objection.

15          MR. JEPSON:  Effect on listener.

16          MS. HYNDMAN:  On what listener?

17          MR. JEPSON:  On this listener.

18          THE COURT:  On actions taken?

19          MR. JEPSON:  Yeah.

20          You were asking her whether she believed there were

21   discrimination and retaliation claims.

22          THE COURT:  What is your response?  It is offered for

23   the impact on her and actions she may or may not have taken in

24   light of the comments.

25          MS. HYNDMAN:  I asked her about the date before the

McAtee - cross

682

1    grievance hearing.  So, I don't think what she learned at the

2    grievance hearing is relevant or that it in any way --

3              MR. JEPSON:  The focus was --

4              MS. HYNDMAN:  -- changes what that testimony was.

5              MR. JEPSON:  And, you know, frankly it's an admission

6    of Dr. Artunduaga for one thing.  Number two -- at a hearing.

7              And, number two, you know, the whole point of the

8    line of questioning was:  Did the university know and should

9    the university have taken some action with respect to

10   complaints of illegal discrimination or retaliation?  So, I

11   believe it's highly relevant.

12             THE COURT:  The objection is overruled.  And it is

13   her statement.  You are free to redirect on it.  It is her

14   statement, so an admission of a party opponent.

15             MR. JEPSON:  Thank you, your Honor.

16             No further questions, Ms. McAtee.

17             THE COURT:  Redirect.

18             MS. HYNDMAN:  No redirect.

19             THE COURT:  Thank you, Ms. McAtee.  You may step

20   down.

21        (Witness excused.)

22             THE COURT:  Please call your next witness.

23             MS. HYNDMAN:  Plaintiffs call Dr. David Song.

24             THE COURT:  Please come forward, Dr. Song.

25             MS. HYNDMAN:  If I could have a moment, your Honor?

Song - direct

683

```
 1              THE COURT:  You may.

 2              MS. HYNDMAN:  I have to set up.

 3          DAVID HABIN SONG, PLAINTIFF'S WITNESS, SWORN

 4       (Brief pause.)

 5                      DIRECT EXAMINATION

 6  BY MS. HYNDMAN:

 7  Q.  Good morning, Dr. Song.

 8  A.  Good morning.

 9  Q.  Can you state your full name for the record, please.

10  A.  David Habin Song.

11  Q.  Dr. Song, in the academic year 2011 to 2012, you were the

12  program director for the plastic surgery residency program at

13  the University of Chicago Medical Center, correct?

14  A.  That is correct.

15  Q.  You no longer work for UCMC, do you?

16  A.  That is correct.

17  Q.  Now, the residency programs at UCMC are Graduate Medical

18  Education programs, correct?

19  A.  Most of them are.

20  Q.  The plastic surgery residency program was a Graduate

21  Medical Education program?

22  A.  It is.

23  Q.  And residency programs are on-the-job training; isn't that

24  correct?

25  A.  Correct.
```

Song - direct

684

1   Q.  To become a licensed physician in the State of Illinois,

2   in fact, you have to go through a residency program, don't

3   you?

4   A.  That is my understanding.

5   Q.  Dr. Song, have you heard of something called the Residency

6   Education Committee?

7   A.  Yes.

8   Q.  What is the Residency Education Committee?

9   A.  Every residency has its own resident education committee.

10  Ours was comprised of myself, Dr. Park, Dr. Reid.  It was more

11  of an ad hoc committee where we got together to discuss

12  resident issues.

13  Q.  Who was the third person?  Dr. Reid?

14  A.  Russell Reid.

15  Q.  And that is -- those were the members in the academic year

16  2011, 2012?

17  A.  That is my recollection.

18  Q.  Now, I believe that there's --

19          MS. HYNDMAN:  Strike that.

20  BY MS. HYNDMAN:

21  Q.  Every year the plastics program at the University of

22  Chicago Medical Center accepts applications for residency

23  positions through the National Residency Matching Program,

24  right?

25  A.  Yes.

Song - direct

685

1   Q.  And every year the plastics program interviews about 25 to

2   30 applicants?

3   A.  Yes.

4   Q.  That was true the year that Dr. Artunduaga applied?

5   A.  That is correct.

6   Q.  And the plastics program, in your view, had a very

7   thorough interview process, right?

8   A.  Yes.

9   Q.  And after the interview process, then from the program

10  standpoint, you would create a rank list of your candidates,

11  right?

12  A.  That is correct.

13  Q.  And, then, the applicants create their rank list, as well

14  --

15  A.  Right.

16  Q.  -- right?

17        And I think we heard some testimony about this.

18  Through the magic of computers, the rank lists of the

19  applicants are matched to the rank lists of the programs,

20  correct?

21  A.  Yeah.  It's actually a mathematical algorithm that sites

22  like Match.com and eHarmony use, as well.

23  Q.  Isn't that interesting.

24      (Laughter.)

25  BY MS. HYNDMAN:

Song - direct

686

1    Q.  And it was through that process that Dr. Artunduaga

2    matched into the plastic surgery residency program for the

3    year beginning 2011?

4    A.  Yes.

5    Q.  June, 2011, right?

6    A.  Yes.

7    Q.  And the plastic surgery residency program at UCMC is

8    highly competitive; wouldn't you agree?

9    A.  Yes.

10   Q.  You were personally involved in recruiting Dr. Artunduaga,

11   weren't you?

12   A.  Very much so.

13   Q.  And at the time you recruited her, you knew she had been

14   working in a non-clinical environment for a number of years,

15   didn't you?

16   A.  Yes.  But she also had done rotations in --

17   Q.  But you knew that she had been working in a non-clinical

18   environment for a number of years?

19   A.  Well, I don't know when her employment stopped, but what

20   we did know was she was --

21   Q.  It's a "Yes" or "No" question, Dr. Song.  You knew she had

22   been working in a non-clinical environment a number of years?

23   A.  At some point before residency, yes.

24   Q.  You didn't have any concerns at all about Dr. Artunduaga

25   transitioning into a clinical setting, did you?

Song - direct

1    A.  Not at all.

2    Q.  And that was because at the time you decided to interview

3    her, she had glowing letters of recommendation, right?

4    A.  As well as rotating at University of Washington, which is

5    a very tough, vigorous plastic surgery and surgical program,

6    yes.

7    Q.  And she had received mentoring at Harvard?

8    A.  What do you mean by "mentoring"?

9    Q.  Well, one of the reasons you thought she wouldn't have

10    trouble transitioning is because she had received mentoring at

11    Harvard, right?

12    A.  As well as rotations at other medical centers.

13    Q.  That's -- the only question, Dr. Song, is:  One of the

14    reasons -- one of the reasons -- that you decided to interview

15    her was because -- or one of the reasons that you thought she

16    would not have trouble transitioning into a clinical setting

17    was because she had received mentoring at Harvard; is that

18    right?

19    A.  Not as much as the other things --

20    Q.  I'm asking you, was it one of the reasons?

21    A.  Yes.

22    Q.  Now, you ranked Dr. Artunduaga high relative to other

23    applicants that you had, correct?

24    A.  We did.

25    Q.  And that was because, in part, her curriculum vitae showed

Song - direct

688

1   promise, right?

2   A.  Yes.

3   Q.  And her achievements showed promise, correct?

4   A.  Yes.

5   Q.  And the fact that Dr. Artunduaga would add to your

6   diversity pool was also beneficial in your mind, wasn't it?

7   A.  Absolutely.  I'm a big fan of that.

8   Q.  Okay.

9         Now, let's talk a little bit -- I want to talk a

10  little bit about the policies and procedures at the University

11  of Chicago Medical Center.

12        Now, you were aware in 2011 and 2012 that the medical

13  center had a non-discrimination policy that applied to

14  residents, correct?

15  A.  That is correct.

16  Q.  But you didn't know any specifics of that policy, did you?

17  A.  I knew where to find it.

18  Q.  You did know where to find it?

19  A.  Yeah.  It's in the handbook.

20  Q.  That's your testimony, that you knew where to find it?

21  A.  I knew -- there's a handbook and there's written things

22  that I can probably go find.

23      (Brief pause.)

24        MS. HYNDMAN:  May I approach, your Honor?

25        THE COURT:  You may.

Song - direct

689

```
 1        MS. HYNDMAN:  This is in two parts for some reason.

 2     (Document tendered to the Court and witness.)

 3  BY MS. HYNDMAN:

 4  Q.  Dr. Song, do you recall giving your deposition in this

 5  case in 2013?

 6  A.  Do you mind if I take a moment to look at it?

 7  Q.  Sure.

 8  A.  I do recall.

 9  Q.  Okay.

10        And if you could look -- that -- for some reason that

11  transcript's in two parts.  So, it would be in the second part

12  that you have there, all the way towards the end on Page 93.

13  Yes, at Page 93.

14        MS. HYNDMAN:  Line 17, Ed.

15        MR. JEPSON:  Give me one second.

16        MS. HYNDMAN:  Sure.

17        MR. JEPSON:  I was confused by the two parts, as

18  well.

19        Go ahead.

20        MS. HYNDMAN:  Do you have it?

21        MR. JEPSON:  Yes, I do.

22  BY MS. HYNDMAN:

23  Q.  Dr. Song, at that deposition --

24  A.  Excuse me for one moment.  Which part do you want me --

25  oh, okay.
```

Song - direct

690

```
 1    Q.  The second part.

 2              THE COURT:  It is the last page.

 3    BY MS. HYNDMAN:

 4    Q.  It's the last page of the second part, Page 93.

 5              Do you see that?

 6    A.  I do see that.

 7    Q.  Okay.

 8              And if you look, there's line numbers down the

 9    left-hand side of the page starting on Line 17.

10              THE COURT:  Page 93.

11    BY MS. HYNDMAN:

12    Q.  Page 93.

13    A.  Okay.  I see that.

14    Q.  So, Dr. Song, at that deposition, were you asked this

15    question and did you give this answer -- actually, start on

16    Line 18.

17              (Reading):  You testified earlier that you are --

18    that you did not know if there was a non-discrimination policy

19    that applies to residents.  Is there anything you want to add

20    to that answer?

21              And your answer was:  I realized after I said that,

22    it came to me that there is a policy.  I don't know the

23    specifics of the policy or where it's located, but I do know

24    that there's a policy.

25              Were you asked that question, and did you give that
```

Song - direct
691

1   answer?

2   A.  I did.

3   Q.  Can you take a look at Joint Exhibit No. 3, please.

4           Dr. Song, you're familiar with the Graduate Medical

5   Education Committee at the UCMC?

6   A.  I am.

7   Q.  Were you, in fact, a member of that committee?

8   A.  I was.

9   Q.  So, you're familiar with the Graduate Medical Education

10  policy manual in your capacity as a member of that committee?

11  A.  I mean, I haven't read it line by line, but I know where

12  it is, yes.  I knew where it was.

13          MS. HYNDMAN:  Could we look at Policy No. 11.  I

14  think it's about Page 30, Jamie.

15          MR. JEPSON:  It has a Bates 10484.

16          MS. HYNDMAN:  That helps.

17          MR. JEPSON:  Well, it's the only thing on the

18  document, so --

19          MS. HYNDMAN:  Thank you.

20  BY MS. HYNDMAN:

21  Q.  This is the policy on resident and fellow evaluation,

22  correct?

23  A.  Do you mind if I just take a look at this?

24  Q.  Absolutely.  Please take all the time you need.

25      (Brief pause.)

Song - direct

692

```
 1   BY THE WITNESS:

 2   A.  Yes, I see it.

 3   BY MS. HYNDMAN:

 4   Q.  Are you familiar with this policy, Dr. Song?

 5   A.  I am.

 6   Q.  Now, if we look under the topic "Evaluation" and in the

 7   first paragraph there, I believe it's the second sentence, it

 8   says:  Each program is required to create and utilize

 9   competency-based evaluation forms, correct?

10   A.  That is correct.

11           MS. HYNDMAN:  And, then, if we look at the next

12   paragraph down, please, Jamie.

13   BY MS. HYNDMAN:

14   Q.  Where it begins "Each program," do you see that?

15           (Reading):  Each program is required to assure that

16   faculty members and others who supervise residents/fellows

17   submit completed evaluation forms in a timely manner and

18   submit them to the program director.  Each program will

19   maintain a file from which completed evaluations for each

20   resident/fellow may be accessed.

21           Correct?

22   A.  Correct.

23   Q.  You didn't do that in the plastics section in 2011, 2012,

24   did you?

25   A.  We didn't do it for our junior residents, but we did it
```

Song - direct

1    for our senior residents.  In fact, if you just go up, it says

2    it is recommended that programs utilize electronic formats.

3    We had --

4    Q.  There's no question pending, Dr. Song.

5         MR. JEPSON:  Dr. Song, please just answer the

6    question or we'll be here a long time.

7         THE WITNESS:  Sorry.

8    BY MS. HYNDMAN:

9    Q.  Now, I want to talk a little bit about the procedures that

10   the plastics program used when there was a disciplinary issue.

11   You yourself as the program director had a procedure for

12   dealing with residents who had performance issues, correct?

13   A.  Well, we didn't really have a lot of residents with

14   performance issues.

15   Q.  But you had a procedure that you used when there was a

16   performance issue, correct?

17   A.  Yeah.

18   Q.  Okay.

19        And the first step in dealing with somebody with

20   performance issues -- or you might call it ineptitude -- would

21   be a series of coaching, one-on-one kind of meetings with the

22   program director and the residency program coordinator; is

23   that right?

24   A.  Or with the senior residents.

25   Q.  One of the steps would be -- in your procedure, isn't it

1   true, Dr. Song, the first step would be a series of meetings

2   with the program director and the residency program

3   coordinator?

4   A.   One of the steps.

5   Q.   That was your first step in dealing with a performance

6   issue; isn't that right?

7   A.   Not a first step, but one of the steps.

8   Q.   If you could take a look at that deposition that's in

9   front of you, please.  It would be in the first section on

10  Page 15.

11          Do you have Page 15 there?

12  A.   I do.

13  Q.   Starting on Line 8, were you asked this question and did

14  you give this answer:

15          Question:  What would be the disciplinary process for

16  ineptitude?

17          Answer:  It would be first a series of coaching,

18  one-on-one meetings with me and the residency program

19  coordinator.

20          MR. JEPSON:  I'm going to object to that as improper

21  impeachment in light of the earlier testimony on Page 14.

22          MS. HYNDMAN:  He's free to redirect.

23          THE COURT:  I will let you redirect on that.  It is a

24  question for the jury.

25  BY MS. HYNDMAN:

Song - direct

695

```
 1   Q.  Who was the residency program coordinator in 2011?

 2   A.  Akilah Williams.

 3   Q.  Now, the next step in the procedure you used as program

 4   director of plastics would be to discuss evaluations and

 5   formulate a plan for coaching, correct?

 6   A.  Yes.

 7   Q.  And, then, if that doesn't work, then the rest of the

 8   faculty in the section would weigh in; and, depending on what

 9   the situation is, further action might be taken, correct?

10   A.  Correct.

11   Q.  And one of those further actions that could be taken would

12   be probation; is that right?

13   A.  That is correct.

14   Q.  And as the program director, you had the ultimate

15   authority about whether to put a resident on probation, right?

16   A.  Yes.

17   Q.  Now, Dr. Artunduaga began her residency in June of 2011,

18   right?

19   A.  Yes.

20   Q.  The plastic surgery residency program at the time was a

21   six-year program, correct?

22   A.  Yes.

23   Q.  And the first three years -- at that time, the first three

24   years the residents would spend through general surgery

25   rotations, correct?
```

Song - direct

696

1   A.  Yes.

2   Q.  And, then, the last three years, they would be doing

3   plastics rotations exclusively?

4   A.  Yes.

5   Q.  Dr. Artunduaga's first rotation was on the Kaplan Service,

6   right?

7   A.  I believe so.

8          MS. HYNDMAN:  Can we look at Joint Exhibit No. 11.

9   BY MS. HYNDMAN:

10  Q.  Dr. Song, did you receive this e-mail from Dr. Jaskowiak

11  on August 4th, 2011?

12  A.  I did.

13  Q.  Now, if we could -- now, Dr. Artunduaga was not copied on

14  this e-mail, was she?

15  A.  It doesn't appear to be so.

16  Q.  And you didn't forward a copy to her, did you?

17  A.  I don't recall, but I don't think so.

18          MS. HYNDMAN:  Let's look at Plaintiff's Exhibit 6,

19  please.

20  BY MS. HYNDMAN:

21  Q.  Dr. Song, this is Plaintiff's Exhibit No. 6.

22          Do you recognize this document?

23  A.  Would you be so kind as to blow it up just a bit --

24  Q.  Yeah.

25  A.  -- so I can read it.

Song - direct

697

1   Q.  Did you send this e-mail to Dr. Jaskowiak on August 4th,

2   2011?

3   A.  Yes.

4           MS. HYNDMAN:  Your Honor, we would move to admit

5   Plaintiff's Exhibit No. 6.

6           THE COURT:  Any objection?

7           MR. JEPSON:  No objection, your Honor.

8           THE COURT:  It is admitted.

9       (Plaintiff's Exhibit No. 6 received in evidence.)

10  BY MS. HYNDMAN:

11  Q.  You didn't copy Dr. Artunduaga on your e-mail, did you?

12  A.  I don't think so.

13  Q.  And you didn't forward a copy of this e-mail to her at any

14  time, did you?

15  A.  I don't recall, but I don't think so.

16  Q.  Let's take a look at Joint Exhibit No. 12.

17          At the bottom section, you received this e-mail from

18  Dr. Dickie on August 31st, 2011, didn't you?

19  A.  Yes.

20  Q.  And Dr. Artunduaga was not copied on that e-mail either?

21  A.  Doesn't appear to be so.

22  Q.  And you didn't forward a copy to Dr. Artunduaga, did you?

23  A.  No, I don't think so.

24  Q.  You didn't speak to Dr. Artunduaga personally about any of

25  the information included in this e-mail; did you, Dr. Song?

Song - direct

1   A.  In this particular e-mail?

2   Q.  Yeah.

3   A.  No.

4   Q.  Okay.

5        MS. HYNDMAN:  Let's look at Joint Exhibit No. 6.

6   BY MS. HYNDMAN:

7   Q.  Dr. Song, this is -- I believe the testimony has been that

8   this is an evaluation that Dr. Edwin Kaplan prepared for Dr.

9   Artunduaga from her first rotation on the Kaplan Service.

10       When did you first see this document?

11  A.  I don't know exactly when, but probably late September,

12  mid-September-ish.

13       MS. HYNDMAN:  If we could just look on the second

14  page.

15  BY MS. HYNDMAN:

16  Q.  There's a date there where it says, evaluation submitted

17  on September 6th, 2011.

18       Does that refresh your recollection as to when you

19  might have seen it?

20  A.  It must have been sometime in September.

21  Q.  As the program director, how do you get access to these

22  evaluations of your residents?

23  A.  Through New Innovations and through Akilah.  So, I would

24  ask her to print them.

25  Q.  Were you notified -- did you have a routine of being

Song - direct

1   notified as evaluations were submitted of your residents?

2   A.  Could you restate that one more time?

3   Q.  I'm just wondering if you got some sort of notification

4   that an evaluation of one of your residents had been

5   submitted?

6   A.  We just knew that by mid-month, the previous month's res-

7   -- evaluations should be in.

8   Q.  Did you ask Ms. Williams to provide them to you as they

9   came in or did you have her collect them all and then give

10   them to you?  Did you have a routine in that regard?

11   A.  I -- I can't recall.

12   Q.  But in any event, at least by November 2nd of 2011, you

13   had seen this evaluation; isn't that right?

14   A.  Yes.

15        MS. HYNDMAN:  Can we look at Plaintiff's Exhibit 14,

16   please.

17        THE COURT:  That is not in evidence yet.

18        MS. HYNDMAN:  No.

19        THE COURT:  Is there any objection to its admission?

20        MR. JEPSON:  No objection, your Honor.

21        THE COURT:  Okay.  It is admitted then.

22        MS. HYNDMAN:  Thank you, Judge.

23    (Plaintiff's Exhibit No. 14 received in evidence.)

24   BY MS. HYNDMAN:

25   Q.  Dr. Song, you received this e-mail from Dr. Dickie on --

Song - direct

700

1    the one at the bottom, on -- September 8th, 2011?

2    A.  I did.

3    Q.  Okay.

4         And in this e-mail -- first of all, it was part of

5    the plan that you had with Dr. Dickie and Dr. Lee to have

6    Dr. Bello work with Dr. Artunduaga on the month that she was

7    on the Block H Service; isn't that right?

8    A.  It was a part of my plan?

9    Q.  It was part of a plan that you had formed with --

10        MS. HYNDMAN:  Strike that.

11   BY MS. HYNDMAN:

12   Q.  Your chief residents, Dr. Dickie and Dr. Lee, had formed a

13   plan to ask Dr. Bello to work with Dr. Artunduaga over the

14   month of September, when she was on the Block H Service,

15   correct?

16   A.  Yes.  And that's the first steps of coaching.

17        MS. HYNDMAN:  Move to strike the last part of that

18   answer as non-responsive.

19        THE COURT:  I will strike it.

20        The jury should disregard the last part.

21   BY MS. HYNDMAN:

22   Q.  Now, in this --

23        MS. HYNDMAN:  Can we look back at the exhibit,

24   please.

25        Thank you.

Song - direct

701

1   BY MS. HYNDMAN:

2   Q.   In this e-mail from Dr. Dickie, she reports to you --

3          MS. HYNDMAN:   Could you blow it up just a little bit

4   at the bottom there, Jamie.

5          Thank you.

6   BY MS. HYNDMAN:

7   Q.   She reports to you that Dr. Bello had told her that Dr.

8   Artunduaga was doing okay, with just a few exceptions,

9   correct?

10  A.   Do you mind if I just read a little bit?

11  Q.   Sure.   I mean, no, I don't mind.

12      (Brief pause.)

13  BY THE WITNESS:

14  A.   Okay.   Can you ask the question, please?

15  BY MS. HYNDMAN:

16  Q.   Dr. Dickie advised you that Dr. Artunduaga -- that

17  Dr. Bello had reported that Dr. Artunduaga was doing okay,

18  with a few exceptions, correct?

19  A.   I wouldn't --

20          MR. JEPSON:   Object.

21          Answer the question, Dr. Song.

22          THE COURT:   Wait.   Were you objecting or --

23          MR. JEPSON:   I was going to, but -- I just -- we'll

24  be here forever.

25          THE WITNESS:   Yeah.

Song - direct

702

```
 1            MS. HYNDMAN:  We will, but I also would like
 2    Mr. Jepson not to interrupt --
 3            MR. JEPSON:  I won't do it again.
 4            MS. HYNDMAN:  -- my examination.
 5            THE COURT:  I think he was attempting to assist.
 6            MR. JEPSON:  I was.
 7            THE COURT:  But I agree.
 8            MS. HYNDMAN:  Thank you.
 9            THE COURT:  Do you want to rephrase?
10            THE WITNESS:  I apologize.
11            MS. HYNDMAN:  Let me rephrase the question.
12            THE WITNESS:  Thank you.
13    BY MS. HYNDMAN:
14    Q.  In this e-mail, Dr. Dickie says:  Brian says she's doing
15    okay, with a few exceptions, correct?
16    A.  Correct.
17    Q.  And on the next page, on -- she says:  Earlier this week,
18    a sick patient needed an urgent IR drain.  She got it ordered,
19    completed and the proper culture sent before noon and without
20    issue.  Brian was impressed.
21            She reports that to you in this e-mail, correct?
22    A.  Correct.
23    Q.  And in the next paragraph, Dr. Dickie reports she
24    accidentally sent a patient home with a PICC line that was
25    supposed to come out before d/c.  Brian was upset because he
```

Song - direct

703

1    told her the day before to remove it prior to d/c.

2           What is d/c?  Do you know?

3    A.  Discharge.

4    Q.  Okay.

5           She got the patient back to the hospital and found a

6    room in DCAM to accommodate the patient and had the PICC out

7    before 9:00 a.m.  He was again impressed, in parens, after

8    being annoyed, with her resourcefulness and motivation to fix

9    the problem.

10          And Dr. Dickie reported that to you in this e-mail,

11   correct?

12   A.  Yes.

13   Q.  And on the previous page, No. 3 at the bottom, Dr. Dickie

14   reports:  Regarding the pain service issue, this was gossip.

15   Maria did nothing wrong.  In fact, she was hesitant to follow

16   their orders because the patient was not tolerating a diet and

17   they wanted to stop the PCA and start orals.  She was right to

18   wait.  The pain service was being difficult and Hurst was

19   angry with them.  Maria did a good job prioritizing the

20   patient needs.

21          Correct?

22   A.  I see that.

23   Q.  And you saw it at the time when you received this e-mail

24   in September of 2011, didn't you?

25   A.  Yes.

Song - direct

704

1    Q.  Now, you didn't share this e-mail with Dr. Artunduaga; did

2    you, Dr. Song?

3    A.  I don't believe so.

4         MS. HYNDMAN:  Let's look at Joint Exhibit 7.

5    BY MS. HYNDMAN:

6    Q.  This was an evaluation that was prepared by Dr. Jaskowiak

7    relating to Dr. Artunduaga's rotation on the Kaplan Service,

8    correct?

9    A.  Yes.

10        MS. HYNDMAN:  And if we could look at the second page

11   on the date submitted.

12   BY MS. HYNDMAN:

13   Q.  This was submitted on September 25th, 2011.

14        When did you first see the document?

15   A.  Probably sometime a week or so after.  Maybe two weeks.

16   Q.  At the end of September, you made a decision to pull Dr.

17   Artunduaga from her scheduled rotation for October, correct?

18   A.  Yes.

19        MS. HYNDMAN:  And let's look at Plaintiff's Exhibit

20   No. 18, which is not in evidence, I don't believe.

21        THE COURT:  Is there any objection to the admission

22   of Plaintiff's 18, Mr. Jepson?

23        MR. JEPSON:  No objection.

24        THE COURT:  I will admit Plaintiff's 18.

25        MS. HYNDMAN:  Thank you.

Song - direct

705

1          (Plaintiff's Exhibit No. 18 received in evidence.)

2     BY MS. HYNDMAN:

3     Q.   Dr. Song, did you send and receive this series of e-mails

4     from Dr. Dickie on September 26th, 2011?  And if you need us

5     to scroll through the pages, we're happy to do that.

6     A.   If you could just blow it up just a little bit.

7     Q.   Sure.

8     A.   Thank you.

9          I do recognize this.

10    Q.   You received these e-mails -- you sent and received these

11    e-mails on September 26th, 2011?

12    A.   Yes.

13         MS. HYNDMAN:  And if we could look at Plaintiff's

14    Exhibit 19, please.

15         THE COURT:  Is there any objection to the admission

16    of Plaintiff's 19?

17         MR. JEPSON:  No objection.

18         THE COURT:  It is admitted.

19         (Plaintiff's Exhibit No. 19 received in evidence.)

20    BY MS. HYNDMAN:

21    Q.   Dr. Song, did you send and receive these e-mails on

22    September 26th, 2011?

23    A.   Yes.

24    Q.   Now, you agreed with a recommendation that was being made

25    by Dr. Dickie to move Dr. Artunduaga to the plastics rotation

Song - direct

706

```
 1   for October --
 2             MS. HYNDMAN:  Could you leave that up, please, Jamie.
 3        Thank you.
 4   BY THE WITNESS:
 5   A.  Could you repeat the question, please?
 6   BY MS. HYNDMAN:
 7   Q.  You agreed with Dr. Dickie in the recommendation that she
 8   was making to move Dr. Artunduaga to the plastics rotation for
 9   October, correct?
10   A.  Yes.
11   Q.  And it was based on the information in these e-mails that
12   you received; is that right?
13   A.  That's correct.
14   Q.  Okay.
15             Now, if you look down at the bottom of that page, the
16   last e-mail on the page there, that's an e-mail you received
17   from Dr. Dickie, correct?
18   A.  Yes.
19   Q.  And in that e-mail, Dr. Dickie says:  I just got off the
20   phone with Justine, which is why this is happening.  She had a
21   long talk with Umanskiy, who thinks Maria is unfixable.  Brian
22   is actually doing all the work on the service.  I just found
23   out about this, as did Justine.
24             As of September 26th, 2011, you had not spoken with
25   Dr. Umanskiy about Dr. Artunduaga, had you?
```

Song - direct

707

1  A.  I don't think so.

2  Q.  And, to your knowledge, Dr. Dickie had not spoken to

3  Dr. Umanskiy either, had she?

4  A.  I don't think so.

5          MS. HYNDMAN:  And if you look up at the e-mail

6  towards the top, please, Jamie.

7  BY MS. HYNDMAN:

8  Q.  In the middle e-mail there from Dr. Dickie, in the middle

9  of it, it says:  Hurst doesn't feel as strongly as Umanskiy,

10 but he avoids rounding with her.

11         Do you see that?

12 A.  I do.

13 Q.  Now, you had not spoken with Dr. Hurst about Dr.

14 Artunduaga as of September 26th, 2011, had you?

15 A.  I don't think I did.

16 Q.  And it's not clear from Dr. Dickie's e-mail whether she

17 had actually spoken to Dr. Hurst.  Do you know whether she

18 had?

19 A.  I wouldn't know.

20 Q.  So, Dr. Umanskiy supposedly has a conversation with

21 Dr. Lee; then Dr. Lee supposedly has a conversation with Dr.

22 Dickie; and, then, Dr. Dickie related that information to you,

23 correct?

24 A.  That is -- that is what I recall.

25 Q.  Okay.

Song - direct

708

1          And, then, you and Dr. Dickie, neither of whom had

2   had a conversation with Dr. Umanskiy, decide to move Dr.

3   Artunduaga to plastics for the month of October, correct?

4   A.  That's correct.

5   Q.  In fact, you spoke to Dr. Umanskiy the next day, didn't

6   you?

7   A.  I don't recall.

8   Q.  Okay.

9          Let me show you Joint Exhibit 15.  If you look at the

10  bottom e-mail there, that's an e-mail you received from

11  Dr. Umanskiy on September 28th, 2011, correct?

12  A.  Yes.

13  Q.  And it says:  Dr. Song, I'm writing to you in follow-up of

14  our conversation on September 27, 2011.

15         Does that refresh your recollection?

16  A.  It does.

17  Q.  And you had that conversation with Dr. Umanskiy because

18  you happened to bump into him in the hallway, right?

19  A.  That's right.

20  Q.  And you asked Dr. Umanskiy to summarize the conversation

21  you had and put it in an e-mail to you, right?

22  A.  That's right.

23  Q.  So, you could put it in Dr. Artunduaga's file, right?

24  A.  Yes.

25  Q.  Now, Dr. Artunduaga was not copied on this e-mail, was

1   she?

2   A.  I don't believe so.

3   Q.  You didn't forward this e-mail to her?

4   A.  I don't think I did.

5   Q.  Okay.

6        Now, Dr. Umanskiy doesn't say in this e-mail

7   anywhere, does he, that Dr. Artunduaga is unfixable?  He

8   doesn't use that word in this e-mail, does he?

9   A.  No.

10  Q.  Okay.

11       And, in fact, he says, towards the bottom:  While I

12  believe that she's capable of addressing the criticisms

13  presented above, she may not be able to achieve a level of

14  performance that we expect from our residents.

15       Correct?

16  A.  Yes.

17  Q.  He also tells you in this e-mail that throughout the

18  rotation, she demonstrated improvement in patient care and

19  communication skills, correct?

20       It's in the second paragraph, second sentence.

21  A.  Yes.

22  Q.  Now, you would agree, wouldn't you, Dr. Song, that that's

23  the goal of any kind of training program, that the

24  participants would improve throughout the course of the

25  training?

Song - direct

 1    A.  Yes.

 2    Q.  Now -- so, Dr. Artunduaga is in the plastics section for

 3    rotation in October.  And your plan is to test her, isn't it?

 4    A.  Well, to have her on our service.

 5    Q.  And your plan was to test Maria --

 6    A.  Yeah.

 7    Q.  -- isn't that right?

 8    A.  Yes.

 9    Q.  Now, I've got a calendar here for the month of October

10    that I'm going to hopefully get onto this easel.

11             THE COURT:  October, 2011, correct?

12             MS. HYNDMAN:  October, 2011.

13             THE COURT:  I think you are going to have to turn it

14    a bit for the jurors to see at the end.

15             Can you see at the end?  No.

16             A JUROR:  No.

17             MS. HYNDMAN:  No?  Okay.

18             THE COURT:  There we go.

19             If you need Dr. Song to step down, he can do that as

20    long --

21             MS. HYNDMAN:  Can you see it, Dr. Song?

22             THE WITNESS:  I can stand up and I can --

23             MS. HYNDMAN:  Whatever's the easiest.

24             THE COURT:  You may step down if you would like.

25    Just keep your voice up.

Song - direct

711

1           If you want that.

2           MS. HYNDMAN:  Ed, do you want to sit somewhere --

3           MR. JEPSON:  Do you mind if I move over there?

4           MS. HYNDMAN:  Not at all.  I have no problem.

5           Your Honor, you don't have a problem with Mr. Jepson

6    moving?

7           MR. JEPSON:  So I can see.

8           THE COURT:  I have no problem with that.

9           MS. HYNDMAN:  Okay.

10           THE COURT:  Just do not stand in the jurors' way.

11           MR. JEPSON:  I will not do that.

12           MS. HYNDMAN:  Okay.

13   BY MS. HYNDMAN:

14   Q.  So, during the month of October, Dr. Song, you had more

15   evaluations of Dr. Artunduaga were being submitted, right?

16   A.  Can you say it one more time?

17   Q.  During the month of October of 2011, there were more

18   evaluations being submitted of Dr. Artunduaga, correct?

