928

```
 1                    IN THE UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3    DR. MARIA ARTUNDUAGA,            ) Docket No. 12 C 8733
                                       )
 4                    Plaintiff,       )
                                       )
 5              vs.                    )
                                       )
 6    THE UNIVERSITY OF CHICAGO        )
      MEDICAL CENTER,                  ) Chicago, Illinois
 7                                     ) February 3, 2017
                      Defendant.       ) 9:15 o'clock a.m.
 8

 9                            VOLUME FIVE
                    TRANSCRIPT OF TRIAL PROCEEDINGS
10        BEFORE THE HONORABLE AMY J. ST. EVE, AND A JURY

11    APPEARANCES:

12    For the Plaintiff:        THE FRANKLIN LAW FIRM, LLC
                                BY:  MS. JAMIE S. FRANKLIN
13                              53 W. Jackson Blvd., Suite 803
                                Chicago, Illinois  60604
14
                                ROBINSON, CURLEY & CLAYTON, P.C.
15                              BY:  MS. CYNTHIA H. HYNDMAN
                                300 South Wacker Drive, Suite 1700
16                              Chicago, Illinois  60606

17    For the Defendant:        VEDDER PRICE, P.C.
                                BY:  MR. EDWARD C. JEPSON, JR.
18                                   MS. ELIZABETH N. HALL
                                222 N. LaSalle St., Suite 2600
19                              Chicago, Illinois  60601

20    Court Reporter:           MR. JOSEPH RICKHOFF
                                Official Court Reporter
21                              219 S. Dearborn St., Suite 1232
                                Chicago, Illinois  60604
22                              (312) 435-5562

23              * * * * * * * * * * * * * * * * * *

24                        PROCEEDINGS RECORDED BY
                          MECHANICAL STENOGRAPHY
25                    TRANSCRIPT PRODUCED BY COMPUTER
```

929

1        (In open court outside presence and hearing of the jury:)

2            THE CLERK:  12 C 8733, Artunduaga v. The University

3    of Chicago Medical Center.

4            MS. HYNDMAN:  Good morning, Your Honor.

5            MS. FRANKLIN:  Good morning.

6            MS. HALL:  Good morning.

7            THE COURT:  Good morning.

8            MS. HYNDMAN:  Mr. Jepson is here somewhere.

9            THE COURT:  I know he was here.

10           MS. HALL:  He's here.

11           THE COURT:  I do want to have a quick sidebar with

12   you before we start.

13           MS. HALL:  Let me go get him.

14           THE COURT:  I can wait for him.  We're early.

15           MS. HALL:  He just went in the hallway I think.

16      (Sealed proceedings held at sidebar, pages 930 to 932.)

17

18

19

20

21

22

23

24

25

933

1      (In open court outside presence and hearing of the jury:)

2           THE COURT:  I have also been informed we have several

3      students coming in to observe today.

4           MR. JEPSON:  University of Missouri and also some

5      Serbian.

6           THE COURT:  So be on your best behavior.

7           MR. JEPSON:  We'll try.

8        (Off the record.)

9           THE COURT:  They're all here.

10          MR. JEPSON:  I love this jury.

11          THE COURT:  If we can get started a little early, you

12     know that makes me happy.

13          And do you have your video teed up?

14          MS. FRANKLIN:  Yes.

15       (Off the record.)

16       (Jury enters.)

17          THE COURT:  You may be seated.

18          Good morning, ladies and gentlemen.

19          THE JURY:  Good morning (in unison).

20          THE COURT:  Thank you for being here early.  I'll

21     give you five minutes back at the end of the day since you're

22     giving me five at the beginning.

23          When we broke yesterday, we were almost done with the

24     video deposition.  We will finish that and continue with the

25     presentation of evidence.

Dickie - direct

934

1           Ms. Franklin, you may continue.

2       (Video deposition played in open court.)

3           THE COURT:  Is that the completion of it?

4           MS. FRANKLIN:  Yes, Your Honor.

5           THE COURT:  Okay.  Please call your next witness.

6           MS. HYNDMAN:  Your Honor, we have agreed to take a

7   break in our case to let defendants call up witnesses.

8           THE COURT:  Okay.

9           MS. HALL:  Dr. Sara Dickie.

10          THE COURT:  Ladies and gentlemen, as I indicated to

11  you earlier in the week, in order to accommodate some

12  schedules, we are calling a few witnesses out of order.  So

13  plaintiff will pick back up with her case.  Dr. Dickie is

14  going to testify first.

15          Please come forward, Doctor.

16          Please raise your right hand.

17      (Witness sworn.)

18          SARA DICKIE, DEFENDANT'S WITNESS, DULY SWORN

19                    DIRECT EXAMINATION

20  BY MS. HALL:

21  Q.  Good morning, Doctor.

22  A.  Good morning.

23  Q.  Please introduce yourself to the jury.

24  A.  Sara Dickie.

25  Q.  And, Dr. Dickie, where do you currently work?

Dickie - direct

935

1   A.   Illinois Dermatology Institute.

2   Q.   And what is your position there?

3   A.   I'm a plastic surgeon.

4   Q.   Did you complete your residency at the University of

5   Chicago Medical Center?

6   A.   I did.

7   Q.   In 2012?

8   A.   Yes.

9   Q.   And were you a six-year resident in the plastic surgery

10  residency program during the academic year 2011 to 2012?

11  A.   Yes.

12  Q.   Was Dr. Justine Lee also a six-year in the program at that

13  time?

14  A.   Yes.

15  Q.   And the program director was Dr. David Song?

16  A.   Yes.

17  Q.   Do you know Dr. Maria Artunduaga?

18  A.   I do.

19  Q.   How?

20  A.   She was an intern of that year.

21  Q.   In the plastic surgery residency program?

22  A.   Yes.

23  Q.   And you worked directly with her that year?

24  A.   I did.

25  Q.   In what month?

Dickie - direct

936

1   A.   October.

2   Q.   Do you know where she's from?

3   A.   Colombia.

4   Q.   And how do you know that?

5   A.   It was on her resume.

6   Q.   Okay.  And do you know where she went to medical school?

7   A.   I don't.

8   Q.   Does Dr. Artunduaga, based on your experience with her,

9   have an accent?

10  A.   Yes.

11  Q.   Did you have any difficulty understanding her?

12  A.   No.

13  Q.   At any time during Dr. Artunduaga's residency at UCMC, did

14  anyone make any negative comments to you about the fact that

15  Dr. Artunduaga is from Colombia?

16  A.   No.

17  Q.   Did anyone make any derogatory comments to you about the

18  fact that she had an accent?

19  A.   No.

20  Q.   At any time did you observe anyone mistreating her in any

21  way in your opinion?

22  A.   No.

23  Q.   At any point in time did Dr. Artunduaga tell you that she

24  was being mistreated or discriminated against because she's

25  from Colombia?

Dickie - direct

937

1   A.  No.

2   Q.  Did she ever tell you that she was being discriminated

3   against or mistreated because she has an accent?

4   A.  No.

5   Q.  Did you have a meeting with Dr. Artunduaga on August 31,

6   2011?

7   A.  I believe it was the date, yes.

8   Q.  And who else was present at that meeting?

9   A.  Justine Lee.

10   Q.  Where did that meeting take place?

11   A.  In the plastic surgery residents office.

12   Q.  And did you speak with a Dr. John Seal about Dr. Maria

13   Artunduaga prior to your meeting with Dr. Artunduaga?

14   A.  I did.

15   Q.  Who was present in that conversation?

16   A.  John Seal, myself and Justine Lee.

17   Q.  And was that an in-person conversation or over the phone?

18   A.  In person.

19   Q.  Where were you at when you spoke with Dr. Seal?

20   A.  In the plastic surgery residents office.

21   Q.  And why did you speak with Dr. Seal?

22   A.  He was at that point the chief of the service that Maria

23   was on as an intern.

24   Q.  And that was which service?

25   A.  The Kaplan service.

Dickie - direct

938

1  Q.  Okay.  Go ahead.  I'm sorry.

2  A.  And we -- it had come to our attention that there were

3  perhaps some problems on the service with either communication

4  or Maria's work on that service.  So we wanted to speak with

5  John and get more details about what was going on.

6  Q.  And who brought those issues to your attention?

7  A.  As I recall, Justine brought them to my attention.  She

8  had learned about them from Dr. Song.

9  Q.  And I want to show you what's been marked as Joint Exhibit

10  No. 12.

11         MS. HALL:  This is in evidence.

12         Michael, would you please call out that e-mail?

13  Right.

14  BY MS. HALL:

15  Q.  Dr. Dickie, this is an e-mail that you sent to Dr. Song on

16  Wednesday, August 31, 2011, correct?

17  A.  Yes.

18  Q.  And in this e-mail, you are summarizing your discussion

19  with John Seal and then your discussion with Dr. Artunduaga,

20  correct?

21  A.  That's right.

22  Q.  In relation to the meeting with Dr. Seal, you wrote, "We

23  started first with John Seal who told us the following:  The

24  problem is not knowledge and is not lack of motivation or

25  wanting to work hard and that she is teachable.  Maria's main

Dickie - direct

1   problems stem from communication which he detailed as such."

2   And the first point here is "accent."

3   A.   Uh-huh.

4   Q.   What is it that Dr. Seal said about Dr. Artunduaga's

5   accent during that meeting?

6   A.   I don't remember his exact words, but my understanding of

7   that was it may have been that he was misunderstanding her

8   because of her accent or that patients were misunderstanding

9   her because of her accent.

10  Q.   And that's what he told you?

11  A.   Yes, not in those exact words, but that was my

12  understanding.

13  Q.   During the discussion with Dr. Seal, did he say anything

14  derogatory about the fact that Dr. Artunduaga has an accent?

15  A.   No.

16  Q.   Or derogatory or negative about the fact that she's from

17  Colombia?

18  A.   No.

19  Q.   Or anything derogatory or negative about where she might

20  have gone to medical school, understanding you don't know

21  where she went?

22  A.   Not at all.

23  Q.   And then there are a couple of other points listed here.

24  "A jumbled and somewhat frenetic thought process that comes

25  out when presenting patients."

Dickie - direct

940

1        Is that something Dr. Seal told you?

2   A.  Yes.

3   Q.  "Too much confidence when it comes to patient management."

4        Is that something Dr. Seal told you?

5   A.  Yes.

6   Q.  "With patients she comes across as abrupt, arrogant and

7   lacking in empathy."

8        Is that something Dr. Seal told you?

9   A.  Yes.

10  Q.  "She is occasionally argumentative when discussing plans

11  or what has been perceived as an error on her part."

12       Is that something Dr. Seal told you?

13  A.  Yes.

14  Q.  And after you spoke with Dr. Seal, you said you spoke with

15  Dr. Artunduaga, correct?

16  A.  That's right.

17  Q.  And why did you want to speak with Dr. Artunduaga?

18  A.  Well, at this point, our intention was to really try and

19  help Maria do better, improve whatever process difficulty she

20  was having in performing her work with the team.  And so we

21  wanted to get a sense from her what she felt the problems were

22  and try and direct her practice to try and make her more

23  efficient and improve some of these problems.

24  Q.  Did you meet with Dr. Artunduaga on the same day that you

25  had met with Dr. Seal?

Dickie - direct

941

1   A.   We did.

2   Q.   Was that an in-person meeting?

3   A.   Yes.

4   Q.   Between you, Dr. Lee and Dr. Artunduaga?

5   A.   Yes.

6   Q.   And where did that meeting take place?

7   A.   In the plastic surgery residents office.

8   Q.   And were you and Dr. Lee there and Dr. Artunduaga joined

9   you?

10  A.   Yes.

11  Q.   And how do you remember that meeting starting?

12  A.   I seem to recall that we asked Maria how things were

13  going, and she told us things were going well.  And we brought

14  up the fact that we had heard that there was some difficulties

15  and we had spoken with Dr. Seal about some miscommunications

16  that had happened on the service and tried to just get, in her

17  words, what she felt was going on.  And then she told us more

18  about some of the issues.

19  Q.   Okay.  And what did Dr. Artunduaga say was going on?

20  A.   Well, my recollection a lot is based on what's written

21  here.

22  Q.   Okay.  So let's look here then.  So you wrote here that

23  Maria sat with you for about 30 minutes; is that true?

24  A.   Right.

25  Q.   And you said, "Her perception of the problem stems from

Dickie - direct

942

1    communications issues as well.  However, they are different."

2    And the first point you wrote here is "accent."

3            What did Dr. Artunduaga say about accent?

4    A.  Again, it was her perception that perhaps some of the

5    miscommunication was because people were not understanding

6    her, either patients or possibly members of the team.

7    Q.  And the next point is "inability to keep up with how

8    quickly plans get made and lists get run."

9            Is that something she told you?

10   A.  Yes.

11   Q.  And the end of that sentence says or that phrase says,

12   "This may be a language processing issue."

13           Is that what she told you?

14   A.  I believe that was something that she discussed or we

15   discussed together, yes.

16   Q.  "Fear of paging too often about stupid things."

17           Is that something she told you that she was concerned

18   about?

19   A.  Yes.

20   Q.  And then did she tell you here that -- as you wrote, that

21   there were two interns on the service and that she feared

22   there was intern favoritism from the top down and that she was

23   the last to know about a lot of things?

24   A.  Mm-hmm.

25   Q.  Yes?

Dickie - direct

943

1   A.   Yes.

2   Q.   Did she say that any of that she at least thought had to

3   do with the fact that she was Colombian?

4   A.   No.

5   Q.   And she wrote down here at the end -- or you wrote, I'm

6   sorry -- that she was also concerned about lack of OR

7   exposure, right?

8   A.   That's right.

9   Q.   In your experience as a resident at UCMC, Dr. Dickie, is

10  it the primary job as an intern, particularly an intern who is

11  within her first two months of residency, to be in the OR?

12  A.   No.  A surgical residency is a very long process, and in

13  the beginning, the goals are really to learn patient

14  management from preoperative to postoperative and beyond and

15  really not so much about surgical technique per se.  So being

16  in the operating room is not a priority.

17  Q.   During your meeting with Dr. Artunduaga, did either you or

18  Dr. Lee say that you hadn't predicted as much resistance to

19  Dr. Artunduaga's background or accent from the general surgery

20  department?

21  A.   Can you repeat the question?  I'm sorry.

22  Q.   Did either of you say that you hadn't predicted that there

23  would be as much resistance to Dr. Artunduaga's background or

24  to her accent?

25  A.   No.

Dickie - direct

944

1    Q.  Did either of you ever say that you wanted to give her

2    advice to overcome the prejudices that were against her

3    because of her background or her accent?

4    A.  No.

5    Q.  Did either of you ever say that John Seal said that her

6    accent was a big problem?

7    A.  No.

8    Q.  Did you tell her during that meeting that Dr. Song knew

9    everything?

10   A.  Not that I recall.

11   Q.  Did you tell her during that meeting that you were in

12   charge of doing Dr. Song's job as program director because he

13   was very busy?

14   A.  No.

15   Q.  During that meeting, did Dr. Artunduaga say that she was

16   looking forward to having Dr. Song intervene and stand up for

17   his resident?

18   A.  No, I don't remember that.

19   Q.  And then after that meeting, you spoke with Dr. Brian

20   Bello, correct?

21   A.  Correct, yes.

22   Q.  And was it your understanding that Dr. Artunduaga was

23   going to work with Dr. Bello the next month?

24   A.  Yes.

25   Q.  And why did you speak with him after talking to Dr. Seal

Dickie - direct

1    and Dr. Artunduaga?

2    A.  So, again, our -- Justine and my intention was to help

3    Maria improve her efficiency and work flow so that it improved

4    communication.  So we wanted to sort of preempt any

5    misunderstandings that could have happened by talking with

6    Dr. Bello and let him know that there were some issues in the

7    past but we really wanted to be helpful and help Maria improve

8    her work practice basically and try to avoid some of these

9    miscommunications.  And so our goal is to just let him know

10   that we were there to help, if he needed our assistance in any

11   way to let us know, and to help prepare their relationship or

12   that -- prepare him for her coming on the service and to

13   really try and remake her image, in a sense, and improve her

14   work practice.

15   Q.  And did Dr. Bello seem to be willing to do that?

16   A.  Very much.

17        MS. HALL:  You can take that down, Michael.

18   BY MS. HALL:

19   Q.  You worked with Dr. Artunduaga in October 2011, correct?

20   A.  Yes.

21   Q.  And when you worked with her, did you have the opportunity

22   to observe her performance?

23   A.  I did.

24   Q.  The plastic surgery section at the time, was it broken

25   down in any particular way?

Dickie - direct

1   A.  So within the plastic surgery section, there were three

2   different services at the time:  Gold, red and blue.

3   Q.  And were attendings, different attendings assigned to each

4   service?

5   A.  Yes.  So there were different attendings on each service,

6   and there was a chief resident responsible for each of those

7   services.  And then the intern or junior residents that were

8   on the service at the time would cover all the patients that

9   were on those services, mainly to take care of floor duties,

10  like order -- making sure orders were put in, patients were

11  seen and rounded on every day, dressings were changed, that

12  sort of thing.

13  Q.  And that would be regardless of the colored part of the

14  service --

15  A.  Right.

16  Q.  -- that the patient was on, correct?

17  A.  Exactly.

18  Q.  And in October of 2011, Dr. Artunduaga was not the only

19  intern on the service, correct?

20  A.  That's right.

21  Q.  Dr. John Lusardi was also an intern on the service?

22  A.  Yes.

23  Q.  And what was your general expectation as to how they would

24  work together on the floor?

25  A.  Well, our expectation was that they would -- they would

Dickie - direct

1   share responsibilities, that they would communicate with one

2   another and organize their day to make sure all the work was

3   done and that they each bore the same amount of weight of that

4   responsibility.

5   Q.   Okay.  And on the service, did interns round on patients?

6   A.   They did.

7   Q.   And was there a circumstance on a regular basis where

8   interns and the attendings and the more senior residents would

9   all round together?

10  A.   Yes.

11  Q.   How often did that occur each week?

12  A.   So every day the patients would be seen by the interns and

13  the chief resident and the attending, but it may not be all

14  together.  Once a week we had group teaching rounds where all

15  of the students, residents and attendings in the plastic

16  surgery service would round together as a form of teaching.

17  Q.   And did you call that something in particular?

18  A.   That was called burn rounds.

19  Q.   And why is it called burn rounds?

20  A.   The burn unit was run by the plastic surgery unit.  It's

21  an ICU, or an intensive care unit.  The plastic surgery

22  patients who are the most critical or had gone through large

23  surgeries were often cared for there.  So we would start our

24  rounding in that unit.

