1069

1      IN THE UNITED STATES DISTRICT COURT
          NORTHERN DISTRICT OF ILLINOIS
2                EASTERN DIVISION

3  DR. MARIA ARTUNDUAGA,           ) Docket No. 12 C 8733
                                   )
4                Plaintiff,        )
                                   )
5            vs.                   )
                                   )
6  THE UNIVERSITY OF CHICAGO       )
   MEDICAL CENTER,                 ) Chicago, Illinois
7                                  ) February 6, 2017
                 Defendant.        ) 8:58 o'clock a.m.
8

9                        VOLUME SIX
          TRANSCRIPT OF TRIAL PROCEEDINGS
10   BEFORE THE HONORABLE AMY J. ST. EVE, AND A JURY

11  APPEARANCES:

12  For the Plaintiff:        THE FRANKLIN LAW FIRM, LLC
                              BY:  MS. JAMIE S. FRANKLIN
13                            53 W. Jackson Blvd., Suite 803
                              Chicago, Illinois  60604
14
                              ROBINSON, CURLEY & CLAYTON, P.C.
15                            BY:  MS. CYNTHIA H. HYNDMAN
                              300 South Wacker Drive, Suite 1700
16                            Chicago, Illinois  60606

17  For the Defendant:        VEDDER PRICE, P.C.
                              BY:  MR. EDWARD C. JEPSON, JR.
18                                 MS. ELIZABETH N. HALL
                              222 N. LaSalle St., Suite 2600
19                            Chicago, Illinois  60601

20  Court Reporter:           MR. JOSEPH RICKHOFF
                              Official Court Reporter
21                            219 S. Dearborn St., Suite 1232
                              Chicago, Illinois  60604
22                            (312) 435-5562

23           *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

24                   PROCEEDINGS RECORDED BY
                    MECHANICAL STENOGRAPHY
25             TRANSCRIPT PRODUCED BY COMPUTER

1    THE CLERK:  12 C 8733, Artunduaga vs. The University

2    of Chicago Medical Center.

3    THE COURT:  Good morning.

4    MS. HYNDMAN:  Good morning, your Honor.

5    MS. FRANKLIN:  Good morning, your Honor.

6    THE COURT:  So, Dr. Dantz is first up?

7    MS. HYNDMAN:  Yes.

8    THE COURT:  All right.

9    MS. HYNDMAN:  He hasn't arrived yet, but we're hoping

10   that he will arrive soon.

11   THE COURT:  Hopefully he will be soon.

12   I am sure our jury is not all here yet.

13   I received your two revised instructions.  Thank you.

14   We will talk later on today about the elements instruction on

15   the retaliation claim.  I have an additional proposed

16   instruction for you -- but I left it on the printer, so I will

17   get it and bring it back out; I call it the road map

18   instruction -- that I want to include before the elements

19   instructions.

20   I took it very close to your statement of the case.

21   Again, just to tell the jury that there are two claims here,

22   to kind of set it out.  So, I will bring that back for you and

23   get your thoughts on that.

24   Verdict form, did you do any --

25   MS. HALL:  We didn't because we thought that your

1   ruling on the elements instruction would impact it.  So, we

2   figured once you do that, we can talk about revisions,

3   although we have some significant disagreement about how the

4   compensatory damage verdict questions should be phrased, and

5   punitive.  So, that might still be an issue.

6           THE COURT:  Okay.  We will resolve that if you cannot

7   agree -- or I will resolve that.

8           Any issues for the Court?

9           MS. HYNDMAN:  I don't believe so.

10          THE COURT:  Any issues?

11          MR. JEPSON:  No.

12          THE COURT:  Okay.

13          I will grab that other instruction and we will see

14  where we are on the jury; you can see where your doctor is;

15  and, we will get started shortly.

16          Then you are resting, right?

17          MS. HYNDMAN:  Yes, your Honor.

18          THE COURT:  Who is up first for you this morning?

19  Any change in your plan?

20          MR. JEPSON:  It should be Krista Curell or Jonathan

21  Rothstein, whoever gets here first, Judge.

22          THE COURT:  Okay.  We will be back out shortly.

23          MS. HYNDMAN:  Thank you.

24          MS. FRANKLIN:  Thank you.

25       (Brief recess.)

1072

 1    THE COURT:  Is your witness here?

 2    MS. HYNDMAN:  Yes, ma'am.

 3    THE COURT:  Our jury is here early.

 4    MR. JEPSON:  Even after the Super Bowl.

 5  (Laughter.)

 6    THE COURT:  Even after the Super Bowl.  I know.

 7    MS. HYNDMAN:  Maybe no New England fans.

 8  (Laughter.)

 9    THE COURT:  That is my proposal.  So, you can let me

10  know what you think.  Again, I took it mostly from your

11  statement.

12    You can bring them in, please.

13    It just helps frame for them where we are going.

14    MR. JEPSON:  That's fine.

15  (Jury in.)

16    THE COURT:  You may be seated.

17    Good morning, ladies and gentlemen.

18    For those of you who are sports fans, you certainly

19  had a good game to watch last night.  Thank you all for being

20  on -- being early despite that.

21    We are continuing today with the presentation of

22  evidence.  As I told you on Friday, I do expect the plaintiff

23  to rest her case today.

24    Please call your next witness.

25    MS. HYNDMAN:  Your Honor, plaintiff calls Dr. Belazel

Dantz - direct

1073

1   Dantz.

2              THE COURT:  Please come forward, Doctor.

3              BELAZEL DANTZ, PLAINTIFF'S WITNESS, SWORN

4                      DIRECT EXAMINATION

5   BY MS. HYNDMAN:

6   Q.  Good morning, Dr. Dantz.  Could you please state your full

7   name for the record.

8   A.  Yes, hi, Belazel Dantz.

9   Q.  What's your occupation, Dr. Dantz?

10  A.  I'm a psychiatrist.

11  Q.  Where are you employed?

12  A.  I'm employed both at Rush University Medical Center in

13  Chicago, and I also have a private practice on Michigan

14  Avenue.

15  Q.  What do you do at Rush?

16  A.  I'm director of medical student education in psychiatry.

17  So, I train medical students and residents there.

18  Q.  Could you just very briefly describe your educational

19  background for the jury?

20  A.  Yes.  I did my undergraduate work at Yale University, then

21  went to medical school at Stanford; did my residency in both

22  internal medicine and in psychiatry at Cornell Medical Center

23  in New York City; and, then, upon leaving -- graduating my

24  residency program, I came to Chicago.

25  Q.  Are you board certified in any medical specialties?

Dantz - direct

```
 1   A.  Yes, in psychiatry.

 2   Q.  Dr. Dantz, do you know Dr. Maria Artunduaga?

 3   A.  Yes.

 4   Q.  How do you know her?

 5   A.  She's my patient.

 6   Q.  When did you first start treating Dr. Artunduaga?

 7   A.  It was about five years ago.  I first saw her in February

 8   of 2012.

 9   Q.  Was that at Rush or in your private practice?

10   A.  In my private practice.

11   Q.  Are you still treating Dr. Artunduaga?

12   A.  Yes, I am.

13   Q.  When is the last time you had a counseling session with

14   her?

15   A.  Is about one to two months ago.

16   Q.  Do you charge Dr. Artunduaga for counseling sessions?

17   A.  Yes.

18   Q.  How much do you charge?

19   A.  We have half-hour sessions, which are $200.

20   Q.  Do you bill Dr. Artunduaga for every counseling session

21   you have with her?

22   A.  Yes.

23   Q.  Do you bill her --

24           MS. HYNDMAN:  Strike that.

25   BY MS. HYNDMAN:
```

Dantz - direct

1075

```
 1  Q.  Are all the counseling sessions that you have with Dr.

 2  Artunduaga face-to-face counseling sessions?

 3  A.  When she's been in Chicago, yes.  Since she's been in

 4  Seattle, then in California, I have talked to her by phone.

 5  Occasionally when she's been in Chicago, I've seen her live.

 6  Q.  Do you bill her for sessions you conduct over the

 7  telephone?

 8  A.  Yes.

 9  Q.  Can you very roughly approximate how many counseling

10  sessions you've had with Dr. Artunduaga since you began

11  treating her?

12  A.  There's 20 -- there's somewhere in the range of 20 to 40,

13  I imagine.

14  Q.  When did you first start treating Dr. Artunduaga?

15  A.  In February of 2012.

16  Q.  What was her condition the first time you saw her?

17  A.  She was distraught.  She was depressed.  She couldn't

18  sleep.  She couldn't concentrate.  She was having suicidal

19  thoughts.

20  Q.  Did she exhibit any symptoms at the time you were having a

21  counseling session with her?

22  A.  Any symptoms?

23  Q.  Yes.

24  A.  Yeah, I mean, depressed, tearful.

25  Q.  Did you have an understanding as to why Dr. Artunduaga
```

Dantz - direct

1  came to see you in February of 2012?

2  A.  Yes.  She was having -- experiencing difficulty in her

3  residency program in plastic surgery at the University of

4  Chicago and was in tremendous distress over the possibility of

5  losing her position as a resident.

6  Q.  During the course of the time that you treated Dr.

7  Artunduaga, did you make a diagnosis of her condition?

8  A.  Yes.  I diagnosed her as having major depressive disorder.

9  Q.  Was that the initial diagnosis you made?

10  A.  Initially it was adjustment disorder with depressed mood

11  and anxiety, but I pretty soon thereafter felt that she met

12  full criteria for a major depressive episode.

13  Q.  Let's start first with the adjustment disorder with

14  mood -- mixed depressed mood and anxiety.  Can you explain to

15  the jury what that is?

16  A.  So, when something very stressful, horrible, a great loss

17  occurs, many people respond with difficulty sleeping, trouble

18  concentrating, but it doesn't meet the full criteria of a

19  major depressive episode, such as feeling suicidal.  A person

20  has a strong reaction to a stressful event, but it doesn't

21  impact them so severely that they would want to die, that they

22  would become hopeless or that -- nor does it persist for a

23  duration that would be greater than that would be otherwise

24  expected.

25  Q.  Dr. Dantz, can you explain to the jury how it is you go

Dantz - direct

1077

1    about making a diagnosis as a psychiatrist?

2    A.   One looks at symptoms that the individual has and whether

3    they're really consistent with the illness of a major

4    depressive episode.  And through asking many questions,

5    finding out what the precipitant is, finding out how they're

6    functioning, one can then arrive at a conclusion.  It's based

7    upon criteria that are in the Diagnostic and Statistical

8    Manual, which is the manual that we use to diagnose

9    psychiatric illness.

10   Q.   You mentioned that you asked questions of your patients,

11   they give you information.  Do you take everything that they

12   tell you at face value?

13   A.   No, no, not at all.  I mean, there's -- I have to

14   interpret what they're saying.  I prod and poke around to kind

15   of see does everything make sense.  And especially on --

16   during multiple sessions over time, I will kind of develop an

17   idea of the truth or if there's distortions or if there's even

18   delusions in what the person is saying.

19   Q.   During the course of your treatment of Dr. Artunduaga, did

20   you make a determination as to whether anything she was saying

21   to you was distorted?

22   A.   No.  Everything she said to me sounded reasonable.  I

23   mean, I have -- I did two residencies myself --

24        MS. HALL:  Objection.  Improper.  Irrelevant.

25   Improper opinion testimony.

Dantz - direct

1078

1     THE COURT:  Why don't you try to rephrase to avoid

2  that.

3     I am not sure that he has the -- you are going to

4  have to lay a foundation --

5     MS. HYNDMAN:  Yes, yes.

6     THE COURT:  -- if you want to continue to pursue --

7     MS. HYNDMAN:  Okay.

8     THE COURT:  -- that line of questioning.  I am not

9  sure you are going to be able to lay that foundation.

10     MS. HYNDMAN:  I'm going to withdraw the question.

11     THE COURT:  Okay.

12     MS. HYNDMAN:  Yeah.

13  BY MS. HYNDMAN:

14  Q.  You testified that at some point in time you made a

15  diagnosis of major depressive disorder for Dr. Artunduaga?

16  A.  Correct.

17  Q.  And what was it that caused you to change the diagnosis

18  from the original one to major depressive disorder?

19  A.  Severity of her system -- symptoms.

20  Q.  Were there any in particular that were severe?

21  A.  The loss of self-esteem and suicidal thoughts and

22  hopelessness pushed against the category of a depressive

23  episode.

24  Q.  Dr. Dantz, going back to the first session when you first

25  saw Dr. Artunduaga in February of 2012, did you recommend a

Dantz - direct

1079

1   course of treatment for Dr. Artunduaga for what at that time

2   was -- I'll get the term right.

3   A.   Right, adjustment disorder?

4   Q.   Adjustment disorder, yes.

5   A.   Yes.  I did prescribe medication for her to help her

6   sleep, and I also preventively, because she had had a prior

7   history of depressive episodes, started her on an

8   antidepressant that had been effective in the past.

9   Q.   What medication did you prescribe?

10  A.   It was lorazepam or Ativan for anxiety and for sleep, and

11  Effexor, also known as venlafaxine, for depression.

12  Q.   Do you recall what dosage you prescribed for those

13  medications?

14  A.   Ativan would be one milligram at night for sleep and as

15  needed for anxiety.  And Effexor we always start low, either

16  37-and-a-half or 75 milligrams, and gradually go up.  The

17  target was going to be a hundred and fifty milligrams.

18  Q.   What did you start her at, if you recall?

19  A.   I don't recall the exact dosage that I started her at.  It

20  would normally be 37-and-a-half milligrams.

21  Q.   How long --

22        MS. HYNDMAN:  Strike that.

23  BY MS. HYNDMAN:

24  Q.   Does Dr. Artunduaga continue to suffer from major

25  depressive disorder?

Dantz - direct

1080

1    A.  It's been a rocky course in which there have been times

2    over the last five years in which her mood has stabilized and

3    she seemed doing relatively well.  But at times her mood has

4    crashed and she'd become depressed again.  At times severely

5    depressed; at times mildly depressed.  But it definitely has

6    varied over the five years.

7    Q.  Dr. Dantz, did you make a determination in the course of

8    your treatment of Dr. Artunduaga as to what caused Dr.

9    Artunduaga's major depressive disorder?

10             MS. HALL:  Objection.  Again, it calls for

11   speculation, your Honor.

12             MS. HYNDMAN:  Your Honor, they asked Dr. Velander and

13   Dr. Keough very similar questions in the depositions as to

14   what the cause of stress was.  I don't see how it's any

15   different.

16             MS. HALL:  Your Honor, I think there's a difference

17   between what does she tell him that he believed was the cause

18   versus what's the true cause.

19             MS. HYNDMAN:  He treated her, your Honor.

20             THE COURT:  You are free to cross-examine on it, but

21   she is asking about during the course of his treatment if he

22   made that determination.  That is a fair ground to go into it.

23             You are free to cross on it.

24   BY MS. HYNDMAN:

25   Q.  Do you remember the question, Dr. Dantz?

Dantz - direct

1081

1   A.   Yeah.   What was the cause of her depressive episode.

2   Q.   Yes.

3   A.   It was a very stressful environment.   She, for years and

4   years, had the dreams of becoming a plastic surgeon, of going

5   back to Colombia where she would contribute back to her

6   country.   And here she was in a situation where she felt that

7   she was being unfairly attacked.   She was -- there was

8   cultural insensitivity.   She felt she was being humiliated.

9   And that, in combination with the fear that you're going to

10  lose your dreams, would make many people depressed.

11  Q.   Did you reach any conclusions as to whether there were any

12  other causes for Dr. Artunduaga's major depressive disorder?

13  A.   That felt to me to be the major cause of her depressive

14  disorder.

15  Q.   Dr. Dantz, when you changed the diagnosis from adjustment

16  disorder to major depressive disorder, did your recommended

17  course of treatment for Dr. Artunduaga change?

18  A.   Not -- not -- not really.   I felt that she just needed a

19  very -- a closer eye, as I became more and more concerned that

20  there were suicidal thoughts.   As she reported those suicidal

21  thoughts to me, I became more concerned.   I had to watch her

22  more closely.   And I had to continue titrating the dosage.   I

23  had to add other medications to make sure she could sleep.

24  So, it really called for more intensive treatment.

25  Q.   Dr. Dantz, did you see Dr. Artunduaga after the University

Dantz - direct

1082

1   of Chicago Medical Center had decided to terminate her from

2   the residency program?

3   A.  Yes, I did.

4   Q.  And how did Dr. Artunduaga present at that session?

5   A.  You mean immediately after or --

6   Q.  Immediately after.  The first session you saw her after

7   that had happened.

8   A.  After that happened, she was extremely distraught.  I

9   mean, throughout the whole time.  There would be periods in

10  which she'd feel better, but for the most part, severely

11  depressed --

12          MS. HALL:  Objection.

13  BY THE WITNESS:

14  A.  -- in the aftermath --

15          MS. HALL:  Not responsive --

16  BY THE WITNESS:

17  A.  -- of this.

18          MS. HALL:  -- to the question, your Honor.

19          MR. JEPSON:  Asked about --

20          THE COURT:  Sustained.

21          And I think you need to lay a better foundation about

22  exactly when it took place.  Are you talking about throughout

23  the whole period of time?

24  BY MS. HYNDMAN:

25  Q.  I just want to focus, Dr. Dantz, on the first session that

Dantz - direct

1083

1   you saw Dr. Artunduaga after she had been terminated from the

2   residency program.  So, at that session, what was Dr.

3   Artunduaga -- how did she present at that session?

4   A.   Throughout this period -- I can't say -- I can't say the

5   session right after I saw her.  But throughout this period,

6   she had difficulty sleeping, poor concentration, her appetite

7   had changed.  Her ability to enjoy things was impaired.  Her

8   ability to be -- her desire to be physically intimate with her

9   husband had been affected.

10          So, I can't tell you whether that was exactly -- I

11  don't have my records in front of me, but whether that was

12  exactly right after she was terminated.  But that was kind

13  of -- that was -- that entire period was characterized by

14  severe depressive symptoms.

15  Q.   Dr. Dantz, does Dr. Artunduaga continue to suffer from

16  major depressive disorder?

17  A.   At my last conversation with her, she was very anxious --

18  Q.   The question only --

19  A.   No.

20  Q.   -- is:  Does she continue --

21  A.   Major depressive order in remission.

22  Q.   What does that mean, in remission?

23  A.   In remission means that currently there are no symptoms.

24  Partial remission would mean there are some symptoms, but not

25  a severe or full depressive episode.  And over the last

Dantz - cross

1084

1   months, she's been vacillating between having -- being in

2   partial remission and full remission.

3   Q.  Do you continue to prescribe medication for --

4   A.  Yes, I do.

5   Q.  -- Dr. Artunduaga?

6        Why do you continue to prescribe medication for her?

7   A.  Once a person's had a depressive episode, the medication

8   needs to be continued even after they're feeling well,

9   otherwise they have a high risk of relapse.

10       Moreover, the stress of this case has led -- makes

11  her very vulnerable to becoming depressed again should

12  medication stop.  So, for that reason, we've elected to

13  continue medication.

14  Q.  Dr. Dantz, at any time over the past five years during

15  which you have treated Dr. Artunduaga, did you ever reach the

16  conclusion that she was feigning or exaggerating any of the

17  symptoms that she told you about?

