1205

```
 1                      IN THE UNITED STATES DISTRICT COURT
                          NORTHERN DISTRICT OF ILLINOIS
 2                             EASTERN DIVISION

 3    DR. MARIA ARTUNDUAGA,            ) Docket No. 12 C 8733
                                       )
 4                    Plaintiff,       )
                                       )
 5              vs.                    )
                                       )
 6    THE UNIVERSITY OF CHICAGO        )
      MEDICAL CENTER,                  ) Chicago, Illinois
 7                                     ) February 8, 2017
                      Defendant.       ) 8:58 o'clock a.m.
 8

 9                            VOLUME SEVEN
                    TRANSCRIPT OF TRIAL PROCEEDINGS
10        BEFORE THE HONORABLE AMY J. ST. EVE, AND A JURY

11    APPEARANCES:

12    For the Plaintiff:         THE FRANKLIN LAW FIRM, LLC
                                 BY:  MS. JAMIE S. FRANKLIN
13                               53 W. Jackson Blvd., Suite 803
                                 Chicago, Illinois  60604
14
                                 ROBINSON, CURLEY & CLAYTON, P.C.
15                               BY:  MS. CYNTHIA H. HYNDMAN
                                 300 South Wacker Drive, Suite 1700
16                               Chicago, Illinois  60606

17    For the Defendant:         VEDDER PRICE, P.C.
                                 BY:  MR. EDWARD C. JEPSON, JR.
18                                    MS. ELIZABETH N. HALL
                                 222 N. LaSalle St., Suite 2600
19                               Chicago, Illinois  60601

20    Court Reporter:            MR. JOSEPH RICKHOFF
                                 Official Court Reporter
21                               219 S. Dearborn St., Suite 1232
                                 Chicago, Illinois  60604
22                               (312) 435-5562

23              * * * * * * * * * * * * * * * * *

24                        PROCEEDINGS RECORDED BY
                          MECHANICAL STENOGRAPHY
25                    TRANSCRIPT PRODUCED BY COMPUTER
```

```
 1              THE CLERK:  12 C 8733, Artunduaga vs. The University
 2   of Chicago Medical Center.
 3              THE COURT:  Good morning.
 4              MS. HYNDMAN:  Good morning, your Honor.
 5              MS. HALL:  Good morning, your Honor.
 6              MS. FRANKLIN:  Good morning.
 7              THE COURT:  We are here for continuation of trial.
 8              Did you get a chance to look at the jury instructions
 9   that I sent you, and did you -- I caught one typo, but other
10   than that, I did not see anything.  I do not know if you did.
11              MS. HYNDMAN:  I hope the typo is not in any of them
12   that I have put on my slides for the closing, because I did
13   not catch them.
14              MS. HALL:  The only issue we wanted to ask about,
15   which plaintiff said they don't take a position on, is in the
16   instruction on retaliation as revised --
17              THE COURT:  Hold on one second.  Let me just pull
18   that up.
19              MS. HALL:  -- which I have to now find myself.
20         (Brief pause.)
21              THE COURT:  Okay.
22              MS. HALL:  The first instance --
23              THE COURT:  Are you on Page 20?
24              MS. HALL:  Well, I have a red-line, so I can't tell
25   you the page.  But if you look at --
```

1207

```
1           THE COURT:  What does it start with?

2           MS. HALL:  "Plaintiff also claims the defendant

3    terminated her from the residency program."

4           MS. HYNDMAN:  It might be Page 20 or 21, yeah.

5           THE COURT:  22 on what I have.

6           MS. HALL:  And, actually, the only question I have is

7    the phrases on this claim were removed from the instruction,

8    and that language is consistent with the first instruction on

9    national origin discrimination.

10          THE COURT:  Tell me where you want to put it then.

11          MS. HALL:  At the very bottom --

12          THE COURT:  Okay.

13          MS. HALL:  -- of the last --

14          THE COURT:  If plaintiff has proved by a

15   preponderance, then you must find for plaintiff on this claim?

16          MS. HALL:  Yeah.

17          THE COURT:  Okay.  That makes sense.  I will put that

18   in.

19          MS. HALL:  And it's in both the end of the second to

20   last sentence and the end of the last sentence.

21          THE COURT:  Okay.

22          I assume there is no objection to that.

23          MS. HYNDMAN:  No objection, your Honor.

24          MS. HALL:  That was the only -- and I don't know

25   where your typo is either.
```

1208

```
 1              THE COURT:  I have changed it.  It is okay.
 2              MS. HYNDMAN:  Which instruction was it?
 3              THE COURT:  I have to go back and look.
 4              MS. HYNDMAN:  Oh, okay.  I only have three that I've
 5    incorporated into slides, so --
 6              THE COURT:  All right.  I made that change.
 7              Any other changes on the jury instructions?
 8              MS. HYNDMAN:  No.
 9              MS. HALL:  No.
10              THE COURT:  Verdict form.  Did you make any progress?
11              MS. HYNDMAN:  No.
12              MS. HALL:  We sent the plaintiff something that we
13    would have been comfortable with, which was a revision of
14    ours, but I think the response was we will agree to disagree.
15    So, no.
16              THE COURT:  Okay.
17              MS. HALL:  I can give you what we sent them as a
18    proposed revision.
19              THE COURT:  Sure.  Why don't you give me what you
20    sent them.
21              MS. HYNDMAN:  Then, your Honor, the verdict forms we
22    had submitted back in -- whenever that was --
23              THE COURT:  A while ago.
24              MS. HYNDMAN:  Seems ages ago.  But anyway, we had the
25    two alternatives on the retaliation because you hadn't ruled
```

1    yet on that instruction.  So, we have a new form with that

2    change made.

3              THE COURT:  Okay.  Why don't you hand me both of your

4    forms, please.

5              And are they still essentially the same on the front

6    part?  I think Claim 1 --

7              MS. HALL:  Yeah.

8              THE COURT:  -- you were essentially the same.

9              MS. HALL:  We said "Colombian national origin" in No.

10   1, and they didn't have a reference to Colombian, I think.

11       (Document tendered to the Court.)

12             MS. HALL:  I've given you a red-line and then a clean

13   version, too.

14             MS. HYNDMAN:  We don't have a red-line.

15             THE COURT:  That is okay.

16             Is there any objection to "Colombian national

17   origin"?

18             MS. HYNDMAN:  No objection to "Colombian national

19   origin."

20             THE COURT:  Okay.  We will leave that in.

21             And, then, Question 2, you have one difference.  You

22   both have:  "Has plaintiff proved by a preponderance of the

23   evidence that defendant retaliated against her -- " defendants

24   have "for complaining of national origin discrimination," and

25   you do not have that.

```
 1          MS. HYNDMAN:  Correct.

 2          MS. HALL:  We believe that language is appropriate,

 3   particularly because there's been evidence presented that she

 4   thinks she was retaliated against for filing a grievance as

 5   opposed to for complaining about national origin

 6   discrimination.  There's obviously a distinction there.

 7          THE COURT:  Is there any objection to that?

 8          MS. HYNDMAN:  No, Judge.

 9          THE COURT:  I will use that.  It is an accurate

10   statement of the law.

11          Defendants have -- maybe you have it carried over.

12   Hold on.

13          I am going to leave the bolded language in just to

14   make it crystal clear for the jury:  "Answer Questions 3 and 4

15   only if you answered 'Yes' to Question 1 or 2."

16          MS. HYNDMAN:  It should be "question" --

17          THE COURT:  Yes.

18          MS. HYNDMAN:  -- singular, yeah.

19          THE COURT:  Question 1 or 2.

20          MS. HALL:  Yeah, that's right.

21          THE COURT:  And then:  "If you answered 'No' to both

22   Questions 1 and 2, sign the verdict form on Page 3 and do not

23   answer any further questions."  That is appropriate, so I am

24   going to leave that in.

25          MS. HALL:  And, your Honor, could you just check on
```

1211

1  the clean version I gave you that it's actually Page 3 where

2  the signatures start?  I'm sorry, I gave you mine.

3          THE COURT:  It is.

4          And, then, 3, I think you -- this was essentially the

5  same.

6          MS. HYNDMAN:  It's similar.

7          MS. HALL:  So, we added language in 3 about what

8  she's had to prove by a preponderance of the evidence.  So,

9  discrimination based on her Colombian national origin and

10  retaliation based on complaining about national origin

11  discrimination.  We also added that "enter no dollar amount if

12  she's not proved entitlement to a particular type."

13          MS. HYNDMAN:  That just repeats the instruction, your

14  Honor.  They're going to have the instructions back there.

15  They're going to know what we have to prove.  I don't think

16  it's appropriate to repeat it in the verdict form.

17          THE COURT:  And before you get there, the first

18  sentence --

19          MS. HALL:  Of theirs or ours, your Honor?

20          THE COURT:  I am looking at both.  Yours, defendants,

21  has more information in it.

22          MS. HYNDMAN:  They included "has proved by a

23  preponderance of the evidence and that it was directly

24  caused."

25          THE COURT:  Do you have an objection to their

1  proposed language?

2         MS. HYNDMAN:  I don't like it, but --

3     (Laughter.)

4         MS. HYNDMAN:  I don't think that's an objection.

5         THE COURT:  I appreciate your candor.

6         MS. HYNDMAN:  No objection, Judge.

7         THE COURT:  All right.  I will leave that in

8  defendant's first sentence on Paragraph 3.

9         I think the second sentence is redundant.  And we

10 have made it pretty clear, and the instructions will make that

11 clear.  And you are free to argue that.  So, I will take out

12 the second sentence.

13        MS. HALL:  Take out the "enter no dollar" --

14        THE COURT:  Yes.

15        MS. HALL:  -- sentence?

16        THE COURT:  And, then, 1 through 4 --

17        MS. HYNDMAN:  I think are --

18        THE COURT:  -- I thought they were the same before.

19        Our jurors are all here.

20        MS. HALL:  We tried to make ours mimic what was in

21 the --

22        THE COURT:  Instructions?

23        MS. HALL:  -- instructions.  And we took out the

24 repeating because of the "unlawful discrimination and

25 retaliation" we had there before, to try to simplify it.

1    THE COURT:  Do you have any objection to the way

2  defendants have worded it?

3          Then our jury is all here.

4          Do you have your first witness here, Mr. Jepson?

5          MR. JEPSON:  Yes, we do.

6          THE COURT:  Excellent.

7          MR. JEPSON:  I will go get her.

8          THE COURT:  If you would go get her, please.

9          MS. HYNDMAN:  No, their 1 through 4 is okay.  That's

10  fine.

11          THE COURT:  And, then, Question 4, do you have any

12  objection -- in light of the agreed portion of the jury

13  instruction on punitives that we included, do you have any

14  objection to the way they have worded their punitive?

15          MS. HYNDMAN:  I don't have an objection to the

16  question on No. 4.  I do have an objection to the splitting

17  out Questions 4-A and 4-B, the defense, because that's

18  incorporated into the instruction and I don't think it's

19  appropriate to have that separated out.

20          MS. HALL:  We've included it because if the answer to

21  the question is "Yes," then punitive damages are not

22  appropriate as a matter of law.

23          THE COURT:  I do not think it is appropriate to split

24  that out.  That is something that is part of the instruction

25  and you can argue.

1214

1   We do need a separate line, though, for the amount.

2   MS. HYNDMAN:  Right.  And that's fine.

3   THE COURT:  You do not have that.  So, I am going to

4   take out 4-A.  Again, you are free to argue it.  That is in

5   the instruction.

6   I will leave in "if you answered 'No' to Question 4,

7   sign the verdict form on Page 3 and do not answer any further

8   questions."

9   "If you answered 'Yes' -- I think I will move that

10  up.

11  "If you answered 'Yes' to Question 4, please enter

12  the amount of punitive damages, if any, that plaintiff has

13  proved by a preponderance of the evidence should be assessed."

14  And I will leave it at that.

15  MS. HYNDMAN:  Okay.

16  THE COURT:  Ms. Hall, could you by chance have this

17  e-mailed to me, please, so I can --

18  MS. HALL:  That document or do you want me to do the

19  changes?

20  THE COURT:  If you could make the changes --

21  MS. HALL:  Well, I shouldn't have offered the second

22  one.

23  (Laughter.)

24  MS. HALL:  Yes, I can.

25  THE COURT:  You are withdrawing your offer to make

1215

1   the changes?

2         MS. HALL:  No, your Honor, I would never do such a

3   thing.

4         THE COURT:  I am fine doing the changes.  But so I do

5   not have to have the whole thing retyped --

6         MS. HALL:  Yeah.

7         THE COURT:  -- and risk typos, if you could have this

8   e-mailed, directly e-mailed to me or e-mailed to Katie,

9   whoever you --

10        MS. HALL:  What I actually have in e-mail now is the

11  red-line version.  So, if you accepted the changes, you would

12  end up with a clean.  Is that okay?  Or I can have someone at

13  my office --

14        THE COURT:  I would prefer the clean.

15        MS. HALL:  -- send the clean.  Okay.  It just might

16  take me a little bit.

17        THE COURT:  That is okay.  We have got all day, I

18  think.

19        I do not always do so well with the accepting of

20  changes.  It does not always work on -- I do not know if we

21  have an old version or not.

22        MS. HALL:  Okay.

23        THE COURT:  Katie, go line up the jury.

24        You can have your first witness come up.

25     (Brief pause.)

Becker - direct

1216

1    (Jury in.)

2         THE COURT:  You may be seated.

3         Good morning, ladies and gentlemen.

4         We are continuing today with the presentation of

5    evidence.

6         Your next witness, Mr. Jepson.

7         MR. JEPSON:  Dr. Yolanda Becker.

8         YOLANDA TAI BECKER, DEFENDANT'S WITNESS, SWORN

9                    DIRECT EXAMINATION

10   BY MR. JEPSON:

11   Q.  Good morning, Dr. Becker.

12   A.  Good morning.

13   Q.  Would you state your full name for the record, please?

14   A.  Yolanda Tai Becker.

15   Q.  And, Dr. Becker, since I'm calling you "Doctor," where did

16   you go to medical school?

17   A.  I went to medical school at Johns Hopkins.

18   Q.  And did you do an internship and residency?

19   A.  I did.

20   Q.  Where was that?

21   A.  Vanderbilt University in Tennessee.

22   Q.  What was your specialty?

23   A.  General surgery.

24   Q.  And did you then do a fellowship?

25   A.  I did.

Becker - direct

1217

1    Q.  Where was that?

2    A.  At University of Wisconsin in Madison, in transplant

3    surgery.

4    Q.  Okay.

5          And are you a transplant surgeon?

6    A.  I am.

7    Q.  And were you at some point in time an attending physician

8    at the University of Wisconsin Madison?

9    A.  Yes, I was.

10   Q.  And from what year to what year, if you can remember?

11   A.  From 1999 to 2010.

12   Q.  And is the University of Wisconsin at Madison a teaching

13   hospital?

14   A.  Yes, it is.

15   Q.  And, so, you would have had interns and residents rotating

16   through your service?

17   A.  Yes.

18   Q.  And you would have evaluated interns and residents?

19   A.  Yes.

20   Q.  Now, where did you go after you finished at University of

21   Wisconsin Madison?

22   A.  University of Chicago.

23   Q.  And are you still at the University of Chicago Medical

24   Center?

25   A.  I am.

Becker - direct

1   Q.  And what are your current titles?

2   A.  I am currently a professor of surgery and the director of

3   kidney and pancreas transplant surgery.

4   Q.  And how long have you held the director position?

5   A.  Since 2010.

6   Q.  Now, what kinds of transplantation surgery do you do?

7   A.  I do kidney and pancreas transplant, as well as

8   laparoscopic donor nephrectomies for living kidney donors.  I

9   also assist in liver transplant when asked.

10  Q.  And since you've been at University of Chicago Medical

11  Center, have you also continued to evaluate interns and

12  residents as they rotate through your service?

13  A.  Yes.

14  Q.  All right.

15       Now, I want to direct your attention to the February,

16  2012, transplant rotation.  Do you recall Dr. Maria Artunduaga

17  rotating through your service that month as an intern?

18  A.  Yes.

19  Q.  And, typically, on the transplant service, do the

20  transplant surgeons spend the whole month with residents or do

21  you take a week or two?

22  A.  We usually take a week or two at a time.

23  Q.  Okay.

24       And did you do that with Dr. Artunduaga?

25  A.  Yes.

Becker - direct

1219

 1   Q.  And did you spend enough time with her that you felt you

 2   had enough basis to give her an evaluation?

 3   A.  Yes.

 4   Q.  And did you -- was that evaluation, in your view, accurate

 5   from your personal observations?

 6   A.  Yes.

 7   Q.  Let me show you what's been marked as Joint Exhibit 65.

 8           MR. JEPSON:  And if we could blow up the top of that,

 9   Michael.

10   BY MR. JEPSON:

11   Q.  It's a little hard to read these screens, but can you see

12   on the left-hand side --

13   A.  Yes.

14   Q.  -- appears -- it says, evaluator you?

15   A.  Yes.

16   Q.  And, then, Dr. Artunduaga; and, the period of time appears

17   to be the month of February in 2012 --

18   A.  Yes.

19   Q.  -- is that right?

20   A.  That's correct.

21   Q.  Do you recognize this as your evaluation of Dr. Artunduaga

22   for that rotation?

23   A.  I do.

24   Q.  I want to --

25           MR. JEPSON:  Michael, if we could go down now to the

Becker - direct

1220

1　first half and blow that up a bit.

2　BY MR. JEPSON:

3　Q.  And are these the ratings that you gave Dr. Artunduaga for

4　the categories here?

5　A.  Yes.

6　Q.  So, you would have given her "could improves" for general

7　knowledge, correct?

8　A.  Correct.

9　Q.  And the same is true for operative knowledge --

10　A.  Correct.

11　Q.  -- pre-op care, post-op care and ability to communicate,

12　justify medical decisions?

13　A.  Correct.

14　Q.  All right.

15　　　　MR. JEPSON:  Michael, if we could --

16　BY MR. JEPSON:

17　Q.  And, then, down below with operative skills, as to

18　preparedness, you gave her a "could improve"?

19　A.  Correct.

20　Q.  All right.

21　　　　MR. JEPSON:  Let's go to the second page, please.

22　BY MR. JEPSON:

23　Q.  And you gave her "goods" at the top in the first two?

24　A.  Correct.

25　Q.  And, then, in the middle --

Becker - direct

1221

1    MR. JEPSON:  If you'd blow that up for us, Michael.

2  BY MR. JEPSON:

3  Q.  As to documentation of practice activities, you gave her a

4  "could improve"?

5  A.  Correct.

6  Q.  And what's documentation of practice activities, at least

7  as you rate?

8  A.  As I evaluated it, I -- was the time of documentation of

9  progress notes.  So, that's the daily note that updates us

10  about what's going on with a patient.

11  Q.  Okay.

12    And, then, ability to lead, manage a service was a

13  "could improve"?

14  A.  Yes.

15  Q.  And the same is true for the presentation quality?

16  A.  Yes.

17  Q.  What's the M&Ms?  I don't think anybody's explained --

18  A.  M&M is the morbidity and mortality.  So, we have formal

19  conferences so that if patients become ill, that we present

20  that in peer review to -- so that we can constantly improve

21  our practice.

22  Q.  All right.

23    Let's go ahead and go to the bottom with the overall

24  comment.  And there were a couple more "could improves."

25    But it says here:  My interaction with Maria was

Becker - direct

1222

1   limited to one week on the service, correct?

2   A.  Correct.

3   Q.  And that was normal for the group, correct?

4   A.  Yes.

5   Q.  And:  She should work toward more timely documentation.

6           And, again, that's referring to the entry of the

7   notes?

8   A.  Yes.

9   Q.  Then:  Maria should also work to build her clinical fund

10  of knowledge.  She has difficulty applying knowledge to a

11  clinical situation and seemed easily overwhelmed.

12  A.  Correct.

13  Q.  Do you recall any specific examples that led you to write

14  that comment?

15  A.  Yes.  When there were tasks that she was asked to do, she

16  wasn't able to complete those tasks in a timely manner.  And

17  when I would query about why something had not occurred, she

18  would become very flustered in trying to present that

19  information back.  Or if there was a complex patient where I

20  had to ask follow-up questions, she would get very flustered

21  and not be able to present accurate -- what I felt was

22  accurate data as to my recollection.

23  Q.  And do you recall any specific instances of failure to

24  follow up?

25  A.  Yes.  Two instances in particular, which --

Becker - direct

1223

1   Q.  Would you tell us about the first?

2   A.  Yes.  They're very important for transplant patients.  One

3   is the administration of antibiotics when a patient was sick

4   with an infection and the order was not entered in a timely

5   fashion.  And the second was steroids, which all transplant

6   patients need to receive so that they don't reject their

7   organs.  I -- in a particular case, the steroid medication was

8   not entered.

9   Q.  Okay.

10          And is that a problem?

11  A.  Yes.

12  Q.  Why?

13  A.  These can lead to patient death.

14  Q.  And did you speak with Dr. Artunduaga about these

15  instances?

16  A.  Did I -- I'm sorry?

17  Q.  Did you speak with Dr. Artunduaga about these instances?

18  A.  I don't recall a specific conversation; but, yes, it was

19  certainly mentioned on rounds, and I fixed the error.

20  Q.  And did you discuss Dr. Artunduaga's performance --

21          MR. JEPSON:  Strike that.

22  BY MR. JEPSON:

23  Q.  You rounded with other residents, as well?

24  A.  Yes.

25  Q.  And do you recall that Dr. Fleming was on the service that

Becker - direct

1224

 1    month?

 2    A.   Yes.

 3    Q.   And also a transplant fellow by the name of Dr. Olaitan?

 4    A.   Yes.

 5    Q.   And during the course of that month, did you have any

 6    informal discussions with them about Dr. Artunduaga's

 7    performance?

 8    A.   Yes.

 9    Q.   And were the things that you just mentioned discussed in

10    general with them?

11    A.   Yes.

12    Q.   And did they give you any feedback as to what they

13    observed?

14    A.   We get inform a lot -- you know, we get informal -- we

15    have informal conversations to try to make sure that, you

16    know, was I clear in my instructions and to make sure that

17    everything was very clear and that there wasn't any

18    misunderstanding.  And it seemed a little odd to me, that when

19    I give a directive, generally it's followed --

20    Q.   Okay.

21    A.   -- and I wanted to make sure that I had given the

22    directive.

23    Q.   And did they confirm that to you?

24    A.   They did.

25    Q.   And it appears from this highlighted portion of the

Becker - direct

1   evaluation that you submitted it on February 21, 2012,

2   correct?

3   A.   That's correct.

4   Q.   And was that because you were done with working with her

5   for the month?

6   A.   That was because I had -- I was given the one-week

7   evaluation.  It came in my inbox.  I have a tendency to turn

8   things around very quickly.  So, I submitted my evaluation

9   based on my observations and the informal conversations that I

10  had at that point in time.

11  Q.   At any point in time did Dr. Artunduaga approach you about

12  this evaluation?

13  A.   Yes.

14  Q.   And where did that occur, if you recall?

15  A.   That occurred in the intensive care unit on Sunday, if I

16  recollect correctly, when we were making rounds together.

17  After I had performed the evaluation, I received an e-mail

18  that asked me to get further --

19  Q.   Let me ask the question.

20  A.   Yes, sir.

21  Q.   I know you want to get on and off the stand.

22          So, at that point, did you and she have a discussion

23  about the evaluation?

24  A.   Yes.

25  Q.   Tell us, to the best of your recollection, about that

Becker - direct

1226

1  discussion.

2  A.  She confronted me in the ICU and I felt very cornered, and

3  said that my evaluation -- my recollection is that she

4  basically said my evaluation could get her fired, that she was

5  under probation, didn't I know that.  It was a very

6  uncomfortable interaction.  She felt that my evaluation was

7  not valid.

8       And I told her at that point that I would contact

9  Dr. Park, the program administrator, and note that Dr.

10  Artunduaga was not accepting of my evaluation.

11      But it was a very uncomfortable interaction.

12  Q.  Have you ever had that happen before with a resident or

13  intern at either University of Wisconsin or University of

14  Chicago Medical Center?

15  A.  No.

16  Q.  Even since then has that happened?

17  A.  No.

18  Q.  I want to direct your attention to Joint Exhibit 82.

19      And first I want to direct your attention to the

20  second page.  And it appears that there's an e-mail there from

21  February 23, 2012, to you from Dr. Artunduaga, correct?

22  A.  That's correct.

23  Q.  And she's thanking you for the rotation and wondering if

24  you could get some input from Dolamu and Irma.

25      Do you see that?

Becker - direct

1227

1   A.  Yes.

2   Q.  And, then, it says:  Dr. Song has decided to put me on

3   probation because I was not performing at the level of a

4   plastic surgery resident and he's going to take into account

5   your evaluation.

6           And, then, it says:  I think I've done a decent job.

7   I'd really appreciate your help in this regard.

8           At this point, you had already filled out the

9   evaluation, correct?

10  A.  That's correct.

11  Q.  And, then, you responded to her above.  Is that the e-mail

12  that you sent to Dr. Artunduaga?

13  A.  Yes, it is.

14  Q.  (Reading):  I've already spoken with the relevant people.

15  I'm glad you had a good time on our rotation.

16          And, then, on February 26, 2012, you sent an e-mail

17  to Dr. Song and Dr. Park.

18          Do you see that?

19  A.  Yes, I do.

20  Q.  Was this after your discussion with Dr. Artunduaga in the

21  ICU?

22  A.  Yes, it was.

23  Q.  And did you then receive the e-mail at the top from

24  Dr. Becker -- I'm sorry, from Dr. Park?

25  A.  Yes, I did.

Becker - direct

1228

1   Q.  Okay.

2          And at some point in time -- and that -- basically

3   she asks whether you evaluated her as you did others, correct?

4   A.  Correct.

5   Q.  And did you?

6   A.  Yes.

7   Q.  And did you respond to Dr. Park's e-mail?

8   A.  Yes.  We had a phone conversation.

9   Q.  And let me show you what's been marked as Defendant's

10  Exhibit 114.

11          MR. JEPSON:  I don't think this is in.

12          THE COURT:  It is not.

13          Is there any objection to its admission?

14          MS. HYNDMAN:  No objection.

15          THE COURT:  I will admit it.

16      (Defendant's Exhibit No. 114 received in evidence.)

17  BY MR. JEPSON:

18  Q.  And it appears that we've got the same e-mails we just

19  looked at below from Joint Exhibit 82, and the only change is

20  at the top.

21          Is that your response to Dr. Park?

22  A.  Yes, with a misspelling.

23  Q.  (Reading):  It's consistent on my part.  The restaurant

24  is -- the resident is clearly -- blaming?

25  A.  Blaming.  I meant blaming.

Becker - direct

1229

```
 1   Q.  -- blaming me for whatever is going on.  Apparently she's
 2   doing better this week.  Perhaps we can discuss the details
 3   offline.
 4            So, you wrote that back to Dr. Park, correct?
 5   A.  Correct.
 6   Q.  Did you have a discussion with Dr. Park after that?
 7   A.  Yes.
 8   Q.  And did you tell Dr. Park what you just told us about the
 9   experience you had with Dr. Artunduaga?
10   A.  Yes.  That was the nature of our conversation.
11   Q.  And did you also tell her about what happened in the ICU?
12   A.  Yes, I did.
13   Q.  Now, Dr. Artunduaga had an accent, correct?
14   A.  Yes.
15   Q.  Did that affect in any way your evaluation of her?
16   A.  No.
17   Q.  Could you understand her?
18   A.  Oh, yes.
19   Q.  And did you have any doubt that she could understand you?
20   A.  No.
21   Q.  And did you take any of the actions that you took with
22   respect to her in writing the evaluation and speaking with
23   Dr. Park because she had an accent?
24   A.  No.
25   Q.  Do you know -- did you know at the time where she was
```

Becker - cross

1230

1   from?

2   A.  No.

3   Q.  And did you take any action against her because you

4   thought she was a foreign medical grad or from a foreign

5   country?

6   A.  No.

7   Q.  Now -- by the way, where were your parents born?

8   A.  China.

9   Q.  And did they emigrate to the U.S.?

10   A.  Yes.

11   Q.  Were your parents non-native English speakers?

12   A.  Yes.

13        MR. JEPSON:  No further questions.

14        THE COURT:  Cross-examination.

15        MS. HYNDMAN:  Yes.  Thank you, Judge.

16                CROSS-EXAMINATION

17   BY MS. HYNDMAN:

18   Q.  Dr. Becker, where were you born?

19   A.  Decatur, Illinois.

20   Q.  And English is your native language?

21   A.  English.

22   Q.  Yes.

23        Now, you testified that you worked with Dr.

24   Artunduaga for just a week and that's not unusual in your

25   service.  During that one week that you worked with Dr.

Becker - cross

1231

1 Artunduaga, did you do any surgeries with her?

2 A. I don't recall.

3 Q. Did you -- do you do a clinic in your practice?

4 A. I do.

5 Q. Did she attend your clinic?

6 A. She did not, that I recall.

7 Q. What did you do with Dr. Artunduaga during that week?

8 A. Primarily make rounds. And during rounds, the residents

9 typically present the patients to us. And sometimes we do

10 telephone follow-ups, consults, things like that.

11 Q. Okay.

12     Did you do any consults with Dr. Artunduaga that

13 week?

14 A. I don't have -- I don't recall.

15 Q. How many rounds did you do with her that week?

16 A. I don't recall exactly. But it's a seven-day week, so --

17 Q. But the residents don't work every day, do they?

18 A. It depends upon their hours.

19 Q. Now, we looked at Joint Exhibit 65.

20     MS. HYNDMAN: Can we take a look at that, please,

21 Jamie.

22 BY MS. HYNDMAN:

23 Q. This was the evaluation you completed for Dr. Artunduaga.

24 That's right?

25 A. Correct.

Becker - cross

1232

1    Q.  And you marked NA or not applicable on three of the

2    competencies.  I think there's one on the first page, and I

3    believe, maybe two on the second.

4            MS. HYNDMAN:  If we could look at that.

5    BY THE WITNESS:

6    A.  Yes.

7    BY MS. HYNDMAN:

8    Q.  Okay.

9            And is it fair to say, Dr. Becker, that apart from

10   these three where you said it was not applicable, that you

11   rated her on competencies that you, yourself, did not directly

12   observe?

13   A.  I wouldn't say that.

14   Q.  You wouldn't say that.  Okay.

15           MS. HYNDMAN:  If we could look at Joint Exhibit 82,

16   please.

17           And if we could look at the e-mail that you sent --

18   the first page, please, Jamie.

19   BY MS. HYNDMAN:

20   Q.  The e-mail that you sent Dr. Park and Dr. Song.  In that

21   e-mail, you tell Dr. Park and Dr. Song that:  She feels that I

22   should have marked NA in several areas where she feels she was

23   not directly observed.

24           You say that, correct?

25   A.  That's correct.

Becker - cross

1233

 1    Q.  Then you say --

 2    A.  I was quoting her.

 3    Q.  Pardon?

 4    A.  I was quoting her.

 5    Q.  Okay.

 6            MS. HYNDMAN:  Move to strike that last part of that

 7    answer.  It's not responsive.

 8            THE COURT:  I will strike it.

 9            The jury should disregard it.

10    BY MS. HYNDMAN:

11    Q.  And, then, you say:  I have received informal feedback

12    from the resident on our service and NP.

13            That's nurse practitioner; isn't that right?

14    A.  That's correct.

15    Q.  Okay.

16            And, then, you say you observed interactions with

17    others, including our fellow, and had discussions with other

18    attendings and that is how my evaluation was derived.

19            What other attendings did you talk to?

20    A.  Dr. Thistlethwaite.

21    Q.  And, so, when you talked to Dr. Thistlethwaite about

22    his -- about observations, those were his observations,

23    correct?

24    A.  No.

25    Q.  Those were your observations?

                                Becker - cross
                                                                    1234

 1   A.  Yes.
 2   Q.  Okay.
 3          And, Dr. Becker, can you tell the jury which of the
 4   competencies on your evaluation that you did were based on
 5   informal feedback from Dr. Fleming?
 6          MS. HYNDMAN:  If could you go back to that.
 7          MR. JEPSON:  Could we have it back in front of her?
 8          THE COURT:  I am sorry, I did not hear you, Mr.
 9   Jepson.
10          MR. JEPSON:  I said, could we have it back --
11          MS. HYNDMAN:  Sure.
12          MR. JEPSON:  -- in front of her?
13          THE COURT:  Okay.
14          For the record, do you want to just clarify what
15   exhibit you are putting back up.
16          MS. HYNDMAN:  Joint Exhibit 65.
17          THE COURT:  Thank you.
18          MS. HYNDMAN:  Thank you.
19   BY MS. HYNDMAN:
20   Q.  So, which of these competencies, Dr. Becker, were based on
21   informal feedback from Dr. Fleming?
22   A.  We have discussions and we talk about evaluations in
23   residents and how we can improve their performance or how
24   they're doing on a service.  And, so, if you're asking me to
25   point out each specific one after which I had a conversation,

Becker - cross

1235

 1   I'm unable to do that.

 2   Q.  Okay.

 3          So, you don't know?

 4   A.  That's correct.

 5   Q.  Okay.

 6          And you don't know which of these competencies was

 7   based on informal feedback from Dr. Olaitan, correct?

 8   A.  Could you please clarify what you're getting at?

 9   Q.  Same question:  Which of these competencies were based on

10   informal feedback from Dr. Olaitan?  Which of these ratings?

11   A.  You want me to enumerate them?

12   Q.  Yes, I do.

13   A.  All of them then.

14   Q.  All of them?

15   A.  And then I would -- I would change my testimony about with

16   Irma, as well.

17          MS. HYNDMAN:  Move to strike.  There's no question

18   pending, your Honor.

19          THE COURT:  I think she was still trying to answer

20   the --

21          MS. HYNDMAN:  She was trying to change --

22          THE COURT:  -- second --

23          MS. HYNDMAN:  -- her testimony from her previous

24   question.

25          THE COURT:  I will strike that part.

Becker - cross

1236

1        You can clarify, if you want, on redirect.

2        But I am not sure she was done with answering the

3   first part.  You might want to inquire.

4        MS. HYNDMAN:  The question was --

5        THE COURT:  You can inquire of her.  I am not sure if

6   she was done with her first answer.

7   BY MS. HYNDMAN:

8   Q.  Were you done with answering the question of which of

9   these competencies were based on informal feedback from

10  Dr. Olaitan?

11  A.  No, I'm not done.

12  Q.  What else would you like to say?

13  A.  I'd like to say that we have conversations about all of

14  these.  We don't enumerate each individual aspect.  So, that

15  is the nature of my inability to answer the question directly.

16  Because we don't enumerate things in a conversation.  I don't

17  take the sheet of paper and have a conversation with a person

18  about this.

19       However, I've been an educator for many years,

20  actually have a surgical education research fellowship, and am

21  quite able to have a discussion about these competencies with

22  a team in general.  But you asked me to enumerate, and that, I

23  cannot do.

24       MS. HYNDMAN:  Move to strike the portion of the

25  answer that talks about how she goes about doing this.  The

Becker - cross

1237

1    question specifically was which happens --

2              THE COURT:  I will strike it.

3              The jury should disregard.

4              You can follow up if you want.

5    BY MS. HYNDMAN:

6    Q.  Now, you told Dr. Park that you rated Dr. Artunduaga

7    consistently with how you rate all other residents; isn't that

8    right?

9    A.  That's correct.

10   Q.  Okay.

11             And you've had other circumstances, if I understand

12   right, where you worked with residents for only a short period

13   of time, right?

