1462

1   IN THE UNITED STATES DISTRICT COURT
    NORTHERN DISTRICT OF ILLINOIS
2                EASTERN DIVISION

3   DR. MARIA ARTUNDUAGA,           ) Docket No. 12 C 8733
                                     )
4                    Plaintiff,      )
                                     )
5              vs.                   )
                                     )
6   THE UNIVERSITY OF CHICAGO        )
    MEDICAL CENTER,                  ) Chicago, Illinois
7                                    ) February 9, 2017
                     Defendant.      ) 9:16 o'clock a.m.
8

9                        VOLUME EIGHT
              TRANSCRIPT OF TRIAL PROCEEDINGS
10       BEFORE THE HONORABLE AMY J. ST. EVE, AND A JURY

11  APPEARANCES:

12  For the Plaintiff:        THE FRANKLIN LAW FIRM, LLC
                              BY:  MS. JAMIE S. FRANKLIN
13                            53 W. Jackson Blvd., Suite 803
                              Chicago, Illinois  60604
14
                              ROBINSON, CURLEY & CLAYTON, P.C.
15                            BY:  MS. CYNTHIA H. HYNDMAN
                              300 South Wacker Drive, Suite 1700
16                            Chicago, Illinois  60606

17  For the Defendant:        VEDDER PRICE, P.C.
                              BY:  MR. EDWARD C. JEPSON, JR.
18                                 MS. ELIZABETH N. HALL
                              222 N. LaSalle St., Suite 2600
19                            Chicago, Illinois  60601

20  Court Reporter:           MR. JOSEPH RICKHOFF
                              Official Court Reporter
21                            219 S. Dearborn St., Suite 1232
                              Chicago, Illinois  60604
22                            (312) 435-5562

23            * * * * * * * * * * * * * * * * *

24                    PROCEEDINGS RECORDED BY
                      MECHANICAL STENOGRAPHY
25             TRANSCRIPT PRODUCED BY COMPUTER

```
 1              THE CLERK:  12 C 8733, Artunduaga vs. University of
 2   Chicago Medical Center.
 3              THE COURT:  Good morning.
 4              MS. HYNDMAN:  Good morning.
 5              MR. JEPSON:  Good morning, your Honor.
 6              THE COURT:  Are you ready?
 7              MS. HYNDMAN:  Yes.
 8              MR. JEPSON:  Yeah.
 9              THE COURT:  Any issues?
10              MR. JEPSON:  One quick question.
11              THE COURT:  Yes.
12              MR. JEPSON:  We have a witness, Krista Curell, who
13   testified, but who is also going to be testifying in the
14   affirmative defense.  Is it okay if she sits in and watches
15   the closings?
16              MS. HYNDMAN:  I have no objection.
17              THE COURT:  Yes, that is fine.
18              MR. JEPSON:  Thank you.
19              THE COURT:  Okay.  I am going to take a quick break.
20   We will check and see if our jury is here and get started.
21              MS. HYNDMAN:  Judge, can I set up before the jury
22   comes in?
23              THE COURT:  You may, of course.
24              MS. HYNDMAN:  Thank you.
25          (Brief recess.)
```

Opening Argument - Hyndman

1464

1    THE COURT:  The jury is all here.

2    MS. HYNDMAN:  Is that blocking your view at all?

3    THE COURT:  No.  I can see them fine.  Thank you.

4    (Brief pause.)

5    (Jury in.)

6    THE COURT:  You may be seated.

7    Good morning, ladies and gentlemen.  This morning you

8    are going to hear the lawyers' closing arguments to you.

9    Closing arguments are not evidence just as opening statements

10   were not evidence.  It is the lawyers' opportunity to address

11   you to let you know what they think the evidence has or has

12   not shown.  After you hear closing arguments, I will then

13   instruct you on the law and you will begin your deliberations.

14   Ms. Hyndman.

15   MS. HYNDMAN:  Thank you, Judge.

16   THE COURT:  Do you want the lights turned down one

17   notch?

18   MS. HYNDMAN:  A little bit.  Thank you.

19   OPENING ARGUMENT ON BEHALF OF PLAINTIFF

20   BY MS. HYNDMAN:

21   May it please the Court.

22   Counsel.

23   Members of the jury, on behalf of Maria and Jamie,

24   we'd like to thank you for your close attention and your

25   service in this case.  This is now my opportunity to talk to

Opening Argument - Hyndman

1465

1   you to explain what the evidence has shown.

2          You've had the opportunity to hear from Maria

3   Artunduaga.  You've heard that she's a successful and

4   accomplished woman.  You've also heard from her directly about

5   the discriminatory and retaliatory behavior she suffered at

6   the hands of the University of Chicago Medical Center.

7          You've also had the opportunity to hear from a number

8   of witnesses from UCMC.  And I want you to remember as you're

9   deliberating that nearly every one of the witnesses that you

10  heard from from UCMC is beholden to UCMC in some way.  You

11  heard from administrators.  You heard from lawyers.  You heard

12  from doctors.  You heard from residents.  These people all

13  work for or have worked for the University of Chicago Medical

14  Center and that institution has been responsible for much of

15  their career.  In some instances, all of their careers.

16         The Judge is going to instruct you on the law in this

17  case.  And the first thing she's going to -- one of the things

18  she's going to instruct you on, not the first, but one of the

19  things she'll instruct you on is what the plaintiff has to

20  prove in order to prove a claim of national origin

21  discrimination, which is one of our claims in this case.  And

22  she will tell you that we have to prove by a preponderance of

23  the evidence that Dr. Artunduaga was terminated from the

24  residency program by the University of Chicago Medical Center

25  because of her Colombian national origin.  And you must decide

Opening Argument - Hyndman

1466

 1  that defendant would not have terminated her had she not been

 2  Colombian but everything else had been the same.

 3          The Judge will also instruct you about our

 4  retaliation claim, which is the second claim we have in this

 5  case.  And in order to prove that claim, we have to show by a

 6  preponderance of the evidence that the defendant terminated

 7  Dr. Artunduaga because she complained about national origin

 8  discrimination.  And you have to decide that the University of

 9  Chicago would not have terminated Dr. Artunduaga if she had

10  not complained about national origin discrimination but

11  everything else had been the same.

12          The Judge will also explain to you what

13  "preponderance of the evidence" means.  "Preponderance of the

14  evidence" means something is more likely true than not true.

15          So, I'm going to explain to you now why the answer to

16  both of these questions is "Yes."

17          Let's go back and talk about our timeline.

18          June, Dr. Artunduaga began her residency at the

19  University of Chicago Medical Center.  And in July, her first

20  rotation was in the Kaplan Service.

21          Now, you heard a lot of testimony about teams and how

22  there are teams during these rotations.  And the teams were

23  made up of not only the attending physicians, but also the

24  fellows, the senior residents, the interns, the nurses, nurse

25  practitioners who worked on the floor.

Opening Argument - Hyndman

1467

1    And in this first month, in July, the team leader of
2 sorts was Dr. Haijin In.  She was the fellow.  She was the
3 senior person other than attendings who worked on that
4 rotation.  She was the person who Dr. Artunduaga had to take
5 orders from.  And what do we know about Dr. Haijin In?  We
6 know that she ridiculed Dr. Artunduaga's accent on a number of
7 occasions.  She ridiculed the fact that Dr. Artunduaga had
8 received her medical training in Colombia.

9    Now, Dr. Artunduaga met with Dr. Jaskowiak, who you
10 heard from yesterday, and she complained about Dr. In.  And
11 she complained about her treatment from Dr. In.  And Dr.
12 Jaskowiak said she had a vague memory of meeting with Maria
13 with respect to Dr. In.  And she did say that there was a very
14 difficult, strained relationship and that Dr. Artunduaga did
15 have issues with Dr. In.

16    Dr. Artunduaga also met with Dr. Justine Lee.  And
17 she talked to Dr. Justine Lee.  She ran into her in the
18 hallway at the end of that rotation.  And she also spoke to
19 Dr. Justine Lee and told her about the ridiculing and the poor
20 treatment she felt she had received from Dr. In.

21    So, her next rotation is in August.  Again, she's on
22 the Kaplan Service.  So, it's the second month she's been
23 there.  But this time her team has changed.  This time her
24 team leader is Dr. John Seal.  And Dr. Seal was the chief
25 resident of general surgery that year.  And he subjected Maria

1    to public humiliation.  Remember how she told you that

2    Dr. Seal on two occasions publicly humiliated her, ridiculed

3    her accent, asked her if she understood English.  He was

4    brutal.

5          Dr. Jaskowiak acknowledged yesterday on the stand

6    that, indeed, the relationship between Dr. Seal and Dr.

7    Artunduaga was strained.

8          Maria spoke to Dr. Lee again.  Again, she ran into

9    her in the hall.  And this time, when Dr. Lee asked her how

10   things were going, Maria was almost in tears, she said, as she

11   told Dr. Lee about her treatment at the hands of Dr. Seal.

12         So, at the end of the month, Dr. Dickie and Dr. Lee

13   sit down to have a conversation with Maria.  And before they

14   did that, they had a conversation with Dr. Seal.  And they

15   talked to Dr. Seal and Dr. Seal said, yes, in fact, he thought

16   one of the main problems that Maria had was communication,

17   specifically her accent.

18         And, so, they told Maria that when they sat down with

19   her.  And Maria acknowledged, yes, I believe that's an issue

20   because Dr. Seal complained about my accent.  And they wrote a

21   memo.

22         MS. HYNDMAN:  If we could click on Joint Exhibit 11.

23   BY MS. HYNDMAN:

24         They wrote this memo.  It's Joint Exhibit -- 12.  I'm

25   sorry.  Joint Exhibit 12.

1       And in this memo, Dr. Dickie tells Dr. Song, in fact,

2   that John Seal said Maria's main problems stem from

3   communication, which he detailed as such, and the first thing

4   he notes is accent.

5       MS. HYNDMAN:  Thanks, Jamie.

6   BY MS. HYNDMAN:

7       Then we move on to September.

8       Now, remember Dr. Jaskowiak testified yesterday she

9   had made the suggestion to Dr. Song in early August that she

10  thought that Maria needed some assistance and she needed some

11  help.  One of the things that she suggested to Dr. Song was a

12  little American surgery boot camp.  And she testified that

13  when she told that to Dr. Song, they had a conversation and

14  Dr. Song said, we don't need that.  I got it covered.  We're

15  going to have Dr. Dickie be her mentor.

16      So, Dr. Dickie takes on this mentorship apparently.

17  And one of the things that she said -- Dr. Dickie said -- was

18  her plan was to have Maria -- was to have Dr. Bello -- they

19  were going to meet with Dr. Bello, and they were going to have

20  Dr. Bello kind of keep an eye and take Maria under her wing --

21  under his wing.  And, so, that was the plan.

22      And Dr. Dickie explained what the reason for that

23  plan was.  She said the main reason for that plan was because

24  the general surgery residents were speaking about Dr.

25  Artunduaga as a poor or weak resident.  In other words, the

1   reason for the plan was to combat the gossip.  It wasn't to

2   help Maria.  It wasn't to see if she could get some extra help

3   where she needed it.  They were concerned, and the main

4   concern -- was Dr. Dickie's testimony -- and the main concern

5   was to combat the gossip.

6           So, apparently, Dr. Dickie's idea of implementing

7   this plan is to check in one time with Dr. Bello.  It's the

8   only evidence we have, is that one time she checked in with

9   Dr. Bello.  And, in fact, Dr. Bello had very positive things

10  to say about Maria.  There were a couple of things that he had

11  concerns about that he expressed.  But in that memo -- it will

12  be there in evidence for you to look at.  In that memo, which

13  is Plaintiff's Exhibit No. 14, Dr. Bello said there were a

14  couple of instances where he was impressed with things that

15  Maria had done.  And Dr. Dickie wrote that up, and she sent

16  that to Dr. Song.

17          Now, Maria didn't have problems with her main team

18  during the September rotation, which was in the Block H

19  colorectal service.  She got along fine with Dr. Bello.  She

20  testified about that.  But this time, the discriminatory

21  behavior came from higher up.  This time it came from the

22  attendings themselves.  We had Dr. Umanskiy.  Maria testified

23  about Dr. Umanskiy.  She testified about the time that he came

24  to her and he ripped the stethoscope off of her neck.  He

25  grabbed the notebooks out of her lab coat, grabbed the colored

Opening Argument - Hyndman

1    pencils and said, that's not how we do things here in the

2    United States.

3            And we had Dr. Hurst who was the other attending on

4    that service for that month.  And he also had a low opinion of

5    Dr. Artunduaga's medical training.  In his evaluation of her

6    for that month, Joint Exhibit No. 13, he said, she was trained

7    where the routines and customs are not necessarily known to

8    us.

9            So, at the end of September, Dr. Song decides that

10   he's going to switch Maria into the plastics rotation.  And he

11   does this based upon gossip.  Remember that testimony?

12   Dr. Lee supposedly talked to Dr. Umanskiy, who then -- no.

13   Dr. Umanskiy allegedly spoke to Dr. Lee.  Dr. Lee then

14   allegedly spoke to Dr. Dickie.  And Dr. Dickie then relayed to

15   Dr. Song.  And four people away, apparently, what Dr. Umanskiy

16   said was that Maria was unfixable.

17           Well, Dr. Umanskiy was on the stand a couple of days

18   ago, and he never said that.  His testimony never was that

19   Maria was unfixable.

20           But based on this gossip, Dr. Song decides, yeah,

21   let's bring Maria into plastics for the month of October.

22   Let's bring her into what he called a nurturing environment.

23   A nurturing environment where Maria was going to be tested and

24   she had to perform flawlessly.  A nurturing environment where

25   apparently she's on some kind of remediation plan, but nobody

Opening Argument - Hyndman

1472

1  bothers to tell her about that.  A nurturing environment

2  where, according to Dr. Dickie, they had a plan to help Maria,

3  but no one bothered to put the plan in writing; no one

4  bothered to tell Maria about it; no one -- and no one actually

5  executed the plan.

6        And this nurturing environment where the two -- two

7  of the senior residents, Dr. Dickie and Dr. Nyugen, at the end

8  of the month meet with Maria to give her what they called the

9  areas of improvement.  Well, Dr. Dickie was interesting.  She

10  didn't call hers areas of improvement.  When she testified,

11  she said they were critiques and criticisms.

12        And look at those areas of improvement.  Apparently,

13  the idea in this nurturing environment was they were going to

14  tell her how she could improve her performance.  But look at

15  those documents.  There is not one single suggestion in those

16  documents about how Maria could improve her performance.  It

17  is merely criticism.

18        Now, we don't really know much about how Dr.

19  Artunduaga performed during the month of October because the

20  folks in the plastics section think the rules don't apply.

21  They think that they don't have to comply with the Graduate

22  Medical Education Committee policy handbook, which says they

23  have to have written evaluations, or the ACGME requirements,

24  which say they have to have written evaluations of their

25  residents.  So, we really don't know what these attendings

Opening Argument - Hyndman

1  thought.

2          We know that Dr. Park worked a little -- Dr. Song

3  worked a little bit with Maria during that month.  He

4  testified really only, though, about one surgery that he had

5  with her.  He didn't testify about any clinic experience.  He

6  didn't testify about going on rounds with her.

7          Now, Dr. Park admitted on the stand yesterday that

8  she was not -- did not directly interact with Dr. Artunduaga

9  for the month of October.

10          And we don't know what Dr. Zachary, one of the other

11  attendings, thought, because he didn't write anything down

12  about Maria and he didn't come to testify.  We don't know what

13  Dr. Reid thought about Maria, because he didn't write anything

14  down either and he didn't come to testify.  We don't know what

15  Dr. Henry thought, because he didn't write anything down and

16  he didn't come to testify.  We don't know what Dr. Lee

17  thought, because he didn't write anything down about Maria and

18  he didn't come to testify.  And we don't know what

19  Dr. Gottlieb thought, because he didn't write down any

20  thoughts and he also didn't come to testify.

21          So, we really don't know much about what happened and

22  what the experience was with Dr. Artunduaga on plastics for

23  the month of October.

24          But we do have our calendar here.  Remember we went

25  through the calendar with Dr. Song when he testified.  And if

Opening Argument - Hyndman

1474

1   you look at this calendar, it's almost blank.  There's really

2   not a lot that went on.  All that we know is sometime between

3   October 1st, when Maria began this rotation, and November 2nd,

4   when Dr. Song met with her, sometime in this month -- Dr. Song

5   doesn't know when -- he made a decision that he wanted Maria

6   out of his program.

7           So, November.  Dr. Song has a meeting with Dr.

8   Artunduaga on November 2nd.  He gives her a choice.  You can

9   leave my program or you can take probation.  What kind of

10  choice is that?

11          And it really was no choice at all because Dr. Song

12  made it abundantly clear that really what he wanted was for

13  Maria to leave.  He urged her to leave in that meeting.

14  Dr. Park urged her to leave in that meeting.  A couple of days

15  later, she met with the chief residents.  They urged her to

16  leave the program.

17          But Maria is nothing if not determined and she said,

18  no, I'm going to take probation.  And, so, she reached out.

19  She reached out to some familiar faces to see if she could get

20  help.  She reached out to Dr. Kaplan and Dr. Jaskowiak.  And

21  they were very helpful.  They gave her some good advice.

22          She reached out to Dr. Kevin Roggin, who was an

23  unfamiliar face.  She never met him before.  He was program

24  director for general surgery.  She reached out to Dr. Roggin

25  and he said, maybe you should write up what your response is

Opening Argument - Hyndman

1475

1    to Dr. Song's probation letter.

2          And her husband Ricardo tried to help her, too.  And

3    remember the testimony from Ricardo?  They looked and they

4    tried to find the right person in the Human Resource

5    Department to go to to talk about Maria's claims of

6    discrimination.  And they found who they thought was the right

7    person -- Jonathan Rothstein.  He had the right title:

8    Director of employee relations and labor relations.

9          And they went to Mr. Rothstein -- or Ricardo called

10   Mr. Rothstein; had a very brief conversation with him.

11   Ricardo explained to him, we're looking to talk about

12   instances of discrimination and we'd like to talk to you about

13   that.

14         Now, Mr. Rothstein denies that Ricardo said that, but

15   he did say it was a very brief phone call and he didn't ask

16   him any questions.  Didn't ask him what the nature of the

17   complaint was.  Didn't ask him if it had anything to do with

18   discrimination, even though that's his job and he might wonder

19   why you're going to him if it didn't have anything to do with

20   discrimination.

21         And, so, Mr. Rothstein calls up Jane McAtee.  You

22   remember Ms. McAtee's testimony.  And Ms. McAtee agreed.  She

23   called Ricardo and said he's not the right guy.  And Ricardo

24   said that, in fact, Ms. McAtee was so adamant, don't talk to

25   human resources, he happened to be on campus that day and she

Opening Argument - Hyndman

1476

1  said, in fact, if you don't leave soon, we're going to call

2  security.  So, that wasn't much help.

3       Maria reached out to Barry Kamin, who was the

4  executive director for Graduate Medical Education.  She wrote

5  him a letter, tried to get a meeting with him.  He refused to

6  meet with her.

7       So, after all of this activity trying to respond to

8  probation, what is waiting for Maria when she's not doing

9  that?  She's in the thoracic rotation that month, which is --

10 has a reputation of being one of the most difficult rotations

11 there is; and, in fact, her experience there was not good.