19   A.  Yes.

20   Q.  Okay.

21           So, let's look at Joint Exhibit 8.

22           THE COURT:  You may have to come back up for that

23   then.

24           MS. HYNDMAN:  Yeah.  Sorry.

25       (Witness resumes stand.)

Song - direct

712

BY MS. HYNDMAN:

1

2  Q.  That is the evaluation from Dr. Angelos of Dr.

3  Artunduaga's performance during the Kaplan Service in July and

4  August of 2011, correct?

5  A.  Yes.

6          MS. HYNDMAN:  Can we look at the date that that was

7  submitted, please, Jamie.

8  BY MS. HYNDMAN:

9  Q.  And that was submitted on October 13th, 2011, right?

10 A.  Yes.

11 Q.  Okay.

12         So, I'm just going to write on here Angelos

13 evaluation.

14         MS. HYNDMAN:  If you want to see it, Ed.

15         MR. JEPSON:  You know, I trust you, Jamie --

16         MS. HYNDMAN:  I'm Cindy.

17         MR. JEPSON:  I mean, Cindy.

18     (Laughter.)

19         MR. JEPSON:  I trust both of you.

20         MS. FRANKLIN:  You trust me, too.

21     (Laughter.)

22         MS. HYNDMAN:  Okay.  And if we could take a look at

23 Joint Exhibit 9.

24 BY MS. HYNDMAN:

25 Q.  This is the evaluation by Dr. Chhablani of Dr.

Song - direct

1    Artunduaga's performance in the Kaplan Service, correct?

2    A.  Yes.

3           MS. HYNDMAN:  Can we look at the date that was

4    submitted, please.

5    BY MS. HYNDMAN:

6    Q.  That was submitted on October 14th, 2011, correct?

7    A.  Correct.

8    Q.  Okay.  We'll just write that in.

9           Now, Dr. Song, do you recall when you saw Dr.

10   Angelos' evaluation?

11   A.  I don't recall.

12   Q.  Do you recall when you saw Dr. Chhablani's evaluation?

13   A.  I don't recall.

14   Q.  You certainly saw both of them by November 2nd, 2011,

15   correct?

16   A.  I'm pretty sure I did.

17          MS. HYNDMAN:  Joint Exhibit 14, please.

18   BY MS. HYNDMAN:

19   Q.  Now, this is Dr. Umanskiy's evaluation of Dr. Artunduaga's

20   performance in September on the Block H Service, correct?

21   A.  Yes.

22          MS. HYNDMAN:  Can we look at the date that was

23   submitted, please, Jamie.

24   BY MS. HYNDMAN:

25   Q.  That was also submitted on October 14th, correct?

Song - direct

```
 1   A.  Correct.

 2         MS. HYNDMAN:  I hope I didn't write too large.

 3   BY MS. HYNDMAN:

 4   Q.  Okay.  Do you recall when you saw Dr. Umanskiy's

 5   evaluation for the first time?

 6   A.  I'm not sure of the exact date.

 7   Q.  At least by November 2nd, though, correct?

 8   A.  I believe so.

 9   Q.  Okay.

10         MS. HYNDMAN:  Can we look at Joint Exhibit No. 13.

11   BY MS. HYNDMAN:

12   Q.  This is the evaluation of Dr. Hurst of Dr. Artunduaga's

13   performance in September on the Block H Service, correct?

14   A.  Yes.

15         MS. HYNDMAN:  Can we look at the date that was

16   submitted, please, Jamie.

17   BY MS. HYNDMAN:

18   Q.  So, that was submitted on October 17th, 2011?

19   A.  Yes.

20   Q.  Do you recall when you first saw it?

21   A.  Again, I don't recall the exact date.

22   Q.  Certainly by November 2nd?

23   A.  I believe so.

24         MS. HYNDMAN:  And, then, if we could take a look at

25   Joint Exhibit 19.
```

Song - direct

715

BY MS. HYNDMAN:

Q.  This is an e-mail from Joly Jose to Dr. Jaskowiak with her

evaluation of Dr. Artunduaga, correct?

A.  Yes.

Q.  And Dr. Jaskowiak then forwarded that to you on October

18th --

A.  Yes.

Q.  -- correct?

        So, you saw that e-mail on that day?

A.  Probably that day.

Q.  I'm going to call that the Jose e-mail evaluation.

        Now, on -- you didn't forward Ms. Jose's e-mail to

Dr. Artunduaga, did you?

A.  I don't believe so.

Q.  Now, would you agree with me, Dr. Song, that all of these

attendings who submitted evaluations -- Dr. Kaplan, Dr.

Jaskowiak, Dr. Angelos, Dr. Chhablani, Dr. Umanskiy and

Dr. Hurst -- they all worked in the Department of Surgery,

correct?

A.  Yes.

Q.  And to the extent they assessed Dr. Artunduaga's

performance, you'd consider them evaluators of her, correct?

A.  Yes.

Q.  Now, there was a Surgical Education Committee meeting on

October 18th, 2011; is that right?

Song - direct

716

1   A.  I believe so.

2   Q.  Okay.

3        You attended that meeting?

4   A.  I think I did.

5   Q.  Do you need to refresh your recollection with the minutes?

6   A.  It would be helpful, yes, please.

7   Q.  Okay.

8        MS. HYNDMAN:  I don't have the exhibit number, but

9   we'll have it in a second.

10        It's in evidence.

11        MR. JEPSON:  It's 25.

12        MS. HYNDMAN:  Plaintiff's 25?

13        MR. JEPSON:  Yeah.

14        MS. HYNDMAN:  Thanks, Ed.

15        Can we take a look at that, please.

16        THE COURT:  The doctor has asked for a cough drop.

17        MS. HALL:  I got it.

18        THE COURT:  You may want to give him water, as well.

19     (Brief pause.)

20        MS. HALL:  Could I approach?

21        THE COURT:  Yes, you may.

22        THE WITNESS:  Thank you.

23   BY MS. HYNDMAN:

24   Q.  Dr. Song, does Plaintiff's Exhibit 25 refresh your

25   recollection that you attended that meeting on October 18th?

Song - direct

717

1    A.  Yes.

2    Q.  Okay.  So, I'm going to just write "Surgical Education

3    Committee" meeting on this calendar.

4          MS. HYNDMAN:  Ed, do you want to --

5          MR. JEPSON:  I'll stretch my legs.

6      (Brief pause.)

7    BY MS. HYNDMAN:

8    Q.  Okay.  Now, Dr. Song, I want to talk to you a little bit

9    about the decision you made to ask Dr. Artunduaga to consider

10   transitioning to another program, all right?

11   A.  Okay.

12   Q.  When did you make that decision?

13   A.  Must have been sometime in November.

14   Q.  You made that decision in November; is that correct?

15   A.  I am not sure of the exact date.

16   Q.  You met with Dr. Artunduaga on November 2nd, correct?

17   A.  That's correct.

18   Q.  Okay.

19          And on the morning of November 1st, 2011, you sent

20   Akilah Williams to see Barry Kamin, right?

21   A.  I believe so.

22   Q.  Okay.

23          And at your direction, she delivered some documents

24   to him, right?

25   A.  I believe so.

Song - direct

718

1   Q.   Okay.

2          And what did she deliver to Mr. Kamin?

3   A.   Did you say what or when?

4   Q.   What?  What did she deliver to Mr. Kamin?

5   A.   I can't recall.

6   Q.   Okay.

7          But there were documents relating to Dr. Artunduaga?

8   A.   Probably a portfolio of evaluations.

9   Q.   Now, you had some e-mail exchange with Mr. Kamin on

10  November 1st, after Ms. Williams took those documents to him,

11  correct?

12  A.   Yes.

13  Q.   And one of the options he suggested to you was a

14  remediation plan, right?

15  A.   Yes.

16  Q.   And you weren't interested in that option, right?

17  A.   I thought that was what October was for.

18  Q.   Did you tell Dr. Artunduaga that October was a remediation

19  plan?

20  A.   No.

21  Q.   Now, Dr. Song, would it have been an option for Dr.

22  Artunduaga to repeat an internship year in plastic surgery?

23  A.   To repeat?

24  Q.   To repeat a year -- repeat an internship year.  Would that

25  have been an option?

Song - direct

1    A.  Yes.

2    Q.  But you weren't interested in that option, right?

3    A.  That's a poor option.

4    Q.  You wanted formal probation -- at least at the time you

5    were communicating with Mr. Kamin on November 1st, you sent

6    him a message that you wanted formal probation for Dr.

7    Artunduaga, correct?

8    A.  We were considering it.

9    Q.  So, by at least November 1st in the morning, you

10   decided -- and let's take a look at that exhibit so that we

11   can make that clear.

12            MS. HYNDMAN:  It's Plaintiff's Exhibit 28.

13            MS. FRANKLIN:  Sorry?

14            MS. HYNDMAN:  Plaintiff's Exhibit 28, please.

15            THE COURT:  That is already in evidence.

16            MS. HYNDMAN:  Yes.

17            If you go to the first -- one of the earlier pages.

18   I think it's actually maybe the second page of the document.

19            The next page, please.

20            MR. JEPSON:  The second page --

21            MS. HYNDMAN:  Yeah.

22            MR. JEPSON:  -- Cindy?

23            MS. HYNDMAN:  Yeah.

24            MR. JEPSON:  Thank you.

25   BY MS. HYNDMAN:

Song - direct

720

```
 1   Q.  So, at least by November 1st in the morning, you had

 2   decided to get some advice from Mr. Kamin about formal

 3   probation; is that fair to say?

 4   A.  Yes.

 5   Q.  And on the very next day, you sat down with Dr. Artunduaga

 6   for a meeting, right?

 7   A.  I believe so.

 8   Q.  Okay.

 9        And Dr. Park and Ms. Williams were there, too, right?

10   A.  Yes.

11   Q.  And in that meeting, you told Dr. Artunduaga that you

12   thought it would be a good idea for her to transition to

13   another program, correct?

14   A.  Yes.

15   Q.  So, at what point in time did you decide that you would

16   offer that or suggest that to Dr. Artunduaga?

17   A.  I mean, probably within the days leading up to that.

18   Q.  Okay.

19        She was on the plastics rotation that month, right?

20   A.  In October.

21   Q.  In October.

22        So, just previously?

23   A.  Yeah.  So, a day or so before.

24   Q.  So, November 2nd is Wednesday.  Do you see that there?

25   A.  I do.
```

Song - direct

721

1   Q.  And if you want to come look, it's fine.

2         So, did you make a decision to have her transition to

3   another program sometime the week of October 24th?

4   A.  I can't recall exactly when.

5   Q.  Could it have been as early as October 17th?

6   A.  Probably not.  We wanted to see the whole month.

7   Q.  Certainly by November 2nd, when you met with her, you had

8   decided to ask her to consider going to another program,

9   right?

10  A.  Yes.

11  Q.  Now, after the meeting you had with Dr. Artunduaga on

12  November 2nd, you gave her a memorandum summarizing that

13  meeting, right?

14  A.  I believe so.

15        MS. HYNDMAN:  Can we look at Joint Exhibit 22,

16  please.

17        The first page.  Thanks.

18  BY MS. HYNDMAN:

19  Q.  Do you recognize this document, Dr. Song?

20  A.  Yes.

21  Q.  Is this a summary of the meeting you had with Dr.

22  Artunduaga on November 2nd, 2011?

23  A.  Yes.

24  Q.  That meeting was at 1:00 o'clock?

25  A.  Yes.

Song - direct

722

```
 1   Q.  You were there, Dr. Park, Ms. Williams, and Dr.

 2   Artunduaga, correct?

 3   A.  Correct.

 4   Q.  Where was the meeting held?

 5   A.  In my office.

 6   Q.  How long did it last?

 7   A.  I can't recall.

 8   Q.  You gave this -- Dr. Artunduaga a copy of this memo, like,

 9   on November 4th?  Does that sound about right to you?

10   A.  That sounds about right, yes.

11   Q.  Okay.

12          Did you write this memo, Dr. Song?

13   A.  I did.

14   Q.  And you believed that this memo accurately reflected what

15   you told Dr. Artunduaga in the meeting on November 2nd?

16   A.  Yes.

17   Q.  And you also believed that all the information that was in

18   this memorandum was true, didn't you?

19   A.  Yes.

20   Q.  Now, Dr. Song, would you agree with me that the word

21   "unanimous" means in complete agreement?

22   A.  Yes.

23   Q.  And, so, if you say an opinion was unanimous amongst the

24   numerous evaluators across the Department of Surgery, you

25   would mean every evaluator, wouldn't you?
```

Song - direct

1   A.  Every evaluator that I -- yes.

2   Q.  Yes.

3         With no exceptions?

4   A.  No exceptions.

5   Q.  Okay.

6         And we established earlier that the evaluators for

7   Dr. Artunduaga in the Department of Surgery include Dr.

8   Kaplan, right?

9   A.  Yes.

10   Q.  And Dr. Jaskowiak?

11   A.  Yes.

12   Q.  And Dr. Angelos?

13   A.  Yes.

14   Q.  Dr. Chhablani?

15   A.  Yes.

16   Q.  Dr. Umanskiy?

17   A.  Yes.

18   Q.  And Dr. Hurst?

19   A.  Yes.

20   Q.  And it also included evaluators in the plastic surgery

21   department, correct -- or section, correct?

22   A.  Correct.

23   Q.  Now, of course, we don't have any written evaluations from

24   anybody in the plastic surgery section of Dr. Artunduaga's

25   rotation in October, do we?

Song - direct

724

1   A.  No.

2   Q.  Now, you told Dr. Artunduaga in this meeting -- and it's

3   reflected in this memo -- that it was unanimous amongst the

4   numerous evaluators across the Department of Surgery that the

5   issues she had would be extremely difficult to correct within

6   the time allotted during the residency period, correct?

7   A.  Correct.

8   Q.  You see that in your memo?

9   A.  I do.

10   Q.  And you told her that in the meeting, right?

11   A.  Yes.

12   Q.  And by "the time allotted during the residency period,"

13   you were referring to the six-year plastic surgery residency

14   program, right?

15   A.  Correct.

16   Q.  So, it's your testimony that Dr. Kaplan had that opinion?

17   A.  Well, I didn't ask him, but he had --

18   Q.  But --

19   A.  -- a different evaluation.

20   Q.  But your -- you felt Dr. Kaplan had that opinion?

21   A.  I wasn't sure about Dr. Kaplan.

22   Q.  Okay.

23         Dr. Jaskowiak had that opinion?

24   A.  I believe so.

25   Q.  Dr. Angelos had that opinion?

Song - direct

725

1    A.   He had concerns.

2    Q.   Dr. Chhablani had that opinion?

3    A.   She had concerns.

4    Q.   I'm asking if she had the opinion that you told Dr.

5    Artunduaga she had?

6    A.   I wouldn't know.

7    Q.   You never talked to Dr. Chhablani?

8    A.   I did not speak to her.

9    Q.   So, all you had was her evaluation, right?

10   A.   Correct.

11   Q.   Okay.

12        And all you had for Dr. Angelos was his evaluation,

13   too, right?  You never spoke to him?

14   A.   Correct.

15   Q.   Okay.

16        Dr. Umanskiy had that opinion?

17   A.   Yes.

18   Q.   And Dr. Hurst had that opinion?

19   A.   He had significant reservations.

20   Q.   But did he tell you that he thought Dr. Artunduaga's

21   issues would be extremely difficult to correct within the time

22   allotted during the residency period?

23   A.   No.

24   Q.   So, not every evaluator had that opinion; did they, Dr.

25   Song?

Song - direct

726

```
 1   A.  Correct.

 2   Q.  But you told Dr. Artunduaga that they did, didn't you?

 3   A.  These are the eval- -- I told her, yes, I did.

 4   Q.  You told her that --

 5   A.  Yeah.

 6   Q.  -- "Yes"?

 7   A.  Right.

 8   Q.  And in the second paragraph of the memo towards the end

 9   there, you have some quotations.  Do you see the first one?

10   There's a quotation:  She frequently appeared disorganized,

11   unsure of her knowledge and at times had an unsuccessful

12   doctor-patient relationship.

13            Do you see that?

14   A.  I do.

15   Q.  Is that a quotation from an evaluation?

16   A.  I can't recall.

17   Q.  Do you know what evaluation it may have been a quotation

18   from?

19   A.  I can't recall.

20   Q.  Then you say:  Another set of reviewers stated that she is

21   often frazzled when presenting patient issues and it was very

22   difficult to keep her organized and goal oriented.

23            So, who is the set of reviewers that thought that?

24   A.  You know, I don't recall exactly, but I know that it was a

25   set of faculty reviewers and a set of residents that had sent
```

Song - direct

727

```
 1   comments to that degree.
 2   Q.  Did you take that quotation out of one of those things?
 3   A.  I'm sorry, could you repeat?
 4   Q.  Did you take that quotation out of some review that you
 5   saw?
 6   A.  A review or something that was spoken to me.
 7   Q.  Did you write down the quote -- the quotes that people
 8   were telling you --
 9   A.  Not always.
10   Q.  -- at the time when you were speaking about Dr.
11   Artunduaga?
12   A.  Not always.
13   Q.  So, to your knowledge, was that a direct quote from any
14   reviewer of Dr. Artunduaga?
15   A.  Yes.
16   Q.  It's a direct quote from someone?
17   A.  Someone verbally or written.
18   Q.  Okay.
19        But you didn't write down any quotes that anybody
20   told you verbally?
21   A.  Not outside of the evaluations.
22   Q.  But this is a direct quote, that's what you're saying?
23   A.  Yes.
24   Q.  Okay.
25        Do you have a photographic memory, Dr. Song?
```

Song - direct

728

1           MR. JEPSON:  Objection to the form.

2           THE COURT:  Sustained.  Argumentative.

3           MS. HYNDMAN:  Okay.

4    BY THE WITNESS:

5    A.  Pretty close.

6           THE COURT:  Are you at a good point to break?

7           MS. HYNDMAN:  Yes.

8           THE COURT:  Let's take our morning break.

9       (Jury out.)

10          THE COURT:  Pick up at ten after.

11          MR. JEPSON:  Thank you, Judge.

12          MS. HYNDMAN:  Thanks.

13       (Brief recess.)

14          THE CLERK:  All rise.

15     (Jury enters courtroom.)

16          THE COURT:  You may be seated.

17          You may continue.

18          MS. HYNDMAN:  Thank you, Judge.

19          If we could have joint exhibit whatever number that

20   was -- 22, is that what you have, Jamie?  Up on the screen,

21   please.

22          MR. JEPSON:  That's the probation?  The summary

23   evaluation?

24          MS. HYNDMAN:  Yeah, the November 2nd, yeah.  There we

25   go.  And if we could look at the last paragraph on the second

Song - direct

729

1   page, please.

2   BY MS. HYNDMAN:

3   Q.  Now, in this last paragraph, Dr. Song, you state, "The

4   meeting ended with Dr. Artunduaga stating that she recognized

5   and understood these issues, yet being adamant that she has

6   improved.  This has further reiterated to us that she feels

7   that she has improved; however, no one else in the entire

8   section and across the department has recognized that fact."

9        That's what you said, right?

10  A.  Yes.

11  Q.  And you believed that at the time you wrote this memo,

12  correct?

13  A.  I did.

14  Q.  The department you're referring to there is the Department

15  of Surgery?

16  A.  Yes.

17  Q.  And the section is your section, plastic section, right?

18  A.  Correct.

19  Q.  All right.  Dr. Dickie was in your section, right?

20  A.  Doctor who?

21  Q.  Dr. Dickie was in your section?

22  A.  Yes.

23       MS. HYNDMAN:  Okay.  Can we take a look at

24  Defendant's Exhibit 47, please.  And if we can zoom in on

25  where it says "consults."

Song - direct

730

 1    BY MS. HYNDMAN:

 2    Q.   In this document, Dr. Dickie states, "Improved

 3    communication with senior on call as to what consults need to

 4    still be seeing, which need disposition," correct?

 5    A.   Correct.

 6              MS. HYNDMAN:   Can we look at Joint Exhibit No. 14.

 7    BY MS. HYNDMAN:

 8    Q.   And this is Dr. Umanskiy's evaluation, correct?   We can

 9    look at the first page if you need to.

10    A.   Yes, please.

11              Yes.

12              MS. HYNDMAN:   And if we look at the comments.   Thank

13    you, Jamie.

14    BY MS. HYNDMAN:

15    Q.   Dr. Umanskiy was in the department, right?

16    A.   Yes, he was.

17    Q.   Okay.  And can you read in the overall comments the

18    sentence that begins with the word "throughout."   It's the

19    second sentence in that comment.

20    A.   "Throughout the rotation, she demonstrated improvement in

21    patient care and communication skills."

22    Q.   Thank you.

23    A.   "However" -- oh.

24    Q.   That's enough.  Thank you.

25              MS. HYNDMAN:   Joint Exhibit 8, please.

Song - direct
731

1   BY MS. HYNDMAN:

2   Q.  Now, this is Dr. Angelos's evaluation, correct?

3   A.  Yes.

4   Q.  And if we could look at the comments section on the second

5   page.

6         And in that comments, Dr. Hurst says --

7   A.  Dr. Angelos.

8   Q.  I mean, Dr. Angelos, thank you.  Dr. Angelos says,

9   "However, despite these weaknesses, she improved during the

10  rotation.  I am convinced that her operative skills will

11  improve, since I saw improvement over the course of the

12  month."  Correct?

13  A.  That's what it says.

14  Q.  And Dr. Angelos was in the Department of Surgery, too,

15  wasn't he?

16  A.  Yes, he was.

17  Q.  So a couple of weeks after you had this meeting with

18  Dr. Artunduaga on November 2nd, you had another meeting with

19  her, right?

20  A.  I believe so.

21  Q.  And at that meeting, you gave her a formal letter of

22  probation, correct?

23  A.  Yes.

24        MS. HYNDMAN:  If we could look at Joint Exhibit 26,

25  please.

Song - direct

1   BY MS. HYNDMAN:

2   Q.  Was this the letter you gave to Dr. Artunduaga on

3   November 15th?

4   A.  It is.

5   Q.  And that's your signature on the second page?

6   A.  Can I see the second page, please?

7   Q.  Yeah.

8           That's your signature?

9   A.  It is.

10  Q.  And Dr. Artunduaga signed it on November 15th, right?

11  A.  Yes.

12  Q.  Did she sign it while she was in the meeting with you?

13  A.  I can't recall.

14  Q.  Now, did you write this letter, Dr. Song?

15  A.  I did.

16  Q.  Did you use the template that Mr. Kamin had provided to

17  you?

18  A.  As a guideline.

19  Q.  When did you write the letter?

20  A.  I don't recall exactly when, but maybe the night before.

21  Q.  Now, in this letter, you say -- you advise Dr. Artunduaga

22  that she's being placed on probation and that she would remain

23  on probation until the time when you decide whether she will

24  be offered a contract for another year of training in the

25  program, right?

Song - direct

733

1    A.  Yes.

2    Q.  Then you say, "This decision was reached by the faculty

3    members of the Residency Education Committee as a whole after

4    a thorough review of your progress in the residency program."

5           When did the faculty members of the Residency

6    Education Committee as a whole conduct this thorough review of

7    her progress?

8    A.  Well, it's just Dr. Park, myself and Dr. Reid, and so

9    we're a small section and so it was just a few phone calls.

10   Q.  When did those phone calls take place?

11   A.  Probably a day or so before.

12   Q.  At the end of the meeting with Dr. Artunduaga on

13   November 2nd, she told you -- strike that.

14          In the meeting on November 2nd, you gave

15   Dr. Artunduaga the option of going on probation, correct?

16   A.  I believe so.

17   Q.  And she said she would take that option, didn't she?

18   A.  I believe so.

19   Q.  You gave her 24 hours to think about it, and she in fact

20   told you that's what she wanted to do.

21   A.  That's correct.

22   Q.  So why did the Residency Education Committee have to

23   decide something about putting Dr. Artunduaga on probation?

24   A.  It's a serious issue, and I wanted to make sure that we

25   can all weigh in, get as many data points as possible.

Song - direct

1   Q.  Now, that committee didn't actually vote, did they?

2   A.  I mean, there's three of us.

3   Q.  But there was no vote taken about whether or not to put

4   her on probation, was there?

5   A.  There was affirmation on the phone calls.

6   Q.  I'm asking whether there was a vote, Doctor.

7   A.  There was no vote.

8   Q.  There was no vote, right?  In fact, you made the decision,

9   didn't you?

10  A.  I did.

11  Q.  You've never put any other resident on probation; at least

12  at this time, you had never put any other resident on

13  probation, right?

14  A.  That's correct.

15  Q.  Now, you state in this letter, "As you are aware from

16  several prior meetings and discussions with me about your

17  progress in the program," do you see that?

18  A.  I do.

19  Q.  Okay.  Can you please tell us what meetings you're

20  referring to in that letter?

21  A.  Probably November 2nd, where we went over a whole host of

22  issues, and then just some e-mail exchanges and phone calls.

23  Q.  Okay.

24  A.  I think the one --

25  Q.  So at the time, as of November 15th, 2011, Dr. Artunduaga

Song - direct

735

1   was officially on probation, correct?

2   A.  Correct.

3           MS. HYNDMAN:  Okay.  Can we take a look at

4   Plaintiff's Exhibit No. 30?

5           THE COURT:  Is there any objection to the admission

6   of Plaintiff's 30?

7           MR. JEPSON:  No objection, your Honor.

8           THE COURT:  It's admitted.

9      (Plaintiff's Exhibit No. 30 was received in evidence.)

10          MS. HYNDMAN:  Thank you, Judge.

11  BY MS. HYNDMAN:

12  Q.  Dr. Song, did you receive this e-mail from Dr. Jaskowiak

13  on November 18th, 2011?

14  A.  Yes.

15  Q.  Okay.  And in this e-mail, Dr. Jaskowiak says, "I am sorry

16  to be a pain, but I was deeply troubled by our conversation

17  about Maria."

18          When did that conversation take place, Dr. Song?

19  A.  I don't know exactly the date, but probably a day or so

20  before.

21  Q.  And then Dr. Jaskowiak says, "I came to you in July and

22  August because of my grave concerns about Maria as a resident,

23  since you are her program director.  I had not encountered the

24  sort of issues that Maria was presenting us with previously

25  and wanted to get you involved at the earliest time, as she is

Song - direct

736

1   your resident.  If you had wanted me to speak directly to

2   Maria at that time, you should have advised me as such at the

3   time.  For you to do so three months later, making me the

4   scapegoat for your problems with Maria is something that I

5   deeply resent and will steadfastly defend myself against.  I

6   did what I thought was correct, speaking with you on multiple

7   occasions, discussing the issues with John Seal, documenting

8   my concerns in my written evaluation on New Innovations, and

9   attending the Resident Education Committee meeting to discuss

10  the concerns.  As you are aware, I have since met with Maria

11  and discussed in detail all concerns."

12          That's what Dr. Jaskowiak said to you, correct?

13  A.  Yes.

14  Q.  Now, the same day that you got that e-mail from

15  Dr. Jaskowiak, you received a letter from Dr. Artunduaga,

16  right?

17  A.  I don't recall the exact --

18  Q.  Well, take a look at Joint Exhibit No. 27, please.

19          Did you receive this letter from Dr. Artunduaga on

20  November 18th, 2011?

21  A.  I did.

22  Q.  And in this letter, she tells you that she was preparing

23  this as a response to both the evaluation summary that you

24  gave her and the letter of probation, correct?

25  A.  Yes.

Song - direct

1    Q.  And you promised Dr. Artunduaga that you would review the

2    factual issues that were raised in this letter, didn't you?

3    A.  I did.

4    Q.  And you did review those factual issues, didn't you?

5    A.  Yes.

6    Q.  And, in fact, Dr. Song, you concluded that some of the

7    factual disputes that Dr. Artunduaga raised in this letter

8    were valid, didn't you?

9    A.  Yes.

10   Q.  Now, Dr. Artunduaga completed the thoracic rotation in

11   November, right?

12   A.  I believe so.

13   Q.  And then she was on vacation in December for her wedding.

14   A.  That's right.

15   Q.  And you had agreed to extend the probation so that she

16   could have that vacation month, correct?

17   A.  Yes.

18   Q.  So then for January, she was on the vascular rotation?

19   A.  Yes.

20   Q.  And then transplant in February, right?

21   A.  Correct.

22   Q.  And then you brought her back to plastics for the first

23   half of March, correct?

24   A.  Yes.

25   Q.  She was only on the service for half the month?

Song - direct

738

1    A.  Two weeks, yes.

2    Q.  And then she went on to the night float, right?

3    A.  I can't remember where she went, but two weeks on our

4    service.

5    Q.  But it was only two weeks with you in any event.

6    A.  Correct.

7    Q.  Now, during the time that she was in thoracic and vascular

8    and transplant, the residents and the fellows and the

9    physician extenders who were working with her had been asked

10   to do weekly evaluations, correct?

11   A.  Correct.

12   Q.  Were you keeping -- were you monitoring those weekly

13   evaluations as they came in?

14   A.  No.

15   Q.  Did you look at them at all?

16   A.  No.

17   Q.  What about monthly evaluations from the attendings, were

18   you looking at those?

19   A.  No.  At that point, I asked Dr. Park to.

20   Q.  Was Dr. Park reporting to you?

21   A.  Not at that time.  I wanted to keep an arm's distance from

22   this process.

23        MS. HYNDMAN:  Let's look at Plaintiff's Exhibit

24   No. 38, which is in evidence.

25   BY MS. HYNDMAN:

Song - direct

739

1  Q.  You sent this e-mail to Jane McAtee on March 8th, correct?

2  A.  Correct.

3  Q.  And the subject line is Draft of Termination Letter -

4  Confidential, correct?

5  A.  Correct.

6  Q.  And that draft termination letter related to

7  Dr. Artunduaga, didn't it?

8  A.  I believe so.

9  Q.  Okay.  And you actually sent a draft of a termination

10  letter to Ms. McAtee on this date, didn't you, with this

11  e-mail?

12  A.  I believe so.

13  Q.  Did you draft the termination letter that you sent to

14  Ms. McAtee?

15  A.  With her help.

16  Q.  But when you sent -- the original one you that sent with

17  this e-mail, was it one that you had drafted?

18  A.  It was a draft, yes.

19  Q.  Okay.  When did you draft, first draft the termination

20  letter?

21  A.  You know, I'd never done something like this before, so I

22  can't remember exact date, but probably right around that

23  time.

24  Q.  Okay.  Day before?

25  A.  Day or so.

Song - direct

740

 1    Q.  A couple of days before?

 2    A.  I believe a day or so before.

 3    Q.  Okay.  Then after you sent this e-mail to Ms. McAtee on

 4    March 8th, you and Dr. Park had a meeting with Ms. McAtee,

 5    right?

 6    A.  I believe so, yes.

 7            MS. HYNDMAN:  Okay.  Could we look at Plaintiff's

 8    Exhibit 39, please.

 9            THE COURT:  Is there any objection to the admission

10    of Plaintiff's 39?

11            MR. JEPSON:  I believe it's already in, but if it

12    isn't, I won't object.

13            MS. HYNDMAN:  I didn't move it in.  I just used it.

14            THE COURT:  It is not in.

15            MR. JEPSON:  Then I will have no objection.

16            THE COURT:  Okay.  I will admit it.

17      (Plaintiff's Exhibit No. 39 was received in evidence.)

18            MS. HYNDMAN:  Thank you, Judge.

19    BY MS. HYNDMAN:

20    Q.  Dr. Song, did you send and receive these series of e-mails

21    from Christine Smith in mid-March of 2012 or early March?

22    A.  Yes.

23    Q.  Okay.  Now, according to this e-mail, it says that the

24    meeting with Jane McAtee was set for March 14th at 11:00 a.m.,

25    right?

Song - direct

741

1    A.  Right.

2    Q.  And did you, in fact, have that meeting at that time?

3    A.  I believe we did.

4    Q.  Okay.  Now, right after the meeting with Ms. McAtee, you

5    advised Dr. Artunduaga that the faculty would be meeting on

6    March 26th, 2012 to review the results of her probation,

7    right?

8    A.  Yes.

9    Q.  And, in fact, you sent that e-mail to Dr. Artunduaga at

10   12:30 p.m.; isn't that right?  Let's look at Joint Exhibit 95.

11         Do you see the time date on that, Dr. Song?

12   A.  I do.

13   Q.  And that was just after you'd met with Ms. McAtee?

14   A.  Right around that time, yes.

15   Q.  How long was the meeting with Ms. McAtee and Dr. Park on

16   March 14th?

17   A.  I don't recall the exact time.

18   Q.  More than an hour?  Less than an hour?  Ten minutes?

19   A.  I don't --

20   Q.  Give me an estimate?

21   A.  Probably 30 minutes or so.

22   Q.  Did the plastic surgery section faculty meet on

23   March 26th, 2012?

24   A.  Yes.

25   Q.  What time of day did they meet?

Song - direct

742

1  A.  It was in the evening.

2  Q.  And that meeting was about 30 minutes, right?

3  A.  It was at least 30 minutes.  I can't recall how long it

4  was.

5  Q.  Okay.  Now, let's take a look at Joint Exhibit -- and at

6  that meeting, after that meeting, you wrote a letter to

7  Dr. Artunduaga to advise her that her contract would not be

8  renewed, right?

9  A.  Correct.

10  Q.  Let's take a look at Joint Exhibit 100.

11       Is that the letter that you gave to Dr. Artunduaga,

12  advising her that her contract would not be renewed?

13  A.  Could you blow it up just a little bit, please?

14       Thank you.

15       It is.

16  Q.  Thank you.  There's no date on this letter.  Is there a

17  reason why you didn't put a date on it?

18  A.  You know, I think I did this on my own and not had Akilah

19  write it.

20  Q.  This is the first time you had not renewed the contract of

21  a resident in your program, correct?