25  Q.   And then when you finished your rounding in the burn unit

Dickie - direct

948

1   on the patients that were plastic surgery specific, would you

2   then move to --

3   A.  We would go to the floor and see less critical patients,

4   patients who were close to discharge or just at least weren't

5   in the ICU.

6   Q.  Who were being treated by --

7   A.  Plastic surgery, right.

8   Q.  Okay.  And during burn rounds, would interns and residents

9   present information on patients to the attendings and the rest

10  of the group?

11  A.  Yes.  So standard presentation protocol is that whoever is

12  in charge of the patient would stand in front of the room and

13  give a short synopsis of why the patient is in the hospital,

14  what's happened thus far and what the plan going forward is.

15  And then for burn rounds, at that point typically attendings

16  would ask questions in sort of a teaching type of way to

17  either the student or the resident or other attendings in a

18  way that would help improve everyone's knowledge and

19  understanding.

20  Q.  Are you familiar with the term "consult"?

21  A.  Yes.

22  Q.  What's a consult?

23  A.  Consult is a patient question that's being brought to a

24  specialist group, usually from another specialty group.  So,

25  for instance, general medicine might have a patient with a

Dickie - direct

1  wound.  They would consult plastic surgery to find out what

2  our advice would be to treat that problem.

3  Q.  And who typically is receiving the consult calls or

4  patients for plastic surgery?

5  A.  That always went through the intern.  The intern carried

6  the consult pager.

7  Q.  And then what was the intern expected to do once they got

8  the inquiry from the other department or area?

9  A.  Essentially their job was to gather data, find out what

10 the question was and then go see the patient, interview the

11 patient, find out the history in the patient's own words and

12 then also gather any other information such as, you know,

13 radiology reports, laboratory data, et cetera.  And then

14 ideally the intern would collate all of that and then come up

15 with a plan and then present that to either their chief

16 resident or the attending in order to agree with that plan and

17 then execute the plan there forward.

18 Q.  While Dr. Artunduaga was on the service and you were

19 working with her, were you giving her feedback?

20 A.  Yes.

21 Q.  Informally as you were working together?

22 A.  Every day, yeah.

23 Q.  And did you participate with Dr. Artunduaga during burn

24 rounds?

25 A.  Yes.

Dickie - direct

1   Q.  At any point in time in October, was Dr. Artunduaga

2   responsible for presenting patients during burn rounds?

3   A.  There was a day toward -- I think it was the last burn

4   rounds of the month, actually Dr. Song had asked me to have

5   Maria present some patients to lead us through burn rounds as

6   a way to sort of test her knowledge and ability to present

7   patients and her organizational methods.  And so on that day,

8   I had asked her to prepare to present some patients.

9   Q.  And you asked her to prepare before the time at which she

10  would actually be presenting the patients?

11  A.  Yes, I believe I asked her the day or two before.

12  Q.  And what was your expectation regarding what she would do

13  when presenting those patients?

14  A.  I mean, like, had always been done as was routine, that

15  she would know the patient history, have a synopsis, know

16  essentially what was currently going on with the patient and

17  what the plan was going forward.

18  Q.  How many beds are there in the burn unit?

19  A.  There were eight.

20  Q.  Okay.  And did you participate in burn rounds on the date

21  that Dr. Artunduaga was supposed to present?

22  A.  Yes.

23  Q.  Who else do you recall being in attendance in your group?

24  A.  I know that Trang was there; Justine was there, so these

25  are two other plastic surgery residents; Daniel Butz, who is

Dickie - direct

1   the second-year resident; Maria was there.  There were a few

2   students who I don't recall who.  And then the attendings were

3   Dr. Song, Dr. Reid, Dr. Gottlieb.  I believe Dr. Lee was there

4   and Dr. Park.

5   Q.  Okay.  And what took place during burn rounds when you

6   came up to the point where it was time to present the first

7   patient?

8   A.  So we were all gathered there, and no one was sort of

9   standing up in front to present the patient.  And I looked for

10  Maria, and she was standing behind the nurse's station doing

11  some sort of work.  And I leaned over and said, Are you ready?

12  Let's start.  And she said, I'm not.  I'm not prepared.  I

13  can't present this patient.  And so we just moved forward, and

14  the chief resident, I believe, presented the patient for that

15  case.

16  Q.  And it had been your expectation that she was going to

17  present that patient?

18  A.  I had really hoped that she would.

19  Q.  Okay.  And that's what you had discussed with her, right?

20  A.  Right.

21  Q.  And then what happened next?

22  A.  So, you know, I told her we would meet -- when we went to

23  the floor, I would like her to present the patients on the

24  floor and that she could choose which patients we would go to

25  see.

Dickie - direct

952

1  Q.  Okay.  And were there patients on the floor at that time

2  that she had actually admitted?

3  A.  Yes.

4  Q.  And did you think that she would possibly present on those

5  patients?

6  A.  Yes.  So we had decided to go to a patient that she had

7  admitted the day before.  The patient was on the red service.

8  Dr. Nyugen was the chief resident on that service.  And I

9  believe Maria had actually operated on that patient as well,

10 so been in the OR with the patient.

11 Q.  And based on the fact that she had admitted the patient

12 and your understanding that she had operated on the patient,

13 did you expect her to have the knowledge of the patient that

14 would be needed to present?

15 A.  Absolutely.

16         MS. HYNDMAN:  Objection.

17         Your Honor, I've given Ms. Hall a lot of leeway here,

18 but I would prefer that she not lead the witness.

19         THE COURT:  Sustained.

20         MS. HALL:  Okay.

21         THE COURT:  Rephrase that.

22 BY MS. HALL:

23 Q.  What was your expectation in relationship to that

24 particular patient and what Dr. Artunduaga would do during

25 burn rounds?

Dickie - direct

953

A.   I anticipated that she would be able to present the

patient clearly and succinctly and know the patient.

Q.   And what happened?

A.   Well, on our way to the room, actually we were all walking

down the hallway, I noticed that Dr. Artunduaga was going the

other way down the hallway with Dr. Butz.  I paged them, and

Dr. Butz let me know they were on their way to see a consult

in the emergency room that had just come through on the pager.

And I asked him to please send Maria back because we wanted

her to present and Dr. Butz could take care of the consult on

his own.

     So Maria returned, and her presentation was very

disorganized.  She needed to read from her list of patients,

the name of the patient and why they were there and basically

just didn't seem, A, very confident or very knowledgeable

about her patient and wasn't able to present in a way that

would be in keeping with an intern level doctor.

Q.   And did you speak with Dr. Artunduaga at any point in time

about that presentation?

A.   Dr. Nyugen did, I believe, because she was -- that was her

patient on her service.  She gave her the feedback about how

that wasn't a very good presentation.

Q.   Why is it that you --

     MS. HYNDMAN:  I'm going to move to strike on the

grounds of hearsay.

Dickie - direct

954

```
 1              THE COURT:  What's your response?
 2              MS. HALL:  Effect on listener as to why she did not
 3    speak with Dr. Artunduaga.
 4              MS. HYNDMAN:  And she can say that Dr. Nguyen did,
 5    but when she goes on to say what Dr. Nguyen told
 6    Dr. Artunduaga, that's hearsay.
 7              THE COURT:  And your response to that?
 8              MS. HALL:  I don't disagree.
 9              THE COURT:  Yes, I agree.
10              Sustained.
11              Ladies and gentlemen, I will strike the last portion
12    of the witness' answer with respect to what Dr. Nguyen said.
13    You should disregard it.
14    BY MS. HALL:
15    Q.  Did you work with Dr. Artunduaga in relation to any
16    consults that were presented to the plastic surgery service?
17    A.  Yes.
18    Q.  And did that happen on more than one occasion in October?
19    A.  I'm sure that it did.
20    Q.  Did you have any concerns in relation to how
21    Dr. Artunduaga presented the consult information to you?
22    A.  Yes.  I remember a particular instance where it was not
23    only disorganized but the information she presented was -- had
24    obviously been written by another physician in the --
25    Q.  Can I stop you there?
```

Dickie - direct

1    A.  Yeah.

2    Q.  Can you -- so let's get some details.  What type of

3    consult was it?

4    A.  It was a hand consult from the emergency room.

5    Q.  Okay.  And why is it that you believe the information she

6    was presenting came from another physician?

7    A.  Basically the way it was phrased and the content of the

8    information was something that wasn't focused on the problem

9    of -- the plastic surgical question.  It was more general

10   about the patient's general health and history, which is,

11   while important while presenting a consult case, you really

12   just want to get to the meat of the matter and state what is

13   the problem and the history of the problem we're being asked

14   about.  And I actually went back and looked at the chart and

15   read word for word in the emergency room doctor's history what

16   she had told me as her intro line basically.

17   Q.  And what else do you remember, if anything, in relation to

18   that consult?

19   A.  You know, so I asked her, you know, I said, well, let's

20   get to the point.  What is the question?  What is the problem?

21   And she told me basically by showing me a photo on her phone

22   of the patient's hand.  And I said, we need -- I need you to

23   be able to tell me in words what the problem is, and I want

24   you to be able to describe in words what the physical exam is,

25   not just show me a picture.  You know, and so as I recall, she

Dickie - direct

956

1   attempted to do that.  However, I mean, it was already kind of

2   done.

3   Q.  Okay.  Do you know a Dr. Mary Lawler?

4   A.  I do.

5   Q.  And who is she?

6   A.  She is a doctor at the University of Chicago, and she

7   works in physical medicine and rehabilitation services.

8   Q.  Did you ever speak to her about Dr. Artunduaga?

9   A.  I did.

10  Q.  On more than one occasion?

11  A.  I recall one in particular.

12  Q.  Okay.  And that discussion with Dr. Lawler about

13  Dr. Artunduaga, was it in person or over the phone?

14  A.  Over the phone.

15  Q.  Who called who?

16  A.  I believe she paged me.

17  Q.  Okay.  And you called her back?

18  A.  Yes.

19  Q.  And what do you recall Dr. Lawler saying to you about

20  whatever she had to say about Dr. Artunduaga?

21  A.  There was a patient that had been on my service, which was

22  the gold service at the time, who had been discharged a couple

23  of days prior.  She had been readmitted for some complications

24  or some problems.  The patient had had abdominal drains in,

25  which are tubes that go under the skin to drain fluid after

Dickie - direct

1   surgery, and they had been pulled out when she was in the

2   rehab center.

3   Q.  Why were or were the patient's abdominal drains important?

4   A.  To drain fluid that collects after surgery.  If you don't

5   drain the fluid out into -- outside of the patient, it remains

6   in the patient and can become infected and lead to an abscess

7   or other problems.  And Dr. Lawler had -- was concerned

8   because she had told Maria specifically --

9   Q.  This is what Dr. Lawler said to you, correct?

10  A.  This is what Dr. Lawler told me, that she had asked Maria

11  specifically to better secure the drains because she did not

12  think they were sewn in tightly enough to not get pulled out

13  when the patient went to rehab.

14  Q.  Okay.  And is this a patient that you had talked to

15  Dr. Artunduaga about?

16  A.  Yes.  I mean, we talked about her many times every day

17  when the patient was admitted to the hospital.

18  Q.  And had you spoken to Dr. Artunduaga at the time the

19  patient was there about the drains?

20  A.  Yes.  So what I recalled -- and when Dr. Lawler told me

21  about this conversation she had with Maria, I was surprised

22  because Maria had -- in fact, I remembered Maria asking me

23  about the drains, but she hadn't asked me about whether the

24  drains were secured well enough or needed to be better

25  secured.  She asked me what the plan was for the drains.

Dickie - direct

1  Q.  And what's the difference between are the drains secured

2  well enough and what's the plan for the drains, if any?

3  A.  So when you ask the question what is the plan for the

4  drains, it's how long the drains are going to stay in.  Will

5  the patient be discharged with the drains in place?  Will they

6  be taken out after the patient is discharged, and how long

7  will they stay?  So the question is -- when you ask the plan

8  for drains, the question is are the drains staying or going?

9  Q.  And that is what you recall Dr. Artunduaga --

10  A.  Yes.

11  Q.  -- asking you about?

12  A.  Yes.  Yes.

13  Q.  And then after you spoke with Dr. Lawler, did you speak

14  with Dr. Artunduaga about the issue that Dr. Lawler -- let me

15  stop myself.

16      Did Dr. Lawler say that she was concerned about what

17  had happened?

18  A.  She was.  She was really frustrated because she had

19  identified a potential problem, and she believed that she

20  took -- took it up with the correct person and indicated all

21  the -- you know, her concerns and that they weren't addressed.

22  They were -- they were either -- not necessarily blown off but

23  they were either misunderstood, but the problem remained and

24  the patient went out to a rehab and the drains got pulled out

25  as she had predicted.  So she was frustrated.

Dickie - direct

959

1    Q.  And did you speak with Dr. Artunduaga about this incident?

2    A.  I did.

3    Q.  Was that an in-person or over-the-phone discussion?

4    A.  I believe it was over the phone.

5    Q.  Was anyone else present?

6    A.  Not that I recall.

7    Q.  Okay.  And what do you recall saying to Dr. Artunduaga

8    during that discussion?

9    A.  You know, I told her what Dr. Lawler had said to me, and I

10   said, you know, what was your understanding?  Because I know

11   you asked me what the plan was for the drains.  And she said,

12   Dr. Lawler had told me that they weren't stitched -- that she

13   was worried they weren't stitched in enough.  I said, Well,

14   there's a big difference there between whether the stitch is

15   strong enough and what the plan is for the drains.  That's a

16   difference after being on the service for nearly a month you

17   should know the difference between.

18   Q.  Okay.

19          MS. HALL:  I would like to show you what's been

20   marked as Defendant's Exhibit No. 44, please.

21          THE COURT:  Is it in evidence?

22          MS. HALL:  It is.

23          MR. JEPSON:  Yes.

24          MS. HALL:  And could you, Michael, blow up that

25   e-mail?  Yep.

Dickie - direct

960

 1              THE COURT:  The doctor would like some water, if you

 2    could provide her some.

 3              I have a cup if you need a cup.

 4              THE WITNESS:  I have one.

 5              MS. HALL:  We don't know whose cup that is.

 6              THE WITNESS:  I'm sure it's clean.

 7              THE COURT:  The cup would be okay.

 8              THE WITNESS:  Thank you.

 9    BY MS. HALL:

10    Q.  Dr. Dickie, do you recognize this as an e-mail that you

11    sent to Dr. Song on October 24, 2011?

12    A.  Yes.

13    Q.  And this e-mail refers in the first paragraph to the

14    discussion you just told us about with Dr. Lawler?

15    A.  Right.

16    Q.  And was this e-mail accurate from your perspective at the

17    time you wrote it?

18    A.  Yes.

19    Q.  The fourth line down, it says, the sentence before, "Mary

20    says she voiced concerns to Maria before the discharge

21    regarding an elevated WBC and temp."

22              Is WBC white blood count?

23    A.  Yes.

24    Q.  And you next wrote "and she felt like her concerns were

25    blown off."

Dickie - direct

961

1   A.   Mm-hmm.

2   Q.   Is that something that Dr. Lawler had told you?

3   A.   Yes.

4          MS. HALL:  And then in the second paragraph, maybe

5   it's the third, where it starts with "I called," Michael.

6   BY MS. HALL:

7   Q.   You wrote here, "I called and spoke to Maria about her

8   interpretation of what Mary wanted," correct?

9   A.   Yes.

10  Q.   And then you relayed here your discussion with

11  Dr. Artunduaga?

12  A.   Mm-hmm.  Yes.

13  Q.   And at the end of the e-mail, you wrote, "She agreed and

14  apologized for not alerting me to this before the patient

15  left."

16          Is that something that Dr. Artunduaga did during your

17  discussion with her?

18  A.   Yes.

19  Q.   And you also wrote, "She stated she would let me know next

20  time this happened."

21  A.   Yes.

22  Q.   And is that something Dr. Artunduaga said to you as well?

23  A.   Yes.

24  Q.   During October of 2011, did you sit down with

25  Dr. Artunduaga to discuss her performance on the service?

Dickie - direct

962

1   A.  I did.

2   Q.  And what was the purpose of that meeting with her?

3   A.  Well, I wanted to give her feedback about how she had done

4   in the month and some of the concerns I had in terms of her --

5   just errors in her process.

6   Q.  Okay.  And that was a meeting with only you and

7   Dr. Artunduaga?

8   A.  Yes, I believe it was.

9   Q.  Was it in person?

10   A.  Yes.

11   Q.  And did you come to that meeting with any type of document

12   to review with her?

13   A.  I wrote down my criticisms or critiques of her month.  And

14   we went over them together, and then she signed that document.

15   Q.  And the document you went over with her, did it reflect

16   your criticisms of your critiques of her alone?

17   A.  Yes.

18   Q.  I would like to show you what's been marked as Defendant's

19   Exhibit No. 47 which is in evidence.

20         MS. HALL:  And, Michael, can you blow up the

21   substance?

22   BY MS. HALL:

23   Q.  Is this the document you're referring to, Dr. Dickie?

24   A.  Yes.

25   Q.  At the top it says "reviewed 10/28/11."  Is that the date

Dickie - direct

1   on which you met with Dr. Artunduaga?

2   A.  I believe it was, yes.

3   Q.  And did you type this document up?

4   A.  I did.

5   Q.  And at the bottom of the document, who is the first

6   signature?

7   A.  Maria.

8   Q.  And did she sign that at the meeting with you?

9   A.  Yes.

10  Q.  Tell us whose signature is at the bottom.

11  A.  Mine.

12  Q.  Okay.  You're fitting the doctor stereotype.

13          Are these issues that you -- the list here, is that

14  something you went over with Dr. Artunduaga?

15  A.  I did.

16  Q.  And this at the top says "areas for improvement," right?

17  A.  Yes.

18  Q.  And then the next line says "notification of senior in

19  change of patient status or continuing decline"?

20  A.  Yes.

21  Q.  And you wrote about a scenario here, right?

22  A.  Yes.

23  Q.  Can you please tell us what happened with this patient in

24  this instance?

25  A.  This actually was the same patient as the one that the

Dickie - direct

1    drains came out in.

2          This patient was on the floor, which means, you know,

3    generally well, planning to go home, but she had some lower --

4    her blood pressure was going down and she was anemic, which

5    indicated to us she was having some bleeding.  She had

6    undergone large volume liposuction, and she most likely was

7    having bleeding into her thigh area.  So our initial plan was

8    to give her blood products or do a blood transfusion on the

9    floor to see if she responded to that, and if not, move her to

10   the ICU where she could undergo more intensive care and closer

11   nursing monitoring.

12   Q.  And what happened -- what caused you to put this instance

13   in this letter?