18  A.  No.  There was no doubt in my mind there was no

19  exaggeration.

20       MS. HYNDMAN:  I have nothing further at this time.

21       THE COURT:  Cross-examination.

22                   CROSS-EXAMINATION

23  BY MS. HALL:

24  Q.  Good morning, Dr. Dantz.

25  A.  Hi.

Dantz - cross

1085

1    Q.  You testified that before you saw Dr. Artunduaga, she

2    suffered from a major depressive episode, correct?

3    A.  Correct.

4    Q.  And you did not have any personal knowledge of what

5    happened with Dr. Artunduaga at UCMC, correct?

6    A.  At where?  University of --

7    Q.  You do not have any personal knowledge -- firsthand

8    knowledge -- of what happened with Dr. Artunduaga at UCMC,

9    correct?

10   A.  Can you tell me, UCMC, is that University of Chicago

11   Medical Center?

12   Q.  Yes.  Thank you.

13   A.  Okay.  No, I have no personal knowledge of that.

14   Q.  So, you were never with Dr. Artunduaga in the clinic,

15   correct?

16   A.  Correct.

17   Q.  Or in the operating room?

18   A.  Correct.

19   Q.  You've never actually seen her perform as a physician,

20   right?

21   A.  Correct.

22   Q.  And your understanding of what she might have gone through

23   at UCMC, the kind of behavior that she said humiliated her or

24   the cultural issues she experienced, that came all from Dr.

25   Artunduaga, right?

Dantz - cross

1086

1    A.  Correct.

2    Q.  You testified, I believe -- I'm not going to use your

3    exact words, but you can correct me if I'm wrong -- that your

4    treatment of Dr. Artunduaga required you to closely follow her

5    over the past five years or so, right?  Is that right?

6            You need to --

7    A.  Correct.

8    Q.  -- verbalize.

9    A.  Correct.

10   Q.  Okay.

11           And you took notes of all the sessions you've had

12   with Dr. Artunduaga, correct?

13   A.  Correct.

14   Q.  And it's your practice to reflect in your notes the

15   relevant information or the information that you believe is

16   relevant that Dr. Artunduaga provides to you, correct?

17   A.  Correct.

18   Q.  And you also reflect in your notes your assessment on the

19   dates in which you see her regarding her condition, whether

20   it's improved and that type of thing, right?

21   A.  Correct.

22   Q.  Isn't it true, Dr. Dantz, that during the period you were

23   still seeing Dr. Artunduaga in person -- so, before she went

24   to Seattle -- that on multiple occasions, you described her

25   condition as -- and you can correct me on the pronunciation of

Dantz - cross

1    this -- euthymic, right?

2    A.  Euthymic.  Correct.

3    Q.  Euthymic.  Thank you.

4         Can you please explain to me what euthymic means?

5    A.  Euthymic was when the mood is improved to be what we would

6    consider normal.  As I said earlier, that --

7    Q.  That's my question.

8    A.  -- her mood fluctuated --

9    Q.  Thanks for the definition.

10        And you repeated -- you reported in your notes from

11   the time that you first saw her in February of 2012 until she

12   went to Seattle that she was euthymic, in your opinion, on

13   multiple occasions, right?

14   A.  Correct.

15   Q.  And that she was also optimistic on multiple occasions --

16   A.  Yes.

17   Q.  -- correct?

18        And, then, once she went to Seattle and since she's

19   been in Seattle in 2014, the vast majority of your

20   conversations with her have been over the phone, right?

21   A.  Yes.

22   Q.  And, so, you haven't had the opportunity to assess her

23   behavior in person, correct?

24   A.  Yes.

25   Q.  You haven't been able to see her facial expressions,

Dantz - cross

1088

 1  correct?

 2  A.  Uh-huh.

 3  Q.  Yes?

 4  A.  Yeah.

 5  Q.  And it's true, isn't it -- I'm sorry.  I think you also

 6  testified that your sessions with her were typically about 30

 7  minutes?

 8  A.  Yes.

 9  Q.  And it's true, isn't it, that in 2015, you saw her over

10  the phone on only four occasions, right?

11  A.  Yes.

12  Q.  And, so, that would be approximately a total of four hours

13  during -- or --

14          MR. JEPSON:  Two.

15  BY MS. HALL:

16  Q.  Four sessions --

17  A.  Two hours.

18  Q.  -- two hours?

19  A.  Yes.  Yes.

20  Q.  Math's not my strong point.

21          Two hours during the year 2015, correct?

22  A.  Yes.

23  Q.  Since Dr. Artunduaga's left the University of Chicago

24  Medical Center, she has reported to you that she entered the

25  M.P.H. program in Seattle, right?

Dantz - cross

1089

1   A.   Yes.

2   Q.   And she graduated from that program, correct?

3   A.   Yes.

4   Q.   She also told you that she made some friends while she was

5   in that program, right?  She had made some friends while she

6   was in that program?

7        Yes?

8   A.   Sure, yeah.

9   Q.   And the frequency -- she also told you that the frequency

10  with which she was thinking about the University of Chicago

11  decreased while she was in Seattle, correct?

12  A.   Correct.

13  Q.   And since she completed the M.P.H. program, she's also

14  been accepted into a master's program at Berkeley, correct?

15  A.   Yes.

16  Q.   And she's moved in with her husband, correct?

17  A.   Yes.

18       (Brief pause.)

19  BY MS. HALL:

20  Q.   And it's your conclusion, as you told Ms. Hyndman, that at

21  present she does not have symptoms of major depressive

22  disorder, correct?

23  A.   She has symptoms of anxiety, but --

24  Q.   But not of major depressive disorder?

25  A.   Correct.

Dantz - redirect

1090

1  Q.  Thank you.

2          MS. HYNDMAN:  Just a couple questions, your Honor.

3          THE COURT:  Okay.

4                      REDIRECT EXAMINATION

5  BY MS. HYNDMAN:

6  Q.  Dr. Dantz, Ms. Hall asked you about an earlier history of

7  major depressive disorder.  What do you know about that early

8  history of Dr. Artunduaga's?

9  A.  When she --

10          MS. HALL:  Objection.  Foundation.

11          THE COURT:  Establish that he has a foundation to

12 give that, if he knows anything about it.

13 BY MS. HYNDMAN:

14 Q.  Dr. Dantz, do you know anything about Dr. Artunduaga's

15 earlier history of major depressive disorder?

16 A.  Yes.  She experienced a depressive episode while in

17 medical --

18          THE COURT:  Doctor, wait.

19 BY MS. HYNDMAN:

20 Q.  First of all --

21          THE COURT:  It is a "Yes" or "No."

22 BY THE WITNESS:

23 A.  Yes.

24          THE COURT:  Then she will ask --

25 BY THE WITNESS:

Dantz - redirect

1    A.  Yes.

2           THE COURT:  -- more questions.

3    BY THE WITNESS:

4    A.  Yes.

5    BY MS. HYNDMAN:

6    Q.  Okay.

7           How do you know about the earlier history of major

8    depressive disorder?

9    A.  She told me she had had -- she had had depression while in

10   medical school.

11   Q.  Okay.

12          What else did she tell you about that major

13   depressive disorder?

14   A.  She had been treated with Effexor.  It sounded like it was

15   severe depressive episode.

16   Q.  Was there any other basis for your conclusion in your

17   notes that she had had an earlier history of major depressive

18   disorder?

19   A.  Her description of the symptoms were consistent with a

20   major depressive episode.

21   Q.  Now, you talked about on cross-examination that you had in

22   your notes that Dr. Artunduaga on occasion was euthymic?

23   A.  Euthymic.

24   Q.  Euthymic?

25   A.  Uh-huh.

Dantz - redirect

1092

1    Q.  In your experience Dr. Dantz, is being euthymic

2    inconsistent with a diagnosis of major depressive disorder?

3    A.  No.  Many people who have depressive episodes also have --

4    in between those depressive episodes feel normal, and even

5    during the span of depressive episode, there are periods

6    during which a person feels relatively normal.

7           So, you can be euthymic at times even if you have

8    major depressive disorder.

9    Q.  And, Dr. Dantz, in your experience, is it inconsistent

10   with major depressive disorder for a person to make friends?

11   A.  People can make friends even while they're very depressed.

12           MS. HYNDMAN:  I have nothing further.

13           THE COURT:  Recross?

14           MS. HALL:  No, your Honor.

15           THE COURT:  Thank you, Doctor.  You may step down.

16           MS. HYNDMAN:  Thank you, Dr. Dantz.

17      (Witness excused.)

18           THE COURT:  Please call your next witness.

19           MS. HYNDMAN:  Your Honor, plaintiff rests her case.

20           THE COURT:  Do we need a brief sidebar?

21           MR. JEPSON:  Yes, we do, your Honor.

22           THE COURT:  Okay.

23      (Proceedings had at sidebar:)

24           MS. HALL:  Your Honor, defendant moves for a directed

25   verdict on plaintiff's claims of national origin

1   discrimination and retaliation.  We don't believe that she has

2   satisfied her burden to show that a reasonable jury could find

3   in her favor.  There's sufficient evidence on the record -- an

4   abundance of evidence on the record -- that her termination

5   was the result of her poor performance, poor behavior, poor

6   conduct.  And she, herself, admits she does not think that Dr.

7   Song, the decision maker in this case, in fact, discriminated

8   against her based on her national origin.

9            In addition, we do not believe that there's

10  sufficient evidence for a jury to consider whether she was

11  retaliated against based on the evidence presented by UCMC

12  concerning the reasons for her termination.  There's no causal

13  connection between any alleged complaint she made and Dr.

14  Song's ultimate decision to terminate her from the residency

15  program.

16           Alternatively, if this Court allows the issue to

17  proceed to verdict, we do not believe there's a sufficient

18  basis on the record for punitive damages instruction to the

19  jury.  Plaintiff has not shown that Dr. Song acted with malice

20  or reckless indifference to her rights.  He was painstakingly

21  careful in the process he took in determining to put plaintiff

22  on probation.  Once he put her on probation, he set up a very

23  detailed probationary process through which she was mentored

24  on 11 separate occasions by Dr. Park and through which she

25  received immediate feedback, all of which she admits was

1094

1   helpful.

2           She also had the opportunity to grieve the decision

3   related to her termination and to appeal her loss of the

4   grievance.

5           We believe that all of this evidence belies any

6   claims that UCMC acted in a way that would justify punitive

7   instruction to the jury and think the motion should be granted

8   on that ground.

9           THE COURT:  I will take your motion under advisement.

10  We will proceed with your case.

11          MS. HALL:  We also have a written motion we can hand

12  over.

13          THE COURT:  Okay.  You can hand it over.  I have not

14  read it.

15          MS. HALL:  I know.  I know.  Well, I didn't want to

16  file it before we --

17          THE COURT:  I appreciate it.  Thank you.

18          MS. HYNDMAN:  Your Honor, will you require a written

19  response?

20          THE COURT:  Probably not.  Let me read it first and

21  we will see.

22          MS. HYNDMAN:  Thank you.

23          THE COURT:  Is your first witness here?

24          MR. JEPSON:  We're going to go check.

25          THE COURT:  Okay.

Curell - direct

1095

 1         MS. HALL:  Thank you.

 2         MS. HYNDMAN:  Thank you, your Honor.

 3      (Proceedings had in open court:)

 4         THE COURT:  Ladies and gentlemen, you heard the

 5  plaintiff has rested her case.  Now the University of Chicago

 6  will continue to present evidence.  They went to check on

 7  their first witness.

 8      (Brief pause.)

 9         THE COURT:  Your first witness?

10         MR. JEPSON:  Krista Curell.

11         THE COURT:  Please come forward.

12          KRISTA CURELL, DEFENDANT'S WITNESS, SWORN

13                      DIRECT EXAMINATION

14  BY MR. JEPSON:

15  Q.  Would you state your full name for the record, please.

16  A.  Krista Marie Curell.

17  Q.  Ms. Curell, where are you employed now?

18  A.  The University of Chicago Medical Center.

19  Q.  Okay.

20         Prior to going to the University of Chicago Medical

21  Center, did you go to college?

22  A.  I did.

23  Q.  And when and where?

24  A.  I received my first degree from Michigan State University.

25  Q.  Okay.

Curell - direct

1096

1       And in what year approximately?

2  A.  That was 1991 to 1995.

3  Q.  And after that, did you pursue any other education?

4  A.  I did.  From there, I received a law degree from DePaul

5  University College of Law from 1995 to 1998.

6  Q.  And after that, did you get any -- you were a glutton for

7  punishment.

8  A.  I was.

9  Q.  Did you get any more education?

10  A.  I did.  I went to nursing school at Rush University

11  College of Nursing and graduated from there in 2001 with a

12  Bachelor's of Science in Nursing.

13  Q.  All right.

14       Now, you have a law degree, but have you ever

15  actually practiced law?

16  A.  No.  I worked briefly right out of law school at Harcourt

17  Brace Publishing Company where I worked as an attorney, but

18  haven't actually, like, practiced in a courtroom or anything.

19  Q.  And when you were there as an attorney, what kinds of

20  things did you do?

21  A.  We primarily wrote study guides for law students.  There

22  were a variety of different guides, both written, as well as

23  electronic publications that we created.

24  Q.  So, you weren't advising clients?

25  A.  I was not, no.

Curell - direct

1097

1    Q.  All right.

2           And when did you begin work at UCMC?

3    A.  In 2001.

4    Q.  And what was your first position?

5    A.  The first position there was as a risk manager.

6    Q.  And how long did you hold that?

7    A.  I held that position until 2004.

8    Q.  And what were your responsibilities in that role?

9    A.  In that role, we primarily investigated patient

10   occurrences in the hospital.  So, any time there was an

11   unusual or unexpected complication, sometimes there were

12   mistakes that occurred, we investigated those initial

13   occurrences with the clinicians that were involved and then

14   also implemented what's referred to as a patient safety action

15   plan.  So, initiatives out on the clinical care units to

16   ensure that particular issue or error never occurred again.

17   Q.  Okay.

18          And in 2004, did you take a new position?

19   A.  I did.  I was promoted to the director of the department,

20   and that included the Risk Management Department, as well as

21   the Quality Department, and then what I would refer to as

22   clinical compliance.

23   Q.  And how long -- what was your title?  Do you recall?

24   A.  Director of risk management and patient safety.

25   Q.  How long did you remain in that role?

Curell - direct

1098

 1   A.  It was a short period, and then I was promoted to the

 2   executive director.

 3   Q.  And what -- did you ever take a vice president role?

 4   A.  Yes.  That was in 2008.

 5   Q.  And what role was that?

 6   A.  So, that was the vice president for risk management and

 7   patient safety and then also the chief compliance officer for

 8   the organization.

 9   Q.  And is that -- what's your current title?

10   A.  That is my current title.

11   Q.  Okay.

12          Is it vice president, chief compliance officer?  Is

13   that a component of it?

14   A.  Yes.

15   Q.  And you took that in what year?

16   A.  2008.

17   Q.  Now, have you ever been in the Law Department at UCMC?

18   A.  When I first started as a risk manager, I did report up to

19   the General Counsel, but I was not hired as an attorney at the

20   hospital.

21   Q.  And have you ever served as an attorney for UCMC?

22   A.  No, I have not.

23   Q.  Now, I want to direct your attention to the spring of

24   2012.  Did you -- were you contacted to be involved in

25   connection with a grievance that had been filed?

Curell - direct

1099

1   A.  Yes, I was.

2   Q.  And who contacted you?

3   A.  Dr. Michael Simon.

4   Q.  What was his role at the time?

5   A.  He was the physician director in charge of the General

6   Medical Education Office.

7   Q.  And who did you understand was bringing a grievance?

8   A.  Dr. Artunduaga.

9   Q.  And what did you understand to be the issues in her

10   grievance?

11   A.  Just that her contract as a resident was not being

12   continued at the end of that year and she was currently on

13   probation.

14   Q.  Okay.

15        And are you familiar with the Graduate Medical

16   Education policy on grievance procedures?

17   A.  Yes.

18   Q.  And was the contact by Dr. Simon of you in connection with

19   that policy?

20   A.  It was, yes.

21   Q.  And what role did you take with respect to that grievance?

22   A.  So, the grievance committee is made up of five individual.

23   One of them needs to be a senior administrator of the

24   hospital, and I fulfilled that role on the committee.  And I

25   also served as the chair.

Curell - direct

1100

1   Q.  Okay.

2         Who else was on the committee?

3   A.  There were two other faculty physicians:  Dr. McConville,

4 who is a faculty member in the department of medicine and also

5 a program director; Dr. Hernandez, who is a faculty member in

6 the Department of Anesthesia and Critical Care, and he was

7 also the program director for that department at the time.

8   Q.  Let's talk about those two right now.

9         Were either of them in the Department of Surgery?

10   A.  No.

11   Q.  And with respect -- when you say "program director," were

12 both Drs. McConville and Hernandez program directors with

13 respect to residency programs?

14   A.  Yes, they were.

15   Q.  And who else was on the committee?

16   A.  There were two other residents then.  There was a

17 Dr. Beck, who was a chief resident in the Department of

18 Medicine, specifically the section of emergency medicine; and,

19 then, Dr. Margaret Mueller, who was a chief resident in the

20 Department of Obstetrics and Gynecology.

21   Q.  And you're not sure how they were selected for the

22 committee, are you?

23   A.  I am not, no.

24   Q.  Okay.

25         And with respect to the committee and this grievance,

Curell - direct

1101

1  did each side or each party submit written materials?

2  A.  Yes.

3  Q.  So, Dr. Artunduaga would have submitted written materials?

4  A.  Correct.

5  Q.  And so would the -- so did the section on plastic and

6  reconstructive surgery?

7  A.  Yes.

8  Q.  How would you describe the materials that were submitted?

9  A.  Voluminous.

10  Q.  Okay.

11  A.  On both sides.

12  Q.  And were they submitted in advance?

13  A.  They were, yeah.

14  Q.  And were they distributed to the members of the committee

15  days in advance of the hearing?

16  A.  Correct.

17  Q.  So the committee could review them?

18  A.  Correct.

19  Q.  All right.

20       Now, do you recall Dr. Artunduaga contacting you and

21  indicating that one of her witnesses, a Dr. Irma Fleming, was

22  reluctant to testify?

23  A.  Yes, I do.

24  Q.  And what action, if any, did you take with respect to that

25  contact?

Curell - direct

1102

1    A.   So, first I had a conversation with Dr. Artunduaga just

2    reinforcing and reassuring her that we had an absolute

3    prohibition on retaliation against individuals that came

4    forward in a manner like this, and then I also offered to

5    speak to Dr. Fleming, as well.

6    Q.   And did you reach out to Dr. Fleming?

7    A.   I did.

8    Q.   And did you e-mail her?

9    A.   It was either e-mail or page.  I can't remember the exact

10   method of communication.

11   Q.   And what was the substance of that communication?

12   A.   It was a short communication, but basically reinforcing,

13   again, that we do not allow for any type of retaliation; and,

14   I encouraged her to give me a call if she wanted to speak

15   about it further.