14   A.  That's correct.

15   Q.  Let's look at Plaintiff's Exhibit No. 65.

16             MS. HYNDMAN:  This is not in evidence yet, your

17   Honor.

18             THE COURT:  Is there any objection to it?

19             MR. JEPSON:  Yes, there is, your Honor.

20             THE COURT:  Okay.  Go ahead and put it up and I will

21   take a look.

22             MS. HYNDMAN:  Jamie, Plaintiff's Exhibit 65, please.

23   Oh, got it.

24             THE COURT:  Okay.

25             MR. JEPSON:  They all look the same.

Becker - cross

1238

1    THE COURT:  All right.  You are going to have to lay

2  a foundation.  I am not sure if you are seeking to admit this

3  or using it to impeach.

4    MS. HYNDMAN:  I'm seeking to admit it on the grounds

5  that it goes to the question of whether she was consistent in

6  her evaluation with Dr. Artunduaga.

7    MR. JEPSON:  Your Honor, this is a completely

8  different resident.  It's a general surgery resident, a

9  different academic year.  Just throwing this up there has no,

10 in our view, probative value.  Indeed, the prejudicial value

11 outweighs it, and it's irrelevant and immaterial.

12    MS. HYNDMAN:  He can certainly cross -- he can

13 certainly ask her all those questions on redirect, your Honor.

14    THE COURT:  I am going to sustain the objection.

15 Given that it is a different resident, different rotation,

16 different part, and given the Court's prior rulings and 403, I

17 am sustaining.

18 BY MS. HYNDMAN:

19 Q.  Now, if we could look at your -- let's look back again at

20 Joint Exhibit 65.

21    MS. HYNDMAN:  And if we could look at the second

22 page.

23 BY MS. HYNDMAN:

24 Q.  And, Dr. Becker, you testified on direct examination that

25 there were two instances, one with -- that involved the

Becker - cross

1239

 1   administration of antibiotics and one that involved an order

 2   for steroids that had not been entered that Dr. Artunduaga

 3   failed to do while she was on your rotation, correct?

 4   A.   That's correct.

 5   Q.   But you didn't indicate any of that in your evaluation,

 6   did you?

 7   A.   No, I did not.

 8   Q.   And you did say at the end, which Mr. Jepson didn't show

 9   the jury, that strong mentorship and tutoring will likely

10   help, as Maria's certainly making a good effort.

11          You believed that at the time, didn't you?

12   A.   I did.

13   Q.   Now, you testified that you had this conversation with Dr.

14   Artunduaga on Saturday in the ICU and that --

15          MR. JEPSON:   I think it was Sunday, Cindy.

16          THE WITNESS:   I think it was Sunday morning.

17          MS. HYNDMAN:   It was Sunday morning?

18          MR. JEPSON:   Sorry.

19   BY MS. HYNDMAN:

20   Q.   Dr. Becker, do you recall writing -- submitting a

21   declaration in this case at some point in time?

22   A.   Yes.

23       (Document tendered to the Court and witness.)

24   BY THE WITNESS:

25   A.   Oh, I made a mistake then.   Because this -- my declaration

Becker - cross

1240

1    said Saturday.  It's obviously been several years.

2    BY MS. HYNDMAN:

3    Q.  Okay.

4              So --

5    A.  And I'm a transplant surgeon --

6    Q.  -- which was the mistake?

7    A.  -- so Saturdays and Sundays get mixed up.

8    Q.  Which was the mistake?  Your testimony today or your

9    testimony in the declaration?

10   A.  I would say -- think that my declaration is correct

11   because this was in more proximate time to my testimony today.

12   I apologize.

13   Q.  So, it was on Saturday.  All right.

14             And you testified that Dr. Artunduaga cornered you in

15   the ICU, correct?

16   A.  Yes.

17   Q.  And you felt that the communication she had with you was

18   inappropriate?

19   A.  Yes.

20   Q.  You wrote an e-mail the next day to Dr. Song and Dr. Park?

21   A.  Yes.

22   Q.  And in that e-mail --

23             MS. HYNDMAN:  If we could look at it again, Joint

24   Exhibit 82, please, Jamie.

25   BY MS. HYNDMAN:

Becker - cross

1    Q.  You don't say anything about that conversation you had

2    with Dr. Artunduaga in the ICU in this e-mail, do you?

3    A.  I do not.

4    Q.  And you said it was one of the most uncomfortable

5    conversations you ever had with a medical student or resident;

6    is that right?

7    A.  That's correct.

8    Q.  Have you ever had a situation where you had a resident who

9    was on probation who was going through one of your rotations?

10   A.  I wouldn't know that, but probably I have in the past.  I

11   didn't know at the time that she was on probation.

12   Q.  She told you in that conversation, didn't she?

13   A.  She did, but that was after my evaluation was already --

14   Q.  I was asking you about the conversation, Dr. Becker, not

15   about your evaluation.  At the time of the conversation, she

16   told you that she was on probation, didn't she?

17   A.  That's correct.

18   Q.  Now, you don't mention in this e-mail to Dr. Song and

19   Dr. Park it was one of the most uncomfortable conversations

20   you ever had with a resident, did you?

21   A.  That's correct.  That was not the nature of the -- that

22   was not the nature of the e-mail.  The e-mail was copied to

23   Dr. Artunduaga.  I did not feel that that was an appropriate

24   thing to enter into the e-mail.  I did what Dr. Artunduaga

25   asked me to do, which was to say that she wanted to appeal my

Becker - redirect

1242

1    evaluation.  I felt that her behavior was irrelevant to this

2    e-mail.

3            MS. HYNDMAN:  Move to strike, your Honor, everything

4    after the answer "Yes."

5            THE COURT:  I will strike it.

6    BY MS. HYNDMAN:

7    Q.  You never had a conversation with Dr. Song about Dr.

8    Artunduaga, did you?

9    A.  No, not that I recall.

10   Q.  And you never told him of any of your impressions of Dr.

11   Artunduaga other than what was in your evaluation or what was

12   in this e-mail, Joint Exhibit 82; isn't that correct?

13   A.  Not that I recall.

14           MS. HYNDMAN:  That's all I have.

15           THE COURT:  Redirect.

16           MR. JEPSON:  Just a couple of questions.

17           Let's go back to Joint Exhibit 65, please.

18                         REDIRECT EXAMINATION

19   BY MR. JEPSON:

20   Q.  Now, you were asked some questions about which particular

21   items on this evaluation you would have received feedback from

22   Drs. Fleming and Olaitan.

23           Do you recall that testimony?

24   A.  Yes, I do.

25   Q.  Aside from that feedback, do you believe that you had

Becker - redirect

1243

1    enough personal observation from rounding with Dr. Artunduaga

2    to put the ratings that you did here?

3    A.  Yes.

4    Q.  So, these ratings are based not only on whatever feedback

5    you had received from the fellow and the resident, but also

6    your personal observation and interaction; is that correct?

7             MS. HYNDMAN:  Objection.  Leading.

8             THE COURT:  Sustained on leading.

9    BY MR. JEPSON:

10   Q.  What are these items, your ratings, based on?

11   A.  The ratings are based on direct observations, feedback to

12   clarify.  And the amount of rounding and the exposure is, you

13   know, not -- not that different than any -- pretty much the

14   same as every resident.

15   Q.  Okay.

16             And you indicated that you rounded with Dr.

17   Artunduaga, correct?

18   A.  That's correct.

19   Q.  And with respect to an intern on the transplant service,

20   is that typically the kind of direct experience and exposure

21   you have to the intern?

22   A.  Yes.

23   Q.  Transplant patients, are they, would you describe them as

24   very sick or not so sick or --

25             MS. HYNDMAN:  Objection.  Beyond the scope of cross.

                          Millis - direct
                                                            1244

 1              THE COURT:  Sustained.

 2              MR. JEPSON:  Okay.  We don't have to go there.

 3   BY MR. JEPSON:

 4   Q.  Finally --

 5              MR. JEPSON:  That's it.  No further questions.

 6              THE COURT:  Recross?

 7              MS. HYNDMAN:  No, thank you, Judge.

 8              THE COURT:  Thank you, Doctor.  You may step down.

 9        (Witness excused.)

10              THE COURT:  Please call your next witness, Mr. Jepson

11   or Ms. Hall.

12              MS. HALL:  Dr. Michael Millis.

13              MR. JEPSON:  I'll go get him.

14        (Brief pause.)

15         JAMES MICHAEL MILLIS, DEFENDANT'S WITNESS, SWORN

16                        DIRECT EXAMINATION

17   BY MS. HALL:

18   Q.  Good morning, Doctor.  Could you please state your name

19   for the jury.

20   A.  James Michael Millis.

21   Q.  Are you currently affiliated with the University of

22   Chicago Medical Center?

23   A.  Yes.

24   Q.  What is your position?

25   A.  I'm professor of surgery, vice chair of global surgery.

Millis - direct

1245

1    Q.   And where did you go to medical school, Dr. Millis?

2    A.   I went to medical school at the University of Tennessee.

3    Q.   Did you complete a residency thereafter?

4    A.   I did.

5    Q.   Where at?

6    A.   University of California Los Angeles.

7    Q.   And did you do any additional research training or

8    fellowship after residency?

9    A.   Yes.

10   Q.   For how long?

11   A.   Two years of a research fellowship and two years of a

12   clinical fellowship.

13   Q.   How long have you been with UCMC?

14   A.   Since 1994.

15   Q.   And since you came to UCMC, have you worked on a

16   particular service?

17   A.   The transplant service the whole time.

18   Q.   That's part of the Department of Surgery, correct?

19   A.   Yes.

20   Q.   And what type of patients do you specialize in?

21   A.   I primarily see patients with liver disease, both

22   pre-transplant, patients with liver tumors, as well as taking

23   care of patients post-transplant and, obviously, doing the

24   operations.

25   Q.   What was your title in 2011 and 2012?

Millis - direct

1246

1   A.   Professor of surgery and chief of the section of

2   transplantation and director of the transplant center.

3   Q.   And at that time and currently, would you work with

4   residents on your service?

5   A.   Yes.

6   Q.   Would that include first-year residents or interns?

7   A.   Yes.

8   Q.   Would you work with them in the clinic?

9   A.   Yes.

10  Q.   And on the floor?

11  A.   Yes.

12  Q.   Do you typically operate with interns?

13  A.   The complexity of my cases is such that interns are not

14  usually very involved in my cases.

15  Q.   And on your service, do interns round on patients on the

16  floor?

17  A.   Yes.

18  Q.   When does that occur?

19  A.   Usually a couple of times a day.  The first time somewhere

20  around 6:00 o'clock in the morning, when the residents and

21  physician extenders, the PAs, advanced practice nurses, et

22  cetera, round and go and see the patients and start developing

23  a tentative plan, that is then discussed with the attending.

24  And, then, the attending usually rounds sometime later in the

25  day.  2:00 o'clock-ish or so is kind of a standard time.

Millis - direct

1247

1   Q.  And it would be your practice as an attending to round at

2   that time with the intern if there was one on your service?

3   A.  Yes.  If the -- if the intern was available, yes.

4   Q.  As part of the rounds in the morning, are notes written?

5   A.  Yes.

6   Q.  Do you have an expectation generally as to when those

7   notes should be put into the system?

8   A.  So, they should be put in as early as possible.  They are

9   key communicating tools to other members of the team that are

10  taking care of the patient.  So, the notes are put in early,

11  preferably by the intern, and then ultimately modified or

12  revised and then signed by the attending later in the day.

13  Q.  And you would be the attending, when you were rounding, to

14  sign off on notes that had been written earlier in the day; is

15  that right?

16  A.  Yes, that's correct.

17  Q.  And is that the case -- or was that the case in 2011 and

18  2012, as well?

19  A.  Yes, it is.

20  Q.  Do you know Dr. Maria Artunduaga?

21  A.  Yes.

22  Q.  How?

23  A.  She was a intern on our service.

24  Q.  Do you remember the month?

25  A.  February.

Millis - direct

1248

1    Q.  Of what year?

2    A.  I don't know the year.

3    Q.  What about 2012?  Does that sound right?

4    A.  That -- I assume so.

5    Q.  Did you meet Dr. Artunduaga before she came onto your

6    service?

7    A.  Nothing formally.  I'm sure that we had crossed paths.

8    It's February.  It's, you know, quite a bit into the year at

9    that point.  So, I'm sure that we had crossed paths, but

10   nothing formally.

11   Q.  Had anyone spoken to you about her before she came onto

12   your service?

13   A.  No.

14   Q.  I want to go back to a question I forgot to ask you.

15          For purposes of rounding, are you typically rounding

16   on your service with an intern every week of the month?

17   A.  So, the transplant service works a little bit different

18   than many of the other surgical services in that we assign an

19   attending to cover the service.  The transplant service is

20   kind of divided into a liver service and a kidney and

21   kidney-pancreas service, and we have an attending for each of

22   those services.  The house staff -- the residents, interns,

23   advanced practice nurses, et cetera -- take care of all of

24   those patients, and then the attending is responsible for

25   either the kidney, kidney-pancreas service or the liver

Millis - direct

1249

```
 1    service.
 2           And that is done usually -- every week there may be a
 3    rotation or, depending on if people are out of town, you
 4    could, you know, do two weeks or whatever that month.
 5    Q.  So, your more direct exposure with an intern would be for
 6    one week or two weeks, depending on the month?
 7    A.  That's correct.
 8           MS. FRANKLIN:  Objection.  Leading.
 9           THE COURT:  Sustained on leading.
10    BY MS. HALL:
11    Q.  How much time generally would you have exposure to the
12    intern?
13    A.  So, usually one to two weeks a month.
14    Q.  And do you know Dr. David Song?
15    A.  Yes.
16    Q.  Did Dr. David Song ever speak with you about Dr.
17    Artunduaga while she was an intern?
18    A.  No.
19    Q.  Do you know Dr. Julie Park?
20    A.  Yes.
21    Q.  Did Dr. Julie Park ever speak with you about Dr.
22    Artunduaga while she was an intern?
23    A.  No.
24    Q.  And did you work with Dr. Artunduaga while she was on the
25    service in February of 2012?
```

Millis - direct

1250

1    A.  Yes, I did.

2    Q.  Did you have the opportunity to observe her performance?

3    A.  Yes.

4    Q.  Did you have, in your opinion, the same amount of exposure

5    to Dr. Artunduaga as you would with any other intern who

6    rotated on your service for a month?

7    A.  Yes.

8              MS. FRANKLIN:  Objection.  Leading.

9              THE COURT:  Sustained on leading.

10   BY MS. HALL:

11   Q.  Did you work with Dr. Artunduaga on the service?  You said

12   "Yes," correct?

13   A.  Yes.

14   Q.  And the frequency with which you worked -- work with

15   interns, is it generally the same across the months on your

16   service?

17   A.  Yes.  Usually one to two weeks a month I would be on

18   service, and I would work with the interns that are on the

19   service at that time.

20   Q.  Do you know where Dr. Artunduaga's from?

21   A.  No.

22   Q.  Did you have any discussions while she was an intern with

23   anyone about where she was from?

24   A.  Not that I recall.

25   Q.  Did anyone ever make comments to you about where she was

Millis - direct
1251

1     from, positive, negative or otherwise?

2     A.  No.

3     Q.  Did Dr. Artunduaga have an accent?

4     A.  Yes.

5     Q.  Were you able to understand her?

6     A.  I was.

7     Q.  And did anyone make any negative comments to you about the

8     fact that she had an accent?

9     A.  No.

10    Q.  Did Dr. Artunduaga ever complain to you that she was being

11    mistreated because of where she's from or because she has an

12    accent?

13    A.  Not that I recall.

14    Q.  Did you evaluate Dr. Artunduaga's performance while she

15    was on your service?

16    A.  I did.

17    Q.  And is one of your responsibilities to evaluate interns

18    while they're on your service?

19    A.  That is one of my responsibilities, yes.

20    Q.  And has that been the case since 1994, when you came to

21    UCMC?

22    A.  Yes, it has been.

23    Q.  I'd like to show you what's been marked as Defendant's

24    Exhibit 110, please.

25              MS. HALL:  It's not in evidence.

Millis - direct

1252

1    THE COURT:  Is there any objection to its admission,

2  Ms. Franklin?

3    MS. FRANKLIN:  No, your Honor.

4    THE COURT:  It is admitted.

5    (Defendant's Exhibit No. 110 received in evidence.)

6    MS. HALL:  And if you can please, Michael, blow up

7  the bottom e-mail on Defendant's Exhibit 110.

8  BY THE WITNESS:

9  A.  Yes, I see that.

10  BY MS. HALL:

11  Q.  Dr. Millis --

12    THE COURT REPORTER:  Excuse me, Ms. Hall.

13    MS. HALL:  Oh, it's not showing.  Let's show the

14  jury.

15  BY MS. HALL:

16  Q.  Dr. Millis, is this an e-mail that you received from Dr.

17  Artunduaga on February 23rd, 2012?

18  A.  Yes, it is.

19  Q.  And in the first sentence, she says:  Although my month

20  isn't over yet, I wanted to thank you for a wonderful

21  rotation.

22    Right?

23  A.  Yes.

24  Q.  And she also wrote:  I have learned a great deal from you

25  and the other members of the team.  It was a delight to be a

Millis - direct

1253

1   part of the transplant team.

2           Correct?

3   A.  Yes.

4   Q.  And, then, in the next sentence, she says:  Also, I was

5   wondering if you could get some input from Dolamu and Irma

6   before completing my evaluation.

7           Who is Dolamu?

8   A.  He was the fellow at the time.

9   Q.  And who is Irma?

10  A.  She was the senior resident.

11  Q.  And in the next sentence, she writes:  Last year my

12  program director, Dr. David Song, decided to put me on

13  probation because I was not performing at the level of a

14  plastic surgery resident.  He is going to take into account

15  your evaluation.  Therefore, I am trying to get a fair

16  assessment of my skills.

17          Before you received this e-mail, were you aware that

18  Dr. Artunduaga was on probation?

19  A.  No.

20          MS. HALL:  Michael, can we go back to the top of the

21  e-mail.

22  BY MS. HALL:

23  Q.  Dr. Millis, is this your response to Dr. Artunduaga from

24  February 23rd?

25  A.  Yes, it is.

Millis - direct

1254

1    Q.  And you wrote:  Maria, yes, I will get input from many

2    members of the team before completing your evaluation.  I am

3    glad you had a good experience on our service.

4            Right?

5    A.  That is correct.

6    Q.  Who were you referring to when you said that you would get

7    input from many members of the team?

8    A.  So, the transplant service has many members that interact

9    with the residents, including an advanced practice nurse,

10   nurse coordinators, social works -- social workers, nutrition,

11   et cetera.  And at times I get input from some of those

12   members before I write my evaluation.

13   Q.  And in the case of Dr. Artunduaga's evaluation, did you

14   ask any team members about their observations of her

15   performance on the service?

16   A.  I asked the fellow and the -- Christine Trotter, the

17   advanced practice nurse.

18   Q.  Okay.

19           And do you recall a specific conversation with either

20   of them?

21   A.  No.

22   Q.  Do you recall generally what the conversation was with the

23   advanced practice nurse Christine Trotter?

24   A.  The general -- from both of them, confirmed my experience

25   and observation of Maria.

Millis - direct

1255

1   Q.  And what was that?

2   A.  That she had some difficulty in time management through

3   the course of the rotation.  Specifically, the things that I

4   saw most pointedly were notes being entered into the system

5   way later than is normal for an intern.  And that usually is

6   indicating that the patient -- that the resident is not

7   managing their time appropriately.

8   Q.  What is the issue with -- or is there an issue with notes

9   being entered way later than normal, as you said?

10  A.  So, as I mentioned earlier, the notes are a critical part

11  of the communication of the team for these very, very sick

12  patients.  And having the note in there early so that the rest

13  of the team members can understand what the general plan for

14  the day is, as well as plan for the week and after, is very

15  important for the proper management of these patients.  And if

16  the notes are not getting in until 4:00, 5:00, 6:00 o'clock in

17  the evening, then that communication obviously is lacking to

18  the other team members and, you know, the ability of the

19  attending to then modify and get a modified plan out there is

20  also delayed.

21  Q.  And Dr. Artunduaga, in her e-mail, also asked you to speak

22  with Irma, who I believe you said was another resident on the

23  service?

24  A.  Yes.

25  Q.  Did you speak with Dr. Fleming -- Irma Fleming -- about

Millis - direct

1256

1   Dr. Artunduaga's --

2   A.  Not that I --

3   Q.  -- performance?

4   A.  -- recall, no.

5   Q.  And is there a reason you would not have done that?

6   A.  Yeah.  I don't usually ask other residents to provide

7   input on other residents.  There can be a lot of other issues

8   that influence how a resident speaks about another resident.

9   They work closely together for many years.  And it just

10  doesn't seem appropriate to get that -- that input.

11  Q.  Did you speak with anyone else, as far as you can recall,

12  about Dr. Artunduaga's evaluation before you completed it?

13  A.  No.

14          MS. HALL:  Michael, would you please pull up Joint

15  Exhibit 67.

16  BY MS. HALL:

17  Q.  Dr. Millis, Michael will pull up the first page a little

18  more clearly, but do you recognize this as being your

19  evaluation of Dr. Artunduaga from February of 2012?

20  A.  Yes.

21  Q.  And when you evaluated her, were you honest in your

22  assessment?

23  A.  Yes.

24  Q.  Does this evaluation reflect your accurate -- the accurate

25  assessment that you had of her performance at the time?

1   A.  Yes.

2         MS. HALL:  Michael, if you could please pull up on

3   Page 1 the "Post-Op Care" section under "Clinical Skills."

4   BY MS. HALL:

5   Q.  For purposes of post-op care, Dr. Millis, what are you

6   evaluating here when you're looking at an intern's

7   performance?

8   A.  Whether they're, as it says in the evaluation form,

9   including recognition of treatment of complications.

10         So, recognizing and documenting and communicating any

11  problems that the patient may have in their post-operative

12  course.

13  Q.  And, then, if we could look at the second page where it

14  says, documentation of practice activities, what are you

15  evaluating in that category, Dr. Millis?

16  A.  I'm sure that was specifically referring to the issue of

17  the notes and being late in documenting the notes.

18  Q.  And you marked her as "could improve" in that category?

19  A.  That's correct.

20         MS. HALL:  And, then, let's pull up the overall

21  comments at the bottom, please, Michael.

22  BY MS. HALL:

23  Q.  And these are your overall comments regarding Dr.

24  Artunduaga, correct?

25  A.  Yes.

Millis - direct

1258

```
 1   Q.  And you wrote here:  Maria is struggling as a resident.
 2           Did you believe that to be true at the time?
 3   A.  I did.
 4   Q.  And you wrote:  She is trying very hard.
 5           You believed that to be true, as well?
 6   A.  Yes.
 7   Q.  (Reading):  I understand that this might be a result of
 8   her being on probation.  She informed me of this status.
 9           Is that correct, that you learned about it from her?
10   A.  That is correct.
11   Q.  And, then, you wrote:  At times it seemed like she was
12   trying too hard to get in front of attendings to demonstrate
13   her value, skills, et cetera.
14           Is that something you observed on your own?
15   A.  Yes.
16   Q.  (Reading):  She had difficulty with time management on our
17   service.
18           Is that something that you observed?
19   A.  Yes.
20   Q.  You wrote:  We were notified of two incidences in which
21   she broke resident work hour rules, neither of which were
22   because the service was too busy or that she was the only one
23   who was available to do the work.
24           What are you referring to or what were you referring
25   to here when you referenced resident work hour rules?
```

Millis - direct

1259

A.   So, there are -- unlike when I trained, there are now work

hour rules in which the residents -- and I can generally

provide the guidelines.  I cannot give the specifics because

they change and I'm not in charge of a residency, never have

been.  So, I've never had to worry about the specifics of the

rules.

        In general, residents are not allowed to work more

than 80 hours a week.  And there's also time limits per day of

how many hours they can work.

        And, so, they -- when they exceed those rules, it

puts residencies -- in fact, the whole residency -- in

jeopardy.  And, so, we have to -- all of us have to support

those 80-hour work rules.  And if residents -- and it's really

-- the primary responsibility is for the resident to

understand what the rules are and the resident understand how

much they've worked that week; and, if there are issues, need

to bring those issues forward to either the -- their senior-

level residents, the fellows and, if necessary, the attending

and program directors, if they're not getting a reasonable

response from the members that they're talking to.

Q.   Dr. Millis, you wrote:  We were notified of two incidences

in which she broke resident work hour rules.

        Do you recall where that notification came from?

A.   I don't recall.

Q.   If we can -- and you just then described the two

Millis - direct

1260

1    incidences.

2          MS. HALL:  And, then, if we can -- the last sentence,

3    "The time" at the bottom, Michael.  So, the sentence starts

4    with "The time" and then it continues.

5    BY MS. HALL:

6    Q.  (Reading):  The time management issues were also a chronic

7    problem, as frequently the notes were not in the computer to

8    co-sign until very late in the day.

9          You told us about that, right?

10   A.  Yes.

11   Q.  You wrote:  This improved as the rotation progressed, but

12   was a consistent problem.

13         And is that true, as well?

14   A.  Yes.

15   Q.  And, then, you wrote:  Maria is a capable resident, but

16   needs to have a slower-paced progression than is typical of a

17   surgical resident at the University of Chicago.

18         Was that your honest assessment of Dr. Artunduaga,

19   Dr. Millis?

20   A.  Yes.

21   Q.  Did any of your criticisms regarding Dr. Artunduaga have

22   to do with the fact that she had an accent?

23         MS. FRANKLIN:  Objection.  Leading.

24         THE COURT:  Sustained.

25         Rephrase.

Millis - direct

1    BY MS. HALL:

2    Q.  Did you take anything into account other than Dr.

3    Artunduaga's performance when completing this evaluation?

4    A.  No.

5    Q.  Dr. Millis, I want to show you what's been marked as

6    Defendant's Exhibit 135.

7             MS. HALL:  And it's not in.

8             MS. FRANKLIN:  No objection.

9             THE COURT:  I will admit it.

10        (Defendant's Exhibit No. 135 received in evidence.)

11            MS. HALL:  And, Michael, we can go to the second

12    page, please.  Pull up that bottom e-mail.

13    BY MS. HALL:

14    Q.  Dr. Millis --

15            MS. HALL:  Could you, Michael, add the date, please.

16    BY MS. HALL:

17    Q.  Dr. Millis, do you recognize this as an e-mail that you

18    received from Dr. Artunduaga on March 15th, 2012?

19    A.  Yes.

20    Q.  And she wrote here:  Hi Dr. Millis, I was wondering if

21    you've had time to get some input from Dolamu/Irma in regards

22    to my performance during the month of February.

23            Right?

24    A.  Yes.

25            MS. HALL:  And, then, the first page of the e-mail,

Millis - direct

 1  Michael, the bottom e-mail.

 2  BY MS. HALL:

 3  Q.  You wrote back on March 17th, 2012, and wrote:  Done.

 4        Right?

 5  A.  Yes.

 6  Q.  Meaning that by that time you completed the evaluation?

 7  A.  That's correct.

 8        MS. HALL:  And, then, if we can go up to the March

 9  29th e-mail, Michael.

10  BY MS. HALL:

11  Q.  So, look at the bottom of what was blown up.  Is this

12  Doctor -- an e-mail that Dr. Artunduaga sent you on March 29th

13  at 9:23 p.m., Dr. Millis?

14  A.  Yes.

15  Q.  And she wrote:  Thank you for filling my evaluation,

16  Dr. Millis.

17        And the evaluation we just looked at is the only one

18  you completed for her, right?

19  A.  That's correct.

20  Q.  And, then, Dr. Artunduaga wrote:  I agree that I should

21  have taken care of my working hours differently.  I've gotten

22  into a few uncomfortable situations like this in the past

23  because I've followed advice from other junior residents.  You

24  can have my word that it will never happen in the future.  I

25  learned my lesson, and I appreciate your honest feedback.

Millis - direct

1263

1      And, then, she wrote:  In regards to the two

2  incidents you mentioned, this is my recall of the account.

3      And the first point she refers to as an organ

4  procurement in Indiana on February 7, 2012, and she described

5  a situation here.

6      Is this one of the two instances you were referring

7  to in your evaluation?

8  A.  Yes.

9  Q.  And the first thing she writes is:  Christine called me at

10  4:15 p.m. asking me if I was available to assist a liver and

11  kidney procurement.

12      Christine, is that Christine Trotter?

13  A.  Yes, it is.

14  Q.  She was the nurse practitioner on the service?

15  A.  Yes.

16  Q.  And she said:  The patient weighed in excess of 250

17  pounds.  Therefore, Dr. Renz requested three to four people

18  assisting him.  Qi and Dolamu signed up.  I took Christine's

19  spot because she had to go home to feed her dog and she asked

20  me to do it.

21  A.  That's correct.

22  Q.  Does the explanation here given to you by Dr. Artunduaga

23  change, or would it have changed or did it change, in any way

24  your assessment of there being an issue in relation to her

25  being over hours on the service?

Millis - direct

1264

1    A.  No.  It's the resident's responsibility to police their

2    hours.  And if she was -- if this request was going to put her

3    over hours, then she had to decline.

4    Q.  And let's look at Point 2.  She wrote:  Saturday rounds

5    2-11-2012.

6           Is this the second incident of being over hours that

7    you referred to in your evaluation?

8    A.  Yes.

9    Q.  And Dr. Artunduaga wrote:  Dr. Witkowski, Nick, medical

10   student, and I rounded on everyone from 9:15 a.m. to 4:30 p.m.

11   It took longer because patient was presenting an

12   intra-thoracic bleeding and required ICU transfer where I

13   started her management under Dr. Witkowski supervision.  When

14   she was more stable, Nick and I took her downstairs to get her

15   CT AP done.  Dolamu had some family plans during the morning.

16   He was able to come until 4:00 p.m., but I was constantly

17   updating him over the phone.  I didn't sign this out to the

18   person on call because I felt I had to take care of her

19   management closely.  Once the most critical parts of our plan

20   were accomplished, I left for home.

21          Did this explanation by Dr. Artunduaga change or

22   cause you to believe that you should change anything you said

23   about her in your evaluation regarding time management?

24   A.  No.

25   Q.  Why not?

Millis - cross

1265

1   A.   Once again, for the same reason.  The residents are

2   responsible for policing their hours -- their duty hours --

3   and especially this one in which the patient was actually

4   transferred to the ICU and had another level of service,

5   another level of residents who could take care of the plan and

6   do the plan with supervising -- by the supervision of the

7   transplant attending.

8           MS. HALL:  Nothing else.  Thank you.

9           THE WITNESS:  Thank you.

10          THE COURT:  Cross-examination.

11                      CROSS-EXAMINATION

12  BY MS. FRANKLIN:

13  Q.   Good morning, Dr. Millis.

14  A.   Good morning.

15  Q.   So, we looked at your evaluation of Dr. Artunduaga.  Was

16  that the only evaluation that you prepared for her?

17  A.   That's the only one I can recall.

18  Q.   And you never talked with Dr. David Song about the

19  evaluation, did you?

20  A.   That's correct.

21  Q.   He never asked you anything about it, did he?

22  A.   Not that I recall.

23  Q.   And he never asked you anything about Dr. Artunduaga's

24  performance in general, did he?

25  A.   No.

Millis - cross

1266

1   Q.  Now, in the evaluation, there was a note that said this

2   might be the result of her being on probation.

3         Do you remember seeing that?

4   A.  Yes.

5   Q.  Okay.

6         You wrote that, right?

7   A.  Yes, I did.

8   Q.  You also discussed being notified about over-hours issues,

9   correct?

10   A.  Yes.

11   Q.  And did you say you -- who notified you, Dr. Millis?

12   A.  I said I didn't recall.  I still don't recall.

13   Q.  You didn't have any personal knowledge of Dr. Artunduaga's

14   number of hours, did you?

15   A.  No.

16   Q.  Okay.

17         Now, regarding the notes, the times the notes were

18   entered, do you remember that issue?

19   A.  Yes.

20   Q.  And you didn't personally go on the system and observe

21   what times the notes were entered, did you?

22   A.  Well, in fact, you do in general, because frequently

23   during the day as you're the attending, you check the

24   electronic medical record -- EPIC -- and you say, well, you

25   know, I'm on service, I need to sign the notes.  So, you go on

                             Millis - cross
                                                                    1267

 1   and there aren't any notes.  So, you -- you sign off and you

 2   go back a couple of hours later and you try to sign the notes

 3   again, because that's your responsibility, and the notes are

 4   still not there.

 5           So, although I didn't go in and specifically look at,

 6   oh, well, the noted was at 4:15, you pretty much know as

 7   you're an attending when the notes are getting on.

 8   Q.  And, Dr. Millis, you had seen notes being -- let me just

 9   ask a different question.

10           Dr. Millis, when a note is edited in the system, that

11   also shows up as a time in the system, correct?

12   A.  Yes.

13   Q.  Okay.

14           MS. FRANKLIN:  That's all I have.

15           THE COURT:  Redirect?

16           MS. HALL:  No.

17           THE COURT:  Thank you, Doctor.  You may step down.

18           THE WITNESS:  I'll take my water away, too.

19           THE COURT:  Thank you.

20       (Witness excused.)

21           THE COURT:  Please call your next witness.

22           MS. HALL:  Dr. Nora Jaskowiak.

23       (Brief pause.)

24           THE COURT:  Please come forward, Doctor.

25            NORA JASKOWIAK, PLAINTIFF'S WITNESS, SWORN

Jaskowiak - direct

1268

<pre>
 1                       DIRECT EXAMINATION
 2    BY MS. HALL:
 3    Q.  Good morning, Doctor.  Could you please introduce yourself
 4    to the jury.
 5    A.  I'm Dr. Nora Jaskowiak.
 6    Q.  Are you currently affiliated with the University of
 7    Chicago Medical Center?
 8    A.  I am.
 9    Q.  What is your current position?
10    A.  I'm currently an associate professor of surgery.
11    Q.  Where did you go to medical school?
12    A.  I went to Harvard Medical School.
13    Q.  And did you complete a residency thereafter?
14    A.  I did complete a residency.
15    Q.  Where?
16    A.  In general surgery at the University of California at San
17    Francisco.
18    Q.  And did you complete -- how long was your residency?
19    A.  The clinical portion of the residency was five years.
20    And, then, in the middle of that, I did two years of research
21    at the National Cancer Institute in Bethesda.
22    Q.  And do you have any additional training after that?
23    A.  I did -- after my general surgery training, I did a
24    surgical oncology clinical fellowship at the University of
25    Chicago.
</pre>

Jaskowiak - direct

1269

1   Q.   Okay.

2              And when did you actually begin as an attending

3   surgeon at the University of Chicago?

4   A.   In July of 2001.

5   Q.   And were you on a particular service in 2011 and 2012?

6   A.   I was.  I was on the Kaplan breast and endocrine surgery

7   service.

8   Q.   And at that time or currently, what is your specialty and

9   focus?

10  A.   I'm mostly focused on breast cancer and other breast

11  problems.  I do -- still do some general surgery, but I'm

12  focused on breast issues.

13  Q.   Have residents rotated through the Kaplan Service since

14  the beginning of your time at UCMC?

15  A.   Yes.  Since 2001.

16  Q.   And would that include interns?

17  A.   Yes.

18  Q.   And in what settings do you see patients on the Kaplan

19  Service?

20  A.   So, I see settings -- the patients really in three

21  settings:  In the clinic, which is the breast center; and,

22  when we have inpatients on the wards; and, then, of course, in

23  the operating room.

24  Q.   For purposes of the clinic, when was your clinic in 2011

25  and 2012?

Jaskowiak - direct

1270

1    A.  My clinic has always been on Monday mornings and all day

2    Tuesdays for breast.  And, then, at that time in 2011, 2012,

3    on every other Thursday afternoon I had a general surgery

4    clinic.