12      Dr. Song took her from the nurturing environment of

13 plastics, throws her to the wolves in thoracic, where

14 Dr. Ferguson makes fun of her accent, says he can't understand

15 what she's saying, and on one occasion even throws her out of

16 the operating room.

17      Now, Maria got some relief in the month of December

18 when she went to Colombia to get married.  And she came back

19 from that month rested and rejuvenated and ready to take on

20 this probation.  And she has a rotation in vascular, which is

21 a very positive experience for her.  She thrives in that.

22 Dr. Fleming and Dr. Shao both testified.  You heard them.  She

23 did very well.  Dr. Fleming was impressed about how much she

24 had improved since the time she had worked with her in July in

25 the Kaplan Service.

Opening Argument - Hyndman

1477

1       All of the attendings in that rotation gave her

2   positive evaluations.  Dr. Eaton, Dr. Skelly, Dr. Hall,

3   Dr. Renz, Dr. Milner, all of those evaluations are positive.

4   You'll have them back in the jury room, and you can look at

5   them yourself.

6       Even Dr. Park acknowledged that she was doing well

7   and she was getting positive reviews in that rotation.  So,

8   that was a good month for Maria.

9       Then we go to February.  And this time Maria is on

10  the transplant rotation.  Now, again, that was overall a

11  positive experience for Maria.  Again, the majority of the

12  evaluations she got from that month from the attending

13  physicians were positive.  Dr. Olaitan -- remember he came to

14  testify.  Dr. Olaitan said she was the best resident who had

15  rotated through that service that year up to that point.

16      And even Dr. Becker, who was very critical of

17  everything Maria did, acknowledges in her evaluation -- you'll

18  see it; we saw it yesterday -- that strong mentorship and

19  tutoring will likely help, as Maria is certainly making a good

20  effort.

21      But at the weekly meetings in February -- and there

22  were three of them -- Dr. Park begins to dial back the praise

23  a little bit.  Take a look at the progression of the minutes

24  of the weekly meetings.  You'll have those in the jury room

25  with you.  Take a look at the progression starting in

Opening Argument - Hyndman

1478

1  November, when she first met with Maria, through January and

2  beginning towards the end of February.

3          And you'll see that the beginning, Dr. Park gave Dr.

4  Artunduaga a lot of advice.  She was trying to teach her,

5  trying to help her.  She was praising her.  She was saying the

6  evaluations were good.  But then something changes in February

7  and the tone becomes very different.

8          So, what happened?  Well, nothing really happened

9  yet.  It was what was about to happen.  What was about to

10  happen was March was about to happen.  And in March, Dr. Park

11  knew that they were going to have to vote on whether to renew

12  Maria's contract.

13          And, so, Dr. Park is no dummy.  She knows which side

14  her bread is buttered on.  She sat in the meeting with Dr.

15  Song and Maria the beginning of November.  She knows Dr. Song

16  wants Maria out of this program.  She herself said Maria

17  should be out of the program.

18          So, what does she do?  She moves the goalpost.  She

19  makes it much more difficult for Maria to pass the probation.

20  She tells Maria that she's improving, but she's not quite

21  there yet.  At the end of February, she even dreams up a

22  condition of probation that wasn't anywhere to be found.  Look

23  at Joint Exhibit No. 26.  We looked at it yesterday during

24  Dr. Park's testimony.

25          Dr. Park now tells Dr. Artunduaga that one of the

Opening Argument - Hyndman

1479

1　conditions of her probation is that she has to perform as well

2　as every other plastic surgery resident and that means she has

3　to have superior or exemplary evaluations.

4　　　　Well, take a look through Joint Exhibit 26 and see if

5　you can find that requirement, that condition in Maria's

6　conditions of probation.  You won't find it, just like

7　Dr. Park couldn't find it yesterday when I asked her.

8　　　　And, then, just to make sure that the goalpost is

9　really far away, as far away as it possibly can be, on

10　February 28th, Dr. Park tells Maria, oh, by the way, your next

11　rotation is plastics.

12　　　　Now, this is the part in the scary horror movie when

13　the victim's about to go into the haunted house and the

14　ominous music starts to play.  You want to say, Maria, don't

15　go to plastics.  Please.  It's not going to be good.

16　　　　We saw what happened in plastics in October.  That's

17　exactly the same thing that happened in March.

18　　　　Dr. Park said yesterday that the October rotation

19　was -- in plastics was Maria's opportunity to shine.  But Dr.

20　Song didn't want Maria to shine.  He wanted to put that light

21　out.  And, so, a week before -- a week after Maria has started

22　in the plastics rotation in the beginning of March -- we'll

23　get there on my timeline -- on March 8th, Dr. Song sends an

24　e-mail to Jane McAtee with a draft of a termination letter.

25　　　　And this is important because Dr. Song sends this

Opening Argument - Hyndman

1480

1    draft termination letter without the benefit of having seen a

2    single weekly evaluation during the probation.  Without the

3    benefit of seeing a single monthly evaluation from any of the

4    attending physicians, without the benefit of reading any of

5    the minutes of the meetings between Dr. Park and Dr.

6    Artunduaga, without the benefit of even having a conversation

7    with Dr. Park about how Maria's doing on the probation, he

8    writes a draft of a termination letter for Maria and sends it

9    to the attorney.

10          Now, he says all the options are still on the table,

11   but he didn't send a draft "you're still on probation" letter.

12   He didn't send a draft "we want you to repeat another intern

13   year" letter.  He doesn't send a draft "congratulations, you

14   passed your probation" letter.  The only letter he sends to

15   Jane McAtee to look at is a draft of a termination letter.

16   His mind was made up.

17          And a lot has happened -- a lot happens after Dr.

18   Song sends this draft termination letter.  In fact, he hadn't

19   even seen Dr. Park's ten-page letter that we went through

20   yesterday.  That didn't come until March 14th.

21          And the meeting of the faculty wasn't scheduled to

22   occur until March 26th.  And, so, 18 days before the faculty

23   is even supposed to meet, 18 days before Maria is even past

24   her probation, Dr. Song has drafted her termination letter.

25          Now, we had this faculty meeting on March 26th.  And

1    there's been some testimony about that from Dr. Song and

2    Dr. Park.  And Dr. Song said the meeting lasted at least 30

3    minutes, maybe a little bit longer.  But we'll give him that.

4    30 minutes.  And Dr. Park testified about how she put together

5    all this information about Dr. Artunduaga and about her

6    probation to be provided to the faculty at this meeting.

7         Now, it's key to understand that nobody had this

8    information -- even Dr. Song did not have this packet of

9    information -- until they walked into this 30-minute meeting.

10   Here it is (indicating).  You'll actually get a copy of this

11   to look at when you're in the jury room.  And I ask you, see

12   if you can read it in 30 minutes.  195 pages.

13        But that wasn't the only thing that happened at that

14   meeting.  See if you can read this in 30 minutes and then

15   still have time to have an extended discussion about the ten

16   conditions of probation that Dr. Artunduaga was supposed to

17   meet.

18        See if you can read this 195 pages in 30 minutes,

19   have a conversation about the ten conditions of probation, and

20   then still have time for seven faculty members to vote.

21   Because that's what UCMC would like you to believe happened.

22   That defies common sense.  And it defies human nature.

23        You've got seven busy surgeons in a room for 30

24   minutes.  What is human nature going to tell you?  They're

25   going to go to their colleague.  They're going to go to the

1   woman who had been meeting with Maria over the last three

2   months.  They're going to look to see what her summary says.

3   They're going to look to see what she had to say about Dr.

4   Artunduaga's progress on the probation.  And you'll see that.

5   We went through it yesterday at length with Dr. Park.

6           And that letter has nothing positive in it at all.

7   It doesn't mention any positive evaluations about Maria.  And

8   it's filled with exaggerations and straight-out lies about

9   things that she had talked to Maria about.

10          And, so, they read this summary -- or maybe they read

11  all 195 pages.  They read the summary, they read the Cliff

12  Notes, and they all got together and they voted the party

13  line.

14          Now, Dr. Song and Dr. Park maintain that this

15  decision was unanimous, but we only have their word to take

16  for it and the minutes that were prepared by their assistant,

17  Akilah Williams.  Again, we didn't hear from Dr. Zachary.  We

18  didn't hear from Dr. Reid.  We didn't hear from Dr. Gottlieb.

19  We didn't hear from Dr. Lee.  There's another one that I'm

20  missing.  We didn't hear from him -- whoever that was --

21  either.  They didn't come to testify to say how they voted,

22  what they thought about Maria.  There's nothing written from

23  any of them, so we don't know.

24          So, after the faculty meeting, Dr. Song writes a

25  letter and he met with Maria.  And you heard Maria's testimony

Opening Argument - Hyndman

1483

1  about this meeting.  It was short.  He told her that they had

2  voted not to renew her contract.  He hands her a letter and

3  she leaves.  She didn't have the nerve to tell her that not

4  only did he not renew her contract, but he's taking her off

5  clinical experience -- clinical rotations -- for the rest of

6  her internship.

7       So, Maria leaves Dr. Song's office.  She said she got

8  about five steps out of the office.  She reads the letter.

9  She sees that he's taken her off clinical rotations.  She

10 turns around to go back.  She's met with a closed door and

11 Akilah Williams standing guard saying, no, he's too busy.  He

12 can't talk to you.

13      Now, by the time April rolls around, Maria's career

14 is in tatters.  Dr. Song relents and puts her back on clinical

15 rotation, and he changes his mind at the end of April.  Why

16 does he change his mind?  Because Maria had the nerve to fight

17 for the education that she had been promised in the contract

18 that she signed the year before.

19      And, then, in May, Maria files her grievance.  The

20 grievance committee meets on May 16th.  And they don't even

21 give Maria all the time she's allotted.  They cut her off at

22 4:30, even though they told her till 5:00.  So, one of her

23 witnesses, Dr. Shao, couldn't testify.  They take some

24 ridiculously short period of time to make a decision, and they

25 rubber stamp the decision that Dr. Song had made.

1    And, then, by the end of June, Maria has left UCMC

2    once and for all.

3    Now, Dr. Kaplan and Dr. Angelos write her letters of

4    recommendation.  And Maria does her best to try to get into

5    another residency program.  You heard her testify.  She

6    applied to something like 270 residency programs after she

7    left U of C.  She didn't get -- she got a few interviews.  She

8    didn't get a single match.  Didn't get any position.  And Dr.

9    Song did his level best to make sure that that didn't happen.

10   He got inquiries from a couple of people, and you'll see those

11   e-mails back in the jury room.  His responses were short and

12   sweet:  We fired her.  First resident ever.

13   Now, what does this evidence show?  The Judge is

14   going to explain to you about direct and circumstantial

15   evidence.  And direct evidence is something that you see or

16   something you observe.  Circumstantial evidence in the example

17   here in the instruction is evidence that if somebody comes in

18   the room carrying a wet umbrella, you can conclude that it's

19   raining outside.  We can use both direct and circumstantial

20   evidence to prove our case.  And we have both direct and

21   circumstantial evidence to prove our claims.

22   We had the comments about accent and culture and

23   Maria's medical training that we looked at in the opening

24   statement.

25   Dr. In:  Where did you go to medical school?  Come

Opening Argument - Hyndman

1485

1    on.

2          Dr. Jaskowiak:  Issues are cultural.  She needs a

3    little American surgery boot camp.

4          Dr. Seal:  Her main problem comes from communication,

5    her accent.

6          Dr. Umanskiy:  This is not how we do things in the

7    U.S.

8          Dr. Hurst:  She was trained where the routines and

9    customs are not necessarily known to us.

10          Dr. Song:  There's no such thing as accent

11    discrimination.

12          Dr. Moreira:  I think there are language and cultural

13    barriers that have affected Maria's ability to effectively

14    communicate.

15          That's in one of Dr. Moreira's evaluations -- weekly

16    evaluations.  You'll see those in the jury room.

17          Dr. Chhablani:  Someone like you will have a very

18    difficult time being successful here.

19          Dr. Song:  Life is never fair for people like you.

20          And even as late as March of 2012, Dr. Matt Greives,

21    the only resident from the plastics service to attend the

22    faculty meeting where the vote was taken to not renew Maria's

23    contract, his weekly evaluation -- Joint Exhibit No. 85, take

24    a look at it -- as late as March of 2012, Dr. Greives makes a

25    comment about Maria's accent in her evaluation.

Opening Argument - Hyndman

1486

1    Now, Maria said on the stand that she didn't believe

2    that Dr. Song discriminated against her on the basis of

3    national origin.  But that doesn't really matter.  That's your

4    job to decide.  It's your job to decide whether the University

5    of Chicago Medical Center discriminated against Maria on the

6    basis of national origin.  This claim isn't against Dr. Song.

7    It's against the medical center.  And all of these people made

8    these comments.

9    And, in fact, not only did they make these comments,

10   but these were the people that Dr. Song was listening to.

11   These are the people he listened to when he made a decision to

12   put Maria on probation.  He listened to what Dr. Seal had to

13   say.  He listened to what Dr. Jaskowiak had to say.

14   Dr. Chhablani.  Dr. Ferguson, who made comments about her

15   accent and said he couldn't understand her.  He listened to

16   Dr. Umanskiy.  These are the people that were influencing his

17   decisions.  And these are the people that made direct comments

18   about Maria's accent, about where she was trained and about

19   culture.

20   Now, Mr. Jepson asked a lot of people on the stand

21   whether they discriminated against Maria because of her

22   national origin or whether they retaliated against her because

23   she complained of her national origin.  I wasn't really

24   expecting any Perry Mason moments where somebody was going to

25   confess on the stand, oh, yes, I did it.  But this is the

Opening Argument - Hyndman

1487

1    evidence, and this is what you should look at.

2            Now, he also said that Maria never complained.

3    Right?  Yes.  I will grant that.  Maria never got up in front

4    of somebody and said, I'm Maria Artunduaga and I have been

5    discriminated against on the basis of my national origin.

6            But she talked about her accent.  She complained to

7    people that people were treating her differently because of

8    her accent, that people were treating her differently because

9    of where she trained in medical school.  She talked to Dr.

10   Song.  She said, people are treating me differently because of

11   my accent.  And Dr. Song's response:  There's no such thing as

12   accent discrimination.  That's your evidence right there of

13   complaint.

14           And they tried to complain to Mr. Rothstein, but

15   Mr. Rothstein wasn't hearing it.  The University of Chicago

16   Medical Center said, don't complain to us.  Human resources

17   has nothing to do with this.

18           Dr. Song knew there were complaints.  Look at Joint

19   Exhibit 109.  He talks about discrimination and Maria's

20   complaints about discrimination.  Jane McAtee knew there were

21   complaints.  When she testified on the stand, she testified

22   that she had said something to Krista Curell about Dr.

23   Artunduaga's complaints of discrimination.

24           But the most compelling evidence in this case of both

25   discrimination and retaliation is that the reasons that the

Opening Argument - Hyndman

1488

1   University of Chicago Medical Center has given for both the

2   probation decision and the termination decision are lies.

3           The probation decision, Joint Exhibit 22.  This is

4   the letter -- this is the summary that Dr. Song put together

5   about his meeting with Maria.  The meeting where he told her

6   she had a choice of staying in the program or taking

7   probation.  And in this letter -- it was last week, but I

8   remember -- if you remember Dr. Song's testimony about this,

9   in this letter, Dr. Song says, it was unanimous amongst the

10  numerous evaluators across the Department of Surgery,

11  particularly within our section, that the issues that Dr.

12  Artunduaga has will be extremely difficult to correct within

13  the time allotted during residency period.

14          Dr. Kaplan never said it.  Dr. Jaskowiak never said

15  it.  Dr. Chhablani never said it.  Dr. Angelos never said it.

16  Dr. Umanskiy never said it.  And Dr. Hurst never said it.

17          And Dr. Song testified on questioning from

18  Mr. Jepson, well, that was the conclusion I reached.

19          From, what?  Not a single person put anything in

20  writing, and he said it was unanimous amongst the numerous

21  evaluators.  He's got quotes in here in this letter.  Take a

22  look through all the evaluations that he had available to him

23  at the time he wrote this letter and had this conversation

24  with Maria on November 2nd.  These quotes are not there.

25  There's little bits and pieces, but he's sort of making stuff

Opening Argument - Hyndman

1489

1    up.  He's making up quotes to justify the decision that he

2    made.

3         He's got something in here about this incident with

4    the PICC line.  We heard a lot about that.  That Maria sent

5    this patient home with a PICC line.  Well, the only evidence

6    that Dr. Song knew anything about the PICC line comes from way

7    back in September in that e-mail that he got from Dr. Dickie

8    about her conversation with Dr. Bello about how Maria was

9    doing on the colorectal rotation.  And in that e-mail,

10   Dr. Bello says that he told Maria to remove the PICC line.

11        Now, in Dr. Song's interpretation, there were

12   multiple times of prompting.  It must be some code word in the

13   plastics section because yesterday Dr. Park talked about

14   multiple times that she told Maria something.  It turned out

15   it was one time.  Maybe multiple means one in the plastics

16   section.  I don't know.  But multiple times of prompting, I

17   don't know where you're going to find that.  It's not in the

18   e-mail.  And that's the only information he has.

19        And Dr. Bello talked about Maria's resourcefulness.

20   When she realized she made the mistake, she got the patient in

21   the next day, found a room and had the PICC line removed.  Dr.

22   Song doesn't mention that in his letter.

23        Then on the second page of this letter, Dr. Song says

24   no one else in the entire section and across the department

25   recognized the fact that Maria had improved.  Now, we saw on

Opening Argument - Hyndman

1490

1    his direct examination that that wasn't true either.

2         Dr. Dickie, a couple of days before in her areas of

3    improvement, actually admitted that Maria had improved in one

4    area.  Dr. Umanskiy talked about the fact that she improved in

5    things during the rotation.  There were lots of people that

6    recognized that Maria had improved.  Dr. Song says it's not

7    true.

8         The other evidence that shows that UCMC has lied

9    about the reasons for Dr. Artunduaga's termination is Dr. Song

10   made the decision, like we saw, 18 days before the faculty

11   ever voted.  Again, without knowing anything about what was

12   going on with Maria's probation, without knowing anything

13   about what evaluators were saying, without knowing even really

14   what Dr. Park thought about how the probation was going.  He

15   made up his mind.  He wrote that draft termination letter.  He

16   sat down and met with the attorney about it days before the

17   faculty meeting ever happened.

18        Then we have the termination decision itself, Joint

19   Exhibit 100.  Another letter by Dr. Song.  And he says in this

20   letter that she failed -- Dr. Artunduaga failed to fulfill the

21   applicable educational and clinical requirements of the

22   graduate education and clinical training program to the

23   satisfaction of the program director.  The same program

24   director who would like you to believe he didn't even vote

25   about whether to renew Maria's contract or not.

Opening Argument - Hyndman

1491

1    It says she's failed to carry out satisfactorily her
2    professional responsibilities.  We see -- look at the
3    evaluations through the probation period.  Maria was doing
4    great.  She was improving.  She was doing well.  Those
5    evaluations were positive.
6    He says that the decision was made -- I've got to
7    find it here -- the decision was made with particular
8    attention to your knowledge, skills and judgment since your
9    probation started.
10   Well, the evaluations were in this packet of
11   material, but who had time to look at them during that
12   30-minute meeting?  And Dr. Song admitted it was the first
13   time he had seen any of that stuff.  The only thing he had
14   seen prior to that was Dr. Park's ten-page letter that had
15   nothing positive to say, didn't include any of the positive
16   evaluations, didn't include any of the information about the
17   positive experience that Maria had had during this probation
18   period.
19   And, then, they say, your overall faculty evaluations
20   are well below the norm for residents at your level of
21   training.  Of course, again, this was moving the goalpost.
22   Look at Joint Exhibit 26.  There's nothing in there about
23   having to perform at the same levels as everybody else.  The
24   idea of probation was to improve.  Can you improve?  Are you
25   going to improve?  She improved.  We'll look at the

1    evaluations in a minute.  By every measure, Maria improved

2    during that time.