22  A.  That's correct.

23  Q.  And, in fact, it's the only time you haven't renewed a

24  contract of a resident, correct?

25  A.  Correct.

1          MS. HYNDMAN:  Can we take a look at Plaintiff's

2    Exhibit 41.  This is not in evidence.

3          THE COURT:  Any objection to the admission?

4          MR. JEPSON:  Let me see it, Judge, please.

5          No objection.

6          THE COURT:  It's admitted.

7      (Plaintiff's Exhibit No. 41 was received in evidence.)

8          MS. HYNDMAN:  Thank you.

9    BY MS. HYNDMAN:

10   Q.  Dr. Song, are you familiar with this document, Plaintiff's

11   Exhibit 41?

12   A.  Could you blow it up just a little bit, please?

13          Thank you.

14          Yes.

15   Q.  What is this?

16   A.  It's an evaluation from the general surgery

17   cardio-thoracic from Dr. Ferguson, and then from Surgi-Gen,

18   Surgi-Transplant, as well as Vascular.

19   Q.  And this is -- is this a document that's generated by the

20   New Innovations system?

21   A.  I believe so.

22   Q.  And it provides an average of Dr. Artunduaga's scores for

23   her evaluations for the period of October 2011 to March 2012,

24   right?

25   A.  Right.

Song - direct

744

1  Q.  Now, Dr. Song, there's been testimony that Dr. Artunduaga

2  filed a grievance over the decision you made not to renew her

3  contract, right?

4  A.  Yes.

5  Q.  And you participated in that grievance, didn't you?

6  A.  I did.

7  Q.  And was it your understanding, Dr. Song, that the

8  grievance committee could override your decision not to renew

9  Dr. Artunduaga's contract?

10 A.  That was my understanding.

11        MS. HYNDMAN:  Can we look at Plaintiff's Exhibit 51,

12 please.

13        THE COURT:  Any objection to the admission of

14 Plaintiff's 51?

15        MR. JEPSON:  No objection, your Honor.

16        THE COURT:  It's admitted.

17   (Plaintiff's Exhibit No. 51 was received in evidence.)

18 BY MS. HYNDMAN:

19 Q.  Dr. Song, you sent this e-mail on May 16, 2012, correct?

20 A.  May 16th, yes.

21 Q.  And it was to an undisclosed group of your colleagues?

22        MR. JEPSON:  I'm going to object to the form.

23        THE COURT:  Sustained.

24 BY MS. HYNDMAN:

25 Q.  Okay.  Who did you send the e-mail to?

Song - direct

1    A.  You know, I don't recall.

2    Q.  But you sent it to -- you didn't send it to yourself,

3    right?

4    A.  No.

5    Q.  Okay.  Can you just read this e-mail into the record,

6    please.

7    A.  The whole thing?

8    Q.  Yes.

9    A.  "Dear colleagues:  I'd like to share with you the good

10   news of the outcome of today's grievance hearing.  We met

11   today and presented our case.  Maria had an opportunity to do

12   the same.  The grievance committee rendered a decision after

13   careful deliberation and was in favor of upholding 1) our

14   decision not to renew her contract and 2) our decision to keep

15   her on probation.

16        "I'd like to thank Drs. Park and Greives for their

17   help today and Dr. Roggin who has been a strong partner during

18   this process.  A special thanks to Akilah Williams.

19        "Sincerely, David."

20   Q.  Thank you.

21        Now, you were aware, weren't you, Dr. Song, that

22   after Dr. Artunduaga left the Medical Center, she was trying

23   to find another residency program?

24   A.  I wasn't -- I didn't know for sure.

25   Q.  You didn't know for sure.

Song - direct

1   A.  No, I didn't.

2   Q.  Okay.  You didn't make any offer to assist her with

3   finding any other positions in any residency programs, did

4   you, after she left?

5   A.  After she left, no.

6           MS. HYNDMAN:  Let's take a look at Plaintiff's

7   Exhibit 62.

8           THE COURT:  Any objection to its admission?

9           MR. JEPSON:  No objection, your Honor.

10          THE COURT:  It's admitted.

11    (Plaintiff's Exhibit No. 62 was received in evidence.)

12  BY MS. HYNDMAN:

13  Q.  So if you look at Plaintiff's 62, did you send and receive

14  these e-mails with Juliana Hansen in October of 2012?

15  A.  I did.

16  Q.  Who is Juliana Hansen?

17  A.  She's the associate professor and chief at Ohio State --

18  no, I'm sorry, Oregon Health Sciences University.

19  Q.  And does she -- is she a program director for a plastic

20  surgery residency program?

21  A.  I'm not sure.

22  Q.  Is she a program director for some residency program?

23  A.  She's a chief of the program.

24  Q.  Did you know Dr. Hansen?

25  A.  Vaguely, as an acquaintance.

Song - direct

747

1    Q.  Okay.  And in that e-mail on October 9th, Dr. Hansen

2    writes, "Hi, David, what is the deal with Maria Artunduaga?

3    Her application looks superhuman."

4           And then you respond to say, "Officially, we had to

5    terminate her.  First resident ever."  Correct?

6    A.  Correct.

7    Q.  And just above that, Dr. Hansen says, "I figured it was

8    something bad.  I was just deciding whether to offer an

9    interview or not.  Say no more."

10           Does that refresh your recollection that

11   Dr. Artunduaga was looking to get positions in other residency

12   programs?

13   A.  I wasn't sure if it was a residency or a lab position.

14   Wasn't quite sure.

15           MS. HYNDMAN:  Okay.  Can we take a look at

16   Plaintiff's Exhibit 64, please.

17           THE COURT:  Any objection to its admission?

18           MR. JEPSON:  No objection, your Honor.

19           THE COURT:  It's admitted.

20    (Plaintiff's Exhibit No. 64 was received in evidence.)

21   BY MS. HYNDMAN:

22   Q.  Dr. Song, did you send and receive these e-mails with

23   Michael Zenn on November 12th, 2012?

24   A.  Yes.

25   Q.  Did know Dr. Zenn before you sent these e-mails?

Song - direct

748

1   A.   Acquaintance.

2   Q.   Now, Dr. Zenn says in this e-mail, "David, what can you

3   tell me about Maria Artunduaga who is applying for plastics at

4   Duke?  Sounds like this might be a good story."

5        And then you respond, "Let's talk.  Can't e-mail.

6   What's a good number?"

7        Does this refresh your recollection that

8   Dr. Artunduaga was looking to apply for other residency

9   programs after she left the University of Chicago Medical

10  Center?

11  A.   Again, I wasn't sure if it was a lab position or a

12  residency program.

13  Q.   But she was looking to get some other position after she

14  left the University of Chicago Medical Center.

15  A.   That appears so.

16  Q.   And you knew that, correct?

17  A.   From these e-mails.

18  Q.   From these e-mails?

19  A.   Yes.

20  Q.   Who's Michelle Roughton?

21  A.   Roughton?

22  Q.   Roughton?

23  A.   One of my former residents.

24  Q.   Was she a resident at the same time as Dr. Artunduaga?

25  A.   I don't think so.

Song - direct

1      MS. HYNDMAN:  Okay.  If we could take a look at

2  Plaintiff's Exhibit No. 63, please.

3      THE COURT:  Any objection to its admission?

4      MR. JEPSON:  No objection, your Honor.

5      THE COURT:  Plaintiff's 63 is admitted.

6    (Plaintiff's Exhibit No. 63 was received in evidence.)

7  BY MS. HYNDMAN:

8  Q.  And Dr. Roughton, you sent and received these e-mails from

9  Dr. Roughton in November of 2012, right?

10 A.  Yes.

11 Q.  Okay.  And Dr. Roughton advises you that she had seen a

12 Facebook feed with Dr. Artunduaga's complaint against the

13 university, right?

14 A.  Yes.

15     MS. HYNDMAN:  And in the middle e-mail on the first

16 page there, can you zoom in on that one?

17 BY MS. HYNDMAN:

18 Q.  Yeah, November 7th, 2012, you write to Dr. Roughton, "Do

19 me a favor and monitor all her comments, as I'd like to use

20 them as evidence."  Correct?

21 A.  Correct.

22     MS. HYNDMAN:  That's all I have right now.

23     MR. JEPSON:  Thank you.

24     THE COURT:  Cross-examination.

25     MR. JEPSON:  Thanks, your Honor.

Song - cross

750

<pre>
 1                    CROSS-EXAMINATION

 2   BY MR. JEPSON:

 3   Q.  All right, Dr. Song, we're going to say, as orchestra

 4   leaders do, let's take it from the top.

 5   A.  Okay.

 6   Q.  Dr. Song, where were you born?

 7   A.  Seoul, South Korea.

 8   Q.  And when did you come to the United States?

 9   A.  I was three-and-a-half.

10   Q.  So you emigrated here with your family?

11   A.  My parents came first and then they brought me about

12   nine months later.

13   Q.  Okay.  Where did you go to medical school?

14   A.  UCLA.

15   Q.  When did you graduate approximately?

16   A.  1995.

17   Q.  And where did you do your internship, residency in general

18   surgery and plastic surgery residency?

19   A.  At the University of Chicago.

20   Q.  And after you completed those, did you do a fellowship?

21   A.  I did.

22   Q.  In what topic or subject?

23   A.  Reconstructive microsurgery.

24   Q.  And where did you do that?

25   A.  At the University of Chicago.
</pre>

Song - cross

 1   Q.  And at some point in time, did you become an attending

 2   physician at the University of Chicago?

 3   A.  Yes.

 4   Q.  And do you recall what year that was?

 5   A.  2001.

 6   Q.  Do you also have an M.B.A. from the University of Chicago?

 7   A.  I do.

 8   Q.  When did you get that?

 9   A.  2009.

10   Q.  Okay.  In your spare time?

11   A.  Yes.

12   Q.  At some point in time, did you become the chief of Plastic

13   and Reconstructive Surgery at the University of Chicago

14   Medical Center?

15   A.  Yes.

16   Q.  And when was that?

17   A.  November 2004.

18   Q.  And at some point in time did you become the residency

19   program director for the residency program of Plastic and

20   Reconstructive Surgery?

21   A.  Yes.

22   Q.  And do you remember about when that was?

23   A.  November 2004.

24   Q.  And how long did you hold that position at UCMC?

25   A.  Until November 2013.

Song - cross

752

```
 1   Q.  And who took your place?

 2   A.  Dr. Julie Park.

 3   Q.  And had Dr. Park been your assistant or associate director

 4   for a couple years beforehand?

 5   A.  Yes.

 6   Q.  Now, did -- you're no longer at the University of Chicago

 7   Medical Center, correct?

 8   A.  Correct.

 9   Q.  When did you leave?

10   A.  January -- December 31st, 2016 was my last day.

11   Q.  And where did you go?

12   A.  Went to -- I'm the regional chief of plastic surgery for

13   MedStar Health in Washington, D.C.

14   Q.  And when you say regional, what does that mean?

15   A.  It's a ten-hospital consortium, and I'm in charge of

16   plastic surgery, podiatry, and all the wound care centers

17   there.

18   Q.  Is that a bigger job than you had at UCMC?

19   A.  Yes.

20   Q.  And did you leave UCMC voluntarily --

21   A.  Yes.

22   Q.  -- to take that offer?

23   A.  Correct.

24   Q.  All right.  In addition to the positions I just inquired

25   about, did you have any other titles or positions at the
```

Song - cross

1    University of Chicago Medical Center before you left?

2    A.  I did.

3    Q.  What were they?

4    A.  I was the Cynthia Chow Professor of Surgery, associate

5    dean for continuing medical education, and I was also the vice

6    chairman for the Department of Surgery for business strategy

7    and development.

8    Q.  Okay.  Did you have any -- is there a professional society

9    for Plastic and Reconstructive Surgery?

10   A.  Yes.

11   Q.  And what is the major professional society for Plastic and

12   Reconstructive Surgery?

13   A.  It's the American Society of Plastic Surgeons.

14   Q.  Okay.  And the people that you just heard about,

15   Dr. Hansen and Dr. Zenn, are they part of that?

16   A.  Yes.

17   Q.  And did you hold any offices in that professional society?

18   A.  Yes.

19   Q.  And what offices have you held?

20   A.  I was the treasurer, then the president-elect and most

21   recently president.

22   Q.  That's for the national organization in the U.S., correct?

23   A.  Correct.

24   Q.  Now, tell us a bit about plastic and reconstructive

25   surgery as it's practiced at the University of Chicago Medical

Song - cross

1    Center.

2            What kinds of procedures do the attending physicians

3    in your section perform?

4    A.  I think most of the time people think of plastic surgery

5    as aesthetic, and at the University of Chicago, it's far from

6    it.  We are some of the pioneers in transplantation.  And so

7    we do everything from burn reconstruction to transplantation

8    to hand reattachments and finger reattachments to breast

9    reconstruction to head-neck reconstruction and repair children

10   born with cleft lip and palate and microtia and misshapen

11   heads.

12   Q.  And at the University of Chicago Medical Center, let's go

13   back to 2011-2012.  Was there an attending there by the name

14   of Dr. Russell Reid?

15   A.  Yes.

16   Q.  And what specialty, if any, was Dr. Reid's?

17   A.  He was a craniofacial surgeon.

18   Q.  Okay.  And was there an attending there by the name of

19   Dr. Ginard Henry?

20   A.  Yes.

21   Q.  And what was Dr. Henry's specialty?

22   A.  Hand surgery.

23   Q.  And what about an attending named Lawrence Zachary?  Is it

24   Lawrence Zachary?

25   A.  Yes.

Song - cross

1  Q.  And what's his specialty?

2  A.  He's a hand surgeon but does also body contouring.  So

3  after massive weight loss, he'll recontour the patient's skin.

4  Q.  And Dr. Lawrence Gottlieb?

5  A.  Yes.

6  Q.  What was his specialty?

7  A.  He was the director of our burn unit and also an

8  accomplished head and neck reconstructive surgeon.

9  Q.  And Dr. Julie Park.  What was her specialty then?

10  A.  Like me, she did breast reconstruction.

11  Q.  You and she would work together in that group or service?

12  A.  Yes.

13  Q.  Am I missing anybody?  I think you had seven attendings

14  then?

15  A.  Raphael Lee.

16  Q.  Ah, sorry.  What was Dr. Lee's specialty?

17  A.  Dr. Lee's specialty is in scar, in keloid scarring, and he

18  was our surgeon scientist, had a lab.

19  Q.  Okay.  Now, you may be biased, but in your view, is

20  plastic and reconstructive surgery a difficult specialty?

21  A.  Yes.

22  Q.  And why is that?

23  A.  We're considered the surgeon's surgeon, and so when

24  there's a complication of any type after cardiac surgery or

25  after abdominal surgery or any type of surgery that is

Song - cross

756

1    routinely performed by other colleagues, if there's a

2    complication, we're the ones that sort of correct that.

3    Q.  And you often work in conjunction with other surgeons with

4    respect to various procedures, correct?

5    A.  Yes.

6    Q.  All right.  Is it fair to say that a plastic and

7    reconstructive surgeon may operate on any part of the body?

8    A.  We say we operate on the skin and all its contents.

9    Q.  I think that covers it.

10   A.  Yeah.

11   Q.  Now, let's talk about a teaching hospital, the team.  We

12   have the attendings, correct?

13   A.  Correct.

14   Q.  And you were an attending, and everyone I just mentioned

15   or discussed with you is an attending physician, correct?

16   A.  Yes.

17   Q.  And what are the attendings' responsibilities?

18   A.  Several fold.  First and foremost, we have a

19   responsibility to our patients and treating patients.

20        Then we are responsible for teaching residents.  And

21   then also at the University of Chicago, we're also responsible

22   for doing research and discovery.

23   Q.  Okay.  And the term fellow has been used generally.  You

24   indicated you did a fellowship.  What's a fellow?

25   A.  A fellow is typically someone after their residency

Song - cross

757

1   program, having graduated successfully, to do another year --

2   excuse me -- of additional training.

3   Q.  Okay.  And you would have fellows on your service from

4   time to time, correct?

5   A.  Correct.

6   Q.  And the same is true at least to your knowledge at the

7   UCMC with respect to other services, correct?

8   A.  Yes.

9   Q.  And then we have the residency program.  We'll talk about

10  that in more detail.

11        The nurse practitioners and physician assistants.

12  They are on staff at the University of Chicago Medical Center

13  as well, correct?

14  A.  Correct.

15  Q.  And typically, what background do they have?

16  A.  They usually have a nursing background or a four-year

17  undergraduate degree.  Then they go into either PA school,

18  which is for physicians' assistants, which is a four-year

19  program or a masters program for a nurse practitioner.

20  Q.  And can these individuals actually prescribe medicine?

21  A.  Nurse practitioners can, yes.

22  Q.  And can they also -- do they also perform floor and other

23  duties as well?

24  A.  Yes.

25  Q.  All right.  Now, the Plastic and Reconstructive Surgery

Song - cross

1  program at the University of Chicago Medical Center is -- how

2  many residents do you typically have?

3  A.  Two a year for six years, so 12.

4  Q.  So 12?

5  A.  Yes.

6  Q.  Okay.  And we've heard about the matching program.  With

7  respect to the residents, and let's focus on internship in

8  your program since that's the main topic here.

9       What is the focus of the intern's year in the Plastic

10  and Reconstructive Surgery residency program?

11  A.  The focus of the intern year is to understand how to take

12  care of patients and to understand the workings of the

13  hospital, protocols, making sure that they're familiar with

14  disease process, identifying, diagnosing and relaying the plan

15  to the senior residents and the attendings.

16  Q.  Okay.  And what is the floor?

17  A.  The floor is the patient ward where patients are admitted

18  to.

19  Q.  Okay.  And do interns have responsibility for the patients

20  on the floor with respect to your section or other sections

21  that they may rotate in?

22  A.  Yes.

23  Q.  And what typically are those responsibilities?

24  A.  In the morning, they are the first to see the patients

25  during rounds, writing the notes, executing the orders of the

Song - cross

759

1   senior residents and the faculty members, discharging

2   patients, taking and escorting them to the operating room,

3   reconciling medications and so forth.

4   Q.  Okay.  Do they enter their notes or information that they

5   develop during the course of the rounds anywhere?

6   A.  Yes, in the medical records.

7   Q.  Okay.  And typically is that an electronic system?

8   A.  Yes.

9   Q.  And do others access that who are treating the patient?

10  A.  Yes.

11  Q.  And typically when should that be done?

12  A.  Usually in the morning.

13  Q.  Okay.  And with respect to the floor -- strike that.

14          Do interns also have responsibilities with respect to

15  clinics?

16  A.  Yes.

17  Q.  And what is a clinic at UCMC?

18  A.  A clinic is an outpatient environment where we are seeing

19  pre-operative and post-operative patients.

20  Q.  Okay.  So people either coming before operations or after

21  they've had one for progress reports or treatment, correct?

22  A.  Correct.

23  Q.  And what role, if any, does an intern in your section have

24  with respect to your section's rotations or that of other

25  general surgery rotations?

Song - cross

1  A.  Similarly, to assist the senior residents and faculty

2  members in seeing the patients, to write the notes and have

3  them placed in the charts, and to carry out the plan for the

4  day that's dictated by the senior residents and attendings.

5  Q.  Okay.  And do they have any responsibility for, again,

6  entry of notes, whether they be progress or plan?

7  A.  Yes.

8  Q.  And are they typically responsible for them?

9  A.  Yes.

10  Q.  And going back to the floor for just a second.  You

11  indicated a plan is made.

12      Does the intern have any responsibility for the plan

13  on the floor for specific patients?

14  A.  Yes.

15  Q.  What is that?

16  A.  So the plan is typically an intern will round with the

17  team, and a plan for the day for that patient is -- is advised

18  and vetted by the faculty member, excuse me, and then the

19  intern would be the one to carry those orders out.

20  Q.  All right.  Now, let's talk about something called

21  consults.  Do other services consult with your interns from

22  time to time?

23  A.  Yes.

24  Q.  And what's the purpose of a consult typically?

25  A.  It depends on -- the consults go both ways, so many of our

Song - cross

1    patients are sick and ill, so we'll often call the consults to

2    other services and vice-versa.  Other services will consult

3    us, depending particularly on what kind of wounds they have

4    and issues related to plastic surgery.

5    Q.  And do the interns in your section handle consults from

6    other services?

7    A.  Yes.

8    Q.  And what is the intern's role in that?

9    A.  Is the primary person to communicate the consults to our

10   team.

11   Q.  Okay.  What do you mean by that?

12   A.  So the primary conduit, because oftentimes surgeons --

13   Q.  You have a sore throat.  I'm making you talk.  I

14   apologize.

15   A.  No problem.  I got a bunch of these, so --

16   Q.  Okay.  What is the intern's role in a consult when your

17   section is being consulted?

18   A.  With our section, the intern is really the first person to

19   engage the patient to identify, diagnose and relay that

20   information to the senior residents, who are often in the

21   operating room, who then relay that to the attendings.

22   Q.  And do -- are interns expected to enter consult notes?

23   A.  Yes.

24   Q.  And are interns expected to follow up with the section

25   that has come to your section for a consult?

Song - cross

1    A.  Yes.

2    Q.  And then, finally, let's talk about the OR.

3           Back in 2011-2012, did the interns in your residency

4    program go into the OR?

5    A.  Yes.

6    Q.  And they would go into the OR -- I'm talking about the

7    operating room.

8           Did they go into the OR on your section as well as

9    others?

10   A.  Yes.

11   Q.  And typically, what was the intern's role in the operating

12   room?

13   A.  Mostly to observe and to understand the flow of surgery,

14   and we would engage them in retraction or being a part of the

15   flow of the operation; and in certain situations where there

16   are minor procedures, we would be the ones, as faculty

17   members, to take them through that, to train them how to do

18   simple procedures.

19   Q.  And is it fair to say that as the course of your six-year

20   program runs, that the intern and then resident, junior

21   resident and then senior resident and then chief resident

22   gradually gets more experience and skill in plastic and

23   reconstructive surgery?

24   A.  Yes.

25   Q.  Now, what is the ultimate goal of the residency program?

Song - cross

763

1   A.   To train a safe and -- a safe practicing plastic surgeon

2   who can practice independently.

3   Q.   And in conducting that program, do you believe you have

4   any -- are there any medical ethical obligations that you're

5   required to make sure you comport with?

6   A.   Yes.

7   Q.   What are they?

8   A.   Well, as a program director and as a chief, you're

9   ultimately the one signing off on their certificate, so we

10  want to make sure and we have the responsibility to make sure

11  that the person that we graduate is safe and ethical and able

12  to practice independently.

13  Q.   And during the course of an internship year, the intern's

14  dealing with real patients, correct?

15  A.   Yes.

16  Q.   And is part of the treatment team, correct?

17  A.   That's right.

18  Q.   And is safety, again, a concern for you as the program

19  director?

20  A.   The utmost concern.

21  Q.   And as an attending?

22  A.   The utmost concern.

23  Q.   And when an intern enters your program, they've already

24  completed medical school, correct?

25  A.   Yes.

Song - cross

1   Q.  And when they come to your program, what are your

2   expectations as to their basic clinical knowledge and other

3   skills and abilities?

4   A.  Well, we anticipate and it has been our experience that

5   our interns from day one are -- are someone with a broad fund

6   of knowledge that understands disease process, that can relay

7   that and communicate that disease process to us precisely and

8   effectively and concisely.

9   Q.  Is that -- when I say communication, I'm not talking

10  about -- is communication important?

11  A.  Critical.

12  Q.  Is prioritization important?

13  A.  Critical.

14  Q.  And is organization important?

15  A.  Absolutely critical.

16  Q.  And is effectively working with other physicians and other

17  individuals on the team important?

18  A.  Yes.

19  Q.  And are these things you expect to at least -- that the

20  intern at least have a basic fundamental skills in?

21  A.  Yes.

22  Q.  In other words, what I'm getting at is are you expecting

23  to be teaching these things?

24  A.  No.

25  Q.  Okay.  Let's talk about the 2011-2012 program.  Your

Song - cross

1  chiefs that year, we've already heard this, were Justine Lee

2  and Sara Dickie, correct?

3  A.  Yes.

4  Q.  Are you aware of Justine Lee's ethnic background?

5  A.  She's Chinese-American.

6  Q.  And with respect to the fifth year, was that Matthew

7  Greives and Trang Nyugen?

8  A.  Yes.

9  Q.  And do you know Trang Nyugen's ethnic background?

10  A.  She's Vietnamese.

11  Q.  And do you know where she was born?

12  A.  In Viet Nam.

13  Q.  And the fourth year, I believe we've already heard

14  testimony that Jonathan Bank and Grant Kleiber were your

15  fourth-year residents, correct?

16  A.  Correct.

17  Q.  And what about Jonathan Bank, do you know where he's from?

18  A.  Israel.

19  Q.  Do you know where he did his medical school?

20  A.  Israel.

21  Q.  And the third year, I believe we've heard testimony that

22  it was Lee Alquerishi and Sam Fuller; is that correct?

23  A.  Yes.

24  Q.  Lee Alquerishi, do you know what his national origin or

25  ethnic background is?

Song - cross

```
 1   A.   He's from Iraq, but is from Scotland.

 2   Q.   So was he originally from Iraq or his family was?

 3   A.   His family is from Iraq.

 4   Q.   Okay.  And he grew up in Scotland?

 5   A.   Yes.

 6   Q.   And did he go to medical school in the United States?

 7   A.   No.

 8   Q.   And then we have -- by the way, did he have an accent?

 9   A.   Pretty severe one.

10   Q.   Scottish?

11   A.   Scottish brogue.

12   Q.   Did you ever have to ask him to slow down?

13   A.   All the time.

14   Q.   Okay.  The second-year residents were Essie Kueberuwa?

15   A.   Yes.

16   Q.   And Dan Butz?

17   A.   Correct.

18   Q.   Dr. Kueberuwa, do you know what her ethnic or national

19   origin background is?

20   A.   Nigerian, and she's from the U.K.

21   Q.   And did she go to medical school in the United States?

22   A.   No.

23   Q.   Finally, the first year was obviously Dr. Artunduaga and

24   her co-intern was Deana Shenaq, correct?

25   A.   Yes.
```

Song - cross

1    Q.  Do you know what her ethnic background is?

2    A.  It's Jordanian.

3    Q.  And prior to the 2011-2012 year, do you recall someone

4    named Dr. Iris Seitz being in your program?

5    A.  Yes.

6    Q.  And where was Dr. Seitz from?

7    A.  Germany.

8    Q.  Do you know if she grew up in Germany?

9    A.  Yes.

10   Q.  Do you know if she went -- did she go to medical school in

11   Germany?

12   A.  Yes.

13   Q.  Did she learn -- was she an English native speaker?

14   A.  No.

15   Q.  Did her medical education occur in Germany?

16   A.  Yes.

17   Q.  And did she successfully complete your program?

18   A.  Yes.

19   Q.  Are you familiar with a Dr. Amir Dorafshar?

20   A.  Dorafshar.

21   Q.  Dorafshar.  I'm sorry.  Thank you.

22        And what's his background?

23   A.  He's from Iran.

24   Q.  And do you know where he went to medical school?

25   A.  In the U.K.

Song - cross

 1   Q.  Okay.  And did he successfully complete your residency

 2   program?

 3   A.  Yes.

 4   Q.  And, indeed, have all the individuals in the second

 5   through sixth years in 2011-2012 successfully completed your

 6   residency program?

 7   A.  Yes.

 8   Q.  Now, you were asked some questions about the GME policies.

 9   I want to direct your attention to first Joint Exhibit 3,

10   Page 10462.

11           Thank you.

12           This appears to be a policy entitled Resident

13   Eligibility, Selection, and Promotion.  Have you seen this

14   before?

15   A.  Yes.

16   Q.  And it's part of a policy manual that has a lot of

17   policies in it, correct?

18   A.  Correct.

19   Q.  And I want to direct -- and it has to do with -- strike

20   that.

21           Let's go to the second page, please.

22           And in particular the paragraph reading

23   non-discrimination.

24           Have you seen this before?

25   A.  I have.

Song - cross

769

1   Q.  And were you aware of this policy in 2011-2012?

2   A.  Yeah.

3           MS. HYNDMAN:  Objection, your Honor, asked and

4   answered.

5           THE COURT:  Sustained.

6   BY MR. JEPSON:

7   Q.  Is it fair to say you were aware there was a

8   non-discrimination policy in place?

9           MS. HYNDMAN:  Objection, your Honor.  It's been asked

10  and answered.

11          THE COURT:  What's your response?

12          MR. JEPSON:  I'm just trying to make the point with

13  him on his direct.  That's it.

14          THE COURT:  Overruled.

15          You may answer that question.

16          MR. JEPSON:  Because it was asked and answered

17  before.

18          THE COURT:  You may answer.

19          THE WITNESS:  Could you repeat the question, please?

20  BY MR. JEPSON:

21  Q.  Sure.  You're aware that there was this policy in place

22  with respect to the advancement and promotion and selection of

23  residents for your program, correct?

24  A.  Yes.

25  Q.  And indeed you wanted your program to be diverse, correct?

1    A.  Yes.

2    Q.  Now, there's also something -- did your residents sign

3    contracts?

4    A.  Yes.

5    Q.  And what was the term or the length of these contracts?

6    A.  One year.

7    Q.  Do you know why the residency contracts are one-year

8    contracts?

9    A.  My understanding is --

10            MS. HYNDMAN:  Can he lay some foundation on that?

11            MR. JEPSON:  Sure.

12   BY MR. JEPSON:

13   Q.  Well, now, you've been a residency program director,

14   correct?

15   A.  Yes.

16   Q.  And you have familiarity with how the program works and

17   how the contracts are offered, correct?

18   A.  Yes.

19   Q.  And have you ever asked why these are one-year contracts?

20   A.  Yes.

21   Q.  And what were you told?

22   A.  If --

23            MS. HYNDMAN:  Your Honor, this calls for a hearsay

24   response.

25   BY MR. JEPSON:

Song - cross

1  Q.  Well, what's your understanding?

2  A.  My understanding is that these are one-year contracts

3  because if a resident doesn't progress satisfactorily, we are

4  not committed to them for years, and that is why it's a

5  one-year contract.

6  Q.  Thank you.

7          Now, let's talk about how you man the program.

8          With respect to the interns as well as all the other

9  residents, who had the authority to make -- to decide who was

10  going to be interviewed?

11  A.  At that time, I reviewed all the applications, and I'm the

12  one that invited all the interviewees.

13  Q.  And you made that decision with respect to Dr. Artunduaga

14  to invite her, correct?

15  A.  I did.

16  Q.  And at the time, you would have seen her full application,

17  correct?

18  A.  Yes.

19  Q.  And with respect to the -- once somebody has matched, who

20  has the ultimate responsibility or did at the time when you

21  were the residency program director with respect to if

22  somebody needed remediation, discipline or the like?

23  A.  It would have been me.

24  Q.  Okay.  And with respect to the issue of renewal or

25  nonrenewal, who had the ultimate authority on that decision?

Song - cross

1   A.  I did.

2   Q.  And would you typically seek input from the attendings

3   when making that decision?

4   A.  Always.

5          MR. JEPSON:  Now, with respect to -- let's look at

6   Defendant's Exhibit 3, please, which has not been admitted, I

7   don't believe.

8          THE COURT:  Is there any objection to the admission

9   of Defendant's 3?

10         MS. HYNDMAN:  Give me a moment, Judge.

11         No objection.

12         THE COURT:  It's admitted.

13    (Defendant's Exhibit No. 3 was received in evidence.)

14  BY MR. JEPSON:

15  Q.  Okay.  Now, let me just tell you that it appears -- oh,

16  let me ask you.  It appears that this is a PGY-1 academic

17  schedule, which, in essence, is the rotation schedule,

18  correct?

19  A.  Correct.

20  Q.  And do you see Dr. Artunduaga's schedule for the year?

21  A.  I do.

22  Q.  And in your knowledge and your understanding of how your

23  interns rotate, is this a typical schedule?

24  A.  Yes.

25  Q.  Okay.  And when there are rotations in the other general

Song - cross

```
 1   surgery sections, there's typically an attending evaluation

 2   submitted, correct?

 3   A.  Correct.

 4   Q.  And you were asked some questions about the evaluations

 5   for your junior residents, correct?

 6   A.  Correct.

 7   Q.  And you didn't use, for your junior residents, the New

 8   Innovations system, correct?

 9   A.  No.

10   Q.  Why not?

11   A.  We're such a small group that the -- you know, every day,

12   I mean, the evaluations were very informal because we're such

13   a small group, much like a family.

14   Q.  Okay.  And you met with Dr. Artunduaga on November 2nd,

15   2011, to discuss not only her performance but whether she

16   would take probation or help transitioning, correct?

17   A.  I did, yes.

18   Q.  And was it your view that that was an evaluation?

19   A.  Can you repeat the question, please?

20   Q.  Was it your view that that was an evaluation meeting?

21   A.  Yes.

22   Q.  And indeed the document says summary evaluation meeting,

23   correct?

24   A.  Correct.

25   Q.  All right.  Now, and with respect to -- strike that.
```

Song - cross

1          What has been your experience generally with respect

2    to the attending evaluations that you received for your

3    interns and residents at the UCMC from other services, not

4    plastics?

5    A.  They're additive to the overall totality of how we view

6    our residents and evaluate them.

7    Q.  Okay.  And with respect to the scores, how do your people

8    typically do in your experience?

9    A.  Our residents typically score at the top.

10   Q.  Okay.  And what do you mean by that?

11   A.  So on a scale of 1 to 6, they're typically in the high 5s.

12   Q.  Got it.

13          And during the period of time that you have been at

14   the University of Chicago Medical Center, have you seen

15   evaluations for other residents or interns from Drs. Kaplan,

16   Jaskowiak, Hurst, Umanskiy that we've heard about?

17   A.  Yes.

18   Q.  Now, let's talk about the beginning of Dr. Artunduaga's

19   internship year.  She -- we've already heard that she started

20   the Kaplan service for two months, correct?