14   A.  Well, because -- as sort of exactly as it states.  I had

15   asked Maria to be responsible for this patient and make sure

16   that the plan was executed in a timely fashion, and if not or

17   the patient continued to decline, that she notify me and

18   get -- and have the patient transferred to the ICU.

19   Q.  And as far as the plan for the patient, what is it that

20   you were expecting Dr. Artunduaga to do?

21   A.  To ensure that the blood products were given in a timely

22   fashion.  Oftentimes on the floor that process can be very

23   slow.  And so as an intern typically you need to really hound

24   the blood bank and the nurses and make sure that it's being

25   done.

1  Q.  Okay.  And go ahead.

2  A.  And so the patient didn't get her blood until later, until

3  around noon or after that.  She continued to be hypotensive,

4  meaning her blood pressure was low and her heart rate was

5  going up.  And according to the nursing notes, they tried to

6  reach out to our team, and there was no response.  No new

7  orders were given.

8  Q.  Dr. Dickie, where were you when this was happening?

9  A.  I was off campus at the time.

10  Q.  And so how did you learn that this had happened?

11  A.  I was called by Justine Lee, who is the senior in the

12  hospital at the time, around -- at 4:30 that the patient was

13  being transferred emergently to the ICU.

14  Q.  Did you consider this -- now, was this is a concern for

15  you in relation to Dr. Artunduaga's performance specifically?

16  A.  Yes.

17  Q.  Why?

18  A.  Because I had given her very direct orders essentially and

19  heightened the alert about this patient, that she was -- that

20  she was a high priority, that this was a concerning

21  development and they wanted her to be really on top of it.

22  And the fact was she wasn't.  Dr. Artunduaga had signed the

23  patient over to the other intern and gone to the operating

24  room.  Right around the time that the patient was continuing

25  to decline, she was getting notification from the floor that

Dickie - direct

1   the patient wasn't doing well.

2   Q.  How is it that you learned that Dr. Artunduaga had

3   assigned a patient to the other intern who I assume is

4   Dr. Lusardi?

5   A.  Yes, I'm not sure who told me.  I think Dr. Artunduaga

6   told me that she had done that.

7   Q.  And did you discuss this incident with Dr. Artunduaga at

8   the time?

9   A.  I did.

10  Q.  And that was a conversation between the two of you?

11  A.  Yes.

12  Q.  And what was Dr. Artunduaga's -- did you explain this

13  issue?

14  A.  Yes.  As I recall, it was a conversation over the phone.

15  Q.  Mm-hmm.

16  A.  And I was upset that this had happened.  And not that the

17  patient went to the ICU.  That was anticipated.  But that it

18  happened in a very chaotic way, at the end of the day rather

19  in the middle of the day as we had discussed.

20  Q.  And what was Dr. Artunduaga's response?

21  A.  It was that it wasn't her fault because she had given the

22  responsibilities over to John.  And she had -- because she had

23  to go to the operating room.

24  Q.  And was that an appropriate response in your opinion?

25  A.  No --

1   Q.   Why?

2   A.   -- it wasn't.

3        First because I had given her the responsibility.

4        And second of all, for her -- her going to the

5   operating room right around the time when the patient should

6   have been transferred to the ICU was not an appropriate

7   transfer.  Her priorities were off.  She did not need to be in

8   the operating room so badly that she couldn't take care of a

9   patient crashing on the floor.  I just didn't think that it

10  was prioritized well at all.

11       MS. HALL:  And, Michael, if you could please zoom out

12  and then zoom back in on the consults down to the signature

13  but don't include the signature.  Yeah.  Okay.

14  BY MS. HALL:

15  Q.   And you also wrote here "consults."

16  A.   Mm-hmm.

17  Q.   And you wrote about seeing consults in an efficient

18  manner, placing consult notes in appropriate time, improved

19  communication with senior on call as to what consults need to

20  still be seen and which need disposition; is that correct?

21  A.   Yes.

22  Q.   And is that something you discussed with Dr. Artunduaga

23  during your meeting on October 28?

24  A.   Yes.

25  Q.   And then you also wrote about prioritization?

Dickie - direct

968

1   A.  Mm-hmm.  Yes.

2   Q.  History gathering?

3   A.  Yes.

4   Q.  General organization?

5   A.  Yes.

6   Q.  And OR?

7   A.  Yes.

8   Q.  And did you discuss all these issues with Dr. Artunduaga

9   during your meeting on October 28th?

10  A.  I did.

11  Q.  During that meeting, did you tell Dr. Artunduaga that you

12  didn't know if some of the things in this document were her

13  fault or Jonathan Lusardi's fault, but you included all of

14  them so she could relate them to Jonathan Lusardi later?

15  A.  No.

16  Q.  I would like to show you what's been marked as Defendant's

17  Exhibit 49.

18          MS. HALL:  This is not in.

19          THE COURT:  Is there any objection to its admission?

20          MS. HYNDMAN:  No.

21          THE COURT:  Okay.  It's admitted.

22      (Defendant's Exhibit No. 49 was received in evidence.)

23  BY MS. HALL:

24  Q.  Dr. Dickie, do you recognize this as an e-mail that

25  Dr. Artunduaga sent to you, Dr. Justine Lee, to Trang, to

Dickie - direct/cross

969

1   Yonni Bank, Sam Fuller, Lee Alquerishi, Daniel Butz and Libby

2   Carlisle on October 31, 2011?

3   A.  Yes.

4   Q.  And the subject is "thank you," right?

5   A.  Yes.

6   Q.  And could you please read to the jury what Dr. Artunduaga

7   wrote to all of you on October 31, 2011.

8   A.  "Hi guys, I just wanted to send a quick thank you note.

9   It was only a month in this service, but I feel I learned a

10  lot from every single one of you.  It is a long road to become

11  a plastic surgeon.  Finding people like you make it nicer to

12  walk."

13          MS. HALL:  That's all, Your Honor.

14          THE COURT:  Cross-examination.

15          MS. HYNDMAN:  Yes, Your Honor.

16                      CROSS-EXAMINATION

17  BY MS. HYNDMAN:

18  Q.  Good morning, Dr. Dickie.  My name is Cindy Hyndman.  I'm

19  one of Dr. Artunduaga's attorneys.

20          Dr. Dickie, do you hold a current position at the

21  University of Chicago Medical Center?

22  A.  I'm a clinical associate.

23  Q.  And what responsibilities do you have in that position?

24  A.  I do resident teaching.  I also volunteer as a volunteer

25  surgeon for one of their charitable groups.  And I lead a

Dickie - cross

970

1    mission trip to the Dominican every year with a resident.

2    Q.   Okay.  We talked about Joint Exhibit No. 12.  Could we

3    take a look at that, please.

4            Now, Dr. Dickie, this was an e-mail, the one at the

5    bottom, the one that you sent to Dr. Song on August, 31, 2011,

6    correct?

7    A.   Yes.

8    Q.   And you don't recall any response you got from Dr. Song to

9    this e-mail, do you?

10   A.   I don't.

11   Q.   And before you sent this e-mail to Dr. Song, you didn't

12   check with Dr. Artunduaga to make sure that your description

13   of the conversation was accurate, did you?

14   A.   No.

15   Q.   And you didn't copy Dr. Artunduaga on this e-mail, did

16   you?

17   A.   No.

18   Q.   Now, you said that your understanding of what Dr. Seal

19   told you about Dr. Artunduaga's accent was that you don't

20   remember exactly what you said, but your understanding was

21   that he thought that Dr. Artunduaga's accent might have been a

22   reason he wasn't understanding her, correct?

23   A.   Correct.

24   Q.   But you didn't write that in your e-mail, did you?

25   A.   I didn't.

Dickie - cross

1   Q.  And you also said that Dr. Artunduaga told you that the

2   problem -- when you say her accent, that what she told you is

3   that she thought perhaps people didn't understand her,

4   correct?

5   A.  That's my recollection of it.

6   Q.  Okay.  And you didn't write that in your e-mail either,

7   did you?

8   A.  No.

9   Q.  Now, you said that -- that Dr. Seal never told you that

10  Dr. Artunduaga's accent was a big problem.  Do you remember

11  that testimony --

12  A.  Yes.

13  Q.  -- from Ms. Hall's questions?

14  A.  Yes.

15  Q.  But you do say in your e-mail, don't you, Dr. Dickie, that

16  Maria's main problems stemmed from communication, and the

17  first item there is "accent," correct?

18  A.  Yes.

19  Q.  Now, you talked about this plan that you had with

20  Dr. Bello.

21  A.  Yes.

22  Q.  That's indicated down there.  And your testimony, if I

23  understand it right, was that the goal was to help

24  Dr. Artunduaga improve, right?

25  A.  Yes.

Dickie - cross

1   Q.  Now, isn't it true, Dr. Dickie, that your main concern at

2   the time that you developed this plan with Dr. Bello was that

3   the general surgery residents were speaking about

4   Dr. Artunduaga as a poor or weak resident?

5   A.  That is -- was a concern as well on our part.

6   Q.  Now, you talked about the rotation that you did with

7   Dr. Artunduaga in October in the plastics section.

8   A.  Yes.

9   Q.  Would you agree with me that the goal of having -- first

10  of all, Dr. Artunduaga wasn't supposed to be on the October

11  plastics rotation, was she?

12  A.  That's right.

13  Q.  And she got switched at the last minute to go into that

14  rotation, correct?

15  A.  She did.  She did.

16  Q.  And would you agree that it was -- your goal in doing that

17  was to help Dr. Artunduaga improve her performance?

18  A.  I would say the goal is two things.  One was to really

19  identify what the core problems were and also whatever they

20  were, to help her improve.

21  Q.  And so in connection with that, you and Dr. Dickie and

22  Dr. Song came up with a plan for Dr. Artunduaga, correct?

23  A.  Dr. Lee, yes.

24  Q.  Dr. Lee, yes.  I'm sorry.

25  A.  Sorry.  I wish she were here.

Dickie - cross

973

1          (Laughter.)

2    BY MS. HYNDMAN:

3    Q.  And that plan was at the time, at the beginning of the

4    rotation, that plan was to work with Dr. Artunduaga and meet

5    with her weekly, right?

6    A.  Yes.

7    Q.  And you were going to compile suggestions and

8    recommendations for her about how she could improve, right?

9    A.  Yes.

10   Q.  And there wasn't ever any summary of this plan put in

11   writing anywhere, was there?

12   A.  No.

13   Q.  And you never told Dr. Artunduaga what the plan was, did

14   you?

15   A.  No.

16   Q.  And you don't know if anybody else ever told

17   Dr. Artunduaga what the plan was, do you?

18   A.  No.

19   Q.  And you don't think Dr. Song ever talked to Dr. Artunduaga

20   about the plan, right?

21          MS. HALL:  Objection.  Foundation.

22   BY THE WITNESS:

23   A.    I don't know.

24          THE COURT:  Sustained.

25          You're going to have to lay a foundation if she has a

1    basis to know that one way or another.

2         MS. HYNDMAN:  I'll withdraw the question.

3    BY MS. HYNDMAN:

4    Q.  You don't remember telling Dr. Artunduaga what you thought

5    about her progress over the month of October, do you?

6    A.  No.

7    Q.  There was never a meeting in October that you can recall

8    that you and Dr. Song and Dr. Artunduaga sat down to discuss

9    her performance, correct?

10   A.  That's right.

11   Q.  And so if I understand right, the plan was to help

12   Dr. Artunduaga, give her ideas about how she could improve her

13   performance, correct?

14   A.  Yes.

15   Q.  The only thing you ever put in writing about

16   Dr. Artunduaga for the month was Defendant's Exhibit 47 that

17   we read -- that we saw, right?

18   A.  Yes.

19   Q.  Okay.

20        MS. HYNDMAN:  And could we call that up on the

21   screen, please.

22   BY MS. HYNDMAN:

23   Q.  Now, you described this document on direct examination as

24   criticisms or critiques of Dr. Artunduaga for the month,

25   right?

Dickie - cross

1   A.   Yeah.   They are sort of evaluations or observations of

2   things that happened and ways to improve.

3   Q.   And did you -- can you point to me in this document

4   anywhere where you give Dr. Artunduaga advice about how to

5   improve her performance?

6   A.   I don't see anything specific.

7   Q.   Now, the only time you ever supervised Dr. Artunduaga was

8   in the month of October, right?

9   A.   That's right.

10  Q.   And at that time, you were the chief on the gold service?

11  A.   Yes.

12  Q.   And during that month, Dr. Artunduaga was working equally

13  between all three of the services on plastics, right?

14  A.   That's right.

15           MS. HYNDMAN:   Let's take a look at Defendant's

16  Exhibit 44, please.

17  BY MS. HYNDMAN:

18  Q.   And this was the e-mail you sent to Dr. Song about the

19  incident with the drains in Dr. Lawler's patient, right?

20  A.   Right.

21  Q.   You didn't copy Dr. Artunduaga on this e-mail, did you?

22  A.   No.

23  Q.   And you didn't run it by her to make sure it was accurate

24  before you gave it to Dr. Song?

25  A.   No.

Dickie - cross

1   Q.  Now, you were not privy, were you, to the initial

2   conversation between Dr. Lawler and Dr. Artunduaga, right?

3   A.  That's right.

4   Q.  Okay.  Now, isn't it true, Dr. Dickie, that you yourself

5   looked at the drains before this patient left and you didn't

6   notice that they were loose, right?

7   A.  I don't recall looking at the drains.  I saw the patient

8   daily, so I would have to agree that I didn't think they were

9   loose.

10   Q.  You don't recall looking at the drains?

11   A.  I don't.  I don't.

12        MS. HYNDMAN:  May I approach, Your Honor?

13        THE COURT:  You may.

14        THE WITNESS:  A standard daily exam of a patient like

15   this is to check the drains.

16        MS. HYNDMAN:  There's no question pending.  Move to

17   strike.

18        THE COURT:  I'll strike it.  The jury should

19   disregard.  Thank you.

20        MS. HYNDMAN:  Page 169.

21   BY MS. HYNDMAN:

22   Q.  Dr. Dickie, you recall giving your deposition in this

23   case?

24   A.  I do.

25   Q.  And if you could look on page 169.  Did you find that?

Dickie - cross

977

1   A.  Yes.

2   Q.  Okay.  And if -- on the left-hand side, there's numbers

3   going down.  If you would look at line -- beginning at line

4   No. 4.

5   A.  Yes.

6   Q.  And at your deposition, were you asked this question --

7           MS. HALL:  Objection, Your Honor.  This is not proper

8   impeachment.

9           THE COURT:  I thought you were seeking to refresh her

10  recollection because she didn't recall.

11          MS. HYNDMAN:  Okay.

12          THE COURT:  I think that's a proper way to do it.

13          Sustained.

14          MS. HYNDMAN:  You're right.  Withdrawn.

15  BY MS. HYNDMAN:

16  Q.  Could you read from line 4 to line 9?

17          THE COURT:  To yourself, Doctor.

18  BY MS. HYNDMAN:

19  Q.  To yourself.

20  A.  Sure.

21          Okay.

22  Q.  Does that refresh your recollection that you did look at

23  the drains that Dr. Lawler was referring to?

24  A.  Yes, it refreshes my recollection that I did not know that

25  the drains were loose.

Dickie - cross

978

1  Q.  Okay.  Now, it's a common occurrence, isn't it,

2  Dr. Dickie, for patients to have drains that were not properly

3  secured?

4  A.  Yes, unfortunately.

5  Q.  And it was also your belief that this incident with

6  Dr. Lawler's patient was a team problem and a team failure,

7  right?

8  A.  I would agree with that.

9  Q.  Now, Dr. Dickie, it's true, isn't it, that interns make

10  mistakes?

11  A.  Absolutely.

12  Q.  It's not unusual at all?

13  A.  It's not unusual at all.

14  Q.  In fact, it's true, isn't it, Dr. Dickie, that mistakes

15  are made in medicine all the time?

16  A.  All the time.

17           MS. HYNDMAN:  Nothing further.

18           THE COURT:  Redirect?

19           MS. HALL:  I just have a couple of questions.

20           Could we please pull up Defendant's Exhibit 47?

21                     REDIRECT EXAMINATION

22  BY MS. HALL:

23  Q.  Dr. Dickie, this is your document that you prepared,

24  correct?

25  A.  Yes.

Dickie - redirect

1   Q.  And was it your expectation that Dr. Artunduaga needed to

2   improve on the various issues that you referenced here?

3   A.  Yes.

4         MS. HALL:  And you can take that down, please.

5   BY MS. HALL:

6   Q.  In relation to the --

7         (Counsel conferring.)

8         MS. HALL:  Okay.  Put it back up.

9   BY MS. HALL:

10  Q.  What's the title of the document?

11  A.  "Areas for improvement."

12  Q.  Thanks.  Okay.

13        MS. HALL:  Now you can take it down.

14  BY MS. HALL:

15  Q.  In relation to the issue of the patient that Dr. Lawler

16  spoke with you about.

17  A.  Yes.

18  Q.  And the concerns that you had in relation to

19  Dr. Artunduaga specifically.

20  A.  Yes.

21  Q.  Was your concern in relation to Dr. Artunduaga that the

22  drains had themselves come out?

23  A.  No.

24  Q.  What was your concern?

25  A.  That Mary had stated very clearly per Mary's telling me

Dickie - redirect

1   what her concerns were.  And when they were relayed to me by

2   Maria, she didn't relay those concerns.  She either didn't

3   understand them or she couldn't communicate to me what the

4   real concern was.  So it was a major gap in understanding on

5   her part.

6              MS. HALL:  That's all.

7              THE COURT:  Any recross?

8              MS. HYNDMAN:  No, Judge.

9              THE COURT:  Thank you, Doctor.

10             You may step down.  You can leave that there.

11  Thank you.

12             Please call your next witness.

13             Back to plaintiff's case?

14             MS. HYNDMAN:  We're actually not back to plaintiff's

15  case.

16             THE COURT:  Okay.

17             MS. HYNDMAN:  Another witness for defense.

18             THE COURT:  All right.  Please call your next

19  witness.

20             MS. HALL:  Dr. Deana Shenaq.

21             THE COURT:  Please come forward, Doctor.  Please come

22  up here, Doctor.