16   Q.   Okay.

17        And do you recall also that Dr. Artunduaga, just

18   prior to the hearing, contacted you about a fellow, Dr. Dolamu

19   Olaitan, expressing reluctance to her to testify?

20   A.   Yes, I do.

21   Q.   And did you do anything with respect to that?

22   A.   Had the same conversation with Dr. Artunduaga, again, just

23   reinforcing that we would absolutely not allow that as a

24   hospital and we would take quick action if that was brought to

25   our attention; and, again, encouraged her to reach out to any

Curell - direct

1103

1    of the individuals that she was trying to bring forward and

2    offer to have them contact me directly and I would be happy to

3    have that conversation with them.

4    Q.  And, indeed, did you e-mail Dr. Artunduaga your pager

5    number so that Dr. Olaitan could contact you?

6    A.  Yes, pager, e-mail.  She had all of the methods of contact

7    for me.

8    Q.  All right.

9         And, then, do you remember making some arrangements

10   for the telephonic testimony of a Dr. Michael Shao?

11   A.  Yes.

12   Q.  And how did that come about?

13   A.  So, we knew that he was not going to be able to be there

14   in person, but we weren't sure when exactly the testimony was

15   going to be able to occur that day.  So, we let Dr. Artunduaga

16   know that at any point during the hearing we could go out of

17   order from the witnesses that were scheduled to present, to

18   accommodate Dr. Shao's schedule.

19   Q.  And did Dr. Shao testify?

20   A.  No.

21   Q.  What happened?

22   A.  To my knowledge, they just never reached back out to Dr.

23   Artunduaga.  They couldn't connect that day to have the

24   testimony take place.

25   Q.  All right.

1       And were you going to hold the committee there, all

2  those physicians, for an hour or two or half an hour to wait?

3  A.  No.  We were pretty strict at the very beginning of the

4  committee to set the parameters from a time perspective.  Many

5  of the physicians had to return to clinical duties later that

6  afternoon, and we just wanted to ensure that the hearing

7  itself did not run over.

8  Q.  And did you let the parties know that?

9  A.  Yes.

10  Q.  Now, there was a hearing held on May 16, 2012, correct?

11  A.  Correct.

12  Q.  And do you recall who testified or presented on behalf of

13  Dr. Artunduaga?

14  A.  I do.

15  Q.  Who was it?

16  A.  Dr. Kaplan.  So, she had a couple physicians that

17  testified.  Dr. Kaplan and then Dr. Bob Steppacher.

18  Q.  And they were both attending physicians?

19  A.  They were, yes.

20  Q.  And did Dr. Artunduaga also present?

21  A.  Absolutely, yes.

22  Q.  And with respect to the section, who presented on behalf

23  of the section?

24  A.  Dr. Song presented, and then Dr. Julie Park presented, and

25  then Dr. Greives presented.

Curell - direct

1105

1    Q.  And Dr. Greives was also a -- was a resident?

2    A.  Resident, correct.

3    Q.  And Song and Park were attendings?

4    A.  Correct.

5    Q.  All right.

6            Now, within the materials that the committee had to

7    review, to your knowledge, were the evaluations of

8    Dr. Olaitan, Fleming and Shao included?

9    A.  They were, yes.

10   Q.  And, in your view, would their test- --

11           MR. JEPSON:  Strike that.

12   BY MR. JEPSON:

13   Q.  Now, after the hearing, did the committee meet to discuss

14   what had been presented and what they had reviewed?

15   A.  We did.

16   Q.  And did the committee make any decision as to the

17   grievance?

18   A.  We did.

19   Q.  And what was the decision?

20   A.  We decided to uphold the decision of the section.

21   Q.  Okay.

22           And was part of that decision that you found that

23   there were facts to support it?

24   A.  Absolutely.

25   Q.  And, also, that it was not arbitrary and capricious?

Curell - direct

1   A.  Correct.

2   Q.  And that's the standard set forth --

3   A.  That was the --

4   Q.  -- in the policy?

5   A.  -- standard, exactly.

6   Q.  All right.

7           And was that decision unanimous?

8   A.  It was, yes.

9   Q.  Did anybody dissent or object to it?

10  A.  They did not.

11  Q.  Did anybody argue against that type of ruling?

12  A.  No, they did not.

13  Q.  And, eventually, did you issue a written decision?

14  A.  We did.  We reached out immediately to both parties that

15  day, a very short e-mail correspondence.  We just wanted to

16  let them know the final recommendation or decision of the

17  committee, and then it was about a week later that we issued

18  the formal written response from the committee.

19          MR. JEPSON:  If we could have, Michael, Defendant's

20  Exhibit 177, please.

21  BY MR. JEPSON:

22  Q.  If you would, take a moment -- I know there's -- may be a

23  little hard to view.

24          MR. JEPSON:  Could you blow this up a little bit,

25  Michael, for the witness.

Curell - direct

1107

BY MR. JEPSON:

Q.  Just take a moment and look at that, Ms. Curell.

        Is this the written decision that the committee
issued?

A.  This is.

Q.  And who drafted it?

A.  I drafted the original copy and then distributed to the
committee members to ensure they didn't have any additional
edits.

Q.  And they reviewed it and gave you comments?

A.  Correct.

Q.  And this was then issued to both Dr. Artunduaga and to the
section of plastic and reconstructive surgery?

A.  Correct.

Q.  Now, to your knowledge, was this decision of the committee
appealed or was a request for review or something done so that
the president and the dean took a look at the issue, as well?

A.  Yes.  That's part of the grievance process, and Dr.
Artunduaga did grieve the --

Q.  And are you aware as to what --

        THE COURT REPORTER:  I'm sorry, I didn't hear the
last part.

BY THE WITNESS:

A.  She did grieve the committee's decision, yeah.

BY MR. JEPSON:

Curell - cross

1108

1    Q.  And are you aware of what the president and the dean

2    decided?

3    A.  Yes.  They upheld the decision of the committee.

4    Q.  Okay.

5           And at any point in time during the grievance

6    hearing, did Dr. Artunduaga raise the issue of national origin

7    discrimination based on her being from Colombia or

8    retaliation?

9    A.  Not during the grievance proceeding itself, no.

10   Q.  Okay.

11          And had you had any prior contact with Dr. Artunduaga

12   prior to serving on the grievance committee?

13   A.  No, I had not.

14   Q.  Had you had any discussions with Dr. Song or Dr. Park or

15   anybody from the section about her prior to the grievance

16   procedure?

17   A.  No, I had not.

18          MR. JEPSON:  No further questions.

19          THE COURT:  Cross-examination, Ms. Franklin.

20                       CROSS-EXAMINATION

21   BY MS. FRANKLIN:

22   Q.  Good morning, Ms. Curell.

23          Ms. Curell, the grievance committee itself decided

24   what its procedures would be that it would follow during Dr.

25   Artunduaga's grievance hearing, correct?

Curell - cross

1109

1  A.  Correct.

2  Q.  Okay.

3       And Dr. Artunduaga expressed a concern to you that

4  people that she asked to be witnesses would fear retaliation,

5  didn't she?

6  A.  She did.

7  Q.  You told her you couldn't force any witnesses to testify,

8  right?

9  A.  Correct.

10 Q.  And that requirement that you -- that policy that you

11 couldn't require people to testify was a policy that the

12 grievance committee itself set up, right?

13 A.  I don't know that it -- we didn't have any formal policy.

14 Q.  Okay.

15      Who set up the policy that witnesses could not be

16 required to testify?

17 A.  I don't know if that's in the grievance committee handbook

18 or not.  I'm not sure.

19 Q.  But you wrote Dr. Artunduaga an e-mail stating that you

20 couldn't require witnesses to testify, right?

21 A.  Correct.  We had no authority as a committee to do that.

22 Q.  No question's pending.  Thank you.

23      So, people could say "No" or change their minds or

24 say they would come and not come at the last minute, right?

25 A.  The witnesses?

Curell - cross

1110

1   Q.  Yes.

2   A.  Yes.

3   Q.  And it's also true that the only issues you allowed to be

4   heard at the grievance hearing were Dr. Song's decision to

5   place Dr. Artunduaga on probation and the decision not to

6   renew her contract, correct?

7   A.  Those are the only two issues that were brought forward to

8   us to hear.

9   Q.  Ms. Curell, the question is a "Yes" or "No" question:  The

10  only issues you allowed to be heard were the probation and the

11  non-renewal, correct?

12          MR. JEPSON:  Objection.  Asked and answered.

13          THE COURT:  Overruled.

14          You can answer.

15  BY THE WITNESS:

16  A.  Those were the only two issues that were heard at the

17  committee hearing.

18  BY MS. FRANKLIN:

19  Q.  Let me show you Defendant's Exhibit 155.

20          MS. FRANKLIN:  I'm not sure if it's in evidence, so

21  I'll ask --

22          MS. HALL:  It's not.

23          MR. JEPSON:  It's not in evidence.

24          MS. FRANKLIN:  Not in evidence.

25          THE COURT:  Is there any objection to the admission

Curell - cross

1111

 1    of Defendant's 155?

 2                MR. JEPSON:  No objection, your Honor.

 3                THE COURT:  I will admit it.

 4         (Defendant's Exhibit No. 155 received in evidence.)

 5                MS. FRANKLIN:  Thank you.

 6                Can we publish?  It's published.

 7    BY MS. FRANKLIN:

 8    Q.  Ms. Curell, please look at the first page of this exhibit.

 9    Is that an e-mail from you to Dr. Artunduaga?

10    A.  It appears to be, yes.

11    Q.  May 1st, 2012, correct?

12    A.  Correct.

13    Q.  Now, I'm going to move us to the second page of the

14    exhibit.  And I'd like you to look at -- give me one second.

15                I'd like you to look at the top of the page.  Do you

16    see that?

17    A.  Yes.

18    Q.  (Reading):  Committee will convene on May 16th from 12:30

19    to 5:00 p.m. and will be charged with review of two grievable

20    issues:  One, the decision of the section of plastic and

21    reconstructive surgery not to offer you a second year in

22    residency; and, two, the decision to continue your probation

23    through the remainder of your contract.

24                You wrote that, right?

25    A.  Yes.

Curell - cross

1112

 1    Q.  And, then, below you also see another phrase highlighted

 2    that says:  Your presentation should focus on the two

 3    grievable issues only.

 4            Do you see that?

 5    A.  Yes.

 6    Q.  You wrote that, right?

 7    A.  Yes.

 8    Q.  Now, you, yourself, created the agenda for the grievance

 9    hearing, correct?

10    A.  We did as a committee, yes.

11    Q.  And we just saw that the time period allotted was 12:30 to

12    5:00 p.m., right?

13    A.  Correct.

14    Q.  And Dr. Artunduaga was allotted from 3:00 to 5:00 p.m. for

15    her witnesses, wasn't she?

16    A.  I believe so, yes.

17    Q.  But you didn't give her till 5:00 p.m., did you?

18    A.  I don't recall.

19    Q.  Do you recall -- Dr. Artunduaga told you that one of her

20    witnesses, Dr. Shao, couldn't testify before 4:30 p.m., didn't

21    she?

22    A.  I can't remember the exact time frame.  I knew that it was

23    going to be later in the afternoon.

24    Q.  You said you couldn't -- you wouldn't wait for him, even

25    though the agenda said Dr. Artunduaga had till 5:00 p.m.,

Curell - cross

1113

1   right?

2   A.  From my recollection, we had no -- we didn't even know if

3   Dr. Shao was going to be available.  There was no confirmation

4   on the day of the committee hearing that he was even available

5   at 4:30.  They weren't able to connect that day, from my

6   recollection.

7   Q.  You terminated Dr. Artunduaga's portion of the grievance

8   hearing before 5:00 p.m., didn't you?

9   A.  I don't recall the exact time we terminated the

10   conversation.

11   Q.  And Dr. Shao never testified, did he?

12   A.  He did not, no.

13         MS. FRANKLIN:  That's all I have.

14         THE COURT:  Redirect?

15         MR. JEPSON:  No redirect, your Honor.

16         THE COURT:  Thank you.  You may step down.

17     (Witness excused.)

18         THE COURT:  Please call your next witness.

19         MR. JEPSON:  We're going to call Jonathan Rothstein,

20   assuming he's here.

21         THE COURT:  Hopefully he is.

22     (Brief pause.)

23         THE COURT:  Please come forward, Doctor.

24         MR. JEPSON:  He's a juris doctor, your Honor.

25       JONATHAN ROTHSTEIN, DEFENDANT'S WITNESS, SWORN

Rothstein - direct

1114

```
 1                         DIRECT EXAMINATION
 2   BY MR. JEPSON:
 3   Q.  Good morning.
 4   A.  Good morning.
 5   Q.  Would you state your name for the record, please.
 6   A.  My name is Jonathan Rothstein, R-o-t-h-s-t-e-i-n.
 7   Q.  And you are a lawyer, Mr. Rothstein, correct?
 8   A.  That's correct.
 9   Q.  And when did you graduate from law school?
10   A.  1979.
11   Q.  And at some point in time, you actually worked for UCMC,
12   correct?
13   A.  That is right.
14   Q.  And do you recall that period and what position you held?
15   A.  Yes.  I was employed from July, 2011, through December
16   2012.  I was initially hired -- excuse me -- as the director
17   of labor relations.  And, then, at some point there was
18   reorganization; I became the director of employee and labor
19   relations.
20   Q.  But you had been out of law school for over 30 years,
21   correct --
22   A.  Yes.
23   Q.  -- at that time?
24   A.  That's right.
25   Q.  And can you give us just a general idea of the kinds of
```

Rothstein - direct

1115

1 things you did before you went to UCMC?

2 A.  Yes.  When I first graduated from law school, I was -- my

3 first position was in-house as a staff attorney for a local

4 union here.  I then was in private practice.  I worked

5 in-house at the Chicago Housing Authority as an Associate

6 General Counsel.  I was the director of labor relations at

7 Cook County for ten years.  And, then, I had the UCMC

8 position.

9        And since then I've been a independent arbitrator and

10 mediator doing primarily labor cases.

11 Q.  Okay.

12        And how long were you in private practice,

13 approximately?

14 A.  About a decade.

15 Q.  Before you went to UCMC?

16 A.  Yeah, about a decade.  Ten years.

17 Q.  And as a lawyer in private practice, did you, yourself,

18 handle discrimination cases?

19 A.  I did.  I handled a range of civil rights cases, including

20 employment discrimination, housing discrimination, did some

21 voting rights work, as well.

22 Q.  And in that work, did you represent plaintiffs?

23 A.  I represented both plaintiffs and defendants.

24 Q.  Okay.

25        And, indeed, you and I had a case together at one

1    point?

2    A.   That's correct.

3    Q.   Decades ago?

4    A.   Yes.  Way too long ago.  You're dating both of us.

5    Q.   I think I had hair then.

6         But in any event, going to UCMC, your job as or role

7    as director of employee and labor relations, what were your

8    responsibilities in that job?

9    A.   I had responsibility for the negotiation and

10   administration of the collective bargaining agreements.  We

11   had four of them:  One covering a broad service and

12   maintenance unit, another the nurses, and then a couple of

13   smaller units.  I was -- I supervised a staff that

14   investigated employee complaints and, as well, handled these

15   grievances and responded to the union.

16   Q.   Okay.

17        And at the time that you were there, did UCMC have a

18   written policy prohibiting discrimination based on national

19   origin or retaliation for raising those complaints?

20   A.   Yeah, we certainly did.

21   Q.   And as part of your responsibilities, would you have

22   responsibility for investigating and enforcing that policy?

23        MS. FRANKLIN:  Your Honor, objection.  Leading.

24        THE COURT:  Sustained.

25   BY MR. JEPSON:

Rothstein - direct

1117

1　Q.　What were your responsibilities with respect to the

2　policy, Mr. Rothstein?

3　A.　My responsibility was to receive complaints regarding

4　claims of discrimination based on national origin and

5　retaliation, among other categories, and to investigate those

6　claims and to prepare -- reach conclusions and prepare a

7　report regarding them.

8　Q.　Okay.

9　　　　　And were there others in your department that also

10　did similar work?

11　A.　Yes.　As I said, we had a small staff that I supervised.

12　Q.　And I want to direct your attention to Joint Exhibit 3.

13　　　　　MR. JEPSON:　Page 1462, Michael.

14　BY THE WITNESS:

15　A.　Yeah, it's up on the screen.

16　BY MR. JEPSON:

17　Q.　All right.　Have you seen this before?

18　A.　I have.

19　Q.　And was this in effect when you were in your role at UCMC?

20　A.　Yes.　It appears to be the same.

21　Q.　And unlike the UCMC written policy of discrimination, this

22　is a policy that applied to the Graduate Medical Education

23　Department, correct?

24　　　　　MS. FRANKLIN:　Objection, your Honor.　Leading.

25　　　　　THE COURT:　Sustained.

Rothstein - direct

1    BY MR. JEPSON:

2    Q.   What did this apply to?

3    A.   This appears to be the manual for the Graduate Medical

4    Education Department.

5    Q.   And that would -- would that apply to residents and

6    interns?

7    A.   Yes.

8    Q.   Okay.

9         I want to direct your attention to the second page

10   and the second paragraph from the top.

11        And what is this?

12   A.   That's the non-discrimination policy that is part of the

13   handbook that we're discussing.

14   Q.   And would you have responsibility with respect to this --

15   A.   Yes.

16   Q.   -- provision, as well?

17   A.   Yes.

18   Q.   Okay.

19        Now, I want to direct your attention to -- the

20   plaintiff in this case is Dr. Maria Artunduaga.  Do you

21   recall --

22        MR. JEPSON:  Strike that.

23   BY MR. JEPSON:

24   Q.   Now, if a resident or intern had issues with respect to

25   the quality of education they were receiving or problems with

Rothstein - direct

1119

1    their assignments or issues with their rotations and they came

2    to you, is that something that you would handle back at that

3    time?

4    A.  No.  Those are -- those were all matters that would be

5    handled by the Department or Office of Graduate Medical

6    Education.

7    Q.  And if, indeed, somebody came to you and said, listen, I

8    have problems with my rotations or my assignments or my

9    program director and he's discriminated against me because of

10   my national origin or some other reason, is that something

11   that you would be involved in?

12   A.  If there was a claim of national origin discrimination,

13   that would trigger the participation of my office.  But in the

14   absence of such claim, that would be something I would

15   redirect the intern or resident to the Office of Graduate

16   Medical Education.

17   Q.  All right.

18          Now, at some point in time in November, 2011, do you

19   recall being contacted by a Mr. Ricardo Garcia?

20   A.  I do recall having a conversation with Mr. Garcia.

21   Q.  And did he identify himself as having a relation to

22   Dr. Maria Artunduaga?

23   A.  Yes.  In the communication, he did identify himself as the

24   husband of Dr. Artunduaga.