5    Q.  And for purposes of your breast clinic on Monday mornings,

6    can you average about how many patients you're seeing there

7    every Monday morning?

8    A.  Generally, about 20 to 22 patients on a Monday morning.

9    Q.  And what about your full-day clinic on Tuesday -- or

10   Tuesday afternoon?

11   A.  Generally, somewhere between 36 and 42 patients.

12   Q.  And do you typically and did you typically work with

13   interns in the breast clinic when you were -- in 2011 and

14   2012?

15   A.  I did.

16   Q.  And what about on your general surgery clinic, as well?

17   A.  I did.

18   Q.  And can you estimate for us the number of patients on the

19   general surgery clinic when you had it, back in 2011, 2012?

20   A.  Much, much lighter in the -- usually five or six patients.

21   Q.  You also obviously treat patients in the operating room?

22   A.  I do.

23   Q.  And your more complex cases, who are you working on those

24   with?

25   A.  For the more complex patients, usually a fellow or a

Jaskowiak - direct

1271

1     senior-level resident.

2     Q.   In your experience, is it the intern's primary duty to

3     operate?

4     A.   Not primarily to operate.  Interns generally take -- see

5     patients in clinic, take care of patients on the floor and

6     also come to the operating room.

7     Q.   I want to focus your attention on the time period of June

8     through about August of 2011.

9              Do you recall who the attendings were on your service

10    in July of 2011?

11    A.   In July, the attendings were Dr. Kaplan, Dr. Angelos,

12    myself, and Dr. Chhablani.

13    Q.   And Dr. Chhablani is also a breast surgeon, correct?

14    A.   Correct.

15    Q.   And was there a fellow on the service at that time?

16    A.   There was a fellow during July.

17    Q.   And what was that fellow's name?

18    A.   Dr. Haijin In.

19    Q.   Was there an intern on the service at the time?

20    A.   There was.

21    Q.   Who was that?

22    A.   Dr. Artunduaga.

23    Q.   And, then, in August of 2011, was the attending makeup

24    generally still the same?

25    A.   Yes, with the addition of Dr. Groggin -- Dr. Ray Groggin.

Jaskowiak - direct

1272

1   And I think right around that time, Dr. Swati Kulkarni was

2   just starting.

3   Q.  And was there a fellow or a senior resident on the service

4   at that time?

5   A.  There was a chief resident, John Seal.

6   Q.  Did you work with Dr. Seal that month?

7   A.  I did.

8   Q.  Do you trust his judgment?

9   A.  I do.

10  Q.  Which residency program was Dr. Artunduaga a part of?

11  A.  She was part of the plastic surgery residency.

12  Q.  And you're familiar with Dr. David Song then, as well?

13  A.  I am.

14  Q.  When did you first meet Dr. Artunduaga?

15  A.  I met Dr. Artunduaga at the new intern cocktail party,

16  which is generally held the night before the new interns

17  start, at the end of their orientation.

18  Q.  Did you have any one-on-one conversations with Dr.

19  Artunduaga at that party?

20  A.  I did.

21  Q.  What do you recall being said by each of you during that

22  discussion?

23  A.  Well, our initial conversation regarded our glasses.  At

24  the time, we had extremely similar glasses, and we talked

25  about that and joked about that.  And, then, we talked

Jaskowiak - direct

1273

1    about -- a little bit about her background, where she came

2    from and what she had been doing leading up to starting

3    plastic surgery residency.

4    Q.  And during that discussion, did she tell you where she was

5    from?

6    A.  She did.

7    Q.  And where --

8    A.  She told me that she was from Colombia.

9    Q.  And did she discuss with you where she had gone to medical

10   school?

11   A.  We didn't discuss where she went to medical school.

12   Q.  Does Dr. Artunduaga have an accent?

13   A.  She does have an accent or she did at the time.

14   Q.  And you spoke with her at that initial conversation,

15   right?

16   A.  Yes.

17   Q.  And, then, you also worked with her in July and August of

18   2011, correct?

19   A.  From -- starting at from June 24th and then through the

20   end of August.

21   Q.  Did Dr. Artunduaga's accent interfere with your ability to

22   understand her?

23   A.  It did not.

24   Q.  Did she ever complain to you that anyone at UCMC was

25   mistreating her or discriminating against her because she has

Jaskowiak - direct

1274

1  an accent?

2  A.  No, she did not.

3  Q.  Did anyone make any negative comments to you about the

4  fact that she had an accent or about her accent itself?

5  A.  No.

6  Q.  At any point in time, did anyone make any negative

7  comments to you about the fact that Dr. Artunduaga's from

8  Colombia?

9  A.  No.

10  Q.  Or about where she went to medical school?

11  A.  No.

12  Q.  Did you ever observe anyone mistreating her in any way?

13  A.  No.

14  Q.  At any time did Dr. Artunduaga complain to you that she

15  was being mistreated because she's from Colombia?

16  A.  No.

17  Q.  Or because of her cultural background?

18  A.  No.

19  Q.  Did she ever tell you that Dr. In was mistreating her or

20  treating her poorly, anything along those lines, because of

21  her cultural background?

22  A.  No.

23  Q.  Or because of where she had her medical training?

24  A.  No.

25  Q.  Or because of the fact that she had an accent?

Jaskowiak - direct

1275

1  A.  No.

2  Q.  When you worked with Dr. Artunduaga from June 24th through

3  the end of August of 2011, did you have the opportunity to

4  observe her performance in the clinic?

5  A.  I did.

6  Q.  And in the OR?

7  A.  Yes.

8  Q.  And on rounds?

9  A.  Yes.

10  Q.  And do you typically work -- she was a new intern at that

11  time, right?

12  A.  Brand-new intern.

13  Q.  Within the first couple months of her residency?

14  A.  Just having started, right.

15  Q.  Did you have any concerns with Dr. Artunduaga's

16  performance while she was on your service?

17  A.  I did.  I had serious concerns.  They started a few weeks

18  into her time on the service --

19  Q.  Let me ask you some questions, okay?

20  A.  Okay.

21  Q.  Can we show you what's been marked as Joint Exhibit 11,

22  please.

23          MS. HALL:  And, Michael, could you please go to the

24  second page and pull up the e-mail there.

25  BY MS. HALL:

Jaskowiak - direct

1276

1    Q.   Dr. Jaskowiak, do you recognize this as an e-mail that you

2    sent to Dr. David Song on August 4th of 2011?

3    A.   I do.

4    Q.   By the time you sent this e-mail, about how long had you

5    been working with Dr. Artunduaga?

6    A.   At that point, it had been about five to six weeks.

7    Q.   And you wrote here:  David, I know you are away and this

8    is nothing major, but there are definitely issues with Maria

9    Artunduaga that need to be addressed and likely the sooner,

10   the better.  I wonder if when you return we can discuss these

11   issues and figure out a plan to help direct her better, as we

12   are all dedicated to her success here.

13        Was that true?

14   A.   Yes.

15   Q.   And David is Dr. David Song?

16   A.   Correct.

17        MS. HALL:  And if we can go to the first page of that

18   e-mail.  The bottom e-mail, please, Michael.

19   BY MS. HALL:

20   Q.   Dr. Song wrote you back here, right?

21   A.   Yes.

22   Q.   And he said:  Can you -- I think it's supposed to be

23   "give" -- me a brief synopsis, correct?

24   A.   Correct.

25        MS. HALL:  And, then, Michael, if you could highlight

Jaskowiak - direct

1    that top e-mail.

2    BY MS. HALL:

3    Q.  And, Dr. Jaskowiak, why were you sending these e-mails to

4    Dr. Song specifically?

5    A.  I was sending them to Dr. Song because he was, at the

6    time, the program director for the general surgery -- I'm

7    sorry, for the plastic surgery residency.  So, therefore,

8    Maria Artunduaga fell under his responsibility.

9    Q.  And in this e-mail that you wrote to Dr. Song on August

10   4th of 2011, you were describing the issues that you believed

11   existed with Dr. Artunduaga, correct?

12   A.  Correct.

13   Q.  And the description of those issues -- which we'll go

14   through -- that you put in this e-mail, were those based on

15   your own observations?

16   A.  They were.

17   Q.  Point No. 1, you wrote:  Something cultural, like she just

18   does not fully understand what is meant when certain things

19   are asked of her or she is asked to do something.

20          What is it that you had observed -- or had you

21   observed anything that led you to make this comment?

22   A.  Right.  There were many tasks.  The interns are constantly

23   being asked to do things and given tasks, and often things are

24   stated, you know, very briefly.  And, then, it just was the

25   case that things -- somehow Maria didn't seem to be

Jaskowiak - direct

1278

1   understanding what she was supposed to do and then, therefore,

2   things weren't getting done.

3   Q.  And you specifically wrote:  Not language, but something

4   is just understanding how things are done in the U.S. medical

5   system.

6         Why did you say "not language"?

7   A.  Because there wasn't a problem with the language at all.

8   It wasn't an issue of language or words, but an issue of just

9   the understanding of the whole -- the statements being made

10   and what was being asked of her.

11   Q.  And this issue here, were you giving her feedback on the

12   things that you didn't think she was understanding or

13   correctly carrying out?

14   A.  Yeah.  I'm sort of known for constantly giving feedback to

15   people, so it was pretty much nonstop.

16   Q.  Did you know as of this time if Dr. Artunduaga had any

17   exposure to any type of clinical rotations in the U.S. before

18   she came to UCMC?

19   A.  I wasn't aware about them.

20   Q.  Did you know at this time that she had rotated as a

21   sub-intern at any medical institution in the United States at

22   this time?

23   A.  I was --

24         MS. HYNDMAN:  Objection.  Leading.

25         THE COURT:  Sustained.

Jaskowiak - direct

1279

1     Rephrase it.

2  BY MS. HALL:

3  Q.  Did you have any knowledge at this time of her clinical

4  experience, if any, in the U.S.?

5  A.  I did not.

6     MS. HALL:  If we can look at Paragraph No. 2.

7  BY MS. HALL:

8  Q.  You wrote:  A sort of nervousness that makes her seem

9  jumpy -- very jumpy.  When you tell her or ask her to do

10  things, she immediately dives into it, even before you finish.

11  This is true in the OR and clinic and floor.

12     And is this something you had observed on your own,

13  Dr. Jaskowiak?

14  A.  Yes, in all of those settings.  Particularly, for me, in

15  the operating room and the clinic where I had the most

16  interaction with her.

17  Q.  So, can you explain what it is you saw in the OR

18  specifically that caused you to write this statement?

19  A.  Sure.  In the operating room, when I'm operating with any

20  resident, but particularly with a res- -- with an intern, I'm

21  providing a lot of, you know, constant guidance, like we're

22  going to make this incision; we're -- and I would start to

23  describe what the next step was going to be, but before I

24  could finish my statement or description, then Dr. Artunduaga

25  was already starting to do the thing.  But I hadn't finished.

Jaskowiak - direct

1280

1       And it was sort of nerve-racking to be operating on a
2   patient with someone sort of plunging ahead, especially
3   obviously at this early phase of her training.
4   Q.  And is this something you gave Dr. Artunduaga feedback on
5   as it was happening?
6   A.  As it was happening in the operating room, yes.
7   Q.  You also wrote here:  John Seal says she does not stand
8   still on rounds, that she is constantly trying to pounce on
9   the next thing.
10      And is that something Dr. Seal had told you about?
11  A.  That John had described that to me and, as well, I had
12  seen in the clinic setting the same sort of thing.  We'd start
13  to -- I or someone else would start to give her an instruction
14  about something to be done and she'd already be moving, you
15  know, towards the door, towards the phone, but not listening
16  through the whole thing.
17  Q.  For purposes of what you described you saw in the OR, do
18  you remember any occasions when there were any other
19  attendings in the OR with you when you saw Dr. Artunduaga
20  behave in that way?
21  A.  Right.  Well, there was one case that was an operation
22  that I was doing in conjunction with Dr. Song, and Dr.
23  Artunduaga was assisting us in that case and it was -- that
24  behavior occurred on that case.
25  Q.  And for purposes of Dr. Seal, the day that you sent this

Jaskowiak - direct

1281

1    e-mail was August 4th of 2011.  And he first came on the

2    service in August, right?

3    A.   True.  On August 1st.

4    Q.   And on your service, do the chief residents and the

5    interns work together a lot?

6    A.   A lot, yes.

7    Q.   And based on your experience, do you think that Dr. Seal

8    would have had enough exposure to her to make this comment by

9    August 4?

10   A.   I --

11           MS. HYNDMAN:  Objection, your Honor.  It's leading.

12           THE COURT:  Sustained.

13           Rephrase it.

14   BY MS. HALL:

15   Q.   On your service, are you able to assess resident

16   performance after working with them for a short period of

17   time, in your opinion?

18   A.   Yes.  I'd say I keep a very open mind, but immediately

19   when I start working with someone, I -- I'm assessing them,

20   you know, from the start.

21   Q.   Do you have any reason to doubt what Dr. Seal told you he

22   had observed?

23   A.   I do not.

24   Q.   In Point No. 3, you wrote:  OR technical, same issue.  She

25   starts to listen, but then dives in in a nervous, pouncing

Jaskowiak - direct

1      sort of fashion.

2             Is that something you had observed yourself?

3      A.  It is.

4      Q.  And you wrote:  No grace or beauty in her OR technique and

5      seems difficult to teach because you are not sure she is

6      really absorbing.

7             And was that your assessment of Dr. Artunduaga based

8      on your own observations?

9      A.  It was.

10     Q.  You then wrote:  She is very smart and very sweet.

11            Is that something you believed?

12     A.  Yes.

13     Q.  (Reading):  And she takes her job very seriously.

14     Example, she is the only resident to reply to my request for

15     input on the students the same day I sent the e-mail.

16            Is that something you had experienced with her?

17     A.  Yes.

18     Q.  And, then, you wrote:  Then she goes on clinic and sees a

19     patient - or then she goes and sees a patient in clinic with a

20     problem and doesn't leave a note or talk to me about it.

21            And is that something that happened while Dr.

22     Artunduaga was on your service, as well?

23     A.  That did happen.

24     Q.  And you said:  So inconsistent.

25            What did you mean by that?

Jaskowiak - direct

1283

1    A.  Well, what I meant was so comma inconsistent.  So, meaning

2    that some things she was doing a very good job at and -- in

3    terms of in this particular example, I always gather input

4    about the students from everyone who's worked with the student

5    so I can give evaluations.  And I need that feedback fast and

6    Maria provided it very quickly, and it felt great and proud

7    about it.

8         And, then, we had a patient who she saw in the breast

9    clinic and didn't leave a note, didn't talk to me about it,

10   and then I found out about it through another direction.  And,

11   so, that was very worrisome.

12   Q.  You wrote:  Hope this helps.  John Seal is our chief right

13   now, so could have some helpful insights also.  He and I were

14   almost wondering if, in a calm way, she could be given a

15   little American surgery boot camp to help her adapt.  But I

16   don't want to make her more nervous.

17        What is it that you had in mind for purposes of the

18   American surgery boot camp?

19   A.  I had this idea, John and I speaking together, just a way

20   of quickly covering the basic things, the basic, you know,

21   things that interns are asked to do:  The way that you should

22   handle phone calls from nurses and handle phone calls from

23   patients, the need for documentation even if it was quick

24   documentation.  Sort of very basic intern jobs that she could

25   be given a little course about it.

Jaskowiak - direct

1284

1   Q.  And why did you think that was appropriate for Dr.

2   Artunduaga?

3   A.  Because I felt that she was missing those skills and that

4   knowledge and that for her to succeed, it would be important

5   to get it going and get that into her, you know, knowledge

6   sphere what she could -- how she could operate.

7         MS. HALL:  One second, please.

8     (Brief pause.)

9   BY MS. HALL:

10   Q.  And for purposes of the basic things you thought this boot

11   camp might help her with, are these things that you were

12   talking to her about giving her feedback on while she was on

13   your service?

14   A.  Yes.  I mean, when -- when things were not going right, I

15   and other members of the service were trying to teach her

16   these things and trying to inform her about these things.

17   Q.  I'd like to show you what's been marked as Defendant's

18   Exhibit 13.

19         MS. HALL:  And just the bottom e-mail.  Oh, good.

20   The bottom e-mail.

21         This has been admitted.

22         MS. HYNDMAN:  Is this in evidence?

23         THE COURT:  Yes, it is in evidence, but just the

24   bottom part.

25   BY MS. HALL:

Jaskowiak - direct

1285

1  Q.  Dr. Jaskowiak, do you recognize this as an e-mail that you

2  sent to Dr. Song and Dr. Seal on August 11th, 2011?

3  A.  I do.

4  Q.  And you wrote here:  Just want to give you both a heads-up

5  on a bad interaction tonight between Maria Artunduaga and the

6  patient.  I only have patient and her husband's side of the

7  story, but they were very upset about how Maria came in

8  tonight and basically grilled them about pain management and

9  as to why patient was still in the hospital at all.  It was

10  very upsetting to even hear about.

11        Is this something that you had experienced yourself

12  after speaking with this patient?

13  A.  Correct.  That same day I had made --

14  Q.  Let me ask you some questions, okay?

15        And, then, you wrote:  I will speak with Maria

16  tomorrow, but I wanted to make you both aware.  I have really

17  serious concerns about Maria, both in the operating room and

18  in patient management.

19        And that's true from your perspective at the time,

20  correct?

21  A.  Yes.

22  Q.  Let's talk a little bit about this patient.  Was the

23  patient -- had you operated on the patient at the time you

24  spoke with them about this issue?

25  A.  Correct.  The patient had had her operation the day

 1   before, on August 10th of 2011.

 2   Q.   What type of operation did the patient have?

 3   A.   The patient had a bilateral mastectomy -- so, removal of

 4   both breasts -- and this was done in a way where we spare all

 5   of the skin; and, then, she had had also an immediate

 6   reconstruction by Dr. Song.  So, this was a shared patient.

 7   So, a big operation that she had just undergone the day

 8   before.

 9   Q.   And how is it that you came to talk to the patient

10   about -- did you have a conversation with the patient about

11   Dr. Artunduaga?

12   A.   I did.  I was making rounds in the evening and came into

13   the room to see the patient.  I was rounding by myself, given

14   the circumstances of the day, and then found the patient and

15   her husband both very upset.  And --

16   Q.   And was it just you, the patient and her husband in the

17   room?

18   A.   Correct.

19   Q.   And what do you recall being said by the patient and her

20   husband to you?

21           MS. HYNDMAN:  Your Honor, if we can have a limiting

22   instruction on this, please?

23           THE COURT:  Yes.

24           Ladies and gentlemen, what the patient and her

25   husband said is not being offered to you for the truth of what

Jaskowiak - direct

1287

1   they said.  Instead, it is being offered to show the impact on

2   the doctor.

3   BY MS. HALL:

4   Q.  Go ahead.  Can you please tell us what the patient and her

5   husband said to you?

6   A.  Sure.  The patient and her husband were both upset and

7   shaken that -- describing that Dr. Artunduaga had come into

8   the room and had -- they had felt very pressured about her

9   pain -- the patient's pain; that it seemed to them that Dr.

10  Artunduaga didn't believe that the patient was in pain, and

11  that she was to be discharged that day, and that she needed to

12  come off her IV medicines and be converted to oral medicines.

13          And they -- so, they felt that there wasn't a belief

14  about the pain and also this incredible pressure that she was

15  supposed to be discharged.

16  Q.  And did both the patient and her husband express those

17  concerns to you?

18  A.  Both of them did, yes.

19  Q.  Did they tell you that they had both been in the room when

20  this interaction occurred with Dr. Artunduaga?

21  A.  That's what they told me, yes.

22  Q.  And what was your response?

23  A.  Well, I was -- I was very upset because I don't like to

24  find patients in that circumstance.  And just the situation

25  had to be dealt with, first of all, to care for the patient,

Jaskowiak - direct

1288

1    but then also it was just very upsetting that an intern would

2    have caused this much distress in the patient.

3    Q.  And turning back to the e-mail that you sent, Defendant's

4    Exhibit No. 13, why did you believe it was appropriate to send

5    this e-mail to both Dr. Song and to Dr. Seal?

6    A.  Well, to Dr. Song, again, because just one week before, I

7    had alerted him about my concerns about Dr. Artunduaga; and,

8    then, John Seal because he would be rounding on the patient in

9    the morning and seeing the patient who didn't get discharged.

10   And, so, I just wanted them to both be aware about the

11   situation.

12   Q.  And did you speak with Dr. Song at any point in time in

13   July or August regarding your concerns about Dr. Artunduaga as

14   described in the e-mails we've looked at?

15   A.  Yes, I did.

16   Q.  Are you responsible for evaluating resident performance at

17   UCMC?

18   A.  I am.

19   Q.  And has that been the case since you came to UCMC in 2001?

20   A.  It has been.

21   Q.  Do you consider yourself to be a difficult evaluator?

22   A.  Yes.

23   Q.  Are you fair, in your opinion?

24   A.  I feel that I'm fair.

25   Q.  Did you prepare an evaluation of Dr. Artunduaga's

Jaskowiak - direct

1289

1  performance on your service from June 24th through August of

2  2011?

3  A.  I did.

4  Q.  And when evaluating her, did you take into account how

5  long she had been a resident at UCMC?

6  A.  Yes.

7  Q.  Was Dr. Artunduaga's performance by the end of August of

8  2011 where you would have expected it to be for an intern at

9  her level?

10  A.  No.  I felt that it was below the level of performance of

11  an intern at that point.

12  Q.  I want to show you what's been marked as Joint Exhibit No.

13  7.  Michael will expand on it so we can read it.

14          MS. HALL:  Thank you.

15  BY MS. HALL:

16  Q.  Do you recognize this as your evaluation of Dr.

17  Artunduaga, Dr. Jaskowiak?

18  A.  I do.

19  Q.  And does this evaluation reflect your accurate -- an

20  accurate assessment, from your opinion, as to her performance?

21  A.  Yes, it -- yes, it does.

22  Q.  Were you honest in this evaluation about your assessment

23  of Dr. Artunduaga's performance?

24  A.  I was.

25          MS. HALL:  We can pull up and make bigger, Michael,

Jaskowiak - direct

1290

1  the "Clinical Skills" and "Operative Skills" section of the

2  evaluation.

3  BY MS. HALL:

4  Q.  And, Dr. Jaskowiak, in pre-op care, what did you rate Dr.

5  Artunduaga as?

6  A.  "Could improve."

7  Q.  And in post-op care, what did you rate Dr. Artunduaga as?

8  A.  "Deficient."

9  Q.  Do you recall why you marked her "deficient" in that

10 category?

11 A.  Well, I know I was influenced in that by the interaction

12 with the patient post-operatively that I just described.

13 Q.  You marked Dr. Artunduaga as "could improve," as well, in

14 able to communicate and justify medical decisions, correct?

15 A.  Correct.

16 Q.  And was that based on your own observation of Dr.

17 Artunduaga's performance?

18 A.  It was.

19 Q.  Were all of the assessments you made of Dr. Artunduaga

20 based on your observations of her performance?

21 A.  Yes.

22 Q.  And, then, in operative skills for preparedness, punctual

23 and knows case, what did you mark her as?

24 A.  "Could improve."

25 Q.  And for purposes of advanced OR skills, dissection,

Jaskowiak - direct

1291

1  exposure and suturing, what did you mark her as?

2  A.  "Deficient."

3          MS. HALL:  Can we turn to the next page, please.

4          If you could pull up the "With Other Healthcare

5  Professionals" section and the one below, Michael, up at the

6  top.

7          Yeah, that section.

8  BY MS. HALL:

9  Q.  For purposes of relations with others and communication

10  skills with other healthcare professionals, what did you rate

11  her as?

12  A.  "Could improve."

13  Q.  And for documentation of practice activities, what did you

14  rate her as?

15  A.  "Could improve."

16  Q.  Okay.

17          MS. HALL:  And let's pull up the comments at the end

18  of the evaluation.

19  BY MS. HALL:

20  Q.  You wrote here, Dr. Jaskowiak:  Maria spent over two

21  months on our service and it was fairly challenging.

22          And was that your honest assessment of how she did

23  over the two months?

24  A.  Yes.

25  Q.  Do you believe you had enough exposure to her during those

Jaskowiak - direct

1292

```
 1  two months to evaluate her performance?

 2  A.  I certainly did.

 3  Q.  You wrote:  Many issues arose with communication, with

 4  clinical care and technical OR skills.

 5          And you described some of that to us, correct?

 6  A.  Correct.

 7  Q.  And you wrote:  These have been brought to the attention

 8  of Dr. Song.  Bottom line, she is very smart and very sweet

 9  and she works hard.

10          And did you believe all that to be true?

11  A.  I did.

12  Q.  And you wrote:  There seem to be some critical issues that

13  may be cultural, as she has not worked in the American medical

14  system before.

15          And was that your belief at the time as to whether

16  she had worked in the medical American system prior to coming

17  to UCMC?

18  A.  That was my belief.  That was my understanding.

19  Q.  You wrote:  She often did not seem to understand

20  completely what the plan was or her role in the plan.

21          And is that something you had observed yourself?

22  A.  Yes.

23  Q.  And you wrote:  Also, she is so eager to do well and to

24  improve that she is constantly diving forward without even

25  fully listening to what is being recommended.
```

Jaskowiak - direct

1293

1    And is that something you observed?

2  A.  Yes.

3  Q.  And something you were concerned about?

4  A.  Yes.

5  Q.  And you wrote:  This occurred technically in the OR and

6  also on rounds.  Steps are being taken to address these

7  issues.

8    What did you mean by that last sentence, steps are

9  being taken to address these issues?

10 A.  Well, I had been made aware by the date of this evaluation

11 that within plastic surgery there were plans for, you know,

12 assisting Maria.  But I believe one of the -- she was going to

13 be mentored, both by a faculty member and by one of the senior

14 plastic surgery residents.

15 Q.  Did any of your criticisms of Dr. Artunduaga and her

16 performance during those months have to do with the fact that

17 she's Colombian?

18 A.  No.

19 Q.  Or the fact that she has an accent?

20 A.  No.

21 Q.  Or the fact that she might have gone to medical school

22 outside of the U.S.?

23 A.  No.

24 Q.  Did you meet with Dr. Artunduaga in 2011, after she

25 finished her rotation on your service?

Jaskowiak - direct

1294

1   A.  I met with her in November.

2   Q.  Okay.

3        And whose request was that at?

4   A.  That was at her request.

5   Q.  I show you what's been marked as Joint Exhibit 25.

6        MS. HALL:  And, Michael, if you could please turn to

7   the second page of that e-mail and blow up the e-mail on the

8   bottom.  The whole thing, yeah.

9   BY MS. HALL:

10  Q.  Dr. Jaskowiak, do you recognize this as the request from

11  Dr. Artunduaga to meet with you on November 10th?

12  A.  Yes.

13  Q.  And she wrote to you:  I felt compelled to write you

14  looking for advice.  My monthly evaluations have been far

15  below what plastic surgery residents usually get.  Dr. Song

16  has decided to put me into probation, which is totally

17  understandable.

18       Is this the first time that you learned she had been

19  put onto probation?

20  A.  I believe there -- this is the first time I was made aware

21  of it, yes.

22  Q.  And you wrote:  I have had difficulties -- she wrote:  I

23  have had difficulties transitioning from my previous position

24  as a human genetics researcher into the clinical life.

25       Is this something that Dr. Artunduaga had told you

Jaskowiak - direct

1295

```
 1   previously, that she was working as a human genetics
 2   researcher --
 3   A.  Yes, I knew --
 4   Q.  -- prior to UCMC?
 5   A.  -- she had been working in Boston, yes.
 6   Q.  And, then, she wrote:  Although uncomfortable and painful,
 7   I understand that it is meant to better me.
 8              Right?
 9   A.  Correct.
10   Q.  And at the bottom, she asked you for a time to meet with
11   you?
12   A.  Yes.
13   Q.  And if you turn to the first page, there's some back and
14   forth between you and Dr. Artunduaga.
15              MS. HALL:  And if you could pull up, Michael, the top
16   e-mail.
17   BY MS. HALL:
18   Q.  And you wrote here on November 11th:  So, let's plan on
19   meeting at the end of the day Monday.  I will be in the breast
20   center.
21              Do you recall if you actually -- if Monday is the
22   actual day on which you met with her?
23   A.  I don't recall the actual day.  And my recollection of the
24   meeting is that we were in my office.  So -- but I don't know.
25   I can't remember the actual date.
```

Jaskowiak - direct

1   Q.  Shortly after you exchanged this e-mail, though, you met

2   with her?

3   A.  Correct.

4   Q.  And was that in -- you said an in-person meeting in your

5   office?

6   A.  Yes.

7   Q.  Did anyone else participate?

8   A.  No.  Just the two of us.

9   Q.  What do you recall being said by each of you during that

10  meeting?

11  A.  Well, Maria and I talked about -- I don't remember a lot

12  of specifics, but we talked about her performance issues and

13  the probation.  And I tried overall to be very supportive of

14  her.  And we talked about other people who had been on

15  probation and how they had succeeded.  And we talked about

16  being female surgeons and that -- some special challenges of

17  being female surgeons.  So, we had a pretty broad conversation

18  in which I was trying to be very supportive of her.

19  Q.  Did you discuss with her during that meeting any of the

20  deficiencies you saw in her performance?

21  A.  We did talk about the problems that had occurred while she

22  was on the service.

23  Q.  During that meeting, did she tell you that she was being

24  treated differently or poorly by anyone because of her accent?

25  A.  No.

Jaskowiak - direct

1297

1   Q.  Or because of her cultural background?

2   A.  No.

3   Q.  Do you believe that the discussion ended on a positive

4   note?

5   A.  It did.

6   Q.  Did you speak with Dr. Artunduaga, again, in the beginning

7   of 2012 about any patients?

8   A.  I did.  There was a particular patient that a problem

9   arose with.

10  Q.  Okay.  I'd like to show you --

11          Do you remember that patient situation?

12  A.  Sure.  This was --

13  Q.  Let me ask you.  Hold on one second.

14          And how were you made aware initially of the issue?

15  A.  Sure.  I was seeing a patient in general surgery clinic.

16  It's sort of a complex story.  She had colicystitis -- a gall

17  bladder problem.  And I had actually seen her almost nine

18  months before, in April of the previous year, when she had an

19  episode of colicystitis or inflammation of the gall bladder.

20  And at the time, the work -- the patient's work situation

21  didn't allow her to have an operation and recover.  She had

22  just started a new job.

23  Q.  And that would be in the April time frame?

24  A.  Right, in the April time frame.

25          And, so, we made a decision.  At the time she was

Jaskowiak - direct

1298

1    treated with antibiotics, which took care of the symptoms that

2    she was having and we put her on a low-fat diet.  And, then,

3    the plan was that when things settled at work and when she had

4    the time to take off, then she would come back and have her

5    gall bladder removed.

6    Q.  Okay.

7         And, so, when did you next see the patient?

8    A.  So, I next saw the patient either -- I think January --

9    late January or early February.

10   Q.  Of 2012?

11   A.  Of 2012.

12   Q.  Okay.

13        And what did the patient tell you during that meeting

14   with her?

15        MS. HYNDMAN:  Again, your Honor, limiting

16   instruction, please.

17        THE COURT:  Ladies and gentlemen, what the patient

18   said is not being offered for the truth of what the patient

19   said, but instead is being offered to show its impact on the

20   doctor.

21   BY MS. HALL:

22   Q.  Let me set the stage a little bit.  Did you see the

23   patient in clinic?

24   A.  I did.

25   Q.  And this conversation that I think you're going to tell us

Jaskowiak - direct

1299

1  about, was it just you and the patient in the room at the

2  time?

3  A.  I think my general surgery nurse was there, also.

4  Q.  Okay.

5       What was said by the patient to you during this

6  meeting?

7  A.  So, at that time, the patient had come back because,

8  again, she was having problems with her gall bladder and she

9  now was -- had the possibility at work of having -- taking

10 time off to have the operation.  And when we were talking, she

11 told me that in the previous August of 2011, she had had a --

12 you know, a repeat episode of her symptoms, and that she then

13 told me that she had called into the hospital and that someone

14 had prescribed her antibiotics over the phone.  And this came

15 as a complete surprise to me.  This was the first I had been

16 aware of it.

17 Q.  Had you reviewed the patient's record before she came to

18 see you in January, February of 2012?

19 A.  I hadn't.  You know, it had been such a long time since

20 April and then the beginning of 2012, that I looked through

21 the medical record.

22 Q.  Was there any indication in the record that the patient

23 had received any antibiotics from anyone at the hospital?

24       MS. HYNDMAN:  Objection.  Leading.

25       THE COURT:  Sustained.

Jaskowiak - direct

1300

1    Rephrase.

2    BY MS. HALL:

3    Q.  Did the record reflect that anyone had seen the patient

4    since you saw her?

5         MS. HYNDMAN:  Objection.  Leading.

6         THE COURT:  Sustained.

7    BY MS. HALL:

8    Q.  What was reflected in the record about the last time --

9    okay.

10        Did the record reflect the times that the patient had

11   come to UCMC?

12   A.  Yes, from the -- when the patient had seen me the previous

13   April, and there were no other encounters recorded.

14   Q.  Until you saw her again in January or February?

15   A.  Correct.

16   Q.  And did the patient tell you during that meeting how she

17   had gotten the prescription or from whom?

18   A.  Well, she -- she described that she had called in and then

19   spoken with a doctor and they had then agreed to prescribe the

20   antibiotics.  And, then, she said, oh, actually, I have the

21   bottle in my purse.  And she went over to her purse and pulled

22   out the empty bottle of antibiotics, and there on the label I

23   could see that Dr. Artunduaga had prescribed the antibiotics.

24   Q.  And how did you know that it was Dr. Artunduaga who had

25   prescribed the antibiotics?

Jaskowiak - direct

1301

1  A.  It always says on the label from a pharmacy what the name

2  of the prescribing physician is.

3  Q.  Were you concerned about this?

4  A.  I was.  I was concerned -- very concerned.

5  Q.  Why?

6  A.  Well, number one, because it's not my practice and I

7  wouldn't condone prescribing antibiotics without seeing a

8  patient; and, number two, that it wasn't documented; and,

9  finally, that I was never made aware of it, as it was my

10  patient, and I had no knowledge of this.

11  Q.  Did you see anything in the patient's record reflecting

12  that Dr. Artunduaga had seen or spoken to the patient?

13  A.  There was nothing that was available to look at, right.

14  Q.  Did you speak with Dr. Artunduaga about this situation?

15  A.  I did.

16  Q.  Was that an in-person conversation or over the phone?

17  A.  It was over the phone.

18  Q.  Did you call her or contact her?

19  A.  I called her, yes.

20  Q.  And what do you recall saying to Dr. Artunduaga and her

21  saying to you during that conversation?

22  A.  Obviously, I was calling her to -- and to let her know

23  that I was seeing the patient and -- who had returned with the

24  symptoms again and then been made aware of this antibiotic,

25  and to tell her that that's not a clinical thing that she

Jaskowiak - direct

1    should have done and also to find out why I hadn't been

2    informed about that whole interaction.

3    Q.  And did Dr. Artunduaga respond to you?

4    A.  Yeah, she answered the page and we talked about this.  And

5    I can't remember the details of the conversation, but she --

6    obviously, it happened months before she -- she was apologetic

7    about it and then she said she needed to think, but she

8    thought that she remembered something about a senior resident

9    -- having checked it out with a senior resident and that the

10    senior resident had said that it was okay to do this

11    prescription.

12    Q.  During your discussion with Dr. Artunduaga, did you

13    express an opinion as to whether you believed her version of

14    events?

15    A.  I would -- I wouldn't have a reason not to believe it.

16    Q.  And were you expecting Dr. Artunduaga to follow up with

17    you after you spoke with her?