3            Remember Dr. Park had some charts at the end of her

4    letter -- her ten-page letter.  And she said that Maria didn't

5    measure up to the other plastic surgery residents.  And

6    remember both -- she said that all -- the plastic surgery

7    residents either score routinely between exemplary and

8    superior.  Dr. Song testified that these plastic surgery

9    residents routinely get in the high 5s.  Now, you'll look at

10   these evaluations and "deficient" is No. 1; 6 is "exemplary."

11   So, "exemplary" and "superior" would be between 5 and 6.  That

12   was Dr. Song's testimony:  They get in the high 5s.

13           Well, look at the information that Dr. Park put at

14   the end of her letter.  There are a couple of categories,

15   things like being ethical and honest and reliable and talking

16   to people where the plastic surgery residents, many of them,

17   get in the high 5s.  But not in the other categories.  Not in

18   the categories of clinical judgment and operative care and

19   taking care of your patients and all the things that they seem

20   to criticize Maria about.  These plastic surgery residents

21   were not getting in the high 5s.

22           And the other thing is that Dr. Park took all of

23   Maria's evaluations for the entire year.  She never isolated

24   out what she did during the probation period.  She lumped them

25   in with the evaluations from the beginning of the year.  So,

1   let's humor her.  Let's look at those.  Let's see what those

2   evaluations have to say.  There were -- there's something like

3   19 competencies, I think, if you count them on these monthly

4   evaluations that the attendings did.  And I think there's

5   about 20-ish evaluations from attending physicians that are in

6   the record.  That between the time of July and the time of

7   March -- of course, none from anybody in plastics in October

8   or March, but anyway, there's about 20.  So, you've got

9   hundreds, right, of separate competencies that she's being

10  rated on.  11 of those were "deficient."  Less than three

11  percent was Maria rated as deficient.  And all those 11 came

12  before November or in November.  After November, Maria's not

13  rated "deficient" in a single competency on any evaluation

14  from an attending physician.

15          So, Dr. Park has these scores.  She compares her to

16  all of the residents that have -- all the interns that have

17  come before in the last, I don't know, four or five years.

18  And you'll see those.  That's in her letter that she wrote to

19  Dr. Song.  But she didn't take into account in making that

20  comparison that Maria was on probation during this period of

21  time.  She was under constant scrutiny, under the microscope.

22  Pressure like I can't even imagine the pressure.  It's already

23  a pressured situation being a surgical intern.  But to have

24  the added pressure of knowing your career is on the line,

25  Maria's got that pressure.  Dr. Park didn't seem to take that

Opening Argument - Hyndman

1494

1  into account.

2          She didn't take into account the fact that Maria's

3  doing this not even in her native language.  She's doing it in

4  English.  She's a native Spanish speaker, and all of her

5  medical training was in Spanish.  You know, there's an old

6  saying about -- people used to talk about Fred Astaire and

7  Ginger Rogers and they would say, oh, Fred Astaire, he's

8  amazing.  Look at how great he is.  But people would say,

9  yeah, but look at Ginger Rogers.  She did everything he did

10  backwards and in heels.  It's exactly what Dr. Artunduaga was

11  doing.  She was doing what the other interns were doing, but

12  she was doing it in not her native language.

13          So, let's look at these evaluation scores.  By any

14  measure, Dr. Artunduaga improved during this probation period.

15          General knowledge, these are the scores that Maria

16  got.  The scores in black are the scores Maria got for the

17  period of July through October, before the probation began.

18  These are average scores of all the attending physicians.

19          These are the scores she got during the probation

20  period, even including November where her evaluations were not

21  very good.  November when, you know, she's had this ton of

22  bricks falling on her and she's in a very difficult rotation.

23  She just found out she's being put on probation.  And those

24  scores are included in this post-probation.

25          And, then, here are Dr. Park's scores.  And the same

Opening Argument - Hyndman

1495

1    thing in the other competencies.  Improvement in the

2    post-probation period.

3           But if you look at these scores, too, the thing

4    that's interesting, that using Dr. Park's numbers that

5    included the entire year, Dr. Artunduaga improved in every

6    single competency she was rated on.  Again, look at these.

7    Even Dr. Park's numbers show improvement.

8           And you can look at the average monthly evaluation

9    scores.  July and August, September.  If it's in red, it means

10   the number went down.  If it's in blue, she improved.  If it's

11   in black, she stays the same.

12          November, numbers went down again.  Improved in a

13   couple of areas.  Then she's on probation.

14          January, all of her scores improved.  February, two

15   competencies her number went down.  A few they stayed the same

16   compared to July and August.  And the rest, some 14 or 15,

17   showed improvement.  Even in February, even with Dr. Becker's

18   poor evaluation of her, those numbers improved.

19          Then we've got the weekly average scores.  November,

20   when they were not so good again.  That was a difficult month

21   for Maria.  She got put on probation.  January.  February.

22   March.

23          So, her numbers in November were around the "could

24   improve" -- between "could improve" and "good."  And in

25   January, February and March, they were between "good" and

Opening Argument - Hyndman

1496

1  "superior" on everything that the residents and fellows and

2  nurse practitioners were evaluating her on.

3          And the bottom line is that the final scores that

4  Maria got were between good and very good for the entire year

5  that she was at the University of Chicago Medical Center in

6  this residency.

7          Now, Doctor Jep- -- Mr. Jepson is going to have a

8  very different story to tell you.  He's going to get up here

9  and he's going to say it's all about Maria's performance;

10 Maria's performance was poor; the doctors had concerns.  Well,

11 I don't know about you, but if my employer fired me when I

12 scored between "good" and "very good" over the course of the

13 year, I'd wonder what was up.

14         He's going to talk about the fact that Maria had

15 excuses for everything.  He said it in his opening.  He had a

16 lot of questions about it from doctors.  Was Maria making

17 excuses?

18         Well, Dr. Song, every time he got wind of something

19 that he didn't like that Maria had done, he asked her to

20 explain herself.  He puts her in this real catch-22.  Asks her

21 to explain herself and then accuses her of making excuses when

22 she does.

23         Now, let's talk about excuses.  Who else is making

24 excuses in this case?  Dr. Song and Dr. Park had an excuse for

25 everything.  Dr. Song's excuse for not following the rules

1   about doing written evaluations for his residents:  Oh, we're

2   a small section.  We don't need to follow the rules.

3          His excuses when asked about the evaluations from

4   Dr. Kaplan and Dr. Angelos:  Oh, they're easy graders.  We

5   can't pay any attention to those.

6          Dr. Park's excuses for the evaluations that are

7   really positive that Maria was getting in the probation:  Oh,

8   well, nobody can believe any of those evaluations because

9   Maria somehow tainted the process.

10         Maria had the temerity to go to the teacher and ask

11  if they would give her a fair shot.  She's the student.

12  They're the teachers.  She wanted a fair shot.  But somehow

13  that taints the whole process.  So, we can't believe those,

14  could we?

15         And, then, Mr. Jepson asked -- said a lot in his

16  opening statement about this idea of patient safety, that the

17  goal of any residency program is to make sure that they

18  graduate safe and competent physicians.  And he asked various

19  doctors whether there was a patient safety issue.  Was this a

20  patient safety issue?

21         Well, if patient safety were really an issue, it

22  would have been a condition of her probation.  If patient

23  safety were really an issue, you would have seen it front and

24  center in Dr. Park's March 14th letter to Dr. Song.  It would

25  have been its own separate category.  It's not there.

Opening Argument - Hyndman

1498

1       If patient safety were really an issue, it would have

2  been in the termination letter.  It's not there.

3       If patient safety were really an issue, do you think

4  Dr. Song would have suggested that she go to some other

5  residency program?

6       And if patient safety were really an issue, do you

7  think Dr. Song would have let her back on a clinical rotation

8  in April; that he would have allowed her to jeopardize the

9  lives of patients simply to give her the chance to finish her

10 internship year?

11      Now, as you deliberate, I would like you to keep one

12 thing in mind.  This residency program is an education.  It is

13 graduate medical education.  It's a training program.  Dr.

14 Song, Dr. Park, the other attendings were there to teach

15 Maria.  But they chose not to teach Maria.  They chose not to

16 help a student who needed it.  Remember Dr. Fleming's

17 evaluation and the comment she made.  It's sad that no one

18 wants to take the time to teach.  Remember that as you're

19 deliberating, please.

20      Now, I want to talk a little bit about the damages.

21 Maria's career, ruined.  Her dream of becoming a plastic

22 surgeon, gone as a result of the experience she had at U of C

23 and their discrimination and their retaliation against her.

24 And you heard Professor Killingsworth and he explained -- he

25 calculated the loss of future earnings.  He compared the

Opening Argument - Hyndman

1  amount of money that Maria would have gotten had she been able

2  to follow her career as a plastic surgeon.  He deducted the

3  amount of money that she did earn and the money that she's

4  expected to earn in her new career with her Master's in Public

5  Health and Master's in Translational Medicine that she'll get

6  this year.  And those charts are available to you.  And

7  they'll be back with you in the jury room.

8          And he does it year by year.  And, so, it's within

9  your judgment to decide how long Maria would have pursued a

10  career as a plastic surgeon.  And every year you can go and

11  look at that chart and figure out how much money Maria has

12  lost because she doesn't have that career as a plastic

13  surgeon.  And the numbers are in the millions.  It goes up --

14  if she were to work until she were age 72, it's like eight,

15  nine million dollars.  It's a lot of money.

16          There's educational expenses.  She had to completely

17  retool her entire life, her entire career.  She went back to

18  get her Master's in Public Health.  She's getting her Master's

19  in Translational Medicine.  And the cost, her husband Ricardo

20  testified, is in the hundreds of -- about a hundred thousand

21  dollars.  So, that we ask you to award as damages, as well.

22          We've got the medical expenses.  About $20,000 from

23  the expenses of paying for her treatment with Dr. Dantz, her

24  treatment with Dr. Velander, her treatment with Dr. Keough.

25          And, then, we'll ask you to award an amount for

1    emotional distress.  And the devastation that was caused by

2    UCMC, the devastation that Maria felt is palpable.  You saw

3    her on the stand talking about how she sat in the car for two

4    hours in the parking garage just getting her thoughts together

5    after Dr. Song fired her.  Just imagine sitting in that car

6    not even having the nerve to tell your family what has

7    happened to you.

8           And you've heard the testimony from her treating

9    psychiatrist and psychologist about the effect this has had on

10   Maria, about the fact that she suffers from major depressive

11   disorder as a result of this, that she still has to take

12   medication just to get through her daily life.

13          I would ask you to think about that devastation and

14   be generous in your award of emotional distress damage to

15   Maria.

16          And, then, the Judge will instruct you that you're

17   entitled to consider a punitive damage award to the

18   University -- against the University of Chicago.  And a

19   punitive damage award is warranted in a situation where a

20   defendant has discriminated or retaliated against an

21   individual in reckless disregard of their federally protected

22   rights.  So, when you're thinking about a punitive damage

23   award, I would like you to consider and ask you to consider

24   the fact that University of Chicago has lied about the reason

25   they fired Maria.  They lied about the reason that they put

Opening Argument - Hyndman

1501

1    her on probation.

2         I'd like you to consider that the University of

3    Chicago Medical Center refused to listen to Maria when she

4    tried to make formal complaints to human resources.  And the

5    University of Chicago Medical Center went so far as to

6    threaten her husband Ricardo with the security, told him they

7    were -- he had to get off the campus, that he couldn't talk to

8    human resources; and, if he didn't leave, they were going to

9    get security after him.

10        I would ask you to consider Dr. Song's testimony

11   about the decision not to renew Maria's contract.  Remember

12   that testimony?  Mr. Jepson asked him, how did you feel

13   because you weren't renewing Dr. Artunduaga's contract?  And

14   his testimony was really telling.  His response was, well, I

15   didn't like it because it hurt us.  We were going to have a

16   couple of months where we were shorthanded.  We weren't going

17   to have a resident to help us out on our rotation.  Yeah, I

18   didn't like that.

19        And I would like you to consider, when you're

20   thinking about punitive damages, the e-mail that Dr. Song sent

21   at the end of the grievance hearing to his colleagues:  I'd

22   like to share with you the good news of the outcome of today's

23   grievance hearing.  Plaintiff's Exhibit 51.

24        Ladies and gentlemen, we ask that you consider all of

25   the evidence.  And we ask that you return a verdict for Maria

Argument - Jepson

1502

1   Artunduaga on both her claim of discrimination on the basis of

2   national origin and on her claim of retaliation.

3           Thank you.

4           THE COURT:  Thank you, Ms. Hyndman.

5           We are going to take a brief recess before we begin

6   with Mr. Jepson.

7           MR. JEPSON:  Thank you, your Honor.

8       (Jury out.)

9           THE COURT:  We will pick up in about ten minutes.

10          MS. HYNDMAN:  Thank you.

11      (Brief recess.)

12          THE COURT:  Ready?

13          MR. JEPSON:  When you are.

14          THE COURT:  We will wait for the jury and then we

15  will go.

16      (Brief pause.)

17      (Jury in.)

18          THE COURT:  You may be seated.

19          Mr. Jepson, you may proceed.

20          MR. JEPSON:  Thank you, your Honor.

21              ARGUMENT ON BEHALF OF DEFENDANT

22  BY MR. JEPSON:

23          Counsel.

24          Members of the jury, I really would like to echo

25  Ms. Hyndman's appreciation.  You have been incredibly

Argument - Jepson

1503

1     attentive and patient with us at times through some very

2     tedious testimony and stuff that you might have felt was

3     cumulative.  But we're doing our jobs.  And all of us in this

4     courtroom thank you so much for your attention.

5           Now, I think Ms. Hyndman and I probably only agree on

6     a couple things and that is the first two things she showed.

7           MR. JEPSON:  If you pull up No. 21, Michael, for us.

8     BY MR. JEPSON:

9           And this is the instruction --

10          MR. JEPSON:  If you could blow it up for all of us.

11    BY MR. JEPSON:

12          -- that you're going to receive about the national

13    origin discrimination claim.  And it says here that, to

14    succeed on this claim, plaintiff must prove by a preponderance

15    of the evidence that she was terminated from the residency

16    program by defendant because of her Colombian national origin.

17    And to determine that plaintiff was terminated from the

18    residency program because of her Colombian national origin,

19    you must decide that defendant would not have terminated

20    plaintiff from the residency program had she not been

21    Colombian and everything else had been the same.

22          So, that's Count 1 that you're going to have to deal

23    with, and that will be the first question you're going to have

24    to answer.

25          MR. JEPSON:  Page 22, please, Michael.

Argument - Jepson

1504

1    BY MR. JEPSON:

2             And this is the instruction with respect to Count 2,

3    which is a retaliation claim.  To succeed on this claim,

4    plaintiff must prove by a preponderance of the evidence that

5    defendant terminated her because she complained about national

6    origin discrimination.  To determine that plaintiff was

7    terminated because she complained about national origin

8    discrimination, you must decide that defendant would not have

9    terminated plaintiff if she had not complained about national

10   origin discrimination but everything else had been the same.

11            We submit that what we are about to show you, are,

12   frankly, the cold, hard facts as to what happened here.  And

13   when you listen not only to what I've said but -- frankly,

14   what I'm saying is not evidence.  When you listen to the

15   testimony and you look at the documents, we believe that

16   you're going to conclude that the preponderance of the

17   evidence shows that plaintiff, who has the burden of proving

18   her case, cannot come close to carrying that burden.

19            Indeed, we'll submit that able counsel has cobbled

20   together a very good argument.  But if you look at it closely,

21   there's a lot of speculation, a lot of surmise, and not the

22   cold, hard facts that you heard testimony about and have seen

23   documents about.

24            And I want to start very briefly with showing you

25   also Page 15.

Argument - Jepson

1505

1    MR. JEPSON:  Michael, from the jury instructions.

2    If you blow that up.

3    BY MR. JEPSON:

4    The law does not require any party to call as a

5    witness every person who might have knowledge of the facts

6    related to this trial.

7    And, yes, we didn't call a bunch of people.  Why not?

8    They're all plastic surgeons, and it would be cumulative and,

9    in our view, we'd be here for weeks.  So, I'll put that to the

10   side right now.

11   The other thing that I want you all to keep in the

12   back of your mind is this:  Now, Ms. Hyndman made reference to

13   the residency is supposed to be teaching.  It's educational.

14   And that's true.  It is.

15   But you heard Dr. Song and the other physicians

16   testify that residency program is not medical school.

17   Residency program is training on live patients.  You're part

18   of a healthcare team.  You're learning as part of that

19   healthcare team.  And you are supposed to come to the program

20   having graduated from medical school, having clinical

21   knowledge, having done and experienced and observed how

22   hospitals work.  Dr. Artunduaga had all of that.

23   And what happened here is that -- and it's very

24   unfortunate.  Nobody's saying that they aren't sympathetic to

25   what happened here.  But what happened here is it was quickly

Argument - Jepson

1   discovered that the baseline fundamental competencies required

2   were not there.  And, indeed, when you think about the program

3   that Dr. Artunduaga was in, you've heard it's six years and

4   it's plastic and reconstructive surgery.  You heard about the

5   complexity.  You heard about the difficulty.  It takes six

6   years to become safe and competent.

7           And there's no right that anyone has to complete the

8   program.  You heard that people at times find out that they

9   can't cut it, that it doesn't work for them, and that they

10  should do something else in the medical field.  That happens.

11  And we believe that that is what happened in this case and, as

12  we said, there's no right to continue or finish the program.

13          I am now going to address damages.  I'm going to do

14  it up front.  And I'm only doing it because I have to as a

15  lawyer.  I do not believe that you're going to reach the

16  question of damages in this case because I believe that the

17  evidence will clearly show that no damages are warranted

18  because there was no discrimination or retaliation.

19          But let's talk a bit about Dr. Killingsworth.

20          MR. JEPSON:  Would you put up No. 26, Michael.

21  BY MR. JEPSON:

22          And this is what the Judge is going to instruct you,

23  is if you find plaintiff has proved any of her claims against

24  defendant, then you must determine the amount of damages, if

25  any, plaintiff is entitled to recover.  Plaintiff must prove

Argument - Jepson

1    her damages by a preponderance of the evidence.

2              So, let's talk about what Dr. Killingsworth gave you.

3    He gave you -- and he admitted it -- two income streams.

4    Income Stream A, plastic and reconstructive surgeon.  Income

5    Stream B, M.P.H. working in academia or a not-for-profit.  I

6    submit that both of those income streams that he laid out for

7    you and that you're going to have back there, which total

8    millions of dollars -- eight-and-a-half to nine-and-a-half

9    million dollars -- are completely unreliable.

10             As to the plastic and reconstructive surgery column,

11   what did he assume?  He assumed that she would be able to

12   complete a plastic and reconstructive surgery program.  He

13   assumed that Dr. Artunduaga would get a fellowship.  He

14   assumed that Dr. Artunduaga would then get a top-paying job as

15   a plastic and reconstructive surgeon.  He admitted that the

16   data he used didn't distinguish between what location you were

17   at or not, whether you worked in academia or whether you were

18   working in a private practice doing nose jobs for the stars or

19   facelifts for the stars.  None of that was in that data.