21   A.  Correct.

22   Q.  And with respect to that, you received a contact from

23   Dr. Jaskowiak in early August that you were shown, an e-mail,

24   correct?

25   A.  Yes.

Song - cross

1   Q.  That was an August 4th e-mail discussing some concerns

2   about her performance, correct?

3   A.  I believe so.

4   Q.  And that e-mail you responded to, correct?

5   A.  I believe I did.

6           MR. JEPSON:  All right.  Let's -- do you have a

7   number, Jamie?  I don't have it written down -- I mean Cindy.

8   I don't have it written down.  Plaintiff's --

9           MS. HYNDMAN:  Joint Exhibit.

10          MR. JEPSON:  Yeah, it's a Joint Exhibit, an early

11  one.

12          MS. FRANKLIN:  11.

13  BY MR. JEPSON:

14  Q.  11, please.

15          All right.  So this is the e-mail exchange you had

16  with Dr. Jaskowiak back then; is that right?

17  A.  It is.

18  Q.  And when you received this, did you have any concerns?

19  A.  I did.

20  Q.  What were your concerns?

21  A.  Several.  I think that sort of -- it's unusual for me to

22  receive something like this early on, and the things that

23  stood out was No. 2, the sort of nervousness makes her feel

24  very jumpy, that she's trying to consistently trying to pounce

25  on the next thing, and that was a bit concerning.

Song - cross

1   Q.  Okay.  And with respect to the first item, "Something

2   cultural, like she does not fully understand what is meant

3   when certain things are asked of her or she is asked to do

4   something, not language, but something is just understanding

5   how things are done in the U.S. medical system."

6        Now, did you have concerns about cultural issues

7   raised by that, or did you have other concerns?

8   A.  Well, I didn't know what to think, and this is

9   Dr. Jaskowiak saying it, so I just didn't -- to me, it was

10  more of a communication issue, so I wasn't sure exactly what

11  Nora was thinking, but it was concerning nonetheless.

12  Q.  And at this time, you knew that she had done rotations in

13  the U.S. previously, correct?

14  A.  Yes.

15  Q.  Or at least been in the system, correct?

16  A.  Correct.

17  Q.  All right.  Now, I want to direct your attention to

18  Defendant's Exhibit 13, please, which I don't believe is in

19  evidence yet.

20        MS. HYNDMAN:  It is not.

21        THE COURT:  Is there any objection to its admission?

22        MS. HYNDMAN:  Can I see it, please?

23  BY MR. JEPSON:

24  Q.  This is an e-mail --

25        MS. HYNDMAN:  Hold on, hold on, please, Ed.  Let me

Song - cross

1   have a chance to look at it.

2           I object to the top e-mail on the grounds of hearsay.

3   It was not shared with Dr. Song.

4           MR. JEPSON:  We can eliminate -- I'm actually looking

5   at the middle one, Judge.

6           THE COURT:  Okay.  How about the middle, if we

7   eliminate the top, is there any objection to the admission of

8   that?

9           MS. HYNDMAN:  The middle one, no.

10          THE COURT:  Okay.  I will admit Defendant's

11  Exhibit 13 with that modification.

12    (Defendant's Exhibit No. 13 modified received in evidence.)

13          MR. JEPSON:  Oh, great.  Thank you, your Honor.  May

14  we publish that --

15          THE COURT:  Yes, you may.

16          MR. JEPSON:  -- portion, your Honor?

17          Thank you.

18  BY MR. JEPSON:

19  Q.  This appears to be an e-mail to you from Dr. Jaskowiak, am

20  I correct?

21  A.  Yes.

22  Q.  And it's also copied to John Seal, correct?

23  A.  It is.

24  Q.  And it says, "Just want to give you both a heads up on a

25  bad interaction tonight between Maria Artunduaga.  I only have

Song - cross

1   blank, the patient's name, and her husband's side of the

2   story, but they were very upset about how Maria came in

3   tonight and basically grilled them about pain management and

4   as to why the patient was still in the hospital.  It was very

5   upsetting to even hear about.  I will speak with Maria

6   tomorrow, but I wanted to make you both aware."

7            You received this e-mail from Dr. Jaskowiak, correct?

8   A.  I did.

9   Q.  And you eventually communicated -- strike that.

10           You eventually received an e-mail from the patient as

11  well, correct?

12  A.  I did.

13  Q.  And you sent that e-mail to Dr. Artunduaga and asked her

14  for her side of the story, correct?

15  A.  Yes.

16           MR. JEPSON:  Would you take -- may we have

17  Defendant's Exhibit 20?

18           THE COURT:  That's in evidence already.

19  BY MR. JEPSON:

20  Q.  All right.  Take a look at the second page first,

21  Dr. Song.  And this appears to be your e-mail to Maria at the

22  top, that is, you're telling her you're sending the e-mail

23  from the patient, correct?

24  A.  Correct.

25  Q.  And then you had originally received the e-mail below from

Song - cross

1    the patient, correct?

2    A.  Correct.

3    Q.  Now, what was your reaction when you received that e-mail?

4    A.  I was disturbed.

5    Q.  Okay.  But you wanted to give Dr. Artunduaga a chance to

6    give her side of the story, correct?

7    A.  Yeah.

8          MR. JEPSON:  So let's go to the first page, and if we

9    could blow up that e-mail at the top.

10   BY MR. JEPSON:

11   Q.  Do you recall receiving this e-mail from Dr. Artunduaga in

12   response to you sending the patient's e-mail?  Take a moment

13   to read it, please.

14   A.  I do remember.

15   Q.  Okay.  And was there anything about Dr. Artunduaga's

16   response that concerned you?

17   A.  Well, the main thing is that she didn't really take

18   response -- I didn't feel she took responsibility for this

19   untoward episode and exchange with the patient but was sort of

20   deflecting blame to nurses and others.

21   Q.  Okay.  At some point in time in late August, did you

22   actually meet with Dr. Artunduaga to talk about these issues?

23   A.  I did.

24   Q.  And who was there?

25   A.  Akilah Williams.

1    Q.   Okay, and who else?

2    A.   Dr. Park.

3    Q.   And at the end of August?

4    A.   That one, I don't know, but I know Akilah Williams was

5    there for sure.

6    Q.   Okay.  And what did you and doctor -- what did you discuss

7    with Dr. Artunduaga at that meeting?

8    A.   You know, I just wanted to address a lot of these concerns

9    that were thematically very similar.  Her lack of

10   organization, being frazzled and overwhelmed, a lack of

11   prioritization, and, of course, the inability or lack thereof

12   to have a healthy doctor-patient relationship.

13   Q.   And what did you tell Dr. Artunduaga in sum or conclusion?

14   A.   I, you know, really wanted to help her, tried to figure

15   out what's going on and tried to inspire her to do better and

16   to figure this out.

17   Q.   Now, for the Kaplan rotation -- strike that.

18        Did you also have the -- or ask your chiefs to meet

19   with her?

20   A.   I did.

21   Q.   And your chiefs again were Justine Lee and Sara Dickie?

22   A.   Yes.

23        MR. JEPSON:  And let's take a look, if we can, at

24   Joint Exhibit 12.  And not the top e-mail but the bottom if

25   that could be blown up, please.

Song - cross

1  BY MR. JEPSON:

2  Q.  And this is an e-mail to you from Sara Dickie, correct?

3  A.  Yes.

4  Q.  And copying Justine Lee, correct?

5  A.  Correct.

6  Q.  All right.  And it appears from this e-mail that they

7  spoke not only with Maria but with John Seal who was the chief

8  resident, am I correct?

9  A.  Yes.

10  Q.  And it says here Maria's main problems in connection with

11  the Seal conversation stem from communication which he

12  detailed, such as, and then there are five things:  Accent; a

13  jumbled and somewhat frenetic thought process that comes out

14  when presenting patients; too much confidence when it comes to

15  patient management; with patients she comes across as abrupt,

16  arrogant and lacking in empathy; and she is occasionally

17  argumentative when discussing plans or what has been perceived

18  as an error on her part.

19        Did this concern you?

20  A.  Very much so.

21  Q.  Okay.  And then Sara wrote about her discussion with

22  Dr. Artunduaga, correct?

23  A.  Yes.

24  Q.  And it indicates that her perception of the problem stems

25  from communication, but it's different, and there's the accent

Song - cross

1  is mentioned again, correct?

2  A.  Correct.

3  Q.  And the inability to keep up with how quickly plans get

4  made and lists get run and that this may be a language

5  processing issue, and fear of paging about stupid things.  Do

6  you see that?

7  A.  I do.

8  Q.  And you received this e-mail, correct?

9  A.  I did.

10  Q.  And did you talk about the situation with Drs. Dickie and

11  Lee as well?

12  A.  I did.

13  Q.  And, indeed, did you meet with Dr. Artunduaga and have the

14  discussion we just went through after you'd received this

15  e-mail or around that time?

16  A.  Around that time, yes.

17  Q.  Okay.  Now, you did receive evaluations for the Kaplan

18  rotation, correct?

19  A.  Yes.

20  Q.  We've already shown you -- well, let's look at Joint

21  Exhibit 6.

22        Now, this is the evaluation from Dr. Kaplan, correct?

23  A.  It is.

24  Q.  Did you actually train yourself with Dr. Kaplan?

25  A.  I did.

Song - cross

783

```
1  Q.  Okay.  And have you seen his evaluations over time?
2  A.  Yes.
3  Q.  And did anything about this evaluation concern you when
4  you received it?
5  A.  Yes.
6  Q.  What?
7  A.  Well, typically, Ed or Dr. Kaplan writes exemplary,
8  superior for virtually everybody.
9  Q.  And you have --
10        MS. HYNDMAN:  I'd move to strike on the grounds of
11 hearsay, your Honor.
12 BY MR. JEPSON:
13 Q.  You have had occasion -- I'll try to lay a foundation.
14        THE COURT:  Okay.
15        MS. HYNDMAN:  Hearsay.
16        THE COURT:  Well, it's a hearsay objection --
17        MS. HYNDMAN:  It's a hearsay objection.
18        THE COURT:  -- I don't know that foundation will cure
19 it.  Are you offering it for the truth of the matter --
20        MR. JEPSON:  No, no.
21        THE COURT: -- or for his state of mind?
22        MR. JEPSON:  No, his state of mind what he's seen in
23 the past.
24        THE COURT:  Yes.  What's your response to that?
25        MS. HYNDMAN:  If we have a limiting instruction.
```

Song - cross

1          THE COURT:  Okay.  Ladies and gentlemen, the

2     testimony you're about to hear with respect to Dr. Kaplan's

3     prior evaluations, that testimony is not being offered for the

4     truth of what he's saying but rather to show Dr. Song's state

5     of mind and why he may or may not have done something.

6     BY MR. JEPSON:

7     Q.  So you have received evaluations yourself from Dr. Kaplan,

8     correct?

9     A.  Yes.

10    Q.  And as an attending, you have -- and as the program

11    director for the Plastic and Reconstructive Surgery residency

12    program, you have reviewed his evaluations for your residents

13    over time, correct?

14    A.  I have.

15    Q.  And what was your reaction when you saw this?

16    A.  Concerning.

17    Q.  And because of what?

18    A.  Because typically, Dr. Kaplan grades exemplary, superior.

19    Q.  And looking at the second page, was there anything about

20    that that was concerning to you?

21    A.  Yes.

22    Q.  What?

23    A.  There's nothing really filled out.

24          MR. JEPSON:  Okay.  Now, let's take a look at Joint

25    Exhibit 7, please.

Song - cross

1  BY MR. JEPSON:

2  Q.  This appears to be the, and in fact we know it is, the

3  attending evaluation from Dr. Jaskowiak for the Kaplan

4  service, correct?

5  A.  Yes.

6  Q.  And there's been testimony about you saw this towards the

7  end of June -- of September, correct?

8  A.  Correct.

9  Q.  And did anything on the first page of this document

10  concern you?

11  A.  Yes.

12  Q.  What?

13  A.  The marks more on the right side of the scale, "improve,"

14  "could improve," "deficient," "could improve," "could

15  improve," "deficient."

16  Q.  Okay, and on the second page?

17  A.  The same several of "could improve," "could improves."

18  Q.  All right.  Let's take a look at the overall.  Did you

19  read this when you reviewed or looked at the review?

20  A.  I did.

21  Q.  Did this concern you as well?

22  A.  Yes.

23  Q.  Why?

24  A.  Well, the main thing that jumped out to me is she's diving

25  forward constantly without fully listening to directions and

Song - cross

1   what is being recommended.  If this happens in the operating

2   room, this could be very dangerous.  You can imagine you're

3   asking a resident to do one thing, and she or he does

4   something different and dives in with a scalpel or another

5   instrument that can cause harm.

6   Q.  Okay.  And let's take a look at Joint Exhibit 8.  This has

7   already been admitted and discussed at length at some point in

8   time in October, and I think we have the calendar here.  This

9   would have been submitted and you would have received this as

10  well, correct?

11  A.  Yes.

12  Q.  And did this evaluation from Dr. Angelos concern you?

13  A.  Yes.

14  Q.  Why?

15  A.  Similar to Dr. Kaplan, Dr. Angelos is considered a very

16  easy grader --

17          MS. HYNDMAN:  Your Honor, I'd move to strike his

18  characterization of Dr. Angelos being considered as an easy

19  grader.

20          THE COURT:  Do you want to respond?

21          MR. JEPSON:  It's the same issue as the Kaplan

22  evaluation.

23          MS. HYNDMAN:  Well, then let's get the testimony in

24  properly, please.

25          THE COURT:  Lay a little more foundation that it's

Song - cross

1   his belief.

2   BY MR. JEPSON:

3   Q.  Have you seen Dr. Angelos's evaluations of other residents

4   over the years?

5   A.  Yes.

6   Q.  And you've seen quite a few of them over time, correct?

7   A.  I have.

8   Q.  And what is your general view of how he grades, again with

9   the limiting instruction?

10  A.  It has been my experience that Dr. Angelos is also someone

11  that -- the resident evaluations that I've seen from him

12  uniformly have been exemplary or superior.

13  Q.  And were you concerned when you got this evaluation?

14  A.  Yes.

15  Q.  And was that the reason?

16  A.  Well, you know, once again, I'm accustomed to seeing

17  bubbles on the left-hand side of the scale as opposed to the

18  right side.

19  Q.  Okay.  Let's go to Joint Exhibit 9.

20          This appears to be the evaluation for Dr. Artunduaga

21  on the Kaplan rotation by Dr. Chhablani.  You've seen this,

22  too, correct?

23  A.  Yes.

24  Q.  And this -- did this evaluation concern you?

25  A.  Yes.

Song - cross

1   Q.  Why?

2   A.  For the similar reasons.  Dr. Chhablani, who I've seen

3   many evaluations from her on our residents, accustomed to

4   seeing exemplary and superior.

5   Q.  Okay.  And at some point in time, you would have also seen

6   Joint Exhibit 19, correct?

7   A.  Could you blow it up?

8          MR. JEPSON:  If you could blow up the bottom one,

9   please, Michael.  Thanks.

10  BY THE WITNESS:

11  A.  Yes.

12  BY MR. JEPSON:

13  Q.  And this was sent to you by Dr. Jaskowiak, correct?

14  A.  Yes.

15  Q.  And did this concern you?

16  A.  Yes.

17  Q.  By the way, have you worked with Joly Jose before?

18  A.  I have.

19  Q.  And what's your general impression of her?

20  A.  Outstanding.  In fact, I tried to recruit her on to my

21  service.

22  Q.  Okay.  What was your overall view of the evaluations that

23  you looked at, as well as the e-mail communications you had

24  from Dr. Jaskowiak as well as your chief about the Kaplan

25  rotation and Maria's performance on it?

Song - cross

1   A.  I was very concerned.

2   Q.  And indeed in early September, there had been some

3   discussion of at that point bringing Dr. Artunduaga on to the

4   plastics rotation in October, correct?

5   A.  Correct.

6   Q.  You decided not to do it at that point, correct?

7   A.  Correct.

8   Q.  Now, with respect to September, Dr. Artunduaga moved on to

9   the colorectal service, correct?

10  A.  Yes.

11  Q.  And Dr. Umanskiy and Dr. Hurst were the attendings,

12  correct?

13  A.  Correct.

14  Q.  Dr. Brian Bello was the chief, correct?

15  A.  Yes.

16  Q.  All right.  I want to draw your attention now, if we can,

17  to -- you were shown this before.  Plaintiff's Exhibit 14.

18  Let's look at that.  And look at the bottom portion, please.

19          And this is -- you gave some testimony about what

20  this says to you, correct?

21  A.  Yes.

22  Q.  And overall, you read this e-mail, correct?

23  A.  I did.

24  Q.  Was there anything in this e-mail that was concerning to

25  you when you read it, even though Dr. Dickie stated at the top

Song - cross

1    that things were going okay?

2    A.  Yes.

3    Q.  What?

4    A.  No. 2.

5           MR. JEPSON:  Okay.  And let's highlight that if we

6    would, Michael.

7    BY MR. JEPSON:

8    Q.  And the word "frazzled" appears there, I think.

9    A.  Yes.

10   Q.  And it says, "She is often frazzled when she presents

11   patients, and Brian has to work with her to keep the

12   presentations organized.  She presented a consult the other

13   day of a patient in the ED with a stoma.  Hurst asked why she

14   had a stoma, and Maria didn't know.  Brian was able to find

15   the information in the last discharge summary.  He was

16   disappointed that she didn't recognize the importance of the

17   question and do the proper history taking before presenting

18   the patient."

19          What -- why would Dr. Bello be disappointed, in your

20   view?

21          MS. HYNDMAN:  Objection, your Honor.

22          MR. JEPSON:  Okay.

23          THE COURT:  Sustained.

24   BY MR. JEPSON:

25   Q.  What was your concern about this?

Song - cross

1    A.  Well, my concern is this is on the colorectal service and

2    a lot of patients actually have stomas.

3    Q.  What is a stoma?

4    A.  A stoma is an external exiting of your bowel contents

5    after someone has had removal of their colon or their small

6    intestine, so there's a bag that catches the feces that come

7    out externally as opposed to the bottom.

8    Q.  And, again, why would that be a concern?

9    A.  Well, this whole rotation is colorectal surgery, and so

10   virtually everyone has had surgery on their bowels and many,

11   many, many patients would have stomas.  And so this was a

12   primary theme of that rotation.

13          And for any resident not to have recognized that

14   why -- question No. 1 is why is the stoma there and what was

15   the cause of the surgery and what was the stoma for.

16   Q.  Okay.  Let's take a look at Joint Exhibit 15.

17     (Counsel conferring.)

18          MR. JEPSON:  Thank you.  Let's go back to the other

19   one, and the second page.  In particular, No. 5.

20   BY MR. JEPSON:

21   Q.  Did this concern you, and that's the accidental discharge

22   of a patient with a PICC line?

23   A.  Very much so.

24   Q.  Why?

25   A.  So a PICC line is a line for usually typically for

Song - cross

1   patients that don't have good IV access, so we'll put a PICC

2   line in that goes from the upper arm all the way and it sits

3   in the right atrium, which is the heart.

4          And so this is a catheter that we use to infuse

5   medication or nutrition.  And because it sits in the heart, if

6   a patient's not aware of it and doesn't have education on how

7   to take care of it, this can be extremely dangerous.

8   Q.  What can happen?

9   A.  You can get an air embolus and die.  You can get an

10  ascending infection and get endocarditis, which is an

11  infection of the heart, and die.

12  Q.  Thank you.

13         MR. JEPSON:  Let's go back now to Joint Exhibit 15,

14  and if you could, blow up the bottom half of that, please.

15  BY MR. JEPSON:

16  Q.  Did you receive this e-mail from Dr. Umanskiy on or about

17  September 28th?

18  A.  I did.

19  Q.  And you would have had a discussion with him about these

20  subjects on the 27th, correct?

21  A.  Yes.

22  Q.  And were you concerned after the discussion and e-mail

23  receipt with respect to Dr. Artunduaga?

24  A.  Very much so.

25  Q.  Why?

Song - cross

1  A.  Once again, the same themes of being disorganized,

2  excessively talkative, not able to establish a doctor-patient

3  relationship, not -- most importantly, in the operating room

4  not following instructions.  Those are major concerns.

5          MR. JEPSON:  All right.  Let's take a look at Joint

6  Exhibit 50 -- I'm sorry -- 14.

7  BY MR. JEPSON:

8  Q.  And then you would have received this evaluation from

9  Dr. Umanskiy, correct?

10  A.  Yes.

11  Q.  And, again, concerning?

12  A.  Very much so.

13  Q.  For the same reasons?

14  A.  Yes.

15          MR. JEPSON:  All right.  Let's take a look at Joint

16  Exhibit 13.

17  BY MR. JEPSON:

18  Q.  This is the evaluation from Dr. Hurst?

19  A.  Yes.

20  Q.  And was this also concerning to you?

21  A.  Yes.

22  Q.  For what reasons?

23  A.  Similarly, Roger and I have known each other for a long

24  time, and typically our residents are -- not typically, almost

25  always on the exemplary/superior side of the scale.

Song - cross

1  Q.  Do you remember actually having an informal conversation

2  with Dr. Hurst prior to getting this?

3  A.  Yes.

4  Q.  Hallway talk?

5  A.  Yeah, just walking in the hallway.

6  Q.  And do you recall it being sometime during September of

7  2011?

8  A.  Right around that time, yeah.

9  Q.  Okay.  And did Dr. Hurst approach you?

10 A.  Yes.

11 Q.  Tell me, to the best of your recollection, what he said to

12 you and you said to him.

13 A.  It was more about, you know, this is a very unusual

14 resident.  I asked why.  He said, your residents are typically

15 superb and excellent, they're typically the best of their

16 year, and she's -- she's nowhere near that.

17         And so I was concerned.

18         MS. HYNDMAN:  Your Honor, if we could just have a

19 limiting instruction on that testimony, please.

20         MR. JEPSON:  No objection to that.

21         THE COURT:  Ladies and gentlemen, Dr. Hurst's

22 comments are not being offered for the truth of what he said.

23 It's that they are being offered to give context to the

24 conversation that took place, as well as for Dr. Song's state

25 of mind.

Song - cross

1    MR. JEPSON:  Thank you, your Honor.

2  BY MR. JEPSON:

3  Q.  In any event, you've already testified and been shown the

4  e-mails between Sara Dickie, Justine Lee and yourself and the

5  reasons for the move to plastics, correct?

6  A.  Correct.

7  Q.  And even though you hadn't yet received a number of these

8  evaluations, did you feel you had enough at that point in time

9  to, in your view, justify that move?

10  A.  I mean, the warning signs were so clear.  We wanted to do

11  this to -- to, you know, in a nurturing environment to really

12  see for ourselves what was going on.

13  Q.  Okay.  And you wanted to be able to test and assess?

14  A.  That's right.

15  Q.  And did you view the switch to October as a form of

16  remediation?

17  A.  Yes.

18  Q.  Now, so she moves in October, and do you recall meeting

19  prior to the move with Dr. Artunduaga to discuss the change in

20  schedule?

21  A.  Yes.

22  Q.  Did that meeting occur on or around September 29, 2011?

23  A.  Right before -- right around that time, yes.

24  Q.  Okay.  To the best of your recollection, what did you say

25  to Dr. Artunduaga, and what did she say to you?

Song - cross

1   A.  You know, just explaining and justifying why we're doing

2   this.  We wanted to bring you on our service in a nurturing

3   environment, where we're all family, try to really help you,

4   coach you to get better.

5   Q.  Did you raise with her any of your concerns about her

6   performance?

7   A.  Yes.  And I shared with her sort of the thematically

8   consistent concerns that many had regarding her performance.

9   Q.  Do you recall what Dr. Artunduaga said to you during that

10  conversation?

11  A.  I don't recall exact words, but she -- much of it was

12  deflection.  Much of it was it was someone else's fault or a

13  fault of the system, and I had to redirect her and say, look,

14  we really need to have you focus on these things and take some

15  accountability and really sort of dive into our learning

16  environment and, you know, take this in.

17  Q.  Okay.  At any point in time during this conversation, did

18  you tell Dr. Artunduaga that there's no such thing as accent

19  discrimination?

20  A.  No.

21  Q.  And indeed did you even discuss her accent during that

22  meeting?

23  A.  No.

24  Q.  During that meeting, did you -- did she raise with you

25  issues that she felt that it was her background from Colombia

Song - cross

1   that somehow led to people not being receptive to her, or

2   words to that effect?

3   A.  No.

4   Q.  And is the same true with respect to that August meeting

5   you had, the earlier one?  Did she raise any of these issues

6   with you then as to either it being her -- her being from

7   Colombia or her having an issue with language that was causing

8   all of this?

9   A.  No.

10  Q.  And, by the way, you dealt with her.  Did you believe,

11  you, that her language was at the root of any of this?

12  A.  No.

13  Q.  Now, in plastic surgery there also was a co-intern named

14  Jon Lusardi who was there as well, correct?

15  A.  Correct.

16  Q.  As far as you knew, he might not have been the strongest

17  intern, correct?

18  A.  Correct.

19          MR. JEPSON:  And I want to direct your attention to

20  Defendant's Exhibit 44, which I don't think has been admitted

21  yet.

22          THE COURT:  Defendant's 44 is not in evidence.  Is

23  there any objection to its admission?

24          MS. HYNDMAN:  No objection, Judge.

25          THE COURT:  It's admitted.  And then when we finish

Song - cross

1   with this, we'll break for lunch.

2     (Defendant's Exhibit No. 44 was received in evidence.)

3          MR. JEPSON:  Thank you, Judge.

4          Now, I want to draw your attention to this -- yes,

5   why don't we do the address first.  Thank you, Michael.

6   BY MR. JEPSON:

7   Q.  This appears to be an e-mail to you from Dr. Sara Dickie

8   dated October 24, 2011, am I correct?

9   A.  Yes.

10  Q.  Now, take a moment and review this, please, Dr. Song.  And

11  trust me when I say the only thing on the second page is the

12  name Sara.

13          Did you -- you received this e-mail, correct?

14  A.  I did.

15  Q.  And did this concern you?

16  A.  Yes.

17  Q.  Why?

18  A.  Several things.  I think that there was a certain lack of

19  respect for an attending and someone that has a lot of

20  experience with our patients, and just not understanding the

21  priority and the plan for these drains.  These are very

22  important things for patients that have body contouring and

23  massive weight loss, and so when the drains come out,

24  prematurely or not, managed improperly, the patients can get

25  infections.

Song - cross

1   Q.  And Dr. Lawler, what kind of doctor is she at UCMC?

2   A.  She's a rehabilitation doctor.

3   Q.  So she's a physician that would have been working with

4   respect to one of your colleagues, Dr. Zachary's patient,

5   correct?

6   A.  Yes, for quite some time.

7   Q.  All right.  Now, did you also speak with Trang -- strike

8   that.

9           MR. JEPSON:  I think it's time for lunch.

10          THE COURT:  Okay.  We'll pick up at 1:45.

11          THE CLERK:  All rise.

12    (Jury exits courtroom.)

13          THE COURT:  You may step down.  We'll pick up at

14   1:45.

15          MR. JEPSON:  Thank you, your Honor.

16    (Court adjourned at 12:38 p.m.)

17                  *    *    *    *    *

18

19   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.
20

21
     /s/ Joseph Rickhoff                February 3, 2017
22   Official Court Reporter

23   /s/ Kathy Fennell                  February 3, 2017
     Official Court Reporter
24

25

800

```
 1                   IN THE UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF ILLINOIS
 2                           EASTERN DIVISION

 3   DR. MARIA ARTUNDUAGA,            ) Docket No. 12 C 8733
                                      )
 4                   Plaintiff,       )
                                      )
 5             vs.                    )
                                      )
 6   THE UNIVERSITY OF CHICAGO        )
     MEDICAL CENTER,                  ) Chicago, Illinois
 7                                    ) February 2, 2017
                     Defendant.       ) 1:45 o'clock p.m.
 8

 9                   TRANSCRIPT OF TRIAL PROCEEDINGS
           BEFORE THE HONORABLE AMY J. ST. EVE, AND A JURY
10
     APPEARANCES:
11
     For the Plaintiff:          THE FRANKLIN LAW FIRM, LLC
12                               BY:  MS. JAMIE S. FRANKLIN
                                 53 W. Jackson Blvd., Suite 803
13                               Chicago, Illinois  60604

14                               ROBINSON, CURLEY & CLAYTON, P.C.
                                 BY:  MS. CYNTHIA H. HYNDMAN
15                               300 South Wacker Drive, Suite 1700
                                 Chicago, Illinois  60606
16
     For the Defendant:          VEDDER PRICE, P.C.
17                               BY:  MR. EDWARD C. JEPSON, JR.
                                      MS. ELIZABETH N. HALL
18                               222 N. LaSalle St., Suite 2600
                                 Chicago, Illinois  60601
19
     Court Reporter:             MR. JOSEPH RICKHOFF
20                               Official Court Reporter
                                 219 S. Dearborn St., Suite 1232
21                               Chicago, Illinois  60604
                                 (312) 435-5562
22

23              *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

24                      PROCEEDINGS RECORDED BY
                        MECHANICAL STENOGRAPHY
25                 TRANSCRIPT PRODUCED BY COMPUTER
```

Song - cross

1      (Jury enters.)

2            THE COURT:  You may be seated.

3            You're all ready to go.  I love it.

4            JUROR:  We're well-trained.

5            THE COURT:  Katie will have you all trained.

6            Go ahead, Mr. Jepson.  You may continue.

7            MR. JEPSON:  Thank you, Your Honor.

8       DAVID HABIN SONG, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN,

9                  CROSS-EXAMINATION (Resumed)

10  BY MR. JEPSON:

11  Q.  Dr. Song, I want to direct your attention to Defendant's

12  Exhibit 45, please.  Take a moment and look at this, please.

13  A.  Yes.

14  Q.  Have you seen this before?

15  A.  I have.

16  Q.  And do you recognize this as something that one of your

17  seniors, Trang, Dr. Trang Nyugen, prepared?

18  A.  Yes.

19  Q.  And did you receive this prior to making the probation

20  decision?

21  A.  Yes.

22  Q.  And in reviewing this, did it concern -- did it raise

23  concerns in your mind about Dr. Artunduaga's performance?

24  A.  Very much so.

25  Q.  Okay.  And I'm not going to ask you to go through it in

Song - cross

1   great detail.  What in particular or in general gave you

2   concern?

3   A.  Well, there's certain examples of Maria not recognizing a

4   patient in extremis, which can be an emergency.

5   Q.  And just extremis, you know, that may be not how we talk

6   normally.

7   A.  Yeah.  Extremis is when a patient can -- is bordering on

8   really tipping over and really -- something really bad

9   happening, being admitted into the intensive care unit,

10  bleeding to death, having a fatal arrythmia where your heart

11  beats differently.

12  Q.  Anything else in here?

13  A.  Again, similar sort of thematics of what's happened

14  since -- since the first few weeks of her residency, you know,

15  not being able to get her work done.  The communication issues

16  come up again, very much along the lines of -- excuse me --

17  what she was going through.  Sorry.

18          THE COURT:  Do you need a drink?

19          THE WITNESS:  Yes, thank you.

20  BY MR. JEPSON:

21  Q.  And did you actually speak with Dr. Nyugen prior to making

22  the decision to put Dr. Artunduaga on probation?

23  A.  Yes.

24  Q.  And you would have -- this is one thing you would have

25  talked about?

Song - cross

1  A.  Yes.

2  Q.  And I want to direct your attention now to Defendant's

3  Exhibit 47, please.

4        This appears to be a similar document?

5  A.  Yes.

6  Q.  And do you recognize this as something prepared by

7  Dr. Dickie?

8  A.  I do.

9  Q.  And you -- it appears that you would have -- strike that.

10        Did you review this prior to making the decision to

11  place Dr. Artunduaga on probation?

12  A.  I did.

13  Q.  And, again, were there concerns raised in your mind when

14  you reviewed this?

15  A.  Yes.

16  Q.  And, in general, what were they?

17  A.  Again, same things of organization, not being able to

18  carry out the orders in a timely fashion, prioritization.

19  Once again, prioritization in what we do is extremely

20  important because of patients that are very ill.  And so we

21  have to be able to understand which patients are going to be

22  ill, what tasks are priority No. 1, 2 and so forth.

23  Q.  Okay.  And did you speak with Dr. Dickie about this

24  document before you made the probation decision?

25  A.  I did.

Song - cross

1    Q.  And did you also speak with Dr. Justine Lee prior to

2    making the probation decision?

3    A.  Yes.

4    Q.  I want to show you what's been marked as Defendant's

5    Exhibit 48.

6              MR. JEPSON:  Which has not been admitted, I believe.

7              THE COURT:  Is there any objection to its admission?

8              MS. HYNDMAN:  48?

9              MR. JEPSON:  Yes.

10             MS. HYNDMAN:  No objection.

11             THE COURT:  It's admitted.

12             MR. JEPSON:  Thank you.

13        (Defendant's Exhibit No. 48 was received in evidence.)

14   BY MR. JEPSON:

15   Q.  Dr. Song, it appears that this is an e-mail that was

16   forwarded to you from Dr. Nguyen on November 6th, correct?

17   A.  It is.

18   Q.  And it's an e-mail from Dr. Butz to Dr. Nguyen which was

19   sent on October 30, 2011, correct?  Do you see at the bottom?

20   A.  I do.

21   Q.  And did you talk with Dr. Nyugen about the substance of

22   this e-mail prior to making the probation decision?