23             THE WITNESS:  Sure.

24             THE COURT:  Please raise your right hand.

25        (Witness sworn.)

```
 1              DEANA SHENAQ, DEFENDANT'S WITNESS, DULY SWORN,

 2                         DIRECT EXAMINATION

 3  BY MS. HALL:

 4  Q.  Good morning, Doctor.  Please introduce yourself to the

 5  jury.

 6  A.  My name is Deana Shenaq.

 7  Q.  Are you currently affiliated with the University of

 8  Chicago Medical Center?

 9  A.  Yes.

10  Q.  In what role?

11  A.  I am one of the chief residents for plastic surgery.

12  Q.  What is your ethnic background, Dr. Shenaq?

13  A.  My parents are Middle Eastern.  My mom is from Palestine.

14  My dad is Jordanian.

15  Q.  Do you speak any languages other than English?

16  A.  Yes.  I speak Spanish fluently and Arabic basic.

17  Q.  Is this your last year in the plastic surgery residency

18  program at UCMC?

19  A.  Yes.

20  Q.  You smiled.  When will your residency end?

21  A.  In June.

22  Q.  And what do you plan on doing after your residency ends?

23  A.  I will be pursuing a microsurgery fellowship at Memorial

24  Sloan Kettering.

25  Q.  When did you begin as a surgical resident at UCMC?
```

Shenaq - direct

982

1   A.  Six years ago.

2   Q.  And would that have been in 2011?

3   A.  2011, mm-hmm.

4   Q.  Do you know Dr. Maria Artunduaga?

5   A.  Yes.

6   Q.  When did you first meet her?

7   A.  I first met her when I was rotating as a fourth-year

8   medical student at Stanford.

9   Q.  And what were you doing at Stanford at that time?

10  A.  At that time I was doing an audition rotation for plastic

11  surgery.

12  Q.  And how is it that you came to meet Dr. Artunduaga?

13  A.  I just met her on the floors.  She was doing I believe an

14  observership there at the same time.

15  Q.  Were you and Dr. Artunduaga both interns at the same time

16  in the plastic surgery residency program at UCMC?

17  A.  Yes.

18          MS. HALL:  Give me one second.

19  BY MS. HALL:

20  Q.  As an intern, Dr. Shenaq, did you rotate through various

21  general surgery services?

22  A.  Yes.

23  Q.  And plastic surgery as well?

24  A.  Yes.

25  Q.  While on those services, did you participate in the

1  clinic?

2  A.  Yes.

3  Q.  And what did you understand your general responsibilities

4  to be as an intern while you were on the clinic?

5  A.  In the clinic, my responsibility was to see patients with

6  the attending, take notes, basically do what I was asked to do

7  by my superiors.

8  Q.  And when in the clinic, were you taking direction from

9  anyone in particular other than the attending?

10  A.  Yes, various services.  There were nurse practitioners and

11  PAs that had been there longer than I had and would give us

12  directions.

13  Q.  And did one of those nurse practitioners include Joly

14  Jose?

15  A.  Yes.

16  Q.  And did you take direction from her while you were on the

17  Kaplan service as an intern?

18  A.  Yes, all the time.

19  Q.  While an intern, did you operate?

20  A.  Not very much.

21  Q.  Not as frequently as you wanted to?

22  A.  Not as often as I wanted to.  That was -- that has always

23  been one of my criticisms of the program.

24  Q.  And during your internship year, was there any minimum

25  number of cases that you had to participate in in the OR?

Shenaq - direct

1   A.   No.

2   Q.   Do you have any idea of how many cases you participated in

3   as an intern?

4   A.   I think probably no more than around 50 cases.

5   Q.   And is that a number that you found to be satisfactory as

6   an intern?

7   A.   No.

8   Q.   Based on your experience at UCMC, including your

9   experience during your intern year and during the subsequent

10  almost five years thereafter, do you believe it's the intern's

11  primary duty to operate?

12  A.   No.

13  Q.   What is the primary duty of a surgical intern at UCMC in

14  your experience?

15  A.   Their primary responsibility is to take care of patients

16  on the floor.

17  Q.   And did you take care of patients on the floor as an

18  intern?

19  A.   Yes, every day.

20  Q.   And what did you understand the expectations to be of you

21  in that setting?

22  A.   In that setting, my role was to complete the tasks I was

23  given during the day by my senior residents, to see consults,

24  to answer the pages timely and basically complete patient care

25  that needed to be done on a daily basis.

Shenaq - direct

985

1   Q.  Okay.

2           MS. HALL:  One second, please.

3       (Counsel conferring.)

4   BY MS. HALL:

5   Q.  During your intern year, Dr. Shenaq, did you have an

6   understanding that you were supposed to take any kind of exam

7   related to your residency?

8   A.  Yes.

9   Q.  And what was your initial understanding as to what that

10  exam would be?

11  A.  My initial understanding that we -- was that we were

12  taking the general surgery ABSITE exam.

13  Q.  Say that again.

14  A.  The ABSITE exam.  It's the in-training exam for general

15  surgeons.

16  Q.  And how did you have that understanding?

17  A.  I believe I spoke with the residents more senior than I

18  was in the PGY-2 year, and that was the test that they had

19  taken.  So I assumed we were taking that as well.

20  Q.  When you say "we," who did you mean?

21  A.  Maria and I.

22  Q.  Did you, in fact, end up taking the ABSITE exam?

23  A.  No.

24  Q.  What exam did you take during your intern year?

25  A.  We took the plastic surgery training exam.

Shenaq - direct

986

1   Q.  And how did you come to learn that you would not be taking

2   the ABSITE exam?

3   A.  I just happened to be sitting next to another resident who

4   was reading his e-mail, and he said that he did not see my

5   name on the list of assignments on where -- what room I was

6   taking the general surgery exam in.  And I thought that was

7   odd, so I sent an e-mail to Dr. Song and our program

8   director -- or our program coordinator at the time, Akilah,

9   asking what exam we were taking to clarify.

10  Q.  I would like to show you Defendant's Exhibit No. 69.

11          MS. HALL:  Which I do not believe is in evidence yet.

12          THE COURT:  Is there any objection to its admission?

13          MS. FRANKLIN:  No, Your Honor.

14          THE COURT:  It's admitted.

15      (Defendant's Exhibit No. 69 was received in evidence.)

16          MS. HALL:  So let's blow up the bottom e-mail,

17  please, Michael.

18  BY MS. HALL:

19  Q.  Dr. Shenaq, do you recognize this to be an e-mail that you

20  sent to Dr. Song on November 28, 2011?

21  A.  Yes.

22  Q.  And can you please read the e-mail that you sent to

23  Dr. Song.

24  A.  It says, "Hi, Dr. Song.  I hope you are doing well.  I

25  wanted to ask whether Maria and I are required to take the

Shenaq - direct

1    ABSITE exam?  Carmen Barr sent an e-mail to the general

2    surgery residents that we as plastics residents do not take

3    the exam as interns.  Is this correct?  Thanks.  Deana."

4              MS. HALL:  And, Michael, could you please zoom out

5    and then cover the next two e-mails?  Pull them out.

6    BY MS. HALL:

7    Q.  And the e-mail at the bottom, is that Dr. Song's response

8    to you?

9    A.  Yes.

10   Q.  On November 28, 2011?

11   A.  Yes.

12   Q.  And what did Dr. Song say in that e-mail to you?

13   A.  "Correct.  But you will have to take our inservice exams

14   in March, I believe.  Hope you had a good Thanksgiving."

15   Q.  And at the top, did you forward that e-mail?

16   A.  Yes.

17   Q.  To whom?

18   A.  To Maria.

19   Q.  Did you study for the inservice exam after?

20   A.  Yes.

21   Q.  Did anyone provide you with study materials for the exam?

22   A.  Yes.

23   Q.  Who?

24   A.  Matt Grieves -- he was the chief resident -- provided us

25   with study materials.

Shenaq - direct

1    Q.   How did he do that?

2    A.   On a couple of days later, Maria sent an e-mail to the

3    entire residents of plastic surgery asking for help in

4    preparation.  In response to that e-mail, Matt Grieves sent

5    out a link to the old inservice exams and questions and said

6    that this was how everyone else prepared.

7    Q.   And that response went to both you and to Dr. Artunduaga?

8    A.   Yes.

9    Q.   And did you take that exam?

10   A.   Yes.

11   Q.   Were you notified of what your score was on that exam?

12   A.   Yes.

13   Q.   Do you recall what it was?

14   A.   Yes.

15   Q.   Can you please tell me?

16   A.   I think it was in the 40th percentile.

17   Q.   During your intern year, did you work with a Dr. Mark

18   Ferguson?

19   A.   Yes.

20   Q.   And he was on the thoracic service?

21   A.   Yes.

22   Q.   Did you work with Dr. Ferguson in the operating room?

23   A.   Yes.

24   Q.   Did he ever get frustrated with you?

25   A.   Yes, frequently.

Shenaq - direct

989

1    Q.  Did he ever yell at you while you were in the OR?

2    A.  Yes.

3    Q.  Do you have specific memories as to what he yelled at you

4    about?

5    A.  Yes.  Specifically he yelled about my knot tying skills.

6    He thought that I needed to practice that and yelled that I

7    was not tying square knots.

8           It was also part of one case I was doing a

9    bronchoscopy, and he felt like I was not doing it correctly

10   and would yell at me in terms of my surgical skills.

11   Q.  When he was yelling at you in the OR, were other people

12   present in the OR as well?

13   A.  Yes.

14   Q.  Did you believe that he was personally attacking you when

15   he did that?

16   A.  No.  Actually I felt like he was doing it because he cared

17   about my education and training.

18   Q.  While you were on the thoracic service during your intern

19   year, did you place a chest tube?

20   A.  No.

21           MS. HALL:  That's all.

22           THE COURT:  Cross-examination.

23                       CROSS-EXAMINATION

24   BY MS. FRANKLIN:

25   Q.  Good morning, Dr. Shenaq.  I'm Jamie Franklin.  Nice to

Shenaq - cross

1   meet you.

2   A.   Good morning.

3   Q.   Dr. Shenaq, you were born in Houston, Texas, correct?

4   A.   I was.

5   Q.   You went to medical school at UCMC, right?

6   A.   Yes.

7   Q.   What are you planning to do when you complete your

8   residency this spring -- this summer?

9   A.   I'm going to do a microsurgery fellowship.

10  Q.   Where is that?

11  A.   In New York.

12  Q.   And did Dr. Song give you a recommendation?

13  A.   He did.

14  Q.   When you were in medical school at UCMC, you spent a year

15  as a research fellow, right?

16  A.   Yes.

17  Q.   Was that with Dr. Russell Reid?

18  A.   Yes.

19  Q.   And he's an attending in plastics, right?

20  A.   Yes.

21  Q.   That was during your fourth year of medical school?

22  A.   It was in between the two years.

23  Q.   Okay.  So you had worked with a plastics faculty before

24  you actually began your residency, correct?

25  A.   Some of them, yes.

Shenaq - cross

1  Q.  You worked with Dr. Reid, correct?

2  A.  Yes.

3  Q.  And you were acquainted with Dr. Song by the time you

4  started your residency, correct?

5  A.  Yes.

6  Q.  Your father is a plastic -- was a plastic surgeon in

7  Houston, right?

8  A.  He was.

9  Q.  You're also the resident representative to the American

10  Society of Plastic Surgeons, Plastic Surgeons Board of

11  Directors, is that right, or you were?

12  A.  I was elected this past year.

13  Q.  Okay.  And Dr. David Song was the president of that

14  organization in 2016, correct?

15  A.  Correct.

16  Q.  Ms. Hall asked you some questions about how you first

17  learned about -- when you would take the -- whether you would

18  take the inservice exam.  Do you remember that?

19  A.  Yes.

20  Q.  And you looked at an e-mail that you had forwarded to

21  Dr. Artunduaga.  Do you remember that?

22  A.  Yes.

23  Q.  The e-mail from Dr. Song to you did not include

24  Dr. Artunduaga, correct?

25  A.  It did not.

Shenaq - redirect

992

1    Q.  Okay.

2               MS. FRANKLIN:  That's all I have.

3               THE COURT:  Redirect?

4               MS. HALL:  I have one question.

5                          REDIRECT EXAMINATION

6    BY MS. HALL:

7    Q.  Dr. Shenaq, is the testimony you gave today truthful?

8    A.  Yes.

9               MS. HALL:  That's all.

10              THE COURT:  Any recross?

11              MS. FRANKLIN:  No, Your Honor.

12              THE COURT:  Thank you, Doctor.  You may step down.

13              Please call your next witness.

14              MS. FRANKLIN:  Your Honor, we call Dr. Mark

15   Killingsworth.

16              THE COURT:  Would you like the limiting instruction

17   before he testifies or at the end?

18              MS. FRANKLIN:  Before will be fine, Your Honor.

19              THE COURT:  Mr. Jepson, are you okay, or Ms. Hall,

20   with the limiting instruction being given before his

21   testimony?

22              MR. JEPSON:  Yes.

23              THE COURT:  Ladies and gentlemen, you are about to

24   hear the testimony of Dr. Killingsworth.  Dr. Killingsworth

25   was not asked to consider and did not consider whether the

1    University of Chicago Medical Center has caused plaintiff to

2    suffer any injury or damages.  You may not consider

3    Dr. Killingsworth's testimony or any evidence he offered to be

4    proof that the University of Chicago Medical Center caused

5    plaintiff to suffer any injury or damages.

6              Doctor, you may come forward, please.  Up here,

7    please.

8              Ms. Franklin, you still have a transcript up here you

9    may want to pick up.

10             Please raise your right hand, please.

11        (Witness sworn.)

12             THE COURT:  You may be seated.

13             MS. HYNDMAN:  I'll grab this transcript, Judge.

14             THE COURT:  Thank you.

15      MARK ROBERT KILLINGSWORTH, PLAINTIFF'S WITNESS, DULY SWORN,

16                         DIRECT EXAMINATION

17   BY MS. FRANKLIN:

18   Q.  Good morning, Dr. Killingsworth.  Can you please state

19   your full name.

20   A.  Yes.  It is Mark Robert Killingsworth.

21   Q.  Now, you were retained by the plaintiff as an expert

22   witness as a labor economist, correct?

23   A.  Yes.

24   Q.  What were you asked to do?

25   A.  I was asked to calculate her economic losses arising from

Killingsworth - direct

1   the nonrenewal of her residency at University of Chicago

2   Medical Center.

3   Q.  All right.  Before we get to the details of that,

4   Dr. Killingsworth, could you give us a brief overview of your

5   educational background.

6   A.  Yes.  I was an undergraduate at the University of

7   Michigan, and I was a graduate student and got an MPhil and a

8   DPhil, which correspond to a master's and a doctorate, at the

9   University of Oxford in England.

10  Q.  And could you also give a brief overview of your

11  professional background?

12  A.  Well, I'm a labor economist, and that involves teaching

13  and doing research on behavior of the labor market, things

14  like wages and earnings and employment and occupations.

15  Q.  And have you had any experience with respect to consulting

16  with courts regarding labor economic issues?

17  A.  Yes.  I was a consultant to Judge Robert Carter of the

18  Southern District of New York, federal court, some time ago.

19  Q.  And have you ever testified in front of any representative

20  organizations, any governmental organizations?

21  A.  Yes.  I testified a number of times at the -- I think it

22  was the Philadelphia House of Representatives, the Joint

23  Economic Committee of the Congress, and I think a subcommittee

24  on immigration.

25  Q.  Where are you currently employed?

Killingsworth - direct

995

1  A.  I'm currently a professor of economics at Rutgers

2  University in New Jersey.

3  Q.  Okay.  And I'm sorry if you had already said this, but how

4  long have you been there?

5  A.  Since 1978.  So I guess this is going to be my 39th

6  anniversary.  Hard to believe.

7  Q.  Congratulations.

8        MS. FRANKLIN:  I would like to show Plaintiff's

9  Exhibit 81.  It has not yet been admitted into evidence.

10  BY MS. FRANKLIN:

11  Q.  This is -- Dr. Killingsworth, can you take a look at

12  what's on the screen?  Is this your current -- is this your

13  curriculum vitae?

14  A.  Yes, it is.

15  Q.  All right.  And I'm going to scroll to page 2 to make sure

16  you can identify that one.  This is the correct version of

17  your CV?

18  A.  Yes.

19  Q.  Okay.

20        MS. FRANKLIN:  We would like to move to admit it into

21  evidence.

22        MR. JEPSON:  No objection.

23        THE COURT:  It's admitted.

24     (Plaintiff's Exhibit No. 81 was received in evidence.)

25  BY MS. FRANKLIN:

Killingsworth - direct

1   Q.  All right.  Dr. Killingsworth, can you explain what you

2   were asked to do in order to render your expert opinion in

3   this case?

4   A.  Well, as I said, I was asked to calculate the plaintiff's

5   economic losses arising from the nonrenewal of her residency.

6   Q.  And how did you go about doing that?

7   A.  Well, basically in this setting, an economic loss is the

8   difference between what you could have earned in the event of

9   something not happening, or happening in this case, continuing

10  and proceeding onward to become a plastic surgeon on the one

11  hand, and on the other hand, contrasting that with what

12  actually transpires given that you didn't proceed on to become

13  a plastic surgeon but instead ending up, out of necessity

14  really, taking another path.

15  Q.  So it's the difference --

16          MR. JEPSON:  Your Honor, I'm going to object to the

17  necessity.

18          THE COURT:  Sustained.

19          MS. FRANKLIN:  Sure.

20  BY MS. FRANKLIN:

21  Q.  So are you saying that you looked at the difference

22  between earnings as a plastic surgeon and earnings in an

23  alternative career?

24  A.  That's right.

25  Q.  Okay.  And what methodology did you use to look at that

1    question?

2    A.  Well, I would say the key idea or the key concept is the

3    notion of an age earnings profile.  We find, and this is one

4    of the best established and most robust empirical findings in

5    all of labor economics, that as people get older, earnings

6    rise at first rather rapidly and then later on may go on

7    rising but typically at a considerably slower rate.

8           And I can kind of do a little hand waving maybe.  The

9    increase is at first rather steep and then sort of continues

10   but flattens out a bit.  And depending on the context, the

11   occupation, et cetera, earnings might actually drop.  I teach

12   a course in sports economics.  And Randy Johnson, the big unit

13   who was a pitcher for the Diamondbacks and the Yankees,

14   actually had just the same pattern.  He had a slump towards

15   the end of his career and a big dip.  But otherwise his

16   earnings followed just the same sort of past.

17   Q.  Wow.

18          So when you did this analysis, what information did

19   you use as inputs?

20   A.  Well, I first got some information -- there's not a lot of

21   information -- about the earnings of plastic surgeons, initial

22   earnings and earnings slightly later in the career.  That

23   wasn't really -- that wasn't sufficient really for me to do a

24   whole age earnings profile.