25   Q.  All right.

Rothstein - direct

1120

         1         I want to direct your attention to Joint Exhibit 26.
 2   I'm sorry, not 26.  Joint Exhibit 29.
 3           This appears to be a couple of -- an e-mail exchange
 4   between you and Ricardo Garcia; is that correct?
 5   A.  That's correct.
 6   Q.  And did you receive the e-mail that's dated Monday,
 7   November 21, 2011, 10:39 a.m., from Mr. Garcia?
 8   A.  Yes.
 9   Q.  And did you respond to him at the top?
10   A.  Yes, I did.
11   Q.  And prior to this e-mail exchange, did you have a
12   telephone conversation with Mr. Garcia?
13   A.  I believe I had a short conversation with him on the
14   phone, but I don't recall if it was prior to or after this
15   exchange of e-mails.
16   Q.  At any point in time during that telephone conversation,
17   did Mr. Garcia raise any issue that his wife was being
18   discriminated against because of her national origin, being
19   from Colombia or that her program director was retaliating
20   against her because she had made some complaint to that
21   effect?
22           MS. FRANKLIN:  Objection.  Leading.
23           THE COURT:  Rephrase.  Sustained.
24   BY MR. JEPSON:
25   Q.  During that conversation with Mr. Garcia, was

Rothstein - direct

1    discrimination discussed?

2    A.  No.

3    Q.  During that discussion with Mr. Garcia, was the issue of

4    retaliation discussed?

5    A.  I do not -- not based on national origin.

6    Q.  Okay.

7           And the e-mail that he sent to you at the bottom,

8    which reads:  I'm Ricardo Garcia, spouse of one of the

9    employees at the University of Chicago Hospital.  As you are

10   probably aware now, my spouse is having some difficulties at

11   her program right now.  We are trying to solve them with the

12   program director.  We believe everything is a big

13   misunderstanding, but we would like to have a short meeting

14   with you to ask some questions and make sure we are taking the

15   right steps to solve this impasse.  Is this possible?

16          Do you recall whether anything else was raised in

17   that telephone conversation other than what's in this e-mail?

18   A.  No.  As I said, we had a brief conversation which really

19   tracked what you're looking at in the e-mail.

20   Q.  All right.

21          Now -- and you had no conversations or contact with

22   Dr. Artunduaga at the time, correct?

23   A.  That's correct.

24   Q.  So, do you recall being contacted, again, with respect to

25   Dr. Artunduaga sometime in the spring?

Rothstein - direct

1122

1   A.  I -- I do know that I was involved subsequently.  So, yes,

2   I was contacted.

3   Q.  Okay.

4        And, in particular, do you recall Dr. Artunduaga

5   reaching out to you sometime in May to arrange a meeting with

6   you?

7   A.  I do -- I don't recall the specific dates, but I know at

8   some point later there was some communication from Dr.

9   Artunduaga.

10  Q.  And did you actually have a meeting with her, if you

11  recall?

12  A.  Yes.  I believe I had one meeting with her.

13  Q.  Okay.

14       And during the course of that meeting, do you recall

15  Dr. Artunduaga raising issues with you about her program or

16  her treatment in the program?

17  A.  Yeah.  If I'm remembering correctly, at that point she had

18  either initiated or gone through a process of complaints that

19  were follow-on to that initial communication I had received.

20  Q.  And do you recall, at that point, did she tell you that

21  she had been non-renewed?

22  A.  I believe that was what had happened at that point.

23  Q.  And what do you recall her raising as issues with respect

24  to her treatment?

25  A.  Again, she didn't raise issues of national origin

Rothstein - direct

1123

1    discrimination.  My recollection is that it was a complaint

2    that the non-renewal was related to her prior complaints about

3    her treatment in the program.

4    Q.  Okay.

5         Do you recall anything else?

6    A.  That's what I recall.

7    Q.  Let me direct your attention, if we could, to Defendant's

8    Exhibit 173.

9         THE COURT:  That is not in evidence yet.

10   BY MR. JEPSON:

11   Q.  Now, do you recognize this e-mail sent from someone named

12   Torry Camishia on your behalf?

13   A.  I do.

14   Q.  And was Ms. Camishia somehow working with you or in your

15   group?

16   A.  Yes.  She was the administrative assistant for the group.

17   Q.  And it appears to be sent to Dr. Artunduaga?

18   A.  Yes, it does.

19   Q.  I want to direct your attention to the second page.

20        Do you recognize this?

21        Please take a moment and read it through.

22      (Brief pause.)

23   BY THE WITNESS:

24   A.  Yes, I've read it.

25   BY MR. JEPSON:

Rothstein - direct

1124

1    Q.  Is this a letter that you sent to Dr. Artunduaga?

2    A.  That -- that is a letter I sent to her.

3           MR. JEPSON:  And I will move its admission.

4           THE COURT:  Any objection?

5           MS. FRANKLIN:  No.

6           THE COURT:  I will admit it.

7       (Defendant's Exhibit No. 173 received in evidence.)

8           MR. JEPSON:  May we publish it, please?

9           THE COURT:  You may.

10           MR. JEPSON:  Second page.

11   BY MR. JEPSON:

12   Q.  And, in particular, would you read the second paragraph to

13   me, please?

14   A.  You want me to read it aloud?

15   Q.  Please.

16   A.  Okay.

17           (Reading):  The GME handbook provides for a work

18   environment free from all forms of prohibited harassment and

19   specifically references sexual harassment, a form of

20   harassment prohibited by both state and federal law.

21   Prohibited harassment is any form of harassment prohibited by

22   law.  In this instance, your sole and exclusive complaint is

23   that your department chair, Dr. Song, has allegedly been

24   harassing you for filing a grievance under a separate

25   provision of the GME handbook.  This claim is not within the

Rothstein - direct

1125

1  purview of human resources, but rather should be addressed

2  through the GME office, which I understand from Barry Kamin

3  has already taken place.  Human resources cannot take any

4  further action with respect to your complaint, and the file on

5  this matter will be closed.

6  Q.  Now, does this refresh your recollection as to what you

7  were told by Dr. Artunduaga during the meeting?

8  A.  Yes.  So, apparently at this point, her -- she was still

9  employed or still in the program, but was complaining that she

10 was being harassed for pursuing a grievance under the GME

11 handbook.

12 Q.  And do you know what that grievance was about?

13 A.  I do not recall.

14 Q.  Okay.

15      And after that meeting, did you have any further

16 involvement with Dr. Artunduaga's issues?

17 A.  Yes, I did.

18 Q.  And at some point in time, were you notified that Dr.

19 Artunduaga had filed an EEOC charge?

20 A.  I was.

21 Q.  And were you also requested by someone else to take a look

22 into the matter?

23 A.  Yes, I was.

24 Q.  And by whom?

25 A.  I believe it was probably the -- you know, I'm not

Rothstein - direct

1126

1　precisely sure.  I think it was a referral I received that was

2　a follow-on from the activity that had been going on with

3　respect to Dr. Artunduaga's complaints.

4　Q.  And do you recall that you began to look into this matter

5　towards the end of June, 2012?

6　A.  Yes.  Once there was an EEO complaint and there was a

7　claim of national origin discrimination, it then fell within

8　my purview to investigate the matter.

9　Q.  Let me show you -- and this is not in evidence --

10　Defendant's Exhibit 186.

11　　　　　THE COURT:  Is there any objection to its admission?

12　　　　　MR. JEPSON:  I'm not necessarily even going to offer

13　it, your Honor.

14　　　　　THE COURT:  Okay.

15　BY MR. JEPSON:

16　Q.  This appears to be, Mr. Rothstein, an e-mail dated June

17　22nd, 2012, to you from Dr. Artunduaga.

18　　　　　Do you see that?

19　A.  Yes.

20　Q.  Would you read that to yourself, please?

21　　　(Brief pause.)

22　BY THE WITNESS:

23　A.  Okay.  I've read it.

24　BY MR. JEPSON:

25　Q.  As of this point, does this refresh your recollection that

Rothstein - direct

1127

1  an EEOC charge would have already been filed and received?

2  A.  Yes.  By June 22nd, the EEO charge had already been filed

3  and received.

4  Q.  All right.

5        Now, did you conduct an investigation under the UCMC

6  EEO policy, as well as the GME EEO policy into this matter?

7  A.  Yes, I did.

8  Q.  And was -- were you reviewing whether or not there had

9  been discrimination in the non-renewal of her contract?

10        MS. FRANKLIN:  Object.  Leading.

11        THE COURT:  Sustained.

12  BY MR. JEPSON:

13  Q.  What were you looking into?

14  A.  Well, Dr. Artunduaga had both internally and through this

15  EEO complaint complained that the non-renewal of her contract

16  was because of national origin.  And, so, yeah, at that point,

17  as I said, that triggered the involvement of my department,

18  and I investigated that claim.

19  Q.  And did those complaints occur after the non-renewal

20  had -- decision had been made?

21  A.  The first time I became aware of them was when I received

22  this referral, and my recollection is that the internal

23  complaint was made after the non-renewal.

24  Q.  Okay.

25        And what did you do to investigate?

Rothstein - direct

1128

1   A.  I conducted interviews with a number of doctors, as well

2   as interns and residents, and I reviewed documents.

3   Q.  And did you interview Dr. Song?

4   A.  Yes, I did.

5   Q.  Did you interview Dr. Park?

6   A.  Yes, I did.

7   Q.  Dr. Jaskowiak?

8   A.  Yes.

9   Q.  Dr. Ferguson?

10   A.  Yes.

11   Q.  Dr. Fleming?

12   A.  I'm not certain of Fleming.

13   Q.  Okay.

14        Dr. Umanskiy?

15   A.  Yes.

16   Q.  Dr. Hurst?

17   A.  Yes.

18   Q.  Dr. Dickie?

19   A.  Yes.

20   Q.  And others, as well?

21   A.  Yeah.  There were -- there were quite a number of people I

22   --

23   Q.  And by the time you were doing your interviews, was Dr.

24   Artunduaga, to your knowledge, represented by counsel?

25   A.  I believe she was, yes.

Rothstein - cross

1129

1    Q.   Okay.

2              At some point in time, after doing these interviews

3    and reviewing the materials, did you reach a conclusion as to

4    whether UCMC's EEO policy or the GME EEO policy had been

5    violated?

6    A.   Yeah.  After conducting a number of interviews and

7    reviewing the documents, I concluded that neither policy had

8    been violated.

9    Q.   Thank you.

10             MR. JEPSON:  No further questions.

11             THE COURT:  Cross-examination.

12                       CROSS-EXAMINATION

13   BY MS. FRANKLIN:

14   Q.   Good morning, Mr. Rothstein -- Rothstein.  Sorry.

15             THE COURT:  The witness would like some water, if

16   somebody wants to get him some.

17             MR. JEPSON:  Can't have that.

18   BY MS. FRANKLIN:

19   Q.   Good morning, Mr. Rothstein.

20   A.   Good morning.

21             MS. FRANKLIN:  I'll wait until you get your water.

22             THE WITNESS:  Thank you.

23        (Brief pause.)

24             THE WITNESS:  Better.

25   BY MS. FRANKLIN:

Rothstein - cross

1  Q.  Mr. Jepson asked you about a conversation you had with Dr.

2  Artunduaga's husband, Ricardo Garcia, in November of 2011.  Do

3  you remember that?

4  A.  Do I remember that he asked me or that -- the

5  conversation?

6  Q.  The conversation.

7  A.  I know we had a very brief conversation.

8  Q.  You said it was brief, correct?

9  A.  Correct.

10 Q.  Okay.

11      And you told Mr. Garcia that you couldn't investigate

12 anything with respect to his issues, correct?

13 A.  That's correct.

14 Q.  Okay.

15      Now, your job is to investigate complaints of

16 unlawful discrimination, correct?

17 A.  Yes.

18 Q.  Did you ever ask Mr. Garcia whether the issues he was

19 trying to bring to you involved unlawful discrimination?

20 A.  I don't recall if I asked that question.  I know that he

21 described to me the situation and --

22 Q.  Mr. Rothstein --

23 A.  Yeah.

24 Q.  -- I only asked you whether you remember Mr. Garcia --

25 asking Mr. Garcia about unlawful discrimination; "Yes" or

Rothstein - cross

1   "No"?

2   A.  Right.  And as I said, I -- no, I don't recall asking

3   that.

4   Q.  Thank you.

5        And is it your testimony you don't recall ever

6   speaking to Dr. Artunduaga during the November, 2011, time

7   frame?

8   A.  I do not recall speaking with her during that time frame.

9   Q.  But you never opened an investigation of anything with

10  respect to Dr. Artunduaga or issues that Mr. Garcia raised

11  with you in November, 2011, correct?

12  A.  Yeah, that's correct.

13  Q.  Then in early May, 2012, when Dr. Artunduaga reached out

14  to you, again, you still didn't do an investigation at that

15  point, right?

16  A.  That is correct.

17  Q.  And when you finally did decide to do an investigation --

18  and I think you said it was June and July, 2012 -- you reached

19  a conclusion without ever talking to Dr. Artunduaga, didn't

20  you?

21  A.  You know, I don't recall if I spoke with her or not.  I

22  believe I had at least a brief conversation with her, but I

23  don't recall specifically.

24  Q.  Did you interview Dr. Artunduaga as part of your July --

25  June and July, 2012, investigation; "Yes" or "No"?

Rothstein - cross

1132

 1    A.  No, I did not.

 2    Q.  Thank you.

 3         And as part of that investigation, in the conclusions

 4    that you prepared for that investigation, you admitted that

 5    Dr. Artunduaga raised the subject of her accent, didn't you?

 6    A.  I'm sorry, say that again.

 7    Q.  You admitted in your conclusions to that investigation,

 8    July -- June, July, 2012 -- that Dr. Artunduaga had raised the

 9    subject of her accent?

10         MR. JEPSON:  I will object as this refers to

11    something that has -- was the subject of an MIL, a report.

12         MS. FRANKLIN:  I'm just asking for Mr. Rothstein's

13    conclusions.

14         THE COURT:  But the objection is it violates the

15    motion in limine.  What is your response to that?

16         MS. FRANKLIN:  Mr. Rothstein can testify about his

17    conclusions under the ruling on the motion.

18         MR. JEPSON:  The report was excluded, your Honor.

19         MS. FRANKLIN:  Agreed.

20         THE COURT:  Okay.  Then I think you are going to have

21    to rephrase or -- because you are walking up against the

22    motion in limine ruling.

23         MS. FRANKLIN:  I'm just going to withdraw the

24    question.

25         THE COURT:  Okay.

1133

1    MS. FRANKLIN:  That's all I have.  Thank you.

2    MR. JEPSON:  Nothing further.

3    THE COURT:  Thank you.  You may step down.

4    (Witness excused.)

5    THE COURT:  Please call your next witness.

6    MS. HALL:  We are going to call Dr. Eric Grossman by

7    video.

8    Your Honor, for timing purposes, I think it's about

9    an hour.

10   THE COURT:  Okay.  We can take our morning break a

11   little bit early.

12   (Jury out.)

13   THE COURT:  Remind me, today other than Grossman --

14   MS. HALL:  We have a video of Dr. Irma Fleming, about

15   40 minutes; and, then, we have Dr. Konstantin Umanskiy, who

16   should be here at or before 2:00 o'clock.

17   MR. JEPSON:  But we have Dr. Ferguson, who is here at

18   1:00.

19   MS. HALL:  And Dr. Ferguson.

20   THE COURT:  Okay.  Dr. Ferguson.

21   Sounds like we may get done early, but --

22   MR. JEPSON:  Not a lot.

23   THE COURT:  -- not a lot.

24   MS. HALL:  Not significantly.

25   THE COURT:  Okay.

1134

```
 1          We will pick up at about 25 till.  Make it 20 till.
 2   Their Dunkin' Donuts did not come this morning.  We will give
 3   them a little extra.
 4          MR. JEPSON:  Super Bowl hangover.
 5      (Laughter.)
 6          THE COURT:  You might be right.  But they did come
 7   about a half hour ago.
 8          20 till.
 9      (Brief recess.)
10          THE COURT:  Katie went to get the jury.
11      (Jury in.)
12          THE COURT:  You may be seated.
13          Your next witness, please.  It's a video, correct?
14          MS. HALL:  Yes.  Dr. Eric Grossman.
15      (Said video played in open court.)
16          THE COURT:  It's the end of the video.
17          MS. HALL:  And we have another.
18          THE COURT:  Okay.
19          MS. HALL:  Dr. Irma Fleming.
20          THE COURT:  All right.  Go ahead and play
21   Dr. Fleming.  This is her 2016 --
22          MS. HALL:  Yes.
23          THE COURT:  -- correct?  Okay.
24      (Said video played in open court.)
25          THE COURT:  That's the end of this video deposition?
```

1135

1    MR. JEPSON:  Yes, it is.

2    THE COURT:  Okay.

3    MR. JEPSON:  And our next witness will not be here

4  till 1:00 o'clock.

5    THE COURT:  Okay.  Perfect timing.  We will break for

6  lunch.

7    Ladies and gentlemen, we will pick back up at 1:35.

8    (Jury out.)

9    THE COURT:  How long do you anticipate your next

10  witness' testimony will be?  It's Dr. Ferguson?

11    MR. JEPSON:  Yes.  Direct, no more than half an hour.

12    THE COURT:  Okay.  And you have one more witness

13  after that?

14    MR. JEPSON:  Yes, Dr. Umanskiy.

15    We do have good news.  Dr. Park was able to shift her

16  schedule, so she will be here Wednesday.

17    THE COURT:  Wonderful.

18    MR. JEPSON:  So we will be able to finish our

19  witnesses Wednesday.

20    THE COURT:  Wonderful.  Thank you and thank her.  And

21  I will see you at 1:35.

22    MR. JEPSON:  Thank you.

23    (Adjournment taken at 12:25 o'clock p.m., until 1:35

24  o'clock p.m., of the same afternoon.)

25                         *    *    *    *    *

1136

1  We certify that the foregoing is a correct transcript from the
   record of proceedings in the above-entitled matter.

2

3

   /s/ Joseph Rickhoff                    February 6, 2017
4  Official Court Reporter

5  /s/ Colleen Conway                     February 6, 2017
   Official Court Reporter

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1137

1           IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION

3   DR. MARIA ARTUNDUAGA,           ) Docket No. 12 C 8733
                                     )
4                  Plaintiff,        )
                                     )
5              vs.                   )
                                     )
6   THE UNIVERSITY OF CHICAGO        )
    MEDICAL CENTER,                  ) Chicago, Illinois
7                                    ) February 6, 2017
                   Defendant.        ) 1:35 o'clock p.m.
8

9            TRANSCRIPT OF TRIAL PROCEEDINGS
       BEFORE THE HONORABLE AMY J. ST. EVE, AND A JURY
10

    APPEARANCES:
11

    For the Plaintiff:        THE FRANKLIN LAW FIRM, LLC
12                            BY:  MS. JAMIE S. FRANKLIN
                              53 W. Jackson Blvd., Suite 803
13                            Chicago, Illinois  60604

14                            ROBINSON, CURLEY & CLAYTON, P.C.
                              BY:  MS. CYNTHIA H. HYNDMAN
15                            300 South Wacker Drive, Suite 1700
                              Chicago, Illinois  60606
16
    For the Defendant:        VEDDER PRICE, P.C.
17                            BY:  MR. EDWARD C. JEPSON, JR.
                                   MS. ELIZABETH N. HALL
18                            222 N. LaSalle St., Suite 2600
                              Chicago, Illinois  60601
19
    Court Reporter:           MR. JOSEPH RICKHOFF
20                            Official Court Reporter
                              219 S. Dearborn St., Suite 1232
21                            Chicago, Illinois  60604
                              (312) 435-5562
22

23           * * * * * * * * * * * * * * * * *

24                   PROCEEDINGS RECORDED BY
                    MECHANICAL STENOGRAPHY
25              TRANSCRIPT PRODUCED BY COMPUTER

Ferguson - direct

1138

```
 1      (Proceedings heard in open court.  Jury out.)
 2          THE COURT:  Ready?
 3              MR. JEPSON:  We are ready.
 4              THE COURT:  Is your next witness here?
 5              MR. JEPSON:  Dr. Ferguson is here.  Dr. Ferguson?
 6              THE COURT:  Doctor, if you want to come up, please.
 7   Just stay standing, sir, when the jury comes in, and I will
 8   swear you in.
 9      (Jury in.)
10              THE COURT:  You may be seated.  Doctor, please raise
11   your right hand.
12      (Witness sworn.)
13              THE COURT:  You may be seated.
14              MARK FERGUSON, DEFENDANT'S WITNESS, SWORN,
15                          DIRECT EXAMINATION
16   BY MR. JEPSON:
17   Q.  Would you state your name for the record.
18   A.  Mark Ferguson.
19   Q.  And it's Dr. Ferguson; correct?
20   A.  Yes.
21   Q.  Where did you go to medical school?
22   A.  University of Chicago.
23   Q.  And did you do a residency?
24   A.  I did.
25   Q.  And what was that in?  What was the specialty?
```

Ferguson - direct

1   A.  General surgery residency, also at the University of

2   Chicago.

3   Q.  And did you do any fellowships afterwards?

4   A.  I did a fellowship in cardiothoracic surgery at the same

5   place.