18    A.  Right.  She told me that she wanted to review things and

19    speak to that resident just to confirm, you know, what had

20    happened and then -- and she promised that she was going to

21    get back in touch with me with an explanation.

22    Q.  Okay.

23        I would like to show you what's been marked as Joint

24    Exhibit No. 77.

25        At the bottom of the page --

Jaskowiak - direct

1303

 1            MS. HALL:  Michael, if you can blow that up.

 2   BY MS. HALL:

 3   Q.  Dr. Jaskowiak, do you recognize this as an e-mail you

 4   received from Dr. Artunduaga on February 9th, 2012, regarding

 5   the patient we've been talking about?

 6   A.  I do.

 7   Q.  And she wrote to you in this e-mail:  First of all, I want

 8   to apologize for taking so long to write you.  I was wrapping

 9   things up during the last two weeks so that I could meet with

10   attendings from my January rotation.

11            Had it -- how long had it taken Dr. Artunduaga to get

12   back to you after you spoke with her?

13   A.  It certainly was a few weeks.

14            MS. HALL:  And if we can turn to the second page,

15   please, and blow that up.

16   BY MS. HALL:

17   Q.  And Dr. Artunduaga wrote:  You are right.  I made a huge

18   mistake, and I regret it.

19            During your conversation with her about this patient

20   issue, did you tell her what she had done is wrong?

21   A.  Yes.

22   Q.  And she wrote:  I know I sounded very defensive during our

23   conversation, but given my situation, ongoing probation, I

24   freaked upon the possibility of getting into more trouble.

25            Correct?

Jaskowiak - direct

1304

1   A.  Correct.

2   Q.  And, then, she describes to you in this e-mail where she

3   says, this is my recall of the account, what happened that led

4   her to prescribe the medication over the phone, right?

5   A.  She described it, yes.

6   Q.  And in the beginning of her description, she says:  On

7   August 20th, Andrea Olivas, general surgery PGY-3, received a

8   page from a patient stating that her prescription needed to

9   get refilled.  Andrea could not get hold of the pharmacy.  She

10  asked me to help her out by calling later during my Saturday

11  night shift.

12        If it's true, as Dr. Artunduaga reflected in here,

13  she wrote on the -- in the second paragraph:  Because you were

14  on vacation that week and the patient refused to come to the

15  ED -- ED is emergency department?

16  A.  Correct.

17  Q.  -- I decided to refill the prescription for only seven

18  days.

19        If Dr. Artunduaga had discussed this with a more

20  senior resident, would you have considered it to be an

21  appropriate response still to refill the prescription over the

22  phone?

23        MS. HYNDMAN:  Objection, your Honor.  Calls for

24  speculation.

25        THE COURT:  Sustained.

Jaskowiak - direct

1  BY MS. HALL:

2  Q.  At the bottom paragraph, she wrote:  I agree with you, a

3  physician should not prescribe antibiotics over the phone.

4  And, again, I want to apologize for my bad clinical judgment.

5          Right?

6  A.  Correct.

7  Q.  And, then, at the end she said:  Thank you for your

8  advice.  I hope to keep counting with your guidance in the

9  future.

10         Right?

11 A.  Yes.

12 Q.  And if we can go to the e-mail that you sent in response.

13         MS. HALL:  Hold on.

14    (Brief pause.)

15 BY MS. HALL:

16 Q.  In your opinion, did Dr. Artunduaga's explanation in this

17 e-mail excuse the fact that she had prescribed something to a

18 patient she had not seen over the phone?

19 A.  To me, it wasn't an acceptable excuse, but the bigger

20 problem was -- for me was the lack of follow-through, the lack

21 of a plan, and then adhering and making sure that the patient

22 adhered to a plan that had been set out.

23         I wouldn't say it was completely wrong to do it.  I

24 wouldn't support it.  But there had to be a follow-up plan.

25 Q.  And on the first page in the middle is your response to

                          Jaskowiak - direct
                                                                      1306

 1   Dr. Artunduaga, right?

 2   A.   Correct.

 3   Q.   And you sent that on February 22nd?

 4   A.   Yes.

 5   Q.   And you wrote:  Maria, thanks for your e-mail.  I really

 6   appreciate having a summary of the events.  It sounds like you

 7   have learned a lot this year and would likely make different

 8   choices were you faced with a similar situation now.

 9          Then you wrote to her:  For me, the most important

10   lessons are -- and in No. 1, you said communicate, right?

11   A.   Yes.

12   Q.   And you gave her the direction that she should have

13   communicated you, even though you were out, correct?

14   A.   Yes.

15   Q.   And, then, you wrote:  No. 2, follow-up, and you explained

16   what your expectation would have been there?

17   A.   I did.

18   Q.   And in No. 3, you wrote:  Document.  And you explained

19   that she could have documented the conversation on EPIC, which

20   is the medical records system?

21   A.   Yes.

22   Q.   And in No. 4, you wrote:  Trust yourself.  If you had

23   doubts about the correctness of this plan, feel free to obtain

24   the input of others who you trust to confirm.

25          Right?

Jaskowiak - direct

1307

1   A.  Yes.

2       (Brief pause.)

3   BY MS. HALL:

4   Q.  And, then, you wrote at the bottom of the e-mail:  As an

5   FYI, when I saw patient a few weeks ago, she was complaining

6   of persistent diarrhea.  She tested positive for C. Diff,

7   which was or has been treated and is now resolved.

8           The patient that you're referencing there, is that

9   the same patient that had received the over-the-phone

10  prescription?

11  A.  That's correct.

12  Q.  And why did you make this statement in here about the

13  patient's condition?

14  A.  I made it because this C. Diff is kind of an infection of

15  the colon which can occur when people are treated with

16  antibiotics.  The antibiotics wipe out the normal flora of the

17  colon and this abnormal kind of bacteria can overgrow and

18  cause some really serious problems.

19          And, so, I was telling Maria this because I wanted

20  her to be aware that prescribing antibiotics can have serious

21  implications for patients.

22          MS. HALL:  No further questions.

23          THE COURT:  Let's take our morning break.

24      (Brief recess.)

25          THE COURT:  Katie went to get the jury.

Jaskowiak - direct

1308

```
 1              Any luck on the verdict form, Ms. Hall?

 2              MS. HALL:  Oh, Jeeze.  Yes.

 3              THE COURT:  Just don't forget.

 4              MS. HALL:  No, I didn't.  It was e-mailed to me.  I

 5    just want to look at it to make sure --

 6              THE COURT:  Okay.  That's fine.

 7              MS. HALL:  -- the right one was sent to me.

 8              THE COURT:  We have time.  That's fine.

 9              MR. JEPSON:  Your Honor, one other thing.  We decided

10    to call just one witness this afternoon.

11              THE COURT REPORTER:  I'm sorry.  I can't hear you.

12              THE COURT:  Okay.  So we'll get to closings.  They

13    have decided to call just one witness this afternoon.

14              Which witness is that?

15              MR. JEPSON:  Dr. Park.

16              THE COURT:  Okay.  So she will be here at 1:00?

17              MR. JEPSON:  Correct.

18              THE COURT:  Great.  So I think -- that's good.  Then

19    we will get to closings and instructions.

20              So I definitely need that verdict form.

21              MS. HALL:  Yeah.  I'm on that.

22              THE COURT:  We can finish with the witness.  We'll

23    have the lunch hour, but --

24              MS. HALL:  Yeah.

25        (Jury in.)
```

Jaskowiak - cross by Hyndman

1309

1     THE COURT:  You may be seated.

2                     CROSS-EXAMINATION

3    BY MS. HYNDMAN:

4    Q.  Good morning, Dr. Jaskowiak.

5    A.  Good morning.

6    Q.  Now, you testified that you worked with Dr. Artunduaga on

7    the Kaplan service in the end of June, July, and August,

8    right?

9    A.  Correct.

10   Q.  And during that time, you had the opportunity to observe

11   her performance, right?

12   A.  Yes.

13   Q.  Now, you thought that Dr. Artunduaga seemed a little more

14   stressed and a little less comfortable than other interns that

15   you've seen in that situation; isn't that right?

16   A.  I did.

17   Q.  But she wasn't the most stressed you've ever seen,

18   correct?

19   A.  Not the most stressed.

20   Q.  Now, you mentioned that the fellow for the service -- on

21   the service for the month of July was Dr. Haijin In, correct?

22   A.  Haijin In, yes.

23   Q.  And you do have a vague memory, don't you, Dr. Jaskowiak,

24   that Dr. Artunduaga had, in fact, complained to you about Dr.

25   In?

Jaskowiak - cross by Hyndman

1310

1   A.   I remember that there was tension between them.

2   Q.   Okay.  And you remember some sort of complaint, but you

3   don't remember exactly what it was.  Is that fair to say?

4   A.   As I would say, I remember there was tension between them.

5   I have no recollection of what the nature of it was.

6   Q.   Do you have a recollection, a memory of Dr. Artunduaga

7   complaining to you, though, about Dr. In?

8   A.   An extremely vague recollection, yes.

9   Q.   Okay.  Now, the next month, Dr. In wasn't on the service

10  and it was Dr. Seal instead, correct?

11  A.   Correct.

12  Q.   Now, from your observations, Dr. Seal and Dr. Artunduaga

13  had a very strained relationship, wouldn't you say?

14  A.   I would say it was strained, yes.

15  Q.   And, in fact, Dr. Seal complained to you about Dr.

16  Artunduaga early in the month of August, didn't he?

17  A.   He did.

18  Q.   And it was at least before August 4th when you wrote the

19  e-mail that we looked at on your direct examination, correct?

20  A.   Possibly the morning of August 4th.

21  Q.   Okay.  So can you take a look at Plaintiff's Exhibit 5,

22  please.

23          THE COURT:  Is it in evidence?

24          MS. HYNDMAN:  Yes, it is.

25          THE COURT:  Okay.

Jaskowiak - cross by Hyndman

1311

1    BY MS. HYNDMAN:

2    Q.  Dr. Jaskowiak, this is the case and clinic coverage for

3    the first week in August of 2011 for the Kaplan service,

4    correct?

5    A.  It looks like it, yes.

6    Q.  Okay.  And then on the first day on Monday, it appears

7    that both Dr. Artunduaga and Dr. Seal attended your clinic; is

8    that right?

9    A.  Yes.

10   Q.  And then on the second day, it appears that Dr. Seal was

11   doing some surgical cases with Dr. Angelos, and Dr. Artunduaga

12   was doing some other surgical cases with Dr. Angelos, correct?

13   A.  That's what it looks like, yes.

14   Q.  Okay.  And then on August 3rd, Dr. Artunduaga was doing

15   surgical cases with you, correct?

16   A.  She was.

17   Q.  And it doesn't appear that Dr. Seal was assisting on those

18   cases, was he?

19   A.  No.  He was in clinic.

20   Q.  Okay.  Oh, that's right.  So he's there in clinic.  Okay.

21            Now, let's look at Joint Exhibit 11, please.  This

22   was your e-mails to Dr. Song.

23            Now, you sent your first e-mail early that morning on

24   the -- that would be on the second page.  You sent the first

25   e-mail at 10:40, and you told Dr. Song this was nothing major,

Jaskowiak - cross by Hyndman

1312

 1  right?

 2  A.  That's what I wrote, yes.

 3  Q.  And you believed that, didn't you?

 4  A.  I hoped it, yes.

 5  Q.  Okay.  Now, you testified, I believe, that you wrote this

 6  to Dr. Song because you thought there were some issues that

 7  needed to be addressed, correct?

 8  A.  That's what I wrote, yes.

 9  Q.  Okay.  And the issues that you thought needed to be

10  addressed were issues relating to Dr. Artunduaga's

11  performance, right?

12  A.  Correct.

13  Q.  And if you'll look at the first page, please.  This is

14  the more explanatory e-mail you sent to Dr. Song.

15          When you wrote this e-mail to Dr. Song, you believed

16  that Dr. Artunduaga had the ability to improve the things that

17  you found were lacking, didn't you?

18  A.  I did.  As I stated in my first e-mail, I was dedicated to

19  her success.

20  Q.  Now, at the end of this e-mail, you have the suggestion

21  here about "a little American surgical boot camp."

22          Did Dr. Song ever respond to you about that idea?

23  A.  I don't recall any response in writing.  I believe that he

24  and I discussed it, were together -- we were together a lot

25  operating.

Jaskowiak - cross by Hyndman

1313

1  Q.  Now, Dr. Song told you, didn't he, that he had proposed

2  some sort of a mentorship-type relationship between Dr.

3  Artunduaga and one of the plastic surgery residents?

4  A.  Yes.

5  Q.  And that you understood that mentorship was going to be

6  with Dr. Dickie, is that right?

7  A.  Yes.

8  Q.  I think you testified on direct you thought there might

9  also be a mentorship with one of the attendings?

10 A.  Correct.

11 Q.  Who was that?

12 A.  Dr. Park, Dr. Julie Park.

13 Q.  Okay.  And when did -- was your understanding as to when

14 that mentorship was going to begin?

15 A.  I don't remember the exact timing.  Definitely in the

16 fall.

17 Q.  Okay.  Now, Dr. Song didn't ask you to do anything with

18 respect to Dr. Artunduaga at this time, did he?

19 A.  No, he did not.

20 Q.  Okay.  He didn't ask you to speak to her, correct?

21 A.  I don't see it in any of the e-mails that I --

22 Q.  And you don't have a recollection of him asking you to

23 speak to her, do you?

24 A.  I don't.

25 Q.  Okay.  Now, on other occasions, you've brought concerns

Jaskowiak - cross by Hyndman

1314

1  about plastic surgery residents to Dr. Song; isn't that

2  correct?

3  A.  I have.

4  Q.  And at one point in time, you brought a concern to Dr.

5  Song about Dr. Essie Kueberuwa?

6  A.  Kueberuwa, yes.

7  Q.  Kueberuwa.  Okay.  Thank you.

8         And on that occasion, Dr. Song encouraged you to

9  speak to Dr. Kueberuwa, didn't he?

10 A.  He did.  He asked me to speak to her.

11 Q.  And you did speak to her, didn't you?

12 A.  I did.

13        MS. HYNDMAN:  Okay.  Now, if you can go back to the

14 e-mail of August 4th.

15 BY MS. HYNDMAN:

16 Q.  Even though Dr. Song didn't ask you to speak to Dr.

17 Artunduaga at this time, later in November, he chastised you

18 for not doing that, didn't he?

19 A.  He did.

20 Q.  And he -- in that conversation, he also chastised you for

21 not having counseled Dr. Artunduaga, didn't he?

22 A.  He did.

23 Q.  And that conversation was in November?

24 A.  November --

25 Q.  Mid-November sometime?

Jaskowiak - cross by Hyndman

1315

1   A.   November, correct.

2   Q.   And you sent Dr. Song an e-mail about that conversation,

3   didn't you?

4   A.   The following day, I did, yes.

5           MS. HYNDMAN:   Okay.  So if we can look at Plaintiff's

6   Exhibit 30.

7   BY MS. HYNDMAN:

8   Q.   And this is the e-mail that you sent to Dr. Song about the

9   conversation that you had with him the day before, correct?

10  A.   Correct.

11  Q.   And you felt that in that conversation that you had with

12  Dr. Song, he was blaming you for some of the issues relating

13  to Dr. Artunduaga, didn't you?

14  A.   I -- that's what I expressed in my e-mail, yes.

15  Q.   Okay.  And in your mind, he seemed to be blaming you for

16  not having done more to intervene with Dr. Artunduaga in

17  August when she was on your service; isn't that right?

18  A.   That's how I felt.

19  Q.   Okay.  And Dr. Song's tone in that conversation was

20  fraught, wouldn't you agree?

21  A.   The -- our conversation was fraught, yes.

22  Q.   Okay.  And it was your impression that he was upset, isn't

23  that right?

24  A.   He seemed upset, yes.

25          MS. HYNDMAN:   Now, if we could look at Joint Exhibit

Jaskowiak - cross by Hyndman

1316

 1    No. 7.

 2    BY MS. HYNDMAN:

 3    Q.  And this was the evaluation you did for Dr. Artunduaga

 4    from her time on your service in the summer of 2011, right?

 5    A.  Correct.

 6    Q.  Now, you rated her "deficient" in post-operative care, and

 7    I believe you testified on direct examination that that rating

 8    was influenced by the interaction you described with one of

 9    your patients, correct?

10    A.  Yes.

11    Q.  Isn't it true, Dr. Jaskowiak, that that was the sole basis

12    for your rating there of "deficient"?

13    A.  Certainly not the sole basis.

14    Q.  Would you say it was specifically based on that

15    interaction?

16    A.  The -- that interaction influenced that score, but, of

17    course, I had worked with her over a more-than-two-month

18    period.

19    Q.  Okay.  My question, though, was, would you say that this

20    score was specifically based on the interaction that Dr.

21    Artunduaga had with one of your patients?

22    A.  I don't understand the question.

23    Q.  Okay.  Now, you testified about that interaction.  It was

24    over a pain management issue, is that correct?

25    A.  Both pain management and discharge.

Jaskowiak - cross by Hyndman

1317

1  Q.  Okay.  And how much time had passed between the time Dr.

2  Artunduaga had spoken to the patient and the time you came in

3  on the rounds?

4  A.  I actually don't remember.  We always have a conference on

5  Thursday afternoon, and I either made rounds right before or

6  right after that conference.  So I don't actually know -- it

7  certainly was not more than two hours, but it might have been

8  a much shorter time.  I don't -- I don't know the exact

9  timing.

10  Q.  But you weren't present for the interaction between Dr.

11  Artunduaga and the patient and her husband, correct?

12  A.  No, I was not.

13  Q.  And you don't remember if you ever spoke yourself to Dr.

14  Artunduaga about what transpired with that patient, is that --

15  A.  I don't remember the -- any conversation.

16  Q.  So you don't know what Dr. Artunduaga's side of the story

17  was, right?

18  A.  From e-mails, I do.

19  Q.  Did she send you an e-mail about her side of the story?

20  A.  No.  I think that I've seen somewhere an e-mail about her

21  describing what she thought about that interaction.

22  Q.  Okay.  At the time you wrote your evaluation, you didn't

23  know Dr. Artunduaga's side of the story, did you?

24  A.  No, I don't believe so.

25  Q.  Okay.  Now, you would agree with me, Dr. Jaskowiak, that

Jaskowiak - cross by Hyndman

1318

1   it's not unusual for patients in pain to be frustrated with

2   their medical care?

3   A.  That might be the case.

4   Q.  And Dr. Artunduaga was never rude in your presence to a

5   patient, was she?

6   A.  I never witnessed her being rude.

7   Q.  And, in fact, you would say that Dr. Artunduaga has a kind

8   personality, wouldn't you?

9   A.  I found her to get along with my patients very well.

10  Q.  And, in fact, on your evaluation on the second page, you

11  rated her "good" for her relations with patients and families,

12  didn't you?

13  A.  I did.

14  Q.  Now, you testified that you believed that Dr. Artunduaga

15  was below the level of other interns that you had seen on your

16  service, correct?

17  A.  I did.

18  Q.  But you didn't specifically say that in your evaluation,

19  did you?

20  A.  Well, I didn't say that in my comments, but if you

21  reviewed all of my eval -- intern evaluations, you would see

22  that I very seldom give "deficient"s.

23  Q.  Do you -- would Dr. Song have access to every evaluation

24  you've done for interns that even weren't on his service?

25  A.  He would have them for the interns that he is responsible

Jaskowiak - cross by Hyndman

1319

1    for.

2    Q.  Okay.  Now, you rated Dr. Artunduaga as "deficient" in her

3    advanced operating room skills, correct?

4    A.  I did.

5    Q.  And that was based upon the concerns you described about

6    her sort of rushing ahead with procedures, correct?

7    A.  Correct.

8    Q.  Now, Dr. Artunduaga never hurt a patient that you're aware

9    of, did she?

10   A.  In the operating room?

11   Q.  She never harmed a patient that you're aware of, did she?

12   A.  I can say in the operating room, she never harmed a

13   patient while I was present with her in the operating room.

14   Q.  Were you ever aware of her harming a patient?  Did you

15   ever observe her harming a patient?

16   A.  This is a few leaps, but I was certainly concerned with

17   the antibiotic issue that we talked about, that the patient's

18   result in C. difficile colitis was related to that antibiotic

19   dosing.

20   Q.  So you made that precise determination that this C. -- and

21   you're going to have to pronounce it for me --

22   A.  C. difficile.

23   Q.  -- C. difficile --

24   A.  Uh-huh.

25   Q.  -- was directly related to Dr. Artunduaga's prescription

Jaskowiak - cross by Hyndman

1320

1   of that antibiotic five months prior?

2   A.  I can't say that that dose -- you know, those doses did,

3   but what we know in medicine is that antibiotics lead to C.

4   difficile.

5   Q.  They can lead to C. difficile?

6   A.  They can lead to C. difficile.  And she had C. difficile.

7   Q.  Okay.  And the antibiotics had been prescribed five months

8   earlier?

9   A.  Correct.

10  Q.  Could you determine how long she had had C. difficile?

11  A.  At that point, I couldn't because she only presented to me

12  in January.

13  Q.  Okay.  Now, you submitted this evaluation on September

14  25th, 2011?

15  A.  I did.

16  Q.  And in the conversation you had with Dr. Song in November,

17  he complained to you that you put that evaluation in too late,

18  didn't he?

19  A.  He said that, yes.

20  Q.  Now, let's talk about this circumstance with the refilling

21  of the prescription.

22          You raised the issue with Dr. Artunduaga as soon as

23  you learned of it, correct?

24  A.  I did.

25  Q.  Okay.  And that was on January 26th of --

Jaskowiak - cross by Hyndman

1321

1   A.  Yes.

2   Q.  -- 2012?  Okay.

3           MS. HYNDMAN:  And then if we can look at Joint

4   Exhibit 77, please.

5   BY MS. HYNDMAN:

6   Q.  And Dr. Artunduaga wrote you a response on February 9th,

7   2012?

8   A.  She did.

9   Q.  So that is about two weeks later?

10  A.  Correct.

11  Q.  Okay.  Not a few weeks later?

12  A.  The date's two weeks -- it's two weeks later.

13  Q.  Okay.  And in the e-mail response that you wrote to Dr.

14  Artunduaga, you said, "It sounds like you've learned a lot

15  this year," right?

16  A.  Yes, I did.

17  Q.  And you believed that at the time you wrote that e-mail,

18  didn't you?

19  A.  I did.

20          MS. HYNDMAN:  That's it.  I have nothing further.

21          THE COURT:  Redirect.

22          MS. HALL:  Michael, could we please pull up

23  Plaintiff's Exhibit No. 5?

24                    REDIRECT EXAMINATION

25  BY MS. HALL:

Jaskowiak - redirect by Hall

1322

1    Q.  Dr. Jaskowiak, you were asked about this exhibit and what

2    it reflected in terms of Dr. Artunduaga and Dr. Seal, right?

3    A.  Right.  We reviewed it to look at their schedules, yes.

4    Q.  Okay.  Does this schedule reflect when Dr. -- when any

5    resident is scheduled to round?

6    A.  Well, no.  Rounds happen outside of this schedule in the

7    morning and in the evening, you know, late afternoon, evening.

8           MS. HALL:  And so let's look at Joint Exhibit No. 11,

9    then.  And pull up point No. 2.  Just point No. 2, Michael.

10   Thank you.

11   BY MS. HALL:

12   Q.  And here, this is your e-mail to Dr. Song from August 4th.

13   You wrote:  "John Seal says she does not stand still on rounds

14   - that she is constantly trying to pounce on the next thing,"

15   right?

16   A.  Correct.

17          MS. HYNDMAN:  Your Honor, if we could have the same

18   limiting instruction, please?

19          THE COURT:  Yes.  Ladies and gentlemen, as I said

20   before, that conversation or information is not being offered

21   for the truth of the matter.  Instead, it is being offered to

22   show the impact on the doctor.

23          MS. HALL:  And then let's turn to Plaintiff's Exhibit

24   No. 30, please.  And if you could blow up just the -- yeah,

25   great.

Jaskowiak - redirect by Hall

1323

1  BY MS. HALL:

2  Q.  And this is the e-mail that you sent to Dr. Song on

3  November 18th, 2011 following your discussion with him, right?

4  A.  Yes.

5  Q.  And in the first sentence, you wrote:  "David - Just

6  wanted to let you know that I spoke with Essie after our

7  second case today and shared my concerns.  She is aware of how

8  she can improve and will work to do so.  We spoke in great" --

9  "in detail" -- sorry -- "and laid out a plan."

10          Dr. Jaskowiak, what year in her residency was Essie

11  at this time?

12  A.  My thought would be that she was certainly a more senior

13  resident, either a second- or a third-year resident.

14  Q.  And what were the issues that you spoke with Essie about?

15  A.  So this was actually a very specific surgical issue that

16  sometimes during long cases, towards the end of the case,

17  Essie would lose focus, and so I think would make it hard to

18  kind of get through the end of the case.  She would seem to

19  wander off and not be dedicated so much to the case.  And so

20  that was something that I felt needed specifically to be

21  addressed.

22  Q.  And while Dr. Artunduaga was on your service, did you give

23  her feedback about her performance and what you thought she

24  needed to improve on?

25  A.  I did.

Jaskowiak - redirect by Hall

1324

1    Q.  And you wrote in this e-mail to Dr. Song:  "I came to you

2    in July and August because of my grave concerns about Maria as

3    a resident since you are her program director."

4            Is it true that you had grave concerns about Dr.

5    Artunduaga at that time?

6    A.  Yes.

7    Q.  "I had not encountered the sorts of issues that Maria was

8    presenting us with previously and wanted to get you involved

9    at the earliest time, as she is your resident."

10           And is that true?

11   A.  Yes.

12   Q.  And do you feel that you had reviewed the issues that --

13   the concerns you had with Dr. Artunduaga appropriately with

14   her while she was on your service?

15   A.  I did.

16           MS. HYNDMAN:  Objection to the form.  "Appropriate"

17   is vague.

18           THE COURT:  Overruled.  You may answer, if you can.

19   BY THE WITNESS:

20   A.  I did.

21   BY MS. HALL:

22   Q.  And had you also discussed them with Dr. Song in July and

23   August?

24   A.  I had.

25   Q.  And then on the patient issue that you were asked about,

Jaskowiak - recross by Hyndman

1325

1    the patient who'd had the -- I think you said bilateral

2    mastectomy?

3    A.  Correct.

4    Q.  You were asked some questions -- or I believe Ms. Hyndman

5    asked you something along the lines of whether it was unusual

6    for a patient in pain to be frustrated, right?

7    A.  Correct.

8    Q.  The feedback you received about the way in which Dr.

9    Artunduaga interacted with the patient, did that feedback come

10   from only the patient?

11   A.  No.  Her husband was present also and shared the same

12   concerns.

13            MS. HALL:  No further questions.

14            THE COURT:  Recross?

15            MS. HYNDMAN:  Just a couple of questions.

16            If we could look at Plaintiff's Exhibit No. 30.

17                       RECROSS-EXAMINATION

18   BY MS. HYNDMAN:

19   Q.  First of all, Dr. Jaskowiak, the feedback that you gave to

20   Dr. Artunduaga was not because Dr. Song asked you to do

21   anything; isn't that right?

22   A.  No.  It was just feedback that I would have normally given

23   her.

24   Q.  And that was just based on your own idea of what you

25   should do to teach a resident, correct?

```
 1   A.  Yes.  Continuous feedback, yes.
 2   Q.  Okay.  And in this e-mail, you stated to Dr. Song:  "If
 3   you had wanted me to speak directly to Maria at that time, you
 4   should have advised me as such at the time.  For you to do so
 5   three months later, making me the scapegoat for your problems
 6   with Maria, is something that I deeply resent and will
 7   steadfastly defend myself against."
 8           And you believed that at the time, didn't you, Dr.
 9   Jaskowiak?
10   A.  Yes.
11           MS. HYNDMAN:  Nothing further.
12           THE COURT:  Okay.  Thank you, Doctor.  You may step
13   down.
14     (Witness excused.)
15           THE COURT:  Your next witness?
16           MR. JEPSON:  Our next witness will be Dr. Park, who
17   is in transit.
18           THE COURT:  Okay.  Is she expected at 1:00?
19           MR. JEPSON:  Yes.
20           THE COURT:  All right.  Ladies and gentlemen -- and
21   you have one witness left and then you're resting --
22           MR. JEPSON:  That's it.
23           THE COURT:  -- correct?  Okay.
24           Ladies and gentlemen, you are going to get a little
25   bit longer lunch hour than you normally would.  The defendants
```

1  have one more witness and then they're done.  We will get to

2  closing arguments and I will instruct you on the law and then

3  you will begin your deliberations.  But they do have one

4  witness remaining because of surgeries scheduled.  She will be

5  here at 1:00 o'clock.

6       So if you would please -- why don't you come back at

7  five to 1:00, and that way, we'll get you in the box by 1:00

8  and get started and go forward.

9       Enjoy the extra time.  Unfortunately, it's a little

10 cold out, but enjoy the extra time, and I'll see you at about

11 five to 1:00, please.

12   (Jury out.)

13       THE COURT:  So we'll pick up at five till and then

14 Dr. Park will finish and then we'll go right into closings.

15       MS. HYNDMAN:  Your Honor, I need to know whether to

16 prepare anything on punitive damages for my case --

17       THE COURT:  I am going to send the question to the

18 jury.

19       MS. HYNDMAN:  Thank you.

20       THE COURT:  So yes, you -- whatever you have prepared

21 you should plan on using.

22       MS. HYNDMAN:  Thank you.

23       THE COURT:  The -- I have one question for you.  It's

24 a small question, but did you have a stipulation?

25       MS. HALL:  We have two --

1328

```
 1              MR. JEPSON:  We have a stipulation.

 2              THE COURT:  All right.  That's fine.

 3              MS. HALL:  -- for the affirmative defense case.

 4              MS. HYNDMAN:  Judge, the equitable defense -- for the

 5      equitable --

 6              THE COURT:  Oh.

 7              MS. HYNDMAN:  Yes.  The stipulations relate to back

 8      and front pay.

 9              THE COURT:  Have you -- you haven't used any

10      stipulations with the jury, have you?

11              MS. HYNDMAN:  No.

12              THE COURT:  Because we have that in the jury

13      instructions.  It's not a big deal, but I'll take it out.

14              MS. HYNDMAN:  Yeah.

15              THE COURT:  I'll take it out.  And then would you

16      like me to e-mail you a new set?

17              MS. HALL:  Yes, please.

18              MS. HYNDMAN:  Yes.

19              THE COURT:  Okay.  I will e-mail all of you a new set

20      of jury instructions with that change and a verdict form

21      whenever I get it.

22              MS. HALL:  Yeah.  I'm reading it right now just to

23      make sure it's the right thing.

24              THE COURT:  I don't know what time we'll finish

25      today.  My guess is it will probably be close to the end of
```

1329

1    the day.

2         In terms of the equitable portion of the case, do you

3    have any live witness testimony or is it just the

4    stipulations?

5         MR. JEPSON:  Live.

6         THE COURT:  Let's start with plaintiff first.  Do you

7    have any witnesses?

8         MS. HYNDMAN:  Your Honor, we've stipulated on the

9    back and front pay, and so I think --

10        MR. JEPSON:  Well, it's not on --

11        MS. HALL:  No.

12        MR. JEPSON:  -- the equitable.  I'm sorry.

13        MS. HALL:  No.

14        MR. JEPSON:  It's on the affirmative defense, the

15   HIPAA defense.

16        MS. HYNDMAN:  Right.  So I think that --

17        THE COURT:  I'm sorry?  The -- I missed what you

18   said.  The --

19        MR. JEPSON:  It's on the HIPAA defense.

20        THE COURT:  Ah.  Okay.

21        MR. JEPSON:  After-acquired evidence.

22        THE COURT:  Okay.

23        MS. HYNDMAN:  Since we have stipulated on the back

24   and front pay, I think that it makes sense for them to go

25   first on their affirmative defenses, so --

```
 1              THE COURT:  How about --

 2              MS. HYNDMAN:  -- we'll -- we won't have any

 3   witnesses.  I mean, we won't have witnesses after they put on

 4   their case.

 5              MS. HALL:  We -- to be -- just to clarify real quick,

 6   we've stipulated on the amount she would have earned if she

 7   stayed at UCMC, because she would have earned what Dr. Shenaq

 8   did, but we haven't been put in any evidence about earnings

 9   since she left UCMC and the impact those might -- that might

10   have on those numbers.  There's, like, an interrogatory

11   response or two that I think are relevant to that.

12              MS. HYNDMAN:  And we will --

13              MR. JEPSON:  But it's --

14              MS. HYNDMAN:  We will --

15              MR. JEPSON:  -- to counter --

16              MS. HYNDMAN:  -- put in -- we're not going to put in

17   testimony.  We'll put in the interrogatory --

18              MS. HALL:  Yeah, fine.

19              MS. HYNDMAN:  -- responses.

20              MS. HALL:  Okay.  That should be quick.

21              THE COURT:  And then how many witnesses do you plan

22   on calling?  And how long do you think it will take?

23              MR. JEPSON:  We will simply -- Dr. Song has a couple

24   questions.  That'll be it.

25              THE COURT:  Okay.
```

1331

1     MR. JEPSON:  And Krista Curell will be laying the

2  background with respect to our policies and what we've done in

3  the past with respect to violations.

4     THE COURT:  Okay.  So we'll see where we are at

5  the --

6     MR. JEPSON:  And I suspect that that will be an hour.

7     THE COURT:  We'll see where we are tonight in terms

8  of when the case goes to the jury.  If it's too late, we'll

9  just do that tomorrow.

10    MR. JEPSON:  Yeah.  And we --

11    THE COURT:  Unless they stay.  They may want to stay.

12    MR. JEPSON:  I told Ms. Curell to be here tomorrow.

13    THE COURT:  Okay.  All right.  So we'll plan on doing

14  that tomorrow.

15    Anything else?

16    MS. HYNDMAN:  No.

17    MS. HALL:  Can I just get your e-mail address?

18    MR. JEPSON:  She e-mailed us.

19    MS. HALL:  I know, but it's not in my --

20    MR. JEPSON:  Okay.

21    MS. HALL:  I can get it from somebody else.

22    THE COURT:  No, I can give it to you.

23    MS. HALL:  Okay.

24    THE COURT:  It's *Amy*, A-m-y, underscore, *St*,

25  underscore, *Eve@ilnd.uscourts.gov*, and I'll send this back to

1332

 1    you.

 2              MS. HALL:  Yes.

 3              THE COURT:  Make sure you copy Ms. Franklin --

 4              MS. HALL:  Yes, I will.

 5              THE COURT:  -- and Ms. Hyndman.

 6              MS. HALL:  Thank you.

 7              THE COURT:  Also, please take the lunch hour to check

 8    your exhibits and have them ready to go back to the jury.

 9              MS. HYNDMAN:  Yeah.  I think we've got ours put

10    together, and we'll double-check.

11              THE COURT:  All right.  I'll see you.  Why don't you

12    come back at about five to 1:00, and we'll -- hopefully

13    everybody will be back, and hopefully Dr. Park will be here,

14    and we'll move forward.

15              MS. HYNDMAN:  Thank you.

16              MS. HALL:  Thank you.

17         (Recess taken at 11:37 o'clock a.m., until 12:55 o'clock

18    p.m., of the same afternoon.)