20             And he also admitted that that data was about -- from

21   about 75 plastic and reconstructive surgeons.  You know how

22   many there are in the United States?  A lot more than that.

23             And -- and -- there's no identifier with respect to

24   that data as to where it came from.  Are people who are making

25   a lot of money happy to say they are?  Who knows?  It's

Argument - Jepson

1508

1    unreliable.  So, in my view, you can throw that column out the

2    window.

3            And let's take a look at Column B.  That assumption,

4    he already admitted, is not borne out by the facts that we now

5    know.  He admit- -- well, he didn't consider.  His sole

6    consideration was an M.P.H. -- Master of Public Health -- in

7    academia or not-for-profit.  Well, he admitted he didn't

8    consider whether the addition of an M.D. to that would add

9    value, would allow you to make more money, would maybe enable

10   you to get a better job.

11           He also admitted that he didn't know anything about a

12   Master's of Translational Medicine, which, frankly, I didn't,

13   until I looked into it with this case.  And you heard Dr.

14   Artunduaga testified that that program involves

15   bioengineering, bringing new devices to the market, opens up

16   all kinds of worlds.  And that was not considered at all by

17   Dr. Killingsworth in his analysis.

18           And, also, Dr. Killingsworth did not consider Dr.

19   Artunduaga's stated intention even after she was married.  In

20   2012 and 2013, you saw those statements that were submitted.

21   The one in 2013:  Ten years from now, I see myself running a

22   clinic for pediatrics or a children's hospital in Colombia.

23   That's what I see myself doing.

24           Dr. Killingsworth took none of that into account.

25   That's not plastic and reconstructive surgery in the U.S.

Argument - Jepson

1509

1   earning top dollar.  I don't know what it is.  He doesn't

2   either.

3          So, bottom line is he didn't properly consider the

4   numbers for plastic and reconstructive surgery or for the

5   alternative income stream and certainly not the preponderance

6   of the evidence standard.  So, we believe that those numbers

7   are worthless.

8          In addition, there's also the component of

9   compensatory damages.  Nobody here from UCMC, Dr. Song or

10  anybody else, is saying that they don't feel for Dr.

11  Artunduaga and what happened to her.  Okay?  Obviously,

12  tremendous disappointment.  Tremendous disappointment.  It

13  happens.

14         But there's good news there.  You heard -- well,

15  there's a couple things.  First, you heard that there was a

16  baseline there.  She had a major depressive episode before.

17  And, also, you heard the psychologist say that she

18  characterized herself as a worrier, which may or may not be

19  general anxiety.  So, that stuff was there.  It was

20  percolating.  We're not denying that what happened to her was

21  a problem and that she had problems.

22         But there's also good news.  You heard Dr. Dantz

23  testify that there are many periods now where she's -- I

24  learned a new word -- euthymic, which means no symptoms,

25  functioning.  And what else has she done?  She's completed

Argument - Jepson

1    successfully a mast- -- a two-year Master's in Public Health

2    program and she's now in another educational program in that

3    Master's in Translational Medicine.  So, that is good news.

4         Another area of damages that you're going to hear

5    about or be instructed about is this whole idea of mitigation,

6    being able to find another residency program, find another

7    job.  And we wish she would have.  Okay?  Clear.  And, indeed,

8    even though it's painted as some sort of nasty, awful thing

9    that we did by offering her the chance to transition into

10   another program, non-surgical, it happens.  You heard that.

11   It happens all the time.

12        And we offered the opportunity to do that in November

13   so that there wouldn't be the probation issue.  We also

14   offered her the opportunity to resign at the end of March

15   rather than have non-renewal.  She decided not to do that,

16   which is her choice.  In fact, I admire her determination to

17   try to do it, to try to make it.  But she didn't.

18        And, thereafter, she did make attempts to get into a

19   residency program.  Don't worry.  I'm not going to spend much

20   time with this.  But what you've seen is here.  She -- you saw

21   a document.  She sent out an e-mail blast to various programs

22   at the end of May talking about the bad environment, UCMC, I

23   want to find another place which is nurturing.  So, she sends

24   that out.  Even though her lawyers tell her don't talk badly

25   about UCMC, she does.

Argument - Jepson

1   And, indeed, what happens is right after the lawsuit

2   is filed, which you're hearing right now, right in the midst

3   of her interviews for residency programs, she posted on

4   FaceBook and asks her FaceBook friends to pass the link

5   around.  And she reaches out to the Tribune -- I'm sorry, to

6   the Sun-Times, another journalist who we're not certain if

7   he's at the Tribune or what he does, that Bruce Japsen, and

8   also Crain's.  And Crain's does an article on it.

9   She also e-mails -- she's interviewing for the Baylor

10  plastic surgery program -- e-mails residents there telling

11  them that she had been discriminated against at UCMC.

12  We believe that those efforts probably scuttled her

13  ability to get into another program.  We don't know -- know

14  for sure.

15  As far as Dr. Song's e-mail, there were two of them.

16  Julianna Hansen.  He told her the truth.  And, indeed, they

17  already made the decision that Dr. Artunduaga was not cut out

18  to be a plastic and reconstructive surgeon.  He has an ethical

19  responsibility for the safety to let them know that if they're

20  reaching out.  He didn't reach out to them.  He didn't go out

21  of his way.  She reached out to him.

22  And as far as the other person, that Michael Zenn,

23  there's no evidence that there was ever any actual

24  communication of the reason or any discussion about it.

25  Finally, we heard the mention of punitive damages and

Argument - Jepson

1512

1　everybody at UCMC lies.  It's all lies.  It's all lies.  We

2　submit that that's not the case.  It might be unpleasant, but

3　nobody was lying here.  Indeed, in any job, in any profession,

4　people have the right to make a reasonable determination in

5　their view as to what your competencies are and what they

6　aren't.  And the Judge is going to instruct you that you are

7　not to second guess -- in other words, you're not supposed to

8　determine whether or not what we did was fair, whether or not

9　what we did was reasonable, whether or not what we did was

10　wise.  That's not within your province.

11　　　　　Your province is to determine whether what we did we

12　did because of Colombian national origin or in retaliation of

13　her complaints.  And we'll submit that with respect to all of

14　that, there's really no evidence that Dr. Song's responsible

15　in any way for Dr. Artunduaga not getting another residency

16　program in the sense of any sorts of contacts.

17　　　　　All right.  Punitive damages was also mentioned.

18　There's going to be instruction on that.  And we'll submit

19　that, in light of everything that occurred here, nothing

20　supports that.  Look at what we did.  We brought her into the

21　program.  We tried to help her succeed.  Everything now, of

22　course -- and I'll get into it -- is being painted the other

23　way.

24　　　　　But we took extraordinary efforts to try to get her

25　to succeed.  We clearly outlined what the issues were.  We put

Argument - Jepson

1513

1    her on probation, which she did not decide to transition.  And

2    then we had Dr. Park -- you heard her -- mentor her, spent

3    eleven long sessions with her and giving her advice.  And the

4    seniors also gave advice.  You saw the areas for improvement.

5    That's advice.

6          And, indeed, you heard Dr. Dickie testify that during

7    the course of that month in plastics, she spoke with her.

8    They talked.  They were working together.  She was trying to

9    help her.

10         So, we submit that the whole idea of any sort of

11   punitive damage claim here is completely unwarranted.

12         She also got to use the grievance procedure.  We

13   followed it, and her case was heard.  Again, a number of

14   physicians heard it.  Lots of time was spent.  Unhappy with

15   the decision, of course.  That's part of why we're here.  But

16   that doesn't support a punitive damage claim.

17         Okay.  Let's get into the facts of the case.  We've

18   heard about the Kaplan Service ad nauseam.  She spent two

19   months on that service.  And, frankly, in two months, you

20   would have expected performance to improve.  You get into the

21   routine.  A lot of these rotations are only one month.  But it

22   didn't.

23         And we have the breast surgeons.  We have their

24   evaluations.  Joint Exhibit 7.  Joint Exhibit 9.

25         You heard Dr. Jaskowiak testify about her experience.

Argument - Jepson

1514

1   And, indeed, you heard her testify that she had gone to Dr.

2   Song with grave concerns about Dr. Artunduaga's performance,

3   not just in the OR, but on the floor and in general.

4         You saw Dr. Chhablani's evaluation, which also had

5   "could improves" marked in the button and also in the overall

6   comment:  She was overwhelmed.  She needs to be monitored.

7         What does monitored mean?  It means somebody needs to

8   watch what's going on with respect to this person.

9         And those were the breast surgeons and those were the

10  ones who, as a plastic and reconstructive surgeon, she would

11  be working closely with.

12        And, indeed, Kaplan's evaluation, it is what it is.

13  You saw Dr. Kaplan.  He's been there a long time.  And you

14  heard the testimony that Dr. Kaplan is an easy grader.

15  Certainly was not a glowing, glowing evaluation of any sort.

16  It was generic.  She's nice.  She works hard.  She's good now.

17  She's going to be good later.

18        Dr. Angelos also raised concerns about her

19  performance, her being overwhelmed, her not getting the work

20  done.  Those kinds of things.

21        And, so, we had those evaluations.  And, yes, they

22  did not come out until September and in October.  But what did

23  happen in August was Dr. Jaskowiak contacted Dr. Song and

24  said, we have concerns.  And she laid out those concerns for

25  Dr. Song.  And you heard Dr. Song testify why he was concerned

Argument - Jepson

1    at that point.

2            And what happens right after that?  He gets the

3    patient complaint.  And a patient complaint that's not only

4    corroborated by the patient, but also the husband who's in the

5    room.  And the patient obviously was very upset.  And Dr.

6    Artunduaga did respond to that.  But it occurred.  It was an

7    issue.  And you heard Dr. Jaskowiak testify that she had to

8    smooth it over.

9            And, then, I think one of the things that's most

10   telling is that -- from that service, is that -- Dr.

11   Artunduaga reaches out to Joly Jose and says, you know, I've

12   had issues.  Jaskowiak raised issues with my performance.  You

13   know me best.  Would you please, you know, send something in.

14           MR. JEPSON:  I think that's Joint Exhibit 19,

15   Michael.

16           If you blow up the bottom.

17   BY MR. JEPSON:

18           (Reading):  Maria's motivated and has willingness to

19   learn.  However, she lacks organization, prioritization,

20   communication skills.  The two months she was on B service,

21   she was overwhelmed with responsibilities and could not

22   prioritize important versus non-important tasks.

23           You know, that is serious.  If you are in a

24   healthcare area and you don't know which thing you should

25   address first or at least don't address what you should

Argument - Jepson

1516

1  address first, that can be a real problem with respect to

2  patient safety.

3           (Reading):  There were also many tasks that were not

4  done because there was a lack of communication.  Overall, she

5  says, I think she did a fair job.  However, she has many areas

6  that need improvement.

7           All right.  So, what Song knows about these.  He has

8  contact with Jaskowiak.  He works with Jaskowiak all the time.

9  They work on the same patients.  There's mutual respect there,

10  although there was a little blowup about this.

11          So, what does he do?  He speaks -- record's clear, he

12  speaks with Maria in August about this.  Hey, you know, you

13  listen -- you need to do better.  You need to improve.

14          And what else does he do?  He says to Sara Dickie,

15  please, step in here.

16          And that makes sense, doesn't it?  The program

17  director doesn't want to increase the anxiety and the stress,

18  so he has the chief resident follow it, work with her, see

19  what they can do to improve.

20          And you saw the -- or heard about this meeting with

21  John Seal.

22          MR. JEPSON:  Let's go to that.  It's Joint Exhibit

23  12.

24          And if you go to the bottom there, blow that up,

25  please.

Argument - Jepson

1    BY MR. JEPSON:

2         I think this is -- Seal says here:  Maria's main

3    problems stem from communication, which he detailed as such.

4         The first thing is accent.  Yeah, that's a component

5    of it, but look at what else he details:  A jumbled and

6    somewhat frenetic thought process that comes out when

7    presenting patients; too much confidence when it comes to

8    patient management; with patients, she comes across as abrupt,

9    arrogant and lacking in empathy -- hence, the complaint from

10   that patient; she is occasionally argumentative when

11   discussing plans or what has been perceived as an error on her

12   part.

13        So, it's not just accent.  He's not just focusing on

14   accent.  And I'm sorry, you heard every one of these witnesses

15   testify that accent wasn't an issue.  They could understand

16   what she was saying.  And looking at the context here, looking

17   at the hospital, they deal with people with accents all the

18   time, whether they be patients or colleagues.

19        All right.  Now, you heard Dr. Artunduaga felt In was

20   mistreating her -- Dr. In, making comments about where she

21   went to medical school, her accent.  You also heard that her

22   description of the month with John Seal was that it was a

23   nightmare with John Seal.  But look at what else we have in

24   the record.

25        You heard me ask Dr. Artunduaga about a tweet that

Argument - Jepson

1518

1    she admitted making on July 30, 2011:  Survived the first

2    month of internship.  Satisfied.

3         Not dealing with a person who's been terrible to me.

4    Not dealing with accent or Colombian national origin

5    discrimination.  Nothing like that.

6         And, then, a tweet in August:  Hit -- this is when

7    she's on with Seal:  Hit 15 junior surgeon cases six-week.

8    Love it, University of Chicago Hospitals.

9         She sent that out.

10        And, in addition, we have Defendant's Exhibit 18.

11        MR. JEPSON:  Can we pull that up, Michael.

12   BY MR. JEPSON:

13        From the same time period.

14        MR. JEPSON:  And if you could go to the middle

15   e-mail.

16   BY MR. JEPSON:

17        Moving was exhausting, but we're finally settled in

18   Chicago.  I had a rocky start, but overall surgery internship

19   has been a great experience.

20        That's on August 22nd.

21        MR. JEPSON:  And let's go, if we would, to

22   Defendant's Exhibit 19.

23   BY MR. JEPSON:

24        By the way, that e-mail was to John Mulliken who had

25   nothing to do with UCMC.  There would be no fear of

Argument - Jepson

1519

1   retaliation or anything else.  This was her mentor.

2           And here, to a former co-worker and friend.  And she

3   says, referring to In:  My chief was a lazy and rude fellow

4   who made me write her reports.

5           She doesn't say my chief was making fun of my accent

6   or my Colombian national origin.  There's nothing in there

7   about that.

8           And, indeed, the second month, look at that -- the

9   month that was a nightmare:  Things got better.  I like it

10  more.  And at least I know where and how to do things.

11          And, again, this is an e-mail that's being sent to

12  somebody who has no affiliation with UCMC.  There should be no

13  fear of confiding.  She was asked why she had a rocky start.

14  All right.

15          MR. JEPSON:  And, finally, let's take a look at

16  Defendant's 26.

17          The second e-mail down.

18  BY MR. JEPSON:

19          (Reading):  Thanks, John -- this is to John Seal, the

20  person who made the month a nightmare -- I'm sorry I couldn't

21  say goodbye on Wednesday.  I had to help Ricardo move into our

22  new place.  It was nice working with you.  I learned a lot,

23  and I really admire your dedication to patient care and

24  surgery education.  Thanks for all your feedback.  I'll work

25  hard on all aspects you emphasized.

Argument - Jepson

1520

1       And, then, take a look at Dr. Seal's response.

2           MR. JEPSON:  The top.

3   BY MR. JEPSON:

4           (Reading):  Thanks, Maria.  Keep up the hard work.

5           A perfectly normal, professional exchange.

6           All right.  So, in September, colorectal.  You heard

7   Dr. Song testify about the September 8th e-mail where the PICC

8   line is mentioned.  You heard the description as to why that

9   was a problem.  Could be potentially fatal, dangerous, with

10  somebody who is not trained on it.  That's a problem.

11          The other thing that was outlined in that e-mail was

12  Dr. Hurst's disappointment with Dr. Artunduaga not recognizing

13  or asking why a patient had a stoma.  And you heard what a

14  stoma is -- something else -- at least what I learned in this

15  case -- and that that would have been a basic question because

16  it's the colorectal service.  So, those were early concerns.

17          And remember, that was that e-mail from Dr. Dickie to

18  Dr. Song.  She was checking up to make sure things were going

19  well, and she characterized it positively.  Dr. Song had

20  concerns, but Dr. Dickie characterized it generally as a

21  positive experience.

22          So, what else happens that month?  Well, again, you

23  saw Dr. Umanskiy's e-mail in which he expresses grave concerns

24  with her performance.

25          MR. JEPSON:  And I believe that's Joint Exhibit 15,

Argument - Jepson

1521

1   Michael.

2           The bottom one, please.

3   BY MR. JEPSON:

4           (Reading):  There are several areas of concern I

5   would like to point out.  She appears to have difficulty

6   keeping up with the workload.

7           MR. JEPSON:  Next down, No. 1.

8   BY MR. JEPSON:

9           (Reading):  Appears to have difficulty keeping up

10  with workload.  She frequently appears disorganized, unsure of

11  her knowledge and excessively talkative.

12          Now, you know, disorganization is kind of

13  fundamental.  Being unsure of your knowledge is also kind of a

14  fundamental thing.  You're supposed to have the knowledge.

15  You've gone through medical school.

16          (Reading):  No. 2, she was not able to establish

17  successful doctor-patient relationships with the patients on

18  the ward.

19          He described what he normally sees and what he saw

20  with Dr. Artunduaga.

21          (Reading):  And in the operating room, she had

22  difficulty following instructions and required frequent

23  prompting.

24          So, that was his e-mail to Dr. Song, and his

25  evaluation was consistent with it.

Argument - Jepson

1522

1    Dr. Hurst.

2    MR. JEPSON:  Let's go to his, which is, I believe,

3    Joint Exhibit 13.

4    And if you'd just go to the last page, please,

5    Michael.

6    BY MR. JEPSON:

7    (Reading):  When Maria started the rotation, it was

8    clear that she was less prepared than her peers.

9    Specifically, she was less independent and was less aware of

10   the routines of running the service.

11   And, then, he speculates:  It's not clear whether

12   this was due to a deficiency in competence or just a result of

13   necessary adjustments to a different system.  Given that she

14   was trained where the routines and customs are not necessarily

15   known to us, this is to a degree understandable.

16   And let's talk about these cultural differences.  Dr.

17   Jaskowiak, you know, said something cultural.  She doesn't

18   seem to understand.  She made it very clear it's not language,

19   but she's not getting it.  You heard her testify about that.

20   Dr. Hurst, the same thing.

21   I submit to you that what was going on here -- and

22   you heard Dr. Jaskowiak testify -- why is this person so

23   lacking?  She's a plastic and reconstructive surgery resident.

24   Why is she so behind?  Why are there so many fundamental

25   flaws?  And they're speculating.  Maybe it's because she was

Argument - Jepson

1523

1   in another system or learned something else.  Maybe that's why

2   we should do an American boot camp.

3           What they didn't know, because they aren't plastic

4   and reconstructive surgery attendings, is that Dr. Artunduaga

5   had spent ten months in the U.S. system observing, rotating in

6   2003 and 2004; and, less than a year before, she spent two

7   months at the University of Washington as a sub-intern, in

8   which you saw her description of it.  She functioned

9   essentially as an intern.  So, they didn't know that.  And in

10  all likelihood, they wouldn't have been speculating if they

11  had known that.

12          Now, the switch to plastic and reconstructive

13  surgery.  She was having problems.  Dr. Song was aware of it.