23   A.  Yes.

24   Q.  Although you may have received it after?

25   A.  Correct.

Song - cross

805

1  Q.  Am I correct?

2  A.  Yes, you are.

3  Q.  And Dr. Butz was a resident who was working on the service

4  in October with Dr. Artunduaga, correct?

5  A.  Yes.

6  Q.  And I want to direct your attention to point No. 2.  It

7  says, Consult notes have not been placed in an efficient time

8  frame.  Frequently they are placed at the end of the day.

9  Earlier in the month one was not placed at all, and we were

10  paged two weeks later requesting our recommendations.

11      Was that concerning to you?

12  A.  Very much so.

13  Q.  And then, Daily notes frequently take until noon to be

14  placed.  As far as I'm concerned, it should only take 20 to 30

15  minutes to enter the daily notes.

16      You read that as well at the time?

17  A.  I did.

18  Q.  And then these concerns have been mentioned several times

19  without significant improvement.

20      Do you see that?

21  A.  I do.

22  Q.  Going to No. 3, Patient issues/clinical decision making.

23  This has been a pretty serious issue.  She has been slow to

24  recognize when patients are unstable and to notify the chiefs.

25  This was especially relevant with blank who wasn't properly

Song - cross

1    resuscitated and ended up in the ICU.  I feel like she has a

2    problem synthesizing data and putting it together in a

3    diagnosis.

4           Does this relate to the concern you just expressed?

5    A.  It is.  It does.

6    Q.  And finally, colleague work relationships/accepting

7    responsibility.

8           When confronted about a lot of the issues, I found

9    that she frequently made excuses and occasionally blamed her

10   co-intern.

11          Did that concern you?

12   A.  Very much so.

13   Q.  Did you believe it to be consistent with what you had

14   seen?

15   A.  Yes.

16   Q.  All right.  So at the time that you made the decision to

17   place her on probation, you would have seen the attending

18   evaluations from the Kaplan rotation and the colorectal

19   rotation, right?

20   A.  Yes.

21   Q.  And you would have seen these various e-mails about

22   concerns, e-mails and notes from the October plastic surgery

23   rotation; is that correct?

24   A.  Yes.

25   Q.  And in October, while Dr. Artunduaga was on the plastic

Song - cross

1   surgery service, did you have occasion to work with her?

2   A.  I did.

3   Q.  And do you recall any of the experiences you had with her

4   during that month?

5   A.  Very clearly one.

6   Q.  Would you tell the jury about that, please.

7   A.  It was a situation where I was trying to teach her how to

8   suture an abdominal incision.  And before I could finish my

9   sentence and try to coach her properly, she was diving in with

10   the needle holder and forceps in hand doing it incorrectly.

11   And I had to tell her to stop and that didn't -- she didn't

12   stop.  So I actually had to grab her hand and say, This is not

13   the right way to do this.  Let me show you.

14   Q.  Did that concern you?

15   A.  Very much so.

16   Q.  And in your mind, was that a patient safety issue?

17   A.  Absolutely.

18        MS. HYNDMAN:  I'm sorry.  I didn't hear that

19   question.

20        THE COURT:  In your mind was that a patient safety

21   issue.

22        MR. JEPSON:  In your mind was that a patient safety

23   issue.

24        MS. HYNDMAN:  Thank you.

25   BY MR. JEPSON:

Song - cross

1   Q.  All right.  Let's talk about the probation.  Prior to

2   placing Dr. Artunduaga on probation, you would have spoken

3   with these seniors, correct?

4   A.  Yes.

5   Q.  I think you also indicated you also spoke with Dr. Reid?

6   A.  Yes.

7   Q.  And also possibly Dr. Park?

8   A.  Yes.

9   Q.  And why at this point as opposed to some other kind of a

10  remediation did you decide to place or at least give

11  Dr. Artunduaga the choice of going on probation or

12  transitioning into another specialty?

13  A.  Well, the issues were so severe and consistent across

14  multiple services, and then of course within our own service,

15  that whole month of October was remediation and coaching.  And

16  even in that month in a nurtured environment the issues were

17  consistent and extremely, in my opinion, dangerous to patient

18  safety.

19  Q.  Okay.  And then you called the meeting on November 2nd,

20  correct?

21  A.  I did.

22  Q.  Dr. Park was there, Dr. Artunduaga and Akilah Williams.

23  Am I correct?

24  A.  Yes.

25  Q.  And a written memo was prepared and then given to

1  Dr. Artunduaga a couple of days later?

2  A.  Yes.

3        MR. JEPSON:  Now, would you go to Joint Exhibit 22,

4  please.

5  BY MR. JEPSON:

6  Q.  And the topic of this was summary of evaluation with

7  Dr. Maria Artunduaga.  Am I correct?

8  A.  You are.

9  Q.  And did you name it that?

10  A.  I did.

11  Q.  And did the meeting take place at 1:00 on November 2,

12  2011?

13  A.  Yes.

14  Q.  And were the things in this document discussed?

15  A.  Yes.

16  Q.  And there was a lot of questioning about the first part,

17  the sentence, Was unanimous among evaluators across the

18  department of surgery, particularly within our section that

19  the issues that Dr. Artunduaga has will be extremely difficult

20  to correct within the time allotted during the residency

21  period.

22        Was that your conclusion?

23  A.  Yes.

24  Q.  And was that the conclusion you drew from having reviewed

25  all of the attending evaluations and the other materials we

Song - cross

1    just discussed?

2    A.  Yes.

3    Q.  Now, let's go to the second page.  There was also a

4    discussion here about the last paragraph which referred to the

5    statement Dr. Artunduaga made, that she felt she had improved.

6    And you stated here, No one else in the entire section across

7    the department has recognized that fact.

8          As far as you were concerned, Dr. Song, had

9    Dr. Artunduaga shown enough improvement such that you would

10   not place her on probation?

11   A.  Not at all.

12   Q.  And it was four months into the internship, correct?

13   A.  Yes.

14   Q.  And internship is the very beginning of residency,

15   correct?

16   A.  It is.

17   Q.  And typically it's a very basic year?

18   A.  Yes.

19   Q.  And were you concerned that this -- these types of

20   numerous and consistent problems had arisen this early?

21   A.  Very much so.

22   Q.  And why is that?

23   A.  Well, these are core, basic, fundamental building blocks

24   that medical students have that they carry into them -- into

25   an internship, any internship with.  And it was very clear to

Song - cross

1  me that this was completely lacking.

2  Q.  And why did you offer Dr. Artunduaga the opportunity to

3  transfer to another specialty?

4  A.  You know, it has been my experience and from talking to my

5  colleagues that when there's -- this happens.  Residents

6  occasionally match into something that is not in their

7  wheelhouse or they don't have the skill set or aptitude for.

8  And instead of putting someone on probation which carries a

9  lifelong mark on someone's record, you want them to transition

10  into something that they're good at, that they'll excel at.

11  And that's really the intent and the spirit of why we did that

12  and why we offered that.

13  Q.  Okay.  And a probation letter was eventually drafted and

14  presented to Dr. Artunduaga, correct?

15  A.  Yes.

16  Q.  And now, during the meeting on November 2nd, did

17  Artunduaga, Dr. Artunduaga, raise an issue with -- that some

18  of these things were being decided as mistakes for her were

19  actually Jonathan Lusardi's fault?

20  A.  She did raise that.

21  Q.  And did you do anything to try to discern which issues

22  were Dr. Artunduaga's and Dr. Lusardi?

23  A.  Yeah, I'm always trying to give people the benefit of the

24  doubt.  So I went back and talked to Trang, talked to all the

25  residents including Trang, Matt Grieves, Sara, Dan Butz,

Song - cross

812

1  people that were on that rotation and wanted to delineate who

2  was really responsible.  And it was very clear to me that

3  those were her responsibilities.

4  Q.  Now, you indicated that -- in the letter, that probation

5  letter, that she had made some valid points, correct?

6  A.  Yes.

7  Q.  And did you discover that there were a few things that

8  probably were Lusardi's fault?

9  A.  There was a couple.

10  Q.  And in your view, did those things at all affect or change

11  your conclusion that she should be placed on probation?

12  A.  No.

13  Q.  As part of the probation period -- strike that.

14          There was also some questioning about the possibility

15  of having Dr. Artunduaga repeat a year.  Do you remember being

16  asked questions about that?

17  A.  I do.

18  Q.  In this situation, did that make any sense to you?

19  A.  Not at all.

20  Q.  Why not?

21  A.  Because the core fundamental, once again, building blocks

22  that someone comes in with that takes several years of even

23  medical school to build were absent in Dr. Artunduaga.  And it

24  was my opinion from experience that that one year, an extra

25  year, would not bring her up to speed at all.  And so that was

Song - cross

813

1   my conclusion.

2   Q.   Okay.  Now, even though Dr. Artunduaga decided to accept

3   probation and as one of those conditions was mentoring by

4   Dr. Park, right?

5   A.   Yes.

6   Q.   And you're aware, aren't you, that Dr. Park met with her

7   repeatedly?

8   A.   I am.

9   Q.   You're also aware, aren't you, that Dr. Park actually set

10  up a separate feedback evaluation which was to be submitted on

11  a weekly basis by those in resident, fellow, or nurse

12  practitioner positions on her rotations, correct?

13  A.   She mentioned she was going to do something like that.

14  Q.   You also indicated that you kind of stepped back.

15  A.   I did.

16  Q.   Is that right?

17  A.   I did.

18  Q.   Why did you do that?

19  A.   You know, it's a matter of giving everyone a shot again,

20  and I didn't want to bias the process.  I wanted to have an

21  arm's length and really focus on the facts.  And if for some

22  chance there was an opportunity for her to, you know,

23  dramatically change, I wanted to give that opportunity to her.

24  Q.   Okay.  I want to draw your attention also to an e-mail

25  dated November 21, 2011.  And, in particular, it's Defendant's

Song - cross

814

1   Exhibit 64.

2           MR. JEPSON:  It has not been admitted.

3           THE COURT:  Is there any objection to its admission?

4           MS. HYNDMAN:  No objection.

5           THE COURT:  It's admitted.

6      (Defendant's Exhibit No. 64 was received in evidence.)

7           MR. JEPSON:  May we publish it?  Thank you.

8   BY MR. JEPSON:

9   Q.  Is this the e-mail you sent to Dr. Artunduaga?

10  A.  Yes.

11  Q.  And I'll just read it.

12          Dear Maria, in thinking about our meetings, I would

13  like you to know that Perspectives, our faculty and staff

14  assistance program, is available as a resource to you.  It is

15  a benefit at no cost to you.  They can be reached at, and you

16  give the number and the service is confidential.

17          Why did you send Dr. Artunduaga that?

18  A.  You know, I got the sense this was very difficult for her

19  beyond --

20  Q.  Did that surprise you?

21  A.  No.  And this is a means of confidentially getting some

22  therapy and perhaps getting some counseling.

23  Q.  Okay.  Now, with respect to the thoracic rotation, do you

24  recall receiving a communication from Dr. Ferguson midway

25  through?

Song - cross

815

1   A.   I do.

2   Q.   Let's go to Defendant's Exhibit 62.

3            MR. JEPSON:   Which I believe has not yet been

4   admitted.

5            THE COURT:   Is there any objection to its admission?

6            MS. HYNDMAN:   No objection.

7            THE COURT:   It's admitted.

8       (Defendant's Exhibit No. 62 was received in evidence.)

9   BY MR. JEPSON:

10  Q.   Dr. Song, this appears to be an e-mail from Mark Ferguson

11  to you dated November 16, 2011.  Take a moment and review it,

12  please.

13  A.   Mm-hmm.

14  Q.   Did you receive this e-mail on or about November 16, 2011?

15  A.   I did.

16  Q.   Did you tell Dr. Ferguson what to say in this e-mail?

17  A.   No.

18  Q.   Indeed, did Dr. Ferguson train you?

19  A.   Yes.

20  Q.   And did you actually have a discussion with Dr. Ferguson

21  about this situation prior to receiving this e-mail, if you

22  recall?

23  A.   I think it was a day, before we ran into the -- there's a

24  common stairwell leading in the operating room.

25  Q.   All the surgical services are in that area, correct?

Song - cross

816

1   A.  Correct.

2   Q.  So you see people?

3   A.  Correct.

4   Q.  Okay.  Go ahead.  And so you ran into him?

5   A.  And said -- you know, he's not a man of many words.

6   Q.  Right.

7   A.  And he said --

8   Q.  Well, the jury will see him Monday and probably be very

9   happy about that.

10  A.  Right.

11  Q.  So what did he tell you?

12  A.  He said that there's some severe concerns with

13  Dr. Artunduaga.

14  Q.  Okay.  And do you know if you asked him to put it in an

15  e-mail or if he just did it?

16  A.  I think he just did it.

17  Q.  Okay.  And do you know if it was Dr. Ferguson's practice

18  to typically have a mid rotation evaluation?

19  A.  I don't recall.

20  Q.  Okay.  Now, let's -- as far as the rotations in January

21  and February, you wouldn't have been keeping track of the

22  evaluations, either weekly or the attendings, correct?

23  A.  No.

24  Q.  That was because you had stepped back?

25  A.  That's correct.

Song - cross

1   Q.  During that period of time, did you become aware of any

2   issues that arose with respect to Dr. Artunduaga's conduct or

3   possible performance?

4   A.  Just a couple of issues.

5   Q.  Let me ask you about this.  Let's take a look at

6   Defendant's Exhibit 90.

7           THE COURT:  Is there any objection to the admission

8   of Defendant's 90, Ms. Hyndman?

9           MS. HYNDMAN:  No, Your Honor.

10          THE COURT:  It's admitted.

11          MR. JEPSON:  Thank you.

12      (Defendant's Exhibit No. 90 was received in evidence.)

13  BY MR. JEPSON:

14  Q.  Would you take a moment, Dr. Song, and review this.  It

15  appears to be an e-mail to you and to Dr. Park from

16  Dr. Artunduaga sent on January 26, 2012.

17  A.  Okay.

18  Q.  Obviously Dr. Artunduaga brought this situation to your

19  attention, correct?

20  A.  Correct.

21  Q.  Reviewing this e-mail, did this cause you any concerns?

22  A.  Yes.

23  Q.  Okay.  What concerns did it cause you?

24  A.  It goes along the theme of not taking full responsibility.

25  There was a lot of deflection in this e-mail, and those are

Song - cross

 1   sort of, in my opinion, really difficult to crack in a

 2   surgical resident.

 3   Q.  And do you know if Dr. Park then followed up with this?

 4   A.  I believe she did.

 5   Q.  Now, do you recall an issue arising in February with

 6   Dr. Artunduaga being over hours?

 7   A.  I do.

 8           MR. JEPSON:  Let's take a look, if we would, first at

 9   Defendant's Exhibit 112 which I believe is already in, but I

10   would ask you to check.

11           THE COURT:  It is.

12           MR. JEPSON:  Thank you.

13   BY MR. JEPSON:

14   Q.  Take a moment, if you would, and look at this e-mail.  At

15   least start with the second page, which appears to be an

16   e-mail from Dr. Artunduaga to you.

17   A.  I see it.

18   Q.  Is the duty hours requirement that's set by ACGME

19   something that you personally take seriously?

20   A.  Absolutely.

21   Q.  Is it something that UCMC takes seriously?

22   A.  Yes.

23   Q.  And this e-mail here, Dr. Artunduaga is informing you that

24   she's been over and, you know, basically asking for help I

25   think of how to deal with it, correct?

Song - cross

1   A.   Correct.

2   Q.   Is there anything about the e-mail that concerned you?

3   A.   Yes.

4   Q.   What?

5   A.   Well, again, she's deflecting in saying that Dr. Park said

6   this was okay.

7   Q.   Okay.

8   A.   And --

9   Q.   What about anything in the second paragraph?

10   A.   You know, once again, this is a personal responsibility,

11   and she's saying this is how other departments do it.  And

12   I -- I just -- we do it differently.  This is a personal

13   responsibility of the individual resident and not, you know,

14   shirking that duty to someone else.

15   Q.   When you say "personal responsibility," you're talking

16   about watching your own hours and managing your schedule?

17   A.   That's correct.

18   Q.   Let's go back to the first page, please.  Is the e-mail in

19   the middle of the page from you to Dr. Artunduaga dated

20   February 24, 2012 your response?

21   A.   It is.

22   Q.   And you copied Dr. Park, correct?

23   A.   Correct.

24   Q.   And Dr. Artunduaga copied Dr. Park on her e-mail to you?

25   A.   Correct.

Song - cross

1    Q.  Had she?  The one below.

2    A.  Oh, the one below, no.  This was just to me.

3    Q.  Okay.  And so you responded, and it was -- and then she --

4    and then Dr. Park weighed in, correct?

5    A.  Correct.

6    Q.  All right.  And you expressed how you felt she should

7    handle it as well as your opinion of the original e-mail,

8    correct?

9    A.  Correct.

10   Q.  All right.  Do you know a physician at the hospital by the

11   name of Dr. Allison Tothy?

12   A.  I do.

13   Q.  And back then in 2012, do you know what her position or

14   title was?  You may or may not.

15   A.  I know she was a faculty member and someone in the

16   pediatric emergency room.  She may have been either one of

17   the -- one of the leads in the pediatric emergency room.

18   Q.  All right.  During March 2012 you were alerted to a

19   situation that arose with Dr. Tothy and Dr. Artunduaga by

20   Dr. Henry?

21   A.  Yes.

22   Q.  And was the first contact you had about that a telephone

23   call?

24   A.  Yes.

25   Q.  And did Dr. Henry call you?

Song - cross

1    A.  He did.

2    Q.  And do you recall that Dr. Henry was actually the

3    attending on call at the time?

4    A.  He was.

5    Q.  What do you recall being the essence of that conversation?

6           MS. HYNDMAN:  Again, Your Honor, if we could just

7    have a limiting instruction on this, please.

8           MR. JEPSON:  No objection to that.

9           THE COURT:  Ladies and gentlemen, the testimony

10   you're about to hear regarding this conversation is not being

11   offered for the truth of what the individual said to Dr. Song

12   but is instead being offered to show what actions he took or

13   his state of mind.

14   BY MR. JEPSON:

15   Q.  Do you recall the essence of that conversation?

16   A.  I do.

17   Q.  I know it was a long time ago.  Tell me what you recall.

18   A.  Well, what I remember is Ginard is -- he's an islander.

19   He calls himself a Trinity.  He's from Trinidad, so nothing

20   gets him riled up.  But this particular phone call, he was

21   very upset.

22   Q.  Okay.  And what do you recall the subject being or the

23   essence?

24   A.  The subject, and we wanted to get more details, but he had

25   told me that Dr. Tothy called and was really upset because

Song - cross

822

1    Maria, in the middle of the conversation, hung up the phone on

2    her.

3    Q.   Okay.   And did you ask Dr. Henry to do some investigation

4    into this?

5    A.   Yeah.   In typical practices there's always two sides of

6    the story.

7    Q.   Sure.

8    A.   Maybe something happened; can you get more facts.

9    Q.   I would like to draw your attention to Defendant's Exhibit

10   123.

11            MR. JEPSON:  Which has not been admitted.

12            THE COURT:  Is there any objection to its admission?

13            MS. HYNDMAN:  No objection.

14            THE COURT:  It's admitted.

15        (Defendant's Exhibit No. 123 was received in evidence.)

16   BY MR. JEPSON:

17   Q.   And obviously at the top, you're just asking this to be

18   placed in the file, but the e-mail on the bottom half of the

19   page, is that an e-mail you received from Dr. Henry regarding

20   the situation?

21   A.   It is.

22   Q.   And to your knowledge, had Dr. Henry spoken both with

23   Dr. Tothy as well as Dr. Artunduaga?

24   A.   Yes.

25   Q.   And he laid out, in essence, what Dr. Tothy said to him

Song - cross

823

1   and what Maria said to him, correct?

2   A.  Yes.

3   Q.  And at this point in time, did you sometime thereafter

4   reach out yourself to Dr. Tothy?

5   A.  I did.

6   Q.  Why?

7   A.  Again, I wanted to get all sides of the story just to

8   hear -- I mean, this just seems so incredulous to me that I

9   just wanted to make sure this was actually true.

10  Q.  Did you apologize to Dr. Tothy?

11  A.  I did.

12  Q.  Why?

13  A.  Because any resident or faculty member is a reflection of

14  me personally, and this is just not something that I stand

15  for.  We are nice and kind to everybody whether they're an

16  attending or the person that helps to mop the floors.  And

17  this is something that's a personal -- an attending of mine.

18  And so when someone in my team does something egregious like

19  this, I feel personally responsible.

20  Q.  And does this kind of thing that you described as

21  egregious, does it happen often with your residents and

22  interns?

23  A.  No.

24  Q.  Had this particular kind of thing ever happened before?

25  A.  No.

Song - cross

1   Q.  I want to direct your attention to what has been marked as

2   Defendant's Exhibit 128.

3           MR. JEPSON:  Which is not in evidence.

4           THE COURT:  Any objection to its admission?

5           MS. HYNDMAN:  No objection.

6   BY MR. JEPSON:

7   Q.  Again, this --

8           THE COURT:  It's admitted.

9           Go ahead.

10          You've got to let me rule, Mr. Jepson, if you want

11  your document in.

12          MR. JEPSON:  I'm sorry, Judge.  I'm trying.  I'm

13  getting overanxious.

14      (Defendant's Exhibit No. 128 was received in evidence.)

15  BY MR. JEPSON:

16  Q.  Middle e-mail from Dr. Tothy to you, correct?

17  A.  It is.

18  Q.  And this is an e-mail that you actually asked her to

19  write?

20  A.  Yes.

21  Q.  Why?

22  A.  Because I wanted this to be part of a file that -- because

23  you hear this story and it's so absurd that I wanted to have

24  the source actually put this in the file.

25  Q.  And I'm looking at the second sentence or actually the

Song - cross

825

1   second paragraph.  It says, This e-mail will serve as a paper

2   trail of the discussion.

3          Did you ask her to put a paper trail together?

4   A.  No.

5   Q.  Okay.

6   A.  This was just please give me something that we can have a

7   discussion of peace on.

8   Q.  All right.  And I want to direct your attention back to

9   Defendant's Exhibit 122 and in particular the second page.

10  Now, this appears to be an e-mail from Dr. Artunduaga to

11  Allison Tothy with a copy to Ginard Henry.  Am I correct on

12  that?

13  A.  Yes.

14  Q.  And Dr. Henry forwarded this to you, correct?

15  A.  Yes.

16  Q.  What was your reaction when you saw this document?

17  A.  I mean, again, it was -- this is not an apology.  This is

18  a deflection.  And a true apology shows contrition saying,

19  look, I'm sorry.  I had a bad day.  This won't happen again.

20  And, yet, this is trying to excuse her behavior, which is just

21  not excusable in my opinion.

22  Q.  Okay.  So in the month of March, Dr. Artunduaga moved from

23  her scheduled rotation for the first half of the month to

24  plastic surgery again, correct?

25  A.  Correct.

Song - cross

1   Q.   And were you involved in the decision to reschedule?

2   A.   Yes.

3   Q.   Why did you reschedule?

4   A.   Again, a final opportunity for us to see her in our

5   environment without the noise of other services to get a

6   direct look to see if there was, you know, dramatic

7   improvement and correction of what I thought were fundamental

8   and foundational deficiencies.

9   Q.   Okay.  And, again, you stayed away for that two weeks,

10  correct?

11  A.   I did.

12  Q.   At some point in time you received an e-mail or a

13  communication from Dr. Park updating you on the probation.  Am

14  I correct?

15  A.   Yes.

16  Q.   And I want to direct your attention to Joint Exhibit 96.

17  This is a long document, Dr. Song, but I'll ask you first, do

18  you recognize this as something that you received from

19  Dr. Park?

20  A.   I do.

21  Q.   And is this something that you asked her to put together?

22  A.   I did.

23  Q.   Okay.  And why did you ask her to put it together on

24  March 14th?

25  A.   Well, if I remember correctly, she was, like, nine months

Song - cross

 1  and a few days pregnant, so she was about to deliver at any

 2  moment, and I wanted her to get this in while her thoughts are

 3  fresh.  And obviously once she has the baby, she's going to be

 4  thinking about other things hopefully.

 5  Q.  This was one day before the end of the plastics rotation,

 6  correct?

 7  A.  That is correct.

 8  Q.  At this point in time, March 14, 2011, there was testimony

 9  about a meeting that you had with Jane McAtee and possibly

10  Dr. Park, correct?

11  A.  Correct.

12  Q.  And I'm not going to ask you about the meeting, but what I

13  am going to ask you is at that point, had a decision been made

14  to terminate Dr. Artunduaga?

15  A.  No.

16  Q.  And at that point, were other possible outcomes still open

17  for consideration?

18  A.  Yes.

19  Q.  Now, did you read this update from Dr. Park?

20  A.  I did.

21  Q.  And did -- it appears to contain issues of clinical

22  performance that Dr. Park either experienced or heard about in

23  March --

24          MS. HYNDMAN:  I'm going to object to the

25  characterization of the document, Your Honor.

Song - cross

1           MR. JEPSON:  Okay.

2   BY MR. JEPSON:

3   Q.  Well, I'll direct your attention.  Second page, what does

4   it say, the title?

5   A.  Could you blow that up, please?  Thank you.

6   Q.  Clinical performance, correct?

7   A.  Yes.

8   Q.  And it then says, There have been several instances in

9   which Maria has shown subpar clinical abilities.  I highlight

10  a few of these below.

11          And you read this at the time, correct?

12  A.  Yes, I did.

13  Q.  And it appears on this page and the next there are five

14  specifics outlined, correct?

15  A.  Correct.

16  Q.  Let's go to the next page, subheading B, interpersonal

17  conflicts.  And it says, Maria has several incidents -- has

18  had several incidents that illustrate a continuing problem to

19  interact constructively with other medical staff.  I discuss a

20  few of these below.  The frequency with which problems come to

21  our attention is far greater than with any of our other

22  residents.

23          Do you believe that to be true?

24  A.  Yes.

25  Q.  And then there's highlighted the Jaskowiak issue in No. 1,

Song - cross

1  correct?

2  A.  Yes.

3  Q.  And then on the second page, the Dr. Tothy issue?

4  A.  Yes.

5  Q.  And then No. 3 appears to be another issue raised with

6  Dr. Reid which I'm not going to ask you about.  Okay.  Is that

7  correct?

8  A.  That is correct.

9  Q.  All right.  And then on the next page of this document,

10  there's another heading, responsiveness to advising.  And it

11  says, we have gone to extraordinary effort to mentor Maria.

12  There are many instances in which she does not heed our

13  advice.  This has hurt her training and preparedness.  This

14  assessment comes from my own personal experiences with Maria

15  and from what she relays in our meetings.

16         Did you read that and then what followed?

17  A.  I did.

18  Q.  And, finally, the next page.  It says, Interference with

19  the evaluation process.  And it references here some of the

20  things we've talked about, Dr. Kaplan speaking with some of

21  the chiefs, correct?

22  A.  Correct.

23  Q.  And there's also a reference to Maria approaching and

24  attendings.  Have you ever heard of any internal resident

25  approaching an attending physician at UCMC and asking

Song - cross

 1    specifically --

 2            MS. HYNDMAN:  Objection, Your Honor.  Calls for

 3    hearsay.

 4            MR. JEPSON:  I'm asking --

 5    BY MR. JEPSON:

 6    Q.  Have you -- in your experience, have you known any of this

 7    to happen with your residents?

 8            MS. HYNDMAN:  Same objection.

 9            THE COURT:  Overruled.

10            You may answer yes or no.

11            And then don't elicit anything.

12            MR. JEPSON:  Yeah, I'm not going to ask anything.

13    BY THE WITNESS:

14    A.  No.

15    BY MR. JEPSON:

16    Q.  All right.  Now, I want to draw your attention to the last

17    three pages of this document beginning with the third to last.

18    Now, this appears to be a bar graph, and it says at the top,

19    averaged faculty evaluations of MA and co PGY1.

20            Do you see that?

21    A.  I do.

22    Q.  And then the red appears to be MA, which I assume means

23    Maria Artunduaga.  Am I correct?

24    A.  You are correct.

25    Q.  And DS would refer to Deana Shenaq?

Song - cross

1   A.   Yes.

2   Q.   Is this something Dr. Park attached to her letter?

3   A.   She did.

4   Q.   Let's go to the next page.  And then it says averaged

5   faculty evaluations of MA and PGY1 of the past three years.

6   And there's a key on the side again; MA, again, being

7   Dr. Artunduaga.  Am I correct?

8   A.   You are correct.

9   Q.   And then DS being Dr. Deana Shenaq?

10  A.   Yes.

11  Q.   And then EK being -- is that Essie Kueberuwa?

12  A.   Yes.

13  Q.   And then the next is DB, Dan Butz?

14  A.   Yes.

15  Q.   And then SF is Sam Fuller?

16  A.   Yes.

17  Q.   And then LA is Lee Alquerishi?

18  A.   Yes.

19  Q.   And was this something also that was attached to this

20  letter which you reviewed?

21  A.   Yes.

22  Q.   And, finally, there appears to be a numerical average of

23  the bar graphs.  Am I correct?

24  A.   You are correct.

25  Q.   All right.  So you got this on or about March 14th.  And

Song - cross

1    you also notified Dr. Artunduaga that a meeting of the

2    attendings would take place to determine whether or not her

3    contract would be renewed or something else happened on

4    March 26, 2012, correct?

5    A.   Yes.

6    Q.   And in preparation for that meeting, are you aware that

7    Dr. Park, along with your coordinator, Akilah Williams, put

8    together a package of materials for the attendings to review?

9    A.   Yes.

10   Q.   I want to direct your attention -- and before that though,

11   you had actually reached out to Dr. Artunduaga and asked her

12   to submit anything she wanted, correct?

13   A.   I did.

14   Q.   And on March 23, 2012, she did that.  Am I right?

15   A.   Yes.

16   Q.   Let me show you what's been marked as Joint Exhibit --

17   bear with me -- 99.

18        This appears -- did you receive this on or about that

19   date?

20   A.   I did.

21   Q.   And did you review it?

22   A.   I did.

23   Q.   And did it become part of the materials that the attending

24   physicians considered?

25   A.   Yes.

Song - cross

1   Q.  And let's go then now to Joint Exhibit 102.  And that's

2   the first page.  Do you remember -- do you recognize this as

3   the first page of the binder of materials that Dr. Park and

4   Akilah Williams put together for the attendings to consider at

5   their March 26th meeting?

6   A.  It was.

7   Q.  And I want to --

8          MR. JEPSON:  Michael, may we go to the next page,

9   please.

10  BY MR. JEPSON:

11  Q.  And this is a table of contents.  And do you recall the

12  document containing a couple of hundred pages of things?

13  A.  It was thick.

14  Q.  Okay.  And it says here, MA summary of probation.  Is that

15  the March 23, 2012 letter we just looked at?

16  A.  Yes.

17  Q.  And summary of probation and graph of faculty evaluations,

18  was that Dr. Park's March 14th summary we just looked at?

19  A.  I believe so, yes.

20  Q.  And then it appears that there were letters and e-mails

21  from Maria and to her regarding the probation.  Were those the

22  formal probation documents we've seen from November?

23  A.  Yes.

24  Q.  And then there were various e-mails regarding incidents,

25  performance and then the evaluations from November 2011,

Song - cross

1    January 2012, February 2012 and March 2012.  Am I correct?

2    A.  You are correct.

3    Q.  And you had indicated earlier when you were testifying

4    that you did not look at the weekly feedback evaluations,

5    correct?

6    A.  Correct.

7    Q.  But they were part of this document, correct?

8    A.  Yes.

9    Q.  And you reviewed them at that time along with the faculty?

10   A.  I did.

11   Q.  And also all of the attending evaluations we've just

12   looked at were in this package, correct?

13   A.  Correct.

14   Q.  And, finally, did Dr. Park include the minutes from her

15   weekly mentoring meetings as well?

16   A.  She did.

17   Q.  And the faculty did meet on March 26, 2012 to go over

18   these materials and decide what to do.  Am I correct?

19   A.  Yes.

20   Q.  And you attended that meeting?

21   A.  I did.

22   Q.  And there were minutes taken of that meeting.  Am I

23   correct?

24   A.  Yes.

25   Q.  And Akilah Williams took those minutes?

Song - cross

835

1   A.  Yes, she did.

2   Q.  Let me find them here.  I want to direct your attention to

3   Joint Exhibit 101.

4         Do you recognize these as the minutes from that

5   meeting?  Take a moment and look at them, please.

6   A.  Yes.

7   Q.  And it indicates that you were there, Drs. Gottlieb,

8   Zachary, Henry, Park, Reid and Lee, correct?

9   A.  Yes.

10  Q.  So all of the attendings were there, correct?

11  A.  Yes.

12  Q.  And Dr. Greives was there too, correct?

13  A.  Yes.

14  Q.  Did he vote?

15  A.  No.

16  Q.  And Akilah Williams was there as well, correct?

17  A.  Yes.

18  Q.  And it references here that you announce what the purpose

19  of the meeting was.  Am I right?

20  A.  Yes.

21  Q.  And it then describes the binder that was distributed?

22  A.  Correct.

23  Q.  Now, did the attendings review the binder at the meeting?

24  A.  They did.

25  Q.  And the next bullet point says much time was spent on the

Song - cross

1   letter issued to Maria regarding the details of her probation

2   and the conditions she had to meet for continuation in the

3   program.  These are as follows.  And those are taken from the

4   probation letter, correct?

5   A.  Yes.

6   Q.  And did the faculty discuss those conditions and whether

7   they had been met?

8   A.  Yes.

9   Q.  And at the end of that meeting, was there a poll taken as

10  to whether or not the contract should be renewed?

11  A.  Yes.

12  Q.  And did you yourself vote?

13  A.  I did not.

14  Q.  Why not?

15  A.  Again, I wanted not to influence the decision.  I wanted

16  it to be a group decision.  I wanted to have everyone feel a

17  part of this decision because this is a big decision.  And

18  that's why I recused myself from the situation.