25          So I then turned to the current population survey,

Killingsworth - direct

1    which is run by the U.S. Bureau of Labor Statistics in the

2    labor department.  And they survey lots and lots of people,

3    something like a hundred thousand people, and ask, among other

4    things, about earnings at different ages for people who are

5    employed.  And although they don't identify plastic surgeons

6    specifically, they do have a category called physicians and

7    surgeons.  And so by looking at how earnings evolve for that

8    group of people as they get older, I was able to construct an

9    age earnings profile for plastic surgeons.  The other part of

10   it was to hook it up to the starting salary numbers that I got

11   from a number of publications that did refer specifically to

12   plastic surgeons.

13           So the sort of very early career salaries I was able

14   to get for plastic surgeons per se, and the later numbers I

15   was able to get by using an age earnings profile for

16   physicians and surgeons of all kinds.

17   Q.  Were you able to get any -- what you considered reliable

18   data for plastic surgeon salaries after the first year?

19   A.  Well, after the first year and I think a couple of years,

20   three to seven years out, after that the data were patchy in

21   the survey that I looked at, which was by an organization

22   called MGMA.  I think it's the Medical Group Management

23   Association.

24   Q.  So you used what you considered to be the most reliable

25   data; is that right?

Killingsworth - direct

999

1  A.  Yes.

2  Q.  Okay.

3  A.  I think there were roughly a thousand physicians in the

4  BLS data which I used to -- the current population survey data

5  which I used to construct age -- the age earnings profile

6  beyond the early career.

7  Q.  So I'm going to look at Plaintiff's Exhibit 82 here.

8          MS. FRANKLIN:  It has not yet been admitted into

9  evidence.

10  BY MS. FRANKLIN:

11  Q.  Dr. Killingsworth, can you take a look and let me know if

12  you recognize this document?

13          THE COURT:  Is there any objection to its admission?

14          MR. JEPSON:  Yeah, there is an objection.

15          THE COURT:  Okay.  What's the objection?

16          MR. JEPSON:  I ask that it not be published until

17  cross, until after cross.

18          MS. FRANKLIN:  What's the objection?

19          MR. JEPSON:  I don't believe it's accurate.

20          THE COURT:  Ms. Franklin?

21          MS. FRANKLIN:  I think we're going to have to see it

22  and talk about it to be able to have the jury decide it.

23          THE COURT:  Ask your questions and then move it in

24  again.  And if -- if you want to do *voir dire* at that point,

25  Mr. Jepson, you can do it.

Killingsworth - direct

1000

1       MR. JEPSON:  That would be good.

2       THE COURT:  So go ahead and ask the questions and lay

3   your foundation.

4   BY MS. FRANKLIN:

5   Q.  Dr. Killingsworth, is this a table that summarizes some of

6   your results from your study?

7   A.  My screen is blank.

8   Q.  Now we have it on the right screens.  Do you recognize

9   this document?

10  A.  Yes.

11  Q.  What is it?

12  A.  Well, that's the first page.  There's a bit -- there's

13  some footnotes that are kind of at the bottom of this page.

14  Q.  I'll show you the entire page.

15  A.  That's all right.  And the notes continue over to the next

16  page.  But that summarizes the calculations that I did.

17  Q.  And can you explain what each of the columns -- what each

18  of the columns represent?

19  A.  Yes.  Well, the first two columns talk about annual

20  earnings.  And as I said, one is about earnings assuming that

21  the plaintiff continued on and became a plastic surgeon, and

22  the second column refers to what actually happened or could be

23  expected to happen in the future given that the plaintiff did

24  not become a plastic surgeon.

25  Q.  So column No. 1, do you see that there?

Killingsworth - direct

1001

1    A.   I do.

2    Q.   It says "annual earnings," correct?

3    A.   Right.

4    Q.   "Retained but for," can you explain what that means?

5    A.   Well, but for having -- having left the residency after

6    the first year and then having become a plastic surgeon, this

7    is the forecast based on the age earnings profile concept that

8    I mentioned for how earnings would have unfolded over time.

9    The first column indicates the year.  The second column

10   indicates the age.  So sort of midway down, we see 2030 when

11   the plaintiff would have been 50 and 2040 when the plaintiff

12   would be 60 and so forth and so on.  So these are earnings at

13   different ages.

14   Q.   So the first column is the year.  The second column is the

15   age.  And then the third column, which is under annual

16   earnings, shows what your study --

17   A.   Again --

18   Q.   -- let me just see if I understand it -- what your study

19   estimated the earnings would have been for that year --

20   A.   That's right.

21   Q.   -- as a plastic surgeon?

22   A.   In column 1, right.  So one could I guess also label that

23   first column "plastic surgeon," although that's not what's in

24   there.

25   Q.   All right.  Exactly.  All right.  Thank you.

Killingsworth - direct

1002

1    And then No. 2 under "annual earnings" says

2  "terminated mitigation"?

3  A.  Right.

4  Q.  What is that column?

5  A.  Well, that refers to what happens or could be expected to

6  happen given that the plaintiff is not a plastic surgeon and

7  instead wound up in an M.P.H. program.

8  Q.  What inputs did you use to calculate the numbers in that

9  column?

10  A.  Well, it was a similar process, but the data were

11  obviously different.  I looked at a survey, a number of

12  surveys actually, and there was one survey in particular which

13  gave me the median -- I think it was starting pay of people

14  with M.P.H. degrees.  And it was done -- the survey was done

15  by the -- I think it was the Association of Public Health

16  Schools or something like that.  And the first few years

17  actually don't refer to earnings, predicted earnings or

18  expected earnings as a public health, an M.P.H., but rather

19  actual earnings because this M.P.H., enrollment in the M.P.H.

20  program didn't take place I believe until 2016 or '17.  So

21  there's some earnings before that.

22    And then upon finishing the M.P.H. program, then I

23  used the starting pay from the M.P.H. survey.  And that's

24  $65,000, and that's in the year 2017, this year.

25    And then after that, again, I found or determined

Killingsworth - direct

1   using the age earnings profile concept an age earnings profile

2   for people in public health with master's degrees.

3   Q.  And did you use the same CPS database for the age earning

4   profiles for both of those calculations?

5   A.  Yes, but it referred to obviously different kinds of

6   people.  These are people in column 2 who have master's

7   degrees and are in public health related positions.

8   Q.  And where did you -- what did you base your assumption

9   that Dr. Artunduaga would enter the public health domain on?

10  A.  Well, it was specifically based on the fact that she was

11  in an M.P.H. program.

12  Q.  Okay.  Now, if we could turn to what's -- you've numbered

13  as column 3.  Do you see that?

14  A.  Yes.

15  Q.  "Annual amount," what does that represent?

16  A.  Right.  Well, that's -- the heading overall says "lost

17  earnings."  So column 3 represents the actual lost earnings,

18  which is simply the difference between what's in column 1 and

19  what's in column 2.

20          So, for example, let's take 2017, in fact.  In 2017,

21  earnings in the plastic surgeon track would have been I

22  calculate 62,500.  Earnings in the M.P.H. track would be

23  65,000 even.  And so the difference is negative, meaning that

24  the public health track would have paid a little bit more in

25  that year.

Killingsworth - direct

1004

1    The other years you can get in just the same sort of

2    way.  Take just one more in 2018.  The plastic surgeon track

3    would have paid 75,000; the M.P.H. track, 68,592.  The

4    difference is 6408, and that's the lost earnings and so forth

5    and so on.  Obviously the numbers get bigger as the two

6    figures get further apart, but the concept is just the same.

7  Q.  So that column is simply arithmetic?  You subtracted the

8    masters earnings from the plastics earnings?

9  A.  That part is definitely just arithmetic.

10 Q.  Great.  And then column 4 in your lost earnings says

11   "present value."  Can you explain what that is?

12 A.  That's right.  Well, present value refers to fact that a

13   sum of money in the future is not the same thing as a sum of

14   money right now.  I'd much rather have a thousand dollars

15   immediately than have to wait a year.

16   But on the other hand, if somebody promises to pay me

17   or is going to pay me or is obliged to pay me a thousand

18   dollars next year, then I would be willing to settle for a

19   little less because I could, without any risk at all, put it

20   into some treasury security where there's no risk of default,

21   put a little bit less money and have it grow in a year's time

22   to equal a thousand dollars.  So that earlier amount of money,

23   the amount of money I could get today, is the present value of

24   having a thousand dollars next year.

25   I would have to add, though, that the key here is

1    that this has to be riskless.  We're not talking about putting

2    money in hedge funds.  We're talking about something that is

3    absolutely safe.  And the best and safest kind of asset is a

4    treasury security.

5    Q.  So the present value is how much the number is worth

6    today, correct?

7    A.  The future number is worth today, that's right.  And the

8    interest rate in effect is a bridge between the present and

9    the future.  You could think, and we often do, I think, of

10   putting money in a bank and earning interest on it, and it

11   will go to something bigger later on.

12          In effect, present value does it in the reverse

13   direction.  It's as we have a future amount, and we want to

14   work backwards and figure out what would we need to have today

15   in order risklessly to generate that amount of money at some

16   point in the future.

17   Q.  And how did you determine what interest rate, approximate

18   interest rates to use for your calculation?

19   A.  Well, as of just about the same time that I did this --

20   and I forget exactly when, but it was very close to the date

21   in which I did this -- the Federal Reserve has a website, and

22   it lists the treasury security rates for different maturities,

23   meaning treasury notes and bills and bonds that will mature in

24   a year, two years, three years, et cetera.  So I used that.

25   Q.  You used the United States Treasury Department's website?

Killingsworth - direct

1006

1   A.  Yes.  Actually it was the Federal Reserve website.

2   Q.  Sorry.

3   A.  But these are treasury securities.

4        THE COURT:  Ms. Franklin, before you go further,

5   let's take our morning break, and you can finish up after the

6   break.

7        MS. FRANKLIN:  Okay.

8        MR. RICKHOFF:  All rise.

9    (Jury exits.)

10        THE COURT:  We'll pick up in ten minutes.

11    (Recess.)

12    (Jury in.)

13        THE COURT:  You may be seated.

14        MS. FRANKLIN:  I'm sorry, your Honor.  All the

15   monitors are on at this point.

16        THE COURT:  I am not sure what happened.

17        They are good now.  Go ahead.

18   BY MS. FRANKLIN:

19   Q.  All right.  Dr. Killingsworth, we had just one column left

20   when we took our break, and that's Column 5, cumulative

21   amount.

22        Do you see that?

23   A.  Yes.

24   Q.  What is that?  How do you calculate that?

25   A.  Well, that's just the sum of the entries for present value

Killingsworth - direct

1007

1    up to and including the current date.  So, for simple --

2    simplicity sake, suppose that the first economic loss was $10

3    and the next economic loss was $20.  So, as of that point, the

4    cumulative loss was $30, and that's what it would appear in

5    the last column.

6    Q.  All right.

7         So, we've talked about how you calculated each of the

8    columns, correct?

9    A.  Yes.

10        MS. FRANKLIN:  I move to admit Plaintiff's Exhibit 81

11   into evidence.

12        THE COURT:  Any objection?

13        MR. JEPSON:  No objection, your Honor.

14        MS. HYNDMAN:  82.

15        MS. FRANKLIN:  82.

16        THE COURT:  It is admitted.

17     (Plaintiff's Exhibit No. 82 received in evidence.)

18        MR. JEPSON:  To that one either.

19        MS. FRANKLIN:  Can we publish?

20        THE COURT:  You may.

21        MS. FRANKLIN:  Thank you.

22        Your Honor, we move to have Dr. Mark Killingsworth

23   designated as an expert witness in labor economics in this

24   case.

25        THE COURT:  Is there any objection?

Killingsworth - direct

1008

 1          MR. JEPSON:  No objection, your Honor.

 2          THE COURT:  He will be accepted as such.

 3          Go ahead.

 4   BY MS. FRANKLIN:

 5   Q.  All right.  Dr. Killingsworth, you explained how each of

 6   these columns was calculated.  Can you tell me what your

 7   opinion was regarding this analysis that you did?

 8   A.  Well, it shows the economic loss for the plaintiff at

 9   different ages.  And, so, for instance at age 72, just for

10   convenience sake -- that's the last row in the whole

11   exhibit -- the cumulative economic loss -- and that's the

12   number on the very far right -- is 9,551,158 or, in other

13   words, about 9.55 million.

14   Q.  So, the cumulative loss at the age of 72, if Dr.

15   Artunduaga worked to age 72, is $9.55 million, correct?

16   A.  Correct.

17   Q.  And for any other year that she would work to, you can

18   look on your chart and find the cumulative amount of loss,

19   correct?

20   A.  That's right.  You could just back up.  And, in fact, if

21   you see the number at the very -- you have a little sort of

22   slice out of the chart.  And the last one I see -- or the

23   first one I see, pardon me, is in the year 2048 at age 68.

24   The cumulative loss is 9.139 million.  That's the one now at

25   the very bottom of the slice that you took.

Killingsworth - direct

1009

1    Q.  I made a new slice.

2    A.  Right.

3    Q.  I'm sorry.  There it is.

4    A.  So, if you thought, for instance, that at age 68 under

5    either circumstance, as a plastic surgeon or as a health

6    professional, the plaintiff would have won the lottery and

7    decided that she was going to retire at age 68, that would be

8    the cumulative loss at that point if she wasn't going to work

9    in anything beyond that point.

10   Q.  All right.

11          And, then, let's just do one more example.  If the

12   plaintiff decided to retire at age 63 -- I'm going to

13   highlight that one for you -- in your opinion, what would the

14   cumulative loss be if she decided to retire at 63?

15   A.  Again, for that age, you've highlighted it.  It's 8.265,

16   just almost 8.266 million.

17   Q.  Thank you.

18   A.  I notice that the courtroom is named after Everett

19   Dirksen, a former Illinois senator.  And he was famous for

20   saying a million here, a million there, pretty soon it adds up

21   to real money.  And I couldn't help but think of that as I

22   walked in the door.

23   Q.  Was there anything else about Table 1 -- I'm sorry, let me

24   ask you another question.

25          Now, sometime later -- sometime after you prepared

Killingsworth - direct

1010

1    Table 1, I asked you to do another analysis, right?

2    A.  Yes.

3    Q.  And what was the difference between the first analysis

4    that we just looked at and this next one that I asked you to

5    do?

6    A.  Well, basically it was aimed at incorporating data

7    recommended or described favorably by the expert whom the

8    defendants had retained.

9    Q.  And who was that?

10   A.  That is Dr. Malcolm Cohen.

11   Q.  Can you explain what that -- what the concern that

12   Dr. Cohen had?  What was the concern that he had with the data

13   that you used?

14   A.  Well, Dr. Cohen's concern was among -- well, he had a

15   number of concerns, but the concern about the data had to do

16   with what was in Column 1 of my chart, the one that we just

17   saw.  In other words, the -- if you want to call it, for

18   simplicity sake, the plastic surgeon earnings figures.

19         He had a different data source in mind, something

20   called ERI, the Economic Research Institute, which produces

21   data.  And he thought that for a variety of reasons that was

22   better, more appropriate to use than the data that I had used.

23   Q.  So, did you locate and look at the data that Dr. Cohen

24   preferred?

25   A.  Yes, I did.

Killingsworth - direct

1  Q.  And what did you do with that?

2  A.  Well, I used it in an analysis that otherwise was just the

3  same as the analysis that we just saw.  The only difference

4  was that I pulled out the data that I had previously used and

5  popped in the data that he used.

6  Q.  So, you actually re-ran your analysis using the data that

7  defendant's witness Dr. Cohen preferred, right?

8  A.  Yes.  Well, the data for plastic surgeons.

9  Q.  Just for the plastic surgeon salary, right?

10 A.  That's right.  He didn't say anything, if I can recall,

11 about data sources for Master's in Public Health people.

12 Q.  I'd like to look at Plaintiff's Exhibit 83, which is not

13 yet in evidence.

14        THE COURT:  Is there any objection to its admission?

15        MR. JEPSON:  No objection, your Honor.

16        THE COURT:  It is admitted.

17        MS. FRANKLIN:  Thank you.

18     (Plaintiff's Exhibit No. 83 received in evidence.)

19        MS. FRANKLIN:  Can we publish?

20        THE COURT:  Yes.

21 BY MS. FRANKLIN:

22 Q.  Do you recognize this document, Dr. Killingsworth?

23 A.  Yes.

24 Q.  What is this?

25 A.  That uses the ERI data, the Economic Research data --

Killingsworth - direct

1012

1  which is the data source that Dr. Cohen preferred -- instead

2  of -- I'm sorry, and he used it in Column 1.

3        It used it in Column 1 basically starting with the

4  year in which the plaintiff would have become a plastic

5  surgeon.  So, it doesn't change anything in earlier years

6  because at that point she wasn't a plastic surgeon.  But it

7  refers -- the ERI data referred to the years in which she

8  would have been a plastic surgeon.

9  Q.  So, did the ERI data result in a difference between

10 your -- this analysis and your first?

11 A.  Yes.

12 Q.  Can you tell us what the difference was?

13 A.  Well, I -- I can't -- I don't remember offhand exactly the

14 number in the previous chart, but it was something like 9

15 something million at age 72.

16       And here, if you look in Column 5, at the very, very

17 bottom for age 72, it's a bit lower -- 8.476 million -- again,

18 using a different source of data for plastic surgeons.

19 Q.  So, using the ERI data, what is your opinion regarding the

20 losses at age 72 for Dr. Artunduaga?

21 A.  Well, based on those data, the losses are about 8.476

22 million.  In other words, still a pretty healthy sum of money.

23       MR. JEPSON:  Objection to the editorializing, your

24 Honor.

25       THE COURT:  Sustained.  I will strike that.

 1              The jury should disregard it.

 2   BY MS. FRANKLIN:

 3   Q.  Column No. 5 here, does that contain your opinion using

 4   the ERI data for any year that you would choose between ages

 5   32 and 72?

 6   A.  Yes.  You could cut off the calculations or you could cut

 7   off the number at any age and year you wanted.

 8   Q.  And I'd like to just quickly return to the prior exhibit

 9   and ask you the same question:  Does the --

10              THE COURT:  And for the record, just identify what

11   exhibit, please.

12              MS. FRANKLIN:  I'm sorry.

13   BY MS. FRANKLIN:

14   Q.  Plaintiff's Exhibit 82.  I've put that back up on your

15   screen.

16              Does the "Cumulative Amount" column, which is No. 5,

17   reflect your opinion on the cumulative losses for any age

18   between 32 and 72?

19   A.  Yes, using the different data source.  That's right.

20   Q.  So, you could look at any age of retirement or any other

21   age between those two points and look at this chart and your

22   opinion would be that Column 5 contains the loss, correct?

23   A.  The cumulative loss, correct.

24   Q.  Did you do any other analyses besides the first one we

25   talked about, and then the one with the data Dr. Cohen

1    preferred?