6   Q.  And are you currently an attending physician at the

7   University of Chicago Medical Center?

8   A.  Yes.

9   Q.  And when did you become an attending physician?

10  A.  1984.

11  Q.  So what titles do you hold currently?

12  A.  I'm a professor of surgery.  I'm a member of the

13  comprehensive cancer center.  I'm the head of the thoracic

14  surgery service.  I'm the director of the cardiothoracic

15  surgery residency training program.

16  Q.  All right.  I want to direct your attention to Defendant's

17  Exhibit 50, which is not in evidence yet.  And the screen is

18  hard to read, Dr. Ferguson, but at the top it says:  Schedule

19  of Surgical Services, November 1 through 30, 2011.  Do you see

20  that?

21  A.  Yes.

22  Q.  And are you familiar with these sorts of things?

23  A.  Yes.

24  Q.  I'd like to direct your attention to the second page,

25  please.

Ferguson - direct

1140

1     And if you could, Michael, blow up the

2  cardiothoracic.  I see the whole section.  Do you see on this

3  page -- first, I'll move this into evidence.

4          THE COURT:  Any objection?

5          MS. HYNDMAN:  No, your Honor.  It's already in as

6  Plaintiff's Exhibit 26.  But if he wants to put it in as well,

7  that's fine.

8          MR. JEPSON:  Well, guess what?  I apologize.

9          THE COURT:  Okay.  I will admit it.

10          MR. JEPSON:  We will have two numbers.

11          THE COURT:  That's fine.

12  BY MR. JEPSON:

13  Q.  All right.  I want to direct your attention to the lower

14  part of this, where it says:  Thoracic virtual pager.  Do you

15  see that?

16  A.  Yes.

17  Q.  It appears that's your name below?

18  A.  Yes.

19  Q.  And then below your name, is that a Dr. Vigneswaran?

20  A.  Yes.

21  Q.  And were you and Dr. Vigneswaran the two attending

22  physicians on the thoracic service for that month?

23  A.  Yes.

24  Q.  And then in the senior resident column, I see the name

25  Moreira.  Do you remember a Dr. Carla Moreira?

Ferguson - direct

1141

1    A.   Vaguely.

2    Q.   Okay.  She is listed as a senior resident for your group;

3    correct?

4    A.   Yes.

5    Q.   And then for junior resident, there appears to be

6    Dr. Artunduaga, Maria Artunduaga.  Do you see that?

7    A.   Yes.

8    Q.   So on that service for the month, it would have been two

9    attendings, Dr. Moreira and Dr. Artunduaga; correct?

10   A.   Yes.

11   Q.   And in addition to the physicians on the service, do you

12   also use what we've been talking about here as physician

13   extenders, such as nurse practitioners?

14   A.   Yes, we have physician assistants.

15   Q.   Okay.  And if I -- does the name Kristy Todd ring a bell

16   in that light?

17   A.   Yes.

18   Q.   What about Amy Durkin Celauro?

19   A.   Yes.

20   Q.   And finally Nirja Mehta?

21   A.   Yes.

22   Q.   And would all three of those have been involved on your

23   service for that month?

24   A.   Yes.

25   Q.   Now, what kinds of -- well, strike that.  Let's go to

Ferguson - direct

1142

1   Dr. Vigneswaran.  Where is he from originally, if you know?

2   A.  I think he is from Sri Lanka.

3   Q.  And, to your knowledge, is he a foreign medical graduate?

4   A.  Yes.

5   Q.  And did he have an accent?

6   A.  Yes.

7   Q.  Now, let's -- what kind of patients do you operate on on

8   that service?

9   A.  In terms of disease processes?

10  Q.  Yeah, that, I think, would be the easiest.

11  A.  It's mostly patients with lung cancer, esophogeal cancer.

12  Diseases of the center of the chest, we call the mediastinum,

13  the thymus, things of that sort.  We do some endoscopies, we

14  do biopsies, things like that.  But primarily lung cancer is

15  the large bulk of it.

16  Q.  All right? Do you use cameras to do some of the surgery?

17  A.  Yes.

18  Q.  Not all of it, though; right?

19  A.  A lot of it, but not all of it.

20  Q.  Okay.  And I want to direct your attention.  Do you

21  remember Dr. Maria Artunduaga?

22  A.  I do.

23  Q.  Did you work with her enough in your view to form an

24  opinion as to her skills and abilities?

25  A.  Yes.

Ferguson - direct

1143

1    Q.  And is it your practice typically to have a mid-rotation

2    discussion about performance with interns on your service?

3    A.  Yes.  We have a handbook that we use for the service that

4    all of the trainees are given at the beginning.  And it

5    specifies in that that they're supposed to see me at the

6    mid-month level for a formative evaluation.

7    Q.  All right.  And at the time of this mid-month evaluation,

8    you would have been an attending for, by my calculation, about

9    27 years.  Does that sound about right?

10   A.  I'll trust your math, yes.

11   Q.  Thank you.  I'm just taking '84 and 2011.  And is it fair

12   to say that you would have had an intern on your service on

13   rotations pretty much every month for those -- that number of

14   years?

15   A.  Yes.

16   Q.  All right.  And did you meet with Dr. Artunduaga to

17   discuss her mid-rotation performance?

18   A.  Yes.

19   Q.  I want to draw your attention to a document that has not

20   been -- I think I'm right on this one -- not admitted into

21   evidence, and that's Defendant's Exhibit 62.

22            THE COURT:  62 is already in.  You can publish it, if

23   you would like.

24            MR. JEPSON:  So let's publish it to the jury, then.

25   BY MR. JEPSON:

Ferguson - direct

1144

1    Q.  This appears to be an e-mail that you sent to Dr. David

2    Song; am I correct?

3    A.  Yes.

4    Q.  And why did you write this e-mail?

5    A.  Dr. Song asked me to provide an evaluation of

6    Dr. Artunduaga's performance.

7    Q.  Okay.  And was that a formal contact, or did you run into

8    the hall?  How did that come about?

9    A.  As I --

10            MS. HYNDMAN:  Your Honor, I hate to interrupt, but I

11   really would like to hear the testimony from the witness.  Mr.

12   Jepson continues to lead all his witnesses.

13            THE COURT:  Sustained.

14            MR. JEPSON:  Go ahead.

15   BY THE WITNESS:

16   A.  I don't recall.

17   BY MR. JEPSON:

18   Q.  Okay.  But you wrote this; correct?

19   A.  Yes.

20   Q.  And it starts off by saying:  David, I met with Maria

21   Artunduaga for her mid-rotation formative evaluation today.

22            Is that correct?  Did you do that?

23   A.  Yes.

24   Q.  And during our discussion, she informed me that she had

25   experienced some performance issues on prior services at this

Ferguson - direct

1145

1    institution and that she had recently been placed on

2    probation.  Did she tell you that?

3    A.   Yes.

4    Q.   And had Dr. Song or anybody else told you that

5    Dr. Artunduaga was on probation prior to this point?

6    A.   No.

7    Q.   Now, you then go on to comment on her performance.  It

8    says:  Her performance on the thoracic service to date has

9    been very poor.  Was that your opinion?

10   A.   Yes.

11   Q.   And it says:  She is not functioning up to the level of a

12   third-year student at this point.  Her areas of weakness are

13   numerous and include lack of technical skills, basic medical

14   knowledge, organizational, prioritization skills,

15   communication skills, and information processing abilities.

16   Did you have those opinions of her at that time?

17   A.   Yes.

18   Q.   It goes on to say:  We have had a few near misses as a

19   result of her performance that fortunately have not yet

20   endangered patients; however, the PAs, that would be physician

21   assistants?

22   A.   Correct.

23   Q.   On the service and senior resident are having to cover

24   Maria's duties closely to ensure that nothing bad happens.

25          Was that your observation and understanding at the

Ferguson - direct

1146

1   time?

2   A.  Yes.

3   Q.  Now, you then go on in the next paragraph to say:  I don't

4   think Maria accepts responsibility for these shortcomings.

5   When I mentioned specifics to her, these were usually met with

6   explanations that involved misunderstandings about her

7   responsibilities, miscommunications from nurses or other

8   healthcare workers, inadequate introduction to the processes

9   at this institution, both medical center and education

10   related, et cetera.

11        Did you have a conversation with Dr. Artunduaga to

12   that effect?

13   A.  Yes.

14   Q.  It goes on to say that:  I had a long discussion with

15   Maria and informed her that, in my opinion, she doesn't have

16   the aptitude for a career in surgery, much less in a specialty

17   like plastic surgery, or a subspecialty like congenital

18   craniofacial disorders.

19        Now, what did you base that on?

20   A.  My observations of her performance.

21   Q.  And you indicate here that your view was she didn't have

22   the aptitude for surgery, let alone plastic or craniofacial

23   disorders.  What did you mean by that?

24   A.  I didn't think she would have success in finishing a

25   training program or in practicing in those specialty or

Ferguson - direct

1147

1  subspecialty areas.

2  Q.  Okay.  Now, it then goes on to say:  I told her that

3  aptitude is not a skill that can be taught.  I suggested that

4  she begin to think immediately about a change in her career

5  path, that there was no point in continuing down a path that

6  is almost certainly to be disappointing and ultimately

7  unsuccessful.

8          Did you tell Dr. Artunduaga that mid November,

9  November 16, 2011?

10  A.  Yes.

11  Q.  And did you believe that to be the case from your

12  experience?

13  A.  Yes.

14  Q.  Now, it goes on:  We agreed that for the next two weeks on

15  service she should focus on improving skills that would serve

16  her well in a medical career, in a non-surgical specialty,

17  specifically being proactive in managing floor patient issues

18  that lie within her knowledge and technical skill set and

19  improving her communication skills.

20          Did you tell her that as well?

21  A.  Yes.

22  Q.  Now, were you aware that Dr. Artunduaga is from Columbia?

23  A.  Yes.

24  Q.  Did she have an accent?

25  A.  Yes.

Ferguson - direct

1148

1    Q.  Could you understand her English?

2    A.  Yes.

3    Q.  Indeed, did you ever either mimic her accent or make fun

4    of her accent in any way?

5    A.  No.

6    Q.  Did you ever ask her:  Can't you speak English, or say

7    words to that effect?

8    A.  No.

9    Q.  Did you ever in any way criticize her command of the

10   English language or her accent?

11   A.  No.

12   Q.  Now, after you had this meeting with Dr. -- strike that.

13   What is a chest tube?

14   A.  It's a plastic tube that is inserted between the ribs to

15   drain the space around the lung.

16   Q.  Okay.  Now, does every intern who is on your service or

17   rotation on your service get the chance to put in a chest

18   tube?

19   A.  No.

20   Q.  What does that depend on?

21   A.  The circumstances of their availability and other people

22   competing for the opportunity to put in the chest tube.

23   Q.  Okay.  And do you recall any specific cases during that

24   rotation in which Dr. Artunduaga would have had an opportunity

25   to do that, or not?

Ferguson - direct

1149

1  A.  I don't recall any.  Either way.

2  Q.  Now, eventually you did submit a summative or final

3  evaluation for the rotation; correct?

4  A.  Yes.

5  Q.  And let's direct your attention to Joint Exhibit 20.

6      If you could blow up the first page, Michael.

7      And I want to direct your attention, it appears that

8  you rated her a "could improve" on her general knowledge; is

9  that right?

10  A.  Yes.

11  Q.  And then with respect to her operative knowledge, you

12  rated her a "deficient;" is that correct?

13  A.  Yes.

14  Q.  And then you rated her a "could improves" on both pre-op

15  and post-op care?

16  A.  Correct.

17  Q.  And then, "ability to communicate and justify medical

18  decisions," you rated her as deficient?

19  A.  Correct.

20  Q.  Did Dr. Artunduaga, not being a native English speaker,

21  factored into your rating on that number?

22      MS. HYNDMAN:  Objection, your Honor.  Leading.

23      THE COURT:  Sustained.  Rephrase.

24  BY MR. JEPSON:

25  Q.  Did you take into account Dr. Artunduaga's -- strike that.

Ferguson - direct

1150

1   Does that rating reflect anything to do with language skills?

2   A.  None whatsoever.

3   Q.  Okay.  Now, just take a look at the second page, if we

4   could.  And you rated her at the top, on second down, a "could

5   improve" with respect to her communications and relations with

6   other professionals.  Correct?

7   A.  Yes.

8   Q.  And that "could improve" on two other columns, further

9   down; is that right?

10  A.  Yes.

11  Q.  And let's highlight the overall please, Michael:  Maria

12  came to our service clearly unprepared for the duties required

13  of an intern.  She is enthusiastic and works hard but is

14  insufficiently experienced to be able to participate at a

15  meaningful level.  My concern is that she does not have

16  aptitude for the work she has chosen.  Very little improvement

17  was evident during our month.  Her knowledge and skill levels

18  are well below her peers.

19          Did you write that overall evaluation?

20  A.  Yes.

21  Q.  At the time you wrote it, did you believe it to be true

22  and accurate?

23  A.  Yes.

24  Q.  Now, with respect to that e-mail that you wrote, we just

25  looked at, Defendant's Exhibit 62, did Dr. Song in any way

Ferguson - direct

1   tell you or suggest to you what should be in that?

2   A.  Not at all.

3   Q.  By the way, you are more senior to Dr. Song; am I right

4   there?

5   A.  Yes.

6   Q.  When Dr. Song was an intern and a resident, did he rotate

7   with you?

8   A.  Yes.

9   Q.  And is the same true with respect to the evaluation, the

10  one that we just looked at?  And by that I mean is, did

11  Dr. Song in any way tell you what to put in their, suggest

12  what should be in there or anything else like that?

13  A.  Not at all.

14  Q.  Okay.  Now, you indicated that you have a position as a

15  program director of a residency program; am I correct?

16  A.  Yes.

17  Q.  What program is that?

18  A.  Cardiothoracic training program.

19  Q.  Okay.  And is that a program that typically someone

20  takes -- is that a program you take right out of medical

21  school?

22  A.  No.

23  Q.  Okay.  How do you get into that program, typically?

24  A.  You have to have finished a training in general surgery

25  first.

Ferguson - cross

1152

1  Q.  Okay.  And as it happens, do you have someone from

2  Columbia in that program today?

3  A.  Yes.

4  Q.  Did that person go to medical school in Columbia?

5  A.  Yes.

6  Q.  And does that person have an accent?

7  A.  Yes.

8  Q.  And how is that person doing in that program?

9  A.  He is on track to finish in June.

10 Q.  So you expect him to be successful?

11 A.  Yes, I do.

12         MR. JEPSON:  No further questions.

13         THE COURT:  Cross-examination?

14         MS. HYNDMAN:  Thank you, Judge.

15                     CROSS EXAMINATION

16 BY MS. HYNDMAN:

17 Q.  Good afternoon, Dr. Ferguson.  Now, you've spent your

18 entire medical career at the University of Chicago Medical

19 Center; isn't that right?

20 A.  Yes.

21 Q.  Dr. Ferguson, when is the last time you spoke with

22 Dr. Song?

23 A.  This afternoon.

24 Q.  Can we take a look at Plaintiff's Exhibit No. 56, please.

25 Dr. Ferguson, did you send this e-mail to Dr. Song on July 12,

Ferguson - cross

1153

1    2012?

2    A.  Sorry, it's not coming up here.

3    Q.  Oh, I'm sorry.  Did you send this e-mail to Dr. Song on

4    July 12, 2012?

5    A.  I did, yes.

6            MS. HYNDMAN:  We would move to admit this.

7            MR. JEPSON:  No objection.

8            THE COURT:  It's admitted.

9    BY MS. HYNDMAN:

10   Q.  Dr. Ferguson, can you just read that e-mail into the

11   record, please?

12   A.  It's just a little off the screen, but I'll read what I

13   can see.  I'm scheduled to talk to some labor relations person

14   on Monday regarding Artunduaga.  Anything we need to discuss

15   beforehand?

16   Q.  Now, you testified, Dr. Ferguson, from Mr. Jepson's

17   questions, that not every intern gets an opportunity to place

18   a chest tube while they rotate through the thoracic rotation.

19   Do you remember that testimony?

20   A.  Yes.

21   Q.  Now, you would agree, though, wouldn't you, that placing a

22   chest tube is a necessary part of an intern's general surgery

23   training?

24   A.  It's a part of a general surgeon's training.  It doesn't

25   have to occur during internship.

Ferguson - cross

1154

1  Q.  But you would agree that it is a necessary part of their

2  training; correct?

3  A.  Yes.

4  Q.  And, generally speaking, placing a chest tube is something

5  that an intern ought to be able to be allowed to do; is that

6  right?

7  A.  Yes.

8  Q.  If we could look at Defendant's Exhibit 62.  That was your

9  e-mail to Dr. Song.  Now, you testified that you routinely

10  have a mid-rotation evaluation with a resident that rotates

11  through your service; correct?

12  A.  Yes.

13  Q.  Now, you don't normally summarize that discussion with an

14  intern -- with a resident in writing, though; do you?

15  A.  No.  Normally it's an informal meeting.

16  Q.  And you don't, then, take a written summary and send it

17  off to somebody else, then, do you, typically?

18  A.  No, I don't.

19  Q.  But you did with Dr. Artunduaga?

20  A.  Yes.

21  Q.  And that's because Dr. Song asked you to do that; didn't

22  he?

23  A.  He asked me to send a summary, yes.

24  Q.  And he asked you that early in Dr. Artunduaga's rotation;

25  didn't he?

Ferguson - cross

1155

1   A.  He asked me about the time that I would normally do the

2   mid-rotation evaluation.

3   Q.  And not early during her rotation?

4   A.  Not that I recall, no.

5   Q.  Now, in that conversation you had with Dr. Song, he asked

6   you specifically to provide an evaluation for Dr. Artunduaga;

7   correct?