19                        *     *     *     *     *

20    I certify that the foregoing is a correct transcript from the
      record of proceedings in the above-entitled matter.
21

22    /s/ Joseph Rickhoff                      February 8, 2017
      Official Court Reporter
23
      /s/ Colleen Conway                       February 8, 2017
24    Official Court Reporter

25

1333

1              IN THE UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF ILLINOIS
2                      EASTERN DIVISION

3    DR. MARIA ARTUNDUAGA,          ) Docket No. 12 C 8733
                                    )
4                    Plaintiff,     )
                                    )
5              vs.                  )
                                    )
6    THE UNIVERSITY OF CHICAGO      )
     MEDICAL CENTER,                ) Chicago, Illinois
7                                   ) February 8, 2017
                     Defendant.     ) 1:55 o'clock p.m.
8

9                 TRANSCRIPT OF TRIAL PROCEEDINGS
          BEFORE THE HONORABLE AMY J. ST. EVE, AND A JURY
10

     APPEARANCES:
11

     For the Plaintiff:        THE FRANKLIN LAW FIRM, LLC
12                             BY:  MS. JAMIE S. FRANKLIN
                               53 W. Jackson Blvd., Suite 803
13                             Chicago, Illinois  60604

14                             ROBINSON, CURLEY & CLAYTON, P.C.
                               BY:  MS. CYNTHIA H. HYNDMAN
15                             300 South Wacker Drive, Suite 1700
                               Chicago, Illinois  60606
16
     For the Defendant:        VEDDER PRICE, P.C.
17                             BY:  MR. EDWARD C. JEPSON, JR.
                                    MS. ELIZABETH N. HALL
18                             222 N. LaSalle St., Suite 2600
                               Chicago, Illinois  60601
19
     Court Reporter:           MR. JOSEPH RICKHOFF
20                             Official Court Reporter
                               219 S. Dearborn St., Suite 1232
21                             Chicago, Illinois  60604
                               (312) 435-5562
22

23              * * * * * * * * * * * * * * * * *

24                      PROCEEDINGS RECORDED BY
                        MECHANICAL STENOGRAPHY
25              TRANSCRIPT PRODUCED BY COMPUTER

Park - direct
1334

```
 1              THE COURT:  Are you ready?

 2              MS. HALL:  Yes.

 3              THE COURT:  Bring in the jury, please.

 4         You should have received the instructions and the

 5    verdict form.  Hopefully you are okay with them both.

 6              MS. HYNDMAN:  I'm sure they are fine.

 7              THE COURT:  Here is a hard copy if you want.

 8         Dr. Park, you could come up here, if you would,

 9    please, ma'am.

10         The jury will be in momentarily.  Just please stay

11    standing.  Thank you.

12        (Jury in at 12:57 p.m.)

13              THE COURT:  You may be seated.

14         Your next witness, Mr. Jepson.

15              MR. JEPSON:  Dr. Julie Park.

16              THE COURT:  Would you raise your right hand.

17              JULIE PARK, DEFENDANT'S WITNESS, SWORN

18                        DIRECT EXAMINATION

19    BY MR. JEPSON:

20    Q.  Would you state your name for the record, please.

21    A.  Julie Park.

22    Q.  Are you a medical doctor?

23    A.  Yes, I am.

24    Q.  Where did you go to college?

25    A.  Harvard College.
```

Park - direct

1335

```
 1    Q.  And where did you go to medical school?

 2    A.  Johns Hopkins.

 3    Q.  After medical school, did you do a residency?

 4    A.  Yes, I did.

 5    Q.  And what was that in?

 6    A.  In plastic and reconstructive surgery.

 7    Q.  Where did you do that?

 8    A.  At Johns Hopkins.

 9    Q.  After that, did you do a fellowship?

10    A.  Yes, I did.

11    Q.  What was that in, Dr. Park?

12    A.  It was in breast microsurgery anesthetic reconstruction.

13         MS. HYNDMAN:  Your Honor, I don't mean to interrupt

14    the testimony, but if Dr. Park could speak up a little bit?  I

15    am having a little trouble hearing her.

16         THE COURT:  Yes.  Please speak up.

17         THE WITNESS:  Sorry about that.  Is that better?

18         THE COURT:  That should work.

19         THE WITNESS:  Sorry about that.

20    BY MR. JEPSON:

21    Q.  At some point in time, you became an attending physician;

22    is that correct?

23    A.  That is correct.

24    Q.  Where was your first stint as an attending physician?

25    A.  I worked at Mercy Medical Hospital in Baltimore, Maryland.
```

Park - direct

1336

1   Q.  And then at some point, did you come to the University of

2   Chicago Medical Center?

3   A.  Yes, I did.

4   Q.  And when was that?

5   A.  In 2008.

6   Q.  Are you still at the University of Chicago Medical Center?

7   A.  Yes, I am.

8   Q.  What positions do you hold there now?

9   A.  I am an associate professor of surgery.  I am the director

10  for the residency program and the director for breast

11  reconstruction.

12  Q.  When did you become the residency program director, if you

13  recall?

14  A.  In 2013.

15  Q.  And prior to that, have you been an assistant or associate

16  director of that residency program?

17  A.  That is correct.

18  Q.  And that was when Dr. Song was the program director?

19  A.  That is correct.

20  Q.  Now, I want to direct your attention to Dr. Maria

21  Artunduaga.

22          You know her, correct?

23  A.  Yes, I do.

24  Q.  And did you interview Dr. Artunduaga for the residency

25  program at UCMC?

Park - direct

1   A.  Yes, I did.

2   Q.  And did you review her application?

3   A.  Yes, I did.

4   Q.  What was your impression of her?

5   A.  I thought at the time that she had an application that

6   showed a lot of skill in terms of publishing and research as

7   she had board scores that were what we were expecting, and she

8   had very good letters of recommendation.  When we spoke with

9   her in our interview, she came off as a very vivacious,

10  energetic person.

11  Q.  So did you think she was an impressive candidate?

12  A.  Yes, I did.

13  Q.  And did you vote to rank her highly?

14  A.  Yes, I did.

15  Q.  Did you notice when you met her that she had an accent?

16  A.  Yes.

17  Q.  Did you ever have any difficulty communicating with her

18  because of the accent?

19  A.  No, I did not.

20  Q.  At the time that you were impressed by her, did you know

21  that she was from Colombia?

22  A.  Yes, I did.

23  Q.  Did you know she was a foreign medical graduate?

24  A.  Yes.

25  Q.  Now, during the first few months Dr. Artunduaga was at

Park - direct

1338

1  UCMC, did you have much contact with her at all?

2  A.  Not direct.

3  Q.  Okay.  At some point in time did you attend a meeting with

4  Dr. Song, Dr. Artunduaga, Akilah Williams to talk about

5  Dr. Artunduaga's performance?

6  A.  Yes, I did.

7  Q.  And can you briefly describe that meeting for us?

8  A.  It was in the fall.  We got together to discuss a lot of

9  concerns that had come through the various rotations that

10  Maria had done so far in terms of her performance.

11  Q.  At that point in time, did Dr. Song offer Maria a choice

12  of any sort?

13  A.  Yes, he did.

14  Q.  What do you recall that being?

15  A.  One choice was to leave training in plastic surgery and we

16  would help her find training in another medical subspecialty,

17  or to go through probation if she decided she wanted to

18  continue in a plastic surgery training program.

19  Q.  All right.  I want to direct your attention, if we can, to

20  Joint Exhibit 22, which will show up on the screen there.

21         If you take a moment, Dr. Park --

22         MR. JEPSON:  Would you blow it up a little bit,

23  Michael, so it's more easily readable.

24  BY MR. JEPSON:

25  Q.  Take a moment and read through that document.

Park - direct
1339

 1        (Brief pause.)

 2             MR. JEPSON:  Go to the next paragraph, Michael, and

 3    track down to the bottom.  Then let's go to the second page.

 4    BY MR. JEPSON:

 5    Q.  Tell me if I'm going way too fast.

 6    A.  I'm okay.

 7    Q.  Did Akilah Williams take notes at this meeting?

 8    A.  I believe she did.

 9    Q.  And having looked at this, does this reflect what happened

10    at the meeting?

11    A.  Yes, it does.

12    Q.  Looking at the bottom, did you sign this document?

13    A.  Yes, I did.

14    Q.  All right.  Did you come to understand whether

15    Dr. Artunduaga chose to transition to another specialty or

16    accept the probation?

17    A.  I was informed that she decided to accept probation.

18    Q.  Do you know if she was given a probation letter?

19    A.  I believe she was.

20    Q.  Let's look at Joint Exhibit 26.

21             Do you recognize this document?

22    A.  Yes, I do.

23             MR. JEPSON:  Go to the second page, if you would,

24    Michael.

25

Park - direct

1340

```
 1   BY MR. JEPSON:
 2   Q.  And what is this?
 3   A.  I'm sorry?
 4   Q.  What is this?
 5   A.  This is the letter that was outlining the probation and
 6   the requirements of what she would need to pass probation.
 7   Q.  All right.  On the second page, I want to direct your
 8   attention to Paragraph 2, which says, "You are required to
 9   schedule and meet with Dr. Julie Park, acting in the role of
10   mentor, at least every other week.  Dr. Park may elect to
11   change the frequency and will provide updates to me on the
12   progress being made to address performance issues."
13           Did you assume the role of mentor to Dr. Artunduaga?
14   A.  Yes, I did.
15   Q.  And, by the way, did you keep Dr. Song updated as it went
16   along?
17   A.  Just that we were meeting.  I did not give him the
18   details.  We decided later that he would like to be kept
19   separate during the course of the probation.
20   Q.  And now, what did you do to mentor Dr. Artunduaga
21   generally?
22   A.  I wanted to make sure that the very clear goals that were
23   outlined in this letter could be addressed.  So I created a,
24   basically, feedback form for Maria to have on her rotations.
25           Typically our residents only get evaluated at the end
```

Park - direct

1341

1   of the month, and they start trickling in when you have

2   already moved on to a different service.  So there is not as

3   much ability to address anything that occurs in realtime.

4   So --

5   Q.  Let me stop you there.

6        That form you created?

7   A.  That is correct.  I created it with the help of Akilah

8   Williams, who put it into the computer system that people were

9   accustomed to using.

10  Q.  And that form's categories were different than the

11  attending physician categories?

12  A.  Correct.  It was tailored specifically to the requirements

13  that had been outlined in this letter.

14  Q.  And who did you intend to fill that -- those feedback

15  evaluations of?

16  A.  The services in the hospital rotated on what we call

17  teams.  That is a combination of the surgeons that the

18  residents are covering.  Every team has a little bit of a

19  different composition but usually involves some sort of

20  collection of junior and senior residents, and sometimes you

21  have a fellow or a nurse practitioner or a physician

22  assistant.

23        So regardless of what the specifics of the particular

24  rotation was, it was the team, the people who would be working

25  and caring for the patients, that had access to this, and that

Park - direct

1342

1   they would fill it out on a weekly basis so that when I met

2   with Maria then the following week, we could review the events

3   that had occurred.

4   Q.  Okay.  So, basically, is it fair to say everybody other

5   than the attendings?

6   A.  Yes.

7   Q.  All right.

8         Now, did you actually meet with Dr. Artunduaga on a

9   regular basis?

10  A.  Yes, I did.

11  Q.  Do you recall approximately how many times you met with

12  her?

13  A.  Pretty much once a week every week that she was in town

14  and available.

15  Q.  During those meetings, in general, what did you cover?

16  What did you do?

17  A.  We first had just a session where it was free-form; tell

18  me what happened, what's going on, what are your concerns.  We

19  reviewed any evaluations or feedback forms that had come in

20  during that period, and we basically discussed any active

21  issues.  We went over scenarios and things of how we could

22  break it down and address them.

23  Q.  Did you try to give her advice?

24  A.  Yes, I did.

25  Q.  And did Akilah Williams attend these meetings as well?

Park - direct

1343

1   A.   Yes, she did.

2   Q.   And did Akilah Williams keep notes at these meetings?

3   A.   Yes, she did.

4   Q.   And did Akilah Williams transcribe those notes?

5   A.   Yes, she did.

6   Q.   Did you review them?

7   A.   Yes, I did.

8   Q.   Did you then cause them to be placed in a file for

9   Dr. Artunduaga?

10  A.   Yes, I did.

11  Q.   Did that happen at every meeting?

12  A.   Every meeting that we had.

13  Q.   Okay.  So you followed that same process?

14  A.   Correct.

15  Q.   In addition, did you have an acknowledgment form signed by

16  Dr. Artunduaga for each meeting?

17  A.   Yes, we did.

18  Q.   Do you recall that the first meeting you had with

19  Dr. Artunduaga took place before she went to Colombia for the

20  month of December?

21  A.   Yes it did.

22  Q.   Let me direct your attention first to Joint Exhibit 39.

23       Have you seen this before?

24  A.   Yes.

25  Q.   Is this the acknowledgment form you described earlier?

Park - direct

1344

```
 1   A.  Yes, it is.

 2   Q.  And do you see the date at the top?

 3   A.  Yes.

 4   Q.  Does this refresh your memory that that first meeting

 5   would have occurred on or about that date?

 6   A.  Yes, it did.

 7   Q.  Were minutes kept of that meeting as well?

 8   A.  Yes.

 9        MR. JEPSON:  This has not been published to the jury

10   or admitted.

11        Let's go to Defendant's Exhibit 67.

12   BY MR. JEPSON:

13   Q.  Do you recognize this document?

14   A.  Yes.

15   Q.  What is it?

16   A.  These are the minutes from the meeting I had on November

17   28th, 2011, between Dr. Artunduaga and myself and Akilah

18   Williams.

19   Q.  And Ms. Williams would have transcribed these?

20   A.  Yes.

21   Q.  And you would have reviewed them at the time?

22   A.  Around the time that she sent them to me.

23   Q.  And would you then have caused them to be placed in her

24   file?

25   A.  Yes.
```

Park - direct

1345

1    Q.  In the normal course?

2    A.  Yes.

3            MR. JEPSON:  I will move the admission of this

4    document.

5            THE COURT:  Any objection?

6            MS. HYNDMAN:  No objection.

7            THE COURT:  It's admitted.

8        (Defendant's Exhibit 67 was received in evidence.)

9    BY MR. JEPSON:

10   Q.  I want to direct your attention to the top of this

11   document.  It says, "Dr. Park covered in detail the seven-page

12   document that was typed by Maria, reviewing what Maria says

13   happened with several patients."

14           Do you remember what that document was?

15   A.  Yes.

16   Q.  Let me show you what has been marked as Joint Exhibit 27.

17           MR. JEPSON:  If you would scroll down a bit, Michael,

18   and then go to the next page.

19   BY MR. JEPSON:

20   Q.  Is this the document that you are referring to as having

21   been discussed with Dr. Artunduaga?

22   A.  Yes, it is.

23   Q.  And it says here that you would have discussed Patient No.

24   1?

25   A.  That is correct.

Park - direct

1346

1  Q.  And is this Patient No. 1 -- or the reference to Patient

2  No. 1 here on the second page of the document?

3  A.  I think so, but since I can't pull up -- but basically I

4  went through all the specific patient scenarios that had been

5  discussed both by Dr. Song and her explanation -- so we had

6  the two points of view -- and discussed what other action she

7  could have taken, so that if she was faced with a similar

8  situation in the future, it would not have been a problem.

9  Q.  So is it fair to say that you were giving -- trying to

10 give her advice to avoid these issues?

11 A.  Not just advice, but active teaching.

12 Q.  Okay.  And you did that with respect to the letter in

13 general?

14 A.  Yes, I believe with all the clinical scenarios that were

15 listed.

16 Q.  Okay.  Let's take a look at the second page of Defendant's

17 Exhibit 67.

18       There is a bullet point that says "Evaluations."  And

19 there is a little hollow bullet point that says, "Maria stated

20 she spoke with Dr. Ferguson and was familiar with his

21 evaluation, and that she also went over his evaluation of her

22 with Dr. Song."

23       Did you discuss that with Dr. Artunduaga?

24 A.  Yes.  I just wanted to make sure she was aware of what was

25 already in her evaluation system, that she had read

Park - direct

1347

1    everything, and that we had the opportunity to discuss any

2    questions she would have about it.

3    Q.  Let's take a look at Joint Exhibit 20.

4         This is the first page of what appears to be an

5    attending evaluation.

6         Do you recognize this as the evaluation you would

7    have discussed with Dr. Artunduaga?

8    A.  Yes, I do.

9    Q.  Okay.  Let's go back to Defendant's Exhibit 67, please.

10        It says also here, "Dr. Park discussed the

11   evaluations of Drs. Carla Moreira and Eric Grossman and Kristy

12   Todd.  It was again discussed that Maria should better

13   identify what are the main problems and become better at

14   verbalizing patient concerns."

15        So is it fair to say that you would have gone over

16   the feedback evaluations of these physicians?

17   A.  That is correct.

18   Q.  Let's take a look, if you would, at Joint Exhibit 31.

19        And in particular, at the top there, it appears this

20   is from somebody named Kristy Todd?

21   A.  Yes.

22   Q.  And appears to be dated 11-21 through 11-25.

23        Do you recognize this as an evaluation that you would

24   have gone over with Dr. Artunduaga at that meeting?

25   A.  Yes.

Park - direct

1348

1  Q.  And let's take a look, if we would, at the next document,

2  which is Joint Exhibit 32.

3          This appears to be a -- I will call it feedback

4  evaluation because it's different than the attending, right?

5  A.  That is correct.

6  Q.  This appears to be one from Dr. Carla Moreira?

7  A.  That is correct.

8  Q.  And again from that same week?

9  A.  Yes.

10  Q.  And you would have discussed with Dr. Artunduaga this

11  evaluation, correct?

12  A.  That is correct.

13  Q.  And, indeed, you would have discussed the overall comments

14  at the end of this?

15  A.  Yes.

16  Q.  So you would have discussed those comments with her?

17  A.  Yes, I did.

18  Q.  Let's go to Joint Exhibit 33.

19          This appears to be another feedback evaluation from a

20  nurse practitioner?

21  A.  Yes.

22  Q.  In the minutes, it references going over this one, too,

23  correct?

24  A.  That is correct.

25  Q.  And then Joint Exhibit 34.

Park - direct

1349

1    This appears to be a feedback evaluation from another

2  nurse practitioner named Nirja Mehta, correct?

3  A.  Yes.

4  Q.  Do you recall reviewing this as well with Dr. Artunduaga?

5  A.  We would have reviewed it as well.

6  Q.  Okay.  Thank you.

7    The next bullet point in the Evaluation section says,

8  "Dr. Park discussed the need for Maria to improve how she

9  receives both positive and negative feedback.

10   "Maria suggested some examples that could help her,

11  such as acknowledging the comments before rushing into

12  explaining her side of the story."

13   Did you do that with Dr. Artunduaga at this meeting?

14  A.  Yes.

15  Q.  All right.

16   Dr. Artunduaga would have been gone to Colombia for

17  the month of December, correct?

18  A.  Yes.

19  Q.  And do you recall meeting with her very close in time to

20  when she returned?

21  A.  Yes, I did.

22  Q.  Let me show you what's been marked as Defendant's Exhibit

23  81.

24   MR. JEPSON:  Which has not yet been introduced into

25  evidence or admitted.

Park - direct

 1   BY MR. JEPSON:

 2   Q.  At the top, there is the date of January 3, 2012.

 3           Do you recognize it now that it's up there for you to

 4   see?

 5   A.  I am still waiting for the screen to -- yes, now I do.

 6   Q.  Okay.  What is this?

 7   A.  This is the minutes from the meeting of January 3rd, 2012,

 8   between myself, Dr. Artunduaga, and Akilah Williams.

 9   Q.  Okay.  So this refreshes your memory that a meeting took

10   place that day?

11   A.  Yes.

12   Q.  And these minutes from that meeting would have been

13   prepared for and kept in the normal course as you described

14   earlier?

15   A.  Yes.

16           MR. JEPSON:  I will move their admission into

17   evidence.

18           THE COURT:  Any objection?

19           MS. HYNDMAN:  No objection.

20           THE COURT:  They are admitted.

21       (Defendant's Exhibit 81 was received in evidence.)

22   BY MR. JEPSON:

23   Q.  I want to direct your attention to the second bullet

24   point.

25           It says, "Dr. Park suggested that Maria perform the

Park - direct

1351

1    following when consulting a patient."  And then it includes a

2    number of bullet points.

3            "Define what is urgent/nonurgent, needs to be

4    operated on.  If there are questions, always err on the urgent

5    side."

6            Next bullet point:  "Define why vascular is being

7    consulted."

8            Next bullet point:  "Think as a surgeon.  Show her

9    that she has assessed the situation."

10           Next bullet point:  "Look at the patient's blood

11   flow."

12           The next one:  "Obtain pulses."

13           And then the final one:  "Find a Doppler."

14           What were you doing here?

15   A.  I was trying to teach her how to efficiently seek consults

16   while she was on the service.

17   Q.  Okay.  In your experience, does an intern come already

18   prepared with this kind of information?

19   A.  Typically.

20   Q.  In fact, when do you typically learn it, in your

21   experience?

22   A.  Medical school.

23   Q.  And then the last bullet point says, "Reviewed

24   evaluations," and it lists Carla Moreira, Nirja Mehta, Amy

25   Durkin, Mark Ferguson, and Wickii Vigneswaran.

Park - direct

1352

1     Dr. Vigneswaran was an attending at the time,

2 correct?

3 A.  That is correct.

4 Q.  It didn't appear that you reviewed this earlier, so did it

5 come in later from your last meeting?

6 A.  Correct.  So the attending evaluations tend to happen at

7 the end of the month.  So they often come into play once you

8 left the service.

9 Q.  All right.  Let's direct your attention, if we can, to

10 Joint Exhibit 21.

11     Do you recognize this?

12 A.  Yes, I do.

13 Q.  Is this the evaluation of Dr. Vigneswaran of

14 Dr. Artunduaga's performance on thoracic rotation in November

15 2011?

16 A.  Yes, it is.

17 Q.  And this is something you would have discussed?

18 A.  Yes.

19 Q.  And you would have also discussed the feedback evaluations

20 of the physician extenders as well from that month that came

21 in later, correct?

22 A.  Correct.

23 Q.  All right.  And, of course, another acknowledgment would

24 have been signed at this meeting, correct?

25 A.  That is correct.

Park - direct

1353

1    Q.  Now, at this point, she really hadn't been doing much work

2    in January, correct?

3    A.  It was the very beginning of the rotation.

4    Q.  All right.  Did you meet again with her a week later or

5    so?

6    A.  Yes, I did.

7    Q.  Let me direct your attention, if we can, to Defendant's

8    Exhibit 82.

9            THE COURT:  It is not in evidence.

10           MR. JEPSON:  Correct.

11           THE COURT:  Is there any objection to its admission?

12           MS. HYNDMAN:  No objection.

13           THE COURT:  I will admit it.

14           MR. JEPSON:  Thank you, your Honor.

15       (Defendant's Exhibit 82 was received in evidence.)

16   BY MR. JEPSON:

17   Q.  It appears here at -- are these the minutes of the meeting

18   you had with her on January 10th, 2012?

19   A.  Yes, it is.

20   Q.  And where it says in the first bullet point you had

21   received feedback evaluations from those -- from that resident

22   and fellow?

23   A.  Yes, I had.

24   Q.  You noted that the scores were better?

25   A.  They had showed improvement.

Park - direct

1354

1    Q.  Dr. Artunduaga told you that she felt good and refreshed?

2    A.  Yes, she did.

3    Q.  And then she also indicated that she felt she was able to

4    run the floor with less P.A.s on the service?

5    A.  That is correct.

6    Q.  And then there is another bullet point, the fourth one

7    down.  "Dr. Park expressed concern over being unable to use

8    the data Maria presented to her over the weekend.  Her numbers

9    did not match."

10          Is this an experience you had directly with

11   Dr. Artunduaga at that time?

12   A.  Yes, it is.

13   Q.  Would you tell us what happened as best you can recall.  I

14   know it's now five years later.

15   A.  On the weekends, multiple services get covered by the same

16   intern, vascular being one of the same services that's covered

17   by the same interns of plastic surgery.  So Maria, who was

18   that particular intern, was covering my service as well.

19          I do a lot of complex breast reconstruction, which

20   can involve operations that can be 10 or 12 hours long, where

21   you take a lady's own tissue to make breasts out of it, and we

22   can lose some blood.  I was following this particular patient

23   because she had some evidence of a little bit of a rapid heart

24   rate.  Her pressures could be a little bit low.  I was trying

25   to determine whether or not she needed more fluid or whether

Park - direct

1355

1    or not she would need actual blood.

2         In the setting of cancer patients, I try to avoid

3    giving blood if possible because it does cause a transient

4    decrease in your immune system.  So for cancer patients, the

5    bar is higher for me for giving blood.

6         One of the data points that I would need would be

7    what her blood values were that morning.  And when I spoke

8    with my senior residents, those labs were still being

9    processed.  So it was signed out for the intern on that day to

10   notify me what those values would be.

11        Additionally, I wanted to look at something called

12   orthostatic vital signs, which is looking at the blood

13   pressure and the heart rate in the patient in multiple

14   positions -- lying down, sitting up, and standing up.  If

15   there are certain changes in the heart rate and the blood

16   pressure, it gives -- in those different positions, it gives

17   you a sense of whether or not they are a little bit low

18   volume.

19        So if you ever are a little bit dehydrated and you go

20   from lying down to standing up really fast and you get dizzy,

21   it's because your blood is not getting to your brain fast

22   enough.  You wait a minute and then your head clears up.

23   That's a great example of orthostatic hypertension.

24   Q.  What did you consult with Dr. Artunduaga about?

25   A.  She was replying with that information, but it came to me

Park - direct

1    rather piecemeal.  I had to keep prompting her for more

2    values.  They weren't making sense.  I --

3    Q.  By "sense" -- in what sense were they not making sense?

4    A.  They had to do with the vital signs.  I can't remember the

5    details, but I remember thinking they weren't making any sense

6    to me in terms of physiologic changes that would occur.

7           So this was -- we text message a lot, because I

8    recognize that, you know, residents are busy.  You don't want

9    to hook them up to a telephone.  So I'm fine with them giving

10   me messages via text message.

11          So it was a lot of texting going back and forth.

12   Finally, I just called her because I wanted to get to the

13   point, and I asked her for some clarity.  And it turned out

14   that the values that she was getting, she was calling the

15   nurse to get them and kind of blamed the nurse for giving her

16   the wrong values, and these are values that could be looked at

17   in the computer.  If they hadn't been entered by a nurse in

18   the computer -- the patients at this time, I believe, were on

19   our unit still.  This was an intensive care unit.  You could

20   just go and get them.  That's very easy to do.

21          And because this was not just a question of what is a

22   value, but information you need to determine whether or not I

23   was going to transfuse somebody, I really needed accurate

24   information.  And with this, if there was some question about

25   getting, you know, accurate information via a telephone call

Park - direct

1357

1    to a nurse -- I really do expect that my residents go

2    personally see the patient, evaluate them, get them themselves

3    if there is any question about having problems communicating

4    through a nurse.

5    Q.  And did you tell Dr. Artunduaga that?

6    A.  Yes, I did.

7    Q.  And, indeed, is that -- there is a little bubble point;

8    "Maria should rely on her senior more to verify that she is

9    relaying the correct information to attendings.  She should

10   utilize her resources."

11   A.  Correct.

12   Q.  All right.  Do you recall meeting again with

13   Dr. Artunduaga a week or so later?

14   A.  Yes, I did.

15   Q.  Let me direct your attention to Defendant's Exhibit 87.

16        MR. JEPSON:  Which is not in evidence yet.

17        THE COURT:  Is there any objection to its admission?

18        MR. JEPSON:  It will be the same foundation.

19        MS. HYNDMAN:  No objection.

20        THE COURT:  It's admitted.

21     (Defendant's Exhibit 87 was received in evidence.)

22   BY MR. JEPSON:

23   Q.  Dr. Park, take a moment and look at this.

24        What is this document?

25   A.  These are the minutes of the meeting of January 18th,

Park - direct

1358

1    2012, between myself, Dr. Artunduaga, and Akilah Williams.

2    Q.  All right.  I want to direct your attention down to No. 6.

3    It says, "Dr. Park reviewed Maria's evaluations, which showed

4    improvement again."

5            Do you see that?

6    A.  Yes.

7    Q.  And, again, these would have been evaluations that were

8    feedback evaluations.  Am I correct?

9    A.  That is correct.

10   Q.  So not the attending evaluations?

11   A.  That is correct.

12   Q.  I, then, want you to go one point down.  "Dr. Park has

13   noticed that she has improved her listening skills and has

14   stopped interrupting others.  She feels Maria should listen

15   carefully to what others tell her."

16           So this was an improvement you noted, correct?

17   A.  Yes, that is correct.

18   Q.  And did you mention it to Dr. Artunduaga, as it indicates

19   here, in the meeting?

20   A.  Yes, I would have.

21   Q.  And then it says, "Next month, Maria will be on the

22   transplant rotation and she will speak with the P.A. prior.

23   She will also be attending clinic."

24           Were you trying to get her ready for the next

25   service?

Park - direct

1359

1    A.  Yes, I was.

2    Q.  Now I want to direct your attention to another meeting

3    minutes, I believe.  Let's go to Defendant's Exhibit 88.

4            THE COURT:  Any objection to the admission?

5            MS. HYNDMAN:  No objection.

6            THE COURT:  It's admitted.

7        (Defendant's Exhibit 88 was received in evidence.)

8    BY MR. JEPSON:

9    Q.  Do you recall meeting again -- does this refresh your

10   memory that you met again with Dr. Artunduaga on January 25th,

11   2012?

12   A.  Yes.

13   Q.  And do these minutes reflect what you and Dr. Artunduaga

14   discussed?

15   A.  Yes.

16   Q.  In particular, here again No. 5 it indicates that the

17   evaluations from Dr. Shao and Dr. Paruch were both positive.

18   "Maria should keep up the good work."

19           That's what you told her, correct?

20   A.  Yes.

21   Q.  And then there is an item where, "Maria recently had a

22   negative experience with one of the nurses."

23           Do you recall, in general, what that was about rather

24   than have us read the whole thing?

25   A.  Sure.  I believe that Maria was caring for a patient who

Park - direct

1360

1    required insulin.  This is to help control how much glucose is

2    in the patient's blood at any one given time.  Every person

3    has a different need.  So we often titrate or change it

4    according to how they are doing.  Also it depends on what they

5    are eating and how they are eating.

6              I believe that Maria had made changes to the orders

7    for that patient and that the nurse didn't actuate it.  So

8    Maria contacted the nurse to talk about this, and the nurse

9    and Maria got into a little bit of a conflict that came down

10   to the nurse saying she was following her orders, didn't see

11   Maria's orders, and that she knew the patient -- "she" being

12   the nurse -- since she had been covering her for three days;

13   and that Maria was basically saying, you know, "You should

14   talk to me.  I'm the resident caring for her."  But the nurse

15   had taken some offense with, I believe, the tone of the

16   conversation and stuck to the position of, she was just doing

17   her job.

18             So basically it --

19   Q.  Did you give Dr. Artunduaga some advice?

20   A.  This was really just about interpersonal conflicts that

21   could be applied to any situation, not just resident and

22   nurses, but often does come into play between residents and

23   nurses in the hospitals.

24             It was my way of saying how to appease somebody who's

25   upset while still getting your point across because

Park - direct

1361

```
 1   ultimately, unlike when you are fighting with the cable guy,

 2   you have to make sure that the patient is getting safely taken

 3   care of.

 4          So we deconstructed, in a way, the conflict, and I

 5   gave some suggestions of other phrases you could say to deal

 6   with somebody who is being argumentative.

 7   Q.  By the way, how long typically did you spend with

 8   Dr. Artunduaga at each of these meetings?

 9   A.  Our meetings were approximately an hour.

10   Q.  Do you recall meeting with Dr. Artunduaga yet again on or

11   about February 6th, 2012?

12   A.  Yes.

13   Q.  I want to direct your attention to Defendant's Exhibit

14   101.

15          MR. JEPSON:  Which is not yet in evidence.

16          THE COURT:  Is there any objection to its admission?

17          MS. HYNDMAN:  No objection.

18          THE COURT:  It's admitted.

19     (Defendant's Exhibit 101 was received in evidence.)

20   BY MR. JEPSON:

21   Q.  Would you take a moment and review this briefly, Dr. Park.

22   A.  Yes.

23   Q.  What is this?

24   A.  These are the meetings from February 6th, 2012, between

25   myself, Dr. Artunduaga, and Akilah Williams.
```

Park - direct

1362

1    Q.   Okay.  And this would have been the minutes from that

2    meeting?

3    A.   That is correct.

4    Q.   I want to direct your attention to bullet point No. 3.  It

5    says, "Maria mentioned she had worked over the 80-hour limit

6    and one day she worked two hours over the limit.  Dr. Park

7    expressed that she needs to work on managing her time better

8    in order to properly follow guidelines set by ACGME."

9             Did you have that discussion with Dr. Artunduaga on

10   that day?

11   A.   Yes, I did.

12   Q.   The next bullet point.  "Maria noted that it has been

13   difficult to keep up with the workload on transplant service.

14   Dr. Park told her that every intern faces the same problems

15   and that she should identify her barriers and work to fix

16   them."

17            Did you have that exchange?

18   A.   Yes, I did.

19   Q.   Was this in relationship to the hours that she -- the

20   over-hours issue?

21   A.   That is correct.

22   Q.   Maria told you that her presentations had gone well,

23   correct?

24   A.   That is correct.

25   Q.   And then there is a bullet point about an issue arising

Park - direct

1363

1   with Dr. Jaskowiak, a phone call from Dr. Jaskowiak to

2   Dr. Artunduaga.

3           Do you see that?

4   A.  Yes.

5   Q.  And do you recall that that involved an issue of a refill

6   of an antibiotic prescription over the phone that Maria had

7   done back in August?

8   A.  That is correct.

9   Q.  And it says here -- there is a bullet point, third bullet

10  down.  I'm sorry.  Strike that.

11          Second bullet point down says, "Maria gave

12  Dr. Jaskowiak the impression she was giving excuses instead of

13  trying to manage the patient's problem."

14          Did you tell that to Dr. Artunduaga?

15  A.  Yes.

16  Q.  And how did you get that information?

17  A.  From a conversation with Dr. Jaskowiak.

18  Q.  Thank you.

19          MS. HYNDMAN:  Your Honor, can we have a limiting

20  instruction on that, please.

21          THE COURT:  Yes.

22          Ladies and gentlemen, the statement from

23  Dr. Jaskowiak has not been offered for the truth of what was

24  said but instead is being offered for its impact on Dr. Park.

25

Park - direct

1364

1  BY MR. JEPSON:

2  Q.  All right.  And then it appears that -- the later bullet

3  points, are you trying to give her advice as to how to handle

4  an issue like this when it comes up?

5          MS. HYNDMAN:  Objection, your Honor.  Leading.

6          THE COURT:  Sustained on leading.

7          MR. JEPSON:  I will read it then.

8  BY MR. JEPSON:

9  Q.  "Dr. Park told her that, when confronted with an issue in

10  which she has made a mistake, she should promptly apologize

11  and explain that it will not happen again to appease the

12  current concern."

13          Did you tell Dr. Artunduaga that?

14  A.  Yes.

15  Q.  "There is no need to explain at that point what happened.

16  She can send a follow-up email later with background

17  information regarding the situation."

18          Did you tell her that?

19  A.  Yes, I did.

20  Q.  And, in your mind, was that advice as to how to handle

21  this kind of situation when it comes up?

22          MS. HYNDMAN:  Objection, your Honor.  Leading.

23          THE COURT:  Sustained.  That's leading.  Rephrase.

24  BY MR. JEPSON:

25  Q.  Was this advice?

Park - direct

1365

1   A.  Yes, it was.

2   Q.  And for what purpose?

3   A.  It's advice on how to deal with conflicts that occur where

4 people's emotions may be riding high and how to successfully

5 sort of soothe the other person to make them feel that the

6 problem that caused that conflict would not happen again, a

7 recognition that at that particular time the other person

8 typically isn't receptive to hearing anything else other than,

9 make sure whatever just occurred doesn't happen again.