14  Dr. Dickie was very aware of it.  You saw the e-mail exchange

15  at the end of September where it became apparent to Dr. Lee

16  and Dr. Dickie that Brian Bello was doing all the work or most

17  of the work or covering.  And they heard that Dr. Umanskiy and

18  Dr. Hurst were very displeased.

19          Now, the word "unfixable" was used.  Yeah,

20  Dr. Umanskiy didn't use that word.  There were problems.  You

21  saw his evaluation.  He clearly saw there were problems.  And

22  Dr. Song, with the help of his chiefs, decided to bring Dr.

23  Artunduaga onto the plastic rotation.  The idea obviously was

24  for them to work closely with her and find out what are the

25  issues here?  Why are we having these problems?  What can we

Argument - Jepson

1524

1    do to make it better?

2         You heard Dr. Song testify his idea was this was I'm

3    making this change, we're making this change in order to see

4    what's going on and help her improve.

5         Well, you saw -- you heard Dr. Dickie testify about

6    what happened that month.  You heard her testify about the

7    issue with respect to the drains, and that it was clear to her

8    that Dr. Artunduaga did not understand what had gone on and

9    what the problem was.  And that came from a phone call from

10   another attending.  It wasn't something that Dr. Dickie rooted

11   out.  Dr. Lawler called her and said, hey, we got a problem

12   with these drains.

13        And you also heard and you saw the detailed list that

14   both Dr. Nyugen and Dr. Dickie prepared.  They are entitled

15   "Areas of Improvement," and they list many issues.  Let's go

16   to Dr. Nyugen's, which I believe is Exhibit -- Defendant's

17   Exhibit 45.

18        MR. JEPSON:  Please blow that up, Michael.

19   BY MR. JEPSON:

20        As said, it's entitled "Areas For Improvement," and

21   it's signed by Dr. Artunduaga and Dr. Nyugen.  And No. 1:

22   Notification of seniors in case of change in patient status.

23        Yes, it was a criticism, but it's also saying this is

24   something you need to do.  As an intern, you need to notify us

25   when you have this happen.

Argument - Jepson

1525

1    Let's go to the next one:  Appropriate understanding

2 and follow-up of consults.  And there's a cardiology consult

3 referred to, a gyne consult referred to and an endo consult

4 referred to.  And, again, there were issues with each one of

5 them.  And Nyugen is saying here, these are the issues.

6 Improve.  Don't do this, again.

7    MR. JEPSON:  Go on down, please.

8 BY MR. JEPSON:

9    And, then:  Following directions, ordering

10 appropriate diagnostic studies and ancillary services.

11    So, she needs to do that.  In other words, she needs

12 to do what she's told, what she's directed to do by her

13 seniors.

14    And, then, we've got a list of things that didn't

15 happen.

16    MR. JEPSON:  Go down again, would you, Michael.

17 BY MR. JEPSON:

18    And, then, we have:  Consults, putting consult notes

19 in a timely manner and communicating recommendations with the

20 service.  Consults were being put in late.

21    Again, yes, it's criticism.  But it's also you need

22 to get these in on a timely basis.  These are areas of

23 improvement for which she was spoken with.

24    You saw Dr. Dickie's.  She testified about what she

25 did that month, how she tried to help Dr. Artunduaga by

Argument - Jepson

1526

1    working with her closely, giving her advice.  And she, too,

2    gave a list, Areas of Improvement, to Dr. Artunduaga at the

3    end of the rotation.

4        Now, Dr. Song decided at that point, at the end of

5    the rotation, you heard him, to place Dr. Artunduaga on

6    probation or offered her the opportunity to transition.  They

7    already worked with her closely in the plastic and

8    reconstructive surgery service.  He had had reports.  And he

9    had worked with her.  And there were three months before where

10   there was serious concerns raised.  So, he made that decision.

11       And, indeed, quibbling about the language in that

12   Joint Exhibit 22, I understand that.  Dr. Song hadn't written

13   any of these things before, done that before.  Yeah, he came

14   to the conclusion that the things that he saw from the

15   attendings indicated to him that there were serious problems

16   here, and he had serious doubts about whether Dr. Artunduaga

17   was going to be able to successfully complete the program.  He

18   had never seen this before with any of his residents.  And he

19   had been the program director since 2004.

20       And the improvement, yeah, people wrote she improved.

21   But in his view, there simply wasn't enough improvement.  I

22   mean, it's one thing to get better when you're told.  It's

23   another thing to be proactive.  It's another thing to be

24   following directions.  And that wasn't happening.

25       Now -- so, she's given that choice.  She's placed on

Argument - Jepson

 1    probation.  There's a meeting.  You saw the details of the

 2    summary evaluation.  And that's what it's called.  That's

 3    Joint Exhibit 22.  Highlighted the performance in writing,

 4    very detailed.

 5           And, then, there's the probation letter.  And that

 6    letter, Joint Exhibit 26, also provides very clear guidance as

 7    to what's expected.  There are ten items listed.

 8           MR. JEPSON:  Let's pull that up, Michael.  And let's

 9    go to the bottom.

10    BY MR. JEPSON:

11           And you heard Ms. Hyndman say that there was nothing

12    about patient safety here.  Well, you know what?  Patient

13    safety is the whole focus of what we're doing.  The health,

14    the care, the treatment.  If you aren't maintaining your

15    workload, getting your work done, that might be a problem.

16           Establishing doctor-patient relationships, that can

17    be a health problem or safety problem.

18           Following technical instructions in the operating

19    room.  You don't do that, that can be a safety or a health

20    problem.

21           Improving organizational skills and understanding

22    what should be prioritized.  Not being organized, not getting

23    to your work, not, as you heard Dr. Becker testify,

24    administering steroids or antibiotics in a timely fashion can

25    be a health problem.

Argument - Jepson

1528

1    Bottom of 2, appropriate clinical decision making?

2    All of these items relate to patient safety and health.

3    That's a given.  That's the focus.  That's why we're a

4    hospital.  And that's why we're treating patients.

5    MR. JEPSON:  Go to the second page, Michael, please,

6    at the top.

7    BY MR. JEPSON:

8    Accepting responsibility.  You heard the testimony

9    that you only learn and move on if you understand, hey, I did

10   make a mistake.  I'm not going to do -- or I'm going to take

11   responsibility for what happened with my patient.

12   Timely placing consult notes.  The other service that

13   asks you for information, you don't put the notes in the

14   system, they don't have the information.  You can't act on it.

15   And understanding the plan and your role in the plan.

16   This is the plan for patient care.

17   So, we'll submit that all of those things relate to

18   patient safety.

19   Now, as to -- Dr. Artunduaga wrote a response, and

20   that was on November 18th.  And you saw that.  And, in

21   essence, the response asked to reconsider the probation and

22   stated most of these things were John Lusardi's fault, not

23   mine.  Or also with the PICC line, for example, you probably

24   remember what she said there:  He told me exactly twice to do

25   this.

Argument - Jepson

1529

1    So, again, it's -- there's deflection, responsibility

2    issues.  Remember the response to the patient complaint:  The

3    patient was confused and upset.  She was upset with the

4    nurses.  Not "I'm sorry."

5    Okay.  Mentoring, I'll just mention briefly.  You saw

6    that as part of the probation, Dr. Song assigned Dr. Park to

7    mentor.  You heard Dr. Park testify at length about what she

8    did.  You heard her testify, never heard of this done before

9    to this extent.  She certainly hadn't.  And Dr. Artunduaga

10   herself admitted that she was appreciative of Dr. Park's

11   assistance.

12   So, November is thoracic and she was placed on

13   probation November 15th.  So, the second half of that would

14   have been part of the probation.  You heard Dr. Ferguson

15   testify.

16   MR. JEPSON:  Let's take a look at his Defense Exhibit

17   62, please, which was an e-mail he sent mid-month.

18   BY MR. JEPSON:

19   And let's go to the -- it says here she told him

20   about the probation.

21   (Reading):  Her performance on the thoracic service

22   to date has been very poor.  She's not functioning up to the

23   level of a third-year student at this point.  Her areas of

24   weakness are numerous, include lack of technical skills, basic

25   medical knowledge, organizational, prioritization skills,

Argument - Jepson

1530

communication skills and information processing abilities.
We've had a few near misses as a result of her performance.

           And, then, the next paragraph:  I don't think Maria
accepts responsibility for these shortcomings.  When I
mentioned specifics to her, things were usually met with
explanations that involve misunderstandings and her
responsibilities.

           Now, you heard Dr. Artunduaga testify, in essence,
with respect to thoracic that she didn't think it was a fair
month because Dr. Moreira didn't allow her to do certain
procedures.  I'd submit she's missing the point here.

           Dr. Ferguson -- you heard him testify; he's been an
attending since 1984 -- perceived this and concluded that Dr.
Artunduaga did not have the aptitude to be a surgeon, let
alone plastic surgeon.  And he told her.  And he submitted
that -- you saw it -- at the end of the month -- he continued
to work with her -- an evaluation that said there was very
little improvement and, again, noted the lack of aptitude for
her chosen work.

           And, so, you heard Dr. Artunduaga testify with
respect to both of the individuals who were highly critical of
her in September and then in November that they treated her
badly.

           With respect to Dr. Umanskiy, you heard her testify
that he pulled pens out, took papers, took her stethoscope

Argument - Jepson

1    off, threw them in the trash.  You heard him deny it.  Why

2    would he do that?  He, himself, is an immigrant.  He, himself,

3    could empathize with what Dr. Artunduaga was going through.

4    You heard his accent.  You heard his story.  He came from the

5    Ukraine.

6             And as to Dr. Ferguson making fun of her accent, lack

7    of speaking English, it's just -- he denied it.  It's not

8    credible.  You heard him testify, I've got a Colombian in my

9    program right now, in my residency program, who went to a

10   foreign medical school who is not a native English speaker.

11   He's doing fine.  It simply doesn't make any sense.

12            And, indeed, Dr. Artunduaga never put any of these

13   things in writing to anybody, and we didn't even hear about

14   them until after the non-renewal decision was made.

15            All right.  In that month, Dr. Vigneswaran was also

16   highly critical of her.  And you heard Dr. Vigneswaran

17   himself, foreign medical grad from India.  And the weekly

18   evaluations, the feedback evaluations, you saw them.  Todd,

19   Mehta, Durkin, they're all highly critical.  They note that

20   she lacks basic clinical knowledge.  And clinical knowledge --

21   basic clinical knowledge -- is not what a residency program is

22   for.  The basic clinical knowledge is what you're supposed to

23   have in medical school.  It's what you're supposed to have

24   when you come to the residency program.

25            Now, let's move on to vascular, January.  Things were

Argument - Jepson

1532

1    better.  And Dr. Park noted they were better.  Remember --

2    again, I'm not going to pull these out and run you through

3    them.  But the minutes that we went through ad nauseam with

4    Dr. Park yesterday for January showed they met four times.

5    The only evaluations that they were looking at at that time

6    were the weekly evaluations from a resident and a fellow.  No

7    attendings at that point.  But Dr. Park was encouraging.

8           And the attendings did evaluate her better.  There

9    were five.  Five of them.  And we, you know, heard their

10   names.  Skelly, Steppacher, Hall -- I'm forgetting the other

11   two.  But there were five of them.  And the evaluations were

12   better.  None of them were superb.  You saw them.  Mostly

13   "goods" and "very goods."  And, indeed, Dr. Artunduaga got

14   rated very highly in being a nice person, being honest and

15   hard working and all of that.  But with respect to the

16   hardcore stuff -- clinical knowledge, operating skills --

17   those were not rated that highly.

18          And you also heard Dr. Park testify -- and there's no

19   reason she would make any of this up.  Yeah, she's employed at

20   UCMC.  So is everybody.  That's what -- they're all employed

21   there.  But they're all physicians.  They all have ethical and

22   other responsibilities.  Highly trained people.  She testified

23   that she learned that Dr. Kaplan had spoken with Dr. Skelly

24   before the rotation to try to set things in place for Maria to

25   succeed.  That's what you heard.

Argument - Jepson

1       You also heard from a nurse practitioner in February

2   on transplant that there was some pressure with respect to the

3   evaluations.  And what she didn't even know at the time was

4   that for January, Dr. Artunduaga was sending e-mails to all of

5   the attendings telling them that she was on probation; telling

6   them she wanted to say in the program; telling them that she

7   thought she had done a good job; and, asking them to talk to

8   the resident or fellow.  I'll just give you two examples of

9   what was going on and, frankly, why Dr. Park's questioning of

10  the credibility of these evaluations makes sense.

11      MR. JEPSON:  Let's go, if we would, to Joint --

12  Defendant's Exhibit 94.

13      Blow that top one up, please.

14  BY MR. JEPSON:

15      (Reading):  Dr. Hall, I wanted to thank you for

16  having me in your clinic.

17      So, there's no mention of being on the floor.

18  There's no mention of surgery.

19      (Reading):  Although we did not interact too often, I

20  really enjoyed those four hours following you.  I'd rather

21  talk to you in person, but I recently found out that you would

22  not be at University of Chicago until Thursday.  I was placed

23  on probation last year by my PD because I was not performing

24  at the level of a plastic surgery resident.

25      And, by the way, how many times have we seen that

Argument - Jepson

1534

 1    admission by Dr. Artunduaga in e-mails?  It happened right

 2    after she knew she was going to be placed on probation.  The

 3    e-mails to Kaplan, the e-mail to Roggin, and the e-mail to

 4    Jaskowiak.

 5            Let's go to the last paragraph:  I am working very

 6    hard to stay in the program, and I would really appreciate any

 7    feedback if you wish to tell me.

 8            Okay.  That's the feedback part.  It's the end of the

 9    month.

10            (Reading):  When the time comes out to fill out my

11    evaluation, I would appreciate if you get Mike's, Jenn's input

12    about my performance.  They have been very supportive and I

13    think I've done a decent job.

14            MR. JEPSON:  Let's go quickly to Joint Exhibit 45.

15            Blow that up a bit, Michael, so we can see it.  First

16    page.

17    BY MR. JEPSON:

18            Now, all that we know is that there were four hours

19    in a clinic.  Yet, we have ratings on pre-operative care,

20    post-operative care, which are good.  And, then, we have, with

21    respect to --

22            MR. JEPSON:  Go to the next page, please.  Going

23    down.

24    BY MR. JEPSON:

25            Ability to lead, manage a service, "good."

Argument - Jepson

1535

1        Well, you've heard leading and managing a service is

2   the floor.  It's not a clinic.

3        Tracking, presentation quality, maybe, maybe not.

4   That's "good."

5        MR. JEPSON:  And, then, let's go to the overall

6   comment.

7   BY MR. JEPSON:

8        (Reading):  Maria performed well on a busy vascular

9   service.  She's a hard worker and did well to manage the

10  demands of the floor work, consults and clinic.

11       Well, you've heard questions asked of our witnesses

12  about whether they personally observed things or not.

13  Clearly, Dr. Hall did not observe any of these things except

14  for the clinic.

15       MR. JEPSON:  Now, let's go to another exhibit, Joint

16  Exhibit 55.

17  BY MR. JEPSON:

18       And you saw that and you heard Dr. Artunduaga told

19  the residents she was working with and fellows that she was on

20  probation.  And that's understandable.  But let's take a look,

21  please, at No. 5 at the bottom.  This is Jennifer Paruch, who

22  was working with her on vascular.  She rated her "very good,"

23  and this is something that will go into the weekly evaluation

24  numbers.  (Reading):  But I need to spend more time observing

25  Maria, her examination and presentation of patient, to

Argument - Jepson

1536

1  effectively comment on this.

2          So, I rated her "very good," but I really can't

3  effectively comment on this.

4          And these are just examples.

5          MR. JEPSON:  That can go off the screen now, Michael.

6  BY MR. JEPSON:

7          Now, we saw and we've heard -- you heard Dr.

8  Jaskowiak testify about it.  You heard Dr. Artunduaga testify

9  about this antibiotic issue.  And you heard Dr. Jaskowiak

10 testify about it wasn't so much that she did it, but it was

11 the way it was handled.  There was no note in the system.

12 There was no record.  The only way Dr. Artunduaga -- I'm

13 sorry, Dr. Jaskowiak knew about it is the patient happened to

14 have the bottle with Dr. Artunduaga's name on it.  And you

15 heard what happened to that patient.  She got C. Diff.

16         All right.  February.  Now, Ms. Hyndman characterized

17 that as being a positive month.  You saw the notes from the

18 minutes of the meetings in which Dr. Artunduaga raised good

19 days and bad days.  There were five attendings on that

20 service.

21         And, by the way, Dr. Olaitan was not an attending

22 physician.  So, his evaluation was not as an attending.  It

23 was on the weekly evaluation form.

24         The five attendings were Dr. Becker -- you heard her

25 testimony; Dr. Thistlethwaite, one of the deans -- and you

Argument - Jepson

1   remember what his e-mail evaluation concluded?  It's in the

2   evidence.  He concluded that Dr. Artun- -- it was not clear

3   that Dr. Artunduaga had the skills to be successful.  That was

4   his ultimate conclusion.

5          And you saw Dr. Millis yesterday testify.  And his

6   overall comment began with:  Maria is struggling as a

7   resident.

8          And this is at the end of February, almost at the end

9   of her probation.

10         And Dr. Millis pointed out not only was Dr.

11  Artunduaga over hours and that that was her responsibility,

12  but, again, that consistently the notes were not being placed

13  in a timely fashion.  These are basic intern responsibilities

14  that still at this point were not getting done.

15         And you did hear Dr. Becker testify about the manner

16  in which Dr. Artunduaga approached her, that she found it to

17  be unprofessional.  And we'll go over what the requirements

18  were for probation in a minute.  But that she had never had

19  that kind of experience before or after with an intern.

20         Now, let's just talk briefly, since the numbers were

21  raised here, about these evaluations.  And you were shown some

22  demonstrative exhibits.  The charts -- well, first, you were

23  shown charts with respect to the weekly evaluations.  You

24  should disregard those because of what they were.  They were

25  meant to be -- to give feedback.  Immediate feedback.  And

Argument - Jepson

1538

they were not filled out by any attendings.  They were filled

out by residents -- third-, fourth-year residents, plus some

of the fellows.  And all of them knew that Dr. Artunduaga was

on probation, and all of them had been told that by her and

that she really wanted to stay in the program.  You know

what's going to happen when you sway or try to sway people's

sympathies to get your support.  Those numbers are going to go

up.

But what's really important to look at are the

evaluations of the attendings.  And those, I think, are

telling.  Now, obviously, in November on thoracic, they were

very low.  Dr. Artunduaga hadn't yet started soliciting

evaluations from the attendings.

In January, they were better.  And in February, they

were better.  But what is interesting is that when you look at

the bar chart -- and I've got it here.  And it's a

demonstrative, so you won't be able to take it back.  But

under general knowledge, she went from 3.16 to 3.25.  Not much

of an improvement, even with everything that went on.  And the

general knowledge, that's the basic clinical knowledge of a

physician.

Operative knowledge, 3.0 to 3.0.  Before probation,

to probation.  Same.  No change on that, even though all these

efforts were being made.  And the others did go up somewhat,

but they're all in the 3s.  And these are averages.  You know

Argument - Jepson

1539

1    what an average is.  There's some that are going to be above,

2    and there are others that are below.

3           So, was there some improvement looking at these bar

4    graphs?  Yes.  Is it significant?  Is it enough to warrant

5    renewal of a contract when you know that a senior attending is

6    talking to people, when you know that the resident is

7    approaching by e-mail these physicians and asking and letting

8    them know about probation?  You can make that conclusion.