19  Q.  Is not renewing an intern or a resident in a later year

20  something that you wanted to do?

21  A.  Absolutely not.

22  Q.  Why not?

23  A.  Because it hurts us.  You know, we don't have -- it's an

24  extra body that is not helping our service, and so other

25  people have to fill in.  Other people have to do extra work.

Song - cross

1  The attendings have to do extra work.  So, you know, it's a

2  very -- we don't have a deep bench in our section because it's

3  so small.  So even the lack of one resident can influence and

4  impact the entire section.

5  Q.  And did you take lightly the impact on the resident, or in

6  this case, resident intern who was being nonrenewed?

7  A.  I mean, this was a heavy decision.  We did not take it

8  lightly.

9  Q.  Now, the vote that was taken, was it unanimous?

10       MS. HYNDMAN:  Your Honor, I would object on the

11  grounds of hearsay.

12       MR. JEPSON:  Well, I'm looking at -- I'll then just

13  read in Joint Exhibit 101.

14       "The unanimous decision was made that Maria had not

15  satisfactorily met the conditions of her probation."

16       MS. HYNDMAN:  May we have a limiting instruction on

17  that, Your Honor?

18       MR. JEPSON:  Well, this is a joint exhibit.

19       THE COURT:  This exhibit is in evidence, so I don't

20  think that's appropriate.

21  BY MR. JEPSON:

22  Q.  It was decided not to renew Maria's contract, and that's

23  what happened, correct?

24  A.  Correct.

25  Q.  Now, a letter was prepared and presented to Dr. Artunduaga

Song - cross

1    the following day, correct?

2    A.  Yes.

3    Q.  I'll show you what's marked as Joint Exhibit 100.  And you

4    were asked questions about this, and this was the letter you

5    gave her, correct?

6    A.  Yes.

7    Q.  Okay.  Now, the letter also -- well, strike that.

8            Was Dr. Artunduaga also offered the opportunity to

9    resign instead of being nonrenewed?

10   A.  Yes.

11   Q.  Why was that?

12   A.  It also looks very bad on someone's curriculum vitae or

13   resume if you're nonrenewed as opposed to you resign on your

14   own accord.

15   Q.  And in this nonrenewal letter, there's reflection there

16   had been some improvement shown, correct?

17   A.  There was some improvement.

18   Q.  Okay.  But not enough?

19   A.  Well, the gap was so large that, you know, some

20   improvement -- once again, we were focused on improvement and

21   honing her skills.  She was focused on creating building

22   blocks of foundational knowledge and foundational actions as

23   an intern.  That gap was -- while she made some improvement,

24   that gap was so large we couldn't close that gap.

25   Q.  And was it your view at the time that whether it be six

Song - cross

839

1  years, seven years, eight years, she could not complete the

2  residency program and become a safe and competent plastic

3  surgeon?

4  A.  That's correct, yes.

5  Q.  All right.  And then in April, there was back and forth

6  with respect to clinical duties, correct?

7  A.  Yes.

8  Q.  And indeed originally you took her off of clinical,

9  correct?

10  A.  I did.

11  Q.  And why did you do that?

12  A.  Well, I initially thought, look, she's going to take this

13  really harsh.  It may impact patient care.  And I was

14  concerned about that.

15  Q.  Okay.  Dr. Artunduaga did send you a letter in response to

16  the nonrenewal letter asking you not only to reconsider the

17  nonrenewal decision and to initiate the grievance process but

18  also to reinstate her clinical, correct?

19  A.  Correct.

20  Q.  And that was Joint Exhibit 103, correct?  Take a quick

21  look.

22  A.  Yes.

23  Q.  And you decided to reinstate her to clinical care,

24  correct?

25  A.  I did.

Song - cross

1   Q.  And why did you do that?

2   A.  I mean, I felt bad.  I wanted her to finish out the year

3   and say at least she could finish the year out.  And so I

4   thought, let's think creatively to give her some clinical

5   experience with, you know, extreme supervision.

6   Q.  Okay.  And who did you reach out to to try to come up with

7   a plan there?

8   A.  Dr. Roggin.

9   Q.  Okay.  And she was then reinstated to the Kaplan endocrine

10  only for April and May, correct?

11  A.  Correct.

12  Q.  And we've seen e-mails back and forth about her

13  displeasure with that, correct?

14  A.  Correct.

15  Q.  And at some point in time, did Dr. -- towards the end of

16  that month, did Dr. Roggin communicate with you as to whether

17  or not he wanted to continue her on general surgery?

18  A.  He did.

19  Q.  And did he indicate whether he wanted to continue her or

20  not?

21  A.  He said he did not want to continue her.

22  Q.  Okay.  Let me show you what's been marked as Defendant's

23  Exhibit 146.

24          MR. JEPSON:  Which is not in evidence.

25          THE COURT:  Is there any objection to its admission?

1          MS. HYNDMAN:  I thought it was in evidence.

2          MR. JEPSON:  If it is, good.

3          THE COURT:  Defendant's 146 is not.

4          MS. HYNDMAN:  It's not?  Oh.

5          MS. HALL:  It is.

6          MS. HYNDMAN:  It was admitted yesterday.

7          MR. JEPSON:  It is in evidence.  And guess what?

8   This is not what I wanted to show Dr. Song.  What I wanted is

9   147, which is not in evidence, Your Honor.  Sorry.

10         THE COURT:  Is there any objection to the admission

11  of 147?

12         MS. HYNDMAN:  147.  Hold on one minute, please.

13         Yes, Your Honor.  It's a hearsay document, and it had

14  nothing to do with the decision that was made at the time, a

15  decision that's before the jury.

16         MR. JEPSON:  Your Honor, this is -- again, we'll

17  offer it for the impact on this listener.

18         THE COURT:  What about that, with the admonition?

19         MR. JEPSON:  It was directed to him.

20         MS. HYNDMAN:  It may have been, but I don't think

21  it's on any issue that is relevant to what the jury is

22  deciding.

23         MR. JEPSON:  Okay.  If it's --

24         THE COURT:  What's the relevance --

25         MR. JEPSON:  It's relevant to the --

Song - cross

 1            THE COURT:  Let me finish, please.

 2            MR. JEPSON:  Sorry.

 3            THE COURT:  What's the relevance of his state of mind

 4   or the impact as of April 27th?

 5            MR. JEPSON:  It's not.  It's only relevant if -- to

 6   the issues raised regarding the removal a second time from the

 7   clinical rotation.  If that's not going to be argued about, I

 8   don't have a problem with it.

 9            THE COURT:  Ms. Hyndman?  It is relevant to that

10   particular issue.

11            MS. HYNDMAN:  It is, with the limiting instruction.

12            THE COURT:  Okay.  I will admit it then.

13       (Defendant's Exhibit No. 147 was received in evidence.)

14            THE COURT:  And, ladies and gentlemen, I am admitting

15   Defendant's Exhibit 147 which you are about to see.  As I have

16   told you with other documents, this is not being offered for

17   the truth of what is contained in the document itself.  It is

18   instead being offered for its impact on Dr. Song's state of

19   mind.

20   BY MR. JEPSON:

21   Q.  All right.  Dr. Song, you received this on or about that

22   date.  Am I correct?

23   A.  Yes.

24   Q.  And in addition, you received e-mails from Dr. Artunduaga

25   complaining about her experience on the program, correct?

Song - cross

843

1   A.  Correct.

2   Q.  And, indeed, after Dr. Roggin indicated to you that he did

3   not want her on general surgery, did you then come to the

4   conclusion that rather than further clinical rotations, you

5   would have her do an independent study?

6   A.  I did.

7   Q.  And did you notify Dr. Artunduaga of that?

8   A.  I did.

9   Q.  Let me show you what I believe is a joint exhibit,

10  April 30th.  It's Joint Exhibit 109.

11          This appears to be a cover e-mail from you to

12  Dr. Artunduaga.  Am I correct?

13  A.  It is.

14  Q.  And it's a cover e-mail with respect to the letter that's

15  attached.  Am I right?

16  A.  Yes.

17  Q.  And in that letter, which is on the next page, I just want

18  to get your thoughts on this.  It says in this third

19  paragraph, you have complained that this is an inadequate

20  experience.  Are you talking about the April rotation there?

21  A.  I am.

22  Q.  And you then state is somehow discriminatory and is in

23  violation of rights you have.

24          What did you mean by that?

25  A.  Discriminatory against two different interns where

Song - cross

844

1    you're -- it's basically -- what I meant is one intern versus

2    another.

3    Q.  In other words, she was complaining about Dr. Stack's

4    experience, correct?

5    A.  That's correct.

6    Q.  And that was in the e-mails he received?

7    A.  That's right.

8    Q.  All right.  Now, you then offered her the opportunity for

9    the independent study.  Did she complete that independent

10   study?

11   A.  She did.

12   Q.  And did you give her a certification of her completion of

13   the year?

14   A.  I did.

15   Q.  And that certification which is already in evidence

16   indicates that she did complete the year, correct?

17   A.  Yes.

18   Q.  Now, you're aware, aren't you, that Dr. Artunduaga filed a

19   grievance in which she challenged the nonrenewal decision and

20   the continuation of probation, correct?

21   A.  Yes.

22   Q.  And both sides you're aware submitted a bunch of papers

23   stating their position?

24   A.  Yes.

25   Q.  And also presented at a grievance hearing, correct?

Song - cross

1  A.  Correct.

2  Q.  And that hearing resulted in the decision being upheld,

3  correct?

4  A.  Correct.

5  Q.  And later the appeal from that decision was denied by the

6  president and the dean, correct?

7  A.  That's right.

8  Q.  Now, I want to direct your attention -- well, first, I

9  don't even have to direct your attention to it.

10         You were shown some e-mails that went back and forth

11  between you and a Michael Zenn, a Juliana Hansen and a

12  Michelle Roughton in the fall of 2012.  Am I correct?

13  A.  Yes.

14  Q.  And with respect to Juliana Hansen, your e-mail to her

15  indicated that Dr. Artunduaga had been terminated from the

16  program, correct?

17  A.  Correct.

18  Q.  Why did you tell her that?

19  A.  Because it was the truth.

20  Q.  And did you feel any ethical obligation?

21  A.  Yes.  I mean, if she was applying for -- at that time I

22  didn't know what she was applying for.

23  Q.  Right.

24  A.  But, you know, this is a small group of specialty surgeons

25  that we take our job seriously.

Song - cross

846

```
 1   Q.  Okay.  And did you reach out yourself, did you make the
 2   first contact with Dr. Hansen?
 3   A.  No.
 4   Q.  She reached out to you, correct?
 5   A.  Correct.
 6   Q.  Is the same true with Dr. Zenn?
 7   A.  Correct.
 8   Q.  Do you know if you ever even spoke to Dr. Zenn?
 9   A.  I don't think I did.
10   Q.  Now, Dr. Artunduaga did submit that rebuttal to the
11   probation dated November 18, 2011, correct?
12   A.  Correct.
13   Q.  And at some point in time, you did have a short meeting
14   with her around that time, correct?
15   A.  Correct.
16   Q.  At any point in time during that meeting, did
17   Dr. Artunduaga say, This stuff is all happening because of my
18   Colombian national origin, that's why you're doing this?
19   A.  No.
20   Q.  Did she say to you, You're doing this because I raised
21   issues of Colombian national origin discrimination?
22   A.  No.
23   Q.  At any point in time during that meeting or any other
24   meeting, did you tell Dr. Artunduaga, Listen, I read something
25   in a *New York Times* article and, you know, people from
```

Song - cross

847

1  developing companies aren't always treated fair and life isn't

2  fair, or words to that effect?

3  A.  No.  No.

4  Q.  And you met -- at the meeting on September 29, 2011 which

5  was discussed, did she ever raise any issues of Colombian

6  national origin discrimination with you then?

7         MS. HYNDMAN:  Objection.  That's been asked and

8  answered, Your Honor, before the lunch break.

9         MR. JEPSON:  That was a long time ago, Judge.  I

10  wanted to make sure --

11         THE COURT:  If you're acknowledging that you did

12  then --

13         MR. JEPSON:  I'm not.  I know I asked it with respect

14  to the August meeting.  I don't know that I did it with the

15  September meeting.  I want to make sure I did.

16         THE COURT:  Okay.  You can clarify it then.

17  BY MR. JEPSON:

18  Q.  So we already talked about the August meeting where I

19  believe your answers were the same, no, there was nothing like

20  that raised, correct?

21  A.  Correct.

22  Q.  Now, with respect to the September meeting, did

23  Dr. Artunduaga raise any issues of accent discrimination, not

24  being accepted because she was from Colombia or discriminated

25  against because of her Colombian national origin?

Song - cross

848

1   A.  No.

2   Q.  And, indeed, at any point in time prior to the nonrenewal

3   decision related to her intern contract in March, did she ever

4   do that with you in any way, shape or form?

5   A.  No.

6   Q.  And did you in any way retaliate against her?

7   A.  No.

8   Q.  Apparently I misspoke and said "developing companies."

9   Were you referring -- did you ever tell her about a *New York*

10  *Times* article regarding developing countries?

11  A.  No.

12  Q.  Okay.  Like Colombia or whatnot?

13  A.  No.

14  Q.  Okay.  By the way, does your family have any personal

15  connection to Colombia?

16  A.  Yes.

17  Q.  What is that?

18  A.  My uncle was a Korean ambassador to Colombia.

19  Q.  Okay.

20          MR. JEPSON:  I don't have any further questions.

21  Thank you, Dr. Song.

22          THE COURT:  Redirect, Ms. Hyndman?

23          MS. HYNDMAN:  If we could just have a moment?

24          THE COURT:  You may.

25      (Counsel conferring.)

Song - redirect

1    MS. HYNDMAN:  Just checking on some other witnesses I

2  wanted to make sure we had.

3                       CROSS-EXAMINATION

4  BY MS. HYNDMAN:

5  Q.  Dr. Song, just a few things.

6       You talked about this meeting you had in August with

7  Dr. Artunduaga, and you said Ms. Williams was there as well?

8  A.  Yes.

9  Q.  And that was a really brief meeting, wasn't it?

10  A.  I don't know what you mean by "brief."

11  Q.  Well, those are your words.  It was a very brief meeting,

12  wasn't it?

13  A.  Yes.

14  Q.  And it was really more of an opportunity for you to get

15  her side of the story, right?

16  A.  Correct.

17  Q.  And you just wanted to sort of check in and make sure

18  there was nothing you could do to improve the process, right?

19  A.  Correct.

20  Q.  Now, we looked at some documents.  We looked at this

21  e-mail, Defendant's Exhibit No. 44, the one that related to

22  the issue with Dr. Lawler.  Do you remember that testimony?

23  A.  I do.

24       MS. HYNDMAN:  Can we look at that, please, Jamie?  Do

25  we have it?

Song - redirect

1    We need the feed from our side, please.  Thank you.

2  BY MS. HYNDMAN:

3  Q.  And that e-mail from Dr. Dickie to you is dated

4  October 24, 2011, right?

5  A.  It is.

6  Q.  And it's not copied to Dr. Artunduaga?

7  A.  It doesn't appear to be.

8  Q.  And you didn't forward it to Dr. Artunduaga, correct?

9  A.  No.

10  Q.  Now, let's look at Defendant's Exhibit No. 47.  Now,

11  Defendant's Exhibit 47, these are notes that -- of a

12  conversation that Dr. Dickie had with Dr. Artunduaga on

13  October 28th, right?

14  A.  Could you just scroll down to the bottom?  I just want to

15  look at the signatures.  Ah, yes.

16  Q.  Now, there's no mention in these notes of October 28th

17  about any issue relating to a patient with drainage, is there,

18  Dr. Song?

19  A.  No.

20  Q.  Okay.  Did you read these notes on October 28th?

21  A.  There or abouts.

22  Q.  Okay.  Now, you talked about -- we talked at length about

23  Joint Exhibit 22.

24    MS. HYNDMAN:  Is that the November 2nd letter?

25    MR. JEPSON:  Yes.

```
 1              MS. HYNDMAN:  Yes.
 2    BY MS. HYNDMAN:
 3    Q.  Joint Exhibit 22, if we could just pull that up.  And we
 4    talked about that at length, and we talked about the first
 5    paragraph and that you said in there it was unanimous amongst
 6    the numerous evaluators, et cetera.  And in response to a
 7    question that Mr. Jepson asked you, you said that that was
 8    your conclusion, correct?
 9    A.  Correct.
10    Q.  But you didn't tell Dr. Artunduaga that that was your
11    conclusion, did you?
12    A.  Didn't tell her what?
13    Q.  You didn't tell Dr. Artunduaga, this is my conclusion,
14    that you can't -- that -- you did not tell Dr. Artunduaga in
15    your meeting that it was your conclusion that the numerous
16    evaluators had -- were unanimous -- that it would be extremely
17    difficult for her to correct her issues?  You didn't use those
18    words, did you, "it is my conclusion"?
19    A.  I did not use the words "it is my conclusion."
20    Q.  Right.  And this letter does not say "it is my
21    conclusion," does it?
22    A.  No.
23    Q.  So there's no way that Dr. Artunduaga would know that that
24    was your conclusion?  Strike that.  I'll withdraw that
25    question.
```

Song - redirect

1       You've talked about people that went to medical

2  school, had foreign medical training.

3       Dr. Alquerishi, where did he go to medical school?

4  A.  Glasgow, Scotland.

5  Q.  And where did Dr. Kueberuwa go to medical school?

6  A.  London.

7  Q.  Now, at the time Dr. Artunduaga was a resident, there were

8  no other residents in your section that had medical training

9  in a developing country, correct?

10  A.  I mean, Israel.  It depends on how you view Israel.

11       MS. HYNDMAN:  Let's look at Defendant's Exhibit

12  No. 20.  This was -- and I want to look at the second page,

13  please, Jamie.

14  BY MS. HYNDMAN:

15  Q.  And on that second page, you say to Dr. Artunduaga, I

16  received this e-mail from one of our patients recently.  And I

17  know there's always two sides to the story, so let's sit down

18  and discuss this.  And then what -- there follows some typing

19  on this page.

20       Now, you can't -- this document does not show who you

21  received this e-mail from, does it?

22  A.  It does not.

23  Q.  It doesn't show you what date you received it?

24  A.  It does not.

25  Q.  It doesn't show you who might have been copied on it?

Song - redirect

853

1    A.  It does not.

2    Q.  It doesn't show you who sent it?

3    A.  Correct.

4    Q.  And it doesn't even show that you ever received it, does

5    it?

6    A.  No, it doesn't.

7    Q.  You talked about Joint Exhibit No. 6.  That was

8    Dr. Kaplan's evaluations.  And you said you were concerned

9    because he had not filled anything out on the second page of

10   that exhibit.  Do you remember that testimony?

11   A.  I do.

12           MS. HYNDMAN:  Can we pull that up?

13   BY MS. HYNDMAN:

14   Q.  Now, that's not true, is it, Dr. Song?  Dr. Kaplan filled

15   in the overall comments on that second page, didn't he?

16   A.  Yes, but I was referring to the bubbles.

17   Q.  But that's not what you said in your testimony.  And, in

18   fact, he says, She is good now, but she will make a fine

19   resident as she gains more confidence and more experience,

20   didn't he?

21   A.  He did write that.

22   Q.  Now, we talked about -- or you talked about with

23   Mr. Jepson Dr. Jaskowiak's evaluation.  That's Joint Exhibit

24   No. 7.  And you testified that you were concerned about the

25   comments that she made in the second page.

Song - redirect

854

1     MS. HYNDMAN:  So if we could look at that, please,

2  Jamie.

3  BY MS. HYNDMAN:

4  Q.  And you said that you were especially concerned about some

5  of the things that Dr. Jaskowiak raised in her comments,

6  correct?

7  A.  Correct.

8  Q.  And Dr. Jaskowiak ended her comments by saying, Steps are

9  being taken to address these issues, didn't she?

10  A.  She did.

11  Q.  You talked about this issue of a patient being sent home

12  with a PICC line.  Now, patients do get sent home with PICC

13  lines from time to time, don't they, Dr. Song?

14  A.  Sure, but they get information.

15  Q.  That's all the -- it was yes or no.

16     Let's look at Defendant's Exhibit 128.  This was the

17  e-mail that you received from Dr. Tothy on March 13th,

18  correct?

19  A.  It is.

20  Q.  And you didn't copy Dr. Artunduaga on this, did you?

21  A.  I did not.

22  Q.  And you didn't forward it to her?

23  A.  No.

24  Q.  Okay.  You said -- I think you were talking about the idea

25  that the reason you agreed to switch Dr. Artunduaga to the

Song - redirect

1    plastics rotation in October, and one of the reasons was that

2    it would be helpful for her to be in a nurturing environment.

3    That's your characterization of what the plastics section was

4    like, isn't it?

5    A.  Yes, it is.

6    Q.  Dr. Artunduaga never said to you that this was a nurturing

7    environment, did she?

8    A.  No.

9    Q.  So we talked about Dr. Park's letter to you, Joint Exhibit

10   No. 96.  That was the March 14th letter.  Did you read that at

11   the time you received it from Dr. Park?

12   A.  Could you restate that one more time?  I'm just not clear.

13   Q.  The March 14th letter from Dr. Park, Joint Exhibit --

14           MR. JEPSON:  96.

15           MS. HYNDMAN:  96.  If we could just pull that up so

16   you know what I'm talking about.

17   BY MS. HYNDMAN:

18   Q.  Did you read this when you received it from Dr. Park on

19   March 14th?

20   A.  There or abouts, yeah.

21   Q.  And Mr. Jepson was talking about Joint Exhibit 102, which

22   is the packet of documents that were provided to the attending

23   physicians.  My copy happens to be double-sided, so it doesn't

24   look as large as it otherwise would.  When did you read -- did

25   you read all the information in this packet?

Song - redirect

1   A.  I did.

2   Q.  When did you read it?

3   A.  At the time of the meeting.

4   Q.  You testified that you gave Dr. Artunduaga the opportunity

5   to resign rather than have her contract not renewed.  When did

6   you give her that opportunity?

7   A.  I believe right after I handed the letter to her.

8   Q.  But it doesn't say anything about that in the letter,

9   right?

10  A.  No.

11  Q.  Okay.  Now, you said that one of the reasons that you were

12  concerned about Dr. Artunduaga and one of the reasons you

13  decided to put her on probation was because you were concerned

14  about these patient safety issues, right?

15  A.  Yes.  Yes.

16  Q.  Now, after you put Dr. Artunduaga on probation, you didn't

17  talk to any program director of any other rotation that she

18  was going to be rotating on, correct?

19  A.  I didn't -- I wanted to stay out of that whole situation.

20  Q.  So you didn't have a conversation with any of them prior

21  to the time she came to the rotation, right?

22  A.  To other program directors?

23  Q.  Right.

24  A.  Could you clarify?  Because what do you mean by "program

25  directors"?  Kevin Roggin was the only other program director.

Song - redirect

1    Q.  I'm sorry.  The -- I'm sorry.  I didn't mean program

2    directors.  You didn't talk to any of the attendings on any of

3    the rotations prior to the time that Maria was going to

4    rotate?  So, for example, when she was going to go vascular,

5    prior to the time she went, you didn't have a conversation

6    with any of those attendings about her?

7    A.  No.

8    Q.  Okay.  Now, do you agree, Dr. Song, that it would be

9    important for those attendings to know that you had concerns

10   about patient safety that you claimed to have with

11   Dr. Artunduaga?

12   A.  Sure.

13   Q.  But you didn't tell them about that, right?

14   A.  Well, she was also being closely supervised.

15   Q.  That wasn't the question.  The question was you didn't

16   tell them about it, did you?

17   A.  No.

18   Q.  Now, Dr. Song, you would agree, wouldn't you, that when

19   someone gets put on probation, let alone has their contract

20   not renewed, it severely scars their record for further

21   employment elsewhere?

22   A.  I would agree.

23              MS. HYNDMAN:  I have nothing further.

24              THE COURT:  Recross?

25              MR. JEPSON:  Just a couple of things.

Song - recross

858

                         RECROSS-EXAMINATION

1

2   BY MR. JEPSON:

3   Q.  Dr. Song, you were asked a couple of questions about the

4   patient that was accidentally sent home with a PICC line.

5   And, in particular, Ms. Hyndman indicated that the patients go

6   home all the time with PICC lines, correct?

7   A.  She did ask that.

8   Q.  Okay.  Now, what was the difference between those who go

9   home who are not accidentally sent home with a PICC line and

10  this situation with Dr. Artunduaga?

11  A.  Well, a tremendous amount of difference.  Because those

12  that are sent home with a PICC line are given extensive

13  training about how to clean it, what to look for, how to take

14  care of it.  If you don't know about that, this could be

15  potentially fatal.

16  Q.  Okay.  And I want to direct your attention to Defendant's

17  Exhibit 44, please.  And there was mention made that there was

18  no mention of this situation in the areas for improvement that

19  Dr. Dickie gave to Dr. Artunduaga on October 28th.  Do you

20  remember those questions?

21  A.  I do.

22  Q.  I want to direct your attention to the second paragraph of

23  this e-mail.  It says, doesn't it, I called and spoke to Maria

24  about her interpretation of what Mary wanted.

25          Again, she stated that -- anyway, they had discussed

1    it, correct?

2    A.  Yes.

3    Q.  Now, I want to direct your attention -- you were asked

4    some questions about Defendant's Exhibit 21 as well.  Now, did

5    you purposely take out the patient's e-mail and contact

6    information here?

7    A.  No.

8    Q.  Okay.  Do you know why it's not in there?

9    A.  I don't know why.

10   Q.  Okay.  And there wouldn't have been any question as to who

11   the patient was, correct?

12   A.  I mean, this is -- I know the patient's name.  For HIPAA

13   reasons, I don't want to say it, but I know exactly who this

14   is.

15   Q.  No, of course you're not going to say it.  You know who

16   the patient was.  Everybody knew who the patient was, correct?

17   A.  That's correct.

18   Q.  And, finally, were minutes taken of the March 27th meeting

19   in which you gave Dr. Artunduaga the nonrenewal letter?  If

20   you recall, was Akilah there?

21   A.  Akilah was there.  She would have taken notes.

22   Q.  Okay.  I want to direct your attention --

23          MR. JEPSON:  Again, I don't want this published to

24   the jury because it's not an exhibit, but to Defendant's

25   Exhibit 132.

Song - recross

```
 1              MS. HYNDMAN:  One moment, please, Judge.  Okay.
 2   BY MR. JEPSON:
 3   Q.  There are a number of bullet points here in this document,
 4   correct?
 5   A.  Correct.
 6   Q.  And is there a bullet -- I want to direct your attention
 7   to bullet point third from the bottom.
 8              MS. HYNDMAN:  Your Honor, it's not been admitted into
 9   evidence.
10              THE COURT:  It has not been admitted.
11              MR. JEPSON:  I'll move its admission.
12              THE COURT:  Any objection?
13              MS. HYNDMAN:  Yes.  I object on the grounds of
14   hearsay.
15   BY MR. JEPSON:
16   Q.  Does this refresh your recollection as to whether
17   Dr. Artunduaga -- I mean, I know you testified, but does this
18   confirm your recollection that Dr. Artunduaga was offered the
19   opportunity to resign at this meeting?
20   A.  Yes.
21              MS. HYNDMAN:  Your Honor --
22              MR. JEPSON:  Nothing further.
23              MS. HYNDMAN:  He didn't not recollect it.  That's
24   improper.  He did not testify on cross -- or on my examination
25   that he didn't recall.
```

Shao - direct

861

```
1            THE COURT:  What's your response to that?

2            MR. JEPSON:  I don't have a response.

3            THE COURT:  Okay.

4            MR. JEPSON:  She's correct.

5            MS. HYNDMAN:  I'm going to move to strike it.

6            THE COURT:  I'll strike it.  The jury should

7    disregard it.

8            MR. JEPSON:  Yes, that's fine.

9            No further questions.

10           THE COURT:  Thank you, Doctor.  You may step down,

11   sir.

12           Please call your next witness.

13           MS. FRANKLIN:  Your Honor, we call Dr. Michael Shao.

14           Could I have the switch to this?

15           THE COURT:  Please come forward, Doctor.  Please

16   raise your right hand.

17       (Witness sworn.)

18         MICHAEL SHAO, PLAINTIFF'S WITNESS, DULY SWORN,

19                      DIRECT EXAMINATION

20   BY MS. FRANKLIN:

21   Q.  Good afternoon, Dr. Shao.  Could you please state your

22   full name for the record.

23   A.  Michael Shao.

24   Q.  And, Dr. Shao, were you a fellow at University of Chicago

25   Medical Center in January 2012?
```

Shao - direct

1   A.   Yes.

2   Q.   And what section or specialty were you a fellow in?

3   A.   Vascular surgery.

4   Q.   Where are you employed now?

5   A.   Swedish Covenant Hospital.

6   Q.   What's your position there?

7   A.   I'm a vascular surgeon there.

8   Q.   How long have you been with Swedish Covenant?

9   A.   Coming on five years.

10  Q.   Do you recall working with Dr. Maria Artunduaga at UCMC

11  when you were a fellow there?

12  A.   Yes.

13  Q.   Do you recall that was January 2011?

14  A.   I don't recall the exact date.

15  Q.   I'm sorry.  I misspoke, Dr. Shao.  January 2012?

16  A.   If that's what the record is.  I don't recall the exact

17  dates, but...

18  Q.   You do recall working with her when she was an intern and

19  you were a fellow, correct?

20  A.   Yes.

21  Q.   All right.  And was that on the vascular service?

22  A.   Yes.

23  Q.   And you had already completed your residency at that point

24  since you were a fellow, correct?

25  A.   Yes, correct.

Shao - direct

1   Q.   Now, when you worked with Dr. Artunduaga on that section,

2   were you aware she was on probation?

3   A.   Yes.

4   Q.   Do you remember how you found out?

5   A.   I believe she had mentioned it to me.  I don't recall

6   specifically.

7        MS. FRANKLIN:  I would like to -- I would like to put

8   up Plaintiff's Exhibit 33 which has not yet been admitted into

9   evidence.

10       THE COURT:  Is there any objection to the admission

11  of Plaintiff's 33?

12       MS. HALL:  No objection, Your Honor.

13       THE COURT:  It's admitted.

14   (Plaintiff's Exhibit No. 33 was received in evidence.)

15  BY MS. FRANKLIN:

16  Q.   Dr. Shao, please take a look at your screen.  Do you see

17  the e-mail there from Dr. -- I'm sorry -- from Akilah Williams

18  to Irma Fleming and you?

19  A.   Yes.

20  Q.   Do you recall getting this e-mail?

21  A.   I don't remember it specifically, but I'm sure I got it

22  and read it.

23  Q.   All right.  Let's just take a quick look at that main

24  paragraph, the first paragraph.  It says, "As you may or may

25  not know, Dr. Maria Artunduaga is currently on probation in

Shao - direct

864

 1     our section."

 2             Do you see that?

 3     A.  Yes.

 4     Q.  So you -- do you recall getting -- I'm sorry.

 5             You did get this e-mail from Akilah Williams then on,

 6     it says, January 4th telling you that Dr. Artunduaga was on

 7     probation, correct?

 8     A.  Yes, correct.

 9     Q.  Okay.  Now, while Dr. Artunduaga was on the rotation with

10     you, Dr. Shao, you filled out a series of evaluations,

11     correct?

12     A.  Correct.

13     Q.  All right.  I would like to take a look at the evaluation

14     that's Joint Exhibit 42.  I'll show you that.

15             Is this your evaluation of Dr. Artunduaga for the

16     week of January 1st to January 6, 2012?

17     A.  Yes.

18     Q.  All right.  I would like to just point out a few things on

19     the document that we will try to pinpoint there, a little bit

20     larger.

21             Now, this was the first week you worked with

22     Dr. Artunduaga on the section, correct?

23     A.  Yes, correct.

24             THE COURT:  Doctor, could you scoot a little bit

25     closer to the microphone, please, sir, so we can hear you?

Shao - direct

1          THE WITNESS:  Sure.

2          THE COURT:  Thank you.

3    BY MS. FRANKLIN:

4    Q.  Now, for question No. 1, do you see that, Dr. Shao?

5    A.  Yes.

6    Q.  It says, "Can Dr. Artunduaga demonstrate the ability to

7    correctly prioritize her work?"  And you said "yes," right?

8    A.  Yes.

9    Q.  And can you read the comment that you wrote below there?

10   A.  "Dr. Artunduaga was able to effectively prioritize her

11   work.  This past week she was pulled in multiple directions on

12   a busy service and was able to correctly address the urgent

13   tasks first."

14   Q.  And then on No. 2, you said "yes" to the question whether

15   Dr. Artunduaga was efficient in completing her work, correct?

16   A.  Correct.

17   Q.  And you said she completed her work in a timely manner; is

18   that right?

19   A.  Yes.

20   Q.  Okay.  Let's scroll down a little.

21          For questions 3 and 4, you rated Dr. Artunduaga

22   "superior," correct?

23   A.  Yes.

24   Q.  Could you tell us what comment you made for question 4,

25   which was regarding notifying senior or attendings regarding

Shao - direct

866

 1  the change of patient status or continuing decline?

 2  A.  "During long OR cases, she would periodically come to the

 3  OR to update myself and the senior resident on the status of

 4  patients, which was quite helpful."

 5  Q.  Did you find, was Dr. Artunduaga slow to recognize when

 6  patients were unstable?

 7  A.  Not that I recall.

 8  Q.  And then if you look at No. 5, you rated Dr. Artunduaga

 9  "very good" with respect to gathering and relaying patient

10  history and exam, correct?