2    A.  Yes.

3    Q.  And what was that analysis?

4    A.  Well, I did another analysis sort of analogous in most

5    ways to the very first analysis that we talked about.  But he

6    argued that the source for initial salary that I used -- that

7    I used -- not his ERI data, but the source for initial salary

8    that I used -- actually wasn't, that I had misinterpreted the

9    description.

10         And, so, I went back.  I believe that the description

11   was kind of ambiguous.  It sort of meandered back and forth

12   between private practice and academic plastic surgeons,

13   between overall averages for people at all experience levels

14   versus starting salaries, and so on.

15         But I went back and I said, okay, based on what I

16   believe Dr. Cohen was saying, is there a different way to

17   measure starting salary.  I used that different measure --

18   developed that different measure -- from the same source, but

19   following Dr. Cohen's interpretation rather than mine, and,

20   again, used the age earnings profile after that point to get

21   later earnings at later ages and, again, came up with a table

22   very similar conceptually to the first table that we saw, but

23   using a slightly different way of determining starting

24   salaries.

25   Q.  All right.

Killingsworth - direct

1015

1     Let's look at Plaintiff's Exhibit 84, which has not

2  yet been admitted.

3          THE COURT:  Is there any objection to its admission?

4          MR. JEPSON:  No objection.

5          THE COURT:  Admitted.

6     (Plaintiff's Exhibit No. 84 received in evidence.)

7          MS. FRANKLIN:  May we publish?

8          THE COURT:  You may.

9  BY MS. FRANKLIN:

10  Q.  Do you recognize Plaintiff's Exhibit 84?

11  A.  Yes.

12  Q.  And what does this reflect?

13  A.  Well, that used the same data that I used in the very

14  first table that we saw, but used it in a somewhat different

15  way; used it in a somewhat different way specifically to get

16  starting salaries.  But otherwise, the general setup is really

17  the same.

18  Q.  So, the first study was using MGMA data, correct?

19  A.  Yes, the very first table we saw --

20  Q.  Right.

21  A.  -- and also this one.

22  Q.  The second study you responded to a concern of Dr. Cohen

23  and you used a different data for the plastic surgery salary,

24  the ERI data, right?

25  A.  Correct.

Killingsworth - direct

1016

1    Q.  And in this one, you went back to the MGMA data, but also

2    addressed another concern of Dr. Cohen's and made that change

3    based on his concern, right?

4    A.  That's right.

5    Q.  Okay.

6    A.  All of this refers, by the way -- again, I think I said

7    this, but just to be clear, all of this is about what went

8    into Column 1 in each of those tables, because that was the --

9    you know, that was the issue that he was raising.

10   Q.  So, with this third analysis, what was your opinion about

11   the total cumulative losses at age 72?

12   A.  Well, the total cumulative losses as of age 72 you see in

13   that little slice that you just did and highlighted in yellow,

14   the lower one on the far right, 9.873 or roughly 9.874 million

15   is the total cumulative loss up to and including age 72.

16   Q.  So, $9.87 million, right?

17   A.  Right.

18   Q.  And that was slightly larger than your first study, right?

19   A.  That's right.

20   Q.  Okay.

21        And is it your opinion that if you look on Column 5,

22   you can find the cumulative loss for any age between 32 and 72

23   there?

24   A.  That's right.

25   Q.  Okay.

Killingsworth - direct

1    Now, just to briefly return to the issue of which

2  data was best, can you explain what your concerns with the ERI

3  data that Dr. Cohen preferred was?

4  A.   Well, the ERI data is produced by the Economic Research

5  Institute.  And when I went to look it up -- because Dr. Cohen

6  spoke very highly of it -- I was a little frustrated because I

7  couldn't find a clear description of how the data came to be.

8  There are apparently two surveys that they use, one of which

9  is actually Bureau of Labor Statistics data and also some kind

10 of health survey.  They never indicated the numbers of people

11 who are included in any of the data points.  And the data

12 points are also, in some unspecified manner, updated and

13 massaged, smoothed, so that I think of these data as sort of

14 sausage data.  You don't really know what went into them.

15    And, so, I must confess that since I don't really

16 know the providence of these data, I'm a little skeptical of

17 what they're going to tell us or of how meaningful they are.

18 But be that as it may, as you saw, I did do an analysis that

19 used those data.

20 Q.   Right.

21    Did you think your data that you used for the first

22 and third analyses, the MGMA data, was more reliable?

23 A.   Well, I think so.  Again, at the very least, I'm able to

24 tell how many people are in the MGMA data and where those data

25 came from, which is not the case, unfortunately, with the ERI

Killingsworth - cross

1018

1   data.  I just have no idea where those numbers came from or

2   how ERI produced them.  And I must say also that although I

3   went very carefully through their description of the data, I

4   really couldn't find a good description.

5           MS. FRANKLIN:  That's all I have, your Honor.

6           THE COURT:  Cross-examination.

7           MR. JEPSON:  Thank you.

8                           CROSS-EXAMINATION

9   BY MR. JEPSON:

10  Q.  Good morning, Dr. Killingsworth.

11  A.  Good morning.

12  Q.  Nice to see you, again.

13          I just have a few questions.  And let's just go back

14  to, since we were talking about the data, MGMA.  How many --

15  that's the, what, Medical -- what is that acronym?

16  A.  I believe it's Medical Group Management Association.

17  Q.  All right.

18          And with respect to the data regarding plastic and

19  reconstructive surgeons, how many plastic and reconstructive

20  surgeons actually provided information?

21  A.  I would have to look that up.

22  Q.  It was about 75, wasn't it?

23  A.  I don't remember.

24  Q.  And, indeed, you had to go to the CPS, which includes all

25  physicians and surgeons, because you didn't have enough data

Killingsworth - cross

1    from that first study, correct?

2    A.  Well, I didn't have enough data to construct an age

3    earnings profile, no.

4    Q.  And, indeed --

5    A.  But that's a little different from constructing something

6    about starting salary --

7    Q.  And, indeed --

8    A.  -- or the initial career.

9    Q.  Indeed, in that MGMA survey, there wasn't even anybody who

10   responded from the first and second years, correct?

11   A.  I think that's right, yes.

12   Q.  All right.

13          And, so, let's talk, if we could, a bit about what

14   you didn't do and just so we're clear as to what -- we know

15   what you did do, so let's talk about what you didn't do.

16          First, you're not here to opine in any way, shape or

17   form on whether Dr. Artunduaga was discriminated or retaliated

18   against, correct?

19   A.  No, that's right.  I haven't studied that.

20   Q.  You know nothing about the underlying facts of the case,

21   except what you were told from the plaintiff?

22   A.  I read the complaint, but --

23   Q.  Okay.  That's --

24   A.  -- beyond that, I don't know anything further.

25   Q.  No personal knowledge, correct?

Killingsworth - cross

1020

1   A.   Correct.

2   Q.   All right.

3        And with respect to -- let's talk about the other

4   stream, the M.P.H. stream -- earnings stream -- that you

5   constructed.

6        There the assumption was that Dr. Artunduaga would

7   get her Master's of Public Health -- and, by the way, she got

8   it; she graduated in 2016 -- and that she would then work in

9   either an academic or not-for-profit setting, correct?

10  A.   Well, I assumed she'd get an M.P.H. and get earnings as

11  a -- was a medi- --

12  Q.   Well, you were told, weren't you, that it would be either

13  an academic or not-for-profit setting?

14  A.   I don't remember that, but --

15  Q.   Okay.

16       Well, I have something you offered here, which says

17  this -- it's not in front of the jury and won't be.

18       Why don't I just show it to you.  It's this --

19       THE COURT:  Can you mark it, please, in some way to

20  identify it.

21       MR. JEPSON:  May I approach, your Honor?

22       THE COURT:  You may.

23  BY MR. JEPSON:

24  Q.   Does this refresh your recollection, Dr. Killingsworth?

25       (Document tendered.)

Killingsworth - cross

1021

1       THE COURT:  Can you identify --

2       MR. JEPSON:  This is a report that was submitted.

3       THE COURT:  Okay.

4       MR. JEPSON:  It's not an exhibit.

5   BY THE WITNESS:

6   A.  Ah, yes.  Okay.  You're right.  I remember that now.

7   Thank you.

8   BY MR. JEPSON:

9   Q.  Thank you, Dr. Killingsworth.

10      And, so, that was the assumption with respect to the

11  income stream for the M.P.H., correct?

12  A.  Well, that's what I was told.  You can't quite pinpoint

13  the data in that way, but --

14  Q.  Well --

15  A.  -- that's what I was told.

16  Q.  And that's what you assumed and that's how you then put

17  things together, correct?

18  A.  Well, again, you can't use the data to identify -- what

19  was the phrase you had?

20  Q.  Academic?

21  A.  Academic --

22  Q.  Or not-for-profit.

23  A.  -- or nonprofit, that's right.

24  Q.  You can't carve it that finely?

25  A.  Not quite in that way, no.

Killingsworth - cross

1022

1    Q.  All right.

2            Did you know that after getting that M.P.H. degree

3    that Dr. Artunduaga went on to a program which she's now in

4    getting a Master's in Translational Medicine?

5    A.  At the time I did the report, no.  And I'm not sure she

6    actually had done that yet.  In fact, I'm not sure she had

7    actually --

8    Q.  No --

9    A.  -- finished.

10   Q.  -- I'm not suggesting you --

11           THE REPORTER:  Excuse me.

12   BY THE WITNESS:

13   A.  And I'm not sure she --

14           THE REPORTER:  Hold on.  You're talking over each

15   other.

16   BY MR. JEPSON:

17   Q.  Please just answer.  I'm not suggesting that you left it

18   out or were mistaken.  I'm just asking you if you know that

19   now she's in that program.

20   A.  I'm aware of that now, yes.

21   Q.  Okay.

22           And you did not factor in that Master's of

23   Translational Medicine in any way, shape or form to the

24   earnings stream for the M.P.H., correct?

25   A.  The earnings stream doesn't reflect any such thing, that's

Killingsworth - cross

1   right.

2   Q.  And, indeed, with respect to that M.P.H. earnings stream,

3   you didn't factor into the numbers the fact that she had a

4   medical degree, correct?

5   A.  That's correct.

6   Q.  Okay.

7           And, indeed, when you were -- that income stream does

8   not reflect -- and, indeed, you weren't opining, and I don't

9   think you believe you're qualified, to determine what other

10  kinds of jobs she could have gotten, correct?

11  A.  That's right.  I'm not a vocational counselor.

12  Q.  Okay.

13          And, so, you didn't consider whether she would go

14  back to Colombia and get a position or -- as a physician or

15  whether she would become employed in industry, developing

16  clinical devices or become an executive at a corporation or a

17  start-up or anything else, correct?

18  A.  No, I didn't.

19  Q.  And with respect to your analysis on the plastic surgery

20  side of things, again, you established -- you used MGMA and --

21  when necessary, to do the profile, you supplemented with the

22  CPS, correct?

23  A.  Yes.

24  Q.  Okay.

25          And did you ever look at any data -- are you familiar

Killingsworth - cross

1   with any data from an organization called Medscape?

2   A.  I don't think so, no.

3   Q.  Okay.

4       And, then, you wouldn't know that Medscape actually

5   has information, surveys annually from about 2,000 plastic

6   surgeons; is that correct?

7   A.  I'm not aware of that, no.

8   Q.  If, indeed, you had been aware of it, you might have

9   looked at it at least to try to factor it in, correct?

10  A.  That's possible, yes.

11  Q.  All right.

12      Now, there was also some assumptions or at least -- I

13  won't say assumptions, but you were asked to calculate the

14  numbers as if Dr. Artunduaga worked till age 72, correct?

15  A.  Well, not really.

16  Q.  Well --

17  A.  As --

18  Q.  -- you were asked to calculate the numbers through age 72?

19  A.  Through age 72, yes.

20  Q.  Okay.

21      And you didn't do any sort of work-life analysis

22  which would be -- well, tell me what that is.

23  A.  Work-life analysis means or consists of attempting to

24  predict the total number of years that someone would work --

25  Q.  Got it.

Killingsworth - cross

1025

```
 1   A.  -- allowing, depending on how the calculation is done, for
 2   periods out of the work force, as well as in employment.
 3   Q.  Okay.
 4        So, you didn't -- and just because your chart goes to
 5   age 72, you express no opinion as to how long she actually
 6   would have worked, correct?
 7   A.  No.
 8   Q.  All right.
 9        And, indeed, if Dr. Artunduaga was born in 1980, it
10   means she's currently 36 or 37.  So, we're stretching this out
11   for about 35 or 36 years, correct?
12   A.  I think that's right, yes.
13   Q.  All right.
14        And many, many things -- some good, some bad -- can
15   happen, such as the lottery and other -- illness or possible
16   death can prevent somebody from continuing to work to age 72,
17   correct?
18   A.  That's a possibility, yes.
19   Q.  And, indeed, some people just decide they don't want to
20   work that long, correct?
21   A.  Correct.  They may.
22   Q.  All right.
23        There were -- another baseline assumption with
24   respect to the plastic surgery column is that Dr. Artunduaga
25   would have successfully completed a residency program,
```

Killingsworth - cross

1026

1    correct?

2    A.  Correct.

3    Q.  And, then, that she would have been accepted into and

4    successfully completed a fellowship for two years, correct?

5    A.  Correct.

6    Q.  And, then, that she would have become employed and been a

7    successful plastic surgeon, correct?

8    A.  Correct.

9    Q.  All right.

10   A.  This is for her as a plastic surgeon.  That's right.

11   Q.  Got it.

12          Now, it is true, isn't it, that the numbers that

13   we're looking at, means or averages, correct?

14   A.  Well, they're predictions.

15   Q.  For the salary numbers, correct?

16   A.  Yeah.

17   Q.  I mean, I'm not a labor economist --

18   A.  Right.

19   Q.  -- but humor me.

20   A.  Okay.

21   Q.  All right.

22   A.  Well, they're forecasts.  They're predictions.

23   Q.  Okay.

24   A.  Yeah.

25   Q.  Okay.

Killingsworth - cross

1027

1     And you would agree, wouldn't you, that the amount

2   that a plastic surgeon actually earns depends on a number of

3   other factors, correct?  An individual plastic surgeon.

4   A.  You mean is there variation around the average?

5   Q.  Well, what -- no.  What I mean is -- I'm not being so

6   technical.

7     It depends what geographic location you work at

8   possibly, correct?

9   A.  Could.  It could.

10  Q.  And it depends as to whether you're working as an academic

11  plastic surgeon or in private practice, correct?

12  A.  It might, yes.

13  Q.  And, indeed, it might depend on whether you're doing

14  cosmetic surgery or doing other kinds of surgery, correct?

15  A.  That might matter, too, yes.

16  Q.  And it can also depend on whether you're working in a

17  large practice group or out there hustling on your own,

18  correct?

19  A.  It might, yes.

20  Q.  Okay.

21    So, there's all kinds of factors like that, and you

22  did not attempt to hone in on any of that.  You just used the

23  mean or the average, correct?

24  A.  Well, there's a single prediction, that's right.

25  Q.  Yeah.  All right.

Killingsworth - cross

1028

1   　　　　Now, there also might be a difference as to the

2   level -- you mentioned that, indeed, sometimes things start to

3   slope off as someone gets a little older, correct?

4   A.  Right.

5   Q.  And, indeed, in your first chart, at the age of 57, you

6   noted a decrease in earnings, correct?

7   A.  I don't remember offhand, but if it did --

8   Q.  Trust me.

9   A.  -- I'll take your word for it.

10  Q.  All right.

11  　　　　And that could be due to a number of things, correct?

12  A.  Yes.

13  Q.  Could be that you're working less hard?

14  A.  Working fewer hours.

15  Q.  Fewer hours.

16  　　　　Or not doing as many cases?  There's all kinds of

17  things that could factor into that, right?

18  A.  That's possible, yes.

19  Q.  And it's true, isn't it, that in your charts, you went

20  down with respect to Plaintiff's Exhibit 82.  You recognized

21  that decrease at age 57.  Let's take a quick look at that and,

22  in particular, in the year 2037.  Do you see that?

23  　　　　And, then, to 2038, there's a slight decrease.

24  　　　　Now you can see it?

25  A.  Yes.

Killingsworth - cross

1    Q.  And it continues then to go down?

2    A.  Right.

3    Q.  All right.

4         Then let's take a look at Exhibit 83.  In 2037 to

5    2038, that actually goes up.  So, you didn't factor in the

6    decrease in this chart, did you?

7    A.  Well, I need to correct you.

8    Q.  Okay.

9    A.  The first chart that you showed is based on the current

10   population survey's age earnings profile.

11   Q.  Okay.

12        So, this is --

13   A.  And -- and --

14   Q.  The data doesn't go down?

15   A.  Okay.  And in the CPS data --

16   Q.  Yeah?

17   A.  -- earnings drop.  Now, in the ERI data, they do not.

18   Q.  Okay.

19   A.  But I wasn't factoring anything in or out.  I was --

20   Q.  Got it.

21   A.  -- just using the two sources of data, which do have

22   different implications.  That's a reason for my

23   reservations --

24   Q.  And is that --

25   A.  -- with ERI data, by the way.

1    THE COURT:  Mr. Jepson, would you please be careful.

2  You are really cutting off the witness.  And it makes Joe's --

3    MR. JEPSON:  I'm not intending --

4    THE COURT:  And now you are cutting me off.

5    It makes Joe's job very difficult.

6    MR. JEPSON:  I will never cut you two off.

7  BY MR. JEPSON:

8  Q.  All right.  And, then, you do show a decrease in 84

9  because you used the other -- Exhibit 84, there's a decrease?

10 A.  My screen's blank.  Which is --

11 Q.  There you go.

12 A.  Oh, yes.  Yes.  Un-huh.  Yes.

13 Q.  All right.

14    Now, I also have some -- you mentioned that the data

15 often shows that start off and shoot up real quick, correct?

16 The first ten years or so?

17 A.  Well, as a sort of a general summary description, yes.

18 Q.  Okay.

19    And, in fact, I want to just -- let's go to your

20 Plaintiff's 82, which is the chart based on the MGMA and CPS

21 data which shows that in 2020, a plastic surgeon starting out

22 then would have started off at 345,000 and ten years later, at

23 age 50, they'd be making 639,000 or about a $300 ,000

24 increase.

25    Why would that be?  What would the factors be that

Killingsworth - cross

1031

1    would cause such an increase?