8   A.  Yes.

9   Q.  And it normally doesn't happen that a program director

10  from some other program would ask for a written mid-rotation

11  evaluation of a resident, though; correct?

12  A.  Correct.

13  Q.  Now, you met with Dr. Artunduaga on November 16th, to have

14  this evaluation?

15  A.  I believe so, yes.

16  Q.  Now, you testified that Dr. Artunduaga told you in that

17  discussion that she was on probation.  Did you -- did the fact

18  that she was on probation change or influence in any way the

19  evaluation you gave her in this e-mail, Defendant's

20  Exhibit 62?

21  A.  No.

22  Q.  Now, you don't recall Dr. Song ever responding to this

23  e-mail of yours; do you?

24  A.  The current e-mail of my evaluation?

25  Q.  Yes.  This one that we're looking at.

Ferguson - cross

1156

1   A.  I don't recall any response.

2   Q.  Okay.  And you don't recall him ever talking to you about

3   it after you submitted it; correct?

4   A.  I have no recollection, correct.

5   Q.  This evaluation was based on your assessment from

6   November 1st through November 16th of Dr. Artunduaga's

7   performance?

8   A.  That's right.

9   Q.  And it wasn't based on anything else; correct?

10  A.  Correct.

11          MS. HYNDMAN:  That's all I have.

12          THE COURT:  Redirect?

13          MR. JEPSON:  No redirect, your Honor.

14          THE COURT:  Thank you, Doctor.  You may step down,

15  sir.

16          THE WITNESS:  Thank you, your Honor.

17          THE COURT:  Please call your next witness.

18          MR. JEPSON:  We're going to call Dr. Umanskiy, who is

19  apparently still in transit.

20          MS. HALL:  Yeah.  He is running about 15 minutes

21  behind.

22          THE COURT:  Okay.  I don't think you have anybody to

23  fill in for the 15 minutes?  Okay.  Let's take a break.  You

24  get an extra break today.

25     (Recess from 2:01 PM to 2:21 PM.)

Umanskiy - direct

1157

1    (Jury in.)

2              THE COURT:  You may be seated.  Doctor, please raise

3    your right hand.

4    (Witness sworn.)

5              THE COURT:  You may be seated.

6          KONSTANTIN UMANSKIY, DEFENDANT'S WITNESS, SWORN,

7                         DIRECT EXAMINATION

8    BY MS. HALL:

9    Q.  Good afternoon, Doctor.  Could you please introduce

10   yourself to the jury.

11   A.  Hello.  My name is Dr. Konstantin Umanskiy.

12   Q.  And, Doctor, are you currently affiliated with the

13   University of Chicago Medical Center?

14   A.  Yes, that's correct.

15   Q.  What's your current position?

16   A.  I'm an associate professor of surgery at the University of

17   Chicago.

18   Q.  Dr. Umanskiy, where are you from?

19   A.  Originally, I grew up in the Ukraine.

20   Q.  And what is the highest level of education you've

21   completed in Ukraine?

22   A.  High school.

23   Q.  Did you have any schooling after high school in Ukraine?

24   A.  Yes, I did.  I enrolled into medical school in Moscow

25   after completing high school.

Umanskiy - direct

1158

1   Q.   Did you complete any medical school there?

2   A.   I did not.

3   Q.   When did you come to the United States?

4   A.   In 1993.

5   Q.   Why did you come to the United States?

6   A.   Being a Jew from former Soviet Union, I immigrated as a

7   refugee.

8   Q.   Where did you go once you got here?

9   A.   Excuse me?

10   Q.   Where did you go once you got here?

11   A.   Cleveland, Ohio.

12   Q.   How old were you?

13   A.   I was 21 years old.

14   Q.   What did you do in Cleveland?

15   A.   I began by enrolling into Cleveland State University to

16   complete my undergraduate degree.

17   Q.   And did you graduate?

18   A.   I did.

19   Q.   When?

20   A.   In 1996.

21   Q.   And what did you do after you graduated from college?

22   A.   I enrolled into Case Western Reserve University School of

23   Medicine.

24   Q.   Did you graduate from Case Western?

25   A.   I did.

Umanskiy - direct

1159

1  Q.  When was that?

2  A.  It was in 2000.

3  Q.  Did you complete a residency program after you graduated

4  from Case Western?

5  A.  Yes, I did.

6  Q.  And where, and for how long were you there?

7  A.  Entire residency took total of seven years, five years

8  clinical and two years research.  And I completed it in 2007.

9  Q.  And did you do a fellowship after that?

10  A.  Yes, I did.

11  Q.  Where was your fellowship?

12  A.  Fellowship was in Chicago, Illinois, at Cook County,

13  University of Illinois Chicago affiliated hospitals.

14  Q.  And, I'm sorry, apparently I didn't ask you where your

15  residency was.

16  A.  It was in Cincinnati, Ohio.

17  Q.  Okay.  And you have been at UCMC since 2008; is that

18  correct?

19  A.  That's correct.

20  Q.  Do you have a specialty?

21  A.  Colon and rectal surgery.

22  Q.  And what type of conditions do you treat?

23  A.  I treat patients with colon cancers, rectal cancers,

24  condition of anus, which involve hemorrhoids, fistulas and

25  similar conditions.

Umanskiy - direct

1160

1    Q.  Do you see patients in a clinic?

2    A.  Yes, I do.

3    Q.  And has that been the case throughout your tenure at UCMC?

4    A.  Yes.

5    Q.  And you operate on patients as well?

6    A.  Yes, I do.

7    Q.  And do you see inpatients on the floor as well?

8    A.  Yes, I do.

9    Q.  And that's been the case throughout your tenure; is that

10   correct?

11   A.  Correct.

12   Q.  I want to focus your attention on September of 2011.

13   Who -- were there any other attendings on the service at that

14   time with you?

15   A.  Yes.

16   Q.  Who?

17   A.  It was Dr. Roger Hurst.

18   Q.  And do you recall if there was a chief resident on the

19   service with you that month?

20   A.  Yes, I do.

21   Q.  Who was the chief resident?

22   A.  It was Dr. Brian Bello.

23   Q.  And then was there a nurse practitioner on the service?

24   A.  Yes, there was a nurse practitioner.

25   Q.  Who was that?

                          Umanskiy - direct
                                                                    1161

 1    A.   That was Tony Villa.

 2    Q.   Did you work with Dr. Artunduaga that month?

 3    A.   Yes, I did.

 4    Q.   What was her role?

 5    A.   She was an intern.

 6    Q.   In the first year of her residency; is that correct?

 7    A.   That's correct.

 8    Q.   Did anyone speak with you about Dr. Artunduaga before she

 9    started on your service in September of 2011?

10    A.   No.

11    Q.   While she was on your service, did you come to learn where

12    she was from?

13    A.   Yes.

14    Q.   And where she went to medical school?

15    A.   Yes.

16    Q.   And who did you learn that from?

17    A.   From Dr. Artunduaga.

18    Q.   And what's your understanding of where she is from,

19    Dr. Umanskiy?

20    A.   My understanding was that she was from Columbia.

21    Q.   And that she went to medical school there as well?

22    A.   Yes.

23    Q.   At any time while Dr. Artunduaga was on your service or

24    any other time while she was at UCMC, did you ever say to her:

25    I don't know how they, or you, do things in your country?

Umanskiy - direct

1162

1    A.  Absolutely not.

2    Q.  Anything along those lines?

3    A.  No.

4    Q.  At any point in time did you remove any items from

5    Dr. Artunduaga's person or from her lab coat?

6    A.  No, I did not.  Absolutely not.

7    Q.  Did you take a stethoscope off of her neck?

8    A.  No.

9    Q.  Did you remove books or clipboards from her hands or from

10   her coat?

11   A.  No.

12   Q.  What about her pens?

13   A.  No, I did not.

14   Q.  At any point in time did you ever make fun of the fact

15   that Dr. Artunduaga was Colombian?

16   A.  No.

17   Q.  Did -- or does Dr. Artunduaga, as far as you know, have an

18   accent?

19   A.  Can you repeat the question?  I missed it.

20   Q.  Does Dr. Artunduaga have an accent?

21   A.  She -- she did, and I'm sure she does, now.

22   Q.  And did her accent ever interfere with her ability to

23   understand her?

24   A.  No, it did not.

25   Q.  While Dr. Artunduaga was on your service in September of

Umanskiy - direct

1163

 1   2011, did you work with her in the clinic?

 2   A.  Yes, I did.

 3   Q.  And did you work with her in the operating room?

 4   A.  Yes, I did.

 5   Q.  Do you recall the number of times that you worked with

 6   her?

 7   A.  I recall --

 8   Q.  In the operating room.  I'm sorry.

 9   A.  I recall one time operating with her, at least once.

10   Q.  And what type of procedure was that?

11   A.  There was a general abdominal operation that involves

12   making an incision in the abdomen and performing complex

13   abdominal surgery.

14   Q.  What role was Dr. Artunduaga supposed to play during that

15   operation?

16   A.  She was an assistant.  She was helping to retract, to

17   expose, for the case.

18   Q.  And do you have any particular recollection of how

19   Dr. Artunduaga performed during that operation?

20   A.  I have a general recollection that she appeared to be not

21   performing to the level that I expect of an intern to perform.

22   Q.  Why?

23   A.  She appeared to try to do too much, sometimes moving the

24   retractor out of the way, or into the way where she felt it

25   should be moved.  And when I asked to redirect her, she did

Umanskiy - direct

1   not seem to follow my instructions, and she seemed to be sort

2   of doing things actively that I asked her not to do.

3   Q.  And did you give her feedback at that time?

4   A.  Yes, I did.

5   Q.  Did you work with Dr. Artunduaga on the floor with

6   inpatients in September of 2011?

7   A.  I did.

8   Q.  Did you have the opportunity to observe her performance?

9   A.  I did.

10  Q.  Did you have any criticisms of her work on the floor?

11  A.  I did.

12  Q.  And what were those criticisms?

13  A.  She had difficulty keeping up with the workload.  She had

14  difficulty with prioritizing her tasks.  Her products of her

15  work, particularly reports to me, were not very accurate.  She

16  was excessively talkative.  I was not able to sort of follow

17  the stream of her speech, even though she didn't have -- she

18  was clear what she was saying, I just couldn't really

19  synthesize information correctly.  She did not really

20  establish a doctor-patient relationship with the patients on

21  the wards.  These are just a few examples.

22  Q.  Okay.  And in terms of not providing you with accurate

23  reports, what is it that you observed that led you to be

24  critical of that?

25  A.  Well, the interns communicate the information about the

Umanskiy - direct

1165

1  patient's condition, sometimes the tests and the studies.  And

2  when I asked her specific question about how certain

3  radiological study, x-ray study looked, the answers were so

4  vague and so roundabout that I was not able to really obtain a

5  sufficiently accurate information so I could make patient-care

6  decisions based on that, just as one example.

7  Q.  That's an example of what you observed?

8  A.  That's correct.

9  Q.  And is this issue something that you observed on more than

10  one occasion?

11  A.  That's right.

12  Q.  When you said that you had issues with her, you didn't

13  believe that she could establish doctor-patient relationships,

14  what did you observe that led you to that statement?

15  A.  Well, the most maybe illustrative example would be when we

16  were in rounds together.  My practice is to take a resident on

17  rounds with me where we would both see patients together.  We

18  would walk into the room.  And I would notice that the

19  patients didn't really acknowledge who Dr. Artunduaga was;

20  whereas, somebody who sees the patients on a daily basis and

21  routinely interacts with them, they would at least acknowledge

22  that they would know who she is, but they did not really seem

23  to do that.  And I've noticed that initially.  And then I've

24  confirmed it while rounding with other patients.  And I said,

25  I don't know if she really knows these patients or the

Umanskiy - direct

1166

1   patients really know her.

2   Q.  And when you made these observations, Dr. Umanskiy, were

3   you standing in the patient's room with Dr. Artunduaga?

4   A.  So I made the observation and took a mental note of that,

5   but I did not discuss it with her in the room.

6   Q.  But when you saw this happening, were you -- was it when

7   you were in a patient's room?

8   A.  That is correct.  I was in the room with her when I made

9   this observation.

10  Q.  And as far as your placement in the room with her, was she

11  in a position, from your perspective, where she could have

12  actually seen the patient?

13  A.  That's correct.  We would stand side by side next to the

14  patient's bed.  So there was clearly an opportunity for the

15  patient to establish an eye contact or some non-verbal

16  communication to establish that they know who she is and

17  communicate with her.

18  Q.  And these issues that you saw while working with

19  Dr. Artunduaga on the floor, were you obviously, for this one

20  issue, you said you didn't give her immediate feedback in the

21  room, but were you otherwise giving her feedback throughout

22  the rotation?

23  A.  I did.

24  Q.  Did you ever speak with Dr. Brian Bello about

25  Dr. Artunduaga's performance that month?

Umanskiy - direct

1167

1  A.  I did.

2  Q.  Do you recall if that was on more than one occasion or

3  just once?

4  A.  I can't recall the number of conversations we had, but I

5  remember at least the fact that I spoke with him about her.

6  Q.  Okay.  What do you recall being discussed by you and

7  Dr. Bello regarding Dr. Artunduaga?

8  A.  So I was concerned that the amount of workload that she

9  was presented with that she needed to handle was seeming too

10 excessive for her.  She couldn't keep up with the tasks that

11 were assigned to her, and a lot of things were left

12 unfinished.  And I was concerned that there were -- you know,

13 I was worried there might be even some patient-care issues

14 because of that because, if the task is not accomplished, I

15 was wondering if there is something that are missed that could

16 be a concern.

17 Q.  And do you recall if Dr. Bello vocalized any concerns to

18 you during that conversation or those conversations about

19 Dr. Artunduaga?

20         MS. HYNDMAN:  Objection, your Honor.  Hearsay.

21         THE COURT:  What's your response?

22         MS. HALL:  Goes to the state of mind and his

23 perception of how Dr. Artunduaga was performing on her

24 service.  He was one of her evaluators, and he prepared an

25 evaluation of her.

Umanskiy - direct

1168

```
 1              THE COURT:  Goes to state of mind.

 2              MS. HYNDMAN:  If we could lay some foundation that

 3    that was relevant to his evaluation, then --

 4              THE COURT:  Okay.  Lay a little bit more of a

 5    foundation.

 6    BY MS. HALL:

 7    Q.  Dr. Umanskiy, your discussions with Dr. Bello regarding

 8    yours and his concerns about Dr. Artunduaga, did those

 9    influence the way in which you evaluated her performance?

10              MS. HYNDMAN:  Objection.  In maybe a non-leading way?

11              THE COURT:  Sustained.  Rephrase it.

12    BY MS. HALL:

13    Q.  You testified that you had conversations with Dr. Bello

14    about Dr. Artunduaga; correct?

15    A.  Correct.

16    Q.  And you also prepared -- did you -- I was waiting for

17    that.  Did you prepare an evaluation of Dr. Artunduaga's

18    performance while she was on your service?

19    A.  I did.

20    Q.  And in preparing that evaluation of Dr. Artunduaga's

21    performance, did you take into account your observations, as

22    well as the discussions you might have had with others about

23    her performance that month?

24              MS. HYNDMAN:  Objection.  Leading.

25              THE COURT:  Sustained.  You can ask him what he took
```

Umanskiy - direct

1169

1    into consideration.

2    BY MS. HALL:

3    Q.  What did you take into consideration when you were putting

4    together your evaluation of Dr. Artunduaga's performance?

5    A.  When I prepared the evaluation, I used my own

6    observations.  I discussed this case with other residents and

7    Tony Villa, and I confirmed my observations, to be accurate.

8    Because, as an attending, I see only a portion of what

9    resident is doing.  I wanted to make sure that my observations

10   were accurate.  And in using other providers on the service, I

11   confirmed my observations that eventually went into my

12   evaluation.

13   Q.  Okay.  So Dr. Umanskiy, can you please tell us what it is

14   that Dr. Bello told you about his perception or concerns

15   related to Dr. Artunduaga that impacted or influenced the way

16   you evaluated her?

17         MS. HYNDMAN:  Objection, your Honor.  I don't think

18   that cures the hearsay exception.  He said he used his own --

19   he relied on his own observations.  The fact that he confirmed

20   them doesn't mean that -- that anything Dr. Bello told him

21   went into the evaluation.

22         THE COURT:  Ms. Hall, do you want to lay a little

23   more foundation?

24   BY MS. HALL:

25   Q.  Did the information that you said you confirmed play any

Umanskiy - direct

1170

 1    role in your evaluations of Dr. Artunduaga's reflected in any

 2    written documentation you prepared regarding her?

 3    A.  Yes, it did.

 4           MS. HALL:  Okay.  Can I ask the question now?

 5           THE COURT:  I think -- go ahead and ask, and we'll

 6    see if there is an objection.

 7    BY MS. HALL:

 8    Q.  Okay.  Dr. Umanskiy, can you please tell us what Dr. Bello

 9    relayed to you regarding Dr. Artunduaga that would have

10    impacted, as you said, any information you put into your

11    evaluation of her?

12           MS. HYNDMAN:  Your Honor, as long as we have a

13    limiting instruction.

14           THE COURT:  Yes.  Ladies and Gentlemen, the testimony

15    you're about to hear about what the doctor told this doctor is

16    not being offered for the truth.  Instead, it's being offered

17    to show the impact it had on this witness.  You may answer.

18    BY THE WITNESS:

19    A.  So when we discussed resident performance, I asked

20    Dr. Bello how he was perceiving Dr. Artunduaga's performance.

21    And I found out from him that he was doing a lot of work,

22    carrying out a lot of tasks that the senior resident, or chief

23    resident, as Dr. Bello was, he had to do.  And I asked him in

24    that conversation, I said, why is he doing this.  He said

25    because he said he wants to make sure things are done, there

Umanskiy - direct

1171

1  is no patient safety issues, there is nothing that is missing.

2  And in that -- sort of in that way, he was trying to

3  compensate for Dr. Artunduaga's lack of performance.

4  BY MS. HALL:

5  Q.  And did you discuss Dr. Artunduaga's performance on the

6  service or any concerns related to her performance with the

7  nurse practitioner?

8  A.  I did.

9  Q.  And did your discussions with the nurse practitioner and

10  any information he provided you influence or impact in any way

11  the evaluation you provided of Dr. Artunduaga?

12  A.  That's correct.  As I mentioned earlier, this information

13  was also taken into account and considered when preparing her

14  evaluation.

15  Q.  And when you spoke with the nurse practitioner about

16  Dr. Artunduaga, was that in one conversation or on more than

17  one occasion?

18  A.  I remember at least once talking to him about that.

19  Q.  Was that an in-person conversation?

20  A.  In person.

21  Q.  Just the two of you?

22  A.  That's correct.

23  Q.  And what do you recall being said by the nurse

24  practitioner regarding Dr. Artunduaga in that conversation?

25          MS. HYNDMAN:  Again, your Honor, if we could just

Umanskiy - direct

1172

 1    have a limiting instruction.

 2            THE COURT:  Yes.  Ladies and Gentlemen, the testimony

 3    you are about to hear is not being offered for the truth of

 4    what was said to this witness, but, instead, to show its

 5    impact on him.