10 Especially in the medical setting when it's dealing with the

11 care of another patient, you really want to make sure that

12 something like this or a near miss or a potential harm won't

13 come again.

14       When you start trying to hear details, it can sound

15 defensive and sound like you are giving excuses, which isn't

16 the impression that you want to give when you are a resident.

17 When you are a resident talking to an attending and you are

18 getting a conversation about something that you have done

19 wrong, you want to give the impression that you understand

20 what the problem was and that it won't happen again.

21   Q.  Did you and Dr. Artunduaga discuss responding in an email

22 eventually to Dr. Jaskowiak?

23   A.  Yes, I did.

24   Q.  And do you know if Dr. Artunduaga eventually did that?

25   A.  Yes, she did.

Park - direct

1366

1   Q.  All right.  Let's take a moment and go to the next

2   meeting, which is February 13, 2012.  I'm sorry.  Defendant's

3   Exhibit 104.

4           THE COURT:  Is there any objection to the admission?

5           MS. HYNDMAN:  No objection.

6           THE COURT:  It's admitted.

7           MR. JEPSON:  Thank you, your Honor.

8       (Defendant's Exhibit 104 was received in evidence.)

9   BY MR. JEPSON:

10  Q.  Before we get to the subject or the details here, had you

11  at this point started to see some of the evaluations come in

12  from attendings from the vascular service?

13  A.  Yes, I had.

14  Q.  At some point in time around this meeting, were there

15  any -- was there anything that happened that caused you to

16  question whether these were valid or not?

17  A.  I can't remember the specifics of the order in which

18  things are happening.

19  Q.  Why don't you just tell us what happened.

20  A.  Sure.

21          As we were reading through different evaluations,

22  Maria would make some comments that struck me as odd.  These

23  would be attending evaluations, such as so-and-so wrote that

24  before she could speak with him.  And that stood out because

25  residents typically don't speak with attendings before their

Park - direct

1   evaluations.  I didn't quite understand why that would be

2   necessary, and it was a little bit concerning to me.

3   Q.  Okay.  Did anything else happen along those lines?

4   A.  I also got feedback from one of my own plastic surgery

5   residents that, unsolicited, a nurse from another rotation

6   came to him and said that she was uncomfortable with doing the

7   feedback evaluations -- the weekly feedback evaluations --

8   because she had been told by an attending on that service that

9   she had to write favorable evaluations to keep Maria in the

10  program.

11          MS. HYNDMAN:  Your Honor, I move to strike.  There

12  are about five levels of hearsay in that answer.

13          MR. JEPSON:  We will try to parse it out.

14          THE COURT:  And are you offering it for the truth?

15          MR. JEPSON:  No, no.  It's just for the impact on

16  this witness.

17          THE COURT:  I think the instruction is appropriate

18  then.

19          The comments in the testimony about what others had

20  said and what others told others, those comments are not being

21  offered for the truth of what was said but rather to show the

22  impact on Dr. Park.

23  BY MR. JEPSON:

24  Q.  Did anything else happen that caused you to question again

25  this evaluation process?

Park - direct
1368

1  A.  There was also an interaction with one of the transplant

2  attendings where --

3  Q.  Who was that?

4  A.  That was Dr. Becker.

5       There was --

6  Q.  Before we go there --

7  A.  Sure.

8  Q.  -- did you ever have a discussion with Dr. Skelly?

9  A.  Yes, I did.

10  Q.  Is that Christopher Skelly?

11  A.  Yes.

12  Q.  What role does he have, or what kind of surgeon was he?

13  A.  He is a vascular surgeon.

14  Q.  And do you know -- does he have any title in that section?

15  A.  He is the chief of vascular surgery.

16  Q.  Did you ever have occasion to speak with him about the

17  evaluation process for the vascular rotation as it related to

18  Dr. Artunduaga?

19  A.  Yes.  I called him.

20  Q.  I am going to ask --

21       MR. JEPSON:  And I will anticipate you want the

22  instruction.

23       MS. HYNDMAN:  I do.

24       MR. JEPSON:  Okay.  We will have the instruction.

25  BY MR. JEPSON:

Park - direct

1369

1   Q.  Never mind that.  That's just lawyers.

2          Tell us, to the best of your recollection, about that

3   discussion you had with Dr. Skelly.

4          THE COURT:  Ladies and gentlemen, before she does,

5   what Dr. Skelly said to this doctor is not being offered for

6   the truth of what Dr. Skelly said.  Instead it is being

7   offered for the impact on Dr. Park.

8   BY MR. JEPSON:

9   Q.  Go ahead, Dr. Park.

10  A.  I was just trying to figure out what was happening because

11  I wasn't directly in the services, but different comments were

12  now coming up from different sources that made me start

13  thinking something was going on in terms of how valid I could

14  rate evaluations.

15  Q.  Is this what prompted you to contact Dr. Skelly?

16  A.  Yes.  I called him.

17  Q.  Let's focus on that conversation.

18         What do you recall Dr. Skelly saying to you and you

19  saying to him?

20  A.  So I called him and I said, "Is anything unusual or

21  different going on with this process?"

22         And he told me that prior to Maria starting the

23  rotation -- he was very political and said he was not going to

24  give names -- but another senior surgeon had told him that we

25  had to rate Maria favorably in order to keep her in the

Park - direct

1    program.

2    Q.  All right.  Let's then go to the February 13th, 2012,

3    meeting, Defendant's Exhibit 104.  And I want to direct your

4    attention to the first paragraph there.  It says, "On

5    Saturday, the 11th, Maria rounded from 9:30 until 5:30.  She

6    usually leaves around 11:00.  She rounded with just her and

7    the attending.  She stayed five hours over.  She did not have

8    to work on Sunday."

9           What was that about?

10   A.  This is, again, in regards to her work hours.

11   Q.  Do you recall anything -- any concerns about this?

12   A.  She is over her hours now for two weeks in a row -- the

13   first one being two hours; the second one being five hours.

14   These are still -- it's still a time frame that, with the rest

15   of the time in that month, could be made up.  The 80-hour

16   workweek rule is averaged over the entire month.  So a

17   seven-hour deficit in the coming 14 days could easily have

18   been worked out.

19          MR. JEPSON:  Let's just scroll down here, Michael, to

20   the third bullet point from the bottom.

21   BY MR. JEPSON:

22   Q.  Which is, "Dr. Park feels that Maria is getting better but

23   still needs improvement."

24          It says, "Dr. Song's bar is higher than standards on

25   other services, and Maria should understand this."

Park - direct

1      All right.  Did you tell Dr. Artunduaga that during

2   this meeting?

3   A.  Yes.

4   Q.  Now let's go to the next -- you had another meeting with

5   her, I assume, correct?

6   A.  That is correct.

7   Q.  Let's go to Defendant's Exhibit 115.

8          MR. JEPSON:  It's not in evidence.

9          MS. HYNDMAN:  No objection, Judge.

10         THE COURT:  Okay.  I will admit it.  Thank you.

11      (Defendant's Exhibit 115 was received in evidence.)

12         MR. JEPSON:  If you could blow it up a little bit,

13  Michael.  I can't read it.

14  BY MR. JEPSON:

15  Q.  Do you recognize what this document is, Dr. Park?

16  A.  These are the minutes from February 28th, 2012, between

17  myself, Maria, and Akilah.

18  Q.  All right.  And it says here that -- so this refreshes

19  your memory you had a meeting that day?

20  A.  That is correct.

21  Q.  The first bullet point, it says, "Maria has expressed that

22  she has had both good and bad days on the transplant service."

23          Do you remember that's what she told you?

24  A.  That is correct.

25  Q.  And then there is another bullet point.  "Regarding the

Park - direct

1   evaluation from Dr. Becker, Maria states that she believes

2   Dr. Becker's evaluation was based on concerns from a team

3   member and hearsay.  Maria told Dr. Becker that she did not

4   think her evaluation would help and that she was submitting

5   her evaluation too early in the rotation."

6           Do you recall Dr. Artunduaga saying this in your

7   meeting?

8   A.  Yes.

9   Q.  Did you become involved in this situation yourself?

10  A.  Yes, I did.

11  Q.  Indeed, did you end up receiving an email from

12  Dr. Artunduaga about this evaluation?

13  A.  Yes, I did.

14  Q.  Let's take a look at Joint Exhibit 81, please, which I

15  want to direct your attention first to the lower half.  It

16  appears to be an email from Dr. Artunduaga to you dated

17  February 24th.

18          Do you remember getting this email?

19  A.  Yes.

20  Q.  Take a moment and read it, please.

21  A.  Do you want me to read it --

22  Q.  To yourself.  I am sorry.

23      (Brief pause.)

24  BY MR. JEPSON:

25  Q.  What was your reaction when you received this email?  Do

Park - direct

1373

1    you remember what your thoughts were?

2    A.  I never received anything like this before.

3    Q.  What about it caused you to think that?

4    A.  I just have never had a resident say -- criticize the

5    metrics on which they were being followed.  It was very

6    specific.  I actually thought that there was plenty of time to

7    have interactions to write an evaluation.

8            And I was mostly concerned that -- you know,

9    different doctors can have different reputations.  As long as

10   that doctor is using the same metric for all their residents,

11   then I think it's fair.  So, you know, one doctor could be

12   easy, one doctor could be nice, one doctor could be strict and

13   have a higher bar; but as long as they evaluated all the

14   residents with their own specific metrics and that was held

15   the same, that was what I was concerned about.  And that's

16   what I replied back in the email, that I would have a

17   discussion with Dr. Becker to see whether or not she was

18   treating her any differently.

19   Q.  And did you do that?

20   A.  Yes, I did.

21   Q.  As a result of that discussion, did you come to any

22   conclusion as to the evaluation that was submitted?

23   A.  I let it stay.

24   Q.  And why was that?

25   A.  I didn't feel that Dr. Becker used any metric that was

Park - direct

1374

1    different than how she ranks any of her residents that she

2    works with.

3    Q.  So you actually had a conversation with Dr. Becker,

4    correct?

5    A.  Yes, I did.

6    Q.  During that conversation, other than discussing the

7    evaluation, was there any discussion about an interaction that

8    Dr. Becker may or may not have had with Dr. Artunduaga?

9    A.  Yes.  Dr. Artunduaga had also discussed this directly

10   with --

11   Q.  Let me ask you a question.

12   A.  I'm sorry.

13   Q.  What did Dr. Becker tell you about that interaction?

14   A.  Dr. Artunduaga had actually talked to her directly about

15   the concerns that she had.

16   Q.  Okay.  And did Dr. Becker say anything about that --

17   characterize that interaction at all?

18   A.  I believe that she felt a lot of pressure, a lot of

19   emotional pressure in terms of trying to play on her

20   sympathies.

21   Q.  All right.  Now, directing your attention back to

22   Defendant's Exhibit 115, there is a reference here to --

23           THE COURT:  115?

24           MR. JEPSON:  Yes.  I am sorry.

25

Park - direct
1375

1   BY MR. JEPSON:

2   Q.   115, third bullet point, "Maria's last rotation on

3   probation will be with plastic surgery."

4            Do you see that?

5   A.   Yes.

6   Q.   And it says here, "Dr. Park states that Maria should

7   already have a sense of how our service runs, the pitfalls,

8   and how to interact with the other intern on the service."

9            Did you tell that to her?

10  A.   Yes.

11  Q.   Why did you say that to her?

12  A.   She had already done the rotation.

13  Q.   The next bullet point, "This will show as a test for Maria

14  to show that she is a resident we should keep."

15            Did you say that to her --

16  A.   Probably.

17  Q.   -- or words to that effect?

18  A.   Correct.

19  Q.   And why?

20  A.   Well, I wanted her to have the opportunity to shine and

21  prove what she has done and her abilities to the whole

22  section.

23  Q.   It then says, "Dr. Park told Maria to email her attendings

24  prior to the service starting to see what their expectations

25  will be."

Park - direct

1    Did you tell her that?

2  A.  Yes.  I wanted her to communicate as much as possible so

3  she could really understand what people wanted to see from

4  her.

5  Q.  Do you know if that happened or not?

6  A.  To my recollection, it did not.

7  Q.  All right.  Then the next bullet point, "Dr. Park states

8  that Maria has been entering her notes late."

9    How did that issue come up, if you recall?

10 A.  This was of concern because it was a very specific point

11 in her probation letter about the timeliness of her notes, and

12 this was coming out, I believe, in evaluations.  It had also

13 to do with her work hours.

14 Q.  Okay.  When you say it was part of probation, was it your

15 understanding that this had been a concern prior to the

16 probation as well?

17 A.  Correct.  It was one of the bullet points of -- I guess I

18 can say the metrics -- that she would have to show improvement

19 and that she got better and would conquer it, I guess.

20 Q.  Okay.  Now, let's go up to the next page, top bullet

21 point.  Do you see that, regarding Maria going over 80 hours?

22 A.  Yes.

23 Q.  It says, "Dr. Park said that she needed to average her

24 hours for the week.  Dr. Park did not say it was okay for her

25 to go over her 80-hour workweek."

Park - direct

1377

1       And then the bubble point.  "Maria acknowledged that

2  that was not what Dr. Park meant when they discussed her

3  hours.  She understands the need to rectify this herself."

4       Did you have this exchange with Dr. Artunduaga?

5  A.  Yes.

6  Q.  What was this about?

7  A.  I became aware of the fact that Maria was not fixing her

8  work hours through a series of emails that I was not on

9  originally that were forwarded to me.

10      In those emails, it was indicated -- or at least the

11  way she wrote them, she indicated that I was aware and had

12  condoned her passing up her work hour week -- I'm sorry -- her

13  weekly work hours.

14      My biggest concern was that this was not the point

15  that I had made with her during our meetings.  And so my

16  concern was that she did not actually understand what I was

17  saying to her when we had our meetings when I was explaining

18  to her for two meetings in a row that she needed to average

19  her work hours.  She needed to keep track of all of them.  And

20  the way to do that is to increase efficiency during the day.

21  We had spent a lot of time in a lot of different ways

22  discussing how to increase efficiencies -- writing her notes,

23  seeing consults, all of these things.

24      What was very concerning to me is that, the way it

25  was written, it was either saying that her understanding of

Park - direct

1378

1  our meetings were completely 180 of the point or they were

2  deliberately misleading.

3  Q.  And did you discuss that with Dr. Artunduaga?

4  A.  Yes, I did.

5  Q.  What was her reaction to you raising that point?

6  A.  I asked if she understood what we had discussed in regard

7  to the concept of averaging the work hours, which, by the way,

8  every intern gets this information in the beginning of the

9  year.  This is not a secret.  This is something -- she

10 informed me that she understood what we had talked about.

11       And then I showed her the email that had been

12 forwarded to me that indicated that I had condoned her going

13 over the hours, and I asked her to explain to me why it was

14 written in this manner.  And her response was that she should

15 not have done that.

16 Q.  Okay.  Now I want to direct your attention further down to

17 the next-to-last bullet point.  It says, "Wrapping up, Maria

18 mentioned that she just needed to pass her evaluations to stay

19 in the program."

20       And then the bubble point, "Dr. Park reiterated that

21 she needs to excel in our program, not just pass.  She needs

22 to hit the level of excellence we expect of our plastic

23 surgery residents."

24       Did you and Dr. Artunduaga have that exchange as well

25 on that February 28, 2012, meeting?

1    A.  Yes, we did.

2    Q.  All right.

3           Now, Dr. Artunduaga then went on to the plastic

4    service, correct?

5    A.  That is correct.

6    Q.  Now, during the course of your meetings with

7    Dr. Artunduaga, you would have continued to review evaluations

8    with her?

9    A.  That is correct.

10   Q.  So you would have reviewed the evaluation from Dr. Becker?

11   A.  That is correct.

12   Q.  As well as other transplant surgeons?

13   A.  Yes.

14   Q.  All right.  Let's take a look at Defendant's Exhibit 21.

15          MR. JEPSON:  Which also is not yet in evidence.

16          THE COURT:  Any objection?

17          MS. HYNDMAN:  Which number?

18          MR. JEPSON:  121.

19          MS. HYNDMAN:  I thought you said 21.

20          No objection to 121.

21          THE COURT:  Okay.  I will admit 121.

22          MR. JEPSON:  Thank you.

23      (Defendant's Exhibit 121 was received in evidence.)

24   BY MR. JEPSON:

25   Q.  Take a look at this, Dr. Park, and tell me if you

Park - direct

1380

1  recognize it?

2  A.  Yes.

3  Q.  What is this?

4  A.  This is the minutes from the meeting on March 5th, 2012,

5  between Dr. Artunduaga and myself and Akilah Williams.

6  Q.  All right.  So the first bullet point, apparently she had

7  just started in plastics, so there was not a lot to talk

8  about, correct?

9  A.  That is correct.

10 Q.  And let's then go down to the fifth bullet point,

11 "Evaluations."

12        What I would like you to do is take a moment and read

13 that to yourself, please.

14     (Brief pause.)

15 BY MR. JEPSON:

16 Q.  With respect to the third bullet point, it says, "Dr. Park

17 wants Maria's attendings to evaluate her just like any other

18 resident.  Maria should not go to her attendings prior to them

19 completing her evaluations because that would show a bias.

20 Her attendings should evaluate her on her actions."

21        Did you tell Dr. Artunduaga that?

22 A.  Yes.

23 Q.  Why did you tell her that?

24 A.  Because the whole point was to have a system in which we

25 could compare Maria to previous residents.  So therefore, the

Park - direct

1381

 1   same metrics that are being used -- you know, it's trying to

 2   make it apples to apples basically.

 3   Q.   What prompted you to say that?

 4   A.   Still just the comment of her sitting down and talking to

 5   attendings before writing their evaluations.  It's a very odd

 6   thing.

 7   Q.   And then it indicates in the fifth bubble point, "Maria

 8   should focus more on the job she does, not on how people will

 9   evaluate her."

10          Did you tell her that?

11   A.   Yes.

12   Q.   And then, "Dr. Park has never had an intern or resident

13   sit down with her and say, 'This is what I have done this

14   month.'  All interns should be evaluated the same way."

15          Did you tell her that?

16   A.   Yes.

17   Q.   For the same reason you expressed?

18   A.   Correct.

19   Q.   All right.  Now let's go to March 12th, Defendant's

20   Exhibit 126.

21          THE COURT:  Any objection to the admission of 126?

22          MS. HYNDMAN:  No objection.

23          THE COURT:  It's admitted.

24      (Defendant's Exhibit 126 was received in evidence.)

25

Park - direct

1    BY MR. JEPSON:

2    Q.  Can you see that on the screen, Dr. Park?

3    A.  Yes.

4    Q.  What is this?

5    A.  These are the minutes from March 12th, 2012, between

6    myself, Dr. Artunduaga, and Akilah Williams.

7    Q.  All right.  And in the first bullet point it says, "Maria

8    spoke with Grant, Matt, and Yonni for feedback."

9           Who was Grant?

10   A.  Grant Kleiber is one of the senior residents in plastic

11   surgery who would have been on the service.

12   Q.  And who was Matt?

13   A.  Matt Greives, similar.  He was one year more senior than

14   Grant.

15   Q.  And what about Yonni?

16   A.  Yonni is the nickname for Jonathan Bank, and he was also a

17   fellow in plastic surgery.  He was the same year as Grant

18   Kleiber.

19   Q.  It says she spoke with them for feedback, and then there

20   are two bullet points.  "She will work on prioritization with

21   the other intern in the service, consults, trying to relax,

22   and slowing her speech."

23          Is this something she told you?

24   A.  I think this had to do with the actual feedback, the

25   specifics in the feedback, trying to basically address what

Park - direct

1   had been concerns.

2   Q.  And is the same true with respect to the next bullet

3   point?  "She will continue to manage her stress and

4   performance.  The performance Dr. Park has witnessed from

5   Maria has not matched her evaluations."

6           Do you see that?

7   A.  Yes.

8   Q.  What evaluations were you referring to?

9   A.  Well, when people -- these are their feedback evaluations.

10  When people say that she is doing better, she is learning a

11  lot, she is not having problems, she is actually on our

12  service working, there was a discordance.

13  Q.  So you would have been referring to the evaluations you

14  have seen from transplant and vascular?

15  A.  Correct.

16  Q.  At this point in time, had you actually worked directly

17  with Dr. Artunduaga on the plastic service?

18  A.  Yes.

19  Q.  Okay.  Now, let's go down to "Orders."

20          It says here:  "Orders.  Dr. Park assumed Maria put

21  in orders for a patient as she requested, but Maria stated she

22  forgot to.  From now on, Maria says she will write these

23  requests down."

24          Did you have that exchange with Dr. Artunduaga?

25  A.  Yes.

Park - direct

1384

1  Q.  Was this something that happened and that you had personal

2  knowledge of?

3  A.  Yes.

4  Q.  In essence, what happened?

5  A.  Maria was operating with me.  I also had Grant Kleiber in

6  the room.

7       Meanwhile, Dr. Reid, who's one of my colleagues who

8  specializes in craniofacial surgery, which is the interest

9  that -- it's the subspecialty that Maria wanted to go in --

10  was doing a case more specific to craniofacial surgery.  I had

11  told Maria that she should go do that case with Dr. Reid to

12  get that one-on-one experience, and that this was more in line

13  with where her future goals were.

14       On leaving, Dr. Kleiber said, "That's great.  Can you

15  please put in the discharge order of the patient who we are

16  finishing up with."  This is a very common thing that interns

17  all do.  It was completely normal.

18       Maria said, "Okay."

19       She went to go do the other case, and I found out

20  later these orders were never placed in.  I asked specifically

21  what happened.  Sometime with the electronic medical

22  records -- sometimes orders just disappear.  They get pended

23  into someplace you can't find them.  I was trying to give her

24  the benefit of the doubt.  So I asked her what happened to the

25  orders?  Was this a problem with Epic, which was our

Park - direct

1385

1    computerized system, which was somewhat new at the time.  And

2    she said that she had just forgotten.

3    Q.   Okay.  The next bullet point is Evaluations.  For the

4    plastics rotation, at this point you would have had some

5    feedback evaluations, correct?

6    A.   That is correct.

7    Q.   We have already -- well, for the juniors, the interns, and

8    first- or second-year residents on plastics or in the plastics

9    program, did, back then, the attendings do written evaluations

10   of the form we have seen generally?

11   A.   No.

12   Q.   And that would be for all?

13   A.   All interns on our service.

14   Q.   All right.

15          Now let's take a look at Joint Exhibit 85, please.

16   This appears to be the Matt Greives feedback evaluation?

17   A.   That is correct.

18   Q.   For the period of time just before you would have had this

19   March 12th meeting.  Am I correct there?

20   A.   Yes

21   Q.   Let's take a look at the second page at the top.  There is

22   the "could improve" regarding patient history and exam.

23          Do you see that?

24   A.   Yes.

25   Q.   "There is still a deficiency in her ability to effectively

Park - direct

1386

1  and quickly convey the problem and solution.  Presentations of

2  consults are lengthy and sometimes difficult to determine her

3  thought process in arriving at a plan for the care of a

4  patient.

5        "Generally she has almost all of the appropriate

6  information gathered, but has a difficult time synthesizing it

7  into a clear and concise message for senior residents.  This

8  has been my experience with her for the past year, both over

9  the phone and in person."

10        So you would have had this and discussed it with

11  Dr. Artunduaga?

12  A.  Yes.

13  Q.  The same is true with respect to the rest of this

14  evaluation, correct?

15  A.  Correct.

16  Q.  I want to direct your attention to Joint Exhibit 87.

17        Do you recognize this as an evaluation -- feedback

18  evaluation of Dr. Artunduaga from Grant Kleiber?

19  A.  Yes.

20  Q.  And this is an evaluation that you would have gone over

21  with her at the -- on the March 12th meeting?

22  A.  That is correct.

23  Q.  And here, at least in Kleiber's opinion, he marked "no" as

24  far as her ability to prioritize, correct?

25  A.  That is correct.

Park - direct

1387

1  Q.  And also "needs help" with respect to efficiently

2  completing her work, correct?

3  A.  That is correct.

4  Q.  I want to direct your attention in particular to -- well,

5  first as to presentations at the top of the next page.

6  "Presentation of new consults has been scattered,

7  disorganized, and unfocused.  She should be better at this

8  considering she has been a resident here for over eight

9  months.  We discussed patient presentation, and she

10  understands that she needs to do better."

11       So you would have discussed that particular point

12  with Dr. Artunduaga?

13  A.  Yes.

14  Q.  And directing your attention now to No. 9, which is,

15  "Effective Listening, Listening and Providing Information."

16       It says, "Could improve.  She frequently interrupts

17  me when I'm trying to speak to her rather than listening.

18  This is excusable when discussing patient care.  It is not

19  appropriate in the operating room when I'm taking her through

20  a procedure when I did not feel she was listening to my

21  instructions.  She needs to be better at taking direction."

22       Did you discuss this with Dr. Artunduaga?

23  A.  Yes.

24  Q.  Indeed, do you have personal knowledge of what happened

25  here?

Park - direct

1  A.  Yes.

2  Q.  Were you there?

3  A.  Yes.

4  Q.  What happened?

5  A.  This was actually the same operation that I had referred

6  to earlier where at the end of it Maria didn't put in the

7  order for that patient.

8           This patient had a breast reconstruction where I took

9  the tissue from her abdomen and made a breast out of it.

10  Three months later, we do a revision surgery where we help

11  shape things.

12           And this particular patient had something called a

13  Mediport.  A Mediport is a specialized IV that's kept buried

14  under the skin.  And it goes -- it's tunneled through the

15  skin.  It goes into a very large vein under your neck or under

16  your clavicle.  This is typically used for chemotherapy.

17           A lot of time, I am doing the reconstruction.  It's

18  the tail end of everything that they have gone through through

19  the treatments, and we can finally remove that.  And patients

20  love it because they like it when the plastic surgeon does it

21  because their scars are a little bit better.  But it is a

22  raised bump on their chest, and it's one of those signs that

23  they finally have finished with a part of their treatment.

24           With a Mediport, there are certain things you have to

25  be careful about because the cord, it's about the thick- --

Park - direct

1389

1   the catheter itself, it's about the thickness of, like, a

2   linguini, maybe.  You want to make sure that air doesn't flow

3   through that catheter or through the tract that the catheter

4   was in that could go into the vein of the patient.  So there

5   is certain maneuvers that we do to decrease this.

6          One of the maneuvers that we do is, I tend to place a

7   suture around the catheter prior to taking it out.  That is

8   what we call a pursestring.  If you can imagine the waistband

9   of sweatpants where you can pull on it and it cinches down,

10  that's what the suture does.  It's very easy to do, but you

11  have to make sure that the needle in your suture doesn't

12  actually go through the catheter that's still there because

13  that could lacerate the catheter.  If this happened, the

14  catheter could actually tear.  And instead of removing it, it

15  goes into the body, which would necessitate the patient going

16  to interventional radiology to have it removed.  It travels

17  into the heart.  We don't like that.

18  Q.  All right.  So what happened here, though?

19  A.  So I had asked Grant to do this procedure.  This is

20  something that typically a junior could do, but I had had some

21  concerns at this point with her progress.  Grant convinced me

22  to let her try it and that he would basically --

23  Q.  And the "her" is Dr. Artunduaga?

24  A.  Sorry.  That we should let Maria do it and that he would

25  basically take her through the whole thing.

Park - direct

1390

1    So I was operating on a different part of the

2    patient, the scar around her hip, but I could hear them talk

3    because they are working on the chest.  And I could actually

4    hear Dr. Kleiber say -- you know, explain, put in a

5    pursestring.  Ha ha.  Don't stick the catheter.  And then I

6    heard, "Wait.  Stop."

7         I don't remember the specifics of the argument, but

8    it was along the lines of:

9         "You just stuck the catheter.

10         "No, I didn't.

11         "Yes, you did."

12         And that level of conversation shouldn't be occurring

13   in the operating room.

14         MS. HYNDMAN:  Your Honor, if we can have a limiting

15   instruction on that, please.

16         THE COURT:  Yes.

17         Ladies and gentlemen, the comments that were just

18   made that Dr. Park testified about are not being offered for

19   truth of those comments but instead to show their impact on

20   Dr. Park.

21   BY MR. JEPSON:

22   Q.  All right.  So let's take a look at the overall comment

23   here on this at the bottom.

24         "I feel that Maria needs to improve in several areas:

25   Efficiency, prioritization, patient presentation, and

Park - direct

1391

1   listening skills.  She and I discussed these areas for

2   improvement extensively.  I believe that she understands the

3   need for improvement."

4            Did you go over that with Dr. Artunduaga?

5   A.  Yes.

6   Q.  Let take a look at Joint Exhibit 88, please.

7            This appears to be a feedback evaluation from

8   Jonathan Yonni Bank from that same period of time.  Am I

9   correct?

10  A.  That is correct.

11  Q.  Would you have gone over the needs for improvement and

12  overall comments that are in this as well with Dr. Artunduaga?

13  A.  Yes.

14  Q.  Let's go to the very first page real quickly.

15           "Did Dr. Artunduaga demonstrate the ability to

16  correctly prioritize her work?"

17           And the answer is "No."

18           Did you discuss the three examples that are listed

19  there with Dr. Artunduaga?

20  A.  Yes.

21  Q.  Let's go back now to Joint Exhibit -- I'm sorry --

22  Defendant's Exhibit 126.

23           So we have the Evaluation section.  Going down the

24  Presentation Skills, it says, "Dr. Park was concerned that

25  Maria still required further development of her presentation

Park - direct

1392

1    skills to this point.  Maria stated every service is different

2    and she needs to adapt.  Dr. Park told her to find the key

3    aspects of what to present on each service."

4             Did you have this discussion with Dr. Artunduaga?

5    A.  Yes.

6    Q.  Did you express that you were concerned at this point that

7    the presentation skills were still in need of improvement?

8    A.  Yes.

9    Q.  And what was your concern about that point?

10   A.  This was something that was identified early on in

11   November and that, as you can see through the minutes, we

12   pretty much addressed throughout the rotation -- sorry --

13   throughout her probation almost weekly but definitely monthly.

14            And my concern was that in the beginning and at the

15   end of an intensive 12-week period it didn't seem that there

16   was a lot of progress made.

17   Q.  All right.  Going down further, "Dr. Park again emphasized

18   the importance of learning every aspect of the services she is

19   on, as these details will help her become a safer surgeon."

20            You gave her that advice?

21   A.  Yes.

22   Q.  And finally on this page it begins "Dr. Tothy."  You were

23   aware at this point of that incident?

24   A.  Yes.

25   Q.  Did you have -- had you heard that Dr. Artunduaga had hung

Park - direct

1393

1  up on Dr. Tothy?

2  A.  I had been in receipt of some emails that explained the

3  situation.

4  Q.  Did you discuss that situation with Dr. Artunduaga?

5  A.  Yes.

6  Q.  Did you give her the advice that's at the bottom of this

7  page as well as the next page?

8  A.  Those were the details we discussed.

9      MR. JEPSON:  Let's go to the next page, Michael, at

10  the top.

11  BY THE WITNESS:

12  A.  Yes.

13  BY MR. JEPSON:

14  Q.  All right.

15      And finally, the bullet point second-to-last, "Maria

16  should talk to Grant to get clarification about his

17  evaluation, ask for feedback, and don't make excuses."

18      Did you give her that advice?

19  A.  Yes.

20  Q.  Do you know if that happened?

21  A.  I do not know.

22  Q.  You had a final meeting with Dr. Artunduaga on or about

23  March 21, 2012.  Does that sound about right?

24  A.  That sounds correct.

25      MR. JEPSON:  Let's see Defendant's Exhibit 121, which

Park - direct

1394

```
 1    is not yet into evidence.
 2              MS. HYNDMAN:  You mean 129?
 3              MR. JEPSON:  129.
 4              MS. HYNDMAN:  No objection, Judge.
 5              THE COURT:  Okay.  I will admit it.
 6         (Defendant's Exhibit 129 was received in evidence.)
 7    BY MR. JEPSON:
 8    Q.  Do you recognize this?
 9    A.  Yes, I do.
10    Q.  And is this the -- are these the minutes from the last
11    meeting?
12    A.  Yes, they are.
13    Q.  It starts here with Maria explaining some improvements she
14    had made since the previous week?
15    A.  That is correct.
16    Q.  All right.  And the third point, "Dr. Park reminded Maria
17    that she needs to give Akilah anything she would like to be
18    reviewed by the faculty by Friday, March 23rd."
19    A.  That is correct.
20    Q.  And you told her that at that time?
21    A.  Yes.
22    Q.  Go down to the bullet point on Evaluations.
23              "Dr. Park feels that Maria presents a mixed picture.
24    Her evaluations say she is receptive to teaching, but there
25    are still issues with her teaching points."
```

Park - direct

1395

1    Did you discuss that with Dr. Artunduaga?

2  A.  Yes.

3  Q.  What was that prompted by?

4  A.  On all the evaluations, they say things like, "She is very

5  teachable.  She can be taught."  And yet I felt that, having

6  worked on her intensively one-on-one for 12 weeks and that I

7  had the same difficulties at Week 12 that I had at Week 1,

8  that, to me, was not an indication of being teachable.

9  Q.  All right.  And then the next bullet point.  "Dr. Park is

10  concerned about interactions Maria has had with colleagues and

11  her breaches with professionalism."

12    Did you tell her that as well?

13  A.  Yes, I did.

14  Q.  What were you referring to there, if you recall?

15  A.  When we do our evaluations, we don't want to be --

16  everyone feels bad.  No one wants to evaluate someone poorly.

17  So usually -- it's like getting an E for effort.  You try to

18  find something that you can say they are doing well.

19    Typically in Maria's evaluations is that she is

20  receptive to teaching and that she is really, really pleasant

21  to work with, and yet we have repeated episodes of just really

22  bad breaches of professionalism.  That was a concern to me.

23  Q.  What were those breaches or some of them, if you recall?

24  A.  Hanging up on attendings, getting into interpersonal

25  conflicts with other attendings or nurses, things like that.

Park - direct

1    Q.  All right.

2    A.  The defensiveness that would occur when people would try

3    to give her feedback.

4    Q.  And then the third point says here, "Core faculty will

5    review the evaluations and all our notes from our weekly

6    meetings."

7           Did you tell her that?

8    A.  Yes.

9    Q.  And those notes would have been these minutes that we have

10   been looking at?

11   A.  That is correct.

12   Q.  All right.  Finally there is a bullet point, "Dr. Park

13   reiterated that the standard of probation was that Maria's

14   performance meet the expectations held for the plastic surgery

15   residents (levels superior and exemplary)."

16          Do you see that?

17   A.  Yes.

18   Q.  And did you tell Dr. Artunduaga that?

19   A.  Yes, I did.

20   Q.  And finally it says, "Dr. Park asked Maria if there were

21   any other questions, concerns, or issues that she wanted to

22   discuss.  Maria said she had none."

23          Did you have that discussion?

24   A.  Yes, I did.

25   Q.  And was this the last meeting you had as far as the

Park - direct

1397

1    mentoring?

2    A.  Yes, it was.

3    Q.  All right.  Dr. Park, have you ever engaged in this level

4    of mentoring with anyone else in your experience?

5    A.  No, I have not.

6    Q.  Are you aware of of it happening at UCMC?

7    A.  I am not aware.

8    Q.  All right.  At some point in time, you put together an

9    update for Dr. Song regarding the probation, correct?