9           Now, March.  At that point in time, Dr. Artunduaga

10   goes back into plastics.  And you heard Dr. Park testify about

11   her experience with Dr. Artunduaga during that period of time.

12   And you also have seen the evaluations of the senior

13   residents.  We went over them in some detail.  Grant Kleiber,

14   Matt Greives, Yonni Bank, the first week.  Lots of criticisms

15   about presentation skills, arguments in the OR, orders that

16   are not being placed.  And you heard Dr. Park testify about a

17   number of those things from her firsthand observation.  And

18   she put them into that joint exhibit March 14th letter that

19   was reviewed yesterday at some length.

20          MR. JEPSON:  And let's pull up quickly, if we can,

21   Joint Exhibit 85, please.

22   BY MR. JEPSON:

23          This is Matt Greives -- and, by the way, she was only

24   on the rotation from March 1st to March 15th.  So, that's a

25   two-week period.  And, in particular, let's go to No. 5.

Argument - Jepson

1    (Reading):  There's still deficiency in her ability

2    to effectively and quickly convey the problem and the

3    solution.  Presentations of consults are lengthy and sometimes

4    it's difficult to determine her thought process in arriving at

5    her plan for the care of the patient.  Generally, she has

6    almost all of the appropriate information, but has a difficult

7    synthesizing it into clear and concise message.

8        This is a fundamental skill.  How do you take what

9    you observe and your knowledge about medicine and come up with

10   a plan, a very -- and it's something that is fundamental and

11   something that should be in place already.

12       Let's look at Joint Exhibit 87.  This is

13   Dr. Kleiber's.  And, again, you saw there were "could

14   improves" and other negatives.  But let's go to the top on the

15   presentation on the second page.

16       (Reading):  Presentation of new consults has been

17   scattered, disorganized and unfocused.  She should be better

18   at this, considering she has been a resident here for over

19   eight months.  We discussed patient presentation and she

20   understands the need to do better.

21       And there are other "could improves" on here, as

22   well.  Let's just go to the last overall comment.

23       (Reading):  I feel that Maria needs to improve in

24   several areas.  Efficiency, prioritization, patient

25   presentation and listening skills.

Argument - Jepson

1541

1       All of these things you've been seeing since August.

2   We're now in March.

3       All right.  So, let's take a quick look at Dr. Park's

4   letter.

5       MR. JEPSON:  Which is Joint Exhibit -- I believe it's

6   100.

7       No, that's not it.  Joint Exhibit 96.

8       All right.  Let's blow this up.

9   BY MR. JEPSON:

10      You heard Dr. Park testify about this at length.  I'm

11  not going to belabor it.  You've been here long enough.  But

12  you heard her testimony that they've never seen performance at

13  this level from anybody.  It was way, way below.  And she

14  describes the four areas of real concern to her.

15      MR. JEPSON:  Let's go to the next page, Michael.

16      At the top, clinical performance.

17  BY MR. JEPSON:

18      Now, the first issue was from January.  Dr. Park

19  explained that.  But we then have incidents on March 6th --

20      MR. JEPSON:  Go down, please.

21  BY MR. JEPSON:

22      -- March 10th, again on March 10th, and then on the

23  next page, March 10th.

24      Rapid fire, one after another.  All of them

25  different.  All of them, as she testified, problematic.  And

Argument - Jepson

1542

1    this is four days before Dr. Artunduaga's probation -- at

2    least her run in plastics will be over and her probation

3    meeting would be March 26th.

4            MR. JEPSON:  Go further down.

5    BY MR. JEPSON:

6            Interpersonal conflicts.  We have the Jaskowiak issue

7    mentioned here.

8            MR. JEPSON:  Next page, please.

9    BY MR. JEPSON:

10           That's the antibiotic.

11           The Dr. Tothy issue mentioned here and, also, an

12   incident involving some nurses reported by Dr. Reid to

13   Dr. Park.

14           MR. JEPSON:  Let's go to the next page, Michael.

15   BY MR. JEPSON:

16           You heard Dr. Park testify about her view of Dr.

17   Artunduaga's responsiveness to the mentoring, and she was

18   critical.

19           MR. JEPSON:  Next page, please.

20   BY MR. JEPSON:

21           And, then, we have her explanation and detail

22   regarding the interference with the evaluation process, none

23   of which have been contradicted, except for putting a

24   different spin on things.  So, that happened, too.  And we

25   submit that it was completely reasonable for Dr. Park to

Argument - Jepson

1543

1   question those evaluations in light of what we know happened.

2           Okay.  Now, let's talk a bit --

3           MR. JEPSON:  Let's put up Joint Exhibit 26, please.

4   Joint Exhibit 26.

5   BY MR. JEPSON:

6           Now, you heard Ms. Hyndman talk about the conditions

7   of probation.

8           MR. JEPSON:  Let's go to the bottom, please.  Blow

9   that up.

10  BY MR. JEPSON:

11          Establishing and maintaining your workload.  You

12  heard the testimony about this was getting your work done.

13  We've already seen that there were issues with that.

14          The over hours in February.  Not happening.

15          Establishing successful doctor-patient relationships.

16  We didn't really hear anything about that from later months

17  after the probation.

18          Following technical instructions in the operating

19  room.  We have a clear example of this with Dr. Kleiber, who

20  is trying to explain to her how to remove this catheter.  And

21  she's arguing with him after he believes she's punctured that

22  catheter.  And that catheter, if punctured, could cause very

23  serious problems.

24          Improving organizational skills.  That continues to

25  be a criticism throughout.  Look at the evaluations.  It's

Argument - Jepson

1544

1    still there.

2            Understanding what should be prioritized.  Again, the

3    evaluations from the plastics service clearly show that there

4    were issues there.

5            Effectively communicating with faculty and staff.

6    Well, we have the exchange with Dr. Jaskowiak.  We have Dr.

7    Artunduaga hanging up on Dr. Tothy and, then, sending her the

8    evaluation -- or not evaluation, but the apology -- which we

9    submit was insincere and, frankly, disrespectful -- telling

10   Dr. Tothy that, I'm sorry, you need to understand that as an

11   intern in surgery, I'm really busy.  That was the essence of

12   it.

13           Appropriate clinical decision making.  Again, there's

14   still problems apparent.  There are orders that are not being

15   submitted and other issues that are continuing.

16           Accepting responsibility.  That's the next one.  And

17   this continues to be a problem.  You know, we saw back at the

18   patient complaint that there were issues there.  And she was

19   called on it.  And we saw that she was blaming Dr. Lusardi.

20   And you saw Dr. Butz's e-mail, Joint Exhibit 47, I believe,

21   maybe 48, in which he said she throws people under the bus.

22           But it continues.  Dr. Ferguson 's -- Exhibit 62 --

23   November 16th:  She does not accept responsibility.

24           MR. JEPSON:  Let's go back to that quickly.  62,

25   defendant.  Defendant 62.

Argument - Jepson

1545

1      Thank you.

2   BY MR. JEPSON:

3      (Reading):  I don't think Maria accepts

4   responsibility for these shortcomings.  When I mentioned

5   specifics to her, they were usually met with explanations that

6   involved misunderstandings about her responsibilities,

7   miscommunication from nurses or other healthcare workers,

8   inadequate introduction to the processes at this institution,

9   both medical center and education related.

10      And the Jaskowiak letter.  Her response to Dr.

11   Jaskowiak, she says, listen, Dr. Oliva told me to do this.

12      Over hours.

13      MR. JEPSON:  Defendant's Exhibit 112, please.

14   BY MR. JEPSON:

15      In February, we saw that she went over hours and

16   towards the end of the month there were e-mail exchanges.

17      MR. JEPSON:  Second page, please.

18      Blow that one up.

19   BY MR. JEPSON:

20      Dr. Song calls her.  Her response:  I didn't notify

21   my senior -- I did notify my senior, but I failed to tell the

22   fellow about my hours because I was afraid that I'd have a

23   detriment.

24      That may be understandable.

25      (Reading):  I also mentioned it to Dr. Park.  It did

Argument - Jepson

1546

1     happen.

2          And it says:  She said it was okay as long as it was

3     only a few hours.  And, then, last Monday I asked Justine and

4     Sara for help.

5          Then further down:  I have noticed that --

6          MR. JEPSON:  Below that paragraph.

7     BY MR. JEPSON:

8          (Reading):  I have noticed that in the General

9     Surgery Department, the chiefs monitor the juniors' hours and

10    they make adjustments so everybody complies.

11         Again, I'm worried about her future.  That's probably

12    understandable.  But the chiefs should be helping me out in

13    this.  And she knows it's an issue.  She knows it's a problem.

14    And you heard Dr. Millis testify about it and testify that

15    the -- as far as he was concerned, there was no need for her

16    to be over hours at that point.

17         Then we have the Dr. Becker evaluation.

18         MR. JEPSON:  Let's go to Joint Exhibit 87.

19    BY MR. JEPSON:

20         She sends an e-mail.  And you saw it yesterday with

21    Dr. Becker, so we won't pull it up.  But, in essence, it's an

22    e-mail to Dr. Park saying, hey, I want to alert you that

23    Dr. Becker sent this evaluation in.  I'm not certain she got

24    all the information.  I don't want her carelessness to affect

25    me.

Argument - Jepson

1547

1        What else?  With respect to Dr. Tothy, with respect

2   to Greives and others, continues to be a lack of acceptance of

3   responsibility.  And that was a requirement of her probation.

4        MR. JEPSON:  Let's go back to Joint Exhibit 26,

5   please, Michael, second page.

6   BY MR. JEPSON:

7        (Reading):  Timely placing consult notes continues to

8   be a problem and understanding the plan and your role in the

9   plan.

10        Still criticisms as to her presentations, her ability

11   to analyze things and get them done.

12        So, I submit to you that these things were not met

13   and they were not met not just because of observations of

14   people in the plastic and reconstructive surgery group, but

15   issues that arose on other services repeatedly through the

16   probation.

17        So, the faculty committee did meet.  Now, Dr. Song

18   said 30 minutes.  Well, he's a busy man.  Okay?  And it's five

19   years ago.  Maybe it was longer.  Probably was longer.  But

20   there is no dispute from the people who were there.  Dr. Park

21   talked about it, he talked about it.  You saw the minutes.

22   They're Joint Exhibit 101.  They described the fact that

23   everyone went through those materials and they discussed

24   whether Dr. Artunduaga had met the requirements in the

25   probation letter, and that the group as a whole voted not to

Argument - Jepson

1548

1    renew her.  That is clear.

2         Then what happened?  Well, we have the grievance

3    procedure, which you've heard about.  The grievance was filed.

4    It was filed according to policy.  And it was heard by a group

5    of people who have -- yes, they're at UCMC.  This is the

6    organization.  But none of them have anything to do with

7    surgery.  None of them report to Dr. Song or report to the

8    plastic and reconstructive surgery group in the sense of their

9    livelihoods being on the line.

10        You heard that Dr. Artunduaga, as well as the

11   section, presented materials -- massive amounts of written

12   material -- which were given in advance; and, that there was a

13   hearing; and, that after that hearing, the committee found,

14   according to the policy's standard, that the decision was

15   supported by the facts and not arbitrary and capricious.

16        You also heard that thereafter, Dr. Artunduaga took

17   an appeal and that appeal went to the president and the dean,

18   and they upheld it.  So, UCMC followed its policy; gave Dr.

19   Artunduaga the full benefit of that policy; she took advantage

20   of it; and, it was still upheld.

21        Now, what happened after that?  Well, you heard

22   Jonathan Rothstein testify.  And you heard Mr. Rothstein

23   testify that at the time, he was the director of employee and

24   labor relations.  You heard him testify about the policies.

25   You heard him clearly delineate, yes, I have responsibility

Argument - Jepson

1549

1  for discrimination issues.  I have responsibility for

2  retaliation issues under the law.  What I don't have

3  responsibility for is things that relate to the disputes about

4  how things are running under these programs or the Graduate

5  Medical Education Committee.

6       And, so, what do you have to show that Dr. Artunduaga

7  or her husband raised any issue of discrimination with him?

8  You have Dr. Artunduaga's husband, who testified that he said

9  that.  You have seen his previous deposition testimony where

10 that appears nowhere.  And you've seen the e-mail that he sent

11 to Dr. Roth- -- or to Mr. Rothstein in which discrimination

12 and retaliation are nowhere mentioned.

13      Submit to you that Dr. Rothstein, based on the

14 knowledge he had at the time, did what he should have done.

15      And you heard --

16      MR. JEPSON:  Strike that.

17 BY MR. JEPSON:

18      Now, let's talk about the termination letter, the

19 draft.  You heard Jane McAtee, former counsel for UCMC,

20 testify about that.  She testified that she routinely consults

21 with program directors about resident issues.  You heard

22 Dr. Song testify about it.  There's absolutely -- you're going

23 to be instructed that it is not evidence of discrimination for

24 anybody to consult with a lawyer.  And, in fact, this is our

25 modern day age, and the University of Chicago Medical Center

Argument - Jepson

1550

1    is fortunate enough to have a staff of in-house lawyers to

2    talk about how to do these things.  Everyone recognized this

3    is a serious issue.  This is a serious decision.  It has

4    effects on not only the program, but certainly on Dr.

5    Artunduaga.  So, the fact that the consultation occurred means

6    nothing.

7         And, indeed, the argument that the decision had

8    already been made is belied by the testimony of the people who

9    were involved.  Dr. Park and Dr. Song both said the decision

10   had not been made.  The fact of the meeting hadn't occurred.

11   And, indeed, the faculty meeting hadn't occurred.  It occurred

12   on March 26th.  That's when the materials were put together,

13   and that is when the decision was made.

14        All right.  I'm almost done.  I know you are happy

15   about that.  I am, too.

16        The claims here.  Again, under the national origin

17   discrimination claim, plaintiff has the burden of proving by

18   the preponderance of the evidence, as the Judge will say, that

19   she would not have been terminated from the residency program

20   had she not been Colombian and had everything else been the

21   same.

22        Now, we've just gone through everything that

23   happened.  And to sum it up, as far as factually, we have

24   five -- at least five of the six attending in the first few

25   months noting grave concerns or concerns with Dr. Artunduaga's

Jepson - closing

1551

1  performance.  We also have the month of October in which there

2  were issues.  The Lawler issue, and you heard Sara Dickie

3  speak about it.  There's no reason for them to lie about any

4  of this.

5        And, indeed, the reason that Dr. Artunduaga was

6  switched was because they hadn't seen this before.  These were

7  such fundamental flaws, such problems that they felt they had

8  to bring her onto plastics and make an assessment.  And they

9  did.  Thereafter, she's on probation.  What do we have?

10 Thoracic, lots of problems.  We have January and February,

11 scores are better, yes, but questionable.

12       And, indeed, after probation, if you look at the

13 attending evaluations, the two in November and three out of

14 the five in February raise concerns.  There were problems,

15 there were issues that they all noted.

16       And in addition, we had a Tothy hang-up issue, we had

17 the over hours issue, we had the issue with Dr. Jaskowiak and

18 the response.  So it wasn't like everything was copacetic.

19 There's plenty of evidence that shows that she did not

20 successfully complete the probation.  And it's her burden to

21 show that it was her Colombian national origin that motivated

22 the decision, and we don't believe she can do that.

23       Additionally, if you think about the context of all

24 of this, where this all occurred, what happened here, we

25 have -- what we have here is a medical center that's

Jepson - closing

1552

1   incredibly diverse.  The attending physicians we're talking

2   about here, Vigneswaran, Chhablani, foreign medical grads just

3   like Dr. Artunduaga, accents, both of them, both of them

4   critical.  Same with Dr. Umanskiy, although he graduated from

5   medical school here.  We also have -- Witkowski was an

6   evaluator.  He rated her well.  He's from Poland.  He went to

7   medical school in Poland, speaks with a heavy accent.

8           And, indeed, Dr. Olaitan, who was called by the

9   plaintiff to testify -- you saw him -- he's from Nigeria.  He

10  has a very heavy accent.  I'd submit, at least in my view --

11  oh, I won't talk about my view.  But a very, very heavy

12  accent.  And what did he say?  Dr. Becker supported him.  He

13  was successful in the program.

14          You've heard Dr. Song.  His uncle was the ambassador

15  to Colombia.  You've heard Dr. Park went on a medical mission

16  to Colombia.  You've heard that Dr. Ferguson has a third-year

17  from Colombia.  Just makes no sense.  I mean, you are going to

18  be instructed by the judge not to leave your common sense at

19  the door.  Because the issue that you have to decide is, was

20  it her Colombian national origin?

21          And look at the residency program.  At the time,

22  there were 12 people in it; four of them, including Dr.

23  Artunduaga, were four medical grads.  Of those, Dr. Bank was

24  from Israel, Dr. Kueberuwa was of Nigerian descent from the

25  U.K., foreign med grad.  Lee Alquerishi, originally from Iran

Jepson - closing

1553

1    or Iraq -- can't remember which -- but was Scottish, also had

2    an accent, foreign medical grad.  And Trang Nyugen, born in

3    Vietnam.  Grew up here, but born in Vietnam.  Justine Lee of

4    Chinese descent.  And Deana Shenaq, you saw her, of Jordanian

5    descent.

6            An incredibly diverse program.  It defies common

7    sense that Dr. Song or UCMC or anybody else would -- in that

8    setting would discriminate against Dr. Artunduaga because

9    she's from Colombia or Colombian.  Just makes no sense at all.

10           Now, and it also doesn't make any sense -- and Cindy

11   Hyndman, Ms. Hyndman referred to this in a comment -- for the

12   program to discriminate.  It's a highly competitive, elite

13   program.  And to wash somebody out, to want to do that, makes

14   no sense.  It's a black mark on the program.  And yes, they're

15   going to have to recruit.  It's also a man- or womanpower

16   issue.  They're going to have to recruit to fill.  So he

17   wasn't being cold and heartless there.  He was just giving you

18   the facts.

19           Now, we submit to you that there is -- there's just

20   simply not a hint that Dr. Artunduaga's Colombian national

21   origin had anything to do with what happened to her here.  And

22   if you want to extend it out to her having an accent or being

23   a non-native English speaker, submit to you that the program

24   has had Iris Seitz from Germany.  She successfully completed

25   it.  In fact, every one of the four medical grads, every one

Jepson - closing

1554

1    of the people who was not raised in the U.S., who went through

2    the program was successful except for Dr. Artunduaga.

3          Now, there's also a retaliation count.  And you

4    heard -- oh, one other thing.  Probably -- one of the most

5    important things.  Dr. Artunduaga herself testified she

6    doesn't believe Dr. Song was motivated by her Colombian

7    national origin.  Testified to that under oath.

8          Now, let's talk about retaliation.  Now, it's clear

9    that Dr. Artunduaga is intelligent, she's accomplished, and I

10   would say she's not uncertain of her rights.  We've seen that.

11   And we've seen many documents that Dr. Artunduaga has authored

12   in this case.  We've seen the November 18th, 2011 rebuttal to

13   the probation, seven pages long, quite detailed, not a mention

14   of discrimination or retaliation.

15         You also saw another exhibit, a letter written -- or

16   e-mail -- it's lengthy -- to Barry Kamin, GME, November 28,

17   2011.  No mention whatsoever in that letter -- and she talks

18   about the difficulties she's having, the lack of a -- what she

19   felt was quality educational experience in November because of

20   this chest tube issue, but not a mention of Colombian national

21   origin discrimination or retaliation.