11  A.  Yes.

12  Q.  And what was your comment there?

13  A.  "This was her first week on the vascular surgery service,

14  a new service for her.  Her history and exam skills are

15  comparable to her peers."

16  Q.  Thank you.

17       I'm now going to just put up page 2 of your

18  evaluation.  And if you would look up at the top on No. 6, you

19  rated her "very good" with ordering appropriate diagnostic

20  studies and ancillary services, correct?

21  A.  Yes.

22  Q.  And can you read the comment that you made there?

23  A.  "She asks appropriate questions to clarify the correct

24  study to order which is appreciated.  She will become more

25  familiar with the nuances of various vascular imaging studies

Shao - direct

867

1    as she gains more experience on the service."

2    Q.  And then with respect to communicating effectively, which

3    is No. 7, you rated her "exemplary," correct?

4    A.  Yes.

5    Q.  No. 8 is regarding patient safety.  Do you see that

6    question?

7    A.  Yes.

8    Q.  And you said you did not have concerns for patient safety,

9    correct?

10   A.  Correct.

11   Q.  And then if you could look down at No. 9, you rated

12   Dr. Artunduaga "very good" in that category, correct?

13   A.  Yes.

14   Q.  And No. 10, "superior" in that category, correct?

15   A.  Correct.

16   Q.  And could you read the additional comments you made below

17   the No. 10 question?

18   A.  "She performed effectively this first week in

19   accomplishing all of the tasks asked of her in a timely

20   fashion."

21   Q.  And then below, there's an overall comments.  Let me make

22   that a little bit larger for you.

23   A.  "Did a fine job as a new intern on the service.

24   Hardworking, always has an upbeat attitude and energy."

25   Q.  And this was your first week with Dr. Artunduaga, correct?

Shao - direct

1    A.   Correct.

2    Q.   Did you think she lacked the fundamental building blocks

3    for being a good resident at this point?

4    A.   No.

5    Q.   Now, let's take a look at the second week.  This is Joint

6    Exhibit 51.

7            Dr. Shao, do you recognize this as your evaluation

8    for week two of Dr. Artunduaga?

9    A.   Yes.

10   Q.   This is from January 7th to the 13th, correct?

11   A.   Correct.

12   Q.   Okay.  I dont want to ask you to read every single thing

13   on this one, but I would like you to just take a quick look at

14   No. 2 where it says, "Was she efficient in completing her

15   work," and you said "yes," correct?

16   A.   Yes.

17   Q.   Okay.  And then below that, there was a "superior," a

18   "very good" and a "superior."  Do you see those?

19   A.   Yes.

20   Q.   And then the final one on the page is also "superior,"

21   correct?

22   A.   Yes.

23   Q.   Okay.  And then we're going to take a look at page 2 of

24   that same evaluation.  Do you see up at the top, No. 8, you

25   had no concerns for patient safety, correct?

Shao - direct

869

1   A.   Correct.

2   Q.   And then listening skills, No. 9, was "superior," correct?

3   A.   Yes.

4   Q.   And then working with others is No. 10, and you rated her

5   "very good," correct?

6   A.   Correct.

7   Q.   And could you read your overall comments from this week's

8   evaluation?

9   A.   "Did fine this week as far as carrying out what needed to

10  be done on the patients.  Again remains highly energetic with

11  a positive attitude.  Needs to familiarize herself with issues

12  in discharge planning, such as insurance approval, and be more

13  proactive in getting arrangements made for discharge needs

14  such as insurance approval, antibiotic plans, setting up

15  rehab, et cetera."

16  Q.   In your experience, how do residents -- how would

17  residents go about becoming better at discharge planning?

18           MS. HALL:  Objection.  Foundation.

19           THE COURT:  Sustained.  Lay a foundation that he can

20  testify to that.

21           MS. FRANKLIN:  Your Honor, I'm going to withdraw the

22  question.

23           THE COURT:  Okay.

24  BY MS. FRANKLIN:

25  Q.   All right.  Let's take a look at the third week

Shao - direct

1    evaluation, and that is Joint Exhibit 54.

2         Is this your week 3 evaluation of Dr. Artunduaga,

3    Dr. Shao?

4    A.  Yes.

5    Q.  And this is from January 14th to the 20th, correct?

6    A.  Correct.

7    Q.  All right.  And, again, with question 1 regarding the

8    ability to correctly prioritize work, you said "yes"?

9    A.  Yes.

10   Q.  And can you read us the comment that you made there?

11   A.  "Dr. Artunduaga continues to function well in clinic and

12   on the floors on a busy clinical service.  She continues to

13   have high energy and always has a positive attitude without

14   complaints."

15   Q.  So did you mean there that Dr. Artunduaga didn't complain?

16   A.  Yes.

17   Q.  And then for No. 2, you said "yes" to whether she was

18   efficient in completing her work, correct?

19   A.  Correct.

20   Q.  Could you read your comment underneath that one?

21   A.  "Dr. Artunduaga is receptive to advice and has a healthy

22   attitude of continued self-improvement."

23   Q.  And that was your observation from working with her these

24   three weeks, correct?

25   A.  Yes.

Shao - direct

1   Q.  All right.  If you could look at No. 3, you said "very

2   good" in terms of seeing consults and placing notes, correct?

3   A.  Yes.

4   Q.  Could you read your comment there?

5   A.  "With regard to seeing consults, Dr. Artunduaga performs

6   adequately and at the level of her peers as far as gathering

7   and presenting pertinent patient information.  With time and

8   more experience, she should continue to make progress as far

9   as synthesizing her own clinical impression and formulating an

10  independent treatment plan."

11  Q.  So you were suggesting an area of improvement there,

12  right?

13  A.  Yes.

14  Q.  Okay.  And for No. 4, you ranked her "superior," and

15  No. 5, "very good," right?

16  A.  Yes.

17  Q.  All right.  And I'm just going to show you page 2 here of

18  that same evaluation.  Can you read the comment at the top

19  which went with No. 5 on the prior page?

20  A.  "She functions at the expected level for her level of

21  training, PGY1, and is comparable to her peers as far as

22  performing a history and physical and relaying the relevant

23  data."

24  Q.  And for No. 6 regarding following directions and ordering

25  diagnostic studies and ancillary services, you said

Shao - direct

1  "superior," correct?

2  A.  Yes.

3  Q.  And what was your comment?

4  A.  "She is detail oriented and reliable."

5  Q.  And then for No. 7 --

6  A.  "She has" --

7  Q.  I'm sorry.  I paused there.

8       For No. 7, you said "superior," right?

9  A.  Yes.

10 Q.  And can you read your comment there?

11 A.  "She has a caring demeanor with patients and families."

12 Q.  Was that something you observed personally?

13 A.  Yes.

14 Q.  And then for No. 8, you didn't see any -- have any

15 concerns for patient safety that week, right?

16 A.  No.

17 Q.  Okay.  For No. 9, listening skills, you rated

18 Dr. Artunduaga "superior," correct?

19 A.  Yes.

20 Q.  And for No. 10 as well, right, working effectively with

21 others, "superior" as well, correct?

22 A.  Yes.

23 Q.  Can you read the comment under that section?

24 A.  "Dr. Artunduaga functions well in a healthcare team.  She

25 always finishes her tasks and is a team player."

Shao - direct

873

1    Q.  And if you could just read your overall comments.

2    A.  "Dr. Artunduaga's strongest attributes are her work ethic,

3    desire for continual self-improvement and willingness to be

4    receptive to advice or criticism.  With these attributes, she

5    will continue to mature as a clinician and should develop as

6    expected into a fine physician."

7    Q.  And you believed that at the time you wrote it, correct?

8    A.  Yes.

9    Q.  You observed the strong -- Dr. Artunduaga having a strong

10   work ethic personally?

11   A.  Yes.

12   Q.  And did you observe what you considered to be a desire for

13   self-improvement?

14   A.  Yes.

15   Q.  Did you observe what you thought was a willingness to be

16   receptive to advice or criticism?

17   A.  Yes.

18   Q.  All right.  Let's take a look at the fourth week

19   evaluation, which is JX 58.

20           Dr. Shao, is this your week 4 evaluation for

21   Dr. Artunduaga?

22   A.  Yes.

23   Q.  And this is dated January 21st to the 27th, 2012, correct?

24   A.  Correct.

25   Q.  And then for No. 1, you rated -- you said "yes" to the

Shao - direct

874

1  question about prioritizing, correct?

2  A.  Correct.

3  Q.  Can you read your comment?

4  A.  "Dr. Artunduaga performs adequately in prioritizing her

5  tasks on a busy clinical service."

6  Q.  And tell me why you called the vascular service a busy

7  clinical service.

8  A.  Generally vascular problems can be acute and need to be

9  dealt with quickly.  And sometimes you have to make decisions

10  quickly about when to escalate it to a senior resident.

11  Q.  What kind of concerns are presented on the vascular

12  service?

13  A.  For example, things like a blood clot in a leg, where

14  blood flow is compromised in the leg or ruptured aneurysm,

15  emergencies like that.

16  Q.  Okay.  And Dr. Shao, for No. 3, back to the third week

17  evaluation -- I'm sorry -- the fourth week evaluation, you

18  said "very good" with respect to seeing consults and placing

19  notes, correct?

20  A.  Correct.

21  Q.  And could you read your comment there?

22  A.  "Dr. Artunduaga was able to see consults and place notes

23  in a timely manner despite competing demands on her time from

24  clinic and from inpatient work duties."

25  Q.  What did you mean by "competing demands" there?

Shao - direct

875

1    A.  Often residents are asked to care for the patient

2    perioperatively as far as their inpatient stay as well as

3    staff outpatient clinic time, seeing outpatients and also

4    seeing inpatient consults as well.  So it's multiple --

5    there's multiple responsibilities.

6    Q.  And for No. 4, you ranked Dr. Artunduaga "superior,"

7    correct?

8    A.  Yes.

9    Q.  This is regarding change of patient status or continuing

10   decline.  Can you read your comment there?

11   A.  "Dr. Artunduaga did an excellent job of keeping seniors

12   and attendings informed of patients' clinical status

13   throughout the day, coming into the OR at regular intervals to

14   keep us updated."

15   Q.  All right.  And then No. 5, you rated her "very good" with

16   patient history and exam, correct?

17   A.  Correct.

18   Q.  Can you read that comment, please?

19   A.  "Dr. Artunduaga has continued to improve and make progress

20   in her history, exam and presentation skills.  She performs

21   comparably to the level of her peers and should continue to

22   make progress -- should continue to progress in maturity as

23   she gains more..."

24   Q.  All right.  And I'll give you the next page here.  All

25   right.  Go ahead.

Shao - direct

1  A.  "...clinical experience.  As is a common theme with many

2  interns, she should continue to focus on transitioning from

3  gathering clinical data to synthesizing the data into a

4  clinical impression of what is going on and then formulating

5  an appropriate diagnostic and treatment plan."

6  Q.  So you were suggesting another area of improvement there,

7  correct?

8  A.  Correct.

9  Q.  For No. 6, you rated Dr. Artunduaga "superior" for

10  diagnostic, ordering studies and ancillary services.  Could

11  you read your comment there?

12  A.  "She asks appropriate questions to clarify any ambiguities

13  and in ordering the appropriate studies or ancillary

14  services."

15  Q.  For No. 7, you ranked her "superior" with respect to

16  interacting with patients.  Could you read your comment?

17  A.  "Very caring and empathetic with patients."

18  Q.  Is that what you believed when you wrote it at the time?

19  A.  Yes.

20  Q.  And did you observe Dr. Artunduaga being caring and

21  empathetic with patients?

22  A.  Yes.

23  Q.  Did you ever observe her being rude to patients?

24  A.  No.

25  Q.  Or dismissive of their concerns?

Shao - direct

1   A.  No.

2   Q.  All right.  Let's look at No. 8.  Here again, you did not

3   have concerns for patient safety in week 4 of the vascular

4   rotation, correct?

5   A.  Correct.

6   Q.  For No. 9, you rated Dr. Artunduaga "very good" for

7   listening skills.  Can you read your comment there?

8   A.  "Dr. Artunduaga is energetic, enthusiastic, receptive to

9   criticism and always willing to pursue self-improvement.  She

10  has made substantial strides in presenting patients and

11  clinical data.  As with most interns, she could use some

12  coaching as to how to concisely and clearly communicate the

13  relevant data when staffing a consult.  She does perform at a

14  comparable level to her peers with regard to communication.

15  She does possess the insight to understand the art and nuance

16  of verbal and nonverbal communication.  Sometimes she merely

17  needs to gather herself to slow down her speech and thought

18  process and she would do fine, as she does a good job of

19  gathering the relevant clinical data."

20  Q.  So in your observations, did you find Dr. Artunduaga to be

21  receptive to criticism?

22  A.  Yes.

23  Q.  And you noted she had made substantial strides there,

24  correct?

25  A.  Yes.

Shao - direct

1    Q.  You saw her improve over the course of the four weeks?

2    A.  Yes.

3    Q.  And at the end of that comment, you suggest that she needs

4    to gather herself to slow down, correct?

5    A.  Yes.

6    Q.  That was an area of improvement that you thought she might

7    look at, correct?

8    A.  Yes.

9    Q.  Let's look at No. 10.  Almost done here.

10            No. 10, you ranked her "very good" with working

11   effectively with others.  Could you read your comment?

12   A.  "Dr. Artunduaga is able to function effectively in a team

13   environment and works well with others.  She does well in

14   fulfilling her role of carrying out the floor work.  As an

15   intern on a service with a PGY3 and senior fellow, she does

16   well in fulfilling her role of carrying out the floor work.

17   By nature on our service, interns are not given the

18   responsibility of running or managing the service.  She is,

19   however, able to contribute appropriate and good suggestions

20   on rounds and always displays a strong willingness" --

21   "willingness to help and to learn."

22   Q.  And then if you could read your overall comments, please.

23   A.  "Overall we were pleased with Dr. Artunduaga's performance

24   on our busy service as far as her work ethic, positive

25   attitude and willingness to learn and to pursue continual

Shao - direct

1    self-improvement.  These traits should serve her well in her

2    professional development and maturation.  Her struggles early

3    in internship can likely be attributed to needing some time to

4    adjust to an unfamiliar clinical environment.  She continues

5    to make progress in all facets of her job and has the insight

6    to understand the areas she should focus on improving.  She

7    has the raw tools to mature into an excellent clinician.  With

8    time, experience and mentorship from senior residents or

9    attendings, she should develop into a fine resident and

10   surgeon."

11   Q.  So you made reference to struggles early in

12   Dr. Artunduaga's internship, correct?

13   A.  Yes.

14   Q.  And did you think that that had to do with her adjustment

15   to the clinical environment as you said here?

16          MS. HALL:  Objection.  Foundation.

17          THE COURT:  Sustained on foundation.

18          Rephrase it.

19          MS. FRANKLIN:  Sure.

20   BY MS. FRANKLIN:

21   Q.  Dr. Shao, you also said here that you thought it had to do

22   with the time to adjust to an unfamiliar clinical environment.

23   You see that?

24   A.  Yes.

25   Q.  Is that what you thought at the time that you wrote it?

Shao - direct

1   A.  Yes.

2   Q.  What did you mean by that?

3   A.  I think I knew she came from a foreign country, and maybe

4   the day-to-day workings of the hospital were, you know,

5   slightly different in our hospital.  And maybe she wasn't used

6   to the systems here.

7   Q.  Did you see an improvement over the four weeks you worked

8   with her?

9   A.  Yes.

10  Q.  And then in the last sentence you say that with time,

11  experience and mentorship from senior residents or attendings,

12  she should develop into a fine resident and surgeon.

13          What did you have in mind when you wrote that?

14  A.  I mean, I thought she just needed some guidance and, you

15  know, she needed some work, but I think she needed some

16  guidance and supervision.

17  Q.  Did you provide -- did you try to provide Dr. Artunduaga

18  with guidance and supervision?

19  A.  I think we all do as senior residents and fellows.  We try

20  to teach the junior residents as best we can.  I mean, there's

21  a challenge because there's only so much time in a day.

22  Q.  And did you find her to be receptive to your efforts to

23  teach?

24  A.  Yes.

25  Q.  Did Dr. David Song ever ask your opinion about

Shao - direct

1  Dr. Artunduaga's performance?

2  A.  Not that I recall.

3  Q.  Okay.  Did you ever talk to anybody in -- did you ever

4  talk to Dr. Song about your evaluations, the ones that we just

5  looked at?

6  A.  No.

7  Q.  Okay.  So we've looked at all four weeks' evaluations, and

8  all four, I just want to confirm this, that you didn't have

9  any concerns with patient safety during any of those weeks,

10 did you, Dr. Shao?

11 A.  No.

12 Q.  Did you ever see Dr. Artunduaga doing anything that you

13 feared would endanger a patient?

14 A.  No.

15 Q.  Did you ever work with Dr. Artunduaga in the operating

16 room, in the OR?

17 A.  I don't recall specifically.

18 Q.  Did you -- do you remember if you observed -- if you had

19 any thoughts or observations on her skills there?

20        MS. HALL:  Objection.  Foundation.

21        THE COURT:  Sustained.

22        MS. FRANKLIN:  I'm sorry.  I'll just -- that's fine.

23 We'll move on.

24        THE COURT:  Do you have a lot longer on direct?

25        MS. FRANKLIN:  I don't, Your Honor.

Shao - direct

882

```
 1        THE COURT:  Okay.  Just trying to time our break.

 2   BY MS. FRANKLIN:

 3   Q.  Do you know a doctor named Dr. Heather Hall?

 4   A.  Yes.

 5   Q.  And what was her position at UCMC?

 6   A.  She was the vascular surgery fellow who was one year ahead

 7   of me.

 8   Q.  And was she working on that service in July -- on January

 9   2012 if you remember?

10   A.  I don't -- I don't recall if she was exactly.  I mean, we

11   could go back in the records and see.

12   Q.  Okay.  Let me show you -- let's see -- Joint Exhibit 45.

13   Do you see Joint Exhibit 45 is an evaluation by Dr. Hall of

14   Dr. Artunduaga?

15   A.  Yes.

16   Q.  And that's January 1, 2012 to January 31, 2012, correct?

17   A.  Correct.

18   Q.  Does that refresh your memory?

19   A.  Yes.  So she must have been working with her at the time.

20   Q.  Do you remember if you ever talked to Dr. Hall about

21   Dr. Artunduaga's performance?

22   A.  I don't remember talking to her.

23   Q.  Okay.  Now, are you aware that Dr. Artunduaga did not

24   continue in the residency?

25   A.  Yes.
```

Shao - direct

883

```
 1   Q.  And are you aware that she filed a grievance?
 2   A.  Yes.
 3   Q.  Did she ask you to testify in her grievance hearing?
 4   A.  Yes.
 5   Q.  And were you happy to do -- you were happy to do so,
 6   weren't you?
 7   A.  Yes.
 8   Q.  But you didn't end up testifying?
 9   A.  No.
10   Q.  Why not?
11   A.  I was travelling for a work interview, so I think there
12   was a conflict as far as the time.
13   Q.  Do you remember trying to get in touch with someone so
14   that you could call in to testify?
15   A.  I think I tried to make an effort to be available by
16   phone, but I think the timing didn't work out.
17   Q.  Okay.
18            MS. FRANKLIN:  Let me show what's already been
19   admitted as, let's see -- it hasn't.  Defendant's Exhibit 91.
20   So it has not yet been admitted.
21            THE COURT:  Is there any objection to the admission
22   of your 91?
23            MS. HALL:  No.
24            THE COURT:  I will admit.
25       (Defendant's Exhibit No. 91 was received in evidence.)
```

Shao - direct

884

1    BY MS. FRANKLIN:

2    Q.   All right.  Dr. Shao, do you see at the top of the page

3    where it says conversation between MAA iPhone, and you see a

4    phone number there?

5    A.   Yes.

6    Q.   And Mike Shao with another phone number?

7    A.   Yes.

8    Q.   Is that your current -- or was that at the time your phone

9    number?

10   A.   Yes.

11   Q.   And are these -- do these appear to be text messages

12   between you and Dr. Artunduaga?

13   A.   Yes.

14   Q.   Okay.  I'm going to go to the last page of this exhibit,

15   and I'm going to direct your attention to the middle of the

16   screen.  Do you see at the right-hand side it says, "Perfect,

17   good luck" -- I'm sorry.  Let's start at the left-hand side:

18   "Not sure.  About to start my last interview.  Will text when

19   I am done."

20           Do you see that?

21   A.   Yes.

22   Q.   Was that your text to Dr. Artunduaga?

23   A.   Yes.

24   Q.   That was at 3:48 p.m., right?

25   A.   Yes.

Shao - direct

885

1    Q.  And then below that it says, "Perfect.  Good luck."  And
2    that one was also 3:48 p.m.
3            Do you see that?
4    A.  Yes.
5    Q.  Was that Dr. Artunduaga responding to you?
6    A.  Yes.
7    Q.  And then below that another message saying, "They won't
8    wait.  Don't worry.  Good luck."
9            Do you see that?
10   A.  Yes.
11   Q.  That was Dr. Artunduaga telling you they wouldn't wait,
12   they won't wait, right?
13   A.  Yes.
14   Q.  And then below that at 4:45, did you respond, "I am free
15   now to talk on the phone"?
16   A.  Yes.
17   Q.  But you ultimately did not -- you weren't able to testify,
18   right?
19   A.  Correct.
20   Q.  Okay.  Dr. Shao, did you ever -- you were a resident at
21   University of Chicago Medical Center, weren't you?
22   A.  Yes.
23   Q.  Do you recall ever rotating in thoracic with Dr. Ferguson,
24   Dr. Mark Ferguson?
25   A.  Yes.

886

1    Q.  Do you remember if Dr. Ferguson ever expressed an opinion

2    about whether you had what it took to become a surgeon?

3              MS. HALL:  Objection.  Relevance.

4              MS. FRANKLIN:  It's not being offered -- the purpose

5    is to talk about Dr. Ferguson's credibility as a reviewer.

6    And that was allowed in the Court's ruling on plaintiff's

7    motion *in limine 1.*

8              MS. HALL:  I'm also concerned about one of the

9    motions, Your Honor.

10             THE COURT:  Yes.  I'm going to sustain the objection.

11   It's a collateral matter through this witness.  That's not

12   what was addressed in the ruling.

13             MS. FRANKLIN:  All right, Your Honor.  Thank you.

14             Nothing else.

15             THE WITNESS:  Thank you.

16             THE COURT:  Let's take our afternoon break.

17             We'll pick up at 3:40 with cross-examination.

18             THE CLERK:  All rise.

19        (Jury exits.)

20             THE COURT:  Counsel, can we have a brief sidebar,

21   please.

22        (Sealed proceedings held at sidebar, pages 887 to 888.)

23

24

25

Shao - cross by Hall

889

1      (Recess.)

2            THE COURT:  Bring in the jury, please.

3      (Jury in.)

4            THE COURT:  You may be seated.

5            Cross-examination.

6                         CROSS-EXAMINATION

7   BY MS. HALL:

8   Q.  Hi, Dr. Shao.

9   A.  Hi.

10  Q.  Your statements and knowledge of Dr. Artunduaga's

11  performance is limited to the one month in which you worked

12  with her on the service, correct?

13  A.  Correct.

14  Q.  You have no firsthand knowledge of how she did on any

15  service before yours, correct?

16  A.  Correct.

17  Q.  Or how she did on any service after yours?

18  A.  Correct.

19  Q.  I'd like to show you again what was marked as Joint

20  Exhibit No. 58.

21            MS. HALL:  If we can pull it up, Michael?  And if you

22  can just expand upon the date at the beginning so to refresh

23  Dr. Shao.

24  BY MS. HALL:

25  Q.  So this is your evaluation covering the period of January

Shao - cross by Hall

1   21st through 27th, 2012, correct?

2   A.  Correct.

3           MS. HALL:  And, Michael, I'd like to go to the

4   Overall Comments.

5   BY MS. HALL:

6   Q.  And in the last sentence that starts on this page, you

7   stated:  "Her struggles early in internship can likely be

8   attributed to needing some" -- and if you can go to the next

9   page, please -- "time to adjust to an unfamiliar clinical

10  environment."

11          Do you see that?

12  A.  Yes.

13  Q.  Anything you knew about Dr. Artunduaga's struggles early

14  on in her internship were based upon what she told you,

15  correct?

16  A.  Yes.

17  Q.  You had no personal knowledge of what those struggles

18  might have been, right?

19  A.  Correct.

20  Q.  And you have no personal knowledge of what the causes of

21  those struggles might have been, correct?

22  A.  Correct.

23  Q.  And when you stated here that she might have needed "time

24  to adjust to an unfamiliar clinical environment," you were

25  speculating, correct?

Case: 1:12-cv-08733 Document #: 295 Filed: 06/20/17 Page 233 of 270 PageID #:8366
Shao - redirect by Franklin
891

1   A.  Yes.

2   Q.  And you did not know as of this time that she had actually

3   participated as a subintern at University of Washington before

4   she came to UCMC, correct?

5   A.  Correct.

6   Q.  And you did not have any knowledge of her clinical

7   experience in detail before she came to UCMC when you wrote

8   this evaluation, right?

9   A.  Right.

10          MS. HALL:  No further questions.

11          THE COURT:  Redirect?

12                      REDIRECT EXAMINATION

13  BY MS. FRANKLIN:

14  Q.  Dr. Shao, you knew that Dr. Artunduaga was on probation at

15  the time you wrote your third-week evaluation, didn't you?

16  A.  Yes.

17          MS. FRANKLIN:  That's all I have.

18          THE COURT:  Any recross?

19          MS. HALL:  No.

20          THE COURT:  Thank you, Doctor.  You may step down,

21  sir.

22    (Witness excused.)

23          THE COURT:  Please call your next witness.

24          MS. FRANKLIN:  We call Dr. Domalu Olaitan.

25    (Witness enters.)

Olaitan - direct by Franklin

892

1           THE COURT:  Please come forward, sir.  Will you raise

2    your right hand, Doctor.

3      (Witness duly sworn.)

4           THE COURT:  You may be seated, sir.

5           THE WITNESS:  Thank you.

6             DOMALU OLAITAN, PLAINTIFF'S WITNESS, SWORN

7                         DIRECT EXAMINATION

8    BY MS. FRANKLIN:

9    Q.  Good afternoon, Dr. Olaitan.  Could you please state your

10   full name.

11   A.  Domalu Olaitan.

12          THE COURT:  And, Doctor, can you scoot up just a

13   little bit closer to the microphone, please.  Thank you.

14          THE WITNESS:  Thank you.

15   BY MS. FRANKLIN:

16   Q.  Dr. Olaitan, were you a fellow at University of Chicago

17   Medical Center in February 2012?

18   A.  Yes, I was.

19   Q.  And what was the specialty or section that you were a

20   fellow in?

21   A.  Transplant Surgery.

22   Q.  Okay.  Where are you employed now?

23   A.  Rush University Medical Center.

24   Q.  How long have you been with Rush?

25   A.  Since 2012.  So that will be four years.

Olaitan - direct by Franklin

1    Q.   And what's your position there?

2    A.   I'm a transplant surgeon there, assistant professor.

3    Q.   Do you recall working with Dr. Maria Artunduaga at

4    University of Chicago Medical Center in February 2012?

5    A.   I recall her rotating through the Transplant service, yes.

6    Q.   Okay.

7    A.   While I was there.

8    Q.   While you were a fellow, correct?

9    A.   That's correct.

10   Q.   And as a fellow, you'd already completed your entire

11   residency; is that right?

12   A.   That's correct.

13   Q.   When you worked with Dr. Artunduaga, were you aware she

14   was on probation?

15   A.   I was.

16   Q.   And how did you find that out?

17   A.   I'm not exactly sure, but I must have heard it from one --

18   either one of the other residents or a nurse practitioner.

19   But I knew before, at the beginning she was on probation.

20   Q.   You knew before the rotation began?

21   A.   Sorry?

22   Q.   You knew before the rotation began?

23   A.   That's correct.

24          MS. FRANKLIN:   Okay.  I'm going to pull up

25   Plaintiff's Exhibit 36, which has not yet been admitted.

Olaitan - direct by Franklin

894

```
 1          THE COURT:  And, Doctor, I'm going to ask you to

 2   scoot back just a tiny bit from the microphone so you're not

 3   right on top of it.  The court reporter is having a hard time

 4   because you're so close.  Thank you.

 5          THE WITNESS:  Sure.

 6          MS. FRANKLIN:  Plaintiff's Exhibit 36 has not yet

 7   been admitted.

 8   BY MS. FRANKLIN:

 9   Q.  Dr. Olaitan, can you see it?

10          THE COURT:  Any objection to its --

11          MS. HALL:  No.

12          THE COURT:  -- admission?  Okay.  I will admit --

13   BY THE WITNESS:

14   A.  Yes, I can.

15          THE COURT:  -- Plaintiff's Exhibit 36.

16     (Plaintiff's Exhibit 36 received in evidence.)

17          MS. FRANKLIN:  Can we publish it, please?  Thank you.

18   BY MS. FRANKLIN:

19   Q.  Dr. Olaitan, do you see that this is an e-mail?

20   A.  Uh-huh, yes.

21   Q.  Is it from Akilah Williams to various people, including

22   yourself?

23   A.  Yes.  I see my e-mail address on it, so I must have seen

24   it then.

25   Q.  All right.  And the date is February 7th, 2012, correct?
```

Olaitan - direct by Franklin

895

1   A.  That's correct.

2   Q.  And the e-mail itself states that:  "I am Akilah Williams,

3   residency coordinator in Plastic Surgery.  As you may or may

4   not know, Dr. Maria Artunduaga is currently on probation in

5   our section."

6           Do you see that?

7   A.  Yes, I do.

8   Q.  So you were informed on February 7th via this e-mail that

9   Dr. Artunduaga was on probation, right?

10  A.  Uh-huh.

11  Q.  Okay.  Now, during the time that you worked with Dr.

12  Artunduaga, do you remember filling out weekly evaluations?

13  A.  Yes, I do remember.

14          MS. FRANKLIN:  Joint Exhibit 61.

15  BY MS. FRANKLIN:

16  Q.  Dr. Olaitan, can you take a look at the document on the

17  screen?

18          Is this your evaluation for the week -- for Dr. Maria

19  Artunduaga for the week of February 1st to February 8th, 2012?

20  A.  Yes.

21  Q.  Okay.  I'm going to make it a little larger for you.

22          Now, if you look at question No. 1, "Did Dr.

23  Artunduaga demonstrate the ability to correctly prioritize her

24  work," do you see that?

25  A.  Yes.

Olaitan - direct by Franklin

896

1    Q.  And you said "Yes," correct?

2    A.  That's correct.

3    Q.  Can you read the comment that you made under that

4    question?

5    A.  "I think for an intern, she's very good and committed to

6    patient care."

7    Q.  Did you observe Dr. Artunduaga during that week that

8    you -- that this evaluation covers interacting with patients?

9    A.  Yes, I did observe her.

10   Q.  I'm sorry?

11   A.  I did observe her.

12   Q.  She --

13   A.  She was on rotation on Transplant service at that period.

14   Q.  What kind of activities go on in the Transplant service?

15   A.  It's usually a busy service.  The program at the U. of C.

16   covered kidney, liver, and pancreas transplant.

17          The residents work with the nurse practitioner on the

18   floor to manage the patient.  They -- when patient comes in

19   for transplants, they see the patient either in the ER or on

20   the floor to do the initial history and examination, but

21   that's under the guidance of the fellow, in most cases, and,

22   of course, the attending on service.  And then they round with

23   the team on a daily basis and then they get instructions on

24   what to do for the day in terms of patient care.

25   Q.  Did you say that you thought it was a busy service?

Olaitan - direct by Franklin

897

1   A.  Transplants usually is a busy service.  For me as a

2   fellow, it was busy.  And at times, it's difficult to

3   completely appreciate what those on the floor do, but at most,

4   I think this is true, I think.

5   Q.  All right.  If you look again at the document at No. 2,

6   you said -- for No. 2, you said "Yes."  The question is:  "Was

7   Dr. Artunduanga efficient in completing her work?"

8          Do you see that?

9   A.  That's correct.

10  Q.  Can you read your comment there?

11  A.  "She's very hardworking in the past 1 week.  Able to

12  appropriately prioritize her work well.  I must also say she

13  is very enthusiastic about her work."

14  Q.  Did you personally observe Dr. Artunduaga prioritizing her

15  work well that week?

16  A.  I thought she did.  There might have been times when she

17  went over hours.  My impression about that was probably

18  because she was on probation and she -- she worked at it, I

19  thought.

20         And in terms of patient care, she prioritized her

21  work, but that might be different from completing work within

22  the working time frame.  And I know there were some issues

23  about them.  But prioritizing her work for patient care, I

24  think she did what she was supposed to do.

25  Q.  If you look at No. 3, you marked -- actually, we'll just

Olaitan - direct by Franklin

898

1    look at 3, 4, 5, and 6.  You marked "very good," "superior,"

2    "could improve," and "exemplary" for those various questions,

3    correct?

4    A.  That's correct.

5    Q.  All right.  I'm going to show you the second page of this

6    week 1 evaluation.

7          All right.  And then for No. 8, you said -- the

8    question is:  "At any time did you have concerns for patient

9    safety?"  You said "No," correct?

10   A.  That's correct.

11   Q.  So for that full -- first week that you worked with Dr.

12   Artunduaga, you didn't have any concerns for patient safety?

13   A.  No, I did not.

14   Q.  And then No. 9, you said "good."  And 10, you said

15   "superior."  Correct?

16   A.  That's correct.

17   Q.  For No. 10, which is "working effectively with others,"

18   can you read the comment that you have there?

19   A.  "She has integrated really well with the team, very

20   enthusiastic and takes direction from senior members and

21   listens and makes appropriate changes to criticism."

22   Q.  What did you mean by when you said she "makes appropriate

23   changes to criticism"?