2    A.  Well, there are a variety of things.  And, typically, the

3    idea here is, the explanation that a labor economist would

4    give you, one like me, would be that early in the career, you

5    have the maximum incentive to learn techniques, to learn on

6    the job, to develop a network of contacts, and so forth and so

7    on.  And, so, a lot of those things contribute to very rapid

8    earnings growth.  And we see this in all kinds of studies, in

9    all kinds of settings.  So, this is quite a rapid increase,

10   but it really doesn't surprise me.

11          And I remind you that this comes from the current

12   population survey.  I'm not putting my finger on the scale.

13   Q.  No, I'm not questioning that you --

14   A.  Right.

15   Q.  -- cooked the books.  I mean, obviously, it comes from

16   various sources but -- and what leads you to believe, in your

17   opinion, that Dr. Artunduaga would be so successful?

18   A.  Well, this is the average pattern for physicians and

19   surgeons.  I don't have a crystal ball, and I certainly don't

20   have a crystal ball for a single individual.  But this is the

21   overall pattern that one sees in the data.

22   Q.  Got it.

23          Now, are you aware that -- or did you look at

24   anything indicating the drop-off from full to part-time in

25   plastic surgery at various ages?

Killingsworth - cross

1032

1   A.  I don't have data -- you mean late in the career?

2   Q.  Yeah, later in the career --

3   A.  Okay.

4   Q.  -- after age 55.

5   A.  I don't think I have data for that.

6   Q.  All right.

7        And with respect to Dr. Artunduaga's earnings

8  potential, did you consider any other source of possible

9  employment other than M.P.H. to counteract the plastic

10  surgery?

11  A.  You mean for Column 2?

12  Q.  Correct.

13  A.  I didn't, no.

14  Q.  Okay.

15      And you're aware, aren't you, that Dr. Artunduaga --

16  and I know we addressed -- or you addressed this in your

17  supplemental report -- but that she has expressed a desire to

18  go back to Colombia and run a -- either work at a children's

19  hospital or run a center for pediatric?

20  A.  Well, I don't -- I don't recall run.  I think it was

21  something like set up --

22  Q.  Okay.

23  A.  -- was the word.

24  Q.  Let me take --

25      (Brief pause.)

Killingsworth - redirect

1033

1          MR. JEPSON:  I apologize.

2      (Brief pause.)

3          MR. JEPSON:  221, which is in evidence.

4          THE COURT:  Defendant's 221?

5          MR. JEPSON:  Correct.

6          Let's go to the last page, I believe, of this.  It's

7  the personal statement.

8          Michael, find the personal statement.

9          Maybe it's the second or third page.

10          There we go.

11          And a particular paragraph towards the bottom.

12  BY MR. JEPSON:

13  Q.  There's a paragraph here, Dr. Killingsworth, which was

14  authored in October, 2013, that states:  Ten years from now I

15  see myself leading a successful surgical practice in a

16  children's hospital, educating residents, participating

17  actively in the making of public health policies concerning

18  the distribution of surgical care in rural areas.

19          Does that seem to you to state that she intended to

20  go back to Colombia?

21  A.  It sounds like it, yes.

22  Q.  All right.  Thank you.

23          MR. JEPSON:  No further questions.

24          THE COURT:  Redirect.

25                      REDIRECT EXAMINATION

Killingsworth - redirect

1    BY MS. FRANKLIN:

2    Q.  Dr. Killingsworth, Mr. Jepson asked you about some factors

3    that could influence a plastic surgeon's earnings, like what

4    part of the country you work in, what kind of practice.

5            Do you remember that?

6    A.  Yes.

7    Q.  Did you have any data that would have allowed you to make

8    those distinctions?

9    A.  Well, the data for the current population survey do

10   indicate region, but the year for which I was using it

11   inexplicably didn't have it for the last year.  So,

12   unfortunately, I couldn't do anything with that.

13           But I would have needed to assume that Dr. Artunduaga

14   would go to this or that region, and I didn't really think I

15   was capable of doing that.  So, this is, if you like, a sort

16   of overall average for the U.S. as a whole.

17   Q.  And if Dr. Artunduaga decided to do something different

18   with her career than become a plastic surgeon and stay in the

19   U.S., if she did, what would that affect in your analyses?

20   A.  I'm not sure that I understood the question.  If she

21   decided to stay in the U.S. and be a plastic surgeon?

22   Q.  What part of -- we looked at three charts, which had

23   three --

24   A.  Right.

25   Q.  -- separate opinions, correct, with a variety of different

Killingsworth - redirect

1035

1  inputs?

2  A.  Right.

3  Q.  If you change the input about what Dr. Artunduaga intended

4  to do as an alternative to her plastic --

5  A.  I see.

6  Q.  -- surgery career -- I may have misspoke and I'm sorry --

7  if you assume she would have done something besides go into

8  public health, how would that change --

9  A.  Well --

10  Q.  -- your analysis?

11  A.  -- as of when is this decision being made?  If I've

12  understood this correctly, the question is:  So, having been

13  unable to complete the residency, she decides to go into an

14  M.P.H. program and, then, at some later point says, oh, well,

15  sorry or, you know, I've changed my mind, I want to do X.

16  That would only change the number in Column 2, the so-called

17  mitigation number.  Wouldn't change -- and the reason is she's

18  not the same person that she would have been had she completed

19  the residency and gone on to become a plastic surgeon.

20  Q.  Mr. Jepson asked you about an application from 2013,

21  correct?

22  A.  Yes.

23  Q.  To a program that Dr. Artunduaga is now in in

24  translational medicine, right?

25  A.  Right.

Killingsworth - recross

1036

1   Q.  That was after she had already been terminated from her

2   residency, right?

3   A.  That's right.

4           MS. FRANKLIN:  That's all I have.

5           THE COURT:  Any recross?

6           MR. JEPSON:  Just a couple questions.

7                        RECROSS EXAMINATION

8   BY MR. JEPSON:

9   Q.  In essence with that second column, she very possibly

10  could find employment where she earned more money than a

11  plastic surgeon; you just don't know, correct?

12  A.  Well, she could find employment that would pay her less.

13  I didn't go --

14  Q.  I'm not asking you to argue with me.  I'm just suggesting

15  to you that would either pay her more than a plastic surgeon

16  or pay her more than what's in Column 2, correct?  You just

17  don't know?

18  A.  Maybe.  Maybe.

19          MR. JEPSON:  Thank you.

20          THE COURT:  Thank you, Doctor.  You may step down.

21      (Witness excused.)

22          THE COURT:  Please call your next witness.

23          MS. HYNDMAN:  Plaintiffs call Ricardo Garcia.

24      (Brief pause.)

25          MS. HYNDMAN:  Your Honor, if I might have a minute?

Garcia - direct

1037

```
 1              THE COURT:  You may.

 2              MS. HYNDMAN:  Mr. Garcia doesn't seem to be in the --

 3              THE COURT:  If anybody needs to stand and stretch, go

 4    right ahead.  I know I am always happy to do this.

 5        (Brief pause.)

 6              MS. HYNDMAN:  My mistake, your Honor.  He was in the

 7    lobby area.

 8              THE COURT:  As long as you found him.

 9              Please come forward.

10          RICARDO GARCIA, PLAINTIFF'S WITNESS, SWORN

11                         DIRECT EXAMINATION

12    BY MS. FRANKLIN:

13    Q.  Good morning, Mr. Garcia.

14    A.  Good morning.

15    Q.  Please state your name.

16    A.  Ricardo Garcia.

17    Q.  And you're Dr. Artunduaga's husband, correct?

18    A.  Yes, I am.

19    Q.  Are you originally from Colombia?

20    A.  Yes, I am.

21    Q.  When did you come to the U.S.?

22    A.  I came in 1997.

23    Q.  And are you a permanent resident here now?

24    A.  I'm a citizen now.

25    Q.  You're a citizen.
```

Garcia - direct

1038

1      When did you become a citizen?

2   A.   2012.

3   Q.   Who is your current employer?

4   A.   I work for Google.

5   Q.   What do you do for them?

6   A.   I'm a senior software engineer working in the Android

7   team.

8   Q.   And where do you work?

9   A.   I work in Mountain View, California.

10  Q.   Is that Google's headquarters?

11  A.   Yes.

12  Q.   Now, you're aware -- you were aware of your wife's

13  probation at UCMC at the time it was occurring, right?

14  A.   Yes, I was aware.

15  Q.   Did you do anything to attempt to help her?

16  A.   Yes.

17  Q.   What did you do?

18  A.   Yes.  I -- I advise her some things before the probation,

19  accept the probation.  And I contact a -- I get in contact

20  with the Human Resources Department of University of Chicago.

21  Q.   And did you speak to -- did you contact any particular

22  person there?

23  A.   Yes.  I made some phone calls and I call first -- got

24  through to talk to -- with someone called Larry Callahan and

25  immediately move me to a Rothstein -- a Mr. Rothstein, and I

 1  had a short conversation with him.

 2  Q.  Is that Jonathan Rothstein --

 3  A.  Yeah.

 4  Q.  -- or Rothstein?

 5  A.  Jonathan Rothstein.  Sorry.

 6  Q.  Why did you choose to talk to -- contact Mr. Rothstein

 7  particularly?

 8  A.  Yes.  I look online in the directory, and I look for who

 9  will be the best person to talk about the discrimination in

10  the Human Resources Department.

11  Q.  Do you remember what his directory listing position was

12  called?

13  A.  I think that he was the head of human resources and he

14  mentioned something -- it mentioned either there or in the

15  directory or in the booklet online about discrimination.

16  Q.  And did you talk to Mr. Rothstein?

17  A.  Yes.  I had a short conversation with him.

18  Q.  What did you say to him?

19  A.  I say that I wanted to talk like him -- like with myself

20  or with my wife, to meet with him to talk about the

21  discrimination and the treatment that my wife was receiving at

22  University of Chicago.

23  Q.  What did he say?

24  A.  He say that he was aware that my -- that -- of the

25  situation of my wife, and that he was not the person

Garcia - direct

1040

1    responsible for that so that I should not -- we should not try

2    to contact him anymore.

3    Q.  Did Mr. Rothstein give you a chance to explain what Dr.

4    Artunduaga's --

5    A.  No.

6    Q.  -- issues were?

7    A.  Sorry.  No.  He say, I'm not the right person; stop

8    talking to me.

9    Q.  Did he ask you if her issues involved unlawful

10   discrimination?

11   A.  No, he didn't.

12   Q.  Did he ask you if they involved any unlawful retaliation?

13   A.  No, he didn't.

14   Q.  Do you remember about what date this was?

15   A.  I got through to him on November 17 or 18.

16   Q.  And did you ask -- did you talk to anybody else at UCMC

17   after that?

18   A.  Yes.  I -- on the 18, I talk to Camisha Torry.  I think

19   she was also involved with human resources at the university

20   somehow.  And, then, I receive a phone call from a Jane

21   McAtee.

22   Q.  What phone did you receive the call on?  Was that your

23   cell phone?

24   A.  Yes, it was my cell phone.

25   Q.  And what did Ms. McAtee say?

Garcia - direct

1041

1   A.  At that moment, I was at university and I just handled

2   the -- helped my wife handle the letter that was the response

3   to the probation.  I was still at the university.  And she say

4   that, oh, I'm Jane McAtee from legal counsel, lawyer from the

5   university.  I have some questions from you regarding the

6   letter that I just received.

7         So, there was very, very prompt response.

8         And her question was:  Is your wife filing a

9   grievance for the probation, or is she just going to take the

10   probation without a grievance?

11         So, I said:  Yes, my wife is going to take the

12   probation.  She's not going to file a grievance.

13         Then she say:  By the way, I'm aware that you guys

14   have been trying to contact human resources.  Don't go to

15   human resources.  This is matter has nothing to do with any of

16   your claims or anything else.  Don't go to human resources.

17         And she told me, if you are still at the university,

18   yous need to leave the premises.  I'm going to tell security.

19   You should not be looking for Human Resources Department.

20   Q.  Did you say anything after that?

21   A.  I was shock and I just --

22         MR. JEPSON:  Objection.

23   BY THE WITNESS:

24   A.  And I didn't say anything else.

25         THE COURT:  Overruled.

Garcia - direct

1     THE WITNESS:  Yeah, sorry.

2     BY MS. FRANKLIN:

3     Q.  And that was the end of the call?

4     A.  Yes, that was the end of the call.

5     Q.  Did Ms. McAtee ask you -- she didn't ask you anything

6     about discrimination or retaliation --

7     A.  No --

8     Q.  -- did she?

9     A.  -- she didn't.

10    Q.  And did you try to contact anyone at UCMC after that?

11    A.  Yes.  I send an e-mail to Mr. Rothstein -- Rothstein --

12    sorry, don't now how to pronounce it -- Mr. Rothstein saying

13    that, please, we needed to talk about the issues that were

14    happening at the university, and that we wanted to leave a

15    decent paper trail, like we wanted to talk to him.  I sent an

16    e-mail, and I got an e-mail back from him.

17    MS. FRANKLIN:  I'd like to show Joint Exhibit 29.

18    It's been admitted.

19    THE COURT:  Okay.

20    BY MS. FRANKLIN:

21    Q.  Mr. Garcia, take a look at the bottom of this document.

22    Is that the e-mail you just mentioned sending to Mr.

23    Rothstein?

24    A.  Yes.  Yes, it is.

25    Q.  I'm going to scroll up and ask you if the top e-mail, is

Garcia - direct

1    that the e-mail he sent back to you?

2    A.  Yes, it is.

3    Q.  It says:  I am not the appropriate person to deal with

4    issues your spouse may have, as this office does not deal with

5    any issues related to the Graduate Medical Education Program

6    or participants in that program.

7            Right?

8    A.  Yes.

9    Q.  Is that what it says?

10   A.  Yes, that's what it says.

11   Q.  Okay.

12           And did you -- after this e-mail exchange, did you

13   ever have any other contact with Mr. Rothstein?

14   A.  Not that I recall.

15   Q.  When did you and Dr. Artunduaga get married?

16   A.  We got married on June 17 of 2011.

17   Q.  And when did you have your wedding in Colombia?

18   A.  That was on December 10 of 2011.

19   Q.  Do you share your income and expenses?

20   A.  Yes.

21   Q.  Do you have a joint bank account?

22   A.  Yes, we do.

23   Q.  Do you file your taxes together?

24   A.  Yes.

25   Q.  After Dr. Artunduaga was terminated or did not continue in

Garcia - direct

1044

1   her residency and decided to pursue a degree in public health,

2   did you become the primary earner in the household?

3   A.  Yes.

4   Q.  Okay.

5       Were you the person who handled paying for her

6   expenses related to healthcare and education?

7   A.  Yes.

8   Q.  I'd like to put up Plaintiff's Exhibit 75, which is not in

9   evidence.

10      THE COURT:  Is there any objection to its admission?

11      MR. JEPSON:  I need to see it first.

12    (Brief pause.)

13      MR. JEPSON:  I'll object to this in that it's a

14  summary and doesn't contain the actual background documents

15  that would let us check to whether it's accurate.

16      MS. FRANKLIN:  The background documents are attached

17  as consecutive pages after the --

18      MR. JEPSON:  Yeah.  We just objected to the summary,

19  your Honor.

20      THE COURT:  I will sustain it.  But if you can lay a

21  foundation or get it in under 1006, you can try.

22      MS. FRANKLIN:  Sure.

23  BY MS. FRANKLIN:

24  Q.  If you could take a look, Mr. Garcia, at what's on your

25  screen.

Garcia - direct

1045

1    Do you see that?

2    A.  Yes, I see it.

3    Q.  Are you familiar with this document?

4    A.  Yes.  I created this document.

5    Q.  And what is in this document?

6    A.  This document shows the date and the check number that we

7    did for Dr. Dantz.

8    Q.  Is that Dr. Belazel Dantz?

9    A.  Yes, Belazel Dantz.

10   Q.  And who is he?

11   A.  He's the -- a psychiatrist that is seeing my wife.

12   Q.  And I'd like to turn to the next page.

13            Do you see that?

14   A.  Yes, I see it.

15   Q.  What is that?

16   A.  That's one of the checks to pay Dr. Dantz.

17   Q.  Okay.

18            Let me turn to the next page.  What is that?

19   A.  That's another one of the invoices from Dr. Dantz.

20   Q.  And let me turn to the third page.  What is that?

21   A.  The check for that invoice of Dr. Dantz.

22   Q.  A copy of a check you paid?

23   A.  Yes.

24   Q.  And the next page, what is that?

25   A.  The invoice and check, pay for Dr. Dantz.

Garcia - direct

1046

1   Q.   Page 5 -- I'm sorry, Page 6?

2   A.   Again, another invoice and check for Dr. Dantz.

3   Q.   Page 7?

4   A.   A invoice from Dr. Dantz.

5   Q.   Page 8?

6   A.   Another invoice for Dr. Dantz.

7   Q.   9?

8   A.   Another invoice for Dr. Dantz.

9   Q.   10?

10  A.   Another invoice from Dr. Dantz.

11  Q.   11?

12  A.   Another invoice from Dr. Dantz.

13  Q.   12?

14  A.   Another invoice from Dr. Dantz.

15  Q.   13?

16  A.   A invoice and check from -- to pay to Dr. Dantz.

17  Q.   And 14?

18  A.   And this is -- yes, summary of payments done to Dr. Dantz.

19  And I think it has also some of the payments, some health.

20  The benefit -- the one that says benefit -- for the health

21  insurance that we were paying, the health coverage for my

22  wife.

23  Q.   Can you estimate how much money you spent -- you had to

24  pay Dr. Dantz from 2012 to the present?

25  A.   Yes.  It was around $8,000.

Garcia - direct

1047

1  Q.  And can you estimate the amount of money that you paid for

2  other healthcare besides Dr. Dantz related to Dr. Artunduaga?

3  A.  I don't -- I do that, but I don't recall exact -- exact

4  amount.  We --

5  Q.  An estimate is fine.

6  A.  Yes, I think that around $20,000.

7          MS. FRANKLIN:  Again, I'd like to admit this document

8  into evidence.

9          THE COURT:  Any objection?

10          MR. JEPSON:  No, your Honor.

11          THE COURT:  It is admitted.

12      (Plaintiff's Exhibit No. 75 received in evidence.)

13          MS. FRANKLIN:  If we could publish it?

14  BY MS. FRANKLIN:

15  Q.  Mr. Garcia, just to review with the jury, the first page,

16  what is that, again?

17  A.  This is a summary of the payments that we did to Dr. Dantz

18  until 5-13 of '16.

19  Q.  And what about the last page, which is Page 14?  What is

20  that?

21  A.  This is, again, a similar summary, but includes other

22  payments done for health.

23  Q.  Okay.

24          Now, I'd like to look at Plaintiff's Exhibit 76,

25  which is not admitted into evidence.