 6    BY THE WITNESS:

 7    A.  So, similarly, the conversation was a dialogue, where we

 8    were talking about the best ways to provide optimal care for

 9    the patients in the -- so we can keep the standard of care.

10    And I asked, in conversation with doctor -- with Nurse

11    Practitioner Villa to help out and to cover for some of the

12    deficiencies of Dr. Artunduaga's performance.  And he sort of

13    relayed to me that he was doing that.  And there is a need for

14    checking and double checking, and also carrying out some tasks

15    that she was missing.

16            MS. HYNDMAN:  Your Honor, I move to strike the

17    portion of that testimony that doesn't relate to what the

18    nurse told him and it doesn't relate to his evaluations.  He

19    talked about patient standard of care and --

20            THE COURT:  I'll strike the last portion.  I will

21    strike the last portion and the jury should disregard it.

22    BY MS. HALL:

23    Q.  Dr. Umanskiy, did you meet with Dr. Artunduaga to discuss

24    her performance during the month of September?

25    A.  Yes, I did.

Umanskiy - direct

1   Q.  Why did you agree to -- why did you meet with

2   Dr. Artunduaga?

3   A.  So the feedback is customary.  And usually we give

4   feedback on the ongoing basis.  But Dr. Artunduaga requested a

5   formal feedback session, which I honored.

6   Q.  Did you meet with her in person?

7   A.  Yes, I did.

8   Q.  Where did that meeting take place?

9   A.  It was in a small conference room on the surgical ward

10  where I usually see patients.

11  Q.  And it was just the two of you in that conversation?

12  A.  That's correct.

13  Q.  And what -- did you give Dr. Artunduaga feedback during

14  that meeting?

15  A.  I did.

16  Q.  And do you recall what that feedback was?

17  A.  I can't recall all the details, but I can give you a

18  general sense that we talked about the issues of patient care,

19  prioritization of the tasks, the lack of efficiency on her

20  part, some of the information not being transmitted correctly.

21  And I remember talking about working on establishing a

22  doctor-patient relationship and working on that.

23  Q.  And are you familiar with Dr. David Song, Dr. Umanskiy?

24  A.  Yes, I am.

25  Q.  Did you speak with Dr. Song regarding Dr. Artunduaga's

Umanskiy - direct

1174

1    performance on your service?

2    A.  I did.

3    Q.  And was that an in-person meeting as well?

4    A.  It was an in-person meeting, yes.

5    Q.  Was it a planned meeting, or did you happen to run into

6    him?

7              MS. HYNDMAN:  Objection, leading.

8    BY MS. HALL:

9    Q.  Was it a planned meeting?

10             MS. HYNDMAN:  Objection.

11             THE COURT:  The first one, overruled.  The first one,

12   was it planned, or did you happen to run into him?  That was

13   not leading.

14   BY THE WITNESS:

15   A.  I ran into him.  It was not a planned meeting.

16   BY MS. HALL:

17   Q.  And during that discussion -- well, let me show you

18   instead.  Can I show you Joint Exhibit No. 15.

19             And, Michael, can you please expand on the e-mail at

20   the bottom of the page.

21             Dr. Umanskiy, do you recognize this as an e-mail that

22   you sent to Dr. Song on September 28, 2011?

23   A.  I do.

24   Q.  And in this e-mail you wrote:  Dear, Dr. Song, I'm writing

25   to you in follow-up of our conversation on September 27, 2011.

Umanskiy - direct

1175

1   Do you see that?

2   A.   Yes.

3   Q.   And is that the discussion that you just said you had with

4   Dr. Song when you ran into him?

5   A.   Yes.

6   Q.   And does this e-mail generally summarize what you talked

7   about with Dr. Song during that conversation?

8   A.   Yes, it does.

9   Q.   If we can look at Point Number 1.  You wrote:

10   Dr. Artunduaga appears to have difficulty keeping up with the

11   workload.  She frequently appears disorganized, unsure of her

12   knowledge and excessively talkative at times.

13          Did you observe that on your service in September of

14   2011?

15   A.   I did.

16   Q.   And in Point Number 2, you stated:  She was not able to

17   establish successful doctor-patient relationships with the

18   patients on the wards.  At times, this led to miscommunication

19   between her and the patients.

20          And is that statement based on something you observed

21   while she was on your service?

22   A.   Yes.

23   Q.   The second portion of that sentence, where it says:  This

24   led to miscommunication between her and the patients.  Do you

25   recall any situation which led you to make that observation in

Umanskiy - direct

1176

1   this e-mail?

2   A.  I recall a situation of which it was based, without

3   remembering all of the details.  I can tell that there was a

4   patient complained or some dissatisfied patient about

5   something that happened on the wards.  And Dr. Artunduaga was

6   asked by the nurse to come in and see if she could resolve the

7   problem.  And I found out that the problem not only was not

8   resolved, but unfortunately was worsened.  And so I had to

9   personally talk with the family and try to solve the situation

10  so that we can move on with patient care.

11  Q.  And in Point Number 3, you wrote:  In the operating room,

12  she had difficulty with following instructions and required

13  frequent prompting as to her role and assignment during the

14  case.

15          And is that something that was based on -- or

16  something that you observed while she was on your service?

17  A.  I did.

18  Q.  In the paragraph above 1, 2 and 3, you wrote that:

19  Throughout the rotation, she demonstrated improvement in

20  patient care and communication skills.  Do you see that?

21  A.  Yes, I do.

22  Q.  Is that something that was truthful at the time?

23  A.  That is correct.

24  Q.  In your opinion, was her improvement significant?

25  A.  It wasn't.

Umanskiy - direct

1177

1    Q.  At the -- in the last paragraph, you wrote:  In summary, I

2    have major concerns that Dr. Artunduaga's performance is

3    significantly below that of a typical resident in general or

4    plastic and reconstructive surgery at the University of

5    Chicago.  Is that what you believed to be true at the time?

6    A.  That's correct.

7    Q.  You also prepared an evaluation of Dr. Artunduaga's

8    performance on your service; correct?

9    A.  Yes.

10   Q.  And let's take a look, Michael, at Joint Exhibit No. 14.

11         Dr. Umanskiy, as part of your duties since 2008, at

12   UCMC, have you been responsible for evaluating the performance

13   of residents who rotate on your service?

14   A.  Yes.  It is my duty and responsibility.

15   Q.  And that would include interns; correct?

16   A.  That's correct.

17   Q.  And am I correct that during your tenure you've had the

18   opportunity to evaluate interns who are within the first

19   couple months of their residencies at UCMC?

20   A.  Yes.

21   Q.  And when you're evaluating interns, are you -- are your

22   expectations generally the same for the interns that come

23   through the service?

24   A.  Yes.

25   Q.  Do you take into account how far into the intern's

Umanskiy - direct

1178

1    residency she might be?

2    A.   I always do that.

3    Q.   Did you talk to anyone, other than Dr. Artunduaga, about,

4    and Dr. Song, about her performance or your evaluation of her

5    before you put together this evaluation?

6    A.   No.

7    Q.   You did speak with Dr. Bello and Tony Villa; right?

8    A.   So I spoke with them.  However, when I was working on

9    preparing this evaluation, I sat down in my office, and I did

10   it myself.

11   Q.   Did it by yourself, okay.  Did anyone ever tell you how

12   you should evaluate Dr. Artunduaga?

13   A.   No.

14   Q.   Did anyone tell you that you should be critical or

15   complimentary about anything in particular in relation to her?

16   A.   Absolutely not.

17   Q.   Do you recognize Joint Exhibit 14, which is in front of

18   you as your evaluation of Dr. Artunduaga on your service in

19   2011?  Can you expand on the top part so he can see it?

20   A.   Yes, I can see my name on it.  Yes, this is an evaluation

21   that I have completed.

22   Q.   Okay.  And, Michael, if you could pull out from the first

23   page generally everything through, up until personal

24   attributes and professionalism.

25          Dr. Umanskiy, these are your ratings for

Umanskiy - direct

1179

1  Dr. Artunduaga; right?

2  A.  Correct.

3  Q.  And you marked her as "could improve" in the general

4  knowledge category; correct?

5  A.  Yes.

6  Q.  And also "could improve" in pre-op care, post-op care and

7  able to communicate and justify medical decisions; is that

8  right?

9  A.  That's correct.

10  Q.  And you also marked her as "could improve" in

11  preparedness; is that right?

12  A.  Yes.

13  Q.  If we could go to the second page, please.  And the same

14  thing.  And you also marked her as "could improve" in

15  communications with patients and families; is that correct?

16  A.  That's correct.

17  Q.  And could improve in documentation of practice activities;

18  is that correct?

19  A.  Yes.

20  Q.  And you marked her as deficient in ability to lead and

21  manage a service; is that correct?

22  A.  That's correct.

23  Q.  What are you evaluating, for purposes of an intern, in the

24  category of ability to lead and manage a service?

25  A.  So when I -- when I think about evaluating the intern, I

Umanskiy - direct

1180

1    think about ability to manage a service because it's a -- sort

2    of a generic evaluation entry where you apply lead to the

3    chief resident but manage to the intern or junior residents.

4    And I felt that there was significant concerns that

5    Dr. Artunduaga did not manage the service, even considering

6    her level of training and program being an intern.  There was

7    significant deficiency, particularly she missed many

8    important, sort of clinical milestones and benchmarks.  That's

9    why she received a deficient, in my opinion.

10   Q.  And you also marked her as "could improve" in critiques

11   personal practice outcomes; right?

12   A.  That's correct.

13   Q.  And, Michael, could you please blow up the overall

14   comments?

15          And, Dr. Umanskiy, these are the comments you

16   prepared for Dr. Artunduaga's evaluation; correct?

17   A.  That's correct.

18   Q.  And these generally are similar, if not the same, as the

19   comments that you put into your e-mail that you sent to

20   Dr. Song; right?

21   A.  Yes.

22   Q.  Did any of your criticisms of Dr. Artunduaga have anything

23   to do with the fact that she is Colombian?

24   A.  No.

25   Q.  Or that she went to medical school in Columbia?

Umanskiy - cross

1181

1  A.  Absolutely not.

2  Q.  Or that she had an accent?

3  A.  No.

4        MS. HALL:  Thank you.

5        THE WITNESS:  Can I get some more water?

6        THE COURT:  Your witness would like more water.

7  Cross-examination?

8        MS. HYNDMAN:  Yes.  Thank you.

9                      CROSS-EXAMINATION

10  BY MS. HYNDMAN:

11  Q.  Good afternoon, Dr. Umanskiy.

12  A.  Good afternoon.

13  Q.  As attending physician at the University of Chicago

14  Medical Center, I think you testified you have responsibility

15  to supervise those general surgery residents and other

16  residents who rotate through your service; right?

17  A.  That's correct.

18  Q.  Okay.  And you see your role as an educator for the

19  residents; don't you?

20  A.  I do.

21  Q.  And in your role as an educator, you believed it was your

22  job to get to know each of the residents that you work with;

23  correct?

24  A.  Correct.

25  Q.  And as an educator, did you see yourself, in the role of

Umanskiy - cross

1182

1    an educator with Dr. Artunduaga?

2    A.  I did.

3    Q.  And as an educator, if you saw Dr. Artunduaga doing

4    something that you thought she needed to improve on, it was

5    your job to help her improve; right?

6    A.  That's correct.

7    Q.  You testified that you had a meeting with Dr. Artunduaga

8    towards the end of September.  And it was at her request;

9    correct?

10   A.  Yes.

11   Q.  You otherwise weren't planning to meet with her; isn't

12   that right?

13   A.  That's correct.

14   Q.  And I think in the -- you testified that in the meeting

15   you expressed concerns about her patient-care skills; correct?

16   A.  Correct.

17   Q.  And is it true, Dr. Umanskiy, you can't remember if you

18   gave Dr. Artunduaga any advice in that meeting that you had

19   with her about how to improve her performance?

20   A.  So I cannot answer yes or no.  So I would like to explain.

21   Q.  My question only is this:  Do you -- you can't remember

22   whether you gave Dr. Artunduaga any advice in that meeting

23   about how to improve her performance?  It's a yes or no.

24   A.  I remember giving advice.

25   Q.  You do remember?

Umanskiy - cross

1183

1    A.  I do.

2           MS. HYNDMAN:  May I approach, your Honor?

3           THE COURT:  You may.

4    BY MS. HYNDMAN:

5    Q.  Dr. Umanskiy, do you remember giving your deposition in

6    this case?

7    A.  Yes.

8    Q.  And if you could look at -- in the transcript I just gave

9    you, page 64, beginning -- actually, let's start on Page 63,

10   beginning with Line 22.

11   A.  Okay.  I have it in front of me.

12   Q.  And, Dr. Umanskiy, at that deposition, were you asked

13   these questions and did you give these answers?

14           Question:  But you did voice concerns about patient's

15   care skills?  Answer:  That's correct.

16           Question:  What did you say?  Answer:  I said that

17   her patient care skills are not adequate.

18           Question:  And did you give her any specifics?

19   Answer:  I can't remember.

20           Question:  Did she ask you to be more specific?

21   Answer:  I can't remember.

22           Question:  Did she ask you for advice on how to

23   improve?  Answer:  I can't remember that either.

24           Question:  Did you give her any advice on how to

25   improve?  Answer:  I can't remember.

Umanskiy - cross

1184

1      Was that your testimony at the deposition?

2  A.   That is correct.  That was my testimony at the time.

3  Q.   Now, Dr. Umanskiy, you testified about this e-mail that

4  you sent to Dr. Song on September 28th.  Can we take a look at

5  that Joint Exhibit 15, please.  Do you have that on your

6  screen in front of you, Dr. Umanskiy?

7  A.   I do.

8  Q.   Okay.  Now, in this e-mail to Dr. Song -- first of all,

9  you didn't copy Dr. Artunduaga on this e-mail; correct?

10 A.   That's correct.

11 Q.   And you didn't forward a copy of it to her at any other

12 time?

13 A.   That's correct.

14 Q.   So in this e-mail, there were three items that Ms. Hall

15 asked you about, and you testified about those on direct

16 examination.  Do you remember that?

17 A.   Yes, I do.

18 Q.   Okay.  Now, in the last sentence, the beginning of the

19 last sentence of this e-mail you say:  While I believe that

20 she is capable of addressing the criticisms presented above,

21 she may not be able to achieve a level of performance that we

22 expect from our residents.  But at the time you sent this

23 e-mail to Dr. Song, you did believe that she was capable of

24 addressing the criticisms you had there; isn't that right?

25 A.   That's correct.

Umanskiy - cross

1185

1    Q.  And it was also your belief, wasn't it, Dr. Umanskiy, that

2    if Dr. Artunduaga addressed these three things, she would be

3    an acceptable resident?

4    A.  Yes.

5    Q.  And you also felt, Dr. Umanskiy, didn't you, that

6    Dr. Artunduaga had the native ability to address these three

7    issues that you presented; isn't that correct?

8    A.  I missed the part of the question.  Can you repeat it

9    slowly so I can get every word of the question?

10   Q.  Sure.  Yeah.  You also felt, didn't you, that

11   Dr. Artunduaga had the native ability to address the three

12   issues that you specified in your e-mail?

13   A.  Could you help me to understand the meaning of the word

14   "native ability."  I don't understand what exactly you mean by

15   that.

16   Q.  Okay.  Let me -- it was a word that you used in your

17   deposition.  Do you recall that, Dr. Umanskiy?

18   A.  The word "native ability"?

19   Q.  Yes.  You were asked that question in your deposition.  Do

20   you recall that testimony?

21   A.  She had an ability, but -- she had an ability.  She was

22   capable of improving.

23   Q.  Okay.  Now, you mentioned on direct examination that you

24   had concerns because there were instances when Dr. Artunduaga

25   didn't give you clear or accurate results when she was

Umanskiy - cross

1186

1   relaying results from labs and studies, and that sort of

2   thing.  Do you remember that testimony?

3   A.  I remember that, yes.

4   Q.  Okay.  Now, isn't it true, Dr. Umanskiy, that you can't

5   remember a specific example of when that occurred?

6   A.  I cannot remember specific examples.

7   Q.  That's the question.

8   A.  Correct.

9   Q.  It's true that you cannot remember specific examples;

10  correct?

11  A.  That's correct.

12  Q.  And you didn't mention anything about labs or her ability

13  to give accurate results from labs or studies in your e-mail

14  to Dr. Song; did you?

15  A.  I did not.

16  Q.  You don't remember Dr. Song sending you an e-mail in

17  response to this; do you?

18  A.  I don't remember getting an e-mail from Dr. Song.

19  Q.  And you don't remember any sort of oral response from

20  Dr. Song from this e-mail; do you?

21  A.  I don't remember any response.  As a matter of fact, I

22  remember that it was no response.

23  Q.  And you didn't have any kind of meeting with Dr. Song to

24  talk about this e-mail?

25  A.  No.

Umanskiy - cross

1187

1 Q. And if we could look at your written evaluation of

2 Dr. Artunduaga that was Joint Exhibit 14. And you don't

3 mention in this evaluation, do you, Dr. Umanskiy, that

4 Dr. Bello was doing a lot of the work that Dr. Artunduaga

5 otherwise should have been doing?

6 A. I didn't.

7 Q. And your comment about -- let's look at the overall

8 comments. In your comment there: In the operating room she

9 had difficulty with following instructions. Do you see that

10 in your comments?

11 A. I do.

12 Q. That's based on the one surgery that you did with

13 Dr. Artunduaga; correct?

14 A. At least one that I remembered.

15 Q. Okay. You don't have any present recollection of any

16 other surgery you did with Dr. Artunduaga; correct?

17 A. Not that I can remember.

18 Q. Now, I think you testified on direct about this statement

19 about her -- she was not able to establish successful

20 doctor-patient relationships was based upon your experience

21 with Dr. Artunduaga with a patient in their room; correct?

22 A. Not just one patient, but when we went with patients in

23 the room.

24 Q. Okay. And, in part, how many such examples can you think

25 of, as you sit here today?

Umanskiy - cross

1   A.  I would say at least a dozen examples.

2   Q.  At least a dozen examples.  And, in every instance, it's

3   your testimony, Dr. Umanskiy, that, in every instance, those

4   patients did not make eye contact with Dr. Artunduaga?

5   A.  I did not specifically say that all those patients did not

6   make eye contact, but I would say that it was consistent from

7   a patient to a patient that I would notice that Dr. Artunduaga

8   did not seem to have -- establish a doctor-patient

9   relationship.

10  Q.  In any instance, in any of those instances, did you ever

11  ask those patients if they knew Dr. Artunduaga?

12  A.  I did not.

13  Q.  And did you ever ask any of those patients why they hadn't

14  acknowledged Dr. Artunduaga when she came in the room?

15  A.  I did not.

16  Q.  And so you don't really know why the patients may have had

17  the reaction that you said you observed?

18  A.  I don't.

19  Q.  Now, you testified that this statement about

20  Dr. Artunduaga's improvement, throughout the rotations she

21  demonstrated improvement in patient care, you testified that

22  that improvement was not significant; correct?