10   A.  That is correct.

11   Q.  I want to direct your attention to Joint Exhibit 26.

12           Do you recognize this document?

13   A.  Yes, I do.

14   Q.  Is this something you prepared?

15   A.  This one is her probation letter.

16   Q.  96?

17   A.  Sorry.  This is 26.

18   Q.  Is this the one -- are you seeing it?

19           MS. HYNDMAN:  You said 26.

20           MR. JEPSON:  96.

21   BY THE WITNESS:

22   A.  There we go.  Yes.

23   BY MR. JEPSON:

24   Q.  I'm sorry.  Is this the document I just described to you

25   and gave you the wrong exhibit number on?

Park - direct

1   A.  Yes, it is.

2   Q.  All right.  Did you prepare this?

3   A.  I did.

4   Q.  And why did you prepare this?

5   A.  Although it's addressed to Dr. Song, it was just really he

6   had been in the title, I wanted to summarize the experiences I

7   had through my 12 weeks of probation with Maria.

8   Q.  All right.  The first paragraph says, "I am writing to

9   provide an update.

10      "During this period, we had hoped both to monitor her

11  progress and to provide timely constructive suggestions on how

12  she could improve to meet the standards we expect of our

13  interns.  We wanted her to succeed, so we took the special

14  steps of implementing a weekly evaluation system and also

15  weekly advising meetings with me in my role as associate

16  program director.

17      "We asked the members comprising Maria's team

18  (fellows, senior residents, and physician extenders) to

19  complete weekly evaluations.  This is unusual and requires

20  extra effort by our surgical service and others.  The goal has

21  been to identify each and every potential problem Maria may be

22  having so that she can address those concerns quickly."

23      Does that accurately reflect what you did and why?

24  A.  Yes.

25  Q.  And then the third paragraph says, "At this point, I have

Park - direct

1399

 1    several serious reservations regarding her continuation as a

 2    resident.  She continues to show problems with clinical

 3    judgment, floor management, handling criticism in a

 4    constructive fashion, and working with peers.  These problems

 5    far exceed those that I have encountered with any other

 6    resident in the section.

 7            "The improvements that we have seen (incremental

 8    improvement on managing floor work) are occurring too slowly,

 9    and the poor receptiveness to teaching suggests this will not

10    exchange in the future."

11            Did you write this?

12    A.  Yes, I did.

13    Q.  And did you believe it to be accurate at the time?

14    A.  Yes.

15    Q.  And in your statement that "these problems far exceed

16    those that I have encountered with any other resident in our

17    section," was that true?

18    A.  Yes.

19    Q.  And then you provided specific examples of the various

20    issues, correct?

21    A.  Yes.

22    Q.  I want to direct your attention to the second page,

23    "Clinical Performance."  It appears you got five -- four

24    paragraphs on the second page and one on the third page.  Am I

25    correct?

Park - direct

1400

1    A.  That is correct.

2    Q.  We have already talked about number one, which is the

3    issue with the orthostatic transfusion question?

4    A.  That is correct.

5    Q.  And number two, what was this about?

6    A.  I had a very complex dressing change to do on a child.  It

7    needed the patient to actually be sedated.  We try to limit

8    the amount of time a patient is under sedation, especially

9    when they are still a kid.

10          Typically, when you are in a situation like that,

11   there is a lot of dressings, parts of body to be held, and you

12   want to do it as quickly as possible.  You usually have an

13   assistant.  It's usually the junior resident who comes with

14   the supplies and comes to assist as well.

15   Q.  Okay.  And did you try to get assistance from

16   Dr. Artunduaga?

17   A.  I asked her why she had not shown up.

18   Q.  And did you page her?

19   A.  Yes, I did.

20   Q.  And what was her response?

21   A.  That she had not been told to go by the senior residents.

22   Q.  Number three says it occurred on March 10, 2012.

23          Does this refer to the incident you described in

24   detail with Grant Kleiber and the -- is it the purse --

25   A.  The Mediport and the pursestring suture.

Park - direct

1401

1  Q.  And then number four, on March 10th, did you already

2  describe this?

3  A.  This is the same situation just in a little bit more

4  detail.

5  Q.  Okay.  The discharge orders that didn't get placed?

6  A.  Correct.  And it also details the fact that Maria was not

7  present in the other operating room for a significant period

8  of time.

9  Q.  All right.  And then there is a subsection, "Interpersonal

10  Conflicts," correct?

11  A.  Correct.

12  Q.  And number one refers to the interaction with

13  Dr. Jaskowiak regarding an antibiotic?

14  A.  Yes.

15  Q.  And number two refers to the Dr. Tothy interaction?

16  A.  Yes.

17  Q.  And you list another one there.

18          And then responsiveness to advising, it says at the

19  top, "We have gone to extraordinary effort to mentor Maria.

20  There are many instances in which she does not heed our

21  advice.  This has hurt her training and preparedness.  This

22  assessment comes from my own personal experience with Maria

23  and from what she relays in our meetings."  And then you go on

24  to describe the details.  Correct?

25  A.  Correct.

Park - direct

1402

1    Q.  Is what I just read to you accurate as far as you are

2    concerned as of that time?

3    A.  Yes.

4    Q.  And then finally (D) "Interference With the Evaluation

5    Process."  And is this -- are you describing what you

6    testified to earlier with respect to your concerns about the

7    evaluation process?

8    A.  Yes, I am.

9    Q.  All right.  Now, I want to go to the next page.

10            MR. JEPSON:  86, Michael.

11   BY MR. JEPSON:

12   Q.  Toward the end, it says, "Her performance on our service

13   these past two weeks reveals that she has not actually reached

14   the level of even an average surgical intern.  Her performance

15   on our service is not compatible with the evaluations I have

16   seen over the last two months.  Clinically, she still lacks

17   many of the basic skills we require.  She has not responded

18   well to teaching and feedback that could help her improve.

19   This is in contrast to the evaluations we have received from

20   other services, but it is consistent with the problems that

21   have arisen on other services that have been expressed to us

22   recently by a range of clinical staff."

23            Does this accurately reflect your conclusion as of

24   that point?

25   A.  Yes.

Park - direct

1403

1   Q.   "Finally, I am very concerned about persistent evidence

2   regarding unprofessional behavior and an inability to accept

3   responsibility for problems that arise surrounding her work."

4           Did you have that conclusion as well at that time?

5   A.   Yes, I did.

6   Q.   Now, did you prepare some charts to compare

7   Dr. Artunduaga's performance with that of other plastic

8   surgery interns?

9   A.   Yes, I did.

10  Q.   Take a look at the next page, which is 87.

11          Tell me what this is.

12  A.   This is the evaluations put into a bar graph that has been

13  averaged between Maria, who's the red bar, and her co-intern

14  that year, who's the blue bar.

15  Q.   And did you take the full year's evaluations?

16  A.   Yes.  I took all the evaluations up to that point.

17  Q.   So then you would have taken each of the categories and

18  put a number on it, correct?

19  A.   That is correct.

20  Q.   And the six would have been exemplary and zero would have

21  been nonapplicable?

22  A.   I believe so.

23  Q.   Okay.  Anyway, DS is Deana Shenaq?

24  A.   That is correct.

25  Q.   That was the co-intern that year?

Park - direct

1404

1   A.  Yes.

2   Q.  And then the next page, can you tell me what that is?

3   A.  Well, I didn't think it was fair to just have it end at

4   one for comparison.  So what I did was then went back over the

5   past three years.  So the other bars in blue would be the two

6   interns from the years previous.

7   Q.  So you would have taken their evaluations from their

8   intern years?

9   A.  Correct.

10  Q.  And that would -- in addition to Deana Shenaq is -- who

11  was EK?

12  A.  That would be Essie Kueberuwa.

13  Q.  Who was DB?

14  A.  Dan Butz.

15  Q.  Who was SF?

16  A.  Sam Fuller.

17  Q.  And who was LA?

18  A.  Lee Alquerishi.

19  Q.  Finally the final page, did you put that together, too?

20  A.  Yes.

21  Q.  And is that just numbers as opposed to the bar graph?

22  A.  Correct.  This is the raw data.

23  Q.  And did you -- you sent this to Dr. Song?

24  A.  I prepared a document that all of the attendings had asked

25  us to.

Park - direct

1  Q.  What I am getting at here is that was part of the letter,

2  the March 14th.

3          Would you have given that to Dr. Song at some point?

4  A.  I believe I did, but, to be quite honest, I can't remember

5  if I personally gave it to him or just included it into my

6  summary binder.

7  Q.  Now, you put together, then, a package of materials.  Am I

8  correct?

9  A.  That is correct.

10  Q.  At the time -- as of March 14, 2012, had any decision yet

11  been made as to whether to renew or nonrenew Dr. Artunduaga's

12  contract?

13  A.  No.

14  Q.  Was there an attending meeting on March 26th, 2012, to

15  discuss that?

16  A.  Yes, there was.

17  Q.  And did you put together materials in order to provide

18  materials for the attendings to review?

19  A.  Yes.

20  Q.  I want to direct your attention to Joint Exhibit 102.

21  Let's take a look at this.

22          You recognize the cover?

23  A.  Yes.

24  Q.  And is this -- did you actually prepare a binder of these

25  materials?

Park - direct

1406

1    A.  Yes, I did.

2    Q.  And did you have Akilah Williams help in doing that?

3    A.  Yes, she did.

4    Q.  Let's take a look at the second page.  The is this a table

5    of contents of the materials you put together for the

6    attendings?

7    A.  Yes, it is.

8    Q.  And number one says, "MA, summary of probation."

9            Do you know what that was?

10   A.  I believe that was Maria's letter that she submitted.

11   Q.  Okay.  And number two, "Summary of probation and graph of

12   faculty evaluations."

13           Do you know what that was?

14   A.  That was the letter we just discussed.

15   Q.  Okay.  The March 14th?

16   A.  Correct.

17   Q.  And then, "Letters and emails from MA regarding

18   probation."

19           Do you know what that was?

20   A.  These are emails and letters that were sent in the very,

21   very beginning, such as the ones that we discussed, the very

22   first ones.

23   Q.  So the probation letter, her responsive letter, and the

24   summary evaluation?

25   A.  Correct.

Park - direct

1407

1   Q.  All right.  And then there are other items.  "Emails

2   regarding incidents with attendings and work hours," those

3   were put in there?

4   A.  Correct.

5   Q.  And then, "Emails from attendings reviewing performance,"

6   those would have been placed in there?

7   A.  Yes.

8   Q.  "Emails from senior residents reviewing performance," to

9   the extent there were any, those were put in there?

10  A.  Correct.

11  Q.  And then, "Emails regarding probation meetings"?

12  A.  Yes.

13  Q.  And then, "Various evaluations, both the monthly for each

14  rotation as well as the weekly from the team"?

15  A.  That is correct.

16  Q.  And then finally, the minutes from your meetings, which we

17  have just spent some time talking about?

18  A.  Yes.

19  Q.  Okay.  And did you attend this meeting --

20  A.  Yes.

21  Q.  -- of the attendings?

22  A.  Yes, I did.

23  Q.  By the way, were you pregnant at the time?

24  A.  Yes, I was.

25  Q.  When was this meeting?  Do you recall the date

Park - direct
1408

 1   approximately?

 2   A.  This was March 26th, I believe.

 3   Q.  When did you give birth?

 4   A.  March 30th.

 5   Q.  All right.  Now, at this meeting were the materials

 6   discussed?

 7   A.  Yes.

 8   Q.  Was there anybody -- was there a vote taken?

 9   A.  Yes.

10   Q.  Was there kind of a poll done of each attending?

11   A.  Correct.

12   Q.  What was the result of that, to your recollection?

13   A.  To not renew her contract.

14   Q.  Was that unanimous?

15   A.  Yes.

16   Q.  Were there any objections or any pushback from anybody?

17   A.  Not that I recall.

18   Q.  All right.  Did you come back while you were on pregnancy

19   leave to attend the grievance procedure?

20   A.  Maternity leave.

21   Q.  Did you?

22   A.  Yes.

23   Q.  Okay.  And did you make a presentation then?

24   A.  I was asked to be at that procedure for some questions.

25   Q.  Okay.  And did you do that?

Park - direct

1  A.  Yes, I did.

2  Q.  Now, are you aware that UCMC has a policy of

3  nondiscrimination in place?

4  A.  Yes.

5  Q.  And had one in place at the time?

6  A.  Yes.

7  Q.  To your knowledge, does UCMC take it seriously?

8  A.  Yes.

9  Q.  And with respect to Dr. Artunduaga, at any point in time,

10  in any of these many meetings that you had with her -- 11

11  meetings each an hour or so long -- did she ever tell you that

12  she believed she was being discriminated against because of

13  her national origin?

14  A.  I cannot recall that.

15  Q.  Did she ever tell you that she thought she was being

16  discriminated against or treated badly because she had an

17  accent?

18  A.  No.

19  Q.  Did she ever tell you that she thought people weren't

20  receptive to her because of her Colombian national origin?

21  A.  No.

22  Q.  Did you ever witness anyone mistreat her or treat her

23  badly because of her accent or her Colombian national origin?

24        MS. HYNDMAN:  Objection, your Honor.  There is no

25  foundation for that question.

Park - direct

1410

1    MR. JEPSON:  I am just asking if she ever witnessed

2 anything.

3    THE COURT:  Overruled.  You can answer.

4    You are free to cross on it.  It's her personal

5 observation.

6 BY THE WITNESS:

7 A.  I did not witness anything.

8 BY MR. JEPSON:

9 Q.  Now, have you ever been to Colombia?

10 A.  Yes.

11 Q.  Why were you in Colombia?

12 A.  I was doing a medical mission when I was a chief resident

13 in residency.

14 Q.  What was your impression?

15 A.  Doing a medical mission is the period where all of a

16 sudden you remember why you want to become a doctor, and it

17 was a wonderful experience and just something that I still

18 integrate into my practice in terms of doing more of this

19 medical mission work.

20 Q.  By the way, have any of the residents in the plastic and

21 reconstructive surgery program at UCMC -- are any of them

22 attending physicians at UCMC now?

23 A.  Let's see.  Currently?

24 Q.  Yes.

25 A.  Well, let me think.  Not anymore.

Park - direct

1411

1   Q.  From the time you were there?

2   A.  From the time I was there, Sara Dickie graduated and then

3   became an attending at North Shore.

4   Q.  Anybody else?

5   A.  Dr. Song himself, obviously, was a resident.

6   Q.  But is it normal?

7           MS. HYNDMAN:  Objection to what's normal.

8           THE COURT:  Sustained.

9           MR. JEPSON:  Strike that.

10  BY MR. JEPSON:

11  Q.  Would you say that the vast majority, at least from your

12  personal knowledge, go on somewhere else?

13  A.  Yes.

14  Q.  Was there any expectation to be hired as an attending

15  after completing your residency in the program?

16  A.  Into our program?  No.

17  Q.  With respect to -- by the way, is your father a physician?

18  A.  He is a retired physician.

19  Q.  Where did he go to medical school?

20  A.  Seoul National, which is in Korea.

21  Q.  Is he from Korea?

22  A.  Yes.

23  Q.  Did he emigrate to the U.S. as a -- after graduating from

24  medical school?

25  A.  Yes, he did.

Park - cross

1412

```
 1            MS. HYNDMAN:  I just object to the relevancy of any
 2   of this.
 3            MR. JEPSON:  Motivation.
 4            THE COURT:  Sustained.  I mean, overruled.  I'm
 5   sorry.  It can stand.  It can stand.
 6   BY MR. JEPSON:
 7   Q.  Is he a native English speaker?
 8   A.  No.
 9   Q.  Did he succeed as a physician?
10   A.  Yes, he did.
11            MR. JEPSON:  No further questions.
12            THE COURT:  Cross-examination.
13            THE WITNESS:  May I have some more water, please?
14            THE COURT:  Yes.
15            Dr. Park would like some more water.
16            MR. JEPSON:  Sure.
17                         CROSS-EXAMINATION
18   BY MS. HYNDMAN:
19   Q.  Dr. Park, your father wasn't a native Spanish speaker, was
20   he?
21   A.  No, he was not.
22   Q.  And he wasn't from Colombia, was he?
23   A.  No, he was not.
24   Q.  You became the associate program director of the plastics
25   residency program in November of 2011, correct?
```

Park - cross

1  A.  That is correct.

2  Q.  Now, was that a position that Dr. Song assigned to you?

3  A.  I don't know who made that decision, but he was the one

4  who asked me to do it.

5  Q.  So he asked you to do it, and you were happy to do it,

6  correct?

7  A.  That is correct.

8  Q.  Does the associate program director typically become the

9  program director when the program director steps out?

10  A.  Not always.  There was another associate program director

11  as well at the time when I was an associate program director.

12  Q.  Who was the other associate program director?

13  A.  Michael Howard.

14  Q.  Pardon?

15  A.  Michael Howard.

16  Q.  At the time that you were the associate program director

17  of plastics?

18  A.  Correct.  We were both associate program directors.

19  Q.  Was Dr. Howard an attending at that time in the plastics

20  program?

21  A.  He is what we call a clinical associate attending.  He

22  works at North Shore.

23  Q.  When Dr. Song asked you to become the associate program

24  director, that was just around the same time that he asked you

25  to be Dr. Artunduaga's probation mentor, correct?

Park - cross

1414

1  A.  It happened prior to any knowledge of probation being

2  necessary.

3  Q.  That wasn't my question, Dr. Park.

4        My question was, it was around the same time,

5  correct?

6  A.  If you can define "around the same time."

7  Q.  November of 2011.

8  A.  So you mean, was it the same month?

9  Q.  Dr. Song asked you to be the associate program director in

10  November of 2011, correct?

11  A.  Correct.

12  Q.  And in November of 2011, he also asked you to be

13  Dr. Artunduaga's mentor, didn't he?

14  A.  He did at the end of the month.

15  Q.  Now, it's true, isn't it, Dr. Park, that you had very

16  little direct exposure to Dr. Artunduaga when she worked on

17  the plastic service in October of 2011?

18  A.  I had the same exposure to her as I do with all the other

19  interns.

20  Q.  That wasn't the question I asked.

21        The question I asked was:  You had very little direct

22  exposure to her in October of 2011; isn't that correct?

23  A.  In order so there is no confusion, could you please define

24  what you mean by "very little."

25  Q.  Do you remember writing a declaration in this case,

Park - cross

 1   Dr. Park -- signing a declaration in this case?

 2   A.  Do you mean the affidavit?

 3   Q.  It's called a declaration.

 4   A.  I'm sorry.  I'm a not a legal specialist.

 5           Yes, I did.

 6       (Document tendered.)

 7   BY MS. HYNDMAN:

 8   Q.  Was this the declaration that you signed in this case in

 9   May of 2015, Dr. Park?

10   A.  Yes, it is.

11           Let me just make sure of that date, please.

12   Q.  I am sorry.  February of 2015?

13   A.  Yes.

14   Q.  And that's your signature on the last page?

15   A.  It is.

16   Q.  If you look at Paragraph 10, you say, "I" --

17           MR. JEPSON:  I object to this because I don't believe

18   it's impeachment.  She can offer it to refresh her

19   recollection.

20           THE COURT:  What's your response?

21   BY MS. HYNDMAN:

22   Q.  Dr. Park, does this refresh your recollection that you had

23   little direct exposure to Dr. Artunduaga in the month of

24   October of 2011?

25   A.  Yes.

Park - cross

1416

1    Q.  You met with her about 11 times during the time that you

2    were her mentor; is that right?

3    A.  Yes.

4    Q.  Prior to March of 2012, when Dr. Artunduaga came into the

5    plastics rotation again, you had one time you worked with her

6    you testified about in January when she was on call and she

7    was relaying information, correct?

8    A.  That is correct.

9    Q.  You testified that you asked Ms. Williams to take notes

10   during the meetings that you had with Dr. Artunduaga, correct,

11   the weekly meetings?

12   A.  Yes.

13   Q.  And she prepared those notes, correct?

14   A.  That is correct.

15   Q.  And then she would give you those notes to review at some

16   point in time?

17   A.  She would email them to me.

18   Q.  Okay.  And did she email you those notes before the next

19   meeting you had with Dr. Artunduaga?

20   A.  Yes.

21   Q.  You never shared those notes with Dr. Artunduaga prior to

22   the time that the faculty met to decide whether to renew her

23   contract, did you?

24   A.  No.

25   Q.  Is it your contention that these notes are accurate

Park - cross

1    summaries of what happened in each meeting?

2    A.  Yes.

3    Q.  Now, there were occasionally -- we saw on your direct

4    examination there were occasionally some email exchanges

5    between you and Dr. Artunduaga about issues as they arose

6    during this period of time, too, right?

7    A.  That is correct.

8    Q.  Other than those email exchanges and the weekly meetings,

9    in November, January, and February when Dr. Artunduaga was not

10   working on your service, did you have contact with her other

11   than those weekly meetings?

12   A.  We would sometime see each other walking in the hallways,

13   and I would ask how she was doing.

14   Q.  Did you have a routine of calling her in between meetings

15   to discuss matters with her?

16   A.  I did not have that routine.

17   Q.  Let's take a look at Defendant's Exhibit No. 67.

18          These were your notes -- these are the notes -- not

19   your notes, but the notes -- from your meeting with

20   Dr. Artunduaga on November 28th, correct?

21   A.  That is correct.

22   Q.  And then on the second page, when you -- let's see.  It's

23   the second-to-last bullet point there.  You say, "Dr. Park

24   suggested that when she starts her vascular rotation in

25   January, she should let them know that she wants to prove

Park - cross

1418

1  herself and ask her seniors what she will be allowed to do to

2  earn their trust."

3          MS. HYNDMAN:  It's actually a little further down,

4  Jamie, the next-to-last bullet point.

5  BY MS. HYNDMAN:

6  Q.  Did you tell Dr. Artunduaga that in the meeting that you

7  had with her on November 28th?

8  A.  Yes.

9  Q.  Let's take a look at Defendant's Exhibit 81.

10          These are the notes from your meeting with

11  Dr. Artunduaga on June 3rd, 2012, correct?

12  A.  Yes.

13  Q.  And you tell Dr. Artunduaga that there was a recurring

14  theme -- it's toward the bottom under "Reviewed

15  Evaluations" -- "a recurring theme that Maria has a lack of

16  clinical knowledge, prioritization, and communication."

17          So, Dr. Park, my question is:  Which of the

18  competencies on the monthly evaluation from the attendings

19  correlate to prioritization?

20  A.  It has to do with organization of work flow, but I would

21  have to look at it specifically.

22          MS. HYNDMAN:  Okay.  Let's take a look at -- do we

23  have an attendings monthly evaluation?

24  BY MS. HYNDMAN:

25  Q.  This is Joint Exhibit No. 44.  This is the standard form

Park - cross

1419

1    that's used by the attending physicians on a monthly basis,

2    correct?

3    A.  Correct.

4    Q.  So which of these competencies correlate to

5    prioritization?

6    A.  So an example would be clinical skills.

7    Q.  So all of them under -- all three under the clinical

8    skills?

9    A.  Prior rotation is an essential ability to be able to do

10   preoperative care, postoperative care, communication and

11   assessment of plans correctly.

12   Q.  And which of the competencies correlate to communication?

13   A.  Clinical skills and I believe it's also professionalism.

14           MR. JEPSON:  I will just object.  Without having the

15   full document in front of her --

16   BY MS. HYNDMAN:

17   Q.  If you need to look at the second page, that's fine.  Or

18   here, I will just give you a copy.

19           THE COURT:  Overruled.  If she wants to see it,

20   that's fine.

21   BY THE WITNESS:

22   A.  You can put it up because I can't recall off the top of my

23   head.  Thank you.

24   BY MS. HYNDMAN:

25   Q.  Let me do this.  Let me give you a hard copy of it.  That

Park - cross

 1    might help.

 2                MS. HYNDMAN:  May I approach, your Honor?

 3                THE COURT:  Yes, you may.

 4                Just identify what exhibit it is, please.

 5                MS. HYNDMAN:  It is Joint Exhibit 44.

 6                THE COURT:  Thank you.

 7    BY THE WITNESS:

 8    A.   There is also competency about relationship with others

 9    and communication skills.

10    BY MS. HYNDMAN:

11    Q.   The clinical knowledge, which of the competencies relate

12    to clinical knowledge?

13    A.   That would be a combination of knowledge base, clinical

14    skills, operative skills.

15    Q.   Now, in the minutes of the meeting from January 3rd, 2012,

16    there was no discussion at that meeting about the in-service

17    exam, correct?

18    A.   Could you please put them up so I can look.

19    Q.   Yes.

20                MS. HYNDMAN:  Defendant's Exhibit 81, please.

21    BY THE WITNESS:

22    A.   That is correct.

23    BY MS. HYNDMAN:

24    Q.   Now, if we can look at Defendant's Exhibit 82.

25                These are the minutes from the meeting of January

Park - cross

1    10th, 2012, correct?

2    A.   That is correct.

3    Q.   And you acknowledged in this meeting with Dr. Artunduaga

4    that she had received better scores from her evaluators this

5    week, correct?

6    A.   That is correct.

7    Q.   And you believed that to be true, correct?

8    A.   That is correct.

9    Q.   There was no discussion of the in-service exam at this

10   meeting on January 10th, 2012, was there?

11   A.   I cannot recall.  It's not in the minutes.

12   Q.   It's not in the minutes?

13   A.   That's what I said.

14   Q.   Let's look at Defendant's Exhibit 87, please.

15        These are the minutes from the meeting of January

16   18th, 2012, correct?

17   A.   Yes.

18   Q.   And once again, Dr. Artunduaga's evaluations showed

19   improvement, correct?

20   A.   Yes, it does.

21   Q.   And you yourself had noticed that Dr. Artunduaga had

22   improved her listening skills and had stopped interrupting

23   others, right?

24   A.   That is correct.

25   Q.   No discussion of the in-service exam during this weekly

Park - cross

1422

1    meeting either, correct?

2    A.  Nothing in the minutes.

3    Q.  And the minutes were accurate, right?

4    A.  To the best of my knowledge, but I can only reflect what I

5    see in the minutes.  I can't reflect what was not in there.  I

6    don't remember.

7    Q.  Well, you reviewed the minutes every week when

8    Ms. Williams sent them to you?

9    A.  That is correct.

10   Q.  And you never went back and had her change anything, did

11   you?

12   A.  The most that I ever changed was, like, formatting.

13   Q.  So if she had missed something and you noticed it, you

14   would have had her change it, wouldn't you?

15   A.  If I had noticed it.

16   Q.  Defendant's Exhibit 88, please.

17         Now, these are the minutes from the January 25th,

18   2012, meeting, correct?

19   A.  That is correct.

20   Q.  And in this meeting, Dr. Artunduaga tells you that she

21   still gets anxious and she is considering medication.

22         Did she tell that to you in that meeting?

23   A.  She told me that -- she kept saying she thinks she should

24   take a certain drug called a beta blocker.  I was very

25   concerned she would self-medicate.

Park - cross

1423

1  Q.  That wasn't my question, Dr. Park.

2  A.  I'm sorry.  Please repeat your question.

3  Q.  My question was:  Did Dr. Artunduaga tell you in this

4  meeting that she still gets anxious and is considering

5  medication?

6  A.  Yes.

7  Q.  Now, you discussed in this meeting with her evaluations

8  from Dr. Shao and Dr. Paruch, and those were both positive,

9  correct?

10  A.  Yes.

11  Q.  And you told her to keep up the good work, right?

12  A.  Yes.

13  Q.  Again, there was no mention of the in-service exam this

14  week at this meeting?

15  A.  Not in these minutes.

16  Q.  Let's go to Defendant's Exhibit 101, please.

17        Now, these are the minutes from the first meeting you

18  had with Dr. Artunduaga in February, correct?

19  A.  Correct.

20  Q.  February 6th, 2012, correct?

21  A.  Yes.

22  Q.  And you told Dr. Artunduaga in this meeting that she was

23  moving in the right direction, but she wasn't there yet,

24  right?

25  A.  Correct.

Park - cross

1424

1    Q.   Do these minutes reflect where you told Dr. Artunduaga she

2    needed to be?

3    A.   I can't remember.  Let me read them.

4        (Brief pause.)

5    BY THE WITNESS:

6    A.   I repeatedly told her about --

7    BY MS. HYNDMAN:

8    Q.   I am asking you if these minutes reflect what you told

9    her, where she needed to be?

10   A.   I can't tell based off these minutes whether or not they

11   are specifically in this time, but every time that we

12   discussed where her goals were, that was discussed as were

13   indicated in later minutes.

14   Q.   But these minutes don't reflect anything to that effect,

15   do they?

16   A.   They do not say those specific terms.  That is correct.

17   Q.   And the minutes were accurate, though, weren't they?

18   A.   That is correct.

19   Q.   Now, in this meeting, you spoke with Dr. -- you spoke with

20   her about the email from Dr. Jaskowiak, correct, or the phone

21   call she had received from Dr. Jaskowiak, correct?

22   A.   We talked about both.

23   Q.   You did.  You talked to her about that?

24   A.   We talked about the whole situation.

25   Q.   Okay.  And you told Dr. Artunduaga that she should follow

Park - cross

1425

1   up with Dr. Jaskowiak, right?

2   A.  Yes.

3   Q.  And she did follow up with Dr. Jaskowiak, didn't she?

4   A.  She did.

5   Q.  And you told Dr. Artunduaga that she shouldn't explain to

6   Dr. Jaskowiak what happened.  She should just merely

7   apologize, correct?

8   A.  At that time, correct.

9           MS. HYNDMAN:  Can we take a look at Joint Exhibit 77,

10  please.

11  BY MS. HYNDMAN:

12  Q.  Dr. Park, the middle email there is an email from

13  Dr. Jaskowiak to Dr. Artunduaga, correct?

14  A.  That is correct.

15  Q.  And you saw a copy of that email at some point; isn't that

16  right?

17  A.  That is correct.

18  Q.  In that email, Dr. Jaskowiak says, "Thanks for your email.

19  I really appreciate having a summary of the events," doesn't

20  she?

21  A.  Yes.

22          MS. HYNDMAN:  Now, if we could go back to Defendant's

23  Exhibit 101.

24  BY MS. HYNDMAN:

25  Q.  There was no conversation at this meeting on February 6th,

Park - cross

1426

1  2012, about the in-service exam according to these minutes;

2  isn't that right, Dr. Park?

3  A.  According to these minutes.

4      MS. HYNDMAN:  Can we take a look at Defendant's

5  Exhibit 104.

6  BY MS. HYNDMAN:

7  Q.  These are the minutes of the meeting on February 13th,

8  2012, correct?

9  A.  That is correct.

10  Q.  And there was a discussion in this meeting about the

11  in-service exam, correct?

12  A.  That is correct.

13  Q.  Okay.  And you told Dr. Artunduaga -- you gave her a

14  homework assignment, right?

15  A.  That is correct.

16  Q.  You told her to complete the 2010 in-service exam by next

17  Monday and report on what she needs to work on for the

18  in-service, right?

19  A.  That is correct.

20  Q.  Now, you didn't have a meeting the following week with

21  Dr. Artunduaga, did you?

22  A.  If that's the week that we could not coordinate, then that

23  is correct.  I can't remember the specific date.  There was

24  one week where she canceled.

25  Q.  That was the week of February 22nd.  Does that refresh

Park - cross

1427

1    your recollection?

2    A.  Sorry.  I can't, no.  But I know that there is a minute in

3    there saying there is one week that we couldn't get together.

4    Q.  So if we take a look at Defendant's Exhibit 115, this is

5    the minutes of the meeting on February 28th, 2012, correct?

6    A.  That is correct.

7    Q.  And at this meeting, Dr. Artunduaga told you -- it's on

8    the second page -- Maria told you she completed the 2010 exam,

9    right?

10   A.  That is correct.

11   Q.  Now, you told Dr. Artunduaga that this was going to be --

12   strike that.

13          You told Dr. Artunduaga at this meeting that she was

14   going to have her last rotation on probation with the

15   plastics, correct?

16   A.  I'm not sure if I said it in this meeting, but that is

17   correct.  She did have her last rotation on plastics.

18   Q.  Let's look at the first page, and it's the third bullet

19   point.  "Maria's last rotation on probation will be with

20   plastic surgery," correct?

21   A.  That is correct.

22   Q.  And this was on February 28th that you told her that?

23   A.  We discussed this on February 28th.

24   Q.  Okay.  And then the rotation was beginning on March 1st,

25   right?

Park - cross

1    A.  I believe so.

2    Q.  Now, you told Dr. Artunduaga that "this will show as a

3    test for Maria to show that she is a resident we should keep,"

4    correct?

5    A.  Did I say "test"?  I can't remember.  But it would be an

6    opportunity for her to show her abilities.

7    Q.  That's not what the minutes say, does it?  It says, "this

8    will show as a test," doesn't it?

9    A.  I can't see it.

10           MS. HYNDMAN:  Can we highlight that, please.

11   BY THE WITNESS:

12   A.  Yes, that is correct.

13   BY MS. HYNDMAN:

14   Q.  Now, you also told Dr. Artunduaga in this meeting, if we

15   look at the second page, the very last -- I guess it's not the

16   last -- the second-to-the-last bullet point, "Dr. Park

17   reiterated that she needs to excel in our program, not just

18   pass.  She needs to hit the level of excellence we expect of

19   our plastic surgery residents."  Correct?

20   A.  That is correct.

21           MS. HYNDMAN:  Let's look at Defendant's Exhibit 121,

22   please.

23   BY MS. HYNDMAN:

24   Q.  These are the minutes from the meeting on March 5th of

25   2012?

Park - cross

1429

1  A.  That is correct.

2  Q.  And at this meeting, you told Dr. Artunduaga that she was

3  focusing too much on her evaluations, correct?

4  A.  Let me find the word.

5      (Brief pause.)

6  BY MS. HYNDMAN:

7  Q.  Well, let me say this.  It wasn't exactly those words.

8          What you said was, "Maria should focus more on the

9  job she does, not on how people will evaluate her."  Correct?

10 A.  That is correct.

11         MS. HYNDMAN:  And if we could go to Defendant's

12 Exhibit 126, please.

13 BY MS. HYNDMAN:

14 Q.  You told Dr. Artunduaga in this meeting on March 12th,

15 2012, that the performance you had witnessed had not matched

16 her evaluations, correct?

17 A.  I am trying to figure out where that one is specifically

18 written.

19     (Brief pause.)

20 BY MS. HYNDMAN:

21 Q.  It's the second bullet point -- indented bullet point

22 under the first bullet point.

23         MS. HYNDMAN:  Can you highlight that, Jamie.  Do you

24 see it?

25

Park - cross

1430

```
 1   BY THE WITNESS:
 2   A.  I see it now.
 3           Yes, that is.
 4   BY MS. HYNDMAN:
 5   Q.  Okay.  Now, at the time of this meeting on March 12th,
 6   2012, you had seen an email from Dr. Song to Jane McAtee with
 7   the Re: line "Draft of Termination Letter"; isn't that right?
 8   A.  I can't remember at this time.
 9   Q.  Okay.  Let me see if I can refresh your recollection.
10        (Document tendered.)
11   BY THE WITNESS:
12   A.  Thank you.
13           THE COURT:  Can you identify for the record, please.
14           MS. HYNDMAN:  Plaintiff's Exhibit 39, just for
15   purposes of refreshing her recollection.
16           THE COURT:  Okay.  Read it to yourself, Doctor.
17           THE WITNESS:  Thank you.
18   BY MS. HYNDMAN:
19   Q.  If you want to look at the -- it's probably the last
20   email.
21        (Brief pause.)
22   BY MS. HYNDMAN:
23   Q.  Did that refresh your recollection that you had seen that
24   email of Dr. Song's prior to March 12th of 2012?
25   A.  Prior to March 12th?
```

Park - cross

1431

1   Q.  That you had seen an email that Dr. Song had sent to

2   Dr. McAtee with a Re: line of "Draft of Termination Letter"

3   prior to March 12th, 2012?