22         After -- well, after the probation was done, she had

23   the opportunity to submit a letter to the attendings.  Again,

24   no mention of discrimination, no mention of retaliation.  And,

25   indeed, as we saw, the only physician comments that she quoted

Jepson - closing

1555

1    were not from attendings.  They were from residents and

2    fellows.

3           After the decision was made, we received a letter

4    from her challenging, asking for reconsideration.  It's dated

5    March 29th.  Initiating the grievance process, saying, "I

6    don't agree with this."  Also saying, "Please put me back on

7    clinical."  And again, no mention of discrimination, no

8    mention of retaliation.  And what does she have to lose at

9    this point?  The decision had already been made to non-renew.

10          Her further e-mails to Dr. Song about assignments, et

11   cetera, afterwards, again, don't contain anything to that

12   effect.

13          Now, I just want to briefly mention this because,

14   frankly, I forgot.  In April, she was reinstated to a clinical

15   service and it was restricted.  And why was it restricted?

16   Her contract had not been renewed.  They had to be very

17   careful.  If something, heaven forbid, untoward happened, and

18   it was because of a mistake from Dr. Artunduaga, the record

19   would show that she had not been renewed.  It could be a big

20   problem.  It was very important that she be restricted.  But

21   she was still allowed to rotate on that service with

22   restrictions, and those restrictions made perfect sense.  And

23   she was demanding, of course, to be on night float.  You heard

24   why that was not good, late at night or be a standalone

25   intern.  I got to tell you, your common sense says this made

Jepson - closing

1556

1    perfect sense, this kind of rotation.

2           And the removal made perfect sense.  You saw the

3    e-mail that Dr. Artunduaga submitted to Eric Grossman, who

4    copied Roggin.  "I will accept this.  I understand it.

5    I'll accept it."  And then within two weeks, "I don't like

6    this, I don't like this.  I demand this.  I demand that."  And

7    they got reports from Dr. Grossman that she wasn't fully

8    participating.  So they made the logical decision to remove

9    her again, give her an independent study.  They promised her

10   that if she finished that independent study that her -- she'd

11   receive a certification that she completed the year, and she

12   got it.  That was the end of her time there.

13          As to retaliation, what do we have here as having

14   been made?  We have comments attributed to Haijin In, making,

15   I think, fun of where she went to medical school, making fun

16   of her accent, and we have Dr. Artunduaga saying something to

17   that effect to Justine Lee in late July, early August.  We

18   also have her stating that John Seal did some of this with the

19   accent.  And that in August when she met with Justine Lee and

20   Sara Dickie, she again said, "I'm not being accepted.  I'm not

21   being welcomed here.  My accent's an issue."

22          And I'll tell you this.  To me, if that's what you're

23   being told, that doesn't necessarily sound like even a

24   complaint of discrimination.  But even so, you heard Sara

25   Dickie, who has no ax to grind with anybody -- she's moved on,

Jepson - closing

1557

1    she went successfully in the program -- testified that that

2    never occurred.

3            Then, what else do we have?  We have the statements

4    made to Dr. Song, allegedly.  You heard Dr. Song deny them.

5            And I'll just come back to you and say this.  Dr.

6    Artunduaga, again, successful, articulate, wrote many, many

7    documents, many e-mails, many things, and not one claim of

8    Colombian national origin discrimination or retaliation

9    appears till well after -- till after the non-renewal decision

10   had been made, after.  So if there's no complaint till after,

11   there can be no retaliation.

12           Now, in closing, we're not saying that what happened

13   to Dr. Artunduaga is not something that is very disappointing,

14   upsetting to her.  There's no question about it.  It happens,

15   and it did happen in this case.  We're not downplaying any of

16   that.  But you as jurors should not let sympathy sway your

17   decision.  You have very narrow issues to decide.  That is,

18   did the national -- Colombian national origin cause this to

19   happen or not?  Did retaliation cause this to happen or not?

20   That's what you have to decide.

21           And the judge is going to instruct you as to one

22   other point which I want to make for you, and that's -- go to

23   No. 23.  If you'd blow that up?  Mentioned this earlier, but

24   it's very important.

25           "In deciding Plaintiff's claims, you should not

Hyndman - rebuttal

1558

 1    concern yourselves with whether Defendant's actions were wise,

 2    reasonable, or fair.  Rather, your concern is only whether

 3    Plaintiff has proved by a preponderance of the evidence that

 4    Defendant terminated her from the residency program because of

 5    her Colombian national origin or because she complained about

 6    national origin discrimination."

 7          And I will submit to you that in this case, this

 8    instruction is especially important.  I am not a physician,

 9    and I don't believe any of you are.  We have a residency

10    program that is charged with training people to become plastic

11    and reconstructive surgeons, and only advancing them

12    ethically, responsibly, if they are confident that she can be

13    safe, if they're confident that she can complete the program,

14    and I'll submit to you that these kinds of severe and

15    fundamental flaws, when they appear in the very first year,

16    the very basic year when you're just entering and before

17    greater experience or greater responsibility is taken on, that

18    the UCMC did the right thing here from a medical and safety

19    perspective, and it's not within our province to second-guess

20    that decision as to whether it's fair or reasonable.

21          Thank you.

22          THE COURT:  Thank you, Mr. Jepson.  Ms. Hyndman?

23          MS. HYNDMAN:  Yeah.

24           REBUTTAL ARGUMENT ON BEHALF OF PLAINTIFF

25          MS. HYNDMAN:  Now, Mr. Jepson raised a lot of issues,

Hyndman - rebuttal

1559

1    but there's only a few that I wanted to touch on and then

2    we'll let the judge instruct you and you can begin your

3    deliberations.

4            One of the things he was talking about was the

5    conditions of probation.  Remember he took the exhibit and he

6    went through each one of them and he told you why they hadn't

7    met -- well, you know what?  I don't really care what

8    Mr. Jepson thinks about whether or not Dr. Artunduaga met the

9    conditions of probation.  It's your job to figure out whether

10   there's evidence that anyone at UCMC went through those

11   conditions of probation and determined whether Dr. Artunduaga

12   met them or not.  All we have is the conclusions, the

13   conclusory statements by Dr. Park and Dr. Song and the

14   conclusory statement in the minutes.  Oh, yeah, they went

15   through them.  Oh, yeah, they all concluded.  Dr. Song didn't

16   even testify why he thought she didn't meet the conditions of

17   probation.  Dr. Park didn't testify about why they thought

18   that she didn't meet the conditions of probation.  There's no

19   document -- remember I asked Dr. Park about that yesterday.

20   Where's the document that lays out the conditions of probation

21   and says whether she met them or not?  She looked at me like I

22   had two heads.  Like, why would we have that?  Because that's

23   what they were doing.  That's what they were supposed to do in

24   that meeting.  They were supposed to go through those

25   conditions of probation, and they didn't.  There's no evidence

Hyndman - rebuttal

1   in this case that they ever did that.  And had they done it,

2   they would have concluded that Maria did a good job on her

3   probation, they would have concluded that she improved.  They

4   would have looked at the evidence, they would have looked at

5   these evaluations.  She ended up being ranked between "good"

6   and "very good," but according to Mr. Jepson, she couldn't cut

7   it.  Being "good" -- between "good" and "very good" didn't cut

8   it.  It's not enough, I guess, to be a good surgeon.  She

9   couldn't cut it.

10          Now, Mr. Jepson told you about the evaluations.  I

11  want to talk a little bit about the evaluations.

12          First, he said disregard the weekly evaluations

13  because Maria went around and told everybody that she was on

14  probation and she told all these residents and all these

15  fellows that she was on probation.  That's not true.  I mean,

16  she may have said that to them, but Akilah Williams sent an

17  e-mail at the beginning of every rotation and said, "Dr.

18  Artunduaga is on probation.  We would like you to fill out a

19  weekly evaluation of her."  And that's what they did.

20          And the weekly evaluations should be ignored except

21  the ones that Mr. Jepson likes.  Mr. Jepson took out the

22  weekly evaluation of Jennifer Paruch.  He took out the weekly

23  evaluations of the people from Plastics.  He likes those.  He

24  took out the weekly evaluations and pointed them out to you

25  from the people from the Thoracic -- or, yeah, the Thoracic

1    rotation because he likes those.  He didn't ask you to look at

2    any of the weekly evaluations from Dr. Shao or Dr. Olaitan or

3    Dr. Fleming that showed that she was doing a great job.  "You

4    can disregard those 'cause those don't really matter."  Just

5    the ones we don't like are the ones that matter.

6        And then this whole idea about the monthly attending

7    evaluations not being reliable because Maria talked to these

8    attending physicians and she went to them and said, "Could you

9    treat me fairly, please?  I'm on probation.  Could you treat

10   me fairly?"  They want you to believe that anybody who gave a

11   good evaluation of Dr. Artunduaga when she was on probation,

12   any one of these attending physicians would compromise their

13   ethics, would compromise patient safety, would compromise

14   everything that is important about these evaluations simply

15   because they wanted to be nice to Dr. Artunduaga.  That's what

16   they want you to believe.  They don't want you to believe that

17   these attending physicians took their jobs seriously and that

18   they evaluated her based upon what they knew and what they

19   observed.

20       And, oh, by the way, they liked the monthly

21   evaluation of Dr. Ferguson, they liked the monthly evaluation

22   of Dr. Vigneswaran, they liked the monthly evaluation of

23   Dr. Becker, Dr. Millis.  Every one of those people knew she

24   was on probation.  So why do those weigh more than others?

25   Because they have to explain away the fact that she improved.

Hyndman - rebuttal

1562

1   They have to explain away everything they did.

2          Now, he talked about diversity and went on and on and

3   on about it, all these people that were diverse.  Not a single

4   Latina, not a single Spanish speaker.  Not any of these people

5   that were in this program that made decisions were

6   Spanish-speaking or Latinas.

7          And so, finally, the one reason -- the one thing I

8   wanted to leave you with is that Mr. Jepson said they had no

9   reason to lie.  Dr. Song had no reason to lie.  Dr. Park had

10  no reason to lie.  Why did they lie?  Why did Dr. Song say in

11  his November 2nd letter that it was unanimous among all the

12  evaluators that she couldn't cut it in a six-year program?

13  Why did he lie?  Why did he have to say that no one had seen

14  any improvement?

15         And Mr. Jepson explains this away.  Well, he'd never

16  done anything like this before.  Well, just because you

17  haven't done anything like it before doesn't mean you have to

18  lie.  Doesn't mean you have to make things up.

19         Dr. Park lied about the stuff that was in her letter.

20  We went through it yesterday in a detailed cross-examination.

21  Why?  Why did they lie?  If they had no reason to lie, why did

22  they lie?  Why did they lie?  Because they were covering up

23  what really happened.  You only lie when the reasons that you

24  were -- really want to talk about you know you can't.  You

25  only lie when you're trying to cover up discrimination and

1563

1   you're trying to cover up retaliation.  And that's what

2   happened here.  And we would like you to return a verdict for

3   Dr. Artunduaga on both her national origin and her retaliation

4   claims.

5           THE COURT:  Thank you, Ms. Hyndman.

6           MS. HYNDMAN:  Thank you.

7           THE COURT:  Ladies and gentlemen, you have seen and

8   heard all the evidence and arguments of the attorneys.  Now I

9   will instruct you on the law.  I will also give each one of

10  you a set of these instructions back in the jury room.

11          You have two duties as a jury.  Your first duty is to

12  decide the facts from the evidence in the case.  This is your

13  job and yours alone.

14          Your second duty is to apply the law that I give you

15  to the facts.  You must follow these instructions even if you

16  disagree with them.  Each of the instructions is important,

17  and you must follow all of them.

18          Perform these duties fairly and impartially.  Do not

19  allow sympathy, prejudice, fear, or public opinion to

20  influence you.  You should not be influenced by any person's

21  race, color, religion, national ancestry, or sex.

22          Nothing I say now, and nothing I said or did during

23  the trial, is meant to indicate any opinion on my part about

24  what the facts are or about what your verdict should be.

25          In this case, the Defendant is a medical center.  All

1564

1   parties are equal before the law.  A medical center is

2   entitled to the same fair consideration that you would give

3   any individual person.

4           The evidence consists of the testimony of the

5   witnesses, the exhibits admitted in evidence.

6           During the trial, certain testimony was presented to

7   you by the reading of depositions and video.  You should give

8   this testimony the same consideration you would give it had

9   the witnesses appeared and testified here in court.

10          Certain things are not to be considered as evidence.

11  I will list them for you.

12          First, if I told you to disregard any testimony or

13  exhibits or struck any testimony or exhibits from the record,

14  such testimony or exhibits are not evidence and must not be

15  considered.

16          Second, anything you may have seen or heard outside

17  of the courtroom is not evidence and must be entirely

18  disregarded.  This includes any press, radio, internet, or

19  television reports you may have seen or heard.  Such reports

20  are not evidence, and your verdict must not be influenced in

21  any way by such publicity.

22          Third, questions and objections or comments by the

23  lawyers are not evidence.  Lawyers have a duty to object when

24  they believe a question is improper.  You should not be

25  influenced by any objection, and you should not infer from my

1    rulings that I have any view as to how you should decide the

2    case.

3          Fourth, the lawyers' opening statements and closing

4    arguments to you are not evidence.  Their purpose is to

5    discuss the issues and the evidence.  If the evidence as you

6    remember it differs from what the lawyers said, your memory is

7    what counts.

8          Any notes you have taken during this trial are only

9    aids to your memory.  The notes are not evidence.  If you have

10   not taken notes, you should rely on your independent

11   recollection of the evidence and not be unduly influenced by

12   the notes of other jurors.  Notes are not entitled to any

13   greater weight than the recollections or impressions of each

14   juror about the testimony.

15         In determining whether any fact has been proved, you

16   should consider all of the evidence bearing on the question

17   regardless of who introduced it.

18         You will recall that during the course of the trial,

19   I instructed you that I admitted certain evidence for a

20   limited purpose.  You must consider this evidence only for the

21   limited purpose for which it was admitted.

22         You should use common sense in weighing the evidence

23   and consider the evidence in light of your own observations in

24   life.

25         In our lives, we often look at one fact and conclude

1   from it that another fact exists.  In law, we call this an

2   inference.  A jury is allowed to make reasonable inferences.

3   Any inference you make must be reasonable and must be based on

4   the evidence in the case.

5          You may have heard the phrases "direct evidence" and

6   "circumstantial evidence."  Direct evidence is proof that does

7   not require an inference, such as the testimony of someone who

8   claims to have personal knowledge of a fact.  Circumstantial

9   evidence is proof of a fact or a series of facts that tends to

10  show that some other fact is true.

11         As an example, direct evidence that it is raining is

12  testimony from a witness who says, "I was outside a minute ago

13  and I saw it raining."  Circumstantial evidence that it is

14  raining is the observation of someone entering a room carrying

15  a wet umbrella.

16         The law makes no distinction between the weight to be

17  given to either direct or circumstantial evidence.  You should

18  decide how much weight to give any evidence.  In reaching your

19  verdict, you should consider all the evidence in the case,

20  including the circumstantial evidence.

21         You must decide whether the testimony of each of the

22  witnesses is truthful and accurate in part, in whole, or not

23  at all.  You must also decide what weight, if any, you give to

24  the testimony of each witness.

25         In evaluating the testimony of any witness, including

1567

1    any party to the case, you may consider, among other things:

2    the ability and opportunity the witness had to see, hear, or

3    know the things that the witness testified about; the witness'

4    memory; any interest, bias, or prejudice the witness may have;

5    the witness' intelligence; the manner of the witness while

6    testifying; and the reasonableness of the witness' testimony

7    in light of all the evidence in the case.

8           You may consider statements given by a party or a

9    witness under oath before trial as evidence of the truth of

10   what he or she said in the earlier statements, as well as in

11   deciding what weight to give his or her testimony.

12          With respect to other witnesses, the law is

13   different.  If you decide that before the trial one of these

14   witnesses made a statement not under oath or acted in a manner

15   that is inconsistent with his or her testimony here in court,

16   you may consider the earlier statement or conduct only in

17   deciding whether his or her testimony here in court was true

18   and what weight to give his or her testimony here in court.

19          In considering a prior inconsistent statement or

20   conduct, you should not consider whether it -- I'm sorry, you

21   should consider whether it was simply an innocent error or an

22   intentional falsehood and whether it concerns an important

23   fact or an unimportant detail.

24          It is proper for a lawyer to meet with any witness in

25   preparation for trial.

1568

1    You may find the testimony of one witness or a few

2 witnesses more persuasive than the testimony of a larger

3 number.  You need not accept the testimony of the larger

4 number of witnesses.

5    The law does not require any party to call as a

6 witness every person who might have knowledge of the facts

7 relating to this trial.  Similarly, the law does not require

8 any party to present as exhibits all papers and things

9 mentioned during the trial.

10    You have heard witnesses give opinions about matters

11 requiring special knowledge or skill.  You should judge this

12 testimony in the same way that you judge the testimony of any

13 other witness.  The fact that such person has given an opinion

14 does not mean that you are required to accept it.  Give the

15 testimony whatever weight you think it deserves, considering

16 the reasons given for the opinion, the witness'

17 qualifications, and all of the other evidence in the case.

18    Certain demonstrative exhibits, such as calendars,

19 timelines, and charts, have been shown to you.  These

20 demonstrative exhibits are not themselves evidence or proof of

21 any facts.

22    When I say a particular party must prove something by

23 "a preponderance of the evidence," or when I use the

24 expression "if you find" or "if you decide," this is what I

25 mean:  When you have considered all of the evidence in the

1569

 1   case, you must be persuaded that it is more probably true than

 2   not true.

 3          Dr. Artunduaga has two claims against the University

 4   of Chicago Medical Center under Title VII of the Civil Rights

 5   Act of 1964.  First, she claims that UCMC terminated her from

 6   the residency program because of her Colombian national

 7   origin.  Second, she claims that UCMC terminated her from the

 8   residency program because she complained that she had been

 9   subjected to discrimination on the basis of her Colombian

10   national origin.  UCMC denies that Dr. Artunduaga was subject

11   to national origin discrimination or that she complained about

12   alleged national origin discrimination until after the

13   decision not to renew her contract was made.  UCMC maintains

14   that Dr. Artunduaga's poor performance, conduct and behavior

15   caused the termination of her residency contract.

16          You have been shown e-mails exchanged by Defendant's

17   management personnel and Defendant's in-house legal counsel

18   that were redacted for purposes of protecting the

19   attorney-client privilege.  When management personnel seek the

20   advice of legal counsel about personnel issues, the substance

21   of such communications is protected by the attorney-client

22   privilege and is not subject to public disclosure.  You may

23   not make any inferences regarding the substance of the legal

24   advice requested or received by Defendant's management

25   personnel from Defendant's legal counsel that is contained in

1   the redacted portions of the e-mails.

2          The fact that Defendant's management personnel

3   communicated with legal counsel about Plaintiff or the fact

4   that those communications are redacted is not evidence that

5   Defendant discriminated against Plaintiff because of her

6   Colombian national origin or retaliated against her for

7   complaining about national origin discrimination.

8          Plaintiff claims that she was terminated from the

9   residency program by Defendant because of her Colombian

10  national origin.  To succeed on this claim, Plaintiff must

11  prove by a preponderance of the evidence that she was

12  terminated from the residency program by Defendant because of

13  her Colombian national origin.  To determine that Plaintiff

14  was terminated from the residency program because of her

15  Colombian national origin, you must decide that Defendant

16  would not have terminated Plaintiff from the residency program

17  had she not been Colombian but everything else had been the

18  same.