24   A.  This has been a while.  I can just say what I think from

25   the way I assess her.  Probably at the beginning, I felt there

Olaitan - direct by Franklin

899

1   was work she needed to do.

2          The way I see interns that I work with, the way I saw

3   them then, the way I still see them, is they need to be

4   guided.  So if I find things that I feel need to be corrected,

5   I talk to her.

6          So for me to have written that made me think I felt

7   she needed to improve on, she worked on it, things that have

8   to do with patient care, in most cases.  Or even preparing for

9   cases, reading about patients on the floor, to know them.  So

10  that's why I must have written that.

11  Q.  Did you see -- did you consider it part of your job to

12  teach interns?

13  A.  Yes, I do.

14  Q.  And did you find -- did you try to teach Dr. Artunduaga?

15  A.  I did.  Since she was my intern, yes, I must have.

16  Q.  Did you find her receptive to your teaching?

17  A.  Yes.

18  Q.  And if you could read the Overall Comments in the box at

19  the bottom of this first-week evaluation, please.

20  A.  "There is room for improvement, but with her attitude,

21  hard work and enthusiasm, she is very good and has improved a

22  lot over the past one week.  Overall, I personally think she

23  is very safe and good, compared to the other interns that have

24  rotated through the service, she is well above average."

25  Q.  You believed that at the time you wrote it, correct?

Olaitan - direct by Franklin

900

1   A.  Yes, I did.  I would say that with a caveat.  Some of the

2   very generals, we do assess people, especially younger,

3   younger trainees.  The way I was trained myself is that the

4   more general you are, you need to be guided.  So that's the

5   way I must have seen it.  As long as someone is receptive to

6   change and seek guidance in patient care, I think they can be

7   trained, and that's the way I saw her.

8   Q.  So you said as long as someone's receptive, you think they

9   can be trained, correct?

10  A.  Overall.  That's in patient care.  It's different from the

11  technical ability in the operating room, which I never

12  assessed at any point.

13  Q.  Okay.  And you -- at the time that you wrote this

14  first-week evaluation, you noted there were areas that -- of

15  room for improvement, correct?

16  A.  Correct.

17          MS. FRANKLIN:  Okay.  Joint Exhibit 71.

18  BY MS. FRANKLIN:

19  Q.  Dr. Olaitan, is this your second-week evaluation of Dr.

20  Artunduaga for February 9th to the 15th?

21  A.  Yes.

22  Q.  Okay.  And then with respect to question 1 about

23  "correctly prioritizing," you said "Yes," correct?

24  A.  That's correct.

25  Q.  And could you read your comment?

Olaitan - direct by Franklin

1   A.  "She was extremely efficient."

2          That's for question No. 2, is that right?

3   Q.  Sorry, Doctor.  Question No. 1.

4   A.  Uh-huh.

5   Q.  Where it says:  "She is excellent at prioritizing her

6   work."

7   A.  "She is excellent at prioritizing her work.  We rounded

8   together last week and had a patient that bled post-op.  She

9   arranged most of the imaging and orders for resuscitation on

10  the patient and was still able to document notes on all the

11  other patients in a timely manner."

12  Q.  Do you remember -- do you happen to remember this

13  particular issue with the patient?

14  A.  I do not.

15  Q.  Okay.  And at the time you wrote this, you -- this is what

16  you believed, correct?

17  A.  That's correct.

18  Q.  No. 2, you've already read.  "She was extremely

19  efficient," is that right?

20  A.  That's right.

21  Q.  And then for No. 3 -- you marked Dr. Artunduaga

22  "exemplary" for 3 and 4, correct?

23  A.  That's correct.

24  Q.  Could you read your comment for No. 3, which is:  "Sees

25  consults and efficiently places notes."

Olaitan - direct by Franklin

1   A.  "Extremely hardworking.  Last week was very busy on the

2   Transplant service, despite that; everything was well

3   organized by her and all the duties assigned to her were

4   completed in a timely" -- "in a very good time frame.  She

5   pays attention to details and follows things up very well.  I

6   think she is an extremely good clinician for her level."

7   Q.  And for No. 4, you ranked Dr. Artunduaga "exemplary" for

8   "notifying senior or attendings regarding change of patient

9   status."

10          Do you see that?

11  A.  Yes, I do.

12  Q.  Could you read your comment there?

13  A.  "She is excellent at communicating with the other members

14  of the team.  She knows when there is a status change in a

15  patient and passes on the information as appropriate."

16  Q.  And did you -- you believed that at the time you wrote it,

17  correct?

18  A.  Yes, I do.

19  Q.  Did you think Dr. Artunduaga was slow to recognize when

20  patients were unstable?

21  A.  I think for her level -- like I said, most interns, the

22  way I see them, as long as they are receptive to training and

23  they communicate with you, I thought she was okay.

24  Q.  Did --

25  A.  So she --

Olaitan - direct by Franklin

1   Q.  Go ahead.  Sorry, Doctor.

2   A.  So she was able to identify changes.

3        Transplants is a peculiar specialty because we manage

4   our patients very closely.  As people, we communicate very

5   well, we are always available.  So small changes in our

6   patients are communicated to us very frequently.  And so I

7   think she must have communicated very well with me there.

8   Q.  On Transplants, it's important to communicate -- for an

9   intern to communicate with a senior very quickly, correct?

10  A.  That's correct.

11  Q.  Okay.  And you found Dr. Artunduaga to be "exemplary" in

12  that regard at the time you wrote this, right?

13  A.  That's right.

14  Q.  Let's just look at page -- well, we're going to look at

15  page 2 of this same evaluation.

16        And at the top, No. 6, you ranked Dr. Artunduaga

17  "exemplary" regarding "following directions."  Do you see

18  that?  "And ordering diagnostic studies and services."

19        Do you see that?

20  A.  Yes, I do.

21  Q.  Could you read your comment?

22  A.  "She's the best of all the residents I've worked with in

23  the past year at following direction and following up on

24  results & consults."

25  Q.  And you -- that's what you believed at the time you wrote

Olaitan - direct by Franklin

904

1   this, right?

2   A.  Yes.  But we have to put it in context.  She was good.

3   I'm very generous with interns.  If -- I think she was at par

4   with every other resident in that -- in the general

5   assessment.

6          There are residents that are very good, there are

7   residents that are average, and I think overall, she will

8   be -- she was an okay resident, she was a good resident.  But

9   it could vary from service to service, and it could vary from

10  one resident to the other resident.

11  Q.  What are your expectations for an intern, for the ability

12  of an intern on your service?

13  A.  Internship is very early in medical training.  And as long

14  as they communicate and are receptive to criticism, I think

15  they're okay, and they follow direction.  Those are my

16  expectations at that point.

17  Q.  If you could look at No. 7.  This is with respect to

18  "interacting with patients."  You ranked her "superior."

19  Could you read your comment?

20  A.  "She is very good with patients and caring."

21  Q.  And then No. 8, you had no concern for patient safety

22  during this second week in February, correct?

23  A.  I did not.

24  Q.  With regard to No. 9, listening skills, you ranked Dr.

25  Artunduaga "very good."  And then for No. 10, "working

Olaitan - direct by Franklin

1   effectively with others," "exemplary," correct?

2   A.  That's correct.

3   Q.  Can you read your comment under No. 10?

4   A.  "She is an excellent team worker with consideration and

5   respect for other members of the team."

6   Q.  And if you wouldn't mind reading your Overall Comments.

7   I'll make it larger.

8   A.  "On the Transplant service, I've worked with her more than

9   anyone else and I think she is exceptional, way above average,

10  very enthusiastic and has improved tremendously over the past

11  two weeks.  I have no concerns whatsoever about her clinical

12  competence.  She pays attention to details, has high integrity

13  and extremely enthusiastic and hardworking.  Arguably one of

14  the best interns I've worked with on the Transplant service."

15  Q.  So did you -- so you say here she's improved over the past

16  two weeks, correct?

17  A.  That's correct.

18  Q.  And you saw those improvements this week that we're

19  looking at, over week 1, correct?

20  A.  That's correct.

21          MS. FRANKLIN:  Joint Exhibit 75.

22  BY MS. FRANKLIN:

23  Q.  Is this your week 3 evaluation of Dr. Artunduaga for

24  February 16th to February 22nd, Doctor?

25  A.  That's correct.

Olaitan - direct by Franklin

906

1  Q.  Okay.  With question No. 1 -- this is the question about

2  "prioritizing" -- you say "Yes."  And could you read your

3  comment there?

4  A.  "I rounded with her this weekend and she was able to

5  complete her notes in a timely and efficient manner and got

6  all the other jobs done as and when appropriate."

7  Q.  What do you mean by "complete her notes in a timely and

8  efficient manner"?  What does that entail?

9  A.  That entails rounding with the team when the -- usually,

10 the fellow and the residents round in the morning, then the

11 attending comes in to round, and then they complete their

12 notes for the fellow to look at after they round and then they

13 are routed to the attending at the end of the day.

14 Q.  Okay.

15 A.  And then we give instructions on what to do.  If a patient

16 needs x-rays or imaging, or needs to go to intervention or

17 radiology, they work with the nurse practitioner to get those

18 done.

19 Q.  And for those types of activities, you rated Dr.

20 Artunduaga that -- you said she was able to do those things,

21 to correctly prioritize, correct?

22 A.  That's correct.

23 Q.  And No. 2, you say "Yes," she was efficient in completing

24 her work, correct?

25 A.  That's correct.

Olaitan - direct by Franklin

907

1   Q.  And then you refer to the note above for an explanation?

2   You say:  "Please see above," right?

3   A.  Uh-huh.

4   Q.  Okay.  For Nos. 3 -- for No. 3, this is the question about

5   "seeing consults and efficiently placing notes."  You say

6   "exemplary."  And can you read your comment, please?

7   A.  "The patients that came in for transplant were admitted by

8   her and she did extremely well at working them up for surgery,

9   communicating with me/attending about their preop requirements

10  and also placing their H&P.  These were all done efficiently."

11  Q.  And then No. 4, "notifying seniors about changes of

12  status," you said "exemplary," correct?

13  A.  I had no concerns about that.

14  Q.  Okay.  And if you could just read your comment, please.

15  A.  "She is very good at communicating changes in patient

16  status and follows-up results of labs and other tests and

17  passes the information on efficiently."

18  Q.  Thank you.  We'll look at the second page.

19          All right.  I'm not going to -- Doctor, I'm not going

20  to make you read every single comment, but I'd like you to

21  look at question 6, "follows directions in ordering

22  appropriate diagnostic studies."

23          Do you see that?

24  A.  Yes, I do.

25  Q.  You said "exemplary."  Could you read your comment there?

Olaitan - direct by Franklin

908

1   A.  "She is excellent at ordering appropriate tests and

2   generally about following instructions.  She is particularly

3   good at also following-up on the results of those tests."

4   Q.  Okay.  Thank you.  And that's what you observed at the

5   time you wrote this evaluation?

6   A.  That's right.

7   Q.  No. 8, you again -- this is the third week.  You had no

8   concerns with patient safety, correct?

9   A.  That's correct.

10  Q.  Could you read your comment there?

11  A.  "I was not concerned for patient safety with her at all as

12  she communicated pretty much every concern she had with the

13  patients and also carried out the required instructions

14  appropriately."

15  Q.  And then if you would look at question 10.  This is

16  "working efficient" -- "effectively with others as a member or

17  leader of a health care team."  You rated "exemplary."

18          Could you read your comment there?

19  A.  "I was very impressed with her last week, she managed the

20  floor pretty much all by herself all last week under

21  supervision of our nurse practitioner" -- sorry, "last week

22  under" -- "as our nurse practitioner was away all week and the

23  third-year resident and myself were in the OR most of the

24  days.  It was also a busy week that we had many patients on

25  the floor and very sick ones in the ICU.  I am very impressed

Olaitan - direct by Franklin

1   by her hardwork and enthusiasm.  She is also very good at

2   interacting with ancillary services as she coordinated a lot

3   of tests for transplant recipients prior to discharge, like

4   arranging tunneled lines in IR and home thymoglobulin towards

5   end of last week with no hitches, and this was a week when our

6   nurse practitioner was away."

7   Q.  So you mentioned the nurse practitioner was away the week

8   you were talking about, correct?

9   A.  That's correct.

10  Q.  And on the first line, you discuss how Dr. Artunduaga

11  managed the floor.  Do you see that?

12  A.  That's correct.

13  Q.  What does it entail to manage the floor?

14  A.  The floor for an intern, as you can see, is essentially

15  carrying out instructions, identifying -- following

16  instructions on what to do.  If carrying information about

17  concerns about patients, if the vitals are not the way they

18  should be, the nurses will communicate with you and then you

19  pass it on to the most senior person for direction as on what

20  to do.

21  Q.  And what would be the impact of having the nurse

22  practitioner be out?

23  A.  One of two things.  It will probably be busier.  And then

24  the second one, because the nurse practitioner that we had was

25  very good and she -- most of them would have relied on her for

Olaitan - direct by Franklin

 1   immediate guidance on the floor.

 2          When the nurse practitioner is not available, then

 3   they will have to communicate with someone more senior, either

 4   the third-year resident -- I think we had either a third- or

 5   fourth-year resident that was the chief on the service then,

 6   or the fellow.

 7   Q.  So during the time period that you're talking about in

 8   this comment, you felt that Dr. Artunduaga managed the floor

 9   pretty much all by herself and did a good job?

10   A.  Yes.

11   Q.  And then if you could read the Overall Comments which

12   start just at the bottom.

13   A.  "Overall, I believe she is definitely safe, extremely

14   hardworking, probably the most hard working resident we've had

15   on," Transplants most likely.

16   Q.  All right.  I'll go to the next page.

17   A.  "The Transplant service recently.  She needs to keep

18   working on her presentation and interpretation of results.

19   Compared to other interns I've worked with, I believe

20   all-in-all, she is very good."

21   Q.  So here, you're suggesting an area of improvement, right?

22   A.  That's correct.

23   Q.  Okay.  And then let's look at Joint Exhibit 79.

24          Is this the third -- I'm sorry, the fourth-week

25   evaluation for February, from the 23rd to the 29th?

Olaitan - direct by Franklin

911

1   A.  Yes, it is.

2   Q.  Okay.  Just want to note that -- just ask you whether --

3   you see that you evaluated Dr. Artunduaga "exemplary" three

4   times, "good" once, and "superior" once on this page, correct?

5   A.  That's correct.

6   Q.  I'll go to page 2.  And at the top, again, for the fourth

7   week, you were asked, "Do you have concerns for patient

8   safety?"  You say "No," correct?

9   A.  That's correct.

10  Q.  So for the entire month of February you worked with Dr.

11  Artunduaga, you didn't have any patient safety concerns?

12  A.  I did not.  It's very difficult on Transplant to have

13  patient safety concern with someone.  The patients are very

14  sick, and the intern would have to be very non-receptive to --

15  for me to have concern.

16  Q.  And Dr. Artunduaga was not very non-receptive, right?

17  A.  No.

18  Q.  No. 9 -- Nos. 9 and 10 are both "exemplary."  Do you see

19  that?

20  A.  Yes.

21  Q.  And then if you could just read your last Overall Comment

22  for that fourth week.

23  A.  "Dr. Artunduaga performed extremely well while on the

24  Transplant service.  She essentially managed the floor by

25  herself with no problems during the week when our nurse

Olaitan - direct by Franklin

1   practitioner was on vacation, and the third-year resident and

2   myself were mostly in the OR."

3           I thought I read this a minute ago.

4   Q.  Yes.  I'm sorry, Doctor.  You don't have to read that in

5   again.  It was the same --

6   A.  Okay.

7   Q.  -- text as before.  Thank you.

8           Did Dr. David Song ever talk to you about Dr.

9   Artunduaga's performance?

10  A.  No, not that I recollect.  Not that I recollect.

11  Q.  Okay.  Do you remember Dr. Song ever asking you your

12  opinion of how she performed on your service?

13  A.  Not that I recollect, no.

14  Q.  Okay.  Are you aware that Dr. Artunduaga didn't continue

15  in the residency, in her residency?

16  A.  Yes.

17  Q.  Are you aware she filed a grievance?

18  A.  Yes.

19  Q.  Are you aware she had a grievance hearing?

20  A.  Yes.

21  Q.  Did she ask you to testify on her behalf at the grievance

22  hearing?

23  A.  She did.

24  Q.  And did you do so?

25  A.  I did not.

Olaitan - cross by Hall

913

1    Q.  Why not?

2    A.  For personal reasons.  I didn't think it was right for me

3    to.

4    Q.  And what did you mean by -- what do you mean by that,

5    Doctor?

6    A.  That's the hospital where I work.  I just didn't think it

7    was right.  I felt -- I had my impression of her assessment,

8    and I -- I was a fellow at that point.  I wouldn't want to --

9    I tend to mind my business in most cases, so I didn't want a

10   situation where I will be going to antagonize people.  I felt

11   I did my job at that point to work with her, train her.  And I

12   knew she was in -- she was in difficulty, but I -- I didn't

13   want to get myself involved in everything else outside that.

14   That's why.

15            MS. FRANKLIN:  Okay.  That's all I have.

16            THE COURT:  Cross-examination.

17                         CROSS-EXAMINATION

18   BY MS. HALL:

19   Q.  Good afternoon, Doctor.

20   A.  Good afternoon.

21   Q.  Doctor, you're originally from Nigeria, correct?

22   A.  That's correct.

23   Q.  And you went to medical school there?

24   A.  That's right.

25   Q.  And did you complete a residency?

Olaitan - cross by Hall

914

 1   A.   In Dublin, in Ireland.

 2   Q.   In Ireland?

 3   A.   Uh-huh.

 4   Q.   And then you came for your fellowship to UCMC, correct?

 5   A.   That's correct.

 6   Q.   And you completed your fellowship in Transplant at UCMC?

 7   A.   That's right.

 8   Q.   And you testified that you worked with Dr. Artunduaga on

 9   the Transplant service in February of 2012, correct?

10   A.   Yes.

11   Q.   Was Dr. Yolanda Becker an attending on the service at that

12   time?

13   A.   She was.

14   Q.   And was Dr. Becker supportive of you?

15   A.   Yes.

16   Q.   You consider her to be your mentor?

17   A.   That's right.

18   Q.   Dr. Becker spoke with you about her assessment of Dr.

19   Artunduaga's performance, correct?

20   A.   I don't recollect exact conversation about her.  Most --

21   reading the message I had there, most of the conversation

22   would have been on the paper assessment that I did.  I don't

23   recollect they all sitting down to discuss her performance.

24   Q.   Okay.  Your personal knowledge of how Dr. Artunduaga

25   performed at UCMC is based on that one month that you worked

Olaitan - cross by Hall

915

1    with her on the service, correct?

2    A.  That's right.

3    Q.  And you don't know how she performed before she worked

4    with you or after, correct?

5    A.  That's right.

6    Q.  You mentioned that Dr. Artunduaga was over hours, right?

7    A.  She was, yes.

8    Q.  While she was on your service?

9    A.  I know -- I know there were concerns about it, and I know

10   there were times that she was over hours.

11   Q.  And your expectation would be that as an intern, if she

12   had a concern about being over hours that she would make sure

13   that she didn't actually go over them, right?

14   A.  That's right.

15   Q.  And that's the direction you would have given her if it

16   had been brought to your attention?

17   A.  That's correct.

18   Q.  You testified about completing a number of evaluations for

19   Dr. Artunduaga, correct?

20   A.  That's correct.

21   Q.  And you said that with Dr. Artunduaga, as with all interns

22   that you work with, you are generous with your remarks,

23   correct?

24   A.  That's right.

25   Q.  Particularly if they're receptive to feedback?

Olaitan - cross by Hall

916

1    A.  That's correct.

2    Q.  When you completed these evaluations, you knew that Dr.

3    Artunduaga was on probation, correct?

4    A.  I did.

5    Q.  And you were sympathetic to that fact, right?

6    A.  I was, yes.

7    Q.  And your knowledge of the fact that she was on probation

8    might have influenced the way in which you rated her, correct?

9            MS. FRANKLIN:  Objection, Your Honor.

10           THE COURT:  What's the objection?

11           MS. FRANKLIN:  I'm going to withdraw it.

12           THE COURT:  Okay.  You may answer, if you can --

13           MS. FRANKLIN:  Sorry.

14           THE COURT:  -- Doctor.

15   BY THE WITNESS:

16   A.  Yes, I was.

17   BY MS. HALL:

18   Q.  And so your sympathy did influence the way in which you

19   evaluated Dr. Artunduaga?

20   A.  Yes and no in that I'm generally generous with my

21   assessment of people.

22   Q.  Okay.  You also testified about being asked to speak at

23   Dr. Artunduaga's grievance hearing, correct?

24   A.  Yes.

25   Q.  And no one at UCMC told you that you should not

Olaitan - redirect by Franklin

917

1   participate in the grievance hearing, correct?

2   A.  Nobody did.

3   Q.  And no one at UCMC told you that if you did participate,

4   there would be some type of repercussions --

5   A.  No.

6   Q.  -- correct?

7   A.  No.

8           MS. HALL:  Thank you, Doctor.

9           THE WITNESS:  Thank you.

10          THE COURT:  Redirect?

11                  REDIRECT EXAMINATION

12  BY MS. FRANKLIN:

13  Q.  Dr. Olaitan, Ms. Hall asked you about the over hours

14  issue.

15  A.  Uh-huh.

16  Q.  Do you know whether Dr. Artunduaga was ever over hours for

17  the entire month of February?

18  A.  So the -- the number of hours she would have been over

19  hours would not -- I'm not involved in that because Transplant

20  was outside the general.  We didn't have -- as a fellow, we

21  were not under restriction in terms of hours.

22  Q.  So you didn't have any personal knowledge of whether she

23  was over hours in February, right?

24  A.  I knew it was discussed.  I knew it was mentioned.  But I

25  wasn't in charge of her hours in any way.

1          MS. FRANKLIN:  Okay.  Thank you.  That's all I have.

2          THE COURT:  Recross?

3          MS. HALL:  No.

4          THE COURT:  Thank you, Doctor.  You may step down,

5     sir.

6          THE WITNESS:  Thank you.

7       (Witness excused.)

8          THE COURT:  Please call your next witness.

9          MS. FRANKLIN:  Your Honor, we're going to call

10    Dr. Jonathan Lusardi by video -- by video.

11         THE COURT:  Okay.

12         MS. FRANKLIN:  I just need one moment to set up.

13    Actually, I can do it from here.

14      (Said video deposition played in open court.)

15         THE COURT:  Please call your next witness.

16         MS. FRANKLIN:  Your Honor, we call Dr. Jennifer

17    Velander by video deposition.

18         THE COURT:  Okay.

19      (Said video deposition played in open court.)

20         THE COURT:  How much time is left?

21         MS. FRANKLIN:  Six minutes and 45 seconds.

22         THE COURT:  Okay.  Let's stop.  I don't want to keep

23    the jury past 5:00.

24         So we will stop for the day.  We'll finish the last

25    six minutes tomorrow morning and then pick up with another

1    live witness.

2         Just a couple things, ladies and gentlemen.

3    Reminder, please don't discuss the case, don't communicate

4    with anybody about the case, don't put anything on social

5    media about the case.

6         We will pick up tomorrow morning at 9:15.  I believe

7    we are going to go into next week.  You will not have court on

8    Tuesday.  I have judicial commitments that were scheduled a

9    while ago that I cannot avoid.  So you are free to go about

10   whatever your daily business would be on Tuesday.  We will not

11   have court on Tuesday.

12        I will try to give you a better sense tomorrow at the

13   end of the day when we see what witnesses we've got and how

14   far past Monday, if at all, it will go next week.

15        So have a great night.  I'll see you tomorrow morning

16   at 9:15.

17     (Jury out.)

18        THE COURT:  Who are you calling tomorrow?

19        MS. HYNDMAN:  We are calling, by agreement,

20   Dr. Dickie and Dr. Shenaq, who are their witnesses, who are

21   going to go in the morning.

22        THE COURT:  Okay.

23        MS. HYNDMAN:  We're going to finish this video.  We

24   have Dr. Killingsworth.  He's a doctor, right?  Dr.

25   Killingsworth --

1          MS. FRANKLIN:  Yes.

2          MS. HYNDMAN:  -- who's our expert witness.

3          THE COURT:  Yes, yes.

4          MS. HYNDMAN:  We then have a video of Dr. Keough.

5  And we have -- if we get to him, we will call Ricardo Garcia,

6  Dr. Artunduaga's husband.

7          And then the only witness we have left after that is

8  Dr. Dantz, her treating psychiatrist, but we have scheduled

9  him for Monday morning at 9:00 a.m.  So --

10         THE COURT:  Okay.

11         MS. HYNDMAN:  -- we'll be done with all of our

12  witnesses tomorrow other than Dr. Dantz, I believe.

13         MS. FRANKLIN:  That's right.

14         MS. HYNDMAN:  Yeah.

15         THE COURT:  If -- I don't know where we're going to

16  get or how far -- how long this will take.  Do you have

17  anybody else you'd call -- if we finish at 3:00 o'clock with

18  witnesses, I would prefer that we could call somebody else.

19         MR. JEPSON:  Some of these are on a surg team.

20         MS. HALL:  Yeah, I don't --

21         THE COURT:  Take a look at your list and see if you

22  could.  I know it's Friday afternoon.  They probably won't be

23  disappointed.  I know you won't be disappointed if we end a

24  little bit early, but --

25         MS. HALL:  We -- you know, we wanted to talk to you

1     about scheduling, Judge.

2              MR. JEPSON:  Why don't we lay out what we've got.

3              MS. HALL:  Yeah.  So -- yes.  We have been

4     negotiating surgeries all day.

5              We believe that Jonathan Rothstein will testify at

6     10:00 a.m. on Monday, or be available by 10:00 on Monday.

7     We're trying to confirm that Krista Curell can come Monday

8     morning.  We have Dr. Umanskiy available at 2:00.

9              So to fill in the gap, we would hope to be able to do

10    Dr. Grossman's video, which is about an hour, and

11    Dr. Fleming's 2016 video, which shouldn't be that long.  And

12    that's what we've got set up for Monday.

13             MR. JEPSON:  And Dr. Ferguson.

14             MS. HYNDMAN:  I thought you had --

15             MS. HALL:  Dr. Ferguson, I'm sorry, in the afternoon.

16    I'm sorry.  I have multiple colors here.

17             And then Tuesday, no one.  And then Wednesday, we

18    have Dr. Becker first, Dr. Tothy next, Dr. Millis after that.

19    We expect them all to be relatively short.

20             Dr. Jaskowiak, she will be here early, so she could

21    start in the morning if -- depending on how it goes.  And then

22    Dr. Hurst is available at 2:00.

23             And then Thursday, we would have Dr. Park.  And

24    unfortunately, Dr. Park is not available Wednesday.  So --

25             MR. JEPSON:  She has surgeries scheduled that day,

1  Your Honor.

2          THE COURT:  Is there anything she could do to

3  rearrange something or make herself available?  Can you --

4          MS. HALL:  I -- we can ask, but I'm not confident.

5          MR. JEPSON:  I don't believe she could.

6          MS. HALL:  Yeah.

7          THE COURT:  Even if she could testify on Monday, out

8  of order?

9          MR. JEPSON:  She can't.  She has surgeries scheduled

10  Monday, Tuesday, and Wednesday.

11          THE COURT:  Okay.  All right.

12          MR. JEPSON:  She blocked out purposefully

13  Thursday/Friday.

14          THE COURT:  Thursday.

15          MR. JEPSON:  And Friday, too, but no one wants that.

16          MS. HYNDMAN:  Is that all your witnesses, then?

17          MS. HALL:  Yeah.  We're no longer calling Dr. Stack.

18          MS. HYNDMAN:  But you're substituting Millis?

19          MS. HALL:  Millis is on our "may call."

20          MR. JEPSON:  He's on "may call."

21          MS. HYNDMAN:  Yeah, he was on your "may call," but

22  you said --

23          MS. HALL:  Yeah, we're going to call --

24          MS. HYNDMAN:  -- you didn't think --

25          MS. HALL:  -- him now.

```
 1              MS. HYNDMAN:  -- you were going to do --

 2              THE COURT:  What about Raju?  Are you calling Joly --

 3              MS. HALL:  No.

 4              THE COURT:  -- Raju?

 5              MR. JEPSON:  No.

 6              THE COURT:  Okay.  Let me go through your list here.

 7              MR. JEPSON:  Yes.

 8              THE COURT:  Dr. Becker?

 9              MS. HALL:  Yes.

10              MR. JEPSON:  Yes.

11              THE COURT:  She's Wednesday morning.

12              MS. HALL:  Yes.

13              THE COURT:  Krista Curell?

14              MS. HALL:  Yes, Monday, hopefully.  We're waiting for

15  confirmation.

16              THE COURT:  Sara Dickie is --

17              MS. HALL:  Tomorrow.

18              MR. JEPSON:  Tomorrow.

19              THE COURT:  -- tomorrow.  Dr. Ferguson --

20              MS. HALL:  Monday.

21              THE COURT:  -- is Monday.  Dr. Hurst --

22              MS. HALL:  Is --

23              THE COURT:  -- Monday?

24              MS. HALL:  -- Wednesday.  Wednesday.

25              THE COURT:  Oh, Wednesday.  Okay.  At 2:00 o'clock?
```

1          MS. HALL:  Yes.

2          THE COURT:  Dr. Jaskowiak is Wednesday.

3          MS. HALL:  Is Wednesday.

4          THE COURT:  Dr. Moreira --

5          MS. HALL:  We do not believe we're going to call her.

6          THE COURT:  And then Dr. Park, Thursday, Wednesday

7   afternoon would be ideal.

8          Dr. Roggin you're not recalling?

9          MS. HALL:  No.

10          THE COURT:  Jonathan Rothstein?

11          MS. HALL:  Monday.

12          THE COURT:  Dr. Shenaq?

13          MS. HALL:  Tomorrow.  Shenaq.

14          THE COURT:  Shenaq.  Dr. Tothy is Wednesday.  No

15   Dr. Stack?

16          MS. HALL:  No.

17          THE COURT:  And you're not recalling Dr. Song for any

18   reason?

19          MS. HALL:  No.

20          THE COURT:  Dr. Umanskiy, Monday --

21          MS. HALL:  Monday.

22          THE COURT:  -- at 2:00.

23          MS. HALL:  Yeah.

24          THE COURT:  Michael Cleveland --

25          MS. HALL:  No.

```
 1                THE COURT:  -- you have no need.  Okay.

 2                MS. HALL:  Thank goodness.

 3                MR. JEPSON:  I'd like to see him --

 4                THE COURT:  And then anybody you're taking off your

 5      "may call" other than Millis?

 6                MS. HALL:  To make them a "will call"?  No.

 7                THE COURT:  All right.  Okay.  Let's --

 8                MR. JEPSON:  We'll explore with Dr. Park.

 9                THE COURT:  Yes.  How long do you anticipate

10      Dr. Park's testimony?

11                MR. JEPSON:  You know, it -- at first, I thought it

12      was going to be very long, but in light of the plaintiff's

13      testimony, I suspect it will be about an hour and a half.

14                THE COURT:  So we'll get to closings --

15                MR. JEPSON:  Oh, yes, on Thursday.

16                THE COURT:  -- and instructions on Thursday.  Okay.

17      Again, ideally -- I understand we're working with surgeons,

18      but we'll see where we are.

19                MR. JEPSON:  Yes.  Yeah, we'll do our best.  We gave

20      them an idea and, you know --

21                THE COURT:  I understand.  Do you anticipate any

22      rebuttal case based on what you know is coming in?

23                MS. HYNDMAN:  Not really.

24                THE COURT:  Okay.  We still have a few jury

25      instructions that we'll have to do at some point, so --
```

1              MS. HYNDMAN:  Uh-huh.

2              MR. JEPSON:  Yeah.  I think there's not going to be

3      any huge surprises in the testimony.

4              THE COURT:  Okay.  Okay.  So tomorrow morning at

5      9:15.

6              Anything else for tonight?

7              MS. FRANKLIN:  No.

8              MS. HYNDMAN:  No.  We're okay.

9              THE COURT:  I know I'm going to -- Ms. Franklin, are

10     you coming back?

11             MS. FRANKLIN:  I'm not, Your Honor, for the meeting.

12             THE COURT:  No?  I'm sorry?

13             MS. FRANKLIN:  I didn't plan to come back for the

14     meeting.

15             THE COURT:  Okay.  Just the plaintiff and her

16     husband?

17             MS. FRANKLIN:  Just the client and her husband.

18             THE COURT:  Okay.  All right.  Give me about three

19     minutes.

20             MS. FRANKLIN:  All right.

21             MS. HALL:  Thank you.

22             MS. FRANKLIN:  Thank you.

23             MS. HYNDMAN:  Thank you, Your Honor.

24             THE COURT:  Thank you.  See you tomorrow.  9:00

25     o'clock for you, please.

927

1          MR. JEPSON:   Thank you, Your Honor.

2      (Adjournment at 5:05 p.m. until 9:00 a.m., 2/3/17.)

```
 1
 2                    C E R T I F I C A T E
 3
 4
 5
 6            We, Kelly M. Fitzgerald and Colleen M. Conway, do
 7    hereby certify that the foregoing is a complete, true, and
 8    accurate transcript of the Trial proceedings, Volume 3, had in
 9    the above-entitled case before the HONORABLE AMY J. ST. EVE,
10    one of the Judges of said Court, at Chicago, Illinois, on
11    February 2, 2017.
12
13
14            /s/ Kelly M. Fitzgerald          02/03/17
15
16            /s/ Colleen M. Conway            02/03/17
17            Official Court Reporters              Date
              United States District Court
18            Northern District of Illinois
                  Eastern Division
19
20
21
22
23
24
25
```