Garcia - direct

1048

```
 1              THE COURT:  Is there any objection to its admission?
 2              MR. JEPSON:  Let me see it.
 3         (Brief pause.)
 4              MR. JEPSON:  Yeah.  It's just the foundation, your
 5    Honor.
 6              THE COURT:  Lay the foundation then.
 7              MS. FRANKLIN:  Sure.
 8    BY MS. FRANKLIN:
 9    Q.  Mr. Garcia, do you see the document?
10    A.  No, I don't see it at this moment.
11              THE COURT:  Hold on.
12         (Brief pause.)
13    BY THE WITNESS:
14    A.  Now I see it.
15    BY MS. FRANKLIN:
16    Q.  All right.
17              What is this document?
18    A.  This document -- just let me see.
19              Yes.  I think that this document tries to summarize
20    the expenses that we have had related to the graduate degrees
21    that my wife has been taking.
22    Q.  What's the approximate amount that you have paid with
23    respect to Dr. Artunduaga's M.P.H. and M.T.M. degrees?
24    A.  Yeah, I think at this moment it's around 60,000 plus the
25    estimated is going to be in total a hundred six.  So, this one
```

Garcia - direct

1049

1   has the current expenses until November of '16, and we have

2   expected expenses for -- until her graduation, a total of

3   hundred six thousand dollars.

4   Q.  So, the total from the beginning until the end of the

5   degree you're estimating at about a hundred and six thousand?

6   A.  Yes.

7   Q.  If we look at the second page of the document, what is

8   that?

9   A.  This is some of the payments done for the University of

10  Washington degree and some of the other allocation of

11  expenses, like, before she was getting --

12          THE REPORTER:  I'm sorry?  Before --

13          THE WITNESS:  Before she has started the degree at

14  the University of Washington.

15  BY MS. FRANKLIN:

16  Q.  Do you see the third page?

17  A.  Yes.

18  Q.  What is this?

19  A.  This is, I think, the copy of the official tuition

20  statement from University of Washington.

21  Q.  And the next page is just a continuation, right?

22  A.  Yes.

23  Q.  And what about the fifth page?

24  A.  This one, I think this is a -- let me --

25  Q.  There's the sixth page, which is the continuation.

Garcia - direct

1050

1   A.  Yes, but this -- I think this one is for -- can you go

2   back?

3   Q.  Yes.

4   A.  Sorry.  I wasn't sure if it was Washington or Berkeley.

5   Q.  Is it a bill for educational expenses?

6   A.  Yes.  This is educational expenses for Berkeley -- for

7   University of Berkeley.

8   Q.  Okay.

9       And, then, the seventh page, what is that?

10  A.  I think it's the summary of the -- for the -- I think

11  these are the FAFSA loans that my wife got for FAFSA.  The,

12  yeah, loans that she got for her education.

13  Q.  So, this has to do with the loans she took out to finance

14  part of her education?

15  A.  Yes.

16  Q.  Okay.

17      The next page -- do you see the next page?

18  A.  Yes.  I see the next page.

19  Q.  What's that?

20  A.  This is the loan overview, and I think that it's an

21  expected interest rate and how much at the end you will need

22  to pay when you finish paying your loans -- your FAFSA loans.

23  Q.  And the next two pages are a continuation of that, right?

24  A.  Yes.

25  Q.  All right.

Garcia - direct

1051

1    MS. FRANKLIN:  I'd like to have the exhibit admitted

2    into evidence.

3    THE COURT:  Any objection?

4    MR. JEPSON:  The summary doesn't seem to me to line

5    up number-wise, your Honor.  So, I'm going to object to the

6    summary.  The other documents, I have no problem with them

7    coming into evidence.

8    MS. FRANKLIN:  That's fine.

9    THE COURT:  Okay.  So, I will admit the backup

10   documentation, just not, I think, what is --

11   MR. JEPSON:  Not the summary.

12   THE COURT:  -- the first page of your --

13   MR. JEPSON:  Right.

14   THE COURT:  -- exhibit, the summary.

15   MR. JEPSON:  Anything that's a summary.

16   MS. FRANKLIN:  That's Page 1.  That's fine.  And Page

17   2 is also a summary.

18   MR. JEPSON:  And Page 2.

19   MS. FRANKLIN:  That's fine.

20   BY MS. FRANKLIN:

21   Q.  All right.  Mr. Garcia, what was Maria like before she

22   started at UCMC?

23   A.  When I met her, she was always very -- very bright, very

24   happy.  She was very active.  She was always kind of like the

25   light of the party, like the bright point.  Very enthusiastic

Garcia - direct

1052

1   about things.  Very curious.  She really liked to talk to

2   people and just go and see what they were feeling, what they

3   were doing, what kind of -- we hang around with a lot of

4   scientists, so what are you doing?  How are you doing that?

5   What is it good for?

6          She was very a happy person, very passionate about

7   things.

8   Q.  What was she like after she started her residency at UCMC?

9   A.  She quickly lost a lot of interest for things, for -- for

10  -- for being passionate about things.  She become, like, a

11  more somber person.  She became less interested in the social

12  life or less interested to going out with people or exploring

13  restaurants.  This is one example, like, let's go out.  No, I

14  don't want to go out.  I don't feel like that.

15         She became less enthusiastic about things.  She

16  became -- yeah, it's like -- like you have a candle and the

17  light is put out, and it was just not there anymore.

18  Q.  Did you notice a change around the time that Dr.

19  Artunduaga was placed on probation?

20  A.  Yes.  She -- even before that, she was worried.  She was

21  not sleeping well.  She had, like, bags on her eyes, even so

22  that she was not in the -- doing, like, overnight or

23  something.  She was sad.  She was not sleeping that well.  And

24  when the probation happened, she was really sad.  She was

25  crying a lot.  She was really, really sad.

Garcia - direct

1053

1   Q.  Did you notice anything else, any other changes that

2   occurred around the time of your wedding in December?

3   A.  Yes.  We had the wedding in December.  We have thought

4   about this wedding for a long time now.  Her mother was doing

5   the preparations for the wedding mostly because she was busy

6   -- Alexandra.  My wife Alexandra.  I call her Alexandra.

7   Sorry.  Alexandra was busy.

8        And she was not that interested even in the details

9   of the wedding.  She delegated everything.  She said, like,

10  yeah, whatever, like just do what you think that is going to

11  look nice.  She was not that -- she was happy of getting

12  married, but she was very stressed and very, very sad with the

13  whole situation.

14  Q.  What about after Dr. Artunduaga found out her residency

15  contract would not be renewed?  What was she like then?

16  A.  At the moment, she was extremely sad.  Even sadder than

17  before.  She came back home and she was -- she was not going

18  to the hospital this moment.  And she was really sleeping late

19  and she didn't want to do anything.  She was -- the curtains

20  were down and she didn't even want to open the curtains from

21  our apartment.  She didn't -- she deflected the calls from her

22  family and she didn't want to talk to her family, to anyone.

23       We had -- we got a cat on January of that year and

24  that was pretty much the whole thing that she was happy about,

25  our cat, Dolly -- Dolly the cat.  That was pretty much the

Garcia - cross

1054

1   only thing that she really like at that moment.

2   Q.  And after Dr. Artunduaga left UCMC in the summer of 2012,

3   what was she like then?

4   A.  That -- she -- she started talking about suicide.  She

5   started talking about, well, what if I just end this and

6   that's all?  And she made a lot of comments like that.  She

7   was crying a lot.

8           She was -- I had to force her to eat.  I had to go

9   out and get -- there was this Thai place that we like close to

10  our house -- and bring food and bring a lot of food because I

11  know that you can heat up the leftovers -- at least in our

12  case -- so I choose that place a lot.  So, after a couple of

13  days, she was hungry and she ate some things, but then she

14  went through long periods without eating.

15          I started working most of my time at home because I

16  was really worried for her, for her well-being.  She was, I

17  don't know, like, really, really sad.  At the same time, she

18  didn't see anything bright in the future.  So, she had no more

19  perspectives for the future that moment.

20          MS. FRANKLIN:  That's all I have.

21          THE COURT:  Cross-examination.

22          MR. JEPSON:  Just a couple of questions.

23                    CROSS-EXAMINATION

24  BY MR. JEPSON:

25  Q.  Hello, Mr. Garcia.

1   A.  Hi, Mr. Jepson.

2   Q.  Now, you mentioned a telephone conversation that you had

3   with Jonathan Rothstein sometime in November of 2011, correct?

4   A.  Yes.

5   Q.  And you never mentioned to Mr. Rothstein that you believed

6   your wife was being discriminated against or retaliated

7   against in that conversation, did you?

8   A.  That's not true.

9   Q.  Okay.

10          Do you remember you were -- you had a deposition

11  taken in this case in 2014?  Do you remember that?

12  A.  Yes.

13          MR. JEPSON:  If I may approach, your Honor?

14          THE COURT:  You may.

15      (Document tendered to the Court and witness.)

16  BY MR. JEPSON:

17  Q.  In particular, I'd like to direct your attention to -- the

18  question is at Page 119, beginning on No. 19 -- Line 19, and

19  then the actual answer about Rothstein begins on the next

20  page.

21          At that deposition, I didn't take it, but one of my

22  partners did.  And you were asked this question, weren't you:

23          Now, besides Ms. Williams, with whom else did you

24  communicate in any way -- in other words, face to face or over

25  the phone, e-mail or otherwise -- regarding Dr. Artunduaga's

Garcia - cross

1056

1   residency at UCMC?

2           And, then, it goes down:  I finally talked to a

3   Rothstein -- Jonathan Rothstein.  I talked to him and he -- I

4   was telling him that my wife -- there are some issues between

5   the program director and my wife and her employment at the

6   University of Chicago Medical Center, that we want to meet

7   with him face to face and get HR involved.  And he was the one

8   that was saying that, no, I cannot get involved.  That's not

9   my jurisdiction -- like HR doesn't have anything to do with

10  the employees of the medical center -- and cannot meet with

11  you.  So, I kept insisting and e-mailed him.  He e-mailed me

12  back on the 21st, I think; that he e-mailed me back saying,

13  stop calling, stop, we have nothing to do with that.  So, that

14  was the one interaction with another employee from the

15  University of Chicago Medical Center.

16          Now, you were asked those questions and gave that

17  answer, correct?

18  A.  Yes.

19  Q.  Okay.

20          And I want to now look at Joint Exhibit 29.  And you

21  were asked about this, and I think you already testified that

22  this was the e-mail at the bottom dated November 21, 2011,

23  that you sent to Mr. Rothstein, correct?

24  A.  Yes.

25  Q.  And that says:  Hello, Mr. Rothstein, I am Ricardo Garcia,

1    spouse of one of the employees of the University of Chicago

2    Hospital.  As you are probably aware now, my spouse is having

3    some difficulties at her program right now.  We are trying to

4    solve them with the program director.  We believe everything

5    is a big misunderstanding.  But we would like to have a short

6    meeting with you to solve some questions and make sure we are

7    taking the right steps to solve this impasse.  Is this

8    possible?  We can also talk on the phone if that suits you

9    best.  My cell phone number is 617 -- and then you give the

10   number -- but I can also go and meet in person if you want.

11           Now, your testimony was that you had the telephone

12   conversation first, correct?

13   A.  Yes.

14   Q.  And, then, you had this e-mail exchange, correct?

15   A.  Yes.

16   Q.  And this is the e-mail you sent to Mr. Rothstein, correct?

17   A.  Yes.

18   Q.  And it doesn't mention discrimination or retaliation

19   anywhere in it, does it?

20   A.  In the e-mail, no.

21           MR. JEPSON:  Thank you.  No further questions.

22           THE COURT:  Redirect.

23                        REDIRECT EXAMINATION

24   BY MS. FRANKLIN:

25   Q.  Mr. Garcia, do you and your wife plan to stay in the U.S.?

1  A.  Yes.

2           MS. FRANKLIN:  That's all I have.

3           MR. JEPSON:  Object.

4           THE COURT:  I will sustain the objection.  It is

5  outside the scope of the cross-examination.

6           You may step down, sir.

7       (Witness excused.)

8           THE COURT:  Please call your next witness.

9           MS. HYNDMAN:  Your Honor, we are going to play the

10 video of Dr. Megan Keough.

11          As a housekeeping matter, we'd like to move for the

12 admission of Plaintiff's Exhibits 71 and 72, which are

13 interrogatory responses.

14          THE COURT:  Any objection?

15          MR. JEPSON:  Plaintiff's 71 and 72?

16          THE COURT:  Yes.

17          MS. HYNDMAN:  There was no objection --

18          MR. JEPSON:  Yeah, I'm sure there's no --

19          No objection.

20          THE COURT:  I will admit them.

21      (Plaintiff's Exhibit Nos. 71 and 72 received in evidence.)

22          THE COURT:  How long do you think the video is?

23          MS. FRANKLIN:  Your Honor, it's 39 minutes and 20

24 seconds.

25          THE COURT:  Does the jury want to break for lunch now

1 and come back and watch or wait 40 more minutes?

2       MS. HYNDMAN:  Your Honor, could we have a quick

3 sidebar?

4       THE COURT:  Oh, sure.

5    (Proceedings had at sidebar:)

6       MS. FRANKLIN:  This is our last witness and it's 39

7 minutes.

8       MS. HYNDMAN:  It's not our last witness.

9       THE COURT:  For today.

10       MS. FRANKLIN:  For today.

11       MS. HYNDMAN:  Dr. Dantz, who is our last witness, we

12 tried to get him available today and he had patients all day.

13       THE COURT:  Okay.

14       MS. HYNDMAN:  He's only --

15       THE COURT:  So, he will be here Monday morning.

16       MS. HYNDMAN:  -- available Monday morning.

17       THE COURT:  So, we will watch it.

18       MS. HALL:  That's why --

19       THE COURT:  Thank you.  No, I appreciate it.

20       MS. HALL:  I told Jamie I didn't mean to step on her

21 toes, but I --

22       MS. FRANKLIN:  No, not at all.

23       MS. HALL:  -- didn't see any point of going to lunch.

24       THE COURT:  I will see if they need a break.

25       MR. JEPSON:  You step on mine all the time.

1    (Laughter.)

2         MR. JEPSON:  Thankfully.

3         THE COURT:  We will not take that up at sidebar.

4         MS. HALL:  Let's not.

5         MS. FRANKLIN:  It's in the record now, guys.

6         THE COURT:  If they need another quick break, I will

7    give them a break and let them know we are going to be done.

8         MS. FRANKLIN:  Thank you.

9    (Proceedings had in open court:)

10        THE COURT:  Ladies and gentlemen, this is the last

11   witness of today, the next video that is going to be played.

12   Plaintiff has one more witness remaining.  That doctor,

13   because of multiple surgeries scheduled, was not able to make

14   it today.  So, that doctor will be here on Monday morning.

15        So, I am sure none of you will be disappointed.  We

16   are going to go ahead with the video now -- it will take us

17   probably close to quarter to 1:00 -- and then we are going to

18   break for the weekend.

19        Does anybody need a quick break before then?

20   Everybody okay?

21        A JUROR:  I wouldn't mind using the bathroom.

22        THE COURT:  Let's take about a ten-minute break.  We

23   will come back and watch the video.  After that, you will be

24   done for the day and for the week.

25   (Jury out.)

```
 1        (Brief recess.)

 2        (Jury in.)

 3             THE COURT:  You may be seated.

 4             You may proceed with the video.

 5             MS. FRANKLIN:  We're presenting Dr. Megan Keough by

 6   video deposition.

 7        (Videotaped deposition of Megan Keough played in open

 8   court.)

 9             THE COURT:  Does that conclude the video deposition?

10             MS. HYNDMAN:  Yes, your Honor.

11             MS. FRANKLIN:  Yes.

12             THE COURT:  Am I correct you only have one witness

13   left before you rest?

14             MS. HYNDMAN:  That's correct.

15             THE COURT:  That witness will be here Monday

16   morning --

17             MS. HYNDMAN:  Correct.

18             THE COURT:  -- given the doctor's schedule?

19             MS. HYNDMAN:  Right.

20             THE COURT:  Ladies and gentlemen, we are done for the

21   day.  We are done for the week.  Remember, we will pick up on

22   Monday.  I think you will be here on Wednesday, as well, but

23   you will not be here Tuesday.  You are free to go about

24   whatever you would normally do, your work or otherwise.

25             Have a great weekend.  Please do not discuss the
```

1062

1    case.  We will see you Monday morning at 9:15, please.

2         By the way, I gave you back more than five minutes.

3    (Laughter.)

4    (Jury out.)

5         THE COURT:  So, just briefly for you -- and then I

6    will take up anything you have for me -- we have three

7    remaining jury instruction issues, if my recollection is

8    correct:  The retaliation instruction, compensatory damages

9    and redacted documents instruction.  I want you to take

10   another -- I would like you to get together and talk about all

11   three and see if you can reach agreement.  If not, Monday we

12   will spend a little bit of time after trial and I will resolve

13   them.

14        You certainly should be able to agree on the redacted

15   documents instruction.  I know that was submitted after the

16   final pretrial order and after the final pretrial conference,

17   so you probably have not had a chance to go through it.  You

18   both proposed the same first paragraph.  You should be able to

19   reach agreement on that.  So --

20        MS. HYNDMAN:  And, then, the verdict form, I think we

21   had some disagreement --

22        MS. HALL:  Yeah.

23        MS. HYNDMAN:  -- on, as well.

24        THE COURT:  Yes.  Thank you.  We will take a look and

25   work on that, as well.  It is a little bit tied to the

1063

1    compensatory damages.  But I am going to direct you to take

2    another shot at that and see if you can reach agreement; and,

3    if not, we will talk about it on Monday.

4            I think that is all I have for you.  Do you have

5    anything for me?

6            MS. HALL:  Do you want us to talk about the issue

7    raised earlier at sidebar?

8            THE COURT:  Yes.  Let's go back to sidebar.

9            Is there anything else we need to do in open court?

10           MS. HYNDMAN:  I don't believe so.

11       (Proceedings had at sidebar, Pages 1064 to 1067, under

12   seal:)

13

14

15

16

17

18

19

20

21

22

23

24

25

1068

1       (Adjournment taken at 12:56 o'clock p.m., until 9:00

2  o'clock a.m., the following Monday, February 6, 2017.)

3                      *     *     *     *     *

4

5  We certify that the foregoing is a correct transcript from the
   record of proceedings in the above-entitled matter.

6

7

8  /s/ Joseph Rickhoff                    February 4, 2017
   Official Court Reporter

9  /s/ Kelly Fitzgerald                   February 4, 2017
   Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25