23  A.  That is correct.

24  Q.  But you didn't write that in your evaluation; did you, Dr.

25  Umanskiy?

Umanskiy - redirect

1189

1    A.  I didn't.

2           MS. HYNDMAN:  I have nothing else.

3           THE COURT:  Redirect?

4                        REDIRECT EXAMINATION

5    BY MS. HALL:

6    Q.  Just a couple of questions, Dr. Umanskiy.  You were asked

7    about whether you gave Dr. Artunduaga any advice as to how she

8    could improve during her face-to-face meeting.  And you said

9    that you could not answer yes or no but you needed to explain.

10   Do you remember that testimony?

11   A.  I do.

12   Q.  What is it that you wanted to explain?

13   A.  I'd like to say that at the time of deposition it was new

14   experience for me.  I never had the deposition before.  And I

15   felt there was a little bit of a rapid fire questioning.  And

16   I couldn't have -- bring up the memory correct.  And I was

17   afraid to make a mistake.  So I said I couldn't remember.  But

18   then, after it was all over and my memory sort of became a

19   little bit more accurate, and I feel comfortable saying that I

20   remember that I gave her advice.

21   Q.  And was your deposition testimony at the time, your answer

22   to that question, truthful?

23   A.  It was because I couldn't remember.

24   Q.  And is the testimony you're giving today truthful as well?

25   A.  Correct.

Umanskiy - redirect

1190

1  Q.  You testified that you can't remember specific examples of

2  -- and I'm paraphrasing -- the issues that Dr. Artunduaga had

3  relaying to you test information and patient information.  Do

4  you recall that?

5  A.  I recall that, yes.

6  Q.  Do you have any doubt in your mind that those types of

7  issues occurred while you were worked with her on the service?

8  A.  No doubt.  And if I say that I don't remember specific

9  information, if somebody says, what was the hemoglobin level,

10  and I say I can't remember; therefore, I would not say that I

11  remember specifics.  But there is no doubt in my mind that the

12  information that was given to me was inaccurate.

13  Q.  Do you believe that you had enough exposure to

14  Dr. Artunduaga's performance, the way in which she worked on

15  clinic and in the OR and with patients on rounds to accurately

16  evaluate her performance?

17  A.  Yes.

18  Q.  You were asked some questions by Ms. Hyndman regarding

19  Dr. Artunduaga's doctor-patient relationships in your

20  evaluation of those.  Do you remember that?

21  A.  Yes.

22  Q.  Is it your expectation or do interns on your service round

23  on patients without you?

24  A.  They're expected to.

25  Q.  They're expected to.  And based on that expectation, did

Umanskiy - recross

1191

1   you expect that Dr. Artunduaga would have had some familiarity

2   with those patients once you got into their rooms with her?

3           MS. HYNDMAN:  Objection, leading.

4           THE COURT:  Sustained.  Rephrase.

5   BY MS. HALL:

6   Q.  Based on -- okay.  So you said that you would have

7   expected that -- you expect interns to round on patients;

8   correct?

9   A.  That's correct.

10  Q.  And in those patient -- doctor-patient situations that you

11  observed with Dr. Artunduaga, did you expect that she would

12  have rounded on them before you rounded with her?

13  A.  That is correct.

14          MS. HALL:  No further questions.

15          THE COURT:  Recross?

16                        RECROSS EXAMINATION

17  BY MS. HYNDMAN:

18  Q.  Dr. Umanskiy, when did you refresh your recollection from

19  your deposition?

20  A.  I cannot remember when, but I re-read my deposition

21  because I wanted to be prepared for the Court.  And sometimes,

22  you know, I've -- I knew that I might be asked this, and I

23  tell you, sometimes you don't remember a name of a person or

24  an act, or something.  And some of those things came back to

25  me.

Umanskiy - recross

1192

1   Q.  But my question, Dr. Umanskiy, was when did you refresh

2   your recollection?

3   A.  When I re-read my deposition.

4   Q.  When was that?

5   A.  It was a month ago.

6   Q.  Okay.  And was it the reading of your deposition that

7   refreshed your recollection?

8   A.  That is correct.

9   Q.  Was there anything else that refreshed your recollection?

10  A.  No.

11          MS. HYNDMAN:  Nothing further.

12          THE COURT:  Thank you, Doctor.  You may step down.

13  Your next witness?

14          THE WITNESS:  Should I leave it here?

15          THE COURT:  Yes, you may leave it there.  Thank you.

16          MR. JEPSON:  We have no other surgeons available

17  today, your Honor.

18          THE COURT:  Okay.  Ladies and Gentlemen, we're going

19  to end a little early today.

20          You may go, Doctor.  Thank you.

21          We're going to end a little early today.  You have

22  tomorrow off.  I do anticipate on Wednesday the defendants

23  will complete the presentation of their witnesses to you.

24  After that, we have closing arguments, and I will instruct you

25  on the law, and you will begin your deliberations.  I don't

1    have a good enough sense of timing.  We're way ahead of

2    schedule today.  We all thought it would take a little bit

3    longer.  I don't have a good enough sense of timing yet if we

4    will get to closing arguments on Wednesday, or if they will

5    carry over to Thursday morning.  We're going to try our best

6    to do it on Wednesday.

7           So, remember, you have tomorrow off to go do whatever

8    you normally do on a Tuesday.  We will pick back up here

9    Wednesday morning at 9:15.  Please don't discuss the case.

10   Don't even discuss it among yourselves yet.  You can't do that

11   until you begin your deliberations.  Enjoy your day off from

12   here tomorrow, and we will see you Wednesday morning at 9:15,

13   please.

14     (Jury out.)

15           THE COURT:  You may be seated.  So I -- by my

16   calculation, we only have one instruction issue left, one

17   substantive one.  I had one other question for you.  On the

18   instruction regarding demonstratives, we just had not

19   completed it yet.  And I can't give you a number.  It was an

20   agreed one.  Let me read it to you because it's so short and

21   get your input.  And if you want to think about it overnight

22   you can.  I don't think we've had that many demonstratives.  I

23   know you had several, Ms. Hyndman, the chart that you brought

24   up?

25           MS. HYNDMAN:  Right.

1194

1      THE COURT:  And the calendar, the big calendar.

2      MS. HYNDMAN:  Yes, the big calendar.

3      MS. HALL:  It's on Page 17 of what Cindy last sent to

4  the Court.

5      THE COURT:  Okay.  Thank you.  I could rearrange

6  these some.  So my number is a little bit different.  And I

7  will give you my set when I'm done in the order I'm going to

8  give them.

9      "Certain described demonstrative exhibits have been

10  shown to you."  I don't know if you want to put a description

11  in, or if you just want to say:  "Certain demonstrative

12  exhibits have been shown to you.  Those demonstrative exhibits

13  are used for convenience and to help explain the facts of the

14  case.  They are not themselves evidence or proof."  I've done

15  that in the past.

16      MR. JEPSON:  May I make a suggestion?

17      THE COURT:  Of course.

18      MR. JEPSON:  With respect to the first sentence, of

19  the:  Certain demonstrative exhibits, such as calendars, or

20  timelines, or charts have been shown to you."  And then you

21  don't have to describe it in a second sentence.

22      MS. HYNDMAN:  That's fine with us.

23      THE COURT:  So certain demonstrative exhibits such as

24  calendars --

25      MR. JEPSON:  Timelines.

1195

```
 1              THE COURT:  -- timelines and charts?

 2              MR. JEPSON:  Charts.

 3              THE COURT:  Have been shown to you.  They are not

 4    themselves evidence or proof of any facts.

 5              MR. JEPSON:  Correct.

 6              THE COURT:  Okay.  Are you okay with that,

 7    Ms. Hyndman?

 8              MS. HYNDMAN:  Yes, that's fine.

 9              THE COURT:  And then the road map instruction that I

10    gave you this morning?

11              MR. JEPSON:  That's fine with us.

12              MS. HYNDMAN:  That's fine with us.

13              THE COURT:  Okay.  I will put that in.  Make sure I

14    didn't have -- I would -- how do you feel about telling the

15    jury, which I generally do, that -- and I don't think it's in

16    here -- that transcripts are not available for them?  Because

17    almost inevitably, especially if you're going to use any kind

18    of transcripts in closing, we will get a note within half

19    hour, can we have the transcript of so and so's testimony.

20              MS. HYNDMAN:  I think it's a good idea to put in the

21    instructions.

22              THE COURT:  Okay.  I will add that, and I will set

23    send you a set back.

24              MR. JEPSON:  With the right juror, we could be here

25    for weeks.
```

 1            THE COURT:  I'll just give the instruction.  The

 2    punitive damages instruction, we're going to have to talk just

 3    a little bit about whether or not that goes with -- and I can

 4    talk on -- we can talk on Wednesday about that.  I would like

 5    you, Ms. Hyndman, to file something brief in response to the

 6    directed verdict on what evidence there is to support the

 7    punitives going back to the jury.

 8            MS. HYNDMAN:  Okay.

 9            THE COURT:  If you would do that.  If you could file

10    that some time tomorrow, and we will talk about it on

11    Wednesday, please.

12            MS. HYNDMAN:  Sure.

13            THE COURT:  One of your proposed instructions I don't

14    think we need was the instruction:  I have a duty to caution

15    or warn an attorney who does something that I believe is not

16    in keeping with the rules of evidence.  I don't think I've had

17    to scold either -- any of you.

18            MR. JEPSON:  Just me with the phone.

19            THE COURT:  But that wasn't in front of the jury.  I

20    was going to take that out, rather than even suggest --

21            MS. HYNDMAN:  That's fine.

22            THE COURT:  -- that something was -- you were scolded

23    for something.  Okay.  I will take that out.  So don't do

24    anything on Wednesday, Mr. Jepson, that makes me have to scold

25    you in front of the jury.

1      MR. JEPSON:  I will try to be good.

2      THE COURT:  Okay.  And then your retaliation elements

3  instruction, I am sustaining plaintiff's objection to

4  defendants.  I'm going to give defendants, which is the

5  pattern with one -- I'll give plaintiff's, I'm sorry, which is

6  the pattern, Pattern 3.02, with one modification.  And the

7  modification will be:  "Plaintiff also claims that defendant

8  terminated her from the residency program."  Just to be

9  consistent with the language we've been using.  I am going to

10  use the pattern instead of defendant's proposed.  The one you

11  have proposed goes beyond what the pattern is, breaks out.  It

12  makes it appear as if there are two -- it makes it appear as

13  if there are two different prongs at the first part.  You can

14  argue this.  It's in the pattern instruction.  I know your

15  argument is that she never complained about national origin

16  discrimination.  That's clearly in the pattern.  You are free

17  to argue it.  The one you proposed goes too far and it becomes

18  a bit confusing.  So rather than separate it into the two

19  elements, I will give Plaintiff's No. 2 with that

20  modification.

21      MR. JEPSON:  Thank you, your Honor.

22      THE COURT:  And you can argue away.

23      MR. JEPSON:  We will, of course, just object for the

24  record.

25      THE COURT:  You go right ahead.

1198

 1    MR. JEPSON:  For what that is worth, and we will

 2  argue.

 3    THE COURT:  Okay.  I think that's it on jury

 4  instructions, other than we will have the question of punitive

 5  damages and whether or not that goes to the jury.  There was

 6  some bolded language in the proposed punitive instruction.

 7    MR. JEPSON:  Yes.

 8    MS. HALL:  We think that, if it goes to the jury,

 9  your Honor, that that language is appropriate.

10  Dr. Artunduaga, or we expect -- she presented evidence that

11  people like Haijin In, John Seal, didn't let her into the OR,

12  didn't give her, you know, the opportunity she should have

13  gotten as an intern, which is essentially an argument that

14  they discriminated against her on the basis of her national

15  origin.  And we think that the jury should consider whether

16  those people, and others like them, are managerial employees

17  of UCMC so as to warrant the consideration of punitive damages

18  for their actions.

19    THE COURT:  What's your response to the bolded

20  language?  And if you need to see it, you can see my --

21    MS. HYNDMAN:  Yeah.  I frankly don't have the ones

22  that we sent in in front of me, so.

23    THE COURT:  Given some of the evidence that has come

24  in.

25    MS. HYNDMAN:  Yeah, I think that's fine.

1    THE COURT:  I agree.  I think it's appropriate.

2    MS. HYNDMAN:  I have no problem.

3    THE COURT:  So I will take the bold out.

4    MS. HALL:  But the way that it's written, it requires

5    the insertion of a name because that is how the pattern does

6    it.

7    MS. HYNDMAN:  I would certainly object to any names

8    being in there.

9    MS. HALL:  Yeah, so can we just change so that it

10   says to determine whether someone is a managerial employee you

11   should consider blah, blah, blah?

12   THE COURT:  Absolutely.

13   MS. HALL:  Okay.  I just wanted to make sure.

14   THE COURT:  So I will change it to, in determining

15   whether someone was a managerial employee.  Okay.  I will -- I

16   will make that change.

17   MS. HALL:  Thank you.

18   THE COURT:  I will make these last changes that we've

19   just talked about, add the transcripts are not available, and

20   e-mail it back to you.  I don't care if you use these in your

21   closing arguments.  You are welcome to.  I have approved all

22   them.  You are welcome to use them.  The verdict form, I would

23   like you, now that I've ruled on everything, to give one more

24   effort and see if you can agree and file something by the end

25   of the day tomorrow.  If you can't agree, then I'll resolve it

1200

1    for you.

2          MS. HALL:  And just for purposes of tracking, will

3    you also be including the Killingsworth instruction again,

4    even though it was verbally read?

5          THE COURT:  I believe it's in here.  Yes.  It's my

6    intention to.

7          MS. HALL:  Okay.  Thank you.

8          THE COURT:  And I'm pretty sure I have it in the set

9    I put together.  But, if not, I will add it in there because

10   it's certainly my intention to.  I'm sure I have it in there.

11         MS. HALL:  Okay.

12         THE COURT:  What else?

13         MR. JEPSON:  For Wednesday, your Honor, the

14   scheduling, as I mentioned, Dr. Park has cleared her schedule.

15         THE COURT:  Just before -- I'm sorry, before we go on

16   to scheduling, and I will get to that, I want to make sure

17   there is nothing else on jury instructions.

18         MS. HYNDMAN:  I don't believe so.

19         MS. HALL:  No.

20         THE COURT:  Okay.  Like I said, I will make these

21   changes, and we will e-mail them back to you.  And, again, you

22   are free to use them if you would like in your closing

23   arguments.

24         Okay.  So let's talk about scheduling, then.  You had

25   several witnesses listed for Wednesday.

1201

```
1        MR. JEPSON:  Yes, and --

2        THE COURT:  Dr. Becker?

3        MR. JEPSON:  The problem is that two of them cannot

4   come until the afternoon.

5        THE COURT:  Okay.  So who do you have?

6        MR. JEPSON:  Dr. Park can be here at 1:00.

7        THE COURT:  And Dr. Hurst?

8        MR. JEPSON:  Correct.  He can be here at 2:00.  And

9   so, frankly, what we'd like to do because he has to -- he is

10  juggling, is start Dr. Park, have Dr. Hurst, and then finish

11  with Dr. Park.

12       THE COURT:  Okay.

13       MR. JEPSON:  And since he is just a bit, I don't know

14  if there is an objection to that, but --

15       MS. HYNDMAN:  I don't have an objection.

16       MR. JEPSON:  And, in the morning, we, for certain,

17  will call Dr. Becker and Dr. Jaskowiak and Dr. Millis.

18       THE COURT:  What about Tothy?

19       MR. JEPSON:  You know, that's -- I haven't decided.

20  She is very, very short.

21       THE COURT:  Let Ms. Hyndman know tomorrow.

22       MR. JEPSON:  I will.

23       THE COURT:  If you're going to call her.

24       MS. HYNDMAN:  Or Ms. Franklin, or both of us.

25       THE COURT:  Or Ms. Franklin, either one.  You are
```

1　just the one in my line of sight here, so.  Either one on the

2　team, let know.  Okay.  How long do you think your closing

3　argument is?

4　　　　　MS. HYNDMAN:  Might be an hour.

5　　　　　THE COURT:  And how long do you think yours is?

6　　　　　MR. JEPSON:  I think an hour is about right.

7　　　　　THE COURT:  How long do you think Dr. Park's

8　testimony will be?

9　　　　　MR. JEPSON:  You know, it shrunk.

10　　　　　THE COURT:  I thought it may have.

11　　　　　MR. JEPSON:  You know me, Judge.  So I think I will

12　be done with her in about an hour and 15 minutes, hour and a

13　half.

14　　　　　THE COURT:  Do you think it will take that long?

15　Just because you estimated today with Dr. Umanskiy would be a

16　good hour.

17　　　　　MR. JEPSON:  No, both of them would be an hour.

18　　　　　THE COURT:  Oh, okay.  I misunderstood you, then.

19　And what about Dr. Hurst?

20　　　　　MS. HALL:  20 minutes.

21　　　　　THE COURT:  All right.  I don't -- I generally don't

22　like to split closings.

23　　　　　MS. HYNDMAN:  I would object to a splitting of

24　closing.

25　　　　　MR. JEPSON:  We wouldn't want to disadvantage them

1203

 1    that way.

 2          THE COURT:  If we get done by 3:00 with the

 3    witnesses, I think -- I would like to do closings, even if it

 4    means keep them a little bit later.  So you should be prepared

 5    to do it, just in case.

 6          MS. HYNDMAN:  Yes.

 7          THE COURT:  Yes, I think they would like that as

 8    well, too, so.

 9          MR. JEPSON:  So would I.

10          THE COURT:  So be prepared on Wednesday, please, to

11    do your closings, and we will just see how timing goes.  If we

12    need to take an earlier lunch so we can start back up at 1:00,

13    it sounds like that may work.

14          MS. HALL:  A question about closings and

15    demonstratives used in them.  If there is a reference to a

16    document or an event, or something, on a timeline where

17    evidence relating to that was not presented to the jury, the

18    exhibit reference was not admitted to the jury, can that event

19    stay on the timeline?

20          THE COURT:  If it's not -- if it isn't something in

21    evidence, it shouldn't be.

22          MS. HALL:  I just wanted to make sure we're on the

23    same page.

24          MR. JEPSON:  No, of course not.

25          THE COURT:  No, if it isn't in evidence, closing

1204

1    argument is not the time to start bringing it up.

2            MS. HALL:  No, I know.  Okay.  Thank you.

3            THE COURT:  Anything else for me today?

4            MR. JEPSON:  Probably, but I forgot.

5            THE COURT:  So please -- I'll finish the instructions

6    and e-mail them back to you.  If you would please, by

7    tomorrow, file or e-mail hopefully a revised agreed jury

8    verdict form.  If not, I will -- I will finalize it.  And be

9    prepared for closings on Wednesday, just in case.

10           MR. JEPSON:  Thanks, Judge.

11           MS. HYNDMAN:  Thank you.

12           THE COURT:  Please be here at 9:00 o'clock.  You're

13   always here early, but on Wednesday morning, please be here at

14   9:00 o'clock.  Okay.  Thank you.

15       (Adjournment taken at 3:16 o'clock p.m., until 9:00

16   o'clock a.m., the following Wednesday, February 8, 2017.)

17                           CERTIFICATE

18     I certify that the foregoing is a correct transcript from

19   the record of proceedings in the above-entitled matter.

20   */s/Sandra M. Tennis*              *February 6, 2017*
     Official Court Reporter

21

22

23

24

25