4   A.  I can't tell who starts it, so I don't know if Dr. -- I'm

5   sorry -- if Jane McAtee is sending it to Dr. Song or who does

6   what because it looks like the initial person is Jane McAtee,

7   but so much of it's redacted, I don't actually know.

8   Q.  In any event, you saw emails back and forth between

9   Dr. Song and Dr. McAtee with the Re: line "Draft of

10  Termination Letter," correct?

11  A.  Correct.

12  Q.  And that was before March 12th of 2012, correct?

13  A.  That is correct.

14          MS. HYNDMAN:  We will look at Defendant's Exhibit

15  129, please.

16  BY MS. HYNDMAN:

17  Q.  This was your last mentoring meeting with Dr. Artunduaga;

18  isn't that right?

19  A.  That is correct.

20  Q.  And it's the -- the bullet point just below Evaluations.

21  It says, "Dr. Park reiterated the standards."

22          Do you see that?

23          MS. HYNDMAN:  Would you highlight that, please,

24  Jamie.

25

Park - cross

1432

```
 1   BY MS. HYNDMAN:
 2   Q.  "Dr. Park reiterated that the standards of probation was
 3   that Maria's performance meet the expectations held for the
 4   plastic surgery residents (levels superior and exemplary)."
 5   Correct?
 6   A.  Correct.
 7          MS. HYNDMAN:  Can we take a look at Joint Exhibit 26,
 8   please.
 9   BY MS. HYNDMAN:
10   Q.  And this was the probation letter that Dr. Artunduaga
11   received in November of 2011, correct?
12   A.  That is correct.
13   Q.  And you had seen this probation letter probably sometime
14   around the end of November.  Is that fair to say?
15   A.  Around that time.
16   Q.  Okay.  Take your time reading through this, Dr. Park.  I
17   would like you to show me where in this probation letter it
18   says that Dr. Artunduaga had to meet the expectations of
19   plastic surgery residents which were superior or exemplary?
20   A.  Can you scroll to the next page, please.
21      (Brief pause.)
22   BY THE WITNESS:
23   A.  It does not use those words.
24   BY MS. HYNDMAN:
25   Q.  By the time you had this meeting with Dr. Artunduaga on
```

Park - cross

1433

1    March 21st, 2012, you had had a meeting with Dr. Song and Jane

2    McAtee, correct?

3    A.  I can't recall.

4    Q.  If you look at the emails that are in front of you --

5            MS. HYNDMAN:  Let's take a look at Plaintiff's

6    Exhibit 39.  It's in evidence.

7    BY MS. HYNDMAN:

8    Q.  And at the top it says -- this is an email addressed to

9    you and Dr. Song from Christine Smith, correct?

10   A.  Uh-huh.

11   Q.  And did you know Christine Smith to be Jane McAtee's

12   assistant?

13   A.  Yes.

14   Q.  Okay.  "This is to confirm the meeting with Jane McAtee

15   for March 14th, 2012, at 11:00 a.m. in legal affairs."

16   Correct?

17   A.  Correct.

18   Q.  Did you have that meeting with Jane McAtee and Dr. Song on

19   that day?

20   A.  I don't remember this meeting.

21   Q.  You don't remember being at this meeting?

22   A.  That is correct.

23   Q.  Okay.  On March 14th, though, you did draft your ten-page

24   letter to Dr. Song about Dr. Artunduaga's progress on her

25   probation, correct?

Park - cross

1434

1   A.  I don't know how many pages it was, but that is correct.

2   Q.  It was multiple pages.  You will agree with that, right?

3   A.  That is correct.

4   Q.  I think the record will show it's ten pages.

5           At the time you had this meeting with -- this last

6   mentoring meeting you had with Dr. Artunduaga on March 21st,

7   you had already written this letter, hadn't you?

8   A.  I had, yes.

9           THE COURT:  We are going to take our afternoon break.

10          MS. HYNDMAN:  Thank you.

11      (Jury out at 2:57 p.m.)

12          THE COURT:  You think you have a half-hour left with

13  Dr. Park?

14          MS. HYNDMAN:  Yes.

15          THE COURT:  Okay.  I don't know if we will get to

16  closings, or if they are willing to stay a little bit later.

17          We will pick up in probably about ten minutes.

18          So please be back, Dr. Park, in about ten minutes.

19          THE WITNESS:  Thank you.

20      (A brief recess was taken at 2:58 p.m.)

21    (Proceedings heard in open court.  Jury In.)

22              CROSS-EXAMINATION (Resumed.)

23  BY MS. HYNDMAN:

24  Q.  Can we look at Defendant's Exhibit 129 again, please.  We

25  were just talking about these, Dr. Park, before we broke.  And

Park - cross

1435

1  these were the minutes from the last meeting you had with Dr.

2  Artunduaga during her probation; correct?

3  A.  That is correct.

4  Q.  And then under the section of evaluations, at that

5  meeting, did you review with Dr. Artunduaga the evaluation

6  that had been -- that had come in from the plastic surgery

7  residents for the prior week?

8  A.  I would have reviewed what had come in during the week

9  before.

10  Q.  Okay.

11  A.  From the last meeting to this meeting.

12  Q.  Okay.  Let's take a look at Joint Exhibit 90, please.  And

13  this is an evaluation from Dr. Bank.  And if we look at the

14  second page, it appears that it was submitted on March 16,

15  2012.  Do you see that?

16  A.  Yes, I do.

17  Q.  Okay.  And in Dr. Bank's overall comments he said:

18  Although I had less opportunity to interact with Maria this

19  week, I did note an improvement in overall function.  Correct?

20  A.  Correct.

21  Q.  And on the first page of this evaluation, under the

22  question:  Did Dr. Artunduaga demonstrate the ability to

23  correctly prioritize her work?  Dr. Bank said:  Yes.  Correct?

24  A.  That is correct.

25  Q.  And then, in the second question:  Was Dr. Artunduaga

Park - cross

1436

1  efficient in completing her work?  He marked that she showed

2  improvement.  Correct?

3  A.  That is correct.

4  Q.  Let's look at Joint Exhibit 92, please.  And this is the

5  weekly evaluation for Dr. Greives for the period March 10th to

6  March 15; correct?

7  A.  Yes.

8  Q.  And Dr. Greives also said yes to the question:  Did

9  Dr. Artunduaga demonstrate the ability to correctly prioritize

10 her work?  Correct?

11 A.  That is correct.

12 Q.  And he also noted that she showed improvement in the

13 efficiency in completing her work; right?

14 A.  That is correct.

15 Q.  And if we will look at Joint Exhibit 93, this is the

16 evaluation, weekly evaluation, by Dr. Kleiber for the week

17 March 10 to March 15th; correct?

18 A.  Yes.

19 Q.  And he, too, said that Dr. Artunduaga demonstrated the

20 ability to correctly prioritize her work; correct?

21 A.  Prioritize?  Sorry.  Yes.

22 Q.  And that she showed improvement in the efficiency in

23 completing her work; correct?

24 A.  Yes.

25 Q.  And down under No. 5, there is a comment that Dr. Kleiber

Park - cross

1437

1 makes. He says: Her ability to give concise and relevant

2 patient presentations has improved since last week. She still

3 needs to work on this, but she understands and is getting

4 better. Correct?

5 A. Yes.

6 Q. And then if we can look at the overall comments that

7 Dr. Kleiber made. He said: I did not work with Maria as much

8 this past week as her first week on the service.

9        I -- I assume he means -- in my limited interactions

10 with her over the past week, I believe she has shown

11 improvement in the specific areas I discussed with her at the

12 end of last week. She still has a long way to go, but I

13 believe she is earnestly working on improving as a resident.

14 Correct?

15 A. Yes.

16 Q. Now, Dr. Park, you testified about the letter you wrote to

17 Dr. Song that was the summary of her experience --

18 Dr. Artunduaga's experience on probation. That's joint

19 Exhibit 96. And is it fair to say, Dr. Park, that you

20 prepared this both as a summary of Dr. Artunduaga's

21 performance on the probation, as well as your assessment of

22 her performance under probation?

23 A. Yes.

24 Q. And you gave your opinion about whether or not

25 Dr. Artunduaga should remain in the program; correct?

Park - cross

1438

1  A.  I don't remember if I said specifically that.  I just gave

2  my opinions on her progress.

3  Q.  Okay.  And, Dr. Park, you believe that this letter

4  truthfully summarized your interactions with Dr. Artunduaga

5  during the probation period; don't you?

6  A.  Yes.

7  Q.  And, Dr. Park, was it your intention in this letter to

8  focus on Dr. Artunduaga's performance during the probation

9  period only?

10  A.  A summary of her probation period, yes.

11  Q.  So you were only talking about her performance during the

12  probation; correct?

13  A.  That is correct.

14  Q.  And not for periods before the probation?

15  A.  This is specifically towards her probation.

16  Q.  Now, your letter offered some specific examples that

17  illustrated your overall assessment; isn't that right?

18  A.  Yes.

19  Q.  And you clustered those into four separate categories that

20  we saw when Mr. Jepson went through the letter?

21  A.  Yes.

22  Q.  Okay.  Now, can we look at Joint Exhibit 26 again.  Do you

23  see, at the bottom of the first page:  The following

24  conditions must be met for you to continue in the program.

25  A.  Correct.

Park - cross

1439

1   Q.  And then it carries on to the second page.  And I believe

2   -- I counted them, I think there are ten there.  That's

3   subject to check, of course.

4           Dr. Park, did you ever prepare an assessment by

5   condition of Dr. Artunduaga's performance, taking each of

6   these conditions and assessing her performance in each of

7   them?

8   A.  I'm not quite sure what you mean.  I'm sorry.

9   Q.  Okay.  Let's go back to the first page, please.  Did you,

10  Dr. Park, ever create a document that took, for example,

11  number one, first condition:  Establishing and maintaining

12  your workload, and then a discussion about Dr. Artunduaga's

13  progress towards that particular condition?

14  A.  You mean did I, like, write a document about specifically

15  those points?

16  Q.  Right.

17  A.  Is that what you mean?  The only document I wrote

18  summarizing is that letter.

19  Q.  Did you ever see a document that took these conditions and

20  then matched Dr. Artunduaga's progress against each of these

21  conditions?

22  A.  I don't recall.  I don't recall making one.

23  Q.  If we can go back to Joint Exhibit 96, please, and on the

24  second page.  In the first incident, there was one that you

25  testified about on direct.  This was the information that you

Park - cross

1440

1  believed Dr. Artunduaga had sent to you in an incomplete and

2  piecemeal fashion.  Do you remember that?

3  A.  Yes.

4  Q.  And the last sentence in your letter here says:  We expect

5  our residents to understand the clinical relevance of their

6  work and to confirm the accuracy of their reports if they have

7  reason to suspect problems with their information.  Correct?

8  A.  That is correct.

9  Q.  Now, can we take a look at defendant's exhibit -- Oh, and

10  -- strike that.  You also say in this -- in your letter, Joint

11  Exhibit 96, that she provided the clinically important

12  information in an incomplete and piecemeal fashion; right?

13  A.  Sorry, I'm trying to find the exact wordage.  But if

14  you're reading it, I trust it.  Where is it?

15  Q.  Yeah, it's:  The main issue?

16  A.  The main issue.  Provided clinically important information

17  in an incomplete and piecemeal fashion.

18  Q.  Okay.  Now, if we can look back at Defendant's Exhibit 82.

19  And those are the minutes from the meeting of January 10th.

20  And, at that meeting, you did not tell Dr. Artunduaga that:

21  We expect our residents to understand the clinical relevance

22  of their work and to confirm the accuracy of their reports if

23  they have reason to suspect problems with their information;

24  did you?

25  A.  I don't recall using those exact words.

Park - cross

1    Q.  Okay.  And instead you say:  Maria should rely on her

2    senior more to verify that she is relating the correct

3    information to the attendings.  Correct?

4    A.  What I am saying is she should work with the knowledge

5    within the team.

6    Q.  Well, I'm asking what is said in the minutes, Dr. Park.

7    The minutes say:  Maria should rely on her senior more to

8    verify that she is relaying the correct information to the

9    attendings?

10   A.  That is correct.

11   Q.  And if we could go back now to Joint Exhibit 96.

12           This is going to test your skills, Jamie.

13   A.  Too bad you can't split screen.

14   Q.  Yeah, I'm sure you could, but it's a little beyond our pay

15   grade.

16           And if we look at the second page again, you refer to

17   an incident on March 6, 2012, where you say Maria should have

18   been present for the procedure that you were doing; correct?

19   A.  Yes.

20   Q.  Okay.  If we could look at Defendant's Exhibit 126.  And

21   these are your notes of your meeting on March 12, 2012; right?

22   A.  Yes.

23   Q.  About six days after this incident occurred?

24   A.  That is correct.

25   Q.  And these minutes don't reflect that you had a discussion

Park - cross

1442

1  with Dr. Artunduaga about that incident; do they?

2  A.  They are not in this minutes.

3  Q.  Now, let's go to the next -- Oh, back to Joint Exhibit 96.

4  And your fifth example on the next page relates to a procedure

5  that you believed Maria did not perform properly; correct?

6  A.  It refers to a procedure where she needed more guidance in

7  order for it to be done correctly.

8  Q.  Okay.  And was that something you were present for?

9  A.  No, I was not.

10  Q.  Okay.  This is something that Dr. Kleiber had done?

11  A.  This is something that Dr. Kleiber was present for and did

12  with her.

13  Q.  Okay.  And Dr. Kleiber reported this to you?

14  A.  That is correct.

15  Q.  And this occurred on March 10, 2012?

16  A.  Yes.

17  Q.  Okay.  So you would expect Dr. Kleiber to mention this in

18  his evaluation from that week?

19  A.  I cannot tell what Dr. Kleiber will or will not choose to

20  put in his specific evaluation.

21  Q.  If we look back at Defendant's Exhibit 126, and this is,

22  again, are the minutes from the meeting of March 12, 2012,

23  these minutes don't reflect a conversation with Dr. Artunduaga

24  about this procedure; do they?

25  A.  No, it does not.

Park - cross

1443

1   Q.  Now, going back to Joint Exhibit 96.  Under interpersonal

2   conflicts, the first example there relates to this incident

3   with Dr. Jaskowiak and her patient; correct?

4   A.  That is correct.

5   Q.  And then towards the end of that paragraph, you say:

6   Finally, after much prompting and guidance by myself, Maria

7   wrote an apology to Dr. Jaskowiak.  Do you see that?

8   A.  Yes.

9   Q.  Isn't it true, Dr. Park, that you only discussed this

10  e-mail from Dr. Jaskowiak at one of your weekly meetings?

11  A.  No, I was asking her repeatedly if she had sent the

12  e-mail.

13  Q.  Well, let's take a look at these, then.  Dr. Artunduaga

14  first reported this incident to you on January 26th; is that

15  right?

16  A.  I can't recall.  I don't have all the documents.  I know

17  there is a string of e-mails.

18  Q.  Well, let's find it.  It's Joint Exhibit 60.  And that's

19  an e-mail to you and Dr. Song from Dr. Artunduaga relating to

20  this incident with Dr. Jaskowiak; correct?

21  A.  That is correct.

22  Q.  And that's the first you heard of it from anyone; right?

23  A.  Yes.

24  Q.  And that was on January 26th?

25  A.  Yes.

Park - cross

1444

1    Q.  So let's look at the minutes of the meeting from

2    February 6, 2012, Defendant's Exhibit 101.  And this is the

3    meeting where you talk to Dr. Artunduaga about the phone call

4    from Dr. Jaskowiak; correct?

5    A.  Correct.

6    Q.  Okay.  And this is February 6, 2012?

7    A.  Yes.

8    Q.  Okay.  And I think the record will reflect that the

9    meeting before February 6, 2012, was a meeting on January 25,

10   2012; right?

11   A.  I can't recall, but I trust you.

12           MR. JEPSON:  Be careful with that.

13   BY THE WITNESS:

14   A.  Sorry.  I trust that the records show accurate data.

15   BY MS. HYNDMAN:

16   Q.  And can we take a look at Plaintiff's Exhibit 77, please.

17   I'm sorry, Joint Exhibit 77.  Sorry.  Joint Exhibit 77 is the

18   apology that Dr. Artunduaga sent to Dr. Jaskowiak; correct?

19   A.  That is correct.

20   Q.  And she sent that e-mail on February 9, 2012?

21   A.  Correct.

22   Q.  Three days after the weekly meeting you had with her?

23   A.  That is correct.

24   Q.  Now, if we could go back to Joint Exhibit 96.  And if we

25   go to the next page.  And in this example, this is a report

Park - cross

1445

1  you received from Dr. Reid; correct?

2  A.  I'm sorry, can you specify?

3  Q.  It's the third example.

4  A.  Yes.

5  Q.  That's a report you received from Dr. Reid?

6  A.  It is something that he told me.

7  Q.  Okay.

8  A.  It's not a written report.

9  Q.  You didn't have a conversation with these neurosurgery

10  nurses?

11  A.  No.  This is something I'm reporting that he told me.

12  Q.  Okay.  And do you know how many neurosurgery nurses were

13  in this conversation with Dr. Reid?

14  A.  I believe he is describing a conversation between two

15  nurses, but --

16  Q.  Do you know who the nurses were that made this report?

17  A.  No, I don't.  That's why I just described what he told me.

18  Q.  And you say:  When prompted, they explained that she was

19  abrupt, rude and unprofessional and lashing out at them.

20  Correct?

21  A.  I am reporting what he told me.

22  Q.  You didn't discuss this incident with Dr. Artunduaga in

23  any of your weekly meetings; did you, Dr. Park?

24  A.  I don't recall.

25  Q.  The minutes would reflect whether it's in there or not; is

Park - cross

1446

1   that right?

2   A.  The minutes would reflect whether or not they're in there,

3   but I don't recall whether or not I spoke to her about this

4   specific incident.

5   Q.  And Dr. Reid didn't commit his report in writing anywhere;

6   did he?

7   A.  No, he did not, that I'm aware of.

8   Q.  Now, if we look at the next page, under responsiveness to

9   advising, the first example there says:  Beginning in January,

10  I repeatedly advised and encouraged Maria to study for the

11  in-service exam.  Do you see that?

12  A.  That is correct.

13  Q.  Now, that's not true; is it, Dr. Park?

14  A.  I believe there are a bunch of e-mails.  That might not be

15  written in the minutes, but we did talk about the in-service.

16  The in-service is on schedule and known at any one given time.

17  Q.  But you didn't discuss it in the weekly meetings with her;

18  did you?

19  A.  I don't recall.

20  Q.  We went through the minutes, and we didn't see --

21  A.  No, that's what I said.  I don't recall if we discussed

22  it.  I agree they're not in the minutes.

23  Q.  And the minutes are accurate; correct?

24  A.  They're accurate to the things that are in them.

25  Q.  Okay.  And you had the opportunity every week to change

Park - cross

1   those minutes, if they were not complete; didn't you,

2   Dr. Park?

3   A.  I did.

4   Q.  Now, you told -- you say in the -- in this same paragraph

5   towards the bottom, you explain that you gave Dr. Artunduaga a

6   homework assignment.  And I believe that was in the minutes of

7   the February 13, 2012, meeting -- weekly meeting you had with

8   her.  And then you go on to say:  When I ran into Maria in the

9   hospital, I asked if she had completed the 2010 in-service

10  yet.  She had not.  When we met the following week, she still

11  had not completed a full in-service exam.

12          Can we look at the minutes from the February 28th

13  meeting.  I believe it's Defendant's Exhibit 115.  And if we

14  look at the second page, and it says:  Maria completed the

15  2010 exam; doesn't it?

16  A.  That's what it says.

17  Q.  Now, if we go back to Joint Exhibit 96, on the next page.

18  Is it the next page, or two pages?  Next page.

19          Now, your first example here, under the category,

20  interference with the evaluation process says:  Maria

21  mentioned Dr. Darwin Eaton wrote his evaluation before she

22  could talk to him as an explanation for why it was an

23  unimpressive review.  Was that your conclusion that it was

24  unimpressive, or is that what Dr. Artunduaga told you?

25  A.  I don't believe that's what she told me.

Park - cross

1448

1   Q.  That was your conclusion, that it was an unimpressive

2   review?

3   A.  I believe what I remember from that conversation was

4   saying -- we were talking about differences.  And his was --

5   stood out as more different than the other ones.

6   Q.  That wasn't my question, though.  My question was:  Whose

7   conclusion was it that it was an unimpressive review?

8   A.  It was my interpretation of his review.

9   Q.  And if we could look at Joint Exhibit 44.  And this is Dr.

10  Eaton's review; correct?

11  A.  That is correct.

12  Q.  And he rates her on the first page, either good or

13  exemplary.  There is a couple categories that were not

14  applicable; correct?

15  A.  That is correct.

16  Q.  And on the second page, again, either good or exemplary

17  were some that were not applicable; correct?

18  A.  That is correct.

19  Q.  And then he comments that:  Dr. Artunduaga performs at her

20  expected level.

21  A.  That is correct.

22  Q.  Correct?  Okay.  Now, if we can go back to Joint

23  Exhibit 96.  The last example, under interference with the

24  evaluation process, you mentioned this conversation that you

25  had with Dr. Skelly.  And on direct examination, you testified

Park - cross

1   that Dr. Skelly had this conversation with the senior surgeon,

2   and the senior surgeon told him he had to rate Dr. Artunduaga

3   favorably.  Do you remember giving that testimony, Dr. Park?

4   A.  I don't remember the exact words, but the -- that was the,

5   you know, the basic gist; that he was encouraged to rate

6   favorably to keep her in the program.

7   Q.  Now, Dr. Park, it's important for attending physicians to

8   be truthful on these evaluations; wouldn't you agree?

9   A.  Yes.

10  Q.  I mean, it doesn't really help anyone, a resident, or

11  anyone, for an evaluator to be too soft; right?

12  A.  That is correct.

13  Q.  And it doesn't give them a fair assessment of what they

14  need to do to improve their performance?

15  A.  That is correct.

16  Q.  And, more importantly, an inaccurate assessment could

17  potentially jeopardize a patient, a patient's safety; isn't

18  that right?

19  A.  That is correct.

20  Q.  So, Dr. Park, is it your testimony that attending

21  physicians at the University of Chicago Medical Center would

22  jeopardize patient safety for the sake of cutting

23  Dr. Artunduaga a little slack?

24  A.  I cannot tell you what they will do.

25  Q.  In any event, there were a lot of attending physicians

Park - cross

1450

1    that knew that Dr. Artunduaga was on probation; isn't that

2    right?

3    A.   Could you clarify what you mean by lots so we're on the

4    same page?

5    Q.   Let me just ask you.  Let me go person by person.  You

6    knew she was on probation?

7    A.   Yes, I did.

8    Q.   Every other attending physician in the plastic section

9    knew she was on probation?

10   A.   I believe she did.

11   Q.   Dr. Ferguson knew she was on probation; right?

12   A.   He was an attending working with her, correct.

13   Q.   Dr. Vigneswaran knew she was on probation; is that right?

14   A.   Yes.

15   Q.   Dr. Becker knew she was on probation?

16   A.   That is correct.

17   Q.   Dr. Millis knew she was on probation?

18   A.   Yes.

19   Q.   Now, you believed the evaluation that Dr. Ferguson gave

20   Dr. Artunduaga; didn't you?

21   A.   Yes, I did.

22   Q.   And you believed the evaluation that Dr. Vigneswaran gave

23   her?

24   A.   I can't remember the specifics of that one.

25   Q.   Okay.  Any reason to think you doubted anything he said in

Park - cross

1451

1 his evaluation?

2 A.  At the time, when I was reviewing them, I was taking

3 things as face value.  As the probation continued and I was

4 seeing inconsistencies with evaluations and performance, I

5 can't say which one in specifics I started questioning.  So,

6 I'm sorry, I mean, you can put it up, and I can look at it,

7 but.

8 Q.  All right.  Well, we don't need to do that.  Now, we

9 looked at your letter, and at the back there are these charts

10 that you put together about Dr. Artunduaga's evaluation

11 scores.  Can we take a look at the first chart.

12        Now, these charts were based upon the evaluation

13 scores that Dr. Artunduaga had received both before probation

14 and during probation; correct?

15 A.  They're all the evaluation scores I had available to that

16 point.

17 Q.  Okay.  And these are the same evaluation scores that you

18 told Dr. Artunduaga she worried too much about; right?

19 A.  No.

20 Q.  They're different evaluation scores?

21 A.  She was very fixated on the weekly evaluations.

22 Q.  But let's take a look back at -- let's look at Defendant's

23 Exhibit 121.  This is the notes of your meeting on March 5,

24 2012; right?

25 A.  Yes.

Park - cross

1   Q.  And there is a whole section here about evaluations;

2   correct?

3   A.  That is correct.

4   Q.  And you told Dr. Artunduaga that you wanted the attendings

5   to evaluate her, just like any other resident; correct?

6   A.  That is correct.

7   Q.  Okay.  And that if she wants feedback, she should wait

8   until the end of the month to ask; right?

9   A.  No, that she should not wait.

10  Q.  Should not wait.  I'm sorry, that's right.  And then you

11  say, you told her in this meeting:  Marie should focus more on

12  the job she does, not on how people will evaluate her.

13  Correct?

14  A.  That is correct.

15  Q.  And that conversation was in the context of a discussion

16  about attendings' evaluation scores; wasn't it, Dr. Park?

17  A.  That context -- the context of that --

18  Q.  Yes or no?

19  A.  -- conversation.  No, not specifically.  That was only

20  part.

21  Q.  Where does it say that there was a discussion about

22  something else?

23  A.  We're talking about evaluations under this all.  Okay?

24  Repeatedly, throughout the whole --

25  Q.  I'm talking about this conversation, Dr. Park.

Park - cross

1453

1   A.   Specifically, these words don't represent every nugget of

2   information that we have discussed.

3   Q.   Okay.

4   A.   And so I'm happy to give you the context of that

5   statement, but it doesn't specifically have it in writing

6   here.

7   Q.   These minutes do not reflect that there was a discussion

8   about anything else other than attending evaluations at this

9   meeting on March 5th; do they, Dr. Park?

10  A.   These minutes do not.  However, that does not --

11  Q.   No however.  The question was:  Do the minutes reflect?

12  The answer is no; correct?

13  A.   The answer is that these minutes do not reflect those

14  specifics.  However, that's not the --

15  Q.   Thank you.  That's the only question.  That's the only

16  question that's pending, Dr. Park, please.

17       Let's go back to these charts.  You never took the

18  scores that Dr. Artunduaga received during the probation

19  period and averaged those alone; did you, Dr. Park?

20  A.   No.

21  Q.   Let's talk about the meeting on March 26, 2012, to discuss

22  whether Dr. Artunduaga's contract would be renewed.  And you

23  testified that you and Akilah Williams put together a binder

24  of material for the attendings; right?

25  A.   That is correct.

Park - cross

1454

1  Q.  And if we could look at Joint Exhibit 102.  That's the

2  binder; right?  That's the cover page?

3  A.  Yes.

4  Q.  And this is a hard copy of that binder.  I think the

5  record will reflect there is about 195 pages in here.  Does

6  that sound about right to you?

7  A.  That looks to be about the right thickness, so --

8  Q.  There are a lot of pages?

9  A.  Yes.

10  Q.  There is a lot of information in here; right?

11  A.  Yes.

12  Q.  Okay.  And this package of materials related to the

13  probationary period; correct?

14  A.  The probationary period and the reasons for her probation.

15  Q.  Okay.  Now, let's take a look at the table of contents.  I

16  think it's the next page.  Under Tab 5, you included an e-mail

17  from Dr. Umanskiy.  Do you remember that?

18  A.  Yes.

19  Q.  Okay.  And if we could take a look at that.  It's the page

20  30426, Jamie, if that's helpful.  It might be faster if I just

21  get a hard copy.  There we go.

22        That's Dr. Umanskiy's e-mail; right?

23  A.  That is correct.

24  Q.  And it's dated September 28, 2011?

25  A.  That is correct.

Park - cross

1455

1   Q.  That was a full month before the probation started; right?

2   A.  That is correct.  Well, a little bit more, yeah.

3   Q.  At least a full month before the probation?

4   A.  That is correct.

5   Q.  Correct?

6   A.  That is correct.

7   Q.  Okay.  And then under Tab 6, the table of contents says

8   there are e-mails from senior residents reviewing performance?

9   A.  That is correct.

10  Q.  Okay.  And if we could take a look at those, the first

11  page.  Let me see if I can find them.  Okay.  I believe the

12  first page, Jamie, is 30433.  And that is an e-mail from

13  Dr. Dickie dated August 31st, 2011; right?

14  A.  Yes, it is.

15  Q.  Okay.  And then two pages later we have an e-mail from Dr.

16  Dickie dated September 8, 2011; right?

17  A.  Yes.

18  Q.  And then the next page, two pages later, is an e-mail from

19  Jose Joly dated October 17, 2011; right?

20  A.  Joly.

21  Q.  And Joly Jose isn't even a senior resident; is she?

22  A.  She is a nurse practitioner.

23  Q.  Okay.  And then the next page is another October e-mail

24  from Dr. Dickie; right?

25  A.  Yes, it is.

Park - cross

1456

1   Q.  And then two pages later, we have an October memo from Dr.

2   Nyugen; right?  You need to zoom out a little bit, I think, so

3   she can see that.

4   A.  Yes.

5   Q.  And then the next page is a memo -- another memo from

6   October of 2011, and that is from Dr. Dickie; correct?

7   A.  If you could maybe scroll up because I don't know who

8   wrote this.

9   Q.  Do you recognize her signature there under

10  Dr. Artunduaga's?

11  A.  I'm sorry --

12  Q.  Oh, can we scroll up a little bit?  In any event, it's

13  from October 28th of 2011; right?

14  A.  Yes.

15  Q.  And then the next page, we have an e-mail from Dr. Butz

16  dated October 30, 2011; correct?

17  A.  Yes.

18  Q.  Now, all of the items under that tab dated from before the

19  probationary period; correct, Dr. Park?

20  A.  That's correct.

21  Q.  So you had this meeting on March 26th, and you distributed

22  this material; right?

23  A.  That's correct.

24  Q.  At the beginning of the meeting?

25  A.  That is correct.

Park - cross

1457

1   Q.  They didn't get it before the meeting?

2   A.  No, I did not think it should be circulated out there.

3         MR. JEPSON:  Would you speak up, please?

4   BY THE WITNESS:

5   A.  Sorry.  I felt that this was confidential information and

6   should not be released and circulated.

7   BY MS. HYNDMAN:

8   Q.  Let's look at Joint Exhibit 101.  These appear to be the

9   minutes from the meeting of March 26, 2012; correct?

10   A.  Yes.

11   Q.  Have you seen these before, Dr. Park?

12   A.  Yes, I have.

13   Q.  Okay.  And these were prepared by Akilah Williams?

14   A.  I believe so.

15   Q.  And are they accurate?

16   A.  I believe they are.

17   Q.  Okay.  And the third bullet point in these minutes say:

18   Much time was spent on the letter issued to Maria regarding

19   the details of her probation and the conditions she had to

20   meet for her continuation in the program.  Is that consistent

21   with your recollection of that meeting?

22   A.  Yes.

23   Q.  After this meeting was over, Dr. Park, you directed Akilah

24   Williams to make some additions to one of Dr. Artunduaga's

25   evaluations; didn't you?

Park - redirect

1458

```
 1   A.  I can't remember.

 2           MS. HYNDMAN:  Plaintiff's Exhibit 40, just to

 3   refresh.

 4           MR. JEPSON:  Thank you.

 5   BY MS. HYNDMAN:

 6   Q.  Just read that to yourself, Dr. Park.

 7   A.  Thank you.

 8   Q.  Does that refresh your recollection that you directed

 9   Akilah Williams to make some additions to one of

10   Dr. Artunduaga's evaluations?

11   A.  I'm sorry, I can't remember.

12   Q.  Okay.  So it doesn't refresh your recollection?

13   A.  That is correct.

14           MS. HYNDMAN:  Okay.  I have nothing further.

15           THE COURT:  Redirect?

16           MR. JEPSON:  I just have, thankfully, a few

17   questions.

18                     REDIRECT EXAMINATION

19   BY MR. JEPSON:

20   Q.  Let's go back to Joint Exhibit 102.  And you were asked

21   some questions about this document, correct, Dr. Park?  Do you

22   remember those questions?

23   A.  I'm sorry?

24   Q.  You were asked questions about this document that you put

25   together for the meeting; right?
```

1   A.   Right now?

2   Q.   Yeah.

3   A.   Sorry.  I thought you meant at the time of review.

4   Q.   I'm trying to cut through this.

5   A.   Yes.

6   Q.   And you were asked a lot of questions about e-mails or

7   other documents from October of 2011, that were placed in

8   here?

9   A.   Yes, I was.

10   Q.   Was Dr. Artunduaga on the plastic and reconstructive

11   surgery rotation in October of 2011?

12   A.   I believe she was.

13   Q.   And was the purpose of the attendings meeting in

14   March 2012, to consider whether or not she should remain as a

15   plastic and reconstructive surgeon in the program -- or

16   reconstructive residency program?

17   A.   Yes.

18   Q.   Why did you include those materials?

19   A.   It gave the information as to why the probation was

20   initiated.

21           MR. JEPSON:  Okay.  No further questions.

22           THE COURT:  Recross?

23           MS. HYNDMAN:  No, your Honor.  Thank you, Doctor.

24   You may step down.  You can leave things there.

25           Mr. Jepson, any additional witnesses?

1460

1       MR. JEPSON:  No, your Honor.  We would rest.

2       THE COURT:  Any rebuttal case?

3       MS. HYNDMAN:  No rebuttal case, your Honor.

4       THE COURT:  Okay.  Ladies and Gentlemen, we are done

5  with the presentation of evidence.  Given the timing, and I

6  don't want to keep you past 5:00 o'clock, we are going to pick

7  up tomorrow morning at 9:15 with closing arguments.  I'll

8  instruct you on the law, and then you will begin your

9  deliberations.  Have a good evening.

10      Remember that you are not deliberating yet.  So

11 please do not discuss this case among yourselves or with

12 anybody else.  Don't post anything on social media.  Have a

13 great night.  9:15 tomorrow morning.

14  (Jury out.)

15      THE COURT:  I think you have everything you need?

16      MS. HALL:  We have only one additional thing for the

17 record, your Honor.

18      THE COURT:  Yes?

19      MS. HALL:  To renew our motion for directed verdict.

20      THE COURT:  Okay.  I will keep it under advisement

21 and send the case to the jury.

22      MS. HALL:  That's it.

23      MS. HYNDMAN:  Thank you, Judge.

24      THE COURT:  So if you would be here by 9:00 o'clock

25 tomorrow morning.  They've been getting here early.  I'm not

1461

1   sure what my call looks tomorrow, so we will get started as

2   soon as we can.  Just like openings, I don't care where you

3   stand for closings.  Wherever you want.  Make sure your

4   exhibits are ready to go back to the jury.

5              MS. HALL:  Yes.

6              THE COURT:  Okay.  See you tomorrow morning.

7              MS. HYNDMAN:  Thank you.

8              MR. JEPSON:  Thank you, your Honor.

9          (Adjournment taken at 3:56 o'clock p.m., until 9:00

10  o'clock a.m., the following day, February 9, 2017.)

11             *      *      *      *      *

12  We certify that the foregoing is a correct transcript from the
    record of proceedings in the above-entitled matter.

13

           /s/ Frances Ward
14  _____

15

16         /s/ Sandra Tennis                February 8, 2017

17  _____    _____
           Official Court Reporters                  Date
           United States District Court
18         Northern District of Illinois
               Eastern Division
19

20

21

22

23

24

25