19         If you find that Plaintiff has proved this by a

20  preponderance of the evidence, then you must find for

21  Plaintiff on this claim.  However, if you find that Plaintiff

22  did not prove this by a preponderance of the evidence, then

23  you must find for Defendant on this claim.

24         Plaintiff also claims that Defendant discrim -- that

25  Defendant terminated her from the residency program because

1571

1  she complained about national origin discrimination.  To

2  succeed on this claim, Plaintiff must prove by a preponderance

3  of the evidence that Defendant terminated her because she

4  complained about national origin discrimination.  To determine

5  that Plaintiff was terminated because she complained about

6  national origin discrimination, you must decide that Defendant

7  would not have terminated Plaintiff if she had not complained

8  about national origin discrimination but everything else had

9  been the same.

10          If you find that Plaintiff has proved this by a

11  preponderance of the evidence, then you must find for

12  Plaintiff on this claim.  However, if you find that Plaintiff

13  did not prove this by a preponderance of the evidence, then

14  you must find for Defendant on this claim.

15          In deciding Plaintiff's claims, you should not

16  concern yourselves with whether Defendant's actions were wise,

17  reasonable, or fair.  Rather, your only concern is whether

18  Plaintiff has proved by a preponderance of the evidence that

19  Defendant terminated her from the residency program (a)

20  because of her Colombian national origin or (b) because she

21  complained about national origin discrimination.

22          You have heard testimony and received evidence

23  regarding the fact that Plaintiff filed a grievance that was

24  heard by a grievance committee at a grievance hearing.

25          The grievance hearing was not a legal proceeding, and

1   the grievance committee was not asked to consider and did not

2   consider or determine whether Defendant terminated Plaintiff

3   from the residency program because of her national origin or

4   because she complained about national origin discrimination.

5   Accordingly, in making your determination of whether Plaintiff

6   has proved that Defendant terminated her from the residency

7   program because of her Colombian national origin or because

8   she complained about national origin discrimination, you may

9   not conclude that the grievance committee's decision

10  constitutes any type of conclusion regarding Plaintiff's

11  claims of discrimination or retaliation.

12        Dr. Killingsworth was not asked to consider and did

13  not consider whether the University of Chicago Medical Center

14  has caused Plaintiff to suffer any injury or damages.  You may

15  not consider Dr. Killingsworth's testimony or any evidence he

16  offered to be proof that the University of Chicago Medical

17  Center caused Plaintiff to suffer any injuries or damages.

18        If you find that Plaintiff has proved any of her

19  claims against Defendant, then you must determine what amount

20  of damages, if any, Plaintiff is entitled to recover.

21  Plaintiff must prove her damages by a preponderance of the

22  evidence.

23        If you find that Plaintiff has failed to prove any of

24  her claims, then you will not consider the question of

25  damages.

1573

1    If you decide for Defendant on the question of

2  liability, then you should not consider the question of

3  damages.

4    You may award compensatory damages only for injuries

5  that Plaintiff has proved by a preponderance of the evidence

6  were caused by Defendant's discrimination against Plaintiff

7  because of her Colombian national origin and/or retaliation

8  against Plaintiff because she complained of national origin

9  discrimination.

10    Your award must be based on evidence and not

11  speculation or guesswork.  This does not mean, however, that

12  compensatory damages are restricted to the actual loss of

13  money.  They include both the physical and mental aspects of

14  injury, even if they are not easy to measure.

15    In calculating compensatory damages, you should not

16  consider the issue of lost wages and benefits.  The Court will

17  calculate and determine any damages for past or future lost

18  wages and benefits.

19    You should consider the following types of

20  compensatory damages, and no others:

21    1.  The physical and mental/emotional pain and

22  suffering that Plaintiff has experienced that was caused by

23  Defendant's unlawful discrimination and/or retaliation and is

24  reasonably certain to experience in the future because of

25  Defendant's unlawful discrimination and/or retaliation.  No

1    evidence of the dollar value of physical or mental/emotional

2    pain and suffering has been or needs to be introduced.  There

3    is no exact standard for setting the damages to be awarded on

4    account of pain and suffering.  You are to determine an amount

5    that will fairly compensate Plaintiff for the injury she has

6    sustained;

7             2.  The reasonable value of medical care that

8    Plaintiff reasonably needed and actually received as a direct

9    result of Defendant's unlawful discrimination and/or

10   retaliation, as well as the present value of the care that she

11   is reasonably certain to need and receive in the future as a

12   direct result of Defendant's unlawful discrimination and/or

13   retaliation;

14            3.  The reasonable value of educational expenses

15   Plaintiff has reasonably incurred as a direct result of

16   Defendant's unlawful discrimination and/or retaliation;

17            And 4.  The present value of the reduction in

18   Plaintiff's future earnings capacity caused by Defendant's

19   unlawful discrimination and/or retaliation.

20            Defendant argues that Plaintiff's claim for lost

21   future earnings capacity damages should be reduced by amounts

22   she would have paid had she obtained comparable employment in

23   another residency program.

24            If you find that Plaintiff, 1, did not take

25   reasonable actions to reduce her damages and, 2, that

1575

1    Plaintiff reasonably might have found comparable employment in

2    another residency program if she had taken such action, you

3    should reduce by any amount you might award Plaintiff for lost

4    future earning capacity by the amount Plaintiff reasonably

5    would have earned during the period for which you are awarding

6    lost future concerning capacity damages.

7          Defendant must prove both that the reduction should

8    be made and its amount.

9          If you find for Plaintiff, you may, but are not

10   required to, assess punitive damages against Defendant.  The

11   purpose of punitive damages is to punish a defendant for its

12   conduct and to serve as an example or warning to Defendant and

13   others not to engage in similar conduct in the future.

14         Plaintiff must prove by a preponderance of the

15   evidence that punitive damages should be assessed against

16   Defendant.  You may assess punitive damages only if you find

17   that the conduct of Defendant's managerial employees was in

18   reckless disregard of Plaintiff's rights.  An action is in

19   reckless disregard of Plaintiff's rights if taken with

20   knowledge that it may violate the law.

21         In determining whether a person was a managerial

22   employee of Defendant, you should consider the kind of

23   authority Defendant gave him or her, the amount of discretion

24   he or she had in carrying out his or her job duties, and the

25   manner in which he or she carried them out.  You should not,

1  however, award Plaintiff punitive damages if Defendant proves

2  that it made a good-faith effort to implement an

3  anti-discrimination policy.

4        If you find that punitive damages are appropriate,

5  then you must use sound reason in setting the amount of those

6  damages.  Punitive damages, if any, should be in an amount

7  sufficient to fulfill the purposes that I have described to

8  you, but should not reflect bias, prejudice, or sympathy

9  toward either party.

10        In determining the amount of punitive damages, you

11  should consider the following factors:  the reprehensibility

12  of Defendant's conduct; the impact of Defendant's conduct on

13  Plaintiff; the relationship between Plaintiff and Defendant;

14  the likelihood that Defendant would repeat the conduct if an

15  award of punitive damages is not made; and the relationship of

16  any award of punitive damages to the amount of actual harm the

17  Plaintiff suffered.

18        Upon retiring to the jury room, you must select a

19  presiding juror or foreperson.  The presiding juror will

20  preside over your deliberations and will be your

21  representative here in court.  A verdict form has been

22  prepared for you.

23        You should take the verdict form to the jury room and

24  when you have reached unanimous agreement on the verdict, your

25  presiding juror will fill in and date the appropriate form,

1577

1    and all of you will sign it.

2         Here's the verdict form, ladies and gentlemen.  It is

3    a three-page document.  And you will see on page 1, there are

4    two questions:

5         "Question 1.  Has Plaintiff proved by a preponderance

6    of the evidence that Defendant discriminated against her

7    because of her Colombian national origin when it terminated

8    her from the residency program?"  There's a place for "Yes"

9    and a place for "No."

10        "Question 2.  Has Plaintiff proved by a preponderance

11   of the evidence that Defendant retaliated against her for

12   complaining of national origin discrimination when it

13   terminated her from the residency program?"  There's a place

14   for "Yes" and a place for "No."

15        You go on to answer questions 3 and 4 only if you

16   answered "Yes" to question 1 or 2.  If you answered "No" to

17   both questions 1 and 2, then you go to page 3 to sign the

18   verdict form and do not answer any further questions.

19        "Question 3 -- again, it reminds you -- "If you

20   answered Yes to either question 1 or 2, for each type of

21   compensatory damage listed in 1 through 4 below, enter the

22   dollar amount, if any, that you find Plaintiff has proved by a

23   preponderance of the evidence was directly caused by

24   Defendant's discrimination against her because of her

25   Colombian national origin and/or Defendant's retaliation

1578

1    against her because she complained of national origin

2    discrimination:

3           "1.  The reasonable value of the mental/emotional

4    pain and suffering that Plaintiff has experienced and is

5    reasonably certain to experience in the future.

6           "2.  The reasonable value of medical care that

7    Plaintiff reasonably needed and actually received and the

8    present value of the care that she is reasonably certain to

9    need and receive in the future.

10          "3.  The present" -- "the reasonable value of

11   educational expenses Plaintiff reasonably incurred."

12          And, "4.  The present value of the reduction in

13   Plaintiff's future earnings capacity."

14          "Question 4.  If you answered Yes to either question

15   1 or 2, has Plaintiff proved by a preponderance of the

16   evidence that the conduct of Defendant's managerial employees

17   was taken in reckless disregard of Plaintiff's rights not to

18   be subjected to national origin discrimination and/or

19   retaliation because she complained of national origin

20   discrimination?"  A place for "Yes" and a place for "No."

21          "If you answered Yes to question 4, please answer the

22   amount of punitive damages, if any, that Plaintiff has proved

23   by a preponderance of the evidence should be assessed against

24   Defendant," and there's a place for that.

25          Once you have reached a unanimous verdict, on page 3,

1    there's a place for your jury foreperson to sign and then each

2    of the other jurors to sign as well.

3            During your deliberations, you must not communicate

4    with or provide any information to anyone by any means about

5    this case.  You may not use any electronic device or media,

6    such as the telephone, a cell phone, smartphone, iPhone,

7    BlackBerry or the computer, the internet, any internet

8    service, any text or instant-messaging service, any internet

9    chatroom, blog, or website such as Facebook, LinkedIn,

10   YouTube, or Twitter, to communicate with anyone any

11   information about this case or to conduct any research about

12   this case until I accept your verdict.  In other words, you

13   cannot talk to anyone on the phone, correspond with anyone, or

14   electronically communicate with anyone about this case.  You

15   can only discuss the case in the jury room with your fellow

16   jurors during jury deliberations.

17           I do not anticipate that you will need to communicate

18   with me.  If you do need to communicate with me, the only

19   proper way is in writing.  The writing must be signed by the

20   presiding juror or, if he or she is unwilling to do so, by

21   some other juror.  The writing should be given to the court

22   security officer who will give it to me.  I will respond

23   either in writing or by having you return to the courtroom so

24   that I can respond orally.  If you do communicate with me, you

25   should not indicate in your note what your numerical division

1580

1    is, if any.

2              Please be advised that transcripts of trial testimony

3    are not available to you.  You must rely on your collective

4    memory of the testimony.

5              The verdict must represent the considered judgment of

6    each juror.  Your verdict, whether for or against the parties,

7    must be unanimous.

8              You should make every reasonable effort to reach a

9    verdict.  In doing so, you should consult with one another,

10   express your own views, and listen to the opinions of your

11   fellow jurors.  Discuss your differences with an open mind.

12   Do not hesitate to reexamine your own views or change your

13   opinion if you come to believe it is wrong.  But you should

14   not surrender your honest beliefs about the weight or effect

15   of evidence solely because of the opinions of other jurors or

16   for the purpose of returning a unanimous verdict.

17             All of you should give fair and equal consideration

18   to all of the evidence and deliberate with the goal of

19   reaching an agreement that is consistent with the individual

20   judgment of each juror.  You are impartial judges of the

21   facts.

22             John, would you raise your right hand, please.

23      (Court security officer duly sworn.)

24             THE COURT:  And your lunches are back there.

25      (Jury out at 12:52 p.m.)

1581

1     THE COURT:  Okay.  So if you would please --

2  hopefully you have all your exhibits together that need to go

3  back to the jury, and we will give them to John.  I'll see if

4  Katie can come out and grab them.

5    (Exhibits tendered to clerk.)

6     THE COURT:  Why don't we -- what do you think, an

7  hour, roughly, for this afternoon?  Do you think it will take

8  that long?

9     MR. JEPSON:  No, it won't take very long.  An hour

10  max from us.

11     THE COURT:  Okay.  And it sounds like you don't have

12  much?

13     MS. HYNDMAN:  We have a little.

14     THE COURT:  A little?

15     MS. HYNDMAN:  Yeah.

16     THE COURT:  So why don't we -- it's almost 1:00

17  o'clock.  Why don't we pick back up at 2:15.  Is that okay?

18     MS. HYNDMAN:  Yeah.

19     THE COURT:  I figured you'd like a little extra --

20     MR. JEPSON:  Thank you.

21     MS. HYNDMAN:  Thank you.

22     THE COURT:  -- given your closings.  So come back

23  here at 2:15.  I do need from each of you, please, your

24  contact information.

25     MS. HYNDMAN:  Yeah, yeah.

1582

1    THE COURT:  Cell phones.  You shouldn't be more than

2  ten minutes away.  We will contact you if we hear from them.

3    So give Katie all of your contact information, where

4  we can reach you.

5    (Counsel conferring.)

6    THE COURT:  And then I will see you back --

7    MR. JEPSON:  Does that mean I can turn my phone on,

8  Judge?

9    THE COURT:  You can turn your phone on, but you have

10  to turn it back off at 2:15.

11    Okay.  So I'll see you back here at 2:15.

12    MS. HYNDMAN:  Thank you, Judge.

13    (Recess taken at 12:54 o'clock p.m., until 2:15 o'clock

14  p.m., of the same afternoon.)

15    *    *    *    *    *

16  We certify that the foregoing is a correct transcript from the
   record of proceedings in the above-entitled matter.

17

18  /s/ Joseph Rickhoff            February 9, 2017
   Official Court Reporter

19
   /s/ Colleen Conway            February 9, 2017
20  Official Court Reporter

21

22

23

24

25

1583

<pre>
 1                    IN THE UNITED STATES DISTRICT COURT
                        NORTHERN DISTRICT OF ILLINOIS
 2                            EASTERN DIVISION

 3   DR. MARIA ARTUNDUAGA,            ) Docket No. 12 C 8733
                                      )
 4                   Plaintiff,       )
                                      )
 5             vs.                    )
                                      )
 6   THE UNIVERSITY OF CHICAGO        )
     MEDICAL CENTER,                  ) Chicago, Illinois
 7                                    ) February 9, 2017
                     Defendant.       ) 2:03 o'clock p.m.
 8

 9                    TRANSCRIPT OF TRIAL PROCEEDINGS
            BEFORE THE HONORABLE AMY J. ST. EVE, AND A JURY
10
     APPEARANCES:
11
     For the Plaintiff:          THE FRANKLIN LAW FIRM, LLC
12                               BY:  MS. JAMIE S. FRANKLIN
                                 53 W. Jackson Blvd., Suite 803
13                               Chicago, Illinois  60604

14                               ROBINSON, CURLEY & CLAYTON, P.C.
                                 BY:  MS. CYNTHIA H. HYNDMAN
15                               300 South Wacker Drive, Suite 1700
                                 Chicago, Illinois  60606
16
     For the Defendant:          VEDDER PRICE, P.C.
17                               BY:  MR. EDWARD C. JEPSON, JR.
                                      MS. ELIZABETH N. HALL
18                               222 N. LaSalle St., Suite 2600
                                 Chicago, Illinois  60601
19
     Court Reporter:             MR. JOSEPH RICKHOFF
20                               Official Court Reporter
                                 219 S. Dearborn St., Suite 1232
21                               Chicago, Illinois  60604
                                 (312) 435-5562
22

23            *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

24                     PROCEEDINGS RECORDED BY
                       MECHANICAL STENOGRAPHY
25               TRANSCRIPT PRODUCED BY COMPUTER
</pre>

1584

1    (Proceedings heard in open court.  Jury out.)

2         THE COURT:  You may be seated.  I received a note

3    that the jury has reached a verdict, signed by Robert

4    Brysiewicz.

5      (Jury in.)

6         THE COURT:  Mr. Brysiewicz, I understand the jury has

7    reached a verdict; is that correct?

8         THE FOREPERSON:  Yes, ma'am.

9         THE COURT:  Would you please provide John with the

10   verdict form.

11        Question 1:  Has plaintiff proved by a preponderance

12   of the evidence that defendant discriminated against her

13   because of her Colombian national origin when they terminated

14   her from the residency program?  No.

15        Question 2:  Has plaintiff proved by a preponderance

16   of the evidence that defendant retaliated against her for

17   complaining of national origin discrimination when it

18   terminated her from the residency program?  No.

19        Signed by each of the jurors on Page 3.

20        Ladies and gentlemen, at this point Katie is going to

21   poll you.  She is going to ask each one of you individually if

22   this was and is your verdict.  When she calls your name, if

23   you would please stand and respond to her question.  Once you

24   have answered the question, you may sit back down.  After she

25   has asked each one of you, she will ask you, "And so say you

1585

1    all?"  If you would please respond as appropriate to her

2    question.

3            THE CLERK:  David Biedrzycki, was this and is this

4    now your verdict?  Was this and is this now your verdict?

5            JUROR BIEDRZYCKI:  Yes.

6            THE CLERK:  Sheri Brooks, was this and is this now

7    your verdict?

8            JUROR BROOKS:  Yes.

9            THE CLERK:  Rafael Brundidge, with this and is this

10   now your verdict?

11           JUROR BRUNDIDGE:  Yes.

12           THE CLERK:  Robert Brysiewicz, was this and is this

13   now your verdict?

14           JUROR BRYSIEWICZ:  Yes.

15           THE CLERK:  Miguel Morna Freitas, was this and is

16   this now your verdict?

17           JUROR MORNA FREITAS:  Yes.

18           THE CLERK:  George Tibbits, Jr., was this and is this

19   now your verdict?

20           JUROR TIBBITS:  Yes.

21           THE CLERK:  Cynthia Vega, was this and is this now

22   your verdict?

23           JUROR VEGA:  Yes.

24           THE CLERK:  Maria Yates, was this and is this now

25   your verdict?

1586

1    JUROR YATES:  Yes.

2    THE CLERK:  So say you all?

3    JURORS:  Yes.

4    THE COURT:  Ladies and gentlemen, thank you very much

5    for your service.  I'm going to ask if you would please follow

6    John back.  I'm going to come back and talk to you very

7    briefly.

8      (Jury out.)

9    THE COURT:  I'm going to enter judgment consistent

10   with the verdict.  Is there anything else for the Court this

11   afternoon?

12   MS. HYNDMAN:  No, Judge.

13   MR. JEPSON:  No, your Honor.

14   THE COURT:  Okay.  Thank you.

15   THE CLERK:  Court stands adjourned.

16     (Which were all the proceedings heard.)

17                    CERTIFICATE

18     I certify that the foregoing is a correct transcript from

19   the record of proceedings in the above-entitled matter.

20   */s/Sandra M. Tennis*              *February 10, 2017*
     Official Court Reporter

21

22

23

24

25